FILED BY _PC_____ D.C.

OCT 04 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:21-CV-21079-Bloom

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

      Defendants.

_____/

### CLERK'S NOTICE OF INTERNATIONAL SERVICES

In accordance with Federal Rules of Civil Procedure Rule 4, and/or 28 U.S.C. §
1608(a)(3) or (b)(3)(B), the Clerk certifies that on this 4th day of **October**, 2021, (*Complaint
and Summons*) have been mailed via International Service to:

                Defendant: Mintbroker International, Ltd.

                Country: Nassau, Bahamas

                Article number:  7748 5775 4814 X5 NASA

DONE at the Federal Courthouse Square, Miami, Florida, this 4th day of **October**, 2021.

                ANGELA E. NOBLE

                Court Administrator – Clerk of Court

      By: _____
           Deputy Clerk

C:     U.S. District Judge
       All counsel of Record

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

|  |  |
|---|---|
| SECURITES AND EXCHANGE COMMISSION | ) ) ) ) |
| _____ | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| MINTBROKER INTERNATIONAL, LTD., F/K/A SWISS AMERICA SECURITIES LTD. AND D/B/A SURETRADER, AND GUY GENTILE A/K/A GUY GENTILE NEGRO | ) ) ) |
| _____ | ) |
| _Defendant(s)_ | ) |

Civil Action No.

1:21-cv-21079-BB

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   MINTBROKER INTERNATIONAL, LTD.
F/K/A SWISS AMERICA SECURITIES LTD. AND D/B/A SURETRADER
Suite 17, Elizabeth on Bay Plaza
Elizabeth Avenue and Bay Street
Nassau, Bahamas

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Amie Riggle Berlin, Esq. and Alice K. Sum, Esq.
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**

Date:   Mar 23, 2021

_s/ C.Davis_

**Deputy Clerk**
**U.S. District Courts**

Angela E. Noble
Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: _____

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

    Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission„) alleges:

### I.    INTRODUCTION

1.    From no later than March 2016 until at least November 2019 (the "Relevant Period„), Defendants MintBroker International, Ltd., f/k/a Swiss America Securities Ltd., d/b/a SureTrader) ("SureTrader„ or the "Company„) and its founder, owner, and chief executive officer Guy Gentile (a/k/a Guy Gentile Nigro) ("Gentile„) operated an offshore broker-dealer in the Bahamas designed to help day traders in the United States circumvent the U.S. rules that regulate pattern day trading.

2.    Gentile hatched his plan in early 2012.  With only about 100 customers and bleak business prospects, Gentile recognized that SureTrader would go out of business absent an influx of new customers.

3.    Gentile focused his gaze on the United States, where pattern day traders are subject to the Financial Industry Regulatory Authority's ("FINRA„) Pattern Day Trader Rules (the "U.S.

Pattern Day Trader Rules,, or the "Rules,,), and began marketing SureTrader as a way to avoid the Rules by trading through an offshore broker-dealer.

4.      Lest U.S. customers miss the point, SureTrader's website explicitly advertised itself as a way "to avoid the nasty PDT [(Pattern Day Trading)] Rule.,,

5.      Gentile's plan worked.  At various times during the Relevant Period, up to 80% of SureTrader's customer base was comprised of U.S. customers.  SureTrader grew from a three-man shop to one with 75 employees, more than 40,000 customer accounts, and assets of more than $10 million.  According to Gentile, SureTrader effected transactions in excess of $1 billion on behalf of its customers.

6.      And Gentile and SureTrader profited from the broker-dealer services they provided. U.S. customers paid SureTrader commissions on their transactions, to the tune of millions of dollars.

7.      While SureTrader worked to help U.S. customers circumvent the Rules, SureTrader itself was failing to comply with the mandatory broker-dealer registration requirements of the U.S. securities laws – namely, the federal securities laws that prohibit unregistered foreign broker-dealers from soliciting U.S. customers.

