# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

**AFFIDAVIT**

Crim. No. 16-155(JLL)
-vs-                                            Hon. Jose L. Linares
Newark, New Jersey

GUY GENTILE,

Defendant.

--------------------------------------------------------------------X

COUNTY OF MiAMi DADE )
                                          )ss:
STATE OF FLORiDA        )

**AFFIDAVIT OF GUY GENTILE
IN SUPPORT OF HIS MOTION TO DISMISS**

I, Guy Gentile, being duly sworn, deposes and says the following under the penalties of perjury:

1.  I was arrested on July 13, 2012 by Customs and Border Patrol ("CBP") while seated on a plane at Westchester Airport. The CBP informed me of my rights, handcuffed me, and then handed me over to the FBI who took me into custody. While in custody and riding in a car with the agents, the FBI agents told me they wanted me to cooperate. I replied that I would, but I wanted the charges against me to go away. The agents told me "we can do that."

2.  Over the course of that weekend, during which I was detained in a Newark jail, FBI agents informed me that they were mostly interested in my connections with Adam Gottbetter, who they believed continued to be involved in various securities frauds, and they wanted me to cooperate against him.

3.   Prior to speaking with an attorney, I indicated my willingness to cooperate with the government.  The next day, after reviewing a copy of the sealed complaint that had been filed against me, and after speaking to counsel, I agreed to cooperate pursuant to an oral cooperation agreement.  I never agreed that I would plead guilty to any charge related to the allegations in the complaint.  The terms of the agreement were that I would offer substantial cooperation beyond that relating to the alleged co-conspirators of RVNG and KYUS.  I agreed to do that plus lead the government to unknown individuals and broker-dealers involved in illegal penny stock schemes who were not affiliated with me.  My cooperation later morphed so as to also include training FBI agents in how to communicate effectively with targets involved in pump and dump schemes, and giving instructional courses to agents and Assistant United States Attorneys on types of conduct involved in securities fraud that are ordinarily extremely difficult to detect because of the high degree of sophistication involved in these security frauds.  In exchange for this significant cooperation, the government agreed to withdraw the complaint it had filed against me and to potentially not reinstate any felony charges.  The government also agreed not to act on its previous threats to close my businesses, freeze my assets and "investigate" my wife, parents, and siblings.

4.   Over the next three years, I provided what the government has consistently described to me as extraordinary cooperation, the likes of which no one in the United States Attorney's Office for the District of New Jersey had previously encountered.

5.   My cooperation started with my alleged co-conspirators of the KYUS deal, Adam Gottbetter, Samuel DelPresto, Mike Taxon, and Itamar Cohen, some of whom had continued to engage in pump and dump schemes since 2008 up through 2013.  As part of this cooperation, I provided information to the government related to Taxon and Cohen, which aided the

government in charging Gottbetter, DelPresto, Taxon, and Cohen with several felonies (all four of whom pleaded guilty). It is my understanding that Neither Gottbetter nor DelPresto were charged with conduct related to KYUS.

6. During the course of this investigation, Gottbetter, a lawyer, consistently told me, during recorded conversations being listened to by the FBI, that neither he nor I committed any crimes or did anything wrong during the KYUS promotion because Gottbetter understood the law and knew how to stay inside of it. The government then instructed me to work with Gottbetter to devise a new pump and dump scheme involving two other tickers, DYNE and HBPE. Setting up the scheme involved significant work, including setting up bank and brokerage accounts. After Gottbetter took sufficient steps in furtherance of this new scheme, the government arrested a co-conspirator, ▆▆▆▆▆▆▆▆, and Gottbetter was charged criminally in connection with the new scheme and well as co-conspirator ▆▆▆▆▆▆.

7. Just as significant, however, is that I was told by the FBI agents that both ▆▆▆▆▆ and his associate, ▆▆▆▆▆▆▆, having been confronted with concrete evidence of criminally fraudulent conduct obtained on account of my cooperation, began cooperating themselves in two separate investigations that resulted in the indictment of over a dozen individuals charged with securities fraud for their involvement in two $300-million pump and dump schemes.

8. After my first 12 months of intensive cooperation, the agents began treating me as one of their own. The agents consistently told me all the work I was doing was to insure I would not be prosecuted. They permitted me to carry a concealed weapon during meetings, and they told me they believed we would be working together forever. As a result of this relationship, I began to believe that my cooperation was resulting in my status changing from that of a cooperator who might be charged with a felony to that of an informant that was working with the government.

Indeed, the government explicitly told me as of early 2014 that I was no longer a cooperator but "more like an undercover agent" and instructed me on exactly how to respond to questions from internal affairs while their unit was under investigation for the amount of money it was spending on the investigations we were working on.  Part of their instructions on how to respond were misleading.

9.   Over the next year and a half, I continued to work with the government in investigations into twenty-five potential targets, the majority of whom I had no prior dealings with, including several "high-value targets" one of whose identity the government did not know, but had only heard about on account of his large-scale securities fraud schemes that went undetected.  During a particularly dangerous operation, I was able to get a photograph and fingerprints of the penny stock promoter ███████████████████  My cooperation led to the shuttering of several broker dealers, as well as stopping several pump and dump schemes prior to any investors being harmed.

10. My cooperation agreement with the DOJ also required me to cooperate with the United States Securities and Exchange Commission.  This cooperation directly led to dozens of individuals being charged not just by the DOJ, but also by the SEC, and the Commission receiving tens of millions of dollars in penalties and disgorgement.  Also the FBI shared my tapes and wiretaps with the SEC, without my written consent.

11. I offered key cooperation necessary to charge my alleged co-conspirators, Mike Taxon and Itamar Cohen, in connection with the Raven Gold Corporation (RVNG) and Kentucky USA Energy (KYUS) stock promotions. The SEC also charged my alleged co-conspirator, attorney Adam Gottbetter, on May 26, 2015

12. I also brought to the attention of the SEC and the DOJ—and provided documentary evidence of—an almost $1 million insider trading scheme involving a former investment bank analyst at J.P. Morgan who was illegally tipping his close friend with confidential information about clients involved in impending mergers and acquisitions of technology companies.  My cooperation resulted in both criminal and civil securities charges being brought against both individuals, Aggarwal and his friend, Bolandian.

13. I trained and assisted an FBI agent with step-by-step instructions regarding how to speak with a target in order to assess whether the target intended to break the law, or was merely being aggressive by attempting to take advantage of legitimate legal loopholes.  I also gave this agent a crash course on financial instruments and tax strategies in preparation for the agent's trip to meet with targets of the investigation.

14. As a result of this training session, the agent was able to infiltrate a securities fraud conspiracy leading to an SEC action filed against Robert Bandfield and Andrew Godfrey. The SEC filed charges against Bandfield and Godfrey for their involvement in managing an offshore business intended to help clients evade U.S. securities laws and tax laws by concealing the ownership of certain microcap stocks as part of a larger money laundering scheme that allowed their clients, totaling more than 100 U.S. citizens and residents, to lauder more than $500 million.

15. All told, my cooperation with the DOJ also directly resulted in the Securities and Exchange Commission already collecting over $12 million in fines and disgorgements with the potential for tens of millions more to come in.

16. As a result of my work, after Gottbetter was indicted in December 2013, in early spring of 2014, the FBI agents working with me began telling me that I would not be charged at the

conclusion of my cooperation.  I have a specific recollection of the agents saying to me things like: They could "make the charges go away" if I cooperated against Gottbetter (on July 13, 2012); they were "not going to let anything happen to [me]" (shortly after February 2014); I was "more like an agent" and "no longer a cooperating witness" (in February 2014); there was no need to charge me given that my testimony was no longer needed (in February 2014); I would "walk" because I "fulfilled [my] agreement with Gurbir" (in February 2014); and, all the work I was doing is so that I would "not be charged" (in 2013 and 2014).

17. In February 2014, I told the agents that I would not sign another tolling agreement because the current one was going to expire in the summer of 2014, and without a third tolling agreement, the Government would only have one year from the expiration of the second tolling agreement in which to file charges against me.  The agents acknowledged that this was the case.

18. In response to what the agents were telling me, by the summer of 2014, I began to make clear both directly during conversations with the agents I had been working with and through statements to the AUSAs that I was no longer interested in further cooperation unless the government explicitly agreed that it would not reinstate its previously withdrawn felony charges. My counsel told me at the time that he and the Assistant United States Attorney had several discussions during which the AUSA was told that I was not interested in further cooperation unless I was not going to be charged at the conclusion, and the AUSA indicated that it was in my best interest to keep cooperating.  The AUSA stated on several occasions, including during a meeting on August 14, 2014, that, while I was more likely to be charged if I stopped cooperating, if I continued my cooperation, I was more likely not to be charged with a felony at its conclusion, because I could then make a "better presentation" as to why I should not be charged with a felony.  The clear implication in my mind was that I had to keep cooperating because if I

stopped I would be charged even though the agents told me I would not be, and given these communications, the government would not charge me with a felony if I kept cooperating as they instructed.

19. As a result of these statements, I believed I had to continue cooperating. However, because I was concerned the government would try to force me to cooperate indefinitely, I told the government that I was refusing to sign another tolling affidavit because I wanted to be certain that everything was over on June 30, 2015. The government agreed that I did not have to sign another tolling agreement.

20. It was during this time that I was cooperating with the government in one of its most sophisticated and ultimately high-profile investigations in the office's history. I had identified and explained to the government that a Russian national was involved in a sophisticated high-speed international stock trading scheme that involved the use of traders from around the world who would buy or sell orders and then quickly cancel them, a scheme known as layering or spoofing. The activity would artificially raise or lower the stock prices and allow traders to exploit the price moves to make profits on trades. This individual's scheme was believed to yield as much $600,000 in a day and generated between $1 million and $50 million per month. Yet, before I explained how the scheme worked, the government did not understand what was fraudulent about the conduct. During the fall of 2014, the target of the investigation, Alex Milrud, and I traveled to the Bahamas on several occasions to visit my brokerage firm, set up a trading account. It was during this stage of the investigation into Milrud that my counsel told me that he had a conversation with the AUSA in charge of the investigation, who advised that the US Attorney's Office was very excited about this investigation, that the office for the first time was given an entry into sophisticated trading cases, and that if I kept cooperating, I

would "get what I wanted."  Because I had told the government on several occasions that what I wanted was a non-prosecution resolution, I understood that the Government would not charge me if I continued cooperating against Milrud to the end.

21. Then, on December 18, 2014, my counsel had a meeting with the government.  During this meeting, I understood that my counsel were explicit that I would no longer cooperate unless the felony charges would not be reinstated.  After that meeting, the government continued using me as an active cooperator for the next six months to help the government finish one of the largest cases brought by that US Attorney's Office and what was believed would be the first indictment in the nation of a securities fraud charge based on high-frequency trading (and spoofing).  I believed that this continued cooperation after the December 2014 meeting meant that the government would not reinstate any charges because I had said I would no longer cooperate unless I would not be charged at the conclusion of my cooperation.

22. The government continued using me as a cooperator all through the summer of 2015, over a year after I refused to sign an additional tolling agreement upon the explicit statement that I was not signing so I could be sure everything was fully resolved a year later.  Yet, in July 2015, the government told me that the felony charges originally brought in July 2012 would be reinstated.

23.  On a number of occasions during the course of my cooperation with the Government, there were restrictions placed on my movements and my ability to travel, sometimes with very little justification.

**A detailed chronology of my cooperation follows below:**

24. As set forth below, for over three years I have provided unprecedented cooperation to two United States Attorney's Offices and the FBI, through proffer sessions, undercover informant work, and practical advice.

**Cooperation in the KYUS Deal**

25. My cooperation began – immediately after agreeing to cooperate with the government – as one would expect.  That is, the agents charged with working with me instructed me to meet with one of my co-conspirators in the KYUS deal, ████████, and to attempt to get ████████ to talk about the KYUS deal, and any other fraudulent stock promotions that he may have done since then.  I was sent in to this first meeting with no additional instructions or guidance.  Just a few days after entering into my cooperation agreement, I arranged a meeting with ████████████████████████████████████.

26. ████████████████████████████████████████. I had not had any dealings with ████████ before this meeting, although I learned that the reason ████████ was invited to the meeting was that the two of them had tried to conduct a pump and dump scheme together, but it flopped.  In keeping with the agents' instructions, I got ████████ to acknowledge his role in the KYUS deal.  However, I went beyond the agents' requests, and improvised in a way that resulted in ████████████████, and myself agreeing to conspire to engage in another, new pump and dump scheme, this time involving ████████████████.

27. Shortly thereafter, on August 8, 2012, I met with ████████████████████ ████████████████████████████.  During this meeting, ████████ stated that he wanted to take his company public, and that he was interested having ████████████████ and

myself "promote it."  (I did not meet with Sandberg again, and I do not know whether he was eventually charged with anything.)

28. Believing that I was a co-conspirator, ████████████ continued to work on completing the promotion of ████. I worked with them to send out a materially misleading mailing promoting on ████ with information known to be false.  They took the affirmative step of agreeing to purchase software to "scrub" the email list that would be used to disseminate the false information. ████████████ and myself also discussed registering domain names and creating a landing page where investors would go after receiving an email blast.  I attended another meeting with ████ at his office where we discussed how to pump up the CEII stock.  At that meeting, an individual named ████████ joined, and without prompting began discussing promotions in which he was involved. ████ sent a follow-up email to me, which I promptly forwarded to the agents.

29. While ████ had already engaged in the trades necessary to establish an act in furtherance of a conspiracy, the government desired additional evidence against DelPresto.  As a result, I continued to work with ████████ wired $5,000 to me to pay for the software to scrub the e-mail list. ████ and myself "agreed" that the money would be paid to "Sur Club Sushi LLC" to provide ████ with deniability regarding his knowledge of the scrubbing.  It was my idea to set up this bogus LLC, and thus convince ████ to launder money.  In connection with this part of the operation, I created a business plan, business proposal, created a new limited liability corporation, and opened a bank account.  I believe that ████ was arrested in early 2014 and became a cooperator with the government.

30. During this time, I was working almost full time with the government.  After I established Sur Club Sushi LLC, the agents then instructed me to fly to Las Vegas to Timothy

Sykes Penny Stock Conference and to find people to setup meeting with.  I was able to meet with (and record) ███████████, who owns a penny stock blogging website. And by chance I ran in to a broker from ████████████████████████. (████████████ is where Gottbetter had his shares in the KYUS deal.) During this conversation, Mohammad expressed a desire to engage in new promotion.  I met with Mohammed on two other occasions in the Bahamas during which meetings he pitched me on helping him with a penny stock promotion.

████Also around this time, in September 2012, government agents asked me if I knew ████ ████, the CEO of ████████████████.  I had never heard of him.  █████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████

32. Meanwhile, ██████████ and his girlfriend pitched me on doing another pump and dump using the company ██████████ (a social media music company), which would cut out ██████████. Shortly thereafter, I called and emailed with ████████████████████████

███████████████████████████████████████████████

███████████

33. At this point in the operation, however, the agents realized that if this fraudulent promotion actually occurred, innocent investors might be harmed.  Having reached the point where both ███████████████ had engaged in sufficient acts to prove all elements of securities fraud, including "bid support" trading intended to manipulate the price of ████ stock done by ███████, I was asked to figure out how to end my undercover work without jeopardizing my cover.  On November 20, 2013 I came up with the idea of having the SEC send a letter to ████████████████████████ inquiring into the trades that ████████ had done in █████████████████████ that were being routed through ████████

34. This idea worked.  The SEC sent Stock USA a letter questioning trades done in ████, which enabled me to plausibly act spooked, and tell my coconspirators that I was exiting the conspiracy.  ████████ girlfriend, ███████████, drove down to the █████████ offices to review the letter in late November 2012.  I do not know if any action has been taken or is being contemplated against ██████████.

35. I then set up meetings with ████████████████████████ ████████ where ████████ was placing his trades and told me he had ownership interest.  The purpose of this meeting was twofold: to find a location to park the shares, and to uncover direct evidence of suspected involvement in market manipulation schemes.  During one of these recordings, Mr. ███████████████████████ ████████████████████████████████ ██████████████ allegations of securities fraud, based, at least partially, on my cooperation.

36. Then, the agents informed me that they had given the United States Attorney's Office for the Southern District of New York copies of the audio recordings that I had made of ████████,

and that those recordings contributed in a meaningful way to the SDNY's ability to induce ████████ to begin cooperating with the government himself.  This cooperation eventually led to the arrest of seven additional persons charged with securities fraud.

**Mike Taxon/Eric Sharon**

████ I also used my connections to locate high-value targets whose identity the government did not know.  While cooperating against the original ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**Adam Gottbetter**

38.  Adam Gottbetter was a practicing attorney who engaged in various penny stock pump and dump schemes over the past decade, most significantly as the ringleader of KYUS.  KYUS was Gottbetter's deal, and accordingly, Gottbetter was an original – and significant – target for me to focus on.  I began working on getting Gottbetter to confess to his illegal actions in KYUS immediately after starting to cooperate.

*DYNA*

39. I spoke with Gottbetter on July 20, 2012 to set up a meeting, met with him, along with

██████████ on July 26th, at the Core Club in New York City.  Similar to ████████, Gottbetter

also wanted to work on a new deal.  I played along, and discussed doing a new promotion.

Gottbetter also admitted to being involved in another promotion on the symbol RACK, that

apparently had failed, and so Gottbetter and ████████ sought my assistance.  Coincidently, during

a subsequent meeting with Gottbetter, on August 1st, Gottbetter spent the better part of the

meeting talking about ██████████, specifically how I should stay away from him because he was

acting reckless and was being watched.

40. I arranged to meet with Gottbetter to discuss the deal down in the Bahamas towards the

end of August.  While this meeting did not take place because the agents asked me to cancel it, I

met again with Gottbetter and ████████ in New York City during this time to discuss opening

accounts and the ultimate division of profits upon the scheme's conclusion.

41. I understood what a difficult target Gottbetter was and began working on strategies to

catch Gottbetter.  Gottbetter articulated his desire to engage in a promotion, but was careful to

not use language that could come back to haunt him, even as his conduct was clearly that of

someone engaged in a pump and dump.  For example, before any trades were placed for this

promotion, I told Gottbetter that I had developed a new algorithm that would "pump the stocks,"

therefore freeing up the coconspirators to do other things.  I explained to Gottbetter that I would

create thirty separate accounts, which would be capable of automatically trading with each other

to pump up the stock.  ████████████████████████████████████████████

████████████████████

42. This deal required me to find a brokerage firm to hold the penny stocks, and I suggested

that I visit with two potential target broker-dealers that were well known in the penny stock

market manipulation world.  The best day to have this meeting happened to fall on Valentine's

Day. Despite my relationship with my wife being in recovery mode (after she agreed to withdraw

divorce filings), I still put my commitment to cooperation above everything else and agreed to be

away from my wife and two children that weekend, without comment. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

43. I organized the materials for the mailer for DYNA and the government agreed to provide

$10,000 to have it designed and printed.  Once completed, I brought a sample mailer to

Gottbetter for a final meeting where I showed it to him, specifically pointed out all the false

statements contained therein, and asked him which price we should pick for where the price of

the stock was likely to go.  Gottbetter instructed me to pick a specific price and then said, "This

looks awesome. I never saw this."  Agents described this line to me as "the nail in the coffin."

44. It appeared that Gottbetter had finally made a mistake.  However, before placing any

trades, Gottbetter decided that DYNA could not be promoted effectively and cancelled the deal,

or at least suggested we put if off.  Thus, despite over a year of work, it appeared that the

government had insufficient evidence with which to charge Gottbetter.  However, I did not give

up.

*LIDO*

45. I was able to secure a meeting on August 8, 2013 with Gottbetter. Gottbetter charted a

private plane to come see me in White Plains NY, At the meeting, Gottbetter explained that he

had a new deal for us to work on involving now a new co-conspirator, K. David Stevenson, and

using an oil and gas company with the ticker LIDO, which would be changed into HBP Energy
Corporation.

46. In connection with this new deal, I met with and covertly recorded ▮▮▮▮▮, who
was supposed to provide promotional work and graphic design, and also C▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Eventually ▮▮▮▮ joined to create a video
pitch and the investor presentations. ▮▮▮▮▮ would later approach me seeking to do a side
deal, also involving an pump and dump.

47. The government wired Gottbetter money to buy the shares in LIDO and I continued to
meet with ▮▮▮▮ to advance the conspiracy. I met with ▮▮▮▮ at least four times. On
November 17, 2013, immediately after the fourth meeting, and immediately after I left the hotel
room in which we had met, the government arrested ▮▮▮▮ because of what I had developed
against him. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

48. ▮▮▮▮ arrest took place in the middle of the conspiracy, before the government was
ready to arrest other co-conspirators. The other co-conspirators, ▮▮▮ and Gottbetter, began
asking me where ▮▮▮▮ was. On my own, I came up with several plausible excuses for why
▮▮▮▮ could not be located. Eventually, government agents took over ▮▮▮▮ e-mail
account and began emailing with Gottbetter, with the agents posing as ▮▮▮▮.

49. Eventually I was told that sufficient evidence had been obtained and the agents asked me
to figure a way to get out of the deal, again without arousing suspicion that I was cooperating. I
concocted the story that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ that he had used in the proposed DYNA deal, got scared and fled. Because all the
automated trading was under ▮▮▮ name, no trades could be placed without his involvement. I
had described ▮▮ as my frontman, and someone I had known for fifteen years. I told Gottbetter

that ▮▮ had fled to Bermuda and that since he went missing everything would have to be on hold.

50. The agents then suggested that I try to hand Gottbetter a bag with $50,000 to pay

▮▮▮▮▮▮▮▮▮▮▮▮▮ finish the deal.  Gottbetter, however, refused, and in fact, stopped speaking with me after this suggestion.  Nevertheless, as I understand it, Gottbetter was arrested around Christmas 2013 and later pled guilty.

51. Because of Gottbetter's sophistication and caution, it took well over a year of work by myself before the government could obtain sufficient evidence to charge him.  Not only did I do so, but I also manufactured a basis on which I could plausibly cease work on the criminal scheme without revealing myself as a cooperator.

52. By January 2014, I had completed my cooperation against every single person who had been involved in the RVNG and KYUS deals.  Any future work would be on completely new targets, some whom I had not met prior to July 2012.  At that time, the United States Attorney's Office for the District of New Jersey offered me the opportunity to continue my cooperation against these new, additional, targets.


**Alex Milrud and High Frequency Trading**

53. My cooperation against Alex Milrud began on January 28, 2013, when I flew to Miami to meet with Milrud.  Given all of my other cooperation work going on at this time, the agents decided that the case against Milrud was a lesser priority, and deferred work on it until my other matters were resolved.

54. In the beginning of 2014, I resumed cooperating against Milrud, ██████████ ████████████████ Previously, Milrud asked me if I could find a shell company with five million unlisted shares. Milrud was completely open about his intentions to break the law, disclosing to me various fraudulent documents he could obtain, including fake passports and his access to hacker who could purportedly break into online trading platforms like Etrade and Ameritrade. More importantly, Milrud told me that he was looking for a place to move his "layering," i.e., his illegal high-frequency trading business. Following numerous failed attempts, I was finally able to arrange a meeting with Milrud in the Bahamas on August 27th 2014.

55. During a strategy session involving well over a dozen government attorneys and agents, I was instructed to begin to lay the groundwork on Milrud at this upcoming meeting. While much was discussed at this meeting, no one in the room expected me to do much more than lay the groundwork for what would be a long investigation into Milrud and his international criminal network. Indeed, I was told that if I "got 10% of what was discussed, that would be incredible."

56. The August 27th 2014 meeting with Milrud required significant improvisation on my part, due to technical failures with the equipment the government had provided me to record the meeting. As soon as Milrud entered my office, I started the computer that had spy software installed that would capture each keystroke made on the computer. Rather than start up as normal, the computer downloaded software and began to set itself up for over 45 minutes, because the government agent had failed to properly install the software before the meeting. During that time, I had to improvise as to why my computer was going through the kind of set-up expected from a brand-new machine. In addition, the government required me to turn on the audio recording system by remote control, a difficult enough maneuver in real time, compounded by the fact that the recording device made a loud "click" when turned on and off. Again, I

improvised, grabbed the remote control, and nonchalantly turned on the television, and at the same time the television was "clicking" on, hit the recording device, thus keeping the operation alive.

57. Ultimately, I was able not only to lay the groundwork for a future investigation into Milrud, but actually convinced him to log onto my computer and engage in fraudulent layering trading with his Chinese traders.

58. Milrud's strategy was extremely complex, and its criminality difficult to detect.  I met with representatives of the United States Attorney's Office for the District of New Jersey to give a detailed explanation of it.  Again, the government requested that I continue to cooperate to obtain additional evidence against Milrud and ▮▮▮▮▮, including getting him to place manipulative trades with a United States broker dealer.  To accomplish this, I offered to permit an undercover agent to open an account at Stock USA.

**Additional Assistance to the SDNY**

59. In addition to my direct cooperation, I have also assisted and trained other FBI agents working on other investigations.  For example, I met with an agent code-named ▮▮▮▮▮.  During the course of this meeting, I provided ▮▮▮▮▮ with step-by-step instructions regarding how to speak with a target in order to assess whether the target intended to break the law, or was merely being "aggressive" by attempting to take advantage of legitimate legal loopholes.  I provided ▮▮▮▮▮ with a believable cover story, and gave him a crash course on various financial instruments and tax strategies in preparation for his trip to Belize to meet with the targets of the investigation.

60. As a result of this training session, ▮▮▮▮▮ was able to infiltrate a securities fraud conspiracy that resulted in the arrest of six individuals in the Eastern District of New York on

charges of securities fraud, money laundering, and tax fraud.  As reported by the New York Times, this was a $500 million fraud.  This cooperation also led to a separate SEC action filed against Robert Bandfield and Andrew Godfrey.

**My Life has been Threatened**

61. One of my colleagues was threatened with physical violence and I myself was threatened, albeit obliquely during the course of my cooperation.   insinuated that he would go after me if he found out I was "the rat".  Even in the face of threats to my person, I continued my cooperation with the government.

**Continuing Cooperation in 2015**

62. From January to July of 2015, my cooperation helped the government close ███████, an unregistered broker dealer.  This cooperation included recording a phone call with ████████ in June of 2015.

63. In July of 2015, Agent ██████ asked me find ██████████ and get him to talk to me.  I was subsequently able to talk to his brother.

64. In March of 2015, I traveled to Miami with an agent to record a meeting with ████ ████████, ██████████████████, and four other individuals regarding the possibility of helping with a new deal using the fake algorithm.

65. Also in March of 2015, I recorded phone calls at the government's behest with ████ ████████████████████████, who was suspected of running pump and dump schemes.

66. In May of 2015, I provided the government with information concerning ████ ████████ an individual targeted by the Securities and Exchange Commission for running an unregistered broker dealer.

**Summary of the Results of My Cooperation**

67. My cooperation has yielded impressive results.  As I understand it, my cooperation led to the arrest of my two co-conspirators in the KYUS scheme, ████████ and Adam Gottbetter, both of whom have pled guilty.  Perhaps more significantly, my cooperation has directly resulted in the arrests of two individuals whom I did not know before the start of my cooperation: ██ ████████████████████.  I further believe that the quality of evidence I helped amass against ██████ was a contributing factor to ████████ decision to cooperate. ████████ cooperation, in turn, resulted in a large-scale securities fraud and extortion prosecution by the United States Attorney's Office for the Southern District of New York that netted six additional defendants. (These six defendants are: Alexander Goldshmidt, Alex Puzaitzer, Michael Vax, Paul Orena, Yitz Grossman, Efim Aksanov, and Steve Koifman.) My cooperation against Alex Milrud, I was told, gave the US Attorney's Office a groundbreaking and highly-visible securities fraud case against an international high-frequency trader, whose conduct was so difficult to detect that even the FBI agents assigned to the case did not understand how the fraud was being perpetrated until I met with the government and explained it.

68. My cooperation has also resulted in the US Attorney's Office shutting down two broker-dealers with which I had no prior dealings, ████████████████████████████. In

connection with these investigations, my work contributed to trading in three stocks being halted,
████████████████████████████████████████████████████████ .

69. In addition, I have brought other frauds to the attention of the Securities and Exchange Commission, including a fully investigated and documented insider trading case involving ██████████████████ , and an illegal market manipulation case involving ███████ , another stock the trading of which was halted as a result of information I brought to the SEC.

70. My work has extended into several jurisdictions, and includes a meeting with Royal Mounted Canadian Police during which they deputized me as a "police agent" which enabled me to make recorded calls into Canada.  Indeed, shortly after I began cooperating, based on my immediate, quality cooperation, the various matters that I was engaged in were transformed from investigations into operations, thus enabling the government to access cash, to purchase securities, and to access other government services to assist in the work.   In fact, on August 20, 2012, Agent ██████████ called me and advised that he was writing a proposal to change the investigation to a "Group One Operation," in which he included a request for $1 million in funding and stated that what I wanted in return for my cooperation was not to be charged.

71. This entire time, my liberty has been substantially restricted as I have been subject to strict "private" bail conditions with the US Attorney's Office, my parents and I had to post a surety bond and confession of judgment, my travel was restricted, my lawfully possessed firearms were taken away, and I was required to do whatever the government instructed me to do.

72. I suffered significant stress during this time, I frequently had migraine headaches, I had to start taking medication for anti-anxiety, my marriage fell apart, my restaurant business collapsed, my other business ventures have suffered, and the burden of the legal expense.

73. The pubic outing of my arrest and cooperation has caused additional anxiety and strain, particularly the statements in local newspapers that I was a government cooperator and under investigation.

Dated:      Dade-Miami
            July 14, 2016

Sworn to before me this
 14  day of July, 2016

_____
        Notary Public

Johan Sandoval
Commission # GG008062
Expires: July 4, 2020
Bonded thru Aaron Notary

Guy Gentile

# EXHIBIT B

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

In the matter of

GUY GENTILE

Examination No.
20080137492

## WELLS SUBMISSION ON BEHALF OF
## GUY GENTILE

Adam Ford
Harris, O'Brien, St. Laurent &
Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(917) 512-6937
aford@harrisobrien.com

*Attorney for Guy Gentile*

# TABLE OF CONTENTS

**TABLES OF AUTHORITIES** ............................................................... ii

**INTRODUCTION** ............................................................................. 1

**PRELIMINARY STATEMEN**T .......................................................... 2

**FACTUAL BACKGROUND** ............................................................... 4

   **I.**   **U.S. residents are blocked from accessing SureTrader's website advertisements** ................. 6

   **II.**  **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons** ................................................................ 10

**LEGAL ARGUMENT** ....................................................................... 12

   **I.**   **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them** .................................... 12

   **II.**  **A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities** ........................................ 13

      A.  SureTrader's website does not solicit U.S. citizens or residents ................................ 16

        1.   *SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities*...…………16

     B. No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons. ............................................. 17

   **III.**  **Mr. Gentile did not aid and abet any violation** ....................................... 19

     A. There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith. ................................................................................... 19

   **IV.**  **A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns** .. 21

**CONCLUSION** ............................................................................... 23

# TABLES OF AUTHORITIES

**Cases**

*Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), ................................................ 22

*Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001) ........................... 22

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). ........................................ 10

*Fryar v. Abell*, 492 U.S. 914 (1989) ......................................................................................... 22

*Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)……………………………………….........22

*Securities and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ.
2575 ................................................................................................................................... 25, 26

**Statutes, Rules, and Other Authorities**

54 Fed. Reg. 30013, 30020 (July 18, 1989) .......................................................................... 15, 16

Exchange Act Rule 15a-6 ..................................................................................................... 4, 5, 6

FINRA Rule 2010 ........................................................................................................................ 4

FINRA Rule 2110 ........................................................................................................................ 4

Section 15 of the Securities and Exchange Act of 1934 ............................................................... 4

Arthur F. Mathews, Enforcement and Litigation under the Federal Securities Laws 1973. ........ 20

*Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017
(July 11, 1989) ........................................................................................................................ 15

*S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices*
(June 1, 1972) .......................................................................................................................... 20

*Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise
Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998) ......................... 14, 15, 21

**INTRODUCTION**

Guy Gentile is the founder and a director of Swiss America Securities, Ltd (d/b/a SureTrader), a foreign broker dealer.  On November 12, 2013, FINRA Enforcement Staff advised Mr. Gentile that it had made a preliminary determination to recommend a disciplinary action be brought against him for violating NASD Conduct Rule 2110 and FINRA Rule 2010, for aiding and abetting SureTrader in violating Section 15 of the Securities and Exchange Act of 1934.  The preliminary determination is premised on a finding that SureTrader engaged in securities transactions for or on behalf of U.S. persons without registering with the United States Securities Exchange Commission (the "Commission").  During a phone conference that same day, the Enforcement Staff acknowledged that unregistered foreign broker dealers may perform services on behalf of U.S. persons if they do not solicit the US customer.  However, the Enforcement Staff takes the position that the SureTrader website is a form of solicitation, which eliminates the statutory registration exemption.  While it has described the website as the "main issue," the Enforcement Staff has also concluded that a disciplinary action is appropriate because Mr. Gentile took part in other internet activities constituting improper solicitation, namely a single webcast with Timothy Sykes on February 8, 2013.  Because SureTrader is a Bahamian broker dealer not registered with FINRA, Enforcement Staff seeks to pursue a disciplinary action against Mr. Gentile on an aiding and abetting theory.  That is, the Enforcement Staff believes Mr. Gentile knew that SureTrader was violating Rule 15 by advertising itself on its website and taking part in the webcast, and intentionally rendered substantial assistance in the violation.

The Enforcement Staff's preliminary determinations are erroneous.  There is no basis for an action against Mr. Gentile, and none should be recommended.

## PRELIMINARY STATEMENT

Foreign broker dealers are permitted to engage in securities transactions for or on behalf of U.S. persons, so long as the foreign broker dealer does not affirmatively solicit the customer. Swiss America, through its Director and Chief Compliance Officer – not Mr. Gentile – followed the letter of the law and all available SEC guidance regarding soliciting U.S. persons, and took every reasonable step to comply with these rules and guidance.  Specifically, once Swiss America decided it would start accepting unsolicited United States investors as customers, the company's Chief Compliance Officer:

1. Set up an internal infrastructure that included strict policies and practices to prevent solicitation of U.S. customers;

2. Redesigned the SureTrader website to include a pop-up blocker that prohibits U.S. customers from accessing any substantive information contained in it;

3. Redesigned the website so that every page carries a bold, unambiguous warning that Swiss America is not intended for and does not service U.S. customers;

4. Drafted new account opening documents which preclude opening an account for any potential new customer who might be a U.S. person, unless the Chief Compliance Officer determines that person was not solicited by Swiss America in any way; and

5. Drafted and maintains new account opening documents that require all U.S. persons to truthfully confirm that they affirmatively reached out to Swiss America without Swiss America having done anything affirmative to solicit that customer.

These facts would be a complete defense to any allegation that Swiss America violated Rule 15 on the basis of it maintaining a website.

Nor can Mr. Gentile's appearance in the February 8, 2013 Timothy Sykes webcast be said to constitute an improper solicitation of US persons.  In keeping with Swiss America's strict non-solicitation policies outlined above, Mr. Gentile intended to, and did, solicit only non-U.S. persons during the course of that interview. Before starting the interview, Mr. Gentile was clear to Mr. Sykes that neither of them could say anything that could be misinterpreted as soliciting

U.S. persons.  And a review of the video proves this – everything both men said was directed specifically at non-U.S. persons.  Moreover, SureTrader took reasonable measures to ensure that it did not effect securities transactions with U.S. persons as a result of this de minimis Internet activity. Specifically, Swiss America blocks U.S. persons from accessing its website. Furthermore, Swiss America's internal policies permit a U.S. person to open an account only if the Chief Compliance Officer has determined that these customers initiated the transaction with SureTrader without solicitation.  The Sykes webcast, therefore does not eliminate SureTrader's exemption from registration, and there is no primary Rule 15 violation.

Here, of course, the question is not just whether Swiss America violated Rule 15a-6, but whether Mr. Gentile *intentionally* aided and abetted that violation.  While Enforcement Staff takes the position that a Rule 15 violation is a strict liability offense, aiding and abetting, of course, requires exacting proof of intent.  Given the extraordinary efforts Swiss America undertook to solicit only non-United States customers, to not solicit U.S. persons, to block US persons from accessing its website, to prevent opening an account for a U.S. persons if they were solicited in any manner, and Mr. Gentile's good faith belief that these policies and practices were squarely in line with Commission rules and guidance, it is inconceivable how FINRA can make out a claim that Swiss America violated this rule, let alone that Mr. Gentile *intentionally* aided and abetted in it.

Moreover, even if FINRA now determines that SureTrader's efforts were lacking, and therefore can be found to have violated Rule 15, Mr. Gentile had no prior notice of this new interpretation.  At the time, Mr. Gentile reasonably believed SureTrader was operating squarely within the bounds of the law.  And his belief regarding SureTrader's compliance was more than reasonable; the Enforcement Staff's position in this proposed disciplinary action is entirely

novel.   To our knowledge, FINRA has not brought a single case alleging a Rule 15 violation based on facts similar to those here.  The Enforcement Staff's preliminary determination that Mr. Gentile aided and abetted SureTrader is a *post hoc* interpretation of the relevant rules and formal SEC guidance, and attempts to penalize Mr. Gentile for conduct that he could not possibly have known would later be deemed a violation.  Any disciplinary action here would raise serious due process concerns. Further, disciplinary proceedings would undermine at least thirty years of the Commission's thoughtful public policy determination that offshore broker dealers may service a U.S. customer so long as the broker dealer takes no affirmative steps to solicit that customer. Bringing a disciplinary action against Mr. Gentile would accomplish the exact opposite of the SEC's stated public policy underpinning these regulations. Accordingly, Mr. Gentile respectfully requests that FINRA decline to pursue this matter any further.

## FACTUAL BACKGROUND

Swiss America is a Nassau, Bahamas-based broker dealer licensed by the Securities Commission of the Bahamas.  It is not registered with the SEC and is not a FINRA member. SureTrader is a division of Swiss America that provides on-line trading access for international equities traders.[1]  It is among the few (if not only) Bahamian broker dealers that offers its international customers the ability to trade securities.

Guy Gentile founded SureTrader in December 2011.  Mr. Gentile is a veteran securities trader and entrepreneur who prior to founding SureTrader had created several entities that are based on online trading, proprietary trading, high-speed algorithmic trading and financial trading technology.  In 1999, he founded Stock USA Execution Services, Inc., a United States registered

---

[1] There is no relevant distinction between the two entities.

broker dealer that provides trade execution and brokerage services to high-frequency, institutional, broker dealer and active-trading clients.  In 2009, he founded ProTrade Securities, LLC, a SEC registered broker-dealer and member of the CBSX Stock Exchange. Mr. Gentile has never been censured or barred by any regulatory agency.

Swiss America currently has 15 employees who report to SureTrader's Director and Chief Compliance Officer, Philip Dorsett, a nine-year veteran of the securities industry.  Mr. Dorsett received his Bachelor's degree from the University of South Florida and his Masters in Business Administration (MBA) in Finance from Nova Southeastern University.  He stays current with the regulatory environment and regularly attends compliance workshops and securities training institutes. SureTrader's decision to hire Mr. Dorsett as a CCO was covered in the Bahamian press and treated as a sign of SureTrader's impressive market presence in that country and around the world.  In addition to Mr. Dorset, SureTrader's management includes a certified public accountant, and each of 15 SureTrader employees has, at a minimum, a bachelor's degree.

SureTrader has, in a very short amount of time, established itself as one of the most well-respected and largest broker dealers in the Bahamas.  It is attractive to its international customers for a number of reasons.  SureTrader permits customers to open an account with a minimal initial investment, an opportunity that is premised on the firm's novel philosophy that it is possible to be a successful day trader with significantly less startup capital than typically suggested. Because the firm is in the Bahamas, and is regulated by the Bahamian Securities Commission, it is not subject to the same regulations as firms that are under the jurisdiction of Canada, the European Union and the United States.  Specifically, clients are not subject to the Commission's Pattern Day Trading Rule.  The firm also offers clients a 6:1 margin, which is significantly

greater than the Canadian 3:1 margin cap and the US 4:1 limit.  (Because of this increased leverage, however, the firm requires its clients to diversify, and hedge themselves.)  SureTrader also charges substantially less per trade than conventional online brokerages.  These attributes permit SureTrader to promote itself and to solicit non-U.S. persons to use it as their broker dealer, rather than an American, Canadian, or European broker dealer.  SureTrader.com directly compares itself to QuestTrade (a Canadian Broker Dealer) and Saxo (a European Broker).

Under Mr. Dorsett's watch, SureTrader markets its services only to the English-speaking market *outside of the United States.* The attached summary of SureTrader's Google AdWords campaigns shows that SureTrader is focused on the English-speaking investor populations in several countries, including Australia, the Bahamas, Canada, Germany, India, the Netherlands and the United Kingdom. A November 2013 screen shot of SureTrader's Google AdWords campaign is attached hereto as Exhibit A. Similarly, SureTrader's Facebook marketing campaign is targeted to several non-U.S. jurisdictions.  A November 2013 screen shot of SureTrader's Facebook advertising is attached hereto as Exhibit B.  Analytical data from Facebook suggests that SureTrader has achieved deepest market penetration in New Delhi, India. *See* screen shot of SureTrader's Facebook page, attached hereto as Exhibit C.  SureTrader does not market itself to U.S. persons through any print or electronic media, nor does it target the United States in any Google, Twitter, Facebook, or other social-media advertising platform.

I.   **U.S. residents are blocked from accessing SureTrader's website advertisements**

SureTrader takes its non-solicitation obligation under Rule 15a-6 seriously, and has taken every reasonable measure to ensure that it, and its employees, comply with the Rule.  Perhaps most significantly, it blocks potential U.S. investors from accessing its website, "www.suretrader.com" ("the SureTrader website").

When any individual's browser opens to the SureTrader website, the viewer is <u>not</u> taken to the SureTrader.com homepage, but is rather confronted by a "pop-up" blocker.  The pop-up has the effect of prohibiting access to any information that is on the website unless the viewer first affirms and agrees with the site's terms and conditions. This pop-up blocker states in relevant part:

> **\*\*Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Click continue below if you are a Non-US resident and you have read and understood SAS policy with regard to US customers and would like to continue.**

A copy of the full text of the "Terms and Conditions" contained in the pop-up blocker is attached hereto as Exhibit D.  Only individuals who accept this pop-up clickwrap agreement,[2] in which the individual affirms they are not a U.S. resident, are given access to information on the website.

This firm practice reflects a conservative approach to Rule 15a-6, as there is nothing in the Commission's guidance that suggests a foreign broker dealer must take affirmative steps to block U.S. persons from viewing its website.  There is no known, legitimate, technological manner to completely block U.S. residents from accessing a particular website. The pop up clickwrap agreement is an effective and reasonable mechanism for preventing U.S. residents from accessing the SureTrader site.  Indeed, other industries regularly utilize such agreements in order to insulate themselves from charges of inappropriate advertising.  For example, while there

---

[2] "A clickwrap agreement appears on an Internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the Internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). Courts have almost universally held such express clickwrap agreements to be enforceable. *Id.* at 235-39 (upholding clickwrap forum-selection clause).

is no law requiring alcohol manufacturers to block their websites from minors by using an age verification clickwrap agreement, practically every producer does so.[3] The practice is in accord with guidance from the Federal Trade Commission that such methods are a best practice for preventing minors from accessing a website. The FTC has noted that, unlike other advertising such as "television or print ads," web sites are different because "consumers must seek them out" and "their content *does not appear unsolicited*."[4]   Similarly, here SureTrader operated under the reasonable assumption that its clickwrap agreement would be as effective in preventing U.S. persons from accessing its website.

SureTrader anticipated that an individual who was confronted with the pop up blocker might lie about citizenship.  While Commission guidance is that foreign broker dealers will not be found to have solicited any U.S. Person that circumvents the reasonably designed measures, i.e., by falsely responding to residence questions, SureTrader nevertheless instituted additional safeguards.[5]  In addition to the pop up blocker, SureTrader designed its website so that *every* page on SureTrader.com displays the following message, in bold, conspicuous lettering:

---

[3] The three major alcohol manufacturer industry groups have adopted age verification as a best practice. *See* Beer Institute Advertising and Marketing Code at 4; Distilled Spirits Council of the United States, Guidance Note on Responsible Digital Marketing Communications at 1, available at www.discus.org/assets/1/7/DISCUS_Digital_Communications_Guidelines.pdf; Wine Institute, Guidance Note on Digital Marketing Communications at 1, available at www.wineinstitute.org/files/Digital_Marketing_Guidelines_FINAL.pdf (same).

[4] In 1999, the FTC identified, as a best practice, the "use of systems to limit access to [alcohol web] sites to users that state that they are over the age of 21." Federal Trade Commission, Alcohol Marketing and Advertising: A Report to Congress, at 16 (September 2003), available at www.ftc.gov/sites/default/files/documents/reports/alcohol-marketing-and-advertising-federal-trade-commission-report-congress-september-2003/alcohol08report.pdf).

[5] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516, at 6 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

> **Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Swiss America Securities, Ltd does not solicit U.S. resident clients.**

This disclaimer is positioned in the website such that it is impossible for anyone who is viewing the website to notice see it.  SureTrader decided to include this language on its website specifically because it is recommended by the United States Securities and Exchange Commission as a best practice for foreign broker dealers.

Further, the SureTrader website is designed so that the only way any individual can open an account with SureTrader is to fill out an online application that is only accessible through the website.  The application requires disclosure of personal information including, among other things, the applicant's financial background (including references), investment experience, and mailing address.  The purpose of requiring a mailing address is to enable SureTrader to determine whether a potential client is a U.S. resident.

If SureTrader becomes aware that the potential customer is a U.S. resident, i.e., by noticing a US address on the application, SureTrader policies, overseen by the company's Chief Compliance Officer, require an inquiry into whether that individual was solicited by SureTrader or whether the individual initiated contact with the company on their own accord.  One of the application forms required for U.S. residents who seek to open an account with Swiss America is an "Unsolicited Acknowledgement Agreement" ("the UAA").  The UAA includes the affirmation that "in no way did Swiss America Securities, Ltd solicit me to become a client. I initiated contact with Swiss America Securities, Ltd. on an unsolicited basis." UAA ¶ i. In this manner, Swiss America is able to track U.S. persons for whom it effects securities transactions to

ensure that these clients came to SureTrader on their own accord and were not solicited by any internet activity.

II.  **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons**

Timothy Sykes is a respected personality among securities traders who gained his reputation by having made his first million from using the thousand dollars he received for his bar mitzvah to trade securities. [6]  He now makes a living both trading for himself, and training his "students" (traders who pay Mr. Sykes for access to his various instructional content) how to make money in trading stocks.  He runs a website under the Timothyskyes.com domain name, which is where his students have access to his live webcasts, and other research materials.  Mr. Sykes has over 2,500 students in over 65 countries.[7]  Mr. Sykes is not an officer, director, employee, nor does he have any ownership interest in SureTrader (or Swiss America).

Having had a pre-existing relationship with Mr. Gentile, Mr. Sykes opened an account with SureTrader once the company started accepting US customers.[8]  Mr. Sykes found early success there and accordingly began touting it to his students.  He also signed up with the affiliate program, in which SureTrader clients are entitled to referral fees for referring *non-US clients* to SureTrader.

---

[6] Mr. Sykes has been described as "a voluble . . . hedge fund manager who made more than a million dollars off his bar mitzvah money" through online trading. Michael de la Merced, "Culturally, Hedge Funds Go Public," New York Times (December 8, 2006) (available at www.nytimes.com/2006/12/08/business/media/08hedge.html?_r=1&).

[7] TimothySykes.com, available at www.timothysykes.com/about/#.

[8] For the first few months SureTrader was open the company had a policy to not accept any U.S. persons as clients.  At that time, none of the non-solicitation policies discussed herein were in effect, as there was no need because of the general ban on providing services for U.S. persons.

Sykes signed the standard affiliate contract, which states in relevant part:

**IT IS SPECIFICIALLY STATED THAT ACCESS TO AND/OR ANY USE OF, THE WEBSITE AND/OR THE PRODUCT AND/OR ANY SERVICES PROVIDED BY SURETRADER BY ANY RESIDENT AND/OR CITIZEN OF THE UNITED STATES OF AMERICA IS PROHIBITED. YOU MUST ABIDE BY ALL RULES AND REQUIREMENTS SET FORTH IN THE TERMS AND CONDITIONS OF OUR WEBSITE WITH RESPECT TO LEGALITY AND ELIGIBILITY OF USERS OF THE PRODUCT.**

Accordingly, Mr. Sykes, like all other clients who have signed up for the affiliate program, is well aware of SureTrader's policies regarding U.S. persons.

In early February 2012, Mr. Sykes traveled to the Bahamas and visited SureTrader's offices, where he broadcasted a live-stream webcast on or about February 8.  During the filming of this webcast, Mr. Sykes invited Mr. Gentile to discuss SureTrader's business.  Importantly, Mr. Gentile agreed to be interviewed during the webcast only after: (1) inquiring with the Chief Compliance Officer whether this type of internet activity was permissible; (2) receiving approval from the CCO; (3) reminding Mr. Sykes that he could not say anything that could be construed as soliciting U.S. persons; and (4) receiving such assurance from Mr. Sykes. The interview lasted roughly twenty minutes, and during the entire question and answer period, Mr. Gentile was clear that he was only interested in soliciting non-U.S. persons and that SureTrader does not solicit U.S. persons.

Mr. Gentile did not originally believe that the video was being recorded and made available to the public on Mr. Sykes' website. However, as soon as he learned about it, he requested that Mr. Sykes embed the required non-solicitation language on the video's landing page.  This, combined with SureTrader's Website, which blocks US citizens from viewing it, satisfied SureTrader's Chief Compliance Officer – and Mr. Gentile – that SureTrader had taken sufficient precautionary measures reasonably designed to ensure that this internet activity did not

result in effecting securities transactions on behalf of U.S. persons.  Other than this single

webcast, Enforcement Staff has not brought any other questionable Internet activity to Mr.

Gentile's attention.

## LEGAL ARGUMENT

I.   **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them**

Foreign broker dealers are permitted to engage in securities transactions with or on behalf

of US persons without registering with the Securities and Exchange Commission so long as the

broker dealer did not solicit the U.S. customer.[9]  In adopting this exemption, the Commission

sought to avoid a regulatory scheme in which foreign broker-dealers "refuse to deal with U.S.

persons under any circumstances."[10]  Indeed, the Commission's policy since the late 1980s has

been to foster the ability of U.S. customers to benefit from the "increasing internationalization of

the securities marketplace," and the steadily increasing "desire of investors to trade in financial

markets around the world."[11]  The Commission was clear that the unsolicited trades exemption

of Rule 15a-6 should foster the ability of U.S. investors to seek out opportunities to utilize the

---

[9] *See* Exchange Act § 15(a)(2); Rule 15a-6; *Registration Requirements for Foreign Broker-dealers*, Exchange Act Release No. 27017 (July 11, 1989), 54 Fed. Reg. 30013, 30020 (July 18, 1989) ("Adopting Release").[9]

[10] The Adopting Release notes at 30017:

> Although the requirements of Section 15(a) do not distinguish between solicited and unsolicited transactions, the Commission does not believe, as a policy matter, that registration is necessary if U.S. investors have sought out foreign broker-dealers outside the United States and initiated transactions in foreign securities markets entirely of their own accord. In that event, U.S. investors would have taken the initiative to trade outside the United States with foreign broker-dealers that are not conducting activities within this country. Consequently, the U.S. investors would have little reason to expect these foreign broker-dealers to be subject to U.S. broker-dealer requirements. Moreover, requiring a foreign broker-dealer to register as a broker-dealer with the Commission because of unsolicited trades with U.S. persons could cause the foreign broker dealer to refuse to deal with U.S. persons under any circumstances.

[11] *Id.* at 30014.

services of foreign broker-dealers, and that foreign broker dealers should not believe they are prohibited from dealing with U.S. investors under any circumstances.

The Adopting Release did not attempt to fully define solicitation, preferring instead to leave the question to staff interpretation on a "case by case basis."[12] The Commission, however, did provide examples of conduct that would constitute solicitation: telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect transactions; advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United States or on any radio or television station whose broadcasting is directed into the United States; and conducting investment seminars for U.S. investors.[13]  In short, the Commission categorized "solicitation" as affirmative actions by a foreign broker dealer specifically directed at a U.S. person.

## II.   A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities

The only guidance issued by the Commission on the use of websites and the internet was issued in March 1998, at a time when the internet bore little resemblance to what it does today. Indeed, while it is hard to comprehend, Google did not exist in March 1998 and dial-up modems were the norm, greatly restricting the flow of information.  Searching the web was a slow and cumbersome process, with unreliable search engines and slow connection speeds.  Blogs had not yet come into widespread use, and video sharing was not available (YouTube is another eight years away).

Against this backdrop, the Commission issued guidance regarding how foreign broker dealers may (1) advertise on a website, and (2) engage in other "internet activities" without

---

[12] *Id.* at 30021.

[13] *Id.* at 30018.

running afoul of non-solicitation regulations.[14] The Commission "clarified" (without altering the fundamental registration requirements) that a foreign broker dealer's merely advertising on a website will not constitute solicitation of a US customer.  If a foreign broker dealer wishes to engage in other "Internet activities," besides advertising on a website, it must take "measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons. . ." who were exposed to the internet activities.

The Commission did not define the term "Internet activities," but since the Commission stated that it was only clarifying pre-existing rules without altering them, the Commission must have intended that the phrase "Internet activities" be interpreted in line with the examples of "solicitation" provided in the Adopting Release, i.e., direct solicitation such as phone calls to a U.S. person, targeted mailings, advertisements in papers of general circulation.  This is a reasonable interpretation of the 1998 Release, especially in light of the Commission's guidance that the registration exemptions should not be interpreted to, "preclude some of the most promising internet applications by investors, issuers, and financial service providers."[15]

For illustrative purposes, the Commission provided an example of one "reasonable measure" to protect against an accusation that any Internet activity was intended to solicit U.S. persons:

- Posting of a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and
- Refusing to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.[16]

---

[14] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

[15] The 1998 Release § III.A.

[16] *Id.* § III.B.

However, the Commission left individual Compliance officers to determine if better, alternative options exist.  Indeed, the Commission stressed that "[t]hese procedures are not exclusive" and that "[a]doption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities."[17]  Stated differently, while posting a prominent disclaimer on the website that contains promotional materials and refusing to provide services to any potential U.S. person is one way for foreign broker dealers to engage in Internet activity and avoid running afoul of the non-solicitation rules, these are not the only precautions foreign broker dealers can take to ensure that their Internet activities have not targeted U.S. persons and resulted in engaging in securities transactions for or on behalf of an investor that did not reach out to the broker dealer "on their own accord."

The Commission also instructed foreign broker dealers that have a website and intend to rely on Rule 15a-6's exemption that they should obtain "as a precaution reasonably designed to prevent [a finding of solicitation], affirmative representations from potential U.S. Customers that they deem unsolicited that those customers have not previously accessed their websites."  Or the broker-dealer could maintain records that are "sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its website."[18]

---

[17] *Id.*

[18] *Id*. § VII.A..

A.   _SureTrader's website does not solicit U.S. citizens or residents_

1.   _SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities._

Once SureTrader changed its policy to start accepting non-solicited U.S. persons as customers in early 2012, SureTrader's Compliance Officer reviewed all relevant Rules and Commission guidance.  While the Guidelines are outdated, internally contradictory, and unclear, SureTrader made a good faith effort to put into place firm policies aimed at conducting business squarely in line with U.S. non-solicitation laws.  By any objective measure, SureTrader went beyond what the most recent Commission guidance suggests as a best practice for avoiding solicitation of U.S.-based persons. [19]  While SureTrader did not (nor was it required to) refuse to effectuate securities transactions for any U.S. person under any circumstances, it followed the Commission's guidance by adopting other, "equally or more effective precautions" to avoid doing business with U.S. persons that accessed its website or its Internet activity.  Such measures included: (1) preventing U.S. persons from accessing its website, and (2) reminding all visitors on every page of its website that Swiss America Securities does not service U.S. resident clients.  These two design features of the SureTrader website negate any charge of improper solicitation.

But the company, following Commission guidance, has also maintained records that are sufficiently detailed and verifiable to reliably determine both that SureTrader's Internet activities did not result in effecting securities transactions with U.S. persons, and that none of its U.S. customers were solicited.  Every United States person that has opened an account with

---

[19] SureTrader's interpretation of the Commission's guidance regarding maintaining a website also finds support in a more well-developed area of law of _in personam_ jurisdiction. In determining whether a potential defendant's Internet activity has subjected him or her to a court's jurisdiction, federal courts employ a "sliding scale analysis" considering "the nature and quality of commercial activity that an entity conducts over the Internet."[19] Generally, personal jurisdiction does not extend to "defendants who simply post information on a web site that is accessible to residents of the forum state. Such 'passive' web sites do no more than make information available to those interested in it."

SureTrader has executed an Unsolicited Acknowledgement Agreement affirming that they "initiated contact with Swiss America Securities on an unsolicited basis." Swiss America maintains all of these records in the ordinary course of business.

      B.      <u>No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons.</u>

What constitutes an adequate measure to avoid targeting U.S. investors is obviously case specific. The Commission takes a totality of the circumstances approach in determining whether conduct was actually aimed at targeting at U.S. persons. As a result, regardless of what precautions a foreign broker dealer adopts to prevent U.S. persons from accessing its website or blocking direct communications, if the foreign broker dealer engages in conduct that makes it appear obvious that it is targeting U.S persons, the registrations exemptions will not be applicable. For example, the Commission has noted solicitations which emphasize an investor's ability to avoid U.S. incomes taxes on his investments is conduct that is obviously aimed at US citizens or residents, as they are the only individuals who would need to attempt to avoid U.S. income taxes.

Here, there is no content contained in either the website or as part of other Internet activities that is obviously aimed at U.S. persons. In fact, all of the language found in both the website and the Sykes webcast – the only internet activity Enforcement Staff brought to Mr. Gentile's attention – is clearly aimed at non-U.S. persons. Contrary to suggesting that U.S. persons could avoid income taxes by dealing with SureTrader, the account opening paperwork requires every U.S. person to acknowledge that he or she has " reporting obligations to the United States Government of income/loss, money transfers to an offshore brokerage firm, or ownership or control of a foreign entity" and that the customer has "independently sought

professional legal and tax advice before opening an account with Swiss America Securities Ltd."
SureTrader provides all U.S. clients with their tax information, including a breakdown of total
net profits per symbol, and a breakdown of all fees paid

During a November 12 phone conference with Enforcement Staff, counsel for Mr.
Gentile was informed that the language on SureTrader's website is clearly aimed at U.S. persons
because it references the Pattern Day Trading Rule, and U.S. margin limits.  But these types of
statements are not obviously targeted at U.S. persons, and certainly are not the type of statements
that the Commission referenced in its guidance as giving rise to an inference of solicitation.  In
fact, these statements are targeted at non-U.S. persons that SureTrader wants as clients, and are
intended to highlight to those foreign persons that SureTrader has a competitive advantage over
U.S. broker dealers who are subject to these restrictions.  The Enforcement Staff is simply wrong
to suggest that a foreign broker dealer targets U.S. persons by making any statement about
America, Americans, or American regulations.  By making such statements, SureTrader is
competing with U.S. broker dealers for English-speaking investors in non-US jurisdictions; it is
not targeting U.S. persons.

This point is equally applicable regarding the only Internet activity at issue, the Sykes
Webcast.  There is not a single statement on that webcast that is obviously targeting Americans.
And in fact, a review of the webcast bears this out.  Specifically:

1.  When asked about SureTrader's high wire transfer fees, Mr. Gentile responded
    that wires are more expensive because they are international, as "we're not
    dealing with US firms."
2.  When Gentile was asked if SureTrader can do an ACH transaction, he
    immediately responded "no, because those wire transfers only come from US
    banks, and SureTrader does not interact with US banks."
3.  When someone asked about SureTrader's Insurance Underwriter, Mr. Gentile
    recommended the individual visit the website, knowing that Americans are
    blocked from viewing the website.

4. When asked which countries' citizens are accepted as clients, Mr. Sykes responded that SureTrader accepts clients from the "United Kingdom, Australia, and Canada." Mr. Gentile responded that "the regulators tell us which countries are on the list of who we can't do business with and we follow the rules."

There are no statements about avoiding U.S. income tax or any other statement that can only be meant to target U.S. persons.

## III.   Mr. Gentile did not aid and abet any violation

A.   <u>There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith.</u>

Three elements are required to establish an aiding and abetting violation of federal securities laws: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation.[20] Individuals who are convicted of aiding and abetting securities violations are universally those who knowingly engaged in conduct that they knew to be wrong.

For the reasons discussed above, there can be no aiding and abetting liability on the part of Mr. Gentile. There is no violation of Rule 15a-6 by Swiss America, the primary party. But even if FINRA now, for the first time, takes the position that a pop-up blocker that blocks U.S. residents from viewing a foreign broker dealer's website, bold disclaimers on every page, and a non-solicitation policy that follows Commission guidance to a T is insufficient to demonstrate compliance with the unsolicited transaction registration exemption, Mr. Gentile certainly had no advance notice of that position. Neither FINRA, nor the Commission, nor any other regulatory

---

[20] *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), *vacated on other grounds sub nom Fryar v. Abell*, 492 U.S. 914 (1989); *Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001) (citing *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)).

body has ever advanced such a strict interpretation of Rule 15a-6(1). Therefore, even were the Commission to find an underlying violation, Mr. Gentile should still not be found to have intentionally aided and abetted it, as he had no prior notice of what the new interpretation of the rules would be. [21]

Furthermore, Mr. Gentile did not aid and abet a registration violation of the Exchange Act by participating in the Sykes webcast.  The webcast, as discussed fully above, was not aimed at US persons, but rather at Mr. Sykes' large non-U.S. audience. It was these individuals, all English speaking non-U.S. investors, who Mr. Gentile was soliciting.  And even if U.S. persons had access to the webcast (whether during its live taping or after being placed on the Sykes webpage) this conduct should not be found to be a solicitation of those persons because the website and the compliance policy provided a backstop that should have prevented any U.S. person who saw the webcast from believing that they were being solicited, or permitted to access the website or open an account with SureTrader.  Mr. Gentile reasonably believed that the website's design and language made clear that SureTrader was not soliciting U.S. persons and therefore anything he said on the webcast could not be considered a solicitation of U.S. investors.

Finally, the webcast was a one off event that occurred two months after SureTrader opened for business and that has never been repeated.  Importantly, other than this one Internet activity that Enforcement Staff has raised, there is not a single allegation of affirmative solicitation by SureTrader. Even if FINRA is not persuaded that the webcast was aimed at non-U.S. persons or that Mr. Gentile believed the website provided the appropriate backstop, it is

---

[21] *See S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices* at iv (June 1, 1972) ("Wells Report"), *reprinted in* Arthur F. Mathews, et al., Enforcement and Litigation under the Federal Securities Laws 1973, at 275 (Practicing Law Institute 1973) ("The Commission should give due consideration in cases which appear to involve [] good faith efforts at compliance to exercising its discretion against bringing a formal enforcement proceeding notwithstanding the appearance of a violation.").

questionable whether this is the type of disciplinary action that FINRA ought to bring.  There is

no pattern of trying to solicit U.S. investors.  There is no obvious and blatant solicitation of any

U.S. person.  There is no systematic attempt to evade Commission registration requirements.  A

webcast that occurred once, and which occurred in the context of a company with well-

established and well-documented non-solicitation policy, should not form the basis of any

disciplinary action against its founder on an aiding and abetting theory.

### IV.    A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns

To our knowledge, no federal court has interpreted the Commission's guidance in the

1998 Release on the "unsolicited transactions" exemption.  Indeed, FINRA has never before – so

far as we know – instituted a disciplinary action against an individual based on similar facts.

There is, however, one case currently pending before Judge Daniels of the United States District

Court for the Southern District of New York.  In that case, the SEC is claiming a foreign broker

dealer solicited U.S. persons by maintaining a website and servicing U.S. persons. *See Securities

and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ. 2575 (GBD)

(S.D.N.Y. filed Apr. 18, 2013).  The *Gibraltar* case involves allegations of significantly more

egregious conduct than the allegations here. While Judge Daniels has not yet ruled on the

defendants' motion for summary judgment, the oral argument on that motion on August 13,

2013, is illuminating for purposes of determining whether FINRA could ultimately be successful

in a disciplinary action against Mr. Gentile.

During that oral argument, a transcript of which is attached hereto as Exhibit F, Judge

Daniels posed two questions that he believes drive the analysis of whether a foreign broker

dealer's website constitutes an improper solicitation.  He asked of the defendants, "Who are you

soliciting through [your] website. And how does it exclude rather than include U.S. Investors."[22] Unlike SureTrader, the defendants in *Gibraltar* did not do anything to exclude U.S. persons from viewing its website – and takes the very reasonable position that it was not legally required to. Unlike Swiss America, Gibraltar did not use a click-wrap blocking agreement, did not have a disclaimer on its site that it did not service US-based persons, and did not maintain records demonstrating non-solicitation.[23] Moreover, Gibraltar's other Internet activity included conduct that was exactly what Commission guidance said was inappropriate. Specifically, Gibraltar promoted U.S. persons' ability to avoid U.S. taxes. Even under these facts, however, Judge Daniels indicated that *if* the case survived a motion to dismiss, the Complaint "quite frankly [] is clearly minimally sufficient," and that "this is one of the weaker set of allegations that one can make with regards to a solicitation claim…"[24]

Regardless of whether Judge Daniels grants summary or judgment, the *Gibraltar* proceedings strongly suggest that there can be no aiding and abetting liability on the part of Mr. Gentile here. If the only articulation by a federal judge on this issue is that a claim of solicitation based on merely having a website which does not block US persons or contain disclaimer language and services U.S. persons is "minimally sufficient" to make out a solicitation claim, we respectfully submit that where, as here, (1) the foreign broker dealer's website blocks U.S. persons, (2) contains disclaimer language on every page, (3) the broker dealer inquires of U.S.

---

[22] Exhibit F at 6.

[23] *Id*. Rather, the defendants argued that they were not required to exclude U.S. investors from viewing the site, nor were they required to post the disclaimer. The Gibraltar defendants instead argue that, as long as customers were not solicited *to* the website, there was no solicitation violation. The Commission disagrees with Gibraltar's position and argues that the solicitation violation was the advertising material on the website itself. The Commission also takes the position that solicitation to the website is not the violation. The Sykes webcast can only be interpreted to be a solicitation to the website, and according to the Commission such conduct is not a violation.

[24] *Id*. at 49-50.

persons whether they were solicited, and (4) maintains records establishing that the potential U.S. customer affirmatively sought out SureTrader, that SureTrader is operating well within the bounds of Rule 15a-6 and that Mr. Gentile was clearly acting in good faith.  And a single webcast, even if found to be directed at U.S. persons – which it was not – should not be found conduct sufficient to give rise to a disciplinary action given all of the other safeguards the foreign broker dealer put in place.

## CONCLUSION

FINRA's proposed disciplinary action against Mr. Gentile is unwarranted.  It represents an abrupt shift away from the Commission's long-term policy to permit foreign broker dealers to service U.S. customers whom they do not solicit and who reach out to the broker dealer "on their own accord." There is no precedent for a case against a broker dealer who has done what SureTrader has done to follow U.S. law and Commission guidance.   It is easy to see why the Commission brought charges against Gibraltar.  That firm was clearly soliciting U.S. persons and a review of the transcript in the Oral Argument demonstrates that they have no compelling response to the Judge's simple questions, *who were you soliciting and how did you exclude Americans*?  Mr. Gentile has easily answered these pivotal questions.  The *Gibraltar* case is the exact opposite of the case here.  Even if FINRA takes issue around the edges of how the non-solicitation program was run, there can be no serious debate that SureTrader tried, in good faith, to follow Commission guidance.  Respectfully, FINRA should not promulgate policy through the novel, post hoc interpretation of Commission rules.

For the foregoing reasons, we respectfully submit that FINRA disciplinary action against Mr. Gentile is unwarranted in this case.

If Enforcement Staff still believes that a disciplinary action against Mr. Gentile is appropriate after reviewing this Wells Submission and the Oral Argument Transcript, we respectfully request an in-person meeting with Enforcement Staff prior to submitting these materials for senior review.


DATED:        January 10, 2014

Respectfully submitted,

Adam Ford
Harris O'Brien, St. Laurent &
Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(917) 512-6937
aford@harrisobrien.com

*Attorney for Guy Gentile*

24

# EXHIBIT C

NPG 2010R01313

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| | : |
| | : Criminal No. 16- |
| v. | : |
| | : 18 U.S.C. § 371 |
| | : 15 U.S.C. §§ 78j(b) & 78ff |
| | : 17 C.F.R. § 240.10b-5 |
| | : 18 U.S.C. § 2 |
| GUY GENTILE | : |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

### COUNT ONE
#### (Conspiracy to Commit Securities Fraud)

#### Background

1. At times relevant to this Indictment:

*Relevant Entities and Individuals*

a. Defendant GUY GENTILE ("defendant GENTILE") was the founder and owner of a registered broker-dealer located in Carmel, New York. Defendant GENTILE was involved in the promotion of "penny" or "micro-cap" stocks, the stocks of publicly traded companies with low share prices that often traded on quotation services and marketplaces operated by OTC Markets Group Inc., such as the OTC Bulletin Board ("OTCBB"), OTC QB, OTC Pink, or Pink Sheets.

b.      Michael Taxon, a conspirator not named as a defendant herein, was a resident of Toronto, Ontario, Canada.  Taxon was a stockbroker in Canada in the 1990s, and from approximately 2005 through approximately 2009, he operated a stock promotion business in Canada that focused on penny stocks.

c.      Itamar Cohen, a conspirator not named as a defendant herein, was a resident of Toronto, Ontario, Canada, and a partner in Taxon's penny stock promotion business in Canada.

d.      Raven Gold Corporation ("RVNG") was a Nevada corporation headquartered in Vancouver and Penticton, British Columbia, Canada, and its common stock was a penny stock quoted on the OTCBB.  RVNG was controlled by two Canadian citizens (collectively the "RVNG Owners").

e.      Kentucky USA Energy, Inc. ("KYUS"), was a Delaware corporation headquartered in London, Kentucky, which purported to be engaged in shale gas exploration in western Kentucky.  KYUS common stock was a penny stock quoted on the OTCBB.  RVNG and KYUS are collectively referred to herein as the "Target Companies."

**Overview of the Scheme**

f.      From at least as early as April 2007 through in or about June 2008, defendant GENTILE and his conspirators engaged in an extensive "pump-and-dump" stock manipulation scheme involving the Target Companies, i.e., a scheme to fraudulently inflate the prices of shares of the

Target Companies in order to later sell those shares at artificially inflated prices.

g.      As part of the scheme, defendant GENTILE and his conspirators first obtained control over large blocks of the free-trading shares of the Target Companies.

h.      Next, defendant GENTILE and his conspirators "pumped" the price of those shares by, among other things, (i) engaging in manipulative trading of the stocks of the Target Companies, and (ii) disseminating misleading promotional materials touting the stocks and encouraging others to purchase them.

i.      After pumping the stocks, defendant GENTILE and his conspirators "dumped" the stocks; that is, they sold large volumes of the Target Companies' stock to victim-investors at artificially inflated prices.

j.      Following the dump phase, the Target Companies' stock prices dropped, causing victim-investors to suffer losses and generating approximately $17.2 million in gross trading proceeds for defendant GENTILE and his conspirators.

### The Conspiracy

2.      From at least as early as in or about April 2007 through in or about June 2008, in the District of New Jersey and elsewhere, the defendant,

GUY GENTILE,

knowingly and willfully conspired and agreed with others to commit an offense against the United States, to wit: securities fraud, contrary to Title 15, United

3

States Code, Sections 78j(b) and 78ff, and Title· 17, Code of Federal Regulations, Section 240.1 0b-5.

<u>Object of the Conspiracy</u>

3.      The object of the conspiracy was for defendant GENTILE and his conspirators to enrich themselves by engaging in a pump-and-dump scheme with the Target Companies.

<u>Manner and Means of the Conspiracy</u>

The RVNG Pump-and-Dump   Scheme

4.      It was part of the conspiracy that, in or about April 2007, the RVNG Owners recruited Taxon and Cohen to promote the stock of RVNG as part of a pump-and-dump scheme, and Taxon and Cohen in turn recruited defendant GENTILE to be part of that scheme.

5.      It was further part of the conspiracy that, between in or about May 2007 and in or about July 2007, the RVNG Owners caused approximately 10 million unrestricted RVNG shares to be delivered to brokerage accounts controlled by Taxon, Cohen, and defendant GENTILE.

6.      It was further part of the conspiracy that, upon receiving the RVNG shares, defendant GENTILE, Taxon, and Cohen engaged in manipulative trading, such as coordinated, cross, or match trades in which the conspirators were on both the "buy" and "sell" side of the same trades, to create the appearance of liquidity, market depth, and demand for RVNG.

7.      It was further part of the conspiracy that, in or around July 2007, to create demand for RVNG stock, defendant GENTILE and his conspirators

4

caused the wide dissemination of an eight-page, glossy promotional mailer (the "RVNG Mailer"), as well as other media advertisements, that had false and misleading information about RVNG, including that the stock had a "strong move upward" in "recent weeks" and a "remarkable uptrend" attributable to RVNG's strong business prospects, when in fact the stock's upward movement was attributable in part or even solely to the conspirators' manipulative trading.

8.      It was further part of the conspiracy that defendant GENTILE sold millions of shares of RVNG through wire transactions in interstate and foreign commerce at artificially inflated prices for profits of more than approximately $6 million.

The KYUS Pump-and-Dump  Scheme

9.      It was further part of the conspiracy that, following the successful RVNG pump-and-dump scheme, in or about October 2007, Ton  and Cohen wired approximately $300,000 to defendant GENTILE's bank accounts to be used to finance part of the fraudulent promotion of KYUS.

10.     It was further part of the conspiracy that, through a series of transfers in or about November 2007, defendant GENTILE acquired and controlled approximately 9 million unrestricted shares of KYUS.

11.     It was further part of the conspiracy that, after acquiring the KYUS shares, defendant GENTILE and his conspirators engaged in manipulative trading, including coordinated trades and "walking up the bid," where conspirators placed and then canceled multiple successively higher bids to

purchase the stock, using foreign and domestic accounts they controlled, to create the appearance of liquidity, market depth, and demand for KYUS.

12.    It was further part of the conspiracy that, in or around May 2008, to create demand for KYUS stock, defendant GENTILE and his conspirators caused the wide dissemination of a promotional mailer that had false and misleading information about KYUS.

13.    It was further part of the conspiracy that defendant GENTILE and his conspirators sold millions of shares of KYUS through wire transactions in interstate and foreign commerce at artificially inflated prices for profits of several million dollars.

## OVERT ACTS

14.    In furtherance of the conspiracy and to effect its unlawful objects, the follo'\\ring overt acts, among others, were committed in the District of New Jersey and elsewhere:

a.    On or about November 20, 2007, defendant GENTILE, through a server located in Carteret, New Jersey, placed a "sell" order for 1,500 KYUS shares at $.60 per share with a market maker, and thereafter placed a "buy" order for 1,500 KYUS shares at $.60 per share through the same market maker.

b.    On or about May 22, 2008, defendant GENTILE caused approximately $400,000 to be wired to Taxon for part of Taxon's share of the illegal proceeds in connection with the KYUS pump-and-dump scheme.

6

       c.      On or about May 27, 2008, defendant GENTILE caused $2.5 million of his illegal proceeds from the KYUS pun;ip-and-dump scheme to be wired to individuals at KYUS.

     All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Securities Fraud)

1.      The allegations set forth in paragraph 1 and paragraphs 3 through 14 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      Between in or about November 2007 and in or around May 2008, in the District of New Jersey, and elsewhere, the defendant,

**GUY GENTILE,**

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, did knowingly and willfully use manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchase and sales of securities by: (a) employing devices, schemes, and artifices to defraud members of the investing public; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon persons, in that he participated in a scheme to defraud the investing public by trading in the securities of Kentucky USA Energy, Inc., for the purpose of artificially inflating and manipulating the price and value of those securities.

8

In violation of Title 15, United States Code, Section 78j(b) and Section 78ff; Title 17, Code of Federal Regulations, Section 240. lOb-5; and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1.      As the result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One and Two of this Indictment, defendant GUY GENTILE shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said conspiracy and securities fraud offenses, and all property traceable thereto.

2.      If by any act or omission of the defendant, any of the property subject to forfeiture described above:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third party;

    c.      has been placed beyond the jurisdiction of the court;

    d.      has been substantially diminished in value; or

    e.      has been commingled with other property which cannot be subdivided without difficulty;

It is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

A TRUE BILL

_____
FOREPERSON

_____
a/#t
PAUL J. FIfHMAN
United St æes Attorney

10

CASE NUMBER: ___ _

## United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

### v.

### GUY GENTILE

# INDICTMENT FOR

18 U.S.C. § 371, 15 U.S.C. §§ 78J(b) and 78ff, and 17 C.F.R. § 240.l0b–5

**A True Bill,**

_____

**Foreperson**

**PAUL J. FISHMAN**
*UNITED STATES' ATTORNEY*
*NEWARK, NEW JERSEY*

NICHOLAS P. GRIPPO
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2915*

# EXHIBIT D

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**            :
                                                                           :
                                    **Plaintiff,**            :            **16 Civ.        (      )**
                                                                           :
                     **-against-**                                :            **COMPLAINT**
                                                                           :
**GUY GENTILE,**                                            :
                                                                           :
                                    **Defendant.**            :
-------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Guy Gentile ("Gentile") (who, upon information and belief, resides at 103 Bryant

Pond Road, Putnam Valley, New York, 10579), alleges:

**SUMMARY**

1.       This case involves two penny stock manipulation schemes perpetrated by Gentile.

The first scheme was perpetrated in 2007 and involved the stock of Raven Gold Corporation

("RVNG"), a purported gold and silver exploration company.  The second scheme was

perpetrated in 2007-2008 and involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a

company involved in natural gas production.  In addition to market manipulation and fraudulent

promotion, the schemes involved illegal unregistered offerings of the issuers' stocks, and,

together, generated over $17 million in illegal gross stock sale proceeds as well as substantial profits for the schemes' participants.

2.      In the RVNG scheme, two penny stock promoters from Toronto, Canada, Mike Taxon and Itamar Cohen ("Taxon" and "Cohen," respectively), were hired to promote RVNG stock by the persons who controlled the company in exchange for a controlling block of the company's purportedly unrestricted shares.  Taxon and Cohen then recruited Gentile, the owner of a broker-dealer based in upstate New York, to execute key aspects of the promotion in exchange for half of their newly-acquired RVNG shares.

3.      Gentile agreed to the arrangement, and manipulated the market for RVNG stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock.

4.      In addition, Gentile, together with the Taxon and Cohen, created and distributed a glossy promotional "newsletter" touting RVNG stock (the "RVNG Mailer").  The RVNG Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements or omissions about the promoters' identity, compensation, and control of the issuer's stock.

5.      Finally, to increase the appearance of active market demand for the stock, Gentile, Taxon and Cohen bribed friends and acquaintances to make open-market purchases of RVNG by handing out free blocks of RVNG stock to them.

6.      In the KYUS scheme, Gentile was recruited to promote the stock by the individuals who controlled the issuer, and then invited Taxon and Cohen to participate and help finance the scheme, in exchange for a share of the ultimate profits.  Gentile used his own funds and the funds provided by Taxon and Cohen to obtain control of a substantial block of the

company's purportedly unrestricted shares and used proceeds from the illegal unregistered sales of the stock to finance the promotion.

7.      As in the RVNG scheme, Gentile manipulated the market for KYUS stock by executing manipulative trades intended to create the false appearance of liquidity and market demand, by, among other things, executing matched trades between multiple accounts that he controlled.  Once again, Gentile, together with Taxon and Cohen, fabricated from whole cloth and distributed a fake promotional newsletter, the "KYUS Mailer."  Just like the RVNG Mailer, the KYUS Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements and omissions about the promoters' identity, compensation, and control of the issuer's stock.

8.      Because Gentile obtained RVNG and KYUS stock from the persons controlling the issuers, with a view to selling it to the public, Gentile was a statutory underwriter under the Securities Act of 1933 ("Securities Act"), and his unregistered sales of the stock violated the securities registration requirements of the Securities Act.

9.      In addition, by engaging in these schemes, Gentile violated the anti-touting and anti-fraud provisions of the Securities Act and violated or aided and abetted violations of the anti-fraud provisions of the Securities Exchange Act of 1934  ("Exchange Act").

### NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment: (a) permanently restraining and enjoining Gentile from engaging in the acts, practices and courses of business alleged herein; (b) requiring Gentile to disgorge his ill-gotten gains and to pay prejudgment interest thereon; (c) imposing

civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) permanently prohibiting Gentile from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## **JURISDICTION AND VENUE**

11.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey.  For example, Gentile sold unregistered RVNG and KYUS securities and executed manipulative trades in those securities, in part, through broker-dealers located in the District of New Jersey, and using trading systems operated through servers in the District of New Jersey.

13.     Gentile, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANT

14.   **Gentile**, age 39, resides in Putnam Valley, New York.  At the time of the conduct alleged herein, Gentile resided in Mahopac, New York.  Gentile is the founder and, at the time of the conduct alleged herein, was the owner of a Commission-registered broker-dealer located in Carmel, New York.  Over the years, Gentile has been the principal of multiple securities-related businesses in addition to his registered broker-dealer, including, most recently, a Bahamas-based online brokerage firm, which Gentile opened in 2011.

## ISSUERS

15.   **RVNG** was a Nevada corporation.  During the scheme alleged herein, RVNG's headquarters were in Vancouver and Penticton, British Columbia, and its common stock was quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

16.   **KYUS** was a Delaware corporation headquartered in London, Kentucky.  During the scheme alleged herein, KYUS represented that it was engaged in shale gas exploration in western Kentucky.  During the scheme alleged herein, its common stock was quoted on the OTCBB and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

## FACTS

I.   **THE RVNG SCHEME**

    A.   **RVNG's Corporate Background**

    17.    RVNG was incorporated in Nevada in or about February 2005, under the name Riverbank Resources, Inc.  In its public filings, the company claimed that it was in the business of mineral exploration.  In reality, however, the company was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies.

    18.    In April 2005, the company conducted two unregistered offerings of a total of 7.424 million shares of its common stock under Regulation S.  The individuals who received the stock in the offerings, including the company's purported officers and directors, were nominees of the attorney who had created the shell, and not true owners of the stock.

    19.    In or about July 2005, the company filed with the Commission a registration statement on Form SB-2, purporting to register the resale of 3.424 million shares held by individuals other than the company's purported officers and directors.  The registration statement became effective in or about September 2005.

    20.    Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the Riverbank Resources shell from the attorney who had created it.  Subsequently, to effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees, including, in 2007, Gentile, Taxon and Cohen.  These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer – first, the attorney who had created the shell and then the RVNG Owners – directed all the transfers.

21.     In or about August 2006, the company, now controlled by the RVNG Owners, changed its name to Raven Gold Corporation, carried out a 5:1 stock split, and announced a change in management.  In September 2006, the company announced that it had "decided to discontinue" mineral exploration at its British Columbia property.  In or about March 2007, RVNG carried out a 2:1 split of its common stock.

22.     As a result of the stock splits in 2006 and 2007, as well as additional restricted stock issuances directed by the RVNG Owners during this time period, during the stock manipulation scheme alleged below, RVNG had approximately 75 million shares of common stock issued and outstanding, of which approximately 34 million shares were traceable to the April 2005 Regulation S offerings and purportedly covered by the subsequent resale registration statement, the goal of which was to make the shares appear unrestricted.

23.     In or about March 2007, RVNG common stock began trading on the OTCBB under its new symbol, "RVNG."

24.     During the stock manipulation scheme alleged below, the RVNG Owners had complete control of RVNG and its management.

**B.     The RVNG Stock Promotion Deal**

25.     In early 2007, the RVNG Owners met Taxon and Cohen through a common acquaintance and proposed that Taxon and Cohen promote RVNG stock.  Taxon and Cohen then reached out to Gentile and invited him to participate in the "deal."

26.     In the course of the following few weeks, the RVNG Owners agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign consisting of a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock.  In

turn, Taxon and Cohen agreed that Gentile would help them execute the key aspects of the promotion, including the advertising campaign and the manipulative trading, in exchange for a portion of Taxon and Cohen's cut of the stock.  Gentile, Taxon, and Cohen also agreed that they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign.

27.     To put these plans in motion, between mid-May and mid-June 2007, the RVNG Owners directed transfers of eighty percent of RVNG's purportedly unrestricted stock (approximately twenty-seven million shares) to accounts controlled by Gentile, Taxon and Cohen.  Of that amount, approximately twenty million shares, represented Gentile's and Taxon and Cohen's compensation, and the remaining, approximately seven million shares, was parked in an offshore account under Taxon's control for the duration of the promotion – a term that Taxon and Cohen negotiated with the RVNG Owners, to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind Gentile, Taxon and Cohen's backs, and thus undermine Gentile, Taxon, and Cohen's efforts to drive up the stock price and sell shares at a high price.

28.     To obscure their connection to and control of the majority of the purportedly unrestricted RVNG stock, Gentile, Taxon, and Cohen did not deposit their RVNG stock in U.S.-based accounts held in their own names.  Instead, the share blocks were deposited in U.S. brokerage accounts held in the names of several offshore brokerage firms where Gentile, Taxon and Cohen had or controlled accounts.

C.      **Manipulative Trading and Fraudulent Promotion of RVNG Stock**

29.      On receiving their blocks of RVNG shares, Gentile, Taxon and Cohen embarked on a promotional campaign for the stock, which consisted of manipulative trading, a promotional mailer, and advertisements placed in multiple news publications.  The RVNG Owners, for their part, supported the promotion by ensuring a steady stream of positive company press releases.

1.      **Manipulative Trading and Kick-Backs**

30.      In June and July 2007, Gentile and Taxon directed manipulative trades in RVNG stock.  Their RVNG stock trading in June and July 2007 was intended to achieve two primary goals.  First, Gentile and Taxon sold RVNG stock to generate cash to fund the promotional mailing and advertising that would follow in July 2007.  Second, Gentile and Taxon traded RVNG stock between their various accounts in order to create the false appearance of liquidity and active interest in the stock – in substance, an attractive (but fake) price and volume history for investors who would be researching the stock after seeing the upcoming promotional mailer or advertisements.

31.      To amplify the false appearance of increased liquidity and market interest in the stock, Gentile, Taxon and Cohen reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock.  Some of those offers were accepted.  For example, on or about July 19, 2007 and August 20, 2007, Taxon and Cohen transferred blocks of 5,000 and 25,000 RVNG shares, respectively, from one of their offshore accounts to the accounts of one of Gentile's acquaintances.  That acquaintance bought approximately 101,500 shares of RVNG in the open market in June and July of 2007, and sold all of his RVNG shares – those received as a kick-back

and those bought in the open market – by early September of 2007, making a profit of approximately $25,600.

## 2. The RVNG Mailer and Media Advertisements

32.     The centerpiece of the RVNG promotion was the RVNG Mailer – an eight-page glossy "newsletter" touting RVNG stock that Gentile, Taxon, and Cohen distributed in mid-July 2007 under a fake entity name, "Stock Trend Report."

33.     The RVNG Mailer contained multiple materially false or misleading statements, as Gentile, one of its authors, knew or was reckless in not knowing.  For example, the mailer was purportedly published by an entity named "Stock Trend Report" and claimed to be a July 2007 "Special Edition of Premium Members."  In reality, Stock Trend Report was an entirely fictional name created specifically for the RVNG campaign, with no prior or subsequent "editions."

34.     Additionally, the RVNG Mailer's cover page claimed that RVNG stock had been "seen on" CNBC, Bloomberg, in the Wall Street Journal, the New York Times, and in other respected news publications, creating the impression that the stock had been a subject of reporting in those publications.  In reality, the stock had only been "seen" in those publications in paid advertisements placed by Gentile, Taxon and Cohen.

35.     These misstatements were material because they lent the RVNG Mailer an aura of legitimacy and reliability, and helped conceal the fact that it was an advertisement placed on behalf of and in coordination with the RVNG Owners.

36.     The RVNG Mailer also touted the stock's "strong move upward" in "recent weeks," which the RVNG Mailer attributed to the company's strong business prospects.  A chart covering the time period from early May to mid-June of 2007 purportedly showed the stock's "remarkable uptrend so far."  These statements were materially misleading.  The RVNG Mailer

10

failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Gentile, Taxon, and those acting in concert with them, which were executed for the very purpose of creating an attractive price and volume history for the stock, not because of legitimate, independent market interest.

37.    The RVNG Mailer's last page contained a warning:  "Please note:  Due to high market demand for RVNG by institutional investors, some brokers may require you to phone in your order."  This statement was materially false:  No "high market demand for RVNG by institutional investors" existed.

38.    The RVNG Mailer contained a fine-print disclaimer that purported to disclose the compensation received by the mailer's publisher and the publisher's motivations and intentions with respect to the stock.  The disclaimer was itself materially false and misleading.

39.    For example, the disclaimer continued to attribute the RVNG Mailer to "Stock Trend Report," a nonexistent entity.

40.    The disclaimer also stated that the company, RVNG, had "not approved the statements made in this opinion."  In reality, the RVNG Owners, who controlled the company and its management, had seen drafts of the mailer and had signed off on its content.

41.    On the subject of compensation, share ownership, and intent to sell with respect to RVNG stock, the disclaimer stated that Stock Trend Report (called "STR" in the disclaimer) "has been compensated by third party shareholders or with cash from the company on behalf of one or more of the companies mentioned in this opinion . . . for dissemination of this advertisement and other professional services. … STR's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value."

42.     These statements were materially false or misleading, as Gentile knew or was reckless in not knowing.  Stock Trend Report was a nonexistent, fictional enterprise.  Moreover, the compensation that Gentile, Taxon and Cohen had received for the "dissemination of this advertisement" and other promotional efforts, including the manipulative trading, consisted of sixty percent of RVNG's purportedly unrestricted stock – and the mailer itself was financed with the proceeds from the sale of that stock.  The disclaimer that Stock Trend Report "may have bought" or "may buy" RVNG shares was also misleading, as most of Gentile, Taxon and Cohen's shares had been received at no cost and had already been partially liquidated to finance the promotional campaign.

43.     In July 2007, Gentile, Taxon and Cohen also placed paid advertisements for RVNG in multiple major publications.  The advertisements were, in substance, condensed versions of the RVNG Mailer and contained many of the same materially false or misleading statements, including the attribution of the advertisements to the nonexistent Stock Trend Report, the misleading touting of the stock's recent performance, and a disclaimer identical to that in the RVNG Mailer.

44.     Gentile closely collaborated with Taxon and Cohen in the creation and distribution of the RVNG Mailer and the RVNG advertising materials.  Gentile knew or was reckless in not knowing that the RVNG Mailer and the advertisements contained the materially false or misleading statements as alleged above.

3.     **Press Releases**

45.     It was understood among the RVNG Owners and Taxon and Cohen that, for the RVNG stock promotion campaign to succeed, the issuer should disclose a string of "positive

events" during the promotion.  Thus, throughout June and July 2007, the RVNG Owners

supported the stock promotion campaign with a steady stream of RVNG press releases.

46.     RVNG issued a total of thirteen press releases during this time period:  five in

June and eight in July.  Of those thirteen releases, five announced purported arrivals of new

officers and directors, and the remaining eight vaguely touted purported developments in

RVNG's exploration business, such as plans to "commence general exploration at La Currita,

Mexico, within the next 21 days," the commissioning of a "detailed 'Phase 1 Exploration

Program' at La Currita," receipt of certain initial sample results, and discovery of a "New

Parallel Mineralized Vein Structure."  The RVNG Owners, Gentile, Taxon and Cohen

coordinated the timing and number of these press releases, and the press releases were intended

to and did support the ongoing market manipulation scheme conducted by Gentile, Taxon and

Cohen.

47.     By taking the steps described above, Gentile, Taxon and Cohen successfully

manipulated the market for RVNG stock.  Until May 31, 2007, RVNG traded at prices not

exceeding $0.80 per share and with minimal volume, with no trading occurring on many days.

Starting on May 31, 2007, the daily price and especially the daily volume went up dramatically –

only to decline as soon as the promotion was complete.  The summary chart below demonstrates

the dramatic manipulative effect of the promotion on the market for RVNG stock.

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07* | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

*Starting after 2:1 stock split and receipt of new symbol RVNG.OB.*

48.    Because Gentile, Taxon and Cohen obtained RVNG stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.  Yet no registration statement was filed or in effect with respect to their sales of RVNG stock.

49.    The selling of unregistered RVNG stock by Gentile, Taxon and Cohen generated an estimated five million dollars in gross proceeds.

## II.    THE KYUS SCHEME

### A.    KYUS Corporate Background

50.    KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas").  In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims."  In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

51.    In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000.  The registration statement became effective in or about June 2007.  The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers.  These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

52.    After the purported public offering, the company had three million common shares issued and outstanding:  two million restricted shares, previously issued to Las Rocas' sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

53.    On or about October 15, 2007, as alleged in greater detail below, Adam S. Gottbetter, a New York microcap lawyer ("Gottbetter"), arranged the purchase of the Las Rocas shell from the KYUS Shell Sellers for $760,000 contributed by Gentile, Taxon, Cohen, and Gottbetter's business partner in the KYUS deal ("Gottbetter's Partner").

54.     Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("KYUS Privco"); the merger ultimately closed on May 2, 2008.

55.     In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding:  24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by Gentile (together with Taxon and Cohen), Gottbetter, and Gottbetter's Partner.

56.     On or about November 20, 2007, the KYUS common stock began trading on the OTCBB under its new symbol, "KYUS."

**B.      The KYUS Stock Promotion Deal**

57.     In the summer of 2007, Gottbetter and Gottbetter's Partner became acquainted with Gentile and invited him to participate in the KYUS "deal."  Over the course of multiple meetings and conversations, it was agreed that Gentile, working with his partners (Taxon and Cohen), would (1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market.  It was further agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for Gentile to obtain control of a substantial block of purportedly unrestricted KYUS stock.

58.     Gentile, in turn, invited Taxon and Cohen to participate in the "deal."  Unlike the RVNG Owners, who provided unrestricted RVNG stock to Gentile, Taxon and Cohen at no cost, Gottbetter insisted that Gentile and his partners purchase KYUS stock in private transactions for $604,000.  Taxon and Cohen agreed to split this upfront cost with Gentile and transferred $300,000 to Gentile for use in the deal.  Gentile then transferred Taxon and Cohen's $300,000 and an additional $304,000 from his own offshore accounts to Gottbetter as payment for seventy-five percent of KYUS's purportedly unrestricted common shares.   The remaining twenty-five percent of the purportedly unrestricted shares were transferred to Gottbetter and Gottbetter's Partner.

59.     As in the RVNG scheme, in the KYUS scheme, Gentile, Taxon and Cohen's allocation of the purportedly unrestricted KYUS stock was directed to accounts in the names of nominee entities ("Nominee Entities"), rather than to accounts held in their own names.  By depositing their shares in the Nominee Entities' accounts – in this case, accounts of three offshore and one domestic brokerage firms – Gentile, Taxon and Cohen obscured their connection to the stock and the upcoming market manipulation.

**C.     <u>Manipulative Trading and Fraudulent Promotion of KYUS Stock</u>**

60.     Similar to the RVNG promotion, the KYUS promotion had two components: manipulative trading, which began in November 2007, and a promotional mailer, which Gentile created and distributed in May 2008, shortly after the merger of the KYUS shell with KYUS Privco.

61.     Immediately after receiving their KYUS shares into the Nominee Entities' accounts in late 2007, Gentile, Taxon and Cohen began "building the chart" for KYUS stock, in preparation for the distribution of the promotional mailer and the ultimate sell-off that they

executed in May 2008, once the promotion worked to inflate the stock's price.  Gentile, Taxon

and Cohen controlled seventy-five percent of the public float, and on many days between late

2007 and May 2008, most and sometimes even all of the market activity in the stock was

generated by accounts that they controlled.

62.     Among other things, Gentile executed matched trades between the Nominee

Entities' accounts and accounts in the names of Gentile's friends and family members that

Gentile controlled.  Gentile also asked some of his acquaintances among penny stock traders to

buy KYUS stock in the open market (in substance, from Gentile), based on the understanding

that Gentile would be promoting the stock and would give his "buyers" a heads-up about the

upcoming promotion, enabling them to sell the stock at a high price.  At least two of Gentile's

acquaintances agreed and purchased KYUS stock in the open market in advance of the

promotion, and then sold it during the promotion at a profit.

63.     The matched trades and the efforts to "bring in buyers" described above had the

same twin goals.  First, KYUS stock sales generated the cash that Gentile would later use to fund

the KYUS promotional mailing.  Second, through these actions, Gentile was delivering on his

promise to "build the chart" for the KYUS stock, by creating the false appearance of broad

market demand and gradually inflating the price.

64.     In or about May 2008, shortly after the KYUS merger closed, Gentile distributed

by mail a glossy promotional mailer touting KYUS.  The promotional mailer took the form of an

eight-page "newsletter" distributed under the fake name Global Investor Watch.  The mailer

touted KYUS stock's seemingly attractive – but contrived – recent stock price history and

claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called

Green Century Capital.  In fact, Gentile funded the KYUS Mailer with proceeds from selling his, Taxon and Cohen's allotments of KYUS stock.

65.     Gentile took the lead role in creating and distributing the KYUS Mailer, and he knew or was reckless in not knowing that the KYUS Mailer contained materially false or misleading statements, including false attribution, as alleged above.

66.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the stock price rose from $0.69 per share to $1.70 per share.  Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008.  The volume also increased dramatically.  While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

67.     By the end of May 2008, Gentile, Taxon and Cohen had sold millions of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for estimated gross proceeds of approximately $10 million.  They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter.

68.     Gottbetter and Gottbetter's Partner, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter.  Gottbetter continued selling KYUS stock through November 2010, and Gottbetter's Partner continued selling KYUS stock at least through November 2009.  Gottbetter and Gottbetter's Partner sold their KYUS stock holdings in whole or in part through offshore accounts.  Gentile had access to and ability to

execute trades in at least one of those accounts, and he assisted in the execution of some of these subsequent sales of KYUS stock.

69.     Because Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.

70.     No registration statement was filed or in effect with respect to the KYUS stock sales of Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner.

**FIRST CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**

71.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

72.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

73.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(b) of the Securities Act**

74.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

75.     By virtue of the foregoing, Gentile, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspaper articles, letters, investment services, or communications which described securities for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

76.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

**THIRD CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

77.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

78.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) with scienter, employed devices, schemes, or artifices to defraud;  (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

79.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

80.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

81.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

82.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Thereunder

83.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

84.     By virtue of the foregoing, Gentile, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to

engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

85.     By virtue of the foregoing, Gentile aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently restraining and enjoining Gentile, his agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), 17(a) and 17(b) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77q(b), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## II.

Ordering Gentile to disgorge his ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

## III.

Ordering Gentile to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Permanently prohibiting Gentile from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the

Exchange Act, 15 U.S.C. § 78u(d)(6).

## V.

Granting such other and further relief as this Court deems just and appropriate.

Dated: *March 23*, 2016
New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against Defendant Gentile in the foregoing Complaint is not the subject of any other civil action against Gentile pending in any court, or of any pending arbitration or administrative proceeding.

A related civil case involving the Commission's claims against Adam S. Gottbetter arising out of the KYUS scheme (SEC v. Gottbetter, et al., 15-CV-3528 (JLL)) was filed in this Court in 2015 but is now closed.

A related civil case involving the Commission's claims against Mike Taxon and Itamar Cohen arising out of the RVNG and KYUS schemes (SEC v. Taxon, et al.; 15-CV-3587 (JLL)) is pending before the Court and is currently stayed pending the resolution of the parallel criminal cases (United States v. Taxon, 15-CR- 0249 (JLL), and United States v. Cohen, 15-CR-0248 (JLL)), which are also pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By:

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

**DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)**

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

> Chief, Civil Division
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Ste. 700
> Newark, New Jersey 07102

SECURITIES AND EXCHANGE COMMISSION

By: _____

> Andrew M. Calamari
> Regional Director
> SECURITIES AND EXCHANGE COMMISSION
> Brookfield Place, 200 Vesey Street
> New York, New York 10281-1022
> (212) 336-1023 (Brown)
> Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

# EXHIBIT E



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
BROOKFIELD PLACE, 200 VESEY STREET
Suite 400
NEW YORK, NEW YORK 10281-1022

Nancy A. Brown
(212) 336-1023
brownn@sec.gov

April 26, 2017

**By ECF**

Hon. Joseph A. Dickson
United States Magistrate Judge
District of New Jersey
Martin Luther King, Jr. Federal Building
    and Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re:    <u>SEC v. Gentile; 16 Civ. 1619 (JLL)(JAD)</u>

Dear Judge Dickson:

We represent the Plaintiff, Securities and Exchange Commission, in the above-captioned civil action. As directed by the Court at our April 12, 2017 conference, we write to provide a status update on the parallel criminal case (<u>United States v. Gentile</u>, 16 Cr. 155 (JLL) ("Criminal Case")) and to set forth the reasons for our opposition to continuing the stay of this matter.

The appeal of the United States Attorney's Office ("USAO") of Judge Linares' January 30, 2017 dismissal of the indictment remains pending. Although the USAO recently filed information due in the Court of Appeals, those filings continue to indicate that the Government has not yet determined whether it will pursue an appeal of the dismissal. (Appeal Docket No. 17-1468, Criminal Appeal Information Statement, at 2 ("Tentatively appealing a dismissal of the indictment").) The pendency of this appeal, however, does not in any way justify the further stay of this matter, since the Criminal Case remains dismissed, and there is no indictment pending against Gentile.

<u>Background</u>

The Commission filed its case on the same day, March 23, 2016, as the indictment was unsealed in the Criminal Case. The Commission's Complaint alleges that Defendant Gentile, with others, perpetrated two lucrative penny stock manipulation and unregistered public distribution schemes, employing, among other devices, manipulative matched trades, kick-backs, and fraudulent stock touting. The Complaint charges Gentile with violations of the anti-fraud, anti-touting, and securities registration requirements of the federal securities laws and seeks injunctions against future violations, disgorgement of ill-gotten gains with interest, penalties, and a bar against future participation in penny stock offerings. (DE 1.)

At the request of Defendant, the Commission consented to the entry of an Order staying the civil case pending resolution of the Criminal Case. (DE 8 (the "Stay").)[1] By its terms, the Stay was to run through a "judgment" in the Criminal Case. Thus, when the Court dismissed the indictment in the Criminal Case on January 30, 2017, the Defendant acknowledged that the Stay was no longer operative. (DE 12 (Gentile Letter to the Court, dated March 9, 2016 [sic], at 1).) However, Defendant now argues that the Stay should be re-imposed because the USAO has filed a notice of appeal from the dismissal of the indictment. (Id.) Because the Commission will suffer prejudice, it no longer consents to a stay of these proceedings, and the Court should allow discovery to commence and set a date by which Defendant should file his answer.

Standards for Ordering a Stay of a Civil Case

Courts in this District apply a six-factor test in considering a motion to stay a civil proceeding pending the resolution of a criminal prosecution: "1) the extent to which the issues in the criminal and civil cases overlap; 2) the status of the case, including whether the defendants have been indicted; 3) the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay; 4) the private interests of and burden on defendants; 5) the interests of the court; and 6) the public interest." Walsh Secs., Inc. v. Cristo Prop. Mgmt., Ltd. 7 F. Supp. 2d 523, 526-27 (D.N.J. 1998).[2]

In applying those factors, courts are mindful that a "stay of a civil case is an extraordinary remedy." Strategic Envtl. Partners, LLC v. NJ Dep't of Envtl. Protection, No. 12 Civ. 3252, 2016 WL 3267285, at *2 (D.N.J. June 8, 2016) (quotations omitted). This is particularly so, where, as here, no indictment is pending, and the resolution of any criminal proceeding that might someday be filed is indeterminate. Cress v. City of Ventnor, No. 08 Civ. 1873, 2009 WL 750193, at *2 (D.N.J. March 18, 2009) ("Unlike when an indictment has been returned, here there is less certainty that [Defendant's] criminal trial will begin shortly. Thus, a stay would be indefinite, prejudicing Plaintiffs."); see also Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc., 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001) (denying stay to pre-indictment defendant, noting that post-indictment, the prejudice to plaintiff of a stay is minimized by the Speedy Trial Act which ensures that the criminal action will produce "a reasonably speedy resolution").

The status of this case is, in all relevant respects, analogous to the pre-indictment situation, in which no speedy resolution of the criminal case can be assured. The indictment against Gentile has been dismissed, and the USAO has not even determined whether to pursue its appeal. (See Criminal Case DE 34 (noting that the notice of appeal was filed "protectively" to permit the Solicitor General "sufficient time to determine whether to pursue an appeal") and Appeal Docket No. 17-1468, Criminal Appeal Information Statement, at 2 ("Tentatively appealing a dismissal of the indictment").) But even if the USAO were to pursue the appeal, no speedy resolution of the criminal charges is assured. A victory on appeal for the Government would simply return the Criminal Case to the District Court, where litigation concerning Gentile's claims of violations of his

---

[1]     The USAO has not moved at any time to intervene and to stay these proceedings.

[2]     There is no dispute that the issues in this case and the dismissed indictment in the Criminal Case overlap.

speedy trial and due process rights – raised but not determined by the earlier proceedings – would precede any trial of the merits. (See Criminal Case DE 14 (Gentile's "Motion to Dismiss the Indictment Based on Violations of the Statute of Limitations, His Right to a Speedy Trial, and His Right to Due Process").) Thus, at best, the delay faced by the Commission here promises to be lengthy and of unknown duration.

The uncertain status of the Criminal Case also means that a further stay of this matter will not promote the Court's interest in judicial efficiency. Cress, 2009 WL 750193, at *3. Because there is no basis to believe that the dismissed Criminal Case will soon, if at all, be adjudicated on the merits, there is no reason to expect that the collateral estoppel effect of a criminal judgment will streamline the matters to be proved in this case.

Also not implicated here is any real, cognizable impact on Gentile's Fifth Amendment rights. Courts are more likely to grant a stay where an indictment has been returned because of the Fifth Amendment dilemma posed where a defendant faces an ongoing criminal proceeding. Walsh Secs., Inc., 7 F. Supp. 2d at 527. In those circumstances, if the defendant asserts his Fifth Amendment rights to avoid self-incrimination, he might be subjected to an adverse inference in the civil action, creating the quandary of choosing between waiving his Fifth Amendment rights and effectively forfeiting the civil case. State Farm Mut. Auto. Ins. Co. v. Beckham-Easley, No. 01 Civ. 5530, 2002 WL 31111766, at *3 (E.D. Pa. Sept. 18, 2002). But it is not unconstitutional to force a defendant to make that choice, Baxter v. Palmigiano, 425 U.S. 308, 318-19 (1976), and where no indictment has been returned, the dangers of self-incrimination are "at least somewhat more remote." Sterling Nat'l Bank, 175 F. Supp. 2d at 577. "Where civil defendants are not subject to criminal charges, therefore, the 'inappropriateness of a stay is manifest.'" State Farm, 2002 WL 31111766, at *3 (quotations omitted); accord De'Omilia Plastic Surgery, PC v. Sweeton, No. 12 Civ. 6415, 2013 WL 6070037, at *3 (D.N.J. Nov. 18, 2013) (defendant's fear that she might be indicted by other jurisdictions did not justify a stay of civil case, holding "courts generally deny *pre* indictment requests for a stay") (emphasis in original); Citibank, NA v. Super Sayin' Publishing, LLC, 86 F. Supp. 3d 244, 249 (S.D.N.Y. 2015).

Moreover, Gentile himself has shown little concern about protecting his Fifth Amendment rights. He has voluntarily sat for lengthy interviews with at least one reporter about his involvement in the matters that led to this case. See Zeke Faux, BloombergBusinessweek, "'Bro, I'm Going Rogue': The Wall Street Informant Who Double-Crossed the FBI," available at https://www.bloomberg.com/news/features/2017-03-23/-bro-i-m-going-rogue-the-wall-street-informant-who-double-crossed-the-fbi. And, according to the USAO, Gentile long ago admitted his guilt for the conduct alleged in this case when he agreed to cooperate with the Government after his arrest in 2012. (Criminal Case, DE 19 (Memorandum of Law in Opposition to Defendant Guy Gentile's Motion to Dismiss the Indictment, Sept. 23, 2016, at 5).)[3] Thus, Gentile's Fifth Amendment rights are not threatened by the SEC case proceeding now.

---

[3] Two of Gentile's confederates in both schemes alleged here have already pled guilty in this Court to their conduct. See United States v. Cohen, 15 Cr. 248 (JLL) (D.N.J.) (DE 3) and United States v. Taxon, 15 Cr. 249 (JLL) (D.N.J.) (DE 3).

In contrast, the prejudice to the Commission from an indefinite and complete stay is real and present. Among the relief sought here is an injunction against future violations of the antifraud provisions of the federal securities laws.[4] By his own admission, Gentile continues to make his living in the securities industry, operating an on-line Bahamian broker-dealer, SureTrader, and retaining his "affiliation" with a US broker-dealer, Stock USA Investments, Inc. Therefore, obtaining an injunction from future violations against Gentile – an industry participant – as quickly as possible is of utmost importance for the Commission and its mission of investor protection. As the court in SEC v. Dresser Indus., Inc. recognized, such relief serves the public interest, and weighs heavily in favor of denying a stay to defendants in securities actions. 628 F.2d 1368, 1377 (D.C. Cir. 1980); accord Walsh Secs., 7 F. Supp. 2d at 529.[5]

Gentile's Statute of Limitations Arguments Are Unavailing

Gentile has indicated that he will move to dismiss the Commission's claims on statute of limitations grounds if the matter is to proceed. But because that motion would be meritless and in any event cannot be addressed without full merits discovery, the statute of limitations defense is no bar to proceeding to full discovery.

Gentile maintains that because the Commission's complaint alleges that his conduct occurred more than five years prior to the complaint's filing, its action is barred by 28 U.S.C. § 2462. That statute provides that any action for the "enforcement of any civil fine, penalty or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." But that statute has no application to the Commission's claims here for three reasons:

First, the Commission's Complaint alleges that at least one of Gentile's manipulation and unregistered offering schemes continued into 2010. (Complaint (DE 1) ¶ 68 (alleging that the last

---

[4]     The Commission also seeks disgorgement and penalties. In weighing prejudice to the non-movant, courts consider the possibility that a dissipation of assets may occur while the stay is in place. State Farm, 2002 WL 31111766, at *2. Here, as noted in the Bloomberg article, and on his own website, http://www.guygentile.com, Gentile owns and operates a broker-dealer in the Bahamas, SureTrader. As he acknowledges on his website, Gentile "splits his time between Miami and the Bahamas," and travels frequently, including to Mexico, Paris, Cuba, Singapore, and throughout the Caribbean. He also apparently lives a lavish lifestyle, most recently throwing himself a James Bond-themed birthday party for 80 guests in a rented Bahamian villa. https://www.bloomberg.com/news/features/2017-03-23/bro-i-m-going-rogue-the-wall-street-informant-who-double-crossed-the-fbi. Given his dual residency, and the fact that he operates his business abroad, the Commission fears that any assets available now to satisfy its monetary claims may well not be available should a judgment be entered in the distant future.

[5]     From the USAO's decision not to seek a stay of this action, the Court can infer that it has no concern about the possibility of interference with its matters, a concern that might otherwise implicate the public interest in favor of a stay. SEC v. Fishoff, No. 15 Civ. 3725, 2016 WL 1262508, at *4 (D.N.J. March 31, 2016) (granting the USAO's motion to intervene and for a stay and citing the public interest in "a complete, unimpeded investigation into potential criminal activity").

unlawful sale of KYUS stock occurred in November 2010).) Because Gentile signed tolling agreements with the Commission that covered approximately two years of the limitations period, the Commission's Complaint, filed in March 2016, was filed within the limitations period.

Second, any statute of limitations defense would have no effect on the Commission's action because Section 2462 bars only certain remedies and not entire actions. Compare 28 U.S.C § 2462 (setting a time limit for enforcement of fines, penalties and forfeitures) with 28 U.S.C. § 1658(a) (providing limitations periods barring new causes of action for statutes enacted after 1990).

Third, Section 2462 bars punitive remedies only and does not bar the Commission's claim for injunctive relief.[6] See Meeker v. Lehigh Valley R.R., 236 U.S. 412, 423 (1915) ("The words 'penalty or forfeiture' in this section refer to something imposed in a punitive way for an infraction of a public law. . . .") (interpreting predecessor to Section 2462); Gabelli v. SEC, 133 S. Ct. 1216, 1223 (2013). In this Circuit, injunctions against securities violators are remedial, not punitive. As a result, 28 U.S.C. § 2462 does not apply to the Commission's claims for injunctive relief.

In SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980), the Third Circuit held that "the purpose of injunctive relief is not to punish the violator, but to deter him from committing future infractions of the securities laws." Id. (citing SEC v. Koracorp Indus., Inc., 575 F.2d 692, 697 (9th Cir. 1978)). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." Id. Bonastia set out the factors courts should consider in making that prediction:

> [T]he degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur.

Id.

Because a properly entered injunction is remedial, it is not a penalty or forfeiture within the meaning of § 2462. For that reason, as one court has recently held in response to a defendant's motion to dismiss on statute of limitations grounds, "the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations." SEC v. Wyly, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013).

---

[6]     This term, the Supreme Court is considering whether 28 U.S.C. § 2462 applies to Commission claims for disgorgement. Kokesh v. SEC, No. 16-529. However, that case raises no question of the statute's application to injunctive relief. See Kokesh, 2017 WL 766064, at *1 (Feb. 24, 2017) (Brief of Petitioner, Question Presented ("Does the five-year statute of limitations in 28 U.S.C. §2462 apply to claims for 'disgorgement'?").) And, as noted above, the Commission's complaint in this case alleges conduct within the statute of limitations, to which the statute does not even arguably apply.

Hon. Joseph A. Dickson

April 26, 2017
Page 6

Indeed, the only courts to have ruled that an injunction is barred by the statute of limitations have done so on a finding – with the benefit of a full evidentiary record – that injunctive relief would not satisfy the remedial standards set out in <u>Bonastia</u>, and would therefore be a penalty for the purposes of 28 U.S.C. § 2462. So, for example, in <u>SEC v. Jones</u>, 476 F. Supp. 2d 374 (S.D.N.Y. 2007), the court granted summary judgment to defendants on the Commission's claim for injunctive relief because the Commission had failed to establish a "realistic likelihood of recurrence," through evidence of a pattern of violations or continued misconduct. <u>Id.</u> at 383-85.[7] And in <u>Johnson v. SEC</u>, 87 F.3d 484, 489-90 (D.C. Cir. 1996), the court ruled that 28 U.S.C. § 2462 would apply to bar the Commission's suspension of a respondent in an administrative proceeding because it had made no evidentiary finding of the respondent's current incompetence or "the degree of risk she posed to the public." <u>See also</u> <u>SEC v. Bartek</u>, 484 F. App'x 949, 957 (5th Cir. 2012) (affirming grant of summary judgment to defendant on statute of limitations grounds where there was no evidence that injunction addressed "the prevention of future harm in light of the minimal likelihood of similar conduct in the future").[8]

For these reasons, Gentile's motion to dismiss on statute of limitations grounds would, at best, be premature before discovery can produce a full evidentiary record. Without discovery, the Court will have no basis to assess the factors dictated by <u>Bonastia</u>, and can therefore make no finding about whether an injunction will protect the public from future harm, and is therefore remedial, or is punitive. If it is the former, it should be entered and no statute of limitations will apply.

*  *  *

At the conference on April 12, 2017, the Court advised the parties that they could agree to adjourn dates set in the Court's Scheduling Order (DE 17) but should apprise the Court of any such adjournments. In keeping with that directive, the Commission advises that, at the Defendant's request for more time, the parties have agreed to exchange Rule 26 disclosures on April 28, 2017, rather than April 26, 2017.

Respectfully submitted,

Nancy A. Brown

cc:    Hon. Jose L. Linares (via regular mail)
       Adam Ford, Esq., (via email)

---

[7]    The Court had first denied defendants' motion to dismiss on statute of limitations grounds. <u>SEC v. Jones</u>, No. 05 Civ. 7044 (RCC), 2006 WL 1084276, at *3-6 (S.D.N.Y. April 25, 2006).

[8]    Whatever the outcome of Gentile's present request for a resumption of the Stay, the Court should be aware that the Commission has a pending, non-public investigation into possible securities laws violations arising out of Gentile's operation of his Bahamian broker-dealer. Of course, if the staff determines that documents obtained in that investigation are relevant to the allegations in the instant Complaint, it will make them available to Gentile if and when discovery is allowed.

# EXHIBIT H



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
BROOKFIELD PLACE, 200 VESEY STREET
Suite 400
NEW YORK, NEW YORK 10281-1022

Nancy A. Brown
(212) 336-1023
brownn@sec.gov

May 9, 2017

**By ECF**

Hon. Joseph A. Dickson
United States Magistrate Judge
District of New Jersey
Martin Luther King, Jr. Federal Building
    and Courthouse
50 Walnut Street
Newark, New Jersey  07102

     Re:    <u>SEC v. Gentile; 16 Civ. 1619 (JLL)(JAD)</u>

Dear Judge Dickson:

     We represent the Plaintiff, Securities and Exchange Commission, in the above-captioned civil action.  As the Court requested at the April 12, 2017 conference, we write to advise the Court that should the Court deny Defendant's request to re-impose the stay in the matter, the parties have agreed to adjourn the dates for serving interrogatories until 60 days after the Defendant has identified in his Answer which Complaint allegations he contests.

     We also write to notify the Court of two errors in Defendant's May 5, 2017 letter (DE 20) of which the Court should be aware.  First, the SEC has not "issued an (erroneous) public statement asserting that the SEC had imposed an injunction against Mr. Gentile." (DE 20, at 9.)  Mr. Gentile's counsel has since conceded that he is not aware of any such statement, and that the assertion in the May 5 letter was an inference based on Mr. Gentile's interactions with certain service providers that may have erroneously reported such information.

     Second, we are aware of no new investigation that has been opened into Mr. Gentile's conduct after the dismissal of the criminal indictment against him.  (DE 20, at 2.)  As Mr. Gentile's counsel is well aware, the investigation into his operation of his Bahamian broker-dealer has been ongoing since before that indictment was filed.

                 Respectfully submitted,

                 Nancy A. Brown

cc:    Hon. Jose L. Linares (via regular mail)
       Adam Ford, Esq. (via email)

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          v.                                              No. 2:16 Civ. 01619 (JLL)(JAD)

GUY GENTILE,

                    Defendant.

Memorandum of Law in Support of Defendant Guy Gentile's Motion to Dismiss

FORD O'BRIEN LLP
85 Broad St., 28th Floor
New York, New York 10004
212.858.0040

*Attorneys for Defendant Guy Gentile*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 6

ARGUMENT ....................................................................................................... 10

    I.      Legal Standard on Motion to Dismiss .................................................. 10

    II.    The Complaint Must Be Dismissed Because All Claims Are Barred by the Statute of Limitations Under Section 2462 ........................................ 12

            A.     Injunctions that seek to address past harm by punishing defendants are penalties under Section 2462 ............................... 12

            B.     The requested injunctions here seek at the very least "in part" to punish Gentile for alleged past conduct and are therefore penalties under Section 2462 ...................................... 14

            C.     Enjoining Gentile from participating in an area of the securities industry is punitive, not equitable……………………..…………… 22

    III.   The Tolling Agreements Are Invalid Because They Were Obtained by Either Fraud or Making Material Misrepresentations to Gentile in Violation of His Due Process Rights ..................................................................... 22

    IV.   The SEC Cannot Obtain Injunctive Relief Because it Has Failed to State a Claim and the Relief Sought Lacks Requisite Specificity ............................... 26

            A.     The Complaint fails to allege any facts entitling the SEC to injunctive relief .......................................................................... 26

            B.     The injunctions sought lack requisite specificity under FRCP 65 ................................................................................ 28

CONCLUSION……………………………………………………………………..30

# TABLE OF AUTHORITIES

Cases

*Am. Bus. Ass'n v. Slater,*

    231 F.3d 1 (D.C. Cir. 2000) ................................................................. 14

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ........................................................................... 28

*Austin v. United States,*

    509 U.S. 602 (1993) ........................................................................... 14

*Daniels v. Woodbury County, Iowa,*

    742 F.2d 1128 (8th Cir. 1984) ........................................................... 29

*Gabelli v. SEC,*

    568 U.S. 442 (2013) ................................................................. 2, 12, 14

*Handelman v. State of New Jersey,*

    2016 WL 3691976 (D.N.J. July 12, 2016) ........................................ 11

*Hines v. Nichols,*

    2016 WL 3460220 (M.D. Ga. May 18, 2016) .................................... 28

*Huntington* v. *Attrill,*

    146 U. S. 657 (1892) ......................................................................... 13

*Proffitt v. F.D.I.C.,*

    200 F.3d 855 (D.C. Cir. 2000) ..................................................... 16, 22

*In re Reserve Fund Secs. & Derivative Litig.,*

    2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013) .................................. 27

*Int'l Union, United Auto. Aerospace & Agr. Implement Workers v. Amerace Corp.,*

   740 F. Supp. 1072 (D.N.J. 1990) ................................................ 25

*Jama Corp. v. Gupta,*

   2008 WL 627410 (M.D. Pa. Mar. 4, 2008) ..................................... 25

*Kokesh v. SEC,*

   2017 WL 2407471 ...................................................... 2, 14, 15

*Kowalsky v. Deutsche Bank National Trust Co.,*

   2015 WL 5770523 (D.N.J. Sept. 30, 2015) .................................... 11

*Kunkle v. Naugle,*

   2015 WL 7756197 (E.D. Pa. Dec. 2, 2015) .................................... 25

*Legacy Gen. Partner, LLC,*

   2017 WL 417093 (M.D. Fla. Jan 31, 2017) .................................... 27

*Louis W. Epstein Family P'ship v. Kmart Corp.,*

   13 F.3d 762 (3d Cir. 1994) ................................................. 28

*McCormick v. Kline,*

   670 F. App'x 764 (3d Cir. 2016) ............................................ 25

*Meeker v. Lehigh Valley R. Co.,*

   236 U.S. 412 (1915) ....................................................... 15

*Payne v. Travenol Laboratories,*

   565 F.2d 895 (5th Cir. 1978) ............................................... 28

*Rockefeller Cir. Props. Inc. Sec. Litig,*

   311 F.3d 198 (3d Cir. 2002) ................................................ 10

*S.E.C. v. Secure Capital Funding Corp.,*

   2013 WL 3286234 (D.N.J. June 28, 2013) ............................................................. 29

*S.E.C. v. Tourre,*

   4 F. Supp. 3d 579 (S.D.N.Y. 2014) ....................................................................... 29

*Schmidt v. Skolas,*

   770 F.3d 241 (3d Cir. 2014) ........................................................................... 13, 14

*SEC v. Bartek,*

   484 F. Appx. 949 (5th Cir. 2012) ......................................................................... 18

*SEC v. Berry,*

   580 F. Supp. 2d 911 (N.D. Cal. 2008) .................................................................. 18

*SEC v. Bonastia,*

   614 F.2d 908 (3d Cir. 1980) ................................................................................. 16

*SEC v. Graham,*

   823 F.3d 1357 (11th Cir. 2016) ............................................................................ 28

*SEC v. Jones,*

   476 F. Supp. 2d 374 (S.D.N.Y. 2007) .............................................................. 19, 20

*SEC v. Lucent Techs., Inc.,*

   363 F. Supp. 2d 708 (D.N.J. 2005) ................................................................. 12, 13

*SEC v. Microtune, Inc.,*

   783 F. Supp. 2d 867 (N.D. Tex. 2011) ............................................................ 23, 24

*SEC v. Quinlan,*

   2008 WL 4852904 (E.D. Mich. Nov. 7, 2008) ...................................................... 18

*SEC v. Sky Way Global, LLC,*

    710 F. Supp. 2d 1274 (M.D. Fla. 2010) ....................................................... 28

*SEC v. Smyth,*

    420 F.3d 1225 (11th Cir. 2005) ................................................................... 28

*SEC v. Torr,*

    87 F.2d 446 (2d Cir. 1937) ......................................................................... 26

*SEC v. Wyly,*

    950 F. Supp. 2d 547 (S.D.N.Y. 2013) ........................................................ 18

*Smith v. Township of Warren,*

    2016 WL 7409952 (D.N.J. Dec. 22, 2016) ................................................. 11

*United States v. Gentile,*

    2017 WL 424907 (D.N.J. Jan. 30, 2017) .................................................... 26

*United States v. Levine,*

    658 F.2d 113 (3d Cir. 1981) ....................................................................... 23

<u>Statutes</u>

15 U.S.C. § 77t(b) ............................................................................................ 26

15 U.S.C. § 78u(d)(1) ...................................................................................... 26

28 U.S.C. § 2462 ........................................................................................ Passim

Guy Gentile respectfully submits this memorandum of law in support of his motion to dismiss the Securities and Exchange Commission's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

The SEC filed the present lawsuit seeking to punish Gentile for allegedly violating specific public laws back in 2008. The Complaint seeks $17 million in disgorgement, even though it fails to allege Gentile actually received even a fraction of this amount; it seeks civil penalties on top of the disgorgement and pre-judgment interest; and it seeks injunctions as a way to further punish and stigmatize Gentile, branding him with a scarlet letter on his record so as to dissuade banks, investment advisors, and others from doing any business with him. On top of all that, it seeks to bar him from an entire area of the securities business, enjoining him from this particular industry even though he has not been involved in it for almost a decade and has no interest in entering it again. And since it purports to seek these penalties to deter both Gentile and others from engaging in similar conduct, there can be no dispute that all the sanctions sought in the Complaint are primarily intended to punish Gentile – to an extent beyond that permitted by law. The Complaint does not even pretend to simply return things to the *status quo ante* as an equitable matter, enjoin him from specific likely future conduct, or compensate victims of his alleged wrongdoing.

Claims governed by § 2462, however, *seeking to punish* a defendant are now indisputably time barred when the charged conduct is greater than five years old. Indeed, the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635, 2017 WL 2407417 (June 5, 2017), leaves no doubt that the Commission's case against Gentile is time barred. While *Kokesh* specifically focused on whether the Commission could seek disgorgement for any conduct

beyond five years – which it cannot – the decision built upon the Court's prior ruling in *Gabelli v. SEC,* 568 U.S. 442 (2013), which precluded the Commission from seeking *civil penalties* after five years. Plainly, the SEC is precluded from obtaining disgorgement or civil penalties for the alleged conduct involving stock tickers RVNG and KYUS from 2007-2008. Notwithstanding this inevitable result, the Commission has suggested that these rulings still leave open the question of whether the Commission can seek an injunction or industry bar for conduct more than five years old – and intends to move forward just to seek these penalties based on the alleged past conduct. The framework and analysis set forth in *Kokesh*, however, entirely forecloses the Commission from seeking all penalties based on eight and nine-year-old conduct, including the "obey the law" and industry bar injunctions the Commission continues to seek here.

Writing on behalf of a unanimous court, Justice Sotomayor set forth a straightforward two-part test, explaining that a "penalty" in the context of an SEC enforcement action is any sanction imposed (1) as a consequence of violating a public law and (2) for punitive purposes. *Kokesh*, 137 S.Ct. at 1643. Plainly, the "obey the law" injunctions and penny-stock bar sought here based on isolated conduct from nearly a decade ago would be sanctions imposed for violating a public law and for punitive purposes – as retribution and as a deterrent (both specifically and generally) – not to compensate anyone or serve any other identifiable remedial or equitable purpose. *Id.* ("…a pecuniary sanction operates as a penalty if it is sought for the purpose of punishment, and to deter others from offending in a like manner…").

While the SEC has long enjoyed the ability to seek and obtain *equitable remedies* without being restrained by any limitations period, the Supreme Court and lower courts have now clearly defined exactly where equity ends and a penalty begins. *Kokesh* clearly delineates the outer time-

limits of the Commission's ability to bring an action against Gentile seeking penalties, whether in the form of fines, disgorgement, "obey the law" injunctions, or a penny-stock bar where the face of the Complaint alleges a "scheme" almost a decade old. This result is even more clear considering that Gentile has cooperated with the SEC and DOJ in numerous joint investigations for almost three years, much of that time without any operative tolling agreement or suggestion that Gentile posed a threat to the public. Indeed, during those four years, the SEC used Gentile as a cooperator to assist it in bringing dozens of successful cases, during which time the Commission never suggested that Gentile was a threat to the public who must be enjoined immediately. This fact alone precludes any argument by the SEC that the demand for any injunction now is 100% equitable and only to protect the public from Gentile's imminent violation of the securities laws.

This case is ripe for disposition on a motion to dismiss because the Commission has pled itself out of court based on the allegations in the Complaint. On its face, the Complaint alleges two schemes that violated securities laws, one that ended in 2007 and one that ended no later than June 30, 2008. These end-dates of Gentile's alleged involvement were affirmed by the Assistant United States Attorney, who jointly worked with the SEC on the RVNG and KYUS investigations, and filed and argued the related criminal case. These end-dates were also affirmed by the Commission itself in two separate complaints filed against alleged co-conspirators Mike Taxon and Itamar Cohen. And these end dates were reaffirmed in the complaint filed against Adam Gottbetter and his partners. Accordingly, Judge Linares has already held that "there is no dispute that … [Gentile's] alleged criminal activity ended as of June 2008." *United States v. Gentile,* – F. Supp. 3d –, 2017 WL 424907 (D.N.J. Jan. 30, 2017).

Gentile signed four agreements with six month tolling periods and one with a nineteen day tolling period, which even if valid – they are not– would toll the statute of limitations for approximately two years and 19 days. Even after excising this time from the calculation, two years and 19 days of tolling from June 30, 2008 required the Commission to file any claim seeking to punish Gentile related to KYUS by August 10, 2015. The Commission filed its Complaint against Gentile seven months later, on March 23, 2016. Accordingly, even if all five tolling agreements are valid, since all of the claims on the face of the Complaint seek penalties that contain five-year limitations periods, they are time barred by § 2462, and as such, this Complaint must be dismissed in its entirety as untimely.

The agreements here, however, like those found invalid in the related criminal case, are invalid for similar reasons: Gentile entered into them unknowingly and apparently after having been intentionally misled by the SEC as to the nature of the agreements. Gentile executed the tolling agreements with the SEC – as he did with the DOJ – based on an understanding that the conduct he was being investigated for involving KYUS ended at the end of the scheme in June 2008. Gentile also signed the agreements under the understanding that he was signing them as part of a cooperation agreement with the SEC, as the SEC told him. To the extent the SEC asserts that it is charging him under an aiding and abetting theory involving conduct engaged in by Gottbetter and his partner in 2009 and 2010, this argument contradicts Gentile's understanding based on the government's representations prior to signing the agreements and renders them signed unknowingly. Had Gentile been informed by government attorneys that they believed his misconduct involving KYUS shares included trades placed by Gottbetter up through 2010, he would not have signed the tolling agreements, as that would have potentially extended his period of cooperation by an additional two years, a fact that Gentile expressed to the

government he was not willing to do. As Judge Linares already found in the related criminal case, it was important to Gentile to know the exact amount of time that he was agreeing to toll with respect to the investigation regarding RVNG and KYUS, so as to not be trapped by the government into a longer period of cooperation than he wanted to provide. Accordingly, if the SEC takes the new position that he can be charged for someone else's trades that took place in 2010, then Gentile did not knowingly and intelligently enter into any tolling agreement with the SEC. And, as Judge Linares already ruled in the related criminal case, all tolling agreements based on this misunderstanding should be found invalid. Given the past four years during which the cooperation agreement between Gentile and the DOJ and SEC was consistently referenced and Gentile provided extra-ordinary cooperation that has repeatedly been acknowledged by the government in court filings, the SEC's post-complaint assertions to Gentile that it never entered into a cooperation agreement with him in 2012, would support a finding that the tolling agreements were procured by fraud, or at the very least a serious misunderstanding by Gentile, and the agreements can also be found void on that basis as well.

The Complaint should also be dismissed because the SEC has not alleged the elements necessary to obtain injunctive relief (the only remaining possible sanction given *Kokesh* and *Gabelli*). Specifically, the SEC has failed to, and cannot, allege that Gentile is presently engaged in or about to engage in any acts or practices which constitute or will constitute a violation of any rule or regulation, which it is required to do before it may enjoin an individual from such acts or practices. Indeed, the Complaint was filed more than fifteen months ago, at which time the SEC declined to seek an injunction, so surely Gentile was not and is not imminently about to engage in any prohibited conduct.

Finally, the Complaint can also be dismissed for the SEC's failure to plead with requisite

specificity under FRCP 65 exactly what conduct of Gentile's the SEC seeks to enjoin beyond the broad mandate to "obey the law." The Third Circuit precludes the generic "obey the law" injunctions that the Commission seeks here.

**STATEMENT OF FACTS**

On March 23, 2016, the SEC filed a complaint against Gentile alleging involvement in two separate schemes that were "perpetrated in 2007" and "perpetrated in 2008" (Cmplt. ¶ 1) when George W. Bush was still president, and several months before Lehman Brothers failed. In its Complaint, the SEC does not allege that Gentile engaged in any conduct that violated any securities laws after June 2008, nor could it. The SEC presented identical allegations in the Commission's complaint against Mike Taxon and Itamar Cohen, which alleged "the [RVNG] scheme was perpetrated in 2007" and the KYUS scheme "was perpetrated in 2007-2008." (Ford Dec. ¶ 4, Ex.1)[1] The SEC has also notified this court in its prior filings that Gentile "had retired shortly after the KYUS scheme," which it described as ending "in 2008." (*Id*. ¶ 5, Ex. 2, ¶¶ 4, 39, 57)

As this court is aware from the related criminal case *United States v. Gentile*, and may take judicial notice of as a matter of public record, the allegations against Gentile involving KYUS ended no later than June 30, 2008. (*Id*. ¶¶ 6, 7, Exs. 3, 4) The Government has acknowledged this as the last date it had evidence that Gentile allegedly engaged in any unlawful conduct. (*Id*. ¶ 8, Ex. 5, pg. 42) The AUSA confirmed to this court that its office, which conducted the investigation into RVNG and KYUS jointly with the SEC, is aware of no evidence

---

[1] All references to "Ford Dec." refer to the Declaration of Adam Ford dated June 30, 2017 submitted in support of Gentile's Motion to Dismiss, and the exhibits attached thereto.

that Gentile engaged in any misconduct after June 30, 2008 related to KYUS (or any other matter). (*Id.*)

In paragraph 68, the Complaint asserts that different individuals, Gottbetter and his partner, placed trades in KYUS until November 2009 and November 2010. (Cmplt. ¶ 68) It also alleges that Gentile "had access to and ability to execute trades in at least one of those accounts, and he assisted in the execution of some of these subsequent sales of KYUS stock." (*Id.*) While the Complaint fails to satisfy basic pleading requirements under 9(b) and is not entirely clear, the reference to "subsequent sales of KYUS stock" can only be intended to refer to the sales of stock that occurred "subsequent" to the alleged fraudulent promotion up until June 30, 2008. As the government has acknowledged on numerous occasions in this case, and related cases, and as Judge Linares has already ruled, there is no dispute that Gentile <u>did not</u> engage in any conduct that allegedly violated any laws at anytime after June 2008.

Indeed, during oral argument on Gentile's motion to dismiss the related indictment (December 21, 2016), Judge Linares went out of his way to protect the appellate record and ensure he understood the very last date that the government could possibly allege Gentile's conduct occurred:

> THE COURT: Okay. And there is no argument here of a continuing offense or any of that. I just want the record to be clear in case of appellate review. There's no argument, this is not a continuing offense of any kind that would save the statute. This is two specific acts as set forth in your indictment, right?
>
> MR. GRIPPO: It's an ongoing scheme and a conspiracy, as we allege in the indictment, your Honor, based on two separate --
>
> THE COURT: Two separate --
>
> MR. GRIPPO: -- it was called pump-and-dump schemes, but it's one conspiracy –
>
> THE COURT: Right.

MR. GRIPPO: -- which we allege ended in June of 2008. So, unless the Government comes --

THE COURT: That is 2008, okay.

MR. GRIPPO: June 2008, your Honor.

THE COURT: All right.

MR. GRIPPO: -- so unless we come into the possession of new evidence, which we don't anticipate, given the age of the case, your Honor, but as it's indicted and charged now, it is a conspiracy that ended in June of 2008. (Ford Dec. ¶ 8, Ex. 5, pg. 42)

A representative of the SEC currently involved in this case was sitting in the courtroom during this exchange. (Ford Dec. ¶ 9) The same SEC staff attorneys involved in this case had been working closely with AUSA Grippo for the prior four years before that exchange. (*Id.*) Obviously, if there were any credible evidence that Gentile's wrongful conduct extended beyond June 2008, or that the Commission's Complaint (which was filed nine months before this exchange with the court), was intended to assert a violation that occurred in 2010, AUSA Grippo, who had jointly investigated the matter, would have been aware of these facts and he obviously would have so notified the court during this exchange. The Commission staff attorneys, of course, had months after this assertion to correct it before Judge Linares relied upon the government's representation that the conduct ended June 30, 2008 in his decision dismissing the indictment. They did not. It is inconceivable that the DOJ and SEC would have been aware of ongoing criminal conduct related to the KYUS scheme and yet failed to notify Judge Linares in opposing Gentile's motion to dismiss the criminal indictment.

Based on the government's representations, Judge Linares concluded, "There is no dispute that … [Gentile's] alleged criminal activity had ended as of June 2008." (*Id.*) As the SEC itself acknowledged, "There is no dispute that the issues in this case and the dismissed

indictment in the Criminal Case overlap." (Ford Dec. ¶ 11, Ex. 7)[2]  Accordingly, the SEC cannot now stand before this court and argue that Gentile's illegal conduct extended beyond this date on the undisputed record.

The Commission has previously taken the position before this court that the conduct of Gottbetter and his partners in 2009 and 2010 involved *different conduct* unrelated to the alleged KYUS scheme that it has asserted in several court filings ended in 2008. (Ford Dec. ¶ 5, Ex. 2) In its complaint against Gottbetter and his partners, the SEC asserted (and Gottbetter acknowledged when he pleaded guilty and settled) that after June 30, 2008, (when Gentile's alleged involvement in KYUS ended), Gottbetter and his partner *inflated* the value of the KYUS stock, and that those two men – without Gentile's knowledge or involvement – continued to sell it.  According to the SEC's complaint against Gottbetter (and the government's prior representations to Judge Linares) Gentile had nothing to do with this. (*Id.* ¶¶ 39, 40)

Finally, no post-June 2008 – or indeed any of Gottbetter's pre-June 2008 conduct – was sufficient for the Commission to allege that Gottbetter engaged in any 10b-5 violation; rather the SEC only alleged he aided and abetted a 10b-5(b) violation with respect to KYUS. (*Id.* ¶¶ 86, 87) The Complaint here, therefore, cannot be interpreted to allege that Gentile ever aided and abetted Gottbetter or his partner in 2009 and 2010 in any 10b-5 violations related to KYUS. That is a

---

[2] The nature of a pump and dump scheme in itself dictates that the scheme must end after the shares are "dumped" and cannot continue for another two years, because after the shares are "dumped" the share price falls below the price at the start of the scheme – after that point there is no rational connection to the alleged material misstatements or artifice to defraud. Given that the stock price of KYUS was significantly lower in 2009 and 2010 than the original purchase price, it is not credible to assert such trades are related to a pump and dump scheme. (Ford Dec. ¶ 12, Ex. 8)

*legal impossibility* as one cannot aid and abet another aider and abettor, but only someone who engaged in the underlying violation.[3]

## ARGUMENT

### I.  Legal Standard on Motion to Dismiss

On a motion to dismiss pursuant to FRCP 12(b)(6), a court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 713 (D.N.J. 2005). That being said, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *S.E.C. v. Kearns*, 691 F. Supp. 2d 601, 608 (D.N.J. 2010) (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)); *accord S.E.C. v. Dubovoy*, 2016 WL 5745099, at *3 (D.N.J. Sept. 29, 2016). "'While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *S.E.C. v. Kearns*, 691 F. Supp. 2d at 608 (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

Federal Rule of Civil Procedure 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." In this case, "because the securities claim asserts fraud, the SEC must meet the heightened pleading standard of Rule 9(b). . ." *S.E.C. v. Kearns*, 691 F. Supp. 2d at 609. *See also Dubovoy*, 2016 WL 5745099, at *3; *In re Rockefeller Ctr. Props. Inc. Sec.*

---

[3] "[F]or a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: (1) the existence of a securities law violation by the primary (as opposed to aiding and abetting) party; (2) knowledge of this violation on part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

*Litig*, 311 F.3d 198, 216 (3d Cir. 2002) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where, and how of the events at issue.").

While technically the FRCP requires a defendant to plead an affirmative defense based on a statute of limitations in the answer, the Third Circuit permits defendants to raise a statute of limitations defense by a Rule 12(b)(6) motion, if "the time alleged in the statement of claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *Smith v. Township of Warren*, 2016 WL 7409952, at *12 (D.N.J. Dec. 22, 2016). In other words, where the statute of limitations bar to bringing the claim is "apparent on the face of the complaint," a court may properly dismiss the claim under Rule 12(b)(6). *Id.*

Courts routinely dismiss cases on statute of limitations grounds on a motion to dismiss where a plaintiff has affirmatively "pleaded himself out of court." *See, e.g.*, *Handelman v. State of New Jersey*, 2016 WL 3691976, at *6-7 (D.N.J. July 12, 2016) ("Plaintiff has affirmatively pleaded that there are no timely allegations" in the complaint); *Kowalsky v. Deutsche Bank Nat'l Trust Co.*, 2015 WL 5770523, at *6 (D.N.J. Sept. 30, 2015) ("Looking only to the dates in the Complaint and matters of public record, the court finds that Plaintiff's claims … are facially time barred by the applicable statute of limitations."). In doing so, a court may properly rely on documents that are "integral to or explicitly relied upon in the complaint" or matters of public record without converting the motion to dismiss into a motion for summary judgment. *Schmidt*, 770 F.3d at 249. Indeed, "the justification for the integral documents exceptions is that it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing

its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Id.* at 250.

## II. The Complaint Must Be Dismissed Because All Claims Are Barred By The Statute of Limitations Under Section 2462

All the counts in the SEC's complaint against Gentile are time barred under 28 U.S.C. § 2462, because the action seeks to impose for the purposes of punishment a civil fine, disgorgement, and punitive injunctions for conduct beyond five years. As an initial matter, the Supreme Court has ruled that SEC actions for civil monetary penalties and disgorgement for conduct more than five years old are precluded. *Gabelli v. SEC*, 568 U.S. 442, 454 (2013); *Kokesh v. SEC*, 137 S. Ct. 1635. Thus, the claims here seeking to impose punishment against Gentile in the form of civil fines and disgorgement for conduct allegedly occurring in 2007-2008 are simply time barred. The remaining issue, therefore, is whether the punishments the SEC seeks to impose on Gentile in the form of "obey the law" injunctions and a penny-stock bar also by way of injunction constitutes penalties subject to section 2462's five-year limitations period. Under the analysis set forth in *Kokesh* and prior guidance, these sanctions are penalties as pleaded in the instant Complaint, and are therefore barred by the applicable statute of limitations.[4]

### A. Injunctions that seek to address past harm by punishing defendants are penalties under Section 2462.

Based on its plain meaning, statutory language, and legislative history, Section 2462 applies to monetary and non-monetary penalties. Section 2462 provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, *pecuniary or*

---

[4] The Court in *Kokesh* left open the question of whether the Commission can seek disgorgement at all, since no explicit statutory authority for this remedy exists. *Kokesh*, 137 S.Ct. at 1645, fn 3.

otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon. (emphasis added)

To be clear, § 2462 places a five-year time limit on *both* pecuniary and non-pecuniary penalties, such as injunctions and industry bars sought by the SEC. Even before *Kokesh*, courts, including the Tenth Circuit, thoroughly analyzed the legislative history and statutory construction of § 2462, setting forth in a detailed analysis why it clearly applies to non-pecuniary penalties. *See e.g.*, *United States v. Telluride, Co.*, 46 F.3d 1241, 1245 (10th Cir. 1998) ("Based on this construction, we view 'pecuniary or otherwise' as modifying both the terms penalty and forfeiture.").

The Supreme Court agrees. In *Kokesh*, the Supreme Court set forth the following definition of a penalty: "a 'penalty' is a punishment, whether *corporal* or pecuniary, imposed and enforced by the State, for a crime or offense against its laws." *Kokesh*, 137 S. Ct. at 1642 (citing *Huntington* v. *Attrill*, 146 U. S. 657, 667 (1892)) (emphasis added). That is, consistent with § 2462's application to penalties "pecuniary or otherwise," the *Kokesh* court clearly defined penalty to include non-monetary punishment, "corporal or pecuniary." In reviewing the historical meaning of penalty, the *Kokesh* court identified two underlying principles: (1) "First, whether a sanction represents a penalty turns in part on 'whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual"; and (2) "Second, a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others in like manner'— as opposed to compensating a victim for his loss." *Id.* Based on these principles, the court established a straightforward two-part test to determine whether a penalty under section 2462 is punitive or remedial (whether addressing monetary or non-monetary sanctions). *Id*. Here, the injunctions and penny stock bar the SEC seeks to impose on Gentile, on the face of the

Complaint, are for violating public laws and for punitive purposes, punishing Gentile by labeling him a wrongdoer, taking away his right to work, and making an example out of him to deter him and others. As such, they are subject to a five-year limitation period. [5]

As the Supreme Court has made clear, injunctions and industry bars are considered penalties even if the objective is only partly to penalize and partly equitable. *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 7 (D.C. Cir. 2000) (*quoting Austin v. United States*, 509 U.S. 602, 610 (1993)) ("[A] penalty [is] any sanction that goes *beyond* remedying the damage caused to the harmed parties by the defendant's action" and "a sanction is a penalty even if only one of its various objectives is to punish wrongful conduct; that is, if it serves *in part* to punish.") (emphasis in original).[6]

B.    The requested injunctions here seek at the very least "in part" to punish Gentile for alleged past conduct and are therefore penalties under Section 2462.

In each Count in the Complaint, the SEC seeks an injunction against Gentile claiming that "[b]y virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating [the securities laws]." Other than Gentile's alleged conduct related to KYUS, which the SEC pleaded as a scheme that "was perpetrated in 2007-2008," (Ford Dec. Exs. 1, 2,

---

[5] The statute of limitations under section 2462 begins to run when the fraud occurs, not when it is discovered, *Gabelli v. SEC*, 568 U.S. 442 (2013), so there is no dispute that the statute of limitations for RVNG began to run as of August 1, 2007 and KYUS began to run as of June 30, 2008, more than nine and eight years ago, respectively.

[6] *Kokesh* affirmed this finding, also quoting *Austin*, that even relief that serves multiple purposes is punishment *if one of those purposes is punitive*. *Kokesh*, 137 S.Ct. at 1643 ("A civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term."). The *Kokesh* decision also emphasized, consistent with prior lower court's analyses, that disgorgement goes "beyond compensation" because it "labels defendants [as] wrongdoers." *Id*. Obviously "obey the law" injunctions and industry bars are intended to, at least in part, label the defendant as a wrongdoer.

3) and allegedly "assisting" in executing trades in the same stock two years later unrelated to the pump and dump scheme, (*Id.* ¶ 68) the SEC does not actually allege any facts to support the assertion that Gentile is currently violating any securities laws, or about to, nor that he is likely to do so in the future, let alone that he will "continue violating" them if not "immediately" enjoined. Accordingly, the Complaint's allegations leave no room for dispute that at least part of the purpose of the injunctions is to punish Gentile for past conduct that allegedly violated public laws, and as such are subjection to a five-year limitations period under *Kokesh*.

Even before the two-part test set forth in *Kokesh*, courts routinely dismissed SEC attempts to impose injunctions for conduct occurring more than five years prior to the SEC enforcement action if such injunctions were intended, at least in part, to punish, as opposed to actually immediately protect the public from an ongoing violation or one that was to occur imminently without a prompt injunction. In doing so, courts relied on an analysis that provided the precedential support for the court in *Kokesh* to refine into a two-part test. That analysis sought to determine if the actual intent of the injunction was to punish – at least in part – and if so, it is subject to Section 2462's limitations period.

For example, the D.C. Circuit Court, in *Johnson v. SEC*, set forth the rationale and standard for determining whether an injunction is remedial, as some injunctions are, or punitive, as is the case here.  87 F.3d 484 (D.C. Cir. 1996).[7] The court held that relief is a penalty when "it

---

[7] The *Johnson* court's analysis, which mirrors *Kokesh* and like *Kokesh* relies heavily on *Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412, 421-22 (1915), is supported by the statutory text of § 2462, which undermines the finding in some courts' pre-*Kokesh* decisions that section 2462 does not apply to injunctions, even though the statutory text states that the limitations period applies to "action[s], suit[s] or proceeding[s] for the enforcement of any civil fine, penalty or forfeiture, *pecuniary or otherwise*." 28 U.S.C. § 2462 (emphasis added). Several federal decisions had held, pre-*Kokesh*, that both disgorgement and injunctions are never penalties but are always *de jure* equitable.  These decisions have been effectively overruled, at least in that part, by *Kokesh*.

goes beyond remedying the damage caused to the harmed parties by the defendant's action" and rejected the SEC's proposed injunction as beyond the limitations in Section 2462. *Id.* at 488; *see SEC v. Bartek*, 484 F. Appx. 949, 957 (5th Cir. 2012) (whether a sanction, including an injunction, is punitive, hinges upon the questions of (1) whether the requested remedies address "past harm allegedly caused by the defendant," and (2) whether there is a "minimal likelihood" that defendant will engage in "similar conduct in the future."); *see also SEC v. Quinlan*, 2008 WL 4852904, at *11 (E.D. Mich. Nov. 7, 2008), *aff'd*, 373 F. Appx. 581 (6th Cir. 2010).

In determining whether an injunction was punitive, courts also previously considered whether an injunction would have a "stigmatizing effect and long-lasting repercussions," and if so, concluded that it is properly considered a penalty. *Id.*; *Proffitt v. F.D.I.C.*, 200 F.3d 855, 861 (D.C. Cir. 2000) (injunction/industry bar barring individual from banking industry is punitive and subject to limitations period); *SEC v. Berry*, 580 F. Supp. 2d 911, 918 (N.D. Cal. 2008) ("The SEC's request for an injunction, officer and director bar, and penalties do not seek to 'remedy the damage caused,' they seek to punish"); *SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) ("While some courts have held that no statute of limitations applies to claims for equitable relief, many apply Section 2462 where the injunctive relief sought is punitive in nature...") (footnote omitted).[8]

_____

[8] Some courts before *Kokesh* noted that "purpose of injunctive relief is not to punish the violator, but to deter him from committing future violations of the securities laws." *see, e.g.*, *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980). To the extent that these prior cases stand for the proposition that injunctions are as a matter of law equitable and can never be punitive, plainly this is inconsistent with the holding in *Kokesh*. *Kokesh*, at 137 S.Ct. at 1643-44 ("sanctions imposed for the purpose of deterring infractions of public laws are inherently punitive because 'deterrence [is] not [a] legitimate nonpunitive governmental objectiv[e].'") ("Deterrence ... has traditionally been viewed as a goal of punishment"). Indeed, *Kokesh* overruled the fiction adopted by some lower courts that disgorgement was, as a matter of law equitable, and never a punishment, specifically rejecting the black-letter rule urged by the SEC, by reasoning that

The case of *SEC v. Jones* is also instructive. 476 F. Supp. 2d 374 (S.D.N.Y. 2007). In *Jones*, the SEC sought a permanent injunction prohibiting defendants from committing future violations of specific sections of the Advisers Act. *Id.* at 383. In determining whether the request for the injunction was time barred, the court highlighted Second Circuit case law that "demands that the Commission 'go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.'" *Id.* The court, as required by the Second Circuit, also looked to "collateral consequences" in evaluating whether the "injunction preventing future violations of the securities laws" was more "punitive than remedial." *Id.* at 383. The court found that (1) "the Commission has not put forth any facts that would indicate Defendants engaged in a pattern of securities laws violations;" (2) "several years have passed since Defendants' alleged misconduct" which "undercuts the Commission's assertion that Defendants pose a continuing risk to the public"; and (3) "the potential collateral consequences of a permanent injunction are quite serious," including "stigmatiz[ing] Defendants in the investment community and significantly impair[ing] their ability to pursue a career." *Id.* Based on these findings, the court held that the injunction sought was a penalty subject to § 2462, and dismissed the request for the injunction and complaint as untimely. *Id.*[9]

---

"disgorgement" as "applied in the SEC enforcement context" routinely exceeds any "compensatory" aim and that while "disgorgement serves compensatory goals in some cases…[a] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 1643. In short, any argument now that all injunctions sought in SEC enforcement actions are equitable as a matter of law is without legal basis.

[9] While *Jones* ruled on summary judgment, the principles stated therein apply equally here, especially where the SEC has failed even to come close to meeting the FRCP's plausibility requirement.

*Kokesh* abandons any analysis that involves the "degree of risk that the defendant poses," or whether there is a more than "minimal likelihood" he will engage in similar conduct when confronted with a request for an injunction based solely on conduct more than five years old, *i.e.,* conduct that is not actually occurring or about to imminently occur at the time of the requested injunction. But even if these considerations survive *Kokesh*, the injunctions and bar the Commission seeks in this case, *based on the facts alleged in this Complaint*, make clear that they are punitive, not remedial, because the Commission failed to plead even a single fact suggesting that Gentile posed any risk whatsoever at the time of filing and because of the demonstrated stigmatizing effect and long-lasting repercussions any injunction against Gentile would have if based solely on such old, alleged conduct. And since the Complaint was filed fifteen months ago, it is now beyond dispute that he did not pose an immediate threat to the public at the time the Complaint was filed, thereby precluding issuing an injunction now.

There can be no question that the injunctions sought here, including "obey the law" prohibitions on violating certain securities laws and a ban on participation in sale of penny stocks, are entirely, or at least primarily, punitive, not remedial under any previously articulated analysis.  Indeed, they would serve no identifiable remedial function – such as compensating an individual or enjoining an individual who is engaged, about to engage, or is likely to engage in a violation – while undermining Gentile's ability to work in an entire field of the securities business (which Gentile has no interest or intention of returning to anyway), permanently stigmatizing him, seeking retribution for alleged conduct that occurred a decade ago, and interfering with his ability to make a living in his chosen profession.

It is not disputed, and the government has recognized in the criminal complaint filed against Gentile, in its papers opposing his motion to dismiss the criminal indictment, and at oral

argument on that motion, that whatever Gentile's alleged involvement in the alleged conduct relating to RVNG and KYUS was, he exited the alleged conspiracy of his own volition more than nine years ago, in June 2008. (Ford Dec. ¶ 8, Ex. 5) For the next four years, Gentile lived an exemplary life, building a business, and taking part in charitable and civic activities. Immediately upon his arrest in July 2012, Gentile offered and agreed to cooperate with the government, both the DOJ and SEC, which he did for the next several years. Not exaggerating, during the four years before the current Complaint was filed, Gentile provided extraordinary cooperation against all individuals involved in the charged RVNG and KYUS schemes, (*Id*. ¶¶ 4, 5, Ex. 1, 2) and assisted the SEC in numerous investigations of high-value targets unknown to Gentile, who, though having been on the radar of the SEC for years, were previously beyond the government's reach. During this time, Gentile also led the SEC to individuals and broker-dealers unaffiliated with Gentile and unknown to the government, whom Gentile learned to be involved in illegal penny-stock schemes. (*Id*. ¶ 10, Ex. 6) Indeed, all told, Gentile's assistance directly led to dozens of individuals being charged by the DOJ and sued by the SEC, which to date has received in excess of 12 million dollars in penalties and disgorgement during his more than 3 years of cooperation. (*Id*.) Of course, in connection with his subsequent criminal indictment (and its dismissal), Gentile's cooperation entered the public record. (*Id*. ¶ 7, Ex. 4)

As this Court can take judicial notice of statements made by the Assistant United States Attorney in the parallel criminal proceeding and in letters the SEC has filed with this court – since his arrest in July 2012, Gentile has been 100 percent truthful, honest, and helpful to the DOJ and SEC as a cooperator.  (*Id*. ¶ 8, Ex. 5) Not a single incident has occurred to raise any questions over the past five years, meaning, that for purposes of this case, it is undisputed (and certainly nothing in the Complaint suggests otherwise) that Gentile cannot be said to have

engaged in any conduct that could be considered a violation of the securities (or any other) laws. (*Id.*)  In fact, the SEC itself has acknowledged that as of a few weeks ago it was not aware of any information suggesting that Gentile had violated any laws, securities or otherwise, excluding the stale allegations in the current Complaint. (*Id.* ¶ 11, Ex. 7)

The SEC must acknowledge also that it has not alleged any facts in the Complaint to support the statement that "unless restrained and enjoined [Gentile] will continue violating [the securities laws]," as it baselessly asserts in Claims 1-5. Rather, after Gentile was indicted one year ago, the SEC agreed to a complete stay of the civil matter, and at that time sought no injunction.  If the SEC actually believed it needed the injunction to protect the public from Gentile, *i.e.* for remedial or equitable purposes, it most certainly would have sought the injunction a year ago, as a pre-condition, to asking this court for a stay.  Or, if there really was an actual concern of a future violation of the securities laws, it would have sought an injunction in July 2012, after his arrest on charges identical to the allegations in the present Complaint, when Gentile started cooperating with the agency on an almost full time basis. The truth is the SEC knows – and the silence in the filed Complaint confirms – that there is no evidence to suggest Gentile needs to be enjoined at this time. If he is actually such a threat, how does the SEC defend its conduct over the past five years during which time it did not seek any injunction. Did the SEC willfully and knowingly expose the public to the danger of Gentile for a full five years? Of course not. The Commission does not believe he poses an actual threat going forward – it seeks the injunctions to penalize him for the conduct alleged to have occurred last decade.

Given these facts, it is clear that the relief sought by the SEC could not possibly serve a pure remedial function, or at the very least, any remedial function would be an afterthought to its

primary purpose: punishing Gentile.[10] It is not disputed that individuals who receive an injunction or bar in the securities field are tarnished in a way that all but precludes their participation in the field at all; indeed, this is precisely the reason the SEC seeks the injunctions. *See, e.g.*, *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 885 (N.D. Tex. 2011) ("The Court finds that injunctive relief and officer-and-director bars in this case are properly construed as penalties as a matter of law, as it is clear that these remedies would have significant collateral consequences…[and] neither remedy addresses past harm caused by the Defendants, and neither remedy is focused on preventing future harm due to the low likelihood that [the defendants] would engage in similar behavior in the future."). Gentile himself, in pre-submission filings with this court, has demonstrated the extent to which he has been penalized and suffered from an erroneous public announcement that the SEC already obtained an injunction against him. (Ford Dec. ¶ 15, Ex. 11)

In sum, the Complaint fails to allege, because it cannot, any pattern of securities violations, or any conduct less than nine years old, that reasonably suggests Gentile poses an imminent threat to the public. Rather it alleges isolated incidents that occurred almost a decade ago involving a lawyer who repeatedly assured Gentile that their conduct did not violate the securities laws. Moreover, given Gentile's work as a cooperator for the DOJ and SEC in

---

[10] That the SEC is continuing to litigate this case in the manner that it is, even after *Kokesh* was decided, strongly supports Gentile's argument that the primary purpose of the claims is to punish Gentile. The SEC's decision to improperly list his home address in the Complaint, given his status as a cooperator, supports this assertion. Given the *Kokesh* and *Gabelli* decisions, it is not legitimately disputed that the SEC is out of time with respect to civil penalties and disgorgement for all conduct pre-dating – at the very least seven years and 19 days ago (assuming the validity of the tolling agreements). As such, if the Commission were actually only seeking remedial measures it would voluntarily dismiss the claims that are clearly precluded and have been found to be pure punishment by the Supreme Court, even if it intends to still put forth arguments regarding these injunctions.

numerous cases involving penny stocks – and his cooperation in this field now being a matter of public record – there is virtually no chance of him committing the harm these injunctions or penny stock bar purport to seek to prevent in the future. Plainly, Gentile's involvement in penny stocks is far behind him. These past five years have sufficiently dissuaded him from wanting to return to that particular field without the need for any injunction or bar. If this court imposes any injunction against Gentile, including one that barred him from the penny stock field, the only practical effect would be to severely tarnish his reputation, and greatly interfere with his ability to work within the securities field in general. In other words, the sole result of any injunction or industry bar would be to punish Gentile. Without argument these sanctions would "in part" punish him. The injunctive remedies sought by the SEC – just like the civil penalties and disgorgement – are subject the § 2462 five-year statute of limitations, and are time-barred.

C.    Enjoining Gentile from participating in an area of the securities industry is punitive, not equitable.

It is well settled that industry bars are punitive and not remedial. *See, e.g.*, *Proffitt v. F.D.I.C.*, 200 F.3d 855, 861 (D.C. Cir. 2000) (injunction/industry bar barring individual from banking industry considered punitive and subject to statute of limitations); *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 885-86 (N.D. Tex. 2011) (officer/director bar punitive as a matter of law). Obviously an industry bar is sought here for the purpose of penalizing Gentile for a violation of public law, and to deter both him and others from engaging in any misconduct. Even if the Commission could argue that its purpose in seeking a penny-stock bar is partially to protect the public, *Kokesh* makes clear that when any purpose of the sanction is punitive it is subject to the five-year limitation period even if another purpose is arguably equitable, noting that "[a] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can

only be explained as also serving either retributive or deterrent purposes, is punishment . . ."

*Kokesh*, 137 S.Ct. at 1643.

**III.     The Tolling Agreements Are Invalid Because They Were Obtained by Either Fraud or Making Material Misrepresentations to Gentile in Violation of His Due Process Rights**

Even if this court were to conclude that the Commission satisfied federal pleading standards and the Complaint alleges on its face that Gentile violated the securities law violations in 2009 and 2010 – which it plainly does not – the case should nevertheless be dismissed as time-barred because the tolling agreements are invalid for several reasons. The tolling agreements, it now appears, were procured by deceiving Gentile into believing that he was signing an agreement for alleged conduct that was about to run past its limitations period in July 2012 (RVNG purportedly ended in 2007), but which the SEC appears to now claim extended to 2010.

Gentile signed the tolling agreements on the express understanding that, as the AUSA candidly admitted to Judge Linares, and as Judge Linares found in his decision, Gentile's alleged conduct ended in 2008.  Four years later, the Commission appears to want to make an entirely different allegation than those discussed at the time Gentile signed the agreement. Should this court conclude that the Commission properly pleaded that Gentile's alleged conduct in the KYUS scheme extended to 2010, and the government's prior representations to Judge Linares do not act as a bar to now arguing for a later date, that means Gentile did not knowingly and voluntarily execute any of the tolling agreements he signed with the SEC.  *See United States v. Levine*, 658 F.2d 113, 124 (3d Cir. 1981) (waivers involve a relinquishment of important rights and must be "informed by an understanding of the consequences of the waiver"); *see also United States v. Gentile*, --- F. Supp. 3d ----, 2017 WL 424907, at *2-3 (D.N.J. Jan. 30, 2017).

SEC staff attorneys were also present at the August 14, 2014 meeting with the DOJ and Gentile that was discussed at length in Judge Linares' decision, when Gentile announced that he would not sign any additional tolling agreements with the DOJ or the SEC because he wanted everything to be over by June 30, 2015, the date everyone believed to be the five year mark (excluding arguably tolled time) from the end of any alleged misconduct. (Ford Dec. ¶ 13, Ex. 9, ¶ 17) Judge Linares has already found that Gentile's assertion that "he would not have signed waivers if at any time, he thought or was advised that the statute of limitations was six years" to be "credible since it seems to be buttressed by the fact that he expressed to his attorneys and the Government that he wanted to assure this case would be resolved on or before June 30, 2015; the date that the twice-extended five-year statute of limitations would have expired. Therefore it appears that repose after this date was important to Defendant. In fact, in an August 2014 meeting Defendant refused to sign a third tolling waiver, further exhibiting that he sought to have the matter resolved by June 30, 2015, the date he, as well as the Government, thought the twice-extended five-year statute of limitations would have expired." *Gentile*, 2017 WL 424907 at *3.

These conclusions, which have already been made and are now the law of the case, must be applied to the SEC tolling agreements, in the same manner they were applied to the DOJ tolling agreements. As with the DOJ, no one from the SEC informed Gentile that he was mistaken in believing that the case would have to be resolved by June 30, 2015 because they believed he was engaged in conduct that extended to 2010. (*Id.*) There is no meaningful difference between the government failing to inform Gentile at this meeting that it believed the statute of limitations was six years (and not five years) and the government not telling Gentile that it believed the statute of limitations began running in 2010, not June 2008 as he was previously led to believe. The results of the government's conduct in this regard must be the

same. Just as with the DOJ, Gentile, in fact refused to sign additional tolling agreements with the SEC in the fall of 2014, because just like with the DOJ, he wanted everything to be over by June 30, 2015 – the date he had been led to believe by the government was the expiration of all relevant statute of limitations, including for all penalties under section 2462. (*Id.*) Accordingly, as Judge Linares found with respect to the tolling waivers from the DOJ, Gentile "unknowingly executed" the tolling agreements. *Gentile*, 2017 WL 424907, at *3.

Second, Gentile signed the tolling agreements with the belief that he was doing so as part of a cooperation agreement that he had entered into with the SEC – because the SEC told him that it was agreeing to enter into a cooperation agreement with him before he signed them. The SEC has since informed Gentile that it never entered into a cooperation agreement with him. Ford Dec. ¶ 14, Ex. 10) The Commission's recent assertion that it never entered into a cooperation agreement with Gentile strongly suggests the tolling agreements were procured in violation of Gentile's due process rights. Indeed, SEC staff attorneys appear to have misled Gentile to believe that he had entered into a cooperation agreement with the Commission that obligated him to sign tolling agreements, but instead they were just using him as a cooperator while tricking him into thinking he had entered into a cooperation agreement. Like the tolling agreements Judge Linares found invalid in the related criminal case, the tolling agreements here are invalid because Gentile did not have an understanding of what rights he was signing away based on the SEC misleading him with respect to his understanding of the scope of the conduct for which he was cooperating, and his mistaken belief that the SEC had agreed to enter into a cooperation agreement with him – based on SEC staff attorneys explicitly telling him they were entering into a cooperation agreement with him which required him to sign tolling agreements.

## IV. The SEC Cannot Obtain Injunctive Relief Because it has Failed to State a Claim and the Relief Sought Lacks Requisite Specificity

### A. The Complaint fails to allege any facts entitling the SEC to injunctive relief.

In addition to the time bar, the SEC also cannot obtain injunctive relief because it has failed to allege actual and imminent, forward-looking harm requiring protection of an injunction and the relief sought lacks the requisite specificity required by Rule 65. In its Complaint, the Commission asserts five causes of action and demands injunctive relief as a remedy for Gentile's alleged violation thereof. The SEC cannot, however, obtain such relief because it has not pleaded any ongoing or future conduct that must be enjoined – nor could it. A mere statutory violation, of course, does not entitle the Commission to automatic injunctive relief. *See, e.g.*, *Int'l Union, United Auto. Aerospace & Agr. Implement Workers v. Amerace Corp.*, 740 F. Supp. 1072, 1086 (D.N.J. 1990) ("Injunctive relief cannot automatically be granted upon a finding of statutory violation."). Instead, "[i]njunctive relief is forward-looking." *Jama Corp. v. Gupta*, 2008 WL 627410, at *2 (M.D. Pa. Mar. 4, 2008). "To establish standing for a forward-looking injunction, a party must show a threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical." *Kunkle v. Naugle*, 2015 WL 7756197, at *7 (E.D. Pa. Dec. 2, 2015), *aff'd*, 660 F. App'x 132 (3d Cir. 2016); *see also, e.g.*, *McCormick v. Kline*, 670 F. App'x 764, 765 (3d Cir. 2016) ("Absent a real and immediate threat of future injury by the defendant, injunctive relief is not an appropriate remedy").

The statutory securities laws track these equitable principles. In this case, each of the five "claims" for injunctive relief rely on the authority granted to the SEC pursuant to 15 U.S.C. § 77t(b) and 15 U.S.C. § 78u(d)(1). First, Section 77t(b) permits: "Whenever it shall appear to the Commission that any person *is engaged or about to engage* in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or

26

regulation prescribed under the authority thereof, the commission may…bring an action…to enjoin such acts of practices…" (emphasis added). Similarly, Section 78u(d)(1) permits: "Whenever it shall appear to the Commission that any person *is engaged or is about to engage* in acts or practices constituting a violation of any provision of this chapter, the rules of regulations thereunder…it may…bring an action…to enjoin such acts or practices…" (emphasis added). Accordingly, for injunctive relief to survive a motion to dismiss, the SEC must allege that Gentile is engaging in prohibited acts or practices or at least allege facts sufficient to "support any reasonable inference that [he is] about to engage" in prohibited acts or practices "at the time the suit was brought or at the time the injunction was made effective." *S.E.C. v. Torr*, 87 F.2d 446, 450 (2d Cir. 1937) (reversing grant of injunction under 15 U.S.C. §§ 77t(b) and 78u where defendants were not engaging in prohibited acts and "circumstances fail to support any reasonable inference that they were about to engage in any at the time the suit was brought"); *see also S.E.C. v. Secure Capital Funding Corp.*, 2013 WL 3286234, at *8 (D.N.J. June 28, 2013) ("The decision on whether to grant injunctive relief 'is based on a determination of whether there is a reasonable likelihood that the defendants, if not enjoined, will again engage in the illegal conduct.'") (*quoting S.E.C. v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980)); *S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014) (denying SEC request for injunctive relief where four years had elapsed between prohibited conduct, because no reasonable likelihood of future violation); *In re Reserve Fund Secs. & Derivative Litigation*, 2013 WL 5432334, at *22-23 (S.D.N.Y. Sept. 30, 2013) (concluding permanent injunction not warranted where infractions were "isolated occurrences" that had occurred "decades" ago).

Moreover, in order to sufficiently make a showing of the need for injunctive relief, the SEC must satisfy the heightened federal fraud pleading standards, which mandate that the claim

is at a minimum "plausible" and sets forth sufficient factual allegations to outline the elements of the claim, and does not require this Court to accept "conclusory allegations" or to make unwarranted inferences. *See, e.g.*, *McCormick*, 670 F. App'x at 765 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) in requiring a demand for injunctive relief to be properly pleaded).

Here, the Complaint fails to set forth any facts suggesting that Gentile is engaged or is about to engage in any prohibited conduct at the time the Complaint was filed. Indeed, since the Complaint was filed fifteen months ago, and Gentile has not engaged in any securities laws violations, any such allegation would have been disproven by now in any event. Accordingly, aside from whether section 2462 precludes an injunction at this time, the SEC failed to plead sufficient facts entitling it to this relief.

B. The injunctions sought lack requisite specificity under FRCP 65.

Finally, the SEC's proposed injunctive relief must also be denied because the Third Circuit precludes judges from issuing the broad and generic "obey the law" injunctions like the ones sought here. Federal Rule of Civil Procedure 65(d) requires that every injunction "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." A generic "obey the law" injunction does not begin to meet this standard. Following the rule – which is clearly written to protect due process concerns – the Third Circuit has held that "[b]road, nonspecific language that merely enjoins a party to obey the law … does not give the restrained party fair notice of what conduct will risk contempt." *Louis W. Epstein Family P'ship v. Kmart Corp.,* 13 F.3d 762, 771 (3d Cir. 1994). Indeed, Rule 65 is "no mere technicality," and requires an injunction "framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law." *S.E.C. v. Smyth*,

at 1233 n.14 (11th Cir. 2005) (rejecting "obey the law" injunction and noting that such an injunction "unacceptably conflicts with a defendant's constitutional rights"). The court in *S.E.C. v. Sky Way Global, LLC*, 710 F. Supp. 2d 1274, 1280-81 (M.D. Fla. 2010), explained succinctly the constitutional issues and separation of powers issues raised by "obey the law" injunctions, and concluded they are impermissible because a defendant may be found guilty of contempt for violating a law without any of the procedural safeguards afforded by criminal procedure and the Constitution.

It is for these reasons that courts routinely reject the SEC's attempts to impose "obey the law" injunctions on individuals. *See S.E.C. v. Smyth*, 420 F.3d at 1233 n.14 ("This court has held repeatedly that 'obey the law injunctions' are unenforceable"); *S.E.C. v. Sky Way Global*, 710 F. Supp. 2d at 1274 ("the Commission's widespread practice of procuring an obey-the-law injunction as a component of resolving litigation is legally flawed and practically mischievous"); *S.E.C. v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016) (restating that "obey-the-law" injunctions are unenforceable); *Hines v. Nichols*, 2016 WL 3460220, at *2 (M.D. Ga. May 18, 2016) ("the Court cannot issue a general injunction barring any Defendant from violating the law at some point in the future"); *Payne v. Travenol Laboratories*, 565 F.2d 895, 898 (5th Cir. 1978) ("Such 'obey the law' injunctions cannot be sustained."); *Daniels v. Woodbury County, Iowa*, 742 F.2d 1128, 1134 (8th Cir. 1984) ("an injunction that does little or nothing more than order the defendants to obey the law is not specific enough").

Here, the Complaint fails to specify what conduct the SEC seeks to enjoin. Rather, each of the five "claims" merely sets forth laws that an injunction would require Gentile to obey. This is precisely the sort of "obey the law" injunction the Third Circuit has held cannot be sustained and which federal courts have explained time and again violates the constitutional rights of

defendants, such as Gentile here, and separation of powers by placing defendants, such as Gentile here, at risk of a contempt hearing without any of the due process or procedural safeguards to which he is entitled under both the criminal law and for securities violations. The reason for the SEC's failure to set forth *any* act or acts to be restrained or required is because, as explained more fully above, the inference that there is a substantial likelihood that Gentile will violate the securities law is, simply put, not supported by any evidence. Gentile, after voluntarily, deliberately, and conclusively walking away from whatever conduct he was allegedly part of nearly a decade ago, became an active and effective cooperator working with the SEC, USAO, and other governmental agencies. During this time, Gentile has operated lawful and successful businesses, gotten involved in civic and charitable endeavors and become a model citizen. Under such circumstances, the SEC appears remiss to actually allege in their five "claims" what it is seeking to enjoin, and instead sets forth a series of blanket "obey the law" injunctions, which this Circuit does not recognize. The claims cannot survive a Rule 12(b)(6) motion to dismiss.

## CONCLUSION

For the foregoing reasons, Gentile respectfully requests that this court dismiss the Complaint in its entirety, with prejudice.

Dated: June 30, 2017

_____
Adam C. Ford, Esq.
Adam Pollock, Esq.
Ford O'Brien LLP
85 Broad Street
New York, New York 10004
Tel: (212) 858-0040
Email: aford@fordobrien.com
*Attorneys for Defendant Guy Gentile*

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,     :
    :
             Plaintiff,     :       16 Civ. 1619 (JLL)(JAD)
    :
    -against-     :
    :
GUY GENTILE,     :
    :
             Defendant.     :

------------------------------------------------------------------- x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

SECURITIES AND EXCHANGE
COMMISSION
    Nancy A. Brown
    Simona K. Suh
    Elizabeth Butler
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0037 (Butler)
butlerel@sec.gov

Attorneys for Plaintiff

July 21, 2017

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................................... iii

Preliminary Statement ...................................................................................................... 1

RELEVANT FACTS ......................................................................................................... 2

    A.  Summary of the Allegations of the Complaint ............................................... 2

        1.  Guy Gentile .................................................................................................. 2

        2.  The RVNG Scheme ................................................................................... 2

        3.  The KYUS Scheme ................................................................................... 4

    B.  The Parallel Criminal Action ............................................................................. 7

    C.  Procedural History of the Instant Action ....................................................... 8

    D.  Additional Facts in the Public Record ............................................................ 9

ARGUMENT ....................................................................................................................... 10

I.  THE COMPLAINT ADEQUATELY PLEADS SECURITIES FRAUD
    AGAINST DEFENDANT ......................................................................................... 10

    A.  Standard of Review ............................................................................................. 10

    B.  Defendant's Motion to Dismiss Should Be Denied Because the Commission
        Seeks Remedial, Not Punitive, Relief ............................................................ 11

        (1) An Injunction, Properly Entered, Is Remedial Relief
            Not Subject to Section 2462's Limitations ....................................... 13

        (2) To Determine Whether an Injunction Is Necessary, the Court Must Assess
            Relevant and Fact-specific Factors, Making a Resolution of Defendant's
            Statute of Limitations Claim Inappropriate on a Motion to Dismiss ........ 16

    C.  Defendant's Motion to Dismiss the Commission's Injunctive Remedy Is Improper
        as a Matter of Law and Premature as a Matter of Fact ............................ 24

    D.  A Penny Stock Bar, Properly Entered, Is Also Remedial
        Because It Seeks to Protect the Investing Public ....................................... 27

i

| | Page |
|---|---|
| II. DEFENDANT'S CLAIMS THAT HIS TOLLING AGREEMENTS SHOULD BE VOIDED ARE WRONG, YET IRRELEVANT | 29 |
| CONCLUSION | 30 |

# TABLE OF AUTHORITIES

**Page**

C‍ASES

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................................ 10

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ................................................ 10

Birdman v. Office of the Governor, 677 F.3d 167 (3d Cir. 2012) ........................ 25

Chruby v. Kowaleski, 534 F. App'x 156 (3d Cir. 2013) ...................................... 25

Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114 (3d Cir. 2013) ...................... 10

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) ................................... 10

In re Emerson Radio Corp. Secs. Litig., No. 03 Civ. 4201 (JLL),
     2005 WL 8131267 (D.N.J. Dec. 20, 2005) ................................................. 26

In re Reserve Fund Secs. and Deriv. Litig., No. 09 Civ. 4346 (PGG),
     2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013) ............................................ 24

Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996) .......................................... 15, 16, 18

Kokesh v. SEC, 137 S. Ct. 1635 (2017) ..................................................... passim

Louis W. Epstein Family P'ship v. Kmart Corp., 13 F.3d 762 (3d Cir. 1994) ....... 24-25

Meadows v. SEC, 119 F.3d 1219 (5th Cir. 1997) ................................................. 16

Proffitt v. FDIC, 200 F.3d 855 (D.C. Cir. 2000) ............................................. 16, 18

Riordan v. SEC, 627 F.3d 1230 (D.C. Cir. 2010) ................................................ 16

Rondeau v. Mosinee Paper Corp., 422 U.S. 49 (1975) ........................................ 15

Schwartz v. Avis Rent A Car Sys., LLC., No. 11 Civ. 4052 (JLL),
     2012 WL 12909908 (D.N.J. Sept. 18, 2012) .............................................. 25

SEC v. Alexander, 115 F. Supp. 3d 1071 (N.D. Cal. 2015) ................................. 19

SEC v. Bankosky, 716 F.3d 45 (2d Cir. 2013) .................................................... 28

iii

**Page**

SEC v. Bartek, 484 F. App'x 949 (5th Cir. 2012)...................................................15-16, 18

SEC v. Becker, No. 09 Civ. 5707 (SAS), 2010 WL 2710613 (S.D.N.Y. July 8, 2010)........................29

SEC v. Berry, 580 F. Supp. 2d 911 (N.D. Cal. 2008) ..................................................16

SEC v. BIH Corp., No. 10 Civ. 0577, 2014 WL 7499053 (M.D. Fla. Dec. 12, 2014)......................23

SEC v. Bonastia, 614 F.2d 908 (3d Cir. 1980)...........................................13, 17, 18, 22, 26

SEC v. Brethen, No. 90 Civ. 0071, 1992 WL 420867 (S.D. Ohio Oct. 15, 1992) ...............................22

SEC v. Brown, 740 F. Supp. 2d 148 (D.D.C. 2010)......................................................28

SEC v. Caserta, 75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...................................................28

SEC v. Clay Capital Mgmt., LLC, No. 11 Civ. 5020 (DMC)(JBC),
    2013 WL 5946989 (D.N.J. Nov. 6, 2013)...................................................20-21, 22

SEC v. Collyard, --- F.3d ----, 2017 WL 2803184 (8th Cir. June 29, 2017)..........................1, 11, 14-15

SEC v. Cole, No. 12 Civ. 8167 (RJS), 2014 WL 4723306 (S.D.N.Y. Sept. 22, 2014),
    aff'd, 661 F. App'x 52 (2d Cir. 2016) ...............................................................28

SEC v. Cooper, 142 F. Supp. 3d 302 (D.N.J. 2015) ...................................................13

SEC v. Desai, 145 F. Supp. 3d 329, 337 (D.N.J. 2015),
    aff'd, 672 F. App'x 201 (3d Cir. 2016), cert. denied
    Desai v. SEC, -- S. Ct. --, 2017 WL 1741726 (June 5, 2017) .......................................19

SEC v. DiBella, No. 04 Civ. 1342, 2008 WL 6965807 (D. Conn. Mar. 13, 2008),
    aff'd, 587 F.3d 553 (2d Cir. 2009).................................................................24

SEC v. Fehn, 97 F.3d 1276 (9th Cir. 1996).........................................................23

SEC v. Fisher, No. 07 Civ. 4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008).............................17-18

SEC v. Gabelli, 653 F.3d 49 (2d Cir. 2011), rev'd on other grounds, 568 U.S. 442 (2013).................17

SEC v. Gann, 565 F.3d 932 (5th Cir. 2009)............................................................21

SEC v. Geswein, No. 10 Civ. 1235, 2011 WL 4565861 (N.D. Ohio Sept. 29, 2011)...........................18

SEC v. Goble, 682 F.3d 934 (11th Cir. 2012) .........................................................25

iv

**Page**

SEC v. Graham, 823 F.3d 1357 (11th Cir. 2016) ................................................. 14

SEC v. Gunn, No. 08 Civ. 1013 WL 3359465 (N.D. Tex. Aug. 25, 2010) ............................................ 20

SEC v. Holschuh, 694 F.2d 130 (7th Cir. 1982) ......................................... 20

SEC v. Investors Security Corp., 560 F.2d 561 (3d Cir. 1977) .................................. 26

SEC v. Johnson, 652 F. Supp. 2d 29 (D.D.C. 2009) .................................. 22

SEC v. Johnson, No. 02 Civ. 5490 (GEB), 2004 WL 5561799 (D.N.J. Aug. 27, 2004),
    aff'd, 174 F. App'x 111 (3d Cir. 2006) ................................................. 27

SEC v. Johnson, 174 F. App'x 111 (3d Cir. 2006) ................................. 24

SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ................................ 15, 18

SEC v. Landberg, 836 F. Supp. 2d 148 (S.D.N.Y. 2011) .............................. 17

SEC v. Life Partners Holdings, Inc., 854 F.3d 765 (5th Cir. 2017) ................................ 22-23

SEC v. Microtune, 783 F. Supp. 2d 867 (N.D. Tex. 2011),
    aff'd sub nom. SEC v. Bartek, 484 F. App'x 949 (5th Cir. 2012) ................. 16

SEC v. Northeastern Fin. Corp., 268 F. Supp. 412 (D.N.J. 1967) ...................... 23-24

SEC v. Power, 525 F. Supp. 2d 415 (S.D.N.Y. 2007) .......................... 18

SEC v. Quinlan, 373 F. App'x 581 (6th Cir. 2010) ............................ 14

SEC v. Quiros, No. 16 Civ. 21301, 2016 WL 7443349 (S.D. Fla. Nov. 21, 2016) ......................... 24-25

SEC v. Radius Capital Corp., No. 11 Civ. 0116,
    2015 WL 1781567 (M.D. Fla. Apr. 20, 2015) ................................... 21

SEC v. Rind, 991 F.2d 1486 (9th Cir. 1993) .......................... 12-13

SEC v. Saltsman, No. 07 Civ. 4370 (NGG), 2016 WL 4136829 (E.D.N.Y. Aug. 8, 2016)............14, 17

SEC v. Savino, No. 01 Civ. 2438 (GBD),
    2006 WL 375074, at *11 (S.D.N.Y. Feb. 16, 2006), aff'd in relevant part,
    208 F. App'x 18 (2d Cir. 2006) ........................................ 21

v

**Page**

SEC v. Secure Capital Funding Corp., No. 11 Civ. 0916,
2013 WL 3286234 (D.N.J. June 28, 2013) ......................................................... 26

SEC v. Shapiro, 494 F.2d 1301 (2d Cir. 1974) ....................................................... 23

SEC v. Straub, No. 11 Civ. 9645 (RJS), 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016) ............... 14, 17

SEC v. Torr, 87 F.2d 446 (2d Cir. 1937) ............................................................ 23, 24

SEC v. Tourre, 4 F. Supp. 3d 579 (S.D.N.Y. 2014) .................................................... 24

SEC v. U.S. Environmental, Inc., No. 94 Civ. 6608 (PKL),
2003 WL 21697891 (S.D.N.Y. July 21, 2003), aff'd, 114 F. App'x 426 (2d Cir. 2004) ............ 21-22

SEC v. U.S. Funding Corp., No. 02 Civ. 2089 (WJM),
2006 WL 995499 (D.N.J. April 11, 2006) ......................................................... 13

SEC v. Verdiramo, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ........................................ 19-20, 23

SEC v. Wey, No. 15 Civ. 7116 (PKC), 2017 WL 1157140 (S.D.N.Y. Mar. 27, 2017) ................. 14, 17

SEC v. Wyly, 950 F. Supp. 2d 547 (S.D.N.Y. 2013) ............................................. 16, 17-18

Strikeforce Technologies, Inc. v. Whitesky, Inc., No. 13 Civ. 1895 (SRC),
2013 WL 3508835, at *10 (D.N.J. July 11, 2013) .............................................. 25-26

United States v. Halper, 490 U.S. 435, 447 (1989) .................................................... 16

**STATUTES AND RULES**

Securities Act of 1933

    Section 5, 15 U.S.C. § 77e.......................................................................... 5, 8

    Section 17(a), 15 U.S.C. § 77q(a) .................................................................... 8

    Section 17(b), 15 U.S.C. § 77q(b) .................................................................... 8

    Section 20(b), 15 U.S.C. § 77t(b) .................................................................... 8

    Section 20(g), 15 U.S.C. § 77t(g) ................................................................. 8, 27

Securities Exchange Act of 1934

    Section 3(a)(51), 15 U.S.C. § 78c(a)(51) ............................................................ 27

**Page**

Rule 3a51-1, 17 C.F.R. § 240.3a51-1 ...................................................................... 27

Section 10(b), 15 U.S.C. § 78j(b)............................................................................... 8

Rule 10b-5, 17 C.F.R. § 240.10b-5.......................................................................... 8

Section 21(d)(1), 15 U.S.C. § 78u(d)(1) ................................................................... 8

Section 21(d)(6)(A), 15 U.S.C. § 78u(d)(6)(A)......................................................8, 27

Insider Trading Sanctions Act of 1984, Pub. L. No. 98–376, 98 Stat. 1264 (1984)............................. 11

Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L No. 101-429, 104 Stat. 931 (1990) .................................................. 11

28 U.S.C. § 2462................................................................................................. passim

Fed. R. Civ. P. 12(b)(6) ....................................................................................10, 24

Fed. R. Civ. P. 15(a)...........................................................................................26-27

M̲ISCELLANEOUS

H.R. Rep. 98-355, reprinted in 1984 U.S.C.C.A.N. 2274 ...................................... 11-12

H.R. Rep. 100-910, reprinted in 1988 U.S.C.C.A.N. 6043 ...................................... 12

H.R. Rep. 101-617, reprinted in 1990 U.S.C.C.A.N. 1408 ..................................... 27

S. Rep. 107-205 (2002) .......................................................................................... 27

Kokesh v. SEC Oral Arg. Tr., available at 2017 WL 1399509 (April 18, 2017).................... 12

vii

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law together with the accompanying Declaration of Nancy A. Brown, executed July 21, 2017 ("Brown Decl."), with Exhibits, and the Declaration of Simona K. Suh, executed July 21, 2017 ("Suh Decl."), in opposition to the motion of Defendant Guy Gentile to dismiss the Complaint.

## Preliminary Statement

The Complaint (DE 1, and submitted herewith as Brown Decl., Ex. A) details Defendant's participation in two penny stock manipulation and unlawful distribution schemes. The schemes, which involved market manipulation, fraudulent promotion, and unregistered offerings of two stocks beginning in 2007, generated more than $17 million in illegal gross proceeds as well as substantial profits for the schemes' participants. (Complaint ¶ 1.)

Two points are undisputed on this Motion to Dismiss: (1) Defendant admitted his role in the two highly profitable fraudulent schemes outlined in the Commission's Complaint; and (2) Defendant has spent the last five years since his arrest and confession attempting to escape the consequences of his misconduct.

What Defendant does contest is the Court's power to enjoin him from future violations of the securities laws -- that is, whether as a matter of law this case must be dismissed because the Commission seeks injunctive relief to protect the public from likely future misconduct by Defendant.

Defendant argues that this Court should ignore years of precedent to hold that injunctive relief is punitive and therefore subject to a five year statute of limitations, pointing to the Supreme Court's recent decision in <u>Kokesh</u> as support. But <u>Kokesh</u> cannot be so extended, as the Eighth Circuit's <u>Collyard</u> decision determined late last month in rejecting all of the arguments Defendant makes here.

Nor would such a determination be appropriate on a motion to dismiss in any event. Injunctions are only punitive if there is no factual basis for them, and that assessment cannot be made before resolution of the merits and consideration of evidentiary factors not determinable at the pleading stage. If the Defendant poses no threat of future misconduct, then an injunction would not properly be entered against him (irrespective of any statute of limitations), but the Court cannot make that determination absent a full evidentiary record.

Defendant's Motion to Dismiss the Commission's Complaint on statute of limitations grounds should be denied.[1]

## RELEVANT FACTS

### A. Summary of the Allegations of the Complaint

#### 1. Guy Gentile

Over the years, Defendant Guy Gentile has been the principal of multiple securities-related businesses. At the time of the conduct alleged in the Complaint, Defendant owned a Commission-registered broker-dealer located in New York State. At the time the Commission commenced this action, Defendant was 39 years old and acting as the principal of a Bahamas-based online brokerage firm, which he founded in 2011. (Complaint ¶ 14.)

#### 2. The RVNG Scheme

In 2007, Defendant was recruited by two penny stock promoters (Mike Taxon and Itamar Cohen)[2] to participate in a scheme to manipulate the stock of Raven Gold Corporation ("RVNG").[3]

---

[1] "MTD at ___" refers to citations to Defendant's Memorandum of Law in Support of his Motion to Dismiss, dated June 30, 2017. (DE 34.)

[2] Both Taxon and Cohen have since pled guilty to parallel criminal charges arising out of their respective conduct in the two schemes detailed here. See United States v. Taxon, 15 Cr. 249 (JLL) (D.N.J.) (DE 3) and United States v. Cohen, 15 Cr. 248 (JLL) (D.N.J.) (DE 3); see also Brown Decl., Exs. C and D (Taxon and Cohen Plea Agreements).

Defendant, along with Taxon and Cohen, engaged in a fraudulent stock promotion campaign, whereby they manipulated the market to create the false impression of liquidity and active interest in RVNG stock, and then sold their shares into the inflated market in an unregistered and unlawful distribution. To that end, Defendant traded RVNG stock between various brokerage accounts held in the names of brokerage firms where he, Taxon, and Cohen had or controlled accounts, in order to create an attractive – but fake – price and volume history for investors, while also shielding the scheme participants' personal involvement in the trading. Defendant also offered and provided to certain penny stock traders blocks of RVNG stock for free, in exchange for the traders purchasing RVNG stock in the open market. This amplified the false appearance of increased liquidity and market interest in the RVNG stock. (Complaint ¶¶ 2-5, and 26-31.)

As part of the scheme, Defendant also co-authored an eight-page glossy "newsletter" touting RVNG stock (the "RVNG Mailer") that was distributed in mid-July 2007. The RVNG Mailer contained multiple materially false and misleading statements concerning both the mailer's origins, as well as the stock's performance. For example, the RVNG Mailer purported to have been published by an entity named "Stock Trend Report" as a "Special Edition of Premium Members." In reality, Stock Trend Report was a fictional name that had been created by Defendant and his collaborators specifically for the RVNG campaign, and no prior or subsequent "editions" of the Stock Trend Report ever appeared. The RVNG Mailer also indicated that RVNG stock had been seen in various respected news publications, implying that the stock had been the subject of independent reporting. In reality, the only appearance of the stock in publications had been in equally misleading paid

---

[3] The penny stock promoters had been recruited to participate in the scheme by individuals who controlled the company and who directed shares of purportedly free-trading stock to Defendant and his collaborators. (Complaint ¶ 2.)

3

advertisements prepared and placed by Defendant and Taxon and Cohen. (Complaint ¶¶ 4, 32-35, 38-43.)

The RVNG Mailer also contained a number of materially false and misleading statements concerning the stock's performance, including its "remarkable uptrend so far." The mailer attributed the stock's "strong move upward" in "recent weeks" to the company's strong business prospects, but failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Defendant, his cohorts, and those acting in concert with them, or that their trading had been executed in order to create an attractive price and volume history for the stock, not because of legitimate, independent market interest. The Mailer also stated that there was "high market demand for RVNG by institutional investors," when no such demand existed. As a co-author of the document, Defendant knew of all of these materially false and misleading statements, or was reckless in not knowing that they were false. (Complaint ¶¶ 33, 36-37.)

Defendant also worked with Taxon and Cohen and individuals who controlled RVNG to coordinate the timing and number of press releases issued by the company – 13 in June and July 2007 – which were designed to support the fiction that the Company's business prospects were strong. (Complaint ¶ 46.)

As a result of these actions, Defendant successfully manipulated the market for RVNG stock. Prior to May 31, 2007, RVNG traded at prices not exceeding $0.80 per share and with minimal volume. Starting on May 31, 2007, the daily price and volume of trading went up dramatically, only to decline as soon as the fraudulent promotion was complete. (Complaint ¶ 47.)

3.    The KYUS Scheme

In the summer of 2007, Defendant was recruited to participate in a second fraudulent stock promotion campaign involving the stock of Kentucky USA Energy, Inc. ("KYUS") by two men

4

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 151 of
364
Case 2:16-cv-01619-LLL-JAD Document 39 Filed 07/21/17 Page 130 of 331 PageID: 615

who controlled KYUS, Adam S. Gottbetter, a well-known New York microcap securities and

transactional lawyer and his business partner, Samuel DelPresto.[4] Specifically, Defendant agreed to

(1) "build the chart" for KYUS stock -- that is, create seemingly attractive price and volume history

for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock,

including its seemingly favorable price and volume history that his manipulative trading had created;

and (3) fund the promotional mailing with proceeds from selling purportedly free-trading KYUS

stock (that he had received from those who controlled KYUS) in the open market. To perpetrate

the scheme, Defendant, Taxon and Cohen, and Gottbetter and DelPresto, bought the KYUS shell

company in October 2007 for $760,000, resulting in 75% of KYUS's purportedly unrestricted stock

being transferred to accounts in the names of four brokerage firms of Defendant, Taxon, and Cohen

(the "nominee accounts"), with the remaining 25% being transferred to Gottbetter and DelPresto.

---

[4] Gottbetter pled guilty to one count of conspiring with others to commit securities fraud and mail
fraud, as a result of his participation in two pump-and-dump schemes. He was sentenced to a
prison term of 18 months, one year of supervised release, a $60,000 fine and ordered to forfeit
$344,966.55. See United States v. Gottbetter, 14 Cr. 467 (JLL) (D.N.J.) (DE 10 (Plea Agreement);
DE 18 (Judgment); Brown Decl., Exs. E and F.). In the Commission's parallel case, SEC v.
Gottbetter, et al., 15 Civ. 3528 (JLL) (D.N.J.), the Commission charged Gottbetter with violations of
the antifraud provisions of the Exchange Act arising out of his role in the same penny stock frauds
as charged in the criminal action. (SEC v. Gottbetter, DE 1 (Complaint); Brown Decl., Ex. G.) In
addition, the Commission also charged Gottbetter with violations of the antifraud provisions of the
Securities and the Exchange Acts, as well as with violations of Securities Act Section 5, based on his
role in the KYUS scheme. (Id.) Gottbetter consented to a Judgment in the Commission's case (1)
permanently enjoining him from future violations of specified federal securities laws; (2) imposing a
penny stock bar; and (3) ordering him to pay disgorgement of his ill-gotten gains, including those
from the KYUS scheme, and pre-judgment interest totaling approximately $4.6 million. (Id., DE 7
(Final Judgment (with Consent); Brown Decl., Ex. H.)

DelPresto, whom the Complaint refers to as "Gottbetter's Partner" (Complaint ¶ 53), also entered
into a plea agreement with the USAO as a result of his involvement in, inter alia, the KYUS scheme,
which is now a matter of public record. See United States v. DelPresto, 15 Cr. 631 (JLL) (D.N.J.)
(DE 5 (Plea Agreement); Brown Decl., Ex. I.) He has not yet been sentenced in the criminal action.
The Commission has also commenced an action against DelPresto as a result of his involvement in
four pump-and-dump frauds. See SEC v. DelPresto, et al., No. 15 Civ. 8656 (JLL) (D.N.J.) (DE 22
(Second Amended Complaint).) That matter is currently stayed due to potential criminal liability of
his co-defendant. (Id., DE 33 (Stipulation and Order).)

By using nominee accounts, Defendant again sought to obscure his connection to the stock. (Complaint ¶¶ 53, 55, 57-59.)

In November 2007, Defendant and Taxon and Cohen began "building the chart" for KYUS stock, in preparation for the distribution of the promotional mailer. Among other things, Defendant executed matched trades between the nominee entity accounts and accounts of his friends and family members that he controlled. Defendant also convinced some penny stock traders he was acquainted with to buy KYUS stock in the open market, based on the understanding that Defendant would be promoting the stock and would give these "buyers" a heads up about the upcoming promotion, enabling them to sell the stock at a high price. As a result, on many days between late 2007 and May 2008, most, if not all of the market activity in KYUS was generated by accounts held by Defendant and his collaborators. As a result of these actions, Defendant created the false appearance of broad market demand for KYUS stock and gradually inflated the price. (Complaint ¶¶ 7, 60-63.)

In about May 2008, Defendant took the lead role in creating and distributing by mail a glossy promotional mailer touting KYUS (the "KYUS Mailer"). The KYUS Mailer took the form of an eight-page "newsletter" distributed under the fake name "Global Investor Watch." The mailer touted KYUS's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a fictional entity named Green Century Capital. In fact, Defendant funded the KYUS Mailer with proceeds from selling his and Taxon and Cohen's allotments of KYUS stock. (Complaint ¶¶ 64, 65.)

The manipulation and fraudulent promotion of KYUS stock were successful, as the stock price rose and the volume increased dramatically after the mailer had been disseminated. By the end of May 2008, Defendant and his collaborators had sold millions of KYUS shares. Defendant's

collaborators in the scheme, Gottbetter and DelPresto, continued selling their KYUS stock through November 2010, during which time Defendant assisted in the execution of some of these sales. (Complaint ¶¶ 66-68.)

### B. The Parallel Criminal Action

In July 2012, Defendant was arrested by the FBI. Almost immediately, and while represented by the same counsel who appears in this case, Defendant admitted his culpability for the RVNG and KYUS schemes and agreed to provide information to the United States Attorney's Office for the District of New Jersey ("USAO") and the Commission in connection with their separate investigations of other fraudulent penny stock schemes. (See United States v. Gentile, 16 Cr. 155 (JLL)(D.N.J.) (the "Parallel Criminal Action") (DE 19) (Memorandum of Law in Opposition to Defendant Guy Gentile's Motion to Dismiss the Indictment, at 5); Brown Decl., Ex. K, at 5; see also Declaration of Adam Ford, executed June 30, 2017, Ex. 9 (Affidavit of Defendant in Support of Motion to Dismiss criminal indictment at ¶¶ 3-6 (DE 34-2).) Over the next approximately two and a half years, Defendant provided the USAO and the Commission information concerning various securities frauds. During this period, Defendant (still represented by Ford) entered into separate tolling agreements with both the USAO and the Commission. (Brown Decl. ¶¶ 13-15, and Ex. L; Suh Decl. ¶¶ 2-3.)

On March 23, 2016, with Defendant unable to persuade the USAO to drop its criminal charges against him, and his cooperation at an end, the Grand Jury returned an indictment against Defendant, charging him with various criminal securities law violations arising out of his conduct in the manipulation and unlawful distribution of RVNG and KYUS. (Parallel Criminal Action (DE 1) (Indictment); Brown Decl., Ex. J.) On July 14, 2016, Defendant filed a motion to dismiss the Indictment. (Id. (DE 14).) On January 30, 2017, the Court granted the motion, dismissing the

7

Indictment on statute of limitations grounds, ruling that Dodd-Frank's six year statute of limitations did not apply to Defendant's pre-Dodd-Frank conduct, and voiding the tolling agreements the Defendant had entered into with the USAO. (Id. (DE 32).)

### C.  Procedural History of the Instant Action

On March 23, 2016, the Commission filed the Complaint in this action, charging Defendant with violations of Sections 5, 17(a), and 17(b) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder. The Complaint alleges that, absent an injunction, Defendant will continue to violate these provisions of the federal securities laws. (Complaint ¶¶ 73, 76, 79, 82, and 85.) In relevant part, the Complaint seeks an injunction, pursuant to Securities Act Section 20(b) and Exchange Act 21(d), against Defendant's further violations of the charged provisions of the securities laws, a penny stock bar pursuant to Securities Act Section 20(g) and Exchange Act Section 21(d)(6)(A), as well as "such other and further relief as this Court deems just and appropriate." (Id. ¶ 10; Prayer for Relief, I, IV and V.)[5]

Shortly after the Complaint was filed, Defendant requested that the SEC stay the civil action until the Parallel Criminal Action against him was resolved, and the SEC agreed to do so. (DE 8.) When the Indictment against Defendant was dismissed, Defendant again requested that this civil proceeding be stayed pending the Supreme Court's decision in Kokesh v. SEC, and the Court granted the request. (DE 24.)

---

[5] The Complaint also sought disgorgement of all of Defendant's ill-gotten gains and civil penalties. (Complaint, Prayer for Relief, II and III.) The Commission has determined at this time, and on the facts now known to it, not to pursue its claims of disgorgement or penalty against Defendant, notwithstanding the actions of his collaborators – Gottbetter and DelPresto – in continuing to unlawfully distribute their KYUS shares into 2010, in violation of Securities Act Section 5, and within the five year statutory period (as extended by the validly executed tolling agreements).

On June 9, 2017, the stay of this action expired, and shortly thereafter the Court issued an order setting the briefing schedule for this Motion, continuing the stay of all proceedings in the interim at Defendant's request. (DE 32.)

### D. Additional Facts in the Public Record

Following the dismissal of the Parallel Criminal Action, Defendant has made several public pronouncements relevant to the factors the Court should consider in determining whether to enter the injunctive relief the Commission will seek if it prevails on the merits of its claims. First, the Defendant now disclaims any culpability for his participation in the KYUS and RVNG schemes, contradicting his earlier acknowledgement of that wrongful conduct. See, e.g., Brown Decl. Exs. O (Faux, "'Bro, I'm Going Rogue': the Wall Street Informant Who Double Crossed the FBI" Bloomberg News Enterprise, March 23, 2017), P (excerpts from Defendant's publicly available Twitter feed), Q (excerpts from Defendant's website, www.guygentile.com), R (excerpts from Defendant's publicly available Instagram account ("I never scammed anyone!"), and S (Taliaferro, "Former Informer Accuses SEC of Fraud, Witch Hunt," Southeast-Brewster Patch, July 10, 2017) ("Instead of investigating a true wrong, the SEC is looking for a wrong where one does not exist. It's a witch hunt."). Compare Parallel Criminal Action (DE 19) (Brown Decl., Ex. K, at 5 ("During those meetings [with the FBI and USAO], Gentile admitted his involvement in the [RVNG and KYUS] pump-and-dump scheme. . .").)

Defendant has also boasted of his plans to not only pursue his career in the securities industry, but to expand the business of his broker-dealer, in light of the dismissal of the criminal action. See, e.g., Brown Decl. Exs. T (Hartnell, "Broker Principal Targets Expansion After Court Win," The Tribune, Feb. 1, 2017) and P (Defendant's Twitter feed).

9

Finally, and in addition to the public statements noted above, Defendant has demonstrated a contempt for the regulatory and enforcement authority of the Commission. Soon after Commission counsel submitted its April 26, 2017 letter to the Court (DE 18; Brown Decl., Ex. B) in which it confirmed its intention to pursue its claims against him, Defendant sent an email to Commission counsel, copying his own attorney as well as members of the press, threatening to render her unable to continue her employment with the Commission: "When i'm done exposing the corruption and your Office's fowl play, you'll be lucking if Starbucks hires you!" (Brown Decl., Ex. U (Gentile email to N. Brown, dated April 26, 2017).)

## ARGUMENT

## II. THE COMPLAINT ADEQUATELY PLEADS SECURITIES FRAUD AGAINST DEFENDANT

### A. Standard of Review

Movants seeking dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) bear a heavy burden. "[T]o survive a motion to dismiss, a complaint merely has to state a 'plausible claim for relief.'" Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 117 (3d Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007) (holding that a complaint need allege only "enough facts to state a claim to relief that is plausible on its face"). "Even post-Twombly, it has been noted that a plaintiff is not required to establish the elements of a *prima facie* case but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009) (internal citations omitted).

Defendant has not challenged the sufficiency of any of the allegations in the Complaint to state a cause of action under the securities laws. Instead, his Motion to Dismiss is directed to the sole question of whether the action against him is time barred by operation of 28 U.S.C. § 2462.

The statute of limitations in 28 U.S.C. § 2462 does not preclude the Court from issuing injunctions in this case because, contrary to defendants' arguments, injunctions are not "penalties" within the meaning of Section 2462. This is apparent from Congress's recognition in the securities laws that injunctions and civil penalties are discrete remedies, the plain language of Section 2462, and numerous decisions holding that Section 2462 does not limit a court's authority to issue an injunction to protect the investing public. Defendant seeks to derive a contrary rule from Kokesh v. SEC, 137 S. Ct. 1635, 1639 (2017), which held that disgorgement is a penalty under Section 2462. But as the Eighth Circuit held in its post-Kokesh decision in SEC v. Collyard, --- F.3d ----, 2017 WL 2803184, at *3 (8th Cir. June 29, 2017), a properly imposed injunction is designed to protect the public, not to punish, and thus is not a penalty under Section 2462. Defendant's remaining arguments about the Commission's entitlement to injunctive relief in this case may be taken into account at the remedies phase, but provide no basis for dismissing the Commission's request for injunctions at the pleading stage.

**B.    Defendant's Motion to Dismiss Should Be Denied Because the Commission Seeks Remedial, Not Punitive, Relief**

The Commission has been authorized to seek injunctions against securities law violations since the 1930s under the Securities Act and Exchange Act, but had no general authority to obtain civil money penalties until Congress in 1984 enacted the Insider Trading Sanctions Act (Pub. L. No. 98–376, 98 Stat. 1264), and in 1990 enacted the Remedies Act (Pub. L. No. 101-429, 104 Stat. 931). When it first authorized civil penalties, Congress noted that the principal remedy available to the Commission was "an injunction against further violations of the securities laws," which serves "only

11

a remedial function and does not penalize a defendant for the illegal conduct." H.R. Rep. 98-355 at *7-*8, reprinted in 1984 U.S.C.C.A.N. 2274, 2280-81; accord H.R. Rep. 100-910 at *11, reprinted in 1988 U.S.C.C.A.N. 6043, 6048. This history confirms that Congress has always understood that an injunction issued in a Commission action cannot be used to punish.

Defendant nevertheless claims that injunctions are penalties under the statute of limitations in 28 U.S.C. § 2462, but that provision by its plain terms makes no reference to injunctions. Section 2462 states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

If Congress had intended Section 2462 to apply to requests for injunctions, it would have included that additional term in Section 2462.

Kokesh's holding that disgorgement is subject to Section 2462 even though the statute does not mention that remedy does not require a different analysis. In holding that Section 2462 applies to disgorgement, the Court in Kokesh noted that this remedy was not explicitly set forth in the federal securities laws and was developed by courts. See id., 137 S. Ct. at 1640; Kokesh, Oral Arg. Tr., available at 2017 WL 1399509, at *33 (April 18, 2017) ("Chief Justice Roberts: But it does seem to me that we kind of have a special obligation to be concerned about how far back the government can go when it's something that Congress did not address because it did not specify the remedy."). In contrast, Congress has indisputably authorized the Commission to seek injunctive relief since its establishment, and Congress's decision not to "impos[e] an explicit time limit on Commission enforcement actions" (while subjecting private litigants to multiple statutes of limitations) therefore

12

"must be interpreted as deliberate" with respect to injunctions. <u>SEC v. Rind</u>, 991 F.2d 1486, 1490

(9th Cir. 1993).

> (1)    An Injunction, Properly Entered, Is Remedial Relief
>        <u>Not Subject to Section 2462's Limitations</u>

An appropriately entered injunction is not punitive, but remedial, designed to protect the

public interest. "[T]he purpose of injunctive relief is not to punish the violator, but to deter him

from committing future infractions of the securities laws," and is "necessary . . . for the basic

protection of the investing public." <u>SEC v. Bonastia</u>, 614 F.2d 908, 912 (3d Cir. 1980).  In fact,

because an injunction by definition *cannot* be used to punish, it does not make sense (particularly at

the pleading stage) to ask whether a request for an injunction is a penalty subject to Section 2462.  A

court has no authority to impose a "punitive injunction" regardless of whether it is sought five years,

five days, or five minutes after a violation, not because of anything in Section 2462, but because

equity does not allow it.

Because the purpose of injunctions is to protect the public from future harm, courts "make[]

a prediction of the likelihood of future violations based on an assessment of the totality of the

circumstances surrounding the particular defendant and the past violations that were committed" in

determining whether to impose the relief. <u>Bonastia</u>, 614 F.2d at 912.  <u>Accord</u> <u>SEC v. Cooper</u>, 142 F.

Supp. 3d 302, 319 (D.N.J. 2015) (applying <u>Bonastia</u> factors to determine that there was a reasonable

likelihood that defendant will violate the securities laws in the future, warranting injunctive relief);

<u>SEC v. U.S. Funding Corp.</u>, No. 02 Civ. 2089 (WJM), 2006 WL 995499, at *6 (D.N.J. April 11,

2006) (same).  If the Court determines to enter an injunction, it has necessarily predicted the

likelihood of future violations and the need to protect the investing public from future harm.

Although Defendant places heavy emphasis on the Court's ruling in <u>Kokesh</u> that

disgorgement is subject to Section 2462, courts before and after <u>Kokesh</u> have consistently ruled that

Case 2:16-cv-01619-LL-JAD Document 88 Filed 07/21/17 Page 228 of 331 PageID: 824

disgorgement is qualitatively different from injunctions for Section 2462 purposes.  See Collyard, 2017 WL 2803184, at *3 (ruling Section 2462 would not bar injunctive relief); SEC v. Graham, 823 F.3d 1357, 1362 (11th Cir. 2016) ("injunctions are equitable, forward-looking remedies and not penalties within the meaning of § 2462"); SEC v. Quinlan, 373 F. App'x 581, 587-88 (6th Cir. 2010) (based on findings of risk to investing public from risk of recurrence of wrongful conduct, injunction was remedial, rather than punitive); SEC v. Wey, No. 15 Civ. 7116 (PKC), 2017 WL 1157140, at *29 (S.D.N.Y. Mar. 27, 2017) (Section 2462 does not apply to injunctions sought to "protect the public from future harm") (quotations omitted);  SEC v. Straub, No. 11 Civ. 9645 (RJS), 2016 WL 5793398, at *14 (S.D.N.Y. Sept. 30, 2016) ("if the SEC is entitled to injunctive relief here, that relief would not be covered by Section 2462"); SEC v. Saltsman, No. 07 Civ. 4370 (NGG), 2016 WL 4136829, at *29 (E.D.N.Y. Aug. 8, 2016) (because injunctions are "forward looking," they are not penalties subject to Section 2462).

At issue in Collyard was a district court injunction that "(1) require[d] only obedience with the law, (2) [was] based on evidence of a likelihood to violate that law, and (3) [sought] to protect the public prospectively from [defendant's] harmful conduct rather than punish [defendant]." Id., 2017 WL 2803184, at *3.  In light of these findings demonstrating that the injunction was "imposed to protect the public prospectively," the Eighth Circuit found it unnecessary to determine whether an injunction could ever be punitive and held that, notwithstanding Kokesh, the injunction on review was remedial and not subject to Section 2462.  Id.

In so ruling, the Collyard court rejected the primary Kokesh argument Defendant advances here:  that because a purpose of injunctive relief includes deterrence, it must be a penalty. (MTD at 13.) General deterrence as a purpose and effect might indeed be punitive, and might render

14

disgorgement subject to Section 2462, but, the court held, injunctions entered against future violations pose little threat of deterring anyone other than the defendant:

> [D]eterrence is an 'incidental effect' of this injunction, not its primary purpose. . . This injunction – non-pecuniary and requiring only obedience with the law – likely does little to deter people other than [defendant].

Id. at *3. Given that the injunction's historic focus was the deterrence of the defendant's own future conduct – not others' – the court distinguished the injunction entered by the district court from the disgorgement remedy that the <u>Kokesh</u> Court ruled had a general deterrent, and thus, punitive effect. Id. "'The historic injunctive process was designed to deter, not to punish.'" Id. (quoting <u>Rondeau v. Mosinee Paper Corp.</u>, 422 U.S. 49, 61 (1975)). <u>Kokesh</u>'s discussion of the disgorgement remedy does not alter that principle for the kind of injunctions at issue in this case.

The only courts to apply Section 2462 to bar injunctive relief (and to which Defendant points) have done so on a finding that the factual record could not support a finding that an injunction was necessary to protect the investing public from future harm. <u>E.g.</u>, <u>Johnson v. SEC</u>, 87 F.3d 484, 489-90 (D.C. Cir. 1996) (ruling that § 2462 would apply to bar Commission's administrative suspension order because it had made no evidentiary finding of the respondent's current incompetence or "the degree of risk she posed to the public") (MTD at 15-16); <u>SEC v. Jones</u>, 476 F. Supp. 2d 374, 383-85 (S.D.N.Y. 2007) (granting summary judgment to defendants on claim for injunctive relief because the Commission had failed to establish a "realistic likelihood of recurrence," through evidence of a pattern of violations or continued misconduct) (MTD at 17); <u>SEC v. Bartek</u>, 484 F. App'x 949, 957 (5th Cir. 2012) (affirming grant of summary judgment to defendant on statute of limitations grounds where there was no evidence that injunction addressed "the prevention of future harm in light of the minimal likelihood of similar conduct in the future"

and the officer and director bar at issue would have had a "stigmatizing effect") (MTD at 16)[6]; see also Proffitt v. FDIC, 200 F.3d 855, 862 (D.C. Cir. 2000) (holding that expulsion sanction was punitive and subject to § 2462 because FDIC "made no attempt to evaluate his present fitness or competence . . . [or] risk to the public.") (MTD at 16.)  It should be noted that these decisions are hardly categorical; in other cases, these same circuits have concluded that orders like the injunctive relief against future violations requested here are "purely remedial and preventative" and "not a 'penalty.'. . . They simply require[d] [the defendant] not to violate the relevant securities laws in the future." Riordan v. SEC, 627 F.3d 1230, 1234-35 (D.C. Cir. 2010) (holding that Section 2462 was inapplicable to cease-and-desist order); see also Meadows v. SEC, 119 F.3d 1219, 1228 & n.20 (5th Cir. 1997) (published Fifth Circuit decision concluding that cease-and-desist order was not punitive).[7]

> (2)    To Determine Whether an Injunction Is Necessary, the Court Must Assess Relevant and Fact-specific Factors, Making a Resolution of Defendant's Statute of Limitations Claim Inappropriate on a Motion to Dismiss

The Court cannot decide Defendant's motion to dismiss on statute of limitations grounds because in order to determine that Section 2462 even applies, the Court would need to determine

---

[6] Bartek affirmed the district court's refusal to enter injunctive relief entered in SEC v. Microtune, 783 F. Supp. 2d 867, 885 (N.D. Tex. 2011), a decision Defendant presents without its subsequent history and as an unrelated decision. (MTD at 21, 22.)  Another case cited by Defendant, SEC v. Berry, 580 F. Supp. 2d 911 (N.D. Cal. 2008) (MTD at 16) actually supports the Commission's position, holding that a defendant's motion to dismiss should be denied because the injunctive relief and officer and director bar sought by the SEC were not punitive and not subject to Section 2462. Id., 580 F. Supp. 2d at 919 ("the court concludes that the relief sought by the SEC is not punitive except for the civil penalties it seeks").

[7] Whether a sanction is punitive is an objective test, "not measured from the subjective perspective of the accused (which would render virtually every sanction a penalty)."  Johnson, 87 F.3d at 488. Thus, while Defendant might find the sanctions sought here – injunction and penny stock bar – "disagreeable . . . as the Supreme Court has pointed out, 'even remedial sanctions carry the sting of punishment.'"  Id. (quoting United States v. Halper, 490 U.S. 435, 447 n.7 (1989)).  So long as the "primary purpose" of the injunction is not to penalize, but to protect against future harm, it is not punitive.  SEC v. Wyly, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013).

16

that the injunction sought is punitive – i.e., that there is no risk of future harm against which it would protect – and therefore that there is no need for an injunction. Such an inquiry cannot precede this Court's decision on whether the Defendant violated the securities laws. "As such, the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations." Wyly, 950 F. Supp. 2d at 558 (rejecting statute of limitations claim on summary judgment as premature); Straub, 2016 WL 5793398, at *14-15 (same).

To determine whether an injunction is appropriate to protect against future harm, the Court must analyze five factual factors:

> [T]he degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur.

Bonastia, 614 F.2d at 912. No one factor is determinative. Id. at 913.

At the motion to dismiss stage, where the Court's review is limited to allegations of the Complaint, dismissal is even less appropriate. SEC v. Gabelli, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds, 568 U.S. 442 (2013) (holding that it would be most "unusual" to dismiss a claim for injunctive relief as time-barred on a motion to dismiss, given that the determination of the "likelihood of future violations is almost always a fact-specific inquiry.").[8] Indeed, in Wyly, the court

---

[8] Accord Wey, 2017 WL 1157140, at *29 (refusing to dismiss claim for injunctive relief and noting defendant's failure to cite any authority for dismissing injunctive relief claim at motion to dismiss stage); Saltsman, 2016 WL 4136829, at *29 & n.19 (holding that Commission's allegation of recurrence is sufficient to withstand motion to dismiss injunction relief on statute of limitations grounds); SEC v. Landberg, 836 F. Supp. 2d 148, 158 (S.D.N.Y. 2011) (where complaint "sufficiently pled a reasonable likelihood of recurrence by alleging repeated and knowing violative conduct, motion to dismiss injunctive relief claim would be denied); SEC v. Fisher, 07 Civ. 4483, 2008 WL 2062699, at *8 (N.D. Ill. May 13, 2008) (ruling defendant's motion to dismiss claims for injunction and officer and director bar on § 2462 grounds premature without benefit of full

rejected a defendant's motion for summary judgment, holding that, even at that stage, "it would be premature to find that injunctive relief is not warranted prior to determining the merits of the SEC's claims against him." 950 F. Supp. 2d at 559. In his Moving Brief, Defendant cites to no precedent for dismissal at this stage of the proceedings on Section 2462 grounds.[9]

Reviewing this Complaint, the Court will find numerous plausible allegations of the Bonastia factors, 614 F.2d at 912, that, if established, support a remedial injunction in this case:

- **The degree of scienter involved on the part of the defendant.**

While the degree of scienter with which Defendant acted cannot be assessed until his culpability is fully examined at trial or on a motion for summary judgment, the Complaint contains sufficient allegations that Defendant acted knowingly and with intent to manipulate the price of both RVNG and KYUS to the detriment of unwitting purchasers of those stocks.

The Complaint alleges that Gentile placed manipulative trades between accounts he controlled to create a false appearance of liquidity, market depth and demand for both RVNG and

---

evidentiary record); SEC v. Power, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007) (denying motion to dismiss where Commission alleged likelihood of recurrence by alleging repeated multiple violations over a period of several years and that, unless enjoined, defendant would continue such conduct); cf. SEC v. Geswein, 10 Civ. 1235, 2011 WL 4565861, at *2 (N.D. Ohio Sept. 29, 2011) (denying motion to dismiss injunction claim, holding that "Section 2462 does not apply").

[9] Not one of the cases Defendant cites was determined on a motion to dismiss; to the contrary, each was determined on a full evidentiary record on a motion for summary judgment or disposition, or after a hearing, and on a finding that the injunctive relief would be punitive, not remedial. See Bartek, 484 F. App'x at 957 (MTD at 16) (affirming grant of summary judgment to defendant where there was no evidence that injunction addressed "the prevention of future harm in light of the minimal likelihood of similar conduct in the future"); Johnson, 87 F.3d at 489-90 (MTD at 15) (following administrative evidentiary hearing, reversing cease-and-desist order on grounds that Commission failed to assess risk of harm to investing public posed by respondent); Jones, 476 F. Supp. 2d at 383-85 (MTD at 17) (granting summary judgment dismissing Commission's claim for injunctive relief because record did not evince "realistic likelihood of recurrence"); see also Proffitt, 200 F.3d at 859, 862 (MTD at 22) (holding injunction under banking regulations barred by 2462 on summary disposition in an administrative proceeding because FDIC had not analyzed petitioner's risk to the public).

KYUS, (Complaint ¶¶ 3, 7, 30, 62), and either bribed friends and acquaintances to buy the stocks to boost the price per share (id. ¶¶ 5, 31), or enticed them to do so with the promise that he would give them a heads-up about the upcoming promotion so that they could sell their stock at the most advantageous time. (id. ¶ 62.) It further alleges that he held the shares in offshore accounts and/or in accounts titled in the names of nominee brokerage firms, to disguise his connection to the trading. (Id. ¶¶ 28, 59.)[10] Finally, the Complaint alleges that Gentile authored and published under fake names fraudulent glossy mailers touting each stock's rosy prospects (id. ¶¶ 32-42, 64-65), and, in the case of RVNG, placed paid advertisements containing the same false claims as the mailer in multiple major publications. (Id. ¶¶ 43-44.)

- **The isolated or recurrent nature of the infraction.**

The Complaint alleges two manipulative and separate schemes, extending over a three year period from 2007, when Defendant first joined the RVNG pump and dump scheme, through the 2010 sales of KYUS stock by Gentile's confederate in that scheme, Gottbetter. (Complaint ¶¶ 25, 68.) Courts have held that even single schemes, perpetrated over shorter periods of time, satisfy the "recurrent" factor. E.g., Desai, 145 F. Supp. 3d at 332, 337 (deception of only five investors over an 11 month period in a single scheme); SEC v. Alexander, 115 F. Supp. 3d 1071, 1086 (N.D. Cal. 2015) (single scheme that spanned less than two years and impacted dozens of investors was recurrent, not isolated, conduct). Even where the defendants participated in only one unregistered offering, involving only 19 sales of unregistered securities over a seven month period, the court

---

[10] Similar evidence of concealment of defendant's fraud while it is ongoing has been held to be sufficient evidence of scienter to establish this factor of the injunction analysis. E.g., SEC v. Desai, 145 F. Supp. 3d 329, 337 (D.N.J. 2015), aff'd, 672 F. App'x 201 (3d Cir. 2016), cert. denied Desai v. SEC, 2017 WL 1741726 (S. Ct. June 5, 2017) (entering injunction against defendant who had attempted to conceal wrongdoing from investors, and holding that his "effort to mask his violations of federal securities law demonstrates a high degree of scienter").

deemed that the conduct was "not isolated" and "indicate[d] a likelihood of future violations." <u>SEC v. Verdiramo</u>, 890 F. Supp. 2d 257, 275 (S.D.N.Y. 2011).

- **The defendant's recognition of the wrongful nature of his conduct.**

The Complaint does not speak to Defendant's recognition of the wrongful nature of his conduct, although there are ample allegations of his wrongdoing. Indeed, at this juncture, where the defendant has not yet even answered the Complaint, there is typically nothing in the record by which the Court can assess this factor, making a motion to dismiss on this basis premature. But while Defendant has not answered the Complaint, his statements to the press make clear that he denies any wrongdoing at all. According to an article in <u>BloombergBusinessweek</u>, "Bro, I'm Going Rogue': The Wall Street Informant Who Double-Crossed the FBI," (Brown Decl., Ex. O), Defendant maintains he "did nothing wrong."[11]

- **The sincerity of defendant's assurances against future violations.**

The Complaint alleges no such assurances, and Defendant has not yet made any. Again, without his Answer, resolution of his Motion to Dismiss, without any basis for analyzing this factor, would be premature. But, like the "recognition of wrongdoing" factor, Defendant's public statements indicate that he will make no such assurances, since he denies any past wrongdoing.[12]

---

[11] This is in stark contradiction to Defendant's apparent admissions of guilt to the USAO when he was arrested in 2012 (Brown Decl., Ex. K (USAO Memorandum of Law in Opposition to Defendant Guy Gentile's Motion to Dismiss the Indictment, Sept. 23, 2016), at 5)), indicating that whatever recognition of wrongdoing Defendant once professed, he has reversed course. Indeed, shifting positions on the facts itself has been viewed by some courts as meriting an injunction. <u>E.g.</u>, <u>SEC v. Gunn</u>, No. 08 Civ. 1013, 2010 WL 3359465, at *6 (N.D. Tex. Aug. 25, 2010) ("if a defendant is dishonest, exhibits a lack of candor, or offers inconsistent testimony during the course of the action, an injunction is more likely to be warranted") (citing <u>SEC v. Holschuh</u>, 694 F.2d 130, 145 (7th Cir. 1982)).

[12] If Defendant were to give such assurances, the Court should view them skeptically, given his recent reversal of his prior admissions. <u>SEC v. Clay Capital Mgmt., LLC</u>, No. 11 Civ. 5020 (DMC)(JBC), 2013 WL 5946989, at *5 (D.N.J. Nov. 6, 2013) (finding that defendant's attempt to

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 167 of
364
Case 2:16-cv-01619-LL-JAD Document 89 Filed 07/21/17 Page 20 of 31 PageID: 831

- **The likelihood, because of defendant's professional occupation, that future violations might occur.**

The Defendant has been employed in the securities industry since prior to his misconduct alleged in this Complaint. (Complaint ¶ 14.) He founded a US-based and Commission-registered broker-dealer, to which he maintains an affiliation. (Id.) Today, he is the principal of a Bahamas-based online brokerage firm, opened in 2011. (Id.) His recent public statements indicate that with the dismissal of the Indictment, he intends to redouble his efforts to increase his presence in the industry. (Brown Decl., Ex. T (Hartnell, "Broker Principal Targets Expansion After Court Win," The Tribune, Feb. 1, 2017).)

Courts have not hesitated to enter injunctive relief against defendants like Gentile, finding that defendant's current occupation in the securities industry makes future misconduct more likely. SEC v. Gann, 565 F.3d 932, 940 (5th Cir. 2009) (defendant who had violated the securities laws in trading mutual funds merited an injunction because his continued employment as a stock broker will provide him with "*opportunities* for future infractions," regardless of his voluntary cessation of mutual fund trading) (emphasis in original); SEC v. Radius Capital Corp., No. 11 Civ. 0116, 2015 WL 1781567, at *2 (M.D. Fla. Apr. 20, 2015) (defendant's continued employment in real estate industry made his future violations in fraudulent offering of mortgage-backed securities more likely); SEC v. Savino, No. 01 Civ. 2438 (GBD), 2006 WL 375074, at *11 (S.D.N.Y. Feb. 16, 2006) (because the "business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present," defendant's occupation as a licensed securities professional put him in a position to engage in further fraudulent conduct and warranted the imposition of a permanent injunction) (quotations omitted), aff'd in relevant part, 208 F. App'x 18 (2d Cir. 2006); SEC v. U.S.

---

recant his sworn admissions "do not demonstrate a recognition of the wrongfulness of his conduct," and imposing injunction). After apparently confessing his guilt to the serious pump-and-dump schemes alleged here, Gentile now disclaims any wrongdoing at all. (See Relevant Facts, p.7, supra.)

21

Environmental, Inc., No. 94 Civ. 6608 (PKL), 2003 WL 21697891, at *25 (S.D.N.Y. July 21, 2003)
(defendants' continued employment in securities industry contributed to the need for an injunction,
given their opportunities to commit further violations), aff'd, 114 F. App'x 426 (2d Cir. 2004).
Indeed, in a recent case from this district, the Court found that the defendant's prior role as a
corporate executive – even though he was not currently so employed – provided him with sufficient
opportunity to return to the business world and repeat his insider trading and therefore warranted an
injunction. Clay Capital, 2013 WL 5946989, at *5.[13]

Some courts add a factor to those dictated by Bonastia – the passage of time since the
infraction without further violations – a factor which Defendant highlights in his submission.
(MTD at 26-27.) But, as Bonastia itself makes clear, the Court will look at the totality of the
circumstances, and no one factor is determinative. Id., 614 F.2d at 913 (holding that district court
had abused its discretion by focusing on only one of the factors in concluding that defendant's
present occupation outside the securities industry made an injunction unnecessary, and noting that
the presence of each of the other factors merited injunctive relief). Thus, even assuming that the
Commission will not point to any additional wrongful conduct by Defendant since 2010, the Court
could nonetheless find that the remaining factors make future misconduct likely, and an injunction
appropriate. As the Fifth Circuit held most recently, "cessation of the violations does not preclude a
finding of reasonable likelihood of future violations, as it does not establish a lack of opportunities

---

[13] In assessing this factor, courts are often persuaded that the youth of the defendant adds to the
need for an injunction. E.g., SEC v. Johnson, 652 F. Supp. 2d 29, 32 (D.D.C. 2009) (imposing
injunction, court reasons that since defendant would be only 55-56 years old when released from
prison, "it is certainly possible for him to be involved in other business ventures"). Compare SEC v.
Brethen, No. 90 Civ. 0071, 1992 WL 420867, at *24 (S.D. Ohio Oct. 15, 1992) (after trial finding
defendant liable for insider trading, court held injunction was unnecessary, in part because "a 66 year
old corporate executive, who has been found to have engaged in insider trading, is not likely to
return to the corporate arena . . . where he will once again have the opportunity to engage in insider
trading").

for future violations." <u>SEC v. Life Partners Holdings, Inc.</u>, 854 F.3d 765, 784 (5th Cir. 2017);

<u>accord</u> <u>SEC v. Fehn</u>, 97 F.3d 1276, 1296 (9th Cir. 1996) ("the fact that the defendant is currently

complying with the securities laws does not preclude an injunction") (quotation omitted); <u>SEC v.

Shapiro</u>, 494 F.2d 1301, 1308 (2d Cir. 1974)("first offenders are not immune from injunctive

relief").[14]

    In analyzing the totality of the circumstances, courts have held that injunctions are

appropriate to prevent future misconduct even as to defendants who have committed no violations

in the interim. <u>E.g.</u>, <u>SEC v. BIH Corp.</u>, No. 10 Civ. 0577, 2014 WL 7499053, at *3 (M.D. Fla. Dec.

12, 2014) (facts that six years had elapsed since defendant's violations without further misconduct

and that he assured that he would not commit further violations were outweighed by the nature of

his misconduct and refusal to fully recognize its "wrongness"); <u>Verdiramo</u>, 890 F. Supp. 2d at 275-

76 (rejecting defendants' claim that an injunction was unnecessary because the violations occurred

years prior with no misconduct in the interim, and imposing injunctions in light of defendants'

failures to acknowledge wrongdoing, the high level of their scienter, and their employment in areas

that gave them opportunities to commit future violations); <u>SEC v. Northeastern Fin. Corp.</u>, 268 F.

Supp. 412, 416 (D.N.J. 1967) (notwithstanding defendant's claim that he was no longer engaged in

---

[14] Given that Defendant contends that he was under the watchful eye of the FBI and the Government since his arrest, and was indicted soon after he ceased his undercover work (Brown Decl., Ex. S ("[m]y work with the government was a 24/7 operation")), this factor has little significance to a prediction of likely recurrence in this case. As the Second Circuit noted in a case on which Defendant relies (MTD at 27), "it is no sufficient answer to a motion for an injunction that the improper conduct repeated in the past has been discontinued when action to impose legal restraint is known or thought to be in the offing, . . . for the likelihood of a resumption of the acts is a continuing menace." <u>SEC v. Torr</u>, 87 F.2d 446, 449-50 (2d Cir. 1937) (citations omitted). In any event, in light of the very high degree of scienter and his participation in two separate fraudulent schemes as alleged in the Complaint, the fair inference to draw at this stage is that Defendant has a propensity for committing further misconduct.

violative conduct, an injunction was necessary to prevent further violations given the level of

defendant's participation in the scheme and his desire to return to the securities industry).[15]

**C.    Defendant's Motion to Dismiss the Commission's Injunctive Remedy Is Improper as
a Matter of Law and Premature as a Matter of Fact**

Defendant's claim that the Commission has no right to an "obey-the-law injunction," and

that, therefore, the Complaint should be dismissed for failure to state a cause of action under Fed. R.

Civ. P. 12(b)(6) (MTD at 26-30), fails as both a matter of law and fact.

First, the Commission has submitted no form of injunction to the Court at all, so

Defendant's attack on any lack of specificity is at best premature.  If, after the Commission

establishes its case on summary judgment or at trial, and the Court determines that an injunction

against further violations is appropriate, it can assess whether the dicta in Louis W. Epstein Family

P'ship v. Kmart Corp., 13 F.3d 762, 771 (3d Cir. 1994) (MTD at 28) precludes its entry of an obey-

the-law injunction, or whether some more specific injunction should be crafted.[16]  See SEC v.

---

[15] Those cases on which Defendant relies are inapposite. (MTD at 27.)  In none was the defendant's
clean record the sole basis for denying injunctive relief.  Rather, in each, other factors supported the
courts' conclusion that the Commission had not established that future misconduct was likely. Torr,
87 F.2d at 450 (reversing grant of preliminary injunction where Commission had failed to establish
that past conduct had been violative, let alone that future misconduct was likely to occur); SEC v.
Tourre, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014) (no evidence that defendant continued in the
industry or had any intention of returning;  court nonetheless retained jurisdiction for three years to
consider renewed request for injunction if he did return to the industry); In re Reserve Fund Secs.
and Deriv. Litig., 09 Civ. 4346 (PGG), 2013 WL 5432334, at *23 (S.D.N.Y. Sept. 30, 2013) (finding
that defendants were "defunct entities" not reasonably likely to commit future violations); SEC v.
DiBella, No. 04 Civ. 1342, 2008 WL 6965807, at *11 (D. Conn. Mar. 13, 2008) (defendant was not
regularly employed in the securities industry and conduct occurred in a single scheme in a relatively
short period of time), aff'd, 587 F.3d 553 (2d Cir. 2009).

[16] Courts have long-entered injunctions against future violations of the securities laws in SEC cases.
Indeed, in a more recent, unpublished decision, the Third Circuit affirmed an obey-the-law
injunction entered by a court in this District without any mention of Epstein.  See SEC v. Johnson,
174 F. App'x 111, 116 (3d Cir. 2006)(specifically affirming lower court's injunction, finding "[u]nder
these circumstances, we are satisfied that the District Court acted within its discretion").  Defendant
cites not a single decision of any court in this District that has declined to enter an obey-the-law

Quiros, No. 16 Civ. 21301, 2016 WL 7443349, at *2 (S.D. Fla. Nov. 21, 2016) (rejecting motion to strike SEC's requested injunctive relief as "an obey-the-law injunction" because "[t]he Court may, should the SEC prevail, modify any requested relief"). At that time, and if it determines it appropriate, the Court can formulate a specific injunction like those entered in the 11th Circuit. "[A] broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do." SEC v. Goble, 682 F.3d 934, 952-53 (11th Cir. 2012) (remanding for redrafting of injunction entered by district court). But Defendant's imaginings about what injunction the Court might enter after resolution of the merits cannot be grounds to dismiss the Commission's Complaint now.

Second, Defendant's motion to dismiss the remedy sought is improper as a matter of law. The Commission's prayer for injunctive relief is a remedy, not a separate claim. Chruby v. Kowaleski, 534 F. App'x 156, 160 n.2 (3d Cir. 2013) ("We agree . . . that an injunction is a remedy rather than a cause of action[.]") (citing Birdman v. Office of the Governor, 677 F.3d 167, 172 (3d Cir. 2012)). Thus, if valid causes of action are stated for violations of securities laws, the motion to dismiss on the basis of the remedy sought should be denied. E.g., Schwartz v. Avis Rent A Car Sys., LLC., 11 Civ. 4052 (JLL), 2012 WL 12909908, at *8 (D.N.J. Sept. 18, 2012) (declining to dismiss stand-alone claim for injunctive relief where complaint adequately stated cause of action which may entitle plaintiff to injunctive relief); see also Strikeforce Technologies, Inc. v. Whitesky, Inc., No. 13 Civ. 1895 (SRC), 2013 WL 3508835, at *10 (D.N.J. July 11, 2013) (dismissing plaintiff's "claim" for an injunction because an injunction is a remedy, not a cause of action, but noting that "such

---

injunction on the basis of Epstein in the 20 years since that case was decided, and relies solely on cases from other jurisdictions. (MTD at 29.)

dismissal will have no effect on Plaintiff's request for 'the issuance of a preliminary or permanent injunction'").

On this motion, Defendant makes no argument that the Complaint fails to state a valid claim for violations of the stated provisions of the federal securities laws.[17] Therefore, he has stated no basis to dismiss those causes of action. The determination of what kind of injunction, if any, should be issued, is committed to the Court's discretion after it decides the merits of the Commission's claims, and provides no basis for dismissing the Complaint. See SEC v. Investors Security Corp., 560 F.2d 561, 567 (3d Cir. 1977) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy."); Complaint, Prayer for Relief, V (seeking a final judgment "[g]ranting such other and further relief as this Court deems just and appropriate").

None of the cases cited by Gentile is to the contrary. Indeed, Defendant concedes (MTD at 27) that injunctive relief in this Circuit is appropriate "'on a determination of whether there is a reasonable likelihood that the defendants, if not enjoined, will again engage in the illegal conduct.'" SEC v. Secure Capital Funding Corp., 11 Civ. 0916, 2013 WL 3286234, at *8 (D.N.J. June 28, 2013) (quoting Bonastia, 614 F.2d 908 at 912) (MTD at id.). Thus, as the Commission has already argued, because that determination requires fact finding inappropriate on a motion to dismiss, Defendant must concede that dismissal of the Commission's prayer for injunctive relief would be premature.[18]

---

[17] Nor could he, given his apparent admission to culpability for those violations. See Relevant Facts, p.7, supra.

[18] Defendant's argument that the Commission must include detailed allegations of the factors supporting its prayer for relief (MTD at 28) has been rejected by the numerous courts that have considered it. See n. 8, supra. Nonetheless, if the Court determines that the Complaint's allegations in this regard are deficient, it should grant the Commission leave to replead. In re Emerson Radio Corp. Secs. Litig., No. 03 Civ. 4201 (JLL), 2005 WL 8131267, at *20 (D.N.J. Dec. 20, 2005) (pursuant to Fed. R. Civ. P. 15(a), granting leave to replead where no evidence of plaintiff's undue

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 173 of
Case 2:16-cv-01619-LL-JAD Document 88 Filed 07/21/17 Page 38 of 331 PageID: 837
364

**D.      A Penny Stock Bar, Properly Entered, Is Also Remedial Because It Seeks to Protect
the Investing Public**

Like injunctions, properly imposed penny stock bars are intended to protect the investing

public from future harm, and are therefore remedial, not punitive.  E.g., SEC v. Johnson, No. 02

Civ. 5490 (GEB), 2004 WL 5561799, at *4 (D.N.J. Aug. 27, 2004) ("In order to protect the investing

public from future fraud on the part of Johnson, this Court will permanently prohibit Johnson from

offering penny stock."), aff'd, 174 F. App'x 111 (3d Cir. 2006).  Congress highlighted that purpose in

enacting the bar, identifying the need to "protect investors from unscrupulous practices in the penny

stock market," H.R. Rep. 101-617, reprinted in 1990 U.S.C.C.A.N. 1408, 1428 – an area Congress

recognized as rife with "fraud and manipulation of investors." Id. at 1409.[19]  Thus, Section 20(g)(1)

of the Securities Act and Section 21(d)(6)(A) of the Exchange Act now provide:

> In any proceeding . . . against any person participating in, or, at the time of the
> alleged misconduct who was participating in, an offering of penny stock, the court
> may prohibit that person from participating in an offering of penny stock,
> conditionally or unconditionally, and permanently or for such period of time as the
> court shall determine.

15 U.S.C. § 77t(g)(1), 15 U.S.C. § 78u(d)(6)(A).[20]

---

delay, bad faith, dilatory motive, prejudice or futility).  See Brown Decl. ¶¶ 4-12, and 19-20
(detailing the additional evidence of public record that supports Plaintiff's entitlement to injunctive
relief).

[19] Congress first provided for the remedy of a penny stock bar as part of the Penny Stock Reform
Act of 1990, authorizing the Commission to impose that relief in its administrative proceedings.  See
Exchange Act Section 15(b)(6)(A), 15 U.S.C. § 78o(b)(6)(A).  In 2002, as part of the Sarbanes-Oxley
Act, Congress expanded the Commission's authority to explicitly permit the Commission to seek the
relief in district court proceedings.  See S. Rep. 107-205, at 41 (2002). The authority to seek penny
stock bars in district court proceedings is codified at Securities Act Section 20(g), 15 U.S.C. § 77t(g)
and Exchange Act Section 21(d)(6), 15 U.S.C. § 78u(d)(6).

[20] The Complaint alleges that both RVNG and KYUS were "penny stocks," as defined in Section
3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. §
240.3a51-1. (Complaint ¶¶ 1, 15, 16.)

Like the analysis whether to impose a permanent injunction, the analysis whether to impose a penny stock bar is fact-specific and includes the likelihood of recurrence as a factor: "'(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation, and (6) the likelihood that misconduct will recur.'" SEC v. Cole, No. 12 Civ. 8167 (RJS), 2014 WL 4723306, at *7-8 (S.D.N.Y. Sept. 22, 2014), aff'd, 661 F. App'x 52 (2d Cir. 2016) (quoting SEC v. Bankosky, 716 F.3d 45, 48 (2d Cir. 2013) and noting that the factors are the same as those analyzed to assess the propriety of an officer and director bar).[21]

As a pleading matter, the Complaint alleges facts that support the imposition of a penny stock bar under this test. It alleges that Defendant was a "repeat offender," engaging in two separate and highly lucrative pump and dump schemes that involved repeated manipulative trading, and the publication and distribution of false and misleading promotional materials for each stock. (Complaint ¶¶ 1, 30-31; 32-44; 49; 60-63; 64-65; 67-68.) It alleges the central role that Gentile played in both schemes, from the manipulative trading to the design and distribution of the mailers. (id. ¶¶ 30-31; 42-44; 60-68.) Because the Complaint alleges that Defendant understood from the start that he was engaged in a scheme to artificially inflate both companies' share prices for the purpose of capturing that gain in a massive sell-off ((id. ¶¶ 25-28, 57-59), that the manipulative

---

[21] Courts have held that officer and director bars are remedial and not subject to Section 2462's statute of limitations. E.g., SEC v. Brown, 740 F. Supp. 2d 148, 157 (D.D.C. 2010) (denying motion to dismiss on statute of limitations grounds because officer and director bar (and permanent injunction against future violations) sought remedial relief necessary to prevent future harm to the public); SEC v. Caserta, 75 F. Supp. 2d 79, 89 (E.D.N.Y. 1999) (denying defendant's motion to dismiss officer and director bar claims as time-barred under Section 2462 where plaintiff may establish that the bar's purpose was to "prevent [defendant] from harming other companies or the securities market in the future"). Because the two remedies are awarded on a showing of the same factors, they both should be viewed as remedial rather than punitive, if appropriately entered.

28

trading was arranged or controlled by him ((id. ¶¶ 29-31, 60-63), and that he knew, or was reckless in not knowing, that the promotional materials for each scheme contained numerous false and misleading claims (id. ¶¶ 32-47, 64-65), the Complaint alleges that Defendant had a high degree of scienter. While the Complaint does not detail Defendant's split from the RVNG scheme, it does allege that he and his cohorts generated an estimated $5 million in gross proceeds from that scheme. With respect to the KYUS scheme, the Complaint alleges that Defendant and Taxon and Cohen had the majority economic stake in the scheme, controlling 75% of KYUS's unrestricted common shares outstanding, and earning gross proceeds of approximately $10 million. (Id. ¶¶ 49, 58, 67.)

With respect to the "recurrence" factor, courts typically review the same factors to predict the likelihood of future misconduct that support the need for a permanent injunction against further violations of the securities laws. E.g., SEC v. Becker, No. 09 Civ. 5707 (SAS), 2010 WL 2710613 at *2 (S.D.N.Y. July 8, 2010) (applying factors and determining that three penny stock offerings made the defendants "repeat offenders," and given that they were in their forties, had spent their careers in the industry, and refused to accept responsibility, they were likely to repeat their violative conduct). For all the reasons cited above, the Complaint alleges most of those factors, and matters of public record amply support the rest. There is no basis – nor authority – for dismissal of the Commission's request for a penny stock bar on a motion to dismiss.

## II. DEFENDANT'S CLAIMS THAT HIS TOLLING AGREEMENTS SHOULD BE VOIDED ARE WRONG, YET IRRELEVANT

Because the Commission has determined not to pursue its claims for disgorgement and penalties on the facts known to it now and alleged in its Complaint, the Court need not address his arguments concerning the validity of the tolling agreements.[22] For that reason, the Court need not

---

[22] Also unnecessary to resolve is Defendant's novel argument that findings made in the Parallel Criminal Action based on a different charging document and on representations made by a different

address Defendant's baseless and reckless accusations of Commission staff misconduct or incredible claims of his (and apparently current counsel's) naiveté in entering into the more than two years of tolling agreements. However, for the Court's reference, and to clarify the record to remove any doubt about the Commission staff's integrity, the Commission has summarized the facts surrounding Defendant's and his counsel's execution of those tolling agreements in the Brown and Suh Declarations, and has submitted the relevant tolling agreements therewith. See Brown Decl. ¶¶ 13-18 and Exs. L and N; Suh Decl. ¶¶ 2-3.

CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court deny Defendant Guy Gentile's motion to dismiss the Complaint and grant such other relief as it may deem appropriate.

Dated:    New York, New York
         July 21, 2017

Nancy A. Brown
Simona K. Suh
Elizabeth Butler
SECURITIES AND EXCHANGE
    COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0037 (Butler)
butlere1@sec.gov

---

litigant are somehow "law of the case" here (MTD at 24), an argument that goes unsupported in his brief by any authority.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated July 21, 2017, to be served on Defendant by emailing a copy of the same to Defendant's counsel, Adam Ford, at <u>aford@fordobrien.com</u>, this 21st day of July 2017.

Nancy A. Brown

# EXHIBIT I

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

GUY GENTILE,

      Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO. 16-1619 (JLL)

**OPINION & ORDER**

**LINARES, Chief District Judge**

    **IT APPEARING THAT:**

    **1.**    The plaintiff, the Securities and Exchange Commission (hereinafter, "the

SEC"), brought this civil action in March 2016 against the defendant, Guy Gentile. (ECF

No. 1.) The SEC alleged that Gentile engaged in conduct that violated several provisions

of the Securities Act, the Exchange Act, and SEC Rule 10b-5. (Id.)

    **2.**    For relief, the SEC sought to: (a) enjoin Gentile from violating the

Securities Act, the Exchange Act, and SEC Rule 10b-5; (b) disgorge ill-gotten gains

received "as a result of the conduct alleged [in the complaint]"; (c) levy civil monetary

penalties; and (d) permanently prohibit Gentile from participating in any offering of

penny stocks. (ECF No. 1 at 23–24.)

    **3.**    Gentile was also indicted in March 2016 for nearly the same conduct. *See*

*United States v. Gentile*, Crim. No. 16-155, ECF No. 1.

4.      In January 2017, this Court granted Gentile's motion to dismiss the indictment in the criminal matter based on statute-of-limitations grounds. *See United States v. Gentile*, 235 F. Supp.3d 649 (D.N.J. Jan. 30, 2017). The Government initially filed a notice of appeal from that dismissal, but ultimately decided not to pursue the appeal. *See United States v. Gentile*, Crim. No. 16-155, ECF Nos. 34–37.

5.      Gentile now moves pursuant to Federal Rule of Civil Procedure (hereinafter, "Rule") 12(b)(6) to dismiss the complaint in the civil action. (ECF No. 34 through ECF No. 34-14.) The Court resolves the motion to dismiss upon a review of the papers and without oral argument. *See* L. Civ. R. 78.1(b).

6.      The SEC, in opposition to the motion to dismiss, states that it "has determined at this time, and on the facts now known to it, not to pursue [many of] its claims" that are asserted against Gentile in the complaint. (ECF No. 38 at 16 n.5; *see also* id. at 37 (the SEC stating that it "has determined not to pursue [certain] claims . . . on the facts known to it now and alleged in its Complaint").) In addition, in its opposition brief, the SEC raises examples concerning certain conduct that Gentile has engaged in after January 2017 that are not asserted in the complaint. (Id. at 17–18; id. at 28; ECF No. 37 at 5–6.)

7.      Thus, the SEC seeks to proceed in this case based upon claims and factual allegations that: (a) have been withdrawn; (b) are not asserted in the complaint, and are being raised for the first time in response to the motion to dismiss; or (c) are hopelessly intertwined with the claims and allegations that have been withdrawn.

**8.**     As a result, the Court is being asked to engage in the task of addressing a motion that has been made pursuant to Rule 12(b)(6) to dismiss a complaint for failure to state a claim, but the Court does not have the benefit of a straightforward complaint to refer to in determining whether a claim has been stated.  It would be improper for the Court to engage in such a task.

**9.**     The Court may exercise "its inherent power to control its docket so as to promote fair and efficient adjudication." *Rolo v. Gen. Dev. Corp.*, 949 F.2d 695, 702 (3d Cir. 1991); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (discussing "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").

**10.**     Therefore, the Court administratively terminates Gentile's motion to dismiss without prejudice, and directs the SEC to clarify exactly which allegations and claims are still viable by filing an amended complaint by October 6, 2017.  Indeed, the SEC appears to admit that it should have filed an amended complaint at this juncture. (ECF No. 38 at 34 n.18 (the SEC stating that the Court may determine that the allegations asserted in the complaint are deficient, and that it would be appropriate for the Court to grant leave to replead).)  Furthermore, the SEC will file an amended complaint without moving for leave to do so before the Magistrate Judge.

**11.**     When the SEC files the amended complaint, Gentile may move again to dismiss the claims asserted therein, if appropriate.

**IT IS THEREFORE** on this _____ 18th _____ day of September, 2017, **ORDERED** that the defendant's motion to dismiss the complaint **(ECF No. 34)** is administratively terminated without prejudice; and it is further

**ORDERED** that the plaintiff is **DIRECTED** to file an amended complaint, in a manner that is consistent with this Court's Opinion and Order, by October 6, 2017; and it is further

**ORDERED** that the defendant is granted leave to move to dismiss the forthcoming amended complaint when it is filed, if appropriate.


_____
**JOSE L. LINARES**
Chief Judge, United States District Court

# EXHIBIT J

Securities and Exchange Commission v. Gentile, 939 F.3d 549 (2019)

Fed. Sec. L. Rep. P 100,587

KeyCite Yellow Flag - Negative Treatment

Distinguished by Bureau of Consumer Financial Protection v. Citizens Bank, N.A., D.R.I., December 1, 2020

939 F.3d 549
United States Court of Appeals, **Third Circuit**.

SECURITIES AND EXCHANGE
COMMISSION, Appellant

v.

Guy **GENTILE**

No. 18-1242
|
Argued November 6, 2018
|
(Opinion Filed: September 26, 2019)

**Synopsis**

**Background:** Securities and Exchange Commission (SEC) brought civil enforcement action against broker, alleging violations of the Securities Exchange Act from broker's penny stock trading, and seeking an injunction prohibiting him from violating the SEA in the future, disgorgement, civil penalties, and an order barring him from penny stock industry. The United States District Court for the District of New Jersey, Jose L. Linares, Chief Judge, 2017 WL 6371301, granted broker's motion to dismiss. SEC appealed.

**[Holding:]** The Court of Appeals, Hardiman, Circuit Judge, held that as a matter of first impression, SEC injunctions that are properly issued and valid in scope are not penalties and thus are not governed by default statute of limitations.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (28)

**[1]** **Federal Courts** ⚬ Pleading

The Court of Appeals reviews de novo the district court's order granting a motion to dismiss

for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

3 Cases that cite this headnote

**[2]** **Federal Courts** ⚬ Dismissal for failure to state a claim

In reviewing the grant of a motion to dismiss a Securities and Exchange Commission action for failure to state a claim, the Court of Appeals accepts the Commission's well-pleaded allegations as true, construes them in the light most favorable to the Commission, and draws all reasonable inferences from those allegations in the Commission's favor. Fed. R. Civ. P. 12(b)(6).

3 Cases that cite this headnote

**[3]** **Securities Regulation** ⚬ Nature and grounds of injunction in general

Provision of Exchange Act permitting a court to bar a person from participating in the penny-stock industry is injunctive in nature. Securities Exchange Act of 1934 § 21, 15 U.S.C.A. § 78u(d)(6).

**[4]** **Securities Regulation** ⚬ Nature and grounds of injunction in general

A judicial prohibition on participating in penny-stock industry, under Exchange Act provision permitting a court to render such prohibition, just like a typical injunction, constitutes a judicial order to refrain from doing a particular thing which operates as a restraint upon the party in the exercise of his real or supposed rights. Securities Exchange Act of 1934 § 21, 15 U.S.C.A. § 78u(d)(6)(A).

**[5]** **Federal Courts** ⚬ Equity jurisdiction in general

Although federal courts' equity jurisdiction mirrors that of the High Court of Chancery in England in 1789, equitable relief is not strictly a common law matter; innumerable acts of Congress explicitly provide for injunctions, and

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 185 of 364
Securities and Exchange Commission v. Gentile, 939 F.3d 549 (2019)
Fed. Sec. L. Rep. P 100,587

courts must account for the policy judgments exemplified by those statutes when exercising their equitable discretion.

**[6]**    **Injunction** 🔑 Equitable nature of remedy

Unless Congress clearly states an intention to the contrary, statutory injunctions are governed by the same established principles of equity that have developed over centuries of practice.

**[7]**    **Injunction** 🔑 Injunctions Sought by Government in General

Rule that statutory injunctions are governed by the same established principles of equity that developed over centuries of practices unless congress clearly states a contrary intention applies to regulatory statutes enforced by government agencies.

**[8]**    **Injunction** 🔑 Prospective, preventive, or future-oriented nature of remedy

A court may not by injunction interfere for purposes of punishment, or compel persons to do right but may only prevent them from doing wrong.

**[9]**    **Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

The most basic rule of preventive injunctive relief is that the plaintiff must show a cognizable risk of future harm.

4 Cases that cite this headnote

**[10]**   **Injunction** 🔑 Persons entitled to apply; standing

Besides being an element of Article III standing for prospective relief, the need to show risk of harm is also a traditional equitable requirement that applies to enforcement agencies pursuing statutory injunctions. U.S. Const. art. 3.

**[11]**   **Injunction** 🔑 Injunctions Sought by Government in General

Unless an enforcement agency seeking a statutory injunction shows a real threat of future harm, there is in fact no lawful purpose to be served by a preventive injunction.

2 Cases that cite this headnote

**[12]**   **Injunction** 🔑 Prospective, preventive, or future-oriented nature of remedy

**Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

A preventive injunction unsupported by a showing of a real threat of future harm could not fairly be said solely to serve a remedial purpose, but a properly issued and framed injunction is fairly so described, because its sole function is to forestall future violations.

2 Cases that cite this headnote

**[13]**   **Securities Regulation** 🔑 Nature and grounds of injunction in general

In deciding whether to grant injunctive relief against securities violations, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts, including the need to protect the public, stigma, humiliation, and loss of livelihood.

1 Cases that cite this headnote

**[14]**   **Securities Regulation** 🔑 Nature and grounds of injunction in general

The adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion to enjoin securities violations.

1 Cases that cite this headnote

**[15]**   **Securities Regulation** 🔑 Nature and grounds of injunction in general

The harsh effects of a Securities and Exchange Commission injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible.

**[16]**    **Injunction** 🔑 Prospective, preventive, or future-oriented nature of remedy

**Injunction** 🔑 Public interest considerations

**Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing.

**[17]**    **Injunction** 🔑 Factors Considered in General

Justifying an injunction, even in part, in terms of propitiating public sentiment, is objectionable as a matter of law.

**[18]**    **Injunction** 🔑 Factors Considered in General

General deterrence is not a proper consideration for issuing an injunction.

**[19]**    **Injunction** 🔑 Scope of Relief in General

**Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

The principle that injunctions may issue only to prevent threatened future harm, not to punish, applies equally to an injunction's scope; just as it is error to issue an injunction for punishment's sake, it is error to broaden the scope of an injunction because of moral desert or to make an example of the defendant.

1 Cases that cite this headnote

**[20]**    **Injunction** 🔑 Specificity, vagueness, overbreadth, and narrowly-tailored relief

Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff.

3 Cases that cite this headnote

**[21]**    **Securities Regulation** 🔑 Nature and grounds of injunction in general

Rather than using punishment to justify Securities and Exchange Commission injunctions, courts must shape those injunctions to provide full relief without inflicting unnecessary pain.

3 Cases that cite this headnote

**[22]**    **Securities Regulation** 🔑 Nature and grounds of injunction in general

That an injunction is permissible only where necessary to prevent misconduct from occurring in the future, and not merely to punish past transgressions, is a standard to which the Securities and Exchange Commission must hold itself.

**[23]**    **Securities Regulation** 🔑 Nature and grounds of injunction in general

**Securities Regulation** 🔑 Proceedings in general

Securities and Exchange Commission injunctions that are properly issued and valid in scope are not penalties and thus are not governed by default statute of limitations; if an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion—not held time barred by default statute of limitations. Securities Exchange Act of 1934 § 21, 📕 15 U.S.C.A. § 78u(d)(1) and (6); 28 U.S.C.A. § 2462.

**[24]**    **Injunction** 🔑 Injunctions to enforce laws and regulations in general

The appropriate scope of an injunction against further lawbreaking depends on the facts and circumstances of each case; courts should

make this determination on a developed record, assuming the plaintiff has stated a plausible claim for relief.

**[25]**    **Injunction** 🔑 Discretion as to scope of relief

**Injunction** 🔑 Specificity, vagueness, overbreadth, and narrowly-tailored relief

The degree of particularity required of an injunction depends on the subject matter involved; ultimately, the district courts are invested with discretion to model their orders to fit the exigencies of the particular case, and have the power to enjoin related unlawful acts which may fairly be anticipated from the defendants' conduct in the past, but a decree cannot enjoin conduct about which there has been no complaint.

**[26]**    **Injunction** 🔑 Injunctions to enforce laws and regulations in general

An injunction against an imminent violation of law is not a penalty.

1 Cases that cite this headnote

**[27]**    **Securities Regulation** 🔑 Nature and grounds of injunction in general

Courts apply a somewhat less demanding imminence standard in Securities and Exchange Commission enforcement cases than they do in reviewing the Federal Trade Commission's exercise of similar statutory injunction authority.

**[28]**    **Securities Regulation** 🔑 Nature and grounds of injunction in general

Securities and Exchange Commission injunctions come with serious collateral consequences: they can lead to administrative sanctions and disabilities, and collaterally estop defendants in subsequent private litigation.

**\*551**  On Appeal from the United States District Court for the District of New Jersey, District Judge: Honorable Jose L. Linares (D.C. No. 2:16-cv-01619)

**Attorneys and Law Firms**

Daniel Staroselsky [Argued] Sarah Prins, United States Securities & Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549, Counsel for Appellant

Adam C. Ford [Argued] Ford O'Brien LLP, 575 Fifth Avenue, 17th Floor, New York, NY 10017, Counsel for Appellee

Before: HARDIMAN, KRAUSE, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

HARDIMAN, Circuit Judge.

**\*552**  A five-year statute of limitations applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. In 📄 *Kokesh v. S.E.C.*, ––– U.S. ––––, 137 S. Ct. 1635, 198 L.Ed.2d 86 (2017), the Supreme Court held that "[d]isgorgement in the securities-enforcement context" is a "penalty" subject to that five-year limitations period. 📄 *Id. at 1639*. At issue in this appeal are two different remedies sought by the SEC: an injunction against further violations of certain securities laws and an injunction barring participation in the penny stock industry. The District Court held that those remedies—like the disgorgement remedy at issue in *Kokesh*—were penalties. We see these questions of first impression differently and hold that because 📄 15 U.S.C. § 78u(d) does not permit the issuance of punitive injunctions, the injunctions at issue do not fall within the reach of § 2462. We will vacate the District Court's order dismissing the Commission's enforcement action and remand the case for the District Court to decide whether the injunctions sought are permitted under 📄 § 78u(d).

I[1]

**[1]**    **[2]**  Appellant Guy **Gentile**, the owner of an upstate New York broker-dealer, was involved in two pump-and-dump schemes to manipulate penny stocks[2] from 2007 to

2008. In both schemes, **Gentile** promoted and "manipulated the market for ... stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock." Am. Compl. ¶ 3, No. 2:16-cv-01619 (D.N.J. Oct. 6, 2017), ECF No. 47 (Complaint); *see id.* ¶ 7.

The United States Attorney's Office for the District of New Jersey filed a sealed criminal complaint against **Gentile** in June 2012 and he was arrested a few weeks later. **Gentile** agreed to cooperate against his confederates, but the deal fell apart in 2016 after the Government rejected **Gentile's**

**\*553** demand for a non-felony disposition. *United States v. Gentile*, 235 F. Supp. 3d 649, 651 (D.N.J. 2017). A grand jury indicted **Gentile**, but the District Court dismissed the indictment as untimely. *Id.* at 656.

**Gentile** "maintains an active presence in the securities industry" as the CEO of a Bahamas-based brokerage and the beneficial owner of a broker-dealer. Compl. ¶ 82. Since his criminal charges were dismissed, he has expressed an intention to expand that brokerage and hire new employees. *Id.* ¶ 14 (alleging **Gentile** announced plans to "increas[e] staff by 60 to 80 employees by year-end 2017, target[ ] 30 per cent growth, and reactivat[e] 'stalled' expansion plans"). And he has been quite candid about his view of the Commission's enforcement action. He called it a "witch hunt," and stated in the news and on social media that he "did nothing wrong" and "never scammed anyone." *Id.* ¶ 80.

The Commission disagrees. In this civil enforcement action, filed eight years after **Gentile's** involvement in the second scheme, it alleges violations of several provisions of the Securities and Exchange Acts.[3] It initially sought: (1) an injunction prohibiting **Gentile** from violating those provisions in the future; (2) disgorgement of wrongful profits; (3) civil money penalties; and (4) an order barring him from the penny stock industry. Following *Kokesh*, the Commission dropped its requests for disgorgement and penalties. That left only its requests for an "obey-the-law" injunction and a prohibition on **Gentile's** participation in penny-stock offerings. *S.E.C. v. Gentile*, No. 2:16-cv-01619, 2017 WL 6371301, at \*1 (D.N.J. Dec. 13, 2017).

The District Court granted **Gentile's** motion to dismiss. *Id.* at \*4. Applying *Kokesh*, the Court found that the remedies the Commission sought were penalties under § 2462. *Id.* at \*3–4. And because **Gentile's** illegal activity ceased in 2008, *id.* at \*1, the Court dismissed the case as untimely.

In holding the obey-the-law injunction was a penalty, the Court first noted that the injunction would not require **Gentile** to do anything the public at large is not already obliged to do, but it would stigmatize him. Nor would the injunction restore the status quo ante or compensate any victim of **Gentile's** schemes. Similarly, the Court found the penny stock bar would punish **Gentile** by "restrict[ing] [his] business structure and methodology, *in perpetuity*," without benefitting any victim or remediating the schemes' effects. *Id.* at \*4. Though it "underst[ood] [the Commission's] desire to protect the public from predatory conduct," the Court could not conclude "that, under the limited set of facts currently before it, the requested injunctions are anything more than a penalty." *Id.* The Commission filed this appeal.

II

The default federal statute of limitations requires that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise," be brought within five years of the claim's accrual. 28 U.S.C. § 2462. In *Kokesh*, the Supreme Court held disgorgement, "as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462." 137 S. Ct. at 1645. The Court defined a "penalty" as a "punishment, whether corporal or pecuniary, imposed and enforced **\*554** by the State, for a crime or offen[s]e against its laws." *Id.* at 1642 (alteration in original) (quoting *Huntington v. Attrill*, 146 U.S. 657, 667, 13 S.Ct. 224, 36 L.Ed. 1123 (1892)). The Court's definition of "penalty" was informed by two principles. First, whether a sanction is a penalty turns in part on whether the wrongdoing it targets was perpetrated against the public, rather than an individual. *Id.* Second, "a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner'—as opposed to compensating a victim for his loss." *Id.* (quoting *Huntington*, 146 U.S. at 668, 13 S.Ct. 224).

The Court held SEC disgorgement "readily" satisfies these criteria because (1) it is imposed for violations of public laws; (2) it is imposed for punitive purposes; and (3) in many cases the disgorged money is not used to compensate victims. *Id.* at 1643–44. The Commission protested that disgorgement sometimes does compensate victims, but the Court was unpersuaded. While "sanctions frequently serve

more than one purpose," a "civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." 📄 *Id.* at 1645 (quoting 📄 *Austin v. United States*, 509 U.S. 602, 610, 621, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)).

According to **Gentile**, the Supreme Court's definition of "penalty" applies equally to injunctions prohibiting future lawbreaking and participation in penny stock offerings. There is no question the Commission's action is to enforce what *Kokesh* described as "public laws." *Id.* at 1643; *see* 📄 *S.E.C. v. Teo*, 746 F.3d 90, 101–02 (3d Cir. 2014). So this case turns on whether the remedies the Commission seeks are imposed for punitive reasons.

### III

 **[3]**  Both remedies are found in 📄 15 U.S.C. § 78u(d).[4] The Commission's general authority to seek injunctions against ongoing or threatened violations, 📄 § 78u(d)(1), states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder ... it may in its discretion bring an action in [district court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

📄 Section 78u(d)(1) injunctions that simply reference or restate the text of statutory prohibitions are called "obey-the-law" injunctions.

The Commission's authority to seek a penny-stock industry bar is found in 📄 § 78u(d)(6)(A):

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

Paragraph (6) does not use the word "enjoin" like paragraph (1) does, so first we **\*555** must determine whether 📄 § 78u(d)(6) penny-stock industry bars are a species of injunction. Several considerations convince us they are.

 **[4]**  First, take the text. 📄 Section 78u(d)(6) authorizes a court to "prohibit" a defendant from participating in penny stock offerings. Just like a typical injunction, this is a judicial order "to refrain from doing a particular thing .... which operates as a restraint upon the party in the exercise of his real or supposed rights." 2 Joseph Story, Commentaries on Equity Jurisprudence § 861, at 154 (1836). It is "wholly preventive, prohibitory, or protective," 4 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 1337, at 3206 (4th ed. 1919), and it "directs the conduct of a party ... with the backing of [the court's] full coercive powers." 📄 *Nken v. Holder*, 556 U.S. 418, 428, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (quoting 📄 *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

The statute's structure also suggests the penny stock bar is injunctive. It is only "in a[ ] proceeding [for an injunction under 📄 § 78u(d)(1)]" that the statute empowers courts to issue the bar. Consistent with that close relation, courts use similar factors to decide whether to issue both industry bars and obey-the-law injunctions. *See SEC v. Kahlon*, 873 F.3d 500, 506–07 (5th Cir. 2017) (per curiam). *Compare* 📄 *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980), *with* 📄 *S.E.C. v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). And paragraph (6), like paragraph (1), bespeaks equitable discretion. *See* 📄 15 U.S.C. § 78u(d)(6)(A) ("[T]he court *may* prohibit that person

from participating in an offering of penny stock, *conditionally or unconditionally*, and permanently *or for such period of time as the court shall determine*." (emphases added)). Because it can be sought only "[i]n a[ ] proceeding under paragraph (1)," *id.*, a district court may impose a penny stock bar only "upon a proper showing," *id.* § 78u(d)(1). Thus, like paragraph (1), paragraph (6) contemplates injunctive relief's "nice adjustment and reconciliation between the public interest and private needs," *Aaron v. S.E.C.*, 446 U.S. 680, 701, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)).

Finally, at least two courts of appeals have acknowledged that these court-ordered industry bars are injunctive. *See Kahlon*, 873 F.3d at 508 (penny stock bar); *Patel*, 61 F.3d at 141 (director-and-officer bar). That makes sense, since courts have also reasoned that the statutory D&O bar authority merely codifies courts' preexisting power to include these bars in injunctions. *See S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1193 & n.8 (9th Cir. 1998); *S.E.C. v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994). For all these reasons, we hold § 78u(d)(6) penny-stock industry bars are injunctive in nature.

### IV

We next consider the question whether properly issued and framed § 78u(d)(1) and (6) injunctions can be penalties subject to the statute of limitations. We look first to the equitable principles governing injunctions, before turning to the text and history of the Commission's authority to seek them.

### A

**[5]** **[6]** **[7]** The federal courts' equity jurisdiction mirrors that of the High Court of Chancery in England in 1789, when Congress passed the first Judiciary Act. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). This does not mean, however, that equitable relief is strictly a common law matter. Innumerable **\*556** acts of Congress explicitly

provide for injunctions, and courts must account for the policy judgments exemplified by those statutes when exercising their equitable discretion. *See Hecht*, 321 U.S. at 331, 64 S.Ct. 587. But unless Congress clearly states an intention to the contrary, statutory injunctions are governed by the same "established principles" of equity that have developed over centuries of practice. *Weinberger*, 456 U.S. at 313, 102 S.Ct. 1798; *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *Hecht*, 321 U.S. at 329, 64 S.Ct. 587. This clear statement rule applies to regulatory statutes enforced by government agencies. *Hecht*, 321 U.S. at 329–30, 64 S.Ct. 587.

**[8]** **[9]** **Gentile's** argument that SEC injunctions are penalties, even when properly issued and framed, runs headlong into a core tenet of equity jurisprudence. "The historic injunctive process was designed to deter, not to punish." *Hecht*, 321 U.S. at 329, 64 S.Ct. 587. Or as one treatise put it, a court may not by injunction "interfere for purposes of punishment, or ... compel persons to do right" but may only "prevent them from doing wrong." 1 James L. High, A Treatise on the Law of Injunctions § 1, at 3 (4th ed. 1905). This principle is a corollary to the most basic rule of preventive injunctive relief—that the plaintiff must show a cognizable risk of future harm. *See United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

**[10]** **[11]** Besides being an element of Article III standing for prospective relief, the need to show risk of harm is also a traditional equitable requirement that applies to enforcement agencies pursuing statutory injunctions. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Douglas Laycock, Modern American Remedies 278 (4th ed. 2010); Gene R. Shreve, Federal Injunctions and the Public Interest, 51 Geo. Wash. L. Rev. 382, 405 (1983). Unless the agency shows a real threat of future harm, "there is in fact no lawful purpose to be served" by a preventive injunction. *SEC v. Torr*, 87 F.2d 446, 450 (2d Cir. 1937).

**[12]** In *Kokesh*'s parlance, a preventive injunction unsupported by that showing could not "fairly be said *solely* to serve a remedial purpose," 137 S. Ct. at 1645 (quoting *Austin*, 509 U.S. at 621, 113 S.Ct. 2801). *Cf. Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150,

Case 1:21-cv-21079-BB   Document 39-3   Entered on FLSD Docket 11/08/2021   Page 191 of
364
Securities and Exchange Commission v. Gentile, 939 F.3d 549 (2019)
Fed. Sec. L. Rep. P 100,587

155–56 (2d Cir. 1949) (L. Hand, C.J.) (rejecting injunction that would not prevent harm and so "must rest upon the theory that it is a proper penalty for the [defendant's] wrong" because "we can find no support [for the injunction] in principle"). But a properly issued and framed injunction is "fairly" so described, because its "sole function ... is to forestall future violations." *Or. State Med. Soc'y*, 343 U.S. at 333, 72 S.Ct. 690. We think this prevention principle most sharply distinguishes SEC injunctions from the disgorgement remedy at issue in *Kokesh*. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 103 n.13 (2d Cir. 1978) (Friendly, J.) (holding that even if the Commission fails "to show the likelihood of recurrence required to justify an injunction," courts may still impose disgorgement); Jayne W. Barnard, The SEC's Suspension and Bar Powers in Perspective, 76 Tul. L. Rev. 1253, 1258 (2002) ("All of these [SEC] injunctions except the disgorgement injunction depend on the government's ability to demonstrate that, in the absence of an injunction, there is a reasonable likelihood of future violations."). In short, injunctions may properly issue only to prevent harm—not to punish the defendant.

**\*557 B**

As we have explained, Congress must provide a clear statement to substantially depart from traditional equitable principles like that one. *See Hecht*, 321 U.S. at 329, 64 S.Ct. 587 ("We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made."). We perceive no such intent in the text of § 78u(d)(1) and (6). And while this clear statement rule might suffice to decide the case, requiring all injunctions under § 78u(d)(1) and (6) to be preventive and thus bringing them out of the realm of penalties, we are mindful that the *Kokesh* Court analyzed how SEC disgorgement operates in practice.[5] So we also analyze the history and caselaw surrounding these provisions. That analysis reinforces our conclusion but also impels us to reinforce the parameters within which an SEC injunction is properly issued and framed.

**1**

Once again, we start with the text. When the Commission believes a person "is engaged or is about to engage" in securities violations, it may bring a suit "to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 78u(d)(1). If the suit is against a "person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock" and a "proper showing" has been made as to likelihood of future harm, the court may also "prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." *Id.* § 78u(d)(1), (6)(A).

Nothing in either provision just quoted suggests Congress meant to depart from the rule that injunctions are issued to prevent harm rather than to punish past wrongdoing. Neither provision mentions retribution or general deterrence. *See Kokesh*, 137 S. Ct. at 1645; *cf. Tull v. United States*, 481 U.S. 412, 423, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) ("[A provision's] authorization of punishment to further retribution and deterrence clearly evidences that [it] reflects more than a concern to provide equitable relief."). Neither shows an intent—let alone a clear intent—that injunctions should issue automatically on a finding of past violations or without a proper showing of the likelihood of future harm. Each uses open-ended language that suggests traditional equitable discretion. *Compare* 15 U.S.C. § 78u(d)(1) ("[U]pon a proper showing ...."), *and id.* § 78u(d)(6)(A) ("[T]he court *may* prohibit that person from participating in an offering of penny stock, *conditionally or unconditionally, and permanently or for such period of time as the court shall determine*." (emphases added)), *with Hecht*, 321 U.S. at 321–22, 329–30, 64 S.Ct. 587 (holding no clear intent to strip traditional discretion in statute that provided that an injunction or other order "shall be granted" "upon a showing ... that [the defendant] has engaged or is about to engage in [prohibited] acts or practices"), *and id.* at 327, 64 S.Ct. 587 (noting distinction between "shall be granted" language and statutes, like § 78u(d)(1), that "provide that an injunction or restraining order shall be granted 'upon a proper showing' " (citations omitted)). In sum, "[a]bsent much **\*558** clearer language than is found in the [Exchange Act], the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 868–69 (2d Cir. 1968) (en banc) (Friendly, J., concurring).

2

The history of the Commission's injunction authority leads to the same conclusion. "Prior to the labor injunctions of the late 1800's, injunctions were issued primarily in relatively narrow disputes over property." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 842, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (Scalia, J., concurring). But that changed as more and more conduct came to be regulated by injunction through a rough analogy to public nuisance. *See* Comment, The Statutory Injunction as an Enforcement Weapon of Federal Agencies, 57 Yale L.J. 1023, 1024 n.5 (1948). Securities enforcement injunctions emerged as part of this expansion of American equity jurisprudence into public law enforcement. *See* Daniel J. Morrissey, SEC Injunctions, 68 Tenn. L. Rev. 427, 437–39 (2001).

Before Congress created the SEC, states authorized injunctive enforcement of laws that targeted "speculative schemes which have no more basis than so many feet of 'blue sky,' " *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 61 L.Ed. 480 (1917). Part of a new breed of statutory remedy, these injunctions were an extension of traditional equity "even less directly traceable to the remedial devices fashioned by the common law" than previous remedies that had "f[ound] a basic analogy in the common-law right of the state to abate and restrain public nuisances." Note, Statutory Extension of Injunctive Law Enforcement, 45 Harv. L. Rev. 1096, 1097, 1099 (1932). Those predecessor nuisance actions distinguished punishment from prevention.

*See* *Eilenbecker v. Dist. Court of Plymouth Cty.*, 134 U.S. 31, 40, 10 S.Ct. 424, 33 L.Ed. 801 (1890) ("[I]t seems to us to be quite as wise to use the processes of the law and the powers of the court to prevent the evil, as to punish the offence as a crime after it has been committed."), *overruled in part on other grounds by* *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); *Mugler v. Kansas*, 123 U.S. 623, 672–73, 8 S.Ct. 273, 31 L.Ed. 205 (1887) ("In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information, also, lies in equity to redress the grievance by way of injunction." (quoting 2 Story, *supra*, §§ 921–922)). And while statutory injunctions aimed at fraud on the public were an innovation, they too respected this fundamental distinction.

New York's Martin Act is perhaps the best-known example. That blue sky law empowered the state attorney general to seek information and commence actions in equity or criminal prosecutions. *See* *Dunham v. Ottinger*, 243 N.Y. 423, 154 N.E. 298, 300 (1926). Injunction actions were meant to "stop[ ]" or "prevent" threatened violations, *id.*, while prosecutions were meant to "punish" them. *Id.* Other states sought to use the injunctive process to "stop" and "suppress" securities fraud. *E.g.*, *Stevens v. Washington Loan Co.*, 107 N.J. Eq. 94, 152 A. 20, 23 (1930). Then, responding to the 1929 stock market crash and the Great Depression, Congress entered the fray.

*See* *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). It enacted first the Securities Act of 1933 and then the Securities Exchange Act of 1934, which created the SEC.

At first the Commission had only one arrow in its quiver: injunctions against future **\*559** violations of the securities laws.[6] *See* *Kokesh*, 137 S. Ct. at 1640. Much like those authorized by blue sky laws, SEC injunctions were "a classic example of modern utilization of traditional equity jurisdiction for the enforcement of a congressionally declared public policy administered by a regulatory agency established for that purpose." *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53 (7th Cir. 1972). For a time, courts were too quick to issue injunctions on modest showings of threatened harm. *See* *Commonwealth Chem.*, 574 F.2d at 99 ("It is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days."). But spurred by renewed attention to the statute's text and the harsh consequences of SEC injunctions, courts began taking a harder look at whether violators posed a real threat of recidivism. *See* *id.* at 99–100 (collecting cases).

Citing *Commonwealth Chemical* with approval, the Supreme Court said of SEC injunctions that "the proper exercise of equitable discretion is necessary to ensure a 'nice adjustment and reconciliation between the public interest and private needs.' " *Aaron*, 446 U.S. at 701, 100 S.Ct. 1945 (quoting *Hecht*, 321 U.S. at 329, 64 S.Ct. 587). To merit an injunction based on threatened harm, "the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." *Id.* Our Court makes that determination based on factors including not merely the

fact of a past violation, but more importantly "the degree of scienter involved [in the past violation], the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, [and] the sincerity of his assurances against future violations." *Bonastia*, 614 F.2d at 912.

[13]  [14]  [15]  Moreover, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972) (citing *Hecht*, 321 U.S. at 328–30, 64 S.Ct. 587). Those considerations include not only the need to protect the public where the circumstances of the offense and of the offender give rise to a substantial risk of future harm, *Bonastia*, 614 F.2d at 912, but also the stigma, humiliation, and loss of livelihood attendant to the imposition of the two injunctions sought here, whether temporary or permanent. So "the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *Manor Nursing Ctrs.*, 458 F.2d at 1102; *see* *Aaron*, 446 U.S. at 703, 100 S.Ct. 1945 (Burger, C.J., concurring) ("An [SEC] injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith."); *SEC v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978) (weighing hardship to defendant in approving injunction's dissolution). In other words, the harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible.

[16]  [17]  [18]  These principles would be dishonored if courts aimed to inflict hardship **\*560** instead of tailoring injunctions to minimize it. A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing. *See* *Hartford-Empire Co. v. United States*, 323 U.S. 386, 433–35, 65 S.Ct. 373, 89 L.Ed. 322 (1945) (striking part of antitrust injunction applicable to directors and officers who, though they "may have rendered themselves liable to prosecution," had not been shown to pose a threat of future violations), *supplemented*,

324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198. As the Court of Appeals for the D.C. Circuit aptly explained, "[j]ustifying an injunction, even in part, in terms of propitiating public sentiment, is objectionable as a matter of law." *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989). Nor is general deterrence a proper consideration. *See* *Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 180 n.6 (2d Cir. 1976) (Friendly, J.) (distinguishing "injunctive proceedings, the objective of which is solely to prevent threatened future harm" from administrative sanctions used "not so much to control the respondent as to warn others ... [which] has a significant 'penal' component" (quoting Louis L. Jaffe, Judicial Control of Administrative Action 267–68 (1965))).

[19]  [20]  And the principle that injunctions may issue only "to prevent threatened future harm," not to punish, *Arthur Lipper*, 547 F.2d at 180 n.6, applies equally to an injunction's scope. *See* *S.E.C. v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 542–43 (2d Cir. 1984) (Friendly, J.). Just as it is error to issue an injunction for punishment's sake, it is error to broaden the scope of an injunction because of moral desert or to make an example of the defendant. That principle is implicit in the well-established rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[ ]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)).

[21]  Indeed, rather than using punishment to *justify* SEC injunctions, courts must shape those injunctions to provide full relief without inflicting unnecessary pain. *See, e.g., Patel*, 61 F.3d at 142 ("The loss of livelihood and the stigma attached to permanent exclusion from the corporate suite certainly requires more."); *Am. Bd. of Trade*, 751 F.2d at 542–43. And courts have consistently explained that SEC injunctions must be intended to deter the violator from further infractions (and thereby protect the public), not punish past misconduct. *See, e.g., Bonastia*, 614 F.2d at 912; *SEC v. Graham*, 823 F.3d 1357, 1361–62 (11th Cir. 2016); *S.E.C. v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978); *S.E.C. v. Geon Indus., Inc.*, 531 F.2d 39, 54–

56 (2d Cir. 1976) (Friendly, J.). Because an injunction must be fully supported by threatened harm, we reject **Gentile's** argument that a properly issued and framed SEC injunction can be a "penalty" as defined by *Kokesh*.

The SEC itself agrees with this approach in principle. In *Saad*, Exchange Act Release No. 86751, 2019 WL 3995968 (Aug. 23, 2019), the Commission was asked to evaluate a disciplinary sanction barring an individual from associating with any FINRA member firm. *Id.* at *1. The Commission observed at the outset that "if a sanction is imposed for punitive purposes as opposed to remedial purposes, the sanction **\*561** is excessive or oppressive and therefore impermissible." *Id.* at *3. The Commission went on to explain that a reasonable, well-grounded finding that the sanctioned party "posed a clear risk of future misconduct" such that "the bar was ... necessary to protect investors" was what distinguished an "appropriately-issued FINRA bar[ ]" from an impermissibly punitive bar. *Id.* at *4 (internal quotation marks and citation omitted). Conversely, "[a] sanction based solely on past misconduct ... would be impermissibly punitive and thus excessive or oppressive." *Id.* at *5.

[22]  That an injunction is permissible only where necessary "to prevent ... misconduct from occurring in the future," and not merely "to punish past transgressions," *Saad*, 2019 WL 3995968, at *12, is a standard to which the SEC must also hold itself. When it does not, the buck stops here: Lest we return to those days when only a modest showing was considered sufficient, *Commonwealth Chem.*, 574 F.2d at 99, federal courts may not grant SEC injunctions except "upon a proper showing" of the likelihood of future harm.[7]

Other courts are divided on whether an injunction can ever be a § 2462 penalty. The Eleventh Circuit, bound by its precedent, held that injunctions cannot be penalties under § 2462 because they are equitable. *Graham*, 823 F.3d at 1360. It went on to explain that even had that precedent not been established, it would hold § 2462 "does not apply to injunctions like the one in [that] case." *Id.* The court reasoned that injunctive relief is forward looking, while penalties address past wrongdoing. *See id.* at 1361–62. By contrast, the Fifth Circuit held in a non-precedential opinion that SEC injunctions and D&O bars could be—and in that case were —penalties under § 2462. *S.E.C. v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) (per curiam). The Eighth, Sixth, and Tenth Circuits declined to say whether injunctions can ever

be § 2462 penalties, instead holding the particular injunctions before them were not punitive. *See SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017); *S.E.C. v. Quinlan*, 373 F. App'x 581, 587 (6th Cir. 2010) (non-precedential); *United States v. Telluride Co.*, 146 F.3d 1241, 1245–48 (10th Cir. 1998). The D.C. Circuit has taken yet another approach in the agency context. That court evaluates whether an administrative sanction constitutes a penalty for purposes of § 2462 on a case-by-case basis, considering "the degree and extent of the consequences to the subject of the sanction." *Johnson v. S.E.C.*, 87 F.3d 484, 488 (D.C. Cir. 1996).[8] None of this is inconsistent **\*562** with our holdings here; these courts simply have not decided the scope of injunctions permitted under § 78u(d).

[23]  In our view, the *Graham* court got it right. We have deemed inappropriate an injunction that was the functional equivalent of a monetary penalty. *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 295–96 (3d Cir. 2013) ("Such injunctive cap-and-trade relief is the equivalent of awarding monetary relief and 'could not reasonably be characterized as an injunction.' " (quoting *United States v. Midwest Generation*, 781 F. Supp. 2d 677, 685 (N.D. Ill. 2011))); *see United States v. Luminant Generation Co.*, 905 F.3d 874, 890–91 (5th Cir. 2018) (Elrod, J., concurring in part and dissenting in part) (advocating our Court's approach in *EME Homer City*), *reh'g en banc granted*, 929 F.3d 316 (5th Cir. 2019); *cf. Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State."). A similar principle applies here. Injunctions may not be supported by the desire to punish the defendant or deter others, so courts abuse their discretion when they issue or broaden injunctions for those reasons. We therefore hold SEC injunctions that are properly issued and valid in scope are not penalties and thus are not governed by § 2462. If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion—not held time barred by § 2462.

There is one puzzle we feel compelled to address. The *Kokesh* Court held SEC disgorgement is a penalty—despite the maxim that "[a] civil penalty was a type of remedy at common

law that could only be enforced in courts of law," *Tull*, 481 U.S. at 421–22, 107 S.Ct. 1831; *see Decorative Stone Co. v. Bldg. Trades Council of Westchester Cty.*, 23 F.2d 426, 427–28 (2d Cir. 1928) ("Courts of equity do not award as incidental relief damages penal in character without express statutory authority ...."). If SEC disgorgement is both an equitable remedy and a § 2462 penalty, could an injunction be both too?

We think not. First, unlike § 78u(d)(1) and (6) injunctions, SEC disgorgement is not authorized by statute. It has instead been justified as part of courts' "inherent equity power to grant relief ancillary to an injunction." *Kokesh*, 137 S. Ct. at 1640 (quoting *SEC v. Tex. Gulf Sulphur Co.*, 312 F. Supp. 77, 91 (S.D.N.Y. 1970)). Without any textual basis, it is hard to see where the Supreme Court would look for a clear statement of congressional intent to deviate from equitable traditions. Indeed, at the *Kokesh* oral argument several Justices expressed frustration that the lack of statutory text made it hard to define SEC disgorgement. *See* Transcript of Oral Argument at 7–9, 13, 31, 52, *Kokesh*, —— U.S. ——, 137 S. Ct. 1635, 198 L.Ed.2d 86 (No.16-259), 2017 WL 1399509.

Second, the *Hecht* admonition—that "[t]he historic injunctive process was designed to deter, not to punish," 321 U.S. at 329, 64 S.Ct. 587—is at the core of preventive injunctive relief. By contrast, *Tull* spoke to equity more broadly. So notwithstanding what *Kokesh* might suggest about equitable relief in general, we do not believe it opens the door to punitive injunctions.

Finally, though the *Kokesh* Court was careful to reserve the issue, *see* 137 S. Ct. at 1642 n.3, we note its skepticism that SEC disgorgement is applied in conformity with traditional equitable principles. *Compare id.* at 1640 ("Generally, disgorgement is a form of '[r]estitution measured by the **\*563** defendant's wrongful gain.' " (alteration in original) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a, at 204 (Am. Law Inst. 2010))), *with id.* at 1644 ("[I]t is not clear that disgorgement, as courts have applied it in the SEC enforcement context, simply returns the defendant to the place he would have occupied had he not broken the law. SEC disgorgement sometimes exceeds the profits gained as a result of the violation."). For these

reasons, we conclude that proper injunctions do not fall within the definition of penalties as defined in *Kokesh*.

### V

Our analysis to this point disposes of most of **Gentile's** arguments, but a few remain. First, **Gentile** argues that the *Hecht* admonition—that "[t]he historic injunctive process was designed to deter, not to punish"—does not apply because it is inconsistent with *Kokesh*'s treatment of § 2462. That is, *Hecht* sets forth a dichotomy—punishment versus deterrence—that is untenable because *Kokesh* holds deterrence is punitive. We think this overreads *Kokesh*. Though the Court referred several times to "deterrence" without elaboration, we understand those references to address general deterrence.

*See Kokesh*, 137 S. Ct. at 1642 ("[A] pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner' ...." (quoting *Huntington*, 146 U.S. at 668, 13 S.Ct. 224)). Our Court's gloss on *Hecht* reflects this important distinction between restraining the defendant on fear of contempt and making an example of him to deter others.

*See Bonastia*, 614 F.2d at 912 (noting that injunctive relief serves "to *deter* [the violator] from committing future infractions of the securities laws," not to "punish" him for past misconduct (emphasis added)). The former is the very point of preventive injunctive relief; the latter is punitive. "When it comes to discerning and applying [traditional equitable] standards ... 'a page of history is worth a volume of logic.' " *eBay*, 547 U.S. at 395, 126 S.Ct. 1837 (Roberts, C.J., concurring) (quoting *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). All the more so here—where **Gentile's** logic is based on a strained reading of a single word in a case addressing a different remedy.

And unlike in *Kokesh*, there are few signs that courts issue SEC injunctions for general deterrence. True, there are isolated examples. *See, e.g.*, *Posner*, 16 F.3d at 522 ("We intend our affirmance ... as a sharp warning to those who violate the securities laws that they face precisely such banishment."). But the caselaw in the main reflects the traditional principles we have discussed. We also find it significant that cases prior to *Kokesh* addressing both SEC injunctions and disgorgement often discuss general deterrence only with respect to the latter. *See, e.g.*, *SEC v. Kokesh*, 834 F.3d 1158, 1162–64 (10th Cir. 2016), *rev'd*,

—— U.S. ——, 137 S. Ct. 1635, 198 L.Ed.2d 86; *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474, 1477–78 (2d Cir. 1996); *First City Fin. Corp.*, 890 F.2d at 1228–29, 1231–32; *see also Collyard*, 861 F.3d at 765. What is more, we have explained in an SEC case that "there is no great public or national interest to be served by an injunction in essence against a single individual." *Warren*, 583 F.2d at 121. That would hardly be true if we sought to implement a program of general deterrence through injunctions.

Part of our disagreement with **Gentile** stems from his focus on the Commission's intent. It may well be that in its zeal for enforcement, the Commission more recently has tended to seek injunctions in part for their general deterrent effect. *See* **\*564** James D. Cox et al., *SEC Enforcement Heuristics: An Empirical Inquiry*, 53 Duke L.J. 737, 751 (2003). The impetus may be understandable; after all, SEC enforcement actions are "independent of the claims of individual investors" and are aimed at "promot[ing] economic and social policies." *Teo*, 746 F.3d at 102 (alteration in original) (quoting *S.E.C. v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993)); *see* Comment, Federal Agencies, *supra*, at 1048–49. But any tendency in that direction would be at odds with the Commission's own understanding of the limits on its powers, *cf. Saad*, 2019 WL 3995968, at *3–5, *12. And ultimately, rather than probe the agency's rationale for seeking a judicial remedy, we look to the nature of the remedy itself as explained by the courts imposing it. *See Kokesh*, 137 S. Ct. at 1643–44 (analyzing why disgorgement "is imposed by the courts"); *cf. Tull*, 481 U.S. at 423, 107 S.Ct. 1831 ("Thus, the District Court intended not simply to disgorge profits but also to impose punishment.").

Second, **Gentile** argues that because obey-the-law injunctions require mere compliance with preexisting obligations, they must be punitive. Citing *Bonastia*, the Commission responds that "injunctions that track the statutory language charged in a complaint are permissible in this Circuit." SEC Br. 30 n.5. **Gentile's** argument has some force to the extent that obey-the-law injunctions pose a risk of overbreadth, lack of fair notice, unmanageability, and noncompliance with Federal Rule of Civil Procedure 65(d). *See Graham*, 823 F.3d at 1362 n.2 (collecting cases); *SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (collecting cases); *Savoy*, 665 F.2d at

1318; *United States v. Corn*, 836 F.2d 889, 892 & n.6 (5th Cir. 1988); Laycock, *supra*, at 274–75. So in some cases—and perhaps in this one—an obey-the-law injunction will add little if anything to the sanctions already in place. There has been and continues to be "a difference of opinion as to whether as a general proposition injunctions to 'obey the law' should be issued in order that enforcement by administrative agencies may be sought by contempt rather than by the statutory route." *SEC v. Thermodynamics, Inc.*, 464 F.2d 457, 461 (10th Cir. 1972).

**[24]** **[25]** But **Gentile** has not asked us to hold obey-the-law injunctions impermissible—he argues only that they are subject to the § 2462 statute of limitations. So we note only that the appropriate scope of an injunction against further lawbreaking depends on the facts and circumstances of each case. Courts should make this determination on a developed record, 🚩 *S.E.C. v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442, 133 S.Ct. 1216, 185 L.Ed.2d 297 (2013), assuming the plaintiff has stated a plausible claim for relief, *see EME Homer City Generation*, 727 F.3d at 295–96 (affirming dismissal of claims for improper injunctive relief). It is true that in *Bonastia* we reversed the district court's refusal to grant an obey-the-law injunction. *See* 614 F.2d at 910–11. We have also struck overbroad language enjoining parties to obey the law. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003) (citing *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 83 (3d Cir. 1990), and *Warren*, 583 F.2d at 121). The "degree of particularity required of an injunction depends on the subject matter involved." *Pub. Interest Research Grp.*, 913 F.2d at 83 (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987)). Ultimately, "[t]he district courts are invested with discretion to model their orders to fit the exigencies of the particular case, and have the power to enjoin related unlawful acts which may fairly be anticipated from the defendants' conduct in the past, but a decree cannot enjoin conduct about which **\*565** there has been no complaint." *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1180 (3d Cir. 1976) (footnotes omitted); *see N.L.R.B. v. Express Publ'g. Co.*, 312 U.S. 426, 435–37, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

Case 1:21-cv-21079-BB   Document 39-3   Entered on FLSD Docket 11/08/2021   Page 197 of
364
Securities and Exchange Commission v. Gentile, 939 F.3d 549 (2019)
Fed. Sec. L. Rep. P 100,587

We stress that the District Court, on remand, should not rubber-stamp the Commission's request for an obey-the-law injunction simply because it has been historically permitted to do so by various courts. After all, *Bonastia* was decided almost 40 years ago, when the landscape for SEC enforcement actions was significantly different than today's.

*See* 📑 *Kokesh*, 137 S. Ct. at 1640. Indeed, Congress did not enact the penny-stock bar until ten years later. If the District Court, after weighing the facts and circumstances of this case as alleged or otherwise, concludes that the obey-the-law injunction sought here serves no preventive purpose, or is not carefully tailored to enjoin only that conduct necessary to prevent a future harm, then it should, and must, reject the Commission's request. We note that the District Court has already addressed some of the relevant concerns involved in its opinion. We are also troubled by the fact that the Commission appears to seek two injunctions that attempt to achieve the same result.

Third, **Gentile** argues the penny stock bar is punitive because it "provides no benefit to victims of alleged past securities violations, nor does it purport to do so." **Gentile** Br. 27. In making this argument, he tacitly agrees with us that 📑 § 78u(d)(6) penny stock bars are injunctive in nature. But then he cites a series of cases that involve administrative suspensions and debarments, not court-ordered injunctive relief. *See* 📑 *de La Fuente v. F.D.I.C.*, 332 F.3d 1208, 1214–15, 1219–20 (9th Cir. 2003); 📑 *Proffitt v. F.D.I.C.*, 200 F.3d 855, 860–61 (D.C. Cir. 2000); 📑⚠️ *Johnson*, 87 F.3d at 488; 📑 *Saad v. S.E.C.*, 873 F.3d 297, 304 (D.C. Cir. 2017) (Kavanaugh, J., concurring). We concede some courts have used similar logic. *See* 📑 *Collyard*, 861 F.3d at 764 (citing 🚩 *Riordan v. S.E.C.*, 627 F.3d 1230, 1234 (D.C. Cir. 2010) (Kavanaugh, J.), *abrogated on other grounds by* 📑 *Kokesh*, —— U.S. ——, 137 S. Ct. 1635, 198 L.Ed.2d 86); 📑 *Telluride*, 146 F.3d at 1246–47; 📑 *Bartek*, 484 F. App'x at 956–57. But we think the distinction between injunctions and administrative sanctions makes all the difference. *See supra* Part IV; 📑 *Arthur Lipper*, 547 F.2d at 180 n.6. Our analysis is, after all, predicated on traditional principles of *judicial* relief. **Gentile** is quite right to point out that exclusion from one's chosen profession is a devastating sanction. But the question is not whether an administrative sanction can be punitive; it is

whether a federal court can issue a 📑 § 78u(d)(6) injunction for punitive purposes. It cannot.

**[26]    [27]**  Finally, **Gentile** argues that the obey-the-law injunction and penny stock bar are punitive because they do not seek to restrain imminent violations. **Gentile** concedes, as he must, that an injunction against an imminent violation is not a penalty. *See* **Gentile** Br. 42 ("Of course the SEC has unlimited power to obtain an injunction against an individual who is actually violating the securities laws or on the precipice of doing so."). He objects that his case does not rise to that standard. It is true that we apply a somewhat less demanding imminence standard in SEC enforcement cases than we do in reviewing the FTC's exercise of similar statutory injunction authority. *Compare* 📑 *Bonastia*, 614 F.2d at 912 ("The well established standard ... is based on a determination of whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct."), *with* 📑 *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019) **\*566** (" '[I]s about to violate' means something more than a past violation and a likelihood of recurrence."). But neither *Bonastia* nor the *Aaron* Court (which seemed to approve a test much like ours) dispensed with the requirement of "a proper showing." *See* 📑 *Aaron*, 446 U.S. at 701, 100 S.Ct. 1945 ("[T]he Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." (citing 📑 *Commonwealth Chem.*, 574 F.2d at 98–100)); 📑 *Bonastia*, 614 F.2d at 913 (concluding that the SEC had made "a strong showing" that justified the reversal of the district court and entry of an injunction). Nor did either suggest that the fact of a past violation alone was sufficient to impose so onerous and stigmatizing a sanction as an industry bar or obey-the-law injunction. Rather, even with a lesser imminence requirement, we insisted the showing itself be substantial and based as well on "the circumstances surrounding the particular defendant." 📑 *Bonastia*, 614 F.2d at 912.

Along those same lines, we are mindful that we are interpreting the meaning of "penalty" for statute of limitations purposes. Even assuming a valid preventive injunction could be a penalty, it is hard to see when it would accrue. *See* 📑⚠️ *Johnson*, 87 F.3d at 489 n.7. **Gentile's** argument must reject either *Bonastia* or our conclusion that 📑 § 78u(d)(1)

and (6) conform to traditional equitable principles. We can do neither.

## VI

[28] SEC injunctions come with serious collateral consequences. *Commonwealth Chem.*, 574 F.2d at 99; *Am. Bd. of Trade*, 751 F.2d at 535. They can lead to administrative sanctions and disabilities, *see* Thomas J. Andre, Jr., The Collateral Consequences of SEC Injunctive Relief: Mild Prophylactic or Perpetual Hazard?, 1981 U. Ill. L. Rev. 625, 643–68, and collaterally estop defendants in subsequent private litigation, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–33, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Enjoined defendants suffer harm to their personal and business reputations. *See Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 423 n.5, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) ("The moment you bring a public proceeding against a broker-dealer who depends upon public confidence in his reputation, he is to all intents and purposes out of business." (quoting Milton V. Freeman, Administrative Procedures, 22 Bus. Law 891, 897 (1967))); *Warren*, 583 F.2d at 122; ABA Committee on Federal Regulation of Securities, Report of the Task Force on SEC Settlements, 47 Bus. Law. 1083, 1091, 1149–50 (1992). And when a court bans a defendant from his industry, it imposes what in the administrative context has been called the "securities industry equivalent of capital punishment." *Saad v. S.E.C.*, 718 F.3d 904, 906 (D.C. Cir. 2013) (quoting *PAZ Sec., Inc. v. S.E.C.*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

So we conclude by repeating Judge Friendly's warning: an SEC injunction "often is much more than [a] 'mild prophylactic.' " *Commonwealth Chem.*, 574 F.2d at 99. When the Commission seeks an injunction, "the famous admonitions in [*Hecht*] must never be forgotten." *Am. Bd. of Trade*, 751 F.2d at 535–36.

\* \* \*

Because properly issued and framed injunctions under § 78u(d)(1) and (6) are not penalties governed by § 2462, we will vacate the District Court's judgment and remand for proceedings consistent with this opinion.

## All Citations

939 F.3d 549, Fed. Sec. L. Rep. P 100,587

## Footnotes

1    The District Court had jurisdiction under sections 20(b) and 22(a) of the Securities Act ( 15 U.S.C. §§ 77t(b) and 77v(a)), sections 21(d) and 27 of the Exchange Act ( 15 U.S.C. §§ 78u(d) and 78aa), and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). We accept the Commission's well-pleaded allegations as true, construe them in the light most favorable to the Commission, and draw all reasonable inferences from those allegations in the Commission's favor. *Davis v. Wells Fargo*, 824 F.3d 333, 341, 351 (3d Cir. 2016).

2    "Penny stocks are low-priced, high-risk equity securities for which there is frequently no well-developed market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 n.14 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 914 n.1 (3d Cir. 1992)).

3    Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c); section 17(b) of the Securities Act, 15 U.S.C. § 77q(b); section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

4   The Commission has parallel injunction and penny-stock bar authority under the Securities Act. *See* 15 U.S.C. § 77t(b), (g). Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them.

5   The disgorgement remedy addressed in *Kokesh* was not created by statute, *see* 137 S. Ct. at 1640, so there would have been nowhere to look for a clear statement of congressional intent to deviate from traditional equitable principles. *See infra* Part IV(B)(2).

6   Decades later, Congress granted the authority to seek penny stock bars. That authority came in 1990 as part of an amendment to the Exchange Act designed "to provide additional enforcement remedies for violations of [the securities] laws and to eliminate abuses in transactions in penny stocks, and for other purposes." Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931, 931 pmbl.

7   As we explain below, we perceive an important distinction between the statutorily authorized equitable relief at issue here and the administrative sanctions at issue in *Saad*. So we do not think all of the *Saad* Release's reasoning is applicable to the injunction context. In particular, we do not believe that, under § 78u(d)(1) or (6), "general deterrence ... may be considered as part of the overall remedial inquiry." *Saad*, 2019 WL 3995968, at *2 (alteration in original) (quoting *PAZ Sec., Inc. v. S.E.C.*, 494 F.3d 1059, 1066 (D.C. Cir. 2007)).

8   While we agree with the D.C. Circuit that considerations of both purpose and effect are relevant to whether an injunction constitutes a penalty, we believe these considerations bear on the authority of the district court to enter an SEC injunction, not on whether that injunction, while within the court's power to grant, is nonetheless time barred. We question too the consistency and administrability of this approach, which appears to contemplate the imposition of both punitive and remedial injunctions within § 2462's limitations period but of only remedial injunctions outside of it, with the time bar conclusively determined on appeal only after the fact. The approach we espouse today has the virtue of providing clear guidance ex ante by focusing instead on the SEC's authority to seek and the court's authority to impose an injunction under § 78u(d)(1) and (6).

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-------------------------------------------------------------x
**SECURITIES AND EXCHANGE**      :
**COMMISSION,**      :
     :
              **Plaintiff,**      :     **16 Civ. 1619 (BRM) (JAD)**
     :
       **-against-**      :     **ECF Case**
     :
**GUY GENTILE,**      :
     :
            **Defendant.**      :
-------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS AND THINGS
## TO DEFENDANT GUY GENTILE

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

Securities and Exchange Commission ("Commission") requests that Defendant Guy

Gentile produce for discovery, inspection and photocopying the documents and things

described herein on or before April 1, 2020, at the offices of the Commission, located at

200 Vesey Street, Suite 400, New York, NY 10281.

## DEFINITIONS

1. The term "communication" means the transmittal of information (in the

form of facts, ideas, inquiries or otherwise).

2. The term "document" is defined to be synonymous in meaning and equal

in scope to the usage of the term "documents or electronically stored information" in Fed.

R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the

meaning of this term.

3. When referring to documents, "to identify" means to give, to the extent

known, the (i) type of document; (ii) general subject matter; (iii) date of the document;

and (iv) author(s), addressee(s) and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

4.　"You" or "Your" shall refer to Defendant Guy Gentile and his current or former accountants, attorneys, agents or other representatives, or any corporations, partnerships, d/b/a's or other entities over which he exercises or has exercised any control.

5.　The term "concerning" means relating to, referring to, describing, evidencing or constituting.

6.　The terms "all," "any," and "each" shall each be construed as encompassing any and all.

7.　The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

8.　The use of the singular form of any word includes the plural and vice versa.

9.　For each entity listed below, the entity shall be defined to include any parent corporations, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners or partnerships, wherever located:

SureTrader

Swiss America Securities Ltd.

Mint Global Markets, Inc., f/k/a Stock USA

MintBrokers International

F1 Trade

Tillerman Securities, Ltd. ("Tillerman")

Alliance Investment Management Ltd. ("Alliance")

Caribbean Investment Management Ltd. ("Caribbean Investment")

VTrader Pro LLC  ("VTrader")

Texas Capital Management LLC ("TCM")

Verdmont Capital, S.A ("Verdmont")

Sentry Global Securities Limited ("Sentry Global")

Quirea Ventures Corp. ("Quirea")

Raven Gold Corporation ("RVNG")

Kentucky USA Energy Inc. ("KYUS")

10.     The "relevant period" shall be from 2007 through the present.  Unless a different period of time is specified, all requests shall be for documents created, modified, sent or received during the relevant period.

## **INSTRUCTIONS**

1.     Where any document is withheld, in whole or in part, due to any claim of privilege, please provide all information required by Local Civil Rule 34.1 of the Civil Rules of the District of New Jersey.  In addition, please provide the following:

   a.   the type of document, *e.g.*, letter or memorandum;

   b.   the general subject matter of the document;

   c.   the date of the document;

   d.   the author of the document, the addressees of the document; and

e.   any other recipients, and, where not apparent, the relationship of

the author, addressees, and recipients to each other.

2.      Each document requested is to be produced in its entirety, including all

non-identical copies and drafts, without abbreviation, expurgation, or redaction, and,

pursuant to Fed. R. Civ. P. 34(b)(1)(C), produced in an electronic format consistent with

the SEC Data Delivery Standards appended hereto.

3.      Each request shall be answered fully unless it is subject to a good faith

objection, in which event the reason for the objection shall be stated in detail.  If an

objection pertains to only a portion of a request, or a word, or phrase, or clause contained

within a request, please state the objection to that portion only, and respond to the

remainder of the request.

4.      If any document sought by these document requests once was, but no

longer is, within Your possession, custody or control, please identify each such document

and its present or last known custodian, and state: (a) the reason why the document is not

being produced; and (b) the date of the loss, destruction, discarding, theft or other

disposal of the document.

5.      This request is ongoing in nature and You should continue to produce

responsive documents as they are found or created on an ongoing basis.

## **DOCUMENTS AND THINGS REQUESTED**

1.      All documents provided by You to any person, entity, governmental

agency or department concerning RVNG or KYUS.

2.      All documents, including communications, concerning RVNG or KYUS.

3.      All communications concerning RVNG or KYUS and any of the

following:

Akerly, Leon
Akerly, Rhea
Arnold, Chad
Balbour, Anthony
Balbour, Janet
Bardelli, Daniel
Breland, L. Raymond
Briner, John
Budd, Jay
Caputo, Vincent
Cassano, Guisippe (Joe)
Cassetta, Anthony
Chin, Peter
Chaudhury, Ranajit
Cohen, Itamar
Coldicutt, Elizabeth
Coldicutt, Thomas
Curshen, Jonathan
Dagostino, Dominick
Davis, Rick
DelPresto, Sam
Eversole, Steven D.
Gentile, Antonietta
Gentile, Joseph
Gentile, Karen
Gentile, Luigi
Gottbetter, Adam
Greenwood, Christopher
Gustaveson, Jeff
Harker, David
Joyner, Lennard Perez
Manhas, Harjinder
Metcalf, Christopher S.
Migdall, Allan
Oziel, Isaac
Pacella, Al
Panetta, Angelo ("Bill")
Patel, Shams
Pietraniello, Michael
Pietraniello, Elvira
Ricci, David
Saunders, Hans Christian

Salazar, Ronny
Taxon, Mike
Uesugi, Darin
U, Susan

4.　　All documents concerning trading in RVNG or KYUS stock, including, without limitation, communications and brokerage statements concerning such trading.

5.　　All documents concerning accounts trading in RVNG or KYUS stock in which You executed trades or directed trades to be executed, including, without limitation, bank or brokerage account records.

6.　　All documents concerning Your business relationship between 2004 and the present with Alliance,  including without limitation, bank or brokerage account records, and communications concerning, or documents supporting, the Affidavit of Peter D. Chin, sworn to February 23, 2016.

7.　　All documents concerning the business relationship between Karen Gentile and any entity she controlled, and Alliance, from 2004 through the present.

8.　　All documents concerning the "algorithmic trading system" You ran at Alliance, from 2006 through the present.

9.　　All documents concerning Your business relationship with Tillerman, including without limitation, communications and bank or brokerage account records.

10.　　All documents concerning Your business relationship with Caribbean Investment, including without limitation, communications and bank or brokerage account records.

11.　　All documents concerning Your business relationship with VTrader, including without limitation, communications and bank or brokerage account records.

12.     All documents concerning Your business relationship with TCM, including without limitation, communications and bank or brokerage account records.

13.     All documents concerning Your business relationship with Verdmont, including without limitation, communications and bank or brokerage account records.

14.     All documents concerning Your business relationship with Sentry Global, including without limitation, communications and bank or brokerage account records.

15.     All documents concerning Your business relationship with Quirea, including without limitation, communications and bank or brokerage account records.

16.     All documents concerning Tillerman's business dealings with KYUS.

17.     All documents concerning any statements made by You to anyone concerning any of the events alleged in the Complaint.

18.     All documents concerning bank accounts in which You held a beneficial interest from 2006 to the present, including without limitation account statements.

19.     All agreements between You and any governmental agency or department, including the Commission and the United States Department of Justice, including without limitation "cooperation agreements."

20.     An un-redacted version of the declaration You submitted in support of Your Motion to Dismiss in United States v. Gentile, 16 Cr. 155 (JLL) (D.N.J.) (D.E. 14-25), dated July 14, 2016.

21.     All documents concerning any disciplinary proceedings initiated, findings made, or penalties leveled by the Securities Commission of the Bahamas ("SCB") in connection with any SCB investigation or inquiry of the business dealings of You,

including, without limitation, inquiries concerning Swiss America Securities, Ltd.,

SureTrader, and/or MintBroker International, Ltd.

22.     All documents concerning the suspension by the SCB of Swiss America

Securities, Ltd., SureTrader and/or MintBroker International, Ltd. in 2019, or any other

entity in which You have or had a beneficial or control interest, including without

limitation all filings made in any court in the Bahamas concerning such action by the

SCB.

23.     All documents concerning Your relationship to F1 Trade or F1Trade.com,

Mint Global Markets, Inc., Swiss America Securities Ltd., and ProTrade Securities LLC,

or any successor entity to the foregoing, including any legal, beneficial, direct or indirect,

ownership interest.

24.     All documents concerning Your relationship to The Stock USA Trust, or

any successor entity to it, including any legal, beneficial, direct or indirect, ownership

interest.

25.     All documents submitted by You to the Office of the Commissioner of

Financial Institutions of Puerto Rico in support of the application of Mint Bank

International, LLC for a license to form an international financial entity in Puerto Rico.

26.     All documents concerning Your claims in connection with this litigation

that You have "completely exited the securities business," and that You "no longer

work[ ] in the securities industry in any manner."

27.     All documents reflecting any complaints against You or any entity

controlled by You, by any customer or client of F1 Trade or F1Trade.com, Mint Global

Markets, Inc., Swiss America Securities Ltd., and ProTrade Securities LLC, or any successor in interest to the foregoing entities.

28.     All documents reflecting Your ownership of, pecuniary interests in, or relationship to, any entity playing any role in the brokerage activities conducted by F1 Trade, Mint Global Markets, Inc., Mint Global Holdings, Inc., Mint Broker International, Ltd., or SureTrader, Swiss America Securities, or any successor in interest to the foregoing entities.

Dated: March 2, 2020
      New York, New York

SECURITIES AND EXCHANGE
COMMISSION

By: _____

      Nancy A. Brown
      Jorge G. Tenreiro
      Phillip A. Fortino

200 Vesey Street, Suite 400
New York, NY  10281-1022
(212) 336-9145 (Tenreiro)

Attorneys for Plaintiff Securities and
Exchange Commission

U.S. Securities and Exchange Commission
Data Delivery Standards



## U.S. Securities and Exchange Commission

## <u>Data Delivery Standards</u>

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).   ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ........................................................................................................................... 1

Delivery Formats ............................................................................................................................... 2

   I.  Imaged Productions ..................................................................................................................... 3

      1.  Images ................................................................................................................................ 3

      2.  Image Cross-Reference File ............................................................................................. 3

      3.  Data File ........................................................................................................................... 3

      4.  Text .................................................................................................................................... 3

      5.  Linked Native Files .......................................................................................................... 3

   II.  Native File Productions without Load Files .............................................................................. 4

   III.  Adobe PDF File Productions ..................................................................................................... 4

   IV.  Audio Files ................................................................................................................................. 4

   V.  Video Files ................................................................................................................................. 4

   VI.  Electronic Trade and Bank Records ......................................................................................... 4

   VII. Electronic Phone Records ......................................................................................................... 4

   VIII. Audit Workpapers ..................................................................................................................... 5

   IX. Mobile Device Data .................................................................................................................. 5

**General Instructions**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet*. (Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

Rev 06/2019

General requirements for **ALL** document productions are:

1.  A cover letter must be included with each production and should include the following information:
    a.  Case number, case name and requesting SEC staff member name
    b.  A list of each piece of media included in the production with its unique production volume number
    c.  A list of custodians, identifying the Bates range for each custodian
    d.  The time zone in which the emails were standardized during conversion
    e.  Whether the production contains native files produced from Mac operating system environments
2.  Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
    a.  Case number
    b.  Production date
    c.  Producing party
    d.  Bates range (if applicable)
3.  All submissions must be organized by **custodian** unless otherwise instructed.
4.  All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5.  All load-ready collections should include only one data load file and one image pointer file.
6.  All load-ready text must be produced as separate document-level text files.
7.  All load-ready collections should account for custodians in the custodian field.
8.  All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9.  Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. Electronic productions may be submitted via Secure File Transfer. The SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
13. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
14. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
15. All electronic productions should be produced free of computer viruses.
16. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
17. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
18. Additional technical descriptions can be found in the addendum to this document.

   **\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

**Delivery Formats**

## I. Imaged Productions

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

### 1. Images

   a. Black and white images must be 300 DPI Group IV single-page TIFF files

   b. Color images must be produced in JPEG format

   c. File names cannot contain embedded spaces or special characters (including the comma)

   d. Folder names cannot contain embedded spaces or special characters (including the comma)

   e. All image files must have a unique file name, i.e. Bates number

   f. Images must be endorsed with sequential Bates numbers in the lower right corner of each image

   g. The number of image files per folder should not exceed 2,000 files

   h. Excel spreadsheets should have a placeholder image named by the Bates number of the file

   i. AUTOCAD/photograph files should be produced as a single page JPEG file

### 2. Image Cross-Reference File

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

    *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

### 3. Data File

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

   a. The first line of the .DAT file must be a header row identifying the field names

   b. The .DAT file must use the following *Concordance*® default delimiters:

      Comma ¶ ASCII character (020)

      Quote þ ASCII character (254)

   c. If the .DAT file is produced in Unicode format it must contain the byte order marker

   d. Date fields should be provided in the format: mm/dd/yyyy

   e. Date and time fields must be two separate fields

   f. The time zone must be included in all time fields

   g. If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments

   h. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.

   i. For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.

   h. BEGATTACH and ENDATTACH fields must be two separate fields

   i. A complete list of metadata fields is available in **Addendum A** to this document

### 4. Text

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

### 5. Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

   a. Native file documents must be named per the FIRSTBATES number

   b. The full path of the native file must be provided in the .DAT file for the LINK field

   c. The number of native files per folder should not exceed 2,000 files

**II.    Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.   Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1.  All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2.  PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3.  All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.  If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.   Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:         Caller's name or account/identification number
2) Originating Number:  Caller's phone number
3) Called Party Name:   Called party's name
4) Terminating Number:  Called party's phone number
5) Date:                Date of call
6) Time:                Time of call
7) Filename:            Filename of audio file

**V.    Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.   Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.  Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.  Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

     a.  The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. When possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email **This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments **The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion. Native: (empty) **This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. Email: Time zone Native: (empty) |

Rev 06/2019

| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
|---|---|---|
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Rev 06/2019

## **ADDENDUM B**

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable


For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 06/2019

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-----------------------------------------------------------------x

SECURITIES AND EXCHANGE                    :
COMMISSION,                                :
                                           :
                    Plaintiff,             :        16 Civ. 1619 (BRM) (JAD)
                                           :
        -against-                          :        ECF Case
                                           :
GUY GENTILE,                               :
                                           :
                    Defendant.             :
-----------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## FIRST SET OF INTERROGATORIES TO DEFENDANT GUY GENTILE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission ("Commission") hereby requests that Defendant Guy Gentile answer the following interrogatories (the "Interrogatories") under oath, in accordance with the definitions and instructions set forth below, by serving its answers on the Commission's counsel, **on or before April 1, 2020**, at the offices of the Commission, located at 200 Vesey Street, Suite 400, New York, NY 10281.

## DEFINITIONS AND INSTRUCTIONS

1.      The following rules of construction apply to these Interrogatories:

    a.  All/Any/Each: The terms "all," "any," and "each" shall each be construed as encompassing any and all;

    b.  And/Or: The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope; and

     c.   Number: The use of the singular form of any word includes the plural and vice versa.

2.     The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3.     The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

4.     When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

5.     The terms "you" and "your" mean Guy Gentile, the Defendant in this action.

6.     Pursuant to Rule 33(b)(3), you must answer each Interrogatory separately and fully in writing under oath, to the extent the Interrogatory is not objected to.

7.     Pursuant to Rule 33(b)(5), you must sign your answers to these Interrogatories.

8.     Pursuant to Rule 33(b)(4), if you object to a Interrogatory, you must state your grounds for objection with specificity.  Any ground not stated in a timely objection may be waived.

9.     Pursuant to Rule 33(a)(2), an Interrogatory is not objectionable merely because it asks for an opinion or contention that relates to the fact or the application of law to fact.

10.     To the extent that you obtain information that changes or requires correction of your responses to these Interrogatories after you serve your responses on the Commission, you

must promptly serve supplemental responses reflecting the new information, pursuant to Rule

26(e)(1).

## FIRST SET OF INTERROGATORIES

**Interrogatory No. 1:**

Identify all sources of income and/or employment from the date of the filing of the Complaint in this action to the present.

**Interrogatory No. 2:**

Identify all steps you have taken to comply with, and the locations of any documents you have preserved, pursuant to your document preservation obligations since your arrest by the Federal Bureau of Investigation on July 13, 2012.

**Interrogatory No. 3:**

Identify all of your current brokerage accounts.

**Interrogatory No. 4:**

Identify any entity in which you have an ownership or pecuniary interest (direct or indirect) that has been engaged in the securities brokerage business from the date of the filing of this action to the present, including the nature of your relationship to any such entity.

**Interrogatory No. 5:**

Identify all regulatory or governmental agencies, whether foreign or domestic, with whom you have had any contact with respect to your professional activities from the date of the filing of this action to the present.

**Interrogatory No. 6:**

Identify all accounts in which you traded Raven Gold Corporation ("RVNG") and/or Kentucky USA Energy Inc. ("KYUS") stock from January 1, 2007, through the present.

**Interrogatory No. 7:**

Identify all marketing materials for RVNG and KYUS stock that you participated in creating.

**Interrogatory No. 8:**

Identify all securities for which you have participated in creating or conducting stock promotional campaigns from January 1, 2007, through the present and state the compensation you received for each such campaigns.

**Interrogatory No. 9:**

For all the stock promotional campaigns identified in response to Interrogatory No. 8, identify any and all persons on whose behalf you traded or directed trading in stock related to such promotional campaigns.

**Interrogatory No. 10:**

Identify all persons on whose behalf you traded in RVNG and KYUS stock from January 1, 2007, through the present, and the firm at which each of those brokerage accounts was located.

**Interrogatory No. 11:**

Identify all persons who traded RVNG and KYUS at your request, recommendation or direction from January 1, 2007, through the present, and the firm at which each of those brokerage accounts was located.

**Interrogatory No. 12:**

Identify all persons to whom you offered to provide RVNG or KYUS stock in exchange for such person's agreement to buy RVNG or KYUS stock on the open market and state whether such stock was provided.

**Interrogatory No. 13:**

Identify your relationship with the entities known as Trade Zero, Ltd., a Bahamian company, and/or Trade Zero, Inc., a Florida Corporation.

**Interrogatory No. 14:**

Identify your direct or indirect ownership or pecuniary interest in F1 Trade, Mint Global Markets, Inc., Mint Global Holdings, Inc., Mint Broker International, Ltd., or SureTrader, Swiss America Securities, or any successor in interest to the foregoing entities.

Dated: March 2, 2020
        New York, New York

SECURITIES AND EXCHANGE
COMMISSION

By: _____
        Nancy A. Brown
        Jorge G. Tenreiro
        Phillip A. Fortino

200 Vesey Street, Suite 400
New York, NY  10281-1022
(212) 336-9145 (Tenreiro)

Attorneys for Plaintiff Securities and
Exchange Commission

# EXHIBIT M

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of New Jersey

| | |
|---|---|
| Securities and Exchange Commission | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   16 Civ. 1619 (BRM) (JAD) |
| Guy Gentile | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     Mint Global Markets, Inc., c/o Mark Jordon, CCO, 1717 Route 6 Suite 102, Carmel, NY 10512

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

      See Attachment A hereto

| Place: 200 Vesey Street, Suite 400<br>New York, NY 10281 | Date and Time:<br><br>09/21/20 10:00 a.m. |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    August 20, 2020

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Securities and Exchange Commission                                      , who issues or requests this subpoena, are:

200 Vesey Street, Suite 400, New York, N.Y.; phone: 212 336 9145; email: tenreiroj@sec.gov

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    16 Civ. 1619 (BRM) (JAD)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A FOR SUBPOENA ISSUED TO Mint Global Markets, Inc.**
<u>SEC v. Guy Gentile, 16 Civ. 1619 (D.N.J.)</u>

August 20, 2020

<u>**Definitions**</u>

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.    "Mint" means Mint Global Markets, Inc., including, parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing, and including, without limitation, Mint Global Holdings, Inc., the Stock USA Trust, Speedtrader, Speedtraderpro, SprintTrader, Stock USA and Stock USA Investments.

2.    "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.    A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

4.    "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

5.    "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

6.    "Concerning" means directly or indirectly, in whole or in part, describing, constituting,

evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

7.    The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

8.    The term "you" and "your" means the Person to whom this subpoena was issued.

9.    To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
       a.    the word "or" means "and/or";
       b.    the word "and" means "and/or";
       c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
       d.    the masculine gender includes the female gender and the female gender includes the masculine gender; and
       e.    the singular includes the plural and the plural includes the singular.

## Instructions

1.    Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.    For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you must secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.    Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.    In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable

markings or attachments should be produced.

5.  Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.  Documents should be labeled with sequential numbering (bates-stamped).

7.  You must produce all Documents created during, or Concerning, the time periods identified in this subpoena, unless otherwise specified.

8.  The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.  You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10. For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11. This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

    a.  its author(s);
    b.  its date;
    c.  its subject matter;
    d.  the name of the Person who has the item now, or the last Person known to have it;
    e.  the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
    f.  the basis upon which you are not producing the responsive Document;
    g.  the specific request in the subpoena to which the Document relates;
    h.  the attorney(s) and the client(s) involved; and
    i.  in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12. If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## **Documents to Be Produced**

1. All Documents Concerning the Stock USA Trust.

2. All Communications between Mint and Guy Gentile from January 1, 2012 to the present, concerning the business, operations, financial condition of, or beneficial ownership interest in, Mint.

3. All Communications between Mint and Nicholas Abadiotakis from January 1, 2012 to the present Concerning Guy Gentile or the Stock USA Trust, and Concerning the business, operations, financial condition of, or beneficial ownership interest in, Mint.

4. All Documents Concerning the beneficial ownership interest of Guy Gentile in Mint.



# U.S. Securities and Exchange Commission

## Data Delivery Standards

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).  ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ................................................................................................................................. 1

Delivery Formats .................................................................................................................................... 2

   I.  Imaged Productions ....................................................................................................................... 3

      1.  Images ................................................................................................................................... 3

      2.  Image Cross-Reference File ................................................................................................. 3

      3.  Data File ............................................................................................................................... 3

      4.  Text ....................................................................................................................................... 3

      5.  Linked Native Files .............................................................................................................. 3

  II.  Native File Productions without Load Files ................................................................................. 4

 III.  Adobe PDF File Productions ....................................................................................................... 4

 IV.  Audio Files ................................................................................................................................... 4

  V.  Video Files ................................................................................................................................... 4

 VI.  Electronic Trade and Bank Records ............................................................................................ 4

VII.  Electronic Phone Records ............................................................................................................ 4

VIII.  Audit Workpapers ...................................................................................................................... 5

 IX.  Mobile Device Data .................................................................................................................... 5

**General Instructions**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

Rev 06/2019

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. Electronic productions may be submitted via Secure File Transfer. The SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
13. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
14. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
15. All electronic productions should be produced free of computer viruses.
16. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
17. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
18. Additional technical descriptions can be found in the addendum to this document.

   **\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

**Delivery Formats**

I.  **Imaged Productions**
    The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

    1.  **Images**
        a.  Black and white images must be 300 DPI Group IV single-page TIFF files
        b.  Color images must be produced in JPEG format
        c.  File names cannot contain embedded spaces or special characters (including the comma)
        d.  Folder names cannot contain embedded spaces or special characters (including the comma)
        e.  All image files must have a unique file name, i.e. Bates number
        f.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image
        g.  The number of image files per folder should not exceed 2,000 files
        h.  Excel spreadsheets should have a placeholder image named by the Bates number of the file
        i.  AUTOCAD/photograph files should be produced as a single page JPEG file

    2.  **Image Cross-Reference File**
        The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

        *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

    3.  **Data File**
        The data file (.DAT) contains all of the fielded information that will be loaded into the database.

        a.  The first line of the .DAT file must be a header row identifying the field names
        b.  The .DAT file must use the following *Concordance*® default delimiters:
            Comma ¶ ASCII character (020)
            Quote þ ASCII character (254)
        c.  If the .DAT file is produced in Unicode format it must contain the byte order marker
        d.  Date fields should be provided in the format: mm/dd/yyyy
        e.  Date and time fields must be two separate fields
        f.  The time zone must be included in all time fields
        g.  If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
        h.  An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.
        i.  For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
        h.  BEGATTACH and ENDATTACH fields must be two separate fields
        i.  A complete list of metadata fields is available in **Addendum A** to this document

    4.  **Text**
        Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

    5.  **Linked Native Files**
        Copies of original email and native file documents/attachments must be included for all electronic productions.
        a.  Native file documents must be named per the FIRSTBATES number
        b.  The full path of the native file must be provided in the .DAT file for the LINK field
        c.  The number of native files per folder should not exceed 2,000 files

Rev 06/2019

**II.   Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.  Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1.  All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2.  PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3.  All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.  If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.   Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:          Caller's name or account/identification number
2) Originating Number:   Caller's phone number
3) Called Party Name:    Called party's name
4) Terminating Number:   Called party's phone number
5) Date:                 Date of call
6) Time:                 Time of call
7) Filename:             Filename of audio file

**V.    Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.   Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.  Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.  Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
    a.  The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

Rev 06/2019

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. When possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

Rev 06/2019

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

6

| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
|---|---|---|
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID Native: (empty) |

Rev 06/2019

U.S. Securities and Exchange Commission
Data Delivery Standards

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 - 0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Rev 06/2019

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable


For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 06/2019

# EXHIBIT N



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Brookfield Place, 200 Vesey Street, Suite 400
New York, NY 10281-1022

NEW YORK
REGIONAL OFFICE

August 24, 2020

VIA ECF
Hon. Joseph A. Dickson
United States Magistrate Judge
U.S. District Court, District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

   Re:  SEC v. Gentile; 16 Civ. 1619 (BRM) (JAD)

Dear Judge Dickson:

  Plaintiff Securities and Exchange Commission ("Commission") respectfully requests, pursuant to paragraph II.7 of the Scheduling Order (DE 74), a telephonic conference concerning a discovery dispute. The Commission seeks to compel Defendant Guy Gentile to produce documents in response to the Commission's document requests (see Ex. A) and to provide verified interrogatory answers in response to the Commission's interrogatories (see Ex. B) as required by Fed. R. Civ. P. 33(b)(5).

  The Commission properly served the relevant document requests and interrogatories on Gentile on March 2, 2020. With respect to the document requests, after a series of meet-and-confer sessions, the parties agreed on June 25, 2020 that Gentile would produce an unredacted version of a declaration Gentile had submitted to the criminal authorities and documents evidencing his involvement in (or exit from) the securities industry in the last several years. Specifically, with respect to the second category, the parties agreed that, in response to Document Requests Nos. 23 and 24, among others, Gentile would produce, by July 2, 2020: 1) documents evidencing the transfers between a Gentile-owned Bahamian entity (Swiss America Securities Ltd) and an entity known as F1 Trade; 2) documents evidencing Mr. Gentile's relationship to the entities Stock USA Trust and Swiss America Securities Ltd.; and 3) documents relating to the wind down of Swiss America. Later, Gentile took the position that he would not produce any documents until the Commission had produced documents responsive to his own document requests.

  Subsequently, at the July 14, 2020 conference, Gentile acknowledged receipt of the Commission's production of documents and represented to the Court and the Commission that he would be producing responsive documents in short order. Since July 14, 2020, and despite at least a half dozen requests from the Commission, Gentile has produced only the unredacted declaration and a single Board resolution relating to the dissolution of Swiss America Securities

Hon. Joseph A. Dickson
August 24, 2020
Page 2

Ltd.—and nothing else. The Commission's requests that Gentile abide by his agreement (and by his representation to counsel and the Court) have all either been met with unfulfilled promises that documents will arrive 'later this week' or soon thereafter or been simply ignored.

With respect to the Commission's interrogatories, although Gentile provided responses to certain of the interrogatories on May 29, 2020, he did not verify his responses. On June 25, Gentile agreed to provide interrogatory responses signed by him and his counsel—as explicitly required by Fed. R. Civ. P. 33(b)(5)—by July 2, 2020. To date, and despite multiple requests, we have not received the promised verified responses. The verifications are important, because "if interrogatory responses may be used at trial, they are nothing short of testimony. When responses are only signed by an attorney, and not by the client, the attorney has effectively been made a witness." Saria v. Mass. Mutual Life Ins. Co., 228 F.R.D. 536, 538–39 (S.D. W. Va. 2005); see also id. at 540 ("The failure to meet the simple requirement of providing verification can only be seen as a flagrant disregard of these Rules, Advisory Notes, and case precedents."); Bracey v. Grenoble, 494 F.2d 566, 570 n.7 (3d Cir. 1974) (holding that district court improperly used interrogatory answers neither signed by the party itself nor made under oath, constituting an independent ground for a new trial).

From August 11 through August 17, 2020, Commission counsel repeatedly sought a further meet-and-confer session with Gentile's counsel regarding these matters. For the most part, the undersigned received assurances that documents were forthcoming without any response to the request to meet and confer until, on August 20, Gentile's counsel rejected the request and suggested he would not turn his attention back to this matter until after Labor Day, September 7. As we let Gentile's counsel know in an email on August 20, the Commission cannot agree to that additional delay, particularly since Gentile appears to be deviating from his earlier agreements in June and July on producing at least certain categories of documents. This pattern of delay is consistent with Gentile's broader failure to meaningfully participate in discovery in this case. See, e.g., DE 91 & 95. These persistent delays in providing discovery threaten to derail the modified schedule the Court has approved.

Accordingly, the Commission respectfully requests a telephone conference, as provided in paragraph II.7 of the Scheduling Order (DE 74), for the reasons described above, and that the conference be recorded, either stenographically or by some other means.

Respectfully submitted,

Jorge G. Tenreiro

cc:     Adam Ford, Esq. (counsel for Defendant Guy Gentile)

# EXHIBIT O

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GUY GENTILE,<br><br>Defendant. | Case No. 2:16-cv-1619 (BRM) (JAD)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss filed by Defendant Guy Gentile ("Defendant"), seeking to dismiss the Amended Complaint of Plaintiff the Securities and Exchange Commission ("SEC" or "Commission" or "Plaintiff"). (ECF No. 81.) Plaintiff opposed Defendant's Motion (ECF No. 84), and Defendant replied (ECF No. 89). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion to Dismiss is **GRANTED**.

# I. BACKGROUND

## A. Factual Background[1]

The Amended Complaint alleges Defendant perpetrated two penny stock[2] manipulation schemes. (ECF No. 47 ¶ 1.) The first scheme, involved Raven Gold Corporation ("RVNG"), "a purported gold and silver exploration company," and is alleged to have been perpetrated during 2007 (the "RVNG Scheme"). (*Id.*) The second scheme "involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a company involved in natural gas production," and is alleged to have been perpetrated between 2007 and 2008. (*Id.*)

### 1. The RVNG Scheme

RVNG was a Nevada corporation formed in or about February 2005 that "claimed [] it was in the business of mineral exploration" but in fact "was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies." (*Id.* ¶ 17.) In or around April 2015, RVNG "conducted two unregistered offerings of a total of 7.424 million shares of its common stock," however the individuals who received the stock "were nominees of the attorney who had created the shell, and not true owners of the stock." (*Id.* ¶ 18.) "Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the . . . shell from the attorney who created it." (*Id.* ¶¶ 19–20.) "[T]o effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees" including Defendant, Mike Taxon, and Itamar Cohen. (*Id.*

---

[1] For the purpose of this motion to dismiss, the Court accepts the factual allegations of the Amended Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[2] "Penny stocks are low-priced, high-risk equity securities for which there is frequently no well-developed market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quotation omitted).

¶ 20.) "These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer—first, the attorney who had created the shell and then the RVNG Owners—directed all transfers." (*Id.*) In August 2006, RVNG carried out a 5:1 stock split and announced in September 2006 it "had decided to discontinue mineral exploration at its British Columbia property." (*Id.* ¶ 21 (internal quotation omitted).) In or around March 2007, RVNG executed a further 2:1 stock split. (*Id.*) During the relevant time period, RVNG "had approximately 75 million shares of common stock issued and outstanding, of which 34 million shares were traceable to [previous offerings] and purportedly covered by the subsequent resale registration statement, the goal of which was to make the shares appear unrestricted." (*Id.* ¶ 22.) During the relevant time period, the RVNG Owners "had complete control of RVNG and its management." (*Id.* ¶ 24.)

In or around early 2007, "the RVNG Owners met Taxon and Cohen . . . and proposed that Taxon and Cohen promote RVNG stock." (*Id.* ¶ 25.) Taxon and Cohen subsequently reached out to Defendant and invited him to participate. (*Id.*) Ultimately, the RVNG Owners "agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign." (*Id.* ¶ 26.) The campaign consisted of "a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock." (*Id.*) Taxon and Cohen "agreed that [Defendant] would help them execute the key aspects of the promotion" and in return he would receive a portion of Taxon and Cohen's cut of the stock. (*Id.*) Additionally, the three men agreed "they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign." (*Id.*)

Between mid-May through mid-June 2007, the RVNG Owners "directed transfers of eighty percent of RVNG's purportedly unrestricted stock . . . to accounts controlled by [Defendant],

Taxon, and Cohen." (*Id.* ¶ 27.) Of the transferred shares, roughly seven million shares were placed in an offshore account under Taxon's control. (*Id.*) This was a negotiated term of the deal "to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind [Defendant], Taxon[,] and Cohen's backs, and thus undermine [Defendant], Taxon[,] and Cohen's efforts to drive up the stock price and sell shares at a high price." (*Id.*) In order to obscure their connection to RVNG, Defendant, Taxon, and Cohen deposited blocks of shares in "U.S. brokerage accounts held in the names of several offshore brokerage firms" where the three men had or controlled accounts. (*Id.* ¶ 28.)

In or around June and July 2007, Defendant and Taxon "directed manipulative trades in RVNG stock." (*Id.* ¶ 30.) These trades were executed to (1) "generate cash to fund the promotional mailing and advertising" campaign; and (2) "to create the false appearance of liquidity and active interest in the stock." (*Id.*) Defendant and Taxon made trades between their various accounts which created "an attractive (but fake) price and volume history" that could be used to entice investors in the upcoming promotions. (*Id.*) Defendant, Taxon, and Cohen also "reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock." (*Id.* ¶ 31.) In total, these acquaintances bought approximately 101,500 shares of RVNG stock and, through the kick-backs, made a profit of approximately $25,600. (*Id.*)

The "centerpiece" of the RVNG promotional campaign was "an eight-page glossy 'newsletter' touting RVNG stock . . . [published] under a fake entity name, 'Stock Trend Report'" (the "RVNG Mailer"). (*Id.* ¶ 32.) Defendant, Taxon, and Cohen collaborated in the creation and distribution of the RVNG Mailer in mid-July 2007. (*Id.* ¶¶ 32, 44.) The RVNG Mailer "contained multiple materially false or misleading statements" and purported to be a July 2017 "Special

4

Edition of Premium Members" when, in reality, there had been no prior and were no subsequent published editions of the "Stock Trend Report." (*Id.* ¶ 33.) The RVNG Mailer touted that RVNG stock had been "seen on" many major news publications, however its appearance in those publications was solely based on paid advertisements placed by Defendant, Taxon, and Cohen. (*Id.* ¶ 34.) The RVNG Mailer also touted the stock's strong performance which it attributed to RVNG's strong business prospects. (*Id.* ¶ 36.) The RVNG Mailer failed to disclose that "a substantial portion" of the stock's trading activity was the result of trades executed by "[Defendant], Taxon, and those acting in concert with them," which were executed to create the appearance of an attractive price and trading history and were not the result of legitimate market interest. (*Id.*) Despite there being a lack of true market demand for RVNG stock, the RVNG Mailer included a notice that read, "Please note: Due to the high market demand for RVNG by institutional investors, some brokers may require you to phone in your order." (*Id.* ¶ 37.)

The RVNG Mailer also contained a disclaimer that was, itself, materially false and misleading, and failed to disclose "the compensation received by the [M]ailer's publisher and the publisher's motivations and intentions with respect to the stock." (*Id.* ¶ 38.) The disclaimer further stated RVNG had "not approved the statements made in this opinion" even though the RVNG Owners "had seen drafts of the mailer and had signed off on its content." (*Id.* ¶ 40.) The disclaimer's statements relating to Stock Trend Report were also misleading because Stock Trend Report was "a nonexistent, fictional enterprise." (*Id.* ¶ 42.) In July 2017, Defendant, Taxon, and Cohen placed paid advertisements in several major publications that contained many of the same materially false and misleading statements as the RVNG Mailer. (*Id.* ¶ 43.)

During this same period, the "RVNG Owners supported the stock promotion campaign with a steady stream of RVNG press releases." (*Id.* ¶ 45.) In total, RVNG issued thirteen press

releases discussing "purported arrivals of new officers and directors" and "purported developments in RVNG's exploration business." (*Id.* ¶ 46.) Defendant, Taxon, Cohen, and the RVNG Owners "coordinated the timing and number of these press releases" with the intention of supporting the "ongoing market manipulation scheme" being carried out by Defendant, Taxon, and Cohen. (*Id.*)

The SEC alleges the RVNG Scheme was successful. Prior to May 31, 2007, "RVNG traded at prices not exceeding $0.80 per share and with minimal volume, with no trading occurring on many days." (*Id.* ¶ 47.) Following the initiation of the promotional campaign, the price and volume increased dramatically and subsequently receded upon completion of the promotion. (*Id.*)[3] "Because [Defendant], Taxon[,] and Cohen obtained RVNG stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act. . . . [however,] no registration statement was filed . . . with respect to their sales of RVNG stock." (*Id.* ¶ 48.) In total, "[t]he selling of unregistered RVNG stock by [Defendant], Taxon[,] and Cohen generated an estimated five million dollars in gross proceeds." (*Id.* ¶ 49.)

### 2. The KYUS Scheme

KYUS was a Delaware corporation formed in or about September 2006 that "claimed that its 'principal business plan was to acquire, explore[,] and develop mineral properties and to

---

[3] Plaintiffs provide the following chart to illustrate their point:

| Time Period | Average Daily Volume | Daily Closing Price–Low | Daily Closing Price–High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07 | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

(ECF No. 47 ¶ 47.)

6

ultimately seek earnings by exploiting the mineral claims.'" (*Id.* ¶ 50.) However, KYUS was "a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives" (the "KYUS Shell Sellers"). (*Id.*)

In or about March 2007, KYUS filed a registration statement "covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000." (*Id.* ¶ 51.) The one million shares were sold to friends and acquaintances of the KYUS Shell Sellers, however these individuals were "mere nominees of the KYUS Shell Sellers." (*Id.*) Instead, the KYUS Shell Sellers maintained control over the shares during the relevant time period. (*Id.*) "After the purported public offering, [KYUS] had three million common shares issued and outstanding: two million restricted shares, previously issued to [a] sole officer and director" and the one million shares distributed to the friends and acquaintances of the KYUS Shell Sellers. (*Id.* ¶ 52.)

On or about October 15, 2007, New York attorney Adam S. Gottbetter "arranged the purchase of the . . . shell from the KYUS Shell Sellers for $760,000." (*Id.* ¶ 53.) The money was contributed by Defendant, Taxon, Cohen, and Gottbetter's business partner, Sam DelPresto. (*Id.*) Following a merger, KYUS effected a 12:1 stock split. (*Id.* ¶ 55.) As a result of the stock split, Defendant, Taxon, Cohen, Gottbetter, and DelPresto controlled "approximately 12 million purportedly unrestricted shares." (*Id.*)

In or around the summer of 2007, Gottbetter and DelPresto invited Defendant to participate in the KYUS "deal." (*Id.* ¶ 57.) Defendant was to (1) "create an attractive price and volume history by means of manipulative trading"; (2) "distribute a promotional mailer touting the stock"; and (3) "fund the promotional mailer with proceeds from selling KYUS stock on the open market." (*Id.*) To facilitate the scheme, Gottbetter "arrange[d] for [Defendant] to obtain control of a substantial

block of purportedly unrestricted KYUS stock." (*Id.*) Defendant subsequently recruited Taxon and Cohen to assist him. (*Id.* ¶ 58.) Unlike the RVNG Owners, Gottbetter "insisted that [Defendant] and his partners purchase KYUS stock in private transactions for $604,000." (*Id.*) Taxon and Cohen sent $300,000 to Defendant who, in turn, contributed an additional $304,000 and sent the entire amount as payment to Gottbetter in return for "seventy-five percent of the purportedly unrestricted shares that were transferred to Gottbetter and DelPresto." (*Id.*) Much like with the RVNG scheme, these shares were placed into different accounts to obscure the connection Defendant, Taxon, and Cohen had to KYUS. (*Id.* ¶ 59.)

Like the RVNG scheme, the KYUS scheme involved a promotional campaign and manipulative trading. (*Id.* ¶ 60.) As a result, "on many days between late 2007 and May 2008, most and sometimes all of the market activity in the [KYUS] stock was generated by accounts" controlled by Defendant, Taxon, or Cohen. (*Id.* ¶ 61.) Defendant also offered to give acquaintances who purchased KYUS stock a "heads-up" about upcoming promotions, allowing the acquaintance to sell the stock at a profit. (*Id.* ¶ 62.) These sales generated cash that Defendant used for the KYUS promotional campaign and also created the false impression of market activity. (*Id.* ¶ 63.)

In or about May 2008, Defendant "distributed by mail a glossy promotional mailer" that "took the form of an eight-page newsletter distributed under the fake name Global Investor Watch" (the "KYUS Mailer"). (*Id.* ¶ 64.) The KYUS Mailer touted KYUS's recent stock price history and falsely claimed it "had been funded by a $2.4 million payment from a fictional entity" when, in reality, Defendant funded the KYUS Mailer with the proceed from selling his KYUS stock. (*Id.*) As a result of the KYUS scheme, KYUS's stock price and the volume of trading "increased dramatically." (*Id.* ¶ 66.) In or around the end of May 2008, Defendant, Taxon, and Cohen had generated approximately $10 million in gross proceeds. (*Id.* ¶ 67.)

### 3.    Subsequent Legal Actions Against Defendant and Others

On or about June 25, 2010, the United States Attorney's Office for the District of New Jersey ("USAO") filed a criminal complaint against Defendant charging him with conspiracy to commit wire fraud. (*Id.* ¶ 71.) The USAO and Defendant subsequently entered a cooperation agreement, under which the criminal complaint was dismissed without prejudice. (*Id.*) The relationship between the parties ultimately deteriorated and, on March 23, 2016, a Grand Jury returned an indictment against Defendant. (*Id.* ¶ 72.)[4] On January 30, 2017, the indictment against Defendant was dismissed on statute of limitations grounds. (*Id.*)

On May 27, 2015, Cohen pleaded guilty to conspiring to commit securities fraud.[5] On May 28, 2015, Taxon pleaded guilty to conspiring to commit securities fraud.[6] Gottbetter ultimately pleaded guilty to conspiring to commit securities fraud and mail fraud relating to different, but highly similar trading schemes.[7]

### 4.    Defendant's Subsequent Actions and Denial of Wrongdoing[8]

The SEC alleges that if an injunction is not granted, Defendant "is likely to engage in further violations of securities laws." (*Id.* ¶ 79.) Since the dismissal of criminal charges, Defendant

---

[4] *United States v. Gentile*, Crim. No. 16-155 (D.N.J.).

[5] *United States v. Cohen*, Crim. No. 15-248 (D.N.J.).

[6] *United States v. Taxon*, Crim. No. 15-249 (D.N.J.).

[7] *United States v. Gottbetter*, Crim. No. 14-467 (D.N.J.).

[8] On February 8, 2019, Defendant filed a civil complaint against the SEC, captioned *Gentile v. Securities and Exchange Commission*, Civil No. 19-5155. (*See* ECF No. 1 in Civil No. 19-5155.) On May 14, 2019, Judge Linares granted the SEC's motion to dismiss, finding that the suit was barred by the doctrine of sovereign immunity. (ECF No. 20 in Civil No. 19-5155.) Defendant appealed and on September 10, 2020, the judgment was affirmed by the Third Circuit. *Gentile v. Sec. & Exch. Comm'n*, No. 19-2252, 2020 WL 5416297 (3d Cir. Sept. 10, 2020).

"has consistently and publicly denied any wrongdoing" in connection with the RVNG and KYUS schemes. (*Id.* ¶ 80.) In an interview with *Bloomberg Businessweek*, Defendant stated he had done nothing wrong and characterized the SEC's investigation as a "witch hunt." (*Id.*) Defendant further stated on his Instagram feed that he "never scammed anyone!" (*Id.*) The SEC alleges Defendant "has not offered any assurance that he will not violate securities laws in the future" and that he "maintains an active presence in the securities industry as the beneficial owner of a Commission-registered broker-dealer and the CEO of a Bahamas-based online brokerage firm." (*Id.* ¶ 82.) The SEC further alleges that "[i]n recent public statements, [Defendant] has committed to expanding his securities industry business" and that his "ongoing involvement in the securities industry will present him with daily opportunities to violate the securities laws again." (*Id.*) The SEC also claims that Defendant "has demonstrated contempt for securities regulators" and notes that when Defendant learned of the SEC's plan to pursue action against him, Defendant "wrote to the [SEC] staff threatening that if the [SEC] pressed its claims against him, he would make sure that the staff would not be able to practice law again." (*Id.* ¶ 83.)

### B. Procedural History

On March 23, 2016, the SEC filed its initial five-count Complaint against Defendant. (ECF No. 1.) On May 13, 2016, the Honorable Jose L. Linares, U.S.D.J. (ret.), entered an order staying the matter "pending the entry of a judgment in the Parallel Criminal Proceeding." (ECF No. 8.) On March 6, 2017, counsel for the SEC e-filed correspondence informing the Court that, because the indictment in the criminal proceeding had been dismissed, it was appropriate to rescind the order staying this case. (ECF No. 9.) After a series of conferences between the parties, on June 30, 2017, Defendant moved to dismiss the Complaint. (ECF No. 34.) The SEC opposed Defendant's motion (ECF No. 38), Defendant replied (ECF No. 39), and the SEC filed a sur-reply

(ECF No. 42). On September 18, 2017, the Court administratively terminated Defendant's first motion to dismiss and ordered the SEC to file an amended complaint. (ECF No. 46.) On October 6, 2017, the SEC filed an Amended Complaint. (ECF No. 47.) The SEC's Amended Complaint alleges five counts against Defendant: Count One, for violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a) & (c) (*id.* ¶¶ 86–88); Count Two, for violations of Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b) (*id.* ¶¶ 89–91); Count Three, for violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (*id.* ¶¶ 92–94); Count Four, for violations of Section 10(b) of the Securities Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 of the Exchange Act, 17 C.F.R. § 240.10b-5 (*id.* ¶¶ 95–97); and Count Five, for aiding and abetting violations of Section 10(b) and Rule 10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) (*id.* ¶¶ 98–100). The Amended Complaint seeks two equitable remedies. (*Id.* at 25–26.) First, the SEC seeks an "obey-the-law" injunction, where the Court would enter an order:

> [p]ermanently restraining and enjoining [Defendant], his agents, servants, employees, attorneys[,] and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violation Sections 5(a), 5(c), 17(a)[,] and 17(c) of the Securities Act . . . and Section 10(b) of the Exchange Act . . . and Rule 10b-5 thereunder . . . .

(*Id.*) Second, the SEC seeks a "penny stock bar" injunction, where the Court would enter an order "[p]ermanently prohibiting [Defendant] from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act . . . and Section 21(d)(6) of the Exchange Act." (*Id.* at 26.)

On October 27, 2017, Defendant moved to dismiss the Amended Complaint (ECF No. 50), the SEC opposed (ECF No. 54), and Defendant replied (ECF No. 55.) On December 13, 2017, Judge Linares filed an Opinion and Order granting Defendant's motion to dismiss and directing the Clerk of the Court to close this matter (the "District Court Opinion"). (ECF Nos. 56, 57.) On

February 2, 2018, the SEC filed a Notice of Appeal. (ECF No. 58.) On September 26, 2019, the U.S. Court of Appeals for the Third Circuit issued a judgment vacating the District Court Opinion and remanding the case to the District of New Jersey for proceedings consistent with the Third Circuit's Opinion. (ECF No. 60.) On November 22, 2019, the mandate from the Third Circuit was docketed. (ECF No. 61.)

On December 4, 2019, the Honorable Chief Judge Freda L. Wolfson, U.S.D.J., reassigned this case to the Honorable John Michael Vasquez, U.S.D.J. (ECF No. 62.) On December 17, 2019, Judge Vasquez ordered this matter reinstated to the Court's active docket. (ECF No. 66.) On January 25, 2020, Chief Judge Wolfson reassigned this case to the Undersigned. (ECF No. 75.) On February 14, 2020, Defendant filed the present Motion to Dismiss. (ECF No. 81.) The SEC opposed Defendant's Motion (ECF No. 84), and Defendant replied (ECF No. 89).

## II.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

III. **DECISION**

A. **The District Court Opinion**

Under federal law, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. Judge Linares highlighted in the District Court Opinion that "[t]he parties all agree . . . that Defendant's allegedly illegal conduct ended in the June of 2008." (ECF No. 56 at 4.) However, the SEC did not file suit against Defendant until March 2016. (ECF No. 1.) Because § 2462 imposes a 5-year statute of limitations, Judge Linares found that whether the SEC's requested relief was penal in nature, and therefore subject to that statute of limitations, was a threshold issue for the Court to address. (ECF No. 56 at 4.) In his analysis, Judge Linares noted that "[c]ourts throughout the country have consistently held that a remedy, including an injunction, is penal in nature which it serves no retributive or remedial purpose and merely seeks to punish an individual." (*Id.*) Judge Linares found that both injunctions requested by the SEC were penal in nature because "there would be no retributive effect" if they were imposed. (*Id.* at 7.) Judge Linares, accordingly, found the SEC's claims were barred by the applicable statute of limitations and granted Defendant's motion to dismiss. (*Id.* at 8.)

B. **The Third Circuit Opinion[9]**

On September 26, 2019, the Third Circuit vacated the District Court Opinion and held, as a matter of first impression, that properly issued and valid SEC injunctions are not penalties and, therefore, are not governed by the five-year statute of limitations contained in 28 U.S.C. § 2462. *Gentile*, 939 F.3d at 552. The court began its analysis by first considering the nature of the relief

---

[9] *See Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549 (3d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 823 (Apr. 20, 2020). Although the Third Circuit's Opinion is included on the Court's docket at ECF No. 61-2, the Court, for clarity, refers to the citations as they appear in the Federal Reporter.

14

sought by the SEC.[10] As to the "obey-the-law" injunction, the Third Circuit noted that § 78u(d)(1) of the Exchange Act affords the SEC the "general authority to seek injunctions against ongoing or threatened violations," and, therefore, it was properly characterized as an injunction. *Id.* at 554. As to the "penny stock bar," the court held that while the relevant section does not specifically use the word "enjoin," the text of the statute and its structure necessitated the conclusion that it, too, is injunctive in nature. *Id.* at 555. The relevant issue before the court, therefore, was whether these remedies, when properly issued and framed, "can be penalties subject to the statute of limitations." *Id.*

The Third Circuit rejected Gentile's argument that all SEC injunctions are penalties, and found his argument ran counter to the core tenets of equity jurisprudence because the "injunctive process was designed to deter, not to punish." *Id.* at 556. The court found "a properly issued and framed injunction is 'fairly' [said to be remedial], because its sole function . . . is to forestall future violations." *Id.* (internal quotation omitted) (citation omitted). Indeed, "injunctions may properly issue only to prevent harm—not to punish the defendant." *Id.* In analyzing the Congressional intent behind the relevant statutory sections, the court found that "[n]othing in either provision . . . suggests Congress meant to depart from the rule that injunctions are issued to prevent harm rather than to punish past wrongdoing. Neither provision mentions retribution or general deterrence." *Id.* at 557. Moreover, the court found that "[a]bsent much clearer language than is found in the [Exchange Act], the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion." *Id.* at 557–58 (quoting *SEC v. Tex. Gulf Sulphur Co.*,

---

[10] The Third Circuit noted that "[t]he [SEC] has parallel injunction and penny-stock bar authority under the Securities Act. . . . Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them." *Gentile*, 939 F.3d at 554 n.4.

401 F.2d 833, 868–69 (2d Cir. 1968) (en banc) (Friendly, J., concurring) (alteration in original).
The Third Circuit further held:

> Injunctions may not be supported by the desire to punish the
> defendant or deter others, so courts abuse their discretion when they
> issue or broaden injunctions for those reasons. We therefore hold
> SEC injunctions that are properly issued and valid in scope are not
> penalties and thus are not governed by § 2462. If an injunction
> cannot be supported by a meaningful showing of actual risk of harm,
> it must be denied as a matter of equitable discretion—not held time
> barred by § 2462.

*Id.* at 562.

The Third Circuit then addressed the Supreme Court's ruling in *Kokesh v. S.E.C.*, 137 S. Ct.
1635, 1640 (2017), where the Supreme Court held SEC disgorgement can be a penalty. The Third
Circuit posited, "[i]f SEC disgorgement is both an equitable remedy and a § 2462 penalty, could
an injunction be both too?" before answering the question in the negative. *Gentile*, 939 F.3d at 562.
The Third Circuit distinguished § 78u(d)(1) and (6) injunctions from SEC disgorgement, noting
that the latter is not authorized by statute and highlighting that "at the *Kokesh* oral argument several
Justices expressed frustration that the lack of statutory text made it hard to define SEC
disgorgement." *Id.* (citation omitted). The Third Circuit further stated that, "notwithstanding what
*Kokesh* might suggest about equitable relief in general, we do not believe it opens the door to
punitive injunctions." *Id.* The Third Circuit noted that the Supreme Court expressed "skepticism
that SEC disgorgement is applied in conformity with traditional equitable principles," and
concluded that properly issued injunctions "do not fall within the definition of penalties as defined
in *Kokesh*." *Id.* at 563.

The Third Circuit ultimately concluded that, "[b]ecause properly issued and framed
injunctions under § 78u(d)(1) and (6) are not penalties governed by § 2462, we will vacate the
District Court's judgment and remand for proceedings consistent with this opinion." *Id.* at 566. In

remanding the matter back to the District Court, the Third Circuit wrote:

> We stress that the District Court, on remand, should not rubber-stamp the Commission's request for an obey-the-law injunction simply because it has been historically permitted to do so by various courts. . . . If the District Court, after weighing the facts and circumstances of this case as alleged or otherwise, concludes that the obey-the-law injunction sought here serves no preventive purpose, or is not carefully tailored to enjoin only that conduct necessary to prevent a future harm, then it should, and must, reject the Commission's request. We note that the District Court has already addressed some of the relevant concerns involved in its opinion. We are also troubled by the fact that the Commission appears to seek two injunctions that attempt to achieve the same result.

*Id.* at 565. The Third Circuit further stated that "we conclude by repeating Judge Friendly's warning: an SEC injunction often is much more than [a] 'mild prophylactic.' When the Commission seeks an injunction, the famous admonitions in *Hecht* must never be forgotten." *Id.* at 566 (internal quotations and citations omitted).

### C. The Parties' Positions

#### 1. Defendant's Position

Defendant contends there are multiple bases upon which this Court should dismiss the Amended Complaint and argues "the SEC has [pleaded] itself out of court by failing to allege facts that could permit this Court to 'properly fashion' any injunction against [Defendant] for conduct alleged to have occurred thirteen years ago." (ECF No. 81-1 at 1–2.) As to the Third Circuit's Opinion, Defendant states that although former the District Court Opinion was vacated, the court "was careful not to reverse it" and instead "provid[ed] a roadmap for dismissing this case on other more proper grounds." (*Id.* at 2.) Defendant urges the Court to dismiss the Amended Complaint now "as a matter of its equitable discretion" instead of "waiting to announce this unavoidable

conclusion at the end of lengthy discovery (on irrelevant matters) and trial (for which there can be no finding of a substantive securities violation)." (*Id.* at 3.)

First, Defendant argues that Plaintiff cannot obtain a declaration that Defendant engaged in a substantive securities law violation because the alleged conduct occurred more than five years in the past. (*Id.* at 11.) The Amended Complaint does not allege a violation of substantive securities law occurring after 2008, and such claims are subject to a five-year statute of limitations. (*Id.* at 11–12.) Plaintiff contends that to properly fashion an injunction, the Court "must find and declare [Defendant] is liable for a substantive securities violation." (*Id.* at 13.) Because it cannot, Defendant contends an injunction is inappropriate. (*Id.*)

Second, Defendant argues that, because the Amended Complaint fails to allege he "engaged [in or is] about to engage in" a securities law violation, an injunction under §§ 78u(d)(1) and (6) cannot issue. (*Id.*) Third, Plaintiff contends that *Bonastia*, 614 F.2d 908 (3d Cir. 1980), creates a two-part test for courts to use when determining whether to issue an injunction. (*Id.* at 15.) Plaintiff asserts courts: (1) ask whether a substantive securities violation has occurred and (2) if so, ask if there is a reasonable likelihood the defendant will again engage in the illegal conduct. (*Id.* (citations and quotations omitted).) Plaintiff argues that, "[b]ecause any finding or declaration of liability based on allegations of a securities law violation from 2007 and 2008 would be punitive and therefore time-barred in this case," the SEC is unable to establish the first prong of *Bonastia* and the Amended Complaint should be dismissed either for failure to state a claim or in the Court's equitable discretion. (*Id.* at 15–16.) Finally, Plaintiff urges the Court to exercise its equitable discretion and dismiss the Amended Complaint because the SEC has failed to sufficiently allege an actual risk of future harm. (*Id.* at 19.)

18

On reply, Defendant disputes his Motion is procedurally barred, noting that because Judge Linares ruled on statute of limitations grounds, the merits of his Motion have never been evaluated by the Court. (ECF No. 89 at 4.) Defendant further contends his Motion "is entirely premised on the new law set forth by the Third Circuit in this case or re-arguing points never substantially considered or ruled on" by this Court. (*Id.* at 5.) Defendant similarly argues he has not waived any arguments put forth in his Motion because he in fact had previously raised them, but they were evaluated by Judge Linares or the Third Circuit. (*Id.* at 7.) Defendant also counters Plaintiff's assertion that it is premature to consider many of his arguments, stating that "this proclamation finds no support in case law." (*Id.* at 11.) Finally, Defendant argues it would be inappropriate for the Court to consider the facts proffered by Plaintiff in its opposition brief because such facts are not contained within the Amended Complaint. (*Id.* at 12.) Defendant similarly argues it would be inappropriate for the Court to take judicial notice of these facts because such facts are "disputed and unreliable." (*Id.* at 13–14.)

## 2.    The SEC's Position

First, the SEC points the Court to "more recent judicially-noticeable facts relevant to injunctive relief" it believes the Court should consider when deciding the present Motion. (ECF No. 84 at 7–8.) Next the SEC argues, as a threshold matter, the Court should deny Defendant's Motion pursuant to Federal Rule of Civil Procedure 12(g)(2)[11] because it "violates [the Rule's] proscription against serial motions to dismiss on grounds previously available." (*Id.* at 9–10.) The SEC contends the Motion merely "rehashes arguments [Defendant] already lost before the Third Circuit or asserts grounds he could have asserted—but chose not to—on his earlier motion and on

---

[11] All references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure, unless otherwise noted.

appeal and are thus barred under the law of the case doctrine." (*Id.* at 10.) The SEC notes Defendant "could simply repackage these same arguments in a post-answer Rule 12(c) motion" and that "forcing him to do so by denying his improper motion [to dismiss] does not impede judicial economy." (*Id.* at 11.) The SEC argues judicial economy would be best served by requiring Defendant to proceed by way of a Rule 12(c) motion because "[Defendant's] answer may well narrow the need for discovery of many of the [Amended] Complaint's factual allegations." (*Id.*) The SEC further notes that "[g]ranting [Defendant's M]otion, by contrast, could require another appeal to the Third Circuit, further and unnecessarily delaying to proceedings." (*Id.*)

The SEC also argues that Defendant's arguments are substantively meritless. (*Id.* at 15.) First, the SEC contends that declaratory judgments are not prerequisites to injunctive relief. (*Id.* at 16.) The SEC concedes, however, that "[w]here a defendant appears in a case and does not consent to an injunction, as here, however, a finding of liability is a prerequisite before a court may consider the relevant factors in fashioning appropriate injunctive relief, if any." (*Id.* (citing *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 295 (3d Cir. 2013).) But, the SEC argues that such a finding "may be made, for example, by the Court on summary judgment or after a bench trial or by the jury after a jury trial." (*Id.* at 16–17 (citations omitted).)

To that end, the SEC asserts that this Court should not consider, at the pleading stage, whether the injunctions are proper or whether "too much time has elapsed to support the entry of injunctions as an equitable matter." (*Id.* at 18.) The SEC argues that because they are not required to plead around affirmative defenses in a complaint, and because "a determination of liability is a prerequisite to the entry of an injunction where a defendant has appeared and contests the case[,]" the necessary implication is that the proper time to determine the propriety of an injunction is after liability has been established. (*Id.*) The SEC highlights the Supreme Court has held the SEC "must

establish a sufficient evidentiary predicate to show that such a future violation may occur," *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 701 (1980), and that the Third Circuit stated that courts "should make this determination on a developed record," *Gentile*, 939 F.3d at 564. (*Id.*) The SEC contends such an analysis cannot be conducted at the pleading stage. (*Id.*)

Additionally, the SEC argues that the cessation of illegal activity, which Defendant contends supports denial of an injunction, is but one factor a court can consider and is not dispositive. (*Id.* at 19.) The Commission again argues it is premature to determine "whether [Defendant's] assurances of lack of violations in intervening years—during some of which he was under FBI supervision and none of which the Commission has examined—is a proper basis to decide whether to issue an injunction." (*Id.*) The SEC concludes that, "[a]t a minimum, the Amended Complaint alleges facts that support the need for an injunction" at this stage. (*Id.* at 20.)

### D. Defendant's Motion to Dismiss is Not Procedurally Barred by Rule 12(g) Or By the Law of the Case Doctrine

The SEC argues the Court should deny Defendant's Motion pursuant to Rule 12(g)(2) because it "violates [the Rule's] proscription against serial motions to dismiss on grounds previously available." (ECF No. 84 at 9–10.) The Court finds this argument meritless.

Rule 12(g)(2) provides, in relevant part, "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." "While the Third Circuit has strictly construed Federal Rule of Civil Procedure 12(g)(2) to impose restrictions on the filing of successive motions to dismiss, it applies only to bar defenses and objections that were 'available' to the moving party at the time of the motion." *Allen v. N.J. State Police*, No. 16-1660, 2017 WL 5714707, at *4 (D.N.J. Nov. 28, 2017) (citing *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) ("Except as provided in rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make

Case 2:16-cv-01079-BRM-JAD Document 108 Filed 09/29/20 Page 26 of 51
Case 2:16-cv-01079-BRM-JAD Document 80 Entered Filed on FLSD Docket 01/08/2021 Page 267 of
364

another motion under [Rule 12] raising a defense or objection that was available to the party but

omitted from its earlier motion."). However, the Rule "does not preclude the filing of a second

motion pursuant to Rule 12 where the defense or objection was not available at the time of the

filing of the initial motion." *Jewett v. IDT Corp.*, No. 04-1454, 2008 WL 508486, at *2 (D.N.J.

Feb. 20, 2008). Furthermore, "[w]hile a technical reading of the rules appears to prevent defendants

from filing successive pre-answer motions to dismiss, many courts have interpreted these rules

permissively and have accepted subsequent motions on discretionary grounds." *Brown v. City of

Essex Cty. N.J.*, No. 10-3980, 2011 WL 3610268, at *3 (D.N.J. Aug. 16, 2011) (internal quotation

omitted) (citation omitted). "Additionally, allowing a subsequent motion to dismiss for failure to

state a claim can provide efficiency benefits, as it prevents unnecessary delay in the

proceedings." *Id.*

  Here, the Third Circuit vacated the District Court Opinion and remanded the matter to this

Court for further analysis consistent with the Third Circuit's judgment. As discussed in its

decision, the Third Circuit addressed the issue as a matter of first impression and, in so doing,

created new binding precedent upon this Court and other courts within this Circuit. The Court,

therefore, is skeptical that the defense and objections contained within Defendant's Motion were

truly available to him when his first motion was filed. Moreover, the decision in the District Court

Opinion was premised on statute of limitations grounds and did not address the substantive merits

of the parties' arguments. The parties' substantive arguments, therefore, are only now truly before

the Court for the first time. The Court finds that judicial efficiency is indeed best served by

consideration of Defendant's Motion, rather than further prolonging the proceedings with an

Answer and likely subsequent Rule 12(c) motion. Once more, the SEC acknowledges that

"[Defendant] could simply repackage these same arguments in a post-answer Rule 12(c) motion

for judgment on the pleadings." (ECF No. 84 at 11.) The SEC's argument that "forcing [Defendant] to [file a Rule 12(c) motion] by denying his improper motion to dismiss does not impede judicial economy." (*Id.*) The Court disagrees. To the extent an exercise of discretion is required, the Court chooses to do so and will consider Plaintiff's Motion.

The SEC's argument that the law of the case doctrine precludes Defendant's arguments is similarly unpersuasive. "Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988)). However, a court "may reconsider issues that we previously resolved if any of the following 'extraordinary circumstances' are present: (1) there has been an intervening change in the law; (2) new evidence has become available; or (3) reconsideration is necessary to prevent clear error or a manifest injustice." *Id.* at 188 (citation omitted) (internal quotation marks omitted). The SEC argues that no extraordinary circumstances are present here, but such an argument is entirely contravened by the vacation of the District Court Opinion. Moreover, as discussed above, the merits of the parties' arguments were never evaluated. To preclude the consideration of Defendant's Motion would be to deny him the right to have his arguments heard by the Court. The Court declines to endorse such a system.

E.  **The Court Declines to Take Judicial Notice of Factual Allegations Not Included in the Amended Complaint**

The SEC urges the Court to take judicial notice of certain facts that it argues are "relevant to injunctive relief." (ECF No. 84 at 7.) These alleged facts include representations made by Defendants regarding his participation in the securities industry in the Bahamas, a temporary suspension order issued against Defendant's firm in the Bahamas by the Securities Commission of the Bahamas, Defendant's attempt to organize and operate an "international financial entity" in

Puerto Rico. (*Id.* at 7–8.) The SEC cites to the Declaration of Nancy A. Brown to support their contentions. (ECF No. 85.)

"[A]s a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6)." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). It is also "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) (citation omitted); *Bolden v. Nat'l Fin. Servs. LLC*, No. 04-5527, 2005 WL 8175134, at *6 (D.N.J. May 23, 2005) (noting that a plaintiff "cannot rely on new facts not alleged in their Complaint to defeat a motion to dismiss"). However, Federal Rule of Evidence 201(b) "permits a district court to take judicial notice of facts that are not subject to reasonable dispute in that they are either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 390 (D.N.J. 2010) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002)) (alterations omitted). "Conversely, judicial notice is improper if a legitimate question exists as to the underlying source of the information." *Id.*

Setting aside the propriety of exercising judicial notice in this specific circumstance, the Court is compelled to highlight that this is not the first time the SEC has attempted to rely on factual assertions not contained in the operative complaint. In a September 18, 2017 Opinion and Order, Judge Linares administratively terminated Defendant's motion to dismiss the original complaint and directed the SEC to file an amended complaint. (ECF No. 46.) In so doing, the Judge Linares noted that "in its opposition brief, the SEC raises examples concerning certain conduct that [Defendant] has engaged in after January 2017 that are not asserted in the complaint."

24

(ECF No. 46 ¶ 6.) "Thus the SEC seeks to proceed in this case based upon claims and factual allegations that . . . are not asserted in the complaint, and are being raised for the first time in response to the motion to dismiss." (*Id.* ¶ 7.) "As a result, the Court is being asked to engage in the task of addressing a . . . [Rule 12(b)(6) Motion], but the Court does not have the benefit of a straightforward complaint to refer to in determining whether a claim has been stated." (*Id.* ¶ 8.)

The SEC appears to be, once again, raising examples of the Defendant's conduct not contained in the Amended Complaint. Such an effort was not previously permitted by the Court, nor will it be permitted now. The Court, accordingly, declines to take judicial notice of the new facts alleged in the SEC's opposition brief. If the SEC wishes the Court to consider these allegations, they must be included in a further amended complaint.

### F.    The Amended Complaint Fails to State a Plausible Claim for Relief

The Amended Complaint seeks two equitable remedies. (ECF No. 47 at 25–26.) First, the SEC seeks an "obey-the-law" injunction, where the Court would enter an order:

> [p]ermanently restraining and enjoining [Defendant], his agents, servants, employees, attorneys[,] and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violation Sections 5(a), 5(c), 17(a)[,] and 17(c) of the Securities Act . . . and Section 10(b) of the Exchange Act . . . and Rule 10b-5 thereunder . . . .

(*Id.*) Second, the SEC seeks a "penny stock bar" injunction, where the Court would enter an order "[p]ermanently prohibiting [Defendant] from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act . . . and Section 21(d)(6) of the Exchange Act." (*Id.* at 26.)

"Both remedies are found in 15 U.S.C. § 78u(d)." *Gentile*, 939 F.3d at 554. The Third Circuit also noted that "[t]he [SEC] has parallel injunction and penny-stock bar authority under the Securities Act. *See* 15 U.S.C. § 77t(b), (g). Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them."

25

*Id.* at 554 n.4. In its directive, the Third Circuit stated that it would "remand the case for the District

Court to decide whether the injunctions sought are permitted under § 78u(d)." *Id.* at 552.

The SEC's general authority to seek injunctive relief is found in 15 U.S.C. § 78u(d)(1),

which states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder . . . it may in its discretion bring an action in [district court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

"Section 78u(d)(1) injunctions that simply reference or restate the text of statutory prohibitions are

called 'obey-the-law' injunctions." *Gentile*, 939 F.3d at 554. The SEC's authority to seek a

"penny-stock bar" appears in 15 U.S.C. § 78u(d)(6)(A), which states:

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

"[T]he Supreme Court said of SEC injunctions that 'the proper exercise of equitable

discretion is necessary to ensure a 'nice adjustment and reconciliation between the public interest

and private needs.'" *Gentile*, 939 F.3d at 559 (quoting *Aaron v. Sec. & Exch. Comm'n*, 446 U.S.

680, 701 (1980)). "In cases where the Commission is seeking to enjoin a person about to engage

in any acts or practices which . . . will constitute a violation of those provisions, the Commission

must establish a sufficient evidentiary predicate to show that such future violation may occur."

*Aaron*, 446 U.S. at 701 (internal quotation marks omitted) (alteration in original); *see also*

*Bonastia*, 614 F.2d at 912 ("The well[-]established standard developed by the courts to determine

if an injunction should issue in a case involving securities violations reflects these purposes and is

based on a determination of whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct."); *see also Gentile*, 939 F.3d at 540 ("That an injunction is permissible only where necessary to prevent . . . misconduct from occurring in the future and not merely to punish past transgressions . . . is a standard to which the SEC must also hold itself. When it does not, the buck stops here: Lest we return to those days when only a modest showing was considered sufficient . . . federal courts may not grant SEC injunctions except upon a proper showing of the likelihood of future harm.") (internal quotations and citations omitted) (first alteration in original).

In the Third Circuit, this determination is based on "factors including not merely the fact of a past violation but more importantly 'the degree of scienter involved [in the past violation], the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, [and] the sincerity of his assurances against future violations.'" *Id.* at 559 (quoting *Bonastia*, 614 F.2d at 912) (alterations in original). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." *Bonastia*, 614 F.2d at 912 (citations omitted). "[I]in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *Gentile*, 939 F.3d at 559 (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972)). "Those considerations include not only the need to protect the public where the circumstances of the offense and of the offender give rise to a substantial risk of future harm . . . but also the stigma, humiliation, and loss of livelihood attendant to the imposition of the two injunctions sought here, whether temporary or permanent." *Id.* (internal citation omitted).

Indeed, "the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *Id.* (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1102).

"[T]he harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible." *Id.* "An [SEC] injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith." *Aaron*, 446 U.S. at 703 (Burger, C.J., concurring); *see also Gentile*, 939 F.3d at 566 ("[W]hen a court bans a defendant from his industry, it imposes what in the administrative context has been called the 'securities industry equivalent of capital punishment.'") (quoting *Saad v. S.E.C.*, 718 F.3d 904, 906 (D.C. Cir. 2013).

"A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing." *Gentile*, 939 F.3d at 560 (citing *Hartford-Empire Co. v. United States*, 323 U.S. 386, 433–35 (1945)). "[T]he principle that injunctions may issue only 'to prevent threatened future harm,' not to punish . . . applies equally to an injunction's scope." *Id.* (internal citation omitted). "If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion." *Id.* at 562. "Courts should make this determination on a developed record, *assuming the plaintiff has stated a plausible claim for relief.*" *Id.* at 564 (citations omitted); *see also EME Homer City Generation*, 727 F.3d at 295–96 (affirming dismissal of claims for improper injunctive relief) (emphasis added).

Here, considering the facts alleged in the Amended Complaint, the Court finds the SEC has not stated a plausible claim for relief. The SEC argues the Court cannot make a determination

as to the propriety of the sought injunctions at this stage because it can only make such a decision upon consideration of a developed factual record. While this is an accurate statement of the general standard governing the issuance of injunctions, the SEC omits, or at least fails to acknowledge, that their complaint must still state a plausible claim for relief. Despite accepting the facts alleged as true, and drawing reasonably inferences in the SEC's favor, the Court concludes the SEC has not stated such a claim.

First, as previously acknowledged in the District Court Opinion, the parties agree Defendant's allegedly illegal conduct ceased in June 2008. (*See* ECF No. 56 at 4.) The SEC, therefore, is asking this Court to enter an injunction to prevent future harm against a Defendant who, according to the allegations of the Amended Complaint, has not engaged in illegal securities activity for over a decade. Second, in order to be successful, the SEC must plausibly allege Defendant will engage in future securities violations absent an injunction. The SEC contends Defendant's denial of wrongdoing and rejection of responsibility for his actions support a conclusion that he is likely to violate securities laws in the future. (*See generally* ECF No. 47.) The specific facts alleged by the SEC to support this conclusion, however, are somewhat feeble. In support of their claims, the SEC relies on commends made by Defendant, including an interview where he stated he "did nothing wrong" and characterizing the investigation as a "witch hunt." (*Id.* ¶ 80.) The SEC also alleges Defendant "has not offered any assurance that he will not violate the securities laws in the future." (*Id.* ¶ 81.)[12] In the District Court Opinion, Judge Linares rejected

---

[12] The Amended Complaint also includes allegations relating to Defendant's presence in the securities industry in the Bahamas. (*See* ECF No. 47 ¶ 82.) These allegations seem in conflict with the more recent facts alleged by the SEC in their opposition brief; facts they seek to bring to this Court's attention by way of the exercise judicial notice. Because the Court declines to take judicial notice of these facts, the SEC might be well-served by including them in a further amended complaint.

this contention, noting that:

> Simply alleging that Defendant violated securities laws does not lead the Court to conclude that Plaintiff is likely to violate securities laws in the future. The fact that Defendant boasted about "not scamming anyone" during an interview and made shrewd comments about the [SEC] on social media also does not indicate that Defendant will violate securities laws in the future.

(ECF No. 56 at 7–8.) This Court agrees. Third, the insufficiency of the SEC's allegations is highlighted by a simple hypothetical. If Defendant had merely posted on social media that, although he was innocent of the charges levelled against him, he nonetheless pledged to follow all securities laws in the future, would the SEC consider that contrition and abandon their sought injunctions? Surely they would not. Yet the SEC argues that a single comment made by the Defendant where he said he "did nothing wrong" bolsters their claim for relief. The Court finds such a conclusion to be suspect. Finally, numerous other courts have exercised their equitable discretion and denied injunctive relief where substantial time has elapsed between the alleged securities violation and the sought injunction. *See, e.g.*, *U.S. S.E.C. v. Boey*, No. 07-39, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (denying the SEC's request for an injunction where "the SEC here has not shown any realistic likelihood that [the defendant] will commit similar violations in the future. Twelve years have passed since [the defendant's] fraudulent conduct, and the SEC does not argue that he has engaged in any additional illegal conduct"); *S.E.C. v. Dibella*, No. 04-1342, 2008 WL 6965807, at *13 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009) ("[T]he passage of nearly 10 years without another violation weighs heavily against an injunction."); *S.E.C. v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) ("[S]everal years have passed since [d]efendants' alleged misconduct apparently without incident. This fact further undercuts the [SEC's] assertion that [d]efendants pose a continuing risk to the public."); *Proffitt v. F.D.I.C.*, 200 F.3d 855, 862 (D.C. Cir. 2000) ("While a serious offense, even long past, may

indicate [defendant's] current risk to the public, that offense cannot alone determine his fitness almost a decade later.").

"Courts should make this determination [regarding the propriety of an injunction] on a developed record, assuming the plaintiff has stated a plausible claim for relief." *Gentile*, 939 F.3d at 564 (citations omitted). While the SEC is not required to make an evidentiary showing to survive a motion to dismiss, they must still include sufficient allegations to plausibly state an entitlement to relief. Here, even with all inferences drawn in the SEC's favor, the allegations of the Amended Complaint are insufficient to state a plausible claim for relief. The Court, accordingly cannot even consider whether to impose the "securities industry equivalent of capital punishment." *Saad*, 718 F.3d at 906. Defendant's Motion to Dismiss is, therefore, **GRANTED**. The Court, however, will permit the SEC one final opportunity to amend their complaint.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**. An accompanying Order will follow.

Date: September 29, 2020                                          *s/ Brian R. Martinotti*
                                                                                    **HON. BRIAN R. MARTINOTTI**
                                                                                    **UNITED STATES DISTRICT JUDGE**

31

# EXHIBIT P

Case 1:21-cv-21078-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 278 of
364
Case 2:16-cv-01619-JLL-JAD Document 41 Filed 15/06/17 Page 1 of 28 PageID: 899

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
--------------------------------------------------------------------- x

**SECURITIES AND EXCHANGE COMMISSION,**                  :
                                                         :
                                **Plaintiff,**           :            **16 Civ. 1619 (JLL)(JAD)**
                                                         :
                        -against-                        :            <u>**AMENDED COMPLAINT**</u>
                                                         :
**GUY GENTILE,**                                         :
                                                         :
                                **Defendant.**           :
--------------------------------------------------------------------- x

   Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against Defendant Guy Gentile ("Gentile") (who, upon information and belief, resides

at 79 SW 12th Street, Miami, Florida), alleges:

<u>SUMMARY</u>

   1.  This case involves two penny stock manipulation schemes perpetrated by Gentile.

The first scheme was perpetrated in 2007 and involved the stock of Raven Gold Corporation

("RVNG"), a purported gold and silver exploration company. The second scheme was

perpetrated in 2007-2008 and involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a

company involved in natural gas production. In addition to market manipulation and fraudulent

promotion, the schemes involved illegal unregistered offerings of the issuers' stocks, and,

together, generated over $17 million in illegal gross stock sale proceeds as well as substantial profits for the schemes' participants.

2.      In the RVNG scheme, two penny stock promoters from Toronto, Canada, Mike Taxon and Itamar Cohen ("Taxon" and "Cohen," respectively), were hired to promote RVNG stock by the persons who controlled the company in exchange for a controlling block of the company's purportedly unrestricted shares.  Taxon and Cohen then recruited Gentile, the owner of a broker-dealer based in upstate New York, to execute key aspects of the promotion in exchange for half of their newly-acquired RVNG shares.

3.      Gentile agreed to the arrangement, and manipulated the market for RVNG stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock.

4.      In addition, Gentile, together with Taxon and Cohen, created and distributed a glossy promotional "newsletter" touting RVNG stock (the "RVNG Mailer").  The RVNG Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements or omissions about the promoters' identity, compensation, and control of the issuer's stock.

5.      Finally, to increase the appearance of active market demand for the stock, Gentile, Taxon and Cohen bribed friends and acquaintances to make open-market purchases of RVNG by handing out free blocks of RVNG stock to them.

6.      In the KYUS scheme, Gentile was recruited to promote the stock by the individuals who controlled the issuer, and then invited Taxon and Cohen to participate and help finance the scheme, in exchange for a share of the ultimate profits.  Gentile used his own funds and the funds provided by Taxon and Cohen to obtain control of a substantial block of the

2

Case 1:21-cv-21078-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 280 of
Case 2:18-cv-01819-JLQ-VAD Document 44 Filed 10/08/21 Page 98 of 23 PageID: 981
364

company's purportedly unrestricted shares and used proceeds from the illegal unregistered sales

of the stock to finance the promotion.

7.        As in the RVNG scheme, Gentile manipulated the market for KYUS stock by

executing manipulative trades intended to create the false appearance of liquidity and market

demand, by, among other things, executing matched trades between multiple accounts that he

controlled.  Once again, Gentile, together with Taxon and Cohen, fabricated from whole cloth

and distributed a fake promotional newsletter, the "KYUS Mailer."  Just like the RVNG Mailer,

the KYUS Mailer contained multiple materially false or misleading statements or materially

misleading omissions, including, among other things, statements and omissions about the

promoters' identity, compensation, and control of the issuer's stock.

8.        Because Gentile obtained RVNG and KYUS stock from the persons controlling

the issuers, with a view to selling it to the public, Gentile was a statutory underwriter under the

Securities Act of 1933 ("Securities Act"), and his unregistered sales of the stock violated the

securities registration requirements of the Securities Act.

9.        In addition, by engaging in these schemes, Gentile violated the anti-touting and

anti-fraud provisions of the Securities Act and violated or aided and abetted violations of the

anti-fraud provisions of the Securities Exchange Act of 1934  ("Exchange Act").

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.        The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d)(1), (5) and (6) of the

Exchange Act, 15 U.S.C. §§ 78u(d)(1), (5) and (6), seeking a final judgment: (a) permanently

restraining and enjoining Gentile from engaging in the acts, practices and courses of business

alleged herein; and (b) permanently prohibiting Gentile from participating in any offering of

penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section

21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of

the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange

Act, 15 U.S.C. §§ 78u(d) and 78aa.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts,

practices, courses of business and transactions constituting the violations alleged herein occurred

within the District of New Jersey.  For example, Gentile sold unregistered RVNG and KYUS

securities and executed manipulative trades in those securities, in part, through broker-dealers

located in the District of New Jersey, and using trading systems operated through servers in the

District of New Jersey.

13.     Gentile, directly or indirectly, made use of the means or instruments of

transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange in connection with the transactions, acts, practices and courses of

business alleged herein.

## DEFENDANT

14.     **Gentile**, age 41, resides in Miami, Florida.  At the time of the conduct alleged

herein, Gentile resided in Mahopac, New York.  Gentile is the founder and, at the time of the

conduct alleged herein, was the owner of a Commission-registered broker-dealer, Stock USA

Execution Services, Inc. (which recently changed its name to Mint Global Markets, Inc.), located

in Carmel, New York.  Gentile continues to be the beneficial owner of that entity, through his

4

control of a trust, Stock USA Trust, that owns the broker-dealer's parent company, Stock USA

Financial, Inc.  Over the years, Gentile has been the principal of multiple securities-related

businesses in addition to his registered broker-dealer, including, most recently, a Bahamas-based

online brokerage firm, which Gentile opened in 2011.  Following the dismissal of parallel

criminal charges against him, Gentile announced plans to expand that business, increasing staff

by 60 to 80 employees by year-end 2017, targeting 30 per cent growth, and reactivating "stalled"

expansion plans.  In February 2017, Gentile posted an article from the <u>Nassau Guardian</u> to his

Twitter feed in which he was quoted as predicting that his firm "will be the largest broker dealer

in [the Bahamas] within six months."

**ISSUERS**

15.     **RVNG** was a Nevada corporation.  During the scheme alleged herein, RVNG's

headquarters were in Vancouver and Penticton, British Columbia, and its common stock was

quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock" as that term is defined

in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17

C.F.R. § 240.3a51-1.

16.     **KYUS** was a Delaware corporation headquartered in London, Kentucky.  During

the scheme alleged herein, KYUS represented that it was engaged in shale gas exploration in

western Kentucky.  During the scheme alleged herein, its common stock was quoted on the

OTCBB and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange

Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

## FACTS

### I.     THE RVNG SCHEME

#### A.     RVNG's Corporate Background

17.     RVNG was incorporated in Nevada in or about February 2005, under the name Riverbank Resources, Inc. In its public filings, the company claimed that it was in the business of mineral exploration. In reality, however, the company was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies.

18.     In April 2005, the company conducted two unregistered offerings of a total of 7.424 million shares of its common stock under Regulation S. The individuals who received the stock in the offerings, including the company's purported officers and directors, were nominees of the attorney who had created the shell, and not true owners of the stock.

19.     In or about July 2005, the company filed with the Commission a registration statement on Form SB-2, purporting to register the resale of 3.424 million shares held by individuals other than the company's purported officers and directors. The registration statement became effective in or about September 2005.

20.     Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the Riverbank Resources shell from the attorney who had created it. Subsequently, to effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees, including, in 2007, Gentile, Taxon and Cohen. These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer – first, the attorney who had created the shell and then the RVNG Owners – directed all the transfers.

6

21.     In or about August 2006, the company, now controlled by the RVNG Owners, changed its name to Raven Gold Corporation, carried out a 5:1 stock split, and announced a change in management.  In September 2006, the company announced that it had "decided to discontinue" mineral exploration at its British Columbia property.  In or about March 2007, RVNG carried out a 2:1 split of its common stock.

22.     As a result of the stock splits in 2006 and 2007, as well as additional restricted stock issuances directed by the RVNG Owners during this time period, during the stock manipulation scheme alleged below, RVNG had approximately 75 million shares of common stock issued and outstanding, of which approximately 34 million shares were traceable to the April 2005 Regulation S offerings and purportedly covered by the subsequent resale registration statement, the goal of which was to make the shares appear unrestricted.

23.     In or about March 2007, RVNG common stock began trading on the OTCBB under its new symbol, "RVNG."

24.     During the stock manipulation scheme alleged below, the RVNG Owners had complete control of RVNG and its management.

**B.     The RVNG Stock Promotion Deal**

25.     In early 2007, the RVNG Owners met Taxon and Cohen through a common acquaintance and proposed that Taxon and Cohen promote RVNG stock.  Taxon and Cohen then reached out to Gentile and invited him to participate in the "deal."

26.     In the course of the following few weeks, the RVNG Owners agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign consisting of a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock.  In

7

turn, Taxon and Cohen agreed that Gentile would help them execute the key aspects of the promotion, including the advertising campaign and the manipulative trading, in exchange for a portion of Taxon and Cohen's cut of the stock. Gentile, Taxon and Cohen also agreed that they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign.

27.     To put these plans in motion, between mid-May and mid-June 2007, the RVNG Owners directed transfers of eighty percent of RVNG's purportedly unrestricted stock (approximately twenty-seven million shares) to accounts controlled by Gentile, Taxon and Cohen. Of that amount, approximately twenty million shares, represented Gentile's and Taxon and Cohen's compensation, and the remaining, approximately seven million shares, was parked in an offshore account under Taxon's control for the duration of the promotion – a term that Taxon and Cohen negotiated with the RVNG Owners, to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind Gentile, Taxon and Cohen's backs, and thus undermine Gentile, Taxon and Cohen's efforts to drive up the stock price and sell shares at a high price.

28.     To obscure their connection to and control of the majority of the purportedly unrestricted RVNG stock, Gentile, Taxon and Cohen did not deposit their RVNG stock in U.S.-based accounts held in their own names. Instead, the share blocks were deposited in U.S. brokerage accounts held in the names of several offshore brokerage firms where Gentile, Taxon and Cohen had or controlled accounts.

### C.     Manipulative Trading and Fraudulent Promotion of RVNG Stock

29.     On receiving their blocks of RVNG shares, Gentile, Taxon and Cohen embarked on a promotional campaign for the stock, which consisted of manipulative trading, a promotional

mailer, and advertisements placed in multiple news publications. The RVNG Owners, for their part, supported the promotion by ensuring a steady stream of positive company press releases.

### 1. **Manipulative Trading and Kick-Backs**

30.     In June and July 2007, Gentile and Taxon directed manipulative trades in RVNG stock. Their RVNG stock trading in June and July 2007 was intended to achieve two primary goals. First, Gentile and Taxon sold RVNG stock to generate cash to fund the promotional mailing and advertising that would follow in July 2007. Second, Gentile and Taxon traded RVNG stock between their various accounts in order to create the false appearance of liquidity and active interest in the stock – in substance, an attractive (but fake) price and volume history for investors who would be researching the stock after seeing the upcoming promotional mailer or advertisements.

31.     To amplify the false appearance of increased liquidity and market interest in the stock, Gentile, Taxon and Cohen reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock. Some of those offers were accepted. For example, on or about July 19, 2007 and August 20, 2007, Taxon and Cohen transferred blocks of 5,000 and 25,000 RVNG shares, respectively, from one of their offshore accounts to the accounts of one of Gentile's acquaintances. That acquaintance bought approximately 101,500 shares of RVNG in the open market in June and July of 2007, and sold all of his RVNG shares – those received as a kick-back and those bought in the open market – by early September of 2007, making a profit of approximately $25,600.

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 287 of
Case 1:16-cv-01619-LLS-JAD Document 40 Filed 10/06/17 Page 108 of 281 PageID: 908
364

## 2.    The RVNG Mailer and Media Advertisements

32.     The centerpiece of the RVNG promotion was the RVNG Mailer – an eight-page glossy "newsletter" touting RVNG stock that Gentile, Taxon and Cohen distributed in mid-July 2007 under a fake entity name, "Stock Trend Report."

33.     The RVNG Mailer contained multiple materially false or misleading statements, as Gentile, one of its authors, knew or was reckless in not knowing.  For example, the mailer was purportedly published by an entity named "Stock Trend Report" and claimed to be a July 2007 "Special Edition of Premium Members."  In reality, Stock Trend Report was an entirely fictional name created specifically for the RVNG campaign, with no prior or subsequent "editions."

34.     Additionally, the RVNG Mailer's cover page claimed that RVNG stock had been "seen on" CNBC, Bloomberg, in the Wall Street Journal, the New York Times, and in other respected news publications, creating the impression that the stock had been a subject of reporting in those publications.  In reality, the stock had only been "seen" in those publications in paid advertisements placed by Gentile, Taxon and Cohen.

35.     These misstatements were material because they lent the RVNG Mailer an aura of legitimacy and reliability, and helped conceal the fact that it was an advertisement placed on behalf of and in coordination with the RVNG Owners.

36.     The RVNG Mailer also touted the stock's "strong move upward" in "recent weeks," which the RVNG Mailer attributed to the company's strong business prospects.  A chart covering the time period from early May to mid-June of 2007 purportedly showed the stock's "remarkable uptrend so far."  These statements were materially misleading.  The RVNG Mailer failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Gentile, Taxon, and those acting in concert with them, which were executed for the

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 288 of
364
Case 2:16-cv-01619-SLL-JAD Document 47 Filed 10/06/17 Page 118 of 281 PageID: 909

very purpose of creating an attractive price and volume history for the stock, not because of legitimate, independent market interest.

37.     The RVNG Mailer's last page contained a warning: "Please note: Due to high market demand for RVNG by institutional investors, some brokers may require you to phone in your order." This statement was materially false: No "high market demand for RVNG by institutional investors" existed.

38.     The RVNG Mailer contained a fine-print disclaimer that purported to disclose the compensation received by the mailer's publisher and the publisher's motivations and intentions with respect to the stock. The disclaimer was itself materially false and misleading.

39.     For example, the disclaimer continued to attribute the RVNG Mailer to "Stock Trend Report," a nonexistent entity.

40.     The disclaimer also stated that the company, RVNG, had "not approved the statements made in this opinion." In reality, the RVNG Owners, who controlled the company and its management, had seen drafts of the mailer and had signed off on its content.

41.     On the subject of compensation, share ownership, and intent to sell with respect to RVNG stock, the disclaimer stated that Stock Trend Report (called "STR" in the disclaimer) "has been compensated by third party shareholders or with cash from the company on behalf of one or more of the companies mentioned in this opinion . . . for dissemination of this advertisement and other professional services. … STR's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value."

42.     These statements were materially false or misleading, as Gentile knew or was reckless in not knowing. Stock Trend Report was a nonexistent, fictional enterprise. Moreover,

11

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 289 of
364
Case 2:16-cv-01619-LL-JAD Document 417 Filed 10/06/17 Page 128 of 281 PageID: 910

the compensation that Gentile, Taxon and Cohen had received for the "dissemination of this
advertisement" and other promotional efforts, including the manipulative trading, consisted of
sixty percent of RVNG's purportedly unrestricted stock – and the mailer itself was financed with
the proceeds from the sale of that stock. The disclaimer that Stock Trend Report "may have
bought" or "may buy" RVNG shares was also misleading, as most of Gentile, Taxon and
Cohen's shares had been received at no cost and had already been partially liquidated to finance
the promotional campaign.

43.     In July 2007, Gentile, Taxon and Cohen also placed paid advertisements for
RVNG in multiple major publications. The advertisements were, in substance, condensed
versions of the RVNG Mailer and contained many of the same materially false or misleading
statements, including the attribution of the advertisements to the nonexistent Stock Trend Report,
the misleading touting of the stock's recent performance, and a disclaimer identical to that in the
RVNG Mailer.

44.     Gentile closely collaborated with Taxon and Cohen in the creation and
distribution of the RVNG Mailer and the RVNG advertising materials. Gentile knew or was
reckless in not knowing that the RVNG Mailer and the advertisements contained the materially
false or misleading statements as alleged above.

      **3.**    **Press Releases**

45.     It was understood among the RVNG Owners and Taxon and Cohen that, for the
RVNG stock promotion campaign to succeed, the issuer should disclose a string of "positive
events" during the promotion. Thus, throughout June and July 2007, the RVNG Owners
supported the stock promotion campaign with a steady stream of RVNG press releases.

46.     RVNG issued a total of thirteen press releases during this time period:  five in June and eight in July.  Of those thirteen releases, five announced purported arrivals of new officers and directors, and the remaining eight vaguely touted purported developments in RVNG's exploration business, such as plans to "commence general exploration at La Currita, Mexico, within the next 21 days," the commissioning of a "detailed 'Phase 1 Exploration Program' at La Currita," receipt of certain initial sample results, and discovery of a "New Parallel Mineralized Vein Structure."  The RVNG Owners, Gentile, Taxon and Cohen coordinated the timing and number of these press releases, and the press releases were intended to and did support the ongoing market manipulation scheme conducted by Gentile, Taxon and Cohen.

47.     By taking the steps described above, Gentile, Taxon and Cohen successfully manipulated the market for RVNG stock.  Until May 31, 2007, RVNG traded at prices not exceeding $0.80 per share and with minimal volume, with no trading occurring on many days. Starting on May 31, 2007, the daily price and especially the daily volume went up dramatically – only to decline as soon as the promotion was complete.  The summary chart below demonstrates the dramatic manipulative effect of the promotion on the market for RVNG stock.

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07* | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

*Starting after 2:1 stock split and receipt of new symbol RVNG.OB.*

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 291 of
364
Case 2:16-cv-01015-LL-JAD Document 1-1 Filed 10/06/17 Page 112 of 281 PageID: 912

48.     Because Gentile, Taxon and Cohen obtained RVNG stock from the persons
controlling the issuer, with a view to selling it to the public, each was a statutory underwriter
under the Securities Act.  Yet no registration statement was filed or in effect with respect to their
sales of RVNG stock.

49.     The selling of unregistered RVNG stock by Gentile, Taxon and Cohen generated
an estimated five million dollars in gross proceeds.

## II.     THE KYUS SCHEME

### A.     KYUS Corporate Background

50.     KYUS was incorporated in Delaware in or about September 2006, under the name
Las Rocas Mining Corp. ("Las Rocas").  In its public filings, the company claimed that its
"principal business plan was to acquire, explore and develop mineral properties and to ultimately
seek earnings by exploiting the mineral claims."  In fact, the company was a shell formed and
controlled by its purported founder (who was also its sole officer and director) and his relatives
(together, "KYUS Shell Sellers").

51.     In March 2007, the company filed with the Commission Form SB-2, a registration
statement covering a purported public offering of one million common shares, at $0.025 per
share, for total offering proceeds of $25,000.  The registration statement became effective in or
about June 2007.  The one million shares covered by the registration statement were sold in or
about June 2007 to friends and acquaintances of the KYUS Shell Sellers.  These friends and
acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the
KYUS Shell Sellers retained control over the shares.

14

52.     After the purported public offering, the company had three million common shares issued and outstanding:  two million restricted shares, previously issued to Las Rocas' sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

53.     On or about October 15, 2007, as alleged in greater detail below, Adam S. Gottbetter, a New York microcap lawyer ("Gottbetter"), arranged the purchase of the Las Rocas shell from the KYUS Shell Sellers for $760,000 contributed by Gentile, Taxon, Cohen, and Gottbetter's business partner in the KYUS deal, Sam DelPresto.

54.     Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("KYUS Privco"); the merger ultimately closed on May 2, 2008.

55.     In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding:  24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by Gentile (together with Taxon and Cohen), Gottbetter and DelPresto.

56.     On or about November 20, 2007, the KYUS common stock began trading on the OTCBB under its new symbol, "KYUS."

**B.     The KYUS Stock Promotion Deal**

57.     In the summer of 2007, Gottbetter and DelPresto became acquainted with Gentile and invited him to participate in the KYUS "deal."  Over the course of multiple meetings and conversations, it was agreed that Gentile, working with his partners (Taxon and Cohen), would

15

(1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market. It was further agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for Gentile to obtain control of a substantial block of purportedly unrestricted KYUS stock.

58.     Gentile, in turn, invited Taxon and Cohen to participate in the "deal." Unlike the RVNG Owners, who provided unrestricted RVNG stock to Gentile, Taxon and Cohen at no cost, Gottbetter insisted that Gentile and his partners purchase KYUS stock in private transactions for $604,000. Taxon and Cohen agreed to split this upfront cost with Gentile and transferred $300,000 to Gentile for use in the deal. Gentile then transferred Taxon and Cohen's $300,000 and an additional $304,000 from his own offshore accounts to Gottbetter as payment for seventy-five percent of KYUS's purportedly unrestricted common shares. The remaining twenty-five percent of the purportedly unrestricted shares were transferred to Gottbetter and DelPresto.

59.     As in the RVNG scheme, in the KYUS scheme, Gentile, Taxon and Cohen's allocation of the purportedly unrestricted KYUS stock was directed to accounts in the names of nominee entities ("Nominee Entities"), rather than to accounts held in their own names. By depositing their shares in the Nominee Entities' accounts – in this case, accounts of three offshore and one domestic brokerage firms – Gentile, Taxon and Cohen obscured their connection to the stock and the upcoming market manipulation.

**C.      Manipulative Trading and Fraudulent Promotion of KYUS Stock**

60.     Similar to the RVNG promotion, the KYUS promotion had two components: manipulative trading, which began in November 2007, and a promotional mailer, which Gentile

16

created and distributed in May 2008, shortly after the merger of the KYUS shell with KYUS Privco.

61.     Immediately after receiving their KYUS shares into the Nominee Entities' accounts in late 2007, Gentile, Taxon and Cohen began "building the chart" for KYUS stock, in preparation for the distribution of the promotional mailer and the ultimate sell-off that they executed in May 2008, once the promotion worked to inflate the stock's price. Gentile, Taxon and Cohen controlled seventy-five percent of the public float, and on many days between late 2007 and May 2008, most and sometimes even all of the market activity in the stock was generated by accounts that they controlled.

62.     Among other things, Gentile executed matched trades between the Nominee Entities' accounts and accounts in the names of Gentile's friends and family members that Gentile controlled. Gentile also asked some of his acquaintances among penny stock traders to buy KYUS stock in the open market (essentially, from Gentile), based on the understanding that Gentile would be promoting the stock and would give his "buyers" a heads-up about the upcoming promotion, enabling them to sell the stock at a high price. At least two of Gentile's acquaintances agreed and purchased KYUS stock in the open market in advance of the promotion, and then sold it during the promotion at a profit.

63.     The matched trades and the efforts to "bring in buyers" described above had the same twin goals. First, KYUS stock sales generated the cash that Gentile would later use to fund the KYUS promotional mailing. Second, through these actions, Gentile was delivering on his promise to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 295 of
364
Case 2:16-cv-01619-LL-JAD Document 4 Filed 10/06/17 Page 108 of 281 PageID: 915

64.     In or about May 2008, shortly after the KYUS merger closed, Gentile distributed by mail a glossy promotional mailer touting KYUS. The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch. The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called Green Century Capital. In fact, Gentile funded the KYUS Mailer with proceeds from selling his, Taxon's and Cohen's allotments of KYUS stock.

65.     Gentile took the lead role in creating and distributing the KYUS Mailer, and he knew or was reckless in not knowing that the KYUS Mailer contained materially false or misleading statements, including false attribution, as alleged above.

66.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the stock price rose from $0.69 per share to $1.70 per share. Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008. The volume also increased dramatically. While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

67.     By the end of May 2008, Gentile, Taxon and Cohen had sold millions of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for estimated gross proceeds of approximately $10 million. They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter.

68.     Gottbetter and DelPresto, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter. Gottbetter continued selling KYUS stock through November 2010, and DelPresto continued selling KYUS stock at least through November 2009. Gottbetter and DelPresto sold their KYUS stock holdings in whole or in part through offshore accounts. Gentile had access to and ability to execute trades in at least one of those accounts, and he assisted in the execution of some of these subsequent sales of KYUS stock.

69.     Because Gentile, Taxon, Cohen, Gottbetter and DelPresto had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.

70.     No registration statement was filed or in effect with respect to the KYUS stock sales of Gentile, Taxon, Cohen, Gottbetter, and DelPresto.

## III.   SUBSEQUENT ACTIONS AGAINST GENTILE AND HIS CONFEDERATES IN THE RVNG AND KYUS SCHEMES

71.     On June 25, 2012, the United States Attorney's Office for the District of New Jersey ("USAO") filed a sealed complaint against Gentile, charging him with conspiracy to commit wire fraud, and alleging his participation in the RVNG and KYUS schemes detailed above. The FBI arrested Gentile on July 13, 2012. Soon after his arrest, Gentile agreed to cooperate with the USAO, and on July 16, 2012, the Court granted the USAO's application to dismiss the sealed complaint without prejudice.

72.     On March 23, 2016, with Gentile unable to persuade the USAO to drop its criminal charges against him, and with his cooperation at an end, the Grand Jury returned an indictment against Gentile, charging him with various criminal securities law violations arising out of his conduct in the manipulation and unlawful distribution of RVNG and KYUS. United

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 297 of
364
Case 2:16-cv-01619-JLL-JAD Document 4 Filed 10/06/17 Page 20 of 28 PageID: 916

<u>States v. Gentile</u>, 16 Cr. 155 (JLL) (D.N.J.).  On January 30, 2017, the Court granted Gentile's

Motion to Dismiss the Indictment on statute of limitations grounds.

73.     On May 27, 2015, Cohen pled guilty to a one-count information filed by the

USAO in <u>United States v. Cohen</u>, 15 Cr. 248 (JLL) (D.N.J.), which charged him with conspiring

to commit securities fraud as a result of his participation in the RVNG and KYUS schemes

detailed above.

74.     On May 28, 2015, Taxon pled guilty to a one-count information filed by the

USAO in <u>United States v. Taxon</u>, 15 Cr. 249 (JLL) (D.N.J.), which charged him with conspiring

to commit securities fraud as a result of his participation in the RVNG and KYUS schemes

detailed above.

75.     Both Taxon and Cohen had been approached by the FBI and USAO in May 2012,

and agreed to cooperate.  Neither has yet been sentenced.

76.     Gottbetter pled guilty to one count of conspiracy to commit securities fraud and

mail fraud in <u>United States v. Gottbetter</u>, 14 Cr. 467 (JLL) (D.N.J.), a case arising out of his

participation in two separate pump-and-dump schemes that he participated in after the KYUS

scheme.  His plea agreement, however, identifies the KYUS scheme as among those other stock

market manipulation schemes for which Gottbetter would not be charged if Gottbetter entered

the plea specified in the agreement.  Gottbetter was subsequently sentenced to a prison term of

18 months, one year of supervised release, a $60,000 fine and ordered to forfeit $344,966.55.

77.     The Commission filed parallel charges against Gottbetter in <u>SEC v. Gottbetter, et

al.</u>, 15 Civ. 3528 (JLL) (D.N.J.).  In addition to the schemes charged by the USAO in its criminal

case against Gottbetter, the Commission's complaint charged him with violations of the antifraud

provisions of the Securities Act and the Exchange Act, as well as violations of Securities Act

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 298 of
364
Case 2:16-cv-01619-JLL-JAD Document 1 Filed 10/06/17 Page 23 of 28 PageID: 913

Section 5, arising out of his participation in the KYUS scheme detailed above. Gottbetter

consented to a Judgment in the Commission's case that permanently enjoined him from future

violations of the specified securities laws, imposed a penny stock bar, and ordered him to pay

disgorgement of the ill-gotten gains he obtained, and prejudgment interest, totaling

approximately $4.6 million.

78. DelPresto has also been criminally charged by the USAO in <u>United States v.</u>

<u>DelPresto</u>, 15 Cr. 631 (JLL) (D.N.J.), for his role in schemes other than KYUS. He has entered

into a plea agreement with the USAO, which, like Gottbetter's, identifies the KYUS scheme as

among those other stock market manipulation schemes for which he would not be charged if he

entered the plea specified in the agreement. He has not yet been sentenced in that matter. The

Commission filed a parallel action against DelPresto, <u>SEC v. DelPresto, et al.</u>, 15 Civ. 8656

(JLL) (D.N.J.), a matter that has been stayed pending resolution of a criminal case filed against

his co-defendant.

## IV. GENTILE'S DENIAL OF WRONGDOING, REJECTION OF RESPONSIBILITY AND OTHER FACTORS INDICATING THE LIKELIHOOD THAT HE WILL COMMIT FUTURE VIOLATIONS OF THE SECURITIES LAWS ABSENT AN INJUNCTION

79. If not enjoined from future violations of Exchange Act Section 10(b) and

Securities Act Sections 5(a) and 5(c), and 17(a) and (b), and barred from participating in any

offering of penny stock, Gentile is likely to engage in further violations of the securities laws.

80. Since the dismissal of the parallel criminal charges against him, Gentile has

consistently and publicly denied any wrongdoing in connection with the allegations asserted

herein. For example, in an interview with <u>BloombergBusinessweek</u>, Gentile claimed he "did

nothing wrong," as reported in an article detailing the circumstances that led to his arrest in 2012.

More recently, he has labeled the Commission's instant action a "witch hunt." On his Instagram feed, he declared, "I never scammed anyone!"

81.     Gentile has not offered any assurance that he will not violate the securities laws in the future.

82.     Gentile maintains an active presence in the securities industry as the beneficial owner of a Commission-registered broker-dealer and the CEO of a Bahamas-based online brokerage firm. In recent public statements, Gentile has committed to expanding his securities industry businesses. Gentile's ongoing involvement in the securities industry will present him with daily opportunities to violate the securities laws again.

83.     At the same time, Gentile has demonstrated contempt for securities regulators and the importance of enforcement of the securities laws. For example, when Gentile learned that the Commission planned to pursue its action against him, Gentile wrote to the Commission staff, threatening that if the Commission pressed its claims against him, he would make sure that the staff would not be able to practice law again.

84.     According to Gentile's public statements, he believed he was closely supervised by the FBI from his arrest in 2012 through the filing of the criminal charges against him, calling his work with the Government "a 24/7 operation."

85.     Unwilling to acknowledge his past violations, presented with daily opportunities to violate the securities laws, contemptuous of securities regulation, and no longer believing that he is being closely supervised by the FBI, Gentile cannot be expected to avoid additional violations in the future.

**FIRST CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**

86.     Paragraphs 1 through 85 are incorporated by reference as if set forth fully herein.

22

87.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

88.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act

89.     Paragraphs 1 through 85 are incorporated by reference as if set forth fully herein.

90.     By virtue of the foregoing, Gentile, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspaper articles, letters, investment services, or communications which described securities for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

91.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

## THIRD CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

92.     Paragraphs 1 through 85 are incorporated by reference as if set forth fully herein.

23

93. By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: (1) with scienter, employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

94. By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### FOURTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

95. Paragraphs 1 through 85 are incorporated by reference as if set forth fully herein.

96. By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

97. By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Thereunder

98.     Paragraphs 1 through 85 are incorporated by reference as if set forth fully herein.

99.     By virtue of the foregoing, Gentile, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

100.    By virtue of the foregoing, Gentile aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Gentile, his agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), 17(a) and 17(b) of

the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77q(b), and Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## II.

Permanently prohibiting Gentile from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the

Exchange Act, 15 U.S.C. § 78u(d)(6).

## III.

Granting such other and further relief as this Court deems just and appropriate.

Dated: October 6 , 2017
     New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
     Andrew M. Calamari
     Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against Defendant Gentile in the foregoing Complaint is not the subject of any other civil action against Gentile pending in any court, or of any pending arbitration or administrative proceeding.

A related civil case involving the Commission's claims against Adam S. Gottbetter arising out of the KYUS scheme (SEC v. Gottbetter, et al., 15-CV-3528 (JLL)) was filed in this Court in 2015 but is now closed.

A related civil case involving the Commission's claims against Mike Taxon and Itamar Cohen arising out of the RVNG and KYUS schemes (SEC v. Taxon, et al.; 15-CV-3587 (JLL)) is pending before the Court and is currently stayed pending the resolution of the parallel criminal cases (United States v. Taxon, 15-CR- 0249 (JLL), and United States v. Cohen, 15-CR-0248 (JLL)), which are also pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

> Chief, Civil Division
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Ste. 700
> Newark, New Jersey 07102

> SECURITIES AND EXCHANGE COMMISSION
>
> By: _____
>
> Andrew M. Calamari
> Regional Director
> SECURITIES AND EXCHANGE COMMISSION
> Brookfield Place, 200 Vesey Street
> New York, New York 10281-1022
> (212) 336-1023 (Brown)
> Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

# EXHIBIT Q

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

--------------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,            :
                                                :
                            Plaintiff,          :            16 Civ. 1619 (BRM) (JAD)
                                                :
        -against-                               :
                                                :
GUY GENTILE,                                    :
                                                :
                            Gentile.            :

--------------------------------------------------------------------- x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO GENTILE'S MOTION TO DISMISS

SECURITIES AND EXCHANGE
COMMISSION
    Jorge G. Tenreiro
    Nancy A. Brown
    Simona K. Suh
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
tenreiroj@sec.gov

Attorneys for Plaintiff

April 3, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

PROCEDURAL HISTORY ................................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 4

    I.      THE AMENDED COMPLAINT'S RELEVANT ALLEGATIONS. ............................... 4

        A.      Gentile's Central Role in Two Stock Manipulation Schemes. ..................................... 4

        B.      Gentile's Cooperation and Admissions in a Criminal Investigation ........................... 6

        C.      Gentile's Recent Conduct Relevant to Injunctive Relief ............................................ 6

    II.     MORE RECENT JUDICIALLY-NOTICEABLE FACTS RELEVANT TO INJUNCTIVE RELIEF. .................................................................................................... 7

STANDARD OF REVIEW .................................................................................................. 8

ARGUMENT ....................................................................................................................... 9

    I.      GENTILE'S SECOND MOTION TO DISMISS THE SAME AMENDED COMPLAINT IS PROCEDURALLY BARRED. ............................................................ 9

        A.      Gentile's Motion to Dismiss Should Be Denied Under Rule 12(g)(2) ..................... 10

        B.      Gentile Made—or Could Have Made—the Same Arguments Before ...................... 12

    II.     GENTILE'S ARGUMENTS ARE SUBSTANTIVELY MERITLESS. ........................ 15

        A.      Declaratory Judgments Are Not Prerequisites to Injunctive Relief .......................... 16

        B.      The Court Cannot Determine Whether Injunctions Are Proper at this Stage. ........... 18

CONCLUSION .................................................................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Aaron v. SEC, 446 U.S. 680 (1980) ....................................................................14

ACLU v. Mukasey, 534 F.3d 181 (3d Cir. 2008) ........................................... 12, 14

Allen v. N.J. State Police, No. 16 Civ. 1660 (BRM), 2017 WL 5714707
 (D.N.J. Nov. 28, 2017) ..................................................................................10

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ..............................................................8

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)..................................................8

Chathas v. Local 134 Int'l Brotherhood of Electrical Workers, 233 F.3d 508
 (7th Cir. 2000) ..............................................................................................16

City of Pittsburgh v. W. Penn. Power Co., 147 F.3d 256 (3d Cir. 1998)................20

Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114 (3d Cir. 2013) ....................8

Dzielak v. Whirlpool Corp., No. 12 Civ. 89, 2018 WL 6985013 (D.N.J. Dec. 21, 2018) ...................10

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) ...................................9

Gomez v. Toledo, 446 U.S. 635 (1980) ......................................................... 9, 18

K.J. v. Greater Egg Harbor Regional High School Dist. Bd. of Ed., No. 14 Civ. 145
 (RBK), 2016 WL 7489046 (D.N.J. Dec. 30, 2016)..........................................10

Leyse v. Bank of America N.A., 804 F.3d 316 (3d Cir. 2015)........................... 10, 11

McKenna v. City of Phila., 511 F. Supp. 2d 518 (E.D. Pa. 2007)....................... 12, 13

Minard Run Oil Co. v. U.S. Forest Serv., 549 F. App'x 93 (3d Cir. 2013)................12

Oliver v. Roquet, No. 13 Civ. 1881 (JLL), 2014 WL 4271628 (D.N.J. Aug. 28, 2014)........................10

Reynolds v. Roberts, 202 F.3d 1303 (11th Cir. 2000)..........................................16

S. Cross Overseas Agency v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410
 (3d Cir. 1999) ...............................................................................................20

SEC v. Bonastia, 614 F.2d 908 (3d Cir. 1980) ...........................................passim

SEC v. Cohen, 332 F. Supp. 3d 575 (E.D.N.Y. 2018) ........................................16

SEC v. Conaway, 697 F. Supp. 2d 733 (E.D. Mich. 2010) ........................................................17

SEC v. Fowler, No. 17 Civ. 139 (GHW), 2020 WL 906182 (S.D.N.Y. Feb. 25, 2020)
   appeal filed No. 20-1081 (2d Cir. Mar. 26, 2020) ........................................................ 18, 19

SEC v. Gabelli, 653 F.3d 49 (2d Cir. 2011), rev'd on other grounds, 568 U.S. 442 (2013) .................18

SEC v. Gentile, 939 F.3d 549 (3d Cir. 2019) ...................................................................passim

SEC v. Glantz, No. 94 Civ. 5737 (LAP), 2009 WL 3335340 (S.D.N.Y. Oct. 13, 2009) .....................17

SEC v. Graham, 823 F.3d 1357 (11th Cir. 2016) ........................................................... 16, 18

SEC v. Graulich, No. 09 Civ. 4355 (WJM), 2013 WL 3146862 (D.N.J. June 19, 2013) .....................20

SEC v. Haswell, No. 77 Civ. 408-B, 1977 WL 1074 (W.D. Okla. Oct. 19, 1977),
   aff'd sub nom., SEC v. Haswell, 654 F.2d 698 (10th Cir. 1981) ........................................17

SEC v. Lawson, 24 F. Supp. 360 (D. Md. 1938) ...................................................................19

SEC v. Sprecher, No. 92 Civ. 2860 (LFO), 1993 WL 544306 (D.D.C. Dec. 16, 1993) .....................17

SEC v. Teo, 746 F.3d 90 (3d Cir. 2014) ............................................................................18

SEC v. Teo, No. 04 Civ. 1815 (SDW), 2011 WL 4074085 (D.N.J. Sept. 12, 2011),
   aff'd, 746 F.3d 90 (3d Cir. 2014) ................................................................................20

SEC v. Tourre, 4 F. Supp. 3d 579 (S.D.N.Y. 2014) ............................................................17

Skretvedt v. E.I. DuPont de Nemours, 372 F.3d 193 (3d Cir. 2004)................................. 12, 14

United States ex rel. Bookwalter v. UPMC, 946 F.3d 162 (3d Cir. 2019) ............................ 8, 9

United States Gypsum Co. v. Indiana Gas Co., 350 F.3d 623 (7th Cir. 2003) .........................9

United States v. EME Homer City Generation LP, 727 F.3d 274 (3d Cir. 2013)........................ 14, 16

**Statutes**

28 U.S.C. § 2462.......................................................................................................passim

  **Securities Act of 1933**

     Section 5, 15 U.S.C. § 77e.................................................................................2

     Section 17(a), 15 U.S.C. § 77q(a) ......................................................................2

     Section 17(b), 15 U.S.C. § 77q(b) ......................................................................2

Section 20(b), 15 U.S.C. § 77t(b) ...............................................................................3

Section 20(g), 15 U.S.C. § 77t(g) ...............................................................................3

**Securites Exchange Act of 1934**

Section 10(b), 15 U.S.C. § 78j(b) ...............................................................................2

Section 21(d)(1), 15 U.S.C. § 78u(d)(1) ...........................................................3, 19, 20

Section 21(d)(5), 15 U.S.C. § 78u(d)(5) .....................................................................3

Section 21(d)(6), 15 U.S.C. § 78u(d)(6) ................................................................3, 19

**Regulations**

Securities Exchange Act, Rule 10b-5, 17 C.F.R. § 230.10b-5 .......................................2

**Rules**

Fed. R. Civ. P. 1 ....................................................................................................10

Fed. R. Civ. P. 8(c) ..................................................................................................9

Fed. R. Civ. P. 9(b) ..................................................................................................9

Fed. R. Civ. P. 12(b)(6) ................................................................................8, 10, 20

Fed. R. Civ. P. 12(c) ...............................................................................................11

Fed. R. Civ. P. 12(g)(2) ...............................................................................2, 9, 10, 11

Fed. R. Civ. P. 38 ...................................................................................................17

Fed. R. Civ. P. 50(a) ...............................................................................................17

Fed. R. Civ. P. 52(a) ...............................................................................................17

Fed. R. Civ. P. 56(a) ...............................................................................................17

Fed. R. Civ. P. 57 ...................................................................................................17

Fed. R. Civ. P. 65(d) ...............................................................................................16

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1384 (3d ed. 2014) ...............11

Case 1:21-cv-20079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 312 of
Case 2:16-cv-01619-BRM-JAD Document 84 Filed 04/03/20 Page 68 of 227 PageID: 3323
364

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this

Memorandum of Law in opposition to the motion of Defendant Guy Gentile ("Gentile") to dismiss,

DE 81, the Amended Complaint, DE 47.

## PRELIMINARY STATEMENT

Having raised the same statute of limitations argument in this case before and having lost on

appeal, Gentile now tries to raise the argument again on yet another motion to dismiss, this time

with additional window-dressing. This Court should deny Gentile's motion because it is both

procedurally barred and substantively meritless.

The Amended Complaint details Gentile's central role, primarily from 2007 through 2008, in

two highly profitable schemes involving penny stock manipulation, fraudulent promotions, and

unlawful securities distribution. The Amended Complaint also alleges facts supporting a finding, at

this stage, that, unless enjoined, Gentile is reasonably likely to violate the relevant federal securities

laws in the future and therefore that injunctive relief is necessary to protect investors. Gentile does

not challenge the plausibility of any of these allegations or their sufficiency to state a claim for relief.

Instead, the thrust of Gentile's latest motion is that the request for injunctive relief is time-

barred—an issue the Third Circuit resolved in the Commission's favor before remanding for the

Court to determine whether an obey-the-law injunction and a penny stock bar are appropriate. This

time around, Gentile primarily contends, in substance, that to enter any kind of injunction a court

must first issue a declaratory judgment, a form of relief that he claims is independently time-barred,

even if an injunction or penny stock bar itself is not. Gentile also re-argues, as he did before,

including on appeal, that neither an obey-the-law injunction nor a penny stock bar are proper

because the Commission will not be able to prove he is about to violate the securities laws.

Yet these arguments, which Gentile explicitly made or could have made in his prior motion

to dismiss, are procedurally barred for two reasons. First, to promote judicial economy and avoid

Case 1:21-cv-20079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 313 of
364
Case 2:16-cv-01619-BRM-JAD Document 84 Filed 04/03/20 Page 78 of 221 PageID: 1334

piecemeal litigation, including serial appeals, Federal Rule of Civil Procedure 12(g)(2) prohibits successive motions to dismiss and instead requires the consolidation of available defenses in a single motion. The Third Circuit has instructed district courts to strictly enforce that requirement. Second, the law of the case doctrine similarly bars litigants from re-litigating arguments already made—or that could have been made—in prior proceedings, absent extraordinary circumstances not present here. These procedural bars preclude Gentile from re-litigating his arguments.

Even if the Court reaches the merits of Gentile's arguments, it should reject them. Gentile's contention that the Court must issue a declaratory judgment (which the Commission does not seek) before entering an injunction is incorrect as a matter of law—Gentile points to no authority to support it, and the Commission knows of none. Nor, as the Commission has demonstrated before, does the passage of time alone suffice to deny a request for a prospective obey the law injunction or penny stock bar, particularly at this stage of the proceedings. The determination of whether injunctive relief is proper depends on the facts and circumstances of each case on a full record. Here, the Amended Complaint alleges sufficient facts—including Gentile's high degree of scienter, his recent violations of law and run-ins with financial services regulators after he ceased cooperating in a related criminal investigation, and his continued refusal to accept responsibility—that, if proven, would more than justify the imposition of the remedies the Commission seeks. For all these reasons, Gentile's latest motion to dismiss the Amended Complaint should be denied.

## PROCEDURAL HISTORY

The Commission filed this action on March 23, 2016. DE 1. Gentile moved to dismiss. DE 34. On October 6, 2017, the Commission filed the Amended Complaint alleging that Gentile violated Sections 5, 17(a), and 17(b) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder and seeking an injunction

against further violations of these provisions under 15 U.S.C. §§ 77t(b) and 78u(d)(1); relief that "may be appropriate or necessary for the benefit of investors," under 15 U.S.C. § 78u(d)(5); and a penny stock bar under 15 U.S.C. §§ 77t(g) and 78u(d)(6)(A). Am. Compl. ¶ 10. Gentile renewed his motion to dismiss, contending that "the Amended Complaint . . . [w]as time-barred under [28] U.S.C. § 2462's five-year statute of limitations" because the relief sought was punitive, Mem. Supp. Mot. to Dismiss 9, Oct. 27, 2017 ("First MTD"), DE 50, and because "injunctive relief" is only permissible when a person "is engaged or about to engage" in securities laws violations, which, he argued, could not be established here. Id. at 19–23. Judge Linares granted the motion. DE 56, 57.

On September 26, 2019, the Third Circuit vacated the order, holding that "because 15 U.S.C. § 78u(d) does not permit the issuance of punitive injunctions, the injunctions at issue do not fall within the reach of § 2462." SEC v. Gentile, 939 F.3d 549, 552 (3d Cir. 2019). Gentile then sought a stay of the Third Circuit's mandate. Mot. to Stay Issuance of Mandate, SEC v. Gentile, No. 18-1242 (3d Cir. Nov. 18, 2019). Gentile argued that there was a "reasonable probability" that the Supreme Court would grant a writ of certiorari and that he had "completely exited the securities business, having shuttered his Bahamian Broker-Dealer, and no longer works in the securities industry in any manner, with no plans to return." Id. at 1, 8–9 & n.3. The Court of Appeals denied the stay motion, and Gentile filed a pending petition for certiorari. No. 19-878 (U.S. Dec. 23, 2019).

At a December 17, 2019 status conference before Judge Vasquez, Gentile renewed his bid to delay these proceedings by seeking a stay of discovery, based on his desire to file this motion to dismiss. See Tr. of Conference 4:9–11, Dec. 17, 2019 ("Tr."), DE 70. The Commission opposed the request and noted that, following the Third Circuit's ruling in Gentile, the district court should consider the "specific elements that [SEC v.] Bonastia, [614 F.2d 908 (3d Cir. 1980)] . . . instruct[s] the Court to take into account in making the determination of whether an injunction is properly

Case 1:21-cv-20079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 315 of
364
Case 2:16-cv-01619-BRM-JAD Document 84 Filed 04/03/20 Page 9 of 22 PageID: 3356

imposed." Id. at 5:7–14.  In accordance with <u>Gentile</u>, the Commission also noted that "much of

[this] cannot be assessed until there is a full evidentiary record before the Court."  Id.  Judge

Vasquez agreed and denied Gentile's motion.  DE 66.  He noted that he "d[id] not think, in light of

the Third Circuit's opinion, that this is a case that's going to be disposed of [by] dispositive motion

practice at the beginning of the case, so I'm also going to order discovery to go forward at this

time."  Tr. 7:20–23; <u>see also</u> DE 66 (providing that "discovery is not stayed" and ordering Rule 16

conference).  On February 4, 2020, in response to Supplemental Initial Disclosures, Gentile filed

another (pending) request for stay of discovery, DE 77, which the Commission opposed.  DE 78.

**STATEMENT OF FACTS**

**I.      THE AMENDED COMPLAINT'S RELEVANT ALLEGATIONS.**

      **A.      Gentile's Central Role in Two Stock Manipulation Schemes.**

In 2007 and 2008, Guy Gentile engineered two fraudulent schemes to manipulate penny

stocks.  Am. Compl. ¶¶ 25–49, 57–70.  At the time, Gentile owned a Commission-registered broker-

dealer located in New York State.  Id. ¶ 14.

First, in 2007, two stock promoters, Mike Taxon and Itamar Cohen, invited Gentile to join

them in a scheme to manipulate the stock of Raven Gold Corporation ("RVNG").  Id. ¶ 25.  To

create an attractive—but fake—price and volume history and to disguise their connection to the

trading, Gentile traded RVNG between various brokerage accounts in the names of brokerage firms

where he, Taxon, and Cohen had or controlled accounts.  Id. ¶¶ 2–5, 26–30.  Gentile also offered

free blocks of RVNG as kickbacks to others for open market purchases of RVNG.  Id. ¶¶ 30–31.

Gentile further drove up the price of RVNG stock by creating and distributing a false and

misleading "newsletter" touting RVNG (the "RVNG Mailer")—purportedly published by "Stock

Trend Report," a fictional entity Gentile and his collaborators created to disguise their involvement.

4

Id. ¶ 32.  The RVNG Mailer falsely heralded the company's appearance in various news publications, as if the company had been the subject of legitimate reporting; misleadingly attributed the stock's performance to the company's supposedly strong business prospects; and falsely stated that there was "high market demand for RVNG by institutional investors."  Id. ¶¶ 4, 32–37.  In reality, as Gentile knew or recklessly disregarded, the stock's only mention in publications had been in equally misleading paid advertisements placed by Gentile, Taxon, and Cohen; most of the touted market activity consisted of their manipulative trades; and no institutional investor demand existed. Id.  As a result of all these actions, as well as coordination by Gentile, Taxon, and Cohen of the timing of positive press releases by RVNG itself, Gentile successfully manipulated the market for RVNG stock, including its price and trading volume.  Id. ¶¶ 45–47.

Second, in 2007, two men who controlled Kentucky USA Energy, Inc. ("KYUS"), another penny stock issuer, enlisted Gentile's participation in another fraudulent stock manipulation campaign, this time involving KYUS stock.  Id. ¶ 57.  To perpetrate the scheme, the two men, Adam S. Gottbetter and Samuel DelPresto, and Gentile, Taxon, and Cohen bought the KYUS shell.  Id. ¶ 53.  They then transferred 75% of KYUS's purportedly unrestricted stock to accounts in the names of firms used by Gentile, Taxon, and Cohen (the "nominee accounts")—again to obscure Gentile's connection to the stock—and the other 25% to Gottbetter and DelPresto.  Id. ¶¶ 58–59.

As they had done with RVNG, Gentile, Taxon, and Cohen then began "building the chart" for KYUS stock:  fabricating an attractive price and volume history for the stock by executing trades between the nominee accounts and other accounts Gentile controlled and convincing acquaintances to buy KYUS stock in the open market, among other things.  Id. ¶¶ 7, 57, 60–63.  And again, as with RVNG, Gentile created and distributed a promotional mailer touting KYUS (the "KYUS Mailer")— distributed under the fake name "Global Investor Watch"—which falsely represented that it had

5

Case 1:21-cv-21079-BB-JAG Document 39-2 Entered on FLSD Docket 11/08/2021 Page 317 of
364
Case 2:16-cv-21619-BRM-JAD Document 84 Filed 04/03/20 Page 13 of 21 PageID: 1310

been funded by a fictional entity.  Id. ¶¶ 64–65.  In fact, Gentile funded the KYUS Mailer with

proceeds from early sales of his, Taxon's, and Cohen's KYUS stock.  Id.  The manipulation and

fraudulent promotion of KYUS stock succeeded: by May 31, 2008, Gentile had sold millions of

KYUS shares at inflated prices and, with his assistance, Gottbetter and DelPresto continued selling

their KYUS stock through November 2010.[1]  Id. ¶¶ 66–68.

### B.      Gentile's Cooperation and Admissions in a Criminal Investigation.

On July 13, 2012, after the FBI arrested Gentile in connection with the RVNG and KYUS

schemes, Gentile admitted his involvement and initially agreed to cooperate with the United States

Attorney's Office for the District of New Jersey ("USAO") and the Commission in connection with

investigations of other penny stock schemes.  Id. ¶ 71; see also Mem. Opp. to Def. Mot. to Dismiss

Indictment 5 ("Crim. Mem."), United States v. Gentile, 16 Cr. 155 (D.N.J.) (the "Parallel Criminal

Action"), DE 19.  On January 30, 2017, with Gentile's cooperation with the USAO at an end and

after a grand jury had returned an indictment against Gentile, the District Court dismissed the

indictment on statute of limitations grounds.  Am. Compl. ¶ 72.

### C.      Gentile's Recent Conduct Relevant to Injunctive Relief.

Even after his central role in the alleged fraudulent schemes, Gentile continued to work in

the financial services business and continued to flout industry regulations.  In 2011, after his

---

[1]      In related criminal proceedings, Taxon and Cohen pleaded guilty to charges arising out of
their conduct in the RVNG and KYUS schemes and await sentencing.  Id. ¶¶ 73–74; see also United
States v. Taxon, 15 Cr. 249 (D.N.J.), DE 3; United States v. Cohen, 15 Cr. 248 (D.N.J.), DE 3.
DelPresto similarly entered into a plea agreement covering his conduct in the KYUS scheme.  See
United States v. DelPresto, 15 Cr. 631 (JLL) (D.N.J.).  Am. Compl. ¶ 78.  In a related Commission
action, SEC v. Gottbetter, et al., 15 Civ. 3528 (JLL) (D.N.J.), Gottbetter settled the claims against
him arising from the KYUS scheme (among other misconduct).  In doing so, he consented, without
admitting or denying the Commission's allegations, to the entry of a judgment that permanently
enjoined him from future violations of specified federal securities laws, imposed a penny stock bar,
and ordered him to disgorge more than $4 million in unlawful gains.  Am. Compl. ¶ 77.

6

schemes concluded, Gentile founded a Bahamas-based online brokerage firm. Id. ¶¶ 14, 82. As of October 6, 2017, when the Commission filed its Amended Complaint, Gentile had announced plans to expand his presence in the offshore securities industry, boasted to a journalist of his plans to grow his Bahamian broker-dealer, and predicted that his firm "will be the largest broker dealer in [the Bahamas] within six months." Id. ¶ 14.

Even more recently—after he ceased cooperating in the related criminal investigation—Gentile made public pronouncements disclaiming any culpability for his participation in the RVNG or KYUS schemes. For example, in a May 2017 interview with BloombergBusinessweek about the circumstances that led to his arrest in 2012, Gentile claimed he "did nothing wrong." Id. ¶ 80. Gentile has also declared on social media platforms that he "never scammed anyone!" Id.

Gentile has also demonstrated disdain for the regulatory and enforcement authority of the Commission and called himself the victim of a "witch hunt." Id. And, after Commission counsel submitted an April 26, 2017 letter to the Court, DE 18, confirming the Commission's intention to pursue its claims against Gentile, Gentile sent an email to Commission counsel, copying his own attorney as well as members of the press, threatening to render her unable to continue her employment as a lawyer. Id. ¶ 83.

## II. MORE RECENT JUDICIALLY-NOTICEABLE FACTS RELEVANT TO INJUNCTIVE RELIEF.

Gentile recently told the Third Circuit, in seeking a stay of these proceedings, that he has exited the securities industry in the Bahamas. But this occurred only after the Bahamian securities regulators cited his firm for numerous violations. In August 2018, Gentile and his Bahamian broker-dealer firm acknowledged that his firm had failed to comply with certain provisions of the Bahamian Securities Industry Act of 2011 (the "Bahamas Securities Act"), including failing to notify the Securities Commission of the Bahamas ("SCB") that he had been charged in a criminal matter.

7

Decl. Nancy A. Brown, executed Apr. 3, 2020 ("Brown Decl.") ¶ 2; Ex. A.  Pursuant to a settlement, Gentile's firm paid the SCB fines totaling $120,000.  Brown Decl. ¶ 2; Ex. A.

In September 2019, after examining the broker-dealer's operations and finding further and continuing violations of the governing statute, the SCB issued a temporary suspension of Gentile's firm's operations.  Brown Decl. ¶ 3; Ex. B.  Gentile obtained an ex parte Order staying the SCB's suspension order but then announced that he was shuttering the business and transferring customer accounts to F1Trade, a company registered in St. Vincent and the Grenadines.  Brown Decl. ¶ 4; Ex. C; see also Login, F1Trade, https://app.f1trade.com/login.

In February 2018, Puerto Rico's Office of the Commissioner of Financial Institutions ("Puerto Rico Commissioner") denied Gentile's application to organize and operate an "international financial entity."  Brown Decl. ¶ 5; Ex. D at 1 (Mem. and Order, Mint Bank Int'l, LLC v. Office of the Comm'r of Fin. Insts. of Puerto Rico, Civil No. 18-1441 (JAG) (D.P.R. Mar. 31, 2019)), DE 20.  The Puerto Rico Commissioner noted that Gentile "did not have the requisite 'commercial integrity' . . . and [had] omitted from [the entity's] application" the existence of this Commission action.  Ex. D at 2.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only "state[] a plausible claim to relief."  United States ex rel. Bookwalter v. UPMC, 946 F.3d 162, 168 (3d Cir. 2019) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); see also Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 118 (3d Cir. 2013).  "Even post-[Bell Atl. Corp. v.] Twombly[, 550 U.S. 544 (2007)], it has been noted that a plaintiff is not required to establish the elements of a prima facie case but instead, need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Fowler v.

UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009) (citation omitted)).  "[C]laims for fraud . . . must also meet [Fed. R. Civ. P.] 9(b)'s heightened pleading requirement."  Bookwalter, 946 F.3d at 168. However, the SEC is not required "to anticipate" and plead around affirmative defenses (such as the statute of limitations, see Fed. R. Civ. P. 8(c)), "in [the] complaint."  Gomez v. Toledo, 446 U.S. 635, 640 (1980); see also United States Gypsum Co. v. Indiana Gas Co., 350 F.3d 623, 626 (7th Cir. 2003) ("Complaints need not anticipate or attempt to defuse potential defenses.").

## ARGUMENT

Gentile does not challenge the sufficiency of the allegations to state a claim of securities fraud, but only the Court's power to enjoin him, based on two arguments he made or could have made in connection with his prior motion.  First, he argues that the Court must issue a "declaration" of liability prior to an injunction, but cannot do so because such declaration is punitive and therefore barred by 28 U.S.C. § 2462.  Mot. to Dismiss ("Mot.") 11–13, 14–16, DE 81.  Second, he argues that obey the law injunctions and penny stock bars are permitted only where a defendant "is engaged or about to engage" in securities laws violations, but that the passage of time precludes that finding.  Id. at 13–14, 17–19.  These arguments are procedurally barred under Federal Rule of Civil Procedure 12(g)(2) and the doctrine of "law of the case."  Yet even if the Court were to reach the merits, these arguments are wrong for three reasons:  (1) Gentile can cite no authority for his contention that a declaratory judgment is a prerequisite to an injunction; (2) determining whether an injunction is proper is premature without development of a full evidentiary record; and (3) penny stock bars— which are injunctions—are permitted by the terms of the statute based solely on past violations.

## I.  GENTILE'S SECOND MOTION TO DISMISS THE SAME AMENDED COMPLAINT IS PROCEDURALLY BARRED.

Gentile's motion should be denied because it violates Rule 12(g)(2)'s proscription against serial motions to dismiss on grounds previously available.  Because refusing to entertain this second

Case 1:21-cv-31079-BB   Document 39-3   Entered on FLSD Docket 11/08/2021   Page 321 of
364
Case 2:16-cv-01619-BRM-JAD   Document 84   Filed 04/03/20   Page 10 of 21 PageID: 1322

bite at the same apple and requiring Gentile to answer will likely streamline discovery, it will serve

the purpose of Rule 1 to secure the "just speedy, and inexpensive determination" of this action.

Moreover, Gentile's motion either rehashes arguments he already lost before the Third Circuit or

asserts grounds he could have asserted—but chose not to—on his earlier motion and on appeal and

are thus barred under the law of the case doctrine.

### A. Gentile's Motion to Dismiss Should Be Denied Under Rule 12(g)(2).

Rule 12(g)(2) bars a second motion to dismiss on Rule 12(b)(6) grounds "raising a defense or

objection that was available to the party but omitted from its earlier motion."  The Third Circuit has

instructed courts to "enforce Rule 12(g)(2)."  Leyse v. Bank of America N.A., 804 F.3d 316, 322 n.5

(3d Cir. 2015).  And district courts have done so.  E.g., Dzielak v. Whirlpool Corp., No. 12 Civ. 89,

2018 WL 6985013, at *3 (D.N.J. Dec. 21, 2018) (denying second motion to dismiss where grounds

for motion were available to defendant at the time it filed earlier motion); K.J. v. Greater Egg

Harbor Regional High School Dist. Bd. of Ed., No. 14 Civ. 145 (RBK), 2016 WL 7489046, at *4

(D.N.J. Dec. 30, 2016) (denying motion raising "a defense or objection that was available to the

party but omitted from its earlier motion"); Oliver v. Roquet, No. 13 Civ. 1881 (JLL), 2014 WL

4271628, at *3 (D.N.J. Aug. 28, 2014) (same); cf. Allen v. N.J. State Police, No. 16 Civ. 1660 (BRM),

2017 WL 5714707, at *4 (D.N.J. Nov. 28, 2017) (allowing second motion against amended

complaint where original complaint alleged insufficient facts to indicate that defense was available).

Rule 12(g)(2) eliminates unnecessary delay in resolution of civil actions.  "This 'consolidation

rule' is intended 'to eliminate unnecessary delay at the pleading stage' by encouraging 'the

presentation of an omnibus pre-answer motion in which the defendant advances every available

Rule 12 defense' simultaneously rather than 'interposing these defenses and objections in piecemeal

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 322 of
364
Case 2:16-cv-01619-BRM-JAD Document 84 Filed 04/03/20 Page 108 of 221 PageID: 1329

fashion.'" Leyse, 804 F.3d at 320 (quoting Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. &
Proc. Civ. § 1384 (3d ed. 2014)).

Although Gentile could simply repackage these same arguments in a post-answer Rule 12(c)
motion for judgment on the pleadings, Leyse, 804 F. 3d at 320-21, forcing him to do so by denying
his improper motion to dismiss does not impede judicial economy, especially in this case. Gentile's
answer may well narrow the need for discovery of many of the Complaint's factual allegations.
Gentile was arrested and subsequently cooperated with the USAO. As Judge Vasquez noted,
"[n]ormally when the U.S. Attorney's Office permits somebody to cooperate, in my experience, the
first thing they want is somebody to admit they did something wrong." Tr. 9:16–20. Gentile
apparently made those admissions in this case. Crim. Mem. 5 ("Gentile admitted his involvement in
the pump-and-dump scheme"). Thus, if Gentile were required to answer the Amended Complaint's
allegations of wrongdoing and to assert his substantive defenses, discovery in this case may be
substantially limited to the extent he admits any of the Complaint's allegations.[2]

Granting Gentile's motion, by contrast, could require another appeal to the Third Circuit,
further and unnecessarily delaying the proceedings. Although Gentile mentions the Court's "time
and resources" in seeking dismissal, Mot. 20, it is Gentile who seeks endless delay in answering the
allegations in the Amended Complaint and completing discovery, as evidenced not only by his
piecemeal motions but also his other attempts to delay since the Third Circuit's decision. See supra
at 3–4. The Court should therefore enforce Rule 12(g)(2), as the Third Circuit directed in Leyse.

---

[2]    At no time did Judge Vasquez "recognize[] that the SEC cannot establish a substantive
securities law violation," as Gentile claims. Mot. 5. Rather, Judge Vasquez noted his anticipation
that "there's going to be full discovery as to whether there was in fact a past violation," Tr. 8, and
said to Gentile's counsel: "[O]bviously, if you have evidence that there was no violation in the first
place, that's a very strong factor in your favor." Id. at 11.

Case 1:21-cv-21079-BB Document 39-2 Entered on FLSD Docket 11/08/2021 Page 323 of
364
Case 1:18-cv-01019-RM-JAD Document 84 Filed 04/03/20 Page 178 of 221 PageID: 2324

**B.      Gentile Made—or Could Have Made—the Same Arguments Before.**

Under the law of the case doctrine, a prior determination on the same legal issue in the same

litigation remains binding for the remainder of the litigation absent certain "extraordinary

circumstances" not present here, such as a change in intervening law or newly discovered facts.

ACLU v. Mukasey, 534 F.3d 181, 188 (3d Cir. 2008); see also Minard Run Oil Co. v. U.S. Forest

Serv., 549 F. App'x 93, 98 (3d Cir. 2013) (citing Mukasey, 534 F.3d at 188).  Moreover, the Third

Circuit has "consistently rejected . . . attempts to litigate on remand issues that were not raised in a

party's prior appeal and that were not explicitly or implicitly remanded for further proceedings."

Skretvedt v. E.I. DuPont de Nemours, 372 F.3d 193, 203 (3d Cir. 2004).  Thus, "[u]nder the law of

the case doctrine, matters that could have been raised in an appeal are waived upon remand."

McKenna v. City of Phila., 511 F. Supp. 2d 518, 528–29 (E.D. Pa. 2007) (citing Skretvedt, 372 F.3d

at 203).  All of Gentile's arguments are precluded under this doctrine.

First, Gentile argues that imposing an injunction requires "a declaration (or finding) of

liability," which "would be punitive, and therefore this Court is precluded from making such a

finding or declaration."  Mot. 2.  Gentile contends that this is so as "a declaration would be a

punitive sanction for a claim more than five years old . . . a 'penalty' under 28 U.S.C. § 2462, and is

thus time-barred."  Id. at 4, 6, 12–13, 17.  But that is precisely the claim that he previously asserted

in this Court and in the Third Circuit, that the Third Circuit rejected, and that he is pursuing in his

pending petition for certiorari.  See, e.g., First MTD 9–10 ("§ 2462 places a five-year limit on . . .

injunctions and industry bars sought by the SEC," because they are "punitive"); Br. for Def., SEC v.

Gentile, No. 18-1242, 2018 WL 3067954 ("Appeal Br."), *2, *4 (3d Cir. June 14, 2018) (arguing that

"[t]his appeal hinges on the question of whether Section 2462 . . . bring[s] injunctions and industry

bars within the statute's five-year limitations period" and that the remedies sought were "for

punitive purposes"); Mot., Ex. A (Pet. For Writ of Cert., <u>Gentile v. SEC</u>, No. 19-878 (U.S. Dec. 23, 2019) ("Cert. Pet.")) at 28 ("The Third Circuit erred in ruling that § 2462 does not apply to the 'obey the law' injunction and penny stock bar sought here"); <u>see also</u> <u>Gentile</u>, 939 F.3d at 555, 562 ("consider[ing] the question whether properly issued and framed . . . injunctions can be penalties subject to the [five-year] statute of limitations" and concluding that "SEC injunctions that are properly issued and valid in scope are not penalties and thus are not governed by § 2462").

Trying to skirt this issue, Gentile attempts to recast his "punitive therefore untimely" argument by claiming not that an injunction is punitive, but, rather, that a declaratory judgment is a necessary predicate to an injunction, that a declaratory judgment is punitive, and essentially therefore that an injunction is punitive. <u>E.g.</u>, Mot. 2–4, 13. As explained below, Gentile is incorrect that a declaratory judgment is a necessary predicate to entering an injunction. <u>See</u> <u>infra</u> at II.A. But, even assuming that such a requirement existed, Gentile's argument that the requested relief is thereby precluded as punitive and time-barred is prohibited by the "law of the case" doctrine. Accepting Gentile's argument would lead to an absurd implication: that the Third Circuit deliberately held that a proper injunction is not subject to the five-year limitations period and that courts should make "this determination on a developed record," <u>Gentile</u>, 939 F.3d at 564, but that it remanded so that this Court could reach the very conclusion being vacated—that an injunction <u>is</u> subject to the five-year limitations period as a matter of law. At most, even assuming the Third Circuit somehow overlooked that injunctions are time-barred while simultaneously holding that injunctions are not time-barred, Gentile could have raised this argument as an alternative ground for affirmance, and, having failed to do so, has waived it on remand. <u>See</u> <u>McKenna</u>, 511 F. Supp. 2d at 528–29.[3]

---

[3]     Gentile understood throughout the litigation that the SEC may and does at times seek declaratory judgment. <u>See, e.g.</u>, First MTD 14 ("SEC's toolbox" of remedies includes "declaratory judgments"); Appeal Br. 25 (same).

Second, Gentile appears to argue that too much time has passed since his violations and that, therefore, neither injunction the Commission seeks is proper as a matter of the Court's equitable discretion. E.g., Mot. 13–14, 17–19. But the Third Circuit explicitly rejected this argument, specifically noting Gentile's "objection that his case does not rise to [the] standard" of seeking to "restrain imminent violations," but holding that the "proper showing" required by Bonastia and the Supreme Court's decision in Aaron v. SEC, 446 U.S. 680, 701 (1980), sufficed to alleviate that concern. Gentile, 939 F.3d at 565–66. Because the Court of Appeals has already disposed of this argument, and because Gentile has not presented any intervening change in law or fact that would warrant revisiting, that holding is the law of the case. See Mukasey, 534 F.3d at 188.[4]

Third, Gentile also appears to suggest that the Commission may not obtain an injunction not only because a "declaration" of liability is punitive and therefore time-barred, but because "a finding of a prior substantive securities law violation" is "punitive and time-barred" as well. Mot. 11, 13 (emphasis added); see also id. at 2 ("a declaration (or finding) of liability on any of the Commission's five claims . . . would be punitive, and therefore this Court is precluded from making such a finding or declaration"). Gentile offers no support for the contention that a "finding" of liability is time-barred. Nor could he. The Gentile panel understood that the Third Circuit has "h[eld] that a plaintiff must first establish a successful claim on the merits against a party before being eligible to obtain injunctive relief." United States v. EME Homer City Generation LP, 727 F.3d 274, 295 (3d Cir. 2013) (cited in Gentile, 939 F.3d at 564). Thus, if the predicate establishment of a successful

---

[4]     And, if Gentile's argument in reality is that "obey-the-law" injunctions are categorically improper, his failure to "ask[ ] [the Third Circuit] to hold obey-the-law injunctions impermissible," Gentile, 939 F.3d at 564, waives that argument on remand. Skretvedt, 373 F.3d at 203. In any event, that argument is foreclosed by Bonastia itself. See Gentile, 939 F.3d at 564 (noting that "in Bonastia [the Third Circuit] reversed the district court's refusal to grant an obey-the-law injunction" (citing 614 F.2d at 910–11)).

claim on the merits were time-barred, the Third Circuit would not have remanded the case only to

have it again dismissed on statute of limitations grounds. Accordingly, the Third Circuit necessarily

rejected this contention and that, too, is the law of the case.

Unable to muster legal support for his now-foreclosed legal theory, Gentile again

mischaracterizes the record (as he did in his prior motion to dismiss and before the Third Circuit

and the Supreme Court) by claiming the Commission has "conceded" that a liability finding is time-

barred. E.g., Mot. 13 ("the SEC has conceded [that] the court cannot issue any finding or

declaration of liability related to" allegations of acts occurring in 2007 and 2008); see also Appeal Br.

1 (claiming that the Commission "acknowledges that its 'claims' are time-barred"); Cert. Pet. 6, 8

(alleging that the Commission has "admitted that all of its claims were time-barred"). In making this

claim, Gentile appears to rely on nothing but his own prior brief, where he argued without

substantiation that "the SEC already acknowledged to this Court that these exact five claims . . . are

barred by the statute of limitations when it withdrew its prayer for relief of disgorgement and civil

money penalties." First MTD 1. But the Commission has never suggested that a liability finding is

time-barred—indeed, it is not—and Gentile appears to conflate legal claims with remedies. The

Commission's filing of the Amended Complaint reflected the Commission's legally-correct position

that injunctive relief and penny stock bars are still viable, timely remedies, available as long as the

Commission establishes its claims that Gentile violated the relevant provisions of the securities laws.

## II.   GENTILE'S ARGUMENTS ARE SUBSTANTIVELY MERITLESS.

The Court should deny Gentile's Motion as procedurally barred as set forth above. But,

even if the Court were to reach the merits of Gentile's contentions that a declaratory judgment is a

prerequisite to the Commission's obtaining an injunction and that injunctions are not proper here,

the Court should reject those arguments.

As a threshold matter, Gentile cites <u>SEC v. Graham</u>, 823 F.3d 1357, 1362 (11th Cir. 2016), and <u>SEC v. Cohen</u>, 332 F. Supp. 3d 575, 586, 588 (E.D.N.Y. 2018), for the proposition that declaratory judgments are punitive and thus subject to the five-year statute of limitations imposed by § 2462. <u>See</u> Mot. 13. But these cases are irrelevant, as the SEC does not seek a declaratory judgment here. <u>See generally</u> Am. Compl. ¶¶ 25–26. Moreover, the case law makes clear that both of Gentile's arguments are substantively wrong—a declaratory judgment is not prerequisite to obtaining injunctive relief, and it is premature to consider the <u>Bonastia</u> factors on this motion.

### A. Declaratory Judgments Are Not Prerequisites to Injunctive Relief.

As an initial matter, "it is not true that a permanent injunction is invalid unless it recites that the defendants violated the law. The obvious counterexample is a permanent injunction entered pursuant to a consent agreement in which the defendants deny liability." <u>Chathas v. Local 134 Int'l Brotherhood of Electrical Workers</u>, 233 F.3d 508, 513 (7th Cir. 2000); <u>see also</u> <u>Reynolds v. Roberts</u>, 202 F.3d 1303, 1315 (11th Cir. 2000) ("A defendant who consents to the entry of an injunction (or other form of judgment) does not <u>necessarily</u> agree that it has committed the wrongful acts alleged in the plaintiff's complaint."). "Although Rule 65(d) does require that the order granting the injunction 'set forth the reasons for its issuance,' they need not take the form of findings that the defendant violated the law." <u>Chathas</u>, 233 F.3d at 513 (pointing out that injunctions entered on default judgments are also valid without any liability findings—findings that would be impermissible advisory opinions in the default context).

Where a defendant appears in a case and does not consent to an injunction, as here, however, a finding of liability is a prerequisite before a court may consider the relevant factors in fashioning appropriate injunctive relief, if any. <u>See, e.g.</u>, <u>EME Homer City</u>, 727 F.3d at 295. Such

16

findings of liability may be made, for example, by the Court on summary judgment or after a bench

trial or by the jury after a jury trial. See Fed. R. Civ. P. 38, 50(a), 52(a), 56(a).

By contrast, the Federal Rules of Civil Procedure specifically contemplate that a declaratory

judgment is a "remedy" that is distinct from "[ ]other adequate remed[ies]." Fed. R. Civ. P. 57.

Indeed, in Bonastia itself, the district court considered whether an obey-the-law injunction was

proper "after it had granted summary judgment in favor of the [C]ommission," 614 F.2d at 910,

where the Commission did not seek declaratory relief. Thus, Gentile is correct that a court deciding

whether to impose an injunction in a Commission action proceeds in "two[ ]part[s]": determining

first whether there has been a substantive securities law violation and, if so, whether "there is a

'reasonable likelihood'" of repetition. Mot. 15 (citing Bonastia, 614 F.2d at 912). But Gentile cites

no case—and the Commission knows of none—for the proposition that "a substantive securities

law violation [must] first be[ ] declared by a Court" through a declaratory judgment. Id. at 3; see also

id. at 15–16 (arguing that a "declaration or a finding of liability" is a prerequisite (emphasis added)).

In fact, the cases Gentile cites throughout his brief, see, e.g., id. at 16, refute his argument

that a declaratory judgment is a prerequisite to an injunction. For example, SEC v. Tourre and SEC

v. Conaway involved the weighing of the relevant injunction factors after a jury verdict. Tourre, 4 F.

Supp. 3d 579, 598 (S.D.N.Y. 2014); Conaway, 697 F. Supp. 2d 733, 773 (E.D. Mich. 2010) (not

weighing passage of time). SEC v. Sprecher and SEC v. Glantz both involved an injunction

imposed after the courts granted summary judgment. Sprecher, No. 92 Civ. 2860 (LFO), 1993 WL

544306, at *1 (D.D.C. Dec. 16, 1993); Glantz, No. 94 Civ. 5737 (LAP), 2009 WL 3335340, at *5

(S.D.N.Y. Oct. 13, 2009). And SEC v. Haswell involved the consideration of an injunction after a

bench trial. No. 77 Civ. 408-B, 1977 WL 1074, at *1 (W.D. Okla. Oct. 19, 1977), aff'd sub nom.,

SEC v. Haswell, 654 F.2d 698 (10th Cir. 1981); see also SEC v. Teo, 746 F.3d 90, 95 (3d Cir. 2014)

17

Case 1:21-cv-21079-BB Document 39-3 Entered on FLSD Docket 11/08/2021 Page 329 of
364
Case 2:16-cv-01619-BRM-JAD Document 84 Filed 04/03/20 Page 23 of 27 PageID: 1380

(entry of injunction after a jury trial); <u>SEC v. Fowler</u>, No. 17 Civ. 139 (GHW), 2020 WL 906182, at

*10–12 (S.D.N.Y. Feb. 25, 2020) <u>appeal filed</u> No. 20-1081 (2d Cir. Mar. 26, 2020) (same).[5]

### B.     The Court Cannot Determine Whether Injunctions Are Proper at this Stage.

Even if it were procedurally proper to consider Gentile's argument that too much time has

elapsed to support the entry of injunctions as an equitable matter, the Court should not do so at the

pleading stage.  The Supreme Court has explained that plaintiffs are not generally required to plead

around affirmative defenses in the complaint.  <u>Gomez</u>, 446 U.S. at 640.  This holding—as well as the

courts' repeated admonitions that a determination of liability is a prerequisite to the entry of an

injunction where a defendant has appeared and contests the case—necessarily implies that the

proper time to make the determination is after liability has been established.  Thus, the Supreme

Court explained in <u>Aaron</u> that, to obtain injunctive relief from future violations, the Commission

"must establish a sufficient <u>evidentiary</u> predicate to show that such a future violation may occur."

<u>Aaron</u>, 446 U.S. at 701 (emphasis added).  Similarly, the Third Circuit in this very case explained that

"[c]ourts should make this determination on a developed record," <u>i.e.</u>, based "on the facts and

circumstances of each case."  <u>Gentile</u>, 939 F.3d at 564 (citing <u>SEC v. Gabelli</u>, 653 F.3d 49, 61 (2d

Cir. 2011), <u>rev'd on other grounds</u>, 568 U.S. 442 (2013)).

Gentile nevertheless argues that the passage of time, purportedly without intervening

violations, alone warrants denying a request for an injunction.  <u>See, e.g.</u>, Mot. 18–19 (arguing that the

Commission is "not currently in possession of any . . . information" indicating that he has violated

the law since 2008); <u>id.</u> at 13–14.  Gentile's argument ignores the language and structure of the

---

[5]     Indeed, in <u>Graham</u>, 823 F.3d at 1361–1362, <u>see</u> Mot. 13, the court held that the Commission
could proceed to seek injunctive relief, but ruled that the declaratory judgment it sought (unlike
here) was time-barred, implicitly rejecting Gentile's contention that a declaratory judgment was a
prerequisite to injunctive relief.

injunctive relief provisions of the Exchange Act. Contrary to Gentile's incorrect contention that a penny stock bar may only issue against a person who "is engaged or about to engage" in a securities law violation, Mot. 14, Section 21(d)(6) specifically gives the Court authority to issue a penny stock bar "against any person participating in, or, <u>at the time of the alleged misconduct who was participating in,</u> an offering of penny stock." 15 U.S.C. § 78u(d)(6) (emphasis added). Moreover, because this relief is "dependent on the action being brought under § [78u(d)(1)]," Mot. 14, it follows that the injunction contemplated by § 78u(d)(1) is not limited to situations where only future violations are alleged. <u>See generally</u> <u>Gentile</u>, 939 F.3d at 557.

Gentile also ignores that the cessation of illegal activity, even if proven, is but one of many factors <u>Bonastia</u> instructs courts to consider. <u>See</u> Pl.'s Mem. Opp. to Def.'s Mot. to Dismiss 19– 23 ("First SEC Br."), DE 38. Recently, for example, a district court in the Second Circuit considered and rejected a securities fraudster's "argument that the events at issue in the trial are now dated" such that an injunction was not warranted. <u>Fowler</u>, 2020 WL 906182, at *12. The court reached this conclusion because it noted its "hesita[tion]," based on "the evidence of the events proven at trial," to rely simply on the defendant's assurances that he had not violated the law, given that the jury did not credit the defendant's testimony and that "the SEC did not examine [the intervening] years." <u>Id.</u> The court also noted that the defendant's testimony at trial "reflected his continued belief in the propriety of his" illegal actions, and that because this "testimony dates from 2019, not 2014, [it] supports the Court's conclusion that injunctive relief remains necessary." <u>Id.</u>

Here, it is premature to determine whether Gentile's assurances of lack of violations in intervening years—during some of which he was under FBI supervision and none of which the Commission has examined—is a proper basis to decide whether to issue an injunction. <u>See also</u> <u>SEC v. Lawson</u>, 24 F. Supp. 360, 365 (D. Md. 1938) (from the dawn of the securities statutes,

recognizing that a "defendant's abandonment of the actions sought to be enjoined subsequent to the filing of the suit, will not bar the issuance of the injunction") (collecting cases in equity). At a minimum, the Amended Complaint alleges facts that support the need for an injunction at the relief stage. See generally First SEC Br. 17–23.[6] Judicially noticeable events since that time confirm that factors supporting injunctive relief can be proved. All support a finding that Gentile acted with a high degree of scienter and has continued to deny wrongdoing while getting himself in trouble with financial services regulators. Am. Compl. ¶¶ 30-44, 59, 62, 64-65, 80, 83; Brown Decl., Exs. A-D.[7]

Finally, and related to the foregoing, Gentile's argument appears to concede that injunctions against more "imminent" violations of the securities laws are not penalties for purposes of Section 2462. Mot. 14; see also Gentile, 939 F.3d at 565 ("Gentile concedes, as he must, that an injunction against an imminent violation is not a penalty"). It is not clear how Gentile defines imminence, but

---

[6]     Gentile seeks to draw a distinction between Sections 21(d)(1) and 21(d)(5) of the Exchange Act for purposes of determining whether injunctions are appropriate. E.g., Mot. 13–16. The Commission does not contend that evidence regarding injunctions with respect to these two provisions. To the extent Section 21(d)(5) is relevant to injunctive relief, the statute provides that the Court may fashion injunctive relief tailored to the specific circumstances of this case—precisely the result the Third Circuit mandated. See Gentile, 939 F.3d at 559–60 (noting that courts "tailor[] injunctions" to make them non-punitive, and that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff" (citation omitted)).

[7]     "To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." S. Cross Overseas Agency v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999) (considering judicial opinions on motion to dismiss and collecting cases); see also City of Pittsburgh v. W. Penn. Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (considering regulatory proceedings on a motion to dismiss). More generally, courts specifically look at evidence beyond the allegations in a complaint to determine the propriety of injunctive relief. See, e.g., SEC v. Graulich, No. 09 Civ. 4355 (WJM), 2013 WL 3146862, at *6 (D.N.J. June 19, 2013) (considering defendant's behavior at sentencing allocution as relevant to determine propriety of injunction under Bonastia factors); SEC v. Teo, No. 04 Civ. 1815 (SDW), 2011 WL 4074085, at *9 (D.N.J. Sept. 12, 2011), aff'd, 746 F.3d 90 (3d Cir. 2014) (noting that the Court "ha[d] not received any assurances against future violations" and that defendant "ha[d] been connected with other inappropriate or illegal trades" beyond those pertaining to the violations at issue in awarding permanent injunctive relief).

additional factual and legal development might result in relief that satisfies even the test that Gentile advocates. Particularly given Gentile's undisputed, active involvement in the financial industry for decades, he could be "about to engage" in violations, which the discovery that Gentile has resisted providing may reveal. Making that determination is yet another reason why Gentile's arguments cannot be resolved on a motion to dismiss.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court deny Gentile's motion to dismiss the Amended Complaint.

Dated:      New York, New York
          April 3, 2020

                                 _____

                                   Jorge G. Tenreiro
                                   Nancy A. Brown
                                   Simona K. Suh
                                   SECURITIES AND EXCHANGE
                                   COMMISSION
                                   New York Regional Office
                                   Brookfield Place
                                   200 Vesey Street, Suite 400
                                   New York, New York 10281-1022
                                   (212) 336-9145 (Tenreiro)
                                   tenreiroj@sec.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Plaintiff's Memorandum of Law in Opposition to

Gentile's Motion to Dismiss, dated April 3, 2020, to be served on Gentile by emailing a copy of the

same to Gentile's counsel, Adam Ford, at aford@fordobrien.com, this 3rd day of April of 2020.

_____
Jorge G. Tenreiro

# EXHIBIT R

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

    :

       Plaintiff,    :       16 Civ. 1619 (BRM)

    :

    -against-    :       ECF Case

    :

GUY GENTILE,    :

    :

       Defendant.    :

------------------------------------------------------------------------x

## <u>DECLARATION OF NANCY A. BROWN</u>

I, Nancy A. Brown, pursuant to 28 U.S.C. § 1746, under penalty of perjury, do hereby declare as follows:

1.      I am employed as a Senior Trial Counsel in the Enforcement Division in the New York Regional Office of Plaintiff Securities and Exchange Commission (the "Commission"). I submit this Declaration in opposition to Defendant's motion to dismiss the Complaint. I am fully familiar with the facts and circumstances herein.

2.      Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of a settlement agreement between the Securities Commission of the Bahamas ("SCB") and Swiss America Securities, Ltd. ("SASL"), dated August 30, 2018 and signed by Gentile, obtained by counsel for the Commission from the SCB's website.

3.      Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of a letter, dated September 18, 2019, from the SCB to Guy Gentile in his capacity as CEO of SASL, suspending SASL's registration under the Bahamas Securities Industry Act of 2011 for five days, publicly filed in connection with proceedings brought by Defendant in the Supreme Court of the Bahamas.

    4.      Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of a November 4, 2019 article published by the <u>Tribune</u>, a Bahamian publication, online, reporting Defendant's plans to close his Bahamian broker dealer, obtained by counsel for the Commission from the <u>Tribune</u>'s website, <u>http://www.tribune242.com/news/2019/nov/04/broker-fighting-commission-to-close-this-week/</u>.

    5.      Attached hereto as **<u>Exhibit D</u>** is a true and correct copy of a decision by Judge Garcia-Gregory of the United States District Court for the District of Puerto Rico in <u>Gentile Nigro v. Commissioner of Fin. Institutions of P.R.</u>, No. 18 Civ. 1441 (D.P.R.), dated March 31, 2019.

    Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated:  New York, New York
        April 3, 2020

                                           s/  Nancy A. Brown
                                          Nancy A. Brown

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Declaration of Nancy A. Brown, executed April 3, 2020, with Exhibits, to be served on Defendant by emailing a copy of the same to Defendant's counsel, Adam Ford, at [aford@fordobrien.com](mailto:aford@fordobrien.com), this 3rd day of April 2020.

_s/ Nancy A. Brown_

Nancy A. Brown

# EXHIBIT U



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

October 19, 2020

VIA ECF
Hon. Brian R. Martinotti
United States District Judge
U.S. District Court, District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

      Re:     <u>SEC v. Gentile, 16 Civ. 1619 (BRM) (JAD)</u>

Dear Judge Martinotti:

      Plaintiff Securities and Exchange Commission ("Commission") respectfully informs the Court that it will not file a further amended complaint in this matter.

                                 Respectfully submitted,

                                   Jorge G. Tenreiro

cc:    Hon. Judge Dickson (via ECF)
       Adam Ford, Esq. (via ECF)

# EXHIBIT T



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

## ORDER

October 19, 2020

VIA ECF
Hon. Brian R. Martinotti
United States District Judge
U.S. District Court, District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

    Re:    SEC v. Gentile, 16 Civ. 1619 (BRM) (JAD)

Dear Judge Martinotti:

    Plaintiff Securities and Exchange Commission ("Commission") respectfully informs the Court that it will not file a further amended complaint in this matter.

Respectfully submitted,

Jorge G. Tenreiro

cc:    Hon. Judge Dickson (via ECF)
        Adam Ford, Esq. (via ECF)

**ORDER**
**So noted. In light of the above and the [109] dismissal order, the [112] scheduling order is moot and the Clerk is directed to CLOSE this matter.**

**SO ORDERED.**

DATE: October 21, 2020

*/s/Brian R. Martinotti*
**BRIAN R. MARTINOTTI**
**United States District Judge**

# EXHIBIT U

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: _____

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

      Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I.      INTRODUCTION

1.     From no later than March 2016 until at least November 2019 (the "Relevant Period"), Defendants MintBroker International, Ltd., f/k/a Swiss America Securities Ltd., d/b/a SureTrader ("SureTrader" or the "Company") and its founder, owner, and chief executive officer Guy Gentile (a/k/a Guy Gentile Nigro) ("Gentile") operated an offshore broker-dealer in the Bahamas designed to help day traders in the United States circumvent the U.S. rules that regulate pattern day trading.

2.     Gentile hatched his plan in early 2012.  With only about 100 customers and bleak business prospects, Gentile recognized that SureTrader would go out of business absent an influx of new customers.

3.     Gentile focused his gaze on the United States, where pattern day traders are subject to the Financial Industry Regulatory Authority's ("FINRA") Pattern Day Trader Rules (the "U.S.

Pattern Day Trader Rules" or the "Rules"), and began marketing SureTrader as a way to avoid the Rules by trading through an offshore broker-dealer.

4.      Lest U.S. customers miss the point, SureTrader's website explicitly advertised itself as a way "to avoid the nasty PDT [(Pattern Day Trading)] Rule."

5.      Gentile's plan worked.  At various times during the Relevant Period, up to 80% of SureTrader's customer base was comprised of U.S. customers.  SureTrader grew from a three-man shop to one with 75 employees, more than 40,000 customer accounts, and assets of more than $10 million.  According to Gentile, SureTrader effected transactions in excess of $1 billion on behalf of its customers.

6.      And Gentile and SureTrader profited from the broker-dealer services they provided. U.S. customers paid SureTrader commissions on their transactions, to the tune of millions of dollars.

7.      While SureTrader worked to help U.S. customers circumvent the Rules, SureTrader itself was failing to comply with the mandatory broker-dealer registration requirements of the U.S. securities laws – namely, the federal securities laws that prohibit unregistered foreign broker-dealers from soliciting U.S. customers.

8.      By failing to comply with the broker-dealer registration requirements, SureTrader and Gentile avoided certain regulatory obligations for broker-dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

9.      Through these activities, SureTrader violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1), by acting as an unregistered securities broker-dealer. Gentile is liable for SureTrader's violations as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for violating Section 15(a)(1) of the

Exchange Act, 15 U.S.C. § 78o(a)(1), through or by means of SureTrader in violation of Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

10.     The Commission requests, among other things, that this Court enjoin SureTrader and Gentile from committing further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and a monetary penalty based upon these violations.

## II. DEFENDANTS

11.     **SureTrader** was in the business of being a broker-dealer from no later than December 2011 until at least November 2019, when SureTrader's clearing firm changed its services to SureTrader. All SureTrader accounts were purportedly transferred to F1Trade, Ltd., a contract-for-difference broker located in St. Vincent and the Grenadines that appears to be run by SureTrader's CFO and another high level SureTrader employee. During the Relevant Period, SureTrader's principal place of business was the Bahamas.

12.     In 2008, Gentile incorporated Swiss America Securities Ltd. in the Bahamas. In 2017, Gentile changed the name of the Company from Swiss America Securities Ltd. to MintBroker International, Ltd. Gentile marketed the Company as SureTrader and it was commonly known as SureTrader, including through its website www.suretrader.com.

13.     In 2011, Gentile registered SureTrader with the Securities Commission of the Bahamas ("SCB") as a broker-dealer. In July 2018, SureTrader and Gentile entered into a settlement with the SCB concerning violations of Bahamian securities laws, pursuant to which SureTrader and Gentile paid a $120,000 monetary penalty. In September 2019, the SCB suspended SureTrader's broker-dealer registration for five days based on, among other things, concerns regarding whether SureTrader customers' orders were entered into the market as represented and for failing to disclose the existence of Canadian and UK subsidiaries. In March

3

2020, the SCB filed with the Supreme Court of the Bahamas a "winding up petition," seeking a court-supervised winding up of SureTrader and the appointment of a joint provisional liquidator to take possession of SureTrader's books and records. The litigation is ongoing.

14.     According to its website, SureTrader's business changed in January 2021 and it is currently in the business of providing day traders use of its proprietary trading platform.

15.     SureTrader has never been registered with the Commission in any capacity.

16.     **<u>Gentile</u>** currently resides in San Juan, Puerto Rico. During the Relevant Period, he lived in Miami, Florida, the Bahamas, New York, and Puerto Rico. He is the founder, owner, director, and CEO of SureTrader.

17.     At various times from about 2000 until 2012, Gentile was registered with at least three securities broker-dealers in the United States. In January 1999, Gentile started an online trading firm called Mint Global Markets, f/k/a Stock USA Execution Services, Inc. (www.speedtrader.com), which is registered with the Commission. Gentile is its founder and, through a trust, its controlling owner. In about 1999, Gentile obtained several securities broker licenses, including Series 4, 7, 24, 55, and 63 securities licenses, all of which have expired.

18.     In 2009, Gentile founded ProTrade Securities, LLC, which was also registered as a broker-dealer with the Commission, and he served as its managing member until at least 2011. In November 2016, Gentile directed the formation of a Delaware-based entity called Mint Custody Limited, and in January 2017 Gentile directed the formation of the West Palm Beach, Florida-based entity MinTrade Technologies, LLC, both of which were created for the purpose of facilitating and concealing the movement of U.S.-based customer funds to SureTrader. By no later than 2017, Gentile was also the beneficial owner of a group of financial institutions located in the United States and other foreign countries, which included MintBroker International, Limited in

the Bahamas and MintBroker International Limited in the U.K., which among other things hold accounts of clearing firms and maintain custody of funds.

19.     In March 2016, Gentile was indicted in the District of New Jersey on federal conspiracy and securities fraud charges related to alleged market manipulation schemes, *U.S. v. Guy Gentile*, Case No. 16-00155 (D.N.J. 2016), and the case was ultimately dismissed on statute of limitations grounds.  In March 2016, the Commission filed an enforcement action against Gentile based on substantially the same conduct at issue in the criminal case, *SEC v. Guy Gentile*, Case No. 16-01619 (D.N.J. 2016), which case was ultimately dismissed.  In February 2019, Gentile filed a complaint against the Commission in the District of New Jersey, *Guy Gentile v. SEC*, Case No. 19-05155 (D.N.J. 2019), alleging abuse of investigatory process and seeking a temporary restraining order in connection with the Commission's investigation that gave rise to the instant Complaint; the district court dismissed that case, and the dismissal was affirmed on appeal.

20.     Gentile is the sole director and member of Mint Bank International, LLC ("Mint Bank").  He has been seeking to organize Mint Bank as an international financial entity under the laws of Puerto Rico since 2017, when he filed a permit application with the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF").  OCIF denied the application, concluding Gentile lacked the "commercial integrity" to organize and operate an international financial entity in Puerto Rico and that Mint Bank omitted from its application a Commission lawsuit pending at that time against Gentile for stock manipulation.  Mint Bank and Gentile filed an administrative appeal before OCIF and in June 2018, OCIF issued a final order denying the application based in part on (i) Gentile's March 2016 federal indictment for criminal securities fraud; (ii) the omission of information in the application regarding the Commission's March 2016 civil action against Gentile; and (iii) Gentile's statements during a March 2017 Bloomberg News interview referencing federal authorities (*e.g.,* "The feds don't know who they got, bro/I'm going

rogue"; "I'm going to make my license plate F—YOUDOJ"). Gentile then filed a civil rights action under 42 U.S.C. § 1983 against OCIF and its Commissioners seeking, among other things, an order compelling OCIF to issue Mint/Gentile the international financial entity they seek. *Gentile, et al. v. OCIF,* 18-cv-01441 (D.P.R. 2018). On March 19, 2021, Gentile filed a notice with the Court that he has reached a tentative settlement with OCIF concerning his claims, the substance of which is not yet public.

21. Gentile currently has a website offering his "hot stock alerts" and offering to teach individuals how to day trade, https://www.guygentile.com. Gentile also founded DayTraderPro, a purported online educational platform and tutorial subscription service for day traders that also provides securities recommendations. This website currently touts itself as "the #1 live trading chat room in the world," offers trading strategies, and claims that "anyone can learn how to day trading [sic] once they learn Guy's secrets [sic] strategies." www.daytraderpro.com.

### III. JURISDICTION AND VENUE

22. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), (e) and 78aa(a).

23. This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Florida, because Defendants transacted business in this District, many of Defendants' acts and transactions constituting violations of the Exchange Act occurred in this District, including those directed at U.S. customers who reside in Miami and in this District, and Defendant Gentile resided in Miami, Florida during at least a portion of the Relevant Period.

24. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails.

## IV.  FACTUAL ALLEGATIONS

### A.  SURETRADER

25.     In 2011, Gentile formed SureTrader in Nassau, the Bahamas and registered it as a broker-dealer with the Securities Commission of the Bahamas.

26.     During the Relevant Period, SureTrader was not registered as a broker-dealer with the Commission.  SureTrader acted as a broker-dealer within the definition of Sections 3(a)(4) and 3(a)(5) of the Exchange Act but outside the exceptions or exemptions provided for by Rule 15a-6 of the Exchange Act by actively making efforts to induce a single transaction and engaging in an ongoing securities business relationship with U.S. customers.[1]

27.     SureTrader engaged in business from the Bahamas as a broker-dealer until at least November 2019, when its clearing firm changed the services it provided to SureTrader.

28.     During the Relevant Period, Gentile owned, controlled, and had sole decision making authority for all aspects of SureTrader's operations, and was responsible for all matters related to SureTrader's compliance with U.S. laws and regulations.

29.     Gentile was the sole signatory for SureTrader on the clearing agreement with SureTrader's clearing firm that allowed SureTrader to execute trades.

30.     Throughout the Relevant Period, SureTrader charged customers a commission of $4.95 per trade and, for an additional monthly fee, provided customers with access to its proprietary online trading platform.

31.     During the Relevant Period, SureTrader only permitted its customers to trade in U.S. equities (99%) and options (1%).

---

[1] Section 3(a)(4) defines "broker" as any person "engaged in the business of effecting transactions in securities," and Section 3(a)(5) defines "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise."

32.     By early 2012, SureTrader had only about 100 customers.  Gentile decided to begin soliciting U.S. customers in order to increase SureTrader's customer base and improve its business prospects.

## B.  SOLICITATION OF U.S. CUSTOMERS

### 1. U.S. Pattern Day Traders Are Subject To FINRA's Rules

33.     U.S. day traders are subject to the Rules of FINRA, a self-regulatory organization (SRO) authorized by Congress to regulate member brokerage firms and exchange markets.

34.     FINRA has enacted rules regulating, among other things, U.S. traders who participate in pattern day trading, and the Rules became operational on September 28, 2001.

35.     A "day trade" occurs when a trader buys and sells, or sells and buys, the same security in a margin account on the same day.

36.     The FINRA Rules adopt the term "pattern day trader," which includes any margin customer that day trades (buys then sells or sells short then buys the same security on the same day) four or more times in five business days, provided the number of day trades are more than six percent of the customer's total trading activity for that same five-day period.

37.     FINRA has identified in its Rules that "[d]ay trading can be extremely risky." FINRA Rule 2270.  As set forth in the Rules, "[d]ay trading generally is not appropriate for someone of limited resources and limited investment or trading experience and low risk tolerance, and day traders "should be prepared to lose all of the funds that [they] use for day trading." FINRA Rule 2270.

38.     The FINRA Rules also provide that "certain evidence indicates that an investment of less than $50,000 will significantly impair the ability of a day trader to make a profit. Of course, an investment of $50,000 or more will in no way guarantee success." FINRA Rule 2270.

39.     FINRA has established Rules to require that certain levels of equity be deposited and maintained in day-trading accounts, and that these levels be sufficient to support the risks associated with day-trading activities.

40.     Under the Rules, a pattern day trader must maintain minimum equity of $25,000 on any day that the customer day trades.   The required minimum equity must be in the account prior to any day-trading activities. If the account falls below the $25,000 requirement, the pattern day trader will not be permitted to day trade until the account is restored to the $25,000 minimum equity level. FINRA Rule 2520(f)(8)(B)(iv)(a).

41.     In addition, pattern day traders cannot trade in excess of their "day-trading buying power," which is defined in FINRA's rules and is generally up to four times an amount known as the maintenance margin excess as of the close of business of the prior day.  If a pattern day trader exceeds the day-trading buying power limitation, the firm will issue a day-trading margin call to the pattern day trader.  The pattern day trader will then have, at most, five business days to deposit funds to meet this day-trading margin call. Until the margin call is met, the day-trading account will be restricted to day-trading buying power of only two times maintenance margin excess based on the customer's daily total trading commitment.  If the day-trading margin call is not met by the fifth business day, the account will be further restricted to trading only on a cash available basis for 90 days or until the call is met.

42.     The Rules also require that any funds used to meet the day-trading minimum equity requirement or to meet any day-trading margin calls remain in the pattern day trader's account for two business days following the close of business on any day when the deposit is required. The Rules also prohibit the use of cross-guarantees to meet any of the day-trading margin requirements.

## 2. The Defendants Marketed SureTrader To U.S. Customers As A Way To Circumvent The FINRA Pattern Day Trader Rules

43. During the Relevant Period, SureTrader marketed itself to potential customers worldwide, including in the United States.

44. SureTrader offered broker-dealer services through which day traders could have their trades executed.

45. SureTrader did not require customers to meet any of the requirements set forth in the U.S. Pattern Day Trader Rules. For example, SureTrader offered customers the ability to open an account and trade with as little as $500 and did not require any margin account balances or place any other restriction required under the Rules.

46. SureTrader solicited U.S. customers through the SureTrader website and e-mail messages, as well as through third party websites focused on day trading and coupon websites.

### a. Solicitation Through The SureTrader Website

47. During the Relevant Period, SureTrader solicited customers through its website, www.suretrader.com, the content on which Gentile controlled.

48. Through its website, SureTrader lured U.S. customers by offering SureTrader's offshore broker-dealer services as a means for circumventing the Rules.

49. For example, in at least October 2017, the SureTrader website stated it would "Allow You to Avoid the Nasty PDT [Pattern Day Trader] Rule."

50. In at least October 2017, the SureTrader website asked potential customers if they "are up for circumventing the rules and getting what you want."

51. The website targeted U.S. customers in several ways, including:

    a.    listing all trading and account fees in U.S. Dollars;

    b.    only permitting trading in U.S. equities and options;

10

        c.      listing a "USA (Direct)" phone number among its contact information along with a New York City-based VoIP phone number "as a courtesy to . . . existing customers;"

        d.      listing telephone numbers with local New York exchanges among its contact information;

        e.      providing ways to fund a trading account specifically for U.S. customers, including an ACH payment method available to "US Bank Holders Only;"

        f.      offering a pricing comparison between its services and other prominent, online brokerages, with five of the six compared brokers being U.S.-based, registered broker-dealers; and

        g.      including information relating to the Foreign Account Tax Compliance Act which requires foreign financial institutions, such as SureTrader, to report on assets held by U.S. accounts holders.

52.     As of October 25, 2017, Suretrader.com attracted over 5,759 visitors per day and as of December 14, 2017, approximately 56% of the traffic to SureTrader.com for the prior three months was from the United States, with the next highest concentration of traffic coming from Italy with 4.2%.

53.     From no later than October 2017 until at least November 2019, SureTrader also promoted its proprietary trading platform that "provide[d] users with streaming real-time data, fast and easy order entry and execution designed to meet day traders' needs." The trading platform was offered for a monthly fee based on selected access and capabilities. During the Relevant Period, numerous U.S. customers subscribed to these services.

54.     By promoting these services on its website and charging a monthly, recurring fee for access, SureTrader solicited U.S. customers through its efforts to develop an ongoing securities business relationship.

55.     According to a sample of IP addresses, from about 2016 until about 2017, more than 50% of trades placed by SureTrader were for U.S. customers.

### b. Solicitation Via E-Mail Messages

56.     From no later than April 2016 until at least February 2017, SureTrader solicited thousands of customers, including U.S. customers, by sending e-mail messages.  These emails, once opened, directed U.S. customers to SureTrader's website.

57.     For example, from no later than April 2016 until at least February 2017, SureTrader sent U.S. customers e-mail messages identifying "Today's Most Actively Traded Symbols at SureTrader," including charts and graphs depicting the trading data for the five most actively traded stocks at SureTrader that day.   These messages included several links, including a prominent banner reading "Find More on Today's Top Stocks Here" that redirected the message recipient to a daily "alert" page on SureTrader's website that encouraged customers to open an account by stating, "Now that you have the knowledge that identifies the right time to buy and sell stocks all you need [is] . . . a reliable, cost-effective online broker to execute your trades . . . Contact SureTrader right away to get started doing trading with the best in online brokers."  Although a disclaimer at the end of the article claimed that the "SureTrader Blog is not intended for U.S. persons," it did not state or otherwise prohibit U.S. persons from opening accounts.

58.     To lure U.S. customers, the Defendants offered a free-trial period and limited free trades.  Once a U.S. customer's trial period expired, SureTrader contacted the U.S. customers via e-mail message to offer them the opportunity to open an account with SureTrader. For example, one such message sent in about March 2017 included a link to a video providing "some important trading tips" and concluded by asking, "Are you ready to Open an Account with SureTrader and be on your way to a successful trading career?  Get Started Now!  To get you started, we'd like to

offer you $99 in Free Trades when you open an account with SureTrader." These e-mail messages did not include any disclaimers regarding restrictions on opening accounts for U.S. persons.

### c. Solicitation Through Online Day Trading School Websites

59.     During the Relevant Period, SureTrader and Gentile solicited U.S. customers through advertisements on seven U.S.-based day trading websites SureTrader referred to internally as "affiliates." These Affiliates offered day trading schools, courses, and advice through on-demand videos and chatrooms.

60.     The Affiliates provided SureTrader with an ideal venue for the solicitation of U.S. customers and offered the novice day trader the opportunity to put their newly-acquired skills to use, at a discount, by opening an account with SureTrader.

61.     The Affiliates prominently advertised SureTrader's brokerage services on their websites and also offered their "students" incentives to open an account with SureTrader. Those incentives included free trades, reduced commissions, rebates, and trading discounts. In exchange for their advertising services, SureTrader gave its Affiliates, for example, free access to its trading platform and, with respect to at least one Affiliate, monthly cash payments.

62.     Gentile, who controlled SureTrader, knew about SureTrader's arrangements with the Affiliates and directed SureTrader's communications with them.

63.     In October 2016, SureTrader entered into a Marketing Services Agreement with Warrior Trading (www.warriortrading.com), a Vermont-based website for day trading. Pursuant to this agreement, Warrior Trading advertised SureTrader on its website as a preferred broker and SureTrader offered a trading commission rebate. While the Marketing Services Agreement stated the rebate would only apply to non-U.S. customers, SureTrader gave the rebate to U.S. customers.

64.     SureTrader discounted the trading commissions (from $4.95 to $3.95 per trade) for customers referred to it by Warrior Trading.

65. Individuals residing in the U.S. opened accounts at SureTrader after learning about it from Warrior Trading.

66. For example, in October 2016, an individual with initials MA who was residing in the U.S. learned about SureTrader through Warrior Trading. MA submitted an account application to SureTrader on about October 4, 2016, listing his Chicago, Illinois address on his application, and attached his driver license. On October 10, 2016, SureTrader approved MA for trading and MA subsequently opened a trading account at SureTrader.

67. Similarly, SureTrader entered into a Marketing Services Agreement signed in August 2016 with New York-based Day Trading Radio, Inc. (www.DayTradingRadio.com), pursuant to which SureTrader paid Day Trading Radio $1,000 a month in exchange for running SureTrader's banner advertisements on the Day Trading Radio website.

68. While the Marketing Services Agreement required Day Trading Radio to market the brokerage services of SureTrader to Day Trading Radio's "international NON-U.S. website visitors," SureTrader accepted U.S. resident customers who learned about SureTrader through the Day Trading Radio site.

69. The Day Trading Radio website prominently displayed two SureTrader ads at the top of its home page, one of which was a banner ad running along the top of the page with the text "Day Trading Radio's Preferred Broker – click to learn more!" Clicking on either ad redirected the visitor to SureTrader's website. Although the advertisements included a small-font disclaimer, "Not Intended for US Persons," Day Trading Radio's website included an article entitled "DayTraderRockStar's Preferred Broker: SureTrader" which explained that SureTrader was "required to post" a disclaimer on its website that meant "they are not allowed to solicit business from the U.S." though "they can accept and open U.S. accounts no problem." The article

concluded with step-by-step instructions for U.S. customers to follow to open an account with SureTrader.

70.    All of the customers who opened trading accounts with SureTrader after learning about SureTrader through Day Trading Radio were based in the U.S.

71.    SureTrader solicited U.S. customers through the five remaining Affiliates in substantively the same way it did with respect to Warrior Trading and Day Trading Radio. SureTrader had arrangements with the following five additional Affiliates: (1) Commission Junction (www.cj.com) based in New York; (2) The Sykes Challenge (www.timothysykes.com) based in Connecticut; (3) Investors Underground (www.investorsunderground.com) based in New Hampshire; (4) StockTradeIdeas.com (www.stocktradeideas.com) based in North Carolina; and (5) MOJO Day Trading (www.mojodaytrading.com) based in Florida.

72.    During the Relevant Period, the vast majority of U.S. customers at SureTrader were referred to SureTrader by the Affiliates.

73.    The Defendants also solicited customers through online coupon programs and websites, as well as social media.

74.    For example, in February 2018, SureTrader offered coupons through Groupon and TheCouponScoop.com, where it advertised coupons for, among other things, $50 in free trades and trading with as little as $500.

### C.  THE DEFENDANTS' ATTTEMPTS TO CONCEAL SURETRADER'S SOLICITATION OF U.S. CUSTOMERS

#### 1.  Bogus Disclaimers and Certifications

75.    SureTrader and Gentile took deliberate steps to create the false appearance that they were not soliciting U.S. customers.

76.     For example, during the Relevant Period, SureTrader's website claimed that SureTrader would only open a trading account for "Persons outside the U.S.," "Trusts outside the U.S.," or "Companies outside the U.S. such as a U.K. company."

77.     This was bogus. SureTrader routinely accepted U.S. customers and actively endeavored to conceal this fact.

78.     On SureTrader's *own* website, it told potential customers that "U.S. customers wanting to work with . . . Swiss America Securities, Ltd. (SureTrader.com) can thus only approach Non-U.S. Broker-Dealers under Rule 15a-6 if they have not been to their website and should be prepared to certify this fact in writing to ensure compliance with applicable law." Thus, in essence, SureTrader told potential customers on its website that the potential customers might have to certify that they had never been to that same website.

79.     In fact, U.S. customers did go to the website, and SureTrader knew that they had. For example, on account opening documents, several U.S. customers identified the SureTrader website as the source of referral.

80.     Despite soliciting U.S. customers as set forth above, SureTrader required U.S. customers to sign statements that they had not been solicited. For example, SureTrader required U.S. customers to sign an "Unsolicited Acknowledgement Agreement," ("UAA") through which they affirmed they had not been solicited. Gentile implemented the UAA requirement for U.S. customers in an attempt to circumvent federal securities laws prohibiting unregistered foreign broker-dealers like SureTrader from soliciting U.S. customers.

81.     The Defendants knew the U.S. customers were solicited through the SureTrader website or through advertisements with the Affiliates. SureTrader's application for opening an account required U.S. customers to indicate how they learned about SureTrader and the vast majority identified the website of SureTrader or one of the Affiliates. Nonetheless, during the

Relevant Period, SureTrader and Gentile continued to open accounts for U.S. customers and continued their use of the bogus UAA certifications.

82.     During the Relevant Period, SureTrader had no policies and procedures in place regarding the solicitation of U.S. customers.  Under the control of Gentile, SureTrader accepted any account application from a U.S. Customer as long as their application included a signed UAA. No further review or inquiry was made by SureTrader.

## 2. The Sham IP Blocker And Pop-Up Window

83.     In about October 2017, the Defendants added a web-based Internet Protocol ("IP") blocker to the SureTrader website to give the appearance that SureTrader was not soliciting U.S.-based customers.

84.     Specifically, the SureTrader website included a pop-up window stating: "In compliance with SEC Rule 15a-6 this website is not intended to solicit U.S. Residents. . . By continuing, you certify that you have not been solicited to this website."  The pop-up window further stated: "You will need an access code or be an existing client to view our website," and included spaces for a new visitor to enter an email address or phone number to receive an access code.  The pop-up window also included an area for SureTrader's existing U.S.-based customers to login and gain website access.

85.     The pop-up window was nothing but window dressing.  It did not restrict or prevent U.S. customers from opening accounts at SureTrader.  SureTrader was continuing to lure potential U.S. customers to its website through its Affiliates, e-mail messages, the SureTrader Facebook page, Instagram, Twitter, and coupon websites.

86.     In essence, SureTrader lured potential U.S.-based customers to its website, where they published a pop-up window falsely stating they did not lure the U.S.-based customers there.

87. Moreover, despite the implementation of the pop-up window, SureTrader did not decline to open an account for any U.S. customer.

### 3. Shell Company Bank Accounts

88. To conceal the U.S. customers, SureTrader created a way to receive U.S. customer funds indirectly, through two U.S. entities created for the sole purpose of facilitating and concealing the movement of U.S.-based customer funds to SureTrader.

89. Specifically, in November 2016, Gentile directed the formation of a Delaware-based entity called Mint Custody Limited, and in January 2017 Gentile directed the formation of the Florida-based entity MinTrade Technologies, LLC.

90. During the Relevant Period, these entities received about $5 million from about 900 U.S.-based customers and transferred these funds to SureTrader.

### D. <u>THE DEEFNDANTS' SOLICITATION EFFORTS WERE SUCCESSFUL</u>

91. SureTrader and Gentile's efforts to solicit U.S.-based customers resulted in a steady increase in new accounts, with hundreds of accounts being opened each month.

92. During the Relevant Period, U.S. customers comprised at least 50% and, at times 80%, of SureTrader's customer base.

93. SureTrader ballooned from a three-man shop to become a broker-dealer employing about 75 employees, with more than 40,000 customer accounts and assets of more than $10 million.

94. According to SureTrader, it has effected transactions "in excess of $1 billion on behalf of its customers."

95. The Defendants profited from their conduct. During the Relevant Period, SureTrader received millions of dollars in transaction-based compensation in the form of commissions and other related fees on the U.S.-based customer accounts.

96.     The Defendants' securities law violations were recurrent and spanned years, from no later than 2016 through at least 2019.  The violations were substantial and involved soliciting U.S. residents without registering with the Commission, thereby allowing the Defendants to avoid certain regulatory obligations for broker-dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.    Further, the Defendants' violations involved circumventing the Pattern Day Trader Rules designed to protect investors in pattern day trading, which is a risky form of trading and which can result in substantial losses.  On top of that, the Defendants took steps to conceal their solicitation of U.S. customers and their violations of the federal securities laws governing the registration of broker-dealers.  SureTrader and Gentile have regulatory histories, and Gentile has consistently worked in the securities industry since at least 1999 and continues to work in the securities industry.   Not only has Gentile failed to take responsibility for the violations at issue in this Complaint, but also he attempted to thwart the Commission's investigation by, among things, refusing to appear for investigative testimony pursuant to a subpoena absent a Court Order compelling his appearance.  The Defendants profited from their conduct to the tune of millions.  Permanent injunctions against the Defendant are warranted.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 15(a)(1) of the Exchange Act
**(Against SureTrader)**

97.     The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

98.     From no later than March 2016 until at least November 2019, SureTrader, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce

effected transactions in, or induced or attempted to induce the purchase or sale of securities, while it was not registered with the Commission as a broker or dealer.

99.     By reason of the foregoing, SureTrader violated, and unless enjoined is reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT II
### Liability Under Section 20(a) of the Exchange Act As a Control Person
### (Against Gentile)

100.     The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

101.     From no later than March 2016 until at least November 2019, Gentile was, directly or indirectly, a control person of SureTrader for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

102.     From no later than March 2016 until at least November 2019, SureTrader violated Section 15(a)(1) of the Exchange Act.

103.     As a control person of SureTrader, Gentile is jointly and severally liable with and to the same extent as SureTrader for its violations of Section 15(a)(1) of the Exchange Act.

104.     By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violate, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT III

### Liability Under Section 20(b) of the Exchange Act
### (Against Gentile)

105.     The Commission repeats and realleges Paragraphs 1 through 96 of its Complaint.

106.     From no later than March 2016 through at least November 2019, SureTrader, directly or indirectly, violated Section 15(a)(1) of the Exchange Act.

107.     From no later than March 2016 through at least November 2019, Gentile, directly or indirectly, through SureTrader, did acts or things which it would have been unlawful for him to do under the provisions of the Exchange Act and the rules and regulations set forth above.

108.     By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violate, Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged and:

### I.

## Permanent Injunctive Relief

Issue a Permanent Injunction, under Section 21(d)(1) of the Exchange Act, enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

### II.

## Disgorgement and Prejudgment Interest

Issue an Order directing Defendants, jointly and severally, to disgorge all ill-gotten gains or proceeds received including prejudgment interest thereon as a result of the acts and/or courses of conduct alleged in this Complaint.

### III.

## Penalties

Issue an Order directing Defendants, jointly and severally, to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

## **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## V.

## **Retention of Jurisdiction**

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a jury trial in this case.

March 22, 2021                    Respectfully submitted,


<u>Amie Riggle Berlin</u>
Amie Riggle Berlin, Esq.
Senior Trial Counsel
Fla. Bar No. 630020
Direct Dial: (305) 982-6322
Email: berlina@sec.gov

Alice K. Sum, Esq.
Trial Counsel
Fla. Bar No. 354510
Direct Dial: (305) 416-6293
Email: sumal@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:    (305) 982-6300
Facsimile:    (305) 536-4154