UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-cv-21079-BB

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

     Defendants.

## AFFIDAVIT OF EDWARD COOPER

     I, **Edward Cooper**, being duly sworn, hereby, under risk of penalty of perjury do

solemnly, sincerely, and truly declare and affirm:

1.     I have a Bachelor of Arts in Banking and Financial Services from the University of
The Bahamas in 2006. I have been a Compliance Manager/Officer in banking
and securities in Nassau, Bahamas for 35 years.

2.     Swiss America Securities Limited (SAS), a Bahamian company formed under the
laws of the jurisdiction of the Bahamas in and in 2011, was registered with the
Securities of the Bahamas (SCB) as an international broker-dealer and
investment advisor.

3.     In 2017, Swiss America Securities, Limited, by a vote of its board of directors,
changed its name to MintBroker International, Limited (MintBroker).

4.     I was hired by MintBroker, in 2014, as a Compliance Officer and later became the
Chief Compliance Officer and its MLRO Officer[1]. I supervised the firm's business
and its employees.

---

[1]     MLRO Officer is a Money Laundering Reporting Officer.

5.       While I was employed at MintBroker, Philip Dorsett was MintBroker's other Corporate Director, Chief Compliance Officer, and MLRO Officer. Mr. Dorsett began his employment with the firm in 2011.

6.       Mr. Dorsett was responsible for keeping the firm compliant with the Bahamas, US, and international securities laws. Mr. Dorsett was responsible for creating and supervising the firm policies regarding accepting non-solicited US clients.

7.       Mr. Dorsett in his capacity as Compliance Officer had access to MintBroker's trade secrets, client account documents, banking information, and the company's internal and external communications such as company emails.

8.       Mr. Dorsett was terminated in the summer of 2017.

9.       Yaniv Frantz was employed by MintBroker beginning in late 2016 as the company's Director of Operations. Mr. Frantz in his capacity as Director of Operations had access to MintBroker's trade secrets, client account documents, banking information, and the company's internal and external communications such as company emails.

10.      Mr. Frantz was terminated in early 2018.

11.      In October 2015, while Mr. Dorsett was employed with the firm, I distributed a Code of Ethics policy to all staff via email. See **Exhibit 1**.

12.      Regarding "Confidentiality," the Code of Ethics policy explained:

31.      Confidentiality

31.1     The Laws of The Commonwealth of The Bahamas prohibit all Financial Institution employees from divulging any information whatsoever concerning the affairs of SAS, its subsidiaries or associated companies, or their customers to any third party, unless disclosure of such information is ordered by The Supreme Court of The Bahamas, or with the express written consent of the customer concerned.

31.2     SAS's very existence is dependent on the Firm's confidentiality and no infringement of the rules and regulations will be tolerated.

31.3     All employees must sign a Confidentiality Clause as a condition of employment.

31.4     Employees may well come into possession of secret, confidential or sensitive information while looking after a customer's or SAS's affairs. No member of staff may use such information directly or indirectly for his / her personal gain or benefit.

31.5    Any telephone requests for information concerning a customer's affairs or SAS's own affairs must not be answered. The correct response is to ask that any such request be put in writing and faxed or mailed to SAS, and any such requests should be brought to the attention of the Deputy Director. It is not permissible even to acknowledge that a person or entity is a customer of SAS.

31.6    It is also essential, when talking to a customer on the telephone, to ensure that it is, in fact, the client. Information must not be given to husbands, wives or children of customers without the express written consent of that customer.

13.    Under a section titled "33. Termination of Employment," the Code of Ethics policy stated:

33.4    Employees leaving SAS, for whatever reason, must hand over to a Manager or the Chief Executive all keys of the office, and must on no account remove originals or copies of any files, papers, documents or accounts belonging to SAS or any of its customers.

33.5    All employees are reminded that the Confidentiality provisions of the terms of employment impose a continuing obligation of confidentiality surviving employment with SAS.

14.    Mr. Frantz would have received the same or a substantially similar Code of Ethics policy after beginning his employment with the firm.

15.    Every employee also would have signed a Terms of Employment at the time of hire that they understood and agreed to these policies.

16.    All staff also signed Non-Complete and Non-Disclosure agreements with the firm. This was to protect company trade secrets and to comply with Bahamian law regarding protecting sensitive client information.

17.    Attached hereto is a true and correct copy of the email and attachment I sent on October 19, 2015

The contents of this Affidavit are true to the best of my knowledge, information,

and belief.

SWORN TO this 2nd }
Day of June A.D., 2022 }

_____
Edward Cooper

Before Me,

_____
NOTARY PUBLIC

TYRONE W. PALMER, J.P.
P. O. BOX N-1501
NASSAU, N.P., THE BAHAMAS
PH# 242-470-3883

4

# EXHIBIT 1



Re: Code Of Ethics - Compliance

**Message**

Delete | Reply | Reply All | Forward | Meeting | Attachment | Move | Junk | Rules | Read/Unread | Categorize | Follow Up

Re: Code Of Ethics

EC  **Edward Cooper <edward@suretrader.com>**
staff@suretrader.com;   'Guy Gentile';   'Wade Matsumoto'
Monday, October 19, 2015 at 4:25 PM
Show Details

Code of Ethics.docx
70 KB

⬇ Download All     👁 Preview All

❗ This message is high priority.

