# Exhibit D

**IN THE SUPREME COURT OF THE BAHAMAS**

**COMMERCIAL DIVISION**

**CAUSE NO. 00014 OF 2020**

**IN THE MATTER OF the Companies Act, Ch. 308**

**AND**

**IN THE MATTER OF an Application under the Securities Industry Act, 2011**

**AND**

**IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.**

<u>**ADVERTISEMENT OF WINDING UP PETITION**</u>

**TAKE NOTICE** that a petition for an order that **SWISS AMERICA SECURITIES LTD.,** whose offices were formerly situated at Elizabeth on Bay Plaza, Suite 17, Bay Street, Nassau, The Bahamas (the "Company"), be put into liquidation and wound up in accordance with the provisions of the Companies Act, was on 5 March 2020, presented to the Supreme Court of The Bahamas.

The petition was presented by the Securities Commission of The Bahamas located at 2nd Floor Poinciana House, North Building, 31A East Bay Street, Nassau, The Bahamas. Joint Provisional Liquidators (JPLs), Mr. Igal Wizman and Ms. Eleanor Fisher, both of Ernst and Young, were appointed by the court on 17 March 2020.  Copies of the petition, supporting affidavits and the Order appointing the JPLs, may all be obtained from the petitioner's website www.scb.gov.bs.

**AND FURTHER TAKE NOTICE** that the hearing of the petition will take place on **Tuesday 19 May 2020** at the Supreme Court, Nassau, New Providence, The Bahamas, at 2:00 p.m. and that any creditor or shareholder of the Company may be heard on the petition provided that he has given three (3) days' notice to the petitioner at the given address. The notice must state the name and address of the person, or, if a firm, the name and address of the firm, and must be signed by the person or firm, or his or their attorney (if any) and must be served, or if posted, must be sent by post in sufficient time to reach the petitioner not later than 4:00 o'clock on the afternoon of the 13th day of May, 2020.

**Securities Commission of The Bahamas (Petitioner)**
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, The Bahamas.

**IN THE SUPREME COURT OF THE BAHAMAS**

**Commercial Division**

**2020**

**COM/com/**

> SUPREME COURT
>
> MAR 0 5 2020
>
> Nassau, Bahamas

**IN THE MATTER of the Companies Act, 1992.**

**AND**

**IN THE MATTER of the Securities Industry Act, 2011.**

**AND**

**IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.**

<u>**AFFIDAVIT OF CHRISTINA R. ROLLE**</u>

**I, Christina R. Rolle**, Executive Director of the Securities Commission of The Bahamas (hereinafter "the Commission"), New Providence, one of the islands of the Commonwealth of The Bahamas, make oath and say as follows:

1. I make this Affidavit on behalf of the Petitioner herein in my capacity as Executive Director, aforesaid.

2. That statements made in the Petition filed on  5th day of March A.D., 2020 now produced and shown to me marked "CRR 1" as they relate to the facts and deeds of the Petitioner are true, and such statements as they relate to the acts and deeds of any person or persons, I believe to be true.

3. The contents of this Affidavit are true to the best of my knowledge, information and belief.

SWORN TO this 5th          }
Day of March A.D., 2020  }          _____

**Christina R. Rolle**

**Before Me,**

_____

NOTARY PUBLIC

IN THE SUPREME COURT OF THE BAHAMAS                     2020

Commercial Division                                     COM/com/


IN THE MATTER of the Companies Act, 1992.


AND


IN THE MATTER of the Securities Industry Act, 2011.


AND


IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

## **CERTIFICATE**

This is the exhibit marked "CR1" referred to in the Affidavit of Christina R. Rolle filed herein and dated the   5th day of March 2020.


Before Me,


_____
Notary Public

**IN THE SUPREME COURT OF THE BAHAMAS**

**Commercial Division**

**IN THE MATTER of the Companies Act, 1992.**

**AND**

**IN THE MATTER of an Application under the Securities Industry Act, 2011**

**AND**

**IN THE MATTER of MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities., a Registered Securities Firm.**

---

### AFFIDAVIT OF CHRISTINA R. ROLLE

---

**2020/COM/com/**

Seantes Commussion of The Bahamas

**Securities Commission of the Bahamas**
**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street,**
**Nassau, Bahamas.**

**Attorney for the Petitioner**

**IN THE SUPREME COURT OF THE BAHAMAS**                    **2020**

**Commercial Division**                                   **COM/com/**

SUPREME COURT

MAR 0 5 2020

Nassau, Bahamas

**IN THE MATTER of the Companies Act, 1992.**

**AND**

**IN THE MATTER of the Securities Industry Act, 2011.**

**AND**

**IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.**

## W I N D I N G  U P  P E T I T I O N

**TO: The Supreme Court of The Commonwealth of The Bahamas**

**The Humble Petition of THE SECURITIES COMMISSION OF THE BAHAMAS** (hereafter, "the Commission"), a statutory corporation established pursuant to the Securities Industry Act, 2011 (hereafter, "the Act"), sheweth that:

1. Swiss America Securities Ltd. (hereafter "SASL" or "the Company") was incorporated in the Commonwealth of The Bahamas, pursuant to the Companies Act, 1992, as a limited liability company on the 10th September, 2008.

2. Swiss America Securities Ltd. (hereafter "SASL" or "the Company") was incorporated in the Commonwealth of The Bahamas, pursuant to the Companies Act, 1992, as a limited liability company on the 10th September, 2008. SASL was registered on the 26th September, 2011,

as a Broker Dealer Class II pursuant to the Securities Industry Act, 1999 and the Securities Industry Regulations, 2000 (both now repealed).

3. SASL is a registered firm authorized, under the Act, to deal in securities as principal and agent, arrange deals in securities, manage securities and advise on securities.

4. SASL was also licensed pursuant to the Financial Corporate Services Providers Act 2000 on 30th November, 2011, to provide corporate services to its clients, such as its online trading and execution services and also custodial brokerage services.

5. The principle address and registered office of SASL is situated at #3 Lookout Hill, Winton Heights in the Island of New Providence, one of the islands in the Commonwealth of The Bahamas.

6. The authorized capital of SASL is $5,000.00 divided into 5000 shares having a par value of $1.00 each.

7. At all material times, Mr. Guy Gentile was the CEO, shareholder and ultimate beneficial owner of SASL and also responsible for the day-to-day operations.

8. SASL's primary business activity comprises providing online day trading services to its clients.

9. In 2015, the Commission became aware that Mr. Gentile was the subject of a probe, both by the United States Securities and Exchange Commission ("USSEC") and the Department of Justice ("DOJ"), respectively. Mr. Gentile was charged with various offences particularly for penny stock manipulation schemes. For that reason, the Commission conducted a For -Cause-Examination ("FC-Exam") in relation to Mr. Gentile's securities dealings in the Bahamas.

10. In May 2016 the Commission conducted another FC-Exam which resulted in numerous breaches, inclusive of SASL's failure to report to the Commission the USSEC's and DOJ's actions.

11. In 2017, the Commission retained Ernst and Young to address concerns relative to the market manipulation and produced an audit report dated 21st February 2018.

12. In an effort to address the various breaches from the FC-Exam 2016, the Commission communicated on an ongoing basis with SASL during early 2018 to remediate the said numerous breaches and compliance issues. As a consequence, the Commission executed a settlement agreement with SASL on 30th August, 2018 wherein SASL paid a total sum of $120,000.00 in fines as a part of the settlement, and SASL agreed to address the compliance issues.

13. During December 2018, the Commission conducted an ROS-Exam on SASL's operations.  As a result, further breaches were revealed.  Similarly, it was apparent that none of the regulatory issues, per the aforesaid settlement, were rectified as SASL had agreed.

14. In 2019 during an investigation, the Commission discovered that Mr. Gentile incorporated a number of unregulated entities bearing the names of Swiss America Custody Ltd. or Mintbroker International Ltd. in various jurisdictions, including Canada and the United Kingdom. These entities were used to accept SASL clients' funds as opposed to clients' fund being remitted to an account in the name of SASL, the regulated entity of the Commission.

15. The Commission received information that the clients' funds in these accounts were transferred to SASL's operational account at Deltec Bank and Trust Ltd. This raised the issue of lack of segregation of clients' funds which is contrary to the statutory requirements. It also raised the concern of fraudulent activities within SASL's operations.

16. Based on SASL's aforesaid failure to satisfy the conditions of the settlement, in conjunction with the further breaches in 2018, and the 2019 investigations, the Commission decided to meet with Mr. Gentile on 12 September 2019 to address the aforementioned issues.

17. As a result of the September 2019 meeting, the Commission became aware that there were many irregularities regarding SASL's activities, such as:

   a. SASL characterizes its activity as "trading in principle", however, in the case of equities trading, clients would expect that "as principle", SASL was selling equities to clients from its own proprietary inventory.  However, such was not the case.

   b. The purchase of securities by SASL's clients do not result in those clients having the securities they believe they have purchased.

   c. SASL's clients not having direct market access, but rather SASL would "act as principal" for the clients and would pay the difference in securities trades.

   d. Mr. Gentile purported that SASL does not hold any inventory of securities, but rather that it is in a "short" position relative to its clients.

   e. SASL established several unregulated entities with similar names to SASL in foreign jurisdictions and had established bank accounts in foreign jurisdictions and these entities were receiving funds on behalf of SASL on terms unknown to the Commission.

18. Prior to the 12 September 2019 meeting, the Commission was unaware that SASL's clients operated within an environment solely dependent upon SASL, as opposed to client orders being placed directly in the market by SASL. The operational structure means that no actual trading is done in the market with respect to the clients' orders. Consequently, clients do not own shares, but are of the belief that they own the shares.

19. This state of affairs is unacceptable to the Commission, and is contrary to industry practice.

20. The Commission then moved to investigate Mr. Gentile's description of SASL' activities and made efforts to halt SASL's operations to prevent exposure to clients due to improper trade practices.

21. In view of these findings, pursuant to the Commissions' statutory powers per section 133(3) of the SIA, the Commission issued Orders via its letter dated 18 September 2019, directing SASL to, *inter alia*, suspend its business for approximately 5 days.

22. By its letter dated 19 September 2019, SASL admitted to improper trading practices as outlined above and once again indicated that SASL was willing to make changes to its operational activity to comply with operational protocols for registered firms.

23. In SASL's letter, SASL implied that it does not segregate its clients' assets as required, per Regulation 88 of the Securities Industry Regulations, 2012 ("SIR"), as SASL promised to "move all client related assets to a segregated account at Deltec Bank in Nassau owned by SASL". As already indicated above, the account at Deltec is an operational account and SASL moving clients' funds there would only create the issue of comingling, as aforesaid which is contrary to the statutory requirement to segregate.

24. SASL's operation as explained by Mr. Gentile is potentially fraudulent and is misleading to its clients who were led to believe that they are involved in trading securities when in fact they are trading against a non-existing position, as described by Mr. Gentile in the meeting with the Commission.

25. The Commission's concerns around the nature of SASL's manner of dealings may be understood by constructing a fictional illustration as follows -

   *Market price of share A may be trading at $50 per share.*

*Via a platform used by SASL, the client performs a purchase of 100 of share A, total cost of which is $5,000.*

*SASL simulates that the client has purchased the shares, while (it seems) unbeknownst to the client, it hasn't.*

*Also it seems unbeknownst to the client, the client's funding for its trades are directed (per instructions issued to the client by SASL) to a bank account of a different entity that has a similar name to SASL, but which is unregulated and domiciled in a foreign jurisdiction.  It is not clear or yet verified by the Commission whether or the extent to which the different entity is owned or controlled by SASL.*

*If the client intends to hold shares it thought it purchased for a period, or wants to liquidate it and cash out, such that the client's actual ownership of the shares by the client must be actualized, then SASL appears to simulate the portfolio value and sale of client shares against prevailing market market prices.  In the case where clients require the liquidation of their presumed shares, SASL can only hope that the current prices are less than the client had (supposedly) paid for them at the time SASL had simulated that the client had purchased them.*

*If at that later time at which the simulation of the sale of shares are being carried out, the shares are then trading lower, say, at $40 per share (given that the client had, supposedly, purchased them at $50 per share) SASL would profit from the difference, which in the example would be $1,000 for 100 shares.*

*However, if the price of the shares were then trading higher in the market, say, up from the $50 per share it was at the time client thought it had purchased to $60 per share, then SASL has to spend $1,000 more to actually effect the simulation of the sale of shares to the client's account.*

*If by chance SASL were faced with having to actualize share sales in large numbers for many clients in which the share prices had risen - apart from the apparent deception of the clients (if they were unaware of these goings on) - there is risk of an inability of SASL to deliver on the sales thereby possibly resulting in insolvency. The scheme would unravel.*

*Recovery against SASL would be complicated by the fact that funds paid by the client were never received into SASL but by the different and unregulated entities of foreign domicile.*

26. Therefore, in exercise of its regulatory authority, the Commission issued its orders and suspended SASL's operations for 5 days in order to address these issues as outlined above, inter alia, lack of proper trading practices, use of unregulated entities and non-segregation of client assets. This short term suspension was to allow the Commission sufficient time to investigate SASL's activities without being overly disruptive to its operations. However, based on Gentile's description of SASL's activity, it would have been irresponsible of the Commission to allow potentially fraudulent activities to continue to take place even while an investigation was ongoing.

27. Accordingly, on 19th, 20th and 23rd September 2019, the Commission sought to enter SASL's premises to conduct the said investigation and obtain relevant information for review, but were unable to perform any review because, while initially appearing to cooperate, SASL did not provide what the Commission requested.

28. To date the Commission is not in receipt of the requested information.

29. Instead of cooperating with the Commission, SASL made an *ex-parte* application for Judicial Review (JR) on the 23 September 2019, one day before the Commission's suspension expired and without ever complying with the Commission's request. SASL also received an Order vacating the Commission's regulatory orders and directives.

30. The orders granted by the Supreme Court has fully disabled the Commission from further investigations of these matters in relation to SASL's activities. The JR matter remains pending before the court.

31. On 3 December 2019, SASL informed the Commission of its intent to voluntarily wind up, although section 73 of the SIA mandates that a registrant seek the Commission's approval to voluntarily wind-up its operations.   However, SASL, without seeking the Commission's

approval, purported to communicate to the Commission its unilateral decision to voluntarily wind-up SASL.

32. The Commission on various occasions, through its correspondences of 19th November 2019, 10th December 2019, and 11th December, 2019, informed and directed SASL that any approval of SASL's voluntary surrender of its registration would be subject to conditions.

33. Therefore, the Commission, in its 10th December 2019 letter, informed and directed SASL that any approval of SASL's voluntary surrender of registration would be subject to SASL providing:

    a.  A complete transaction history of all activity on the IB brokerage accounts for the period beginning 1st June 2019 up to the closure of the IB accounts;

    b.  A full reconciliation of all client accounts held with SASL, whether or not they are/were held with IB, for the period beginning 01 June 2019 up to the closure of the IB accounts;

    c.  To the Commission its audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018;

    d.  A detailed plan (as approved by the directors) for winding up SASL's operations, including, but not limited to, details of any clients who could not be contacted or where there were any issues closing any client's account;

    e.  All of the above items listed (a) through (d) to the Commission by **Tuesday 31 December 2019**; and

    f.  Items (a) through (d) above having been provided, submit the remaining outstanding registration certificates for –

- Guy Gentile;
- Edward Cooper; and
- All other registered personnel for whom SASL received registration certificates.

34. To date, despite the numerous requests from the Commission, SASL, has failed again to comply with and/or provide all of the requested details.

35. In its 4th February 2020 letter, the Commission formally advised SASL that by reason of SASL's failures to provide all required information and the current non-operational status, the Commission will seek a court supervised winding up to ensure the protection of SASL's clients, investors and creditors in the winding up process and suspended the registration of SASL.

36. It is proposed that Mr. Igal Wizman, Licensed Insolvency Trustee ("LIT"), Chartered Insolvency and Restructuring Professional ("CIRP") and an Associate Partner with EY, having its place of business at One Montague Place, East Bay Street, Nassau, Bahamas; and Ms. Eleanor Fisher, of EY Cayman Ltd., 62 Forum Lane, Camana Bay, Grand Cayman, KY-1106, Cayman Islands, be appointed as joint provisional liquidators for the Company.

37. For the reasons set out above the Petitioner makes this application under section 134 of the Securities Industry Act, 2011 in conjunction with the Companies Act 1992, for the company to be wound up on the following grounds:

    I.  **That the Company:**
        a.  **Is currently non-operational;**
        b.  **Sought to wind up voluntarily but failed to meet the conditions necessary for this to occur; and**
        c.  **As a consequence, had its registration suspended.**

    II. **That it is in the public interest and in the interest of clients and/or investors that the Company be wound up.**

    III. **That it is just and equitable that the Company be wound up.**

**Your Petitioner therefore humbly prays that:-**

1) the Company be wound up by this Honourable Court pursuant to the Companies (Winding Up Amendment) Act, 2011;

2) Mr. Igal Wizman, LIT, CIRP, and Ms. Eleanor Fisher, aforesaid, both of the firm EY (Ernst and Young), be appointed as joint provisional liquidators, forthwith;

3) The Court confirm the commencement date of this liquidation;

4) All costs incurred by Igal Wizman and Eleanor Fisher, both of EY, and their advisors to date, if any, shall be costs in the winding-up; and

5) That such other Order may be made in the premises as is deemed just.

AND your petitioner will ever pray, etc.

**Dated the 5th day of March, A.D., 2020**

**Securities Commission of The Bahamas**
**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street**
**Nassau, The Bahamas**

**Attorney for the Petitioner**

**NOTE**: This petition is intended to be served on the Company and Mr. Guy Gentile, San Juan, Puerto Rico.

This Petition was presented by the Securities Commission of The Bahamas, whose address for service is 2nd Floor Poinciana House, North Building, 31A East Bay Street, Nassau, The Bahamas.

## NOTICE OF HEARING

TAKE NOTICE that this Petition will be heard before a Judge of the Supreme Court at the Supreme Court Building in the city of Nassau on the Island of New Providence on the      day of March A.D., 2020 at          o'clock in the         noon.


Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Commercial Division of the Supreme Court at Nassau.


**REGISTRAR**

**IN THE SUPREME COURT OF THE BAHAMAS**

**Commercial Division**

**IN THE MATTER of the Companies Act, 1992.**

**AND**

**IN THE MATTER of an Application under the Securities Industry Act, 2011**

**AND**

**IN THE MATTER of MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities., a Registered Securities Firm.**

---

**PETITION**

---

**2020/COM/com/**

*Securities Commission of the Bahamas*

**Securities Commission of the Bahamas**
Poinciana House
North Building, 2nd Floor
31A East Bay Street,
Nassau, Bahamas.

**Attorney for the Petitioner**

**THE COMMONWEALTH OF THE BAHAMAS**                          2020

**IN THE SUPREME COURT**                                    COM/com/

**Commercial Division**

> **SUPREME COURT**
>
> MAR 0 5 2020
>
> Nassau, Bahamas

IN THE MATTER of the Companies Act, 1992

AND

IN THE MATTER of an Application under the Securities Industry Act, 2011

AND

IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA
SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

## AFFIDAVIT OF CHRISTINA R. ROLLE

I, **Christina R. Rolle,** Executive Director of the Securities Commission of The Bahamas (the
**Commission**), New Providence, one of the Islands of the Commonwealth of The Bahamas, make
oath and say as follows:

1. I make this Affidavit on behalf of the Petitioner herein in my capacity as the Executive
   Director of the Commission.

2. The facts and matters referred to herein are, unless otherwise stated, within my own
   knowledge or are obtained from documents in possession of the Commission or its legal
   advisors as the case may be, and are true to the best of my knowledge, information and
   belief.

3. Swiss America Securities Ltd. (hereafter "SASL" or "the Company") was incorporated in
   the Commonwealth of The Bahamas, pursuant to the Companies Act, 1992, as a limited
   liability company on the 10th September, 2008. SASL was registered on the 26th

September, 2011, as a Broker Dealer Class II pursuant to the Securities Industry Act, 1999 and the Securities Industry Regulations, 2000 (both now repealed).

4. SASL is a registered firm authorized, under the Act, to deal in securities as principal and agent, arrange deals in securities, manage securities and advise on securities.

5. SASL was also licensed pursuant to the Financial Corporate Services Providers Act 2000 on 30th November, 2011, to provide corporate services to its clients, such as online trading and execution services, and custodial brokerage services.

6. At all material times, Mr. Guy Gentile was the CEO, shareholder and ultimate beneficial owner of the SASL and solely responsible for the day-to-day operations.

7. Pursuant to Part IV of the SIA, it is within the Commission's regulatory purview, by virtue of sections 42-43 and 45 to conduct examinations of all regulated persons. In view of that, the Commission, for regulatory purposes, conducts Routine-On-Site Examinations ("ROS-Exam") and For-Cause-Examinations ("FC-Exam"). The ROS-Exam involves a general review of the regulated person's AML/CFT Policies and procedures inclusive of risk management, AML training, Reporting of STR's and complaints and KYC/Due Diligence to determine compliance or conversely, areas of identified deficiencies during the ROS-exam. The FC-Exam is a focused examination of all the books and records of the regulated person and is normally applied where there are allegations of and/or reasons to suspect irregularities with respect to the regulated person's operations and activities.

8. Sometime in 2015, the Commission was made aware that Mr. Gentile was the subject of a probe, both by the United States Securities and Exchange Commission ("USSEC") and the Department of Justice ("DOJ"), respectively. Mr. Gentile was charged with various offences particularly for penny stock manipulation schemes. Therefore, as a result, the Commission conducted a FC-Exam in relation to Mr. Gentile's securities dealings in the Bahamas. **Now shown to me is a true copy of the said USSEC's Complaint marked and exhibited as "CRR1".**

9.  During May 2016 the Commission conducted a FC-Exam which revealed numerous breaches, inclusive of SASL's failure to report to the Commission the USSEC's and DOJ's actions. **Now shown to me is a true copy of the said FC-Exam 2016 marked and exhibited as "CRR2".**

10. In 2017, the Commission engaged Ernst and Young to address concerns relative to market manipulation. The consequential audit report of 21st February 2018 was produced. **Now shown to me is a true copy of the said audit report marked and exhibited as "CRR3".**

11. In an effort to address the various breaches from the FC-Exam 2016, the Commission communicated on an ongoing basis with SASL during early 2018 to remediate the said numerous breaches and compliance issues. As a consequence, the Commission executed a settlement agreement with SASL on 30th August, 2018 wherein SASL paid a total sum of $120,000.00 in fines as a part of the settlement, and SASL agreed to address the compliance issues. **Now shown to me is a true copy of the said Settlement agreement marked and exhibited as "CRR4".**

12. During December 2018, the Commission conducted an ROS-Exam on SASL's operations. As a result, further breaches were revealed.  Similarly, it was apparent that none of the regulatory issues, per the aforesaid settlement, were rectified as SASL had agreed. **Now shown to me is a true copy of the said on-site-examination marked and exhibited as "CRR5".**

13. In 2019 during an investigation, the Commission discovered that Mr. Gentile incorporated a number of unregulated entities bearing the name of Swiss America Custody Ltd. or Mintbroker International Ltd. in various jurisdictions, including Canada and the United Kingdom. These entities were used to accept SASL clients' funds as opposed to clients' fund being remitted to an account in the name of SASL, the regulated entity of the Commission.

14. The Commission received information that the clients' funds in these accounts were transferred to SASL's operational account at Deltec Bank and Trust Ltd. This raised the issue of lack of segregation of clients' funds which is contrary to the statutory requirements. It also raised the concern of fraudulent activities within SASL's operations.

15. Based on SASL's aforesaid failure to satisfy the conditions of the settlement, in conjunction with the further breaches in 2018 and the 2019 investigations, the Commission decided to meet with Mr. Gentile on 12 September 2019 to address the aforementioned issues.

16. As a result of the September 2019 meeting, the Commission became aware that there were many irregularities regarding SASL's activities, such as:

   a. SASL characterizes its activity as "trading in principle", however, in the case of equities trading, clients would expect that "as principle", SASL was selling equities to clients from its own proprietary inventory. However, such was not the case;

   b. The purchase of securities by SASL's clients do not result in those clients having the securities they believe they have purchased;

   c. SASL's clients not having direct market access, but rather SASL would "act as principal" for the clients and would pay the difference in securities trades;

   d. Mr. Gentile purported that SASL does not hold any inventory of securities, but rather that it is in a "short" position relative to its clients; and

   e. SASL established several unregulated entities with similar names to SASL in foreign jurisdictions and had established bank accounts in foreign jurisdictions and these entities were receiving funds on behalf of SASL on terms unknown to the Commission.

17. Prior to the 12 September 2019 meeting, the Commission was unaware that SASL's clients operated within an environment solely dependent upon SASL as opposed to client orders being placed directly in the market by SASL. The operational structure means that no actual trading is done in the market with respect to the clients' orders. Consequently, clients do not own shares, but are of the belief that they own the shares.

18. This state of affairs is unacceptable to the Commission, and is contrary to industry practice.

19. The Commission then moved to investigate Mr. Gentile's description of SASL' activities and made efforts to halt SASL's operations to prevent exposure to clients due to improper trade practices.

20. In view of these findings, pursuant to the Commissions' statutory powers per section 133(3) of the SIA, the Commission issued Orders via its letter dated 18 September 2019, directing SASL to, *inter alia*, suspend its business for approximately 5 days. **Now shown to me is a true copy of the said Letter marked and exhibited as "CRR6".**

21. By its letter dated 19 September 2019, SASL admitted to improper trading practices as outlined above and once again indicated that SASL was willing to make changes to its operational activity to comply with operational protocols for registered firms. **Now shown to me is a true copy of the said Letter marked and exhibited as "CRR7".**

22. In SASL's letter, SASL implied that it does not segregate its clients' assets as required, per Regulation 88 of the Securities Industry Regulations, 2012 ("SIR"), as SASL promised to "move all client related assets to a segregated account at Deltec Bank in Nassau owned by SASL". As already indicated above, the account at Deltec is an operational account and SASL moving clients' funds there would only create the issue of comingling, as aforesaid which is contrary to the statutory requirement to segregate.

**23.** SASL's operation as explained by Mr. Gentile is potentially fraudulent and is misleading to its clients who were led to believe that they are involved in trading securities when in fact they are trading against a non-existing position, as described by Mr. Gentile in the meeting with the Commission.

