# Exhibit D

Philip Dorsett
February 28, 2023

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
-----------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                PLAINTIFF,

        -against-    Case No.:
                     1:21-cv-21079-bb


MINTBROKER INTERNATIONAL, LTD., f/k/a SWISS
AMERICA SECURITIES LTD. and d/b/a
SURETRADER, and GUY GENTILE, a/k/a GUY
GENTILE NIGRO,

                DEFENDANTS.
-----------------------------------------X


             DATE: February 28, 2023

             TIME: 9:36 A.M.
```

        DEPOSITION of PHILIP DORSETT,

taken by the Defendant, pursuant to a

Subpoena, held via videoconference, before

Victoria Scro, a Notary Public of the State

of New York.

```
                                              Page 2
 1
 2    A P P E A R A N C E S:
 3
 4    SECURITIES AND EXCHANGE COMMISSION
         Attorney for the Plaintiff
 5       SECURITIES AND EXCHANGE COMMISSION
         450 Fifth Street, N.W.
 6       Washington, DC 20549
         BY: ALICE SUM, ESQ.
 7           ALISE JOHNSON, ESQ.
             RUSSELL KOONIN, ESQ.
 8
 9    FORD, O'BRIEN, LANDY, LLP
         Attorneys for the Defendant
10       GUY GENTILE
         275 Madison Avenue, 24th Floor
11       New York, New York 10016
         BY: MATTHEW AARON FORD, ESQ.
12           ADAM C. FORD, ESQ.
             STEPHEN R. HALPIN, III, ESQ.
13           CARA FILIPPELLI, ESQ.
14
      ALSO PRESENT:
15
      Guy Gentile
16
17
18
19
20           *         *         *
21
22
23
24
25
```

```
                                              Page 3
 1
 2                  FEDERAL STIPULATIONS
 3
 4         IT IS HEREBY STIPULATED AND AGREED by
 5    and between the parties hereto, through
 6    their respective Counsel, that the
 7    certification, sealing and filing of the
 8    within examination will be and the same are
 9    hereby waived;
10
11         IT IS FURTHER STIPULATED AND AGREED
12    that all objections, except as to the form
13    of the question, will be reserved to the
14    time of the trial;
15
16         IT IS FURTHER STIPULATED AND AGREED
17    that the within examination may be signed
18    before any Notary Public with the same
19    force and effect as if signed and sworn to
20    before this Court.
21
22
23
24
25
```

```
                                              Page 4
 1              VIDEOCONFERENCE STIPULATIONS
 2
 3         IT IS HEREBY STIPULATED AND
 4    AGREED BY and between counsel for all
 5    parties present that pursuant to CPLR
 6    section 3113 (d) this deposition is to be
 7    conducted by video conference, that the
 8    court reporter, all counsel, and the
 9    witness are all in separate remote
10    locations and participating via
11    videoconference meeting under the control
12    of US Legal Support, that the officer
13    administering the oath to the witness need
14    not be in the place of the deposition and
15    the witness shall be sworn in remotely by
16    the court reporter after confirming the
17    witnesses identity, that this video
18    conference will not be recorded in any
19    manner and that any recording without the
20    express written consent of all parties
21    shall be considered unauthorized, in
22    violation of law, and shall not be used for
23    any purpose in this litigation or
24    otherwise.
25
```

```
                                              Page 5
 1              VIDEOCONFERENCE STIPULATIONS
 2         IT IS FURTHER STIPULATED that
 3    exhibits may be marked by the attorney
 4    presenting the exhibit to the witness, and
 5    that a copy of any exhibit presented to a
 6    witness shall be e-mailed to or otherwise
 7    in possession of all counsel prior to any
 8    questioning of a witness regarding the
 9    exhibit in question.  All parties shall
10    bear their own costs the conduct of this
11    deposition by video conference,
12    notwithstanding the obligation by CPLR to
13    supply a copy of the transcript to the
14    deposed party by the taking party in
15    civil litigation matters.
16
17
18
19
20
21
22
23
24
25
```

Philip Dorsett
February 28, 2023

Page 50

1        P. DORSETT
2   passport, it will take a long while to
3   get," do you see that?
4        A.   Yes.
5        Q.   Do you know who Bob Walker is?
6        A.   I don't recall.
7        Q.   It looks like you respond, if
8   we go up, about 51 minutes later you
9   respond to Bob Walker, "Hello Bob, we would
10  prefer if one of your IDs was a passport.
11  However, if you do not have a passport, we
12  will accept another form of
13  government-issued ID in the interim.  With
14  regard to IBC.  Senior management has
15  worked out an agreement whereas if a U.S.
16  client wishes to open, they will only have
17  to complete an unsolicited acknowledgment
18  agreement as opposed to having an IBC.  We
19  send an unsolicited acknowledgment
20  agreement form after the client has
21  completed an application.  I hope this
22  answers your question," do you see that,
23  Mr. Dorsett?
24       A.   Yes.
25       Q.   You were not being truthful

Page 51

1        P. DORSETT
2   when you testified yesterday at length that
3   the unsolicited acknowledgment agreement
4   was not created in February of 2012; isn't
5   that right?
6        A.   Well, obviously, I was
7   mistaken.  It was created a few months
8   earlier.
9        Q.   Well, you testified about half
10  a dozen times yesterday that it was created
11  around February 2012, do you recall that?
12       A.   There's a reason why I always
13  thought it was February.
14       Q.   And in fact, you told an entire
15  story yesterday about a supposed meeting
16  that happened between you and Mr. Gentile
17  and Ms. Gentile months after the company
18  was up and running; isn't that correct?
19       A.   Well, then it wasn't months,
20  that's what that means.
21       Q.   Do you recall telling that
22  story -- strike that.
23            Do you recall testifying just
24  maybe 30 minutes ago that the unsolicited
25  acknowledgement agreement was created in

Page 52

1        P. DORSETT
2   response to a meeting that Mr. Gentile, you
3   and Ms. Gentile had months after the
4   company was up and running, do you recall
5   that?
6        A.   Yes, I thought it was months
7   after we started.  Turns out, it was not.
8   There is a reason why I thought it was
9   February --
10           MR. FORD:  Please turn --
11           MS. SUM:  Counsel, he --
12           MR. FORD:  I've already started
13       the next question.
14           MS. SUM:  Counsel, allow the
15       witness to finish answering your
16       questions.
17           MR. FORD:  We're pulling up the
18       next -- I'm sorry, this is also part
19       of Exhibit 20.  If we can go to the
20       Zak Ahmad's e-mail on November 22,
21       2011, as well.
22       Q.   This is an e-mail from Zak
23  Ahmad to Philip@SureTrader.com and it says,
24  "Subject:  Compliance," do you see that?
25       A.   Yes.

Page 53

1        P. DORSETT
2        Q.   There is nobody else on this
3   e-mail; isn't that correct?
4        A.   That's correct.
5        Q.   There's nobody else on the last
6   e-mail that we saw either, was there?
7        A.   Could you show me again,
8   please?
9        Q.   It was sent --
10       A.   Okay.
11       Q.   -- to Bob Walker only to you
12  and you responded only to Bob Walker.
