# Exhibit K

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 18-cv-7291 (DLC) (RJL)
ECF Case
-------------------------------------x
AVALON HOLDINGS CORP.,

                              Plaintiff,
          v.
GUY GENTILE and MINTBROKER
INTERNATIONAL, LTD.,

                              Defendants.
-------------------------------------X
Related to:
-------------------------------------x
No. 18-cv-8896 (DLC) (RJL)
ECF Case
-------------------------------------x
NEW CONCEPT ENERGY, INC.
                              Plaintiff,
          v.

GUY GENTILE and
MINTBROKER INTERNATIONAL, LTD.,
                              Defendants.
-------------------------------------x

                    January 25, 2023
                    6:38 p.m.

    VIDEOTAPED ZOOM DEPOSITION of STEPHEN
DARVILLE, the Witness in the
above-entitled action, located in Nassau,
New Providence, The Bahamas, taken before
Dawn Matera, a Shorthand Reporter and
Notary Public of the State of New York.
```

Page 94

1        STEPHEN DARVILLE
2   either.
3        MS. TAUBER: That's all the
4     questions I have for you. Thank you
5     again for joining us.
6        MR. FORD: I know it's late
7     everybody, but I do have a few
8     follow-up questions.
9        Mr. Darville, if you have some
10    more time, I don't think it will be
11    too long.
12       THE WITNESS: Okay. No problem,
13    go ahead.
14  BY MR. FORD:
15    Q.   First do you recall Ms. Tauber
16  asking you about the manner in which
17  customers opened accounts at SureTrader?
18    A.   Mm-hmm.
19    Q.   Is that a yes?
20    A.   Yes.
21    Q.   And you said that you were not
22  part of that group within the company; is
23  that right?
24    A.   Right, that's correct.
25    Q.   But that you were able to

```
                                              Page 95
 1            STEPHEN DARVILLE
 2   answer some of her questions and provide
 3   some insight?
 4        A.    Yeah, I was familiar with the
 5   process by which the clients had to
 6   follow the sign-up.
 7        Q.    Were there any measures in
 8   place to prohibit the solicitation of
 9   United States citizens from opening
10   accounts with SureTrader?
11        A.    Yes, we had -- there was a
12   disclaimer that was put up on the
13   website.  So as soon as anybody had the
14   website, they would immediately see a
15   pop-up stating that, you know, we
16   wouldn't be soliciting any U.S. clients
17   and you have to accept that, you know, as
18   a part of agreeing to sign up.  That you
19   weren't being solicited.
20        Q.    Were you -- you said it was a
21   pop-up blocker; is that right?
22        A.    A pop-up that came up on the
23   website.
24        Q.    Do you recall what it said on
25   the pop-up?
```

Page 96

1      STEPHEN DARVILLE
2      A.    It basically said that you, you
3   know, you were agreeing that you weren't
4   solicited by the company, you know, to
5   sign up or join, you know, SureTrader.
6      Q.    Were you involved in any way in
7   the creation of it?
8      A.    No, I wasn't personally
9   involved in that part of it.
10     Q.    Can you describe to me from an
11  IT perspective how that pop-up blocker
12  would work, for example, if a person in
13  the United States went to SureTrader's
14  website?
15     A.    As soon as they would type in
16  the SureTrader address the pop-up would
17  come up out of the website and you would
18  have to acknowledge it before you would
19  be allowed to actually get to the site.
20     Q.    What about in the context of
21  advertising, were there any similar
22  measures to prohibit the solicitation of
23  U.S. customers?
24     A.    Yes.  Our marketing team also
25  made that known during advertisements,

Page 97

1            STEPHEN DARVILLE
2  that we are not soliciting any U.S.
3  clients.
4       Q.    And what about when customers
5  filled out their forms?
6       A.    And when they had to fill out
7  their applications, it was also a part of
8  the application form that they weren't
9  solicited.
10      Q.    While you were employed at
11 SureTrader, about how many employees were
12 there?
13      A.    During my tenure, we grew to
14 about almost 70 people, 70-something
15 people, roughly.
16      Q.    And to the extent you have
17 knowledge of this, were these procedures
18 aimed at prohibiting the solicitation of
19 U.S. customers abided by by the company?
20      A.    Yeah, definitely.
21      Q.    Were they abided by by the
22 individual employees of the company?
23      A.    Yup.  We were told to mention
24 that to the clients.
25      Q.    Who told you that?

