# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3                       --o0o--
 4   SECURITIES AND EXCHANGE       )
     COMMISSION,                   )
 5                                 )
          Plaintiff,                )
 6                                 ) Case No.
        vs.                        ) 1:21-cv-21079
 7                                 )
     MINTBROKER INTERNATIONAL, LTD., )
 8   f/k/a SWISS AMERICA            )
     SECURITIES LTD. and d/b/a      )
 9   SURETRADER, and GUY GENTILE,   )
     a/k/a GUY GENTILE NIGRO,       )
10                                 )
          Defendants.               )
11   _____)
12
13
14
15          VIDEOTAPED DEPOSITION OF
16                PHILIP DORSETT
17          VOLUME 1 - PAGES (1-221)
18    CONFIDENTIAL PORTIONS BOUND SEPARATELY
19          VIA REMOTE VIDEOCONFERENCE
20          MONDAY, FEBRUARY 27, 2023
21
22
23
     Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
     California CSR License No. 3036
25   Job No. 230227VV
                        1
```

```
 1              REMOTE APPEARANCES:
 2
 3   FOR PLAINTIFF:
 4      SECURITIES AND EXCHANGE COMMISSION
        BY: Alice K. Sum, Esq.
 5          Alise Johnson, Esq.
            Russell Koonin, Esq.
 6      801 Brickell Avenue, Suite 1950
        Miami, Florida  33131
 7      305-982-6300
        sumal@sec.gov
 8      johnsonali@sec.gov
        kooninr@sec.gov
 9
10   FOR DEFENDANTS:
11      FORD O'BRIEN LANDY LLP
        BY: Matthew A. Ford, Esq.
12          Cara Filippelli, Esq.
        3700 Ranch Road 620 South, Suite B
13      Austin, Texas 78738
        512-503-6388     Fax: 212-256-1047
14      mford@fordobrien.com
15      FORD O'BRIEN LANDY LLP
        BY: Adam C. Ford, Esq.
16          Stephen R. Halpin, III, Esq.
        275 Madison Avenue, Floor 24
17      New York, New York  10016
        212-858-0040     Fax: 212-256-1047
18      aford@fordobrien.com
        shalpin@fordobrien.com
19
20
21   Also Present: Guy Gentile
22   Videographer: DeShawn White, Legal Videographer
23
24   (All parties appeared remotely via videoconference.)
25
                        2
```

```
 1                       INDEX
 2               EXAMINATION BY COUNSEL
 3                                          PAGE
 4   Examination By Ms. Sum                    9
 5
                        3
```

```
 1                     E X H I B I T S
 2
 3   EXHIBIT NO.    DESCRIPTION                  PAGE
 4   Exhibit 1      Deposition Subpoena            9
 5   Exhibit 2      SureTrader.com Account Application  77
                    Bates No. SEC-SCB-P-0009184 -
 6                  SEC-SCB-P-0009221
                    Confidential pursuant to
 7                  Securities Exchange Act s.24(d)
     Exhibit 3      SureTrader Account Application  91
 8                  Bates No. SEC-SCB-P-0010164 -
                    SEC-SCB-P-0010198
 9                  Confidential pursuant to
                    Securities Exchange Act s.24(d)
10
     Exhibit 4      SureTrader Tell Us About You form  101
11                  Bates No. SEC-SCB-P-0010428 -
                    SEC-SCB-P-0010428
12                  Confidential pursuant to
                    Securities Exchange Act s.24(d)
13
     Exhibit 5      Swiss America Securities, Ltd. Web  108
14                  Page
                    Bates No.
15                  SEC-SECWEBCAPTURE-E-0000340 -
                    SEC-SECWEBCAPTURE-E-0000345
16
     Exhibit 6      Funding & Banking Web Page      111
17                  Bates No.
                    SEC-SECWEBCAPTURE-E-0000377 -
18                  SEC-SECWEBCAPTURE-E-0000382
19   Exhibit 7      Email Thread                   113
                    Bates No. SEC-FL-03848-E-0012118 -
20                  SEC-FL-03848-E-0012120
21   Exhibit 8      Email Thread                   139
22   Exhibit 9      Email Thread                   154
23   Exhibit 10     Email Thread                   167
                    Bates No. SEC-FL-03848-E-0000228 -
24                  SEC-FL-03848-E-0000229
25
                        4
```

Page 5:

