# Exhibit D

Philip Dorsett
February 28, 2023

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                    PLAINTIFF,

        -against-    Case No.:
                     1:21-cv-21079-bb


MINTBROKER INTERNATIONAL, LTD., f/k/a SWISS
AMERICA SECURITIES LTD. and d/b/a
SURETRADER, and GUY GENTILE, a/k/a GUY
GENTILE NIGRO,

                    DEFENDANTS.
------------------------------------------X
```

            DATE: February 28, 2023

            TIME: 9:36 A.M.



        DEPOSITION of PHILIP DORSETT,

taken by the Defendant, pursuant to a

Subpoena, held via videoconference, before

Victoria Scro, a Notary Public of the State

of New York.

Philip Dorsett
February 28, 2023

```
                                                   Page 2
 1
 2   A P P E A R A N C E S:
 3
 4   SECURITIES AND EXCHANGE COMMISSION
       Attorney for the Plaintiff
 5     SECURITIES AND EXCHANGE COMMISSION
       450 Fifth Street, N.W.
 6     Washington, DC 20549
       BY: ALICE SUM, ESQ.
 7         ALISE JOHNSON, ESQ.
           RUSSELL KOONIN, ESQ.
 8
 9   FORD, O'BRIEN, LANDY, LLP
       Attorneys for the Defendant
10     GUY GENTILE
       275 Madison Avenue, 24th Floor
11     New York, New York 10016
       BY: MATTHEW AARON FORD, ESQ.
12         ADAM C. FORD, ESQ.
           STEPHEN R. HALPIN, III, ESQ.
13         CARA FILIPPELLI, ESQ.
14
     ALSO PRESENT:
15
     Guy Gentile
16
17
18
19
20           *         *         *
21
22
23
24
25
```

```
                                                   Page 3
 1
 2              FEDERAL STIPULATIONS
 3
 4        IT IS HEREBY STIPULATED AND AGREED by
 5   and between the parties hereto, through
 6   their respective Counsel, that the
 7   certification, sealing and filing of the
 8   within examination will be and the same are
 9   hereby waived;
10
11        IT IS FURTHER STIPULATED AND AGREED
12   that all objections, except as to the form
13   of the question, will be reserved to the
14   time of the trial;
15
16        IT IS FURTHER STIPULATED AND AGREED
17   that the within examination may be signed
18   before any Notary Public with the same
19   force and effect as if signed and sworn to
20   before this Court.
21
22
23
24
25
```

```
                                                   Page 4
 1             VIDEOCONFERENCE STIPULATIONS
 2
 3        IT IS HEREBY STIPULATED AND
 4   AGREED BY and between counsel for all
 5   parties present that pursuant to CPLR
 6   section 3113 (d) this deposition is to be
 7   conducted by video conference, that the
 8   court reporter, all counsel, and the
 9   witness are all in separate remote
10   locations and participating via
11   videoconference meeting under the control
12   of US Legal Support, that the officer
13   administering the oath to the witness need
14   not be in the place of the deposition and
15   the witness shall be sworn in remotely by
16   the court reporter after confirming the
17   witnesses identity, that this video
18   conference will not be recorded in any
19   manner and that any recording without the
20   express written consent of all parties
21   shall be considered unauthorized, in
22   violation of law, and shall not be used for
23   any purpose in this litigation or
24   otherwise.
25
```

```
                                                   Page 5
 1             VIDEOCONFERENCE STIPULATIONS
 2        IT IS FURTHER STIPULATED that
 3   exhibits may be marked by the attorney
 4   presenting the exhibit to the witness, and
 5   that a copy of any exhibit presented to a
 6   witness shall be e-mailed to or otherwise
 7   in possession of all counsel prior to any
 8   questioning of a witness regarding the
 9   exhibit in question.  All parties shall
10   bear their own costs the conduct of this
11   deposition by video conference,
12   notwithstanding the obligation by CPLR to
13   supply a copy of the transcript to the
14   deposed party by the taking party in
15   civil litigation matters.
16
17
18
19
20
21
22
23
24
25
```

Philip Dorsett
February 28, 2023

Page 50

1    P. DORSETT
2    passport, it will take a long while to
3    get," do you see that?
4    	A.	Yes.
5    	Q.	Do you know who Bob Walker is?
6    	A.	I don't recall.
7    	Q.	It looks like you respond, if
8    we go up, about 51 minutes later you
9    respond to Bob Walker, "Hello Bob, we would
10   prefer if one of your IDs was a passport.
11   However, if you do not have a passport, we
12   will accept another form of
13   government-issued ID in the interim.  With
14   regard to IBC.  Senior management has
15   worked out an agreement whereas if a U.S.
16   client wishes to open, they will only have
17   to complete an unsolicited acknowledgment
18   agreement as opposed to having an IBC.  We
19   send an unsolicited acknowledgment
20   agreement form after the client has
21   completed an application.  I hope this
22   answers your question," do you see that,
23   Mr. Dorsett?
24   	A.	Yes.
25   	Q.	You were not being truthful

Page 51

1    P. DORSETT
2    when you testified yesterday at length that
3    the unsolicited acknowledgment agreement
4    was not created in February of 2012; isn't
5    that right?
6    	A.	Well, obviously, I was
7    mistaken.  It was created a few months
8    earlier.
9    	Q.	Well, you testified about half
10   a dozen times yesterday that it was created
11   around February 2012, do you recall that?
12   	A.	There's a reason why I always
13   thought it was February.
14   	Q.	And in fact, you told an entire
15   story yesterday about a supposed meeting
16   that happened between you and Mr. Gentile
17   and Ms. Gentile months after the company
18   was up and running; isn't that correct?
19   	A.	Well, then it wasn't months,
20   that's what that means.
21   	Q.	Do you recall telling that
22   story -- strike that.
23   		Do you recall testifying just
24   maybe 30 minutes ago that the unsolicited
25   acknowledgement agreement was created in

Page 52

1    P. DORSETT
2    response to a meeting that Mr. Gentile, you
3    and Ms. Gentile had months after the
4    company was up and running, do you recall
5    that?
6    	A.	Yes, I thought it was months
7    after we started.  Turns out, it was not.
8    There is a reason why I thought it was
9    February --
10   		MR. FORD:  Please turn --
11   		MS. SUM:  Counsel, he --
12   		MR. FORD:  I've already started
13   	the next question.
14   		MS. SUM:  Counsel, allow the
15   	witness to finish answering your
16   	questions.
17   		MR. FORD:  We're pulling up the
18   	next -- I'm sorry, this is also part
19   	of Exhibit 20.  If we can go to the
20   	Zak Ahmad's e-mail on November 22,
21   	2011, as well.
22   	Q.	This is an e-mail from Zak
23   Ahmad to Philip@SureTrader.com and it says,
24   "Subject:  Compliance," do you see that?
25   	A.	Yes.

Page 53

1    P. DORSETT
2    	Q.	There is nobody else on this
3    e-mail; isn't that correct?
4    	A.	That's correct.
5    	Q.	There's nobody else on the last
6    e-mail that we saw either, was there?
