# Exhibit A



**Fwd: FW:**

▮▮▮▮▮▮▮▮

▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮

▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

**From:** Guy Gentile </O=M2WEX/OU=EXCHANGE>
**Date:** Saturday, June 6, 2015 at 3:51 PM
**To:** " Carla Marin" < carla@carlamarin.com>, "Philip Dorsett" <philip@suretrader.com>

No client has direct market access – Principal trading only. – we did do agency from Nov-2011 to May 2015.

Suretrader.com has a popup disclaimer & on ever page of its website.

All brokerage US clients have to sign a non-solicitation acknowlagement.

We do not target US clients in our ads.

Our banners say not intented for US Persons.

Our office is in the Bahamas.

We have staff of 25-30 people.

Potential Issues: Some SEC, Some IRS.

We need a review of all adveristing to ensure comlpiance with SEC Rule 15a-6

We need a review of Candice and Guy work out of the holding company to insure its not deemed dealer or broker activity.

Review of having Banking accounts in the US.

Review of offering ACH services to clients with US accounts.

Review of offering a US phone number for exisiting US clients.

Review of certificate from Delaware State from providing corporate servcies for Swiss America Securities, Ltd.

Review of filing of fuctitus name (Swiss America Securities, Ltd) is the state of Florida.

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

**3 attachments**



📄 **Gentile FINRA Wells Final.pdf**
261K

📄 **Gentile - Wells Exhibits.pdf**
779K

📄 **Philip Dorset Affidavit.pdf**
797K

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL



# EXHIBIT B

CONFIDENTIAL

GENTILE0005089



# EXHIBIT C

CONFIDENTIAL

GENTILE0005091



CONFIDENTIAL
GENTILE0005092

EXHIBIT D

CONFIDENTIAL

GENTILE0005093

**Swiss America Securities, Ltd (SAS) TERMS & CONDITIONS**

Use of this website is subject to your acceptance of the following terms and conditions.

By entering this website and reading or using any of the information contained herein, you hereby acknowledge that You, of your volition, are requesting information and documentation pertaining to opening an account with SAS (SureTrader) under the auspices and using the execution, custodial and administrative services of SAS.

You understand and agree that all information obtained from/at this website is in no way to be interpreted as legal, taxation, or investment advice, and you understand that there has been given no expressed guarantee or warranty on any service or product by the SAS, its agents, representatives or any of its affiliate sites.

You further understand and agree that all transactions, communications and exchanges of information using this website are to be considered as having taken place in the jurisdiction in which the office is domiciled in The Bahamas.

You further understand that this website is operated in compliance with the laws of the jurisdiction in which the office is physically located is The Bahamas. Compliance with the laws of the jurisdiction in which you are a resident or citizen is your responsibility alone. SAS, its agents, representatives or any of its affiliate sites, only conduct business in the jurisdiction in The Bahamas. Neither SAS, its agents, representatives or any of its affiliate sites, by offering you the opportunity to do business through them are agreeing to subject themselves to the laws, customs and procedures of the jurisdiction of your residence.

None of the information contained herein constitutes an offer to buy or sell a financial instrument. SAS is liable neither for the completeness and accuracy of the information given, nor for any loss incurred as a result of action taken on the basis of information provided here or in any other SAS publication. SAS expressly reserves the right to alter prices or product composition at any time.

**Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**

**Click continue below if you are a Non-US residents and you have read and understood SAS policy with regard to US customers and would like to continue.**

CONFIDENTIAL

GENTILE0005094

# EXHIBIT E

CONFIDENTIAL



# UNSOLICITED ACKNOWLEDGEMENT AGREEMENT

## To: Swiss America Securities Ltd:

i.   I affirm that in no way did Swiss America Securities, Ltd solicit me to become a client. I initiated contact with Swiss America Securities, Ltd on an unsolicited basis.

ii.   I understand that Swiss America Securities, Ltd does not target or intend their services for United States Citizens or residents. I acted on my own behalf in my choice to open an account, transact business and use the services of Swiss America Securities, Ltd.

iii.   I acknowledge as a United States Citizen or resident that I have reporting obligations to the United States Government of income/loss, money transfers to an offshore brokerage firm, or ownership or control of a foreign entity.

iv.   I have read all the disclaimers on Swiss America Securities, Ltd.'s websites and account documentation and agree to the contents and terms of those disclaimers.

v.   I understand that Swiss America Securities, Ltd does not provide legal or tax advice and indemnify Swiss America Securities, Ltd for any issues that may arise in regards to reporting requirements.

vi.   I attest that I have independently sought professional legal and tax advice before opening an account with Swiss America Securities Ltd.

Printed Name: _____

Signature:        _____

# EXHIBIT F

CONFIDENTIAL

GENTILE0005097

```
                                                          1
        D8D7SECC
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------x
 2
 3   SECURITIES AND EXCHANGE COMMISSION,
 3
 4                  Plaintiff,
 4
 5           v.                          13 Civ. 2575 (GBD)
 5
 6   GIBRALTAR GLOBAL SECURITIES, INC.
 6   and WARREN A. DAVIS,
 7
 7                  Defendants.
 8
 8   ----------------------------------x
 9
 9                                       August 13, 2013
10                                       12:00 p.m.
10
11   Before:
11
12                    HON. GEORGE B. DANIELS
12
13                                       District Judge
13
14                       APPEARANCES
14
15   JAMES KIDNEY
15        Attorney for Plaintiff
16
16   DEFEIS O'CONNELL & ROSE, P.C.
17        Attorneys for Defendants
17   BY:  NICHOLAS DEFEIS
18        PHILIP PATTERSON
18
19
20
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

CONFIDENTIAL

GENTILE0005098

2

D8D7SECC

```
 1               (Case called)
 2               (In open court)
 3               MR. KIDNEY:  Good morning.  James Kidney for the
 4    plaintiff Securities and Exchange Commission.
 5               THE COURT:  Good morning.
 6               MR. DEFEIS:  Good morning, your Honor.  Nicholas
 7    DeFeis and Philip Patterson for the defendants Warren Davis and
 8    Gibraltar Securities.
 9               THE COURT:  Good morning.  Let me hear defense on
10    their motion.  Is that you, Mr. DeFeis?
11               MR. DEFEIS:  That would be me.  Thank you.  I guess
12    there are essentially two claims made by the SEC, both of which
13    we argue are deficiently pled:  One is that these defendants
14    solicited U.S. customers without being licensed, essentially to
15    operate it as a broker dealer in the United States.
16               And we contend principally -- and I should say as a
17    preliminary matter, that website is currently down.  It hasn't
18    been in operation.  Gibraltar is in the process of winding down
19    itself.  I should further indicate that we are aware of no
20    cases that have been brought or sustained relying solely on the
21    presence of a website as a solicitation in any way, and we
22    think that the website did nothing to solicit within the terms
23    of the statute itself, and even within the terms of the
24    interpretive guidance given about it.  There were no phone
25    calls made to people in the United States, no mailings, no
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL

GENTILE0005099

3

D8D7SECC

1    spam, no advertising whatsoever, no presence whatsoever within
2    the United States.  And as the SEC itself points out in its
3    interpretive release -- which we cite at page 12 of our opening
4    brief -- "The Commission does not believe as a policy matter
5    that registration is necessary if U.S. investors have sought
6    out foreign broker dealers outside the United States and
7    initiated transactions in foreign securities markets entirely
8    of their own accord."  That is precisely what this case is
9    about.
10          The case has been under investigation for years.
11    There is a parallel action pending before your Honor, as you
12    know, involving some additional defendants, but also involving
13    other investors of a substantial amount.  There was an
14    investigation and a settlement in Florida involving still
15    additional investors.  The SEC obtained records as part of its
16    investigation through the Bahamian Security Commission -- with
17    the cooperation, by the way, of my client and his company -- of
18    19 investors that are listed in the subpoena, and they have yet
19    to point to someone who was actually solicited.
20          All of the transactions involved in this case -- and
21    even common sense tells us could take place -- were initiated
22    by the customers.  These customers went to Gibraltar for their
23    own reasons, and common sense tells us that you don't just surf
24    the Web thinking about what potential brokerage opportunities
25    there are for you.  None of these customers involved or

             SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

CONFIDENTIAL

GENTILE0005100

4

D8D7SECC

1    investors involved in the various SEC complaints -- and, by the
2    way, in the companion action just about all those investors are
3    Canadian, and I think the SEC itself agrees that 80 percent of
4    the traffic based on its website statistics were from Canada.
5              THE COURT:  Well, I don't think I had an opportunity
6    to see the websites.  Is there attached a copy of any of the
7    information attached to any of the affidavits?
8              MR. KIDNEY:  No, it's described in our brief fully in
9    the complaint.
10             MR. DEFEIS:  Well, it's selectively described.  It's
11   eight pages long -- when it existed.  It no longer exists.  And
12   the SEC, pardon me, relies on in my view the essentially junk
13   science to establish that customers were solicited by this
14   website.  They haven't pointed to any of their customers
15   involved in these complaints or these investigations who
16   actually were solicited or drawn to the website as a result of
17   what is there, and they certainly have this within their power.
18   Common sense tells us that that's not the way anyone would
19   decide to open a brokerage account.  Then they use this web
20   analyzer tool which every day -- and they cite this in the
21   complaint.  You know, we get the complaint, we look at the web
22   analyzer, and we see that every day of the week, whenever you
23   try it, including the day that we filed the reply brief, says
24   that there are 2,200 some odd people who came in to view the
25   site.  It's meaningless, but they decided to cite it.  But it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                    GENTILE0005101

D8D7SECC

5

1   proves absolutely nothing.
2           Then they rely on language in the complaint to
3   essentially -- I don't know how they think that the court is
4   going to ignore the fact that, yeah, the website is in
5   English -- of course the national language of the Bahamas is
6   English.  Everybody speaks English there -- the currency is in
7   U.S. dollars.  And of course the Bahamian currency is tied to
8   the U.S. dollar on a one-to-one basis.  I mean there is really
9   no reason to make the jump between this website and the
10  solicitation of any U.S. customers whatsoever.
11          THE COURT:  Would it be incorrect or inaccurate to
12  characterize the website as an advertisement or including an
13  advertisement?
14          MR. DEFEIS:  I don't know.  Obviously, the website is
15  promotional in some way.  Our law firm, every law firm in the
16  city that I know of has a website.  I think we are required to
17  have some sort of legend that may say this is advertising.  But
18  is it the solicitation of customers anywhere?
19          The SEC itself has indicated in its interpretive
20  guides that the mere presence of a website is not enough to
21  make out a solicitation of U.S. customers.  And they have
22  adequate opportunity during this investigation to point to U.S.
23  customers who were actually solicited as a result of the
24  website, and they just don't exist.
25          So, they ask the court to draw the inference that some

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                                      GENTILE0005102

6

D8D7SECC

```
 1   U.S. customers must have come to the website as a result of its
 2   just barely being there, but I think common sense tells us it's
 3   not the case.
 4           THE COURT:  Well, the difficulty that I have initially
 5   is answering I guess two questions.  Who are you soliciting
 6   through the website?  And how does it exclude rather than
 7   include U.S. investors?
 8           MR. DEFEIS:  I don't think it's required to exclude
 9   U.S. investors.  The key is whether U.S. investors initiated
10   the content.  That's what it says in the interpretive release
11   which we cite.  They give some examples --
12           THE COURT:  Well, U.S. investors don't initiate the
13   contact if they do so in response to an advertisement or
14   solicitation.
15           MR. DEFEIS:  That's right.
16           THE COURT:  So, the first question that I have is, all
17   right, I have a website -- and I assume that it's not critical
18   to your argument that I make some determination that the
19   website does not constitute a solicitation.
20           MR. DEFEIS:  No, it's not critical.  You could still
21   determine that it is a solicitation or an advertisement of some
22   kind, but you still have to determine was it targeted to U.S.
23   customers in any way.
24           THE COURT:  That's what I'm asking.
25           MR. DEFEIS:  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

CONFIDENTIAL

GENTILE0005103

7

D8D7SECC

```
 1              THE COURT:  Well, who is it targeted to?
 2              MR. DEFEIS:  The investing community, and
 3    already-existing customers who might have heard about Gibraltar
 4    in some way.
 5              THE COURT:  Well, it can't be existing customers who
 6    heard about Gibraltar.  If they are already existing
 7    customers --
 8              MR. DEFEIS:  All right.  In the same way somebody
 9    checking out a law firm or an accounting firm would say, oh,
10    let me just see what's on their website.
11              THE COURT:  So, give me an example of who is being
12    solicited.
13              MR. DEFEIS:  I'm not -- I think it's informational.
14    So I guess I hesitate -- I don't think we have to determine --
15    it's not critical to our argument that the court find that it
16    doesn't solicit at all.
17              THE COURT:  Well, it has to be critical unless you can
18    answer that question.  Because if it's a solicitation, then you
19    are soliciting customers, and so the natural question is which
20    customers are you soliciting.
21              Now, if you say you are only soliciting Chinese
22    customers, then I can understand it.  If they want to argue
23    that you are only soliciting U.S. customers, that's kind of
24    difficult to argue since I don't hear anything that directly
25    says this is supposed to be only to U.S. customers.  But if you
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL

GENTILE0005104

8

D8D7SECC

1    say it's a general solicitation, then it obviously begs the
2    question.  If you say that general solicitation includes
3    Canadians, then in what way at this stage of the proceeding am
4    I supposed to say the general solicitation doesn't include
5    Americans, U.S. citizens?
6              MR. DEFEIS:  I think because you have to look at the
7    interpretive -- you have to look at the interpretive guidance,
8    which basically says the mere presence of a website does not
9    constitute solicitation of U.S. customers.  And you do not have
10   to have these legends or warnings excluding U.S. customers to
11   stay away.
12             I mean if the case goes forward, you know, we go to
13   the next step and look at what kind of compliance procedures
14   there are in effect, and what a potential customer would have
15   to provide in order to be able to open an account at Gibraltar.
16   But again, this defunct website was not targeted to U.S.
17   customers, it was informational.
18             THE COURT:  Well, again, that's why it can't be
19   just -- if it's just informational and that's the determinative
20   factor, then it's not a solicitation.  If it's a solicitation,
21   if one of the purposes or the primary purpose is to attain new
22   customers, if they get the benefit of that argument at this
23   stage of the proceedings --
24             MR. DEFEIS:  Right.
25             THE COURT:  -- then the question is:  Is there any way
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9

D8D7SECC

1  that you can look at this website and determine that it is
2  targeting a particular customer?  Or is there any way that you
3  can look at this website and say that it's targeting customers
4  other than United States investors?
5          MR. DEFEIS:  It does not distinguish among potential
6  customers, but it's not required to.  The key is who initiated
7  the contact with the website.  If it's just a potential
8  customer -- and I don't know how the person would go to the
9  website.  Let's just think about this.  OK?
10         We have a potential customer who received no spam, no
11  mailings, no cold calls, no advertisements in the U.S. at all,
12  no physical presence in the U.S. at all.  How would this
13  potential customer come to the site?  If he is going there with
14  the intent to engage in a transaction and obtains some
15  reassurance that this company is capable of handling the
16  transaction, and has certain features about the way it handles
17  accounts, then that is not something that is a solicitation
18  that is covered by the U.S. securities laws.
19         THE COURT:  Well, you are characterizing it
20  differently.  If you are going to characterize it that way,
21  that characterizes the -- you are making the determinative
22  factor how the contact is initiated with the website, but
23  that's not the critical question.  The question is how does the
24  American investor, the U.S. investor, become a customer.  So,
25  the solicitation isn't did I talk them into coming to my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL

