# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:21-CV-21079-BLOOM/Otazo-Reyes**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

      Defendants.

_____/

# EXPERT REPORT OF DAVID F. MACNAIR ON BEHALF OF SECURITIES AND EXCHANGE COMMISSION

**Prepared by:**
**David F. MacNair**
**Date: February 3, 2023**

# EXPERT REPORT OF DAVID F. MACNAIR

**Table of Contents**

*I. Qualifications* .................................................................................................................3

*II. Engagement* ..................................................................................................................4

*III. Basis for Opinion and Documents Reviewed* ............................................................5

*IV. Regulatory Framework* ..............................................................................................5

   **1. The SEC and its Regulatory Framework** ................................................................5

   **2. Financial Industry Regulatory Authority ("FINRA")** ...........................................6

   **3. Section 15(a)(1) of the Exchange Act of 1934** ......................................................7

   **4. Broker Dealer Registration Requirements** .............................................................7

   **5. Day Trading Overview** ...........................................................................................9

      **A. Overview and Risk** ........................................................................................9

      **B. The Need for Regulation** ...............................................................................9

      **C. Regulations to Protect Investors** ..................................................................10

      **D. Day Trading Firms Avoiding Regulation** ....................................................11

   **6. Know Your Customer ("KYC")** ...........................................................................12

   **7. Rule 15a-6 Exemptions** ........................................................................................12

   **8. Rule 15a-6 Types of Investors** .............................................................................13

   **9. Rule 15a-6 Controls** .............................................................................................13

*V. Opinion* .......................................................................................................................14

   **1. SEC Complaint** ....................................................................................................14

   **2. Defendant Gentile's Amended Answer** ................................................................15

   **3. Executive Summary** .............................................................................................15

   **4. Standards of Care** ................................................................................................16

      **A. FBD vetting by BDs** .....................................................................................16

      **B. Practices of BDs to protect investors** ...........................................................18

   **5. Findings**…………………………………………………………………………19

      **A. Section 15a-6 Registration Exemptions Do Not Apply** ...............................19

      **B. Day Trading Rules Were Not Followed** ........................................................25

      **C. Red Flags Should Have Triggered Further Investigation** .............................26

*VI. Conclusion*………………………………………………………………………...27

# EXPERT REPORT OF DAVID F. MACNAIR

## I. <u>Qualifications</u>

My experience and qualifications are set forth in the attached Resume **(See "Attachment A").**  I have over 30 years of experience in the securities industry.  I am the founder and managing principal of MacNair Consulting, LLC, a regulatory compliance consulting firm founded in November 2021, which offers compliance support to broker-dealers ("BD"), banks, and other financial institutions.  In addition, I provide expert witness and litigation support in securities industry cases.  I was previously employed by Credit Suisse Securities (USA) LLC, Barclays Capital Inc., Citigroup Global Markets Inc., and Prudential Securities Inc.

In addition to my industry and consulting experience, my regulatory experience includes three (3) years as an Examiner for the Financial Industry Regulatory Authority ("FINRA"), formerly the National Association of Securities Dealers ("NASD").  As an Examiner, I conducted sales practice exams of BDs and special investigations into market abuse allegations.  Through the aforementioned experience, I gained an understanding of industry practices and the standard of care governing registration, day trading, suitability, suspicious activity and related regulatory requirements.

My knowledge of SEC Rule 15a-6 requirements and the regulatory framework which encompasses these activities was gained through performing on-boarding of higher risk foreign financial institutions to determine if those institutions qualified for the relevant exemption.  In addition, I performed annual reviews of foreign financial institutional clients where SEC Rule 15a-6 exemptions were evaluated.  Lastly, I was responsible for the investigation of suspect activity involving foreign financial institutions where evaluation of applicable exemptions and regulations would be determined.

I earned a Bachelor of Science, Business Administration from SUNY New Paltz, New Paltz, New York.  I am a FINRA Arbitrator Panelist and Chairperson.  I have a Wharton School of Business Certificate: Fintech: Foundations/Applications of Financial Tech and a NYSDFS Techsprint for Digital Regulatory Reporting Certificate (CSBS Education Foundation).

I currently hold the following FINRA Licenses:  Series 3, Series 7, Series 8, Series 14, Series 24, Series 63, and SIE.  As a self-employed consultant, not employed by a registered BD, the aforementioned licenses cannot be active.  I have experience as a Certified Fraud Examiner (CFE) and Certified Anti-Money Laundering Specialist (CAMS).

# EXPERT REPORT OF DAVID F. MACNAIR

I participated as a Panelist and Moderator at industry events which provided training seminars, conferences, and forums for discussing areas of regulatory interest and industry best practices.   Speaking events included a presentation held at the Library of Congress for the Congressional Taskforce on Terrorism and Unconventional Warfare.  Industry event presentations included events hosted by the Financial Technologies Forum (FTE) and by Anti-Money Laundering, Audit, Compliance and Fraud Forum (AMLAC).  I am also a current member of the Advisory Council of the Association of Certified Fraud Examiners (ACFE).

My regulatory experience included assisting the NASD Enforcement Department with investigation and litigation matters, including, but not limited to, assisting with depositions and giving factual testimony as an expert witness at NASD hearings.

In the past five (5) years, I have not testified as an expert at trial.  I have not authored articles in the past ten (10) years.

## II. Engagement

I was engaged by the Securities and Exchange Commission ("SEC") Miami Regional Office, to be an expert witness in this case.  Specifically, I have been asked to render an opinion on whether the conduct and activities of MintBroker International, Ltd., f/k/a Swiss America Securities Ltd., d/b/a SureTrader ("SureTrader") and its founder, owner, and chief executive officer Guy Gentile (a/k/a Guy Gentile Nigro) ("Gentile"), collectively referred to as the ("Defendants"), comported with standards, practices, and regulations governing specified exemptions under SEC Rule 15a-6 of the Securities and Exchange Act of 1934 ("Exchange Act") and FINRA Rules  governing "Pattern Day Trading" ("PDT") from an industry perspective.

Within rendering such an opinion, I was asked to provide background as to the function of the SEC and FINRA, and the underpinnings of the Securities Act of 1933 ("Securities Act") and the Exchange Act.  I have been asked to explain the definitions of a "Security," a Broker-Dealer ("BD") and a "foreign broker-dealer" ("FBD")[1].  I have also been asked to explain the relevant registration requirements for a BD and FBD.  I have been further asked to explain Section 15(a)

---

[1] Rule 15a-6(b)(3) defines foreign Broker-Dealer to include "any non-U.S. resident person (including any U.S. person engaged in business as a broker or dealer entirely outside the United States, except as otherwise permitted by this rule) that is not an office or branch of, or a natural person associated with, a registered broker or dealer, whose securities activities, if conducted in the United States, would be described by the definition of 'broker' or 'dealer' in sections 3(a)(4) or 3(a)(5) of the [Exchange] Act."

## EXPERT REPORT OF DAVID F. MACNAIR

of the Exchange Act, its purpose, its various exemptions, the purpose of those exemptions, required elements to qualify under these exemptions, and controls used to ensure those exemption requirements are met.

Moreover, in conjunction with my opinion, I have been asked to explain the difference between institutional and retail investors. I have also been asked to explain the Know Your Customer ("KYC") standard, its purpose and requirements.

My compensation for this case is at the rate of $350 per hour and is not contingent on the outcome of the case.

## III. <u>Basis for Opinion and Documents Reviewed</u>

I have extensive experience in the review of FBDs from a compliance perspective, including:  review of new account documents; KYC information; incorporation documents; and, performing due diligence on FBDs.  Also, I performed accuracy evaluations of materials presented by FBDs submitted for purported exemption under the relevant registration requirements.

The observations and opinions expressed in this report are based upon my understanding of the facts of the case, review of the SEC's Complaint against the Defendants, Defendant Gentile's Amended Answer and Affirmative Defenses,[2] certain documents and communications, and relevant regulations and statutes (**See Attachment B**).  Also, my knowledge of industry practices and standards, in particular as they apply to Rule 15a-6 of the Exchange Act, FINRA Rule 2130, FINRA Rule 2270 and FINRA Rule 4210 have formed my observations and opinions regarding this matter.

