**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:21-CV-21079-BLOOM/Torres**

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

     Defendants.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") pursuant to Federal Rules of Civil Procedure Rule 56(a) and Southern District of Florida Local Rule 56.1, respectfully requests that this Court enter summary judgment in favor of the SEC and against Defendants MintBroker International, Ltd., f/k/a Swiss America Securities Ltd. and d/b/a SureTrader ("SureTrader") and Guy Gentile a/k/a Guy Gentile Nigro ("Gentile") on (1) the SEC's claim that SureTrader operated as an unregistered dealer in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"); (2) the SEC's claim that Gentile is liable under Section 20(a) of the Exchange Act as a control person of SureTrader; (3) the SEC's claim that Gentile is liable under Section 20(b) of the Exchange Act for acting through SureTrader to commit violations of Section 15(a)(1) of the Exchange Act; and (4) Gentile's Affirmative Defenses.

## I. INTRODUCTION

As detailed in the Complaint, and supported by the undisputed evidence, from March 2016 through at least November 2019 ("Relevant Period"), SureTrader and its founder, owner, and chief executive officer Guy Gentile operated an offshore broker-dealer in the Bahamas designed to help day traders in the U.S. circumvent the U.S. rules that regulate pattern day trading.  Gentile readily

admits that he founded and registered SureTrader, a foreign broker-dealer, in the Bahamas, and that SureTrader was never registered with the Commission in the U.S.

At various times during the Relevant Period, up to 80-85% of SureTrader's customer base was comprised of U.S. customers.  SureTrader grew from a three-man shop to one with 75 employees, more than 40,000 customer accounts, and assets of more than $10 million.  According to Gentile, SureTrader effected transactions in excess of $1 billion on behalf of its customers. These customers were solicited by SureTrader through its website, e-mail messages, and advertising with U.S. based day trading schools with which SureTrader had marketing agreements.

Gentile's defenses that SureTrader is subject to an exemption to registration because it used pop-up blockers on its website, unsolicited acknowledgement agreements, and disclaimers in advertising that SureTrader's services are not intended for U.S. persons are wholly unsupported by the undisputed evidence.  In fact, these pop-up blockers, acknowledgments, and disclaimers were nothing more than window dressing manufactured by Gentile and SureTrader to give the impression of non-solicitation when the opposite was true.  The evidence shows, time and again, SureTrader accepted potential customers located in the U.S.

Because SureTrader operated as a foreign broker-dealer without registering with the Commission, it violated Section 15(a)(1) of the Exchange Act.  Additionally, Gentile should be held liable as a control person for SureTrader's violations under Section 20(a) of the Exchange Act because he had the power to control the general affairs of SureTrader and the specific corporate policy that resulted in SureTrader's violations.  Gentile should also be held liable for violating Section 15(a)(1) through or by means of SureTrader in violation of Section 20(b) of the Exchange Act.  Finally, summary judgment should be entered in favor of the Commission on all of Gentile's Affirmative Defenses.

## II.      UNDISPUTED FACTS

### Founding of SureTrader and Gentile's Control and Ownership of SureTrader

In 2008, Gentile incorporated and founded Swiss America Securities Ltd. in the Bahamas. SMF ¶ 7.  In 2017, Gentile changed the name of the Company from Swiss America Securities Ltd. to MintBroker International, Ltd.  *Id.*  at ¶ 8.  Gentile marketed the company as SureTrader, and it was commonly known as SureTrader, including through its website www.suretrader.com.  *Id.*  at ¶ 9.  SureTrader's principal place of business was the Bahamas.  *Id.* at ¶ 10.  In 2011, Gentile registered SureTrader with the Securities Commission of the Bahamas ("SCB") as a broker-dealer.

*Id.* at ¶ 11.  SureTrader has never been registered with the Commission in any capacity.  *Id.* at ¶ 12.  Gentile was an owner and chief executive officer of SureTrader from February 2017 until November 2019. *Id.*  at ¶ 13.  At all times since Gentile founded SureTrader, Gentile was in charge and the "boss" of SureTrader.  *Id.*  at ¶ 14.

**SureTrader's Operations**

SureTrader was in the business of being a broker-dealer from no later than December 2011 until at least November 2019, when its clearing firm changed the services it provided to SureTrader.   *Id.* at ¶ 20.  SureTrader offered broker-dealer services through which day traders could have their trades executed.  *Id.* at ¶ 21.  SureTrader did not require customers to meet any of the requirements set forth in the U.S. Pattern Day Trader Rules.  For example, SureTrader offered customers the ability to open an account and trade with as little as $500 and did not require any margin account balances or place any other restriction required under the Rules.  *Id.* at ¶ 22.  During the Relevant Period in the Complaint, SureTrader only permitted its customers to trade in U.S. equities (99%) and options (1%).  *Id.* at ¶ 23.  SureTrader ballooned from a three-man shop to become a broker-dealer employing about 75 employees, with more than 40,000 customer accounts and assets of more than $10 million.  *Id.* at ¶ 24.  SureTrader has effected transactions "in excess of $1 billion on behalf of its customers."  *Id.* at ¶ 25.  During the Relevant Period in the Complaint, U.S. customers comprised at least 50% and, at times 80%-85%, of SureTrader's customer base. *Id.* at ¶ 26.  The Active Traders List shows customers located in the U.S. who received a trade commission structure that had a special deal with an affiliate program from the U.S.  *Id.* at ¶ 27. The potential customers targeted by SureTrader advertising on Affiliate websites ("Affiliates") were U.S. customers.  *Id.* at ¶ 28.  SureTrader's Affiliate programs "were a way to get access to more U.S. clients without there being any direct solicitation.  *Id.* at ¶ 29.  SureTrader did not treat the applications from U.S. customers any differently than customers from other locations.  *Id.* at ¶ 30.  In 2020, the Supreme Court of the Bahamas ordered that SureTrader be placed in liquidation and appointed Joint Provisional Liquidators to wind down the company.  In or around December 2021, the Supreme Court of the Bahamas issued a Winding Up Order formally requiring that SureTrader be wound up and appointed the Joint Provisional Liquidators as the Joint Official Liquidators for SureTrader.  *Id.* at ¶ 32.  As a result of the appointment of the Liquidators, SureTrader's directors and officers, including Gentile, ceased to have any duties, functions, or powers with respect to the company.  *Id.* at ¶ 33.

