SEC-FL-03848-E-0001431





## DECLARATION OF PHILIP A. DORSETT

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1. My name is Philip A. Dorsett and I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2. I received a Bachelor of Science in finance from the University of South Florida in August 2003. I received a Master of Business Administration from Nova Southeastern University in March 2013.

3. I am currently employed by LCG Capital Markets Limited ("LCG"), a broker-dealer registered with the Securities Commission of the Bahamas. I have served as LCG's Chief Compliance Officer ("CCO") and Money Laundering & Reporting Officer since April 1, 2018.

4. From November 2011 until August 2017, I was registered with the Bahamian securities regulators as the CCO at Swiss America Securities, Ltd, also known as SureTrader, and most recently known as Mint Broker International Ltd., a broker-dealer registered with the Securities Commission of the Bahamas (hereinafter "SureTrader"). My duties were focused on ensuring SureTrader's compliance with Bahamian securities laws and regulations and approving new customer accounts.

5. SureTrader opened in the Bahamas in November 2011. The only employees of SureTrader at that time were me, Guy Gentile ("Gentile"), and a clerical staff person.

6. SureTrader was created in the Bahamas to avoid U.S. trading rules and restrictions. Between March and May 2011, Gentile told me that if we opened a broker-dealer in the Bahamas, his U.S.-based customers would immediately become SureTrader customers in the Bahamas so they could avoid the U.S. day-trading rules and restrictions.

7. During the process of opening SureTrader in the Bahamas, Gentile again told me he wanted to start SureTrader in the Bahamas because the U.S. had restrictions on day trading, but FINRA and the SEC had no jurisdiction in the Bahamas to enforce these rules. However, Gentile became somewhat hesitant to onboard those US clients once we actually started

DEPOSITION
EXHIBIT
15

SEC-FL-03848-E-0001431

operations (this would have been during November and December 2011).  Around January or February 2012, Gentile told me that we were not getting enough customers and that if we did not go after US clients he would have to shut the business down.

8.  From November 2011 until August 2017, Gentile served as the President and Chief Executive Officer of SureTrader.

9.  Gentile exercised control over and had sole discretion regarding all aspects of SureTrader's operations.  Gentile had direct oversight of compliance matters.  As CCO, I reported directly to Gentile.

10. At all times that I worked at SureTrader, SureTrader traded exclusively in U.S. securities.

11. Beginning in 2010, Gentile told me numerous times that he owned Stock USA, now known as Mint Global Markets, Inc. (hereinafter "Stock USA"), which was SureTrader's U.S.-based clearing firm.  In 2012, I heard Gentile say he was placing his ownership of Stock USA in a trust.

12. On or around August 2017, the Chief Financial Officer of SureTrader ("CFO"), directed me to affirm to Stock USA that SureTrader customers did not have direct market access.  I was uncomfortable with the request because it was not true.  SureTrader's trading desk manager had previously informed me that customers were routinely granted direct market access.  I informed the CFO that, according to the trading desk manager, SureTrader was, in fact, granting direct market access to its customers.  I was terminated from SureTrader shortly after I refused to make the false statement to Stock USA.

13. In or about December 2011 or early 2012, SureTrader had less than 100 customers.  In 2012, Gentile told me that he was concerned that SureTrader did not have enough customers, and told me that the only way for SureTrader to survive was to solicit U.S.-based customers.  Gentile told me he had expertise with U.S.-based customers and that if we did not solicit them, SureTrader would have to shut down.

14. As a result, Gentile began soliciting U.S.-based customers by advertising with popular U.S.-based day-trading websites, such as TimSykes.com, DayTradingRadio.com, and WarriorTrading.com.  I knew about these relationships because I was routinely copied on

SEC-FL-03848-E-0001431

email messages with representatives of those websites.  In 2012, Gentile told me that these advertising relationships would increase the number of U.S.-based customers at SureTrader.

15. Gentile's efforts at promoting SureTrader's brokerage services to U.S.-based customers resulted in a steady increase in new accounts.  From 2012 through 2017, roughly 80% of SureTrader's customers were based in the U.S.  I know these facts because I reviewed the applications for new customers until 2014, the SureTrader staff responsible for new accounts from 2014 until I left SureTrader in 2017 reported this information to me, and I reviewed customer records in 2017.

