UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-cv-21079-BB

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

    Defendants.

**DEFENDANT GUY GENTILE'S STATEMENT OF MATERIAL FACTS**

1. Undisputed.
2. Undisputed.
3. Undisputed.
4. Undisputed.
5. Undisputed.
6. Undisputed.
7. Undisputed.
8. Undisputed.
9. Disputed. Gentile maintains he did not individually "market" the company and that marketing efforts were done through other employees, such as Chief Marketing Officer Janay Pyfrom. *See* Ex. Q.
10. Undisputed.
11. Undisputed.
12. Undisputed.
13. Undisputed.
14. Disputed. As Gentile testified multiple times throughout his deposition, there were significant periods of time between 2012 and 2019 when he was not "in charge" of

SureTrader. For example, Gentile testified that, while he was cooperating with federal law enforcement to ensnare securities-law violators between about 2012 and 2015, the government—the FBI, DOJ, and the SEC—instructed him on how SureTrader should operate. *See* Ex. A, Gentile Tr. 65:20–25 ("[The FBI, the DOJ, and the SEC] were completely controlling me, so I had to do whatever they said. So that's who was really running my firm during those periods."); *id.* at 70. Gentile also testified about how he had resigned from SureTrader in late-2015 when he was trying to negotiate an agreement to conclude his cooperation with the government and did not return to the firm until 2017. *See id.* at 70–72; *see also* Ex. B, Dorsett Tr. Day 2 243:13–21 (acknowledging in an early-2016 communication that Gentile had "officially resigned from our firm").

      15.      Undisputed. But this rule applies only to customers of FINRA-member broker–dealers. *See* FINRA Rule 4210. Margin Requirements, https://www.finra.org/rules-guidance/rulebooks/finra-rules/4210.

      16.      Undisputed.

      17.      Undisputed.

      18.      Undisputed.

      19.      Undisputed.

      20.      Undisputed.

      21.      Undisputed.

      22.      Disputed. SureTrader was not a FINRA member and was not governed by FINRA's Rules. *See* FINRA Rule 0140. Applicability, https://www.finra.org/rules-guidance/rulebooks/finra-rules/0140.

      23.      Undisputed.

      24.      Disputed. This statement omits that "most accounts [were] never either completed or funded" and that, at its peak, SureTrader had about "3,500" customers. *See* Ex. A, Gentile Tr. 46:14–19.

      25.      Undisputed.

      26.      Disputed. The exhibit cited by the SEC does not support the proposition that "at times 80%-85%[] of SureTrader's customer base" was U.S. customers, and Gentile maintains that neither Dorsett nor Yaniv Frantz is credible on this point.

27.     Disputed. Counsel for Gentile examined this issue at length during the deposition of SEC witness Yaniv Frantz and showed that vast majority of U.S. customers received no special commission rate. *See* Ex. G, Frantz Tr. Day 2 138–57.

28.     Disputed. In the same deposition cited by the SEC, former SureTrader employee Drameko Moore admitted that he was not particularly familiar with SureTrader's marketing efforts and also testified that "affiliate" websites catered to customers from various countries, not just the United States. *See* Ex. C, Moore Tr. 23:20–22 ("Q. In what country were Warrior Trading's customers that came to SureTrader primarily located? A. I'm not sure. Different countries.").

Ross Cameron—the founder and CEO of Warrior Trading—whom the SEC also deposed in this case, testified the same. *See, e.g.*, Ex. D, Cameron Tr. 21:13–24 ("**A.** . . . [S]ome of the U.S. brokers were not accepting international students, and we do have international students, mostly from English speaking countries, like U.K. and Australia. Anyways, so we looked -- that was when we sort of began the process of looking to add some international brokers . . . . **Q.** And who were those two international brokers? **A.** TradeZero and SureTrader."); Ex. E, Cameron Def. Ex. 1 (discussing over email the design for a SureTrader banner on Warrior Trading's website and confirming: "We will make the note that this offer [with SureTrader] is only valid for international traders (non US residents)."); *see also* Ex. D at 98:20–24 ("**A.** An international trader, a non U.S. trader, would probably not want to subject themselves to the U.S. PDT rule thus requiring a $25,000 minimum balance and would be much more likely to use an international broker, any international broker."); *id.* at 94:14–20 ("**Q.** And could you explain again who can access the chat room that you run. **A.** Paid members. **Q.** And are those members just U.S. residents? **A.** No. **Q.** Do they include international traders? **A.** They do.").

