# EXHIBIT A

**Page 45**

1  Q.  Okay.
2  A.  -- under management.
3  Q.  I'm not asking exactly.
4      Was it more than $10 million?
5      MR. FORD:  Objection.
6  A.  It could have been more; it could have been
7  less.  I just don't remember.
8  BY MS. JOHNSON:
9  Q.  Okay.  How many customers did Swiss America
10 have in 2016?
11 A.  I don't remember.
12 Q.  Was that more than $10,000?
13     MR. FORD:  Objection.
14 A.  I don't remember.
15 BY MS. JOHNSON:
16 Q.  How many customers did they have in 2017?
17 A.  I don't remember.
18 Q.  2018, do you remember?
19 A.  I don't remember.
20 Q.  How many customers in 2019?
21 A.  I don't remember how many customers the
22 firm had in each specific year.
23 Q.  Okay.  How about at its peak?  How many
24 customers did they have?
25 A.  It would be a guess, but --

**Page 46**

1      MR. FORD:  You don't need to
2  guess.
3  A.  -- there's a difference between how many
4  customers it had and how many accounts it opened.
5      I'm not really sure which question
6  you're asking me.
7  BY MS. JOHNSON:
8  Q.  Okay.  Let's ask both.  How many
9  accounts -- customer accounts did it have?
10 A.  Maybe between 40,000 and 50,000.
11 Q.  Okay.  That's at the peak?
12 A.  Yeah.  Accounts.
13 Q.  Okay.
14 A.  But most accounts are never either
15 completed or funded.  Probably -- my guess is
16 80 percent of them are never completed.
17 Q.  Okay.  How many customers, then, did you
18 have at the peak -- did SureTrader have?
19 A.  3,500 maybe.  4,000, in that range.  I just
20 don't remember exactly the number.
21 Q.  Okay.
22 A.  But I'm just going off of the approximation
23 of -- you know, if we had 50,000 people open
24 accounts -- that number rings a bell to me -- and
25 10 percent funded, it doesn't mean that we had 5,000

**Page 47**

1  accounts, though, because, over the years, people
2  close their accounts.  So maybe 3,500.
3  Q.  People come; people go; people trade.
4      The general trend from 2016 to 2019,
5  did you increase your customer base or decrease?
6  A.  I don't remember if it increased.  I
7  remember it just being consistent.
8  Q.  Okay.  In 2016, what percentage of
9  Swiss America/SureTrade's customers resided in the
10 United States?
11 A.  I don't know.
12 Q.  Was it more than 50 percent?
13     MR. FORD:  Objection.
14 A.  I don't know.
15 BY MS. JOHNSON:
16 Q.  We'll go to our first exhibit.  I'm going
17 to show you what I have previously marked as 68.
18     (Plaintiff's Exhibit 68
19     marked for identification.)
20 BY MS. JOHNSON:
21 Q.  Do you recognize this document?
22 A.  It's very blurry.
23     MR. FORD:  Can we actually go off
24 the record for a second?
25     MS. JOHNSON:  Yes.

**Page 48**

1      THE VIDEOGRAPHER:  Going off the
2  record at 12:01.
3      (Discussion off the record.)
4      THE VIDEOGRAPHER:  We're back on
5  the record at 12:02.
6  BY MS. JOHNSON:
7  Q.  Do you recognize what this is?
8  A.  I've seen it -- I've seen this document,
9  but I don't remember what's in it.
10 Q.  Okay.  I would not expect that.
11     It says, "AML Program Review of
12 Swiss America Securities."  There's a signature up on
13 the right-hand page.  Is that your signature?
14 A.  No.
15 Q.  Do you know whose that is?
16 A.  No.
17 Q.  And it says, "Prepared for Miles &
18 Stockbridge, P.C., and Stock USA Execution
19 Services."
20     Do you know why this was produced?  Why
21 Miles & Stockbridge was asking for this document?
22 A.  Well, it says it was prepared for Miles &
23 Stockbridge.
24 Q.  Right.  Do you know the circumstances that
25 this document was prepared?

**Page 57**

1   restaurant, and he just locked off the parking lot
2   with no explanation, no nothing, so customers had
3   nowhere to park.  The revenue plummeted, and it was
4   sayonara to the business.
5       Q.  Okay.  Any other businesses that you
6   thought of?
7       A.  If I remember them while we're talking,
8   I'll just bring up.
9       Q.  Just bring it up.
10          All right.  Back to
11  Swiss America/SureTrader.  I'll show you what's been
12  previously marked as Exhibit 24.
13          And do you recognize this?
14      A.  Yes.  I mean, I believe I've seen this
15  before, but I don't remember when I saw it.  I don't
16  know if I saw it as a discovery thing that you have
17  provided me or it was through some other means.  But
18  I have seen it.
19      Q.  Okay.  What is it?
20      A.  It looks like a flowchart to me.
21      Q.  An organizational chart of Swiss America
22  Securities?
23      A.  Yes.
24      Q.  And just take a minute and look through it,
25  and let me know if it correctly represents the

