# EXHIBIT F

**Page 13**

1 like CNBC, but on video.
2   Q.  And what --
3       Pardon.
4       What language did these videos occur in?
5   A.  English.
6   Q.  Did they ever occur in any other languages?
7   A.  No.  I had a -- we had some members that
8 probably -- you know, that were Spanish that probably
9 did some subtitles in Spanish that you might find on
10 the internet, but I would never speak -- I don't speak
11 any other languages, and no one can speak for me under
12 any other languages now.
13   Q.  When Day Trading Radio started in 2007, other
14 than you, did it have any employees?
15   A.  No.
16   Q.  Did there come a time in the future when Day
17 Trading Radio had employees?
18   A.  Yes.
19   Q.  When was that?
20   A.  Probably when I moved up here.  I would say
21 it would probably be probably 2010, 2011 somewhere.  I
22 can't really remember.  I don't really remember, but I
23 did have a couple employees.  They were just, you
24 know...
25   Q.  How did you describe them?

**Page 14**

1   A.  The assistant, someone to do the e-mail, send
2 out, you know, whatever needed to be sent out, do
3 marketing.
4   Q.  Did Day Trading Radio's number of employees
5 further increase after 2010 or 2011?
6   A.  No.
7   Q.  What were the names of the employees?
8   A.  Brian See, S-e-e, and Kate, Kaitlin Wolfe.
9 First it was Kaitlin, and then Brian came in.
10   Q.  Does Day Trading Radio currently have any
11 employees?
12   A.  No.
13   Q.  Just you?
14   A.  Yes, just me.
15   Q.  How many?
16   A.  Just me.
17   Q.  Okay.  Did you have a particular target
18 audience for your videos?
19       MR. HALPIN:  Objection.
20       MISS SUM:  There may be objections during the
21 course of your deposition.  Counsel may assert them.
22 But unless someone instructs you not to answer, I'm
23 going to ask you to go ahead and answer the question.
24       THE WITNESS:  No, Day Trading Radio was, you
25 know, whoever tuned in to YouTube was available to

**Page 15**

1 watch it.  I didn't have a targeted audience or
2 anything.
3   Q.  BY MISS SUM:  Do you know the people who
4 watched your videos, where they were located
5 geographically?
6       MR. HALPIN:  Objection.
7       THE WITNESS:  The only way to do that, you
8 know, at some points, I did put a tracker on the
9 website, but I never really paid attention to it.  But
10 I knew, you know, you can listen from all over the
11 world because, you know, I'd get e-mails and stuff.  So
12 it went from Russia, South Africa, England, France,
13 Canada, USA, you know, South America, everywhere.
14 Probably every country.
15   Q.  BY MISS SUM:  And do you have an estimate as
16 far as the persons based in the United States, what
17 percentage of your total viewership came from the U.S.?
18       MR. HALPIN:  Objection.
19       THE WITNESS:  I really -- I would say that
20 most people came from the U.S., but I have no idea what
21 the ratio is or anything.
22   Q.  BY MISS SUM:  Did you say most people?
23   A.  I would -- I would guess.  I mean, I never
24 did the analytics on that.
25   Q.  All right.  With respect to Day Trading

**Page 16**

1 Radio's website and its content, who created the
2 content on the website?
3   A.  I did.
4   Q.  Did you get any assistance from any third
5 parties?
6   A.  No.
7   Q.  And can you generally describe the content on
8 Day Trading Radio's website.
9       MR. HALPIN:  Objection.  What time period?
10       MISS SUM:  All right, let's talk about the
11 content in approximately 2013.
12       THE WITNESS:  Basically, it's always been the
13 same.  I'd have the video screen on there, I'd have a
14 watchlist, meaning that the stock -- I would put out a
15 video watchlist every week, describe my research on
16 technical levels on the charts, the S&P 500, any stocks
17 that I like, and they would go out to the members, and
18 that was it.  I had a blog -- well, at that point, in
19 the beginning, I had a blog, but maybe in 2013 we
20 probably turned a little bit -- readjusted the site so
21 we didn't have the blog and just the video screen, I
22 believe.  And there might have been some newsfeeds, you
23 know, random newsfeeds, and...
24   Q.  BY MISS SUM:  And earlier I believe you said
25 that you provided videos for free, but then at a later

