# EXHIBIT J

| | |
|---|---|
| **From:** | Guy Gentile <guy@stockusainc.com> |
| **Sent:** | Monday, June 17, 2013 3:45 PM |
| **To:** | philip@suretrader.com |
| **Cc:** | justin@suretrader.com |
| **Subject:** | SEC Rule 15a-6 |
| **Attachments:** | SEC Rule 15a-6.pdf |

1

SEC-FL-03848-E-0010576

# Swiss America Securities Limited

# Policy and Procedures

# For Compliance with

## U.S. Securities and Exchange Commission Rule 15a-6 exemption.

**Exemption**

Rule 15a-6 under the Securities Exchange Act of 1934 provides conditional exemptions from broker-dealer registration for foreign broker-dealers[1] that engage in certain specified activities involving U.S. investors. These activities include: 1. Effecting unsolicited securities transactions.

In addition to not soliciting securities transactions the firm will also have a disclaimers on its website, facebook and twitter; stating "Swiss America Securities, Ltd does not service accounts for U.S. citizens, U.S. residents or U.S. corporations." The firm will also have a popup and its suretrader.com website stating this. If a U.S. Investor insists on opening an account the firm will have all U.S. investors that open an account sign a NON-Solicitation Agreement.

**Below are all the things Swiss America will not do to insure compliance with SEC Rule 15a-6.**

Do not offer IBC services.
Do not DTC/DWAC/ACAT or process any certificates for penny stocks.
Do not maintain brokerage accounts in the U.S.
Do not mail anything to U.S clients/residents.
Do not compare our firm to U.S. firms.
Do not mention the words offshore brokerage.
Do not discuss taxes, other than say "It's the client's reasonability to pay taxes or to ask a tax attorney".
Do not promise any confidentiality, or asset protection.
Do not only show U.S market quotes on website.
Do not write anything in American English, Use British English.
Do not charge fee in U.S dollars, use BSD dollars.
Do not have any U.S. depository on the website.
Do not advertise in the U.S.
Do not call U.S. investors to open an account even if they contact us first.
Do not call U.S. clients to place any trades.
Do not give U.S. phone numbers to U.S. Investors
Do not put a U.S. phone/fax on the website
Do not meet with U.S. Investors in the U.S.
Do not recommend Securities to trade.

6/17/13 Division of Trading and Markets Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers; March 21, 2013; Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 4 of 14



**U.S. Securities and Exchange Commission**

# Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers

**Division of Trading and Markets:**

**March 21, 2013 (Updated June 6, 2013)**

The following answers to frequently asked questions were prepared by and represent the views of the staff of the SEC's Division of Trading and Markets ("staff"). They are not rules, regulations, or statements of the SEC, and do not have the approval or disapproval of the SEC.

The staff may update these questions and answers periodically. In each update, the questions added after publication of the last version will be marked with "MODIFIED" or "NEW."

**For Further Information Contact:** David W. Blass, Chief Counsel, at (202) 551-5165, Paula R. Jenson, Deputy Chief Counsel, at (202) 551-5554, Joseph Furey, Assistant Chief Counsel, at (202) 551-5760, or Andrew R. Bernstein, Branch Chief, at (202) 551-5565, Office of Chief Counsel (with regard to broker-dealer registration requirements); Michael A. Macchiaroli, Associate Director, at (202) 551-5525, Thomas K. McGowan, Deputy Associate Director, at (202) 551-5521, Mark M. Attar, Branch Chief, at (202) 551-5889, or Carrie A. O'Brien, Special Counsel, at (202) 551-5640, Office of Financial Responsibility (with regard to financial responsibility requirements), Division of Trading and Markets, Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.

## Background

Rule 15a-6 under the Securities Exchange Act of 1934 provides conditional exemptions from broker-dealer registration for foreign broker-dealers[1] that engage in certain specified activities involving U.S. investors. These activities include:

1. Effecting unsolicited securities transactions;

2. Providing research reports to major U.S. institutional investors, and effecting transactions in the subject securities with or for those investors;

3. Soliciting and effecting transactions with or for U.S. institutional investors or major U.S. institutional investors through a "chaperoning broker-dealer"[2]; and

4. Soliciting and effecting transactions with or for registered broker-dealers, banks[3] acting in a broker or dealer capacity, certain international organizations, foreign persons temporarily present in the U.S., U.S. citizens resident abroad, and foreign branches and agencies of U.S. persons.[4]

