# EXHIBIT A

**Page 21**

1 capital requirement was only $5,000 to get it going.
2 We filed the application. It probably took six to
3 nine months to get -- to get it approved.
4      And then I let Ralph Mann know. I
5 said, Hey, we have our own firm now. It's been
6 great. I appreciate all the help you've given me,
7 but we're going to basically move our clients into
8 our own broker-dealer.
9      And so it was a little process getting
10 that set up, getting the clearing firm set up, and
11 so on. And so I think it was the year 2000 or 2001
12 that we ended up getting the license. Probably 2001
13 is when I got the license.
14      And at that point, all the -- all the
15 staff moved to -- well, I guess were already
16 employees of the new firm and they got registered
17 with the new -- with the broker-dealer itself. We
18 moved the clients over, which was maybe 100 clients,
19 maybe 150.
20      And that's the -- I can't remember if
21 I had any other -- I eventually shut down
22 DayTrader Pro at that point, once I started my own
23 firm, and I just -- I wasn't running it anyway; I
24 had someone else running it for -- from the time I
25 became a broker, and it just wasn't profitable, so I

**Page 22**

1 ended up closing that company down.
2   Q.  When was that?
3   A.  Probably in the year 2000.
4   Q.  Okay.
5   A.  So just like a year. It probably lasted
6 like a couple of years. And --
7   Q.  And what is -- SpeedTrader, what was their
8 business in 2000-2001?
9   A.  It's -- so SpeedTrader -- the firm that we
10 became initially, SpeedTrader was a website of
11 Stock USA, Inc. It was a -- it was a California
12 broker-dealer out of San Diego owned by Ralph Mann.
13 And he might have had other owners. That's how it
14 originally started out.
15      And then once -- later on, when I
16 incorporated -- not incorporated. I had already
17 incorporated SpeedTrader.Com, Inc., what it was
18 called, I then became a FINRA member.
19      That firm was an online trading firm
20 that mainly catered to -- not investors, but catered
21 to active traders and, you know, equity -- U.S.
22 equities and options.
23      I don't recall having any other
24 businesses until probably 2008. I could have had
25 other businesses, I just don't remember them now if

**Page 23**

1 I did.
2   Q.  Before we get there, let's finish up with
3 SpeedTrader.
4      Is SpeedTrader still in business?
5   A.  I believe it is. Yeah. It is.
6   Q.  And what is your relationship to
7 SpeedTrader?
8   A.  I don't have any relationship with it right
9 now.
10  Q.  And did you end up selling it? How did
11 you --
12  A.  In 2010, it was put into a trust.
13  Q.  Okay.
14  A.  The holding company was put into a trust.
15 And it's for the benefit of my children.
16  Q.  Okay. Do you or your children get any
17 income from the trust --
18  A.  I mean --
19  Q.  -- currently?
20  A.  -- they could ask for a distribution
21 once -- I mean, now that they're -- two of them are
22 over 18, so they could ask for a distribution if
23 they wanted to.
24  Q.  What is the name of the trust holding
25 company or the -- what's the name of the holding

**Page 24**

1 company, and then what's the name of the trust?
2   A.  The holding company is call Mint Global
3 Holdings, Inc.
4   Q.  And are you the owner of Mint Global
5 Holdings?
6   A.  No.
7   Q.  Who are the shareholders of that?
8   A.  The trust is the shareholder, as far as I
9 know.
10  Q.  Okay. And you said your children are the
11 beneficiaries? Who is the trustee?
12  A.  Nicholas Abadiotakis.
13  Q.  And who is he?
14  A.  He is someone that I've known since
15 probably 2007.
16  Q.  He's a friend? Or banker? Both?
17      What's his relationship to you, I
18 guess?
19  A.  I would say that he's a friend. Yeah.
20  Q.  Okay. And the name of the trust?
21  A.  I believe it's called the Stock USA Trust.
22  Q.  And Mint Global Holdings, what other
23 companies are they the holder of?
24  A.  I don't know off the top of my head what
25 other companies they hold. It could hold other

```
 1   Q.  Okay.
 2   A.  -- under management.
 3   Q.  I'm not asking exactly.
 4       Was it more than $10 million?
 5       MR. FORD:  Objection.
 6   A.  It could have been more; it could have been
 7  less.  I just don't remember.
 8  BY MS. JOHNSON:
 9   Q.  Okay.  How many customers did Swiss America
10  have in 2016?
11   A.  I don't remember.
12   Q.  Was that more than $10,000?
13       MR. FORD:  Objection.
14   A.  I don't remember.
15  BY MS. JOHNSON:
16   Q.  How many customers did they have in 2017?
17   A.  I don't remember.
18   Q.  2018, do you remember?
19   A.  I don't remember.
20   Q.  How many customers in 2019?
21   A.  I don't remember how many customers the
22  firm had in each specific year.
23   Q.  Okay.  How about at its peak?  How many
24  customers did they have?
25   A.  It would be a guess, but --
                           45
```

```
 1       MR. FORD:  You don't need to
 2  guess.
 3   A.  -- there's a difference between how many
 4  customers it had and how many accounts it opened.
 5       I'm not really sure which question
 6  you're asking me.
 7  BY MS. JOHNSON:
 8   Q.  Okay.  Let's ask both.  How many
 9  accounts -- customer accounts did it have?
10   A.  Maybe between 40,000 and 50,000.
11   Q.  Okay.  That's at the peak?
12   A.  Yeah.  Accounts.
13   Q.  Okay.
14   A.  But most accounts are never either
15  completed or funded.  Probably -- my guess is
16  80 percent of them are never completed.
17   Q.  Okay.  How many customers, then, did you
18  have at the peak -- did SureTrader have?
19   A.  3,500 maybe.  4,000, in that range.  I just
20  don't remember exactly the number.
21   Q.  Okay.
22   A.  But I'm just going off of the approximation
23  of -- you know, if we had 50,000 people open
24  accounts -- that number rings a bell to me -- and
25  10 percent funded, it doesn't mean that we had 5,000
                           46
```

```
 1  accounts, though, because, over the years, people
 2  close their accounts.  So maybe 3,500.
 3   Q.  People come; people go; people trade.
 4       The general trend from 2016 to 2019,
 5  did you increase your customer base or decrease?
 6   A.  I don't remember if it increased.  I
 7  remember it just being consistent.
 8   Q.  Okay.  In 2016, what percentage of
 9  Swiss America/SureTrade's customers resided in the
10  United States?
11   A.  I don't know.
12   Q.  Was it more than 50 percent?
13       MR. FORD:  Objection.
14   A.  I don't know.
15  BY MS. JOHNSON:
16   Q.  We'll go to our first exhibit.  I'm going
17  to show you what I have previously marked as 68.
18       (Plaintiff's Exhibit 68
19       marked for identification.)
20  BY MS. JOHNSON:
21   Q.  Do you recognize this document?
22   A.  It's very blurry.
23       MR. FORD:  Can we actually go off
24  the record for a second?
25       MS. JOHNSON:  Yes.
                           47
```

```
 1       THE VIDEOGRAPHER:  Going off the
 2  record at 12:01.
 3       (Discussion off the record.)
 4       THE VIDEOGRAPHER:  We're back on
 5  the record at 12:02.
 6  BY MS. JOHNSON:
 7   Q.  Do you recognize what this is?
 8   A.  I've seen it -- I've seen this document,
 9  but I don't remember what's in it.
10   Q.  Okay.  I would not expect that.
11       It says, "AML Program Review of
12  Swiss America Securities."  There's a signature up on
13  the right-hand page.  Is that your signature?
14   A.  No.
15   Q.  Do you know whose that is?
16   A.  No.
17   Q.  And it says, "Prepared for Miles &
18  Stockbridge, P.C., and Stock USA Execution
19  Services."
20       Do you know why this was produced?  Why
21  Miles & Stockbridge was asking for this document?
22   A.  Well, it says it was prepared for Miles &
23  Stockbridge.
24   Q.  Right.  Do you know the circumstances that
25  this document was prepared?
                           48
```

**Page 57**

restaurant, and he just locked off the parking lot with no explanation, no nothing, so customers had nowhere to park. The revenue plummeted, and it was sayonara to the business.

