# EXHIBIT D

```
 1  was a small amount.
 2     Q.  Did Warrior Trading ever come to have a
 3  relationship with SureTrader?
 4     A.  We did.
 5     Q.  And how did that relationship come about?
 6     A.  So I don't recall what year it was that it
 7  came about, although on the marketing agreement, I
 8  think there's a date, so I'm sure you know.  But we had
 9  been in the practice of setting up broker rebate
10  programs and trying to negotiate discounted commissions
11  on behalf of our students.  We were U.S. brokers, and
12  we had done that successfully, which was great.  But
13  some of the U.S. brokers were not accepting
14  international students, and we do have international
15  students, mostly from English speaking countries, like
16  U.K. and Australia.
17         Anyways, so we looked -- that was when we
18  sort of began the process of looking to add some
19  international brokers, and we did end up adding two
20  international brokers, and they were willing to
21  negotiate group rates, which we called broker rebate
22  programs.
23     Q.  And who were those two international brokers?
24     A.  TradeZero and SureTrader.
25     Q.  Okay.  And when were these negotiations with
                           21
```

```
 1  SureTrader about entering into some type of
 2  relationship?  When did they occur?
 3     A.  Off the top of my head, I don't recall, but I
 4  think it was...
 5         I don't want to speculate, because it's on
 6  the agreement, I know it's on the agreement, so...
 7     Q.  Okay.  I will show you the agreement.  I'm
 8  just asking what you know now.
 9         And who on behalf of Warrior Trading
10  negotiated that agreement?
11     A.  That was reviewed by myself and also by Jeff
12  and Alex.
13     Q.  Who are Jeff and Alex?
14     A.  Jeff and Alex were brothers.  Both were
15  employees at Warrior Trading.
16     Q.  What were their positions there?
17     A.  At the time...
18         It depends on -- they moved up the ladder, so
19  I don't know when exactly this agreement was, but Alex
20  was in charge of marketing, and Jeff, he wasn't --
21  well, I guess he did a little bit of business.  He
22  helped with kind of running the business when I was
23  bogged down with teaching so many of the classes.  So
24  he was helping a little bit more with operations,
25  day-to-day operations, I guess you could say.
                           22
```

```
 1     Q.  Is he still with Warrior Trading?
 2     A.  No, neither are still at Warrior Trading.
 3         MISS JOHNSON:  Let's call up Exhibit 34.
 4         THE WITNESS:  Okay.
 5         (Deposition Exhibit 34 marked for
 6  identification.)
 7         MISS JOHNSON:  I'm showing you what you'll
 8  see at the bottom is a little yellow sticker, it says
 9  "Exhibit 34."  I premarked these.  And at the very
10  bottom of the page, you'll see WARRIORSEC_00...
11         That's just how we refer to the documents
12  going forward, so if I say that, you'll know what we're
13  talking about.
14         Can we make this a little bigger?
15         MR. MORGAN:  I actually have the ability to
16  make it bigger.  Maybe we each do.  There's a
17  plus/minus.
18         MISS JOHNSON:  That will help.  Thank you.
19         THE WITNESS:  I do see that.
20     Q.  BY MISS JOHNSON:  Okay.  And I'm showing
21  you...
22         Look at the document, and let me know if you
23  recognize this document.
24     A.  I do.  I can only see the first page.
25         THE VIDEOGRAPHER:  You can just say "next
                           23
```

```
 1  page" when you want me to move on.
 2     Q.  BY MISS JOHNSON:  Do you want to look through
 3  the whole thing?
 4     A.  Okay.  Next page.
 5         Okay.
 6     Q.  So let's go to the first document.  It
 7  appears to be an e-mail.  It says
 8  rosspcameron@gmail.com.  Is that your e-mail address?
 9     A.  Yes.
10     Q.  And it says justin@suretrader.com.  Do you
11  know who that is?
12     A.  I recall Justin.
13     Q.  Who was that?  Who was Justin?
14     A.  I couldn't say with certainty who he was, but
15  I understood that he was an employee of SureTrader,
16  but, you know, I don't know for sure.
17     Q.  This appears to be an e-mail from you to
18  Justin on April 28, 2016 at 4:31 p.m., and it says,
19  "Hey, Justin.  Just touching base with you guys.  We've
20  had a number of members express concern over the recent
21  news of Guy's indictment and how that might impact
22  SureTrader.  Is Guy still part of the SureTrader
23  business?  Is there any reason for concern among our
24  members who use SureTrader?"
25         Do you see that?
                           24
```

