# EXHIBIT M

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| In the matter of<br><br>GUY GENTILE | Examination No.<br>20080137492 |

**WELLS SUBMISSION ON BEHALF OF
GUY GENTILE**

Adam Ford
Harris, O'Brien, St. Laurent &
Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
(917) 512-6937
aford@harrisobrien.com

*Attorney for Guy Gentile*

CONFIDENTIAL                                                          GENTILE0004390

## TABLE OF CONTENTS

**TABLES OF AUTHORITIES** ........................................................................................ ii

**INTRODUCTION** ...................................................................................................... 1

**PRELIMINARY STATEMEN**T ................................................................................... 2

**FACTUAL BACKGROUND** ...................................................................................... 4

    **I.**    **U.S. residents are blocked from accessing SureTrader's website advertisements** ................. 6

    **II.**    **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons** ...................................................................... 10

**LEGAL ARGUMENT** ............................................................................................... 12

    **I.**    **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them** ..................................................... 12

    **II.**    **A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities** ......................................................... 13

        A.   SureTrader's website does not solicit U.S. citizens or residents ................................. 16

           1.    *SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities* ...…………16

       B. No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons. ............................................. 17

    **III.**  **Mr. Gentile did not aid and abet any violation** ........................................................ 19

       A. There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith. ................................................................................................... 19

    **IV.**  **A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns** .. 21

**CONCLUSION** ......................................................................................................... 23

CONFIDENTIAL               GENTILE0004391

## TABLES OF AUTHORITIES

**Cases**

*Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), .................................................. 22

*Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001)........................... 22

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). ......................................... 10

*Fryar v. Abell*, 492 U.S. 914 (1989) ........................................................................................... 22

*Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)……………………………………........22

*Securities and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ.
     2575.................................................................................................................................... 25, 26

**Statutes, Rules, and Other Authorities**

54 Fed. Reg. 30013, 30020 (July 18, 1989)............................................................................ 15, 16

Exchange Act Rule 15a-6 ......................................................................................................... 4, 5, 6

FINRA Rule 2010 ............................................................................................................................. 4

FINRA Rule 2110 ............................................................................................................................. 4

Section 15 of the Securities and Exchange Act of 1934 ................................................................... 4

Arthur F. Mathews, Enforcement and Litigation under the Federal Securities Laws 1973. ........ 20

*Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017
(July 11, 1989) ............................................................................................................................. 15

*S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices*
(June 1, 1972)............................................................................................................................... 20

*Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise
     Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998)......................... 14, 15, 21

CONFIDENTIAL

GENTILE0004392

**INTRODUCTION**

Guy Gentile is the founder and a director of Swiss America Securities, Ltd (d/b/a SureTrader), a foreign broker dealer.  On November 12, 2013, FINRA Enforcement Staff advised Mr. Gentile that it had made a preliminary determination to recommend a disciplinary action be brought against him for violating NASD Conduct Rule 2110 and FINRA Rule 2010, for aiding and abetting SureTrader in violating Section 15 of the Securities and Exchange Act of 1934.  The preliminary determination is premised on a finding that SureTrader engaged in securities transactions for or on behalf of U.S. persons without registering with the United States Securities Exchange Commission (the "Commission").  During a phone conference that same day, the Enforcement Staff acknowledged that unregistered foreign broker dealers may perform services on behalf of U.S. persons if they do not solicit the US customer.  However, the Enforcement Staff takes the position that the SureTrader website is a form of solicitation, which eliminates the statutory registration exemption.  While it has described the website as the "main issue," the Enforcement Staff has also concluded that a disciplinary action is appropriate because Mr. Gentile took part in other internet activities constituting improper solicitation, namely a single webcast with Timothy Sykes on February 8, 2013.  Because SureTrader is a Bahamian broker dealer not registered with FINRA, Enforcement Staff seeks to pursue a disciplinary action against Mr. Gentile on an aiding and abetting theory.  That is, the Enforcement Staff believes Mr. Gentile knew that SureTrader was violating Rule 15 by advertising itself on its website and taking part in the webcast, and intentionally rendered substantial assistance in the violation.

The Enforcement Staff's preliminary determinations are erroneous.  There is no basis for an action against Mr. Gentile, and none should be recommended.

1

GENTILE0004393

## PRELIMINARY STATEMENT

Foreign broker dealers are permitted to engage in securities transactions for or on behalf of U.S. persons, so long as the foreign broker dealer does not affirmatively solicit the customer. Swiss America, through its Director and Chief Compliance Officer – not Mr. Gentile – followed the letter of the law and all available SEC guidance regarding soliciting U.S. persons, and took every reasonable step to comply with these rules and guidance. Specifically, once Swiss America decided it would start accepting unsolicited United States investors as customers, the company's Chief Compliance Officer:

1.   Set up an internal infrastructure that included strict policies and practices to prevent solicitation of U.S. customers;

2.   Redesigned the SureTrader website to include a pop-up blocker that prohibits U.S. customers from accessing any substantive information contained in it;

3.   Redesigned the website so that every page carries a bold, unambiguous warning that Swiss America is not intended for and does not service U.S. customers;

4.   Drafted new account opening documents which preclude opening an account for any potential new customer who might be a U.S. person, unless the Chief Compliance Officer determines that person was not solicited by Swiss America in any way; and

5.   Drafted and maintains new account opening documents that require all U.S. persons to truthfully confirm that they affirmatively reached out to Swiss America without Swiss America having done anything affirmative to solicit that customer.

