Release No. 1125 (S.E.C. Release No.), Release No. 1710, Release No. 7516, Release No. 23071, Release No. 39779, Release No. 33-7516, Release No. 34-39779, Release No. IA - 1710, Release No. IC - 23071, Release No. IS - 1125, 66 S.E.C. Docket 1869, 1998 WL 128173

Securities and Exchange Commission (S.E.C.)
Securities Act of 1933
Securities Exchange Act of 1934
Investment Advisers Act of 1940
Investment Company Act of 1940
International Series
17 CFR Parts 231, 241, 271, 276



SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

STATEMENT OF THE COMMISSION REGARDING USE OF INTERNET WEB SITES TO OFFER SECURITIES, SOLICIT SECURITIES TRANSACTIONS OR ADVERTISE INVESTMENT SERVICES OFFSHORE

March 23, 1998

\*1 **AGENCY:** Securities and Exchange Commission

**ACTION:** Interpretation

**SUMMARY:** The Securities and Exchange Commission is publishing its views on the application of the registration obligations under the U.S. federal securities laws to the use of Internet Web sites to disseminate offering and solicitation materials for offshore sales of securities and investment services.

**EFFECTIVE DATE:** March 23, 1998

**FOR FURTHER INFORMATION CONTACT:** Paul Dudek, Chief, and Rani Doyle, Attorney, Office of International Corporate Finance at 202-942-2990 (with respect to Securities Act issues); Paula Jenson, Deputy Chief Counsel, Division of Market Regulation, at 202-942-0073 (with respect to broker-dealer registration issues), Elizabeth King, Senior Special Counsel, Division of Market Regulation, at 202-942-0140 (with respect to exchange registration issues); and Karrie McMillan, Assistant Chief Counsel, Sarah A. Wagman, Special Counsel, and Brendan C. Fox, Attorney, Division of Investment Management, at 202-942-0660 (with respect to matters relating to investment companies and investment advisers).

**SUPPLEMENTARY INFORMATION**

I. EXECUTIVE SUMMARY

The Internet permits market participants to disseminate advertisements and other information regarding securities and investment services across national borders. Because persons in the United States have access to this securities-related information, market participants have expressed uncertainty about the application of the registration requirements of the U.S. securities laws to their offshore Internet offers (i.e., offers over Internet Web sites of securities or investment services that by their terms are not made to U.S. persons). Today, we are providing our views on how issuers, investment companies, broker-dealers, exchanges and investment advisers may use Internet Web sites to solicit offshore securities transactions and clients without the securities or investment company being registered with the Commission under the Securities Act of 1933[1] or the

Investment Company Act of 1940,[2] or without the investment service provider registering under the Investment Advisers Act of 1940,[3] or the broker-dealer or exchange registering under the broker-dealer and exchange registration provisions under the Securities Exchange Act of 1934.[4]

The purpose of this interpretation is to clarify when the posting of offering or solicitation materials on Internet Web sites would not be considered activity taking place "in the United States." We are only providing clarification on this aspect of the registration requirements and are not altering the fundamental requirement that all offers and sales in the United States be registered under the U.S. securities laws or made under an applicable exemption.

**\*2** Under this interpretation, application of the registration provisions of the U.S. securities laws depends on whether Internet offers, solicitations or other communications are targeted to the United States. We would not view issuers, broker-dealers, exchanges, and investment advisers that implement measures that are reasonably designed to guard against sales or the provision of services to U.S. persons to have targeted persons in the United States with their Internet offers. Under these circumstances, Internet postings would not, by themselves, result in a registration obligation under the U.S. securities laws.

The determination of whether measures reasonably designed to guard against sales to U.S. persons have been implemented depends on the facts and circumstances, and can be satisfied through different means. We discuss in this release examples of measures that are adequate to serve this purpose for both U.S. and foreign entities. We also discuss why measures that are adequate for foreign issuers would not necessarily be adequate measures for U.S. issuers. U.S. issuers should undertake more restrictive measures when using the Internet to solicit offshore securities transactions.

This interpretation does not address the anti-fraud and anti-manipulation provisions of the securities laws, which will continue to reach all Internet activities that satisfy the relevant jurisdictional tests.[5] Even in the absence of sales in the United States, we will take appropriate enforcement action whenever we believe that fraudulent or manipulative Internet activities have originated in the United States or placed U.S. investors at risk. Further, we are not addressing the circumstances under which a U.S. court could exercise personal jurisdiction over a non-U.S. person with respect to that person's offshore Internet offer.

The interaction between the U.S. securities laws and the Internet can be expected to continue to evolve. As technology and practice develop, we may revisit these and related issues.

**II. BACKGROUND**

A. The Global Reach of the Internet
The development of the Internet presents numerous opportunities and benefits for consumers and investors throughout the world. It also presents significant challenges for regulators charged with protecting consumers and investors. Regulators in many countries are attempting to administer their respective laws to preserve important protections provided by their regulatory schemes without stifling the Internet's vast communications potential.[6] We share this goal in our administration of the U.S. securities laws.[7]

Information posted on Internet Web sites concerning securities and investments can be made readily available without regard to geographic and political boundaries.[8] Additionally, the interactive nature of the Internet makes it possible for investors to purchase electronically the securities or services offered. For these and other reasons, we believe that the use of the Internet by market participants and investors presents significant issues under the U.S. securities laws.

**\*3** Although this release focuses on Internet Web sites, the Internet offers a variety of forms of communication. We distinguish between Web site postings and more targeted Internet communication methods. More targeted communication methods are comparable to traditional mail because the sender directs the information to a particular person, group or entity. These methods include e-mail and technology that allows mass e-mailing or "spamming." Information posted on a Web site, however, is not

sent to any particular person, although it is available for anyone to search for and retrieve.[9] Offerors using those more targeted technologies must assume the responsibility of identifying when their offering materials are being sent to persons in the United States and must comply fully with the U.S. securities laws.

B. Regulation of Offers

Many registration requirements under the U.S. securities laws are triggered when an offer of securities or financial services, such as brokerage or investment advisory services, is made to the general public.

