**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3                       --o0o--
 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
            Plaintiff,              )
 6                                  ) Case No.
        vs.                         ) 1:21-cv-21079
 7                                  )
     MINTBROKER INTERNATIONAL, LTD., )
 8   f/k/a SWISS AMERICA            )
     SECURITIES LTD. and d/b/a      )
 9   SURETRADER, and GUY GENTILE,   )
     a/k/a GUY GENTILE NIGRO,       )
10                                  )
            Defendants.             )
11   _____)
12
13
14
15        VIDEOTAPED DEPOSITION OF
16              PHILIP DORSETT
17         VOLUME 1 - PAGES (1-221)
18   CONFIDENTIAL PORTIONS BOUND SEPARATELY
19        VIA REMOTE VIDEOCONFERENCE
20        MONDAY, FEBRUARY 27, 2023
21
22
23
     Stenographically Reported by:
24   Victoria L. Valine, CSR, RMR, CRR, RSA
     California CSR License No. 3036
25   Job No. 230227VV
```

**Page 2**

```
 1        REMOTE APPEARANCES:
 2
 3   FOR PLAINTIFF:
 4        SECURITIES AND EXCHANGE COMMISSION
          BY:  Alice K. Sum, Esq.
 5            Alice Johnson, Esq.
              Russell Koonin, Esq.
 6        801 Brickell Avenue, Suite 1950
          Miami, Florida  33131
 7        305-982-6300
          sumal@sec.gov
 8        johnsonali@sec.gov
          kooninr@sec.gov
 9
10   FOR DEFENDANTS:
11        FORD O'BRIEN LANDY LLP
          BY:  Matthew A. Ford, Esq.
12            Cara Filippelli, Esq.
          3700 Ranch Road 620 South, Suite B
13        Austin, Texas 78738
          512-503-6388    Fax: 212-256-1047
14        mford@fordobrien.com
15        FORD O'BRIEN LANDY LLP
          BY:  Adam C. Ford, Esq.
16            Stephen R. Halpin, III, Esq.
          275 Madison Avenue, Floor 24
17        New York, New York  10016
          212-858-0040    Fax: 212-256-1047
18        aford@fordobrien.com
          shalpin@fordobrien.com
19
20
21   Also Present: Guy Gentile
22   Videographer:  DeShawn White, Legal Videographer
23
24    (All parties appeared remotely via videoconference.)
25
```

**Page 3**

```
 1                  INDEX
 2           EXAMINATION BY COUNSEL
 3                   PAGE
 4   Examination By Ms. Sum                9
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                E X H I B I T S
 2
 3   EXHIBIT NO.   DESCRIPTION          PAGE
 4   Exhibit 1   Deposition Subpoena      9
 5   Exhibit 2   SureTrader.com Account Application   77
             Bates No. SEC-SCB-P-0009184 -
 6           SEC-SCB-P-0009221
             Confidential pursuant to
 7           Securities Exchange Act s.24(d)
     Exhibit 3   SureTrader Account Application   91
 8           Bates No. SEC-SCB-P-0010164 -
             SEC-SCB-P-0010198
 9           Confidential pursuant to
             Securities Exchange Act s.24(d)
10
     Exhibit 4   SureTrader Tell Us About You form   101
11           Bates No. SEC-SCB-P-0010428 -
             SEC-SCB-P-0010428
12           Confidential pursuant to
             Securities Exchange Act s.24(d)
13
     Exhibit 5   Swiss America Securities, Ltd. Web   108
14           Page
             SEC-SECWEBCAPTURE-E-0000340 -
15           SEC-SECWEBCAPTURE-E-0000345
16
     Exhibit 6   Funding & Banking Web Page   111
17           Bates No.
             SEC-SECWEBCAPTURE-E-0000377 -
18           SEC-SECWEBCAPTURE-E-0000382
19   Exhibit 7   Email Thread             113
             Bates No. SEC-FL-03848-E-0012118 -
20           SEC-FL-03848-E-0012120
21   Exhibit 8   Email Thread             139
22   Exhibit 9   Email Thread             154
23   Exhibit 10  Email Thread             167
             Bates No. SEC-FL-03848-E-0000228 -
24           SEC-FL-03848-E-0000229
25
```

EXHIBIT
C

1  Exhibit 11   Swiss America Securities Order      168
       Flow
2         Bates No. SEC-FL-03848-E-0000230 -
       SEC-FL-03848-E-0000231
3
   Exhibit 12   SureTrader Application -      184
4      Christopher Miguel Penalver
       Bates No. SEC-SCB-P-0010391 -
5      SEC-SCB-P-0010409
       Confidential pursuant to
6      Securities Exchange Act s.24(d)
7  Exhibit 13   Email Thread      175
       Bates No.
8      SEC-FL-03848-E-0001195-SEC-FL-
       03848-E-0001203
9
   Exhibit 15   Declaration      188
10        Bates No. SEC-FL-03848-E-0001431
11 Exhibit 16   Declaration of Philip A. Dorsett   191
       Dated June 27, 2022
12
   Exhibit 17   Affidavit of Philip Dorsett Dated   192
13     January 9, 2014
       Bates No. GENTILE0004495 -
14     GENTILE0004497
       CONFIDENTIAL
15
16
17 *** EXHIBITS 2-4 BOUND IN CONFIDENTIAL TRANSCRIPT **
18
19
20
21
22
23
24
25
                        5

1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF FLORIDA
3             --o0o--
4  SECURITIES AND EXCHANGE         )
   COMMISSION,                )
5                     )
       Plaintiff,         )
6                     ) Case No.
       vs.          ) 1:21-cv-21079
7                     )
   MINTBROKER INTERNATIONAL, LTD.,  )
8  f/k/a SWISS AMERICA          )
   SECURITIES LTD. and d/b/a     )
9  SURETRADER, and GUY GENTILE,    )
   a/k/a GUY GENTILE NIGRO        )
10                     )
       Defendants.     )
11  _____)
12            --o0o--
13    BE IT REMEMBERED, that on Monday, February 27,
14 2023, commencing at the hour of 9:49 a.m. Eastern
15 Standard Time, all parties appearing via WebEx
16 videoconference, before me, Victoria L. Valine,
17 Certified Shorthand Reporter of the State of California,
18 appeared:
19         PHILIP DORSETT
20 called as a witness by the Plaintiff, who, being by me
21 remotely sworn, was thereupon examined and interrogated
22 as hereinafter set forth.
23            --o0o--
24    THE VIDEOGRAPHER:  This is the videotaped
25 deposition of Philip Dorsett in the matter of SEC versus
                        7

1       CONFIDENTIAL - ATTORNEYS' EYES ONLY
2            BOUND SEPARATELY
3             - - -
4         Pages 77 - 107
5         Pages 186 - 187
6         Pages 193 - 198
                        6

1  Mintbroker International, Ltd., et al., pending in the
2  United States District Court Southern District -- yes,
3  United States District Court Southern District of
4  Florida.  Case number 1:21-cv-21079.
5       Today's date is February 27th, 2023.
6       The time on the video monitor is 9:49 a.m.
7  eastern time.
8       My name is DeShawn White.  The court reporter
9  today is Victoria Valine, both are with Gradillas Court
10 Reporters.
11      Would counsel please identify yourselves for
12 the record.
13      MS. SUM:  Good morning.  This is Alice Sum on
14 behalf of the United States Securities and Exchange
15 Commission.  Also present is trial counsel Alise
16 Johnson, and later my colleague, Russell Koonin, will be
17 joining.
18      MR. MATTHEW FORD:  Matthew Ford here for
19 defendant Guy Gentile along with my colleagues Adam
20 Ford, Stephen Halpin, and Cara Filippelli.
21      THE VIDEOGRAPHER:  Will the court reporter now
22 swear in the oath.
23      CERTIFIED STENOGRAPHER:  Raise your right
24 hand, please, sir.
25      Do you solemnly swear or affirm that the
                        8

1 testimony you will give will be the truth, the whole
2 truth, and nothing but the truth?
3          THE WITNESS: I do.
4          CERTIFIED STENOGRAPHER: Thank you very much.
5 Counsel, you may proceed.
6          MS. SUM: Thank you.
7              EXAMINATION
8 BY MS. SUM:
9      Q.  Good morning.  Would you please state your
10 full name and spell it for the record?
11     A.  My name is Philip Dorsett, P-H-I-L-I-P,
12 D-O-R-S-E-T-T.
13     Q.  Mr. Dorsett, are you represented by counsel?
14     A.  No.
15         MS. SUM: I'd ask the videographer to bring up
16 Exhibit 1, please.
17         (Deposition Exhibit 1 marked.)
18 BY MS. SUM:
19     Q.  First, are you able to read that on the
20 screen, Mr. Dorsett?
21     A.  No.
22     Q.  Okay.  We will tinker with it a little bit and
23 you let us know when it's large enough for you to see.
24     A.  Are you able to make it wider?
25     Q.  What I see on the screen is a portrait view of

9

1 Mr. Dorsett can see the entirety of the document.
2 BY MS. SUM:
3      Q.  Okay.  And here, Mr. Dorsett, do you see
4 "Plaintiff's Re-Notice of Taking Videotaped Deposition
5 of Philip Dorsett" --
6      A.  Yes.
7      Q.  -- do you see that in front of you?  Okay.
8         MS. SUM: And please just scroll to the end.
9 Thank you.
10 BY MS. SUM:
11     Q.  All right.  Mr. Dorsett, have you seen what
12 we're putting up as Exhibit 1 before?
13     A.  Yes.  I've seen this document.
14     Q.  And you're appearing here voluntarily today to
15 testify?
16     A.  Correct.
17     Q.  All right.  Let me start with the --
18         MS. SUM: You can take down Exhibit 1.  Thank
19 you.
20 BY MS. SUM:
21     Q.  All right.  So let me just start with some
22 ground rules for the deposition today.
23         Are you under the influence of any medication
24 or substances that would affect your ability to answer
25 my questions, remember facts, or answer truthfully?

11

1 it.
2         MS. SUM: I ask the videographer, is there any
3 way to expand it -- the window itself?
4         Yes.  Thank you.  And then please fill the
5 screen if you could.
6         We do not need to see the full page just --
7 but if you would make it larger, please?
8 BY MS. SUM:
9      Q.  We're getting closer, Mr. Dorsett.  Would you
10 like it to be --
11     A.  Yes.  Just a little bigger.  That's good.
12         MS. SUM: Why don't we try to go at
13 200 percent, and see if that will work for the duration
14 of the deposition, and we can adjust if necessary.
15 BY MS. SUM:
16     Q.  Is that sufficient, Mr. Dorsett?
17     A.  Yes.  That's good.
18     Q.  So what you see is the first page.
19         Do you see it's a subpoena to testify at a
20 deposition in a civil action issued by the SEC to you?
21     A.  Yes.
22     Q.  Okay.
23         MS. SUM: May I please have the document
24 scrolled?
25         If you could keep on scrolling just so

10

1      A.  No.
2      Q.  Is there any reason why you might not be able
3 to answer any questions truthfully today?
4      A.  No.
5      Q.  I ask that if you do not understand a question
6 that I ask, please, you can request that I clarify.
7         Since we are conducting this by video
8 conference, if, for some reason, you do not hear me or
9 the question clearly, please ask me and I can either
10 repeat the question or we can have the court reporter
11 read it back.
12         Do you understand those basic ground rules for
13 this deposition?
14     A.  Yes.
15     Q.  Thank you.
16         Have you ever been deposed or given oral sworn
17 testimony before?
18     A.  I have.
19     Q.  Okay.  And can you identify the number of
20 times you have been deposed?
21     A.  When you say "deposed," do you mean given
22 sworn testimony?
23     Q.  Have you ever sat for a deposition before?
24     A.  Well, yes.  I was a witness in a case before.
25     Q.  Okay.  And what was that case?

12

1    A.  I think it was United States versus Balandian
2  (phonetic).
3    Q.  Okay.  And was that for a deposition or at a
4  trial?
5    A.  That was at a trial.
6    Q.  So you're appearing hear today voluntarily to
7  testify in a lawsuit that the SEC has brought against
8  Guy Gentile and a company called Mintbroker
9  International Ltd., formerly known as Swiss America
10 Securities, Ltd., and doing business as SureTrader; is
11 that correct?
12   A.  Correct.
13   Q.  And if I refer to the company that's called
14 Mintbroker and Swiss America as SureTrader, do you
15 understand that SureTrader is the reference to the
16 entity?
17   A.  Yes.
18   Q.  Okay.  Prior to this morning did you speak
19 with anyone regarding this deposition?
20   A.  Yes.
21   Q.  Okay.  And who did you speak with?
22   A.  I spoke with you.
23   Q.  Okay.  Anybody else?
24   A.  Do you mean personally?  Like I spoke with my
25 wife.

13

1    Q.  Okay.  Personally.  Okay.
2        Other than your wife, did you discuss this
3  deposition with anyone else -- other than me and your
4  wife?
5    A.  No.
6    Q.  Okay.  Could you please briefly describe your
7  education history?
8    A.  Well, I have a Master's in business
9  administration from Nova Southeastern.
10       I have a Bachelor's in finance from the
11 University of South Florida.
12       I also have the Series 7.
13       I recently completed the compliance -- that's
14 an FIU compliance course by the financial -- sorry, the
15 Florida International University.  I forget the actual
16 name of it.  Yeah.  I mean, that's basically me.  I have
17 about -- how many years -- 18 or 19 years in the
18 securities industry --
19   Q.  Okay.
20   A.  -- give or take.
21   Q.  Thank you.
22       What is your current place of employment?
23   A.  I currently work at LTG Capital Markets, Ltd.
24   Q.  Okay.  And how long have you worked there?
25   A.  Since 2018.

14

1    Q.  All right.  Do you know someone named Guy
2  Gentile?
3    A.  Yes, I do.
4    Q.  All right.  And when did you first meet
5  Mr. Gentile?
6    A.  Well, I first met Guy way back -- I was
7  working for another broker-dealer.  This would have been
8  maybe about six years or so before we started
9  SureTrader.
10       Guy -- Guy's company, Stock USA, provided
11 services to that firm, and I was working on the trade
12 desk, and so, as the owner of the company, Guy came out
13 to meet us, and that was the first time I met him.  And
14 then later I think Guy actually opened some sort of
15 account with us as well, and so I got to know him back
16 then.
17   Q.  Okay.  So you said it was approximately five
18 or six years before SureTrader was opened?
19   A.  That's -- that sounds about correct --
20   Q.  Okay.
21   A.  -- give or take a few years.  Yeah.
22   Q.  Okay.  So can you estimate from the time that
23 SureTrader was opened what -- what year that would be?
24   A.  So we opened SureTrader the end of 2011.  All
25 right.  I was at another firm for maybe about three

15

1  years.  And then the firm before that is the one where I
2  met Guy, and I was there for about four years.  And I
3  think maybe about halfway through that time I met Guy.
4  So maybe -- that's, what, three plus about two and a
5  half, that's where I got about five years before.  Yeah.
6    Q.  And --
7    A.  So about 2006, maybe.  2005 --
8    Q.  Okay.
9    A.  -- somewhere in there.
10   Q.  All right.  And did your business relationship
11 with Mr. Gentile evolve from when you first met him?
12   A.  Well, yeah, I think.  Eventually I actually
13 approached Guy about a business idea that I had.  I
14 wanted to establish my own broker-dealer, and Guy was
15 someone who I thought might be able to assist me in
16 that, and I thought it might be something he would be
17 interested in as well.
18       So we -- he came down -- he flew down.  We had
19 dinner.  And we discussed it.  And he told me he would think
20 about it.  He told me, you know, we would have to
21 establish trust -- he would think about it, and we
22 discussed some other things, and then we went from
23 there.
24   Q.  Okay.  And did you and Mr. Gentile, in fact,
25 enter into a business relationship?

16

1    A.  Well, we didn't enter into that business
2  relationship, but some years later Guy contacted me and
3  he told me that -- well, he didn't want to do the idea
4  that I gave, but he had a different idea.  And that's
5  when he told me about SureTrader, and he wanted me to be
6  his compliance officer.
7    Q.  Okay.  So can you estimate -- I'm sorry.  I
8  apologize for interrupting you.
9        What was the timeframe when Mr. Gentile
10  reached out to you about potentially opening SureTrader?
11    A.  This would have been probably early 2011 -- it
12  could have been 2010, but definitely in 2011 -- it could
13  have been 2010, but definitely by 2011 we were
14  definitely into the swing of things.
15    Q.  Okay.  And when did you say SureTrader opened?
16    A.  So we started taking -- I think we took our
17  first client in late November 2011.
18    Q.  Okay.  So from the time that you first started
19  discussing the possibility of working together on
20  SureTrader, how long would you estimate it took to -- to
21  formally open the company?
22    A.  Yeah.  I think -- I think we probably -- we
23  may have been talking about it since, like, late 2010.
24  So maybe a year.  Because I know it takes quite awhile
25  to get the stuff -- you know, to go through the

17

1  Commission and everything.  So maybe an year.  I'm not
2  really sure.  But it was -- it was definitely most of
3  2011 itself, but it might have gone back as early as
4  2010.
5    Q.  Just in your answer you referenced "the
6  Commission."  Only because I represent the United States
7  Securities and Exchange Commission, I would like to
8  clarify which commission you were talking about.
9    A.  The Securities Commission of The Bahamas.
10    Q.  Okay.  For the purposes of this deposition is
11  it acceptable for you to understand that when I use the
12  word "SCB" or that term, that I'm referring to the
13  Securities Commission of The Bahamas?
14    A.  Yes.
15    Q.  Okay.  Thank you.
16        All right.  So when Mr. Gentile approached you
17  about the possibility of opening SureTrader, what was
18  the business plan for the company?
19    A.  Well, he was pretty excited about it.  He
20  started to explain to me, you know, how we would earn
21  money.  He asked me if I was familiar with something
22  called PDT Rule -- the Pattern Day Trader Rule.  I told
23  him no, I wasn't familiar with it.  And so he explained
24  to me that in the U.S. there's this rule that limits how
25  much trades most customers can do.  All right.

18

1        And he was explaining to me that, you know,
2  before this rule came into place, customers used to
3  trade a lot and, you know, there was a lot of money
4  making for the broker-dealers, and after this rule came
5  into place, you know, clients -- well, he theorized that
6  clients would be looking for a broker-dealer where they
7  could trade freely like how they used to in the past.
8        And he said in the Bahamas there's no such
9  thing as a PDT Rule.  And so if we open up SureTrader,
10  basically all those clients that -- you know, that
11  stopped trading from his firm or restricted their
12  trading basically, he said everywhere else -- a client
13  from anywhere else in the United States are going to
14  flock to SureTrader.  He said we're going to make a ton
15  of money.
16        And so I was like okay.  He seemed really
17  excited about it.  He seemed like he had really done his
18  research.  It was something he was -- you know, he was
19  really sure about, and I was like okay.
20    Q.  Okay.  So when you discussed entering into
21  this business relationship, did you and Mr. Gentile
22  agree on what your job responsibilities would be, and
23  what his responsibilities would be?
24    A.  Well, I think the reason why Guy contacted me
25  -- because I think he had already done some preliminary

19

1  research and he knew that he needed a compliance
2  officer.
3        So back then I think we got a Class 2
4  broker-dealer license.  So the requirements were you
5  need two registered officers, the CEO and the CCO.  All
6  right.  And so he told me he needed me to be his
7  compliance officer.
8        And so basically much -- over the next few
9  months -- because I think he had hired a lawyer to give
10  him some assistance, and so we were filling out a bunch
11  of documents and stuff like that, and just going through
12  that whole process.
13    Q.  As far as you potentially being the CCO -- the
14  Chief Compliance Officer, were there any requirements
15  that you had to fulfill as far as licensing?
16    A.  Yes.
17        Now, admittedly, the requirements back then --
18  this is over 10 years ago, were not as stringent as they
19  are today, right?  And so my background, at that time,
20  actually was not in compliance.
21        I -- I had -- well, I had a lot of experience
22  in the industry, and the Commission -- the SCB -- I was
23  registered as a -- I think I was on the trade desk at
24  the first firm, and then I was registered as a -- I
25  forget the actual title, but I was selling financial

20

1  products and services.  So the point is the SCB, they
2  knew me.  There was a history on me, you know, and I
3  think that helped a lot with regard to them approving my
4  application.
5        They -- you know, because they basically
6  had -- you know, they were already following my career.
7  You know, I was already registered with them.  There was
8  no complaints.  There was nothing against me.
9        And so from the compliance perspective -- you
10 know, when you work in the industry, there's a lot of
11 compliance that you would naturally know in the Bahamas,
12 anyway.  We big on AML -- it doesn't matter if you're in
13 compliance or not, you know.  So we big on KYC.  And so
14 a lot of that stuff I knew.  All right.
15       It was just getting into the specific
16 requirements that the Commission required -- that the
17 SCB required.  So, like I said, we had a lawyer who was
18 helping us.  We were filling out the documents, and it
19 was just a matter of getting the actual approval.
20       I also -- I also had to -- at the same time,
21 apply for -- with the Financial Intelligence Unit -- the
22 FIU, as the money laundering reporting officer.  That
23 was another position that was mandated by law as well.
24 And so I got approved for both.
25       Q.  All right.  Could you briefly summarize what

21

1  your job responsibilities were as the Chief Compliance
2  Officer for SureTrader when it opened in approximately
3  November of 2011?
4        A.  Well, back then roles were not -- you know,
5  roles were not really established.  It was just me and
6  Guy, basically, right.  And I would be -- I would let
7  him know, from my understanding of compliance, what we
8  needed to do in order for -- to open up accounts for
9  clients.
10       So, again, my main focus was things like KYC,
11 doing proper due diligence on clients.  You know, making
12 sure that, you know, that the countries they come from
13 aren't on sanctions lists, that type of things.  Those
14 were like my main focus, and making sure we get proper
15 IDs, making sure -- you know, that type of stuff.  So we
16 went back and forth with trying to get the actual
17 application together.
18       And initially the application was really just
19 a dumbed down version of the SpeedTrader application.
20 SpeedTrader was like the -- SpeedTrader is basically the
21 same as Stock USA.  All right.  And so, you know, we ran
22 through that, and it was like, okay, well, that just
23 doesn't apply.  We don't need this.  We don't need this.
24 Okay.  We need that.  So it was that type of thing.  It
25 was a lot of back and forth.  We were bouncing ideas off

22

1  of each other.
2        And so, basically, my role as Chief Compliance
3  Officer was, you know, to make sure that the clients, as
4  they were coming in, were in accordance with Bahamian
5  law and, to a broader spectrum, to make sure our firm
6  was running in accordance with Bahamian law and
7  regulations.
8        Q.  Okay.  Did you have any responsibilities with
9  respect to whether SureTrader complied with U.S. laws?
10       A.  No.
11       Q.  Okay.  Did you have any responsibility as
12 Chief Compliance Officer as to whether SureTrader
13 complied with any other country's laws other than the
14 Bahamas?
15       A.  No.
16       Q.  What was Mr. Gentile's role when SureTrader
17 opened in November of 2011?
18       A.  All right.  So from the start, like I said,
19 Guy, he was aware that I wanted to open up my -- a
20 broker-dealer some day.  So he -- you know, he told me,
21 he's like Phil, you stick with me.  I'll teach you
22 everything I know.
23       And so it was really like -- I viewed him
24 almost like a mentor, really.  He was someone -- you
25 know, back then his -- Guy was, I would say, almost like

23

1  the golden child of the broker-dealers, you know, he was
2  the man.  So it was quite an honor to be working with
3  him.  And, you know, in some ways I was sort of in awe
4  of him.
5        So a lot of it was me just taking in what Guy
6  was explaining to me about how broker-dealers work.  And, to
7  that end, he also had a lot of experience with the
8  securities markets themselves.  He knew the ins and outs
9  of how the various -- literally, how the physical
10 systems of how trades would take place, and how they
11 would run, and all the rest of it, and I was quite
12 impressed.  And he also had a very healthy knowledge of
13 U.S. regulations as well.  You know, he was -- you know,
14 he had his own firms and that was something I knew for
15 many years.
16       And so he -- we had had discussions -- because
17 earlier when we were talking about when he mentioned
18 that, you know, we're going to get these U.S. clients
19 because of the PDT Rule, one of the things I mentioned
20 to Guy -- I told him, I said, well, Guy, I've worked for
21 a few firms at that time, and as far as I knew nobody
22 really had U.S. clients.  I didn't know why.  In fact, I
23 used to -- I was under the impression that it was some
24 sort of Bahamian thing.  Like it was some reason why it
25 was always more difficult for there to be U.S. clients.

24

1  I really didn't know.  Like I said, back then my
2  background was actually not in really compliance, but
3  I --
4       Q.   So I'm just going to pause you right there
5  because you talked about it a bit.  So let's, you know,
6  break it down.
7       When SureTrader opened, did you and
8  Mr. Gentile plan on having SureTrader handle U.S.
9  customers?
10      A.   Yes.  Yes.
11      Q.   Okay.  And what -- what was the plan with
12 respect to finding U.S. customers to work with
13 SureTrader?
14      A.   Well, initially -- well, initially I think Guy
15 had this thing whereas once -- once he opened the firm,
16 they would come.  All right.
17      Now, the reason why I said it because there
18 was a -- there was a short time just before Christmas
19 when Guy --
20      Q.   Christmas 2011?
21      A.   Yes.  All right.
22      Q.   Okay.
23      A.   When Guy -- he seemed to have like backed away
24 from his idea of, you know, getting the U.S. clients in
25 the PDT Rule and everything, right?  It was like -- you

25

1  know I was a bit surprised by it because he was all
2  gung-ho like, you know, over the summer for the last --
3  I don't know how much months.  Right.
4       And he had had me check on the Bahamian side
5  to see if there was any problem with us having U.S.
6  clients, and there wasn't.  All right.  And so when we
7  finally opened, like he would tell me, he would say, you
8  know -- you know, I'm not sure if I want to do it.  And
9  I didn't -- I wasn't sure where the hesitation was
10 coming from, but I knew there was some hesitation.
11      And then as the weeks went on we were not
12 getting as much clients as I think Guy had hoped.  All
13 right.  And he was like -- he was like Philip, you know,
14 we gotta get U.S. clients.  This is -- I'm going to have
15 to shut down if we don't.  And I was like well, okay.
16 You know, I mean -- you know, it's up to you, right.
17 And so he made a decision -- this was within like the
18 first quarter -- the first few months -- first few weeks
19 of 2012, that we were going to start allowing for U.S.
20 clients.
21      And so, at that point, I think U.S. clients
22 were opening, but I don't think he was advertising.  He
23 had not really discussed advertising with me at that
24 point.  However, later on the idea started to come up
25 with okay, if we're going to have U.S. clients, we need

26

1  to, you know, like come up with a way to, I guess,
2  protect ourselves, or to make sure that we're in line
3  with U.S. regulations.  All right.
4       And so that -- that was probably like around
5  February or so -- definitely within the first quarter,
6  that's when -- it was one day after work, you know, this
7  idea came up with the unsolicited acknowledgement
8  agreement.  All right.  And, apparently, this
9  unsolicited acknowledgement agreement would have a
10 certain amount of points that a U.S. client would attest
11 to, and then they would sign it, and then we would be
12 able to have that document in case U.S. regulators had
13 an issue, we would be able to say well hey, we didn't
14 solicit these clients.  All right.
15      And so in that meeting he gave me a list of
16 points and he said, you know, he wanted it to come from
17 compliance.  I said well, okay.  So I put the points
18 together.  It was a separate one-page document.  All
19 right.  And -- yeah.  And then we attached it to the
20 applications, and we started sending them out.
21      Q.   Okay.  I'm going to pause you there.
22      Going back as far as when SureTrader opened in
23 November 2011, can you estimate, in the first couple of
24 months, how many customers SureTrader had?
25      A.   Yeah.  I estimated it altogether to be maybe a

27

1  hundred at best.  And some of those -- I think what Guy
2  told me, some of those were not like real customers.
3  They were just persons he knew.  All right.  And they
4  weren't like, I guess, genuine customers.  And so he was
5  concerned.  He's like well, we don't have real new
6  people coming in.  All right.
7       Q.   All right.
8       A.   So we had maybe about a hundred customers.
9       Q.   And of those 100 -- approximate 100 customers,
10 can you estimate how many of those customers were U.S.
11 based?
12      A.   Well, I -- I really don't know to be honest,
13 because it wasn't something that I was -- like my mind
14 was keen to keep track of at that point.
15      So some of them definitely were U.S., but to
16 say well, what percentage of that initial amount was
17 U.S., I really don't know.  I mean, I would think most
18 of them probably were U.S., but, again, I didn't really
19 start taking note of like where the customers were
20 coming from until like -- for to retain in my memory,
21 until a little time later.
22      Q.   All right.  So I believe you were testifying
23 that there came a point when you were discussing with
24 Mr. Gentile concerns about there not being enough
25 customers and needing to increase the number of

28

1  customers.
2       Can you tell me what was the first
3  conversation where -- where the concern about the number
4  of customers came up?
5       A.  Well, like I said, Guy was -- was visually
6  frustrated, and he would tell me, he would say Philip,
7  I'm not used to this -- you know, we supposed to have,
8  like -- you know, a bunch of clients by now.  This is
9  just not going to work.
10      And I'm like well, okay.  What do you want to
11  do about it?
12      And then he would say well, okay.  We have to
13  go after U.S. customers.
14      And I would say, well, I mean, you tell me.  I
15  say, you are the one who said it's okay for us to do it.
16  So, I mean, if you want us to go after U.S. clients,
17  then let's do it.
18      So -- but I could tell it was something --
19  like he was trying to be careful about in his mind.  He
20  was like we have to be careful how we do it.  All right.
21  But, at the same time, you know -- you know, Guy's a
22  really smart guy.  He would come back with these
23  suggestions.  He would come back -- like I said, I knew
24  him to be someone who was very knowledgeable in the
25  industry.

29

1       And so when he came back with the unsolicited
2  acknowledgement agreement -- all right -- idea, I read
3  it, and I said well, okay.  I mean, basically it's
4  telling -- it would be saying that U.S. clients were not
5  solicited.  All right.  They would be agreeing they were
6  not solicited.
7       And so once -- once that took place, Guy's
8  focus sort of shifted.  All right.  Guy would be on the
9  phone all day.  I would be listening to Guy on the phone
10  all day with various, I guess, business partners or
11  individuals, and he would be, you know, what we call
12  hustling, you know, trying to get business into the
13  firm.
14      And so once it was sort of established that
15  okay, U.S. clients were okay, he went to town on getting
16  basically as much clients as possible.  He was making
17  call after call after call and, eventually,
18  that what led into what would become the affiliates
19  program -- all right -- where we -- Guy eventually got
20  into contact with some of the big guys like Tim Sykes
21  and those guys who had massive platforms, and the idea
22  was if they would send their clients to us, then they
23  would get some sort of like kickback -- I think we
24  referred to them as rebates.  And so we gave -- you
25  know, the idea was to give these affiliates -- that's

30

1  what we called them -- incentive to send as much clients
2  to us as possible.
3       So Guy, he -- like I said, that became the
4  whole thing.  All right.
5       Q.  Okay.  So let me just pause you again.  I'm
6  trying to understand the timeframe here.
7       The discussion about the unsolicited
8  acknowledgement agreement, was that within days, weeks,
9  months after SureTrader opened?
10      Can you estimate the time period?
11      A.  That would have been, I would say, about two
12  months.
13      Q.  Okay.  This would then be early 2012?
14      A.  Right.  Early 2012.  Definitely within the
15  first quarter.  So, maybe two or three months.
16      Q.  Okay.  I'm going to go back to -- you
17  described a meeting with Mr. Gentile about the
18  unsolicited acknowledgement agreement document.
19      Can you estimate when that conversation
20  occurred?
21      A.  So, again, this conversation occurred -- you
22  know, I think -- I think in my deposition I indicated
23  around February.  And so that is -- I'm thinking in my
24  mind it was around February that, you know, Guy wanted
25  me to stay behind.  There was another individual with

31

1  him -- and it was obvious they had already discussed
2  this at length -- and so he presented this idea to me
3  with the unsolicited acknowledgement agreement, and he
4  said this, you know -- because he was referring to it as
5  a loophole.  And I remember saying -- I was like, well,
6  you know, is that going to be okay?
7       And he was like well, you know, with U.S. laws
8  you're either breaking the law or you're not breaking
9  the law, you know.  And he was like we will not be
10  breaking the law, and that's -- you know, that's it.
11  And I was like, okay.
12      Q.  Okay.  So again -- I apologize.  Let me pause
13  you there.
14      You said, asked you to stay behind.  What do
15  you mean "stay behind"?
16      A.  Right.
17      So this was not during working hours.  Like
18  the office had closed, right, and then we had the
19  meeting after work in the office.
20      Q.  Okay.  And you said "we" is that just you and
21  Mr. Gentile that were at the meeting?
22      A.  Right.  Yeah.  And there was another
23  individual there as well.
24      Q.  And who was the other individual?
25      A.  It was Karen, his wife.

32

1    Q.  And during this meeting, what specifically was
2  discussed?
3    A.  Well, basically what it was discussed was how,
4  you know, SureTrader can actively have U.S. clients
5  without getting in problems with U.S. regulators.
6  And -- and so that's when -- and, like I said, it wasn't
7  so much discussed.  It came across as if like this was
8  sort of discussed before, like, and so the idea with the
9  unsolicited acknowledgement agreement it was like okay.
10  Well, this is a good idea.  Da-da-da-da-da.  And then
11  Philip just type this out.  It should come from
12  compliance -- I mean, I understood that -- and we'll
13  send this out to all the U.S. -- well, we'll make --
14  whenever we get a U.S. client, we'll just make sure they
15  sign this, and that should suffice the SEC, right.
16    Q.  Okay.  When you say that it seemed like it was
17  discussed before, what are you referring to?
18    A.  It didn't seem like the -- the topic of how to
19  get U.S. clients but without getting U.S. authorities on
20  your back.  It seemed like that discussion had a -- was
21  already going on between Guy and his wife, and it was a
22  continuing -- a continuation of that.  It's like, okay.
23  Philip, listen to these ideas.  That's how it came
24  across.
25    Q.  And during the meeting when the topic of the

33

1  unsolicited acknowledgement agreement was discussed, how
2  did the -- the words get created to -- to fit whatever
3  needed to be in this document?
4    A.  Guy actually wrote -- with the unsolicited
5  acknowledgement agreement the main point of it is the
6  points that U.S. clients would agree to.  And so Guy
7  actually -- I don't know if he typed them out or if he
8  wrote them out, and he said well, this is the main
9  points.  And so that's was it.  I think I put like a
10  paragraph to say something to the extent of, I am a U.S.
11  client and I -- something like that, I agree -- I can't
12  remember, actually.  But the main points were basically
13  verbatim that -- what he had written down.  It was like
14  five or six points.
15    It was very basic and straightforward,
16  actually.
17    Q.  All right.  I'm going to just step away
18  momentarily from the topic of the unsolicited
19  acknowledgement agreement and go back to opening of
20  SureTrader in November of 2011.
21    When SureTrader opened, how many employees did
22  it have?
23    A.  Right.
24    So SureTrader it was just myself and Guy.  He
25  also brought on another lady.  She wasn't really a part

34

1  of SureTrader.  Guy also had a -- a magazine, I guess,
2  is the best -- or like a newspaper-type thing slash
3  magazine, and she -- I think she was sort of associated
4  with that, but, at the same time, she still was helping
5  with us.
6    And as that magazine grew, I think they got
7  two other staff.  And, again, they were doing the
8  magazine, but then they were still helping with us.  And
9  then eventually, I think Guy just forgot about the
10  magazine idea, and those three individuals just came --
11  they were officially a part of SureTrader at that time.
12    Q.  All right.  And what were their -- very
13  briefly, what were their job duties at SureTrader?
14    A.  Well, again, I think with the lady, I think he
15  gave her the title of office manager because I remember
16  later when Justin came, Justin became the office
17  manager, and then the lady, she left.  Right.  So I
18  think that was her title.  And so -- but she was really
19  responsible for the magazine.  All right.
20    And then later on when they all basically were
21  working for SureTrader, they basically was all doing
22  like customer service and customer support.  And so as
23  the applications were coming in, going through the
24  process, making sure that, you know -- you know, I had
25  to basically teach the staff what we were looking for

35

1  from a compliance perspective, you know.  And so it was
2  really hands-on -- that early time was really hands-on
3  for all of us.  But Guy and I were the main ones, and
4  then we had these other folks.
5    Eventually, Guy started to employ staff who
6  actually had like -- like finance backgrounds.  There
7  was two gentlemen who came in, and -- yeah.  So this is
8  all during 2012.  And so we were growing.
9    At that time we were -- you know, it was no
10  longer a question of are we going to survive, you know.
11  The clients were coming in pretty strong, you know, and
12  it was quite --
13    Q.  Can you -- all right.
14    So was there a physical office when SureTrader
15  opened in November 2011?
16    A.  Yes.  And so --
17    Q.  Can you just very briefly describe like what
18  was the office setup?
19    The basic office setup?
20    A.  It was a very small office.  We were in, I
21  guess, like the front corner of a building, and so the
22  office was like a half circle, and it was an open floor
23  plan.  And so we had, I think, about maybe eight to ten
24  desks going along the outer wall, and then Guy would sit
25  just a little bit diagonal behind me and his desk was

36

1 against the flat wall.  And he wanted it like that so he
2 could see everyone very clearly.
3        And so where I was sitting, I could see
4 everyone in front of me, and then Guy was in my
5 peripheral vision diagonally.  So it was an open floor
6 plan, really small office.  Yeah.
7     Q.   Okay.  And did SureTrader have a website when
8 it opened in November of 2011?
9     A.   I -- I can't -- I can't say for sure.  I don't
10 know if that happened immediately to say in
11 November 2011.  I -- I don't -- I can't recall right now
12 to say if it was at that date.
13     Q.   Do you recall if, within the first six months
14 SureTrader had --
15     A.   Yes.
16     Q.   -- a website?
17     A.   Yeah.  We certainly had a website by 2012.
18 And that was -- yeah.  We -- we had a website definitely
19 by 2012.  But, again, I -- you know, most of my memories
20 of the website was when we updated it when we moved to
21 the bigger office.  I think that's because they're more
22 recent in my mind.  But we certainly did have a website
23 back then, and then clients would go to the website.
24 They would download -- it was actual PDF application.
25 They would download the application, fill it in, and

37

1 then fax it in to us, or whatever the case may be.
2     Q.   Did SureTrader have any phone numbers where
3 someone could actually call in and ask questions?
4     A.   Yeah.  Yeah.  We had a phone -- we had local
5 numbers.  And I remember that ended up being a problem.
6 I think it was Tim Sykes who got upset with Guy, and he
7 was saying, you know, how can you expect my students to
8 make a long distance call just to, you know, check on
9 their accounts and stuff.  So Guy set it up where we had
10 a U.S. number so when clients would call, it wouldn't be
11 a long distance call for them.
12     Q.   Okay.  When you say Mr. Sykes complained, are
13 you talking about U.S.-based customers having to make a
14 long distance phone call?
15     A.   Right.
16        So he was upset -- Sykes referred to his
17 people as his students, right.  And so he did not like
18 the fact that they had to make a long distance call to
19 the Bahamas just, you know, for whatever reason -- to
20 check on their accounts or whatever the case may be, you
21 know, and Guy -- Guy concurred.  Because Guy told me
22 this.  He said, you know, Tim was upset.  And so he said
23 -- he said so I'm going to be setting up a number
24 whereas -- and I think he used his New York -- it was an
25 affiliation with like his New York office or something

38

1 that he added, like, an extra number or something like
2 that.  And he set it up whereas -- I think initially it
3 was just his phone where it would ring to, but as we
4 grew, he set it up where when they -- a person ring, it
5 would just ring to any of the phones.
6     Q.   Who made the decision to -- to create a U.S.
7 phone number for customers to call?
8     A.   Guy did.
9     Q.   Did you have any input on that decision?
10     A.   Nope.
11     Q.   Did any other employees of SureTrader have
12 input on that decision?
13     A.   No.  I mean, you know, Guy would tell us what
14 he's going to do.
15     Q.   Well, what do you mean Guy would just tell us
16 what we were going to do?
17     A.   You know, especially -- definitely early on in
18 the firm, you know, like, Guy was the man.  Guy
19 basically told everybody what to do.  This is how you do
20 it.
21        We were still very much, I guess, in the
22 embryonic stage and growing.  Like I said, my view
23 towards Guy was, you know, I viewed him like a mentor.
24 So I didn't question, you know, if he wanted to have a
25 U.S. number that made it easier for clients to be able

39

1 to reach us, that made sense.  And so I wouldn't -- I
2 didn't have any reason to question it.  So he would, you
3 know, tell us what to do, and we would do it, you know.
4     Q.   Regarding SureTrader's website, who created
5 the website including its content?
6     A.   Oh, well, I don't know specifically who Guy
7 hired.  So I don't -- I can't say.
8     Q.   Who approved the content for the SureTrader
9 website?
10     A.   Oh, well, Guy would have approved everything.
11 Like I say, anything to do with the company.  Certainly
12 the website Guy was the only -- Guy was the only one
13 dealing with that.
14        At that point, we didn't -- I don't even think
15 we had an I.T. person.  We didn't.  And so very early on
16 everything with the website -- because, you know, Guy
17 would tell me he already had the people in place who
18 knew how to do these things.  All right.  And so
19 remember, he already had a firm in the U.S., Stock USA,
20 and he had considerable experience.  So he knew exactly
21 how to get things done.  So he got the website done.
22        I remember -- he would -- you know, he didn't
23 ask us, you know, about the website or have to approve
24 anything.  It wouldn't have been us.  It would have been
25 me, really, because, I guess, I was the only other

40

1 person, I guess, on a senior level, but he didn't really
2 need approval from me with, you know, getting a website
3 done, stuff like that.
4     **Q.**  So when we talk about the formation of the
5 company, did you and Mr. Gentile discuss whose
6 responsibility it would be to get customers for
7 SureTrader?
8     **A.**  Oh, that was definitely Guy's responsibility.
9 And he, you know, he -- it was his responsibility.  We
10 just had to do what he said to do.  He told me straight
11 up, this is how we're going to do it.  We're going to
12 make a lot of money.  You know, he had it all thought
13 out.
14         Like, I said once we opened, Guy was on the
15 phone constantly.  I was quite impressed with his, I
16 guess, tenacity.  Like, he was just non-stop making
17 deals, talking to this one, talking to this one, trying
18 to generate business for the firm.  So he was calling
19 everybody and --
20     **Q.**  How did you know Mr. Gentile was doing what
21 you just described?
22     **A.**  Well, like I said, his desk literally was like
23 less than 10 feet away from me, and I could hear very
24 loudly what Guy was doing.  And, like I said, he -- it
25 was almost like he was mentoring me.

41

1     So Guy would -- would be saying something
2 loudly and he'd know like I'd hear him.  So sometimes I
3 would turn around and hear it, and he would give me the
4 thumbs up to be like yeah, we got this one, or this, and
5 this.  So I could hear very clearly everything that Guy
6 was doing.
7         The one or two times that Guy spoke quietly
8 those were odd.  And it's interesting.  As we talk I'll
9 probably talk more about that.  There was a difference
10 when Guy was just talking to some sort of like business
11 partner than when he was talking, perhaps, like a
12 regulator, or a lawyer, or something like that.
13 Normally when he was talking to his business partners,
14 he was very suave, very loud, very confident.
15         You could tell when he was talking to someone
16 of more importance he was more quiet, and more reserved.
17 So I would hear all day he was making these deals.
18         Sometimes I thought it was questionable
19 because it -- like he would be talking with -- let's say
20 business person A, and they're having a conversation
21 about business person B, and he'd say no, no don't trust
22 business person B.  It's me and you.  We're going to do
23 this.  Trust me.  And five minutes later he's on the
24 phone with business person B, and he's saying the same
25 thing about business person A, you know.  He says trust

42

1 me, don't trust the other guy.  And I would turn around
2 and look and he'd be like -- after the call, he would be
3 like, you know, Phil you gotta run circles around these
4 guys.  That's how you do it, you know.
5         So it was like he -- he was trying to teach
6 me, I guess, the ins and outs of the business, you know.
7 And it was interesting.
8     **Q.**  Did he -- did he ask you for input for these
9 conversations where he was trying to make deals with
10 business partners?
11     **A.**  He never asked me for input.  And, quite
12 honestly, I wouldn't -- I wouldn't even have known what
13 to say, to be honest.  I mean, a lot of the stuff -- you
14 know, that was -- it was -- a lot of it I could hear he
15 was discussing a lot of like U.S. regulations and stuff
16 with various people, and he was saying well, no, this is
17 going to work because of this, and this, and that.  So I
18 couldn't really give input to that because that's not --
19 you know, I cannot really comment on U.S. regulations.
20         But, like I said, he really knew what he was
21 doing.  And he, you know, would be talking with these
22 folks back and forth constantly, you know.  And yeah, he
23 felt really excited about it and -- you know, he would
24 give me the thumbs up a lot.  Like, I would turn
25 around -- every now and then, you know, Guy he's -- I

43

1 don't know, he's an interesting character, you know.
2 And so I get the feeling sometimes he may have been
3 trying to show off in front of me a bit, but I don't
4 know.  But he would just say things, and I would be like
5 okay.  Okay.  I guess that's how you do it.
6     **Q.**  All right.  So with respect to when he was on
7 the phone.  After he hung up, let's say on a particular
8 call, would he turn to you and say, Philip, this is what
9 just happened?  Or, you know, summarize it in any way
10 for you?
11     **A.**  The only times he would do that is like he
12 would be excited and he would say, Philip, there's some
13 big business coming our way, man, you know, like he
14 would say things like that.  So he would hang up the
15 phone and he would say, Philip, hey, this is going to
16 work.  This is going to work, or something like that.
17         It was never -- like, he never asked me for my
18 input or my opinion on his business deals, or his
19 conversations, and stuff like that.
20         The only time when Guy came to me with stuff
21 was when there was something from the Commission -- from
22 the SCB.  And he would be like oh, Philip -- and even
23 back then we would both go through it.  He wouldn't just
24 leave it to me.  We would still, you know, both go
25 through it, make sure we both understood it.  But

44

1 anything from the U.S. side, I mean, he just did that
2 totally on his own, you know. I mean, I wasn't
3 qualified to give input there anyway.
4    Q. All right. So I'm now going to just go back
5 to some of your testimony regarding what you called the
6 affiliate program.
7       Do you recall specifically who else
8 Mr. Gentile spoke with that was part of the -- what you
9 called the affiliate program?
10   A. Right. So some of the bigger names they stood
11 out to me. Obviously, Tim Sykes was the massive one,
12 right. You know, Tim Sykes is the one who really put us
13 on the map, right.
14      But then you had like Day Trading Radio. You
15 had, like, Warrior Trading. There was another one,
16 another guy's name -- and so -- like I said, that
17 eventually became Guy's total focus.
18      I mentioned that we hired two other gentleman,
19 and one of their main jobs was to stay inside of, I
20 think it was Tim Sykes -- inside of his chatroom so he
21 could talk directly with Tim Sykes's students as opposed
22 -- you know, I guess, Tim having to do all these things.
23 So we had a person in the chatroom or on the website
24 directly for the various affiliates' websites -- for the
25 larger ones. And so they would speak to the clients

45

1 directly and, you know -- but, like I said, things were
2 doing pretty good, like, we were -- we were no longer
3 concerned about shutting down. Things were growing --
4 you know, Guy was really excited about it. It was an
5 exciting time. I was excited too, you know.
6    Q. So can you estimate the approximate timeframe
7 when SureTrader went from approximately a hundred
8 customers to something more?
9    A. Definitely by mid 2012 we were on our feet and
10 running. All right. And so between, let's say February
11 when we came up with the unsolicited acknowledgement
12 agreement -- in retrospect, I think he wanted the
13 unsolicited acknowledgement agreement so he could start
14 making these business deals right away, because within
15 the next, what, three to four months clients were
16 rolling in. We were doing very well. So I would say by
17 mid 2012, definitely we were doing well.
18   Q. Can you estimate what the volume was by mid
19 2012 of customers?
20   A. Well, I cannot say what the volume was, but it
21 was certainly more than a hundred. You know, at one
22 point he brought in another individual to sort of manage
23 the affiliates as well, I think, and that would have
24 been Justin, because it was really growing -- not just
25 the clients, but the amount of affiliates, and he wanted

46

1 someone -- like a senior level person whose one of the
2 main duties would have been to manage that.
3       And, so, I don't know if that was Justin's
4 initial role, but that became his role very quickly.
5    Q. All right. And what's Justin's full name?
6    A. That would be Justin Ritchie.
7    Q. All right. I'm going to ask you, like, about
8 a specific affiliate program.
9       What was the basic idea of why SureTrader
10 would work with a company, for example, like Day Trading
11 Radio?
12      What was the business arrangement?
13   A. Right. So I've actually seen some of the
14 actual affiliate contracts, right.
15      Like I said, even though Guy initially set
16 that up where Justin was handling it, sometimes I would
17 be involved in those communications. And so if you
18 wanted to be an affiliate, basically there was a
19 particular -- like there was an affiliate application
20 that you would download and fill out, and then you would
21 agree to what percentage you would get -- like per
22 client that you send in, and then -- in essence, well,
23 Guy would agree, right. And then -- yeah.
24      And then I think what would happen is the
25 affiliates could try to renegotiate their rate after a

47

1 certain time, you know. I remember being privy to some
2 emails sometimes where some affiliates were complaining
3 that they didn't get the correct amount of rebates this
4 month, stuff like that.
5    Q. So what -- what was the expectation as far as
6 what these -- these affiliates -- and, again, I'm just
7 using the example of Day Trading Radio.
8       Like what -- what were -- what were they
9 supposed to do?
10      What was Day Trading Radio's job pursuant to
11 the agreement with SureTrader?
12   A. Well, they would talk about SureTrader. Talk
13 about this new broker-dealer in the Bahamas, right.
14      And, you know, talk about how you could make a
15 whole lot of money there because there's no Pattern Day
16 Trader Rule in the Bahamas. You know, and so once their
17 clients got aware of this, then they would come and open
18 up.
19      I remember there was -- I mentioned earlier, I
20 said, Tim was the man. I remember there was an incident
21 that happened where one of the ladies had established an
22 account numbering system -- like she put in a new
23 account numbering system, right, that neither Guy nor
24 myself were aware of, right. And I remember Tim
25 absolutely blasted us, right.

48

1   And, basically, what it really showed is that
2   how much of our clients were basically just his
3   students, because he saw that the account numbering
4   system that she came up with, it made it possible for
5   other persons to know what the account numbers were for
6   other people, and it would potentially cause, like, some
7   sort of hacking or something like that.  And I remember
8   he totally blasted us.  And I remember we had to switch
9   the account numbering system for our whole firm because
10  he -- well, basically our firm was made up of mostly his
11  clients at that point.  And so it was a really big deal,
12  you know.  Like, I said, Tim was the big one, but then
13  we had other big guys as well.
14      **Q.**  All right.  When I asked you for an example of
15  what a Day Trading Radio's job would be and you said
16  talk about SureTrader, the new Bahamian broker-dealer.
17      What do you mean by "talk about SureTrader"?
18      **A.**  Well, again, sometimes I would go into the
19  websites and I would hear or whatever, but the main
20  thing is these guys were receiving -- they had incentive
21  to send as much clients to us as possible.  All right.
22      And so I don't know if there was any agreement
23  to say this is what you must say, all right.  I doubt if
24  that existed.  But what existed was this is what you
25  would get for each client you send to us.

49

1   And so, you know -- now, I would hear Guy on
2   the phone talking to folks telling them well, listen,
3   there's no PDT Rule here man.  You can't make funds
4   trading in the states.  I mean, your clients this and
5   this, and that.
6       So I'm assuming this was a lot of the verbiage
7   that was being said to these affiliates' clients, but I
8   can't say that for sure.  All I know was these
9   affiliates had incentive to send as much clients to us
10  as possible.
11      **Q.**  Okay.  And earlier when I asked you about the
12  names of the affiliates, you mentioned Mr. Sykes, Day
13  Trading Radio, and Warrior Trading.
14      Where were these companies based?
15      **A.**  Tim was based in the U.S.  I think, basically,
16  all of them were based in the U.S.  And the reason why I
17  say that, because we mostly had U.S. clients.  And so --
18  I don't know.  I guess if one of them -- it could have
19  been based in Europe, but then they had U.S. listeners.
20  I don't know.  But we had mostly U.S. clients, at that
21  point.  And so I just assumed -- I know that Tim was in
22  the U.S., but I assume that the others were in the U.S.
23  as well.
24      **Q.**  And why were these particular affiliates
25  selected to work with SureTrader?

50

1       **A.**  Well, again, I didn't make that decision.  All
2   right.  But, again, listening to Guy, listening to the
3   deals and so forth, it -- it seems like they were
4   selected based on their large client base.
5       **Q.**  And their large client base was with customers
6   located where?
7       **A.**  Well, I would imagine it would have to be in
8   the U.S. because that's where the clients -- that's
9   where our clients were coming from you, know, so -- but,
10  I mean, I can't say definitively that Day Trading Radio
11  didn't have clients in Europe or something like that.  I
12  mean, I don't know that.  But based on the conversations
13  I would hear Guy talking, the whole incentive was based
14  off this PDT rule.  I don't know if that would come into
15  effect with other jurisdictions or not.
16      **Q.**  And did you discuss with Mr. Gentile, once
17  SureTrader started working with these affiliates, the
18  propriety of customers from -- sent by these affiliates
19  signing the unsolicited acknowledgement agreement?
20      **A.**  Did I discuss with Guy?
21      **Q.**  Yes.
22      **A.**  The need for these customers to sign the --
23      **Q.**  No.  No.
24      These were U.S.-based customers that were
25  coming to SureTrader what I understood your testimony

51

1   to be; is that correct?
2       **A.**  Correct.
3       **Q.**  Okay.  Did you discuss with Mr. Gentile these
4   U.S.-based customers being sent by the affiliates
5   signing the unsolicited acknowledgement agreement?
6       **A.**  Well, all U.S. customers had to sign the
7   unsolicited acknowledgement agreement.  And so, I don't
8   know -- I think, at one point, certain documents were
9   made available -- like I said, to -- like in the
10  chatrooms and so forth to make it easier.
11      And so -- but, at that point, the unsolicited
12  acknowledgement agreement was almost -- you know, it was
13  just like needing an I.D. or proof of address.  It's
14  like well, this is just something you need this as well.
15  All right.
16      I remember there was one client -- we were
17  about to deny this account because they didn't fill out
18  the unsolicited acknowledgement agreement.  Right.  And
19  we checked.  They were actually not from the U.S.  And
20  everybody was like, oh, okay.  Well, I guess they don't
21  have to fill it out.  But most of the clients were from
22  the U.S., and so we were just used to everyone filling
23  out the unsolicited management agreement.  But every now
24  and then, like I said, there were clients who would not
25  fill it out, and we checked, they actually were not

52

Philip Dorsett (nonconfidential)
2/27/2023

1 U.S., so they didn't have to fill it out.
2 **Q.** Who was responsible for approving customer
3 applications in the first six months of 2012?
4 **A.** Right. So that would have been me. I would
5 have been ultimately responsible -- in the beginning,
6 like, literally me and Guy were actually going through
7 the applications ourselves. As we got more staff, we
8 tried to put together, like -- I guess, like departments
9 and so forth.
10 I still was ultimately responsible for that,
11 so I would be constantly going around to the desks and
12 so forth making sure -- like I said -- they have -- like
13 I said, they have like the KYC, proof of address,
14 everything. Making sure that they're not from any sort
15 of sanctioned country, and making sure that they fill
16 out the unsolicited acknowledgement agreement.
17 **Q.** When approving a U.S.-based customer who had
18 signed an unsolicited acknowledgement agreement, did you
19 conduct any further checks regarding whether, in fact,
20 they were not solicited?
21 MR. MATTHEW FORD: Objection.
22 BY MS. SUM:
23 **Q.** You can go ahead and answer, Mr. Dorsett.
24 **A.** Well, no, I didn't -- I didn't check into if
25 they were actually solicited or not. Once -- that was

53

1 never like -- that was never like going to be the focus.
2 The whole focus was, once they fill out this form, then
3 Guy will be able to show that to the U.S. regulators
4 that hey, we didn't solicit them. It was never even
5 discussed to be like, okay, are we soliciting them or
6 not. It was just make sure they fill out this form.
7 And he told me, make sure we don't advertise. He was
8 very big on that. Like, we could not advertise, you
9 know.
10 He -- I remember he told me like, at one
11 point, I spend zero dollars on advertisement so how
12 could they tell me I'm soliciting, you know, their
13 citizens. And so that was the whole thing. So once you
14 don't advertise, and once U.S. clients fill out this
15 unsolicited acknowledgement agreement, that's it. If
16 the U.S. authorities have a problem, then we'll be able
17 to show them that, and, according to Guy, like, that was
18 all we needed.
19 **Q.** All right. Did you have any subsequent
20 discussions with Mr. Gentile about the application
21 process and whether there needed to be any additions or
22 improvements to it?
23 **A.** Yes, actually. Guy and I would go back and
24 forth -- Guy wanted to make it, let's just say, as easy
25 as possible for clients to open an account and start

54

1 trading. All right.
2 And so, naturally, as a compliance officer,
3 you know, I want to make sure that we are good as far as
4 Bahamian regulations are concerned. And so we had --
5 you know, I would try to push with him to be like okay,
6 we have to -- we have to have systems in place to ensure
7 that we have proper KYC.
8 We have to have a proper system -- because I
9 remember there was a big one, at one point, Guy wanted
10 to make the application more automated, and he wanted to
11 have an automated signature -- sorry, electronic
12 signature. And I had a problem with it because the
13 technology, at the time, the signature was -- it
14 didn't -- it didn't so closely match the person's actual
15 signature. All right.
16 We would go back and forth, back and forth,
17 and so, finally, you know, I would -- so we would talk
18 about those type things. But, again, that was all from
19 the Bahamian regulatory perspective. Like, the main
20 thing I was really concerned with was know your clients,
21 doing due diligence, making sure we had everything in
22 case the regulators that came in and did a -- you know,
23 a surprise inspection, you know, and we had everything
24 on file. So that was my main thing.
25 And I -- and I went back and forth with him

55

1 just to make sure that us trying to make it easier for
2 clients to open, that we weren't shooting ourselves in
3 the foot, you know. So we would have those type
4 discussions.
5 **Q.** When you said that Mr. Gentile said no
6 advertising, what -- did he describe what advertising
7 was or what he considered it to be?
8 **A.** Well, I think, from his perspective,
9 advertising was like an actual advertising like a
10 commercial like or -- you know, on a website some sort
11 of ad or something like that. Because I knew he --
12 he -- just from the things he would say, I knew he had
13 experience with advertising because he would tell me how
14 expensive it is, right. But then he would also say, we
15 have it great, man. We don't have to advertise. He
16 would always say, I don't spend one dollar on
17 advertising, you know. How can anyone tell me I'm
18 advertising. I'm not spending -- someone is someone
19 advertising for us for free. You know, he would say
20 things like that.
21 So -- and, again, not just to me. I would
22 hear him saying things, like, on the phone to different
23 persons, you know. And so that's why, you know, I
24 realized that we were not advertising. And Guy was very
25 proud of the fact that he was not spending money on

56

1  advertising.  So I think his idea of advertising was
2  like a commercial -- like an ad.
3      **Q.**  As far as the business, can you briefly
4  describe its trajectory from approximately mid 2012
5  through late 2015 in terms of the volume of customers?
6      **A.**  Well, okay, that's a big jump.
7          Now, at some point, we had to switch offices.
8  We moved into a much bigger office.  It was literally
9  about -- I would say ten times bigger.  And so once --
10  you know, and Guy -- I have to give it to him, he's like
11  a forward thinker.  And he said, Philip, we're going to
12  grow like crazy.  We need space.  We need more people.
13          So we moved into this huge office.  And I
14  remember when we first moved in, we were just in one
15  small room in the back.  I was like wow, are we actually
16  going to fill out this place.  But, to his credit, we
17  filled it out.  In fact, we even had more people that
18  can adequately could have fit -- comfortably, I should
19  say, could fit in the office in the future.
20          And so certainly by 2015 we were a huge firm
21  by then.  Like, you know, things were -- by that time I
22  would say the staff, maybe, was in the 20s or 30s,
23  maybe, you know, or even more.  We probably, at that
24  point, we had proper departments, and he had other --
25  you know, other senior officers as well.  And so it was

                                    57

1  a very well-oiled machine by that time.  We were a
2  massive firm, you know.
3          Things had changed between me and Guy by that
4  time, too.  You know -- well --
5      **Q.**  Okay.  Well, let's pause for a moment there.
6  I just wanted to understand the size in terms of, you
7  know, the number of customers, and you've described as
8  customers and staff.
9          So did your job duties change during the same
10  time period from middle of 2012 to 2015?
11      **A.**  My job duties never changed for the whole time
12  I was in Swiss America Securities.  There was one time
13  when Guy actually made me CEO, right, but that -- you
14  know, and I did not -- I was not even aware of it.
15  Literally, I came to work that day and the staff -- one
16  of the receptionists -- I remember she came to me she
17  said, "Good morning, boss."  I was like what?
18          She showed me the newspaper where Guy was
19  congratulating me.  He made a public statement in the
20  newspaper saying I was the new CEO.  All right.  But I
21  told Guy, I said Guy, you can't just make me CEO.  You
22  have to -- that's a regulated position.  You have to vet
23  that with the SCB.  You know, that's not just something
24  -- you can't just decide that, right.
25          So I don't know if that really counts.  But,

                                    58

1  officially, from a regulatory perspective, my duties
2  never changed.  I was Chief Compliance Officer and MLRO
3  from the beginning right up until the day that I
4  departed.
5          My basic duties never changed.  They just sort
6  of evolved, because we had so much more staff, and so I
7  had to make sure that people knew what the regulatory
8  requirements were.  I had to make sure -- so that --
9  that was sort of my thing.  So --
10          MS. SUM:  Okay.  All right.  I know we've been
11  on for about an hour and a half.  I'd like to take a
12  short break.
13          THE WITNESS:  Okay.
14          MS. SUM:  Do you want to take a 10-minute
15  break?
16          THE WITNESS:  Okay.
17          MS. SUM:  All right, Matt?
18          MR. MATTHEW FORD:  Sounds good to me.  I would
19  leave it in the hands of the witness and the court
20  reporter how much time they need if they want 10, 15,
21  let me know.  I'm fine with either.
22          MS. SUM:  Okay.  Mr. Dorsett, how much time
23  would you like?
24          THE WITNESS:  Ten minutes is good for me.
25          MS. SUM:  So it's 11:00, plan to sign back on

                                    59

1  at 11:10.
2          THE WITNESS:  Okay.
3          THE VIDEOGRAPHER:  The time is 11:00 a.m.  We
4  are now off the record.
5          (Off the record at 11:00 a.m.  Back on the
6  record at 11:12 a.m.)
7          --o0o--
8          THE VIDEOGRAPHER:  The time is 11:12 a.m.  We
9  are now on the record.
10          MS. SUM:  Thank you.
11  BY MS. SUM:
12      **Q.**  Before we took a break, Mr. Dorsett, we were
13  talking about the affiliate program, and I believe you
14  testified that sometimes there were SureTrader employees
15  in a chatroom with an affiliate.
16          Did I understand that correctly?
17      **A.**  Yes.
18      **Q.**  Okay.
19      **A.**  And so --
20      **Q.**  Why -- why did any SureTrader employees attend
21  or participate in a chatroom with an affiliate?
22      **A.**  Right.  So it was becoming too much of a task
23  for the affiliates themselves to be constantly trying to
24  deal with all of their clients' concerns with us.  All
25  right.  And so, at some point, a decision was made, it

                                    60

1  just made sense for us to have one of our own people in
2  the chatroom, and they would just be called, I think,
3  SureTrader rep.
4        And so not only -- it was for clients, but it
5  was for prospective clients, too.  So if persons had
6  questions and so forth -- like say, it was Tim Sykes,
7  they didn't have to bother Tim Sykes.  They would just
8  ask our guy.  So it just made it -- it was a lot more
9  efficient that way.
10       Q.  Can you explain whether there was, like, one
11 employee at SureTrader that was assigned to this task or
12 was it, you know, more than one employee?
13       A.  Initially, it was one, but, eventually, it was
14 more than one.  Because it would be different persons
15 for different -- but, again, I'm not -- I'm not sure, to
16 be honest.  I'm not entirely sure.  I don't know if it
17 was one person going into different affiliates'
18 chatrooms at different times or if they had different
19 persons.
20       I can't recall, to be honest.
21       Q.  Was the SureTrader employee parked, if you
22 will, in the -- a particular chatroom for a set period
23 of time?
24       A.  Well, yeah --
25       MR. MATTHEW FORD:  Objection.

61

1  BY MS. SUM:
2        Q.  You can go ahead and answer.
3        A.  Well, yeah.  So --
4        Q.  Okay.  So, actually, let me stop you.
5        Can you explain how it was decided which
6  SureTrader employee would go where and for how long with
7  respect to these chatrooms?
8        MR. MATTHEW FORD:  Objection.
9  BY MS. SUM:
10       Q.  You can go ahead and answer.
11       A.  All right.  So -- all right.  So, Guy was the
12 one who told us, listen, we need -- the affiliates are
13 complaining that they are getting flooded with stuff
14 dealing just with SureTrader.  It makes more sense to
15 have one of our actual people in there who could
16 directly answer these people -- these clients' questions
17 and do whatever they need to do.
18       And so I think what it would be -- I -- this
19 was not like set in stone.  So, initially, I think we
20 had one of the guys in there and he would stay in
21 there -- he would be doing his work, but keep a window
22 open just in case someone gave him questions.  I think
23 that's how it was initially.
24       And then I think that setup was probably
25 duplicated for other persons for other chatrooms.  But,

62

1  again, this was not like set in stone.  It was, like,
2  definitely for the bigger chatrooms, we even had persons
3  in there, and they would be doing their work but also
4  just looking to see if someone has contacted them.  And
5  so they just keep the window open while they're doing
6  their work.
7        Q.  And can you estimate approximately when
8  SureTrader started having an employee participate in an
9  affiliates' chatroom?
10       A.  Again, I want to say this probably would have
11 started around mid 2012.
12       Q.  Was there a specific event that precipitated
13 the need for an employee to -- for a SureTrader employee
14 to sit in a chatroom for one of the affiliates?
15       A.  I can't recall, but, like I said, I remember
16 Guy saying that, listen, the affiliates -- the idea
17 actually came from the affiliates.  It was like Guy was
18 saying listen, they're complaining.  You know, we need
19 to have somebody in there dealing with all these
20 questions and all the rest of it so they could, I guess,
21 finish doing what they normally do.  All right.
22       And so -- but I cannot say -- I cannot say
23 that I recall a specific event, or that I remember a
24 specific event that led to it, no.
25       Q.  Earlier you testified about the agreements

63

1  between SureTrader and the affiliates.
2        Can you describe what was the compensation
3  agreement or compensation understanding for the
4  affiliates and what they would bring to the table?
5        MR. MATTHEW FORD:  Objection.
6  BY MS. SUM:
7        Q.  Okay.
8        A.  Okay.  So I can -- I've seen the affiliate
9  agreements, but I've also seen how we worked out how we
10 would pay some of the affiliates as well.  And so --
11       Q.  Okay.  I'm going to stop you.
12       Do you have a specific affiliate -- let's
13 speak to Warrior Trading.
14       Do you have any knowledge of what the
15 compensation agreement was between SureTrader and
16 Warrior Trading?
17       A.  I would not know what the percentage is or
18 what the details.  Like I said, Guy -- he dealt
19 specifically -- especially with the bigger affiliates
20 like Warrior Trading, he would have had very specific
21 deals with them.  So I couldn't tell you what those
22 dealings -- what those specifics were.
23       Q.  Were you ever involved in any discussion
24 within SureTrader about the amount or percentage that
25 SureTrader would pay to the affiliates for the role that

64

1  they were playing?
2    A.  I was privy to conversations where Guy was
3  complaining that -- I think it was Tim Sykes, wanted too
4  much.  But, again, you know, it wasn't so much
5  discussion as opposed to Guy complaining to us.
6       By the time I think, you know, he would have
7  been complaining to like myself -- well, back then, like
8  I said, the office was so open.  So it's like he's
9  complaining, but I think he really would have been
10  talking to like Justin, but he's sort of complaining to
11  all of us.  Right.
12       And so -- but, again, I can't say -- I can't
13  say definitively what the exact numbers were all in my
14  head.  I know that the documents exist that -- where
15  they go over what monthly amounts were sent to the
16  various affiliates, and it was based on that affiliate
17  contract.
18    Q.  Did SureTrader ever offer any incentives to
19  potential customers?
20       MR. MATTHEW FORD:  Objection.
21       THE WITNESS:  You mean if clients could send
22  in other clients?  Yes.
23  BY MS. SUM:
24    Q.  I mean -- okay.  So let's -- let me restate.
25       Were there -- did SureTrader offer any free

65

1  trial periods to potential customers?
2       MR. MATTHEW FORD:  Objection.
3       THE WITNESS:  I can't recall.  There were --
4  when you say "free trial," what we offered -- there were
5  times when you would be able to trade and we don't
6  charge you commissions.  So I don't know if that's what
7  you're referring to "free trial."
8  BY MS. SUM:
9    Q.  Okay.  Were there instances where SureTrader
10  offered --
11    A.  Right.  So, for instance --
12    Q.  -- for -- to allow -- I'm sorry.  Let me just
13  finish.
14       Were there times when SureTrader offered
15  potential customers to trade without paying a
16  commission?
17    A.  Correct.
18       I remember we had incentive programs where
19  persons would open and they could get like 30 free
20  trades.  I remember that was a big one.
21       And a lot of that was attached with the
22  affiliates, too, to be like hey -- because someone would
23  complain and say, listen, Tim told me I was supposed to
24  get 30 free trades and I didn't get it or something.
25  Sometimes we would offer things like that direct to

66

1  clients as well outside of an affiliate.
2    Q.  Were there any other types of deals that were
3  offered to potential customers to trade either for --
4  for a lesser amount than what was normally charged?
5    A.  Well, I know that some of the larger clients
6  was able to negotiate directly with Guy.  I don't know
7  if we had an official system in place for a client to
8  apply for this.  Something like that would be like a
9  client would just send us an email saying hey, we doing
10  this amount of trading.  You need to give me a better
11  rate.  It's as simple as that.  And then that email
12  would get forwarded to Guy, and he would contact the
13  client and make a decision.
14       So I don't know if we had things like that set
15  in stone, but certainly amongst our larger clients they
16  would receive incentives to pay a lesser -- to pay a
17  lesser rate to.
18    Q.  All right.  I want to clarify.
19       When you refer to a larger client, are you
20  talking about a client that's existing with -- already
21  existing with SureTrader?
22    A.  Right.  So the larger clients would be clients
23  who either have a lot on deposit or who have high
24  trading volume.  Especially the ones with the high
25  trading volume they would, I guess, feel that they can

67

1  ask for a better commission rate.
2    Q.  Were there any incentives offered to potential
3  customers that were coming in through the affiliate
4  program?
5       MR. MATTHEW FORD:  Objection.
6       And, Alice, I just want to note.  I don't
7  think you should be leading this witness.  This is not
8  cross-examination, nor is he an adverse witness.  It's
9  been sort of going on throughout and I've been letting
10  it go, but during this second session here we've got a
11  lot of leading going on.
12       MS. SUM:  Well, your objection is noted.
13  BY MS. SUM:
14    Q.  You can answer, Mr. Dorsett.
15    A.  Could you repeat the question?
16       MS. SUM:  Madam Court Reporter, could you read
17  it back?
18       CERTIFIED STENOGRAPHER:  Certainly.
19       "QUESTION:  Were there any
20       incentives offered to potential
21       customers that were coming in through
22       the affiliate program?"
23       THE WITNESS:  Well, yes.  I mentioned that --
24  I remember definitely with the Tim Sykes clients they
25  would get 30 free trades if they came in through Tim

68

1 Sykes. Right. And we had other similar incentives for
2 other affiliates as well where if you mentioned this
3 particular affiliate, you would either get 30 free
4 trades or potentially get this rate or some other type
5 of incentive.
6 BY MS. SUM:
7    Q.  Okay. Earlier you testified that you were
8 made CEO --
9    A.  Yes.
10   Q.  -- for a day.
11   Why were you made CEO of SureTrader?
12   MR. MATTHEW FORD:  Objection.
13 BY MS. SUM:
14   Q.  You can answer.
15   A.  Well, Guy never told me why he made me CEO,
16 but I -- later on I sort of figured it out.
17   I realized that Guy had incentive to separate
18 himself from the company. He wanted to show that there
19 was separation, and I think this was for some foreign --
20 I don't know if it was regulatory or -- well, I guess it
21 would have been regulatory reasons, but he wanted to
22 show that there was separation. And -- the problem is
23 he just didn't tell me about it. He didn't advise me or
24 anything -- ask my advice. He just did it, you know. I
25 noticed that Guy would just do things like that

69

1 sometimes, whereas job position and title, Guy would
2 just switch it around as he sees fit.
3   Later on in the firm when we rehired a Chief
4 Financial Officer, there was a few times when Guy went
5 back and forth with him as to well, okay. You are the
6 CEO or not. I think, at some point, Guy officially
7 resigned as CEO. When I say that I mean it was done
8 through the Commission. All right. But that didn't
9 happen until much later.
10   But definitely before that there were these
11 times -- and the first one was with me, and that was
12 with my knowledge. Right. Because I get the impression
13 that Guy would use us to just position around him as he
14 needed whether or not it was to our advantage or not.
15   And so, yeah, he made me CEO. It would have
16 been longer than a day except for I told him that, you
17 know, we can't do that. And, actually, the Commission,
18 I think they reached out to him as well because he put
19 this in the newspaper. I think they reached out to him
20 to be like well, no, you can't do that. Right.
21   But, like I said, later on I realized it was
22 some sort of -- it was -- I can't remember if he was
23 trying to establish a business relationship and their
24 regulatory reasons prohibited them from dealing with him
25 because he was CEO of a company in the Bahamas, but

70

1 that's why he did it. And, again, I was literally the
2 last person to know about it.
3   Q.  So what was the resolution of Mr. Gentile's
4 decision to appoint you to be CEO for a day?
5   A.  So when you say, "the resolution"?
6   Q.  Okay. You -- did you -- you came to learn
7 that you were made CEO of the company?
8   A.  Correct.
9   Q.  What happened immediately after you learning
10 of becoming the CEO of the company?
11   A.  Well, the first thing I did was I waited for
12 Guy to come into the office and I spoke to him about it.
13   I'm like Guy, what is this?
14   He was like, congratulations, man.
15   I'm like Guy, you can't just make me CEO just
16 because you want to, you know, that's -- I'm flattered,
17 but you have to vet that through the Securities
18 Commission Bahamas.
19   Q.  Okay. And then after you had the conversation
20 with Mr. Gentile that you just described, what happened?
21   A.  He -- his response was don't worry about it.
22 Like, you know -- Guy would give me that response a lot.
23 I would bring concerns to him -- genuine compliance
24 concerns, and I can't tell you the amount of time that
25 Guy told me, don't worry about it, you know, those guys

71

1 are idiots, or they don't know nothing, or I can run
2 circles around them all day. He just told me, oh, don't
3 worry about it.
4   And I think it was later that day the
5 Commission gave him a call, and he -- I think he
6 actually had to go there. They demanded he come there.
7 I don't recall directly, but by the next day I was back
8 to Chief Compliance Officer.
9   Well, in the eyes of the law I was never not
10 Chief Compliance Officer.
11   Q.  How did you learn that that was the end result
12 of Mr. Gentile's attempt to appoint you as CEO?
13   A.  Well, I cannot say that I knew for certain
14 that that was the end of it. I don't know what Guy was
15 telling other folks. Right. I knew there was a reason
16 that he wanted to appoint me as CEO, and I picked it up
17 a few weeks later that it was because -- I think it was
18 some business deal or something and he wanted to show
19 separation from the company.
20   I don't know definitively that he had told
21 whoever it was that that didn't happen or not. All I
22 know is that I told him -- you know, I cannot be CEO
23 just because he says so, and I know the Commission
24 contacted him as well, and I imagine they reiterated the
25 same message.

72

1    Q.  Who had the authority at SureTrader to make
2  decisions regarding the hiring and firing of employees?
3    A.  Well, in the beginning Guy -- Guy hired
4  everyone.  Guy didn't like to fire people personally,
5  and so he would ask me to do it.  I didn't like to do it
6  personally either, so we would ask the firm's local
7  lawyer to do it.  But Guy basically hired everyone.
8        Later on, once we grew, we moved into the new
9  office, Guy did not hands-on pick every single person,
10  but that would have been, I would say, the lower tier
11  staff.  But certainly all of the officers Guy
12  handpicked, and even the managers Guy would have
13  handpicked.
14    Q.  Did you have --
15    A.  Certainly the persons like the trade desk
16  manager, stuff like that, Guy would pick them himself.
17    Q.  Did you have authority to hire or fire any
18  employees of SureTrader?
19    A.  I did not have authority to hire.  I would say
20  I probably have more authority to fire someone if I -- if
21  someone was outright breaking the law and I knew about
22  it, I would imagine -- it never happened, but I would
23  imagine I could fire them.  But, obviously, I would
24  still have to really clear that with Guy.  So this
25  person would have to be doing something obviously

73

1  illegal right in front of my face.
2        And so within the firm, you know, I carried a
3  certain amount of seniority so people listened to me.
4  Right.  But I don't know if it was written down anywhere
5  to say that Philip has the right to -- well, I didn't --
6  I never felt I had to right to hire anyone.  And I
7  don't know if it was written out anywhere that Philip
8  had the right to fire people, but it probably was
9  understood that if you did something outrageous that,
10  you know, I could fire you.
11    Q.  If --
12    A.  In fact, I think one time I was talking to
13  Guy -- we were having a conversation about letting
14  someone go, and he sort of hinted that I could have just
15  fired the person, but I wasn't sure because, again, it
16  wasn't -- you know, I wasn't really sure if I had that
17  authority or not.  So, you know, everything had -- I had
18  to run -- any major decision had to be run by Guy.
19    Q.  When you say you had to run any major
20  decision, what -- what did you believe that constituted?
21    A.  Well, certainly hiring and firing.  But
22  anything that had to do with the course or the direction
23  of the firm I had to run it with Guy.  You know -- I
24  mean, well, he was the boss.  I had to keep him
25  informed.  Right.

74

1    A lot of times Guy was not there.  Right.
2  After we grew and after we moved into the big office,
3  Guy actually spent a lot of time out of the office.  So
4  I would be speaking to him, a lot of times, on the
5  phone, and he would also be speaking to the other
6  officers a lot on the phone.  And, you know, so -- there
7  was not one day that went by that senior officers were
8  not in constant communication with Guy, whether he was
9  there or not.
10        So Guy was still hands-on even though he was
11  not physically there.
12    Q.  I'm going to go back to the application
13  materials that you testified about earlier.
14        Within the application package, can you please
15  describe what the components were?
16    A.  Right.  So, again, our application sort of
17  evolved over time.  And so, in the beginning, the basic
18  application was a PDF application that was almost
19  verbatim a copy of the SpeedTrader application, but was
20  dumbed down.
21        And so things that were in the application was
22  the know your client information.  So they would fill
23  out information about themselves.  Right.  And then --
24  then we had the client agreements.  And then the client
25  agreements, basically, were like word-for-word like

75

1  SpeedTrader.  A lot of that was a lot of legal jargon
2  that Guy wanted in there.  In essence, you know -- you
3  know, like the terms and conditions to protect the firm
4  and things like that, right.  And so a lot of that
5  writing that made up actually like the bulk of the
6  application -- the terms and agreements.
7        And then, in the beginning, we had the
8  separate unsolicited acknowledgement agreement.  When
9  Guy changed the application to have -- to be more
10  streamlined and make it more of an online application,
11  the unsolicited acknowledgement agreement was actually a
12  part of the application itself.  And he told me that he
13  would have his IT persons set it up that when a person
14  signs, I think a separate signature would still show up
15  under the unsolicited acknowledgement agreement.  So he
16  would still be able to show that this portion was
17  significant and it had to be signed separately.
18        CERTIFIED STENOGRAPHER:  Mr. Ford, can I ask
19  that you mute yourself.  I'm getting some feedback from
20  you.
21        Thank you.
22        (Pages 77 to 107 were designated confidential
23  and are bound separately.)
24              - - -
25

76

1    (The following portion of the transcript was
2  designated as nonconfidential.)
3         --o0o--
4    (The proceedings resumed after the lunch break
5  at 1:19 p.m.)
6    THE VIDEOGRAPHER:  The time is 1:19 p.m.  We
7  are now on the record.
8  BY MS. SUM:
9    Q.  Mr. Dorsett, earlier I asked you some
10  questions regarding SureTrader's website.  I'm going to
11  bring up Exhibit 5 now and ask you some questions about
12  it.
13    MS. SUM:  I'm sorry.  Videographer, if you
14  could please bring up Exhibit 5.
15    Could you enlarge it a little bit?  And scroll
16  down a little bit.  It's doing something strange with
17  the way it's scrolling.
18    Okay.  If you could just take it back to the
19  top, please.
20    (Deposition Exhibit 5 marked.)
21  BY MS. SUM:
22    Q.  Okay.  Mr. Dorsett, do you recognize what's
23  been placed in front of you as Exhibit 5?
24    A.  Yes.
25    Q.  Okay.  And what is it?

1    A.  This is the SureTrader website.
2    Q.  And, specifically, what -- what page is this
3  on SureTrader's website?
4    A.  So this is the contact us page.
5    Q.  Do you see on this page that there are
6  telephone numbers and fax numbers?
7    A.  Yes.
8    Q.  Okay.  What phone numbers does SureTrader
9  have, according to its website?
10    A.  That's 328-7800, or -- I can't recall the last
11  four.
12    Q.  Okay.  And is that for a particular office or
13  country?
14    A.  That's -- that's -- that's just the -- if
15  you're calling us locally.  So that's the Bahamas'
16  number.
17    Q.  And below that is there another number?
18    A.  Right.  It says, "USA Direct."
19    Q.  And is that a U.S. number?
20    A.  I think that's a U.S. area code.  It's not
21  Bahamian.
22    Q.  Earlier I asked you some questions about
23  whether SureTrader had a U.S. phone number.  Is this the
24  phone number that you recall SureTrader having?
25    A.  Well, I don't remember the phone number, but I

1  know that it was a New York number.
2    Q.  A U.S. number was placed on SureTrader's --
3    CERTIFIED STENOGRAPHER:  I'm sorry.  Ms. Sum,
4  I didn't get the last part of the question.
5  BY MS. SUM:
6    Q.  Do you recall if, when SureTrader's website
7  was created, there was a U.S. number?
8    A.  Initially, I don't know if there was a U.S.
9  number in the very beginning, but in time Guy had to add
10  a U.S. number.  Like I said, I think he receive -- we
11  received a complaint, I think it was from Tim, that it
12  didn't make sense for U.S. clients to have to call us
13  long distance -- or, you know, call a different country
14  area code.
15    Q.  Do you believe that SureTrader had a U.S.
16  number up until the time that you departed SureTrader?
17    A.  Yes.  At the time I departed, yeah, they
18  definitely would have had a U.S. number.
19    MS. SUM:  All right.  Just to -- for the
20  record, the Bates range for Exhibit 5 is
21  SEC-SECWEBCAPTURE-E-0000340.
22    All right.  You can bring that down.  Thank
23  you.
24    And then videographer, I'll ask you to please
25  bring up Exhibit 6.

1    (Deposition Exhibit 6 marked.)
2    MS. SUM:  And if you could, please, enlarge
3  that a little bit.
4  BY MS. SUM:
5    Q.  Are you able to read Exhibit 6, Mr. Dorsett?
6    A.  I can see where it says, "Funding & Banking."
7    Q.  Okay.
8    MS. SUM:  So the Bates range for Exhibit 6 is
9  SEC-SECWEBCAPTURE-E-0000377.
10  BY MS. SUM:
11    Q.  Mr. Dorsett, do you recognize Exhibit 6?
12    A.  Yes.  So this is the funding and banking page
13  from the website.
14    MS. SUM:  I'll ask the videographer to please
15  scroll down through the document, please.
16    Okay.  And if -- yes.  If you could slow down
17  there.
18  BY MS. SUM:
19    Q.  Mr. Dorsett, do you see where it says the
20  letters "ACH"?
21    A.  Yes.
22    Q.  Okay.  Can you describe what -- what that is?
23    A.  Well, that's for clients who wanted to fund
24  their account via ACH transfer.
25    Q.  Okay.  And which clients would that be?

Philip Dorsett (nonconfidential)
2/27/2023

1    A.  Just the clients.  I don't know if there was
2  specific clients who used ACH or not.
3    Q.  Do you see under "ACH" where it references
4  available currencies?
5    A.  Yes.  It says --
6    Q.  And what is the currency?
7    A.  USD.
8    Q.  Okay.  And then do you see where there's a
9  reference to availability?
10   A.  Yes.
11   Q.  Okay.  And what does that say?
12   A.  U.S. Bank holders only.
13   Q.  Why was the ACH option created and placed on
14  the SureTrader website?
15   A.  I -- I -- I cannot say why.  I don't know
16  directly why.
17      I know Guy wanted as much options as possible
18  for clients.  Initially, I think we just had the wire
19  transfer.  And, again, I think some of the affiliates
20  who sort of schooled him on it wanted to have more
21  options available as opposed to just doing a traditional
22  bank wire.
23   Q.  Did you discuss with Mr. Gentile the options
24  available on Exhibit 6 to increase options for payment
25  or transfers?

112

1    A.  Well, it's more correct to say he would have
2  discussed with me, because he would have brought this to
3  my attention, but I wouldn't have been able to give him
4  additional options.  He would have been the one to add
5  the various funding options.
6    Q.  Was he the ultimate decision-maker for what
7  funding options there were for SureTrader?
8    A.  Yes.
9    MR. MATTHEW FORD:  Objection.
10     THE WITNESS:  Yes.
11     MS. SUM:  All right.  You can bring down
12  Exhibit 6.
13     MR. MATTHEW FORD:  I just want to raise an
14  objection to that -- to that exhibit on the basis that
15  it was never authenticated, and we don't know what time
16  period it's from.  Just for the record.
17     MS. SUM:  All right.  I'm going to ask the
18  videographer to bring up Exhibit 7, please.
19     (Deposition Exhibit 7 marked.)
20     MS. SUM:  And to please scroll for Mr. Dorsett
21  to review.
22      And I'll ask that you please bring it back up
23  to the top.
24  BY MS. SUM:
25   Q.  Are you able to hear me because I'm having a

113

1  connection disconnect.
2    A.  I can hear you.
3    Q.  You can hear me.  Okay.  All right.
4    MS. SUM:  Just for identification purposes,
5  exhibit -- it just locked up on me -- Exhibit 7 is Bates
6  stamped SEC-FL-03848-E-0012118 through 12120.
7  BY MS. SUM:
8    Q.  Mr. Dorsett, do you recognize Exhibit 7?
9    A.  Well, this is an email from -- between Guy and
10  it seems Antonio and Justin, and I was copied.
11   Q.  And what is the substance of this email?
12   A.  Well, I would have to look at it.  When you
13  scrolled through, you went pretty quickly.
14   Q.  Okay.
15     MS. SUM:  Mr. Videographer, are you able to
16  scroll down -- well, we'll start with the very bottom
17  and then work our way to the top.  Start with the first
18  email from the bottom.  If you could scroll back up now.
19  Okay.  Pause here for a moment, please.
20      And then you let us know, Mr. Dorsett, when
21  you're ready for it to scroll further up.
22     THE WITNESS:  Okay.  You can scroll up.  Okay.
23  Okay.  All right.
24  BY MS. SUM:
25   Q.  So I'll just ask my question again.

114

1      What was the substance of this email exchange
2  at Exhibit 7?
3    A.  I actually cannot recall --
4    Q.  Okay.
5    A.  -- it's...
6    Q.  All right.  Do you -- did you see at the -- in
7  the first email there -- there was --
8    A.  Well, sorry --
9    MR. MATTHEW FORD:  Objection.  Leading.
10      So if the witness could wait for the question
11  to be asked.
12     MS. SUM:  Okay.  So let's go back to the first
13  email working our way up from the bottom, please.
14      Scroll back up a little bit, please, so we can
15  find the first email.  Scroll a little bit more please.
16  Okay.  Let's stop there, please.
17  BY MS. SUM:
18   Q.  Do you see an email from July 4, 2013, at
19  10:15 a.m from a Courtney Kurisko?
20   A.  Yes.
21   Q.  Okay.  And do you see where it says,
22     "Good morning and happy 4th.
23     Attached is the invoice for July"?
24   A.  Yes.
25   Q.  Okay.  And then, as we scroll further up do

115

1   you see an email from Justin Ritchie to Courtney Kurisko
2   with a cc to guy@stockusainc.com?
3       **A.** Yes.
4       **Q.** And a Dac Benasillo -- dac@daytradingradio.com?
5       **A.** Yes.
6       **Q.** Okay. And what is your understanding of what
7   this email provides?
8       **A.** All right. At first when you went through I
9   missed that Dac was included on this because I didn't
10   recognize the Courtney lady. So I think this is
11   payment -- let's see. Right. So we sent them some
12   funds, and it looks like we sent it twice through an
13   error --
14      **Q.** Okay.
15      **A.** -- and --
16          MS. SUM: If we could just scroll further up.
17  BY MS. SUM:
18      **Q.** So you're referring to the payment going
19   twice, did I hear you correctly?
20      **A.** Yes.
21      **Q.** Okay. And then now up on the screen you see
22   the email from a Justin Ritchie to Antonio Collie with a
23   cc to philip@suretrader.com and Guy Gentile?
24      **A.** Yes.
25      **Q.** Okay. And what's internally being discussed?

116

1       **A.** Well, so, Justin has let Antonio know that the
2   wire to Day Trading Radio went out twice.
3          Courtney says she received two deposits of
4   3,600 yesterday. Can this be reversed.
5          MS. SUM: I ask the videographer to scroll
6   further up, please. Okay.
7   BY MS. SUM:
8       **Q.** Do you see the last -- the two most recent
9   emails?
10      **A.** Yes.
11      **Q.** Okay. And what was the end result of this
12   email chain at Exhibit 7?
13      **A.** All right. That -- we couldn't reverse the
14   payment, but that -- would they would apply the extra
15   amount to next month's billing invoice, this would have
16   been for September -- well, he's asking if it's for
17   September. And then Guy came back and said it's fine
18   with him.
19      **Q.** At this point in time, you see at the top the
20   date of September 18, 2013, was Mr. Gentile typically
21   involved in these types of communications?
22      **A.** Yes.
23          MR. MATTHEW FORD: Objection.
24  BY MS. SUM:
25      **Q.** Okay. And --

117

1       **A.** Yes, he was.
2       **Q.** And during your time of employment at
3   SureTrader did Mr. Gentile continue this level of
4   involvement?
5       **A.** Yes.
6          MR. MATTHEW FORD: Objection.
7   BY MS. SUM:
8       **Q.** And can you describe any other similar
9   instances of Mr. Gentile being involved in similar types
10   of communications?
11      **A.** Actually, there was an email communication
12   surrounding what ultimately led up to my departure in
13   which Guy ultimately had the final say, and it had to do
14   with -- with the debate over whether our clients had
15   direct market access or not and how we were to
16   respond to --
17      **Q.** Okay. I'll -- I'll get to that in a little
18   bit.
19          I'm trying to understand the level of
20   Mr. Gentile's involvement in the company's day-to-day
21   decision-making throughout the course of your employment
22   at SureTrader.
23          Can you describe his day-to-day involvement,
24   please?
25      **A.** Certainly -- this is dealing with the

118

1   affiliates. Certainly anything dealing with monetary
2   compensation to affiliates Guy would have been on top of
3   it. But even more so, from my perspective, with
4   compliance matters. So, for instance, if I get some
5   sort of request from the SCB, Guy would be made aware.
6   And I would also be cc'd in when Mr. Collie would send
7   financial matters that needed Guy's approval as well.
8   And so Guy -- yeah.
9          Guy would either approve everything, but
10   definitely he was cc'd on everything. And so he would
11   approve most things. So certainly those things -- those
12   higher end things that needed his approval, but he
13   certainly would have been cc'd on most of, if not all,
14   of the emails between the senior officers with the --
15   with the day-to-day runnings of the company.
16      **Q.** Is your testimony that you just provided true
17   for 2016?
18      **A.** This would be true for every year. There was
19   one time when Guy, I think, tried to separate himself
20   from the company. I don't know if that was official
21   through the Commission or not, but even then Guy was
22   still very much hands-on, you know. He just officially
23   didn't have the title of CEO at that time.
24      **Q.** Okay.
25          MS. SUM: You can bring down Exhibit 7. Thank

119

1  you.
2  BY MS. SUM:
3       Q.  Mr. Dorsett, do you -- do you recall when
4  Mr. Gentile, as you just testified, stepped down?
5       A.  I cannot remember the exact dates, but I know
6  it had something to do, I think, with foreign regulatory
7  investigations, and he thought it was best if he
8  separated himself from the company.  That was -- that
9  was the big official one.  I think that's when he --
10 they officially did it and made -- I think they made
11 Mr. Collie the new CEO or the new president, but the
12 Commission was aware of that.
13      Q.  And by "Commission," you're referring to the
14 SCB?
15      A.  Yes.
16      Q.  You used the term Mr. Gentile, "separated from
17 the company."
18          What do you mean by that?
19      A.  The main thing is, it was important for him to
20 show the separation.  You know, he still was very much
21 in charge and, you know, he was still running the
22 company, but he had to show to whoever the powers that
23 be were, that he was separated from the company.  He was
24 no longer in the day-to-day runnings of the company.
25      Q.  Did this involve a change in title?

120

1       A.  Yes, it did.  I think, at that time,
2  Mr. Collie either became the president and CEO or
3  something of that nature -- I can't remember, but there
4  certainly was a change and Guy was no longer the CEO.
5       Q.  Who is Mr. Collie?  Could you give us his full
6  name, please?
7       A.  That would be Antonio Collie, and he was the
8  Chief Financial Officer.
9       Q.  Okay.  And during the time that Mr. Gentile
10 was -- again, I'm using your words, separated from the
11 company, was he being copied on communications within
12 the company?
13      A.  From what I recall, yes and no.  Because I
14 remember Guy wanted -- he wanted to show, physically,
15 that he was not being copied on everything.  I remember
16 there was some discussion on that.  But, at the same
17 time -- and I'm not sure if he had a different email
18 address -- there was some discussion on it.  But there
19 still was communications with Guy.  There still was
20 email communications with Guy.
21          But, from what I recall, there was a change --
22 he either had a different email address, or he went
23 about it differently, or we were to -- I cannot remember
24 the exact specifics, but I remember there was some
25 discussion as to his email presence, and how we would be

121

1  emailing him, and how we would be able to communicate
2  with him during this time.
3       Q.  Okay.  When you say "there was some
4  discussion," who was involved in the discussion?
5       A.  Well, it would have been the senior officers.
6  So certainly myself, Mr. Collie, Justin -- depending on
7  what time this was, so Mr. -- Mr. Cooper or Janay might
8  have been involved as well.
9       Q.  All right.  And who is Mr. Cooper?
10      A.  Mr. Edward Cooper was the other compliance
11 officer that Guy hired, I think, around 2015.
12      Q.  And who was Janay?
13      A.  Janay Pyfrom.  I think she was hired for
14 marketing.  She would have come on after Mr. Cooper.  I
15 want to say late 2015, but I'm not sure.
16      Q.  During the time period when Mr. Gentile was
17 separated from the company, did you communicate with him
18 via phone?
19      A.  Yes.
20      Q.  Did you communicate with him by text message?
21      A.  I can't specifically recall if I used text
22 message or not.  I would have to think about that.
23      Q.  Did you communicate with him by email?
24      A.  Yes.  I think I still would have sent some
25 emails to him.

122

1       Q.  Did Mr. Gentile come to the office during the
2  time he was separated, as you've described, from the
3  company?
4       A.  Yes.  He would still come into his office.  I
5  remember he did this thing where he put a new sign on
6  his office door and he said it's technically a different
7  company because he had the sign on his door.  And he was
8  saying his office is no longer Swiss America Securities
9  because he had this sign on his door.
10          I'm not sure if that is directly related to
11 this point of him being separated from the company, but,
12 in my mind, I think it was related.
13      Q.  Okay.
14      A.  But he was in the -- he was in the office,
15 yes.
16      Q.  What did the sign on his door say?
17      A.  I cannot remember.
18      Q.  And what different company are you referring
19 to?
20      A.  I cannot remember the name.
21      Q.  Did Mr. Gentile provide any further
22 explanation for his actions of putting a different sign
23 on the door?
24          Excuse me.  On his door.
25      A.  No.  What was explained to us was that inside

123

1  his office is no longer Swiss America Securities.  That
2  was it.
3      Q.   At the time this occurred, what was the office
4  layout?
5      A.   Well, this was in the new office and so we had
6  a -- it was a pretty large office.  Guy's office was
7  probably about the size of our first entire office.  All
8  right.  So it was a good sized office.  He had a full
9  bathroom in there.
10         And then behind -- adjacent to his office was
11  the conference room.  And then behind that was an open
12  floor where we kept the trade desk folks.  And then
13  there was a corridor in the middle, and on the other
14  side there was a massive open floor that ran the span of
15  the entire office where everyone else was seated.  And
16  then towards the front was the receptionist desk, and
17  the bathrooms, and the kitchen.  So his office was sort
18  of in the middle.
19      Q.   How many floors was the office on?
20      A.   We were on the second floor.  We took up -- we
21  took up -- we took up the entire second floor of that
22  portion of the building.
23      Q.   Was SureTrader only on a single floor?
24      A.   Correct.
25      Q.   Did there come a time when Mr. Gentile resumed

1  title as president of the company?
2      A.   I'm not sure.  But there did come a time
3  when -- because his presence did diminish.  It was
4  noticeable.  But there did come a time when he was very
5  much back on the scene, but I -- to my knowledge, I
6  don't know if any official titles were changed.
7      Q.   When you say that he was "back on the scene,"
8  can you describe what the difference was compared to the
9  time when he was "separated" from the company?
10      A.   Right.  So there was a time when Guy was
11  making a real effort to disassociate himself from the
12  company.  So we would hardly see him.  And, you know, we
13  would only communicate with him if absolutely necessary.
14         There was a time when that came to an end, but
15  I'm not sure if -- if he ever took back on actual title
16  as CEO or not.  But certainly there was a time when he
17  came back and resumed his normal being about the
18  business, and you see -- you saw him a lot more.
19      Q.   When did you finish your employment with the
20  company?
21      A.   That --
22      Q.   A date.
23      A.   -- was August 2017, I believe.
24      Q.   Did -- so how long before you finished your
25  employment with the company did Mr. Gentile come back

1  from his separation?
2      A.   I can't -- I don't know -- I don't know if
3  I -- I don't have an answer to that.  I can't really --
4  I can't say.
5      Q.   From the time that Mr. Gentile came back from
6  his separation from the company, what was his level of
7  involvement in decision-making for the company?
8      A.   After he returned?
9      Q.   Yes.
10      A.   Well, again, his -- ultimately his level of
11  decision-making never changed, but now he was more
12  visual with it where you could see that he's back
13  around.  He's talking with everyone.  That he's making
14  decisions.
15      Q.   Did there come a time where you had
16  disagreements with Mr. Gentile about how you were doing
17  your job?
18      A.   Yes, there were.
19      Q.   Approximately when did you have that situation
20  occur?
21      A.   Well, it -- I guess it -- I guess this sort of
22  officially occurred when Guy actually wrote me a letter
23  that he entitled "Warning Letter."
24         This would have been around 2015 because this
25  would have been after Mr. Cooper had joined the company.

1  And Mr. Gentile was, in this warning letter, basically
2  saying that he did not like my job performance, right.
3  And -- he did not like my job performance and some other
4  things that I actually took exception with.  Right.
5         I realized the real reason why he was sending
6  that letter to me.  As I noted earlier, by 2015 the
7  relationship between myself and Mr. Guy -- and Guy had
8  deteriorated significantly.  You know, in the beginning
9  back in like 2012, you know, even 2013, the relationship
10  between myself and Guy was really good.  Again, you
11  know, I viewed him almost as like a mentor figure.  You
12  know, he said he would teach me everything he knew, and,
13  to his credit, I felt that he taught me quite a bit.
14         So I really looked up to Guy.  And, back then,
15  you know, I sort of just took what Guy said as just --
16  as gospel so to speak.  You know, it was like when he
17  would talk about various things, I, you know, took it as
18  okay, that's just how it is.
19         But over time -- like I said, Guy would talk
20  in my hearing, just a little behind me a lot.  Right.
21  And I started to feel as if, like, well, listening to
22  Guy talking to various business associates and so forth,
23  that he sort of just says whatever he needs to say to
24  appease the person and it's not always to the other
25  person's benefit.  And I started to see that over and

1  over again.  And he even -- it's almost like he boasted
2  it.  He was like this is the way to go, you know, you
3  gotta run circles around these guys.  I witnessed that a
4  lot.  Right.
5      Q.   And when was this occurring, what you just
6  described?
7      A.   This was occurring almost from the beginning,
8  like as soon as -- like from 2012.  I noticed -- I did
9  take note that the way how he was dealing with folks, it
10  was just different than what I expected.
11      And I said to myself, well, maybe this really
12  is how it's done, you know.  You know, it's -- you know,
13  granted nothing about what he was doing seemed illegal
14  to me.  You could make an argument that maybe it was
15  morally questionable, right -- but, you know, but I
16  started to notice that more and more and more.
17      And I also noticed when Guy and his wife
18  eventually went through their divorce, there was a few
19  things that was done in my presence that really sort
20  of -- sort of shook me up and, you know, I realized when
21  people are going through a divorce there's a lot of
22  anger going on, but he did some things -- at least one
23  thing to her that really sort of made me sort of view
24  him in a very different way.  And it made me think that,
25  you know, I had to probably start to be careful around

128

1  Guy.  And then there were some other things as well.
2      Q.   Okay.  I'm going to ask you just to pause for
3  a second.
4      MR. MATTHEW FORD:  If I could just get a
5  clarification.  I think my zoom cut out.
6      Did you say that nothing seemed illegal?
7      Did I hear you right?  I-L-L-E-G-A-L, illegal,
8  the did I hear that?
9      THE WITNESS:  Correct.  In his
10  communications with like --
11      MR. MATTHEW FORD:  Thank you.  My zoom cut
12  out.
13      THE WITNESS:  -- with his business partners.
14      MS. SUM:  Please, Matt -- Matt, I'm trying to
15  conduct my examination here.
16      MR. MATTHEW FORD:  I couldn't hear on my end.
17  I think it's a zoom issue.
18      Thank you.
19  BY MS. SUM:
20      Q.   All right.  So are we still talking about the
21  same time period when you're seeing what you just
22  described with Mr. Gentile -- is this still in 2015?
23      A.   No.  No.  This is leading up to 2015 and --
24  because you asked me about if we ever had -- I don't
25  know, you probably didn't use the word confrontation,

129

1  but if there was any sort of dispute between me and Guy.
2  And this is what sort of led up to it, and that's why I
3  started talking about this stuff.
4      But anyway, let's -- I will just say by the
5  time 2015 came around I viewed Guy totally different
6  from in 2012.  I -- I was not trusting of Guy at all.
7  And by that time I can also say I was a lot more
8  confident to challenge him with things, whereas, back in
9  the beginning, you know, I wasn't really so confident.
10  You know, he would say things.  I may have an issue with
11  it, but I probably didn't have the confidence to
12  challenge him.  By the time -- certainly by the time
13  2015 came around, that was very different.  And very
14  regularly, unfortunately, Guy and I would -- you know, I
15  would have to challenge a lot of the things that he was
16  doing.
17      He didn't -- I know he didn't like it, based
18  on his responses, but, at the same time, you know, I
19  felt I had to do it.  And so we were getting -- you
20  know, going back and forth, and there were a few
21  incidents --
22      Q.   Okay.  So I want to understand, because you're
23  talking about certain things happening.
24      Can you give an example of a situation where
25  you just described that you felt you needed to challenge

130

1  Mr. Gentile on what he was doing?
2      A.   Right.  So there was a time when this -- and
3  based on my estimation this had to be 2015, if not, then
4  it was early 2016.  But there were investigations going
5  on with reference to Guy, and I received an email from
6  Securities Commission of The Bahamas requesting some
7  company documents.  The email was not unusual in my
8  position as Chief Compliance Officer.  It was normal for
9  me to be in regular communication with the SCB, and I
10  would normally send documents whenever they asked for
11  it.
12      And so I was preparing what they requested,
13  and I got a call from Guy, and he said, Philip, how are
14  you going to respond to the SCB?
15      Q.   Okay.  I'm -- sorry.  I'm going to ask you to
16  pause.
17      How did Mr. Gentile know about the
18  communication from the SCB to you?
19      A.   Well, I was just going to say I was a bit
20  surprised because the email was just addressed to me,
21  but yet he somehow knew about it.  So I started to think
22  to myself okay.  Guy is reading my emails.
23      And so I told him -- I said, well, I'm putting
24  the information together.
25      And he says, well, no, you can't send it to

131

1  them.
2        And I said, well, Guy, I mean, they asked for
3  it.  They were very specific in their request.
4        And then he says, well, all you have to do is
5  redact it.
6        And I say, what do you mean by "redact it"?
7        And he say, Philip -- he said, all you have to
8  do is go into the system and just delete -- delete the
9  information and tell them you don't have it.
10       I said, Guy, I cannot do that.  I says,
11 there's no way I can just delete company documents and
12 then lie about it to the regulator.
13       And then he started to say, well, Philip,
14 they're trying to take us down, man.  They're going to
15 send this information to the SEC, man, come on.
16       I said, Guy, what you are asking me to do is
17 impossible.  I cannot delete company records and then
18 lie outright to the regulator about it.
19       And we went back and forth with that for
20 awhile.  And then, like, he switched over -- Guy knew
21 that I was partial to staff matters.  I would bring
22 staff matters to him many times.  And so he switched
23 over.  He said, well, what about the staff, you know.
24 If they shut us down, what are we going to do about the
25 staff, man.  You don't want that to happen to the staff,

132

1  right.
2        And I'm saying to myself, wow, as if Guy cares
3  about the staff all of a sudden.
4        I said, Guy, I'm sorry.  No.  I can't do it.
5  And he was very upset.
6        And I sent the information in.  I remember Guy
7  did not speak to me for like well over a month.  Like he
8  would come into the office, hail everyone else, and just
9  walk right passed me.  And it -- literally for like five
10 or six weeks later, I went -- I finally -- like I
11 couldn't take it anymore.  I went into his office, and I
12 said, I said, Guy, we have to speak about this.  I said,
13 listen, what you were asking me to do, it's not like I
14 was just trying to say no.  I said, I couldn't do it.  I
15 said, I'm the compliance officer.  I said, do you know
16 how much trouble I would get in if they found out what I
17 did, you know.
18       And then he was just quiet, and I figured -- I
19 said, well, let me try to appease to them more.  I said,
20 well, listen, I said, you know, the regulator doesn't
21 ask you for stuff unless they already have the answer.
22 I said, you know, they were probably just seeing if we
23 were going to be honest.  I said, if we had, you know,
24 not given them what they wanted, that just would have
25 made it worse.  And that seemed to get through to him a

133

1  bit.  He said, okay.  It's cool.  And then things
2  started to -- to get a little better.  Right.
3        And so that was an example of when Guy was
4  asking me to do something outright illegal.  There were
5  other examples of when Guy was asking me to do things --
6     Q.  I'm going to ask you to pause just for a
7  second.
8        So what was the approximate timeframe for that
9  request from the SCB and then the following events with
10 Mr. Gentile?
11    A.  This would have been in the first quarter of
12 the year.  Now --
13    Q.  Which year?
14    A.  -- I trace the year to be about 2015 because,
15 in my memory, Mr. Cooper wasn't with us yet.  And so
16 that's why I'm thinking it's 2015.  But it could have
17 been 2015 or 2016.  But I want to think more it's 2015
18 because I don't think Mr. Cooper was with us yet.
19    Q.  All right.  I interrupted you when you were
20 about to describe a different situation or example when
21 you and Mr. Gentile did not agree on something.
22    A.  Right.  So there was another time -- this one
23 was a little earlier.  This would have been, maybe,
24 around 2013 or so, where Guy calls me into his office
25 and he says, Phil, he said, he heard that Tim Sykes is

134

1  opening up his own broker-dealer.  I want to say that he
2  said it was Cayman, but I am not sure, but it was
3  another Caribbean country that, apparently, Tim Sykes
4  was trying to open up his own broker-dealer.
5        I said, okay.
6        And he said, well, we cannot let this happen,
7  man.  He said, you know -- you know, we gotta do
8  something about this, you know.  If he leaves, obviously
9  all of his students are going to go with him.
10       I say, well, I mean, I'm not sure there's much
11 we could do.
12       And he says, yes.  He says, you are a
13 registered compliance officer.  I want you to write the
14 regulators -- again, I'm thinking it was Cayman, but it
15 may have been another Caribbean country.
16       He said, I want you to write the regulators --
17 and he starts to list off this list of things he wants
18 me to put in this letter as to why Tim Sykes should not
19 be granted a broker-dealer license, right.
20       And I'm like, Guy, I cannot do that.
21       And he's like, come on, man, you don't even
22 like Tim Sykes -- which was an odd statement.  It is
23 true that I told Guy I didn't like that Tim Sykes had a
24 foul mouth, which, you know, he really had a foul mouth,
25 and when I found out he was coming to the office, I told

135

1  Guy I didn't want to be associated with Tim Sykes.  I
2  didn't want to be in the video.  Please set it up where
3  me and Tim Sykes don't have anything to do with each
4  other because, you know, I don't like his foul mouth.
5       So Guy believes that because I didn't like Tim
6  Sykes' foul mouth that I somehow would be -- that I -- I
7  don't know, like I hated him or something, like I was
8  willing to go along with this.  And I said, Guy, you
9  know, just because I don't like his foul mouth -- which
10 is true, I don't -- it doesn't mean I'm going to try to
11 sabotage him opening up a business.
12       And, I said, on top of that, I cannot just
13 write these things.  I say, I don't even know them to be
14 true.  That's going to cause me to get in trouble.
15       And he was like, come on -- he started the
16 same thing, come on, Phil, if all of his students go,
17 think about the staff.  I'm going to have to start
18 laying off folks.  You don't want that to happen to the
19 staff, right?
20       And I'm like, Guy, I cannot do that.  I'm
21 sorry.
22       And so there were things that we started to
23 split.  But the biggest split, in my mind, happened very
24 early on -- and this happened way back in 2012 where --
25 again, at this time, you know, Guy could have told me to

136

1  do anything I wouldn't have questioned it.  I was like
2  yes, sir, you know.
3       But I remember Guy was on the telephone -- and
4  he was not talking to one of his regular she -- you
5  know, like the broker-dealer friends or some other
6  people in the business -- I got the impression that he
7  was talking to someone more official like a lawyer or a
8  regulator, because he wasn't his normal self.  Like Guy
9  is very loud and very like suave, stuff like that.
10 That's how he talks.  He puts his foot up on the desk
11 and stuff.  But he was talking to this person, and he
12 was sort of hunched over, and I could tell he was very
13 serious, and I'm listening, and he is saying to this
14 person oh, well, that's -- that has nothing to do with
15 me.  You have to ask my compliance officer.  Oh, well,
16 then, no that's not my fault.  Oh, that's my compliance
17 officer's fault.  Oh well, that -- that's not me, I
18 guess you have to ask him.  And he was just going on,
19 and on, and on.
20       And I'm trying to figure out what is -- what
21 is he talking about?  Who's he talking to?
22       And like I said, I got the impression he was
23 talking to someone official.  And he kept saying, well,
24 that's him.  That has nothing to do with me.  I have
25 nothing to do with it.  No.  That's my compliance

137

1  officer.
2       When the conversation was over, I turned and I
3  was like, Guy, what's going on?
4       And he said, oh, Philip, don't worry about it.
5  Those guys are just idiots.  Back to work.  I mean --
6       Q.  All right.  So you've provided some examples
7  of where you and Mr. Gentile had some disagreements.
8       My question now is:  After the -- the issue
9  concerning the SCB's request for information -- okay --
10 did you and Mr. Gentile move on from that disagreement?
11      A.  When you say "move on," did things get better?
12      Q.  Well, did they get better?
13      A.  Well, yes.  Like I said, after I came to him,
14 and I reasoned with him, and I told him -- you know, I
15 really tried to reason with him, things seemed to get
16 better.  He said, okay.  Everything's cool.  All right.
17 And seems things did seem to get cool.
18       But, to sort of wrap this all up now,
19 towards -- in 2015 now, I get this letter saying --
20 basically questioning my -- you know, my work ethic and,
21 you know, telling me I need to do better or else sort of
22 thing.  Right.
23       And I knew exactly what it was.  It wasn't
24 something to question my work ethic.  It was him giving
25 me a shot across the bow telling me listen, stop

138

1  challenging me so much and -- you know, that's how it
2  came across to me.  And I really didn't -- I didn't like
3  that at all.  And so when I responded -- sorry?
4       Q.  Okay.  I'm going to just interrupt you here,
5  so -- I would like to bring up an exhibit regarding
6  you're -- what you're testifying to.
7       MS. SUM:  So could we please bring up
8  Exhibit 8?
9       THE VIDEOGRAPHER:  You said Exhibit 8,
10 Counsel?
11      MS. SUM:  Yes.  Exhibit 8.
12      THE VIDEOGRAPHER:  Okay.
13      (Deposition Exhibit 8 marked.)
14 BY MS. SUM:
15      Q.  All right.  Mr. Dorsett -- hello?  Hello?
16      MR. MATTHEW FORD:  Yeah.  So have these
17 documents been produced to us?
18      MS. SUM:  This was in the -- so I received
19 this last night from Mr. Dorsett.
20      MR. MATTHEW FORD:  Okay.
21      MS. SUM:  And, yes --
22      MR. MATTHEW FORD:  I'm going to request that
23 we have the opportunity to --
24      MS. SUM:  Yes.  Let me -- let me allow myself
25 to finish.  Okay.

139

1   They were sent as part of the Accellion
2   transmission with the -- with the rest of the exhibits.
3       MR. MATTHEW FORD:  No.  No.  What I'm asking
4   is, we received that link this morning 15 minutes before
5   the deposition.  I'm going to request -- I'm going to
6   insist that any documents that were produced 15 minutes
7   before the deposition not be used during the deposition,
8   at least until we've had the chance to review them.
9       I understand Mr. Dorsett stole over 30,000
10  emails from the company --
11      MS. SUM:  Matt -- Matt --
12      MR. MATTHEW FORD:  -- that this was not
13  included in that --
14      MS. SUM:  -- this is not how we practice in
15  Miami.
16      MR. MATTHEW FORD:  Yeah.  This is --
17      MS. SUM:  He's a witness.  We don't accuse a
18  witness of stealing documents.  This is not the way to
19  handle ourselves.
20      MR. MATTHEW FORD:  Oh, yeah.  Okay.  Well,
21  then let's pull this down and go to exhibits that have
22  been produced in this case.
23      MS. SUM:  No.  No.  I'm not going to pull this
24  down.
25      MR. ADAM FORD:  Alice, this is Adam.  I

140

1   just received 10, 15 minutes prior to the start of the
2   deposition is something that you can introduce as an
3   exhibit into the deposition and ask questions on.
4       So let's try and get the judge on the phone.
5       MS. SUM:  It's -- to clarify, for the record,
6   this is a document that I received last evening.  This
7   is not a document that's been withheld.  It has been
8   turned over, okay, from over the weekend on a Sunday
9   night to the morning to you.  Okay.  But fine.  We can
10  go ahead and try to --
11      MR. KOONIN:  I don't think we need to contact
12  the judge at all.  You guys have lodged your
13  objections --
14      CERTIFIED STENOGRAPHER:  Excuse me.  Who is --
15      MR. KOONIN:  -- you also have an opportunity
16  to come back and ask him questions, whether that's today
17  or tomorrow.  You'll have ample time to review this.
18      You do not have the right or authority to stop
19  our deposition.  You can later move in limine to exclude
20  this based on your argument, to the extent you want to,
21  you know, you don't think that this is a proper line of
22  questioning, your objection has been noted.
23      You do not have the authority to stop our
24  deposition and call the judge.  It's not your witness
25  right now it's our witness.

142

1   don't -- I don't think you can pull up exhibits that
2   have not been produced to us in advance of the
3   deposition and ask the question.
4       So we can bring this to the judge, but this is
5   not how we practice either in Miami, New York, or
6   anywhere else.  Documents have to be exchanged in
7   discovery.  This document was not produced.  It can't be
8   asked.
9       We can bring the witness back a later if the
10  judge allows it, but we're not going to do this right
11  now.
12      MS. SUM:  Well, I am going to proceed with
13  questioning him.  This is a document that I received
14  last evening.  This was produced this morning.
15      MR. ADAM FORD:  Why don't we -- why don't we
16  try and get the judge on the phone and ask about this.
17      MS. SUM:  I don't believe it's necessary.
18  This was produced and --
19      MR. MATTHEW FORD:  We're insisting --
20      MS. SUM:  -- this is a document that you all
21  are aware of.
22      MR. MATTHEW FORD:  Alice, we're insisting it's
23  within our right to suspend the deposition.  We want to
24  get the judge on the phone to determine whether or not
25  an email you never produced in discovery, but that we

141

1       So Alice, as she's stated multiple times, is
2   going to proceed with her questions.  Your objection is
3   noted for the record, and you can then move to --
4       MR. MATTHEW FORD:  It's a bigger objection
5   than an objection for the record.
6       The problem is, from what we can see and what
7   we can glean, based on what we know about this
8   situation, this witness, and what we've been arguing
9   about for, what, years now, there is no reason that this
10  should have been withheld until 15 minutes before the
11  start of the deposition.
12      We would like to raise this the with the judge
13  or the magistrate.  It's been part of an ongoing
14  discovery dispute -- this witness's exhibits, and that's
15  our position.  So why don't we try and get the
16  magistrate on.
17      MR. KOONIN:  We're not going to do that, Matt.
18  You don't have the right to stop our deposition.
19      MR. ADAM FORD:  Russell, Russell --
20      MR. KOONIN:  Yes?
21      MR. ADAM FORD:  -- it's not stopping the
22  deposition.  It's calling in to the judge for an
23  immediate ruling.  This is not that unusual.
24      If there was a privilege issue, we would call
25  in.  And if we had called in and asked the judge, we

143

**Philip Dorsett (nonconfidential)**
**2/27/2023**

1 could have gotten an answer, and we would be back to the
2 deposition.
3       Why are we going around in circles?  Let's
4 just call the judge and ask for a ruling on this issue.
5       We're not stopping the deposition.  We're
6 seeking guidance.  We do this all the time.
7       I don't know how you practice in Miami, to
8 paraphrase what you guys keep repeating.
9       MS. SUM:  Okay.  To be clear, this email that
10 I received last night from Mr. Dorsett approximately at
11 6:45, okay, is the first that I've received it.  This
12 has not been withheld somehow during the course of
13 discovery, and it was turned over the following morning,
14 meaning this morning prior to the deposition.  Okay.
15       And to be further clear about it, okay,
16 there -- the email below is actually embedded in your
17 client's production that was only dumped on us last
18 week.  Okay.  So if we're -- this is not the moment to
19 be getting into a discussion about, you know, raising
20 and tit for tat as far as the parties and their
21 production dates.
22       I intend to proceed with questioning with
23 Mr. Dorsett.
24       MR. MATTHEW FORD:  It just seems like an easy
25 thing to go ahead and call the magistrate and get a

144

1 ruling on whether you can use these documents.
2       MS. SUM:  It's not a question of whether it's
3 easy.  You don't have the right to stop this deposition
4 at this point.  I'm going to proceed.
5       MR. MATTHEW FORD:  We're not stopping the
6 deposition, as I've said.  We're just going to call the
7 judge for a ruling.
8       MS. SUM:  My position is that it is not
9 necessary, and you don't have the right to even pause
10 this deposition for a document that actually embeds
11 something that your client produced last week.
12       Do you deny that your client produced part of
13 this email last week?
14       MR. MATTHEW FORD:  Is that a question for the
15 witness?
16       MS. SUM:  Well, apparently, there's no answer.
17 Well, no.  We've been having our colloquy here.
18       So, without your answer, then I'm going to go
19 ahead and proceed with the questioning.
20 BY MS. SUM:
21       Q.  Mr. Dorsett, you described an instance where
22 disagreements with Mr. Gentile occurred, and you
23 referenced something called a warning letter, is that --
24 did I understand your testimony correctly?
25       A.  Yes.

145

1       Q.  Okay.
2       MS. SUM:  So starting from the bottom of
3 Exhibit 8 if -- thank you.  No.  I'm sorry.  Scroll
4 back -- scroll back up -- of the email chain.  Okay.  A
5 little bit further down there's another email.
6       MR. MATTHEW FORD:  Oh, and to answer your
7 question, Alice, I had never actually seen this email
8 because you're just pulling it up for the first time,
9 and you didn't scroll down.  So all I saw was an email
10 from Mr. Dorsett to you last night or whenever it was --
11 this morning.
12       MS. SUM:  Okay.  So this is an email that's,
13 in fact, embedded in your client's production of
14 documents last week.  But I'm going to continue with the
15 questioning.
16 BY MS. SUM:
17       Q.  So, Mr. Dorsett, do you see what I'll call
18 the first email chronologically at the bottom of
19 Exhibit 8?
20       A.  Yes.
21       Q.  Okay.  And could you please describe the
22 November 23, 2015, email?
23       A.  All right.  So it's a letter -- it's an
24 email -- sorry -- from Justin making me aware that Guy
25 sent a letter to me and that I can discuss the contents

146

1 of the letter with Guy at a later time.
2       MS. SUM:  Please, videographer, scroll up to
3 the later email.
4 BY MS. SUM:
5       Q.  Okay.  And what is this November 23, 2015
6 email at 6:20 p.m.?
7       A.  So I read Guy's warning letter, which was the
8 attached letter Justin referenced, and I responded to
9 it.  And this email was letting Guy know that I attached
10 my response for him to read.
11       MS. SUM:  Videographer, could you please
12 scroll to page 4 of the PDF, please?
13 BY MS. SUM:
14       Q.  Mr. Dorsett, is this the response to
15 Mr. Gentile's letter to you?
16       A.  Yes, it is.
17       Q.  And can you briefly describe your response to
18 Mr. Gentile's letter.
19       A.  Well -- well, can I just read it or is it too
20 long?
21       Q.  Yes.  Please go ahead and read it.
22       A.  So "To:  Guy Gentile" and "From:  Philip
23 Dorsett, November 23, 2015."
24       Q.  Oh, you don't need to read it out loud.
25       A.  Oh, sorry.  Okay.

147

1    Q.  You can read it.
2    A.  You can scroll down.  Scroll down.  And scroll
3  down.  Scroll down.
4      Okay.
5    Q.  All right.
6      MS. SUM:  So why don't we scroll back to the
7  top of this letter -- not to the PDF.
8      Okay.  Thank you.  Thank you.
9  BY MS. SUM:
10   Q.  All right.  First of all, Mr. Dorsett, why did
11 you feel like you had to write this letter in response
12 to Mr. Gentile's -- what you described as a warning
13 letter?
14   A.  By him writing the warning letter to me, that
15 was an official letter.  You know, it's official.  It's
16 going to be part of the company records.  It's going to
17 be on my file.  And it was very inaccurate.
18     It would have been different if Guy had called
19 me aside -- which he had done times before, and we
20 thrash it out.  Right.  But him writing a warning letter
21 and then putting things in the warning letter as if it's
22 my job performance that he has a problem with when, in
23 reality, it's not my job performance that Guy had a
24 problem with, it was me standing up to him that he had a
25 problem with.  But he's trying to pin something about

148

1  job performance that can be on the record against me.
2  And I saw right through it, and I didn't like it at all.
3      And so that's why I felt compelled to respond
4  to him.  And I told him just like how -- you know, well,
5  my thinking was, you write an official letter for the
6  record, I'm going to write an official letter for the
7  record, but the difference is mine says everything in
8  this is truth.
9      And so I started from the beginning with all
10 of the grievances that I've had with him.  I told him, I
11 say, how can I be your Chief Compliance Officer -- I'm
12 registered with the Commission which means I'm
13 accountable for this firm.  I have to -- I have to
14 basically give accounts to the regulator.  How can I be
15 your Chief Compliance Officer when you don't take my --
16 you don't adhere to the things that I'm saying at all?
17 It's as if I don't exist.
18     And other things that I brought him up to him,
19 I said, I notice that whenever I bring up an issue to
20 him that basically is in the best interest of the firm,
21 it's like he just automatically dismisses it.  It's like
22 he doesn't want to hear anything that's not his opinion.
23 He doesn't want to hear anything that goes against his
24 opinion.  And he certainly never wants to hear the words
25 no to anything, you know.

149

1      And I brought up certain situations where he
2  specifically put the risk at risk because he did not
3  come to me first and discuss his actions first.  And
4  that is one of the major problems I had with Guy.  Guy
5  would do things in a very reckless manner at times, and
6  put me and my fellow officers at risk and put the entire
7  firm at risk.
8      You know, earlier one of the conversations I
9  heard with Guy that made me start to think -- change my
10 thinking towards him when he was speaking to one of
11 those earlier business partners, he said to them, you
12 know, I don't know how long this is going to last so I
13 have to milk it for everything I can.  I'll always
14 remember that.  He said that way in the beginning.  And
15 that's one of the things that started to make me realize
16 that the way how I thought about the firm was very
17 different from the way how Guy thought about the firm.
18     And so my opinions as Chief Compliance Officer
19 that I'm trying to bring to him -- and initially, in the
20 beginning, I didn't bring that much because it was just
21 all him.  But in time, once I started to realize, okay,
22 you know what, I have to stand up to Guy, and I got the
23 courage to do so, he was not impressed at all, you know.
24 When I got the -- you know, it's -- and he was just
25 blatant with it.

150

1      I mentioned how he hired the other compliance
2  officer.  I noticed that the compliance officer was
3  referring to himself as the Chief Compliance Officer.
4  And I'm like, okay, how can you have two chief
5  compliance officers?  I know Guy had this thing where he
6  likes to set people off against each other but, you
7  know, I didn't decide to be upset with the other
8  compliance officer.  I knew where it came from.  I went
9  to Guy.  I went to the source.
10     I'm like, what's going on?
11     He said, oh, don't worry about it.  You know,
12 you the man.
13     I said, well, no.  Obviously this other guy
14 thinks he's the man.  Where's he going to get that from?
15 He's not going to just say that, right.
16     So I had a problem because Guy was, in
17 essence, treating this Guy as the Chief Compliance
18 Officer, but yet I'm the one with the responsibility
19 with the regulator, you know.  They're making decisions
20 that affect the company -- compliance decisions --
21   Q.  I hate to interrupt you, but I need to
22 understand.
23     You mentioned there was another compliance
24 officer that was hired and that Mr. Gentile referred to
25 him as the Chief Compliance Officer?

151

1     **A.**  The person referred to himself as Chief
2  Compliance Officer.  And, yes, Guy, I had noticed, would
3  even refer to him as the Chief Compliance Officer.
4     **Q.**  What was his name?
5     **A.**  Edward Cooper.
6     **Q.**  And was any kind of paperwork filed with the
7  SCB to reflect any change in the name of the Chief
8  Compliance Officer for SureTrader?
9     **A.**  None.  None.
10    **Q.**  After --
11    **A.**  And I -- sorry.  Go ahead.
12    **Q.**  Okay.  After you sent this response letter to
13 Mr. Gentile, did Mr. Gentile respond?
14    **A.**  Yes.
15    **Q.**  Okay.
16       MS. SUM:  Please take down Exhibit 8 and bring
17 up Exhibit 9.
18       And, Counsel, I will represent to you this --
19 this is a version that Mr. Dorsett -- I shouldn't say
20 version.
21       It is a forward of an email that you all
22 produced in Mr. Gentile's production last week.  So this
23 is just a -- you know, being forwarded from him with
24 Mr. Gentile's response in the email -- emails below.
25       MR. MATTHEW FORD:  Were these letters included

152

1  in the 33,000 documents that we received?
2        Were these emails included?
3        MS. SUM:  The short answer is, I do not know,
4  but it was produced from your client --
5        MR. MATTHEW FORD:  Well --
6        MS. SUM:  -- as well.
7        MR. MATTHEW FORD:  -- it says it's from
8  padorsett@gmail.com to Sum, Alice.
9        Was this produced in the 33,000 emails that we
10 received?
11       MS. SUM:  The short answer is, I do not know,
12 but I am producing it because it is the version that he
13 provided to me last night -- as you can see from the
14 date, but the -- you have this email -- excuse me --
15 yes, this email in the exhibits that I sent.
16       MR. MATTHEW FORD:  It's -- it's in the Bates
17 stamped 33,000 documents that we received?
18       MS. SUM:  I've answered you already.  I do not
19 know, but I also know it was in your client's
20 production.
21       MR. ADAM FORD:  Alice, you don't mean that the
22 email from Mr. Dorsett to you --
23       MS. SUM:  No.  No.
24       MR. ADAM FORD:  -- that you're using --
25       MS. SUM:  I'm not referring --

153

1        MR. ADAM FORD:  -- was in my client's
2  production --
3        MS. SUM:  -- to that.
4        MR. MATTHEW FORD:  Do you -- do you mean the
5  email from Mr. Dorsett SureTrader email address to his
6  Gmail address is --
7        MS. SUM:  No.  I'm referring to -- I will be
8  going to an email from Mr. Gentile responding to Mr. --
9  Mr. Gentile responding to Mr. Dorsett's letter that we
10 just covered in Exhibit 8.
11       MR. MATTHEW FORD:  Okay.  So, just to be
12 clear, this email chain was not produced by Mr. Gentile.
13 It was produced by Mr. Dorsett to you last night,
14 correct?
15       MS. SUM:  This -- this iteration, because it
16 was forwarded by Mr. Dorsett last night, was produced
17 this morning.  But the substance -- like the email chain
18 below was produced by your client last week.
19       MR. MATTHEW FORD:  Thank you.
20       MS. SUM:  Okay.  Mr. Videographer, could you
21 please scroll down a little bit to show the middle --
22 keep on going, please.  Okay.  Yes.
23       Actually, scroll back a little bit up so we
24 can see the date.  Okay.
25       (Deposition Exhibit 9 marked.)

154

1  BY MS. SUM:
2     **Q.**  Mr. Dorsett, is this Mr. Gentile's response to
3  the letter that we just looked at in Exhibit 8?
4     **A.**  Yes.
5     **Q.**  Okay.  Do you want to take a moment to review
6  Mr. Gentile's response to you?
7     **A.**  Scroll down.  Okay.  Yep.
8        MS. SUM:  You've reviewed it.
9  BY MS. SUM:
10    **Q.**  Do you -- I'm going to ask you questions about
11 Mr. Gentile's email response to you.
12       First, I'll start with, do you see where here
13 it says, in point number 1 and 2, the first point it
14 says, "removing you as director of the firm."
15       And point two is "assigning Mr. Cooper as
16 Chief Compliance Officer."
17       Do you see that?
18    **A.**  Yes.
19    **Q.**  Did Mr. Gentile state that he was going to
20 take these two actions?
21    **A.**  Yes.
22    **Q.**  Did he, in fact, take those two actions?
23    **A.**  I think I was removed as director and
24 principal.  I was not removed as Chief Compliance
25 Officer.

155

1     Q.  Did you discuss with Mr. Gentile, after he
2  sent this email, basically, the contents of both his
3  email and your response that we looked at in Exhibit 8?
4     A.  Yes, I did.
5        Again, I didn't -- I didn't say it, but in my
6  email -- in my letter response to him, I told him well,
7  if you really have a problem with my work experience,
8  then let's discuss my departure from the company
9  because, you know, I don't want to work for a company
10  where the CEO feels I'm not doing my job.  And so that's
11  what we discussed when I went into his office.
12        It became very evident right away that no, he
13  didn't want to do that.
14        And I said, well, okay, if you want to assign
15  Mr. Cooper as Chief Compliance Officer, you know, we can
16  fill out the documentation with the Securities
17  Commission of The Bahamas.
18        No.  No, Philip, we don't have to do that.  We
19  don't have to do that.
20        You know -- and so it's like he is putting
21  these things on record that -- even this email response
22  to me this is not for my eyes, this is for other
23  people's eyes who may see it later.  Like I noticed here
24  he responded to the bank, and his response is
25  incorrect.  But, when you speak to him, it's a whole

156

1        I didn't mind not being a director anymore.  I
2  mean, I was not being compensated for it in any case.
3  And, quite honestly, I didn't even mind if he wanted to
4  change the position of Chief Compliance Officer, just do
5  it properly.  Notify the Commission and take that
6  responsibility from a regulatory perspective off of me
7  and put it on to whoever you want.  And that is what Guy
8  did not want to do.  And once he realized that I was
9  pushing him to do that, it's like he turned back
10  completely.  He's like oh, no.  No, Phil.  I'm sure
11  things will work out, blah, blah, blah.
12        So I decided to let it go.  But there's a
13  whole lot of things that my letter response -- I'm glad
14  I documented it, but the reality is I was already
15  explaining these things to Guy anyway.  I told him,
16  listen, you can't just be upset with me because I tell
17  you no about stuff.  Why don't you ask me why I say no.
18  There's a reason for that, and let's just discuss it.
19  Don't just get upset, you know, that's not how you run
20  the firm.
21        And not just that, I tried to point out,
22  listen, we put ourselves at risk when you do these
23  things, you know, and -- well, you put us at risk when
24  you do these things.  And, you know, I try to make it --
25  make him understand because he's the owner of the firm.

158

1  'nother story.
2        And so what I saw right away was that Guy was
3  not interested in actually firing me.  I gave him the
4  opportunity.  I said, you know, it doesn't have to be a
5  bad thing, you know.  If you feel this way, you really
6  shouldn't have me as your chief -- you shouldn't have me
7  as an employee let alone your Chief Compliance Officer.
8  Right.  And if you want to remove and give the Chief
9  Compliance Officer to position to Mr. Cooper, certainly
10  that's your choice.  Let's fill out the paperwork with
11  the Commission.  And he was very much against it.
12        And so it showed me that it's like Guy wanted
13  me to maintain my official position which came with
14  responsibility to the regulator, but he actually didn't
15  want me to have responsibility within the firm.  Like,
16  he didn't want me to be able to challenge him in the
17  firm.  And he was trying to keep me out of the decisions
18  in the firm, but I had to be accountable to the
19  regulator, nonetheless.  And so things -- that's what
20  came out of this whole thing.
21        Interestingly enough, the relationship between
22  us got better even after this.  You know, because he was
23  like, well, you know, Philip, you know, we both said --
24  we both said our sides and, you know, let's move on, you
25  know, and things were better.

157

1  He's the one who ultimately benefits when we do well.
2  But, I don't know, it's like he just -- he wants me to
3  just do as he says and that's it.
4     Q.  All right.
5        MS. SUM:  I think this is a good time to take
6  a short break.
7        Is 10 minutes sufficient, Mr. Dorsett, and to
8  the court reporter, and to the videographer?
9        THE VIDEOGRAPHER:  Yes.  That's fine.
10        Do you want to go off the record?
11        MS. SUM:  Yes.
12        THE VIDEOGRAPHER:  The time is 2:35 p.m.  We
13  are now off the record.
14        (Off the record at 2:35 p.m.  Back on the
15  record at 2:46 p.m.)
16            --o0o--
17        THE VIDEOGRAPHER:  The time is 2:46 p.m.  We
18  are now on the record.
19  BY MS. SUM:
20     Q.  Mr. Dorsett, after the exchange between you
21  and Mr. Gentile in November of 2015, did anything occur
22  that -- that renewed any kind of disagreement between
23  you and Mr. Gentile?
24     A.  Do you mean --
25     Q.  In the immediate aftermath.

159

1    A.  No.  I wouldn't say -- not in the immediate
2  aftermath.  I mean, Guy just went back to being his
3  normal self.  Things -- when I say things got better,
4  the confrontation had subsided.  And so -- but the
5  situation remained the same, basically.
6    Q.  What do you mean "the situation remained the
7  same"?
8    A.  Guy would do things according to however he
9  wanted to do it, and he did not want to hear your
10  opinion on it unless it was in agreement, basically.
11  And when I would give my opinion on it that was not in
12  agreement, it was evident that it irritated him.  And I
13  would not have a problem if this -- these were
14  insignificant things, but these are major things that
15  affect the company, and things that me, as the
16  registered compliance officer, are also accountable for.
17  And that was always my major concern.
18    That's why I never had a problem actually
19  giving over my position to someone else, because when
20  you give over that position, you give over the
21  responsibility that comes with it, you know.  And that's
22  what I told Guy.  And even I explained to Mr. Cooper
23  too, because I wanted to make sure -- we had to work
24  together.  I didn't want it to be this back and forth.
25  He's a seasoned professional in the industry.

1    I said, you know, surely you can understand
2  that if I am the one who have to be accountable to the
3  Commission, then it puts me in an odd position when you
4  and Guy are making the decisions that I have to be
5  accountable for.  And he understood that, you know.
6  That was not -- it's not something that he did not
7  understand.
8    So things got better.  They got back to the
9  normal bad, right.  And so that's -- you know, that's
10  how things continued.
11    Q.  In early 2016 did there come a time when you
12  reached out to the U.S. Securities and Exchange
13  Commission?
14    A.  Yes.
15    MR. MATTHEW FORD:  Objection.
16    THE WITNESS:  Yes, I did.
17  BY MS. SUM:
18    Q.  When -- when did you reach out to the U.S.
19  SEC?
20    A.  Well, I think I did officially, I think it was
21  in March.  It had been something that I had been
22  considering probably for well over a year at that time,
23  but I wasn't entirely sure how to go about doing it, and
24  I wasn't entirely sure if I wanted to do it.
25    But, the reality is -- and I mentioned the

1  thing that happened back in 2012 where I noticed Guy was
2  on the phone with someone who I assumed probably was a
3  regulator and he was just putting everything on his
4  compliance officer.  And when I -- when I asked him
5  about it, I really didn't like his response.  He just --
6  I got the feeling he was giving me one of the responses
7  like what he just gives to anyone else, like just
8  telling me what I wanted to hear.  And that's the first
9  time that I realized that, you know, Guy might just be
10  using me for my position as Chief Compliance Officer.
11  Like, he's just using that title, and if I get in
12  problems or if I get in trouble with foreign regulator
13  or the local regulator, like, it didn't matter to him.
14    And so I was thinking for a long time, because
15  I didn't like how -- I didn't like how I didn't know
16  what Guy was presenting to others about me.  And I got
17  the impression that Guy was setting me up to take the
18  fall in case it came to that.  I just got that
19  impression.
20    And I -- I saw -- I didn't bring it up
21  outright, but I tried to bring it up to him again.  I
22  said -- what was that you were talking about?  And he
23  just brushed me off again.  And, you know, that's not
24  going to make you feel comfortable.  It's going to
25  really be like okay -- and back then I was not in a

1  position to like really challenge Guy.  Things -- you
2  know, it was very different, you know.  Three years
3  later, 2015, 2014 -- sorry, three to four years later,
4  2015, 2016, I was a very different individual and as
5  that whole exchange just -- just exemplified, you know,
6  things were very different.
7    And, you know, I realized, you know, if Guy
8  can expect for me to redact things with the Securities
9  Commission of The Bahamas and have no care for what that
10  would do to my career -- I may have even been charged
11  with something like that -- what is he doing with the
12  U.S. regulators when he's talking about me.  And so --
13  and I was looking at all of the things that he was doing
14  with the firm, his reckless behavior, and I came to the
15  conclusion that, you know what, I need to contact the
16  U.S. authorities and let them know that me and Guy are
17  not the same.  I am not a part of his inner circle.
18    I used to see how Guy used to be going to war
19  with the regulators, and, quite honestly, it almost
20  seemed at times like he enjoyed it.  Like he would do
21  things and say things that were just very reckless.  And
22  it came across to me that he was doing those things
23  because he knew I would be the one to take the fall if
24  something happened, you know.
25    And so I said to myself, you know what, I

Philip Dorsett (nonconfidential)
2/27/2023

1  think I need to contact the U.S. regulators, at the very
2  least, to let them know that, you know, I'm not in
3  cahoots with Guy, you know.  I'm not a part of his inner
4  circle, you know.  I work for him, yes, but -- you know,
5  I needed to dispel whatever was happening there, you
6  know.  I had a very, very strong urge to do that.  The
7  problem is, I didn't know how to do it.  You know, I
8  even contemplated if I should go to the embassy and give
9  them a letter to give to the SEC.  I didn't really know
10  what to do.  And I started to research, and research,
11  and research, and I realized that the only way that you
12  can safely contact the SEC to bring up these type of
13  concerns was with the whistleblower program.  When I say
14  "safely," I mean, confidentially without, you know,
15  everyone knowing about it.
16         Obviously, I was still very much working for
17  Guy at the time, and so confidentiality and secrecy was
18  something very, very high on my agenda.  And so that was
19  actually the first time I heard of the whistleblower --
20  I mean, I know what a whistleblower is, but that's the
21  first time I knew of the SEC whistleblower program,
22  per se.
23         And so I started to look into it -- like I
24  said, I had been thinking -- I had been thinking and
25  praying about it for over a year at that point.  And I

164

1  realized things were not going to get better and I had
2  to -- I just had to do it, and not just to protect me,
3  but to protect the fellow officers as well because Guy
4  wasn't just setting me up to protect him.  I realized he
5  was doing the same with all his officers.  It's like he
6  treats you like pawns on a board, and he positions you
7  just so he does not get attacked.  And he positions you,
8  many times, without you even knowing, you know.
9         And I felt like I had to contact the SEC, and
10  I finally built up the courage to do so, I think it was
11  first quarter, like I say, in 2016.
12     Q.  Mr. Dorsett, did you contact the U.S. SEC
13  because of what happened in November of 2015 that we
14  just went over in the warning letter, and your response,
15  and then Mr. Gentile's response back to you, was it
16  because of that incident?
17     A.  No.  It was not because of that.  I mean,
18  that's not -- you know, that -- that really wasn't
19  anything to do with U.S. regulators, you know, that was
20  more of my concerns with really Bahamian stuff.
21         Like I said, the main reason I contacted the
22  SEB [sic] was really way back in 2012 when I heard that
23  conversation and just the subsequent behavior of Guy
24  since then, that showed me that, you know what, I can't
25  trust that Guy is doing right by me.  And that's the

165

1  reason why -- you know -- you know, I had no clue.  I
2  didn't even know how the U.S. system worked or whatever.
3  But -- I mean, by his own mouth he was blaming things on
4  his compliance officer right in front of me.
5         You know, I noticed later that he would go on
6  the calls and he would leave the office, right, and I
7  always assumed that he was still doing those
8  conversations because he never did that before.  You
9  know, he would now leave the office.  And I'm like, you
10  know, I can't trust Guy.  I just don't know.
11         And that's why I contacted the SEC.  It had
12  nothing to do with the confrontation in November.  Like
13  I said, things actually got better and, you know,
14  things -- and even when I contacted the SEC, at that
15  time, things were good.  There was nothing really bad,
16  you know what I mean.  So it wasn't -- I thought about
17  it very calmly, and I had been thinking about it and
18  praying about it for -- like I said, for about a year at
19  that time.  And so I just realized, okay, it's now or
20  never.  You know, how long you gonna hold off on this?
21  You think you need to do it, Guy is not getting better.
22  You try to talk to him.  You bring your concerns to him
23  and he makes you pay for it, you know.
24         And so that's -- that's why I reached out to
25  the SEC.

166

1     Q.  After you reached out to the SEC, did the SEC
2  ask you for more information?
3     A.  Yes.
4     Q.  And did you provide information to the SEC?
5     A.  Yes, I did.
6     Q.  Did you provide that information voluntarily
7  to the SEC?
8     A.  Yes.
9     Q.  After you filed with the -- strike that.
10         After you contacted the SEC with your concerns
11  as you've described, how did you continue doing your job
12  at SureTrader?
13     A.  With a sense of relief because at least, you
14  know, the U.S. authorities -- at least I figured they
15  were getting things from a different perspective now.
16  And so -- you know, I just did my job and -- you know,
17  continued doing my job.  I just continued doing my work
18  to the best of my ability.
19     Q.  All right.
20         MS. SUM:  I'm going to ask the videographer to
21  bring up Exhibit 10.
22         (Deposition Exhibit 10 marked.)
23         MS. SUM:  And I'll ask the videographer to
24  please scroll through for Mr. Dorsett to review.
25         Okay.  Sorry.  Scroll back down a little

167

Philip Dorsett (nonconfidential)
2/27/2023

1  further.  Okay.  Stop right there, please.
2  BY MS. SUM:
3      Q.  Mr. Dorsett, do you see that there is this
4  April 12, 2016 email from a Wade Matasumoto at
5  SureTrader --
6      A.  Yes.
7      Q.  -- to Edward Cooper, Antonio Collie, and to
8  you?
9      A.  Yes.
10     Q.  Okay.  And you see the subject is "Flow
11  Chart"?
12     A.  Yes.
13     Q.  Okay.  Do you recall this particular exchange?
14     A.  It doesn't come to memory right --
15     Q.  Okay.
16     A.  -- off the top of my mind.  I think I would
17  need to see it.
18     Q.  Okay.  I'll bring up the attachment.
19         MS. SUM:  Could we please bring up Exhibit 11?
20         (Deposition Exhibit 11 marked.)
21         THE WITNESS:  Okay.
22  BY MS. SUM:
23     Q.  Do you recognize the document that's in
24  Exhibit 11?
25     A.  Yes.

168

1  flow in a particular way.  And this may eventually have
2  something to do with -- at least -- I don't want to
3  speculate.
4      Q.  I'm not asking you to speculate, but what are
5  you referring to that Mr. Gentile had reasons for the
6  preparation of this document?
7      A.  Right.  So I think this eventually may have
8  had something to do with how Guy wanted to show that the
9  clients didn't have direct market access.  That's what I
10  was gonna say.
11     Q.  All right.  And what is your reason for your
12  belief that this may relate to the issue of whether
13  clients had direct market access?
14     A.  Well, the reason why I say that is because I
15  know that came up as a big thorn with Stock USA where we
16  couldn't -- they couldn't have us with our clients
17  having direct market access.  And so I remember when Guy
18  signed the agreement and sent it over to Stock USA
19  stating that our clients do not have direct market access.
20         And so when I see this with the order flow --
21  and I remember there's some discussion with this -- now,
22  again, I'm not an expert on this -- this is Wade and
23  Guy, but that's one of the things that I think about.
24     Q.  Okay.
25     A.  The other thing is, I know Guy was really good

170

1      Q.  Okay.  And what is it?
2      A.  All right.  So this is what we're referring to
3  as the order flow.
4      Q.  Does this help you recall now in Exhibit 9 the
5  -- excuse me, Exhibit 10 the email, what it was
6  referring to, the flow chart?
7      A.  Yes.
8      Q.  Why was this document prepared?
9      A.  Well, I -- well, I don't know if I can say why
10  it was prepared, but I know that -- right.  I mean, I
11  don't know if I can answer this and say I knew exactly
12  why the document was prepared.
13     Q.  Why -- based on what information you have
14  available to you what do you know about why it was
15  prepared?
16     A.  Right.  So Wade was brought on, I think,
17  officially as a consultant, right.  And he was someone
18  who was knowledgeable of the securities business Guy
19  worked with, I think back in Stock USA, I think.  But
20  Wade was brought on for a number of reasons, and one of
21  them was to try to put together an order flow.
22         And I think parts of this were -- this --
23  parts of it were so we could generate more profits, how
24  we were sending the orders to various desks, but parts
25  of it were also -- I think Guy wanted to show the order

169

1  when it came to how he was able to cipher profits by
2  having orders go through various desks and so forth,
3  too, so I think that was a part of it as well.
4          MS. SUM:  Just for clarification purposes for
5  the record, I'd like to identify the Bates numbers for
6  Exhibits 10 and 11.
7          For Exhibit 10 it is SEC-FL-0348-E-0000228
8  through 229.  And then for Exhibit 11 same prefix 230.
9  BY MS. SUM:
10     Q.  So, as you continued your employment at the
11  company through later in 2016, did you encounter any
12  other difficulties or disagreements with Mr. Gentile?
13         MR. MATTHEW FORD:  Objection.
14         THE WITNESS:  Well, again, we went to -- back
15  to the norm which was, you know, just the usual where
16  Guy, you know, he didn't change.
17         We were not having outright confrontations
18  anymore, but -- you know, the writing was somewhat on
19  the wall.  Even though Guy had indicated to me
20  everything was cool -- and everything was cool.  There
21  was no more confrontation and stuff -- it was very clear
22  to me that I was out of the loop.
23         You know, during 2016 there would be a
24  management meeting and I would find out about it when
25  it's over, you know.  And it's like, okay.  And so --

171

1  and again, I'm still the registered Chief Compliance
2  Officer.
3       And so, during this time, like, I started to
4  think seriously about leaving the company.  I started to
5  really think about it.  Again, I started to really pray
6  about it and stuff like that.  And so that's how things
7  were.
8       I mean, off the top of my mind, I cannot think
9  of any major events that really happened in 2016.  I'm
10  sure there was a whole bunch of little stuff.
11  BY MS. SUM:
12     Q.  Okay.
13     A.  The next big thing would have been in -- you
14  know, a year later after, you know, that culminated with
15  my departure from the company.
16     Q.  Okay.  So let's hold off.
17     MS. SUM:  You can take down Exhibit 11.
18  BY MS. SUM:
19     Q.  Let's talk about your ultimate departure from
20  the firm.  I believe you were just saying that the next
21  event occurred sometime in 2017.
22       What was the -- the genesis of the issue that
23  ultimately led to your departure from the firm?
24     A.  Right.  So it had to do with Stock USA and our
25  clients and if -- whether or not they had direct market

172

1  access or not.
2       Now, again, I -- myself and Mr. Collie, we --
3  we were there and sort of in the beginning when Guy
4  explained to us why he had to show the Stock USA why we
5  did not have direct market access and, you know, we were
6  there.  Mr. Cooper didn't come on until much later.  So,
7  in essence, what I'm saying is that I knew that our
8  clients had direct market access.  All right.
9       The problem is, one of our clients mistakenly
10  contacted Stock USA and was complaining about a trade.
11  And the genesis of what he was saying seemed to imply
12  that he had direct market access.  And, of course, Stock
13  USA now has a problem.  They have a dilemma.  And so
14  they sent, I think, Mr. Collie, an official email saying
15  please explain this, right.  So that's how it started.
16       And so through a bunch of emails back and
17  forth, Mr. Collie, in essence, wanted me to respond to
18  Stock USA officially saying no, we do not have direct
19  market access.  Right.
20       I obviously did not want to do that.  At that
21  time, you know, I was -- like I said, I was a very
22  different person from when I first entered the firm way
23  back in 2012.  At this time I was very cautious about
24  anything that I signed, anything that I put my name
25  to -- especially dealing with like foreign -- because I

173

1  got the impression that Stock USA was doing this for
2  some regulatory reason.  It wasn't just their choice.
3  They was requiring this of us for some regulatory
4  reason.  That was my impression.
5       So I did not want to -- in essence, I would
6  have been attesting to something -- something that might
7  go before a regulator that I knew -- that I outright
8  knew wasn't true.  Right.  And so I didn't want to say
9  that in the email chain, so I was just sort of back and
10  forth with Collie.  In essence, I was trying to get him
11  to do it.  Right.  And I can't say what his reasons
12  were.  I can speculate, but he was trying to get me to
13  do it.  Right.  None of us would do it.
14       And finally, like I -- I wrote something to
15  the effect of, are you authorizing me to do this?
16  Something to that effect, and I took offense to that.
17  He said, no.  I'm not authorizing you to do it.  You
18  must do it based on your own -- or something.  In fact,
19  it got like into an argument.  Right.  And it got
20  heated, and he said something that was, I thought, very
21  strange.  He said, Philip, you know, he says, you always
22  wash your hands of the stuff we are doing in this firm.
23  You know, he actually wrote that in the email.  I
24  thought that was just very strange.  And where --
25     Q.  Okay.  So I'm going to just pause you and

174

1  bring up Exhibit 13.
2       MS. SUM:  While it's coming up, I will note
3  the Bates stamp range for Exhibit 13.  It is
4  SEC-FL-03848-E-0001195 through 1203.
5       THE VIDEOGRAPHER:  Counsel, what exhibit did
6  you say you wanted up?
7       MS. SUM:  13.
8       THE VIDEOGRAPHER:  Okay.
9       MS. SUM:  And I'll ask the videographer to
10  please scroll through it so that Mr. Dorsett can review
11  Exhibit 13.
12       (Deposition Exhibit 13 marked.)
13  BY MS. SUM:
14     Q.  Is this the email exchange that you were just
15  testifying about?
16     A.  Yes.
17     Q.  And on page 3 -- I want to direct your
18  attention to the bottom of page 3 of the -- okay.
19       MS. SUM:  If you could continue scrolling just
20  so it leaves the last original message and starting on
21  page 4.
22  BY MS. SUM:
23     Q.  Okay.  So I know you can't see what's on
24  page 4, but do you see where there's an email from
25  Mr. Cooper to you on July 28, 2017, and then it will

175

1 continue scrolling.  Yep.  Stop right there.
2     What is -- what is the message from
3 Mr. Cooper?
4     A.  Let me just read this again.  Right.  So I
5 think this is ultimately what -- because there's been
6 some communication between Mr. -- well, after the big
7 confrontation between myself and Mr. Collie, Guy was
8 getting upset.  Right.  And so Mr. Cooper was brought in
9 and he was now going to be the person who was going to
10 respond to Stock USA.
11     And I think -- I think he was sending this to
12 me to show me that what he was going to say, but I could
13 be wrong about that.  But, eventually, he -- like I say,
14 he consulted with Guy, and he responded to Stock USA.
15     MS. SUM:  Can I ask the videographer to please
16 scroll up closer towards the top of -- keep scrolling.
17 Okay.  Right -- slow down right here.
18 BY MS. SUM:
19     Q.  Do you see the email dated July 28, 2017, from
20 Mr. Gentile to you with cc to the
21 executives@SureTrader.com?
22     A.  Yes.
23     Q.  Okay.  And did you discuss Mr. Gentile's email
24 to you?
25     A.  Sorry, did I?

1     Q.  Did you discuss what Mr. Gentile says -- said
2 in this email to you?
3     A.  You said, did I discuss?
4     Q.  Yes.
5     Did you discuss it -- did you and Mr. Gentile
6 discuss what's in this July 28th, 2017, email at 11:43?
7     A.  No.  I think -- I don't know if me and Guy --
8 well, he -- he told me that, you know, my response was
9 not what they wanted to hear.  Right.  And that's what
10 he was -- he was very upset.  Right.
11     And then, I think, after this, this is we
12 Mr. -- Mr. Cooper got involved, and that's why the in
13 email he says this isn't what they want to hear, guys.
14 And so that's -- but I didn't -- I don't think I
15 responded to Guy.
16     MS. SUM:  All right.  We can scroll up just so
17 you can see the rest of the email.
18     Will the videographer please scroll up.  So
19 we'll pause for a second.
20 BY MS. SUM:
21     Q.  Here do you see that there's an email from
22 Yaniv Frantz?
23     Who is Yaniv Frantz?
24     A.  Right.  So he was brought in, I think, as an
25 operations guy.  He was someone known to Guy.  And he

1 came in and he was the Chief of Operations.
2     Q.  And he provides a response here?
3     A.  Yeah.  Because I think the email that Guy sent
4 went to all the -- all the -- all of us.  Right.  And so
5 I think, at this point, Yaniv is trying to figure out
6 what's going on.
7     Him and Ed would not have been aware of the
8 actual facts of the matter.  The only ones who were
9 really aware was myself, and Mr. Collie, and Guy.
10     MS. SUM:  Let's scroll further up from
11 Mr. Frantz's email.  And then you see -- whoops.  Sorry.
12 Slow down.  There.
13 BY MS. SUM:
14     Q.  Do you see the email from you in response?
15     A.  Right.  The email was sent to Mr. Collie for
16 his approval.
17     Q.  Okay.  I mean, what did you understand, at
18 this point, was a potential resolution to this
19 disagreement?
20     A.  Well, the problem is, there was no resolution.
21 I -- okay.  I was not going to do -- I was not going to,
22 basically, attest to something that I knew was not true.
23 All right.  And, you know, it was -- the pressure was
24 there.  So, the only resolution would be for me to just
25 send it out and just do what Guy wanted.  And, at that

1 point, I had already decided, you know, I'm not going to
2 do that anymore.  You know, I have to be very careful
3 when dealing with Guy.
4     And so I sort of, you know, held my ground, so
5 to speak that, you know, I was just -- I was not going
6 to do this.  And, yes, so this -- and so it got resolved
7 in the sense that I think Mr. Cooper eventually
8 responded to Stock USA and told them, in effect, that
9 the client was just wrong.  That they don't -- our
10 clients do not have direct market access.
11     Q.  Did you agree with that response?
12     A.  Well, no.  I don't agree with that response.
13 That's inaccurate.  It was inaccurate.
14     MS. SUM:  Let's scroll further up in the email
15 chain, please.  Okay.  Stop there, please.
16 BY MS. SUM:
17     Q.  Okay.  Do you see an email from Mr. Collie
18 dated July 28, 2017?
19     A.  Yes.
20     Q.  In response to you, Mr. Frantz, Mr. Gentile,
21 cc to the executives?
22     A.  Yes.
23     Q.  Is this the message from Mr. Collie that you
24 were referring to earlier about you washing your hands?
25     A.  Correct.  All right.  And -- and, again, I was

1  just -- you know, and he's very -- the email is very --
2  I don't know if everyone can see what I'm seeing, but
3  it's very -- you know, somewhat insulting.  You know, he
4  used some harsh language and stuff, which is actually a
5  first.  Right.
6          And so -- but I found it interesting that he
7  said, you always wash your hands of the stuff we do in
8  this firm.  Right.  And mind you that's probably a half
9  truth.  I would like to think I try to keep my hands
10 clean so I don't need to wash them, but I got his point.
11         After this I basically just -- I gave -- I
12 gave an answer very similar to the answer what I gave to
13 -- what I gave to Guy when I sent him the letter, and I
14 told him I said, well -- I told him something to the
15 effect of, I think, well, my answers are going to be in
16 line with, you know, things that I can explain before a
17 competent regulator.  I said something to that effect.
18 Or I might have said competent authority.
19         MS. SUM:  I'm going to ask the videographer to
20 please go to the very first chronological email in
21 exhibit -- excuse me, 13.  So it's at the very bottom of
22 the exhibit.  Okay.
23 BY MS. SUM:
24     Q.  Is this the name of the customer that made the
25 inquiry?

180

1      A.  Yes.  That's the one that contacted Stock USA.
2      Q.  Okay.  And what's his name?
3      A.  Chris Penalver.
4      Q.  Had you ever separately had any dealings with
5  Mr. Penalver?
6          Did you ever talk to Mr. Penalver?
7      A.  I -- I may have -- I don't know -- in the
8  course of, you know, just working at the firm, but I
9  can't really recall.
10     Q.  After this email exchange, how would you
11 describe your relationship with Mr. Gentile?
12     A.  Well, after this email exchange, if I recall,
13 I think I was informed the very next day or the day
14 after that I was being let go.  And so -- and it was
15 actually Mr. Cooper who let me know.
16         And I'll always remember, it took him over an
17 hour to say -- like it was so difficult for him to come
18 out and say it.  I was like, you know, you could say it,
19 you know.  But he informed me that Guy decided to let me
20 go.
21         I think -- and I can't remember the exact
22 details of how it happened, but eventually they made me
23 an offer which, on the surface, seemed like a very good
24 offer.  They offered to keep me on the payroll for an
25 entire year and I would continue to get paid.  I would

181

1  even continue to get my benefits for an entire year.
2  And, in addition, they would also give me a reference
3  letter -- a good reference letter.  And, again, that on
4  the surface --
5      Q.  Did you accept that offer?
6      A.  No.  I did not.  I thought about it, and --
7      Q.  Why -- why didn't you take the money and the
8  benefits that they offered you?
9      A.  Well, the problem is -- the problem that I had
10 in SureTrader was that my title as the registered
11 compliance officer was just being used and sometimes
12 probably not without my knowledge and, you know, they're
13 making decisions that I have to be accountable to for
14 the regulator.  And I'm like, well, if I'm not even
15 here, but yet they have my title to do whatever they
16 want with, that's not going to make things better for
17 me.  And, you know, I suspected that's one of the
18 reasons and -- well, that's one of the reasons why I was
19 very hesitant.
20         I suspected part of the reason why Guy didn't
21 want to officially fire me is because in the Bahamas if
22 you -- if your -- if a registered compliance officer or
23 a registered CEO if they -- even if they resign, if they
24 leave the company for whatever reason, the company has
25 to report that to the regulator.  Okay.  And Guy, for

182

1  whatever reason, did not want to report to the regulator
2  that, you know -- even earlier when I was giving him the
3  opportunity, I said, well, okay.  You could just remove
4  me from that position and officially give it to
5  Mr. Cooper.  Like he just did not want to do that.  Like
6  he wanted to keep my title and position to do with as he
7  wished.
8          And I thought about that, and I was like, you
9  know what, no.  I think it's best if I do a clean split.
10 A clean cut.  Obviously I wasn't going to get all the
11 money.  You know, it was a good offer.  You know, I
12 would have, in essence, been getting a paycheck without
13 working for a whole year.  Right.  But I was like, the
14 risk of it is too much.  Right.  And, at that point, you
15 know, it just was too much.
16         So I came back to them and I said, no.  You
17 know, we'll just do a clean split.  And Guy was upset.
18 He was like well, we're making you such a good offer.
19 Why are you so -- what's the word -- why are you so -- I
20 don't know if it was ungrateful -- anyway, they thought
21 that I was -- you know, I was not being fair because
22 they made such a good offer.
23         I didn't tell them the reasons why.  I just
24 said, no.  Let's just do a clean split.  And that's what
25 they did.  They did the clean split.  They paid me what

183

184

1  was required by law, and they still gave me my good
2  reference letter.
3       And so things actually departed relatively
4  well. I have to give it to Guy. I think he made an
5  effort to try to make the split amicable, you know. And
6  so we split.
7    Q.  And what was the effective date of your
8  departure from the company?
9    A.  I don't remember the actual effective date,
10 but it was August something. I would have to check my
11 records to see the actual date on the letter.
12   Q.  August of 2017?
13   A.  Yes. 2017.
14   Q.  All right.
15      MS. SUM: We can take down Exhibit 13, please.
16 I'd like to bring up Exhibit 12, please.
17      (Deposition Exhibit 12 marked.)
18      MS. SUM: And I ask that the videographer
19 scroll to the -- through the first 12 pages of
20 Exhibit 12.
21      Okay. Thank you.
22      I realized we scrolled through that quickly,
23 Mr. Dorsett.
24      Could we go back to the first page and I'll
25 ask the questions from there.

188

1       (The following portion of the transcript was
2  designated as nonconfidential)
3       MS. SUM: All right. Let me -- hold on one
4  moment, please.
5  BY MS. SUM:
6    Q.  After your departure from SureTrader did you
7  communicate further with the U.S. SEC?
8    A.  Yes.
9    Q.  Did there come a time that you provided a
10 declaration to the SEC?
11   A.  Yes.
12      MS. SUM: I'd like to bring up Exhibit 15.
13 I'd ask -- let me go ahead and identify the Bates. It
14 is SEC-FL-03848-E-0001431 through -- oh, it's just a
15 single Bates. 1431.
16      And could the videographer please scroll
17 through this declaration? And then we'll, please, pop
18 back up to the first page.
19      (Deposition Exhibit 15 marked.)
20 BY MS. SUM:
21   Q.  Mr. Dorsett, I realize the scrolling went a
22 little bit quickly, but is this a declaration that you
23 provided to the SEC?
24   A.  Yes, it is.
25   Q.  As we sit here today, are you aware of

185

1       (Pages 186 to 187 were designated confidential
2  and are bound separately.)
3              - - -

189

1  anything that's inaccurate or untrue in this
2  affidavit -- this declaration?
3    A.  Not -- I'm not aware of anything that's
4  untrue.
5    Q.  And did you provide this declaration to the
6  SEC voluntarily?
7    A.  Yes.
8    Q.  And what was the date of this declaration?
9    A.  This was 2020. I think it was September 2020
10 is what we saw.
11      MS. SUM: Yes. Videographer if you could
12 please just scroll to the very last page.
13 BY MS. SUM:
14   Q.  Do you see the date, Mr. Dorsett?
15   A.  Correct. So it was the 1st of September 2020.
16      MS. SUM: And you can take down Exhibit 15.
17      And, you know what, I need to do cleanup on
18 Exhibit 12 -- you don't have to bring it up, but that
19 actually was stamped confidential.
20      Counsel, are you amenable to me basically back
21 designating it since it has a confidential stamp -- that
22 is the application of Mr. Penalver?
23      MR. MATTHEW FORD: No.
24      MS. SUM: You're not willing to agree to that?
25      MR. MATTHEW FORD: No. I am willing to agree.

1  We already discussed this.  You can -- you're
2  designating it confidential for the purpose of this, and
3  then if we have the argument, we'll have it somewhere
4  down the line, but with regards to the transcript, it
5  will be designated confidentially, yes.
6      MS. SUM:  Okay.  So I'm just instructing the
7  court reporter to note that Exhibit 12 is stamped
8  confidential and the questions that resulted from
9  Exhibit 12, please.
10 BY MS. SUM:
11     Q.  All right.  When you went to go work for
12 SureTrader, what kind of technology were you provided?
13     A.  Well, Guy bought both me and himself two
14 laptops, and when we started off, we just used those.
15     Q.  And did you ever use a personal computer or a
16 personal laptop to conduct work for SureTrader?
17     MR. MATTHEW FORD:  Objection.  The leading
18 again.
19     THE WITNESS:  Yes.  I used my personal
20 computer for work as well.
21 BY MS. SUM:
22     Q.  Was Mr. Gentile aware of you using your
23 personal computer?
24     MR. MATTHEW FORD:  Objection.  Leading.
25     THE WITNESS:  Yes.  He was aware.  He would

                        190

1      Q.  Okay.  This is a declaration that was
2  submitted in the SEC's lawsuit against Mr. Gentile and
3  SureTrader, yes?
4      MR. MATTHEW FORD:  Objection.  Leading.
5      THE WITNESS:  Yes.  It appears to be a legal
6  document.
7  BY MS. SUM:
8      Q.  And, as you sit here today, are you aware of
9  any inaccuracy or incorrect statement in Exhibit 16?
10     A.  I am not aware of any inaccuracies.
11     Q.  And did you provide this declaration
12 voluntarily to the SEC?
13     A.  Yes.
14     MS. SUM:  All right.  I'm going to ask that
15 Exhibit 17 -- sorry.  Take down Exhibit 16 and put up
16 Exhibit 17.
17     (Deposition Exhibit 17 marked.)
18     MS. SUM:  I'm noting the Bates range for this
19 document is GENTILE0004495 through 4497, and it's
20 designation as confidential.
21     I ask the videographer to please scroll
22 through this document for Mr. Dorsett to review.
23     Okay.  And then please scroll all the way back up.
24     (Pages 193- 198 were designated confidential
25 and are bound separately.)

                        192

1  see it open on my desk.
2  BY MS. SUM:
3      Q.  What email did you use to conduct business for
4  SureTrader?
5      A.  Well, I used my SureTrader email, just the
6  philipdorsett@suretrader.com.
7      MS. SUM:  And let me bring up Exhibit 16.
8      (Deposition Exhibit 16 marked.)
9      MS. SUM:  And I will ask the court reporter to
10 scroll the document.
11     Thank you.
12 BY MS. SUM:
13     Q.  All right.  Mr. Dorsett, do you recognize
14 Exhibit 16?
15     A.  Yes.
16     Q.  And what is Exhibit 16?
17     A.  So this is the declaration I made on the 27th
18 of June, 2022.
19     MS. SUM:  And let's -- could you please scroll
20 all the way back up to the top?
21 BY MS. SUM:
22     Q.  Mr. Dorsett, do you see that there is what we
23 would describe as a court case and a number on this
24 document?
25     A.  Yes.

                        191

1  BY MS. SUM:
2      Q.  When was the last time you spoke with
3  Mr. Gentile?
4      A.  The last time I spoke with Guy was probably at
5  some point in August 2017.
6      Q.  Have you ever talked about the SEC's lawsuit
7  against Mr. Gentile and SureTrader with Mr. Gentile?
8      A.  No.
9      Q.  Have you -- other than the SEC, have you
10 discussed the SEC's lawsuit against Mr. Gentile and
11 SureTrader with anybody else?
12     A.  No.
13     Q.  Have you ever seen Mr. Gentile's court filing
14 titled "Answer and Affirmative Defenses" in this
15 lawsuit?
16     A.  I -- I don't remember.  I cannot say that I
17 have or have not.
18     Q.  Did Mr. Gentile ever talk to you about any
19 U.S. authority investigating either him or SureTrader?
20     A.  Yes.
21     Q.  And what were those discussions?
22     A.  Well, again, like I said, Guy used to have
23 numerous regulators coming after him.  The first one was
24 FINRA.  That was the big one.  That was, I guess, really
25 the scary one.

                        199

1  I don't know if it was so much him talking to
2  me, but he was certainly talking out loud, you know.
3  But he also made mention of the other -- of the others
4  as well, that -- you know, the SEC, they're coming after
5  him again. He doesn't really have a high opinion of
6  regulators. Every time he refers to the SEC it's a four
7  letter word, idiots. It's like -- so sometimes it would
8  seem like he just is very flippant, like he doesn't
9  care. And then other times it looks like he's taking it
10 very serious.
11         And that's one of the things that sort of
12 concerned me with his behavior. Like, he would take
13 very serious matters like it's a joke. Like oh, the SEC
14 they're just a bunch of idiots, don't worry about it,
15 Phil. Blah, blah, blah. And I would say, okay. Well,
16 maybe you should -- you know, maybe you should do things
17 different, or maybe this and that. No.
18         So it's -- he would talk to me, but he
19 wouldn't go in-depth. He would let me know they're
20 coming after me again, but no, don't worry about it.
21 They're idiots. But what we need to do is this, and
22 this, and this, and this. So it was that type of
23 conversation. He certainly didn't really take me into
24 his confidence.
25     Q.  Did you discuss with any SureTrader employee

200

1  any U.S. regulatory authority investigating Mr. Gentile?
2         MR. MATTHEW FORD:  Objection.
3         THE WITNESS:  Well, yes. Some of the other
4  senior officers were very concerned.
5         Mr. Collie was very concerned about the
6  investigations. And he had some very serious concerns,
7  and he -- well, yeah. He -- he and I would discuss
8  them.
9  BY MS. SUM:
10    Q.  What were Mr. Collie's specific concerns?
11    A.  Well, his concerns was -- was if these things
12 could somehow endanger him. Right. He was the Chief
13 Financial Officer -- you know, he had brought some
14 concerns to me before as Chief Compliance Officer. He
15 did not like how the funds of the firm were being
16 handled, and how Guy just had sole authority to move
17 client funds wherever he wanted without anyone knowing.
18 He was bothered by that and he brought it to my
19 attention, I think -- well, I know he brought it to my
20 attention. So if something ever came about it, he would
21 be able to say he discussed it with me who was the
22 compliance officer.
23         And so he was concerned -- he was concerned.
24 I don't know if the junior staff -- I think they were
25 concerned, but I wouldn't -- I didn't really have

201

1  discussions with them. I would just say oh, no.
2  Everything is going to be okay and stuff like that. But
3  Mr. Collie was very concerned.
4         Justin was concerned, too.
5     Q.  I'm sorry. Who was?
6     A.  I said, Justin was concerned, too. It was --
7  you know --
8     Q.  What were -- this is Justin Ritchie you're
9  talking about?
10    A.  Yes.
11    Q.  Okay. What were Mr. Ritchie's concerns about
12 U.S. regulators and SureTrader?
13    A.  Well, one of the big things that we were all
14 talking about and it was -- I don't think anybody liked
15 Guy's response -- I'm referring to that "Bloomberg"
16 article that Guy did. That was just horrific and no --
17 even -- you know, some of the other officers were a lot
18 closer to Guy, I would say. No one was impressed by
19 that. They were all horrified by that. I was horrified
20 by that, and I actually told Guy.
21         So I told him that was a huge mistake. You
22 know, that made absolutely no sense. I told him, again,
23 you're just putting us at risk. I said yes. The U.S.
24 authorities, you have these problems with them, but you
25 throw in fuel on the fire by saying these very insulting

202

1  things. I told him --
2     Q.  I apologize. I'm going to pause you for a
3  second.
4         What "Bloomberg" article are you referring to?
5     A.  Guy wrote a "Bloomberg" article saying
6  something about him going rogue. About he -- he's not
7  helping the FBI anymore, but instead he's going -- he
8  started recording the FBI. And in the article he refers
9  to the Department of Justice. He refers to the FBI. I
10 think he refers to the SEC. He uses lots of
11 explicatives, and it is a very -- it was very poor and
12 out of taste. And, basically, he was insulting the
13 whole U.S. authoritative system it almost seemed.
14         But the part where I had a big problem, I told
15 him, I said, the gist of this article comes across
16 like -- like it almost comes across like you're saying
17 hey, I'm in the Bahamas. You can't do anything to me.
18 F you. That was the gist of it.
19         And I said, Guy, the Commission is not going
20 to be impressed when they read this. I said -- and, you
21 know, he was just laughing -- when I first came to him,
22 he actually thought that I came to compliment him. I
23 mean, I don't understand. I said, Guy, this article.
24         And he was like, oh, did you read it?
25         I said, yes. I read it. It's horrific.

203

```
 1          He said, no.  It's not that bad.
 2          And I said, Guy, what are you doing?
 3          And then he just, oh, you know, they're a
 4  bunch of idiots and this, and that.
 5          And I said, no.  I said, but Guy, any
 6  regulator on the planet who reads this, they're not
 7  going to be impressed, including the Securities
 8  Commission of The Bahamas.
 9          And it's like he could not see that.  And the
10  other officers were -- Mr. Collie was upset -- I think
11  me and Mr. Collie spoke about this, but I remember
12  speaking to one of the other ones -- I don't remember if
13  it was Mr. Collie or Justin at the time, but I was not
14  the only one who was upset about this, you know.  And I
15  tried to plead with Guy.  I said, well, listen, that is
16  just -- in fact, I think the Commission actually called
17  him in to explain himself.  You know, it was just -- and
18  that's the type of stuff he did.  Like, he did these
19  completely reckless things putting us at risk.
20          At that time, if you were associated to Guy,
21  that, quite literally, that would be an equivalent of
22  having a close association to Putin right now in the
23  eyes of America.  It's like really -- you really want to
24  do that to your officers?
25          And it was just crazy, you know.  It was
```

204

```
 1  crazy.  But that's the type of stuff Guy did.  Very
 2  reckless, and it's like carefree.
 3          MS. SUM:  I'd like to take a short break here,
 4  and my expectation is that we'll -- we will wrap up
 5  before 4:30.
 6          THE WITNESS:  Okay.
 7          MS. SUM:  Okay.  Is 10 minutes okay with you,
 8  Mr. Dorsett, and the videographer, and the court
 9  reporter?
10          THE VIDEOGRAPHER:  Yes.  Do you want to go off
11  the record?
12          MS. SUM:  Yes.
13          THE VIDEOGRAPHER:  Time is 3:57 p.m.  We are
14  now off the record.
15          (Off the record at 3:57 p.m.  Back on the
16  record at 4:11 p.m.)
17                  --o0o--
18          THE VIDEOGRAPHER:  The time is 4:11 p.m.  We
19  are now on the record.
20  BY MS. SUM:
21      Q.  Mr. Dorsett, did Mr. Gentile ever tell you
22  that he discussed SureTrader and solicitation of U.S.
23  customers with any U.S. authority?
24      A.  That he discussed SureTrader --
25          MR. MATTHEW FORD:  Objection.
```

205

```
 1          THE WITNESS:  That he discussed SureTrader
 2  with U.S. authorities?
 3  BY MS. SUM:
 4      Q.  No.  Discussed soliciting U.S. customers with
 5  the U.S. authorities?
 6      A.  No.  I don't -- I don't think Guy had
 7  discussions with the regulators.
 8      Q.  But did he tell you that he discussed with the
 9  regulators?
10      A.  No.
11      Q.  Did ever tell you that U.S. regulators,
12  such as the DOJ, or the FBI, or the SEC told him that he
13  could solicit U.S. customers?
14          MR. MATTHEW FORD:  Objection.  Leading.
15  Compound.  Form.
16          THE WITNESS:  Well, no.  He never told me that.
17  BY MS. SUM:
18      Q.  Did Mr. Gentile ever tell you that the
19  U.S. Government assured him that SureTrader's acceptance
20  of non-solicited U.S. clients conformed with U.S.
21  securities laws?
22          MR. MATTHEW FORD:  Objection.  Leading.
23          THE WITNESS:  No.  He never told me that.
24  BY MS. SUM:
25      Q.  Did Mr. Gentile ever tell you that the
```

206

```
 1  U.S. Government assured him that SureTrader's use of the
 2  unsolicited acknowledgement agreement conformed with
 3  U.S. securities laws?
 4          MR. MATTHEW FORD:  Objection.  Leading.
 5          THE WITNESS:  He -- well, he basically told us
 6  that this would be acceptable, but he never made it seem
 7  as if -- like persons specifically told him it was
 8  acceptable if that's what you're asking.
 9  BY MS. SUM:
10      Q.  Did he say that someone from the
11  U.S. Government told him that using the unsolicited
12  acknowledgement agreement conformed with U.S. securities
13  laws?
14      A.  No.
15          MR. MATTHEW FORD:  Objection.  Leading.
16          THE WITNESS:  No.  He never told me that.
17          MS. SUM:  I'm going to -- I'm going to ask
18  that we bring back up Exhibit 15.  And then please
19  scroll to page 2.
20          Actually, just to show Mr. Dorsett what it is,
21  could you please pop up to page 1?
22  BY MS. SUM:
23      Q.  Mr. Dorsett, I'm referring to Exhibit 15 which
24  you previously acknowledged is your declaration.
25      A.  Yes.
```

207

Philip Dorsett (nonconfidential)
2/27/2023

1    Q.  I point your attention to paragraph 10 on
2  page 2.
3        Do you see where it says,
4            "At all times that I worked at
5        SureTrader, SureTrader traded
6        exclusively in U.S. securities"?
7        Do you see that?
8    A.  Yes.
9    Q.  Is that a -- that an accurate statement?
10   A.  Well, what I probably should say is, to my
11  knowledge.  In the beginning when Guy was discussing the
12  opening of the firm, he made it very clear that he
13  wasn't interested in trading foreign securities, that
14  his expertise was with U.S. securities.
15       And so, as far as I know, I never really, to
16  my understanding, had knowledge of persons trading other
17  markets.
18       MS. SUM:  Please scroll to page 3,
19  paragraph 15.
20  BY MS. SUM:
21   Q.  Do you see in paragraph 15 where it says,
22           "Gentile's efforts at promoting
23       SureTrader's brokerage services to
24       U.S.-based customers resulted in a
25       steady increase in new accounts.  From

208

1        2012 through 2017, roughly 80 percent
2        of SureTrader's customers were based in
3        the U.S.  I know these facts because I
4        reviewed the applications for new
5        customers until 2014.  The SureTrader
6        staff responsible for new accounts from
7        2014 until I left SureTrader in 2017
8        reported this information to me, and I
9        reviewed customer records in 2017."
10       Is paragraph 15 accurate?
11   A.  Yes.  Now, what I would say is that's me
12  looking back over the entire time that I was at
13  SureTrader.
14       So, for instance -- let's see, when I have
15  roughly 80 percent of SureTrader's customers were based
16  in the U.S., that's because I actually did a study one
17  time at Guy's request.  He wanted to know how much U.S.
18  clients we had.
19   Q.  When -- I'm sorry.  When did you do this
20  study?
21   A.  I think that was in -- that would either have
22  been in 2015 or 2016.  I want to say 2016.
23   Q.  Did Mr. Gentile -- strike that.
24       Did Mr. Gentile tell you why he wanted you to
25  do that study?

209

1    A.  He didn't tell me why, but, I mean, I was able
2  to decipher that it had something to do with the
3  investigations, I think, into him.
4    Q.  Okay.  And did you, in fact, perform a review
5  of the percentage of SureTrader's customers that were
6  based in the U.S.?
7    A.  Yes, I did.
8    Q.  Okay.  And how did you conduct that review?
9    A.  I think -- well, what I did was on a monthly
10  basis I chose the last, I think, business day of the
11  month, and I looked at all the clients in iBoss as of
12  that date, and I just basically sorted it on
13  jurisdiction, and then I got the percentages, and that's
14  when I got to, basically, about 80 percent.
15       So it was like 12 amounts because I did it per
16  month for the full year.
17       Now, I don't think it was -- it was a full
18  year in total, but it wasn't the end of 2016.  I just
19  did it to encompass a full year.  But I -- I don't
20  remember the exact date it was done to be honest.
21   Q.  But you performed it in approximately 2016?
22   A.  Yes.  I do remember that.
23   Q.  At the time of your departure is it your
24  belief that it was still approximately 80 percent of
25  SureTrader's customers were based in the U.S.?

210

1    A.  Yeah.  I had no reason not to think that.
2    Q.  I'm going to turn your attention to page 4,
3  paragraph 20.  If you want to take a moment to read to
4  yourself paragraph 20, and I'll ask you a specific
5  question after that.
6    A.  Okay.
7    Q.  All right.  I'm going to go up five lines from
8  the bottom of paragraph 20 starting with "Pursuant to
9  Gentile's instructions."
10   A.  Okay.
11   Q.  Did you create an account for each U.S.-based
12  applicant who completed an application and signed the
13  unsolicited acknowledgement agreement pursuant to his
14  instructions?
15   A.  Yes.  The clients' accounts were opened.
16   Q.  And your statement that,
17           "No other evaluation was conducted
18       by me, nor requested of me, nor, to my
19       knowledge, was any other evaluation
20       conducted at SureTrader to determine
21       whether the U.S.-based customer had
22       been solicited by SureTrader"?
23   A.  That's correct.
24   Q.  I'm going to go to page 5, paragraph 24.  If
25  you could please take a moment to read to yourself

211

1  paragraph 24.
2      A.  Okay.
3      Q.  All right.  Going to the third line where it
4  says,
5          "Gentile instructed me, and I
6      instructed staff at SureTrader, to
7      accept any account application from a
8      U.S. resident as long as their
9      application was complete, including
10     submission of the signed unsolicited
11     acknowledgement agreement.  No further
12     inquiry into whether the applicant had
13     been solicited by SureTrader was
14     conducted."
15     Is that accurate?
16     A.  Right.  So when I say "application was
17  complete," that includes the due diligence as well.  So,
18  yes.  That's accurate.
19     Q.  So I'm going to turn your attention to
20  paragraph 25.  If you could read that to yourself,
21  please.
22     A.  Okay.
23     Q.  Okay.  Turn your attention to the second
24  sentence,
25          "I did not deny any account

212

1          application nor am I aware of any
2      SureTrader account application that was
3      ever denied because the applicant was a
4      U.S. resident."
5      Is that accurate?
6      A.  That's accurate.
7      Q.  Turn your attention to paragraph 29.  Please
8  read it to yourself.
9      A.  Yes.
10     Q.  Okay.  So earlier you testified that you
11  reviewed the customer records.
12         Is that the same instance that you describe
13  here in paragraph 29?
14     A.  No.  This is different.
15     Q.  Okay.  Can you please explain what happened
16  when Mr. Gentile made the request referenced in
17  paragraph 29?
18     A.  Right.  So in this one he specifically wanted
19  me to state that most of our clients were not U.S.
20  residents.  All right.  And I don't think I did the
21  comprehensive review as I did in the other one, but it
22  didn't take much for me to conclude that that was not
23  the case.
24         And so I told him, you know, I couldn't give
25  you something in writing to state that some -- that most

213

1  of our clients are not U.S. residents.
2      Q.  What was the context for the request?
3      A.  Well, my understanding is that he wanted this
4  because of, you know, foreign regulators' cases against
5  him, and this was going to be to help his case.
6      Q.  And when you refer to "foreign regulators,"
7  what -- who is that specifically?
8      A.  Well, the SEC.
9      Q.  And did you have any further discussion with
10  him in response to his request to create the document
11  referenced in paragraph 29?
12     A.  Let me just add, also, this is, perhaps, one
13  of the things that moved towards me receiving that
14  warning letter, because I'm looking at the dates, too.
15  And I think I got -- this would have been something that
16  I denied probably weeks before I received that warning
17  letter, that just came to mind.
18         I'm sorry, but could you repeat the question?
19     Q.  So did you have any further discussion with
20  Mr. Gentile regarding his request for you to provide
21  this document referenced in paragraph 29?
22     A.  No.  Actually, what I recall is when I told
23  him no, I couldn't let it go.
24     Q.  All right.  I'm going to turn your attention
25  to page 6, paragraph 30.  And please read it to

214

1  yourself.
2      A.  Okay.
3      Q.  So is it accurate when you stated in the
4  declaration,
5          "When I left SureTrader in 2017, the
6      vast majority of customers remained
7      U.S. residents who were solicited by
8      advertising websites Gentile used for
9      solicitation efforts"?
10     A.  Right.  So what I really should -- I should
11  explain that.  I was basically referring to the affiliates.
12     Q.  But is paragraph 30 accurate?
13     A.  Yes.  Uh-huh.
14     Q.  When you left your employment in August
15  of 2017, was Mr. Gentile still in charge of SureTrader,
16  making decisions for the company?
17         MR. MATTHEW FORD:  Objection.  Leading.
18         THE WITNESS:  I don't know if he officially
19  was still an officer, but he certainly was making
20  decisions, including the one to fire me.  But I'm not
21  sure if he was registered as an officer at that time.
22  BY MS. SUM:
23     Q.  To the best of your knowledge, was he still
24  making decisions for the company like you previously
25  described in your testimony?

215

1      A.  Yes.
2      Q.  Did you ever express any concerns to
3  Mr. Gentile about the number and percentage of
4  SureTrader's clients being from the U.S.?
5           MR. MATTHEW FORD:  Objection.  Leading.
6           THE WITNESS:  No, I did not.
7  BY MS. SUM:
8      Q.  And why is that?
9      A.  Well -- okay.  I remember I was at SureTrader
10  for many years.  Right.  And so my reasons for not
11  having a discussion with him probably changed over the
12  years.  It was the latter, and it didn't make sense --
13  it didn't make sense -- well, first off, Guy's -- well,
14  it didn't make sense me trying to bring up stuff with
15  Guy that I knew was just going to cause an argument.
16           If I was going to cause an argument, I wanted
17  it to be based, perhaps, on Bahamian regulations.
18  Something that -- so I had to sort of choose my battles.
19  Right.
20           In the beginning I probably wouldn't have had
21  the conversation with him just through naivety.  And so,
22  you know, I never really had that type of conversation
23  with him, but it was for different reasons.
24      Q.  Do you know if SureTrader, when it conducted
25  trades, whether -- strike that.

                              216

1           "What currency did customers trade
2           in with SureTrader?
3           "ANSWER:  Well, I think for most, if
4           not all of our time, I think -- well,
5           for most of the time we had U.S. dollar
6           accounts.  I do remember, at some
7           point, I think -- anyway, I'm not sure.
8           I remember there was some discussion
9           with him opening up --"
10           And that's where it ended.
11  BY MS. SUM:
12      Q.  Okay.  Mr. Dorsett, did you want to conclude
13  your answer?
14      A.  Yes.  So I think there was some discussion
15  with him opening up a pound sterling account.  I can't
16  remember if it was actually done or not, but I do
17  remember there was some discussion.
18      Q.  Okay.
19           MS. SUM:  All right.  Give me just one moment.
20  Let me take a quick look through my notes.
21           THE VIDEOGRAPHER:  Do you want to go off the
22  record or stay on?
23           MS. SUM:  Just stay on.  It will take me less
24  than 30 seconds.
25           THE VIDEOGRAPHER:  Okay.

                              218

1           What currency did customers trade in with
2  SureTrader?
3      A.  Well, I think for most, if not all of our
4  time, I think -- well, for most of the time we had U.S.
5  dollar accounts.  I do remember, at some point, I
6  think -- anyway, I'm not sure.
7           I remember there was some discussion with him
8  opening up --
9           (Zoom meeting disconnected.)
10           (Off the record at 4:30 p.m.  Back on the
11  record at 4:33 p.m.)
12           THE VIDEOGRAPHER:  The time is 4:33 p.m.  We
13  are now on the record.
14           MS. SUM:  Thank you.
15           Madam Court Reporter, I'm not sure where folks
16  were disconnected, so could you please read back my
17  question, and then we'll pick up with Mr. Dorsett after
18  that.
19           CERTIFIED STENOGRAPHER:  Would you like me to
20  read the part of his answer that I got?
21           MS. SUM:  Yes.
22           CERTIFIED STENOGRAPHER:  Okay.
23           "QUESTION:  Do you know if
24           SureTrader, when it conducted trades,
25           whether -- strike that.

                              217

1           MS. SUM:  Thank you.
2           I'm done with my questions.  We can go off
3  the -- well, Matt, given the time today, I didn't see a
4  notice for tomorrow's start time or anything related to
5  the Webex, like if you were planning on using our Webex
6  or anything else and your court reporter.
7           MR. MATTHEW FORD:  We're going to circulate
8  the zoom link.  We'll meet tomorrow at the same time,
9  which is 9:30 a.m. Eastern Standard Time.  We expect to
10  take the full day of deposition.  So that's how tomorrow
11  will go.
12           MS. SUM:  Can you please provide a notice so
13  we know who the court reporter is?  We have to make
14  arrangements, as you would expect.  If it's not with the
15  SEC's court reporter, I have to make arrangements to
16  obtain transcripts and those internal red tape type of
17  things.
18           MR. MATTHEW FORD:  Yeah.  Absolutely.  Emily
19  Bratton, my paralegal who is in charge of doing that
20  stuff, will provide you with that information.
21           So we will be -- we'll have a court reporter.
22  We will also be recording tomorrow's deposition.
23           MS. SUM:  Okay.  Do you -- so I think we can
24  go off the record, but I did want to just finish up with
25  the folks on the defense side, please.

                              219

Philip Dorsett (nonconfidential)
2/27/2023

1      MR. MATTHEW FORD:  Sure.  Should we excuse the
2  witness then?
3      MS. SUM:  Yes.  I just wanted him to go off
4  the record and then formally finish it out.
5      THE VIDEOGRAPHER:  This concludes for today's
6  deposition.  The date is February 27, 2023.  It's
7  4:37 p.m.
8      We are now off the record.
9      CERTIFIED STENOGRAPHER:  And, Counsel, before
10  I log off, can I ask, Mr. Ford, would you like a
11  certified copy of the transcript?
12      MR. MATTHEW FORD:  Yeah.  And as quick as you
13  can get a rough, we'll take it.
14      CERTIFIED STENOGRAPHER:  Okay.  And, Ms. Sum,
15  would you like a copy of the rough?
16      MS. SUM:  Yes.
17      CERTIFIED STENOGRAPHER:  All right.  Thank
18  you.  That's all for me.
19      We are now off the stenographic record.
20      (The matter concluded at 4:39 p.m.)
21                  --o0o--
22
23
24
25

220

ERRATA SHEET
Deposition of: PHILIP DORSETT
Date taken: FEBRUARY 27, 2023
Case: SEC v. MINTBROKER INTERNATIONAL, LTD., et al.
PAGE  LINE
        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
        CHANGE: _____
     REASON: _____

        CHANGE: _____
     REASON: _____
Signed_____
Dated_____

222

CERTIFICATE OF WITNESS

I, PHILIP DORSETT, do hereby declare under
penalty of perjury that I have read the entire
foregoing transcript of my deposition testimony,
or the same has been read to me, and certify that
it is a true, correct and complete transcript of
my testimony given on February 27, 2023, save and
except for changes and/or corrections, if any, as
indicated by me on the attached Errata Sheet, with
the understanding that I offer these changes and/or
corrections as if still under oath.
_____ I have made corrections to my deposition.
_____ I have NOT made any changes to my deposition.

Signed: _____
        PHILIP DORSETT

Dated this _____ day of _____ of 20____.

221

STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION
- - -
        I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,
RSA, certify:  That the foregoing proceedings were
remotely taken before me via videoconference at the time
herein set forth; at which time the witness was duly
sworn; that a record of the proceedings was made by me
using machine shorthand which was thereafter transcribed
under my direction; and that the transcript is a true
record of the testimony so given.
        Further, that these proceedings pertain to the
original transcript of a deposition in a federal case,
and before completion of the proceedings, review of
transcript was requested.
        The dismantling, unsealing, or unbinding of
the original transcript will render the Stenographer's
Certificate null and void.
        I further certify that I am not financially
interested in the action, and I am not a relative or
employee of any attorney of the parties, nor of any of
the parties.
        Dated this 1st day of March, 2023.

        _____
        Victoria L. Valine, CSR License #3036

223

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

1                    CERTIFICATE OF WITNESS

2

3

4          I, PHILIP DORSETT, do hereby declare under

5     penalty of perjury that I have read the entire

6     foregoing transcript of my deposition testimony,

7     or the same has been read to me, and certify that

8     it is a true, correct and complete transcript of

9     my testimony given on February 27, 2023, save and

10    except for changes and/or corrections, if any, as

11    indicated by me on the attached Errata Sheet, with

12    the understanding that I offer these changes and/or

13    corrections as if still under oath.

14          _____✓_____ I have made corrections to my deposition.

15          _____ I have NOT made any changes to my deposition.

16

17    Signed: _____
                 PHILIP DORSETT
18

19    Dated this __2 7__ day of __MARCH__ of 20_23_.

20

21

22

23

24

25

                                                      221

ERRATA SHEET

Deposition of: PHILIP DORSETT
Date taken: FEBRUARY 27, 2023
Case:   SEC v. MINTBROKER INTERNATIONAL, LTD., et al.

PAGE   LINE

_14_   _23_   CHANGE: LTG → LCG
               REASON: LCG  Recorded Incorrectly

_70_   _3_    CHANGE: REHIRED → HIRED
               REASON: Recorded Incorrectly

_70_   _12_   CHANGE: WITH → WITHOUT
               REASON: Recorded Incorrectly

_72_   _9_    CHANGE: LAW → REGULATORS
               REASON: MORE CORRECT WORD

_76_   _7_    CHANGE: HAD THE → HAD A
_133_          REASON: MORE CORRECT WORD

_102_  _19_   CHANGE: TO THEM → TO HIM
_151_          REASON: RECORDED INCORRECTLY

_120_  _12_   CHANGE: VOU → YOU'RE
_165_          REASON: RECORDED Incorrectly

_134_  _22_   CHANGE: SEB → SEC
_173_          REASON: RECORDED Incorrectly

_141_  _18_   CHANGE: WE → OUR CLIENTS
_174_          REASON: CLARIFICATION

_143_  _16_   CHANGE: AND I → AND HE
_200_          REASON: RECORDED INCORRECTLY

_161_  _20_   CHANGE: AFTER ME → AFTER HIM
               REASON: CORRECTION

_____  _____  CHANGE: _____
               REASON: _____

_____  _____  CHANGE: _____
               REASON: _____

Signed _____

Dated _MARCH 27 2023_____

222

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**A**

**a.m** 7:14 8:6 60:3,5,6,8 115:19 219:9
**a/k/a** 1:9 7:9
**ability** 11:24 167:18
**able** 9:19,24 12:2 16:15 27:12,13 39:25 54:3,16 66:5 67:6 76:16 111:5 113:3,25 114:15 122:1 157:16 171:1 201:21 210:1
**absolutely** 48:25 125:13 202:22 219:18
**Accellion** 140:1
**accept** 182:5 212:7
**acceptable** 18:11 207:6,8
**acceptance** 206:19
**access** 118:15 170:9,13,17 170:19 173:1,5,8,12,19 179:10
**account** 4:5,7 15:15 48:22 48:23 49:3,5,9 52:17 54:25 111:24 211:11 212:7,25 213:2 218:15
**accountable** 149:13 157:18 160:16 161:2,5 182:13
**accounts** 22:8 38:9,20 149:14 208:25 209:6 211:15 217:5 218:6
**accurate** 208:9 209:10 212:15,18 213:5,6 215:3 215:12
**accuse** 140:17
**ACH** 111:20,24 112:2,3,13
**acknowledged** 207:24
**acknowledgement** 27:7,9 30:2 31:8,18 32:3 33:9 34:1,5,19 46:11,13 51:19 52:5,7,12,18 53:16,18 54:15 76:8,11,15 207:2,12 211:13 212:11
**Act** 4:7,9,12 5:6
**action** 10:20 223:19
**actions** 123:22 150:3 155:20 155:22
**actively** 33:4
**actual** 14:15 20:25 21:19 22:16 37:24 47:14 55:14 56:9 62:15 125:15 178:8 184:9,11
**ad** 56:11 57:2
**Adam** 2:15 8:19 140:25,25 141:15 143:19,21 153:21 153:24 154:1
**add** 110:9 113:4 214:12
**added** 39:1

**addition** 182:2
**additional** 113:4
**additions** 54:21
**address** 52:13 53:13 121:18 121:22 154:5,6
**addressed** 131:20
**adequately** 57:18
**adhere** 149:16
**adjacent** 124:10
**adjust** 10:14
**administration** 14:9
**admittedly** 20:17
**advance** 141:2
**advantage** 70:14
**adverse** 68:8
**advertise** 54:7,8,14 56:15
**advertisement** 54:11
**advertising** 26:22,23 56:6,6 56:9,9,13,17,18,19,24 57:1 57:1 215:8
**advice** 69:24
**advise** 69:23
**affect** 11:24 151:20 160:15
**affidavit** 5:12 189:2
**affiliate** 45:6,9 47:8,14,18,19 60:13,15,21 64:8,12 65:16 67:1 68:3,22 69:3
**affiliates** 30:18,25 46:23,25 47:25 48:2,6 50:9,12,24 51:17,18 52:4 60:23 62:12 63:14,16,17 64:1,4,10,19 64:25 65:16 66:22 69:2 112:19 119:1,2 215:11
**affiliates'** 45:24 50:7 61:17 63:9
**affiliation** 38:25
**affirm** 8:25
**Affirmative** 199:14
**aford@fordobrien.com** 2:18
**aftermath** 159:25 160:2
**agenda** 164:18
**ago** 20:18
**agree** 19:22 34:6,11 47:21 47:23 134:21 179:11,12 189:24,25
**agreeing** 30:5
**agreement** 27:8,9 30:2 31:8 31:18 32:3 33:9 34:1,5,19 46:12,13 48:11 49:22 51:19 52:5,7,12,18,23 53:16,18 54:15 64:3,15 76:8,11,15 160:10,12 170:18 207:2,12 211:13 212:11

**agreements** 63:25 64:9 75:24,25 76:6
**ahead** 53:23 62:2,10 142:10 144:25 145:19 147:21 152:11 188:13
**al** 8:1 222:3
**Alice** 2:4 8:13 68:6 140:25 141:22 143:1 146:7 153:8 153:21
**Alise** 2:5 8:15
**allow** 66:12 139:24
**allowing** 26:19
**allows** 141:10
**altogether** 27:25
**amenable** 189:20
**America** 1:8 4:13 5:1 7:8 13:9,14 58:12 123:8 124:1 204:23
**amicable** 184:5
**AML** 21:12
**amount** 27:10 28:16 46:25 48:3 64:24 67:4,10 71:24 74:3 117:15
**amounts** 65:15 210:15
**ample** 142:17
**and/or** 221:10,12
**anger** 128:22
**answer** 11:24,25 12:3 18:5 53:23 62:2,10,16 68:14 69:14 126:3 133:21 144:1 145:16,18 146:6 153:3,11 169:11 180:12,12 199:14 217:20 218:3,13
**answered** 153:18
**answers** 180:15
**Antonio** 114:10 116:22 117:1 121:7 168:7
**anybody** 13:23 74:6 199:11 202:14
**anymore** 133:11 158:1 171:18 179:2 203:7
**anyway** 21:12 45:3 130:4 158:15 183:20 217:6 218:7
**apologize** 17:8 32:12 203:2
**apparently** 27:8 135:3 145:16
**APPEARANCES** 2:1
**appeared** 2:24 7:18
**appearing** 7:15 11:14 13:6
**appears** 192:5
**appease** 127:24 133:19
**applicant** 211:12 212:12 213:3
**application** 4:5,7 5:3 21:4 22:17,18,19 37:24,25

**47:19 54:20 55:10 75:12 75:14,16,18,18,19,21 76:6 76:9,10,12 189:22 211:12 212:7,9,16 213:1,2
**applications** 27:20 35:23 53:3,7 209:4
**apply** 21:21 22:23 67:8 117:14
**appoint** 71:4 72:12,16
**approached** 16:13 18:16
**approval** 21:19 41:2 119:7 119:12 178:16
**approve** 40:23 119:9,11
**approved** 21:24 40:8,10
**approving** 21:3 53:2,17
**approximate** 28:9 46:6 134:8
**approximately** 15:17 22:2 46:7 57:4 63:7 126:19 144:10 210:21,24
**April** 168:4
**area** 109:20 110:14
**arguing** 143:8
**argument** 128:14 142:20 174:19 190:3 216:15,16
**arrangement** 47:12
**arrangements** 219:14,15
**article** 202:16 203:4,5,8,15 203:23
**aside** 148:19
**asked** 18:21 32:14 43:11 44:17 49:14 50:11 108:9 109:22 115:11 129:24 131:10 132:2 141:8 143:25 162:4
**asking** 117:16 132:16 133:13 134:4,5 140:3 170:4 207:8
**assign** 156:14
**assigned** 61:11
**assigning** 155:15
**assist** 16:15
**assistance** 20:10
**associated** 35:3 136:1 204:20
**associates** 127:22
**association** 204:22
**assume** 50:22
**assumed** 50:21 162:2 166:7
**assuming** 50:6
**assured** 206:19 207:1
**attached** 27:19 66:21 115:23 147:8,9 221:11
**attachment** 168:18
**attacked** 165:7

Philip Dorsett (nonconfidential)
2/27/2023

2

**attempt** 72:12
**attend** 60:20
**attention** 113:3 175:18
201:19,20 208:1 211:2
212:19,23 213:7 214:24
**attest** 27:10 178:22
**attesting** 174:6
**attorney** 223:20
**ATTORNEYS'** 6:1
**August** 125:23 184:10,12
199:5 215:14
**Austin** 2:13
**authenticated** 113:15
**authoritative** 203:13
**authorities** 33:19 54:16
163:16 167:14 202:24
206:2,5
**authority** 73:1,17,19,20
74:17 142:18,23 180:18
199:19 201:1,16 205:23
**authorizing** 174:15,17
**automated** 55:10,11
**automatically** 149:21
**availability** 112:9
**available** 52:9 112:4,21,24
169:14
**Avenue** 2:6,16
**aware** 23:19 48:17,24 58:14
119:5 120:12 141:21
146:24 178:7,9 188:25
189:3 190:22,25 192:8,10
213:1
**awe** 24:3
**awhile** 17:24 132:20

**B**

**B** 2:12 4:1 42:21,22,24
**Bachelor's** 14:10
**back** 12:11 15:6,15 18:3
20:3,17 22:4,16,25 23:25
25:1 27:22 29:22,23 30:1
31:16 33:20 34:19 37:23
43:22 44:23 45:4 54:23
55:16,16,25 57:15 59:25
60:5 65:7 68:17 70:5 72:7
75:12 108:18 113:22
114:18 115:12,14 117:17
125:5,7,15,17,25 126:5,12
127:9,14 130:8,20 132:19
136:24 138:5 141:9 142:16
144:1 146:4,4 148:6
154:23 158:9 159:14 160:2
160:24 161:8 162:1,25
165:15,22 167:25 169:19
171:14 173:16,23 174:9

183:16 184:24 188:18
189:20 191:20 192:23
205:15 207:18 209:12
217:10,16
**backed** 25:23
**background** 20:19 25:2
**backgrounds** 36:6
**bad** 157:5 161:9 166:15
204:1
**Bahamas** 18:9,13 19:8
21:11 23:14 38:19 48:13
48:16 70:25 71:18 131:6
156:17 163:9 182:21
203:17 204:8
**Bahamas'** 109:15
**Bahamian** 23:4,6 24:24 26:4
49:16 55:4,19 109:21
165:20 216:17
**Balandian** 13:1
**bank** 112:12,22 156:24
**banking** 4:16 111:6,12
**base** 51:4,5
**based** 28:11 50:14,15,16,19
51:4,12,13 65:16 130:17
131:3 142:20 143:7 169:13
174:18 209:2,15 210:6,25
216:17
**basic** 12:12 34:15 36:19
47:9 59:5 75:17
**basically** 14:16 19:10,12
20:8 21:5 22:6,20 23:2
30:3,16 33:3 34:12 35:20
35:21,25 39:19 47:18 49:1
49:2,10 50:15 73:7 75:25
127:1 138:20 149:14,20
156:2 160:5,10 178:22
180:11 189:20 203:12
207:5 210:12,14 215:11
**basis** 113:14 210:10
**Bates** 4:5,8,11,14,17,19,23
5:2,4,7,10,13 110:20 111:8
114:5 153:16 171:5 175:3
188:13,15 192:18
**bathroom** 124:9
**bathrooms** 124:17
**battles** 216:18
**becoming** 60:22 71:10
**beginning** 53:5 59:3 73:3
75:17 76:7 110:9 127:8
128:7 130:9 149:9 150:14
150:20 173:3 208:11
216:20
**behalf** 8:14
**behavior** 163:14 165:23
200:12

**belief** 170:12 210:24
**believe** 28:22 60:13 74:20
110:15 125:23 141:17
172:20
**believes** 136:5
**Benasillo** 116:4
**benefit** 127:25
**benefits** 159:1 182:1,8
**best** 28:1 35:2 120:7 149:20
167:18 183:9 215:23
**better** 67:10 68:1 134:2
138:11,12,16,21 157:22,25
160:3 161:8 165:1 166:13
166:21 182:16
**big** 21:12,13 30:20 44:13
49:11,12,13 54:8 55:9 57:6
66:20 75:2 120:9 170:15
172:13 176:6 199:24
202:13 203:14
**bigger** 10:11 37:21 45:10
57:8,9 63:2 64:19 143:4
**biggest** 136:23
**billing** 117:15
**bit** 9:22 25:5 26:1 36:25 44:3
108:15,16 111:3 115:14,15
118:18 127:13 131:19
134:1 146:5 154:21,23
188:22
**blah** 158:11,11,11 200:15,15
200:15
**blaming** 166:3
**blasted** 48:25 49:8
**blatant** 150:25
**Bloomberg** 202:15 203:4,5
**board** 165:6
**boasted** 128:1
**boss** 58:17 74:24
**bother** 61:7
**bothered** 201:18
**bottom** 114:16,18 115:13
146:2,18 175:18 180:21
211:8
**bought** 190:13
**bouncing** 22:25
**bound** 1:18 5:17 6:2 76:23
185:2 192:25
**bow** 138:25
**Bratton** 219:19
**break** 25:6 59:12,15 60:12
108:4 159:6 205:3
**breaking** 32:8,8,10 73:21
**Brickell** 2:6
**briefly** 14:6 21:25 35:13
36:17 57:3 147:17
**bring** 9:15 64:4 71:23

108:11,14 110:22,25
113:11,18,22 119:25
132:21 139:5,7 141:4,9
149:19 150:19,20 152:16
162:20,21 164:12 166:22
167:21 168:18,19 175:1
184:16 188:12 189:18
191:7 207:18 216:14
**broader** 23:5
**broker-dealer** 15:7 16:14
19:6 20:4 23:20 48:13
49:16 135:1,4,19 137:5
**broker-dealers** 19:4 24:1,6
**brokerage** 208:23
**brought** 13:7 34:25 46:22
113:2 149:18 150:1 169:16
169:20 176:8 177:24
201:13,18,19
**brushed** 162:23
**building** 36:21 124:22
**built** 165:10
**bulk** 76:5
**bunch** 20:10 29:8 172:10
173:16 200:14 204:4
**business** 13:10 14:8 16:10
16:13,25 17:1 18:18 19:21
30:10,12 41:18 42:10,13
42:20,21,22,24,25 43:6,10
44:13,18 46:14 47:12 57:3
70:23 72:18 125:18 127:22
129:13 136:11 137:6
150:11 169:18 191:3
210:10

**C**

**C** 2:15
**cahoots** 164:3
**California** 1:24 7:17
**call** 30:11,17,17,17,17 38:3
38:8,10,11,14,18 39:7 43:2
44:8 72:5 110:12,13
131:13 142:24 143:24
144:4,25 145:6 146:17
**called** 7:20 13:8,13 18:22
31:1 45:5,9 61:2 143:25
145:23 148:18 204:16
**calling** 41:18 109:15 143:22
**calls** 134:24 166:6
**calmly** 166:17
**Capital** 14:23
**Cara** 2:12 8:20
**care** 163:9 200:9
**career** 21:6 163:10
**carefree** 205:2
**careful** 29:19,20 128:25

Philip Dorsett (nonconfidential)
2/27/2023

3

179:2
**cares** 133:2
**Caribbean** 135:3,15
**carried** 74:2
**case** 1:6 7:6 8:4 12:24,25
27:12 38:1,20 55:22 62:22
140:22 158:2 162:18
191:23 213:23 214:5 222:3
223:12
**cases** 214:4
**cause** 49:6 136:14 216:15
216:16
**cautious** 173:23
**Cayman** 135:2,14
**cc** 116:2,23 176:20 179:21
**cc'd** 119:6,10,13
**CCO** 20:5,13
**CEO** 20:5 58:13,20,21 69:8
69:11,15 70:6,7,15,25 71:4
71:7,10,15 72:12,16,22
119:23 120:11 121:2,4
125:16 156:10 182:23
**certain** 27:10 48:1 52:8
72:13 74:3 130:23 150:1
**certainly** 37:17,22 40:11
46:21 57:20 67:15 68:18
73:11,15 74:21 118:25
119:1,11,13 121:4 122:6
125:16 130:12 149:24
157:9 200:2,23 215:19
**Certificate** 221:1 223:17
**CERTIFICATION** 223:1
**certified** 7:17 8:23 9:4 68:18
76:18 110:3 142:14 217:19
217:22 220:9,11,14,17
**certify** 221:7 223:4,18
**chain** 117:12 146:4 154:12
154:17 174:9 179:15
**challenge** 130:8,12,15,25
157:16 163:1
**challenging** 139:1
**chance** 140:8
**change** 58:9 120:25 121:4
121:21 150:9 152:7 158:4
171:16 222:4,6,7,9,10,12
222:13,15,16,18,19,21,22
**changed** 58:3,11 59:2,5
76:9 125:6 126:11 216:11
**changes** 221:10,12,15
**character** 44:1
**charge** 66:6 120:21 215:15
219:19
**charged** 67:4 163:10
**chart** 168:11 169:6
**chatroom** 45:20,23 60:15,21

61:2,22 63:9,14
**chatrooms** 52:10 61:18 62:7
62:25 63:2
**check** 26:4 38:8,20 53:24
184:10
**checked** 52:19,25
**checks** 53:19
**chief** 20:14 22:1 23:2,12
59:2 70:3 72:8,10 121:8
131:8 149:11,15 150:18
151:3,4,17,25 152:1,3,7
155:16,24 156:15 157:6,7
157:8 158:4 162:10 172:1
178:1 201:12,14
**child** 24:1
**choice** 157:10 174:2
**choose** 216:18
**chose** 210:10
**Chris** 181:3
**Christmas** 25:18,20
**Christopher** 5:4
**chronological** 180:20
**chronologically** 146:18
**cipher** 171:1
**circle** 36:22 163:17 164:4
**circles** 43:3 72:2 128:3
144:3
**circulate** 219:7
**citizens** 54:13
**civil** 10:20
**clarification** 129:5 171:4
**clarify** 12:6 18:8 67:18 142:5
**Class** 20:3
**clean** 180:10 183:9,10,17,24
183:25
**cleanup** 189:17
**clear** 73:24 144:9,15 154:12
171:21 208:12
**clearly** 12:9 37:2 42:5
**client** 17:17 19:12 27:10
33:14 34:11 47:22 49:25
51:4,5 52:16 67:7,9,13,19
67:20 75:22,24,24 145:11
145:12 153:4 154:18 179:9
201:17
**client's** 144:17 146:13
153:19 154:1
**clients** 19:5,6,10 22:9,11
23:3 24:18,22,25 25:24
26:6,12,14,20,21,25 27:14
29:8,16 30:4,15,16,22 31:1
33:4,19 34:6 36:11 37:23
38:10 39:25 45:25 46:15
46:25 48:17 49:2,11,21
50:4,7,9,17,20 51:8,9,11

52:21,24 54:14,25 55:20
56:2 61:4,5 65:21,22 67:1
67:5,15,22,22 68:24
110:12 111:23,25 112:1,2
112:18 118:14 170:9,13,16
170:19 172:25 173:8,9
179:10 206:20 209:18
210:11 213:19 214:1 216:4
**clients'** 60:24 62:16 211:15
**close** 204:22
**closed** 32:18
**closely** 55:14
**closer** 10:9 176:16 202:18
**clue** 166:1
**code** 109:20 110:14
**colleague** 8:16
**colleagues** 8:19
**Collie** 116:22 119:6 120:11
121:2,5,7 122:6 168:7
173:2,14,17 174:10 176:7
178:9,15 179:17,23 201:5
202:3 204:10,11,13
**Collie's** 201:10
**colloquy** 145:17
**come** 22:12 25:16 26:24
27:1,16 29:22,23 33:11
48:17 51:14 71:12 72:6
122:14 123:1,4 124:25
125:2,4,25 126:15 132:15
133:8 135:21 136:15,16
142:16 150:3 161:11
168:14 173:6 181:17 188:9
**comes** 160:21 203:15,16
**comfortable** 162:24
**comfortably** 57:18
**coming** 23:4 26:10 28:6,20
35:23 36:11 44:13 51:9,25
68:3,21 135:25 175:2
199:23 200:4,20
**commencing** 7:14
**comment** 43:19
**commercial** 56:10 57:2
**commission** 1:4 2:4 7:4
8:15 18:1,6,7,8,9,13 20:22
21:16 44:21 66:16 68:1
70:8,17 71:18 72:5,23
119:21 120:12,13 131:6
149:12 156:17 157:11
158:5 161:3,13 163:9
203:19 204:8,16
**commissions** 66:6
**communicate** 122:1,17,20
122:23 125:13 188:7
**communication** 75:8 118:11
131:9,18 176:6

**communications** 47:17
117:21 118:10 121:11,19
121:20 129:10
**companies** 50:14
**company** 13:8,13 15:10,12
17:21 18:18 40:11 41:5
47:10 69:18 70:25 71:7,10
72:19 119:15,20 120:8,17
120:22,23,24 121:11,12
122:17 123:3,7,11,18
125:1,9,12,20,25 126:6,7
126:25 131:7 132:11,17
140:10 148:16 151:20
156:8,9 160:15 171:11
172:4,15 182:24,24 184:8
215:16,24
**company's** 118:20
**compared** 125:8
**compelled** 149:3
**compensated** 158:2
**compensation** 64:2,3,15
119:2
**competent** 180:17,18
**complain** 66:23
**complained** 38:12
**complaining** 48:2 62:13
63:18 65:3,5,7,9,10 173:10
**complaint** 110:11
**complaints** 21:8
**complete** 212:9,17 221:8
**completed** 14:13 211:12
**completely** 158:10 204:19
**completion** 223:13
**compliance** 14:13,14 17:6
20:1,7,14,20 21:9,11,13
22:1,7 23:2,12 25:2 27:17
33:12 36:1 55:2 59:2 71:23
72:8,10 119:4 122:10
131:8 133:15 135:13
137:15,16,25 149:11,15
150:18 151:1,2,3,5,8,17,20
151:23,25 152:2,3,8
155:16,24 156:15 157:7,9
158:4 160:16 162:4,10
166:4 172:1 182:11,22
201:14,22
**complied** 23:9,13
**compliment** 203:22
**components** 75:15
**Compound** 206:15
**comprehensive** 213:21
**computer** 190:15,20,23
**concern** 29:3 160:17
**concerned** 28:5 46:3 55:4
55:20 200:12 201:4,5,23

201:23,25 202:3,4,6
**concerning** 138:9
**concerns** 28:24 60:24 71:23
71:24 164:13 165:20
166:22 167:10 201:6,10,11
201:14 202:11 216:2
**conclude** 213:22 218:12
**concluded** 220:20
**concludes** 220:5
**conclusion** 163:15
**concurred** 38:21
**conditions** 76:3
**conduct** 53:19 129:15
190:16 191:3 210:8
**conducted** 211:17,20
212:14 216:24 217:24
**conducting** 12:7
**conference** 12:8 124:11
**confidence** 130:11 200:24
**confident** 42:14 130:8,9
**confidential** 1:18 4:6,9,12
5:5,14,17 6:1 76:22 185:1
189:19,21 190:2,8 192:20
192:24
**confidentiality** 164:17
**confidentially** 164:14 190:5
**conformed** 206:20 207:2,12
**confrontation** 129:25 160:4
166:12 171:21 176:7
**confrontations** 171:17
**congratulating** 58:19
**congratulations** 71:14
**connection** 114:1
**considerable** 40:20
**considered** 56:7
**considering** 161:22
**constant** 75:8
**constantly** 41:15 43:22
53:11 60:23
**constituted** 74:20
**consultant** 169:17
**consulted** 176:14
**contact** 30:20 67:12 109:4
142:11 163:15 164:1,12
165:9,12
**contacted** 17:2 19:24 63:4
72:24 165:21 166:11,14
167:10 173:10 181:1
**contemplated** 164:8
**content** 40:5,8
**contents** 146:25 156:2
**context** 214:2
**continuation** 33:22
**continue** 118:3 146:14
167:11 175:19 176:1

181:25 182:1
**continued** 161:10 167:17,17
171:10
**continuing** 33:22
**contract** 65:17
**contracts** 47:14
**conversation** 29:3 31:19,21
42:20 71:19 74:13 138:2
165:23 200:23 216:21,22
**conversations** 43:9 44:19
51:12 65:2 150:8 166:8
**cool** 134:1 138:16,17 171:20
171:20
**Cooper** 122:7,9,10,14
126:25 134:15,18 152:5
155:15 156:15 157:9
160:22 168:7 173:6 175:25
176:3,8 177:12 179:7
181:15 183:5
**copied** 114:10 121:11,15
**copy** 75:19 220:11,15
**corner** 36:21
**correct** 11:16 13:11,12
15:19 48:3 52:1,2 66:17
71:8 113:1 124:24 129:9
154:14 179:25 189:15
211:23 221:8
**corrections** 221:10,13,14
**correctly** 60:16 116:19
145:24
**corridor** 124:13
**counsel** 3:2 8:11,15 9:5,13
139:10 152:18 175:5
189:20 220:9
**countries** 22:12
**country** 53:15 109:13
110:13 135:3,15
**country's** 23:13
**counts** 58:25
**couple** 27:23
**courage** 150:23 165:10
**course** 14:14 74:22 118:21
144:12 173:12 181:8
**court** 1:1 7:1 8:2,3,8,9,21
12:10 59:19 68:16 159:8
190:7 191:9,23 199:13
205:8 217:15 219:6,13,15
219:21
**Courtney** 115:19 116:1,10
117:3
**covered** 154:10
**crazy** 57:12 204:25 205:1
**create** 39:6 211:11 214:10
**created** 34:2 40:4 110:7
112:13

**credit** 57:16 127:13
**cross-examination** 68:8
**CRR** 1:24 223:3
**CSR** 1:24,24 223:3,24
**culminated** 172:14
**currencies** 112:4
**currency** 112:6 217:1 218:1
**current** 14:22
**currently** 14:23
**customer** 35:22,22 53:2,17
180:24 209:9 211:21
213:11
**customers** 18:25 19:2 25:9
25:12 27:24 28:2,4,8,9,10
28:19,25 29:1,4,13 38:13
39:7 41:6 46:8,19 51:5,18
51:22,24 52:4,6 57:5 58:7
58:8 65:19 66:1,15 67:3
68:3,21 205:23 206:4,13
208:24 209:2,5,15 210:5
210:25 215:6 217:1 218:1
**cut** 129:5,11 183:10

_____

**D**

**D-O-R-S-E-T-T** 9:12
**d/b/a** 1:8 7:8
**Da-da-da-da-da** 33:10
**Dac** 116:4,9
**dac@daytradingradio.com**
116:4
**date** 8:5 37:12 117:20
125:22 153:14 154:24
184:7,9,11 189:8,14
210:12,20 220:6 222:2
**dated** 5:11,12 176:19 179:18
221:19 222:25 223:22
**dates** 120:5 144:21 214:14
**day** 18:22 23:20 27:6 30:9
30:10 42:17 45:14 47:10
48:7,10,15 49:15 50:12
51:10 58:15 59:3 69:10
70:16 71:4 72:2,4,7 75:7
117:2 181:13,13 210:10
219:10 221:19 223:22
**day-to-day** 118:20,23
119:15 120:24
**days** 14:3
**deal** 49:11 60:24 72:18
**dealing** 40:13 62:14 63:19
70:24 118:25 119:1 128:9
173:25 179:3
**dealings** 64:22 181:4
**deals** 41:17 42:17 43:9
44:18 46:14 51:3 64:21
67:2

**dealt** 64:18
**debate** 118:14
**decide** 58:24 151:7
**decided** 62:5 158:12 179:1
181:19
**decipher** 210:2
**decision** 26:17 39:6,9,12
51:1 60:25 67:13 71:4
74:18,20
**decision-maker** 113:6
**decision-making** 118:21
126:7,11
**decisions** 73:2 126:14
151:19,20 157:17 161:4
182:13 215:16,20,24
**declaration** 5:9,11 188:10
188:17,22 189:2,5,8
191:17 192:1,11 207:24
215:4
**declare** 221:4
**defendant** 8:19
**Defendants** 1:10 2:10 7:10
**defense** 219:25
**Defenses** 199:14
**definitely** 17:12,13,14 18:2
27:5 28:15 31:14 37:18
39:17 41:8 46:9,17 63:2
68:24 70:10 110:18 119:10
**definitively** 51:10 65:13
72:20
**delete** 132:8,8,11,17
**demanded** 72:6
**denied** 213:3 214:16
**deny** 52:17 145:12 212:25
**departed** 59:4 110:16,17
184:3
**Department** 203:9
**departments** 53:8 57:24
**departure** 118:12 156:8
172:15,19,23 184:8 188:6
210:23
**depending** 122:6
**deposed** 12:16,20,21
**deposit** 67:23
**deposition** 1:15 4:4 7:25
9:17 10:14,20 11:4,22
12:13,23 13:3,19 14:3
18:10 31:22 108:20 111:1
113:19 139:13 140:5,7,7
141:3,23 142:2,3,19,24
143:11,18,22 144:2,5,14
145:3,6,10 154:25 167:22
168:20 175:12 184:17
188:19 191:8 192:17
219:10,22 220:6 221:6,14

221:15 222:2 223:12
**deposits** 117:3
**describe** 14:6 36:17 56:6
57:4 64:2 75:15 111:22
118:8,23 125:8 134:20
146:21 147:17 181:11
191:23 213:12
**described** 31:17 41:21 58:7
71:20 123:2 128:6 129:22
130:25 145:21 148:12
167:11 215:25
**DESCRIPTION** 4:3
**DeShawn** 2:22 8:8
**designated** 76:22 108:2
185:1 188:2 190:5 192:24
**designating** 189:21 190:2
**designation** 192:20
**desk** 15:12 20:23 36:25
41:22 73:15 124:12,16
137:10 191:1
**desks** 36:24 53:11 169:24
171:2
**details** 64:18 181:22
**deteriorated** 127:8
**determine** 141:24 211:20
**diagonal** 36:25
**diagonally** 37:5
**difference** 42:9 125:8 149:7
**different** 17:4 56:22 61:14
61:15,17,18,18 110:13
121:17,22 123:6,18,22
128:10,24 130:5,13 134:20
148:18 150:17 163:2,4,6
167:15 173:22 200:17
213:14 216:23
**differently** 121:23
**difficult** 24:25 181:17
**dilemma** 173:13
**diligence** 22:11 55:21
212:17
**diminish** 125:3
**dinner** 16:19
**direct** 66:25 109:18 118:15
170:9,13,17,19 172:25
173:5,8,12,18 175:17
179:10
**direction** 74:22 223:9
**directly** 45:21,24 46:1 62:16
67:6 72:7 112:16 123:10
**director** 155:14,23 158:1
**disagreement** 138:10
159:22 178:19
**disagreements** 126:16
138:7 145:22 171:12

**disassociate** 125:11
**disconnect** 114:1
**disconnected** 217:9,16
**discovery** 141:7,25 143:14
144:13
**discuss** 14:2 41:5 51:16,20
52:3 112:23 146:25 150:3
156:1,8 158:18 176:23
177:1,3,5,6 200:25 201:7
**discussed** 16:19,22 19:20
26:23 32:1 33:2,3,7,8,17
34:1 54:5 113:2 116:25
156:11 190:1 199:10
201:21 205:22,24 206:1,4
206:8
**discussing** 17:19 28:23
43:15 208:11
**discussion** 31:7 33:20
64:23 65:5 121:16,18,25
122:4,4 144:19 170:21
214:9,19 216:11 217:7
218:8,14,17
**discussions** 24:16 54:20
56:4 199:21 202:1 206:7
**dismantling** 223:15
**dismisses** 149:21
**dispel** 164:5
**dispute** 130:1 143:14
**distance** 38:8,11,14,18
110:13
**District** 1:1,2 7:1,2 8:2,2,3,3
**divorce** 128:18,21
**document** 10:23 11:1,13
27:12,18 31:18 34:3
111:15 141:7,13,20 142:6
142:7 145:10 168:23 169:8
169:12 170:6 191:10,24
192:6,19,22 214:10,21
**documentation** 156:16
**documented** 158:14
**documents** 20:11 21:18
52:8 65:14 131:7,10
132:11 139:17 140:6,18
141:6 145:1 146:14 153:1
153:17
**doing** 13:10 22:11 35:7,21
41:20,24 42:6 43:21 46:2
46:16,17 55:21 62:21 63:3
63:5,21 67:9 73:25 108:16
112:21 126:16 128:13
130:16 131:1 156:10
161:23 163:11,13,22 165:5
165:25 166:7 167:11,17,17
174:1,22 204:2 219:19
**DOJ** 206:12

**dollar** 56:16 217:5 218:5
**dollars** 54:11
**door** 123:6,7,9,16,23,24
**Dorsett** 1:16 5:11,12 7:19,25
9:11,13,20 10:9,16 11:1,3
11:5,11 53:23 59:22 60:12
68:14 108:9,22 111:5,11
111:19 113:20 114:8,20
120:3 139:15,19 140:9
144:10,23 145:21 146:10
146:17 147:14,23 148:10
152:19 153:22 154:5,13,16
155:2 159:7,20 165:12
167:24 168:3 175:10
184:23 188:21 189:14
191:13,22 192:22 205:8,21
207:20,23 217:17 218:12
221:4,17 222:2
**Dorsett's** 154:9
**doubt** 49:23
**download** 37:24,25 47:20
**due** 22:11 55:21 212:17
**duly** 223:6
**dumbed** 22:19 75:20
**dumped** 144:17
**duplicated** 62:25
**duration** 10:13
**duties** 35:13 47:2 58:9,11
59:1,5

**— E —**

**E** 4:1
**earlier** 24:17 48:19 50:11
63:25 69:7 75:13 108:9
109:22 127:6 134:23 150:8
150:11 179:24 183:2
213:10
**early** 17:11 18:3 31:13,14
36:2 39:17 40:15 131:4
136:24 161:11
**earn** 18:20
**easier** 39:25 52:10 56:1
**eastern** 7:14 8:7 219:9
**easy** 54:24 144:24 145:3
**Ed** 178:7
**education** 14:7
**Edward** 122:10 152:5 168:7
**effect** 51:15 174:15,16 179:8
180:15,17
**effective** 184:7,9
**efficient** 61:9
**effort** 125:11 184:5
**efforts** 208:22 215:9
**eight** 36:23
**either** 12:9 32:8 59:21 67:3

67:23 69:3 73:6 119:9
121:2,22 141:5 199:19
209:21
**electronic** 55:11
**email** 4:19,21,22,23 5:7 67:9
67:11 114:9,11,18 115:1,7
115:13,15,18 116:1,7,22
117:12 118:11 121:17,20
121:22,25 122:23 131:5,7
131:20 141:25 144:9,16
145:13 146:4,5,7,9,12,18
146:22,24 147:3,6,9
152:21,24 153:14,15,22
154:5,5,8,12,17 155:11
156:2,3,6,21 168:4 169:5
173:14 174:9,23 175:14,24
176:19,23 177:2,6,13,17
177:21 178:3,11,14,15
179:14,17 180:1,20 181:10
181:12 191:3,5
**emailing** 122:1
**emails** 48:2 117:9 119:14
122:25 131:22 140:10
152:24 153:2,9 173:16
**embassy** 164:8
**embedded** 144:16 146:13
**embeds** 145:10
**embryonic** 39:22
**Emily** 219:18
**employ** 36:5
**employee** 61:11,12,21 62:6
63:8,13,13 157:7 200:25
223:20
**employees** 34:21 39:11
60:14,20 73:2,18
**employment** 14:22 118:2,21
125:19,25 171:10 215:14
**encompass** 210:19
**encounter** 171:11
**endanger** 201:12
**ended** 38:5 218:10
**enjoyed** 163:20
**enlarge** 108:15 111:2
**ensure** 55:6
**enter** 16:25 17:1
**entered** 173:22
**entering** 19:20
**entire** 124:7,15,21 150:6
181:25 182:1 209:12 221:5
**entirely** 61:16 161:23,24
**entirety** 11:1
**entitled** 126:23
**entity** 13:16
**equivalent** 204:21
**Errata** 221:11 222:1

error 116:13
especially 39:17 64:19 67:24 173:25
Esq 2:4,5,5,11,12,15,16
essence 47:22 76:2 151:17 173:7,17 174:5,10 183:12
establish 16:14,21 70:23
established 22:5 30:14 48:21
estimate 15:22 17:7,20 27:23 28:10 31:10,19 46:6 46:18 63:7
estimated 27:25
estimation 131:3
et 8:1 222:3
ethic 138:20,24
Europe 50:19 51:11
evaluation 211:17,19
evening 141:14 142:6
event 63:12,23,24 172:21
events 134:9 172:9
eventually 16:12 30:17,19 35:9 36:5 45:17 61:13 128:18 170:1,7 176:13 179:7 181:22
everybody 39:19 41:19 52:20
Everything's 138:16
evident 156:12 160:12
evolve 16:11
evolved 59:6 75:17
exact 65:13 120:5 121:24 181:21 210:20
exactly 40:20 138:23 169:11
examination 3:2,4 9:7 129:15
examined 7:21
example 47:10 48:7 49:14 130:24 134:3,20
examples 134:5 138:6
exception 127:4
exchange 1:4 2:4 4:7,9,12 5:6 7:4 8:14 18:7 115:1 159:20 161:12 163:5 168:13 175:14 181:10,12
exchanged 141:6
excited 18:19 19:17 43:23 44:12 46:4,5
exciting 46:5
exclude 142:19
exclusively 208:6
excuse 123:24 142:14 153:14 169:5 180:21 220:1
executives 179:21
executives@SureTrader....

176:21
exemplified 163:5
exhibit 4:3,4,5,7,10,13,16,19 4:21,22,23 5:1,3,7,9,11,12 9:16,17 11:12,18 108:11 108:14,20,23 110:20,25 111:1,5,8,11 112:24 113:12,14,18,19 114:5,5,8 115:2 117:12 119:25 139:5 139:8,9,11,13 142:3 146:3 146:19 152:16,17 154:10 154:25 155:3 156:3 167:21 167:22 168:19,20,24 169:4 169:5 171:7,8 172:17 175:1,3,5,11,12 180:21,22 184:15,16,17,20 188:12,19 189:16,18 190:7,9 191:7,8 191:14,16 192:9,15,15,16 192:17 207:18,23
exhibits 5:17 140:2,21 141:1 143:14 153:15 171:6
exist 65:14 149:17
existed 49:24,24
existing 67:20,21
expand 10:3
expect 38:7 163:8 219:9,14
expectation 48:5 205:4
expected 128:10
expensive 56:14
experience 20:21 24:7 40:20 56:13 156:7
expert 170:22
expertise 208:14
explain 18:20 61:10 62:5 173:15 180:16 204:17 213:15 215:11
explained 18:23 123:25 160:22 173:4
explaining 19:1 24:6 158:15
explanation 123:22
explicatives 203:11
express 216:2
extent 34:10 142:20
extra 39:1 117:14
eyes 6:1 72:9 156:22,23 204:23

---

**F**

F 203:18
f/k/a 1:8 7:8
face 74:1
fact 16:24 24:22 38:18 53:19 56:25 57:17 74:12 146:13 155:22 174:18 204:16 210:4

facts 11:25 178:8 209:3
fair 183:21
fall 162:18 163:23
familiar 18:21,23
far 20:13,15 24:21 27:22 48:5 55:3 57:3 144:20 208:15
fault 137:16,17
fax 2:13,17 38:1 109:6
FBI 203:7,8,9 206:12
February 1:20 7:13 8:5 27:5 31:23,24 46:10 220:6 221:9 222:2
federal 223:12
feedback 76:19
feel 67:25 127:21 148:11 157:5 162:24
feeling 44:2 162:6
feels 156:10
feet 41:23 46:9
fellow 150:6 165:3
felt 43:23 74:6 127:13 130:19,25 149:3 165:9
figure 127:11 137:20 178:5
figured 69:16 133:18 167:14
file 55:24 148:17
filed 152:6 167:9
filing 199:13
Filippelli 2:12 8:20
fill 10:4 37:25 47:20 52:17 52:21,25 53:1,15 54:2,6,14 57:16 75:22 156:16 157:10
filled 57:17
filling 20:10 21:18 52:22
final 118:13
finally 26:7 55:17 133:10 165:10 174:14
finance 14:10 36:6
financial 14:14 20:25 21:21 70:4 119:7 121:8 201:13
financially 223:18
find 115:15 171:24
finding 25:12
fine 59:21 117:17 142:9 159:9
finish 63:21 66:13 125:19 139:25 219:24 220:4
finished 125:24
FINRA 199:24
fire 73:4,17,20,23 74:8,10 182:21 202:25 215:20
fired 74:15
firing 73:2 74:21 157:3
firm 15:11,25 16:1 19:11 20:24 23:5 25:15 30:13

39:18 40:19 41:18 49:9,10 57:20 58:2 70:3 74:2,23 76:3 149:13,20 150:2,7,16 150:17 155:14 157:15,17 157:18 158:20,25 163:14 172:20,23 173:22 174:22 180:8 181:8 201:15 208:12
firm's 73:6
firms 24:14,21
first 9:19 10:18 15:4,6,13 16:11 17:17,18 20:24 26:18,18,18 27:5,23 29:2 31:15 37:13 53:3 57:14 70:11 71:11 114:17 115:7 115:12,15 116:8 124:7 134:11 144:11 146:8,18 148:10 150:3,3 155:12,13 162:8 164:19,21 165:11 173:22 180:5,20 184:19,24 188:18 199:23 203:21 216:13
fit 34:2 57:18,19 70:2
FIU 14:14 21:22
five 15:17 16:5 34:14 42:23 133:9 211:7
flat 37:1
flattered 71:16
flew 16:18
flippant 200:8
flock 19:14
flooded 62:13
floor 2:16 36:22 37:5 124:12 124:14,20,21,23
floors 124:19
Florida 1:2 2:6 7:2 8:4 14:11 14:15
flow 5:1 168:10 169:3,6,21 170:1,20
focus 22:10,14 30:8 45:17 54:1,2
folks 36:4 43:22 50:2 72:15 124:12 128:9 136:18 217:15 219:25
following 21:6 108:1 134:9 144:13 188:1
foot 56:3 137:10
Ford 2:11,11,15,15 8:18,18 8:20 53:21 59:18 61:25 62:8 64:5 65:20 66:2 68:5 69:12 76:18 113:9,13 115:9 117:23 118:6 129:4 129:11,16 139:16,20,22 140:3,12,16,20,25 141:15 141:19,22 143:4,19,21 144:24 145:5,14 146:6

152:25 153:5,7,16,21,24
154:1,4,11,19 161:15
171:13 189:23,25 190:17
190:24 192:4 201:2 205:25
206:14,22 207:4,15 215:17
216:5 219:7,18 220:1,10
220:12
**foregoing** 221:6 223:4
**foreign** 69:19 120:6 162:12
173:25 208:13 214:4,6
**forget** 14:15 20:25
**forgot** 35:9
**form** 4:10 54:2,6 206:15
**formally** 17:21 220:4
**formation** 41:4
**formerly** 13:9
**forth** 7:22 22:16,25 43:22
51:3 52:10 53:9,12 54:24
55:16,16,25 61:6 70:5
127:22 130:20 132:19
160:24 171:2 173:17
174:10 223:6
**forward** 57:11 152:21
**forwarded** 67:12 152:23
154:16
**foul** 135:24,24 136:4,6,9
**found** 133:16 135:25 180:6
**four** 16:2 46:15 109:11
163:3 200:6
**Frantz** 177:22,23 179:20
**Frantz's** 178:11
**free** 56:19 65:25 66:4,7,19
66:24 68:25 69:3
**freely** 19:7
**friends** 137:5
**front** 11:7 36:21 37:4 44:3
74:1 108:23 124:16 166:4
**frustrated** 29:6
**fuel** 202:25
**fulfill** 20:15
**full** 9:10 10:6 47:5 121:5
124:8 210:16,17,19 219:10
**fund** 111:23
**funding** 4:16 111:6,12 113:5
113:7
**funds** 50:3 116:12 201:15
201:17
**further** 53:19 114:21 115:25
116:16 117:6 123:21
144:15 146:5 168:1 178:10
179:14 188:7 212:11 214:9
214:19 223:11,18
**future** 57:19

---

**G**

---

**generate** 41:18 169:23
**genesis** 172:22 173:11
**Gentile** 1:9,9 2:21 7:9,9 8:19
13:8 15:2,5 16:11,24 17:9
18:16 19:21 25:8 28:24
31:17 32:21 41:5,20 45:8
51:16 52:3 54:20 56:5
71:20 112:23 116:23
117:20 118:3,9 120:4,16
121:9 122:16 123:1,21
124:25 125:25 126:5,16
127:1 129:22 131:1,17
134:10,21 138:7,10 145:22
147:22 151:24 152:13,13
154:8,9,12 155:19 156:1
159:21,23 170:5 171:12
176:20 177:1,5 179:20
181:11 190:22 192:2 199:3
199:7,7,10,18 201:1
205:21 206:18,25 209:23
209:24 212:5 213:16
214:20 215:8,15 216:3
**Gentile's** 23:16 71:3 72:12
118:20 147:15,18 148:12
152:22,24 155:2,6,11
165:15 176:23 199:13
208:22 211:9
**GENTILE0004495** 5:13
192:19
**GENTILE0004497** 5:14
**gentleman** 45:18
**gentlemen** 36:7
**genuine** 28:4 71:23
**getting** 10:9 21:15,19 25:24
26:12 30:15 33:5,19 41:2
62:13 76:19 130:19 144:19
166:21 167:15 176:8
183:12
**gist** 203:15,18
**give** 9:1 14:20 15:21 20:9
30:25 42:3 43:18,24 45:3
57:10 67:10 71:22 113:3
121:5 130:24 149:14 157:8
160:11,20,20 164:8,9
182:2 183:4 184:4 213:24
218:19
**given** 12:16,21 133:24 219:3
221:9 223:10
**gives** 162:7
**giving** 138:24 160:19 162:6
183:2
**glad** 158:13
**glean** 143:7
**Gmail** 154:6
**go** 10:12 17:25 29:13,16

---

31:16 34:19 37:23 44:23
44:24 45:4 49:18 53:23
54:23 55:16 62:2,6,10
65:15 68:10 72:6 74:14
75:12 115:12 128:2 132:8
135:9 136:8,16 140:21
142:10 144:25 145:18
147:21 152:11 158:12
159:10 161:23 164:8 166:5
171:2 174:7 180:20 181:14
181:20 184:24 188:13
190:11 200:19 205:10
211:7,24 214:23 218:21
219:2,11,24 220:3
**goes** 149:23
**going** 19:13,14 20:11 24:18
25:4 26:14,19,25 27:21,22
29:9 31:16 32:6 33:21
34:17 35:23 36:10,24
38:23 39:14,16 41:11,11
42:22 43:17 44:15,16 45:4
47:7 53:6,11 54:1 57:11,16
61:17 64:11 68:9,11 75:12
108:10 113:17 116:18
128:21,22 129:2 130:20
131:4,14,15,19 132:14,24
133:23 134:6 135:9 136:10
136:14,17 137:18 138:3
139:4,22 140:5,5,23
141:10,12 143:2,17 144:3
145:4,6,18 146:14 148:16
148:16 149:6 150:12
151:10,14,15 154:8,22
155:10,19 162:24,24
163:18 165:1 167:20
174:25 176:9,9,12 178:6
178:21,21 179:1,5 180:15
180:19 182:16 183:10
192:14 202:2 203:2,6,16
204:7 207:17,17 211:2,7
211:24 212:3,19 214:5,24
216:15,16 219:7
**golden** 24:1
**gonna** 166:20 170:10
**good** 8:13 9:9 10:11,17
33:10 46:2 55:3 58:17
59:18,24 115:22 124:8
127:10 159:5 166:15
170:25 181:23 182:3
183:11,18,22 184:1
**gospel** 127:16
**gotta** 26:14 43:3 128:3
135:7
**gotten** 144:1
**Government** 206:19 207:1

---

207:11
**Gradillas** 8:9
**granted** 128:13 135:19
**great** 56:15
**grew** 35:6 39:4 73:8 75:2
**grievances** 149:10
**ground** 11:22 12:12 179:4
**grow** 57:12
**growing** 36:8 39:22 46:3,24
**guess** 27:1 28:4 30:10 35:1
36:21 39:21 40:25 41:1,16
43:6 44:5 45:22 50:18
52:20 53:8 63:20 67:25
69:20 126:21,21 137:18
199:24
**guidance** 144:6
**gung-ho** 26:2
**guy** 1:9,9 2:21 7:9,9 8:19
13:8 15:1,6,10,12,14 16:2
16:3,13,14 17:2 19:24 22:6
23:19,25 24:5,20,20 25:14
25:19,23 26:12 28:1 29:5
29:22 30:8,9,19 31:3,24
33:21 34:4,6,24 35:1,9
36:3,5,24 37:4 38:6,9,21
38:21,21 39:8,13,15,18,18
39:23 40:6,10,12,12,16
41:14,24 42:1,5,7,10 43:1
43:25 44:20 46:4 47:15,23
48:23 50:1 51:2,13,20 53:6
54:3,17,23,24 55:9 56:24
57:10 58:3,13,18,21,21
61:8 62:11 63:16,17 64:18
65:2,5 67:6,12 69:15,17,25
70:1,4,6,13 71:12,13,15,22
71:25 72:14 73:3,3,4,7,9
73:11,12,16,24 74:13,18
74:23 75:1,3,8,10 76:2,9
110:9 112:17 114:9 116:23
117:17 118:13 119:2,5,8,9
119:19,21 121:4,14,19,20
122:11 125:10 126:22
127:7,7,10,14,15,19,22
128:17 129:1 130:1,5,6,14
131:5,13,22 132:2,10,16
132:20 133:2,4,6,12 134:3
134:5,24 135:20,23 136:1
136:5,8,20,25 137:3,8
138:3 146:24 147:1,9,22
148:18,23 150:4,4,9,17,22
151:5,9,13,16,17 152:2
157:2,12 158:7,15 160:2,8
160:22 161:4 162:1,9,16
162:17 163:1,7,16,18
164:3,17 165:3,23,25

166:10,21 169:18,25 170:8
170:17,23,25 171:16,19
173:3 176:7,14 177:7,15
177:25,25 178:3,9,25
179:3 180:13 181:19
182:20,25 183:17 184:4
190:13 199:4,22 201:16
202:16,18,20 203:5,19,23
204:2,5,15,20 205:1 206:6
208:11 216:15
**guy's** 15:10 29:21 30:7 41:8
45:16,17 119:7 124:6
147:7 202:15 209:17
216:13
**guy@stockusainc.com**
116:2
**guys** 30:20,21 43:4 49:13,20
62:20 71:25 128:3 138:5
142:12 144:8 177:13

———————————
**H**

**H** 4:1
**hacking** 49:7
**hail** 133:8
**half** 16:5 36:22 59:11 180:8
**halfway** 16:3
**Halpin** 2:16 8:20
**hand** 8:24
**handle** 25:8 140:19
**handled** 201:16
**handling** 47:16
**handpicked** 73:12,13
**hands** 59:19 174:22 179:24
180:7,9
**hands-on** 36:2,2 73:9 75:10
119:22
**hang** 44:14
**happen** 47:24 70:9 72:21
132:25 135:6 136:18
**happened** 37:10 44:9 48:21
71:9,20 73:22 136:23,24
162:1 163:24 165:13 172:9
181:22 213:15
**happening** 130:23 164:5
**happy** 115:22
**harsh** 180:4
**hate** 151:21
**hated** 136:7
**head** 65:14
**healthy** 24:12
**hear** 12:8 13:6 41:23 42:2,3
42:5,17 43:14 49:19 50:1
51:13 56:22 113:25 114:2
114:3 116:19 129:7,8,16
149:22,23,24 160:9 162:8

177:9,13
**heard** 134:25 150:9 164:19
165:22
**hearing** 127:20
**heated** 174:20
**held** 179:4
**hello** 139:15,15
**help** 169:4 214:5
**helped** 21:3
**helping** 21:18 35:4,8 203:7
**hereinafter** 7:22
**hesitant** 182:19
**hesitation** 26:9,10
**hey** 27:13 44:15 54:4 66:22
67:9 203:17
**high** 67:23,24 164:18 200:5
**higher** 119:12
**hinted** 74:14
**hire** 73:17,19 74:6
**hired** 20:9 40:7 45:18 73:3,7
122:11,13 151:1,24
**hiring** 73:2 74:21
**history** 14:7 21:2
**hold** 166:20 172:16 188:3
**holders** 112:12
**honest** 28:12 43:13 61:16
61:20 133:23 210:20
**honestly** 43:12 158:3
163:19
**honor** 24:2
**hoped** 26:12
**horrific** 202:16 203:25
**horrified** 202:19,19
**hour** 7:14 59:11 181:17
**hours** 32:17
**huge** 57:13,20 202:21
**hunched** 137:12
**hundred** 28:1,8 46:7,21
**hung** 44:7
**hustling** 30:12

———————————
**I**

**I-L-L-E-G-A-L** 129:7
**I.D** 52:13
**I.T** 40:15
**iBoss** 210:11
**idea** 16:13 17:3,4 25:24
26:24 27:7 30:2,21,25 32:2
33:8,10 35:10 47:9 57:1
63:16
**ideas** 22:25 33:23
**identification** 114:4
**identify** 8:11 12:19 171:5
188:13
**idiots** 72:1 138:5 200:7,14

200:21 204:4
**IDs** 22:15
**III** 2:16
**illegal** 74:1 128:13 129:6,7
134:4
**imagine** 51:7 72:24 73:22,23
**immediate** 143:23 159:25
160:1
**immediately** 37:10 71:9
**imply** 173:11
**importance** 42:16
**important** 120:19
**impossible** 132:17
**impressed** 24:12 41:15
150:23 202:18 203:20
204:7
**impression** 24:23 70:12
137:6,22 162:17,19 174:1
174:4
**improvements** 54:22
**in-depth** 200:19
**inaccuracies** 192:10
**inaccuracy** 192:9
**inaccurate** 148:17 179:13
179:13 189:1
**incentive** 31:1 49:20 50:9
51:13 66:18 69:5,17
**incentives** 65:18 67:16 68:2
68:20 69:1
**incident** 48:20 165:16
**incidents** 130:21
**included** 116:9 140:13
152:25 153:2
**includes** 212:17
**including** 40:5 204:7 212:9
215:20
**incorrect** 156:25 192:9
**increase** 28:25 112:24
208:25
**INDEX** 3:1
**indicated** 31:22 171:19
221:11
**individual** 31:25 32:23,24
46:22 163:4
**individuals** 30:11 35:10
**industry** 14:18 20:22 21:10
29:25 160:25
**influence** 11:23
**information** 75:22,23
131:24 132:9,15 133:6
138:9 167:2,4,6 169:13
209:8 219:20
**informed** 74:25 181:13,19
**initial** 28:16 47:4
**initially** 22:18 25:14,14 39:2

47:15 61:13 62:19,23
110:8 112:18 150:19
**inner** 163:17 164:3
**input** 39:9,12 43:8,11,18
44:18 45:3
**inquiry** 180:25 212:12
**ins** 24:8 43:6
**inside** 45:19,20 123:25
**insignificant** 160:14
**insist** 140:6
**insisting** 141:19,22
**inspection** 55:23
**instance** 66:11 119:4 145:21
209:14 213:12
**instances** 66:9 118:9
**instructed** 212:5,6
**instructing** 190:6
**instructions** 211:9,14
**insulting** 180:3 202:25
203:12
**Intelligence** 21:21
**intend** 144:22
**interest** 149:20
**interested** 16:17 157:3
208:13 223:19
**interesting** 42:8 43:7 44:1
180:6
**Interestingly** 157:21
**internal** 219:16
**internally** 116:25
**International** 1:7 7:7 8:1
13:9 14:15 222:3
**interrogated** 7:21
**interrupt** 139:4 151:21
**interrupted** 134:19
**interrupting** 17:8
**introduce** 142:2
**investigating** 199:19 201:1
**investigations** 120:7 131:4
201:6 210:3
**invoice** 115:23 117:15
**involve** 120:25
**involved** 47:17 64:23 117:21
118:9 122:4,8 177:12
**involvement** 118:4,20,23
126:7
**irritated** 160:12
**issue** 27:13 129:17 130:10
138:8 143:24 144:4 149:19
170:12 172:22
**issued** 10:20
**iteration** 154:15

———————————
**J**

**Janay** 122:7,12,13

**January** 5:13
**jargon** 76:1
**job** 1:25 19:22 22:1 35:13
    48:10 49:15 58:9,11 70:1
    126:17 127:2,3 148:22,23
    149:1 156:10 167:11,16,17
**jobs** 45:19
**Johnson** 2:5 8:16
**johnsonali@sec.gov** 2:8
**joined** 126:25
**joining** 8:17
**joke** 200:13
**judge** 141:4,10,16,24 142:4
    142:12,24 143:12,22,25
    144:4 145:7
**July** 115:18,23 175:25
    176:19 177:6 179:18
**jump** 57:6
**June** 5:11 191:18
**junior** 201:24
**jurisdiction** 210:13
**jurisdictions** 51:15
**Justice** 203:9
**Justin** 35:16,16 46:24 47:6
    47:16 65:10 114:10 116:1
    116:22 117:1 122:6 146:24
    147:8 202:4,6,8 204:13
**Justin's** 47:3,5

## K

**K** 2:4
**Karen** 32:25
**keen** 28:14
**keep** 10:25 28:14 62:21 63:5
    74:24 144:8 154:22 157:17
    176:16 180:9 181:24 183:6
**kept** 124:12 137:23
**kickback** 30:23
**kind** 152:6 159:22 190:12
**kitchen** 124:17
**knew** 20:1 21:2,14 24:8,14
    24:21 26:10 28:3 29:23
    40:18,20 43:20 56:11,12
    59:7 72:13,15 73:21
    127:12 131:21 132:20
    138:23 151:8 163:23
    164:21 169:11 173:7 174:7
    174:8 178:22 216:15
**know** 9:23 15:1,15 16:20
    17:24,25 18:20 19:1,3,5,10
    19:18 21:2,5,6,7,10,11,13
    22:4,7,11,12,15,21 23:3,20
    23:22,25 24:1,3,13,13,18
    24:22 25:1,5,24 26:1,2,3,8
    26:8,13,16,16 27:1,6,16

28:12,17 29:7,8,21,21
30:11,12,25 31:22,24 32:4
32:6,7,9,10 33:4 34:7
35:24,24 36:1,9,10,11
37:10,19 38:7,8,19,21,22
39:13,17,18,23,24 40:3,3,6
40:16,22,23 41:2,9,12,20
42:2,25 43:3,4,6,14,19,21
43:22,23,25 44:1,1,4,9,13
44:24 45:2,12,22 46:1,4,5
46:21 47:3 48:1,14,16 49:5
49:12,22 50:1,8,18,20,21
51:9,12,14 52:8,12 54:9,12
55:3,5,17,20,22,23 56:3,10
56:17,18,19,23,23 57:10
57:21,23,25 58:2,4,7,14,23
58:25 59:10,21 61:12,16
63:18 64:17 65:4,6,14 66:6
67:5,6,14 69:20,24 70:17
71:2,16,22,25 72:1,14,20
72:22,22,23 74:2,4,7,10,16
74:17,23 75:6,22 76:2,3
110:1,8,13 112:1,15,17
113:15 114:20 117:1
119:20,22 120:5,20,21
125:6,12 126:2,2 127:8,9
127:11,12,15,16,17 128:2
128:12,12,12,15,20,25
129:25 130:9,10,14,17,18
130:20 131:17 132:23
133:15,17,20,22,23 135:7
135:7,8,24 136:4,7,9,13,25
137:2,5 138:14,20,21
139:1 142:21 143:7 144:7
144:19 147:9 148:15 149:4
149:25 150:8,12,12,22,23
150:24 151:5,7,11,19
152:23 153:3,11,19,19
156:9,15,20 157:4,5,22,23
157:23,24,25 158:19,23,24
159:2 160:21 161:1,5,9
162:9,15,23 163:2,2,5,7,7
163:15,16,24,25 164:2,2,3
164:4,4,6,7,7,9,14,20
165:8,18,19,24 166:1,1,2,5
166:9,10,10,13,16,20,23
167:14,16,16 169:9,10,11
169:14 170:15,25 171:15
171:16,18,23,25 172:14,14
173:5,21 174:21,23 175:23
177:7,8 178:23 179:1,2,4,5
180:1,2,3,3,16 181:7,8,15
181:18,19 182:12,17 183:2
183:9,11,11,15,17,20,21
184:5 189:17 200:1,2,4,16

200:19 201:13,19,24 202:7
202:17,22 203:21 204:3,14
204:17,25 208:15 209:3,17
213:24 214:4 215:18
216:22,24 217:23 219:13
**knowing** 164:15 165:8
    201:17
**knowledge** 24:12 64:14
    70:12 125:5 182:12 208:11
    208:16 211:19 215:23
**knowledgeable** 29:24
    169:18
**known** 13:9 43:12 177:25
**Koonin** 2:5 8:16 142:11,15
    143:17,20
**kooninr@sec.gov** 2:8
**Kurisko** 115:19 116:1
**KYC** 21:13 22:10 53:13 55:7

## L

**L** 1:24 7:16 223:3,24
**ladies** 48:21
**lady** 34:25 35:14,17 116:10
**LANDY** 2:11,15
**language** 180:4
**laptop** 190:16
**laptops** 190:14
**large** 9:23 51:4,5 124:6
**larger** 10:7 45:25 67:5,15,19
    67:22
**late** 17:17,23 57:5 122:15
**laughing** 203:21
**laundering** 21:22
**law** 21:23 23:5,6 32:8,9,10
    72:9 73:21 184:1
**laws** 23:9,13 32:7 206:21
    207:3,13
**lawsuit** 13:7 192:2 199:6,10
    199:15
**lawyer** 20:9 21:17 42:12
    73:7 137:7
**laying** 136:18
**layout** 124:4
**leading** 68:7,11 115:9
    129:23 190:17,24 192:4
    206:14,22 207:4,15 215:17
    216:5
**learn** 71:6 72:11
**learning** 71:9
**leave** 44:24 59:19 166:6,9
    182:24
**leaves** 135:8 175:20
**leaving** 172:4
**led** 30:18 63:24 118:12
    130:2 172:23

**left** 35:17 209:7 215:5,14
**legal** 2:22 76:1 192:5
**length** 32:2
**lesser** 67:4,16,17
**let's** 25:5 29:17 42:19 44:7
    46:10 54:24 58:5 64:12
    65:24 115:12,16 116:11
    130:4 140:21 142:4 144:3
    156:8 157:10,24 158:18
    172:16,19 178:10 179:14
    183:24 191:19 209:14
**letter** 126:22,23 127:1,6
    135:18 138:19 145:23
    146:23,25 147:1,7,8,15,18
    148:7,11,13,14,15,20,21
    149:5,6 152:12 154:9
    155:3 156:6 158:13 164:9
    165:14 180:13 182:3,3
    184:2,11 200:7 214:14,17
**letters** 111:20 152:25
**letting** 68:9 74:13 147:9
**level** 41:1 47:1 118:3,19
    126:6,10
**license** 1:24 20:4 135:19
    223:24
**licensing** 20:15
**lie** 132:12,18
**liked** 202:14
**likes** 151:6
**limine** 142:19
**limits** 18:24
**line** 27:2 142:21 180:16
    190:4 212:3 222:4
**lines** 211:7
**link** 140:4 219:8
**list** 27:15 135:17,17
**listen** 33:23 50:2 62:12
    63:16,18 66:23 133:13,20
    138:25 158:16,22 204:15
**listened** 74:3
**listeners** 50:19
**listening** 30:9 51:2,2 127:21
    137:13
**lists** 22:13
**literally** 24:9 41:22 53:6 57:8
    58:15 71:1 133:9 204:21
**little** 9:22 10:11 28:21 36:25
    108:15,16 111:3 115:14,15
    118:17 127:20 134:2,23
    146:5 154:21,23 167:25
    172:10 188:22
**LLP** 2:11,15
**local** 38:4 73:6 162:13
**locally** 109:15
**located** 51:6

Philip Dorsett (nonconfidential)
2/27/2023

10

**locked** 114:5
**lodged** 142:12
**log** 220:10
**long** 14:24 17:20 38:8,11,14
    38:18 62:6 110:13 125:24
    147:20 150:12 162:14
    166:20 212:8
**longer** 36:10 46:2 70:16
    120:24 121:4 123:8 124:1
**look** 43:2 114:12 164:23
    218:20
**looked** 127:14 155:3 156:3
    210:11
**looking** 19:6 35:25 63:4
    163:13 209:12 214:14
**looks** 116:12 200:9
**loop** 171:22
**loophole** 32:5
**lot** 19:3,3 20:21 21:3,10,14
    22:25 24:5,7 41:12 43:13
    43:14,15,24 48:15 50:6
    61:8 66:21 67:23 68:11
    71:22 75:1,3,4,6 76:1,1,4
    125:18 127:20 128:4,21
    130:7,15 158:13 202:17
**lots** 203:10
**loud** 42:14 137:9 147:24
    200:2
**loudly** 41:24 42:2
**lower** 73:10
**LTG** 14:23
**lunch** 108:4

**M**

**machine** 58:1 223:8
**Madam** 68:16 217:15
**Madison** 2:16
**magazine** 35:1,3,6,8,10,19
**magistrate** 143:13,16
    144:25
**main** 22:10,14 34:5,8,12
    36:3 45:19 47:2 49:19
    55:19,24 120:19 165:21
**maintain** 157:13
**major** 74:18,19 150:4
    160:14,17 172:9
**majority** 215:6
**making** 19:4 22:11,14,15
    30:16 35:24 41:16 42:17
    46:14 53:12,14,15 55:21
    125:11 126:13 146:24
    151:19 161:4 182:13
    183:18 215:16,19,24
**man** 24:2 39:18 44:13 48:20
    50:3 56:15 71:14 132:14

**132**:15,25 135:7,21 151:12
    151:14
**manage** 46:22 47:2
**management** 52:23 171:24
**manager** 35:15,17 73:16
**managers** 73:12
**mandated** 21:23
**manner** 150:5
**map** 45:13
**March** 161:21 223:22
**marked** 9:17 108:20 111:1
    113:19 139:13 154:25
    167:22 168:20 175:12
    184:17 188:19 191:8
    192:17
**market** 118:15 170:9,13,17
    170:19 172:25 173:5,8,12
    173:19 179:10
**marketing** 122:14
**markets** 14:23 24:8 208:17
**massive** 30:21 45:11 58:2
    124:14
**Master's** 14:8
**Matasumoto** 168:4
**match** 55:14
**materials** 75:13
**Matt** 59:17 129:14,14 140:11
    140:11 143:17 219:3
**matter** 7:25 21:12,19 162:13
    178:8 220:20
**matters** 119:4,7 132:21,22
    200:13
**Matthew** 2:11 8:18,18 53:21
    59:18 61:25 62:8 64:5
    65:20 66:2 68:5 69:12
    113:9,13 115:9 117:23
    118:6 129:4,11,16 139:16
    139:20,22 140:3,12,16,20
    141:19,22 143:4 144:24
    145:5,14 146:6 152:25
    153:5,7,16 154:4,11,19
    161:15 171:13 189:23,25
    190:17,24 192:4 201:2
    205:25 206:14,22 207:4,15
    215:17 216:5 219:7,18
    220:1,12
**mean** 12:21 13:24 14:16
    26:16 28:17 29:14,16 30:3
    32:15 33:12 39:13,15
    43:13 45:1,2 49:17 50:4
    51:10,12 65:21,24 70:7
    74:24 120:18 132:2,6
    135:10 136:10 138:5
    153:21 154:4 158:2 159:24
    160:2,6 164:14,20 165:17

**166**:3,16 169:10 172:8
    178:17 203:23 210:1
**meaning** 144:14
**means** 149:12
**medication** 11:23
**meet** 15:4,13 219:8
**meeting** 27:15 31:17 32:19
    32:21 33:1,25 171:24
    217:9
**memories** 37:19
**memory** 28:20 134:15
    168:14
**mention** 200:3
**mentioned** 24:17,19 45:18
    48:19 50:12 68:23 69:2
    151:1,23 161:25
**mentor** 23:24 39:23 127:11
**mentoring** 11:1
**message** 72:25 122:20,22
    175:20 176:2 179:23
**met** 15:6,13 16:2,3,11
**mford@fordobrien.com**
    2:14
**Miami** 2:6 140:15 141:5
    144:7
**mid** 46:9,17,18 57:4 63:11
**middle** 58:10 124:13,18
    154:21
**Miguel** 5:4
**milk** 150:13
**mind** 28:13 29:19 31:24
    37:22 123:12 136:23 158:1
    158:3 168:16 172:8 180:8
    214:17
**mine** 149:7
**Mintbroker** 1:7 7:7 8:1 13:8
    13:14 222:3
**minutes** 42:23 59:24 140:4
    140:6 142:1 143:10 159:7
    205:7
**missed** 116:9
**mistake** 202:21
**mistakenly** 173:9
**MLRO** 59:2
**moment** 58:5 114:19 144:18
    155:5 188:4 211:3,25
    218:19
**momentarily** 34:18
**Monday** 1:20 7:13
**monetary** 119:1
**money** 18:21 19:3,15 21:22
    41:12 48:15 56:25 182:7
    183:11
**monitor** 8:6
**month** 48:4 133:7 210:11,16

**month's** 117:15
**monthly** 65:15 210:9
**months** 20:9 26:3,18 27:24
    31:9,12,15 37:13 46:15
    53:3
**morally** 128:15
**morning** 8:13 9:9 13:18
    58:17 115:22 140:4 141:14
    142:9 144:13,14 146:11
    154:17
**mouth** 135:24,24 136:4,6,9
    166:3
**move** 138:10,11 142:19
    143:3 157:24 201:16
**moved** 37:20 57:8,13,14
    73:8 75:2 214:13
**multiple** 143:1
**mute** 76:19

**N**

**naivety** 216:21
**name** 8:8 9:10,11 14:16
    45:16 47:5 121:6 123:20
    152:4,7 173:24 180:24
    181:2
**named** 15:1
**names** 45:10 50:12
**naturally** 21:11 55:2
**nature** 121:3
**necessary** 10:14 125:13
    141:17 145:9
**need** 10:6 20:5 22:23,23,24
    26:25 41:2 51:22 52:14
    57:12,12 59:20 62:12,17
    63:13,18 67:10 138:21
    142:11 147:24 151:21
    163:15 164:1 166:21
    168:17 180:10 189:17
    200:21
**needed** 20:1,6 22:8 34:3
    54:18,21 70:14 119:7,12
    130:25 164:5
**needing** 28:25 52:13
**needs** 127:23
**negotiate** 67:6
**neither** 48:23
**never** 43:11 44:17,17 54:1,1
    54:4 58:11 59:2,5 69:15
    72:9 73:22 74:6 113:15
    126:11 141:25 146:7
    149:24 160:18 166:8,20
    206:16,23 207:6,16 208:15
    216:22
**new** 2:17,17 28:5 38:24,25
    48:13,22 49:16 58:20 73:8

110:1 120:11,11 123:5
124:5 141:5 208:25 209:4
209:6
**newspaper** 58:18,20 70:19
**newspaper-type** 35:2
**night** 139:19 142:9 144:10
146:10 153:13 154:13,16
**NIGRO** 1:9 7:9
**non-solicited** 206:20
**non-stop** 41:16
**nonconfidential** 108:2
188:2
**Nope** 39:10
**norm** 171:15
**normal** 125:17 131:8 137:8
160:3 161:9
**normally** 42:13 63:21 67:4
131:10
**note** 28:19 68:6 128:9 175:2
190:7
**noted** 68:12 127:6 142:22
143:3
**notes** 218:20
**nother** 157:1
**notice** 128:16 149:19 219:4
219:12
**noticeable** 125:4
**noticed** 69:25 128:8,17
151:2 152:2 156:23 162:1
166:5
**Notify** 158:5
**noting** 192:18
**Nova** 14:9
**November** 17:17 22:3 23:17
27:23 34:20 36:15 37:8,11
146:22 147:5,23 159:21
165:13 166:12
**null** 223:17
**number** 8:4 12:19 28:25
29:3 38:10,23 39:1,7,25
58:7 109:16,17,19,23,24
109:25 110:1,2,7,9,10,16
110:18 155:13 169:20
191:23 216:3
**numbering** 48:22,23 49:3,9
**numbers** 38:2,5 49:5 65:13
109:6,6,8 171:5
**numerous** 199:23

---

**O**

**O'BRIEN** 2:11,15
**o0o--** 1:3 7:3,12,23 60:7
108:3 159:16 205:17
220:21
**oath** 8:22 221:13

**objection** 53:21 61:25 62:8
64:5 65:20 66:2 68:5,12
69:12 113:9,14 115:9
117:23 118:6 142:22 143:2
143:4,5 161:15 171:13
190:17,24 192:4 201:2
205:25 206:14,22 207:4,15
215:17 216:5
**objections** 142:13
**obtain** 219:16
**obvious** 32:1
**obviously** 45:11 73:23,25
135:8 151:13 164:16
173:20 183:10
**occur** 126:20 159:21
**occurred** 31:20,21 124:3
126:22 145:22 172:21
**occurring** 128:5,7
**odd** 42:8 135:22 161:3
**offense** 174:16
**offer** 65:18,25 66:25 181:23
181:24 182:5 183:11,18,22
221:12
**offered** 66:4,10,14 67:3 68:2
68:20 181:24 182:8
**office** 32:18,19 35:15,16
36:14,18,19,20,22 37:6,21
38:25 57:8,13,19 65:8
71:12 73:9 75:2,3 109:12
123:1,4,6,8,14 124:1,3,5,6
124:6,7,8,10,15,17,19
133:8,11 134:24 135:25
156:11 166:6,9
**officer** 17:6 20:2,7,14 21:22
22:2 23:3,12 55:2 59:2
70:4 72:8,10 121:8 122:11
131:8 133:15 135:13
137:15 138:1 149:11,15
150:18 151:2,2,3,8,18,24
151:25 152:2,3,8 155:16
155:25 156:15 157:7,9
158:4 160:16 162:4,10
166:4 172:2 182:11,22
201:13,14,22 215:19,21
**officer's** 137:17
**officers** 20:5 57:25 73:11
75:6,7 119:14 122:5 150:6
151:5 165:3,5 201:4
202:17 204:10,24
**offices** 57:7
**official** 67:7 119:20 120:9
125:6 137:7,23 148:15,15
149:5,6 157:13 173:14
**officially** 35:11 59:1 70:6
119:22 120:10 126:22

161:20 169:17 173:18
182:21 183:4 215:18
**oh** 40:6,10 41:8 44:22 52:20
72:2 137:14,15,16,17
138:4 140:20 146:6 147:24
147:25 151:11 158:10
188:14 200:13 202:1
203:24 204:3
**okay** 9:22 10:18,22 11:3,7
12:19,25 13:3,18,21,23
14:1,1,6,19,24 15:17,20,22
16:8,24 17:7,15,18 18:10
18:15 19:16,19,20 22:22
22:24 23:8,11 25:11,22
26:15,25 27:17,21 29:10
29:12,15 30:3,15,15 31:5
31:13,16 32:6,11,12,20
33:9,16,22 37:7 38:12 44:5
44:5 50:11 52:3,20 54:5
55:5 57:6 58:5 59:10,13,16
59:22 60:2,18 62:4 64:7,8
64:11 65:24 66:9 69:7 70:5
71:6,19 108:18,22,25
109:8,12 111:7,16,22,25
112:8,11 114:3,14,19,22
114:22,23 115:4,12,16,21
115:25 116:6,14,21,25
117:6,11,25 118:17 119:24
121:9 122:3 123:13 127:18
129:2 130:22 131:15,22
134:1 135:5 138:9,16
139:4,12,20,25 140:20
142:8,9 144:9,11,14,15,18
146:1,4,12,21 147:5,25
148:4,8 150:21 151:4
152:12,15 154:11,20,22,24
155:5,7 156:14 162:25
166:19 167:25 168:1,10,13
168:15,18,21 169:1 170:24
171:25 172:12,16 174:25
175:8,18,23 176:17,23
178:17,21 179:15,17
180:22 181:2 182:25 183:3
184:21 190:6 192:1,23
200:15 202:2,11 205:6,7,7
210:4,8 211:6,10 212:2,22
212:23 213:10,15 215:2
216:9 217:22 218:12,18,25
219:23 220:14
**once** 25:15,15 30:7,7,14
41:14 48:16 51:16 53:25
54:2,13,14 57:9 73:8
150:21 158:8
**one-page** 27:18
**ones** 36:3 45:25 67:24 178:8

204:12
**ongoing** 143:13
**online** 76:10
**open** 17:21 19:9 22:8 23:19
36:22 37:5 48:17 54:25
56:2 62:22 63:5 65:8 66:19
124:11,14 153:9 161:15
**opened** 15:14,18,23,24
17:15 22:2 23:17 25:7,15
26:7 27:22 31:9 34:21
36:15 37:8 41:14 211:15
**opening** 17:10 18:17 26:22
34:19 135:1 136:11 208:12
217:8 218:9,15
**operations** 177:25 178:1
**opinion** 44:18 149:22,24
160:10,11 200:5
**opinions** 150:18
**opportunity** 139:23 142:15
157:4 183:3
**opposed** 45:21 65:5 112:21
**option** 112:13
**options** 112:17,21,23,24
113:4,5,7
**oral** 12:16
**order** 5:1 22:8 169:3,21,25
170:20
**orders** 169:24 171:2
**original** 175:20 223:12,16
**outer** 36:24
**outrageous** 74:9
**outright** 73:21 132:18 134:4
162:21 171:17 174:7
**outs** 24:8 43:6
**outside** 67:1
**owner** 15:12 158:25

---

**P**

**P-H-I-L-I-P** 9:11
**p.m** 108:5,6 147:6 159:12,14
159:15,17 205:13,15,16,18
217:10,11,12 220:7,20
**package** 75:14
**padorsett@gmail.com**
153:8
**page** 3:3 4:3,14,16 10:6,18
109:2,4,5 111:12 147:12
175:17,18,21,24 184:24
188:18 189:12 207:19,21
208:2,18 211:2,24 214:25
222:4
**pages** 1:17 6:4,5,6 76:22
184:19 185:1 192:24
**paid** 181:25 183:25
**paperwork** 152:6 157:10

**paragraph** 34:10 208:1,19
208:21 209:10 211:3,4,8
211:24 212:1,20 213:7,13
213:17 214:11,21,25
215:12
**paralegal** 219:19
**paraphrase** 144:8
**parked** 61:21
**part** 34:25 35:11 45:8 76:12
110:4 140:1 143:13 145:12
148:16 163:17 164:3 171:3
182:20 203:14 217:20
**partial** 132:21
**participate** 60:21 63:8
**particular** 44:7 47:19 50:24
61:22 69:3 109:12 168:13
170:1
**parties** 2:24 7:15 144:20
223:20,21
**partner** 42:11
**partners** 30:10 42:13 43:10
129:13 150:11
**parts** 169:22,23,24
**passed** 133:9
**Pattern** 18:22 48:15
**pause** 25:4 27:21 31:5 32:12
58:5 114:19 129:2 131:16
134:6 145:9 174:25 177:19
203:2
**pawns** 165:6
**pay** 64:10,25 67:16,16
166:23
**paycheck** 183:12
**paying** 66:15
**payment** 112:24 116:11,18
117:14
**payroll** 181:24
**PDF** 37:24 75:18 147:12
148:7
**PDT** 18:21 19:9 24:19 25:25
50:3 51:14
**penalty** 221:5
**Penalver** 5:4 181:3,5,6
189:22
**pending** 8:1
**people** 28:6 38:17 40:17
43:16 49:6 57:12,17 59:7
61:1 62:15,16 73:4 74:3,8
128:21 137:6 151:6
**people's** 156:23
**percent** 10:13 209:1,15
210:14,24
**percentage** 28:16 47:21
64:17,24 210:5 216:3
**percentages** 210:13

**perform** 210:4
**performance** 127:2,3
148:22,23 149:1
**performed** 210:21
**period** 31:10 58:10 61:22
113:16 122:16 129:21
**periods** 66:1
**peripheral** 37:5
**perjury** 221:5
**person** 39:4 40:15 41:1
42:20,21,22,24,25 45:23
47:1 61:17 71:2 73:9,25
74:15 76:13 127:24 137:11
137:14 152:1 173:22 176:9
**person's** 55:14 127:25
**personal** 190:15,16,19,23
**personally** 13:24 14:1 73:4
73:6
**persons** 28:3 49:5 56:23
61:5,14,19 62:25 63:2
66:19 73:15 76:13 207:7
208:16
**perspective** 21:9 36:1 55:19
56:8 59:1 119:3 158:6
167:15
**pertain** 223:11
**Phil** 23:21 43:3 134:25
136:16 158:10 200:15
**Philip** 1:16 5:11,12 7:19,25
9:11 11:5 26:13 29:6 33:11
33:23 44:8,12,15,22 57:11
74:5,7 131:13 132:7,13
138:4 147:22 156:18
157:23 174:21 221:4,17
222:2
**philip@suretrader.com**
116:23
**philipdorsett@suretrader...**
191:6
**phone** 30:9,9 38:2,4,14 39:3
39:7 41:15 42:24 44:7,15
50:2 56:22 75:5,6 109:8,23
109:24,25 122:18 141:16
141:24 142:4 162:2
**phones** 39:5
**phonetic** 13:2
**physical** 24:9 36:14
**physically** 75:11 121:14
**pick** 73:9,16 217:17
**picked** 72:16
**pin** 148:25
**place** 14:22 19:2,5 24:10
30:7 40:17 55:6 57:16 67:7
**placed** 108:23 110:2 112:13
**Plaintiff** 1:5 2:3 7:5,20

**Plaintiff's** 11:4
**plan** 18:18 25:8,11 36:23
37:6 59:25
**planet** 204:6
**planning** 219:5
**platforms** 30:21
**playing** 65:1
**plead** 204:15
**please** 8:11,24 9:9,16 10:4,7
10:23 11:8 12:6,9 14:6
75:14 108:14,19 110:24
111:2,14,15 113:18,20,22
114:19 115:13,16,16
117:6 118:24 121:6 129:14
136:2 139:7 146:21 147:2
147:11,12,21 152:16
154:21,22 167:24 168:1,19
173:15 175:10 176:15
177:18 179:15,15 180:20
184:15,16 188:4,16,17
189:12 190:9 191:19
192:21,23 207:18,21
208:18 211:25 212:21
213:7,15 214:25 217:16
219:12,25
**plus** 16:4
**point** 21:1 26:21,24 28:14
28:23 34:5 40:14 46:22
49:11 50:21 52:8,11 54:11
55:9 57:7,24 60:25 70:6
117:19 123:11 145:4
155:13,13,15 158:21
164:25 178:5,18 179:1
180:10 183:14 199:5 208:1
217:5 218:7
**points** 27:10,16,17 34:6,9
34:12,14
**poor** 203:11
**pop** 188:17 207:21
**portion** 76:16 108:1 124:22
188:1
**PORTIONS** 1:18
**portrait** 9:25
**position** 21:23 58:22 70:1
70:13 131:8 143:15 145:8
157:9,13 158:4 160:19,20
161:3 162:10 163:1 183:4
183:6
**positions** 165:6,7
**possibility** 17:19 18:17
**possible** 30:16 31:2 49:4,21
50:10 54:25 112:17
**potential** 65:19 66:1,15 67:3
68:2,20 178:18
**potentially** 17:10 20:13 49:6

69:4
**pound** 218:15
**powers** 120:22
**practice** 140:14 141:5 144:7
**pray** 172:5
**praying** 164:25 166:18
**precipitated** 63:12
**prefix** 171:8
**preliminary** 19:25
**preparation** 170:6
**prepared** 169:8,10,12,15
**preparing** 131:12
**presence** 121:25 125:3
128:19
**present** 2:21 8:15
**presented** 32:2
**presenting** 162:16
**president** 120:11 121:2
125:1
**pressure** 178:23
**pretty** 18:19 36:11 46:2
114:13 124:6
**previously** 207:24 215:24
**principal** 155:24
**prior** 13:18 142:1 144:14
**privilege** 143:24
**privy** 48:1 65:2
**probably** 17:11,22 27:4
28:18 42:9 57:23 62:24
63:10 73:20 74:8 124:7
128:25 129:25 130:11
133:22 161:22 162:2 180:8
182:12 199:4 208:10
214:16 216:11,20
**problem** 26:5 38:5 54:16
55:12 69:22 143:6 148:22
148:24,25 151:16 156:7
160:13,18 164:7 173:9,13
178:20 182:9,9 203:14
**problems** 33:5 150:4 162:12
202:24
**proceed** 9:5 141:12 143:2
144:22 145:4,19
**proceedings** 108:4 223:4,7
223:11,13
**process** 20:12 35:24 54:21
**produced** 139:17 140:6,22
141:2,7,14,18,25 145:11
145:12 152:22 153:4,9
154:12,13,16,18
**producing** 153:12
**production** 144:17,21
146:13 152:22 153:20
154:2
**products** 21:1

**professional** 160:25
**profits** 169:23 171:1
**program** 30:19 45:6,9 47:8
    60:13 68:4,22 164:13,21
**programs** 66:18
**prohibited** 70:24
**promoting** 208:22
**proof** 52:13 53:13
**proper** 22:11,14 55:7,8
    57:24 142:21
**properly** 158:5
**propriety** 51:18
**prospective** 61:5
**protect** 27:2 76:3 165:2,3,4
**proud** 56:25
**provide** 123:21 167:4,6
    189:5 192:11 214:20
    219:12,20
**provided** 15:10 119:16
    138:6 153:13 188:9,23
    190:12
**provides** 116:7 178:2
**public** 58:19
**pull** 140:21,23 141:1
**pulling** 146:8
**purpose** 190:2
**purposes** 18:10 114:4 171:4
**pursuant** 4:6,9,12 5:5 48:10
    211:8,13
**push** 55:5
**pushing** 158:9
**put** 27:17 34:9 45:12 48:22
    53:8 70:18 123:5 135:18
    150:2,6,6 158:7,22,23
    169:21 173:24 192:15
**Putin** 204:22
**puts** 137:10 161:3
**putting** 11:12 123:22 131:23
    148:21 156:20 162:3
    202:23 204:19
**Pyfrom** 122:13

**Q**

**qualified** 45:3
**quarter** 26:18 27:5 31:15
    134:11 165:11
**question** 12:5,9,10 36:10
    39:24 40:2 68:15,19 110:4
    114:25 115:10 138:8,24
    141:3 145:2,14 146:7
    211:5 214:18 217:17,23
**questionable** 42:18 128:15
**questioned** 137:1
**questioning** 138:20 141:13
    142:22 144:22 145:19

146:15
**questions** 11:25 12:3 38:3
    61:6 62:16,22 63:20
    108:10,11 109:22 142:3,16
    143:2 155:10 184:25 190:8
    219:2
**quick** 218:20 220:12
**quickly** 47:4 114:13 184:22
    188:22
**quiet** 42:16 133:18
**quietly** 42:7
**quite** 17:24 24:2,11 36:12
    41:15 43:11 127:13 158:3
    163:19 204:21

**R**

**R** 2:16
**Radio** 45:14 47:11 48:7
    50:13 51:10 117:2
**Radio's** 48:10 49:15
**raise** 8:23 113:13 143:12
**raising** 144:19
**ran** 22:21 124:14
**Ranch** 2:12
**range** 110:20 111:8 175:3
    192:18
**rate** 47:25 67:11,17 68:1
    69:4
**Re-Notice** 11:4
**reach** 40:1 161:18
**reached** 17:10 70:18,19
    161:12 166:24 167:1
**read** 9:19 12:11 30:2 68:16
    111:5 147:7,10,19,21,24
    148:1 176:4 203:20,24,25
    211:3,25 212:20 213:8
    214:25 217:16,20 221:5,7
**reading** 131:22
**reads** 204:6
**ready** 114:21
**real** 28:2,5 125:11 127:5
**reality** 148:23 158:14 161:25
**realize** 150:15,21 188:21
**realized** 56:24 69:17 70:21
    127:5 128:20 158:8 162:9
    163:7 164:11 165:1,4
    166:19 184:22
**really** 18:2 19:16,17,19 22:5
    22:18 23:23,24 24:22 25:1
    25:2 26:23 28:12,17,18
    29:22 34:25 35:18 36:2,2
    37:6 40:25 41:1 43:18,19
    43:20,23 45:12 46:4,24
    49:1,11 55:20 58:25 65:9
    73:24 74:16 115:3 126:3

127:10,14 128:11,19,23
    130:9 135:24 138:15 139:2
    156:7 157:5 162:5,25
    163:1 164:9 165:18,20,22
    166:15 170:25 172:5,5,9
    178:9 181:9 199:24 200:5
    200:23 201:25 204:23,23
    208:15 215:10 216:22
**reason** 12:2,8 19:24 24:24
    25:17 38:19 40:2 50:16
    72:15 127:5 138:15 143:9
    158:18 165:21 166:1
    170:11,14 174:2,4 182:20
    182:24 183:1 211:1 222:5
    222:6,8,9,11,12,14,15,17
    222:18,20,21,23
**reasoned** 138:14
**reasons** 69:21 70:24 169:20
    170:5 174:11 182:18,18
    183:23 216:10,23
**rebates** 30:24 48:3
**recall** 37:11,13 45:7 61:20
    63:15,23 66:3 72:7 109:10
    109:24 110:6 115:3 120:3
    121:13,21 122:21 168:13
    169:4 181:9,12 214:22
**receive** 67:16 110:10
**received** 110:11 117:3 131:5
    139:18 140:4 141:13 142:1
    142:6 144:10,11 153:1,10
    153:17 214:16
**receiving** 49:20 214:13
**receptionist** 124:16
**receptionists** 58:16
**reckless** 150:5 163:14,21
    204:19 205:2
**recognize** 108:22 111:11
    114:8 116:10 168:23
    191:13
**record** 8:12 9:10 60:4,5,6,9
    108:7 110:20 113:16 142:5
    143:3,5 149:1,6,7 156:21
    159:10,13,14,15,18 171:5
    205:11,14,15,16,19 217:10
    217:11,13 218:22 219:24
    220:4,8,19 223:7,10
**recording** 203:8 219:22
**records** 132:17 148:16
    184:11 209:9 213:11
**red** 219:16
**redact** 132:5,6 163:8
**refer** 13:13 67:19 152:3
    214:6
**reference** 13:15 112:9 131:5
    182:2,3 184:2

**referenced** 18:5 145:23
    147:8 213:16 214:11,21
**references** 112:3
**referred** 30:24 38:16 151:24
    152:1
**referring** 18:12 32:4 33:17
    66:7 116:18 120:13 123:18
    151:3 153:25 154:7 169:2
    169:6 170:5 179:24 202:15
    203:4 207:23 215:11
**refers** 200:6 203:8,9,10
**reflect** 152:7
**regard** 21:3
**regarding** 13:19 40:4 45:5
    53:19 73:2 108:10 139:5
    214:20
**regards** 190:4
**registered** 20:5,23,24 21:7
    135:13 149:12 160:16
    172:1 182:10,22,23 215:21
**regular** 131:9 137:4
**regularly** 130:14
**regulated** 58:22
**regulations** 23:7 24:13 27:3
    43:15,19 55:4 216:17
**regulator** 42:12 132:12,18
    133:20 137:8 149:14
    151:19 157:14,19 162:3,12
    162:13 174:7 180:17
    182:14,25 183:1 204:6
**regulators** 27:12 33:5 54:3
    55:22 135:14,16 163:12,19
    164:1 165:19 199:23 200:6
    202:12 206:7,9,11 214:6
**regulatory's** 214:4
**regulatory** 55:19 59:1,7
    69:20,21 70:24 120:6
    158:6 174:2,3 201:1
**rehired** 70:3
**reiterated** 72:24
**relate** 170:12
**related** 123:10,12 219:4
**relationship** 16:10,25 17:2
    19:21 70:23 127:7,9
    157:21 181:11
**relative** 223:19
**relatively** 184:3
**relief** 167:13
**remained** 160:5,6 215:6
**remember** 11:25 32:5 34:12
    35:15 38:5 40:19,22 48:1
    48:19,20,24 49:7,8 52:16
    54:10 55:9 57:14 58:16
    63:15,23 66:18,20 68:24
    70:22 109:25 120:5 121:3

Philip Dorsett (nonconfidential)
2/27/2023

14

121:14,15,23,24 123:5,17
123:20 133:6 137:3 150:14
170:17,21 181:16,21 184:9
199:16 204:11,12 210:20
210:22 216:9 217:5,7
218:6,8,16,17
**REMEMBERED** 7:13
**REMOTE** 1:19 2:1
**remotely** 2:24 7:21 223:5
**remove** 157:8 183:3
**removed** 155:23,24
**removing** 155:14
**render** 223:16
**renegotiate** 47:25
**renewed** 159:22
**rep** 61:3
**repeat** 12:10 68:15 214:18
**repeating** 144:8
**report** 182:25 183:1
**reported** 1:23 209:8
**reporter** 7:17 8:8,21 12:10
59:20 68:16 159:8 190:7
191:9 205:9 217:15 219:6
219:13,15,21
**REPORTER'S** 223:1
**Reporters** 8:10
**reporting** 21:22
**represent** 18:6 152:18
**represented** 9:13
**request** 12:6 119:5 132:3
134:9 138:9 139:22 140:5
209:17 213:16 214:2,10,20
**requested** 131:12 211:18
223:14
**requesting** 131:6
**required** 21:16,17 184:1
**requirements** 20:4,14,17
21:16 59:8
**requiring** 174:3
**research** 19:18 20:1 164:10
164:10,11
**reserved** 42:16
**resident** 212:8 213:4
**residents** 213:20 214:1
215:7
**resign** 182:23
**resigned** 70:7
**resolution** 71:3,5 178:18,20
178:24
**resolved** 179:6
**respect** 23:9 25:12 44:6
62:7
**respond** 118:16 131:14
149:3 152:13 173:17
176:10

**responded** 139:3 147:8
156:24 176:14 177:15
179:8
**responding** 154:8,9
**response** 71:21,22 147:10
147:14,17 148:11 152:12
152:24 155:2,6,11 156:3,6
156:21,24 158:13 162:5
165:14,15 177:8 178:2,14
179:11,12,20 202:15
214:10
**responses** 130:18 162:6
**responsibilities** 19:22,23
22:1 23:8
**responsibility** 23:11 41:6,8
41:9 151:18 157:14,15
158:6 160:21
**responsible** 35:19 53:2,5,10
209:6
**rest** 24:11 63:20 140:2
177:17
**restate** 65:24
**restricted** 19:11
**result** 72:11 117:11
**resulted** 190:8 208:24
**resumed** 108:4 124:25
125:17
**retain** 28:20
**retrospect** 46:12
**returned** 126:8
**reverse** 117:13
**reversed** 117:4
**review** 113:21 140:8 142:17
155:5 167:24 175:10
192:22 210:4,8 213:21
223:13
**reviewed** 155:8 209:4,9
213:11
**right** 8:23 11:11,17,21 15:1
15:4,25 16:10 18:16,25
20:6,19 21:14,25 22:6,21
23:18 25:4,16,21,25 26:3,6
26:13,16 27:3,8,14,19 28:3
28:6,7,22 29:20 30:2,5,8
30:19 31:4,14 32:16,18,22
33:15 34:17,23 35:12,17
35:19 36:13 37:11 38:15
38:17 40:18 44:6 45:4,10
45:12,13 46:10,14 47:5,7
47:13,14,23 48:13,23,24
48:25 49:14,21,23 51:2
52:15,18 53:4 54:19 55:1
55:15 56:14 58:13,20,24
59:3,10,17 60:22,25 62:11
62:11 63:21 65:11 66:11

67:18,22 69:1 70:8,12,20
72:15 74:1,4,5,6,8,25 75:1
75:16,23 76:4 109:18
110:19,22 113:11,17 114:3
114:23 115:6 116:8,11
117:13 122:9 124:8 125:10
127:2,4,20 128:4,15 129:7
129:20 131:2 133:1,9
134:2,19,22 135:19 136:19
138:6,16,22 139:15 141:10
141:23 142:18,25 143:18
145:3,9 146:23 148:5,10
148:20 149:2 151:15
156:12 157:2,8 159:4
161:9 165:25 166:4,6
167:19 168:1,14 169:2,10
169:16,17 170:7,11 172:24
173:8,15,19 174:8,11,13
174:19 176:1,4,8,17,17
177:9,10,16,24 178:4,15
178:23 179:25 180:5,8
183:13,14 184:14 188:3
190:11 191:13 192:14
201:12 204:22 211:7 212:3
212:16 213:18,20 214:24
215:10 216:10,19 218:19
220:17
**ring** 39:3,4,5
**risk** 150:2,6,7 158:22,23
183:14 202:23 204:19
**Ritchie** 47:6 116:1,22 202:8
**Ritchie's** 202:11
**RMR** 1:24 223:3
**Road** 2:12
**rogue** 203:6
**role** 23:2,16 47:4,4 64:25
**roles** 22:4,5
**rolling** 46:16
**room** 57:15 124:11
**rough** 220:13,15
**roughly** 209:1,15
**RSA** 1:24 223:4
**rule** 18:22,22,24 19:2,4,9
24:19 25:25 48:16 50:3
51:14
**rules** 11:22 12:12
**ruling** 142:3 144:4 145:1,7
**run** 24:11 43:3 72:1 74:18
74:18,19,23 128:3 158:19
**running** 23:6 46:10 120:21
**runnings** 119:15 120:24
**Russell** 2:5 8:16 143:19,19

**S**

**S** 4:1

**s.24(d)** 4:7,9,12 5:6
**sabotage** 136:11
**safely** 164:12,14
**sanctioned** 53:15
**sanctions** 22:13
**sat** 12:23
**save** 221:9
**saw** 49:3 125:18 146:9
149:2 157:2 162:20 189:10
**saying** 30:4 32:5 38:7 42:1
42:24 43:16 56:22 58:20
63:16,18 67:9 123:8 127:2
133:2 137:13,23 138:19
149:16 172:20 173:7,11,14
173:18 202:25 203:5,16
**says** 42:25 72:23 109:18
111:6,19 112:5 115:21
117:3 127:23 131:25 132:4
132:10 134:25 135:12,12
149:7 153:7 155:13,14
159:3 174:21 177:1,13
208:3,21 212:4
**scary** 199:25
**SCB** 18:12 20:22 21:1,17
44:22 58:23 119:5 120:14
131:9,14,18 134:9 152:7
**SCB's** 138:9
**scene** 125:5,7
**schooled** 112:20
**screen** 9:20,25 10:5 116:21
**scroll** 11:8 108:15 111:15
113:20 114:16,18,21,22
115:14,15,25 116:16 117:5
146:3,4,9 147:2,12 148:2,2
148:2,3,6 154:21,23 155:7
167:24,25 175:10 176:16
177:16,18 178:10 179:14
184:19 188:16 189:12
191:10,19 192:21,23
207:19 208:18
**scrolled** 10:24 114:13
184:22
**scrolling** 10:25 108:17
175:19 176:1,16 188:21
**se** 164:22
**seasoned** 160:25
**seated** 124:15
**SEB** 165:22
**SEC** 7:25 10:20 13:7 33:15
132:15 161:19 164:9,12,21
165:9,12 166:11,14,25
167:1,1,4,7,10 188:7,10,23
189:6 192:12 199:9 200:4
200:6,13 203:10 206:12
214:8 222:3

**SEC's** 192:2 199:6,10 219:15
**SEC-FL-0348-E-0000228** 171:7
**SEC-FL-03848-E-0000228** 4:23
**SEC-FL-03848-E-0000229** 4:24
**SEC-FL-03848-E-0000230** 5:2
**SEC-FL-03848-E-0000231** 5:2
**SEC-FL-03848-E-0001195** 175:4
**SEC-FL-03848-E-0001195...** 5:8
**SEC-FL-03848-E-0001431** 5:10 188:14
**SEC-FL-03848-E-0012118** 4:19 114:6
**SEC-FL-03848-E-0012120** 4:20
**SEC-SCB-P-0009184** 4:5
**SEC-SCB-P-0009221** 4:6
**SEC-SCB-P-0010164** 4:8
**SEC-SCB-P-0010198** 4:8
**SEC-SCB-P-0010391** 5:4
**SEC-SCB-P-0010409** 5:5
**SEC-SCB-P-0010428** 4:11 4:11
**SEC-SECWEBCAPTURE-...** 4:15 110:21
**SEC-SECWEBCAPTURE-...** 4:15
**SEC-SECWEBCAPTURE-...** 4:17 111:9
**SEC-SECWEBCAPTURE-...** 4:18
**second** 68:10 124:20,21 129:3 134:7 177:19 203:3 212:23
**seconds** 218:24
**secrecy** 164:17
**securities** 1:4,8 2:4 4:7,9,12 4:13 5:1,6 7:4,8 8:14 13:10 14:18 18:7,9,13 24:8 58:12 71:17 123:8 124:1 131:6 156:16 161:12 163:8 169:18 204:7 206:21 207:3 207:12 208:6,13,14
**see** 9:23,25 10:6,13,18,19 11:1,3,7 26:5 37:2,3 63:4 109:5 111:6,19 112:3,8 115:6,18,21 116:1,11,21 117:8,19 125:12,18 126:12

127:25 143:6 146:17 153:13 154:24 155:12,17 156:23 163:18 168:3,10,17 170:20 175:23,24 176:19 177:17,21 178:11,14 179:17 180:2 184:11 189:14 191:1,22 204:9 208:3,7,21 209:14 219:3
**seeing** 129:21 133:22 180:2
**seeking** 144:6
**seen** 11:11,13 47:13 64:8,9 146:7 199:13
**sees** 70:2
**selected** 50:25 51:4
**self** 137:8 160:3
**selling** 20:25
**send** 30:22 31:1 33:13 47:22 49:21,25 50:9 65:21 67:9 119:6 131:10,25 132:15 178:25
**sending** 27:20 127:5 169:24 176:11
**senior** 41:1 47:1 57:25 75:7 119:14 122:5 201:4
**seniority** 74:3
**sense** 40:1 61:1 62:14 110:12 167:13 179:7 202:22 216:12,13,14
**sent** 51:18 52:4 65:15 116:11,12 122:24 133:6 140:1 146:25 152:12 153:15 156:2 170:18 173:14 178:3,15 180:13
**sentence** 212:24
**separate** 27:18 69:17 76:8 76:14 119:19
**separated** 120:8,16,23 121:10 122:17 123:2,11 125:9
**separately** 1:18 6:2 76:17 76:23 181:4 185:2 192:25
**separation** 69:19,22 72:19 120:20 126:1,6
**September** 117:16,17,20 189:9,15
**Series** 14:12
**serious** 137:13 200:10,13 201:6
**seriously** 172:4
**service** 35:22
**services** 15:11 21:1 208:23
**session** 68:10
**set** 7:22 38:9 39:2,4 47:15 61:22 62:19 63:1 67:14 76:13 136:2 151:6 223:6

**setting** 38:23 162:17 165:4
**setup** 36:18,19 62:24
**shalpin@fordobrien.com** 2:18
**Sheet** 221:11 222:1
**shifted** 30:8
**shook** 128:20
**shooting** 56:2
**short** 25:18 59:12 153:3,11 159:6 205:3
**shorthand** 7:17 223:1,8
**shot** 138:25
**show** 44:3 54:3,17 69:18,22 72:18 76:14,16 120:20,22 121:14 154:21 169:25 170:8 173:4 176:12 207:20
**showed** 49:1 58:18 157:12 165:24
**shut** 26:15 132:24
**shutting** 46:3
**sic** 165:22
**side** 26:4 45:1 124:14 219:25
**sides** 157:24
**sign** 27:11 33:15 51:22 52:6 59:25 123:5,7,9,16,22
**signature** 55:11,12,13,15 76:14
**signed** 53:18 76:17 170:18 173:24 211:12 212:10 221:17 222:24
**significant** 76:17
**significantly** 127:8
**signing** 51:19 52:5
**signs** 76:14
**similar** 69:1 118:8,9 180:12
**simple** 67:11
**single** 73:9 124:23 188:15
**sir** 8:24 137:2
**sit** 36:24 63:14 188:25 192:8
**sitting** 37:3
**situation** 126:19 130:24 134:20 143:8 160:5,6
**situations** 150:1
**six** 15:8,18 34:14 37:13 53:3 133:10
**size** 58:6 124:7
**sized** 124:8
**slash** 35:2
**slow** 111:16 176:17 178:12
**small** 36:20 37:6 57:15
**smart** 29:22
**sole** 201:16
**solemnly** 8:25
**solicit** 27:14 54:4 206:13

**solicitation** 205:22 215:9
**solicited** 30:5,6 53:20,25 211:22 212:13 215:7
**soliciting** 54:5,12 206:4
**somebody** 63:19
**somewhat** 171:18 180:3
**soon** 128:8
**sorry** 14:14 17:7 55:11 66:12 108:13 110:3 115:8 131:15 133:4 136:21 139:3 146:3,24 147:25 152:11 163:3 167:25 176:25 178:11 192:15 202:5 209:19 214:18
**sort** 15:14 24:3,24 30:8,14 30:23 33:8 35:3 42:10 46:22 49:7 53:14 56:10 59:5,9 65:10 68:19 69:16 70:22 74:14 75:16 112:20 119:5 124:17 126:21 127:15,23 128:19,20,23,23 130:1,2 137:12 138:18,21 173:3 174:9 179:4 200:11 216:18
**sorted** 210:12
**sounds** 15:19 59:18
**source** 151:9
**South** 2:12 14:11
**Southeastern** 14:9
**Southern** 1:2 7:2 8:2,3
**space** 57:12
**span** 124:14
**speak** 13:18,21 45:25 64:13 127:16 133:7,12 156:25 179:5
**speaking** 75:4,5 150:10 204:12
**specific** 21:15 47:8 63:12,23 63:24 64:12,20 112:2 132:3 201:10 211:4
**specifically** 33:1 40:6 45:7 64:19 109:2 122:21 150:2 207:7 213:18 214:7
**specifics** 64:22 121:24
**spectrum** 23:5
**speculate** 170:3,4 174:12
**SpeedTrader** 22:19,20,20 75:19 76:1
**spell** 9:10
**spend** 54:11 56:16
**spending** 56:18,25
**spent** 75:3
**split** 136:23,23 183:9,17,24 183:25 184:5,6
**spoke** 13:22,24 42:7 45:8

71:12 199:2,4 204:11
**staff** 35:7,25 36:5 53:7 57:22
58:8,15 59:6 73:11 132:21
132:22,23,25,25 133:3
136:17,19 201:24 209:6
212:6
**stage** 39:22
**stamp** 175:3 189:21
**stamped** 114:6 153:17
189:19 190:7
**stand** 150:22
**Standard** 7:15 219:9
**standing** 148:24
**start** 11:17,21 23:18 26:19
28:19 46:13 54:25 114:16
114:17 128:25 136:17
142:1 143:11 150:9 155:12
219:4
**started** 15:8 17:16,18 18:20
26:24 27:20 36:5 51:17
63:8,11 127:21,25 128:16
130:3 131:21 132:13 134:2
136:15,22 149:9 150:15,21
164:10,23 172:3,4,5
173:15 190:14 203:8
**starting** 146:2 175:20 211:8
**starts** 135:17
**state** 7:17 9:9 155:19 213:19
213:25
**stated** 143:1 215:3
**statement** 58:19 135:22
192:9 208:9 211:16
**states** 1:1 7:1 8:2,3,14 13:1
18:6 19:13 50:4
**stating** 170:19
**stay** 31:25 32:14,15 45:19
62:20 218:22,23
**steady** 208:25
**stealing** 140:18
**STENOGRAPHER** 8:23 9:4
68:18 76:18 110:3 142:14
217:19,22 220:9,14,17
**Stenographer's** 223:16
**stenographic** 220:19 223:1
**Stenographically** 1:23
**step** 34:17
**Stephen** 2:16 8:20
**stepped** 120:4
**sterling** 218:15
**stick** 23:21
**Stock** 15:10 22:21 40:19
169:19 170:15,18 172:24
173:4,10,12,18 174:1
176:10,14 179:8 181:1
**stole** 140:9

**stone** 62:19 63:1 67:15
**stood** 45:10
**stop** 62:4 64:11 115:16
138:25 142:18,23 143:18
145:3 168:1 176:1 179:15
**stopped** 19:11
**stopping** 143:21 144:5
145:5
**story** 157:1
**straight** 41:10
**straightforward** 34:15
**strange** 108:16 174:21,24
**streamlined** 76:10
**strike** 167:9 209:23 216:25
217:25
**stringent** 20:18
**strong** 36:11 164:6
**students** 38:7,17 45:21 49:3
135:9 136:16
**study** 209:16,20,25
**stuff** 17:25 20:11 21:14
22:15 38:9 41:3 43:13,15
44:19,20 48:4 62:13 73:16
130:3 133:21 137:9,11
158:17 165:20 171:21
172:6,10 174:22 180:4,7
202:2 204:18 205:1 216:14
219:20
**suave** 42:14 137:9
**subject** 168:10
**submission** 212:10
**submitted** 192:2
**subpoena** 4:4 10:19
**subsequent** 54:19 165:23
**subsided** 160:4
**substance** 114:11 115:1
154:17
**substances** 11:24
**sudden** 133:3
**suffice** 33:15
**sufficient** 10:16 159:7
**suggestions** 29:23
**Suite** 2:6,12
**Sum** 2:4 3:4 8:13,13 9:6,8
9:15,18 10:2,8,12,15,23
11:2,8,10,18,20 53:22
59:10,14,17,22,25 60:10
60:11 62:1,9 64:6 65:23
66:8 68:12,13,16 69:6,13
108:8,13,21 110:3,5,19
111:2,4,8,10,14,18 113:11
113:17,20,24 114:4,7,15
114:24 115:12,17 116:16
116:17 117:5,7,24 118:7
119:25 120:2 129:14,19

139:7,11,14,18,21,24
140:11,14,17,23 141:12,17
141:20 142:5 144:9 145:2
145:8,16,20 146:2,12,16
147:2,4,11,13 148:6,9
152:16 153:3,6,8,11,18,23
153:25 154:3,7,15,20
155:1,8,9 159:5,11,19
161:17 167:20,23 168:2,19
168:22 171:4,9 172:11,17
172:18 175:2,7,9,13,19,22
176:15,18 177:16,20
178:10,13 179:14,16
180:19,23 184:15,18 188:3
188:5,12,20 189:11,13,16
189:24 190:6,10,21 191:2
191:7,9,12,19,21 192:7,14
192:18 199:1 201:9 205:3
205:7,12,20 206:3,17,24
207:9,17,22 208:18,20
215:22 216:7 217:14,21
218:11,19,23 219:1,12,23
220:3,14,16
**sumal@sec.gov** 2:7
**summarize** 21:25 44:9
**summer** 26:2
**Sunday** 142:8
**support** 35:22
**supposed** 29:7 48:9 66:23
**sure** 18:2 19:19 22:12,14,15
23:3,5 26:8,9 27:2 33:14
35:24 37:9 44:25 50:8
53:12,14,15 54:6,7 55:3,21
56:1 59:7,8 61:15,16 74:15
74:16 121:17 122:15
123:10 125:2,15 130:2,10
158:10 160:23 161:23,24
172:10 215:21 217:6,15
218:7 220:1
**surely** 161:1
**SureTrader** 1:9 4:7,10 5:3
7:9 13:10,14,15 15:9,18,23
15:24 17:5,10,15,20 18:17
19:9,14 22:2 23:9,12,16
25:7,8,13 27:22,24 31:9
33:4 34:20,21,24 35:1,11
35:13,21 36:14 37:7,14
38:2 39:11 40:8 41:7 46:7
47:9 48:11,12 49:16,17
50:25 51:17,25 60:14,20
61:3,11,21 62:6,14 63:8,13
64:1,15,24,25 65:18,25
66:9,14 67:21 69:11 73:1
73:18 109:1,8,23,24
110:15,16 112:14 113:7

118:3,22 124:23 152:8
154:5 167:12 168:5 182:10
188:6 190:12,16 191:4,5
192:3 199:7,11,19 200:25
202:12 205:22,24 206:1
208:5,5 209:5,7,13 211:20
211:22 212:6,13 213:2
215:5,15 216:9,24 217:2
217:24 218:2
**SureTrader's** 40:4 108:10
109:3 110:2,6 206:19
207:1 208:23 209:2,15
210:5,25 216:4
**SureTrader.com** 4:5
**surface** 181:23 182:4
**surprise** 55:23
**surprised** 26:1 131:20
**surrounding** 118:12
**survive** 36:10
**suspected** 182:17,20
**suspend** 141:23
**swear** 8:22,25
**swing** 17:14
**Swiss** 1:8 4:13 5:1 7:8 13:9
13:14 58:12 123:8 124:1
**switch** 49:8 57:7 70:2
**switched** 132:20,22
**sworn** 7:21 12:16,22 223:7
**Sykes** 30:20 38:6,12,16
45:11,12,20 50:12 61:6,7
65:3 68:24 69:1 134:25
135:3,18,22,23 136:1,3
**Sykes'** 45:21 136:6
**system** 48:22,23 49:4,9 55:8
67:7 132:8 166:2 203:13
**systems** 24:10 55:6

---

**T**

**T** 4:1
**table** 64:4
**take** 11:18 14:20 15:21
24:10 59:11,14 108:18
128:9 132:14 133:11
149:15 152:16 155:5,20,22
158:5 159:5 162:17 163:23
172:17 182:7 184:15
189:16 192:15 200:12,23
205:3 211:3,25 213:22
218:20,23 219:10 220:13
**taken** 222:2 223:5
**takes** 17:24
**talk** 41:4 42:8,9 45:21 48:12
48:12,14 49:16,17 55:17
127:17,19 166:22 172:19
181:6 199:18 200:18

talked 25:5 199:6
talking 17:23 18:8 24:17
 38:13 41:17,17 42:10,11
 42:13,15,19 43:21 50:2
 51:13 60:13 65:10 67:20
 74:12 126:13 127:22
 129:20 130:3,23 137:4,7
 137:11,21,21,23 162:22
 163:12 200:1,2 202:9,14
talks 137:10
tape 219:16
task 60:22 61:11
taste 203:12
tat 144:20
taught 127:13
teach 23:21 35:25 43:5
 127:12
technically 123:6
technology 55:13 190:12
telephone 109:6 137:3
tell 4:10 26:7 29:2,6,14,18
 39:13,15 40:3,17 42:15
 54:12 56:13,17 64:21
 69:23 71:24 132:9 137:12
 158:16 183:23 205:21
 206:8,11,18,25 209:24
 210:1
telling 30:4 50:2 72:15
 138:21,25 162:8
ten 36:23 57:9 59:24
tenacity 41:16
term 18:12 120:16
terms 57:5 58:6 76:3,6
testified 60:14 63:25 69:7
 75:13 120:4 213:10
testify 10:19 11:15 13:7
testifying 28:22 139:6
 175:15
testimony 9:1 12:17,22 45:5
 51:25 119:16 145:24
 215:25 221:6,9 223:10
Texas 2:13
text 122:20,21
thank 9:4,6 10:4 11:9,18
 12:15 14:21 18:15 60:10
 76:21 110:22 119:25
 129:11,18 146:3 148:8,8
 154:19 184:21 191:11
 217:14 219:1 220:17
theorized 19:5
thing 19:9 22:24 24:24
 25:15 31:4 35:2 42:25
 49:20 54:13 55:20,24 59:9
 71:11 120:19 123:5 128:23
 136:16 138:22 144:25

151:5 157:5,20 162:1
 170:25 172:13
things 16:22 17:14 22:10,13
 24:19 40:18,21 44:4,14
 45:22 46:1,3 55:18 56:12
 56:20,22 57:21 58:3 66:25
 67:14 69:25 75:21 76:4
 119:11,11,12 127:4,17
 128:19,22 129:1 130:8,10
 130:15,23 134:1,5 135:17
 136:13,22 138:11,15,17
 148:21 149:16,18 150:5,15
 156:21 157:19,25 158:11
 158:13,15,23,24 160:3,3,8
 160:14,14,15 161:8,10
 163:1,6,8,13,21,21,22
 165:1 166:3,13,14,15
 167:15 170:23 172:6
 180:16 182:16 184:3
 200:11,16 201:11 202:13
 203:1 204:19 214:13
 219:17
think 13:1 15:14 16:3,12,19
 16:21 17:16,22,22 19:24
 19:25 20:3,9,23 21:3 25:14
 26:12,21,22 28:1,17 30:23
 31:22,22 34:9 35:3,6,9,14
 35:14,18 36:23 37:21 38:6
 38:24 39:2 40:14 45:20
 46:12,23 47:24 50:15 52:8
 56:8 57:1 61:2 62:18,19,22
 62:24 65:3,6,9 68:7 69:19
 70:6,18,19 72:4,5,17 74:12
 76:14 109:20 110:10,11
 112:18,19 116:10 119:19
 120:6,9,10 121:1 122:11
 122:13,22,24 123:12
 128:24 129:5,17 131:21
 134:17,18 136:17 141:1
 142:11,21 150:9 155:23
 159:5 161:20,20 164:1
 165:10 166:21 168:16
 169:16,19,19,22,25 170:7
 170:23 171:3 172:4,5,8
 173:14 176:5,11,11 177:7
 177:11,14,24 178:3,5
 179:7 180:9,15 181:13,21
 183:9 184:4 189:9 201:19
 201:24 202:14 203:10
 204:10,16 206:6 209:21
 210:3,9,10,17 211:1
 213:20 214:15 217:3,4,6
 218:3,4,7,14 219:23
thinker 57:11
thinking 31:23 134:16

135:14 149:5 150:10
 162:14 164:24,24 166:17
thinks 151:14
third 212:3
thorn 170:15
thought 16:15,16 41:12
 42:18 120:7 150:16,17
 166:16 174:20,24 182:6
 183:8,20 203:22
thrash 148:20
Thread 4:19,21,22,23 5:7
three 15:25 16:4 31:15
 35:10 46:15 163:2,3
throw 202:25
thumbs 42:4 43:24
tier 73:10
Tim 30:20 38:6,22 45:11,12
 45:20,21,22 48:20,24
 49:12 50:15,21 61:6,7 65:3
 66:23 68:24,25 110:11
 134:25 135:3,18,22,23
 136:1,3,5
time 7:15 8:6,7 15:13,22
 16:3 17:18 20:19 21:20
 24:21 25:18 28:21 29:21
 31:10 35:4,11 36:2,9 44:20
 46:5 48:1 55:13 57:21 58:1
 58:4,10,11,12 59:20,22
 60:3,8 61:23 65:6 71:24
 74:12 75:3,17 108:6 110:9
 110:16,17 113:15 117:19
 118:2 119:19,23 121:1,9
 121:17 122:2,7,16 123:2
 124:3,25 125:2,4,9,10,14
 125:16 126:5,15 127:19
 129:21 130:5,7,12,12,18
 131:2 134:22 136:25
 142:17 144:6 146:8 147:1
 150:21 159:5,12,17 161:11
 161:22 162:9,14 164:17,19
 164:21 166:15,19 172:3
 173:21,23 188:9 199:2,4
 200:6 204:13,20 205:13,18
 209:12,17 210:23 215:21
 217:4,4,12 218:4,5 219:3,4
 219:8,9 223:5,6
timeframe 17:9 31:6 46:6
 134:8
times 12:20 42:7 44:11 57:9
 61:18 66:5,14 70:4,11 75:1
 75:4 132:22 143:1 148:19
 150:5 163:20 165:8 200:9
 208:4
tinker 9:22
tit 144:20

title 20:25 35:15,18 70:1
 119:23 120:25 125:1,15
 162:11 182:10,15 183:6
titled 199:14
titles 125:6
today 8:9 11:14,22 12:3 13:6
 20:19 142:16 188:25 192:8
 219:3
today's 8:5 220:5
told 16:19,20 17:3,5 18:22
 20:6 23:20 24:20 28:2
 38:21 39:19 41:10 54:7,10
 58:21 62:12 66:23 69:15
 70:16 71:25 72:2,20,22
 76:12 131:23 135:23,25
 136:25 138:14 149:4,10
 156:6 158:15 160:22 177:8
 179:8 180:14,14 202:20,21
 202:22 203:1,14 206:12,16
 206:23 207:5,7,11,16
 213:24 214:22
tomorrow 142:17 219:8,10
tomorrow's 219:4,22
ton 19:14
top 108:19 113:23 114:17
 117:19 119:2 136:12 148:7
 168:16 172:8 176:16
 191:20
topic 33:18,25 34:18
total 45:17 210:18
totally 45:2 49:8 130:5
town 30:15
trace 134:14
track 28:14
trade 15:11 19:3,7 20:23
 66:5,15 67:3 73:15 124:12
 173:10 217:1 218:1
traded 208:5
Trader 18:22 48:16
trades 18:25 24:10 66:20,24
 68:25 69:4 216:25 217:24
trading 19:11,12 45:14,15
 47:10 48:7,10 49:15 50:4
 50:13,13 51:10 55:1 64:13
 64:16,20 67:10,24,25
 117:2 208:13,16
traditional 112:21
trajectory 57:4
transcribed 223:8
transcript 5:17 108:1 188:1
 190:4 220:11 221:6,8
 223:9,12,14,16
transcripts 219:16
transfer 111:24 112:19
transfers 112:25

transmission 140:2
treating 151:17
treats 165:6
trial 8:15 13:4,5 66:1,4,7
tried 53:8 119:19 138:15
158:21 162:21 204:15
trouble 133:16 136:14
162:12
true 119:16,18 135:23
136:10,14 174:8 178:22
221:8 223:9
trust 16:21 42:21,23,25 43:1
165:25 166:10
trusting 130:6
truth 9:1,2,2 149:8 180:9
truthfully 11:25 12:3
try 10:12 47:25 55:5 133:19
136:10 141:16 142:4,10
143:15 158:24 166:22
169:21 180:9 184:5
trying 22:16 29:19 30:12
31:6 41:17 43:5,9 44:3
56:1 60:23 70:23 118:19
129:14 132:14 133:14
135:4 137:20 148:25
150:19 157:17 174:10,12
178:5 216:14
turn 42:3 43:1,24 44:8 211:2
212:19,23 213:7 214:24
turned 138:2 142:8 144:13
158:9
twice 116:12,19 117:2
two 16:4 20:5 31:11,15 35:7
36:7 42:7 45:18 117:3,8
151:4 155:15,20,22 190:13
type 22:13,15,24 33:11
55:18 56:3 69:4 164:12
200:22 204:18 205:1
216:22 219:16
typed 34:7
types 67:2 117:21 118:9
typically 117:20

U

U.S 18:24 23:9 24:13,18,22
24:25 25:8,12,24 26:5,14
26:19,21,25 27:3,10,12
28:10,15,17,18 29:13,16
30:4,15 32:7 33:4,5,13,14
33:19,19 34:6,10 38:10
39:6,25 40:19 43:15,19
45:1 50:15,16,17,19,20,22
50:22 51:8 52:6,19,22 53:1
54:3,14,16 109:19,20,23
110:2,7,8,10,12,15,18

112:12 161:12,18 163:12
163:16 164:1 165:12,19
166:2 167:14 188:7 199:19
201:1 202:12,23 203:13
205:22,23 206:2,4,5,11,13
206:19,20,20 207:1,3,11
207:12 208:6,14 209:3,16
209:17 210:6,25 212:8
213:4,19 214:1 215:7
216:4 217:4 218:5
U.S.-based 38:13 51:24 52:4
53:17 208:24 211:11,21
Uh-huh 215:13
ultimate 113:6 172:19
ultimately 53:5,10 118:12
118:13 126:10 159:1
172:23 176:5
unbinding 223:15
understand 12:5,12 13:15
18:11 31:6 58:6 60:16
118:19 130:22 140:9
145:24 151:22 158:25
161:1,7 178:17 203:23
understanding 22:7 64:3
116:6 208:16 214:3 221:12
understood 33:12 44:25
51:25 74:9 161:5
unfortunately 130:14
ungrateful 183:20
Unit 21:21
United 1:1 7:1 8:2,3,14 13:1
18:6 19:13
University 14:11,15
unsealing 223:15
unsolicited 27:7,9 30:1 31:7
31:18 32:3 33:9 34:1,4,18
46:11,13 51:19 52:5,7,11
52:18,23 53:16,18 54:15
76:8,11,15 207:2,11
211:13 212:10
untrue 189:1,4
unusual 131:7 143:23
updated 37:20
upset 38:6,16,22 133:5
151:7 158:16,19 176:8
177:10 183:17 204:10,14
urge 164:6
USA 15:10 22:21 40:19
109:18 169:19 170:15,18
172:24 173:4,10,13,18
174:1 176:10,14 179:8
181:1
USD 112:7
use 18:11 70:13 129:25
145:1 190:15 191:3 207:1

uses 203:10
usual 171:15

V

v 222:3
Valine 1:24 7:16 8:9 223:3
223:24
various 24:9 30:10 43:16
45:24 65:16 113:5 127:17
127:22 169:24 171:2
vast 215:6
verbatim 34:13 75:19
verbiage 50:6
version 22:19 152:19,20
153:12
versus 7:25 13:1
vet 58:22 71:17
Victoria 1:24 7:16 8:9 223:3
223:24
video 8:6 12:7 136:2
videoconference 1:19 2:24
7:16 223:5
videographer 2:22,22 7:24
8:21 9:15 10:2 60:3,8
108:6,13 110:24 111:14
113:18 114:15 117:5 139:9
139:12 147:2,11 154:20
159:8,9,12,17 167:20,23
175:5,8,9 176:15 177:18
180:19 184:18 188:16
189:11 192:21 205:8,10,13
205:18 217:12 218:21,25
220:5
videotaped 1:15 7:24 11:4
view 9:25 39:22 128:23
viewed 23:23 39:23 127:11
130:5
vision 37:5
visual 126:12
visually 29:5
void 223:17
volume 1:17 46:18,20 57:5
67:24,25
voluntarily 11:14 13:6 167:6
189:6 192:12
vs 1:6 7:6

W

Wade 168:4 169:16,20
170:22
wait 115:10
waited 71:11
walk 133:9
wall 36:24 37:1 171:19
want 17:3 26:8 29:10,16

55:3 59:14,20 63:10 67:18
68:6 71:16 113:13 122:15
130:22 132:25 134:17
135:1,13,16 136:1,2,18
141:23 142:20 149:22,23
155:5 156:9,13,14 157:8
157:15,16 158:7,8 159:10
160:9,24 170:2 173:20
174:5,8 175:17 177:13
182:16,21 183:1,5 204:23
205:10 209:22 211:3
218:12,21 219:24
wanted 16:14 17:5 23:19
27:16 31:24 37:1 39:24
46:12,25 47:18 54:24 55:9
55:10 58:6 65:3 69:18,21
72:16,18 76:2 111:23
112:17,20 121:14,14
133:24 157:12 158:3 160:9
160:23 161:24 162:8
169:25 170:8 173:17 175:6
177:9 178:25 183:6 201:17
209:17,24 213:18 214:3
216:16 220:3
wants 135:17 149:24 159:2
war 163:18
warning 126:23 127:1
145:23 147:7 148:12,14,20
148:21 165:14 214:14,16
Warrior 45:15 50:13 64:13
64:16,20
wash 174:22 180:7,10
washing 179:24
wasn't 18:23 26:6,9 28:13
33:6 34:25 45:2 65:4 74:15
74:16,16 130:9 134:15
137:8 138:23 161:23,24
165:4,18 166:16 174:2,8
183:10 208:13 210:18
way 10:3 15:6 27:1 44:9,13
61:9 108:17 114:17 115:13
128:2,9,24 132:11 136:24
140:18 150:14,16,17 157:5
164:11 165:22 170:1
173:22 191:20 192:23
ways 24:3
we'll 33:12,13,14 54:16
114:16 177:19 183:17
188:17 190:3 205:4 217:17
219:8,21 220:13
we're 10:9 11:12 19:14
24:18 26:25 27:2 41:11,11
42:22 57:11 141:10,19,22
143:17 144:5,5,18 145:5,6
169:2 183:18 219:7

we've 59:10 68:10 140:8
143:8 145:17
Web 4:13,16
WebEx 7:15 219:5,5
website 37:7,16,17,18,20,22
37:23 40:4,5,9,12,16,21,23
41:2 45:23 56:10 108:10
109:1,3,9 110:6 111:13
112:14
websites 45:24 49:19 215:8
week 144:18 145:11,13
146:14 152:22 154:18
weekend 142:8
weeks 26:11,18 31:8 72:17
133:10 214:16
well-oiled 58:1
went 16:22 22:16 26:11
30:15 46:7 55:25 70:4 75:7
114:13 116:8 117:2 121:22
128:18 132:19 133:10,11
151:8,9 156:11 160:2
165:14 171:14 178:4
188:21 190:11
weren't 28:4 56:2
whistleblower 164:13,19,20
164:21
White 2:22 8:8
whoops 178:11
wider 9:24
wife 13:25 14:2,4 32:25
33:21 128:17
willing 136:8 189:24,25
window 10:3 62:21 63:5
wire 112:18,22 117:2
wished 183:7
withheld 142:7 143:10
144:12
witness 7:20 9:3 12:24
59:13,16,19,24 60:2 65:21
66:3 68:7,8,23 113:10
114:22 115:10 129:9,13
140:17,18 141:9 142:24,25
143:8 145:15 161:16
168:21 171:14 190:19,25
192:5 201:3 205:6 206:1
206:16,23 207:5,16 215:18
216:6 220:2 221:1 223:6
witness's 143:14
witnessed 128:3
word 18:12 129:25 183:19
200:7
word-for-word 75:25
words 34:2 121:10 149:24
work 10:13 14:23 21:10 24:6
25:12 27:6 29:9 32:19

43:17 44:16,16 47:10
50:25 58:15 62:21 63:3,6
114:17 138:5,20,24 156:7
156:9 158:11 160:23 164:4
167:17 190:11,16,20
worked 14:24 24:20 64:9
166:2 169:19 208:4
working 15:7,11 17:19 24:2
32:17 35:21 51:17 115:13
164:16 181:8 183:13
worry 71:21,25 72:3 138:4
151:11 200:14,20
worse 133:25
wouldn't 38:10 40:1,24
43:12,12 44:23 113:3
137:1 160:1 200:19 201:25
216:20
wow 57:15 133:2
wrap 138:18 205:4
write 135:13,16 136:13
148:11 149:5,6
writing 76:5 148:14,20
171:18 213:25
written 34:13 74:4,7
wrong 176:13 179:9
wrote 34:4,8 126:22 174:14
174:23 203:5

___

X

X 4:1

___

Y

Yaniv 177:22,23 178:5
yeah 14:16 15:21 16:5,12
17:22 27:19,25 32:22 36:7
37:6,17,18 38:4,4 42:4
43:22 47:23 61:24 62:3
70:15 110:17 119:8 139:16
140:16,20 178:3 201:7
211:1 219:18 220:12
year 15:23 17:24 18:1
119:18 134:12,13,14
161:22 164:25 166:18
172:14 181:25 182:1
183:13 210:16,18,19
years 14:17,17 15:8,18,21
16:1,2,5,17,2 20:18 24:15
143:9 163:2,3 216:10,12
Yep 155:7 176:1
yesterday 117:4
York 2:17,17 38:24,25 110:1
141:5

___

Z

zero 54:11

zoom 129:5,11,17 217:9
219:8

___

0

03848-E-0001203 5:8

___

1

1 1:17 4:4 9:16,17 11:12,18
155:13 207:21
1-221 1:17
1:19 108:5,6
1:21-cv-21079 1:6 7:6 8:4
10 4:23 20:18 41:23 59:20
142:1 159:7 167:21,22
169:5 171:6,7 205:7 208:1
10-minute 59:14
10:15 115:19
100 28:9,9
10016 2:17
101 4:10
107 6:4 76:22
108 4:13
11 5:1 168:19,20,24 171:6,8
172:17
11:00 59:25 60:3,5
11:10 60:1
11:12 60:6,8
11:43 177:6
111 4:16
113 4:19
12 5:3 168:4 184:16,17,19
184:20 189:18 190:7,9
210:15
1203 175:4
12120 114:6
13 5:7 175:1,3,7,11,12
180:21 184:15
139 4:21
1431 188:15
15 5:9 59:20 140:4,6 142:1
143:10 188:12,19 189:16
207:18,23 208:19,21
209:10
154 4:22
16 5:11 191:7,8,14,16 192:9
192:15
167 4:23
168 5:1
17 5:12 192:15,16,17
175 5:7
18 14:17 117:20
184 5:3
186 6:5 185:1
187 6:5 185:1
188 5:9

19 14:17
191 5:11
192 5:12
193 6:6
193- 192:24
1950 2:6
198 6:6 192:24
1st 189:15 223:22

___

2

2 4:5 20:3 155:13 207:19
208:2
2-4 5:17
2:35 159:12,14
2:46 159:15,17
20 211:3,4,8 221:19
200 10:13
2005 16:7
2006 16:7
2010 17:12,13,23 18:4
2011 15:24 17:11,12,13,17
18:3 22:3 23:17 25:20
27:23 34:20 36:15 37:8,11
2012 26:19 31:13,14 36:8
37:17,19 46:9,17,19 53:3
57:4 58:10 63:11 127:9
128:8 130:6 136:24 162:1
165:22 173:23 209:1
2013 115:18 117:20 127:9
134:24
2014 5:13 163:3 209:5,7
2015 57:5,20 58:10 122:11
122:15 126:24 127:6
129:22,23 130:5,13 131:3
134:14,16,17,17 138:19
146:22 147:5,23 159:21
163:3,4 165:13 209:22
2016 119:17 131:4 134:17
161:11 163:4 165:11 168:4
171:11,23 172:9 209:22,22
210:18,21
2017 125:23 172:21 175:25
176:19 177:6 179:18
184:12,13 199:5 209:1,7,9
215:5,15
2018 14:25
2020 189:9,9,15
2022 5:11 191:18
2023 1:20 7:14 8:5 220:6
221:9 222:2 223:22
20s 57:22
212-256-1047 2:13,17
212-858-0040 2:17
229 171:8
23 146:22 147:5,23

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)    2/27/2023

| | |
|---|---|
| 1    UNITED STATES DISTRICT COURT<br>2    SOUTHERN DISTRICT OF FLORIDA<br>3    --o0o--<br>4  SECURITIES AND EXCHANGE      )<br>COMMISSION,              )<br>5                    )<br>Plaintiff,        )<br>6                  ) Case No.<br>vs.        ) 1:21-cv-21079<br>7                    )<br>MINTBROKER INTERNATIONAL, LTD., )<br>8  f/k/a SWISS AMERICA          )<br>SECURITIES LTD. and d/b/a     )<br>9  SURETRADER, and GUY GENTILE,   )<br>a/k/a GUY GENTILE NIGRO,     )<br>10                   )<br>Defendants.     )<br>11 _____)<br>12<br>13      CONFIDENTIAL<br>14       SECTION<br>15    PAGES 77-107, 186-187 & 193-198<br>16    VIDEOTAPED DEPOSITION OF<br>17      PHILIP DORSETT<br>18    VOLUME 1 - CONFIDENTIAL PAGES<br>19    VIA REMOTE VIDEOCONFERENCE<br>20    MONDAY, FEBRUARY 27, 2023<br>21<br>22<br>23<br>Stenographically Reported by:<br>24 Victoria L. Valine, CSR, RMR, CRR, RSA<br>California CSR License No. 3036<br>25 Job No. 230227VV | 1      INDEX<br>2    EXAMINATION BY COUNSEL<br>3              PAGE<br>4  Examination By Ms. Sum              9<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |
| 1    REMOTE APPEARANCES:<br>2<br>3  FOR PLAINTIFF:<br>4    SECURITIES AND EXCHANGE COMMISSION<br>BY:  Alice K. Sum, Esq.<br>5      Alise Johnson, Esq.<br>Russell Koonin, Esq.<br>6    801 Brickell Avenue, Suite 1950<br>Miami, Florida  33131<br>7    305-982-6300<br>sumal@sec.gov<br>8    johnsonali@sec.gov<br>kooninr@sec.gov<br>9<br>10 FOR DEFENDANTS:<br>11    FORD O'BRIEN LANDY LLP<br>BY:  Matthew A. Ford, Esq.<br>12      Cara Filippelli, Esq.<br>3700 Ranch Road 620 South, Suite B<br>13    Austin, Texas 78738<br>512-503-6388     Fax:  212-256-1047<br>14    mford@fordobrien.com<br>15    FORD O'BRIEN LANDY LLP<br>BY:  Adam C. Ford, Esq.<br>16      Stephen R. Halpin, III, Esq.<br>275 Madison Avenue, Floor 24<br>17    New York, New York  10016<br>212-858-0040     Fax:  212-256-1047<br>18    aford@fordobrien.com<br>shalpin@fordobrien.com<br>19<br>20<br>21 Also Present: Guy Gentile<br>22 Videographer:  DeShawn White, Legal Videographer<br>23<br>24  (All parties appeared remotely via videoconference.)<br>25 | 1      E X H I B I T S<br>2<br>3 EXHIBIT NO.    DESCRIPTION       PAGE<br>4 Exhibit 1    Deposition Subpoena      9<br>5 Exhibit 2    SureTrader.com Account Application    77<br>Bates No. SEC-SCB-P-0009184 -<br>6    SEC-SCB-P-0009221<br>Confidential pursuant to<br>7    Securities Exchange Act s.24(d)<br>8 Exhibit 3    SureTrader Account Application    91<br>Bates No. SEC-SCB-P-0010164 -<br>9    SEC-SCB-P-0010198<br>Confidential pursuant to<br>10    Securities Exchange Act s.24(d)<br>11 Exhibit 4    SureTrader Tell Us About You form    101<br>Bates No. SEC-SCB-P-0010428 -<br>12    SEC-SCB-P-0010428<br>Confidential pursuant to<br>13    Securities Exchange Act s.24(d)<br>14 Exhibit 5    Swiss America Securities, Ltd. Web    108<br>Page<br>15    Bates No.<br>SEC-SECWEBCAPTURE-E-0000340 -<br>16    SEC-SECWEBCAPTURE-E-0000345<br>17 Exhibit 6    Funding & Banking Web Page    111<br>Bates No.<br>18    SEC-SECWEBCAPTURE-E-0000377 -<br>SEC-SECWEBCAPTURE-E-0000382<br>19<br>20 Exhibit 7    Email Thread    113<br>Bates No. SEC-FL-03848-E-0012118 -<br>20    SEC-FL-03848-E-0012120<br>21<br>22 Exhibit 8    Email Thread    139<br>23 Exhibit 9    Email Thread    154<br>24 Exhibit 10    Email Thread    167<br>Bates No. SEC-FL-03848-E-0000228 -<br>24    SEC-FL-03848-E-0000229<br>25 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

1   Exhibit 11   Swiss America Securities Order   168
                 Flow
2                Bates No. SEC-FL-03848-E-0000230 -
                 SEC-FL-03848-E-0000231
3
    Exhibit 12   SureTrader Application -   184
4                Christopher Miguel Penalver
                 Bates No. SEC-SCB-P-0010391 -
5                SEC-SCB-P-0010409
                 Confidential pursuant to
6                Securities Exchange Act s.24(d)
7   Exhibit 13   Email Thread   175
                 Bates No.
8                SEC-FL-03848-E-0001195-SEC-FL-
                 03848-E-0001203
9
    Exhibit 15   Declaration   188
10               Bates No. SEC-FL-03848-E-0001431
11  Exhibit 16   Declaration of Philip A. Dorsett   191
                 Dated June 27, 2022
12
    Exhibit 17   Affidavit of Philip Dorsett Dated   192
13               January 9, 2014
                 Bates No. GENTILE0004495 -
14               GENTILE0004497
                 CONFIDENTIAL
15
16
17
18
19
20
21
22
23
24
25

1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF FLORIDA
3                      --oOo--
4   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
5                                  )
        Plaintiff,                 )
6                                  ) Case No.
        vs.                        ) 1:21-cv-21079
7                                  )
    MINTBROKER INTERNATIONAL, LTD.,  )
8   f/k/a SWISS AMERICA              )
    SECURITIES LTD. and d/b/a        )
9   SURETRADER, and GUY GENTILE,     )
    a/k/a GUY GENTILE NIGRO,         )
10                                   )
        Defendants.                  )
11  _____)
12                     --oOo--
13          BE IT REMEMBERED, that on Monday, February 27,
14  2023, commencing at the hour of 9:49 a.m. Eastern
15  Standard Time, all parties appearing via WebEx
16  videoconference, before me, Victoria L. Valine,
17  Certified Shorthand Reporter of the State of California,
18  appeared:
19              PHILIP DORSETT
20  called as a witness by the Plaintiff, who, being by me
21  remotely sworn, was thereupon examined and interrogated
22  as hereinafter set forth.
23                     --oOo--
24
25

1          CONFIDENTIAL - ATTORNEYS' EYES ONLY
2                  BOUND SEPARATELY
3                       - - -
4                 Pages 77 - 107
5                 Pages 186 - 187
6                 Pages 193 - 198
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          (The following testimony is designated as
2   confidential.)
3          MS. SUM:  I'm going to ask the videographer to
4   please bring up Exhibit 2 which is marked confidential.
5          So, Madam Court Reporter, please note that for
6   the record.
7          (Deposition Exhibit 2 marked.)
8   BY MS. SUM:
9      Q.  And, Mr. Dorsett, let us know if this is at a
10  level that you can read it or if it needs to be further
11  magnified.
12     A.  I'm good.  I can read it.
13         MS. SUM:  Okay.  Just for the record,
14  Exhibit 2 is Bates stamped SEC-SCB-P-0009184 through
15  9221.
16  BY MS. SUM:
17     Q.  Mr. Dorsett, I would like for you to review
18  the first --
19         MS. SUM:  I'll ask the videographer to
20  please scroll through the first 12 -- 12 pages just to
21  allow you a moment to familiarize yourself with the
22  exhibit.
23         Thank you.
24         We'll pop back up to page 1, and I'll proceed
25  with asking Mr. Dorsett questions.

77

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

BY MS. SUM:

1 BY MS. SUM:
2   Q.  Mr. Dorsett, you've had an opportunity now to
3 review the first 12 pages of Exhibit 2.
4       Does this document generally appear to be the
5 form of an application that SureTrader customers used?
6   A.  Yes.  This would have been either the second
7 or the third iteration of the application.
8   Q.  And why do you say this is the second or the
9 third iteration?
10   A.  Well, like I said, the first one was a PDF
11 that the clients actually filled out themselves.  And I
12 think this actually is the third version, because the
13 second one was more like an online version of that first
14 one, but it still looked like the first one.  And in
15 this third one this is when, basically, everything was
16 online.  So in this one I saw the unsolicited
17 acknowledgement agreement.
18       With this application the client would
19 digitally sign once and then it applies it to all the
20 places it needs to be.  So I think -- that's why I say
21 this is either the second or third one.  It's been a
22 while now, but this is one of the later ones,
23 definitely.
24   Q.  Okay.  I'll turn your attention to the top of
25 page 3, please.

78

1       Okay.  Mr. Dorsett, do you see where there is
2 a signature and then a date on page 3 of Exhibit 2?
3   A.  Yes.
4   Q.  Okay.  And what date do you see on this
5 document?
6   A.  That looks like August 17, 2012.
7   Q.  Do you recall, around this time, which form of
8 the application SureTrader was using?
9   A.  I cannot say I recall.  To be honest, I
10 thought -- I would have thought that it took a little
11 longer for us to get -- I thought we used those initial
12 applications for longer, but -- so I can't say
13 definitively.  And so we probably ran through those
14 first set of application -- applications all within the
15 first year.
16   Q.  On page 3 below the signature do you see
17 where -- excuse me, the first signature where -- do you
18 see where it says, "unsolicited acknowledgement
19 authorization"?
20   A.  Unsolicited acknowledgement?
21   Q.  Yes, sir.
22       MS. SUM:  If you could please scroll,
23 Mr. Videographer.
24       THE WITNESS:  Okay.
25       /////

79

1 BY MS. SUM:
2   Q.  Do you see where it says "unsolicited
3 acknowledgement authorization"?
4   A.  Correct.
5   Q.  And the paragraph below it?
6   A.  Yes.
7   Q.  Could you take a moment to review the
8 paragraph, please?
9   A.  Okay.
10   Q.  Does this appear to be the unsolicited
11 acknowledgement authorization language that you
12 testified about earlier?
13   A.  Yes.  Some of it, I think, has changed
14 slightly.  Well, the bottom part was added dealing with
15 the digital signature.
16   Q.  When you say, "the bottom part," could you
17 please identify the starting portion of the sentence
18 that you're referring to?
19   A.  Right.  So the part that's in capitals it
20 says, "by electronically signing this agreement below."
21   Q.  Yes.
22   A.  So that was not initially part of the
23 unsolicited acknowledgement agreement.  And, for some
24 reason, I think the wording has changed slightly from
25 the original one.  But I -- I want to say -- I would

80

1 have to look at one of the original ones, but I want to
2 say it looks like the wording has changed very slightly.
3   Q.  Is this language similar to what was --
4   A.  Yes.
5   Q.  -- discussed during the meeting with you,
6 Mr. Gentile, and Ms. Gentile?
7   A.  Yes.  It's basically all the same thing.  It's
8 just one or two things in there I was like -- I wasn't
9 sure if that was the exact word that was used.
10   Q.  Did you make the change that you're referring
11 to to this unsolicited acknowledgement authorization
12 language in Exhibit 2?
13   A.  No.
14   Q.  Who made the change?
15   A.  Well, I only can assume it's Guy because
16 anything to do with the application or anything to do
17 with that nature Guy either did it himself or instructed
18 the relevant persons to do it.
19       At that time, I don't think we had -- I don't
20 think we had a full-time IT person, and so we would
21 have -- Guy would have used IT persons that -- you know,
22 that he was familiar with.
23       The part that seems a little different is
24 where it says, "U.S. or any other country other than
25 Bahamas."  That just seems a bit -- I just don't recall

81

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)    2/27/2023

1  that part being similar to the original one.
2      Q.  Other than you and Mr. Gentile, would any
3  other employee of SureTrader have authority to change
4  the language in the application package?
5      A.  No.
6      Q.  And in August of 2012 were there any other
7  employees that worked on the content of the application
8  package?
9      A.  I would say -- I would say no.  I know Justin
10  and Guy were pretty close, so maybe there was discussion
11  privately between them, but I -- but I still would say
12  no.
13      MS. SUM:  I'll ask the videographer to please
14  scroll back up to the first page.
15      Thank you.
16  BY MS. SUM:
17      Q.  Do you see, Mr. Dorsett, where in bold it says
18  "account application" and "account type"?
19      A.  Yes.
20      Q.  Okay.  And below that, what is the account
21  type?
22      A.  Individual.
23      Q.  And do you see where it says, "How did you
24  hear about us," immediately below that?
25      A.  Yes.

82

1      Q.  Okay.  What does it say?
2      A.  Timothysykes.com.
3      Q.  Is that information typed in or filled in by
4  the applicant?
5      A.  Initially in the early applications it used to
6  be filled in, but I think this is a drop-down menu.  And
7  so they would select timothysykes.com.
8      Q.  When you use the term "drop down," can you --
9  can you please describe it a little bit further how that
10  looked?
11      A.  So when the clients are filling out the
12  application online where it says, "How did you hear
13  about us," they can either leave it blank, or they would
14  click on a little arrow that points down, and once they
15  click on that, it would -- a menu would open up with
16  selections that they can choose.
17      Q.  Do you recall what are the selections
18  available to an applicant when filling out the
19  application?
20      A.  Well, Tim Sykes is the big one.  The other big
21  ones would have been like Warrior Trading, Day Trading
22  Radio, et cetera.  I can't remember all the names.
23      Q.  But this is information filled out by the
24  applicant?
25      A.  Correct.  They would choose which one applied

83

1  to them.
2      Q.  And do you see on this first page where there
3  appears to be a stamp and it says, "approved"?
4      A.  Correct.
5      Q.  Who would have stamped this application with
6  approved?
7      A.  Now, that depends because, like I said, we
8  went through various processes.  There would have been a
9  time where every single application would have been
10  approved by me, but that would have changed very quickly
11  once the volume shot up through the roof.
12      And so by the time -- we obviously have --
13  this is a Tim Sykes client.  So we probably were
14  getting, you know, hundreds and hundreds of applications
15  in.  So this would have been stamped by a particular
16  staff member who would have been trained to look for
17  specific things to make sure everything was okay.
18      Q.  What is the primary account owner name on the
19  application at Exhibit 2?
20      A.  Jeff Bucknum.
21      Q.  And what is -- what country is Mr. Bucknum
22  listing as the contact information on Exhibit 2?
23      A.  United States of America.
24      Q.  When this application was received, would
25  there have been any specific review of the application

84

1  based on Mr. Bucknum's identification of his country as
2  United States of America?
3      MR. MATTHEW FORD:  Objection.  Leading.
4      THE WITNESS:  No.
5  BY MS. SUM:
6      Q.  What review -- what review was performed on
7  this application upon receipt at SureTrader?
8      A.  All right.  So the review would have been --
9  first off, to go over the actual information to see if
10  it makes sense.  And then to compare the KYC information
11  with the actual information that the client filled out,
12  make sure that the things like -- they were not out of
13  date, like, if you had like an I.D., make sure it was
14  not more than 10 years old, proof of address no more
15  than, I think, it was six months old.  And so that's the
16  stuff that we were looking for.
17      And then with this application it was much
18  easier for us because where it was automated the client
19  couldn't submit it unless it was at a certain level of
20  completedness.  So this actually made it a lot easier
21  for us to process these.
22      And so with this one -- with these
23  applications, like I said, the unsolicited
24  acknowledgement agreement is in it, and so the person
25  wouldn't even have to check for that because that would

85

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

1 be just automatically done. I think Guy had it in the
2 system where once it was a U.S. person, the unsolicited
3 acknowledgement agreement would automatically be a part
4 of the application.
5      And so, by this point, we were not probably
6 even checking to see if the unsolicited acknowledgement
7 agreement, because, you know, the main thing was really
8 this first page because everything would have been
9 signed. So we wouldn't even have to really go in to
10 make sure everything was signed because we knew it would
11 be signed. So we had to make sure that the KYC
12 documentation really matched up with what the client was
13 saying, and basically that was it, yeah.
14      We had various checklists that we would run as
15 well, and that would be a part of the process -- like,
16 we would do like -- we would do an old fact check. And
17 so -- and, again, when we move up, we had various
18 departments -- like different department would do
19 different things. And so I think -- I can't remember
20 the actual process, but once everything was done, the
21 approved stamp would be applied.
22      Q.  When did the application approval process
23 evolve from early on when you and/or Mr. Gentile were
24 approving them?
25      A.  Basically with the -- the onset of having a

86

1 lot more clients come in.
2      So with Guy reaching out and establishing the
3 relationships with the affiliates, that's when
4 everything changed and we had to come up with a new
5 system or else we would have been drowned. We got a lot
6 of clients coming in.
7      So, again, I -- I sort of figured it was about
8 the first half of the first year, you know -- and that
9 seems about in line with this one was showing 2012, so
10 that seems about right. But it was around that time the
11 affiliates program was really doing well. And, like I
12 said, back then Tim was a big guy -- Tim was always the
13 big guy. And so we basically had to have a better
14 system unless we would have been drowned with client
15 accounts.
16      Q.  You've been using the term "affiliate
17 programs." Who came up with that term?
18      A.  Guy. Guy called it the affiliate program, and
19 he referred to them as affiliates. And I heard him on
20 the phone discussing that title like -- you know, I
21 can't remember why he chose that, but I -- that's what
22 he went with.
23      Q.  Do you recall when you first heard the term
24 "affiliate program" from Mr. Gentile?
25      A.  Well, again, that would have been very early

87

1 on. Probably like within the first quarter when he
2 would have been on the phone discussing with the various
3 individuals how he was going to do all of this. So he
4 would -- I would hear him talk about hey, we're going to
5 have -- he would have called it different things, but,
6 at some point, the name "affiliate" sort of just stuck.
7      Q.  And when you say "first quarter," what year
8 are you referring to?
9      A.  2012.
10     Q.  When you said that the process needed to
11 change because, otherwise, you would all be drowning
12 with the number of applications, who else was employed
13 by SureTrader to be part of the account approval
14 process?
15     A.  Well, like I said, the three individuals who
16 were doing the magazine, we brought them over to our
17 side and they were assisting. And we also hired two
18 additional gentlemen as well.
19     The two additional gentlemen, they had a
20 background in finance, and they would be the ones, as I
21 recall, who were actually in the chatrooms as well
22 because they could actually speak to clients more
23 intelligently, and, whereas, the other three individuals
24 they were more, just -- I guess, back office. They
25 would be assisting with things just to make sure that we

88

1 receive all proper information from the clients.
2      Q.  Okay.
3      A.  And, again, that would have grown -- we
4 grew -- we grew very quickly. And so that situation we
5 probably get a new staff every two to three weeks, you
6 know. We were really, really growing quickly.
7      Q.  In what timeframe are you referring to when
8 you say, "a new staff member every two to three weeks"?
9      A.  Again, around I would say like mid 2012 we
10 just started to like take off. Like, it was just a lot
11 of folks and I think a lot of growth.
12     Q.  The additional employees that you described
13 that were brought over from the magazine and the
14 individuals with the finance background, who supervised
15 their work?
16     A.  Well, I would have supervised their work.
17 Now, the thing is, Guy -- and I brought this to Guy's
18 attention very early -- right -- because within the
19 magazine there was their manager and then these two
20 other persons. Right. When Guy brought them over, you
21 know, none of them really had a background in this type
22 of business, but he still wanted to respect her position
23 as manager. Right. So she was managing them. This is
24 the same lady that came with the accounting system that
25 Tim Sykes blasted us over.

89

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)    2/27/2023

1    But I spoke to Guy about -- and Guy -- I told
2  him, listen, it's causing confrontation because I'm
3  trying to tell this lady what to do, but -- I don't
4  know, maybe because she was from a different company,
5  technically, she, for whatever reason, didn't want to, I
6  guess, respect my authority or whatever the case may be.
7  So I went to Guy about it and I said, you know, to
8  correct this -- and he told me something that was a bit
9  shocking.  He says, in all of his firms he doesn't like
10  to actually appoint persons to be in charge, because he
11  believes in this like -- you know, the strongest will
12  survive type of thing.  And I said, well, Guy, that
13  sounds nice and good, but that's going to cause a lot of
14  confusion inside the office.
15    Now, later on -- I say that because later on
16  the relationship sort of changed -- the dynamics of the
17  relationship changed between myself and Guy, and I still
18  saw where he would seemingly be encouraging, in my view,
19  to be confrontation between especially high staff
20  members with each other.  But, what I started to realize
21  it's not because he wanted the strongest to survive.  I
22  think if -- if we were bickering with each other, then
23  we couldn't see the stuff that Guy was doing.  I think
24  that's the reason why he really was encouraging that,
25  but I didn't -- I didn't start to notice that until

90

1  sometime later.
2    Q.  All right.
3    A.  But I -- to answer your question, I was trying
4  to supervise these individuals, but there was
5  confrontation.
6    MS. SUM:  I'm going to ask that Exhibit 2 --
7  excuse me -- yes.  Exhibit 2 be brought down, and then
8  Exhibit 3 to be put on the screen, please.
9    And Exhibit 3 is also similarly stamped
10  confidential.
11    So please note that for the record, Madam
12  Court Reporter.
13    (Deposition Exhibit 3 marked.)
14  BY MS. SUM:
15    Q.  I ask, Mr. Dorsett, that you review, as the
16  court reporter scrolls through the first -- give me one
17  moment.  My PDF is locked up.
18    MS. SUM:  It's a bit of a scroll, but scroll
19  through the pages 1 through 24.
20  BY MS. SUM:
21    Q.  Mr. Dorsett, I'm asking you just to look at
22  it.  I'll point you to, later, specific information that
23  I'll ask you questions about.
24    MS. SUM:  Okay.  Thank you.
25    /////

91

1  BY MS. SUM:
2    Q.  Mr. Dorsett, does the account application at
3  Exhibit 3 appear to be a different form than what you
4  reviewed in Exhibit 2?
5    A.  Yes.
6    Q.  Okay.
7    MS. SUM:  Videographer, could you please bring
8  it back to page 1?
9    Thank you.  All right.
10  BY MS. SUM:
11    Q.  I realize we very quickly scrolled through,
12  but can you describe what you recall about the change
13  of -- or changes between the application at Exhibit 3
14  versus the application at Exhibit 2?
15    A.  Right.  So, again, this goes to show the fluid
16  nature of how things were changing within the firm.  I
17  think I saw it -- was it 2017?  Was that the date around
18  this application?
19    Q.  It scrolled rather quickly.  I will represent
20  to you that the --
21    A.  So, again --
22    Q.  I will make the representation to you that
23  there is a portion of this document that -- that
24  reflects a time period in 2016.
25    A.  Okay.  And so --

92

1    MR. MATTHEW FORD:  Again, could we just go to
2  the page where there's a signature to verify the date?
3    MS. SUM:  All right.  Hold on.  Let me scroll.
4  My PDF is locking up so please give me a moment.
5    All right.  Actually, I'm going to turn
6  Mr. Dorsett's attention to page 29 of the PDF, please.
7  BY MS. SUM:
8    Q.  Okay.  Mr. Dorsett, do you see before you
9  page 29, and do you recognize this document?
10    MR. MATTHEW FORD:  Can we just -- before we
11  move forward with the questioning, can we please get a
12  date on when this document was created?
13    MS. SUM:  I'll get to the question.  I want to
14  ask if he recognizes --
15  BY MS. SUM:
16    Q.  Do you recognize the nature of the -- the
17  general format of what's on page 29?
18    A.  Yes.
19    Q.  Okay.  Can you describe whether, during your
20  employment at SureTrader, whether you've ever seen a
21  document like what starts at page 29?
22    MR. MATTHEW FORD:  Objection.
23    THE WITNESS:  Yes.
24    MR. MATTHEW FORD:  I'm objecting to the use of
25  the document until we've identified what it is.

93

Case 1:21-cv-21079-BB Document 260-3 Entered on FLSD Docket 05/17/2024 Page 74 of 245
CONFIDENTIAL - ATTORNEYS' EYES ONLY
Philip Dorsett (confidential section)   2/27/2023

BY MS. SUM:
2    **Q.** Mr. Dorsett, could you please identify what is
3 on page 29?
4    MR. MATTHEW FORD: Not what's on page 29. I'm
5 not sure what I'm looking at.
6    I understood earlier it was described as a
7 customer application. We were unable to identify a
8 timeframe, and now we're looking at something that most
9 obviously would not have been on a customer application.
10    So can we just confirm what it is and when
11 it's from?
12    MS. SUM: You can make your objection, and
13 I'll continue with my questioning.
14    So, noted for the record.
15 BY MS. SUM:
16    **Q.** Mr. Dorsett, do you recognize what starts on
17 page 29 of Exhibit 3?
18    **A.** Yes.
19    **Q.** Okay. What is the starting page 29 of
20 Exhibit 3?
21    **A.** Right. So iBoss is basically our back office
22 system. And so if you needed, like, a printout of,
23 like, customer trades, or customer deposits, and so
24 forth, you can get it from iBoss. And that's -- it
25 seems that's what we're looking at.

94

1    **Q.** During your employment as SureTrader did you
2 review such iBoss printouts?
3    **A.** Yes.
4    **Q.** What is the date on this iBoss printout?
5    **A.** This date goes from January 1, 2016 to
6 January 30th, 2018.
7    MS. SUM: And I would ask the court
8 reporter -- excuse me, the videographer, to scroll to
9 page 30 closer to the second half.
10    Yes. Thank you. Right there.
11 BY MS. SUM:
12    **Q.** Do you see entry dates on this iBoss report,
13 Mr. Dorsett?
14    **A.** Yes, I do.
15    **Q.** Okay. What is the first entry date that
16 appears on page 30 of this iBoss report?
17    **A.** Now, it's small, but it looks like
18 September 30, 2016.
19    **Q.** Okay.
20    MS. SUM: And then I'll ask the videographer
21 to scroll back to the top of page 29.
22 BY MS. SUM:
23    **Q.** What's the account name for this iBoss report?
24    **A.** This is Carismir Martinez.
25    MS. SUM: And then, videographer, could you

95

1 please bring it back to page 1 of Exhibit 3?
2    MR. MATTHEW FORD: And, just to be clear for
3 the record, that date you're reading was entry date on
4 an Excel spreadsheet that the title of the actual iBoss
5 report includes the date of January 13 -- or January 31,
6 2018. So I'm not -- I didn't catch the significance of
7 the date from September 2016, but I just want to be
8 clear that that's not the appropriate date that this
9 document was created.
10    MS. SUM: Well, Matt, I don't know how you
11 practice in Texas, but you know not to make speaking
12 objections like that.
13    So, going back to page number 1 of Exhibit 3.
14 BY MS. SUM:
15    **Q.** Mr. Dorsett, this application, can you tell me
16 whose name appears as the primary account owner?
17    **A.** Carismir Martinez.
18    **Q.** Is it fair to say that Carismir Martinez would
19 have had to apply to be a customer of SureTrader prior
20 to any trades being conducted?
21    **A.** Yes.
22    **Q.** And when you looked at the iBoss report, I
23 believe you identified that the first transaction was
24 September -- excuse me, in September of 2016, correct?
25    **A.** Yes.

96

1    **Q.** So Carismir Martinez would have applied prior
2 to that date; is that correct?
3    **A.** Correct.
4    MR. MATTHEW FORD: Objection.
5 BY MS. SUM:
6    **Q.** All right. Does that help refresh your memory
7 as far as when the timeframe would be for this
8 particular form of account application for SureTrader?
9    MR. MATTHEW FORD: Objection.
10    THE WITNESS: Well, it -- it doesn't because,
11 again, Guy would switch these sometimes without us even
12 knowing about it. And so he may make slight changes,
13 you know, and so I cannot really say that I can confirm
14 that that's the first time this exact type of
15 application was -- started to be in use.
16 BY MS. SUM:
17    **Q.** On page 1 of this application, does it contain
18 a part that says, "How did you hear about us"?
19    **A.** Yes.
20    **Q.** Okay. And what does it say on Exhibit 3?
21    **A.** It says, "Tim Sykes."
22    **Q.** Do you recall if this form of application had
23 what you previously described as a drop-down menu for,
24 "How did you hear about us"?
25    MR. MATTHEW FORD: Objection.

97

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

1    THE WITNESS:  I cannot say if this one had a
2  drop-down menu or not.
3  BY MS. SUM:
4    Q.  Well, was there a point in time when, on the
5  application, that information about how did you hear
6  about us was manually entered?
7    A.  Yes.
8    Q.  Okay.  When was that?
9    A.  In the very beginning the clients would have
10  to literally write it in.
11    I think by the second iteration of the
12  application -- probably the second or third, then we
13  started either using a drop-down menu or something of
14  that nature.
15    MS. SUM:  Okay.  I'm going to ask the
16  videographer to please scroll to -- give me a moment
17  because my PDF is scrolling -- to page 22, the bottom,
18  please, of page 22.
19  BY MS. SUM:
20    Q.  Mr. Dorsett, do you see on page 22 of
21  Exhibit 3 where it says, "Unsolicited Acknowledgement
22  Agreement"?
23    A.  Uh-huh.
24    MS. SUM:  Okay.  May I ask the videographer
25  just to scroll a little bit so that, perhaps, we can see

98

1  the top of the next page -- no.  I'm sorry.  Scroll
2  down.  Yes.  Thank you.  Okay.
3    Just to show Mr. Dorsett the balance of that
4  paragraph.  If you can, please scroll back up to the
5  text of the paragraph.
6  BY MS. SUM:
7    Q.  Okay.  If you'll take a moment, please,
8  Mr. Dorsett, to review this paragraph.
9    A.  I've read it.
10    Q.  Okay.  Does the unsolicited acknowledgement
11  agreement, in Exhibit 3, appear to be different than
12  what you reviewed in Exhibit 2?
13    A.  Yes.
14    Q.  Do you recall any details for why the
15  unsolicited acknowledgement agreement paragraph is
16  different between Exhibit 3 and Exhibit 2?
17    A.  I -- I don't know why he changed it.
18    Q.  But your testimony today is that if there are
19  any changes, that Mr. Gentile made them?
20    A.  Yes.
21    MR. MATTHEW FORD:  Objection.
22  BY MS. SUM:
23    Q.  Do you recall having any conversations with
24  Mr. Gentile about the form of the language in the
25  unsolicited acknowledgement agreement in Exhibit 3?

99

1    A.  The only time we had conversation about the
2  language is in the very beginning.
3    Q.  When you say "the very beginning," what time
4  period are you referring to?
5    A.  Like back in that -- like I think it was
6  February 2012 when, you know, we first did the
7  unsolicited acknowledgement agreement on a separate
8  sheet.  And that's when -- that's when, you know, that
9  meeting that I discussed, that's when we discussed the
10  content of the unsolicited acknowledgement agreement.
11    I -- I would have known that these slight
12  changes were taking place, but, you know, Guy would fine
13  tune them to better suit, I guess, what he thought was
14  required by American law.
15    Q.  Did Mr. Gentile discuss that with you before
16  making any changes to the unsolicited acknowledgement
17  agreement?
18    A.  No.  He didn't discuss it with me, but I
19  would -- again, sometimes the staff would bring -- like
20  when there's changes, the staff would bring it to my
21  attention and be oh, this looks different.  I would go
22  through it and try to point out some of the differences.
23    MS. SUM:  All right.  Please take down
24  exhibit -- oh, actually, before you take it down.
25    For the record, just to note the Bates stamp

100

1  range for Exhibit 3 is SEC-SCB-P-0010164 to 10198.
2    And then you can take it down, please.
3    All right.  At this time I'm going to ask the
4  videographer to bring up Exhibit 4 which is also marked
5  confidential.
6    And the Bates stamp range for Exhibit 4 is
7  SEC-SCB-P-0010428 to 10446.
8    And I will ask the videographer to please
9  scroll from page 1 down to 12, please.
10    (Deposition Exhibit 4 marked.)
11    MS. SUM:  All right.  Thank you.
12    And could you please bring it back to page 1?
13  BY MS. SUM:
14    Q.  Mr. Dorsett, we are looking at Exhibit 4.
15    Does this appear to be the same format of an
16  account application as the ones we reviewed in
17  Exhibits 3 and 2?
18    A.  No.
19    Q.  Do you recall, roughly, when this form was
20  being used at SureTrader?
21    A.  So I want to say this would probably be like
22  the second iteration, but I can't say for sure.
23    Q.  Okay.  And what leads you to believe that it
24  was the second iteration?
25    A.  Well, like I said, the very first ones we used

101

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Philip Dorsett (confidential section)    2/27/2023

1  was a PDF very similar to this, but clients would fill
2  it out themselves.  And I think this was just a natural,
3  like, update to that.  And so they would fill it out
4  online, right, but it still used the same formats
5  from -- from the first one.  That's why I say that.
6     **Q.**  All right.
7        MS. SUM:  If the videographer could please
8  scroll to page 2.  Scroll down a little bit more,
9  please.
10       Okay.  Stop there, please.
11 BY MS. SUM:
12    **Q.**  All right.  Mr. Dorsett, do you see the date
13 on this page?
14    **A.**  Yes.
15    **Q.**  And what is the date?
16    **A.**  3/12/2027 -- that looks like an error.
17    **Q.**  Okay.  Absent a time machine, the date appears
18 to be incorrect on this application.
19       With -- is there any reason why the date would
20 be incorrect, noting a date far into the future?
21    **A.**  I -- I don't understand that.  I don't recall
22 ever seeing something like that before.
23    **Q.**  Okay.
24       MS. SUM:  Let me ask the videographer to
25 please scroll to the bottom of page 8.

102

1        If you could scroll just a little bit more to
2  get into -- no.  I'm sorry.  Back down so we can see the
3  date in the middle of the page, please.
4  BY MS. SUM:
5     **Q.**  Okay.  Mr. Dorsett, do you see a date on
6  page 8 of Exhibit 4?
7     **A.**  Yes.
8     **Q.**  Okay.  And what is the date?
9     **A.**  So March 23, 2017.
10    **Q.**  Okay.  So, given that, does that give you an
11 indication of the timeframe for when this application
12 was being used?
13    **A.**  Well, that -- there's something off about that
14 because this is definitely one of the newer
15 applications -- sorry.  This is one of the older
16 applications, but that date is far along in the firm.
17 And so I'm not sure why this application was used.
18       I know that Guy still had the ability to print
19 off some of the older applications, but I'm not sure why
20 this one was being used at that time.  I mean, I could
21 be wrong, but I'm thinking that this is one of the
22 earlier applications, but that date is one of the later
23 dates.
24       MS. SUM:  Could we scroll back, please, to
25 page one?

103

1  BY MS. SUM:
2     **Q.**  Who is the applicant on Exhibit 4?
3     **A.**  Dion Von Moltke -- Moltke.
4     **Q.**  Thank you.
5        And where does Mr. Von Moltke indicate he
6  resides?
7     **A.**  His -- let's see.  His residence is
8  Charleston, United States.
9        MS. SUM:  Could you please scroll to the
10 bottom of -- or the middle of page 2?
11 BY MS. SUM:
12    **Q.**  Do you see in bold where it says, "How did you
13 hear about us"?
14    **A.**  Yes.
15    **Q.**  Okay.  What does it say?
16    **A.**  "Investor's hub."
17    **Q.**  Is investor's hub part of the affiliate
18 program?
19    **A.**  Yes.
20    **Q.**  And with this particular form of the
21 application do you recall if the applicant needed to
22 type in how they heard about us -- how they heard about
23 SureTrader or was it a drop down?
24       MR. MATTHEW FORD:  Objection.
25       THE WITNESS:  I -- I don't recall at this

104

1  point.  There was discussion -- well, I remember Guy
2  telling me, but I don't remember the exact time, that
3  the reason why he chose drop downs was so the computer
4  could automatically know how much clients were going to
5  a specific affiliate.  And so -- but on that other
6  application I remember because I think I saw that one
7  how that works.
8        So with these I can't say that I know for sure
9  that there's a drop down, but I think there was probably
10 a drop down for all of these, because I remember Guy --
11 he made that point that this is going to make it much
12 easier for us to just automatically know where they're
13 coming from and to take the work off the staff.
14       MS. SUM:  All right.  You can take down
15 Exhibit 4.  And I'm going to ask you to briefly bring
16 back up Exhibit 3, and we're just going to look at the
17 first page.
18       If you could scroll down just a little bit,
19 please.
20 BY MS. SUM:
21    **Q.**  Who is the applicant for Exhibit 3 again?
22    **A.**  Carismir Martinez.
23    **Q.**  And what is listed as the -- the state and
24 country?
25    **A.**  He is Florida, United States.

105

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

1   **Q.**  Okay.
2       MS. SUM:  You can bring down Exhibit 3.
3   BY MS. SUM:
4   **Q.**  During the time that you were employed with
5   SureTrader, Mr. Dorsett, do you recall ever denying an
6   application on the basis that the applicant resides in
7   the United States?
8       MR. MATTHEW FORD:  Objection.  Leading.
9       THE WITNESS:  Well, no.
10      We would reject applicants based on things
11  like KYC -- know your client -- and the due diligence.
12  The only time when the client's country would come into
13  consideration is if that country was on the black list.
14  BY MS. SUM:
15  **Q.**  What do you mean when a country was on the
16  black list?
17  **A.**  So like a sanction country like North Korea,
18  or like Iran, or something like that.
19  **Q.**  And during the time that you were employed at
20  SureTrader, did you, when reviewing applications from an
21  applicant who listed the United States as their
22  residence, did you ever perform any further review of
23  the application to determine whether they should be
24  approved?
25      MR. MATTHEW FORD:  Objection.  Leading.

106

1       (The following testimony is designated as
2   confidential.)
3   BY MS. SUM:
4   **Q.**  Mr. Dorsett, what is Exhibit 12?
5   **A.**  So this is an application form individual.
6   **Q.**  Okay.  And who is the applicant?
7   **A.**  Christopher Penalver.
8   **Q.**  Okay.  Is this the same person that we were --
9   excuse me.
10      Is this the same person that we were just
11  discussing with respect to the email exchange in
12  Exhibit 13?
13  **A.**  I think it is the same person.  You could
14  double check the email just to be on the safe side, but
15  I think it is the same person.
16  **Q.**  Where does Mr. Penalver indicate is his state
17  and country of residence?
18  **A.**  He is from Plano, United States.
19  I don't know if I'm saying that correctly.
20  Plano, United States.
21  **Q.**  Yes.  Okay.
22      MS. SUM:  Videographer, could you please
23  scroll to page 2 of Exhibit 12?
24      Scroll down a little bit more.  Just a little
25  bit more.  Okay.

186

1       THE WITNESS:  Well, again, in the beginning --
2   and if they're from the United States, the main thing we
3   check for is if they had signed the unsolicited
4   acknowledgement agreement which, in the beginning, was a
5   separate document.
6   BY MS. SUM:
7   **Q.**  Other than checking that, did you do anything
8   else during the time that you were employed at
9   SureTrader?
10  **A.**  No.  Not in relation to them being U.S.
11  **Q.**  Okay.
12      MS. SUM:  This, I think, is the right point to
13  break because it's kind of a good finish of the section.
14  So, if acceptable to Mr. Dorsett, I'd like to go ahead
15  and start our lunch break at this time.  And Madam Court
16  Reporter, of course, and the videographer.
17      THE VIDEOGRAPHER:  Okay.  Do you want to go
18  off the record?
19      MS. SUM:  Yes.
20      THE VIDEOGRAPHER:  Time is 12:27 p.m.  We are
21  now off the record.
22      (The lunch recess was taken at 12:27 p.m.)
23      (Here ends the confidential portion of the
24  transcript.)
25          --o0o--

107

1   BY MS. SUM:
2   **Q.**  Do you see there at the bottom of the screen
3   it says, "How did you hear about us?"
4   **A.**  Yes.
5   **Q.**  Okay.  And then what does it say?
6   **A.**  "Website."
7   **Q.**  Okay.  What is that referring to?
8   **A.**  So this is one of the -- one of the few
9   clients who didn't come to us through one of the
10  affiliates.  So what he's saying, he just heard about us
11  through our website.
12      MS. SUM:  You can take down Exhibit 12.
13  BY MS. SUM:
14  **Q.**  To the best of your knowledge was
15  Mr. Penalver's application approved?
16  **A.**  Well, yes, because he's the same one who was
17  complaining about his trading day.
18      (Here ends the confidential portion of the
19  transcript.)
20          --o0o--
21
22
23
24
25

187

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Philip Dorsett (confidential section)   2/27/2023

1      (The following testimony is designated as
2  confidential pursuant to protective order.)
3  BY MS. SUM:
4      **Q.**  Mr. Dorsett, do you recognize Exhibit 17?
5      **A.**  I actually do not recall this document.
6      Can you go to the last page for me?  Sorry --
7  that shows the signature.
8      **Q.**  Okay.
9      **A.**  I do not recall this document, but that is my
10 signature on it.
11     **Q.**  Do you recall speaking with Mr. Gentile
12 regarding any kind of proceeding before the Financial
13 Industry Regulatory Authority or what's known as FINRA?
14     MR. MATTHEW FORD:  Objection.  Leading.
15     THE WITNESS:  Well, I remember because I think
16 FINRA was actually the first regulator to go after Guy
17 after we opened the firm.  You know, since then you
18 could almost say we sort of got immune to it.  We just
19 got used to regulators going after Guy.  It wasn't as
20 eventful.  But this -- back when this happened -- I see
21 the date on this is 9th of January, so that's what like
22 2013.  Back when FINRA was going after Guy, that was
23 like a big deal for us.  It was very scary.  It was
24 pretty scary for me, too.  It was a big-time U.S.
25 regulator, in essence, coming after our boss.

193

1      And, you know, Guy made it very clear to us
2  that, you know, there was a very serious chance that the
3  firm was going to shut down.
4      So, yeah, he spoke about it, and we knew about
5  it, and we did know -- we did know about that FINRA was
6  going after Guy.
7  BY MS. SUM:
8      **Q.**  Do you remember executing this affidavit?
9      **A.**  I do not.  And I certainly don't remember --
10 is this -- when it says "Before me," does that mean that
11 I signed this in front of a notary?
12     **Q.**  Well, I'm not -- I'm not able to answer your
13 questions.  I'll -- let's just proceed with me asking
14 questions and you answering to the best of your
15 knowledge.
16     MR. MATTHEW FORD:  Well, one way to assist
17 would be to scroll down so he could see the document.  I
18 raise it only because it's a technological issue.  If we
19 were in person, he would be able to look at the page.
20     So if we just -- why don't we just scroll down
21 and allow him to look at the document.
22     We could stop right there.
23     THE WITNESS:  Right.  So I think I would
24 remember signing a document in front of a lawyer,
25 because we had to do that one or two times, Guy and

194

1  myself, in the course of us being in the firm.  But I
2  don't recall this.  I don't recall this.
3  BY MS. SUM:
4      **Q.**  As you read through this affidavit, is any of
5  it familiar to you?
6      **A.**  Could you go back up to the top of page 3?
7  All right.  So Tim -- I remember that there -- I
8  remember when Tim Sykes came to the office.  I think I
9  mentioned that earlier.  And I think this is referencing
10 a video that Tim Sykes made.  I remember Guy talking
11 about this on the phone to some persons and there being
12 some issue with it.
13     **Q.**  Did you draft this language that appears on
14 page 3?
15     **A.**  No.  I did not.  And -- could you go back to
16 page 1, please?
17     I did not draft this language.
18     Could I look at number 2?  No.  Sorry.  Could
19 I look at number 2?
20     **Q.**  Do you mean on page 1?
21     **A.**  Yeah.
22     **Q.**  Okay.
23     **A.**  I remember that Guy did ask me for an updated
24 resume.  And the reason why I remember that because it
25 was around that time I had just literally completed that

195

1  MBA.  The Nova Southeastern University has like an
2  off-campus -- here in the Bahamas, that used to meet
3  every two weeks.  And I had literally had just completed
4  that MBA, and I remember Guy had asked me for my updated
5  resume, and I was really happy to put that in there.
6      **Q.**  Did you provide that information for it to be
7  included in this affidavit?
8      **A.**  No.  No.  I did not.
9      **Q.**  With respect to paragraph 6 on page 1 of this
10 affidavit, could you -- actually, first, let's -- can
11 you read paragraph -- paragraph 6, and then we'll ask
12 for it to be scrolled so you can read paragraph 7.
13     **A.**  "In connection with this policy, I --"
14     **Q.**  Correct.  No.  No.  You don't need to read it
15 out loud.  I'm just asking you to read it so you're
16 familiar with it.
17     **A.**  Oh, sorry.  I've read it.
18     **Q.**  Okay.  With respect to paragraph 6 which says,
19          "In connection with this policy, I
20          reviewed all relevant rules and
21          guidance of the U.S. Securities and
22          Exchange Commission regarding
23          solicitation of U.S. persons by
24          unregistered non-U.S. broker-dealers."
25      As you sit here today, is that a correct

196

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Philip Dorsett (confidential section)   2/27/2023

| | |
|---|---|
| 1 statement in your affidavit? | 1           CERTIFICATE OF WITNESS |
| 2    **A.** That is not a correct statement. | 2 |
| 3    **Q.** Okay. And paragraph 7, | 3 |
| 4       "Based on SEC rules and guidance, | 4    I, PHILIP DORSETT, do hereby declare under |
| 5       Swiss America developed policies and | 5   penalty of perjury that I have read the entire |
| 6       procedures designed to ensure that | 6   foregoing transcript of my deposition testimony, |
| 7       SureTrader complied with U.S. laws | 7   or the same has been read to me, and certify that |
| 8       regarding solicitation." | 8   it is a true, correct and complete transcript of |
| 9    Do you remember creating or drafting that | 9   my testimony given on February 27, 2023, save and |
| 10 language? | 10   except for changes and/or corrections, if any, as |
| 11    **A.** I did not. I certainly didn't draft number 6, | 11   indicated by me on the attached Errata Sheet, with |
| 12 either because, I mean, that's -- that sounds like | 12   the understanding that I offer these changes and/or |
| 13 that's written by a lawyer. But no. I didn't -- I | 13   corrections as if still under oath. |
| 14 didn't write any of this. | 14       _____ I have made corrections to my deposition. |
| 15    **Q.** Did -- do you recall Mr. Gentile asking you to | 15       _____ I have NOT made any changes to my deposition. |
| 16 sign this affidavit in connection with proceedings | 16 |
| 17 pending before FINRA? | 17 Signed: _____ |
| 18    **A.** There were times back in that first year, I |      PHILIP DORSETT |
| 19 confess, that Guy did come to me on more than one | 18    (CONFIDENTIAL SECTION) |
| 20 occasion and wanted me to sign things -- things that I | 19 |
| 21 didn't fully understand, but, at that time, I really | 20 Dated this _____ day of _____ of 20____. |
| 22 wasn't -- I really wasn't in a position to really sort | 21 |
| 23 of stand up to him. I don't know if this is one of | 22 |
| 24 those documents. | 23 |
| 25    I really don't remember it though, and | 24 |
| | 25 |
| 197 | |

| | |
|---|---|
| 1 certainly I would have remembered it if it was in front | 1        ERRATA SHEET |
| 2 of an actual lawyer because I think I certainly would | 2 Deposition of: PHILIP DORSETT (CONFIDENTIAL SECTION) |
| 3 have been more hesitant. But there were at least two or |   Date taken: FEBRUARY 27, 2023 |
| 4 three documents -- and yes, I do remember it was around | 3 Case: SEC v. MINTBROKER INTERNATIONAL, LTD., et al. |
| 5 the time of the investigations because he was very -- | 4 PAGE LINE |
| 6 like very apprehensive. He was very upset and -- you |          CHANGE: _____ |
| 7 know, and it was like hey, we need to do this. We need | 5   REASON: _____ |
| 8 to do this. | 6         CHANGE: _____ |
| 9    So if I did sign this, I can only say that it |   REASON: _____ |
| 10 was maybe under duress. But, again, I don't -- if you | 7 |
| 11 scroll back up to the top, please? |         CHANGE: _____ |
| 12    I don't -- I don't think -- like I wouldn't | 8   REASON: _____ |
| 13 have seen -- like how it says affidavit and stuff like | 9         CHANGE: _____ |
| 14 that, I would have -- that would have jumped out at me. |   REASON: _____ |
| 15 I wouldn't have just -- I wouldn't have just done that. | 10 |
| 16    MS. SUM: All right. Okay. We can take down |         CHANGE: _____ |
| 17 Exhibit 17. | 11   REASON: _____ |
| 18    (Here ends the confidential portion of the | 12         CHANGE: _____ |
| 19 transcript.) |   REASON: _____ |
| 20      --o0o-- | 13 |
| 21 |         CHANGE: _____ |
| 22 | 14   REASON: _____ |
| 23 | 15         CHANGE: _____ |
| 24 |   REASON: _____ |
| 25 | 16 |
| |         CHANGE: _____ |
| | 17   REASON: _____ |
| | 18         CHANGE: _____ |
| |   REASON: _____ |
| | 19 |
| |         CHANGE: _____ |
| | 20   REASON: _____ |
| | 21         CHANGE: _____ |
| |   REASON: _____ |
| | 22 |
| |         CHANGE: _____ |
| | 23   REASON: _____ |
| | 24 Signed_____ |
| | 25 Dated_____ |
| 198 | |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Philip Dorsett (confidential section)   2/27/2023

```
 1       STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION
 2              - - -
 3       I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,
 4   RSA, certify:  That the foregoing proceedings were
 5   remotely taken before me via videoconference at the time
 6   herein set forth; at which time the witness was duly
 7   sworn; that a record of the proceedings was made by me
 8   using machine shorthand which was thereafter transcribed
 9   under my direction; and that the transcript is a true
10   record of the testimony so given.
11       Further, that these proceedings pertain to the
12   original transcript of a deposition in a federal case,
13   and before completion of the proceedings, review of
14   transcript was requested.
15       The dismantling, unsealing, or unbinding of
16   the original transcript will render the Stenographer's
17   Certificate null and void.
18       I further certify that I am not financially
19   interested in the action, and I am not a relative or
20   employee of any attorney of the parties, nor of any of
21   the parties.
22       Dated this 1st day of March, 2023.
23
24   _____
25       Victoria L. Valine, CSR License #3036
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
 1                  CERTIFICATE OF WITNESS

 2

 3

 4        I, PHILIP DORSETT, do hereby declare under

 5    penalty of perjury that I have read the entire

 6    foregoing transcript of my deposition testimony,

 7    or the same has been read to me, and certify that

 8    it is a true, correct and complete transcript of

 9    my testimony given on February 27, 2023, save and

10    except for changes and/or corrections, if any, as

11    indicated by me on the attached Errata Sheet, with

12    the understanding that I offer these changes and/or

13    corrections as if still under oath.

14        _____ I have made corrections to my deposition.

15        _____ I have NOT made any changes to my deposition.

16

17    Signed: _____

18            PHILIP DORSETT
              (CONFIDENTIAL SECTION)

19

20    Dated this __27__ day of __MARCH__ of 20 23 .

21

22

23

24

25
```

CONFIDENTIAL SECTION

1           ERRATA SHEET

2       Deposition of: PHILIP DORSETT
        Date taken: FEBRUARY 27, 2023
3       Case:   SEC v. MINTBROKER INTERNATIONAL, LTD., et al.

4       PAGE   LINE
     86  ~~17~~   16    CHANGE:  OLD FACT → OFAC
5                       REASON:  RECORDED INCORRECTLY

6    196  ~~44~~   5    CHANGE:  IN THERE → IN MY RESUMAE
                        REASON:  CLARIFICATION
7
     198  ~~46~~   6    CHANGE:  APPREHENSIVE → AGGRESIVE
8                       REASON:  RECORDED INCORRECTLY

9    _____  ____   CHANGE:  _____
                    REASON:  _____
10
     _____  ____   CHANGE:  _____
11                  REASON:  _____

12   _____  ____   CHANGE:  _____
                    REASON:  _____
13
     _____  ____   CHANGE:  _____
14                  REASON:  _____

15   _____  ____   CHANGE:  _____
                    REASON:  _____
16
     _____  ____   CHANGE:  _____
17                  REASON:  _____

18   _____  ____   CHANGE:  _____
                    REASON:  _____
19
     _____  ____   CHANGE:  _____
20                  REASON:  _____

21   _____  ____   CHANGE:  _____
                    REASON:  _____
22
     _____  ____   CHANGE:  _____
23                  REASON:  _____

24   Signed  _____

25   Dated   MARCH 27, 2023

                                              222

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Philip Dorsett
February 28, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
----------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                     PLAINTIFF,

          -against-      Case No.:
                         1:21-cv-21079-bb


MINTBROKER INTERNATIONAL, LTD., f/k/a SWISS
AMERICA SECURITIES LTD. and d/b/a
SURETRADER, and GUY GENTILE, a/k/a GUY
GENTILE NIGRO,

                     DEFENDANTS.
----------------------------------------X


               DATE: February 28, 2023

               TIME: 9:36 A.M.




          DEPOSITION of PHILIP DORSETT,

taken by the Defendant, pursuant to a

Subpoena, held via videoconference, before

Victoria Scro, a Notary Public of the State

of New York.

Philip Dorsett
February 28, 2023

Page 2

```
1
2    A P P E A R A N C E S:
3
4    SECURITIES AND EXCHANGE COMMISSION
        Attorney for the Plaintiff
5    SECURITIES AND EXCHANGE COMMISSION
        450 Fifth Street, N.W.
6    Washington, DC 20549
     BY: ALICE SUM, ESQ.
7        ALISE JOHNSON, ESQ.
         RUSSELL KOONIN, ESQ.
8
9    FORD, O'BRIEN, LANDY, LLP
        Attorneys for the Defendant
10       GUY GENTILE
        275 Madison Avenue, 24th Floor
11   New York, New York 10016
     BY: MATTHEW AARON FORD, ESQ.
12       ADAM C. FORD, ESQ.
         STEPHEN R. HALPIN, III, ESQ.
13       CARA FILIPPELLI, ESQ.
14
     ALSO PRESENT:
15
     Guy Gentile
16
17
18
19
20          *        *        *
21
22
23
24
25
```

Page 3

```
1
2               FEDERAL STIPULATIONS
3
4        IT IS HEREBY STIPULATED AND AGREED by
5    and between the parties hereto, through
6    their respective Counsel, that the
7    certification, sealing and filing of the
8    within examination will be and the same are
9    hereby waived;
10
11       IT IS FURTHER STIPULATED AND AGREED
12   that all objections, except as to the form
13   of the question, will be reserved to the
14   time of the trial;
15
16       IT IS FURTHER STIPULATED AND AGREED
17   that the within examination may be signed
18   before any Notary Public with the same
19   force and effect as if signed and sworn to
20   before this Court.
21
22
23
24
25
```

Page 4

```
1               VIDEOCONFERENCE STIPULATIONS
2
3        IT IS HEREBY STIPULATED AND
4    AGREED BY and between counsel for all
5    parties present that pursuant to CPLR
6    section 3113 (d) this deposition is to be
7    conducted by video conference, that the
8    court reporter, all counsel, and the
9    witness are all in separate remote
10   locations and participating via
11   videoconference meeting under the control
12   of US Legal Support, that the officer
13   administering the oath to the witness need
14   not be in the place of the deposition and
15   the witness shall be sworn in remotely by
16   the court reporter after confirming the
17   witnesses identity, that this video
18   conference will not be recorded in any
19   manner and that any recording without the
20   express written consent of all parties
21   shall be considered unauthorized, in
22   violation of law, and shall not be used for
23   any purpose in this litigation or
24   otherwise.
25
```

Page 5

```
1               VIDEOCONFERENCE STIPULATIONS
2        IT IS FURTHER STIPULATED that
3    exhibits may be marked by the attorney
4    presenting the exhibit to the witness, and
5    that a copy of any exhibit presented to a
6    witness shall be e-mailed to or otherwise
7    in possession of all counsel prior to any
8    questioning of a witness regarding the
9    exhibit in question.  All parties shall
10   bear their own costs the conduct of this
11   deposition by video conference,
12   notwithstanding the obligation by CPLR to
13   supply a copy of the transcript to the
14   deposed party by the taking party in
15   civil litigation matters.
16
17
18
19
20
21
22
23
24
25
```

Philip Dorsett
February 28, 2023

Page 6

P. DORSETT

1        P. DORSETT
2    P H I L I P   D O R S E T T, called as a
3    witness, having been first duly sworn by a
4    Notary Public of the State of New York, was
5    examined and testified as follows:
6    BY THE REPORTER:
7        Q.    Please state your name for the
8    record.
9        A.    Philip Dorsett.
10        Q.    What is your address?
11        A.    Sea Breeze Boulevard, Nassau,
12    Bahamas.
13    EXAMINATION BY MATTHEW FORD:
14        Q.    Good morning, Mr. Dorsett.
15    Before we start, I just have a couple of my
16    personal deposition ground rules.  So, I'm
17    going to be asking you questions today.
18    The first thing I ask is that, make sure
19    you give a verbal response, yes or no,
20    rather than shaking your head.  That's
21    primarily for the benefit of the court
22    reporter.  The other thing is, yesterday,
23    we were a little fast and loose with our
24    breaks.  My personal preference is every
25    hour to do a 10 to 15 minute break and to

Page 7

P. DORSETT

1        P. DORSETT
2    do an hour long break for lunch.  This will
3    wind up as a practical matter, extending
4    the deposition a little bit longer, but I
5    find everybody stays more fresh that way.
6    If you're okay with that, we'll try to
7    stick with that schedule.  With that said,
8    the breaks are for the benefit of
9    everybody, especially for you as the
10    witness and for the support staff, the
11    court reporter.  So, if the preference is
12    to do a 45 minute lunch or ten minute
13    breaks, we can work that as we go along,
14    but that's how I like to do the breaks, is
15    that okay with you?
16        A.    Sure, that's fine.
17        Q.    Can you just tell me the dates
18    that you worked for MintBroker,
19    approximately?
20        A.    Right, so I worked for
21    SureTrader.  I started in 2011, it was
22    November, the very beginning, and I worked
23    right up until August 2017.
24        Q.    To be clear, the named
25    defendant in this case is MintBroker

Page 8

P. DORSETT

1        P. DORSETT
2    International LTD, so when I refer to
3    MintBroker, I'm also referring to
4    SureTrader.
5        A.    Yes.
6        Q.    Do you recall testifying
7    yesterday about your roles as an employee
8    of SureTrader?
9        A.    Yes.
10        Q.    And you've served as a chief
11    compliance officer during your time there;
12    is that accurate?
13        A.    That is correct.
14        Q.    And do you recall testifying
15    that your responsibility as the chief
16    compliance officer was to ensure compliance
17    with Bahamian rules, regulations and laws?
18        A.    That's correct.
19        Q.    You also testified on the flip
20    side, Mr. Gentile was responsible for
21    making sure SureTrader complied with U.S.
22    rules and regulations; is that accurate?
23        A.    Yes.  Now, what I should add to
24    that --
25        Q.    Okay, if you need to clarify an

Page 9

P. DORSETT

1        P. DORSETT
2    answer, that's fine, but generally, I'm
3    just going to asking yes or no questions.
4    We'll just continue on that flow.
5        So, given that Mr. Gentile's
6    responsibility was ensuring that SureTrader
7    complied with U.S. laws and regulations and
8    your responsibility was to ensure that they
9    complied with Bahamian regulations, during
10    your time there, would you have done any
11    work to ensure that SureTrader was
12    complying with U.S. laws, rules and
13    regulations?
14        A.    Right, so, I would not have
15    done work, but there certainly were times,
16    I noticed Guy did come to me and ask me to
17    sign a few things, especially once the U.S.
18    investigation started --
19        Q.    Okay, thank you.
20        So, did you ever work with an
21    individual named Steven Darville while you
22    were employed by SureTrader?
23        A.    I think he was one of our IT
24    persons.
25        Q.    Did you work with Mr. Darville

Philip Dorsett
February 28, 2023

Page 10

1          P. DORSETT
2   while you were employed at SureTrader?
3   It's just yes or no.
4       A.   If Steven Darville was an IT
5   person, then yes.
6       Q.   Just yes or no, were you
7   employed at SureTrader at the same time as
8   Steven Darville?
9       A.   Yes.  That was, I think, that
10  was our IT person.
11      Q.   During your time at SureTrader,
12  were you employed at the same time as
13  Edward Cooper?
14      A.   Yes.
15      Q.   During your time, did you
16  have -- during your employment, did you
17  have the opportunity to review all the
18  relevant rules and guidance of U.S. law
19  regarding the solicitation of U.S. citizens
20  by foreign broker dealers?
21      A.   No.
22      Q.   Did you, during your time
23  employed as a chief compliance officer of
24  SureTrader, did you have the opportunity to
25  review any rules and guidance regarding the

Page 11

1          P. DORSETT
2   solicitation of U.S. persons by registered,
3   non-U.S. broker dealers?
4       A.   Guy did present to me.  I think
5   it's called the 15- that was referenced
6   yesterday.  He did show me that this was
7   the main law that he wanted to -- that that
8   was the issue.
9       Q.   So, other than 15A-6, during
10  your time employed at SureTrader, did you
11  review any rules and guidance regarding
12  solicitation of U.S. persons by
13  unregistered non-U.S. broker dealers?
14      A.   I can't recall.  I know he did
15  provide me the 50 and one, I don't know if
16  there were others, but I cannot recall.
17      Q.   You had testified yesterday
18  that in November of 2011, that's when the
19  firm first started; is that accurate?
20      A.   Yes.
21      Q.   Do you recall testifying that
22  it wasn't until February of 2012 that you,
23  meaning SureTrader, implemented the UAA
24  form that you referred to, the unsolicited
25  acknowledgment agreement?

Page 12

1          P. DORSETT
2       A.   Right, it was around that time.
3   I figured it was around February.
4       Q.   Do you recall testifying
5   repeatedly yesterday that it was in
6   February of 2012; is that accurate?
7       A.   Yeah, I recall.
8       Q.   And you were able to remember
9   that because you had testified that there
10  was a meeting with you and Karen Gentile
11  and Guy Gentile, in which they discussed
12  use of the UAA; is that accurate?
13      A.   Correct.  And the reason why I
14  decided it was February, because during the
15  course of that meeting, it was --
16      Q.   All right, I'm not asking about
17  the content.
18      MS. SUM:  Counsel, I'm going to
19  object.  He's try to answer your
20  question.  Please don't cut the
21  witness off when he's trying to
22  answer.
23      MR. FORD:  I'll object to the
24  response that's nonresponsive.  Moved
25  to strike the part that was

Page 13

1          P. DORSETT
2   nonresponsive.  And moving on.
3       MR. KOONIN:  Matt, you're going
4   to have to let him answer the
5   questions.  You want a perfect yes
6   and no, not all of your questions are
7   leading to a perfect yes or no
8   answer, and he's entitled to provide
9   the clarification.  I understand you
10  want to go at your rhythm and your
11  pace, but you're going to need to let
12  him answer to the best of his ability
13  that are directly responsive.
14      MR. FORD:  With due respect Mr.
15  Koonin, if you go over the transcript
16  of what happened yesterday, there
17  were these lengthy long-winded
18  answers that sometimes gone for
19  minutes and minutes at a time
20  unrelated to the question, and it's
21  not going to be helpful for my
22  deposition.
23      MR. KOONIN:  I appreciate that,
24  but answering your question directly,
25  you're going to need to let him

Philip Dorsett
February 28, 2023

Page 14

P. DORSETT
1
2     answer your question.  If it strays
3     from that, you might as well take it.
4          MR. FORD:  Can we pull up
5     Exhibit 5.  I'm sorry, 4, Exhibit 4.
6          MS. SUM:  Just so I understand,
7     are these your numberings or
8     continuing from yesterday's?
9          MR. FORD:  These are new
10    numbers.  This is our exhibit
11    numbers.
12         MS. SUM:  Okay.  Will you note
13    defense?
14         MR. FORD:  Yeah, we'll list
15    them as defense exhibit.  That's
16    standing for all of them.
17         MS. SUM:  Okay.
18    Q.     Mr. Dorsett, this is an
19    affidavit we had looked at yesterday.  Do
20    you recall seeing this document yesterday?
21    A.     Yes.
22    Q.     Do you recall testifying that
23    you did not draft this document?
24    A.     That's correct.
25    Q.     Do you recall testifying that

Page 15

P. DORSETT
1
2     you don't remember receiving this document?
3     A.     That's correct.
4     Q.     Do you have any reason to doubt
5     the authenticity of this document?
6     A.     There were times, as I said
7     yesterday, that Guy brought things for me
8     to sign, and I did sign about three or four
9     documents.  I don't know if this is one of
10    them, but the reason why I was a bit unsure
11    when I saw this yesterday, because I see it
12    says, "Affidavit" on it, so I was looking
13    up and down at the document more carefully,
14    because it is my signature and I certainly,
15    you know, that's my signature, I don't deny
16    that, but certainly, I know what an
17    affidavit is and I don't recall signing an
18    affidavit.  I know there was some documents
19    Guy wanted me to sign, and I know back
20    then, I think I said that, you know,
21    especially --
22    Q.     Okay, thank you.  I appreciate
23    the answer.
24         MR. FORD:  If we could scroll
25         down to the bottom of the document.

Page 16

P. DORSETT
1
2     We can scroll down.  We can go back
3     to the top.  If we can just scroll
4     down and we can stop there.
5     Q.     Do you see paragraph six, it
6     says in connection -- it says, "in
7     connection with this policy, I reviewed all
8     relevant rules and guidance of the U.S.
9     Securities and Exchange Commission
10    regarding the solicitation of U.S. persons
11    by unregistered non-U.S. broker dealers,"
12    do you see that?
13    A.     I see that.
14    Q.     Do you recall testifying
15    yesterday that that was not accurate?
16    A.     Correct.  I never wrote that.
17    Q.     I didn't ask if you wrote it.
18    Do you recall testifying that it was not
19    accurate?
20    A.     Oh, the statement is not
21    accurate either.
22    Q.     The statement is part of -- is
23    the reason the statement is not accurate is
24    because your responsibilities at MintBroker
25    or SureTrader did not include reviewing

Page 17

P. DORSETT
1
2     rules and guidance regarding solicitation
3     of U.S. persons by unregistered non-U.S.
4     broker dealers?
5     A.     Correct.  I certainly did not
6     do that.
7     Q.     You did not do that, okay.
8          Is part of the reason that that
9     is incorrect is because nobody at
10    SureTrader ever provided you rules or
11    guidance regarding solicitation of U.S.
12    persons by unregistered non-U.S. broker
13    dealers.
14    A.     Like I said, this subject was
15    discussed, but never to the point where I
16    can say that I have reviewed all relevant
17    rules and guidelines, and I can state that
18    as of -- regarding solicitation of U.S.
19    persons unregistered, and you know, that's
20    not true.  I couldn't say that I was, you
21    know, I read all guidelines --
22    Q.     And as --
23         MS. SUM:  Counsel, please allow
24         the witness to finish answered.
25    Q.     As the chief compliance

Philip Dorsett
February 28, 2023

Page 18

```
1              P. DORSETT
2    officer, was it common for you to sign
3    documents you did not read?
4         A.    Well, as I stated earlier --
5         Q.    Again, as a chief compliance
6    officer, did you ever sign a document
7    related to SureTrader that you did not
8    read?
9         A.    I would not say I did not read
10   them.  However, I probably should have
11   insisted that Guy explainrf them more to
12   me.  So, I probably did read over the
13   documents, but --
14        Q.    With all due respect
15   Mr. Dorsett, I'm not asking you to
16   speculate of what you might have done or
17   what you probably did.  I'm just asking a
18   general question.  As chief compliance
19   officer of SureTrader, did you read
20   documents before signing them?
21        A.    Right, so I was chief
22   compliance officer from 2011 to 2017.
23   Certainly by 2017, I would not sign just
24   about anything that Guy put before me, but
25   in the first two or three years, yes, I may
```

Page 19

```
1              P. DORSETT
2    have signed things I did not fully read.
3         Q.    So, your testimony is that as
4    chief compliance officer of regulating
5    Bahamian entity, you would sign documents
6    that you did not read; is that accurate?
7         A.    That is not accurate.  I said
8    that in the beginning, under certain
9    pressure, I probably signed things under
10   duress.  However, once I realized that that
11   was -- well, I couldn't trust Guy to be
12   doing that type of stuff, that came to an
13   end.
14        MR. FORD:  Can we pull up
15        Exhibit 5.  This is an affidavit of
16        Edward Cooper in this case.  We're
17        going to -- it is signed by Edward
18        Cooper under risk of penalty of
19        perjury and submitted in this case.
20        We're going to scroll down to
21        paragraph six.  I'm sorry, we'll
22        start with paragraph five.
23        Q.    "While I was employed at
24   MintBroker, Philip Dorsett was MintBroker's
25   other corporate director, chief compliance
```

Page 20

```
1              P. DORSETT
2    officer and MLRO officer.  Mr. Dorsett
3    began his employment with the firm in
4    2011," is that an accurate statement?
5         A.    Yes.
6         Q.    Paragraph six, "Mr. Dorsett was
7    responsible for keeping the firm compliant
8    with the Bahamas, U.S. and international
9    securities laws.  Mr. Dorsett was
10   responsible for creating and supervising
11   the firm's policies regarding accepting
12   non-soliciting U.S. clients," is that an
13   accurate statement?
14        A.    No, that is not.
15        Q.    Is that an inaccurate statement
16   because you were not responsible for
17   keeping the firm compliant with U.S. and
18   international securities laws; is that what
19   makes it inaccurate?
20        A.    That is correct.  In addition,
21   it's also the last part about supervising
22   policies --
23        Q.    With all due respect --
24        A.    -- is also incorrect.
25        MS. SUM:  Counsel, he's trying
```

Page 21

```
1              P. DORSETT
2         to finish his answer.  You asked
3         about whether a particular portion of
4         another individual's declaration is
5         correct.  So, he'll answer your
6         question that you've asked, what are
7         the inaccuracies.
8         A.    The entire statement is
9    incorrect.
10        Q.    Mr. Dorsett, I'm asking the
11   questions.  I will get to it.  The first
12   question about this is whether or not you
13   believe that it is incorrect because it
14   says you were responsibile for keeping the
15   firm compliant with U.S. securities laws,
16   is that part --
17        A.    That's part of the reason it is
18   incorrect.
19        Q.    Mr. Dorsett, do you think this
20   is inaccurate because you were not
21   responsible for creating and supervising
22   the firm's policies regarding accepting
23   non-solicited U.S. clients, do you believe
24   that is incorrect?
25        A.    I think that is not accurate,
```

Phillip Dorsett
February 28, 2023

Page 22

1                    P. DORSETT
2  and I'll say why.  The only thing I
3  wrote --
4         Q.   I'm not asking you why it's
5  incorrect.
6         MS. SUM:  Counsel, he's
7     providing the answer.  You cannot box
8     him into not providing the reasoning
9     for his answer.  If this is the way
10    you insist on conducting the
11    deposition, it's not proper.
12        MR. FORD:  Ms. Sum, you had the
13    opportunity to depose him yesterday
14    for eight hours.  You have the
15    opportunity to ask questions after I
16    am completed.  I am trying to get
17    through and ask my questions.  I did
18    not ask him why he thought it was
19    incorrect.  I just asked him if it
20    was incorrect.
21        MS. SUM:  He's still entitled
22    to complete his answers.
23        A.   I don't think --
24        Q.   There is no pending question
25  right now.

Page 23

1                    P. DORSETT
2         MR. KOONIN:  The irony is, your
3     tactic is going to make this
4     deposition ten times longer.  We're
5     never going to not let him answer the
6     questions in full.  So, every time
7     you cut him off, we're going to have
8     the same conversation where you're
9     refusing to let him answer entirely.
10    We can do this for hours, Matt, or
11    let him answer your question.
12        MR. FORD:  It sounds like we're
13    going to do this for hours.  We're
14    asking specific questions and he's
15    not answering specific questions.
16        MR. KOONIN:  I guess we're
17    going to keep doing this.
18        MR. FORD:  This seems to be
19    what we're going to keep doing.  If
20    we could pull up Tab 22.
21        Q.   This is an e-mail from Guy
22  Gentile to Phillip@SureTrader.com.  Is that
23  your SureTrader e-mail address,
24  Mr. Dorsett?
25        A.   Correct.

Page 24

1                    P. DORSETT
2         Q.   Do you see that the subject of
3  this is non-U.S. broker dealers?
4         A.   Yes.
5         Q.   Do you see the first sentence
6  where Mr. Gentile says to you, "We cannot
7  send mail to clients in the U.S., so no
8  overnight checks," do you see that?
9         A.   Yes.
10        Q.   He then attached a link that
11  says www.cadwalader.com with some more
12  information.  Do you see the hyperlink
13  there?
14        A.   I do.
15        Q.   Now, do you recall receiving
16  this e-mail?
17        A.   I don't specifically recall.
18  This was January 2012.
19        Q.   Okay.
20        A.   I don't remember it.  I'm not
21  saying I didn't send it, I'm just saying I
22  don't remember.
23        Q.   This was in January of 2012.
24  So, this would have been before SureTrader
25  started using an unsolicited acknowledgment

Page 25

1                    P. DORSETT
2  agreement; is that accurate?
3         A.   Yeah.  I don't think at this
4  time we were not using it for sure.
5         Q.   So, it then has what appears to
6  be excerpts of that article and there's one
7  entitled, "Non-U.S. broker dealers," do you
8  see that?
9         A.   I'm sorry, number two?
10        Q.   No, just at the top above A, it
11  says, "Non-U.S. broker dealers," do you see
12  that?
13        A.   Yes.
14        Q.   And then it says number two,
15  "Unsolicited Contacts," do you see that?
16        A.   Yes.
17        Q.   Receiving this e-mail from
18  Mr. Gentile, is that the type of e-mail you
19  would have read?
20        A.   Yeah, if I received it, I
21  definitely would have read it.
22        Q.   Would you have clicked on the
23  hyperlink that he attached and sent to you?
24        A.   Well, I mean, I don't know if I
25  clicked on the hyperlink or not.

Phillip Dorsett
February 28, 2023

Page 26
```
 1               P. DORSETT
 2      Q.     As chief compliance officer of
 3 SureTrader, if the CEO of the company sent
 4 you a link to an article, would you have
 5 clicked on that link in the ordinary course
 6 of your responsibilities?
 7      A.     Well, it depends on what's the
 8 seriousness of the article.
 9      Q.     So, your testimony is that if
10 the article was not serious, you would not
11 have clicked on a link that was sent to you
12 by the CEO of the company, which you're a
13 chief compliance officer of?
14      A.     Again, if the e-mail and the
15 article, if it's presented as is, you need
16 to look at this link, you know, this would
17 not gave been some intrical [sic], yes.
18 I'm not saying I did not click on it, but
19 you know, this would not have been
20 something of importance.  It deals with
21 U.S. regulations, my thing was Bahamian
22 regulations.
23           MR. FORD:  Can we pull up
24       Exhibit 22A.
25      Q.     While we're clear, since you
```

Page 27
```
 1               P. DORSETT
 2 just testified your thing was not U.S.
 3 regulations, but Bahamian regulations, is
 4 it fair to say that Mr. Gentile, during
 5 your time as chief compliance officer,
 6 never asked you about U.S. regulations?
 7      A.     Guy would talk to me about U.S.
 8 regulations all the time, but he never
 9 asked me about them to get my advise.
10      Q.     Okay, now looking at 22A, this
11 is a PDF of the link that was attached.
12 It's dated May 1, 2008.  SEC regulations of
13 non-U.S. broker dealer and foreign
14 securities exchanges, do you see that?
15      A.     I do.
16      Q.     Do you know who Cadwalader is?
17      A.     I do not.
18      Q.     You were not aware that it's
19 one of the largest law firms in the United
20 States of America?
21      A.     No.
22      Q.     You'll see the first paragraph,
23 it says, "This article discusses the
24 historical and current approach of the U.S.
25 Securities and Exchange Commission to
```

Page 28
```
 1               P. DORSETT
 2 regulating the activities of non-U.S.
 3 broker dealers and foreign exchanges," do
 4 you see that?
 5      A.     Yes.
 6      Q.     Would you have been able to
 7 tell by reading the title in that first
 8 sentence whether or not this was the sort
 9 of the thing that the CEO would send to you
10 that you would deem important enough to
11 read?
12      A.     I don't know if I actually read
13 this.  Can I see the whole document?
14      Q.     Sure.
15      A.     Okay, I do not think I've seen
16 this before.  Initially, I thought this was
17 something -- like I said, he sent me
18 something from the SEC --
19      Q.     There's no pending question.
20 You asked to see the document.
21           MS. SUM:  He's answering --
22           MR. FORD:  Ms. Sum, there's no
23       pending question.  He asked to see
24       the document and I said he can look
25       over it.  It does not provide the
```

Page 29
```
 1               P. DORSETT
 2 opportunity in a deposition for him
 3 to give a soliloquy of what he
 4 thinks.  I was merely showing him the
 5 document.
 6           MS. SUM:  He's not giving a
 7       soliloquy.  He is providing
 8       information about the Cadwalader --
 9           MR. FORD:  Ms. Scro, can you
10       please read the last question, which
11       I believe is a question in which
12       Mr. Dorsett asked if he could see the
13       complete document.  Can you confirm
14       that's what we have in the
15       transcript?
16           MS. SUM:  In fact, you asked
17       him a question proceeding his request
18       to look at the document.
19           MR. FORD:  Yes, but it was
20       already answered.  We're going to the
21       next exhibit which is Exhibit 23.
22      Q.     This is an e-mail from Guy
23 Gentile again to Phillip@SureTrader.com
24 CCing justin@SureTrader.com.  Do you know
25 who Justin@suretrader.com is?
```

Philip Dorsett
February 28, 2023

Page 30

1                       P. DORSETT
2        A.     Yes.
3        Q.     Who is --
4               MS. SUM:  Counsel, what's the
5        bates stamp for this document?
6               MR. FORD:  We'll pull it up.
7               MR. HALPIN:  The bates stamp is
8        -- FEC-03848-00 --
9               MR. FORD:  Mr. Halpin will send
10       it in the chat.
11       Q.     Who is Justin@SureTrader?
12       A.     Justin had many titles, but I
13  think during --
14       Q.     No, no.  Mr. Dorsett, can you
15  tell me what Justin's last name is.
16       A.     Justin Ritchie.
17       Q.     Thank you.  Did you work with
18  Justin Ritchie around this time in June of
19  2013?
20       A.     Yes.
21       Q.     What was his title?
22       A.     He had many titles during this
23  time at SureTrader.  I would say this was
24  towards the middle.  It could have been
25  deputy director, it could have been office

Page 31

1                       P. DORSETT
2   manager, it could have been affiliates
3   manager.  I really don't know.
4        Q.     Okay.  Do you recall receiving
5   this e-mail?
6        A.     I mean, I would have to look at
7   it.  This does seem like something Guy
8   would send to me, but I can't say, "Oh, I
9   remember this off the top of my head," but
10  this is certainly something in line of what
11  Guy would have sent to me.
12       Q.     Do you see that there's an
13  attachment that says SEC Rule 15A-6, do you
14  see that?
15       A.     Yes.
16       Q.     You had testified earlier that
17  you were familiar with SEC Rule 15A-6?
18       A.     I testified that Guy showed it
19  to me.
20       Q.     He showed you the rule?
21       A.     Yes.  In fact, I think he
22  showed it to me more than once.
23       Q.     Given that this e-mail was sent
24  directly to you and only you with a CC, is
25  that the sort of the attachment you would

Page 32

1                       P. DORSETT
2   have opened from the CEO of SureTrader as
3   the chief compliance officer?
4        A.     Yes, I certainly would have
5   opened that.
6               MR. FORD:  We can go ahead and
7        go to the attachment.
8        Q.     Do you see that this document
9   is titled Swiss America Securities Limited
10  policy and procedures for compliance with
11  U.S. Securities and Exchange Commission
12  Rule 15A-6 exemption, do you see that?
13       A.     Yes, I see it.
14       Q.     And if we scroll down --
15               MR. FORD:  We can go back up.
16       Q.     Do you see where it says,
17  "Exemption" and then it says, "Rule 15A-6
18  under the Securities Exchange Act of 1934
19  provides a conditional exemption from
20  broker dealer registration for foreign
21  broker dealers that engaged in certain
22  specified activities involving U.S.
23  investors, these activities include, one,
24  effecting unsolicited security
25  transaction," do you see that?

Page 33

1                       P. DORSETT
2        A.     Yes.
3        Q.     Is that consistent with your
4   understanding of Rule 15A-6?
5        A.     Yes, it is.
6        Q.     Is that consistent with your
7   understanding of Rule 15A-6 at the time you
8   received this e-mail?
9        A.     Well, yes, I think.  Yes.
10       Q.     The next paragraph says, "In
11  addition to not soliciting securities
12  transactions, the firm will also have
13  disclaimers on its website, Facebook and
14  Twitter, stating Swiss America Securities
15  does not service accounts for U.S.
16  citizens, U.S. residents or U.S.
17  corporations.  The firm will also have a
18  pop up, and its SureTrader.com website
19  stating this.  If a U.S. investor insists
20  on opening an account, the firm will have
21  all U.S. investors that open an account,
22  sign a non-solicitation agreement," do you
23  see that?
24       A.     Yes.
25       Q.     If we go down, below are all

Philip Dorsett
February 28, 2023

Page 34

P. DORSETT

1
2    the things Swiss America will not do to
3    ensure compliance with SEC Rule 15A-6, do
4    you see that?
5        A.   Yes.
6        Q.   Below, if we scroll, do you see
7    there's a list of what appears to be maybe
8    20 or so different things that
9    SureTrader -- SureTrader is saying it will
10   not do to comply with SEC Rule 15A-6, do
11   you see that?
12       A.   Yes.
13       Q.   Do you see where it says, about
14   six down, it says, "do not mention the
15   words offshore brokerage," do you see that?
16       A.   Yes.
17       MR. FORD:  We'll go to
18       Exhibit 24.
19       MS. SUM:  Counsel, did you
20       e-mail these exhibits prior to the
21       commencement of the deposition?  I
22       searched my e-mail and I do not see
23       them.
24       MR. FORD:  They should have
25       been.

Page 35

P. DORSETT

1
2        MS. SUM:  We do not have one.
3        I checked with my colleagues.  So,
4        please have one of your colleagues
5        send them to us.
6        MR. FORD:  No problem.  That
7        just sounds like a mix up on our end.
8        We'll get them over to you shortly.
9        Q.   Do you see that now this is an
10   e-mail on June 20, 2013, so three days
11   after the last e-mail from Justin Ritchie
12   to Guy Gentile and Phillip@SureTrader.com,
13   do you see that?
14       A.   Yes.
15       Q.   It's responding to the previous
16   e-mail, correct?
17       A.   Yes.
18       Q.   In it Justin Ritchie says,
19   "I've highlighted my concerns about this in
20   the attachment.  When will the disclaimers
21   be installed on the website and how do we
22   ensure that we're not advertising in the
23   U.S. via internet," do you see that?
24       A.   Yes.
25       MR. FORD:  Can we scroll to the

Page 36

P. DORSETT

1
2        attachment.
3        Q.   Do you see where Mr. Ritchie
4    has underlined some words in that
5    paragraph?
6        A.   Yes.
7        Q.   If we scroll down a little bit
8    more, do you see where he underlines where
9    it says, "do not mention the words offshore
10   brokerage"?
11       A.   M-hm, yes.
12       Q.   Do you see where he underlines
13   "do not advertise in the U.S."?
14       A.   Yes.
15       Q.   Do you see where he says, "do
16   not call U.S. investors to open an account,
17   even if they contact us first," do you see
18   that's underlined as well?
19       A.   Yes.
20       Q.   Do you recall yesterday
21   testifying that SureTrader did not
22   advertise?
23       A.   Right, Guy was very proud that
24   he did not spend advertising dollars.
25       MR. FORD:  Let's go to

Page 37

P. DORSETT

1
2        Exhibit 26.
3        Q.   Do you see this is an e-mail
4    from Guy Gentile on Friday June 28, 2013,
5    to Justin@SureTrader.com and
6    Phillip@SureTrader.com, do you see that?
7        A.   Yes.
8        Q.   This again is a response to the
9    first e-mail that we looked at, do you see
10   that?
11       MR. FORD:  If we scroll down a
12       little, he can see -- keep scrolling.
13       Q.   Do you see where
14   Mr. Ritchie says --
15       A.   Yes.
16       Q.   -- "I've highlighted the same
17   e-mail we just read," do you see that?
18       A.   Yes.
19       MR. FORD:  Let's scroll up
20       back.
21       Q.   Mr. Gentile says to this e-mail
22   to you and Mr. Ritchie this statement,
23   quote, "Swiss America Securities LTD,
24   SureTrader does not service accounts for
25   U.S. citizens, U.S. residents or U.S.

Page 38

P. DORSETT

1             P. DORSETT
2 corporations. "Swiss America LTD does not
3 solicit U.S. resident clients," is already
4 on every website of SureTrader.com and
5 meant to be a deterrent for America
6 clients." Do you see that?
7     A.   Yes.
8     Q.   Were you aware that on every
9 website of SureTrader.com that statement
10 that SureTrader did not service or solicit
11 U.S. clients was on every page, on every
12 SureTrader web page?
13     A.   I certainly was aware of the
14 discussions, and yeah, I can say yes. Guy
15 made a big deal about it.
16     Q.   Just to be clear, the question
17 is, were you aware that on every website of
18 SureTrader.com, there appeared first the
19 disclaimer that they do not service
20 accounts for U.S. citizens, U.S. residents
21 or U.S. corporations, were you aware of
22 that?
23     A.   So, in 2013, at the point of
24 this e-mail, that became a thing. So, when
25 I say yes, I remember there was a big set

Page 39

1             P. DORSETT
2 of discussions about making sure the
3 website had these disclaimers. So, I can
4 say yes as of this point and going forward
5 actually. I would think it stayed there
6 until the end.
7     Q.   That's because, for example,
8 even on the unsolicited acknowledgment
9 agreement didn't even come into place until
10 February of 2012?
11     A.   Around that time, yes.
12     Q.   And you know for sure it wasn't
13 the unsolicited acknowledgment agreement
14 was not in effect in November of 2011 when
15 the company started; is that correct?
16     A.   No, it was not in the
17 beginning.
18     Q.   And then do you see where
19 Mr. Gentile says, "The reason I do not want
20 to mention the words, "offshore brokerage"
21 is because that indicates that we are an
22 offshore broker to an American. When in
23 fact, a non-Bahamian citizen living in the
24 Bahamas can open an account and we wouldn't
25 be offshore to him," do you see that?

Page 40

1             P. DORSETT
2     A.   Yes.
3     Q.   Did you have an understanding
4 of why Mr. Gentile did not want to use the
5 term "offshore brokerage" at the time this
6 was sent?
7     A.   I think Guy spoke to me about
8 this. Do you want me to reflect that
9 conversation or what he wrote?
10     Q.   I'm just asking, did you have
11 an understanding of why -- strike that.
12     The next paragraph says, "We
13 cannot advertise in the U.S. as part of the
14 SEC Rule 15A-6," do you see at that?
15     A.   Yes.
16     Q.   Was that consistent with your
17 understanding of Rule 15A-6 at the time you
18 received this e-mail?
19     A.   His statement, is it consistent
20 with what I saw in Rule 15A-6?
21     Q.   Was it your understanding at
22 the time you received this e-mail that
23 SureTrader could not advertise in the U.S.
24 as part of SEC Rule 15A-6?
25     A.   Yes, I understand that we were

Page 41

1             P. DORSETT
2 not supposed to advertise in the U.S.
3     Q.   And then he says to you and
4 Mr. Ritchie, "We do not want to be seen as
5 actively engaging with U.S. clients. If
6 they want to do business with us and they
7 contact us and push to open an account,
8 then it's okay to take it, but we have to
9 deter them as much as we can to be
10 compliant with the SEC rules," do you see
11 that?
12     A.   Yes, I see that.
13     MR. FORD: We could go to
14   Exhibit 30. Sorry, 29. Can we
15   scroll down.
16     Q.   Do you see this is an e-mail
17 from Guy Gentile --
18     MR. FORD: Okay, stop so we can
19   see the e-mail. Okay, good.
20     Q.   Do you see where this is an
21 e-mail from Guy Gentile to you,
22 Phillip@SureTrader.com, and Antonio Collie,
23 do you see this?
24     A.   Yes.
25     Q.   Do you see attached are

Phillip Dorsett
February 28, 2023

Page 42

P. DORSETT

1        P. DORSETT
2    Justin@SureTrader.com and Carla Marin?
3        A.   Yes.
4        Q.   Do you know who Carla Marin is?
5        A.   No, I do not.
6        Q.   Do you know who Antonio Collie
7    is?
8        A.   Yes.
9        Q.   And he was a SureTrader
10   executive; is that correct?
11       A.   That's correct.
12       Q.   Do you see where it says,
13   "Phillip/Antonio"?
14       A.   Yes.
15       Q.   Do you see that it says,
16   "subject, please read this." Do you see
17   that?
18       A.   Yes.
19       Q.   Do you recall receiving this
20   e-mail?
21       A.   I can't say that I recall the
22   specific e-mail.  I would have to look at
23   the attachment I think or the link.
24       Q.   As of June 6, 2015, if the
25   director of SureTrader and founder sent you

Page 43

P. DORSETT

1    an e-mail, as chief compliance officer
2    saying, Please read this," would you have
3    read this e-mail?
4        A.   Yes.
5        Q.   It says, "Please read the
6    latest from the SEC and tell me how you
7    think this would impact the way they do
8    business," do you see that?
9        A.   Yes.
10       Q.   And then there is a link to a
11   website from SEC.gov/litigation, it's a
12   PDF, do you see that?
13       A.   Yes.
14       Q.   Do you recall testifying just a
15   few minutes ago that Mr. Gentile would not
16   ask for your advise about U.S. regulations,
17   do you recall testifying to that?
18       A.   Correct.
19       Q.   And you recall testifying that
20   you would not give your opinions to
21   Mr. Gentile regarding U.S. regulations;
22   isn't that correct?
23       A.   Well, I can certainly give my
24   opinion, but that's not having a

Page 44

P. DORSETT

1    professional opinion.
2        Q.   But do you recall just a few
3    minutes ago testifying and telling us that
4    during the course of your employment as
5    chief compliance officer, you would not
6    provide Mr. Gentile with your opinions
7    regarding U.S. regulations, do you recall
8    that?
9        A.   Right, so the point is, I
10   couldn't give professional advice to Guy on
11   foreign regulations, but certainly, he
12   would talk to us about it and what we think
13   and we would tell him.  Who is the Carla
14   Marin person?  Sorry, if I can ask.
15       Q.   I'm asking the questions here.
16   What I was asking, and I'll just try again,
17   do you recall testifying just a few minutes
18   ago that during your employment as chief
19   compliance officer, you would not provide
20   Mr. Gentile with advise regarding U.S.
21   regulations, do you recall that?
22       A.   As chief compliance officer, I
23   could not give Mr. Gentile professional
24   advise on U.S. regulations.  I would tell

Page 45

P. DORSETT

1    him what I thought, but I could not give
2    any professional advice on foreign
3    regulations.
4        Q.   But the e-mail goes to
5    Phillip@SureTrader.com, isn't that your
6    work e-mail address?
7        A.   I think the e-mail is for the
8    benefit of somebody else.
9        Q.   Isn't Phillip@SureTrader.com
10   your work e-mail?
11       A.   Yes, it is.
12       Q.   Isn't this e-mail address to
13   you at your e-mail address and to Antonio
14   Collie, another executive at SureTrader?
15       A.   That's correct.
16       Q.   And isn't Justin Ritchie CCed
17   on this e-mail, who is also an employee of
18   SureTrader?
19       A.   That is correct.
20       Q.   Is it your testimony that when
21   Mr. Gentile sent this to you, he was
22   seeking your personal, not professional
23   advice; is that your testimony?
24       A.   It is my testimony that

Philip Dorsett
February 28, 2023

Page 46

```
 1              P. DORSETT
 2  Mr. Gentile sent this so he could have it
 3  for the record.
 4          MR. FORD:  Let's scroll up.
 5      Okay, we can stop.
 6      Q.    This is an e-mail sent on
 7  June 8, 2015, so about a day and a half
 8  later from you, Phillip Dorsett,
 9  philip@SureTrader.com, do you see at that?
10      A.    Yes.
11      Q.    And you are responding to Guy
12  Gentile and Antonio Collie and CC Justin at
13  SureTrader and Carla Marin, do you see
14  that?
15      A.    Yes.
16      Q.    And you say, "Hello, Guy.  The
17  names Brickman and Barrato and BSI all seem
18  familiar to me, will go do more research.
19  However, in the interim, I think we should
20  be fine as long as we continue to act in
21  line with Rule 15A-6," do you see that?
22      A.    Yes.
23      Q.    Did you write that e-mail?
24      A.    Yes, I did.
25      Q.    Do you recall if you did more
```

Page 47

```
 1              P. DORSETT
 2  research?
 3      A.    I think I did.  I would have
 4  to -- I would have to get familiarized with
 5  what we were talking about.  This actually
 6  seems a bit familiar to me, that's why I
 7  say yes, I think I did the research.
 8      Q.    You said to Mr. Gentile, "I
 9  think we should be fine as long as we
10  continue to act in line with Rule 15A-6."
11  When you say, "we should be fine," were you
12  intending to indicate to Mr. Gentile that
13  you believed that SureTrader was acting in
14  compliance with Rule 15A-6?
15      A.    I said, I think we should be
16  fine as long as we continue to act in line
17  of Rule 15A-6.
18      Q.    Correct if me I'm wrong,
19  doesn't it say here, "if we continue to act
20  in --
21      A.    Exactly.  So, if we continue
22  and not do something else.
23      Q.    So, your testimony earlier that
24  you never provided Mr. Gentile advice
25  regarding 15-A6, was not accurate, was it,
```

Page 48

```
 1              P. DORSETT
 2  Mr. Dorsett?
 3      A.    Well, I cannot give
 4  professional advice to Guy on 15A-6.  The
 5  same way I couldn't give you legal advice
 6  on some legal document you gave me.  I
 7  mean, I could, but do you accept that as
 8  professional advice from me?
 9          MR. FORD:  Objection.  Moved to
10      strike what was nonresponsive.
11      Q.    My question is, your testimony
12  earlier is that you never provided advice
13  to Mr. Gentile regarding U.S. regulations
14  was inaccurate, wasn't it?
15      A.    It was accurate because I did
16  not volunteer advice to Guy with regards to
17  us following U.S. regulations.  Everything
18  I answered Guy with U.S. regulations was in
19  response to his questions to me.
20      Q.    Okay, so to be clear, you did
21  give advice to Mr. Gentile, but only in
22  response if he asked you questions about
23  U.S. regulations, is that what you're
24  saying?
25      A.    I gave him my opinions.
```

Page 49

```
 1              P. DORSETT
 2          MR. FORD:  We're going to pull
 3      up another exhibit here.  Exhibit 20.
 4      Q.    So, it looks like if we scroll
 5  down, this is an e-mail from
 6  Phillip@SureTrader.com on November 21,
 7  2011, to someone named Bob Walker, it says
 8  "RE: To open an account," do you see that?
 9      A.    Yes.
10      Q.    We'll scroll down, there's
11  another one.  Earlier in the chain, it's
12  from Bob Walker to info@SureTrader.com and
13  the subject is, "To open an account," do
14  you see that?
15      A.    Yes.
16      Q.    It says, "Hi, I was at the
17  Investor Underground seminar last evening,
18  and I see on your website that you need two
19  picture IDs.  I have only one, my driver's
20  license.  Do I need to get a passport to
21  open an account or is there another way?  I
22  also understand that as a U.S. citizen, I
23  need an international business corp. I hope
24  to be able to open an account with you, but
25  even if you pay extra for a rush on your
```

Philip Dorsett
February 28, 2023

Page 50

```
 1              P. DORSETT
 2   passport, it will take a long while to
 3   get,"  do you see that?
 4        A.   Yes.
 5        Q.   Do you know who Bob Walker is?
 6        A.   I don't recall.
 7        Q.   It looks like you respond, if
 8   we go up, about 51 minutes later you
 9   respond to Bob Walker, "Hello Bob, we would
10   prefer if one of your IDs was a passport.
11   However, if you do not have a passport, we
12   will accept another form of
13   government-issued ID in the interim.  With
14   regard to IBC.  Senior management has
15   worked out an agreement whereas if a U.S.
16   client wishes to open, they will only have
17   to complete an unsolicited acknowledgment
18   agreement as opposed to having an IBC.  We
19   send an unsolicited acknowledgment
20   agreement form after the client has
21   completed an application.  I hope this
22   answers your question," do you see that,
23   Mr. Dorsett?
24        A.   Yes.
25        Q.   You were not being truthful
```

Page 51

```
 1              P. DORSETT
 2   when you testified yesterday at length that
 3   the unsolicited acknowledgment agreement
 4   was not created in February of 2012; isn't
 5   that right?
 6        A.   Well, obviously, I was
 7   mistaken.  It was created a few months
 8   earlier.
 9        Q.   Well, you testified about half
10   a dozen times yesterday that it was created
11   around February 2012, do you recall that?
12        A.   There's a reason why I always
13   thought it was February.
14        Q.   And in fact, you told an entire
15   story yesterday about a supposed meeting
16   that happened between you and Mr. Gentile
17   and Ms. Gentile months after the company
18   was up and running; isn't that correct?
19        A.   Well, then it wasn't months,
20   that's what that means.
21        Q.   Do you recall telling that
22   story -- strike that.
23             Do you recall testifying just
24   maybe 30 minutes ago that the unsolicited
25   acknowledgement agreement was created in
```

Page 52

```
 1              P. DORSETT
 2   response to a meeting that Mr. Gentile, you
 3   and Ms. Gentile had months after the
 4   company was up and running, do you recall
 5   that?
 6        A.   Yes, I thought it was months
 7   after we started.  Turns out, it was not.
 8   There is a reason why I thought it was
 9   February --
10             MR. FORD:  Please turn --
11             MS. SUM:  Counsel, he --
12             MR. FORD:  I've already started
13        the next question.
14             MS. SUM:  Counsel, allow the
15        witness to finish answering your
16        questions.
17             MR. FORD:  We're pulling up the
18        next -- I'm sorry, this is also part
19        of Exhibit 20.  If we can go to the
20        Zak Ahmad's e-mail on November 22,
21        2011, as well.
22        Q.   This is an e-mail from Zak
23   Ahmad to Philip@SureTrader.com and it says,
24   "Subject:  Compliance," do you see that?
25        A.   Yes.
```

Page 53

```
 1              P. DORSETT
 2        Q.   There is nobody else on this
 3   e-mail; isn't that correct?
 4        A.   That's correct.
 5        Q.   There's nobody else on the last
 6   e-mail that we saw either, was there?
 7        A.   Could you show me again,
 8   please?
 9        Q.   It was sent --
10        A.   Okay.
11        Q.   -- to Bob Walker only to you
12   and you responded only to Bob Walker.
13   Mr. Gentile was not on that e-mail?
14        A.   Yes.
15        Q.   If would you have forwarded
16   this e-mail to Mr. Gentile, there would be
17   an electronic copy of that; isn't that
18   correct?
19        A.   Yes.
20        Q.   Do you recall testifying
21   yesterday that when the company first
22   started, Mr. Gentile was responsible for
23   accepting new clients, do you recall that?
24        A.   Accepting new clients?
25        Q.   Do you recall testifying
```

Philip Dorsett
February 28, 2023

Page 54

P. DORSETT

1  P. DORSETT
2  yesterday that Mr. Gentile was responsible
3  for reviewing new client applications?
4      A.    In the very beginning, both me
5  and Guy were reviewing new client
6  applications.
7      Q.    But Mr. Dorsett, on this
8  e-mail, Mr. Gentile is not included, is he?
9      A.    That's correct.
10     Q.    And on the last e-mail when you
11  responded to Mr. Walker, you did not CC
12  Mr. Gentile, did you?
13     A.    That's correct.
14     Q.    This e-mail is from Zak Ahmad
15  to you on November 22, 2011.  Do you know
16  who Zak Ahmad is?
17     A.    I can't remember the
18  individual.
19     Q.    Do you see the attachments, it
20  says, "Unsolicited acknowledgment
21  chaker.JPG," do you see that?
22     A.    Yes.
23     Q.    Do you see where it says,
24  "Hello, attached is signed compliance," do
25  you see that?

Page 55

P. DORSETT

1  P. DORSETT
2      A.    Yes.
3          MR. FORD:  Let's scroll down a
4      page.
5      Q.    Do you see where this says,
6  "Unsolicited acknowledgement agreement"?
7      A.    Yes, that's the very first one.
8      Q.    And it says, "To Swiss America
9  LTD, I affirm that no way did U.S. America
10  Securities LTD solicited me to become a
11  client.  I initiated contact with Swiss
12  American Securities LTD on an unsolicited
13  basis," do you see that?
14     A.    Yes.
15         MS. SUM:  Counsel, where is the
16     bates stamp on this document?
17         MR. FORD:  This is provided by
18     you to us, but Mr. Halpin will send
19     you the bates stamp.
20         MS. SUM:  We need the documents
21     so we're not trying to sort out where
22     the document is from.  It lacks a
23     bates range.
24         MR. FORD:  This is Exhibit 20
25     and these were produced in the 15,000

Page 56

P. DORSETT

1  P. DORSETT
2  documents that your witness took them
3  from SureTrader.
4          MS. SUM:  When they're
5      produced, they have bates stamp
6      ranges, that's why we needs these
7      documents with bates ranges.  So,
8      we're not doing a guessing game in
9      the deposition.
10         MR. FORD:  We had this
11     conversation, there was an error when
12     it was uploaded.  It appears to have
13     cut off the bates stamp, so we
14     provided you a folder with all the
15     bates stamp copies.  In the interim,
16     Mr. Halpin will send you the bates
17     stamp.
18         MS. SUM:  How is this?  It's
19     been an hour, you said you were going
20     to take breaks every hour.  Why don't
21     we take a break now so that folder
22     can be transmitted to us so I don't
23     actually have to be forced to
24     interrupt you to find out this
25     information in this deposition.

Page 57

P. DORSETT

1  P. DORSETT
2          MR. FORD:  I would just request
3      -- I was in the middle of a line of
4      questioning.
5          MS. SUM:  This is going to
6      continue to happen until we receive
7      the folder that you've been talking
8      about, which wasn't sent to us prior
9      to the start of this deposition, and
10     that's the cause of some of these
11     problems.
12         MR. FORD:  Ms. Filippelli, can
13     we scroll down?
14     Q.    Do you see there's a printed
15  name and signature on this document?
16     A.    Yes.  I was the one who
17  actually put that bottom part there.  That
18  was my input to the unsolicited
19  acknowledgment agreement.
20     Q.    Do you recall testifying
21  yesterday that you had no input into the
22  unsolicited acknowledgment agreement?
23     A.    Yes.
24     Q.    But this refreshes your
25  recollection that you did in fact have some

Philip Dorsett
February 28, 2023

Page 58

P. DORSETT

1  P. DORSETT
2  input into the unsolicited acknowledgment
3  agreement?
4     A.    I was the one who put it
5  together officially and put the name at the
6  signature line there.
7     Q.    So, to be clear, you officially
8  put the unsolicited acknowledgment
9  agreement together?
10    A.    The very first one.  The
11  subsequent ones, I had no input on.
12    Q.    This refreshes your
13  recollection that your testimony throughout
14  yesterday that the unsolicited
15  acknowledgement agreement was created
16  around February 2012 was not accurate?
17    A.    Well, it had to be in November,
18  it was from the beginning.
19       MR. FORD:  We can take a break
20    now.
21       MR. KOONIN:  We still don't
22    have them.  So, find the documents.
23       MR. FORD:  You have them
24    because they're documents that you
25    produced.

Page 59

P. DORSETT

1  P. DORSETT
2       MR. KOONIN:  No, that's not it.
3    You love to say 30,000 plus.  So,
4    give us the ones you're using today
5    in your deposition, which you
6    acknowledged is the appropriate thing
7    to do.  Send us the link and that's
8    the end of the conversation.
9       MS. SUM:  Either send a link or
10    send it literally by e-mails.  This
11    isn't that difficult to do so.
12    Ms. Filippelli has been bringing up
13    these exhibits one by one pursuant to
14    your direction.  So, she has access
15    to e-mails, she has our e-mail
16    addresses.  Please have
17    Ms. Filippelli -- I'm not trying to
18    be disrespectful to you -- we request
19    the use, as you are an attorney in
20    this case to send us the documents
21    you've been pulling up as Mr. Ford
22    has been instructing you.
23       MR. FORD:  Okay, see you all in
24    ten minutes.  Thank you.
25       (At this time, there was a

Page 60

P. DORSETT

1  P. DORSETT
2    pause in the proceeding.)
3     Q.    Mr. Dorsett, during that break,
4  did you have any conversations with anybody
5  about your testimony here today?
6     A.    No.
7     Q.    When we left off, we were
8  looking at Exhibit 20, which is in an
9  e-mail that you provided to us or an e-mail
10  the SEC provided to us.
11       MR. FORD:  Can we pull that
12    document back up?  If we can scroll
13    down to the e-mail from Mr. Walker.
14    Q.    Do you see in that first
15  sentence where it says, "Hi, I was at the
16  Investors Underground seminar last
17  evening," do you see that?
18    A.    Yes.
19    Q.    Do you know what Investors
20  Underground is?
21    A.    I remember that name.  I think
22  that's one of our affiliates.
23    Q.    You had testified yesterday
24  that it was Mr. Gentile's responsibility to
25  work with the members of the affiliate

Page 61

P. DORSETT

1  P. DORSETT
2  program, do you recall that?
3     A.    Yeah, he dealt directly with
4  the affiliates in the beginning.
5     Q.    Did you ever deal with any
6  members of the affiliate program?
7     A.    There would have been times
8  when I had direct conversations with Tim
9  Sykes and some of the other -- like the
10  persons who were in charge of the
11  affiliates, yes.
12    Q.    What about Investors
13  Underground, did you have any
14  communications with anybody from Investors
15  Underground?
16    A.    I probably did.  I remember
17  they were one of the bigger ones.
18    Q.    Do you recall signing any of
19  the agreements between SureTrader and any
20  members of the affiliate program?
21    A.    I do not recall.  Now, in the
22  beginning, I don't know if Guy would have
23  had maybe signed those, but at some point,
24  Justin took over all of that.
25    Q.    When you say in the beginning,

Philip Dorsett
February 28, 2023

Page 62

P. DORSETT

1    P. DORSETT
2    what time period are you referring to?
3        A.    Well, I guess we have
4    established my timing is a couple months
5    off, but Justin didn't come until about
6    mid-2012, right?  So, this was very early.
7    We had been open just about weeks, so this
8    is just the beginning.
9            MR. FORD:  Can we pull up
10       Exhibit 48.
11       Q.    Just to be clear Mr. Dorsett,
12   2014, you would not consider to be the
13   beginning, correct?
14       A.    I would say 2014 is around the
15   middle.
16           MR. FORD:  This is a marketing
17       services agreement between Investors
18       Live LLC and SureTrader.
19       Q.    Do you see that?
20       A.    Yes, I see Investors Live.
21       Q.    Do you know that Investors Live
22   and Investors Underground were the same
23   thing?
24       A.    Yeah, they were the same thing.
25           MR. FORD:  If we can go to the

Page 63

1            P. DORSETT
2        second to last page of this.  Keep
3        going.
4        A.    Just to let you know, this was
5    not an affiliate agreement that we were
6    looking at.
7            MR. FORD:  There was no pending
8        question and I'm going to strike that
9        as nonresponsive.
10           Can we please scroll to the
11       second to last page.  There it is.
12       Q.    Mr. Dorsett, is that your
13   signature there?
14       A.    Yes, it is.
15           MR. FORD:  We can pull that
16       down.
17       Q.    Do you recall testifying
18   yesterday regarding an affidavit that you
19   provided to the SEC in 2020?
20       A.    Yes.
21       Q.    And do you recall -- did the
22   SEC draft that affidavit on your behalf?
23       A.    No, I wrote it.
24           MR. FORD:  If we can go to
25       Exhibit 73.  This is an e-mail first

Page 64

1            P. DORSETT
2        from Jessica Weissman, it's on
3        August 20, 2020.
4        Q.    It says, "Good morning.  I sent
5    you the declaration for signature by
6    secured e-mail last week, please confirm
7    that you have received it," do you see
8    that?
9        A.    Yes.
10       Q.    Do you recall who Jessica
11   Weissman is?
12       A.    She was one of the second
13   people from SEC that I was speaking to.
14       Q.    Does this refresh your
15   recollection that the SEC drafted the
16   declaration?
17       A.    No, I sent what I sent to them
18   and they put in their official form and
19   sent it back for me to sign.
20       Q.    Then it says on August 20,
21   2022, you say, "Yes, I have received it.
22   We will revert shortly," do you see that?
23       A.    Yes.
24       Q.    It looks like you sent another
25   e-mail on September 1, 2020.  So, about 10,

Page 65

1            P. DORSETT
2    11 days later, you say, "Hi, Jessica, I
3    apologize for the delay.  Please find
4    attached the signed document along with my
5    IDs.  Please note I made some changes to
6    the document wording," do you see that?
7        A.    Okay, could you scroll, because
8    I'm looking -- oh, yes, yes, sorry.  I see
9    it.
10       Q.    Does that refresh your
11   recollection that it was Jessica Weissman
12   that drafted the affidavit?
13       A.    No, I drafted the affidavit.
14           MR. FORD:  If we can pull up
15       Exhibit 1.
16       A.    I think after there was put
17   officially in the document --
18           MR. FORD:  Mr. Dorsett, there's
19       no pending question.  We've moved
20       onto another exhibit.  Your counsel
21       will have the opportunity to ask you
22       questions.  If we can scroll down to
23       that first e-mail.  Scroll up.
24       Q.    Do you see it says on Monday
25   July 13, 2020, there's an e-mail from

Philip Dorsett
February 28, 2023

Page 66

P. DORSETT

1       P. DORSETT
2   Jessica Weissman and it says, "I sent you
3   an e-mail using smail, please let me know
4   if you are able to access it," do you see
5   that?
6       A.   Yes.
7       Q.   Now, during this time period,
8   were you communicating with Jessica
9   Weissman in person?
10      A.   No.
11      Q.   So, if you had drafted a copy
12  of this affidavit, did you send it through
13  the mail to Ms. Weissman?
14      A.   I would have e-mailed it.
15      Q.   So, if you had e-mailed it, we
16  would necessarily have a copy of that
17  e-mail; isn't that true?
18      A.   I don't know, but --
19      Q.   Did you delete the e-mail where
20  you sent your draft of the affidavit to
21  Ms. Weissman?
22      A.   No.
23      Q.   Okay.
24      A.   Oh, I think it was sent in
25  their official upload thing.  I think

Page 67

1       P. DORSETT
2   that's what it is.
3       Q.   So, now, if we scroll upward a
4   little bit to the next e-mail, this is a
5   response a few days later from PA Dorsett,
6   that's you, correct?
7       A.   Yes.
8       Q.   To Jessica Weissman and you
9   say, "Hello Jessica.  Further to my e-mail
10  in reference to number six, I have
11  completed my review of the other points and
12  would like to point out the following," do
13  you see that?
14      A.   Yes.
15      Q.   It say says, "It was not
16  initially Guy's idea about the
17  non-solicitation agreement, it was Karen's.
18  Guy agreed to the idea and instructed me to
19  cary it out," do you see that?
20      A.   Yes.
21      Q.   It is your testimony that you
22  drafted this document and then were
23  providing comments to change your earlier
24  drafting, is that an accurate description
25  of what happened?

Page 68

P. DORSETT

1       P. DORSETT
2       A.   Right, so I drafted the
3   document, right, and I think basically they
4   probably made some changes or something,
5   but it was a mistake because -- I don't
6   know.  It was a mistake, but number 16 is
7   not accurate.
8       Q.   So, you drafted this affidavit,
9   but you think SEC changed it and put
10  information that was not accurate into it;
11  is that correct?
12      A.   To be honest, I'm not sure.
13  But for whatever reason, what they came
14  back with, I read it again and I thought
15  about it and I realized that it probably
16  was not accurate.  So, I don't really --
17  you know, a lot of this stuff happened over
18  ten years ago and as I was reading it, it
19  was an official document, I was trying to
20  be more accurate as possible.  So I'm not
21  sure exactly what it was.  But I do
22  remember after I got it and I had looked at
23  it and it was the official document, I was
24  like, you know, I wasn't sure about some of
25  the dates, I wasn't sure -- my

Page 69

1       P. DORSETT
2   recollection --
3       Q.   Okay, moving on to the next
4   question.  It says number 20, the
5   non-solicitation agreement part of the
6   application came in 2012 not 2011, do you
7   see where it says that?
8       A.   Yes.
9       Q.   That is not accurate?
10      A.   It turns out it did come in
11  late 2011.
12      Q.   So, when you sent this to the
13  SEC, that was a false statement, correct?
14      A.   That was based on my memory,
15  which was very true.
16      Q.   At the time that you sent this
17  e-mail, did you have access to SureTrader
18  e-mails?
19      A.   Well, yes, I had access.  It
20  was quite a lot of them, but I was not
21  actively going through them if that's what
22  you mean.
23      Q.   It says number 23, the only
24  policy specific to U.S. persons was to
25  ensure that they signed the

Philip Dorsett
February 28, 2023

Page 70

                    P. DORSETT
1
2   non-solicitation agreement, do you see
3   that?
4        A.    Yes.
5        Q.    But that is a false statement
6   isn't it Mr. Dorsett?
7        A.    Well, my definition is what we
8   do in practice, not what we write in
9   foreign regulators --
10       Q.    Okay, so --
11             MS. SUM:  Counsel, allow him to
12         finish answering his question.
13       Q.    Mr. Dorsett, in practice --
14             MS. SUM:  Counsel, you continue
15         to insist on interrupting him.
16       Q.    Mr. Dorsett --
17             MS. SUM:  Mr. Dorsett, you are
18         allowed to finish answering his
19         questions.
20       Q.    Mr. Dorsett, just yes or no,
21   the only policy specific to U.S. persons,
22   in practice, to use your words, was to make
23   sure they signed the non-solicitation
24   agreement, do you agree with that?
25       A.    Yes, that is the only thing the

Page 71

                    P. DORSETT
1
2   staff did in relation to U.S. persons.
3             MR. FORD:  Can we scroll back
4         up?
5        Q.    Do you see where Jessica
6   responds, "Many thanks, I will make the
7   revisions for your additional review.  I
8   expect to send it to you via secure e-mail
9   the week of 8/3," do you see that?
10       A.    Yes.
11             MR. FORD:  Let's scroll down to
12         the actual affidavit.  Can we go to
13         page 6.
14       Q.    Do you see where it says
15   executed on this first day of
16   September 2020, do you see that?
17       A.    Yes.
18       Q.    Do you see where it says
19   Phillip A Dorsett and there's a signature,
20   do you see that?
21       A.    Yes.
22       Q.    Is that your signature?
23       A.    Yes it is.
24       Q.    Do you see where it says
25   pursuant to 28 U.S.C 1746, "I declare under

Page 72

                    P. DORSETT
1
2   penalty of perjury that the foregoing is
3   true and correct," do you see that?
4        A.    Yes.
5        Q.    Do you know what the 28 U.S.C.
6   1746 is?
7        A.    I never personally read it, but
8   it's the U.S. laws dealing with perjury and
9   forgery.
10       Q.    Yes, and did you understand
11   when you signed this you could be subject
12   to penalty perjury?
13       A.    Yes.
14             MR. FORD:  Can we go up to
15         paragraph 16.
16       Q.    It says, "On or around
17   February 2012, I met with Gentile and
18   another individual at Sure Traders'
19   headquarter in Nassau, The Bahamas.  At
20   this meeting, I was informed about the
21   loophole to the U.S. regulations
22   prohibiting the solicitation of U.S.
23   residents, but unregistered foreign broker
24   dealers.  As Gentile and the other
25   individual explained to me, in order to

Page 73

                    P. DORSETT
1
2   circumvent the regulation, each U.S.
3   customer of SureTrader would be required to
4   sign the statement claiming that they have
5   not been solicited by SureTrader.
6   According to Gentile, SureTrader would
7   continue to use online advertisements and
8   e-mails to solicit U.S. residents to open
9   accounts and trade through SureTrader.
10   During this February 2012 meeting, Gentile
11   said the non-solicitation statement would
12   allow SureTrader to claim that such
13   transaction were unsolicited," do you see
14   that?
15       A.    Yes.
16       Q.    Isn't it true that the
17   statement that this non-solicitation
18   statement was created in February 2012 is
19   false?
20       A.    It actually happened three
21   months earlier.
22       Q.    So, that statement is false,
23   correct?
24       A.    The statement was true to the
25   best of my memory.

Philip Dorsett
February 28, 2023

P. DORSETT

1
2      Q.   No, I'm not asking about your
3   memory, I'm asking about a fact.  Is it a
4   fact that the statement that this agreement
5   was created in February 2012 false?
6      A.   It's true that that is not
7   correct.
8      Q.   It's false, isn't it?
9      A.   Yes, it's false.  I think we
10   realize that.  I realize that now.
11      Q.   Do you remember testifying that
12   Gentile did -- that SureTrader did not do
13   any advertising, do you recall testifying
14   that today and yesterday?
15      A.   I said Guy was very against
16   advertising dollars.
17      Q.   No, what you said, as you'll
18   recall, is that he did not advertise; isn't
19   that correct?
20      A.   What I said was, Guy was very
21   much against advertising and he explained
22   the reasons why.
23      Q.   He says here he would continue
24   to use online advertisements and e-mail for
25   U.S. residents; is that correct, yes or no?

P. DORSETT

1
2      A.   This statement looks at the
3   entirety of our time in SureTrader and
4   advertising in the beginning for Guy was
5   basically through the online affiliates,
6   later on Guy did actual real advertising
7   when he brought on a marketing person,
8   okay, so this statement starts off by
9   referring to the affiliates right he was
10   basically advertising SureTrader
11   unofficially through them but later he did
12   actually do real advertising I think when
13   the marketing person was brought on.  And
14   again, that advertising he did later, I
15   think that was just to show that he was not
16   advertising to U.S. persons.
17      MR. FORD:  We're going to
18      scroll down to paragraph 23.
19      Q.   Throughout my employment at
20   SureTrader other than paragraph 20 there
21   were no policies or procedures implemented
22   by me or to my knowledge otherwise
23   implements at SureTrader to prevent the
24   solicitation of U.S. regulations residents,
25   do you see that?

P. DORSETT

1
2      A.   Yes, I see that.
3      Q.   That is a false statement isn't
4   it Mr. Dorsett?
5      A.   That is a very true statement.
6   We never did anything to stop U.S. clients
7   in fact we encouraged.
8      Q.   What you said is that
9   throughout your employment at SureTrader
10   meaning November 20th to July 17th there
11   were no policies or procedures implements
12   at SureTrader to prevent the solicitation
13   of U.S. residents, do you see that?
14      A.   Yes, I see that.
15      Q.   But that statement is false,
16   isn't it, Mr. Dorsett?
17      A.   No, that statement is not false
18   at all.
19      MR. FORD:  Can you please mute
20      yourself Mr. Koonin.
21      Q.   As you sit here today as chief
22   compliance officer for six years, were you
23   under any policy other than the unsolicited
24   acknowledgement agreement that SureTrader
25   implemented; is that correct?

P. DORSETT

1
2      A.   Earlier you showed me, I think
3   it was a policy that Guy came up with,
4   right?  Guy would come up with a lot of
5   stuff that some of them he would show to me
6   or some of them he would show to the U.S.
7   regulators to show we were following U.S.
8   laws, but when I talk about a policy and
9   when I talk about a procedure, those things
10   have to do with practice.  Those have to do
11   with what you're actually doing, not just
12   what you're showing to the regulator.
13   Certainly, the only policy that we were
14   doing, that we were following, the only
15   procedure we were following when it came to
16   U.S. persons was the unsolicited
17   acknowledgement agreement, there was
18   nothing else.
19      MR. FORD:  Can we pull up
20      Exhibit 6.  Mr. Koonin's audio is
21      interfering.  Can you contact your
22      colleague and tell him to mute his
23      audio.  In the meantime, we're going
24      to pull up Exhibit 6.
25      Q.   Mr. Dorsett, this is sworn

Philip Dorsett
February 28, 2023

Page 78

```
 1              P. DORSETT
 2   deposition testimony given by Steven
 3   Darville in another action.  You recall
 4   that Mr. Darville, you had testified
 5   earlier, was the IT Guy --
 6        A.    Yes.
 7        Q.    -- at SureTrader?
 8        A.    Yes.
 9              MR. FORD:  Can we scroll down
10        to page 95.
11        Q.    I'm going to just read through
12   this and ask you if you see it.  It says,
13         "QUESTION:  Were there any
14         measures in place to prohibit the
15         solicitation of United States
16         citizens from opening accounts with
17         SureTrader?
18        Q.    I'm going to scroll down and
19   Mr. Darville answers, "Yes, there was a
20   disclaimer that was put up on the website.
21   So, as soon as anybody had the website,
22   ,they would immediately see a pop up
23   stating that, you know, we wouldn't be
24   soliciting any U.S. clients and you have to
25   accept that, you know, as part of agreement
```

Page 79

```
 1              P. DORSETT
 2   to sign up," do you see that statement?
 3        A.    Yes.
 4        Q.    During the time that you were
 5   employed at SureTrader, were you aware that
 6   there was a pop up blocker that appeared
 7   any time somebody with a U.S. IP address
 8   accessed SureTrader website?
 9        A.    That conversation did come up
10   eventually, and I think it was put in
11   place.
12        Q.    So, your statement that the
13   only practice policies that SureTrader had
14   in place to prevent solicitation of U.S.
15   customers with the UAA is false, wasn't it?
16   Because as you just testified, you were
17   aware they used a pop up blocker to
18   prohibit U.S. customers from --
19        A.    I think my statement was the
20   only policy and practice that we followed
21   dealing with U.S. clients and their
22   onboarding was the unsolicited
23   acknowledgement agreement.
24        Q.    Mr. Dorsett, I can pull back up
25   if we need to, we can go back to Exhibit 1
```

Page 80

```
 1              P. DORSETT
 2   and see what you said because now you're
 3   saying something very different.  So, we're
 4   going to go back to Exhibit 1 and we'll
 5   continue to do that as often as needed and
 6   we're going to pull up Exhibit 1,
 7   paragraph 3.
 8              MS. FILIPPELLI:  Matt, I don't
 9         think it's Exhibit 1.
10              MR. FORD:  Yes, it is.  It's an
11         e-mail with the affidavit attached.
12         Paragraph 23.
13        Q.    You said, "There were no
14   policies or procedures implemented by
15   SureTrader to prevent the solicitation of
16   U.S. residents," do you see that in
17   paragraph 23?
18        A.    That's correct.
19        Q.    Isn't it true there was a pop
20   up blocker that would pop up on the website
21   if a U.S. IP address attempted to access
22   the Sure Trader website; isn't that true?
23        A.    Yes, that did come into effect.
24        Q.    So, your statement that there
25   was no policies or procedures implemented
```

Page 81

```
 1              P. DORSETT
 2   was false, because there was at least one
 3   other policy, pop up blocker, that would
 4   appear if a U.S. IP address attempted to
 5   access the website; isn't that true?
 6        A.    No, and I'll tell you why that
 7   is not the case.  Right in this statement,
 8   I state that and I'll read it, "Throughout
 9   my employment at SureTrader, other than the
10   unsolicited acknowledgement agreement,
11   there were no policies or procedures
12   implemented by me or to my knowledge
13   otherwise implements at SureTrader to
14   prevent the solicitation of the U.S.
15   residents."
16              A policy is something that the
17   staff follows and the procedures are how
18   you follow those policies.  There was
19   nothing that the staff followed to stop
20   U.S. persons from opening an account with
21   us.  The only thing they had to do was to
22   find --
23        Q.    Mr. Dorsett, I'm going to
24   strike that answer as nonresponsive.
25   Mr. Dorsett, it says, "Implemented to
```

Philip Dorsett
February 28, 2023

Page 82

P. DORSETT
1
2  prevent the solicitation of U.S.
3  residents," do you understand what the word
4  solicitation means?
5      A.    Solicitation means we are
6  trying to get U.S. clients.
7          MR. FORD:  Let's go back to
8      Exhibit 6.
9      Q.    On page 96, there's a question
10  to Mr. Darville, "Can you describe to me
11  from an IT perspective how that pop up
12  blocker would work?  For example, if a
13  person in the United States went to Sure
14  Trader's website."  Mr. Darville testified,
15  "As soon as they type up the SureTrader
16  website, a pop up would come out of the
17  website and you have to acknowledge it
18  before you get into the site," do you see
19  that?
20          MR. FORD:  We have to scroll
21      down a little bit.
22      A.    Yes, I see.
23      Q.    Is that consistent with your
24  understanding of how the pop up blocker
25  would work?

Page 83

P. DORSETT
1
2      A.    Yes, I think Mr. Darville
3  explained this to me as well.
4          MR. FORD:  Can we pull up
5      Exhibit 44.  This is a screen shot of
6      the pop up blocker that would appear
7      if somebody tried to access Sure
8      Trader's website.
9      Q.    Does this look familiar to you,
10  Mr. Dorsett?
11      A.    No, it does not.
12      Q.    During your time as chief
13  compliance officer, you were never shown
14  the pop up blocker that appeared when a
15  U.S. IP address attempted to access Sure
16  Traders website?
17      A.    I certainly heard about the pop
18  up blocker.  You're saying this is a pop up
19  blocker?  Because I don't recall seeing
20  this.
21          MR. FORD:  Mr. Halpin, can we
22      pull up a copy of this that's not a
23      photo copy.
24          MR. HALPIN:  We're looking for
25      it.

Page 84

P. DORSETT
1
2          MR. FORD:  It's Exhibit 44.
3          MS. SUM:  I got it.
4          MR. FORD:  Here we go, can we
5      zoom out a little bit.
6      Q.    Do you see it says website
7  unavailable --
8          THE COURT:  Mr. Ford is frozen.
9          MR. FORD:  Matt, you froze.
10      Q.    Mr. Dorsett, are you able to
11  hear me?
12      A.    Yes.
13          MS. SUM:  You froze, Matt, for
14      about ten seconds.  We didn't hear
15      you saying anything.
16          MR. FORD:  Okay.
17      Q.    This is a screen shot of the
18  pop up blocker that would appear if
19  somebody attempted to access Sure Trader's
20  website from a U.S. IP address.  Do you see
21  where it says, "Website unavailable.  U.S.
22  IP address detected.  This website is not
23  intended to solicit U.S. clients, and go
24  above and beyond the SEC non-solicitation
25  exemption.  You will now need an access

Page 85

P. DORSETT
1
2  code or be an existing client to view our
3  website.  By continuing, you certify you
4  have not been solicited directly or
5  indirectly to this website, that you are
6  initiating contact with this firm," do you
7  see that?
8      A.    Yes.
9      Q.    Do you see where it requires an
10  e-mail or access code before you can click
11  continue?
12      A.    Yes.
13      Q.    Do you see where you can login
14  with a username and password, do you see
15  that?
16      A.    Yes.
17      Q.    You just testified a few
18  moments ago that you never seen this pop up
19  blocker?
20      A.    This is while I was at
21  SureTrader?
22      Q.    Mr. Dorsett, I'm asking the
23  questions here.
24      A.    Sorry.
25      Q.    Do you recall ever seeing this

Philip Dorsett
February 28, 2023

Page 86

1              P. DORSETT
2    pop up blocker?
3         A.    I don't recall seeing that.  I
4    remember what Guy was discussing, was
5    something like a banner.
6         MR. FORD:  Can we go back to
7         Exhibit 6.
8         Q.    I'm going to read through this
9    and ask if you see it.  This is from Mr.
10   Darville's sworn deposition testimony.
11        "ANSWER:  As soon as they would
12        type in the SureTrader address, the
13        pop up would come up out of the
14        website and you would have to
15        acknowledge it before you would be
16        allowed to actually get to the site.
17        "QUESTION:  What about in the
18        context of advertising, were there
19        any similar measures to prohibit the
20        solicitation of U.S. customers?
21        "ANSWER:  Yes.  Our marking
22        team made that known during
23        advertisement that we are not
24        soliciting any U.S. clients.
25        "QUESTION:  And what about when

Page 87

1              P. DORSETT
2    customers fill out their forms?
3         "ANSWER:  And when they had to
4         fill out their application, it was
5         also apart of the application form
6         that they weren't solicited.
7         "QUESTION:  While you were
8         employed at SureTrader, about how
9         many employees were there?
10        "ANSWER:  During my tenure, we
11        grew to about 70 people, 70-something
12        people roughly.
13        "QUESTION:  And to the extent
14        you have knowledge of this, were
15        these procedures aimed at prohibiting
16        the solicitation of U.S. customers
17        abided by the company?
18        "ANSWER:  Yeah, definitely.
19        "QUESTION:  Were they abided by
20        the individual employees of the
21        company?
22        "ANSWER:  Yup, we were told to
23        mention that to the clients.
24        "QUESTION:  Who told you that?
25        "ANSWER:  That would have been

Page 88

1              P. DORSETT
2    the executive team.
3         "QUESTION:  Okay, do you recall
4    who was on the executive team?
5         "ANSWER:  Basically Mr. Cooper
6    and Mr. Collie.  They made it clear
7    to let the customers know they
8    weren't solicited --
9         MS. SUM:  I going to object to
10   you continuing to read a deposition
11   transcript.  Do you have a question
12   here?  I object to this line of
13   questioning.
14        "QUESTION:  Would the chief
15   compliance officer have been involved
16   in those sort of the discussions?
17        "ANSWER:  Yes.
18        "QUESTION:  And do you recall
19   any of the chief compliance officers?
20   Their names while you worked there.
21        "ANSWER:  Yes, one was Edward
22   Cooper and then the next one was
23   Phillip Dorsett.
24        Q.    Do you see that testimony?
25        MS. SUM:  I object.  This is an

Page 89

1              P. DORSETT
2    excerpt from a deposition transcript.
3    There's not a complete transcript
4    here that's been marked as an
5    exhibit.  So, I object to these
6    question with incomplete information.
7         MR. FORD:  Objection noted.
8         Q.    Do you see that testimony that
9    I just read to you?
10        A.    Yes.
11        Q.    Were you aware there was a
12   marketing team while you worked at
13   SureTrader?
14        A.    There was an executive in
15   charge of marketing.  She came on in 2016 I
16   think.
17        Q.    Having seen Mr. Darville's
18   testimony, does that refresh your
19   recollection that you were aware of the
20   existence of the pop up blocker that would
21   appear when you tried to access the
22   SureTrader website?
23        MS. SUM:  Objection, again,
24   based on an incomplete transcript.
25        Q.    I'm sorry, the answer was yes?

Philip Dorsett
February 28, 2023

Page 90

P. DORSETT

1          P. DORSETT
2     A.    No.
3     Q.    It does not refresh your
4  recollection --
5     A.    My answer was, this seems to be
6  taken after I left the company.  I'm not
7  sure because he said Mr. Cooper and
8  Mr. Collie said these things to him.
9          MR. FORD:  Let's go back to --
10         well, right here.
11         "QUESTION:  Would the chief
12         compliance officers have been
13         involved in those sorts of
14         discussions?
15         "ANSWER:  Yes.
16         "QUESTION:  Do you recall any
17         of the chief compliance officers,
18         their names while you worked there,.
19         "ANSWER:  Yes, Phillip Dorsett."
20    A.    Yes, I see, one was Edward
21  Cooper and then the next was Phillip
22  Dorsett.
23    Q.    And that's you, right?
24    A.    Mr. Cooper was chief compliance
25  officer after I left.

Page 91

1          P. DORSETT
2     Q.    Do you recall testifying
3  yesterday that Edward Cooper and you served
4  as chief compliance officer simultaneously,
5  do you recall?
6     A.    Yes, we were compliance
7  officers simultaneously.  Did I work at the
8  firm during this time?
9     Q.    So, you testified earlier that
10  you were involved in some of the affiliate
11  agreements, do you recall that?
12    A.    I testified earlier that some
13  of the affiliates would copy me on the
14  e-mails when they were sending in their
15  affiliate contracts.
16    Q.    Did you have the opportunity to
17  ever review an affiliate agreement?
18    A.    I was able to look at some of
19  them however that was I think Justin and
20  Guy's portfolio.
21    Q.    Isn't it true, Mr. Dorsett, you
22  even signed some of the affiliate
23  agreements?
24    A.    The document you showed me
25  earlier was not an affiliate agreement.

Page 92

1          P. DORSETT
2          MR. FORD:  Let's go to the
3          Exhibit 7.  This is a deposition
4          transcript of an investigatory
5          interview performed by the Securities
6          and Exchange Commission with Nathan
7          Michaud, that was provided to us as
8          discovery.
9     Q.    Do you know who Nathan Michaud
10  is?
11    A.    That name is familiar to me.
12  He was one of the affiliates.
13    Q.    Do you recall that Nathan
14  Michaud was in charge of Investors
15  Underground?
16    A.    Yes, that sounds correct.
17    Q.    Do you recall Mr. Michaud was
18  in charge of Investors Live?
19    A.    Like you said earlier, they
20  were the same company or affiliated.
21         MR. FORD:  Can we scroll down
22         to what is the third to last page on
23         this transcript, it would be page 90.
24         Keep it right there.
25         "QUESTION:  And there was a

Page 93

1          P. DORSETT
2  click on it or a link in that
3  advertisement that would take the
4  listener or viewer to a, block which
5  was then a description about
6  SureTrader that you drafted?
7          "MR. MICHAUD:  Correct.
8          "QUESTION:  And in that blog or
9  description, you made clear that
10  SureTrader was an offshore Bahamian
11  entity managed by the Bahamian
12  Exchange and their explicit U.S
13  Residents or U.S citizens?
14         "ANSWER:  Correct."
15    Q.    Do you see that testimony?
16    A.    Yes.
17         "QUESTION:  U.S. citizens, is
18  there anything that U.S. citizens
19  could in fact trade with them or just
20  that you couldn't -- they couldn't
21  solicit U.S. citizens?
22         "MR. MICHAUD:  I didn't mention
23  in it that you could be a U.S.
24  citizen.  I said it was not intend
25  for -- the same bullet point, not

Philip Dorsett
February 28, 2023

Page 94

P. DORSETT

1         P. DORSETT
2      intended for the U.S. persons,
3    Bahamian Security Exchange or
4    Bahamian Exchange.
5      Q.    Do you see that testimony?
6      A.    Yes.
7      Q.    Is that consistent with your
8  understanding that Mr. Michaud wrote, "not
9  intended for U.S. persons," on the
10  Investors Underground advertisements on
11  behalf of SureTrader?
12      A.    Sorry, could you repeat that
13  question?
14      Q.    What I'm asking, Mr. Dorsett,
15  did you understand that when SureTrader
16  advertised on Mr. Michaud's website
17  Investor Underground, that it included the
18  statement, "not intended for U.S. persons"
19  with regards to SureTrader, did you
20  understand that?
21      A.    I think at some point Guy had
22  all of the affiliates add something to that
23  effect to their various platforms.  This
24  would have been after I think -- after the
25  first several cases against them.

Page 95

P. DORSETT

1         P. DORSETT
2      Q.    So, it is your testimony that
3  Mr. Michaud did not add that until after
4  the first set of cases of Mr. Gentile; is
5  that correct?
6      A.    Yeah, and the reason I say that
7  is because --
8      Q.    Can you --
9            MS. SUM:  Counsel --
10      Q.    Can you give me a year?
11      A.    I can't give you a year, but
12  what I can say is, in the beginning --
13      Q.    What year do you think that
14  Mr. Michaud started including, "not
15  intended for U.S. persons," on the banner
16  that SureTrader was using to advertise?
17      A.    I don't know, but I think he
18  was one of the persons who was one of the
19  earlier affiliates and -- well, you know, I
20  can't say what the conversations were
21  between him and Guy.  All I know is what we
22  did at the firm, but I do remember later
23  on --
24      Q.    I'm not asking about your
25  conversations with him.  I asked what the

Page 96

P. DORSETT

1         P. DORSETT
2  time period was that you were referring to.
3  So, I'll ask again Mr. Dorsett, when is it
4  that you think that Investors Underground
5  first put up the banner that said not
6  intended for U.S. persons on the SureTrader
7  ads?
8      A.    I don't know when they first
9  put that up.
10          THE COURT REPORTER:  Mr. Ford,
11      you're breaking up.  Maybe you can
12      log out and come back in.
13          MR. FORD:  I'll do that.
14          (At this time, there was a
15      pause in the proceeding.)
16          MR. FORD:  Scrolling down to
17      page 93.
18      Q.    Question from Mr. Peabody,
19  "what was the admonition?"
20          "MR. MICHAUD:  Oh, it was
21      actually -- it was an SEC.  It was
22      some type of -- it was a copy and
23      paste from --
24          "QUESTION:  But what did it
25      say, what was it telling you you

Page 97

P. DORSETT

1         P. DORSETT
2  couldn't do?  What was the admonition
3  or the prohibition that you are
4  describing?
5          "MR. MICHAUD:  That it for the
6      international traders only."
7      Q.    Do you see that?
8      A.    Yes.
9      Q.    Do you believe Mr. Michaud was
10  testifying truthfully?
11      A.    I can't say if he was
12  testifying truthfully or not.
13      Q.    Well, as chief compliance
14  officer of SureTrader, were you aware that
15  when an affiliate program entity put up an
16  advertisement for SureTrader, it included
17  the language, "not intended for U.S.
18  persons," were you aware of that?
19      A.    Well, as I said earlier, Guy
20  was the one who handled the affiliates
21  program, and then it was Justin so --
22      Q.    Mr. Dorsett, the question I'm
23  asking is were you aware -- were you
24  personally, Mr. Dorsett, aware that when a
25  member of the affiliates program put up a

Philip Dorsett
February 28, 2023

Page 98

1           P. DORSETT
2    SureTrader ad, it included the admonition,
3    "not intended for U.S. persons," were you
4    aware of that?
5        A.    That was not something I would
6    have been made aware of.  Again, Guy had
7    all the affiliates and then it was Justin,
8    he handled everything to do with the
9    affiliates.
10       Q.    Were you -- were you aware that
11   Investors Underground, when they put up an
12   advertisement on behalf of SureTrader, that
13   they included the language, "not intended
14   for U.S. persons," are you aware of that?
15       A.    That's not something that comes
16   to my memory to say that I was aware of
17   that.  I knew that they were one of our
18   affiliates and we were getting clients
19   through them.  I do not know what
20   disclaimers they had.
21       "QUESTION:  And then you said
22       something about you had a link for
23       international traders and a link for
24       domestic traders?  What did you mean
25       by that?  It was unclear.

Page 99

1           P. DORSETT
2        "ANSWER:  Oh, Investors
3        Underground on the broker, there was
4        U.S., we had at the time for U.S.
5        traders and then for international
6        traders and then there was --
7        "QUESTION:  What does that
8        mean?  Describe what you mean.  There
9        was a link for both.
10       "THE WITNESS:  If you're a U.S.
11       client, there was CenterPoint and
12       Speed Trader.
13       "MR. PEABODY:  CenterPoint,
14       meaning that brokers --
15       "MR. MICHAUD:  The brokers,
16       yeah.  And if you're an international
17       trader on SureTrader.
18       "QUESTION:  And so on your
19       website, you directed international
20       customers to the international broker
21       link so to speak?
22       "THE WITNESS:  Correct."
23       Q.    Do you see that testimony,
24   Mr. Dorsett?
25       A.    Yes, I see that.

Page 100

1           P. DORSETT
2        Q.    Were you aware Investors
3    Underground provided two links, the first
4    that was for U.S. customers linked to Speed
5    Trade were you aware of that?
6        A.    No, I was not aware of that.
7        Q.    Were you aware that there was a
8    second link that linked to SureTrader that
9    was for non-U.S. persons?
10       A.    No, I was not aware of that.
11       Q.    You were not aware of that.
12   Were you aware of any restrictions that
13   were placed on affiliate members when they
14   were advertising on behalf of SureTrader?
15       A.    Now, I do remember overhearing
16   conversations that Guy would be having with
17   the affiliates where they had to be careful
18   to make sure that, you know, they're not
19   going to get in trouble for sending U.S.
20   clients.  I was not privy to specifics.
21       MR. FORD:  Moved to strike that
22       answer as nonresponsive.  If we can
23       pull up Exhibit 48.  We looked at
24       this document earlier, it is a
25       marketing services agreement between

Page 101

1           P. DORSETT
2    SureTrader and Investors Live LLC.
3        And if we go back to the second to
4        last page of this document.
5        Q.    Do you remember testifying that
6    that's your signature?
7        A.    Yes, that is my signature.
8        Q.    Now, in the bottom right hand
9    corner, it appears to be a little squiggle,
10   do you see that?
11       A.    Yes.
12       Q.    Is that your initials?
13       A.    Yes, it is.
14       Q.    If we scroll up to the next
15   page, is that your initials on the bottom
16   right-hand corner?
17       A.    Yes, it is it.  Looks a little
18   different.
19       MR. FORD:  Scroll up one more
20       page and up one more page.
21       Q.    Is that your initials on the
22   bottom right-hand corner?
23       A.    Yes.
24       Q.    Mr. Dorsett, as chief
25   compliance officer of SureTrader when you

Philip Dorsett
February 28, 2023

Page 102

P. DORSETT

1
2   signed a document, was it your regular
3   practice to put your initials on the bottom
4   right-hand corner of each page?
5       A.    No, not initially.  I think Guy
6   instructed me that he wanted me to initial
7   the various pages to prove that I saw them.
8           MR. FORD:  Let's go back one
9       page.  I'm sorry, up.  Down, it's the
10      first page of the agreement there it
11      is okay.
12      Q.    Do you see where it says
13  purpose and scope, Swiss America desires to
14  engage marketing agent and marketing agent
15  is qualified to and desires to provide
16  certain marketing services for non-U.S.
17  investors, do you see that?
18      A.    Yes.
19      Q.    It is your testimony that this
20  document titled marketing services
21  agreement was not the agreement that was
22  used between SureTrader and the program
23  affiliates; is that right?
24      A.    Correct, that's not the one
25  that I saw, the one I see was different to

Page 103

P. DORSETT

1
2   this.
3       Q.    Your belief is that there's a
4   separate agreement not titled marketing
5   services agreement that program affiliates
6   would sign; is that correct?
7       A.    Right.  So, initially and it
8   wasn't -- this was 2014.  Initially, a lot
9   of the stuff, Guy sort of formalized later.
10  In the beginning, Guy would make these
11  agreements per individual and so -- per
12  affiliates, sorry.  So, they were not
13  standardized as you're looking here.
14      Q.    Were those agreements part of
15  the documents you took from SureTrader when
16  you left?
17      A.    When you say documents I
18  took --
19      Q.    You took 15,000 documents from
20  SureTrader after you were fired, correct?
21          MS. SUM:  Objection.
22      A.    I discovered there were
23  documents on my computer after I had
24  already left SureTrader, that is true.
25      Q.    Did anybody at the SEC ask you

Page 104

P. DORSETT

1
2   to obtain a documents from SureTrader while
3   you worked there?
4       A.    Well, I can't recall off the
5   top of my head.
6       Q.    Well, I want to know -- I'll
7   ask again, did somebody from the Securities
8   and Exchange Commissions of the United
9   States of America ever send you an e-mail
10  to take a document from SureTrader while
11  you were employed there?
12          MS. SUM:  Objection.
13      A.    Nobody.
14      Q.    Nobody?
15      A.    Nobody ever told me to take
16  documents from SureTrader.
17      Q.    Looking back at the marketing
18  services agreement.  By the way, is it your
19  testimony that -- strike that.
20          Do you know who Day Radio
21  Trading or Day Trading Radio?
22      A.    That's one of the the
23  affiliates.
24      Q.    Is it your testimony they would
25  have signed an agreement other than this

Page 105

P. DORSETT

1
2   marketing services agreement; is that your
3   testimony?
4       A.    Well -- remember, I do not
5   handle the affiliates.  What I'm saying to
6   you is, in the beginning, there was the
7   affiliates program and the documents that I
8   saw, were different to this.  This was
9   something that Guy brought on much later,
10  and I think it was in response to some of
11  the investigations that were at the time
12  ongoing.  But in the beginning, I can't --
13  I tell you, it was very personal and
14  individual between Guy and the affiliates.
15  And then Justin was involved, then I got
16  the impression I was kept out of that.
17      Q.    Do you see where it says,
18  "Swiss America desires to engage marketing
19  agent and marketing agent is qualified to
20  and desires to provide certain marketing
21  services to Swiss America for United States
22  investors," do you see that?
23      A.    Yes.
24      Q.    Do you understand that the
25  terms of this contract were only for the

Philip Dorsett
February 28, 2023

Page 106

P. DORSETT
1
2  purposes of marketing non-United States
3  investors, do you see that in the
4  agreement?
5      A.    I'm sorry?  Read it again.
6      Q.    "Swiss America desires to
7  engage marketing agent and marketing agent
8  is qualified --
9      A.    Yes, yes.
10     Q.    -- to and desires -- marketing
11 services to Swiss America for non-United
12 States investors?"
13     A.    Yes.
14     Q.    You saw that?
15     A.    Yes.
16     Q.    And if we scroll down --
17         MS. SUM:  Matt, may I ask that
18     it be enlarged a little bit?  It's a
19     little fuzzy.
20         MR. FORD:  Before we move on.
21     Do people want to take a lunch break
22     at 12:30?  Is everyone okay with
23     going until 12:30?
24         THE WITNESS:  I'm okay.
25         MR. FORD:  In the interim, is

Page 107

P. DORSETT
1
2      there a way to pull up a better copy
3      of this?  We'll pull up a document
4      with the bates stamps.  Let's scroll
5      to the bottom of that page.  This is
6      the wrong copy, Cara.  There's a copy
7      that's just signed by Mr. Michaud and
8      there's another copy at the bottom of
9      the document.  Keep going.  Stop
10     there.  Now scroll to the bottom of
11     that page.
12     Q.    Those are your initials at the
13 bottom of this page, correct?
14     A.    Correct.
15     Q.    That indicates that you read
16 the purpose and scope of this agreement was
17 for non-U.S. investors; is that correct?
18     A.    Yes.
19         MR. FORD:  Let's scroll past
20     the second page to the third page.
21     Q.    It says, "Regulatory issues,
22 marking agent be will abide by all
23 reasonable policies and instructions which
24 are or may be from time to time established
25 by Swiss America or deemed necessary by

Page 108

P. DORSETT
1
2  Swiss America to comply with all applicable
3  laws, rules and regulations, including, but
4  not limited to, any regulations promulgated
5  by the United States Securities and
6  Exchange Commission, specifically marketing
7  agent warrant and represents that it has
8  reviewed, understands and agrees to comply
9  with Exchange Act Section 15A-6 17CFR
10 Section 248.15A-6A1 and relevant SEC
11 guidance regarding the non-solicitation of
12 United States Investors.  Swiss America
13 shall have the right to terminate this
14 agreement if any change in the laws
15 significantly impedes Swiss America's
16 ability and Swiss America's sole discretion
17 to perform its obligation in connection
18 with this agreement," do you see that?
19     A.    Yes.
20     Q.    As chief compliance officer,
21 it's your testimony that you were not
22 concerned with these regulatory issues in
23 the United States; is that correct?
24     A.    Well, when I say concerned at
25 this point, I think Guy was already being

Page 109

P. DORSETT
1
2  sued by the regulatory agencies in the
3  United States and so there was concern --
4         MR. FORD:  I'm moving to
5     strike.  The answer is nonresponsive.
6     Q.    My question is whether or not
7  as the chief compliance officer, you would
8  have been concerned with the regulatory
9  issues you personally built or set in
10 paragraph eight, yes or no?
11     A.    Yes, I was concerned to the
12 extent that Guy was already being sued and
13 we had to make a lot of changes in the
14 firm --
15     Q.    Mr. Dorsett --
16         MS. SUM:  I object to you
17     interrupting him from completing his
18     answer.  The witness should be
19     allowed to finish answering his
20     question.
21     Q.    Mr. Dorsett, who was suing Guy
22 Gentile on January 1st of 2014?
23     A.    I think the first one, I think
24 it was FINRA.  I think that was the big
25 one.  That's sort of hard for me to

Philip Dorsett
February 28, 2023

Page 110

P. DORSETT

1   remember.  I'm not an expert in U.S.
2
3   regulatory affairs.
4         Q.    I'm not asking you.  You just
5   said he was being sued on January 1, 2014
6   when this agreement was signed, so I want
7   to know who was suing him.
8         A.    Well, perhaps the word -- the
9   U.S. regulators were going after him.
10   Perhaps sued was the wrong word.  But the
11   U.S. regulators were going after him at
12   this time.
13         MR. FORD:  Can you scroll
14      towards the bottom of this page.
15         Q.    That is your initial on the
16   bottom right-hand corner, correct?
17         A.    Yes.
18         Q.    Can we scroll up to
19   paragraph 10C.  It says, "Advertising,
20   accept the specifically provided in Exhibit
21   A.  Marketing agents shall not use Swiss
22   America's name for Swiss America or any of
23   its affiliates directly or indirectly in
24   any marketing agent advertisement for
25   public marketing materials without

Page 111

P. DORSETT

1
2   receiving approval from the appropriate
3   Swiss America officer.  Any such mention of
4   Swiss America on public marketing materials
5   will have the disclaimer included in
6   subsection H," do you see that?
7         A.    Yes.
8         MR. FORD:  We're going to
9      scroll down to paragraph H.
10         Q.    Paragraph H, "Non-solicitation
11   of U.S. investors.  Marking agent agrees
12   not to directly or indirectly engage in the
13   solicitation of U.S. investors.  Any
14   mention of Swiss America or its affiliates
15   on marking agent's website or other
16   promotional materials must have the
17   following disclaimer attached in prominent
18   font.  This does not constitute an offer or
19   solicitation for brokerage services,
20   investment advisory services or other
21   products or service in any jurisdiction
22   where we are not authorized to conduct
23   investment business or such offer or
24   solicitation would be contrary to the
25   securities or local laws and regulations of

Page 112

P. DORSETT

1
2   that jurisdiction.  Swiss America
3   Securities LTD does not service accounts
4   for U.S. citizens, U.S. residents or U.S.
5   corporations," do you see that?
6         A.    Yes.
7         Q.    Do you understand that part of
8   the contract that you signed on behalf of
9   SureTrader with Investors Underground, that
10   Investor Underground was not allowed to
11   advertise SureTrader service accounts for
12   U.S. citizens, U.S. residents or U.S.
13   corporations."
14         A.    Yes, that's what the contract
15   say.
16         MR. FORD:  Can we scroll up to
17      paragraph F.
18         Q.    This says, "Non-solicitation,
19   marketing agent agrees that during the time
20   of marketing agents' engagement with Swiss
21   America and for a period -- strike that.
22         I want to go down one page.
23   Exhibit A.  This is Exhibit A to the
24   contract number one.  It says "Services and
25   duties of marketing agent subject to the

Page 113

P. DORSETT

1
2   terms and conditions of this agreement.
3   Swiss America retains marketing agent as a
4   marketing agent in Swiss America.  To
5   market Swiss America's brokerage services
6   to international non-U.S. investors and
7   marketing agent accepts such engagement.
8   Marketing agent shall use its best efforts
9   to market the brokerage services of Swiss
10   America to potential new brokerage
11   customers, to its international non-U.S.
12   website visitors.  Marketing agent is
13   generally in the business of providing
14   website, community and information on
15   trading securities," do you see that?
16         A.    Yes.
17         Q.    Did you understand that the
18   contract you signed on behalf of SureTrader
19   with Investors Underground prohibited
20   Investors Underground for any marketing
21   efforts to any international non-U.S.
22   website visitors?
23         A.    I understood that's what the
24   contract said.
25         Q.    Now, going back to Exhibit 1

Philip Dorsett
February 28, 2023

Page 114

P. DORSETT

1   paragraph 23.  This is again the paragraph
2   where you declared under penalty and
3   perjury that SureTrader did not implement
4   any policies and procedures to prevent the
5   solicitation of U.S. residents, do you
6   remember that paragraph?
7        A.    Yes, I do.
8        Q.    As your role in chief
9   compliance officer, did you come in contact
10  with an entity known as WarriorTrading?
11       A.    Yes, I know of WarriorTrading.
12           MR. FORD:  Can we go to
13       paragraph 22 of his affidavit.
14       Q.    Do you see where it says, from
15  March 2016 to August 2017, online
16  application -- I'm paraphrasing -- they
17  were asking how to open an account, do you
18  see that?
19       A.    Yes.
20       Q.    It says, "That section included
21  a drop down menu are with referral sources
22  including among others, Day Trading Radio,
23  WarriorTrading and Timothy Sykes and
24  Investors Underground," do you see that?

Page 115

P. DORSETT

2        A.    Yes.
3        Q.    Is it your belief that from
4   March 2014 to August 2017, Investors
5   Underground was part of the affiliate
6   program for SureTrader?
7        A.    To my understanding, they all
8   remained affiliates.
9        Q.    How about Timothy Sykes, was it
10  your understanding that Timothy Sykes was a
11  member of the affiliate program?
12       A.    Yes, he especially was a member
13  of the affiliate program.  Sorry, you mean
14  right up until the end?
15       Q.    No, I'm asking between
16  March 2014 to August 2017 -- strike that.
17           I've already asked the question
18  and I received the answer.  I'm moving onto
19  another question.
20           MR. FORD:  We can pull up
21       Exhibit 7.  Go to page 46.
22       Q.    This is again the testimony of
23  Nathan Michaud during an SEC investigative
24  interview.  Mr. Matin, M-A-T-I-N.
25           "QUESTION:  And you had this

Page 116

P. DORSETT

2   relationship for how long with
3   SureTrader?
4           "ANSWER:  Between 2012 and 2014
5       somewhere in '12 and then the end of
6       2014, maybe January 2015.  I believe
7       we ended it."
8        Q.    Do you see that?
9        A.    Yes.  That was not to my
10  knowledge.
11       Q.    But going back to Exhibit 1,
12  you just testified that you believe that
13  Investors Underground was part of the
14  affiliate program from March 2014 to
15  March 2017; is that correct?
16       A.    Yes.
17       Q.    And in fact, you attested to
18  that under penalty and perjury; isn't that
19  correct?
20       A.    Yes.
21       Q.    And now you're testifying to me
22  that you didn't know that they weren't a
23  member of the affiliate program after 2014?
24       A.    No, I said that he wasn't aware
25  that he left.  The reason I say that is

Page 117

P. DORSETT

2   because as clients were coming in, we could
3   see the names that were attached to them
4   and I saw -- you're talking about Nathan
5   Michaud.  I still saw his name attached to
6   many clients, especially in 2016, and made
7   reference to a report that I did in 2016,
8   and I remember Nate's name was still very
9   much there.  When I said Nate and those
10  other guys, I stand by that.  That was
11  truly my understanding that they were the
12  affiliates up until that time.
13       Q.    Well, let's go back to your
14  sworn statement that says something
15  different.  It says, and we're pulling it
16  up in paragraph 22, "Day Trading Radio,
17  WarriorTrading, Timothy Sykes and Investors
18  Underground, based on my role at SureTrader
19  and based on what Gentile had told me, I
20  knew these referral sources were the day
21  trading websites, which SureTrader had
22  engaged to market and advertise its
23  services to U.S. customers," do you see
24  that?
25       A.    Yes.

Phillip Dorsett
February 28, 2023

Page 118

```
1                P. DORSETT
2       Q.    But, in fact, between
3  March 2016 and August 2017, Investors
4  Underground was not performing any
5  marketing services on behalf of SureTrader;
6  isn't that true?
7       A.    Well, again, I can only base
8  this on the information that was provided
9  to me.  I certainly thought that Nate was
10  still very much one of the affiliates
11  based on the clients and that's true based
12  on my conversations with Guy.  Granted, I
13  was not responsible for the affiliates
14  program, so this is what I'm hearing around
15  the firm and seeing on the actual client
16  accounts, so --
17       Q.    Mr. Dorsett --
18       A.    -- if he's saying 2015, I have
19  no knowledge of that.  I was under the
20  impression that he continued on.
21       Q.    Mr. Dorsett, you're not
22  testifying that Mr. Michaud was being
23  untruthful when he spoke to the SEC during
24  the investigator interview?
25       A.    I'm not saying at all if he's
```

Page 119

```
1                P. DORSETT
2  being untruthful or not, but certainly
3  during that time period, I would have
4  thought that Nate was still bringing in
5  clients to us based on the client
6  applications and certainly what was on the
7  client accounts.
8       Q.    Mr. Dorsett, if we go back to
9  the very top of your declaration, what it
10  says is, "My name is Phillip A. Dorsett.  I
11  am over twenty-one years of age and have
12  personal knowledge of the matters set forth
13  herein."
14       A.    Yes, I do have personal
15  knowledge.
16       Q.    That statement is false, isn't
17  it?
18       A.    No, it's not false.  It wasn't
19  hearsay.  Nobody told me that Nate used to
20  be an affiliate.  That's something I knew,
21  that's something I saw on the applications
22  myself.  So, it's very much personal
23  knowledge.  You're saying my judgment is
24  incorrect, then that's a different story.
25       Q.    Your testimony is that from
```

Page 120

```
1                P. DORSETT
2  March 2016 to August 2017, you believe
3  Investors Underground was engaged by
4  SureTrader and to market and advertise its
5  services to U.S. customers, you had
6  personal knowledge of that?
7       A.    I was under the impression,
8  based on the client accounts that I was
9  seeing, that Nate was still sending clients
10  to us.
11       Q.    I'm not asking what your
12  impression was.  I'm asking if you had
13  personal knowledge of the fact that
14  Investors Underground terminated the
15  contract that you signed by the end of
16  2014?
17       A.    I have no personal knowledge as
18  to when the contract terminated.
19  Again, that was handled by Guy and others.
20  All I can say is, I can see from the
21  account records, the clients were
22  recommended by particular affiliates and
23  Nate's name was still there.
24       Q.    Mr. Dorsett, do you know if one
25  of the things that SureTrader would do to
```

Page 121

```
1                P. DORSETT
2  prohibit solicitation of U.S. customers was
3  to refuse to provide referral fees to
4  affiliate program members recommending U.S.
5  customers?
6       A.    Like I said, during my tenure
7  at SureTrader, there were a lot of things
8  that happened --
9       Q.    Mr. Dorsett, I'm not asking
10  about a lot of things that happened, I'm
11  asking a specific question.  The specific
12  question is, are you aware of a SureTrader
13  policy -- strike that.
14            At the time you worked at
15  SureTrader, were you aware of a policy
16  whereby SureTrader would not pay referral
17  fees to affiliate program members who
18  referred U.S. persons, were you aware of
19  that?
20       A.    As far as I know, when you say
21  a policy, if you mean Guy made the decision
22  to stop making referrals, I don't know, but
23  I don't remember seeing a written policy
24  for the staff to follow in this regard.
25  The way you're using the word policy is
```

Philip Dorsett
February 28, 2023

Page 122

P. DORSETT

1 different than my understanding of a
2 policy.  My understanding of a policy is
3 the things that the staff follow within the
4 firm.
5     Q.    I'm not asking for your
6 understanding of a policy. I'm asking if
7 you are aware -- strike that.
8         Did you recognize your time --
9     MS. SUM:  Counsel, I'm going to
10     object.  Clearly the witness doesn't
11     understand or has a different
12     understanding of the word policy and
13     he's trying to explain it.
14     Q.    During your time as a chief
15 compliance officer at SureTrader, are you
16 aware whether affiliate program members
17 contracts expressly stated that they would
18 not be paid for referrals of U.S. persons,
19 are you aware, yes or no?
20     A.    No.
21     MR. FORD:  Can we go to
22     Exhibit 50.
23     Q.    This is an e-mail from Ross
24 Cameron to Justin Ritchie and Alex at

Page 122

P. DORSETT

1 different than my understanding of a
2 policy.  My understanding of a policy is
3 the things that the staff follow within the
4 firm.
5     Q.    I'm not asking for your
6 understanding of a policy. I'm asking if
7 you are aware -- strike that.
8         Did you recognize your time --
9     MS. SUM:  Counsel, I'm going to
10     object.  Clearly the witness doesn't
11     understand or has a different
12     understanding of the word policy and
13     he's trying to explain it.
14     Q.    During your time as a chief
15 compliance officer at SureTrader, are you
16 aware whether affiliate program members
17 contracts expressly stated that they would
18 not be paid for referrals of U.S. persons,
19 are you aware, yes or no?
20     A.    No.
21     MR. FORD:  Can we go to
22     Exhibit 50.
23     Q.    This is an e-mail from Ross
24 Cameron to Justin Ritchie and Alex at

Page 123

P. DORSETT

1 WarriorTrading and Jeff at WarriorTrading,
2 do you see that?
3     A.    Yes.
4     Q.    Do you recall testifying
5 earlier that Ross Cameron was affiliated
6 with WarriorTrading?
7     A.    I think I testified that I
8 recognized WarriorTrading.
9     Q.    I just want to point your
10 attention to a sentence about three
11 paragraphs down and it says, "Hi Justin.
12 Speed Trader appeals to the U.S. residents
13 with over 25,000, but we'd like an
14 arrangement that appeals to international
15 traders as well," do you see that?
16     A.    Yes.
17     Q.    Do you see that six days later,
18 Ross Cameron sends another message, "Hi
19 Justin.  I wanted to follow up.  Did you
20 have a chance to see my e-mail below," do
21 you see that?
22     A.    Yes.
23     Q.    And then on September 14th
24 Mr. Ritchie responds, "Hi Ross, looks good.

Page 124

P. DORSETT

1 However, how do you ensure that U.S.
2 clients don't come to us or is it up to us
3 not to accept U.S. persons using your code
4 or name," do you see that?
5     A.    Yes.
6     Q.    Mr. Cameron responds about
7 30 minutes later, "There are a couple
8 things we can do.  We can state that this
9 is only for international traders.  As a
10 requirement, students will send you a copy
11 of their invoice so they can get a
12 discounted commission, that will show their
13 billing address.  If it's a domestic
14 address, you'll say sorry, can't help you."
15 And then down a couple paragraphs, "how do
16 you typically handle U.S. customers?  Since
17 we wouldn't be receiving compensation for
18 promoting Sure Traders to U.S. residents,
19 does that change things? We're simply
20 offering students a discounted commission,"
21 do you see that?
22     A.    Okay, could you make it a
23 little bigger.  Okay.
24     Q.    Have you ever seen these

Page 125

P. DORSETT

1 e-mails?
2     A.    I don't recall seeing this.
3 Were these sent to me?
4     Q.    Would these be the sort of
5 conversations that you would be privy to by
6 a virtue of being a chief compliance
7 officer of SureTrader?
8     A.    By 20 -- is this 2016?  Guy
9 very permanently and intentionally kept me
10 out of the business dealings and I
11 complained to him about that, which
12 warranted my warning letter.  So, it's not
13 surprising that I'm not included on this.
14     Q.    So, your testimony is that
15 during 2016, you were kept out of the
16 business dealings of SureTrader?
17     A.    Many of them I was kept out of.
18     Q.    Were you cut out of the
19 business dealings for solicitation of U.S.
20 customers in 2016?
21     A.    Well, Guy would only allow me
22 to see things that he probably would allow
23 the SEC to see to be quite honest.
24     Q.    Yes or no?

Philip Dorsett
February 28, 2023

Page 126

P. DORSETT

1
2    A.    What was the question?
3    Q.    Were you kept out of Sure
4 Trader's dealings regarding solicitation in
5 2016?
6    A.    Most of them, I would have been
7 kept out of, yes.
8    Q.    You were aware at the time that
9 you were being kept out of them; is that
10 correct?
11    A.    Yes, I was being kept out of a
12 lot of stuff.  I don't know exactly what
13 was being discussed obviously.
14          MR. FORD:  Can we go back to
15      Exhibit 1.
16    Q.    If we scroll to paragraph 22,
17 you say from March 2016 to August 2017 that
18 quote, "I knew these referral sources were
19 the day trading websites referring to Day
20 Trading Radio, WarriorTrading, Timothy
21 Sykes and Investment Underground, which
22 SureTrader had engaged to market and
23 advertise its services U.S. customers," do
24 you recall looking over that?
25    A.    Yes.

Page 127

P. DORSETT

1
2    Q.    If we go back up to the top of
3 this document in paragraph one, pursuant to
4 28 U.S.C 1746, you attested that you have
5 personal knowledge of the matters set
6 forth; is that correct?
7    A.    That's very correct.
8    Q.    But in fact, you just testified
9 you were being kept out of decisions
10 related to the affiliate program; is that
11 right?
12    A.    Well, I was being kept out of a
13 whole lot and I would imagine that some of
14 what was being discussed with the
15 affiliates program was there as well, but
16 just because I was kept out of an official
17 meeting, I still knew what was going on in
18 the company very much.
19    Q.    But you didn't have personal
20 knowledge that Investors Underground had
21 terminated their relationship with
22 SureTrader more than two years before at
23 the time you signed that declaration; is
24 that correct?
25    A.    No, I did not have personal

Page 128

P. DORSETT

1 knowledge of that.
2
3    Q.    Nor did you have personal
4 knowledge regarding the terms of the
5 relationship between WarriorTrading and
6 SureTrader; isn't that correct?
7    A.    You mean in 2016?  Because I
8 think it changes.
9          MS. SUM:  Objection.  You
10      confused Day Trading and
11      WarriorTrading.
12          MR. FORD:  No, WarriorTrading.
13    Q.    Your testimony is that the
14 relationship with WarriorTrading changed?
15    A.    By 2016, Guy was very much
16 trying to adjust everything so he could
17 appear to be following U.S. regulations.
18          MR. FORD:  Move to strike that
19      answer was nonresponsive.  And we're
20      going to pull up Exhibit 50 again.
21      Scroll to the top.
22    Q.    This e-mail is dated
23 August 2016 and it says, "I wanted it reach
24 out to see if you'd be interested in
25 working together to promote SureTrader

Page 129

P. DORSETT

1
2 among the WarriorTrading community" do you
3 see that?
4    A.    Yes.
5    Q.    You just testified five seconds
6 ago that WarriorTrading had a relationship
7 to SureTrader prior to 2016, do you recall
8 that?
9    A.    Yes, because I remember
10 WarriorTrading quite a bit actually.
11    Q.    So, your testimony is that Ross
12 Cameron was sending an e-mail to Justin
13 Ritchie and nobody else at SureTrader
14 saying, "I wanted to reach out to see if
15 you'd be interested in working together to
16 to promote SureTrader," at a time that
17 there was already an agreement in place; is
18 that your testimony?
19    A.    I don't know, but I do recall
20 WarriorTrading -- yeah, I do recall
21 WarriorTrading being discussed by Guy early
22 on.
23    Q.    Mr. Dorsett, you don't know,
24 but you attested that you had personal
25 knowledge to these facts that you know

Philip Dorsett
February 28, 2023

Page 130

P. DORSETT

1    P. DORSETT
2    nothing about in your 2020 affidavit; isn't
3    that a fact?
4         A.    It's not like I made that up.
5    I know that name for a reason.  It's not
6    like I'm seeing it for the first time in
7    this e-mail with Justin.  I know of
8    WarriorTrading because I think Guy was
9    mentioning that very early on.
10   WarriorTrading continued to be mentioned
11   very early on.
12            MR. FORD:  Can we pull up
13        Exhibit 49.
14        Q.    This is an e-mail to Ross
15   Cameron to Justin Ritchie dated October 4,
16   2017, it says, "Hey Justin.  We will make
17   this rebate program valid for non-U.S.
18   residents who join after 10/1/2016, is that
19   okay," do you see that?
20        A.    Yes.
21        Q.    And then Mr. Ritchie responds
22   saying, "The link below is giving me a 404
23   error message.  Note that banners should
24   say, 'not intended for U.S. persons,' this
25   is what our legal and compliance team has

Page 131

1    P. DORSETT
2    advised us to use in an advertising
3    material," do you see that?
4         A.    Yes.
5         Q.    Do you know what a 404 error
6    message is?
7         A.    Yes, it's getting an internet
8    error message.
9         Q.    Does that mean he couldn't see
10   the screen shot of what was being sent to
11   him?
12        A.    It sounds so.
13        Q.    Ritchie says the banner should
14   say, "not intended for U.S. persons," do
15   you see that?
16        A.    Yes.
17        Q.    And then he says, "This is what
18   our legal and compliance team has advised
19   us to use in advertising material," do you
20   see that?
21        A.    Yes.
22        Q.    And who was in the legal and
23   compliance team at SureTrader?
24        A.    Well, in 2016, I was the chief
25   compliance officer.  This would have

Page 132

1    P. DORSETT
2    been -- yeah, in 2016 I was the chief
3    compliance officer.  Sorry, I thought it
4    was 2015.
5             MR. FORD:  Can we scroll down.
6         Q.    You see there's another e-mail
7    from Mr. Cameron to Mr. Ritchie where he
8    says, "We have added, 'not intend for U.S.
9    persons,' to all images as requested.  You
10   can see below on the website."  And then if
11   we scroll down, there's an image that says,
12   "enroll in our a hundred percent tuition
13   rebate program," and then it says, "not
14   intended for U.S. persons," do you see
15   that?
16        A.    Yes.
17            MR. FORD:  Can we go to
18        Exhibit 51.  This will be the last
19        Exhibit before lunch and I'll try to
20        move quickly.  This is titled
21        marketing services agreement.
22        Q.    Do you see that?
23        A.    Yes.
24        Q.    It's between New Feign Design,
25   D/B/A WarriorTrading and SureTrader, do you

Page 133

1    P. DORSETT
2    see that?
3         A.    Yes.
4         Q.    And is it still your testimony
5    that the affiliate program agreements said
6    something other than marketing services
7    agreement?
8         A.    Yes, the affiliate agreements
9    were very different.
10        Q.    Do you see that this was
11   entered to on October 1, 2016?
12        A.    Yes, I see that.
13        Q.    Under purpose and scope it
14   says, "Swiss America secure and marketing
15   agent is qualified to and desired to
16   provide certain marketing services to Swiss
17   America for non-United States investors,"
18   do you see that?
19        A.    Yes.
20        Q.    Is that consistent with your
21   understanding as a chief compliance officer
22   that the agreement between SureTrader and
23   WarriorTrading was only for non-United
24   States investors?
25        A.    I cannot say that.  Did I sign

Philip Dorsett
February 28, 2023

Page 134

```
1                    P. DORSETT
2    this agreement?
3         Q.    As you sit here today
4    Mr. Dorsett, is it -- strike that.
5               Did you have an understanding
6    as of October 2016 as the chief compliance
7    officer, that SureTrader was refusing to
8    compensate WarriorTrading of the U.S.
9    person or resident?
10        A.    No, I cannot say I recall that
11   at all.
12        Q.    Do you think that that was true
13   what I just said?
14        A.    Whey think is that by 2016 --
15        Q.    I'm asking a specific question
16   about what I just said.
17        A.    I don't know if that is true or
18   not.  The reason why I say that is because
19   I notice in a lot of these, even on these
20   banners, "not ended for U.S. persons," I
21   know categorically that that's not true.
22   We opened U.S. accounts up until I left.
23   So, when we say, "not intended for U.S.
24   persons," that is there strictly for U.S.
25   regulators to see.  We allowed U.S. persons
```

Page 135

```
1                    P. DORSETT
2    to open right until I left.  All of these
3    affiliates basically knew that, and it's my
4    understanding that they knew they decided
5    to officially put things on their websites.
6    The specifics and the agreements, no, I
7    don't know all of them.
8         Q.    Do you think they were being
9    compensated by SureTrader?
10        A.    I think they were being
11   compensated, yes.
12        MR. FORD:  Can we scroll down
13        to paragraph four of this agreement.
14        Q.    Photograph four, "Compensation,
15   none.  Swiss America agrees to offer
16   marketing agent's non-U.S. residents
17   students a discounted -- strike that.
18        "Compensation, none.  Swiss
19   America agrees to offer market agents
20   non-U.S. resident students a discounted
21   commission rate, in accordance with the
22   rates and terms set forth in Exhibit A," do
23   you see that?
24        A.    Yes.
25        Q.    Does this refresh your
```

Page 136

```
1                    P. DORSETT
2    recollection that SureTrader was not
3    providing compensation for WarriorTrading
4    for non-U.S. resident students --
5         A.    No, it does not, and the reason
6    I say that because I would hear Guy on the
7    phone, again, I don't know the exact time,
8    it's difficult to place it, but Guy would
9    be telling people --
10        Q.    Well, the time we're talking
11   about --
12        MS. SUM:  Counsel, allow him to
13        finish answering the question.
14        MR. FORD:  Ms. Sum, he's not
15        answering the question.  We're
16        talking about the document from 2016.
17        Q.    Mr. Dorsett, is it your
18   testimony that you overheard a conversation
19   between Mr. Gentile and somebody at
20   WarriorTrading on October 1, 2016 or around
21   that time?
22        A.    No, I cannot say it was around
23   that day and I can't say it was with
24   WarriorTrading, but I can say I heard --
25        Q.    Mr. Dorsett --
```

Page 137

```
1                    P. DORSETT
2         A.    -- do get them paid --
3         Q.    I'm asking about the
4    contract --
5         A.    -- he would find ways to get
6    them paid.
7         Q.    I'm asking about the marketing
8    services agreement between WarriorTrading
9    and SureTrader -- this is not a soliloquy.
10   I'm asking specific questions about a
11   contract from October 1, 2016, this is not
12   an opportunity where you can speak about
13   whatever comes to your mind.  I'm asking to
14   please stick to answering my questions.
15        MR. FORD:  Can we go to page
16        29, the final page of this document.
17        Can we go to paragraph two.
18        Q.    Do you see where it says,
19   "Compensation.  Compensation will not be
20   paid on the basis that this is purely a
21   co-marketing relationship.  Swiss America
22   shall agree to offer non-U.S. students of
23   marketing agent a discounted commission
24   rate of $3.95 per trade.  This is not
25   intended for U.S. persons, U.S. residents
```

Philip Dorsett
February 28, 2023

Page 138

P. DORSETT
1
2  or U.S. companies," do you see that?
3      A.    Yes, I see that.  Was this
4  contract signed?
5      Q.    Paragraph three, "Swiss America
6  has the right to disclose its relationship
7  with market agent to its client.  Such
8  disclosure will contain the following
9  language," do you see that?
10      A.    Yes.
11          MS. SUM:  I'm going to object.
12      He asked for clarification, you
13      scrolled past it.  Show him the page,
14      so he has the entirety of it.  If he
15      can see if it's signed or not.
16      Q.    Let's go to the next sentence,
17  "Swiss America has entered into a marketing
18  agreement with marketing agent whereby
19  Swiss America offers a discounted
20  commission," do you see that?
21      A.    Yes, I see that.
22      Q.    And you were saying
23  something -- let's scroll down.  You were
24  saying something about it not being signed?
25      A.    I'm not familiar with this

Page 139

P. DORSETT
1
2  document.  So, it's a contract between
3  Swiss America and WarriorTrading, I'm
4  assuming it should be signed.
5      Q.    Do you think that this was the
6  loophole that SureTrader used that they
7  would just send the agreements and not have
8  them signed?
9      A.    Well, I don't know if an
10  agreement is an agreement if none of the
11  parties sign it, but it's just a thought.
12  But I know for sure that Guy at this time
13  was certainly trying to do anything he
14  could to make it appear to U.S. regulators
15  that we were not soliciting U.S. clients
16  and turn away U.S. clients.  I can tell you
17  categorically we weren't not turning away
18  U.S. clients and we were getting U.S.
19  clients from affiliates.
20          MR. FORD:  I'm going to move
21      the strike any part of the answer
22      that was non-responsive, which was
23      about whether --
24      A.    Could you repeat the question?
25      Q.    Sure.  Do you think that what

Page 140

P. DORSETT
1
2  SureTrader was doing was sending these
3  contracts and they weren't being signed and
4  that's how they were getting around things?
5      A.    No, I can't say that.  All I
6  can speak to is what is in front of me
7  because it's not signed by either party.
8      Q.    Do you think that if we scroll
9  back up, do you think that where it says,
10  "two, compensation, this is not intended
11  for U.S. persons and the co-marketing
12  agreement is only an offer for non-U.S.
13  students," you don't think this was not
14  enforceful because it wasn't signed; is
15  that your testimony?
16      A.    I think it's a farce.  That's
17  what my testimony is.
18          MR. FORD:  Can we pull up
19      Exhibit 52.  Scroll down.  Scroll
20      back up.
21      Q.    Do you see where it says
22  paragraph two, "Compensation will not be
23  paid on the basis that this is purely a
24  co-marketing relationship.  Swiss America
25  shall agree to offer a discontinue --

Page 141

P. DORSETT
1
2  strike that.
3          "Swiss America shall agree to
4  offer non-U.S. students of marketing agent,
5  a discounted commission rate of 3.95 per
6  trade, this is not intended for U.S.
7  persons, U.S. residents, U.S. companies,"
8  do you see that?
9      A.    Yes.
10          MS. SUM:  Objection.  As a
11      single page doesn't reflect the
12      entirety that was shown in the prior
13      exhibit.
14          MR. FORD:  Ms. Sum, this
15      document was produced to us by you
16      from WarriorTrading and if we scroll
17      down, it's the same document we're
18      looking at.
19      Q.    Do you see the signature at the
20  bottom?
21          MS. SUM:  It was in
22      protection --
23          MR. FORD:  Ms. Sum --
24          MS. SUM:  -- I'm putting my
25      objection on the record that it is an

Philip Dorsett
February 28, 2023

Page 142

1               P. DORSETT
2        incomplete document.
3            MR. FORD:  He signed that it's
4        not for U.S. persons, the agreement
5        only applies to U.S. people, there's
6        a signature underneath it.  What I'm
7        asking the witness is, can you read
8        the name where it says name.
9            MS. SUM:  Instead of you
10       testifying -- I placed an objection
11       on the record.  Finish up your
12       question.
13       Q.    Mr. Dorsett, do you see where
14   the name is written there?
15       A.    Yes, I can see the name.
16       Q.    What does it say there?
17       A.    It says Ross Cameron.
18       Q.    Do you see the signature above
19   it?
20       A.    Yes.
21       Q.    Do you see where it says,
22   "Agreed to page one through four in full"?
23       A.    Yes.
24       Q.    Do you see where it says title?
25       A.    Sorry?  Yes.

Page 143

1               P. DORSETT
2        Q.    What does it say above title?
3        A.    President.
4        Q.    Do you see where it says date?
5        A.    Yes.
6        Q.    What's the date on that?
7        A.    10/4/2016.
8        Q.    As chief compliance officer of
9    SureTrader in 2016, this is not the type of
10   contract you would have seen?
11       A.    No.  Anything -- like I said,
12   certainly things with affiliates at this
13   time, it was kept away from me.
14       Q.    But, again, you put in an
15   affidavit in 2020, you had personal
16   knowledge of the WarriorTrading and
17   SureTrader engagement, didn't you, you put
18   that in?  You swore under penalty of
19   perjury in 2020 in an affidavit that you
20   had personal knowledge of the agreement
21   between WarriorTrading and SureTrading,
22   didn't you?
23       A.    I had personal knowledge of the
24   agreement between WarriorTrading and
25   SureTrader, that's what I said?

Page 144

1               P. DORSETT
2        Q.    Yeah, you said you had personal
3    knowledge.
4        A.    Can I see where I said I had
5    personal knowledge between WarriorTrading
6    and SureTrader, please?
7            MR. FORD:  Moving on.
8            MS. SUM:  Counsel, are we
9        taking the lunch break now or are you
10       continuing?  I thought this was the
11       last exhibit before a break.
12           MR. FORD:  Now is a good time
13       as any to take a break.  Mr. Dorsett,
14       I would just remind you that you are
15       under oath and to recommend that you
16       not discuss the substance of your
17       testimony with anybody during the
18       break.
19           MS. SUM:  How long are we
20       taking?
21           MR. FORD:  Forty-five minutes.
22           (At this time, there was a
23       pause in the proceeding.)
24       Q.    Good afternoon, Mr. Dorsett.
25       A.    Good afternoon.

Page 145

1               P. DORSETT
2        Q.    We are back on the record.
3    Hope you had a good break and just a
4    proform of matter, I just want to confirm
5    that you did not have any conversations
6    about the substance of your testimony
7    during the break.
8        A.    I have not.
9        Q.    What are the U.S. day trading
10   rules?
11       A.    U.S. day trading rules?
12       Q.    Right.  What does that mean to
13   you that phrase, U.S. day trading rules?
14       A.    Sorry, you mean the PDT rules?
15       Q.    I mean the phrase, U.S. day
16   trading rules, what does that mean?
17       A.    Well, if someone says U.S. day
18   trading rules to me, I would assume that's
19   referring to the PDT rule.
20           MR. FORD:  Can we just pull up
21       Exhibit 1.  Scroll to paragraph 6.
22       Q.    In paragraph 6 of your 2020
23   affidavit, you say, "Gentile told me if we
24   open a broker dealer in the Bahamas,
25   U.S.-based customers would immediately

Philip Dorsett
February 28, 2023

Page 146

P. DORSETT

1           P. DORSETT
2   become SureTrader customers in the Bahamas
3   so they could avoid U.S. day trading rules
4   and restrictions."  What did you mean by
5   U.S. day trading rules and restrictions?
6           A.    Right, so pattern day trading
7   rules, that's the same thing to me.
8           Q.    Are you aware of any other U.S.
9   day trading rules and restrictions that you
10  might have been referring to in that
11  phrase?
12          A.    No, I meant pattern day trading
13  rules.
14          Q.    What are the pattern day
15  trading rules?
16          A.    Well, from my understanding is
17  that I think a client cannot trade more
18  than -- is it four lots in a five day
19  period, is that it?
20          Q.    I'm asking you what the pattern
21  day trading rules are.  You tell me.
22          A.    Like I said I'm not an expert
23  on U.S. regulations.  My understanding is
24  that PDT rules, in the past before it was
25  put into effect, clients could trade as

Page 147

P. DORSETT

1           P. DORSETT
2   much as they wanted, but after this PDT
3   rule was put into effect, clients can only
4   trade, I think, it was four round lots per
5   week.  I think that's how Guy explained it
6   to me, which was causing a lot of people
7   not to make a lot of money.
8           Q.    Do you recall testifying that
9   around the time you started SureTrader that
10  people were getting frustrated with the
11  PDT, it was a new rule, do you recall that?
12          A.    Right, so Guy told me a lot of
13  persons were frustrated because, you know,
14  when the pattern day trading rule came into
15  effect, people couldn't make as much money
16  trading.
17          Q.    He told you that around the
18  time that you were discussing day trading?
19          A.    Yes, he already explained the
20  PDT rule to me for the first time.
21          Q.    Is the pattern day trading rule
22  a SEC rule?
23          A.    I don't know if it's an SEC
24  rule -- I think it's FINRA actually.  I'm
25  not sure.  I don't want to say for sure,

Page 148

P. DORSETT

1           P. DORSETT
2   but I think it's actually FINRA.  I don't
3   exactly -- FINRA or SEC, I don't know.
4           Q.    Are you aware that FINRA passed
5   what you're referring to as the pattern day
6   trading rule in 2001?
7           A.    No, I didn't know the exact
8   date.
9           Q.    But you do understand that 2001
10  is ten years before 2011, you understand
11  that, right?
12          A.    Yes.
13          MR. FORD:  Cara, let's go ahead
14      and pull those up.
15          Q.    Have you ever seen this
16  document?  It's from FINRA's website
17  explaining what the pattern day trading
18  rule is.
19          A.    I don't recall.
20          Q.    Do you see where it says, "Who
21  is a pattern day trader?"  By the way, can
22  we get an Exhibit number Cara?  You can
23  leave it where it is.  Just stop.
24          MR. FORD:  What's the Exhibit
25      number on this for the record?

Page 149

P. DORSETT

1           P. DORSETT
2           MR. ADAM FORD:  Thirty-nine.
3           Q.    This is Exhibit 39.  Do you see
4   where it is says, "You are considered a
5   pattern day trader if you execute four or
6   more trades within five business days,
7   providing that number of day trades
8   represents more than six percent of your
9   totalled trades in the margin account for
10  that same five day business period."
11          A.    Yes.
12          Q.    Is that your understanding of
13  the pattern day trading rule?
14          A.    Yeah, that's what it is, yes.
15          Q.    That's what Mr. Gentile told
16  you in 2011, that people were getting
17  frustrated with?
18          A.    Yes, they would be very happy
19  when they realized it was the firm, but
20  didn't have a PDT rule.
21          Q.    Because it was your
22  understanding that people in the U.S. could
23  not place four or more trades within five
24  business days, that was your understanding?
25          A.    Well, initially, again, I

Philip Dorsett
February 28, 2023

Page 150

P. DORSETT

1           P. DORSETT
2    didn't really know it was a U.S. thing.
3         Q.    Mr. Dorsett, I'm asking you
4    about the conversations that you had in
5    2011 when you were discussing FINRA Shore
6    Trader, is it your understanding that four
7    or more day trades within five business
8    days was what the pattern day trader rule
9    was?
10        A.    That's how Guy explained it to
11   me.
12        Q.    Were you aware there was any
13   other significant aspects of the pattern
14   day trading rules?
15        A.    I think he did mention in order
16   to not be effected by the rule, you needed
17   to have a certain amount, which most people
18   didn't.
19        Q.    Do you recall what that amount
20   was?
21        A.    No.
22        Q.    Just to be clear, during that
23   conversation, he told you that even though
24   the law had been passed -- strike that.
25             He told you that even though

Page 151

P. DORSETT

1           P. DORSETT
2    FINRA had created the pattern day trading
3    rule ten years earlier, people in 2011 were
4    telling you they were frustrated with it;
5    is that your testimony?
6         A.    He never said anything about
7    ten years earlier.  He said a lot of folks
8    are frustrated with the PDT rule, and if we
9    have a firm in the Bahamas with no PDT
10   rule, all those folks were going to come
11   here.
12             MR. FORD:  If we go back to
13        Exhibit 1.
14        Q.    In paragraph six, you say, "If
15   U.S. based customers would immediately
16   become SureTrader customers," do you see
17   that phrase?
18        A.    Yes.
19        Q.    Were you referring to Speed
20   Trader customers?
21        A.    Right.  So, a lot of this was
22   based off of certain things I remember Guy
23   saying to me specifically.  I remember one
24   of the things he said was, "Listen, my U.S.
25   customers would like immediately come over

Page 152

P. DORSETT

1           P. DORSETT
2    and beat all the customers -- I mean
3    Bahamian customers.
4         Q.    Was he referring to his Speed
5    Trader customers?
6         A.    I can't recall if he said
7    specifically, but he said all my U.S.
8    customers and then afterwards he said
9    everybody else.
10        Q.    So, he said all his U.S.
11   customers, that's what you meant by U.S.
12   based customers; is that correct?
13        A.    Yeah, yeah.
14        Q.    So, let's go back to that
15   Exhibit 39, the FINRA guidance.  If we
16   scroll down, it says, "Pattern day traders
17   must maintain minimum equity of $25,000 in
18   their margin account," do you see that?
19        A.    Yes.
20        Q.    Does that refresh your
21   recollection that the pattern day trading
22   restriction applies only to customers with
23   less than 25,000 in their margin account?
24        A.    It does actually, yes.
25        Q.    Now, you understand that this

Page 153

P. DORSETT

1           P. DORSETT
2    rule applied only to FINRA member firms;
3    isn't that correct?
4         A.    When you say a FINRA member
5    firm, could you please elaborate, sorry?
6         Q.    A firm that's a member of
7    FINRA.  Do you know what FINRA is?
8         A.    Yes, but I mean -- okay.  Well
9    FINRA is a U.S. regulator.
10        Q.    That's your understanding is
11   that FINRA is a U.S. regulator?
12        A.    I actually got to know a little
13   bit more about FINRA since then.  But I
14   think FINRA is made up of persons from the
15   industry who are trying to regulate the
16   industry; is that correct, whereas it's the
17   federal government, that's my
18   understanding.
19        Q.    Did you understand in 2011 that
20   the pattern day trading rules apply to only
21   two FINRA members?
22        A.    No, I don't think that train of
23   thought was in my mind.  I thought it was a
24   U.S. thing.
25             MR. FORD:  Can we pull up Cara

Philip Dorsett
February 28, 2023

Page 154

P. DORSETT

1        P. DORSETT
2       the next exhibit, it would be
3       Exhibit 38.  This is FINRA Rule 2270
4       Day Trading Risk Disclosure
5       statement.
6       Q.    Do you see that?
7       A.    Yes.
8       Q.    Do you know if this rule would
9    have been in place in 2011?
10      A.    I have no idea.  I don't know.
11      Q.    Have you ever seen this before?
12      A.    I doubt it.
13      Q.    Have you ever heard of anything
14   called NASD?
15      A.    NASDAQ, yes.
16      Q.    Not NASDAQ.  Have you ever
17   heard of an entity called NASD?
18      A.    Sorry, I want to think that's
19   an acronym of National Association of
20   Security Dealers, yes?
21      Q.    M-hm, that is correct.  Have
22   you heard of it?
23      A.    Yes.
24      Q.    Do you understand it was the
25   precursor to FINRA?

Page 155

P. DORSETT

1        P. DORSETT
2       A.    Well, now that you say that, I
3    think I did read that somewhere like in the
4    history that NASD client and became FINRA,
5    is that correct?  -- I'm sorry, like I
6    said -- yes, I have heard of NASD.
7    Certainly back then I would not have known
8    that NASD was a precursor to FINRA, but
9    since then, this is over ten years ago, I
10   think I did hear.  If anything, I do know
11   now that NASD and some other regulatory
12   agency, I think they combined to become
13   FINRA.  But again, this is not exactly my
14   expertise.
15      Q.    During your time as chief
16   compliance officer, did you ever hear of a
17   company called, doing business as Speed
18   Trader?
19      A.    Yes.
20      Q.    Is it your understanding that
21   this was a U.S. based firm?
22      A.    Yes.
23      Q.    Do you know if they traded U.S.
24   securities?
25      A.    Yes.

Page 156

P. DORSETT

1        P. DORSETT
2       Q.    Do you know if they were a
3    FINRA member?
4       A.    I can't say that.
5       Q.    Do you know if they were
6    registered with the SEC?
7       A.    I would certainly think that
8    they were.
9             MR. FORD:  Can we go back to
10      Exhibit 1.
11      Q.    Do you understand that if Speed
12   Trader was registered with the USSEC that
13   would subject to the pattern day trading
14   rule, do you understand that?
15      A.    Yeah, that makes sense.
16   Probably why Guy wanted to come down here.
17      Q.    Do you understand that if
18   people therefore were day trading with
19   Speed Trader, they would necessarily have
20   to have more than 25,000 in their margin
21   account in order to place four or more
22   trades over the span of five days?
23      A.    Yes.
24      Q.    In your affidavit, you claim
25   that those same individuals who have more

Page 157

P. DORSETT

1        P. DORSETT
2    than $25,000 in their Speed Trader account,
3    margin account, to trade with, would
4    immediately go to SureTrader to avoid the
5    PTD, do you see where you say that?
6       A.    I said nothing about $25,000.
7    Can you show me that, please.
8       Q.    You testified that the U.S. day
9    trading rules and restrictions were the
10   pattern day trading, do you recall that
11   testimony three minutes ago?
12      A.    Yes, you just showed me what
13   they were.
14      Q.    After I showed you the FINRA
15   rule, you agreed that there was -- the day
16   trading rules, the pattern day trading
17   rules, did not apply to margin accounts
18   with more than $25,000, do you remember
19   that?
20      A.    Yes, yes, I know that as well.
21      Q.    I want to go to paragraph 30 of
22   this exhibit.  The first clause, it says
23   "When I left SureTrader in 2017," do you
24   see that?
25      A.    Yes.

Philip Dorsett
February 28, 2023

Page 158

P. DORSETT

1                    P. DORSETT
2     Q.    You didn't leave SureTrader,
3 did you?  You were fired; isn't that
4 correct?
5     A.    Well, I left.  It wasn't of my
6 own fruition, but yes, I was fired.
7     Q.    You were fired, correct?
8     A.    Yes, that's correct.
9     Q.    And you testified yesterday
10 that you were fired in August 2017, do you
11 recall that?
12     A.    Yes.
13     Q.    And that is not accurate, is
14 it?
15     A.    I was fired before then?  What
16 is not accurate?
17     Q.    Mr. Dorsett, it is not in fact
18 the case that you were fired in August of
19 2017; is that right?
20     A.    When was I fired?  As far as I
21 recall, it was August 2017.
22     MR. FORD:  Can we pull up
23     Exhibit 2.  This is exhibit 2, it is
24     pulled off a docket.  It is another
25     affidavit that you submitted in this

Page 159

1                    P. DORSETT
2     case.  The declaration of 2022 and
3     we'll scroll to the last page.
4     Q.    Executed on the 27th day of the
5 June 2022, do you see your signature there?
6     A.    Yes.
7     Q.    Is that your signature?
8     A.    Yes.
9     Q.    Is this an affidavit that you
10 signed?
11     A.    Yes, it is.
12     Q.    Did you draft this affidavit?
13     A.    Yes, I did.
14     Q.    Attorneys for the SEC did not
15 draft this affidavit?
16     A.    I drafted the affidavit.
17     Q.    Do you know if attorneys for
18 the SEC did any revisions to this affidavit
19 you drafted?
20     A.    They may or may not have.  I
21 can't recall to be honest.
22     I asked you earlier, what the
23 28 U.S.C. 1746 was, do you recall me asking
24 you what that was?
25     A.    Yes.

Page 160

1                    P. DORSETT
2     Q.    Do you remember you didn't know
3 what it was?
4     A.    I didn't know what exactly it
5 said.
6     Q.    Mr. Dorsett, if you didn't know
7 what 28 U.S.C Section 1746 was, how did you
8 know to put it in this affidavit you
9 drafted -- strike that.
10     Let's scroll back up to
11 paragraph ten.  It says, "When I separated
12 from SureTrader in August 2017," that's a
13 false statement, isn't it?
14     A.    No.
15     Q.    Isn't it the case then that you
16 were fired in July of 2017 from SureTrader?
17     A.    Can you show me proof of that?
18 I thought I separated in August.  I would
19 have to check my records as well.
20     Q.    Let's scroll back up to the top
21 of this document.  Do you see where it
22 says, "You have personal knowledge of the
23 matters set forth herein"?
24     A.    Yes.
25     Q.    Let's scroll down to the bottom

Page 161

1                    P. DORSETT
2 of the document, and do you see where it
3 says that, "You declare under penalty of
4 perjury that the foregoing is true and
5 correct," do you see that?
6     A.    Yes, I see that.
7     Q.    Back to paragraph ten.  That
8 statement that you separated from
9 SureTrader is false because you were, in
10 fact, fired in July of 2017; isn't that
11 true?
12     A.    You would have to show me proof
13 of that because that's not to my knowledge
14 at all.
15     Q.    When you say that you were
16 separated, isn't it the case that you were
17 not separated, but you were fired for
18 malfeasance; isn't that correct?
19     A.    How do you define malfeasance?
20     Q.    Mr. Dorsett, you were fired
21 from SureTrader, weren't you?
22     A.    Yes, I was.
23     MS. SUM:  Objection.  Asked and
24     answered.
25     Q.    And you were fired from

Phillip Dorsett
February 28, 2023

Page 162

P. DORSETT

1           P. DORSETT
2    SureTrader for stealing company documents,
3    weren't you?
4        A.    That is a categoric lie.
5             MR. FORD:  Let's go to --
6             THE WITNESS:  Can you show me
7        why you say that --
8             MR. FORD:  Can we go to
9        Exhibit 5.  I'm only going to
10       introduce this as an affidavit of
11       Cooper, we're going to paragraph 8.
12       Q.    Do you see where it says,
13   "Mr. Dorsett was terminated in the summer
14   of 2017"?
15       A.    Yes.
16       Q.    Is that an accurate statement?
17       A.    Yes.
18       Q.    And you were terminated for
19   stealing company documents; isn't that
20   true?
21       A.    No, that is not true, and I
22   need you to show me why you are saying
23   that.  I challenge that.
24       Q.    During the summer of 2017,
25   Mr. Dorsett, at any time did you forward to

Page 163

1           P. DORSETT
2    any individual outside of SureTrader, a
3    SureTrader document?
4        A.    Yes, I did.
5        Q.    Did you forward them from your
6    SureTrader e-mail to your personal e-mail?
7        A.    I cannot remember, probably
8    yes.  In fact, yes, that probably would
9    have made sense.
10       Q.    Did you forward e-mails from
11   your SureTrader e-mail to the Securities
12   and Exchange Commission of the United
13   States?
14       A.    I can't remember if that was
15   during -- you said the summer of 2017 or
16   not?  I would have to check my records.
17            MR. FORD:  Can we go to
18       Exhibit 6.
19            MS. SUM:  I'm going to renew my
20       objection directed to questions to
21       Exhibit 6.  This is an incomplete
22       transcript of Steven Darville.
23            MR. FORD:  This is sworn
24       testimony of Steven Darville.  If we
25       go to the bottom of page 98.

Page 164

1           P. DORSETT
2        Q.    It says, "Okay did Phillip
3    Dorsett work at the company for the entire
4    time that you were there?
5             "ANSWER:  No, he was only there
6        for a brief period and then he was
7        let go.
8             "QUESTION:  Can you tell me
9        anything about the circumstances of
10       him being fired?
11            "ANSWER:  Yes, he was found to
12       be doing some shady business with
13       forwarding company e-mails to his
14       personal e-mails.  So, he was let go
15       for breach of confidentiality."
16       Q.    Do you see that, Mr. Dorsett?
17       A.    Yes, I see that.
18       Q.    It is your testimony that you
19   were not fired for forwarding personal
20   e-mails and other confidential materials
21   from the company outside of the company?
22       A.    No, this is the first time this
23   is being presented to me.
24       Q.    But you did in fact do that,
25   didn't you?

Page 165

1           P. DORSETT
2        A.    Yes, at times I would forward
3    e-mails to myself.  It's interesting --
4             "QUESTION:  How did you come to
5        know that?
6             "ANSWER:  From monitoring his
7        work machine, his computer.
8             "QUESTION:  In your process of
9        monitoring his work computer, did you
10       ever observe him sending work e-mails
11       to his personal e-mail address?
12            "ANSWER:  Yes, that was one of
13       the things I observed him doing.
14            "QUESTION:  And do you know,
15       would that have been a violation of
16       company policy?
17            "ANSWER:  Yes, that was
18       definitely a violation of company
19       policy.
20            "QUESTION:  Was that the sort
21       of thing that Mr. Dorsett would have
22       been made aware of?
23            "ANSWER:  Yes, he was aware of
24       that because we all had to sign
25       agreements when being onboarded by

Philip Dorsett
February 28, 2023

Page 166

P. DORSETT

1
2      the company.
3      Q.    Do you see that testimony,
4  Mr. Dorsett?
5      A.    Yes, I see that testimony.
6      Q.    Were you aware that your
7  company computer was being monitored while
8  you worked there?
9      A.    Well, I did know that Guy was
10 reading my e-mails.  So, yes, I guess.
11     Q.    As chief compliance officer in
12 your estimation, would it be a violation of
13 company policy to forward e-mails from your
14 personal computer outside of SureTrader,
15 would that be a violation of company
16 policy?  You're the chief compliance
17 officer.
18     A.    I did not forward e-mails
19 outside of SureTrader from my SureTrader
20 account.  I think what he said is that I
21 was forwarding e-mails to myself and I do
22 not deny that.
23     Q.    Is it your testimony that you
24 never forwarded any e-mails to the
25 Securities and Exchange of the United

Page 167

P. DORSETT

1
2  States while employed at SureTrader?
3      A.    I did send documents to the
4  Securities and Exchange Commission while I
5  was at SureTrader.
6      Q.    You understood not only that
7  this was a violation of company policy, but
8  also a violation of Bahamian law; is that
9  correct?
10     A.    No to either.  Well, first off,
11 the thing that Mr. Darville was referring
12 to, I don't know if I ever signed that
13 because I was never really a staff.  I was
14 there from the beginning, but I think I am
15 aware of that because Mr. Cooper
16 implemented that later on.  With regards to
17 me providing documents to government
18 regulators, I don't have an issue with that
19 at all.
20     Q.    So, it's your testimony,
21 Mr. Dorsett, that you have no issue with
22 providing SureTrader documents to a foreign
23 regulator without first getting approval
24 from the Securities and Exchange Commission
25 in the Bahamas; is that your testimony?

Page 168

P. DORSETT

1
2      A.    I will not mention anything
3  that may have to do with privileged
4  information between myself and the
5  Securities Commission in the Bahamas.
6      Q.    I'm not asking about that.  As
7  chief compliance officer, is it your
8  understanding of Bahamian law that you are
9  not permitted to send documents or a
10 registered broker dealer in the Bahamas to
11 a foreign regulator without SEC approval,
12 is that true or false?
13     A.    Well, again, my understanding
14 is that the information I sent was to a
15 government regulator in reference to a
16 person that they were investigating, that's
17 what I will say about that.
18         MR. FORD:  Can you go to
19     Exhibit 49.
20     Q.    This is an e-mail sent to you
21 and Mr. Gentile.  It says, "Hello Guy.  It
22 is not as simple as that.  Even as the
23 president, you cannot authorize me to do
24 something that we haven't established as
25 being legal.  I understand the seriousness

Page 169

P. DORSETT

1
2  of receiving the subpoena, and I also know
3  that there tends to be a deadline for these
4  types of requests.  However, in our haste
5  to fulfill U.S. law, we must be cautious
6  not to break Bahamian law.  To that end and
7  to save on time, I will put the information
8  together and I will also request the legal
9  opinion from Michael.  The legal opinion
10 will cement our legal footing in case this
11 situation somehow turns against us.
12 Additionally, in the future, any requests
13 for client information from a foreign
14 jurisdiction should be addressed to the
15 attorney general's office.  That is the
16 proper way in which these requests are made
17 to grant any client info, otherwise would
18 expose us to legal ramifications both from
19 client and also the attorney general," do
20 you see that?
21     A.    Yes.
22     Q.    Do you know what subpoena
23 you're referring to when you sent this
24 e-mail?
25     A.    I think Guy showed me

Phillip Dorsett
February 28, 2023

Page 170

P. DORSETT

1  something.  I can't say I remember it
2  offhand, but I would say asking for some
3  investigation on a client maybe.
4      Q.    You say you're going to request
5  any other --
6      A.    That was the firm's lawyer.
7      Q.    Michael Miller was his name?
8      A.    Yes.
9      Q.    Mr. Dorsett, to be clear, what
10 you're saying in this e-mail to
11 Mr. Gentile, is that you understand that he
12 received a subpoena; is that correct?
13     A.    Yeah, I think he told me that
14 he received a subpoena and I was
15 referencing -- because he was saying it's a
16 very serious matter.
17     Q.    You understood, however, that
18 responding to that subpoena could cause the
19 firm to break Bahamian law; isn't that
20 true?
21     A.    Yeah, because if they were
22 investigating a client of ours, I think
23 that had to go through Bahamian
24 authorities.

Page 171

P. DORSETT

1      Q.    And you were going to request
2  an opinion from Michael Miller, who was the
3  firm's attorney; is that correct?
4      A.    That's correct.
5      Q.    And do you know if you did in
6  fact ask Michael Miller for his opinion?
7      A.    I can only assume that I did.
8      Q.    Do you recall Michael Miller
9  telling you that it would be a violation of
10 Bahamian law to disclose information to the
11 Securities and Exchange Commission without
12 first getting permission, do you recall
13 Mr. Miller saying that to you?
14     A.    I don't know if I recall that
15 exact exchange.  Can you show it to me?
16     Q.    I'm asking if you recall
17 Mr. Miller telling you that.
18     A.    Again, I don't recall what his
19 exact words were, and I think he would have
20 sent it.  I think he would have responded
21 in writing.  We asked them for a legal
22 opinion and he would have given us a legal
23 opinion, and so for me to say what I think,
24 I would actually have to read the legal

Page 172

P. DORSETT

1  opinion because it would state various laws
2  and so forth.
3      Q.    As you're sitting here today,
4  do you recall whether he, in fact, provided
5  that to you?
6      A.    I think he did send a legal
7  opinion to us.
8          MR. FORD:  Can we pull up
9      Exhibit 69.
10     Q.    This is an e-mail from
11 PhillipDorsett@SureTrader.com dated
12 March 12, 2015, subpoena for information in
13 the matter of Nonko Trading NY 9203, do you
14 see that?
15     A.    Yes.
16     Q.    Do you know who Simona Suh is?
17     A.    I do not.  I'm assuming she
18 works for the SEC.
19     Q.    Do you know who Nonko Trading
20 is?
21     A.    Yes, that was one of our
22 clients.
23     Q.    And do you have a recollection
24 as to why they were being investigated?

Page 173

P. DORSETT

1      A.    I can't say off the top of my
2  head.  I cannot remember.
3      Q.    Do you remember if they were
4  indicted, the company or any individuals
5  associated with the company?
6      A.    I knew -- well, I don't
7  remember if they are indicted, but I do
8  remember that there was some sort of
9  investigation and they have an account with
10 us.
11     Q.    Do you remember if the SEC took
12 action against Nonko Trading?
13     A.    I do not recall.
14     Q.    Do you remember if the SEC took
15 action against any of Nonko Trading's
16 principles?
17     A.    I cannot recall off the top of
18 my mind.
19     Q.    Are you aware that Mr. Gentile
20 was acting as a cooperator from
21 approximately 2012 to the end of 2015 on
22 behalf of the Federal Bureau of
23 Investigations for the United States of
24 America?

Philip Dorsett
February 28, 2023

Page 174

P. DORSETT

1        P. DORSETT
2        A.    The only time I got wind of
3   that is when I read the article, the
4   Bloomberg article that I referenced
5   yesterday.
6        Q.    Are you aware from 2012 to late
7   2015, Mr. Gentile was acting as cooperator
8   on the Exchange Commission for the United
9   States of America?
10       A.    Sorry, what's the dates again?
11  Sorry.
12       Q.    From 2012 to the end of 2015.
13       A.    No, that doesn't make sense to
14  me at all.
15       Q.    Do you know if any of the
16  conversations that you heard between 2012
17  and 2015 where Mr. Gentile was on the phone
18  with people that you testified yesterday,
19  whether he was talking to FBI agents?
20       A.    I cannot say if he was talking
21  to FBI agents.  There was one conversation,
22  actually a few conversations, where he was
23  referring to me and it sounded as if he was
24  talking to regulators.
25       Q.    Do you know if he was speaking

Page 175

P. DORSETT

1        P. DORSETT
2   to individuals after having been directed
3   by the FBI to contact those individuals, do
4   you know?
5        A.    I know nothing about that.
6        MR. FORD:  We'll pull this
7     Exhibit 69 down.  This is taken from
8     an opposition to motion to dismiss a
9     criminal indictment that was filed
10    against Mr. Gentile in 2016.  Scroll
11    to the top for me.  This was filed in
12    the United States District Court for
13    the the District of New Jersey by
14    Honorable Jose Laneres by Paul
15    Fishman, United States Attorney on
16    the memorandum of Nicholas Grippo,
17    Paul Murphy and Mark Koyn, assistant
18    United States Attorneys.
19       Q.    Do you see that?
20       A.    Yes.
21       Q.    Do you know Nick Grippo?
22       A.    No.
23       Q.    Do you know Paul Fishman?
24       A.    No, I cannot say I do.
25       Q.    Do you know Gregory Yanko?

Page 176

P. DORSETT

1        P. DORSETT
2        A.    I am not familiar with that
3   name.
4        Q.    In paragraph C of this
5   submission it says, "During the two years
6   after his arrest, Gentile's cooperation
7   included engaging in recorded calls and
8   meetings with potential targets of
9   investigations and meeting with law
10  enforcement agents and representatives of
11  the USAO and the United States Securities
12  and Exchange Commission," do you see that?
13       A.    Yes.
14       Q.    Were you aware -- strike that.
15       You testified that you were
16  unaware that during the two years after
17  Gentile's arrest that he was cooperating on
18  behalf of the United States Attorneys
19  office?
20       A.    When you say his arrest, when
21  did this happen again?
22       Q.    Mr. Dorsett, are you aware --
23       MS. SUM:  What's the exhibit
24    number on this?
25       MR. FORD:  It's not an exhibit.

Page 177

P. DORSETT

1        P. DORSETT
2   It's a public e-filed document.  Ms.
3   Sum, we were the attorney's office
4   physically present along with the FBI
5   agents when we argued this motion to
6   dismiss, but multiple members were
7   present in a room when we were
8   arguing this motion to dismiss.  This
9   should be no objections in this case.
10       MS. SUM:  I was asking you the
11    exhibit number, Mr. Ford.
12       MR. FORD:  It's Exhibit 102.
13       MS. SUM:  Did you say 152?
14       MR. FORD:  102 for the time
15    being because I'm not sure what we're
16    marking it.  We'll come back to it,
17    but we'll list it as 102 for now.
18       Q.    Mr. Dorsett, do you know when
19  Mr. Gentile was arrested?
20       A.    I do not know when he was
21  arrested.
22       Q.    Do you know the circumstances
23  of his arrest?
24       A.    No.  I remember there was a
25  time when I started getting a little

Philip Dorsett
February 28, 2023

Page 178

P. DORSETT

1           P. DORSETT
2    suspicious of Guy's trustworthiness and I
3    tried to do some research, and I think he
4    had a firm in the past.  I think it was a
5    black box or something like that --
6           Q.    Mr. Dorsett, I hate to
7    interrupt, I'm going to move to strike that
8    as nonresponsive.  But I'm asking about
9    whether or not you knew the date
10   Mr. Gentile was arrested and I think the
11   answer was no, is that your answer?
12          A.    Correct, I don't know the date
13   that he was arrested.  In fact, I didn't
14   even know he was arrested.
15          Q.    Between 2012 and March 2016,
16   were you aware that Mr. Gentile had been
17   arrested?
18          A.    I mean, I can't say that that
19   comes to mind.  I don't know.  Between 2012
20   and 2016?
21          Q.    Further on, the U.S. attorney's
22   office says, "Meanwhile Gentile continued
23   to operate two securities brokerage firms,
24   one in New York and one in the Bahamas and
25   engaged in other business ventures,

Page 179

P. DORSETT

1           P. DORSETT
2    participated in various community and civic
3    activities and traveled extensively.  For
4    instance, between August 2012 and
5    February 2015, Gentile routinely traveled
6    to the Bahamas for both business and
7    personal purposes, went to Italy in July of
8    2013 and went to Jamaica in May 2014," do
9    you see that?
10          A.    Yes.
11          Q.    Is it consistent in your
12   experience that Mr. Gentile would routinely
13   travel to the Bahamas in August 2012 and
14   February 2015?
15          A.    I would say yes, he was in and
16   out of the office quite a bit.
17          Q.    Did he live in the Bahamas?
18          A.    I think so.  He had a house
19   actually.  He bought a house.  Before he
20   bought the house he had an apartment.
21          Q.    When you were observing
22   Mr. Gentile between August 2012 and
23   February 2015, the phone calls you
24   observed, during --
25          A.    The phone calls weren't in

Page 180

P. DORSETT

1           P. DORSETT
2    2012 --
3           Q.    Allow me to finish the
4    question.
5           A.    Sorry.
6           Q.    Between August 2012 and
7    February of 2015, did you observe
8    Mr. Gentile making phone calls?
9           A.    I observed Mr. Gentile making a
10   lot of phone calls in 2012.  And I guess
11   late 2011.
12          Q.    Did you observe him making any
13   phone calls between 2012 and 2015?
14          A.    By the time we moved to the new
15   office, Guy had his own office.  So, I was
16   not privy to a lot of his calls.  So, I
17   can't say up until 2015.
18          Q.    Remind me when you moved to the
19   new office, please.
20          A.    We would have moved to the new
21   office maybe in 2013 I want to say.
22          Q.    Between August 2012 and when
23   you moved to the new office in 2013, did
24   you observe Mr. Gentile making phone calls?
25          A.    Well, I would have to say yes,

Page 181

P. DORSETT

1           P. DORSETT
2    he would have been making phone calls.
3           Q.    Do you know if any of those
4    phone calls that he made between 2012 and
5    when you moved to the new office in 2013,
6    he was speaking to representatives from the
7    Federal Bureau of Investigations of the
8    United States of America?
9           A.    I have not heard any
10   conversations that made me think he was
11   talking to the FBI.
12          Q.    During August 2012 to the time
13   you moved to the office in 2013, did you
14   ever hear Mr. Gentile having phone
15   conversations with potential U.S.
16   customers?
17          A.    Well, yes I would say.  I mean,
18   I can't -- well, I can't say potential U.S.
19   customers.  He seemed to be focussing on
20   the affiliates persons who hired a lot of
21   U.S. clients.  I can't say individual U.S.
22   persons he was going after per se.  I
23   remember because it's not like he was
24   making deals with business people.  That's
25   my assessment.

Page 182

```
          P. DORSETT
1
2      Q.   Do you know -- would Timothy
3  Sykes been one of those peoples?
4      A.   Yes, he would speak to Tim a
5  whole lot.
6      Q.   Do you know whether Timothy
7  Sykes was a target in the FBI investigation
8  during that time?
9      A.   I have no knowledge of that.
10     Q.   Do you know whether Tim Sykes
11 was a target of Securities and Exchange
12 Commission investigation at that time?
13     A.   Again, I have no knowledge of
14 that.  I can't say that I recall that.
15     Q.   We're going to come back to
16 this document but in the meantime can we
17 pull up Exhibit 7.  This is deposition of
18 Nathan Michaud.  We're going to scroll to
19 page 20.  This is Securities and Exchange
20 Commission in 2016.  Question by Mr. Matin,
21 M-A-T-I-N.
22          "QUESTION:  When was the Tim
23 Sykes conference?
24          "ANSWER:  He's -- I mean he
25 does it annually.
```

Page 183

```
          P. DORSETT
1
2          "QUESTION:  When was the time
3  you met?
4          "ANSWER: Yeah, maybe 2013,
5  2014.
6          "QUESTION:  Where was it
7  located?
8          "ANSWER:  In Las Vegas.
9          "QUESTION:  Were you a guest of
10 Mr. Sykes or did you pay for the
11 conference.
12          "ANSWER: Guest.
13          "QUESTION:  And was Mr. Gentile
14 a guest to the conference or did he
15 pay for the conference?
16          "ANSWER:  Best of readings of
17 Guy's new stories, I believe that he
18 was the guest.
19     Q.   Do you see that?
20     A.   Yes.
21     Q.   Did Mr. Gentile tell you he was
22 going to the Timothy Sykes conference at
23 the direction of the FBI?
24     A.   No.
25     Q.   Did he ever tell you he was
```

Page 184

```
          P. DORSETT
1
2  going to the Timothy Sykes conference at
3  the direction of the Security and Exchange
4  Commission of the United States?
5      A.   No.
6          MR. FORD:  Can we take this
7  down.
8      Q.   Paragraph D, this is submitted
9  by United States Attorney's office in a
10 criminal indictment against Mr. Gentile in
11 March 2016, that was all dismissed.
12 Paragraph D, meetings and related event in
13 2014 and 2015, it says, "On October 10,
14 2014, after a meeting with the FBI United
15 States Attorney's office and SEC in August
16 of 2014 to discuss a significant securities
17 fraud investigation, in which Gentile was
18 cooperating in the 2014 investigation.
19 Gentile's counsel committed the Ford letter
20 with details his cooperation, et cetera,"
21 do you see that?
22     A.   Yes.
23     Q.   Are you aware of this meeting
24 that took place on October 10, 2014 between
25 Mr. Gentile and his counsel, the FBI, the
```

Page 185

```
          P. DORSETT
1
2  United States Attorney's office and the
3  Securities and Exchange Commission to
4  discuss the significant securities fraud
5  investigation?
6      A.   I cannot say I was aware of
7  that.
8      Q.   Mr. Gentile never told you as
9  of August 2014 that he was assisting the
10 SEC in a significant securities fraud
11 investigation?
12     A.   No.  Like I said, the only
13 thing I knew of that nature was what I read
14 an article that talked about the FBI.  And
15 I actually asked Guy about it and he
16 actually didn't want to talk to me about
17 it.  I don't know anything else about him
18 or him helping anybody else.
19     Q.   Mr. Dorsett, you don't believe
20 Paul Fishman and three assistant attorneys
21 were lying when they said there was a
22 meeting with the FBI United States
23 Attorneys exchange commission in 2014 to
24 discuss a significant securities fraud
25 investigation in which Gentile was
```

Philip Dorsett
February 28, 2023

Page 186

P. DORSETT

1  P. DORSETT
2  cooperating, do you?
3      A.    No, I have no reason to think
4  they're lying.
5      Q.    Isn't it a fact that this
6  e-mail sent March 12, 2015, sent by you was
7  sent to the Securities and Exchange
8  Commission at the time the United States
9  attorney's office of the United States has
10  represented Gentile was cooperating with
11  the SEC, isn't that a fact?
12     A.    This happened around the same
13  time the prior document you just showed me?
14  Yes, it says March 2015, I think it's
15  around the same time.
16     Q.    And you said, "Good day, Simona
17  Suh." Then it says, "RE: Subpoena for
18  information in the matter of the Nonko
19  Trading NY9203," do you see that?
20     A.    Yes.
21     Q.    It says, "My name is Phillip
22  Dorsett, and I am the chief compliance
23  officer here at Swiss America Securities
24  LTD in reference to the above referenced.
25  Please be advised that we are a Bahamian

Page 187

P. DORSETT

1  P. DORSETT
2  company located in the Bahamas and
3  therefore, must adhere to Bahamian law.  To
4  that end, we sought legal advise to ensure
5  that our compliance to your request did not
6  break any laws within jurisdiction.  I have
7  attached the response to that request
8  below, we will be happy to furnish the
9  requested information once all matters of
10  legality Bahamian law are met, please do
11  not hesitate to contact me," do you see
12  that?
13     A.    Yes.
14     Q.    Was it your understanding at
15  the time of this letter that if you
16  forwarded the documents directly to the
17  SEC, that you would be violating Bahamian
18  law?
19     A.    It was my understanding that we
20  were going to abide by the legal counsel
21  that we received from our lawyer.
22     Q.    Wasn't that legal counsel that
23  you could not send documents directly to
24  the SEC, that they had to go to the SCB
25  first?

Page 188

P. DORSETT

1      A.    Correct, because this was a
2  client under the Bahamas jurisdiction.
3      Q.    It appears you then cut and
4  paste an e-mail from Michael Miller that
5  says, "Dear Phillip, reference is made to
6  your e-mail dated March 9, 2015, please be
7  advised that Swiss America Securities may
8  be exposed to potential liability from its
9  customer for breach of confidentiality if
10  the U.S. regulators demands are met.  We
11  are of the view that any requests from a
12  foreign regulator should come through the
13  attorney general office and/or the
14  securities commission of the Bahamas or by
15  the order of the Supreme Court of the
16  Bahamas.  Kindly note that our opinion is
17  very general in nature, as we have not been
18  privy to the correspondents, documents,
19  etcetera pertaining to this mater, if you
20  have any question please feel free to
21  contact our office," do you see that?
22     A.    Yes.
23     Q.    Mr. Dorsett, it's a fact that
24  you copy and pasted this e-mail from

Page 189

P. DORSETT

1  Michael Miller SureTrader's legal counsel
2  and sent it to the Securities and Exchange
3  Commission in March 2015; is that a fact?
4      A.    Yes.
5      Q.    And this opinion says, "in no
6  uncertain charms that it could expose
7  SureTrader if customer information was sent
8  to U.S. Regulators," do you see that?
9      A.    That's correct because of
10  breach of confidentiality of those
11  customers.
12         MR. FORD:  Can we pull up
13    Exhibit 70.
14     Q.    This document says, "Foyer
15  confidential treatment requested
16  confidential pursuant to 17 C.F.R. Section
17  200.83."  I request that this document be
18  designated confidential until we get
19  approval from the court to release it to
20  the public.
21         It is addressed to Simona Suh,
22  Senior investigative counsel at the
23  division of enforcement.  United States
24  Securities and Exchange Commission.

P. Philip Dorsett
February 28, 2023

Page 190

```
1                P. DORSETT
2           MR. FORD:  Can we scroll down.
3       Q.   It says, "Subpoena for
4  information in the matter of Nonko Trading.
5  Dear Ms. Suh, due to the Swiss America's
6  compliance officer position, I'm sharing
7  prime information maintained in the
8  Bahamas.  I have asked Karen from DAS INC,
9  to directly send you files that they
10 maintain on their servers.  This will be
11 orders and trading files.  I will be
12 providing information on non-Swiss America
13 client's information below.  E-mails
14 between Jeffrey Goldman when he was trying
15 to do business with Protrade LP, e-mails
16 from Chris Arce.  Please request the
17 following from the Securities Commission of
18 the Bahamas," do you see that?
19      A.   Yes, I see that.
20      Q.   "All the information is already
21 prepared to be sent to the securities
22 commission of the Bahamas, thank you.  Guy
23 Gentile."  Have you seen this document
24 before?
25      A.   I cannot say that I have.
```

Page 191

```
1                P. DORSETT
2       Q.   Do you understand that
3  Mr. Gentile was providing information to
4  the SEC and asking them to seek additional
5  information about this individuals from the
6  securities commission of the Bahamas, do
7  you see that?
8       A.   Well, it appears he is asking
9  them to ask Karen and then get the
10 additional information through the
11 Securities Commission on the client.
12      Q.   And that's because?
13      A.   Because client information is
14 protected.
15      Q.   I'm sorry, I didn't mean to
16 interrupt.  That's because client
17 information is protected you said?
18      A.   Yes, and this investigation was
19 into a client.
20      Q.   If you released that client
21 investigation, you would be violating
22 Bahamian law; isn't that true?
23      A.   Correct.  Now, again --
24      Q.   Okay, so --
25           MR. FORD:  We can pull this
```

Page 192

```
1                P. DORSETT
2  down and go to Exhibit 40.  This is a
3  press release for the SEC's website
4  entitled, "SEC charges unregistered
5  broker in Tampa area with stealing
6  from investors in fraudulent day
7  trading scheme."  This is not the
8  right document.  It has to be maybe
9  the next one.  I'll pull it up.
10 We'll sort the exhibit numbers out.
11 We'll try again.
12      This is a screen shot of the
13 Securities and Exchange Comission
14 website.  It's a press release dated
15 September 5, 2018, entitled "SEC
16 charges two men with fraud in fake
17 trading account scheme."
18      Q.   Do you see that?
19      A.   Yeah, I can make out the title.
20      Q.   Well, let me zoom in.  How
21 about now?
22      A.   Yes, much better.
23      Q.   It says, "September 5, 2018,
24 the Securities and Exchange Commission
25 today charged two Michigan men with fraud
```

Page 193

```
1                P. DORSETT
2  for their roles in a fake accounts scheme
3  perpetrated by the a phony day trading
4  firm, Nonko Trading," do you see that?
5       A.   Yes.
6       Q.   It says, "The SEC alleges that
7  Jeffrey Goldman of West Bloomfield,
8  Michigan and Christopher Eikenberry of
9  Birmingham, Michigan participated in and
10 profited from a scheme to defraud Nonkos
11 customers out of the at least
12 $1.4 million," do you see that?
13      A.   Yes.
14      Q.   Do you recognize this is the
15 same entity and same individuals about whom
16 Ms. Suh from the SEC was requesting
17 information of SureTrader?
18      A.   Yes, it appears to be the same
19 company.
20      Q.   Do you recognize this as being
21 the same company that Mr. Gentile was
22 providing information about to Ms. Suh?
23      A.   It appears to be the same
24 company.
25      Q.   It is the same company, isn't
```

Phillip Dorsett
February 28, 2023

Page 194

P. DORSETT

1
2  it?
3       A.    Like I said, it appears to be
4  the same company.  It's a very unique name,
5  Nonko Trading, that's why I said it appears
6  to be the same company.
7       Q.    Mr. Dorsett, do you ever recall
8  being threatened by an SEC for criminal
9  prosecution?
10      A.    No.
11            MR. FORD:  Can we pull up
12       Exhibit 71.
13      Q.    This is a letter from the U.S.
14  SEC from a staff attorney named Sajaad
15  Matin to Phillip Dorsett at SureTrader and
16  it is titled, "RE:  In the matter of
17  Traders Cafe," do you see that?
18      A.    Yes.
19      Q.    It says, "Dear Mr. Dorsett, we
20  believe Swiss America Securities,
21  SureTrader, may possess or control
22  documents and data relevant to an ongoing
23  investigation being conducted by the staff
24  of the United States Securities and
25  Exchange Commission.  Accordingly, we

Page 195

P. DORSETT

1
2  hereby provide notice that such evidence
3  should be preserved ad retained until
4  further notice.  Failure to do so could
5  give rise to civil and criminal liability,"
6  do you see that?
7       A.    Yes.
8       Q.    Do you understand that the
9  phrase, "failure to do so could give rise
10  to criminal liability," means that you
11  could be criminally prosecuted if you fail
12  to do what is being said here?
13      A.    Well, yeah.  They didn't want
14  us to destroy records.  I can understand
15  why they would be subject to criminal
16  liability.
17      Q.    You are the chief compliance
18  officer of the Bahamian company.  Is it
19  your understanding that the Bahamian
20  company is bound by the regulations of the
21  SEC?
22      A.    No, we are bound by the
23  regulations of the Bahamas that also does
24  not allow us to destroy company documents.
25      Q.    So, when you receive this

Page 196

P. DORSETT

1
2  message, you understood that you could be
3  subject to criminal liability if you did
4  not preserve or retain documents; is that
5  correct?
6       A.    Correct.  If I destroy the
7  documents or the firm destroys the
8  documents, we could be in trouble.
9             MR. FORD:  Can we go to
10       Exhibit 72.
11      Q.    There's an e-mail from Michael
12  Miller to matins@SEC.gov, CCing
13  miami@SEC.gov, do you see that?
14      A.    Yes.
15      Q.    It says, "Dear Mr. Matin,
16  please find attached here with our response
17  to your letter address to Swiss America
18  securities Nassau Bahamas," do you see
19  that?
20      A.    Yes.
21      Q.    Signed by Michael Miller?
22      A.    Yes, it's from him.
23      Q.    He's an attorney that
24  represented SureTrader at the time?
25      A.    Yes.

Page 197

P. DORSETT

1
2             MR. FORD:  Scroll down to the
3       next pain.
4       Q.    It says, "I act on behalf of
5  Swiss Americas Securities LTD, SureTrader,
6  and write in response to your letter
7  addressed to my client dated August 17,
8  2015," do you see that?
9       A.    Yes.
10      Q.    That's the letter we just
11  looked at; isn't that correct?
12      A.    I didn't catch the date, but
13  it's the same it letter I think.
14      Q.    Would you like me to pull it
15  back up to confirm?
16      A.    No, I'm good.
17      Q.    It says, "Your letter appears
18  to attempt to instruct Swiss America
19  Securities to preserve and retain certain
20  documents and threatens civil or criminal
21  proceedings for failure to do so," do you
22  see that?
23      A.    Yes.
24      Q.    Mr. Dorsett, isn't it true that
25  the SEC does not have jurisdiction or

Philip Dorsett
February 28, 2023

Page 198

P. DORSETT

1
2 authority to institute criminal proceedings
3 against a foreign broker dealer?
4      A.   Well, yes, I would think that
5 has to be done in the country.
6      Q.   The SEC, you understand, is not
7 a criminal regulatory body, do you
8 understand that?
9      A.   Well, to say that I understand
10 them as not being a criminal regulatory
11 body, which means what?  They don't have
12 power?  What do you mean?
13      Q.   I'm asking if you know, if you
14 understand that the SEC does not have the
15 authority or power to bring criminal
16 proceedings in the United States or
17 anywhere, do you understand that?
18      A.   No, I don't really know how the
19 SEC works with bringing proceedings.  I
20 don't know how that works.
21      Q.   But you did receive a letter
22 from Sajaad Matin threatening you with
23 criminal proceedings, you, meaning
24 SureTrader; is that correct?
25      A.   Yes, he said if the company

Page 199

P. DORSETT

1
2 destroyed documents, we would face some
3 criminal repercussions.
4      Q.   If we go down to the second
5 paragraph, "Although my client has no
6 intention of destroying or altering any
7 documents identified in your letter, I must
8 note that as you must know, the Miami
9 Regional office, SEC, lacks authority.  It
10 issued a subpoena duces tecum to accompany
11 dually incorporated licensed or registered
12 in the Bahamas for documents located in the
13 Bahamas or anywhere outside of the United
14 States," do you see that?
15      A.   Yes.
16      Q.   Is that your understanding of
17 Bahamian law?
18      A.   Yes.
19      Q.   "Given this clear absence of
20 authority to subpoena such records, I
21 question your jurisdiction and your
22 authority to attempt to instruct a Bahamian
23 company with respect to their document
24 retention policies," do you agree with that
25 statement?

Page 200

P. DORSETT

1
2      A.   Can you just read it again?  It
3 sounds legal.
4      Q.   "Given this clear absence of
5 authority to subpoena such records, I
6 question your jurisdiction and/or authority
7 to attempt to instruct a Bahamian company
8 with respect to their document retention
9 policies."
10      A.   Well, I can understand why he
11 says that.  He's the lawyer, he has more
12 knowledge than me.
13      Q.   You are the chief compliance
14 officer of the company at this time,
15 Mr. Dorsett, is it accurate or is it not?
16      A.   Well, that's why we ask the
17 lawyer because, you know, I'm not a lawyer
18 and he has more information than me.
19      Q.   Your responsibilities was to
20 ensure the company was complying with
21 Bahamian law, do you recall testifying that
22 repeatedly?
23      A.   That is true.  So, on matters
24 we weren't sure, that's why we got an
25 Bahamian lawyer.

Page 201

P. DORSETT

1
2      Q.   "If you believe the United
3 States Securities and Exchange Commission
4 has the authority or jurisdiction to
5 instruct the Bahamian company with regards
6 to its records, please provide me with the
7 appropriate citation.  Otherwise, I
8 respectfully request that you cease sending
9 any correspondents to my client that seeks
10 to compel conduct or otherwise threatens
11 legal action based on the failure to comply
12 with unauthorized and improbable
13 directives.  Swiss America securities is
14 licensed and regulated in the Bahamas and
15 is in full compliance with all lawful
16 requirements by the securities commission
17 of the Bahamas," do you see that?
18      A.   Yes.
19      MR. FORD:  We can pull this
20 document down.  Can we go to Exhibit
21 3.  This document is called "Tips,
22 Complaints and Referrals.  It is
23 dated March 10, 2016.
24      Q.   Do you see that?
25      MS. SUM:  I just want to note

Philip Dorsett
February 28, 2023

Page 202

P. DORSETT
1            P. DORSETT
2        this is a confidential document.
3        MR. FORD:  Okay.
4        MS. SUM:  For the record, if
5     the court reporter can please note.
6        Q.    Do you see there's a
7   document --
8        A.    Yes.
9        Q.    -- called Tips, Complaints and
10   Referrals with a commission date March 10,
11   2016?
12       A.    Yes, I see.
13       Q.    I'm going to scroll down.  Do
14   you see under the fourth question it says,
15   "Provide additional details about your
16   complaint."  Do you see where it says, "My
17   name is Phillip Dorsett and I am the chief
18   compliance officer for Swiss America
19   Securities?"
20       A.    Yes.
21       Q.    The question above it says,
22   "Please provide more information."  And you
23   say, "Provided platform for Traders Cafe to
24   defraud clients," do you see that?
25       A.    Yes.

Page 203

P. DORSETT
1            P. DORSETT
2        Q.    That was false, wasn't it
3   Mr. Dorsett?
4        A.    What is false?
5        Q.    SureTrader did not provide a
6   platform for Traders Cafe to defraud
7   clients, that is a false statement, isn't
8   it?
9        A.    No.  Why do you say that is a
10   false statement?
11       Q.    Under question one of your
12   whistleblower complaint, "please select the
13   option that best describes your complaint."
14   You say, "fraudulent investment scheme,
15   such as a ponzi scheme or the promise of
16   high yield returns," do you see that?
17       A.    Yes.
18       Q.    Were you instructed by the
19   Securities and Exchange Commissions to
20   write that?
21       A.    No.  In fact, I was trying to
22   figure out which one is sort of fits.  That
23   was kind of difficult.
24       Q.    Underneath the question that
25   says, "Provide additional details about

Page 204

P. DORSETT
1   your complaint," you say, "My name is
2   Phillip Dorsett, and I am the chief
3   compliance officer of SureTrader.  I
4   believe that I have evidence that shows
5   that on or about from Guy Gentile
6   facilitated the defrauding of U.S.
7   investors through the affiliation of
8   Traders Cafe, Matt Ionne and Albert
9   Schipone," do you see that?
10       A.    Yes.
11       Q.    Do you know who Matt Ionne is?
12       A.    I don't know him personally,
13   but I know he is someone of ill repute.
14   I'll venture to say if that's allowed.
15       Q.    How about Albert Schipone, you
16   know who he is?
17       A.    Same thing I would say.
18       Q.    Mr. Dorsett, when did Mr. Ionne
19   and Mr. Schipone use SureTrader as platform
20   of Traders Cafe to defraud clients, what
21   year?
22       A.    I don't remember -- do you mind
23   if I finish reading this?  Can I finish
24   reading it to bring it to my memory?

Page 205

P. DORSETT
1            P. DORSETT
2        Q.    Sure, read the whole paragraph.
3        A.    I think the Al --
4        Q.    Mr. Dorsett, there was a
5   pending question.  I'm asking you, what was
6   the year that Mr. Matt Ionne and Albert
7   Schipone used SureTrader to assist Traders
8   Cafe to defraud clients, what was the year?
9        A.    I can't recall the year.
10       Q.    Was it 2016, the year you
11   submitted this?
12       A.    Like I said, I cannot remember
13   the year.
14       Q.    When was the last time Traders
15   Cafe used their account at SureTrader?
16       A.    Again, I cannot remember the
17   year.
18       Q.    Do you know --
19       A.    The reason --
20       Q.    Did you know that Matt Ionne
21   was charged and convicted as a criminal in
22   the United States, did you know that?
23       A.    Like I said, I got to
24   understand the use of the words ill repute.
25       Q.    But did you know that he was

Philip Dorsett
February 28, 2023

Page 206

P. DORSETT

1         P. DORSETT
2    indicted and convicted for a crime in the
3    United States, did you know that?
4         A.    I can't say that I knew that at
5    the time.  I can't say that I just knew
6    that at the time.  If you say that name to
7    me and he was convicted, I can't say, oh
8    that I know that.
9         Q.    Did you know that Albert
10   Schipone was convicted of a crime in the
11   United States?
12        A.    Again, I cannot say that I know
13   that.
14        Q.    Do you know whether Mr. Ionne
15   was charged by the SEC?
16        A.    Again, I cannot say that I know
17   that.
18        Q.    Do you know whether
19   Mr. Schipone was charged by the SEC for
20   securities fraud?
21        A.    I cannot say that I know that.
22   What I do know is that --
23        Q.    Tell me what you know, please.
24        A.    What I do know is that I had
25   reason to believe that Guy was involved

Page 207

P. DORSETT

1         P. DORSETT
2    with these gentleman and that he was
3    keeping certain things from me, and if you
4    notice, I carry on with the rest of the
5    statement --
6         Q.    I'm not asking about that,
7    Mr. Dorsett.  I want to know the time
8    period of Mr. Ionne and Mr. Schipone's
9    misconduct.  Was it during the same time
10   Mr. Gentile was cooperating on behalf of
11   the FBI, DOJ, Attorney's office and SEC?
12        A.    No, I cannot because you're
13   telling me this now with this cooperation.
14   So, I have no idea of his supposed
15   cooperation.
16        MR. FORD:  Can we go to
17     Exhibit 40, please.
18        Q.    This is an SEC press release we
19   pulled from their website.  It is
20   Exhibit 40, it is titled, "SEC charges
21   unregistered broker in Tampa area with
22   stealing from investors in fraudulent day
23   trading scheme," do you see that?
24        A.    Yes.
25        Q.    Do you see the date, it's from

Page 208

P. DORSETT

1         P. DORSETT
2    Washington DC, November 18, 2014, that was
3    a year and a half before your whistleblower
4    complaint?
5         A.    Yes.
6         Q.    Do you see it says, "The SEC
7    alleges that Albert Schipone and business
8    partners solicited investments to establish
9    the count of their company called Traders
10   Cafe for the purpose of day trading and
11   that they defrauded their investors," do
12   you see that?
13        A.    Yes.
14        Q.    At the time you put in your SEC
15   whistleblower complaints, accusing
16   Mr. Schipone and Ionne in committing a
17   fraud, you were not aware that a year and a
18   half earlier that the SEC had already
19   charged them on the same alleged conduct?
20        A.    I said, I believe my words
21   were, that Guy was conducting -- can you
22   pull that up again?
23        Q.    I'm asking you a specific
24   question of what you knew at the time you
25   put in the whistleblower complaint.

Page 209

P. DORSETT

1         P. DORSETT
2         A.    You're asking me what I did in
3    2016, and you're asking me very specific
4    question --
5         Q.    Very specific.  Exactly about
6    March 2016, a year and a half after the SEC
7    charged Schipone and Ionne, you put in a
8    whistleblower complaint; isn't that true
9    Mr. Dorsett?
10        A.    The dates show that's correct.
11        Q.    Did you try to find something
12   to accuse Mr. Gentile because you had been
13   threatened by the SEC staff attorney with a
14   criminal proceeding, was that the
15   justification?
16        A.    No, no, and I was not
17   personally threatened.
18        Q.    Can we go to --
19        THE WITNESS:  I was going to
20     answer your question.
21        MR. FORD:  There is no pending
22   question.  I'm going to ask one more
23   question on one more document and
24   we'll take a break.  We've been at it
25   longer than I'd like to go.  Can we

Philip Dorsett
February 28, 2023

Page 210

1              P. DORSETT
2         pull up Exhibit 21, please.
3         Q.    This is a document dated
4    April 2, 2019, with a letterhead for Swiss
5    America Securities SureTrader April 2,
6    2019, it's addressed to Mr. Gentile.  This
7    is after your time at SureTrader; is that
8    correct, Mr. Dorsett?
9         A.    Yes, I've already left at this
10   point.
11        Q.    You see where it says, "Army
12   Traders Cafe Worldwide"?
13        A.    Yes.
14        Q.    If we scroll down this says --
15   I'm sorry, scroll down to the bottom, it
16   says, "Respectfully yours, Edward Cooper,
17   chief compliance officer/MLRO," do you see
18   that?
19        A.    Yes.
20        Q.    It says Swiss America
21   securities LTD, do you see that?
22        A.    Yes.
23        Q.    I'm going to scroll back up.
24   It says, "Mr. Gentile, please note that the
25   above mentioned account Traders Cafe

Page 211

1              P. DORSETT
2    Worldwide account with Swiss America
3    Securities LTD was closed on March 22,
4    2013.  The following were the last
5    transaction on the related account.  Client
6    deposited on March 22, 2013, USD $2,895.
7    Client went negative, March 27, 2013, USD
8    $406.15.  Client trader on March 28, 2013,
9    Stock OWW.  Client received some dividend
10   in amount USD 13.37.  From April 1, 2013
11   platform, USD 392, 7.78. If you require any
12   additional information, please do not
13   hesitate to contact the undersigned as I
14   remain."  Do you see that?
15        A.    Yes.
16        Q.    Mr. Dorsett, when you filed
17   your whistleblower complaint in March 2016
18   about Traders Cafe about Ionne and
19   Schipone, were you aware that -- strike
20   that.
21             When you filed your
22   whistleblower complaint in March of 2016,
23   were you aware that SureTrader had shut
24   down the Traders Cafe account three years
25   earlier?

Page 212

1              P. DORSETT
2         A.    I was aware that Guy officially
3    shut them down.
4         Q.    And you were aware that they
5    had been shut down three years earlier?
6         A.    I mean, yes, I guess if that's
7    the date they were closed, then that's the
8    date they were closed.
9         Q.    Do you know if during
10   Mr. Gentile's cooperation with the SEC, FBI
11   DOJ and U.S. attorney's office, whether he
12   provided information to them related to
13   Mr. Ionne or Schipone for Traders Cafe?
14        A.    Not to my knowledge.  In fact,
15   I did not know he was cooperating as you
16   say.
17             MR. FORD:  All right everybody,
18   I think we can do a 15-minute break.
19   We'll come back at 3:10 p.m.
20             (At this time, there was a
21   pause in the proceeding.)
22             MR. ADAM FORD:  If I can just
23   jump in quickly before we get started
24   with the questioning.  Alise, Alice
25   and Russell, I've e-mailed about

Page 213

1              P. DORSETT
2    this, but I just wanted to put it on
3    the record that Mr. Dorsett, during
4    his testimony, has testified to
5    drafting two affidavits that the SEC
6    later filed.  We have not received in
7    production a copy of either of those
8    original drafts that Mr. Dorsett
9    testified he drafted and sent to the
10   SEC.  So, I e-mailed you to put it in
11   writing and requesting an immediate
12   production of this documents.  If you
13   can get them to us today, we may be
14   able to take a break and continue to
15   question Mr. Dorsett about them.  If
16   we don't have them before the end of
17   today, then we'll seek to hold
18   Mr. Dorsett's deposition open until
19   the documents are produced and we're
20   able to set up a time of examination
21   on him for those two documents.
22             MS. SUM:  I'm prepared to
23   respond, Adam on the record, I was
24   actually typing the response, but
25   since you're raising it.  We believe

Philip Dorsett
February 28, 2023

Page 214

P. DORSETT

1        P. DORSETT
2    there's a misunderstanding by
3    Mr. Dorsett --
4        MR. ADAM FORD:  Hold on.
5        MR. FORD:  Ms. Sum --
6        MR. ADAM FORD:  Alice, you
7    cannot testify, no, no.  You are not
8    --
9        MS. SUM:  You asked me about
10   the issue --
11       MR. ADAM FORD:  You cannot
12   characterize Mr. Dorsett's testimony.
13       THE COURT REPORTER:  Everybody
14   is talking at the same time.
15       MS. SUM:  We have no other
16   documents that's it.  You don't want
17   to hear what I have to say --
18       MR. ADAM FORD:  For the record,
19   you have stated that you have no
20   further documents.
21       MS. SUM:  We do not have these
22   first drafts that you've requested in
23   your e-mails.
24       MR. ADAM FORD:  Also
25   Mr. Dorsett testified twice that he

Page 215

P. DORSETT

1        P. DORSETT
2    was the first drafter of two
3    affidavits and that he provided these
4    documents to the SEC.  We would
5    request that the SEC take additional
6    time to locate these documents.  We
7    do not think that this witness was
8    mischaracterizing anything.  We
9    believe he was testifying truthfully.
10   So, we demand the SEC take additional
11   time to get these documents.
12       MR. FORD:  Pull up -- Ms. Sum,
13   there's --
14       MS. SUM:  We have not had an
15   opportunity --
16       MR. FORD:  Your objection has
17   been recorded.
18       MS. SUM:  -- raised an issue.
19       MR. FORD:  It is my deposition.
20   It is impossible for the court
21   reporter to do her job when everybody
22   is talking over me.  We are back on
23   the record.  We are examining the
24   witness.  I am continuing.
25       MS. SUM:  I object to

Page 216

P. DORSETT

1        P. DORSETT
2    proceeding.  You are not giving me an
3    opportunity.  Your cocounsel decided
4    to put something on the record, I
5    will not allow it to go unresponded
6    to.
7        MR. FORD:  This sort of
8    speaking objection -- objection to
9    form or privilege is --
10       MS. SUM:  -- to raise it on the
11   record --
12       MR. FORD:  Ms. Sum, this is my
13   deposition --
14       MS. SUM:  It doesn't matter
15   your --
16       MR. FORD:  -- that is permitted
17   under the Federal Rules of Civil
18   Procedure.
19       MS. SUM:  -- the following
20   statement on the record --
21       MR. FORD:  This can be put on
22   outside the presence of the witness.
23       MS. SUM:  Your cocounsel
24   decided to interject --
25       MR. FORD:  This can be done

Page 217

P. DORSETT

1        P. DORSETT
2    outside the presence of the witness.
3        MS. SUM:  No.  Stipulate to
4    strike your cocounsel's statement.
5        MR. FORD:  We'll discuss
6    outside the presence of the witness.
7        MS. SUM:  Your cocounsel raised
8    the issue.
9        MR. FORD:  This is
10   inappropriate.
11       MS. SUM:  It's on the record.
12       MR. FORD:  This is
13   inappropriate.
14       MS. SUM:  It is inappropriate
15   for you.
16       MR. FORD:  Ms. Sum --
17       MS. SUM:  -- on the record.
18   Your cocounsel interrupted you
19   deposition to put it on the record --
20       MR. FORD:  Ms. Sum, please
21   stop.
22       MS. SUM:  No.  You don't get --
23       MR. FORD:  Ms. Sum --
24       MS. SUM:  -- we have the
25   opportunity to respond.  You know

Philip Dorsett
February 28, 2023

Page 218

P. DORSETT

1  P. DORSETT
2  that is not the a way the practice
3  law --
4        MR. FORD:  This is completely
5  out of control.
6        MS. SUM:  No, you're refusing
7  to let me to put something on the
8  record.  I demand the court reporter
9  to put this on the record.
10       MR. FORD:  We're pulling up the
11 Exhibit 4.
12       MS. SUM:  I'm asking for an
13 opportunity.  I request this on the
14 record, Mr. Ford.
15 Q.    Earlier in the deposition --
16       MS. SUM:  You're not going to
17 be able -- this is unprofessional for
18 you to be continuing doing this.
19 Q.    Mr. Dorsett --
20       MS. SUM:  This needs to be
21 placed on the record.
22 Q.    Mr. Dorsett --
23       MS. SUM:  I'm sorry, what did
24 you say?
25       MR. FORD:  I've never had this

Page 219

P. DORSETT

1  P. DORSETT
2  happen before.  We're pulling up
3  exhibit --
4        MS. SUM:  -- response to your
5  cocounsel --
6        MR. FORD:  Exhibit 4.
7  Q.    Mr. Dorsett, do you recognize
8  this affidavit that we went over earlier in
9  the day?
10 A.    Can you scroll down again?
11       MR. KOONIN:  Before Mr. Dorsett
12 answers.  I'm going to put on the
13 record that Mr. Ford --
14       MR. FORD:  There is a pending
15 question --
16       MR. KOONIN:  We spend --
17       MR. FORD:  There is a pending
18 question. --
19       MR. KOONIN:  We're going to
20 instruct him not to answer it until
21 you give us an opportunity to respond
22 on the record about an e-mail that
23 Mr. Ford introduced in the record.
24 So, we'll respond on the record.
25       MR. FORD:  Mr. Koonin, there is

Page 220

P. DORSETT

1  a pending question.  We can discuss
2  it outside the presence of the
3  witness.  None of this is going to
4  get on the record.  This is a highly
5  inappropriate discussion.  We can
6  discuss it outside the presence of
7  the witness after the deposition.
8  Please let's move forward.
9        MR. KOONIN:  We are going to
10 instruct him not to answer until
11 Ms. Sum gets an opportunity to speak
12 on the record.
13       MR. FORD:  This is not how a
14 deposition works and as you
15 described --
16       MR. KOONIN:  Thank you for the
17 lesson.
18       MR. FORD:  You do not have the
19 authority to stop my deposition --
20       MR. KOONIN:  I saw authority --
21       MR. FORD:  -- in the federal
22 procedure -- United States of America
23 and this conduct is not acceptable or
24 permissible.  This is not the first

Page 221

P. DORSETT

1  P. DORSETT
2  time Mr. Koonin that you've screamed
3  at me.  We had a phone conversation
4  the other day --
5        MR. KOONIN:  You're raising
6  your voice, not me.  Please let her
7  respond on the record to what Adam
8  said, and you are refusing to let her
9  do it.
10       MR. FORD:  Let's go to Exhibit
11 4.
12 Q.    Mr. Dorsett, do you recall
13 testifying about this document the past two
14 days?
15       THE WITNESS:  Is it okay for me
16 to respond?
17       MR. FORD:  Yes.
18 Q.    Do you recall testifying about
19 this exhibit the past two days?
20 A.    Can you scroll to the bottom
21 please?
22 Q.    Do you see where there is a
23 stamp at the bottom of this exhibit, it
24 says before me and there's a named notary
25 public, do you see that?

Philip Dorsett
February 28, 2023

Page 222

P. DORSETT

1          P. DORSETT
2    A.    Yes.
3    Q.    Do you recall testifying
4    yesterday that you would have remembered
5    this document because you would have
6    remembered if you had signed this in front
7    of an attorney, do you recall saying that?
8    A.    Yes.
9    Q.    Based on this document, just
10   tell me, how were you able to determine
11   that it was an attorney who you signed this
12   document in front of?
13   A.    I see the stamp and the notary
14   public and the number.
15   Q.    And where does it say that this
16   individual is an attorney?
17   A.    Well, when I say an attorney,
18   that's the stamp and that's the notary
19   public.
20   Q.    As chief compliance officer in
21   the Bahamas, is there a difference between
22   an attorney and notary public?
23   A.    I think you can be a notary
24   public without being an attorney.
25   Q.    Given that you can be a notary

Page 223

P. DORSETT

1          P. DORSETT
2    public without being an attorney, how was
3    it from this stamp and this information
4    that you were able the determine this
5    individual was an attorney?
6    A.    Because the vast majority of
7    notary publics are attorneys.  That's what
8    you get, you don't just get some person
9    who's just getting -- it's an attorney and
10   they are also a notary public.
11   Q.    You were not asked about the
12   vast majority of notary publics
13   Mr. Dorsett.  You said you would have
14   remembered it because it was signed before
15   an attorney, and I'm trying to ask you how
16   you could have possibly known from this
17   information on this document that this
18   individual was an attorney?
19   A.    It says before me, and I see a
20   notary public sign, it makes me think it's
21   an attorney.  So, it's true, it may not
22   have been an attorney, it could have been
23   someone only a notary public.
24   Q.    It was in fact an attorney,
25   Mr. Dorsett?

Page 224

P. DORSETT

1          P. DORSETT
2    A.    Well, I would think it would
3    make more sense that this is an attorney.
4    In the Bahamas, 99 percent of people who
5    have notary public are attorneys.  The only
6    ones who have notary public who aren't
7    attorneys are like pastors.
8    Q.    And Mr. Dorsett, you're so
9    certain because in fact what happened was
10   you took a physical copy of this and walked
11   across the street to a notary public and
12   had this signed without Mr. Gentile
13   present, isn't that a fact?
14   A.    No, that is not a fact, that is
15   a complete lie.  I challenge that.  Please
16   prove that to me.
17   Q.    Isn't it a fact that my law
18   firm at the time, Harris O'Brien sent you a
19   copy of this document for review prior to
20   you signing it, isn't that a fact?
21   A.    No, I don't recall that at all.
22   Q.    Isn't it a fact --
23   A.    No --
24   Q.    Isn't it a fact that in that
25   e-mail, it was requested by an attorney

Page 225

P. DORSETT

1          P. DORSETT
2    from Harris O'Brien?
3    A.    Could you show me that he mail.
4    Q.    I'm asking, isn't it a fact --
5    A.    No, I don't remember that at
6    all.  As I said, I don't recall this
7    document.
8    Q.    If you receive that sort of the
9    e-mail, is that the sort of e-mail you
10   would have deleted?
11   A.    No, I probably would have
12   carried it to Guy.  If it was 2014 -- well,
13   at any point, I think I would have
14   discussed that with him.
15   Q.    Were you instructed by anybody
16   to delete an e-mail sending you a copy of
17   this affidavit to review?
18   A.    Only Guy deletes Sure Trader
19   official records.
20         MR. FORD:  I'm going to object
21       and move that as nonresponsive.
22   Q.    Did anybody instruct you to
23   delete an e-mail regarding a draft of this
24   document?
25   A.    Guy asked me to delete

Philip Dorsett
February 28, 2023

Page 226

                    P. DORSETT
1
2    e-mails --
3         Q.    No, Mr. Dorsett, this document,
4    do you recall receiving an e-mail from the
5    law firm of Harris O'Brien attaching a
6    draft of this affidavit, yes or no?
7         A.    No, I do not.  And I do not
8    recall deleting anything or anything of
9    that nature.
10        Q.    Mr. Dorsett, when you left
11   SureTrader, isn't it a fact that you took
12   15,000 SureTrader documents with you, isn't
13   that true?
14        A.    I later found out when Guy set
15   up a back up of my computer, it was still
16   there and there was a large number of
17   documents.  I never counted them.
18        Q.    And you never forwarded those
19   documents to your e-mail; is that your
20   testimony?
21        A.    Well, a lot of the documents --
22   the documents are a part of my e-mail and
23   many more actually are not -- they're just
24   on the computer.  Guy actually --
25             MR. FORD:  We're moving on to

Page 227

                    P. DORSETT
1
2        the next exhibit.  Can you pull up
3        the next exhibit.  Actually, before
4        we move on I want to ask about --
5        another question on Exhibit 4.
6         Q.    Do you recall testifying that
7    Mr. Gentile had asked you to send a copy of
8    your resume, but that you had no idea why
9    he asked you to send that?
10        A.    Well, he asked for a copy of
11   the resume, he didn't really say why I.  I
12   just figured he wanted it for whatever
13   reason.  As chief compliance officer, he
14   wanted my resume.
15        Q.    Isn't it a fact that the reason
16   he asked you for it is because he planned
17   on including this information in the
18   affidavit?
19        A.    I think he did do that, but
20   just not with my knowledge.  As I'm
21   reading, you showed this to me.  I think
22   this is the document that Guy must have
23   been referring to when he was talking to
24   those regulators saying --
25        Q.    Mr. Dorsett, I'm moving to

Page 228

                    P. DORSETT
1
2    strike what was nonresponsive.
3             MR. FORD:  Let's move on.  Can
4    we pull up the next exhibit.
5             THE WITNESS:  This is the
6    document --
7             MR. FORD:  There is no pending
8    question.  Mr. Dorsett, there is no
9    pending question.
10            THE WITNESS:  I know that he
11   somehow had that document.
12            MR. FORD:  It is impossible --
13   you're being very disrespectful to
14   Ms. Scro.  I will ask the questions
15   and you will respond to the question.
16            THE WITNESS:  I'm sorry, I was
17   trying to tell the truth.
18            MS. SUM:  Please allow him the
19   opportunity to answer.
20            MR. FORD:  Mr. Dorsett, there
21   is no pending question --
22            THE WITNESS:  I was not
23   finished what I was saying about the
24   document.
25            MS. SUM:  He just said he was

Page 229

                    P. DORSETT
1
2    not finished answering --
3             MR. FORD:  You had things to
4    say uninterrupted for eight hours
5    yesterday.  I would ask that you
6    please not engage in soliloquy.
7             THE WITNESS:  I'm not engaging
8    in soliloquy, but I vowed to tell the
9    whole truth.
10            MR. FORD:  There is no pending
11   question.
12            THE WITNESS:  -- create lies --
13            MR. FORD:  I am reminding you
14   right now this is a deposition and
15   you are under oath.
16            THE WITNESS:  Your questioning
17   is causing me to say a lie.  Your
18   question is not wanting me to say the
19   whole truth.
20            MR. FORD:  Mr. Dorsett.
21            THE WITNESS:  Yes, sir.
22            MR. FORD:  I'm going to show
23   you an e-mail.  Can we please scroll
24   down.
25        Q.    This is an e-mail from

Phillip Dorsett
February 28, 2023

Page 230

P. DORSETT

1          P. DORSETT
2    PADorsett@Gmail.com to Guy@stockUSAinc, do
3    you do that?
4        A.    Yes.
5        Q.    It says, "Please see attached,"
6    it was sent on January 3, 2014, do you see
7    that?
8        A.    Yes.
9        Q.    It was in response to a message
10   on January 3, 2014, it said, "Can you send
11   me a copy of your latest resume?"
12       A.    Yes.
13       Q.    And you attached your resume
14   for Guy .PDF, do you see that?
15       A.    Yes.
16       Q.    And that on January 3, 2014.
17       MR. FORD:  Can we go to the
18       attachment.
19       Q.    Mr. Dorsett, this is the
20   attachment to that e-mail?
21       A.    Correct.
22       Q.    Does this refresh your
23   recollection that you sent your resume to
24   Mr. Gentile to be included in the affidavit
25   that we were just looking at?

Page 231

P. DORSETT

1          P. DORSETT
2        A.    It was not my understanding to
3    being included in any affidavit.
4        Q.    Does it refresh your
5    recollection that you received an e-mail
6    with a drafted copy of this affidavit prior
7    to --
8        A.    No, I never received an e-mail
9    with a copy of that affidavit of that
10   nature, to my knowledge.
11       MR. FORD:  Can we pull up the
12       next exhibit.  Scroll to the bottom.
13       Q.    This is an e-mail from Adam
14   Ford, do you know who Adam Ford is?
15       A.    He is the lawyer with your
16   firm.
17       Q.    It says sent January, 8, 2014
18   five days after the last e-mail we saw; is
19   that correct?
20       A.    Yes.
21       Q.    It says to Guy Gentile; is that
22   correct?
23       A.    Yes.
24       Q.    It says, "Guy, attached is a
25   copy of an affidavit that we would like

Page 232

P. DORSETT

1          P. DORSETT
2    Phillip to sign and get notarized.  Can you
3    give him this document and make sure he a
4    hundred percent agrees with everything that
5    is contained in it and get it back to us
6    signed and notarized tomorrow, thanks," do
7    you see that?
8        A.    I see that.
9        Q.    Do you see it says
10   Gentile-Dorsett affidavit.DOCX, do you see
11   that?
12       A.    Yes.
13       Q.    Do you know what .DOCX means?
14       A.    It's a document.
15       Q.    It's a Microsoft Word document,
16   right?
17       A.    Okay, I just know it's a
18   document.
19       Q.    Do you recognize the little
20   blue W?
21       A.    Oh, yes, it's a Word document.
22       Q.    Does this refresh your
23   recollection that you received a copy of
24   this?
25       A.    No, it does not.  You need to

Page 233

P. DORSETT

1          P. DORSETT
2    send me the e-mail where it says I received
3    it.
4        Q.    Do you see where it says from
5    Guy Gentile at the top of this e-mail?
6        A.    Yes.
7        Q.    And it says date, January 8,
8    2014, 11:47?
9        A.    Yes.
10       Q.    And it says to suretrader.com?
11       A.    Yes.
12       Q.    Do you see where it says "FW:
13   Privileged and confidential"?
14       A.    Correct.
15       Q.    Do you know what FW means?
16       A.    It's a forward.
17       Q.    So, is it fair to say that
18   Mr. Gentile was forwarding you the e-mail I
19   just showed you from Harris O'Brien?
20       A.    I need to see where I received
21   the e-mail because the e-mail that he
22   received wasn't claimed privileged and
23   confidential, was it not?  Can I see the
24   document again, please.
25       Q.    Mr. Dorsett, it says, "Phillip

Philip Dorsett
February 28, 2023

Page 234

                    P. DORSETT
1
2    please review attached.  I'll be in the
3    office early tomorrow.  Thanks, Guy
4    Gentile, president."
5              MR. FORD:  Scroll up.
6         A.   No, can I see the actual
7    document, the actual affidavit --
8         Q.   Mr. Dorsett, we are getting
9    there.  I just want to know having now seen
10   this e-mail, forwarding an e-mail with this
11   attachment, does this refresh your
12   recollection that you saw --
13        A.   No, it still does not
14   refresh -- I still --
15        Q.   Mr. Dorsett, do you see where
16   it says, "Can you give him this document,
17   make sure that he one hundred percent
18   agrees with everything that is contained in
19   it and get it back to us signed and
20   notarized tomorrow," do you see where it
21   says that?
22        A.   Yes.
23        Q.   If you received a document like
24   that from the president of the company to
25   which you're the chief compliance officer

Page 235

                    P. DORSETT
1
2    of, is that the type of thing you would
3    have done?
4         A.   Sorry, that message was to me?
5    This message is from Adam Ford to Guy.
6         Q.   Mr. Dorsett, you received an
7    e-mail --
8              MR. FORD:  I'm going to move to
9         strike the last response, it's
10        nonresponsive.
11        Q.   If the president of SureTrader
12   forwarded you an e-mail, "can you give this
13   document to Phillip," is that the type of
14   thing you would have read?
15        A.   Well, I would hope so.  But the
16   problem is --
17        Q.   Mr. Dorsett --
18        A.   -- that's the point.  Can I see
19   the document again, please.
20        Q.   Mr. Dorsett, if he said, "make
21   sure that he one hundred percent agrees
22   with everything that is contained in it,"
23   when you got the e-mail as chief compliance
24   officer of the company, would you have made
25   sure everything was accurate?

Page 236

                    P. DORSETT
1
2         A.   Well, I don't recall receiving
3    this e-mail, and so this e-mail was not
4    sent to me.
5         Q.   Let's go back up.  There you
6    go, Mr. Dorsett, the e-mail that was sent
7    to you on January 8th, 2014 at is
8    11:47 p.m. attaching the affidavit, do you
9    see it, yes or no?
10        A.   Yes, I see the e-mail that's
11   sent.
12        Q.   Can we please pull up the
13   attachment to this e-mail? I'm not asking
14   you to comment on the contents, just look
15   at this and confirm this is the same
16   affidavit we've been talking about.
17        A.   As I'm reading this, I think
18   this is the document that Guy was referring
19   to when he was saying, "blame my compliance
20   officer."
21             MR. FORD:  Moved to strike what
22        was nonresponsive.
23        A.   Can I see the document that has
24   my signature on it, please.
25        Q.   Mr. Dorsett, we're going to

Page 237

                    P. DORSETT
1
2    keep scrolling.  Do you notice any
3    differences?
4         A.   That's why I want to see -- can
5    you put them side by side?
6              MR. FORD:  Let's go down to the
7         bottom.
8              MS. FILIPPELLI:  Do you want me
9         to pull up the word document?
10             MR. ADAM FORD:  Our system
11        converts it from Word to PDF.
12             MR. FORD:  Please pull up the
13        word attached for the witness to see.
14             MS. SUM:  For what it's worth,
15        I think he was asking you to pull up
16        the signed version since you're
17        asking him --
18             MR. FORD:  Ms. Sum, you have at
19        it when it's your turn.
20             MS. SUM:  It's not about having
21        at it.  It's about making it more
22        efficient.
23             MR. FORD:  Scroll all the way
24        to the bottom.
25        Q.   Do you see where it says, dated

Philip Dorsett
February 28, 2023

Page 238

P. DORSETT

1
2 New York, New York, January underscore
3 2014, then Philip Dorsett, do you see that?
4      A.    Yes, I see that.
5      Q.    This was a copy of a word
6 document that was forwarded to you by the
7 president of SureTrader, Guy Gentile, with
8 annotation, "to please review and make sure
9 a hundred percent of it was correct," and
10 your testimony is that you don't recall --
11      A.    That annotation was not in the
12 e-mail from Guy.
13      MR. FORD:  Let's go back to
14      Exhibit 4.  Let's go to paragraph
15      eight.
16      Q.    SureTrader maintains a website
17 at the URL SureTrader.com, true?
18      A.    Yes, that was correct.
19      Q.    The website is designed to
20 prevent access by U.S. based persons, isn't
21 that consistent with the document I showed
22 you earlier that if a U.S. based person
23 attempted to access the SureTrader website,
24 a pop up blocker would come up before
25 having entering the password and login, is

Page 239

P. DORSETT

1
2 that consistent with that?
3      A.    You're referring to the
4 document that was referenced after I left
5 the company by Mr. Darville?
6      MR. FORD:  We're going to go
7      ahead and pull up the document.
8      MS. FILIPPELLI:  I'm sorry,
9      which document?
10      MR. FORD:  Sorry, one second.
11      A.    Can I see my signature again,
12 please, if it's okay?
13      MR. FORD:  It's Document 44.
14      THE WITNESS:  Can I see my
15      signature?
16      MR. FORD:  You requested that
17      you see the document and then we'll
18      go one by one.  Let's look at
19      Document 44.
20      Q.    Do you recall looking at
21 document 44 earlier?
22      A.    I remember you showing me this.
23 Can you show me the clearer version,
24 please, so I can read it?
25      Q.    Sure.  Mr. Dorsett, is it not a

Page 240

P. DORSETT

1
2 fact in 2014 if a person with a U.S. based
3 IP address attempted to access Sure
4 Trader's website, this pop up blocker would
5 pop up; is that a fact?
6      A.    No, I would not say that's a
7 fact.  In fact, what you are looking at
8 here now, I think if this was -- I think I
9 may have heard them talking about this and
10 this would have been very late in my tenure
11 in the company.  And as the communication
12 between Mr. Darville and the regulators
13 suggested, it seems that was after I had
14 already left.
15      MR. FORD:  We'll pull this
16      document down.  We're going to go
17      back to Exhibit 3.  This is your
18      whistleblower complaint that you
19      submitted to the SEC.
20      Q.    Are you aware that SEC
21 whistleblowers are entitled to a percentage
22 of recovery as a result of an action
23 successfully brought by the SEC?
24      A.    I'm aware of that now, but I
25 certainly was not aware of that --

Page 241

P. DORSETT

1
2      Q.    I'm asking if you're aware of
3 that now.
4      A.    Yes, I am aware of that now.
5      Q.    What is your understanding of
6 the SEC recovery you're entitled to if
7 they're successful in this action?
8      A.    I don't have that deep of a
9 knowledge or understanding of it.
10      Q.    Do you know if it's 20 percent?
11      A.    I don't know what percent.
12      Q.    Thirty percent?
13      A.    I don't know.
14      Q.    Mr. Dorsett, do you think
15 you're going to get money if the SEC wins
16 this case?
17      A.    I do not know and that
18 certainly was not my motivation at all.  My
19 motivation was the confidentiality of the
20 program.
21      MR. FORD:  Let's go to page 8.
22      Q.    There's a question on this SEC
23 whistleblower questionnaire where it says,
24 "Identify with particularity any documents
25 or other information in your submission

Philip Dorsett
February 28, 2023

Page 242

P. DORSETT
1
2    that you believe could reasonably be
3    expected to reveal your identity and
4    explain the basis of your belief that your
5    identity would be revealed if the documents
6    were disclosed to a third party," do you
7    see that?
8         A.   Yes.
9         Q.   This says, "All of these
10   documents were procured from my personal
11   e-mail account," do you see that?
12        A.   Yes.
13        Q.   And then it says, "Hence,
14   Mr. Gentile will know that it was me who
15   gave them to you.  I have also noticed that
16   they cannot all fit here.  In the past when
17   the SEC wanted info from us, they would do
18   so by the requesting the Securities
19   Commission of the Bahamas and request the
20   information from us and we would be
21   compelled to give it," do you see that?
22        A.   Yes.
23        Q.   When you say the information
24   would not fit here, how much information
25   did you have at that time?

Page 243

P. DORSETT
1
2         A.   I can't say.  I don't know.
3         Q.   Was it thousands of documents?
4         A.   Certainly not.  In addition,
5    because I see you said something here --
6         Q.   Mr. Dorsett, there is no
7    pending question.
8         "However, Mr. Gentile would
9    have been aware and would have to have
10   approved anything I sent to local
11   regulators," do you see that?
12        A.   Yes.
13        Q.   And it says, "However, now that
14   he has officially resigned from our firm,
15   if the SEC specifically asking the SCB
16   to demand of us all documents that show any
17   relationship between Traders Cafe, Guy
18   Gentile, Momu Mia, then I can send over all
19   I can get my hands on, more than I can
20   attach here," do you see that?
21        A.   Correct.
22        Q.   At the time you wrote that,
23   this was approximately -- strike that.
24        This was several months after
25   the communications with Ms. Suh from the

Page 244

P. DORSETT
1
2    SEC that we looked at earlier.  In which,
3    attorney Michael Miller advised that it
4    could not produce documents directly to the
5    SEC; isn't that correct?
6         A.   You could not produce client
7    documents.
8         Q.   Okay.
9         A.   Guy however, was not a client.
10        Q.   So, is it your testimony that
11   -- strike that.
12        You said that you were going to
13   provide all you could get your hands on, do
14   you see that?
15        A.   Yes, if they sent that request
16   through the the SCB, because I think it was
17   in reference to a client as I noted, Guy is
18   not a client.
19        Q.   That included documents with
20   passwords belonging to U.S. persons; isn't
21   that true?
22        A.   No.
23        MR. FORD:  We're going to come
24        back to this, but we'll pull up
25        another exhibit.  This is Exhibit 19.

Page 245

P. DORSETT
1
2         Q.   As we pull this up,
3    Mr. Dorsett, are you familiar with a
4    legislation called the Computer Fraud and
5    Abuse Act, or CFAA, it's a United States
6    Criminal Legislation?
7         A.   I can't say that I am, no.
8         Q.   It also provides civil
9    remedies, are you familiar with it?
10        A.   No.
11        Q.   This is an e-mail from Karen
12   Gentile, Karen@dastrader.com, do you know
13   who Karen Gentile is?
14        A.   Yes.
15        Q.   Do you know where she lived at
16   the time she sent this e-mail on
17   November 7, 2011?
18        A.   I think she lived in New York.
19        Q.   And it's sent to
20   info@SureTrader.com?
21        A.   Yes.
22        Q.   If we scroll down, this has a
23   bates stamp of SEC-FL-03848-E-001704, that
24   is indicating you provided this document to
25   the SEC and Miami and they produced it to

Philip Dorsett
February 28, 2023

Page 246

P. DORSETT

1         P. DORSETT
2    us, is that your understanding?
3        A.    I'm sorry, repeat that.
4        Q.    This is a document you gave to
5    the SEC, isn't it?
6        A.    I don't recall this document.
7    Can I see it again, can I see what it's in
8    reference to?
9        Q.    Sure, we'll scroll back up.
10       A.    I actually don't recognize this
11   document, and I'm trying to figure out what
12   it's in reference to answer.
13       Q.    How was it that you were able
14   to provide access -- strike that.
15             You provided this document to
16   the SEC; isn't that correct?
17       A.    Like I said, I cannot confirm
18   if that came from me or the SCB, I don't
19   recognize this.  I do recognize the word
20   Protrade and that's ringing a bell for some
21   reason.
22       Q.    Do you understand that the SEC
23   produced this document to us as part of
24   15,000 documents that the SEC says they
25   received from you, do you understand that?

Page 247

P. DORSETT

1         P. DORSETT
2        A.    Well, if you say that, then
3    okay, I'll accept your word for it.
4        Q.    Do you see that this has a
5    login ID, do you see where it says login
6    ID?
7        A.    Yes.
8        Q.    And you see where it says
9    password?
10       A.    I see where the login ID is and
11   it says Protrade, which was the name of an
12   account I was associated with.
13       Q.    And do you see where it says
14   password, SureTrader123?
15       A.    Right, I think that was his
16   password as well.
17       Q.    Did you understand that a U.S.
18   person was providing a login password when
19   they sent this e-mail?
20       A.    I'm sorry, could you repeat the
21   question?
22             MR. FORD:  We can move on.  If
23        we can go back to Exhibit 3.
24       Q.    At the bottom it says, "With
25   regards to your question for the SCB, it

Page 248

P. DORSETT

1         P. DORSETT
2    would help me if the request from the SCB
3    specifically stated that I was not allow to
4    discuss the request with Mr. Gentile.
5    Therefore, when he realized that the
6    information all came from me, I would be
7    able to say I was only obeying the SCB's
8    order," do you see that?
9        A.    Yes, that would have helped a
10   lot.
11       Q.    But what happened in fact was
12   you began providing information to the
13   Securities and Exchange Commission; isn't
14   that correct?
15       A.    The Securities and Exchange
16   Commission approached me about my
17   investigation dealing with client things.
18   They were only with Guy Gentile --
19             MR. FORD:  I'm going to strike
20        that as nonresponsive.  We're going
21        to put up Exhibit 74.
22       Q.    This is an e-mail that was
23   produced to us by the SEC.  If you scroll
24   down to the bottom to the last e-mail.
25   This is Exhibit 74.

Page 249

P. DORSETT

1         P. DORSETT
2             MR. FORD:  This is not the
3        right document.
4             THE WITNESS:  That did show --
5             MR. FORD:  Mr. Dorsett, there
6        was no pending question.
7             THE WITNESS:  The e-mail you
8        just showed me, proved that's the
9        account that you showed me --
10            MR. FORD:  Mr. Dorsett, this is
11       a deposition, not a soliloquy and you
12       are not permitted to just say
13       anything.  We are pulling up a
14       document.  I ask that you wait for
15       the next question before responding.
16       Ms. Filippelli, it is the
17       e-mail and the chain is dated
18       April 1, 2016.
19       Q.    Just to be clear, Mr. Dorsett,
20   your testimony is that you did not provide
21   the SEC any documents with client
22   information; is that correct?
23       A.    My testimony is that the SEC
24   was not investigating any of our clients.
25   They were investigating Guy, who did not

Philip Dorsett
February 28, 2023

Page 250

P. DORSETT
1        P. DORSETT
2  enjoy the privileges of client protection.
3       Q.    Did you provide documents to
4  the SEC, yes or no?
5       A.    There would have been client
6  information that would have been
7  privileged, but they were not the source of
8  any investigation and the information would
9  not have been sensitive information as you
10 suggested like the password that belonged
11 to Guy.
12      MR. FORD:  Let us scroll down
13       to the second page.
14      Q.    This is an e-mail --
15      MS. SUM:  I just note that this
16       document is marked confidential for
17       the record, Madam Court Reporter
18       please.
19      MR. FORD:  Keep scrolling.
20      Q.    This is an e-mail on March 3rd,
21 2016 from Sajaad Matin, it says,
22 "Mr. Dorsett, I am writing in response to a
23 recent submission made by you to the U.S.
24 Securities and Exchange Commission.  I
25 would like to schedule a time for us to

Page 251

1        P. DORSETT
2  discuss your submission.  Please let me
3  know a phone number you would prefer to be
4  contacted at," do you see that?
5       A.    Yes.
6       Q.    And then you respond to him
7  with an e-mail about an hour and 20 minutes
8  later, do you see that?
9       A.    Yes.
10      Q.    And in your whistleblower
11 complaint, you do not mention anything
12 about solicitation of U.S. customers, do
13 you?
14      A.    Well, the problem with the
15 whistleblower complaint --
16      Q.    It's a yes or no question,
17 Mr. Dorsett.
18      A.    Can I just read it again?
19      Q.    To the best of your
20 recollection as we sit here, do you recall
21 mentioning the solicitation of U.S.
22 customers in your whistleblower complaint
23 that you submitted in March of 2016, yes or
24 no?
25      A.    I cannot recall.

Page 252

1        P. DORSETT
2       MR. FORD:  We will pull it up
3       it's Exhibit 3.  I'm going ask, given
4       the way this has been going, you not
5       comment on it.
6       Q.    Do you reference soliciting
7  U.S. customers in this document, yes or no?
8  That's it.  I'm not asking for commentary.
9       A.    Scroll down slightly, a little
10 bit more.  I do reference it.
11      Q.    You reference solicitation of
12 U.S. customers?
13      A.    Yes.
14      Q.    Go ahead.
15      A.    You want me to read it?
16      Q.    Please.
17      A.    All right, "So, the firms made
18 me very uneasy as chief compliance officer
19 and I also realized he has been dishonest
20 with me regarding his fights with U.S.
21 regulators.  Specifically, he was trying to
22 ban me for soliciting U.S. clients.
23      Q.    What you just said is not
24 included in this whistleblower complaint.
25 When you said, he has been dishonest with

Page 253

1        P. DORSETT
2  me regarding his fights with U.S.
3  regulators, that's what you were referring
4  to?
5       A.    That's one of the things I was
6  referring to.  I know he was trying to
7  claim a lot of things on his chief
8  compliance officer.
9       MR. FORD:  Let's go back to the
10       previous exhibit.  If we scroll up.
11      Q.    Mr. Matin asked you to have a
12 brief call at 3:00 p.m.  Do you recall
13 having a phone call?
14      A.    I remember speaking to him.  I
15 don't know the exact date.
16      MR. FORD:  Let's scroll back
17       up.
18      Q.    This document obtains
19 attachments, so we scroll all the way to
20 the top.  It's an e-mail from you
21 PADorsett@gmail.com to Sajaad Matin on
22 April 1, 2016.  It's all the way at the
23 top.  Do you see this is an e-mail from
24 your Gmail to Mr. Matin?
25      A.    Yes.

Philip Dorsett
February 28, 2023

Page 254

P. DORSETT

2  Q.   Do you see you're attaching
3  multiple files, Arxis Trading, LLC PDF,
4  David Marquez, PDF, David Thompson PDF,
5  Robert Edelman PDF and Wesley Dalton PDF,
6  do you see that?
7  A.   Correct, again, they were not
8  subjects of the SEC's investigation.
9  Q.   Do you see where you write,
10  "Good day, Mr. Matin, it says further to
11  your conversation today," does that refresh
12  your recollection that you had a
13  conversation with Mr. Matin on that day?
14  A.   Okay, yes.
15  Q.   "I found some U.S. client files
16  where there was no unsolicited
17  acknowledgment agreement.  I have attached
18  them here.  I also included the first page
19  of their P&L to show that they were
20  active," do you see that?
21  A.   Yes.
22  Q.   During your conversation with
23  Mr. Matin, did you discuss solicitation of
24  U.S. customers by SureTrader?
25  A.   I think we would have discussed

Page 255

P. DORSETT

2  that, yes.
3  Q.   Did Mr. Matin ask you to search
4  through client files where there was no
5  unsolicited acknowledgment agreement?
6  A.   No, I don't think he would make
7  such a request.  I think I did these of my
8  own fruition.
9  Q.   If you go down another
10  paragraph, it says, "If you do decide to
11  use any of these files, please remember to
12  officially request them from us through the
13  SCB," do you see that?
14  A.   Yes.
15  Q.   Is that because you understood
16  that sending them directly to the SEC would
17  be a violation of Bahamian law?
18  A.   If it's a file, if it's an
19  official thing, a client file, yes, that
20  has to come from the Bahamas.  It's one
21  thing if we're investigating Guy, and this
22  information was presented, it's not
23  privileged information.  It's another thing
24  to request an entire file as part of an
25  official investigation.

Page 256

P. DORSETT

2  Q.   So, the SEC was requesting
3  files of clients, weren't they?
4  A.   No, I don't think he was
5  requesting anything.  I was sending him
6  proof in regards to what I was explaining
7  about Guy.
8  Q.   As we come now having sat
9  together for quite some time Mr. Dorsett,
10  you're still of the opinion that the SEC
11  did not ask you for any documents; is that
12  accurate?
13  A.   I cannot say they did not ask
14  me for documents, but they asked me for
15  client files?  No, but I cannot say they --
16  they surely probably asked me for some
17  stuff specific to Guy, maybe.  I don't
18  know.
19      MR. FORD:  We can take this
20      down.  Let's do a ten minute break
21      and come back at 4:15.
22      (At this time, there was a
23      pause in the proceeding.)
24  Q.   The first question,
25  Mr. Dorsett, did you have any discussions

Page 257

P. DORSETT

2  about your testimony during that break?
3  A.   No.
4  Q.   Did you speak to anybody during
5  that break?
6  A.   No.
7  Q.   I'm pulling up the same
8  document as before.  This is an e-mail from
9  Sajaad Matin on April 8, 2016, to you and
10  CCed to Jessica Weissman, this is
11  approximately one month after you filed the
12  whistleblower complaint; is that correct?
13  A.   Yes.
14  Q.   It says, "Phillip, thank you
15  again for your e-mails," do you see that?
16  A.   Correct.
17  Q.   It says, "Were you able to find
18  any documents that specifically listed
19  Guy's managing partner Protrade LP or any
20  of Protrade's official documents," do you
21  see that?
22  A.   Yes.
23  Q.   Does this refresh your
24  recollection that the SEC was asking you to
25  obtain documents?

Philip Dorsett
February 28, 2023

Page 258

P. DORSETT

1          P. DORSETT
2     A.    Well, they were asking me a
3  question in reference to Guy's ownership of
4  Protrade I think.
5     Q.    What they're asking is, if you
6  were able to find documents, does this
7  refresh your recollection that they were --
8  the SEC was asking you to get documents?
9     A.    Well, again, I told him, I
10 think I would look to see if Guy having
11 affiliation of Protrade.  I think sometime
12 later he came back with this.
13    Q.    It says, "Do you know if
14 Protrade registered or required to file
15 with any Bahamian authority," do you see
16 that?
17    A.    Yes.
18    Q.    Then it says, "Additionally,
19 did Guy or Justin keep any written
20 agreements with SureTrader affiliates for
21 example, Timothy Sykes or Day Trading
22 Radio," do you see that?
23    A.    Yes.
24    Q.    Do you understand that
25 Mr. Matin was asking you to look for

Page 259

P. DORSETT

1          P. DORSETT
2  written agreements with SureTrader
3  affiliates?
4     A.    Well, based on our discussions,
5  I was going to be looking for stuff that
6  had to do with the affiliates and also had
7  to do with Guy's solicitation of clients.
8     Q.    Then it says, "Lastly, I've
9  attached a file that we received during the
10 course of our investigation and would like
11 to hear your thoughts on the arguments
12 presented," do you see that?
13    A.    Yes.
14    Q.    "We would appreciate it if you
15 could treat it as confidential.  The
16 attached document and the statements made
17 within.  Please let me know if you have
18 some free time next week," do you see that?
19    A.    Yes.
20    Q.    Do you recall why a foreign
21 regulator was contacting you and asking you
22 to treat it confidential?
23    A.    Well, this is in reference to
24 my whistleblower case in reference to Guy
25 Gentile.

Page 260

P. DORSETT

1          P. DORSETT
2     Q.    And it says, "Wells Submission
3  on Behalf of Guy Gentile," do you see that?
4     A.    Yes.
5     Q.    Have you ever seen this
6  document before?
7     A.    I don't recall it, but you said
8  it was attached right, so I think I would
9  have looked at it.
10    Q.    And it says, "Adam Ford, Harris
11 O'Brien, St Laurent and Chaudhry, LLP," do
12 you see that?
13    A.    Yes.
14    Q.    Submission to FINRA, do you see
15 that?
16    A.    Yes.
17    Q.    It says, "In the Matter of Guy
18 Gentile," do you see that?
19    A.    Yes.
20    Q.    If you scroll down to page 23
21 of this document, did you know who Adam
22 Ford was at this time?
23    A.    I can't say.  At one point, Guy
24 introduced him to us, but I can't say -- I
25 don't know -- I don't know.  At one point,

Page 261

P. DORSETT

1          P. DORSETT
2  Guy did introduce him to us.
3     Q.    You understood -- didn't you
4  understand that Adam Ford was Guy Gentile's
5  lawyer?
6     A.    Well, interestingly enough --
7     Q.    Just yes or no.
8     A.    Well, I found --
9     Q.    When you received this e-mail,
10 did you know that Adam Ford was
11 Mr. Gentile's lawyer yes or no?
12    A.    I had e-mails that suggested
13 that he was the lawyer for Swiss America.
14    Q.    At the time you received this
15 e-mail, did you know that Adam Ford was Guy
16 Gentile's attorney?
17    A.    I'm not sure when Guy Gentile
18 introduced him to us.  You said the date of
19 this is -- if this is 2016, I think he
20 would have introduced him to us.  But I
21 remember bringing up a point that if he is
22 our lawyer -- is he our lawyer --
23    Q.    I'm just asking you a simple
24 yes or no question as to whether or not you
25 knew at the time you received this e-mail

Philip Dorsett
February 28, 2023

Page 262

P. DORSETT

1    that Adam Ford represented Mr. Gentile.  I
2    have no idea what your answer is and we're
3    going to move past the question because
4    you're refusing to answer the question.
5              We'll go back to this document.
6    Did you notice on page 23 that this
7    document is not signed by anybody?
8         A.    Okay, yes, I see it.
9         Q.    This document was produced to
10   us by the SEC who has told us that they
11   received this e-mail from you.
12        A.    Okay.
13        Q.    And what this document is is a
14   Word attachment of a draft of a document
15   written by Adam Ford, do you recall that?
16        A.    No, I don't recall it.  Can I
17   see it?
18        Q.    You're looking at it.  It says,
19   "Adam Ford attorney for --
20        A.    I'm sorry, I thought it was
21   something else.
22        Q.    Then Mr. Matin sent to you with
23   the note, "Treat This As Confidential."
24        A.    I don't actually recognize this

Page 263

P. DORSETT

1    to be honest.  It's not really that
2    significant.  Nothing is jumping out for me
3    to remember it.
4         Q.    During your time as a
5    compliance officer, did you ever come in
6    contact with the notion of attorney/client
7    privilege?
8         A.    Yes.
9         Q.    Did it create any pause in you
10   that an SEC attorney was e-mailing you an
11   unsigned Word document draft of a document
12   drafted by Mr. Gentile's personal attorney?
13             MS. SUM:  Objection.
14             THE WITNESS:  Should I answer?
15             MR. FORD:  Yes.
16        A.    Well, again, I don't know if it
17   was at this time, but I remember something
18   came up as to whose attorney he was.  If he
19   was our attorney or Guy's attorney or both,
20   and I don't know if this was in reference
21   to that because I think I may have brought
22   that up with him.  I'm not sure because I
23   think he might have asked the question and
24   if -- I don't know.  I wasn't sure if

Page 264

P. DORSETT

1    Mr. Ford was representing us or if he was
2    representing Guy.  Because I think Mr. Ford
3    told me himself that he was not our
4    attorney, but I found something that
5    indicated that he was.
6         Q.    If we scroll back to the top of
7    this document, you will see, "Wells
8    Submission on behalf of Guy Gentile," and
9    not of SureTrader; is that correct?
10        A.    Like I said, there was
11   question --
12        Q.    It's a yes or no question.  Do
13   you see where it says, "Wells Submission on
14   behalf of Guy Gentile?
15        A.    Yes.
16        Q.    It does not say, "Wells
17   Submission on behalf of SureTrader;" is
18   that correct?
19        A.    That's correct.
20        Q.    And it says, "In the Matter of
21   Guy Gentile."
22        A.    Yes.
23        Q.    Do you recall testifying
24   yesterday at length that it was a big, huge

Page 265

P. DORSETT

1    deal about regulators in 2013 --
2         A.    Around that time, yes.
3         Q.    That was based on FINRA
4    contacting Mr. Gentile; wasn't that
5    correct?
6         A.    When you say FINRA contacting
7    Gentile?
8         Q.    Yes.  Yesterday it was FINRA
9    that was the first, quote unquote,
10   regulators?
11        A.    I think FINRA was going after
12   Gentile or investigating in the interim.
13        Q.    Did you understand that in this
14   submission by Adam Ford, he was making the
15   argument that SureTrader was operating
16   within the bounds of the law, did you know
17   that?
18        A.    No, I don't actually recall the
19   document -- what was the request made by
20   the SEC person?  Did I recognize it that
21   was his request of me?
22             MR. FORD:  Let's scroll back up
23        it's just one page.
24        Q.    It says, "We would appreciate

Philip Dorsett
February 28, 2023

Page 266

P. DORSETT
1          P. DORSETT
2   if you could treat as confidential the
3   attached document and the statements made
4   within.  Please let me know if you have
5   some free time next week," and he says he
6   would love to hear your thoughts, right?
7          MS. SUM:  Objection to the
8      characterization.  He said like.
9          MR. FORD:  I'll read it again.
10      Q.    "Lastly, I've attached a file
11  that we received during the course of our
12  investigation and would like to hear your
13  thoughts on the arguments presented.  We
14  would appreciate if you could treat this as
15  confidential," do you see that?
16      A.    Yes.
17      Q.    Mr. Matin was sending this to
18  you as he wanted to know your thoughts on
19  the arguments presented?
20      A.    Yes.
21      Q.    Were you aware that within this
22  document, Mr. Ford was taking the position
23  that neither SureTrader nor you nor
24  Mr. Gentile has done anything wrong with
25  regards to the solicitation of SureTrader?

Page 267

1          P. DORSETT
2      A.    I can't say I recall that.
3      Q.    You see it says, "It's a letter
4   from FINRA, Mark Fernandez," do you know
5   who that is?
6      A.    No.
7      Q.    It's dated November 12, 2013
8   and it's a letter to Adam Ford, Harris,
9   O'Brien, do you see that?
10      A.    Yes.
11      Q.    Do you see where it says Guy
12  Gentile and then FINRA examination number,
13  do you see that?
14      A.    Yes.
15      Q.    It says, "Dear Mr. Ford, on
16  November 12, 2013, FINRA enforcement staff
17  advised you that it has made a preliminary
18  determination to recommend that
19  disciplinary action be brought against your
20  client," do you see that?
21      A.    Yes.
22      Q.    If we go down a couple more,
23  "Mr. Gentile is in violation of the pending
24  SEC Conduct Rule 21100 and FINRA Rule 2010
25  aided and abetted Swiss America Securities

Page 268

1          P. DORSETT
2   doing business as SureTrader in a violation
3   of Section 15," do you see that?
4      A.    Yes.
5      Q.    The next paragraph says, "In
6   the event your client wishes to file a
7   wells submission," and it provides a date,
8   do you see that?
9      A.    Yes.
10      Q.    Is -- when you were talking
11  about a FINRA regulatory letter in 2013 and
12  everybody was worked up in the office, this
13  was the investigation you were talking
14  about, correct?
15      A.    Well, I only can assume so.  I
16  mean, I knew it was something from FINRA, I
17  don't know the details.
18      Q.    You didn't advise of the
19  details?
20      A.    I did.  He told me don't worry
21  about it, these guys are idiots.
22      Q.    Did you understand at the time
23  that Mr. Gentile was working with the DOJ?
24      A.    No.
25      Q.    That is consistent with the

Page 269

1          P. DORSETT
2   representations made by the District of New
3   Jersey in the submission we looked at
4   earlier where Mr. Gentile is acting as
5   cooperator?
6      A.    Say again.
7          THE COURT REPORTER:  There's
8      feedback.
9          THE WITNESS:  It's the wire.
10          MR. FORD:  Can we go to
11      Exhibit 32.
12      Q.    This is a message from Adam
13  Ford on January 10, 2014, it's subject is,
14  "Guy Gentile, Wells Submission," do you see
15  that?
16      A.    Yes.
17      Q.    It says, "Please find attached
18  Mr. Gentile's Wells Submission and exhibits
19  as well as his affidavit from SureTraders
20  chief compliance officer, Phillip Dorsett.
21  I look forward to your response," do you
22  see that?
23      A.    Yes.
24      Q.    If we scroll down it says
25  there's three attachments, it says, Gentile

Phillip Dorsett
February 28, 2023

Page 270

P. DORSETT

1            P. DORSETT
2    FINRA Wells Final, that's a PDF, Gentile
3    Wells Exhibits, Phillip Dorsett affidavit,
4    do you see that?
5        A.    I see that.
6        Q.    If we scroll to the first
7    exhibit, this is a draft of the Wells
8    Submission of the final PDF form that we
9    just looked at, do you see that?
10       A.    I see it.
11       Q.    If we go down to page 24,
12   you'll recall on the Word version that
13   Mr. Matin sent you, it was on page 23 that
14   the signature block appears, do you recall?
15       A.    I don't recall.
16       Q.    There was no signature on it,
17   remember, it just said the letter S --
18       A.    Yes.
19       Q.    But on this document on
20   page 24, there is an actual signature, Adam
21   Ford, do you see that?
22       A.    Yes.
23       Q.    If we go to page two of this
24   document -- actually we can move on.
25            MR. FORD:  Let's move onto

Page 271

P. DORSETT

1            P. DORSETT
2        exhibit A to the attachment.
3        A.    Can I see the attachment if
4    possible?
5        Q.    Yeah, we're going through them.
6    Would you like us to scroll through?
7        A.    There something you showed me
8    that showed an actual attachments, the two
9    or three attachments at the bottom.
10       Q.    The attachments were exhibits
11   to the Wells Submission, as well as the
12   wells submission self and then your
13   affidavit.
14       A.    This is in response to FINRA's
15   investigation against Guy?
16       Q.    Yes.
17            MR. FORD:  For the sake of
18       time, let's go to Exhibit 33 because
19       you've never seen this document in
20       its PDF form.
21       A.    I don't recognize this
22   document.
23       Q.    With these exhibits attached?
24       A.    No.
25            MR. FORD:  Let's scroll down to

Page 272

P. DORSETT

1            P. DORSETT
2        Exhibit 33.
3        Q.    If we scroll down to the e-mail
4    from Mark Fernandez to Nicholas Grippo on
5    August 5, 2014, do you see that?
6        A.    Yes.
7        Q.    Have you ever seen this e-mail
8    Mr. Dorsett?
9        A.    I don't think so.
10       Q.    Do you recall the name Nicholas
11   Grippo as being a signatory submission on
12   the U.S. attorneys office that we reviewed
13   today?
14       A.    I don't remember the name, no.
15       Q.    But you see where it says
16   USANJ, you see that next to his name?
17       A.    Yes.
18       Q.    This was written by Mark
19   Fernandez.  Do you recognize this as the
20   same individual who submitted the November
21   12th letter to Mr. Gentile saying that
22   FINRA was contemplating disciplinary
23   action?
24       A.    I don't recall the name.
25       Q.    "Nick, after briefing FINRA

Page 273

P. DORSETT

1            P. DORSETT
2    senior management on the matter that you
3    and I discussed last week, they would like
4    to have a call with you and your office and
5    the appropriate persons at the FBI to
6    discuss the matter with you all directly.
7    Were you aware that FINRA was meeting with
8    the FBI regarding the investigation?
9        A.    No, I knew nothing about any of
10   this.
11       Q.    Can we go to Exhibit 34?  This
12   is an e-mail from Nicholas Grippo to Mark
13   Fernandez.  We're going to scroll down a
14   little bit.  It says, "Thanks Mark, I'm
15   available all afternoon.  Although, later
16   in the day would be better.  Joining me on
17   the call tomorrow from our office will be
18   Gurber Grewel, chief of the economic crimes
19   unit and potentially Chris Kelly deputy
20   chief of the criminal division from the
21   FBI.  We will have special agent Gregory
22   Yanko one of the case agents involved in
23   the investigation.  Special agent Michelle
24   Pickels, Michelle supervises the white
25   collar crime unit in the field office," do

Philip Dorsett
February 28, 2023

Page 274

P. DORSETT

1 you see that?
2
3     A.    Yes.
4     Q.    Have you ever seen this e-mail
5 before?
6     A.    No.
7     Q.    Do you know who any of those
8 people are in this e-mail?
9     A.    I don't know any of those
10 names.
11     Q.    Do you know who Gurber Grewel
12 is?
13     A.    I do not.
14     MR. FORD:  Moving to
15     Exhibit 35.
16     Q.    Now, scrolling down, an e-mail
17 from Mark Fernandez to Nicholas Grippo, "Do
18 you and Mr. Grewel have any time available
19 this week for a conference call with Sarah
20 Green and me, we have a few follow-up
21 questions," do you see that?
22     A.    I see it.
23     Q.    Have you seen this e-mail
24 before?
25     A.    I cannot say that I have.

Page 275

P. DORSETT

1
2     Q.    Were you aware of any of the
3 meetings that were taking place between
4 FINRA and the SEC regarding Mr. Gentile at
5 this time?
6     A.    No.
7     MR. FORD:  Can we go to
8     Exhibit 35.  We skipped one.  We can
9     move onto this exhibit.  This is
10     Exhibit 35.
11     Q.    Do you see, if we scroll to the
12 top -- oh wait.  I'm sorry, keep scrolling
13 down.  I got confused.  It's the last
14 e-mail on September 24th on this.  It's
15 from Gurbur Grewel and Nicholas Grippo on
16 September 24, 2014, do you see that?
17     A.    Yes, I see that.
18     Q.    It says, "The only window I
19 have is from three and five."
20     A.    Yes, I see that.
21     Q.    And if you scroll down it's
22 responding to an e-mail from Mark Fernandez
23 to Gurbur Grewl and Nicholas Grippo,
24 saying, "Nick and Gurbur, do you have time
25 today for a brief call with Sarah and I,"

Page 276

P. DORSETT

1 do you see that?
2
3     A.    Yes.
4     Q.    Do you recognize these e-mails
5 were sent during the time that the U.S.
6 attorneys office represented that
7 Mr. Gentile was actively cooperating with
8 the USAO and SEC?
9     A.    If you say so, I'm not familiar
10 with the dates.
11     Q.    You've never seen this e-mails,
12 have you?
13     A.    No, I have not.
14     Q.    If we can go to the next
15 Exhibit 36, it's a FINRA letter dated
16 April 14, 2015, it's from Adam Ford.  I'm
17 sorry, it's to Adam Ford, ESQ.  FINRA
18 examination number, blah blah blah, do you
19 see that?
20     A.    Yes.
21     Q.    It says, "Dear Mr. Ford, please
22 accept this letter as notification that
23 FINRA enforcement staff has determined not
24 to recommend the commencement of
25 disciplinary action against Mr. Gentile in

Page 277

P. DORSETT

1
2 connection with an above captioned matter.
3 This notification does not represent an
4 addition by any other FINRA department and
5 relates solely to matters that were the
6 subject of enforcement investigation in the
7 above captioned matter," do you see that?
8     A.    Yes.
9     Q.    Do you understand that on
10 April 20, 2015, FINRA made the
11 determination not to bring any action
12 against Mr. Gentile for soliciting or
13 aiding and abetting the U.S. customers?
14     A.    I cannot recall.
15     Q.    Did Mr. Gentile ever tell you,
16 hey, by the way, my chief compliance
17 officer decided not to take action against
18 me?
19     A.    I remember Guy telling me we
20 beat these guys or something like that, but
21 I wasn't sure -- Guy would say stuff, but I
22 wouldn't really know what it meant -- any
23 way, he told me something to the effect,
24 Phil, we beat these guys.
25     Q.    You weren't at any of the

Phillip Dorsett
February 28, 2023

Page 278

P. DORSETT

1
2   meetings with any of the FBI and FINRA,
3   were you, Mr. Dorsett?
4       A.    No.
5       Q.    Do you know if anybody from the
6   SEC was at those meetings?
7       A.    If I know if anybody from the
8   SEC was at these meetings?  I mean, I
9   couldn't say.  I mean, I don't know.
10      Q.    Do you know if Adam Ford was at
11  these meetings?
12      A.    I don't know who was at these
13  meetings.  This is the first time I'm
14  hearing about this.
15          MR. FORD:  Let's go back to
16      Exhibit 74.
17      Q.    Mr. Dorsett, do you know with
18  regards to recording people, the Bahamas is
19  a two-party consent country?
20      A.    Explain that.
21      Q.    Are you familiar with the
22  concept of two parties consent recordings?
23  Meaning, both parts have to consent if a
24  there's a recording of a conversation.
25      A.    Okay.

Page 279

P. DORSETT

1
2       Q.    There are some states that are
3   one party states.  As long as one party
4   consents, they can be recorded without
5   attaining a search warrant.  Are you
6   familiar with that concept as a chief
7   compliance officer?
8       A.    You mean the differences in the
9   states with one party or two party?
10      Q.    Yes.
11      A.    That's not something -- I mean,
12  that's not something I'm really familiar
13  with recording people and stuff.
14      Q.    You're not familiar with
15  recording people?
16      A.    Any laws associated with it, I
17  don't know the specifics of one party, two
18  party or which state and all that stuff.
19          MR. FORD:  If we can scroll
20      down past the draft and e-mail to
21      Mr. Dorsett.  Scroll down and stop on
22      this page.
23      Q.    There's an e-mail from
24  April 11, 2016, more than a month after you
25  sent your whistleblower letter from Sajaad

Page 280

P. DORSETT

1
2   Matin, and it says, "Thanks Phillip again.
3   We truly appreciate your help in guiding us
4   through the operational aspects of this
5   matter.  We can be available this evening
6   for further discussion.  Please let me know
7   your schedule," do you see that?
8       A.    Yes.
9       Q.    Do you recall receiving this
10  e-mail?
11      A.    I don't recall specifically.  I
12  don't deny it though.
13          MR. FORD:  Let's scroll back
14      up.
15      Q.    Do you see where it says e-mail
16  from you to Sajaad Matin on April 11, 2016,
17  do you see that?
18      A.    Yes.
19      Q.    And you said, "I started making
20  recordings of the executive meetings.  I
21  made the first one today.  We are currently
22  attempting to move all relationships away
23  from the U.S., we can discuss at length
24  when we speak again," do you see that?
25      A.    I see that.

Page 281

P. DORSETT

1
2       Q.    Is that a true statement?
3       A.    If I did that?  I can't
4   actually recall.  I can't recall if this is
5   a real e-mail.  I must have recorded
6   something.
7       Q.    You produced this e-mail to us.
8   It's an e-mail between you and Sajaad
9   Matin.  Do you recall recording the
10  executive meetings at SureTrader?
11      A.    I don't actually recall making
12  the recording.  Did we discuss what was
13  recorded?
14      Q.    Mr. Dorsett, were you lying to
15  Mr. Matin when you said you started
16  recording executive meetings and that you
17  made the first one today was that a lie?
18      A.    No, it's not a lie.  I'm just
19  saying I don't recall making recordings.
20  If we could see what the wording was about,
21  maybe that would jog my memory maybe.
22      Q.    Did you produce the recording
23  to the SEC?
24      A.    I don't recall doing that
25  either.

Philip Dorsett
February 28, 2023

Page 282

P. DORSETT

1          P. DORSETT
2      Q.    As an expert of the Bahamian
3  law and a chief compliance officer of a
4  Bahamian broker dealer, do you know whether
5  or not it was lawful for you to record the
6  executive meetings of a Bahamian broker
7  dealer without authorization, just yes or
8  no?
9      A.    Well, I can't say.
10     Q.    Did you delete those recordings
11  or recording?
12     A.    Well, I have to make sure they
13  were actually made, right?
14     Q.    Were you lying, Mr. Dorsett?
15  You said, I started making the
16  recordings --
17     A.    Could we see --
18     Q.    Were you lying to Mr. Matin?
19     A.    Can we see the other e-mail?
20  Maybe I tried to do a recording and it
21  didn't come out well.  For some reason, I'm
22  not really recalling this.  Let me see what
23  the recordings are about or something.
24          MR. FORD:  Let's move onto
25      Exhibit 75.

Page 283

P. DORSETT

1          P. DORSETT
2      Q.    You had testified --
3          MR. FORD:  Can we take this
4      down actually.
5      Q.    You had testified earlier that
6  you did not forward any e-mails from your
7  SureTrader e-mail to your personal e-mail;
8  isn't that correct?
9      A.    I did not forward any e-mails
10  from my SureTrader e-mail to my personal
11  e-mail?  No, I never said that.
12     Q.    Did you do that?
13     A.    Yes, I forwarded e-mails to my
14  SureTrader account to my personal account.
15          MR. FORD:  Let's pull up 75.
16     Q.    It's an e-mail from your Gmail
17  account with no recipients and it says,
18  "work e-mails," do you see that?
19     A.    Yes.
20     Q.    All the other e-mails we looked
21  at today had two, isn't that true?
22     A.    Okay, yes.
23     Q.    So, I don't know if this is an
24  issue with the download, but there's no to
25  line.  Do you know who you sent this e-mail

Page 284

P. DORSETT

1  to on April 20, 2016?
2      A.    I don't know if it was sent.
3      Q.    Do you know how the SEC came
4  into possession of this document?
5      A.    Well, is this one of the
6  e-mails that was on my file.
7      Q.    Mr. Dorsett, do you know how
8  the SEC came into connection of this
9  document?
10     A.    Well, no.  I mean, you can tell
11  me.
12     Q.    It says, "Guy is in town and I
13  overheard the IT person stating that they
14  may be looking into ways to block or notify
15  the system if someone forwards work e-mails
16  from the company to their personal e-mail.
17  I will try to stay up to date with Guy to
18  know for sure."  Do you see that?
19     A.    Yes.
20     Q.    Do you understand that the
21  reason they were blocking or notifying the
22  system if someone forwarded e-mails to
23  their personal e-mail because that was a
24  violation of company policy?

Page 285

P. DORSETT

1          P. DORSETT
2      A.    Well, I think the reason why
3  Guy didn't want that happening is because
4  he didn't want anything getting out and --
5          MR. FORD:  Mr. Dorsett, I'm asking whether
6  or not you understood that to be a
7  violation of company policy, for somebody
8  to forward a work e-mail to their personal
9  e-mail, yes or no?
10     A.    I don't know.
11          MR. FORD:  Let's go to
12      Exhibit 77.
13     Q.    This is from you to Sajaad
14  Matin on May 7, 2017, do you see that?
15     A.    Yes.
16     Q.    Hello.  Matin's number is
17  917-292-1425, do you see that?
18     A.    Yes, correct.
19     Q.    It says, "Please be aware that
20  Yaviv and Guy are good friends and that he
21  may still be acting on Guy's behalf by
22  pretending to be upset with him in order to
23  get information," do you see that?
24     A.    Yes.
25     Q.    You said, "I would be very

Philip Dorsett
February 28, 2023

Page 286

```
1                P. DORSETT
2    careful not to mention anything of
3    substance to Yaviv that you wouldn't want
4    to get back to Guy," do you see that?
5        A.   Yes.
6        Q.   You said, "it's my
7    understanding that he was not fired, but
8    instead was forced out of the country by
9    the labor board of immigration department.
10   However, it could still technically be for
11   the case.  I just don't know," do you see
12   that?
13       A.   Yes.
14       Q.   And that entire reference is in
15   reference to Yaviv who?
16       A.   I don't remember his last name.
17       Q.   Does Frantz ring a bell?
18       A.   Say again.
19       Q.   Frantz, F-R-A-N-T-Z?
20       A.   That could be.  But he came
21   somewhat late, but they were really, really
22   close, so I was just cautious of him.
23           MR. FORD:  Let's go to
24        Exhibit 78.
25       Q.   This is an e-mail from Jessica
```

Page 287

```
1                P. DORSETT
2    Weissman to the PA Dorsett, but it does not
3    say who it's to on June 6, 2018, do you see
4    these e-mails?
5        A.   Yes.
6        Q.   It says, "Hi Jessica.  I
7    received the information from Matin," do
8    you see that?
9        A.   Yes.
10       Q.   It says, "In reference to what
11   you mentioned earlier about the heat being
12   turned up so to speak, I am concerned that
13   Guy's lawyers may try to argue that I'm
14   only assisting the SEC because I was fired
15   perhaps out of vengeance," do you see that?
16       A.   Yes.
17       Q.   When you say the heat being
18   turned up, were you referring to the SEC
19   turning up the heat on Mr. Gentile?
20       A.   Right, so this is in response
21   to something they wrote.
22       Q.   But my question was, when you
23   say you mentioned earlier about the heat
24   being turned up so to speak, were you
25   referring to the SEC turning up the heat on
```

Page 288

```
1                P. DORSETT
2    Mr. Gentile?
3        A.   I don't know if that's what it
4    is.  I think what I might have been saying
5    is the case is getting to point where the
6    heat is turned up, but I didn't ask what it
7    was.
8        Q.   When you say case, Mr. Dorsett,
9    were you aware at the time this e-mail was
10   sent, there was an ongoing litigation
11   between the SEC and Mr. Gentile in New
12   Jersey?
13       A.   I don't know the specifics.
14   Guy didn't tell me the specifics of the
15   cases against him.  We would know -- I
16   think it was one or the other officers who
17   brought something to my attention to some
18   of these cases, but I didn't really know
19   the specifics of the case.  I normally
20   don't follow the case --
21       Q.   When you say the other
22   officers, who were you referring to?
23       A.   I think it was Mr. Collie at
24   one point who was concerned --
25       Q.   Oh, officers, I see, I thought
```

Page 289

```
1                P. DORSETT
2    you said offices.
3            So, along those lines, were you
4    aware that the SEC action against
5    Mr. Gentile in New Jersey was stayed at the
6    time this e-mail was sent?
7        A.   Again, I don't know anything
8    about the cases my whole thing --
9        Q.   Okay, that's fine.
10       A.   -- the heat was being turned
11   up.  My recollection and confidentiality
12   was maintained.  That's the reason I was
13   concerned because I chose the whistleblower
14   status.
15       Q.   What I wanted to know was, was
16   what you meant when you said this, it
17   sounds like somebody from the SEC told you
18   the heat was going to be turned up --
19       A.   I think it was almost like the
20   heat would be turned up on me.  I get that
21   impression, and then I was trying to figure
22   out okay, if this actually explodes and I'm
23   actually talking with the SEC, this and
24   that, I don't want them to think I'm just
25   talking to the SEC because I got fired.  I
```

Philip Dorsett
February 28, 2023

Page 290

P. DORSETT

1       don't want them to think I'm just mad at
2       him and the rest of that stuff.  I wanted
3       him to know it was a conscious decision at
4       least, so he wouldn't be so upset over
5       that.
6
7       Q.    What you say is, "Guy's lawyer
8       may try to argue that, I'm only assisting
9       the SEC because I was fired perhaps out of
10      the vengeance," do you see that?
11      A.    Yes.
12      Q.    That was a concern on June 6,
13      2017, that Guy's lawyers were going to
14      argue that you were doing this because you
15      were acting out of vengeance?
16      A.    Right, because the heat was
17      being turned up and it might have indicated
18      that my name might have might have been
19      exposed and that was the heat and that was
20      in fact, very terrifying for me.  And I was
21      upset because when I really got into it,
22      the whole point was for the confidentiality
23      status.
24      Q.    So it says, "Is there a way
25      that you can show the court that I was in

Page 291

P. DORSETT

1
2       communication with the SEC on this matter
3       before that event, but won't make mention
4       to the whistleblower status," do you see
5       that?
6       A.    Yes.
7       Q.    You were requesting that you
8       wanted the SEC to lie to the court; isn't
9       that right?
10      A.    Is there a way that you can
11      show the court that I was in communication
12      with SEC on this matter before that event
13      but without making mention to the whistle
14      blower -- well, I was involved with the SEC
15      before I got fired.
16      Q.    No.  Were you involved with the
17      SEC prior to the whistleblower status?
18      A.    No, that's not what that's
19      saying.  It's prior to me being fired.
20      Q.    Got it, thank you.
21      A.    I was trying to protect the
22      whistleblower status at all costs because
23      that's the main thing for me.
24      Q.    Got it.
25      MR. FORD:  We can go back to

Page 292

P. DORSETT

1
2       Exhibit 10.
3       Q.    This is an e-mail from D'sante
4       Beneby to you on November 15, 2011
5       attaching several documents including an
6       employee nondisclosure agreement, do you
7       know who D'sante Beneby is?
8       A.    She was the other person who
9       came in who was writing the magazine, who
10      was running the magazine, Guy's magazine,
11      she was in charge of that.
12      Q.    If we go to the next page,
13      which is the first page of the agreement
14      and we scroll down a little bit.  Do you
15      see where it says, "I agree that I shall
16      not during or at any time after the
17      termination of my employment with the
18      company use for myself or others to
19      disclose or give understanding to others
20      including future employees any trade
21      secrets, confidential information and other
22      appropriate data of the company of this
23      agreement," do you see that?
24      A.    Yes, it didn't apply to
25      regulators.

Page 293

P. DORSETT

1
2       Q.    Mr. Dorsett, do you recall the
3       e-mail you sent to Ms. Suh saying you could
4       not turn documents over?
5       A.    I couldn't turn client
6       documents over to clients that were being
7       investigated by the SEC.  That's very
8       different from Guy being investigated.
9       Q.    Mr. Dorsett, you've given that
10      speech many times.  It's not responsive so
11      again, I'm going --
12      MS. SUM:  Objection to his
13      characterization.
14      MR. FORD:  I'm going to object
15      to move to strike what was
16      nonresponsive.  We're going to pull
17      up another document.  While we do
18      that.
19      Q.    Mr. Dorsett, what is direct
20      market access?
21      A.    My understanding now, I have
22      not been on the trade desk for many, many
23      years.  So, the last time I had direct
24      market access was literally back in 2013,
25      2014 which is five, six, eight years ago.

Philip Dorsett
February 28, 2023

Page 294

P. DORSETT
1     P. DORSETT
2  So, my understanding of direct market
3  access is that you can trade on principle
4  where in essence the firm is the only one
5  with the actual account.  The firm does the
6  trading and then the clients -- in essence,
7  sell to the clients from your inventory
8  where direct market access the clients they
9  go -- they don't trade on principle, they
10 have direct access to the market, so that's
11 my understanding of it.
12     Q.    Did you ever place a trade on
13 the SureTrader while you were employed
14 there?
15     A.    I can't recall.  I don't
16 recall.  I may or may not have.  I don't
17 know if Guy ever asked me to do that.  I
18 can't remember.
19     Q.    Did you ever place a trade on
20 behalf of a SureTrader client while you
21 were employed with SureTrader?
22     A.    On behalf of a client?  Like a
23 discretionary trade?
24     Q.    Did you ever place a trade on
25 behalf of a client while you worked at

Page 295

1     P. DORSETT
2  SureTrader?
3     A.    I can't recall ever placing a
4  trade on behalf of a client.  I would have
5  to go through a trade desk.
6     Q.    Were you ever part of the
7  SureTrader trade desk?
8     A.    In the beginning, it was just
9  me and Guy and we used to do everything.
10 So, it was just a two man team and we sort
11 of did everything.  Then, I don't know if I
12 can recall if I did any discretionary
13 trading for a client.
14     MR. FORD:  We're going to pull
15 up another document.
16     Q.    This is Swiss America
17 securities SureTrader letterhead it's date
18 is November 9, 2015, and it says warning
19 letter, do you see that?
20     A.    Yes.
21     Q.    We're going to scroll through
22 it just look at it and let me know, do you
23 recognize this document?
24     A.    Could you pause so I can read
25 it scroll down I've read it.

Page 296

1     P. DORSETT
2     MR. FORD:  Scroll down.
3     A.    Okay.
4     Q.    Do you recognize this document?
5     A.    Yes, this is the warning letter
6  that's precipitated me sending Guy my
7  response letter that we discussed
8  yesterday.
9     Q.    So, you recognize it.
10    MR. FORD:  Let's scroll back up
11    to the top this document is signed by
12    Guy Gentile.
13    Q.    It says, "this letter is in
14 regards to recent events relating to a
15 specific account and then it says on
16 June 16, 2015 a client's equity was
17 entirely encumbered by non-marginable
18 positions in TSTS, short positions should
19 have been liquidated and TSTS brought down
20 to cash levels, no action by risk team," do
21 you see that?
22    A.    Yes.
23    Q.    Then it says on 6/17/2015 to
24 October 28, 2015, "buying power continually
25 updated upon client's request despite the

Page 297

1     P. DORSETT
2  lack of equity to substantiate any
3  adjustment," do you see that?
4     A.    I see that.
5     Q.    On 8/6/2015, account went
6  unsecured, do you see that?
7     A.    Yes.
8     Q.    It says on October 28, 2015,
9  the account was brought to the attention of
10 Mr. Gentile and the following day all
11 positions were liquidated in the account,
12 do you see that?
13    A.    I see.
14    Q.    Then it says through
15 discussions with another team
16 members, we discovered that you authored
17 the request for buying power adjustment
18 without full knowledge of the account
19 status and there was a lack of diligence on
20 following up on issues with the account?
21    A.    I see that.
22    Q.    It is determined that you were
23 complicit in allowing this account to go
24 unsecured through negligence and acquiring
25 vital information and this results in a

Philip Dorsett
February 28, 2023

Page 298

```
1                P. DORSETT
2  potential uncollectible account of
3  approximately $22,000 for the firm, do you
4  see that?
5       A.   I see that.
6            MR. FORD:  Let's scroll down
7       again.
8       Q.   It says, "consequently
9  responsibilities within the firm will be
10 re-evaluated and assigned to another
11 position.  Please note that this recent
12 event along with your overall managerial
13 performance as a chief compliance officer
14 is not meeting the firm's needs or
15 expectations.  In light of this, any
16 reports or failure to performing your
17 assigned duties may result in immediate
18 termination," do you see that?
19      A.   Yes.
20           MR. FORD:  Can we pull up
21      Exhibit 13.  This was sent to Antonio
22      Collie by you.
23      Q.   If we scroll down to the
24 bottom, we can see your signature there,
25 correct?
```

Page 299

```
1                P. DORSETT
2       A.   Yes.
3       Q.   Ands you say, "Good day,
4  Antonio."  And then you say, "It is no
5  secret that borrowing from banks here in
6  the Bahamas can be both expensive and
7  frustratingly difficult and to that end, I
8  am very happy that SureTrader has stepped
9  up to ease this burden that's faced its
10 staff," do you see that?
11      A.   Yes.
12      Q.   "I would like to formally
13 request a loan.  There is no secret that my
14 wife and I have been trying to save toward
15 a down payment on a home.  I would like to
16 borrow to facilitate this effort.  The
17 amount I would like to borrow is $10,000,
18 which would allow my wife and I to complete
19 a down payment on our home so we can
20 finally move away from renting," do you see
21 that?
22      A.   Yes.
23      Q.   Do you recall sending this
24 e-mail to Antonio Collie?
25      A.   Yes.
```

Page 300

```
1                P. DORSETT
2       Q.   At the time you sent this
3  letter, you were actively communicating
4  with SEC?
5       A.   Yes.
6            MR. FORD:  We're going to go to
7       Exhibit 14.
8       Q.   This is a letter dated July 31,
9  2017, to Mr. Phillip Dorsett, Nassau
10 Bahamas and titled letter of dismissal, do
11 you see that?
12      A.   Yes.
13      Q.   It says, "Mr. Dorsett, your
14 employment with Swiss America securities
15 for cause effective immediately -- your
16 employment with -- strike that.
17           It says, the second paragraph,
18 "As discussed during the determination
19 meeting with senior compliance officer,
20 your employment is terminated because you
21 committed company personnel and resources
22 to a third party after being told by the
23 president and your department head not to
24 communicate unless and until the firm would
25 have had proper discussions so to do as it
```

Page 301

```
1                P. DORSETT
2  relates to a client," do you see that?
3       A.   I see that.  When was this
4  document sent to me?
5       Q.   It says that it was a gross
6  violation of company policy, do you see
7  that?  It says, "In attempting to cover up
8  your commitment, you tried to involve
9  several other employees in your deception.
10 This is behavior that cannot be countenance
11 and it also violated our conduct," do you
12 see that?
13      A.   Yes.
14      Q.   We request from you your
15 security swipe card, your office keys and
16 the company owned laptop, do you see that?
17      A.   Okay.
18           MR. FORD:  Moving onto --
19      A.   Can you scroll down please,
20 because I don't recognize this at all.
21           MR. FORD:  We can scroll down.
22      A.   So, this apparently was
23 e-mailed to me, is that what this is
24 supposed to be?  I don't see a signature on
25 it.  I don't think I ever received that.
```

Philip Dorsett
February 28, 2023

Page 302

P. DORSETT

1         P. DORSETT
2    This is the first time ever seeing that.
3         Q.    Your testimony says other --
4         A.    I can give you the documents
5    that were filed.
6         Q.    We're moving onto Exhibit 15.
7    Your response has been noted that you've
8    never seen the document.
9              MR. FORD:  Can we take this
10        down.
11        Q.    Do you remember testifying
12   yesterday that Mr. Gentile had offered to
13   allow you to continue to appear to be an
14   employee of SureTrader for up to a year
15   after you were terminated, do you recall
16   saying that yesterday?
17        A.    He offered to continue to put
18   me on the payroll and give me benefits for
19   a full year.
20        Q.    And you testified that he
21   offered to give you $100,000 during that
22   time?
23        A.    No.
24        Q.    Do you recall -- was your
25   intent to suggest that Mr. Gentile was

Page 303

P. DORSETT

1         P. DORSETT
2    trying to get you to go along with
3    something wrongful and that's why he was
4    offering that money, is that your testimony
5    yesterday?
6         A.    He didn't offer me money.  He
7    offered to allow me to continue to be paid
8    and receive benefits for a year.  I think
9    the reason why he wanted that is because he
10   didn't want to have to report to the
11   commission that was no longer going to be
12   with the company and I couldn't trust my
13   title and position sort of still being
14   there just for him to do whatever he wanted
15   without me being there to actually see it.
16   So, that's why --
17        Q.    Do you know whether or not
18   after you were fired, SureTrader reported
19   the appointment of Edward Cooper to the
20   Securities Submission of the Bahamas?
21        A.    I only imagine that they had
22   to.  They would have had to.
23        Q.    That story you just told, that
24   is fabricated, isn't it?
25        A.    That's one hundred percent

Page 304

P. DORSETT

1         P. DORSETT
2    true.
3              MR. FORD:  Let's go to
4         Exhibit 15.
5         Q.    Can you look at this e-mail
6    from you to Guy Gentile on July 31, 2017,
7    do you see that?
8         A.    Okay, let me read it.  Okay,
9    continue.  Okay, continue.
10        Q.    Is that an e-mail that you sent
11   to Guy Gentile?
12        A.    Yes, I recognize this e-mail.
13        Q.    And you said that Antonio
14   indicated that Guy was insisting on a
15   six-month payment period with each month
16   paying 10k until the 60k is reached, do you
17   see that?
18        A.    Yes, and I think this was after
19   I rejected that first offer.
20        Q.    It says that, "in exchange you
21   would sign an agreement for legal action
22   with regards to your resignation slash
23   termination," do you see that?
24        A.    Correct.  I think that was in
25   reference to the commission as well.

Page 305

P. DORSETT

1         P. DORSETT
2         Q.    Was it your understanding as of
3    July 31, 2017, that you had to resign from
4    SureTrader?
5         A.    Sorry, say it again.
6         Q.    On July 31st, 2017, did you
7    believe that you had to resign from
8    SureTrader?
9         A.    No.  Guy wanted to end my
10   employment.
11        Q.    You were terminated, right?
12        A.    Correct.
13        Q.    You don't say that, you said --
14   you talked about your rights to legal
15   action with regards to your resignation, do
16   you see that?
17        A.    Resignation, termination.  The
18   reason why it says that is because he was
19   trying to pose it as something else.
20        Q.    Does this refresh your
21   recollection that you did not work for
22   SureTrader in August of 2017?
23        A.    Go up.  I think the reason why
24   I say August --
25        Q.    Mr. Dorsett, does this refresh

Philip Dorsett
February 28, 2023

Page 306

P. DORSETT

1     P. DORSETT
2  your recollection that you were not working
3  for SureTrader in August of 2017?
4     A.    My exit letter was received in
5  August, my recollection, and I can actually
6  check that because I still have it.
7     Q.    Did you produce that document
8  to the SEC in the 15,000 documents you gave
9  them?
10    A.    That was not produced to the
11 SEC to my knowledge.  That document, all of
12 this has already been squashed away.  This
13 is like negotiation back and forth.  That
14 document was the actual exit document, the
15 check and it actually had the breakdown.
16 You mentioned the loan I received because
17 they took that out and it was a proper,
18 official document required by Bahamian law.
19    Q.    So, do you recall producing
20 15,000 documents to the SEC?
21    A.    I don't know how much documents
22 were there.
23    Q.    Mr. Dorsett, it's just a yes or
24 no question.  I understand this is --
25    A.    I don't remember.

Page 307

1     P. DORSETT
2     Q.    I'm asking you just yes or no,
3  do you recall producing 15,000 documents to
4  the SEC in this action?
5     A.    I don't recall the number.
6     Q.    When you produced those
7  documents, did you select only certain
8  documents to produce to the SEC?
9     A.    Please clarify.
10    Q.    Did you produce all SureTrader
11 documents in your position to the SEC when
12 you produced the documents in this case,
13 yes or no?
14    A.    No, actually.  I think I have
15 quite a bit more.
16    Q.    How did you determine which
17 will documents to give to the SEC and which
18 documents to hold back?
19    A.    I can't recall at this point.
20 I can't recall at this point.  I think --
21    Q.    Did the SEC instruct you to
22 take certain documents out of the
23 production?
24    A.    No.  I think -- well, I can't
25 recall, but I think it was more or less

Page 308

1     P. DORSETT
2  that e-mails that I was able to send to the
3  SEC but actual documents a lot of those --
4  it's a lot of stuff -- I'm still actually
5  finding them I don't know exactly what Guy
6  did to the computer but I'm still finding
7  stuff to this day and I'm like what is this
8  some of it is coded stuff I can't read.  A
9  lot of it is that.  A lot of that wasn't
10 actually sent, it had to do, I think, just
11 with e-mails, company e-mails that's what
12 it was.
13    Q.    That was on your SureTrader
14 laptop?
15    A.    This was on my personal laptop
16 that Guy put certain codes on.
17    Q.    When you say the very
18 beginning, please specify the exact time
19 period you're referring to.
20    A.    This would have had to be late
21 2011 or early 2012.  He asked if he could
22 take my laptop home because he wanted to
23 back some stuff on it and he said now if
24 something happens to the work computer
25 we'll be okay.

Page 309

1     P. DORSETT
2     Q.    Understood.  Therefore, none of
3  the documents that you produced from your
4  personal computer to the SEC are after
5  2012; is that correct?
6     A.    None of them are after 2012?
7  No.
8     Q.    Mr. Dorsett, you just said Guy
9  instructed you to back things up --
10    A.    He did not instruct me.  He did
11 it himself and he told me.
12    Q.    So, here is my question --
13    MS. SUM:  Allow him to finish
14    answering the question.
15    A.    He explained to me --
16    Q.    Mr. Dorsett, I'm asking about
17 the time period that something happened.
18 Your testimony is that Mr. Dorsett backed
19 up documents onto your computer in 2012, we
20 would not expect to see any documents on
21 your personal computer after 2012; isn't
22 that correct?
23    A.    I did not say that he backed up
24 documents.  I said he did something to my
25 computer.  I did not know what he did, but

Philip Dorsett
February 28, 2023

Page 310

P. DORSETT
1
2   he said if anything happens to us, we have
3   a back up.  In fact, it wasn't until years
4   later until -- and that computer, I stopped
5   using it -- literally, the hard drive
6   crashed and I had to get it
7   reconstructed --
8       Q.   What year did the hard drive
9   crash?
10      A.   I think 2016 and it sat there
11  over eight years because I spent a lot of
12  money to get it repaired.  The IT person
13  who I hired told me that the way he had to
14  reconstruct my hard drive caused my files
15  to be all over the place.  Looking at my
16  family photos, I see some SAS documents and
17  I press on it and I see a bunch of codes
18  and stuff.  That's when I see a bunch of
19  stuff at that time --
20      Q.   What year did you have the hard
21  drive reconstructed, Mr. Dorsett?
22      A.   I think that was around, I
23  saved up to get it reconstructed and I
24  wanted to let him put a new computer disk,
25  right, so I think that was around 2017 that

Page 311

P. DORSETT
1
2   I built -- I had to build the new laptop
3   and then it was later that year -- like I
4   said, a lot of it was just coding gibberish
5   that I couldn't understand and it was
6   sometime later that I was going through the
7   coding gibberish and stuff and then i was
8   going in my e-mails and I realized, buried
9   in my e-mails was Swiss America Securities.
10  It dawned on me, you know what, this had to
11  have been there from Guy -- I don't know
12  what he did, but whatever he did, it's
13  literally still on my computer to this day.
14          MR. FORD:  Can we go back to
15      the Exhibit 3.
16      Q.   As we pull that up, did the SEC
17  instruct you to remove privileged
18  communication from the e-mails that you
19  were transmitting?
20      A.   Yes, I think they said make
21  sure nothing is privileged between anything
22  to do with a lawyer or anything like that.
23      Q.   Can you please provide me the a
24  name of the law firm that conducted the
25  privilege review?

Page 312

P. DORSETT
1
2       A.   Sorry, what do you mean by a
3   privilege review?
4       Q.   You said the SEC instructed you
5   to remove privileged documents, did you
6   hire a law firm to do that?
7       A.   No, I didn't hire a law firm.
8       Q.   Did they hire a law firm to do
9   that, yes or no?
10      A.   No.  They told me they couldn't
11  receive anything that had privileged
12  communications, and so what I did was, I
13  tried to do a search for the company's
14  lawyer and I think I just deleted those to
15  be honest.  Anything that came up with
16  Michael Miller's, name I just deleted them.
17      Q.   So, they would be available
18  then in your Gmail trash; is that correct?
19      A.   Well, this is sometime ago -- I
20  mean, I don't know.  Interestingly enough,
21  the very week that it became known to the
22  courts that I was in possession of Swiss
23  America Securities e-mails, my Gmail was
24  actually hacked.  And that's when I started
25  following this case because I wanted to log

Page 313

P. DORSETT
1
2   in to see the exact time that you guys
3   became aware of it.  My Gmails were hacked
4   and security e-mails were deleted.
5       Q.   Mr. Dorsett, when did you make
6   the SEC aware that you had these documents,
7   what year?
8       A.   I can't recall.  I think it
9   would have been -- you mean the e-mails?
10      Q.   No.  When did you tell the SEC
11  that you had access to these documents
12  approximately what year?
13      A.   When you say these documents
14  please clarify.
15      Q.   The documents you obtained from
16  SureTrader?
17      A.   I did not obtain documents from
18  SureTrader if you were talking about the
19  documents that Guy backed up to my computer
20  I think I made SEC aware of that just
21  recently, like I don't know -- maybe last
22  year or the year before I'm not sure I'll
23  have to check my records.
24      Q.   You never told Sajaad Matin in
25  2016 that Guy Gentile backed up documents

Philip Dorsett
February 28, 2023

Page 314

```
1                P. DORSETT
2   onto your personal computer?
3        A.    I would have to check because
4   my recollection, I might have rebuilt my
5   computer until the next year, that's what I
6   think.  I don't know -- I mean, if you can
7   show me an e-mail that I told him the stuff
8   was backed up.
9              MR. FORD:  Let's go to
10        Exhibit 16.
11        Q.    Do you know who Randol MA
12  Dorsett is?
13        A.    That is my brother.
14        Q.    And he is a lawyer?
15        A.    He is.
16        Q.    Has he represented you in the
17  past?
18        A.    Well, he wrote this letter, but
19  I don't know if he's represented -- I don't
20  know if I call that a representation.  The
21  reason I say that is because it's a legal
22  term.  In the Bahamas to represent -- I
23  didn't pay him for this.
24        Q.    It's dated August 1st, 2017,
25  and it says, "Dear Mr. Gentile, termination
```

Page 315

```
1                P. DORSETT
2   of employment contract Phillip Dorsett," do
3   you see that?
4        A.    Yes.
5        Q.    It says, "I instructed that on
6   31st July, 2017 Mr. Edward Cooper followed
7   by Antonio Collie informed Philip that his
8   employment had been terminated with
9   immediate effect," do you see that?
10        A.    Yes.
11        Q.    Does this refresh your
12  recollection that you did not work for
13  SureTrader in August of 2017?
14        A.    I already told you why I said
15  August, because I didn't receive the
16  official letter until two weeks later I
17  think.
18        Q.    How did your brother know you
19  were terminated effective immediately if
20  you didn't receive the letter until later?
21        A.    Because this was verbally said
22  to me.
23              MR. FORD:  Strike that
24        question.
25        Q.    Do you see here your brother
```

Page 316

```
1                P. DORSETT
2   knew that on July 31st, 2017, your
3   employment had been terminated with
4   immediate effect, do you see that your
5   brother wrote that?
6        A.    Yes, that's based on a
7   conversation between myself and Mr. Cooper.
8        Q.    It says, "Mr. Cooper
9   subsequently demanded that Philip turn over
10  the keys for the office, which Phillip did,
11  and Phillip's work access was revoked
12  electronically," do you see that?
13        A.    Yes.
14        Q.    If we scroll to --
15        A.    Can we read the rest of it?
16        Q.    You can take as much time as
17  you want.
18        A.    Can you read it for the record?
19  Would you read all of it?
20              MR. FORD:  Scroll down to page
21        two.
22        Q.    It says, "Phillip attended your
23  offices today with the undersigned to
24  collect the funds, which are owed to him
25  upon termination, not withstanding
```

Page 317

```
1                P. DORSETT
2   Mr. Edward Cooper and Mr. Antonio Collie
3   refused to give Phillip's said funds,
4   protesting that the presence of Philip's
5   legal counsel put them at a disadvantage,"
6   do you see that?
7        A.    Yes.
8        Q.    And then you say, "in the
9   circumstances, I am instructed to demand
10  and hereby demand you immediately pay the
11  Phillip the $100,000 being the amount due
12  and owing upon his unlawful termination
13  inclusive of the legal costs and the
14  damages which he has been put in respect of
15  this matter," do you see that?
16        A.    I see that's what he wrote,
17  yes.
18        Q.    Were you so insistent about
19  reading the rest because right before you
20  made that demand for $100,000, you include
21  the company for which you were chief
22  compliance officer for the proceeding six
23  years of engaging in violations of U.S.
24  law, is that why you wanted me to read it?
25        A.    No, I wanted you to read the
```

Phillip Dorsett
February 28, 2023

Page 318

P. DORSETT

1        P. DORSETT
2    whole document --
3        Q.    It's a yes or no question.  The
4    answer is no?
5        A.    No.
6            MR. FORD:  Let's move on.
7        A.    This letter --
8        Q.    Mr. Dorsett, there's no pending
9    question.
10           MR. FORD:  Let's go to
11       Exhibit 17.
12       Q.    This is an e-mail from Guy
13   Gentile dated August 1, 2017, to Randol
14   Dorsett, it CCs a couple e-mail addresses
15   Guy@SureTrader.com,
16   executives@SureTrader.com,
17   PADorsett@Gmail.COM. Do you see that?
18       A.    Yes.
19       Q.    It says, "Dear Mr. Randol, I'm
20   sorry, but I'm not scared of your bullshit
21   threats.  Phillip was offered a very fair
22   severance package, which he refused, now
23   there is no deal.  He will be paid what is
24   required by the law minus what we owes.
25   Philip's check will be ready for pick up on

Page 319

P. DORSETT

1        P. DORSETT
2    Friday," do you see that?
3        A.    Yes.
4        Q.    "Please do not contact me or
5    anyone at the firm.  If you need our firm's
6    attorney, I'm happy to provide that," do
7    you see that?
8        A.    Yes.
9        Q.    Do you recall receiving this
10   e-mail?
11       A.    Well, I think this was sent to
12   my brother.
13       Q.    Do you recall receiving it?
14       A.    Yes, I recall seeing this
15   e-mail and I see where Guy references what
16   he referred to as the fair package, which I
17   referred to in my first deposition.
18       Q.    The question I asked was, do
19   you recall seeing this e-mail, do you
20   recall seeing it or not?
21       A.    Yes.
22           MR. FORD:  We're going to go
23       back to Exhibit 16.
24       Q.    This is your brother Randol's
25   letter.  We're going to scroll past the

Page 320

P. DORSETT

1        P. DORSETT
2    letter to Gentile 3695.
3            Mr. Dorsett, while we do that,
4    was SureTrader able to execute trades of
5    United States Securities?
6        A.    Yes.  Well, they did it through
7    USA, is that what you're asking?
8        Q.    No, I'm asking you whether
9    SureTrader, to your knowledge, had the
10   ability to execute the share of a trade in
11   the United States?
12       A.    Can you please clarify the
13   question because in essence, we had to use
14   the services of Stock USA.
15       Q.    Isn't it a fact that if
16   SureTrader wanted to execute a trade, they
17   were required to do so through an
18   authorized United States broker dealer;
19   isn't that a fact?
20       A.    Well, I don't know if that is a
21   fact or not.
22       Q.    Have you ever heard of IB,
23   International Brokers?
24       A.    I have.
25       Q.    Do you know what the function

Page 321

P. DORSETT

1        P. DORSETT
2    of International Brokers is?
3        A.    I don't know what their
4    function is.  I know they're very large.
5        Q.    Do you know what a clearing
6    company is?
7        A.    Yes, I know what a clearing
8    firm is.
9        Q.    Tell me what a clearing firm
10   is.
11       A.    It's my understanding we were
12   having our trades cleared through Stock
13   USA.
14       Q.    No, Mr. Dorsett.  My question
15   was, first, do you know what a clearing
16   firm is and you said yes, then I asked you
17   to explain what a clearing firm is.  Of a
18   registered broker dealer, I'm asking you to
19   tell me what a clearing firm is.
20       A.    A clearing firm would be a firm
21   basically that has a lot of smaller firms
22   as clients and then those clients would
23   send their client's trades through that
24   larger firm and then that larger firm would
25   execute those trades on the U.S. market.

Philip Dorsett
February 28, 2023

Page 322

P. DORSETT

1
2   MR. FORD: I do have some more
3   questions. I just request that we
4   take a quick break. I think there's
5   a couple more questions on this issue
6   and a couple more clean up, but I
7   don't anticipate much longer.
8   MS. SUM: Are you saying you
9   expect to finish by 5:45 or what are
10  you saying?
11  MR. FORD: Can we do a five
12  minute break and see where we're at
13  at 6:00 p.m.?
14  (At this time, there was a
15  pause in the proceeding.)
16  MR. FORD: During the course of
17  this deposition, we were notified for
18  the first time that the witness has
19  additional documents in his
20  possession that were not produced.
21  As a result of that, we are holding
22  open the deposition, pending briefing
23  before the court on the issue. I
24  will leave it at that in the interim.
25  We are requesting that the witness be

Page 323

P. DORSETT

1
2   dismissed and then Ms. Sum,
3   Ms. Johnson, to the extent at any of
4   the issues we discuss earlier, we
5   want to bring up, we will do it
6   outside of the presence of the
7   witness and permitted and make
8   whatever record you want, and so that
9   is it.
10  Mr. Dorsett, you are dismissed
11  for the time being with the
12  understanding that this deposition is
13  ongoing.
14  MS. SUM: I'm not going to
15  speak to that issue --
16  MR. FORD: Ms. Sum, this is not
17  a conversation before the witness.
18  MS. SUM: You cannot do this.
19  This is not about the issue about the
20  affidavit. This is applies
21  specifically on what you just said
22  and I want to state my objection
23  about keeping the deposition open.
24  MR. FORD: We're doing it
25  outside the presence of the witness.

Page 324

P. DORSETT

1
2   MS. SUM: This is not how
3   deposition --
4   MR. FORD: Mr. Dorsett, you are
5   dismissed.
6   MS. SUM: This is not the way
7   this works.
8   MR. FORD: Ms. Sum --
9   MS. SUM: No --
10  MR. FORD: Ms. Sum, I am
11  dismissing the witness. I have never
12  encountered anything like this. I
13  would be interested to see if the
14  court reporter has seen anything like
15  this.
16  MS. SUM: You cannot stop me
17  from stating on the record --
18  MR. FORD: I'm not going to.
19  I'm requesting that the witness be
20  dismissed --
21  MS. SUM: This is
22  unprofessional --
23  MR. FORD: We are going to
24  dismiss the witness and then we will
25  put --

Page 325

P. DORSETT

1
2   MS. SUM: You placed the
3   objection in his presence.
4   MR. FORD: Ms. Sum, I said we
5   are holding the deposition open.
6   MS. SUM: -- on the
7   transcript --
8   MR. FORD: Ms. Sum, I ask that
9   you please stop doing this again for
10  the benefit of the court reporter.
11  MS. SUM: No, you keep cutting
12  me off --
13  MR. FORD: Mr. Dorsett --
14  MS. JOHNSON: -- and we'll be
15  done --
16  MS. SUM: It will take ten
17  seconds.
18  MR. FORD: Ms. Sum. We are not
19  doing any objections.
20  MS. SUM: You do not get the
21  cut me off and stop me from speaking.
22  MR. FORD: This is my
23  deposition and I'm dismissing the
24  witness.
25  MS. JOHNSON: You're not

Phillip Dorsett
February 28, 2023

Page 326

P. DORSETT

1
2    letting her make an objection.
3         MR. FORD:  Ms. Johnson, it will
4    be on the record outside of the
5    presence of the witness.
6         MS. SUM:  -- on the record and
7    I am permitted to respond.
8         MR. FORD:  You are going to get
9    to respond --
10        MS. SUM:  This whole discussion
11   --
12        MR. FORD:  Ms. Sum, all I'm
13   requesting that it's -- all I'm
14   asking is that we dismiss the
15   witness.
16        MS. SUM:  You don't dictate --
17        MR. FORD:  Mr. Dorsett, can you
18   please log off.  We will get all of
19   your --
20        MS. SUM:  This is not the
21   way -- let me put it on the record.
22        MR. FORD:  We're not doing it
23   in the presence of the witness.
24        MS. SUM:  You're being -- sir,
25   you made your statement in the

Page 327

P. DORSETT

1
2    presence of the witness --
3         MR. FORD:  There's no
4    statement.  All I said was --
5         MS. SUM:  Sir, you made a
6    statement, you know full well what
7    you did.  This is really unfortunate
8    in this matter.  This is not
9    tolerated that you are --
10        MR. FORD:  Mr. Dorsett, you are
11   excused.  You will be further
12   contacted about continuance --
13        MS. SUM:  The witness is
14   entitled to hear the commission's
15   position --
16        MR. FORD:  Then call him on the
17   phone and tell your position.
18        MS. SUM:  Sir, you made yours
19   statement in the presence of the
20   witness.  Ten seconds of my time is
21   not going to make a difference and
22   this is unheard of.  This is not how
23   we practice in Southern District.
24        MR. FORD:  Go ahead.
25        MS. SUM:  We object to the

Page 328

P. DORSETT

1
2    statement you just made and we do not
3    agree that this deposition should be
4    held open.  We will make our position
5    known to the court.
6         MR. FORD:  Thank you, Ms. Sum.
7    Mr. Dorsett, you are dismissed.
8         THE WITNESS:  Thank you.
9         MS. SUM:  Have a good evening,
10   Mr. Dorsett.
11        MR. FORD:  I've never seen that
12   before, but go ahead.
13        MS. SUM:  You absolutely refuse
14   to let me have something on the
15   record and I literally needed ten
16   seconds to respond and that's it.
17        MR. FORD:  Put it on the
18   record.  Everything that you want to
19   put on the record about that
20   deposition, you can do.  I wanted it
21   done outside of the presence of the
22   witness, because last time you tried
23   to modify the witness' testimony in
24   front of him.  I don't think that's
25   appropriate and I was afraid you were

Page 329

P. DORSETT

1
2    going to do it again.  That's why I
3    was talking over you because I don't
4    think it is fair of you to attempt to
5    modify a witness' sworn statement.
6    If you want to testify, we'd be more
7    than happy to appear, whether you're
8    taking it or we're taking it, but in
9    the mean time the witness is the one
10   who is testifying and the prior
11   statement you made on the record, it
12   sounded an awful lot like coaching.
13   You were trying to modify his
14   previously existing testimony.
15        Ms. Sum, Ms. Johnson you can
16   put whatever objections on the
17   record, the court reporter is here.  I
18   would only say that we do it with
19   recognition that it's been a very
20   long day and I, myself, have never
21   seen anything like this from other
22   attorneys, but let's go easy on her.
23   I know Ms. Scro and I appreciate it,
24   and I'm sorry that some of my
25   adversaries were conducting

Philip Dorsett
February 28, 2023

Page 330

P. DORSETT

1
2  themselves this way.
3      MS. SUM:  Mr. Ford, I don't
4  appreciate your sarcastic remarks.
5  Putting everything that's happened
6  aside, given the colloquy, I've never
7  had counsel preempt me from putting
8  my statement on the record, that's
9  not how we practice here.
10     For the record, we believe we
11  produced all documents related to the
12  drafts of the affidavits.  We don't
13  believe there's anything else,
14  however, we will nonetheless go back
15  and we will advise if there's
16  anything else.  That's what I was
17  going to say.  If you would have
18  allowed me to state that, this would
19  have been resolved much earlier and
20  we wouldn't have had to have any back
21  and forth to that effect.
22     MR. ADAM FORD:  Alice, if I
23  could, as Matt said, I think there
24  was a real concern with, the client
25  testified that he first drafted those

Page 331

P. DORSETT

1
2  affidavits.  To be honest, we think
3  that was a knowing false statement
4  and we offered you and the witness to
5  prove otherwise by producing the
6  documents, what you then did, you
7  came on and you said they don't
8  exist, which isn't surprising and
9  proves that the witness just perjured
10  himself, and then you went onto say,
11  I think the witness -- I think it was
12  confused or misremembering.  You were
13  attempting to put something in the
14  witness' mind to get him out of the
15  perjury that he undoubtedly committed
16  during this deposition and that is
17  why we were so intense, because I
18  also have never had a situation like
19  we did today, but I've also never
20  been involved where we honestly felt
21  where a lawyer was attempting to
22  change a witness' testimony having
23  realized they just perjured
24  themselves.
25     MS. JOHNSON:  We just said we

Page 332

P. DORSETT

1
2  produced everything.  I've never had
3  a situation where you didn't let them
4  object.  If you felt it was out of
5  hand, you say we want to strike that,
6  you can't make a speaking objection.
7  I've never had someone scream over.
8  That behavior, I think that's
9  sanctionable.  I've been doing this a
10  long time and I know you have to.
11  That's not an example you want to
12  send to the judge.
13     We produced everything that we
14  had, we're going to do another check
15  to make sure there's nothing else and
16  you can deal with it then.
17     MR. ADAM FORD:  I appreciate
18  that --
19     MS. SUM:  To be clear, I
20  disagree with your characterization
21  of my statements.  I'm not here to
22  argue with you, it's been a very long
23  day and I think some nerves are
24  frayed at this point.  The
25  representation --

Page 333

P. DORSETT

1
2     MS. JOHNSON:  What does it
3  matter?  It's not a material fact in
4  this case, but make your arguments.
5     MS. SUM:  Listen, we said we
6  produced and we're going to check
7  produce we will advise.
8     MS. JOHNSON:  And we ask that
9  you do the same thing on the
10  affidavit you drafted.  We would like
11  that and all the copies and all the
12  drafts, please.
13     MR. FORD:  It should be in Mr.
14  Dorsett's e-mails.
15     MS. SUM:  I do not appreciate
16  any kind of being characterization
17  being casted.  That's unprofessional.
18     MR. ADAM FORD:  As I think you
19  can tell, I'm trying to tone down the
20  temperature.  Let me raise a couple
21  more issues that go to the question
22  of whether this deposition needs to
23  be held open and we can -- you can
24  object and we can go before the judge
25  on it.  Let me say again for the

Philip Dorsett
February 28, 2023

Page 334

P. DORSETT

1  record, as we understand it,
2  Mr. Dorsett testified beyond the
3  affidavits that there was letters
4  regarding his termination or a letter
5  and then he went onto suggest, if I
6  understand his testimony, there were
7  lots more documents in his possession
8  that he did not turn over.  And we
9  can get exact phrasing, but certainly
10 there was an impression that there
11 was a lot of documents that he did
12 not turn over
13 MS. JOHNSON:  I don't mean to
14 interrupt.  Do we need this on the
15 record?
16 MR. ADAM FORD:  I need it on
17 the record.  Two, I let you speak, I
18 was not interrupting.
19 MS. JOHNSON:  I'm going to let
20 you speak.  I just didn't know if
21 this was important on the record.
22 MR. ADAM FORD:  Two, we
23 understand the SEC previously
24 represented to us that you had

Page 335

P. DORSETT

1  instructed Mr. Dorsett to od a
2  privilege review to make sure that
3  there were no privileged documents,
4  and we understood that and it was
5  explicitly referenced what we were of
6  course most concerned about
7  communications without me personally
8  and members of my law firm and prior
9  law firm.  Our understanding was that
10 Mr. Dorsett was going to be looking
11 for those types of communications.
12 The way that he testified, as I
13 understood it, he only looked for
14 Michael Miller communications.  Now,
15 he then goes onto say that he deleted
16 all of the Michael Miller e-mails.
17 Meaning, while we're in litigation,
18 this is your lead whistle blower,
19 your lead witness, there's a fight
20 over documents, all the highlight on
21 the document and after a conversation
22 with you on what he should be doing,
23 in terms of gathering and doing a
24 privilege review, he does a privilege

Page 336

P. DORSETT

1  review and deletes documents.
2  MR. FORD:  I'll tack onto that
3  that there appears to be a ruling
4  from the magistrate judge, the
5  privileged belonged to MintBroker and
6  therefore, since MintBroker did not
7  exist and nobody was there to assert
8  it, that the privilege had been
9  waived.  Therefore, all of those
10 documents are not privileged and
11 should have been produced, rather
12 than being deleted.  So, I just
13 wanted --
14 MS. SUM:  Just to respond to
15 you though, those e-mails were
16 transmitted to us back in April of
17 2022 when we first raised this issue
18 and a what I represented, I believe
19 in writing actually, was that we had
20 received them so to speak via
21 excelon, but they were parked
22 somewhere in the ether, where we
23 couldn't access them.  Pending, us
24 meeting Cooper, and then as you know,

Page 337

P. DORSETT

1  sometime passed and ultimately there
2  wasn't a resolution and we had a
3  court hearing.  The first time that
4  anyone on our end were able to access
5  that -- has been called is 11,000
6  e-mails plus attachments, which was
7  after the magistrate ruled on them.
8  So, we did instruct him to run a
9  search and at the time, it include, I
10 think, we talked about the names of
11 the lawyers at your law firm, the
12 Ford, O'Brien law firms, the names of
13 counsel et cetera.  Also Michael
14 Miller, there was a lawyer, a
15 Bahamian minister, we can certainly
16 go back.  We did not, I want to
17 emphasize, once you run that search,
18 delete those e-mails.  I want to be
19 explicit about at that.
20 MR. ADAM FORD:  Alice, I'm sure
21 that's true.  That's not in question.
22 The issue is that it happened.  The
23 other issue that we raised is that --
24 MR. FORD:  I will say, Ms. Sum

Philip Dorsett
February 28, 2023

Page 338

P. DORSETT

1  and Ms. Johnson, it is not your
2  candor at issue here, it is the
3  candor of the man you put in front of
4  this tribunal.
5
6       MR. ADAM FORD:  The final issue
7  Mr. Dorsett's testimony raises is
8  that his statement that around the
9  time it became known that his
10  e-mails -- that these documents were
11  at issue and that he was hacked and
12  thousands of e-mails were deleted.
13  Can I ask you, were you aware that
14  this hack had happened?  Was this
15  something -- do you know about this?
16      MS. SUM:  My understanding is
17  this happened after April when he
18  already made that transmission to us.
19  The 11,000 was the universe.  When we
20  refer to the is 11,000, that's from
21  that snapshot in time from April of
22  2022, but parked somewhere in the SEC
23  where it was inaccessible for review.
24      MR. FORD:  Okay, I appreciate
25  that.  In any event, I think the

Page 339

P. DORSETT

1
2  issue is that all of this raises is
3  we have significant issues about the
4  fulsomeness and the propriety of
5  Mr. Dorsett's production of document
6  to you and that's why we're going to
7  need -- I mean, had he admitted -- he
8  testified he has lots more documents.
9       MS. SUM:  We were not aware.  I
10  want to make the representation on
11  the record, because guess what, we
12  would have asked for them.
13      MR. FORD:  I'm sure you would
14  have.
15      MS. JOHNSON:  I would point
16  out, this is just voluntary
17  production.  No subpoena.
18      MR. FORD:  But you have
19  represented to the court, right.
20  Again, there have been
21  representations to the court and I
22  think we all believe and agreed that
23  the documents that Mr. Dorsett were
24  all documents in his position, not
25  some random subset.

Page 340

P. DORSETT

1
2       MS. JOHNSON:  I don't think we
3  ever represented that.
4       MR. FORD:  By the way, we're
5  going to have --
6       MS. SUM:  -- we would have
7  asked for it --
8       MR. FORD:  Adam, let me
9  interrupt.  This is all going to go
10  before the judge obviously, if there
11  are objections related to the
12  deposition that need to get on, that
13  was the intent.  Sounds like
14  everybody got them on.  It's been a
15  very long day for the court reporter
16  and I say that if we have some sort
17  of disagreement, we're going to go
18  before the court and that will be
19  excused and call it a night for
20  everybody.
21      MS. JOHNSON:  That we agree on.
22      MS. SUM:  We do need to square
23  away the dates and I did want to
24  raise --
25      MS. JOHNSON:  One thing --

Page 341

P. DORSETT

1
2       MS. SUM:  Do you want to excuse
3  Madam Court Reporter?
4       MS. JOHNSON:  Yes, she can go.
5       (Whereupon, the examination of
6  this witness was concluded at
7  6:07 P.M.)

Philip Dorsett
February 28, 2023

Page 342

```
1        A C K N O W L E D G M E N T
2   STATE OF NEW YORK  )
3                      ) ss.:
4   COUNTY OF          )
5
6     I, PHILIP DORSETT, hereby certify that I
7   have read the transcript of my testimony
8   taken under oath in my deposition of
9   February 28, 2023; that the transcript is a
10  true, complete and correct record of what
11  was asked, answered and said during this
12  deposition, and that the answers on the
13  record as given by me are true and correct.
14
15
16
                    _____
17                  PHILIP DORSETT
18
    Subscribed and sworn to
19  before me this _____ day
    of _____, 2023.
20
    _____
21  NOTARY PUBLIC
22
23
24
25
```

Page 344

```
1        C E R T I F I C A T I O N
2
3     I, VICTORIA SCRO, a Notary Public of
4   the State of New York do hereby certify:
5     That the testimony in the within
6   proceeding was held before me at the
7   aforesaid time and place.
8     That said witness was duly sworn
9   before the commencement of the testimony,
10  and that the testimony was taken
11  stenographically by me, then transcribed
12  under my supervisor, and that the within
13  transcript is a true record of the
14  testimony of said witness.
15    I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, that I am not
18  interested directly or indirectly in the
19  matter in controversy, nor am I in the
20  employ of any of the counsel.
21    IN WITNESS WHEREOF, I have hereunto
22  set my hand this 1st day of March, 2023.
23
24  _____
25          VICTORIA SCRO
```

Page 343

```
1                   INDEX
2
3   EXAMINATION OF      BY            PAGE
4   Philip Dorset     Matthew Ford      6
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 345

```
1   Errata Sheet
2
3   NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL
4   DATE OF DEPOSITION: 02/28/2023
5   NAME OF WITNESS: Philip Dorsett
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page ____ Line _____ Reason _____
11  From _____ to _____
12  Page ____ Line _____ Reason _____
13  From _____ to _____
14  Page ____ Line _____ Reason _____
15  From _____ to _____
16  Page ____ Line _____ Reason _____
17  From _____ to _____
18  Page ____ Line _____ Reason _____
19  From _____ to _____
20  Page ____ Line _____ Reason _____
21  From _____ to _____
22  Page ____ Line _____ Reason _____
23  From _____ to _____
24
25  _____
```

Philip Dorsett
February 28, 2023

```
 1        A C K N O W L E D G M E N T

 2    STATE OF NEW YORK  )

 3                       ) ss.:

 4    COUNTY OF          )

 5

 6      I, PHILIP DORSETT, hereby certify that I

 7    have read the transcript of my testimony

 8    taken under oath in my deposition of

 9    February 28, 2023; that the transcript is a

10    true, complete and correct record of what

11    was asked, answered and said during this

12    deposition, and that the answers on the

13    record as given by me are true and correct.

14    (INCLUSIVE OF ERRATA SHEETS)

15

16                                      MARCH 26, 2023

17                 PHILIP DORSETT

18

19    Subscribed and sworn to
      before me this _____ day
20    of _____, 2023.

21    _____
      NOTARY PUBLIC

22

23

24

25
```

Philip Dorsett
February 28, 2023

1  Errata Sheet

2

3  NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL

4  DATE OF DEPOSITION: 02/28/2023

5  NAME OF WITNESS: Philip Dorsett

6  Reason Codes:

7  1. To clarify the record.

8  2. To conform to the facts.

9  3. To correct transcription errors.

10  Page _11_ Line _15_ Reason _3_

11  From _50 and_ to _15 A_

12  Page _19_ Line _2_ Reason _1_

13  From _read_ to _understAND_

14  Page _24_ Line _21_ Reason _3_

15  From _I didn't_ to _he didn't_

16  Page _26_ Line _17_ Reason _3_

17  From _Intrical_ to _integral_

18  Page _31_ Line _9_ Reason _2_

19  From _remember_ to _don't remember_

20  Page _51_ Line _20_ Reason _1_

21  From _means_ to _seems_

22  Page _58_ Line _18_ Reason _1_

23  From _WAS FROM_ to _MUST HAVE BEEN FROM_

24

25

MARCH 26, 2023

Philip Dorsett
February 28, 2023

1    Errata Sheet

2

3    NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL

4    DATE OF DEPOSITION: 02/28/2023

5    NAME OF WITNESS: Philip Dorsett

6    Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10   Page 63 Line 23 Reason 1

11   From I wrote it to they were my thoughts

12   Page 64 Line 17 Reason 1

13   From I SENT THEM WHAT I SENT THEM, to → WE WENT BACK AND FORTH

14   Page 65 Line 13 Reason 1

15   From I DRAFTED THE to IT WAS MY

16   Page 68 Line 2 Reason 1

17   From DRAFTED to WENT BACK AND FORTH OVER

18   Page 68 Line 5 Reason 1

19   From A MISTAKE to NOT ACCURATE

20   Page 79 Line 10 Reason 1

21   From WAS to MAY HAVE BEEN

22   Page 79 Line 11 Reason 1

23   From PLACE. to PLACE BEFORE I LEFT.

24

25                MARCH 26, 2023

1   Errata Sheet

2

3   NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL

4   DATE OF DEPOSITION: 02/28/2023

5   NAME OF WITNESS: Philip Dorsett

6   Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10  Page _80_ Line _23_ Reason _1_

11  From _DID COME_ to _EVENTUALLY CAME_

12  Page _383_ Line _18_ Reason _1_

13  From _a pop up_ to _the pop up_

14  Page _85_ Line _20_ Reason _1_

15  From _This is_ to _This image is_

16  Page _91_ Line _8_ Reason _1_

17  From _THIS TIME?_ to _THE TIME OF DARVILLES STATEMENT?_

18  Page _103_ Line _23_ Reason _1_

19  From _Documents on_ to _Documents Remaining On_

20  Page _135_ Line _4_ Reason _1_

21  From _Knew they_ to _Knew this when they_

22  Page _139_ Line _17_ Reason _3_

23  From _WEREN'T_ to _WERE_

24

25                 MARCH 26, 2023

Philip Dorsett
February 28, 2023

1   Errata Sheet

2

3   NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL

4   DATE OF DEPOSITION: 02/28/2023

5   NAME OF WITNESS: Philip Dorsett

6   Reason Codes:

7       1. To clarify the record.

8       2. To conform to the facts.

9       3. To correct transcription errors.

10  Page _140_ Line _16_   Reason _1_

11  From _Its a FARCE_ to _It does not REpResent the truth_

12  Page _149_ Line _19_   Reason _1_

13  From _It was the FIRM, BUT_ to _there WAS A FIRM THAT_

14  Page _152_ Line _3_   Reason _3_

15  From _BAHAMIAN_ to _BECOME OUR_

16  Page _153_ Line _16_   Reason _1_

17  From _it is the_ to _SEC is the_

18  Page _159_ Line _13_   Reason _1_

19  From _I did_ to _It IS MINE_

20  Page _159_ Line _16_   Reason _1_

21  From _I DRAFTED THE_ to _It WAS MY_

22  Page _159_ Line _20_   Reason _1_

23  From _THEY MAY OR MAY NOT HAVE_ to → _I CAN'T REMEMBER ALL THE CHANGES WE MADE._

24

25  _MARCH 26, 2023_

Philip Dorsett
February 28, 2023

```
 1   Errata Sheet

 2

 3   NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL

 4   DATE OF DEPOSITION: 02/28/2023

 5   NAME OF WITNESS: Philip Dorsett

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page 168 Line 16   Reason 1

11   From a person      to  Guy Gentile

12   Page 180 Line 2   Reason 2

13   From    2012       to    2015

14   Page 181 Line 23   Reason 3

15   From It's NOT Like to It's Like

16   Page 247 Line 12   Reason 3

17   From    I          to    Guy

18   Page 248 Line 16   Reason 1

19   From APPROACHED    to Didn't APPROACH

20   Page 250 Line 10   Reason 1

21   From Like the      to Like That

22   Page 252 Line 22   Reason 3

23   From    ban        to    blame

24

25                        MARCH 26, 2023
```

Philip Dorsett
February 28, 2023

```
 1  │  Errata Sheet
 2  │
 3  │  NAME OF CASE: SECURITIES AND EXCHANGE COMMISSION -against- MINTBROKER INTERNATIONAL
 4  │  DATE OF DEPOSITION: 02/28/2023
 5  │  NAME OF WITNESS: Philip Dorsett
 6  │  Reason Codes:
 7  │       1. To clarify the record.
 8  │       2. To conform to the facts.
 9  │       3. To correct transcription errors.
10  │  Page 253 Line 7 Reason 3
11  │  From CLAIM          to BLAME
12  │  Page 289 Line 11 Reason 1
13  │  From   AND          to     TO ENSURE
14  │  Page 290 Line 4 Reason 3
15  │  From CONSCIOUS  to  CONSCIENCE
16  │  Page 291 Line 22 Reason 1
17  │  From WHISTLEBLOWER STATUS to  WHISTLEBLOWER CONFIDENTIALITY STATUS
18  │  Page 310 Line 11 Reason 3
19  │  From OVER EIGHT YEARS to    OVER  A  YEAR
20  │  Page 310 Line 25 Reason 2
21  │  From    2017         to   2017 OR EARLIER
22  │  Page ____ Line ____ Reason ____
23  │  From _____ to _____
24  │
25  │                    MARCH  26, 2023
```

**$**

**$1.4**
193:12
**$10,000**
299:17
**$100,000**
302:21
317:11,20
**$2,895**
211:6
**$22,000**
298:3
**$25,000**
152:17
157:2,6,18
**$3.95**
137:24
**$406.15**
211:8

**1**

**1**
27:12 64:25
65:15 79:25
80:4,6,9
110:5 113:25
116:11
126:15
133:11
136:20
137:11
145:21
151:13
156:10
211:10
249:18
253:22
318:13
**10**
6:25 64:25
184:13,24
201:23
202:10
269:13 292:2

**10/1/2016**
130:18
**10/4/2016**
143:7
**102**
177:12,14,17
**10C**
110:19
**10k**
304:16
**11**
65:2 279:24
280:16
**11,000**
337:6
338:19,20
**11:47**
233:8 236:8
**12**
116:5 172:13
186:6 267:7,
16
**12:30**
106:22,23
**12th**
272:21
**13**
65:25 298:21
**13.37**
211:10
**14**
276:16 300:7
**14th**
123:24
**15**
6:25 268:3
292:4 302:6
304:4
**15,000**
55:25 103:19
226:12
246:24
306:8,20
307:3
**15-**
11:5

**15-A6**
47:25
**15-minute**
212:18
**152**
177:13
**15A-6**
11:9 31:13,
17 32:12,17
33:4,7 34:3,
10 40:14,17,
20,24 46:21
47:10,14,17
48:4 108:9
**16**
68:6 72:15
296:16
314:10
319:23
**17**
189:17 197:7
318:11
**1746**
71:25 72:6
127:4 159:23
160:7
**17CFR**
108:9
**17th**
76:10
**18**
208:2
**19**
244:25
**1934**
32:18
**1st**
109:22
314:24

**2**

**2**
158:23
210:4,5
**20**
34:8 35:10

**49:3 52:19**
55:24 60:8
64:3,20 69:4
75:20 125:9
182:19
241:10 251:7
277:10 284:2
**200.83**
189:18
**2001**
148:6,9
**2008**
27:12
**2010**
267:24
**2011**
7:21 11:18
18:22 20:4
39:14 49:7
52:21 54:15
69:6,11
148:10
149:16 150:5
151:3 153:19
154:9 180:11
245:17 292:4
308:21
**2012**
11:22 12:6
24:18,23
39:10 51:4,
11 58:16
69:6 72:17
73:10,18
74:5 116:4
173:22
174:6,12,16
178:15,19
179:4,13,22
180:2,6,10,
13,22 181:4,
12 308:21
309:5,6,19,
21
**2013**
30:19 35:10
37:4 38:23
179:8

Philip Dorsett
February 28, 2023

180:21,23
181:5,13
183:4 211:4,
6,7,8,10
265:2 267:7,
16 268:11
293:24
**2014**
62:12,14
103:8 109:22
110:5 115:4,
16 116:4,6,
14,23 120:16
179:8 183:5
184:13,14,
16,18,24
185:9,23
208:2 225:12
230:6,10,16
231:17 233:8
236:7 238:3
240:2 269:13
272:5 275:16
293:25
**2015**
42:24 46:7
116:6 118:18
132:4 172:13
173:22
174:7,12,17
179:5,14,23
180:7,13,17
184:13
186:6,14
188:7 189:4
197:8 276:16
277:10
295:18
296:16,24
297:8
**2016**
89:15 114:16
117:6,7
118:3 120:2
125:9,16,21
126:5,17
128:7,15,23
129:7 131:24

132:2 133:11
134:6,14
136:16,20
137:11 143:9
175:10
178:15,20
182:20
184:11
201:23
202:11
205:10
209:3,6
211:17,22
249:18
250:21
251:23
253:22 257:9
261:19
279:24
280:16 284:2
310:10
313:25
**2017**
7:23 18:22,
23 114:16
115:4,16
116:15 118:3
120:2 126:17
130:16
157:23
158:10,19,21
160:12,16
161:10
162:14,24
163:15
285:14
290:13 300:9
304:6 305:3,
6,22 306:3
310:25
314:24
315:6,13
316:2 318:13
**2018**
192:15,23
287:3
**2019**
210:4,6

**2020**
63:19 64:3,
25 65:25
71:16 130:2
143:15,19
145:22
**2022**
64:21 159:2,
5 336:18
338:22
**20th**
76:10
**21**
49:6 210:2
**21100**
267:24
**22**
23:20 52:20
54:15 114:14
117:16
126:16
211:3,6
**2270**
154:3
**22A**
26:24 27:10
**23**
29:21 69:23
75:18 80:12,
17 114:2
260:20 262:7
270:13
**24**
34:18
270:11,20
275:16
**248.15A-6A1**
108:10
**24th**
275:14
**25,000**
123:14
152:23
156:20
**26**
37:2

**27**
211:7
**27th**
159:4
**28**
37:4 71:25
72:5 127:4
159:23 160:7
211:8 296:24
297:8
**29**
41:14 137:16

---

**3**

**3**
80:7 201:21
230:6,10,16
240:17
247:23 252:3
311:15
**3.95**
141:5
**30**
41:14 51:24
124:8 157:21
**30,000**
59:3
**31**
300:8 304:6
305:3
**31st**
305:6 315:6
316:2
**32**
269:11
**33**
271:18 272:2
**34**
273:11
**35**
274:15
275:8,10
**36**
276:15
**3695**
320:2

Philip Dorsett
February 28, 2023

**38**
  154:3
**39**
  149:3 152:15
**392**
  211:11
**3:00**
  253:12
**3:10**
  212:19
**3rd**
  250:20

---

**4**

**4**
  14:5 130:15
  218:11 219:6
  221:11 227:5
  238:14
**40**
  192:2
  207:17,20
**404**
  130:22 131:5
**44**
  83:5 84:2
  239:13,19,21
**45**
  7:12
**46**
  115:21
**48**
  62:10 100:23
**49**
  130:13
  168:19
**4:15**
  256:21

---

**5**

**5**
  14:5 19:15
  162:9
  192:15,23

  272:5
**50**
  11:15 122:23
  128:20
**51**
  50:8 132:18
**52**
  140:19
**5:45**
  322:9

---

**6**

**6**
  42:24 71:13
  77:20,24
  82:8 86:7
  145:21,22
  163:18,21
  287:3 290:12
**6/17/2015**
  296:23
**60k**
  304:16
**69**
  172:10 175:7
**6:00**
  322:13
**6:07**
  341:7

---

**7**

**7**
  92:3 115:21
  182:17
  245:17
  285:14
**7.78**
  211:11
**70**
  87:11 189:14
**70-something**
  87:11
**71**
  194:12

**72**
  196:10
**73**
  63:25
**74**
  248:21,25
  278:16
**75**
  282:25
  283:15
**77**
  285:12
**78**
  286:24

---

**8**

**8**
  46:7 162:11
  231:17 233:7
  241:21 257:9
**8/3**
  71:9
**8/6/2015**
  297:5
**8th**
  236:7

---

**9**

**9**
  188:7 295:18
**90**
  92:23
**917-292-1425**
  285:17
**9203**
  172:14
**93**
  96:17
**95**
  78:10
**96**
  82:9
**98**
  163:25

**99**
  224:4

---

**A**

**abetted**
  267:25
**abetting**
  277:13
**abide**
  107:22
  187:20
**abided**
  87:17,19
**ability**
  13:12 108:16
  320:10
**able**
  12:8 28:6
  49:24 66:4
  84:10 91:18
  213:14,20
  218:17
  222:10 223:4
  246:13 248:7
  257:17 258:6
  308:2 320:4
  337:5
**above**
  25:10 84:24
  142:18 143:2
  186:24
  202:21
  210:25
  277:2,7
**absence**
  199:19 200:4
**absolutely**
  328:13
**Abuse**
  245:5
**accept**
  48:7 50:12
  78:25 110:20
  124:4 247:3
  276:22

**acceptable**
 220:24
**accepting**
 20:11 21:22
 53:23,24
**accepts**
 113:7
**access**
 59:14 66:4
 69:17,19
 80:21 81:5
 83:7,15
 84:19,25
 85:10 89:21
 238:20,23
 240:3 246:14
 293:20,24
 294:3,8,10
 313:11
 316:11
 336:24 337:5
**accessed**
 79:8
**accompany**
 199:10
**accordance**
 135:21
**account**
 33:20,21
 36:16 39:24
 41:7 49:8,
 13,21,24
 81:20 114:18
 120:21 149:9
 152:18,23
 156:21
 157:2,3
 166:20
 173:10
 192:17
 205:15
 210:25
 211:2,5,24
 242:11
 247:12 249:9
 283:14,17
 294:5 296:15
 297:5,9,11,

 18,20,23
 298:2
**accounts**
 33:15 37:24
 38:20 73:9
 78:16 112:3,
 11 118:16
 119:7 120:8
 134:22
 157:17 193:2
**accurate**
 8:12,22
 11:19 12:6,
 12 16:15,19,
 21,23 19:6,7
 20:4,13
 21:25 25:2
 47:25 48:15
 58:16 67:24
 68:7,10,16,
 20 69:9
 158:13,16
 162:16
 200:15
 235:25
 256:12
**accuse**
 209:12
**accusing**
 208:15
**acknowledge**
 82:17 86:15
**acknowledged**
 59:6
**acknowledgeme
nt**
 51:25 55:6
 58:15 76:24
 77:17 79:23
 81:10
**acknowledgmen
t**
 11:25 24:25
 39:8,13
 50:17,19
 51:3 54:20
 57:19,22
 58:2,8

 254:17 255:5
**acquiring**
 297:24
**acronym**
 154:19
**across**
 224:11
**act**
 32:18 46:20
 47:10,16,19
 108:9 197:4
 245:5
**acting**
 47:13 173:21
 174:7 269:4
 285:21
 290:15
**action**
 78:3 173:13,
 16 201:11
 240:22 241:7
 267:19
 272:23
 276:25
 277:11,17
 289:4 296:20
 304:21
 305:15 307:4
**active**
 254:20
**actively**
 41:5 69:21
 276:7 300:3
**activities**
 28:2 32:22,
 23 179:3
**actual**
 71:12 75:6
 118:15
 234:6,7
 270:20 271:8
 294:5 306:14
 308:3
**ad**
 98:2 195:3
**Adam**
 149:2 212:22

 213:23
 214:4,6,11,
 18,24 221:7
 231:13,14
 235:5 237:10
 260:10,21
 261:4,10,15
 262:2,16,20
 265:15 267:8
 269:12
 270:20
 276:16,17
 278:10
 330:22
 332:17
 333:18
 334:17,23
 337:21 338:6
 340:8
**add**
 8:23 94:22
 95:3
**added**
 132:8
**addition**
 20:20 33:11
 243:4 277:4
**additional**
 71:7 191:4,
 10 202:15
 203:25
 211:12
 215:5,10
 322:19
**Additionally**
 169:12
 258:18
**address**
 6:10 23:23
 45:7,13,14
 79:7 80:21
 81:4 83:15
 84:20,22
 86:12
 124:14,15
 165:11
 196:17 240:3

addressed
  169:14
  189:22 197:7
  210:6
addresses
  59:16 318:14
adhere
  187:3
adjust
  128:16
adjustment
  297:3,17
admitted
  339:7
admonition
  96:19 97:2
  98:2
ads
  96:7
adversaries
  329:25
advertise
  36:13,22
  40:13,23
  41:2 74:18
  95:16 112:11
  117:22 120:4
  126:23
advertised
  94:16
advertisement
  86:23 93:3
  97:16 98:12
  110:24
advertisement
s
  73:7 74:24
  94:10
advertising
  35:22 36:24
  74:13,16,21
  75:4,6,10,
  12,14,16
  86:18 100:14
  110:19
  131:2,19

advice
  44:11 45:3,
  24 47:24
  48:4,5,8,12,
  16,21
advise
  27:9 43:17
  44:21,25
  187:4 268:18
  330:15 333:7
advised
  131:2,18
  186:25 188:8
  244:3 267:17
advisory
  111:20
affairs
  110:3
affidavit
  14:19 15:12,
  17,18 19:15
  63:18,22
  65:12,13
  66:12,20
  68:8 71:12
  80:11 114:14
  130:2
  143:15,19
  145:23
  156:24
  158:25
  159:9,12,15,
  16,18 160:8
  162:10 219:8
  225:17 226:6
  227:18
  230:24
  231:3,6,9,25
  234:7 236:8,
  16 269:19
  270:3 271:13
  323:20
  333:10
affidavit.
docx
  232:10
affidavits
  213:5 215:3

  330:12 331:2
  334:4
affiliate
  60:25 61:6,
  20 63:5
  91:10,15,17,
  22,25 97:15
  100:13
  115:5,11,13
  116:14,23
  119:20
  121:4,17
  122:17
  127:10
  133:5,8
affiliated
  92:20 123:6
affiliates
  31:2 60:22
  61:4,11
  75:5,9 91:13
  92:12 94:22
  95:19 97:20,
  25 98:7,9,18
  100:17
  102:23
  103:5,12
  104:23
  105:5,7,14
  110:23
  111:14 115:8
  117:12
  118:10,13
  120:22
  127:15 135:3
  139:19
  143:12
  181:20
  258:20
  259:3,6
affiliation
  204:8 258:11
affirm
  55:9
afraid
  328:25
afternoon
  144:24,25

  273:15
afterwards
  152:8
age
  119:11
agencies
  109:2
agency
  155:12
agent
  102:14
  105:19 106:7
  107:22 108:7
  110:24
  111:11
  112:19,25
  113:3,4,7,8,
  12 133:15
  137:23
  138:7,18
  141:4
  273:21,23
agent's
  111:15
  135:16
agents
  110:21
  135:19
  174:19,21
  176:10 177:5
  273:22
agents'
  112:20
ago
  43:16 44:4,
  19 51:24
  68:18 85:18
  129:6 155:9
  157:11
  293:25
  312:19
agree
  70:24 137:22
  140:25 141:3
  199:24
  292:15 328:3
  340:21

Philip Dorsett
February 28, 2023

agreed
  67:18 142:22
  157:15
  339:22
agreement
  11:25 25:2
  33:22 39:9,
  13 50:15,18,
  20 51:3,25
  55:6 57:19,
  22 58:3,9,15
  62:17 63:5
  67:17 69:5
  70:2,24 74:4
  76:24 77:17
  78:25 79:23
  81:10 91:17,
  25 100:25
  102:10,21
  103:4,5
  104:18,25
  105:2 106:4
  107:16
  108:14,18
  110:6 113:2
  129:17
  132:21
  133:7,22
  134:2 135:13
  137:8 138:18
  139:10
  140:12 142:4
  143:20,24
  254:17 255:5
  292:6,13,23
  304:21
agreements
  61:19 91:11,
  23 103:11,14
  133:5,8
  135:6 139:7
  165:25
  258:20 259:2
agrees
  108:8 111:11
  112:19
  135:15,19
  232:4 234:18

235:21
ahead
  32:6 148:13
  239:7 252:14
  327:24
  328:12
Ahmad
  52:23 54:14,
  16
Ahmad's
  52:20
aided
  267:25
aiding
  277:13
aimed
  87:15
Albert
  204:9,16
  205:6 206:9
  208:7
Alex
  122:25
Alice
  212:24 214:6
  330:22
  337:21
Alise
  212:24
alleged
  208:19
alleges
  193:6 208:7
allow
  17:23 52:14
  70:11 73:12
  125:22,23
  136:12 180:3
  195:24 216:5
  228:18 248:3
  299:18
  302:13 303:7
  309:13
allowed
  70:18 86:16
  109:19
  112:10

134:25
  204:15
  330:18
allowing
  297:23
altering
  199:6
America
  27:20 32:9
  33:14 34:2
  37:23 38:2,5
  55:8,9
  102:13 104:9
  105:18,21
  106:6,11
  107:25
  108:2,12
  110:22
  111:3,4,14
  112:2,21
  113:3,4,10
  133:14,17
  135:15,19
  137:21
  138:5,17,19
  139:3 140:24
  141:3 173:25
  174:9 181:8
  186:23 188:8
  190:12
  194:20
  196:17
  197:18
  201:13
  202:18
  210:5,20
  211:2 220:23
  261:13
  267:25
  295:16
  300:14 311:9
  312:23
America's
  108:15,16
  110:22 113:5
  190:5
American
  39:22 55:12

Americas
  197:5
amount
  150:17,19
  211:10
  299:17
  317:11
and/or
  188:14 200:6
Ands
  299:3
annotation
  238:8,11
annually
  182:25
answer
  9:2 12:19,22
  13:4,8,12
  14:2 15:23
  21:2,5 22:7,
  9 23:5,9,11
  81:24 86:11,
  21 87:3,10,
  18,22,25
  88:5,17,21
  89:25 90:5,
  15,19 93:14
  99:2 100:22
  109:5,18
  115:18 116:4
  128:19
  139:21
  164:5,11
  165:6,12,17,
  23 178:11
  182:24
  183:4,8,12,
  16 209:20
  219:20
  220:11
  228:19
  246:12
  262:3,5
  263:15 318:4
answered
  17:24 29:20
  48:18 161:24

answering
13:24 23:15
28:21 52:15
70:12,18
109:19
136:13,15
137:14 229:2
309:14
answers
13:18 22:22
50:22 78:19
219:12
anticipate
322:7
Antonio
41:22 42:6
45:14 46:12
298:21
299:4,24
304:13 315:7
317:2
anybody
60:4 61:14
78:21 103:25
144:17
185:18
225:15,22
257:4 262:8
278:5,7
anyone
319:5 337:5
apart
87:5
apartment
179:20
apologize
65:3
apparently
301:22
appeals
123:13,15
appeared
38:18 79:6
83:14
appears
25:5 34:7
56:12 101:9

188:4 191:8
193:18,23
194:3,5
197:17
270:14 336:4
applicable
108:2
application
50:21 69:6
87:4,5
114:17
applications
54:3,6
119:6,21
applied
153:2
applies
142:5 152:22
323:20
apply
153:20
157:17
292:24
appointment
303:19
appreciate
13:23 15:22
259:14
265:25
266:14 280:3
329:23 330:4
332:17
333:15
338:24
approach
27:24
approached
248:16
appropriate
59:6 111:2
201:7 273:5
292:22
328:25
approval
111:2 167:23
168:11
189:20

approved
243:10
approximately
7:19 173:22
243:23
257:11 298:3
313:12
April
210:4,5
211:10
249:18
253:22 257:9
276:16
277:10
279:24
280:16 284:2
336:17
338:17,21
Arce
190:16
area
192:5 207:21
argue
287:13
290:8,14
332:22
argued
177:5
arguing
177:8
argument
265:16
arguments
259:11
266:13,19
333:4
Army
210:11
around
12:2,3 30:18
39:11 51:11
58:16 62:14
72:16 118:14
136:20,22
140:4 147:9,
17 186:12,15
265:3

310:22,25
338:8
arrangement
123:15
arrest
176:6,17,20
177:23
arrested
177:19,21
178:10,13,
14,17
article
25:6 26:4,8,
10,15 27:23
174:3,4
185:14
Arxis
254:3
asked
21:2,6 22:19
27:6,9
28:20,23
29:12,16
48:22 95:25
115:17
138:12
159:22
161:23
171:22
185:15 190:8
214:9 223:11
225:25
227:7,9,10,
16 253:11
256:14,16
263:24
294:17
308:21
319:18
321:16
339:12 340:7
asking
6:17 9:3
12:16 18:15,
17 21:10
22:4 23:14
40:10 44:16,
17 74:2,3

Philip Dorsett
February 28, 2023

85:22 94:14
95:24 97:23
110:4 114:18
115:15
120:11,12
121:9,11
122:6,7
134:15
137:3,7,10,
13 142:7
146:20 150:3
159:23 168:6
170:3 171:17
177:10 178:8
191:4,8
198:13 205:5
207:6 208:23
209:2,3
218:12 225:4
236:13
237:15,17
241:2 243:15
252:8 257:24
258:2,5,8,25
259:21
261:23 285:5
307:2 309:16
320:7,8
321:18
326:14
**aspects**
150:13 280:4
**assert**
336:8
**assessment**
181:25
**assigned**
298:10,17
**assist**
205:7
**assistant**
175:17
185:20
**assisting**
185:9 287:14
290:8
**associated**
173:6 247:12

279:16
**Association**
154:19
**assume**
145:18 171:8
268:15
**assuming**
139:4 172:18
**attach**
243:20
**attached**
24:10 25:23
27:11 41:25
54:24 65:4
80:11 111:17
117:3,5
187:7 196:16
230:5,13
231:24 234:2
237:13
254:17
259:9,16
260:8 266:3,
10 269:17
271:23
**attaching**
226:5 236:8
254:2 292:5
**attachment**
31:13,25
32:7 35:20
36:2 42:23
230:18,20
234:11
236:13
262:15
271:2,3
**attachments**
54:19 253:19
269:25
271:8,9,10
337:7
**attaining**
279:5
**attempt**
197:18
199:22 200:7
329:4

**attempted**
80:21 81:4
83:15 84:19
238:23 240:3
**attempting**
280:22 301:7
331:13,21
**attended**
316:22
**attention**
123:11
288:17 297:9
**attested**
116:17 127:4
129:24
**attorney**
59:19
169:15,19
171:4 175:15
188:14
194:14
196:23
209:13
222:7,11,16,
17,22,24
223:2,5,9,
15,18,21,22,
24 224:3,25
244:3 261:16
262:20
263:11,13,
19,20 264:5
319:6
**attorney's**
177:3 178:21
184:9,15
185:2 186:9
207:11
212:11
**attorney/**
**client**
263:7
**attorneys**
159:14,17
175:18
176:18
185:20,23
223:7 224:5,

7 272:12
276:6 329:22
**audio**
77:20,23
**August**
7:23 64:3,20
114:16
115:4,16
118:3 120:2
126:17
128:23
158:10,18,21
160:12,18
179:4,13,22
180:6,22
181:12
184:15 185:9
197:7 272:5
305:22,24
306:3,5
314:24
315:13,15
318:13
**authenticity**
15:5
**authored**
297:16
**authorities**
170:25
**authority**
198:2,15
199:9,20,22
200:5,6
201:4
220:20,21
258:15
**authorization**
282:7
**authorize**
168:23
**authorized**
111:22
320:18
**available**
273:15
274:18 280:5
312:17

Philip Dorsett
February 28, 2023

avoid
  146:3 157:4
aware
  27:18 38:8,
  13,17,21
  79:5,17
  89:11,19
  97:14,18,23,
  24 98:4,6,
  10,14,16
  100:2,5,6,7,
  10,11,12
  116:24
  121:12,15,18
  122:8,17,20
  126:8 146:8
  148:4 150:12
  165:22,23
  166:6 167:15
  173:20 174:6
  176:14,22
  178:16
  184:23 185:6
  208:17
  211:19,23
  212:2,4
  240:20,24,25
  241:2,4
  243:9 266:21
  273:7 275:2
  285:19 288:9
  289:4 313:3,
  6,20 338:13
  339:9
awful
  329:12

B

back
  15:19 16:2
  32:15 37:20
  60:12 64:19
  68:14 71:3
  79:24,25
  80:4 82:7
  86:6 90:9
  96:12 101:3

102:8 104:17
113:25
116:11
117:13 119:8
126:14 127:2
140:9,20
145:2 151:12
152:14 155:7
156:9
160:10,20
161:7 177:16
182:15
197:15
210:23
212:19
215:22
226:15 232:5
234:19 236:5
238:13
240:17
244:24 246:9
247:23
253:9,16
256:21
258:12 262:6
264:7 265:23
278:15
280:13 286:4
291:25
293:24
296:10
306:13
307:18
308:23 309:9
310:3 311:14
319:23
330:14,20
336:17
337:17
backed
  309:18,23
  313:19,25
  314:8
Bahamas
  6:12 20:8
  39:24 72:19
  145:24 146:2
  151:9 167:25

168:5,10
178:24
179:6,13,17
187:2 188:3,
15,17 190:8,
18,22 191:6
195:23
196:18
199:12,13
201:14,17
222:21 224:4
242:19
255:20
278:18 299:6
300:10
303:20
314:22
Bahamian
  8:17 9:9
  19:5 26:21
  27:3 93:10,
  11 94:3,4
  152:3 167:8
  168:8 169:6
  170:20,24
  171:11
  186:25
  187:3,10,17
  191:22
  195:18,19
  199:17,22
  200:7,21,25
  201:5 255:17
  258:15
  282:2,4,6
  306:18
  337:16
ban
  252:22
banks
  299:5
banner
  86:5 95:15
  96:5 131:13
banners
  130:23
  134:20

Barrato
  46:17
base
  118:7
based
  69:14 89:24
  117:18,19
  118:11 119:5
  120:8
  151:15,22
  152:12
  155:21
  201:11 222:9
  238:20,22
  240:2 259:4
  265:4 316:6
basically
  68:3 75:5,10
  88:5 135:3
  321:21
basis
  55:13 137:20
  140:23 242:4
bates
  30:5,7
  55:16,19,23
  56:5,7,13,
  15,16 107:4
  245:23
beat
  152:2
  277:20,24
began
  20:3 248:12
beginning
  7:22 19:8
  39:17 54:4
  58:18 61:4,
  22,25 62:8,
  13 75:4
  95:12 103:10
  105:6,12
  167:14 295:8
  308:18
behalf
  63:22 94:11
  98:12 100:14
  112:8 113:18

Philip Dorsett
February 28, 2023

118:5 173:23
176:18 197:4
207:10 260:3
264:9,15,18
285:21
294:20,22,25
295:4
**behavior**
301:10 332:8
**belief**
103:3 115:3
242:4
**believe**
21:13,23
29:11 97:9
116:6,12
120:2 183:17
185:19
194:20 201:2
204:5 206:25
208:20
213:25 215:9
242:2 305:7
330:10,13
336:19
339:22
**believed**
47:13
**bell**
246:20
286:17
**belonged**
250:10 336:6
**belonging**
244:20
**below**
33:25 34:6
123:21
130:22
132:10 187:8
190:13
**Beneby**
292:4,7
**benefit**
6:21 7:8
45:9 325:10
**benefits**

302:18 303:8
**best**
13:12 73:25
113:8 183:16
203:13
251:19
**better**
107:2 192:22
273:16
**big**
38:15,25
109:24
264:25
**bigger**
61:17 124:24
**billing**
124:14
**Birmingham**
193:9
**bit**
7:4 15:10
36:7 47:6
67:4 82:21
84:5 106:18
129:10
153:13
179:16
252:10
273:14
292:14
307:15
**black**
178:5
**blah**
276:18
**blame**
236:19
**block**
93:4 270:14
284:15
**blocker**
79:6,17
80:20 81:3
82:12,24
83:6,14,18,
19 84:18
85:19 86:2

89:20 238:24
240:4
**blocking**
284:22
**blog**
93:8
**Bloomberg**
174:4
**Bloomfield**
193:7
**blower**
291:14
335:19
**blue**
232:20
**board**
286:9
**Bob**
49:7,12
50:5,9
53:11,12
**body**
198:7,11
**borrow**
299:16,17
**borrowing**
299:5
**bottom**
15:25 57:17
101:8,15,22
102:3 107:5,
8,10,13
110:14,16
141:20
160:25
163:25
210:15
221:20,23
231:12
237:7,24
247:24
248:24 271:9
298:24
**bought**
179:19,20
**Boulevard**
6:11

**bound**
195:20,22
**bounds**
265:17
**box**
22:7 178:5
**breach**
164:15
188:10
189:11
**break**
6:25 7:2
56:21 58:19
60:3 106:21
144:9,11,13,
18 145:3,7
169:6 170:20
187:6 209:24
212:18
213:14
256:20
257:2,5
322:4,12
**breakdown**
306:15
**breaking**
96:11
**breaks**
6:24 7:8,13,
14 56:20
**Breeze**
6:11
**Brickman**
46:17
**brief**
164:6 253:12
275:25
**briefing**
272:25
322:22
**bring**
198:15
204:25
277:11 323:5
**bringing**
59:12 119:4
198:19

261:21
**broker**
  10:20 11:3,
  13 16:11
  17:4,12 24:3
  25:7,11
  27:13 28:3
  32:20,21
  39:22 72:23
  99:3,20
  145:24
  168:10 192:5
  198:3 207:21
  282:4,6
  320:18
  321:18
**brokerage**
  34:15 36:10
  39:20 40:5
  111:19
  113:5,9,10
  178:23
**brokers**
  99:14,15
  320:23 321:2
**brother**
  314:13
  315:18,25
  316:5
  319:12,24
**brought**
  15:7 75:7,13
  105:9 240:23
  263:22
  267:19
  288:17
  296:19 297:9
**BSI**
  46:17
**build**
  311:2
**built**
  109:9 311:2
**bullet**
  93:25
**bullshit**
  318:20

**bunch**
  310:17,18
**burden**
  299:9
**Bureau**
  173:23 181:7
**buried**
  311:8
**business**
  41:6 43:9
  49:23 111:23
  113:13
  125:11,17,20
  149:6,10,24
  150:7 155:17
  164:12
  178:25 179:6
  181:24
  190:15 208:7
  268:2
**buying**
  296:24
  297:17

---

### C

**C.F.R.**
  189:17
**Cadwalader**
  27:16 29:8
**Cafe**
  194:17
  202:23 203:6
  204:9,21
  205:8,15
  208:10
  210:12,25
  211:18,24
  212:13
  243:17
**call**
  36:16
  253:12,13
  273:4,17
  274:19
  275:25
  314:20

327:16
  340:19
**called**
  6:2 11:5
  154:14,17
  155:17
  201:21 202:9
  208:9 245:4
  337:6
**calls**
  176:7
  179:23,25
  180:8,10,13,
  16,24 181:2,
  4
**Cameron**
  122:25
  123:6,19
  124:7 129:12
  130:15 132:7
  142:17
**candor**
  338:3,4
**captioned**
  277:2,7
**Cara**
  107:6
  148:13,22
  153:25
**card**
  301:15
**careful**
  100:17 286:2
**carefully**
  15:13
**Carla**
  42:2,4 44:14
  46:13
**carried**
  225:12
**carry**
  207:4
**cary**
  67:19
**case**
  7:25 19:16,
  19 59:20

81:7 158:18
  159:2 160:15
  161:16
  169:10 177:9
  241:16
  259:24
  273:22
  286:11
  288:5,8,19,
  20 307:12
  312:25 333:4
**cases**
  94:25 95:4
  288:15,18
  289:8
**cash**
  296:20
**casted**
  333:17
**catch**
  197:12
**categoric**
  162:4
**categorically**
  134:21
  139:17
**caused**
  310:14
**causing**
  147:6 229:17
**cautious**
  169:5 286:22
**CC**
  31:24 46:12
  54:11
**CCED**
  45:17 257:10
**CCING**
  29:24 196:12
**CCS**
  318:14
**cease**
  201:8
**cement**
  169:10
**Centerpoint**
  99:11,13

Philip Dorsett
February 28, 2023

CEO
  26:3,12 28:9
  32:2
certain
  19:8 32:21
  102:16
  105:20
  133:16
  150:17
  151:22
  197:19 207:3
  224:9 307:7,
  22 308:16
certainly
  9:15 15:14,
  16 17:5
  18:23 31:10
  32:4 38:13
  43:24 44:12
  77:13 83:17
  118:9 119:2,
  6 139:13
  143:12 155:7
  156:7 240:25
  241:18 243:4
  334:10
  337:16
certify
  85:3
cetera
  184:20
  337:14
CFAA
  245:5
chain
  49:11 249:17
chaker.jpg
  54:21
challenge
  162:23
  224:15
chance
  123:21
change
  67:23 108:14
  124:20
  331:22

changed
  68:9 128:14
changes
  65:5 68:4
  109:13 128:8
characterizat
ion
  266:8 293:13
  332:20
  333:16
characterize
  214:12
charge
  61:10 89:15
  92:14,18
  292:11
charged
  192:25
  205:21
  206:15,19
  208:19 209:7
charges
  192:4,16
  207:20
charms
  189:7
chat
  30:10
Chaudhry
  260:11
check
  160:19
  163:16
  306:6,15
  313:23 314:3
  318:25
  332:14 333:6
checked
  35:3
checks
  24:8
chief
  8:10,15
  10:23 17:25
  18:5,18,21
  19:4,25
  26:2,13 27:5

32:3 43:2
44:6,19,23
76:21 83:12
88:14,19
90:11,17,24
91:4 97:13
101:24
108:20 109:7
114:9 122:15
125:7 131:24
132:2 133:21
134:6 143:8
155:15
166:11,16
168:7 186:22
195:17
200:13
202:17 204:3
210:17
222:20
227:13
234:25
235:23
252:18 253:7
269:20
273:18,20
277:16 279:6
282:3 298:13
317:21
chose
  289:13
Chris
  190:16
  273:19
Christopher
  193:8
circumstances
  164:9 177:22
  317:9
circumvent
  73:2
citation
  201:7
citizen
  39:23 49:22
  93:24
citizens
  10:19 33:16

37:25 38:20
78:16 93:13,
17,18,21
112:4,12
civic
  179:2
civil
  195:5 197:20
  216:17 245:8
claim
  73:12 156:24
  253:7
claimed
  233:22
claiming
  73:4
clarification
  13:9 138:12
clarify
  8:25 307:9
  313:14
  320:12
clause
  157:22
clean
  322:6
clear
  7:24 26:25
  38:16 48:20
  58:7 62:11
  88:6 93:9
  150:22
  170:10
  199:19 200:4
  249:19
  332:19
cleared
  321:12
clearer
  239:23
clearing
  321:5,7,9,
  15,17,19,20
Clearly
  122:11
click
  26:18 85:10

93:2
**clicked**
  25:22,25
  26:5,11
**client**
  50:16,20
  54:3,5 55:11
  85:2 99:11
  118:15
  119:5,7
  120:8 138:7
  146:17 155:4
  169:13,17,19
  170:4,23
  188:3
  191:11,13,
  16,19,20
  197:7 199:5
  201:9 211:5,
  7,8,9 244:6,
  9,17,18
  248:17
  249:21
  250:2,5
  254:15
  255:4,19
  256:15
  267:20 268:6
  293:5
  294:20,22,25
  295:4,13
  301:2 330:24
**client's**
  190:13
  296:16,25
  321:23
**clients**
  20:12 21:23
  24:7 38:3,6,
  11 41:5
  53:23,24
  76:6 78:24
  79:21 82:6
  84:23 86:24
  87:23 98:18
  100:20
  117:2,6
  118:11 119:5

120:9,21
124:3
139:15,16,
18,19 146:25
147:3 172:23
181:21
202:24 203:7
204:21 205:8
249:24
252:22 256:3
259:7 293:6
294:6,7,8
321:22
**close**
  286:22
**closed**
  211:3 212:7,
  8
**co-marketing**
  137:21
  140:11,24
**coaching**
  329:12
**cocounsel**
  216:3,23
  217:7,18
  219:5
**cocounsel's**
  217:4
**code**
  85:2,10
  124:4
**coded**
  308:8
**codes**
  308:16
  310:17
**coding**
  311:4,7
**collar**
  273:25
**colleague**
  77:22
**colleagues**
  35:3,4
**collect**
  316:24

**Collie**
  41:22 42:6
  45:15 46:12
  88:6 90:8
  288:23
  298:22
  299:24 315:7
  317:2
**colloquy**
  330:6
**combined**
  155:12
**come**
  9:16 39:9
  62:5 69:10
  77:4 79:9
  80:23 82:16
  86:13 96:12
  114:10 124:3
  151:10,25
  156:16 165:4
  177:16
  182:15
  188:13
  212:19
  238:24
  244:23
  255:20
  256:8,21
  263:6 282:21
**comes**
  98:15 137:13
  178:19
**Comission**
  192:13
**commencement**
  34:21 276:24
**comment**
  236:14 252:5
**commentary**
  252:8
**comments**
  67:23
**commission**
  16:9 27:25
  32:11 92:6
  108:6
  124:13,21

135:21
137:23
138:20 141:5
163:12
167:4,24
168:5 171:12
174:8 176:12
182:12,20
184:4 185:3,
23 186:8
188:15
189:4,25
190:17,22
191:6,11
192:24
194:25
201:3,16
202:10
242:19
248:13,16
250:24
303:11
304:25
**commission's**
  327:14
**Commissions**
  104:8 203:19
**commitment**
  301:8
**committed**
  184:19
  300:21
  331:15
**committing**
  208:16
**common**
  18:2
**communicate**
  300:24
**communicating**
  66:8 300:3
**communication**
  240:11
  291:2,11
  311:18
**communications**
  61:14 243:25

312:12
335:8,12,15
**community**
113:14 129:2
179:2
**companies**
138:2 141:7
**company**
26:3,12
39:15 51:17
52:4 53:21
87:17,21
90:6 92:20
127:18
155:17
162:2,19
164:3,13,21
165:16,18
166:2,7,13,
15 167:7
173:5,6
187:2
193:19,21,
24,25 194:4,
6 195:18,20,
24 198:25
199:23
200:7,14,20
201:5 208:9
234:24
235:24 239:5
240:11
284:17,25
285:7
292:18,22
300:21
301:6,16
303:12
308:11
317:21 321:6
**company's**
312:13
**compel**
201:10
**compelled**
242:21
**compensate**
134:8

**compensated**
135:9,11
**compensation**
124:18
135:14,18
136:3 137:19
140:10,22
**complained**
125:12
**complaint**
202:16
203:12,13
204:2 208:4,
25 209:8
211:17,22
240:18
251:11,15,22
252:24
257:12
**complaints**
201:22 202:9
208:15
**complete**
22:22 29:13
50:17 89:3
224:15
299:18
**completed**
22:16 50:21
67:11
**completely**
218:4
**completing**
109:17
**compliance**
8:11,16
10:23 17:25
18:5,18,22
19:4,25
26:2,13 27:5
32:3,10 34:3
43:2 44:6,
20,23 47:14
52:24 54:24
76:22 83:13
88:15,19
90:12,17,24
91:4,6 97:13

101:25
108:20 109:7
114:10
122:16 125:7
130:25
131:18,23,25
132:3 133:21
134:6 143:8
155:16
166:11,16
168:7 186:22
187:5 190:6
195:17
200:13
201:15
202:18 204:4
210:17
222:20
227:13
234:25
235:23
236:19
252:18 253:8
263:6 269:20
277:16 279:7
282:3 298:13
300:19
317:22
**compliant**
20:7,17
21:15 41:10
**complicit**
297:23
**complied**
8:21 9:7,9
**comply**
34:10 108:2,
8 201:11
**complying**
9:12 200:20
**computer**
103:23
165:7,9
166:7,14
226:15,24
245:4 308:6,
24 309:4,19,
21,25 310:4,

24 311:13
313:19
314:2,5
**concept**
278:22 279:6
**concern**
109:3 290:12
330:24
**concerned**
108:22,24
109:8,11
287:12
288:24
289:13 335:7
**concerns**
35:19
**concluded**
341:6
**conditional**
32:19
**conditions**
113:2
**conduct**
111:22
201:10
208:19
220:24
267:24
301:11
**conducted**
194:23
311:24
**conducting**
22:10 208:21
329:25
**conference**
182:23
183:11,14,
15,22 184:2
274:19
**confidential**
164:20
189:16,17,19
202:2
233:13,23
250:16
259:15,22

Philip Dorsett
February 28, 2023

262:24
266:2,15
292:21
**confidentiali
ty**
164:15
188:10
189:11
241:19
289:11
290:22
**confirm**
29:13 64:6
145:4 197:15
236:15
246:17
**confused**
128:10
275:13
331:12
**connection**
16:6,7
108:17 277:2
284:9
**conscious**
290:4
**consent**
278:19,22,23
**consents**
279:4
**consider**
62:12
**considered**
149:4
**consistent**
33:3,6
40:16,19
82:23 94:7
133:20
179:11
238:21 239:2
268:25
**constitute**
111:18
**contact**
36:17 41:7
55:11 77:21

85:6 114:10
175:3 187:11
188:22
211:13 263:7
319:4
**contacted**
251:4 327:12
**contacting**
259:21
265:5,7
**Contacts**
25:15
**contained**
232:5 234:18
235:22
**contemplating**
272:22
**content**
12:17
**contents**
236:14
**context**
86:18
**continually**
296:24
**continuance**
327:12
**continue**
9:4 46:20
47:10,16,19,
21 57:6
70:14 73:7
74:23 80:5
85:11 213:14
302:13,17
303:7 304:9
**continued**
118:20
130:10
178:22
**continuing**
14:8 85:3
88:10 144:10
215:24
218:18
**contract**
105:25

112:8,14,24
113:18,24
120:15,18
137:4,11
138:4 139:2
143:10 315:2
**contracts**
91:15 122:18
140:3
**contrary**
111:24
**control**
194:21 218:5
**conversation**
23:8 40:9
56:11 59:8
79:9 136:18
150:23
174:21 221:3
254:11,13,22
278:24 316:7
323:17
335:22
**conversations**
60:4 61:8
95:20,25
100:16
118:12 125:6
145:5 150:4
174:16,22
181:10,15
**converts**
237:11
**convicted**
205:21
206:2,7,10
**Cooper**
10:13 19:16,
18 88:5,22
90:7,21,24
91:3 162:11
167:15
210:16
303:19 315:6
316:7,8
317:2 336:25
**cooperating**
176:17

184:18
186:2,10
207:10
212:15 276:7
**cooperation**
176:6 184:20
207:13,15
212:10
**cooperator**
173:21 174:7
269:5
**copies**
56:15 333:11
**copy**
53:17 66:11,
16 83:22,23
91:13 96:22
107:2,6,8
124:11
188:25 213:7
224:10,19
225:16
227:7,10
230:11
231:6,9,25
232:23 238:5
**corner**
101:9,16,22
102:4 110:16
**corp**
49:23
**corporate**
19:25
**corporations**
33:17 38:2,
21 112:5,13
**correct**
8:13,18
12:13 14:24
15:3 16:16
17:5 20:20
21:5 23:25
35:16 39:15
42:10,11
43:19,23
45:16,20
47:18 51:18
53:3,4,18

Philip Dorsett
February 28, 2023

54:9,13
62:13 67:6
68:11 69:13
72:3 73:23
74:7,19,25
76:25 80:18
92:16 93:7,
14 95:5
99:22 102:24
103:6,20
107:13,14,17
108:23
110:16
116:15,19
126:10
127:6,7,24
128:6 152:12
153:3,16
154:21 155:5
158:4,7,8
161:5,18
167:9 170:13
171:4,5
178:12 188:2
189:10
191:23
196:5,6
197:11
198:24
209:10 210:8
230:21
231:19,22
233:14
238:9,18
243:21 244:5
246:16
248:14
249:22 254:7
257:12,16
264:10,19,20
265:6 268:14
283:8 285:18
298:25
304:24
305:12
309:5,22
312:18

**correspondents**
188:19 201:9
**costs**
291:22
317:13
**counsel**
12:18 17:23
20:25 22:6
30:4 34:19
52:11,14
55:15 65:20
70:11,14
95:9 122:10
136:12 144:8
184:19,25
187:20,22
189:2,23
317:5 330:7
337:14
**count**
208:9
**counted**
226:17
**countenance**
301:10
**country**
198:5 278:19
286:8
**couple**
6:15 62:4
124:8,16
267:22
318:14
322:5,6
333:20
**course**
12:15 26:5
44:5 259:10
266:11
322:16 335:7
**court**
6:21 7:11
84:8 96:10
175:12
188:16
189:20 202:5
214:13

215:20 218:8
250:17 269:7
290:25
291:8,11
322:23
324:14
325:10 328:5
329:17 337:4
339:19,21
340:15,18
341:3
**courts**
312:22
**cover**
301:7
**crash**
310:9
**crashed**
310:6
**create**
229:12
263:10
**created**
51:4,7,10,25
58:15 73:18
74:5 151:2
**creating**
20:10 21:21
**crime**
206:2,10
273:25
**crimes**
273:18
**criminal**
175:9 184:10
194:8 195:5,
10,15 196:3
197:20
198:2,7,10,
15,23 199:3
205:21
209:14 245:6
273:20
**criminally**
195:11
**current**
27:24

**customer**
73:3 188:10
189:8
**customers**
79:15,18
86:16 87:2,
16 88:7
99:20 100:4
113:11
117:23 120:5
121:2,5
124:17
125:21
126:23
145:25 146:2
151:15,16,
20,25 152:2,
3,5,8,11,12,
22 181:16,19
189:12
193:11
251:12,22
252:7,12
254:24
277:13
**cut**
12:20 23:7
56:13 125:19
188:4 325:21
**cutting**
325:11

---

**D**

**D'SANTE**
292:3,7
**D/b/a**
132:25
**Dalton**
254:5
**damages**
317:14
**Darville**
9:21,25
10:4,8 78:3,
4,19 82:10,
14 83:2

163:22,24
167:11 239:5
240:12
**Darville's**
86:10 89:17
**DAS**
190:8
**data**
194:22
292:22
**date**
143:4,6
148:8 178:9,
12 197:12
202:10
207:25
212:7,8
233:7 253:15
261:18 268:7
284:18
295:17
**dated**
27:12 128:22
130:15
172:12 188:7
192:14 197:7
201:23 210:3
237:25
249:17 267:7
276:15 300:8
314:24
318:13
**dates**
7:17 68:25
174:10
209:10
276:10
340:23
**David**
254:4
**dawned**
311:10
**day**
46:7 71:15
104:20,21
114:23
117:16,20
126:19

128:10
136:23
145:9,11,13,
15,17 146:3,
5,6,9,12,14,
18,21
147:14,18,21
148:5,17,21
149:5,7,10,
13 150:7,8,
14 151:2
152:16,21
153:20 154:4
156:13,18
157:8,10,15,
16 159:4
186:16 192:6
193:3 207:22
208:10 219:9
221:4
254:10,13
258:21
273:16
297:10 299:3
308:7 311:13
329:20
332:23
340:15
**days**
35:10 65:2
67:5 123:18
149:6,24
150:8 156:22
221:14,19
231:18
**DC**
208:2
**deadline**
169:3
**deal**
38:15 61:5
265:2 318:23
332:16
**dealer**
27:13 32:20
145:24
168:10 198:3
282:4,7

320:18
321:18
**dealers**
10:20 11:3,
13 16:11
17:4,13 24:3
25:7,11 28:3
32:21 72:24
154:20
**dealing**
72:8 79:21
248:17
**dealings**
125:11,17,20
126:4
**deals**
26:20 181:24
**dealt**
61:3
**Dear**
188:6 190:5
194:19
196:15
267:15
276:21
314:25
318:19
**deception**
301:9
**decide**
255:10
**decided**
12:14 135:4
216:3,24
277:17
**decision**
121:21 290:4
**decisions**
127:9
**declaration**
21:4 64:5,16
119:9 127:23
159:2
**declare**
71:25 161:3
**declared**
114:3

**deem**
28:10
**deemed**
107:25
**deep**
241:8
**defendant**
7:25
**defense**
14:13,15
**define**
161:19
**definitely**
25:21 87:18
165:18
**definition**
70:7
**defraud**
193:10
202:24 203:6
204:21 205:8
**defrauded**
208:11
**defrauding**
204:7
**delay**
65:3
**delete**
66:19
225:16,23,25
282:10
337:19
**deleted**
225:10
312:14,16
313:4 335:16
336:13
338:12
**deletes**
225:18 336:2
**deleting**
226:8
**demand**
215:10 218:8
243:16
317:9,10,20

Philip Dorsett
February 28, 2023

demanded
316:9
demands
188:11
deny
15:15 166:22
280:12
department
277:4 286:9
300:23
depends
26:7
depose
22:13
deposited
211:6
deposition
6:16 7:4
13:22 22:11
23:4 29:2
34:21 56:9,
25 57:9 59:5
78:2 86:10
88:10 89:2
92:3 182:17
213:18
215:19
216:13
217:19
218:15
220:8,15,20
229:14
249:11
319:17
322:17,22
323:12,23
324:3 325:5,
23 328:3,20
331:16
333:22
340:12
deputy
30:25 273:19
describe
82:10 99:8
described
220:16

describes
203:13
describing
97:4
description
67:24 93:5,9
Design
132:24
designated
189:19
designed
238:19
desired
133:15
desires
102:13,15
105:18,20
106:6,10
desk
293:22
295:5,7
destroy
195:14,24
196:6
destroyed
199:2
destroying
199:6
destroys
196:7
details
184:20
202:15
203:25
268:17,19
detected
84:22
deter
41:9
determination
267:18
277:11
300:18
determine
222:10 223:4
307:16

determined
276:23
297:22
deterrent
38:5
dictate
326:16
difference
222:21
327:21
differences
237:3 279:8
different
34:8 80:3
101:18
102:25 105:8
117:15
119:24
122:2,12
133:9 293:8
difficult
59:11 136:8
203:23 299:7
diligence
297:19
direct
61:8 293:19,
23 294:2,8,
10
directed
99:19 163:20
175:2
direction
59:14 183:23
184:3
directives
201:13
directly
13:13,24
31:24 61:3
85:4 110:23
111:12
187:16,23
190:9 244:4
255:16 273:6
director
19:25 30:25

42:25
disadvantage
317:5
disagree
332:20
disagreement
340:17
disciplinary
267:19
272:22
276:25
disclaimer
38:19 78:20
111:5,17
disclaimers
33:13 35:20
39:3 98:20
disclose
138:6 171:11
292:19
disclosed
242:6
disclosure
138:8 154:4
discontinue
140:25
discounted
124:13,21
135:17,20
137:23
138:19 141:5
discovered
103:22
297:16
discovery
92:8
discretion
108:16
discretionary
294:23
295:12
discuss
144:16
184:16
185:4,24
217:5 220:2,
7 248:4

251:2 254:23
273:6 280:23
281:12 323:4
**discussed**
12:11 17:15
126:13
127:14
129:21
225:14
254:25 273:3
296:7 300:18
**discusses**
27:23
**discussing**
86:4 147:18
150:5
**discussion**
220:6 280:6
326:10
**discussions**
38:14 39:2
88:16 90:14
256:25 259:4
297:15
300:25
**dishonest**
252:19,25
**disk**
310:24
**dismiss**
175:8 177:6,
8 324:24
326:14
**dismissal**
300:10
**dismissed**
184:11
323:2,10
324:5,20
328:7
**dismissing**
324:11
325:23
**disrespectful**
59:18 228:13
**District**
175:12,13

**dividend**
211:9
**division**
189:24
273:20
**docket**
158:24
**document**
14:20,23
15:2,5,13,25
18:6 28:13,
20,24 29:5,
13,18 30:5
32:8 48:6
55:16,22
57:15 60:12
65:4,6,17
67:22 68:3,
19,23 91:24
100:24 101:4
102:2,20
104:10
107:3,9
127:3 136:16
137:16 139:2
141:15,17
142:2 148:16
160:21 161:2
163:3 177:2
182:16
186:13
189:15,18
190:23 192:8
199:23 200:8
201:20,21
202:2,7
209:23 210:3
221:13
222:5,9,12
223:17
224:19
225:7,24
226:3 227:22
228:6,11,24
232:3,14,15,
18,21 233:24
234:7,16,23

235:13,19
236:18,23
237:9 238:6,
21 239:4,7,
9,13,17,19,
21 240:16
245:24
246:4,6,11,
15,23 249:3,
14 250:16
252:7 253:18
257:8 259:16
260:6,21
262:6,8,10,
14,15 263:12
264:8 265:20
266:3,22
270:19,24
271:19,22
284:5,10
293:17
295:15,23
296:4,11
301:4 302:8
306:7,11,14,
18 318:2
335:22 339:5
**documents**
15:9,18
18:3,13,20
19:5 55:20
56:2,7
58:22,24
59:20
103:15,17,
19,23 104:2,
16 105:7
162:2,19
167:3,17,22
168:9
187:16,23
188:19
194:22
195:24
196:4,7,8
197:20
199:2,7,12
213:12,19,21
214:16,20

215:4,6,11
226:12,17,
19,21,22
241:24
242:5,10
243:3,16
244:4,7,19
246:24
249:21 250:3
256:11,14
257:18,20,25
258:6,8
292:5 293:4,
6 302:4
306:8,20,21
307:3,7,8,
11,12,17,18,
22 308:3
309:3,19,20,
24 310:16
312:5 313:6,
11,13,15,17,
19,25 322:19
330:11 331:6
334:8,12
335:4,21
336:2,11
338:10
339:8,23,24
**DOCX**
232:13
**doing**
19:12 23:17,
19 56:8
77:11,14
140:2 155:17
164:12
165:13
218:18 268:2
281:24
290:14
323:24
325:9,19
326:22 332:9
335:23,24
**DOJ**
207:11
212:11

Philip Dorsett
February 28, 2023

268:23
**dollars**
36:24 74:16
**domestic**
98:24 124:14
**Dorsett**
6:1,9,14 7:1
8:1 9:1 10:1
11:1 12:1
13:1 14:1,18
15:1 16:1
17:1 18:1,15
19:1,24
20:1,2,6,9
21:1,10,19
22:1 23:1,24
24:1 25:1
26:1 27:1
28:1 29:1,12
30:1,14 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1,8 47:1
48:1,2 49:1
50:1,23 51:1
52:1 53:1
54:1,7 55:1
56:1 57:1
58:1 59:1
60:1,3 61:1
62:1,11
63:1,12 64:1
65:1,18 66:1
67:1,5 68:1
69:1 70:1,6,
13,16,17,20
71:1,19 72:1
73:1 74:1
75:1 76:1,4,
16 77:1,25
78:1 79:1,24
80:1 81:1,
23,25 82:1

83:1,10
84:1,10
85:1,22 86:1
87:1 88:1,23
89:1 90:1,
19,22 91:1,
21 92:1 93:1
94:1,14 95:1
96:1,3 97:1,
22,24 98:1
99:1,24
100:1 101:1,
24 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1,15,21
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1,17,21
119:1,8,10
120:1,24
121:1,9
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1,
23 130:1
131:1 132:1
133:1 134:1,
4 135:1
136:1,17,25
137:1 138:1
139:1 140:1
141:1 142:1,
13 143:1
144:1,13,24
145:1 146:1
147:1 148:1
149:1 150:1,
3 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1,17
159:1 160:1,
6 161:1,20

162:1,13,25
163:1 164:1,
3,16 165:1,
21 166:1,4
167:1,21
168:1 169:1
170:1,10
171:1 172:1
173:1 174:1
175:1 176:1,
22 177:1,18
178:1,6
179:1 180:1
181:1 182:1
183:1 184:1
185:1,19
186:1,22
187:1 188:1,
24 189:1
190:1 191:1
192:1 193:1
194:1,7,15,
19 195:1
196:1 197:1,
24 198:1
199:1 200:1,
15 201:1
202:1,17
203:1,3
204:1,3,19
205:1,4
206:1 207:1,
7 208:1
209:1,9
210:1,8
211:1,16
212:1 213:1,
3,8,15
214:1,3,25
215:1 216:1
217:1 218:1,
19,22 219:1,
7,11 220:1
221:1,12
222:1 223:1,
13,25 224:1,
8 225:1
226:1,3,10
227:1,25

228:1,8,20
229:1,20
230:1,19
231:1 232:1
233:1,25
234:1,8,15
235:1,6,17,
20 236:1,6,
25 237:1
238:1,3
239:1,25
240:1 241:1,
14 242:1
243:1,6
244:1 245:1,
3 246:1
247:1 248:1
249:1,5,10,
19 250:1,22
251:1,17
252:1 253:1
254:1 255:1
256:1,9,25
257:1 258:1
259:1 260:1
261:1 262:1
263:1 264:1
265:1 266:1
267:1 268:1
269:1,20
270:1,3
271:1 272:1,
8 273:1
274:1 275:1
276:1 277:1
278:1,3,17
279:1,21
280:1 281:1,
14 282:1,14
283:1 284:1,
8 285:1,5
286:1 287:1,
2 288:1,8
289:1 290:1
291:1 292:1
293:1,2,9,19
294:1 295:1
296:1 297:1
298:1 299:1

300:1,9,13
301:1 302:1
303:1 304:1
305:1,25
306:1,23
307:1 308:1
309:1,8,16,
18 310:1,21
311:1 312:1
313:1,5
314:1,12
315:1,2
316:1 317:1
318:1,8,14
319:1 320:1,
3 321:1,14
322:1 323:1,
10 324:1,4
325:1,13
326:1,17
327:1,10
328:1,7,10
329:1 330:1
331:1 332:1
333:1 334:1,
3 335:1,2,11
336:1 337:1
338:1 339:1,
23 340:1
341:1
**Dorsett's**
  213:18
  214:12
  333:14 338:7
  339:5
**doubt**
  15:4 154:12
**download**
  283:24
**dozen**
  51:10
**draft**
  14:23 63:22
  66:20
  159:12,15
  225:23 226:6
  262:15
  263:12 270:7

279:20
**drafted**
  64:15 65:12,
  13 66:11
  67:22 68:2,8
  93:6 159:16,
  19 160:9
  213:9 231:6
  263:13
  330:25
  333:10
**drafter**
  215:2
**drafting**
  67:24 213:5
**drafts**
  213:8 214:22
  330:12
  333:12
**drive**
  310:5,8,14,
  21
**driver's**
  49:19
**drop**
  114:22
**dually**
  199:11
**duces**
  199:10
**due**
  13:14 18:14
  20:23 190:5
  317:11
**duly**
  6:3
**duress**
  19:10
**duties**
  112:25
  298:17

---

**E**

---

**e-filed**
  177:2

**e-mail**
  23:21,23
  24:16 25:17,
  18 26:14
  29:22 31:5,
  23 33:8
  34:20,22
  35:10,11,16
  37:3,9,17,21
  38:24 40:18,
  22 41:16,19,
  21 42:20,22
  43:2,4 45:5,
  7,8,11,13,
  14,18 46:6,
  23 49:5
  52:20,22
  53:3,6,13,16
  54:8,10,14
  59:15 60:9,
  13 63:25
  64:6,25
  65:23,25
  66:3,17,19
  67:4,9 69:17
  71:8 74:24
  80:11 85:10
  104:9 122:24
  123:21
  128:22
  129:12
  130:7,14
  132:6 163:6,
  11 165:11
  168:20
  169:24
  170:11
  172:11 186:6
  188:5,7,25
  196:11
  219:22
  224:25
  225:9,16,23
  226:4,19,22
  229:23,25
  230:20
  231:5,8,13,
  18 233:2,5,
  18,21 234:10

235:7,12,23
236:3,6,10,
13 238:12
242:11
245:11,16
247:19
248:22,24
249:7,17
250:14,20
251:7
253:20,23
257:8 261:9,
15,25 262:12
272:3,7
273:12
274:4,8,16,
23 275:14,22
279:20,23
280:10,15
281:5,7,8
282:19
283:7,10,11,
16,25
284:17,24
285:8,9
286:25 288:9
289:6 292:3
293:3 299:24
304:5,10,12
314:7
318:12,14
319:10,15,19
**e-mailed**
  66:14,15
  212:25
  213:10
  301:23
**e-mailing**
  263:11
**e-mails**
  59:10,15
  69:18 73:8
  91:14 125:2
  163:10
  164:13,14,20
  165:3,10
  166:10,13,
  18,21,24

Philip Dorsett
February 28, 2023

190:13,15
214:23 226:2
257:15
261:12
276:4,11
283:6,9,13,
18,20 284:7,
16,23 287:4
308:2,11
311:8,9,18
312:23
313:4,9
333:14
335:17
336:16
337:7,19
338:10,12
**earlier**
18:4 31:16
47:23 48:12
49:11 51:8
67:23 73:21
77:2 78:5
91:9,12,25
92:19 95:19
97:19 100:24
123:6 151:3,
7 159:22
208:18
211:25 212:5
218:15 219:8
238:22
239:21 244:2
269:4 283:5
287:11,23
323:4 330:19
**early**
62:6 129:21
130:9,11
234:3 308:21
**ease**
299:9
**easy**
329:22
**economic**
273:18
**Edelman**
254:5

**Edward**
10:13 19:16,
17 88:21
90:20 91:3
210:16
303:19 315:6
317:2
**effect**
39:14 80:23
94:23 146:25
147:3,15
277:23 315:9
316:4 330:21
**effected**
150:16
**effecting**
32:24
**effective**
300:15
315:19
**efficient**
237:22
**effort**
299:16
**efforts**
113:8,21
**eight**
22:14 109:10
229:4 238:15
293:25
310:11
**Eikenberry**
193:8
**either**
16:21 53:6
59:9 140:7
167:10 213:7
281:25
**elaborate**
153:5
**electronic**
53:17
**electronically**
316:12
**emphasize**
337:18

**employed**
9:22 10:2,7,
12,23 11:10
19:23 79:5
87:8 104:11
167:2
294:13,21
**employee**
8:7 45:18
292:6 302:14
**employees**
87:9,20
292:20 301:9
**employment**
10:16 20:3
44:5,19
75:19 76:9
81:9 292:17
300:14,16,20
305:10
315:2,8
316:3
**encountered**
324:12
**encouraged**
76:7
**encumbered**
296:17
**end**
19:13 35:7
39:6 59:8
115:14 116:5
120:15 169:6
173:22
174:12 187:4
213:16 299:7
305:9 337:5
**ended**
116:7 134:20
**enforceful**
140:14
**enforcement**
176:10
189:24
267:16
276:23 277:6
**engage**

102:14
105:18 106:7
111:12 229:6
**engaged**
32:21 117:22
120:3 126:22
178:25
**engagement**
112:20 113:7
143:17
**engaging**
41:5 176:7
229:7 317:23
**enjoy**
250:2
**enlarged**
106:18
**enroll**
132:12
**ensure**
8:16 9:8,11
34:3 35:22
69:25 124:2
187:4 200:20
**ensuring**
9:6
**entered**
133:11
138:17
**entering**
238:25
**entire**
21:8 51:14
164:3 255:24
286:14
**entirely**
23:9 296:17
**entirety**
75:3 138:14
141:12
**entitled**
13:8 22:21
25:7 192:4,
15 240:21
241:6 327:14
**entity**
19:5 93:11

97:15 114:11
154:17
193:15
equity
152:17
296:16 297:2
error
56:11 130:23
131:5,8
ESQ
276:17
essence
294:4,6
320:13
establish
208:8
established
62:4 107:24
168:24
estimation
166:12
et
184:20
337:14
etcetera
188:20
ether
336:23
evening
49:17 60:17
280:5 328:9
event
184:12 268:6
291:3,12
298:12
338:25
events
296:14
eventually
79:10
everybody
7:5,9 152:9
212:17
214:13
215:21
268:12
340:14,20

everyone
106:22
evidence
195:2 204:5
exact
136:7 148:7
171:16,20
253:15
308:18 313:2
334:10
exactly
47:21 68:21
126:12 148:3
155:13 160:4
209:5 308:5
examination
6:13 213:20
267:12
276:18 341:5
examined
6:5
examining
215:23
excelon
336:22
excerpt
89:2
excerpts
25:6
exchange
16:9 27:25
32:11,18
92:6 93:12
94:3,4 104:8
108:6,9
163:12
166:25
167:4,24
171:12,16
174:8 176:12
182:11,19
184:3 185:3,
23 186:7
189:3,25
192:13,24
194:25 201:3
203:19
248:13,15

250:24
304:20
exchanges
27:14 28:3
excuse
341:2
excused
327:11
340:19
execute
149:5 320:4,
10,16 321:25
executed
71:15 159:4
executive
42:10 45:15
88:2,4 89:14
280:20
281:10,16
282:6
executives@
suretrader.
com
318:16
exemption
32:12,17,19
84:25
exhibit
14:5,10,15
19:15 26:24
29:21 34:18
37:2 41:14
49:3 52:19
55:24 60:8
62:10 63:25
65:15,20
77:20,24
79:25 80:4,
6,9 82:8
83:5 84:2
86:7 89:5
92:3 100:23
110:20
112:23
113:25
115:21
116:11
122:23

126:15
128:20
130:13
132:18,19
135:22
140:19
141:13
144:11
145:21
148:22,24
149:3 151:13
152:15
154:2,3
156:10
157:22
158:23 162:9
163:18,21
168:19
172:10 175:7
176:23,25
177:11,12
182:17
189:14
192:2,10
194:12
196:10
201:20
207:17,20
210:2 218:11
219:3,6
221:10,19,23
227:2,3,5
228:4 231:12
238:14
240:17
244:25
247:23
248:21,25
252:3 253:10
269:11 270:7
271:2,18
272:2 273:11
274:15
275:8,9,10
276:15
278:16
282:25
285:12
286:24 292:2

298:21 300:7
302:6 304:4
311:15
314:10
318:11
319:23
**exhibits**
34:20 59:13
269:18 270:3
271:10,23
**exist**
331:8 336:8
**existence**
89:20
**existing**
85:2 329:14
**exit**
306:4,14
**expect**
71:8 309:20
322:9
**expectations**
298:15
**expected**
242:3
**expensive**
299:6
**experience**
179:12
**expert**
110:2 146:22
282:2
**expertise**
155:14
**explain**
122:14 242:4
278:20
321:17
**explained**
72:25 74:21
83:3 147:5,
19 150:10
309:15
**explaining**
148:17 256:6
**explainrf**
18:11

**explicit**
93:11 337:20
**explicitly**
335:6
**explodes**
289:22
**expose**
169:18 189:7
**exposed**
188:9 290:19
**expressly**
122:18
**extending**
7:3
**extensively**
179:3
**extent**
87:13 109:12
323:3
**extra**
49:25

---

**F**

**F-R-A-N-T-Z**
286:19
**fabricated**
303:24
**face**
199:2
**Facebook**
33:13
**faced**
299:9
**facilitate**
299:16
**facilitated**
204:7
**fact**
29:16 31:21
39:23 51:14
57:25 74:3,4
76:7 93:19
116:17 118:2
120:13 127:8
130:3 158:17
161:10 163:8

164:24 171:7
172:5 178:13
186:5,11
188:24 189:4
203:21
212:14
223:24
224:9,13,14,
17,20,22,24
225:4 226:11
227:15
240:2,5,7
248:11
290:20 310:3
320:15,19,21
333:3
**facts**
129:25
**fail**
195:11
**failure**
195:4,9
197:21
201:11
298:16
**fair**
27:4 233:17
318:21
319:16 329:4
**fake**
192:16 193:2
**false**
69:13 70:5
73:19,22
74:5,8,9
76:3,15,17
79:15 81:2
119:16,18
160:13 161:9
168:12
203:2,4,7,10
331:3
**familiar**
31:17 46:18
47:6 83:9
92:11 138:25
176:2 245:3,
9 276:9

278:21
279:6,12,14
**familiarized**
47:4
**family**
310:16
**far**
121:20
158:20
**farce**
140:16
**fast**
6:23
**FBI**
174:19,21
175:3 177:4
181:11 182:7
183:23
184:14,25
185:14,22
207:11
212:10
273:5,8,21
278:2
**February**
11:22 12:3,
6,14 39:10
51:4,11,13
52:9 58:16
72:17 73:10,
18 74:5
179:5,14,23
180:7
**FEC-03848-00**
30:8
**federal**
153:17
173:23 181:7
216:17
220:22
**feedback**
269:8
**feel**
188:21
**fees**
121:3,17

Feign
  132:24
felt
  331:20 332:4
Fernandez
  267:4 272:4,
  19 273:13
  274:17
  275:22
field
  273:25
fight
  335:20
fights
  252:20 253:2
figure
  203:22
  246:11
  289:21
figured
  12:3 227:12
file
  255:18,19,24
  258:14 259:9
  266:10 268:6
  284:7
filed
  175:9,11
  211:16,21
  213:6 257:11
  302:5
files
  190:9,11
  254:3,15
  255:4,11
  256:3,15
  310:14
Filippelli
  57:12 59:12,
  17 80:8
  237:8 239:8
  249:16
fill
  87:2,4
final
  137:16
  270:2,8

338:6
finally
  299:20
find
  7:5 56:24
  58:22 65:3
  81:22 137:5
  196:16
  209:11
  257:17 258:6
  269:17
finding
  308:5,6
fine
  7:16 9:2
  46:20 47:9,
  11,16 289:9
finish
  17:24 21:2
  52:15 70:12,
  18 109:19
  136:13
  142:11 180:3
  204:24
  309:13 322:9
finished
  228:23 229:2
FINRA
  109:24
  147:24
  148:2,3,4
  150:5 151:2
  152:15
  153:2,4,7,9,
  11,13,14,21
  154:3,25
  155:4,8,13
  156:3 157:14
  260:14
  265:4,7,9,12
  267:4,12,16,
  24 268:11,16
  270:2
  272:22,25
  273:7 275:4
  276:15,17,23
  277:4,10
  278:2

FINRA's
  148:16
  271:14
fired
  103:20
  158:3,6,7,
  10,15,18,20
  160:16
  161:10,17,
  20,25
  164:10,19
  286:7 287:14
  289:25 290:9
  291:15,19
  303:18
firm
  11:19 20:3,
  7,17 21:15
  33:12,17,20
  85:6 91:8
  95:22 109:14
  118:15 122:5
  149:19 151:9
  153:5,6
  155:21
  170:20 178:4
  193:4 196:7
  224:18 226:5
  231:16
  243:14
  294:4,5
  298:3,9
  300:24
  311:24
  312:6,7,8
  319:5 321:8,
  9,16,17,19,
  20,24 335:9,
  10 337:12
firm's
  20:11 21:22
  170:7 171:4
  298:14 319:5
firms
  27:19 153:2
  178:23
  252:17
  321:21

337:13
first
  6:3,18 11:19
  18:25 21:11
  24:5 27:22
  28:7 36:17
  37:9 38:18
  53:21 55:7
  58:10 60:14
  63:25 65:23
  71:15 94:25
  95:4 96:5,8
  100:3 102:10
  109:23 130:6
  147:20
  157:22
  164:22
  167:10,23
  171:13
  187:25
  214:22 215:2
  220:25
  254:18
  256:24
  265:10 270:6
  278:13
  280:21
  281:17
  292:13 302:2
  304:19
  319:17
  321:15
  322:18
  330:25
  336:18 337:4
Fishman
  175:15,23
  185:20
fit
  242:16,24
fits
  203:22
five
  19:22 129:5
  146:18
  149:6,10,23
  150:7 156:22
  231:18

Philip Dorsett
February 28, 2023

275:19
293:25
322:11
**flip**
8:19
**flow**
9:4
**focussing**
181:19
**folder**
56:14,21
57:7
**folks**
151:7,10
**follow**
81:18 121:24
122:4 123:20
288:20
**follow-up**
274:20
**followed**
79:20 81:19
315:6
**following**
48:17 67:12
77:7,14,15
111:17
128:17 138:8
190:17 211:4
216:19
297:10,20
312:25
**follows**
6:5 81:17
**font**
111:18
**footing**
169:10
**forced**
56:23 286:8
**Ford**
6:13 12:23
13:14 14:4,
9,14 15:24
19:14 22:12
23:12,18
26:23 28:22

29:9,19
30:6,9 32:6,
15 34:17,24
35:6,25
36:25 37:11,
19 41:13,18
46:4 48:9
49:2 52:10,
12,17 55:3,
17,24 56:10
57:2,12
58:19,23
59:21,23
60:11 62:9,
16,25 63:7,
15,24 65:14,
18 71:3,11
72:14 75:17
76:19 77:19
78:9 80:10
82:7,20
83:4,21
84:2,4,8,9,
16 86:6 89:7
90:9 92:2,21
96:10,13,16
100:21
101:19 102:8
106:20,25
107:19 109:4
110:13 111:8
112:16
114:13
115:20
122:22
126:14
128:12,18
130:12
132:5,17
135:12
136:14
137:15
139:20
140:18
141:14,23
142:3 144:7,
12,21 145:20
148:13,24
149:2 151:12

153:25 156:9
158:22
162:5,8
163:17,23
168:18 172:9
175:6 176:25
177:11,12,14
184:6,19
189:13 190:2
191:25
194:11 196:9
197:2 201:19
202:3 207:16
209:21
212:17,22
214:4,5,6,
11,18,24
215:12,16,19
216:7,12,16,
21,25 217:5,
9,12,16,20,
23 218:4,10,
14,25 219:6,
13,14,17,23,
25 220:14,
19,22
221:10,17
225:20
226:25
228:3,7,12,
20 229:3,10,
13,20,22
230:17
231:11,14
234:5 235:5,
8 236:21
237:6,10,12,
18,23 238:13
239:6,10,13,
16 240:15
241:21
244:23
247:22
248:19
249:2,5,10
250:12,19
252:2 253:9,
16 256:19
260:10,22

261:4,10,15
262:2,16,20
263:16
264:2,3
265:15,23
266:9,22
267:8,15
269:10,13
270:21,25
271:17,25
274:14 275:7
276:16,17,21
278:10,15
279:19
280:13
282:24
283:3,15
285:11
286:23
291:25
293:14
295:14
296:2,10
298:6,20
300:6
301:18,21
302:9 304:3
311:14 314:9
315:23
316:20
318:6,10
319:22
322:2,11,16
323:16,24
324:4,8,10,
18,23 325:4,
8,13,18,22
326:3,8,12,
17,22 327:3,
10,16,24
328:6,11,17
330:3,22
332:17
333:13,18
334:17,23
336:3
337:13,21,25
338:6,24
339:13,18

340:4,8
**foregoing**
  72:2 161:4
**foreign**
  10:20 27:13
  28:3 32:20
  44:12 45:3
  70:9 72:23
  167:22
  168:11
  169:13
  188:13 198:3
  259:20
**forgery**
  72:9
**form**
  11:24 50:12,
  20 64:18
  87:5 216:9
  270:8 271:20
**formalized**
  103:9
**formally**
  299:12
**forms**
  87:2
**forth**
  119:12 127:6
  135:22
  160:23 172:3
  306:13
  330:21
**Forty-five**
  144:21
**forward**
  39:4 162:25
  163:5,10
  165:2
  166:13,18
  220:9 233:16
  269:21
  283:6,9
  285:8
**forwarded**
  53:15 166:24
  187:16
  226:18

235:12 238:6
  283:13
  284:23
**forwarding**
  164:13,19
  166:21
  233:18
  234:10
**forwards**
  284:16
**found**
  164:11
  226:14
  254:15 261:8
  264:5
**founder**
  42:25
**four**
  15:8 135:13,
  14 142:22
  146:18 147:4
  149:5,23
  150:6 156:21
**fourth**
  202:14
**Foyer**
  189:15
**Frantz**
  286:17,19
**fraud**
  184:17
  185:4,10,24
  192:16,25
  206:20
  208:17 245:4
**fraudulent**
  192:6 203:14
  207:22
**frayed**
  332:24
**free**
  188:21
  259:18 266:5
**fresh**
  7:5
**Friday**
  37:4 319:2

**friends**
  285:20
**front**
  140:6 222:6,
  12 328:24
  338:4
**froze**
  84:9,13
**frozen**
  84:8
**fruition**
  158:6 255:8
**frustrated**
  147:10,13
  149:17
  151:4,8
**frustratingly**
  299:7
**fulfill**
  169:5
**full**
  23:6 142:22
  201:15
  297:18
  302:19 327:6
**fully**
  19:2
**fulsomeness**
  339:4
**function**
  320:25 321:4
**funds**
  316:24 317:3
**furnish**
  187:8
**future**
  169:12
  292:20
**fuzzy**
  106:19
**FW**
  233:12,15

---

**G**

---

**game**
  56:8

**gathering**
  335:24
**gave**
  26:17 48:6,
  25 242:15
  246:4 306:8
**general**
  18:18 169:19
  188:14,18
**general's**
  169:15
**generally**
  9:2 113:13
**Gentile**
  8:20 12:10,
  11 23:22
  24:6 25:18
  27:4 29:23
  35:12 37:4,
  21 39:19
  40:4 41:17,
  21 43:16,22
  44:7,21,24
  45:22 46:2,
  12 47:8,12,
  24 48:13,21
  51:16,17
  52:2,3
  53:13,16,22
  54:2,8,12
  72:17,24
  73:6,10
  74:12 95:4
  109:22
  117:19
  136:19
  145:23
  149:15
  168:21
  170:12
  173:20
  174:7,17
  175:10
  177:19
  178:10,16,22
  179:5,12,22
  180:8,9,24
  181:14

Philip Dorsett
February 28, 2023

183:13,21
184:10,17,25
185:8,25
186:10
190:23 191:3
193:21 204:6
207:10
209:12
210:6,24
224:12 227:7
230:24
231:21
233:5,18
234:4 238:7
242:14
243:8,18
245:12,13
248:4,18
259:25
260:3,18
261:17 262:2
264:9,15,22
265:5,8,13
266:24
267:12,23
268:23
269:4,14,25
270:2 272:21
275:4 276:7,
25 277:12,15
287:19
288:2,11
289:5 296:12
297:10
302:12,25
304:6,11
313:25
314:25
318:13 320:2

**Gentile's**
9:5 60:24
176:6,17
184:19
212:10
261:4,11,16
263:13
269:18

**Gentile-dorsett**
232:10
**gentleman**
207:2
**get all**
326:18
**getting**
98:18 131:7
139:18 140:4
147:10
149:16
167:23
171:13
177:25 223:9
234:8 285:4
288:5
**gibberish**
311:4,7
**give**
6:19 29:3
43:21,24
44:11,24
45:2 48:3,5,
21 59:4
95:10,11
195:5,9
219:21 232:3
234:16
235:12
242:21
292:19
302:4,18,21
307:17 317:3
**given**
9:5 31:23
78:2 171:23
199:19 200:4
222:25 252:3
293:9 330:6
**giving**
29:6 130:22
216:2
**Gmail**
253:24
283:16
312:18,23

**Gmails**
313:3
**goes**
45:5 335:16
**going**
6:17 9:3
12:18 13:3,
11,21,25
19:17,20
23:3,5,7,13,
17,19 29:20
39:4 49:2
56:19 57:5
63:3,8 69:21
75:17 77:23
78:11,18
80:4,6 81:23
86:8 88:9
100:19
106:23 107:9
110:9,11
111:8 113:25
116:11
122:10
127:17
128:20
138:11
139:20
151:10
162:9,11
163:19 170:5
171:2 178:7
181:22
182:15,18
183:22 184:2
187:20
202:13
209:19,22
210:23
218:16
219:12,19
220:4,10
225:20
229:22 235:8
236:25 239:6
240:16
241:15
244:12,23

248:19,20
252:3,4
259:5 262:4
265:12 271:5
273:13
289:18
290:13
293:11,14,16
295:14,21
300:6 303:11
311:6,8
319:22,25
323:14
324:18,23
326:8 327:21
329:2 330:17
332:14 333:6
334:20
335:11 339:6
340:5,9,17
**Goldman**
190:14 193:7
**good**
6:14 41:19
64:4 123:25
144:12,24,25
145:3 186:16
197:16
254:10
285:20 299:3
328:9
**government**
153:17
167:17
168:15
**government-issued**
50:13
**grant**
169:17
**Granted**
118:12
**Green**
274:20
**Gregory**
175:25
273:21

Philip Dorsett
February 28, 2023

grew
  87:11
Grewel
  273:18
  274:11,18
  275:15
Grewl
  275:23
Grippo
  175:16,21
  272:4,11
  273:12
  274:17
  275:15,23
gross
  301:5
ground
  6:16
guess
  23:16 62:3
  166:10
  180:10 212:6
  339:11
guessing
  56:8
guest
  183:9,12,14,
  18
guidance
  10:18,25
  11:11 16:8
  17:2,11
  108:11
  152:15
guidelines
  17:17,21
guiding
  280:3
Gurber
  273:18
  274:11
Gurbur
  275:15,23,24
Guy
  9:16 11:4
  12:11 15:7,
  19 18:11,24

19:11 23:21
27:7 29:22
31:7,11,18
35:12 36:23
37:4 38:14
40:7 41:17,
21 44:11
46:11,16
48:4,16,18
54:5 61:22
67:18 74:15,
20 75:4,6
77:3,4 78:5
86:4 94:21
95:21 97:19
98:6 100:16
102:5 103:9,
10 105:9,14
108:25
109:12,21
118:12
120:19
121:21
125:9,22
128:15
129:21 130:8
136:6,8
139:12
147:5,12
150:10
151:22
156:16 166:9
168:21
169:25
180:15
185:15
190:22 204:6
206:25
208:21 212:2
225:12,18,25
226:14,24
227:22
230:14
231:21,24
233:5 234:3
235:5 236:18
238:7,12
243:17
244:9,17

248:18
249:25
250:11
255:21
256:7,17
258:10,19
259:24
260:3,17,23
261:2,4,15,
17 264:3,9,
15,22 267:11
269:14
271:15
277:19,21
284:13,18
285:3,20
286:4 288:14
293:8 294:17
295:9 296:6,
12 304:6,11,
14 305:9
308:5,16
309:8 311:11
313:19,25
318:12
319:15
Guy's
  67:16 91:20
  178:2 183:17
  257:19 258:3
  259:7 263:20
  285:21
  287:13
  290:7,13
  292:10
Guy@
stockusainc
  230:2
Guy@
suretrader.
com
  318:15
guys
  117:10
  268:21
  277:20,24
  313:2

                 H

hack
  338:14
hacked
  312:24 313:3
  338:11
half
  46:7 51:9
  208:3,18
  209:6
Halpin
  30:7,9 55:18
  56:16 83:21,
  24
hand
  101:8 332:5
handle
  105:5 124:17
handled
  97:20 98:8
  120:19
hands
  243:19
  244:13
happen
  57:6 176:21
  219:2
happened
  13:16 51:16
  67:25 68:17
  73:20 121:8,
  10 186:12
  224:9 248:11
  309:17 330:5
  337:23
  338:14,17
happening
  285:3
happy
  149:18 187:8
  299:8 319:6
  329:7
hard
  109:25
  310:5,8,14,

20
Harris
  224:18 225:2
  226:5 233:19
  260:10 267:8
haste
  169:4
hate
  178:6
he'll
  21:5
head
  6:20 31:9
  104:5 173:3
  300:23
headquarter
  72:19
hear
  84:11,14
  136:6
  155:10,16
  181:14
  214:17
  259:11
  266:6,12
  327:14
heard
  83:17 136:24
  154:13,17,22
  155:6 174:16
  181:9 240:9
  320:22
hearing
  118:14
  278:14 337:4
hearsay
  119:19
heat
  287:11,17,
  19,23,25
  288:6
  289:10,18,20
  290:16,19
held
  328:4 333:23
Hello
  46:16 50:9

54:24 67:9
168:21
285:16
help
  124:15 248:2
  280:3
helped
  248:9
helpful
  13:21
helping
  185:18
Hence
  242:13
hesitate
  187:11
  211:13
hey
  130:16
  277:16
high
  203:16
highlight
  335:21
highlighted
  35:19 37:16
highly
  220:5
hire
  312:6,7,8
hired
  181:20
  310:13
historical
  27:24
history
  155:4
hold
  213:17 214:4
  307:18
holding
  322:21 325:5
home
  299:15,19
  308:22
honest
  68:12 125:24

159:21 263:2
312:15 331:2
honestly
  331:20
Honorable
  175:14
hope
  49:23 50:21
  145:3 235:15
hour
  6:25 7:2
  56:19,20
  251:7
hours
  22:14 23:10,
  13 229:4
house
  179:18,19,20
huge
  264:25
hundred
  132:12 232:4
  234:17
  235:21 238:9
  303:25
hyperlink
  24:12 25:23,
  25

I

IB
  320:22
IBC
  50:14,18
ID
  50:13 247:5,
  6,10
idea
  67:16,18
  154:10
  207:14 227:8
  262:3
identified
  199:7
Identify
  241:24

identity
  242:3,5
idiots
  268:21
IDS
  49:19 50:10
  65:5
ill
  204:14
  205:24
image
  132:11
images
  132:9
imagine
  127:13
  303:21
immediate
  213:11
  298:17 315:9
  316:4
immediately
  78:22 145:25
  151:15,25
  157:4 300:15
  315:19
  317:10
immigration
  286:9
impact
  43:8
impedes
  108:15
implement
  114:4
implemented
  11:23 75:21
  76:25 80:14,
  25 81:12,25
  167:16
implements
  75:23 76:11
  81:13
importance
  26:20
important
  28:10 334:22

Philip Dorsett
February 28, 2023

impossible
  215:20
  228:12
impression
  105:16
  118:20
  120:7,12
  289:21
  334:11
improbable
  201:12
inaccessible
  338:23
inaccuracies
  21:7
inaccurate
  20:15,19
  21:20 48:14
inappropriate
  217:10,13,14
  220:6
include
  16:25 32:23
  317:20
  337:10
included
  54:8 94:17
  97:16 98:2,
  13 111:5
  114:21
  125:14 176:7
  230:24 231:3
  244:19
  252:24
  254:18
including
  95:14 108:3
  114:23
  227:17
  292:5,20
inclusive
  317:13
incomplete
  89:6,24
  142:2 163:21
incorporated
  199:11

incorrect
  17:9 20:24
  21:9,13,18,
  24 22:5,19,
  20 119:24
indicate
  47:12
indicated
  264:6 290:17
  304:14
indicates
  39:21 107:15
indicating
  245:24
indicted
  173:5,8
  206:2
indictment
  175:9 184:10
indirectly
  85:5 110:23
  111:12
individual
  9:21 54:18
  72:18,25
  87:20 103:11
  105:14 163:2
  181:21
  222:16
  223:5,18
  272:20
individual's
  21:4
individuals
  156:25 173:5
  175:2,3
  191:5 193:15
industry
  153:15,16
info
  169:17
  242:17
info@
suretrader.
com
  49:12 245:20

information
  24:12 29:8
  56:25 68:10
  89:6 113:14
  118:8 168:4,
  14 169:7,13
  171:11
  172:13
  186:18 187:9
  189:8 190:4,
  7,12,13,20
  191:3,5,10,
  13,17
  193:17,22
  200:18
  202:22
  211:12
  212:12
  223:3,17
  227:17
  241:25
  242:20,23,24
  248:6,12
  249:22
  250:6,8,9
  255:22,23
  285:23 287:7
  292:21
  297:25
informed
  72:20 315:7
initial
  102:6 110:15
initially
  28:16 67:16
  102:5 103:7,
  8 149:25
initials
  101:12,15,21
  102:3 107:12
initiated
  55:11
initiating
  85:6
input
  57:18,21
  58:2,11

insist
  22:10 70:15
insisted
  18:11
insistent
  317:18
insisting
  304:14
insists
  33:19
installed
  35:21
instance
  179:4
institute
  198:2
instruct
  197:18
  199:22 200:7
  201:5 219:20
  220:11
  225:22
  307:21
  309:10
  311:17 337:9
instructed
  67:18 102:6
  203:18
  225:15 309:9
  312:4 315:5
  317:9 335:2
instructing
  59:22
instructions
  107:23
intend
  93:24 132:8
intended
  84:23 94:2,
  9,18 95:15
  96:6 97:17
  98:3,13
  130:24
  131:14
  132:14
  134:23
  137:25

140:10 141:6

**intending**
47:12

**intense**
331:17

**intent**
302:25
340:13

**intention**
199:6

**intentionally**
125:10

**interested**
128:24
129:15
324:13

**interesting**
165:3

**interestingly**
261:6 312:20

**interfering**
77:21

**interim**
46:19 50:13
56:15 106:25
265:13
322:24

**interject**
216:24

**international**
8:2 20:8,18
49:23 97:6
98:23 99:5,
16,19,20
113:6,11,21
123:15
124:10
320:23 321:2

**internet**
35:23 131:7

**interrupt**
56:24 178:7
191:16
334:15 340:9

**interrupted**
217:18

**interrupting**
70:15 109:17
334:19

**interview**
92:5 115:24
118:24

**intrical**
26:17

**introduce**
162:10 261:2

**introduced**
219:23
260:24
261:18,20

**inventory**
294:7

**investigated**
172:25
293:7,8

**investigating**
168:16
170:23
249:24,25
255:21
265:13

**investigation**
9:18 170:4
173:10
182:7,12
184:17,18
185:5,11,25
191:18,21
194:23
248:17 250:8
254:8 255:25
259:10
266:12
268:13
271:15
273:8,23
277:6

**investigations**
105:11
173:24 176:9
181:7

**investigative**
115:23

189:23

**investigator**
118:24

**investigatory**
92:4

**investment**
111:20,23
126:21
203:14

**investments**
208:8

**investor**
33:19 49:17
94:17 112:10

**investors**
32:23 33:21
36:16 60:16,
19 61:12,14
62:17,20,21,
22 92:14,18
94:10 96:4
98:11 99:2
100:2 101:2
102:17
105:22
106:3,12
107:17
108:12
111:11,13
112:9 113:6,
19,20 114:25
115:4 116:13
117:17 118:3
120:3,14
127:20
133:17,24
192:6 204:8
207:22
208:11

**invoice**
124:12

**involve**
301:8

**involved**
88:15 90:13
91:10 105:15
206:25
273:22

291:14,16
331:20

**involving**
32:22

**Ionne**
204:9,12,19
205:6,20
206:14 207:8
208:16 209:7
211:18
212:13

**IP**
79:7 80:21
81:4 83:15
84:20,22
240:3

**irony**
23:2

**issue**
11:8 167:18,
21 214:10
215:18 217:8
283:24
322:5,23
323:15,19
336:18
337:23,24
338:3,6,11
339:2

**issued**
199:10

**issues**
107:21
108:22 109:9
297:20 323:4
333:21 339:3

**Italy**
179:7

---

**J**

---

**Jamaica**
179:8

**January**
24:18,23
109:22 110:5
116:6 230:6,

10,16 231:17
233:7 236:7
238:2 269:13
**Jeff**
123:2
**Jeffrey**
190:14 193:7
**Jersey**
175:13 269:3
288:12 289:5
**Jessica**
64:2,10
65:2,11
66:2,8 67:8,
9 71:5
257:10
286:25 287:6
**job**
215:21
**jog**
281:21
**Johnson**
323:3
325:14,25
326:3 329:15
331:25
333:2,8
334:14,20
338:2 339:15
340:2,21,25
341:4
**join**
130:18
**Joining**
273:16
**Jose**
175:14
**judge**
332:12
333:24 336:5
340:10
**judgment**
119:23
**July**
65:25 76:10
160:16
161:10 179:7

300:8 304:6
305:3,6
315:6 316:2
**jump**
212:23
**jumping**
263:3
**June**
30:18 35:10
37:4 42:24
46:7 159:5
287:3 290:12
296:16
**jurisdiction**
111:21 112:2
169:14 187:6
188:3 197:25
199:21 200:6
201:4
**justification**
209:15
**Justin**
30:12,16,18
35:11,18
45:17 46:12
61:24 62:5
91:19 97:21
98:7 105:15
122:25
123:12,20
129:12
130:7,15,16
258:19
**Justin's**
30:15
**Justin@**
**suretrader**
30:11
**Justin@**
**suretrader.**
**com**
29:25 37:5
42:2
**justin@**
**suretrader.**
**com.**
29:24

**K**

**Karen**
12:10 190:8
191:9
245:11,13
**Karen's**
67:17
**Karen@**
**dastrader.com**
245:12
**keep**
23:17,19
37:12 63:2
92:24 107:9
237:2 250:19
258:19
275:12
325:11
**keeping**
20:7,17
21:14 207:3
323:23
**Kelly**
273:19
**kept**
105:16
125:10,16,18
126:3,7,9,11
127:9,12,16
143:13
**keys**
301:15
316:10
**kind**
203:23
333:16
**Kindly**
188:17
**knew**
98:17 117:20
119:20
126:18
127:17
135:3,4
173:7 178:9

185:13
206:4,5
208:24
261:25
268:16 273:9
316:2
**know**
11:14,15
15:9,15,16,
18,19,20
17:19,21
25:24 26:16,
19 27:16
28:12 29:24
31:3 39:12
42:4,6 50:5
54:15 60:19
61:22 62:21
63:4 66:3,18
68:6,17,24
72:5 78:23,
25 88:7 92:9
95:17,19,21
96:8 98:19
100:18
104:6,20
110:7 114:12
116:22
120:24
121:20,22
126:12
129:19,23,25
130:5,7
131:5
134:17,21
135:7 136:7
139:9,12
147:13,23
148:3,7
150:2 153:7,
12 154:8,10
155:10,23
156:2,5
157:20
159:17
160:2,4,6,8
165:5,14
166:9 167:12
169:2,22

171:6,15
172:17,20
174:15,25
175:4,5,21,
23,25
177:18,20,22
178:12,14,19
181:3 182:2,
6,10 185:17
198:13,18,20
199:8 200:17
204:12,13,
14,17
205:18,20,
22,25 206:3,
8,9,12,14,
16,18,21,22,
23,24 207:7
212:9,15
217:25
228:10
231:14
232:13,17
233:15 234:9
241:10,11,
13,17 242:14
243:2
245:12,15
251:3 253:6,
15 256:18
258:13
259:17
260:21,25
261:10,15
263:17,21,25
265:17
266:4,18
267:4 268:17
274:7,9,11
277:22
278:5,7,9,
10,12,17
279:17 280:6
282:4
283:23,25
284:3,4,8,19
285:10
286:11
288:3,13,15,

18 289:7,15
290:4 292:7
294:17
295:11,22
303:17
306:21 308:5
309:25
311:10,11
312:20
313:21
314:6,11,19,
20 315:18
320:20,25
321:3,4,5,7,
15 327:6
329:23
332:10
334:21
336:25
338:15
**knowing**
331:3
**knowledge**
75:22 81:12
87:14 116:10
118:19
119:12,15,23
120:6,13,17
127:5,20
128:2,4
129:25
143:16,20,23
144:3,5
160:22
161:13
182:9,13
200:12
212:14
227:20
231:10 241:9
297:18
306:11 320:9
**known**
86:22 114:11
155:7 223:16
312:21 328:5
338:9

**Koonin**
13:3,15,23
23:2,16
58:21 59:2
76:20
219:11,16,
19,25
220:10,17,21
221:2,5
**Koonin's**
77:20
**Koyn**
175:17

---

**L**

**labor**
286:9
**lack**
297:2,19
**lacks**
55:22 199:9
**Laneres**
175:14
**language**
97:17 98:13
138:9
**laptop**
301:16
308:14,15,22
311:2
**large**
226:16 321:4
**larger**
321:24
**largest**
27:19
**Las**
183:8
**Lastly**
259:8 266:10
**late**
69:11 174:6
180:11
240:10
286:21
308:20

**latest**
43:7 230:11
**Laurent**
260:11
**law**
10:18 11:7
27:19 150:24
167:8 168:8
169:5,6
170:20
171:11 176:9
187:3,10,18
191:22
199:17
200:21 218:3
224:17 226:5
255:17
265:17 282:3
306:18
311:24
312:6,7,8
317:24
318:24
335:9,10
337:12,13
**lawful**
201:15 282:5
**laws**
8:17 9:7,12
20:9,18
21:15 72:8
77:8 108:3,
14 111:25
172:2 187:6
279:16
**lawyer**
170:7 187:21
200:11,17,25
231:15
261:5,11,13,
22 290:7
311:22
312:14
314:14
331:21
337:15
**lawyers**
287:13

Philip Dorsett
February 28, 2023

290:13
337:12
**lead**
335:19,20
**leading**
13:7
**leave**
148:23 158:2
322:24
**left**
60:7 90:6,25
103:16,24
116:25
134:22 135:2
157:23 158:5
210:9 226:10
239:4 240:14
**legal**
48:5,6
130:25
131:18,22
168:25
169:8,9,10,
18 171:22,
23,25 172:7
187:4,20,22
189:2 200:3
201:11
304:21
305:14
314:21
317:5,13
**legality**
187:10
**legislation**
245:4,6
**length**
51:2 264:25
280:23
**lengthy**
13:17
**lesson**
220:18
**letter**
125:13
184:19
187:15

194:13
196:17
197:6,10,13,
17 198:21
199:7 267:3,
8 268:11
270:17
272:21
276:15,22
279:25
295:19
296:5,7,13
300:3,8,10
306:4 314:18
315:16,20
318:7 319:25
320:2 334:5
**letterhead**
210:4 295:17
**letters**
334:4
**letting**
326:2
**levels**
296:20
**liability**
188:9 195:5,
10,16 196:3
**license**
49:20
**licensed**
199:11
201:14
**lie**
162:4 224:15
229:17
281:17,18
291:8
**lies**
229:12
**light**
298:15
**limited**
32:9 108:4
**line**
31:10 46:21
47:10,16

57:3 58:6
88:12 283:25
**lines**
289:3
**link**
24:10 26:4,
5,11,16
27:11 42:23
43:11 59:7,9
93:2 98:22,
23 99:9,21
100:8 130:22
**linked**
100:4,8
**links**
100:3
**liquidated**
296:19
297:11
**list**
14:14 34:7
177:17
**listed**
257:18
**Listen**
151:24 333:5
**listener**
93:4
**literally**
59:10 293:24
310:5 311:13
328:15
**litigation**
288:10
335:18
**little**
6:23 7:4
36:7 37:12
67:4 82:21
84:5 101:9,
17 106:18,19
124:24
153:12
177:25
232:19 252:9
273:14
292:14

**live**
62:18,20,21
92:18 101:2
179:17
**lived**
245:15,18
**living**
39:23
**LLC**
62:18 101:2
254:3
**LLP**
260:11
**loan**
299:13
306:16
**local**
111:25
243:10
**locate**
215:6
**located**
183:7 187:2
199:12
**log**
96:12 312:25
326:18
**login**
85:13 238:25
247:5,10,18
**long**
7:2 46:20
47:9,16 50:2
116:2 144:19
279:3 329:20
332:10,22
340:15
**long-winded**
13:17
**longer**
7:4 23:4
209:25
303:11 322:7
**look**
26:16 28:24
29:18 31:6
42:22 83:9

91:18 236:14
239:18
258:10,25
269:21
295:22 304:5
**looked**
14:19 37:9
68:22 100:23
197:11 244:2
260:9 269:3
270:9 283:20
335:14
**looking**
15:12 27:10
60:8 63:6
65:8 83:24
103:13
104:17
126:24
141:18
230:25
239:20 240:7
259:5 262:19
284:15
310:15
335:11
**looks**
49:4 50:7
64:24 75:2
101:17
123:25
**loophole**
72:21 139:6
**loose**
6:23
**lot**
68:17 69:20
77:4 103:8
109:13
121:7,10
126:12
127:13
134:19
147:6,7,12
151:7,21
180:10,16
181:20 182:5
226:21

248:10 253:7
308:3,4,9
310:11 311:4
321:21
329:12
334:12
**lots**
146:18 147:4
334:8 339:8
**love**
59:3 266:6
**LP**
190:15
257:19
**lunch**
7:2,12
106:21
132:19 144:9
**lying**
185:21 186:4
281:14
282:14,18

———————

M

**M-A-T-I-N**
115:24
182:21
**M-HM**
36:11 154:21
**MA**
314:11
**machine**
165:7
**mad**
290:2
**Madam**
250:17 341:3
**made**
38:15 65:5
68:4 86:22
88:6 93:9
98:6 117:6
121:21 130:4
153:14 163:9
165:22
169:16

181:4,10
188:6 235:24
250:23
252:17
259:16
265:20 266:3
267:17 269:2
277:10
280:21
281:17
282:13
313:20
317:20
326:25
327:5,18
328:2 329:11
338:18
**magazine**
292:9,10
**magistrate**
336:5 337:8
**mail**
24:7 66:13
225:3
**main**
11:7 291:23
**maintain**
152:17
190:10
**maintained**
190:7 289:12
**maintains**
238:16
**majority**
223:6,12
**make**
6:18 23:3
70:22 71:6
100:18
103:10
109:13
124:23
130:16
139:14
147:7,15
174:13
192:19 224:3
232:3 234:17

235:20 238:8
255:6 282:12
291:3 311:20
313:5 323:7
326:2 327:21
328:4 332:6,
15 333:4
335:3 339:10
**makes**
20:19 156:15
223:20
**making**
8:21 39:2
121:22
180:8,9,12,
24 181:2,24
237:21
265:15
280:19
281:11,19
282:15
291:13
**malfeasance**
161:18,19
**man**
295:10 338:4
**managed**
93:11
**management**
50:14 273:2
**manager**
31:2,3
**managerial**
298:12
**managing**
257:19
**March**
114:16
115:4,16
116:14,15
118:3 120:2
126:17
172:13
178:15
184:11
186:6,14
188:7 189:4
201:23

margin
  202:10 209:6
  211:3,6,7,8,
  17,22 250:20
  251:23

margin
  149:9
  152:18,23
  156:20
  157:3,17

Marin
  42:2,4 44:15
  46:13

Mark
  175:17 267:4
  272:4,18
  273:12,14
  274:17
  275:22

marked
  89:4 250:16

market
  113:5,9
  117:22 120:4
  126:22
  135:19 138:7
  293:20,24
  294:2,8,10
  321:25

marketing
  62:16 75:7,
  13 89:12,15
  100:25
  102:14,16,20
  103:4 104:17
  105:2,18,19,
  20 106:2,7,
  10 108:6
  110:21,24,25
  111:4
  112:19,20,25
  113:3,4,7,8,
  12,20 118:5
  132:21
  133:6,14,16
  135:16
  137:7,23
  138:17,18
  141:4

marking
  86:21 107:22
  111:11,15
  177:16

Marquez
  254:4

mater
  188:20

material
  131:3,19
  333:3

materials
  110:25
  111:4,16
  164:20

Matin
  115:24
  182:20
  194:15
  196:15
  198:22
  250:21
  253:11,21,24
  254:10,13,23
  255:3 257:9
  258:25
  262:23
  266:17
  270:13
  280:2,16
  281:9,15
  282:18
  285:14 287:7
  313:24

Matin's
  285:16

matins@sec.
gov
  196:12

Matt
  13:3 23:10
  80:8 84:9,13
  106:17
  204:9,12
  205:6,20
  330:23

matter
  7:3 145:4

  170:17
  172:14
  186:18 190:4
  194:16
  216:14
  260:17
  264:21
  273:2,6
  277:2,7
  280:5 291:2,
  12 317:15
  327:8 333:3

matters
  119:12 127:5
  160:23 187:9
  200:23 277:5

MATTHEW
  6:13

mean
  25:24 31:6
  48:7 69:22
  98:24 99:8
  115:13
  121:21 128:7
  131:9
  145:12,14,
  15,16 146:4
  152:2 153:8
  178:18
  181:17
  182:24
  191:15
  198:12 212:6
  268:16
  278:8,9
  279:8,11
  284:11
  312:2,20
  313:9 314:6
  329:9 334:14
  339:7

meaning
  11:23 76:10
  99:14 198:23
  278:23
  335:18

means
  51:20 82:4,5

  195:10
  198:11
  232:13
  233:15

meant
  38:5 146:12
  152:11
  277:22
  289:16

meantime
  77:23 182:16

measures
  78:14 86:19

meeting
  12:10,15
  51:15 52:2
  72:20 73:10
  127:17 176:9
  184:14,23
  185:22 273:7
  298:14
  300:19
  336:25

meetings
  176:8 184:12
  275:3 278:2,
  6,8,11,13
  280:20
  281:10,16
  282:6

member
  97:25
  115:11,12
  116:23
  153:2,4,6
  156:3

members
  60:25 61:6,
  20 100:13
  121:4,17
  122:17
  153:21 177:6
  297:16 335:9

memorandum
  175:16

memory
  69:14 73:25
  74:3 98:16

204:25
281:21

**men**
192:16,25

**mention**
34:14 36:9
39:20 87:23
93:22 111:3,
14 150:15
168:2 251:11
286:2 291:3,
13

**mentioned**
130:10
210:25
287:11,23
306:16

**mentioning**
130:9 251:21

**menu**
114:22

**message**
123:19
130:23
131:6,8
196:2 230:9
235:4,5
269:12

**met**
72:17 183:3
187:10
188:11

**Mia**
243:18

**Miami**
199:8 245:25

**miami@sec.gov**
196:13

**Michael**
169:9 170:8
171:3,7,9
188:5 189:2
196:11,21
244:3 312:16
335:15,17
337:14

**Michaud**
92:7,9,14,17
93:7,22 94:8
95:3,14
96:20 97:5,9
99:15 107:7
115:23 117:5
118:22
182:18

**Michaud's**
94:16

**Michelle**
273:23,24

**Michigan**
192:25
193:8,9

**Microsoft**
232:15

**mid-2012**
62:6

**middle**
30:24 57:3
62:15

**Miller**
170:8 171:3,
7,9,14,18
188:5 189:2
196:12,21
244:3
335:15,17
337:15

**Miller's**
312:16

**million**
193:12

**mind**
137:13
153:23
173:19
178:19
204:23
331:14

**minimum**
152:17

**minister**
337:16

**Mintbroker**
7:18,25 8:3
16:24 19:24
336:6,7

**Mintbroker's**
19:24

**minus**
318:24

**minute**
6:25 7:12
256:20
322:12

**minutes**
13:19 43:16
44:4,18 50:8
51:24 59:24
124:8 144:21
157:11 251:7

**mischaracteri
zing**
215:8

**misconduct**
207:9

**misrememberin
g**
331:12

**mistake**
68:5,6

**mistaken**
51:7

**misunderstand
ing**
214:2

**mix**
35:7

**MLRO**
20:2

**modify**
328:23
329:5,13

**moments**
85:18

**Momu**
243:18

**Monday**
65:24

**money**
147:7,15
241:15
303:4,6
310:12

**monitored**
166:7

**monitoring**
165:6,9

**month**
257:11
279:24
304:15

**months**
51:7,17,19
52:3,6 62:4
73:21 243:24

**morning**
6:14 64:4

**motion**
175:8 177:5,
8

**motivation**
241:18,19

**move**
106:20
128:18
132:20
139:20 178:7
220:9 225:21
227:4 228:3
235:8 247:22
262:4
270:24,25
275:9 280:22
282:24
293:15
299:20 318:6

**moved**
12:24 48:9
65:19 100:21
180:14,18,
20,23 181:5,
13 236:21

**moving**
13:2 69:3
109:4 115:18
144:7 226:25

227:25
274:14
301:18 302:6
**multiple**
177:6 254:3
**Murphy**
175:17
**mute**
76:19 77:22

---

**N**

**name**
6:7 30:15
57:15 58:5
60:21 92:11
110:22
117:5,8
119:10
120:23 124:5
130:5 142:8,
14,15 170:8
176:3 186:21
194:4 202:17
204:2 206:6
247:11
272:10,14,
16,24 286:16
290:18
311:24
312:16
**named**
7:24 9:21
49:7 194:14
221:24
**names**
46:17 88:20
90:18 117:3
274:10
337:11,13
**NASD**
154:14,17
155:4,6,8,11
**NASDAQ**
154:15,16
**Nassau**
6:11 72:19

196:18 300:9
**Nate**
117:9 118:9
119:4,19
120:9
**Nate's**
117:8 120:23
**Nathan**
92:6,9,13
115:23 117:4
182:18
**National**
154:19
**nature**
185:13
188:18 226:9
231:10
**necessarily**
66:16 156:19
**necessary**
107:25
**need**
8:25 13:11,
25 26:15
49:18,20,23
55:20 79:25
84:25 162:22
232:25
233:20 319:5
334:15,17
339:7
340:12,22
**needed**
80:5 150:16
328:15
**needs**
56:6 218:20
298:14
333:22
**negative**
211:7
**negligence**
297:24
**negotiation**
306:13
**nerves**
332:23

**never**
16:16 17:15
23:5 27:6,8
47:24 48:12
72:7 76:6
83:13 85:18
151:6 166:24
167:13 185:8
218:25
226:17,18
231:8 271:19
276:11
283:11 302:8
313:24
324:11
328:11
329:20 330:6
331:18,19
332:2,7
**Nicholas**
175:16
272:4,10
273:12
274:17
275:15,23
**Nick**
175:21
272:25
275:24
**night**
340:19
**non-bahamian**
39:23
**non-marginable**
296:17
**non-responsive**
139:22
**non-solicitation**
33:22 67:17
69:5 70:2,23
73:11,17
84:24 108:11
111:10
112:18

**non-solicited**
21:23
**non-soliciting**
20:12
**non-swiss**
190:12
**non-u.s.**
11:3,13
16:11 17:3,
12 24:3
25:7,11
27:13 28:2
100:9 102:16
107:17
113:6,11,21
130:17
135:16,20
136:4 137:22
140:12 141:4
**non-united**
106:2,11
133:17,23
**nondisclosure**
292:6
**nonetheless**
330:14
**Nonko**
172:14,20
173:13,16
186:18 190:4
193:4 194:5
**Nonkos**
193:10
**nonresponsive**
12:24 13:2
48:10 63:9
81:24 100:22
109:5 128:19
178:8 225:21
228:2 235:10
236:22
248:20
293:16
**notarized**
232:2,6
234:20

Philip Dorsett
February 28, 2023

notary
  6:4 221:24
  222:13,18,
  22,23,25
  223:7,10,12,
  20,23 224:5,
  6,11
note
  14:12 65:5
  130:23
  188:17 199:8
  201:25 202:5
  210:24
  250:15
  262:24
  298:11
noted
  89:7 244:17
  302:7
notice
  134:19
  195:2,4
  207:4 237:2
  262:7
noticed
  9:16 242:15
notification
  276:22 277:3
notified
  322:17
notify
  284:15
notifying
  284:22
notion
  263:7
November
  7:22 11:18
  39:14 49:6
  52:20 54:15
  58:17 76:10
  208:2 245:17
  267:7,16
  272:20 292:4
  295:18
number
  25:9,14

67:10 68:6
69:4,23
112:24
148:22,25
149:7 176:24
177:11
222:14
226:16 251:3
267:12
276:18
285:16 307:5
numberings
  14:7
numbers
  14:10,11
  192:10
NY
  172:14
NY9203
  186:19

─────────

O

O'BRIEN
  224:18 225:2
  226:5 233:19
  260:11 267:9
  337:13
oath
  144:15
  229:15
obeying
  248:7
object
  12:19,23
  88:9,12,25
  89:5 109:16
  122:11
  138:11
  215:25
  225:20
  293:14
  327:25 332:4
  333:24
objection
  48:9 89:7,23
  103:21

104:12 128:9
141:10,25
142:10
161:23
163:20
215:16 216:8
263:14 266:7
293:12
323:22 325:3
326:2 332:6
objections
  177:9 325:19
  329:16
  340:11
obligation
  108:17
observe
  165:10
  180:7,12,24
observed
  165:13
  179:24 180:9
observing
  179:21
obtain
  104:2 257:25
  313:17
obtained
  313:15
obtains
  253:18
obviously
  51:6 126:13
  340:10
October
  130:15
  133:11 134:6
  136:20
  137:11
  184:13,24
  296:24 297:8
od
  335:2
offer
  111:18,23
  135:15,19
  137:22

140:12,25
141:4 303:6
304:19
offered
  302:12,17,21
  303:7 318:21
  331:4
offering
  124:21 303:4
offers
  138:19
offhand
  170:3
office
  30:25 169:15
  176:19 177:3
  178:22
  179:16
  180:15,19,
  21,23 181:5,
  13 184:9,15
  185:2 186:9
  188:14,22
  199:9 207:11
  212:11 234:3
  268:12
  272:12
  273:4,17,25
  276:6 301:15
  316:10
officer
  8:11,16
  10:23 18:2,
  6,19,22 19:4
  20:2 26:2,13
  27:5 32:3
  43:2 44:6,
  20,23 76:22
  83:13 88:15
  90:25 91:4
  97:14 101:25
  108:20 109:7
  111:3 114:10
  122:16 125:8
  131:25 132:3
  133:21 134:7
  143:8 155:16
  166:11,17

168:7 186:23
190:6 195:18
200:14
202:18 204:4
222:20
227:13
234:25
235:24
236:20
252:18 253:8
263:6 269:20
277:17 279:7
282:3 298:13
300:19
317:22
**officer/mlro**
210:17
**officers**
88:19 90:12,
17 91:7
288:16,22,25
**offices**
289:2 316:23
**official**
64:18 66:25
68:19,23
127:16
225:19
255:19,25
257:20
306:18
315:16
**officially**
58:5,7 65:17
135:5 212:2
243:14
255:12
**offshore**
34:15 36:9
39:20,22,25
40:5 93:10
**okay**
7:6,15 8:25
9:19 14:12,
17 15:22
17:7 24:19
27:10 28:15
31:4 41:8,

18,19 46:5
48:20 53:10
59:23 65:7
66:23 69:3
70:10 75:8
84:16 88:3
102:11
106:22,24
124:23,24
130:19 153:8
164:2 191:24
202:3 221:15
232:17
239:12 244:8
247:3 254:14
262:9,13
278:25
283:22
289:9,22
296:3 301:17
304:8,9
308:25
338:24
**onboarded**
165:25
**onboarding**
79:22
**once**
9:17 19:10
31:22 187:9
337:18
**one**
9:23 11:15
15:9 25:6
27:19 32:23
35:2,4
49:11,19
50:10 55:7
57:16 58:4,
10 59:13
60:22 61:17
64:12 81:2
88:21,22
90:20 92:12
95:18 97:20
98:17
101:19,20
102:8,24,25

104:22
109:23,25
112:22,24
118:10
120:24 127:3
142:22
151:23
165:12
172:22
174:21
178:24 182:3
192:9
203:11,22
209:22,23
234:17
235:21
239:10,18
253:5 255:20
257:11
260:23,25
265:24
273:22 275:8
279:3,9,17
280:21
281:17 284:6
288:16,24
294:4 303:25
329:9 340:25
**ones**
58:11 59:4
61:17 224:6
**ongoing**
105:12
194:22
288:10
323:13
**online**
73:7 74:24
75:5 114:16
**open**
33:21 36:16
39:24 41:7
49:8,13,21,
24 50:16
62:7 73:8
114:18 135:2
145:24
213:18

322:22
323:23 325:5
328:4 333:23
**opened**
32:2,5
134:22
**opening**
33:20 78:16
81:20
**operate**
178:23
**operating**
265:16
**operational**
280:4
**opinion**
43:25 44:2
169:9 171:3,
7,23,24
172:2,8
188:17 189:6
256:10
**opinions**
43:21 44:7
48:25
**opportunity**
10:17,24
22:13,15
29:2 65:21
91:16 137:12
215:15 216:3
217:25
218:13
219:21
220:12
228:19
**opposed**
50:18
**opposition**
175:8
**option**
203:13
**order**
72:25 150:15
156:21
188:16 248:8
285:22

orders
  190:11
ordinary
  26:5
original
  213:8
outside
  163:2 164:21
  166:14,19
  199:13
  216:22
  217:2,6
  220:3,7
  323:6,25
  326:4 328:21
overheard
  136:18
  284:14
overhearing
  100:15
overnight
  24:8
owed
  316:24
owes
  318:24
owing
  317:12
owned
  301:16
ownership
  258:3
OWW
  211:9

P

P&l
  254:19
p.m.
  212:19 236:8
  253:12
  322:13 341:7
PA
  67:5 287:2
pace
  13:11

package
  318:22
  319:16
PADORSETT@
GMAIL.COM
  230:2 253:21
Padorsett@
gmail.com.
  318:17
page
  38:11,12
  55:4 63:2,11
  71:13 78:10
  82:9 92:22,
  23 96:17
  101:4,15,20
  102:4,9,10
  107:5,11,13,
  20 110:14
  112:22
  115:21
  137:15,16
  138:13
  141:11
  142:22 159:3
  163:25
  182:19
  241:21
  250:13
  254:18
  260:20 262:7
  265:24
  270:11,13,
  20,23 279:22
  292:12,13
  316:20
pages
  102:7
paid
  122:19
  137:2,6,20
  140:23 303:7
  318:23
pain
  197:3
paragraph
  16:5 19:21,
  22 20:6

27:22 33:10
36:5 40:12
72:15 75:18,
20 80:7,12,
17 109:10
110:19
111:9,10
112:17
114:2,7,14
117:16
126:16 127:3
135:13
137:17 138:5
140:22
145:21,22
151:14
157:21
160:11 161:7
162:11 176:4
184:8,12
199:5 205:2
238:14
255:10 268:5
300:17
paragraphs
  123:12
  124:16
paraphrasing
  114:17
parked
  336:22
  338:22
part
  12:25 16:22
  17:8 20:21
  21:16,17
  40:13,24
  52:18 57:17
  69:5 78:25
  103:14 112:7
  115:5 116:13
  139:21
  226:22
  246:23
  255:24 295:6
participated
  179:2 193:9

particular
  21:3 120:22
particularity
  241:24
parties
  139:11
  278:22
partner
  257:19
partners
  208:8
parts
  278:23
party
  140:7 242:6
  279:3,9,17,
  18 300:22
passed
  148:4 150:24
  337:2
passport
  49:20 50:2,
  10,11
password
  85:14 238:25
  247:9,14,16,
  18 250:10
passwords
  244:20
past
  107:19
  138:13
  146:24 178:4
  221:13,19
  242:16 262:4
  279:20
  314:17
  319:25
paste
  96:23 188:5
pasted
  188:25
pastors
  224:7
pattern
  146:6,12,14,
  20 147:14,21

148:5,17,21
149:5,13
150:8,13
151:2
152:16,21
153:20
156:13
157:10,16
**Paul**
175:14,17,23
185:20
**pause**
60:2 96:15
144:23
212:21
256:23
263:10
295:24
322:15
**pay**
49:25 121:16
183:10,15
314:23
317:10
**paying**
304:16
**payment**
299:15,19
304:15
**payroll**
302:18
**PDF**
27:11 43:13
230:14
237:11
254:3,4,5
270:2,8
271:20
**PDT**
145:14,19
146:24
147:2,11,20
149:20
151:8,9
**Peabody**
96:18 99:13
**penalty**
19:18 72:2,

12 114:3
116:18
143:18 161:3
**pending**
22:24 28:19,
23 63:7
65:19 205:5
209:21
219:14,17
220:2 228:7,
9,21 229:10
243:7 249:6
267:23 318:8
322:22
336:24
**people**
64:13 87:11,
12 106:21
136:9 142:5
147:6,10,15
149:16,22
150:17 151:3
156:18
174:18
181:24 224:4
274:8 278:18
279:13,15
**peoples**
182:3
**percent**
132:12 149:8
224:4 232:4
234:17
235:21 238:9
241:10,11,12
303:25
**percentage**
240:21
**perfect**
13:5,7
**perform**
108:17
**performance**
298:13
**performed**
92:5
**performing**
118:4 298:16

**period**
62:2 66:7
96:2 112:21
119:3 146:19
149:10 164:6
207:8 304:15
308:19
309:17
**perjured**
331:9,23
**perjury**
19:19 72:2,
8,12 114:4
116:18
143:19 161:4
331:15
**permanently**
125:10
**permissible**
220:25
**permission**
171:13
**permitted**
168:9 216:16
249:12 323:7
326:7
**perpetrated**
193:3
**person**
10:5,10
44:15 66:9
75:7,13
82:13 134:9
168:16 223:8
238:22 240:2
247:18
265:21
284:14 292:8
310:12
**personal**
6:16,24
45:23 105:13
119:12,14,22
120:6,13,17
127:5,19,25
128:3 129:24
143:15,20,23
144:2,5

160:22 163:6
164:14,19
165:11
166:14 179:7
242:10
263:13
283:7,10,14
284:17,24
285:8 308:15
309:4,21
314:2
**personally**
72:7 97:24
109:9 204:13
209:17 335:8
**personnel**
300:21
**persons**
9:24 11:2,12
16:10 17:3,
12,19 61:10
69:24 70:21
71:2 75:16
77:16 81:20
94:2,9,18
95:15,18
96:6 97:18
98:3,14
100:9 121:18
122:19 124:4
130:24
131:14
132:14
134:20,24,25
137:25
140:11 141:7
142:4 147:13
153:14
181:20,22
238:20
244:20 273:5
**persons,'**
132:9
**perspective**
82:11
**pertaining**
188:20

**Phil**
  277:24
**Philip**
  6:9 19:24
  238:3 315:7
  316:9
**Philip's**
  317:4 318:25
**philip@**
**suretrader.**
**com**
  46:9 52:23
**Phillip**
  46:8 71:19
  88:23 90:19,
  21 119:10
  164:2 186:21
  188:6 194:15
  202:17 204:3
  232:2 233:25
  235:13
  257:14
  269:20 270:3
  280:2 300:9
  315:2
  316:10,22
  317:11
  318:21
**Phillip's**
  316:11 317:3
**Phillip/**
**antonio**
  42:13
**Phillip@**
**suretrader.**
**com**
  29:23 35:12
  37:6 41:22
  45:6,10 49:6
**Phillip@**
**suretrader.**
**com.**
  23:22
**Phillipdorset**
**t@suretrader.**
**com**
  172:12

**phone**
  136:7 174:17
  179:23,25
  180:8,10,13,
  24 181:2,4,
  14 221:3
  251:3 253:13
  327:17
**phony**
  193:3
**photo**
  83:23
**Photograph**
  135:14
**photos**
  310:16
**phrase**
  145:13,15
  146:11
  151:17 195:9
**phrasing**
  334:10
**physical**
  224:10
**physically**
  177:4
**pick**
  318:25
**Pickels**
  273:24
**picture**
  49:19
**place**
  39:9 78:14
  79:11,14
  129:17 136:8
  149:23 154:9
  156:21
  184:24 275:3
  294:12,19,24
  310:15
**placing**
  295:3
**planned**
  227:16
**platform**
  202:23 203:6

  204:20
  211:11
**platforms**
  94:23
**please**
  6:7 12:20
  17:23 29:10
  35:4 42:16
  43:3,6 52:10
  53:8 59:16
  63:10 64:6
  65:3,5 66:3
  76:19 137:14
  144:6 153:5
  157:7 180:19
  186:25
  187:10
  188:7,21
  190:16
  196:16 201:6
  202:5,22
  203:12
  206:23
  207:17
  210:2,24
  211:12
  217:20 220:9
  221:6,21
  224:15
  228:18
  229:6,23
  230:5 233:24
  234:2 235:19
  236:12,24
  237:12 238:8
  239:12,24
  250:18 251:2
  252:16
  255:11
  259:17 266:4
  269:17
  276:21 280:6
  285:19
  298:11
  301:19 307:9
  308:18
  311:23
  313:14 319:4

  320:12 325:9
  326:18
  333:12
**point**
  17:15 38:23
  39:4 44:10
  61:23 67:12
  93:25 94:21
  108:25
  123:10
  210:10
  225:13
  235:18
  260:23,25
  261:21
  288:5,24
  290:22
  307:19,20
  332:24
  339:15
**points**
  67:11
**policies**
  20:11,22
  21:22 75:21
  76:11 79:13
  80:14,25
  81:11,18
  107:23 114:5
  199:24 200:9
**policy**
  16:7 32:10
  69:24 70:21
  76:23 77:3,
  8,13 79:20
  81:3,16
  121:13,15,
  21,23,25
  122:3,7,13
  165:16,19
  166:13,16
  167:7 284:25
  285:7 301:6
**ponzi**
  203:15
**pop**
  33:18 78:22
  79:6,17

80:19,20
81:3 82:11,
16,24 83:6,
14,17,18
84:18 85:18
86:2,13
89:20 238:24
240:4,5
**portfolio**
91:20
**portion**
21:3
**pose**
305:19
**position**
190:6 266:22
298:11
303:13
307:11
327:15,17
328:4 339:24
**positions**
296:18
297:11
**possess**
194:21
**possession**
284:5 312:22
322:20 334:8
**possible**
68:20 271:4
**possibly**
223:16
**potential**
113:10 176:8
181:15,18
188:9 298:2
**potentially**
273:19
**power**
198:12,15
296:24
297:17
**practical**
7:3
**practice**
70:8,13,22

77:10 79:13,
20 102:3
218:2 327:23
330:9
**precipitated**
296:6
**precursor**
154:25 155:8
**preempt**
330:7
**prefer**
50:10 251:3
**preference**
6:24 7:11
**preliminary**
267:17
**prepared**
190:21
213:22
**presence**
216:22
217:2,6
220:3,7
317:4 323:6,
25 325:3
326:5,23
327:2,19
328:21
**present**
11:4 177:4,7
224:13
**presented**
26:15 164:23
255:22
259:12
266:13,19
**preserve**
196:4 197:19
**preserved**
195:3
**president**
143:3 168:23
234:4,24
235:11 238:7
300:23
**press**
192:3,14

207:18
310:17
**pressure**
19:9
**pretending**
285:22
**prevent**
75:23 76:12
79:14 80:15
81:14 82:2
114:5 238:20
**previous**
35:15 253:10
**previously**
329:14
334:24
**primarily**
6:21
**prime**
190:7
**principle**
294:3,9
**principles**
173:17
**printed**
57:14
**prior**
34:20 57:8
129:7 141:12
186:13
224:19 231:6
291:17,19
329:10 335:9
**privilege**
216:9 263:8
311:25 312:3
335:3,25
336:9
**privileged**
168:3
233:13,22
250:7 255:23
311:17,21
312:5,11
335:4 336:6,
11

**privileges**
250:2
**privy**
100:20 125:6
180:16
188:19
**probably**
18:10,12,17
19:9 61:16
68:4,15
125:23
156:16
163:7,8
225:11
256:16
**problem**
35:6 235:16
251:14
**problems**
57:11
**procedure**
77:9,15
216:18
220:23
**procedures**
32:10 75:21
76:11 80:14,
25 81:11,17
87:15 114:5
**proceeding**
29:17 60:2
96:15 144:23
209:14
212:21 216:2
256:23
317:22
322:15
**proceedings**
197:21
198:2,16,19,
23
**process**
165:8
**procured**
242:10
**produce**
244:4,6

281:22 306:7
307:8,10
333:7
produced
  55:25 56:5
  58:25 141:15
  213:19
  245:25
  246:23
  248:23
  262:10 281:7
  306:10
  307:6,12
  309:3 322:20
  330:11
  332:2,13
  333:6 336:12
producing
  306:19 307:3
  331:5
production
  213:7,12
  307:23
  339:5,17
products
  111:21
professional
  44:2,11,24
  45:3,23
  48:4,8
profited
  193:10
proform
  145:4
program
  61:2,6,20
  97:15,21,25
  102:22 103:5
  105:7 115:6,
  11,13
  116:14,23
  118:14
  121:4,17
  122:17
  127:10,15
  130:17
  132:13 133:5
  241:20

prohibit
  78:14 79:18
  86:19 121:2
prohibited
  113:19
prohibiting
  72:22 87:15
prohibition
  97:3
prominent
  111:17
promise
  203:15
promote
  128:25
  129:16
promoting
  124:19
promotional
  111:16
promulgated
  108:4
proof
  160:17
  161:12 256:6
proper
  22:11 169:16
  300:25
  306:17
propriety
  339:4
prosecuted
  195:11
prosecution
  194:9
protect
  291:21
protected
  191:14,17
protection
  141:22 250:2
protesting
  317:4
Protrade
  190:15
  246:20
  247:11

257:19
  258:4,11,14
Protrade's
  257:20
proud
  36:23
prove
  102:7 224:16
  331:5
proved
  249:8
proves
  331:9
provide
  11:15 13:8
  28:25 44:7,
  20 102:15
  105:20 121:3
  133:16 195:2
  201:6
  202:15,22
  203:5,25
  244:13
  246:14
  249:20 250:3
  311:23 319:6
provided
  17:10 47:24
  48:12 55:17
  56:14 60:9,
  10 63:19
  92:7 100:3
  110:20 118:8
  172:5 202:23
  212:12 215:3
  245:24
  246:15
provides
  32:19 245:8
  268:7
providing
  22:7,8 29:7
  67:23 113:13
  136:3 149:7
  167:17,22
  190:12 191:3
  193:22
  247:18

248:12
PTD
  157:5
public
  6:4 110:25
  111:4 177:2
  189:21
  221:25
  222:14,19,
  22,24 223:2,
  10,20,23
  224:5,6,11
publics
  223:7,12
pull
  14:4 19:14
  23:20 26:23
  30:6 49:2
  60:11 62:9
  63:15 65:14
  77:19,24
  79:24 80:6
  83:4,22
  100:23
  107:2,3
  115:20
  128:20
  130:12
  140:18
  145:20
  148:14
  153:25
  158:22 172:9
  175:6 182:17
  189:13
  191:25 192:9
  194:11
  197:14
  201:19
  208:22 210:2
  215:12 227:2
  228:4 231:11
  236:12
  237:9,12,15
  239:7 240:15
  244:24 245:2
  252:2 283:15
  293:16

Philip Dorsett
February 28, 2023

295:14
298:20
311:16
**pulled**
158:24
207:19
**pulling**
52:17 59:21
117:15
218:10 219:2
249:13 257:7
**purely**
137:20
140:23
**purpose**
102:13
107:16
133:13
208:10
**purposes**
106:2 179:7
**pursuant**
59:13 71:25
127:3 189:17
**push**
41:7
**put**
18:24 57:17
58:4,5,8
64:18 65:16
68:9 78:20
79:10 96:5,9
97:15,25
98:11 102:3
135:5
143:14,17
146:25 147:3
160:8 169:7
208:14,25
209:7 213:2,
10 216:4,21
217:19
218:7,9
219:12 237:5
248:21
302:17
308:16
310:24

317:5,14
324:25
326:21
328:17,19
329:16
331:13 338:4
**putting**
141:24
330:5,7

_____

**Q**

**qualified**
102:15
105:19 106:8
133:15
**question**
12:20 13:20,
24 14:2
18:18 21:6,
12 22:24
23:11 28:19,
23 29:10,11,
17 38:16
48:11 50:22
52:13 63:8
65:19 69:4
70:12 78:13
82:9 86:17,
25 87:7,13,
19,24 88:3,
11,14,18
89:6 90:11,
16 92:25
93:8,17
94:13 96:18,
24 97:22
98:21 99:7,
18 109:6,20
115:17,19,25
121:11,12
126:2 134:15
136:13,15
139:24
142:12 164:8
165:4,8,14,
20 180:4
182:20,22

183:2,6,9,13
188:21
199:21 200:6
202:14,21
203:11,24
205:5 208:24
209:4,20,22,
23 213:15
219:15,18
220:2 227:5
228:8,9,15,
21 229:11,18
241:22 243:7
247:21,25
249:6,15
251:16
256:24 258:3
261:24
262:4,5
263:24
264:12,13
287:22
306:24
309:12,14
315:24
318:3,9
319:18
320:13
321:14
333:21
337:22
**questioning**
57:4 88:13
212:24
229:16
**questionnaire**
241:23
**questions**
6:17 9:3
13:5,6 21:11
22:15,17
23:6,14,15
44:16 48:19,
22 52:16
65:22 70:19
85:23
137:10,14
163:20

228:14
274:21
322:3,5
**quick**
322:4
**quickly**
132:20
212:23
**quite**
69:20 125:24
129:10
179:16 256:9
307:15
**quote**
37:23 126:18
265:10

_____

**R**

**Radio**
104:20,21
114:23
117:16
126:20
258:22
**raise**
216:10
333:20
340:24
**raised**
215:18 217:7
336:18
337:24
**raises**
338:7 339:2
**raising**
213:25 221:5
**ramifications**
169:18
**Randol**
314:11
318:13,19
**Randol's**
319:24
**random**
339:25

**range**
55:23
**ranges**
56:6,7
**rate**
135:21
137:24 141:5
**rates**
135:22
**re-evaluated**
298:10
**reach**
128:23
129:14
**reached**
304:16
**read**
17:21 18:3,
8,9,12,19
19:2,6
25:19,21
28:11,12
29:10 37:17
42:16 43:3,
4,6 68:14
72:7 78:11
81:8 86:8
88:10 89:9
106:5 107:15
142:7 155:3
171:25 174:3
185:13 200:2
205:2 235:14
239:24
251:18
252:15 266:9
295:24,25
304:8 308:8
316:15,18,19
317:24,25
**reading**
28:7 68:18
166:10
204:24,25
227:21
236:17
317:19

**readings**
183:16
**ready**
318:25
**real**
75:6,12
281:5 330:24
**realize**
74:10
**realized**
19:10 68:15
149:19 248:5
252:19 311:8
331:23
**reason**
12:13 15:4,
10 16:23
17:8 21:17
39:19 51:12
52:8 68:13
95:6 116:25
130:5 134:18
136:5 186:3
205:19
206:25
227:13,15
246:21
282:21
284:22 285:2
289:12 303:9
305:18,23
314:21
**reasonable**
107:23
**reasoning**
22:8
**reasons**
74:22
**rebate**
130:17
132:13
**rebuilt**
314:4
**recall**
8:6,14
11:14,16,21
12:4,7

14:20,22,25
15:17 16:14,
18 24:15,17
31:4 36:20
42:19,21
43:15,18,20
44:3,8,18,22
46:25 50:6
51:11,21,23
52:4 53:20,
23,25 57:20
61:2,18,21
63:17,21
64:10 74:13,
18 78:3
83:19 85:25
86:3 88:3,18
90:16 91:2,
5,11 92:13,
17 104:4
123:5 125:3
126:24
129:7,19,20
134:10
147:8,11
148:19
150:19 152:6
157:10
158:11,21
159:21,23
171:9,13,15,
17,19 172:5
173:14,18
182:14 194:7
200:21 205:9
221:12,18
222:3,7
224:21 225:6
226:4,8
227:6 236:2
238:10
239:20 246:6
251:20,25
253:12
259:20 260:7
262:16,17
264:24
265:19 267:2
270:12,14,15

272:10,24
277:14
280:9,11
281:4,9,11,
19,24 293:2
294:15,16
295:3,12
299:23
302:15,24
306:19
307:3,5,19,
20,25 313:8
319:9,13,14,
19,20
**recalling**
282:22
**receive**
57:6 195:25
198:21 225:8
303:8 312:11
315:15,20
**received**
25:20 33:8
40:18,22
64:7,21
115:18
170:13,15
187:21 211:9
213:6 231:5,
8 232:23
233:2,20,22
234:23 235:6
246:25 259:9
261:9,14,25
262:12
266:11 287:7
301:25
306:4,16
336:21
**receiving**
15:2 24:15
25:17 31:4
42:19 111:2
124:18 169:2
226:4 236:2
280:9 319:9,
13

recent
  250:23
  296:14
  298:11
recently
  313:21
recipients
  283:17
recognition
  329:19
recognize
  122:9
  193:14,20
  219:7 232:19
  246:10,19
  262:25
  265:21
  271:21
  272:19 276:4
  295:23
  296:4,9
  301:20
  304:12
recognized
  123:9
recollection
  57:25 58:13
  64:15 65:11
  69:2 89:19
  90:4 136:2
  152:21
  172:24
  230:23 231:5
  232:23
  234:12
  251:20
  254:12
  257:24 258:7
  289:11
  305:21
  306:2,5
  314:4 315:12
recommend
  144:15
  267:18
  276:24
recommended
  120:22

recommending
  121:4
reconstruct
  310:14
reconstructed
  310:7,21,23
record
  6:8 46:3
  141:25
  142:11 145:2
  148:25 202:4
  213:3,23
  214:18
  215:23
  216:4,11,20
  217:11,17,19
  218:8,9,14,
  21 219:13,
  22,23,24
  220:5,13
  221:7 250:17
  282:5 316:18
  323:8 324:17
  326:4,6,21
  328:15,18,19
  329:11,17
  330:8,10
  334:2,16,18,
  22 339:11
recorded
  176:7 215:17
  279:4 281:5,
  13
recording
  278:18,24
  279:13,15
  281:9,12,16,
  22 282:11,20
recordings
  278:22
  280:20
  281:19
  282:10,16,23
records
  120:21
  160:19
  163:16
  195:14

  199:20 200:5
  201:6 225:19
  313:23
recovery
  240:22 241:6
refer
  8:2 338:20
reference
  67:10 117:7
  168:15
  186:24 188:6
  244:17
  246:8,12
  252:6,10,11
  258:3
  259:23,24
  263:21
  286:14,15
  287:10
  304:25
referenced
  11:5 174:4
  186:24 239:4
  335:6
references
  319:15
referencing
  170:16
referral
  114:22
  117:20
  121:3,16
  126:18
referrals
  121:22
  122:19
  201:22
  202:10
referred
  11:24 121:18
  319:16,17
referring
  8:3 62:2
  75:9 96:2
  126:19
  145:19
  146:10 148:5
  151:19 152:4

  167:11
  169:23
  174:23
  227:23
  236:18 239:3
  253:3,6
  287:18,25
  288:22
  308:19
reflect
  40:8 141:11
refresh
  64:14 65:10
  89:18 90:3
  135:25
  152:20
  230:22 231:4
  232:22
  234:11,14
  254:11
  257:23 258:7
  305:20,25
  315:11
refreshes
  57:24 58:12
refuse
  121:3 328:13
refused
  317:3 318:22
refusing
  23:9 134:7
  218:6 221:8
  262:5
regard
  50:14 121:24
regarding
  10:19,25
  11:11 16:10
  17:2,11,18
  20:11 21:22
  43:22 44:8,
  21 47:25
  48:13 63:18
  108:11 126:4
  128:4 225:23
  252:20 253:2
  273:8 275:4
  334:5

Regional
199:9
registered
11:2 156:6,
12 168:10
199:11
258:14
321:18
registration
32:20
regular
102:2
regulate
153:15
regulated
201:14
regulating
19:4 28:2
regulation
73:2
regulations
8:17,22 9:7,
9,13 26:21,
22 27:3,6,8,
12 43:17,22
44:8,12,22,
25 45:4
48:13,17,18,
23 72:21
75:24 108:3,
4 111:25
128:17
146:23
195:20,23
regulator
77:12 153:9,
11 167:23
168:11,15
188:13
259:21
regulators
70:9 77:7
110:9,11
134:25
139:14
167:18
174:24
188:11 189:9

227:24
240:12
243:11
252:21 253:3
265:2,11
292:25
regulatory
107:21
108:22
109:2,8
110:3 155:11
198:7,10
268:11
rejected
304:19
related
18:7 127:10
184:12 211:5
212:12
330:11
340:11
relates
277:5 301:2
relating
296:14
relation
71:2
relationship
116:2 127:21
128:5,14
129:6 137:21
138:6 140:24
243:17
relationships
280:22
release
189:20
192:3,14
207:18
released
191:20
relevant
10:18 16:8
17:16 108:10
194:22
remain
211:14

remained
115:8
remarks
330:4
remedies
245:9
remember
12:8 15:2
24:20,22
31:9 38:25
54:17 60:21
61:16 68:22
74:11 86:4
95:22 100:15
101:5 105:4
110:2 114:7
117:8 121:23
129:9
151:22,23
157:18 160:2
163:7,14
170:2 173:3,
4,8,9,12,15
177:24
181:23
204:23
205:12,16
225:5 239:22
253:14
255:11
261:21
263:4,18
270:17
272:14
277:19
286:16
294:18
302:11
306:25
remembered
222:4,6
223:14
remind
144:14
180:18
reminding
229:13

remove
311:17 312:5
renew
163:19
renting
299:20
repaired
310:12
repeat
94:12 139:24
246:3 247:20
repeatedly
12:5 200:22
repercussions
199:3
report
117:7 303:10
reported
303:18
reporter
6:6,22 7:11
96:10 202:5
214:13
215:21 218:8
250:17 269:7
324:14
325:10
329:17
340:15 341:3
reports
298:16
represent
277:3 314:22
representatio
n
314:20
332:25
339:10
representatio
ns
269:2 339:21
representativ
es
176:10 181:6
represented
186:10
196:24 262:2

Philip Dorsett
February 28, 2023

276:6
314:16,19
334:25
336:19
339:19 340:3
**representing**
264:2,3
**represents**
108:7 149:8
**repute**
204:14
205:24
**request**
29:17 57:2
59:18 169:8
170:5 171:2
187:5,7
189:18
190:16 201:8
215:5 218:13
242:19
244:15
248:2,4
255:7,12,24
265:20,22
296:25
297:17
299:13
301:14 322:3
**requested**
132:9 187:9
189:16
214:22
224:25
239:16
**requesting**
193:16
213:11
242:18
256:2,5
291:7 322:25
324:19
326:13
**requests**
169:4,12,16
188:12
**require**
211:11

**required**
73:3 258:14
306:18
318:24
320:17
**requirement**
124:11
**requirements**
201:16
**requires**
85:9
**research**
46:18 47:2,7
178:3
**resident**
38:3 134:9
135:20 136:4
**residents**
33:16 37:25
38:20 72:23
73:8 74:25
75:24 76:13
80:16 81:15
82:3 93:13
112:4,12
114:6 123:13
124:19
130:18
135:16
137:25 141:7
**resign**
305:3,7
**resignation**
304:22
305:15,17
**resigned**
243:14
**resolution**
337:3
**resolved**
330:19
**resources**
300:21
**respect**
13:14 18:14
20:23 199:23
200:8 317:14

**respectfully**
201:8 210:16
**respond**
50:7,9
213:23
217:25
219:21,24
221:7,16
228:15 251:6
326:7,9
328:16
336:15
**responded**
53:12 54:11
171:21
**responding**
35:15 46:11
170:19
249:15
275:22
**responds**
71:6 123:25
124:7 130:21
**response**
6:19 12:24
37:8 48:19,
22 52:2 67:5
105:10 187:7
196:16 197:6
213:24 219:4
230:9 235:9
250:22
269:21
271:14
287:20 296:7
302:7
**responsibile**
21:14
**responsibilit
ies**
16:24 26:6
200:19 298:9
**responsibilit
y**
8:15 9:6,8
60:24
**responsible**
8:20 20:7,

10,16 21:21
53:22 54:2
118:13
**responsive**
13:13 293:10
**rest**
207:4 290:3
316:15
317:19
**restriction**
152:22
**restrictions**
100:12
146:4,5,9
157:9
**result**
240:22
298:17
322:21
**results**
297:25
**resume**
227:8,11,14
230:11,13,23
**retain**
196:4 197:19
**retained**
195:3
**retains**
113:3
**retention**
199:24 200:8
**returns**
203:16
**reveal**
242:3
**revealed**
242:5
**revert**
64:22
**review**
10:17,25
11:11 67:11
71:7 91:17
224:19
225:17 234:2
238:8 311:25

312:3 335:3,
25 336:2
338:23
**reviewed**
16:7 17:16
108:8 272:12
**reviewing**
16:25 54:3,5
**revisions**
71:7 159:18
**revoked**
316:11
**rhythm**
13:10
**right**
7:20,23 9:14
12:2,16
18:21 22:25
36:23 44:10
51:5 62:6
68:2,3 75:9
77:4 81:7
90:10,23
92:24 101:8
102:23 103:7
108:13
115:14
127:11 135:2
138:6 145:12
146:6 147:12
148:11
151:21
158:19 192:8
212:17
229:14
232:16
247:15 249:3
252:17 260:8
266:6 282:13
287:20
290:16 291:9
305:11
310:25
317:19
339:19
**right-hand**
101:16,22
102:4 110:16

**rights**
305:14
**ring**
286:17
**ringing**
246:20
**rise**
195:5,9
**risk**
19:18 154:4
296:20
**Ritchie**
30:16,18
35:11,18
36:3 37:14,
22 41:4
45:17 122:25
123:25
129:13
130:15,21
131:13 132:7
**Robert**
254:5
**role**
114:9 117:18
**roles**
8:7 193:2
**room**
177:7
**Ross**
122:24
123:6,19,25
129:11
130:14
142:17
**roughly**
87:12
**round**
147:4
**routinely**
179:5,12
**rule**
31:13,17,20
32:12,17
33:4,7 34:3,
10 40:14,17,
20,24 46:21

47:10,14,17
145:19
147:3,11,14,
20,21,22,24
148:6,18
149:13,20
150:8,16
151:3,8,10
153:2 154:3,
8 156:14
157:15
267:24
**ruled**
337:8
**rules**
6:16 8:17,22
9:12 10:18,
25 11:11
16:8 17:2,
10,17 41:10
108:3
145:10,11,
13,14,16,18
146:3,5,7,9,
13,15,21,24
150:14
153:20
157:9,16,17
216:17
**ruling**
336:4
**run**
337:9,18
**running**
51:18 52:4
292:10
**rush**
49:25
**Russell**
212:25

—————————

**S**

—————————

**Sajaad**
194:14
198:22
250:21

253:21 257:9
279:25
280:16 281:8
285:13
313:24
**sake**
271:17
**sanctionable**
332:9
**Sarah**
274:19
275:25
**sarcastic**
330:4
**SAS**
310:16
**sat**
256:8 310:10
**save**
169:7 299:14
**saved**
310:23
**saying**
24:21 26:18
34:9 43:3
48:24 80:3
83:18 84:15
105:5
118:18,25
119:23
129:14
130:22
138:22,24
151:23
162:22
170:11,16
171:14 222:7
227:24
228:23
236:19
272:21
275:24
281:19 288:4
291:19 293:3
302:16
322:8,10
**says**
15:12 16:6

Philip Dorsett
February 28, 2023

| | | | |
|---|---|---|---|
| 21:14 24:6, | 186:14,17,21 | 297:8,14 | 131:10 |
| 11 25:11,14 | 188:6 189:6, | 298:8 | 192:12 |
| 27:23 31:13 | 15 190:3 | 300:13,17 | **Scro** |
| 32:16,17 | 192:23 193:6 | 301:5,7 | 29:9 228:14 |
| 33:10 34:13, | 194:19 | 302:3 304:20 | 329:23 |
| 14 35:18 | 196:15 | 305:18 | **scroll** |
| 36:9,15 | 197:4,17 | 314:25 315:5 | 15:24 16:2,3 |
| 37:14,21 | 200:11 | 316:8,22 | 19:20 32:14 |
| 39:19 40:12 | 202:14,16,21 | 318:19 | 34:6 35:25 |
| 41:3 42:12, | 203:25 208:6 | **scared** | 36:7 37:11, |
| 15 43:6 | 210:11,14, | 318:20 | 19 41:15 |
| 49:7,16 | 16,20,24 | **SCB** | 46:4 49:4,10 |
| 52:23 54:20, | 221:24 | 187:24 | 55:3 57:13 |
| 23 55:5,8 | 223:19 230:5 | 243:15 | 60:12 63:10 |
| 60:15 64:4, | 231:17,21,24 | 244:16 | 65:7,22,23 |
| 20 65:24 | 232:9 233:2, | 246:18 | 67:3 71:3,11 |
| 66:2 67:15 | 4,7,10,12,25 | 247:25 248:2 | 75:18 78:9, |
| 69:4,7,23 | 234:16,21 | 255:13 | 18 82:20 |
| 71:14,18,24 | 237:25 | **SCB's** | 92:21 |
| 72:16 74:23 | 241:23 | 248:7 | 101:14,19 |
| 78:12 81:25 | 242:9,13 | **schedule** | 106:16 |
| 84:6,21 | 243:13 | 7:7 250:25 | 107:4,10,19 |
| 102:12 | 246:24 | 280:7 | 110:13,18 |
| 105:17 | 247:5,8,11, | **scheme** | 111:9 112:16 |
| 107:21 | 13,24 250:21 | 192:7,17 | 126:16 |
| 110:19 | 254:10 | 193:2,10 | 128:21 |
| 112:18,24 | 255:10 | 203:14,15 | 132:5,11 |
| 114:15,21 | 257:14,17 | 207:23 | 135:12 |
| 117:14,15 | 258:13,18 | **Schipone** | 138:23 |
| 119:10 | 259:8 260:2, | 204:10,16,20 | 140:8,19 |
| 123:12 | 10,17 262:19 | 205:7 | 141:16 |
| 128:23 | 264:14,21 | 206:10,19 | 145:21 |
| 130:16 | 265:25 266:5 | 208:7,16 | 152:16 159:3 |
| 131:13,17 | 267:3,11,15 | 209:7 211:19 | 160:10,20,25 |
| 132:8,11,13 | 268:5 | 212:13 | 175:10 |
| 133:14 | 269:17,24,25 | **Schipone's** | 182:18 190:2 |
| 137:18 | 272:15 | 207:8 | 197:2 202:13 |
| 140:9,21 | 273:14 | **scope** | 210:14,15,23 |
| 142:8,17,21, | 275:18 | 102:13 | 219:10 |
| 24 143:4 | 276:21 | 107:16 | 221:20 |
| 145:17 | 280:2,15 | 133:13 | 229:23 |
| 148:20 149:4 | 283:17 | **scream** | 231:12 234:5 |
| 152:16 | 284:13 | 332:7 | 237:23 |
| 157:22 | 285:19 | **screamed** | 245:22 246:9 |
| 160:11,22 | 287:6,10 | 221:2 | 248:23 |
| 161:3 162:12 | 290:24 | **screen** | 250:12 252:9 |
| 164:2 168:21 | 292:15 | 83:5 84:17 | 253:10,16,19 |
| 176:5 178:22 | 295:18 | | 260:20 264:7 |
| 184:13 | 296:13,15,23 | | |

Philip Dorsett
February 28, 2023

265:23
269:24 270:6
271:6,25
272:3 273:13
275:11,21
279:19,21
280:13
292:14
295:21,25
296:2,10
298:6,23
301:19,21
316:14,20
319:25
**scrolled**
138:13
**scrolling**
37:12 96:16
237:2 250:19
274:16
275:12
**Sea**
6:11
**search**
255:3 279:5
312:13
337:10,18
**searched**
34:22
**SEC**
27:12 28:18
31:13,17
34:3,10
40:14,24
41:10 43:7
60:10 63:19,
22 64:13,15
68:9 69:13
84:24 96:21
103:25
108:10
115:23
118:23
125:24
147:22,23
148:3 156:6
159:14,18
168:11

172:19
173:12,15
184:15
185:10
186:11
187:17,24
191:4 192:4,
15 193:6,16
194:8,14
195:21
197:25
198:6,14,19
199:9
206:15,19
207:11,18,20
208:6,14,18
209:6,13
212:10
213:5,10
215:4,5,10
240:19,20,23
241:6,15,22
242:17
243:15
244:2,5
245:25
246:5,16,22,
24 248:23
249:21,23
250:4 255:16
256:2,10
257:24 258:8
262:11
263:11
265:21
267:24 275:4
276:8 278:6,
8 281:23
284:4,9
287:14,18,25
288:11
289:4,17,23,
25 290:9
291:2,8,12,
14,17 293:7
300:4 306:8,
11,20 307:4,
8,11,17,21
308:3 309:4

311:16 312:4
313:6,10,20
334:24
338:22
**SEC's**
192:3 254:8
**SEC-FL-03848-
E-001704**
245:23
**SEC.GOV/
LITIGATION**
43:12
**second**
63:2,11
64:12 100:8
101:3 107:20
199:4 239:10
250:13
300:17
**seconds**
84:14 129:5
325:17
327:20
328:16
**secret**
299:5,13
**secrets**
292:21
**section**
108:9,10
114:21 160:7
189:17 268:3
**secure**
71:8 133:14
**secured**
64:6
**securities**
16:9 20:9,18
21:15 27:14,
25 32:9,11,
18 33:11,14
37:23 55:10,
12 92:5
104:7 108:5
111:25 112:3
113:15
155:24

163:11
166:25
167:4,24
168:5 171:12
176:11
178:23
182:11,19
184:16
185:3,4,10,
24 186:7,23
188:8,15
189:3,25
190:17,21
191:6,11
192:13,24
194:20,24
196:18
197:5,19
201:3,13,16
202:19
203:19
206:20
210:5,21
211:3 242:18
248:13,15
250:24
267:25
295:17
300:14
303:20 311:9
312:23 320:5
**security**
32:24 94:3
154:20 184:3
301:15 313:4
**see**
15:11 16:5,
12,13 24:2,
5,8,12 25:8,
11,15 27:14,
22 28:4,13,
20,23 29:12
31:12,14
32:8,12,13,
16,25 33:23
34:4,6,11,
13,15,22
35:9,13,23

Philip Dorsett
February 28, 2023

36:3,8,12,
15,17 37:3,
6,9,12,13,17
38:6 39:18,
25 40:14
41:10,12,16,
19,20,23,25
42:12,15,16
43:9,13
46:9,13,21
49:8,14,18
50:3,22
52:24 54:19,
21,23,25
55:5,13
57:14 59:23
60:14,17
62:19,20
64:7,22
65:6,8,24
66:4 67:13,
19 69:7 70:2
71:5,9,14,
16,18,20,24
72:3 73:13
75:25 76:2,
13,14 78:12,
22 79:2
80:2,16
82:18,22
84:6,20
85:7,9,13,14
86:9 88:24
89:8 90:20
93:15 94:5
97:7 99:23,
25 101:10
102:12,17,25
105:17,22
106:3 108:18
111:6 112:5
113:15
114:15,19,25
116:8 117:3,
23 120:20
123:3,16,18,
21,22 124:5,
22 125:23,24
128:24

129:3,14
130:19
131:3,9,15,
20 132:6,10,
14,22 133:2,
10,12,18
134:25
135:23
137:18
138:2,3,9,
15,20,21
140:21
141:8,19
142:13,15,
18,21,24
143:4 144:4
148:20 149:3
151:16
152:18 154:6
157:5,24
159:5 160:21
161:2,5,6
162:12
164:16,17
166:3,5
169:20
172:15
175:19
176:12 179:9
183:19
184:21
186:19
187:11
188:22 189:9
190:18,19
191:7 192:18
193:4,12
194:17 195:6
196:13,18
197:8,22
199:14
201:17,24
202:6,12,14,
16,24 203:16
204:10
207:23,25
208:6,12
210:11,17,21
211:14

221:22,25
222:13
223:19
230:3,5,6,14
232:7,8,9,10
233:4,12,20,
23 234:6,15,
20 235:18
236:9,10,23
237:4,13,25
238:3,4
239:11,14,17
242:7,11,21
243:5,11,20
244:14 246:7
247:4,5,8,
10,13 248:8
251:4,8
253:23
254:2,6,9,20
255:13
257:15,21
258:10,15,22
259:12,18
260:3,12,14,
18 262:9,18
264:8,14
266:15
267:3,9,11,
13,20 268:3,
8 269:14,22
270:4,5,9,
10,21 271:3
272:5,15,16
274:2,21,22
275:11,16,
17,20 276:2,
19 277:7
280:7,15,17,
24,25 281:20
282:17,19,22
283:18
284:19
285:14,17,23
286:4,11
287:3,8,15
288:25
290:10 291:4
292:15,23

295:19
296:21
297:3,4,6,
12,13,21
298:4,5,18,
24 299:10,20
300:11
301:2,3,6,
12,16,24
303:15
304:7,17,23
305:16
309:20
310:16,17,18
313:2 315:3,
9,25 316:4,
12 317:6,15,
16 318:17
319:2,7,15
322:12
324:13
**seeing**
  14:20 83:19
  85:25 86:3
  118:15 120:9
  121:23 125:3
  130:6 302:2
  319:14,19,20
**seek**
  191:4 213:17
**seeking**
  45:23
**seeks**
  201:9
**select**
  203:12 307:7
**sell**
  294:7
**seminar**
  49:17 60:16
**send**
  24:7,21 28:9
  30:9 31:8
  35:5 50:19
  55:18 56:16
  59:7,9,10,20
  66:12 71:8
  104:9 124:11

Philip Dorsett
February 28, 2023

139:7 167:3
168:9 172:7
187:23 190:9
227:7,9
230:10 233:2
243:18 308:2
321:23
332:12
**sending**
91:14 100:19
120:9 129:12
140:2 165:10
201:8 225:16
255:16 256:5
266:17 296:6
299:23
**sends**
123:19
**senior**
50:14 189:23
273:2 300:19
**sense**
156:15 163:9
174:13 224:3
**sensitive**
250:9
**sentence**
24:5 28:8
60:15 123:11
138:16
**separate**
103:4
**separated**
160:11,18
161:8,16,17
**September**
64:25 71:16
123:24
192:15,23
275:14,16
**serious**
26:10 170:17
**seriousness**
26:8 168:25
**served**
8:10 91:3

**servers**
190:10
**service**
33:15 37:24
38:10,19
111:21
112:3,11
**services**
62:17 100:25
102:16,20
103:5 104:18
105:2,21
106:11
111:19,20
112:24
113:5,9
117:23 118:5
120:5 126:23
132:21
133:6,16
137:8 320:14
**set**
38:25 95:4
109:9 119:12
127:5 135:22
160:23
213:20
226:14
**several**
94:25 243:24
292:5 301:9
**severance**
318:22
**shady**
164:12
**shaking**
6:20
**share**
320:10
**sharing**
190:6
**Shore**
150:5
**short**
296:18
**shortly**
35:8 64:22

**shot**
83:5 84:17
131:10
192:12
**show**
11:6 53:7
75:15 77:5,
6,7 124:13
138:13 157:7
160:17
161:12
162:6,22
171:16
209:10 225:3
229:22
239:23
243:16 249:4
254:19
290:25
291:11 314:7
**showed**
31:18,20,22
77:2 91:24
157:12,14
169:25
186:13
227:21
233:19
238:21
249:8,9
271:7,8
**showing**
29:4 77:12
239:22
**shown**
83:13 141:12
**shows**
204:5
**shut**
211:23
212:3,5
**sic**
26:17
**side**
8:20 237:5
**sign**
9:17 15:8,19
18:2,6,23

19:5 33:22
64:19 73:4
79:2 103:6
133:25
139:11
165:24
223:20 232:2
304:21
**signatory**
272:11
**signature**
15:14,15
57:15 58:6
63:13 64:5
71:19,22
101:6,7
141:19
142:6,18
159:5,7
236:24
239:11,15
270:14,16,20
298:24
301:24
**signed**
19:2,9,17
54:24 61:23
65:4 69:25
70:23 72:11
91:22 102:2
104:25 107:7
110:6 112:8
113:18
120:15
127:23
138:4,15,24
139:4,8
140:3,7,14
142:3 159:10
167:12
196:21
222:6,11
223:14
224:12 232:6
234:19
237:16 262:8
296:11

Philip Dorsett
February 28, 2023

significant
  150:13
  184:16
  185:4,10,24
  263:3 339:3
significantly
  108:15
signing
  15:17 18:20
  61:18 224:20
similar
  86:19
Simona
  172:17
  186:16
  189:22
simple
  168:22
  261:23
simply
  124:20
simultaneousl
y
  91:4,7
single
  141:11
sir
  229:21
  326:24
  327:5,18
sit
  76:21 134:3
  251:20
site
  82:18 86:16
sitting
  172:4
situation
  169:11
  331:18 332:3
six-month
  304:15
skipped
  275:8
slash
  304:22

slightly
  252:9
smail
  66:3
smaller
  321:21
snapshot
  338:21
sole
  108:16
solely
  277:5
solicit
  38:3,10 73:8
  84:23 93:21
solicitation
  10:19 11:2,
  12 16:10
  17:2,11,18
  72:22 75:24
  76:12 78:15
  79:14 80:15
  81:14 82:2,
  4,5 86:20
  87:16
  111:13,19,24
  114:6 121:2
  125:20 126:4
  251:12,21
  252:11
  254:23 259:7
  266:25
solicited
  55:10 73:5
  85:4 87:6
  88:8 208:8
soliciting
  33:11 78:24
  86:24 139:15
  252:6,22
  277:12
soliloquy
  29:3,7 137:9
  229:6,8
  249:11
sort
  28:8 31:25

55:21 88:16
103:9 109:25
125:5 165:20
173:9 192:10
203:22 216:7
225:8,9
295:10
303:13
340:16
sorts
  90:13
sought
  187:4
sounded
  174:23
  329:12
sounds
  23:12 35:7
  92:16 131:12
  200:3 289:17
  340:13
source
  250:7
sources
  114:22
  117:20
  126:18
Southern
  327:23
span
  156:22
speak
  99:21 137:12
  140:6 182:4
  220:12 257:4
  280:24
  287:12,24
  323:15
  334:18,21
  336:21
speaking
  64:13 174:25
  181:6 216:8
  253:14
  325:21 332:6
special
  273:21,23

specific
  23:14,15
  42:22 69:24
  70:21 121:11
  134:15
  137:10
  208:23
  209:3,5
  256:17
  296:15
specifically
  24:17 108:6
  110:20
  151:23 152:7
  243:15 248:3
  252:21
  257:18
  280:11
  323:21
specifics
  100:20 135:6
  279:17
  288:13,14,19
specified
  32:22
specify
  308:18
speculate
  18:16
speech
  293:10
Speed
  99:12 100:4
  123:13
  151:19 152:4
  155:17
  156:11,19
  157:2
spend
  36:24 219:16
spent
  310:11
spoke
  40:7 118:23
square
  340:22

Philip Dorsett
February 28, 2023

squashed
  306:12
squiggle
  101:9
St
  260:11
staff
  7:10 71:2
  81:17,19
  121:24 122:4
  167:13
  194:14,23
  209:13
  267:16
  276:23
  299:10
stamp
  30:5,7
  55:16,19
  56:5,13,15,
  17 221:23
  222:13,18
  223:3 245:23
stamps
  107:4
stand
  117:10
standardized
  103:13
standing
  14:16
start
  6:15 19:22
  57:9
started
  7:21 9:18
  11:19 24:25
  39:15 52:7,
  12 53:22
  95:14 147:9
  177:25
  212:23
  280:19
  281:15
  282:15
  312:24
starts

75:8
state
  6:4,7 17:17
  81:8 124:9
  172:2 279:18
  323:22
  330:18
stated
  18:4 122:18
  214:19 248:3
statement
  16:20,22,23
  20:4,13,15
  21:8 37:22
  38:9 40:19
  69:13 70:5
  73:4,11,17,
  18,22,24
  74:4 75:2,8
  76:3,5,15,17
  79:2,12,19
  80:24 81:7
  94:18 117:14
  119:16 154:5
  160:13 161:8
  162:16
  199:25
  203:7,10
  207:5 216:20
  217:4 281:2
  326:25
  327:4,6,19
  328:2 329:5,
  11 330:8
  331:3 338:8
statements
  259:16 266:3
  332:21
states
  27:20 78:15
  82:13 104:9
  105:21
  106:2,12
  108:5,12,23
  109:3
  133:17,24
  163:13 167:2
  173:24 174:9

175:12,15,18
  176:11,18
  181:8 184:4,
  9,15 185:2,
  22 186:8,9
  189:24
  194:24
  198:16
  199:14 201:3
  205:22
  206:3,11
  220:23 245:5
  279:2,3,9
  320:5,11,18
stating
  33:14,19
  78:23 284:14
  324:17
status
  289:14
  290:23
  291:4,17,22
  297:19
stay
  284:18
stayed
  39:5 289:5
stays
  7:5
stealing
  162:2,19
  192:5 207:22
stepped
  299:8
Steven
  9:21 10:4,8
  78:2 163:22,
  24
stick
  7:7 137:14
Stipulate
  217:3
Stock
  211:9 320:14
  321:12
stop
  16:4 41:18

46:5 76:6
  81:19 107:9
  121:22
  148:23
  217:21
  220:20
  279:21
  324:16
  325:9,21
stopped
  310:4
stories
  183:17
story
  51:15,22
  119:24
  303:23
strays
  14:2
street
  224:11
strictly
  134:24
strike
  12:25 40:11
  48:10 51:22
  63:8 81:24
  100:21
  104:19 109:5
  112:21
  115:16
  121:13 122:8
  128:18 134:4
  135:17
  139:21 141:2
  150:24 160:9
  176:14 178:7
  211:19 217:4
  228:2 235:9
  236:21
  243:23
  244:11
  246:14
  248:19
  293:15
  300:16
  315:23 332:5

students
  124:11,21
  135:17,20
  136:4 137:22
  140:13 141:4
stuff
  19:12 68:17
  77:5 103:9
  126:12
  256:17 259:5
  277:21
  279:13,18
  290:3 308:4,
  7,8,23
  310:18,19
  311:7 314:7
subject
  17:14 24:2
  42:16 49:13
  52:24 72:11
  112:25
  156:13
  195:15 196:3
  269:13 277:6
subjects
  254:8
submission
  176:5 241:25
  250:23 251:2
  260:2,14
  264:9,14,18
  265:15 268:7
  269:3,14,18
  270:8
  271:11,12
  272:11
  303:20
submitted
  19:19 158:25
  184:8 205:11
  240:19
  251:23
  272:20
subpoena
  169:2,22
  170:13,15,19
  172:13
  186:17 190:3

199:10,20
  200:5 339:17
subsect
  339:25
subsection
  111:6
subsequent
  58:11
subsequently
  316:9
substance
  144:16 145:6
  286:3
substantiate
  297:2
successful
  241:7
successfully
  240:23
sued
  109:2,12
  110:5,10
suggest
  302:25 334:6
suggested
  240:13
  250:10
  261:12
Suh
  172:17
  186:17
  189:22 190:5
  193:16,22
  243:25 293:3
suing
  109:21 110:7
Sum
  12:18 14:6,
  12,17 17:23
  20:25 22:6,
  12,21 28:21,
  22 29:6,16
  30:4 34:19
  35:2 52:11,
  14 55:15,20
  56:4,18 57:5
  59:9 70:11,

14,17 84:3,
  13 88:9,25
  89:23 95:9
  103:21
  104:12
  106:17
  109:16
  122:10 128:9
  136:12,14
  138:11
  141:10,14,
  21,23,24
  142:9 144:8,
  19 161:23
  163:19
  176:23
  177:3,10,13
  201:25 202:4
  213:22
  214:5,9,15,
  21 215:12,
  14,18,25
  216:10,12,
  14,19,23
  217:3,7,11,
  14,16,17,20,
  22,23,24
  218:6,12,16,
  20,23 219:4
  220:12
  228:18,25
  237:14,18,20
  250:15
  263:14 266:7
  293:12
  309:13 322:8
  323:2,14,16,
  18 324:2,6,
  8,9,10,16,21
  325:2,4,6,8,
  11,16,18,20
  326:6,10,12,
  16,20,24
  327:5,13,18,
  25 328:6,9,
  13 329:15
  330:3 332:19
  333:5,15
  336:15

337:25
  338:16 339:9
  340:6,22
  341:2
summer
  162:13,24
  163:15
supervises
  273:24
supervising
  20:10,21
  21:21
support
  7:10
supposed
  41:2 51:15
  207:14
  301:24
Supreme
  188:16
sure
  6:18 7:16
  8:21 25:4
  28:14 39:2,
  12 68:12,21,
  24,25 70:23
  72:18 80:22
  82:13 83:7,
  15 84:19
  90:7 100:18
  124:19 126:3
  139:12,25
  147:25
  177:15
  200:24 205:2
  225:18 232:3
  234:17
  235:21,25
  238:8 239:25
  240:3 246:9
  261:17
  263:23,25
  277:21
  282:12
  284:19
  311:21
  313:22
  332:15 335:3

337:21
339:13
**surely**
256:16
**Suretrader**
7:21 8:4,8,
21 9:6,11,22
10:2,7,11,24
11:10,23
16:25 17:10
18:7,19
23:23 24:24
26:3 30:23
32:2 34:9
36:21 37:24
38:10,12
40:23 42:9,
25 45:15,19
46:13 47:13
56:3 61:19
62:18 69:17
73:3,5,6,9,
12 74:12
75:3,10,20,
23 76:9,12,
24 78:7,17
79:5,8,13
80:15 81:9,
13 82:15
85:21 86:12
87:8 89:13,
22 93:6,10
94:11,15,19
95:16 96:6
97:14,16
98:2,12
99:17 100:8,
14 101:2,25
102:22
103:15,20,24
104:2,10,16
112:9,11
113:18 114:4
115:6 116:3
117:18,21
118:5 120:4,
25 121:7,12,
15,16 122:16

125:8,17
126:22
127:22
128:6,25
129:7,13,16
131:23
132:25
133:22 134:7
135:9 136:2
137:9 139:6
140:2 143:9,
17,25 144:6
146:2 147:9
151:16
157:4,23
158:2
160:12,16
161:9,21
162:2 163:2,
3,6,11
166:14,19
167:2,5,22
189:8 193:17
194:15,21
196:24 197:5
198:24 203:5
204:4,20
205:7,15
210:5,7
211:23
226:11,12
235:11
238:7,16,23
254:24
258:20 259:2
264:10,18
265:16
266:23,25
268:2 281:10
283:7,10,14
294:13,20,21
295:2,7,17
299:8 302:14
303:18
305:4,8,22
306:3 307:10
308:13
313:16,18
315:13

320:4,9,16
**Suretrader's**
189:2
**suretrader.**
**com**
33:18 38:4,
9,18 233:10
238:17
**Suretrader123**
247:14
**Suretraders**
269:19
**Suretrading**
143:21
**surprising**
125:14 331:8
**suspicious**
178:2
**swipe**
301:15
**Swiss**
32:9 33:14
34:2 37:23
38:2 55:8,11
102:13
105:18,21
106:6,11
107:25
108:2,12,15,
16 110:21,22
111:3,4,14
112:2,20
113:3,4,5,9
133:14,16
135:15,18
137:21
138:5,17,19
139:3 140:24
141:3 186:23
188:8 190:5
194:20
196:17
197:5,18
201:13
202:18
210:4,20
211:2 261:13
267:25

295:16
300:14 311:9
312:22
**swore**
143:18
**sworn**
6:3 77:25
86:10 117:14
163:23 329:5
**Sykes**
61:9 114:24
115:9,10
117:17
126:21
182:3,7,10,
23 183:10,22
184:2 258:21
**system**
237:10
284:16,23

---

**T**

**Tab**
23:20
**tack**
336:3
**tactic**
23:3
**take**
14:3 41:8
50:2 56:20,
21 58:19
93:3 104:10,
15 106:21
144:13 184:6
209:24
213:14
215:5,10
256:19
277:17 283:3
302:9 307:22
308:22
316:16 322:4
325:16
**taken**
90:6 175:7

taking
144:9,20
266:22 275:3
329:8
talk
27:7 44:13
77:8,9
185:16
talked
185:14
305:14
337:11
talking
47:5 57:7
117:4
136:10,16
174:19,20,24
181:11
214:14
215:22
227:23
236:16 240:9
268:10,13
289:23,25
313:18 329:3
Tampa
192:5 207:21
target
182:7,11
targets
176:8
team
86:22 88:2,4
89:12 130:25
131:18,23
295:10
296:20
297:15
technically
286:10
tecum
199:10
tell
7:17 28:7
30:15 43:7
44:14,25
77:22 81:6
105:13

139:16
146:21 164:8
183:21,25
206:23
222:10
228:17 229:8
277:15
284:11
288:14
313:10
321:9,19
327:17
333:19
telling
44:4 51:21
96:25 136:9
151:4
171:10,18
207:13
277:19
temperature
333:20
ten
7:12 23:4
59:24 68:18
84:14 148:10
151:3,7
155:9 160:11
161:7 256:20
325:16
327:20
328:15
tenure
87:10 121:6
240:10
term
40:5 314:22
terminate
108:13
terminated
120:14,18
127:21
162:13,18
300:20
302:15
305:11
315:8,19
316:3

termination
292:17
298:18
304:23
305:17
314:25
316:25
317:12 334:5
terms
105:25 113:2
128:4 135:22
335:24
terrifying
290:20
testified
6:5 8:19
11:17 12:9
27:2 31:16,
18 51:2,9
60:23 78:4
79:16 82:14
85:17 91:9,
12 116:12
123:8 127:8
129:5 157:8
158:9 174:18
176:15
213:4,9
214:25
283:2,5
302:20
330:25 334:3
335:13 339:8
testify
214:7 329:6
testifying
8:6,14 11:21
12:4 14:22,
25 16:14,18
36:21 43:15,
18,20 44:4,
18 51:23
53:20,25
57:20 63:17
74:11,13
91:2 97:10,
12 101:5
116:21

118:22 123:5
142:10 147:8
200:21 215:9
221:13,18
222:3 227:6
264:24
302:11
329:10
testimony
19:3 26:9
45:21,24,25
47:23 48:11
58:13 60:5
67:21 78:2
86:10 88:24
89:8,18
93:15 94:5
95:2 99:23
102:19
104:19,24
105:3 108:21
115:22
119:25
125:15
128:13
129:11,18
133:4 136:18
140:15,17
144:17 145:6
151:5 157:11
163:24
164:18
166:3,5,23
167:20,25
213:4 214:12
226:20
238:10
244:10
249:20,23
257:2 302:3
303:4 309:18
328:23
329:14
331:22 334:7
338:7
thank
9:19 15:22
30:17 59:24

190:22
220:17
257:14
291:20
328:6,8
**thanks**
71:6 232:6
234:3 273:14
280:2
**thing**
6:18,22 22:2
26:21 27:2
28:9 38:24
59:6 62:23,
24 66:25
70:25 81:21
146:7 150:2
153:24
165:21
167:11
185:13
204:18
235:2,14
255:19,21,23
289:8 291:23
333:9 340:25
**things**
9:17 15:7
19:2,9 34:2,
8 77:9 90:8
120:25
121:7,10
122:4 124:9,
20 125:23
135:5 140:4
143:12
151:22,24
165:13 207:3
229:3 248:17
253:5,7
309:9
**think**
9:23 10:9
11:4 15:20
21:19,25
22:23 25:3
28:15 30:13
31:21 33:9

39:5 40:7
42:23 43:8
44:13 45:8
46:19 47:3,
7,9,15 60:21
65:16 66:24,
25 68:3,9
74:9 75:12,
15 77:2
79:10,19
80:9 83:2
89:16 91:19
94:21,24
95:13,17
96:4 102:5
105:10
108:25
109:23,24
123:8 128:8
130:8
134:12,14
135:8,10
139:5,25
140:8,9,13,
16 146:17
147:4,5,24
148:2 150:15
153:14,22
154:18
155:3,10,12
156:7 166:20
167:14
169:25
170:14,23
171:20,21,24
172:7 178:3,
4,10 179:18
181:10
186:3,14
197:13 198:4
205:3 212:18
215:7 222:23
223:20 224:2
225:13
227:19,21
236:17
237:15 240:8
241:14
244:16

245:18
247:15
254:25
255:6,7
256:4 258:4,
10,11 260:8
261:19
263:22,24
264:3 265:12
272:9 285:2
288:4,16,23
289:19,24
290:2 301:25
303:8
304:18,24
305:23
307:14,20,
24,25 308:10
310:10,22,25
311:20
312:14
313:8,20
314:6 315:17
319:11 322:4
328:24 329:4
330:23
331:2,11
332:8,23
333:18
337:11
338:25
339:22 340:2
**thinks**
29:4
**third**
92:22 107:20
242:6 300:22
**Thirty**
241:12
**Thirty-nine**
149:2
**Thompson**
254:4
**thought**
22:18 28:16
45:2 51:13
52:6,8 68:14
118:9 119:4

132:3 139:11
144:10
153:23
160:18
262:21
288:25
**thoughts**
259:11
266:6,13,18
**thousands**
243:3 338:12
**threatened**
194:8
209:13,17
**threatening**
198:22
**threatens**
197:20
201:10
**threats**
318:21
**three**
15:8 18:25
35:10 73:20
123:11 138:5
157:11
185:20
211:24 212:5
269:25 271:9
275:19
**Tim**
61:8 182:4,
10,22
**time**
8:11 9:10
10:7,11,12,
15,22 11:10
12:2 13:19
23:6 25:4
27:5,8
30:18,23
33:7 39:11
40:5,17,22
59:25 62:2
66:7 69:16
75:3 79:4,7
83:12 91:8
96:2,14 99:4

Philip Dorsett
February 28, 2023

105:11
107:24
110:12
112:19
117:12 119:3
121:14
122:9,15
126:8 127:23
129:16 130:6
136:7,10,21
139:12
143:13
144:12,22
147:9,18,20
155:15
162:25
164:4,22
169:7 174:2
177:14,25
180:14
181:12
182:8,12
183:2 186:8,
13,15 187:15
196:24
200:14
205:14
206:5,6
207:7,9
208:14,24
210:7 212:20
213:20
214:14
215:6,11
221:2 224:18
242:25
243:22
245:16
250:25
256:9,22
259:18
260:22
261:14,25
263:5,18
265:3 266:5
268:22
271:18
274:18
275:5,24

276:5 278:13
288:9 289:6
292:16
293:23 300:2
302:2,22
308:18
309:17
310:19 313:2
316:16
322:14,18
323:11
327:20
328:22 329:9
332:10
337:4,10
338:9,21
**times**
  9:15 15:6
  23:4 51:10
  61:7 165:2
  293:10
**timing**
  62:4
**Timothy**
  114:24
  115:9,10
  117:17
  126:20
  182:2,6
  183:22 184:2
  258:21
**Tips**
  201:21 202:9
**title**
  28:7 30:21
  142:24 143:2
  192:19
  303:13
**titled**
  32:9 102:20
  103:4 132:20
  194:16
  207:20
  300:10
**titles**
  30:12,22
**today**
  6:17 59:4

60:5 74:14
76:21 134:3
172:4 192:25
213:4,13,17
254:11
272:13
275:25
280:21
281:17
283:21
316:23
331:19
**told**
  51:14 87:22,
  24 104:15
  117:19
  119:19
  145:23
  147:12,17
  149:15
  150:23,25
  170:14 185:8
  258:9 262:11
  264:4 268:20
  277:23
  289:17
  300:22
  303:23
  309:11
  310:13
  312:10
  313:24 314:7
  315:14
**tolerated**
  327:9
**tomorrow**
  232:6 234:3,
  20 273:17
**tone**
  333:19
**top**
  16:3 25:10
  31:9 104:5
  119:9 127:2
  128:21
  160:20
  173:2,18
  175:11 233:5

253:20,23
264:7 275:12
296:11
**totalled**
  149:9
**town**
  284:13
**trade**
  73:9 93:19
  100:5 137:24
  141:6
  146:17,25
  147:4 157:3
  292:20
  293:22
  294:3,9,12,
  19,23,24
  295:4,5,7
  320:10,16
**traded**
  155:23
**trader**
  80:22 99:12,
  17 123:13
  148:21 149:5
  150:6,8
  151:20 152:5
  155:18
  156:12,19
  157:2 211:8
  225:18
**Trader's**
  82:14 83:8
  84:19 126:4
  240:4
**traders**
  83:16 97:6
  98:23,24
  99:5,6
  123:16
  124:10,19
  152:16
  194:17
  202:23 203:6
  204:9,21
  205:7,14
  208:9
  210:12,25

Philip Dorsett
February 28, 2023

211:18,24
212:13
243:17
Traders'
  72:18
trades
  149:6,7,9,23
  150:7 156:22
  320:4
  321:12,23,25
trading
  104:21
  113:15
  114:23
  117:16,21
  126:19,20
  128:10
  145:9,11,13,
  16,18 146:3,
  5,6,9,12,15,
  21 147:14,
  16,18,21
  148:6,17
  149:13
  150:14 151:2
  152:21
  153:20 154:4
  156:13,18
  157:9,10,16
  172:14,20
  173:13
  186:19
  190:4,11
  192:7,17
  193:3,4
  194:5 207:23
  208:10 254:3
  258:21 294:6
  295:13
Trading's
  173:16
train
  153:22
transaction
  32:25 73:13
  211:5
transactions
  33:12

transcript
  13:15 29:15
  88:11 89:2,
  3,24 92:4,23
  163:22 325:7
transmission
  338:18
transmitted
  56:22 336:17
transmitting
  311:19
trash
  312:18
travel
  179:13
traveled
  179:3,5
treat
  259:15,22
  262:24
  266:2,14
treatment
  189:16
tribunal
  338:5
trouble
  100:19 196:8
true
  17:20 66:17
  69:15 72:3
  73:16,24
  74:6 76:5
  80:19,22
  81:5 91:21
  103:24
  118:6,11
  134:12,17,21
  161:4,11
  162:20,21
  168:12
  170:21
  191:22
  197:24
  200:23 209:8
  223:21
  226:13
  238:17

244:21 281:2
283:21 304:2
337:22
trust
  19:11 303:12
trustworthine
ss
  178:2
truth
  228:17
  229:9,19
truthful
  50:25
truthfully
  97:10,12
  215:9
try
  7:6 12:19
  44:17 132:19
  192:11
  209:11
  284:18
  287:13 290:8
trying
  12:21 20:25
  22:16 55:21
  59:17 68:19
  82:6 122:14
  128:16
  139:13
  153:15
  190:14
  203:21
  223:15
  228:17
  246:11
  252:21 253:6
  289:21
  291:21
  299:14 303:2
  305:19
  329:13
  333:19
TSTS
  296:18,19
tuition
  132:12

turn
  52:10 139:16
  237:19
  293:4,5
  316:9 334:9,
  13
turned
  287:12,18,24
  288:6
  289:10,18,20
  290:17
turning
  139:17
  287:19,25
turns
  52:7 69:10
  169:11
twenty-one
  119:11
twice
  214:25
Twitter
  33:14
two
  18:25 25:9,
  14 49:18
  100:3 127:22
  137:17
  140:10,22
  153:21
  176:5,16
  178:23
  192:16,25
  213:5,21
  215:2
  221:13,19
  270:23 271:8
  278:22
  279:9,17
  283:21
  295:10
  315:16
  316:21
  334:18,23
two-party
  278:19
type
  19:12 25:18

82:15 86:12
96:22 143:9
235:2,13
**types**
169:4 335:12
**typically**
124:17
**typing**
213:24

---

**U**

---

**U.s**
93:12,13
**U.S.**
8:21 9:7,12,
17 10:18,19
11:2,12
16:8,10
17:3,11,18
20:8,12,17
21:15,23
24:7 26:21
27:2,6,7,24
32:11,22
33:15,16,19,
21 35:23
36:13,16
37:23 38:3,
11,20,21
40:13,23
41:2,5
43:17,22
44:8,21,25
48:13,17,18,
23 49:22
50:15 55:9
69:24 70:21
71:2 72:8,
21,22 73:2,8
74:25 75:16,
24 76:6,13
77:6,7,16
78:24 79:7,
14,18,21
80:16,21
81:4,14,20
82:2,6 83:15

84:20,21,23
86:20,24
87:16 93:17,
18,21,23
94:2,9,18
95:15 96:6
97:17 98:3,
14 99:4,10
100:4,19
110:2,9,11
111:11,13
112:4,12
114:6 117:23
120:5 121:2,
4,18 122:19
123:13
124:2,4,17,
19 125:20
126:23
128:17
130:24
131:14
132:8,14
134:8,20,22,
23,24,25
137:25 138:2
139:14,15,
16,18 140:11
141:6,7
142:4,5
145:9,11,13,
15,17 146:3,
5,8,23
149:22 150:2
151:15,24
152:7,10,11
153:9,11,24
155:21,23
157:8 169:5
178:21
181:15,18,21
188:11 189:9
194:13 204:7
212:11
238:20,22
240:2 244:20
247:17
250:23
251:12,21

252:7,12,20,
22 253:2
254:15,24
272:12 276:5
277:13
280:23
317:23
321:25
**U.s.-based**
145:25
**U.s.c**
71:25 127:4
160:7
**U.S.C.**
72:5 159:23
**UAA**
11:23 12:12
79:15
**ultimately**
337:2
**unauthorized**
201:12
**unavailable**
84:7,21
**unaware**
176:16
**uncertain**
189:7
**unclear**
98:25
**uncollectible**
298:2
**Underground**
49:17 60:16,
20 61:13,15
62:22 92:15
94:10,17
96:4 98:11
99:3 100:3
112:9,10
113:19,20
114:25 115:5
116:13
117:18 118:4
120:3,14
126:21
127:20

**underlined**
36:4,18
**underlines**
36:8,12
**underneath**
142:6 203:24
**underscore**
238:2
**undersigned**
211:13
316:23
**understand**
13:9 14:6
40:25 49:22
72:10 82:3
94:15,20
105:24 112:7
113:17
122:12
148:9,10
152:25
153:19
154:24
156:11,14,17
168:25
170:12 191:2
195:8,14
198:6,8,9,
14,17 200:10
205:24
246:22,25
247:17
258:24 261:4
265:14
268:22 277:9
284:21
306:24 311:5
334:2,7,24
**understanding**
33:4,7 40:3,
11,17,21
82:24 94:8
115:7,10
117:11
122:2,3,7,13
133:21 134:5
135:4
146:16,23

149:12,22,24
150:6
153:10,18
155:20
168:8,13
187:14,19
195:19
199:16 231:2
241:5,9
246:2 286:7
292:19
293:21
294:2,11
305:2 321:11
323:12
335:10
338:16
**understands**
108:8
**understood**
113:23 167:6
170:18 196:2
255:15 261:3
285:6 309:2
335:5,14
**undoubtedly**
331:15
**uneasy**
252:18
**unfortunate**
327:7
**unheard**
327:22
**uninterrupted**
229:4
**unique**
194:4
**unit**
273:19,25
**United**
27:19 78:15
82:13 104:8
105:21
108:5,12,23
109:3 163:12
166:25
173:24 174:8
175:12,15,18

176:11,18
181:8 184:4,
9,14 185:2,
22 186:8,9
189:24
194:24
198:16
199:13 201:2
205:22
206:3,11
220:23 245:5
320:5,11,18
**universe**
338:19
**unlawful**
317:12
**unofficially**
75:11
**unprofessiona
l**
218:17
324:22
333:17
**unquote**
265:10
**unregistered**
11:13 16:11
17:3,12,19
72:23 192:4
207:21
**unrelated**
13:20
**unresponded**
216:5
**unsecured**
297:6,24
**unsigned**
263:12
**unsolicited**
11:24 24:25
25:15 32:24
39:8,13
50:17,19
51:3,24
54:20 55:6,
12 57:18,22
58:2,8,14

73:13 76:23
77:16 79:22
81:10 254:16
255:5
**unsure**
15:10
**untruthful**
118:23 119:2
**updated**
296:25
**upload**
66:25
**uploaded**
56:12
**upset**
285:22
290:5,21
**upward**
67:3
**URL**
238:17
**USA**
320:7,14
321:13
**USANJ**
272:16
**USAO**
176:11 276:8
**USD**
211:6,7,10,
11
**username**
85:14
**USSEC**
156:12

_____

**V**

_____

**valid**
130:17
**various**
94:23 102:7
172:2 179:2
**vast**
223:6,12
**Vegas**

183:8
**vengeance**
287:15
290:10,15
**venture**
204:15
**ventures**
178:25
**verbal**
6:19
**verbally**
315:21
**version**
237:16
239:23
270:12
**view**
85:2 188:12
**viewer**
93:4
**violated**
301:11
**violating**
187:17
191:21
**violation**
165:15,18
166:12,15
167:7,8
171:10
255:17
267:23 268:2
284:25 285:7
301:6
**violations**
317:23
**virtue**
125:7
**visitors**
113:12,22
**vital**
297:25
**voice**
221:6
**voluntary**
339:16

Philip Dorsett
February 28, 2023

volunteer
  48:16
vowed
  229:8

—————

W

wait
  249:14
  275:12
waived
  336:10
walked
  224:10
Walker
  49:7,12
  50:5,9
  53:11,12
  54:11 60:13
want
  13:5,10
  39:19 40:4,8
  41:4,6 104:6
  106:21 110:6
  112:22
  123:10 145:4
  147:25
  154:18
  157:21
  180:21
  185:16
  195:13
  201:25 207:7
  214:16 227:4
  234:9 237:4,
  8 252:15
  285:3,4
  286:3 289:24
  290:2 303:10
  316:17
  323:5,8,22
  328:18 329:6
  332:5,11
  337:17,19
  339:10
  340:23 341:2
wanted
  11:7 15:19

102:6 123:20
128:23
129:14 147:2
156:16 213:2
227:12,14
242:17
266:18
289:15 290:3
291:8 303:9,
14 305:9
308:22
310:24
312:25
317:24,25
320:16
328:20
336:14
wanting
  229:18
warning
  125:13
  295:18 296:5
warrant
  108:7 279:5
warranted
  125:13
Warriortradin
g
  114:11,12,24
  117:17
  123:2,7,9
  126:20
  128:5,11,12,
  14 129:2,6,
  10,20,21
  130:8,10
  132:25
  133:23 134:8
  136:3,20,24
  137:8 139:3
  141:16
  143:16,21,24
  144:5
Washington
  208:2
way
  7:5 22:9
  43:8 48:5

49:21 55:9
104:18 107:2
121:25
148:21
169:16 218:2
237:23 252:4
253:19,22
277:16,23
290:24
291:10
310:13 324:6
326:21 330:2
335:13 340:4
ways
  137:5 284:15
web
  38:12
website
  33:13,18
  35:21 38:4,
  9,17 39:3
  43:12 49:18
  78:20,21
  79:8 80:20,
  22 81:5
  82:14,16,17
  83:8,16
  84:6,20,21,
  22 85:3,5
  86:14 89:22
  94:16 99:19
  111:15
  113:12,14,22
  132:10
  148:16
  192:3,14
  207:19
  238:16,19,23
  240:4
websites
  117:21
  126:19 135:5
week
  64:6 71:9
  147:5 259:18
  266:5 273:3
  274:19
  312:21

weeks
  62:7 315:16
Weissman
  64:2,11
  65:11 66:2,
  9,13,21 67:8
  257:10 287:2
wells
  260:2 264:8,
  14,17 268:7
  269:14,18
  270:2,3,7
  271:11,12
went
  82:13 179:7,
  8 211:7
  219:8 297:5
  331:10 334:6
Wesley
  254:5
West
  193:7
Whey
  134:14
whistle
  291:13
  335:19
whistleblower
  203:12
  208:3,15,25
  209:8
  211:17,22
  240:18
  241:23
  251:10,15,22
  252:24
  257:12
  259:24
  279:25
  289:13
  291:4,17,22
whistleblower
s
  240:21
white
  273:24
wife

299:14,18
**wind**
  7:3 174:2
**window**
  275:18
**wins**
  241:15
**wire**
  269:9
**wishes**
  50:16 268:6
**withstanding**
  316:25
**witness**
  6:3 7:10
  12:21 17:24
  52:15 56:2
  99:10,22
  106:24
  109:18
  122:11 142:7
  162:6 209:19
  215:7,24
  216:22
  217:2,6
  220:4,8
  221:15
  228:5,10,16,
  22 229:7,12,
  16,21 237:13
  239:14
  249:4,7
  263:15 269:9
  322:18,25
  323:7,17,25
  324:11,19,24
  325:24
  326:5,15,23
  327:2,13,20
  328:8,22
  329:9 331:4,
  9,11 335:20
  341:6
**witness'**
  328:23 329:5
  331:14,22
**word**
  82:3 110:8,

10 121:25
122:13
232:15,21
237:9,11,13
238:5 246:19
247:3 262:15
263:12
270:12
**wording**
  65:6 281:20
**words**
  34:15 36:4,9
  39:20 70:22
  171:20
  205:24
  208:20
**work**
  7:13 9:11,
  15,20,25
  30:17 45:7,
  11 60:25
  82:12,25
  91:7 164:3
  165:7,9,10
  283:18
  284:16 285:8
  305:21
  308:24
  315:12
  316:11
**worked**
  7:18,20,22
  50:15 88:20
  89:12 90:18
  104:3 121:14
  166:8 268:12
  294:25
**working**
  128:25
  129:15
  268:23 306:2
**works**
  172:19
  198:19,20
  220:15 324:7
**Worldwide**
  210:12 211:2

**worry**
  268:20
**worth**
  237:14
**write**
  46:23 70:8
  197:6 203:20
  254:9
**writing**
  171:22
  213:11
  250:22 292:9
  336:20
**written**
  121:23
  142:14
  258:19 259:2
  262:16
  272:18
**wrong**
  47:18 107:6
  110:10
  266:24
**wrongful**
  303:3
**wrote**
  16:16,17
  22:3 40:9
  63:23 94:8
  243:22
  287:21
  314:18 316:5
  317:16
**www.
cadwalader.
com**
  24:11

---

**Y**

---

**Yanko**
  175:25
  273:22
**Yaviv**
  285:20
  286:3,15

**yeah**
  12:7 14:14
  25:3,20
  38:14 61:3
  62:24 87:18
  95:6 99:16
  129:20 132:2
  144:2 149:14
  152:13
  156:15
  170:14,22
  183:4 192:19
  195:13 271:5
**year**
  95:10,11,13
  204:22
  205:6,8,9,
  10,13,17
  208:3,17
  209:6
  302:14,19
  303:8 310:8,
  20 311:3
  313:7,12,22
  314:5
**years**
  18:25 68:18
  76:22 119:11
  127:22
  148:10
  151:3,7
  155:9 176:5,
  16 211:24
  212:5
  293:23,25
  310:3,11
  317:23
**yesterday**
  6:22 8:7
  11:6,17 12:5
  13:16 14:19,
  20 15:7,11
  16:15 22:13
  36:20 51:2,
  10,15 53:21
  54:2 57:21
  58:14 60:23
  63:18 74:14

Philip Dorsett
February 28, 2023

91:3 158:9
174:5,18
222:4 229:5
264:25 265:9
296:8
302:12,16
303:5

**yesterday's**
14:8

**yield**
203:16

**York**
6:4 178:24
238:2 245:18

**Yup**
87:22

---

**Z**

---

**Zak**
52:20,22
54:14,16

**zoom**
84:5 192:20