**Page 1**

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF FLORIDA
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,            )
 5                          )
          Plaintiff,    )
 6                          )
          vs.           ) CASE NO.:
 7                          ) 1:21-CV-21079-Bloom/Otazo-Reyes
     MINTBROKER INTERNATIONAL,   )
 8   LTD., f/k/a SWISS AMERICA   )
     SECURITIES LTD. and d/b/a   )
 9   SURETRADER, and GUY        )
     GENTILE, a/k/a GUY GENTILE  )
10   NIGRO,              )
                         )
11        Defendants.    )
     _____)
12
13
14   REMOTE VIDEOTAPED DEPOSITION OF JOHN MICHAEL KURISKO
15                   VIA WEBEX
16         Wednesday, March 15, 2023
17
18
19
20
21
22
23
     Reported by:
24   Diane M. Bolan,
     CSR No. 12883
25   Job No. 230315DBO
```

**Page 2**

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF FLORIDA
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,            )
 5                          )
          Plaintiff,    )
 6                          )
          vs.           ) CASE NO.:
 7                          ) 1:21-CV-21079-Bloom/Otazo-Reyes
     MINTBROKER INTERNATIONAL,   )
 8   LTD., f/k/a SWISS AMERICA   )
     SECURITIES LTD. and d/b/a   )
 9   SURETRADER, and GUY        )
     GENTILE, a/k/a GUY GENTILE  )
10   NIGRO,              )
                         )
11        Defendants.    )
     _____)
12
13
14
15
16
17        Remote videotaped deposition of JOHN
18   MICHAEL KURISKO, taken on behalf of Plaintiff, via
19   Webex, beginning at 3:03 p.m. (ET) on Wednesday,
20   March 15, 2023, before Diane M. Bolan, Certified
21   Shorthand Reporter No. 12883.
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4      UNITED STATES SECURITIES AND EXCHANGE COMMISSION
        BY: ALICE SUM, ESQ.
 5           ALISE JOHNSON, ESQ.
        801 Brickell Avenue, Suite 1950
 6      Miami, Florida 33131
 7
     For the Defendant Gentile:
 8
        FORD O'BRIEN LANDY, LLP
 9      BY:  STEPHEN R. HALPIN III, ESQ.
             MATTHEW A. FORD, ESQ.
10           CARA FILIPPELLI, ESQ.
        275 Madison Avenue, Floor 24
11      New York, NY 10016
12
     Also appearing:
13   "guy"
14
     Videographer:  Tim Hunter
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1               I N D E X
 2
 3   WITNESS: JOHN MICHAEL KURISKO
 4      EXAMINATION                    PAGE
 5      By Miss Sum             6/91
 6      By Mr. Halpin           65/97
 7
 8               EXHIBITS
 9   EXHIBIT                    MARKED
10   Exhibit 49 - Multiple invoices        25
11   Exhibit 52 - Email - 3/30/17          41
12   Exhibit 51 - Marketing Services Agreement   43
13   Exhibit 50 - Multiple invoices        52
14   Exhibit 53 - Email thread - 3/24/17        56
15   Exhibit 54 - Web capture          60
16   Exhibit 1 - Web capture           81
17   Exhibit 2 - Web capture           83
18   Exhibit 3 - Web capture           84
19   Exhibit 4 - Web capture           86
20   Exhibit 58 - Declaration of John Kurisko      91
21   Exhibit 57 - Screenshot           93
22
23
24
25
```

EXHIBIT

E

1    Webex Proceedings, Wednesday, March 15, 2023
2    3:03 p.m. (ET) - 5:49 p.m. (ET)
3
4    THE VIDEOGRAPHER:  Here begins the
5  videotaped deposition of John Kurisko in the matter of
6  the SEC versus MintBroker International, LTD.  This
7  deposition is being held via Webex.
8    Today's date is March 15, 2023.  The time
9  on the record is 12:03 p.m.
10    My name is Tim Hunter.  I'm your legal
11  videographer.  Our court reporter today is Diane Bolan.
12    Counsel, would you please introduce
13  yourselves and state whom you represent for the record,
14  starting with the noticing counsel, and the witness
15  will be sworn.
16    MISS SUM:  Good afternoon.  This is Alice
17  Sum for the Securities and Exchange Commission.
18  Present with me is my co-counsel, Alise Johnson.
19    MR. HALPIN:  Good afternoon.  This is
20  Stephen Halpin from Ford O'Brien Landy, LLP on behalf
21  of defendant Guy Gentile.  My colleagues with me at the
22  moment are Matthew Ford and Cara Filippelli, and my
23  colleague Adam Ford may be joining as we get going.
24    MISS SUM:  Madam Court Reporter, could you
25  please swear in the witness.

5

1    THE COURT REPORTER:  My name is Diane Bolan,
2  and I am a certified California court reporter.  This
3  deposition is being held via videoconferencing
4  equipment.  The witness and the reporter are not in the
5  same room.  The witness will be sworn in remotely.
6
7    JOHN MICHAEL KURISKO,
8    having been first duly sworn, was
9    examined and testified as follows:
10    EXAMINATION
11  BY MISS SUM:
12    Q.  Thank you, and good afternoon, Mr. Kurisko.
13  As I mentioned before, my name is Alice Sum.  I
14  represent the SEC.
15    Could you please state your full name and
16  spell it for the record.
17    A.  My name is John Michael Kurisko.  Last name
18  is K-u-r-i-s-k-o.
19    Q.  And Mr. Kurisko, are you represented by
20  counsel today?
21    A.  No.
22    Q.  All right.  I'm going to start with some
23  basic ground rules for this deposition.
24    First, are you under the influence of any
25  medication or substances that will affect your ability

6

1  to answer my questions, remember facts, or answer
2  truthfully?
3    A.  No.
4    Q.  Is there any reason why you may not be able
5  to answer my questions truthfully today?
6    A.  No.
7    Q.  If you do not hear a question clearly, please
8  ask for me to repeat it, or we can have the court
9  reporter read it back.
10    If you do not understand the question that I
11  ask, you can ask me to clarify.  If you answer a
12  question that I ask, I will assume that you understood
13  it.
14    During this deposition, we will try to take a
15  break every hour or so.  This is not meant to be a
16  marathon.  And if for some reason you need a break
17  prior to the hour or so mark, you can -- you may feel
18  free to request one.  And the only thing that I ask is
19  that you do not request a break while a question is
20  pending.
21    Do you understand these general ground rules?
22    A.  Yes.
23    Q.  Thank you.  Could you please provide your
24  current address.
25    A.  79 Strawtown Road, West Nyack, New York.

7

1    Q.  Have you ever been deposed before?
2    A.  No.
3    Q.  Have you ever been a plaintiff or a defendant
4  in a civil lawsuit?
5    A.  No.
6    Q.  And prior to this afternoon, did you speak
7  with anyone regarding this deposition?
8    A.  The lady from the SEC last night, yes.
9    Q.  Was that me?
10    A.  That's you, yes.  What is your name again?
11    Q.  Alice Sum.
12    A.  Yes, I believe that was it.  You know, I'm
13  sorry.  It was a whirlwind the last couple days, so...
14    Q.  All right.  Then did you speak with anyone
15  else about this deposition?
16    A.  No, no.
17    Q.  What is your current place of employment?
18    A.  Day Trading Radio.
19    Q.  And what is your title with Day Trading
20  Radio?
21    A.  CEO, president.
22    Q.  And prior to Day Trading Radio, where did you
23  work?
24    A.  Nyack post office.
25    Q.  I'm sorry, did you say Nyack post office?

8

1    **A.**  Yes.
2    **Q.**  All right.  Let me back up for a moment,
3  then.
4         With respect to Day Trading Radio, when did
5  you start working for Day Trading Radio?
6    **A.**  Day Trading Radio came in existence in about
7  2007.
8    **Q.**  Did you form --
9    **A.**  Yeah, I did.
10   **Q.**  -- Day Trading Radio?
11   **A.**  Yes, I did.
12   **Q.**  And with respect to your prior employment
13  with the Nyack post office, was that up until 2007?
14   **A.**  No, that was up until 2007.  Between
15  1996 and 2007, I was just a regular trader, day trader,
16  so I was self-employed.
17   **Q.**  Do you have any licenses or certifications?
18   **A.**  No, just a driver's license.
19   **Q.**  Where is Day Trading Radio based?
20   **A.**  Nyack, New York.
21   **Q.**  And who owns Day Trading Radio?
22   **A.**  I do.
23   **Q.**  When you started Day Trading Radio in 2007,
24  can you describe what was the nature of Day Trading
25  Radio's business?

9

1    **A.**  I was a trader in Florida and just -- you
2  know, just really starting to get going there, so I was
3  using YouTube and I was just into building websites,
4  streaming, and doing -- you know, doing my trading
5  life.  You know, I think that really started the
6  beginning of the online trading things back then, so
7  there was a lot of people just getting online and
8  learning how to stream.  And I was trading, and we
9  started getting a big following.  I was doing it for
10  free for a while, and then people started giving me
11  donations, and then I said, well, this may turn into
12  something better, so maybe I'll do a membership type of
13  base where they can watch for a fee, and that's how it
14  started.  It was just started as kind of a mistake.  It
15  just grew and took off on its own.
16   **Q.**  Did I hear you correctly that you said you
17  streamed video?
18   **A.**  Yeah.
19   **Q.**  Okay.  And how would someone be able to watch
20  such a video?
21   **A.**  Just on YouTube.
22   **Q.**  And other than on YouTube, did video that you
23  provided appear anywhere else?
24   **A.**  At the time, I started on Mobilus, which was
25  like a different streaming.  You know, back at that

10

1  point, it was a lot of different streaming services.
2  There was Justin.tv, there was Mobilus, there was some
3  other ones.  I think I was, you know, just
4  experimenting and trying all of those.  Eventually, I
5  just, you know -- and YouTube, too.  And then those
6  consolidated, some of them disappeared, so mainly just
7  on YouTube now.
8    **Q.**  When you started in 2007, did Day Trading
9  Radio have a website?
10   **A.**  Yes.
11        Well, yeah, I believe I had a website.  I
12  started one around then.  I don't know the exact date
13  or -- I built one myself.
14        You could check the Wayback Machine.  That
15  would probably be a better place to find that
16  information.
17   **Q.**  Could someone go on your website and see any
18  streaming of the videos that you've just described?
19   **A.**  The live videos?  Yeah.  I mean, that was the
20  whole process of it.  You know, I captured my screen
21  and people could tune in and watch and hear me talk.
22   **Q.**  All right.  Did the business of Day Trading
23  Radio evolve over time from 2007 forward?
24   **A.**  Yes.
25   **Q.**  Okay.  So let me please try to take it in

11

1  chunks of time between 2007 to 2013.
2        Can you generally describe how Day Trading
3  Radio's business evolved, if any?
4    **A.**  Yeah.  You know, at the beginning, I didn't
5  expect it to, you know, grow as fast as it did, and
6  then it started growing.  I ended up moving back to New
7  York, and, you know, it just took off, you know.  You
8  know, we went from no -- no viewers to thousands of
9  viewers.
10   **Q.**  Who would appear on these videos?
11   **A.**  Just me.
12   **Q.**  And what types of topics were typically
13  discussed during these videos?
14   **A.**  I would be just trading the markets, so I
15  would be discussing the markets.  Usually -- I probably
16  wouldn't have my face on the screen.  I rarely do that.
17  So they would just see a picture of a screen, of my
18  screen, you know, what I'm trading, and I talk over it.
19  So you can hear my voice, and, you know, we talk about
20  the news and events, and I'd say, you know, there's a
21  breakout coming up on this news, let's take a look at
22  this stock and see what's going on.
23        You know, I always called it the play-by-play
24  of the market, because I would get on at 8 o'clock in
25  the morning and go all the way to 4 o'clock.  So it was

12

1  like CNBC, but on video.
2     **Q.**  And what --
3     Pardon.
4     What language did these videos occur in?
5     **A.**  English.
6     **Q.**  Did they ever occur in any other languages?
7     **A.**  No.  I had a -- we had some members that
8  probably -- you know, that were Spanish that probably
9  did some subtitles in Spanish that you might find on
10  the internet, but I would never speak -- I don't speak
11  any other languages, and no one can speak for me under
12  any other languages now.
13     **Q.**  When Day Trading Radio started in 2007, other
14  than you, did it have any employees?
15     **A.**  No.
16     **Q.**  Did there come a time in the future when Day
17  Trading Radio had employees?
18     **A.**  Yes.
19     **Q.**  When was that?
20     **A.**  Probably when I moved up here.  I would say
21  it would probably be probably 2010, 2011 somewhere.  I
22  can't really remember.  I don't really remember, but I
23  did have a couple employees.  They were just, you
24  know...
25     **Q.**  How did you describe them?

            13

1     **A.**  The assistant, someone to do the e-mail, send
2  out, you know, whatever needed to be sent out, do
3  marketing.
4     **Q.**  Did Day Trading Radio's number of employees
5  further increase after 2010 or 2011?
6     **A.**  No.
7     **Q.**  What were the names of the employees?
8     **A.**  Brian See, S-e-e, and Kate, Kaitlin Wolfe.
9  First it was Kaitlin, and then Brian came in.
10     **Q.**  Does Day Trading Radio currently have any
11  employees?
12     **A.**  No.
13     **Q.**  Just you?
14     **A.**  Yes, just me.
15     **Q.**  How many?
16     **A.**  Just me.
17     **Q.**  Okay.  Did you have a particular target
18  audience for your videos?
19     MR. HALPIN:  Objection.
20     MISS SUM:  There may be objections during the
21  course of your deposition.  Counsel may assert them.
22  But unless someone instructs you not to answer, I'm
23  going to ask you to go ahead and answer the question.
24     THE WITNESS:  No, Day Trading Radio was, you
25  know, whoever tuned in to YouTube was available to

            14

1  watch it.  I didn't have a targeted audience or
2  anything.
3     **Q.**  BY MISS SUM:  Do you know the people who
4  watched your videos, where they were located
5  geographically?
6     MR. HALPIN:  Objection.
7     THE WITNESS:  The only way to do that, you
8  know, at some points, I did put a tracker on the
9  website, but I never really paid attention to it.  But
10  I knew, you know, you can listen from all over the
11  world because, you know, I'd get e-mails and stuff.  So
12  it went from Russia, South Africa, England, France,
13  Canada, USA, you know, South America, everywhere.
14  Probably every country.
15     **Q.**  BY MISS SUM:  And do you have an estimate as
16  far as the persons based in the United States, what
17  percentage of your total viewership came from the U.S.?
18     MR. HALPIN:  Objection.
19     THE WITNESS:  I really -- I would say that
20  most people came from the U.S., but I have no idea what
21  the ratio is or anything.
22     **Q.**  BY MISS SUM:  Did you say most people?
23     **A.**  I would -- I would guess.  I mean, I never
24  did the analytics on that.
25     **Q.**  All right.  With respect to Day Trading

            15

1  Radio's website and its content, who created the
2  content on the website?
3     **A.**  I did.
4     **Q.**  Did you get any assistance from any third
5  parties?
6     **A.**  No.
7     **Q.**  And can you generally describe the content on
8  Day Trading Radio's website.
9     MR. HALPIN:  Objection.  What time period?
10     MISS SUM:  All right, let's talk about the
11  content in approximately 2013.
12     THE WITNESS:  Basically, it's always been the
13  same.  I'd have the video screen on there, I'd have a
14  watchlist, meaning that the stock -- I would put out a
15  video watchlist every week, describe my research on
16  technical levels on the charts, the S&P 500, any stocks
17  that I like, and they would go out to the members, and
18  that was it.  I had a blog -- well, at that point, in
19  the beginning, I had a blog, but maybe in 2013 we
20  probably turned a little bit -- readjusted the site so
21  we didn't have the blog and just the video screen, I
22  believe.  And there might have been some newsfeeds, you
23  know, random newsfeeds, and...
24     **Q.**  BY MISS SUM:  And earlier I believe you said
25  that you provided videos for free, but then at a later

            16

1  date that you started receiving donations --
2      **A.** Yeah.
3      **Q.** -- if I understood you correctly.
4          Did there come a time where Day Trading Radio
5  offered services that people who visited your website
6  could pay for?
7      **A.** Yeah, yeah.
8      **Q.** And what services...
9          Well, strike that.
10         When did that start?
11     **A.** That probably started when I moved back here
12  to New York, because I thought, you know, the site was
13  getting very popular, I was getting a lot of donations,
14  so I started off charging about 14.95 a month for my
15  newsletter --
16     **Q.** Okay.
17     **A.** -- and they could still watch the show for
18  free, though.
19     **Q.** And did things evolve where you charged for
20  other services from Day Trading Radio's website?
21     **A.** I have a course. I essentially -- I
22  developed a course, trading course that's for sale on
23  the site and just access to the private member site,
24  which there's a chat room for people to get into the
25  chat room, and so there was the chat room with a

17

1  watchlist.
2          Trade alerts, if I did a trade, I would send
3  it out to the members and they would see what I'm
4  trading, and a video watchlist that went out under
5  YouTube, and that was basically it.
6      **Q.** Okay. I'm going to break this down here.
7          For the watchlist, do you remember when you
8  started charging for those services?
9      **A.** I would guess...
10         I don't really remember, but it would have to
11  be probably in 2010 -- 2009, 2010 maybe.
12     **Q.** And what about trading courses?
13     **A.** Trading courses, I just recently kind of did
14  that within the last ten years, I would say, maybe --
15  what is this, 2023 -- so maybe 2017, 2018.
16     **Q.** You also mentioned private members chat room.
17     **A.** Yeah.
18     **Q.** When did that start?
19     **A.** I don't know when we went private on that.
20  We always had kind of a public chat room, and then we
21  kind of locked it down, I locked it down as private.
22  It had to be, best of my recollection, same time, 2010,
23  you know, maybe up to 2010.
24     **Q.** Okay. And you mentioned there was trade
25  alerts.

18

1      **A.** Yeah.
2      **Q.** When did that start?
3      **A.** That might have started in the beginning.
4  That was a long time ago, so I don't know if I was
5  charging for those or just sending those out at the
6  time, you know. So when we started charging, whatever
7  the -- I don't know what I was charging. When I
8  started charging, that's probably when we started
9  sending out the alerts and stuff.
10     **Q.** All right. Do you know someone named Guy
11  Gentile?
12     **A.** Yeah, I know him.
13     **Q.** And how did you come to know Mr. Gentile?
14     **A.** We're in the same industry. I think we met
15  at a trade show, traders expo. I do trade shows and I
16  do speaking engagements at the MoneyShow down in New
17  York City, and, you know, at that time, probably
18  back -- I don't know when it was, but, you know, in the
19  early 2000s, whenever, 2008, 2009, 2010, I don't know
20  when I started doing those, but the thing to do was go
21  around and just network. And I think we just
22  networked, you know, met a lot of people, and he was
23  one of the guys that I went around to see if we could
24  work together, you know.
25         You know, that's what you do at these trade

19

1  shows. You just kind of network and partner up.
2      **Q.** Can you explain, did you seek him out, or did
3  he seek you out?
4          MR. HALPIN: Objection.
5          THE WITNESS: I probably -- I was probably
6  the one who approached him, because, you know, I was
7  new and I was just trying to get, you know -- you know,
8  just trying to make it, you know. At the time, I think
9  it was a different broker at the time. I don't think
10  it was -- I think it was Speedtrader at the time.
11  That's how I met him.
12     **Q.** BY MISS SUM: Okay. You said that you were
13  starting to go these shows in about 2008, 2009, or
14  2010?
15     **A.** Well, best of...
16         I'm trying to remember.
17         I might have been going to the shows even
18  before I had -- you know, because I was always into
19  trading stuff. I couldn't tell you the year I met him.
20  I really can't. I would say it was back then, maybe
21  over ten years ago.
22     **Q.** Did you and Mr. Gentile ever discuss entering
23  into a business relationship?
24         MR. HALPIN: Objection.
25         THE WITNESS: Just, yeah, because of the

20

1 broker, yeah, a broker relationship. That was --
2    **Q.**  BY MISS SUM: Can you describe what potential
3 work or relationship you're talking about.
4    **A.**  When I met him, he was -- I think he was
5 owner of Speedtrader at the time, and, you know, we
6 didn't have any associations with any brokers or
7 anything, so I think that was what we were looking at,
8 having an exclusive broker that we promote.
9    **Q.**  Okay.  And did that ever turn into a business
10 relationship?
11    **A.**  I believe so.  Yeah, I mean, we -- monetarily
12 on Speedtrader, I'm not 100 percent sure.  You know, I
13 know we did have a monetary agreement with SureTrader.
14    **Q.**  Okay.  How did the topic of the business
15 relationship between Day Trading Radio and SureTrader
16 come up?
17    MR. HALPIN:  Objection.
18    THE WITNESS:  I think I probably approached
19 him, and that's what you would do.  You go from table
20 to table and you see if there's any zenergy between
21 companies.  I had a big dealer -- you know, I had a big
22 audience and stuff, and people wanted to get on the
23 radio on what was called e-trading radio, even though
24 it's a streaming service, but they would like to get on
25 the radio and, you know, do whatever they do.  If, you

21

1 know, they had a service or something, they would
2 promote the service.  Everyone wanted to get on the
3 radio to promote their service, basically.  We always
4 had people come on as guests, you know.  Someone would
5 come on with an indicator, so I'd have them on for an
6 indicator, you know, they talk about their indicator
7 and they sell it and stuff.
8    **Q.**  BY MISS SUM: Did Mr. Gentile ever come on as
9 a guest on your videos?
10    **A.**  I know he had wanted someone on his -- in his
11 company to come on, I don't even know his name, and we
12 talked about, you know, the service he provided.  I
13 don't think I ever talked to Guy online, no.
14    **Q.**  Did you and Mr. Gentile discuss SureTrader
15 needing Day Trading Radio services?
16    **A.**  Yeah, I mean, that's how we got the banner on
17 our site.
18    **Q.**  All right.  I'll get to the banner in a
19 moment, but as far as your discussions with Mr.
20 Gentile, what was the -- effectively the exchange that
21 you were offering and that he would be offering?
22    MR. HALPIN:  I'm going to object again.  I
23 think it's been a little unclear whether these
24 conversations involve Speedtrader or SureTrader, so
25 I'll just note that that's not clear for the record.