8.      By failing to comply with the broker-dealer registration requirements, SureTrader and Gentile avoided certain regulatory obligations for broker-dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

9.      Through these activities, SureTrader violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act,,), 15 U.S.C. § 78o(a)(1), by acting as an unregistered securities broker-dealer. Gentile is liable for SureTrader's violations as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for violating Section 15(a)(1) of the

Exchange Act, 15 U.S.C. § 78o(a)(1), through or by means of SureTrader in violation of Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

10.     The Commission requests, among other things, that this Court enjoin SureTrader and Gentile from committing further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and a monetary penalty based upon these violations.

## II. **DEFENDANTS**

11.     **SureTrader** was in the business of being a broker-dealer from no later than December 2011 until at least November 2019, when SureTrader's clearing firm changed its services to SureTrader. All SureTrader accounts were purportedly transferred to F1Trade, Ltd., a contract-for-difference broker located in St. Vincent and the Grenadines that appears to be run by SureTrader's CFO and another high level SureTrader employee. During the Relevant Period, SureTrader's principal place of business was the Bahamas.

12.     In 2008, Gentile incorporated Swiss America Securities Ltd. in the Bahamas. In 2017, Gentile changed the name of the Company from Swiss America Securities Ltd. to MintBroker International, Ltd. Gentile marketed the Company as SureTrader and it was commonly known as SureTrader, including through its website www.suretrader.com.

13.     In 2011, Gentile registered SureTrader with the Securities Commission of the Bahamas ("SCB,,) as a broker-dealer. In July 2018, SureTrader and Gentile entered into a settlement with the SCB concerning violations of Bahamian securities laws, pursuant to which SureTrader and Gentile paid a $120,000 monetary penalty. In September 2019, the SCB suspended SureTrader's broker-dealer registration for five days based on, among other things, concerns regarding whether SureTrader customers' orders were entered into the market as represented and for failing to disclose the existence of Canadian and UK subsidiaries. In March

2020, the SCB filed with the Supreme Court of the Bahamas a "winding up petition,,, seeking a court-supervised winding up of SureTrader and the appointment of a joint provisional liquidator to take possession of SureTrader's books and records. The litigation is ongoing.

14. According to its website, SureTrader's business changed in January 2021 and it is currently in the business of providing day traders use of its proprietary trading platform.

15. SureTrader has never been registered with the Commission in any capacity.

16. **Gentile** currently resides in San Juan, Puerto Rico. During the Relevant Period, he lived in Miami, Florida, the Bahamas, New York, and Puerto Rico. He is the founder, owner, director, and CEO of SureTrader.

17. At various times from about 2000 until 2012, Gentile was registered with at least three securities broker-dealers in the United States. In January 1999, Gentile started an online trading firm called Mint Global Markets, f/k/a Stock USA Execution Services, Inc. (www.speedtrader.com), which is registered with the Commission. Gentile is its founder and, through a trust, its controlling owner. In about 1999, Gentile obtained several securities broker licenses, including Series 4, 7, 24, 55, and 63 securities licenses, all of which have expired.

18. In 2009, Gentile founded ProTrade Securities, LLC, which was also registered as a broker-dealer with the Commission, and he served as its managing member until at least 2011. In November 2016, Gentile directed the formation of a Delaware-based entity called Mint Custody Limited, and in January 2017 Gentile directed the formation of the West Palm Beach, Florida-based entity MinTrade Technologies, LLC, both of which were created for the purpose of facilitating and concealing the movement of U.S.-based customer funds to SureTrader. By no later than 2017, Gentile was also the beneficial owner of a group of financial institutions located in the United States and other foreign countries, which included MintBroker International, Limited in

the Bahamas and MintBroker International Limited in the U.K., which among other things hold accounts of clearing firms and maintain custody of funds.

19.     In March 2016, Gentile was indicted in the District of New Jersey on federal conspiracy and securities fraud charges related to alleged market manipulation schemes, *U.S. v. Guy Gentile*, Case No. 16-00155 (D.N.J. 2016), and the case was ultimately dismissed on statute of limitations grounds.  In March 2016, the Commission filed an enforcement action against Gentile based on substantially the same conduct at issue in the criminal case, *SEC v. Guy Gentile*, Case No. 16-01619 (D.N.J. 2016), which case was ultimately dismissed.  In February 2019, Gentile filed a complaint against the Commission in the District of New Jersey, *Guy Gentile v. SEC*, Case No. 19-05155 (D.N.J. 2019), alleging abuse of investigatory process and seeking a temporary restraining order in connection with the Commission's investigation that gave rise to the instant Complaint; the district court dismissed that case, and the dismissal was affirmed on appeal.