Dear Staff,

Please find enclosed the procedure entitled "Code of Ethics" which we all are required to follow.

Please review the said documents and govern yourselves accordingly.  As is the case in any procedure, this document may be amended from time to time as the need arises.

Any clarification on the said documents you may seek clarification from the undersigned. I thank you for your cooperation as I remain.

Respectfully yours,


Edward Cooper

Compliance Officer
Swiss America Securities Ltd.
Nassau Bahamas
www.suretrader.com
1-242-328-7800

# Swiss America Securities Limited
# Code of Ethics

| 1. | INTRODUCTION |
|----|----|

1.1    The contents of this booklet are intended to:

> ➢ Provide employees with certain background information relating to Swiss America Securities Ltd;
>
> ➢ Set forth the rules, regulations, policies, procedures and conditions of employment, and should be read in conjunction with each member of staffs' service contract.

1.2    The contents hereof may be amended or varied from time to time, in which case, replacement pages will be handed out and each staff member must ensure that his / her booklet is kept up-to-date.

1.3    No significant changes will be made without prior notification, and staff will have the opportunity to comment on such changes.

1.4    On notification of such changes, your contract of employment will be deemed to be varied accordingly.

| 2. | Swiss America Securities Limited |
|----|----|

2.1    SAS holds an unrestricted Securities licence issued by the Securities Commission of The Bahamas, operating from and regulated primarily in The Bahamas.

2.2    SAS provides a complete range of securities services to a sophisticated clientele, emphasizing close personal contact and service tailored to each individual client.  SAS seeks to promote the traditional role of securities trading – to provide clients with the highest level of security, confidentiality and personal service.

2.3    The primary objective of SAS is to provide the most effective structure for the long-term protection and growth of our clients' assets.  Because each client has specific needs and objectives, we use a "listening" approach in order to understand, formulate and then implement the most appropriate solutions, always in close consultation with the client and professional advisers.  Our intention is to establish long-term relationships based on mutual trust, confidence and professionalism.

2.4     SAS is governed by a Board of Directors under the Chairmanship of Mr. Guy Gentile and is assisted by professional Managers who are in charge of the day to day operations.

2.5     The corporate structure for SAS is shown on the attached sheet.

### 3.     Swiss America Securities Limited

3.1     Swiss America Securities Ltd is structured around the core business of :-

- o     Securities Trading;

### 4.     PRODUCTS AND SERVICES OFFERED

4.1     SAS currently offers the following products and services to its customers, either directly or on a referral basis:

> ➢     Securities trading and settlement covering all major world markets for clients who wish to manage their own portfolio.

### 5.     TERMS OF EMPLOYMENT

5.1     Once an employee of SAS has completed his or her probationary period (as stated in the letter of offer of employment, the immediate supervisor will report to the Chief Executive with a report on the performance and may recommend that the employee be confirmed in the position for which he or she was employed.

5.2     Once a favorable recommendation has been submitted by the supervisor or Department Manager, the employee will receive written confirmation of the employment.

5.3     Each SAS employee who has been confirmed in his or her position is required to execute a Service Agreement which details the duties of the employee and specific terms as to remuneration, vacation entitlement, benefits, and rights of each party.

5.4     Any modification of the terms of an employee's terms of employment will be advised in writing and acknowledged by the employee, in which event the service agreement will be deemed suitably amended.

## 6.      CONFIDENTIALITY

6.1      Each employee is required to sign a confidentiality clause which is appended to the letter of offer of employment issued by SAS.  The clause outlines the strict confidentiality imposed by SAS in relation to clients' identify, affairs and dealings and the employee is required to acknowledge his or her awareness of the obligations and that the fact that such obligations remain binding both during and after employment with SAS.

6.2      The employee must also acknowledge that any breach of the confidentiality obligations could give rise to substantial liability on the part of SAS and will constitute grounds for summary dismissal.

6.3      Confidentiality obligations of the employee extend to any business or trade secrets, technical or commercial information relating to the business, organization, transactions, accounts, finances or affairs of SAS and its customers or affiliates.

## 7.      CHANGE OF STATUS

7.1      From time to time, employees may be transferred from one department to another, or from one position in a department to another.

7.2      Consequently, employees must be prepared to undertake duties not initially contemplated and to fill in for other members of staff from time to time.  For these reasons, job titles must not be regarded as limiting the work which staff may be requested to perform.

7.3      SAS aims to place its employees in the positions for which they are best suited; however because of the quantum of staff complement, it may be necessary to lend assistance in other areas in an effort to achieve the common goals set by SAS for the efficient servicing of customers' needs.