**24.** The Commission's concerns around the nature of SASL's manner of dealings may be understood by constructing a fictional illustration as follows -

*Market price of share A may be trading at $50 per share.*

*Via a platform used by SASL, the client performs a purchase of 100 of share A, total cost of which is $5,000.*

*SASL simulates that the client has purchased the shares, while (it seems) unbeknownst to the client, it hasn't.*

*Also it seems unbeknownst to the client, the client's funding for its trades are directed (per instructions issued to the client by SASL) to a bank account of a different entity that has a similar name to SASL, but which is unregulated and domiciled in a foreign jurisdiction. It is not clear or yet verified by the Commission whether or the extent to which the different entity is owned or controlled by SASL.*

*If the client intends to hold shares it thought it purchased for a period, or wants to liquidate it and cash out, such that the client's actual ownership of the shares by the client must be actualized, then SASL appears to simulate the portfolio value and sale of client shares against prevailing market market prices. In the case where clients require the liquidation of their presumed shares, SASL can only hope that the current prices are less than the client had (supposedly) paid for them at the time SASL had simulated that the client had purchased them.*

*If at that later time at which the simulation of the sale of shares are being carried out, the shares are then trading lower, say, at $40 per share (given that the client had, supposedly, purchased them at $50 per share) SASL would profit from the difference, which in the example would be $1,000 for 100 shares.*

*However, if the price of the shares were then trading higher in the market, say, up from the $50 per share it was at the time client thought it had purchased to $60*

*per share, then SASL has to spend $1,000 more to actually effect the simulation of the sale of shares to the client's account.*

*If by chance SASL were faced with having to actualize share sales in large numbers for many clients in which the share prices had risen - apart from the apparent deception of the clients (if they were unaware of these goings on) - there is risk of an inability of SASL to deliver on the sales thereby possibly resulting in insolvency. The scheme would unravel.*

*Recovery against SASL would be complicated by the fact that funds paid by the client were never received into SASL but by the different and unregulated entities of foreign domicile.*

25. Therefore, in exercise of its regulatory authority, the Commission issued its aforesaid order suspending SASL's operations for 5 days, so as to address the issues outlined above, inter alia, lack of proper trading practices, use of unregulated entities and non-segregation of client assets. This short term suspension was to allow the Commission sufficient time to investigate SASL's activities without being overly disruptive to its operations. However, based on Gentile's description of SASL's activity, it would have been irresponsible of the Commission to allow potentially fraudulent activities to continue to take place even while an investigation was ongoing.

26. To assist the Commission's efforts aforesaid, the Commission appointed James Gomez of Baker Tilly Gomez to conduct an audit of SASL's financial transactions, inclusive of banking, trading and client records.

27. Accordingly, on 19th, 20th and 23rd September 2019, the Commission sought to enter SASL's premises to conduct the said investigation and obtain relevant information for review, but were unable to perform any review because, while initially appearing to cooperate, SASL did not provide what the Commission requested.

28. To date the Commission is not in receipt of the requested information.

29. Instead of cooperating with the Commission, SASL made an *ex-parte* application for Judicial Review on the 23 September 2019, one day before the Commission's suspension expired and without ever complying with the Commission's request. SASL also received an Order vacating the Commission's regulatory orders and directives.

30. The orders granted by the Supreme Court has fully disabled the Commission from further investigations of these matters in relation to SASL's activities. **Now shown to me is a true copy of the said Order filed 23September 2019 marked and exhibited as "CRR8".**

31. On 3 December 2019, SASL informed the Commission of its intent to voluntarily wind up, although section 73 of the SIA mandates that a registrant seek the Commission's approval to voluntarily wind-up its operations. However, SASL, without seeking the Commission's approval, purported to communicate to the Commission its unilateral decision to voluntarily wind-up SASL. **Now shown to me is a true copy of the said letter marked and exhibited as "CRR9".**

32. The Commission on various occasions, through its correspondences of 19th November 2019, 10th December 2019, and 11th December, 2019, informed and directed SASL that any approval of SASL's voluntary surrender of its registration would be subject to conditions.

33. Therefore, the Commission, in its 10th December 2019 letter, informed and directed SASL that any approval of SASL's voluntary surrender of registration would be subject to SASL providing:

   a. Provide a complete transaction history of all activity on the IB brokerage accounts for the period beginning 1st June 2019 up to the closure of the IB accounts;

   b. Provide a full reconciliation of all client accounts held with SASL, whether or not they are/were held with IB, for the period beginning 01 June 2019 up to the closure of the IB accounts;

    c.  Submit to the Commission its audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018;

    d.  Provide a detailed plan (as approved by the directors) for winding up SASL's operations, including, but not limited to, details of any clients who could not be contacted or where there were any issues closing any client's account;

    e.  Submit all of the above items listed (a) through (d) to the Commission by **Tuesday 31 December 2019**; and

    f.  Upon items (a) through (d) above having been provided, submit the remaining outstanding registration certificates for –

- Guy Gentile;
- Edward Cooper; and
- All other registered personnel for whom SASL received registration certificates.

**Now shown to me are true copies of the said letters marked and exhibited as "CCR 10", respectively.**

34. To date, despite the numerous requests from the Commission, SASL, has failed again to comply with and/or provide all of the requested information.

35. By its letter dated 4th February 2020, the Commission formally advised SASL that by reason of its failure to provide all required information and SASL's current non-operational status, the Commission will immediately suspend the registration of SASL and seek a court supervised winding up to ensure the protection of SASL's clients, investors and creditors in the winding up process. **Now shown to me are true copies of the said letters marked and exhibited as "CCR 11".**

36. It is paramount that the Commission protect the welfare of investors and/or clients as well as to maintain the integrity of the Bahamas' securities and investment markets. Therefore, the Commission seeks orders to prevent any further or any potential harm to SASL's clients.

37. In the circumstances I submit and confirm that the Commission has determined that it is in the public interest and the interest of SASL's clients to have SASL subject to a court-supervised winding up, and I further submit that a provisional liquidator should immediately be appointed to protect the company pending the hearing of the Petition.

38. That the contents of this Affidavit are true and correct to the best of my knowledge information and belief.

SWORN TO in the City of Nassau   }

This 5th day of March, A.D., 2020   }

BEFORE ME,

_____

NOTARY PUBLIC

**COMMONWEALTH OF THE BAHAMAS**                    2020

**IN THE SUPREME COURT**                                       COM/com/

**Commercial Division**

IN THE MATTER of the Companies Act, 1992

AND

IN THE MATTER of an Application under the Securities Industry Act, 2011

AND

IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA

SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

## CERTIFICATE

These are the Exhibits marked **"CRR 1"** through **"CRR 11"** referred to in the Affidavit of Christina R. Rolle filed herein and dated the 5th day of March, 2020.

Before Me,

Notary Public

EXHIBIT CRR1

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
------------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **16 Civ.       (     )** |
| | : | |
| -against- | : | **COMPLAINT** |
| | : | |
| **GUY GENTILE,** | : | |
| | : | |
| **Defendant.** | : | |

------------------------------------------------------------------------x

   Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Guy Gentile ("Gentile") (who, upon information and belief, resides at 103 Bryant

Pond Road, Putnam Valley, New York, 10579), alleges:

<u>**SUMMARY**</u>

   1.       This case involves two penny stock manipulation schemes perpetrated by Gentile.

The first scheme was perpetrated in 2007 and involved the stock of Raven Gold Corporation

("RVNG"), a purported gold and silver exploration company.  The second scheme was

perpetrated in 2007-2008 and involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a

company involved in natural gas production.  In addition to market manipulation and fraudulent

promotion, the schemes involved illegal unregistered offerings of the issuers' stocks, and,

together, generated over $17 million in illegal gross stock sale proceeds as well as substantial profits for the schemes' participants.

2.      In the RVNG scheme, two penny stock promoters from Toronto, Canada, Mike Taxon and Itamar Cohen ("Taxon" and "Cohen," respectively), were hired to promote RVNG stock by the persons who controlled the company in exchange for a controlling block of the company's purportedly unrestricted shares.  Taxon and Cohen then recruited Gentile, the owner of a broker-dealer based in upstate New York, to execute key aspects of the promotion in exchange for half of their newly-acquired RVNG shares.

3.      Gentile agreed to the arrangement, and manipulated the market for RVNG stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock.

4.      In addition, Gentile, together with the Taxon and Cohen, created and distributed a glossy promotional "newsletter" touting RVNG stock (the "RVNG Mailer").  The RVNG Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements or omissions about the promoters' identity, compensation, and control of the issuer's stock.

5.      Finally, to increase the appearance of active market demand for the stock, Gentile, Taxon and Cohen bribed friends and acquaintances to make open-market purchases of RVNG by handing out free blocks of RVNG stock to them.

6.      In the KYUS scheme, Gentile was recruited to promote the stock by the individuals who controlled the issuer, and then invited Taxon and Cohen to participate and help finance the scheme, in exchange for a share of the ultimate profits.  Gentile used his own funds and the funds provided by Taxon and Cohen to obtain control of a substantial block of the

2

company's purportedly unrestricted shares and used proceeds from the illegal unregistered sales of the stock to finance the promotion.

7.      As in the RVNG scheme, Gentile manipulated the market for KYUS stock by executing manipulative trades intended to create the false appearance of liquidity and market demand, by, among other things, executing matched trades between multiple accounts that he controlled.  Once again, Gentile, together with Taxon and Cohen, fabricated from whole cloth and distributed a fake promotional newsletter, the "KYUS Mailer."  Just like the RVNG Mailer, the KYUS Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements and omissions about the promoters' identity, compensation, and control of the issuer's stock.

8.      Because Gentile obtained RVNG and KYUS stock from the persons controlling the issuers, with a view to selling it to the public, Gentile was a statutory underwriter under the Securities Act of 1933 ("Securities Act"), and his unregistered sales of the stock violated the securities registration requirements of the Securities Act.

9.      In addition, by engaging in these schemes, Gentile violated the anti-touting and anti-fraud provisions of the Securities Act and violated or aided and abetted violations of the anti-fraud provisions of the Securities Exchange Act of 1934  ("Exchange Act").

**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

10.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment: (a) permanently restraining and enjoining Gentile from engaging in the acts, practices and courses of business alleged herein; (b) requiring Gentile to disgorge his ill-gotten gains and to pay prejudgment interest thereon; (c) imposing

civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and

Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) permanently prohibiting

Gentile from participating in any offering of penny stock pursuant to Section 20(g) of the

Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. §

78u(d)(6).

<strong><u>JURISDICTION AND VENUE</u></strong>

11.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of

the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange

Act, 15 U.S.C. §§ 78u(d) and 78aa.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts,

practices, courses of business and transactions constituting the violations alleged herein occurred

within the District of New Jersey.  For example, Gentile sold unregistered RVNG and KYUS

securities and executed manipulative trades in those securities, in part, through broker-dealers

located in the District of New Jersey, and using trading systems operated through servers in the

District of New Jersey.

13.     Gentile, directly or indirectly, made use of the means or instruments of

transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange in connection with the transactions, acts, practices and courses of

business alleged herein.

## DEFENDANT

14.     **Gentile**, age 39, resides in Putnam Valley, New York.  At the time of the conduct alleged herein, Gentile resided in Mahopac, New York.  Gentile is the founder and, at the time of the conduct alleged herein, was the owner of a Commission-registered broker-dealer located in Carmel, New York.  Over the years, Gentile has been the principal of multiple securities-related businesses in addition to his registered broker-dealer, including, most recently, a Bahamas-based online brokerage firm, which Gentile opened in 2011.

## ISSUERS

15.     **RVNG** was a Nevada corporation.  During the scheme alleged herein, RVNG's headquarters were in Vancouver and Penticton, British Columbia, and its common stock was quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

16.     **KYUS** was a Delaware corporation headquartered in London, Kentucky.  During the scheme alleged herein, KYUS represented that it was engaged in shale gas exploration in western Kentucky.  During the scheme alleged herein, its common stock was quoted on the OTCBB and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

## FACTS

**I.**     **THE RVNG SCHEME**

    **A.**     **RVNG's Corporate Background**

    17.     RVNG was incorporated in Nevada in or about February 2005, under the name Riverbank Resources, Inc.  In its public filings, the company claimed that it was in the business of mineral exploration.  In reality, however, the company was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies.

    18.     In April 2005, the company conducted two unregistered offerings of a total of 7.424 million shares of its common stock under Regulation S.  The individuals who received the stock in the offerings, including the company's purported officers and directors, were nominees of the attorney who had created the shell, and not true owners of the stock.

    19.     In or about July 2005, the company filed with the Commission a registration statement on Form SB-2, purporting to register the resale of 3.424 million shares held by individuals other than the company's purported officers and directors.  The registration statement became effective in or about September 2005.

    20.     Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the Riverbank Resources shell from the attorney who had created it.  Subsequently, to effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees, including, in 2007, Gentile, Taxon and Cohen.  These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer – first, the attorney who had created the shell and then the RVNG Owners – directed all the transfers.

21.     In or about August 2006, the company, now controlled by the RVNG Owners, changed its name to Raven Gold Corporation, carried out a 5:1 stock split, and announced a change in management.  In September 2006, the company announced that it had "decided to discontinue" mineral exploration at its British Columbia property.  In or about March 2007, RVNG carried out a 2:1 split of its common stock.

22.     As a result of the stock splits in 2006 and 2007, as well as additional restricted stock issuances directed by the RVNG Owners during this time period, during the stock manipulation scheme alleged below, RVNG had approximately 75 million shares of common stock issued and outstanding, of which approximately 34 million shares were traceable to the April 2005 Regulation S offerings and purportedly covered by the subsequent resale registration statement, the goal of which was to make the shares appear unrestricted.

23.     In or about March 2007, RVNG common stock began trading on the OTCBB under its new symbol, "RVNG."

24.     During the stock manipulation scheme alleged below, the RVNG Owners had complete control of RVNG and its management.

**B.     The RVNG Stock Promotion Deal**

25.     In early 2007, the RVNG Owners met Taxon and Cohen through a common acquaintance and proposed that Taxon and Cohen promote RVNG stock.  Taxon and Cohen then reached out to Gentile and invited him to participate in the "deal."

26.     In the course of the following few weeks, the RVNG Owners agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign consisting of a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock.  In

turn, Taxon and Cohen agreed that Gentile would help them execute the key aspects of the promotion, including the advertising campaign and the manipulative trading, in exchange for a portion of Taxon and Cohen's cut of the stock.  Gentile, Taxon, and Cohen also agreed that they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign.

27.     To put these plans in motion, between mid-May and mid-June 2007, the RVNG Owners directed transfers of eighty percent of RVNG's purportedly unrestricted stock (approximately twenty-seven million shares) to accounts controlled by Gentile, Taxon and Cohen.  Of that amount, approximately twenty million shares, represented Gentile's and Taxon and Cohen's compensation, and the remaining, approximately seven million shares, was parked in an offshore account under Taxon's control for the duration of the promotion – a term that Taxon and Cohen negotiated with the RVNG Owners, to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind Gentile, Taxon and Cohen's backs, and thus undermine Gentile, Taxon, and Cohen's efforts to drive up the stock price and sell shares at a high price.

28.     To obscure their connection to and control of the majority of the purportedly unrestricted RVNG stock, Gentile, Taxon, and Cohen did not deposit their RVNG stock in U.S.-based accounts held in their own names.  Instead, the share blocks were deposited in U.S. brokerage accounts held in the names of several offshore brokerage firms where Gentile, Taxon and Cohen had or controlled accounts.

**C.**     **Manipulative Trading and Fraudulent Promotion of RVNG Stock**

29.     On receiving their blocks of RVNG shares, Gentile, Taxon and Cohen embarked on a promotional campaign for the stock, which consisted of manipulative trading, a promotional mailer, and advertisements placed in multiple news publications.  The RVNG Owners, for their part, supported the promotion by ensuring a steady stream of positive company press releases.

**1.**     **Manipulative Trading and Kick-Backs**

30.     In June and July 2007, Gentile and Taxon directed manipulative trades in RVNG stock.  Their RVNG stock trading in June and July 2007 was intended to achieve two primary goals.  First, Gentile and Taxon sold RVNG stock to generate cash to fund the promotional mailing and advertising that would follow in July 2007.  Second, Gentile and Taxon traded RVNG stock between their various accounts in order to create the false appearance of liquidity and active interest in the stock – in substance, an attractive (but fake) price and volume history for investors who would be researching the stock after seeing the upcoming promotional mailer or advertisements.

31.     To amplify the false appearance of increased liquidity and market interest in the stock, Gentile, Taxon and Cohen reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock.  Some of those offers were accepted.  For example, on or about July 19, 2007 and August 20, 2007, Taxon and Cohen transferred blocks of 5,000 and 25,000 RVNG shares, respectively, from one of their offshore accounts to the accounts of one of Gentile's acquaintances.  That acquaintance bought approximately 101,500 shares of RVNG in the open market in June and July of 2007, and sold all of his RVNG shares – those received as a kick-back

and those bought in the open market – by early September of 2007, making a profit of approximately $25,600.

## 2.  The RVNG Mailer and Media Advertisements

32.  The centerpiece of the RVNG promotion was the RVNG Mailer – an eight-page glossy "newsletter" touting RVNG stock that Gentile, Taxon, and Cohen distributed in mid-July 2007 under a fake entity name, "Stock Trend Report."

33.  The RVNG Mailer contained multiple materially false or misleading statements, as Gentile, one of its authors, knew or was reckless in not knowing.  For example, the mailer was purportedly published by an entity named "Stock Trend Report" and claimed to be a July 2007 "Special Edition of Premium Members."  In reality, Stock Trend Report was an entirely fictional name created specifically for the RVNG campaign, with no prior or subsequent "editions."

34.  Additionally, the RVNG Mailer's cover page claimed that RVNG stock had been "seen on" CNBC, Bloomberg, in the Wall Street Journal, the New York Times, and in other respected news publications, creating the impression that the stock had been a subject of reporting in those publications.  In reality, the stock had only been "seen" in those publications in paid advertisements placed by Gentile, Taxon and Cohen.

35.  These misstatements were material because they lent the RVNG Mailer an aura of legitimacy and reliability, and helped conceal the fact that it was an advertisement placed on behalf of and in coordination with the RVNG Owners.

36.  The RVNG Mailer also touted the stock's "strong move upward" in "recent weeks," which the RVNG Mailer attributed to the company's strong business prospects.  A chart covering the time period from early May to mid-June of 2007 purportedly showed the stock's "remarkable uptrend so far."  These statements were materially misleading.  The RVNG Mailer

failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Gentile, Taxon, and those acting in concert with them, which were executed for the very purpose of creating an attractive price and volume history for the stock, not because of legitimate, independent market interest.

37.     The RVNG Mailer's last page contained a warning: "Please note: Due to high market demand for RVNG by institutional investors, some brokers may require you to phone in your order." This statement was materially false: No "high market demand for RVNG by institutional investors" existed.

38.     The RVNG Mailer contained a fine-print disclaimer that purported to disclose the compensation received by the mailer's publisher and the publisher's motivations and intentions with respect to the stock. The disclaimer was itself materially false and misleading.

39.     For example, the disclaimer continued to attribute the RVNG Mailer to "Stock Trend Report," a nonexistent entity.

40.     The disclaimer also stated that the company, RVNG, had "not approved the statements made in this opinion." In reality, the RVNG Owners, who controlled the company and its management, had seen drafts of the mailer and had signed off on its content.

41.     On the subject of compensation, share ownership, and intent to sell with respect to RVNG stock, the disclaimer stated that Stock Trend Report (called "STR" in the disclaimer) "has been compensated by third party shareholders or with cash from the company on behalf of one or more of the companies mentioned in this opinion . . . for dissemination of this advertisement and other professional services. … STR's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value."

42.     These statements were materially false or misleading, as Gentile knew or was reckless in not knowing.  Stock Trend Report was a nonexistent, fictional enterprise.  Moreover, the compensation that Gentile, Taxon and Cohen had received for the "dissemination of this advertisement" and other promotional efforts, including the manipulative trading, consisted of sixty percent of RVNG's purportedly unrestricted stock – and the mailer itself was financed with the proceeds from the sale of that stock.  The disclaimer that Stock Trend Report "may have bought" or "may buy" RVNG shares was also misleading, as most of Gentile, Taxon and Cohen's shares had been received at no cost and had already been partially liquidated to finance the promotional campaign.

43.     In July 2007, Gentile, Taxon and Cohen also placed paid advertisements for RVNG in multiple major publications.  The advertisements were, in substance, condensed versions of the RVNG Mailer and contained many of the same materially false or misleading statements, including the attribution of the advertisements to the nonexistent Stock Trend Report, the misleading touting of the stock's recent performance, and a disclaimer identical to that in the RVNG Mailer.

44.     Gentile closely collaborated with Taxon and Cohen in the creation and distribution of the RVNG Mailer and the RVNG advertising materials.  Gentile knew or was reckless in not knowing that the RVNG Mailer and the advertisements contained the materially false or misleading statements as alleged above.

3.      **Press Releases**

45.     It was understood among the RVNG Owners and Taxon and Cohen that, for the RVNG stock promotion campaign to succeed, the issuer should disclose a string of "positive

events" during the promotion.  Thus, throughout June and July 2007, the RVNG Owners supported the stock promotion campaign with a steady stream of RVNG press releases.

46.     RVNG issued a total of thirteen press releases during this time period:  five in June and eight in July.  Of those thirteen releases, five announced purported arrivals of new officers and directors, and the remaining eight vaguely touted purported developments in RVNG's exploration business, such as plans to "commence general exploration at La Currita, Mexico, within the next 21 days," the commissioning of a "detailed 'Phase 1 Exploration Program' at La Currita," receipt of certain initial sample results, and discovery of a "New Parallel Mineralized Vein Structure."  The RVNG Owners, Gentile, Taxon and Cohen coordinated the timing and number of these press releases, and the press releases were intended to and did support the ongoing market manipulation scheme conducted by Gentile, Taxon and Cohen.

47.     By taking the steps described above, Gentile, Taxon and Cohen successfully manipulated the market for RVNG stock.  Until May 31, 2007, RVNG traded at prices not exceeding $0.80 per share and with minimal volume, with no trading occurring on many days.  Starting on May 31, 2007, the daily price and especially the daily volume went up dramatically – only to decline as soon as the promotion was complete.  The summary chart below demonstrates the dramatic manipulative effect of the promotion on the market for RVNG stock.

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07* | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

*Starting after 2:1 stock split and receipt of new symbol RVNG.OB.*

48.     Because Gentile, Taxon and Cohen obtained RVNG stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.  Yet no registration statement was filed or in effect with respect to their sales of RVNG stock.

49.     The selling of unregistered RVNG stock by Gentile, Taxon and Cohen generated an estimated five million dollars in gross proceeds.

## II.   THE KYUS SCHEME

### A.   KYUS Corporate Background

50.    KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas").  In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims."  In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

51.    In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000.  The registration statement became effective in or about June 2007.  The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers.  These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

52.    After the purported public offering, the company had three million common shares issued and outstanding:  two million restricted shares, previously issued to Las Rocas' sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

53.    On or about October 15, 2007, as alleged in greater detail below, Adam S. Gottbetter, a New York microcap lawyer ("Gottbetter"), arranged the purchase of the Las Rocas shell from the KYUS Shell Sellers for $760,000 contributed by Gentile, Taxon, Cohen, and Gottbetter's business partner in the KYUS deal ("Gottbetter's Partner").

54.     Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("KYUS Privco"); the merger ultimately closed on May 2, 2008.

55.     In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding:  24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by Gentile (together with Taxon and Cohen), Gottbetter, and Gottbetter's Partner.

56.     On or about November 20, 2007, the KYUS common stock began trading on the OTCBB under its new symbol, "KYUS."

**B.     <u>The KYUS Stock Promotion Deal</u>**

57.     In the summer of 2007, Gottbetter and Gottbetter's Partner became acquainted with Gentile and invited him to participate in the KYUS "deal."  Over the course of multiple meetings and conversations, it was agreed that Gentile, working with his partners (Taxon and Cohen), would (1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market.  It was further agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for Gentile to obtain control of a substantial block of purportedly unrestricted KYUS stock.

58.     Gentile, in turn, invited Taxon and Cohen to participate in the "deal."  Unlike the

RVNG Owners, who provided unrestricted RVNG stock to Gentile, Taxon and Cohen at no cost,

Gottbetter insisted that Gentile and his partners purchase KYUS stock in private transactions for

$604,000.  Taxon and Cohen agreed to split this upfront cost with Gentile and transferred

$300,000 to Gentile for use in the deal.  Gentile then transferred Taxon and Cohen's $300,000

and an additional $304,000 from his own offshore accounts to Gottbetter as payment for seventy-

five percent of KYUS's purportedly unrestricted common shares.   The remaining twenty-five

percent of the purportedly unrestricted shares were transferred to Gottbetter and Gottbetter's

Partner.

59.     As in the RVNG scheme, in the KYUS scheme, Gentile, Taxon and Cohen's

allocation of the purportedly unrestricted KYUS stock was directed to accounts in the names of

nominee entities ("Nominee Entities"), rather than to accounts held in their own names.  By

depositing their shares in the Nominee Entities' accounts – in this case, accounts of three

offshore and one domestic brokerage firms – Gentile, Taxon and Cohen obscured their

connection to the stock and the upcoming market manipulation.

**C.     Manipulative Trading and Fraudulent Promotion of KYUS Stock**

60.     Similar to the RVNG promotion, the KYUS promotion had two components:

manipulative trading, which began in November 2007, and a promotional mailer, which Gentile

created and distributed in May 2008, shortly after the merger of the KYUS shell with KYUS

Privco.

61.     Immediately after receiving their KYUS shares into the Nominee Entities'

accounts in late 2007, Gentile, Taxon and Cohen began "building the chart" for KYUS stock, in

preparation for the distribution of the promotional mailer and the ultimate sell-off that they

executed in May 2008, once the promotion worked to inflate the stock's price.  Gentile, Taxon and Cohen controlled seventy-five percent of the public float, and on many days between late 2007 and May 2008, most and sometimes even all of the market activity in the stock was generated by accounts that they controlled.

62.     Among other things, Gentile executed matched trades between the Nominee Entities' accounts and accounts in the names of Gentile's friends and family members that Gentile controlled.  Gentile also asked some of his acquaintances among penny stock traders to buy KYUS stock in the open market (in substance, from Gentile), based on the understanding that Gentile would be promoting the stock and would give his "buyers" a heads-up about the upcoming promotion, enabling them to sell the stock at a high price.  At least two of Gentile's acquaintances agreed and purchased KYUS stock in the open market in advance of the promotion, and then sold it during the promotion at a profit.

63.     The matched trades and the efforts to "bring in buyers" described above had the same twin goals.  First, KYUS stock sales generated the cash that Gentile would later use to fund the KYUS promotional mailing.  Second, through these actions, Gentile was delivering on his promise to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

64.     In or about May 2008, shortly after the KYUS merger closed, Gentile distributed by mail a glossy promotional mailer touting KYUS.  The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch.  The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called

Green Century Capital.  In fact, Gentile funded the KYUS Mailer with proceeds from selling his, Taxon and Cohen's allotments of KYUS stock.