13  Mr. Gentile was not on that e-mail?
14       A.   Yes.
15       Q.   If would you have forwarded
16  this e-mail to Mr. Gentile, there would be
17  an electronic copy of that; isn't that
18  correct?
19       A.   Yes.
20       Q.   Do you recall testifying
21  yesterday that when the company first
22  started, Mr. Gentile was responsible for
23  accepting new clients, do you recall that?
24       A.   Accepting new clients?
25       Q.   Do you recall testifying

Page 54

1     P. DORSETT
2  yesterday that Mr. Gentile was responsible
3  for reviewing new client applications?
4      A.   In the very beginning, both me
5  and Guy were reviewing new client
6  applications.
7      Q.   But Mr. Dorsett, on this
8  e-mail, Mr. Gentile is not included, is he?
9      A.   That's correct.
10     Q.   And on the last e-mail when you
11 responded to Mr. Walker, you did not CC
12 Mr. Gentile, did you?
13     A.   That's correct.
14     Q.   This e-mail is from Zak Ahmad
15 to you on November 22, 2011.  Do you know
16 who Zak Ahmad is?
17     A.   I can't remember the
18 individual.
19     Q.   Do you see the attachments, it
20 says, "Unsolicited acknowledgment
21 chaker.JPG," do you see that?
22     A.   Yes.
23     Q.   Do you see where it says,
24 "Hello, attached is signed compliance," do
25 you see that?

Page 55

1     P. DORSETT
2      A.   Yes.
3          MR. FORD:  Let's scroll down a
4      page.
5      Q.   Do you see where this says,
6  "Unsolicited acknowledgement agreement"?
7      A.   Yes, that's the very first one.
8      Q.   And it says, "To Swiss America
9  LTD, I affirm that no way did U.S. America
10 Securities LTD solicited me to become a
11 client.  I initiated contact with Swiss
12 American Securities LTD on an unsolicited
13 basis," do you see that?
14     A.   Yes.
15         MS. SUM:  Counsel, where is the
16     bates stamp on this document?
17         MR. FORD:  This is provided by
18     you to us, but Mr. Halpin will send
19     you the bates stamp.
20         MS. SUM:  We need the documents
21     so we're not trying to sort out where
22     the document is from.  It lacks a
23     bates range.
24         MR. FORD:  This is Exhibit 20
25     and these were produced in the 15,000

Page 56

1     P. DORSETT
2     documents that your witness took them
3     from SureTrader.
4         MS. SUM:  When they're
5     produced, they have bates stamp
6     ranges, that's why we needs these
7     documents with bates ranges.  So,
8     we're not doing a guessing game in
9     the deposition.
10        MR. FORD:  We had this
11    conversation, there was an error when
12    it was uploaded.  It appears to have
13    cut off the bates stamp, so we
14    provided you a folder with all the
15    bates stamp copies.  In the interim,
16    Mr. Halpin will send you the bates
17    stamp.
18        MS. SUM:  How is this?  It's
19    been an hour, you said you were going
20    to take breaks every hour.  Why don't
21    we take a break now so that folder
22    can be transmitted to us so I don't
23    actually have to be forced to
24    interrupt you to find out this
25    information in this deposition.

Page 57

1     P. DORSETT
2         MR. FORD:  I would just request
3     -- I was in the middle of a line of
4     questioning.
5         MS. SUM:  This is going to
6     continue to happen until we receive
7     the folder that you've been talking
8     about, which wasn't sent to us prior
9     to the start of this deposition, and
10    that's the cause of some of these
11    problems.
12        MR. FORD:  Ms. Filippelli, can
13    we scroll down?
14     Q.   Do you see there's a printed
15 name and signature on this document?
16     A.   Yes.  I was the one who
17 actually put that bottom part there.  That
18 was my input to the unsolicited
19 acknowledgment agreement.
20     Q.   Do you recall testifying
21 yesterday that you had no input into the
22 unsolicited acknowledgment agreement?
23     A.   Yes.
24     Q.   But this refreshes your
25 recollection that you did in fact have some

Page 58

| | |
|---|---|
| 1 | P. DORSETT |
| 2 | input into the unsolicited acknowledgment |
| 3 | agreement? |
| 4 | A.   I was the one who put it |
| 5 | together officially and put the name at the |
| 6 | signature line there. |
| 7 | Q.   So, to be clear, you officially |
| 8 | put the unsolicited acknowledgment |
| 9 | agreement together? |
| 10 | A.   The very first one.  The |
| 11 | subsequent ones, I had no input on. |
| 12 | Q.   This refreshes your |
| 13 | recollection that your testimony throughout |
| 14 | yesterday that the unsolicited |
| 15 | acknowledgement agreement was created |
| 16 | around February 2012 was not accurate? |
| 17 | A.   Well, it had to be in November, |
| 18 | it was from the beginning. |
| 19 | MR. FORD:  We can take a break |
| 20 | now. |
| 21 | MR. KOONIN:  We still don't |
| 22 | have them.  So, find the documents. |
| 23 | MR. FORD:  You have them |
| 24 | because they're documents that you |
| 25 | produced. |

Page 59

| | |
|---|---|
| 1 | P. DORSETT |
| 2 | MR. KOONIN:  No, that's not it. |
| 3 | You love to say 30,000 plus.  So, |
| 4 | give us the ones you're using today |
| 5 | in your deposition, which you |
| 6 | acknowledged is the appropriate thing |
| 7 | to do.  Send us the link and that's |
| 8 | the end of the conversation. |
| 9 | MS. SUM:  Either send a link or |
| 10 | send it literally by e-mails.  This |
| 11 | isn't that difficult to do so. |
| 12 | Ms. Filippelli has been bringing up |
| 13 | these exhibits one by one pursuant to |
| 14 | your direction.  So, she has access |
| 15 | to e-mails, she has our e-mail |
| 16 | addresses.  Please have |
| 17 | Ms. Filippelli -- I'm not trying to |
| 18 | be disrespectful to you -- we request |
| 19 | the use, as you are an attorney in |
| 20 | this case to send us the documents |
| 21 | you've been pulling up as Mr. Ford |
| 22 | has been instructing you. |
| 23 | MR. FORD:  Okay, see you all in |
| 24 | ten minutes.  Thank you. |
| 25 | (At this time, there was a |

Page 60

| | |
|---|---|
| 1 | P. DORSETT |
| 2 | pause in the proceeding.) |
| 3 | Q.   Mr. Dorsett, during that break, |
| 4 | did you have any conversations with anybody |
| 5 | about your testimony here today? |
| 6 | A.   No. |
| 7 | Q.   When we left off, we were |
| 8 | looking at Exhibit 20, which is in an |
| 9 | e-mail that you provided to us or an e-mail |
| 10 | the SEC provided to us. |
| 11 | MR. FORD:  Can we pull that |
| 12 | document back up?  If we can scroll |
| 13 | down to the e-mail from Mr. Walker. |
| 14 | Q.   Do you see in that first |
| 15 | sentence where it says, "Hi, I was at the |
| 16 | Investors Underground seminar last |
| 17 | evening," do you see that? |
| 18 | A.   Yes. |
| 19 | Q.   Do you know what Investors |
| 20 | Underground is? |
| 21 | A.   I remember that name.  I think |
| 22 | that's one of our affiliates. |
| 23 | Q.   You had testified yesterday |
| 24 | that it was Mr. Gentile's responsibility to |
| 25 | work with the members of the affiliate |

Page 61

| | |
|---|---|
| 1 | P. DORSETT |
| 2 | program, do you recall that? |
| 3 | A.   Yeah, he dealt directly with |
| 4 | the affiliates in the beginning. |
| 5 | Q.   Did you ever deal with any |
| 6 | members of the affiliate program? |
| 7 | A.   There would have been times |
| 8 | when I had direct conversations with Tim |
| 9 | Sykes and some of the other -- like the |
| 10 | persons who were in charge of the |
| 11 | affiliates, yes. |
| 12 | Q.   What about Investors |
| 13 | Underground, did you have any |
| 14 | communications with anybody from Investors |
| 15 | Underground? |
| 16 | A.   I probably did.  I remember |
| 17 | they were one of the bigger ones. |
| 18 | Q.   Do you recall signing any of |
| 19 | the agreements between SureTrader and any |
| 20 | members of the affiliate program? |
| 21 | A.   I do not recall.  Now, in the |
| 22 | beginning, I don't know if Guy would have |
| 23 | had maybe signed those, but at some point, |
| 24 | Justin took over all of that. |
| 25 | Q.   When you say in the beginning, |

Page 62

1     P. DORSETT
2  what time period are you referring to?