```
                                        Page 98
 1              STEPHEN DARVILLE
 2       A.    That would have been the
 3   executive team.
 4       Q.    Okay.  Do you recall who was on
 5   the executive team?
 6       A.    Basically Mr. Cooper and
 7   Mr. Collie, they made it clear to let the
 8   customers know, if there were any U.S.
 9   customers, that they weren't solicited.
10       Q.    Would the chief compliance
11   officer have been involved in those sort
12   of discussions?
13       A.    Yes.
14       Q.    And do you recall any of the
15   chief compliance officers, their names
16   while you worked there?
17       A.    Yes.  One was Edward Cooper and
18   then the next one was Philip Dorsett.
19       Q.    Okay.  Did Philip Dorsett work
20   at the company for the entire time that
21   you were there?
22       A.    No, he was only there for a
23   brief period and then he was let go.
24       Q.    Can you tell me anything about
25   the circumstances of him being fired?
```

Page 99

1         STEPHEN DARVILLE
2     A.    Yes, he was found to be doing
3  some shady business with forwarding
4  company e-mails to his personal e-mails.
5  So he was let go for breach of
6  confidentiality.
7     Q.    And how did you come to know
8  that?
9     A.    From monitoring his work
10 machine, his work computer.
11    Q.    In your process of monitoring
12 his work computer, did you ever observe
13 him sending work e-mails to his personal
14 e-mail address?
15    A.    Yes.  That was one of the
16 things that I observed him doing.
17    Q.    And do you know, would that
18 have been a violation of company policy?
19    A.    Yes, that was definitely a
20 violation of company policy.
21    Q.    Was that the sort of thing that
22 Mr. Dorsett would have been made aware
23 of?
24    A.    Yeah, he was aware of that,
25 because we all had to sign agreements

```
                                          Page 100
 1              STEPHEN DARVILLE
 2   when being onboarded by the company.
 3        Q.    Do you know whether Mr. Dorsett
 4   had a company computer?
 5        A.    Yes, he did.
 6        Q.    And was it your job
 7   responsibility to hand out computers or
 8   take them back when an employee came or
 9   went?
10        A.    Yes.
11        Q.    Can you tell me about after
12   Mr. Dorsett was fired, what, if anything,
13   happened with his computer, if you
14   recall?
15        A.    From what I recall, his
16   computer probably would have been
17   redistributed, cleaned up and
18   redistributed to another person.
19        Q.    That is ordinarily what would
20   happen, the company would take the
21   computer back, wipe it?
22        A.    Wipe it clean and redistribute
23   it to another person.
24        Q.    Okay.  Do you have any idea
25   whether he -- you said you're not -- do
```