```
 1  Exhibit 11   Swiss America Securities Order      168
              Flow
 2            Bates No. SEC-FL-03848-E-0000230 -
              SEC-FL-03848-E-0000231
 3
    Exhibit 12   SureTrader Application -             184
 4            Christopher Miguel Penalver
              Bates No. SEC-SCB-P-0010391 -
 5            SEC-SCB-P-0010409
              Confidential pursuant to
 6            Securities Exchange Act s.24(d)
 7  Exhibit 13   Email Thread                         175
              Bates No.
 8            SEC-FL-03848-E-0001195-SEC-FL-
              03848-E-0001203
 9
    Exhibit 15   Declaration                          188
10            Bates No. SEC-FL-03848-E-0001431
11  Exhibit 16   Declaration of Philip A. Dorsett     191
              Dated June 27, 2022
12
    Exhibit 17   Affidavit of Philip Dorsett Dated    192
13            January 9, 2014
              Bates No. GENTILE0004495 -
14            GENTILE0004497
              CONFIDENTIAL
15
16
17  *** EXHIBITS 2-4 BOUND IN CONFIDENTIAL TRANSCRIPT **
```

Page 6:

```
 1           CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2                    BOUND SEPARATELY
 3                         - - -
 4                    Pages 77 - 107
 5                    Pages 186 - 187
 6                    Pages 193 - 198
```

Page 7:

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF FLORIDA
 3              --o0o--
 4  SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
 5                                 )
         Plaintiff,                )
 6                                 ) Case No.
       vs.                         ) 1:21-cv-21079
 7                                 )
    MINTBROKER INTERNATIONAL, LTD.,)
 8  f/k/a SWISS AMERICA            )
    SECURITIES LTD. and d/b/a      )
 9  SURETRADER, and GUY GENTILE,   )
    a/k/a GUY GENTILE NIGRO        )
10                                 )
         Defendants.                )
11  _____)
12              --o0o--
13       BE IT REMEMBERED, that on Monday, February 27,
14  2023, commencing at the hour of 9:49 a.m. Eastern
15  Standard Time, all parties appearing via WebEx
16  videoconference, before me, Victoria L. Valine,
17  Certified Shorthand Reporter of the State of California,
18  appeared:
19              PHILIP DORSETT
20  called as a witness by the Plaintiff, who, being by me
21  remotely sworn, was thereupon examined and interrogated
22  as hereinafter set forth.
23              --o0o--
24       THE VIDEOGRAPHER:  This is the videotaped
25  deposition of Philip Dorsett in the matter of SEC versus
```

Page 8:

```
 1  Mintbroker International, Ltd., et al., pending in the
 2  United States District Court Southern District -- yes,
 3  United States District Court Southern District of
 4  Florida.  Case number 1:21-cv-21079.
 5       Today's date is February 27th, 2023.
 6       The time on the video monitor is 9:49 a.m.
 7  eastern time.
 8       My name is DeShawn White.  The court reporter
 9  today is Victoria Valine, both are with Gradillas Court
10  Reporters.
11       Would counsel please identify yourselves for
12  the record.
13       MS. SUM:  Good morning.  This is Alice Sum on
14  behalf of the United States Securities and Exchange
15  Commission.  Also present is trial counsel Alise
16  Johnson, and later my colleague, Russell Koonin, will be
17  joining.
18       MR. MATTHEW FORD:  Matthew Ford here for
19  defendant Guy Gentile along with my colleagues Adam
20  Ford, Stephen Halpin, and Cara Filippelli.
21       THE VIDEOGRAPHER:  Will the court reporter now
22  swear in the oath.
23       CERTIFIED STENOGRAPHER:  Raise your right
24  hand, please, sir.
25       Do you solemnly swear or affirm that the
```

### Page 21

products and services. So the point is the SCB, they knew me. There was a history on me, you know, and I think that helped a lot with regard to them approving my application.