7    	A.	Could you show me again,
8    please?
9    	Q.	It was sent --
10   	A.	Okay.
11   	Q.	-- to Bob Walker only to you
12   and you responded only to Bob Walker.
13   Mr. Gentile was not on that e-mail?
14   	A.	Yes.
15   	Q.	If would you have forwarded
16   this e-mail to Mr. Gentile, there would be
17   an electronic copy of that; isn't that
18   correct?
19   	A.	Yes.
20   	Q.	Do you recall testifying
21   yesterday that when the company first
22   started, Mr. Gentile was responsible for
23   accepting new clients, do you recall that?
24   	A.	Accepting new clients?
25   	Q.	Do you recall testifying

Philip Dorsett
February 28, 2023

| | Page 54 | | Page 56 |
|---|---|---|---|
| 1 | P. DORSETT | 1 | P. DORSETT |
| 2 | yesterday that Mr. Gentile was responsible | 2 | documents that your witness took them |
| 3 | for reviewing new client applications? | 3 | from SureTrader. |
| 4 |     A.   In the very beginning, both me | 4 |         MS. SUM:  When they're |
| 5 | and Guy were reviewing new client | 5 |     produced, they have bates stamp |
| 6 | applications. | 6 |     ranges, that's why we needs these |
| 7 |     Q.   But Mr. Dorsett, on this | 7 |     documents with bates ranges.  So, |
| 8 | e-mail, Mr. Gentile is not included, is he? | 8 |     we're not doing a guessing game in |
| 9 |     A.   That's correct. | 9 |     the deposition. |
| 10 |     Q.   And on the last e-mail when you | 10 |         MR. FORD:  We had this |
| 11 | responded to Mr. Walker, you did not CC | 11 |     conversation, there was an error when |
| 12 | Mr. Gentile, did you? | 12 |     it was uploaded.  It appears to have |
| 13 |     A.   That's correct. | 13 |     cut off the bates stamp, so we |
| 14 |     Q.   This e-mail is from Zak Ahmad | 14 |     provided you a folder with all the |
| 15 | to you on November 22, 2011.  Do you know | 15 |     bates stamp copies.  In the interim, |
| 16 | who Zak Ahmad is? | 16 |     Mr. Halpin will send you the bates |
| 17 |     A.   I can't remember the | 17 |     stamp. |
| 18 | individual. | 18 |         MS. SUM:  How is this?  It's |
| 19 |     Q.   Do you see the attachments, it | 19 |     been an hour, you said you were going |
| 20 | says, "Unsolicited acknowledgment | 20 |     to take breaks every hour.  Why don't |
| 21 | chaker.JPG," do you see that? | 21 |     we take a break now so that folder |
| 22 |     A.   Yes. | 22 |     can be transmitted to us so I don't |
| 23 |     Q.   Do you see where it says, | 23 |     actually have to be forced to |
| 24 | "Hello, attached is signed compliance," do | 24 |     interrupt you to find out this |
| 25 | you see that? | 25 |     information in this deposition. |

| | Page 55 | | Page 57 |
|---|---|---|---|
| 1 | P. DORSETT | 1 | P. DORSETT |
| 2 |     A.   Yes. | 2 |         MR. FORD:  I would just request |
| 3 |         MR. FORD:  Let's scroll down a | 3 |     -- I was in the middle of a line of |
| 4 |     page. | 4 |     questioning. |
| 5 |     Q.   Do you see where this says, | 5 |         MS. SUM:  This is going to |
| 6 | "Unsolicited acknowledgement agreement"? | 6 |     continue to happen until we receive |
| 7 |     A.   Yes, that's the very first one. | 7 |     the folder that you've been talking |
| 8 |     Q.   And it says, "To Swiss America | 8 |     about, which wasn't sent to us prior |
| 9 | LTD, I affirm that no way did U.S. America | 9 |     to the start of this deposition, and |
| 10 | Securities LTD solicited me to become a | 10 |     that's the cause of some of these |
| 11 | client.  I initiated contact with Swiss | 11 |     problems. |
| 12 | American Securities LTD on an unsolicited | 12 |         MR. FORD:  Ms. Filippelli, can |
| 13 | basis," do you see that? | 13 |     we scroll down? |
| 14 |     A.   Yes. | 14 |     Q.   Do you see there's a printed |
| 15 |         MS. SUM:  Counsel, where is the | 15 | name and signature on this document? |
| 16 |     bates stamp on this document? | 16 |     A.   Yes.  I was the one who |
| 17 |         MR. FORD:  This is provided by | 17 | actually put that bottom part there.  That |
| 18 |     you to us, but Mr. Halpin will send | 18 | was my input to the unsolicited |
| 19 |     you the bates stamp. | 19 | acknowledgment agreement. |
| 20 |         MS. SUM:  We need the documents | 20 |     Q.   Do you recall testifying |
| 21 |     so we're not trying to sort out where | 21 | yesterday that you had no input into the |
| 22 |     the document is from.  It lacks a | 22 | unsolicited acknowledgment agreement? |
| 23 |     bates range. | 23 |     A.   Yes. |
| 24 |         MR. FORD:  This is Exhibit 20 | 24 |     Q.   But this refreshes your |
| 25 |     and these were produced in the 15,000 | 25 | recollection that you did in fact have some |

Philip Dorsett
February 28, 2023

Page 58

1        P. DORSETT
2   input into the unsolicited acknowledgment
3   agreement?
4        A.   I was the one who put it
5   together officially and put the name at the
6   signature line there.
7        Q.   So, to be clear, you officially
8   put the unsolicited acknowledgment
9   agreement together?
10       A.   The very first one.  The
11  subsequent ones, I had no input on.
12       Q.   This refreshes your
13  recollection that your testimony throughout
14  yesterday that the unsolicited
15  acknowledgement agreement was created
16  around February 2012 was not accurate?
17       A.   Well, it had to be in November,
18  it was from the beginning.
19            MR. FORD:  We can take a break
20       now.
21            MR. KOONIN:  We still don't
22       have them.  So, find the documents.
23            MR. FORD:  You have them
24       because they're documents that you
25       produced.

Page 59

1        P. DORSETT
2            MR. KOONIN:  No, that's not it.
3       You love to say 30,000 plus.  So,
4       give us the ones you're using today
5       in your deposition, which you
6       acknowledged is the appropriate thing
7       to do.  Send us the link and that's
8       the end of the conversation.
9            MS. SUM:  Either send a link or
10      send it literally by e-mails.  This
11      isn't that difficult to do so.
12      Ms. Filippelli has been bringing up
13      these exhibits one by one pursuant to
14      your direction.  So, she has access
15      to e-mails, she has our e-mail
16      addresses.  Please have
17      Ms. Filippelli -- I'm not trying to
18      be disrespectful to you -- we request
19      the use, as you are an attorney in
20      this case to send us the documents
21      you've been pulling up as Mr. Ford
22      has been instructing you.
23           MR. FORD:  Okay, see you all in
24      ten minutes.  Thank you.