GENTILE0005106

10

D8D7SECC

1  website; the solicitation is did my website talk them into
2  investing with my company.
3          MR. DEFEIS:  I actually think the former question is
4  important, which is basically who initiated the contact with
5  the website.  Was this a U.S. customer that was looking for
6  whatever reason to engage in a transaction, open an account
7  with a foreign broker dealer?
8          Again, we cite this in somewhat greater length on page
9  12 of our opening brief, "In the event that U.S. investors
10 would have taken the initiative to trade outside the United
11 States with foreign broker dealers, they are not conducting
12 activities within this country.  Consequently, the U.S.
13 investors would have little reason to expect these foreign
14 broker dealers to be subject to U.S. broker dealer
15 requirements.  Requiring a foreign broker dealer to register as
16 a broker dealer with the Commission because of unsolicited
17 trades with U.S. persons could cause that foreign broker dealer
18 to refuse to deal with U.S. persons under any circumstances."
19         THE COURT:  I know, but that's what I say, you're
20 right, the critical point seems to me -- unless you can
21 convince me I should refocus -- it's whether the trades are
22 solicited or unsolicited:  It's not whether the contact is.
23         If I go on the website in this day and age and I say
24 that I am looking for a licensed contractor, and I need
25 somebody to fix the sink --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                          GENTILE0005107

```
                                                          11
        D8D7SECC
 1              MR. DEFEIS:  Right.
 2              THE COURT:  -- and I get on the website and put in
 3      "broken sink" and it comes up with all of these people who can
 4      fix sinks --
 5              MR. DEFEIS:  Right.
 6              THE COURT:  -- and if I see a website, and this person
 7      says we fix sinks the cheapest of anybody else, you ought to
 8      come to us, and you ought to hire us to fix your sink --
 9              MR. DEFEIS:  Um-hum.
10              THE COURT:  -- now, if they're not licensed, and their
11      website is geared to convincing me to choose them over someone
12      else, then once I make a decision based on what I see on their
13      website, that that website convinces me to hire them, in what
14      way is that not a solicitation?
15              MR. DEFEIS:  That would be a solicitation.
16              THE COURT:  OK.  How is that different than if I
17      searched for broker dealers, I come up with a list, I see
18      Gibraltar on that list, Gibraltar says, yeah, we can invest in
19      whatever you want to invest in, you know, we'll take it in U.S.
20      dollars, and clearly in English and says, you know, no question
21      that we're the greatest broker dealer in the world, come and
22      invest with us.  And if I look at the website and based on that
23      I call you up and send you my money, why is that not a
24      solicitation?
25              MR. DEFEIS:  Because it would cover a universe of
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                        GENTILE0005108

D8D7SECC

1  broker dealers operating all around the world that have decided
2  for whatever reason not to register in the United States.  I
3  mean the problem is it proves too much.
4          THE COURT:  Well, no, the question is how did I get
5  the customer.  That's the only question.  The question is did I
6  get this customer -- solicitation to me means did I get this
7  customer because I decided to let the customer know that I was
8  available to do this type of business, and then I convinced the
9  customer to invest with me.
10         MR. DEFEIS:  Right.
11         THE COURT:  Now, if that is the general scenario that
12 the SEC is alleging at this point, why wouldn't that in the
13 abstract fall within, yes, that's what you cannot do.  You
14 cannot put on your website something that convinces them to
15 contact you because they think that you're eligible to do the
16 investment.  And the purpose of the website is to convince them
17 to invest their money with you, and so, therefore, when they
18 contact you you follow up and you convince them to go ahead
19 and --
20         You are saying it's not a solicitation if they go to
21 your website first.
22         MR. DEFEIS:  It's not a solicitation if their
23 intent -- right, if they go to the website first.
24         THE COURT:  But suppose I just search it?  That's what
25 web searches are.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

CONFIDENTIAL                              GENTILE0005109

13

D8D7SECC

1          MR. DEFEIS:  But again it proves -- the SEC intended
2     to provide some sort of safe harbor, international exchanges,
3     trading, the world is becoming smaller place and so forth, for
4     international broker dealers -- not to block out U.S. customers
5     from actually going to the website.
6          THE COURT:  Isn't the purpose of the website -- or at
7     least their arguable purpose of the website -- is to basically
8     say to the customers come and invest with me?
9          MR. DEFEIS:  I think --
10         THE COURT:  Isn't that the definition of a
11    solicitation?
12         MR. DEFEIS:  In a very broad sense, in the same way
13    that any legal website is saying, you know, come hire me as
14    your lawyer.  But I think, with all respect, it's sort of a
15    simple way, too simple a way to look at it.  I think the more
16    complex way to look at it, and the probably the more
17    appropriate way to look at it, is why these customers were
18    there in the first place.
19         THE COURT:  They were there because you told them
20    that -- well, they were there because they were searching not
21    for you, they were searching for someplace to invest.
22         MR. DEFEIS:  Right.
23         THE COURT:  And they happened to run into you, and you
24    told them that, yes, invest with me because I can do this for
25    you.  Why isn't that the scenario?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                    GENTILE0005110

14

D8D7SECC

1          MR. DEFEIS:  Well, again, because then we assume that
2     every website would be subject to the same -- every foreign
3     broker dealer that has not blocked U.S. accounts or U.S.
4     citizens from accessing their website would run the same risks.
5          THE COURT:  Well, no, not necessarily, because you
6     have certain websites that make it clear that they're not
7     soliciting U.S. investors.  That's not your case.
8          MR. DEFEIS:  Right.
9          THE COURT:  Two, you have certain websites that would
10    indicate that they're looking for certain types of non-U.S.
11    investors, or -- what was my other example -- that the
12    information is somehow inconsistent with an argument that you
13    are targeting U.S. investors.
14          Obviously, if you said invest with us, we do all our
15    investments in French francs, and you were in French, obviously
16    the argument could easily been made that you could not have
17    been targeting U.S. citizens.  And obviously in the most
18    extreme example, if it was a website in French, saying you
19    invest in francs, saying you invest in euros in Europe, and
20    saying, by the way, we don't invest in U.S. dollars, you'd have
21    a real easy case that that's not a solicitation.
22          But how do I get from one extreme on that side to the
23    other extreme that when I'm saying come invest with me, I will
24    invest in U.S. dollars, I'm giving this in English, I'm not
25    excluding U.S. investors, and their argument is, look, you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005111

15

D8D7SECC

1   know, it doesn't take a rocket scientist to understand that
2   when you do that it's going to make certain U.S. investors
3   decide based on your communication that they should invest with
4   you.  And they might not have done that unless you had put out
5   a communication, just as if you had sent out a mass mailing.
6   You wouldn't argue if you sent out a mass mailing and that
7   mailing went to both Canada and the U.S. that that mailing
8   wasn't targeted to U.S. citizens.
9           So, the question is where do I draw the line?  Do I
10  draw the line at -- and I haven't seen any case law either way
11  that either one of you have cited that say I should draw the
12  line there -- you want me to interpret the SEC guidelines --
13  but where do I draw the line with regard to websites that are
14  clearly communicating they are not limiting the universe of
15  people that they're communicating with.
16          So, clearly there is nothing about this website that
17  would give anyone the impression that whatever you are trying
18  to communicate, that you're not including U.S. citizens within
19  whatever you are trying to communicate.  So, if you are trying
20  to solicit, isn't there an argument to be made, well, look,
21  based on the communication itself, what's the argument to be
22  made that you are soliciting Canadians rather than U.S.
23  citizens from the website itself?
24          MR. DEFEIS:  You could make the argument that you are
25  soliciting people of any English-speaking country, I suppose,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                    GENTILE0005112

16

D8D7SECC
```
 1    but --
 2                THE COURT:  But that includes U.S. citizens.
 3                MR. DEFEIS:  -- but that proves too much.  That proves
 4    too much.  And I think you do need something.  Yes, I mean you
 5    could have the extreme example where it's a website in French,
 6    and they only deal in I guess it's euros or whatever.  I
 7    remember French francs myself.  But in any event, yeah, you
 8    could make the argument that you could have a stronger case
 9    where there were, you know, no intent to solicit in the United
10    States whatsoever just by looking at the face of the website.
11                But our point is you don't have to have that extreme.
12    You don't have to deliberately block U.S. people.  You don't
13    need to have Surgeon General warnings.  All you need to look at
14    is who initiated these transactions and whether that was
15    actually an intent that involved solicitation -- as opposed to
16    U.S. investors just coming to the site for their own reasons.
17    who want to invest, who want to have a foreign brokerage
18    account, which is what the SEC says that they can do.
19                THE COURT:  But that's a little different than I
20    understood the papers as saying, because I thought you were at
21    least conceding the argument that regardless of how they got to
22    the website, if they had an investor who said I went to the
23    website and the website said they could do all of these
24    services, and I invested because of the website, I thought your
25    argument -- at least part of your concession -- was if they at
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

CONFIDENTIAL                                                      GENTILE0005113

D8D7SECC

1   least had someone who said they invested because they went to
2   the website, some U.S. investor, that that would be sufficient.
3   That was not your argument?
4           MR. DEFEIS:  That would at least accomplish at least
5   something of the link that the SEC's complaint lacks.
6           THE COURT:  Well, would that be a sufficient link or
7   an insufficient link?
8           MR. DEFEIS:  Well, I guess if it's one isolated
9   investor, I guess conceivably -- you know, we might be before
10  you arguing, maybe it's on a motion for summary judgment stage,
11  that this is really insignificant.
12          THE COURT:  So, suppose there were five investors.
13  Suppose they said, for example, these five people said they are
14  U.S. investors, they went to the website, and because of the
15  information and what they characterize as a solicitation on the
16  website that's the reason that they decided to invest.
17          MR. DEFEIS:  Right.  Then we would have a factual
18  issue.  We would have to depose these investors.  You know, we
19  would have something -- we might have a complaint that survives
20  the motion to dismiss.
21          THE COURT:  Well, that's the question.
22          MR. DEFEIS:  But they don't have that here.  They
23  don't have the link.  I mean they have tons of investors, they
24  have a significant amount of money, a lot of trading that takes
25  place, but they don't have anyone -- despite an investigation

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

18

D8D7SECC

1  that's at least three years old -- that can say that I was
2  solicited by this particular brokerage firm.
3          And, even in this complaint they yoked on transactions
4  with MDOR -- I forgot what the acronym stock symbol stands
5  for -- involving it was a case down in Florida, they had three
6  or four people who were charged, many of whom settled, they
7  were U.S. investors, but they don't even contend that these
8  people were solicited to the website.  It's basically two
9  unrelated --
10          THE COURT:  But solicited by the website.
11          MR. DEFEIS:  Either one.  They don't contend that.
12  It's unrelated.  And they try to paint over this by what I
13  characterized as the junk science, which is basically a
14  website.  They know they need that link, by the way, which is
15  why they plead it.  That's why it's there.  But their website
16  analyzer comes up with the same result day after day.
17          And, you know, again, they have selectively quoted
18  information from the website to argue, including information
19  that -- again, I think it's, you know, ridiculous to say that
20  they shouldn't be able to provide quotes in U.S. dollars, since
21  their currency is tied to the dollar, and English is the native
22  language down there.  Again, we are talking about a website
23  that is no longer operational; it hasn't been since before the
24  SEC filed the complaint.
25          THE COURT:  Well, the tougher part is that there is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                      GENTILE0005115

19

D8D7SECC

1   nothing about the website that I am aware -- and again I
2   haven't seen the website but I have heard it described -- there
3   is nothing about the website that would indicate that the
4   website is not a communication -- at least I will use that
5   word -- not a communication to U.S. investors.
6           MR. DEFEIS:  Well, I guess I would say not a
7   communication to the world, including U.S. investors.
8           THE COURT:  Well, but if it includes -- I mean, let's
9   put it this way, it would be difficult to argue, and may even
10  be not a genuine reasonable argument to say that this website,
11  that whatever reaction was expected of investors by what was on
12  this website, that it was intended to affect Canadians the same
13  way it affects U.S. citizens and vice versa.
14          MR. DEFEIS:  I agree a hundred percent, I did not
15  distinguish among viewers of the website.
16          THE COURT:  Right.  So, whatever you are trying to
17  communicate, you clearly can't argue that the website only
18  intended to solicit Canadians.
19          MR. DEFEIS:  Correct.
20          THE COURT:  You can't make that converse offer.
21          MR. DEFEIS:  You can't argue the website was intended
22  to solicit any particular group or to deny access to any
23  particular group.
24          THE COURT:  OK.  And again I want to concentrate,
25  because I will see how they characterize it, but I think that

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CONFIDENTIAL                                          GENTILE0005116

20

D8D7SECC

1   it's critical -- it may be critical to my decision as to
2   whether or not the issue is whether they were solicited to the
3   website or solicited by the website.  What do you say the issue
4   is?
5           MR. DEFEIS:  I think that they have to be solicited --
6   I think it's actually both, but I would say solicited to the
7   website is a critical issue.
8           THE COURT:  Well, but if I'm solicited to the website,
9   and I go decide -- if nothing on the website is a solicitation
10  for me to invest, what difference does it make whether I was
11  solicited to the website?
12          If I did a general search, and the website was one of
13  ten websites that I came up with, and I went to Gibraltar's
14  website, and Gibraltar says, please, U.S. investors, invest
15  with us, it wouldn't matter why I got to the website.
16          MR. DEFEIS:  Because I think that the latter involves
17  too much of a subjective determination frankly for broker
18  dealers to have to contend with.  I think it's beyond what the
19  SEC intended, and I think when we have to try to figure out why
20  this person decided to invest, we're getting into territory
21  that would be very difficult to deal with.
22          THE COURT:  Well, but I'm not sure I can agree with
23  that, because if once you get to the website the website had
24  what is a clear advertisement and solicitation to convince U.S.
25  investors to invest money, I think it would be irrelevant how

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                              GENTILE0005117

D8D7SECC

1   you got to the website if it was the website that was used to
2   convince you to invest, if the nature of the substance of what
3   was on the website --
4            MR. DEFEIS:  Well, then it's hard to argue that you
5   didn't satisfy the former, I suppose, that that wasn't your
6   intent in having the website, which was to solicit U.S.
7   investors.  In fact, if they get to the website and say, hey,
8   U.S. investors, we're closed for the Fourth of July, whatever,
9   then it's hard to argue that wasn't the intent.
10           But I think that the intent of the I guess I will call
11   it the safe harbor provision is to say you still can have a
12   website, and so long as you didn't intend to initiate or
13   solicit, have customers come to open up accounts as a result of
14   a solicitation of the website, that you are OK to operate in
15   this international environment.
16           I think that what we are missing here is we're missing
17   all the other indicia that may exist of solicitation of U.S.
18   customers, including, as a factual matter, people who were
19   solicited in these three cases, which we don't have.  And, you
20   know, again, no advertising, no spam or junk mail, no U.S.
21   presence, no cold calling.
22           THE COURT:  All right.  I mean -- OK, I think I
23   understand.
24           MR. DEFEIS:  What are they supposed to know about --
25   they're not licensed obviously by definition to operate here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL

GENTILE0005118

22

D8D7SECC

1  What are they supposed to know about what they should put on
2  the website?
3          THE COURT:  I think I understand your argument.  They
4  have to avoid two things:  They have to avoid soliciting U.S.
5  customers to the website, and they have to avoid once they get
6  to the website convincing them to invest.
7          So, I understand your argument then if they have done
8  nothing to get U.S. investors to come to the website, and
9  they've done nothing specifically on the website that targets
10 the U.S. investor so that it tries to convince them once they
11 get there to invest, then you're saying the government needs
12 something else to define a solicitation.
13         MR. DEFEIS:  Right.
14         THE COURT:  Because, as I said, I guess they don't do
15 that anymore.  I don't know if you had this experience, but
16 I've had friends probably decades ago that would be like Amway
17 representatives, and they would say come to my house, and they
18 wouldn't tell me why.  And they'd say, well, we got this thing,
19 we're going to have a get-together, and then I show up, and
20 then they have this whole Amway presentation about how I should
21 buy Amway products.  And I say to myself, well, golly, you
22 convinced me to come to your house under false pretenses, and
23 now when I get here, I'm sitting here with everybody trying to
24 convince me with everybody else to buy a product.  I don't want
25 to disparage Amway, but I'm just saying that that's the way in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005119

23

D8D7SECC

1   those days I reacted to it when some people approached me.
2           But in this case your position is that they don't
3   allege that any of the U.S. customers were directed to the
4   website by the company, and they don't allege that anything on
5   the website specifically attempts to convince U.S. customers to
6   invest with Gibraltar.
7           MR. DEFEIS:  That is correct.
8           THE COURT:  If U.S. customers did invest with
9   Gibraltar, then safe harbor applies, unless they can identify
10  or at least give an example of one of those U.S. investors not
11  doing so on their own, but having done so because they were
12  either solicited to the website or solicited by the website.
13          MR. DEFEIS:  That's correct.
14          THE COURT:  All right.
15          MR. DEFEIS:  You know, moving on to -- we also argue
16  that they haven't -- you know, again with respect to the
17  operating as an unlicensed broker dealer, they allege control
18  person liability of Warren Davis.
19          THE COURT:  Well, how is Warren Davis not a control
20  person?  He is the sole investor, sole officer, sole owner of
21  the company.  Who else?
22          MR. DEFEIS:  He controlled Gibraltar, conceded, but
23  again we have not found a case imposing control person
24  liability where there is no fraud alleged.  And the language
25  which we cite there is basically he has to be a culpable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