## IV. <u>Regulatory Framework</u>

### 1. The SEC and its Regulatory Framework

The Securities Act and the Exchange Act were implemented after the stock market crash of 1929 to among other things, create an orderly market and restore investor confidence in the securities markets.

---

[2] Defendant SureTrader did not make an appearance, did not answer the Complaint, and was defaulted by the Court.

# EXPERT REPORT OF DAVID F. MACNAIR

Securities are a type of investment that are the most actively traded instrument on the market.  They generally represent ownership of a portion of publicly traded company.[3]  A publicly traded company is an entity which is owned by the public persons and entities (shareholders).  The primary benefit of owning a security is that it can, in most cases, be bought and sold easily through a BD on a securities exchange.

The primary purpose of the Securities Act is to ensure that investors receive accurate information about securities being traded in the market and that the markets operate fairly (e.g., investors receive material information concerning securities and it prohibits deceit, misrepresentation, and other fraud in the sale of securities).

The primary purpose of the Exchange Act was to create the SEC.  It is the SEC's mission to protect investors and maintain a fair and orderly securities market. The SEC accomplishes this mission, in part, by:

- Requiring companies that issue securities to disclose accurate and truthful information about its operations;
- Requiring BDs and other market participants to register with the SEC;
- Prohibits fraudulent conduct; and
- Use disciplinary powers to hold regulated entities and person associate with those entities accountable.

## 2. Financial Industry Regulatory Authority ("FINRA")

While Congress enacted the laws governing the securities market and created the SEC to implement those laws, it is FINRA, a Self-Regulatory Organization ("SRO") that creates the mechanisms to make those laws work.  While it is overseen by the SEC, FINRA is not a government organization.  As an SRO, it has broad powers to regulate its member BDs in an effort to protect investors and operate a securities market that has public confidence.  FINRA accomplishes this mission by, among other things, requiring BDs to register as members, requiring that most persons that operate the BDs be trained through certification processes, conduct oversight through audits, and perform surveillance and enforcement actions to keep the bad actors out of the securities market.

---

[3] For purposes of the facts of this case and my opinion, it is unnecessary to articulate and explain other products, such as investment contracts, that also qualify as a "security."

## EXPERT REPORT OF DAVID F. MACNAIR

### 3. Section 15(a)(1) of the Exchange Act

Section 15(a)(1) of the Exchange Act generally requires BDs to register with the SEC if they effect transactions on an exchange (e.g., NYSE).  The primary purpose of this registration is to provide the SEC, FINRA and state regulators with the mechanism to determine whether the applicant meets the basic requirements and expertise to engage in the securities business.  This is an essential tool used by the SEC to meet its objectives of investor protection through regulatory and disciplinary powers.

By having the ability to approve registration requests, the SEC and FINRA have the ability to, among other things, keep out bad actors, ensure designated personnel are properly trained, and, ensuring that there are adequate processes and controls in place to protect investors.

### 4. Broker Dealer Registration Requirements

Under Section 3(a)(4) of the Exchange Act, a "Broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of another."[4] Under Section 3(a)(5) of the Exchange Act, a "Dealer" is defined as any person engaged in  the business of buying and selling securities for such person's own account through a broker or otherwise.[5]  A person can act as both a broker and a dealer, i.e. a BD.  Any BD wishing to operate in the U.S. must first register with the SEC, FINRA and the state(s) of operation.

Under Section 15(a)(1) of the Exchange Act, registration is required as this is the most effective mechanism to know who is operating in the securities market.  The SEC and FIRNA use the registration process to operate as gatekeepers, enforce the customer protection rules, and keep out the bad actors.  Together, they ensure that only those BDs who agree to be regulated, be subject to oversight, have sufficient expertise, and can act as a BD entrusted with U.S. investor funds.

Registration is accomplished by completing the Uniform Application for BD Registration ("Form BD") that is filed with FINRA through the Central Registration Depository system ("CRD").  The information contained on the Form BD is publicly available so that investors and other parties (e.g., other BDs, etc.) can, among other things, confirm the BD is regulated, subject to customer protection rules, and evaluate any disciplinary history.  Form BD contains information that is critical to regulatory efforts and includes but is not limited to:

---

[4] 15 U.S.C. § 79u(a)(4)(A).
[5] 15 U.S.C. § 79u(a)(5)(A)

# EXPERT REPORT OF DAVID F. MACNAIR

- Contact Employee – The person who is authorized to receive information on behalf of the organization
- Control Persons – The person(s) with the power, directly or indirectly, to direct the management or policies of the company (e.g., Director, Officer, 25% or more ownership of the company)
- Identification of owners
- States that the BD will operate in
- Types of business the BD will engage in
- Criminal, civil, regulatory issues (both in U.S. and foreign) involving the entity, owners or Control Persons

There is also a requirement for the BD to join the Securities Investor Protection Program ("SIPC"), a type of insurance. SIPC insures investor funds deposited at BDs in the event the BD is unable to return investor funds (e.g., a BD has lost investor funds to fraud and declares bankruptcy). Also, certain employees of the BDs are required to pass qualification exams to ensure that they have sufficient knowledge and expertise in the securities market to process customer orders.

By registering, BDs agree to comply with the general antifraud provisions of federal securities laws and maintain high industry standards. The primary standards include:

- "Duty of Fair Dealing" - a requirement that the BD will among other things, execute orders promptly, disclose material information, charge reasonable fees and disclose any conflicts of interest
- "Suitability"-a requirement that BDs only recommend securities or investment strategies that are suitable for the particular investor (based on experience, resources, financial condition, etc.)
- "Best Execution"- a requirement that the BD attempt to get the best price available in the purchase or sale of securities for its clients.
- "Customer Confirmations"- a requirement to ensure customers all relevant information on trades (e.g., date, time, price, fees, etc.)
- "Credit Terms"- a requirement to ensure customers are notified of the terms of credit (e.g., loaned funds)

Registration and the accompanying regulatory environment is a time consuming and expensive process. U.S. based BDs would therefore be at a distinct competitive disadvantage in the U.S. market if they were required to register while FBDs who solicited, obtained, and profited from U.S. based customers were not required to similarly register. More importantly, U.S. investors who utilized the services of FBDs would be at risk because the FBDs would not be required to follow customer protection rules and have customer funds protected by SIPC.

# EXPERT REPORT OF DAVID F. MACNAIR

### 5. Day Trading

#### A.  Overview and Risk

Day Trading is a high-risk strategy involving the purchase and sale of the same security on the same day.  It typically involves actively buying and selling securities to take advantage of short-term price swings in a security.  As the profits (if any) are typically small, day traders will often borrow (margin loan) money from their BD so that they can make bigger trades in hope of making larger profits.  However, this strategy substantially increases the risk of losing not only the money the day trader invested, but the money they borrowed.

Inexperienced retail investors have historically fallen victim to day trading schemes and material financial losses, including incurring large debts owed to the BD from the margin loans. For example, if an inexperienced retail investor deposits $10,000, they may be able to buy $20,000 worth of shares of securities using a margin loan (margin is a loan made by the BD to the investor).[6] Should the share price of security decline significantly, the small investor could lose their $10,000 initial deposit in addition to the $10,000 they borrowed.

The day trading market is also susceptible to market abuse schemes such as the "Pump & Dump."[7] In this scheme, a person or entity that owns a security, will, for example issue a fabricated research report touting a security as a buy (the Pump), and/or flood social media with false rumors. Many inexperienced day traders will be fooled into then buying the stock which causes the price of the stock to increase.  The issuer will then sell (the Dump).  The stock eventually falls back down leaving the inexperienced day trader with losses.

#### B.  The Need for Regulation

The reason the regulators are focused on day trading is because of the high risk associated with day trading.  Regulators have warned that without proper training, technology and available time to monitor the market, it is difficult to make profits and easy to lose everything.  Regulators have also continuously issued warnings to inexperienced retail investors to be wary of

---

[6] Under Regulation T ("Reg T"), an investor may borrow up to 50% of the purchase price of securities that can be bought using a loan from a broker or dealer.  The remaining 50% of the price must be funded with cash.  12 C.F.R.Part 220 et seq.