**SureTrader's Solicitation of U.S. Customers**

<u>Solicitation Via SureTrader's Website</u>

During the Relevant Period, SureTrader solicited customers through its website, www.suretrader.com. *Id.* at ¶ 34. For example, in at least October 2017, the SureTrader website stated it would "Allow You to Avoid the Nasty PDT [Pattern Day Trader] Rule." *Id.* at ¶ 35. In at least October 2017, the SureTrader website asked potential customers if they "are up for circumventing the rules and getting what you want." *Id.* at ¶ 36. The website targeted U.S. customers in several ways, including:

a. listing all trading and account fees in U.S. Dollars; *Id.* at ¶ 37a.

b. only permitting trading in U.S. equities and options; *Id.* at ¶ 37b.

c. listing a "USA (Direct)" phone number among its contact information along with a New York City-based VoIP phone number "as a courtesy to . . . existing customers;" *Id.* at ¶ 37c.

d. providing ways to fund a trading account specifically for U.S. customers, including an ACH payment method available to "US Bank Holders Only;" *Id.* at ¶ 37d.

e. offering a pricing comparison between its services and other prominent, online brokerages, with five of the six compared brokers being U.S.-based, registered broker dealers; *Id.* at ¶ 37e.

f. A promotional offer for new accounts prominently located at the top of the webpage: "Hey! We're offering $50 in free trades to new traders like you! GET YOUR $50 PROMO CODE NOW." *Id.* at ¶ 37f. The ad shows up prominently at the top of the website; however, the only disclaimer (SureTrader "does not accept accounts for U.S. Persons that have been solicited") is only located in the smallest print at the very bottom of the page, nowhere near the ad. This offer was accepted by at least two U.S. customers: Warren Williams and Hunter Huddleston; their accounts show $50 credit for "50ONUS" on May 18, 2017 and March 22, 2017, respectively. *Id.*

<u>Solicitation Via E-Mail Messages</u>

SureTrader also solicited existing U.S. Customers and prospective U.S. Customers by e-mail messages. These emails, once opened, directed U.S. customers to SureTrader's website. Orestes Jimenez, who was located in Miami, Florida, received multiple e-mail messages from SureTrader. On March 8, 2017 (time stamped 4:57pm), SureTrader sent an email to Jimenez with

4

the subject "Trading Tips You Can't Afford to Ignore." *Id.* at ¶ 38. The email included a link to a video, stated that it is providing "some important trading tips," and concluded by asking, "Are you ready to Open an Account with SureTrader and be on your way to a successful trading career? Get Started Now! To get you started, we'd like to offer you $99 in Free Trades when you open an account with SureTrader. Use Code: SURE99, and fund your account with a minimum of $1,000. This is an exclusive offer that expires in 14 days." Minutes later, SureTrader sent an email to Jimenez (time stamped 5:13 pm) with the subject "Please Confirm Your Account" dated March 8, 2017. *Id.* Approximately one month later, after Jimenez had already opened a SureTrader account, SureTrader sent a reminder email on April 12, 2017, to entice him to trade through SureTrader, informing that his margin "buying power has been updated." *Id.* SureTrader sent this same email "Trading Tips You Can't Afford to Ignore" on August 22, 2016, to another U.S. resident, Mazen Agha, who opened an account with ST after receiving this email. *Id.* at ¶ 39. These e-mail messages did not include any disclaimers regarding restrictions on opening accounts for U.S. persons. *Id.* at ¶ 40.

<u>Solicitation Through Online Day Trading School Websites</u>

During the Relevant Period, SureTrader solicited U.S. customers through advertisements on U.S.-based day trading school websites such as DayTradingRadio.com and WarriorTrading.com, which SureTrader referred to internally as "Affiliates." *Id.* at ¶ 41. The Affiliates prominently advertised SureTrader's brokerage services on their websites and also offered their "students" incentives to open an account with SureTrader. *Id.* at ¶ 42. Gentile, who controlled SureTrader, knew about SureTrader's arrangements with the Affiliates and directed SureTrader's communications with them. *Id.* at ¶ 43.