16. On or around February 2012, I met with Gentile and another individual at SureTrader's headquarters in Nassau, The Bahamas.  At this meeting, I was informed about a "loop-hole" to the U.S. regulations prohibiting the solicitation of U.S. residents by unregistered, foreign broker-dealers.  As Gentile and the other individual explained to me, in order to circumvent the regulation, each U.S.-based customer of SureTrader would be required to sign a statement claiming that they have not been solicited by SureTrader.  According to Gentile, SureTrader would continue to use online advertisements and emails to solicit U.S. residents to open accounts at and trade through SureTrader.  During this February 2012 meeting, Gentile said the non-solicitation statement would allow SureTrader to claim that such transactions were unsolicited.

17. During this meeting, I was present when Gentile and another individual drafted the language for an "Unsolicited Acknowledgement Agreement," which Gentile then instructed me to include in the application package for every new account opened by a U.S.-based customer. We accepted every person as a customer who wanted to invest through SureTrader, even if they told us they came to SureTrader through one of the advertising websites, and even if they were U.S. residents.

18. The Unsolicited Acknowledgement Agreement was included in the application package for each U.S.-based customer.  After opening an account, the U.S.-based customer was never again required to re-sign or otherwise re-confirm the terms of the Unsolicited Acknowledgement Agreement before placing trades through that account.

SEC-FL-03848-E-0001431

19. Gentile first provided a copy of the SureTrader customer application to me in 2011.  The SureTrader account application required the prospective customer to supply personal information, including name, social security number, phone number, email address, home address, employer's name and address, and annual income, as well as to provide copies of documents as proof of identity and proof of residency.

20. From 2012 to 2014, new applicants were required to sign their application, which included the Client Agreement, Letter of Authorization & Risk Disclosure. A separate signature was required for the Unsolicited Acknowledgement Agreement. They would then fax or email the application to SureTrader, along with proof of identity and residency.  During this time, I reviewed customer applications to ensure that they had been completed and provided adequate proof of identity and residency.  Pursuant to Gentile's instructions, I created an account for each U.S.-based applicant who completed the application and signed the Unsolicited Acknowledgement Agreement.  No other evaluation was conducted by me nor requested of me, nor to my knowledge was any other evaluation conducted at SureTrader, to determine whether the U.S.-based customer had been solicited by SureTrader.

21. On or around 2014, SureTrader automated the application as an online process available at accounts.suretrader.com.  Applicants could now upload electronic images of identification documents and provide a single e-signature, which would then be automatically affixed to each application agreement.  After the application process was automated and SureTrader had hired staff to review customer applications, I no longer reviewed applications except when a problem was elevated to me, for example, where the identification information was inadequate or illegible.

22. From March 2016 to August 2017, SureTrader's online application included a section for the applicant to disclose how they were referred to open an account with SureTrader.  That section included a drop-down menu with referral sources including, among others, DayTradingRadio, WarriorTrading, TimothySykes, and InvestorsUnderground.  Based on my role at SureTrader and based on what Gentile had told me, I knew these referral sources were the day-trading websites which SureTrader had engaged to market and advertise its services to U.S. customers.

4

SEC-FL-03848-E-0001431

23. Throughout my employment at SureTrader, other than the Unsolicited Acknowledgement Agreement described in paragraph 20, there were no policies or procedures implemented by me or, to my knowledge, otherwise implemented at SureTrader to prevent the solicitation of U.S. residents.

24. Throughout my employment at SureTrader there were no policies or procedures implemented by me or, to my knowledge, otherwise implemented at SureTrader to deny an account application because the applicant was a U.S. resident.  Gentile instructed me, and I instructed staff at SureTrader, to accept any account application from a U.S. resident as long as their application was complete, including submission of the signed Unsolicited Acknowledgement Agreement.  No further inquiry into whether the applicant had been solicited by SureTrader was conducted.

25. Throughout my employment at SureTrader, I was the person responsible for denying customer applications.  I did not deny any account application, nor am I aware of any SureTrader account application that was ever denied, because the applicant was a U.S. resident.

26. At all times, Gentile personally took charge of all matters related to SureTrader's compliance with U.S. laws and regulations.

27. Gentile directed all advertising and website development activities related to SureTrader, including the promotion of SureTrader to U.S. residents.  I was not permitted to make suggestions as to the content of the website or advertisements.

28. During my employment at SureTrader, I became aware of a few instances where Gentile opened trading accounts for customers who had not completed the usual account opening process.

29. In late 2015, Gentile asked me to create a document stating that most of the customers of SureTrader were not residents of the U.S.  I reviewed the customer records for SureTrader, which showed that most of the customers were U.S. residents. I did not draft any such document because that statement was not true.

SEC-FL-03848-E-0001431

30. When I left SureTrader in 2017, the vast majority of customers remained U.S. residents who were solicited by advertising websites Gentile used for solicitation efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _1st__ day of September__ 2020.

_____
Philip A. Dorsett

6