John Kurisko—founder and CEO of Day Trading Radio—another witness the SEC deposed in this case, also testified the same. *See, e.g.*, Ex. F, Kurisko Tr. 15:10–14 ("[Y]ou can listen [to the stream on the Day Trading Radio website] from all over the world because, you know, I'd get e-mails and stuff. So it went from Russia, South Africa, England, France, Canada, USA, you know, South America, everywhere. Probably every country."); *id.* at 32:18–21 ("I do believe [the SureTrader banner on our website] did say it had something about not intended for U.S. clients, I believe."); *id.* at 34:24–35:3 (Day Trading Radio's customers "were from all over the world."); *id.* at 50:18–51:16 ("Did Guy Gentile know that persons from the U.S. visited Day

Trading Radio's website? . . . THE WITNESS: I wouldn't expect him to know, but I have no idea. No, I don't know.").

29. Disputed. See paragraph 28, *supra*.

30. Disputed. The SEC's only cited record support is from a deposition transcript that Gentile has not yet received.

31. Undisputed.

32. Undisputed.

33. Undisputed.

34. Disputed. The use of the term "solicited" is an unsupported legal conclusion.

35. Disputed. The single piece of record material cited by the SEC is a website screenshot titled "7 Great Reasons Why You Should Consider SureTrader," which appears to be a customer review by a poster named "Ignite." *See* SEC Ex. 10 at 3. The SEC has pointed to no record evidence establishing that "Ignite" was affiliated with or employed by SureTrader. The screenshot indicates that Ignite's post received: "No comments yet, 0 Views." *See id.* Gentile did not draft the post by Ignite and does not know who did. *See* Ex. A, Gentile Tr. 91:14–92:18.

36. Disputed. See paragraph 35, *supra*.

37. Disputed.

    a. Disputed. The face of the sole record material cited by the SEC shows the fees were listed in both U.S. dollars ("USD") and Bahamian dollars ("BSD"). The Bahamian dollar is pegged one-to-one to the U.S. dollar. *See* Ex. A, Gentile Tr. 97:24–98:2; *id.* at 108:9–11; *id.* at 109:12–16.

    b. Disputed. That SureTrader's website "permit[ed] trading in U.S. equities and options" does not demonstrate the "website targeted U.S. customers." People all over the world trade in U.S. equities and options. *See* paragraph 28, *supra*.

    c. Disputed. Gentile testified that his understanding was that it was "very expensive for customers to call a Bahamanian phone number, sometimes costing [customers] at that time $1 to $2 a minute, and [SureTrader was] just trying to figure out a way to make it less expensive for existing customers to call them." Ex. A, Gentile Tr. 96:19–23. Gentile was not at SureTrader when the U.S. phone number was added to the website. *Id.* at 96:13–17, 188:17–21.

    d. Disputed. SureTrader "provided many different funding options. It provided credit cards, debit cards, Skrill. It provided Neteller, bank wire, and ACH." Ex. A, Gentile Tr. 105:23–25. Gentile also explained:

> [N]on-U.S. persons can have a U.S. account. So it's not just for a U.S. person. Anyone in the world can open an account at a U.S. bank, as far as I know. . . It provided -- it's for anyone that has a U.S. bank account. It didn't matter whether they resided in the U.S. or not. **Q.** Okay. But they could have resided in the U.S. and used this funding source. Correct? **A.** They could have resided in China, too.