**Page 58**

1   employees and the officers of Swiss America
2   Securities.
3           Start with you.  Were you and
4   Mr. Collie on the board of directors?
5           MR. FORD:  And just -- there's a
6       notation on the bottom right.  Can you read
7       that?
8           MS. JOHNSON:  The last update,
9       the 27th.
10          MR. FORD:  Yeah.
11      A.  On that date, I believe Antonio and I were
12  both directors at that time.
13      BY MS. JOHNSON:
14      Q.  Okay.  Was there a date after that where
15  you were not?
16      A.  Yes.
17      Q.  When was that?
18      A.  When it was put into receivership.
19      Q.  Okay.
20      A.  But I also don't agree with the flow -- the
21  way this is written out.
22      Q.  Okay.  What do you disagree with?
23      A.  Well, Antonio and I are both directors.  I
24  was the chief compliance officer, but he was also
25  the president, so he should be up here with me as

**Page 59**

1   well.
2       Q.  Under "CEO" or under "President" -- where
3   it says "President" --
4       A.  Under "Board of Directors" --
5       Q.  Okay.
6       A.  -- there should just -- basically, the CEO
7   should just basically be right here in the next
8   line.  And I'm just part of the executive team; I'm
9   not an executive by myself here.
10      Q.  Okay.  And then was Mr. Collie the
11  president and chief financial officer at the time?
12      A.  Yes.
13      Q.  Did he tree up to you?  Who was his -- who
14  was his superior?
15      A.  He was a board of director -- right? -- so
16  he was able to be autonomous in his decision-making.
17      Q.  Could you have fired him?
18      A.  I never fired him.
19      Q.  But could you have?  Did you have the
20  authority to do that?
21      A.  The shareholder could have got a resolution
22  to bring in another director, but in the Bahamas,
23  you're required to have two directors for a
24  broker-dealer so that not one person can be
25  autonomous by themselves.  So you're required to

**Page 60**

1   have two directors at all times.  And --
2       Q.  And who was the shareholder in August of
3   2017?
4       A.  Myself and -- and Michael Miller.
5       Q.  Okay.
6       A.  So I could have done a resolution to
7   replace someone with someone else, but there would
8   have still been always someone there.  It wouldn't
9   have just been me on my own.
10      Q.  Okay.  And then this says the chief
11  compliance officer is Edward Cooper.  Is that
12  correct?
13      A.  Where does it say that?
14      Q.  The next line over.  I'm just going left to
15  right.
16      A.  Yes.  It does say that.
17      Q.  And when did he become chief -- is that
18  correct?
19          Was he the chief compliance officer?
20      A.  I don't remember when he became the chief
21  compliance officer.  I know that there's probably a
22  document out there from the Securities Commission
23  saying when he became the chief compliance officer.
24  But at some point, he was the chief compliance
25  officer, to my recollection.

p. 65

1  have done it without talking to anybody?
2      Q.  Did you have the authority?
3      A.  I would have never done that.
4      Q.  That's not my question.
5          Do you have the authority, if you
6  wanted to, to fire employees?
7      A.  I believe that --
8          MR. FORD:  Objection.
9      A.  -- it would have still have to have gone
10 through the board of directors, and the other
11 executives would have had to get together to make a
12 decision on that.  It's not something I would have
13 done autonomously.
14     BY MS. JOHNSON:
15     Q.  Okay.  Did you have the authority, prior to
16 August of 2017, to fire an employee?
17     A.  So let's just say from when?  Like, 2012 to
18 2016?
19     Q.  Yeah.
20     A.  Well, I mean, during -- during that time,
21 from 2012 to, let's just say, 2016, the people that
22 were actually running my firm was the FBI, the DOJ,
23 and the SEC.  They were completely controlling me,
24 so I had to do whatever they said.  So that's who
25 was really running my firm during those periods.

p. 66

1      Q.  Could you have fired an employee, even
2  though they were involved?
3          MR. FORD:  Objection.  He just
4      answered your question.
5      BY MS. JOHNSON:
6      Q.  All right.  Okay.  Who at the SEC was
7  running your firm in 2012?
8      A.  What's the question?
9      Q.  Who at the SEC was running your firm in
10 2016?  Give me a name.
11     A.  Well, in 2012, I had a meeting with the
12 SEC --
13     Q.  I'm asking 2016.  Please stick to my
14 question.
15         2016:  Who from the SEC was running
16 your firm?
17     A.  Well, I said "between;" I didn't say 2016.
18 I said in between that range.
19     Q.  Okay.
20     A.  So from 2012 to when I stopped cooperating
21 with the FBI and the SEC, which was the sum- --late
22 2015.
23     Q.  Okay.
24     A.  From that time, I had to do whatever the
25 government told me to do.