**Page 29**

1  good.
2  **Q.** Who is Dac?
3  **A.** Dac is just a good friend of mine. He was a
4  trader also, but he's just a really good friend, and he
5  helped me out, and, you know, he's just a good friend,
6  but...
7  **Q.** Was he an employee of Day Trading Radio?
8  **A.** No.
9  **Q.** Did he have any official title at Day Trading
10 Radio?
11 **A.** No.
12 **Q.** Did he have an e-mail address with Day
13 Trading Radio?
14 **A.** He did at one time. I think it was
15 dac@daytradingradio.com.
16 **Q.** And what was Dac authorized to negotiate on
17 behalf of Day Trading Radio with third parties?
18     MR. HALPIN: Objection, just to the extent
19 this calls for a legal conclusion and he's not a lawyer
20 or represented by counsel.
21 **Q.** BY MISS SUM: Did you give Dac approval to
22 talk to other people in negotiating potential deals?
23     MR. HALPIN: Objection.
24     THE WITNESS: Yes.
25     MISS SUM: I'm sorry?

**Page 30**

1     THE WITNESS: Yes.
2  **Q.** BY MISS SUM: Did you talk with Dac about the
3  services that are described on page 43 of Exhibit 49?
4     MR. HALPIN: Objection.
5     THE WITNESS: Forty-three? Do you want me to
6  look at it right now?
7  **Q.** BY MISS SUM: Yes, the first page of
8  Exhibit 49. Did you talk to Dac about what's described
9  on this invoice?
10 **A.** Oh, yeah, I'm sure we did.
11 **Q.** Did you approve the contents of the invoice?
12 **A.** Yes.
13 **Q.** What is the date of this invoice?
14 **A.** 2013 something. 9-5-2013.
15 **Q.** Did you have an agreement with SureTrader at
16 this time?
17     MR. HALPIN: Objection.
18     THE WITNESS: I guess so. I mean, this is
19 what it says.
20 **Q.** BY MISS SUM: As of September 2013, did Day
21 Trading Radio have any written agreements with
22 SureTrader?
23 **A.** Written agreements? I mean -- I mean, I
24 don't know. What do you mean? Excuse me. You have to
25 clarify.

**Page 31**

1  **Q.** A written contract.
2  **A.** We might have had. If you have it, you have
3  to show it to me and I'll tell you.
4  **Q.** We'll get there. I'm just trying to see what
5  you remember.
6  **A.** I don't remember. I really don't remember
7  what the written contract was, but if this was a
8  contract, yeah, this is something we agreed on.
9  **Q.** Do you see below the description providing
10 the advertising banner there's "August Commission"?
11 **A.** Yeah.
12 **Q.** Okay. What is that referring to?
13 **A.** I don't really know. I'm guessing that it
14 might be people who signed up or, you know, became a
15 member, you know.
16 **Q.** Okay. When you say...
17     Okay. When you say "people who signed up,"
18 who are you referring to?
19 **A.** People went through the banner, I guess.
20 We'd -- I think we'd have the banner up and get paid
21 for having the banner and ask them what they said, and
22 then if anybody clicked through the banner, we'd get
23 $20 per whatever, per click-through or someone who
24 starts an account with them.
25     That's what I'm guessing. I'm not

**Page 32**

1  100 percent sure what that commission is from. That's
2  the only thing I can theorize. That's probably what
3  it's from.
4  **Q.** When you say "clicked through" to them, who
5  is "them"?
6     MR. HALPIN: Objection.
7     THE WITNESS: To the banner, to SureTrader.
8  **Q.** BY MISS SUM: You refer to a banner. What
9  was reflected in this banner?
10 **A.** Just SureTrader, the SureTrader banner,
11 broker. It was the broker's banner, and it probably
12 had something about good margins. I'm trying to
13 remember what it looks like. You know, good margins,
14 it said --
15 **Q.** Did you create the banner?
16     MR. HALPIN: I'm going to...
17     Please let him finish answering.
18     THE WITNESS: It did say -- I do believe it
19 did say it had something about not intended for U.S.
20 clients, I believe. I'm not 100 percent sure, but that
21 sticks out to me.
22 **Q.** BY MISS SUM: At the time the banner was on
23 the Day Trading Radio website and it said it's not for
24 U.S. persons, did U.S. persons visit your website?
25     MR. HALPIN: Objection. How does he know