SEC-FL-03848-E-0010578

In adopting Rule 15a-6, the SEC sought "to facilitate access to foreign markets by U.S. institutional investors through foreign broker-dealers and the research that they provide, consistent with maintaining the safeguards afforded by broker-dealer registration," and "to provide clear guidance to foreign broker-dealers seeking to operate in compliance with U.S. broker-dealer registration requirements."[5]

Since that time, the staff has provided guidance on the operation of Rule 15a-6 in various no-action letters. For example, in a 1996 letter to counsel for seven registered broker-dealers, staff indicated that they would not recommend enforcement action to the SEC if a foreign broker-dealer affiliated with any of the firms named in the letter (each, a "U.S. Affiliated Foreign Broker-Dealer") effected transactions in Foreign Securities (as defined therein) with a U.S. Resident Fiduciary (as defined therein) for Offshore Clients (as defined therein) without the U.S. Affiliated Foreign Broker-Dealer either registering with the SEC or effecting the transactions in accordance with Rule 15a-6.[6] The following year, staff informed counsel to nine registered broker-dealers (including all of the firms party to the Seven Firms Letter) that they would not recommend enforcement action to the SEC if any U.S. Affiliated Foreign Broker-Dealer (as modified to reflect the addition of two additional firms party to the letter) engaged in certain activities without the U.S. Affiliated Foreign Broker-Dealer either registering with the SEC as a broker-dealer or effecting the transactions in accordance with Rule 15a-6.[7] Among other things, the Nine Firms Letter:

1. Established an expanded interpretation of the definition of "major U.S. institutional investor" to include "any entity, including any investment adviser (whether or not registered under the Investment Advisers Act), that owns or controls (or, in the case of an investment adviser, has under management) in excess of $100 million in aggregate financial assets," subject to certain limitations set forth in the letter;

2. Permitted a foreign broker-dealer or its agent, in reliance on Rule 15a-6(a)(3), to transfer funds or securities directly to a U.S. institutional investor or its agent so long as: (i) the transactions involve Foreign Securities (as defined in the Seven Firms Letter) or U.S. government securities; (ii) the foreign broker-dealer agrees to make available to the chaperoning broker-dealer all clearance and settlement information related to such transfers; (iii) the foreign broker-dealer is not acting as a custodian of the funds or securities of the U.S. investor; and (iv) the foreign broker-dealer is not in default to any counterparty on any material financial market transaction; and

3. Permitted foreign associated persons of a foreign broker-dealer, without the participation of an associated person of a chaperoning broker-dealer, to (i) engage in oral communications from outside the U.S. with U.S institutional investors (that do not qualify as major U.S. institutional investors) where such communications take place outside of the trading hours of the New York Stock Exchange, so long as the foreign associated persons do not accept orders to effect transactions other than those involving Foreign Securities, and (ii) have in-person contacts during visits to the U.S. with major U.S. institutional investors (as such definition was expanded in the letter), so long as the number of days on which such in-person contacts occur does not exceed 30 per year and the foreign associated persons engaged in such in-person contacts do not accept orders to effect securities

SEC-FL-03848-E-0010579

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 6 of 14

transactions while in the U.S.[8]

In addition, staff has provided responses to certain frequently asked questions regarding the application of Regulation AC to research activities of foreign broker-dealers, including foreign broker-dealers that rely on the exemption from U.S. broker-dealer registration in Rule 15a-6(a)(2).[9] Notwithstanding this existing guidance, market participants have asked the staff to provide additional guidance with respect to the operation of the rule. Some of the more frequently asked questions are discussed below.

**Answers to Frequently Asked Questions**

**Question 1: For purposes of Rule 15a-6(a)(4)(iii), would a foreign person be considered to be "temporarily present in the United States" if the person is in the U.S. for a finite period of time for employment, educational, or similar purposes and affirmatively acknowledges that he or she desires to maintain the existing relationship that had been established with the foreign broker-dealer prior to entering the U.S.?**

**Answer:** The determination of whether a foreign person is temporarily present in the United States will ultimately depend on the specific facts and circumstances of each particular situation.[10] However, the SEC noted in the Rule 15a-6 Adopting Release that a foreign person not otherwise deemed a resident of the U.S. under applicable law would be presumed to be temporarily present in this country for purposes of Rule 15a-6(a)(4)(iii).[11]

The staff believes that the SEC, in adopting Rule 15a-6(a)(4)(iii), intended to permit a foreign broker-dealer, without registering with the SEC, to effect transactions with a foreign person located in the U.S. with whom the foreign broker-dealer had a bona fide, pre-existing relationship before the foreign person entered the U.S., so long as such person: (1) is not a U.S. citizen and (2) is not a lawful permanent resident of the U.S. (*i.e.*, a "Green Card holder").