Q. Okay. Any other businesses that you thought of?

A. If I remember them while we're talking, I'll just bring up.

Q. Just bring it up.

All right. Back to Swiss America/SureTrader. I'll show you what's been previously marked as Exhibit 24.

And do you recognize this?

A. Yes. I mean, I believe I've seen this before, but I don't remember when I saw it. I don't know if I saw it as a discovery thing that you have provided me or it was through some other means. But I have seen it.

Q. Okay. What is it?

A. It looks like a flowchart to me.

Q. An organizational chart of Swiss America Securities?

A. Yes.

Q. And just take a minute and look through it, and let me know if it correctly represents the

**Page 58**

employees and the officers of Swiss America Securities.

Start with you. Were you and Mr. Collie on the board of directors?

MR. FORD: And just -- there's a notation on the bottom right. Can you read that?

MS. JOHNSON: The last update, the 27th.

MR. FORD: Yeah.

A. On that date, I believe Antonio and I were both directors at that time.

BY MS. JOHNSON:

Q. Okay. Was there a date after that where you were not?

A. Yes.

Q. When was that?

A. When it was put into receivership.

Q. Okay.

A. But I also don't agree with the flow -- the way this is written out.

Q. Okay. What do you disagree with?

A. Well, Antonio and I are both directors. I was the chief compliance officer, but he was also the president, so he should be up here with me as

**Page 59**

well.

Q. Under "CEO" or under "President" -- where it says "President" --

A. Under "Board of Directors" --

Q. Okay.

A. -- there should just -- basically, the CEO should just basically be right here in the next line. And I'm just part of the executive team; I'm not an executive by myself here.

Q. Okay. And then was Mr. Collie the president and chief financial officer at the time?

A. Yes.

Q. Did he tree up to you? Who was his -- who was his superior?

A. He was a board of director -- right? -- so he was able to be autonomous in his decision-making.

Q. Could you have fired him?

A. I never fired him.

Q. But could you have? Did you have the authority to do that?

A. The shareholder could have got a resolution to bring in another director, but in the Bahamas, you're required to have two directors for a broker-dealer so that not one person can be autonomous by themselves. So you're required to

**Page 60**

have two directors at all times. And --

Q. And who was the shareholder in August of 2017?

A. Myself and -- and Michael Miller.

Q. Okay.

A. So I could have done a resolution to replace someone with someone else, but there would have still been always someone there. It wouldn't have just been me on my own.

Q. Okay. And then this says the chief compliance officer is Edward Cooper. Is that correct?

A. Where does it say that?

Q. The next line over. I'm just going left to right.

A. Yes. It does say that.

Q. And when did he become chief -- is that correct?

Was he the chief compliance officer?

A. I don't remember when he became the chief compliance officer. I know that there's probably a document out there from the Securities Commission saying when he became the chief compliance officer. But at some point, he was the chief compliance officer, to my recollection.

**Page 61**

1  Q. Okay. Who was the chief compliance officer
2  prior to Mr. Cooper?
3  A. Dorsett.
4  Q. And when did Mr. Dorsett become the chief
5  compliance officer?
6  A. When the firm started, he became the chief
7  compliance officer.
8  Q. Okay. So sometime around 2011-2012?
9  A. 2011.
10 Q. And then we have Mr. Darville was the
11 information technology person. Is that correct?
12 A. I don't not know if he was -- I don't think
13 he was an officer like this says. That's why I
14 don't think this document is correct. I don't --
15 Q. It doesn't have him as the chief technology
16 officer, it just says --
17 A. Oh. It just says "Open." Okay.
18 Q. Yeah.
19 A. He was one of the information technology
20 people.
21       There was more than one, but I just
22 don't remember at what time it just became him. It
23 could have been at this time that it was just him,
24 but there was, usually, I think, two people in that
25 role.

**Page 62**

1  Q. Okay. And for chief operating officer, it
2  has Yaniv Frantz?
3  A. Yes.
4  Q. What period of time did he serve in that
5  role?
6  A. I don't remember the years exactly, but I
7  think 2017 and '18. I think those -- I think those
8  are the years.
9  Q. Did anyone succeed him?
10 A. No.
11 Q. Okay. And then Justin Ritchie was the
12 deputy director?
13 A. Yes. I mean, he was, like, an office
14 manager, I would say. And that's -- and human
15 resources.
16 Q. Okay. And then Janay Symonette, she was
17 your chief marketing officer?
18 A. Correct.
19 Q. And was she that until 2019?
20 A. Yes.
21 Q. And did you have the -- could you have
22 fired or hired Janay?
23       First of all, did you hire Janay?
24 A. I recommended her to be hired.
25 Q. To who?

**Page 63**

1  A. To human resources. Justin. And then
2  he -- he hired her.
3        But most of the hiring was not done by
4  me at all, or most of the interviews were not done
5  by me.
6  Q. Who did the hiring?
7  A. Justin.
8  Q. Did you have the authority to fire any of
9  the executives on this list?
10 A. I'm trying to think if I actually ever even
11 fired a single person.
12 Q. My question was, did you have the
13 authority? And then we can move on to the did you.
14 A. I had -- I had authority. I believe I had
15 authority to -- I mean, it would have been a
16 discussion with Antonio, because if it's an officer,
17 I couldn't fire them on my own. I would have to
18 have a board resolution.
19       So it would have been something I
20 wouldn't have done on my own. It would have been
21 something I would have discussed with Antonio.
22 Q. Okay. What about non-officers?
23       What about, like, Mr. Ritchie or
24 Mr. Darville? Did you have the authority to fire
25 them?

**Page 64**

1  A. Again, that would have -- that's not
2  something I've ever -- I never did. That's
3  something that human resources would have -- would
4  have done. I didn't get involved into that other.
5  Q. If you wanted to be involved, did you have
6  the authority to fire them?
7       MR. FORD: Objection.
8  A. It would have been something I would have
9  talked to Antonio first, and then a decision would
10 have been made either between the two of us, if it's
11 an executive. If it's not an executive, I did not
12 get involved in any hiring and firing of
13 nonexecutives.
14 BY MS. JOHNSON:
15 Q. Did you have the authority?
16      MR. FORD: Objection. Asked and
17 answered.
18      MS. JOHNSON: He hasn't answered.
19 BY MS. JOHNSON:
20 Q. Did you have the authority to fire
21 Jasmine Sands?
22 A. I didn't fire her --
23      MR. FORD: Objection.
24 BY MS. JOHNSON:
25 Q. If you had wanted to fire her, could you

Page 65:

1  have done it without talking to anybody?
2         Did you have the authority?
3      A.  I would have never done that.
4      Q.  That's not my question.
5         Do you have the authority, if you
6  wanted to, to fire employees?
7      A.  I believe that --
8         MR. FORD:  Objection.
9      A.  -- it would have still have to have gone
10 through the board of directors, and the other
11 executives would have had to get together to make a
12 decision on that.  It's not something I would have
13 done autonomously.
14     BY MS. JOHNSON:
15     Q.  Okay.  Did you have the authority, prior to
16 August of 2017, to fire an employee?
17     A.  So let's just say from when?  Like, 2012 to
18 2016?
19     Q.  Yeah.
20     A.  Well, I mean, during -- during that time,
21 from 2012 to, let's just say, 2016, the people that
22 were actually running my firm was the FBI, the DOJ,
23 and the SEC.  They were completely controlling me,
24 so I had to do whatever they said.  So that's who
25 was really running my firm during those periods.