**Page 93**

1      MISS JOHNSON:  Why don't we take a
2  five-minute break and just talk.
3      THE VIDEOGRAPHER:  The time is now 4:42 p.m.
4  Going off the record.
5              (Recess.)
6      THE VIDEOGRAPHER:  The time is now 5:02 p.m.,
7  and we're on the record.
8      MR. HALPIN:  Miss Johnson, do you have any
9  more questions for the witness?
10     MISS JOHNSON:  I'm sorry, no.  I tender the
11 witness to you.
12     MR. HALPIN:  Thank you.
13              EXAMINATION
14 BY MR. HALPIN:
15   Q.  Hello, Mr. Cameron.
16   A.  Hi.
17   Q.  As we mentioned at the outset, I'm Steve
18 Halpin.  I'm with the firm Ford O'Brien Landy, who
19 represents Guy Gentile on this matter.  I just have
20 some questions for you.  I'm going to try to do this as
21 efficiently as possible.  I want to be cognizant of
22 your time.
23      The same general ground rules that Miss
24 Johnson laid out before apply, with the caveat I may be
25 asking you some questions that really just call for a

**Page 94**

1  yes or no answer, so if I move on, it's not because I'm
2  being discourteous, again, just kind of in the interest
3  of time, but I obviously want to give you a chance to
4  respond.  Does that all make sense?
5    A.  Yes.
6    Q.  Great.  I want to talk a little bit about how
7  your various -- kind of the way you put out content for
8  Warrior Trading works.  You testified about a chat room
9  earlier.  Do you recall that?
10   A.  Yes.
11   Q.  Do you recall testifying that the chat room
12 is limited to who can access it?
13   A.  Yes.
14   Q.  And could you explain again who can access
15 the chat room that you run.
16   A.  Paid members.
17   Q.  And are those members just U.S. residents?
18   A.  No.
19   Q.  Do they include international traders?
20   A.  They do.
21   Q.  And in that chat room, can anyone who is in
22 the chat room post content or leave comments?
23   A.  Yes.
24   Q.  And do you moderate what those messages are?
25   A.  Yes, to a certain extent.

**Page 95**

1    Q.  Is it fair to say you're not approving every
2  single message that's sent within the chat room?
3    A.  Certainly not.
4    Q.  So if...
5        Strike that.
6        So you said you also have a YouTube presence;
7  correct?
8    A.  Correct.
9    Q.  And what type of content do you post to the
10 YouTube channel?
11   A.  I post recaps of my trading days, both green
12 days and red days, and I post general educational
13 content about day trading and the financial markets in
14 general.
15   Q.  Does that include any recorded excerpts from
16 your chat rooms?
17   A.  Rarely, but occasionally.
18   Q.  And you said other content, instructional
19 content?
20   A.  Yes.
21   Q.  And how long have you run the YouTube
22 channel?
23   A.  Since 2013.
24   Q.  And is that accessible by anyone?
25   A.  It is.

**Page 96**

1    Q.  Accessible by anyone in the world?
2    A.  Yes, as far as I know.  I think so.
3    Q.  And do you recall in any of the content
4  that's posted to YouTube, are there references to
5  SureTrader?
6    A.  There likely are.
7    Q.  Would you have ever referenced SureTrader on
8  something that was posted on YouTube?
9    A.  Sure.
10   Q.  I think you mentioned earlier, as well, that
11 you have trading accounts with a few different
12 international brokerages; is that correct?
13   A.  Yes.
14   Q.  And what are those brokerages?
15   A.  Are you asking about my personal trading
16 accounts, or broker programs?
17   Q.  The personal accounts first, yes.
18   A.  I have a personal account at CMEG, Chapter
19 Markets Elite Group, and I had a personal account at
20 SureTrader.
21   Q.  Did you have a personal account at TradeZero
22 ever?
23   A.  I did not.
24   Q.  And for what reason do you have an account at
25 CME Group?