These facts would be a complete defense to any allegation that Swiss America violated Rule 15 on the basis of it maintaining a website.

Nor can Mr. Gentile's appearance in the February 8, 2013 Timothy Sykes webcast be said to constitute an improper solicitation of US persons. In keeping with Swiss America's strict non-solicitation policies outlined above, Mr. Gentile intended to, and did, solicit only non-U.S. persons during the course of that interview. Before starting the interview, Mr. Gentile was clear to Mr. Sykes that neither of them could say anything that could be misinterpreted as soliciting

CONFIDENTIAL                                                                                      GENTILE0004394

U.S. persons.  And a review of the video proves this – everything both men said was directed specifically at non-U.S. persons.  Moreover, SureTrader took reasonable measures to ensure that it did not effect securities transactions with U.S. persons as a result of this de minimis Internet activity. Specifically, Swiss America blocks U.S. persons from accessing its website. Furthermore, Swiss America's internal policies permit a U.S. person to open an account only if the Chief Compliance Officer has determined that these customers initiated the transaction with SureTrader without solicitation.  The Sykes webcast, therefore does not eliminate SureTrader's exemption from registration, and there is no primary Rule 15 violation.

Here, of course, the question is not just whether Swiss America violated Rule 15a-6, but whether Mr. Gentile *intentionally* aided and abetted that violation.  While Enforcement Staff takes the position that a Rule 15 violation is a strict liability offense, aiding and abetting, of course, requires exacting proof of intent.  Given the extraordinary efforts Swiss America undertook to solicit only non-United States customers, to not solicit U.S. persons, to block US persons from accessing its website, to prevent opening an account for a U.S. persons if they were solicited in any manner, and Mr. Gentile's good faith belief that these policies and practices were squarely in line with Commission rules and guidance, it is inconceivable how FINRA can make out a claim that Swiss America violated this rule, let alone that Mr. Gentile *intentionally* aided and abetted in it.

Moreover, even if FINRA now determines that SureTrader's efforts were lacking, and therefore can be found to have violated Rule 15, Mr. Gentile had no prior notice of this new interpretation.  At the time, Mr. Gentile reasonably believed SureTrader was operating squarely within the bounds of the law.  And his belief regarding SureTrader's compliance was more than reasonable; the Enforcement Staff's position in this proposed disciplinary action is entirely

CONFIDENTIAL

GENTILE0004395

novel.   To our knowledge, FINRA has not brought a single case alleging a Rule 15 violation based on facts similar to those here.  The Enforcement Staff's preliminary determination that Mr. Gentile aided and abetted SureTrader is a *post hoc* interpretation of the relevant rules and formal SEC guidance, and attempts to penalize Mr. Gentile for conduct that he could not possibly have known would later be deemed a violation.  Any disciplinary action here would raise serious due process concerns. Further, disciplinary proceedings would undermine at least thirty years of the Commission's thoughtful public policy determination that offshore broker dealers may service a U.S. customer so long as the broker dealer takes no affirmative steps to solicit that customer. Bringing a disciplinary action against Mr. Gentile would accomplish the exact opposite of the SEC's stated public policy underpinning these regulations. Accordingly, Mr. Gentile respectfully requests that FINRA decline to pursue this matter any further.

## **FACTUAL BACKGROUND**

Swiss America is a Nassau, Bahamas-based broker dealer licensed by the Securities Commission of the Bahamas.  It is not registered with the SEC and is not a FINRA member. SureTrader is a division of Swiss America that provides on-line trading access for international equities traders.[1]  It is among the few (if not only) Bahamian broker dealers that offers its international customers the ability to trade securities.

Guy Gentile founded SureTrader in December 2011.  Mr. Gentile is a veteran securities trader and entrepreneur who prior to founding SureTrader had created several entities that are based on online trading, proprietary trading, high-speed algorithmic trading and financial trading technology.  In 1999, he founded Stock USA Execution Services, Inc., a United States registered

---

[1] There is no relevant distinction between the two entities.

CONFIDENTIAL                                                    GENTILE0004396

broker dealer that provides trade execution and brokerage services to high-frequency, institutional, broker dealer and active-trading clients.  In 2009, he founded ProTrade Securities, LLC, a SEC registered broker-dealer and member of the CBSX Stock Exchange. Mr. Gentile has never been censured or barred by any regulatory agency.

Swiss America currently has 15 employees who report to SureTrader's Director and Chief Compliance Officer, Philip Dorsett, a nine-year veteran of the securities industry.  Mr. Dorsett received his Bachelor's degree from the University of South Florida and his Masters in Business Administration (MBA) in Finance from Nova Southeastern University.  He stays current with the regulatory environment and regularly attends compliance workshops and securities training institutes. SureTrader's decision to hire Mr. Dorsett as a CCO was covered in the Bahamian press and treated as a sign of SureTrader's impressive market presence in that country and around the world.  In addition to Mr. Dorset, SureTrader's management includes a certified public accountant, and each of 15 SureTrader employees has, at a minimum, a bachelor's degree.