• Under the Securities Act, absent an exemption, an issuer that offers or sells securities in the United States through use of the mails or other means of interstate commerce must register the offering with the Commission.[10] An offering of securities may be exempt from registration if it is conducted as a "private placement," without any general solicitation of investors.[11]

• Under the Investment Company Act, a foreign investment company may not use the mails or other means of interstate commerce to publicly offer its securities in the United States or to U.S. persons unless the investment company receives an order from the Commission permitting it to register under the Investment Company Act.[12] A foreign investment company may, however, make a private offer of its securities in the United States or to U.S. persons in reliance on one of the exclusions from the definition of "investment company" under the Investment Company Act.[13]

• Under the Advisers Act, an adviser is prohibited from using the mails or other means of interstate commerce in connection with its business as an investment adviser, unless the adviser is registered with the Commission, or is exempted or excluded from the requirement to register.[14]

• Under the Exchange Act, a broker or dealer generally must register with the Commission if it uses the mails or any means of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security.[15]

• Under the Exchange Act, and exchange generally must register with the Commission if it uses the mails or any means of interstate commerce for the purpose of using its facilities to effect any transaction in a security or to report any such transaction.[16]

The posting of information on a Web site may constitute an offer of securities or investment services for purposes of the U.S. securities laws.[17] Our discussion of these issues will proceed on the assumption that the Web site contains information that constitutes an "offer" of securities or investment services under the U.S. securities laws.[18] Because anyone who has access to the Internet can obtain access to a Web site unless the Web site sponsor adopts special procedures to restrict access, the pertinent legal issue is whether those Web site postings are offers in the United States that must be registered.

III. OFFSHORE OFFERS AND SOLICITATIONS ON THE INTERNET

*4  A. General Approach

Some may argue that regulators could best protect investors by requiring registration or licensing for any Internet offer of securities or investment services that their residents could access. As a practical matter, however, the adoption of such an approach by securities regulators could preclude some of the most promising Internet applications by investors, issuers, and financial service providers.

The regulation of offers is a fundamental element of federal and some U.S. state securities regulatory schemes. Absent the transaction of business in the United States or with U.S. persons, however, our interest in regulating solicitation activity is less compelling.[19] We believe that our investor protection concerns are best addressed through the implementation by issuers and

financial service providers of precautionary measures that are reasonably designed to ensure that offshore Internet offers are not targeted to persons in the United States or to U.S. persons.[20]

B. <u>Procedures Reasonably Designed to Avoid Targeting the United States</u>
When offerors implement adequate measures to prevent U.S. persons from participating in an offshore Internet offer, we would not view the offer as targeted at the United States and thus would not treat it as occurring in the United States for registration purposes. What constitutes adequate measures will depend on all the facts and circumstances of any particular situation. We generally would not consider an offshore Internet offer made by a non-U.S. offeror as targeted at the United States, however, if:

• The Web site includes a prominent disclaimer making it clear that the offer is directed only to countries other than the United States. For example, the Web site could state that the securities or services are not being offered in the United States or to U.S. persons, or it could specify those jurisdictions (other than the United States) in which the offer is being made;[21] and

• The Web site offeror implements procedures that are reasonably designed to guard against sales to U.S. persons in the offshore offering. For example, the offeror could ascertain the purchaser's residence by obtaining such information as mailing addresses or telephone numbers (or area code) prior to the sale. This measure will allow the offeror to avoid sending or delivering securities, offering materials, services or products to a person at a U.S. address or telephone number.

These procedures are not exclusive; other procedures that suffice to guard against sales to U.S. persons also can be used to demonstrate that the offer is not targeted at the United States. Regardless of the precautions adopted, however, we would view solicitations that appear by their content to be targeted at U.S. persons as made in the United States. Examples of this type of solicitation include purportedly offshore offers that emphasize the investor's ability to avoid U.S. income taxes on the investments.[22] We are concerned that the advice that we provide to assist those who attempt to comply with both the letter and spirit of the securities laws will be used by others as a pretext to violate those laws. Sham offshore offerings or procedures, or other schemes will not allow issuers or promoters to escape their registration obligations under the U.S. securities laws.

**\*5** C. <u>Effect of Attempts by U.S. Persons to Evade Restrictions</u>
We recognize that U.S. persons may respond falsely to residence questions, disguise their country of residence by using non-resident addresses, or use other devices, such as offshore nominees, in order to participate in offshore offerings of securities or investment services. Thus, even if the foreign market participant has taken measures reasonably designed to guard against sales to U.S. persons, a U.S. person nevertheless could circumvent those measures.

In our view, if a U.S. person purchases securities or investment services notwithstanding adequate procedures reasonably designed to prevent the purchase, we would not view the Internet offer after the fact as having been targeted at the United States, absent indications that would put the issuer on notice that the purchaser was a U.S. person. This information might include (but is not limited to): receipt of payment drawn on a U.S. bank; provision of a U.S. taxpayer identification or social security number; or, statements by the purchaser indicating that, notwithstanding a foreign address, he or she is a U.S. resident. Confronted with such information, we would expect offerors to take steps to verify that the purchaser is not a U.S. person before selling to that person.[23] Additionally, if despite its use of measures that appear to be reasonably designed to prevent sales to U.S. persons, the offeror discovers that it has sold to U.S. persons, it may need to evaluate whether other measures may be necessary to provide reasonable assurance against future sales to U.S. persons.

D. <u>Third-Party Web Services</u>
An issuer, underwriter or other type of offshore Internet offeror may seek to have its offering materials posted on a third-party's Web site. In that event, if the offeror uses a third-party Web service that employs at least the same level of precautions against

sales to U.S. persons as would be adequate for the offshore Internet offeror to employ, we would not view the third-party's Web site as an offer that is targeted to the United States.[24]

When an offeror, or those acting on its behalf, uses a third-party's Web site to generate interest in the Internet offer, more stringent precautions by the offeror than those outlined in Section III.B. may be warranted. These precautions may include limiting access to its Internet offering materials to persons who can demonstrate that they are not U.S. persons. For example, additional precautions may be called for when the Internet offeror:

• Posts offering or solicitation material or otherwise causes the offer to be listed on an investment-oriented Web site that has a significant number of U.S. clients or subscribers, or where U.S. investors could be expected to search for information about investment opportunities or services; or

• Arranges for direct or indirect hyperlinks from a third-party investment-oriented page to its own Web page containing the offering material.