22

1    **Q.**  BY MISS SUM: All right.  These questions
2 relate to SureTrader, but specifically I'll rephrase
3 this question.
4    Regarding SureTrader, what did you understand
5 the exchange of services to be if Day Trading Radio
6 were to work with SureTrader?
7    MR. HALPIN:  Objection.
8    THE WITNESS:  Like I said, I didn't have any
9 affiliations with any brokers or anything, so it would
10 be -- they would be our -- they would be our broker, I
11 guess, I think I called it preferred broker, and that
12 would be -- you know, we'd put the banner on there and
13 his -- an employee of his would have access to our chat
14 room, and, you know, maybe come on and talk about the
15 services, if they have any specials going on or
16 anything like that.
17    **Q.**  BY MISS SUM: When you say their employee
18 would have access to the chat room, are you talking
19 about a SureTrader employee having access to a Day
20 Trading Radio chat room?
21    MR. HALPIN:  Objection; leading.
22    THE WITNESS:  Well, I mean, I was -- you
23 know, we knew him as Speedtrader first, so I didn't
24 have Speedtrader.  You know, they had those, I guess,
25 employees come into our chat room also.  I don't know

23

1 if they coexisted at the same time.  I don't remember.
2 You know, but SureTrader, yeah, I think there was one
3 person who had come in and, you know, just been part of
4 the site, answer any questions.  If someone had any
5 questions or anything, they would be available to
6 ask -- you know, answer those questions, because I
7 wasn't a broker.
8    **Q.**  Okay.  And what was the name of the
9 SureTrader person that would come into Day Trading
10 Radio's chat room?
11    MR. HALPIN:  Objection.
12    THE WITNESS:  I don't know.  I really don't
13 know.  He wouldn't come on that much, you know.  If I
14 see him in the room, I wouldn't even remember who it
15 was.
16    **Q.**  BY MISS SUM: Do you remember the time period
17 when someone from Speedtrader would come into Day
18 Trading Radio's chat room?
19    **A.**  I thought it was all around the same time,
20 you know.  I mean, Speedtrader came first, so, you
21 know, that was something that, you know, we'd see him,
22 I'd see Speedtrader down at the shows a lot more, and
23 so they were a little bit more active on our site, you
24 know.  I don't know if we had an agreement at that
25 time.  I don't even know.  We might have had it, but...

24

1    Q.  Okay.
2    A.  It wasn't...
3        You know, SureTrader I do remember, but the
4    Speedtrader time, I don't know what the agreement is
5    with that.
6    Q.  Did you ever send invoices to Speedtrader?
7    A.  I don't remember.  I don't think so.
8    Q.  All right.  I'm going to go ahead and ask the
9    videographer to bring up what's been premarked as
10   Exhibit 49.
11       THE VIDEOGRAPHER:  Okay.  One second.
12       (Deposition Exhibit 49 marked for
13   identification.)
14       MR. HALPIN:  Miss Sum, it looks like this
15   Bates numbering is out of order.  Is that intentional?
16       MISS SUM:  It is intentional.  I combined all
17   of the invoices chronologically.
18       MR. HALPIN:  Okay.
19   Q.  BY MISS SUM:  Before I ask you a question
20   about Exhibit 49, were there ever instances where both
21   a Speedtrader representative and a SureTrader
22   representative were in the chat room at the same time?
23   A.  I don't think so.
24       MR. HALPIN:  Objection.
25   Q.  BY MISS SUM:  So how do you know whether

25

1    someone was from SureTrader or Speedtrader that joined
2    the Day Trading Radio chat room?
3        MR. HALPIN:  Objection.
4        THE WITNESS:  I only knew one person from
5    Speedtrader that we were pretty good friends with;
6    Craig.  So I know Craig, so I know he was in the room.
7    I didn't really know the people from SureTrader, so,
8    you know, I don't remember who the guy was.  I know
9    they had access, but I couldn't tell you.  I know it
10   was a guy.  I think it was a male.
11   Q.  BY MISS SUM:  Did there come a time when
12   Speedtrader stopped having a representative join Day
13   Trading Radio's chat room?
14       MR. HALPIN:  Objection.
15       THE WITNESS:  It just dwindled over
16   time, you know.  There was never a cutoff or anything
17   like that that I can remember.  There was never a
18   falling out.  Or I don't even know -- I don't think we
19   had any type of agreement at the time.  That was like
20   the beginning of everything, and at that point, I
21   wasn't -- you know, I was just promoting the site.  I
22   wasn't thinking about, you know, the recordkeeping or,
23   you know, what we're talking about right now.  I just
24   couldn't even tell you what the deal was, what
25   arrangement we had with Speedtrader.

26

1    Q.  BY MISS SUM:  Okay.  I'm going to point your
2    attention to the first page of Exhibit 49.  Do you see
3    it in front of you?
4    A.  Um-hmm, yeah.
5    Q.  Okay.  Is it clear enough for you to be able
6    to read?
7    A.  Yeah, I have it on my -- I brought a copy.
8    Q.  All right.  And what is the first page of
9    Exhibit 49, which is Bates stamped SEC-DTR-E, some
10   leading zeros, and then 43?  What is this first page of
11   Exhibit 49?
12   A.  Day Trading Radio, looks like an invoice.
13   It's a bill, yeah.  Swiss American Securities,
14   advertising banner, top of web page, access to chat
15   room, monthly promotional e-mail.
16   Q.  Okay.  Is this an invoice that Day Trading
17   Radio sent to Swiss America Securities, LTD?
18   A.  Probably.
19   Q.  Do you have any reason to believe that this
20   isn't an invoice that --
21   A.  No, no, no, it probably is.  I didn't send it
22   out myself, but I would say it is, you know.
23   Q.  Okay.  With the name Swiss America
24   Securities, do you understand that to be SureTrader?
25   A.  Yeah, I think I remember that being, yeah,

27

1    SureTrader.
2    Q.  And where it provides a description, it says,
3    "advertising banner on daytradingradio.com (top of web
4    page), access to chat room, on-air time, and monthly
5    promotional e-mail," and then it provides an amount of
6    3,500.
7        How did you -- when I say "you," excuse me --
8    Day Trading Radio and SureTrader come to agree on the
9    description and the amount?
10       MR. HALPIN:  Objection.
11       THE WITNESS:  You have that e-mail from Dac?
12   You mentioned you have an e-mail from Dac,
13   correspondence?  Does that --
14   Q.  BY MISS SUM:  We'll get to that, but I'm just
15   asking you, do you --
16   A.  I'm just telling you that he was the one that
17   kind of did that.  I was never really good at
18   face-to-face meetings and stuff.  He was my
19   right-hand -- well, he wasn't my right-hand man, but I
20   asked him -- he was really good at doing business and
21   stuff, so he really was the contact person that did the
22   invoices and did everything and came to the deal.  I
23   never really talked to Guy or made the deal.  You know,
24   I just wasn't there.  I wouldn't be the person who made
25   those deals.  So he came up with this, and this was

28

good.
    Q.  Who is Dac?
    A.  Dac is just a good friend of mine.  He was a trader also, but he's just a really good friend, and he helped me out, and, you know, he's just a good friend, but...
    Q.  Was he an employee of Day Trading Radio?
    A.  No.
    Q.  Did he have any official title at Day Trading Radio?
    A.  No.
    Q.  Did he have an e-mail address with Day Trading Radio?
    A.  He did at one time.  I think it was dac@daytradingradio.com.
    Q.  And what was Dac authorized to negotiate on behalf of Day Trading Radio with third parties?
    MR. HALPIN:  Objection, just to the extent this calls for a legal conclusion and he's not a lawyer or represented by counsel.
    Q.  BY MISS SUM:  Did you give Dac approval to talk to other people in negotiating potential deals?
    MR. HALPIN:  Objection.
    THE WITNESS:  Yes.
    MISS SUM:  I'm sorry?

29

    THE WITNESS:  Yes.
    Q.  BY MISS SUM:  Did you talk with Dac about the services that are described on page 43 of Exhibit 49?
    MR. HALPIN:  Objection.
    THE WITNESS:  Forty-three?  Do you want me to look at it right now?
    Q.  BY MISS SUM:  Yes, the first page of Exhibit 49.  Did you talk to Dac about what's described on this invoice?
    A.  Oh, yeah, I'm sure we did.
    Q.  Did you approve the contents of the invoice?
    A.  Yes.
    Q.  What is the date of this invoice?
    A.  2013 something.  9-5-2013.
    Q.  Did you have an agreement with SureTrader at this time?
    MR. HALPIN:  Objection.
    THE WITNESS:  I guess so.  I mean, this is what it says.
    Q.  BY MISS SUM:  As of September 2013, did Day Trading Radio have any written agreements with SureTrader?
    A.  Written agreements?  I mean -- I mean, I don't know.  What do you mean?  Excuse me.  You have to clarify.

30

    Q.  A written contract.
    A.  We might have had.  If you have it, you have to show it to me and I'll tell you.
    Q.  We'll get there.  I'm just trying to see what you remember.
    A.  I don't remember.  I really don't remember what the written contract was, but if this was a contract, yeah, this is something we agreed on.
    Q.  Do you see below the description providing the advertising banner there's "August Commission"?
    A.  Yeah.
    Q.  Okay.  What is that referring to?
    A.  I don't really know.  I'm guessing that it might be people who signed up or, you know, became a member, you know.
    Q.  Okay.  When you say...
    Okay.  When you say "people who signed up," who are you referring to?
    A.  People went through the banner, I guess.  We'd -- I think we'd have the banner up and get paid for having the banner and ask them what they said, and then if anybody clicked through the banner, we'd get $20 per whatever, per click-through or someone who starts an account with them.
    That's what I'm guessing.  I'm not

31

100 percent sure what that commission is from.  That's the only thing I can theorize.  That's probably what it's from.
    Q.  When you say "clicked through" to them, who is "them"?
    MR. HALPIN:  Objection.
    THE WITNESS:  To the banner, to SureTrader.
    Q.  BY MISS SUM:  You refer to a banner.  What was reflected in this banner?
    A.  Just SureTrader, the SureTrader banner, broker.  It was the broker's banner, and it probably had something about good margins.  I'm trying to remember what it looks like.  You know, good margins, it said --
    Q.  Did you create the banner?
    MR. HALPIN:  I'm going to...
    Please let him finish answering.
    THE WITNESS:  It did say -- I do believe it did say it had something about not intended for U.S. clients, I believe.  I'm not 100 percent sure, but that sticks out to me.
    Q.  BY MISS SUM:  At the time the banner was on the Day Trading Radio website and it said it's not for U.S. persons, did U.S. persons visit your website?
    MR. HALPIN:  Objection.  How does he know

32

1  that?
2       THE WITNESS:  Yeah, I have no control over --
3       MISS SUM:  Counsel, you can object, you can
4  preserve it, but you are not here to testify in place
5  of Mr. Kurisko.  What you just stated is impeding my
6  examination of him and inserting words into testimony.
7       MR. FORD:  Miss Sum, are you declaring this
8  witness an adverse witness?
9       MISS SUM:  Mr. Ford, I am not declaring.  I
10 am telling him he is not allowed to make statements --
11      MR. FORD:  Well, then, that's fine, but if
12 you're not declaring him an adverse witness, then the
13 Rules of Procedure dictate that you're not permitted to
14 ask leading questions.  We've had this issue with prior
15 depositions where I've had to repeatedly object, so we
16 would ask that you refrain from the leading questions.
17 I think there was at least one of the bases of the last
18 objection, so moving forward, if we could stay off the
19 leading --
20      MISS SUM:  Counsel, I will ask my questions,
21 you can preserve your objections, but they cannot be
22 speaking objections, okay?
23      So Mr. Halpin, I'm noting that you are, in
24 fact, making speaking objections and providing
25 testimony to clue in the witness, and that's

33

1  inappropriate.
2       MR. FORD:  The Rules of Procedure permit
3  clarification, as long as it's short and concise.
4       MISS SUM:  The Rules of Procedure do not
5  permit your colleague to provide testimony and hints to
6  the witness.
7       (Simultaneous speakers.)
8       MR. HALPIN:  I'll note for the record, he
9  previously testified he didn't attract visitors to his
10 website, so it's been asked and answered, a separate
11 basis for the objection.  Please continue.
12      MISS SUM:  No, I've asked a different
13 question, Mr. Halpin.  Would you please stop trying to
14 testify for the witness.
15      Madam Court Reporter, could you please reread
16 my last question.
17      (Question read.)
18      THE WITNESS:  People who come to the site and
19 seen the banner.
20    Q.  BY MISS SUM:  You testified earlier that Day
21 Trading Radio started providing services that people
22 could pay for; is that correct?
23    A.  Yeah.
24    Q.  And where were those persons from
25 geographically that paid Day Trading Radio's services?

34

1       MR. HALPIN:  Objection.
2       THE WITNESS:  They were from all over the
3  world.
4    Q.  BY MISS SUM:  Did that include the United
5  States?
6    A.  Yes.
7       MR. HALPIN:  Objection; asked and answered.
8       MISS SUM:  No, that was not asked and
9  answered.
10      MR. FORD:  Objection; leading.
11      MISS SUM:  All right.  Are you guys going to
12 tag team, then?
13      MR. HALPIN:  Objection; vague.  He's
14 testified to time periods.  Vagueness.
15    Q.  BY MISS SUM:  All right.  In 2013, did Day
16 Trading Radio provide services that people paid for?
17    A.  Yes.
18    Q.  When people paid for Day Trading Radio
19 services, what was the mechanism for them to make
20 payments?
21    A.  They go to a checkout page and they would put
22 in their credit card and it would go to what's called
23 an A Member system, which is the membership portal.
24 And it would give you, you know, something that would
25 protect the portion of the site that was for members

35

1  only, and then they would have ability to put a
2  password and user name to log in.
3    Q.  Did these members provide their addresses?
4    A.  If they did, it was...
5       We don't hold on to any of the billing
6  information, the A Member situation doesn't.  So if
7  they do have any address, I don't think we have
8  addresses.
9    Q.  Did any of your...
10      Strike that.
11      Did any of Day Trading Radio's private
12 members that paid for services ever communicate with
13 you directly?
14    A.  Oh, yeah.
15    Q.  Did they ever tell you where they were
16 located?
17      MR. HALPIN:  Objection.
18      THE WITNESS:  Yeah, I'd end up knowing where
19 they're located over time, because they become friendly
20 with the site and, you know, build relationships over
21 time.
22    Q.  BY MISS SUM:  And did you come to learn from
23 any of those people that contacted you that they were
24 based in the United States?
25      MR. HALPIN:  Objection; leading.

36

1     THE WITNESS:  Yeah.  I mean, yeah.  Like I
2  said, there was people that I met from the United
3  States, Canada, Europe, and all over, so I met people
4  from the United States, yes.
5     Q.  BY MISS SUM:  When you say you met people
6  from the United States, are you referring through your
7  website?
8     MR. HALPIN:  Objection.
9     THE WITNESS:  Yes, that's how the initial
10  contact would happen.
11    Q.  BY MISS SUM:  All right.  I'm going to turn
12  your attention back to Exhibit 49, and specifically the
13  second page.
14    MISS SUM:  Videographer, if you could please
15  scroll to the second page.
16    Let me make it a little bit bigger.  Hold on
17  one second so I can make sure it's the correct one.
18    Q.  BY MISS SUM:  All right.  Mr. Kurisko, what
19  is the document that's located at Bates stamp page
20  SEC-DTR-E-35?
21    And when I say that, I'm referring to a page
22  number that's in the lower --
23    A.  Okay.  I didn't know.
24    Q.  Are you able to see that?
25    A.  Yes, I am now.

                    37

1     Q.  Yeah.  So when I refer to those as Bates
2  stamped pages, that's a number that's affixed to the
3  document just so we can identify it, and I'm doing that
4  for the record.
5     So what is the document located at SEC-DTR
6  page 35?
7     A.  It looks like another invoice.
8     Q.  And what is the date of the invoice?
9     A.  11-2-2013.
10    Q.  All right.  And what is the description
11  contained in this invoice?
12    A.  Advertising banner, access to chat room, air
13  time, monthly promotional e-mail.
14    Q.  And did Day Trading Radio provide these
15  services to SureTrader?
16    A.  Pretty much.  I would say, yeah, we had a
17  banner, access to the chat room, and I did do a
18  write-up on them.  They had access to air time if they
19  wanted it.  Yeah.
20    Q.  And do you see where below the advertising
21  description, it says "September Commission"?
22    A.  Um-hmm.
23    Q.  Okay.  What was the September commission?
24    A.  It was "rate, 20," "260."
25    Q.  And how was that calculated?

                    38

1     A.  Again, I guess -- I'm guessing, because I
2  don't actually know what this was from, but I'm taking
3  a guess that it is people who clicked through, you
4  know, and went to their site and maybe became a client
5  or, you know, signed up on SureTrader.
6     Q.  And just for clarity, when you say "clicked
7  through," what are you referring to?
8     MR. HALPIN:  Objection.
9     THE WITNESS:  The banner.
10    Q.  BY MISS SUM:  And where is that banner
11  located?
12    A.  It was on the website.
13    Q.  On whose website?
14    A.  Day Trading Radio.
15    Q.  All right.  I'm going to turn to what will be
16  the fourth page in the PDF of Exhibit 49, and the Bates
17  for this page is SEC-DTR-E-44.
18    Do you see this, Mr. Kurisko?
19    A.  Yes, I do.
20    Q.  Okay.  And what is the document located at
21  DTR-44?
22    A.  Can you repeat that?
23    Q.  What is the document located at page DTR-44?
24    MR. HALPIN:  Objection.
25    THE WITNESS:  I don't understand the

                    39

1  question.  Where is it located at?
2     Q.  BY MISS SUM:  How would you describe the
3  document that's located at DTR --
4     A.  Okay.  Okay.  All right.  It's another
5  invoice.
6     Q.  And what's the date of the invoice?
7     A.  September 4th, 2014.
8     Q.  And can you see where it says "Description"?
9     A.  Yep, same description.  Banner, chat room,
10  air time, and monthly promotional e-mail.
11    Q.  When you say "same description," same as
12  what?
13    A.  The previous one.
14    Q.  The previous ones we've reviewed, is that
15  what you're referring to?
16    A.  Yes.
17    Q.  Okay.  Do you see where it includes an
18  amount?
19    A.  Yes.
20    Q.  And what is the amount?
21    A.  $1,000.
22    Q.  Okay.  Why...
23    Is this amount different than the prior
24  invoices?
25    A.  It is.

                    40

1    Q.   Okay.  Do you know why it's different?
2    A.   Probably because they weren't getting any --
3  you know, I would guess they weren't getting the value
4  out of, you know, what they were advertising.
5    Q.   Do you remember having any discussions with
6  anyone at SureTrader about the change?
7    A.   No, no.
8    Q.   Okay.  Did Day Trading Radio approve this
9  change?
10    MR. HALPIN:  Objection.
11    THE WITNESS:  I would say yes.
12    Q.   BY MISS SUM:  Who would have negotiated this
13  amount with SureTrader?
14    A.   My friend Dac.
15    Q.   Is that the Dac that you were referring to
16  earlier?
17    A.   Yes.
18    Q.   All right.  I'm going to show you what's...
19    We can take this down, and then I'd like to
20  bring up Exhibit 52.
21    MISS SUM:  I'll ask the videographer to bring
22  up Exhibit 52, please.
23    Thank you.
24    (Deposition Exhibit 52 marked for
25  identification.)

                            41

1    Q.   BY MISS SUM:  Are you able to see it --
2    A.   Yes.
3    Q.   -- Mr. Kurisko?
4    A.   Um-hmm.
5    Q.   Okay.  I'll represent to you that this is not
6  an e-mail that you are a party to.
7    A.   No.
8    Q.   Okay.  I'm going to point your attention to
9  the first e-mail at the bottom.  Do you see where
10  Justin Ritchie says, "We already paid DTR a flat fee
11  per month of 3,500, plus commission, based on $20 per
12  active account.  The average commission earned for the
13  past three months was $250.  Therefore, let's propose a
14  flat marketing fee of $3,750 per month.  What say you?"
15    Do you see that language?
16    A.   Yes.
17    Q.   Did you have any discussion with anyone at
18  SureTrader regarding the amount that SureTrader was to
19  pay Day Trading Radio?
20    MR. HALPIN:  Objection.
21    MISS SUM:  I'm sorry, I couldn't hear you,
22  Mr. Kurisko.
23    THE WITNESS:  No, I didn't.
24    Q.   BY MISS SUM:  Do you know if Dac communicated
25  with someone at SureTrader regarding the amount that

                            42

1  SureTrader would pay Day Trading Radio?
2    MR. HALPIN:  Objection; leading.
3    THE WITNESS:  Yes, he did.
4    Q.   BY MISS SUM:  You said...
5    I'm sorry.  I couldn't hear you.  You said he
6  did?
7    A.   Yes, Dac -- Dac had contact with SureTrader
8  more than I did.
9    Q.   Okay.  Do you know what Dac discussed with
10  SureTrader about the compensation for Day Trading Radio
11  services by SureTrader?
12    A.   Not really.  I mean, I thought this was
13  probably a great thing, so, you know, again, this was
14  really a long time ago.  We were just starting, so I
15  think at this point, this was a good deal, and, you
16  know, at that point, we were just taking what we
17  could -- you know, what we could get on this.  I didn't
18  have any value placed on this.  I thought this was
19  great.
20    MISS SUM:  Okay.  All right.  We can bring
21  down this exhibit, please.
22    I'm going to ask you to bring up Exhibit 51.
23    (Deposition Exhibit 51 marked for
24  identification.)
25    Q.   BY MISS SUM:  Okay.  This is a four-page

                            43

1  document, Mr. Kurisko.  I'd like to give you the
2  opportunity to just let us scroll through it so you see
3  what it is before I ask questions.
4    A.   Okay.  I see.
5    Q.   I just want to make sure you can actually see
6  the entirety of the document.
7    A.   Yeah, I have it on my side.  I scrolled down.
8  I can see my signature on the bottom.
9    Q.   Okay.  You've gone through all four pages,
10  sir?
11    A.   Yes.  Yeah.
12    Q.   All right.  What is the document in
13  Exhibit 51?
14    A.   It looks like the agreement we had, marketing
15  services agreement.
16    Q.   And who were the parties to the marketing
17  services agreement?
18    A.   Day Trading Radio and Swiss America
19  Securities.
20    Q.   And did you understand Swiss America
21  Securities to be SureTrader?
22    A.   Yes.
23    Q.   What is the date that this agreement was
24  entered into?
25    A.   First day of August, 2014.