20.     Gentile is the sole director and member of Mint Bank International, LLC ("Mint Bank,,).  He has been seeking to organize Mint Bank as an international financial entity under the laws of Puerto Rico since 2017, when he filed a permit application with the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF,,).  OCIF denied the application, concluding Gentile lacked the "commercial integrity,, to organize and operate an international financial entity in Puerto Rico and that Mint Bank omitted from its application a Commission lawsuit pending at that time against Gentile for stock manipulation.  Mint Bank and Gentile filed an administrative appeal before OCIF and in June 2018, OCIF issued a final order denying the application based in part on (i) Gentile's March 2016 federal indictment for criminal securities fraud; (ii) the omission of information in the application regarding the Commission's March 2016 civil action against Gentile; and (iii) Gentile's statements during a March 2017 Bloomberg News interview referencing federal authorities (*e.g.,* "The feds don't know who they got, bro/I'm going

rogue,; ,I'm going to make my license plate F—YOUDOJ,). Gentile then filed a civil rights action under 42 U.S.C. § 1983 against OCIF and its Commissioners seeking, among other things, an order compelling OCIF to issue Mint/Gentile the international financial entity they seek. *Gentile, et al. v. OCIF,* 18-cv-01441 (D.P.R. 2018). On March 19, 2021, Gentile filed a notice with the Court that he has reached a tentative settlement with OCIF concerning his claims, the substance of which is not yet public.

21.     Gentile currently has a website offering his "hot stock alerts, and offering to teach individuals how to day trade, https://www.guygentile.com. Gentile also founded DayTraderPro, a purported online educational platform and tutorial subscription service for day traders that also provides securities recommendations. This website currently touts itself as "the #1 live trading chat room in the world,, offers trading strategies, and claims that "anyone can learn how to day trading [sic] once they learn Guy's secrets [sic] strategies., www.daytraderpro.com.

### III. JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), (e) and 78aa(a).

23.     This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Florida, because Defendants transacted business in this District, many of Defendants' acts and transactions constituting violations of the Exchange Act occurred in this District, including those directed at U.S. customers who reside in Miami and in this District, and Defendant Gentile resided in Miami, Florida during at least a portion of the Relevant Period.

24.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails.

## IV. FACTUAL ALLEGATIONS

### A. SURETRADER

25.     In 2011, Gentile formed SureTrader in Nassau, the Bahamas and registered it as a broker-dealer with the Securities Commission of the Bahamas.

26.     During the Relevant Period, SureTrader was not registered as a broker-dealer with the Commission. SureTrader acted as a broker-dealer within the definition of Sections 3(a)(4) and 3(a)(5) of the Exchange Act but outside the exceptions or exemptions provided for by Rule 15a-6 of the Exchange Act by actively making efforts to induce a single transaction and engaging in an ongoing securities business relationship with U.S. customers.[1]

27.     SureTrader engaged in business from the Bahamas as a broker-dealer until at least November 2019, when its clearing firm changed the services it provided to SureTrader.

28.     During the Relevant Period, Gentile owned, controlled, and had sole decision making authority for all aspects of SureTrader's operations, and was responsible for all matters related to SureTrader's compliance with U.S. laws and regulations.

29.     Gentile was the sole signatory for SureTrader on the clearing agreement with SureTrader's clearing firm that allowed SureTrader to execute trades.

30.     Throughout the Relevant Period, SureTrader charged customers a commission of $4.95 per trade and, for an additional monthly fee, provided customers with access to its proprietary online trading platform.

31.     During the Relevant Period, SureTrader only permitted its customers to trade in U.S. equities (99%) and options (1%).

---

[1] Section 3(a)(4) defines "broker,, as any person "engaged in the business of effecting transactions in securities,,, and Section 3(a)(5) defines "dealer,, as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise.,,

32.     By early 2012, SureTrader had only about 100 customers. Gentile decided to begin soliciting U.S. customers in order to increase SureTrader's customer base and improve its business prospects.