## 8.      EMPLOYEE EVALUATION / BONUSES

8.1      Employees may be awarded a non-contractual bonus but whether any such bonus is to be awarded for any period, and if it is, the amount of the bonus and the date of payment shall be for the Board of Directors to decide in its absolute discretion.

8.2     SAS requires that a performance evaluation form be completed for each employee by the Department Manager in December of each year.  The form is appended hereto.

8.3     The performance evaluation is considered by the HR Manager who submits to the CEO/President proposed salary increments and bonuses.

8.4     There is no automatic entitlement to a bonus.   In cases where an employee's performance is not considered satisfactory, it is not the intention of the Directors to award a performance bonus.

8.5     In day to day matters, it is the responsibility of Department Managers to maintain discipline.

8.6     The procedures, which are intended to be fair to the employee concerned, are as follows:

## 9.    DISCIPLINARY MEASURES

➢ First Infraction - the Manager should meet with the staff member and discuss the matters involved, giving the person an opportunity to explain his or her views.

The Manager will make written notes of the meeting (see Form attached), to which the staff member may add his / her comments. If thought fit, the Manager will pass the notes of the meeting to the HR Manager, but in any event, will retain a copy.

➢ Second infraction or more serious infractions - the Manager will review the matter with the staff member and write a report.  Again, the staff member may add his / her comments.  The report will be submitted to the HR Manager who will, if it is deemed appropriate, issue a written warning.

➢ Third infraction - the same procedures as for the second infraction, which will trigger a final warning and, if thought necessary, the staff member may be placed on probation.

➢ Further infractions - may result in immediate dismissal.

The type of offences which would normally give rise to the imposition of disciplinary measures include the following:

- Unexplained absenteeism.
- Insubordination and rudeness.
- Refusal or failure to carry out reasonable requests.
- Poor work standards and time management.
- Abuse of the Firm's property.
- Irresponsible or offensive behaviour.

## 9.    DISCIPLINARY MEASURES (CONTINUED)

In cases where an employee's performance or attitude is of such a poor standard that, in the opinion of the Manager and/or the HR Manager, might result in potential loss to SAS or its customers, warnings may not be appropriate.  In such cases, SAS may institute immediate dismissal procedures.

**DISCIPLINARY REPORT**

Date                    : _____

Name                    : _____

Department          : _____

Manager             : _____

Infraction           : _____

                            _____

                            _____

                            _____

Action        :          _____

                            _____

                            _____

                            _____

Signed              : _____Manager     : _____

I acknowledge that a copy of the above has been given to me.  I have the following comments:

_____
_____
_____

Employee's Signature    : _____Date      : _____

## 9.      Dismissal

9.1      An employee may be subject to summary dismissal without notice for the following offences:

> ➢ Breach of Confidentiality obligations.
> ➢ Theft from SAS, its employees or customers.
> ➢ Conviction in respect of a serious criminal offence.
> ➢ Sub-standard work performance, if no improvement after 3 warnings.
> ➢ Failure to inform SAS, at the time of taking up employment, of circumstances which might have affected the decision to offer employment.
> ➢ Serious breaches of any professional, regulatory or Governmental laws, rules or regulations.
> ➢ Money laundering.
> ➢ Insider dealing.
> ➢ Gross negligence or wilful default.
> ➢ Wilful damage to company property or equipment.
> ➢ Refusal to carry out any lawful and reasonable request from management.

## 10.      DRESS CODE

10.1      All employees are expected to adopt a standard of dress which is appropriate to a professional office.

10.2      From time to time, and in particular Friday's may be considered "casual" days. Employees are requested to use common sense in selecting their casual dress, so as not to offend other members of staff or customers.

## 11.      Educational ASSISTANCE

11.1      To assist employees in continuing their "Series7 education" to enhance job performance, SAS has established a policy whereby it will finance the coursework at 50%. If the Employee passes the exam, the Firm shall reimburse them 100% for the cost of all travel expenses including the repayment of the initial coursework. Time off allotted for examinations SHALL NOT exceed a '2 day' duration. All receipts shall be retained and presented to the HR Manager for approval.

| 12. | EDUCATIONAL ASSISTANCE (CONTINUED) |
|---|---|

Copies of all "Series 7" transcripts (e.g. grades, assessments and exam results) must be handed to the HR Manager on completion of the course.

At the second attempt of the "Series 7" – these related expenses are covered by the employee themselves. Non-completion of courses or failure after the second attempt will be 100% that of the employee.

| 12. | GENERAL PROCEDURES |
|---|---|

12.1   **CLIENT ETIQUETTE -** Employees must not lose sight of the fact that SAS is a service and professional organization. Our success depends on the ability of employees to respond efficiently and courteously to all customers.  The basic rules are :-

> ➢ <u>No correspondence should remain unanswered for more than **24 hours**</u>- even if the response is that the matter is being investigated and / or researched and that you will respond as soon as possible.