65.     Gentile took the lead role in creating and distributing the KYUS Mailer, and he knew or was reckless in not knowing that the KYUS Mailer contained materially false or misleading statements, including false attribution, as alleged above.

66.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the stock price rose from $0.69 per share to $1.70 per share.  Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008.  The volume also increased dramatically.  While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

67.     By the end of May 2008, Gentile, Taxon and Cohen had sold millions of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for estimated gross proceeds of approximately $10 million.  They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter.

68.     Gottbetter and Gottbetter's Partner, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter.  Gottbetter continued selling KYUS stock through November 2010, and Gottbetter's Partner continued selling KYUS stock at least through November 2009.  Gottbetter and Gottbetter's Partner sold their KYUS stock holdings in whole or in part through offshore accounts.  Gentile had access to and ability to

execute trades in at least one of those accounts, and he assisted in the execution of some of these subsequent sales of KYUS stock.

69.     Because Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.

70.     No registration statement was filed or in effect with respect to the KYUS stock sales of Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

71.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

72.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

73.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

## SECOND CLAIM FOR RELIEF
## Violations of Section 17(b) of the Securities Act

74.      Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

75.      By virtue of the foregoing, Gentile, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspaper articles, letters, investment services, or communications which described securities for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

76.      By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

## THIRD CLAIM FOR RELIEF
## Violations of Section 17(a) of the Securities Act

77.      Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

78.      By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) with scienter, employed devices, schemes, or artifices to defraud;  (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

79.      By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

80.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

81.     By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

82.     By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Thereunder

83.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

84.     By virtue of the foregoing, Gentile, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to

engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

85.     By virtue of the foregoing, Gentile aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Gentile, his agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), 17(a) and 17(b) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77q(b), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Ordering Gentile to disgorge his ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

### III.

Ordering Gentile to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Permanently prohibiting Gentile from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the

Exchange Act, 15 U.S.C. § 78u(d)(6).

## V.

Granting such other and further relief as this Court deems just and appropriate.

Dated: _March 23_, 2016
      New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____

      Andrew M. Calamari
      Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against Defendant Gentile in the foregoing Complaint is not the subject of any other civil action against Gentile pending in any court, or of any pending arbitration or administrative proceeding.

A related civil case involving the Commission's claims against Adam S. Gottbetter arising out of the KYUS scheme (SEC v. Gottbetter, et al., 15-CV-3528 (JLL)) was filed in this Court in 2015 but is now closed.

A related civil case involving the Commission's claims against Mike Taxon and Itamar Cohen arising out of the RVNG and KYUS schemes (SEC v. Taxon, et al.; 15-CV-3587 (JLL)) is pending before the Court and is currently stayed pending the resolution of the parallel criminal cases (United States v. Taxon, 15-CR- 0249 (JLL), and United States v. Cohen, 15-CR-0248 (JLL)), which are also pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By:

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

                Chief, Civil Division
                United States Attorney's Office
                District of New Jersey
                970 Broad Street, Ste. 700
                Newark, New Jersey 07102

                        SECURITIES AND EXCHANGE COMMISSION

By:                                        

                        Andrew M. Calamari
                        Regional Director
                SECURITIES AND EXCHANGE COMMISSION
                Brookfield Place, 200 Vesey Street
                New York, New York 10281-1022
                (212) 336-1023 (Brown)
                Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

EXHIBIT CRR2



## SECURITIES COMMISSION OF THE BAHAMAS

**INSPECTIONS DEPARTMENT**

---

**INTEROFFICE MEMORANDUM**

---

To:      Executive Director – Ms. Christina Rolle
CC:      Enforcement Committee
From:   Manager, Inspections Department - Ms. Lesley Pearson
Date:   25 May 2016
Re:      Inspection for Cause – Swiss America Securities Limited

---

## 1.0 INTRODUCTION

The Inspections Department was instructed by the Executive Director and the Enforcement Department in a meeting on 2 May 2016 to conduct an Inspection For Cause of Swiss America Securities Limited ("SASL") or ("the company"), to exam all the books and records of SASL, its clients and related parties.

The field work of the Inspection for Cause of SASL began on 4 May 2016 and ended on 23 May 2016. The examination was conducted at the Registrant's office located at Elizabeth on Bay Plaza, Suite 17, Bay Street, Nassau, Bahamas.

## 2.0 BACKGROUND OF THE INSPECTION FOR CAUSE

The Securities Commission of The Bahamas ("Commission") received allegations of irregularities in the operations of SASL which was cause for concern.  SASL CEO and Director, Guy Gentile was charged by the Securities and Exchange Commission for penny stock manipulation schemes.  However, SASL did not advise the Commission of the charges against Guy Gentile; therefore, is in breach of Regulation 53(2)(h)[2] of the Securities Industry Regulations, 2012.  In addition, SASL failed to meet its statutory reporting obligations and submission of outstanding documents and fees.

**See Appendix A for SEC Court Indictment and a complaint from a confidential informant on SASL failure on performing proper due diligence on clients and lack of basic corporate governance.**

## 3.0 BACKGROUND OF SASL:

Swiss America Securities Ltd. ("SASL" or "the Company") was incorporated in the Commonwealth of The Bahamas under the Companies Act 1992, as a limited liability company on 10 September, 2008. SASL was licensed with the Securities Commission of The Bahamas ("the Commission"), as a Broker

Dealer Class II, on 26 September, 2011, pursuant to The Securities Industry Act, 1999 (now repealed) and the Securities Industry Regulations, 2000 ("the Regulations").  Pursuant to the Securities Industry Act, 2011 ("the Act"), SASL is currently licensed as a registered firm, authorized to Deal in Securities as Principal and Agent, Arrange Deals in Securities, Manage Securities and Advise on Securities.  The Company was also licensed under the Financial and Corporate Service Providers Act, 2000 ("FCSPA") on 30 November, 2011 to provide corporate services to its clients.

SASL's business activities include the following:

  ➢ Online Trading and execution services;
  ➢ Custodial services;
  ➢ Brokerage account services;

**4.0 OBJECTIVE OF THE INSPECTION FOR CAUSE**

The objectives of the inspection for cause were to review SASL's operations in regards to the following:

  ➢ Operational Systems and Controls;
  ➢ Anti-Money Laundering (AML) / Counter Terrorist Financing:
      o Compliance Officer (CO) / Money Laundering Reporting Officer (MLRO) Duties;
      o Customer Due Diligence / Know Your Customer;
      o Suspicious Transaction Reporting;
      o Large Cash Transactions;
      o Complaints; and
      o AML Training and Monitoring System
  ➢ Reporting Obligation to the Commission
  ➢ Segregation of Clients' Assets from SASL's financial affairs
  ➢ Other Matters
      o Risk Monitoring of Client Accounts
      o Books and Records

This report will detail factual results found onsite, offsite, and inquiries with SASL key personnel.

**5.0 SCOPE OF THE EXAMINATION**

The scope of the examination was 1 January 2012 – 30 April 2016. It was communicated by Antonio Collie – President / Chief Financial Officer/Director, that SASL has a total of 17,076 accounts; however, no documents provided ascertained that number.  Documents provided to the Commission confirmed SASL client base as 13,323 client accounts.   The client population sampled varied across testing the areas.

**6.0 EXAMINATION RESULTS:**

**OPERATIONAL SYSTEMS AND CONTROLS**

 **ASSETS UNDER CUSTODY**

 **6.1** During the inspection, SCB Examiners obtained and analyzed the Assets under Custody (AUC) of SASL for the period 1 January 2012 – 31 March 2016.  As the AUC are reported on a

quarterly basis, examiners obtained only the 1st Q in 2016.  It was revealed that the company provides services on a non-discretionary basis for both corporate and individual clients and has AUC totaling $9,763,856 as at 31 March 2016 as noted below:

| 31-Mar-16 | | |
|---|---|---|
| Account Type | Number of Accounts (#) | Value of Accounts ($) |
| **Non-Discretionary (Not Managed)** | | |
| Individual | 17,076 | 9,763,856.00 |
| Corporate | | |
| **Total Non-Discretionary AUC** | **17,076** | **9,763,856.00** |

**6.1a** Examiners further noted that SASL was unable to segregate the provided AUC listing between individual and corporate accounts. Upon inquiry, Mr. Antonio Collie (President/CFO/Director) informed examiners that SASL was in the process of uploading all client information into its electronic software International Back Office System Software (IBOSS) and as a result, client information was not readily available. Further, senior management of SASL gave examiners contradictory information on the number of client accounts SASL currently serviced. Upon inquiry, Ms. Janay Symonette (Chief Marketing Officer) informed examiners that this inconsistency was due to the system not taking into account inactive client accounts.

| CLIENT LISTING | | | |
|---|---|---|---|
| | AUC | IBOSS | By Client Type |
| **Number of Client** | 17,076 | 13,265 | 13,159 |

**See Appendix B for various Client Listings provided.**

**6.1b** SASL experienced a steady incline in client accounts during the period under review resulting in fluctuations varying from 12% to 32% during January 2012 - June 2015. Examiners noted that while SASL continued to experience growth in client accounts after June 2015; the fluctuation was below the 10% threshold.  As the number of SASL's client accounts increased, the value ($) of client accounts also increased.  However, during the following periods:

> September 2012,
> September - December 2013,
> September 2014 and
> June - December 2015

SASL experienced a decline in the value ($) of accounts despite the rising number of clients. The decline I value was attributed to unfunded and/or inactive trading/brokerage accounts as well as existing clients withdrawing funds.  It is SASL policy to give clients thirty days to provide funding before the account status is changed to inactive.

**See Appendix B for SASL's Asset Under Custody Analysis**

**INVESTMENT HOLDINGS OWNED BY SASL**

**6.2** SASL 31 December 2014 audited financial statements noted investments totaling $3,033,447 which comprised of equities, exchange traded funds, fixed income and exchange traded notes.  Examiners obtained a detailed listing of the type of investments held by SASL.

Examiners noted that the AFS reflected an Exchange Traded Funds balance of $505,907; however, the custodian statement provided reflected a balance of $505,996.50 (a difference of $89.50). Upon inquiry, Mr. Collie informed examiners that SASL was unaware of the inaccuracy on the AFS and are not alarmed as the difference is trivial.

**See Appendix C for SASL's Investment Listing and Custodian Statement**

**MEMORANDUM AND/OR ARTICLES OF ASSOCIATION / RIGHTS AND OBLIGATIONS**

**6.3** Mr. Antonio Collie (President/CFO/Director) revealed there were no amendments to the Memorandums of Association of Swiss America Securities Ltd (SASL) neither to the nature of issued capital of SASL.  However, there were changes made to the Articles of Association and to the rights and obligations of SASL security holders.

**6.3a**  The following was noted during a review of the below documents regarding the above stated:

    a.  *Articles and Memorandum of Association* - Examiners reviewed the Articles and Memorandum of Association on file at the Commission to the Articles and Memorandum of Association on file at SASL and noted that there were no changes made to the Memorandum of Association of SASL; however, Article 4 of the Articles of Association was amended and Article 4A inserted.

        **Article 4** - *"the shares shall be under the control of the Directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and at such times as the holder of the majority of the shares thinks fit*."

        **Article 4A** - "*No shares of a class of shares may be issued unless the shares have first been offered to the shareholders of the company holding shares of that class; and those shareholders have a pre-emptive right to acquire the offered shares in proportion to their holdings of the shares of that class at such price and on such terms as those shares are to be offered to others*."

    b.  *Board of Directors Meeting Minutes* - Examiners reviewed the Board of Directors Meeting Minutes and Directors Resolutions for 2008 - 2015 and noted that on the 18 December 2015; the Directors of SASL resolved to amend the Articles of Association.

    c.  *Risk Assessment Brief* - Market Surveillance Department's Risk Assessment Brief indicated that SASL has made changes to the Articles of Association.

**See appendix D for Amended Articles of Association**

**See appendix D for Directors Resolution**
**See appendix D for Board of Directors Meeting Minutes**.

**6.3b** Via a letter dated 27 January 2016 SASL advised the Commission of the amendments to the Articles of Association as at 18 December 2015. The Commission requested further documentation via letter on 10 March 2016 which was provided on 17 March 2016.  On 18 April 2016, the Commission issued a no objection letter to SASL in relation to the amended Articles of Association dated 18 December 2015; however, SASL did not receive prior written consent as per the legislative requirement.

**See appendix D for the Commission's No Objection Letter**.

**Legislation**

Regulation 55(a) – Securities Industry Regulations, 2012 – Transaction Affecting Financial Resources

*A registered firm shall obtain the prior written consent of the Commission before:*

> *(a) seeking to reduce or change the nature of its issued capital or the rights and obligations of its security holders*

**Breach**

SASL did not obtain prior written consent of the Commission before amending its Articles of Association on 18 December 2015.

**Recommendation**

SASL must obtain prior written consent of the Commission before changing the rights of its security holders.

**PROFESSIONAL INDEMNITY INSURANCE**

 **6.4** *To ensure that the registrant has submitted its* current insurance policy to the Commission with the renewal of its registration. *[Regulations 43 (3) of the SIR, 2012]*

**6.4a** A review of Swiss America Securities Ltd.'s (SASL) Indemnity Insurance Policy revealed that SASL's insurance appears to be appropriate to the size, complexity and nature of the firm to cover at least professional indemnity and fidelity bonding.

Examiners noted that the policy note comprised of the following:

- ➢ **Policy Holder:** Swiss America Securities Ltd
- ➢ **Policy Type:**  Financial Institution Professional Indemnity
- ➢ **Policy Period:**  26 November 2015 - 26 November 2016
- ➢ **Limit of Liability:** $1,000,000

**6.4b** A review of the 2015 Annual Information Update Form (AIUF) submitted by SASL on 13 January 2016 did not include the details of SASL current insurance policy to the Commission with the renewal of its registration.

Examiners noted that SASL subsequently submitted the details of the firm's Insurance Policy to the Commission on 05 April 2016 after the legislative deadline of the 31 of January of each year.

**See appendix E for Annual information update Form.**

<u>**Legislation:**</u>

<u>Securities Industry Regulation, 2012 – Regulation 43 (3) - Insurance</u>

*43 (3) A registered firm shall deliver to the Commission, with the application for renewal of its registration, current details of the insurance policies held by the firm.*

<u>**Breach (es):**</u>

SASL did not deliver to the Commission the current details of the Insurance Policy held by SASL with the application for renewal of its registration on or before the 31 of January of each year as per the legislative requirement.


Breach

<u>**Recommendation (s):**</u>

SASL must deliver to the Commission the current details of the Insurance Policy held by SASL with the application for renewal of its registration on or before the 31 of January of each year as per the legislative requirement.

## <u>ANTI-MONEY LAUNDERING (AML) / COUNTER TERRORIST FINANCING</u>

### <u>**COMPLIANCE OFFICER / MONEY LAUNDERING REPORTING OFFICER**</u>

**6.5** *To ensure the Money Laundering Reporting Officer (MLRO) and/or Compliance Officer (CO) is sufficiently senior within the organization with unrestricted access to directors, books and records.*

**6.5a** SASL has a registered Compliance Manager/MLRO, Mr. Philip Dorsett along with an Acting Chief Compliance Officer Mr. Edward Cooper. Inquiry with both individuals and review of the organizational chart revealed that Mr. Dorsett currently reports to Mr. Cooper – the acting Chief Compliance Officer. However, both Mr. Cooper and Mr. Dorsett report to Mr. Antonio Collie (President/CFO/Director) and Mr. Guy Gentile (CEO/Director). Further discussions held with Mr. Cooper revealed that his role in the organization is only temporary as his position on the organizational chart indicates (Acting Chief Compliance Manager). Mr. Cooper, at this point in time is therefore deemed more senior in his role than Mr. Dorsett and

we do note that Mr. Dorsett resigned as a Director and as such, some exposure as a senior management official may be limited.

The appearance is present that Mr. Dorsett is sufficiently senior within the organization, however after a review of seventy-seven (77) client account opening files and no evidence of review or approval from Mr. Dorsett, we deem it reasonable to state that he is not sufficiently senior in his role as a registered CO/MLRO within the organization and may have limited access to all books and records, customer due diligence files and related correspondence files. Furthermore, Mr. Dorsett himself vaguely expressed to examiners his concerns of not having full unrestricted access to these elements.

**See appendix F for Philip Dorsett Warning Letter.**

**REVIEW FREQUENCY AND RISK RATING FRAMEWORK**

**6.6** *To ensure the Registrant has an Anti-Money Laundering (AML) risk based approach to monitoring facilities.*

**6.6a** SASL compliance manual notes that all client accounts are reviewed periodically as follows:

  ➢ Low Risk - reviewed as the need arises
  ➢  Medium Risk - reviewed every 3 to five years
  ➢  High Risk - reviewed annually
  ➢ PEPs - any and all PEP accounts should be classified High Risk and shall be subject to continuous monitoring.

**6.6b** SASL has utilized OFAC (Office of Foreign Assets Control) as a global system check on performing further due diligence on clients, however, Mr. Edward Cooper noted that he does not have 100% confidence in the system and prefers the use of World Check.  Mr. Edward Cooper then informed examiners that prior to his commencement with the organization 6 July 2015 as a Compliance Consultant, which was subsequently changed to Acting Chief Compliance Officer effective 1 November 2015 to current, there were no risk reviews performed on clients. A sample of seventy-seven (77) client files revealed fifty-nine (59) client accounts not containing evidence of a review conducted by either Mr. Philip Dorsett, Compliance Officer or Mr. Edward Cooper (Acting Chief Compliance Officer).  The risk rating of client accounts came into effect January 2016.

Further, we discovered that certain risk areas were not addressed in assessing the risk profile of each customer relationship until amended account opening forms and policies and procedures were introduced in late 2015 by Mr. Edward Cooper, Acting Chief Compliance Officer.

SASL was not complaint with ensuring the source of business funding, the type of assets and the level of transactions were identified on the client account opening documents.  This was evident on sixty-three (63) client files of the seventy-seven (77) client files sampled.  In addition, evidence of the Complexity of Ownership & Legal Structure were also not identified for one (1) corporate client sampled.

**See appendix G for account opening form 1 & 2 for Individuals & Companies (Old Form).**
**See appendix G for revised account opening form (January 2016).**
**See appendix G for risk rating reviews (SCB) & spreadsheet (SASL).**

<u>**Legislation**</u>

<u>Anti-Money Laundering and Countering the Financing of Terrorism Rules, 2015 – Rule 5 (1)
(2)(a)(c – e) - Requirements for risk rating framework</u>

*A regulated person's risk rating framework shall -*

*1. A regulated person shall assess the risk profile of each new customer relationship or
product prior to establishing a business relationship with the customer or issuing the product.*

*2. (a) Categorize customer relationships and products so that the level of risk associated with
each customer relationship or product is identifiable;*

> *(c) Establish the level of management able to approve the regulated person entering
> into customer relationships at the various levels of risk rating categories*

> *(d) Establish Know Your Customer and due diligence information requirements
> appropriate for the risk profile of the customer relationship or product*

> *(e) Require the periodic review of the customer relationship or product to -*
> > *i. Ensure that the categorizations are current and appropriate*
> > *ii. Enable the regulated person to determine whether any adjustment should
> > be made to the risk rating*

<u>**Breach**</u>

SASL did not assess the risk profile of each new customer (low, medium, high) prior to
establishing a business relationship with the customer. SASL began risk rating its client after
Mr. Cooper's commencement with the organization in late 2015.

<u>**Recommendation**</u>

SASL must ensure file reviews are conducted as in accordance with the legislation.

<u>**Legislation**</u>

<u>Anti-Money Laundering and Countering the Financing of Terrorism Rules, 2015 – Rule 5 (2) -
Requirement for risk rating framework</u>

*A regulated person's risk rating framework shall -*

*(b) Categorize customer relationships and products to take account of risk factors related to the
particular customer relationship or product including -*
> *iii. Complexity of ownership*
> *iv. Complexity of legal structure*

*v. Source of business*
*vi. Type of assets*
*viii. Level of cash transactions*

**Breach**

SASL did not identify the below when on-boarding new clients:

(i)     Source of Business/Funding; Type of Assets and Level of Cash Transactions were not clearly identified and indicated for those clients selected who were initially on-boarded.

(ii)    Complexity of Ownership & Legal Structure not clearly identified and indicated for corporate clients initially on-boarded.

**Recommendation**

SASL must ensure that the following information is obtained and clearly identified when on-boarding new clients:

➢ Source of Business/Funding; Type of Assets; Level of Cash Transactions
➢ Complexity of Ownership & Complexity of Legal Structure (Corporate Clients)

**Legislation**

Financial Transaction Reporting Regulation – 9(2) - Continued Verification of Accounts

*Financial Institutions shall monitor facility holders for consistency with the facility holders stated account purposes and businesses and the identified potential account activity during the first year of operation of the facility.*

**Breach**

Although an AML monitoring system was established in late 2015 (after Mr. Edward Cooper's commencement with the organization), there was no evidence of this being performed prior and as such the registrant failed to comply with legislation.

**Recommendation**

The Registrant must ensure adherence with the legislation as it requires all accounts to be monitored to prevent money laundering and to ensure consistency with the facility holders stated account purposes.

**JURISDICTION**

**6.7** *To* determine if the Registrant conducts business in other Jurisdictions *and if the registrant has considered the reputation of that institution and jurisdiction.*

**6.7a** Swiss America Securities conducts business with institutions in other jurisdictions (both businesses and clients of the registrant).  We confirmed with management and per review of the Compliance Policies and Procedures Manual that an integral part of the risk rating criteria established in 2015 is to consider the reputation of both institution and jurisdiction.

**6.7b** However, per review of the Domicile spreadsheet presented to examiners by Antonio Collie (President/CFO/Director), Afghanistan was listed as a country of domicile for clients they conduct business with, which indicates they may have not fully considered the reputation of the jurisdictions that SASL conducts business with. This can also be attributed to line staff approving client acceptance before Mr. Coopers position with the SASL.  When inquired with Mr. Philip Dorsett, Compliance Officer if the reputation of this jurisdiction was considered, he confirmed via email that the account (PFS15086) related to this jurisdiction was set up only as a "test Demo".

**See appendix H for jurisdiction listing provided by President/CFO/Director Mr. Collie (Domicile Spreadsheet).**
**See appendix H for email correspondence from Philip Dorsett (Domicile Email).**

**6.7c** A review of the incomplete client listing provided by SASL noted that the account balance was listed at $-0- with no proper address and as such appears to be a "test demo". Other than the information received, there is no other evidence to validate the claim of the test demo account.  SASL should consider using other client coding to differentiate between "test demo" and actual client accounts.

### CUSTOMER DUE DILIGENCE / KNOW YOUR CUSTOMER

**6.8** *To ensure that the Registrant maintains client account opening forms and documentation for each client and the registrant has taken reasonable steps in identifying the clients and keeping the information required up to date.*

**6.8a** In 2014, SASL launched an online trading platform entitled Sure Trader (a division of Swiss America) that allows clients to log onto the online platform and execute trades on their own behalf in real time.

Potential clients would apply online via Sure Trader's website (www.suretrader.com) and complete a three part process to apply for an account. The process includes selecting an account type (Individual, Joint, Trust or Corporate), completing the online application form, and reviewing and confirming their understanding to SASL's agreements (General Client Agreement, Letter of Authorization, Securities Markets Risk Disclosure, US/Non-US Person Status Declaration, Unsolicited Acknowledgement Agreement and Identity Declaration Form).

Upon completion of the online account application process, SASL's Compliance Department awaits a due diligence package to begin the vetting process. The required due diligence documents include:

| # | DOCUMENTS REQUIRED |
|---|---|
| 1 | 2 valid colour photo IDs: passport and driver's license or government issued identification card |
| 2 | Bank account information |
| 3 | Employer's address and telephone number |
| 4 | Financial information (annual income, liquid and total net worth) |
| 5 | Financial and professional references |
| 6 | Proof of residency (utility bill, bank or brokerage statement, etc. with your address on it - no older than 6 months) |
| 7 | Due to recent legislation (FATCA), Swiss America Securities, Ltd. now requires every client to submit either a W-8BEN for NON-U.S. Individuals, or W-8BEN-E for NON-U.S. Entities or W-9 for U.S. Individuals & Entities. |

Upon receipt of the prospect documents, the Accounts Department personnel will submit the file to Compliance for complete file review, and the verification of the name(s) against the "OFAC" (Office of Foreign Assets Control) as a global system check on performing further due diligence on clients. The client's KYC file may be supplemented with additional information such as Internet search results, newspaper and magazine articles as well as advertisements and business cards.

**6.8b** A review of seventy-seven (77) client files sampled, revealed that all customer accounts forms were signed by customers.  In addition, the following was noted:

- ➢ Eleven (11) files that did not contain the relevant proof of identity (i.e. passport & driver's license);
- ➢ Fifteen (15) files identified where the client's proof of address was not obtained.  The address was, however, indicated on the account opening form

**See appendix I for KYC testing spreadsheet.**

**6.8c** During a review of the files, examiners noted the below eleven (11) client accounts that was not listed on SASL client account listing provided to examiners.

| # | Name | Account Number | Type of Account | Comments |
|---|------|----------------|-----------------|----------|
| 1 | | PFS06145 | Individual | Not included in the overall client listing provided by the Registrant |
| 2 | | PFS15667 | Individual | |
| 3 | Michael Tedeschi | NIL | Individual | The Client file did not have an account number assigned and not included in the overall client listing provided by the Registrant. |
| 4 | Anthony Akiniz | NIL | Individual | |
| 5 | Dustin Enochs | NIL | Individual | |
| 6 | David Narita | NIL | Individual | |
| 7 | Jasmine Travers | Nil | Individual | |

| 8  | Tatenda Tabulo            | NIL | Individual  |  |
| 9  | A Latin Pro Trading, LLC  | NIL | Corporation |  |
| 10 | Morgan Buban              | NIL | Individual  |  |
| 11 | Mehmet Onur               | NIL | Individual  |  |

**In light of the information noted above at 6.8c, examiners requested SASL management to provide client information such as trading and cash summary reports to ascertain that these clients do exist.**

**6.8d** Client files opened prior to Edward Cooper's (Acting Chief Compliance Officer) commencement to SASL revealed that there was no evidence of review or approval by Mr. Philip Dorsett, Compliance Officer & MLRO with regards to client acceptance.   A review of the KYC checklist only indicated a signature by SASL line staff.  Out of the 77 client accounts tested, only 18 showed proper review and approval by the Client Acceptance Committee, which comprises of Mr. Cooper and/or Mr. Dorsett.  Evidence of the review and approval process has also since been transitioned to IBOSS.