3     A.   Well, I guess we have
4  established my timing is a couple months
5  off, but Justin didn't come until about
6  mid-2012, right?  So, this was very early.
7  We had been open just about weeks, so this
8  is just the beginning.
9           MR. FORD:  Can we pull up
10          Exhibit 48.
11    Q.   Just to be clear Mr. Dorsett,
12  2014, you would not consider to be the
13  beginning, correct?
14    A.   I would say 2014 is around the
15  middle.
16          MR. FORD:  This is a marketing
17          services agreement between Investors
18          Live LLC and SureTrader.
19    Q.   Do you see that?
20    A.   Yes, I see Investors Live.
21    Q.   Do you know that Investors Live
22  and Investors Underground were the same
23  thing?
24    A.   Yeah, they were the same thing.
25          MR. FORD:  If we can go to the

Page 63

1     P. DORSETT
2          second to last page of this.  Keep
3          going.
4     A.   Just to let you know, this was
5  not an affiliate agreement that we were
6  looking at.
7           MR. FORD:  There was no pending
8           question and I'm going to strike that
9           as nonresponsive.
10          Can we please scroll to the
11          second to last page.  There it is.
12    Q.   Mr. Dorsett, is that your
13  signature there?
14    A.   Yes, it is.
15          MR. FORD:  We can pull that
16          down.
17    Q.   Do you recall testifying
18  yesterday regarding an affidavit that you
19  provided to the SEC in 2020?
20    A.   Yes.
21    Q.   And do you recall -- did the
22  SEC draft that affidavit on your behalf?
23    A.   No, I wrote it.
24          MR. FORD:  If we can go to
25          Exhibit 73.  This is an e-mail first

Page 64

1     P. DORSETT
2       from Jessica Weissman, it's on
3       August 20, 2020.
4     Q.   It says, "Good morning.  I sent
5  you the declaration for signature by
6  secured e-mail last week, please confirm
7  that you have received it," do you see
8  that?
9     A.   Yes.
10    Q.   Do you recall who Jessica
11  Weissman is?
12    A.   She was one of the second
13  people from SEC that I was speaking to.
14    Q.   Does this refresh your
15  recollection that the SEC drafted the
16  declaration?
17    A.   No, I sent what I sent to them
18  and they put it in their official form and
19  sent it back for me to sign.
20    Q.   Then it says on August 20,
21  2022, you say, "Yes, I have received it.
22  We will revert shortly," do you see that?
23    A.   Yes.
24    Q.   It looks like you sent another
25  e-mail on September 1, 2020.  So, about 10,

Page 65

1     P. DORSETT
2  11 days later, you say, "Hi, Jessica, I
3  apologize for the delay.  Please find
4  attached the signed document along with my
5  IDs.  Please note I made some changes to
6  the document wording," do you see that?
7     A.   Okay, could you scroll, because
8  I'm looking -- oh, yes, yes, sorry.  I see
9  it.
10    Q.   Does that refresh your
11  recollection that it was Jessica Weissman
12  that drafted the affidavit?
13    A.   No, I drafted the affidavit.
14          MR. FORD:  If we can pull up
15          Exhibit 1.
16    A.   I think after there was put
17  officially in the document --
18          MR. FORD:  Mr. Dorsett, there's
19          no pending question.  We've moved
20          onto another exhibit.  Your counsel
21          will have the opportunity to ask you
22          questions.  If we can scroll down to
23          that first e-mail.  Scroll up.
24    Q.   Do you see it says on Monday
25  July 13, 2020, there's an e-mail from

Page 74

1    P. DORSETT
2    Q.   No, I'm not asking about your
3　memory, I'm asking about a fact.  Is it a
4　fact that the statement that this agreement
5　was created in February 2012 false?
6    A.   It's true that that is not
7　correct.
8    Q.   It's false, isn't it?
9    A.   Yes, it's false.  I think we
10　realize that.  I realize that now.
11    Q.   Do you remember testifying that
12　Gentile did -- that SureTrader did not do
13　any advertising, do you recall testifying
14　that today and yesterday?
15    A.   I said Guy was very against
16　advertising dollars.
17    Q.   No, what you said, as you'll
18　recall, is that he did not advertise; isn't
19　that correct?
20    A.   What I said was, Guy was very
21　much against advertising and he explained
22　the reasons why.
23    Q.   He says here he would continue
24　to use online advertisements and e-mail for
25　U.S. residents; is that correct, yes or no?

Page 75

1    P. DORSETT
2    A.   This statement looks at the
3　entirety of our time in SureTrader and
4　advertising in the beginning for Guy was
5　basically through the online affiliates,
6　later on Guy did actual real advertising
7　when he brought on a marketing person,
8　okay, so this statement starts off by
9　referring to the affiliates right he was
10　basically advertising SureTrader
11　unofficially through them but later he did
12　actually do real advertising I think when
13　the marketing person was brought on.  And
14　again, that advertising he did later, I
15　think that was just to show that he was not
16　advertising to U.S. persons.
17        MR. FORD:  We're going to
18        scroll down to paragraph 23.
19    Q.   Throughout my employment at
20　SureTrader other than paragraph 20 there
21　were no policies or procedures implemented
22　by me or to my knowledge otherwise
23　implements at SureTrader to prevent the
24　solicitation of U.S. regulations residents,
25　do you see that?

Page 76

1    P. DORSETT
2    A.   Yes, I see that.
3    Q.   That is a false statement isn't
4　it Mr. Dorsett?
5    A.   That is a very true statement.
6　We never did anything to stop U.S. clients
7　in fact we encouraged.