```
                                            Page 101
 1             STEPHEN DARVILLE
 2   you know whether or not he took the
 3   computer or gave it back; do you recall?
 4        A.    I don't recall if he gave it
 5   back.  I don't recall the particular --
 6   if he took it or if we got it.
 7        Q.    But your understanding is that
 8   it would have been against company policy
 9   for him to have taken the company
10   computer?
11        A.    Definitely, yes.
12        Q.    Okay.  What about the chief
13   operating officer, would he have been
14   involved in discussions related to the
15   solicitation of U.S. customers?
16        A.    I believe he would have.
17        Q.    Were you familiar with a chief
18   operating officer named Yaniv Franz or
19   Yan Franz?
20        A.    Yes, I do recall Mr. Franz.
21        Q.    What can you tell me about him?
22        A.    He was a very horrible guy.
23   Just was an unpleasant individual.  Came
24   into the company and, you know, basically
25   started firing people and just was -- he
```

Page 102

|    |                                                      |
|----|------------------------------------------------------|
| 1  | STEPHEN DARVILLE                                     |
| 2  | would insult vendors who he would have               |
| 3  | come in to do work at the company.  Just             |
| 4  | a real mean guy.                                     |
| 5  | Q.    Did you think he was mean?                     |
| 6  | A.    I didn't have any personal                     |
| 7  | clashes with him.  I tried to keep on his            |
| 8  | good side for the most part.  But I                  |
| 9  | witnessed him in action speaking with                |
| 10 | other staff members and firing people.               |
| 11 | And with the EC technician, he                       |
| 12 | told the guy -- I don't know how he                  |
| 13 | didn't get punched, he said some really              |
| 14 | mean things to the guy.  Just like a                 |
| 15 | malicious fellow.                                    |
| 16 | Q.    How was his -- how did his                     |
| 17 | employment end, do you recall?                       |
| 18 | A.    So basically a lot of the staff                |
| 19 | members complained to the labor board of             |
| 20 | the Bahamas.  And they actually sent a               |
| 21 | team of people to the company and they               |
| 22 | interviewed everybody, and after that                |
| 23 | process took place, his immigration, his             |
| 24 | papers were not renewed.  So he was asked            |
| 25 | to leave the country once his paperwork              |

Page 103

|    |                                              |
|----|----------------------------------------------|
| 1  | STEPHEN DARVILLE                             |
| 2  | expired.                                     |
| 3  | Q. When you were talking about               |
| 4  | Mr. Dorsett, you had mentioned that you      |
| 5  | were monitoring his e-mail because it        |
| 6  | appeared that he was doing improper or       |
| 7  | unlawful things with his e-mail. Was         |
| 8  | there anything similar with Mr. Franz,       |
| 9  | with Yan Franz?                              |
| 10 | A. I didn't personally monitor his           |
| 11 | machine. But I know when he left, he         |
| 12 | did -- it was kind of a bad situation, as    |
| 13 | well. He did take his machine as well,       |
| 14 | when he left.                                |
| 15 | Q. And was that --                           |
| 16 | A. We were unable to get it.                 |
| 17 | Q. Was that a violation of company           |
| 18 | policy?                                      |
| 19 | A. Yes, it was a violation.                  |
| 20 | Q. Would he have known about it,             |
| 21 | and if so, how?                              |
| 22 | A. Yeah, because he would have --            |
| 23 | he would have seen our policies, our IT      |
| 24 | policies, and been familiar with the         |
| 25 | procedures because he did a lot of           |

Page 104

|    |                                                        |
|----|--------------------------------------------------------|
| 1  | STEPHEN DARVILLE                                       |
| 2  | firing, so.                                            |
| 3  | MR. LOPEZ: Mr. Ford, does this                         |
| 4  | line of questioning have anything to                   |
| 5  | do with this case?                                     |
| 6  | MR. FORD: Well, it does,                               |
| 7  | because I have information in my                       |
| 8  | possession that suggests that these                    |
| 9  | individuals may have taken company                     |
| 10 | documents, and while that is likely to                 |
| 11 | have occurred prior to the events at                   |
| 12 | issue in this case, I don't know the                   |
| 13 | extent to which they may have                          |
| 14 | documents, so that's why I am                          |
| 15 | inquiring.                                             |
| 16 | MR. LOPEZ: Okay.                                       |
| 17 | Q.   In addition to the internal                       |
| 18 | policies of MintBroker, would there be                 |
| 19 | anything else wrong with him taking, with              |
| 20 | Mr. Franz taking his work computer; do                 |
| 21 | you know?                                              |
| 22 | A.   Would there be anything wrong?                    |
| 23 | I mean that's basically stealing if you                |
| 24 | look at it, you know.  He was not                      |
| 25 | authorized to take the machine.                        |

Page 105

1       STEPHEN DARVILLE
2       Q.    In your estimation, from what
3  you know about the situation, is there
4  any reason to believe that he was acting
5  vindictively when he stole that company
6  property?
7       A.    Yes, definitely.
8       Q.    Why do you say that?
9       A.    Just because he was very
10 unhappy with the situation of him being,
11 you know, told to leave the country.  And
12 he felt like the company was behind it.
13 And that Mr. Gentile was against him and
14 trying to get rid of him.  You know, and
15 when it was actually his own actions that
16 led to him being, you know, asked to
17 leave the country.
18      Q.    Aside from Mr. Franz and
19 Mr. Dorsett, where there seems like there
20 was a lot of drama, was there other drama
21 between the 70 or so employees that you
22 worked with that you recall?
23      A.    For the most part, it was
24 pretty quiet.
25            I did have another -- when we

Page 106

```
 1              STEPHEN DARVILLE
 2   had our sales department, I did have a
 3   guy who was manipulating the -- because
 4   we had a top performer reward, and he was
 5   basically manipulating the system to get
 6   all of the, I guess, the clients who were
 7   funded with large amounts.  So he would
 8   take that title home every month.  So we
 9   had to monitor his system for a few weeks
10   and I basically found out what he was
11   doing and we had to let him go.
12        Q.    And he was eventually, he was
13   fired?
14        A.    Yeah, he was fired.
15        Q.    What was Mr. Gentile's role
16   with the company while you worked there?
17        A.    We didn't really see him often.
18   He was just like an executive of the
19   company.  You know, we didn't -- as far
20   as I know, he was running the company
21   along with the executive team.
22        Q.    And who else was on the
23   executive team?
24        A.    It would have been Janay, Janay
25   Pyfrom, Antonio Collie and Edward Cooper.
```