They -- you know, because they basically had -- you know, they were already following my career. You know, I was already registered with them. There was no complaints. There was nothing against me.

And so from the compliance perspective -- you know, when you work in the industry, there's a lot of compliance that you would naturally know in the Bahamas, anyway. We big on AML -- it doesn't matter if you're in compliance or not, you know. So we big on KYC. And so a lot of that stuff I knew. All right.

It was just getting into the specific requirements that the Commission required -- that the SCB required. So, like I said, we had a lawyer who was helping us. We were filling out the documents, and it was just a matter of getting the actual approval.

I also -- I also had to -- at the same time, apply for -- with the Financial Intelligence Unit -- the FIU, as the money laundering reporting officer. That was another position that was mandated by law as well. And so I got approved for both.

Q. All right. Could you briefly summarize what

### Page 22

your job responsibilities were as the Chief Compliance Officer for SureTrader when it opened in approximately November of 2011?

A. Well, back then roles were not -- you know, roles were not really established. It was just me and Guy, basically, right. And I would be -- I would let him know, from my understanding of compliance, what we needed to do in order for -- to open up accounts for clients.

So, again, my main focus was things like KYC, doing proper due diligence on clients. You know, making sure that, you know, that the countries they come from aren't on sanctions lists, that type of things. Those were like my main focus, and making sure we get proper IDs, making sure -- you know, that type of stuff. So we went back and forth with trying to get the actual application together.

And initially the application was really just a dumbed down version of the SpeedTrader application. SpeedTrader was like the -- SpeedTrader is basically the same as Stock USA. All right. And so, you know, we ran through that, and it was like, okay, well, that just doesn't apply. We don't need this. We don't need this. Okay. We need that. So it was that type of thing. It was a lot of back and forth. We were bouncing ideas off

### Page 23

of each other.

And so, basically, my role as Chief Compliance Officer was, you know, to make sure that the clients, as they were coming in, were in accordance with Bahamian law and, to a broader spectrum, to make sure our firm was running in accordance with Bahamian law and regulations.

Q. Okay. Did you have any responsibilities with respect to whether SureTrader complied with U.S. laws?

A. No.

Q. Okay. Did you have any responsibility as Chief Compliance Officer as to whether SureTrader complied with any other country's laws other than the Bahamas?

A. No.

Q. What was Mr. Gentile's role when SureTrader opened in November of 2011?

A. All right. So from the start, like I said, Guy, he was aware that I wanted to open up my -- a broker-dealer some day. So he -- you know, he told me, he's like Phil, you stick with me. I'll teach you everything I know.

And so it was really like -- I viewed him almost like a mentor, really. He was someone -- you know, back then his -- Guy was, I would say, almost like

### Page 24

the golden child of the broker-dealers, you know, he was the man. So it was quite an honor to be working with him. And, you know, in some ways I was sort of in awe of him.

So a lot of it was me just taking in what Guy was explaining to me how broker-dealers work. And, to that end, he also had a lot of experience with the securities markets themselves. He knew the ins and outs of how the various -- literally, how the physical systems of how trades would take place, and how they would run, and all the rest of it, and I was quite impressed. And he also had a very healthy knowledge of U.S. regulations as well. You know, he was -- you know, he had his own firms and that was something I knew for many years.

And so he -- we had had discussions -- because earlier when we were talking about when he mentioned that, you know, we're going to get these U.S. clients because of the PDT Rule, one of the things I mentioned to Guy -- I told him, I said, well, Guy, I've worked for a few firms at that time, and as far as I knew nobody really had U.S. clients. I didn't know why. In fact, I used to -- I was under the impression that it was some sort of Bahamian thing. Like it was some reason why it was always more difficult for there to be U.S. clients.