25           (At this time, there was a

Page 60

1        P. DORSETT
2       pause in the proceeding.)
3       Q.   Mr. Dorsett, during that break,
4   did you have any conversations with anybody
5   about your testimony here today?
6       A.   No.
7       Q.   When we left off, we were
8   looking at Exhibit 20, which is in an
9   e-mail that you provided to us or an e-mail
10  the SEC provided to us.
11           MR. FORD:  Can we pull that
12      document back up?  If we can scroll
13      down to the e-mail from Mr. Walker.
14      Q.   Do you see in that first
15  sentence where it says, "Hi, I was at the
16  Investors Underground seminar last
17  evening," do you see that?
18      A.   Yes.
19      Q.   Do you know what Investors
20  Underground is?
21      A.   I remember that name.  I think
22  that's one of our affiliates.
23      Q.   You had testified yesterday
24  that it was Mr. Gentile's responsibility to
25  work with the members of the affiliate

Page 61

1        P. DORSETT
2   program, do you recall that?
3       A.   Yeah, he dealt directly with
4   the affiliates in the beginning.
5       Q.   Did you ever deal with any
6   members of the affiliate program?
7       A.   There would have been times
8   when I had direct conversations with Tim
9   Sykes and some of the other -- like the
10  persons who were in charge of the
11  affiliates, yes.
12      Q.   What about Investors
13  Underground, did you have any
14  communications with anybody from Investors
15  Underground?
16      A.   I probably did.  I remember
17  they were one of the bigger ones.
18      Q.   Do you recall signing any of
19  the agreements between SureTrader and any
20  members of the affiliate program?
21      A.   I do not recall.  Now, in the
22  beginning, I don't know if Guy would have
23  had maybe signed those, but at some point,
24  Justin took over all of that.
25      Q.   When you say in the beginning,

Page 62

1  P. DORSETT
2  what time period are you referring to?
3  A.  Well, I guess we have
4  established my timing is a couple months
5  off, but Justin didn't come until about
6  mid-2012, right?  So, this was very early.
7  We had been open just about weeks, so this
8  is just the beginning.
9        MR. FORD:  Can we pull up
10       Exhibit 48.
11  Q.  Just to be clear Mr. Dorsett,
12  2014, you would not consider to be the
13  beginning, correct?
14  A.  I would say 2014 is around the
15  middle.
16       MR. FORD:  This is a marketing
17       services agreement between Investors
18       Live LLC and SureTrader.
19  Q.  Do you see that?
20  A.  Yes, I see Investors Live.
21  Q.  Do you know that Investors Live
22  and Investors Underground were the same
23  thing?
24  A.  Yeah, they were the same thing.
25       MR. FORD:  If we can go to the

Page 63

1  P. DORSETT
2       second to last page of this.  Keep
3       going.
4  A.  Just to let you know, this was
5  not an affiliate agreement that we were
6  looking at.
7        MR. FORD:  There was no pending
8       question and I'm going to strike that
9       as nonresponsive.
10       Can we please scroll to the
11       second to last page.  There it is.
12  Q.  Mr. Dorsett, is that your
13  signature there?
14  A.  Yes, it is.
15       MR. FORD:  We can pull that
16       down.
17  Q.  Do you recall testifying
18  yesterday regarding an affidavit that you
19  provided to the SEC in 2020?
20  A.  Yes.
21  Q.  And do you recall -- did the
22  SEC draft that affidavit on your behalf?
23  A.  No, I wrote it.
24       MR. FORD:  If we can go to
25       Exhibit 73.  This is an e-mail first

Page 64

1  P. DORSETT
2  from Jessica Weissman, it's on
3  August 20, 2020.
4  Q.  It says, "Good morning.  I sent
5  you the declaration for signature by
6  secured e-mail last week, please confirm
7  that you have received it," do you see
8  that?
9  A.  Yes.
10  Q.  Do you recall who Jessica
11  Weissman is?
12  A.  She was one of the second
13  people from SEC that I was speaking to.
14  Q.  Does this refresh your
15  recollection that the SEC drafted the
16  declaration?
17  A.  No, I sent what I sent to them
18  and they put it in their official form and
19  sent it back for me to sign.
20  Q.  Then it says on August 20,
21  2022, you say, "Yes, I have received it.
22  We will revert shortly," do you see that?
23  A.  Yes.
24  Q.  It looks like you sent another
25  e-mail on September 1, 2020.  So, about 10,

Page 65

1  P. DORSETT
2  11 days later, you say, "Hi, Jessica, I
3  apologize for the delay.  Please find
4  attached the signed document along with my
5  IDs.  Please note I made some changes to
6  the document wording," do you see that?
7  A.  Okay, could you scroll, because
8  I'm looking -- oh, yes, yes, sorry.  I see
9  it.
10  Q.  Does that refresh your
11  recollection that it was Jessica Weissman
12  that drafted the affidavit?
13  A.  No, I drafted the affidavit.
14       MR. FORD:  If we can pull up
15       Exhibit 1.
16  A.  I think after there was put
17  officially in the document --
18       MR. FORD:  Mr. Dorsett, there's
19       no pending question.  We've moved
20       onto another exhibit.  Your counsel
21       will have the opportunity to ask you
22       questions.  If we can scroll down to
23       that first e-mail.  Scroll up.
24  Q.  Do you see it says on Monday
25  July 13, 2020, there's an e-mail from

Philip Dorsett
February 28, 2023

Page 74

1    P. DORSETT
2    Q.   No, I'm not asking about your
3  memory, I'm asking about a fact.  Is it a
4  fact that the statement that this agreement
5  was created in February 2012 false?
6    A.   It's true that that is not
7  correct.
8    Q.   It's false, isn't it?
9    A.   Yes, it's false.  I think we
10 realize that.  I realize that now.
11   Q.   Do you remember testifying that
12 Gentile did -- that SureTrader did not do
13 any advertising, do you recall testifying
14 that today and yesterday?
15   A.   I said Guy was very against
16 advertising dollars.
17   Q.   No, what you said, as you'll
18 recall, is that he did not advertise; isn't
19 that correct?
20   A.   What I said was, Guy was very
21 much against advertising and he explained
22 the reasons why.
23   Q.   He says here he would continue
24 to use online advertisements and e-mail for
25 U.S. residents; is that correct, yes or no?

Page 75

1    P. DORSETT
2    A.   This statement looks at the
3  entirety of our time in SureTrader and
4  advertising in the beginning for Guy was
5  basically through the online affiliates,
6  later on Guy did actual real advertising
7  when he brought on a marketing person,
8  okay, so this statement starts off by
9  referring to the affiliates right he was
10 basically advertising SureTrader
11 unofficially through them but later he did
12 actually do real advertising I think when
13 the marketing person was brought on.  And
14 again, that advertising he did later, I
15 think that was just to show that he was not
16 advertising to U.S. persons.
17        MR. FORD:  We're going to
18     scroll down to paragraph 23.
19   Q.   Throughout my employment at
20 SureTrader other than paragraph 20 there
21 were no policies or procedures implemented
22 by me or to my knowledge otherwise
23 implements at SureTrader to prevent the
24 solicitation of U.S. regulations residents,
25 do you see that?