D8D7SECC

1  participant.  And we cite the authority for that.
2          So, it's not ownership; it's culpable participation.
3  And we're not aware of any case that holds -- all these control
4  person cases are Section 10 and Section 17 claims involving
5  fraud.
6          THE COURT:  But why do you say the culpable
7  participation has to rise to the level of fraud?  If I am the
8  control person in the broader sense, in the generic sense, and
9  I am responsible for the illegal acts that the company commits,
10  why are those illegal acts only limited to fraud?  If I know
11  that the company is not supposed to solicit customers in the
12  U.S., and I deliberately make the company solicit customers in
13  the U.S. in violation of U.S. law, why do I escape control
14  person liability simply because in most cases -- if not all
15  examples that you have cited -- the cases are usually fraud
16  cases?
17          MR. DEFEIS:  They all appear to be fraud cases, and
18  the language used is that you have to be a culpable
19  participant.
20          THE COURT:  Well, what is culpable?  Culpable means
21  that you are responsible for the illegal acts of the company.
22          MR. DEFEIS:  Right.
23          THE COURT:  You're not saying the definition of the
24  word culpable is fraud.
25          MR. DEFEIS:  No, I'm saying -- no, they may not be

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CONFIDENTIAL                                                                    GENTILE0005121

25

D8D7SECC
```
 1   synonymous, but there is a certain level of intent involved and
 2   a certain level of participation.  This company had --
 3           THE COURT:  Well, if I intended to break U.S. laws,
 4   why is that not culpable?
 5           MR. DEFEIS:  Well, yeah, if you were a one person
 6   shop, maybe you would be, maybe you would be chargeable as a
 7   principal.  But we are talking about a brokerage firm that when
 8   it was in operation employed ten people.  So, again we have
 9   what the SEC contends is a case where it's essentially strict
10   liability.  So that's why the courts are, in my opinion --
11           THE COURT:  Well, suppose I violated the tax laws?
12   Are you saying that I can't be a control person?  I mean you
13   say it's limited to fraud.
14           MR. DEFEIS:  I'm saying the cases that we have
15   found -- if the SEC has another case, they should call it to
16   our attention -- but the cases we have found impose control
17   person liability in cases where the allegations are fraud.
18   They're saying this is a strict liability offense.
19           THE COURT:  Right.  But you don't know of any case
20   that says that it is limited to fraud.
21           MR. DEFEIS:  No.  But this would be maybe the first
22   time a court, you know -- this will be the first time that
23   control person liability were imposed for Section 15(a)(1)
24   claims, so far as we know.
25           THE COURT:  But it also would be the first time that
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CONFIDENTIAL                                                            GENTILE0005122

26

D8D7SECC
```
 1   any court would say that unless you commit fraud you can't be a
 2   control person.
 3              MR. DEFEIS:  Correct.  But they've always used -- they
 4   have used this language culpable participant.
 5              THE COURT:  Right, culpable --
 6              MR. DEFEIS:  But that's something beyond ownership.
 7              THE COURT:  Yeah, but if you want to give me a
 8   definition of culpable that excludes this, I'm willing to hear
 9   it, but the definition of culpable is not fraud; the definition
10   of culpable is something much broader that includes other
11   illegal acts that you are responsible for other than fraud.
12              MR. DEFEIS:  Certainly the colloquial understanding
13   that we have of what a control person would be -- sorry -- of
14   what culpable would be would be beyond fraud, that they're
15   basically responsible somewhere.
16              But, again, given the breadth of the claims here, and
17   the fact that they don't have to show intent to deceive, we
18   could see why a court would be reluctant to reflexively impose
19   control person liability in instances where there was no intent
20   to defraud involved.  OK?
21              THE COURT:  Well, I'm not sure I would understand
22   that, because, as I say, if there was an intent to violate the
23   tax laws or intent to violate other laws of the U.S., I don't
24   know what would be the good public policy reason to say, well,
25   you get a pass on that because it wasn't fraud.
```
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

GENTILE0005123

27

D8D7SECC

1           MR. DEFEIS:  Well, I mean you still would punish the
2   company.  The company would still be subject to -- so, maybe
3   there is no --
4           THE COURT:  What's the rationale for punishing the
5   control person on fraud and not punishing the control person on
6   other violations of U.S. law?
7           MR. DEFEIS:  Well, because in the fraud instances they
8   are, you know -- the culpable participant does include I think
9   a concept that there is some awareness of the situation and
10  ability to change.
11          THE COURT:  Well, that's the concept here too.
12          MR. DEFEIS:  OK.  Well, you know, maybe we will be
13  making law in the case.  I don't know.  But the bottom line is
14  that we have not found authority for imposing control person
15  liability in claims of this kind.  So, that's basically it.
16  You know, we could argue whether it's good public policy or bad
17  public policy, but we just don't think it exists.
18          The other contention that we make -- and I appreciate
19  all the time the court has given me to make the argument -- is
20  that the MDOR securities themselves were not registered, and
21  that Gibraltar's involvement in that, in basically arranging
22  for sale of these MDOR securities, should be punishable under
23  Section 5(a) or Section 5(c).
24          And I guess we argue a couple of things, and I will be
25  brief about this.  One is that Gibraltar itself was not a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CONFIDENTIAL                                          GENTILE0005124

28

D8D7SECC

1   substantial participant in this transaction at all.  And it's
2   related to the second point that --
3           THE COURT:  Well, it depends on what your definition
4   of substantial participant is.  They were the ones who bought
5   the shares, and they were the ones who transferred the shares.
6           MR. DEFEIS:  They held the shares.
7           THE COURT:  Who is a more substantial participant than
8   the buyer or seller?
9           MR. DEFEIS:  Well, it could have been anyone else in
10  the world.  It could have been another international broker
11  dealer.
12          THE COURT:  Right.  And if another international
13  broker dealer had done that for the purpose of avoiding U.S.
14  laws, then why are they a less significant player?
15          MR. DEFEIS:  That's a critical clause, for the
16  purposes of evading U.S. laws, but the safe harbor here is that
17  it was just providing ordinary broker dealer services.
18          THE COURT:  But that's a question of intent.  That's
19  not a question of the extent of their involvement or whether
20  they are a critical player.  They are clearly a critical
21  player.  If you have nobody buying and selling the shares for
22  the company that you are trying to hide, then it's not going to
23  happen.  So, you need to find somebody who is willing to go
24  along with your plan to make sure that people don't know that
25  you are just buying and selling it to yourself by being the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005125

D8D7SECC
1  front person who pretends like they're really the independent
2  buyer and seller.  Why is that not the most critical part?
3          MR. DEFEIS:  I don't know that they pretended they are
4  really the buyer.
5          THE COURT:  Isn't that what they allege?  They
6  structured a transaction to make it look like this was not a
7  transaction in which the company was transferring the shares --
8  I guess I don't want to say -- to itself.  But maybe that's
9  what I should say.
10         MR. DEFEIS:  What they say is we don't meet the broker
11 dealer exception because effectively we were an underwriter.
12 That is, that the MDOR proceeds were going back to MDOR.
13         THE COURT:  Right.  Because you contend that you were
14 the beneficial owner of these shares, and you knew you weren't,
15 and you knew that MDOR was, and you faked it.  Why isn't that a
16 claim?
17         MR. DEFEIS:  First of all, I think there has been no
18 allegation that they deceived the actual transfer agents
19 involved.  I think that the allegation -- particularly as
20 exemplified by the case that was pled out in Florida -- was
21 that everybody was deceived.
22         THE COURT:  Everybody but MDOR and you.
23         MR. DEFEIS:  And the Flatt nominees, as they're
24 called, who engaged in the fraud.  But as they alleged down in
25 Florida, they indicated that they had false promissory notes
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005126

30

D8D7SECC
```
 1    that indicated that these proceeds were going to MDOR to repay
 2    a note.  And they deceived a law firm involved, which we
 3    alleged, taking shares without a restrictive legend and
 4    payment.
 5            Again, what we contend is that --
 6            THE COURT:  -- you were deceived too.  But why is that
 7    a pleading problem?  Because, you know, as they say --
 8            MR. DEFEIS:  These were ordinary broker dealer
 9    services, what we're saying is -- because they don't allege
10    that --
11            THE COURT:  But they don't claim that you were
12    deceived.
13            MR. DEFEIS:  They don't claim that we were deceived.
14            THE COURT:  They claimed that you were in the know.
15            MR. DEFEIS:  Well, they put two and two together and
16    claimed that we know.  They don't really say that there was a
17    conversation and we were in on the deal.
18            THE COURT:  Well.
19            MR. DEFEIS:  What they say is -- and they don't
20    contend that we received anything other than ordinary broker
21    dealer commissions.
22            THE COURT:  But they are saying of all of the people
23    involved in this transaction, you knew or should have known,
24    there is no way you can argue that you didn't know that these
25    were your shares.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

31

D8D7SECC
```
 1              MR. DEFEIS:  Except if you look at the complaint down
 2    in Florida, right.
 3              THE COURT:  I mean they didn't belong to you, and you
 4    represented that they belonged to you.
 5              MR. DEFEIS:  But it goes over with the proceeds, for
 6    the benefit of a particular customer.
 7              THE COURT:  Right.  And they say you hid that.
 8              MR. DEFEIS:  I don't know if they said that we did.
 9              THE COURT:  Well, I mean for the benefit of the same
10    customer that was selling the shares, if I have it right.
11              MR. DEFEIS:  Right.
12              THE COURT:  Well, it can't be for the benefit of the
13    same -- if you are transferring it right back to the same
14    customer and just taking a commission, that's not a legitimate
15    transaction.  You would agree with that, right?  That if I
16    played the role, if I say I want to buy -- if I say I want to
17    buy a hundred shares of IBM, and I get the hundred shares, and
18    they want to know, well, whose shares are these, and I say
19    they're mine and they're for me, but what I really do is then I
20    take the shares and I sell it back to the person who sold it to
21    me, and then I take a 10 percent commission, what else am I but
22    a broker dealer?  I'm not the buyer or the seller.  I'm not the
23    beneficial owner.  I have no interest in this transaction in
24    owning shares.
25              MR. DEFEIS:  Right.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL

GENTILE0005128

32

D8D7SECC

 1          THE COURT:  I only have an interest in facilitating
 2   the transaction and getting a fee for that.  Isn't that the
 3   classic definition of broker dealer?
 4          MR. DEFEIS:  Facilitating a transaction and getting a
 5   fee for it is the classic --
 6          THE COURT:  And isn't that exactly what they allege on
 7   this particular instance?
 8          MR. DEFEIS:  No.  They alleged that we were
 9   effectively an underwriter because we knowingly were seeing to
10   it that the proceeds went back to MDOR.
11          THE COURT:  Right.
12          MR. DEFEIS:  But that's different.  They try to take
13   us out of that exception.  What we're saying is --
14          THE COURT:  Why is that not a sufficient allegation?
15   I'm not questioning whether it's true.  Why isn't that a
16   sufficient allegation for this liability?
17          MR. DEFEIS:  Because it's contradicted by another
18   pleading that the SEC filed.
19          THE COURT:  Well, that may make the facts incorrect,
20   but it doesn't make the independent allegation insufficient,
21   does it?  I mean if you were going to say that they can't prove
22   it because there is evidence that they admitted that it's not
23   the case, or in a different circumstance --
24          MR. DEFEIS:  Well, frankly I think they should rely on
25   consistent theories.  That's basically it.  I think maybe it's

CONFIDENTIAL                                                    GENTILE0005129

33

D8D7SECC
```
 1   a question of harmonizing what they filed before your Honor
 2   with what they filed before another federal --
 3              THE COURT:  How do I resolve that on a motion to
 4   dismiss though?  Suppose the facts are the way they allege it
 5   in front of me rather than the way they alleged it in Florida?
 6              MR. DEFEIS:  Conceivably it's difficult to resolve on
 7   a motion to dismiss, other than to say, hey, why don't you
 8   replead this allegation so we understand exactly what you are
 9   contending here.  I mean, how were they not operating as an
10   ordinary broker dealer?  I mean why is it if they deceive a
11   large law firm involved in D.C., and as you claim yourself on
12   paragraph 21 that even the share certificates, although they're
13   titled in Gibraltar's name, they generally include the legend
14   for the benefit of the particular customer.
15              THE COURT:  But I don't think there was anything in
16   the Florida case that directly made inconsistent allegations
17   with regard to your client.
18              MR. DEFEIS:  No, we were not involved in the Florida
19   case.
20              THE COURT:  Right.  So, you weren't involved in it.
21   So, how is it -- you are saying it's inconsistent with the
22   allegations they are making here, because in Florida they said
23   all of those people in Florida were deceived --
24              MR. DEFEIS:  Correct.
25              THE COURT:  -- and so, therefore, that should mean
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                                      GENTILE0005130

34

D8D7SECC

1 that you were deceived too.
2   MR. DEFEIS:  Correct.  I would say we were included
3 within, you know --
4   THE COURT:  But they didn't include you.
5   MR. DEFEIS:  They used general language there.
6   THE COURT:  No, they said those other people were
7 deceived, and they explain how they were deceived.  And you
8 want to say that it makes it insufficient pleading for them to
9 say everybody else was deceived except you, and you knew
10 exactly what was going on.
11   MR. DEFEIS:  Yes, and we're saying it would be
12 impossible for us to know if promissory notes were false and
13 that restrictive legends were inappropriately removed from the
14 certificates.
15   THE COURT:  OK.  And how do I resolve that short of a
16 factual dispute?
17   MR. DEFEIS:  I think you ask the SEC to replead it,
18 you know, to consider whether this should be harmonized with a
19 pleading it filed in another federal court.
20   THE COURT:  Well, what is it you say that they haven't
21 alleged against your client?
22   MR. DEFEIS:  I guess what I say is that they haven't
23 alleged anything to take us out of the broker dealer exception.
24   THE COURT:  But they have.  They gave you the
25 elements.  They said that you knew, and you were involved in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                         GENTILE0005131

35

D8D7SECC

1  transaction, and you were involved in a transaction that
2  defines you as an underwriter because you played simply a role
3  of issuing those shares -- I may not be characterizing it
4  accurately -- but issuing those shares rather than simply
5  acting as a broker dealer who should be protected by that
6  exemption.
7           MR. DEFEIS:  I guess what I'm saying is we are relying
8  on the allegations made in another federal proceeding.
9           THE COURT:  Right.  And what are the allegations made
10 in another federal proceeding that would make it inconsistent
11 with the allegations that they made against you?
12          MR. DEFEIS:  That Gibraltar knew that there was some
13 problem with engaging in transactions with these particular --
14          THE COURT:  What's inconsistent with what Gibraltar
15 knew that was in the Florida case?
16          MR. DEFEIS:  Well, in the Florida case they say that
17 the Flatt nominees who were involved in the MDOR transaction
18 deceived the transfer agent into issuing MDOR share
19 certificates without the required restrictive legend, so that
20 they wouldn't have known that these particular shares -- which
21 are allegedly and apparently were not properly registered --
22 were in fact problematic and shouldn't have been registered.
23          THE COURT:  Are you saying that because they wouldn't
24 have known, you couldn't have known?  It's impossible that you
25 couldn't have known?