[7] SEC, "Pump and Dump Schemes," Aug. 7, 2006, found at https://www.sec.gov/rss/your_money/pump_and_dump.htm (last visited Feb. 2, 2023).

## EXPERT REPORT OF DAVID F. MACNAIR

advertisements claiming that large profits can be made.[8] It is difficult to make a profit for many reasons including:

- The BD is charging commissions on each trade that become substantial for those placing many trades.
- It is essentially a form of gambling as the day trader is making a bet the security will go up or down in a short time period.  But short-term changes in a security price tend to be random, so investor odds are typically 50/50 at any given time that the right trade was chosen.
- Professional traders have the experience and sophisticated technology that place inexperienced investors at a substantial disadvantage.
- Profit margins on same day trades are typically minimal.
- Day traders are reliant on the BD to execute orders timely (not always executed at the best price available in a fast-moving market in a timely manner).

### C. Regulations to Protect Investors

Due to these increased risks, FINRA has instituted several rules that registered BDs are required to follow in an effort to protect inexperienced investors.  Specifically:

- FINRA Rule 4210 defines a PDT as generally a customer who does four (4) or more day trades in a five-business day period (provided the number of day trades represent more than 6 % of the customer's trades).  It requires BDs to implement special lending requirements on these customers where, among other things, the investor must maintain a value of $25,000 in the account to ensure a cushion is available for market volatility.  Trading is supposed to be restricted by the BD if the equity falls below $25,000 in an attempt to prevent the day trader from experiencing excessive losses.
- FINRA Rule 2270 requires BDs to provide the identified PDT with a Risk Disclosure Statement in an effort to educate investors of the risk involved.
- FINRA Rule 2130 provides procedures BDs must follow when opening PDT accounts to ensure that a non-institutional investor[9] is suitable for day trading.

---

[8] <u>SEC.gov | Day Trading: Your Dollars at Risk,</u> Day Trading: Your dollars At Risk, April 20, 2005, found at https://www.sec.gov/about/reports-publications/investor-publications/day-trading-your-dollars-at-risk   (last  visited Feb. 2, 2023) and Senate Report 106-364-DAY Trading: CASE STUDIES AND CONCLUSIONS, July 27, 2000, found at   https://www.govinfo.gov/content/pkg/CRPT-106srpt364/html/CRPT-106srpt364.htm (last visited Feb. 2, 2023).

[9] FINRA Rule 4512: (c) For purposes of this Rule, the term "institutional account" shall mean the account of:
    (1) a bank, savings and loan association, insurance company or registered investment company;
    (2) an investment adviser registered either with the SEC under Section 203 of the Investment Advisers Act or with a state securities commission (or any agency or office performing like functions); or
    (3) any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million

# EXPERT REPORT OF DAVID F. MACNAIR

In light of these requirements, U.S. BDs typically implement extensive investor protective processes covering day trading due to the regulatory and reputational risk associated with this activity. These processes include suitability reviews and account balance requirements.

### D. Day Trading Firms Avoiding Regulation

Day Trading firms have taken advantage of investors by offering "day trading platforms" to inexperienced retail investors. These platforms typically offer day traders basic tools such as market research and order execution.  These day trading platforms are not on par with those used by professional traders (Hedge Funds, etc.), placing the inexperienced retail investor (day traders, etc.) at a significant disadvantage.  For example, professional traders will often utilize "program trading" applications that can analyze market trends and execute trades before day traders have had a chance to react.  This often leaves day traders in a position of "chasing the market" (e.g., buying at the high, selling at the low).  Similarly, the trading programs utilized by professional traders monitor the markets 24/7 so that while the day trader was away from their desk, the professional traders program traded on the news, leaving little opportunity for the day trader to trade profitably.  Retail investors are also typically at the mercy of their cable internet service provider (e.g., computer crashes, slow speed, etc.) while professional traders have the most advanced trading technology.  The result is that the retail trader will almost always get a worse trade execution price than that of the professional trader.  Especially if there is a major news released on a security.

In order to generate business, these day trading platforms will often target inexperienced investors through various forms of solicitation.  For example, they may enter "affiliate" arrangements with other entities to bring in new day traders.  These affiliates will typically advertise the day trading platform and receive a referral fee when a new day trader joins the platform.

These day trading platforms often do not have the experienced professional operating the business.  They also need to circumvent existing customer protection regulations to maximize profits.  As such, they often run afoul of the U.S. customer protection rules in place covering day

# EXPERT REPORT OF DAVID F. MACNAIR

trading.  Many have been subject to regulatory fines due to compliance failures.  Indeed, sometimes they are fictitious.[10]

### 6. Know Your Customer ("KYC")

KYC is outlined under FINRA Rule 2090.  KYC is generally considered a combination of customer identification (e.g., Name, Address, Tax ID), customer profile information (e.g., investment objectives, assets, Investment Experience) and customer due diligence (e.g., negative news searches, confirmation of assets, etc.).

KYC is generally obtained during the new account opening process and involves obtaining enough information on the investor to, among other things, confirm their identity and prevent fraud (e.g., identity theft).  KYC also involves obtaining enough information to understand customer investment experience, assets, and investment objectives.  This information should be used by the BD to ensure that the investments and/or strategies being used by the investor are suitable.

### 7. Rule 15a-6 Exemptions

In order to facilitate access to non-U.S. markets by certain U.S. investors, and to provide guidance to FBDs seeking to solicit brokerage business from persons in the United States, the SEC adopted Rule 15a-6 in 1989.[11]  This rule provides exemptions from FBD registration under limited circumstances so that they may conduct limited securities business with certain U.S. investors.

Should the FBD decide to do business outside of the exemptions of Rule 15a-6, they must then register with the SEC.  It is therefore important for any FBD claiming an exemption, to have controls in place to ensure compliance with the rule.

The activities that FBD may engage in under this regulatory framework include:

- Effecting unsolicited securities transactions [SEC Rule 15a-6(a)(1)];
- Providing research reports to major U.S. institutional investors, and effecting transactions in the subject securities with or for those investors [SEC Rule 15a-6(a)(2)];
- Soliciting and effecting transactions with or for U.S. institutional investors or major U.S. institutional investors through a "chaperoning broker-dealer"[12] [SEC Rule 15a-6(a)(3)]; and,

---

[10] *See e.g. SEC v. Naris Chamroonrat and Adam L. Plumer,* Case No. 2:16-cv-09403-KM-JBC (D. NJ, Dec. 21, 2016).

[11] 17 C.F.R. § 240.15a-6.

[12] "Chaperoning broker-dealer" means a registered broker-dealer that satisfies all of the requirements set forth in Rule 15a-6(a)(3)(iii) including, among other things, effecting transactions, issuing confirmations, maintaining books and records, participating in oral communications, and obtaining certain representations and consents.

## EXPERT REPORT OF DAVID F. MACNAIR

- Soliciting and effecting transactions with or for registered BDs, banks acting in a broker or dealer capacity, certain international organizations, foreign persons temporarily present in the U.S., U.S. citizens resident abroad, and foreign branches and agencies of U.S. persons. [SEC Rule 15a-6(a)(4)].

### 8. Rule 15a-6 Types of Investors

As part of the 15a-6 exemption process, the rules generally categorize customers, based in part, on the customers' expertise and resources:

- Major U.S. Institutional Investors: any entity that owns or controls in excess of $100 million in aggregate financial assets
- Institutional Investors: Registered investment companies, banks, savings and loans, insurance companies, pension plans and certain trusts with assets in excess of $5 million
- Retail Investors (do not meet the definition of an institutional investor): Generally considered individuals with limited investing experience investing their personal funds

### 9. Rule 15a-6 Controls

Any FBD planning to operate under any of the exemptions should have processes and controls in place to ensure they are not in breach of the exemptions.  Should they fail to be in compliance, the FBD and Control Persons would be subject to censures, fines and other regulatory actions.[13]

In practice, because of the complex regulatory environment, when transacting within the U.S., FBDs typically employ the services of legal counsel in the country in which they are seeking to do business to ensure compliance with local regulations.  FBDs would also typically have controls in place to ensure compliance.  Controls may include, for example:

- Utilization of IP Address (formally known as "Internet Protocol Address") blocking technology to ensure that advertisements, marketing, and other solicitations are not broadly disseminated to the general public in the U.S.  IP Blocking technology is a common form of control to prevent advertisements and other forms of solicitation from appearing in a certain country.  This technology is an extremely important tool, in particular, to ensure that information is not viewed in countries under U.S. sanctions restrictions (e.g., Iran).[14]
- New account applications that identify clients as Institutional, Major Institutional or Retail investors.