In October 2016, SureTrader entered into a Marketing Services Agreement with Warrior Trading (www.warriortrading.com), a Vermont-based website for day trading. *Id.* at ¶ 44. Pursuant to this agreement, Warrior Trading advertised SureTrader on its website as a preferred broker, and SureTrader offered a trading commission rebate. *Id.* at ¶ 45. While the Marketing Services Agreement stated the rebate would only apply to non-U.S. customers, SureTrader gave the rebate to U.S. customers. For example, in October 2016, Mazen Agha, who was residing in the U.S., learned about SureTrader through Warrior Trading. *Id.* at ¶ 46. Warrior Trading informed its students that it has a deal with SureTrader: Warrior Trading students will get an incentive from SureTrader when they open a trading account with SureTrader. Warrior Trading

students who bought courses from Warrior Trading and opened a trading account with SureTrader will get an incentive from SureTrader where SureTrader will rebate to Warrior Trading students the full price of the Warrior Trading courses in form of a discount on trade commissions (discounted from $4.95 to $3.95 per trade).  Agha personally received that promotion from SureTrader and the discounted price on his trade commissions ($3.95 per trade instead of $4.95) after he contacted SureTrader support and provided them with his Warrior Trading course receipt. *Id.*

Prior to opening his SureTrader account, Agha reviewed SureTrader's website where it stated that he could avoid pattern day trading rules by opening an account with SureTrader.  *Id.* at ¶ 47.  He was attracted to SureTrader because he could open an account and trade with less than $25,000 in his account, which he could not do in his U.S. day trading account at E*Trade.  On August 22, 2016, Agha received an email from SureTrader stating that his SureTrader demo had expired, and that "it's time to put all your practice into action!" The email also offered $99 in free trades when you opened an account at SureTrader.  There was nothing in the email stating the offer for free trades was not available for residents of the U.S.  Agha submitted an account application to SureTrader on about October 4, 2016, listing his Chicago, Illinois address on his application and attached his driver license.  On October 10, 2016, SureTrader approved Agha for trading, and Agha subsequently opened a trading account at SureTrader.  Although SureTrader was aware Agha lived in the U.S., it did not prevent Agha from opening an account or making trades.  Agha was never questioned by SureTrader about his U.S. residency.  Agha also negotiated with a SureTrader representative to receive a highly discounted trade commission fee in return for a large initial account deposit and the promise of high-volume trading as reflected in the email exchange between Agha and SureTrader on November 2, 2017.  *Id.* at ¶ 53.

SureTrader opened accounts for U.S. customers referred by Warrior Trading while SureTrader had an active marketing agreement with Warrior Trading.  Notably, these U.S. customers specifically acknowledged in their applications that they were referred to SureTrader by Warrior Trading.  *Id.* at ¶ 49.

SureTrader entered into a Marketing Services Agreement signed in August 2016 with New York-based Day Trading Radio, Inc. ([www.DayTradingRadio.com](www.DayTradingRadio.com)), pursuant to which SureTrader paid Day Trading Radio $1,000 a month in exchange for running SureTrader's banner advertisements on the Day Trading Radio website.  *Id.* at ¶ 50.  The Day Trading Radio website

prominently displayed two SureTrader ads at the top of its home page, one of which was a banner ad running along the top of the page with the text "Day Trading Radio's Preferred Broker – click to learn more!" Clicking on either ad redirected the visitor to SureTrader's website. Although the advertisements included a small-font disclaimer, "Not Intended for US Persons," Day Trading Radio's website included an article entitled "DayTraderRockStar's Preferred Broker: SureTrader" which explained that SureTrader was "required to post" a disclaimer on its website that meant "they are not allowed to solicit business from the U.S." though "they can accept and open U.S. accounts no problem." The article concluded with step-by-step instructions for U.S. customers to follow to open an account with SureTrader. *Id.* Day Trading Radio invoiced SureTrader for its advertisements during the Relevant Period. *Id.* at ¶ 52.

### Defendants' Solicitation Efforts Were Successful

SureTrader ballooned from a three-man shop to become a broker-dealer employing about 75 employees, with more than 40,000 customer accounts and assets of more than $10 million. *Id.* at ¶ 54. According to SureTrader, it has effected transactions "in excess of $1 billion on behalf of its customers." *Id.* at ¶ 55.

### SureTrader's Sham Attempts to Conceal Its Solicitation of U.S. Customers

On or around March 24, 2017, Yaniv Frantz at SureTrader sent an email to Day Trading Radio advising that "SureTrader senior management have decided to stop any prior deal moving forward, as we made it clear that we are not endorsing to solicit for U.S. customers on our behalf as mentioned on our website." *Id.* at ¶ 56. Day Trading Radio responded: "I'm a bit confused are we canceling our marketing agreement? Your banner states not intended for US customers and our customer base is both US and non US? Best Dac" *Id.* Frantz discussed the email with Gentile and obtained his approval as this was during Frantz's first three months with SureTrader and Frantz did not make "big statements on [his] own." *Id.* at ¶ 57. Frantz also confronted Gentile about the emails with the Affiliates and the program. *Id.* at ¶ 58. Frantz explained that SureTrader's email to the Affiliates was a ruse—"maybe a like a small CYA, and then, later on, it was a big one" and "plaster on the hole of the wall...painting there almost like it doesn't exist." *Id.* at ¶ 59. After the March 24, 2017 email exchange with Day Trading Radio, SureTrader approved U.S. based customers. *Id.* at ¶ 60.

On SureTrader's website, it told potential customers that "U.S. customers wanting to work with . . . Swiss America Securities, Ltd. (SureTrader.com) can thus only approach Non-U.S.