*Id.* at 106:1–14.

    e.    Disputed. Apart from SureTrader, the six online brokerages listed on the SEC's exhibit are Questrade, TD Ameritrade, ETrade, Fidelity, Scottrade, and Schwab. Gentile testified about this SEC screenshot:

> Questrade is a Canadian-based broker-dealer. . . I believe TD Ameritrade is an international broker-dealer with offices in the U.S., Canada, and Europe as well. . . . As well as E*TRADE. . . I think Fidelity is also -- has broker-dealers internationally. Scottrade. I don't even think Scottrade existed anymore. This thing is outdated at that time.

Ex. A, Gentile Tr. 107:17–108:5.

    f.    Disputed. The SEC's screenshot omits—and its characterization of the screenshot omits—that to access the SureTrader website a customer had to review a pop-up message and affirm he had not been solicited to the website. *See, e.g.*, Gentile Tr. 107:3–7 ("Well, before you start, I want to just make a point that all of these screenshots are misleading because none of them show the pop-up blocker that would have appeared, and I don't believe that that is being shown.").

38.    Disputed. Gentile maintains that before any email would have been sent to a SureTrader customer, the customer would have already agreed to receive emails from SureTrader and agreed to the terms and conditions of the website, i.e., affirm that they were not solicited to the website. *See* SEC Exs. 18, 19, 20.

39.    Disputed. See Gentile Additional Facts, *infra*.

40.    Disputed. Gentile maintains that before any email would have been sent to a SureTrader customer, the customer would have already agreed to receive emails from SureTrader and agreed to the terms and conditions of the website, i.e., affirm that they were not solicited to the website. *See* SEC Exs. 18, 19, 20.

41.    Disputed. Gentile maintains that all advertisements for SureTrader on any day-trading website would have stated that SureTrader was not intended for U.S. persons. *See* Ex. I.

42.    Disputed. See paragraph 28, *supra*.

43. Disputed. Gentile maintains he did not "control" SureTrader individually; it was controlled by a two-person Board of Directors, of which Gentile was a member at various times. *See* Ex. A, Gentile Tr. 57–58.

44. Undisputed. Gentile was not at SureTrader during this time; the agreement was negotiated by Justin Ritchie. *See* paragraph 28, *supra*.

45. Undisputed.

46. Disputed. When Gentile subsequently returned to SureTrader in early-2017, he instructed that any improper rebates for U.S. persons should be discontinued. *See* SEC Ex. 3 at 40–42.

47. Disputed. The record does not contain sufficient evidence of Agha's purported state of mind when he opened a SureTrader account in 2016, and counsel for Gentile intends to cross Agha on this and other issues at trial. *See* Ex. U.

48. Disputed. The statement omits that any U.S. person who saw an advertisement for SureTrader through Warrior Trading should have also seen the statement that SureTrader was not intended for U.S. persons and would have also had to click through the pop-up disclosure on SureTrader's website. *See* paragraph 28, *supra*; Gentile Add'l Facts ¶ 85, *infra*.

49. Disputed. The SEC has not submitted declarations from the individuals referenced in SEC Exhibits 35, 36, and 37. The face of those applications references "Warrior Trading," or "Warrior Trader" in one instance, but does not rule out that the customers could have learned about SureTrader through an online day-trading chatroom or through the internet more generally.

50. Disputed. Gentile was not working at SureTrader when the CEO of Day Trading Radio purportedly signed the agreement in August 2016. Day Trading Radio also had an agreement with SpeedTrader to refer U.S. clients to SpeedTrader, a U.S. broker–dealer.

51. Disputed. Neither Gentile nor Suretrader had input into the creation of the referenced article on Day Trading Radio's website. *See* Ex. F, Kurisko Tr. 83–85.

52. Undisputed.

53. Disputed. There is a question whether Mazen Agha qualifies as a "U.S. person." *See* Gentile's Add'l Facts, *infra*.

54. Disputed. See paragraph 25, *supra*.

55. Undisputed.

56. Undisputed.

6

57. Disputed. Gentile contests Frantz's characterization of the email referenced in paragraph 56, *supra*.

58. Disputed. Gentile contests Frantz's testimony that he "confronted Gentile" about the emails discussed here and in paragraphs 56–57, *supra*.