p. 67

1          And I -- I had a meeting with -- in
2  2012 -- I don't remember which month it was, maybe
3  November 2012 -- with six SEC attorneys --
4      Q.  Well, let's not go there yet.  I'll give
5  you the opportunity --
6          MR. FORD:  Well, wait.  Allow him
7      to answer the question.
8          MS. JOHNSON:  I didn't ask him
9      the question.
10         MR. FORD:  You asked him --
11         MS. JOHNSON:  I asked him in
12     2016.
13         MR. FORD:  You asked him who
14     was --
15         MS. JOHNSON:  I asked him in
16     2016 --
17         MR. FORD:  You asked him who
18     was --
19         MS. JOHNSON:  -- I did not ask
20     him about 2012.
21         (Simultaneous discussion.)
22         MR. FORD:  Alise, let's just --
23     let's just let him finish the --
24     A.  I remember that Simona Sun [sic] was there
25 from the SEC.  And --

p. 68

1      BY MS. JOHNSON:
2      Q.  What year was this?
3      A.  From 2012, I had over a dozen meetings with
4  -- between the SEC, the FBI, and the DOJ --
5      Q.  Okay.  Let's just put a pin on that.  We
6  will get to it --
7          MR. FORD:  But you asked --
8      BY MS. JOHNSON:
9      Q.  -- and you'll have an opportunity --
10         MR. FORD:  But you asked him a
11     question who during this -- no.  You
12     asked --
13         MS. JOHNSON:  He's not answering
14     my question.
15         MR. FORD:  You asked who, and he
16     just said Simona Suh.  So he's naming the
17     people.
18         MS. JOHNSON:  We'll get -- that's
19     not the question I asked.
20         MR. FORD:  The question was who
21     from the SEC --
22         MS. JOHNSON:  Who in 2016 --
23         MR. FORD:  -- was assisting with
24     running the firm, and he's telling you.
25         MS. JOHNSON:  I said, Who in 2016

**Page 69**

1  was assisting in running your firm.
2  BY MS. JOHNSON:
3  **Q.** Was there anybody in 2016? We can go
4  back --
5      MR. FORD: Ms. Johnson, we
6  know the --
7      MS. JOHNSON: Let him answer the
8  question.
9      MR. FORD: We know the timing --
10     MS. JOHNSON: Are you instructing
11 him not to answer?
12     (Simultaneous discussion
13     interrupted by the reporter.)
14     MS. SUM: Go ahead. Go ahead.
15 Give him a monologue.
16     THE STENOGRAPHER: I'm not
17 getting it. I'm not getting it. Sorry.
18 **A.** Okay.
19 BY MS. JOHNSON:
20 **Q.** My question is --
21 **A.** Well --
22 **Q.** -- and you can answer it however you want:
23 Who in 2016 -- you can repeat my question if you
24 want.
25     But who, in 2016 from the SEC, was

**Page 70**

1  running your firm?
2      MR. FORD: Objection.
3  Foundation. He never testified that
4  somebody was running his firm in 2016.
5  BY MS. JOHNSON:
6  **Q.** Okay. Go ahead. Answer the question if
7  you can.
8  **A.** So from 2012 to the middle of 2015, I had
9  over a dozen meetings with, like I said, the SEC,
10 the DOJ, and the FBI, with my attorneys there,
11 Adam Ford.
12     And in 2012 -- this is, like, probably
13 October-November range of 2012 -- the FBI -- or the
14 SEC asked me to explain to them, you know, how
15 SureTrader was running.
16     And I told them everything about the
17 firm. I told them, you know, how it got clients,
18 what the firm did, and, you know, who the employees
19 were, who the customers were, how it got customers.
20     Never once did they ever tell me that
21 there was anything wrong with the way it was
22 operating. They told me it was the opposite. The
23 FBI told me, in front of the SEC there, that I was
24 not to change any way, in any form, how the firm was
25 operating; that I had to do whatever they said.

**Page 71**

1      The DOJ told me I had to do whatever
2  the SEC said to do, and whatever the FBI told me to
3  do, and I couldn't change anything. That was the
4  main thing. Don't change anything. And, I believe
5  it's because they wanted to use the firm, which they
6  eventually did.
7      And to answer your question, in 2016,
8  you know, when the prior -- at the end of 2015 -- I
9  remember this. December 31 of 2015, I resigned from
10 the firm completely as the director and CEO, and I
11 didn't come back to the firm until after the
12 indictment was dismissed, which was in probably late
13 January or February of 2017.
14     So during that time, I was not -- from
15 my recollection, I wasn't involved in the firm
16 during that time. I had stepped away. And the main
17 reason why I had did it at the time was because I
18 was negotiating a settlement with the SEC, which
19 would have required me to have stepped down,
20 which -- so I had prepared myself to step down.
21     And I had, you know, put -- you know,
22 just basically resigned, submitted my paperwork to
23 resign. And then I didn't come back until after --
24 those -- that deal broke apart anyway with the SEC,
25 and I just stayed away.

**Page 72**

1  **Q.** What was the time period you stepped away?
2  **A.** I believe it was pretty much all of 2016.
3      And I didn't come back until probably
4  January of late -- late January of 2017, or
5  February.
6  **Q.** Okay. When you say "stepped away," did
7  you -- were you on the board of directors during
8  that time period?
9  **A.** I resigned my -- I resigned as a board of
10 director. I resigned as a CEO. I was still, I
11 believe, a shareholder, but I had stepped away
12 completely from the firm.
13 **Q.** Okay. So you stepped away from the
14 operations of the company fully.
15     Were you involved at all in the
16 operations during that time.
17 **A.** I mean, there might have been questions
18 that they had of just things that I may have had
19 information for. Like, Hey, this happened, what do
20 we do.
21     There might have been some questions
22 that they may have called me about here and there,
23 but I wasn't -- I remember -- like, I was under
24 indictment at the time, so I was under -- what's it
25 called? Supervised release of some sort.