**Page 33**

1  that?
2      THE WITNESS: Yeah, I have no control over --
3      MISS SUM: Counsel, you can object, you can
4  preserve it, but you are not here to testify in place
5  of Mr. Kurisko. What you just stated is impeding my
6  examination of him and inserting words into testimony.
7      MR. FORD: Miss Sum, are you declaring this
8  witness an adverse witness?
9      MISS SUM: Mr. Ford, I am not declaring. I
10 am telling him he is not allowed to make statements --
11     MR. FORD: Well, then, that's fine, but if
12 you're not declaring him an adverse witness, then the
13 Rules of Procedure dictate that you're not permitted to
14 ask leading questions. We've had this issue with prior
15 depositions where I've had to repeatedly object, so we
16 would ask that you refrain from the leading questions.
17 I think there was at least one of the bases of the last
18 objection, so moving forward, if we could stay off the
19 leading --
20     MISS SUM: Counsel, I will ask my questions,
21 you can preserve your objections, but they cannot be
22 speaking objections, okay?
23     So Mr. Halpin, I'm noting that you are, in
24 fact, making speaking objections and providing
25 testimony to clue in the witness, and that's

**Page 34**

1  inappropriate.
2      MR. FORD: The Rules of Procedure permit
3  clarification, as long as it's short and concise.
4      MISS SUM: The Rules of Procedure do not
5  permit your colleague to provide testimony and hints to
6  the witness.
7      (Simultaneous speakers.)
8      MR. HALPIN: I'll note for the record, he
9  previously testified he didn't attract visitors to his
10 website, so it's been asked and answered, a separate
11 basis for the objection. Please continue.
12     MISS SUM: No, I've asked a different
13 question, Mr. Halpin. Would you please stop trying to
14 testify for the witness.
15     Madam Court Reporter, could you please reread
16 my last question.
17     (Question read.)
18     THE WITNESS: People who come to the site and
19 seen the banner.
20     Q. BY MISS SUM: You testified earlier that Day
21 Trading Radio started providing services that people
22 could pay for; is that correct?
23     A. Yeah.
24     Q. And where were those persons from
25 geographically that paid Day Trading Radio's services?

**Page 35**

1      MR. HALPIN: Objection.
2      THE WITNESS: They were from all over the
3  world.
4      Q. BY MISS SUM: Did that include the United
5  States?
6      A. Yes.
7      MR. HALPIN: Objection; asked and answered.
8      MISS SUM: No, that was not asked and
9  answered.
10     MR. FORD: Objection; leading.
11     MISS SUM: All right. Are you guys going to
12 tag team, then?
13     MR. HALPIN: Objection; vague. He's
14 testified to time periods. Vagueness.
15     Q. BY MISS SUM: All right. In 2013, did Day
16 Trading Radio provide services that people paid for?
17     A. Yes.
18     Q. When people paid for Day Trading Radio
19 services, what was the mechanism for them to make
20 payments?
21     A. They go to a checkout page and they would put
22 in their credit card and it would go to what's called
23 an A Member system, which is the membership portal.
24 And it would give you, you know, something that would
25 protect the portion of the site that was for members

**Page 36**

1  only, and then they would have ability to put a
2  password and user name to log in.
3      Q. Did these members provide their addresses?
4      A. If they did, it was...
5      We don't hold on to any of the billing
6  information, the A Member situation doesn't. So if
7  they do have any address, I don't think we have
8  addresses.
9      Q. Did any of your...
10     Strike that.
11     Did any of Day Trading Radio's private
12 members that paid for services ever communicate with
13 you directly?
14     A. Oh, yeah.
15     Q. Did they ever tell you where they were
16 located?
17     MR. HALPIN: Objection.
18     THE WITNESS: Yeah, I'd end up knowing where
19 they're located over time, because they become friendly
20 with the site and, you know, build relationships over
21 time.
22     Q. BY MISS SUM: And did you come to learn from
23 any of those people that contacted you that they were
24 based in the United States?
25     MR. HALPIN: Objection; leading.