**Question 2: Could a foreign broker-dealer chosen by a foreign issuer to administer a global employee stock option plan ("ESOP") rely on Rule 15a-6(a)(1) to transmit communications regarding the ESOP to, and effect transactions in the foreign issuer's securities for, U.S. employees of the foreign issuer or its U.S. subsidiary?**

**Answer:** A foreign broker-dealer that administers or seeks to administer an ESOP or other plan that is an "employee benefit plan" as defined in 17 C.F.R. § 230.405, and that is established and administered in accordance with foreign law for a foreign issuer that is organized outside the U.S. and whose principal office and place of business are located outside of the U.S. would not, solely because of that activity, be considered to have solicited the U.S. employees or U.S. subsidiary, provided that the foreign broker-dealer:

- Deals exclusively with management and employee benefit representatives from the foreign issuer (so long as such persons are not located within the U.S.) in administering the plan; and

- Limits its activities with respect to U.S. persons to the following activities: (i) facilitating the transfer of the foreign issuer's securities to a U.S. person employed by the foreign issuer or its U.S. subsidiary; (ii) sending required plan documents, account statements, confirmations, privacy notices, prospectuses, proxy statements or

SEC-FL-03848-E-0010580

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers; March 21, 2013; Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 7 of 14

other legally required documents to the employee; and (iii) selling, transferring, or otherwise disposing of the foreign issuer's securities, in each case so long as the activities described in (i) through (iii) relate solely to foreign securities acquired by U.S. persons pursuant to the applicable employee benefit plan.

As a general matter, the staff believes that U.S. employees should not be precluded from participating in an employee benefit plan where the employing entity is a foreign issuer or a U.S. subsidiary of a foreign issuer. In such circumstances, the staff generally would consider a foreign broker-dealer administering the plan to have an ongoing securities business relationship primarily with the foreign issuer, and any solicitation by the foreign broker-dealer in ordinary circumstances would be directed to the foreign issuer, rather than to employees who happen to be present in the U.S.

The staff would not consider such conduct to involve the solicitation of a U.S. person even if the foreign broker-dealer actively solicits the foreign issuer as part of its efforts to become a plan administrator, so long as the foreign broker-dealer's active solicitation is performed entirely outside the U.S. and does not involve employees of the company who are located within the U.S.

By contrast, the staff likely would consider a foreign broker-dealer that went beyond the circumstances described in this FAQ as having solicited a U.S. person. As the SEC explained when adopting Rule 15a-6, "the deliberate transmission of information, opinions, or recommendations to investors in the United States, whether directed at individuals or groups, could result in the conclusion that the foreign broker-dealer has solicited those investors."[12]

Finally, to the extent the foreign broker-dealer is unable to rely on Rule 15a-6(a)(1) for these purposes, it would not be precluded from relying on any other applicable exemption from broker-dealer registration, such as Rule 15a-6(a)(4)(iii), which permits foreign broker-dealers to effect transactions with a foreign person temporarily present in the U.S., with whom the foreign broker-dealer had a bona fide, pre-existing relationship before the foreign person entered the U.S.[13]

**Question 2.1: Would the answer to question 2 be different if U.S. persons participating in a foreign issuer's employee benefit plan received, held or transferred their shares in the foreign issuer's securities pursuant to a sponsored American Depositary Receipt ("ADR") program?**

**Answer:** No. Staff recognizes that many companies use ADRs to raise capital or to establish a trading presence in the U.S. for a variety of legal or operational reasons. As explained in the answer to question 2, staff generally believes that U.S. employees should not be precluded from participating in an employee benefit plan where the employing entity is a foreign issuer or a U.S. subsidiary of a foreign issuer. Accordingly, staff believes that a foreign broker-dealer administering a foreign issuer's employee benefit plan in accordance with the limitations set forth in the answer to question 2 would not be considered to have solicited a U.S. person to the extent that distributions or transfers of the foreign issuer's securities were made pursuant to a sponsored ADR program, as opposed to directly in shares of the issuer's securities.[14]
**(NEW 3/28/2013)**

SEC-FL-03848-E-0010581

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers; March 21, 2013; Updated June ...