Page 66:

1      Q.  Could you have fired an employee, even
2  though they were involved?
3         MR. FORD:  Objection.  He just
4     answered your question.
5     BY MS. JOHNSON:
6     Q.  All right.  Okay.  Who at the SEC was
7  running your firm in 2012?
8      A.  What's the question?
9      Q.  Who at the SEC was running your firm in
10 2016?  Give me a name.
11     A.  Well, in 2012, I had a meeting with the
12 SEC --
13     Q.  I'm asking 2016.  Please stick to my
14 question.
15        2016:  Who from the SEC was running
16 your firm?
17     A.  Well, I said "between;" I didn't say 2016.
18 I said in between that range.
19     Q.  Okay.
20     A.  So from 2012 to when I stopped cooperating
21 with the FBI and the SEC, which was the sum- --late
22 2015.
23     Q.  Okay.
24     A.  From that time, I had to do whatever the
25 government told me to do.

Page 67:

1         And I -- I had a meeting with -- in
2  2012 -- I don't remember which month it was, maybe
3  November 2012 -- with six SEC attorneys --
4      Q.  Well, let's not go there yet.  I'll give
5  you the opportunity --
6         MR. FORD:  Well, wait.  Allow him
7     to answer the question.
8         MS. JOHNSON:  I didn't ask him
9     the question.
10        MR. FORD:  You asked him --
11        MS. JOHNSON:  I asked him in
12    2016.
13        MR. FORD:  You asked him who
14    was --
15        MS. JOHNSON:  I asked him in
16    2016 --
17        MR. FORD:  You asked him who
18    was --
19        MS. JOHNSON:  -- I did not ask
20    him about 2012.
21        (Simultaneous discussion.)
22        MR. FORD:  Alise, let's just --
23    let's just let him finish the --
24    A.  I remember that Simona Sun [sic] was there
25 from the SEC.  And --

Page 68:

1  BY MS. JOHNSON:
2      Q.  What year was this?
3      A.  From 2012, I had over a dozen meetings with
4  -- between the SEC, the FBI, and the DOJ --
5      Q.  Okay.  Let's just put a pin on that.  We
6  will get to it --
7         MR. FORD:  But you asked --
8  BY MS. JOHNSON:
9      Q.  -- and you'll have an opportunity --
10        MR. FORD:  But you asked him a
11    question who during this -- no.  You
12    asked --
13        MS. JOHNSON:  He's not answering
14    my question.
15        MR. FORD:  You asked who, and he
16    just said Simona Suh.  So he's naming the
17    people.
18        MS. JOHNSON:  We'll get -- that's
19    not the question I asked.
20        MR. FORD:  The question was who
21    from the SEC --
22        MS. JOHNSON:  Who in 2016 --
23        MR. FORD:  -- was assisting with
24    running the firm, and he's telling you.
25        MS. JOHNSON:  I said, Who in 2016

**Page 69**

1 was assisting in running your firm.
2 BY MS. JOHNSON:
3    **Q.**  Was there anybody in 2016?  We can go
4 back --
5           MR. FORD:  Ms. Johnson, we
6 know the --
7           MS. JOHNSON:  Let him answer the
8 question.
9           MR. FORD:  We know the timing --
10           MS. JOHNSON:  Are you instructing
11 him not to answer?
12           (Simultaneous discussion
13           interrupted by the reporter.)
14           MS. SUM:  Go ahead.  Go ahead.
15 Give him a monologue.
16           THE STENOGRAPHER:  I'm not
17 getting it.  I'm not getting it.  Sorry.
18    **A.**  Okay.
19 BY MS. JOHNSON:
20    **Q.**  My question is --
21    **A.**  Well --
22    **Q.**  -- and you can answer it however you want:
23 Who in 2016 -- you can repeat my question if you
24 want.
25           But who, in 2016 from the SEC, was

**Page 70**

1 running your firm?
2           MR. FORD:  Objection.
3       Foundation.  He never testified that
4       somebody was running his firm in 2016.
5 BY MS. JOHNSON:
6    **Q.**  Okay.  Go ahead.  Answer the question if
7 you can.
8    **A.**  So from 2012 to the middle of 2015, I had
9 over a dozen meetings with, like I said, the SEC,
10 the DOJ, and the FBI, with my attorneys there,
11 Adam Ford.
12           And in 2012 -- this is, like, probably
13 October-November range of 2012 -- the FBI -- or the
14 SEC asked me to explain to them, you know, how
15 SureTrader was running.
16           And I told them everything about the
17 firm.  I told them, you know, how it got clients,
18 what the firm did, and, you know, who the employees
19 were, who the customers were, how it got customers.
20           Never once did they ever tell me that
21 there was anything wrong with the way it was
22 operating.  They told me it was the opposite.  The
23 FBI told me, in front of the SEC there, that I was
24 not to change any way, in any form, how the firm was
25 operating; that I had to do whatever they said.

**Page 71**

1 The DOJ told me I had to do whatever
2 the SEC said to do, and whatever the FBI told me to
3 do, and I couldn't change anything.  That was the
4 main thing.  Don't change anything.  And, I believe
5 it's because they wanted to use the firm, which they
6 eventually did.
7           And to answer your question, in 2016,
8 you know, when the prior -- at the end of 2015 -- I
9 remember this.  December 31 of 2015, I resigned from
10 the firm completely as the director and CEO, and I
11 didn't come back to the firm until after the
12 indictment was dismissed, which was in probably late
13 January or February of 2017.
14           So during that time, I was not -- from
15 my recollection, I wasn't involved in the firm
16 during that time.  I had stepped away.  And the main
17 reason why I had did it at the time was because I
18 was negotiating a settlement with the SEC, which
19 would have required me to have stepped down,
20 which -- so I had prepared myself to step down.
21           And I had, you know, put -- you know,
22 just basically resigned, submitted my paperwork to
23 resign.  And then I didn't come back until after --
24 those -- that deal broke apart anyway with the SEC,
25 and I just stayed away.

**Page 72**

1    **Q.**  What was the time period you stepped away?
2    **A.**  I believe it was pretty much all of 2016.
3           And I didn't come back until probably
4 January of late -- late January of 2017, or
5 February.
6    **Q.**  Okay.  When you say "stepped away," did
7 you -- were you on the board of directors during
8 that time period?
9    **A.**  I resigned my -- I resigned as a board of
10 director.  I resigned as a CEO.  I was still, I
11 believe, a shareholder, but I had stepped away
12 completely from the firm.
13    **Q.**  Okay.  So you stepped away from the
14 operations of the company fully.
15           Were you involved at all in the
16 operations during that time.
17    **A.**  I mean, there might have been questions
18 that they had of just things that I may have had
19 information for.  Like, Hey, this happened, what do
20 we do.
21           There might have been some questions
22 that they may have called me about here and there,
23 but I wasn't -- I remember -- like, I was under
24 indictment at the time, so I was under -- what's it
25 called?  Supervised release of some sort.

**Page 73**

So I was restricted in my travel to some degree and -- and I had stepped away. So I wasn't involved.

Q. Okay. So back to my original question: Who, in 2016 from the SEC, was running your company?

MR. FORD: Objection.

BY MS. JOHNSON:

Q. You can answer.

A. I believe I answered that already. I said from 2012 -- from the middle of 2012 to the middle of 2015 is when I was told from the DOJ --

Q. I'm not asking about that time period. 2016. If you don't know, if you don't have a name -- I'm asking specifically in 2016.

A. Oh. In 2016. In 2016, the person that was controlling my firm was Sajjad from the SEC. He was -- he had an undercover operative working in my office, stealing documents on behalf of the SEC and providing them to the government while I was in active litigation with them and then forwarding those documents again to the DOJ, which was in active litigation also.