**Page 97**

  A. I use the CMEG account in the same way that I used the SureTrader account, for doing a small cap challenge, trading with 500 or 1,000 dollars or 2,000, whatever it was.
  Q. And you mentioned a potential referral or rebate program with other international brokerages. Does Warrior Trading have such programs with any international brokerages other than SureTrader?
  A. We did have one with CMEG and we had one with TradeZero.
  Q. Okay. And were those -- as far as you are aware, did those entities have to abide by the pattern day trading rule?
  A. I don't believe either of those enforced the PDT rule. I'm certain on CMEG, but I didn't use TradeZero, so I don't know exactly what their policy was.
  Q. Under Warrior Trading's arrangements with those brokerages, would Warrior Trading receive any type of payment for a referral to one of those?
  A. Nope.
  Q. And just talking about the pattern day trading rule, the PDT rule a little more broadly, what is your understanding of who that applies to?
  A. Well, I understand that it's enforced by U.S.

**Page 98**

brokers, so I think that it applies to anyone who opens an account with a U.S. broker. But I'm not an attorney, so, you know, this is my understanding, but I think that when an international customer goes to Lightspeed or E*Trade or Ameritrade, even though they're international, they're forced to follow that same PDT rule.
  Q. So would you agree that the PDT rule is imposed on brokerages?
     MR. MORGAN: I object as Mr. Cameron is not an attorney, but go ahead and give your understanding, Mr. Cameron.
     THE WITNESS: My understanding is, it is a rule that brokerages follow, so any customers have to follow it by default.
  Q. BY MR. HALPIN: And I think you mentioned...
     Well, let me ask you this: So why, in your opinion, would an international trader look for a non U.S. broker or broker that isn't registered with FINRA?
  A. An international trader, a non U.S. trader, would probably not want to subject themselves to the U.S. PDT rule thus requiring a $25,000 minimum balance and would be much more likely to use an international broker, any international broker.
  Q. I think you testified earlier that...

**Page 99**

     Well, let me ask you this way: You testified earlier about communications with Guy Gentile. Can you just explain again approximately how many total times you think you've communicated with Mr. Gentile?
  A. I only remember speaking with him on the phone once, and I didn't recall ever having e-mail communication with him until I saw that e-mail today. So any communication I had with him certainly didn't stand out, but it was very limited.
  Q. Did you ever meet him in person?
  A. No.
     MR. HALPIN: Can we pull up what we've marked as Exhibit 1. And this I think is very similar to something we were looking at earlier, but we can pull it up and take a look here.
     THE VIDEOGRAPHER: Would that be Exhibit 34?
     MR. HALPIN: I don't know if it's identical, so I just prefer to use what we've prepared. Just bear with us for a minute. All right.
     (Deposition Exhibit 1 marked for identification.)
  Q. BY MR. HALPIN: Mr. Cameron, do you recall -- this appears to be an e-mail, a top e-mail dated August 23rd, 2016 from Ross Cameron, ross.p.cameron@gmail.com, to Justin Ritchie, Alex at