SureTrader has, in a very short amount of time, established itself as one of the most well-respected and largest broker dealers in the Bahamas.  It is attractive to its international customers for a number of reasons.  SureTrader permits customers to open an account with a minimal initial investment, an opportunity that is premised on the firm's novel philosophy that it is possible to be a successful day trader with significantly less startup capital than typically suggested. Because the firm is in the Bahamas, and is regulated by the Bahamian Securities Commission, it is not subject to the same regulations as firms that are under the jurisdiction of Canada, the European Union and the United States.  Specifically, clients are not subject to the Commission's Pattern Day Trading Rule.  The firm also offers clients a 6:1 margin, which is significantly

5

GENTILE0004397

greater than the Canadian 3:1 margin cap and the US 4:1 limit.  (Because of this increased leverage, however, the firm requires its clients to diversify, and hedge themselves.)  SureTrader also charges substantially less per trade than conventional online brokerages.  These attributes permit SureTrader to promote itself and to solicit non-U.S. persons to use it as their broker dealer, rather than an American, Canadian, or European broker dealer.  SureTrader.com directly compares itself to QuestTrade (a Canadian Broker Dealer) and Saxo (a European Broker).

Under Mr. Dorsett's watch, SureTrader markets its services only to the English-speaking market *outside of the United States.* The attached summary of SureTrader's Google AdWords campaigns shows that SureTrader is focused on the English-speaking investor populations in several countries, including Australia, the Bahamas, Canada, Germany, India, the Netherlands and the United Kingdom. A November 2013 screen shot of SureTrader's Google AdWords campaign is attached hereto as Exhibit A. Similarly, SureTrader's Facebook marketing campaign is targeted to several non-U.S. jurisdictions.  A November 2013 screen shot of SureTrader's Facebook advertising is attached hereto as Exhibit B.  Analytical data from Facebook suggests that SureTrader has achieved deepest market penetration in New Delhi, India. *See* screen shot of SureTrader's Facebook page, attached hereto as Exhibit C.  SureTrader does not market itself to U.S. persons through any print or electronic media, nor does it target the United States in any Google, Twitter, Facebook, or other social-media advertising platform.

I.   **U.S. residents are blocked from accessing SureTrader's website advertisements**

SureTrader takes its non-solicitation obligation under Rule 15a-6 seriously, and has taken every reasonable measure to ensure that it, and its employees, comply with the Rule.  Perhaps most significantly, it blocks potential U.S. investors from accessing its website, "www.suretrader.com" ("the SureTrader website").

6

GENTILE0004398

When any individual's browser opens to the SureTrader website, the viewer is <u>not</u> taken to the SureTrader.com homepage, but is rather confronted by a "pop-up" blocker.  The pop-up has the effect of prohibiting access to any information that is on the website unless the viewer first affirms and agrees with the site's terms and conditions. This pop-up blocker states in relevant part:

> **\*\*Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Click continue below if you are a Non-US resident and you have read and understood SAS policy with regard to US customers and would like to continue.**

A copy of the full text of the "Terms and Conditions" contained in the pop-up blocker is attached hereto as Exhibit D.  Only individuals who accept this pop-up clickwrap agreement,[2] in which the individual affirms they are not a U.S. resident, are given access to information on the website.

This firm practice reflects a conservative approach to Rule 15a-6, as there is nothing in the Commission's guidance that suggests a foreign broker dealer must take affirmative steps to block U.S. persons from viewing its website.  There is no known, legitimate, technological manner to completely block U.S. residents from accessing a particular website. The pop up clickwrap agreement is an effective and reasonable mechanism for preventing U.S. residents from accessing the SureTrader site.  Indeed, other industries regularly utilize such agreements in order to insulate themselves from charges of inappropriate advertising.  For example, while there

---

[2] "A clickwrap agreement appears on an Internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the Internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). Courts have almost universally held such express clickwrap agreements to be enforceable. *Id.* at 235-39 (upholding clickwrap forum-selection clause).

7

GENTILE0004399

is no law requiring alcohol manufacturers to block their websites from minors by using an age verification clickwrap agreement, practically every producer does so.[3] The practice is in accord with guidance from the Federal Trade Commission that such methods are a best practice for preventing minors from accessing a website. The FTC has noted that, unlike other advertising such as "television or print ads," web sites are different because "consumers must seek them out" and "their content *does not appear unsolicited*."[4]   Similarly, here SureTrader operated under the reasonable assumption that its clickwrap agreement would be as effective in preventing U.S. persons from accessing its website.

SureTrader anticipated that an individual who was confronted with the pop up blocker might lie about citizenship.  While Commission guidance is that foreign broker dealers will not be found to have solicited any U.S. Person that circumvents the reasonably designed measures, i.e., by falsely responding to residence questions, SureTrader nevertheless instituted additional safeguards.[5]  In addition to the pop up blocker, SureTrader designed its website so that *every* page on SureTrader.com displays the following message, in bold, conspicuous lettering:

---

[3] The three major alcohol manufacturer industry groups have adopted age verification as a best practice. *See* Beer Institute Advertising and Marketing Code at 4; Distilled Spirits Council of the United States, Guidance Note on Responsible Digital Marketing Communications at 1, available at www.discus.org/assets/1/7/DISCUS_Digital_Communications_Guidelines.pdf; Wine Institute, Guidance Note on Digital Marketing Communications at 1, available at www.wineinstitute.org/files/Digital_Marketing_Guidelines_FINAL.pdf (same).

[4] In 1999, the FTC identified, as a best practice, the "use of systems to limit access to [alcohol web] sites to users that state that they are over the age of 21." Federal Trade Commission, Alcohol Marketing and Advertising: A Report to Congress, at 16 (September 2003), available at www.ftc.gov/sites/default/files/documents/reports/alcohol-marketing-and-advertising-federal-trade-commission-report-congress-september-2003/alcohol08report.pdf).