IV. ADDITIONAL ISSUES UNDER THE SECURITIES ACT

**\*6** Our Securities Act analysis assumes that the information posted on a Web site would, were we to deem it to occur in the United States, constitute an "offer" within the meaning of Section 5(c) of the Securities Act and Regulation S, a "public offering" prohibited under Section 4(2) of the Act, a "general solicitation or general advertising" prohibited under Rule 502(c) of Regulation D,[25] and a "directed selling effort" prohibited under Regulation S.[26] The focus of our analysis, then, is under what circumstances should we deem offshore Internet offers to which U.S. persons can gain access not to occur in the United States.

A. Offshore Offerings by Foreign Issuers
1. Regulation S

When a foreign issuer is making an unregistered offshore Internet offer and does not plan to sell securities in the United States as part of the offering, it should implement the general measures outlined in Section III.B. to avoid targeting the United States. Assuming that the offering is made pursuant to Regulation S, the offering must comply with all of the applicable requirements under that regulation, including the requirement that all offers and sales be made in "offshore transactions."[27]

2. U.S. Exempt Component

Foreign issuers commonly make offshore offerings concurrently with private offerings to U.S. institutional buyers. An offering exempt under Section 4(2) of the Securities Act may not involve "any public offering." Regulation D specifically prohibits the offer or sale of securities through a "general solicitation or general advertising." Publicly accessible Web site postings may <u>not</u> be used as a means to locate investors to participate in a pending or imminent U.S. offering relying on those provisions. If a Web site posting would be inappropriate for a U.S. private placement, an issuer should not attempt to accomplish the same result indirectly through the posting of an offshore Internet offer.

In addition to implementing the type of precautionary measures previously discussed, foreign issuers could implement other procedures to prevent their offshore Internet offers from being used to solicit participants for their U.S.-based exempt offerings, including:

• The Internet offeror could allow unrestricted access to its offshore Internet offering materials, but not permit persons responding to the offshore Internet offering to participate in its exempt U.S. offering, even if otherwise qualified to do so. In that situation,

the offeror would keep a record of all persons responding over the Internet and all persons who otherwise indicate that they are responding to the offshore Internet offering;[28] or

• The Web site offeror could ensure that access to the posted offering materials is limited to those viewers who first provide their residence information and, in doing so, do not provide information such as a U.S. area code or address that indicates that they are a U.S. person.[29] Thus, U.S. persons could obtain access only by misrepresenting their residence information.[30]

**\*7**  We believe that it would not be advisable for us to dictate the use of any one particular technology or screening method to protect against general solicitation in these instances. Any less costly, less intrusive method that is equally or more effective than those that we have suggested would be adequate as well.

In addition, the posted offering materials should relate only to the offshore offering.[31] The materials should contain only that information (if any) concerning the private U.S. offering that is required by foreign law to be provided to investors participating in the offshore public offering.[32]

B. Offshore Offerings by U.S. Issuers

Our approach to the use of Web sites to post offshore securities offerings distinguishes between domestic and foreign issuers.[33] For the following reasons, additional precautions are justified for Web sites operated by domestic issuers purporting not to make a public offering in the United States:

• The substantial contacts that a U.S. issuer has with the United States justifies our exercise of more extensive regulatory jurisdiction over its securities-related activities;

• There is a strong likelihood that securities of U.S. issuers initially offered and sold offshore will enter the U.S. trading markets; and

• U.S. issuers and investors have a much greater expectation that securities offerings by domestic issuers will be subject to the U.S. securities laws.

Our experience with abusive practices under Regulation S indicates that we should proceed cautiously when giving guidance to U.S. issuers in the area of unregistered offshore offerings. As a result, we would not consider a U.S. issuer using a Web site to make an unregistered offer to have implemented reasonable measures to prevent sales to U.S. persons unless, in addition to the general precautions discussed above in Section III.B., the U.S. issuer implements password-type procedures that are reasonably designed to ensure that only non-U.S. persons can obtain access to the offer.[34] Under this procedure, persons seeking access to the Internet offer would have to demonstrate to the issuer or intermediary that they are not U.S. persons before obtaining the password for the site.[35]

In the context of broader Securities Act reform, we have been considering whether the current general solicitation and other offering communications restrictions on issuers and other offering participants should be modified to create greater flexibility.[36] To the extent that we reform those restrictions on offering communications in the future, we also will consider the implications of those changes for unregistered offshore Internet offerings.

C. Concurrent U.S. Registered Offering

A registered offering in the United States that takes place concurrently with an unregistered offshore Internet offer presents concerns because of the Securities Act's restrictions on making offers prior to the filing of a registration statement or, in the case of written or published offers, outside of the statutory prospectus. Consistent with these requirements, therefore, premature

posting of offering information must be avoided. Existing Commission rules that provide a safe harbor for announcements of anticipated offerings provide guidance in this respect.[37] The Commission is considering whether to provide further guidance or to make further changes concerning concurrent U.S. registered offerings and offshore Internet offers in the context of broader Securities Act reforms.

**\*8** D. Underwriters

Just as an issuer must take reasonable steps to avoid offers of unregistered securities in the United States, so too must persons acting on behalf of the issuer, such as underwriters or distributors. These persons, for purposes of the Securities Act, stand in the place of the issuer. Thus, regardless of whether the underwriter is foreign or domestic, what constitutes measures reasonably designed to prevent sales to U.S. persons will depend on the status of the issuer. For example, if the issuer is domestic and precautionary measures would call for its Web site containing offshore offering information to be password-protected, so too should the information be protected on the underwriter's Web site.[38]

V. ADDITIONAL ISSUES UNDER THE INVESTMENT COMPANY ACT

This portion of the release addresses certain issues that arise under the Investment Company Act when a foreign fund (that is, an investment company that is organized under the laws of a jurisdiction other than the United States) makes an offshore Internet offer of its securities. In general, as with other types of securities offerings, we would not consider an Internet offer by a foreign fund to cause the fund to be subject to regulation or registration under the Investment Company Act if the foreign fund implements measures reasonably designed to guard against sales to U.S. persons.