                            44

1    **Q.**   And if I could ask you to scroll to the
2  bottom of page 3, going into the top of page 4, please,
3  do you see -- right there, do you see that there is
4  some signatures?
5    **A.**   Yes, yes.
6    **Q.**   Okay.  And is that your signature, Mr.
7  Kurisko?
8    **A.**   Yes.
9    **Q.**   Okay.  Do you see on the left-hand side where
10 it says "Swiss America" and there's a signature?
11   **A.**   Yes.
12   **Q.**   Do you know who signed on behalf of Swiss
13 America there?
14   **A.**   No.
15       MISS SUM:  Okay.  Let's scroll down to the
16 top of page 4.
17       And make that a little bit bigger.
18   **Q.**   BY MISS SUM:  Are you able to tell now who
19 signed on behalf of Swiss America?
20       MR. HALPIN:  Objection.
21       THE WITNESS:  I can't tell the signature, but
22 I do see it says "Guy Gentile."
23   **Q.**   BY MISS SUM:  And is that the same name as
24 the person you described earlier meeting at trade
25 shows?

45

1       MR. HALPIN:  Objection.
2       THE WITNESS:  Yes.
3    **Q.**   BY MISS SUM:  Let me go back to page 1 of
4  this agreement.
5       Before I ask you a specific question about
6  the agreement, what was your understanding of what Day
7  Trading Radio would do pursuant to this marketing
8  services agreement?
9       MR. HALPIN:  Objection.
10      THE WITNESS:  Place a banner on our site and
11 give them access to the chat room, have them on
12 whenever they wanted to come on, talk about -- you
13 know, answer questions, talk about their services, and
14 that was it.
15   **Q.**   BY MISS SUM:  And what would Day Trading
16 Radio receive as compensation under this marketing
17 services agreement?
18   **A.**   We -- you know, I guess the invoices that you
19 provided before would be the compensation.
20      MISS SUM:  Okay.  Can we scroll down to page
21 4 of this agreement, please.
22      And I ask to please enlarge this a little
23 bit.
24   **Q.**   BY MISS SUM:  Do you see in front of you the
25 words "Exhibit A"?

46

1    **A.**   Um-hmm.
2    **Q.**   Okay.  Do you see further down where there's,
3  in bold, paragraph two, "Compensation"?
4    **A.**   Yes.
5    **Q.**   Okay.  Do you see where it says, "During the
6  term of this agreement, Swiss America agrees to pay a
7  fixed monthly fee of $1,000 to marketing agent,
8  prorated for any partial months"?
9    **A.**   Yes.
10   **Q.**   Does that refresh your recollection as to how
11 much Swiss America was to pay Day Trading Radio for the
12 services provided in this marketing services agreement?
13      MR. HALPIN:  Objection.
14      THE WITNESS:  I thought it was around a
15 thousand.
16   **Q.**   BY MISS SUM:  Do you see where it says
17 "Marketing Agent"?
18   **A.**   Yes, up on top, "Service and Duties of
19 Marketing Agent," yes.
20   **Q.**   Do you know who the marketing agent is on
21 this agreement?
22   **A.**   On which side?
23      No --
24   **Q.**   Okay.  So again going back to paragraph --
25      MR. HALPIN:  Please let the witness finish

47

1  his answer.
2       MISS SUM:  I didn't hear him talking,
3  Mr. Halpin.  There's a lot of background noise.
4       THE WITNESS:  No, I don't know who the
5  marketing agent was.
6    **Q.**   BY MISS SUM:  Okay.  I'm going to point you
7  back to paragraph two, "Compensation."
8    **A.**   Okay.
9    **Q.**   Okay.  And same sentence that I read earlier,
10 "During the term of this agreement, Swiss America
11 agrees to pay a fixed monthly fee of $1,000 to
12 marketing agent."
13      "Marketing agent" there, do you know who that
14 refers to?
15   **A.**   "Swiss America agrees to pay a fixed monthly
16 fee to marketing agent prorated for special marketing
17 agent"... (reading)
18      I would take it that it's Day Trading Radio.
19      MISS SUM:  All right.  Can we go back to the
20 top of the marketing services agreement, so that will
21 be page 1.
22   **Q.**   BY MISS SUM:  Okay.  And do you see the
23 second paragraph, where it says "Purpose and Scope"?
24   **A.**   Um-hmm.
25   **Q.**   Okay.  Do you see where it says, "Swiss

48

1  America desires to engage marketing agent and marketing
2  agent is qualified to and desires to provide certain
3  marketing services to Swiss America for non United
4  States investors"?
5  **A.**  Um-hmm.
6  **Q.**  "Parties agree that marketing agent will
7  supply such services to Swiss America upon request
8  pursuant to the terms and conditions contained in this
9  agreement."
10  **A.**  That's correct.
11  **Q.**  Do you see that?
12  **A.**  Um-hmm.
13  **Q.**  Did you or anyone at Day Trading Radio
14  discuss with SureTrader providing services that related
15  to non U.S. investors?
16  MR. HALPIN:  Objection.
17  THE WITNESS:  No, we didn't discuss anything.
18  **Q.**  BY MISS SUM:  Did you discuss the...
19  Strike that.
20  Was it Day Trading Radio's responsibility to
21  tell SureTrader who it should or shouldn't accept as a
22  customer?
23  MR. HALPIN:  Objection; leading.
24  MISS SUM:  Let me finish my question.  You're
25  welcome to --

49

1  counsel, and so one of the issues with these leading
2  questions is they seem designed to confuse the witness,
3  who is not represented by counsel.
4  MISS SUM:  Mr. Ford --
5  MR. FORD:  You just asked whether he knew
6  something that -- whether Mr. --
7  MISS SUM:  You are making speaking objection
8  after speaking objection.  You are not here to tell the
9  witness how to testify, and that's exactly what you're
10  doing, and that is not proper conduct.
11  Madam Court Reporter, could you please read
12  back the question.
13  (Question read.)
14  MR. HALPIN:  Objection.
15  THE WITNESS:  I wouldn't expect him to know,
16  but I have no idea.  No, I don't know.
17  MISS SUM:  All right.  Why don't we go ahead
18  and take a ten-minute break right now.  Is that
19  sufficient for you, Mr. Kurisko?
20  THE WITNESS:  Yeah, sure.
21  THE VIDEOGRAPHER:  We're going off the record
22  at 1:06 p.m.
23  MISS SUM:  Thank you.
24  (Recess.)
25  THE VIDEOGRAPHER:  We're back on the record

51

1  MR. HALPIN:  I thought you were finished.  I
2  wanted to object before the witness answered.  I
3  apologize.
4  MISS SUM:  Okay.
5  **Q.**  BY MISS SUM:  Did you or anyone from...
6  Excuse me.
7  Did you or anyone from Day Trading Radio
8  discuss the geographical locations of persons who
9  visited Day Trading Radio's website?
10  MR. HALPIN:  Objection.
11  THE WITNESS:  No, but it was implied that it
12  was for non U.S. customers.
13  **Q.**  BY MISS SUM:  Did U.S. customers visit Day
14  Trading Radio's website?
15  **A.**  Yes.
16  MR. HALPIN:  Objection.
17  THE WITNESS:  Yes.
18  **Q.**  BY MISS SUM:  Did Guy Gentile know that
19  persons from the U.S. visited Day Trading Radio's
20  website?
21  MR. FORD:  Objection; leading, and, Alice,
22  you know the witness is not represented --
23  MISS SUM:  Counsel, you preserved it.  Please
24  don't interrupt.
25  MR. FORD:  The witness is not represented by

50

1  at 1:20 p.m.
2  **Q.**  BY MISS SUM:  Okay.  Can we bring back up
3  Exhibit 50, please.
4  THE VIDEOGRAPHER:  One second.
5  **Q.**  BY MISS SUM:  All right.  Mr. Kurisko, can
6  you see Exhibit 50?
7  **A.**  Let me bring it up on my side.
8  Yes, I can.
9  **Q.**  Yes.  We brought this up before.
10  **A.**  Yes.
11  **Q.**  Okay.  So I'm going to ask that the court
12  reporter [sic] to scroll through it to make sure you've
13  seen all the pages in Exhibit 50.
14  MR. HALPIN:  Miss Sum, just a clarifying
15  question.  Have we looked at Exhibit 50 previously, or
16  was it Exhibit 49?
17  MISS SUM:  Oh.  Well, I believe we went
18  through Exhibit 50, but if not, okay.
19  (Deposition Exhibit 50 marked for
20  identification.)
21  **Q.**  BY MISS SUM:  Mr. Kurisko, I've asked the
22  videographer to bring up Exhibit 50.  We'll just ask
23  you to take a look at the first page.
24  **A.**  Okay.
25  **Q.**  Okay.  Do you see, first page, the date on

52

1  this document?
2      **A.**  Yeah, 3-6-2016.
3      **Q.**   Okay.  What is the first page of Exhibit 50,
4  which is Bates stamp SEC-DTR-31?
5          MR. HALPIN:  Objection.
6          THE WITNESS:  Yes.
7      **Q.**  BY MISS SUM:  Okay, what is this document?
8      **A.**  Oh, it's an invoice.
9      **Q.**   Okay.  And what does this invoice provide?
10         MR. HALPIN:  Objection.
11         THE WITNESS:  It provides -- it's advertising
12  banner, top of the page, same thing, access to chat
13  room, monthly promotions for $1,000.
14     **Q.**  BY MISS SUM:  Did Day Trading...
15         I'm sorry.  I didn't mean to cut you off.
16     **A.**  I'm just saying that would be the
17  compensation, $1,000.
18     **Q.**   Did Day Trading Radio issue this invoice to
19  Swiss America Securities?
20     **A.**  I believe so.
21     **Q.**   I'm going to now ask you to look at the
22  remainder of the pages in Exhibit 50 and confirm if
23  these were invoices that Day Trading Radio issued to
24  SureTrader.
25     **A.**  Yes, they look like it.

53

1      **Q.**   Okay.  I want to make sure you've looked at
2  all the pages before you answer.
3      **A.**  Oh, yeah, I scrolled through them on my side.
4      **Q.**   Oh, you scrolled through.  Okay.  I didn't
5  realize you already scrolled through them.
6          Okay.  So with respect to the invoices
7  contained in Exhibit 50, are they invoices issued by
8  Day Trading Radio to Swiss America?
9      **A.**  Yes, sure.
10         MR. HALPIN:  Objection.
11     **Q.**  BY MISS SUM:  And what was the last date of
12  the invoice issued to SureTrader?
13         MR. HALPIN:  Objection.
14         THE WITNESS:  Last date is 11-6-2018.
15     **Q.**  BY MISS SUM:  Did Day Trading Radio provide
16  services to SureTrader after November 6, 2018?
17         MR. HALPIN:  Objection.
18         THE WITNESS:  I would probably say no, but
19  I'm not sure.
20     **Q.**  BY MISS SUM:  Do you have any records which
21  would reflect whether Day Trading Radio provided
22  services to SureTrader after November 6th, 2018?
23         MR. HALPIN:  Objection.
24         THE WITNESS:  No, this would be it.
25     **Q.**  BY MISS SUM:  From March 2016 to November of

54

1  2018, did Day Trading Radio change any of the services
2  it provided to SureTrader?
3          MR. HALPIN:  Objection.
4          MISS SUM:  I couldn't hear his answer.
5          THE WITNESS:  No, not that I can recall, no.
6      **Q.**   BY MISS SUM:  Can you please describe the
7  services that were provided as of March 2016, Day
8  Trading Radio to SureTrader?
9          MR. HALPIN:  Objection.
10         THE WITNESS:  It would be a banner, having
11  access to the chat room, and ability to come on the
12  show.
13     **Q.**   BY MISS SUM:  And as of November 2018, did
14  Day Trading Radio provide the same services that you
15  just described?
16     **A.**  Yes.
17         MR. HALPIN:  Objection.
18         MISS SUM:  I'm sorry.  I couldn't hear your
19  answer, sir.
20         THE WITNESS:  Yes.
21         MISS SUM:  May I ask you, I don't know if you
22  can get closer to your microphone, because I think I at
23  least hear counsel pretty clearly, but it's not quite
24  so clear when you speak.
25         THE WITNESS:  All right.  How's that?

55

1          MISS SUM:  A little bit better.  Thank you
2  very much.
3          Let's take down Exhibit 50 and then bring up
4  Exhibit 53.
5      **A.**  Okay.
6          (Deposition Exhibit 53 marked for
7  identification.)
8      **Q.**   BY MISS SUM:  I'll just wait for the
9  videographer to also bring it up.
10         All right.  Mr. Kurisko, do you see the top
11  e-mail on Exhibit 53 from Yaniv Frantz to DTR on
12  Friday, March 24th, 2017 at 3:20?
13     **A.**  Yes.
14     **Q.**   Were you aware of communications between Mr.
15  Frantz and DTR?
16         MR. HALPIN:  Objection.
17         THE WITNESS:  No.
18     **Q.**   BY MISS SUM:  I'll point your attention to
19  the e-mail at the very bottom, if the videographer
20  could please scroll.
21         All right.  In the middle, do you see where
22  it says from DTR, mailed to, and then it says
23  dac@daytradingradio.com?
24     **A.**  Um-hmm.
25     **Q.**   And it was sent on Friday, March 24th, 2017,

56

1  and then to Yaniv Frantz at yaniv@SureTrader.com?
2      A.  Yes.
3      Q.  Do you see where it says "Re: SureTrader
4  Policy," immediately below the "To"?
5      A.  Where am I?  So let me go down here again.
6  I'm sorry.
7          What do you want me to look at again here?
8  I'm sorry.
9          Yeah, "ShareTrader Policy," yeah.
10     Q.  Where it says "dac," D-a-c,
11 "@daytradingradio.com," who is this Dac in this e-mail
12 address?
13     A.  Dac is my friend.
14     Q.  And earlier I asked you if Dac had a
15 daytradingradio.com e-mail address.  Do you recall
16 that?
17     A.  Yes.
18     Q.  Is this that e-mail address?
19     A.  I gave you that one, right, yes, that's it.
20     Q.  That's the one that Day Trading Radio gave to
21 Dac?
22     A.  Yes.
23     Q.  All right.  I'll turn your attention now just
24 to the bottom e-mail, which is the first
25 chronologically.  Do you see on March 24, 2017, 1:57,

57

1  Yaniv Frantz, yaniv@SureTrader.com, sent an e-mail to
2  Day Trading Radio?
3      A.  Yes.
4      Q.  Were you aware that Mr. Frantz sent this
5  e-mail to Day Trading Radio?
6          MR. HALPIN:  Objection.
7          THE WITNESS:  Probably not, no.
8      Q.  BY MISS SUM:  Do you recall if Dac brought
9  the e-mail to your attention?
10         MR. HALPIN:  Objection.
11         THE WITNESS:  If I read it.
12         MISS SUM:  Sure.  Of course you can read it.
13         THE WITNESS:  I think he mentioned it.  I
14 don't know if I read this before, but, yeah, you know,
15 like I said, he was doing a lot of the back and forth
16 with SureTrader.  I wouldn't get to really, you know,
17 pay attention to it, because I was mainly the guy just
18 doing the radio show and stuff.
19     Q.  BY MISS SUM:  Did you give Dac approval to
20 communicate with SureTrader regarding the SureTrader
21 policy?
22     A.  Yes.
23         MR. HALPIN:  Objection.
24         MISS SUM:  I'm sorry.  I couldn't hear you,
25 sir.

58

1          THE WITNESS:  Yes, yes.
2      Q.  BY MISS SUM:  All right.  Do you see where it
3  says -- in Mr. Frantz's e-mail, he says, "SureTrader
4  senior management have decided to stop any prior deal
5  moving forward, as we made it clear that we're not
6  endorsing to solicit to U.S. customers on our behalf,
7  as mentioned on our website"?  Do you see that?
8      A.  Yes.
9      Q.  Did you have any discussions with Dac about
10 that specific sentence in Mr. Frantz's e-mail?
11         MR. HALPIN:  Objection.
12         THE WITNESS:  Not that I remember.
13     Q.  BY MISS SUM:  All right.  Above that, do you
14 see Dac's response?
15     A.  Yes.
16     Q.  Okay.  Dac says to Mr. Frantz, "Hello.  I'm a
17 bit confused.  Are we canceling our marketing
18 agreement?  Your banner states 'Not intended for U.S.
19 customers,' and our customer base is both U.S. and non
20 U.S.  Best, Dac."
21     A.  Okay.
22     Q.  Do you see that?
23     A.  I see it, yes.
24     Q.  Did you discuss Dac's response with Dac?
25     A.  No.

59

1          MR. HALPIN:  Objection.
2      Q.  BY MISS SUM:  Where Dac says "our customer
3  base is both U.S. and non U.S.," is that a correct
4  statement?
5      A.  Definitely.
6      Q.  I'm sorry.  I apologize.
7      A.  I have my mic all the way up here, so let me
8  reset my mic here.
9          I don't know if that helps.
10     Q.  And I apologize.  Maybe it's my speaker, so I
11 don't want to blame you if it's on my end, so I
12 apologize.
13         THE WITNESS:  Is there a way I could put the
14 volume up on the Webex platform?
15         MR. HALPIN:  Did the court reporter get that
16 last answer?
17         THE COURT REPORTER:  Let me go back and look.
18 The answer was, "Definitely."
19         MR. HALPIN:  Thank you.
20         THE WITNESS:  Okay, I'm ready.
21         MISS SUM:  Okay.  Thank you.
22         All right, we can bring down Exhibit 53, and
23 let's bring up Exhibit 54, please.
24         (Deposition Exhibit 54 marked for
25 identification.)

60

1     MR. HALPIN:  I'm going to object to the use
2 of this exhibit.
3     **Q.**  BY MISS SUM:  Are you able to see Exhibit 54,
4 Mr. Kurisko?
5     **A.**  Um-hmm.
6     **Q.**  Does this look familiar to you?
7     **A.**  Yeah, it looks like an old version of the
8 website, one of the early versions of the website.
9     **Q.**  I will represent to you that this is a web
10 capture from February of 2018 of daytradingradio.com.
11 I'm going to point your attention to the top right
12 corner.
13        Do you see -- I don't know if it comes up
14 clearly for you or if we need to enlarge it.  Do you
15 see at the top, it says "Day Trading Radio" and there's
16 a microphone?
17     **A.**  Yeah.
18     **Q.**  Okay.  What is that to the right of "Day
19 Trading Radio" and the microphone?
20     **A.**  That's the SureTrader banner.
21     **Q.**  And is this the banner to which you referred
22 to in your earlier testimony?
23     **A.**  Yes.
24     **Q.**  I don't remember if I asked you this.  Who
25 created this image or the banner?

61

1     MR. HALPIN:  Objection.
2     THE WITNESS:  I believe it was supplied from
3 SureTrader.
4     **Q.**  BY MISS SUM:  Did you have any comments or
5 edits to this image or banner?
6     MR. HALPIN:  Objection.
7     THE WITNESS:  No.
8     **Q.**  BY MISS SUM:  Did you say no?
9     **A.**  No.
10    **Q.**  Do you recall if this banner ever changed
11 during the time that Day Trading Radio had a business
12 relationship with SureTrader?
13    MR. HALPIN:  Objection.
14    THE WITNESS:  I don't think so.  I don't
15 know.
16    **Q.**  BY MISS SUM:  Was there ever a time when Day
17 Trading Radio created its own banner related to
18 SureTrader?
19    MR. HALPIN:  Objection.
20    THE WITNESS:  Not that I remember.
21    **Q.**  BY MISS SUM:  And if Day Trading Radio sent
22 an invoice to SureTrader for services, would it have
23 included the display of this banner?
24    MR. HALPIN:  Objection.
25    THE WITNESS:  Repeat that, please.

62

1     **Q.**  BY MISS SUM:  If Day Trading Radio sent an
2 invoice to SureTrader for services, would it have
3 included this banner?
4     MR. HALPIN:  Objection.
5     THE WITNESS:  I don't see a reason why we
6 would include the banner on the invoice.
7     MISS SUM:  All right.  We can bring down
8 Exhibit 54.
9     **Q.**  BY MISS SUM:  Did Day Trading Radio receive
10 any notifications of when someone clicked on the banner
11 we just looked at on Exhibit 54?
12    MR. HALPIN:  Objection.
13    THE WITNESS:  The only thing I remember is
14 probably from what they gave me.  I don't think we had
15 a way of tracking it.
16    **Q.**  BY MISS SUM:  Did Day Trading Radio have any
17 involvement in SureTrader's process of accepting
18 applications from potential customers?
19    MR. HALPIN:  Objection.
20    THE WITNESS:  Not at all.
21    **Q.**  BY MISS SUM:  And why is that?
22    MR. HALPIN:  Objection.
23    THE WITNESS:  Just it wasn't -- you know,
24 when I did this deal with SureTrader, it was mainly for
25 the banner space and what we did.  Anything beyond that

63

1 wasn't -- you know, wasn't part of it and wasn't
2 responsible for clearing or -- you know, that was all
3 we were doing, nothing else.
4     **Q.**  BY MISS SUM:  Did anyone at SureTrader ever
5 complain about the services that Day Trading Radio
6 provided to SureTrader?
7     MR. HALPIN:  Objection.
8     THE WITNESS:  No, I don't think so.
9     **Q.**  BY MISS SUM:  When was the last time you
10 communicated directly with Mr. Gentile?
11    **A.**  Years.  Probably eight years maybe.  I might
12 have seen him at a trade show once and we said hi.
13    **Q.**  Did you ever discuss the lawsuit the SEC
14 filed against SureTrader and Mr. Gentile?
15    MR. HALPIN:  Objection.
16    THE WITNESS:  We didn't know anything about
17 it.
18    MISS SUM:  I'm going to take just a brief
19 moment to see if there's anything else, and then I
20 expect to be finished very shortly if I have any
21 additional questions.  So we'll just go off for three
22 minutes?
23    MR. HALPIN:  Are we off?
24    THE VIDEOGRAPHER:  We're going off the record
25 at 1:38 p.m.