## B. SOLICITATION OF U.S. CUSTOMERS

### 1. U.S. Pattern Day Traders Are Subject To FINRA's Rules

33.     U.S. day traders are subject to the Rules of FINRA, a self-regulatory organization (SRO) authorized by Congress to regulate member brokerage firms and exchange markets.

34.     FINRA has enacted rules regulating, among other things, U.S. traders who participate in pattern day trading, and the Rules became operational on September 28, 2001.

35.     A "day trade" occurs when a trader buys and sells, or sells and buys, the same security in a margin account on the same day.

36.     The FINRA Rules adopt the term "pattern day trader," which includes any margin customer that day trades (buys then sells or sells short then buys the same security on the same day) four or more times in five business days, provided the number of day trades are more than six percent of the customer's total trading activity for that same five-day period.

37.     FINRA has identified in its Rules that "[d]ay trading can be extremely risky," FINRA Rule 2270. As set forth in the Rules, "[d]ay trading generally is not appropriate for someone of limited resources and limited investment or trading experience and low risk tolerance, and day traders "should be prepared to lose all of the funds that [they] use for day trading," FINRA Rule 2270.

38.     The FINRA Rules also provide that "certain evidence indicates that an investment of less than $50,000 will significantly impair the ability of a day trader to make a profit. Of course, an investment of $50,000 or more will in no way guarantee success," FINRA Rule 2270.

39.     FINRA has established Rules to require that certain levels of equity be deposited and maintained in day-trading accounts, and that these levels be sufficient to support the risks associated with day-trading activities.

40.     Under the Rules, a pattern day trader must maintain minimum equity of $25,000 on any day that the customer day trades.  The required minimum equity must be in the account prior to any day-trading activities. If the account falls below the $25,000 requirement, the pattern day trader will not be permitted to day trade until the account is restored to the $25,000 minimum equity level. FINRA Rule 2520(f)(8)(B)(iv)(a).

41.     In addition, pattern day traders cannot trade in excess of their "day-trading buying power," which is defined in FINRA's rules and is generally up to four times an amount known as the maintenance margin excess as of the close of business of the prior day.  If a pattern day trader exceeds the day-trading buying power limitation, the firm will issue a day-trading margin call to the pattern day trader.  The pattern day trader will then have, at most, five business days to deposit funds to meet this day-trading margin call. Until the margin call is met, the day-trading account will be restricted to day-trading buying power of only two times maintenance margin excess based on the customer's daily total trading commitment.  If the day-trading margin call is not met by the fifth business day, the account will be further restricted to trading only on a cash available basis for 90 days or until the call is met.

42.     The Rules also require that any funds used to meet the day-trading minimum equity requirement or to meet any day-trading margin calls remain in the pattern day trader's account for two business days following the close of business on any day when the deposit is required. The Rules also prohibit the use of cross-guarantees to meet any of the day-trading margin requirements.

## 2. The Defendants Marketed SureTrader To U.S. Customers As A Way To Circumvent The FINRA Pattern Day Trader Rules

43.     During the Relevant Period, SureTrader marketed itself to potential customers worldwide, including in the United States.

44.     SureTrader offered broker-dealer services through which day traders could have their trades executed.

45.     SureTrader did not require customers to meet any of the requirements set forth in the U.S. Pattern Day Trader Rules.  For example, SureTrader offered customers the ability to open an account and trade with as little as $500 and did not require any margin account balances or place any other restriction required under the Rules.

46.     SureTrader solicited U.S. customers through the SureTrader website and e-mail messages, as well as through third party websites focused on day trading and coupon websites.

### a. Solicitation Through The SureTrader Website

47.     During the Relevant Period, SureTrader solicited customers through its website, www.suretrader.com, the content on which Gentile controlled.

48.     Through its website, SureTrader lured U.S. customers by offering SureTrader's offshore broker-dealer services as a means for circumventing the Rules.