> ➢ If you receive or answer a telephone call from a client who is the responsibility of another department/employee and are unable to contact the relevant person within the company, you should make a written record of the nature of their enquiry/instruction and refer it to the appropriate person as soon as possible for action.

> ➢ If you receive or answer a telephone call, you should greet that customer with enthusiasm, courtesy, and with a high degree of professionalism. Always remember to treat a customer the way you would want to be treated. Never start a conversation with a 'negative' response or tone- always be willing to assist, and if you do not have the answer you shall assure the customer that you will find the proper and correct response to their question. If your Supervisor is not available, you should ascertain their name, the nature of their enquiry and obtain their telephone number so that you can arrange for someone who does know shall return the call to them.

➢ Before hanging up, always ask the customer "*Is there anything else I can do to assist you?*" Be certain to sign off in a positive note from your valued customer.

## 13.    GENERAL PROCEDURES (CONTINUED)

**VERIFICATION OF INSTRUCTIONS** - Great care should be taken, when acting upon emails, chats or verbal instructions, to ensure that they originate from the person authorized to issue such instructions.  There are times when we may be required to confirm the validity of the contacting customer.

**Where there is an issue, please refer to your 'Supervisor' and or Compliance Officer.**

## 13.    OFFICE PROCEDURES

13.1    **SECURITY -** Security is of the utmost importance. All staff should ensure that the entrances to the offices from the reception area remain closed at all times, that all visitors are escorted by a member of staff when they are in the office area and that visitors are not left unattended in any area, other than the boardroom.

13.2    **COMPUTERS -** The network computer installation is very sensitive to viruses and corrupt information. No member of staff should copy data or programs to or from diskettes without first checking with the system supervisor, the IT Technician, and the Compliance Officer are to ensure that the diskette does not contain a virus and that the data or program will not affect the network installation.

13.3    **TIDINESS -** All desks should be left neat and tidy before leaving the office in the evening. Papers should not be left scattered around the desk and surrounding areas. Client files should be properly secured and locked in their respective filing cabinet.

13.4    When using the kitchen, fax and photocopy machines etc., all staff must ensure that they leave the area neat and tidy. You must also be alert to ensure that the general appearance of the office is maintained at a high standard. This includes ensuring that deliveries are not left littering the office and that when removing items from the stationery cupboard etc. you leave it neat and tidy.

13.5    **FILING –** Only Compliance personnel have access to Firm's account documentary files. Requests for files or information contained thereon must be made to Compliance Officer

upon request. Person(s) assisting in the file request may keep a file-log which is maintained by the respective department. On return of the file or document, a notation is made on the log. It is essential that all files are returned to the filing system as soon as possible and that client filing is maintained up to date.

## 14.    Gifts from Clients AND OTHER RELATED PARTIES

14.1    IT IS FORBIDDEN FOR MEMBERS OF STAFF TO SOLICIT OR ACCEPT GIFTS FROM CLIENTS, OR OTHER RELATED PARTIES.

14.2    Employees may not, directly or indirectly, solicit or accept gifts, commissions, rebates, retrocessions or other inducements of whatsoever nature in cash or in kind from clients, or, brokers, suppliers and other professional / business contacts / advisors / introducers etc. ("other related parties").

14.3    It is recognized that it is not uncommon for clients or other related parties to give **small** presents, e.g. at Christmas, and normally these are acceptable. In case of doubt, the approval of Compliance Officer or the Deputy Director must be obtained.

14.4    The reasons for these restrictions are to avoid any possible suggestions of accepting bribes as gifts, which might influence an employee's judgement or decisions. Our independence is essential to the success of SAS.

14.5    Failure to comply with these guidelines may result in an employee facing disciplinary action or summary dismissal

## 15.    Holidays

15.1    Unless otherwise agreed, all employees are entitled to a designated number of working days holiday per year, as outlined in the contract at the inception of employment.

15.2    The holiday year commences on 1st January, and as a general rule, every employee must take one holiday each year of at least 10 continuous working days.

15.3    Holidays may be taken in half days, subject to the convenience of the Firm, however, this must first be pre-approved by the Department Manager.

15.4    All holidays must be agreed in advance with your Department Manager, who should ensure that the department at all times has sufficient personnel to operate efficiently.

15.5    Holidays will be booked on a first-come basis, and an employee who fails to book early may have to schedule his / her vacation around remaining available dates.

15.6    An employee who fails to take the entire allowed number of vacation days during a calendar year is allowed to carry forward the remaining days for up to 6 months at the discretion of the HR Manager.

15.7    No new employee may take any holiday during the probationary period, unless duly authorized by HR Manager.

## 16.        Illness and Maternity Leave

16.1    Employees who are unable to come to work due to sickness must, whenever possible, telephone their immediate Supervisor or the Manager of their department, failing whom, the HR Manager, to let the company know that they will not be coming to work.