**See appendix J for client acceptance committee form and I for KYC Checklist.**

**6.8e** Examiners obtained internal email correspondence dated 11 November 2015 with reference to a named individual  Luis D. Amaro and his desperate desire to trade.  Information was also obtained that gave light to Amaro being hospitalized 17 – 25 May 2011 for major depressive disorder, severe post-traumatic stress disorder. In light of the information noted above, examiners reviewed SASL client listing from inception to current and discovered that Luis D. Amaro was a client of SASL with the client number PFS02637.  A review of SASL records confirmed that Amaro became a client of Swiss in mid-2013 (June) with a deposit amount of $2,895.  However, SASL still deemed it necessary to accept Amaro as client after due diligence revealed his medical history with severe depression and his desperate desire to succeed as a stock trader. In addition, it appears suspicious as examiners reviewed email correspondence with SASL advising Amaro they are unable to accept him as a client, despite trading records and cash history proving otherwise.

**See appendix K for email correspondence with Luis De Amaro.**
**See appendix K for Luis De Amaro medical records.**
**See appendix K for Luis De Amaro cash and trading history.**

**Legislation**

Securities Industries Regulation, 2012 [68 (1)(2)(3)] - Client account opening form and documentation

*(1)  A registered firm must maintain account opening documentation for each client.*

*(2) No registered firm shall execute any transaction for a client until it has in its possession a 'client account form' executed by the client and approved by the designated officer of the firm.*

*(3) The client account form shall contain information concerning the client's identity, financial status, employment, education, investment objectives, ability to incur risk, status as an insider to any public issuers, and any other information that may be considered reasonable by the firm in making an investment recommendation to the client*

**Breach**

SASL did not maintain account opening documents for all client files.

All new accounts should be approved by management, either by Philip Dorsett (Compliance Officer) or Mr. Edward Cooper (Acting Chief Compliance Officer) in order to properly execute transactions on behalf of clients.   This was not evidenced on client files prior to the commencement of Mr. Edward Cooper in 2015.

SASL did not obtained proof of identity for all clients, which as prescribed by legislation.

**Recommendation**

SASL must ensure that all new accounts are approved by either Philip Dorset (Compliance Officer) and or Edward Cooper (Acting Chief Compliance Officer) in order to properly execute transactions on behalf of their clients.

SASL must ensure that proof of identity has been obtained for all clients.

The registrant must ensure that all account opening documents are maintained on client files.

**COMPLAINTS**

**6.9** *To determine if client complaints or unusual matters are maintained in a central register and responded to in a timely manner as prescribed legislation.*

**6.9a** It was evident through inquiry and review of SASL operations, that SASL does not maintain a centralized customer complaint log.  Examiners were provided with a complaint log that has been recently started and currently maintained by Alexis Delancy, Supervisor Customer Support Center (CSC).   As complaints can be received and resolved by any individual/department of SASL, examiners were presented with a listing only from two individuals and as such the complaint log presented may not be comprehensive of SASL complaints.  To ascertain the above statement, it was noted that Kelly Kramp (PFS02675) was not listed on the complaint log.   However, examiners discovered email correspondence between SASL management and the client, in addition to the complaint received by the Commission, where the client alleged that, during the week of 10 August, 2015, options trading was halted within the Company and as a result clients lost a substantial amount of money.   The deficiency in not maintaining a Central Register/Log may prevent SASL from compiling and resolving all complaints and unusual circumstances in a timely manner.

**6.9b** Examiners were provided a complaint log with thirty-four (34) clients from Alexis Hanna, CSC Supervisor, however, only obtained the support for twenty (20) client complaints.  Of the twenty (20) tested, there were two (2) complaints whereby, examiners were not able to

determine whether a proper response was submitted within fourteen (14) days.  All other complaints sampled were in compliance with legislation.

**See appendix L for customer complaint log.**
**See appendix L for compliant filed with the Commission (Kramp 1,2,3,4).**
**See appendix L for customer complaint testing.**

**Legislation**

Securities Industries Regulation, 2012 (75) – Complaints

*A registered firm shall establish effective complaints handling systems and procedures that ensure that*

> *(a) adequate records of complaints, including a central register, are established and maintained;*

> *(b) all complaints are responded to in writing within 14 days of receipt of the complaint; and (c) each complaint is effectively and fairly resolved.*

**Breach**

SASL does not maintain a centralized customer complaint log and the proper support to show evidence that a response is submitted to all client complaints within fourteen (14) days.  The Customer complaint log provided is that which has been recently started and maintained by Alexis Delancey, Supervisor Customer Support Centre, however, customer complaints or queries can be received and resolved by any other department within the organization.

**Recommendation**

SASL must ensure that they maintain a centralized customer complaint log and the proper support to show evidence that a response is submitted to all client complaints within fourteen (14) days.  The deficiency in maintaining a Central Register/Log may prevent the Registrant from compiling and resolving all complaints and unusual circumstances in a timely manner.

**TRADING**

**6.10a**  During a review of the trading operations and the risk monitoring of client margin accounts perform by the risk team, the following was noted:

> ➢  Report does not show who prepared and or reviewed the risk analysis report
> ➢  The report appears to be incomplete as the required objectives are not selected proving that the work was performed
> ➢  No manager sign off

A significant amount of clients with negative equity balances due to trading losses which presents a significant risk to SASL not being able to recover losses since most of the clients opt to let accounts be deactivated rather than injecting additional funds to cover such losses.

As noted in the external auditor's BDO Chartered Accountants 12-31-2014 management comment letter to SASL, higher limits should be set on the amount of trades a client can place base on their equity balance.

SASL should ensure this area is well monitored by the risk analysis team to possible reduce the amount of negative balances in client accounts.

**6.10b** A review of SASL trading department operations, along with inquires made of the department, it was revealed that Michael Bain as the Trade Desk Manager is not currently registered with the Commission as a trading representative.  Examiners noted that in the capacity of a managerial role, possibilities can occur that can put Mr. Bain in situations to act as a registered trading representative in assisting clients.  During a walkthrough of SASL trading operations, no evidence was obtained to support the claim of Mr. Bain conducting trades on client's behalf and not registered with the Commission.

**See appendix P for Michael Bain Job Description**

**Legislation**

Securities Industry Regulation, 2012 – 74 (2)(b) - Supervision, compliance and risk management systems

*A registered firm must establish, maintain and apply a system of controls and supervision sufficient to -*

> *(b) manage the risks associated with its business in conformity with prudent business practices.*

**Breach**

SASL did not ensure that the risk monitoring report objectives were completed and signed off indicating that the work has been performed.

**Recommendation**

SASL must ensure that the risk monitoring reports are completed and signed to ensure a system of controls and supervision sufficient to manage the risks associated with its business.

**REPORTING OBLIGATIONS TO THE COMMISSION**

**6.11** *Determine if the registrant is compliant with its reporting requirements to the Commission.* *[Regulation 17,  49 – 50, & 91 of the SIR 2012]*

**6.11a** Examiners confirmed that SASL did not file its quarterly filings interim financial statements and Financial and operational report Form 13 within the timeframe prescribed; therefore, not satisfying the Commission's requirements.  The following was confirmed by the Market Surveillance Department (MSD):

**6.11b** SASL was not compliant in submitting its interim financial reports for quarters 1, 2, 3 or 4 of 2015.

➢ As it relates to the Q1 2015 interim reports which was received 26 May 2015, the Commission imposed a penalty of $700.00 for the period 19-25 May, 2015. The penalty fee was received on 12 June, 2015. Furthermore, SASL was not complaint with its certification regarding reconciliations and segregation requirement of Division 2 of part VII of the regulation for Q1 of 2015.

➢ As it relates to Q2 2015 late filing of the interim reports which was received 29 March 2016, the Commission imposed a penalty of $6,000.00 for the period 28 October, 2015 - 28 December, 2015. To date, the Commission is not in receipt of the request.

➢ SASL Q3 2015 late filing of the interim reports was received 29 March 2016, after the prescribed time frame of October 30th, 2015.

➢ SASL Q4 2015 late filing of the interim reports was received 16 March 2016, after the prescribed time frame of January 30th, 2016.

➢ As it relates to Q1 of 2016 interim reports, SASL requested an extension, however that extension has not been granted and is pending correspondence between SASL management and The Commission on the previous penalty imposed in 2015.

**6.11c** SASL was not compliant in submitting the information set out in Form 13 of Schedule 2 (Financial & Operational Report) for quarters 1, 2, 3 and 4 of 2015 and Q1 of 2016.

**6.11d** The Market Surveillance Department provided a Risk Assessment Brief indicating that Mr. Guy Gentile was charged with perpetrating penny stock manipulation schemes by the Securities and Exchange Commission on 23 March 2016.  In addition, The Enforcement Department provided an e-mail correspondence indicating that the department was aware of the regulatory action being taken against Mr. Guy Gentile by the SEC.

Upon inquiry; Mr. Antonio Collie (President/CFO/Director) informed examiners that Swiss America Securities Ltd (SASL) is aware that Mr. Guy Gentile was charged with perpetrating penny stock manipulation schemes by the Securities and Exchange Commission.  However, the Commission was not notified of such by SASL.

**Legislation**

Securities Industry Regulation, 2012 – 62 (1)(b) - Notice Of Change Of Information - After Registration

*(1) A registered representative of a registered firm shall promptly deliver a notice to the Commission and the registered firm if that representative:*

*(b)  is named as a defendant or respondent in any criminal or regulatory proceeding or any civil proceeding, either domestic or foreign, exceeding twenty-five thousand dollars*

**Breach**

A registered representative of SASL did not inform the Commission that the Securities and Exchange Commission charged him with perpetrating penny stock manipulation schemes in the amount of $17,000,000.

**Recommendation**

A registered representative of SASL must promptly deliver a notice to the Commission if that representative is named as a defendant or respondent in any criminal or regulatory proceeding or any civil proceeding, either domestic or foreign, exceeding twenty-five thousand dollars.

**RECONCILIATIONS**

**6.12** *To ensure reconciliations are being performed and differences (if any) are corrected immediately.* *[Regulation 87 of the SIR, 2012] [Regulation 20(1) (a) (b) of the SIR, 2012]*

**6.12a** Examiners selected reconciliations for the months ending February, June, December 2014, and May 2015 to ensure that reconciliations were being performed in accordance with the legislations.

> ➢ On balances with banks on a monthly basis
> ➢ On its own records of client assets (with accountable statements for Custodians)

**6.12b** SASL does not perform bi-monthly reconciliations of its records of client assets for which it is accountable with the statements reconciliations of its client assets with the custodian statements for Checkbook Inc.

**6.12c** In addition, Danielle Romer - Assistant Financial Controller is responsible for reconciling all accounts in a timely manner.  It was noted during an interview with Ms. Romer, that there is a back log in the reconciliations being prepared for the 2015 period on some of the accounts.   The reconciliations do note the preparer however, a review by management is not indicated on the reconciliations prepared.  Mr. Collie is responsible for reviewing all reconciliations for accuracy.

**See appendix M for late reconciliation preparation.**

**Legislation**

Securities Industry Regulations, 2012 – Regulation 87 (1)(a)(i)(c)(iii)  – Reconciliations

87. (1)   A registered firm shall perform re-conciliations as often as necessary to ensure the accuracy of its records, and shall perform reconciliations –

       (a) At least once every month –
          a.   On all balances with banks;

       (c ) at least twice per month-
          (iii) on its records of client assets for which it is accountable with statements obtained from the custodian.

**Breach (es):**

SASL is not performing reconciliations at least twice per month on its records of client assets for which it is accountable at the custodian.

**Recommendation:**

SASL must ensure reconciliations of its record of client assets for which it is accountable with statements obtained from the custodian are performed at least twice per month as prescribed by legislation.

**SEGREGATION OF CLIENTS ASSETS**

**6.13** *To determine if the company holds clients' assets and that the assets are separate and apart from its own.* **[Regulation 88 of the SIR, 2012]**

Examiners review of the company's accounts, operating systems and inquiry of management, revealed that SASL maintains its assets in segregated bank accounts from that of its clients' accounts.

A review of SASL's accounts and internal systems revealed the following:

➢ SASL has one (1) Bahamian dollar (BSD) operating account with Bank of The Bahamas B$ account # - A/C NO. - BSD – 1350003824 with an ending balance of $20,783.85 as at 31 March 2016;
➢ SASL one (1) fixed deposit with British Caribbean Bank with a balance of $1,030,000 as at 31 December 2015;
➢ SASL has twelve (12) other operating firm bank accounts as listed below:

| 31 March 2016 | | | |
|---|---|---|---|
| # | Bank Account Name | | Amount |
| 1 | Capital Security Bank | $ | 889,100.00 |
| 2 | Citi Bank | $ | 249,537.49 |
| 3 | Citibank N.A SAS (UK) Ltd; | $ | 100,000.00 |
| 4 | DBS Bank Ltd SAS (UK) Ltd.; | $ | 854,624.81 |
| 5 | DBS SAS Group Ltd; | $ | 100,142.85 |
| 6 | Hellenic Bank Public Company Ltd. - EUR | $ | 14.17 |
| 7 | HSBC SAS (UK) GPB; | $ | - |
| | Oppenheimer & Co. with five (5) sub accounts: | | |
| 8 | G42-0108321 | -$ | 95.16 |
| 9 | G79-1372928 | $ | 0.15 |
| 10 | G42-0098035 | $ | 10,128.42 |
| 11 | G42-0107513 | $ | 9.81 |
| 12 | G79-1372647 - January 31 2016 | $ | - |

➢ SASL has two (2) main brokerage accounts with:
   ○ Interactive Brokers with SASL maintaining three sub accounts:

| # | Bank Account Name | Amount |
|---|---|---|
| 1 | Interactive Brokers - 11043365 - Balance at 31-3-2016 | $ 1,687,064.09 |
| 2 | Interactive Brokers - 1043811 Balance at 31-12-2015 | $ 3,831,582.90 |
| 3 | Interactive Brokers - 1043812 Balance at 30-11-2015 | $ 1,726,426.06 |

      o   Electronic Transaction Clearing Inc.
  ➢  SASL maintains clients' cash and securities at the following Brokers/Custodians:

| SWISS CUSTODIAL ACCOUNTS | | | |
|---|---|---|---|
| BANK NAME | ACCT # | MONTH | BALANCE |
| CitiBank Client Checking | 4996933780 | 31-03-2016 | $ 1,049,133.17 |
| DBS Bank Ltd. | 0003-027144-01-7-022 | 31-03-2016 | $ 100,139.11 |
| DBS Bank Ltd. SAS Client Custody | 0003-027099-01-9-022 | 31-03-2016 | $ 6,500,110.94 |
| Deltec Bank & Trust Ltd. | | 31-01-2016 | $ 834,111.88 |
| Equity Bank & Trust (Bahamas) Ltd. | 1.3.00084.01 USD | 31-03-2016 | $ 249,626.97 |
| Global Transaction Services USD | 9120256963 | 31-03-2016 | $ 190,876.91 |
| Key Bank US Money Market | 7108190 | 31-12-2015 | $ 170.23 |
| Key Bank US Checking | 1001605 | 31-12-2015 | $ 917,118.94 |
| Online Payment Providers | | | |
| BANK NAME | ACCT # | MONTH | BALANCE |
| Checkbook Io. | | 31-01-2016 | $ 2,391,861.20 |
| Concept Payments | | | |
| Mistralpay | | | |
| Nettler | | | |
| Skrill | | | |
| COINX | | | |

**NOTE:** Online Payment Providers – Examiners were not able to obtain the 2016 balances for the online payment provider accounts noted above up till 5 June 2016. The information is currently pending from SASL management.

A review of the custody accounts held at the various Brokers/Custodians listed above, confirmed that only clients' cash and securities are maintained in those accounts. As such it appears that SASL cash/securities are properly segregated from that of its client.

However, examiners noted (refer to 16.4d) that client funds were removed and transferred to SASL operating accounts. Of the eight (8) custodial accounts above, examiners noted various transfers to SASL operating accounts from three of the client accounts (Citibank Client Checking, Global Transaction Services and Scotia Bank US #2646 – which was closed in November 2015). Management was not able to provide examiners with a sweep report indicating which client owed fees and what amounts were removed from the custodial accounts. In addition, this can be attributed to

reconciliations not being prepared on a timely basis (refer to 6.12) to determine and keep proper records of the amount of funds transferred between various accounts.

**USE OF CLIENTS' ASSETS**

**6.14** *To determine if the Registrant is making improper use of client's securities or funds*. **[Regulation 84 of the SIR,2012]**

**6.14a** During review of the operating accounts of the firm, Examiners observed monthly transfers of funds from the Citibank and Scotia US dollar account (where only client funds are held) to SASL's Citibank and BOB B$ Operating Accounts. Further Inquiry with Mr. Antonio Collie – President/CFO/Director, explained that on a monthly or quarterly basis, SASL can deduct the fees from the client account, as payment of trading and commission services to SASL.

**6.14b** Examiners received a fee report which depicts the amount of funds owed to SASL along with the listing of clients and the fees associated to each customer account; however, discrepancies were noted in the reports provided.  Examiners are awaiting managements response.

| 2015 MONTHS | AMOUNT PER FEE SUMMARY INCOME SCHEDULE | AMOUNT PER SUMMARY COMMISSION/FEES DUE | VARIANCE |
|---|---|---|---|
| JANUARY | 1,066,037.76 | 1,288,021.96 | 221,984.20 |
| FEBRUARY | 1,042,902.69 | 970,181.62 | -72,721.07 |
| MARCH | 1,095,156.89 | 1,034,860.71 | -60,296.18 |
| APRIL | 1,179,044.80 | 1,148,661.69 | -30,383.11 |
| MAY | 1,158,744.10 | 1,131,358.35 | -27,385.75 |
| JUNE | 1,177,280.65 | 1,138,666.25 | -38,614.40 |
| JULY | 1,234,231.36 | 1,200,632.04 | -33,599.32 |
| AUGUST | 1,201,570.20 | 1,176,107.81 | -25,462.39 |
| SEPTEMBER | 1,042,601.03 | 990,745.17 | -51,855.86 |
| OCTOBER | 1,199,785.66 | 1,159,878.16 | -39,907.50 |
| NOVEMBER | 1,017,353.10 | 987,012.10 | -30,341.00 |
| DECEMBER | 1,388,624.30 | 1,329,495.35 | -59,128.95 |
| TOTAL | 13,803,332.54 | 13,555,621.21 | -247,711.33 |

**6.14c** In addition, Mr. Collie noted that as SASL has such vast amounts owed from its client, SASL remove funds occasionally.  For the 2015 period Mr. Collie provided examiners with a report that showed SASL removed $1,250,000 from the clients Citibank US custodial account to its Citibank operating account.

➤ September 2015 - $500,000
➤ December 2015 – 750,000

**6.14d** Upon further review, examiners noted more than the above mentioned was transferred from clients custodial account to SASL operating accounts.  Examiners inquired again of Antonio Collie – President/CFO/Director who provided the below response as to transfer of funds from the clients custodial account to SASL operating accounts: *"SASL experienced a banking restructuring exercise where many of the client's fund were being transferred because of terminated banking relationships with SASL.  Mr. Collie went on to explain that because it operates as a online brokerage firm, many banks didn't want to be associated with such services as it is considered high risk and as a result a lot of our banking relationships were ceased.  In addition, this caused SASL having to seek other banking institutions to secure its cash."*

| Transfer from Account | Date | Amount | Description | Notes |
|---|---|---|---|---|
| Scotia US Client - 400-2646 | 07-07-2015 | 450,000.00 | Transfer to Swiss America Securities Ltd. | |
| Scotia US Client - 400-2646 | 7/21/15 | 450,026.88 | Transfer to Oppenheimer Acct T403 | Transfer to Operating a/c#G42xx7513 (cleared Aug 3, 2015)?? |
| Scotia US Client - 400-2646 | 7/22/15 | 475,026.88 | Transfer to Oppenheimer Acct T403 | Transfer to Operating A/C#G42xx7513 |
| Scotia US Client - 400-2646 | 7/29/15 | 425,026.88 | Transfer to Oppenheimer Acct T403 | |
| Scotia US Client - 400-2646 | 7/29/15 | 450,026.88 | Transfer to Oppenheimer Acct T403 | |
| Scotia US Client - 400-2646 | 7/30/15 | 450,026.88 | Transfer to Oppenheimer Acct T403 | |
| Scotia US Client - 400-2646 | 08-04-2015 | 390,000.00 | Transfer to Swiss America Securities UK | |
| Scotia US Client - 400-2646 | 08-04-2015 | 2,500,000.00 | Transfer to Oppenheimer & Co | Transfer to Operating a/c#G42xxx8035 |
| Scotia US Client - 400-2646 | 11-11-2015 | 532,775.34 | Transfer to Swiss America Securities Ltd | |
| **Total Scotia Client Transfer** | | **6,122,909.74** | | |
| **Transfer from Account** | **Date** | **Amount** | **Description** | **Notes** |
| CITI CLIENT CHECKING X33780 | 02-Dec-15 | 250,000.00 | Transfer to Checking | |

| | | | | |
|---|---|---|---|---|
| CITI CLIENT CHECKING X33780 | 21-Dec-15 | 250,000.00 | Transfer to Checking | Transferred to CITI OPERATING X 40993 |
| CITI CLIENT CHECKING X33780 | 24-Dec-15 | 250,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 15-Jan-16 | 50,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 25-Jan-16 | 300,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 08-Feb-16 | 400,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 07-Mar-16 | 400,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 11-Mar-16 | 500,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 11-04-2016 | 250,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 13-04-2016 | 400,000.00 | Transfer to Checking | |
| CITI CLIENT CHECKING X33780 | 26-04-2016 | 400,000.00 | Transfer to Checking | |
| **Total Citibank Client Transfer** | | **3,450,000.00** | | |
| | | | | |
| **2015 TOTAL FEE'S TRANSFERRED** | | **9,572,909.74** | | |

Examiners discovered that SASL was not keeping a proper sweep report that detailed which clients and the fees associated with each account made up the lump sum amounts being removed from the clients custodial account.

**6.14e** It was observed during the review of the Account Opening Documents of SASL and discussion with Mr. Collie, that the 'Account Application Client Agreement of SASL includes a clause where clients acknowledge that their securities *"may be loaned to you (the firm) or loaned out to others"*.

Furthermore, The Account Application Client Agreement (addendum to the account opening document) revealed a clause which provides, SASL with prior written consent from clients to utilize clients' securities (not cash). ***Section 25 - Custody of Customer Assets*** of the Account Application states that *"Swiss America declares that the Customer will enjoy a beneficial ownership in (a) securities purchased on its behalf and (b) any free cash balances held by Swiss America for the account of the Customer and these assets are not to be treated as general assets of Swiss America."*

Examiners tested a sample of seventy-seven (77) clients' accounts which showed that all customer files maintained a signed copy of the Client Agreement agreeing to the above clause.

**See Appendix N for SASL's Account Application.**

**6.14f** A review of SASL 31 December 2015 interim yearend draft reports revealed an investment convertible note of $65,000. Examiners inquired of Mr. Antonio Collie (President/CFO/Director) who informed examiners that the investment security belonged to SASL. However, upon further review, it

was noted the investment was purchased from one of SASL client custodial accounts – Global Transaction Services (GTS) where clients cash is held. When asked of Mr. Collie why the security was purchased using the clients account and not SASL operating accounts, he could not provide an answer to examiners.

**See Appendix O for Convertible Note**
**See Appendix O for QuickBooks Extract**
**See Appendix O for email correspondence from GTS**

**6.14g** A review of SASL's operations in conjunction with inquiry with Mr. Antonio Collie (President/CFO/Director) revealed that SASL has outsourced some of its responsibilities however the Commission was not given notification of the arrangements between SASL and Cloud Carib Limited or DAS Inc. DAS Inc. provides SASL with back office suite and risk system, simulated trading platform, support services and Cloud Carib acts as SASL web server.

SASL must give the Commission prompt notice of its outsourcing arrangements if SASL enters into an arrangement with a third party service provider whereby that service provider will undertake a material business function, activity or process on behalf of SASL.

**Legislation**

Securities Industry Regulations, 2012 – 44(1) – Outsourcing

*If a registered firm proposes to enter into an arrangement with a third party service provider whereby that service provider will undertake a material business function, activity or process on behalf of the registered firm, the registered firm shall give the Commission prompt notice of such outsourcing arrangement.*

**Breach**

SASL did not provide the Commission prompt notice of its outsourcing arrangements with Cloud Carib Limited or DAS Inc. as per the legislative requirement.

**Recommendation**

SASL must give the Commission prompt notice of its outsourcing arrangements if SASL enters into an arrangement with a third party service provider whereby that service provider will undertake a material business function, activity or process on behalf of SASL.

**OTHER MATTERS**

**6.15** SASL had difficulty in providing proper source documents for information requested. In particular client withdrawal/incoming transactions. In addition, other documents presented were at times incomplete due to SASL not being able to locate information as requested.

**6.15a** During the on-site examination, examiners were provided with verbal communication that SASL had experienced a security breach by a Russian Hacker in its operations where client funds were removed from its account and caused a substantial loss to SASL. To ascertain the information further, examiners conducted several interviews with SASL President/CFO/Director Antonio Collie,

Information Technology Manager Lorenzo Lewis, staff from the customer service department, as well banking and funding department; all of whom confirmed they were not aware of SASL operations ever experiencing a system hack.  Despite the information presented to examiners by a management member of SASL team, no physical evidence was able to be gathered to support the above mentioned. In addition, the Commission was also not notified of such event.  Furthermore, the informant noted that they were instructed not to alert the examiners who were on-site at the time of the security breach.

**6.15b** While the company is transitioning from hard copy to electronic filing and until they are certain they have successfully uploaded all files in IBOSS, SASL must ensure that files are also kept in a fire-proof room &/or cabinets.  While enabling alarms and other security features are useful, this will not prevent destruction of integral client information in the event of a natural disaster or fire.  Pertinent client files were noted throughout SASL office space in filing boxes and not secured in a fire proof cabinets or vault.

**6.15c** Observation was also made that Janay Pyfrom Symonette - Chief Marketing Officer appears to have unrestricted access with editing capabilities to client account opening information through SASL IBOSS software with the capability of changing client information (example - approving clients and/or assigning or changing risk rating factors).  Such information should only be available to line staff for viewing access only. CO/MLRO who has the overall responsibility for approving and risk rating clients should have editing access.

**6.15d**  During an interview with Mr. Dorsett, it was revealed that the DAS developers (in particular Anthony) have access to delete information whether a mistake or intentional from the system with no evidence that the transaction/information ever occurred, leaving no audit trail.  This was communicated on two (2) occasions during an interview with Mr. Dorsett.