8    Q.   What you said is that
9　throughout your employment at SureTrader
10　meaning November 20th to July 17th there
11　were no policies or procedures implements
12　at SureTrader to prevent the solicitation
13　of U.S. residents, do you see that?
14    A.   Yes, I see that.
15    Q.   But that statement is false,
16　isn't it, Mr. Dorsett?
17    A.   No, that statement is not false
18　at all.
19        MR. FORD:  Can you please mute
20        yourself Mr. Koonin.
21    Q.   As you sit here today as chief
22　compliance officer for six years, were you
23　under any policy other than the unsolicited
24　acknowledgement agreement that SureTrader
25　implemented; is that correct?

Page 77

1    P. DORSETT
2    A.   Earlier you showed me, I think
3　it was a policy that Guy came up with,
4　right?  Guy would come up with a lot of
5　stuff that some of them he would show to me
6　or some of them he would show to the U.S.
7　regulators to show we were following U.S.
8　laws, but when I talk about a policy and
9　when I talk about a procedure, those things
10　have to do with practice.  Those have to do
11　with what you're actually doing, not just
12　what you're showing to the regulator.
13　Certainly, the only policy that we were
14　doing, that we were following, the only
15　procedure we were following when it came to
16　U.S. persons was the unsolicited
17　acknowledgement agreement, there was
18　nothing else.
19        MR. FORD:  Can we pull up
20        Exhibit 6.  Mr. Koonin's audio is
21        interfering.  Can you contact your
22        colleague and tell him to mute his
23        audio.  In the meantime, we're going
24        to pull up Exhibit 6.
25    Q.   Mr. Dorsett, this is sworn

Page 210

1    P. DORSETT
2    pull up Exhibit 21, please.
3         Q.   This is a document dated
4    April 2, 2019, with a letterhead for Swiss
5    America Securities SureTrader April 2,
6    2019, it's addressed to Mr. Gentile.  This
7    is after your time at SureTrader; is that
8    correct, Mr. Dorsett?
9         A.   Yes, I've already left at this
10   point.
11        Q.   You see where it says, "Army
12   Traders Cafe Worldwide"?
13        A.   Yes.
14        Q.   If we scroll down this says --
15   I'm sorry, scroll down to the bottom, it
16   says, "Respectfully yours, Edward Cooper,
17   chief compliance officer/MLRO," do you see
18   that?
19        A.   Yes.
20        Q.   It says Swiss America
21   securities LTD, do you see that?
22        A.   Yes.
23        Q.   I'm going to scroll back up.
24   It says, "Mr. Gentile, please note that the
25   above mentioned account Traders Cafe

Page 211

1    P. DORSETT
2    Worldwide account with Swiss America
3    Securities LTD was closed on March 22,
4    2013.  The following were the last
5    transaction on the related account.  Client
6    deposited on March 22, 2013, USD $2,895.
7    Client went negative, March 27, 2013, USD
8    $406.15.  Client trader on March 28, 2013,
9    Stock OWW.  Client received some dividend
10   in amount USD 13.37.  From April 1, 2013
11   platform, USD 392, 7.78. If you require any
12   additional information, please do not
13   hesitate to contact the undersigned as I
14   remain."  Do you see that?
15        A.   Yes.
16        Q.   Mr. Dorsett, when you filed
17   your whistleblower complaint in March 2016
18   about Traders Cafe about Ionne and
19   Schipone, were you aware that -- strike
20   that.
21             When you filed your
22   whistleblower complaint in March of 2016,
23   were you aware that SureTrader had shut
24   down the Traders Cafe account three years
25   earlier?

Page 212

1    P. DORSETT
2         A.   I was aware that Guy officially
3    shut them down.
4         Q.   And you were aware that they
5    had been shut down three years earlier?
6         A.   I mean, yes, I guess if that's
7    the date they were closed, then that's the
8    date they were closed.
9         Q.   Do you know if during
10   Mr. Gentile's cooperation with the SEC, FBI
11   DOJ and U.S. attorney's office, whether he
12   provided information to them related to
13   Mr. Ionne or Schipone for Traders Cafe?
14        A.   Not to my knowledge.  In fact,
15   I did not know he was cooperating as you
16   say.
17             MR. FORD:  All right everybody,
18        I think we can do a 15-minute break.
19        We'll come back at 3:10 p.m.
20             (At this time, there was a
21        pause in the proceeding.)
22             MR. ADAM FORD:  If I can just
23        jump in quickly before we get started
24        with the questioning.  Alise, Alice
25        and Russell, I've e-mailed about

Page 213

1    P. DORSETT
2        this, but I just wanted to put it on
3        the record that Mr. Dorsett, during
4        his testimony today, has testified to
5        drafting two affidavits that the SEC
6        later filed.  We have not received in
7        production a copy of either of those
8        original drafts that Mr. Dorsett
9        testified he drafted and sent to the
10       SEC.  So, I e-mailed you to put it in
11       writing and requesting an immediate
12       production of this documents.  If you
13       can get them to us today, we may be
14       able to take a break and continue to
15       question Mr. Dorsett about them.  If
16       we don't have them before the end of
17       today, then we'll seek to hold
18       Mr. Dorsett's deposition open until
19       the documents are produced and we're
20       able to set up a time of examination
21       on him for those two documents.
22            MS. SUM:  I'm prepared to
23       respond, Adam on the record, I was
24       actually typing the response, but
25       since you're raising it.  We believe

Philip Dorsett
February 28, 2023

Page 214

1  P. DORSETT
2  there's a misunderstanding by
3  Mr. Dorsett --
4      MR. ADAM FORD:  Hold on.
5      MR. FORD:  Ms. Sum --
6      MR. ADAM FORD:  Alice, you
7  cannot testify, no, no.  You are not
8  --
9      MS. SUM:  You asked me about
10 the issue --
11     MR. ADAM FORD:  You cannot
12 characterize Mr. Dorsett's testimony.
13     THE COURT REPORTER:  Everybody
14 is talking at the same time.
15     MS. SUM:  We have no other
16 documents that's it.  You don't want
17 to hear what I have to say --
18     MR. ADAM FORD:  For the record,
19 you have stated that you have no
20 further documents.
21     MS. SUM:  We do not have these
22 first drafts that you've requested in
23 your e-mails.
24     MR. ADAM FORD:  Also
25 Mr. Dorsett testified twice that he

Page 215

1  P. DORSETT
2  was the first drafter of two
3  affidavits and that he provided these
4  documents to the SEC.  We would
5  request that the SEC take additional
6  time to locate these documents.  We
7  do not think that this witness was
8  mischaracterizing anything.  We
9  believe he was testifying truthfully.
10 So, we demand the SEC take additional
11 time to get these documents.
12     MR. FORD:  Pull up -- Ms. Sum,
13 there's --
14     MS. SUM:  We have not had an
15 opportunity --
16     MR. FORD:  Your objection has
17 been recorded.
18     MS. SUM:  -- raised an issue.
19     MR. FORD:  It is my deposition.
20 It is impossible for the court
21 reporter to do her job when everybody
22 is talking over me.  We are back on
23 the record.  We are examining the
24 witness.  I am continuing.