```
                                        Page 107
 1              STEPHEN DARVILLE
 2      Q.    About how often would
 3   Mr. Gentile be in the office physically?
 4      A.    Every few months we would see
 5   him pop him and say hello to everybody.
 6   Every three months or six months he would
 7   come in.
 8      Q.    And what about other employees,
 9   would they come in sort of five days a
10   week?
11      A.    Yeah, mostly, everyone else,
12   you know, regular Monday through Friday,
13   9 to 5.
14      Q.    How about Mr. Collie, how often
15   would he be in?
16      A.    Mr. Collie would be in almost
17   daily.
18      Q.    Almost daily?
19      A.    Yes.
20      Q.    And Mr. Gentile would be like
21   every few months he would pop in?
22      A.    Yeah, every few months.
23            MR. FORD:  So I am just going to
24        request a three-minute break.  If we
25        can do that.  I don't think I will
```

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

|   |   |
|---|---|
| 1 | STEPHEN DARVILLE |
| 2 | have any more questions when I come |
| 3 | back, but I just want to make sure. |
| 4 | MS. TAUBER:  Okay, I might have |
| 5 | a few follow-up questions after that, |
| 6 | but it won't be long. |
| 7 | MR. FORD:  Okay. |
| 8 | THE VIDEOGRAPHER:  The time is 9 |
| 9 | p.m., we are going off the record. |
| 10 | (Off the record.) |
| 11 | THE VIDEOGRAPHER:  Time is 9:03, |
| 12 | we are back on the record. |
| 13 | MR. FORD:  Mr. Darville, just a |
| 14 | few more questions. |
| 15 | BY MR. FORD: |
| 16 | Q.   We had talked about the process |
| 17 | of approving customers.  Was Mr. Gentile |
| 18 | involved in that process, do you recall? |
| 19 | A.   No. |
| 20 | Q.   Who would have been involved in |
| 21 | the process of approving customer |
| 22 | applications? |
| 23 | A.   That would have been Mr. Cooper |
| 24 | and his team. |
| 25 | Q.   What about Mr. Dorsett, would |

Page 109

```
 1              STEPHEN DARVILLE
 2   he have been involved?
 3       A.    Yes, Mr. Dorsett was involved,
 4   was a part of it.
 5       Q.    What about Mr. Franz?
 6       A.    Mr. Franz, I am not 100 percent
 7   sure if he had any involvement.  To my
 8   knowledge, no.  But he quite possibly
 9   might have, but I wouldn't have been
10   aware, as far as I know.
11       Q.    Do you recall when Mr. Franz
12   left the company -- strike that.
13             Do you recall when Mr. Dorsett
14   was fired from the company?
15       A.    Yes, I do.  I don't remember
16   the exact time, but I do remember when he
17   left.
18       Q.    And when was that about?
19       A.    I will say it has been roughly
20   about a year after he started, from what
21   I can recall.  So somewhere in 2017
22   maybe.
23       Q.    So to the extent Mr. Dorsett
24   had stolen documents from the company,
25   would he have been able to access
```

```
                                            Page 110
 1              STEPHEN DARVILLE
 2   documents after he left?
 3       A.    No, he shouldn't have been able
 4   to.
 5       Q.    So any documents he stole from
 6   the company would have been before he
 7   left in 2017?
 8       A.    Yes.
 9       Q.    And what about Mr. Franz, do
10   you remember when he was fired?
11       A.    He, I don't recall the exact
12   date, but I believe it was sometime in,
13   before we closed, maybe 2018.
14       Q.    Would that have been early
15   2018?
16       A.    Possibly.  I don't recall
17   exactly the date.  This has been a few
18   years now.
19       Q.    Understood.  But the same thing
20   as Mr. Dorsett, had he had stolen
21   documents from the company, he would not
22   have been able to steal anymore after
23   he's fired?
24       A.    Exactly.
25             MR. FORD:  I think that is all
```

Page 111

1           STEPHEN DARVILLE
2       of my questions for you.  We
3       appreciate you taking the time.  I
4       know it's a late night here.
5       Hopefully we'll be out of here in a
6       few moments here.
7   BY MS. TAUBER:
8       Q.    I just have a few questions
9   based on that whole exchange.  You
10  mentioned the application form contained
11  some language, I think about soliciting
12  customers, the account application form?
13      A.    Mm-hmm.  U.S. customers, yeah.
14      Q.    Do you have a copy of the
15  application form?
16      A.    I do not, no.
17      Q.    And then you had mentioned
18  somebody, I don't recall who, had
19  manipulated data or manipulated some
20  trading lists?
21      A.    Not a trading list.  It was a
22  member of the sales department.  He
23  had -- he was manipulating his sales
24  numbers through the system.  He was using
25  the e-mail system to basically change a