I really didn't know. Like I said, back then my background was actually not in really compliance, but I --

Q. So I'm just going to pause you right there because you talked about it a bit. So let's, you know, break it down.

When SureTrader opened, did you and Mr. Gentile plan on having SureTrader handle U.S. customers?

A. Yes. Yes.

Q. Okay. And what -- what was the plan with respect to finding U.S. customers to work with SureTrader?

A. Well, initially -- well, initially I think Guy had this thing whereas once -- once he opened the firm, they would come. All right.

Now, the reason why I said it because there was a -- there was a short time just before Christmas when Guy --

Q. Christmas 2011?

A. Yes. All right.

Q. Okay.

A. When Guy -- he seemed to have like backed away from his idea of, you know, getting the U.S. clients in the PDT Rule and everything, right? It was like -- you

25

know I was a bit surprised by it because he was all gung-ho like, you know, over the summer for the last -- I don't know how much months. Right.

And he had had me check on the Bahamian side to see if there was any problem with us having U.S. clients, and there wasn't. All right. And so when we finally opened, like he would tell me, he would say, you know -- you know, I'm not sure if I want to do it. And I didn't -- I wasn't sure where the hesitation was coming from, but I knew there was some hesitation.

And then as the weeks went on we were not getting as much clients as I think Guy had hoped. All right. And he was like -- he was like Philip, you know, we gotta get U.S. clients. This is -- I'm going to have to shut down if we don't. And I was like well, okay. You know, I mean -- you know, it's up to you, right. And so he made a decision -- this was within like the first quarter -- the first few months -- first few weeks of 2012, that we were going to start allowing for U.S. clients.

And so, at that point, I think U.S. clients were opening, but I don't think he was advertising. He had not really discussed advertising with me at that point. However, later on the idea started to come up with okay, if we're going to have U.S. clients, we need

26

to, you know, like come up with a way to, I guess, protect ourselves, or to make sure that we're in line with U.S. regulations. All right.

And so that -- that was probably like around February or so -- definitely within the first quarter, that's when -- it was one day after work, you know, this idea came up with the unsolicited acknowledgement agreement. All right. And, apparently, this unsolicited acknowledgement agreement would have a certain amount of points that a U.S. client would attest to, and then they would sign it, and then we would be able to have that document in case U.S. regulators had an issue, we would be able to say well hey, we didn't solicit these clients. All right.

And so in that meeting he gave me a list of points and he said, you know, he wanted it to come from compliance. I said well, okay. So I put the points together. It was a separate one-page document. All right. And -- yeah. And then we attached it to the applications, and we started sending them out.

Q. Okay. I'm going to pause you there.

Going back as far as when SureTrader opened in November 2011, can you estimate, in the first couple of months, how many customers SureTrader had?

A. Yeah. I estimated it altogether to be maybe a

27

hundred at best. And some of those -- I think what Guy told me, some of those were not like real customers. They were just persons he knew. All right. And they weren't like, I guess, genuine customers. And so he was concerned. He's like well, we don't have real new people coming in. All right.

Q. All right.

A. So we had maybe about a hundred customers.

Q. And of those 100 -- approximate 100 customers, can you estimate how many of those customers were U.S. based?

A. Well, I -- I really don't know to be honest, because it wasn't something that I was -- like my mind was keen to keep track of at that point.

So some of them definitely were U.S., but to say well, what percentage of that initial amount was U.S., I really don't know. I mean, I would think most of them probably were U.S., but, again, I didn't really start taking note of like where the customers were coming from until like -- for to retain in my memory, until a little time later.