Page 76

1    P. DORSETT
2    A.   Yes, I see that.
3    Q.   That is a false statement isn't
4  it Mr. Dorsett?
5    A.   That is a very true statement.
6  We never did anything to stop U.S. clients
7  in fact we encouraged.
8    Q.   What you said is that
9  throughout your employment at SureTrader
10 meaning November 20th to July 17th there
11 were no policies or procedures implements
12 at SureTrader to prevent the solicitation
13 of U.S. residents, do you see that?
14   A.   Yes, I see that.
15   Q.   But that statement is false,
16 isn't it, Mr. Dorsett?
17   A.   No, that statement is not false
18 at all.
19        MR. FORD:  Can you please mute
20     yourself Mr. Koonin.
21   Q.   As you sit here today as chief
22 compliance officer for six years, were you
23 under any policy other than the unsolicited
24 acknowledgement agreement that SureTrader
25 implemented; is that correct?

Page 77

1    P. DORSETT
2    A.   Earlier you showed me, I think
3  it was a policy that Guy came up with,
4  right?  Guy would come up with a lot of
5  stuff that some of them he would show to me
6  or some of them he would show to the U.S.
7  regulators to show we were following U.S.
8  laws, but when I talk about a policy and
9  when I talk about a procedure, those things
10 have to do with practice.  Those have to do
11 with what you're actually doing, not just
12 what you're showing to the regulator.
13 Certainly, the only policy that we were
14 doing, that we were following, the only
15 procedure we were following when it came to
16 U.S. persons was the unsolicited
17 acknowledgement agreement, there was
18 nothing else.
19        MR. FORD:  Can we pull up
20     Exhibit 6.  Mr. Koonin's audio is
21     interfering.  Can you contact your
22     colleague and tell him to mute his
23     audio.  In the meantime, we're going
24     to pull up Exhibit 6.
25   Q.   Mr. Dorsett, this is sworn

Page 210
```
 1                 P. DORSETT
 2      pull up Exhibit 21, please.
 3      Q.    This is a document dated
 4  April 2, 2019, with a letterhead for Swiss
 5  America Securities SureTrader April 2,
 6  2019, it's addressed to Mr. Gentile.  This
 7  is after your time at SureTrader; is that
 8  correct, Mr. Dorsett?
 9      A.    Yes, I've already left at this
10  point.
11      Q.    You see where it says, "Army
12  Traders Cafe Worldwide"?
13      A.    Yes.
14      Q.    If we scroll down this says --
15  I'm sorry, scroll down to the bottom, it
16  says, "Respectfully yours, Edward Cooper,
17  chief compliance officer/MLRO," do you see
18  that?
19      A.    Yes.
20      Q.    It says Swiss America
21  securities LTD, do you see that?
22      A.    Yes.
23      Q.    I'm going to scroll back up.
24  It says, "Mr. Gentile, please note that the
25  above mentioned account Traders Cafe
```

Page 211
```
 1                 P. DORSETT
 2  Worldwide account with Swiss America
 3  Securities LTD was closed on March 22,
 4  2013.  The following were the last
 5  transaction on the related account.  Client
 6  deposited on March 22, 2013, USD $2,895.
 7  Client went negative, March 27, 2013, USD
 8  $406.15.  Client trader on March 28, 2013,
 9  Stock OWW.  Client received some dividend
10  in amount USD 13.37.  From April 1, 2013
11  platform, USD 392, 7.78. If you require any
12  additional information, please do not
13  hesitate to contact the undersigned as I
14  remain."  Do you see that?
15      A.    Yes.
16      Q.    Mr. Dorsett, when you filed
17  your whistleblower complaint in March 2016
18  about Traders Cafe about Ionne and
19  Schipone, were you aware that -- strike
20  that.
21            When you filed your
22  whistleblower complaint in March of 2016,
23  were you aware that SureTrader had shut
24  down the Traders Cafe account three years
25  earlier?
```

Page 212
```
 1                 P. DORSETT
 2      A.    I was aware that Guy officially
 3  shut them down.
 4      Q.    And you were aware that they
 5  had been shut down three years earlier?
 6      A.    I mean, yes, I guess if that's
 7  the date they were closed, then that's the
 8  date they were closed.
 9      Q.    Do you know if during
10  Mr. Gentile's cooperation with the SEC, FBI
11  DOJ and U.S. attorney's office, whether he
12  provided information to them related to
13  Mr. Ionne or Schipone for Traders Cafe?
14      A.    Not to my knowledge.  In fact,
15  I did not know he was cooperating as you
16  say.
17            MR. FORD:  All right everybody,
18       I think we can do a 15-minute break.
19       We'll come back at 3:10 p.m.
20            (At this time, there was a
21       pause in the proceeding.)
22            MR. ADAM FORD:  If I can just
23       jump in quickly before we get started
24       with the questioning.  Alise, Alice
25       and Russell, I've e-mailed about
```

Page 213
```
 1                 P. DORSETT
 2       this, but I just wanted to put it on
 3       the record that Mr. Dorsett, during
 4       his testimony today, has testified to
 5       drafting two affidavits that the SEC
 6       later filed.  We have not received in
 7       production a copy of either of those
 8       original drafts that Mr. Dorsett
 9       testified he drafted and sent to the
10       SEC.  So, I e-mailed you to put it in
11       writing and requesting an immediate
12       production of this documents.  If you
13       can get them to us today, we may be
14       able to take a break and continue to
15       question Mr. Dorsett about them.  If
16       we don't have them before the end of
17       today, then we'll seek to hold
18       Mr. Dorsett's deposition open until
19       the documents are produced and we're
20       able to set up a time of examination
21       on him for those two documents.
22            MS. SUM:  I'm prepared to
23       respond, Adam on the record, I was
24       actually typing the response, but
25       since you're raising it.  We believe
```

Philip Dorsett
February 28, 2023

Page 214

1   P. DORSETT
2   there's a misunderstanding by
3   Mr. Dorsett --
4       MR. ADAM FORD: Hold on.
5       MR. FORD: Ms. Sum --
6       MR. ADAM FORD: Alice, you
7   cannot testify, no, no. You are not
8   --
9       MS. SUM: You asked me about
10  the issue --
11      MR. ADAM FORD: You cannot
12  characterize Mr. Dorsett's testimony.
13      THE COURT REPORTER: Everybody
14  is talking at the same time.
15      MS. SUM: We have no other
16  documents that's it. You don't want
17  to hear what I have to say --
18      MR. ADAM FORD: For the record,
19  you have stated that you have no
20  further documents.
21      MS. SUM: We do not have these
22  first drafts that you've requested in
23  your e-mails.
24      MR. ADAM FORD: Also
25  Mr. Dorsett testified twice that he

Page 215

1   P. DORSETT
2   was the first drafter of two
3   affidavits and that he provided these
4   documents to the SEC. We would
5   request that the SEC take additional
6   time to locate these documents. We
7   do not think that this witness was
8   mischaracterizing anything. We
9   believe he was testifying truthfully.