CONFIDENTIAL

GENTILE0005132

36

D8D7SECC

```
 1              MR. DEFEIS:  It's possible.  No, I'm not saying it's
 2    inconsistent.  We're not saying that one necessarily excludes
 3    the other.  What I am saying is that, you know, you have --
 4    again I apologize for repeating myself -- but you have another
 5    federal proceeding where the same agency is alleging there was
 6    an elaborate con and deception involved.  And I am also
 7    alleging that they don't contend that Gibraltar itself received
 8    anything more than ordinary commissions on these transactions.
 9              THE COURT:  All right.
10              MR. DEFEIS:  Thank you, your Honor.
11              THE COURT:  Sure.  Let me hear from the SEC.
12              MR. KIDNEY:  I think based on your questions I'm sure
13    you are going to have questions for me too, but I think you hit
14    on a lot of the reasons why this is not an appropriate case to
15    entertain this motion to grant this motion to dismiss.
16              Mr. DeFeis made a number -- as they have done
17    throughout this motion practice -- made a number of assertions
18    which are not in evidence, and I think it's important that we
19    revisit what the standards are on a motion to dismiss.
20              As we cited in our brief by reference to the Federal
21    Practice Digest -- which has dozens if not hundreds of
22    citations -- the standard wisdom on a motion to dismiss, the
23    SEC is entitled that fair inferences be drawn from its
24    complaint, and it is not an occasion on a motion to dismiss to
25    receive allegations which would require additional evidence.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                              GENTILE0005133

D8D7SECC

```
 1              THE COURT:  So, let's just go -- I mean we don't have
 2   to go through the basic standard.  I'm fully familiar with
 3   that.  Let's just go straight to the factual allegations.  And
 4   let me first ask you -- I have put aside some things.
 5              You don't allege that Gibraltar did anything to
 6   convince investors to go to the website.  That's not your
 7   contention.
 8              MR. KIDNEY:  That is not.  But it's only because while
 9   we received some voluntary production in the Magnum DOR --
10   which is the MDOR case from Gibraltar, which of course is in
11   the Bahamas, as to which we can't exercise any regulatory
12   authority for investigators to be down there -- we got only
13   voluntary production in that case, very limited.  Mr. DeFeis
14   says there were no phone calls, no mailings, no spam, no
15   presence in the United States.  That is a subject that is a
16   matter that's subject to proof.
17              THE COURT:  Well, it's not a matter subject to proof
18   unless it's a factual dispute that's relevant to your
19   allegations.  You don't allege that that's the basis of your
20   claim.
21              MR. KIDNEY:  No.
22              THE COURT:  So --
23              MR. KIDNEY:  The basis of our claim is -- to step back
24   for a minute, obviously a website is a solicitation, it's an
25   advertisement.  Amazon.com, which some of us may have heard of,
```

CONFIDENTIAL

GENTILE0005134

38

D8D7SECC

1  didn't send out postcard, didn't get well known by sending out
2  postcards saying go to Amazon.com.  It didn't get rich by
3  calling people up and say go to our website Amazon.com.  People
4  were originally looking for books, and they wanted to get them
5  cheaper, they went on the website and Amazon.com said come and
6  buy your books here because we can do it cheaper and we will
7  mail it to you real fast.
8           THE COURT:  So, have I accurately characterized your
9  set of allegations by saying that you are not alleging that the
10  violation is convincing them to go to the website?  You are
11  alleging that the violation is that the website itself is a
12  solicitation by Gibraltar.
13          MR. KIDNEY:  Correct.
14          THE COURT:  So, once I get to the website, you're
15  saying on the website the website itself solicits U.S.
16  investors to invest.
17          MR. KIDNEY:  Well, it says, for example --
18          THE COURT:  Is that a yes?
19          MR. KIDNEY:  Yes, sir.
20          THE COURT:  OK, go ahead.
21          MR. KIDNEY:  And it does so by claiming to offer
22  offshore brokerage services.  Offshore.  From where?  I mean if
23  you were just soliciting people in the Bahamas, it wouldn't be
24  offshore.  I mean obviously the main offshore is the Bahamas,
25  and it says that it has commissions comparable to those on the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                            GENTILE0005135

39

D8D7SECC

1    "mainland".
2            Now, today Mr. DeFeis says, well, you can't
3    distinguish between U.S. and Canada.  In their initial moving
4    memorandum they said well, it probably only meant Canada
5    because both the Bahamas and Canada are part of the British
6    Commonwealth.  Which is not a fair inference.  The inference --
7    which at this point is all the court is asked to draw -- is
8    when they say mainland, and say our commissions are lower or
9    are comparable to those in the mainland, the mainland we are
10   talking about is North America, which includes the United
11   States and Canada.
12           THE COURT:  So, you are not contending that mainland
13   is supposed to be a definition, solely a reference to the
14   United States.
15           MR. KIDNEY:  No.  In fact we put in the website
16   statistics, which are subject to further development of
17   evidence.  And if they're admitted, they have to have a
18   sufficient foundation and so forth.  But it's a fair inference
19   that at least these website counter things found that whenever
20   they did it -- and of course the number is probably the same
21   because the website has been down; it hasn't been operating for
22   months and months, so whatever number it is, there is no reason
23   to change it because the website hasn't been operating.  But if
24   it's necessary, subject to going to those people, and
25   establishing their methodology and so forth, but it's an
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

40

D8D7SECC
```
 1   inference drawn from what is available on the website as to
 2   where the audience for Gibraltar was coming from, and it was
 3   U.S. and Canadian.
 4           THE COURT:  But I'm not sure what that proves.  I'm
 5   not sure what that proves.  If you say -- that's why I'm trying
 6   to figure out whether or not I can clearly draw a line between
 7   whether or not you are arguing about solicitation to the
 8   website or you are arguing about what has convinced them to
 9   invest.
10           If the only real issue is whether or not they are
11   being solicited by the website -- and when I say solicited,
12   that means that the website itself has content that is trying
13   to convince them, to convince U.S. investors to invest -- how
14   is -- I don't understand how those statistics advance that
15   argument one way or the other, unless you have some statistics
16   telling me somebody invested.
17           MR. KIDNEY:  Well, somebody did invest.  As we said in
18   the complaint also, there were millions of dollars, that
19   Gibraltar used U.S. brokers, and in the MDOR case alone they
20   made 600 sales transactions.
21           THE COURT:  But you don't claim that that is a
22   violation of any U.S. laws, to simply have U.S. investors.  The
23   question is how they got those U.S. investors.
24           MR. KIDNEY:  Are they solicited.
25           THE COURT:  OK.  So, in what way have you alleged that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

GENTILE0005137

41

D8D7SECC

1  they -- I assume that you are not -- and maybe you are -- you
2  are not saying that this complaint alleges that there were
3  certain investors who were solicited and in fact invested as a
4  result of that solicitation.
5          MR. KIDNEY:  Actually we're asking the court to take
6  those allegations about the website, the offering to hide the
7  profits so you don't have to disclose it in a divorce
8  settlement or other thing -- and in fact we say in the
9  complaint they lied to broker dealers about who actually they
10  were investing for, they said it was only for themselves,
11  Gibraltar in the Bahamas, so there wouldn't be any tax
12  consequences.
13         THE COURT:  Yeah, but that's true of everybody, right?
14  That's --
15         MR. KIDNEY:  Right.  But it is more evidence that they
16  in fact were putting their muscle where their word was, what
17  they put on their website to say we will do this for.  And we
18  are saying, yes, American consumers, investors did come and
19  become customers due to this website.
20         THE COURT:  All right.  Let me ask you this then.  Is
21  it your position -- I assume it's not, but it may be -- is it
22  your position that even if you can't prove that any of the
23  people that you say were solicited, even if you can't prove
24  that any of them invested, that you still can make out this
25  claim?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                          GENTILE0005138

```
                                                                42
       D8D7SECC
 1              MR. KIDNEY:  We think we can make out the claim by
 2      showing that they had a lot of U.S. customers and that they had
 3      this website that attracted them.
 4              THE COURT:  But that's not my question.
 5              MR. KIDNEY:  We think it's a fair inference for the
 6      court to draw.
 7              THE COURT:  No, I understand that part of it.  I'm
 8      just trying to figure out the extent or the limits of your
 9      allegation.  You're not saying that you can prove this claim
10      simply by proving they solicited U.S. customers who never
11      invested?
12              MR. KIDNEY:  Well, it's the SEC's position that when
13      U.S. customers go on that website, and go into the website,
14      that they are in effect successfully solicited by the website
15      whether they become customers or not.
16              THE COURT:  That's what I'm asking.
17              So you're saying if you showed that ten people came to
18      the website but they never invested, in what way do these
19      factual allegations -- with regard to people who didn't
20      invest -- in what ways are these factual allegations sufficient
21      to make out solicitation?
22              MR. KIDNEY:  Because the term is solicitation.  They
23      intentionally -- well, they don't even have to have intent.
24      But they don't take any effort -- in this case they clearly did
25      make efforts to attract "mainland investors".  And they were
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

CONFIDENTIAL                                                                      GENTILE0005139

43

D8D7SECC

1   successful at that, and they had this website.
2           At this stage of the proceeding it is not a fair
3   inference to suggest that Gibraltar maintained this website for
4   four years and it didn't result in any business, which is what
5   in effect the defense is asking this court to infer at this
6   stage.
7           THE COURT:  So, at this point I would have to conclude
8   that the fact that they have the website, the fact that the
9   website advertises that they're offshore, and they are not on
10  the mainland, and that you can avoid taxes by investing with
11  them.
12          MR. KIDNEY:  Well, they offer comparable-to-mainland
13  commissions.
14          THE COURT:  OK, comparable-to-mainland commissions.
15  It's reasonable to assume that all of those are references to
16  the United States?
17          MR. KIDNEY:  As well as to Canada.
18          THE COURT:  All right.  So, your argument is not that
19  any of this language is exclusively targeted or defined as the
20  United States.  Your argument is it is at least the United
21  States and Canada, and that that's good enough, as long as it
22  includes the United States.
23          MR. KIDNEY:  Correct.  And that answers Mr. DeFeis'
24  argument in response to your question, that -- basically his
25  position would be if it's in English, and it's an English
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CONFIDENTIAL                                                              GENTILE0005140

44

D8D7SECC

1   website in, I don't know, Jakarta, the SEC's position would be
2   that if it's just in English and it doesn't specifically say we
3   are not soliciting U.S. investors, well, then, the SEC can go
4   after them.
5           Well, that's not true, because in this instance this
6   website has indicia clearly indicating that it's seeking
7   customers on the mainland.  And the reason why that website
8   number, the 2570 or whatever it is -- which shows more Canadian
9   hits than U.S. hits -- is significant -- and we will have to
10  prove it up, whatever the number is -- is because actual U.S.
11  citizens or U.S. ISPs, in any event, were going to that
12  website.  Some of them may have become customers, maybe none of
13  them did, but they were solicited.  They went to that website.
14          THE COURT:  And in what way once they got to the
15  website, what way were they targeted and in what way did they
16  attempt to convince them to invest as U.S. investors?
17          MR. KIDNEY:  Well, because they said we can keep it
18  secret.
19          THE COURT:  Well, that's true in China, they keep it
20  secret.
21          MR. KIDNEY:  Well, I don't know.  We know for a fact
22  they did it in the United States by filling out falsely IRS
23  forms for the broker dealers so that they wouldn't withhold
24  taxes from those accounts.
25          THE COURT:  But if that's true, that would be true
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CONFIDENTIAL

GENTILE0005141

45

D8D7SECC
1    even as to clients they didn't solicit.
2            MR. KIDNEY:  It doesn't matter.
3            THE COURT:  That's what I'm saying, it doesn't matter.
4    What difference does it make?  It doesn't advance the
5    solicitation argument.
6            MR. KIDNEY:  Sure it does, because you asked me
7    basically what would cause a U.S. investor -- who is going to
8    pay mainland commissions to this offshore broker dealer -- to
9    invest.
10           THE COURT:  No, but that's not the question I should
11   have asked.  The question is not what would have caused them.
12   The question is whether were they caused to do that because the
13   company, Gibraltar, was attempting to convince them to do that
14   even though they knew that they didn't have the legal right to
15   do so?
16           MR. KIDNEY:  Well, sure, website.  The website was an
17   ad, a solicitation, and it identified reasons why U.S.
18   customers, Canadian customers should invest in -- should buy
19   and sell their securities through Gibraltar.
20           THE COURT:  But what's critical to your argument is
21   the inference that even though it doesn't mention U.S. at all,
22   that the references are meant to be veiled references to U.S.
23   investors, and it's intended to convince U.S. investors to
24   invest offshore with them?
25           MR. KIDNEY:  Correct.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005142

46

D8D7SECC

1          THE COURT:  All right.
2          MR. KIDNEY:  And it succeeded.  Because we know they
3     had many, many U.S. investors.  I don't quite understand how
4     they could get all those investors and run a website.  And
5     discovery presumably will show that Gibraltar itself maintained
6     sufficient records to show that its website was successful for
7     four years.  Otherwise why would they maintain it?
8          THE COURT:  We don't know.
9          MR. KIDNEY:  And we don't know.  We should find out in
10    discovery.  At this stage of the game on a motion to dismiss,
11    the SEC need only establish sufficient facts along with
12    inferences -- and we pled both facts and asked the court to
13    draw inferences -- so more than sufficient to show that what is
14    an elephant is in fact an elephant.
15         THE COURT:  Yeah, but your argument isn't that if the
16    statistics show that 75 percent of the customers were Canadian
17    and 25 percent of the customers were U.S., that that somehow
18    inherently proves that 25 percent of U.S. customers were
19    solicited by the website.
20         MR. KIDNEY:  Well, they went to the website, and
21    because of what the content of the website says, yes, they were
22    solicited.
23         THE COURT:  Yeah, but you don't allege that you know
24    somebody who went to the website and therefore invested after
25    they went to the website because of the website.  You don't

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                              GENTILE0005143

47

D8D7SECC

1  make that allegation.

2          MR. KIDNEY:  No, we don't say that, because basically
3  all of these witnesses, the investors that Mr. DeFeis talked
4  about, are supposed investors that were part of this Magnum DOR
5  scheme.  So, they weren't going to say that -- I mean they went
6  there because Magnum DOR was willing to help them return the
7  money to Magnum DOR.

8          THE COURT:  Well, wouldn't you agree that logic would
9  at least dictate that if your claim is that all of these
10  people -- and whatever the raw numbers are -- all of these
11  people came to invest as a result of being solicited by their
12  website, it wouldn't be unreasonable to say that one would
13  expect that you would have such evidence?  You would have
14  identified at least one investor who you claim was such an
15  investor.

16          MR. KIDNEY:  Why would any investor like that want to
17  bring themselves to the attention of the Securities and
18  Exchange Commission when they probably are also avoiding taxes
19  for the IRS?

20          THE COURT:  Then how are you going to prove that any
21  of these people -- how are you going to prove that any investor
22  they have was solicited by the website?

23          MR. KIDNEY:  Well, first of all, we have the website.
24  We don't have to prove that people actually invested.

25          THE COURT:  So, you don't intend that that would be

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CONFIDENTIAL                                                      GENTILE0005144

48

D8D7SECC

1   required with regard to your proof.

2           MR. KIDNEY:  No.  If they visited the website, they

3   were solicited.

4           THE COURT:  So, you say it's sufficient to allege and

5   prove that people came to website, they saw that it was

6   offshore and there was mainland to avoid taxes, and there is

7   some U.S. investors that we can't say are the same investors,

8   but they have U.S. investors, that that in and of itself is

9   sufficient allegations and proof to prove your case?

10          MR. KIDNEY:  Well, we have asked -- at some point I

11  assume we might get to the litigation planning -- but we have

12  asked the defense to provide us with all evidence of any

13  contacts with the United States, which would include the very

14  things that Mr. DeFeis says they didn't do.  But I would be

15  very surprised if there were no phone calls to the United

16  States.  I would be very surprised if there was no e-mail

17  communication to the United States.  After all, it dealt with

18  all these brokers from the United States.

19          THE COURT:  The only relevance of that would be such

20  communications with people who are not customers.

21          MR. KIDNEY:  Well, to the brokers maybe.  No, that

22  would include --

23          THE COURT:  What difference does it make?  If it's

24  already to customers, it doesn't prove how they got those

25  customers.  The critical issue here is not a debate about

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

CONFIDENTIAL

GENTILE0005145

D8D7SECC
1  whether they have U.S. customers.  We know they have U.S.
2  customers, and your position is they are entitled to have U.S.
3  customers, and they would be entitled to have as many U.S.
4  customers as want to come to them.
5         MR. KIDNEY:  And that they don't solicit.
6         THE COURT:  Right.  That's not the issue.  The issue
7  is where is there the evidence that the customers they get are
8  being solicited, or some other customers that they're not
9  getting are being solicited?
10        MR. KIDNEY:  The website.
11        THE COURT:  Well, I mean let's put it this way.  I
12 understand your position, and you may convince me for purposes
13 of a motion to dismiss -- and I haven't decided yet -- that
14 that's minimally sufficient.  But quite frankly it is clearly
15 minimally sufficient.  It is not significant proof of
16 solicitation to simply say, well, you have to infer that
17 mainland means that they are talking to U.S. citizens, and you
18 have to infer that offshore means that they want U.S. people to
19 invest, and you've got to infer that because they say you can
20 avoid taxes that they are talking about avoiding U.S. taxes.
21        I mean this isn't the strongest set of allegations
22 that one could make with regard to a solicitation claim.  This
23 is one of the weaker set of allegations that one can make with
24 regards to a solicitation claim because you have no direct
25 evidence of identifying U.S., or articulating that this is for
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                                            GENTILE0005146

50

D8D7SECC

1   U.S. investors in that direct sense, and you have no allegation
2   that you have a person, a company that says, yes, I am a
3   customer, and I am a customer because I was solicited by the
4   company.
5           So, I mean, you know, your inferences are -- as I say,
6   I won't characterize them as weak, but I will characterize them
7   at best minimal as opposed to a maximum set of allegations that
8   one could make.
9           I know what you would characterize as a stronger case,
10  but I don't know what you would characterize as a much weaker
11  case than just simply saying, ah, they solicited because they
12  said mainland, you know what that is a buzzword for.  That's
13  the way your argument is based.
14          MR. KIDNEY:  Well, actually to the contrary, your
15  Honor.  I feel strongly that this is a strong case.  We have a
16  website that was in existence for four years.  We have some
17  statistical information that says U.S. customers did go to that
18  website.  We have a website which presumably was maintained
19  because Mr. Davis and Gibraltar were actually getting results
20  from it.  We have many, many, many --
21          THE COURT:  What do you mean getting results from?
22          MR. KIDNEY:  Getting people to sign up, to invest with
23  them.
24          THE COURT:  Well, where is that?  You don't allege
25  that.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

CONFIDENTIAL

GENTILE0005147

51

D8D7SECC

1          MR. KIDNEY:  Well, we haven't taken any discovery from
2      them because they are down in the Bahamas.
3          THE COURT:  I am not talking about discovery.  You
4      just said you have a stronger case, and you say you have a
5      stronger case because of this fact.  But I'm saying to you not
6      on your complaint, because that's not what you allege in your
7      complaint.
8          MR. KIDNEY:  Actually, the complaint alleges that
9      they -- we have alleged language that the only logical
10     inference is that it was directed to Canadian and U.S.
11     customers.
12         THE COURT:  Tell me where in your complaint.  Show me
13     where in your complaint you allege that customers of Gibraltar
14     are customers because they were solicited.
15         MR. KIDNEY:  We allege they were solicited.
16         THE COURT:  No.  You see again you are avoiding my
17     question.  That's not my question.  You made a different
18     statement just a minute ago, and I am just saying that that's
19     not what you have in your complaint.
20         You don't have in your complaint that any current
21     customers of Gibraltar or any customer that Gibraltar got was
22     solicited by Gibraltar.  That's not what you allege.
23         MR. KIDNEY:  That's not even an element of the
24     offense.
25         THE COURT:  I didn't ask you that.  You would agree
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005148

52

D8D7SECC

 1    with me that's not what you allege.
 2             MR. KIDNEY:  We have not put that in.
 3             THE COURT:  So, based on that argument -- that's not
 4    part of the argument on why this complaint is sufficient,
 5    because you have alleged that they have customers who were
 6    solicited.  That's not what you allege.  Your case would be
 7    stronger if you had alleged that.  As I say, that's a stronger
 8    case rather than a weaker case.  I'm not saying that it is an
 9    insufficient case, but obviously a stronger case would be if
10    the website said something specifically about U.S. citizens
11    investing with the company rather than just buzzwords.  And
12    obviously it would be stronger if you can allege that there are
13    certain individuals who were customers and they are customers
14    because they were solicited by them.  I am not saying that it's
15    necessary, but that would be a stronger case rather than a
16    weaker case than what you have alleged.
17             MR. KIDNEY:  Well, given that the SEC is a regulator
18    and does not represent individual investors, given that the
19    investors that it has communicated with were by and large to
20    one degree or another involved in a Section 5 violation, the
21    sale of unregistered securities, and given that Gibraltar is a
22    Bahamian company which is not subject to investigative
23    subpoenas down there, it is not surprising that we can't allege
24    with great specificity that there were specific customers who
25    actually became customers because of the website.  But that is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                     GENTILE0005149

53

D8D7SECC

1  not an element of the offense.  I agree that if we had such
2  people, we would be in better shape, we would have a stronger
3  case, but I think that right now there is no doubt that we have
4  a sufficiently strong case to withstand a motion to dismiss,
5  which is largely based on matters not alleged and as to which
6  there is no evidence, which Mr. DeFeis makes.  At one point he
7  even argued mainland could mean Great Britain, again bringing
8  up the Commonwealth argument, even though Great Britain is not
9  a mainland.  It's called the British Isles for a reason.  And
10 these inferences that they ask the court to draw are just
11 crazy.
12          THE COURT:  So, what am I supposed to assume is going
13 to be the underlying proof of the way that you have alleged
14 these claims?
15          As I say, the way you have alleged it, I don't have
16 any reason to believe that we'll have a whole lot more at the
17 end of this case than we have at the beginning of the case.
18 The only question is, it seems to me, whether it is reasonable
19 to -- if you are not going to show that there is -- if you
20 don't think that you are going to find direct evidence that
21 certain customers were solicited by the website or in any other
22 way, then the facts as you've given to me aren't going to
23 change.  The question is whether or not the content of the
24 website can reasonably be interpreted as being legally a
25 solicitation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                                    GENTILE0005150

54

D8D7SECC