---

[13] Section 20(a) of the Exchange Act indicates that it shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of the Exchange Act or any rule or regulation thereunder through or by means of any other person. [15 U.S.C. § 78t(a)].

[14] An IP Address is a unique set of numbers that identify a device (e.g., computer) and country using the internet.

# EXPERT REPORT OF DAVID F. MACNAIR

- Perform suitability review prior to approving for day trading.
- Ensure that research reports were only sent to account holders that are designated as Major Institutional investors.
- Have surveillance in place to identify account holders with U.S. addresses, IP addresses, etc.
- Margin requirement monitoring technology.

## V. **Opinion**

### 1. **SEC Complaint**

The SEC has alleged, in part, that from no later than March 2016 until at least November 2019:

- Defendants operated an FBD in the Bahamas designed to help day traders in the United States circumvent the U.S. rules that regulate PDT;
- Defendants directly or indirectly, by the use of mails or any other means or instrumentality of Interstate commerce affected transactions in or induced or attempted to induce the purchase or sale of securities while it was not registered with the SEC as a BD;
- By reason of the foregoing, Defendants, violated, and unless enjoined, are reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)][15].
- That Gentile was directly or indirectly, a Control Person of SureTrader for purposes of Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)] [16];
- SureTrader violated Section 15(a)(1)[17] of the Exchange Act;
- As a Control Person of SureTrader, Gentile is jointly and severally liable with and to the same extent as SureTrader for its violations of Section 15(a)(1) [18] of the Exchange Act;
- By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violation, Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] [19];
- SureTrader, directly or indirectly, violated Section 15(a)(1) [20] of the Exchange Act;
- Gentile, directly or indirectly, through SureTrader, did acts or things which it would have been unlawful for him to do under the provisions of the Exchange Act and the rules and regulations set forth above;
- By reason of the foregoing, Gentile violated, and, unless enjoined, is reasonably likely to continue to violate, Section 20(b) of the Exchange Act, [15 U.S.C. § 78t(b)] [21].

---

[15] 15 U.S.C. § 78o(a)(1): Registration and regulation of Broker-Dealers/Registration of all persons utilizing exchange facilities to effect transactions.

[16] 15 U.S.C. §78t : Liability of controlling persons and persons who aid and abet violations.

[17] 15 U.S.C. § 78o(a)(1) : Registration and regulation of Broker-Dealers/Registration of all persons utilizing exchange facilities to effect transactions.

[18] 15 U.S.C. § 78o(a)(1) : Registration and regulation of Broker-Dealers/Registration of all persons utilizing exchange facilities to effect transactions

[19] 15 U.S.C. §78t : Liability of controlling persons and persons who aid and abet violations

[20] 15 U.S.C. § 78o(a)(1) : Registration and regulation of Broker-Dealers/Registration of all persons utilizing exchange facilities to effect transactions

[21] 15 U.S.C. §78t: Liability of controlling persons and persons who aid and abet violations

# EXPERT REPORT OF DAVID F. MACNAIR

### 2. Defendant Gentile's Amended Answer

Gentile denies all substantive allegations against him. He further raises numerous affirmative defenses, which are legal defenses beyond the scope of my expertise and not the subject of this report.

### 3. Executive Summary

In forming my opinion, I reviewed the supporting documents to build a profile of the Defendants' business to determine if they met the requirements of Rule 15a-6 exemptions. I also considered the Defendants' processes and controls for permitting client day trading as required under the FINRA Day Trading rules.

Based on my experience in evaluating FBDs, there were not the necessary processes and controls associated with the general standards of care expected when evaluating the four (4) possible U.S. registration exemption requirements as noted below:

**A. Effecting unsolicited securities transactions [SEC Rule 15a-6(a)(1)]:**

o   This exemption should have been ruled out as it was clear that the communications aimed at U.S. Investors were solicitations based on the SEC broad definition of "Solicitation". These findings are supported by the various SEC exhibits (e.g., SECWEBCAPTURE-E-0000339) and email exhibits (e.g., SEC-AchaM-E-0000139).

**B. Providing research reports to major U.S. institutional investors, and effecting transactions in the subject securities with or for those U.S. investors [SEC Rule 15a-6(a)(2)].**

o   This exemption would not apply as there was no apparent effort to qualify customers as major institutional U.S. investors. These findings were supported by review of various SEC exhibits which indicated that the research reports were available to all registered users of SureTrader (e.g., SECWEBCAPTURE- E-0000176) and (SEC-BOROSSL-E-0000001), including those in the U.S.

**C. Soliciting and effecting transactions with or for U.S. institutional investors or major U.S. institutional investors through a "chaperoning broker-dealer"[22] [SEC Rule 15a-6(a)(3)].**

---

[22] "Chaperoning broker-dealer" means a registered broker-dealer that satisfies all of the requirements set forth in Rule 15a-6(a)(3)(iii) including, among other things, effecting transactions, issuing confirmations, maintaining books and records, participating in oral communications, and obtaining certain representations and consents

# EXPERT REPORT OF DAVID F. MACNAIR

   o  This exemption would not apply to SureTrader as there was no U.S. Registered BD participating in the arrangement as a "chaperoning broker-dealer".

**D. Soliciting and effecting transactions with or for registered BDs, banks acting in a broker or dealer capacity, certain international organizations, foreign persons temporarily present in the U.S., U.S. citizens resident abroad, and foreign branches and agencies of U.S. persons. [SEC Rule 15a-6(a)(4)].**

   o  This exemption would not apply as the relevant day trading services were marketed directly to U.S. retail investors residing in the U.S.

The failure to register may have been done deliberately to afford the Defendants the ability to circumvent the FINRA Day Trading Rules. Defendants' own Marketing Material targeted at U.S investors encouraged the circumvention of PDT rules. It appears the Defendants failed to implement Information Barriers related to "Top Stocks", etc., and general trade surveillance monitoring associated with PDT. This failure subjected inexperienced U.S. retail investors to unsuitable trading strategies and potential market abuse. Lastly, based on the amount of conflicting information and red flags present, there is a strong possibility that a U.S BD would not only have rejected the relationship with the Defendants, but would have also escalated such an attempt for a possible Suspicious Activity Report (SAR) filing. A SAR filing would have alerted the Financial Crime Enforcement Network ("FinCEN") for possible investigation of the Defendants.

### 4. Standards of Care

#### A. FBD vetting by BDs

In determining whether reasonable standards of care were practiced by the Defendants with respect to U.S. registration requirements, I reviewed regulatory guidance[23] and used my knowledge of standard industry practices of U.S. BDs.

In practice, U.S. BDs would generally rely on Section 312 of the USA PATRIOT Act[24] and related Customer Due Diligence (CDD) guidance issued by Federal Financial Institutions Examination Council (FFIEC)[25] when evaluating an entity claiming to be an FBD.

---

[23] SEC Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers, found at https://www.sec.gov/tm/divisionsmarketregfaq-15a-6-foreign-bdhtm (last visited Feb. 2, 2023).

[24] FACT Sheet for Section 312 of the USA PATRIOT Act, found at https://www.fincen.gov/fact-sheet-section-312-usa-patriot-act-final-regulation-and-notice-proposed-rulemaking, Dec. 2005 (last visited Feb. 2, 2023).

[25] FFIEC CDD Guidance, found at https://www.ffiec.gov/press/pdf/Customer%20Due%20Diligence%20-%20Overview%20and%20Exam%20Procedures-FINAL.pdf (last visited Feb. 2, 2023).

## EXPERT REPORT OF DAVID F. MACNAIR

When opening new FBD relationships, standard industry practice is to conduct extensive due diligence on those FBDs in order to meet regulatory expectations. This is because such relationships pose a higher risk due to potential inadequate regulatory requirements in the FBDs countries of operation.