Broker-Dealers under Rule 15a-6 if they have not been to their website and should be prepared to certify this fact in writing to ensure compliance with applicable law." *Id.* at ¶ 61. During 2016, SureTrader's website incorporated a single pop-up warning the visitor that by clicking "Accept" you agree to SureTrader's "Terms & Conditions." *Id.* at ¶ 62. The pop-up could also be closed by clicking on an "X" on the upper right-hand corner of the pop-up window. No later than October 2017, SureTrader added a web-based Internet Protocol ("pop-up") blocker to the SureTrader website to give the appearance that SureTrader was not soliciting U.S.-based customers. *Id.* at ¶ 63. SureTrader's pop-up blocker was created at the direction of Gentile. *Id.* at ¶ 64. The SureTrader pop-up window stated: "In compliance with SEC Rule 15a-6 this website is not intended to solicit U.S. Residents. . . By continuing, you certify that you have not been solicited to this website." The pop-up blocker and disclaimers were sham attempts to conceal SureTrader's solicitation of U.S. based customers. *Id.* at ¶ 66. Despite the existence of the pop-up blocker, applications from customers located in the U.S. that listed "website" as the source of referral to SureTrader were approved by SureTrader. *Id.* at ¶ 67.

Other than the Unsolicited Acknowledgement Agreement, which Gentile drafted, there were no other policies or procedures implemented by SureTrader to prevent solicitation of U.S. residents. *Id.* at ¶ 68. There were no policies or procedures implemented by SureTrader to deny account applications because the applicant was a U.S. resident. *Id.* at ¶ 69. Gentile instructed SureTrader's Chief Compliance Officer, who instructed staff at SureTrader, to accept any account application from a U.S. resident as long as their application was complete, including submission of the signed Unsolicited Acknowledgment Agreement. No further inquiry whether the applicant had been solicited by SureTrader was conducted. *Id.* at ¶ 70.

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment should be entered, as a matter of law, whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the Commission has carried its burden of establishing liability, the burden shifts to defendants, who must "do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Id.* at 586. Defendants must come forward with sworn statements or other admissible evidence, as provided by Rule 56, "showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). As the Supreme Court has stated, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must be material and genuine. *Id.* at 248.

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings and factual statements made in support of the motion. *Celotex*, 477 U.S. at 322-323; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

**B.     The Undisputed Facts Show That SureTrader Was a Broker-Dealer, Was Not Registered, Was Not Subject To An Exemption, And Thus Violated Section 15(a)(1)**

1.   SureTrader Was A Broker-Dealer And Not Registered With The Commission

Section 15(a)(1) of the Exchange Act makes it illegal for a "broker" or "dealer" to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security unless such broker: (1) is registered with the Commission; (2) in the case of a natural person, is an associated person of a registered broker-dealer; or (3) satisfies the conditions of an exemption or safe harbor. Those who buy and sell securities for their own account as part of a regular business must register with the SEC as securities dealers. 15 U.S.C. §§ 78c(a)(5)(A) & (B). This provision is an essential part of securities regulation. *See Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The broker-dealer registration requirement serves as the 'keystone of the entire system of broker-dealer regulation.'") (citation omitted). A party claiming an exemption from the broker-dealer

registration requirement "bears the burden of proving that an exemption applies."  *UBS Asset Management (New York) Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 70 (S.D.N.Y. 1996).

Section 15(a)(1) does not require a showing of scienter to establish a violation[1] because it imposes strict liability.  *SEC v. Merchant Capital*, 311 Fed. Appx. 250, 252 (11th Cir. 2009).  The SEC need only show that a defendant functioned as a "broker" or "dealer" as the term is defined in the Exchange Act, regardless of the person's intent, to establish a violation.

In this case, there is no dispute that SureTrader was a broker-dealer or that SureTrader was not registered with the Commission.  Gentile—SureTrader's founder, owner, chief executive officer, and "boss"—admits in his Answer that SureTrader was a foreign broker-dealer that was registered and licensed with the Securities Commission of the Bahamas ("SCB") and that SureTrader has never been registered with the Commission in any capacity.  SMF ¶ 11, 12.  Thus, SureTrader and Gentile bear the burden of proving an exemption or safe harbor in order to avoid liability for their violations of Section 15(a)(1) of the Exchange Act.

2.  <u>SureTrader Cannot Rely on the Registration Exemption Available Under Rule 15a-6 of the Exchange Act</u>

Gentile argues that SureTrader was subject to the "foreign broker exemption" in Rule 15a-6(a)(1), which describes certain limited exemptions from the Exchange Act's broker-dealer registration requirement for foreign brokers who participate in certain activities with U.S. investors and securities markets.  *See,* 17 C.F.R. § 240.15a-6.   The exemption under Rule 15(a)-6(a)(1) provides that a foreign broker need not register in circumstances where it has *not* solicited customers in the U.S. with or for whom it is effecting securities transactions.  Solicitation under the Rule is construed broadly to include both efforts to induce a single transaction and efforts to develop an ongoing securities business relationship.  *See Registration Requirements for Foreign Broker-Dealers*, Adopting Release No. 34-27017, 54 FR 30013, 30017-18, 1989 WL 27982 (July 18, 1989) (in the context of the Exchange Act's broker-dealer registration requirement, solicitation includes "any affirmative effort by a broker or dealer intended to induce transactional business for

---

[1] *See SEC v. Corporate Relations Group*, No. 6:99-CV-1222-ORL28KRS, 2003 WL 25570113, at *17 (M.D. Fla. Mar. 28, 2003); *SEC v. United Monetary Servs. Inc.*, No. 83-3540-CIVPaine, 1990 WL 91812, at *8 (S.D. Fla. May 18, 1990); *accord SEC v. Novus Tech., LLC*, No. 3:07-CV-235-TC, 2010 WL 4180550, at *12 (D. Utah Oct. 20, 2010); *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Wilde*, No. SACV 11-0315 DOC, 2012 WL 6621747, at *14 (C.D. Cal. Dec. 17, 2012), aff'd, 669 F. App'x 423 (9th Cir. 2016); *SEC v. National Executive Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

the broker-dealer or its affiliates," including "efforts to induce a single transaction or to develop an ongoing securities business relationship").