59. Disputed. Gentile contests Frantz's testimony regarding the emails discussed here and in paragraphs 56–58, *supra*.

60. Disputed. Gentile submits this is speculation on Frantz's part.

61. Disputed. SureTrader's policy was to accept U.S. customers who were not solicited improperly. *See* Exs. W, I, J.

62. Disputed. Gentile was not at SureTrader during 2016. *See* Ex. S. Gentile also maintains that at the time the SureTrader website would have indicated on each page that it did not intend its services for U.S. clients. *See* Ex. T.

63. Disputed. Gentile maintains it was not just for "appearance." The pop-up disclosure was not fake it worked as intended by detecting U.S. IP addresses. *See* Gentile's Add'l Facts, *infra*.

64. Disputed. Gentile was not the only person involved in directing creation of an IP-detecting pop-up disclosure in 2017. *See* Gentile Add'l Facts, *infra*

65. Disputed. This was an IP pop-up disclosure only for U.S. persons. Users accessing the website with a non-U.S. IP address would not see the pop-up disclosure. *See* Ex. Y.

66. Disputed. It was not a "sham"; the pop-up disclosure worked as intended and was consistent with SEC interpretive guidance. *See* Ex. T, Y.

67. Disputed. SEC Exhibit 33 lists "Website" in the space for "Type Source" under "How did you hear about us?" This does not establish that Christopher Penalver was "referr[ed]" to SureTrader through SureTrader's website.

68. Disputed. Dorsett testified that he "was the one who put [the Unsolicited Acknowledgment Agreement] together officially and put the name at the signature line . . . ." Ex. B, Dorsett Tr. 58:4–6. Compliance consultant Arthur Quintero provided input as well. *See* Ex. W. Dorsett's Declaration for the SEC is unreliable, as was demonstrated during his deposition. *See generally* Gentile Mot. for Sanctions [ECF No. 201].

69. Disputed. SureTrader had a policy of not opening accounts for U.S. persons that were solicited and a policy of not opening accounts for anyone who was a U.S. person who did

not attest in writing that he was not solicited. Dorsett's Declaration for the SEC is unreliable, as was demonstrated during his deposition. *See generally* Gentile Mot. for Sanctions [ECF No. 201].

70. Disputed. Dorsett's Declaration for the SEC is unreliable, as was demonstrated during his deposition. *See generally* Gentile Mot. for Sanctions [ECF No. 201].

**DEFENDANT GUY GENTILE'S ADDITIONAL FACTS**

71. In the fall of 2011 and thereafter, Gentile conferred with compliance consultant Arthur Quintero about steps SureTrader should take so as not to run afoul of Rule 15a-6. *See* Ex. W.

72. On January 15, 2012, Gentile sent an email to Philip Dorsett stating: "We cannot send mail to clients in the U.S. So no overnight checks." Ex H. Gentile also pasted information from an article on Rule 15a-6 drafted by a law firm. *See id.*

73. In December 2012, Gentile exchanged emails with a digital marketing company called Blue Cherry Group, during which the representative from Blue Cherry indicated after speaking with Gentile: "We . . . manage many brands with campaigns in other languages (French, German, Italian, etc.). After reviewing your business and some of the limitations that you have with advertising in the US, there is much we can offer you with advertising in Canada, Mexico and the entire Latin American region." Ex. I.

74. On June 17, 2013, Gentile sent SureTrader employees Philip Dorsett and Justin Ritchie an email with the subject line "SEC Rule 15a-6," which attached a document titled "Swiss America Securities Limited [SureTrader] Policy and Procedures For Compliance with U.S. Securities and Exchange Commission Rule 15a-6 exemption," as well as guidance issued by the SEC dated March 21, 2013. Ex. J. In a follow-up email on the same thread, Gentile reiterated:

> We cannot advertise in the U.S. as part of SEC Rule 15a-6.
> We do not want to be seen as active[el]y engaging with U.S. Clients. If they want to do business with us and the[y] contact us and push to open an account, th[e]n its ok to take it, but we have to deter them as much as we can to be compliant with the SEC rules.