Page 89:

as well before it launched.
**Q.** What's his name?
**A.** I don't remember who it was at that time.
**Q.** Okay. So this is back in 2012 or 2011?
**A.** '11.
**Q.** I'm going to show you what has previously been marked as Plaintiff's Exhibit 63.
I'm going to show it to you in two forms. This is from SureTrader's website, but this is so small, we blew it up. And this is it blown up in, hopefully, readable form.
THE STENOGRAPHER: And those are both 63?
MS. JOHNSON: Yeah. We'll call it Composite 63.
BY MS. JOHNSON:
**Q.** I'll give you a minute to look at it.
Do you recognize this?
**A.** No.
I mean, I recognize it. It says "SureTrader" on it.
MR. FORD: Do we know when this is from?
BY MS. JOHNSON:
**Q.** If you look at the last page, it was pulled

Page 90:

on 2018. June 1st, 2018, this was pulled from SureTrader's website, and it will say SureTrader.com.
MR. FORD: And do we have -- okay. I see. Because I have the -- I have a Bates stamp for the declaration of Russell Castillo, but I don't see this as being -- do we have Bates stamp for the screenshots?
MS. JOHNSON: The screenshot was just one.
MR. FORD: Well, there's --
MS. JOHNSON: This is the blowup. This is just the blowup of this.
MR. FORD: Oh, okay. Yeah.
MS. JOHNSON: So this is what he pulled on June 1st.
MR. FORD: But we have -- what I'm saying is, we have the declaration but not the --
MS. SUM: Oh. Here it is.
Oh. I think this is because it was a native file and a native only has, I think, a stamp on those.
MS. JOHNSON: Okay. So it's 339.

Page 91:

MR. FORD: Okay. I see.
BY MS. JOHNSON:
**Q.** Okay. So, do you recognize this as a screenshot of SureTrader's website in June of 2018?
**A.** I don't remember reading this, but if that's what you tell me, that it was on the website, I don't disbelieve it.
**Q.** Okay. The title is "7 Reasons Why You Should Consider SureTrader."
**A.** Okay.
**Q.** And if we look at what's the second page of the blowup --
**A.** Okay.
**Q.** -- it says -- this first big title bold, "SureTrader Allows You to Avoid the Nasty PDT Rule."
And then if you go down three sentences, the fourth sentence starts: "Remember FINRA, the killjoy financial industry regulatory authority?
"Well, they have this annoying rule about having $25,000 in equity before you're allowed to be a pattern day trader. It's called the PDT, pattern day trader rule."
And it continues: "What is the pattern day trader rule? In short, the PDT rule states you

Page 92:

need $25,000 in your margin account at all times, or you can't trade more than three times in five consecutive trading days."
Then: "There are many legitimate ways to avoid the PDT rule, and SureTrader is one of the best for new traders."
And then if you skip over to the next sentence, it says: "Luckily, SureTrader means business, and they are willing to level the playing field. And with their robust tools, they have been able to ensure that you can profit from pattern day trading as long as you have the required minimum funds to trade."
Did you draft this content?
**A.** No. I did not.
**Q.** Do you know who did?
**A.** I don't know who drafted it. Janay could have hired a third party to do it. I don't know.
But I will say that in 2012, when I was in one of those meetings with the SEC, I told them that SureTrader was created to avoid the pattern day trading rule.
And at no time did they tell me that that was ever an issue. And they used the firm for three whole years and never said one time that I was

**Page 93**

doing anything wrong. In fact, they told me on many occasions they didn't have a problem with the business.
Q. Okay. Is FINRA a U.S. regulator?
A. I believe so.
Q. And what is the pattern day trader rule?
A. I don't have the rule right in front of me, but I believe that it limits U.S. broker-dealers from allowing their clients to day trade more than three or four times within a five-day period.
    And unless you have $25,000 in your account, then you can day trade as much as you want. And if you have less than that, then you have to trade -- if you get stricken as a pattern day trader after the fourth or fifth time that you day trade, then you would be restricted to trading in cash for a period of time. I don't remember how long.
Q. Okay. And the rule applies to persons who want to trade at a U.S. broker-dealer?
A. It applies to U.S. broker-dealers.
Q. Okay. What could a trader do at SureTrader that they couldn't do at a U.S. day trading firm?
A. I'm sorry? Say that one more time.
Q. What were you offering traders to do at SureTrader that they could not do with a U.S.

**Page 94**

trading firm?
    MR. FORD: Objection.
A. Well, they can do -- they can day trade at a U.S. firm, they would just need to have $25,000 in their account.
BY MS. JOHNSON:
Q. Okay. So what was SureTrader doing that was different than that?
A. It was not a member of FINRA, so it did not require a $25,000 minimum deposit in order to day trade.
Q. What was your minimum deposit?
A. I believe it was $500.
Q. Did you have any minimums on how many times -- what was your margin requirements?
A. It was similar to the U.S. in the sense of overnight margin was 2 to 1, and intraday margin in the U.S. -- some firms in the U.S. will give you 6 to 1 if you have what's called a portfolio margin E account.
    And we were also offering 6-to-1 leverage, and that was approved by the regulator in the Bahamas. I remember having a meeting with them specifically about offering 6-to-1 leverage, and then they authorized us to offer that leverage.