**Page 49**

1  America desires to engage marketing agent and marketing
2  agent is qualified to and desires to provide certain
3  marketing services to Swiss America for non United
4  States investors"?
5      A.  Um-hmm.
6      Q.  "Parties agree that marketing agent will
7  supply such services to Swiss America upon request
8  pursuant to the terms and conditions contained in this
9  agreement."
10     A.  That's correct.
11     Q.  Do you see that?
12     A.  Um-hmm.
13     Q.  Did you or anyone at Day Trading Radio
14 discuss with SureTrader providing services that related
15 to non U.S. investors?
16         MR. HALPIN:  Objection.
17         THE WITNESS:  No, we didn't discuss anything.
18     Q.  BY MISS SUM:  Did you discuss the...
19         Strike that.
20         Was it Day Trading Radio's responsibility to
21 tell SureTrader who it should or shouldn't accept as a
22 customer?
23         MR. HALPIN:  Objection; leading.
24         MISS SUM:  Let me finish my question.  You're
25 welcome to --

**Page 50**

1          MR. HALPIN:  I thought you were finished.  I
2  wanted to object before the witness answered.  I
3  apologize.
4          MISS SUM:  Okay.
5      Q.  BY MISS SUM:  Did you or anyone from...
6          Excuse me.
7          Did you or anyone from Day Trading Radio
8  discuss the geographical locations of persons who
9  visited Day Trading Radio's website?
10         MR. HALPIN:  Objection.
11         THE WITNESS:  No, but it was implied that it
12 was for non U.S. customers.
13     Q.  BY MISS SUM:  Did U.S. customers visit Day
14 Trading Radio's website?
15     A.  Yes.
16         MR. HALPIN:  Objection.
17         THE WITNESS:  Yes.
18     Q.  BY MISS SUM:  Did Guy Gentile know that
19 persons from the U.S. visited Day Trading Radio's
20 website?
21         MR. FORD:  Objection; leading, and, Alice,
22 you know the witness is not represented --
23         MISS SUM:  Counsel, you preserved it.  Please
24 don't interrupt.
25         MR. FORD:  The witness is not represented by

**Page 51**

1  counsel, and so one of the issues with these leading
2  questions is they seem designed to confuse the witness,
3  who is not represented by counsel.
4          MISS SUM:  Mr. Ford --
5          MR. FORD:  You just asked whether he knew
6  something that -- whether Mr. --
7          MISS SUM:  You are making speaking objection
8  after speaking objection.  You are not here to tell the
9  witness how to testify, and that's exactly what you're
10 doing, and that is not proper conduct.
11         Madam Court Reporter, could you please read
12 back the question.
13         (Question read.)
14         MR. HALPIN:  Objection.
15         THE WITNESS:  I wouldn't expect him to know,
16 but I have no idea.  No, I don't know.
17         MISS SUM:  All right.  Why don't we go ahead
18 and take a ten-minute break right now.  Is that
19 sufficient for you, Mr. Kurisko?
20         THE WITNESS:  Yeah, sure.
21         THE VIDEOGRAPHER:  We're going off the record
22 at 1:06 p.m.
23         MISS SUM:  Thank you.
24              (Recess.)
25         THE VIDEOGRAPHER:  We're back on the record

**Page 52**

1  at 1:20 p.m.
2      Q.  BY MISS SUM:  Okay.  Can we bring back up
3  Exhibit 50, please.
4          THE VIDEOGRAPHER:  One second.
5      Q.  BY MISS SUM:  All right.  Mr. Kurisko, can
6  you see Exhibit 50?
7      A.  Let me bring it up on my side.
8          Yes, I can.
9      Q.  Yes.  We brought this up before.
10     A.  Yes.
11     Q.  Okay.  So I'm going to ask that the court
12 reporter [sic] to scroll through it to make sure you've
13 seen all the pages in Exhibit 50.
14         MR. HALPIN:  Miss Sum, just a clarifying
15 question.  Have we looked at Exhibit 50 previously, or
16 was it Exhibit 49?
17         MISS SUM:  Oh.  Well, I believe we went
18 through Exhibit 50, but if not, okay.
19         (Deposition Exhibit 50 marked for
20 identification.)
21     Q.  BY MISS SUM:  Mr. Kurisko, I've asked the
22 videographer to bring up Exhibit 50.  We'll just ask
23 you to take a look at the first page.
24     A.  Okay.
25     Q.  Okay.  Do you see, first page, the date on