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 8 of 14

**Question 3: If a foreign broker-dealer effects an unsolicited transaction on behalf of a U.S. investor in reliance on Rule 15a-6(a)(1), may the foreign broker-dealer send confirmations and account statements to the U.S. investor in connection with such transaction?**

**Answer:** Yes. Staff would not consider a foreign broker-dealer to have solicited a U.S. investor solely because the foreign broker-dealer, in connection with effecting an unsolicited transaction for a U.S. investor under Rule 15a-6(a)(1), provides the U.S. investor with a confirmation of the transaction and periodic account statements. Similarly, a foreign broker-dealer may provide a U.S. investor, with or for which the foreign broker-dealer effects an unsolicited transaction, documents related to the transaction that are required under foreign law, such as a prospectus, proxy statement or a privacy notice. A foreign broker-dealer seeking to rely on Rule 15a-6(a)(1) may not, however, provide a U.S. investor with any document that includes advertising or other material intended to induce either a securities transaction or transactional business for the foreign broker-dealer or its affiliates.

**Question 4: Rule 15a-6(a)(3)(iii)(A)(2) requires a chaperoning broker-dealer to issue "all required confirmations and statements to the U.S. institutional investor or the major U.S. institutional investor" with respect to transactions effected thereunder. If required under foreign law, may the foreign broker-dealer send confirmations and account statements directly to U.S. counterparties?**

**Answer:** Yes. To the extent required by foreign law or as required by a firm's internal policies and procedures applicable to its global business operations, a foreign broker-dealer may send confirmations and account statements directly to U.S. counterparties. Notwithstanding the delivery of any document to the investor by the foreign broker-dealer, however, the chaperoning broker-dealer maintains an obligation to be sure that confirmations and account statements are sent to the investor that comply with all applicable U.S. requirements, including Rule 10b-10 under the Exchange Act and applicable self-regulatory organization rules. In addition, any confirmation or account statement sent to a U.S. counterparty by a foreign broker-dealer on behalf of a chaperoning broker-dealer must clearly identify the U.S. broker-dealer on whose behalf the document is sent.

**Question 5: May a foreign broker-dealer distribute research directly to major U.S. institutional investors pursuant to Rule 15a-6(a)(2) without any intermediation or other involvement of a registered broker-dealer in connection with the distribution of the reports, such as review, approval, or retention of the research reports so distributed or the maintenance of records?**

**Answer:** Yes. Rule 15a-6(a)(2) permits a foreign broker-dealer to furnish research reports to major U.S. institutional investors and to effect transactions in the securities discussed in the reports with or for those major U.S. institutional investors provided that certain conditions are satisfied.[15] The rule does not require that the distribution be made by a registered broker-dealer, even if the foreign broker-dealer has a chaperoning arrangement with a registered broker-dealer. Moreover, the chaperoning broker-dealer would not have any obligations with respect to a research report if the chaperoning broker-dealer was not involved in the distribution (*i.e.*, where the research was distributed directly by the foreign broker-dealer to major U.S. institutional investors) and it would not be required to

SEC-FL-03848-E-0010582

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers; March 21, 2013; Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 9 of 14

retain a copy of a research report that it did not ever possess.

It is important to keep in mind, however, that if the foreign broker-dealer has a chaperoning arrangement with a registered broker-dealer that satisfies the requirements of Rule 15a-6(a)(3), any transactions with the foreign broker-dealer in securities discussed in the research reports must be effected only through the chaperoning broker-dealer in compliance with the requirements of paragraph (a)(3). Among other things, Rule 15a-6(a)(3) requires the chaperoning broker-dealer to maintain all books and records relating to the transactions effected thereunder, including those required by Rules 17a-3 and 17a-4 under the Exchange Act. Accordingly, to the extent that a chaperoning broker-dealer obtains a copy of a research report distributed directly to major U.S. institutional investors by a foreign broker-dealer pursuant to Rule 15a-6(a)(2) (regardless of the source from which it was obtained), such research report should be retained by the chaperoning broker-dealer in light of its obligation to effect transactions in the relevant securities as described above.