That's who was controlling my firm. Manipulating --

Q. How was Sajjad controlling your firm?

**Page 74**

A. He was telling a director to steal documents from the firm.

Q. Mr. -- who are you saying he told to steal from the firm?

A. He was telling lying Philip Dorsett to steal documents from my firm. And he was doing it at his request.

Q. All right. How is that controlling your firm?

Did -- Mr. Sajjad Matin, did he tell you what customers to accept?

MR. FORD: Objection. Foundation.

A. He -- he -- controlling the firm --

BY MS. JOHNSON:

Q. All right. Define "control" for me. What are you talking about when you say "control of the firm"?

A. Well, he threatened Philip Dorsett with criminal charges. There's a letter from Sajjad to Philip saying, Do this, or I'm going to potentially bring criminal charges against you, from my recollection of that.

And based on discovery, we found out that lying Philip Dorsett was working with Sajjad

**Page 75**

while I'm in active litigation with the SEC, and Sajjad was asking him to go into the firm and, say, Hey, look for these documents and get these documents and send them to me, you know?

And this guy's the chief compliance officer of the firm -- or the compliance officer at the firm being directed by the SEC on what to do under threat of being charged criminally. So, to me, that's a form of control.

Q. Okay.

A. Just the same way I was controlled by the DOJ, the FBI, and the SEC, Philip Dorsett was also controlled.

Q. All right. In 2016 --

A. The SEC has been really controlling this whole thing.

Q. -- who decided which customers to accept?

A. Philip Dorsett.

Q. Who decided what trades could be made in 2016?

A. Customers. Customers.

Q. Who decided what your marketing campaign would be in 2016?

A. Well, that would have been Janay.

Q. All right. What about in 2017? Who

**Page 76**

decided which customers to accept at the firm?

A. Is this after Philip Dorsett was fired?

Q. Yeah. After he left.

A. I mean, accepting clients is something that the -- that compliance would do. And Philip Dorsett is who laid out the compliance guidelines on how a customer should be accepted.

So I believe that the compliance department, even after his termination for stealing documents on behalf of the government, that those policies were probably very similar.

Q. Okay. Who was enforcing the policies in 2017?

A. That would have been -- the chief compliance officer should have been enforcing the policies of the company.

Q. Okay. Who was on --

A. And just to --

Q. -- the board of directors of 2016?

A. And just to -- just to add to that -- just to add to that, you know, all chief compliance officers would have known that if at any time that they needed any help, that they had legal -- legal staff. Not staff in house, but legal counsel that were retained by the firm; you know, Adam Ford,

### Page 89

1  as well before it launched.
2  **Q.** What's his name?
3  **A.** I don't remember who it was at that time.
4  **Q.** Okay. So this is back in 2012 or 2011?
5  **A.** '11.
6  **Q.** I'm going to show you what has previously
7  been marked as Plaintiff's Exhibit 63.
8      I'm going to show it to you in two
9  forms. This is from SureTrader's website, but this
10 is so small, we blew it up. And this is it blown up
11 in, hopefully, readable form.
12     THE STENOGRAPHER: And those are
13 both 63?
14     MS. JOHNSON: Yeah. We'll call
15 it Composite 63.
16 BY MS. JOHNSON:
17 **Q.** I'll give you a minute to look at it.
18     Do you recognize this?
19 **A.** No.
20     I mean, I recognize it. It says
21 "SureTrader" on it.
22     MR. FORD: Do we know when this
23 is from?
24 BY MS. JOHNSON:
25 **Q.** If you look at the last page, it was pulled

### Page 90

1  on 2018. June 1st, 2018, this was pulled from
2  SureTrader's website, and it will say
3  SureTrader.com.
4      MR. FORD: And do we have --
5  okay. I see. Because I have the -- I have
6  a Bates stamp for the declaration of
7  Russell Castillo, but I don't see this as
8  being -- do we have Bates stamp for the
9  screenshots?
10     MS. JOHNSON: The screenshot was
11 just one.
12     MR. FORD: Well, there's --
13     MS. JOHNSON: This is the blowup.
14 This is just the blowup of this.
15     MR. FORD: Oh, okay. Yeah.
16     MS. JOHNSON: So this is what he
17 pulled on June 1st.
18     MR. FORD: But we have -- what
19 I'm saying is, we have the declaration but
20 not the --
21     MS. SUM: Oh. Here it is.
22     Oh. I think this is because it
23 was a native file and a native only has, I
24 think, a stamp on those.
25     MS. JOHNSON: Okay. So it's 339.

### Page 91

1      MR. FORD: Okay. I see.
2  BY MS. JOHNSON:
3  **Q.** Okay. So, do you recognize this as a
4  screenshot of SureTrader's website in June of 2018?
5  **A.** I don't remember reading this, but if
6  that's what you tell me, that it was on the website,
7  I don't disbelieve it.
8  **Q.** Okay. The title is "7 Reasons Why You
9  Should Consider SureTrader."
10 **A.** Okay.
11 **Q.** And if we look at what's the second page of
12 the blowup --
13 **A.** Okay.
14 **Q.** -- it says -- this first big title bold,
15 "SureTrader Allows You to Avoid the Nasty PDT Rule."
16     And then if you go down three
17 sentences, the fourth sentence starts: "Remember
18 FINRA, the killjoy financial industry regulatory
19 authority?
20     "Well, they have this annoying rule
21 about having $25,000 in equity before you're allowed
22 to be a pattern day trader. It's called the PDT,
23 pattern day trader rule."
24     And it continues: "What is the pattern
25 day trader rule? In short, the PDT rule states you

### Page 92

1  need $25,000 in your margin account at all times, or
2  you can't trade more than three times in five
3  consecutive trading days."
4      Then: "There are many legitimate ways
5  to avoid the PDT rule, and SureTrader is one of the
6  best for new traders."
7      And then if you skip over to the next
8  sentence, it says: "Luckily, SureTrader means
9  business, and they are willing to level the playing
10 field. And with their robust tools, they have been
11 able to ensure that you can profit from pattern day
12 trading as long as you have the required minimum
13 funds to trade."
14     Did you draft this content?
15 **A.** No. I did not.
16 **Q.** Do you know who did?
17 **A.** I don't know who drafted it. Janay could
18 have hired a third party to do it. I don't know.
19     But I will say that in 2012, when I
20 was in one of those meetings with the SEC, I told
21 them that SureTrader was created to avoid the
22 pattern day trading rule.
23     And at no time did they tell me that
24 that was ever an issue. And they used the firm for
25 three whole years and never said one time that I was

**Page 93**

doing anything wrong. In fact, they told me on many occasions they didn't have a problem with the business.
   Q. Okay. Is FINRA a U.S. regulator?
   A. I believe so.
   Q. And what is the pattern day trader rule?
   A. I don't have the rule right in front of me, but I believe that it limits U.S. broker-dealers from allowing their clients to day trade more than three or four times within a five-day period.
      And unless you have $25,000 in your account, then you can day trade as much as you want. And if you have less than that, then you have to trade -- if you get stricken as a pattern day trader after the fourth or fifth time that you day trade, then you would be restricted to trading in cash for a period of time. I don't remember how long.
   Q. Okay. And the rule applies to persons who want to trade at a U.S. broker-dealer?
   A. It applies to U.S. broker-dealers.
   Q. Okay. What could a trader do at SureTrader that they couldn't do at a U.S. day trading firm?
   A. I'm sorry? Say that one more time.
   Q. What were you offering traders to do at SureTrader that they could not do with a U.S.