**Page 100**

warriortrading.com, and Jeff at warriortrading.com. Do you see that?
  A. I do.
  Q. And do you recall this e-mail?
  A. Yeah, I believe we looked at it earlier, and it looks familiar, yes.
  Q. And do you see where it says, "I wanted to reach out"...
     It says, "Hi, Justin. I wanted to reach out to see if you'd be interested in working together to promote SureTrader among the Warrior Trading community."
     Do you see that?
  A. I do.
  Q. So as of that date, August 23rd, 2016, did Warrior Trading have a prior agreement with SureTrader?
  A. No. No, not that I'm aware of. I don't think we would have had anything prior to this date.
  Q. And you go on to say, "We have just launched a rebate program with Speedtrader and we'd love to have a similar arrangement with SureTrader," and skipping down to the next line, "Speedtrader appeals to U.S. residents with over 25k, but we'd like an arrangement that appeals to international traders, as well."
     Do you see that?

```
 1  Alex at warriortrading.com.  Do you see that?
 2     A.  I do.
 3     Q.  You say, "referring probably to our updated
 4  review where we no longer recommend."  Do you see that?
 5     A.  I do.
 6     Q.  And were you referring there to the updated
 7  review that you posted in early 2017?
 8     A.  Yes.
 9         MR. HALPIN:  Okay.  We can take that exhibit
10  down.
11         Is everyone amenable to maybe a ten-minute
12  break?  I don't know that I have a lot more, but if
13  it's convenient now, it's a good time for me to break.
14         MISS JOHNSON:  That's fine with me.
15         THE VIDEOGRAPHER:  The time is 5:51 p.m.
16  Going off the record.
17                    (Recess.)
18         THE VIDEOGRAPHER:  Back on the record.  The
19  time is now 6:01 p.m.
20     Q.  BY MR. HALPIN:  Mr. Cameron, thanks again for
21  your time.  I just have a few more questions.
22     A.  Okay.
23     Q.  Mr. Cameron, you never agreed with Mr.
24  Gentile to solicit U.S. investors on SureTraders'
25  behalf in violation of U.S. law; correct?
                           125
```

```
 1     A.  That's correct.
 2         MISS JOHNSON:  Objection.
 3     Q.  BY MR. HALPIN:  And you never agreed with any
 4  other SureTrader employee to solicit U.S. investors in
 5  violation of U.S. law; correct?
 6         MISS JOHNSON:  Objection.
 7         THE WITNESS:  Correct.
 8     Q.  BY MR. HALPIN:  And you're not aware of
 9  anyone else at Warrior Trading entering into any
10  unlawful agreement to solicit U.S. investors; is that
11  correct?
12     A.  That's correct.
13         MR. HALPIN:  Thank you.  I have no further
14  questions.
15         MISS JOHNSON:  I just have one on redirect.
16         Could you call up Exhibit 43 again, please,
17  plaintiff's exhibit.
18                FURTHER EXAMINATION
19  BY MISS JOHNSON:
20     Q.  While we're reviewing this, this is the
21  e-mail that you had sent to Jeff and Alex on July 17th,
22  2017 saying, "referring probably to our updated review
23  where we no longer recommended them."  Do you see that?
24     A.  Yes.
25     Q.  And you're responding to Yaniv Frantz's
                           126
```

```
 1  e-mail of that same date, July 17th, where he says,
 2  "I'm writing you today in regards to a new review I
 3  noticed that you posted about SureTrader"?
 4     A.  Yes.
 5     Q.  Does that refresh your recollection as to
 6  when this new review was posted on your website?
 7         MR. HALPIN:  Objection.
 8         THE WITNESS:  Yes, more or less.
 9     Q.  BY MISS JOHNSON:  And when more or less was
10  that?
11     A.  It was certainly following the change in
12  pricing, which occurred in or around March, I think is
13  what we saw in the e-mails, if I'm not mistaken.  So it
14  would have been sometime after that, and, I don't know,
15  maybe it took him a little while before he noticed it
16  when he e-mailed in July.  I'm not sure if it was --
17  how recently we had changed it from when that e-mail
18  came in, but it had certainly been at least within the
19  last couple of months, I'd say.
20     Q.  Couple months of July 17th?
21     A.  Yes.
22         MISS JOHNSON:  Okay.  Thank you.  That's all
23  I have.
24         MR. MORGAN:  All right.
25         THE VIDEOGRAPHER:  That concludes today's
                           127
```

```
 1  deposition.  It is March 14th, 2023.  The time is now
 2  6:04 p.m.  Off the record.
 3         (Deposition concluded at 6:04 p.m. (ET).
 4         (Signature requested.)
                           128
```