[5] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516, at 6 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

CONFIDENTIAL                                                                                      GENTILE0004400

> **Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations.**
>
> **Swiss America Securities, Ltd does not solicit U.S. resident clients.**

This disclaimer is positioned in the website such that it is impossible for anyone who is viewing the website to notice see it. SureTrader decided to include this language on its website specifically because it is recommended by the United States Securities and Exchange Commission as a best practice for foreign broker dealers.

Further, the SureTrader website is designed so that the only way any individual can open an account with SureTrader is to fill out an online application that is only accessible through the website. The application requires disclosure of personal information including, among other things, the applicant's financial background (including references), investment experience, and mailing address. The purpose of requiring a mailing address is to enable SureTrader to determine whether a potential client is a U.S. resident.

If SureTrader becomes aware that the potential customer is a U.S. resident, i.e., by noticing a US address on the application, SureTrader policies, overseen by the company's Chief Compliance Officer, require an inquiry into whether that individual was solicited by SureTrader or whether the individual initiated contact with the company on their own accord. One of the application forms required for U.S. residents who seek to open an account with Swiss America is an "Unsolicited Acknowledgement Agreement" ("the UAA"). The UAA includes the affirmation that "in no way did Swiss America Securities, Ltd solicit me to become a client. I initiated contact with Swiss America Securities, Ltd. on an unsolicited basis." UAA ¶ i. In this manner, Swiss America is able to track U.S. persons for whom it effects securities transactions to

9

GENTILE0004401

ensure that these clients came to SureTrader on their own accord and were not solicited by any internet activity.

II.    **SureTrader's internet activity did not target U.S. persons; the Timothy Sykes Webcast only solicited non-U.S. persons**

Timothy Sykes is a respected personality among securities traders who gained his reputation by having made his first million from using the thousand dollars he received for his bar mitzvah to trade securities. [6]  He now makes a living both trading for himself, and training his "students" (traders who pay Mr. Sykes for access to his various instructional content) how to make money in trading stocks.  He runs a website under the Timothyskyes.com domain name, which is where his students have access to his live webcasts, and other research materials.  Mr. Sykes has over 2,500 students in over 65 countries.[7]  Mr. Sykes is not an officer, director, employee, nor does he have any ownership interest in SureTrader (or Swiss America).

Having had a pre-existing relationship with Mr. Gentile, Mr. Sykes opened an account with SureTrader once the company started accepting US customers.[8]  Mr. Sykes found early success there and accordingly began touting it to his students.  He also signed up with the affiliate program, in which SureTrader clients are entitled to referral fees for referring *non-US clients* to SureTrader.

---

[6] Mr. Sykes has been described as "a voluble . . . hedge fund manager who made more than a million dollars off his bar mitzvah money" through online trading. Michael de la Merced, "Culturally, Hedge Funds Go Public," New York Times (December 8, 2006) (available at www.nytimes.com/2006/12/08/business/media/08hedge.html?_r=1&).

[7] TimothySykes.com, available at www.timothysykes.com/about/#.

[8] For the first few months SureTrader was open the company had a policy to not accept any U.S. persons as clients.  At that time, none of the non-solicitation policies discussed herein were in effect, as there was no need because of the general ban on providing services for U.S. persons.

10

                                                                          GENTILE0004402

Sykes signed the standard affiliate contract, which states in relevant part:

> **IT IS SPECIFICIALLY STATED THAT ACCESS TO AND/OR ANY USE OF, THE WEBSITE AND/OR THE PRODUCT AND/OR ANY SERVICES PROVIDED BY SURETRADER BY ANY RESIDENT AND/OR CITIZEN OF THE UNITED STATES OF AMERICA IS PROHIBITED. YOU MUST ABIDE BY ALL RULES AND REQUIREMENTS SET FORTH IN THE TERMS AND CONDITIONS OF OUR WEBSITE WITH RESPECT TO LEGALITY AND ELIGIBILITY OF USERS OF THE PRODUCT.**

Accordingly, Mr. Sykes, like all other clients who have signed up for the affiliate program, is well aware of SureTrader's policies regarding U.S. persons.

In early February 2012, Mr. Sykes traveled to the Bahamas and visited SureTrader's offices, where he broadcasted a live-stream webcast on or about February 8.  During the filming of this webcast, Mr. Sykes invited Mr. Gentile to discuss SureTrader's business.  Importantly, Mr. Gentile agreed to be interviewed during the webcast only after: (1) inquiring with the Chief Compliance Officer whether this type of internet activity was permissible; (2) receiving approval from the CCO; (3) reminding Mr. Sykes that he could not say anything that could be construed as soliciting U.S. persons; and (4) receiving such assurance from Mr. Sykes. The interview lasted roughly twenty minutes, and during the entire question and answer period, Mr. Gentile was clear that he was only interested in soliciting non-U.S. persons and that SureTrader does not solicit U.S. persons.

Mr. Gentile did not originally believe that the video was being recorded and made available to the public on Mr. Sykes' website. However, as soon as he learned about it, he requested that Mr. Sykes embed the required non-solicitation language on the video's landing page.  This, combined with SureTrader's Website, which blocks US citizens from viewing it, satisfied SureTrader's Chief Compliance Officer – and Mr. Gentile – that SureTrader had taken sufficient precautionary measures reasonably designed to ensure that this internet activity did not

CONFIDENTIAL                                                                                          GENTILE0004403

result in effecting securities transactions on behalf of U.S. persons.  Other than this single

webcast, Enforcement Staff has not brought any other questionable Internet activity to Mr.