The issue raised by the use of the Internet is whether a foreign fund's Internet offer that can be accessed by U.S. persons should be considered a public offer in the United States.[39] Consistent with our position under the Securities Act, if a foreign fund implements measures reasonably designed to guard against sales to U.S. persons, we would not consider the foreign fund's Internet offer to be targeted to U.S. persons, and therefore would not consider the Internet offer to constitute a public offer in the United States subjecting the foreign fund to regulation and registration under the Investment Company Act.

An Internet offer by a foreign fund may arise in a number of situations. For example, a foreign fund could conduct an Internet offer that is targeted exclusively offshore. A foreign fund also could conduct an offshore Internet offer in addition to a private U.S. offer.[40] We discuss these situations separately below. We also address the use of the Internet by unregistered U.S. funds making private offshore offers, and the use of other forms of Internet marketing of investment company securities.

A. Internet Offers by a Foreign Fund
1. Offers Targeted Exclusively Offshore

When a foreign fund is making an unregistered offshore Internet offer and does not intend to sell securities in the United States as part of the offering, our general statements in Section III.B. outlining the need for precautionary measures to avoid targeting the United States apply here as well. We may view an Internet offer as being targeted to U.S. persons, however, if the foreign fund is engaged in activities, either as a part of or in addition to its Internet offer, that are designed to attract U.S. persons to the Internet offer, such as advertising the existence of the foreign fund's Web site in a U.S. publication.

**\*9** 2. Foreign Funds Conducting Offshore and Private U.S. Offers

Next, we address offshore Internet offers by foreign funds that also are conducting private U.S. offers.[41] We would not consider a foreign fund that is concurrently conducting both a private U.S. offer and an offshore Internet offer to be making a public offer of its securities in the United States if the foreign fund implements measures reasonably designed to guard against public sales

of its securities to U.S. persons, and the Internet offer is not indirectly used as a general solicitation for participants in the private U.S. offer. As stated above, what constitutes adequate measures will depend on all of the facts and circumstances. In addition to implementing the type of precautionary measures discussed in Section III.B. (with one modification noted below), a foreign fund could use any procedures reasonably designed to guard against use of its Internet offer to generally solicit participants in the U.S. private offer.[42]

If a foreign fund that is concurrently conducting a private U.S. offer and an Internet offer uses a disclaimer that reflects the existence of two separate offers and indicates that the Internet offer is not being made in the United States, we would view this action as an indication that the fund has taken measures reasonably designed to guard against publicly selling its securities to U.S. persons. The disclaimer could state, for example, that <u>this</u> offer (the offshore Internet offer) is not being made in the United States (or identify the jurisdictions in which the Internet offer is being made) and that the offer and sale of securities in the United States is not permitted except pursuant to an exemption from registration.

If, however, a foreign fund directly or indirectly provides any additional information on its Web site about the types of persons to whom offers and sales can be made pursuant to an exemption under U.S. law, or provides guidance on how U.S. persons may obtain this or other purchasing information, we would view this action as an indication that the foreign fund is using its Internet offer to target the United States, except to the extent that foreign law requires that the information be disclosed.[43] Moreover, if the foreign fund provides a hyperlink, or otherwise directs U.S. persons, to another source that provides information about the private offering, we would view this action as an indication that the foreign fund is targeting the United States. In our view, either of these actions could result in the foreign fund making a public offer in the United States.

A foreign fund also may be making a public offer in the United States if it provides any other information about the private U.S. offer on its Web site, except to the extent that foreign law requires that the information be disclosed.[44] If the foreign fund wishes to provide information on its Web site relating to its private U.S. offer (other than information required by foreign law), it generally may do so without registering under the Investment Company Act if it adopts and implements password-type procedures with respect to that information.[45]

 **\*10**  As with our position under the Securities Act, we are concerned that our guidance with respect to the Investment Company Act may be used by some foreign funds that are conducting Internet offers to engage in activities that are part of a plan or scheme to make public offers in the United States. None of our statements in this release is intended to suggest that any foreign fund could do indirectly what it could not lawfully do directly.[46]

B. <u>Offshore Offers by U.S. Funds</u>
As previously noted, the Commission's position on the use of the Internet for unregistered offshore offers generally distinguishes between U.S. and foreign issuers, based upon the Commission's greater interest in regulating the conduct of U.S. issuer in the United States. As noted in Section IV.B., we will not require a U.S. issuer making an offshore offer over the Internet to register the offer under the Securities Act if it uses procedures reasonably designed to ensure that only non-U.S. persons may view the offer. We conclude that the same approach should apply under the Investment Company Act to U.S. funds making offshore Internet offers. Thus, we would not consider a U.S. fund making a private offshore offer in reliance on one of the exclusions from the definition of "investment company" in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be making a public offer in the United States if the fund uses procedures, such as password-protected web sites, reasonably designed to ensure the private nature of the offer.[47]

As noted above, we are considering whether the current restrictions on general solicitations in connection with private offers under the Securities Act should be modified.[48] In the event that we revise current Securities Act restrictions on exempt private offers and unregistered offshore offers, we anticipate that we would consider parallel revisions under the Investment Company Act.