64

1          (Recess.)
2     THE VIDEOGRAPHER:  And we're back on the
3 record at 1:50 p.m.
4     MISS SUM:  I have no additional questions.
5         EXAMINATION
6 BY MR. HALPIN:
7     Q.  Hi, Mr. Kurisko.  My name is Stephen Halpin.
8 As I mentioned earlier today, I represent Guy Gentile
9 in this matter, along with my other colleagues from
10 Ford O'Brien Landy, LLP.  Thank you for your time.
11     I'm going to try to make this hopefully
12 efficient and quick.  I don't anticipate more than --
13 certainly no more than an hour of questions, and
14 hopefully, we can be done comfortably before then.
15     And the same rules, ground rules that Miss
16 Sum outlined at the beginning apply, as well.  I'm
17 hoping -- we may need one short break, but if we're
18 going for an hour, I'll suggest a break.  If you would
19 like a break before then, feel free to request one.
20 Just if there is a question pending, I ask that you
21 answer first.
22     Does that make sense?
23     A.  Sure.
24     Q.  Okay.  Mr. Kurisko, you testified earlier
25 that you spoke with Miss Sum last night; is that

65

1 correct?
2     A.  Yes.
3     Q.  Is that the only time you've spoken with Miss
4 Sum?
5     A.  Yes.
6     Q.  And have you spoken with anyone else at the
7 SEC about this case?
8     A.  No, I haven't.
9     Q.  How long did you speak with Miss Sum last
10 night?
11     A.  Maybe about ten minutes.
12     Q.  Did she show you any documents?
13     A.  I was driving my car.  I was picking up my
14 son, so I wasn't able to see anything.
15     Q.  So did she send you any documents?
16     A.  She sent me some today.  I asked for the ones
17 that I'm going over right now.
18     Q.  Did she send you anything that we haven't
19 looked at today?
20     A.  You know, yeah.  54, I guess 55, 56, 57.  I
21 got Exhibit 49, 50, 51, 52, 53, 54, 55, 56, and 57.
22 That's what she sent me.
23     Q.  Other than what has been premarked as
24 exhibits, did Miss Sum send you anything else?
25     A.  No, I don't believe so.

66

1     Q.  And what did you discuss with Miss Sum?
2     A.  She said that she didn't want me to be
3 surprised by the documents or anything.  I think she
4 asked me my relationship with Guy in the beginning, how
5 I met him.  And, again, I was driving at the time, so
6 it wasn't a long conversation.  She just wanted to, you
7 know, tell me that she didn't want me to be surprised
8 by any documents that might be coming up.
9     Q.  Did she advise you whether or not you should
10 have a lawyer today?
11     A.  No, I don't think she did.
12     Q.  And did she suggest to you how to answer any
13 of her questions before today?
14     A.  No.
15     Q.  And have you been promised anything by Miss
16 Sum or the SEC in connection with your testimony?
17     A.  No --
18     Q.  Okay.
19     A.  -- other than this was not about Day Trading
20 Radio or myself.
21     Q.  So Miss Sum said this was not about Day
22 Trading Radio?
23     A.  It wasn't directed at me, it was against Guy
24 Gentile.
25     Q.  So was it your understanding, then, that you

67

1 weren't risking any exposure by testifying today?
2     A.  Yes.
3     Q.  And that understanding, you gleaned that from
4 your conversation with Miss Sum?
5     A.  Yes.
6     Q.  Mr. Kurisko, can you explain the pattern day
7 trading or PDT rule?
8     A.  Yeah.  Pattern day trading is a FINRA rule
9 for clients -- I believe it's just basically for U.S.
10 clients.  If they don't have $25,000, then they cannot
11 make more than three trades in a five-day period.
12     Q.  And is that rule -- you said it's a FINRA
13 rule?
14     A.  Yeah, I believe so.
15     Q.  And that's enforced through brokers who are
16 registered with FINRA; right?
17     A.  I would -- I don't really know who enforces,
18 but, yes, I guess so.
19     Q.  So are international brokerages registered
20 with FINRA?
21     A.  I don't believe so.
22     Q.  I think you testified earlier that your
23 audience consists of people from all over the world; is
24 that correct?
25     A.  That's correct.

68

1    Q.  Can you think of a reason why an
2  international trader might seek out an international
3  brokerage that isn't registered with FINRA?
4    A.  Repeat that.  Sorry.
5    Q.  Can you think of a reason why, say, a person
6  from Russia or China or Brazil, one of the countries
7  you mentioned, why they would seek out an international
8  brokerage that isn't registered with FINRA?
9    A.  Probably because...
10      There's a couple reasons.  Lots of times it's
11  hard to open up an account, you know, in the United
12  States for clients, they don't have much choice, and
13  the pattern day trading rule.
14    Q.  Can you explain what you mean by that a
15  little bit more?
16    A.  That if they don't have enough money, then
17  they'd be limited to their trading, and I think they
18  wouldn't be limited if they went through someone that's
19  not regulated by FINRA.
20    Q.  And you testified about your website
21  daytradingradio.com, and I believe you said you
22  launched that around 2007; is that right?
23    A.  Yeah, that was, like, the rough launch.  You
24  know, it just took off.  I wasn't planning on launching
25  it.  It was just a hobby at the time and just

69

1  to anyone in the world, as far as you're aware?
2    A.  Yes.
3    Q.  Okay.  You mentioned, as well, I think a chat
4  room for -- access to a chat room for paid customers of
5  Day Trading Radio; is that right?
6    A.  That's correct.
7    Q.  And where do those paying customers come
8  from?
9    A.  All over the world.
10    Q.  I believe you testified earlier about an
11  entity called Speedtrader, do you recall that?
12    A.  Yes.
13    Q.  And do you recall what Speedtrader is?
14    A.  Speedtrader is a broker in the U.S.
15    Q.  It's a broker in the U.S.  Do you know
16  whether Speedtrader services accounts for international
17  traders?
18    A.  I don't know.  Honestly, I don't think so,
19  but I'm not sure.
20    Q.  It doesn't, does it?
21    A.  I don't think so.  I don't know.
22      MR. HALPIN:  If we could pull up SEC's
23  Exhibit 49...
24    Q.  BY MR. HALPIN:  This is a compilation of what
25  appear to be invoices we were looking at earlier, Mr.

71

1  broadcasting live on the internet, and then it got a
2  following, and then, you know what, I'm going to make
3  it into something, and that's where it all began.
4    Q.  And that website is accessible anywhere in
5  the world, as far as you're aware?
6    A.  Oh, yeah, anywhere.
7    Q.  And it has been since its inception?
8    A.  Yes.
9    Q.  And you still operate that website today;
10  correct?
11    A.  Yes.
12    Q.  And I think you mentioned that you broadcast
13  live every day on the website; is that right?
14    A.  That's correct.
15    Q.  And how long have you been doing that?
16    A.  Since 2007 -- 2007, 2008, right around there.
17    Q.  And I think you also mentioned you have a
18  YouTube channel; is that right?
19    A.  Yeah, um-hmm.
20    Q.  And is that videos of your daily broadcast?
21    A.  Yes.
22    Q.  And does it include other content, as well,
23  that you create?
24    A.  Educational videos on trading.
25    Q.  And that YouTube channel, is that accessible

70

1  Kurisko.  Did you create these invoices?
2    A.  Not personally, no.
3    Q.  You didn't draft this...
4      Sorry.  Can you see it now?
5    A.  Yeah, I see it.
6    Q.  You didn't draft this description, did you?
7    A.  No.
8    Q.  Do you know who did?
9    A.  No, I really don't.  I don't know if it was
10  Dac, my wife, or did it come from ShareTrader.  I was
11  kind of hands off on the whole process.
12    Q.  So this is one of the documents Miss Sum sent
13  you last night; correct?
14    A.  Yes.
15    Q.  Before Miss Sum sent you this document, when
16  was the last time you had seen it, if you recall?
17    A.  I don't remember ever -- I don't remember
18  seeing it really.  You know, like I said, this was kind
19  of behind my -- this was just something that was going
20  on while I did the show, so I would really never be
21  privy to this.  I never really saw the documents.
22    Q.  You don't think you saw this at all; correct?
23    A.  Yeah, no, I wouldn't be privy to it really.
24  I mean, I'm not doing the books or anything.
25    Q.  If we look at this first page, which is dated

72

1 September 5th, 2013, it says, "Advertising banner on
2 daytradingradio.com (top of web page)."
3      Do you see that?
4   **A.**  Yeah.
5   **Q.**  Do you recall having a SureTrader banner on
6 the daytrading.com website?
7   **A.**  Yeah.
8   **Q.**  It also says "access to chat room."  Do you
9 see that?
10  **A.**  Yes.
11  **Q.**  You testified knowing a Craig earlier with
12 Speedtrader.  That's Craig Manderson; correct?
13  **A.**  Yes, Speedtrader Craig.
14  **Q.**  And Craig is not affiliated with SureTrader
15 at all?
16  **A.**  No, not that I know.
17  **Q.**  And Craig would enter your chat room;
18 correct?
19  **A.**  Yes.
20  **Q.**  But you don't recall a particular SureTrader
21 employee entering your chat room; right?
22  **A.**  I don't know any.  I don't know any of the
23 names.  There might have been.  I don't know.
24  **Q.**  And you don't recall any SureTrader employees
25 coming on your radio show; right?

73

1   **A.**  I think we had a SureTrader employee come on
2 once to introduce them, you know, when we first made
3 the agreement, but...
4   **Q.**  You think, or you know?
5   **A.**  I think.
6   **Q.**  So it's possible that no one from SureTrader
7 ever came on, in your recollection?
8   **A.**  Yeah, it was a long time ago, so I'm not
9 100 percent sure.
10  **Q.**  Then it also says here "monthly promotional
11 e-mail."  Do you see that?
12  **A.**  Yes.
13  **Q.**  Day Trading Radio never sent a monthly
14 promotional e-mail on SureTrader's behalf, did it?
15  **A.**  I sent out a write-up once.  I wrote it up
16 and I put it on the site.
17  **Q.**  So you said you drafted a write-up once?
18  **A.**  I believe it was once.  I wrote up a nice
19 review of SureTrader.
20  **Q.**  So then it's correct that you didn't send out
21 a monthly promotional e-mail?
22  **A.**  I don't believe I sent out a monthly, no.
23  **Q.**  And if you had sent out a monthly promotional
24 e-mail, you would have produced that to the SEC,
25 presumably; right?

74

1   **A.**  Yes, if I would have found it.
2      MR. HALPIN:  All right.  We can take down
3 Exhibit 49.
4      And let's pull up SEC's Exhibit 51, if you
5 have that handy.
6   **Q.**  BY MR. HALPIN:  Do you recall testifying
7 about this agreement earlier, Mr. Kurisko?
8   **A.**  Yes.
9   **Q.**  And this is an agreement between Day Trading
10 Radio, Inc. and Swiss America Securities, LTD; correct?
11  **A.**  Yes.
12  **Q.**  And you understand Swiss America Securities,
13 LTD to be SureTrader; correct?
14  **A.**  Yes.
15  **Q.**  Do you see under "Purpose and Scope" on the
16 first page...
17      Well, let me back up.
18      Do you see in the first paragraph following
19 "Day Trading Radio, Inc., a limited liability company,"
20 in parentheses and in quotation marks, ("marketing
21 agent)"?  Do you see that?
22  **A.**  Yes.
23  **Q.**  Then a little further down, under "Purpose
24 and Scope," "Swiss America desires to engage marketing
25 agent and marketing agent is qualified to and desires

75

1 to provide certain marketing services to Swiss America
2 for non United States investors."
3      Do you see that?
4   **A.**  Yes.
5   **Q.**  And we can flip to what's marked with Bates
6 10, I think it's the last page, 10 and 11.
7      I think we confirmed earlier that this was
8 your signature?
9   **A.**  Yes.
10  **Q.**  And you were signing this on behalf of
11 marketing agent; correct?
12  **A.**  Yes.
13  **Q.**  Which is Day Trading Radio; correct?
14  **A.**  Yes.
15  **Q.**  So when you signed this, it was your
16 understanding that the marketing agreement was intended
17 for non United States investors; correct?
18  **A.**  Yes.
19  **Q.**  And if we go to I think what's the second
20 page, Bates ending in 9, paragraph 8, titled
21 "Regulatory Issues," do you see that?
22  **A.**  Yes.
23  **Q.**  And it says, "Marketing agent will abide by
24 all reasonable policies and instructions which are or
25 may be from time to time established by Swiss America

76

1 or deemed necessary by Swiss America to comply with all
2 applicable laws, rules, and regulations (laws),
3 including but not limited to any regulations
4 promulgated by the United States Securities and
5 Exchange Commission."
6     Q.  Do you see that?
7     A.  Yes.
8     Q.  And then the following sentence,
9 "Specifically, marketing agent warrants and represents
10 that it has reviewed, understands, and agrees to comply
11 with Exchange Act 15a-6, 17 C.F.R. section
12 240.15a-6(a)(1) and relevant SEC guidance regarding the
13 non-solicitation of United States investors."
14     Q.  Do you see that?
15     A.  Yes.
16     Q.  And that was part of the agreement that you
17 signed with SureTrader; correct?
18     A.  Yes.
19     Q.  And if we go to the next page, paragraph F is
20 titled "Non-Solicitation of U.S. Investors."  Do you
21 see that?
22     A.  Yes.
23     Q.  It says, "Marketing agent agrees not to
24 directly or indirectly engage" I think it is "in the
25 solicitation" -- I think there should be an "of" "U.S.

77

1 investors."
2     Q.  Do you see that?
3     A.  Yes.
4     Q.  And then "Any mention of Swiss America or its
5 affiliates on marketing agent's website or other
6 promotional materials must have the following
7 disclaimer attached in prominent font:  'This does not
8 constitute an offer or solicitation for brokerage
9 services, investment advisory services, or other
10 products or services in any jurisdiction where we are
11 not authorized to conduct investment business or where
12 such offer or solicitation would be contrary to the
13 securities or local laws and regulations of that
14 jurisdiction."  In bold, "Swiss America Securities,
15 LTD, SureTrader, does not service accounts for U.S.
16 citizens, U.S. residents, or U.S. corporations."
17     Q.  Do you see that?
18     A.  Um-hmm, yes.
19     Q.  And then if we turn to the last page, Exhibit
20 A, under "Services and Duties of Marketing Agent,"
21 again the agreement says, "Subject to the terms and
22 conditions of this agreement, Swiss America retains
23 marketing agent as a marketing agent for Swiss America
24 to market Swiss America's brokerage services to
25 international non U.S. investors, and marketing agent

78

1 accepts such engagement."
2     Q.  Do you see that?
3     A.  Yes.
4     Q.  "Marketing agent shall use its best efforts
5 to market the brokerage services of Swiss America to
6 potential new brokerage customers to its international
7 non U.S. website visitors."
8     Q.  Do you see that?
9     A.  Yes.
10     MR. HALPIN:  We can take down that exhibit.
11     And if we can pull up SEC's Exhibit 53.
12     Q.  BY MR. HALPIN:  And do you recall testifying
13 about this exhibit earlier?
14     A.  Yes.
15     Q.  And you're not copied on this e-mail chain;
16 correct?
17     A.  No.
18     Q.  If you look down at the bottom, on
19 March 24th, 2017 at 1:57 p.m., Yaniv Frantz,
20 yaniv@suretrader, writes, "Good day, Day Trading Radio.
21 SureTrader senior management have decided to stop any
22 prior deal moving forward, as we made it clear that we
23 were not endorsing to solicit for U.S. customers on our
24 behalf, as mentioned on our website.  We will continue
25 to welcome non U.S. persons, as we've done from day

79

1 one, and for future deals, you should simply refer your
2 students directly to our U.S. sister company,
3 StockUSA."
4     Q.  Do you see that?
5     A.  Yes.
6     Q.  And StockUSA, that's another name for
7 Speedtrader; is that right?
8     A.  Yes.
9     Q.  And we see the response from Dac, who I
10 believe you testified is your friend.
11     A.  Yes.
12     Q.  I think we went over this earlier, but do you
13 recall confirming that your customer base is both U.S.
14 and non U.S.?
15     A.  Yes.
16     MR. HALPIN:  Okay.  You can take down that
17 exhibit.
18     If we could just take a short five-minute
19 break, I realize there are a few things I might want to
20 show you, Mr. Kurisko, that I provided to the SEC but I
21 haven't yet shown you, and I know you've been following
22 along on your own copies, so I'd like to send this to
23 you, and hopefully, we can finish up here soon.
24     So can we go off the record?
25     THE VIDEOGRAPHER:  Going off the record at

80

**Page 81**

1  2:11 p.m.
2                    (Recess.)
3        THE VIDEOGRAPHER:  We're back on the record
4  at 2:18 p.m.
5        Q.  BY MR. HALPIN:  So, Mr. Kurisko, isn't it a
6  fact that Craig Manderson from Speedtrader was the only
7  employee of Speedtrader or SureTrader that was in one
8  of your chat rooms?
9        A.  I'm not 100 percent positive on that, but
10  that's the person I remember the most.
11        MR. HALPIN:  And if we could pull up our
12  Exhibit 1...
13        (Deposition Exhibit 1 marked for
14  identification.)
15        Q.  BY MR. HALPIN:  And while we're doing that,
16  Mr. Kurisko, I believe you mentioned earlier the
17  Wayback Machine.  Are you familiar with the Wayback
18  Machine?
19        A.  Yeah.
20        Q.  Can you kind of explain for me what the
21  Wayback Machine is?
22        A.  It takes a snapshot of a website at a time,
23  you know, going way back.
24        Q.  And I believe you also testified you did one
25  write-up on SureTrader.  Do you remember that?

81

**Page 82**

1        A.  Yeah, I did.  I know I did one.
2        Q.  And do you recall when that was?
3        A.  Not really.
4        Q.  If you take a look at Exhibit 1, do you
5  recall --
6        A.  It had to be --
7        (Zoom interference.)
8        (Interruption by the court reporter.)
9        Q.  Do you recall when you would have made that
10  one write-up about SureTrader?
11        A.  I'm just saying that it probably was around
12  the time we had the agreement.
13        Q.  And I'll represent to you that this is --
14  these are screenshots from the Wayback Machine taken
15  today showing...
16        Well, let me direct your attention to the top
17  right.  Do you see September 12, 2012 in a black box?
18  Do you see that?
19        A.  Yes, I do.
20        Q.  And do you see the URL
21  https:bacwww.daytradingradio.com/pages/preferredbroker?
22  Do you see that?
23        A.  Yes, I do.
24        Q.  And does this refresh your recollection as to
25  the one...

82

**Page 83**

1        Strike that.
2        This is the one write-up you referred to when
3  you testified earlier; correct?
4        A.  Yeah, yeah.
5        Q.  And this was posted in 2012; right?
6        A.  Looks like it.
7        Q.  And I don't know if you got the documents we
8  e-mailed, or we can scroll through and you can take a
9  look, if you'd like.
10        And this is the write-up you did in 2012 on
11  SureTrader; right?
12        A.  Yeah.
13        MR. HALPIN:  We can take that down and pull
14  up Exhibit 2.
15        (Deposition Exhibit 2 marked for
16  identification.)
17        Q.  BY MR. HALPIN:  And do you know how long that
18  write-up was on the Day Trading Radio website?
19        A.  Honestly, I don't.
20        Q.  It was taken down -- it was taken down in
21  2016, wasn't it, the actual page?
22        A.  If that's what it says, then it was, but I
23  don't know.  It's something I don't know.  I mean, I'll
24  go with the Wayback Machine.  If it says it was off
25  then, it was off.

83

**Page 84**

1        Q.  If we zoom in here on Exhibit 2, we can see
2  the same URL ending in "preferredbroker."  Can you see
3  that?
4        A.  Yeah.
5        Q.  And do you see, say, between -- say 50 times
6  between September 12th, 2012 and August 11th, 2016?  Do
7  you see that?
8        A.  Yes.
9        Q.  So -- and do you see any other -- there
10  aren't any other captures after --
11        A.  No, no.
12        Q.  -- right?  So that means that the page was no
13  longer accessible after August 2016; right?
14        A.  That's correct.
15        MR. HALPIN:  All right.  You can take that
16  down.
17        Q.  BY MR. HALPIN:  In fact, even though the page
18  was accessible until August of 2016, in fact, it was no
19  longer linked directly from the Day Trading Radio home
20  page earlier than that; right?
21        A.  Yeah, you're probably right on that.
22        MR. HALPIN:  Can we pull up Exhibit 3,
23  please.
24        (Deposition Exhibit 3 marked for
25  identification.)

84

1    Q.  BY MR. HALPIN:  And if we can...
2        You see this is a capture from the Wayback
3    Machine from January 10, 2015?  Do you see that in the
4    top right?
5    A.  Yes.
6    Q.  And the URL for the capture is
7    daytradingradio.com.  Do you see that?
8    A.  Yes.
9    Q.  And that's your website; right?
10   A.  Yes.
11   Q.  And then if you scroll down on this exhibit,
12   I'll represent to you that this gray box is the link
13   that appears when hovering over this historical version
14   of your website.  Do you see that gray box at the
15   bottom?
16   A.  Yes.
17   Q.  And it's directing -- as of January 10th,
18   2015, it's directing to the URL ending in
19   "preferredbroker"; right?
20   A.  Yes.
21   Q.  So as of January 10th, 2015, it's directing
22   to that write-up; correct?
23   A.  Yes.
24       MR. HALPIN:  You can take down Exhibit 3 and
25   pull up Exhibit 4.

85

1    Q.  I'm representing to you, if you hover your
2    cursor over that banner, this is the URL that shows up.
3    A.  All right.  Then it did not point --
4    Q.  So --
5    A.  I was saying that the link, I don't know if
6    the banner went directly to the site and my write-up.
7    I had a separate link to the write-up, which I believe
8    was right underneath the banner, it says "click more."
9    So if that's where you're pointing at, then, yes,
10   you're correct.
11       MR. HALPIN:  Okay.  We can take this down.
12   Q.  BY MR. HALPIN:  Mr. Kurisko, I think you
13   testified earlier that you hadn't spoken with anyone
14   from the SEC about this case before Miss Sum yesterday
15   evening; is that correct?
16   A.  About this case, about this one, I don't
17   know.  I was contacted probably a year or two ago,
18   again about something.  I don't know if that referenced
19   this or something else.
20   Q.  Were you contacted at any point in time about
21   this case prior to March of 2021?
22   A.  I don't believe so.  I don't think so.
23   Q.  And have you ever seen a copy of the
24   complaint in this case?
25   A.  No.  When I was contacted, I looked it up on

87

1        (Deposition Exhibit 4 marked for
2    identification.)
3    Q.  BY MR. HALPIN:  And this is another capture
4    from the Wayback Machine.  Do you see it's from
5    February 5th, 2015?  Do you see that?
6    A.  Yep.
7    Q.  And you also see this is the same URL as the
8    main site, daytradingradio.com; correct?
9    A.  Yes, yes.
10   Q.  And now I'll represent this gray box at the
11   bottom is what shows when hovering over the SureTrader
12   banner.  Do you see that?
13   A.  Yes.
14   Q.  And do you see it directs to just the
15   SureTrader website?
16   A.  Yes.
17   Q.  So as of February 5th, 2015, on the main
18   page, you were not linking directly to your SureTrader
19   review on your website; correct?
20   A.  I don't know if there was any other links on
21   the page directing you to that, but I guess the main
22   Day Trader has a banner up on top, the banner
23   underneath there, there's a link says "Day Trading
24   Radio, preferred broker, click here for more
25   information."  I think that was the link.