49.     For example, in at least October 2017, the SureTrader website stated it would "Allow You to Avoid the Nasty PDT [Pattern Day Trader] Rule.,,

50.     In at least October 2017, the SureTrader website asked potential customers if they "are up for circumventing the rules and getting what you want.,,

51.     The website targeted U.S. customers in several ways, including:

      a.      listing all trading and account fees in U.S. Dollars;

      b.      only permitting trading in U.S. equities and options;

       c.      listing a "USA (Direct)," phone number among its contact information along with a New York City-based VoIP phone number "as a courtesy to . . . existing customers;"

       d.      listing telephone numbers with local New York exchanges among its contact information;

       e.      providing ways to fund a trading account specifically for U.S. customers, including an ACH payment method available to "US Bank Holders Only;"

       f.      offering a pricing comparison between its services and other prominent, online brokerages, with five of the six compared brokers being U.S.-based, registered broker-dealers; and

       g.      including information relating to the Foreign Account Tax Compliance Act which requires foreign financial institutions, such as SureTrader, to report on assets held by U.S. accounts holders.

52.     As of October 25, 2017, Suretrader.com attracted over 5,759 visitors per day and as of December 14, 2017, approximately 56% of the traffic to SureTrader.com for the prior three months was from the United States, with the next highest concentration of traffic coming from Italy with 4.2%.

53.     From no later than October 2017 until at least November 2019, SureTrader also promoted its proprietary trading platform that "provide[d] users with streaming real-time data, fast and easy order entry and execution designed to meet day traders' needs." The trading platform was offered for a monthly fee based on selected access and capabilities. During the Relevant Period, numerous U.S. customers subscribed to these services.

54.     By promoting these services on its website and charging a monthly, recurring fee for access, SureTrader solicited U.S. customers through its efforts to develop an ongoing securities business relationship.

55.     According to a sample of IP addresses, from about 2016 until about 2017, more than 50% of trades placed by SureTrader were for U.S. customers.

### b. Solicitation Via E-Mail Messages

56.     From no later than April 2016 until at least February 2017, SureTrader solicited thousands of customers, including U.S. customers, by sending e-mail messages.  These emails, once opened, directed U.S. customers to SureTrader's website.

57.     For example, from no later than April 2016 until at least February 2017, SureTrader sent U.S. customers e-mail messages identifying "Today's Most Actively Traded Symbols at SureTrader,,, including charts and graphs depicting the trading data for the five most actively traded stocks at SureTrader that day.   These messages included several links, including a prominent banner reading "Find More on Today's Top Stocks Here,, that redirected the message recipient to a daily "alert,, page on SureTrader's website that encouraged customers to open an account by stating, "Now that you have the knowledge that identifies the right time to buy and sell stocks all you need [is] . . . a reliable, cost-effective online broker to execute your trades . . . Contact SureTrader right away to get started doing trading with the best in online brokers.,,   Although a disclaimer at the end of the article claimed that the "SureTrader Blog is not intended for U.S. persons,,, it did not state or otherwise prohibit U.S. persons from opening accounts.

58.     To lure U.S. customers, the Defendants offered a free-trial period and limited free trades. Once a U.S. customer's trial period expired, SureTrader contacted the U.S. customers via e-mail message to offer them the opportunity to open an account with SureTrader. For example, one such message sent in about March 2017 included a link to a video providing "some important trading tips,, and concluded by asking, "Are you ready to Open an Account with SureTrader and be on your way to a successful trading career?  Get Started Now!  To get you started, we'd like to

offer you $99 in Free Trades when you open an account with SureTrader.,, These e-mail messages did not include any disclaimers regarding restrictions on opening accounts for U.S. persons.

### c. Solicitation Through Online Day Trading School Websites

59.     During the Relevant Period, SureTrader and Gentile solicited U.S. customers through advertisements on seven U.S.-based day trading websites SureTrader referred to internally as "affiliates.,, These Affiliates offered day trading schools, courses, and advice through on-demand videos and chatrooms.

60.     The Affiliates provided SureTrader with an ideal venue for the solicitation of U.S. customers and offered the novice day trader the opportunity to put their newly-acquired skills to use, at a discount, by opening an account with SureTrader.