16.2    If more than two consecutive work days are missed due to illness, a doctor's certificate must be produced.

16.3    Only full-time permanent female employees may be eligible for maternity leave subject to the following provisions:-

> ➢ A female employee must have been in continuous employment with SAS for at least one year to qualify for maternity leave.
> ➢ Additional unpaid maternity leave may also be granted at the discretion of the HR Manager.

16.4    Salaries will be reduced by the amount of the National Insurance benefits to which the employee is entitled.

## 17.        Injustices and Grievances

17.1    Should a member of staff have a grievance or feel that an injustice has been done, this should be reported, in the first instance, to the immediate Supervisor or Department Manager.

17.2    If the matter is not satisfactorily resolved within a reasonable and considerable timeframe, then the matter should be brought to the attention of the Deputy Director, whose decision will be final.

## 18.      LEAVE - Compassionate

18.1     Paid compassionate leave is granted to an employee upon the death or serious illness of a member of his/her immediate family.

18.2     For the purposes of this policy, "**immediate family**" will include the employee's spouse, children, parents, grandparents, sisters and brothers, and other persons at the discretion of the Deputy Director.

18.3     Compassionate leave to be taken within New Providence may be granted for a maximum of 5 days.

18.4     Compassionate leave to be taken in the Family Islands or outside The Bahamas may be granted for a maximum of 5 days.

## 19.      LEAVE – Examination & Study

19.1     Any examination leave for persons enrolled on approved degree and professional qualification courses must be approved by the Deputy Director. This is not a mandatory exercise and should not be considered approved by the Firm.

## 20.      Leave - Jury Duty & Other Court Appearances

20.1     All employees legally summoned to appear in court during regular office hours for Jury duty, are entitled to paid leave upon satisfactory evidence of the Court Summons.

20.2     Other Court appearances, such as traffic offences, will be unpaid unless payment is recommended by the Department Manager and approved by the Deputy Director.

## 21.      LEAVE - Unpaid

21.1     From time to time, members of staff may require to be absent from the office for some reason, but have no holiday entitlement left.  In such cases, a request for unpaid leave should be made in writing to the Departmental Manager, if time permits.

21.2     Leave taken or extended without proper authorization may result in disciplinary action.

## 22.      Medical Group Insurance

22.1     All employees in permanent, full-time employment are included in the company's Group Medical Insurance scheme - subject to acceptance by the insurers.

22.2     SAS does not pay the entire cost of the scheme, as there is a salary deductions in respect thereof.

22.3     Full details of the scheme, which may be amended from time to time by the insurer, may be obtained from the Deputy Director.

22.4     IT IS ESSENTIAL THAT YOU READ AND UNDERSTAND THE SCHEME.

22.5     All claims under the medical insurance scheme are processed through the Financial Controller and Deputy Director.

## 23.      National Insurance

23.1     Under the National Insurance Act 1972 both SAS and its employees are required to make monthly contributions to the National Insurance programme.

23.2     SAS is required by law to deduct employees' contributions from their salaries for payment to the National Insurance Board (NIB).

23.3     The contributions, terms and benefits under the programme are laid down by NIB.

23.4    All employees must account back to SAS for benefits received from NIB, while being paid in full by SAS.

## 24.    Organizational STRUCTURE – STAFF COMPLEMENT

24.1    The organisational structure for SAS staff is shown on the attached chart.

24.2    As changes occur in staff complement, new charts will be produced and circulated.

## 25.    Personal Finances and Business Interests

25.1    SAS expects all employees to conduct their personal financial affairs in a prudent, responsible and professional manner.

25.2    Employees of SAS should not be directly or indirectly engaged, concerned or involved in the conduct of any business, trade, profession or other occupation (whether as an employee, consultant, agent, director or otherwise) of similar nature to or competitive with that carried on by SAS, without the express written consent of SAS.

25.3    In the course of employment with SAS, employees may obtain, or become aware of, sensitive information. It is forbidden for an employee to use such information (e.g. insider trading) to obtain, directly or indirectly, any financial advantage or benefit from the use of such information or to enable any third parties to so benefit.

25.4    Employees are required to assign to SAS any intellectual property rights in respect of copyright works created or made by the employee during the period of his or her employment (except only those works created which are wholly unconnected with the employment). Employees are further required to give notice in writing to SAS promptly on becoming aware of any infringement or suspected infringement of any intellectual property right.

## 26.    Probationary Period

26.1    New employees are generally subject to 6 months period of probation. During this period, progress will be monitored regularly and if not satisfactory, SAS may terminate the employment without notice.

26.2    Upon the successful completion of the probationary period, the employee will receive a letter confirming that he/she has been accepted as a permanent member of staff, at which

time he or she will be required to execute SAS's form of service agreement and be eligible to join the group medical scheme.

26.3    The HR Manager may extend the period of probation, if deemed appropriate.

## 27.    MONEY LAUNDERING AND DUE DILIGENCE

This section is intended to outline the procedures implemented by SAS to combat the efforts of criminals legitimise assets of unlawful origin and to ensure that employees are aware of the basic concepts of money laundering in an effort to avoid facilitating the process.  Detailed procedural guidelines have been issued by SAS and distributed to each employee for retention and ease of reference in the day-to-day activities performed.