**6.15e** During the on-site examination, examiners were presented with various policy manuals.  SASL must ensure their policy manuals are updated to reflect the firm's processes. A few areas identified by the team in their review were:

- Advertising policies & procedures
- Accounts Receivable
- Reconciliation Process
- Trading
- Compliance
- AML

## 7 CONCLUSION

**7.1** The Inspection for cause of SASL's operations revealed that the firm is not adequate based on the following:

1. SASL's failure to conduct proper KYC procedures on clients.
2. SASL's failure to maintain all customer complaints.
3. SASL's failure to maintain proper books and records of its operation.
4. SASL's failure to conduct adequate periodic review of clients' accounts.
5. SASL's failure to deliver to the Commission documents as requested.

6.  SASL's failure to obtain prior consent from the Commission with regards to change in its rights and obligation.
7.  SASL's failure to meet its timely continuing obligation to the Commission with regards to Financial and Operational reports.

## 8 RECOMMENDATION

**8.1** In light of these findings identified during the examination and based on the review of the company's operations, it is recommended that:

1.  Seek consultancy services from industry specialists with strong quantitative analysis skills to analyze SASL vast quantities of trade data to identify potentially fraudulent activity, such as front running, insider trading, fraudulent investment performance reporting, and window dressing
2.  The Enforcement Committee review the information submitted in this report by the Inspections Department to closely monitor its client complaint and suspicious transactions for fraudulent activities.
3.  The inspections department conduct a follow up on the operations of SASL by the 2016 yearend.

EXHIBIT CRR3

# Securities Commission of The Bahamas

## Review of Swiss America Securities Limited ("SASL")

21 February 2018



# Contents

▶ Procedures performed

▶ Representations made at meeting with SASL

▶ Overview of analyzed SASL trade data

▶ Summary of findings from forensic data analytics

▶ Proposed areas of further investigation

▶ Limitations of review



# Procedures performed

1. Held fact gathering meeting on 8 August 2017 at the SASL office in Nassau to discuss the background and operations of the company.

2. Requested and obtained additional data from SASL including:

   a. Download of trade data directly from DAS for the period 1 January 2014 through 30 June 2017

   b. Client listing and equity position as of 1 January 2016 (approx. $8.2M)

   c. Selected policies and procedures

3. Reviewed and analyzed the following SASL polices and procedures:

   a. Account opening process and procedures

   b. Compliance manual and compliance function

   c. Securities risk manual

   d. Funding and banking process and procedures

4. Performed forensic data analytics on the trade data provided by SASL to identify trends or anomalies within the data.

5. Performed open source research.



# Procedures performed

6.   Presented our initial findings to the Securities Commission of the Bahamas ("SCB") on 23 October 2017.

7.   Held in-person meetings in the SASL office on 27 October 2017 to discuss initial findings.

8.   Following this meeting, additional analytical procedures were performed based on the responses received from SASL.

9.   Final meeting held in the SASL office on 19 January 2018 to follow-up on outstanding questions.



# Representations made by SASL management on 8 August 2017

| Trading |
| --- |
| 1.  SASL's trading platform, SureTrader, offers trading of equities and options, however options make up a marginal portion of trading activity. |
| 2.  The trading activity consists of approximately NASDAQ/NYSE (98%), penny stocks (1%) and options (1%). |
| 3.  SureTrader offers leverage models for intraday trading (6:1) and overnight trades (2:1). |
| 4.  SureTrader executes approximately 10,000 trades per day and between 200,000-250,000 per month. |
| 5.  The average amount of a wire is approximately $2,000. Wires over $10,000 are rare. |
| 6.  It is common for many clients to trade the same securities on the same day. |
| 7.  SASL serves as the custodian for all trades and is a self-clearing firm. |

| Clients |
| --- |
| 1.  SASL currently has approximately 17,000 client accounts with assets of approximately $12 million. |
| 2.  SASL opens approximately 300 new client accounts per month. |
| 3.  The SASL client base consists of individuals and corporations in the following locations: |
|     a.  40 – 50% - United States (attracted by "no pattern day trader" rules and account minimums); |
|     b.  10% - Canada (attracted by 6:1 leverage model); |
|     c.  20% - United Kingdom and Europe (attracted by the opportunity to trade NASDAQ/NYSE stocks); and |
|     d.  Remaining percentage – various global locations. |



# Overview of analyzed SASL trade data

The period under scope for our review was 1 January 2014 through 30 June 2017. However, the trade data provided by SASL also included executed trades from 1 July 2017 through 9 August 2017 (1 January 2014 through 9 August 2017 collectively the "Review Period").

In our initial analysis of the trade data, we noted six accounts which began with '328' as opposed to the typical customer identifier of 'PFS' or 'MBS', and further follow-up with SASL was required to understand the nature of these accounts and the associated trading volumes.

We understand from discussions with SASL that the '328' accounts are a combination of SASL's own proprietary trading ("Prop Trading") accounts and a clearing account (32812). Further information in relation to the clearing account is included on page 20 of this report.

The table below summarizes the trade data provided by SASL (during the Review Period), both including and excluding the '328' accounts.

|  | All accounts | Customer accounts (excluding '328' accounts) |
|---|---|---|
| Number of executed trades | 17,578,950 | 5,808,854 |
| Number of unique tickers traded (including options) | 29,068 | 28,991 |
| Number of accounts | 14,975 | 14,969 |
| Volume of shares traded | 8,755,858,054 | 3,531,818,192 |
| Value of shares traded | $76,868,025,062 | $34,527,016,404 |

*Note: [1] Proprietary trading occurs when a firm or bank invests for its own direct gain. [2] The clearing account (32812) represents a mirror of all trades executed in both customer and proprietary trading accounts. [3] Source Thomson Reuters, Capital IQ and other public stock market data.*



# Overview of analyzed SASL trade data

The following graphs show the breakdown of trade volume (number of shares), executed trades (number of trades), and value of trades (dollars value for trades) by year executed in the customer accounts (i.e. excluding the '328' accounts).









# Summary of findings
# Test 1 - Identify the most frequently traded tickers

One of the initial representations made by SASL was that customers primarily traded on NASDAQ/NYSE and trading of penny stocks is minimal.  However, the trade data showed that at least of nine the top fifteen most frequently traded tickers by customers (when based on volume of shares traded) were penny stocks as detailed in the table below.

Most frequently traded tickers based on volume of shares

| Symbol | Volume of shares | Number of trades | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|--------|------------------|------------------|---------------------|-----------------|----------------|----------|
| SUNE | 40,391,014 | 46,801 | 258,883,134 | n/a | n/a | NYSE |
| JNUG | 37,952,677 | 50,295 | 304,661,870 | 18.3500 | n/a | NYSE Arca |
| PLUG | 36,607,798 | 37,082 | 202,643,074 | 2.0800 | 484,360,000 | NASDAQ |
| MNKD | 29,412,789 | 29,316 | 165,863,764 | 2.8800 | 436,520,000 | NASDAQ |
| NUGT | 26,723,685 | 56,508 | 611,444,290 | 35.3600 | n/a | NYSE Arca |
| UVXY | 25,887,544 | 58,916 | 684,329,371 | 9.9200 | n/a | NYSE Arca |
| GENE | 23,708,880 | 32,062 | 102,461,830 | 1.7800 | 51,420,000 | NASDAQ |
| GALE | 22,975,788 | 16,848 | 94,125,079 | 0.2910 | 399,225,000,000 | NASDAQ |
| TVIX | 22,259,002 | 32,741 | 177,523,255 | 5.4300 | n/a | NASDAQ |
| AMD | 19,179,256 | 28,145 | 189,881,471 | 12.8900 | 11,973,150,000 | NASDAQ |
| GBSN | 17,375,932 | 17,339 | 44,058,830 | 0.1300 | 710,000 | OTC Market |
| HEMP | 17,210,248 | 2,436 | 2,953,216 | 0.0277 | 7,587,000 | OTC Market |
| VLTC | 16,901,360 | 31,665 | 128,200,432 | 1.3239 | 12,140,000 | OTC Market |
| FCEL | 16,793,914 | 5,942 | 55,104,664 | 1.7600 | 163,870,000 | NASDAQ |
| ISR | 16,707,152 | 15,590 | 47,740,468 | 0.4856 | 25,340,000 | NYSE American |

*Notes: [1] Stock Price and Market cap is quoted as at 26 January 2018 where available. [2] The above table excludes trades in all "328" accounts. [3] For the purposes of this analysis, penny stocks are those with a stock price of less than $5.00 per share. [4] Certain stocks have been delisted or no longer trade under the ticker listed in the trade data provided, thus the stock price for these tickers have been listed as not available, N/A)*



# Summary of findings
# Test 1 - Identify the most frequently traded tickers

During the meeting with SASL in October 2017, Mr. Guy Gentile, CEO of SASL, indicated that the initial trading patterns which were referenced during the kickoff meeting in August were based on the number of trades executed rather than the number of shares traded.

In view of these comments, we completed further analysis on the trade data to identify the most frequently traded tickers by customers, when based on the number of trades executed and the value of trades. The results of which are shown in the tables below.

Most frequently traded tickers based on number of trades

| Symbol | Number of trades | Volume of shares | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|--------|------------------|------------------|---------------------|-----------------|----------------|----------|
| FRX | 60,244 | 11,102,266 | 1,038,007,709 | 0.0760 | 14,720,000 | NYSE |
| UVXY | 58,916 | 25,887,544 | 684,329,371 | 9.9200 | n/a | NYSE Arca |
| NUGT | 56,508 | 26,723,685 | 611,444,290 | 35.3600 | n/a | NYSE Arca |
| JNUG | 50,295 | 37,952,677 | 304,661,870 | 18.3500 | n/a | NYSE Arca |
| VRX | 46,857 | 16,540,811 | 46,633,760 | 19.3200 | 6,864,210,000 | NYSE |
| SUNE | 46,801 | 40,391,014 | 258,883,134 | n/a | n/a | NYSE |
| ACT | 44,874 | 3,529,504 | 737,627,538 | n/a | n/a | n/a |
| FB | 42,056 | 12,476,955 | 848,597,100 | 190.0000 | n/a | NASDAQ |
| PLUG | 37,082 | 36,607,798 | 202,643,074 | 2.0800 | 484,360,000 | NASDAQ |
| TVIX | 32,741 | 22,259,002 | 177,523,255 | 5.4300 | n/a | NASDAQ |
| GENE | 32,062 | 23,708,880 | 102,461,830 | 1.7800 | 51,420,000 | NASDAQ |
| VLTC | 31,665 | 16,901,360 | 128,200,432 | 1.3239 | 12,140,000 | OTC Market |
| TWTR | 30,349 | 10,020,361 | 330,595,652 | 24.2700 | 16,460,300,000 | NYSE |
| MNKD | 29,316 | 29,412,789 | 165,863,764 | 2.8800 | 436,520,000 | NASDAQ |
| AMD | 28,145 | 19,179,256 | 189,881,471 | 12.8900 | 11,973,150,000 | NASDAQ |

When based on number of trades executed, the number of penny stocks traded reduced from at least nine to five.



# Summary of findings
# Test 1 - Identify the most frequently traded tickers

Most frequently traded tickers based on value of trades ($)

| Symbol | Value of trades ($) | Volume of shares | Number of trades | Stock Price ($) | Market Cap ($) | Exchange |
|--------|---------------------|------------------|------------------|-----------------|----------------|----------|
| FRX | 1,038,007,709 | 11,102,266 | 60,244 | 0.0760 | 14,720,000 | NYSE |
| FB | 848,597,100 | 12,476,955 | 42,056 | 190.000 | n/a | NASDAQ |
| ACT | 737,627,538 | 3,529,504 | 44,874 | n/a | n/a | n/a |
| UVXY | 684,329,371 | 25,887,544 | 58,916 | 9.9200 | n/a | NYSE Arca |
| NUGT | 611,444,290 | 26,723,685 | 56,508 | 35.3600 | n/a | NYSE Arca |
| AAPL | 498,003,511 | 3,158,744 | 18,990 | 171.5100 | 878,531,700,000 | NASDAQ |
| VRX | 486,633,760 | 16,540,811 | 46,857 | 19.3200 | 6,864,210,000 | NYSE |
| GOOG | 457,296,399 | 812,409 | 13,500 | 1,175.8400 | 819,345,600,000 | NASDAQ |
| GOOGL | 454,530,405 | 826,160 | 12,759 | 1,187.5600 | 819,345,600,000 | NASDAQ |
| TSLA | 349,204,283 | 1,579,362 | 13,054 | 342.8500 | 56,746,230,000 | NASDAQ |
| TWTR | 330,595,652 | 10,020,361 | 30,349 | 24.2700 | 16,460,300,000 | NASDAQ |
| JNUG | 304,661,870 | 37,952,677 | 50,295 | 18.3500 | n/a | NYSE Arca |
| NFLX | 292,646,606 | 1,954,440 | 13,737 | 274.6000 | 116,707,500,000 | NASDAQ |
| SUNE | 258,883,134 | 40,391,014 | 46,801 | n/a | n/a | NYSE |
| NVDA | 213,261,889 | 2,154,311 | 12,639 | 243.3300 | 143,228,100,000 | NASDAQ |

When based on value of shares traded, the number of penny stocks reduced from at least nine to one.

As noted, the previous three tables in relation to frequently traded tickers, exclude trades through the '328' accounts. We have completed a high level analysis of the Prop Trading accounts 32810 and 32813, and have summarized the most frequently traded tickers in these accounts by volume of shares traded, number of trades executed, and value of trades executed. These are shown in the tables in Appendix A (pages 22-27) to this report.



# Summary of findings
## Test 1 - Discussions on SASL customers and frequently traded tickers

► SASL noted that customers typically open accounts with SASL after hearing about the company on trading community chatrooms.

► In some instances, certain customers may be referred to SASL, however, no compensations is paid in relation to this. The customer is typically given the recommendation as a result of attending a course/seminar that 'teaches' them to trade (e.g. seminar hosted by Timothy Sykes, a well known penny stock trader).

► SASL noted that they did previously have an agreement in place with Timothy Sykes who would refer customers to SASL, but this expired in 2014 and no new agreements were executed with him or any other party.

► We discussed with SASL the nature of day trading and enquired on the mechanisms that SASL have in place to connect their customers and facilitate information sharing, along with SASL's role in this.

► Mr. Gentile commented that it is common for SASL customers to trade the same securities on the same day.

► It was also noted that the Suretrader website issues a daily update on the most actively traded tickers, along with other trading information.

► SureTrader has also recently set up an Instagram account which also publishes the trading information.

► We have separately found a Twitter account for SASL which appears to publish daily updates on the most actively traded stocks at SureTrader (@SureTraders).



# Summary of findings
# Test 1 – Observations related to SunEdison Inc. (SUNE)

1. 20 July 2015 - SunEdison purchases Vivint Solar Inc. for $2.2 billion

2. 7 October 2015 – SASL trading of SUNE spikes to a record high

3. 11 December 2015 - Shareholder Class Action Filed Against SunEdison, Inc. which alleges SunEdison and certain of its senior executive officers issued a series of false and misleading statements, and omitted to disclose material information to investors during the Class Period of 16 June 2015 and 6 October 2015. (https://www.ktmc.com/new-cases/sunedison-inc)

4. 21 April 2016 - SunEdison files for Chapter 11 bankruptcy protection

5. 17 May 2017 – SUNE is delisted from NYSE and now trades as SUNEQ on OTC markets

6. 25 July 2017- SunEdison wins final approval for its bankruptcy plan





# Summary of findings
# Test 1 – Observations related to Hemp Inc. (HEMP)

1. 3 February 2014 through 6 February 2014 – Significant increase in trading activity

2. 4 August 2014 - Pump and dump: SEC v. Galas, Civil Action No. 14-cv-5621 filed against Michail Galas, Alexander Hawatmeh, Christopher Mwroca and Tovy Pustovit. The defendants are charged with manipulating the share price of six microcap stocks since 2012 using coordinated trading, aggressive promotions over the internet through social media and e-mails. The six securities include ISML, ADPC, ADSU, PHOT, HEMP and RVDO. (https://www.sec.gov/litigation/complaints/2014/comp-pr2014-159.pdf)

    a. PHOT, HEMP and RVDO were traded by SASL

    b. Tovy Pustovit is a SASL customer (account number PFS03985)





# Summary of findings
## Test 1 – Observations related to Hemp Inc. (HEMP)

► From a review of the trade data we noted that:
  ► Account PFS03985 had not completed any trades in HEMP during the Review Period;
  ► SASL, using their Prop Trading account had completed minimal trading in HEMP during the Review Period; and
  ► SASL customers have traded for approximately $3,000,000 worth of HEMP shares during the Review Period.

► We discussed the trading of HEMP with SASL and requested that they provide us with the following additional information:
  ► The equity position and movements on account PFS03985 since it was activated with SASL;
  ► Details of all trades in HEMP by account PFS03985 prior 1 January 2014 (prior to the Review Period); and
  ► Details of all trades in HEMP by SASL, using their Prop Trading account prior 1 January 2014 (prior to the Review Period).

► We were advised that account PFS03985 was never made active as there was a missing application document. We were further advised that when a customer applies to open an account with SASL they are assigned an account reference, but the account is only active once all documentation is received.

► SASL provided the equity position for account PFS03985 for the period 18 January 2000 to 18 January 2018, which confirmed it was nil for the entire period.

► Furthermore, Mr. Gentile advised that SASL did not start proprietary trading until late 2015, therefore there would be little or no trades in HEMP executed by SASL in their Prop Trading account prior 1 January 2014. In view of this information, we reviewed the trade data for the '328' accounts and did not identify any significant volumes of trading for HEMP during the Review Period.



# Summary of findings
## Test 1 - Market surveyor

- SASL advised that a third party, 'Market Surveyor' ("MS"), monitors the trades that are processed through SureTrader. SASL explained that this company uses technology to detect instances of potential fraud and provides SASL with reports to identify transactions which have been flagged as potentially fraudulent. It also reports instances of significant customer gains/ losses.

- Over the course of our discussions, SASL advised that their trades would be 'flagged' on MS' reviews under suspicion of 'wash trading' was occurring at SASL. Wash trading refers to buying shares through one broker and selling through another, in order to manipulate the market and encourage other investors to move into a buying position. They would also flag the large volumes of shares being moved on a daily basis.

- SASL explained that this was a result of MS viewing trades from SASL in a single account rather than an individual customer account basis. In addition, whilst MS now understand the structure of SASL's trading (namely that all customer trades are executed by SASL and not directly by the customer's account), including that customers regularly trade the same stocks, MS may still flag any activity that is deemed suspicious in accordance with their regulations.

- We requested copies of the MS reports that SASL receives, however, were advised that MS' relationship and all documentation is with Mint Global Markets Inc. (formerly Stock USA Execution Services) ("Mint Global") and that SASL does not have any supporting documentation from MS. Mint Global is the firm which SASL execute their equity trades through. We found this response to be vague and could not confirm or deny the statement made by SASL.

- We have also been unable to locate any information on this company independently. Further clarification will be needed on the legal entity name of MS.

- SASL advised in October 2017 that one customer's account had been shut down as a result of MS, due to a suspicion of layering. When asked to provide additional detail on the said customer account, SASL advised that the account was identified internally and that they could not recall the account details furthermore that the staff member who dealt with the matter was no longer at SASL. Mr. Gentile confirmed that SASL noticed that the customer was making consistent profits and larger wires so SASL internally reviewed the customers activity. It was during this review that they suspected layering based on Mr. Gentiles' personal knowledge.

- SASL advised that customer accounts would be reviewed internally if wires exceeding $10,000 were being made due to the nature of their customer's trading.



# Summary of findings
# Test 2 - Identify the highest trading accounts

► Highest trading accounts with standardized customer numbers based on volume of shares traded:

| ID | Account holder type | Account holder name | Account number | Volume of shares traded | Number of trades | Value of trades ($) | % of total shares traded |
|----|--------------------|--------------------|----------------|------------------------|------------------|--------------------|--------------------------|
| 1 | Individual | Simon Amos | PFS01970 | 112,583,468 | 60,708 | 530,681,642 | 3.2% |
| 2 | Individual | Alexander Dmitrievich Kostrov | PFS02578 | 51,354,291 | 14,410 | 28,467,809 | 1.5% |
| 3 | Corporate | Nevis Capital LLC | PFS01402 | 50,913,967 | 151,939 | 1,556,999,875 | 1.4% |
| 4 | Corporate | Arxcis Trading LLC | PFS02472 | 41,165,456 | 345,705 | 4,280,033,462 | 1.2% |
| 5 | Corporate | Nostrum Trading LLC | PFS02341 | 37,674,006 | 124,239 | 1,672,237,213 | 1.1% |

► Highest trading accounts with non-standardized customer numbers:

| ID | Account holder type | Account holder name | Account number | Volume of shares traded | Number of trades | Value of trades ($) |
|----|--------------------|--------------------|----------------|------------------------|------------------|--------------------|
| 1 | Clearing | SASL | 32812 | 4,393,055,556 | 10,075,284 | 36,979,405,569 |
| 2 | Proprietary | SASL | 32813 | 804,600,933 | 1,672,748 | 5,153,249,569 |
| 3 | Proprietary | SASL | 32810 | 25,231,451 | 21,647 | 197,325,410 |

*Note: 32812 has been identified as a clearing account which is a mirror of all trades executed in both customer accounts and proprietary accounts. 32813 and 32810 have been identified as proprietary accounts.*



# Summary of findings
## Test 3 – Stratification of trading activity by broker

► Top three highest trading brokers by volume of shares traded in customer accounts:

| ID | Broker symbol | Broker name | Volume of shares traded | Number of trades | Value of trades ($) |
|----|---------------|-------------|-------------------------|------------------|---------------------|
| 1 | SURE | SureTrader | 2,079,172,747 | 3,432,091 | 17,792,377,501 |
| 2 | ARCA | Arca Capital Investments | 234,286,264 | 522,560 | 4,551,524,622 |
| 3 | ALTX | AltX | 192,143,629 | 285,274 | 1,571,903,071 |

► Trades executed without a broker include:[1]

| Broker symbol | Broker name | Volume | Number of trades | Value of trades ($) |
|---------------|-------------|--------|------------------|---------------------|
| [Blank] | Unknown | 818,889 | 40,370 | 589,771 |

*Note:*
*[1] We followed up with SASL to understand the nature of trading activity without a designated broker and were advised that if a broker was not assigned then it would likely be that it is an option. We have reviewed the trade data and this appears consistent with the nature of the trades, i.e. the underlying symbol for these trades is related to an option rather than a standard stock symbol.*



# Summary of findings
## Additional tests

| Test | High level observations |
|---|---|
| Test 4 - Identify trades outside of normal trading hours | • Two trades identified as being executed over the weekend:<br>• We confirmed with SASL that whilst customers have 24 hour access to the platform, trades are only executed between the hours of 8am and 6pm on working days.<br>• Account PFS12991 bought and sold 1,062 shares of RTGN on 16 May 2015 (Saturday)<br>    • *SASL confirmed that this was a manual trade to reflect a change in the stock symbol on 16 June 2015 from RTGN to PULM. There was also a stock split of 2:5 on the same day.*<br>    • *We were provided with evidence from the website 'marketocracy' to substantiate this.*<br>    • *The trade data shows a manual entry for the above on 16 June 2015. The same was entered on 16 May 2015, however. the shares were bought and sold on the same day for nil value.*<br>• Account PFS15783 bought 200 shares of 813991833 on 19 June 2016 (Sunday)<br>    • *SASL confirmed that this was another manual trade as the rights expired. The stock symbol was EYES but subsequently changed following expiration of the rights.*<br>    • *We were provided with a print screen from 'speedtrader pro' to evidence the expiration.*<br>    • *The trade data shows a manual trade on 16 June 2016 for the expired rights and a further manual trade on 19 June 2016 for a rights distribution. We have evidence of a rights distribution however, this was on 19 May 2016.* |



# Summary of findings
## Additional tests

| Test | High level observations |
|---|---|
| Test 5 – Correlate quantity with commissions | • Generally, higher volume trades are charged $0.00 in commission fees.<br>• Two large quantity trades, however, were charged high value commission fees.<br>  • Broker: BATS traded 940,000 shares of UWTI and was charged a commission fee of $1,500 (Account 32810).<br>  • Broker: BI traded 481,800 shares of USO and was charged a commission fee of $2,500 (Account 32810). |
| Test 6 – Identify volume of manually entered trades | • Of the 5,808,854 total trades, 6,968 trades were manually entered.<br>• In our discussions in October 2017, SASL advised that manual trades would primarily relate to either options or corporate actions which are entered into the system.<br>• We subsequently reviewed the data and the descriptions in the trade data corroborates with this explanation. However, we noted that a number of entries with the comment 'adjustment'.<br>  • We requested additional information on these items however, were informed that the trade data we were provided is a replica of their system, so there would be no additional notes.<br>• We enquired how SASL keep up to date on any corporate actions and were advised that staff review the market for updates, as well as subscribing to various websites which provide a list of corporate actions on a daily basis. |
| Test 7 – Identify tickers frequently traded after hours | • UVXY, NUGT and VRX are the most frequently traded tickers between 5:00 a.m-8:00 a.m.<br>• TWTR, TVIX and KBIO are the most frequently traded tickers between 5:00 a.m-8:00 a.m. |

EY

# Clearing account

▸ As previously discussed, we had identified that account 32812 had a significant amount of trades and SASL advised that this is a clearing account, and essentially a mirror of all trades executed in the customer and SASL accounts.

▸ In view of this, we reviewed the trades in this account against those made in all other accounts to confirm if they reconciled.

▸ We found 111 instances in which trade positions were not cleared in the 32812 account and thus appears an open position remained.

▸ During our January 2018 meeting with SASL, they advised that if the data has been reconciled on a daily basis then open positions might remain as customers and/or SASL do not always sell the shares purchased on that day and can hold the shares for as long as they wish.

▸ We reviewed two of the instances from July 2015 with SASL which related to one stock, DANG:

  ▸ On 8 July 2015 purchased 212,170 shares and sold 203,317 shares;

  ▸ On 9 July 2015 purchased 196,105 shares and sold 191,565 shares; and

  ▸ Total volume difference equals 13,393 shares.

▸ SASL were unable to provide us with a full history for trading of the stock, however, they provided daily holding positions which eventually demonstrated that the 13,393 shares were sold.

▸ The trade data shows this was a manual entry detailed as 'flatten position'.

▸ We reviewed a sample of other instances and identified the same practice for other positions.



# Proprietary trading
# Recommended areas of investigation

---

► As previously discussed in this report, SASL advised that their firm conducts proprietary trading.

► We have completed a high level analysis of the Prop Trading accounts 32810 and 32813, and have summarized the most frequently traded tickers in these accounts by volume of shares traded, number of trades executed, and value of trades executed. These are shown in the tables in Appendix A to this report.