25     MS. SUM:  I object to

Page 216

1  P. DORSETT
2  proceeding.  You are not giving me an
3  opportunity.  Your cocounsel decided
4  to put something on the record, I
5  will not allow it to go unresponded
6  to.
7      MR. FORD:  This sort of
8  speaking objection -- objection to
9  form or privilege is --
10     MS. SUM:  -- to raise it on the
11 record --
12     MR. FORD:  Ms. Sum, this is my
13 deposition --
14     MS. SUM:  It doesn't matter
15 your --
16     MR. FORD:  -- that is permitted
17 under the Federal Rules of Civil
18 Procedure.
19     MS. SUM:  -- the following
20 statement on the record --
21     MR. FORD:  This can be put on
22 outside the presence of the witness.
23     MS. SUM:  Your cocounsel
24 decided to interject --
25     MR. FORD:  This can be done

Page 217

1  P. DORSETT
2  outside the presence of the witness.
3      MS. SUM:  No.  Stipulate to
4  strike your cocounsel's statement.
5      MR. FORD:  We'll discuss
6  outside the presence of the witness.
7      MS. SUM:  Your cocounsel raised
8  the issue.
9      MR. FORD:  This is
10 inappropriate.
11     MS. SUM:  It's on the record.
12     MR. FORD:  This is
13 inappropriate.
14     MS. SUM:  It is inappropriate
15 for you.
16     MR. FORD:  Ms. Sum --
17     MS. SUM:  -- on the record.
18 Your cocounsel interrupted you
19 deposition to put it on the record --
20     MR. FORD:  Ms. Sum, please
21 stop.
22     MS. SUM:  No.  You don't get --
23     MR. FORD:  Ms. Sum --
24     MS. SUM:  -- we have the
25 opportunity to respond.  You know

Philip Dorsett
February 28, 2023

|  |  |
|---|---|
| Page 222<br>1              P. DORSETT<br>2      A.    Yes.<br>3      Q.    Do you recall testifying<br>4  yesterday that you would have remembered<br>5  this document because you would have<br>6  remembered if you had signed this in front<br>7  of an attorney, do you recall saying that?<br>8      A.    Yes.<br>9      Q.    Based on this document, just<br>10 tell me, how were you able to determine<br>11 that it was an attorney who you signed this<br>12 document in front of?<br>13     A.    I see the stamp and the notary<br>14 public and the number.<br>15     Q.    And where does it say that this<br>16 individual is an attorney?<br>17     A.    Well, when I say an attorney,<br>18 that's the stamp and that's the notary<br>19 public.<br>20     Q.    As chief compliance officer in<br>21 the Bahamas, is there a difference between<br>22 an attorney and notary public?<br>23     A.    I think you can be a notary<br>24 public without being an attorney.<br>25     Q.    Given that you can be a notary | Page 224<br>1              P. DORSETT<br>2      A.    Well, I would think it would<br>3  make more sense that this is an attorney.<br>4  In the Bahamas, 99 percent of people who<br>5  have notary public are attorneys.  The only<br>6  ones who have notary public who aren't<br>7  attorneys are like pastors.<br>8      Q.    And Mr. Dorsett, you're so<br>9  certain because in fact what happened was<br>10 you took a physical copy of this and walked<br>11 across the street to a notary public and<br>12 had this signed without Mr. Gentile<br>13 present, isn't that a fact?<br>14     A.    No, that is not a fact, that is<br>15 a complete lie.  I challenge that.  Please<br>16 prove that to me.<br>17     Q.    Isn't it a fact that my law<br>18 firm at the time, Harris O'Brien sent you a<br>19 copy of this document for review prior to<br>20 you signing it, isn't that a fact?<br>21     A.    No, I don't recall that at all.<br>22     Q.    Isn't it a fact --<br>23     A.    No --<br>24     Q.    Isn't it a fact that in that<br>25 e-mail, it was requested by an attorney |
| Page 223<br>1              P. DORSETT<br>2  public without being an attorney, how was<br>3  it from this stamp and this information<br>4  that you were able the determine this<br>5  individual was an attorney?<br>6      A.    Because the vast majority of<br>7  notary publics are attorneys.  That's what<br>8  you get, you don't just get some person<br>9  who's just getting -- it's an attorney and<br>10 they are also a notary public.<br>11     Q.    You were not asked about the<br>12 vast majority of notary publics<br>13 Mr. Dorsett.  You said you would have<br>14 remembered it because it was signed before<br>15 an attorney, and I'm trying to ask you how<br>16 you could have possibly known from this<br>17 information on this document that this<br>18 individual was an attorney?<br>19     A.    It says before me, and I see a<br>20 notary public sign, it makes me think it's<br>21 an attorney.  So, it's true, it may not<br>22 have been an attorney, it could have been<br>23 someone only a notary public.<br>24     Q.    It was in fact an attorney,<br>25 Mr. Dorsett? | Page 225<br>1              P. DORSETT<br>2  from Harris O'Brien?<br>3      A.    Could you show me that he mail.<br>4      Q.    I'm asking, isn't it a fact --<br>5      A.    No, I don't remember that at<br>6  all.  As I said, I don't recall this<br>7  document.<br>8      Q.    If you receive that sort of the<br>9  e-mail, is that the sort of e-mail you<br>10 would have deleted?<br>11     A.    No, I probably would have<br>12 carried it to Guy.  If it was 2014 -- well,<br>13 at any point, I think I would have<br>14 discussed that with him.<br>15     Q.    Were you instructed by anybody<br>16 to delete an e-mail sending you a copy of<br>17 this affidavit to review?<br>18     A.    Only Guy deletes Sure Trader<br>19 official records.<br>20           MR. FORD:  I'm going to object<br>21       and move that as nonresponsive.<br>22     Q.    Did anybody instruct you to<br>23 delete an e-mail regarding a draft of this<br>24 document?<br>25     A.    Guy asked me to delete |

| Page 230 | Page 232 |
|---|---|
| 1    P. DORSETT<br>2  PADorsett@Gmail.com to Guy@stockUSAinc, do<br>3  you see that?<br>4      A.   Yes.<br>5      Q.   It says, "Please see attached,"<br>6  it was sent on January 3, 2014, do you see<br>7  that?<br>8      A.   Yes.<br>9      Q.   It was in response to a message<br>10 on January 3, 2014, it said, "Can you send<br>11 me a copy of your latest resume?"<br>12     A.   Yes.<br>13     Q.   And you attached your resume<br>14 for Guy .PDF, do you see that?<br>15     A.   Yes.<br>16     Q.   And that on January 3, 2014.<br>17         MR. FORD:  Can we go to the<br>18      attachment.<br>19     Q.   Mr. Dorsett, this is the<br>20 attachment to that e-mail?<br>21     A.   Correct.<br>22     Q.   Does this refresh your<br>23 recollection that you sent your resume to<br>24 Mr. Gentile to be included in the affidavit<br>25 that we were just looking at? | 1    P. DORSETT<br>2  Phillip to sign and get notarized.  Can you<br>3  give him this document and make sure he a<br>4  hundred percent agrees with everything that<br>5  is contained in it and get it back to us<br>6  signed and notarized tomorrow, thanks," do<br>7  you see that?<br>8      A.   I see that.<br>9      Q.   Do you see it says<br>10 Gentile-Dorsett affidavit.DOCX, do you see<br>11 that?<br>12     A.   Yes.<br>13     Q.   Do you know what .DOCX means?<br>14     A.   It's a document.<br>15     Q.   It's a Microsoft Word document,<br>16 right?<br>17     A.   Okay, I just know it's a<br>18 document.<br>19     Q.   Do you recognize the little<br>20 blue W?<br>21     A.   Oh, yes, it's a Word document.<br>22     Q.   Does this refresh your<br>23 recollection that you received a copy of<br>24 this?<br>25     A.   No, it does not.  You need to |