Q. All right. So I believe you were testifying that there came a point when you were discussing with Mr. Gentile concerns about there not being enough customers and needing to increase the number of

28

**Page 29**

1  customers.
2          Can you tell me what was the first
3  conversation where -- where the concern about the number
4  of customers came up?
5      A.  Well, like I said, Guy was -- was visually
6  frustrated, and he would tell me, he would say Philip,
7  I'm not used to this -- you know, we supposed to have,
8  like -- you know, a bunch of clients by now.  This is
9  just not going to work.
10         And I'm like well, okay.  What do you want to
11 do about it?
12         And then he would say well, okay.  We have to
13 go after U.S. customers.
14         And I would say, well, I mean, you tell me.  I
15 say, you are the one who said it's okay for us to do it.
16 So, I mean, if you want us to go after U.S. clients,
17 then let's do it.
18         So -- but I could tell it was something --
19 like he was trying to be careful about in his mind.  He
20 was like we have to be careful how we do it.  All right.
21 But, at the same time, you know -- you know, Guy's a
22 really smart guy.  He would come back with these
23 suggestions.  He would come back -- like I said, I knew
24 him to be someone who was very knowledgeable in the
25 industry.

**Page 30**

1          And so when he came back with the unsolicited
2  acknowledgement agreement -- all right -- idea, I read
3  it, and I said well, okay.  I mean, basically it's
4  telling -- it would be saying that U.S. clients were not
5  solicited.  All right.  They would be agreeing they were
6  not solicited.
7          And so once -- once that took place, Guy's
8  focus sort of shifted.  All right.  Guy would be on the
9  phone all day.  I would be listening to Guy on the phone
10 all day with various, I guess, business partners or
11 individuals, and he would be, you know, what we call
12 hustling, you know, trying to get business into the
13 firm.
14         And so once it was sort of established that
15 okay, U.S. clients were okay, he went to town on getting
16 basically as much clients as possible.  He was making
17 call after call after call after call and, eventually,
18 that what led into what would become the affiliates
19 program -- all right -- where we -- Guy eventually got
20 into contact with some of the big guys like Tim Sykes
21 and those guys who had massive platforms, and the idea
22 was if they would send their clients to us, then they
23 would get some sort of like kickback -- I think we
24 referred to them as rebates.  And so we gave -- you
25 know, the idea was to give these affiliates -- that's

**Page 31**

1  what we called them -- incentive to send as much clients
2  to us as possible.
3          So Guy, he -- like I said, that became the
4  whole thing.  All right.
5      Q.  Okay.  So let me just pause you again.  I'm
6  trying to understand the timeframe here.
7          The discussion about the unsolicited
8  acknowledgement agreement, was that within days, weeks,
9  months after SureTrader opened?
10         Can you estimate the time period?
11     A.  That would have been, I would say, about two
12 months.
13     Q.  Okay.  This would then be early 2012?
14     A.  Right.  Early 2012.  Definitely within the
15 first quarter.  So, maybe two or three months.
16     Q.  Okay.  I'm going to go back to -- you
17 described a meeting with Mr. Gentile about the
18 unsolicited acknowledgement agreement document.
19         Can you estimate when that conversation
20 occurred?
21     A.  So, again, this conversation occurred -- you
22 know, I think -- I think in my deposition I indicated
23 around February.  And so that is -- I'm thinking in my
24 mind it was around February that, you know, Guy wanted
25 me to stay behind.  There was another individual with

**Page 32**

1  him -- and it was obvious they had already discussed
2  this at length -- and so he presented this idea to me
3  with the unsolicited acknowledgement agreement, and he
4  said this, you know -- because he was referring to it as
5  a loophole.  And I remember saying -- I was like, well,
6  you know, is that going to be okay?
7          And he was like well, you know, with U.S. laws
8  you're either breaking the law or you're not breaking
9  the law, you know.  And he was like we will not be
10 breaking the law, and that's -- you know, that's it.
11 And I was like, okay.
12     Q.  Okay.  So again -- I apologize.  Let me pause
13 you there.
14         You said, asked you to stay behind.  What do
15 you mean "stay behind"?
16     A.  Right.
17         So this was not during working hours.  Like
18 the office had closed, right, and then we had the
19 meeting after work in the office.
20     Q.  Okay.  And you said "we" is that just you and
21 Mr. Gentile that were at the meeting?
22     A.  Right.  Yeah.  And there was another
23 individual there as well.
24     Q.  And who was the other individual?
25     A.  It was Karen, his wife.