10  So, we demand the SEC take additional
11  time to get these documents.
12      MR. FORD: Pull up -- Ms. Sum,
13  there's --
14      MS. SUM: We have not had an
15  opportunity --
16      MR. FORD: Your objection has
17  been recorded.
18      MS. SUM: -- raised an issue.
19      MR. FORD: It is my deposition.
20  It is impossible for the court
21  reporter to do her job when everybody
22  is talking over me. We are back on
23  the record. We are examining the
24  witness. I am continuing.
25      MS. SUM: I object to

Page 216

1   P. DORSETT
2   proceeding. You are not giving me an
3   opportunity. Your cocounsel decided
4   to put something on the record, I
5   will not allow it to go unresponded
6   to.
7       MR. FORD: This sort of
8   speaking objection -- objection to
9   form or privilege is --
10      MS. SUM: -- to raise it on the
11  record --
12      MR. FORD: Ms. Sum, this is my
13  deposition --
14      MS. SUM: It doesn't matter
15  your --
16      MR. FORD: -- that is permitted
17  under the Federal Rules of Civil
18  Procedure.
19      MS. SUM: -- the following
20  statement on the record --
21      MR. FORD: This can be put on
22  outside the presence of the witness.
23      MS. SUM: Your cocounsel
24  decided to interject --
25      MR. FORD: This can be done

Page 217

1   P. DORSETT
2   outside the presence of the witness.
3       MS. SUM: No. Stipulate to
4   strike your cocounsel's statement.
5       MR. FORD: We'll discuss
6   outside the presence of the witness.
7       MS. SUM: Your cocounsel raised
8   the issue.
9       MR. FORD: This is
10  inappropriate.
11      MS. SUM: It's on the record.
12      MR. FORD: This is
13  inappropriate.
14      MS. SUM: It is inappropriate
15  for you.
16      MR. FORD: Ms. Sum --
17      MS. SUM: -- on the record.
18  Your cocounsel interrupted you
19  deposition to put it on the record --
20      MR. FORD: Ms. Sum, please
21  stop.
22      MS. SUM: No. You don't get --
23      MR. FORD: Ms. Sum --
24      MS. SUM: -- we have the
25  opportunity to respond. You know

Philip Dorsett
February 28, 2023

| | |
|---|---|
| Page 222<br>1             P. DORSETT<br>2      A.   Yes.<br>3      Q.   Do you recall testifying<br>4  yesterday that you would have remembered<br>5  this document because you would have<br>6  remembered if you had signed this in front<br>7  of an attorney, do you recall saying that?<br>8      A.   Yes.<br>9      Q.   Based on this document, just<br>10 tell me, how were you able to determine<br>11 that it was an attorney who you signed this<br>12 document in front of?<br>13     A.   I see the stamp and the notary<br>14 public and the number.<br>15     Q.   And where does it say that this<br>16 individual is an attorney?<br>17     A.   Well, when I say an attorney,<br>18 that's the stamp and that's the notary<br>19 public.<br>20     Q.   As chief compliance officer in<br>21 the Bahamas, is there a difference between<br>22 an attorney and notary public?<br>23     A.   I think you can be a notary<br>24 public without being an attorney.<br>25     Q.   Given that you can be a notary | Page 224<br>1             P. DORSETT<br>2      A.   Well, I would think it would<br>3  make more sense that this is an attorney.<br>4  In the Bahamas, 99 percent of people who<br>5  have notary public are attorneys.  The only<br>6  ones who have notary public who aren't<br>7  attorneys are like pastors.<br>8      Q.   And Mr. Dorsett, you're so<br>9  certain because in fact what happened was<br>10 you took a physical copy of this and walked<br>11 across the street to a notary public and<br>12 had this signed without Mr. Gentile<br>13 present, isn't that a fact?<br>14     A.   No, that is not a fact, that is<br>15 a complete lie.  I challenge that.  Please<br>16 prove that to me.<br>17     Q.   Isn't it a fact that my law<br>18 firm at the time, Harris O'Brien sent you a<br>19 copy of this document for review prior to<br>20 you signing it, isn't that a fact?<br>21     A.   No, I don't recall that at all.<br>22     Q.   Isn't it a fact --<br>23     A.   No --<br>24     Q.   Isn't it a fact that in that<br>25 e-mail, it was requested by an attorney |
| Page 223<br>1             P. DORSETT<br>2  public without being an attorney, how was<br>3  it from this stamp and this information<br>4  that you were able the determine this<br>5  individual was an attorney?<br>6      A.   Because the vast majority of<br>7  notary publics are attorneys.  That's what<br>8  you get, you don't just get some person<br>9  who's just getting -- it's an attorney and<br>10 they are also a notary public.<br>11     Q.   You were not asked about the<br>12 vast majority of notary publics<br>13 Mr. Dorsett.  You said you would have<br>14 remembered it because it was signed before<br>15 an attorney, and I'm trying to ask you how<br>16 you could have possibly known from this<br>17 information on this document that this<br>18 individual was an attorney?<br>19     A.   It says before me, and I see a<br>20 notary public sign, it makes me think it's<br>21 an attorney.  So, it's true, it may not<br>22 have been an attorney, it could have been<br>23 someone only a notary public.<br>24     Q.   It was in fact an attorney,<br>25 Mr. Dorsett? | Page 225<br>1             P. DORSETT<br>2  from Harris O'Brien?<br>3      A.   Could you show me that he mail.<br>4      Q.   I'm asking, isn't it a fact --<br>5      A.   No, I don't remember that at<br>6  all.  As I said, I don't recall this<br>7  document.<br>8      Q.   If you receive that sort of the<br>9  e-mail, is that the sort of e-mail you<br>10 would have deleted?<br>11     A.   No, I probably would have<br>12 carried it to Guy.  If it was 2014 -- well,<br>13 at any point, I think I would have<br>14 discussed that with him.<br>15     Q.   Were you instructed by anybody<br>16 to delete an e-mail sending you a copy of<br>17 this affidavit to review?<br>18     A.   Only Guy deletes Sure Trader<br>19 official records.<br>20          MR. FORD:  I'm going to object<br>21      and move that as nonresponsive.<br>22     Q.   Did anybody instruct you to<br>23 delete an e-mail regarding a draft of this<br>24 document?<br>25     A.   Guy asked me to delete |

Page 230

1    P. DORSETT
2    PADorsett@Gmail.com to Guy@stockUSAinc, do
3    you see that?
4        A.   Yes.
5        Q.   It says, "Please see attached,"
6    it was sent on January 3, 2014, do you see
7    that?
8        A.   Yes.
9        Q.   It was in response to a message
10   on January 3, 2014, it said, "Can you send
11   me a copy of your latest resume?"
12       A.   Yes.
13       Q.   And you attached your resume
14   for Guy .PDF, do you see that?
15       A.   Yes.
16       Q.   And that on January 3, 2014.
17            MR. FORD:  Can we go to the
18        attachment.
19       Q.   Mr. Dorsett, this is the
20   attachment to that e-mail?