```
 1              MR. KIDNEY:  Correct.
 2              THE COURT:  That doesn't depend on any new evidence or
 3      any discovery.  Either I have to agree with you that that in
 4      and of itself is sufficient to be a solicitation, or it's not
 5      sufficient to be a solicitation.
 6              So, I would have to determine where it is alleging and
 7      proven offshore, mainland, taxes, that that combination of
 8      things.  If a reasonable trier of fact, by understanding that
 9      that's the nature of the language being used by the website,
10      whether that would constitute in and of itself, legally without
11      any further proof -- because you are not alleging any further
12      proof -- whether that in and of itself would legally constitute
13      a solicitation.  Isn't that really a legal issue and not a
14      factual issue?
15              MR. KIDNEY:  Well, that's partly a legal issue, but I
16      think also you have to take into account that all of the
17      business is North American mainland business.
18              THE COURT:  You can't do it that way, because 75
19      percent of their business is Canadian.  So, the only statement
20      you can make is 25 percent of their business is U.S., and we
21      have no idea how they got that business.
22              MR. KIDNEY:  Well, we probably will after we take some
23      discovery.
24              THE COURT:  Well, you may or may not, but you don't
25      allege in this complaint that that's a relevant consideration.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                    GENTILE0005151

55

D8D7SECC
```
 1   That's not part of your allegations.
 2            MR. KIDNEY:  Well, the SEC has put in the complaint
 3   that 25 percent of the visitors to this website were from the
 4   United States, and we have put in --
 5            THE COURT:  Well, let me make sure I have this right.
 6   I thought the allegation was that 25 percent of their customers
 7   were U.S. citizens.  It's 25 percent of the people who --
 8            MR. KIDNEY:  Website hits.
 9            THE COURT:  Wait a minute.  That 25 percent of the
10   website hits are customers?
11            MR. KIDNEY:  No, are U.S. citizens.  Come from the
12   U.S.
13            THE COURT:  Right.  But that's not what you just said.
14   So, you are not talking about customers.
15            MR. KIDNEY:  I'm talking about website hits.
16            THE COURT:  25 percent of the website hits are --
17            MR. KIDNEY:  -- are U.S. people.
18            THE COURT:  But that does not advance your argument
19   one way or the other --
20            MR. KIDNEY:  Yes, it does.
21            THE COURT:  -- with regard to solicitation.
22            MR. KIDNEY:  Sure it does.
23            THE COURT:  How?  Who cares whether or not --
24            MR. KIDNEY:  It's not necessary that any of those 25
25   percent have gone the extra step and invested through
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CONFIDENTIAL

GENTILE0005152

56

D8D7SECC

 1   Gibraltar.  What it does show is that there is a website, that
 2   the language we have cited shows that they are soliciting
 3   people as investors in North America, and in 25 percent of
 4   their hits they were successful in at least showing their ad to
 5   25 percent.
 6           THE COURT:  Yeah, but you see that's the thing.  I
 7   think I understand your argument.  That's a false argument.
 8   That just means that 25 percent of the hits were U.S.
 9   customers.  That means --
10           MR. KIDNEY:  No, U.S. people.
11           THE COURT:  U.S. people, not customers.  So let's
12   say -- that means that, you know, 1,000 people looked at their
13   website, 1,000 U.S. people looked at their website.  What does
14   that prove?  What does that prove about solicitation?
15           MR. KIDNEY:  That they solicited U.S. customers.
16           THE COURT:  How?
17           MR. KIDNEY:  By saying we have commissions equal to
18   the mainland, we do all of this stuff.  What other kind
19   of solicitation would your Honor want?
20           THE COURT:  Because I'm just saying that that's an
21   irrelevant statistic.  It doesn't matter whether or not a
22   thousand people came to the website; it doesn't matter if it
23   was one person that came to the website.  The question is
24   whether the website is a solicitation.  If I'm looking up
25   Gibraltar as a place, and this comes up as a hit, that doesn't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005153

57

D8D7SECC

```
 1   prove one way or the other that I have been solicited.  How
 2   does it prove that I have been solicited by the percentage of
 3   people who went to the website?  If your argument is it's not
 4   how many people go to the website, it's how many people are
 5   convinced by the website, are being solicited by the words of
 6   the website, if they haven't seen the words ever the website
 7   until they got there, what difference does it make that 25
 8   percent of the people who got there were U.S. people?
 9              MR. KIDNEY:  Because --
10              THE COURT:  Because you don't tell me how they got
11   there.
12              MR. KIDNEY:  Well, they got to the website.
13              THE COURT:  Not by being solicited.
14              MR. KIDNEY:  And once they got to the website they
15   were solicited.
16              THE COURT:  That's true whether it's 25 percent or 90
17   percent.
18              MR. KIDNEY:  Yeah, we are showing -- it just says that
19   people in the United States went to the website --
20              THE COURT:  Went to the website.
21              MR. KIDNEY:  Yeah.
22              THE COURT:  That's right.  That doesn't prove --
23              MR. KIDNEY:  And the language --
24              THE COURT:  That doesn't advance --
25              MR. KIDNEY:  They weren't told you can't invest here.
```

CONFIDENTIAL

GENTILE0005154

58

D8D7SECC

```
 1   They weren't told you can't do anything like that.
 2             THE COURT:  I know.  But again I just don't see --
 3             MR. KIDNEY:  In fact, it said we offer commissions to
 4   you that are equal to that of the mainland, we will hide your
 5   trading, we will do all this stuff.  It's an ad.
 6             THE COURT:  But the problem I have with that argument
 7   is that argument stands on its own regardless of what
 8   percentage of the people got there.  How does the percentage of
 9   the people who got there advance that argument?  Whether it was
10   5 percent or 95 percent, what difference does it make?
11             MR. KIDNEY:  That's true.  We just put that in the
12   complaint because that's what the number was.
13             THE COURT:  I understand that, but I'm saying to you
14   you are trying to argue that that somehow advances the argument
15   that they are being solicited.  I'm saying I don't understand
16   that part of the argument, because telling me what percentage
17   went to the website that were U.S. citizens doesn't tell me
18   whether or not they are solicited.  If they went to the website
19   and the website is not a solicitation, then they weren't
20   solicited.  If they went to the website and the website is a
21   solicitation, they were solicited.  And that's irrelevant as to
22   what number went to the website.
23             MR. KIDNEY:  Well, I don't think it is irrelevant,
24   because one way you consider an ad is where you place the ad
25   and who your audience is likely to be.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

CONFIDENTIAL

GENTILE0005155

59

D8D7SECC

```
 1              THE COURT:  Right.
 2              MR. KIDNEY:  And if I wanted to do advertise to the
 3    people in Brooklyn or in Manhattan, I would put an ad in a New
 4    York newspaper.  But it would be very difficult to argue when
 5    we're only in the print version, at least, that that was a
 6    solicitation of people in San Francisco.
 7              THE COURT:  I know.  But you are not arguing in this
 8    case that this website is somehow more accessible to people who
 9    are on the Internet in the U.S. than the people who are on the
10    Internet net in Afghanistan.  That's not an argument to make.
11              MR. KIDNEY:  I have no idea how accessible it is.
12              THE COURT:  Right.  I could be anywhere in the world
13    and I go on the website and put in Gibraltar, and I'm going to
14    come up with this website.
15              MR. KIDNEY:  But the point is you asked about the
16    website, and you seemed to be skeptical that the use of the
17    term mainland and the comparison to mainland commissions and so
18    forth is sufficient evidence.
19              THE COURT:  Is not the strongest.
20              MR. KIDNEY:  I disagree with that, but other evidence
21    would be --
22              THE COURT:  Do you have a case in which that was the
23    only set of allegations and that it was held to be sufficient
24    either on motion to dismiss or on summary judgment?
25              MR. KIDNEY:  I think this may be the first case --
```

CONFIDENTIAL                                          GENTILE0005156

60

D8D7SECC

1           THE COURT:  It will be the first one I heard of too.
2   Most of them are stronger than this.
3           MR. KIDNEY:  But the fact the ad drew flies shows that
4   it was intended to be what it said.  So, it's just more
5   evidence in support.  You say it's a weak inference, I don't
6   think it is a weak inference.  It would be a stronger inference
7   if it said U.S. investors come to this website.
8           THE COURT:  That's right.
9           MR. KIDNEY:  Yeah, but --
10          THE COURT:  But let's put it this way.  It is a weaker
11  set of allegations than any other case that I am aware of that
12  gives me a factual scenario in which the SEC says, look, they
13  are solicited; it's obvious they are solicited.
14          I mean, every other case I have seen is a stronger set
15  of allegations than this.
16          MR. KIDNEY:  Well, you probably end up mostly with
17  fraud cases, because those are the ones that tend to litigate.
18          THE COURT:  Probably.
19          MR. DEFEIS:  So, on a fraud case you are really saying
20  you're lying, and you have a directed audience from whom you
21  are trying to steal money.
22          THE COURT:  That may be true.  And, as I say, that's
23  not the determinative factor here whether or not you've got the
24  strongest set of allegations or the weakest set of allegations.
25  But obviously if I have to put this on one spectrum or the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                                                    GENTILE0005157

61

D8D7SECC

 1  other, I put it on the weaker set of allegations that I've been
 2  aware of in terms of cases that I've seen rather than the
 3  stronger set of allegations that I am aware of.
 4          MR. KIDNEY:  Well, the way we pled it we don't need to
 5  prove scienter.  And we're not suggesting that Gibraltar didn't
 6  do exactly what it said it was going to do, which was hide your
 7  income from taxes and do all those things.  So, we are not
 8  alleging fraud.  The fact is they may defraud the IRS, but they
 9  didn't defraud their investors.  So, the website itself was
10  accurate, or at least we're not claiming it wasn't accurate.
11          Now, on the Section 5 claim -- if I can spend a minute
12  on that -- basically the complaint says -- first of all, this
13  business about promissory notes, we don't even allege that
14  Gibraltar got involved in the promissory notes.  We suspect
15  these promissory notes created by the flat nominees were
16  created after the SEC investigation.  Had they in fact seen the
17  promissory notes, the case would be even stronger against
18  Gibraltar because then they'd see -- which they should have
19  known anyway because it was S8 stock, which goes to consultants
20  and so forth, and mostly for start-up companies who don't have
21  the cash, so they give stock to their outside consultants and
22  so forth-- which the consultants then are supposed to be able
23  to sell so that they can be compensated, and Gibraltar knew
24  this was S8 stock supposedly that these nominees sent to it, it
25  changed it, put it in its own name, the broker dealer, and then

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

62

D8D7SECC

1  sent most of the proceeds back to Magnum DOR.
2          So, they knew or should have known -- and we are not
3  even alleging scienter here -- that it was actually to raise
4  capital for Magnum DOR rather than to compensate outside
5  vendors.
6          But in any event, as your Honor said -- and as the
7  government said, and there was the case in the sentencing we
8  all heard just this morning -- just as that doctor was
9  important to that scheme because he could sign the scripts and
10  so forth, and they could have got other doctors -- apparently
11  from what I heard they did get another doctor -- the fact that
12  you can get other people to do your work for you doesn't make
13  you not an important party for conducting the Section 5
14  violation that we allege here that they participated in.  And
15  they were totally instrumental in that; they were not a minor
16  party.  So, the Section 5 certainly should withstand any motion
17  to dismiss.
18          The control person liability, I don't think the
19  defendants went to administrative proceedings.  I have not
20  looked to see whether there are control person cases that are
21  not also fraud cases, but I suspect if you went -- I am
22  familiar from just my 25 years at the SEC that that happens.
23  If your Honor want more authority on that, we are glad to give
24  it to you.  But certainly culpable means responsible.  And
25  Mr. Davis is the only person at Gibraltar, as far as we are