U.S. BDs therefore have Compliance Officers ("CO") on staff to review these higher risk relationships. Should any "Red Flags" (i.e., conflicting or suspect information) be identified during the due diligence process, the CO would seek to resolve the discrepancy or reject the relationship.

Generally, steps to be taken when evaluating an FBD include but are not limited to:

- Obtain supporting documentation to confirm the existence of the entity (e.g., Articles of Incorporation, Proof of Regulation)
- Analyze the country associated with the place of business (e.g., is it a prohibited country? is the country considered a high-risk for fraud? etc.,)
- Determine the Source of Wealth ("SOW") and Source of Funds ("SOF"). For example:
  - Do the funds being deposited belong to the FBD or its underlying clients? If the latter, there are additional risks that the CO would then need to assess prior to permitting the relationship. These risks include assessment including:
    - Are they nominees acting on behalf of sanctioned entities or individuals?
    - Are they seeking to conceal the proceeds of money laundering?
    - Are they knowledgeable investors?
    - Do they have criminal records?
    - Are they elderly?, etc.
- Determine how the FBD obtains its clients, especially if the FBD is relying on an exemption such as SEC Rule 15a-6 of the Exchange Act. For example, in the case of an FBD claiming that it is exempt from U.S. registration under Section 15a-6, the CO would typically request information from the FBD to validate the exemption claim. In addition, there is a reasonable expectation that the CO would perform independent research such as visiting the prospective client's website, conducting OFAC and sanctions list screening and searching internet sites for information that is circulating around the web to confirm the data. Should the CO identify conflicting information, they would need to clarify the information and if unable to do so, reject the relationship.
- Identify the Officers/Directors controlling the entity. The CO would be expected to know who is controlling the FBD to ensure these persons are reputable and qualified to run an FBD.
- Determine products and services offered. For example, if the FBD offers only registered Mutual Funds, the risk may be low but if the FBD offers day trading and permits trades in penny stocks, etc., the risk is much higher.

# EXPERT REPORT OF DAVID F. MACNAIR

- Policies, Procedures & Controls.  The CO would be expected to review the FBD's policies/procedures and controls to ensure that the regulatory required processes are in place.

### B. Practices of BDs to protect investors

With respect to standards of care for day trading, FINRA Day Trading Rules 2130, 2270 and 4210, were implemented to, among other things, protect small inexperienced investors from inadvertently losing more money than the total amount in the relevant account.  The Day Trading Rules require that U.S. BDs provide a risk disclosure statement to potential Day Traders.  In addition, the rules require that the U.S. BD implement stringent margin related requirements.

Therefore, U.S. BDs implemented extensive due diligence, operational controls and surveillance programs to ensure compliance with these FINRA Day Trading Rules.

Standards of care practiced by U.S. BDs when doing business with day traders generally include but are not limited to:

- Determining if Day Trading is "Suitable"[26] for the investor (e.g., determine # of years of investing experiencing, total & liquid net worth, investment objectives, etc.)
- Ongoing monitoring of the client activity to ensure that the actual activity is consistent with expected activity (e.g., is client actual trading consistent with what they indicated on their new account form)
- Implement margin and trading operational controls in line with FINRA Day Trading rules and internal procedures (which may be more stringent than FINRA requirements)
- Surveillance of trading activity to prevent various forms of market abuse that are common on Day Trading platforms (e.g., Pump & Dump Schemes[27],  Front-Running[28])

Implementing such policies and procedures are important because they are protecting investors from potentially large losses which they cannot afford.

---

[26] FINRA Rule 2111 on Suitability

[27] FINRA Infographic: The Anatomy of a Pump and Dump

[28] FINRA Rule 5320: Prohibition Against Trading Ahead of Customer Orders

# EXPERT REPORT OF DAVID F. MACNAIR

**5. Findings**

    **A.** <u>**Section 15a-6 Registration Exemptions Do Not Apply**</u>

There are exemptions from registration available to FBD through Rule 15a-6 of the Exchange Act. However, FBDs must have controls in place to ensure compliance with the rule in order to protect U.S. investors.

It is clear based on the review of the available information that Gentile did not perform any meaningful evaluation of the available exemptions. Had Gentile done so, he would have come to the conclusion based on the facts and circumstances, the Defendants did not meet the requirements of any of the four (4) exemptions under SEC Rule 15a-6 of the Exchange Act as described below:

<u>**Exemption Category 1:**</u>

<u>**Effecting unsolicited securities transactions [SEC Rule 15a-6(a)(1)].**</u>

The SEC regulatory guidance broadly defines "Solicitation"[29] to include "any affirmative effort by a broker or dealer intended to induce transactional business for the broker dealer or its affiliates". Also, the SEC FAQ on the subject[30] states "a foreign broker dealer seeking to rely on Rule 15a-6(a)(1) may not, however, provide a U.S. investor with any document that includes advertising or other material intended to induce either a securities transaction or transactional business for the foreign BD or its affiliates."

The Defendants failed to implement controls to prevent SureTrader solicitations from targeting U.S. residents. SureTrader was, therefore, not in a position to claim an exemption as "unsolicited".

---

[29] Final Rule: Registration Requirements for Foreign Broker-Dealers: Solicitation: "including any affirmative effort by a broker or dealer intended to induce transactional business for the broker dealer or its affiliates. Solicitation includes efforts to induce a single transaction or to develop an ongoing securities business relationship." Rule 15a-6 Adopting Release at 54 FR 30017-30018 (footnote omitted). Conduct deemed to be solicitation includes telephone calls from a broker dealer to a customer encouraging use of the Broker-Dealer to effect transactions, as well as advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United States or on any radio or television station whose broadcasting is directed into the United States. Similarly, conducting investment seminars for U.S. investors, whether or not the seminars are hosted by a registered U.S. broker-dealer, would constitute solicitation. A broker dealer also would solicit customers by, among other things, recommending the purchase or sale of particular securities, with the anticipation that the customer will execute the recommended trade through the broker-dealer." Final Rule: Registration requirements for Foreign Broker Dealers, Fed. Reg. Vol. 54, No. 136 at 30018, Jul. 18, 1989.
[30] SEC Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker- Dealers found at https://www.sec.gov/tm/divisionsmarketregfaq-15a-6-foreign-bdhtm#_ednref18.

# EXPERT REPORT OF DAVID F. MACNAIR

The "Declaration of Philip A. Dorsett" (*See* SEC-FL-03848-E-0001431) ("Dorsett Declaration") who at the time was SureTrader's Chief Compliance Officer states that, among other things, Gentile stated that "…the only way for SureTrader to survive was to solicit U.S. based customers…", "…began soliciting U.S. based customers by advertising with popular U.S. based day-trading websites…", "…in order to circumvent the regulation, each U.S. based customer of SureTrader would be required to sign a statement claiming that they have not been solicited". Dorsett also stated that "From 2012 through 2017, roughly 80% of the SureTrader's customer were based in the U.S.  I know these facts because I reviewed the applications …."

With respect to the new account application forms, under the "Conflict of Interest" section (See New Account Application Exhibits SEC-SCB-P-0009635 to 0010773, SEC-SCB-P-0010497 to SEC-SCB-P-0010527) there is a statement "Swiss America may compensate Swiss America employees and agents who refer accounts to the firm", an indicator that affiliate solicitation would be utilized.

The applications also have an "Unsolicited Acknowledgment Agreement" which requires the client to affirm that they were not solicited to become a client.  From a compliance perspective, the client does not have the subject matter expertise to affirm what meets the regulatory definition of "solicitation" as written by the SEC.  Moreover, SureTrader did not provide the definition of "solicitation" for the client to consider before signing.  In practice, it is the financial institution's own processes and actions that will determine if the firm is in compliance with the rule.  It is the firm, not the client, that is the responsible party to determine if there was solicitation or not.  SureTrader cannot avoid its responsibility by attempting to transfer this responsibility to a potential client.