Here, the evidence is replete with examples of SureTrader soliciting customers in the U.S. through its website, agreements with affiliate day trading school websites, and emails to prospective and existing customers in the U.S. SureTrader's efforts included the solicitation of U.S. customers to induce a single transaction and to develop an ongoing securities business relationship.

### a. Solicitation Through The SureTrader Website

During the Relevant Period, SureTrader maintained a website, www.suretrader.com. SMF ¶ 9. "[T]he Commission will not consider a foreign broker-dealer's advertising on an Internet Web site to constitute an attempt to induce a securities transaction with U.S. persons if the foreign broker-dealer takes measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons as a result of its Internet activities. Under our general principles, as applied in the broker-dealer context, a foreign broker-dealer generally would be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities if it:

> • Posts a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; *and*
>
> • Refuses to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds."

*Statement of the Commission Regarding the Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore,* SEC Release No. 1125, 1998 WL 128173 at *12 (March 23, 1998) (emphasis added).

SureTrader's website did not meet the above guidance and actively served as a solicitation to U.S. residents, inducing prospective U.S. customers to open an account and inducing current U.S. customers to continue trading with SureTrader. In at least October 2017, the SureTrader website stated it would "Allow You to Avoid the Nasty PDT [Pattern Day Trader] Rule." SMF 35. The SureTrader website also asked potential customers if they "are up for circumventing the

rules and getting what you want."  *Id*.  The website targeted U.S. customers in several ways, including:

    g.   listing all trading and account fees in U.S. Dollars; SMF ¶ 37a.

    h.   only permitting trading in U.S. equities and options; SMF ¶ 37b.

    i.   listing a "USA (Direct)" phone number among its contact information along with a New York City-based VoIP phone number "as a courtesy to . . . existing customers;" SMF ¶ 37c.

    j.   providing ways to fund a trading account specifically for U.S. customers, including an ACH payment method available to "US Bank Holders Only;" SMF ¶ 37d.

    k.   offering a pricing comparison between its services and other prominent, online brokerages, with five of the six compared brokers being U.S.-based, registered broker dealers; SMF ¶ 37e.

    l.   A promotional offer for new accounts prominently located at the top of the webpage: "Hey!  We're offering $50 in free trades to new traders like you!  GET YOUR $50 PROMO CODE NOW."  The ad shows up prominently at the top of the website; however, the only disclaimer (SureTrader "does not accept accounts for U.S. Persons that have been solicited") is only located in the smallest print at the very bottom of the page, nowhere near the ad.  SMF ¶ 37f.  This offer was accepted by at least two US customers: Warren Williams and Hunter Huddleston; their accounts show $50 credit for "50ONUS" on May 18, 2017 and March 22, 2017, respectively.  SMF ¶ 37f.

    *b. Solicitation Through Online Day Trading School Websites*

       SureTrader also engaged in a marketing campaign with online day trading school websites to attract the websites' U.S. audience to open accounts with SureTrader.   For example, Warrior Trading signed a Marketing Services Agreement with SureTrader to advertise SureTrader as a preferred broker.  SMF ¶ 44-45.   Although the banner advertisement for SureTrader contained a disclaimer that it was not intended for U.S. persons, SureTrader nonetheless opened accounts for U.S. customers referred by Warrior Trading while SureTrader had an active marketing agreement with Warrior Trading.  SMF ¶ 46.  Notably, these U.S. customers specifically acknowledged in their applications that they were referred to SureTrader by Warrior Trading.  SMF ¶ 49.

Additionally, SureTrader specified that only non-U.S. customers would be eligible for a rebate and asked for the ad with Warrior Trading to include a disclaimer that it was not intended for U.S. persons.  SMF ¶ 46.  However, although the rebate was supposed to be solely for non-U.S. customers, at least one U.S. customer, Mazen Agha, asked for and received the rebate he heard about on Warrior Trading.  *Id.*  Agha was asked by SureTrader to provide a copy of his Warrior Trading receipt (which listed Agha's Chicago, IL home address).  *Id.*  SureTrader then granted Agha the "non-U.S. only" rebate.  *Id.*  Although the grant of a request for a rebate on commissions to a U.S. customer itself is an affirmative act by SureTrader to induce a securities transaction, the action also shows that SureTrader took no steps to enforce its putative restrictions. As testified to by SureTrader's Chief of Compliance, U.S. customers were treated no differently than other customers.  SMF ¶ 14.

SureTrader had a similar Marketing Services Agreement with Affiliate Day Trading Radio. SMF ¶ 50.  The Day Trading Radio website prominently displayed two SureTrader ads at the top of its home page, one of which was a banner ad running along the top of the page with the text "Day Trading Radio's Preferred Broker – click to learn more!" SMF ¶ 51.  Clicking on either ad redirected the visitor to SureTrader's website.  *Id.*  Although the advertisements included a small-font disclaimer, "Not Intended for US Persons," Day Trading Radio's website included an article entitled "DayTraderRockStar's Preferred Broker: SureTrader" which explained that SureTrader was "required to post" a disclaimer on its website that meant "they are not allowed to solicit business from the U.S." though "they can accept and open U.S. accounts no problem."  *Id.*  The article concluded with step-by-step instructions for U.S. customers to follow to open an account with SureTrader.  *Id.*

The Commission has noted that: "We are concerned that the advice that we provide to assist those who attempt to comply with both the letter and spirit of the securities laws will be used by others as a pretext to violate those laws.  Sham offshore offerings or procedures, or other schemes will not allow issuers or promoters to escape their registration obligations under the U.S. securities laws."  SEC Release No. 1125, 1998 WL 128173 at *12.  The evidence is undisputed that SureTrader actively marketed and advertised with Warrior Trading and Day Trading Radio for the purpose of soliciting U.S. customers, and purported disclaimers that these ads were "not intended for U.S. persons," were mere pretext to avoid registering as a foreign broker-dealer as required by Section 15(a)(1).