Ex. K.

75. FINRA began investigating Gentile in 2013 for the same conduct that forms the basis of the SEC's Complaint in this action. *See* Ex. L.

76. In that proceeding, Gentile submitted a "Wells submission" in January 2014 before a formal charging decision by FINRA that detailed SureTrader's policies and procedures for complying with Rule 15a-6. *See* Ex M.

77. That submission included a signed, notarized affidavit dated January 9, 2014, from then-Chief Compliance Officer of SureTrader Philip Dorsett. *See id.* Dorsett averred:

> 5. In early 2012, Swiss America adopted a policy of accepting certain unsolicited US-based persons as customers in compliance with US law.
>
> 6. In connection with this policy, I reviewed all relevant Rules and Guidance of the U.S. Securities and Exchange Commission regarding solicitation of US persons by unregistered non-US broker-dealers.
>
> 7. Based on SEC Rules and Guidance, Swiss America developed policies and procedures designed to ensure that SureTrader complied with US laws regarding solicitation.

Ex N.

78. On April 14, 2015, FINRA informed counsel for Gentile by letter that "FINRA Enforcement staff has determined not to recommend the commencement of a disciplinary action against Mr. Gentile." Ex. X.

79. On June 6, 2015, Gentile emailed SureTrader executive Antonio Collie, Chief Compliance Officer Philip Dorsett, and company attorney Carla Marin with the instruction: "Please read the latest from the SEC and tell me how you think this could impact the way we do business." Ex. O. On June 8, 2015, Dorsett responded that he would "do more research" but "in the interim I think we should be fine as long as we continue to act in line with Rule 15a-6." *Id.*

80. In August 2015, Gentile exchanged emails with SureTrader employee Janay Pyfrom about a potential "affiliate" setting up advertising for SureTrader. *See* Ex. P. Pyfrom asked Gentile whether he agreed that Pyfrom should inform the potential "affiliate" that "[i]t's important that in any campaign it is clearly indicated that 'services are not intended for U.S. persons' and that United States is not targeted in their PPC [pay-per-click campaign]." *Id.* Gentile responded: "Yes. I agree." *Id.*

81. Pyfrom forwarded a similar exchange to Gentile in September 2015 after she made clear:

> It would be best for CJ affiliates to limit their PPG ads to the top 3 countries:
>
> **Countries:**
> UK
> Canada
> Australia
> ***Strictly no advertising to the United States***
>
> We can make keyword recommendations, however we are not as strict as it relates to this.
>
> **The reason we will not tolerate PPC ads to U.S. persons:**
> Non-U.S. Broker-Dealers such as Swiss America Securities. Ltd. (SureTrader.com) maintaining an Internet Website can thus only accept a U.S. person if he or she has not

2

been solicited either directly or indirectly through accessing their websites under the 'unsolicited' exemption Rule 15a-6.

Ex. Q. Gentile chimed in: "Please make sure they are not showing ads in the United States." *Id.*

82. In December 2015, Pyfrom and Gentile exchanged emails about advertising provided by Yieldmo, Inc. Gentile directed Pyfrom to "ensure this [advertising campaign] has no U.S. impressions," and the "count[r]ies targeted" included: Canada, Australia, the United Kingdom, Italy, Israel, and Brazil. Ex. R.

83. Gentile resigned from SureTrader effective December 29, 2015. *See* Ex. S.

84. During 2016, SureTrader employee Justin Ritchie negotiated a marketing services agreement with Warrior Trading. *See* Ex. E.