**Page 95**

    (Plaintiff's Exhibit 85 marked for identification.)
BY MS. JOHNSON:
Q. Let's go on to --
A. Are we done with this exhibit?
Q. Yeah. I think so.
    -- what's been premarked as 85.
    Oh. I meant to give you this one. I'm sorry. I don't want to give you the marked one.
    This is another web capture from the SureTrader website. Do you recognize it?
A. What is the date of this screenshot?
Q. It is May 11th, 2017.
A. Okay.
Q. And it says, "Contact us," and it has some phone numbers.
    Were these the ways that your clients could contact Swiss America Securities?
A. Okay.
Q. And if you look under "Telephone," it has a U.S. direct number. Is that correct?
A. I do see that.
Q. And under "VoIP Numbers" -- and you have to flip to the next page -- it says, "As a courtesy to our existing clients, we've added numbers that

**Page 96**

forward to our office phone line."
    And there's a United States number there.
A. I see it.
Q. Why did you offer that courtesy?
A. I think that when this was implemented was -- when I wasn't working at the firm is when they implemented this system. And it was something that the Bahamas phone company was -- my understanding is that it was something that the Bahamas was offering as part of the phone package that they had at the office.
    I do remember asking -- I don't remember who I asked, but I remember asking about it because, from the time that I was there up until the end of 2015, I think we only had a Bahamanian phone number.
    And what I was explained is that -- that it's very expensive for customers to call a Bahamanian phone number, sometimes costing them at that time $1 to $2 a minute, and they were just trying to figure out a way to make it less expensive for existing customers to call them.
Q. Okay. Let's go to exhibit -- I'll have to mark this, I think.

**Page 97**

1    (Plaintiff's Exhibit 83
2    marked for identification.)
3  BY MS. JOHNSON:
4  Q. Do you recognize this?
5  A. I haven't seen it yet.
6  Q. Okay. I'm sorry.
7  A. Yes. I see it.
8  Q. And do you recognize this as a screenshot
9  of SureTrader.com's -- from SureTrader.com's
10 website?
11 A. It looks like it came from that website.
12 Yeah.
13 Q. And it says "Account Fees" and --
14 A. Hang on one second.
15 Q. -- it lists $40 USD/BSD outgoing funds, $50
16 USD/BSD inactivity fee quarterly, $25 USD/BSD per
17 day margin.
18     What are those?
19 A. Well, outgoing wire fee would have been a
20 pass-through fee of what the bank was charging
21 someone to send a wire out.
22     And it says USD for U.S. dollar, BSD
23 for Bahamian dollar. The U.S. dollar and the
24 Bahamanian dollar is pegged one-for-one, so Bahamas
25 does business in both U.S. dollars and Bahamanian

**Page 98**

1  dollars, because it's pegged one-to-one. So that's
2  the reason why it has that.
3      And a $50 inactivity quarterly fee was
4  mainly to cover the cost of like web-based software
5  that the firm didn't charge people for. So it would
6  get charged maybe $12 a month, approximately, for
7  that.
8      So if you take $12 and you times that
9  by 3, you get close to $50, which is basically just
10 to cover that pass-through fee of software fee for
11 web-based users.
12     And the $25 margin call fee would have
13 been in the event that someone went on a -- I
14 believe, an overnight basis of over 50 percent, or
15 over 2-to-1 leverage.
16 Q. Okay.
17 A. Are we done with this one?
18 Q. We're done with that one.
19     (Plaintiff's Exhibit 80
20     marked for identification.)
21 BY MS. JOHNSON:
22 Q. Do you recognize this as a screenshot of
23 SureTrader's website?
24 A. I mean, I don't remember this specific
25 layout, but -- it may have changed over time, but I

**Page 99**

1  just don't remember it. But yeah. It looks like
2  SureTrader's website.
3  Q. Okay. It says "Trade Rates" --
4  A. Is this the same page over and over? Or
5  no. It's not.
6      Okay. I see that.
7  Q. "Trade rates."
8      And it says, "Commissions, U.S. stocks,
9  U.S. options, routing fees."
10     And it says -- listing their
11 commissions for the trading in U.S. stocks and U.S.
12 options. Is that correct?
13 A. That's what it says. Yes.
14 Q. And it has the fees listed there per trade?
15 A. Yes.
16 Q. I don't see anything for Canadian equities.
17     Were you selling them in 2017, or
18 allowing customers to trade in them in 2017?
19     MR. FORD: Objection.
20 A. This is the same page over and over, unless
21 it's different in some way.
22 BY MS. JOHNSON:
23 Q. I have trade rates on the first page,
24 commissions on the back.
25 A. I remember there being a rate for

**Page 100**

1  international transactions, but I don't -- maybe it
2  got cut off on this? I just don't see it.
3      But I do remember it having a rate for
4  international -- it could be covered under the
5  call-in trades are an additional $25. Maybe it
6  would have been covered under that.
7  Q. Okay. And there's -- on the front page,
8  there's a little pop-up box, "SureTrader Santina
9  Customer Support."
10     "We're here to help. Ask our customer
11 support people any questions you may have."
12 A. Okay.
13 Q. When would that box appear?
14 A. That box would -- I don't know if there was
15 a timer for it popping up after 30 seconds or so. I
16 just don't -- I don't remember how that was set up.
17     But in order to get to the website,
18 you would have to have gone through a pop-up first,
19 and I don't remember exactly what that pop-up said.
20 When the -- the pop-up transformed over the years.
21     When it first started in 2011 -- or
22 late 2011, early 2012, the pop-up blocker would pop
23 up for every single person with some type of
24 disclaimer that it's not intended for U.S. persons,
25 and maybe something else.