**Page 81**

1  2:11 p.m.
2           (Recess.)
3       THE VIDEOGRAPHER:  We're back on the record
4  at 2:18 p.m.
5       Q.  BY MR. HALPIN:  So, Mr. Kurisko, isn't it a
6  fact that Craig Manderson from Speedtrader was the only
7  employee of Speedtrader or SureTrader that was in one
8  of your chat rooms?
9       A.  I'm not 100 percent positive on that, but
10 that's the person I remember the most.
11      MR. HALPIN:  And if we could pull up our
12 Exhibit 1...
13         (Deposition Exhibit 1 marked for
14 identification.)
15      Q.  BY MR. HALPIN:  And while we're doing that,
16 Mr. Kurisko, I believe you mentioned earlier the
17 Wayback Machine.  Are you familiar with the Wayback
18 Machine?
19      A.  Yeah.
20      Q.  Can you kind of explain for me what the
21 Wayback Machine is?
22      A.  It takes a snapshot of a website at a time,
23 you know, going way back.
24      Q.  And I believe you also testified you did one
25 write-up on SureTrader.  Do you remember that?

**Page 82**

1       A.  Yeah, I did.  I know I did one.
2       Q.  And do you recall when that was?
3       A.  Not really.
4       Q.  If you take a look at Exhibit 1, do you
5  recall --
6       A.  It had to be --
7          (Zoom interference.)
8          (Interruption by the court reporter.)
9       Q.  Do you recall when you would have made that
10 one write-up about SureTrader?
11      A.  I'm just saying that it probably was around
12 the time we had the agreement.
13      Q.  And I'll represent to you that this is --
14 these are screenshots from the Wayback Machine taken
15 today showing...
16         Well, let me direct your attention to the top
17 right.  Do you see September 12, 2012 in a black box?
18 Do you see that?
19      A.  Yes, I do.
20      Q.  And do you see the URL
21 https:bacwww.daytradingradio.com/pages/preferredbroker?
22 Do you see that?
23      A.  Yes, I do.
24      Q.  And does this refresh your recollection as to
25 the one...

**Page 83**

1          Strike that.
2          This is the one write-up you referred to when
3  you testified earlier; correct?
4       A.  Yeah, yeah.
5       Q.  And this was posted in 2012; right?
6       A.  Looks like it.
7       Q.  And I don't know if you got the documents we
8  e-mailed, or we can scroll through and you can take a
9  look, if you'd like.
10         And this is the write-up you did in 2012 on
11 SureTrader; right?
12      A.  Yeah.
13      MR. HALPIN:  We can take that down and pull
14 up Exhibit 2.
15         (Deposition Exhibit 2 marked for
16 identification.)
17      Q.  BY MR. HALPIN:  And do you know how long that
18 write-up was on the Day Trading Radio website?
19      A.  Honestly, I don't.
20      Q.  It was taken down -- it was taken down in
21 2016, wasn't it, the actual page?
22      A.  If that's what it says, then it was, but I
23 don't know.  It's something I don't know.  I mean, I'll
24 go with the Wayback Machine.  If it says it was off
25 then, it was off.

**Page 84**

1       Q.  If we zoom in here on Exhibit 2, we can see
2  the same URL ending in "preferredbroker."  Can you see
3  that?
4       A.  Yeah.
5       Q.  And do you see, say, between -- say 50 times
6  between September 12th, 2012 and August 11th, 2016?  Do
7  you see that?
8       A.  Yes.
9       Q.  So -- and do you see any other -- there
10 aren't any other captures after --
11      A.  No, no.
12      Q.  -- right?  So that means that the page was no
13 longer accessible after August 2016; right?
14      A.  That's correct.
15      MR. HALPIN:  All right.  You can take that
16 down.
17      Q.  BY MR. HALPIN:  In fact, even though the page
18 was accessible until August of 2016, in fact, it was no
19 longer linked directly from the Day Trading Radio home
20 page earlier than that; right?
21      A.  Yeah, you're probably right on that.
22      MR. HALPIN:  Can we pull up Exhibit 3,
23 please.
24         (Deposition Exhibit 3 marked for
25 identification.)