**Question 6: Does the staff position in the Nine Firms Letter apply generally to foreign broker-dealers not affiliated with a registered broker-dealer?**

**Answer:** Yes. Although the no-action position in the Nine Firms Letter was based on representations regarding particular facts and conditions that included affiliation between the nine registered broker-dealers named in the letter and their affiliated foreign broker-dealers, the staff considers the position taken in the letter to apply as well to a foreign broker-dealer that has a chaperoning arrangement with an unaffiliated registered broker-dealer.[16]

**Question 7: Does the staff's expanded view of the term "major institutional investor" as set forth in the Nine Firms Letter apply to every provision of Rule 15a-6 in which that term is used?**

**Answer:** Yes. The staff's expanded view of the term "major U.S. institutional investor" applies to all provisions of Rule 15a-6, including paragraphs (a)(2) and (a)(3) of the rule.[17]

**Question 8: Does the staff position in the Seven Firms Letter apply generally to foreign broker-dealers not affiliated with a registered broker-dealer?**

**Answer:** Yes. For reasons similar to those discussed in the response to question 6, the staff considers the position taken in the Seven Firms Letter to apply to a foreign broker-dealer whether or not the registered broker-dealer with which it has a chaperoning arrangement is an affiliate.

**Question 8.1: Does the response in question 8 mean that a foreign broker-dealer would be required to have a chaperoning arrangement with a registered broker-dealer in order to rely on the Seven Firms Letter?**

**Answer:** No. The staff's position in the Seven Firms Letter applies without regard to whether the foreign broker-dealer has a chaperoning arrangement with a registered broker-dealer.
**(NEW 4/2/2013)**

**Question 9: Is a foreign broker-dealer able to rely on the exemption in

SEC-FL-03848-E-0010583

Rule 15a‑6(a)(1) to effect more than one unsolicited securities transaction on behalf of a single U.S. investor?

**Answer:** Staff would not ordinarily view a single securities transaction effected by a foreign broker-dealer on behalf of a U.S. investor in accordance with Rule 15a-6(a)(1) as precluding such foreign broker-dealer from relying on that same authority to effect one or more additional unsolicited securities transactions on behalf of the same U.S. investor, absent any other indicia of solicitation. This is largely due to the emphasis the SEC placed in the Rule 15a-6 Adopting Release on the importance of analyzing a foreign broker-dealer's efforts and activities to determine whether solicitation has occurred, as opposed to focusing merely on the number of securities transactions effected by a foreign broker-dealer.

Specifically, the SEC takes a broad view of what constitutes solicitation. In the context of broker-dealer registration, the SEC generally considers solicitation "as including any affirmative effort by a broker or dealer intended to induce transactional business for the broker-dealer or its affiliates. Solicitation includes efforts to induce a single transaction or to develop an ongoing securities business relationship."[18]

In the Rule 15a-6 Adopting Release, the SEC provided examples of conduct that it would consider to be solicitation by a foreign broker-dealer, including:

- Telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect transactions;
- Advertising directed into the U.S. of one's function as a broker or a market maker; and
- Recommending the purchase or sale of particular securities, with the anticipation that the customer will execute the recommended trade through the broker-dealer.

At the same time, however, staff would view a series of frequent transactions or a significant number of transactions between a foreign broker-dealer and a U.S. investor as being indicative of solicitation through the establishment of an "ongoing securities business relationship."[19]

Finally, the SEC, in adopting Rule 15a-6, also explained that because of the "expansive, fact-specific, and variable nature" of the concept of solicitation, it believes that "the question of solicitation is best addressed by the staff on a case-by-case basis, consistent with the principles elucidated in the [Rule 15a-6 Adopting Release]."[20]

**Question 10: What is the minimum net capital required for a registered broker‑dealer that has entered into a chaperoning arrangement with a foreign broker-dealer pursuant to Rule 15a-6(a)(3)?**

**Answer:** A registered broker-dealer that enters into a chaperoning arrangement with a foreign broker-dealer under Rule 15a-6(a)(3) is subject to a minimum net capital requirement of at least $250,000, unless the chaperoning broker-dealer has entered into a fully disclosed carrying agreement with another registered broker-dealer that has agreed, in writing, to comply with the SEC's broker-dealer financial responsibility rules with respect to the chaperoning arrangement. A chaperoning broker-dealer that has entered into such a carrying agreement is subject to a minimum net capital requirement of $5,000 or such other greater amount as would be

SEC-FL-03848-E-0010584

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers, March 21, 2013; Updated Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 11 of 14

required under Rule 15c3-1 based on the broker-dealer's activities.