**Page 94**

trading firm?
      MR. FORD: Objection.
   A. Well, they can do -- they can day trade at a U.S. firm, they would just need to have $25,000 in their account.
   BY MS. JOHNSON:
   Q. Okay. So what was SureTrader doing that was different than that?
   A. It was not a member of FINRA, so it did not require a $25,000 minimum deposit in order to day trade.
   Q. What was your minimum deposit?
   A. I believe it was $500.
   Q. Did you have any minimums on how many times -- what was your margin requirements?
   A. It was similar to the U.S. in the sense of overnight margin was 2 to 1, and intraday margin in the U.S. -- some firms in the U.S. will give you 6 to 1 if you have what's called a portfolio margin E account.
      And we were also offering 6-to-1 leverage, and that was approved by the regulator in the Bahamas. I remember having a meeting with them specifically about offering 6-to-1 leverage, and then they authorized us to offer that leverage.

**Page 95**

      (Plaintiff's Exhibit 85 marked for identification.)
   BY MS. JOHNSON:
   Q. Let's go on to --
   A. Are we done with this exhibit?
   Q. Yeah. I think so.
      -- what's been premarked as 85.
      Oh. I meant to give you this one. I'm sorry. I don't want to give you the marked one.
      This is another web capture from the SureTrader website. Do you recognize it?
   A. What is the date of this screenshot?
   Q. It is May 11th, 2017.
   A. Okay.
   Q. And it says, "Contact us," and it has some phone numbers.
      Were these the ways that your clients could contact Swiss America Securities?
   A. Okay.
   Q. And if you look under "Telephone," it has a U.S. direct number. Is that correct?
   A. I do see that.
   Q. And under "VoIP Numbers" -- and you have to flip to the next page -- it says, "As a courtesy to our existing clients, we've added numbers that

**Page 96**

forward to our office phone line."
      And there's a United States number there.
   A. I see it.
   Q. Why did you offer that courtesy?
   A. I think that when this was implemented was -- when I wasn't working at the firm is when they implemented this system. And it was something that the Bahamas phone company was -- my understanding is that it was something that the Bahamas was offering as part of the phone package that they had at the office.
      I do remember asking -- I don't remember who I asked, but I remember asking about it because, from the time that I was there up until the end of 2015, I think we only had a Bahamanian phone number.
      And what I was explained is that -- that it's very expensive for customers to call a Bahamanian phone number, sometimes costing them at that time $1 to $2 a minute, and they were just trying to figure out a way to make it less expensive for existing customers to call them.
   Q. Okay. Let's go to exhibit -- I'll have to mark this, I think.

**Page 97**

           (Plaintiff's Exhibit 83
           marked for identification.)
BY MS. JOHNSON:
Q. Do you recognize this?
A. I haven't seen it yet.
Q. Okay. I'm sorry.
A. Yes. I see it.
Q. And do you recognize this as a screenshot of SureTrader.com's -- from SureTrader.com's website?
A. It looks like it came from that website. Yeah.
Q. And it says "Account Fees" and --
A. Hang on one second.
Q. -- it lists $40 USD/BSD outgoing funds, $50 USD/BSD inactivity fee quarterly, $25 USD/BSD per day margin.
   What are those?
A. Well, outgoing wire fee would have been a pass-through fee of what the bank was charging someone to send a wire out.
   And it says USD for U.S. dollar, BSD for Bahamian dollar. The U.S. dollar and the Bahamanian dollar is pegged one-for-one, so Bahamas does business in both U.S. dollars and Bahamanian

**Page 98**

dollars, because it's pegged one-to-one. So that's the reason why it has that.
   And a $50 inactivity quarterly fee was mainly to cover the cost of like web-based software that the firm didn't charge people for. So it would get charged maybe $12 a month, approximately, for that.
   So if you take $12 and you times that by 3, you get close to $50, which is basically just to cover that pass-through fee of software fee for web-based users.
   And the $25 margin call fee would have been in the event that someone went on a -- I believe, an overnight basis of over 50 percent, or over 2-to-1 leverage.
Q. Okay.
A. Are we done with this one?
Q. We're done with that one.
           (Plaintiff's Exhibit 80
           marked for identification.)
BY MS. JOHNSON:
Q. Do you recognize this as a screenshot of SureTrader's website?
A. I mean, I don't remember this specific layout, but -- it may have changed over time, but I

**Page 99**

just don't remember it. But yeah. It looks like SureTrader's website.
Q. Okay. It says "Trade Rates" --
A. Is this the same page over and over? Or no. It's not.
   Okay. I see that.
Q. "Trade rates."
   And it says, "Commissions, U.S. stocks, U.S. options, routing fees."
   And it says -- listing their commissions for the trading in U.S. stocks and U.S. options. Is that correct?
A. That's what it says. Yes.
Q. And it has the fees listed there per trade?
A. Yes.
Q. I don't see anything for Canadian equities.
   Were you selling them in 2017, or allowing customers to trade in them in 2017?
MR. FORD: Objection.
A. This is the same page over and over, unless it's different in some way.
BY MS. JOHNSON:
Q. I have trade rates on the first page, commissions on the back.
A. I remember there being a rate for

**Page 100**

international transactions, but I don't -- maybe it got cut off on this? I just don't see it.
   But I do remember it having a rate for international -- it could be covered under the call-in trades are an additional $25. Maybe it would have been covered under that.
Q. Okay. And there's -- on the front page, there's a little pop-up box, "SureTrader Santina Customer Support."
   "We're here to help. Ask our customer support people any questions you may have."
A. Okay.
Q. When would that box appear?
A. That box would -- I don't know if there was a timer for it popping up after 30 seconds or so. I just don't -- I don't remember how that was set up.
   But in order to get to the website, you would have to have gone through a pop-up first, and I don't remember exactly what that pop-up said. When the -- the pop-up transformed over the years.
   When it first started in 2011 -- or late 2011, early 2012, the pop-up blocker would pop up for every single person with some type of disclaimer that it's not intended for U.S. persons, and maybe something else.

**Page 105**

(Plaintiff's Exhibit 84 marked for identification.)

BY MS. JOHNSON:

Q. Okay. We are showing you what has been marked as Plaintiff's Exhibit 84, which is another screenshot from the SureTrader.com website. This one is the section on funding and banking.

And it says -- it lists different ways in which you can fund a SureTrader account. And if you look on what's marked at the bottom 380 --

A. 380?

Q. It's about the fourth page in.

A. Okay.

Q. The page that says "ACH."

A. Okay.

Q. It says "Available currencies, ACH" -- I'm sorry. "ACH; Available currencies, U.S. dollars; estimated transaction, five to seven business days; maximum funding, $10,000; available to U.S. bank holders only."

Why did SureTrader provide U.S. bank holders with ACH services?

A. Well, it provided many different funding options. It provided credit cards, debit cards, Skrill. It provided Neteller, bank wire, and ACH.

**Page 106**

And, by the way, non-U.S. persons can have a U.S. account. So it's not just for a U.S. person. Anyone in the world can open an account at a U.S. bank, as far as I know.

Q. Okay. So this was provided for persons -- for U.S. -- who have a bank account but they might not have been a U.S. citizen. Is that -- or reside in the U.S.? Is that what you said?

A. It provided -- it's for anyone that has a U.S. bank account. It didn't matter whether they resided in the U.S. or not.

Q. Okay. But they could have resided in the U.S. and used this funding source. Correct?

A. They could have resided in China, too.

Q. Okay. One more of the SureTrader website.

MS. JOHNSON: You can mark this as 81.

A. In fact, there are many Canadians who have U.S. bank accounts.

(Plaintiff's exhibit 81 marked for identification.)

BY MS. JOHNSON:

Q. I'm showing you a screenshot from the SureTrader.com website concerning pricing comparison. And it says, "Broker Comparison," and

**Page 107**

it compares SureTrader to several other brokers.

Q. Where is Questrade located?

A. Well, before you start, I want to just make a point that all of these screenshots are misleading because none of them show the pop-up blocker that would have appeared, and I don't believe that that is being shown.

Additionally, this document says it was created on August 30 of 2016, when I was not working at the firm.

Q. That's the date it was collected.

A. Correct.

Q. And you were working at the firm in 2017?

A. Yes.

Q. Okay. So back to the original question.

Where is Questrade?