Gentile's attention.

## LEGAL ARGUMENT

I.   **Foreign broker dealers may service U.S. investors without registering with the Commission if they do not affirmatively solicit them**

Foreign broker dealers are permitted to engage in securities transactions with or on behalf

of US persons without registering with the Securities and Exchange Commission so long as the

broker dealer did not solicit the U.S. customer.[9]  In adopting this exemption, the Commission

sought to avoid a regulatory scheme in which foreign broker-dealers "refuse to deal with U.S.

persons under any circumstances."[10]  Indeed, the Commission's policy since the late 1980s has

been to foster the ability of U.S. customers to benefit from the "increasing internationalization of

the securities marketplace," and the steadily increasing "desire of investors to trade in financial

markets around the world."[11]  The Commission was clear that the unsolicited trades exemption

of Rule 15a-6 should foster the ability of U.S. investors to seek out opportunities to utilize the

---

[9] *See* Exchange Act § 15(a)(2); Rule 15a-6; *Registration Requirements for Foreign Broker-dealers*, Exchange Act Release No. 27017 (July 11, 1989), 54 Fed. Reg. 30013, 30020 (July 18, 1989) ("Adopting Release").[9]

[10] The Adopting Release notes at 30017:

> Although the requirements of Section 15(a) do not distinguish between solicited and unsolicited transactions, the Commission does not believe, as a policy matter, that registration is necessary if U.S. investors have sought out foreign broker-dealers outside the United States and initiated transactions in foreign securities markets entirely of their own accord. In that event, U.S. investors would have taken the initiative to trade outside the United States with foreign broker-dealers that are not conducting activities within this country. Consequently, the U.S. investors would have little reason to expect these foreign broker-dealers to be subject to U.S. broker-dealer requirements. Moreover, requiring a foreign broker-dealer to register as a broker-dealer with the Commission because of unsolicited trades with U.S. persons could cause the foreign broker dealer to refuse to deal with U.S. persons under any circumstances.

[11] *Id*. at 30014.

CONFIDENTIAL

GENTILE0004404

services of foreign broker-dealers, and that foreign broker dealers should not believe they are prohibited from dealing with U.S. investors under any circumstances.

The Adopting Release did not attempt to fully define solicitation, preferring instead to leave the question to staff interpretation on a "case by case basis."[12] The Commission, however, did provide examples of conduct that would constitute solicitation: telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect transactions; advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United States or on any radio or television station whose broadcasting is directed into the United States; and conducting investment seminars for U.S. investors.[13]  In short, the Commission categorized "solicitation" as affirmative actions by a foreign broker dealer specifically directed at a U.S. person.

**II.    A foreign broker dealer's advertising on its website is not a solicitation as long as it takes "reasonable measures" to not service any U.S. investor that was targeted by the foreign broker dealer's other Internet Activities**

The only guidance issued by the Commission on the use of websites and the internet was issued in March 1998, at a time when the internet bore little resemblance to what it does today. Indeed, while it is hard to comprehend, Google did not exist in March 1998 and dial-up modems were the norm, greatly restricting the flow of information.  Searching the web was a slow and cumbersome process, with unreliable search engines and slow connection speeds.  Blogs had not yet come into widespread use, and video sharing was not available (YouTube is another eight years away).

Against this backdrop, the Commission issued guidance regarding how foreign broker dealers may (1) advertise on a website, and (2) engage in other "internet activities" without

---

[12] *Id*. at 30021.

[13] *Id*. at 30018.

CONFIDENTIAL                                                                                    GENTILE0004405

running afoul of non-solicitation regulations.[14] The Commission "clarified" (without altering the fundamental registration requirements) that a foreign broker dealer's merely advertising on a website will not constitute solicitation of a US customer.  If a foreign broker dealer wishes to engage in other "Internet activities," besides advertising on a website, it must take "measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons. . ." who were exposed to the internet activities.

The Commission did not define the term "Internet activities," but since the Commission stated that it was only clarifying pre-existing rules without altering them, the Commission must have intended that the phrase "Internet activities" be interpreted in line with the examples of "solicitation" provided in the Adopting Release, i.e., direct solicitation such as phone calls to a U.S. person, targeted mailings, advertisements in papers of general circulation.  This is a reasonable interpretation of the 1998 Release, especially in light of the Commission's guidance that the registration exemptions should not be interpreted to, "preclude some of the most promising internet applications by investors, issuers, and financial service providers."[15]

For illustrative purposes, the Commission provided an example of one "reasonable measure" to protect against an accusation that any Internet activity was intended to solicit U.S. persons:

- Posting of a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and
- Refusing to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.[16]

---

[14] *See Use of Internet Web Sites To Offer Securities, Solicit Securities Transactions, or Advertise Investment Services Offshore*, Release No. 33-7516 (Mar. 23, 1998) ("The 1998 Release"), available at www.sec.gov/rules/interp/33-7516.htm.

[15] The 1998 Release § III.A.

[16] *Id.* § III.B.