C. Other Forms of Internet Marketing of Investment Company Securities

We analyze Internet offers made by or on behalf of a foreign fund in generally the same manner as offers by other types of issuers.[49] If a foreign fund or persons acting on its behalf seek to use a third-party Web site to generate interest in an offshore offer, the implementation of more stringent restrictions on the offshore Internet offer may be necessary to ensure that the offer is not being directed into the United States, including limiting access to the Internet offering materials to persons who can demonstrate that they are not U.S. persons.[50]

VI. OFFERS OF ADVISORY SERVICES UNDER THE ADVISERS ACT

This portion of the release addresses issues that arise under the Advisers Act when a foreign adviser (that is, an investment adviser that is organized under the laws of a jurisdiction other than the United States) offers its advisory services over the Internet. In general, a foreign adviser may be able to rely on an exemption from registration under the Advisers Act if it has fewer than fifteen U.S. clients and implements measures reasonably designed to ensure that, based on its Internet activities, the adviser is not holding itself out as an investment adviser in the United States.[51]

 *11  The issue raised by a foreign investment adviser's use of the Internet is whether and, if so, under what circumstances, the foreign adviser may provide information about its advisory services over the Internet without being considered to be holding itself out as an investment adviser in the United States. We conclude that a foreign adviser providing advisory services over the Internet generally would be holding itself out as an investment adviser. Specifically, we have stated that we generally will consider an adviser who uses a publicly available electronic medium, such as the Internet, to provide information about its services to be holding itself out to the public as an adviser, and to not qualify for the exemption from registration contained in Section 203(b)(3) of the Advisers Act.[52] If, however, the adviser implements measures reasonably designed to guard against directing information provided on the Internet about its advisory services to U.S. persons, we would not consider the foreign adviser to be holding itself out as an investment adviser in the United States for purposes of Section 203(b)(3).

What constitutes measures reasonably designed to guard against an adviser holding itself out as an investment adviser in the United States will depend on all of the facts and circumstances. We generally would consider an adviser to have implemented measures reasonably designed to guard against holding itself out as an investment adviser in the United States if:

• The Web site includes a prominent disclaimer making it clear to whom the site materials are (or are not) directed.[53]

• The adviser implements procedures reasonably designed to guard against directing information about its advisory services to U.S. persons (e.g., obtaining sufficient residency information such as mailing addresses or telephone numbers prior to sending further information), other than to its fourteen or fewer U.S. clients.[54]

Other measures also may provide adequate assurance that a foreign adviser is not holding itself out as an investment adviser in the United States.

VII. EXCHANGE ACT REGISTRATION ISSUES

The Internet activities of broker-dealers and markets (including exchanges) also raise issues under the Exchange Act. Foreign entities that perform these functions should consider whether their Internet activities would subject them to registration under the Exchange Act.

A. Broker-Dealer Activities

Broker-dealers must register with the Commission if they are physically present in the United States, or if, regardless of their location, they effect, induce, or attempt to induce securities transactions with investors in the United States. The issue, therefore, is whether the Commission would deem a broker-dealer's Web site to be an attempt to induce securities transactions with U.S. persons. Broker-dealer Web sites may offer market information and investment tools, real-time or delayed quote information, market summaries, research, portfolio management tools, and analytic programs. Some sites also include information on commissions and other fees, branch office locations, and instructions on how to contact the broker-dealer. In essence, Web sites advertise the broker-dealers' services to potential investors with the intent of attracting securities business.

**\*12**  In keeping with the general principles outlined above (Section III.B.), the Commission will not consider a foreign broker-dealer's advertising on an Internet Web site to constitute an attempt to induce a securities transaction with U.S. persons if the foreign broker-dealer takes measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons as a result of its Internet activities. Under our general principles, as applied in the broker-dealer context, a foreign broker-dealer generally would be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities if it:

• Posts a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and

• Refuses to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.
As a means to implement the latter procedure, the broker-dealer should require potential customers to provide sufficient residence information.

These procedures are not exclusive. Adoption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities.

The Commission has exempted foreign broker-dealer that effect transactions with U.S. customers from registering in the United States if these customers initiated transactions with the foreign broker-dealers outside of the United States without solicitation. Specifically, Exchange Act Rule 15a-6 currently provides an exemption from U.S. broker-dealer registration for foreign broker-dealers that effect transactions in securities with or for persons that they have not solicited.[55] Foreign broker-dealers that solicit transactions with U.S. persons, however, are required to register as broker-dealers in the United States.

Foreign broker-dealers that have Internet Web sites and that intend to rely on Rule 15a-6's "unsolicited" exemption should ensure that the "unsolicited" customer's transactions are not in fact solicited, either directly or indirectly, through customers accessing their Web sites.[56] In particular, these broker-dealers could obtain, as a precaution reasonably designed to prevent that result, affirmative representations from potential U.S. customers that they deem unsolicited that those customers have not previously accessed their Web sites. Alternatively, a broker-dealer could maintain records that are sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its Web site.

B. Exchange Activities
Until recently, in order to obtain current market information about, and to purchase or sell securities on, a foreign market, a U.S. investor typically contacted a U.S. broker-dealer by telephone or facsimile. Alternatively, the U.S. investor could directly contact a foreign broker-dealer that is a member of the foreign market. Today, however, the technology exists for investors to obtain real-time information about trading on foreign markets from a number of different sources, and to enter and execute orders on those markets electronically from the United States. Many exchanges, for example, offer Web sites through which they provide real-time quotes and other market information, e-mail addresses for questions, general contact and membership information (including the names and addresses of members), and other investing tools.

**\*13**  The U.S. securities laws require exchanges to register with the Commission if they (or any broker or dealer) "make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction."[57] The Commission currently is considering the question of under what circumstances a foreign market that provides the ability in the United States for U.S. persons to trade directly in the market must register as a U.S. exchange.[58]

At this time, however, the Commission will not apply the exchange registration requirements to a foreign market that sponsors a Web site generally advertising the foreign exchange, disseminating quotes (including real-time quotes with counterparty identification), or allowing orders to be directed to the market through its Web site, so long as the exchange takes steps reasonably designed to prevent U.S. persons from directing orders to the market through its Web site. In our view, an exchange generally would be considered to have taken steps reasonably designed to prevent U.S. persons from accessing the market through its Web site if it:

• Posts a disclaimer on the Web site affirmatively stating either the countries in which the exchange's services are directly available, or that the exchange's services are not directly available to U.S. persons;

• Requires potential members or direct participants in the exchange to state their residence and mailing address;

• Refuses to allow trading on the exchange through the Web site by any person that the exchange has reason to believe, or that indicates it, is a U.S. person; and

• Refrains from making arrangements to provide U.S. persons with access to the exchange over the Internet indirectly through its members.[59]

LIST OF SUBJECTS

17 CFR Parts 231, 241 and 276

Securities.

17 CFR Part 271

Investment companies, Securities.