86

1    the internet to see what was going on.
2    Q.  So you didn't have any input...
3        To the extent there are allegations regarding
4    Day Trading Radio in the SEC's complaint in this case,
5    you had no input into that content; correct?
6    A.  Meaning what?  I didn't understand that.
7    Q.  You weren't asked to provide any information
8    for the SEC's use in drafting its complaint, were you?
9    A.  I had to submit financials at one point to
10   the SEC, but I'm not sure if that was a year or two
11   years ago, and I don't know what case that was for.
12   Q.  You never saw -- you never were asked to
13   provide input on a complaint in SEC v. MintBroker and
14   Guy Gentile; correct?
15   A.  Like I said, I had to supply my financial
16   records to SureTrader at one point, and I don't know if
17   that was in reference to this site being prepared,
18   because that seemed like that was about over a year
19   ago.
20   Q.  Okay.  Mr. Kurisko, you never agreed with Guy
21   Gentile to solicit U.S. customers on SureTrader's
22   behalf in violation of U.S. law; correct?
23   A.  No.
24       MISS SUM:  Objection.
25   Q.  BY MR. HALPIN:  And you never agreed with

88

1  anyone else at SureTrader to solicit U.S. customers in
2  violation of U.S. law; correct?
3      MISS SUM:  Objection.
4      THE WITNESS:  No.
5      Q.  BY MR. HALPIN:  And you're not aware of
6  anyone else affiliated with Day Trading Radio who
7  agreed with Mr. Gentile or anyone else at SureTrader to
8  solicit U.S. customers on SureTrader's behalf in
9  violation of U.S. law; correct?
10     MISS SUM:  Objection.
11     THE WITNESS:  Correct.
12     Q.  BY MR. HALPIN:  We're going to pull up --
13  quickly pull back up our Exhibit 1.
14         And this is the write-up we were just
15  discussing that you authored in 2012.  Do you see that?
16     A.  Yes.
17     Q.  And you testified earlier about a marketing
18  services agreement.  This write-up predates that
19  agreement; right?
20     A.  If it does, I mean, I didn't -- I'm not
21  checking the dates, but...
22     Q.  I'll represent to you that you signed the
23  marketing services agreement on August 1st, 2016.  Do
24  you recall that?
25     A.  Yes.

89

1      THE VIDEOGRAPHER:  We're back on the record
2  at 2:37 p.m.
3      MR. HALPIN:  Mr. Kurisko, thank you very much
4  for your time.  We appreciate it.  We have no further
5  questions.
6      THE WITNESS:  Okay.
7      MISS SUM:  All right, I have a short redirect
8  of Mr. Kurisko, just a few follow-up questions.
9         FURTHER EXAMINATION
10  BY MISS SUM:
11     Q.  All right.  I am going to bring up on screen
12  what I've marked as Exhibit 58, Mr. Kurisko.  This was
13  not previously sent to you from our transmission
14  earlier today, so I will bring it up as a share on my
15  screen.
16         (Deposition Exhibit 58 marked for
17  identification.)
18     MISS SUM:  Does everyone see a PDF?  Anybody?
19     MR. HALPIN:  I see it.
20     MISS SUM:  Okay.  I just want to make sure
21  you all can see it.
22     THE WITNESS:  I see it.
23     Q.  BY MISS SUM:  Okay.  Thank you.
24         Mr. Kurisko, do you see a document that I've
25  marked as Plaintiff's Exhibit 58 on the screen?

91

1      Q.  And this is from 2012; correct?
2      A.  If that's what it says, then it's correct,
3  yes.
4      Q.  So there are no -- we haven't looked today at
5  any invoices to SureTrader from 2012; correct?
6      A.  I don't have, no no.
7      Q.  And they don't exist, do they?
8      A.  I don't believe so.
9      Q.  So you wrote this write-up before your
10  written agreement with SureTrader; correct?
11     A.  I guess so.  I guess I did.
12     Q.  And this wasn't -- this write-up wasn't
13  pursuant to that marketing services agreement; correct?
14     A.  I don't think so.  If it was before it, yeah.
15  No, I guess it wouldn't be.  I mean...
16         You know.
17     MR. HALPIN:  Thank you, Mr. Kurisko.
18     Can we just take another short five-minute
19  break?  We may be finished, but we're off the record.
20     MISS SUM:  I expect to have very short
21  redirect.
22     MR. HALPIN:  Okay.
23     THE VIDEOGRAPHER:  We're going off the record
24  at 2:31 p.m.
25         (Recess.)

90

1      A.  Yes.
2      Q.  Okay.  Do you recall last year the SEC
3  issuing a subpoena for documents to Day Trading Radio?
4      A.  Yes.
5      Q.  Do you recall signing a declaration
6  certifying records of regularly conducted business
7  activity?
8      A.  Yes.
9      Q.  And do you see in front of you Plaintiff's
10  Exhibit 58?  Is that your signature on Plaintiff's
11  Exhibit 58?
12     A.  Probably.  It's not my -- it's a
13  computer-generated signature.
14     Q.  Okay.  Do you have any reason to believe that
15  you did not execute this declaration?
16     A.  No.
17     Q.  Okay.  And in conjunction with you executing
18  this declaration, do you recall producing Day Trading
19  Radio's invoices for services provided to SureTrader?
20     A.  Yes.
21     Q.  I believe earlier you testified that you were
22  not directly involved in creating the invoices; is that
23  correct?
24     A.  Correct.
25     Q.  But otherwise, these invoices that we have

92

1  reviewed, Exhibits 49 and 50, are those business
2  records --
3          MR. HALPIN:  Objection.
4      **Q.**  BY MISS SUM:  -- of Day Trading Radio?
5          MR. HALPIN:  Objection.
6      **Q.**  BY MISS SUM:  Are those the business records
7  that you referred to in the declaration that is at
8  Exhibit 58?
9          MR. HALPIN:  Objection.
10         THE WITNESS:  I'm sorry, I didn't understand.
11  The ones that we sent?
12         MISS SUM:  Yes, sir.
13         THE WITNESS:  Yes, I believe they are.
14         MISS SUM:  Okay.  I'm going to bring this
15  down now.
16         I'm now going to ask the videographer to
17  please bring up the SEC's Exhibit 57.
18      **Q.**  BY MISS SUM:  While we're waiting for that,
19  Mr. Kurisko, you recall the questions that Mr. Halpin
20  asked you regarding printouts from the Wayback Machine
21  just a few minutes ago?
22      **A.**  Yeah.
23         (Deposition Exhibit 57 marked for
24  identification.)
25      **Q.**  BY MISS SUM:  Okay.  I'm showing you what was

                          93

1  marked as Plaintiff's Exhibit 57.  Do you see that on
2  your screen, sir?
3      **A.**  Yes.
4      **Q.**  Okay.  And what do you see on your screen?
5      **A.**  I see what looks like my old site, but it's
6  missing the banner.  You know, it's just a screenshot
7  of what looks like my site.
8      **Q.**  Do you see the web address?
9      **A.**  Yes, daytradingradio.com.
10     **Q.**  Okay.  And do you see that there is a date on
11  Exhibit 57?
12     **A.**  November 2nd, 2018.
13     **Q.**  Do you see below that date you just recited a
14  banner?
15     **A.**  Yes, I do.
16     **Q.**  And can you please describe that banner.
17     **A.**  SureTrader banner.
18     **Q.**  Is this similar to a banner that we looked at
19  earlier?
20     **A.**  I believe it is.
21     **Q.**  And do you see under the banner in orange
22  writing, "Day Trading Radio's preferred broker - click
23  to learn more"?
24     **A.**  Yes.
25     **Q.**  Based on your review of Exhibit 57, did Day

                          94

1  Trading Radio refer to SureTrader as Day Trading
2  Radio's preferred broker as of November 2nd, 2018?
3          MR. HALPIN:  Objection.
4          THE WITNESS:  Honestly, I don't remember, you
5  know, having a relationship with Guy at this point.
6  You know, that's how many years ago?  It's 2023 now.
7  That's five years ago.  I just don't even think we had
8  a connection back then.
9      **Q.**  BY MISS SUM:  Do you recall when we looked at
10  invoices earlier in Exhibit 50?
11     **A.**  I guess we did.  I'm just saying --
12     **Q.**  I can't hear you, sir, because there's a lot
13  of background noise.
14     **A.**  I'm just saying, I guess it was, but it was
15  only five years ago; right?
16         MISS SUM:  All right.  Can we bring down
17  Exhibit 57 and bring up Exhibit 50, and we're going to
18  go to the last page.
19         The very last page of the document, please.
20     **Q.**  BY MISS SUM:  Are you able to see that?  You
21  can make it a little bit bigger, if you like.
22         All right.  Do you see the last page of
23  Exhibit 50?
24     **A.**  Um-hmm, yeah.
25     **Q.**  What is it?

                          95

1          MR. HALPIN:  Objection.
2          THE WITNESS:  It's an invoice, 2018.
3      **Q.**  BY MISS SUM:  What's the date on the invoice?
4      **A.**  November 6th.
5      **Q.**  Does this refresh your recollection whether
6  Day Trading Radio was still doing business with
7  SureTrader in November of 2018?
8          MR. HALPIN:  Objection.
9          THE WITNESS:  You know what?  It's all a blur
10  to me, honestly, but since you have the records, then
11  it must be true, but, you know, my memory is --
12  actually, I don't remember if this is...
13         If you got this from us, then it has to be
14  true.
15     **Q.**  BY MISS SUM:  Do you dispute that we obtained
16  these records as business records from you, sir?
17         MR. HALPIN:  Objection.
18         THE WITNESS:  No, I'm sure you got them.  I'm
19  just saying I just don't remember.  I thought it was
20  longer.  You know, I might be wrong.
21         MISS SUM:  All right.  You can take down the
22  exhibit.
23         I'm still hearing noise.  I'm not sure where
24  it's coming from.
25         MR. HALPIN:  Matt, you might not be muted,

                          96

John Kurisko
3/15/2023

1 Matt.
2      MISS SUM:  Okay.  Mr. Kurisko, let's bring
3 back up Exhibit 57.
4      Sorry.
5      Okay.  I'm not on mute.  Okay.
6      THE VIDEOGRAPHER:  That was 57?
7      MISS SUM:  Yes, sir.
8      THE VIDEOGRAPHER:  Okay.
9      Q.  BY MISS SUM:  Mr. Kurisko, the banner that we
10 looked at earlier on Exhibit 57, did the format or look
11 of the banner ever change over the time that you had
12 a business relationship with SureTrader from March of
13 2016 to November of 2018?
14      MR. HALPIN:  Objection.
15      THE WITNESS:  I don't believe so.
16      MISS SUM:  I have no further questions.
17      MR. HALPIN:  Miss Sum, I have just a handful
18 on -- just based on one of your recent lines of
19 questioning, so it shouldn't take me more than a
20 minute.
21      Can we pull back up SEC's Exhibit 50.
22           FURTHER EXAMINATION
23 BY MR. HALPIN:
24      Q.  And Mr. Kurisko, this is some of the invoices
25 we've been looking at.  I think you testified that

97

1 prior to receiving these last night, you don't think
2 you had ever seen them before; correct?
3      A.  Yeah, I wouldn't be the one that makes them
4 up or sends them.
5      Q.  And you don't know whether these invoices
6 were actually sent to SureTrader; correct?
7      A.  Like I say, anything that happened between
8 SureTrader and Day Trading Radio was taken care of by
9 Dac or my wife, who is an accountant.  She would send
10 out invoices.
11      Q.  Were those sent by e-mail, do you recall?
12      A.  They would probably be.  I'm not 100 percent
13 sure.
14      Yeah, they would have to be.  I don't see us
15 using anything other than e-mail.
16      Q.  And in your production to the SEC, you
17 didn't -- did you produce e-mails showing transmittal
18 of these invoices to the SEC?
19      A.  Again, my wife probably took care of all
20 that, because she does all the bookkeeping, so she sent
21 all that stuff.  I wasn't privy to what was sent out.
22      Q.  So as you sit here today, you don't know
23 whether these were ever actually sent to SureTrader;
24 correct?
25      A.  No, no, I wasn't.  We got paid, and, you

98

1 know, there's no reason for me not to believe it wasn't
2 sent.
3      MR. HALPIN:  Thank you.  We have no further
4 questions.
5      MISS SUM:  Nothing else from me.  Thank you,
6 Mr. Kurisko.
7      Mr. Kurisko, there was a court reporter, as
8 we explained to you, sitting and typing up the
9 questions that the lawyers asked you, as well as your
10 answers.  You have the right to read the transcript if
11 you wish and an opportunity to note if there are any
12 errors in the transcription, or you can waive that
13 right.  You have the opportunity to advise the court
14 reporter how you'd like to proceed.
15      THE WITNESS:  I answered to the best of my
16 ability and honestly, so I'm fine with it.
17      MISS SUM:  All right.  To confirm, that means
18 you're waiving?
19      THE WITNESS:  Yes.
20      MISS SUM:  Okay.  We can go off the record.
21      THE VIDEOGRAPHER:  We're going off the record
22 at 2:49 p.m.
23      (Deposition concluded at 5:49 p.m. (ET).)
24      (Signature waived.)
25

99

1           REPORTER'S CERTIFICATE
2
3      I, DIANE M. BOLAN, CSR NO. 12883, Certified
4 Shorthand Reporter, certify:
5      That the foregoing proceedings were taken
6 before me at the time and place therein set forth, at
7 which time the witness was put under oath by me;
8      That the testimony of the witness, the
9 questions propounded, and all objections and statements
10 made at the time of the examination were recorded
11 stenographically by me and were thereafter transcribed;
12      That the foregoing is a true and correct
13 transcript of my shorthand notes so taken.
14      I further certify that I am not a relative
15 or employee of any attorney of the parties, nor am I
16 financially interested in the action.
17      I declare under penalty of perjury of the
18 laws of California that the foregoing is true and
19 correct.
20      Dated this 17th day of March, 2023.
21
22
23
24      _____
25      DIANE M. BOLAN, CSR No. 12883

100

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, DIANE M. BOLAN, CSR NO. 12883, Certified

 4   Shorthand Reporter, certify:

 5            That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8            That the testimony of the witness, the

 9   questions propounded, and all objections and statements

10   made at the time of the examination were recorded

11   stenographically by me and were thereafter transcribed;

12            That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14            I further certify that I am not a relative

15   or employee of any attorney of the parties, nor am I

16   financially interested in the action.

17            I declare under penalty of perjury of the

18   laws of California that the foregoing is true and

19   correct.