61.     The Affiliates prominently advertised SureTrader's brokerage services on their websites and also offered their "students,, incentives to open an account with SureTrader. Those incentives included free trades, reduced commissions, rebates, and trading discounts. In exchange for their advertising services, SureTrader gave its Affiliates, for example, free access to its trading platform and, with respect to at least one Affiliate, monthly cash payments.

62.     Gentile, who controlled SureTrader, knew about SureTrader's arrangements with the Affiliates and directed SureTrader's communications with them.

63.     In October 2016, SureTrader entered into a Marketing Services Agreement with Warrior Trading (www.warriortrading.com), a Vermont-based website for day trading. Pursuant to this agreement, Warrior Trading advertised SureTrader on its website as a preferred broker and SureTrader offered a trading commission rebate. While the Marketing Services Agreement stated the rebate would only apply to non-U.S. customers, SureTrader gave the rebate to U.S. customers.

64.     SureTrader discounted the trading commissions (from $4.95 to $3.95 per trade) for customers referred to it by Warrior Trading.

13

65. Individuals residing in the U.S. opened accounts at SureTrader after learning about it from Warrior Trading.

66. For example, in October 2016, an individual with initials MA who was residing in the U.S. learned about SureTrader through Warrior Trading. MA submitted an account application to SureTrader on about October 4, 2016, listing his Chicago, Illinois address on his application, and attached his driver license. On October 10, 2016, SureTrader approved MA for trading and MA subsequently opened a trading account at SureTrader.

67. Similarly, SureTrader entered into a Marketing Services Agreement signed in August 2016 with New York-based Day Trading Radio, Inc. (www.DayTradingRadio.com), pursuant to which SureTrader paid Day Trading Radio $1,000 a month in exchange for running SureTrader's banner advertisements on the Day Trading Radio website.

68. While the Marketing Services Agreement required Day Trading Radio to market the brokerage services of SureTrader to Day Trading Radio's "international NON-U.S. website visitors,,, SureTrader accepted U.S. resident customers who learned about SureTrader through the Day Trading Radio site.

69. The Day Trading Radio website prominently displayed two SureTrader ads at the top of its home page, one of which was a banner ad running along the top of the page with the text "Day Trading Radio's Preferred Broker – click to learn more!,, Clicking on either ad redirected the visitor to SureTrader's website. Although the advertisements included a small-font disclaimer, "Not Intended for US Persons,,, Day Trading Radio's website included an article entitled "DayTraderRockStar's Preferred Broker: SureTrader,, which explained that SureTrader was "required to post,, a disclaimer on its website that meant "they are not allowed to solicit business from the U.S.,, though "they can accept and open U.S. accounts no problem.,, The article

concluded with step-by-step instructions for U.S. customers to follow to open an account with SureTrader.

70.  All of the customers who opened trading accounts with SureTrader after learning about SureTrader through Day Trading Radio were based in the U.S.

71.  SureTrader solicited U.S. customers through the five remaining Affiliates in substantively the same way it did with respect to Warrior Trading and Day Trading Radio. SureTrader had arrangements with the following five additional Affiliates: (1) Commission Junction (www.cj.com) based in New York; (2) The Sykes Challenge (www.timothysykes.com) based in Connecticut; (3) Investors Underground (www.investorsunderground.com) based in New Hampshire; (4) StockTradeIdeas.com (www.stocktradeideas.com) based in North Carolina; and (5) MOJO Day Trading (www.mojodaytrading.com) based in Florida.

72.  During the Relevant Period, the vast majority of U.S. customers at SureTrader were referred to SureTrader by the Affiliates.

73.  The Defendants also solicited customers through online coupon programs and websites, as well as social media.

74.  For example, in February 2018, SureTrader offered coupons through Groupon and TheCouponScoop.com, where it advertised coupons for, among other things, $50 in free trades and trading with as little as $500.

### C. THE DEFENDANTS' ATTTEMPTS TO CONCEAL SURETRADER'S SOLICITATION OF U.S. CUSTOMERS

#### 1. Bogus Disclaimers and Certifications

75.  SureTrader and Gentile took deliberate steps to create the false appearance that they were not soliciting U.S. customers.