27.1    The Bahamas has recently undergone legislative changes which affect the operation of financial institutions licensed and operating under and in accordance with the guidelines of the Central Bank of The Bahamas and addressing the specific issue of Prevention of Money Laundering.  New legislation enacted on 29th December, 2000, which deals specifically with Money Laundering and prevention thereof include:

♦ Proceeds of Crime Act, 2000;

♦ Financial Transactions Reporting Act, 2000; and

♦ Financial Transactions Reporting Regulations, 2000

27.2    Money Laundering is defined as the process by which criminals attempt to conceal the true origin and ownership of the proceeds of drug trafficking and activities related to it and/or any relevant offence with the ultimate aim of providing a legitimate cover for their sources of income.  It consists of injecting money of unlawful origin into the actual or fictitious cash flow of a legitimate activity.

27.3    SAS in particular is committed to preventing the use of its global operations for criminal purposes and cooperating, as appropriate, and with global enforcement and prosecution efforts, to prevent misuse of the banking system.

## 28.    MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

27.4    The Directors for SAS have appointed a senior person as Compliance Officer.

27.5    Any queries or comments regarding issues relating to money laundering, the identification process, suspicions and/or prevention may in the first instance be brought

to the attention of an employee's immediate supervisor who will report any suspicion to the Money Laundering Prevention Officer who will request an investigation. The Money Laundering Reporting Officer is responsible for the submission of any reports of suspicious activity to the authorities. Reports of suspicious activity may also be submitted to the authorities by the Chief Executive.

## THE MONEY LAUNDERING PROCESS

27.6    Money laundering is generally accomplished in three phases:-

    I.   Placement phase – Where assets derived from an illegal activity are deposited or introduced into the banking system;

    II.   Layering phase – Where those assets are concealed or separated from their source by the creation of complex layers of financial transactions, designed to disguise the audit trail of funds and to provide anonymity; and

    III.   Integration – Where the assets re-enter the financial system in such a way as to appear legitimate.

## 28.    MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

27.7    Typical examples of the three phases are:-

Example 1    - Cash is paid into a Financial Institution, often combined with legitimate business proceeds (Placement).

Funds are then wire-transferred abroad, often using shell companies (IBCs) (Layering).

The funds are then used to repay fictitious loans or to pay forged or fictitious invoices (Integration).

Example *2*    - Cash may be brought physically to the Bahamas (Placement).

The cash is accepted by a Financial Institution, and enters the banking system in the name of the trust or an IBC (Layering).

There follows a series of wire transfers, both domestic and international, make the tracing of the original source of the funds virtually impossible (Integration).

Example *3*     - Cash is used to buy high value items, (jewellery, cars, etc.)  (Placement).

The items are then re-sold and the proceeds, in cheque or wire transfer form, enter the banking system (Layering).

The proceeds, now appearing "clean", are used for legitimate business purposes (Integration).

## SAS MONEY LAUNDERING POLICY

27.8     Bahamian legislation, including SAS policies specifically require that financial institutions implement certain procedures to ensure that money laundering activity is prevented and effectively combated.  SAS's policy falls into the following categories:-

## 28.      MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

### 1.     CLIENT DUE DILIGENCE

27.9     The key essential to any new client relationship is knowledge of the proposed customer ("KNOW YOUR CLIENT"). This obligation is imposed not only in respect of new customers but also for existing customers.

27.10     The list of required documentation/information for each customer follows:-

1. Evidence of identity of the customer – normally in the form of a certified copy of the relevant pages of their passport or other satisfactory identification which shows the complete name of the customer, his date of birth, place of birth, the issue and expiry dates and the customer's signature.

2. Evidence of a permanent residential address in the form of a utility bill, credit care or bank statement in the name of the customer.

3. One professional reference (from an attorney or accountant) and a financial reference from a recognized financial institution

4. Detailed curriculum vitae on the customer.

5.    Completed SAS Client Profile form which must indicate details of proposed activity.

6.    Completed SAS Source of Funds section of the Client Profile.

7.    Completion of SAS's account-opening forms signed by the customer or his properly-appointed representative.

## 28.   MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

In the event it is proposed that a bank account be operated in the name of a trust or company, then the customer must complete and sign SAS's Trust Questionnaire or Corporate Questionnaire and the relevant trust deed or management agreement.

Should any doubts arise as to the accuracy of the information provided or the ownership or source of funds or if transactions occurring are not in conformity with the customer profile, then re-verification of the customer must be undertaken.

In compliance with the requirements of SAS and Bahamian legislation and in an effort to fight against bribery and corruption the SAS requires that certain categories of customers constitute "sensitive" customers.  These are primarily persons involved in political functions for a foreign State or individuals or companies closely related to them.  Special attention must be given to the ownership, origin and source of funding of any account or structure and this should be independently verified.  All transactions for such customers must be verified and monitored and a list of these accounts must be provided to Compliance for eventual approval.