► Whilst we understand that the SCB would like for EY to examine the source of funds entering SASL's accounts and review their customer listing for potential fictitious customers, we would also recommend a review of SASL's Prop Trading activity to confirm that it does not negatively impact their customers.

► The list below is a high level summary of our recommended areas of investigation for Prop Trading analysis.

   i.   Compliance testing

      a.   Review and analyze compliance program elements related to Prop Trading.

   ii.   Forensic data analytics

      a.   <u>Front running</u>: *examine if SASL are stepping out in front of orders placed or about to be placed by their customers to gain a price advantage;*

      b.   <u>Promotion of stocks traded in Prop Trading accounts</u>: *examine the promotion of tickers traded by SASL in their Prop Trading accounts. Identify instances where SASL is actively promoting the opposite position taken by SALS in their Prop Trading accounts. Determine impact on SASL's capital and customer accounts from trading; and*

      c.   <u>Extension of capital</u>: *examine daily asset balances of SASL accounts and compare to reserve capital for trading. Understand funding of the Prop Trading.*

---



# Appendix A: Analysis of SASL Prop Trading account
Frequently traded tickers based on number of trades

The tables below show the most frequently traded tickers in each of SASL's Prop Trading accounts, 32810 and 32813.

Account 32810 - most frequently traded tickers based on number of trades

| Symbol | Number of trades | Volume of shares | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|--------|------------------|------------------|---------------------|-----------------|----------------|----------|
| MBRX | 1,297 | 2,055,394 | 6,125,486 | 1.9500 | 40,590,000 | NASDAQ |
| IDXG | 871 | 1,380,378 | 2,767,556 | 1.1200 | 29,270,000 | NASDAQ |
| AMD | 599 | 299,488 | 3,711,845 | 12.8900 | 11,973,150,000 | NASDAQ |
| GLYC | 562 | 175,354 | 1,967,391 | 22.3500 | 797,670,000 | NASDAQ |
| HMNY | 358 | 213,638 | 919,471 | 8.5900 | 209,690,000 | NASDAQ |
| PIRS | 338 | 276,924 | 998,438 | 7.9200 | 345,810,000 | NASDAQ |
| APHB | 332 | 217,054 | 928,853 | 1.1700 | 14,520,000 | NYSE American |
| AEZS | 328 | 371,314 | 951,487 | 2.8500 | 37,590,000 | NASDAQ |
| SORL | 327 | 199,596 | 1,373,281 | 6.4700 | 121,620,000 | NASDAQ |
| INPX | 320 | 216,122 | 872,137 | 0.3200 | 14,260,000 | NASDAQ |
| CCCR | 294 | 186,664 | 551,856 | 1.7000 | 33,306,000 | NASDAQ |
| MTBC | 272 | 229,826 | 623,155 | 3.8300 | 41,390,000 | NASDAQ |
| NADL | 269 | 197,016 | 606,879 | 0.0650 | 1,760,000 | OTC Market |
| TEVA | 243 | 169,488 | 3,350,220 | 21.3300 | 22,592,780,000 | NYSE |
| JNUG | 230 | 542,490 | 5,298,660 | 18.3500 | n/a | NYSE Arca |



# Appendix A: Analysis of SASL Prop Trading account
## Frequently traded tickers based on number of trades

Account 32813 - most frequently traded tickers based on number of trades

| Symbol | Number of trades | Volume of shares | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|--------|------------------|------------------|---------------------|-----------------|----------------|----------|
| AMD | 21,702 | 9,846,706 | 103,658,136 | 12.8900 | 11,973,150,000 | NASDAQ |
| JNUG | 19,242 | 7,592,070 | 66,501,776 | 18.3500 | n/a | NYSE Arca |
| DRYS | 17,106 | 6,537,751 | 27,745,667 | 3.5400 | 374,350,000 | NASDAQ |
| VRX | 14,185 | 4,592,694 | 78,093,735 | 19.3200 | 6,864,210,000 | NYSE |
| MGT | 14,070 | 11,045,858 | 37,654,351 | 3.2500 | 178,720,000 | OTC Market |
| AUPH | 13,957 | 6,325,374 | 34,378,469 | 5.6700 | 473,860,000 | NASDAQ |
| MTBC | 10,819 | 6,406,516 | 15,046,536 | 3.8300 | 41,390,000 | NASDAQ |
| EXAS | 10,631 | 4,271,220 | 51,424,681 | 50.4900 | 6,017,650,000 | NASDAQ |
| IDXG | 10,606 | 5,508,400 | 14,080,070 | 1.1200 | 29,270,000 | NASDAQ |
| AEZS | 10,458 | 5,947,476 | 18,033,653 | 2.8500 | 37,590,000 | NASDAQ |
| SORL | 10,291 | 5,574,952 | 33,703,567 | 6.4700 | 121,620,000 | NASDAQ |
| UVXY | 10,273 | 2,971,370 | 48,233,428 | 9.9200 | n/a | NYSE Arca |
| MBRX | 9,972 | 6,202,410 | 14,736,741 | 1.9500 | 40,590,000 | NASDAQ |
| NUGT | 9,714 | 2,321,866 | 68,682,857 | 35.3600 | n/a | NYSE Arca |
| HTGM | 9,397 | 4,003,994 | 17,377,540 | 3.9900 | 57,950,000 | NASDAQ |



# Appendix A: Analysis of SASL Prop Trading account
## Frequently traded tickers based on volume of shares traded

Account 32810 - most frequently traded tickers based on volume of shares

| Symbol | Volume of shares | Number of trades | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|--------|------------------|------------------|---------------------|-----------------|----------------|----------|
| UWTI | 4,956,560 | 211 | 21,170,817 | n/a | n/a | NYSE Arca |
| MBRX | 2,055,394 | 1,297 | 6,125,486 | 1.9500 | 40,590,000 | NASDAQ |
| IDXG | 1,380,378 | 871 | 2,767,556 | 1.1200 | 29,270,000 | NASDAQ |
| USO | 1,138,240 | 23 | 16,554,439 | 13.2400 | 2,180,000,000 | NYSE Arca |
| AKAO | 966,936 | 221 | 13,803,311 | 11.0000 | 468,450,000 | NASDAQ |
| BAC | 704,164 | 87 | 15,221,147 | 32.2000 | 329,190,000,000 | NYSE |
| OPGN | 632,516 | 77 | 1,512,322 | 6.2000 | 14,830,000 | NASDAQ |
| JNUG | 542,490 | 230 | 5,298,660 | 18.3500 | n/a | NYSE Arca |
| RLOG | 532,160 | 59 | 911,991 | 0.0580 | 1,120,000 | NASDAQ |
| ARRY | 437,134 | 86 | 2,634,902 | 14.5400 | 2,906,150,000 | NASDAQ |
| UVXY | 414,226 | 181 | 6,864,259 | 9.9200 | n/a | NYSE Arca |
| AEZS | 371,314 | 328 | 951,487 | 2.8500 | 37,590,000 | NASDAQ |
| SCON | 301,712 | 75 | 732,040 | 1.1400 | 12,480,000 | NASDAQ |
| AMD | 299,488 | 599 | 3,711,845 | 12.8900 | 11,973,150,000 | NASDAQ |
| PIRS | 276,924 | 338 | 998,438 | 7.9200 | 345,810,000 | NASDAQ |



# Appendix A: Analysis of SASL Prop Trading Account
## Frequently traded tickers based on volume of shares traded

Account 32813 - most frequently traded tickers based on volume of shares

| Symbol | Volume of shares | Number of trades | Value of trades ($) | Stock price ($) | Market cap ($) | Exchange |
|---|---|---|---|---|---|---|
| MGT | 11,045,858 | 14,070 | 37,654,351 | 3.2500 | 178,720,000 | OTC Market |
| DCTH | 10,980,100 | 4,207 | 1,881,366 | 0.0400 | 2,380,000 | NASDAQ |
| AMD | 9,846,706 | 21,702 | 103,658,136 | 12.8900 | 11,973,150,000 | NASDAQ |
| JNUG | 7,592,070 | 19,242 | 66,501,776 | 18.3500 | n/a | NYSE Arca |
| DRYS | 6,537,751 | 17,106 | 27,745,667 | 3.5400 | 374,350,000 | NASDAQ |
| MTBC | 6,406,516 | 10,819 | 15,046,536 | 3.8300 | 41,390,000 | NASDAQ |
| AUPH | 6,325,374 | 13,957 | 34,378,469 | 5.6700 | 473,860,000 | NASDAQ |
| MBRX | 6,202,410 | 9,972 | 14,736,741 | 1.9500 | 40,590,000 | NASDAQ |
| AEZS | 5,947,476 | 10,458 | 18,033,653 | 2.8500 | 37,590,000 | NASDAQ |
| SUNE | 5,877,204 | 6,580 | 39,410,203 | n/a | n/a | NYSE |
| SORL | 5,574,952 | 10,291 | 33,703,567 | 6.4700 | 121,620,000 | NASDAQ |
| IDXG | 5,508,400 | 10,606 | 14,080,070 | 1.1200 | 29,270,000 | NASDAQ |
| TOPS | 5,279,162 | 8,632 | 15,897,149 | 0.2000 | 23,800,000 | NASDAQ |
| CLRB | 5,051,484 | 6,717 | 17,851,299 | 1.2300 | 18,820,000 | NASDAQ |
| CHK | 4,940,670 | 7,910 | 27,860,127 | 3.9700 | 4,516,230,000 | NYSE |



# Appendix A: Analysis of SASL Prop Trading Account
## Frequently traded tickers based on value of shares traded

Account 32810 - most frequently traded tickers based on value of trades ($)

| Symbol | Value of trades ($) | Volume of shares | Number of trades | Stock price ($) | Market cap ($) | Exchange |
|--------|--------------------|-----------------|-----------------|----------------|----------------|----------|
| UWTI | 21,170,817 | 4,956,560 | 211 | n/a | n/a | NYSE Arca |
| USO | 16,554,439 | 1,138,240 | 23 | 13.2400 | 2,180,000,000 | NYSE Arca |
| BAC | 15,221,147 | 704,164 | 87 | 32.2000 | 329,190,000,000 | NYSE |
| AKAO | 13,803,311 | 966,936 | 221 | 11.0000 | 468,450,000 | NASDAQ |
| UVXY | 6,864,259 | 414,226 | 181 | 9.9200 | n/a | NYSE Arca |
| MBRX | 6,125,486 | 2,055,394 | 1,297 | 1.9500 | 40,590,000 | NASDAQ |
| JNUG | 5,298,660 | 542,490 | 230 | 18.3500 | n/a | NYSE Arca |
| NFLX | 4,012,957 | 31,892 | 92 | 274.6000 | 116,707,500,000 | NASDAQ |
| AMD | 3,711,845 | 299,488 | 599 | 12.8900 | 11,973,150,000 | NASDAQ |
| TEVA | 3,350,220 | 169,488 | 243 | 21.3300 | 22,592,780,000 | NYSE |
| AERI | 2,807,775 | 76,072 | 88 | 56.7000 | 2,159,850,000 | NASDAQ |
| IDXG | 2,767,556 | 1,380,378 | 871 | 1.1200 | 29,270,000 | NASDAQ |
| ARRY | 2,634,902 | 437,134 | 86 | 14.5400 | 2,906,150,000 | NASDAQ |
| SRPT | 2,337,433 | 66,438 | 93 | 67.5800 | 4,369,770,000 | NASDAQ |
| GLYC | 1,967,391 | 175,354 | 562 | 22.3500 | 797,670,000 | NASDAQ |



# Appendix A: Analysis of SASL Prop Trading Account
## Frequently traded tickers based on value of shares traded

Account 32813 - most frequently traded tickers based on value of trades ($)

| Symbol | Value of trades ($) | Volume of shares | Number of trades | Stock price ($) | Market cap ($) | Exchange |
|--------|--------------------|------------------|------------------|-----------------|----------------|----------|
| AMD | 103,658,136 | 9,846,706 | 21,702 | 12.8900 | 11,973,150,000 | NASDAQ |
| VRX | 78,093,735 | 4,592,694 | 14,185 | 19.3200 | 6,864,210,000 | NYSE |
| NUGT | 68,682,857 | 2,321,866 | 9,714 | 35.3600 | n/a | NYSE Arca |
| NVDA | 68,597,849 | 640,698 | 7,293 | 243.3300 | 143,228,100,000 | NASDAQ |
| JNUG | 66,501,776 | 7,592,070 | 19,242 | 18.3500 | n/a | NYSE Arca |
| EXAS | 51,424,681 | 4,271,220 | 10,631 | 50.4900 | 6,017,650,000 | NASDAQ |
| WTW | 48,961,521 | 3,117,462 | 6,482 | 65.4400 | 4,251,890,000 | NYSE |
| UVXY | 48,233,428 | 2,971,370 | 10,273 | 9.9200 | n/a | NYSE Arca |
| HTZ | 46,298,874 | 2,991,308 | 8,611 | 24.1500 | 1,915,560,000 | NYSE |
| X | 40,631,595 | 1,831,858 | 6,500 | 40.9500 | 7,047,020,000 | NYSE |
| SUNE | 39,410,203 | 5,877,204 | 6,580 | n/a | n/a | NYSE |
| TEVA | 38,174,857 | 1,687,810 | 5,004 | 21.3300 | 22,592,780,000 | NYSE |
| MGT | 37,654,351 | 11,045,858 | 14,070 | 3.2500 | 178,720,000 | OTC Market |
| SRPT | 36,871,915 | 1,739,054 | 8,072 | 67.5800 | 4,369,770,000 | NASDAQ |
| AUPH | 34,378,469 | 6,325,374 | 13,957 | 5.6700 | 473,860,000 | NASDAQ |



# Limitations of review

## Scope of our work

▶ Our work has been limited in scope and time, and we note that more detailed procedures may have identified additional issues. The procedures summarized in our report do not constitute an audit, a review or other form of assurance in accordance with any generally accepted auditing, review or other assurance standards, and accordingly, we do not express any form of assurance. Additionally, the procedures do not address the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act.

▶ Our work has been limited in scope and cannot be relied upon to have identified all information or issues that may be of relevance.

▶ EY performed certain searches using publicly-available information  We cannot assess whether the information from these sources is accurate or complete, and there is a risk that this information may be false, incomplete, or no longer relevant. EY cannot assume liability for these risks. The findings presented in this report are a result of the identification, compilation, and cross-referencing of information as it was publicly available.

▶ The contents of this report are based on information provided and disclosed by SASL during the course of the review. EY did not have access to SASL's internal systems and our analysis has been based on the trade data and any supporting documentation that was extracted by SASL and provided to EY.

▶ During the engagement we asked for copies of 'Market Surveyor' reports or communications. SASL advised that the relationship and all documentation is with Mint Global Markets Inc. (formerly Stock USA Execution Services) ("Mint Global") and that SASL does not have any supporting documentation from Market Surveyor. Mint Global is the firm which SASL execute their equity trades through. We found this response to be vague and could not confirm or deny the statement made by SASL.

▶ SASL highlighted to us that a customer account was closed due to suspicion of layering. SASL were unable to advise which customer or account this was or any documentation to support this.



# Limitations of review

► Following a reconciliation of SASL's clearing account (32812) we found 111 instances in which trade positions were not cleared in this account and thus appears an open position remained. SASL explained that if the reconciliation was completed on a daily basis then this could be the case as customers are not required to sell the shares purchased on that day and can hold a position for as long as they wish. When asked for supporting data, we were informed that providing a full trade history of the stock was too cumbersome for SASL's system and instead provided with copies of the daily position in relation to two of the instances from the date on which the open position was created until it cleared. The trade data shows this was a manual entry detailed as 'flatten position'. We reviewed a sample of other instances and identified the same practice for other positions. We did not review all 111 instances.

► Upon requesting additional information in regards to the notes for manual trades, SASL advised that they would be unable to provide this and that there would be no further information on their system i.e. the trade data contains all information available in relation to that trade. We are unable to confirm or deny this statement.



EY | Assurance | Tax | Transactions | Advisory

About EY

EY is a global leader in assurance, tax, transaction and advisory services. The insights and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization and may refer to one or more of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com.

About EY's Assurance Services

Our assurance services help our clients meet their reporting requirements by providing an objective and independent examination of the financial statements that are provided to investors and other stakeholders. Throughout the audit process, our teams provide timely and constructive challenge to management on accounting and reporting matters and a robust and clear perspective to audit committees charged with oversight.

The quality of our audit starts with our 60,000 assurance professionals, who have the breadth of experience and on-going professional development that comes from auditing many of the world's leading companies.

For every client, we assemble the right multidisciplinary team with the sector knowledge and subject-matter expertise to address your specific issues. All teams use our Global Audit Methodology and latest audit tools to deliver consistent audits worldwide.

© 2018 Ernst & Young
All Rights Reserved.

# THE COMMONWEALTH OF THE BAHAMAS
# THE SECURITIES COMMISSION OF THE BAHAMAS

**IN THE MATTER** of the Administration of the Securities Industry Act, 2011 and the Securities Industry Regulations, 2012

BETWEEN

## THE SECURITIES COMMISSION OF THE BAHAMAS

**Plaintiff**

AND

## SWISS AMERICA SECURITIES LTD.

**Defendant**

### <u>SETTLEMENT AGREEMENT</u>

1.    **RECITALS**

**WHEREAS** the above-named Defendant has on the **25th day of July 2018** agreed to settle, pursuant to section 133(1) of the Securities Industry Act 2011 (hereafter, "the Act"), with the Plaintiff, Securities Commission of The Bahamas (hereafter "the Commission"), this Settlement Agreement (hereafter "Settlement") is accordingly executed concerning the breaches and allegations outlined in the Commission's for-cause examination report dated 19 February 2018 ("the report");

**AND WHEREAS** the Commission has approved the Settlement on the terms in Clause 3 below;

2.    **FACTS AGREED**

Solely for securities regulatory purposes and as the basis for this Settlement concerning the Commission's disciplinary action against Swiss America Securities Ltd. (hereafter "SASL" or "the Defendant"), the facts and conclusions set out herein are agreed as follows —

(1) At all material times, the Defendant was and remains a securities firm duly licensed by the Commission on September 26, 2011.  During May 2016, the Commission conducted an examination for cause and discovered breaches further outlined in the report, aforesaid.

(2) The issues revealed in the report primarily concerned SASL's operations and the failure to ensure full

**Settlement Agreement – Re: SASL.**

compliance with provisions of the Act, including KYC issues, maintenance of books and records and failing to notify the Commission of material changes.

(3) The Commission notes that the report is based on evidence obtained directly from SASL's files and from interviews with SASL's employees.

### The Defendants Position

(4) The Defendant responded primarily via letter dated 22 March 2018, indicating that contrary to the report the breaches were unfounded, and further proposed reductions in the penalties proposed by the Commission. However, SASL did not indicate the basis for its assertion, which the Commission pointed out in its letter to SASL, dated 4 May 2018.

(5) The Defendant met with the Commission on 25 July 2018 and agreed to accept sanctions imposed by the Commission who, in imposing sanctions, took into consideration facts and information discussed in the aforementioned meeting. SASL has since indicated, via letter dated 30 July 2018, its efforts to address the mentioned compliance issues.

### Breaches

(6) The Commission considered the gravity of the mentioned breaches, as outlined in the report aforesaid, and addressed what was deemed to be the most serious of those breaches, more specifically outlined in **Appendix A**, appended hereto.

### Mitigating Factors

(7) The Defendant acknowledges and accepts responsibility for its non-compliance, which is the subject matter of the report and this ensuing Settlement.

### Conduct contrary to Public Interest

(8) In summary, during the material times and notwithstanding the Defendant's explanation outlined above, the Defendant's actions did not comply with securities laws, contrary to the public interest.

3.   **TERMS OF SETTLEMENT**

IT IS HEREBY AGREED THAT THE FOLLOWING CONSTITUTE THE TERMS OF THIS SETTLEMENT:

(1) The Defendant understands and agrees that notwithstanding anything to the contrary, and solely for purposes of this Settlement, the Commission here agrees to the Defendant neither admitting nor denying breaches, allegations and/or liability per the report, aforesaid. However, the Defendant accepts the above Facts Agreed as stated herein and further agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, the Facts Agreed, any of the breaches in the report or creating the impression that any of the foregoing is without legal or factual basis. If the Defendant breaches this Settlement, the Commission may then commence administrative and/or court proceedings in the usual manner and pursue a full hearing of the breaches in the report and any other matter emanating therefrom.

**Settlement Agreement – Re: SASL.**

(2) Orders and/or sanctions will be imposed by the Commission in the public interest, pursuant to section 133 of the Act, and accepted by the Defendant as follows:

    a. **A Penalty,** pursuant to section 135(1) of the Act, for the sums outlined in **Appendix A** aforesaid, to be paid by the Defendant for each breach outlined therein **(totalling $120,000.00 for 10 breaches)**.

    b. **Directive,** pursuant to section 132 of the Act, that SASL immediately proceed to rectify all breaches outlined in the report **by or before 31st August 2018**.

(3) Provided the Defendant fully satisfies Terms 3(1) and 3(2) above, the Commission will not pursue further disciplinary action relative to this matter.

(4) The effective date for the sanctions in Term 3(2), including the prohibition period, will commence from the date of execution of this settlement agreement. **The payment of monetary sanctions is expected by no later than 31 August 2018, failing which further disciplinary action may ensue to address such failure.**

**4. WAIVERS, UNDERTAKINGS AND ACKNOWLEDGEMENTS**

(1) This Settlement Agreement and its terms will be treated as confidential by all parties to it until approved by the Commission, and forever if, for any reason whatsoever, this Settlement is not approved by the Commission.

(2) If this Settlement is approved by the Commission, the parties to this Settlement will not make any statement that is inconsistent with this Settlement.

(3) The parties waive any rights to a hearing, judicial review or appeal of this Settlement and/or any of its provisions, or any document outlining the breaches and/or allegations giving rise to this Settlement.

(4) The parties acknowledge that the terms set out in Clause 3 above shall be deemed to be and treated as a final decision of the Commission.

Signed ......................................................................

(print name)...... Guy Gentile, CEO ........................
                 (for Defendant)

Signed ......................................................................

(print name) ...... R. V. LOTMORE ........................

Chairman
Securities Commission of The Bahamas (Plaintiff)

Made this .....30th..... day of.....August..... 20.18

Settlement Agreement – Re: SASL.

## APPENDIX A

| No. | Breaches | Penalty |
|---|---|---|
| 1. | Maintain documents and/or records. | $13,500.00 |
| 2. | Verify client accounts. | $13,500.00 |
| 3. | Conduct KYC on all of its clients. | $26,500.00 |
| 4. | Conduct risk monitoring of clients (penalty takes into consideration the Rules coming into effect in 2016) | $3,500.00 |
| 5. | Conduct reconciliation of client accounts. | $10,000.00 |
| 6. | Deliver current details of insurance coverage. | $3,500.00 |
| 7. | Obtain prior written consent for transaction affecting financial resources. | $6,500.00 |
| 8. | Notify the Commission of outsourcing agreement. | $10,000.00 |
| 9. | Notify the Commission of material change (i.e. name change for Swiss and an aggravating factor being the failure to notify of the name change at the 15 Feb. 2017 meeting). | $16,500.00 |
| 10. | Notify the Commission of material change (i.e. Mr. Gentile having been a defendant in a criminal matter). | $16,500.00 |
| | **TOTAL** | $120,000.00 |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

22 May 2019

| | |
|---|---|
| **Registrant:** | **Swiss America Securities Ltd.** |
| **License Type:** | **Registered Firm (RF) – Dealing as Agent and Principle, Arranging, Managing and Advising on Securities.** |
| **License Date:** | **30th December, 2011** |
| **License No:** | **SIA-F108** |
| **Inspection Date:** | **19th November 2018 – 3rd December 2018** |
| **Response Date:** | |
| **Follow-Up Date:** | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**

The Securities Commission of The Bahamas (the Commission) is a statutory body established under the Securities Industry Act, 2011 (the SIA) for the regulation of investment funds and securities and capital markets in The Bahamas. The regulatory authority of the Commission to regulate participants in the securities industry of The Bahamas, is contained in the SIA, while the Investment Funds Act, 2003 (the IFA) makes similar provisions relating to the regulation of the investment fund industry participants.

The responsibilities of the Commission are clearly delineated in Section 12 of the SIA which charges the Commission inter alia with responsibility to:

1. Formulate principles to regulate and govern investment funds, securities and capital markets;
2. Maintain surveillance over investment funds, securities and capital markets ensuring orderly, fair and equitable dealings; and
3. Create and promote conditions to ensure the orderly growth and development of the capital markets.

In addition to these specific functions, the Commission is granted, pursuant to Section 45 of the SIA, powers to conduct onsite inspections to execute its mandate. This is necessary to ensure fair-play and the integrity of the market while facilitating its development.  Investor education and protection also constitute an important part of the Commission's mandate.

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

The Commission's regulatory activities are not only designed to ensure compliance with the laws governing the industry, but ultimately to contribute to the development and maintenance of a financial environment that is vibrant and competitive; one in which the public can have confidence because of its sound corporate governance, prudent business practices and transparency, with due regard to international standards and the need for operational freedom.

**THE COMMISSION'S REGISTER**

As of the end of fieldwork, the Commission's Official Register included the following information with respect to the Company's registration as a Registered Firm:

| | |
|---|---|
| **NAME** | **LICENSE\| REGISTRATION** |
| Swiss America Securities Ltd. ("SASL") | SIA-F108\| 30 December 2011 |
| | |
| **ADDRESS** | **TELEPHONE NUMBERS** |
| Suite 2017, Elizabeth Avenue | 242-603-8600 |
| Elizabeth on Bay Plaza | |
| P.O. Box CB-8340 | |
| Nassau, The Bahamas | |
| | |
| **PERSONNEL** | **LICENSE\| REGISTRATION** |
| Guy Gentile | Chief Executive Officer\| 30 December 2011 |
| Edward Cooper | Compliance Officer\| MLRO\| 27 March 2018 |

*If any of the above information is incorrect, please contact the Commission's Supervision Department at (242) 397-4100 Monday through Friday between the hours of 9:00 am to 5:00 pm Eastern Time.*

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

**THE ONSITE EXAMINATION**

In carrying out its mandate, the Commission conducts periodic onsite examinations to ensure that its registrants are complying with the legislation that governs the investment funds and securities and capital markets industries in The Bahamas.  In particular, the objectives of the Commission's onsite examination process are to:

(i)    Update the Commission's understanding of the Registrant's operations.
(ii)   Determine the accuracy of the Registrant's registration as dealing in securities, managing securities, arranging deals in securities and advising on securities, Investment Funds Administrator and the registration of individuals within the Company.
(iii)  Testing the Registrant's compliance with the Securities Industry Act, 2011, the Securities Industry Regulations, 2012 (the SIA Regulations), the Investment Funds Act, 2003, the Investment Funds Regulations, 2003 (the IFA Regulations), the Financial Transactions Reporting Act, 2000, its procedures manual and generally accepted corporate governance practices.