| Page 231 | Page 233 |
|---|---|
| 1    P. DORSETT<br>2      A.   It was not my understanding to<br>3  being included in any affidavit.<br>4      Q.   Does it refresh your<br>5  recollection that you received an e-mail<br>6  with a drafted copy of this affidavit prior<br>7  to --<br>8      A.   No, I never received an e-mail<br>9  with a copy of that affidavit of that<br>10 nature, to my knowledge.<br>11         MR. FORD:  Can we pull up the<br>12      next exhibit.  Scroll to the bottom.<br>13     Q.   This is an e-mail from Adam<br>14 Ford, do you know who Adam Ford is?<br>15     A.   He is the lawyer with your<br>16 firm.<br>17     Q.   It says sent January, 8, 2014<br>18 five days after the last e-mail we saw; is<br>19 that correct?<br>20     A.   Yes.<br>21     Q.   It says to Guy Gentile; is that<br>22 correct?<br>23     A.   Yes.<br>24     Q.   It says, "Guy, attached is a<br>25 copy of an affidavit that we would like | 1    P. DORSETT<br>2  send me the e-mail where it says I received<br>3  it.<br>4      Q.   Do you see where it says from<br>5  Guy Gentile at the top of this e-mail?<br>6      A.   Yes.<br>7      Q.   And it says date, January 8,<br>8  2014, 11:47?<br>9      A.   Yes.<br>10     Q.   And it says to suretrader.com?<br>11     A.   Yes.<br>12     Q.   Do you see where it says "FW:<br>13 Privileged and confidential"?<br>14     A.   Correct.<br>15     Q.   Do you know what FW means?<br>16     A.   It's a forward.<br>17     Q.   So, is it fair to say that<br>18 Mr. Gentile was forwarding you the e-mail I<br>19 just showed you from Harris O'Brien?<br>20     A.   I need to see where I received<br>21 the e-mail because the e-mail that he<br>22 received wasn't claimed privileged and<br>23 confidential, was it not?  Can I see the<br>24 document again, please.<br>25     Q.   Mr. Dorsett, it says, "Phillip |

Page 234

1  P. DORSETT
2  please review attached.  I'll be in the
3  office early tomorrow.  Thanks, Guy
4  Gentile, president."
5       MR. FORD:  Scroll up.
6   A.   No, can I see the actual
7  document, the actual affidavit --
8   Q.   Mr. Dorsett, we are getting
9  there.  I just want to know having now seen
10 this e-mail, forwarding an e-mail with this
11 attachment, does this refresh your
12 recollection that you saw --
13  A.   No, it still does not
14 refresh -- I still --
15  Q.   Mr. Dorsett, do you see where
16 it says, "Can you give him this document,
17 make sure that he one hundred percent
18 agrees with everything that is contained in
19 it and get it back to us signed and
20 notarized tomorrow," do you see where it
21 says that?
22  A.   Yes.
23  Q.   If you received a document like
24 that from the president of the company to
25 which you're the chief compliance officer

Page 235

1  P. DORSETT
2  of, is that the type of thing you would
3  have done?
4   A.   Sorry, that message was to me?
5  This message is from Adam Ford to Guy.
6   Q.   Mr. Dorsett, you received an
7  e-mail --
8       MR. FORD:  I'm going to move to
9     strike the last response, it's
10    nonresponsive.
11  Q.   If the president of SureTrader
12 forwarded you an e-mail, "can you give this
13 document to Phillip," is that the type of
14 thing you would have read?
15  A.   Well, I would hope so.  But the
16 problem is --
17  Q.   Mr. Dorsett --
18  A.   -- that's the point.  Can I see
19 the document again, please.
20  Q.   Mr. Dorsett, if he said, "make
21 sure that he one hundred percent agrees
22 with everything that is contained in it,"
23 when you got the e-mail as chief compliance
24 officer of the company, would you have made
25 sure everything was accurate?

Page 236

1  P. DORSETT
2   A.   Well, I don't recall receiving
3  this e-mail, and so this e-mail was not
4  sent to me.
5   Q.   Let's go back up.  There you
6  go, Mr. Dorsett, the e-mail that was sent
7  to you on January 8th, 2014 at is
8  11:47 p.m. attaching the affidavit, do you
9  see it, yes or no?
10  A.   Yes, I see the e-mail that's
11 sent.
12  Q.   Can we please pull up the
13 attachment to this e-mail? I'm not asking
14 you to comment on the contents, just look
15 at this and confirm this is the same
16 affidavit we've been talking about.
17  A.   As I'm reading this, I think
18 this is the document that Guy was referring
19 to when he was saying, "blame my compliance
20 officer."
21      MR. FORD:  Moved to strike what
22    was nonresponsive.
23  A.   Can I see the document that has
24 my signature on it, please.
25  Q.   Mr. Dorsett, we're going to

Page 237

1  P. DORSETT
2  keep scrolling.  Do you notice any
3  differences?
4   A.   That's why I want to see -- can
5  you put them side by side?
6       MR. FORD:  Let's go down to the
7     bottom.
8       MS. FILIPPELLI:  Do you want me
9     to pull up the word document?
10      MR. ADAM FORD:  Our system
11    converts it from Word to PDF.
12      MR. FORD:  Please pull up the
13    word attached for the witness to see.
14      MS. SUM:  For what it's worth,
15    I think he was asking you to pull up
16    the signed version since you're
17    asking him --
18      MR. FORD:  Ms. Sum, you have at
19    it when it's your turn.
20      MS. SUM:  It's not about having
21    at it.  It's about making it more
22    efficient.
23      MR. FORD:  Scroll all the way
24    to the bottom.
25  Q.   Do you see where it says, dated

Philip Dorsett
February 28, 2023

Page 238

1  P. DORSETT
2  New York, New York, January underscore
3  2014, then Philip Dorsett, do you see that?
4  A.   Yes, I see that.
5  Q.   This was a copy of a word
6  document that was forwarded to you by the
7  president of SureTrader, Guy Gentile, with
8  annotation, "to please review and make sure
9  a hundred percent of it was correct," and
10  your testimony is that you don't recall --
11  A.   That annotation was not in the
12  e-mail from Guy.
13       MR. FORD:  Let's go back to
14   Exhibit 4.  Let's go to paragraph
15   eight.
16  Q.   SureTrader maintains a website
17  at the URL SureTrader.com, true?