**Q.** And during this meeting, what specifically was discussed?

**A.** Well, basically what it was discussed was how, you know, SureTrader can actively have U.S. clients without getting in problems with U.S. regulators. And -- and so that's when -- and, like I said, it wasn't so much discussed. It came across as if like this was sort of discussed before, like, and so the idea with the unsolicited acknowledgement agreement it was like okay. Well, this is a good idea. Da-da-da-da-da. And then Philip just type this out. It should come from compliance -- I mean, I understood that -- and we'll send this out to all the U.S. -- well, we'll make -- whenever we get a U.S. client, we'll just make sure they sign this, and that should suffice the SEC, right.

**Q.** Okay. When you say that it seemed like it was discussed before, what are you referring to?

**A.** It didn't seem like the -- the topic of how to get U.S. clients but without getting U.S. authorities on your back. It seemed like that discussion had a -- was already going on between Guy and his wife, and it was a continuing -- a continuation of that. It's like, okay. Philip, listen to these ideas. That's how it came across.

**Q.** And during the meeting when the topic of the

33

unsolicited acknowledgement agreement was discussed, how did the -- the words get created to -- to fit whatever needed to be in this document?

**A.** Guy actually wrote -- with the unsolicited acknowledgement agreement the main point of it is the points that U.S. clients would agree to. And so Guy actually -- I don't know if he typed them out or if he wrote them out, and he said well, this is the main points. And so that's was it. I think I put like a paragraph to say something to the extent of, I am a U.S. client and I -- something like that, I agree -- I can't remember, actually. But the main points were basically verbatim that -- what he had written down. It was like five or six points.

It was very basic and straightforward, actually.

**Q.** All right. I'm going to just step away momentarily from the topic of the unsolicited acknowledgement agreement and go back to opening of SureTrader in November of 2011.

When SureTrader opened, how many employees did it have?

**A.** Right.

So SureTrader it was just myself and Guy. He also brought on another lady. She wasn't really a part

34

of SureTrader. Guy also had a -- a magazine, I guess, is the best -- or like a newspaper-type thing slash magazine, and she -- I think she was sort of associated with that, but, at the same time, she still was helping with us.

And as that magazine grew, I think they got two other staff. And, again, they were doing the magazine, but then they were still helping with us. And then eventually, I think Guy just forgot about the magazine idea, and those three individuals just came -- they were officially a part of SureTrader at that time.

**Q.** All right. And what were their -- very briefly, what were their job duties at SureTrader?

**A.** Well, again, I think with the lady, I think he gave her the title of office manager because I remember later when Justin came, Justin became the office manager, and then the lady, she left. Right. So I think that was her title. And so -- but she was really responsible for the magazine. All right.

And then later on when they all basically were working for SureTrader, they basically was all doing like customer service and customer support. And so as the applications were coming in, going through the process, making sure that, you know -- you know, I had to basically teach the staff what we were looking for

35

from a compliance perspective, you know. And so it was really hands-on -- that early time was really hands-on for all of us. But Guy and I were the main ones, and then we had these other folks.

Eventually, Guy started to employ staff who actually had like -- like finance backgrounds. There was two gentlemen who came in, and -- yeah. So this is all during 2012. And so we were growing.

At that time we were -- you know, it was no longer a question of are we going to survive, you know. The clients were coming in pretty strong, you know, and it was quite --

**Q.** Can you -- all right.

So was there a physical office when SureTrader opened in November 2011?

**A.** Yes. And so --

**Q.** Can you just very briefly describe like what was the office setup?

The basic office setup?