21       A.   Correct.
22       Q.   Does this refresh your
23   recollection that you sent your resume to
24   Mr. Gentile to be included in the affidavit
25   that we were just looking at?

Page 231

1    P. DORSETT
2        A.   It was not my understanding to
3    being included in any affidavit.
4        Q.   Does it refresh your
5    recollection that you received an e-mail
6    with a drafted copy of this affidavit prior
7    to --
8        A.   No, I never received an e-mail
9    with a copy of that affidavit of that
10   nature, to my knowledge.
11            MR. FORD:  Can we pull up the
12        next exhibit.  Scroll to the bottom.
13       Q.   This is an e-mail from Adam
14   Ford, do you know who Adam Ford is?
15       A.   He is the lawyer with your
16   firm.
17       Q.   It says sent January, 8, 2014
18   five days after the last e-mail we saw; is
19   that correct?
20       A.   Yes.
21       Q.   It says to Guy Gentile; is that
22   correct?
23       A.   Yes.
24       Q.   It says, "Guy, attached is a
25   copy of an affidavit that we would like

Page 232

1    P. DORSETT
2    Phillip to sign and get notarized.  Can you
3    give him this document and make sure he a
4    hundred percent agrees with everything that
5    is contained in it and get it back to us
6    signed and notarized tomorrow, thanks," do
7    you see that?
8        A.   I see that.
9        Q.   Do you see it says
10   Gentile-Dorsett affidavit.DOCX, do you see
11   that?
12       A.   Yes.
13       Q.   Do you know what .DOCX means?
14       A.   It's a document.
15       Q.   It's a Microsoft Word document,
16   right?
17       A.   Okay, I just know it's a
18   document.
19       Q.   Do you recognize the little
20   blue W?
21       A.   Oh, yes, it's a Word document.
22       Q.   Does this refresh your
23   recollection that you received a copy of
24   this?
25       A.   No, it does not.  You need to

Page 233

1    P. DORSETT
2    send me the e-mail where it says I received
3    it.
4        Q.   Do you see where it says from
5    Guy Gentile at the top of this e-mail?
6        A.   Yes.
7        Q.   And it says date, January 8,
8    2014, 11:47?
9        A.   Yes.
10       Q.   And it says to suretrader.com?
11       A.   Yes.
12       Q.   Do you see where it says "FW:
13   Privileged and confidential"?
14       A.   Correct.
15       Q.   Do you know what FW means?
16       A.   It's a forward.
17       Q.   So, is it fair to say that
18   Mr. Gentile was forwarding you the e-mail I
19   just showed you from Harris O'Brien?
20       A.   I need to see where I received
21   the e-mail because the e-mail that he
22   received wasn't claimed privileged and
23   confidential, was it not?  Can I see the
24   document again, please.
25       Q.   Mr. Dorsett, it says, "Phillip

Page 234

1    P. DORSETT
2  please review attached.  I'll be in the
3  office early tomorrow.  Thanks, Guy
4  Gentile, president."
5        MR. FORD:  Scroll up.
6     A.   No, can I see the actual
7  document, the actual affidavit --
8     Q.   Mr. Dorsett, we are getting
9  there.  I just want to know having now seen
10 this e-mail, forwarding an e-mail with this
11 attachment, does this refresh your
12 recollection that you saw --
13    A.   No, it still does not
14 refresh -- I still --
15    Q.   Mr. Dorsett, do you see where
16 it says, "Can you give him this document,
17 make sure that he one hundred percent
18 agrees with everything that is contained in
19 it and get it back to us signed and
20 notarized tomorrow," do you see where it
21 says that?
22    A.   Yes.
23    Q.   If you received a document like
24 that from the president of the company to
25 which you're the chief compliance officer

Page 235

1    P. DORSETT
2  of, is that the type of thing you would
3  have done?
4     A.   Sorry, that message was to me?
5  This message is from Adam Ford to Guy.
6     Q.   Mr. Dorsett, you received an
7  e-mail --
8        MR. FORD:  I'm going to move to
9     strike the last response, it's
10    nonresponsive.
11    Q.   If the president of SureTrader
12 forwarded you an e-mail, "can you give this
13 document to Phillip," is that the type of
14 thing you would have read?
15    A.   Well, I would hope so.  But the
16 problem is --
17    Q.   Mr. Dorsett --
18    A.   -- that's the point.  Can I see
19 the document again, please.
20    Q.   Mr. Dorsett, if he said, "make
21 sure that he one hundred percent agrees
22 with everything that is contained in it,"
23 when you got the e-mail as chief compliance
24 officer of the company, would you have made
25 sure everything was accurate?

Page 236

1    P. DORSETT
2     A.   Well, I don't recall receiving
3  this e-mail, and so this e-mail was not
4  sent to me.
5     Q.   Let's go back up.  There you
6  go, Mr. Dorsett, the e-mail that was sent
7  to you on January 8th, 2014 at is
8  11:47 p.m. attaching the affidavit, do you
9  see it, yes or no?
10    A.   Yes, I see the e-mail that's
11 sent.
12    Q.   Can we please pull up the
13 attachment to this e-mail? I'm not asking
14 you to comment on the contents, just look
15 at this and confirm this is the same
16 affidavit we've been talking about.
17    A.   As I'm reading this, I think
18 this is the document that Guy was referring
19 to when he was saying, "blame my compliance
20 officer."
21       MR. FORD:  Moved to strike what
22    was nonresponsive.
23    A.   Can I see the document that has
24 my signature on it, please.
25    Q.   Mr. Dorsett, we're going to

Page 237

1    P. DORSETT
2  keep scrolling.  Do you notice any
3  differences?
4     A.   That's why I want to see -- can
5  you put them side by side?
6        MR. FORD:  Let's go down to the
7     bottom.
8        MS. FILIPPELLI:  Do you want me
9     to pull up the word document?
10       MR. ADAM FORD:  Our system
11    converts it from Word to PDF.
12       MR. FORD:  Please pull up the
13    word attached for the witness to see.
14       MS. SUM:  For what it's worth,
15    I think he was asking you to pull up
16    the signed version since you're
17    asking him --
18       MR. FORD:  Ms. Sum, you have at
19    it when it's your turn.
20       MS. SUM:  It's not about having
21    at it.  It's about making it more
22    efficient.
23       MR. FORD:  Scroll all the way
24    to the bottom.