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CONFIDENTIAL                                                          GENTILE0005159

63

D8D7SECC

 1  concerned -- I mean he had people working for him but he was in
 2  charge.
 3          Finally, I know the other side has asked to
 4  consolidate this case.  There are no common factual issues with
 5  the other case.  Our case has no scienter claims.
 6          THE COURT:  Are you representing the SEC in both
 7  cases?
 8          MR. KIDNEY:  No, I'm not.
 9          THE COURT:  All right.  I can tell you what my view is
10  on this, and you can convince me otherwise.  But my view is
11  that I would deny the motion without prejudice to consolidate
12  at this point, but I would probably -- I think I'm going to
13  order that you still coordinate discovery.  I don't see any
14  reason why you shouldn't coordinate discovery.
15          And I know that there is a motion that's just recently
16  been made in the other case, and my intention is to adjourn
17  this case to the date when the other case is on and to have the
18  SEC and the defense coordinate discovery so we don't have a
19  waste of resources.
20          Now, if it turns out to be appropriate for some
21  consolidation at trial, that's an issue and I can revisit.  But
22  at this point I think consolidation is necessary, and I can put
23  that off once we get further into it, depending on where we are
24  in both of these cases, after the motions are decided.
25          But there is no reason why you shouldn't coordinate

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL                                                  GENTILE0005160

D8D7SECC

1   the document production.  There is no reason why you shouldn't
2   coordinate the depositions, to the extent you propose to
3   depose.
4              MR. KIDNEY:  The only comment I have on that, you
5   know, I don't have any objection in principle to that.  I think
6   though then that our earlier -- we submitted a statement to the
7   court last week saying that we were happy with the court's
8   proposed litigation schedule.  We would have to revisit that
9   depending on what the schedule is for the other case, which is
10  bigger and more complicated and has a lot more facts that it
11  needs to develop.  So, I would probably have to withdraw that
12  based on whatever your Honor rules.
13             THE COURT:  Why don't we do this.  I think I have the
14  motion filed, but I don't have a response to the motion in the
15  other case.  Hopefully it will be fully submitted, and I will
16  hear them on the motion on that day.  I think they are coming
17  here in September.
18             MR. KIDNEY:  There is a September date I heard.
19             MR. PATTERSON:  I think it's September 10, your Honor.
20             THE COURT:  I don't even know if that motion is going
21  to be fully submitted by September 10.
22             MR. KIDNEY:  Well, if your Honor would just include us
23  in whatever notice for both cases for the next scheduling
24  conference.
25             THE COURT:  As a matter of fact, I'm going to leave

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CONFIDENTIAL

GENTILE0005161

D8D7SECC

1 the September 10 date on for now, and I'm going to say that you
2 guys should be here too, and if we need to deal with some joint
3 issues, we will.  I don't know whether or not in that short
4 period of time I can get a decision out to you on this one
5 before then, this being the end of August, and quite frankly
6 I'm going to be transitioning new law clerks in the next couple
7 of weeks too.  So, we will see if I can do it by then.
8          Otherwise, I'm going to tell the other parties to be
9 heard on that motion, if it's fully submitted, on the 10th.  If
10 not, I will put it off until it's fully submitted, hear you on
11 that, resolve the motions, and then have you coordinate the
12 discovery, and then we can revisit the consolidation for trial,
13 if it's necessary.
14          Mr. DeFeis, did you want to add anything?
15          MR. DEFEIS:  Just one additional housekeeping
16 schedule.  We would just like to request an opportunity to file
17 our initial disclosures by September 3, because our client is
18 presently traveling on vacation.  That's a week before the
19 initial conference in that case.
20          MR. KIDNEY:  Well, I guess it probably wouldn't be
21 worth objecting.  We are going to start our document production
22 in two weeks.
23          MR. DEFEIS:  Thank you, your Honor.
24          THE COURT:  As I say, I don't want to have a lot of
25 unnecessary duplicative work.  Judge Cedarbaum said to me in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CONFIDENTIAL                                                    GENTILE0005162

66

D8D7SECC

1  another case the government is fungible.  So, it's hard enough
2  to say when I have the SEC, the CFTC, and the U.S. Attorney's
3  office, and they're all arguing from a different government
4  point of view, but when I have the SEC in one case and the SEC
5  in another case, I would assume that there's is one SEC and
6  that you could --
7              MR. KIDNEY:  It's the New York office versus the
8  Washington office.  We aren't all that close.
9              THE COURT:  That distinction I don't think I'll draw.
10             All right.  So, let me get to this as quickly as
11 possible.  But I will see you on the 10th unless their motion
12 is not fully submitted.  And if we need to adjourn that, I will
13 adjourn that until quickly after that, right after it is fully
14 submitted, so we can move forward.  All right?
15             MR. KIDNEY:  Thank you, your Honor.
16             MR. DEFEIS:  Thank you.
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CONFIDENTIAL                                    GENTILE0005163

CONFIDENTIAL

GENTILE0005164

### FINANCIAL INDUSTRY REGULATORY AUTHORITY

In the matter of

GUY GENTILE

Examination No.
20080137492

### WELLS SUBMISSION ON BEHALF OF
### GUY GENTILE

Adam Ford
Harris, O'Brien, St. Laurent &
Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(917) 512-6937
aford@harrisobrien.com

*Attorney for Guy Gentile*

# TABLE OF CONTENTS

**TABLES OF AUTHORITIES** ................................................................................................. ii

**INTRODUCTION** ........................................................................................................... 1

**PRELIMINARY STATEMEN**T ........................................................................................... 2

**FACTUAL BACKGROUND** ............................................................................................ 4

   **I.**   **U.S. residents are blocked from accessing SureTrader's website advertisements** ................. 6

   **II.**  **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons** ........................................................................................... 10

**LEGAL ARGUMENT** ..................................................................................................... 12

   **I.**   **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them** ................................................................... 12

   **II.**  **A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities** ................................................................. 13

      A.  SureTrader's website does not solicit U.S. citizens or residents ............................... 16

         1.   *SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities*...…………16

      B. No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons. ............................................. 17

   **III.**  **Mr. Gentile did not aid and abet any violation** ..................................................... 19

      A. There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith. ................................................................................................................. 19

   **IV.**  **A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns** .. 21

**CONCLUSION** ............................................................................................................. 23

CONFIDENTIAL                                                             GENTILE0005166

## TABLES OF AUTHORITIES

**Cases**

*Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), ................................................. 22

*Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001)............................ 22

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). ........................................ 10

*Fryar v. Abell*, 492 U.S. 914 (1989) ............................................................................................. 22

*Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)………………………………….........22

*Securities and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ.
2575...................................................................................................................................... 25, 26

**Statutes, Rules, and Other Authorities**

54 Fed. Reg. 30013, 30020 (July 18, 1989)............................................................................. 15, 16

Exchange Act Rule 15a-6 ........................................................................................................ 4, 5, 6

FINRA Rule 2010 ............................................................................................................................. 4

FINRA Rule 2110 ............................................................................................................................. 4

Section 15 of the Securities and Exchange Act of 1934 .................................................................. 4

Arthur F. Mathews, Enforcement and Litigation under the Federal Securities Laws 1973. ........ 20

*Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017
(July 11, 1989) .......................................................................................................................... 15

*S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices*
(June 1, 1972)............................................................................................................................. 20

*Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise
Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998)........................ 14, 15, 21

CONFIDENTIAL                                                                                    GENTILE0005167

## **INTRODUCTION**

Guy Gentile is the founder and a director of Swiss America Securities, Ltd (d/b/a SureTrader), a foreign broker dealer. On November 12, 2013, FINRA Enforcement Staff advised Mr. Gentile that it had made a preliminary determination to recommend a disciplinary action be brought against him for violating NASD Conduct Rule 2110 and FINRA Rule 2010, for aiding and abetting SureTrader in violating Section 15 of the Securities and Exchange Act of 1934. The preliminary determination is premised on a finding that SureTrader engaged in securities transactions for or on behalf of U.S. persons without registering with the United States Securities Exchange Commission (the "Commission"). During a phone conference that same day, the Enforcement Staff acknowledged that unregistered foreign broker dealers may perform services on behalf of U.S. persons if they do not solicit the US customer. However, the Enforcement Staff takes the position that the SureTrader website is a form of solicitation, which eliminates the statutory registration exemption. While it has described the website as the "main issue," the Enforcement Staff has also concluded that a disciplinary action is appropriate because Mr. Gentile took part in other internet activities constituting improper solicitation, namely a single webcast with Timothy Sykes on February 8, 2013. Because SureTrader is a Bahamian broker dealer not registered with FINRA, Enforcement Staff seeks to pursue a disciplinary action against Mr. Gentile on an aiding and abetting theory. That is, the Enforcement Staff believes Mr. Gentile knew that SureTrader was violating Rule 15 by advertising itself on its website and taking part in the webcast, and intentionally rendered substantial assistance in the violation.

The Enforcement Staff's preliminary determinations are erroneous. There is no basis for an action against Mr. Gentile, and none should be recommended.

CONFIDENTIAL

GENTILE0005168

## PRELIMINARY STATEMENT

Foreign broker dealers are permitted to engage in securities transactions for or on behalf of U.S. persons, so long as the foreign broker dealer does not affirmatively solicit the customer. Swiss America, through its Director and Chief Compliance Officer – not Mr. Gentile – followed the letter of the law and all available SEC guidance regarding soliciting U.S. persons, and took every reasonable step to comply with these rules and guidance.  Specifically, once Swiss America decided it would start accepting unsolicited United States investors as customers, the company's Chief Compliance Officer:

1.  Set up an internal infrastructure that included strict policies and practices to prevent solicitation of U.S. customers;

2.  Redesigned the SureTrader website to include a pop-up blocker that prohibits U.S. customers from accessing any substantive information contained in it;

3.  Redesigned the website so that every page carries a bold, unambiguous warning that Swiss America is not intended for and does not service U.S. customers;

4.  Drafted new account opening documents which preclude opening an account for any potential new customer who might be a U.S. person, unless the Chief Compliance Officer determines that person was not solicited by Swiss America in any way; and

5.  Drafted and maintains new account opening documents that require all U.S. persons to truthfully confirm that they affirmatively reached out to Swiss America without Swiss America having done anything affirmative to solicit that customer.

These facts would be a complete defense to any allegation that Swiss America violated Rule 15 on the basis of it maintaining a website.

Nor can Mr. Gentile's appearance in the February 8, 2013 Timothy Sykes webcast be said to constitute an improper solicitation of US persons.  In keeping with Swiss America's strict non-solicitation policies outlined above, Mr. Gentile intended to, and did, solicit only non-U.S. persons during the course of that interview. Before starting the interview, Mr. Gentile was clear to Mr. Sykes that neither of them could say anything that could be misinterpreted as soliciting

2

GENTILE0005169

U.S. persons.  And a review of the video proves this – everything both men said was directed specifically at non-U.S. persons.  Moreover, SureTrader took reasonable measures to ensure that it did not effect securities transactions with U.S. persons as a result of this de minimis Internet activity. Specifically, Swiss America blocks U.S. persons from accessing its website. Furthermore, Swiss America's internal policies permit a U.S. person to open an account only if the Chief Compliance Officer has determined that these customers initiated the transaction with SureTrader without solicitation.  The Sykes webcast, therefore does not eliminate SureTrader's exemption from registration, and there is no primary Rule 15 violation.

Here, of course, the question is not just whether Swiss America violated Rule 15a-6, but whether Mr. Gentile *intentionally* aided and abetted that violation.  While Enforcement Staff takes the position that a Rule 15 violation is a strict liability offense, aiding and abetting, of course, requires exacting proof of intent.  Given the extraordinary efforts Swiss America undertook to solicit only non-United States customers, to not solicit U.S. persons, to block US persons from accessing its website, to prevent opening an account for a U.S. persons if they were solicited in any manner, and Mr. Gentile's good faith belief that these policies and practices were squarely in line with Commission rules and guidance, it is inconceivable how FINRA can make out a claim that Swiss America violated this rule, let alone that Mr. Gentile *intentionally* aided and abetted in it.

Moreover, even if FINRA now determines that SureTrader's efforts were lacking, and therefore can be found to have violated Rule 15, Mr. Gentile had no prior notice of this new interpretation.  At the time, Mr. Gentile reasonably believed SureTrader was operating squarely within the bounds of the law.  And his belief regarding SureTrader's compliance was more than reasonable; the Enforcement Staff's position in this proposed disciplinary action is entirely

CONFIDENTIAL

GENTILE0005170

novel.   To our knowledge, FINRA has not brought a single case alleging a Rule 15 violation based on facts similar to those here.  The Enforcement Staff's preliminary determination that Mr. Gentile aided and abetted SureTrader is a *post hoc* interpretation of the relevant rules and formal SEC guidance, and attempts to penalize Mr. Gentile for conduct that he could not possibly have known would later be deemed a violation.  Any disciplinary action here would raise serious due process concerns. Further, disciplinary proceedings would undermine at least thirty years of the Commission's thoughtful public policy determination that offshore broker dealers may service a U.S. customer so long as the broker dealer takes no affirmative steps to solicit that customer. Bringing a disciplinary action against Mr. Gentile would accomplish the exact opposite of the SEC's stated public policy underpinning these regulations. Accordingly, Mr. Gentile respectfully requests that FINRA decline to pursue this matter any further.

## **FACTUAL BACKGROUND**

Swiss America is a Nassau, Bahamas-based broker dealer licensed by the Securities Commission of the Bahamas.  It is not registered with the SEC and is not a FINRA member. SureTrader is a division of Swiss America that provides on-line trading access for international equities traders.[1]  It is among the few (if not only) Bahamian broker dealers that offers its international customers the ability to trade securities.

Guy Gentile founded SureTrader in December 2011.  Mr. Gentile is a veteran securities trader and entrepreneur who prior to founding SureTrader had created several entities that are based on online trading, proprietary trading, high-speed algorithmic trading and financial trading technology.  In 1999, he founded Stock USA Execution Services, Inc., a United States registered

---

[1] There is no relevant distinction between the two entities.

CONFIDENTIAL                                                                                      GENTILE0005171

broker dealer that provides trade execution and brokerage services to high-frequency, institutional, broker dealer and active-trading clients.  In 2009, he founded ProTrade Securities, LLC, a SEC registered broker-dealer and member of the CBSX Stock Exchange. Mr. Gentile has never been censured or barred by any regulatory agency.

Swiss America currently has 15 employees who report to SureTrader's Director and Chief Compliance Officer, Philip Dorsett, a nine-year veteran of the securities industry.  Mr. Dorsett received his Bachelor's degree from the University of South Florida and his Masters in Business Administration (MBA) in Finance from Nova Southeastern University.  He stays current with the regulatory environment and regularly attends compliance workshops and securities training institutes. SureTrader's decision to hire Mr. Dorsett as a CCO was covered in the Bahamian press and treated as a sign of SureTrader's impressive market presence in that country and around the world.  In addition to Mr. Dorset, SureTrader's management includes a certified public accountant, and each of 15 SureTrader employees has, at a minimum, a bachelor's degree.

SureTrader has, in a very short amount of time, established itself as one of the most well-respected and largest broker dealers in the Bahamas.  It is attractive to its international customers for a number of reasons.  SureTrader permits customers to open an account with a minimal initial investment, an opportunity that is premised on the firm's novel philosophy that it is possible to be a successful day trader with significantly less startup capital than typically suggested. Because the firm is in the Bahamas, and is regulated by the Bahamian Securities Commission, it is not subject to the same regulations as firms that are under the jurisdiction of Canada, the European Union and the United States.  Specifically, clients are not subject to the Commission's Pattern Day Trading Rule.  The firm also offers clients a 6:1 margin, which is significantly

CONFIDENTIAL

GENTILE0005172

greater than the Canadian 3:1 margin cap and the US 4:1 limit.  (Because of this increased leverage, however, the firm requires its clients to diversify, and hedge themselves.)  SureTrader also charges substantially less per trade than conventional online brokerages.  These attributes permit SureTrader to promote itself and to solicit non-U.S. persons to use it as their broker dealer, rather than an American, Canadian, or European broker dealer.  SureTrader.com directly compares itself to QuestTrade (a Canadian Broker Dealer) and Saxo (a European Broker).