The SECWEBCAPTURE exhibits also support the representations made in the Dorsett Declaration.  During review of the fifty-two (52) "SECWEBCAPTURE" exhibits, it was apparent that no IP Address blocking technology was utilized by SureTrader to prevent the advertisement and solicitation of U.S. investors. Moreover, the availability of access to the solicitations in the U.S. was made clear by my review of the exhibits below:

<u>First</u>, SureTrader's website traffic (i.e., number of people located in the United States that have visited the site) was made available by the two vendors listed below:

- SECWEBCAPTURE E-0000082 to 0000091: This is the website of "Hupso", a service that provides website traffic (i.e., number of people that have visited the site) information. The service noted among other things, that the SureTrader website had daily U.S. traffic of

## EXPERT REPORT OF DAVID F. MACNAIR

5,759 and Facebook "Likes" of 2,122 as of 12/14/2017. Hupso also noted that the SureTrader website was hosted on a web server located in San Francisco and that a "General rule is: try to host your website in country where your visitors are located. This will boost traffic for your target audience and also reduce page loading time."

- SECWEBCAPTURE E-0000064 to 00000681: This is the website of Alexa (Amazon) and is also a web traffic information service provider. As of 12/14/2017, Alexa indicated that approximately 56% of the site visitors to SureTrader were located in the U.S.

Second, SureTrader's affiliations with the specified U.S. based websites demonstrate its goal to reach U.S investors:

- SECWEBCAPTURE E-0000356 to E-0000370 is the website of "Warrior Trading" (a website known to promote day trading training to individuals with insufficient capital and/or experience) where a review of SureTrader is posted (the "Review"). Throughout the Warrior Trading Review, SureTrader's banner advertisement appears. The Review also highlights a program where traders can purchase Warrior Trading's training course and receive rebates by opening an account at SureTrader. This program is a clear indicator that Warrior Trader had an affiliation with SureTrader to solicit investors.
- SECWEBCAPTURE E-0000171, 0000106 to 0000118, and 0000093 to 0000105 are screenshots for a website called "Day Trading Radio" ("DTR") that includes an advertisement with the SureTrader banner. The DTR website is also promoting the use of the promo code "DTR" when opening an account with SureTrader to receive a 30 days of free trading. This promotion indicates an affiliation between DTR and SureTrader to solicit investors.
- SECWEBCAPTURE- E-0000135 and E-0000132 are screenshots of the Groupon website which includes an advertisement for SureTrader and a promotion for $50 in free trading. Groupon is a website that offers coupons, discounts, and other deals to the general public, including the U.S.
- SECWEBCAPTURE-E-000130 to 0000131 are screenshots of the "The CouponScoop.com" website advertising a $50 Free Credit Promo Code for SureTrader. The CouponScoop is like Groupon and offers coupons, etc., to the general public, including the U.S.

Third, SureTrader's solicitations on popular social media sharing platforms widely used in the U.S., such as Instagram and Twitter, demonstrate its goal to reach U.S investors:

- SECWEBCAPTURE- E-0000325 to 0000327, and 0000174 to 0000175 are screenshots of SureTrader's solicitations on Instagram, a website platform available to the general public.
- SECWEBCAPTURE- E-0000176-0000249 are screenshots of SureTrader's Twitter feed which is available to the general public. It includes actively traded stocks with solicitations such as "Day Trading with the Gann Square | SureTrader" and "DAY TRADING STRATEGIES".
- SECWEBCAPTURE -E-0000340 and E-0000341 are screenshots of SureTrader's "Contact Us" page which advertises "Take our platform for a test drive" and list two U.S. base telephone numbers:

## EXPERT REPORT OF DAVID F. MACNAIR

- o   USA(Direct) +1 718-247-9939
- o   VOIP 1-718-412-1256

<u>Fourth</u>, while there are various statements such as "not intended for U.S. Persons" throughout the Web capture screenshots, the fact is that these advertisements and other forms of solicitation were available to U.S. persons. A reasonable control person should have ensured that the U.S. residents could not see these solicitations (e.g., by using IP Address blocking technology). Marking these solicitations as "not for U.S Persons", does not override SureTrader's knowledge that these websites, etc. were widely available solicitations in the United States.

<u>Fifth</u>, it is apparent that the Defendants were aware of the technology available to block IP Addresses located in the U.S. but did not utilize this technology to prevent solicitations from appearing in the U.S. Exhibits indicate that SureTrader was aware of IP blocking technology as it used some form of IP Address screening (see SECWEBCAPTURE-E-0000127, 0000061, 0000054, 0000009, 0000006, and 0000003) where a pop-up message appears stating "U.S. IP Address Detected"). SureTrader did not take any blocking action after such U.S. addresses were flagged. To the contrary, SureTrader tried to shift its duty to the potential customer.

For example, SureTrader allowed the user to proceed with the statement "By continuing, you certify that you have not been solicited to this website". Such a statement does not constitute the required blocking. SureTrader left it up to the prospective clients to determine if they were "solicited" by clicking the relevant pop-up box. Standard industry practice is that the broker-dealer, not the prospective client, should be making the determination of whether solicitation was involved (e.g., use a pop-up with terminology "how did you hear about us?" so that the BD, not the prospective client, is making the final determination of solicitation).

<u>Sixth</u>, review of exhibits noted SureTrader sending solicitations via email directly to U.S. residents:

- SEC-AghaM-E0000132 to 0000140 indicate SureTrader was emailing solicitations for SureTraderPRO with statements including "14 Days Free" and "Join Here".
- SEC-AghaM-E0000136 to 0000138 advertise SureTrader "DayTraderPro", "Exclusive Offer" and "Join Here".
- SEC-BOROSSL-E0000001 to 0000035 are SureTrader "Today's Most Actively Traded Symbols" sent to a U.S. based individual.
- SEC-JIMENEZO-E-0000001 is an email from SureTrader to a U.S. resident advising that "your buying power has been updated" and" contact a representative via (Live Chat)".

# EXPERT REPORT OF DAVID F. MACNAIR

Based on the facts and circumstances referenced above, it is apparent that SureTrader actively solicited U.S. investors. Thus, SureTrader could not use the "unsolicited" exemptions under Rule 15a-6(1).

**Exemption Category 2:**

**Providing research reports to major U.S. institutional investors, and effecting transactions in the subject securities with or for those investors [SEC Rule 15a-6(a)(2)].**

This exemption would not apply as there was no apparent effort to qualify customers as major institutional investors.

- Major institutional investors are generally defined as entities that own or control in excess of $100 million in aggregate financial assets.
- It is apparent by the review of the exhibits, of the "Top Stocks" screenshots (SECWEBCAPTURE exhibits E-0000441 to 0000443, E-0000438 to 440, E-0000435 to 437, E-0000432 to 434, E-0000429 to 0000431, E-0000293 to 0000323) that the Defendants made no effort to limit the "Top Stock" research reports to major institutional accounts. The exhibits illustrate that "Top Stock" research reports are available to all subscribers. Additionally, SureTrader had a screen "Get Free Alert of the Top Stocks…Subscribe Now". There is also a "Top Stock" access button which appears on the SureTrader website, which is available not just available to all, not just major institutional investors.

**Exemption Category 3:**

**Soliciting and effecting transactions with or for U.S. institutional investors or major U.S. institutional investors through a "chaperoning broker-dealer" [SEC Rule 15a-6(a)(3)].**

This exemption would not apply as there was no U.S. Registered BD participating in the arrangement as a "chaperoning broker-dealer". As noted in the exhibits, SureTrader was soliciting its services directly to non-institutional investors (not through a chaperoning broker-dealer) with solicitations such as "Level II, Direct Access software. This trading platform comes complete with fully integrated point-and-click trading" (See SECWEBCAPTURE -E-0000410 to E-000409, E-0000401 to E0000409, and E-0000398 to 0000400).