### c.   *Solicitation Via E-Mail Messages*

SureTrader also solicited prospective and existing U.S. customers by e-mail messages. Orestes Jimenez, who was located in Miami, Florida, received multiple e-mail messages from SureTrader.  On March 8, 2017 (time stamped 4:57pm), SureTrader sent an email with the subject "Trading Tips You Can't Afford to Ignore."  SMF ¶ 38.  The email includes the following line: "To get you started, we'd like to offer you $99 in Free Trades when you open an account with SureTrader.  Use Code: SURE99, and fund your account with a minimum of $1,000.  This is an exclusive offer that expires in 14 days." *Id.*  Minutes later, SureTrader sent an email (time stamped 5:13 pm) with the subject "Please Confirm Your Account" dated March 8, 2017.  *Id.* Approximately one month later, after Jimenez had already opened a SureTrader account, SureTrader sent a reminder email on April 12, 2017, to entice him to trade through SureTrader, informing that his margin "buying power has been updated." *Id.*

SureTrader sent this same email "Trading Tips You Can't Afford to Ignore" on August 22, 2016, to another U.S. resident, Mazen Agha.  Agha opened an account with ST after receiving this email.  SMF ¶ 39.

### d.   *Efforts To Develop An Ongoing Securities Business Relationship*

In addition to soliciting new customers located in the U.S., SureTrader also made efforts with existing U.S. customers to "develop an ongoing securities business relationship."  Rule 15a-6 Adopting Release, 54 FR 30017-18.  First, SureTrader cleared a significant number of trades for each U.S. customer.  SMF 37f.  Second, U.S. customer Mazen Agha negotiated with a SureTrader representative to receive a highly discounted trade commission fee in return for a large initial account deposit and the promise of high-volume trading as reflected in the email exchange between Agha and SureTrader on November 2, 2017:

**Agha**: "Yes, I am planning to fund my account with 17K.  If you don't offer per trade commission, then I am looking for $0.001 per share rate, $0.95 per trade minimum, $10 per trade maximum."

**SureTrader**: "At this moment, I can only suggest a $0.004 per share with $1.95 per trade minimum and NO ECN fees.  As well as $50 max per trade.  To be qualified you will need to trade 1M shares minimum each month.  Once you trade less, the system will move you to the next best tier.

14

"Once we see your monthly volume of 1-month trading, perhaps we could chat again over this."

**Agha**: "Alright, I approve the new rates for now.  However, I would expect to have better ones next month."

SMF ¶ 53.

The fact that SureTrader and a customer negotiated trade commissions extensively demonstrates that SureTrader meant to develop "an ongoing securities business relationship." SEC Adopting Release at 54 FR 30017-30018.  "[S]taff would view a series of frequent transactions or a significant number of transactions between a foreign broker-dealer and a U.S. investor as being indicative of solicitation through the establishment of an 'ongoing securities business relationship.'"  Frequently Asked Questions, Question 9, citing Rule 15a-6 Adopting Release at 54 FR 30017-30018.

> e.  *SureTrader's Sham Disclaimers and Certifications*

The evidence is undisputed that SureTrader actively solicited U.S. customers.  Gentile is expected to argue that SureTrader's website, e-mail messages, and application materials were designed to not solicit U.S. customers.  For example, Gentile has pointed to the SureTrader website containing an Internet Protocol ("pop up") blocker stating that SureTrader was not intended for U.S. residents, e-mail messages containing a similar disclaimer, and SureTrader's application materials containing "Unsolicited Acknowledgement Agreement," which states that a prospective customer was not solicited.   These are no more than window dressing to give the impression that SureTrader was not soliciting U.S. customers and to shoehorn SureTrader's business into the Rule 15a-6(1) non-solicitation exemption.

While there are certain circumstances under which the Commission will not consider a foreign broker's advertisement on the internet to constitute solicitation, these circumstances exist only where the foreign broker "takes measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons as a result of its Internet activities."  *See* SEC Release No. 1125, 1998 WL 128173, at *11-12.  Such measures include, for example, prominently stating on the broker's internet site that its services are not available to U.S. customers or identifying the foreign countries where the broker's services are exclusively available and declining to provide brokerage services to anyone that the broker has reason to believe is a U.S. person.

Contrary to Gentile's assertions, these circumstances do not exist here. During the Relevant Period, SureTrader made no genuine effort to decline to provide brokerage services to any U.S. customer. Indeed, there is no evidence that SureTrader prohibited *any* U.S. customer from opening an account with and trading through SureTrader.

With respect to the pop-up blocker on SureTrader's website, during 2016, SureTrader's website incorporated a single pop-up warning the visitor that by clicking "Accept" you agree to SureTrader's "Terms & Conditions." SMF ¶ 62. The pop-up could also be closed by clicking on an "X" on the upper right-hand corner of the pop-up window. *Id*. No later than October 2017, SureTrader added a web-based Internet Protocol ("pop-up") blocker to the SureTrader website to give the appearance that SureTrader was not soliciting U.S.-based customers. SMF at ¶ 63, 65. A U.S. visitor to the SureTrader website will see a text window, "U.S. IP Address Detected." *Id.* The window blocks access to the website unless the visitor is willing to supply an email address or phone number to receive a passcode. *Id.* By entering this information, the visitor "certif[ies] that you have not been solicited to this website." *Id.* Thus, prospective customers need only give SureTrader their contact information to receive a passcode to access the website. The blocker is not meant to be an effective or legitimate means to keep the SureTrader website unavailable to U.S. residents, instead it is meant to provide SureTrader dubious absolution from its solicitations of U.S. residents through email and online advertising.