85. The founders of Warrior Trading and Day Trading Radio—Ross Cameron and John Kurisko—both testified in this action that they never agreed with Gentile or anyone else at SureTrader to improperly solicit U.S. investors on behalf of SureTrader. *See* Ex. D, Cameron Tr. 125:23–126:12; Ex. F, Kurisko Tr. 88:20–89:11.

86. In May 2017, a few months after Gentile returned to SureTrader, he endeavored to strengthen the pop-up disclosure on SureTrader's website so that the website would detect whether a user was attempting to access the website from the United States. *See* Ex. G, Frantz Tr. Day 2 256:6–11 ("Q. And do you remember, was it Mr. Gentile's idea to add a pop-up disclosure that customers have to agree for terms and conditions with their IP address from the US at that time [in May 2017]? A. Yes. I'm not tech-savvy to know that we can block IP addresses."). Contemporaneous messages between Pyfrom and Frantz show that Pyfrom even insisted the modified pop-up disclosure appear for all visitors to the website until all the kinks could be ironed out:

```
[5/2/17, 9:25:46 AM] YANN: I saw the the disclaimer is up... its only for U.S. IP address correct?
[5/2/17, 9:26:47 AM] Janay Pyfrom: At the moment it is up for all visitors until we finish coding to all for this.
[5/2/17, 9:27:37 AM] YANN: how long will it take you think? i rather have it down until the coding is done
[5/2/17, 9:29:05 AM] Janay Pyfrom: It could take one or 2 days. I wouldn't risk having it down until then
```

*See* Ex. T, Def Ex. 49 to Frantz Dep.

3

87. When former SureTrader customer Mazen Agha opened his account, he submitted an employment authorization card set to expire August 9, 2017, indicating that his country of birth was "Syria" and that the card was "**NOT VALID FOR REENTRY to U.S.**" *See* Ex. U.

88. In early-2018, after Gentile returned to SureTrader, a firm called ITA Compliance, LLC ("ITA") conducted an "Advertising Review" of SureTrader at the behest of law firm Miles & Stockbridge, P.C. *See* Ex. V. According to its February 21, 2018 report, ITA "specializes in providing examination services to broker-dealers, investment advisers, and transfer agents. These services include FINRA, SEC, and state-required testing and audits, as well as consultative mock regulatory-type reviews." *Id.* at 7. ITA reviewed SureTrader's policies and procedures on advertising and interviewed SureTrader employees. *See id.* at 4. ITA specifically "discussed and viewed controls and disclosures in place relating to the display of advertising content to U.S. individuals." *Id.* After its review, "ITA did not discover any evidence of the firm targeting U.S. individuals through advertising to promote its online trading services. In addition, online content included disclosures to explain SAS's trading services are not intended for U.S. persons. ITA did not identify any material findings during this review." *Id.* at 6.

Dated: February 27, 2024      Respectfully submitted,

FORD O'BRIEN LANDY LLP

By:  */s/ Gabriela M. Ruiz*
Gabriela M. Ruiz
Fla. Bar. 46844
One Biscayne Tower
2 South Biscayne Boulevard, Suite 3200
Miami, Florida 33131
Tel.: (786) 310-1135 (main)
gruiz@fordobrien.com

Adam C. Ford (admitted *pro hac vice*)
Matthew A. Ford (admitted *pro hac vice*)
Stephen R. Halpin III (admitted *pro hac vice*)
275 Madison Avenue, 24th Floor
New York, New York 10016
Tel.: (212) 858-0040 (main)
aford@fordobrien.com
mford@fordobrien.com
shalpin@fordobrien.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Defendant Guy Gentile's Statement of Material Facts, dated February 27, 2024, to be served via CM/ECF on the following counsel for Plaintiff:

Alice Sum
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131
(305) 982-6300
sumal@sec.gov

Alise Meredith Johnson
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
(305) 982-6385
johnsonali@sec.gov

Russell Koonin
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131
305-982-6390
kooninr@sec.gov

                                    */s/ Gabriela M. Ruiz*
                                    Gabriela M. Ruiz