---

**Page 105**

1   (Plaintiff's Exhibit 84
2       marked for identification.)
3   BY MS. JOHNSON:
4   Q.  Okay.  We are showing you what has been
5   marked as Plaintiff's Exhibit 84, which is another
6   screenshot from the SureTrader.com website.  This
7   one is the section on funding and banking.
8       And it says -- it lists different ways
9   in which you can fund a SureTrader account.  And if
10  you look on what's marked at the bottom 380 --
11  A.  380?
12  Q.  It's about the fourth page in.
13  A.  Okay.
14  Q.  The page that says "ACH."
15  A.  Okay.
16  Q.  It says "Available currencies, ACH" -- I'm
17  sorry.  "ACH; Available currencies, U.S. dollars;
18  estimated transaction, five to seven business days;
19  maximum funding, $10,000; available to U.S. bank
20  holders only."
21      Why did SureTrader provide U.S. bank
22  holders with ACH services?
23  A.  Well, it provided many different funding
24  options.  It provided credit cards, debit cards,
25  Skrill.  It provided Neteller, bank wire, and ACH.

---

**Page 106**

1       And, by the way, non-U.S. persons can
2   have a U.S. account.  So it's not just for a U.S.
3   person.  Anyone in the world can open an account at
4   a U.S. bank, as far as I know.
5   Q.  Okay.  So this was provided for persons --
6   for U.S. -- who have a bank account but they might
7   not have been a U.S. citizen.  Is that -- or reside
8   in the U.S.?  Is that what you said?
9   A.  It provided -- it's for anyone that has a
10  U.S. bank account.  It didn't matter whether they
11  resided in the U.S. or not.
12  Q.  Okay.  But they could have resided in the
13  U.S. and used this funding source.  Correct?
14  A.  They could have resided in China, too.
15  Q.  Okay.  One more of the SureTrader website.
16      MS. JOHNSON:  You can mark this
17  as 81.
18  A.  In fact, there are many Canadians who have
19  U.S. bank accounts.
20      (Plaintiff's exhibit 81
21      marked for identification.)
22  BY MS. JOHNSON:
23  Q.  I'm showing you a screenshot from the
24  SureTrader.com website concerning pricing
25  comparison.  And it says, "Broker Comparison," and

---

**Page 107**

1   it compares SureTrader to several other brokers.
2   Q.  Where is Questrade located?
3   A.  Well, before you start, I want to just make
4   a point that all of these screenshots are misleading
5   because none of them show the pop-up blocker that
6   would have appeared, and I don't believe that that
7   is being shown.
8       Additionally, this document says it
9   was created on August 30 of 2016, when I was not
10  working at the firm.
11  Q.  That's the date it was collected.
12  A.  Correct.
13  Q.  And you were working at the firm in 2017?
14  A.  Yes.
15  Q.  Okay.  So back to the original question.
16      Where is Questrade?
17  A.  Questrade is a Canadian-based
18  broker-dealer.
19  Q.  And what about TD Ameritrade?
20  A.  I believe TD Ameritrade is an international
21  broker-dealer with offices in the U.S., Canada, and
22  Europe as well.
23  Q.  Okay.
24  A.  As well as E*TRADE.
25      I'm not sure about Fidelity.  I think

---

**Page 108**

1   Fidelity is also -- has broker-dealers
2   internationally.
3       Scottrade.  I don't even think
4   Scottrade existed anymore.  This thing is outdated
5   at that time.
6   Q.  Okay.  All of these comparisons are made in
7   U.S. dollars?
8       MR. FORD:  Objection.
9   A.  Well, as I said earlier, the Bahamas and
10  the U.S., the currency is pegged.  So when you have
11  a dollar sign, it's both USD and Bahamas.
12  BY MS. JOHNSON:
13  Q.  Does TD Ameritrade take -- charge in
14  Bahamanian dollars?
15  A.  I don't think so.
16      MR. FORD:  Objection.
17  A.  But, again, they also have international
18  offices that charge in different currencies as well.
19      I didn't draft this, so I don't --
20  BY MS. JOHNSON:
21  Q.  Aren't these comparisons all online stock
22  orders?  Are these -- all of these made in U.S.
23  dollars?
24      MR. FORD:  Objection.
25  A.  It has a dollar sign.  It doesn't say "USD"