**Page 85**

1  Q. BY MR. HALPIN: And if we can...
2      You see this is a capture from the Wayback
3  Machine from January 10, 2015? Do you see that in the
4  top right?
5  A. Yes.
6  Q. And the URL for the capture is
7  daytradingradio.com. Do you see that?
8  A. Yes.
9  Q. And that's your website; right?
10 A. Yes.
11 Q. And then if you scroll down on this exhibit,
12 I'll represent to you that this gray box is the link
13 that appears when hovering over this historical version
14 of your website. Do you see that gray box at the
15 bottom?
16 A. Yes.
17 Q. And it's directing -- as of January 10th,
18 2015, it's directing to the URL ending in
19 "preferredbroker"; right?
20 A. Yes.
21 Q. So as of January 10th, 2015, it's directing
22 to that write-up; correct?
23 A. Yes.
24     MR. HALPIN: You can take down Exhibit 3 and
25 pull up Exhibit 4.

**Page 86**

1      (Deposition Exhibit 4 marked for
2  identification.)
3  Q. BY MR. HALPIN: And this is another capture
4  from the Wayback Machine. Do you see it's from
5  February 5th, 2015? Do you see that?
6  A. Yep.
7  Q. And you also see this is the same URL as the
8  main site, daytradingradio.com; correct?
9  A. Yes, yes.
10 Q. And now I'll represent this gray box at the
11 bottom is what shows when hovering over the SureTrader
12 banner. Do you see that?
13 A. Yes.
14 Q. And do you see it directs to just the
15 SureTrader website?
16 A. Yes.
17 Q. So as of February 5th, 2015, on the main
18 page, you were not linking directly to your SureTrader
19 review on your website; correct?
20 A. I don't know if there was any other links on
21 the page directing you to that, but I guess the main
22 Day Trader has a banner up on top, the banner
23 underneath there, there's a link says "Day Trading
24 Radio, preferred broker, click here for more
25 information." I think that was the link.

**Page 87**

1  Q. I'm representing to you, if you hover your
2  cursor over that banner, this is the URL that shows up.
3  A. All right. Then it did not point --
4  Q. So --
5  A. I was saying that the link, I don't know if
6  the banner went directly to the site and my write-up.
7  I had a separate link to the write-up, which I believe
8  was right underneath the banner. It says "click more."
9  So if that's where you're pointing at, then, yes,
10 you're correct.
11     MR. HALPIN: Okay. We can take this down.
12 Q. BY MR. HALPIN: Mr. Kurisko, I think you
13 testified earlier that you hadn't spoken with anyone
14 from the SEC about this case before Miss Sum yesterday
15 evening; is that correct?
16 A. About this case, about this one, I don't
17 know. I was contacted probably a year or two ago,
18 again about something. I don't know if that referenced
19 this or something else.
20 Q. Were you contacted at any point in time about
21 this case prior to March of 2021?
22 A. I don't believe so. I don't think so.
23 Q. And have you ever seen a copy of the
24 complaint in this case?
25 A. No. When I was contacted, I looked it up on

**Page 88**

1  the internet to see what was going on.
2  Q. So you didn't have any input...
3      To the extent there are allegations regarding
4  Day Trading Radio in the SEC's complaint in this case,
5  you had no input into that content; correct?
6  A. Meaning what? I didn't understand that.
7  Q. You weren't asked to provide any information
8  for the SEC's use in drafting its complaint, were you?
9  A. I had to submit financials at one point to
10 the SEC, but I'm not sure if that was a year or two
11 years ago, and I don't know what case that was for.
12 Q. You never saw -- you never were asked to
13 provide input on a complaint in SEC v. MintBroker and
14 Guy Gentile; correct?
15 A. Like I said, I had to supply my financial
16 records to SureTrader at one point, and I don't know if
17 that was in reference to this site being prepared,
18 because that seemed like that was about over a year
19 ago.
20 Q. Okay. Mr. Kurisko, you never agreed with Guy
21 Gentile to solicit U.S. customers on SureTrader's
22 behalf in violation of U.S. law; correct?
23 A. No.
24     MISS SUM: Objection.
25 Q. BY MR. HALPIN: And you never agreed with