**Question 11: What minimum net capital requirement applies to a registered broker-dealer acting as a chaperone to a foreign broker-dealer if the foreign broker-dealer's business under Rule 15a-6 is limited to M&A advisory services to a U.S. counterparty or a non-U.S. counterparty contemplating the acquisition of a company?**

**Answer:** If the foreign broker-dealer's business under Rule 15a-6 is limited to giving advice to a U.S. institutional investor or a major U.S. institutional investor contemplating an acquisition of a company, the chaperoning broker-dealer's minimum net capital requirement, by virtue of that activity, would be $5,000.

**Question 12: Can a registered introducing broker-dealer act as chaperone for a foreign broker-dealer under Rule 15a-6(a)(3) and rely on all the terms of the Nine Firms Letter if the registered broker-dealer has in effect a fully disclosed carrying agreement with another registered broker-dealer that has agreed to comply with the financial responsibility rules?**

**Answer:** Yes. The registered broker-dealer can act as a chaperone for a foreign broker-dealer under Rule 15a-6(a)(3) and rely on the Nine Firms Letter if it has in effect a fully disclosed carrying agreement with another registered broker-dealer that has agreed, in writing, to comply with the SEC's broker-dealer financial responsibility rules with respect to the chaperoning arrangement. In such an arrangement, the registered broker-dealer would be subject to a minimum net capital requirement of $5,000, or such greater amount as would be required under Rule 15c3-1 based on the broker-dealer's activities.

**Question 13: Can a registered introducing broker-dealer act as chaperone for a foreign broker-dealer under Rule 15a-6(a)(3) and rely on all the terms of the Nine Firms Letter if the registered broker-dealer has a minimum net capital requirement of $100,000 in accordance with Rule 15c3-3(k)(2)(i)?**

**Answer:** No. An introducing broker-dealer cannot rely on the Rule 15c3-3(k)(2)(i) exception and maintain net capital of $100,000 while acting as a chaperone for a foreign broker-dealer under Rule 15a-6(a)(3) and relying on the Nine Firms Letter. As stated in response to question 10, a registered broker-dealer that enters into a chaperoning arrangement with a foreign broker-dealer under Rule 15a-6(a)(3) is subject to a minimum net capital requirement of at least $250,000, unless the chaperoning broker-dealer has entered into a fully disclosed carrying agreement with another registered broker-dealer that has agreed, in writing, to comply with the SEC's broker-dealer financial responsibility rules with respect to the chaperoning arrangement.[21] A broker-dealer that maintains minimum net capital of at least $250,000 and relies on the Rule 15c3-3(k)(2)(i) exception or a broker-dealer that is fully computing under Rule 15c3-3 may operate under the Nine Firms Letter. This net capital requirement is based on the chaperone's responsibilities under Rule 15a-6(a)(3)(iii).

**Question 14: What is the minimum net capital required for a registered broker-dealer that has entered into an arrangement under Rule 15a-6(a)(3) with a foreign broker-dealer to act as a chaperone for DVP/RVP transactions with institutional investors?**

SEC-FL-03848-E-0010585

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers; March 21, 2013; Updated Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 12 of 14

**Answer:** A broker-dealer acting as a chaperone under Rule 15a-6(a)(3) for DVP/RVP transactions with institutional investors has a minimum net capital requirement of at least $250,000. The chaperoning broker-dealer cannot rely on the $100,000 minimum net capital requirement set forth in Rule 15c3-1(a)(2)(ii) that is available to broker-dealers exempt from Rule 15c3-3 under paragraph (k)(2)(i) of that rule. This net capital requirement is based on the chaperone's responsibilities under Rule 15a-6(a)(3)(iii).