A. Questrade is a Canadian-based broker-dealer.

Q. And what about TD Ameritrade?

A. I believe TD Ameritrade is an international broker-dealer with offices in the U.S., Canada, and Europe as well.

Q. Okay.

A. As well as E*TRADE.

I'm not sure about Fidelity. I think

**Page 108**

Fidelity is also -- has broker-dealers internationally.

Scottrade. I don't even think Scottrade existed anymore. This thing is outdated at that time.

Q. Okay. All of these comparisons are made in U.S. dollars?

MR. FORD: Objection.

A. Well, as I said earlier, the Bahamas and the U.S., the currency is pegged. So when you have a dollar sign, it's both USD and Bahamas.

BY MS. JOHNSON:

Q. Does TD Ameritrade take -- charge in Bahamanian dollars?

A. I don't think so.

MR. FORD: Objection.

A. But, again, they also have international offices that charge in different currencies as well.

I didn't draft this, so I don't --

BY MS. JOHNSON:

Q. Aren't these comparisons all online stock orders? Are these -- all of these made in U.S. dollars?

MR. FORD: Objection.

A. It has a dollar sign. It doesn't say "USD"

**Page 109**

1 next to it. It could be Bahamanian dollars as well,
2 equivalent.
3     BY MS. JOHNSON:
4     Q. Does Schwab trade in the Bahamas? Does it
5 have an operation there?
6     A. I don't think they do. Fidelity might, but
7 I don't know.
8     Q. Do you have any reason to think that the
9 $8.95 that's listed here is not representative of
10 U.S. dollars?
11         MR. FORD: Objection.
12     A. If you're -- if the firm, SureTrader, which
13 is based in the Bahamas, who is pegged to the U.S.
14 dollar, is comparing itself in the same dollar
15 equivalent, then I just don't see how that would
16 make any difference.
17     BY MS. JOHNSON:
18     Q. Okay. I'm not trying to be cute.
19         Are these represented as comparing
20 what -- the U.S. dollar to what the other firms
21 charge in U.S. dollars?
22     A. They're all compared in the U.S. dollar
23 in -- and the Bahamanian dollar. Equivalent. It's
24 equivalent.
25         MS. JOHNSON: Okay. That's all

**Page 110**

1 for that one.
2         This is premarked already as 64.
3     BY MS. JOHNSON:
4     Q. I'm showing you a screenshot, a Groupon
5 coupon. If you'll turn to the -- it's the second
6 physical page, but it says 1 of 3 at the bottom.
7         MR. FORD: I just have a question
8 on the last page. I don't think there's --
9 I don't know if I see any Bates stamping at
10 all on this one. And then it looks like
11 the last page is -- this is a declaration
12 of Russell Castillo. It says he got these
13 and gave them to Sajjad Matin.
14         This document, do we have a Bates
15 stamp for that?
16         MS. JOHNSON: We'll have to see.
17 These were pulled in May of 2018.
18         MR. FORD: Okay. We'll just --
19 I'm going to object to the use of it, but
20 you can go ahead with the question.
21         I'm going to object to the use
22 and any questions on it just because it's
23 not Bates-stamped, but we can go ahead. I
24 don't need to jam it up.
25         MS. JOHNSON: Okay. It's

**Page 111**

1 Bates-stamped as 339. And we'll replace it
2 after.
3         MR. FORD: And that is -- is
4 that -- when you say "339," is that the
5 document that says it was stored on a
6 network share in which the location was
7 provided by Sajjad Matin?
8         Is it the same document, or is it
9 two separate documents?
10         MS. JOHNSON: What's your
11 question again?
12         MR. FORD: On this declaration,
13 the one that says it was stored on a
14 network share in which the location was
15 provided by Sajjad Matin, I'm just
16 wondering, is it two separate documents or
17 is this one?
18         This seems like this would be
19 different, separate things; the declaration
20 from the screenshots.
21         MS. JOHNSON: The declaration
22 goes with the screenshot.
23         MS. SUM: It's a composite
24 exhibit.
25         So, to clarify --

**Page 112**

1         MR. FORD: But there's no Bates
2 stamp on any of this.
3         MS. SUM: Well, we'll provide the
4 Bates stamp. She just said --
5         MR. FORD: Oh. I got it.
6         MS. SUM: -- that it's 339.
7         But we'll locate it, and we can
8 certainly replace it.
9         MR. FORD: Okay.
10         MS. SUM: But it's a composite in
11 that there's what we call the actual web
12 capture and the declaration, so that it
13 goes hand in hand.
14         MR. FORD: Okay.
15         MS. JOHNSON: All right.
16     BY MS. JOHNSON:
17     Q. You'll see -- if you'd turn to the next
18 page, it has "SureTrader Coupons & Promo Codes.
19 $50 off promo code to use today, $50 in free trades.
20 SureTrader is offering new customers $50 in free
21 trades."
22         How long -- what period of time did
23 SureTrader offer discounts through Groupon?
24     A. Never.
25         MR. FORD: Objection.

**Page 113**

BY MS. JOHNSON:
Q. Never?
A. Never.
    We never had any deal with Groupon. If you go to Groupon website right now and type in SureTrader, this still comes up. It's not real.
    You should have done some more investigative work and maybe asked Groupon for a contract, which none exists. So it's just a way for Groupon to get traffic to their website.
Q. Did anyone from SureTrader ask them to take it down?
A. I don't know.
    I didn't even know it existed. I only found about it from your Complaint, and then looked and Googled it and see that it still shows up to this day. These coupons, they're obviously fake.
Q. And over here on the left, it says "Shop SureTrader.com."
    Did you ever have anyone call SureTrader and ask about the Groupon coupon?
A. No.
    And I can see "About SureTrader" has zero stars here. There's not a single person that rated this or reviewed it. It's a fake ad to get

**Page 114**

traffic. That's my view on it, because I don't believe that SureTrader ever had any dealings with Groupon, as far as I know.
Q. Okay. Did SureTrader have procedures to make sure that U.S. residents were not signing up to trade at SureTrader after viewing the website?
A. Ask me that one more time.
Q. Sure.
    Did SureTrader have procedures to ensure that U.S. persons, residents, were not signing up to trade at SureTrader after reviewing the website?
    MR. FORD: Objection.
A. SureTrader had procedures to make sure that, in order to view the website, they would have to go through a disclosure or pop-up of some sort so they could not see the website until after they've gone through that process.
BY MS. JOHNSON:
Q. Okay. So they cannot view the website.
    Was there an additional procedure to keep them from signing up to trade as a customer at SureTrader after they viewed the website?
A. If -- you're talking specifically a U.S. person?

**Page 115**

Q. Okay. A U.S. person goes to the website.
A. Uh-huh. They see a pop-up blocker.
Q. They see a pop-up blocker.
A. Okay.
Q. And then what happens after that?
A. Well, it depends on the timing. If this was, let's just say, 2013 --
Q. Let's keep it to 2016 to 2019.
    MR. FORD: If you want to discuss 2013, you can discuss the time period.
A. Okay. Well, as I said earlier, it was --
    MS. JOHNSON: You can ask him later. I asked a question.
    MR. FORD: You asked the question, you didn't --
    MS. JOHNSON: He asked me to clarify and I did.
    MR. FORD: But you did not specify a time period. So if he wishes to answer by comparing the two time periods --
    MS. JOHNSON: Okay. We'll be here till midnight.
BY MS. JOHNSON:
Q. Go ahead.
A. When it had the IP-specific pop-up blocker