CONFIDENTIAL

GENTILE0004406

However, the Commission left individual Compliance officers to determine if better, alternative options exist.  Indeed, the Commission stressed that "[t]hese procedures are not exclusive" and that "[a]doption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities."[17]  Stated differently, while posting a prominent disclaimer on the website that contains promotional materials and refusing to provide services to any potential U.S. person is one way for foreign broker dealers to engage in Internet activity and avoid running afoul of the non-solicitation rules, these are not the only precautions foreign broker dealers can take to ensure that their Internet activities have not targeted U.S. persons and resulted in engaging in securities transactions for or on behalf of an investor that did not reach out to the broker dealer "on their own accord."

The Commission also instructed foreign broker dealers that have a website and intend to rely on Rule 15a-6's exemption that they should obtain "as a precaution reasonably designed to prevent [a finding of solicitation], affirmative representations from potential U.S. Customers that they deem unsolicited that those customers have not previously accessed their websites."  Or the broker-dealer could maintain records that are "sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its website."[18]

---

[17] *Id.*

[18] *Id.* § VII.A..

CONFIDENTIAL                                                                    GENTILE0004407

A.    SureTrader's website does not solicit U.S. citizens or residents

1.    *SureTrader goes beyond the Commission guidance on maintaining a website and it implemented reasonable procedures to ensure it does effect securities transactions with U.S. persons as a result of its Internet activities.*

Once SureTrader changed its policy to start accepting non-solicited U.S. persons as customers in early 2012, SureTrader's Compliance Officer reviewed all relevant Rules and Commission guidance.  While the Guidelines are outdated, internally contradictory, and unclear, SureTrader made a good faith effort to put into place firm policies aimed at conducting business squarely in line with U.S. non-solicitation laws.  By any objective measure, SureTrader went beyond what the most recent Commission guidance suggests as a best practice for avoiding solicitation of U.S.-based persons.[19]  While SureTrader did not (nor was it required to) refuse to effectuate securities transactions for any U.S. person under any circumstances, it followed the Commission's guidance by adopting other, "equally or more effective precautions" to avoid doing business with U.S. persons that accessed its website or its Internet activity.  Such measures included: (1) preventing U.S. persons from accessing its website, and (2) reminding all visitors on every page of its website that Swiss America Securities does not service U.S. resident clients. These two design features of the SureTrader website negate any charge of improper solicitation.

But the company, following Commission guidance, has also maintained records that are sufficiently detailed and verifiable to reliably determine both that SureTrader's Internet activities did not result in effecting securities transactions with U.S. persons, and that none of its U.S. customers were solicited.  Every United States person that has opened an account with

---

[19] SureTrader's interpretation of the Commission's guidance regarding maintaining a website also finds support in a more well-developed area of law of *in personam* jurisdiction. In determining whether a potential defendant's Internet activity has subjected him or her to a court's jurisdiction, federal courts employ a "sliding scale analysis" considering "the nature and quality of commercial activity that an entity conducts over the Internet."[19] Generally, personal jurisdiction does not extend to "defendants who simply post information on a web site that is accessible to residents of the forum state. Such 'passive' web sites do no more than make information available to those interested in it."

CONFIDENTIAL                                                                                    GENTILE0004408

SureTrader has executed an Unsolicited Acknowledgement Agreement affirming that they "initiated contact with Swiss America Securities on an unsolicited basis." Swiss America maintains all of these records in the ordinary course of business.

B.   <u>No content contained in SureTrader.com is targeted at U.S. persons and nothing said during the Sykes Webcast was obviously targeted at U.S. persons.</u>

What constitutes an adequate measure to avoid targeting U.S. investors is obviously case specific.  The Commission takes a totality of the circumstances approach in determining whether conduct was actually aimed at targeting at U.S. persons.  As a result, regardless of what precautions a foreign broker dealer adopts to prevent U.S. persons from accessing its website or blocking direct communications, if the foreign broker dealer engages in conduct that makes it appear obvious that it is targeting U.S persons, the registrations exemptions will not be applicable.  For example, the Commission has noted solicitations which emphasize an investor's ability to avoid U.S. incomes taxes on his investments is conduct that is obviously aimed at US citizens or residents, as they are the only individuals who would need to attempt to avoid U.S. income taxes.

Here, there is no content contained in either the website or as part of other Internet activities that is obviously aimed at U.S. persons.  In fact, all of the language found in both the website and the Sykes webcast – the only internet activity Enforcement Staff brought to Mr. Gentile's attention – is clearly aimed at non-U.S. persons. Contrary to suggesting that U.S. persons could avoid income taxes by dealing with SureTrader, the account opening paperwork requires every U.S. person to acknowledge that he or she has " reporting obligations to the United States Government of income/loss, money transfers to an offshore brokerage firm, or ownership or control of a foreign entity" and that the customer has "independently sought

17

GENTILE0004409

professional legal and tax advice before opening an account with Swiss America Securities Ltd."
SureTrader provides all U.S. clients with their tax information, including a breakdown of total
net profits per symbol, and a breakdown of all fees paid

During a November 12 phone conference with Enforcement Staff, counsel for Mr.
Gentile was informed that the language on SureTrader's website is clearly aimed at U.S. persons
because it references the Pattern Day Trading Rule, and U.S. margin limits.  But these types of
statements are not obviously targeted at U.S. persons, and certainly are not the type of statements
that the Commission referenced in its guidance as giving rise to an inference of solicitation.  In
fact, these statements are targeted at non-U.S. persons that SureTrader wants as clients, and are
intended to highlight to those foreign persons that SureTrader has a competitive advantage over
U.S. broker dealers who are subject to these restrictions.  The Enforcement Staff is simply wrong
to suggest that a foreign broker dealer targets U.S. persons by making any statement about
America, Americans, or American regulations.  By making such statements, SureTrader is
competing with U.S. broker dealers for English-speaking investors in non-US jurisdictions; it is
not targeting U.S. persons.