AMENDMENTS TO THE CODE OF FEDERAL REGULATIONS

For the reasons set forth in the preamble, the Commission is amending Title 17, Chapter II of the Code of Federal Regulations as follows:

PART 231 - INTERPRETATIVE RELEASES RELATING TO THE SECURITIES ACT OF 1933 AND GENERAL RULES AND REGULATIONS THEREUNDER

1. Part 231 is amended by adding Release No. 33-7516 and the release date of March 23, 1998, to the list of interpretative releases.

PART 241 - INTERPRETATIVE RELEASES RELATING TO THE SECURITIES EXCHANGE ACT OF 1934 AND GENERAL RULES AND REGULATIONS THEREUNDER

2. Part 241 is amended by adding Release No. 34-39779 and the release date of March 23, 1998, to the list of interpretative releases.

PART 271 - INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT COMPANY ACT OF 1940 AND GENERAL RULES AND REGULATIONS THEREUNDER

3. Part 271 is amended by adding Release No. IC-23071 and the release date of March 23, 1998, to the list of interpretative releases.

PART 276 - INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS THEREUNDER

*14  4. Part 276 is amended by adding Release No. IA-1710 and the release date of March 23, 1998, to the list of interpretative releases.

By the Commission.
Jonathan G. Katz
Secretary

Footnotes

| | |
|---|---|
| 1 | 15 U.S.C. 77a, etseq. (the "Securities Act"). |
| 2 | 15 U.S.C. 80a-1, etseq. (the "Investment Company Act"). |
| 3 | 15 U.S.C. 80b-1, etseq. (the "Advisers Act"). |
| 4 | 15 U.S.C. 78a, etseq. (the "Exchange Act"). |
| 5 | The courts have recognized U.S. jurisdiction over fraudulent conduct where substantial conduct or effects occur in the United States. SeegenerallyItoba Ltd. v. LEP Group PLC, 54 F.3d 118 (2d Cir. 1995), cert.denied, 516 U.S. 1044 (1996) and Robinson v. TCI/US West Communications Inc., 117 F.3d 900 (5th Cir. 1997) (citing Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir.), rev'donothergroundsonrehrg. enbanc, 405 F.2d 215 (2d Cir. 1968), cert.denied, 395 U.S. 906 (1969) (effects test)); Bersch v. Drexel Firestone Inc., 519 F.2d 974 (2d Cir.), cert.denied, 423 U.S. 1018 (1975) (conduct test); Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972) (conduct test). |
| 6 | See President William J. Clinton and Vice President Albert Gore, Jr., A Framework for Global Electronic Commerce (1997), < http:// www.iitf.nist.gov/eleccomm/ecomm.htm>; European Ministerial Conference, "Global Information Networks: Realizing the Potential," July 6-8, 1997, Ministerial Declaration, Global Informational Networks, < http:// www2.echo.lu/bonn/final.html>. |
| 7 | For a discussion of recent Commission actions addressing the Internet, seeThe Impact of Recent Technological Advances on the Securities Markets, Report prepared by the Staff of the U.S. Securities and Exchange Commission pursuant to Section 510(a) of the National Securities Markets Improvements Act of 1996 (Oct. 1997) < http://www.sec.gov/news/studies/techrp97.htm>. |
| 8 | Wilske and Schiller, International Jurisdiction in Cyberspace: Which States May Regulate the Internet?, < http:// www.law.indiana.edu/fuj/pubs/v50/no1/wilske.html>, Section II.A.2.(c). |
| 9 | The Web site sponsor can aid Internet searches by adding "tags" to its Web site that facilitate a search engine identifying the site as containing information relating to targeted topics. Generally, we will not view the use of tags relating to securities or investments as transforming the Web site into a targeted communication that would require additional measures to assure against sales to U.S. persons, such as blocking access by U.S. persons to the offering materials. |

10      Section 5 of the Securities Act, 15 U.S.C. 77e.

11      See, e.g., Section 4(2) of the Securities Act, 15 U.S.C. 77d(2); Regulation D [17 CFR 230.501-508].

12      Section 7(d) of the Investment Company Act, 15 U.S.C. 80a-7(d).

13      See Section 3(c)(1) and Section 3(c)(7) of the Investment Company Act, 15 U.S.C. 80a-3(c)(1), 15 U.S.C. 80a-3(c)(7). Seealso Staff no-action letter, Goodwin, Procter & Hoar (available Feb. 28, 1997) ("Goodwin Procter").

14      Section 203(a) of the Advisers Act, 15 U.S.C. 80b-3(a).

15      Section 15(a) of the Exchange Act, 15 U.S.C. 78$o$(a).

16      Section 6 of the Exchange Act, 15 U.S.C. 78f.

17      Seee.g., Securities Act Release No. 7233, Question 20 (Oct. 6, 1995) [60 FR 53458] ("The placing of the offering materials on the Internet would not be consistent with the prohibition against general solicitation or advertising in Rule 502(c) of Regulation D.").

18      We also assume that the Internet is an instrument of interstate commerce and that its use satisfies the "jurisdictional means" requirements of the federal securities laws. SeeAmerican Library Ass'n v. Pataki, 969 F. Supp. 160, 161 (S.D.N.Y. 1997).

19      Under a resolution adopted by the North American Securities Administrators Association ("NASAA"), states are encouraged to take appropriate steps to exempt Internet offers from the registration provisions of their securities laws when the offers indicate that the securities are not being offered to residents of their state and the offers are not otherwise specifically made to any persons in their state. Sales of the securities that were the subject of the Internet offer could be made in that state after the offering has been registered and the final prospectus has been delivered to investors, or where the sales are exempt from registration. NASAA, Resolution Regarding Securities Offered on the Internet (adopted Jan. 7, 1996), 1996 CCH Par. 7040 (Jan. 1996). According to NASAA, 32 states have implemented the resolution and 15 states have indicated an intent to do so.

       Several foreign authorities have provided guidance on Internet and securities related issues. See, e.g., Policy Statement 107 on Electronic Prospectuses (Sept. 1996) < http://www.asc.gov.au> (Australia); Notice and Interpretation Note, Trading Securities and Providing Advice Respecting Securities on the Internet (Mar. 3, 1997), NIN #97/9 (British Columbia, Canada).