20            Dated this 17th day of March, 2023.

21

22

23
                        Diane M. Bolan
24       _____

25       DIANE M. BOLAN, CSR No. 12883
```

                                                        100

## A

a/k/a 1:9 2:9
abide 76:23
ability 6:25 36:1 55:11 99:16
able 7:4 10:19 27:5 37:24
    42:1 45:18 61:3 66:14
    95:20
accept 49:21
accepting 63:17
accepts 79:1
access 17:23 23:13,18,19
    26:9 27:14 28:4 38:12,17
    38:18 46:11 53:12 55:11
    71:4 73:8
accessible 70:4,25 84:13,18
account 31:24 42:12 69:11
accountant 98:9
accounts 71:16 78:15
Act 77:11
action 100:16
active 24:23 42:12
activity 92:7
actual 83:21
Adam 5:23
additional 64:21 65:4
address 7:24 29:12 36:7
    57:12,15,18 94:8
addresses 36:3,8
adverse 33:8,12
advertising 27:14 28:3
    31:10 38:12,20 41:4 53:11
    73:1
advise 67:9 99:13
advisory 78:9
affect 6:25
affiliated 73:14 89:6
affiliates 78:5
affiliations 23:9
affixed 38:2
Africa 15:12
afternoon 5:16,19 6:12 8:6
agent 47:7,17,19,20 48:5,12
    48:13,16,17 49:1,2,6 75:21
    75:25,25 76:11,23 77:9,23
    78:20,23,23,25 79:4
agent's 78:5
ago 19:4 20:21 43:14 74:8
    87:17 88:11,19 93:21 95:6
    95:7,15
agree 28:8 49:6
agreed 31:8 88:20,25 89:7
agreement 4:12 21:13 24:24
    25:4 26:19 30:15 44:14,15
    44:17,23 46:4,6,8,17,21
    47:6,12,21 48:10,20 49:9

59:18 74:3 75:7,9 76:16
    77:16 78:21,22 82:12
    89:18,19,23 90:10,13
agreements 30:21,23
agrees 47:6 48:11,15 77:10
    77:23
ahead 14:23 25:8 51:17
air 38:12,18 40:10
alerts 18:2,25 19:9
Alice 3:4 5:16 6:13 8:11
    50:21
Alise 3:5 5:18
allegations 88:3
allowed 33:10
America 1:8 2:8 15:13 27:17
    27:23 44:18,20 45:10,13
    45:19 47:6,11 48:10,15
    49:1,3,7 53:19 54:8 75:10
    75:12,24 76:1,25 77:1 78:4
    78:14,22,23 79:5
America's 78:24
American 27:13
amount 28:5,9 40:18,20,23
    41:13 42:18,25
analytics 15:24
answer 7:1,1,5,11 14:22,23
    24:4,6 46:13 48:1 54:2
    55:4,19 60:16,18 65:21
    67:12
answered 34:10 35:7,9 50:2
    99:15
answering 32:17
answers 99:10
anticipate 65:12
anybody 31:22 91:18
apologize 50:3 60:6,10,12
appear 10:23 12:10 71:25
APPEARANCES 3:1
appearing 3:12
appears 85:13
applicable 77:2
applications 63:18
apply 65:16
appreciate 91:4
approached 20:6 21:18
approval 29:21 58:19
approve 30:11 41:8
approximately 16:11
arrangement 26:25
asked 28:20 34:10,12 35:7,8
    51:5 52:21 57:14 61:24
    66:16 67:4 88:7,12 93:20
    99:9
asking 28:15
assert 14:21

assistance 16:4
assistant 14:1
associations 21:6
assume 7:12
attached 78:7
attention 15:9 27:2 37:12
    42:8 56:18 57:23 58:9,17
    61:11 82:16
attorney 100:15
attract 34:9
audience 14:18 15:1 21:22
    68:23
August 31:10 44:25 84:6,13
    84:18 89:23
authored 89:15
authorized 29:16 78:11
available 14:25 24:5
Avenue 3:5,10
average 42:12
aware 56:14 58:4 70:5 71:1
    89:5

## B

back 7:9 9:2 10:6,25 12:6
    17:11 19:18 20:20 37:12
    46:3 47:24 48:7,19 51:12
    51:25 52:2 58:15 60:17
    65:2 75:17 81:3,23 89:13
    91:1 95:8 97:3,21
background 48:3 95:13
banner 22:16,18 23:12
    27:14 28:3 31:10,19,20,21
    31:22 32:7,8,9,10,11,15,22
    34:19 38:12,17 39:9,10
    40:9 46:10 53:12 55:10
    59:18 61:20,21,25 62:5,10
    62:17,23 63:3,6,10,25 73:1
    73:5 86:12,22,22 87:2,6,8
    94:6,14,16,17,18,21 97:9
    97:11
base 10:13 59:19 60:3 80:13
based 9:19 15:16 36:24
    42:11 94:25 97:18
bases 33:17
basic 6:23
basically 16:12 18:5 22:3
    68:9
basis 34:11
Bates 25:15 27:9 37:19 38:1
    39:16 53:4 76:5,20
began 70:3
beginning 2:19 10:6 12:4
    16:19 19:3 26:20 65:16
    67:4
begins 5:4

behalf 2:18 5:20 29:17 45:12
    45:19 59:6 74:14 76:10
    79:24 88:22 89:8
believe 8:12 11:11 16:22,24
    21:11 27:19 32:18,20
    52:17 53:20 62:2 66:25
    68:9,14,21 69:21 71:10
    74:18,22 80:10 81:16,24
    87:7,22 90:8 92:14,21
    93:13 94:20 97:15 99:1
best 18:22 20:15 59:20 79:4
    99:15
better 10:12 11:15 56:1
beyond 63:25
big 10:9 21:21,21
bigger 37:16 45:17 95:21
bill 27:13
billing 36:5
bit 16:20 24:23 37:16 45:17
    46:23 56:1 59:17 69:15
    95:21
black 82:17
blame 60:11
blog 16:18,19,21
blur 96:9
Bolan 1:24 2:20 5:11 6:1
    100:3,25
bold 47:3 78:14
bookkeeping 98:20
books 72:24
bottom 42:9 44:8 45:2 56:19
    57:24 79:18 85:15 86:11
box 82:17 85:12,14 86:10
Brazil 69:6
break 7:15,16,19 18:6 51:18
    65:17,18,19 80:19 90:19
breakout 12:21
Brian 14:8,9
Brickell 3:5
brief 64:18
bring 25:9 41:20,21 43:20
    43:22 52:2,7,22 56:3,9
    60:22,23 63:7 91:11,14
    93:14,17 95:16,17 97:2
broadcast 70:12,20
broadcasting 70:1
broker 29:9 21:1,1,8 23:10
    23:11 24:7 32:11 71:14,15
    86:24 94:22 95:2
broker's 32:11
brokerage 69:3,8 78:8,24
    79:5,6
brokerages 68:19
brokers 21:6 23:9 68:15
brought 27:7 52:9 58:8

**build** 36:20
**building** 10:3
**built** 11:13
**business** 9:25 11:22 12:3
20:23 21:9,14 28:20 62:11
78:11 92:6 93:1,6 96:6,16
97:12

**C**

**C.F.R** 77:11
**calculated** 38:25
**California** 6:2 100:18
**called** 12:23 21:23 23:11
35:22 71:11
**calls** 29:19
**Canada** 15:13 37:3
**canceling** 59:17
**capture** 4:15,16,17,18,19
61:10 85:2,6 86:3
**captured** 11:20
**captures** 84:10
**car** 66:13
**Cara** 3:10 5:22
**card** 35:22
**care** 98:8,19
**case** 1:6 2:6 66:7 87:14,16
87:21,24 88:4,11
**CEO** 8:21
**certain** 49:2 76:1
**certainly** 65:13
**CERTIFICATE** 100:1
**certifications** 9:17
**certified** 2:20 6:2 100:3
**certify** 100:4,14
**certifying** 92:6
**chain** 79:15
**change** 41:6,9 55:1 97:11
**changed** 62:10
**channel** 70:18,25
**charged** 17:19
**charging** 17:14 18:8 19:5,6
19:7,8
**charts** 16:16
**chat** 17:24,25,25 18:16,20
23:13,18,20,25 24:10,18
25:22 26:2,13 27:14 28:4
38:12,17 40:9 46:11 53:12
55:11 71:3,4 73:8,17,21
81:8
**check** 11:14
**checking** 89:21
**checkout** 35:21
**China** 69:6
**choice** 69:12
**chronologically** 25:17 57:25

**chunks** 12:1
**citizens** 78:16
**City** 19:17
**civil** 8:4
**clarification** 34:3
**clarify** 7:11 30:25
**clarifying** 52:14
**clarity** 39:6
**clear** 22:25 27:5 55:24 59:5
79:22
**clearing** 64:2
**clearly** 7:7 55:23 61:14
**click** 86:24 87:8 94:22
**click-through** 31:23
**clicked** 31:22 32:4 39:3,6
63:10
**client** 39:4
**clients** 32:20 68:9,10 69:12
**closer** 55:22
**clue** 33:25
**CNBC** 13:1
**co-counsel** 5:18
**coexisted** 24:1
**colleague** 5:23 34:5
**colleagues** 5:21 65:9
**combined** 25:16
**come** 13:16 17:4 19:13
21:16 22:4,5,8,11 23:14,25
24:3,9,13,17 26:11 28:8
34:18 36:22 46:12 55:11
71:7 72:10 74:1
**comes** 61:13
**comfortably** 65:14
**coming** 12:21 67:8 73:25
96:24
**comments** 62:4
**commission** 1:4 2:4 3:4
5:17 31:10 32:1 38:21,23
42:11,12 77:5
**communicate** 36:12 58:20
**communicated** 42:24 64:10
**communications** 56:14
**companies** 21:21
**company** 22:11 75:19 80:2
**compensation** 43:10 46:16
46:19 47:3 48:7 53:17
**compilation** 71:24
**complain** 64:5
**complaint** 87:24 88:4,8,13
**comply** 77:1,10
**computer-generated** 92:13
**concise** 34:3
**concluded** 99:23
**conclusion** 29:19
**conditions** 49:8 78:22

**conduct** 51:10 78:11
**conducted** 76:6
**confirm** 53:22 99:17
**confirmed** 76:7
**confirming** 80:13
**confuse** 51:2
**confused** 59:17
**conjunction** 92:17
**connection** 67:16 95:8
**consists** 68:23
**consolidated** 11:6
**constitute** 78:8
**contact** 28:21 37:10 43:7
**contacted** 36:23 87:17,20
87:25
**contained** 38:11 49:8 54:7
**content** 16:1,2,7,11 70:22
88:5
**contents** 30:11
**continue** 34:11 79:24
**contract** 31:1,7,8
**contrary** 78:12
**control** 33:2
**conversation** 67:6 68:4
**conversations** 22:24
**copied** 79:15
**copies** 80:22
**copy** 27:7 87:23
**corner** 61:12
**corporations** 78:16
**correct** 34:22 37:17 49:10
60:3 66:1 68:24,25 70:10
70:14 71:6 72:13,22 73:12
73:18 74:20 75:10,13
76:11,13,17 77:17 79:16
83:3 84:14 85:22 86:8,19
87:10,15 88:5,14,22 89:2,9
89:11 90:1,2,5,10,13 92:23
92:24 98:2,6,24 100:12,19
**correctly** 10:16 17:3
**correspondence** 28:13
**counsel** 5:12,14 6:20 14:21
29:20 33:3,20 50:23 51:1,3
55:23
**countries** 69:6
**country** 15:14
**couple** 8:13 13:23 69:10
**course** 14:21 17:21,22,22
58:12
**courses** 18:12,13
**court** 1:1 2:1 5:11,24 6:1,2
7:8 34:15 51:11 52:11
60:15,17 82:8 99:7,13
**Craig** 26:6,6 73:11,12,13,14
73:17 81:6

**create** 32:15 70:23 72:1
**created** 16:1 61:25 62:17
**creating** 92:22
**credit** 35:22
**CSR** 1:24 100:3,25
**current** 7:24 8:17
**currently** 14:10
**cursor** 87:2
**customer** 49:22 59:19 60:2
80:13
**customers** 50:12,13 59:6
63:18 71:4,7 79:6,23 88:21
89:1,8
**customers,'** 59:19
**cut** 53:15
**cutoff** 26:16

**D**

**D** 4:1
**D-a-c** 57:10
**d/b/a** 1:8 2:8
**dac** 28:11,12 29:2,3,16,21
30:2,8 41:14,15 42:24 43:7
43:7,9 57:10,11,13,14,21
58:8,19 59:9,16,20,24 60:2
72:10 80:9 98:9
**Dac's** 59:14,24
**dac@daytradingradio.com**
29:15 56:23
**daily** 70:20
**date** 5:8 11:12 17:1 30:13
38:8 40:6 44:23 52:25
54:11,14 94:10,13 96:3
**dated** 72:25 100:20
**dates** 89:21
**day** 8:18,19,22 9:4,5,6,10,15
9:19,21,23,24 11:8,22 12:2
13:13,16 14:4,10,24 15:25
16:8 17:4,20 21:15 22:15
23:5,19 24:9,17 26:2,12
27:12,16 28:8 29:7,9,12,17
30:20 32:23 34:20,25
35:15,18 36:11 38:14
39:14 41:8 42:19 43:1,10
44:18,25 46:6,15 47:11
48:18 49:13,20 50:7,9,13
50:19 53:14,18,23 54:8,15
54:21 55:1,7,14 57:20 58:2
58:5 61:15,18 62:11,16,21
63:1,9,16 64:5 67:19,21
68:6,8 69:13 70:13 71:5
74:13 75:9,19 76:13 79:20
79:20,25 83:18 84:19
86:22,23 88:4 89:6 92:3,18
93:4 94:22,25 95:1 96:6

98:8 100:20
**days** 8:13
**daytrading.com** 73:6
**daytradingradio.com** 28:3
57:11,15 61:10 69:21 73:2
85:7 86:8 94:9
**deal** 26:24 28:22,23 43:15
59:4 63:24 79:22
**dealer** 21:21
**deals** 28:25 29:22 80:1
**decided** 59:4 79:21
**declaration** 4:20 92:5,15,18
93:7
**declare** 100:17
**declaring** 33:7,9,12
**deemed** 77:1
**defendant** 3:7 5:21 8:3
**Defendants** 1:11 2:11
**Definitely** 60:5,18
**deposed** 8:1
**deposition** 1:14 2:17 5:5,7
6:3,23 7:14 8:7,15 14:21
25:12 41:24 43:23 52:19
56:6 60:24 81:13 83:15
84:24 86:1 91:16 93:23
99:23
**depositions** 33:15
**describe** 9:24 12:2 13:25
16:7,15 21:2 40:2 55:6
94:16
**described** 11:18 30:3,8
45:24 55:15
**description** 28:2,9 31:9
38:10,21 40:8,9,11 72:6
**designed** 51:2
**desires** 49:1,2 75:24,25
**developed** 17:22
**Diane** 1:24 2:20 5:11 6:1
100:3,25
**dictate** 33:13
**different** 10:25 11:1 20:9
34:12 40:23 41:1
**direct** 82:16
**directed** 67:23
**directing** 85:17,18,21 86:21
**directly** 36:13 64:10 77:24
80:2 84:19 86:18 87:6
92:22
**directs** 86:14
**disappeared** 11:6
**disclaimer** 78:7
**discuss** 20:22 22:14 49:14
49:17,18 50:8 59:24 64:13
67:1
**discussed** 12:13 43:9

**discussing** 12:15 89:15
**discussion** 42:17
**discussions** 22:19 41:5
59:9
**display** 62:23
**dispute** 96:15
**DISTRICT** 1:1,2 2:1,2
**document** 37:19 38:3,5
39:20,23 40:3 44:1,6,12
53:1,7 72:15 91:24 95:19
**documents** 66:12,15 67:3,8
72:12,21 83:7 92:3
**doing** 10:4,4,9 19:20 28:20
38:3 51:10 58:15,18 64:3
70:15 72:24 81:15 96:6
**donations** 10:11 17:1,13
**draft** 72:3,6
**drafted** 74:17
**drafting** 88:8
**driver's** 9:18
**driving** 66:13 67:5
**DTR** 40:3 42:10 56:11,15,22
**DTR-44** 39:21,23
**duly** 6:8
**Duties** 47:18 78:20
**dwindled** 26:15

**E**

**E** 4:1
**e-mail** 14:1 27:15 28:5,11,12
29:12 38:13 40:10 42:6,9
56:11,19 57:11,15,18,24
58:1,5,9 59:3,10 74:11,14
74:21,24 79:15 98:11,15
**e-mailed** 83:8
**e-mails** 15:11 98:17
**e-trading** 21:23
**earlier** 16:24 34:20 41:16
45:24 48:9 57:14 61:22
65:8,24 68:22 71:10,25
73:11 75:7 76:7 79:13
80:12 81:16 83:3 84:20
87:13 89:17 91:14 92:21
94:19 95:10 97:10
**early** 19:19 61:8
**earned** 42:12
**edits** 62:5
**Educational** 70:24
**effectively** 22:20
**efficient** 65:12
**efforts** 79:4
**eight** 64:11
**Email** 4:11,14
**employee** 23:13,17,19 29:7
73:21 74:1 81:7 100:15

**employees** 13:14,17,23 14:4
14:7,11 23:25 73:24
**employment** 8:17 9:12
**ended** 12:6
**endorsing** 59:6 79:23
**enforced** 68:15
**enforces** 68:17
**engage** 49:1 75:24 77:24
**engagement** 79:1
**engagements** 19:16
**England** 15:12
**English** 13:5
**enlarge** 46:22 61:14
**enter** 73:17
**entered** 44:24
**entering** 20:22 73:21
**entirety** 44:6
**entity** 71:11
**equipment** 6:4
**errors** 99:12
**ESQ** 3:4,5,9,9,10
**essentially** 17:21
**established** 76:25
**estimate** 15:15
**ET** 2:19 5:2,2 99:23
**Europe** 37:3
**evening** 87:15
**events** 12:20
**Eventually** 11:4
**evolve** 11:23 17:19
**evolved** 12:3
**exact** 11:12
**exactly** 51:9
**examination** 4:4 6:10 33:6
65:5 91:9 97:22 100:10
**examined** 6:9
**exchange** 1:4 2:4 3:4 5:17
22:20 23:5 77:5,11
**exclusive** 21:8
**excuse** 28:7 30:24 50:6
**execute** 92:15
**executing** 92:17
**exhibit** 4:9,10,11,12,13,14
4:15,16,17,18,19,20,21
25:10,12,20 27:2,9,11 30:3
30:8 37:12 39:16 41:20,22
41:24 43:21,22,23 44:13
46:25 52:3,6,13,15,16,18
52:19,22 53:3,22 54:7 56:3
56:4,6,11 60:22,23,24 61:2
61:3 63:8,11 66:21 71:23
75:3,4 78:19 79:10,11,13
80:17 81:12,13 82:4 83:14
83:15 84:1,22,24 85:11,24
85:25 86:1 89:13 91:12,16

91:25 92:10,11 93:8,17,23
94:1,11,25 95:10,17,17,23
96:22 97:3,10,21
**exhibits** 4:8 66:24 93:1
**exist** 90:7
**existence** 9:6
**expect** 12:5 51:15 64:20
90:20
**experimenting** 11:4
**explain** 20:2 68:6 69:14
81:20
**explained** 99:8
**expo** 19:15
**exposure** 68:1
**extent** 29:18 88:3

**F**

**F** 77:19
**f/k/a** 1:8 2:8
**face** 12:16
**face-to-face** 28:18
**fact** 33:24 81:6 84:17,18
**facts** 7:1
**falling** 26:18
**familiar** 61:6 81:17
**far** 15:16 22:19 70:5 71:1
**fast** 12:5
**February** 61:10 86:5,17
**fee** 10:13 42:10,14 47:7
48:11,16
**feel** 7:17 65:19
**filed** 64:14
**Filippelli** 3:10 5:22
**financial** 88:15
**financially** 100:16
**financials** 88:9
**find** 11:15 13:9
**fine** 33:11 99:16
**finish** 32:17 47:25 49:24
80:23
**finished** 50:1 64:20 90:19
**FINRA** 68:8,12,16,20 69:3,8
69:19
**first** 6:8,24 14:9 23:23 24:20
27:2,8,10 30:7 42:9 44:25
52:23,25 53:3 57:24 65:21
72:25 74:2 75:16,18
**five** 95:7,15
**five-day** 68:11
**five-minute** 80:18 90:18
**fixed** 47:7 48:11,15
**flat** 42:10,14
**flip** 76:5
**Floor** 3:10
**Florida** 1:2 2:2 3:6 10:1

**follow-up** 91:8
**following** 10:9 70:2 75:18
    77:8 78:6 80:21
**follows** 6:9
**font** 78:7
**Ford** 3:8,9 5:20,22,23 33:7,9
    33:11 34:2 35:10 50:21,25
    51:4,5 65:10
**foregoing** 100:5,12,18
**form** 9:8
**format** 97:10
**forth** 58:15 100:6
**Forty-three** 30:5
**forward** 11:23 33:18 59:5
    79:22
**found** 75:1
**four** 44:9
**four-page** 43:25
**fourth** 39:16
**France** 15:12
**Frantz** 56:11,15 57:1 58:1,4
    59:16 79:19
**Frantz's** 59:3,10
**free** 7:18 10:10 16:25 17:18
    65:19
**Friday** 56:12,25
**friend** 29:3,4,5 41:14 57:13
    80:10
**friendly** 36:19
**friends** 26:5
**front** 27:3 46:24 92:9
**full** 6:15
**further** 14:5 47:2 75:23 91:4
    91:9 97:16,22 99:3 100:14
**future** 13:16 80:1

**G**

**general** 7:21
**generally** 12:2 16:7
**Gentile** 1:9,9 2:9,9 3:7 5:21
    19:11,13 20:22 22:8,14,20
    45:22 50:18 64:10,14 65:8
    67:24 88:14,21 89:7
**geographical** 50:8
**geographically** 15:5 34:25
**getting** 10:7,9 17:13,13 41:2
    41:3
**give** 29:21 35:24 44:1 46:11
    58:19
**giving** 10:10
**gleaned** 68:3
**go** 11:17 12:25 14:23 16:17
    19:20 20:13 21:19 25:8
    35:21,22 46:3 48:19 51:17
    57:5 60:17 64:21 76:19

**77:19 80:24 83:24 95:18**
    99:20
**going** 5:23 6:22 10:2 12:22
    14:23 18:6 20:17 22:22
    23:15 25:8 27:1 32:16
    35:11 37:11 39:15 41:18
    42:8 43:22 45:2 47:24 48:6
    51:21 52:11 53:21 61:1,11
    64:18,24 65:11,18 66:17
    70:2 72:19 80:25 81:23
    88:1 89:12 90:23 91:11
    93:14,16 95:17 99:21
**good** 5:16,19 6:12 26:5
    28:17,20 29:1,3,4,5 32:12
    32:13 43:15 79:20
**gray** 85:12,14 86:10
**great** 43:13,19
**grew** 10:15
**ground** 6:23 7:21 65:15
**grow** 12:5
**growing** 12:6
**guess** 15:23 18:9 23:11,24
    30:18 31:19 39:1,3 41:3
    46:18 66:20 68:18 86:21
    90:11,11,15 95:11,14
**guessing** 31:13,25 39:1
**guest** 22:9
**guests** 22:4
**guidance** 77:12
**guy** 1:9,9 2:9,9 3:13 5:21
    19:10 22:13 26:8,10 28:23
    45:22 50:18 58:17 65:8
    67:4,23 88:14,20 95:5
**guys** 19:23 35:11

**H**

**Halpin** 3:9 4:6 5:19,20 14:19
    15:6,18 16:9 20:4,24 21:17
    22:22 23:7,21 24:11 25:14