76.     For example, during the Relevant Period, SureTrader's website claimed that SureTrader would only open a trading account for "Persons outside the U.S.„„ "Trusts outside the U.S.„„ or "Companies outside the U.S. such as a U.K. company.„

77.     This was bogus. SureTrader routinely accepted U.S. customers and actively endeavored to conceal this fact.

78.     On SureTrader's *own* website, it told potential customers that "U.S. customers wanting to work with . . . Swiss America Securities, Ltd. (SureTrader.com) can thus only approach Non-U.S. Broker-Dealers under Rule 15a-6 if they have not been to their website and should be prepared to certify this fact in writing to ensure compliance with applicable law.„ Thus, in essence, SureTrader told potential customers on its website that the potential customers might have to certify that they had never been to that same website.

79.     In fact, U.S. customers did go to the website, and SureTrader knew that they had. For example, on account opening documents, several U.S. customers identified the SureTrader website as the source of referral.

80.     Despite soliciting U.S. customers as set forth above, SureTrader required U.S. customers to sign statements that they had not been solicited. For example, SureTrader required U.S. customers to sign an "Unsolicited Acknowledgement Agreement„„ ("UAA„) through which they affirmed they had not been solicited. Gentile implemented the UAA requirement for U.S. customers in an attempt to circumvent federal securities laws prohibiting unregistered foreign broker-dealers like SureTrader from soliciting U.S. customers.

81.     The Defendants knew the U.S. customers were solicited through the SureTrader website or through advertisements with the Affiliates. SureTrader's application for opening an account required U.S. customers to indicate how they learned about SureTrader and the vast majority identified the website of SureTrader or one of the Affiliates. Nonetheless, during the

Relevant Period, SureTrader and Gentile continued to open accounts for U.S. customers and continued their use of the bogus UAA certifications.

82.     During the Relevant Period, SureTrader had no policies and procedures in place regarding the solicitation of U.S. customers.  Under the control of Gentile, SureTrader accepted any account application from a U.S. Customer as long as their application included a signed UAA.  No further review or inquiry was made by SureTrader.

### 2. The Sham IP Blocker And Pop-Up Window

83.     In about October 2017, the Defendants added a web-based Internet Protocol ("IP,,) blocker to the SureTrader website to give the appearance that SureTrader was not soliciting U.S.-based customers.

84.     Specifically, the SureTrader website included a pop-up window stating: "In compliance with SEC Rule 15a-6 this website is not intended to solicit U.S. Residents. . . By continuing, you certify that you have not been solicited to this website.,, The pop-up window further stated: "You will need an access code or be an existing client to view our website,,, and included spaces for a new visitor to enter an email address or phone number to receive an access code.  The pop-up window also included an area for SureTrader's existing U.S.-based customers to login and gain website access.

85.     The pop-up window was nothing but window dressing.  It did not restrict or prevent U.S. customers from opening accounts at SureTrader.  SureTrader was continuing to lure potential U.S. customers to its website through its Affiliates, e-mail messages, the SureTrader Facebook page, Instagram, Twitter, and coupon websites.

86.     In essence, SureTrader lured potential U.S.-based customers to its website, where they published a pop-up window falsely stating they did not lure the U.S.-based customers there.

87. Moreover, despite the implementation of the pop-up window, SureTrader did not decline to open an account for any U.S. customer.

### 3. Shell Company Bank Accounts

88. To conceal the U.S. customers, SureTrader created a way to receive U.S. customer funds indirectly, through two U.S. entities created for the sole purpose of facilitating and concealing the movement of U.S.-based customer funds to SureTrader.

89. Specifically, in November 2016, Gentile directed the formation of a Delaware-based entity called Mint Custody Limited, and in January 2017 Gentile directed the formation of the Florida-based entity MinTrade Technologies, LLC.

90. During the Relevant Period, these entities received about $5 million from about 900 U.S.-based customers and transferred these funds to SureTrader.

### D. **THE DEEFNDANTS' SOLICITATION EFFORTS WERE SUCCESSFUL**

91. SureTrader and Gentile's efforts to solicit U.S.-based customers resulted in a steady increase in new accounts, with hundreds of accounts being opened each month.