27.11    All business relations are approved by the Board of Directors for SAS and the usual due diligence is conducted on them.

## 28.   MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

27.12    It is of vital importance that SAS maintain records for all its clients and the due diligence procedures undertaken.  All forms and questionnaires are specifically designed to provide the information required on all new clients since the enactment of the Bahamian legislation.  The forms and questionnaires may be updated from time to time. No work should be carried out for a new client unless and until all required information has been

fully provided and the Compliance Officer has confirmed the acceptance of the client by memorandum to the Operations Department indicating that the account may be activated.

## 2.    IDENTIFICATION OF SUSPICIOUS TRANSACTIONS

27.13    The types of transactions which a money launderer may choose are virtually unlimited, and there are no simple tests to identify a suspicious transaction.  It is to be noted that such transactions will often be inconsistent with a customer's known, legitimate business or personal activities as contained in the Client Profile.  The key to recognition is knowing enough about the customer's business to recognize that a transaction or a series of transactions is unusual.

27.14    Some examples of Suspicious Transactions are as follows :

(1)  Attempts by a customer to deposit large amounts of cash – NOTE: SAS's policy is not to accept cash deposits for funding accounts.

(2)  Large deposits into an account with immediate transfers of the same (or very similar) amount to a third party with no evident connection.

(3)  A sudden, unusual and inexplicable increase in the turnover of assets in an account.

(4)  A person or company maintaining large accounts with no real connection with normal business activity of any kind, but whose accounts regularly receive or transfer large sums of money.

## 28.    MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

(5)  Customers who are unwilling to provide necessary information upon opening an account or in respect of a query raised with regard to a particular transaction.

(6)  Deposits of bearer shares or bonds.

(7)  Transactions emanating from or made to countries where drug trafficking or production is known to be prevalent.

## 3.    NOTIFICATION OF SUSPICIOUS TRANSACTIONS

27.15    Financial institutions have a statutory obligation to report suspicions of money laundering to the Bahamian authorities (The Financial Intelligence Unit).

27.16    If doubts arise in respect of a transaction, or series of transactions, employees MUST advise their immediate supervisor who will address the matter with the Money Laundering Prevention Officer.   Once an employee reports his/her suspicions to the MLRO he or she has fully satisfied the statutory obligation.

27.17    If the results of any investigation conducted as a result of a report of suspicious activity reveals no known facts to negate the suspicion, then it is the responsibility of the Compliance Officer to notify the Financial Intelligence Unit in the prescribed "Report of Suspicious Transaction" form.

### 4.    RECORD KEEPING

27.18    Not only must copies of documents establishing the identity of clients be retained during the term of the relationship, but for a minimum of five years after the relationship is closed.

### 28.    MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

27.19    In the case of financial records, these must be kept for a minimum of five years from the date of each transaction.  Financial records, for this purpose, include bank advices and bank statements, invoices and other documents and supporting evidence of transactions entered into on behalf of a client.  SAS's policy is to maintain all records for at least 5 years.

### 5.    EDUCATION

27.20    Money Laundering is a fast moving crime. Those involved are always looking for new means and opportunities to undertake their illicit activities.

27.21    For this reason, ongoing education is an essential component of our procedures. This is achieved by our own internal seminars and attendance at external courses and seminars run by the various professional and other bodies.

### OTHER POINTS TO NOTE

27.22    In addition to the foregoing you should also be aware of the following general points :-

27.23    Due diligence and know-your customer obligations apply not only to customers of the Bank opening accounts after 29th December, 2000, it also extends to pre-existing customers of the Bank.  It is noted that it has always been the policy of SAS to undertake such enquiries in respect of customers.

### TIPPING OFF

27.24    It is an offence to prejudice an investigation by informing a person that a disclosure is about to be, or has been, made ("tipping off") or that the authorities may be acting, or proposing to act, in connection with an investigation into money laundering. This offence is subject to the levy of a fine/or penal sentence on conviction.

## 28.     MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

### CASH TRANSACTIONS

27.25    SAS does <u>NOT</u> as a rule accept cash deposits from clients.

### WIRE TRANSFERS

27.26    It is very important that SAS maintains records of incoming and outgoing wire transfers. Whilst outgoing transfers present no material problems, incoming transfers may be difficult to track down and record accurately.  In such cases, enquiries should be made of the transmitting bank for further information.

### SAFE CUSTODY

27.27    SAS does not provide safe deposit facilities, nor do we arrange Safe Custody facilities for persons who are not customers.  In cases where we may be asked to hold sealed envelopes, parcels or boxes on behalf of a customer, we must be given details of the contents.  This is important not only in the money laundering context, but for insurance purposes also.