**Rotation**

The Commission seeks to conduct such examinations on a periodic basis, at intervals that it determines to be appropriate, considering its assessed level of risk of the registrant's business and operations.

**Disclaimer**

This report should not be relied upon for assurance that a registrant's operations are in compliance with the prescribed legislation or any other legislation to which it is subject.  The Commission would remind you that it is the responsibility of the registrant and its management to ensure that it complies with all applicable legislation.  Because of the test nature and other inherent limitations of the examination, there is an unavoidable risk that certain breaches may remain undiscovered.  Essentially, the Commission makes no assurance to any party as to the adequacy of a registrant's operations or its compliance with legislation.

**Use of Report**

This report is to be used solely by the Commission in carrying out its duties and responsibilities under its mandate and for the Registrant's information.  It is not to be used for any other purpose, or to be distributed to any other party without the Commission's prior consent.  The Commission accepts no responsibility for any third party relying on the contents of this report.

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

**SUMMARY OF FINDINGS – REGISTERED FIRM**

The Commission's current examination covered the period 1 May 2016 to 31 October 2018. The examination began on 19th November 2018 and ended on 3rd December 2018. The examination was conducted at the Registrant's Office, Suite 2017 Elizabeth Avenue, Elizabeth on the Bay, Nassau, The Bahamas.

*SASL – Registered Firm – SIA-F108*

| No. | Description of Findings | Page |
|---|---|---|
| | **Anti-Money Laundering/ Countering Financing of Terrorism** | |
| 1 | Financial Intelligence (Internal Reporting) Regulations, 2001 – Regulation 5 (a) – Internal reporting procedures | 6 |
| 2 | Financial Intelligence (Internal Reporting) Regulations, 2001 – Regulation 6 (1) (2) – Training procedures | 6–7 |
| 3 | Securities Industry Regulations, 2012 – Regulation 20 (4) (a) (b) – Records location and retention requirements | 7–8 |
| 4 | Securities Industry Regulations, 2012 – Regulation 53(2) (p) -  Notice of change in information-after registration | 8-9 |
| | **Financial and Capital Operations** | |
| 5 | Securities Industry Regulations, 2012- Regulation 49 (1)(a)- Reporting to the Commission-annual reporting | 9-10 |
| 6 | Securities Industry Regulations, 2012 – Regulation 50 (1) (a) (b) – Reporting to the Commission-interim reporting | 10 |
| 7 | Securities Industry Regulations, 2012 – Regulation 87 (1) (c) (iii) – Reconciliations | 11 |
| | **Registration Matters** | |
| 8 | Securities Industry Regulations, 2012 – Regulation 48 (1) – Termination of representative | 11-12 |
| 9 | Securities Industry Regulations, 2012 – Regulation 45 (1) (2) – Renewal Process | 12 |
| | **Trading Operations** | |
| 10 | Securities Industry Regulations, 2012 – Regulation 72 (3) – Reporting to clients- contract note | 13 |
| | **Other Recommendations** | |
| 1 | IT Governance- Security Awareness Training | 13 |
| 2 | Disaster Recovery Plan | 14 |
| 3 | IT Governance- Documenting Meetings | 14 |
| 4 | Aging Receivables & Receivables Report | 14-15 |
| 5 | Internal Policies on Distribution | 15 |
| 6 | Churning Procedures | 15 |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

The findings are discussed in more detail on pages 6 to 15 .  We require that you provide the Commission with your response to the finding noted within 30 days from the date of this report in the registrant's response space provided below the finding.  Your response should outline any corrective measures already taken or planned, along with the target dates for implementation. There is a potential for disciplinary action, where breaches are not resolved in a reasonable time. Spaces below registrant's response are to be completed by the Commission.

We take this opportunity to thank you and your staff for the cooperation and assistance provided during the examination.

Yours truly,

Ms. Lesley Pearson
Senior Manager, Risk Analytics & Examinations

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

**FINDINGS**

*SASL – Registered Firm – SIA-F108*

| Anti-Money Laundering/Countering Financing of Terrorism | | | | |
|---|---|---|---|---|
| **Finding 1** | **Legislation** | **Financial Intelligence (Internal Reporting) Regulations, 2001 – Regulation 5 (a) – Internal reporting procedures** *A financial institution shall institute and maintain internal reporting procedures which include provision -* *(a) identifying and appointing a person ("the Money Laundering Reporting Officer" who shall be registered with the Financial Intelligence Unit) to whom a report is to be made of any information or other matter which comes to the attention of an employee and which in the opinion of that employee gives rise to a knowledge or suspicion that another person is engaged in money laundering.* | | |
| | **Breach** | SASL's MLRO, Mr. Edward Cooper, was not registered with the FIU for the period under review. **Current Status** Mr. Cooper is now registered with the FIU effective 27 November 2018. | | |
| | **Required Action** | SASL must ensure that the MLRO is registered with the Financial Intelligence Unit as prescribed by legislation. | | |
| | **Registrant's Response** | | | |
| | **Action Plan** | | | |
| | **Due Date** | | | |
| | **SCB's Response** | | | |
| | **Follow-Up Date** | | | |
| | **Assigned Department** | | **Resolved** | **Yes** | **No** |
| | | | Date | | |
| | | | Comments: | | |
| **Finding 2** | **Legislation** | **Financial Intelligence (Internal Reporting) Regulations, 2001 – Regulation 6 (1)(2) – Training procedures** *(1) A financial institution shall take appropriate measures from time to time for the purposes of making all relevant employees aware -* *(a) of the provisions of the Financial Intelligence Unit Act, the Financial Transactions Reporting Act, the Financial and Corporate Service Providers Act, the Proceeds of Crime Act, these regulations and any other statutory provision relating to money laundering; and* | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| | | | | | |
|---|---|---|---|---|---|
| | | *(b) of the procedures maintained by the institution in compliance with the duties imposed under these regulations.*<br>*(2)   A financial institution shall provide all relevant employees from time to time and in any case at least once per year with appropriate training in the recognition and handling of transactions carried out by or on behalf of any person who is, or appears to be, engaged in money laundering.* | | | |
| | Breach | SASL did not ensure that all relevant staff received AML training in 2018. The following employees did not attend training:<br><br>• Shawn Gomex<br>• Leslie Gibson<br>• Kaverin Kirill<br>• Helin Kaya Sendil<br>• Brittney Miller<br>• Barry Burrows<br>• Abria Hield | | | |
| | Required Action | SASL must ensure that all staff receive AML training at least annually. | | | |
| | Registrant's Response | | | | |
| | Action Plan | | | | |
| | Due Date | | | | |
| | SCB's Response | | | | |
| | Follow-Up Date | | | | |
| | Assigned Department | | Resolved | Yes | No |
| | | | Date | | |
| | | | Comments: | | |
| Finding 3 | Legislation | **Securities Industry Regulations, 2012 – Regulation 53(2)(p) - Notice of change in information-after registration**<br>*(2) In addition to the notice requirements under subsection (I), a registered firm shall deliver to the Commission immediate written notice of the occurrence of any of the following in relation to the registered firm or its securities business, as the case may be-*<br>*(p) where the registered firm is the subject of any written customer complaint involving allegations of forgery, fraud, theft or misappropriation of funds or securities* | | | |

THE SECURITIES COMMISSION OF THE BAHAMAS
ROUTINE EXAMINATION REPORT

| | | | | |
|---|---|---|---|---|
| | Breach | A review of SASL's client complaint log revealed a complaint where the client alleged that the firm illegally manipulated the Stock "AWX" via a "pump and dump scheme" which resulted in a loss to the client. While the compliant was responded to, SASL did not inform the Commission that it was subject to an allegation of fraud by its client. | | |
| | Required Action | SASL should immediately notify the Commission if the firm is the subject of any written customer complaint involving allegations of forgery, fraud, theft or misappropriation of funds or securities. | | |
| | Registrant's Response | | | |
| | Action Plan | | | |
| | Due Date | | | |
| | SCB's Response | | | |
| | Follow-Up Date | | | |
| | Assigned Department | | Resolved | Yes | No |
| | | | Date | | |
| | | | Comments: | | |
| Finding 4 | Legislation | **Securities Industry Regulations, 2012 – Regulation 20 (4) (a) (b) – Records location and retention requirements.** <br> *(4) A market participant must keep a record for the longer of-* <br> *(a) seven years from the date the entry was made; and* <br> *(b) any period set by any other relevant law.* | | |
| | Breach | SASL does not have written policies that documents its record retention requirements. | | |
| | Required Action | SASL must maintain and update its manual to state that all documents must be kept for seven years from the date of entry as prescribed by legislation. | | |
| | Registrant's Response | | | |
| | Action Plan | | | |
| | Due Date | | | |
| | SCB's Response | | | |
| | Follow-Up Date | | | |
| | Assigned Department | | Resolved | Yes | No |
| | | | Date | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| | | | Comments: |
|---|---|---|---|
| | | | |
| | | **Financial & Capital Operations** | |
| **Finding 5** | Legislation | **Securities Industry Regulations, 2012- Regulation 49 (1)(a)- Reporting to the Commission - annual reporting** *(1) A registered firm must deliver to the Commission no later than the 120th day after the end of its financial year-* *(a) its audited annual financial statements for the financial year;* | |
| | Breach | **2016 Financials** 2016 Audited Financials SASL did not submit the 31 December 2016 Audited Financials within the legislative time frame. The Financials were submitted on 18 June 2018, when they were due 30 April 2017. Examiners noted that four extension requests for the 2016 financials were submitted and approved: | |

Within the Breach cell:

**Extension Request** · **Date Granted For:**

1st   11 April 2017          31 July 2017
2nd  12 July 2017           31 October 2017
3rd   24 October 2017       31 December 2017
4th   18 December 2017     28 February 2018

**2017 Financials**
SASL did not submit the 31 December 2017 Audited Financials within the legislative time frame. The financials are still currently outstanding.

Examiners noted that three (3) extension requests where submitted, however the 3rd request is under review by the Supervision Department.

**Extension Request** · **Date Granted For:**

1st   23 April 2018          31 July 2016
2nd  27 July 2018           30 September 2016
3rd   23 October 2018       as at 30 October 2018 the extension request was under review.

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| | | | | | |
|---|---|---|---|---|---|
| | **Required Action** | Going forward, SASL should ensure that their Audited Financial Statements are filed with the Commission before the prescribed deadline. | | | |
| | **Registrant's Response** | | | | |
| | **Action Plan** | | | | |
| | **Due Date** | | | | |
| | **SCB's Response** | | | | |
| | **Follow-Up Date** | | | | |
| | **Assigned Department** | | **Resolved** | **Yes** | **No** |
| | | | **Date** | | |
| | | | **Comments:** | | |
| **Finding 6** | **Legislation** | **Securities Industry Regulations, 2012 – Regulation 50 (1) (a) (b) – Reporting to the Commission - interim reporting** <br> *(1) A registered firm must deliver to the Commission no later than the 30th day after the end of the first, second, third and fourth quarter of its financial year-* <br> *(a) Its financial statements for that quarter;* <br> *(b) The information set out in Form 13 of the Second Schedule for that quarter.* | | | |
| | **Breach** | SASL did not file its Interim financial statements for quarters three (3) and four (4) of 2016 within the legislative deadline of the 30th day after the end of the first, second, third and fourth quarter of its financial year. | | | |
| | **Required Action** | SASL must ensure Form 13 and its interim reports are submitted to the Commission 30 days after the end of each quarter as prescribed by legislation. | | | |
| | **Registrant's Response** | | | | |
| | **Action Plan** | | | | |
| | **Due Date** | | | | |
| | **SCB's Response** | | | | |
| | **Follow-Up Date** | | | | |
| | **Assigned Department** | | **Resolved** | **Yes** | **No** |
| | | | **Date** | | |
| | | | **Comments:** | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| Finding 7 | Legislation | **Securities Industry Regulations, 2012 – Regulation 87 (1) (c) (iii) – Reconciliations** | | | |
|---|---|---|---|---|---|
| | | *(1) A registered firm shall perform re-conciliations as often as necessary to ensure the accuracy of its records, and shall perform reconciliations* | | | |
| | | *(c) at least twice per month-* | | | |
| | | *(iii) on its records of client assets for which it is accountable with statements obtained from the custodians of those assets.* | | | |
| | Breach | SASL is not preparing reconciliations on its balances on its records of client assets (Checkbook Inc.) for which it is accountable. | | | |
| | Required Action | SASL must ensure that reconciliations are performed on balances of each client transaction account at least twice per month as prescribed by legislation. | | | |
| | Registrant's Response | | | | |
| | Action Plan | | | | |
| | Due Date | | | | |
| | SCB's Response | | | | |
| | Follow-Up Date | | | | |
| | Assigned Department | | Resolved | Yes | No |
| | | | Date | | |
| | | | Comments: | | |
| | **Registration Matters** | | | | |
| Finding 8 | Legislation | **Securities Industry Regulations, 2012 – Regulation 48 (1) – Termination of representative** | | | |
| | | *(1) A registered firm shall file notice with the Commission immediately upon the termination, resignation or retirement of any registered individual who carried out securities business on behalf of the registered firm.* | | | |
| | Breach | SASL did not ensure that Commission received immediate notice of the resignations for the following registered individuals: <br><br> • Michael Donald Bain- Trading Representative - resigned April 3, 2017 and the Commission was notified on May 8, 2017. <br> • Tiffany Raquel Donaldson- Trading Representative- resigned June 1, 2018 and the Commission was notified on June 5, 2018. | | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | **Required Action** | SASL must ensure that the Commission is notified immediately of the resignations of registered individuals. | | | |
| | **Registrant's Response** | | | | |
| | **Action Plan** | | | | |
| | **Due Date** | | | | |
| | **SCB's Response** | | | | |
| | **Follow-Up Date** | | | | |
| | **Assigned Department** | | **Resolved** | **Yes** | **No** |
| | | | **Date** | | |
| | | | **Comments:** | | |
| **Finding 9** | **Legislation** | <u>**Securities Industry Regulation, 2012 – Regulation 45 (1) (2) – Renewal process**</u><br>*(1) A registered firm shall deliver to the Commission the information set out in Form 10 of the Second Schedule on or before the 31" day of January of each year.*<br>*(2) Where, in any year, the registered firm has failed to file or deliver all required information and pay all required fees on or before the date.* | | | |
| | **Breach** | The Annual Information Update Form (AIUF) for the period ended 31 December 2017 was not submitted until 2 February, 2018 which is outside of the time prescribed by legislation (31st day of January each year). | | | |
| | **Required Action** | SASL must ensure that required information is submitted within the time line prescribed by legislation. | | | |
| | **Registrant's Response** | | | | |
| | **Action Plan** | | | | |
| | **Due Date** | | | | |
| | **SCB's Response** | | | | |
| | **Follow-Up Date** | | | | |
| | **Assigned Department** | | **Resolved** | **Yes** | **No** |
| | | | **Date** | | |
| | | | **Comments:** | | |
| | | **Trading Operations** | | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| Finding 10 | Legislation | <u>Securities Industry Regulation, 2012 – Regulation 72 (3) (e) (f) – Reporting to clients - contract note</u><br>*A contract note shall set out -*<br>    *(e) whether the registered firm was acting as principal or agent;*<br>    *(f) the marketplace, if any, on which the transaction took place, or, if applicable, a statement that the transaction took place on more than one marketplace or over more than one day.* | | | |
| --- | --- | --- | --- | --- | --- |
| | Breach | SASL does not display the marketplace and whether SASL is acting as principal or agent on the trade confirmations for their clients. | | | |
| | Required Action | SASL must ensure that contract notes include the marketplace and whether SASL is acting as principal or agent as prescribed by legislation. | | | |
| | Registrant's Response | | | | |
| | Action Plan | | | | |
| | Due Date | | | | |
| | SCB's Response | | | | |
| | Follow-Up Date | | | | |
| | Assigned Department | | Resolved | Yes | No |
| | | | Date | | |
| | | | Comments: | | |

| Other Recommendations | | | | |
| --- | --- | --- | --- | --- |
| Recommendation 1 | Currently SASL does not host an annual security awareness training programs for staff.  It is recommended that SASL host an IT security awareness training program for all staff. | | | |
| Registrant's Response | | | | |
| Action Plan | | | | |
| Due Date | | | | |
| SCB's Response | | | | |
| Follow-Up Date | | | | |
| Assigned Department | | Resolved | Yes | No |
| | | Date | | |
| | | Comments: | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| Recommendation 2 | It is recommended that SASL list the Securities Commission as a critical vendor in SASL's Disaster Recovery Plan. | | | |
|---|---|---|---|---|
| Registrant's Response | | | | |
| Action Plan | | | | |
| Due Date | | | | |
| SCB's Response | | | | |
| Follow-Up Date | | | | |
| Assigned Department | | Resolved | Yes | No |
| | | Date | | |
| | | Comments: | | |
| Recommendation 3 | It is recommended that IT Matters be addressed and documented at the Board Level. | | | |
| Registrant's Response | | | | |
| Action Plan | | | | |
| Due Date | | | | |
| SCB's Response | | | | |
| Follow-Up Date | | | | |
| Assigned Department | | Resolved | Yes | No |
| | | Date | | |
| | | Comments: | | |
| Recommendation 4 | It is recommended that SASL revise its policy manual to include the accounts receivable process and the monitoring and collection of overdue balances, and create a report that lists each customer with an accounts receivable balance and the balanced owed. | | | |
| Registrant's Response | | | | |
| Action Plan | | | | |
| Due Date | | | | |
| SCB's Response | | | | |
| Follow-Up Date | | | | |
| Assigned Department | | Resolved | Yes | No |
| | | Date | | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

| | | Comments: | | |
|---|---|---|---|---|
| **Recommendation 5** | It is recommended that SASL document its policy of distribution of client statements. | | | |
| **Registrant's Response** | | | | |
| **Action Plan** | | | | |
| **Due Date** | | | | |
| **SCB's Response** | | | | |
| **Follow-Up Date** | | | | |
| **Assigned Department** | | Resolved | Yes | No |
| | | Date | | |
| | | Comments: | | |
| **Recommendation 6** | It is recommended that SASL document in their procedures manual trading procedures regarding churning. | | | |
| **Registrant's Response** | | | | |
| **Action Plan** | | | | |
| **Due Date** | | | | |
| **SCB's Response** | | | | |
| **Follow-Up Date** | | | | |
| **Assigned Department** | | Resolved | Yes | No |
| | | Date | | |
| | | Comments: | | |

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**By Hand and Email:** guy@suretrader.com; guy@mintbroker.com

18th September 2019

Mr. Guy Gentile
CEO
**Swiss America Securities Ltd.**
Suite 17, Elizabeth on Bay Plaza,
Elizabeth Ave. and Bay Street,
Nassau, Bahamas.

Dear Mr. Gentile,

Re:   **Notice of Suspension of Registration -**
        **Swiss America Securities Ltd.**

Reference is made to our meeting of 12 September 2019 with Mr. Guy Gentile, sole shareholder and
CEO of Swiss America Securities Ltd. ("SASL").

As mentioned during the meeting, the Securities Commission of The Bahamas ("the Commission") is
gravely concerned with respect to the specific operations of Swiss America Securities Ltd. ("SASL") as
described by Mr. Gentile in the aforementioned meeting.  The Commission is particularly concerned
that:

1.   SASL's online "day trading" facilities do not enable clients to trade directly with the
     market, or against a market held position, as is the premise for trading facilities generally.
     Instead, SASL's clients' orders are placed via an online platform called "Das Trader" and
     routed to a purported "trading desk"/back office of SASL in The Bahamas.  Clients' orders
     are not filled in the market but instead are recorded as orders by SASL with no transaction
     having been entered in the market.  As such, clients' positions do not exist in the market
     as would be expected but, rely on SASL's ability to cover gains and withdrawals in a
     manner that is akin to a "ponzi" scheme.  This practice is wholly unacceptable to the
     Commission and must cease immediately;

2.   SASL has established a purported "subsidiary" in Canada for the purpose of receiving
     clients' funds on behalf of SASL.  This Canadian entity is not regulated either in The
     Bahamas or in Canada.  Moreover, SASL's clients are not aware that they are not sending
     funds directly to the SASL and the Commission has received no satisfactory explanation
     for this operational structure.  SASL's inability to obtain a bank account in its own name
     is an unsatisfactory explanation for the diverting of clients' funds to an unregulated entity

18th September, 2019

Mr. Guy Gentile
Swiss America Securities Ltd.

Re: <u>Notice of Suspension of Registration</u>

and demonstrates, at the very least, gross deficiencies in SASL's operational capacity. This practice, as described, is wholly unacceptable to the Commission and must cease immediately; and

3. SASL has established purported "subsidiaries" in the United Kingdom and elsewhere. SASL has entered into client referral and other agreements with these entities. In the case of client referral agreements, SASL has either paid or intends to pay referral fees to these entities which are purported "subsidiaries" to SASL. Additionally, the existence of these arrangements have not been disclosed to SASL's clients.

In addition to the key issues identified above, the Commission notes that there are various deficiencies arising from onsite examinations conducted by the Commission that have not been addressed satisfactorily. Moreover, SASL's name change from Swiss America Securities Ltd. to Mint Broker Securities Ltd. remains unapproved by the Commission. These matters are also a source of grave concern.

### *SUSPENSION OF REGISTRATION AND RELATED ORDERS.*

In light of the gravity of the Commission's concerns regarding the operations of SASL, the Commission notifies SASL that, pursuant to sections 133(1)(b) and (f), and 133(3) of the Securities Industry Act, 2011 ("the Act"), **<u>SASL's continued registration under the Act is suspended for five (5) days</u>, and SASL is hereby Ordered to immediately, and for the entire period:**

1. Not accept any new clients/customers;

2. Not accept any new funds from existing clients of SASL;

3. Cease the facilitating of client trade orders in the manner described above by Mr. Guy Gentile or in any other manner;

4. Cease the facilitating of trade orders on its own behalf;

5. Not deal in any manner with clients' assets, wherever held. More specifically, SASL or any of its related-party companies, affiliates and/or subsidiaries and its employees, including Guy Gentile, **are restrained**, whether acting by any director, officer, or other agent or howsoever otherwise, from charging, pledging, hypothecating, transferring, borrowing, <u>transacting or in any way whatsoever, handling or dealing with clients' assets, whether by instruction or for the benefit of the clients or making advances to the credit of unrelated parties</u> such balances as shall be held on any account standing to the credit of clients of SASL or any of its related-party companies, affiliates and/or subsidiaries, without the Commission's prior written approval.

18th September, 2019

Mr. Guy Gentile
Swiss America Securities Ltd.

Re: <u>Notice of Suspension of Registration</u>

Pursuant to section 133(3) of the SIA the Commission has determined to give SASL an opportunity to be heard by the Commission as to the reasons for its noncompliance and why the aforesaid issues should not result in SASL's winding up. <u>SASL, its registered CEO and Compliance Officer are hereby directed to attend the Commission **within five (5) days or in any event on Tuesday 24 September 2019 at 10:00 am, in order to address same.**</u>

Failure to attend the Commission at the time stated or fully comply with the Orders issued above may render SASL subject to further disciplinary action.

Yours sincerely,

Christina Rolle
**Executive Director**

Sep-18 2019



Elizabeth on Bay Plaza
Elizabeth Avenue and Bay St.
Suite #17
Nassau, Bahamas

242-328-7800/1
Fax: 242-328-7803
www.suretrader.com
info@suretrader.com

September 19, 2019

Securities Commission of the Bahamas

Christina Rolle

Executive Director

North Building, 2nd Floor

31A East Bay Street

PO Box N-8347

Nassau, The Bahamas

Re: Letter regarding Notice of Suspension of Registration – Swiss America Securities, Ltd. ("SASL")

Dear Ms. Rolle:

We are in receipt of your letter dated September 18, 2019 which notices the suspension of registration for Swiss America Securities, Ltd. for five days, effective from  yesterday until September 24, when you requested a meeting with SASL's Chief Compliance Officer and Chief Executive Officer.

We write to respond to your concerns in a manner that we hope will permit SASL to immediately restart operations today, and to clear up some misunderstandings that appear to have led to yesterday's notice.

I would note that the Commission's actions in shutting down SASL, without notice or opportunity to cure the deficiencies cited in your letter, put at risk customer funds, because such customers are precluded from managing their accounts during the suspension, and because our clients where not given any notice to wind down their positions.

1

Your order, as you may know, has severely impacted the livelihood of our 40 Bahamian employees, who may have lost confidence in the security of their jobs.

I must note that SASL has been in good standing with the Commission for the past nine years, employing at one time any where from 40 -70 Bahamians, without any serious issues or out-of-the-ordinary customer complaints.  It is our hope to continue operating in full compliance with all your requirements.

What we are willing to immediately do now and will do until we reach a resolution with the Commission:

1.  Switch to agency trading only;
2.  Move all  client related assets to a segregated account at Deltec Bank in Nassau owned by SASL.
3.  We will change the name of the company to Swiss America Securities, Ltd.
4.  We will end the referral agreement with Mint Global Markets UK.

When I had the meeting with you last week, particularly when we reached hour three, I was dehydrated and very overwhelmed and tired, becoming frustrated, and as a result, was not able to explain to your satisfaction the questions asked of me.

I was at a loss because I was told our meeting was about the audits and that was what I was prepared to discuss, but your seemingly rapid questions were not about the audits.

My frustration was because I was not able to express sufficiently that we went through two audits and one forensic audit regarding our trading and our entire operation at your direction.  I was surprised at the line of questioning because you hired Ernst and Young to examine our trading history since our inception.

You stated to me that the Commission did not understand our business model, which was very upsetting and  I was trying to understand why you said that while trying to  keep up with your questions.

We have followed the same business model since our inception.

2

In fact, another Bahamian company, Trade Zero, Ltd. also uses our same business model: it has a US [Florida] Corporation by the name Trade Zero, Inc. that accepts/holds client funds of their Bahamian broker dealer. I have attached below screen shots of wiring instructions for the Bahamian Trade Zero, Ltd. with TD Bank and the Florida corporate name records.





Further, the reason we set up the UK firm was to hold client assets because the rule changes said we had to have a segregated account, and management decided to do it in a wholly owned entity and the account in Canada was set up for low cost ability to send and receive wires.

We are prepared to meet with you on September 24, but we request a sooner meeting because of the impact your order has on so many people who rely upon us, which is our 40 Bahamian employees whose livelihoods have been halted without recourse, and our 4,000 clients who have been cut off from their trading positions and assets, particularly options which have always been traded in an agency capacity, and are time sensitive and could result in a complete loss to such clients.