18  A.   Yes, that was correct.
19  Q.   The website is designed to
20  prevent access by U.S. based persons, isn't
21  that consistent with the document I showed
22  you earlier that if a U.S. based person
23  attempted to access the SureTrader website,
24  a pop up blocker would come up before
25  having entering the password and login, is

Page 239

1  P. DORSETT
2  that consistent with that?
3  A.   You're referring to the
4  document that was referenced after I left
5  the company by Mr. Darville?
6       MR. FORD:  We're going to go
7   ahead and pull up the document.
8       MS. FILIPPELLI:  I'm sorry,
9   which document?
10       MR. FORD:  Sorry, one second.
11  A.   Can I see my signature again,
12  please, if it's okay?
13       MR. FORD:  It's Document 44.
14       THE WITNESS:  Can I see my
15   signature?
16       MR. FORD:  You requested that
17   you see the document and then we'll
18   go one by one.  Let's look at
19   Document 44.
20  Q.   Do you recall looking at
21  document 44 earlier?
22  A.   I remember you showing me this.
23  Can you show me the clearer version,
24  please, so I can read it?
25  Q.   Sure.  Mr. Dorsett, is it not a

Page 240

1  P. DORSETT
2  fact in 2014 if a person with a U.S. based
3  IP address attempted to access Sure
4  Trader's website, this pop up blocker would
5  pop up; is that a fact?
6  A.   No, I would not say that's a
7  fact.  In fact, what you are looking at
8  here now, I think if this was -- I think I
9  may have heard them talking about this and
10  this would have been very late in my tenure
11  in the company.  And as the communication
12  between Mr. Darville and the regulators
13  suggested, it seems that was after I had
14  already left.
15       MR. FORD:  We'll pull this
16   document down.  We're going to go
17   back to Exhibit 3.  This is your
18   whistleblower complaint that you
19   submitted to the SEC.
20  Q.   Are you aware that SEC
21  whistleblowers are entitled to a percentage
22  of recovery as a result of an action
23  successfully brought by the SEC?
24  A.   I'm aware of that now, but I
25  certainly was not aware of that --

Page 241

1  P. DORSETT
2  Q.   I'm asking if you're aware of
3  that now.
4  A.   Yes, I am aware of that now.
5  Q.   What is your understanding of
6  the SEC recovery you're entitled to if
7  they're successful in this action?
8  A.   I don't have that deep of a
9  knowledge or understanding of it.
10  Q.   Do you know if it's 20 percent?
11  A.   I don't know what percent.
12  Q.   Thirty percent?
13  A.   I don't know.
14  Q.   Mr. Dorsett, do you think
15  you're going to get money if the SEC wins
16  this case?
17  A.   I do not know and that
18  certainly was not my motivation at all.  My
19  motivation was the confidentiality of the
20  program.
21       MR. FORD:  Let's go to page 8.
22  Q.   There's a question on this SEC
23  whistleblower questionnaire where it says,
24  "Identify with particularity any documents
25  or other information in your submission

Page 306

1    P. DORSETT
2  your recollection that you were not working
3  for SureTrader in August of 2017?
4       A.   My exit letter was received in
5  August, my recollection, and I can actually
6  check that because I still have it.
7       Q.   Did you produce that document
8  to the SEC in the 15,000 documents you gave
9  them?
10      A.   That was not produced to the
11 SEC to my knowledge.  That document, all of
12 this has already been squashed away.  This
13 is like negotiation back and forth.  That
14 document was the actual exit document, the
15 check and it actually had the breakdown.
16 You mentioned the loan I received because
17 they took that out and it was a proper,
18 official document required by Bahamian law.
19      Q.   So, do you recall producing
20 15,000 documents to the SEC?
21      A.   I don't know how much documents
22 were there.
23      Q.   Mr. Dorsett, it's just a yes or
24 no question.  I understand this is --
25      A.   I don't remember.

Page 307

1    P. DORSETT
2       Q.   I'm asking you just yes or no,
3  do you recall producing 15,000 documents to
4  the SEC in this action?
5       A.   I don't recall the number.
6       Q.   When you produced those
7  documents, did you select only certain
8  documents to produce to the SEC?
9       A.   Please clarify.
10      Q.   Did you produce all SureTrader
11 documents in your position to the SEC when
12 you produced the documents in this case,
13 yes or no?
14      A.   No, actually.  I think I have
15 quite a bit more.
16      Q.   How did you determine which
17 will documents to give to the SEC and which
18 documents to hold back?
19      A.   I can't recall at this point.
20 I can't recall at this point.  I think --
21      Q.   Did the SEC instruct you to
22 take certain documents out of the
23 production?
24      A.   No.  I think -- well, I can't
25 recall, but I think it was more or less

Page 308

1    P. DORSETT
2  that e-mails that I was able to send to the
3  SEC but actual documents a lot of those --
4  it's a lot of stuff -- I'm still actually
5  finding them I don't know exactly what Guy
6  did to the computer but I'm still finding
7  stuff to this day and I'm like what is this
8  some of it is coded stuff I can't read.  A
9  lot of it is that.  A lot of that wasn't
10 actually sent, it had to do, I think, just
11 with e-mails, company e-mails that's what
12 it was.
13      Q.   That was on your SureTrader
14 laptop?
15      A.   This was on my personal laptop
16 that Guy put certain codes on.
17      Q.   When you say the very
18 beginning, please specify the exact time
19 period you're referring to.
20      A.   This would have had to be late
21 2011 or early 2012.  He asked if he could
22 take my laptop home because he wanted to
23 back some stuff on it and he said now if
24 something happens to the work computer
25 we'll be okay.

Page 309

1    P. DORSETT
2       Q.   Understood.  Therefore, none of
3  the documents that you produced from your
4  personal computer to the SEC are after
5  2012; is that correct?
6       A.   None of them are after 2012?
7  No.
8       Q.   Mr. Dorsett, you just said Guy
9  instructed you to back things up --
10      A.   He did not instruct me.  He did
11 it himself and he told me.
12      Q.   So, here is my question --
13           MS. SUM:  Allow him to finish
14      answering the question.
15      A.   He explained to me --
16      Q.   Mr. Dorsett, I'm asking about
17 the time period that something happened.
18 Your testimony is that Mr. Dorsett backed
19 up documents onto your computer in 2012, we
20 would not expect to see any documents on
21 your personal computer after 2012; isn't
22 that correct?