**A.** It was a very small office. We were in, I guess, like the front corner of a building, and so the office was like a half circle, and it was an open floor plan. And so we had, I think, about maybe eight to ten desks going along the outer wall, and then Guy would sit just a little bit diagonal behind me and his desk was

36

**Page 41**

person, I guess, on a senior level, but he didn't really need approval from me with, you know, getting a website done, stuff like that.

Q. So when we talk about the formation of the company, did you and Mr. Gentile discuss whose responsibility it would be to get customers for SureTrader?

A. Oh, that was definitely Guy's responsibility. And he, you know, he -- it was his responsibility. We just had to do what he said to do. He told me straight up, this is how we're going to do it. We're going to make a lot of money. You know, he had it all thought out.

Like, I said once we opened, Guy was on the phone constantly. I was quite impressed with his, I guess, tenacity. Like, he was just non-stop making deals, talking to this one, talking to this one, trying to generate business for the firm. So he was calling everybody and --

Q. How did you know Mr. Gentile was doing what you just described?

A. Well, like I said, his desk literally was like less than 10 feet away from me, and I could hear very loudly what Guy was doing. And, like I said, he -- it was almost like he was mentoring me.

**Page 42**

So Guy would -- would be saying something loudly and he'd know like I'd hear him. So sometimes I would turn around and hear it, and he would give me the thumbs up to be like yeah, we got this one, or this, and this. So I could hear very clearly everything that Guy was doing.

The one or two times that Guy spoke quietly those were odd. And it's interesting. As we talk I'll probably talk more about that. There was a difference when Guy was just talking to some sort of like business partner than when he was talking, perhaps, like a regulator, or a lawyer, or something like that. Normally when he was talking to his business partners, he was very suave, very loud, very confident.

You could tell when he was talking to someone of more importance he was more quiet, and more reserved. So I would hear all day he was making these deals.

Sometimes I thought it was questionable because it -- like he would be talking with -- let's say business person A, and they're having a conversation about business person B, and he'd say no, no don't trust business person B. It's me and you. We're going to do this. Trust me. And five minutes later he's on the phone with business person B, and he's saying the same thing about business person A, you know. He says trust

**Page 43**

me, don't trust the other guy. And I would turn around and look and he'd be like -- after the call, he would be like, you know, Phil you gotta run circles around these guys. That's how you do it, you know.

So it was like he -- he was trying to teach me, I guess, the ins and outs of the business, you know. And it was interesting.

Q. Did he -- did he ask you for input for these conversations where he was trying to make deals with business partners?

A. He never asked me for input. And, quite honestly, I wouldn't -- I wouldn't even have known what to say, to be honest. I mean, a lot of the stuff -- you know, that was -- it was -- a lot of it I could hear he was discussing a lot of like U.S. regulations and stuff with various people, and he was saying well, no, this is going to work because of this, and this, and that. So I couldn't really give input to that because that's not -- you know, I cannot really comment on U.S. regulations.

But, like I said, he really knew what he was doing. And he, you know, would be talking with these folks back and forth constantly, you know. And yeah, he felt really excited about it and -- you know, he would give me the thumbs up a lot. Like, I would turn around -- every now and then, you know, Guy he's -- I

**Page 44**

don't know, he's an interesting character, you know. And so I get the feeling sometimes he may have been trying to show off in front of me a bit, but I don't know. But he would just say things, and I would be like okay. Okay. I guess that's how you do it.

Q. All right. So with respect to when he was on the phone. After he hung up, let's say on a particular call, would he turn to you and say, Philip, this is what just happened? Or, you know, summarize it in any way for you?

A. The only times he would do that is like he would be excited and he would say, Philip, there's some big business coming our way, man, you know, like he would say things like that. So he would hang up the phone and he would say, Philip, hey, this is going to work. This is going to work, or something like that.

It was never -- like, he never asked me for my input or my opinion on his business deals, or his conversations, and stuff like that.

The only time when Guy came to me with stuff was when there was something from the Commission -- from the SCB. And he would be like oh, Philip -- and even back then we would both go through it. He wouldn't just leave it to me. We would still, you know, both go through it, make sure we both understood it. But