25    Q.   Do you see where it says, dated

|  | Page 238 |
|---|---|
| 1 | P. DORSETT |
| 2 | New York, New York, January underscore |
| 3 | 2014, then Philip Dorsett, do you see that? |
| 4 | A.    Yes, I see that. |
| 5 | Q.    This was a copy of a word |
| 6 | document that was forwarded to you by the |
| 7 | president of SureTrader, Guy Gentile, with |
| 8 | annotation, "to please review and make sure |
| 9 | a hundred percent of it was correct," and |
| 10 | your testimony is that you don't recall -- |
| 11 | A.    That annotation was not in the |
| 12 | e-mail from Guy. |
| 13 |         MR. FORD:  Let's go back to |
| 14 |      Exhibit 4.  Let's go to paragraph |
| 15 |      eight. |
| 16 | Q.    SureTrader maintains a website |
| 17 | at the URL SureTrader.com, true? |
| 18 | A.    Yes, that was correct. |
| 19 | Q.    The website is designed to |
| 20 | prevent access by U.S. based persons, isn't |
| 21 | that consistent with the document I showed |
| 22 | you earlier that if a U.S. based person |
| 23 | attempted to access the SureTrader website, |
| 24 | a pop up blocker would come up before |
| 25 | having entering the password and login, is |

|  | Page 239 |
|---|---|
| 1 | P. DORSETT |
| 2 | that consistent with that? |
| 3 | A.    You're referring to the |
| 4 | document that was referenced after I left |
| 5 | the company by Mr. Darville? |
| 6 |         MR. FORD:  We're going to go |
| 7 |      ahead and pull up the document. |
| 8 |         MS. FILIPPELLI:  I'm sorry, |
| 9 |      which document? |
| 10 |         MR. FORD:  Sorry, one second. |
| 11 | A.    Can I see my signature again, |
| 12 | please, if it's okay? |
| 13 |         MR. FORD:  It's Document 44. |
| 14 |         THE WITNESS:  Can I see my |
| 15 |      signature? |
| 16 |         MR. FORD:  You requested that |
| 17 |      you see the document and then we'll |
| 18 |      go one by one.  Let's look at |
| 19 |      Document 44. |
| 20 | Q.    Do you recall looking at |
| 21 | document 44 earlier? |
| 22 | A.    I remember you showing me this. |
| 23 | Can you show me the clearer version, |
| 24 | please, so I can read it? |
| 25 | Q.    Sure.  Mr. Dorsett, is it not a |

|  | Page 240 |
|---|---|
| 1 | P. DORSETT |
| 2 | fact in 2014 if a person with a U.S. based |
| 3 | IP address attempted to access Sure |
| 4 | Trader's website, this pop up blocker would |
| 5 | pop up; is that a fact? |
| 6 | A.    No, I would not say that's a |
| 7 | fact.  In fact, what you are looking at |
| 8 | here now, I think if this was -- I think I |
| 9 | may have heard them talking about this and |
| 10 | this would have been very late in my tenure |
| 11 | in the company.  And as the communication |
| 12 | between Mr. Darville and the regulators |
| 13 | suggested, it seems that was after I had |
| 14 | already left. |
| 15 |         MR. FORD:  We'll pull this |
| 16 |      document down.  We're going to go |
| 17 |      back to Exhibit 3.  This is your |
| 18 |      whistleblower complaint that you |
| 19 |      submitted to the SEC. |
| 20 | Q.    Are you aware that SEC |
| 21 | whistleblowers are entitled to a percentage |
| 22 | of recovery as a result of an action |
| 23 | successfully brought by the SEC? |
| 24 | A.    I'm aware of that now, but I |
| 25 | certainly was not aware of that -- |

|  | Page 241 |
|---|---|
| 1 | P. DORSETT |
| 2 | Q.    I'm asking if you're aware of |
| 3 | that now. |
| 4 | A.    Yes, I am aware of that now. |
| 5 | Q.    What is your understanding of |
| 6 | the SEC recovery you're entitled to if |
| 7 | they're successful in this action? |
| 8 | A.    I don't have that deep of a |
| 9 | knowledge or understanding of it. |
| 10 | Q.    Do you know if it's 20 percent? |
| 11 | A.    I don't know what percent. |
| 12 | Q.    Thirty percent? |
| 13 | A.    I don't know. |
| 14 | Q.    Mr. Dorsett, do you think |
| 15 | you're going to get money if the SEC wins |
| 16 | this case? |
| 17 | A.    I do not know and that |
| 18 | certainly was not my motivation at all.  My |
| 19 | motivation was the confidentiality of the |
| 20 | program. |
| 21 |         MR. FORD:  Let's go to page 8. |
| 22 | Q.    There's a question on this SEC |
| 23 | whistleblower questionnaire where it says, |
| 24 | "Identify with particularity any documents |
| 25 | or other information in your submission |

Philip Dorsett
February 28, 2023

Page 306
1  P. DORSETT
2  your recollection that you were not working
3  for SureTrader in August of 2017?
4       A.   My exit letter was received in
5  August, my recollection, and I can actually
6  check that because I still have it.
7       Q.   Did you produce that document
8  to the SEC in the 15,000 documents you gave
9  them?
10      A.   That was not produced to the
11 SEC to my knowledge.  That document, all of
12 this has already been squashed away.  This
13 is like negotiation back and forth.  That
14 document was the actual exit document, the
15 check and it actually had the breakdown.
16 You mentioned the loan I received because
17 they took that out and it was a proper,
18 official document required by Bahamian law.
19      Q.   So, do you recall producing
20 15,000 documents to the SEC?
21      A.   I don't know how much documents
22 were there.
23      Q.   Mr. Dorsett, it's just a yes or
24 no question.  I understand this is --
25      A.   I don't remember.

Page 307
1  P. DORSETT
2       Q.   I'm asking you just yes or no,
3  do you recall producing 15,000 documents to
4  the SEC in this action?
5       A.   I don't recall the number.
6       Q.   When you produced those
7  documents, did you select only certain
8  documents to produce to the SEC?
9       A.   Please clarify.
10      Q.   Did you produce all SureTrader
11 documents in your position to the SEC when
12 you produced the documents in this case,
13 yes or no?
14      A.   No, actually.  I think I have
15 quite a bit more.
16      Q.   How did you determine which
17 will documents to give to the SEC and which
18 documents to hold back?
19      A.   I can't recall at this point.
20 I can't recall at this point.  I think --
21      Q.   Did the SEC instruct you to
22 take certain documents out of the
23 production?
24      A.   No.  I think -- well, I can't
25 recall, but I think it was more or less

Page 308
1  P. DORSETT
2  that e-mails that I was able to send to the
3  SEC but actual documents a lot of those --
4  it's a lot of stuff -- I'm still actually
5  finding them I don't know exactly what Guy
6  did to the computer but I'm still finding
7  stuff to this day and I'm like what is this
8  some of it is coded stuff I can't read.  A
9  lot of it is that.  A lot of that wasn't
10 actually sent, it had to do, I think, just
11 with e-mails, company e-mails that's what
12 it was.
13      Q.   That was on your SureTrader
14 laptop?
15      A.   This was on my personal laptop
16 that Guy put certain codes on.
17      Q.   When you say the very
18 beginning, please specify the exact time
19 period you're referring to.
20      A.   This would have had to be late
21 2011 or early 2012.  He asked if he could
22 take my laptop home because he wanted to
23 back some stuff on it and he said now if
24 something happens to the work computer
25 we'll be okay.

Page 309
1  P. DORSETT
2       Q.   Understood.  Therefore, none of
3  the documents that you produced from your
4  personal computer to the SEC are after
5  2012; is that correct?
6       A.   None of them are after 2012?
7  No.
8       Q.   Mr. Dorsett, you just said Guy
9  instructed you to back things up --
10      A.   He did not instruct me.  He did
11 it himself and he told me.