Under Mr. Dorsett's watch, SureTrader markets its services only to the English-speaking market *outside of the United States.* The attached summary of SureTrader's Google AdWords campaigns shows that SureTrader is focused on the English-speaking investor populations in several countries, including Australia, the Bahamas, Canada, Germany, India, the Netherlands and the United Kingdom. A November 2013 screen shot of SureTrader's Google AdWords campaign is attached hereto as Exhibit A. Similarly, SureTrader's Facebook marketing campaign is targeted to several non-U.S. jurisdictions.  A November 2013 screen shot of SureTrader's Facebook advertising is attached hereto as Exhibit B.  Analytical data from Facebook suggests that SureTrader has achieved deepest market penetration in New Delhi, India. *See* screen shot of SureTrader's Facebook page, attached hereto as Exhibit C.  SureTrader does not market itself to U.S. persons through any print or electronic media, nor does it target the United States in any Google, Twitter, Facebook, or other social-media advertising platform.

I.   **U.S. residents are blocked from accessing SureTrader's website advertisements**

SureTrader takes its non-solicitation obligation under Rule 15a-6 seriously, and has taken every reasonable measure to ensure that it, and its employees, comply with the Rule.  Perhaps most significantly, it blocks potential U.S. investors from accessing its website, "www.suretrader.com" ("the SureTrader website").

CONFIDENTIAL

GENTILE0005173

When any individual's browser opens to the SureTrader website, the viewer is <u>not</u> taken to the SureTrader.com homepage, but is rather confronted by a "pop-up" blocker.  The pop-up has the effect of prohibiting access to any information that is on the website unless the viewer first affirms and agrees with the site's terms and conditions. This pop-up blocker states in relevant part:

> **Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Click continue below if you are a Non-US resident and you have read and understood SAS policy with regard to US customers and would like to continue.**

A copy of the full text of the "Terms and Conditions" contained in the pop-up blocker is attached hereto as Exhibit D.  Only individuals who accept this pop-up clickwrap agreement,[2] in which the individual affirms they are not a U.S. resident, are given access to information on the website.

This firm practice reflects a conservative approach to Rule 15a-6, as there is nothing in the Commission's guidance that suggests a foreign broker dealer must take affirmative steps to block U.S. persons from viewing its website.  There is no known, legitimate, technological manner to completely block U.S. residents from accessing a particular website. The pop up clickwrap agreement is an effective and reasonable mechanism for preventing U.S. residents from accessing the SureTrader site.  Indeed, other industries regularly utilize such agreements in order to insulate themselves from charges of inappropriate advertising.  For example, while there

---

[2] "A clickwrap agreement appears on an Internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the Internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). Courts have almost universally held such express clickwrap agreements to be enforceable. *Id.* at 235-39 (upholding clickwrap forum-selection clause).

CONFIDENTIAL                                                                                      GENTILE0005174

is no law requiring alcohol manufacturers to block their websites from minors by using an age verification clickwrap agreement, practically every producer does so.[3] The practice is in accord with guidance from the Federal Trade Commission that such methods are a best practice for preventing minors from accessing a website. The FTC has noted that, unlike other advertising such as "television or print ads," web sites are different because "consumers must seek them out" and "their content *does not appear unsolicited*."[4]   Similarly, here SureTrader operated under the reasonable assumption that its clickwrap agreement would be as effective in preventing U.S. persons from accessing its website.

SureTrader anticipated that an individual who was confronted with the pop up blocker might lie about citizenship.  While Commission guidance is that foreign broker dealers will not be found to have solicited any U.S. Person that circumvents the reasonably designed measures, i.e., by falsely responding to residence questions, SureTrader nevertheless instituted additional safeguards.[5]  In addition to the pop up blocker, SureTrader designed its website so that *every* page on SureTrader.com displays the following message, in bold, conspicuous lettering:

---

[3] The three major alcohol manufacturer industry groups have adopted age verification as a best practice. *See* Beer Institute Advertising and Marketing Code at 4; Distilled Spirits Council of the United States, Guidance Note on Responsible Digital Marketing Communications at 1, available at www.discus.org/assets/1/7/DISCUS_Digital_Communications_Guidelines.pdf; Wine Institute, Guidance Note on Digital Marketing Communications at 1, available at www.wineinstitute.org/files/Digital_Marketing_Guidelines_FINAL.pdf (same).

[4] In 1999, the FTC identified, as a best practice, the "use of systems to limit access to [alcohol web] sites to users that state that they are over the age of 21." Federal Trade Commission, Alcohol Marketing and Advertising: A Report to Congress, at 16 (September 2003), available at www.ftc.gov/sites/default/files/documents/reports/alcohol-marketing-and-advertising-federal-trade-commission-report-congress-september-2003/alcohol08report.pdf).

[5] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516, at 6 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

CONFIDENTIAL                                                                                          GENTILE0005175

> **Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Swiss America Securities, Ltd does not solicit U.S. resident clients.**

This disclaimer is positioned in the website such that it is impossible for anyone who is viewing the website to notice see it.  SureTrader decided to include this language on its website specifically because it is recommended by the United States Securities and Exchange Commission as a best practice for foreign broker dealers.

Further, the SureTrader website is designed so that the only way any individual can open an account with SureTrader is to fill out an online application that is only accessible through the website.  The application requires disclosure of personal information including, among other things, the applicant's financial background (including references), investment experience, and mailing address.  The purpose of requiring a mailing address is to enable SureTrader to determine whether a potential client is a U.S. resident.

If SureTrader becomes aware that the potential customer is a U.S. resident, i.e., by noticing a US address on the application, SureTrader policies, overseen by the company's Chief Compliance Officer, require an inquiry into whether that individual was solicited by SureTrader or whether the individual initiated contact with the company on their own accord.  One of the application forms required for U.S. residents who seek to open an account with Swiss America is an "Unsolicited Acknowledgement Agreement" ("the UAA").  The UAA includes the affirmation that "in no way did Swiss America Securities, Ltd solicit me to become a client. I initiated contact with Swiss America Securities, Ltd. on an unsolicited basis." UAA ¶ i. In this manner, Swiss America is able to track U.S. persons for whom it effects securities transactions to

9

ensure that these clients came to SureTrader on their own accord and were not solicited by any internet activity.

II.   **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons**

Timothy Sykes is a respected personality among securities traders who gained his reputation by having made his first million from using the thousand dollars he received for his bar mitzvah to trade securities.[6]  He now makes a living both trading for himself, and training his "students" (traders who pay Mr. Sykes for access to his various instructional content) how to make money in trading stocks.  He runs a website under the Timothyskyes.com domain name, which is where his students have access to his live webcasts, and other research materials.  Mr. Sykes has over 2,500 students in over 65 countries.[7]  Mr. Sykes is not an officer, director, employee, nor does he have any ownership interest in SureTrader (or Swiss America).

Having had a pre-existing relationship with Mr. Gentile, Mr. Sykes opened an account with SureTrader once the company started accepting US customers.[8]  Mr. Sykes found early success there and accordingly began touting it to his students.  He also signed up with the affiliate program, in which SureTrader clients are entitled to referral fees for referring *non-US clients* to SureTrader.

---

[6] Mr. Sykes has been described as "a voluble . . . hedge fund manager who made more than a million dollars off his bar mitzvah money" through online trading. Michael de la Merced, "Culturally, Hedge Funds Go Public," New York Times (December 8, 2006) (available at www.nytimes.com/2006/12/08/business/media/08hedge.html?_r=1&).

[7] TimothySykes.com, available at www.timothysykes.com/about/#.

[8] For the first few months SureTrader was open the company had a policy to not accept any U.S. persons as clients.  At that time, none of the non-solicitation policies discussed herein were in effect, as there was no need because of the general ban on providing services for U.S. persons.

CONFIDENTIAL                                                                                                      GENTILE0005177

Sykes signed the standard affiliate contract, which states in relevant part:

> **IT IS SPECIFICIALLY STATED THAT ACCESS TO AND/OR ANY USE OF, THE WEBSITE AND/OR THE PRODUCT AND/OR ANY SERVICES PROVIDED BY SURETRADER BY ANY RESIDENT AND/OR CITIZEN OF THE UNITED STATES OF AMERICA IS PROHIBITED. YOU MUST ABIDE BY ALL RULES AND REQUIREMENTS SET FORTH IN THE TERMS AND CONDITIONS OF OUR WEBSITE WITH RESPECT TO LEGALITY AND ELIGIBILITY OF USERS OF THE PRODUCT.**

Accordingly, Mr. Sykes, like all other clients who have signed up for the affiliate program, is well aware of SureTrader's policies regarding U.S. persons.

In early February 2012, Mr. Sykes traveled to the Bahamas and visited SureTrader's offices, where he broadcasted a live-stream webcast on or about February 8.  During the filming of this webcast, Mr. Sykes invited Mr. Gentile to discuss SureTrader's business.  Importantly, Mr. Gentile agreed to be interviewed during the webcast only after: (1) inquiring with the Chief Compliance Officer whether this type of internet activity was permissible; (2) receiving approval from the CCO; (3) reminding Mr. Sykes that he could not say anything that could be construed as soliciting U.S. persons; and (4) receiving such assurance from Mr. Sykes. The interview lasted roughly twenty minutes, and during the entire question and answer period, Mr. Gentile was clear that he was only interested in soliciting non-U.S. persons and that SureTrader does not solicit U.S. persons.

Mr. Gentile did not originally believe that the video was being recorded and made available to the public on Mr. Sykes' website. However, as soon as he learned about it, he requested that Mr. Sykes embed the required non-solicitation language on the video's landing page.  This, combined with SureTrader's Website, which blocks US citizens from viewing it, satisfied SureTrader's Chief Compliance Officer – and Mr. Gentile – that SureTrader had taken sufficient precautionary measures reasonably designed to ensure that this internet activity did not

CONFIDENTIAL                                                                     GENTILE0005178

result in effecting securities transactions on behalf of U.S. persons.  Other than this single webcast, Enforcement Staff has not brought any other questionable Internet activity to Mr. Gentile's attention.

## **LEGAL ARGUMENT**

I.   **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them**

Foreign broker dealers are permitted to engage in securities transactions with or on behalf of US persons without registering with the Securities and Exchange Commission so long as the broker dealer did not solicit the U.S. customer.[9]  In adopting this exemption, the Commission sought to avoid a regulatory scheme in which foreign broker-dealers "refuse to deal with U.S. persons under any circumstances."[10]  Indeed, the Commission's policy since the late 1980s has been to foster the ability of U.S. customers to benefit from the "increasing internationalization of the securities marketplace," and the steadily increasing "desire of investors to trade in financial markets around the world."[11]  The Commission was clear that the unsolicited trades exemption of Rule 15a-6 should foster the ability of U.S. investors to seek out opportunities to utilize the

---

[9] *See* Exchange Act § 15(a)(2); Rule 15a-6; *Registration Requirements for Foreign Broker-dealers*, Exchange Act Release No. 27017 (July 11, 1989), 54 Fed. Reg. 30013, 30020 (July 18, 1989) ("Adopting Release").[9]

[10] The Adopting Release notes at 30017:

> Although the requirements of Section 15(a) do not distinguish between solicited and unsolicited transactions, the Commission does not believe, as a policy matter, that registration is necessary if U.S. investors have sought out foreign broker-dealers outside the United States and initiated transactions in foreign securities markets entirely of their own accord. In that event, U.S. investors would have taken the initiative to trade outside the United States with foreign broker-dealers that are not conducting activities within this country. Consequently, the U.S. investors would have little reason to expect these foreign broker-dealers to be subject to U.S. broker-dealer requirements. Moreover, requiring a foreign broker-dealer to register as a broker-dealer with the Commission because of unsolicited trades with U.S. persons could cause the foreign broker dealer to refuse to deal with U.S. persons under any circumstances.

[11] *Id*. at 30014.

CONFIDENTIAL                                                                                    GENTILE0005179

services of foreign broker-dealers, and that foreign broker dealers should not believe they are prohibited from dealing with U.S. investors under any circumstances.

The Adopting Release did not attempt to fully define solicitation, preferring instead to leave the question to staff interpretation on a "case by case basis."[12] The Commission, however, did provide examples of conduct that would constitute solicitation: telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect transactions; advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United States or on any radio or television station whose broadcasting is directed into the United States; and conducting investment seminars for U.S. investors.[13]  In short, the Commission categorized "solicitation" as affirmative actions by a foreign broker dealer specifically directed at a U.S. person.

## II. A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities

The only guidance issued by the Commission on the use of websites and the internet was issued in March 1998, at a time when the internet bore little resemblance to what it does today. Indeed, while it is hard to comprehend, Google did not exist in March 1998 and dial-up modems were the norm, greatly restricting the flow of information.  Searching the web was a slow and cumbersome process, with unreliable search engines and slow connection speeds.  Blogs had not yet come into widespread use, and video sharing was not available (YouTube is another eight years away).

Against this backdrop, the Commission issued guidance regarding how foreign broker dealers may (1) advertise on a website, and (2) engage in other "internet activities" without

---

[12] *Id*. at 30021.

[13] *Id*. at 30018.

CONFIDENTIAL                                                                      GENTILE0005180

running afoul of non-solicitation regulations.[14] The Commission "clarified" (without altering the fundamental registration requirements) that a foreign broker dealer's merely advertising on a website will not constitute solicitation of a US customer.  If a foreign broker dealer wishes to engage in other "Internet activities," besides advertising on a website, it must take "measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons. . ." who were exposed to the internet activities.

The Commission did not define the term "Internet activities," but since the Commission stated that it was only clarifying pre-existing rules without altering them, the Commission must have intended that the phrase "Internet activities" be interpreted in line with the examples of "solicitation" provided in the Adopting Release, i.e., direct solicitation such as phone calls to a U.S. person, targeted mailings, advertisements in papers of general circulation.  This is a reasonable interpretation of the 1998 Release, especially in light of the Commission's guidance that the registration exemptions should not be interpreted to, "preclude some of the most promising internet applications by investors, issuers, and financial service providers."[15]

For illustrative purposes, the Commission provided an example of one "reasonable measure" to protect against an accusation that any Internet activity was intended to solicit U.S. persons:

- Posting of a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and
- Refusing to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.[16]

---

[14] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

[15] The 1998 Release § III.A.

[16] *Id.* § III.B.

14

GENTILE0005181

However, the Commission left individual Compliance officers to determine if better, alternative options exist.  Indeed, the Commission stressed that "[t]hese procedures are not exclusive" and that "[a]doption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities."[17]  Stated differently, while posting a prominent disclaimer on the website that contains promotional materials and refusing to provide services to any potential U.S. person is one way for foreign broker dealers to engage in Internet activity and avoid running afoul of the non-solicitation rules, these are not the only precautions foreign broker dealers can take to ensure that their Internet activities have not targeted U.S. persons and resulted in engaging in securities transactions for or on behalf of an investor that did not reach out to the broker dealer "on their own accord."

The Commission also instructed foreign broker dealers that have a website and intend to rely on Rule 15a-6's exemption that they should obtain "as a precaution reasonably designed to prevent [a finding of solicitation], affirmative representations from potential U.S. Customers that they deem unsolicited that those customers have not previously accessed their websites."  Or the broker-dealer could maintain records that are "sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its website."[18]

---

[17] *Id.*

[18] *Id.* § VII.A..

CONFIDENTIAL

GENTILE0005182

A.     SureTrader's website does not solicit U.S. citizens or residents

1.   *SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities.*

Once SureTrader changed its policy to start accepting non-solicited U.S. persons as customers in early 2012, SureTrader's Compliance Officer reviewed all relevant Rules and Commission guidance.  While the Guidelines are outdated, internally contradictory, and unclear, SureTrader made a good faith effort to put into place firm policies aimed at conducting business squarely in line with U.S. non-solicitation laws.  By any objective measure, SureTrader went beyond what the most recent Commission guidance suggests as a best practice for avoiding solicitation of U.S.-based persons. [19]  While SureTrader did not (nor was it required to) refuse to effectuate securities transactions for any U.S. person under any circumstances, it followed the Commission's guidance by adopting other, "equally or more effective precautions" to avoid doing business with U.S. persons that accessed its website or its Internet activity.  Such measures included: (1) preventing U.S. persons from accessing its website, and (2) reminding all visitors on every page of its website that Swiss America Securities does not service U.S. resident clients. These two design features of the SureTrader website negate any charge of improper solicitation.