**Exemption Category 4:**

**Soliciting and effecting transactions with or for registered BDs, banks acting in a broker or dealer capacity, certain international organizations, foreign persons temporarily present in the U.S., U.S. citizens resident abroad, and foreign branches and agencies of U.S. persons. [SEC Rule 15a-6(a)(4)].**

# EXPERT REPORT OF DAVID F. MACNAIR

This exemption would not apply as the day trading services were soliciting and effecting transactions directly to permanent U.S. resident non-institutional investors. Specifically, my review of the twenty-four (24) new accounts applications (See New Account Application Exhibits SEC-SCB-P-0009635 to 0010773) indicated:

- All were opened for U.S. citizens that reside in the U.S.
- Not one investor had an occupation as a professional trader or similar expertise.
- Sixteen (16) had a listed liquid net worth of under $30,000.
- The "iBoss" Profit & Loss summaries included with most of the new account application exhibits indicated that most of the accounts were effecting transactions.
- A number of account applications had the "How did you hear about us" box marked as "Warrior Trader". As previously noted, Warrior Trading is a website that offered day trading training along with an apparent referral agreement with SureTrader (See SECWEBCAPTURE-E-0000359).
- The referrals as identified in "How did you hear about us" (e.g., Warrior Trader) for U.S. based accounts contradicts SureTrader's own policies. Specifically, SECWEBCAPTURE-E-0000392 to 0000396 regarding "Partnership" program states that "Only Non-U.S. Referrals permitted" and "Prohibited from soliciting U.S. entities" and "not U.S.". It therefore appears that, in contravention of their own policy, SureTrader did not implement basic controls to prevent the solicitation of referred investors permanently residing in the U.S.

In addition, a number of SECWEBCAPTURE exhibits contain statements that indicate that the SureTrader solicitations clearly targeted the general public in the U.S., not the entities subject to this exemption. For example:

- SECWEBCAPTURE-E-0000425 includes the statement "No Pattern Day Trading Rules" & "no account minimums".
- SECWEBCAPTURE-E-0000339 includes the statement "SureTrader Allows You to
- Avoid the Nasty PDT Rule"
- SECWEBCAPTURE-E-0000262 includes an advertisement "7 HACKS FOR NEWBIE TRADERS….Trading Alerts, Strategies, and Live Training"
- SECWEBCAPTURE-E-0000291 includes an advertisement "BEGINNER DAY TRADING STRATEGIES"

Also, on the new account Application (See New Account Application Exhibits SEC-SCB-P-0009635 to 0010773), under "Definitions" on one application and "Account Disclaimers" on the other Application (See SEC-SCB-P-0010497 to SEC-SCB-P-0010527) (there were two different types of applications), there is an indication that $1,000 is required to open the account. This is well below (only 4% of the required amount) the $25,000 minimum equity required under FINRA

# EXPERT REPORT OF DAVID F. MACNAIR

Rule covering day trading (and not a typical concern of institutional investors).  These solicitations by SureTrader clearly targeted retail day traders directly with the promises of avoiding the PDT rules and minimum account balances.

### B.  Day Trading Rules Were Not Followed

SureTrader's own disclaimer (See exhibit SECWEBCAPTURE-E-0000422) states "The risk of loss in electronic trading can be substantial.  You should therefore consider whether such trading is suitable for you in light of your financial resources and circumstances."

Despite this disclaimer, SureTrader opened accounts for investors who clearly did not have the resources or experience to day trade (See New Accounts exhibits SEC-SCB-P-0009635 through P-0010773).   My review of the new account documents noted identifiers consistent with solicitation of U.S. investors and a lack of day trading suitability checks.  Among other things, I observed that:

- There was no apparent consideration of risks involved in day trading as required under FINRA rules (e.g., experience, resources, etc.) when the new account Applications were approved:
    - o  Objectives for seven (7) of the accounts listed Moderate or Low Risk event though day trading should be considered high risk.
    - o  None indicated an occupation as a professional trader or similar expertise with margin loans, collateral, shorts sales, options exercises, etc.  Rather, three (3) were listed as unemployed and three (3) were listed as students.
    - o  Sixteen (16) had stated liquid net worth of under $30,000 which is and indicator that the clients would not be able to withstand volatile markets.
    - o  Two (2) indicated that the source of funding for the account was Credit Card and one student indicated they were accessing funds from their savings accounts derived from allowance.
    - o  Fifteen (15) of the accounts indicated investment experience of under two years, a further indication of lack of suitability to day trade.
    - o  Review of the profit & loss data supports the fact that these clients were not suited for day trading and confirms regulatory concerns about the risk involved in day trading (of the eighteen (18) accounts providing profit & loss data, all had generated overall losses).

These actions by SureTrader demonstrate its failure to seek financially appropriate clients and encouraged setting up accounts with credit cards.

## EXPERT REPORT OF DAVID F. MACNAIR

### C. **Red Flags Should Have Triggered Further Investigation**

There were other red flags that conflict with being a FBD exempt from registration and not being subject to day trading rules:

- Based upon the applicable regulatory guidance on FBDs, the Defendants use of U.S. based contact information was indicative of a U.S. based BD that should have been registered with the SEC. SECWEBCAPTURE-E-0000340 and E-0000341 are screenshots of SureTrader's "Contact Us" page which lists two U.S. based telephone numbers:
  - o USA(Direct) +1 718-247-9939
  - o VOIP 1-718-412-1256
- The primary SureTrader Control Person during the relevant period, Gentile, lived at various locations in the U.S. including Miami, Florida, New York, and Puerto Rico;
- At various times from 2000 until 2012, Gentile was registered with at least three (3) U.S. BDs;
- In or around 1999, Gentile obtained five (5) U.S. securities licenses through FINRA (Series 4, 7, 24, 55 and 63). The Series 24 designation is for Control Persons who perform Supervisory functions including, but not limited to, Advertising, Market Making, Trading and Underwriting;
- Providing ACH payment methods available to "U.S. Bank Holders Only" (See exhibit SECWEBCAPTURE-E-0000385)
- New account applications included information relating to the Foreign Account Tax Compliance Act which requires foreign financial institutions, such as SureTrader, to report on assets held by U.S. accounts holders. (See New Account Application Exhibits SEC-SCB-P-0009635 through 0010773S)
- Solicitations issued by the Defendants including, but not limited to, "…are you up for circumventing the rules and getting what you want…" (e.g., SECWEBCAPTURE-E-0000339).
- New account Applications (See SEC exhibits SEC-SCB-P-0009635 to 0010773) under "Definitions" on one Application and "Account Disclaimers" on the other (there are two different types of Applications), there is an indication that $1,000 is required to open the account. However, the requirements under FINRA Rules for PDT include, but are not limited to:
  - o Must be in a Margin Account
  - o Maintain a minimum equity of $25,000
- Controls must also be in place to ensure:
  - o If the account value falls under $25,000, day trading is not be permitted until the account is restored to $25,000
  - o Cannot trade in excess of the "day-trading buying power," which is generally four times the maintenance margin excess as the of the close of business of the prior day.
  - o If the day trader exceeds the day-trading buying power limit, the firm is required to issue a day-trading margin call. The day-trader will then have 5 business days to deposit the funds to meet the call.
  - o Until the margin call is met, the day-trader is limited to 2 times the buying power until the call is met.

## EXPERT REPORT OF DAVID F. MACNAIR

o   Surveillance is in place to identify PDT activity (e.g., identify accounts with four or more "day trades" that represent no more than 6% of total trading during a five (5) business period)

However, there is no indication that these processes or controls were in place.

Lastly, the Defendants should have implemented Information Barriers[31], general trade surveillance and controls associated with the issuance of research reports (e.g., See SEC-BOROSSL-E-0000001). These rules require broker dealers to implement procedures so that in part, the broker-dealer and its employees do not trade ahead of the issuance of the research report and subsequently benefiting from a price change once the report is issued to the investors. However, there was no evidence that any of these processes were in place as would be expected.

## VI. <u>CONCLUSION</u>

Defendants were required to register with the SEC as an FBD but did not do so. None of the Rule 15a-6 exemptions applied. Also, the Defendants' primary business was offering Day Trading service to U.S. investors and therefore the relevant FINRA PTD Rules should have been applied. Defendants did not follow, and attempted to avoid, those PTD rules. Moreover, numerous red flags were present in the Defendants' business operations that would have triggered an investigation by a registered U.S. BD. Defendants targeted U.S. investors, while avoiding the U.S. rules regarding such investors.

I reach this opinion with the information currently available to me. I reserve the right to supplement, augment and/or revise this opinion if additional information becomes available to me during the course of this matter's litigation.

Prepared by:                                                    Dated:

_David F. MacNair_                                          2/3/23

---

[31] FINRA/NYSE Joint Memo on Chinese Wall Policies and Procedures, Notice To Members 91-45, found at https://www.finra.org/rules-guidance/notices/91-45 (last visited Feb. 2, 2023).