Additionally, after the pop-up blocker activates, to putatively block U.S. investors, a new dialogue window pops-up – a customer service chat request, stating: "New to SureTrader? I'm happy to help with opening a new account or giving you a walk-through of our desktop platform demo." *Id.* At this point, SureTrader is aware that this visitor to its website is likely a US resident. By incorporating a dialogue box to initiate a chat with this blocked person, SureTrader is attempting to "cold-call" an individual whom it knows is likely a U.S. resident. The chat request itself is not an innocuous greeting, rather it asks the U.S. resident if he would need "help with opening a new account."

Moreover, although SureTrader might argue that the IP blocker is an attempt to keep out U.S. investors who might have been solicited to the website, that argument does not hold valid for current U.S. customers of SureTrader. The pop-up blocker is easily bypassed by current U.S. customers who need only enter their account information to access the website. The pop-up

blocker also does not protect the SureTrader website page for opening new accounts (accounts.suretrader.com) and is not protected by the pop-up blocker.

Ultimately, the undisputed evidence shows multiple customers in the U.S. were approved by SureTrader to open an account even though (1) their account opening documents reflected that the customers resided in the U.S., and they had signed the Unsolicited Acknowledgement Agreement and/or (2) they listed "website" as the source of referral to SureTrader.  SMF ¶¶ 47, 49, 67.  When processing new customer applications, SureTrader did not treat the applications of customers located in the U.S. any differently than the ones located outside of the U.S.  SMF ¶ 30.  Other than the Unsolicited Acknowledgement Agreement, there were no other policies or procedures implemented by SureTrader to prevent solicitation of U.S. residents.  SMF ¶ 68.  There were no policies or procedures implemented by SureTrader to deny account applications because the applicant was a U.S. resident.  SMF ¶ 69.  Gentile instructed SureTrader's Chief Compliance Officer, who instructed staff at SureTrader, to accept any account application from a U.S. resident as long as their application was complete, including submission of the signed Unsolicited Acknowledgment Agreement.  No further inquiry whether the applicant had been solicited by SureTrader was conducted.  SMF ¶ 70.  There is no evidence whatsoever that SureTrader ever denied an application made by a U.S. person.    In fact, during the Relevant Period in the Complaint, U.S. customers comprised at least 50% and, at times 80%-85%, of SureTrader's customer base.  SMF ¶ 26.  As of approximately February or March 2018, the majority of the more than 2,800 customers on SureTrader's active trader list were located in the U.S.  *Id.*

Taking all the undisputed evidence together, SureTrader actively solicited U.S. customers through its website, day trading schools, and e-mail messages.  The evidence also demonstrates that SureTrader's attempts to prevent U.S. customers from using its services were nothing more than lip service.  Accordingly, the non-solicitation exemption from registration for foreign brokers was not available to SureTrader, and summary judgment should be entered on Count I against SureTrader.

## C.      Gentile Is Liable Under Section 20(A) Of The Exchange Act As A Control Person

In addition to finding that SureTrader violated Section 15(a)(1), the Court should also conclude that Gentile is liable as a control person for SureTrader pursuant to Section 20(a) of the Exchange Act.  The evidence is undisputed that Gentile is the founder, owner, chief executive officer, and "boss" of SureTrader.

Section 20(a) of the Exchange Act makes a person "who, directly or indirectly, controls any person liable under any provision of [the act] or of any rule or regulation thereunder ... liable jointly and severally with ... such controlled person." 15 U.S.C. § 78t(a). To plead a violation under Section 20(a), the Commission must allege "that (1) the defendant had the power to control the general affairs of the primary violator, and (2) the defendant had the power to control the specific corporate policy that resulted in the primary violation." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 723 (11th Cir. 2008); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996). "The plaintiff must also establish that the controlled person violated the securities laws." *Brown*, 84 F.3d at 396–97. A controlling person is liable if he "acted recklessly in failing to do what he could have done to prevent the violation." *Id.*

The Eleventh Circuit does not require a plaintiff to plead that the defendant was a "culpable participant." *Laperriere*, 526 F.3d at 724. Although a defendant can raise a "good faith defense," he must "prove more than a lack of participation in the primary violation." *Id.* at 725. A controlling person is liable if he "acted recklessly in failing to do what he could have done to prevent the violation." *Id.*

Here, Gentile is liable as a control person of SureTrader by virtue of his status as founder, owner, director, CEO, and boss, and he does not have a good faith defense. SMF ¶ 13-14. Gentile exercised control over and had sole discretion regarding all aspects of SureTrader's operations. *Id.* Gentile directed the actions of others regarding the solicitation of U.S. customers, including, among other things, the advertising agreements with SureTrader Affiliates. SMF ¶ 43. Thus, Gentile had the power to control SureTrader's general affairs and the specific SureTrader policy that resulted in the violation. As a result, pursuant to Section 20(a) Gentile can be held equally liable as SureTrader is for violations of Section 15(a)(1) of the Exchange Act, and summary judgment on Count II should be entered against Gentile.