**Page 109**

next to it. It could be Bahamanian dollars as well, equivalent.
BY MS. JOHNSON:
Q. Does Schwab trade in the Bahamas? Does it have an operation there?
A. I don't think they do. Fidelity might, but I don't know.
Q. Do you have any reason to think that the $8.95 that's listed here is not representative of U.S. dollars?
MR. FORD: Objection.
A. If you're -- if the firm, SureTrader, which is based in the Bahamas, who is pegged to the U.S. dollar, is comparing itself in the same dollar equivalent, then I just don't see how that would make any difference.
BY MS. JOHNSON:
Q. Okay. I'm not trying to be cute.
Are these represented as comparing what -- the U.S. dollar to what the other firms charge in U.S. dollars?
A. They're all compared in the U.S. dollar in -- and the Bahamanian dollar. Equivalent. It's equivalent.
MS. JOHNSON: Okay. That's all

**Page 110**

for that one.
This is premarked already as 64.
BY MS. JOHNSON:
Q. I'm showing you a screenshot, a Groupon coupon. If you'll turn to the -- it's the second physical page, but it says 1 of 3 at the bottom.
MR. FORD: I just have a question on the last page. I don't think there's --
I don't know if I see any Bates stamping at all on this one. And then it looks like the last page is -- this is a declaration of Russell Castillo. It says he got these and gave them to Sajjad Matin.
This document, do we have a Bates stamp for that?
MS. JOHNSON: We'll have to see. These were pulled in May of 2018.
MR. FORD: Okay. We'll just -- I'm going to object to the use of it, but you can go ahead with the question.
I'm going to object to the use and any questions on it just because it's not Bates-stamped, but we can go ahead. I don't need to jam it up.
MS. JOHNSON: Okay. It's

**Page 111**

Bates-stamped as 339. And we'll replace it after.
MR. FORD: And that is -- is that -- when you say "339," is that the document that says it was stored on a network share in which the location was provided by Sajjad Matin?
Is it the same document, or is it two separate documents?
MS. JOHNSON: What's your question again?
MR. FORD: On this declaration, the one that says it was stored on a network share in which the location was provided by Sajjad Matin, I'm just wondering, is it two separate documents or is this one?
This seems like this would be different, separate things; the declaration from the screenshots.
MS. JOHNSON: The declaration goes with the screenshot.
MS. SUM: It's a composite exhibit.
So, to clarify --

**Page 112**

MR. FORD: But there's no Bates stamp on any of this.
MS. SUM: Well, we'll provide the Bates stamp. She just said --
MR. FORD: Oh. I got it.
MS. SUM: -- that it's 339.
But we'll locate it, and we can certainly replace it.
MR. FORD: Okay.
MS. SUM: But it's a composite in that there's what we call the actual web capture and the declaration, so that it goes hand in hand.
MR. FORD: Okay.
MS. JOHNSON: All right.
BY MS. JOHNSON:
Q. You'll see -- if you'd turn to the next page, it has "SureTrader Coupons & Promo Codes. $50 off promo code to use today, $50 in free trades. SureTrader is offering new customers $50 in free trades."
How long -- what period of time did SureTrader offer discounts through Groupon?
A. Never.
MR. FORD: Objection.

**Page 113**

BY MS. JOHNSON:
Q. Never?
A. Never.
    We never had any deal with Groupon. If you go to Groupon website right now and type in SureTrader, this still comes up. It's not real.
    You should have done some more investigative work and maybe asked Groupon for a contract, which none exists. So it's just a way for Groupon to get traffic to their website.
Q. Did anyone from SureTrader ask them to take it down?
A. I don't know.
    I didn't even know it existed. I only found about it from your Complaint, and then looked and Googled it and see that it still shows up to this day. These coupons, they're obviously fake.
Q. And over here on the left, it says "Shop SureTrader.com."
    Did you ever have anyone call SureTrader and ask about the Groupon coupon?
A. No.
    And I can see "About SureTrader" has zero stars here. There's not a single person that rated this or reviewed it. It's a fake ad to get

**Page 114**

traffic. That's my view on it, because I don't believe that SureTrader ever had any dealings with Groupon, as far as I know.
Q. Okay. Did SureTrader have procedures to make sure that U.S. residents were not signing up to trade at SureTrader after viewing the website?
A. Ask me that one more time.
Q. Sure.
    Did SureTrader have procedures to ensure that U.S. persons, residents, were not signing up to trade at SureTrader after reviewing the website?
    MR. FORD: Objection.
A. SureTrader had procedures to make sure that, in order to view the website, they would have to go through a disclosure or pop-up of some sort so they could not see the website until after they've gone through that process.
BY MS. JOHNSON:
Q. Okay. So they cannot view the website.
    Was there an additional procedure to keep them from signing up to trade as a customer at SureTrader after they viewed the website?
A. If -- you're talking specifically a U.S. person?