**Page 89**

1 anyone else at SureTrader to solicit U.S. customers in
2 violation of U.S. law; correct?
3     MISS SUM: Objection.
4     THE WITNESS: No.
5     Q. BY MR. HALPIN: And you're not aware of
6 anyone else affiliated with Day Trading Radio who
7 agreed with Mr. Gentile or anyone else at SureTrader to
8 solicit U.S. customers on SureTrader's behalf in
9 violation of U.S. law; correct?
10     MISS SUM: Objection.
11     THE WITNESS: Correct.
12     Q. BY MR. HALPIN: We're going to pull up --
13 quickly pull back up our Exhibit 1.
14     And this is the write-up we were just
15 discussing that you authored in 2012. Do you see that?
16     A. Yes.
17     Q. And you testified earlier about a marketing
18 services agreement. This write-up predates that
19 agreement; right?
20     A. If it does, I mean, I didn't -- I'm not
21 checking the dates, but...
22     Q. I'll represent to you that you signed the
23 marketing services agreement on August 1st, 2016. Do
24 you recall that?
25     A. Yes.

**Page 90**

1     Q. And this is from 2012; correct?
2     A. If that's what it says, then it's correct,
3 yes.
4     Q. So there are no -- we haven't looked today at
5 any invoices to SureTrader from 2012; correct?
6     A. I don't think so, no.
7     Q. And they don't exist, do they?
8     A. I don't believe so.
9     Q. So you wrote this write-up before your
10 written agreement with SureTrader; correct?
11     A. I guess so. I guess I did.
12     Q. And this wasn't -- this write-up wasn't
13 pursuant to that marketing services agreement; correct?
14     A. I don't think so. If it was before it, yeah.
15 No, I guess it wouldn't be. I mean...
16     You know.
17     MR. HALPIN: Thank you, Mr. Kurisko.
18     Can we just take another short five-minute
19 break? We may be finished, but we're off the record.
20     MISS SUM: I expect to have very short
21 redirect.
22     MR. HALPIN: Okay.
23     THE VIDEOGRAPHER: We're going off the record
24 at 2:31 p.m.
25         (Recess.)

**Page 91**

1     THE VIDEOGRAPHER: We're back on the record
2 at 2:37 p.m.
3     MR. HALPIN: Mr. Kurisko, thank you very much
4 for your time. We appreciate it. We have no further
5 questions.
6     THE WITNESS: Okay.
7     MISS SUM: All right, I have a short redirect
8 of Mr. Kurisko, just a few follow-up questions.
9             FURTHER EXAMINATION
10 BY MISS SUM:
11     Q. All right. I am going to bring up on screen
12 what I've marked as Exhibit 58, Mr. Kurisko. This was
13 not previously sent to you from our transmission
14 earlier today, so I will bring it up as a share on my
15 screen.
16     (Deposition Exhibit 58 marked for
17 identification.)
18     MISS SUM: Does everyone see a PDF? Anybody?
19     MR. HALPIN: I see it.
20     MISS SUM: Okay. I just want to make sure
21 you all can see it.
22     THE WITNESS: I see it.
23     Q. BY MISS SUM: Okay. Thank you.
24     Mr. Kurisko, do you see a document that I've
25 marked as Plaintiff's Exhibit 58 on the screen?

**Page 92**

1     A. Yes.
2     Q. Okay. Do you recall last year the SEC
3 issuing a subpoena for documents to Day Trading Radio?
4     A. Yes.
5     Q. Do you recall signing a declaration
6 certifying records of regularly conducted business
7 activity?
8     A. Yes.
9     Q. And do you see in front of you Plaintiff's
10 Exhibit 58? Is that your signature on Plaintiff's
11 Exhibit 58?
12     A. Probably. It's not my -- it's a
13 computer-generated signature.
14     Q. Okay. Do you have any reason to believe that
15 you did not execute this declaration?
16     A. No.
17     Q. Okay. And in conjunction with you executing
18 this declaration, do you recall producing Day Trading
19 Radio's invoices for services provided to SureTrader?
20     A. Yes.
21     Q. I believe earlier you testified that you were
22 not directly involved in creating the invoices; is that
23 correct?
24     A. Correct.
25     Q. But otherwise, these invoices that we have