**Question 15: Is a registered broker-dealer that acts as a chaperone in connection with securities transactions with a U.S. institutional investor or a major U.S. institutional investor required to take a net capital charge for failed transactions, even if the foreign broker-dealer is required to take a fails charge under foreign law?**

**Answer:** Yes, unless the chaperoning broker-dealer has entered into a fully disclosed carrying agreement with another registered broker-dealer as described in the response to question 10, in which case the carrying broker-dealer would be required to take the net capital charge for failed transactions. The existence of a carrying agreement does not relieve the chaperoning broker-dealer from maintaining books and records that identify open trades and failed transactions. The chaperoning broker-dealer can obtain this information directly from the foreign broker-dealer or another party but is responsible for ensuring that its books and records are accurate.

**Question 16: What other recordkeeping obligations apply to a registered broker-dealer that has entered into a chaperoning agreement with a foreign broker-dealer pursuant to Rule 15a-6(a)(3)?**

**Answer:** A registered broker-dealer acting as a chaperone for a foreign broker-dealer must comply with Rules 17a-3 and 17a-4. A chaperoning broker-dealer is required to make and keep current books and records that reflect trades between the U.S. customer and the foreign broker-dealer, including, but not limited to, transaction records and failed transaction records. The chaperoning broker-dealer may obtain this information from the foreign broker-dealer or another source; however, the chaperoning broker-dealer is responsible for the accuracy of its books and records. For example, a chaperoning broker-dealer may download information for its books and records, such as its ledger, from the foreign broker-dealer provided that the chaperoning broker-dealer's books and records are kept current.

**Question 17: Does the 30-day limit referred to in the Nine Firms letter that allows unchaperoned in-person contacts with major U.S. institutional investors during visits to the U.S apply to the foreign broker-dealer (the entity) or per associated person of a foreign broker-dealer?**

**Answer:** The 30-day limit referred to in the Nine Firms Letter applies per foreign associated person. This means that the number of days each foreign associated person of a foreign broker-dealer could participate in unchaperoned meetings in the U.S. is limited to no more than 30 days per year.[22]

In other words, a foreign associated person of a foreign broker-dealer may, without the participation or physical presence of an associated person of the chaperoning broker-dealer, have in-person contacts during visits to the U.S. with major U.S. institutional investors so long as:

SEC-FL-03848-E-0010586

6/17/13 Division of Trading and Markets: Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers, March 21, 2013; Update Updated June …

Case 1:21-cv-21079-BB Document 232-10 Entered on FLSD Docket 02/27/2024 Page 13 of 14

- the number of days on which such unchaperoned in-person contacts occur does not exceed 30 per year; and
- the foreign associated persons engaged in such in-person contacts do not accept orders while in the U.S. to effect securities transactions. **(NEW 6/6/2013)**

---

[1]   Rule 15a-6(b)(3) defines foreign broker-dealer to include "any non-U.S. resident person (including any U.S. person engaged in business as a broker or dealer entirely outside the United States, except as otherwise permitted by this rule) that is not an office or branch of, or a natural person associated with, a registered broker or dealer, whose securities activities, if conducted in the United States, would be described by the definition of 'broker' or 'dealer' in sections 3(a)(4) or 3(a)(5) of the [Exchange] Act."

[2]   For purposes of these FAQs, the term "chaperoning broker-dealer" means a registered broker-dealer that satisfies all of the requirements set forth in Rule 15a-6(a)(3)(iii) including, among other things, effecting transactions, issuing confirmations, maintaining books and records, participating in oral communications, and obtaining certain representations and consents.

[3]   As explained in the release adopting Rule 15a-6, the term "bank" is defined in section 3(a)(6) of the Exchange Act to mean a bank directly regulated by U.S. state or federal bank regulators.  Accordingly, a foreign bank is excluded from this term except to the extent that the "foreign bank establishes a branch or agency in the United States that is supervised and examined by a federal or state banking authority and otherwise meets the requirements of section 3(a)(6)." *See Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017 (July 11, 1989), 54 FR 30013, n.16 (July 18, 1989) ("Rule 15a-6 Adopting Release") (noting, however, that the determination whether any particular financial institution meets the requirements of section 3(a)(6) is the responsibility of the financial institution and its counsel) (internal citations omitted).

[4]   17 C.F.R. § 240.15a-6.

[5]   Rule 15a-6 Adopting Release at 54 FR 30013; *see also Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 25801 (June 14, 1988), 53 FR 23645 (June 23, 1988).