**Page 116**

that only shows U.S. persons -- or U.S. IP addresses, they would have to contact the firm via phone message or email, I believe, in order to get an access code to get into the website.
    So they would have to initiate contact with the firm in order to get into the website.
    At that point --
BY MS. JOHNSON:
Q. Can I just stop you just for clarification?
    Okay. When they called the firm to get the code, was there any procedure for who they would give the code to?
A. I don't know. Sajjad should know. He obviously did it.
Q. So you don't know.
A. I mean, if someone messaged and said, "I want to access the website," they would be given a code. I don't remember what the code was or how they generated it specifically.
    But, obviously, someone who went to this website -- all these websites, went -- and went through that process, or maybe their insider filter said just give them a code. I don't know.
Q. Your average client -- I'm a U.S. client, and I go to the website, and it pops up, and it says

**Page 133**

1  testimony is.
2      MS. JOHNSON: I'll get there. I
3  haven't gotten there yet.
4  BY MS. JOHNSON:
5  Q. "Program affiliates through CJ."
6      What is CJ?
7  A. Commission Junction.
8  Q. Okay. "If you own a website about trading,
9  investing, penny stocks, et cetera, or interact with
10 groups of traders, you can refer accounts to
11 SureTrader."
12      And then it says you could earn $100 on
13 every account opened and funded by your website
14 visitor, you get 60 days of cookie tracking, and it
15 has different dates.
16      "No minimum requirements, dedicated
17 affiliate manager to assist you every step of the
18 way. Sign-up is easy through our affiliate network,
19 Commission Junction. If you have questions ..."
20      And then on the next page --
21      MR. FORD: Is there a question?
22      MS. JOHNSON: I'm getting there.
23      MR. FORD: Well -- but you just
24 read the entire thing up until where it
25 says "only non-U.S. referrals permitted."

**Page 134**

1      MS. JOHNSON: I haven't finished.
2  I'm trying to get to your non-U.S.
3  residents.
4      MR. FORD: -- finish your
5  question is --
6      MS. JOHNSON: Please don't
7  interrupt me, Matt.
8      MR. FORD: -- it's the next --
9      MS. JOHNSON: Please don't
10 interrupt me.
11     MR. FORD: Is there a question?
12 BY MS. JOHNSON:
13 Q. "No minimum requirements or commissions;
14 dedicated affiliate manager to assist you every step
15 of the way; sign-up is easy through our affiliate
16 network."
17     And then on the next page, it says
18 "only non-U.S. referrals permitted."
19     Is that what it says?
20 A. Yes.
21 Q. And then under "Direct" --
22     MR. FORD: Objection to the
23 notion that these are separate pages. It's
24 a website. It's only separate pages
25 because it was printed this way.

**Page 135**

1      MS. JOHNSON: I know about this,
2  Matt.
3  BY MS. JOHNSON:
4  Q. Direct --
5      MR. FORD: It's all on one
6  page --
7      MS. JOHNSON: Okay.
8      MR. FORD: -- right?
9      MS. JOHNSON: Thank you.
10 BY MS. JOHNSON:
11 Q. "Direct Affiliate: Our direct affiliate
12 program is targeted to large businesses or
13 organizations that can drive a sizeable amount of
14 traffic or members to our website.
15     "Designed for organizations to
16 generating traffic specific for day trading.
17     "Specialized referral rates.
18     "Must qualify to become -- must qualify
19 to become a direct affiliate.
20     "Should be able to generate at least 15
21 new accounts per month.
22     "Certain minimal requirements must be
23 met in order to qualify for a direct affiliate
24 program.
25     "Please send an email to

**Page 136**

1  info@suretrader.com. Only non-U.S. referrals
2  permitted."
3      Does that describe what is on here as a
4  direct affiliate?
5  A. What was the last part of it?
6  Q. Only non-U.S. referrals --
7  A. Okay.
8  Q. -- permitted.
9  A. Okay. Yes.
10 Q. Now, what qualifications did you need to
11 become a direct affiliate?
12 A. I think it listed it right here. It just
13 says it.
14 Q. Where? You have to be able to --
15 A. It said designed for an organization that
16 have traffic in -- for day traders. Basically, what
17 it says here is the requirements.
18 Q. Okay. Who approved who SureTrader would
19 affiliate through with this program?
20 A. That was done by Justin Ritchie.
21 Q. Okay. Who developed these programs?
22 A. All of these programs?
23 Q. Just the program affiliate through CJ and
24 the direct affiliate.
25 A. CJ is its own company. That's what they

**Page 149**

1  A. Right. This document could be fake. It
2  was produced by Yan, so it has zero credibility.
3  Q. Were you aware of any promotions going on
4  in March of 2017 with any of these affiliates?
5  A. These affiliates? I don't remember any
6  promotions going on with these affiliates, because,
7  as far as I knew, the relationships were over with
8  Sykes and Nate.
9       StockTradeIdeas never existed. It
10 never got off the ground. In 2015, the website was
11 down, so it didn't exist.
12      I don't remember MOJO. It's not -- I
13 wasn't involved in any of that -- in that
14 relationship. I don't remember any of that.
15      MS. JOHNSON: The court reporter
16 [sic] needs to take a break to change his
17 tape, so we'll just be a minute so we don't
18 have to leave the room.
19      THE WITNESS: Do you want to take
20 a break?
21      MR. FORD: Let's -- yeah. Can
22 we --
23      MS. JOHNSON: Okay. Five
24 minutes?
25      THE VIDEOGRAPHER: Going off the

**Page 150**

1  record at 3:19.
2      (Recess taken.)
3      THE VIDEOGRAPHER: We are back on
4  the record at 3:45.
5  BY MS. JOHNSON:
6  Q. Okay. I'll show you what's been previously
7  marked as Exhibit 51, and I'll ask you if you
8  recognize it.
9  A. Yes.
10 Q. And did you sign this document?
11 A. That appears to be my signature.
12 Q. And this is the marketing services
13 agreement between Day Trading Radio and
14 Swiss America Securities. Is that correct?
15 A. Yes.
16 Q. And it outlines what services -- what
17 marketing services Day Trading Radio would be
18 providing to Swiss America. Is that correct?
19 A. Yes.
20 Q. And they're delineated in Exhibit A, which
21 is the last page of this agreement.
22 A. I mean, there's some other -- there's some
23 other things in there, too, but yes. There's some
24 exhibits --
25 Q. Those other services are spelled out in

**Page 151**

1  this agreement. Is that correct?
2  A. Yes.
3  Q. Okay. And then if you look on page 10,
4  your signature page, under F, non-solicitation of
5  U.S. investors.
6  A. Where is that?
7  Q. It's on your signature page.
8  A. Okay. On the signature page.
9  Q. Number 10, on the bottom.
10     Do you see paragraph F?
11 A. Paragraph S? F?
12 Q. "F" as in Frank.
13 A. Yeah. I see that.
14 Q. And then it says "Non-solicitation of U.S.
15 investors."
16     And it says "Marketing agent agrees not
17 to directly or indirectly engaged" -- it's spelled
18 correctly, but I think it's supposed to be "engaged
19 in the solicitation of U.S. investors." Correct?
20 A. Yes.
21 Q. And then the last line -- I guess I'll read
22 the whole thing.
23     "Any mention of Swiss America or its
24 affiliates or marketing agents' websites or other
25 promotional materials must have the following

**Page 152**

1  disclaimer attached in prominent font."
2      And then it has four lines with the
3  disclaimer. Correct?
4  A. That is under letter F, the last sentence
5  you're talking about? Or is there somewhere else
6  that says that?
7  Q. Under F, it says any --
8  A. It's just hard to read because my eyes just
9  are really terrible.
10     MR. FORD: I've got the best
11 vision, and I can't -- I can barely read
12 it.
13 BY MS. JOHNSON:
14 Q. I'll read it out loud, then. Okay.
15     "Any mention of Swiss investors or its
16 affiliates or marketing agents' website or other
17 promotional materials must have the following
18 disclaimer attached in prominent font.
19     "This does not constitute an offer or
20 solicitation for brokerage services, investment
21 advisory services, or other products or services in
22 any jurisdiction where we are not authorized to
23 conduct investment business or where such offer or
24 solicitation would be contrary to the securities or
25 local laws and regulations of that jurisdiction."