This point is equally applicable regarding the only Internet activity at issue, the Sykes
Webcast.  There is not a single statement on that webcast that is obviously targeting Americans.
And in fact, a review of the webcast bears this out.  Specifically:

1. When asked about SureTrader's high wire transfer fees, Mr. Gentile responded
   that wires are more expensive because they are international, as "we're not
   dealing with US firms."
2. When Gentile was asked if SureTrader can do an ACH transaction, he
   immediately responded "no, because those wire transfers only come from US
   banks, and SureTrader does not interact with US banks."
3. When someone asked about SureTrader's Insurance Underwriter, Mr. Gentile
   recommended the individual visit the website, knowing that Americans are
   blocked from viewing the website.

18

GENTILE0004410

4.  When asked which countries' citizens are accepted as clients, Mr. Sykes responded that SureTrader accepts clients from the "United Kingdom, Australia, and Canada."  Mr. Gentile responded that "the regulators tell us which countries are on the list of who we can't do business with and we follow the rules."

There are no statements about avoiding U.S. income tax or any other statement that can only be meant to target U.S. persons.

### III.    Mr. Gentile did not aid and abet any violation

A.    <u>There is no underlying violation; Mr. Gentile had no awareness of a violation, and acted in good faith.</u>

Three elements are required to establish an aiding and abetting violation of federal securities laws: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation.[20] Individuals who are convicted of aiding and abetting securities violations are universally those who knowingly engaged in conduct that they knew to be wrong.

For the reasons discussed above, there can be no aiding and abetting liability on the part of Mr. Gentile. There is no violation of Rule 15a-6 by Swiss America, the primary party.  But even if FINRA now, for the first time, takes the position that a pop-up blocker that blocks U.S. residents from viewing a foreign broker dealer's website, bold disclaimers on every page, and a non-solicitation policy that follows Commission guidance to a T is insufficient to demonstrate compliance with the unsolicited transaction registration exemption, Mr. Gentile certainly had no advance notice of that position. Neither FINRA, nor the Commission, nor any other regulatory

---

[20] *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), *vacated on other grounds sub nom Fryar v. Abell*, 492 U.S. 914 (1989); *Abraham & Sons Capital, Inc.*, 75 S.E.C. Docket 1481, 1492 (July 31, 2001) (citing *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000)).

CONFIDENTIAL                                                                                           GENTILE0004411

body has ever advanced such a strict interpretation of Rule 15a-6(1). Therefore, even were the Commission to find an underlying violation, Mr. Gentile should still not be found to have intentionally aided and abetted it, as he had no prior notice of what the new interpretation of the rules would be. [21]

Furthermore, Mr. Gentile did not aid and abet a registration violation of the Exchange Act by participating in the Sykes webcast. The webcast, as discussed fully above, was not aimed at US persons, but rather at Mr. Sykes' large non-U.S. audience. It was these individuals, all English speaking non-U.S. investors, who Mr. Gentile was soliciting. And even if U.S. persons had access to the webcast (whether during its live taping or after being placed on the Sykes webpage) this conduct should not be found to be a solicitation of those persons because the website and the compliance policy provided a backstop that should have prevented any U.S. person who saw the webcast from believing that they were being solicited, or permitted to access the website or open an account with SureTrader. Mr. Gentile reasonably believed that the website's design and language made clear that SureTrader was not soliciting U.S. persons and therefore anything he said on the webcast could not be considered a solicitation of U.S. investors.

Finally, the webcast was a one off event that occurred two months after SureTrader opened for business and that has never been repeated. Importantly, other than this one Internet activity that Enforcement Staff has raised, there is not a single allegation of affirmative solicitation by SureTrader. Even if FINRA is not persuaded that the webcast was aimed at non-U.S. persons or that Mr. Gentile believed the website provided the appropriate backstop, it is

---

[21] *See S.E.C.*, *Report of the Advisory Committee on Enforcement Policies and Practices* at iv (June 1, 1972) ("Wells Report"), *reprinted in* Arthur F. Mathews, et al., Enforcement and Litigation under the Federal Securities Laws 1973, at 275 (Practicing Law Institute 1973) ("The Commission should give due consideration in cases which appear to involve [] good faith efforts at compliance to exercising its discretion against bringing a formal enforcement proceeding notwithstanding the appearance of a violation.").

20

questionable whether this is the type of disciplinary action that FINRA ought to bring.  There is no pattern of trying to solicit U.S. investors.  There is no obvious and blatant solicitation of any U.S. person.  There is no systematic attempt to evade Commission registration requirements.  A webcast that occurred once, and which occurred in the context of a company with well-established and well-documented non-solicitation policy, should not form the basis of any disciplinary action against its founder on an aiding and abetting theory.