20      We use the term "U.S. person" as it is defined in Rule 902(k) of Regulation S under the Securities Act [17 CFR 230.902(k)], which is premised on residence in the United States, regardless of any temporary presence outside the United States. SeeSecurities Act Release No. 7505 (Feb. 18, 1998) [63 FR 9632 (Feb. 25, 1998)] (renumbering CFR sections). "U.S. person" generally has the same meaning for purposes of Section 7(d) of the Investment Company Act as under Rule 902(k) of Regulation S under the Securities Act. See Goodwin Procter, supra note 13. For purposes of this release, we deem Internet offers "targeted at the United States" to include Internet offers targeted to U.S. persons. Cf. Rule 902(h)(2) of Regulation S [17 CFR 230.902(h)(2)] (offers targeting identifiable groups of U.S. persons offshore are not offshore transactions).

21      The disclaimer would have to be meaningful. For example, the disclaimer could state, "This offering is intended only to be available to residents of countries within the European Union." Because of the global reach of the Internet, a disclaimer that simply states, "The offer is not being made in any jurisdiction in which the offer would or could be illegal," however, would not be meaningful. In addition, if the disclaimer is not on the same screen as the offering material, or is not on a screen that must be viewed before a person can view the offering materials, it would not be meaningful.

22      In our view, while a relevant factor, the fact that an Internet offeror posts offering materials in English even though it is based in a non-English speaking country will not, by itself, demonstrate that the offer is targeted at the United States.

23      These additional steps could include a request for further evidence (e.g., a copy of a passport or driver's license).

24      Governmental authorities or securities exchanges could post issuer information that is required by law to be filed with them, including prospectuses, on their Web sites without restriction. Securities exchanges, however, should consider the U.S. registration implications of their Web sites as a whole. Seeinfra Section VII.B.

25   Rule 502(c) under the Securities Act [17 CFR 240.502(c)].

26   Rule 902(c) [17 CFR 230.902(c)].

27   Rule 902(h) and Rule 903 of Regulation S [17 CFR 230.902(h) and 230.903]. The issuer's or underwriter's use of an Internet Web site to offer securities will not, by itself, prevent bona fide offshore purchasers in a Regulation S offering from reselling into the United States pursuant to registration or an exemption, such as Rule 144A [17 CFR 230.144A], provided that: (1) those purchasers are not part of the selling group; (2) those purchasers are not affiliated with the issuer or any member of the selling group; and (3) the issuer's or underwriter's use of the Web site was not undertaken as part of an arrangement with, or on behalf of, such offshore purchasers.

28   To identify those persons who are responding to the Internet offer, the Web site could provide telephone numbers, contact persons, or addresses that differ from those used in the offeror's other, more traditional offering materials. Under an approach suggested in staff no-action letters, the offeror could communicate with U.S. persons on the list to determine whether they are accredited investors with a view towards permitting their participation in separate, future exempt U.S. offerings by the issuer or, where the Web site offeror is an intermediary, other issuers. See Staff no-action letters, Royce Exchange Fund (available Aug. 28, 1996); Bateman Eichler (available Dec. 3, 1985); E.F. Hutton & Co. (available Dec. 3, 1985); Woodtrails-Seattle (available Aug. 9, 1982). Likewise, any investor solicited by the issuer or underwriter prior to or independent of the Web site posting could participate in the private offer, regardless of whether the investor may have viewed the posted offshore offering materials.

29   This step could be accomplished in multiple ways. For example, when a person reaches the Web site and then attempts to move to a section that includes offering information, a screen could ask for the required residence information. After the user enters the information, the area code and address could be automatically and immediately screened to eliminate further access to those who match a U.S. area code or address. Alternatively, the offeror could require a password and not assign a password until it verifies that address information, or it could block access by using technology that recognizes the country from which the Web site is being accessed.

30   Web site offerors must act in good faith to screen U.S. persons from viewing offering information. A screening mechanism that suggests ways of easy bypass would not be evidence of good faith.

31   A foreign issuer that wishes to use an Internet Web site to conduct the concurrent private placement in the United States could follow the general procedures developed in the domestic context for private placements on the Internet. See, e.g., Staff no-action letters, IPONET (available July 26, 1996); Lamp Technologies, Inc. (available May 29, 1997). Under these procedures, the public offer posted on the Web site may not provide a hyperlink or otherwise alert the viewer to any Web site containing private placement offering materials.

32   Rule 135c under the Securities Act [17 CFR 230.135c] provides useful guidance on what limited information could be included on the Web site under these circumstances.

33   We use the term "foreign issuer" as it is defined in Rule 902(e) of Regulation S [17 CFR 230.902(e)]. See Securities Act Release No. 7505.

34   See, e.g., IPONET and Lamp Technologies, Inc., supra note 31. Our interpretation therefore would allow for the creation of limited-access systems. Eventually, closed systems may develop that target only non-U.S. persons and qualified U.S. investors.

35   See Securities Act Release No. 7392 at n.31 (Feb. 28, 1997) [62 FR 9258] (issuer cannot accept at face value representations by investors regarding their residence). See also IPONET, supra note 31 (IPONET's activities were supervised by an entity that verified information provided to IPONET by people who filled out IPONET's on-line questionnaire. Information from the questionnaires was used to determine whether respondents qualified as accredited investors and therefore were eligible to obtain password to access password-protected Web pages where IPONET posted private offerings).

36   Securities Act Release No. 7314 (July 25, 1996) [61 FR 40044]; Securities Act Release No. 7187 (July 10, 1995) [60 FR 35645].