    25:18,24 26:3,14 28:10
    29:18,23 30:4,17 32:6,16
    32:25 33:23 34:8,13 35:1,7
    35:13 36:17,25 37:8 39:8
    39:24 41:10 42:20 43:2
    45:20 46:1,9 47:13,25 48:3
    49:16,23 50:1,10,16 51:14
    52:14 53:5,10 54:10,13,17
    54:23 55:3,9,17 56:16 58:6
    58:10,23 59:11 60:1,15,19
    61:1 62:1,6,13,19,24 63:4
    63:12,19,22 64:7,15,23
    65:6,7 71:22,24 75:2,6
    79:10,12 80:16 81:5,11,15
    83:13,17 84:15,17,22 85:1
    85:24 86:3 87:11,12 88:25

**89**:5,12 90:17,22 91:3,19
    93:3,5,9,19 95:3 96:1,8,17
    96:25 97:14,17,23 99:3
**handful** 97:17
**hands** 72:11
**handy** 75:5
**happen** 37:10
**happened** 98:7
**hard** 69:11
**hear** 7:7 10:16 11:21 12:19
    42:21 43:5 48:2 55:4,18,23
    58:24 95:12
**hearing** 96:23
**held** 5:7 6:3
**Hello** 59:16
**helped** 29:5
**helps** 60:9
**hi** 64:12 65:7
**hints** 34:5
**historical** 85:13
**hobby** 69:25
**hold** 36:5 37:16
**home** 84:19
**honestly** 71:18 83:19 95:4
    96:10 99:16
**hopefully** 65:11,14 80:23
**hoping** 65:17
**hour** 7:15,17 65:13,18
**hover** 87:1
**hovering** 85:13 86:11
**How's** 5:16
**https:bacwww.daytradin...**
    82:21
**Hunter** 3:14 5:10

**I**

**idea** 15:20 51:16
**identification** 25:13 41:25
    43:24 52:20 56:7 60:25
    81:14 83:16 84:25 86:2
    91:17 93:24
**identify** 38:3
**III** 3:9
**image** 61:25 62:5
**immediately** 57:4
**impeding** 33:5
**implied** 50:11
**inappropriate** 34:1
**inception** 70:7
**include** 35:4 63:6 70:22
**included** 62:23 63:3
**includes** 40:17
**including** 77:3
**increase** 14:5
**indicator** 22:5,6,6

**indirectly** 77:24
**industry** 19:14
**influence** 6:24
**information** 11:16 36:6
    86:25 88:7
**initial** 37:9
**input** 88:2,5,13
**inserting** 33:6
**instances** 25:20
**instructions** 76:24
**instructs** 14:22
**intended** 32:19 59:18 76:16
**intentional** 25:15,16
**interested** 100:16
**interference** 82:7
**international** 1:7 2:7 5:6
    68:19 69:2,2,7 71:16 78:25
    79:6
**internet** 13:10 70:1 88:1
**interrupt** 50:24
**Interruption** 82:8
**introduce** 5:12 74:2
**investment** 79:10,11
**investors** 49:4,15 76:2,17
    77:13,20 78:1,25
**invoice** 27:12,16,20 30:9,11
    30:13 38:7,8,11 40:5,6
    53:8,9,18 54:12 62:22 63:2
    63:6 96:2,3
**invoices** 4:10,13 25:6,17
    28:22 40:24 46:18 53:23
    54:6,7 71:25 72:1 90:5
    92:19,22,25 95:10 97:24
    98:5,10,18
**involve** 22:24
**involved** 92:22
**involvement** 63:17
**issue** 33:14 53:18
**issued** 53:23 54:7,12
**issues** 51:1 76:21
**issuing** 92:3

**J**

**January** 85:3,17,21
**Job** 1:25
**John** 1:14 2:17 4:3,20 5:5
    6:7,17
**Johnson** 3:5 5:18
**join** 26:12
**joined** 26:1
**joining** 5:23
**jurisdiction** 78:10,14
**Justin** 42:10
**Justin.tv** 11:2

**K**

**K-u-r-i-s-k-o** 6:18
**Kaitlin** 14:8,9
**Kate** 14:8
**kind** 10:14 18:13,20,21 20:1
  28:17 72:11,18 81:20
**knew** 15:10 23:23 26:4 51:5
**know** 8:12 10:2,4,5,25 11:3
  11:5,12,20 12:4,5,7,7,8,18
  12:19,20,23 13:8,24 14:2
  14:25 15:3,8,10,11,13
  16:23 17:12 18:19,23 19:4
  19:6,7,10,12,13,17,18,18
  19:19,22,24,25 20:6,7,7,8
  20:18 21:5,12,13,21,25
  22:1,4,6,10,11,12 23:12,14
  23:23,24,25 24:2,3,6,12,13
  24:13,20,21,21,24,24,25
  25:3,4,25 26:6,6,7,8,8,9,16
  26:18,21,22,23 27:22
  28:23 29:5 30:24 31:13,14
  31:15 32:13,25 35:24
  36:20 37:23 39:2,4,5 41:1
  41:3,4 42:24 43:9,13,16,17
  45:12 46:13,18 47:20 48:4
  48:13 50:18,22 51:15,16
  55:21 58:14,14,16 60:9
  61:13 62:15 63:23 64:1,2
  64:16 66:20 67:7 68:17
  69:11,24 70:2 71:15,18,21
  72:8,9,18 73:16,22,22,23
  74:2,4 80:21 81:23 82:1
  83:7,17,23,23 86:20 87:5
  87:17,18 88:11,16 90:16
  94:6 95:5,6 96:9,11,20
  98:5,22 99:1
**knowing** 36:18 73:11
**Kurisko** 1:14 2:18 4:3,20 5:5
  6:7,12,17,19 33:5 37:18
  39:18 42:3,22 44:1 45:7
  51:19 52:5,21 56:10 61:4
  65:7,24 68:6 72:1 75:7
  80:20 81:5,16 87:12 88:20
  90:17 91:3,8,12,24 93:19
  97:2,9,24 99:6,7

**L**

**lady** 8:8
**Landy** 3:8 5:20 65:10
**language** 13:4 42:15
**languages** 13:6,11,12
**launch** 69:23
**launched** 69:22
**launching** 69:24
**law** 88:22 89:2,9

**laws** 77:2,2 78:13 100:18
**lawsuit** 8:4 64:13
**lawyer** 29:19 67:10
**lawyers** 99:9
**leading** 23:21 27:10 33:14
  33:16,19 35:10 36:25 43:2
  49:23 50:21 51:1
**learn** 36:22 94:23
**learning** 10:8
**left-hand** 45:9
**legal** 5:10 29:19
**let's** 12:21 16:10 42:13
  45:15 56:3 60:23 75:4 97:2
**levels** 16:16
**liability** 75:19
**license** 9:18
**licenses** 9:17
**life** 10:5
**limited** 69:17,18 75:19 77:3
**lines** 97:18
**link** 85:12 86:23,25 87:5,7
**linked** 84:19
**linking** 86:18
**links** 86:20
**listen** 15:10
**little** 16:20 22:23 24:23
  37:16 45:17 46:22 56:1
  69:15 75:23 95:21
**live** 11:19 70:1,13
**LLP** 3:8 5:20 65:10
**local** 78:13
**located** 15:4 36:16,19 37:19
  38:5 39:11,20,23 40:1,3
**locations** 50:8
**locked** 18:21,21
**log** 36:2
**long** 19:4 34:3 43:14 66:9
  67:6 70:15 74:8 83:17
**longer** 84:13,19 96:20
**look** 12:21 30:6 52:23 53:21
  53:25 57:7 60:17 61:6
  72:25 79:18 82:4 83:9
  97:10
**looked** 52:15 54:1 63:11
  66:19 87:25 90:4 94:18
  95:9 97:10
**looking** 21:7 71:25 97:25
**looks** 25:14 27:12 32:13
  38:7 44:14 61:7 83:6 94:5
  94:7
**lot** 10:7 11:1 17:13 19:22
  24:22 48:3 58:15 95:12
**Lots** 69:10
**lower** 37:22

**M**

**M** 1:24 2:20 100:3,25
**Machine** 11:14 81:17,18,21
  82:14 83:24 85:3 86:4
  93:20
**Madam** 5:24 34:15 51:11
**Madison** 3:10
**mailed** 56:22
**main** 86:8,17,21
**making** 33:24 51:7
**male** 26:10
**man** 28:19
**management** 59:4 79:21
**Manderson** 73:12 81:6
**marathon** 7:16
**March** 1:16 2:20 5:1,8 54:25
  55:7 56:12,25 57:25 79:19
  87:21 97:12 100:20
**margins** 32:12,13
**mark** 7:17
**marked** 4:9 25:12 41:24
  43:23 52:19 56:6 60:24
  76:5 81:13 83:15 84:24
  86:1 91:12,16,25 93:23
  94:1
**market** 12:24 78:24 79:5
**marketing** 4:12 14:3 42:14
  44:14,16 46:7,16 47:7,12
  47:17,19,20 48:5,12,13,16
  48:16,20 49:1,1,3,6 59:17
  75:20,24,25 76:1,11,16,23
  77:9,23 78:5,20,23,23,25
  79:4 89:17,23 90:13
**markets** 12:14,15
**marks** 75:20
**materials** 78:6
**Matt** 96:25 97:1
**matter** 5:5 65:9
**Matthew** 3:9 5:22
**mean** 11:19 15:23 21:11
  22:16 23:22 24:20 30:18
  30:23,23,24 37:1 43:12
  53:15 69:14 72:24 83:23
  89:20 90:15
**meaning** 16:14 88:6
**means** 84:12 99:17
**meant** 7:15
**mechanism** 35:19
**medication** 6:25
**meeting** 45:24
**meetings** 28:18
**member** 17:23 31:15 35:23
  36:6
**members** 13:7 16:17 18:3
  18:16 35:25 36:3,12

**membership** 10:12 35:23
**memory** 96:11
**mention** 78:4
**mentioned** 6:13 18:16,24
  28:12 58:13 59:7 65:8 69:7
  70:12,17 71:3 79:24 81:16
**met** 19:14,22 20:11,19 21:4
  37:2,3,5 67:5
**Miami** 3:6
**mic** 60:7,8
**Michael** 1:14 2:18 4:3 6:7,17
**microphone** 55:22 61:16,19
**middle** 56:21
**mine** 29:3
**MintBroker** 1:7 2:7 5:6
  88:13
**minute** 97:20
**minutes** 64:22 66:11 93:21
**missing** 94:6
**mistake** 10:14
**Mobilus** 10:24 11:2
**moment** 5:22 9:2 22:19
  64:19
**monetarily** 21:11
**monetary** 21:13
**money** 69:16
**MoneyShow** 19:16
**month** 17:14 42:11,14
**monthly** 27:15 28:4 38:13
  40:10 47:7 48:11,15 53:13
  74:10,13,21,22,23
**months** 42:13 47:8
**morning** 12:25
**moved** 13:20 17:11
**moving** 12:6 33:18 59:5
  79:22
**Multiple** 4:10,13
**mute** 97:5
**muted** 96:25

**N**

**N** 4:1
**name** 5:10 6:1,13,15,17,17
  8:10 22:11 24:8 27:23 36:2
  45:23 65:7 80:6
**named** 19:10
**names** 14:7 73:23
**nature** 9:24
**necessary** 77:1
**need** 7:16 61:14 65:17
**needed** 14:2
**needing** 22:15
**negotiate** 29:16
**negotiated** 41:12
**negotiating** 29:22

network 19:21 20:1
networked 19:22
never 13:10 15:9,23 26:16
  26:17 28:17,23 72:20,21
  74:13 88:12,12,20,25
new 3:11 7:25 9:20 12:6
  17:12 19:16 20:7 79:6
news 12:20,21
newsfeeds 16:22,23
newsletter 17:15
nice 74:18
night 8:8 65:25 66:10 72:13
  98:1
NIGRO 1:10 2:10
noise 48:3 95:13 96:23
non 49:3,15 50:12 59:19
  60:3 76:2,17 78:25 79:7,25
  80:14
non-solicitation 77:13,20
note 22:25 34:8 99:11
notes 100:13
noticing 5:14
notifications 63:10
noting 33:23
November 54:16,22,25
  55:13 94:12 95:2 96:4,7
  97:13
number 14:4 37:22 38:2
numbering 25:15
NY 3:11
Nyack 7:25 8:24,25 9:13,20

**O**

O'Brien 3:8 5:20 65:10
o'clock 12:24,25
oath 100:7
object 22:22 33:3,15 50:2
  61:1
objection 14:19 15:6,18
  16:9 20:4,24 21:17 23:7,21
  24:11 25:24 26:3,14 28:10
  29:18,23 30:4,17 32:6,25
  33:18 34:11 35:1,7,10,13
  36:17,25 37:8 39:8,24
  41:10 42:20 43:2 45:20
  46:1,9 47:13 49:16,23
  50:10,16,21 51:7,8,14 53:5
  53:10 54:10,13,17,23 55:3
  55:9,17 56:16 58:6,10,23
  59:11 60:1 62:1,6,13,19,24
  63:4,12,19,22 64:7,15
  88:24 89:3,10 93:3,5,9
  95:3 96:1,8,17 97:14
objections 14:20 33:21,22
  33:24 100:9

obtained 96:15
occur 13:4,6
offer 78:8,12
offered 17:5
offering 22:21,21
office 8:24,25 9:13
official 29:9
Oh 30:10 36:14 52:17 53:8
  54:3,4 70:6
okay 10:19 11:25 14:17
  17:16 18:6,24 20:12 21:9
  21:14 24:8 25:1,11,18 27:1
  27:5,16,23 31:12,16,17
  33:22 37:23 38:23 39:20
  40:4,4,17,22 41:1,8 42:5,8
  43:9,20,25 44:4,9 45:6,9
  45:15 46:20 47:2,5,24 48:6
  48:8,9,22,25 50:4 52:2,11
  52:18,24,25 53:3,7,9 54:1
  54:4,6 56:5 59:16,21 60:20
  60:21 61:18 65:24 67:18
  71:3 80:16 87:11 88:20
  90:22 91:6,20,23 92:2,14
  92:17 93:14,25 94:4,10
  97:2,5,5,8 99:20
old 61:7 94:5
on-air 28:4
once 64:12 74:2,15,17,18
ones 11:3 40:14 66:16 93:11
online 10:6,7 22:13
open 69:11
operate 70:9
opportunity 44:2 99:11,13
orange 94:21
order 25:15
outlined 65:16
owner 21:5
owns 9:21

**P**

p.m 2:19 5:2,2,9 51:22 52:1
  64:25 65:3 79:19 81:1,4
  90:24 91:2 99:22,23
page 4:4 27:2,8,10,14 28:4
  30:3,7 35:21 37:13,15,19
  37:21 38:6 39:16,17,23
  45:2,2,16 46:3,20 48:21
  52:23,25 53:3,12 72:25
  73:2 75:16 76:6,20 77:19
  78:19 83:21 84:12,17,20
  86:18,21 95:18,19,22
pages 38:2 44:9 52:13 53:22
  54:2
paid 15:9 31:20 34:25 35:16
  35:18 36:12 42:10 71:4

98:25
paragraph 47:3,24 48:7,23
  75:18 76:20 77:19
Pardon 13:3
parentheses 75:20
part 24:3 64:1 77:16
partial 47:8
particular 14:17 73:20
parties 16:5 29:17 44:16
  49:6 100:15
partner 20:1
party 42:6
password 36:2
pattern 68:6,8 69:13
pay 17:6 34:22 42:19 43:1
  47:6,11 48:11,15 58:17
paying 71:7
payments 35:20
PDF 39:16 91:18
PDT 68:7
penalty 100:17
pending 7:20 65:20
people 10:7,10 11:21 15:3
  15:20,22 17:5,24 19:22
  21:22 22:4 26:7 29:22
  31:14,17,19 34:18,21
  35:16,18 36:23 37:2,3,5
  39:3 68:23
percent 21:12 32:1,20 74:9
  81:9 98:12
percentage 15:17
period 16:9 24:16 68:11
periods 35:14
perjury 100:17
permit 34:2,5
permitted 33:13
person 24:3,9 26:4 28:21,24
  45:24 69:5 81:10
personally 72:2
persons 15:16 32:24,24
  34:24 50:8,19 79:25
picking 66:13
picture 12:17
place 8:17 11:15 33:4 46:10
  100:6
placed 43:18
plaintiff 1:5 2:5,18 3:3 8:3
Plaintiff's 91:25 92:9,10
  94:1
planning 69:24
platform 60:14
play-by-play 12:23
please 5:12,25 6:15 7:7,23
  11:25 32:17 34:11,13,15
  37:14 41:22 43:21 45:2

46:21,22 47:25 50:23
  51:11 52:3 55:6 56:20
  60:23 62:25 84:23 93:17
  94:16 95:19
plus 42:11
point 11:1 16:18 26:20 27:1
  42:8 43:15,16 48:6 56:18
  61:11 87:3,20 88:9,16 95:5
pointing 87:9
points 15:8
policies 76:24
policy 57:4,9 58:21
popular 17:13
portal 35:23
portion 35:25
positive 81:9
possible 74:6
post 8:24,25 9:13
posted 83:5
potential 21:2 29:22 63:18
  79:6
predates 89:18
preferred 23:11 86:24 94:22
  95:2
preferredbroker 84:2 85:19
premarked 25:9 66:23
prepared 88:17
Present 5:18
preserve 33:4,21
preserved 50:23
president 8:21
presumably 74:25
pretty 26:5 38:16 55:23
previous 40:13,14
previously 34:9 52:15 91:13
printouts 93:20
prior 7:17 8:6,22 9:12 33:14
  40:23 59:4 79:22 87:21
  98:1
private 17:23 18:16,19,21
  36:11
privy 72:21,23 98:21
probably 11:15 12:15 13:8,8
  13:20,21,21 15:14 16:20
  17:11 18:11 19:8,17 20:5,5
  21:18 27:18,21 32:2,11
  41:2 43:13 54:18 58:7
  63:14 64:11 69:9 82:11
  84:21 87:17 92:12 98:12
  98:19
Procedure 33:13 34:2,4
proceed 99:14
proceedings 5:1 100:5
process 11:20 63:17 72:11
produce 98:17

produced 74:24
producing 92:18
production 98:16
products 78:10
prominent 78:7
promised 67:15
promote 21:8 22:2,3
promoting 26:21
promotional 27:15 28:5
  38:13 40:10 74:10,14,21
  74:23 78:6
promotions 53:13
promulgated 77:4
proper 51:10
propose 42:13
propounded 100:9
prorated 47:8 48:16
protect 35:25
provide 7:23 34:5 35:16
  36:3 38:14 49:2 53:9 54:15
  55:14 76:1 88:7,13
provided 10:23 16:25 22:12
  46:19 47:12 54:21 55:2,7
  64:6 80:20 92:19
provides 28:2,5 53:11
providing 31:9 33:24 34:21
  49:14
public 18:20
pull 71:22 75:4 79:11 81:11
  83:13 84:22 85:25 89:12
  89:13 97:21
Purpose 48:23 75:15,23
pursuant 46:7 49:8 90:13
put 15:8 16:14 23:12 35:21
  36:1 60:13 74:16 100:7

Q

qualified 49:2 75:25
question 7:7,10,12,19 14:23
  23:3 25:19 34:13,16,17
  40:1 46:5 49:24 51:12,13
  52:15 65:20
questioning 97:19
questions 7:1,5 23:1 24:4,5
  24:6 33:14,16,20 44:3
  46:13 51:2 64:21 65:4,13
  67:13 91:5,8 93:19 97:16
  99:4,9 100:9
quick 65:12
quickly 89:13
quite 55:23
quotation 75:20

R

R 3:9

radio 8:18,20,22 9:4,5,6,10
  9:19,21,23 11:9,23 13:13
  13:17 14:10,24 17:4 21:15
  21:23,23,25 22:3,15 23:5
  23:20 26:2 27:12,17 28:8
  29:7,10,13,17 30:21 32:23
  34:21 35:16,18 38:14
  39:14 41:8 42:19 43:1,10
  44:18 46:7,16 47:11 48:18
  49:13 50:7 53:18,23 54:8
  54:15,21 55:1,8,14 57:20
  58:2,5,18 61:15,19 62:11
  62:17,21 63:1,9,16 64:5
  67:20,22 71:5 73:25 74:13
  75:10,19 76:13 79:20
  83:18 84:19 86:24 88:4
  89:6 92:3 93:4 95:1 96:6
  98:8
Radio's 9:25 12:3 14:4 16:1
  16:8 17:20 24:10,18 26:13
  34:25 36:11 49:20 50:9,14
  50:19 92:19 94:22 95:2
random 16:23
rarely 12:16
rate 38:24
ratio 15:21
read 7:9 27:6 34:17 48:9
  51:11,13 58:11,12,14
  99:10
reading 48:17
readjusted 16:20
ready 60:20
realize 54:5 80:19
really 10:2,5 13:22,22 15:9
  15:19 18:10 20:20 24:12
  26:7 28:17,20,21,23 29:4
  31:6,13 43:12,14 58:16
  68:17 72:9,18,20,21,23
  82:3
reason 7:4,16 27:19 63:5
  69:1,5 92:14 99:1
reasonable 76:24
reasons 69:10
recall 55:5 57:15 58:8 62:10
  71:11,13 72:16 73:5,20,24
  75:6 79:12 80:13 82:2,5,9
  89:24 92:2,5,18 93:19 95:9
  98:11
receive 46:16 63:9
receiving 17:1 98:1
Recess 51:24 65:1 81:2
  90:25
recited 94:13
recollection 18:22 47:10
  74:7 82:24 96:5

record 5:9,13 6:16 22:25
  34:8 38:4 51:21,25 64:24
  65:3 80:24,25 81:3 90:19
  90:23 91:1 99:20,21
recorded 100:10
recordkeeping 26:22
records 54:20 88:16 92:6
  93:2,6 96:10,16,16
redirect 90:21 91:7
refer 32:8 38:1 80:1 95:1
reference 88:17
referenced 87:18
referred 61:21 83:2 93:7
referring 31:12,18 37:6,21
  39:7 40:15 41:15
refers 48:14
reflect 54:21
reflected 32:9
refrain 33:16
refresh 47:10 82:24 96:5
regarding 8:7 23:4 42:18,25
  58:20 77:12 88:3 93:20
registered 68:16,19 69:3,8
regular 9:15
regularly 92:6
regulated 69:19
regulations 77:2,3 78:13
Regulatory 76:21
relate 23:2
related 49:14 62:17
relationship 20:23 21:1,3,10
  21:15 62:12 67:4 95:5
  97:12
relationships 36:20
relative 100:14
relevant 77:12
remainder 53:22
remember 7:1 13:22,22 18:7
  18:10 20:16 24:1,14,16
  25:3,7 26:8,17 27:25 31:5
  31:6,6 32:13 41:5 59:12
  61:24 62:20 63:13 72:17
  72:17 81:10,25 95:4 96:12
  96:19
Remote 1:14 2:17
remotely 6:5
repeat 7:8 39:22 62:25 69:4
repeatedly 33:15
rephrase 23:2
Reported 1:23
reporter 2:21 5:11,24 6:1,2
  6:4 7:9 34:15 51:11 52:12
  60:15,17 82:8 99:7,14
  100:4
REPORTER'S 100:1

represent 5:13 6:14 42:5
  61:9 65:8 82:13 85:12
  86:10 89:22
representative 25:21,22
  26:12
represented 6:19 29:20
  50:22,25 51:3
representing 87:1
represents 77:9
request 7:18,19 49:7 65:19
reread 34:15
research 16:15
reset 60:8
residents 78:16
respect 9:4,12 15:25 54:6
response 59:14,24 80:9
responsibility 49:20
responsible 64:2
retains 78:22
review 74:19 86:19 94:25
reviewed 40:14 77:10 93:1
right 6:22 8:14 9:2 11:22
  15:25 16:10 19:10 22:18
  23:1 25:8 26:23 27:8 30:6
  35:11,15 37:11,18 38:10
  39:15 40:4 41:18 43:20
  44:12 45:3 48:19 51:17,18
  52:5 55:25 56:10,21 57:19
  57:23 59:2,13 60:22 61:11
  61:18 63:7 66:17 68:16
  69:22 70:13,16,18 71:5
  73:21,25 74:25 75:2 80:7
  82:17 83:5,11 84:12,13,15
  84:20,21 85:4,9,19 87:3,8
  89:19 91:7,11 95:15,16,22
  96:21 99:10,13,17
right-hand 28:19,19
risking 68:1
Ritchie 42:10
Road 7:25
room 6:5 17:24,25,25 18:16