92. During the Relevant Period, U.S. customers comprised at least 50% and, at times 80%, of SureTrader's customer base.

93. SureTrader ballooned from a three-man shop to become a broker-dealer employing about 75 employees, with more than 40,000 customer accounts and assets of more than $10 million.

94. According to SureTrader, it has effected transactions "in excess of $1 billion on behalf of its customers.,,

95. The Defendants profited from their conduct. During the Relevant Period, SureTrader received millions of dollars in transaction-based compensation in the form of commissions and other related fees on the U.S.-based customer accounts.

96.     The Defendants' securities law violations were recurrent and spanned years, from no later than 2016 through at least 2019.  The violations were substantial and involved soliciting U.S. residents without registering with the Commission, thereby allowing the Defendants to avoid certain regulatory obligations for broker-dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.   Further, the Defendants' violations involved circumventing the Pattern Day Trader Rules designed to protect investors in pattern day trading, which is a risky form of trading and which can result in substantial losses.  On top of that, the Defendants took steps to conceal their solicitation of U.S. customers and their violations of the federal securities laws governing the registration of broker-dealers.  SureTrader and Gentile have regulatory histories, and Gentile has consistently worked in the securities industry since at least 1999 and continues to work in the securities industry.   Not only has Gentile failed to take responsibility for the violations at issue in this Complaint, but also he attempted to thwart the Commission's investigation by, among things, refusing to appear for investigative testimony pursuant to a subpoena absent a Court Order compelling his appearance.  The Defendants profited from their conduct to the tune of millions.  Permanent injunctions against the Defendant are warranted.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 15(a)(1) of the Exchange Act
### (Against SureTrader)

97.     The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

98.     From no later than March 2016 until at least November 2019, SureTrader, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce

effected transactions in, or induced or attempted to induce the purchase or sale of securities, while it was not registered with the Commission as a broker or dealer.

99.     By reason of the foregoing, SureTrader violated, and unless enjoined is reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### COUNT II
### Liability Under Section 20(a) of the Exchange Act As a Control Person
### (Against Gentile)

100.    The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

101.    From no later than March 2016 until at least November 2019, Gentile was, directly or indirectly, a control person of SureTrader for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

102.    From no later than March 2016 until at least November 2019, SureTrader violated Section 15(a)(1) of the Exchange Act.

103.    As a control person of SureTrader, Gentile is jointly and severally liable with and to the same extent as SureTrader for its violations of Section 15(a)(1) of the Exchange Act.

104.    By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violate, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

### COUNT III

### Liability Under Section 20(b) of the Exchange Act
### (Against Gentile)

105.    The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

106.    From no later than March 2016 through at least November 2019, SureTrader, directly or indirectly, violated Section 15(a)(1) of the Exchange Act.

107.    From no later than March 2016 through at least November 2019, Gentile, directly or indirectly, through SureTrader, did acts or things which it would have been unlawful for him to do under the provisions of the Exchange Act and the rules and regulations set forth above.

108.   By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violate, Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged and:

## I.

## Permanent Injunctive Relief

Issue a Permanent Injunction, under Section 21(d)(1) of the Exchange Act, enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

## Disgorgement and Prejudgment Interest

Issue an Order directing Defendants, jointly and severally, to disgorge all ill-gotten gains or proceeds received including prejudgment interest thereon as a result of the acts and/or courses of conduct alleged in this Complaint.

## III.

## Penalties

Issue an Order directing Defendants, jointly and severally, to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## V.

### Retention of Jurisdiction

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### DEMAND FOR JURY TRIAL

The Commission hereby demands a jury trial in this case.

March 22, 2021                              Respectfully submitted,


<u>Amie Riggle Berlin</u>
Amie Riggle Berlin, Esq.
Senior Trial Counsel
Fla. Bar No. 630020
Direct Dial: (305) 982-6322
Email: berlina@sec.gov

Alice K. Sum, Esq.
Trial Counsel
Fla. Bar No. 354510
Direct Dial: (305) 416-6293
Email: sumal@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:    (305) 982-6300
Facsimile:    (305) 536-4154