### THIRD PARTY TRANSACTIONS

27.28    SAS does not conduct money transfers from third parties to pass through its entity.

## 28.     MONEY LAUNDERING AND DUE DILIGENCE (CONTINUED)

### FUTURE CHANGES

27.29    As you will appreciate, Money Laundering is an evolving problem and amendments and or additional Guidelines will be issued as and when necessary.

From time to time lists of unacceptable customers and "sensitive" countries are circulated by the FAFT and OECD List of Countries.

## 28.      PENSION FUND

28.1      SAS is currently investigating the various pension products available within the local industry with a view to establishing a fund for the benefit of employees.

28.2      Once a plan has been selected for SAS, the Deputy Director will arrange a presentation and details will be circulated to employees.

## 29.      Remuneration

29.1      At commencement of employment, a starting salary will be agreed.  Thereafter, salaries are reviewed annually, with changes becoming effective on the first of each employee's fiscal year.

29.2      The salary review will take into account all aspects of a person's employment, including ability, dedication, punctuality and attitude both to customers and other members of staff.

29.3      Salaries are paid to employees in conjunction with the terms of employment (refer to individual contract).

29.4      Overtime payment is made in accordance with the country Fair Labor Standard Act. This overtime should be approved by the Department's head prior to engagement.

## 30.      Salary Deductions

30.1      Each employee, in accepting employment with SAS, agrees to and authorizes SAS to deduct from his / her salary or from any other amounts which may be due to the employee, any amounts which may be due to SAS, as follows:-

> ➤ Spouse and / or dependent Medical Group Insurance premiums;

30.2      Upon leaving SAS's employment, all amounts owing to SAS of whatsoever nature, including educational costs and outstanding loans, will become due and payable.

30.3    In addition to the foregoing, there will be automatic deductions from salary of the employee's portion of National Insurance contributions.


## 31.    Confidentiality

31.1    The Laws of The Commonwealth of The Bahamas prohibit all Financial Institution employees from divulging any information whatsoever concerning the affairs of SAS, its subsidiaries or associated companies or their customers to any third party, unless disclosure of such information is ordered by The Supreme Court of The Bahamas, or with the express written  consent of the customer concerned.

31.2    SAS's very existence is dependent on the Firm's confidentiality and no infringement of the rules and regulations will be tolerated.

31.3    All employees must sign a Confidentiality Clause as a condition of employment.

31.4    Employees may well come into possession of secret, confidential or sensitive information while looking after a customer's or SAS's affairs.  No member of staff may use such information directly or indirectly for his / her personal gain or benefit.

31.5    Any telephone requests for information concerning a customer's affairs or SAS's own affairs must not be answered.  The correct response is to ask that any such request be put in writing and faxed or mailed to SAS, and any such requests should be brought to the attention of the Deputy Director.  It is not permissible even to acknowledge that a person or entity is a customer of SAS.

31.6    It is also essential, when talking to a customer on the telephone, to ensure that it is, in fact, the client. Information must not be given to husbands, wives or children of customers without the express written consent of that customer.


## 32.    Telephone Calls

32.1    The use of the office telephones for personal calls must be kept to an absolute minimum. The very nature of SAS's business requires that telephones lines be available for customers to call in, and for SAS to make outgoing calls.

32.2    Persistent personal use of the telephones is considered misconduct and may give rise to Disciplinary measures. It will also be taken into account in Staff Reviews.

## 33.      Termination of Employment

33.1     Permanent employees are required to give 2- 4 weeks notices depending on the seniority with the Firm, these notices must be in writing, indicating the intention to terminate employment with SAS.

33.2     Unless otherwise stated in letters of employment, SAS is also required to give employees 4 weeks' notice, in writing, of its intention to terminate a member of staff's employment.  SAS reserves the right to make immediate payment of 4 weeks salary in lieu of notice, in addition to any sums which may be due to the employee by law.

33.3     In certain cases, Dismissal without Notice (Summary Dismissal) may be appropriate, which overrides the necessity to give 4 weeks' notice, or a payment in lieu thereof, and any provisions regarding termination of employment in the letter of Employment.

33.4     Employees leaving SAS, for whatever reason, must hand over to a Manager or the Chief Executive all keys of the office, and must on no account remove originals or copies of any files, papers, documents or accounts belonging to SAS or any of its customers.

33.5     All employees are reminded that the Confidentiality provisions of the terms of employment impose a continuing obligation of confidentiality surviving employment with SAS.

## 34.      Time Keeping

34.1     The standard office hours are 9 a.m. to 5 p.m.  Or unless stated in your contract as hours of work, with one hour for lunch.

34.2     SAS Management expects all members of staff not only to arrive at the office on time, but to commence work on time.

34.3     Persistently poor time keeping is regarded as misconduct and may give rise to disciplinary action.

34.4     It is essential that all departments are adequately staffed throughout the lunch period. Lunch hours should be agreed with the Department Managers, who will be responsible to ensure that their departments are not left unattended.

34.5     The lunch break of one hour should be taken between 12:00 noon and 2 p.m. unless otherwise approved by the Department Manager.