Please advise if the above is satisfactory and if a meeting sooner than 9/24/19 can be accommodated.

Respectfully Submitted,

Guy Gentile



3

EXHIBIT CRB8

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPEME COURT**

**Public Law Division**

SUPREME COURT
**SEP 2 3 2019**
Nassau, Bahamas

**2019**

**PUB/jrv/**

**IN THE MATTER OF** an application by **MINTBROKER INTERNATIONAL LTD.** (formerly known as **SWISS AMERICAN SECURITIES, LTD) T/A SURE TRADER** for Leave to apply for Judicial Review

**AND IN THE MATTER OF** the Application for Leave to apply for an Order of Certiorari

**AND IN THE MATTER OF** purported suspension dated 18th September, 2019 made pursuant to sections 133 (1) (b) and (f) and 133(3) of the Securities Industries Act

**AND IN THE MATTER OF** the decision of the Securities Commission of The Bahamas to appoint an auditor pursuant to section 45 of the Securities Industries Act, 2011

**AND IN THE MATTER OF** the Securities Industries Act, 2011

**AND IN THE MATTER OF** the Securities Industries (Amendment) Act, 2016

**AND IN THE MATTER OF** the Securities Industries (Amendment) Act, 2019

**AND IN THE MATTER OF** the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017

**BETWEEN**

**MINTBROKER INTERNATIONAL LTD. (formerly known as SWISS AMERICAN SECURITIES, LTD) T/A SURE TRADER**

**Applicant**

**AND**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Respondent**

# <u>ORDER</u>

**BEFORE** Her Ladyship the Honourable Madam Justice Ruth Bowe-Darville, a Justice of the Supreme Court of the Commonwealth of The Bahamas

**DATED THIS 23**[rd] **day of September A.D., 2019**

**UPON APPLICATION** made by Ex-Parte Summons filed on 23rd September, 2019

**AND UPON READING** the Statement lodged pursuant to Rule 3 (2) of the Order 53 of the Rules of the Supreme Court and the Affidavit of Mr. **GUY GENTILE** sworn on the 23rd day of September, A.D, 2019

**AND UPON HEARING** Mr. Philip E. Davis, Q.C and with him Miss. Glenda M. Roker of Counsel on behalf of the abovementioned Applicant for leave to apply for Judicial Review for an Order of Certiorari in respect to a decision / Orders made by the Securities Commission of The Bahamas on the 18th day of September A.D., 2019:

**IT IS HEREBY ORDERED THAT :**

1.  The application be allowed and that leave be granted to the Applicant to apply for Judicial Review with respect to removing into the Supreme Court the decision/ Orders, made by the Securities Commission of The Bahamas dated 18th September, 2019 namely:-

    "SALS continued registration under the act is suspended for five (5) days and the company is hereby ordered to immediately and for the entire period:

    1.  not to accept any new client/customers;

    2.  not to accept any new fund from existing clients of SASL;

    3.  cease the facilitation of client trade orders in the manner described above by Mr. Guy Gentile or any other manner;

    4.  cease the facilitating of trade orders on its own behalf ;

    5.  not deal in any manner with client's assets wherever held. More specifically, SASL or any of its related-party companies, affiliates, and/or subsidiaries and its employees, including Guy Gentile are restrained, whether acting by any director, officer or other agent,/or howsoever otherwise, from charging, pledging, hypothecating, transferring, borrowing, transacting or in any way whatsoever, handling or dealing with clients assets, whether by instructions or for the benefit

of the clients or making advances to the credit of unrelated parties such balances as shall be held on any account standing to the credit of clients of SASL or any of its related party companies, affiliates and/or subsidiaries, without the commissions prior written approval"

2.      The application for Judicial Review be made by originating motion to a Judge of the Supreme Court.

3.      The Decision/ Orders contained in the letter dated the 18th September, 2019 and all such further orders issued by or on behalf of the Securities Commission of The Bahamas in connection with the matters related directly or indirectly to the Orders are hereby stayed until after the hearing of the motion for Judicial Review or until further Order.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS

IN THE SUPEME COURT

Public Law Division

IN THE MATTER OF an application by MINTBROKER INTERNATIONAL LTD. (formerly known as SWISS AMERICAN SECURITIES, LTD) T/A SURE TRADER for Leave to apply for Judicial Review

AND IN THE MATTER OF the Application for Leave to apply for an Order of Certiorari

AND IN THE MATTER OF purported suspension dated 18th September, 2019 made pursuant to sections 133 (1) (b) and (f) and 133(3) of the Securities Industries Act

AND IN THE MATTER OF the decision of the Securities Commission of The Bahamas to appoint an auditor pursuant to section 45 of the Securities Industries Act, 2011

AND IN THE MATTER OF the Securities Industries Act, 2011

AND IN THE MATTER OF the Securities Industries (Amendment) Act, 2016

AND IN THE MATTER OF the Securities Industries (Amendment) Act, 2019

AND IN THE MATTER OF the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017

BETWEEN

MINTBROKER INTERNATIONAL LTD. (formerly known as SWISS AMERICAN SECURITIES, LTD) T/A SURE TRADER

Applicant

AND

SECURITIES COMMISSION OF THE BAHAMAS

Respondent

---

# ORDER

---

2019/ PUB/jrv/

DAVIS & CO.
Chambers
Nassau, The Bahamas

Attorneys for the Applicant

EXHIBIT CRR9

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY MAIL AND EMAIL:** guy@suretrader.com; antonio@suretrader.com;

3rd December 2019

Guy Gentile
Swiss America Securities Ltd.
Elizabeth on Bay Plaza
Elizabeth Ave & Bay Street
Nassau, The Bahamas.

Dear Mr. Gentile,

**Re:      Interactive Brokers – Cessation of Business with Swiss America Securities Ltd.**

We, the Securities Commission of The Bahamas (the "**Commission**"), refer to the letter of Swiss America Securities Ltd. ("**SASL**") to us dated 1 November 2019, and write further to the Commission's letters dated 6 November 2019 and 19 November 2019, and our email dated 25 November 2019.

The Commission notes the following:

1)      SASL maintained one or more brokerage accounts (collectively "**IB brokerage account**") with the US-based brokerage firm Interactive Brokers LLC ("**IB**"). Through the IB brokerage account, in turn, SASL offered brokerage services to SASL's clients.

2)      By SASL's said letter, SASL informed the Commission that IB notified ("**IB brokerage account closure notice**") SASL that on or about 31 October 2019 IB had placed SASL in 'liquidation only trading status…and [as such, required SASL] to close or to transfer out all positions within [SASL's IB brokerage account] within…30 days, ending November 30, 2019."

3)      Given the IB brokerage account closure notice, SASL's IB brokerage account was (due to be) closed as of 30 November 2019;

4)      By reason of the closure of the IB brokerage account, it follows that as of 1 December 2019 SASL no longer has operating brokerage account(s) by which to enable SASL to render brokerage services to SASL's clients;

5)      SASL has not answered the Commission's question regarding SASL's intentions for its continued operations, given the termination of its IB brokerage account and consequential impact of that on SASL's capacity to render brokerage services to its clients; and

6)      SASL has by email dated 02 December 2019 requested a meeting this week with the Commission.

In the abovementioned circumstances, the Commission hereby sets out regulatory requirements for SASL in alternative scenarios which may or ought reasonably to be under SASL's considerations, namely:

*Scenario A*:  If SASL were to elect to continue to offer services under current registrations to deal as principal or agent, discretionary management services and for arranging deals, given the closure of the IB brokerage account SASL would be required by the Commission to demonstrate that it has the operational capacity to do so. Pursuant to Regulation 53(3) of the *Securities Industry Regulations, 2012*, the following would be required:

1. SASL must file, for the Commission's approval, a revised and detailed business plan, addressing how all or parts of SASL's operations/registrations will continue;

2. SASL must ensure that it has received the required approvals from the Commission for any personnel required to provide, or continue providing, those services; and

3. SASL must file with the Commission its unqualified, audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018.

*Scenario B*:  If SASL were to elect that it would not continue to offer services requiring registrations to deal as principal or agent, discretionary management services and for arranging deals, then there would need to be a proper winding up of such business.  The Commission would be concerned that the winding up is done in an orderly manner as per requirements laid out in the Commission's letter to SASL dated 19 November 2019. You will note those requirements included court supervision.  That is towards enhancing the protection of clients, investors and/or creditors in the winding up process.

In the event of scenario B, the only remaining registration of SASL would concern advisory services.  Should SASL determine to retain such registration and to offer that service, again, SASL would be subject to the requirements of Regulation 53(3) of the *Securities Industry Regulations, 2012*, already referenced above.  Under which, amongst other things, SASL would be required by the Commission to obtain it's prior approval of such personnel as would provide SASL's advisory services.

SASL has by its email dated yesterday, 2 December 2019, requested a meeting with the Commission during this week.  Promptly the Commission has agreed to meet at 11am Wednesday, 4 December 2019.

Take notice that to assist the Commission with assessing SASL's current state of affairs, the Commission requires and directs SASL to provide the following information, namely:

1.      Complete transaction history of all activity on the IB brokerage accounts for the period beginning 1st June 2019 up to the closure of the IB accounts; and

2.      A full reconciliation of all client accounts held with SASL, whether or not they are held with IB, for the period beginning 1 June 2019 up to the closure of the IB accounts; and

SASL
Re: Interactive Brokers: Cessation of business...

3.    A reasonable deadline by which SASL will address its lack of operational capacity and matters described above.

The Commission looks forward to the upcoming meeting tomorrow. In that connection, please be guided by all of the information set out above. It is hoped that the meeting will result in clarity regarding SASL's immediate future.

Thank you, and we look forward to your cooperation.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:    Philip Davis, Q.C. - **Davis and Co.**

EXHIBIT 10

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY MAIL AND EMAIL:** guy@suretrader.com; antonio@suretrader.com

19th November 2019

Guy Gentile
Swiss America Securities Ltd.
Elizabeth on Bay Plaza
Elizabeth Ave & Bay Street
Nassau, The Bahamas

Dear Mr. Gentile:

**Re:    Interactive Brokers – Notice of Change of Information**

We refer to the captioned notice and letter to the Commission dated 1 November 2019 and our letter of 6 November 2019, outlining the Commission's teleconference of 5 November 2019 with Mr. Antonio Collie.  As Swiss America Securities Ltd. ("SASL") remains a licensee of the Commission, we will continue to address SASL directly on regulatory matters.

***Significant Changes in status/operations and ongoing obligations***
The Securities Commission of The Bahamas ("the Commission") further expresses our understanding, based on the aforementioned conversation with Mr. Collie and as referred to in our letter of 6 November 2019.  It is the Commission's understanding that as a result of SASL's lack of operational capacity due to the pending closure of its account with Interactive Brokers, SASL has determine to cease all brokerage activity on behalf of clients and that SASL no longer intends to offer this service.

Please note the Commission's concerns that while SASL has informed the Commission that it is "considering" whether to wind up its current operations, SASL has not provided the Commission with any of details as the Commission would expect to receive.

The Commission notes that SASL is currently registered as a firm in all four (4) registrable categories under the Securities Industry Act, 2011 ("SIA, 2011" or "the Act").  As far as the Commission is aware, however, SASL's brokerage operations represents its sole current offering to clients.  Therefore, in the event that SASL has determined to cease its brokerage activity, SASL must wind up its brokerage operations subject the Commission's approval.  Furthermore, SASL must also determine whether it will surrender all or parts of its registrations under the SIA, 2011.

T:  242 397-4100        E:  info@scb.gov.bs        W:  www.scb.gov.bs



SASL
Re: Interactive Brokers: Notice of Change in Information

The Commission advises SASL, pursuant to its authority under Regulation 53(3)[1] of the Securities Industry Regulations, 2012 ("SIR, 2012" or "the SIR"), that the winding up of its brokerage operations and/or the surrender of relevant registrations is subject to the following conditions:

1. To facilitate the winding up of SASL's brokerage operations, SASL must file the following documentation with the Commission, within seven (7) days of the receipt of this letter:

   a. Director's resolution to wind up SASL's brokerage operations;

   b. Detailed plan (as approved by the directors) for winding up SASL's brokerage operations, including but not limited to: a detailed timeline for complete wind up of brokerage operations; details on how SASL intends to deal with client liquidations and transfers; as well as details of clients who cannot be contacted or where there may be issues closing the client's account.

2. The Commission requires the appointment of an approved accounting firm to oversee this process and provide a report to the Commission on the wind up. To this end, should SASL determine to proceed with its plans, the Commission will petition the court, pursuant to section 134 of the Act, to appoint an approved firm for this process.

3. The Commission requires the surrender of all of SASL's registrations under the Act, unless a revised business plan is filed with the Commission, for approval, addressing how all or parts of SASL's operations/registrations will continue.

Please be advised that should SASL determine to continue with any or all of its registration(s), the Commission, pursuant to its authority under Regulation 53(3) of the SIR, will subject such continuation to the following conditions:

1. SASL must file, for the Commission's approval, a detailed business plan outlining the services that will be offered under the remaining registration(s);

2. SASL must ensure that it has received the required approvals from the Commission for any personnel required to provide those services; and

3. SASL must file with the Commission its unqualified, audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018.

---

[1] **Reg. 53(3)** Upon receipt of a notice under this regulation, the Commission may review the person's continued fitness for registration and take appropriate action as a result, including imposing conditions on the person's registration or revoking that registration.



SASL
Re: Interactive Brokers: Notice of Change in Information

**Note that failure to meet the above conditions may result in SASL's registration becoming ineffective.**

Should you have any questions or concerns, or if there are any matters that require further clarification, please do not hesitate to reach out to us.

Thank you and we look forward to your reply and/or the receipt of the requested documentation.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:     Philip Davis, Q.C. - **Davis and Co.**

SECURITIES COMMISSION
OF THE BAHAMAS

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY MAIL AND EMAIL:** guy@suretrader.com; antonio@suretrader.com;

10th December 2019

Guy Gentile
**SWISS AMERICA SECURITIES LTD.**
Elizabeth on Bay Plaza
Elizabeth Ave & Bay Street
Nassau, The Bahamas.

Dear Mr. Gentile,

**Re:**   **Voluntary Surrender of Registration of Swiss America Securities Ltd. (Mintbroker International Ltd.)**

We refer to the letter of Swiss America Securities Ltd. ("**SASL**") dated 3 December 2019 to the Securities Commission of The Bahamas (the "**Commission**").   We also write further to the Commission's letter that was also dated 3 December 2019 and to certain prior communications to SASL (as may be indicated below) on the same subject matter.

The Securities Commission of The Bahamas (the "**Commission**") notes as follows:

1.   The Commission's practice is to communicate directly to its registrants on matters giving rise to the need for regulatory communications.  SASL may expect that this practice will continue respecting all matters concerning its registration.

2.   The subject matter currently being addressed between the Commission and SASL (namely, the purported surrender by SASL of its registration) is new material arising for the Commission's consideration.

3.   The Commission regrets that the meeting between the Commission and SASL which had been agreed at SASL's request made on 2 December 2019 and scheduled for 11am on Wednesday 4 December 2019, was cancelled by SASL without explanation. The Commission wishes to encourage fulsome communications with SASL.  Such a meeting may have been helpful.

4.   SASL communicated in its said letter dated 3 December 2019 a decision voluntarily to surrender its registration to the Commission, and enclosed certain documents in furtherance of such surrender;

T:  242 397-4100      E:  info@scb.gov.bs      W:  www.scb.gov.bs



SASL
Re: Voluntary Surrender of Registration

5.   The Commission previously advised SASL in its letter dated 19 November 2019 of statutory requirements regulating (amongst other things) a voluntary surrender of registration[1].

6.   Specifically, in our letter dated 19 November 2019 the Commission advised that any voluntary surrender would require certain conditions to be satisfied.

Accordingly, the Commission informs and directs SASL that, pursuant to the Securities Industry Regulations 2012 (Reg 64), any approval of SASL's voluntary surrender of registration is subject to the following conditions, namely, that SASL must:

a)   Provide a complete transaction history of all activity on the IB brokerage accounts for the period beginning 1st June 2019 up to the closure of the IB accounts;

b)   Provide a full reconciliation of all client accounts held with SASL, whether or not they are/were held with IB, for the period beginning 01 June 2019 up to the closure of the IB accounts;

c)   Submit to the Commission its audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018;

d)   Provide a detailed plan (as approved by the directors) for winding up SASL's operations, including, but not limited to, details of any clients who could not be contacted or where there were any issues closing any client's account;

e)   Submit all of the above items listed 9(a) through 9(d) to the Commission **by Tuesday 31 December 2019**; and

f)   Upon items (a) through (d) above having been provided, submit the remaining outstanding registration certificates for -

---

[1]  **SIA - Section 71. Surrender of registration.**

(1) The Commission may, on application by a registrant, accept, subject to such terms and conditions as it may impose, the voluntary surrender of the registration of the registrant if the Commission is satisfied that the surrender of the registration would not be prejudicial to the public interest.

(2) On receiving an application under subsection (1), the Commission may, without providing an opportunity to be heard, suspend or impose any condition or restriction on the registration that the Commission deems appropriate.

**SIR - Regulation 64. Voluntary surrender of registration or liquidation.**

(1) No registered firm shall cease to carry on securities business or go into voluntary liquidation without the prior approval of the Commission.

(2) A registrant may voluntarily surrender the registrant's registration by making application to the Commission and the surrender of the registration shall not take effect until the later of -
  (a) 21 days after the notice has been received by the Commission; or
  (b) all conditions imposed by the Commission on the registrant have been complied with.

(3) Where a registered firm decides to cease to carry on any securities business, it shall ensure that any securities business that is outstanding is properly completed or is transferred to another firm registered to carry on that securities business.



SASL
Re: Voluntary Surrender of Registration

- Guy Gentile;
- Edward Cooper; and
- All other registered personnel for whom SASL received registration certificates.

As previously stated in the Commission's letter dated 19 November 2019, a winding up of SASL will be required by the Commission upon cessation of SASL's activities. The Commission will be concerned to ensure that SASL undergoes an orderly winding up and that the same would be court-supervised.

The Commission reserves all regulatory rights.

Thank you, and we look forward to your cooperation.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:      Philip Davis, Q.C. - **Davis and Co.**

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY MAIL AND EMAIL:** guy@suretrader.com; guy@mintbroker.com;

11th December 2019

Mr. Guy Gentile
**SWISS AMERICA SECURITIES LTD.**
Elizabeth on Bay Plaza
Elizabeth Ave & Bay Street
Nassau, The Bahamas.

Dear Mr. Gentile,

**Re:   Voluntary Surrender of Registration of Swiss America Securities Ltd. (Mintbroker International Ltd.)**

The Securities Commission of The Bahamas refers to the letter ("**Mintbroker letter**") dated 3 December 2019 under the letterhead of "Mintbroker International Ltd".  The Commission responds as follows:

- Swiss America Securities Ltd. ("**SASL**") is the relevant entity registered with the Commission.  As you are well aware, the purported change of SASL's name to "Mintbroker International Ltd" is not a change of name ever approved by the Commission.  As a consequence, the Commission responds to SASL and in so doing to you, Mr. Guy Gentile, its principal;

- The Mintbroker letter contains grossly inaccurate and defamatory material all of which is strongly rejected by the Commission.   It has been referred to our attorneys for advice and appropriate action in due course;

- Without prejudice to further points of objection to be forthcoming by the Commission, the Commission categorically rejects your statements attributing to it, its management, or its staff, any mal-intent, bias or abuse of power in any form or manner against SASL and/or its employees and directors;

- The Commission, its Executive Director and staff (in their professional and/or personal capacities) hereby expressly reserve all rights of legal recourse against SASL and/or Mr. Guy Gentile personally; and

- Those matters of the Mintbroker letter concerning SASL's purported surrender of registrations have been separately addressed in correspondence sent to you dated 10 December 2019.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:     John K F Delaney, QC – **Delaney Partners**

EXHIBIT CRR11

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY HAND AND VIA EMAIL:** guy@suretrader.com; antonio@suretrader.com;

4 February 2020

Guy Gentile
Swiss America Securities Ltd.
Elizabeth on Bay Plaza
Elizabeth Ave & Bay Street
Nassau, The Bahamas.

Dear Mr. Gentile,

**Re:** **Swiss America Securities Ltd. – Voluntary Surrender of Registration.**

We, the Securities Commission of The Bahamas (the "**Commission**"), refer to your letter to the Commission dated 3 December 2019, the Commission's letter to Swiss America Securities Ltd. ("**SASL**") dated 10 December 2019, and your letter to the Commission dated 30 December 2019.

The Commission notes the following:

1) On 3 December 2019, SASL wrote to the Commission purporting to voluntarily surrender SASL's registration. You will note, however, that the Commission's approval is required for the voluntary surrender of a Registrant's registration.

2) After review and considering your abovementioned letter dated 3 December 2019, the Commission responded by indicating in its abovementioned letter of 10 December 2019, that the approval of such surrender would be subject to certain conditions, including the submission, to the Commission, of certain information and/or documents by 31 December 2019.

3) To date, the following documents and/or information remain outstanding :

   a. A full reconciliation of all client accounts held with SASL, whether or not they are/were held with Interactive Brokers, for the period beginning 01 June 2019 up to the closure of the IB accounts;

   b. A detailed plan (as approved by the directors) for winding up SASL's operations, including, but not limited to, details of any clients who could not be contacted or where there were any issues closing any client's account;

   c. SASL's unqualified, audited financial statements which are currently outstanding for the years ending 31 December 2017 and 31 December 2018.



SASL
Re: Swiss America Securities Ltd.: Voluntary Surrender of Registration.

In your letter of 30 December 2019, you purported to provide certain information relative to Interactive Brokers.  However, the information provided was incomplete as the information did not sufficiently identify client transactions.

In light of the above stated failures to provide the required information and the current non-operational state of SASL, the Commission:

1. Does not approve SASL's voluntary surrender of registration; and

2. Suspends SASL's registration, with immediate effect.

**Take notice** that the Commission will seek a court supervised winding up to ensure the protection of clients, investors and/or creditors in the winding up process.

We look forward to your cooperation.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:       Michael Miller – Kensington Chambers (Registered Agent)
          Philip Davis, QC – Davis & Co.

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

Commercial Division

IN THE MATTER of the Companies Act, 1992

AND

IN THE MATTER of an Application under the Securities Industry Act, 2011

AND

IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

---

### AFFIDAVIT OF CHRISTINA R. ROLLE

---

2020/COM/com/

Securities Commission of The Bahamas
3rd Floor Charlotte House
Shirley & Charlotte Streets
Nassau, Bahamas.

**IN THE SUPREME COURT OF THE BAHAMAS**

Commercial Division

SUPREME COURT

MAR 1 9 2020

Nassau, Bahamas

CAUSE NO. 00014 of 2020

IN THE MATTER of the Companies Act, Ch. 308

AND

IN THE MATTER of an Application under the Securities Industry Act, 2011

AND

IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

## ORDER FOR APPOINTMENT OF PROVISIONAL LIQUIDATOR

Before The Honorable Justice Ian Winder, a Judge of the Supreme Court of The Bahamas, in Chambers.

**UPON HEARING** Messrs. Gawaine Ward and Gladstone Brown of counsel for the Securities Commission of The Bahamas ("**the Commission**"), the Petitioner/ Applicant herein, upon its Ex Parte Summons dated and filed herein on the 5th day of March, 2020 for an order that Igal Wizman and Eleanor Fisher be appointed joint provisional liquidators of Mintbroker International Ltd. (Formerly Swiss America Securities Ltd.) T/A Sure Trader ("**the Company**").

**AND UPON READING** the Petition presented by the Commission, filed herein on the 5th March 2020.

AND UPON READING the Affidavits of Christina R. Rolle, all filed herein on 5th March 2020 concerning the Company's present status, namely that:

a.    the Company is currently non-operational;

b.    the Company sought to wind up voluntarily, but failed to meet the conditions necessary for this to occur;

c.    As a consequence, the Company's registration is currently suspended; and

d.    the Commission seeks to protect the welfare of investors and/or clients, and the Company and clients' assets, information and/or records.

AND UPON the Petitioner/Applicant undertaking by its counsel to pay any damage suffered by the Company as a result of this order and/or the appointment of provisional liquidators in the event that the winding up petition is ultimately withdrawn or dismissed.

IT IS HEREBY ORDERED THAT:

1.    Mr. Igal Wizman, Licensed Insolvency Trustee ("LIT"), Chartered Insolvency and Restructuring Professional ("CIRP") and an Associate Partner with Ernst and Young (EY), having its place of business at One Montague Place, East Bay Street, Nassau, Bahamas; and Ms. Eleanor Fisher, of EY Cayman Ltd., 62 Forum Lane, Camana Bay, Grand Cayman, KY-1106, Cayman Islands, be appointed as joint provisional liquidators (JPLs) for the Company with authority to act jointly or severally.

2.    **The JPLs is/are hereby authorized to:**

1)    forthwith take possession of, collect, and protect the property and assets of the said Company and its clients, but not to distribute or part with the same until further order;

2)    discharge rents, salaries and other current expenses;

3)    require of any person who has in his possession documents or information
in relation to the accounts, assets and securities or affairs of the Company
and its clients, to produce the same;

4)    require any person who has information in relation to the accounts, assets,
securities or affairs of the Company as the JPLs may require in the exercise
of their duties, to attend upon the JPLs at such time and place as they may
appoint and give them all information they may require;

5)    do all other things necessary to preserve the assets and estate of the Company
and its clients.

3.   The JPLs be at liberty to apply to this Honourable Court, as necessary, for further
directions pursuant to O. 4, r. 5 of the CLR.

4.   The winding up petition shall be advertised locally, in Canada, the USA and in the
United Kingdom, no later than _19th April, 2020_____.

5.   The petition shall be heard on _19th May, 2020_ 2020 at 10:00 a.m. 2pm

DATED the 17th day of **MARCH**, A. D., 2020

FILED the   19th   day of March 2020

_____
**The Honourable Mr. Justice Ian Winder**
**JUDGE OF THE SUPREME COURT**

*This Order was filed by The Securities Commission of the Bahamas, 2nd Floor Poinciana House, North Building,
31A East Bay Street, Nassau, The Bahamas.*

IN THE SUPREME COURT OF THE BAHAMAS

Commercial Division

IN THE MATTER of the Companies Act, 1992

AND

IN THE MATTER of an Application under the Securities Industry Act, 2011

AND

IN THE MATTER of MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER Swiss America Securities, a Registered Securities Firm.

---

ORDER FOR APPOINTMENT OF PROVISIONAL LIQUIDATOR

---

2020

COM/com/00014

*Securities Commission of The Bahamas*

Securities Commission of The Bahamas
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, Bahamas.

The Petitioner/Applicant