23      A.   I did not say that he backed up
24 documents.  I said he did something to my
25 computer.  I did not know what he did, but

|  | Page 310 |
|---|---|
| 1 | P. DORSETT |
| 2 | he said if anything happens to us, we have |
| 3 | a back up.  In fact, it wasn't until years |
| 4 | later until -- and that computer, I stopped |
| 5 | using it -- literally, the hard drive |
| 6 | crashed and I had to get it |
| 7 | reconstructed -- |
| 8 |     Q.    What year did the hard drive |
| 9 | crash? |
| 10 |     A.    I think 2016 and it sat there |
| 11 | over eight years because I spent a lot of |
| 12 | money to get it repaired.  The IT person |
| 13 | who I hired told me that the way he had to |
| 14 | reconstruct my hard drive caused my files |
| 15 | to be all over the place.  Looking at my |
| 16 | family photos, I see some SAS documents and |
| 17 | I press on it and I see a bunch of codes |
| 18 | and stuff.  That's when I see a bunch of |
| 19 | stuff at that time -- |
| 20 |     Q.    What year did you have the hard |
| 21 | drive reconstructed, Mr. Dorsett? |
| 22 |     A.    I think that was around, I |
| 23 | saved up to get it reconstructed and I |
| 24 | wanted to let him put a new computer disk, |
| 25 | right, so I think that was around 2017 that |

|  | Page 311 |
|---|---|
| 1 | P. DORSETT |
| 2 | I built -- I had to build the new laptop |
| 3 | and then it was later that year -- like I |
| 4 | said, a lot of it was just coding gibberish |
| 5 | that I couldn't understand and it was |
| 6 | sometime later that I was going through the |
| 7 | coding gibberish and stuff and then i was |
| 8 | going in my e-mails and I realized, buried |
| 9 | in my e-mails was Swiss America Securities. |
| 10 | It dawned on me, you know what, this had to |
| 11 | have been there from Guy -- I don't know |
| 12 | what he did, but whatever he did, it's |
| 13 | literally still on my computer to this day. |
| 14 |           MR. FORD:  Can we go back to |
| 15 |      the Exhibit 3. |
| 16 |     Q.    As we pull that up, did the SEC |
| 17 | instruct you to remove privileged |
| 18 | communication from the e-mails that you |
| 19 | were transmitting? |
| 20 |     A.    Yes, I think they said make |
| 21 | sure nothing is privileged between anything |
| 22 | to do with a lawyer or anything like that. |
| 23 |     Q.    Can you please provide me the a |
| 24 | name of the law firm that conducted the |
| 25 | privilege review? |

|  | Page 312 |
|---|---|
| 1 | P. DORSETT |
| 2 |     A.    Sorry, what do you mean by a |
| 3 | privilege review? |
| 4 |     Q.    You said the SEC instructed you |
| 5 | to remove privileged documents, did you |
| 6 | hire a law firm to do that? |
| 7 |     A.    No, I didn't hire a law firm. |
| 8 |     Q.    Did they hire a law firm to do |
| 9 | that, yes or no? |
| 10 |     A.    No.  They told me they couldn't |
| 11 | receive anything that had privileged |
| 12 | communications, and so what I did was, I |
| 13 | tried to do a search for the company's |
| 14 | lawyer and I think I just deleted those to |
| 15 | be honest.  Anything that came up with |
| 16 | Michael Miller's, name I just deleted them. |
| 17 |     Q.    So, they would be available |
| 18 | then in your Gmail trash; is that correct? |
| 19 |     A.    Well, this is sometime ago -- I |
| 20 | mean, I don't know.  Interestingly enough, |
| 21 | the very week that it became known to the |
| 22 | courts that I was in possession of Swiss |
| 23 | America Securities e-mails, my Gmail was |
| 24 | actually hacked.  And that's when I started |
| 25 | following this case because I wanted to log |

|  | Page 313 |
|---|---|
| 1 | P. DORSETT |
| 2 | in to see the exact time that you guys |
| 3 | became aware of it.  My Gmails were hacked |
| 4 | and security e-mails were deleted. |
| 5 |     Q.    Mr. Dorsett, when did you make |
| 6 | the SEC aware that you had these documents, |
| 7 | what year? |
| 8 |     A.    I can't recall.  I think it |
| 9 | would have been -- you mean the e-mails? |
| 10 |     Q.    No.  When did you tell the SEC |
| 11 | that you had access to these documents |
| 12 | approximately what year? |
| 13 |     A.    When you say these documents |
| 14 | please clarify. |
| 15 |     Q.    The documents you obtained from |
| 16 | SureTrader? |
| 17 |     A.    I did not obtain documents from |
| 18 | SureTrader if you were talking about the |
| 19 | documents that Guy backed up to my computer |
| 20 | I think I made SEC aware of that just |
| 21 | recently, like I don't know -- maybe last |
| 22 | year or the year before I'm not sure I'll |
| 23 | have to check my records. |
| 24 |     Q.    You never told Sajaad Matin in |
| 25 | 2016 that Guy Gentile backed up documents |

Philip Dorsett
February 28, 2023

Page 338

1   P. DORSETT
2   and Ms. Johnson, it is not your
3   candor at issue here, it is the
4   candor of the man you put in front of
5   this tribunal.
6       MR. ADAM FORD:  The final issue
7   Mr. Dorsett's testimony raises is
8   that his statement that around the
9   time it became known that his
10  e-mails -- that these documents were
11  at issue and that he was hacked and
12  thousands of e-mails were deleted.
13  Can I ask you, were you aware that
14  this hack had happened?  Was this
15  something -- do you know about this?
16      MS. SUM:  My understanding is
17  this happened after April when he
18  already made that transmission to us.
19  The 11,000 was the universe.  When we
20  refer to the is 11,000, that's from
21  that snapshot in time from April of
22  2022, but parked somewhere in the SEC
23  where it was inaccessible for review.
24      MR. FORD:  Okay, I appreciate
25  that.  In any event, I think the

Page 339

1   P. DORSETT
2   issue is that all of this raises is
3   we have significant issues about the
4   fulsomeness and the propriety of
5   Mr. Dorsett's production of document
6   to you and that's why we're going to
7   need -- I mean, had he admitted -- he
8   testified he has lots more documents.
9       MS. SUM:  We were not aware.  I
10  want to make the representation on
11  the record, because guess what, we
12  would have asked for them.
13      MR. FORD:  I'm sure you would
14  have.
15      MS. JOHNSON:  I would point
16  out, this is just voluntary
17  production.  No subpoena.
18      MR. FORD:  But you have
19  represented to the court, right.
20  Again, there have been
21  representations to the court and I
22  think we all believe and agreed that
23  the documents that Mr. Dorsett were
24  all documents in his position, not
25  some random subsect.

Page 340

1   P. DORSETT
2       MS. JOHNSON:  I don't think we
3   ever represented that.
4       MR. FORD:  By the way, we're
5   going to have --
6       MS. SUM:  -- we would have
7   asked for it --
8       MR. FORD:  Adam, let me
9   interrupt.  This is all going to go
10  before the judge obviously, if there
11  are objections related to the
12  deposition that need to get on, that
13  was the intent.  Sounds like
14  everybody got them on.  It's been a
15  very long day for the court reporter
16  and I say that if we have some sort
17  of disagreement, we're going to go
18  before the court and that will be
19  excused and call it a night for
20  everybody.
21      MS. JOHNSON:  That we agree on.
22      MS. SUM:  We do need to square
23  away the dates and I did want to
24  raise --
25      MS. JOHNSON:  One thing --

Page 341

1   P. DORSETT
2       MS. SUM:  Do you want to excuse
3   Madam Court Reporter?
4       MS. JOHNSON:  Yes, she can go.
5       (Whereupon, the examination of
6   this witness was concluded at
7   6:07 P.M.)