12      Q.   So, here is my question --
13           MS. SUM:   Allow him to finish
14      answering the question.
15      A.   He explained to me --
16      Q.   Mr. Dorsett, I'm asking about
17 the time period that something happened.
18 Your testimony is that Mr. Dorsett backed
19 up documents onto your computer in 2012, we
20 would not expect to see any documents on
21 your personal computer after 2012; isn't
22 that correct?
23      A.   I did not say that he backed up
24 documents.  I said he did something to my
25 computer.  I did not know what he did, but

Page 310

1        P. DORSETT
2    he said if anything happens to us, we have
3    a back up.  In fact, it wasn't until years
4    later until -- and that computer, I stopped
5    using it -- literally, the hard drive
6    crashed and I had to get it
7    reconstructed --
8        Q.    What year did the hard drive
9    crash?
10       A.    I think 2016 and it sat there
11   over eight years because I spent a lot of
12   money to get it repaired.  The IT person
13   who I hired told me that the way he had to
14   reconstruct my hard drive caused my files
15   to be all over the place.  Looking at my
16   family photos, I see some SAS documents and
17   I press on it and I see a bunch of codes
18   and stuff.  That's when I see a bunch of
19   stuff at that time --
20       Q.    What year did you have the hard
21   drive reconstructed, Mr. Dorsett?
22       A.    I think that was around, I
23   saved up to get it reconstructed and I
24   wanted to let him put a new computer disk,
25   right, so I think that was around 2017 that

Page 311

1        P. DORSETT
2    I built -- I had to build the new laptop
3    and then it was later that year -- like I
4    said, a lot of it was just coding gibberish
5    that I couldn't understand and it was
6    sometime later that I was going through the
7    coding gibberish and stuff and then i was
8    going in my e-mails and I realized, buried
9    in my e-mails was Swiss America Securities.
10   It dawned on me, you know what, this had to
11   have been there from Guy -- I don't know
12   what he did, but whatever he did, it's
13   literally still on my computer to this day.
14           MR. FORD:    Can we go back to
15       the Exhibit 3.
16       Q.    As we pull that up, did the SEC
17   instruct you to remove privileged
18   communication from the e-mails that you
19   were transmitting?
20       A.    Yes, I think they said make
21   sure nothing is privileged between anything
22   to do with a lawyer or anything like that.
23       Q.    Can you please provide me the a
24   name of the law firm that conducted the
25   privilege review?

Page 312

1        P. DORSETT
2        A.    Sorry, what do you mean by a
3    privilege review?
4        Q.    You said the SEC instructed you
5    to remove privileged documents, did you
6    hire a law firm to do that?
7        A.    No, I didn't hire a law firm.
8        Q.    Did they hire a law firm to do
9    that, yes or no?
10       A.    No.  They told me they couldn't
11   receive anything that had privileged
12   communications, and so what I did was, I
13   tried to do a search for the company's
14   lawyer and I think I just deleted those to
15   be honest.  Anything that came up with
16   Michael Miller's, name I just deleted them.
17       Q.    So, they would be available
18   then in your Gmail trash; is that correct?
19       A.    Well, this is sometime ago -- I
20   mean, I don't know.  Interestingly enough,
21   the very week that it became known to the
22   courts that I was in possession of Swiss
23   America Securities e-mails, my Gmail was
24   actually hacked.  And that's when I started
25   following this case because I wanted to log

Page 313

1        P. DORSETT
2    in to see the exact time that you guys
3    became aware of it.  My Gmails were hacked
4    and security e-mails were deleted.
5        Q.    Mr. Dorsett, when did you make
6    the SEC aware that you had these documents,
7    what year?
8        A.    I can't recall.  I think it
9    would have been -- you mean the e-mails?
10       Q.    No.  When did you tell the SEC
11   that you had access to these documents
12   approximately what year?
13       A.    When you say these documents
14   please clarify.
15       Q.    The documents you obtained from
16   SureTrader?
17       A.    I did not obtain documents from
18   SureTrader if you were talking about the
19   documents that Guy backed up to my computer
20   I think I made SEC aware of that just
21   recently, like I don't know -- maybe last
22   year or the year before I'm not sure I'll
23   have to check my records.
24       Q.    You never told Sajaad Matin in
25   2016 that Guy Gentile backed up documents

Page 338

1  P. DORSETT
2  and Ms. Johnson, it is not your
3  candor at issue here, it is the
4  candor of the man you put in front of
5  this tribunal.
6      MR. ADAM FORD:  The final issue
7  Mr. Dorsett's testimony raises is
8  that his statement that around the
9  time it became known that his
10 e-mails -- that these documents were
11 at issue and that he was hacked and
12 thousands of e-mails were deleted.
13 Can I ask you, were you aware that
14 this hack had happened?  Was this
15 something -- do you know about this?
16     MS. SUM:  My understanding is
17 this happened after April when he
18 already made that transmission to us.
19 The 11,000 was the universe.  When we
20 refer to the is 11,000, that's from
21 that snapshot in time from April of
22 2022, but parked somewhere in the SEC
23 where it was inaccessible for review.
24     MR. FORD:  Okay, I appreciate
25 that.  In any event, I think the

Page 339

1  P. DORSETT
2  issue is that all of this raises is
3  we have significant issues about the
4  fulsomeness and the propriety of
5  Mr. Dorsett's production of document
6  to you and that's why we're going to
7  need -- I mean, had he admitted -- he
8  testified he has lots more documents.
9      MS. SUM:  We were not aware.  I
10 want to make the representation on
11 the record, because guess what, we
12 would have asked for them.
13     MR. FORD:  I'm sure you would
14 have.
15     MS. JOHNSON:  I would point
16 out, this is just voluntary
17 production.  No subpoena.
18     MR. FORD:  But you have
19 represented to the court, right.
20 Again, there have been
21 representations to the court and I
22 think we all believe and agreed that
23 the documents that Mr. Dorsett were
24 all documents in his position, not
25 some random subsect.

Page 340

1  P. DORSETT
2      MS. JOHNSON:  I don't think we
3  ever represented that.
4      MR. FORD:  By the way, we're
5  going to have --
6      MS. SUM:  -- we would have
7  asked for it --
8      MR. FORD:  Adam, let me
9  interrupt.  This is all going to go
10 before the judge obviously, if there
11 are objections related to the
12 deposition that need to get on, that
13 was the intent.  Sounds like
14 everybody got them on.  It's been a
15 very long day for the court reporter
16 and I say that if we have some sort
17 of disagreement, we're going to go
18 before the court and that will be
19 excused and call it a night for
20 everybody.
21     MS. JOHNSON:  That we agree on.
22     MS. SUM:  We do need to square
23 away the dates and I did want to
24 raise --
25     MS. JOHNSON:  One thing --

Page 341

1  P. DORSETT
2      MS. SUM:  Do you want to excuse
3  Madam Court Reporter?
4      MS. JOHNSON:  Yes, she can go.
5      (Whereupon, the examination of
6  this witness was concluded at
7  6:07 P.M.)