But the company, following Commission guidance, has also maintained records that are sufficiently detailed and verifiable to reliably determine both that SureTrader's Internet activities did not result in effecting securities transactions with U.S. persons, and that none of its U.S. customers were solicited.  Every United States person that has opened an account with

---

[19] SureTrader's interpretation of the Commission's guidance regarding maintaining a website also finds support in a more well-developed area of law of *in personam* jurisdiction. In determining whether a potential defendant's Internet activity has subjected him or her to a court's jurisdiction, federal courts employ a "sliding scale analysis" considering "the nature and quality of commercial activity that an entity conducts over the Internet."[19] Generally, personal jurisdiction does not extend to "defendants who simply post information on a web site that is accessible to residents of the forum state. Such 'passive' web sites do no more than make information available to those interested in it."

CONFIDENTIAL                                                                    GENTILE0005183

SureTrader has executed an Unsolicited Acknowledgement Agreement affirming that they "initiated contact with Swiss America Securities on an unsolicited basis." Swiss America maintains all of these records in the ordinary course of business.

      B.    <u>No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons.</u>

What constitutes an adequate measure to avoid targeting U.S. investors is obviously case specific. The Commission takes a totality of the circumstances approach in determining whether conduct was actually aimed at targeting at U.S. persons. As a result, regardless of what precautions a foreign broker dealer adopts to prevent U.S. persons from accessing its website or blocking direct communications, if the foreign broker dealer engages in conduct that makes it appear obvious that it is targeting U.S persons, the registrations exemptions will not be applicable. For example, the Commission has noted solicitations which emphasize an investor's ability to avoid U.S. incomes taxes on his investments is conduct that is obviously aimed at US citizens or residents, as they are the only individuals who would need to attempt to avoid U.S. income taxes.

Here, there is no content contained in either the website or as part of other Internet activities that is obviously aimed at U.S. persons. In fact, all of the language found in both the website and the Sykes webcast – the only internet activity Enforcement Staff brought to Mr. Gentile's attention – is clearly aimed at non-U.S. persons. Contrary to suggesting that U.S. persons could avoid income taxes by dealing with SureTrader, the account opening paperwork requires every U.S. person to acknowledge that he or she has " reporting obligations to the United States Government of income/loss, money transfers to an offshore brokerage firm, or ownership or control of a foreign entity" and that the customer has "independently sought

CONFIDENTIAL    GENTILE0005184

professional legal and tax advice before opening an account with Swiss America Securities Ltd."
SureTrader provides all U.S. clients with their tax information, including a breakdown of total
net profits per symbol, and a breakdown of all fees paid

During a November 12 phone conference with Enforcement Staff, counsel for Mr.
Gentile was informed that the language on SureTrader's website is clearly aimed at U.S. persons
because it references the Pattern Day Trading Rule, and U.S. margin limits.  But these types of
statements are not obviously targeted at U.S. persons, and certainly are not the type of statements
that the Commission referenced in its guidance as giving rise to an inference of solicitation.  In
fact, these statements are targeted at non-U.S. persons that SureTrader wants as clients, and are
intended to highlight to those foreign persons that SureTrader has a competitive advantage over
U.S. broker dealers who are subject to these restrictions.  The Enforcement Staff is simply wrong
to suggest that a foreign broker dealer targets U.S. persons by making any statement about
America, Americans, or American regulations.  By making such statements, SureTrader is
competing with U.S. broker dealers for English-speaking investors in non-US jurisdictions; it is
not targeting U.S. persons.

This point is equally applicable regarding the only Internet activity at issue, the Sykes
Webcast.  There is not a single statement on that webcast that is obviously targeting Americans.
And in fact, a review of the webcast bears this out.  Specifically:

1. When asked about SureTrader's high wire transfer fees, Mr. Gentile responded
   that wires are more expensive because they are international, as "we're not
   dealing with US firms."
2. When Gentile was asked if SureTrader can do an ACH transaction, he
   immediately responded "no, because those wire transfers only come from US
   banks, and SureTrader does not interact with US banks."
3. When someone asked about SureTrader's Insurance Underwriter, Mr. Gentile
   recommended the individual visit the website, knowing that Americans are
   blocked from viewing the website.

CONFIDENTIAL                                                            GENTILE0005185

4.   When asked which countries' citizens are accepted as clients, Mr. Sykes responded that SureTrader accepts clients from the "United Kingdom, Australia, and Canada."  Mr. Gentile responded that "the regulators tell us which countries are on the list of who we can't do business with and we follow the rules."

There are no statements about avoiding U.S. income tax or any other statement that can only be meant to target U.S. persons.

### III.   Mr. Gentile did not aid and abet any violation

A.   <u>There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith.</u>

Three elements are required to establish an aiding and abetting violation of federal securities laws: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation.[20] Individuals who are convicted of aiding and abetting securities violations are universally those who knowingly engaged in conduct that they knew to be wrong.

For the reasons discussed above, there can be no aiding and abetting liability on the part of Mr. Gentile. There is no violation of Rule 15a-6 by Swiss America, the primary party.  But even if FINRA now, for the first time, takes the position that a pop-up blocker that blocks U.S. residents from viewing a foreign broker dealer's website, bold disclaimers on every page, and a non-solicitation policy that follows Commission guidance to a T is insufficient to demonstrate compliance with the unsolicited transaction registration exemption, Mr. Gentile certainly had no advance notice of that position. Neither FINRA, nor the Commission, nor any other regulatory

---

[20] *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), *vacated on other grounds sub nom Fryar v. Abell*, 492 U.S. 914 (1989); *Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001) (citing *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)).

CONFIDENTIAL                                                                                                    GENTILE0005186

body has ever advanced such a strict interpretation of Rule 15a-6(1). Therefore, even were the Commission to find an underlying violation, Mr. Gentile should still not be found to have intentionally aided and abetted it, as he had no prior notice of what the new interpretation of the rules would be. [21]

Furthermore, Mr. Gentile did not aid and abet a registration violation of the Exchange Act by participating in the Sykes webcast. The webcast, as discussed fully above, was not aimed at US persons, but rather at Mr. Sykes' large non-U.S. audience. It was these individuals, all English speaking non-U.S. investors, who Mr. Gentile was soliciting. And even if U.S. persons had access to the webcast (whether during its live taping or after being placed on the Sykes webpage) this conduct should not be found to be a solicitation of those persons because the website and the compliance policy provided a backstop that should have prevented any U.S. person who saw the webcast from believing that they were being solicited, or permitted to access the website or open an account with SureTrader. Mr. Gentile reasonably believed that the website's design and language made clear that SureTrader was not soliciting U.S. persons and therefore anything he said on the webcast could not be considered a solicitation of U.S. investors.

Finally, the webcast was a one off event that occurred two months after SureTrader opened for business and that has never been repeated. Importantly, other than this one Internet activity that Enforcement Staff has raised, there is not a single allegation of affirmative solicitation by SureTrader. Even if FINRA is not persuaded that the webcast was aimed at non-U.S. persons or that Mr. Gentile believed the website provided the appropriate backstop, it is

---

[21] *See S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices* at iv (June 1, 1972) ("Wells Report"), *reprinted in* Arthur F. Mathews, et al., Enforcement and Litigation under the Federal Securities Laws 1973, at 275 (Practicing Law Institute 1973) ("The Commission should give due consideration in cases which appear to involve [] good faith efforts at compliance to exercising its discretion against bringing a formal enforcement proceeding notwithstanding the appearance of a violation.").

CONFIDENTIAL

GENTILE0005187

questionable whether this is the type of disciplinary action that FINRA ought to bring.  There is no pattern of trying to solicit U.S. investors.  There is no obvious and blatant solicitation of any U.S. person.  There is no systematic attempt to evade Commission registration requirements.  A webcast that occurred once, and which occurred in the context of a company with well-established and well-documented non-solicitation policy, should not form the basis of any disciplinary action against its founder on an aiding and abetting theory.

### IV.    A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns

To our knowledge, no federal court has interpreted the Commission's guidance in the 1998 Release on the "unsolicited transactions" exemption.  Indeed, FINRA has never before – so far as we know – instituted a disciplinary action against an individual based on similar facts. There is, however, one case currently pending before Judge Daniels of the United States District Court for the Southern District of New York.  In that case, the SEC is claiming a foreign broker dealer solicited U.S. persons by maintaining a website and servicing U.S. persons. *See Securities and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ. 2575 (GBD) (S.D.N.Y. filed Apr. 18, 2013).  The *Gibraltar* case involves allegations of significantly more egregious conduct than the allegations here. While Judge Daniels has not yet ruled on the defendants' motion for summary judgment, the oral argument on that motion on August 13, 2013, is illuminating for purposes of determining whether FINRA could ultimately be successful in a disciplinary action against Mr. Gentile.

During that oral argument, a transcript of which is attached hereto as Exhibit F, Judge Daniels posed two questions that he believes drive the analysis of whether a foreign broker dealer's website constitutes an improper solicitation.  He asked of the defendants, "Who are you

CONFIDENTIAL                                                                                          GENTILE0005188

soliciting through [your] website.  And how does it exclude rather than include U.S. Investors."[22] Unlike SureTrader, the defendants in *Gibraltar* did not do anything to exclude U.S. persons from viewing its website – and takes the very reasonable position that it was not legally required to. Unlike Swiss America, Gibraltar did not use a click-wrap blocking agreement, did not have a disclaimer on its site that it did not service US-based persons, and did not maintain records demonstrating non-solicitation.[23]  Moreover, Gibraltar's other Internet activity included conduct that was exactly what Commission guidance said was inappropriate.  Specifically, Gibraltar promoted U.S. persons' ability to avoid U.S. taxes.  Even under these facts, however, Judge Daniels indicated that *if* the case survived a motion to dismiss, the Complaint "quite frankly [] is clearly minimally sufficient," and that "this is one of the weaker set of allegations that one can make with regards to a solicitation claim…"[24]

Regardless of whether Judge Daniels grants summary or judgment, the *Gibraltar* proceedings strongly suggest that there can be no aiding and abetting liability on the part of Mr. Gentile here.  If the only articulation by a federal judge on this issue is that a claim of solicitation based on merely having a website which does not block US persons or contain disclaimer language and services U.S. persons is "minimally sufficient" to make out a solicitation claim, we respectfully submit that where, as here, (1) the foreign broker dealer's website blocks U.S. persons, (2) contains disclaimer language on every page, (3) the broker dealer inquires of U.S.

---

[22] Exhibit F at 6.

[23] *Id*.  Rather, the defendants argued that they were not required to exclude U.S. investors from viewing the site, nor were they required to post the disclaimer.  The Gibraltar defendants instead argue that, as long as customers were not solicited *to* the website, there was no solicitation violation.  The Commission disagrees with Gibraltar's position and argues that the solicitation violation was the advertising material on the website itself.  The Commission also takes the position that solicitation to the website is not the violation.  The Sykes webcast can only be interpreted to be a solicitation to the website, and according to the Commission such conduct is not a violation.

[24] *Id*. at 49-50.

CONFIDENTIAL                                                                 GENTILE0005189

persons whether they were solicited, and (4) maintains records establishing that the potential U.S. customer affirmatively sought out SureTrader, that SureTrader is operating well within the bounds of Rule 15a-6 and that Mr. Gentile was clearly acting in good faith.  And a single webcast, even if found to be directed at U.S. persons – which it was not – should not be found conduct sufficient to give rise to a disciplinary action given all of the other safeguards the foreign broker dealer put in place.

## **CONCLUSION**

FINRA's proposed disciplinary action against Mr. Gentile is unwarranted.  It represents an abrupt shift away from the Commission's long-term policy to permit foreign broker dealers to service U.S. customers whom they do not solicit and who reach out to the broker dealer "on their own accord." There is no precedent for a case against a broker dealer who has done what SureTrader has done to follow U.S. law and Commission guidance.   It is easy to see why the Commission brought charges against Gibraltar.  That firm was clearly soliciting U.S. persons and a review of the transcript in the Oral Argument demonstrates that they have no compelling response to the Judge's simple questions, *who were you soliciting and how did you exclude Americans*?  Mr. Gentile has easily answered these pivotal questions.  The *Gibraltar* case is the exact opposite of the case here.  Even if FINRA takes issue around the edges of how the non-solicitation program was run, there can be no serious debate that SureTrader tried, in good faith, to follow Commission guidance.  Respectfully, FINRA should not promulgate policy through the novel, post hoc interpretation of Commission rules.

For the foregoing reasons, we respectfully submit that FINRA disciplinary action against Mr. Gentile is unwarranted in this case.

23

GENTILE0005190

If Enforcement Staff still believes that a disciplinary action against Mr. Gentile is appropriate after reviewing this Wells Submission and the Oral Argument Transcript, we respectfully request an in-person meeting with Enforcement Staff prior to submitting these materials for senior review.

DATED:        January 10, 2014

Respectfully submitted,

Adam Ford
Harris O'Brien, St. Laurent &
Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(917) 512-6937
aford@harrisobrien.com

*Attorney for Guy Gentile*

CONFIDENTIAL                                                                     GENTILE0005191

# FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| In the matter of<br><br>GUY GENTILE | **AFFIDAVIT** |

Philip Dorsett, being duly sworn, deposes and says:

1.  I make the following statements in connection with a FINRA investigation involving Guy Gentile.

2.  I have worked in the securities industry for the past nine years. I hold a Bachelor's degree from the University of South Florida, and a Masters in Business Administration in Finance from Nova Southeastern University.

3.  Since 2012, I have been employed as the Chief Compliance Officer and Anti-Money Laundering Officer of Swiss America Securities, Ltd. ("Swiss America"). Swiss America operates as a broker-dealer under the trade name "SureTrader."

4.  As part of my duties and responsibilities at Swiss America, I regularly attend compliance workshops and securities training institutes covering topics in international securities regulation.

5.  In early 2012, Swiss America adopted a policy of accepting certain unsolicited US-based persons as customers in compliance with US law.

6.  In connection with this policy, I reviewed all relevant Rules and Guidance of the U.S. Securities and Exchange Commission regarding solicitation of US persons by unregistered non-US broker-dealers.

7.  Based on SEC Rules and Guidance, Swiss America developed policies and procedures designed to ensure that SureTrader complied with US laws regarding solicitation.

1

CONFIDENTIAL

GENTILE0005192

## The SureTrader Website

8. SureTrader maintains a website at the URL "www.suretrader.com."

9. The website is designed to prevent access by US-based persons.

10. All visitors to the SureTrader website are first shown a "pop-up" window. This pop-up blocks access to the website unless the visitor acknowledges and agrees to the site's terms and conditions.

11. One of the terms and conditions visitors are required to acknowledge and agree to before they are granted access the website are that they are not a US resident.

12. Every page of the SureTrader website contains the disclaimer that Swiss America, "does not service accounts for U.S. citizens, U.S. residents or U.S. corporations. Swiss America Securities, Ltd does not solicit U.S. resident clients."

13. Based on my training and experience, Securities and Exchange Commission Guidance recommends such a disclaimer as a best practice for foreign broker dealers.

14. In order to open a SureTrader account, Swiss America requires visitors to fill out an online application. The application requires applicants to disclose personal information including, among other things, a mailing address.

15. Where an applicant provides an address within the United States, Swiss America policy requires that an inquiry be made into whether that individual was solicited by SureTrader. This inquiry consists of, among other things, inquiring of the applicant whether SureTrader solicited them or whether the individual initiated contact with the company on their own accord.

16. Swiss America policy requires that US-based applicants execute an Unsolicited Acknowledgement Agreement ("UAA") available on the SureTrader website.

17. By signing the UAA, applicants acknowledge that, "in no way did Swiss America Securities, Ltd solicit me to become a client. I initiated contact with Swiss America Securities, Ltd. on an unsolicited basis."

2

CONFIDENTIAL

GENTILE0005193

**The Timothy Sykes Video**

18. In 2012, I became aware that a SureTrader client, Timothy Sykes, had requested an interview with Mr. Gentile. It was explained to me that Mr. Sykes was a well-known trader with an international reputation.

19. Upon consideration, I advised Mr. Gentile that I believed there was no legal impediment to him participating in an interview.

20. Some time later, I became aware that Mr. Sykes had made a video of the interview available on his website.

21. After reviewing the video, I recommended that Mr. Sykes be asked to include on his website a disclaimer alongside the video stating that Swiss America and SureTrader do not solicit United States persons.

22. Based on my training and experience, I believed that such a disclaimer, in combination with the non-solicitation safeguards on SureTrader's website discussed above, satisfied US law regarding solicitation of US-based persons.

Dated: ~~New York, New York~~
9ᵗʰ January __, 2014
at Nassau, Bahamas

Philip Dorsett

Before Me,

NOTARY PUBLIC # 713
My Commission Expires
31ˢᵗ December 2014

3