# EXPERT REPORT OF DAVID F. MACNAIR

**Attachment A: Résumé**

**DAVID F. MACNAIR**

96 Muirfield Rd                                                                 516-592-3621
Rockville Centre, NY 11570                                        dmacnair@optonline.net

## SUMMARY

Financial services professional with extensive compliance experience across the brokerage industry. Specialization in the development of Foreign Financial Institution Enhanced Due Diligence programs, performing Risk Assessment, developing AML and Trade Surveillance tools, and implement Investigation and SAR filing processes. Serve as Subject Matter Expert at senior management committees, industry conferences and for regulatory enforcement authorities on a broad range of topics including AML, Market Abuse and Suitability. Member of the Advisory Council for Association of Certified Fraud Examiners. Preside as an Arbitration Panelist and Chairperson at FINRA Arbitration hearings.

## PROFESSIONAL EXPERIENCE

**MACNAIR CONSULTING, LLC**                              **November 2020 – Present**

Through independent consulting and affiliations, assist financial institutions with the development and implementation of Financial Crime Compliance programs; Assist with the evaluation and on-boarding of higher-risk clients including Foreign Banks, Foreign Broker/Dealers and Hedge Funds; Perform Compliance Risk Assessments to enhance policies, procedures, and controls; Conduct annual reviews of Working Supervisory Procedures to ensure adequacy; Build KYC, Sanctions, AML surveillance and SAR filings processes and procedures; Prepare expert witness reports on customer trading, suitability, profit/loss and financial crime compliance related issues.

**CREDIT-SUISSE SECURITIES (USA), LLC**          **May 2016 – October 2020**

**Director - Financial Crime Compliance Investigations**

Developed, implemented and supervised the Financial Crime Compliance Surveillance, Investigations and SAR filing program covering the Investment Bank, Correspondent Bank and Ultra High Net Worth business lines.

- Supervised a global team of Investigators responsible for the review and reporting of potential money laundering, market abuse, insider trading, penny stock fraud, market manipulation, elder abuse, suitability, sanctions, and other suspicious activities.
- Performed annual reviews of Foreign Financial Institutions and offshore broker/dealer affiliates in accordance with Section 312 of the USA PATRIOT Act.
- Chaired the SAR Review Committee which approved SAR filings, evaluated higher-risk offshore clients, and reviewed complex trading issues including market abuse.
- Managed the design, development, tuning and optimization of product specific surveillance reports covering money laundering, penny stock and related market abuse.

28

# EXPERT REPORT OF DAVID F. MACNAIR

- Evaluated new business initiatives such as private placements, IPOs and secondary offerings in emerging fields including blockchain and cryptocurrency.
- Coordinated BSA/KYC Risk Assessments to ensure adequate controls were in place.
- Drafted and delivered compliance training for Front Office, Middle Office and Compliance personnel on AML and Market Abuse related topics.
- Developed and implemented a Financial Crime Quality Assurance program.
- Drafted and implemented investigation and surveillance policies and procedures to ensure standardized processes were in compliance with BSA and USA PATRIOT Act.

**BARCLAYS CAPITAL**                                    **May 2009 – April 2016**

**Director – Compliance Investigations and Surveillance**

Developed, implemented and supervised the Financial Crime Compliance surveillance and investigations program for the Investment Banking, Retail Brokerage, Trading and Correspondent Banking businesses lines.

- Drafted and implemented surveillance policies and procedures.
- Performed annual reviews of Foreign Financial Institutions and offshore broker/dealer affiliates in accordance with Section 312 of the USA PATRIOT Act.
- Supervised the team responsible for the investigations and reporting of suspicious activity.
- Managed the optimization of the surveillance and investigative processes.
- Conducted Risk Assessments of departmental operations.
- Coordinated AML, OFAC, ABC, Trade Surveillance and compliance reporting processes.
- Coordinated SEC, FINRA and internal audits.

**CITIGROUP (SMITH BARNEY)**                          **April 1997 – July 2008**

**Manager of Anti-Money Laundering Investigations Department**

Supervised the AML and OFAC Surveillance and Investigations team filed Suspicious Activity Reports on potential money laundering, fraud, and securities market abuse related violations.

- Drafted and implemented AML surveillance policies/procedures for new products/services.
- Managed the OFAC Sanctions screening and blocked property processes.
- Created a fraud management program that included a reporting hotline, due diligence and red flag educational tools for both staff and clients.
- Managed the development and implementation of the Enhanced Due Diligence program.

**ADDITIONAL EXPERIENCE**

**PRUDENTIAL SECURITIES**: Compliance Officer, Litigation Support

**NASD (FINRA):** Examiner

# EXPERT REPORT OF DAVID F. MACNAIR

**NEW YORK LIFE INSURANCE:** Claims Analyst

**EDUCATION**

**Bachelor of Science,** Business Administration, SUNY New Paltz, New Paltz, New York

### CERTIFICATIONS/MEMBERSHIPS/SKILLS

FINRA Licenses (inactive): Series 3, Series 7, Series 8, Series 14, Series 24, Series 63, SIE

FINRA Arbitrator Panelist and Chairperson

Wharton School of Business Certificate: Fintech: Foundations/Applications of Financial Tech.

NYSDFS Techsprint for Digital Regulatory Reporting Certificate (CSBS Education Foundation)

Microsoft Office (Excel, PowerPoint, Word)

Association of Certified Fraud Examiners (ACFE)

# EXPERT REPORT OF DAVID F. MACNAIR

### Attachment B: Documents reviewed and relied upon

- SEC's Complaint [DE 1]

- Defendant Gentile's Amended Answer [DE 80]

- Twenty-four (24) **New Account** applications completed by U.S. residents covering the time-period of approximately April 2016 through July 2017. Three of the identified clients had two account applications each. Therefore, twenty-two (22) customers' New Account applications were reviewed.

- Four (4) documents from the **Supreme Court of the Bahamas**. These encompassed files titled "Affidavit", "First Supplemental Affidavit", "Second Supplemental Affidavit" and, "Settlement Agreement SCB SASL".

- Fifty-Two (52) **Website Captures** in pdf form, of among other things, SureTrader's website (e.g., "Top Stocks", Platforms/ Products, Pricing/Fees, Partnership Programs, Contact Information Terms & Conditions, SureTrader on Instagram, Leverage, FAQ, etc.), Warrior Trader's review of SureTrader, Day Trading Radio's review of SureTrader, Groupon coupons for SureTrader, and SureTrader website traffic statistics provided by Hupso and Alexa.

- Three (3) **Web Capture Videos**. The first two illustrate the Instant Messaging/Chat function when a user enters the SureTrader website where assistance is offered to open accounts. The third illustrates that when on the Day Trading Radio and the user clicks on the SureTrader banner advertisement, the user is brought to the SureTrader website.

- The investigatory sworn testimony of:
  - Guy Gentile, May 1, 2012 (FINRA);
  - Timothy K. Sykes, July 27, 2016;
  - Nathan Michael Michaud, August 2, 2016; and
  - Carla Marin, February 5, 2020

- Two (2) **Swiss America Securities Limited ("SASL")** business plan documents.

- Two (2) **Advertiser Service Agreements** between Commission Junction, Inc. ("CJ") and Speed Trader.Com (a division of Stock USA Execution Services, Inc.), signed by Guy Gentile (Chairman).

- Nine (9) **Emails** between SureTrader and various U.S. clients. The first three (3) are solicitations sent to "Agha" (one to sign-up for 14 day free trial access to DayTraderPro live Trade and chat room, two with an "Exclusive Offer" to join DayTraderPro). Five (5) are SureTrader "Today's Most Actively Traded Symbols at SureTrader" sent to "Boross".

31

## EXPERT REPORT OF DAVID F. MACNAIR

One was a notice to "Jimenez" advising that their buying power has been updated.   Jimenez
was identified in new account documents as a U.S. resident.

- A declaration of **Philip Dorsett.**

- A **Foreign BD Agreement with Stock USA.**

- An **AML Program Review** of SureTrader.

- A **Checkbook, Inc**. excel spreadsheet.

- All statutory and regulatory authority cited herein.