## D. Gentile Is Liable Under Section 20(b) Of The Exchange Act

Gentile is further liable under Section 20(b) of the Exchange Act, which makes it "unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this title or any rule or regulation thereunder through or by means of any other person." To establish a violation of Section 20(b), the Commission has to show that the defendant (i) acted through or used another person to execute at least some action forming the basis of the substantive violation and (ii) acted with the state of mind necessary to

establish the substantive violation.  The plain language of the statute requires nothing more.  *See SEC v. Strebinger*, No. 1:14-CV-03553- LMM, 2015 WL 4307398, at \*11 (N.D. Ga. June 11, 2015) ("The Court does not read Section 20(b) to contain a 'control' limitation on liability.  Such an interpretation of Section 20(b) makes logical sense as it allows the SEC to pursue claims against individuals that perpetrate fraud through the use of non-culpable third parties).

Gentile is liable for acting through SureTrader to commit violations of Section 15(a)(1) of the Exchange Act as prohibited by Section 20(b).  Gentile used SureTrader to solicit U.S. customers.  For example, Gentile made the decisions regarding the pop-up window on SureTrader's website.  SMF ¶ 64.  He also directed communications with Affiliates regarding the terms of the advertising agreements.  SMF ¶¶ 57-59.  Gentile knew that SureTrader was not allowed to solicit U.S. Customers, as evidenced by, among other things, the steps he took through SureTrader to circumvent such restrictions through the implementation of the pop-up blocker and the Unsolicited Acknowledgment Agreement.  SMF ¶ 64, 68.  Thus, summary judgment should be entered on Count III against Gentile.

**E.      Gentile's Third, Fourth, Fifth and Sixth Affirmative Defenses Fail as a Matter of Law, and Summary Judgment Should Be Entered Against Gentile**

Gentile's Affirmative Defenses should be rejected as there is no evidence that supports any of them.

1. First, Sixth, Seventh, Eighth, Ninth, and Tenth Affirmative Defenses

Gentile's First, Sixth, Seventh, Eighth, Ninth, and Tenth Affirmative Defenses (are all based on his claim that the DOJ, FBI, and SEC "assured him that SureTrader's acceptance of non-solicited U.S. customers and the use of the pop-up blocker and attestation of non-solicitation conformed with the U.S. securities laws" and any SureTrader policies related to solicitation of U.S. clients was done at the express instruction and with knowledge and approval" of the Government.  However, there has been no evidence developed that support any of Gentile's claims that the Government somehow blessed the manner in which Gentile ran SureTrader or otherwise formed SureTrader's policies regarding solicitation of U.S. customers.  Additionally, Section 15(a)(1) does not require a showing of scienter to establish a violation because it imposes strict liability.  *SEC v. Merchant Capital*, 311 Fed. Appx. 250, 252 (11th Cir. 2009).  Thus, even if there was a scintilla of evidence (there isn't) that the Government approved of SureTrader's solicitation policies, what Gentile was or was not told is entirely irrelevant to this Court's analysis of whether

SureTrader violated Section 15(a)(1) by operating a foreign broker-dealer and not registering with the Commission.

    2. <u>Third Affirmative Defense</u>

Gentile's Third Affirmative Defense, that the statute of limitations has run because the DOJ, FBI, and SEC were aware of and approved SureTrader's policies no later than 2012 similarly fails because Section 15(a)(1) does not require a showing of scienter to establish a violation because it imposes strict liability. *Id.*

    3. <u>Fourth Affirmative Defense</u>

Gentile's Fourth Affirmative Defense of fraud also fails because there has been no evidence of fraud by the SEC, the Government, or a third-party (which would have no effect on the SEC's claims). The recitation of this Affirmative Defense in Gentile's Answer contained no details of the purported "fraud," and no such evidence has been developed or produced by Gentile.

    4. <u>Fifth Affirmative Defense</u>

Gentile's Fifth Affirmative Defense of res judicata similarly fails because the SEC's claims against Gentile in this case were not alleged and dismissed in the case *SEC v. Gentile*, Case No. 2:16-cv-1619 (BRM). As set forth in great detail in the SEC's Response to Gentile's Motion to Stay this Action, ECF No. [39], the instant case alleges completely different conduct and violations of securities laws by SureTrader and Gentile. ECF No. [48].

    5. <u>Eleventh Affirmative Defense</u>

Gentile's Eleventh Affirmative Defense that the claims are barred due to spoliation of evidence are not supported by the evidence, and the SEC's Response in Opposition to Gentile's Renewed Motion for Sanctions for Spoliation of Evidence Under Rule 37(e) fully addresses why there has been no spoliation of evidence by the Commission or a third-party in this case.

    6. <u>Twelfth Affirmative Defense</u>

Gentile's Twelfth Affirmative Defense of duress and unconscionability fails because there has been no evidence of same. The recitation of this Affirmative Defense in Gentile's Answer contained no details of the purported "duress" and "unconscionability," and no such evidence has been developed or produced by Gentile. Regardless, this defense would have no impact on the SEC's claims because Section 15(a)(1) does not require a showing of scienter to establish a violation because it imposes strict liability. *Id.* Thus, Gentile's purported mental state is not relevant.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of the SEC on Counts I, II, and III of the Complaint and against Gentile on all of his Affirmative Defenses.

February 12, 2024.                          Respectfully submitted,


/s/ Alice Sum_____
Alice Sum
Senior Trial Counsel
Fla Bar No.: 354510
Phone: (305) 416-6293
Email: sumal@sec.gov

Alise Johnson
Senior Trial Counsel
Fla. Bar No. 0003270
Direct Dial: (305) 982-6385
Email: johnsonali@sec.gov

*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154