**Page 115**

Q. Okay. A U.S. person goes to the website.
A. Uh-huh. They see a pop-up blocker.
Q. They see a pop-up blocker.
A. Okay.
Q. And then what happens after that?
A. Well, it depends on the timing. If this was, let's just say, 2013 --
Q. Let's keep it to 2016 to 2019.
    MR. FORD: If you want to discuss 2013, you can discuss the time period.
A. Okay. Well, as I said earlier, it was --
    MS. JOHNSON: You can ask him later. I asked a question.
    MR. FORD: You asked the question, you didn't --
    MS. JOHNSON: He asked me to clarify and I did.
    MR. FORD: But you did not specify a time period. So if he wishes to answer by comparing the two time periods --
    MS. JOHNSON: Okay. We'll be here till midnight.
BY MS. JOHNSON:
Q. Go ahead.
A. When it had the IP-specific pop-up blocker

**Page 116**

that only shows U.S. persons -- or U.S. IP addresses, they would have to contact the firm via phone message or email, I believe, in order to get an access code to get into the website.
    So they would have to initiate contact with the firm in order to get into the website.
    At that point --
BY MS. JOHNSON:
Q. Can I just stop you just for clarification?
    Okay. When they called the firm to get the code, was there any procedure for who they would give the code to?
A. I don't know. Sajjad should know. He obviously did it.
Q. So you don't know.
A. I mean, if someone messaged and said, "I want to access the website," they would be given a code. I don't remember what the code was or how they generated it specifically.
    But, obviously, someone who went to this website -- all these websites, went -- and went through that process, or maybe their insider filter said just give them a code. I don't know.
Q. Your average client -- I'm a U.S. client, and I go to the website, and it pops up, and it says

1  I believe, for FINRA.  So with him as well around
2  the time the firm -- well, before the firm started,
3  but right close to it.
4       And then, again, with Adam Ford, this
5  would have been in mid-2012.  Again, with
6  Carla Marlin, probably in 2013, maybe.  But it could
7  have been '12.  I met her in 2012, so it could have
8  been as early as 2012.
9       As well as Dana Gore, who was
10 SpeedTrader's counsel, I had -- I had talked with
11 her several times about -- about how to make sure
12 the firm was in compliance with the rule.
13      So I don't know.  Sev- -- and also,
14 the Bahamanian counsel.  I would talk to him about
15 it as well.  But, obviously, he could only advise me
16 on Bahamanian law, so I was using U.S. counsel
17 mainly.
18      And these -- the staff at the firm had
19 access to speak to any of these attorneys, with the
20 exception of probably Dana, since she only
21 represented SpeedTrader.
22      But they has access to speak to Adam,
23 and I'm sure they have spoken to Adam before.
24 Adam's been to the office in the Bahamas at least a
25 couple of times.

185

1       As well, by the way, when I was
2  cooperating with the SEC and the DOJ, they are
3  attorneys.  I would always ask them questions as
4  well.  Not that they're my attorneys, but they are
5  the ones telling me what to do.  So I was relying on
6  them as well.
7       When they told me that they had no
8  issues with the way the firm was operating, I relied
9  on that.
10   Q.  And what years was that?
11   A.  What years were that?
12   Q.  Yeah.  What year.
13   A.  From the middle of 2012 until I stopped
14 cooperating with them, probably sometime in 2015.
15   Q.  Let's see.  Let me show you what I'm going
16 to mark as 60.
17      (Plaintiff's Exhibit 60
18      marked for identification.)
19 BY MS. JOHNSON:
20   Q.  This purports to be an email -- it is an
21 email from Guy Gentile dated June 17th, 2013, to
22 philip@suretrader, and it cc's Justin.
23      The subject is Rule -- SEC Rule 15a-6,
24 and it attaches SEC Rule 15a-6 PDF with the
25 attachment.

186

1       And then if you look at the first
2  one -- it's going to be on the back of the page,
3  Bates-marked 10577 -- it says "Swiss America
4  Securities, Ltd, policy and procedures for compliance
5  with the U.S. Securities and Exchange Commission
6  Rule 15a-6 exemption."
7       What is this document?
8    A.  I mean, it's -- it's -- it says it's a
9  policies and procedures for compliance with
10 Rule 15a-6 exemptions.
11   Q.  Is this the company SureTrader's written
12 policy?  Was this in effect?
13   A.  I mean, it was more than one page, so
14 you're missing quite a bit of it.
15   Q.  Okay.  Was this the first page of it?
16   A.  I don't know if it was the first page.
17 This is -- this is ten years ago.  More than ten
18 years ago.
19   Q.  Okay.
20   A.  So I remember it being several pages.
21   Q.  Who drafted this?
22   A.  I believe Philip Dorsett and I put this
23 together after talking with some of the attorneys
24 and compliance consultants who put something
25 together just to have an in-house written policy.

187

1    Q.  Okay.  In the middle of the page, it says,
2  "Below are all the things Swiss America will not do
3  to ensure compliance with SEC Rule 15a-6."
4       Do you see that list?
5    A.  Yes.
6    Q.  Did you charge fees in U.S. dollars?
7       Did SureTrader charge fees in U.S.
8  dollars?
9    A.  Well, as I explained, we charged fees in
10 Bahamas dollars, and USD is the equivalent.
11      If you Google the BSD symbol, it is a
12 dollar sign just like the U.S. dollar sign.  So it
13 is exactly the same.
14   Q.  So did you charge in U.S. dollars?
15   A.  We charged in Bahamanian dollars.  It's the
16 same fee.  It's the same thing.
17   Q.  Did you give out U.S. phone numbers to U.S.
18 investors?
19   A.  As I stated before, when -- the website you
20 showed me, when that was put on the website, that's
21 while I was not there.
22   Q.  So that's a "yes"?
23      MR. FORD:  Objection.
24 BY MS. JOHNSON:
25   Q.  You did, but you weren't there during that

188