[6]   *See* Letter re: Transactions in Foreign Securities by Foreign Brokers or Dealers with Accounts of Certain Foreign Persons Managed or Advised by U.S. Resident Fiduciaries from Catherine McGuire, Chief Counsel, Division of Market Regulation to Giovanni P. Prezioso, Cleary, Gottlieb, Steen & Hamilton, dated January 30, 1996 ("Seven Firms Letter").

[7]   *See* Letter re: Securities Activities of U.S.-Affiliated Foreign Dealers from Richard R. Lindsey, Director, Division of Market Regulation to Giovanni P. Prezioso, Cleary, Gottlieb, Steen & Hamilton, dated April 9, 1997 ("Nine Firms Letter"), available at http://www.sec.gov/divisions/marketreg/mr-noaction/cleary040997.pdf.

[8]   *See id*.

[9]   *See* Responses to Frequently Asked Questions Concerning Regulation Analyst Certification, available at http://www.sec.gov/divisions/marketreg/mregacfaq0803.htm.

SEC-FL-03848-E-0010587

10 In addition to requiring that the foreign customer be "temporarily present in the United States," Rule 15a-6(a)(4)(iii) also provides that the foreign broker-dealer must have had a bona fide, pre-existing relationship with the foreign customer before such person entered the U.S." *See* 17 C.F.R. § 240.15a-6(a)(4)(iii). While the rule does not expressly require the type of affirmative acknowledgement described in the question, such representation would likely be useful in determining whether a bona fide, pre-existing relationship exists.

11 *See* Rule 15a-6 Adopting Release at 54 FR 30030. This presumption would be subject to rebuttal in light of all of the facts and circumstances surrounding the foreign person's presence in the U.S.

12 Rule 15a-6 Adopting Release at 54 FR 30021.

13 *See* 17 C.F.R. § 240.15a-6(a)(4)(iii); and Rule 15a-6 Adopting Release at 54 FR 30030-31. *See also* question 1 and the accompanying response.

14 Staff notes, however, that the position set forth in this response is limited to the facts described in the question and does not otherwise modify any requirements or restrictions applicable to the trading of ADRs pursuant to any existing statute, regulation or legal interpretation, including the limitation to the definition of "Foreign Security" contained in the Seven Firms Letter. *See supra* note 6.

15 *See* 17 C.F.R. § 240.15a-6(a)(2); Rule 15a-6 Adopting Release at 54 FR 30022-23. Specifically, the research reports must not recommend the use of the foreign broker-dealer to effect trades in any security, and the foreign broker-dealer may not initiate contact with the major U.S. institutional investor to follow-up on the research reports or otherwise induce or attempt to induce the purchase or sale of any security by the major U.S. institutional investor. Moreover, a foreign broker-dealer may not provide research to U.S. persons pursuant to any express or implied understanding that those U.S. persons will direct commission income to the foreign broker-dealer (*i.e.*, "soft-dollar" arrangements).

16 The staff believes that this view is consistent with the SEC's decision to adopt Rule 15a-6(a)(3) without, as initially proposed, requiring "any affiliation between the foreign broker-dealer and the registered broker-dealer through ownership or control." *See* Rule 15a-6 Adopting Release at 54 FR 30025 (noting that the rule, as proposed, would have required such affiliation). Notwithstanding this view, the U.S. and foreign broker-dealers would still have to meet the other conditions of the Nine Firms Letter.

17 *See* Letter re: Securities Activities of U.S.-Affiliated Foreign Dealers from Catherine McGuire, Chief Counsel, Division of Market Regulation to Giovanni P. Prezioso, Cleary, Gottlieb, Steen & Hamilton, dated April 28, 1997 (clarifying the no-action position taken in Nine Firms Letter).

18 Rule 15a-6 Adopting Release at 54 FR 30017-30018 (footnote omitted).

19 *See id.* The SEC has previously indicated that the exception in Rule 15a-6(a)(1) for unsolicited trades was designed to reflect the view that "U.S. persons seeking out unregistered foreign broker-dealers outside the U.S. cannot expect the protection of U.S. broker-dealer standards." *See* Rule 15a-6 Adopting Release at 54 FR 30031. In this regard, staff believes that if a foreign broker-dealer regularly effects transactions directly with or for a U.S. investor, the investor might reasonably expect to be protected by

SEC-FL-03848-E-0010588