**Q.** Okay. Warrior Trading offers and sells online day trading courses to customers throughout the United States.
**A.** Throughout the world.
**Q.** Okay. How did you first learn about the Warrior Trading arrangement?
**A.** I believe that Justin maybe told me about it. I don't remember how I heard about it, but I heard about it once I came back.
    I did ask Justin -- I said to make sure that it's very clear that that's not intended for U.S. people, to do what he needs to do to make sure that that is clear, that there's no U.S. people being told to go to the firm from Warrior Trading as a company.
    I also remember telling this to Yan as well, to reiterate that to him, once I came back to the firm, to make sure that there was a review of all the affiliate agreements once I came back to make sure that they where all in compliance.
**Q.** I show you what's been previously marked as Depo Exhibit 42.
    And this is an email from ross@ -- Ross Cameron, ross@warriortrading.com, sent on 3/21/2017 to guy@suretrader.com.

165

    Is that -- guy@suretrade.com, is that your email address --
**A.** It was.
**Q.** -- company email address?
    Do you recall receiving this?
**A.** I vaguely remember something about this.
**Q.** And Ross says, "Hey, Guy, hope you are doing well. I wanted to touch base with you on an issue we are having.
    "I'm not sure if you are aware, but Drameko has been working as the Warrior Trading representative for our students who join SureTrader as part of a broker rebate program we built together."
    Do you know who Drameko is?
**A.** Drameko worked at SureTrader on the trading desk.
**Q.** Do you know what Mr. Cameron is referring to when he says he's the Warrior Trading representative for students who join SureTrader?
**A.** I'm sorry? Say that again.
**Q.** What is -- what is Mr. Cameron referring to when he says Drameko was working as the Warrior Trading Representative for our students who join SureTrader as part of a broker rebate program?

166

    MR. FORD: Objection.
    You can testify as to your understanding, but not to what Mr. Cameron meant.
    MS. JOHNSON: Okay. Just object; please don't coach.
**A.** So, as I said earlier, that Justin put this agreement together. I'm just coming back to the firm maybe a month or two when this email was drafted, so I don't -- I'm just getting my handle on the firm --
**Q.** Okay.
**A.** -- back from being gone for about a year. So I don't know what Drameko was specifically doing for Warrior Trading.
**Q.** Okay.
**A.** It would be just an assumption of whatever Justin told him to do.
**Q.** Okay. And then if you skip down to the paragraph that says "Previously."
    "Previously, we had agreed that students who joined SureTrader through Warrior Trading would be given a dollar-per-trade discount, $3.95 versus $4.95, and that rate would stay in place until they had recouped a savings equal

167

to the cost of their course. $2,497.
    "Drameko has now informed us that the agreement will no longer be honored, and the new agreement will be one of the following."
    Do you see that?
**A.** I do.
    But I want to, again, say that this is something that Justin put in place.
    And when he says we previously agreed, I didn't agree to anything because I didn't know about this agreement until after the fact.
**Q.** Okay. And then if you go gown to -- I guess it's the big -- third paragraph from the bottom that starts "Since."
    "Since we've sent hundreds of students to SureTrader and actively promote --
**A.** Where is this at? Since?
**Q.** I'm sorry. The big paragraph here.
**A.** Okay. Okay.
**Q.** "Since we've sent hundreds of students to SureTrader and actively promote your firm to all of our students, we asked Drameko if our students could be priced at 9 cents and save $1 per 1,000 shares up to the purchase price of the course.
    "We asked if this offer could be valid

168

**Page 185**

1  I believe, for FINRA.  So with him as well around
2  the time the firm -- well, before the firm started,
3  but right close to it.
4         And then, again, with Adam Ford, this
5  would have been in mid-2012.  Again, with
6  Carla Marlin, probably in 2013, maybe.  But it could
7  have been '12.  I met her in 2012, so it could have
8  been as early as 2012.
9         As well as Dana Gore, who was
10 SpeedTrader's counsel, I had -- I had talked with
11 her several times about -- about how to make sure
12 the firm was in compliance with the rule.
13        So I don't know.  Sev- -- and also,
14 the Bahamanian counsel.  I would talk to him about
15 it as well.  But, obviously, he could only advise me
16 on Bahamanian law, so I was using U.S. counsel
17 mainly.
18        And these -- the staff at the firm had
19 access to speak to any of these attorneys, with the
20 exception of probably Dana, since she only
21 represented SpeedTrader.
22        But they has access to speak to Adam,
23 and I'm sure they have spoken to Adam before.
24 Adam's been to the office in the Bahamas at least a
25 couple of times.

**Page 186**

1         As well, by the way, when I was
2  cooperating with the SEC and the DOJ, they are
3  attorneys.  I would always ask them questions as
4  well.  Not that they're my attorneys, but they are
5  the ones telling me what to do.  So I was relying on
6  them as well.
7         When they told me that they had no
8  issues with the way the firm was operating, I relied
9  on that.
10    Q.   And what years was that?
11    A.   What years were that?
12    Q.   Yeah.  What year.
13    A.   From the middle of 2012 until I stopped
14 cooperating with them, probably sometime in 2015.
15    Q.   Let's see.  Let me show you what I'm going
16 to mark as 60.
17        (Plaintiff's Exhibit 60
18        marked for identification.)
19 BY MS. JOHNSON:
20    Q.   This purports to be an email -- it is an
21 email from Guy Gentile dated June 17th, 2013, to
22 philip@suretrader, and it cc's Justin.
23        The subject is Rule -- SEC Rule 15a-6,
24 and it attaches SEC Rule 15a-6 PDF with the
25 attachment.

**Page 187**

1         And then if you look at the first
2  one -- it's going to be on the back of the page,
3  Bates-marked 10577 -- it says "Swiss America
4  Securities, Ltd, policy and procedures for compliance
5  with the U.S. Securities and Exchange Commission
6  Rule 15a-6 exemption."
7         What is this document?
8     A.   I mean, it's -- it's -- it says it's a
9  policies and procedures for compliance with
10 Rule 15a-6 exemptions.
11    Q.   Is this the company SureTrader's written
12 policy?  Was this in effect?
13    A.   I mean, it was more than one page, so
14 you're missing quite a bit of it.
15    Q.   Okay.  Was this the first page of it?
16    A.   I don't know if it was the first page.
17 This is -- this is ten years ago.  More than ten
18 years ago.
19    Q.   Okay.
20    A.   So I remember it being several pages.
21    Q.   Who drafted this?
22    A.   I believe Philip Dorsett and I put this
23 together after talking with some of the attorneys
24 and compliance consultants who put something
25 together just to have an in-house written policy.

**Page 188**

1     Q.   Okay.  In the middle of the page, it says,
2  "Below are all the things Swiss America will not do
3  to ensure compliance with SEC Rule 15a-6."
4         Do you see that list?
5     A.   Yes.
6     Q.   Did you charge fees in U.S. dollars?
7         Did SureTrader charge fees in U.S.
8  dollars?
9     A.   Well, as I explained, we charged fees in
10 Bahamas dollars, and USD is the equivalent.
11        If you Google the BSD symbol, it is a
12 dollar sign just like the U.S. dollar sign.  So it
13 is exactly the same.
14    Q.   So did you charge in U.S. dollars?
15    A.   We charged in Bahamanian dollars.  It's the
16 same fee.  It's the same thing.
17    Q.   Did you give out U.S. phone numbers to U.S.
18 investors?
19    A.   As I stated before, when -- the website you
20 showed me, when that was put on the website, that's
21 while I was not there.
22    Q.   So that's a "yes"?
23        MR. FORD:  Objection.
24 BY MS. JOHNSON:
25    Q.   You did, but you weren't there during that