IV.     **A disciplinary action against Mr. Gentile for this conduct is inconsistent with the Commission's approach to foreign broker dealers and would raise due process concerns**

To our knowledge, no federal court has interpreted the Commission's guidance in the 1998 Release on the "unsolicited transactions" exemption.  Indeed, FINRA has never before – so far as we know – instituted a disciplinary action against an individual based on similar facts.  There is, however, one case currently pending before Judge Daniels of the United States District Court for the Southern District of New York.  In that case, the SEC is claiming a foreign broker dealer solicited U.S. persons by maintaining a website and servicing U.S. persons. *See Securities and Exchange Commission v. Gibraltar Global Securities, Inc. et al.*, No. 13 Civ. 2575 (GBD) (S.D.N.Y. filed Apr. 18, 2013).  The *Gibraltar* case involves allegations of significantly more egregious conduct than the allegations here. While Judge Daniels has not yet ruled on the defendants' motion for summary judgment, the oral argument on that motion on August 13, 2013, is illuminating for purposes of determining whether FINRA could ultimately be successful in a disciplinary action against Mr. Gentile.

During that oral argument, a transcript of which is attached hereto as Exhibit F, Judge Daniels posed two questions that he believes drive the analysis of whether a foreign broker dealer's website constitutes an improper solicitation.  He asked of the defendants, "Who are you

CONFIDENTIAL                                          GENTILE0004413

soliciting through [your] website.  And how does it exclude rather than include U.S. Investors."[22]
Unlike SureTrader, the defendants in *Gibraltar* did not do anything to exclude U.S. persons from
viewing its website – and takes the very reasonable position that it was not legally required to.
Unlike Swiss America, Gibraltar did not use a click-wrap blocking agreement, did not have a
disclaimer on its site that it did not service US-based persons, and did not maintain records
demonstrating non-solicitation.[23]  Moreover, Gibraltar's other Internet activity included conduct
that was exactly what Commission guidance said was inappropriate.  Specifically, Gibraltar
promoted U.S. persons' ability to avoid U.S. taxes.  Even under these facts, however, Judge
Daniels indicated that *if* the case survived a motion to dismiss, the Complaint "quite frankly [] is
clearly minimally sufficient," and that "this is one of the weaker set of allegations that one can
make with regards to a solicitation claim…"[24]

  Regardless of whether Judge Daniels grants summary or judgment, the *Gibraltar*
proceedings strongly suggest that there can be no aiding and abetting liability on the part of Mr.
Gentile here.  If the only articulation by a federal judge on this issue is that a claim of solicitation
based on merely having a website which does not block US persons or contain disclaimer
language and services U.S. persons is "minimally sufficient" to make out a solicitation claim, we
respectfully submit that where, as here, (1) the foreign broker dealer's website blocks U.S.
persons, (2) contains disclaimer language on every page, (3) the broker dealer inquires of U.S.

---

[22] Exhibit F at 6.

[23] *Id*.  Rather, the defendants argued that they were not required to exclude U.S. investors from viewing
the site, nor were they required to post the disclaimer.  The Gibraltar defendants instead argue that, as
long as customers were not solicited *to* the website, there was no solicitation violation.  The Commission
disagrees with Gibraltar's position and argues that the solicitation violation was the advertising material
on the website itself.  The Commission also takes the position that solicitation to the website is not the
violation.  The Sykes webcast can only be interpreted to be a solicitation to the website, and according to
the Commission such conduct is not a violation.

[24] *Id*. at 49-50.

CONFIDENTIAL    GENTILE0004414

persons whether they were solicited, and (4) maintains records establishing that the potential U.S. customer affirmatively sought out SureTrader, that SureTrader is operating well within the bounds of Rule 15a-6 and that Mr. Gentile was clearly acting in good faith.  And a single webcast, even if found to be directed at U.S. persons – which it was not – should not be found conduct sufficient to give rise to a disciplinary action given all of the other safeguards the foreign broker dealer put in place.

## **CONCLUSION**

FINRA's proposed disciplinary action against Mr. Gentile is unwarranted.  It represents an abrupt shift away from the Commission's long-term policy to permit foreign broker dealers to service U.S. customers whom they do not solicit and who reach out to the broker dealer "on their own accord." There is no precedent for a case against a broker dealer who has done what SureTrader has done to follow U.S. law and Commission guidance.   It is easy to see why the Commission brought charges against Gibraltar.  That firm was clearly soliciting U.S. persons and a review of the transcript in the Oral Argument demonstrates that they have no compelling response to the Judge's simple questions, *who were you soliciting and how did you exclude Americans*?  Mr. Gentile has easily answered these pivotal questions.  The *Gibraltar* case is the exact opposite of the case here.  Even if FINRA takes issue around the edges of how the non-solicitation program was run, there can be no serious debate that SureTrader tried, in good faith, to follow Commission guidance.  Respectfully, FINRA should not promulgate policy through the novel, post hoc interpretation of Commission rules.

For the foregoing reasons, we respectfully submit that FINRA disciplinary action against Mr. Gentile is unwarranted in this case.

23

CONFIDENTIAL

GENTILE0004415

If Enforcement Staff still believes that a disciplinary action against Mr. Gentile is appropriate after reviewing this Wells Submission and the Oral Argument Transcript, we respectfully request an in-person meeting with Enforcement Staff prior to submitting these materials for senior review.


DATED:          January 10, 2014

                                             Respectfully submitted,


                                             Adam Ford
                                             Harris O'Brien, St. Laurent &
                                             Chaudhry LLP
                                             111 Broadway, Suite 1502
                                             New York, NY 10006
                                             (917) 512-6937
                                             aford@harrisobrien.com

                                             *Attorney for Guy Gentile*

24