37   See, e.g., Rule 135 under the Securities Act [17 CFR 230.135].

38   This, however, would not include bona fide research that complies with the Commission's safe harbor rules for research reports. See Rules 137 - 139 under the Securities Act [17 CFR 230.137 - 230.139]. Cf. Exchange Act Rule 15a-6(a)(2) [17 CFR 240.15a-6(a)

| | |
|---|---|
| | (2)](conditional exemption from U.S. broker-dealer registration for foreign broker-dealers that furnish research reports to "major institutional investors" as defined in the rule). |
| 39 | Section 7(d) of the Investment Company Act generally prohibits a foreign fund from using U.S. jurisdictional means to make a public offer of its securities in the United States or to U.S. persons, unless the fund receives an order from the Commission permitting it to register under the Investment Company Act. The Commission may issue such an order only if it finds that it is legally and practically feasible to enforce the provisions of the Investment Company Act effectively against the foreign fund, and that the issuance of the order is consistent with the public interest and the protection of investors.<br><br>For purposes of Section V, references to offers and sales to U.S. persons include offers or sales in the United States. Similarly, references to offers or sales in the United States include offers or sales to U.S. persons. |
| 40 | In addition, a foreign fund also may use the Internet exclusively to conduct a private U.S. offer. This release does not address the ability of a foreign fund to conduct a private U.S. offer over the Internet, except to the extent that it is relevant to the foreign fund's ability to simultaneously conduct an offshore Internet offer. See infra note 45 and accompanying text. As discussed above in Section I, the statements made in this release do not alter the requirement that all offers and sales in the United States must be pursuant to registration under the U.S. securities laws or an applicable exemption. |
| 41 | The staff previously took the position that under certain circumstances a foreign fund that is conducting an offshore offer also may make a private U.S. offer in reliance on the exclusion from the definition of "investment company" in Section 3(c)(1) of the Investment Company Act consistent with the public offering prohibition contained in Section 7(d). See Staff no-action letter, Touche Remnant & Co. (available Aug. 27, 1984) ("Touche Remnant"). In Goodwin Procter, supra note 13, the staff similarly took the position that under certain circumstances a foreign fund that is conducting an offshore offer also may make a private U.S. offer in reliance on the exclusion from the definition of "investment company" in Section 3(c)(7) of the Investment Company Act consistent with the public offering prohibition contained in Section 7(d). The staff also has stated that if U.S. persons become shareholders of a foreign fund for reasons beyond the control of the fund or persons acting on its behalf, the fund would not be required to count those shareholders as U.S. persons for purposes of determining whether the fund may rely on the exception from the definition of "investment company" in Section 3(c)(1) of the Investment Company Act. See Staff no-action letter, Investment Funds Institute of Canada (available Mar. 4, 1996). The same position applies to foreign funds relying on Section 3(c)(7) of the Investment Company Act. See generally Goodwin Procter, supra note 13. We take the position that Touche Remnant is superseded to the extent that it is inconsistent with these positions. |
| 42 | See notes 28-32 supra and accompanying text. |
| 43 | Although Rule 135c by its terms applies only to Section 5 of the Securities Act, we would take a similar approach with respect to the type of information that a foreign fund may, if required by foreign law, provide on its Internet site about a U.S. private offer without violating the public offering prohibition contained in Section 7(d) of the Investment Company Act. See supra note 32 and accompanying text. |
| 44 | An adviser to a foreign fund conducting an offshore Internet offer that also sponsors a U.S.-registered investment company with the same investment objectives and policies as the foreign fund may provide information about, or direct the viewer to, the registered U.S. offer without the Internet offer being considered to be a public offer of the foreign fund's securities in the United States. |
| 45 | See Lamp Technologies, Inc. and IPONET, supra note 31. Prequalification and password-type procedures are intended to ensure that only persons eligible to privately purchase the securities can obtain access to a Web site used in connection with a private offer and that the dissemination of information through the Internet site does not constitute a "general solicitation" under Rule 502(c) of Regulation D under the Securities Act. In addition to the procedures discussed in Lamp Technologies, there may be other, equally effective procedures designed to restrict access to information on the Internet to those persons who are eligible to purchase securities in a private U.S. offer. |
| 46 | See Section 48(a) of the Investment Company Act. |
| 47 | See supra notes 34-35 and accompanying text. |
| 48 | See supra note 36 and accompanying text. |

| | |
|---|---|
| 49 | See Section III.D., supra. |
| 50 | Id. |
| 51 | Section 203(a) of the Advisers Act generally prohibits any investment adviser from using U.S. jurisdictional means in connection with its business as an investment adviser, unless the adviser is registered with the Commission, or is exempted or excluded from the requirement to register. Section 203(b)(3) of the Advisers Act provides for an exemption from registration for any adviser who during the course of the preceding twelve months has had fewer than fifteen clients and who neither holds itself out generally to the public as an investment adviser nor acts as an adviser to a U.S.-registered investment company or business development company. The staff has taken the position that foreign advisers are required to count only their U.S. clients for purposes of determining whether they are exempt from registration under Section 203(b)(3). SeeProtecting Investors: A Half Century of Investment Company Regulation, at 223 n.6 (1992); Staff no-action letter, Murray Johnstone Ltd. (available Oct. 7, 1994). |
| 52 | SeeUse of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information, Securities Act Release No. 7288 (May 9, 1996) at text accompanying n. 32. Butsee Lamp Technologies, Inc., supra note 31. |
| 53 | Seesupra note 21 and accompanying text. |
| 54 | See text following supra note 21. |
| 55 | Exchange Act Rule 15a-6(a)(1) [17 CFR 240.15a-6(a)(1)]. |
| 56 | Because a securities firm's Web site itself typically is a solicitation, orders routed through the Web site would not be considered "unsolicited." |
| 57 | Section 5 of the Exchange Act, 15 U.S.C. 78e. |
| 58 | Exchange Act Release No. 38672 (May 23, 1997). |
| 59 | This last step would preclude an exchange from relying on this release if it, for example, sets the terms under which exchange members provide Internet access to the exchange, or makes arrangements for U.S. persons to directly clear and settle trades conducted on the exchange through the Internet. Foreign exchanges that knowingly provide U.S. persons with access to their trading facilities through the Internet would not be able to rely on this interpretation, and may be required to register with the Commission. |

Release No. 1125 (S.E.C. Release No.), Release No. 1710, Release No. 7516, Release No. 23071, Release No. 39779, Release No. 33-7516, Release No. 34-39779, Release No. IA - 1710, Release No. IC - 23071, Release No. IS - 1125, 66 S.E.C. Docket 1869, 1998 WL 128173

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.