  18:20 23:14,18,20,25
  24:10,14,18 25:22 26:2,6
  26:13 27:15 28:4 38:12,17
  40:9 46:11 53:13 55:11
  71:4,4 73:8,17,21
rooms 81:8
rough 69:23
rule 68:7,8,12,13 69:13
rules 6:23 7:21 33:13 34:2,4
  65:15,15 77:2
Russia 15:12 69:6

S

S-e-e 14:8

**S&P** 16:16
**sale** 17:22
**saw** 72:21,22 88:12
**saying** 53:16 82:11 87:5
  95:11,14 96:19
**says** 28:2 30:19 38:21 40:8
  42:10 45:10,22 47:5,16
  48:23,25 56:22,22 57:3,10
  59:3,3,16 60:2 61:15 73:1
  73:8 74:10 76:23 77:23
  78:21 83:22,24 86:23 87:8
  90:2
**Scope** 48:23 75:15,24
**screen** 11:20 12:16,17,18
  16:13,21 91:11,15,25 94:2
  94:4
**screenshot** 4:21 94:6
**screenshots** 82:14
**scroll** 37:15 44:2 45:1,15
  46:20 52:12 56:20 83:8
  85:11
**scrolled** 44:7 54:3,4,5
**SEC** 5:6 6:14 8:8 64:13 66:7
  67:16 74:24 77:12 80:20
  87:14 88:10,13 92:2 98:16
  98:18
**SEC's** 71:22 75:4 79:11 88:4
  88:8 93:17 97:21
**SEC-DTR** 38:5
**SEC-DTR-31** 53:4
**SEC-DTR-E** 27:9
**SEC-DTR-E-35** 37:20
**SEC-DTR-E-44** 39:17
**second** 25:11 37:13,15,17
  48:23 52:4 76:19
**section** 77:11
**securities** 1:4,8 2:4,8 3:4
  5:17 27:13,17,24 44:19,21
  53:19 75:10,12 77:4 78:13
  78:14
**see** 11:17 12:17,22 14:8
  18:3 19:23 21:20 24:14,21
  24:22 27:2 31:4,9 37:24
  38:20 39:18 40:8,17 42:1,9
  42:15 44:2,4,5,8 45:3,3,9
  45:22 46:24 47:2,5,16
  48:22,25 49:11 52:6,25
  56:10,21 57:3,25 59:2,7,14
  59:22,23 61:3,13,15 63:5
  64:19 66:14 72:4,5 73:3,9
  74:11 75:15,18,21 76:3,21
  77:6,14,21 78:2,17 79:2,8
  80:4,9 82:17,18,20,22 84:1
  84:2,5,7,9 85:2,3,7,14 86:4
  86:5,7,12,14 88:1 89:15

91:18,19,21,22,24 92:9
  94:1,4,5,8,10,13,21 95:20
  95:22 98:14
**seeing** 72:18
**seek** 20:2,3 69:2,7
**seen** 34:19 52:13 64:12
  72:16 87:23 98:2
**self-employed** 9:16
**sell** 22:7
**send** 14:1 18:2 25:6 27:21
  66:15,18,24 74:20 80:22
  98:9
**sending** 19:5,9
**sends** 98:4
**senior** 59:4 79:21
**sense** 65:22
**sent** 14:2 27:17 56:25 58:1,4
  62:21 63:1 66:16,22 72:12
  72:15 74:13,15,22,23
  80:21 91:13 93:11 98:6,11
  98:20,21,23 99:2
**sentence** 48:9 59:10 77:8
**separate** 34:10 87:7
**September** 30:20 38:21,23
  40:7 73:1 82:17 84:6
**service** 21:24 22:1,2,3,12
  47:18 78:15
**services** 4:12 11:1 17:5,8,20
  18:8 22:15 23:5,15 30:3
  34:21,25 35:16,19 36:12
  38:15 43:11 44:15,17 46:8
  46:13,17 47:12,12 48:20
  49:3,7,14 54:16,22 55:1,7
  55:14 62:22 63:2 64:5
  71:16 76:1 78:9,9,10,20,24
  79:5 89:18,23 90:13 92:19
**set** 100:6
**share** 91:14
**ShareTrader** 57:9 72:10
**short** 34:3 65:17 80:18
  90:18,20 91:7
**shorthand** 2:21 100:4,13
**shortly** 64:20
**show** 17:17 19:15 31:3
  41:18 55:12 58:18 64:12
  66:12 72:20 73:25 80:20
**showing** 82:15 93:25 98:17
**shows** 19:15 20:1,13,17
  24:22 45:25 86:11 87:2
**sic** 52:12
**side** 44:7 45:9 47:22 52:7
  54:3
**signature** 44:8 45:6,10,21
  76:8 92:10,13 99:24
**signatures** 45:4

**signed** 31:14,17 39:5 45:12
  45:19 76:15 77:17 89:22
**signing** 76:10 92:5
**similar** 94:18
**simply** 80:1
**Simultaneous** 34:7
**sir** 44:10 55:19 58:25 93:12
  94:2 95:12 96:16 97:7
**sister** 80:2
**sit** 98:22
**site** 16:20 17:12,23,23 22:17
  24:4,23 26:21 34:18 35:25
  36:20 39:4 46:10 74:16
  86:8 87:6 88:17 94:5,7
**sitting** 99:8
**situation** 36:6
**snapshot** 81:22
**solicit** 59:6 79:23 88:21 89:1
  89:8
**solicitation** 77:25 78:8,12
**son** 66:14
**soon** 80:23
**sorry** 8:13,25 29:25 42:21
  43:5 53:15 55:18 57:6,8
  58:24 60:6 69:4 72:4 93:10
  97:4
**South** 15:12,13
**SOUTHERN** 1:2 2:2
**space** 63:25
**Spanish** 13:8,9
**speak** 8:6,14 13:10,10,11
  55:24 66:9
**speaker** 60:10
**speakers** 34:7
**speaking** 19:16 33:22,24
  51:7,8
**special** 48:16
**specials** 23:15
**specific** 46:5 59:10
**specifically** 23:2 37:12 77:9
**Speedtrader** 20:10 21:5,12
  22:24 23:23,24 24:17,20
  24:22 25:4,6,21 26:1,5,12
  26:25 71:11,13,14,16
  73:12,13 80:7 81:6,7
**spell** 6:16
**spoke** 65:25
**spoken** 66:3,6 87:13
**stamp** 37:19 53:4
**stamped** 27:9 38:2
**start** 6:22 9:5 17:10 18:18
  19:2
**started** 9:23 10:5,9,10,14,14
  10:24 11:8,12 12:6 13:13
  17:1,11,14 18:8 19:3,6,8,8

19:20 34:21
**starting** 5:14 10:2 20:13
  43:14
**starts** 31:24
**state** 5:13 6:15
**stated** 33:5
**statement** 60:4
**statements** 33:10 100:9
**states** 1:1 2:1 3:4 15:16 35:5
  36:24 37:3,4,6 49:4 59:18
  69:12 76:2,17 77:4,13
**stay** 33:18
**stenographically** 100:11
**Stephen** 3:9 5:20 65:7
**sticks** 32:21
**stock** 12:22 16:14
**stocks** 16:16
**StockUSA** 80:3,6
**stop** 34:13 59:4 79:21
**stopped** 26:12
**Strawtown** 7:25
**stream** 10:8
**streamed** 10:17
**streaming** 10:4,25 11:1,18
  21:24
**strike** 17:9 36:10 49:19 83:1
**students** 80:2
**stuff** 15:11 19:9 20:19 21:22
  22:7 28:18,21 58:18 98:21
**Subject** 78:21
**submit** 88:9
**subpoena** 92:3
**substances** 6:25
**subtitles** 13:9
**sufficient** 51:19
**suggest** 65:18 67:12
**Suite** 3:5
**Sum** 3:4 4:5 5:16,17,24 6:11
  6:13 8:11 14:20 15:3,15,22
  16:10,24 20:12 21:2 22:8
  23:1,17 24:16 25:14,16,19
  25:25 26:11 27:1 28:14
  29:21,25 30:2,7,20 32:8,22
  33:3,7,9,20 34:4,12,20
  35:4,8,11,15 36:22 37:5,11
  37:14,18 39:10 40:2 41:12
  41:21 42:1,21,24 43:4,20
  43:25 45:15,18,23 46:3,15
  46:20,24 47:16 48:2,6,19
  48:22 49:18,24 50:4,5,13
  50:18,23 51:4,7,17,23 52:2
  52:5,14,17,21 53:2 54:1,14
  54:11,15,20,25 55:4,6,13
  55:18,21 56:1,8,18 58:8,12
  58:19,24 59:2,13 60:2,21

61:3 62:4,8,16,21 63:1,7,9
63:16,21 64:4,9,18 65:4,16
65:25 66:4,9,24 67:1,16,21
68:4 72:12,15 87:14 88:24
89:3,10 90:20 91:7,10,18
91:20,23 93:4,6,12,14,18
93:25 95:9,16,20 96:3,15
96:21 97:2,7,9,16,17 99:5
99:17,20
**supplied** 62:2
**supply** 49:7 88:15
**sure** 21:12 30:10 32:1,20
37:17 44:5 51:20 52:12
54:1,9,19 58:12 65:23
71:19 74:9 88:10 91:20
96:18,23 98:13
**SureTrader** 1:9 2:9 21:13,15
22:14,24 23:2,4,6,19 24:2
24:9 25:3,21 26:1,7 27:24
28:1,8 30:15,22 32:7,10,10
38:15 39:5 41:6,13 42:18
42:18,25 43:1,7,10,11
44:21 49:14,21 53:24
54:12,16,22 55:2,8 57:3
62:3,12,18,22 63:2,24 64:4
64:6,14 73:5,14,20,24 74:1
74:6,19 75:13 77:17 78:15
79:21 81:7,25 82:10 83:11
86:11,15,18 88:16 89:1,7
90:5,10 92:19 94:17 95:1
96:7 97:12 98:6,8,23
**SureTrader's** 63:17 74:14
88:21 89:8
**surprised** 67:3,7
**swear** 5:25
**Swiss** 1:8 2:8 27:13,17,23
44:18,20 45:10,12,19 47:6
47:11 48:10,15,25 49:3,7
53:19 54:8 75:10,12,24
76:1,25 77:1 78:4,14,22,23
78:24 79:5
**sworn** 5:15 6:5,8
**system** 35:23

**T**

**table** 21:19,20
**tag** 35:12
**take** 7:14 11:25 12:21 41:19
48:18 51:18 52:23 56:3
64:18 75:2 79:10 80:16,18
82:4 83:8,13 84:15 85:24
87:11 90:18 96:21 97:19
**taken** 2:18 82:14 83:20,20
98:8 100:5,13

**takes** 81:22
**talk** 11:21 12:18,19 16:10
22:6 23:14 29:22 30:2,8
46:12,13
**talked** 22:12,13 28:23
**talking** 21:3 23:18 26:23
48:2
**target** 14:17
**targeted** 15:1
**team** 35:12
**technical** 16:16
**tell** 20:19 26:9,24 31:3 36:15
45:18,21 49:21 51:8 67:7
**telling** 28:16 33:10
**ten** 18:14 20:21 66:11
**ten-minute** 51:18
**term** 47:6 48:10
**terms** 49:8 78:21
**testified** 6:9 34:9,20 35:14
65:24 68:22 69:20 71:10
73:11 80:10 81:24 83:3
87:13 89:17 92:21 97:25
**testify** 33:4 34:14 51:9
**testifying** 68:1 75:6 79:12
**testimony** 33:6,25 34:5
61:22 67:16 100:8
**thank** 6:12 7:23 41:23 51:23
56:1 60:19,21 65:10 90:17
91:3,23 99:3,5
**theorize** 32:2
**they'd** 69:17
**thing** 7:18 19:20 32:2 43:13
53:12 63:13
**things** 10:6 17:19 80:19
**think** 10:5 11:3 19:14,21
20:8,9,10 21:4,7,18 22:13
22:23 23:11 24:2 25:7,23
26:10,15,18 27:25 29:14
31:20 33:17 36:7 43:15
55:22 58:13 62:14 63:14
64:8 67:3,11 68:22 69:1,5
69:17 70:12,17 71:3,18,21
72:22 74:1,4,5 76:6,7,19
77:24,25 80:12 86:25
87:12,22 90:6,14 95:7
97:25 98:1
**thinking** 26:22
**third** 16:4 29:17
**thought** 17:12 24:19 43:12
43:18 47:14 50:1 96:19
**thousand** 47:15
**thousands** 12:8
**thread** 4:14
**three** 42:13 64:21 68:11
**Tim** 3:14 5:10

**time** 5:8 10:24 11:23 12:1
13:16 16:9 17:4 18:22 19:4
19:6,17 20:8,9,10 21:5
24:1,16,19,25 25:4,22
26:11,16,19 28:4 29:14
30:16 32:22 35:14 36:19
36:21 38:13,18 40:10
43:14 62:11,16 64:9 65:10
66:3 67:5 69:25 72:16 74:8
76:25,25 81:22 82:12
87:20 91:4 97:11 100:6,7
100:10
**times** 69:10 84:5
**title** 8:19 29:9
**titled** 76:20 77:20
**today** 5:11 6:20 7:5 65:8
66:16,19 67:10,13 68:1
70:9 82:15 90:4 91:14
98:22
**Today's** 5:8
**top** 27:14 28:3 45:2,16 47:18
48:20 53:12 56:10 61:11
61:15 73:2 82:16 85:4
86:22
**topic** 21:14
**topics** 12:12
**total** 15:17
**tracker** 15:8
**tracking** 63:15
**trade** 18:2,2,24 19:15,15,25
45:24 64:12
**trader** 9:15,15 10:1 29:4
69:2 86:22
**traders** 19:15 71:17
**trades** 68:11
**trading** 8:18,19,22 9:4,5,6
9:10,19,21,23,24 10:4,6,8
11:8,22 12:2,14,18 13:13
13:17 14:4,10,24 15:25
16:8 17:4,20,22 18:4,12,13
20:19 21:15 22:15 23:5,20
24:9,18 26:2,13 27:12,16
28:8 29:7,9,13,17 30:21
32:23 34:21,25 35:16,18
36:11 38:14 39:14 41:8
42:19 43:1,10 44:18 46:7
46:15 47:11 48:18 49:13
49:20 50:7,9,14,19 53:14
53:18,23 54:8,15,21 55:1,8
55:14 57:20 58:2,5 61:15
61:19 62:11,17,21 63:1,9
63:16 64:5 67:19,22 68:7,8
69:13,17 70:24 71:5 74:13
75:9,19 76:13 79:20 83:18
84:19 86:23 88:4 89:6 92:3

92:18 93:4 94:22 95:1,1
96:6 98:8
**transcribed** 100:11
**transcript** 99:10 100:13
**transcription** 99:12
**transmission** 91:13
**transmittal** 98:17
**true** 96:11,14 100:12,18
**truthfully** 7:2,5
**try** 7:14 11:25 65:11
**trying** 11:4 20:7,8,16 31:4
32:12 34:13
**tune** 11:21
**tuned** 14:25
**turn** 10:11 21:9 37:11 39:15
57:23 78:19
**turned** 16:20
**two** 47:3 48:7 87:17 88:10
**type** 10:12 26:19
**types** 12:12
**typically** 12:12
**typing** 99:8

**U**

**U.S** 15:17,20 32:19,24,24
49:15 50:12,13,19 59:6,18
59:19,20 60:3,3 68:9 71:14
71:15 77:20,25 78:15,16
78:16,25 79:7,23,25 80:2
80:13,14 88:21,22 89:1,2,8
89:9
**um-hmm** 27:4 38:22 42:4
47:1 48:24 49:5,12 56:24
61:5 70:19 78:18 95:24
**unclear** 22:23
**underneath** 86:23 87:8
**understand** 7:10,21 23:4
27:24 39:25 44:20 75:12
88:6 93:10
**understanding** 46:6 67:25
68:3 76:16
**understands** 77:10
**understood** 7:12 17:3
**United** 1:1 2:1 3:4 15:16
35:4 36:24 37:2,4,6 49:3
69:11 76:2,17 77:4,13
**URL** 82:20 84:2 85:6,18 86:7
87:2
**USA** 15:13
**use** 61:1 79:4 88:8
**user** 36:2
**Usually** 12:15

**V**

**v** 88:13

**vague** 35:13
**Vagueness** 35:14
**value** 41:3 43:18
**version** 61:7 85:13
**versions** 61:8
**versus** 5:6
**video** 10:17,20,22 13:1
  16:13,15,21 18:4
**videoconferencing** 6:3
**videographer** 3:14 5:4,11
  25:9,11 37:14 41:21 51:21
  51:25 52:4,22 56:9,19
  64:24 65:2 80:25 81:3
  90:23 91:1 93:16 97:6,8
  99:21
**videos** 11:18,19 12:10,13
  13:4 14:18 15:4 16:25 22:9
  70:20,24
**videotaped** 1:14 2:17 5:5
**viewers** 12:8,9
**viewership** 15:17
**violation** 88:22 89:2,9
**visit** 32:24 50:13
**visited** 17:5 50:9,19
**visitors** 34:9 79:7
**voice** 12:19
**volume** 60:14
**vs** 1:6 2:6

**W**

**wait** 56:8
**waiting** 93:18
**waive** 99:12
**waived** 99:24
**waiving** 99:18
**want** 30:5 44:5 54:1 57:7
  60:11 67:2,7 80:19 91:20
**wanted** 21:22 22:2,10 38:19
  46:12 50:2 67:6
**warrants** 77:9
**wasn't** 24:7 25:2 26:21,22
  28:19,24 63:23 64:1,1,1
  66:14 67:6,23 69:24 83:21
  90:12,12 98:21,25 99:1
**watch** 10:13,19 11:21 15:1
  17:17
**watched** 15:4
**watchlist** 16:14,15 18:1,4,7
**way** 12:25 15:7 60:7,13
  63:15 81:23
**Wayback** 11:14 81:17,17,21
  82:14 83:24 85:2 86:4
  93:20
**we'll** 28:14 31:4 52:22 64:21
**we're** 19:14 26:23 51:21,25

59:5 64:24 65:2,17 81:3,15
  89:12 90:19,23 91:1 93:18
  95:17 99:21
**we've** 33:14 40:14 79:25
  97:25
**web** 4:15,16,17,18,19 27:14
  28:3 61:9 73:2 94:8
**Webex** 1:15 2:19 5:1,7 60:14
**website** 11:9,11,17 15:9
  16:1,2,8 17:5,20 32:23,24
  34:10 37:7 39:12,13 50:9
  50:14,20 59:7 61:8,8 69:20
  70:4,9,13 73:6 78:5 79:7
  79:24 81:22 83:18 85:9,14
  86:15,19
**websites** 10:3
**Wednesday** 1:16 2:19 5:1
**week** 16:15
**welcome** 49:25 79:25
**went** 12:8 15:12 18:4,19
  19:23 31:19 39:4 52:17
  69:18 80:12 87:6
**weren't** 41:2,3 68:1 88:7
**West** 7:25
**whirlwind** 8:13
**wife** 72:10 98:9,19
**wish** 99:11
**witness** 4:3 5:14,25 6:4,5
  14:24 15:7,19 16:12 20:5
  20:25 21:18 23:8,22 24:12
  26:4,15 28:11 29:24 30:1,5
  30:18 32:7,18 33:2,8,8,12
  33:25 34:6,14,18 35:2
  36:18 37:1,9 39:9,25 41:11
  42:23 43:3 45:21 46:2,10
  47:14,25 48:4 49:17 50:2
  50:11,17,22,25 51:2,9,15
  51:20 53:6,11 54:14,18,24
  55:5,10,20,25 56:17 58:7
  58:11,13 59:1,12 60:13,20
  62:2,7,14,20,25 63:5,13,20
  63:23 64:8,16 89:4,11 91:6
  91:22 93:10,13 95:4 96:2,9
  96:18 97:15 99:15,19
  100:7,8
**Wolfe** 14:8
**words** 33:6 46:25
**work** 8:23 19:24 21:3 23:6
**working** 9:5
**world** 15:11 35:3 68:23 70:5
  71:1,9
**wouldn't** 12:16 24:13,14
  28:24 51:15 58:16 69:18
  72:23 90:15 98:3
**write-up** 38:18 74:15,17

81:25 82:10 83:2,10,18
  85:22 87:6,7 89:14,18 90:9
  90:12
**writes** 79:20
**writing** 94:22
**written** 30:21,23 31:1,7
  90:10
**wrong** 96:20
**wrote** 74:15,18 90:9

**X**

**X** 4:1

**Y**

**Yaniv** 56:11 57:1 58:1 79:19
**yaniv@suretrader** 79:20
**yaniv@SureTrader.com**
  57:1 58:1
**yeah** 9:9 10:18 11:11,19
  12:4 17:2,7,7 18:17 19:1
  19:12 20:25 21:1,11 22:16
  24:2 27:4,7,13,25,25 30:10
  31:8,11 33:2 34:23 36:14
  36:18 37:1,1 38:1,16,19
  44:7,11 51:20 53:2 54:3
  57:9,9 58:14 61:7,17 66:20
  68:8,14 69:23 70:6,19 72:5
  72:23 73:4,7 74:8 81:19
  82:1 83:4,4,12 84:4,21
  90:14 93:22 95:24 98:3,14
**year** 20:19 87:17 88:10,18
  92:2
**years** 18:14 20:21 64:11,11
  88:11 95:6,7,15
**Yep** 40:9 86:6
**yesterday** 87:14
**York** 3:11 7:25 9:20 12:7
  17:12 19:17
**YouTube** 10:3,21,22 11:5,7
  14:25 18:5 70:18,25

**Z**

**zenergy** 21:20
**zeros** 27:10
**zoom** 82:7 84:1

**0**

**1**

**1** 4:16 46:3 48:21 81:12,13
  82:4 89:13
**1,000** 40:21 47:7 48:11
  53:13,17
**1:06** 51:22
**1:20** 52:1

**1:21-CV-21079-Bloom/Ot...**
  1:7 2:7
**1:38** 64:25
**1:50** 65:3
**1:57** 57:25 79:19
**10** 76:6,6 85:3
**100** 21:12 32:1,20 74:9 81:9
  98:12
**10016** 3:11
**10th** 85:17,21
**11** 76:6
**11-2-2013** 38:9
**11-6-2018** 54:14
**11th** 84:6
**12** 82:17
**12:03** 5:9
**12883** 1:24 2:21 100:3,25
**12th** 84:6
**14.95** 17:14
**15** 1:16 2:20 5:1,8
**15a-6** 77:11
**17** 77:11
**17th** 100:20
**1950** 3:5
**1996** 9:14,15
**1st** 89:23

**2**

**2** 4:17 83:14,15 84:1
**2:11** 81:1
**2:18** 81:4
**2:31** 90:24
**2:37** 91:2
**2:49** 99:22
**20** 31:23 38:24 42:11
**2000s** 19:19
**2007** 9:7,13,15,23 11:8,23
  12:1 13:13 69:22 70:16,16
**2008** 19:19 20:13 70:16
**2009** 18:11 19:19 20:13
**2010** 13:21 14:5 18:11,11,22
  18:23 19:19 20:14
**2011** 13:21 14:5
**2012** 82:17 83:5,10 84:6
  89:15 90:1,5
**2013** 12:1 16:11,19 30:14,20
  35:15 73:1
**2014** 40:7 44:25
**2015** 85:3,18,21 86:5,17
**2016** 54:25 55:7 83:21 84:6
  84:13,18 89:23 97:13
**2017** 18:15 56:12,25 57:25
  79:19
**2018** 18:15 54:16,22 55:1,13
  61:10 94:12 95:2 96:2,7

97:13
**2021** 87:21
**2023** 1:16 2:20 5:1,8 18:15
  95:6 100:20
**230315DBO** 1:25
**24** 3:10 57:25
**240.15a-6(a)(1)** 77:12
**24th** 56:12,25 79:19
**25** 4:10
**25,000** 68:10
**250** 42:13
**260** 38:24
**275** 3:10
**2nd** 94:12 95:2

---

**3**

**3** 4:18 45:2 84:22,24 85:24
**3-6-2016** 53:2
**3,500** 28:6 42:11
**3,750** 42:14
**3/24/17** 4:14
**3/30/17** 4:11
**3:03** 2:19 5:2
**3:20** 56:12
**33131** 3:6
**35** 38:6

---

**4**

**4** 4:19 12:25 45:2,16 46:21
  85:25 86:1
**41** 4:11
**43** 4:12 27:10 30:3
**49** 4:10 25:10,12,20 27:2,9
  27:11 30:3,8 37:12 39:16
  52:16 66:21 71:23 75:3
  93:1
**4th** 40:7

---

**5**

**5:49** 5:2 99:23
**50** 4:13 52:3,6,13,15,18,19
  52:22 53:3,22 54:7 56:3
  66:21 84:5 93:1 95:10,17
  95:23 97:21
**500** 16:16
**51** 4:12 43:22,23 44:13
  66:21 75:4
**52** 4:11,13 41:20,22,24
  66:21
**53** 4:14 56:4,6,11 60:22
  66:21 79:11
**54** 4:15 60:23,24 61:3 63:8
  63:11 66:20,21
**55** 66:20,21
**56** 4:14 66:20,21

**57** 4:21 66:20,21 93:17,23
  94:1,11,25 95:17 97:3,6,10
**58** 4:20 91:12,16,25 92:10
  92:11 93:8
**5th** 73:1 86:5,17

---

**6**

**6** 54:16
**6/91** 4:5
**60** 4:15
**65/97** 4:6
**6th** 54:22 96:4

---

**7**

**79** 7:25

---

**8**

**8** 12:24 76:20
**801** 3:5
**81** 4:16
**83** 4:17
**84** 4:18
**86** 4:19

---

**9**

**9** 76:20
**9-5-2013** 30:14
**91** 4:20
**93** 4:21