AGvSecuritiesExchange 2023CLEgen00125

```
 1          (The following was derived from an audio
 2   recording:)
 3          (Court commenced)
 4          THE COURT:  You can go ahead, Counsel.
 5          MS. MAYCOCK:  I can start?
 6          THE COURT:  Yes.
 7          MS. MAYCOCK:  Good morning, Registrar Toote.
 8          THE COURT:  Good Morning.
 9          MS. MAYCOCK:  This morning we appear in the
10   matter of an application by the Competent Authority of
11   The Bahamas, i.e the Attorney-General, and in the matter
12   of the Evidence and (Proceedings in Other Jurisdictions)
13   Act, Chapter 66.  And in the matter of the Banks and
14   Trust Companies Regulations Act 2020, Act No. 22 of
15   2020.  And in the matter of Order 65 of the Rules of the
16   Supreme Court, and in the matter of a request for
17   judicial assistance by the Honorable Alicia M.
18   Otazo-Reyes, Magistrate Court judge of the United States
19   District Court of the Southern District of Florida, in
20   the manner of an application by the Competent Authority
21   of The Bahamas, i.e the Attorney-General.  And the claim
22   No. 2023CLE/gen/00125.
23          The party's my Lord, is the Attorney-General
24   and the Securities Exchange Commission.  And Mint Broker
25   International Limited formerly known as Swiss America
26   Securities Limited.  And doing business as Suretrader,
27   and Guy Gentile aka Guy Gentile Nigro.  We last appeared
28   --
29          THE COURT:  Appearances for the record,
30   please?
31          MS. MAYCOCK:  Oh, sorry, for the record.
32   Deirdre Clarke-Maycock for the Attorney-General, along
```

ROUGH - 26 JANUARY 2024

**EXHIBIT**

**F**

AGvSecuritiesExchange 2023CLEgen00125

1  with Ronique Carey.  Tara Archer-Burnside, sorry, why do
2  I keep calling you Burnside - Tara Archer-Glasglow.  And
3  Ms. Swain, Oluwafolakemi-Swain for the first defendant.
4          THE COURT:  For the first or the second
5  defendant?
6          MS. MAYCOCK:  Sorry, the --
7          THE COURT:  Second Defendant, if I'm not
8  mistaken.
9          MS. MAYCOCK:  On this, I have the first
10  defendant.
11          THE COURT:  Oh, sorry.  This ruling is telling
12  me the second defendant, but I think you are
13  representative on the first defendant, right Counsellor?
14          MS. MAYCOCK:  She is representing the first
15  defendant.
16          THE COURT:  First and Second.
17          MS. MAYCOCK:  And Philip McKenzie, KC, for
18  representing the third respondent.  And the second or
19  just the third?
20          MR. MCKENZIE, KC: No, just the third.
21          MS. MAYCOCK:  Just the third.  The third
22  respondent.  We also have Ms. Dwana Davis representing
23  Mr. --
24          THE COURT:  Edward Cooper.
25          MS. MAYCOCK:  Edward Cooper.
26          THE COURT:  So sorry.  Start it one more time,
27  Counsel.
28          MS. MAYCOCK:  Mr. Registrar, we last, if
29  memory serves me correctly, we were last before the
30  court sometime I think in November on this matter where
31  we adjourned for a number of reasons.  And one of them
32  was for the taking up, for the petition of Ms. Dwana

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  Davis before the Supreme Court on an application to
2  providing the cross-examination of her clients as well,
3  as the taking of additional, well, the questioning of
4  additional questions to her client.
5          MS. DAVIS:  (Inaudible) I don't think my
6  application related to additional questions.
7          MS. MAYCOCK:  Okay, it was just the
8  cross-examination. Thank you, very much for the
9  clarification.  And the matter was heard before Justice
10  Carla Card-Stubbs, therein Justice Card made an order
11  that, she made an order on the 6th of December, 2023.
12  The order and directions of this court are as follows:
13          1.  The Notice of Application filed by Edward
14  Cooper, Applicant, on first November, 2023 is hereby
15  dismissed.
16          2.  Pursuant to Rule 33.8 of the CPR, the
17  examination of a witness deposed pursuant to the request
18  under the Evidence (Proceedings in Other Jurisdictions)
19  Act, Chapter 66 must be conducted in the same manner as
20  if the witness was giving evidence at trial.  Pursuant
21  to Rule 33.8(5) of the CPR if any person being examined
22  objects to answer any question put to him or her, the
23  ground of the objection and the answer to any such
24  question must be set out in the deposition or in a
25  Statement annexed to the deposition.
26          3.  The Applicant shall pay the cost of an
27  occasion by the application to the Attorney-General, the
28  first Respondent and the third Respondent in relation to
29  this application, which costs were hereby fixed
30  respectively, and that was on the 6th of December, 2023.
31          Mr. Registrar we are now before this honorable
32  court for the continuation of the examination of Mr.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  Edward Cooper, and with your leave, I would like to call
2  Mr. Cooper.
3          THE COURT:  There's no objection, leave
4  granted.
5          MS. MAYCOCK:  Pardon?
6          MS. DAVIS:  I'm sorry.
7          THE COURT:  I said, there's no objection for
8  my leave preliminary.  Wasn't that one of your, no, just
9  listen, wasn't that one of the points you raised before
10  you would have made the application before Justice Carla
11  Card-Stubbs for clarity as well?
12          MS. DAVIS:  (Inaudible)
13          THE COURT:  So, is your issue the fact that,
14  is your issue on the grounds of the additional questions
15  or whether or not the questions are the clarification?
16          MS. DAVIS:  (Inaudible)
17          THE COURT:  Now when you, so sorry, when you
18  refer to the court, which court are you referring to?
19  That's the judge from the original jurisdiction.
20          MS. DAVIS:  (Inaudible)
21          THE COURT:  Okay.
22          MS. DAVIS:  (Inaudible)
23          THE COURT:  But Counsel, this is what I
24  thought would have been, you raised the same point, the
25  same points you're making now.  You'd make this here on
26  the last occasion prior to you making your application
27  before Justice Carla Card.  And so I was under the
28  impression that all of this would have been addressed in
29  your application.
30          MS. DAVIS:  (Inaudible)
31          THE COURT:  But the Notice of Application
32  didn't come before me, the Notice of Application went

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  before the judge, so I --

2          MS. DAVIS:  (Inaudible)

3          THE COURT:  Say it again.

4          MS. DAVIS:  (Inaudible)

5          THE COURT:  Were there a list of questions

6  that was prepared for account for the witness today?

7          MS. MAYCOCK:  There are a list of questions,

8  Mr. Registrar, but these list of questions are akin to

9  clarification because they stemmed from the evidence of

10  Mr. Cooper has made before the courts.  And I should, I

11  mean, Counsel Davis had indicated that there were

12  additional new questions.  I would like to invite her to

13  highlight these new questions that she was referring to

14  because right now, everything that we have on here refer

15  to evidences before the court.

16          THE COURT:  I think she's right.  I mean, it's

17  not for you to identify.  But if you're now - If the

18  question is being put to the witness, you're now

19  objecting to the fact of it is outside the scope of the

20  original order because there are new questions, not so

21  much as though that they are clarification.  And so, if

22  there is an objection to the particular questions, I

23  think it's for counsel, on behalf of the witness to

24  object on the ground that this is not a clarification,

25  this is actually, this is not permissible because it

26  doesn't clarify any of the original points that was

27  made.

28          MS. DAVIS:  (Inaudible)

29          THE COURT:  I think that was provided to

30  previously, correct?

31          MS. DAVIS:  (Inaudible)

32          THE COURT:  Yes.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1          MS. DAVIS:  (Inaudible)

 2          THE COURT:  Yes.

 3          MS. DAVIS:  (Inaudible)

 4          THE COURT:  The registrar's never the

 5  examining guidance.

 6          MS. DAVIS:  (Inaudible)

 7          MS. MAYCOCK:  The first thing I want to say is

 8  that we've come this far by faith.  And right now, it

 9  seems as if every time we come before this court to

10  execute the purpose for which we are here, we have

11  another hurdle to jump over.  And this hurdle my Lord,

12  Mr. Registrar, it is my view that this is not the place

13  for the concerns of Ms. Davis to be raised.  We are

14  here before this court, to pursuant to an order.  An

15  order which has even been further clarified by the judge

16  who had initial carriage of the order.

17          THE COURT:  I think that's her point there

18  exactly as to whether or not it was clarified.  If I'm

19  not mistaken, Counsel's point was that her notice that

20  was adjudicated before the honorable justice was on the

21  grounds as the cross-examination.

22          MS. MAYCOCK:  Correct.

23          THE COURT:  And not in as much as to the

24  additional questions, and that the rightful applicant

25  for clarity, and those additional questions should have

26  came from the the applicant inside this matter.  Am I

27  correct in what I said, Ms. Davis?

28          MS. DAVIS:  (Inaudible)

29          MS. MAYCOCK:  And Mr. Registrar, I stand to

30  say to, that when we appeared before, sorry, before

31  Justice Carla Card, because the issue was raised before

32  you with regards to the additional questions, that was
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1   put before the court, who made a ruling indicating at
2   that particular point in time that as long as the --
3           THE COURT:  Is that in the ruling?
4           MS. MAYCOCK:  Pardon?
5           THE COURT:  Is that identified in the ruling?
6           MS. MAYCOCK:  The fact that an application was
7   made.
8           THE COURT:  No, no, no.  The issue on
9   additional questions.
10          MS. MAYCOCK:  The issue on additional
11  questions.  I see the court referred to it on paragraph
12  84 of the ruling where my Lady speaks that,
13          "The issue was raised as to whether as to
14  whether a witness may be asked specific questions
15  outside of those contained in the court's order.  To my
16  mind, in the examination of a witness, there ought to be
17  scope for clarifying questions.  This dynamic is not
18  unknown in trial.  It could be counter-productive if
19  follow-up questions were not allowed in cases where, for
20  example, the question posed or the answer given was
21  vague or ambiguous or, where the answer is obviously out
22  of context - suggesting a misunderstanding of the
23  question.  I consider clarification questions to be
24  contemplated in the conduct of the examination of a
25  witness being deposed under the regime of the Evidence
26  (Proceedings in Other Jurisdictions) Act."
27          I pause, she continues, "I pause to note that
28  the Act and CPR make provision for the protection of a
29  witness" and it goes on that if we feel that there's an
30  issue, in the event a witness would wish to refrain from
31  answering or object to answering the question, there's
32  protection within the Act.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          And I go on further to note, again, that these
2     are not just additional questions.  We are just seeking
3     clarification.  And I will even go further.  The
4     witness, and I will present before the court an
5     affidavit in which the witness, well, now backtrack a
6     little bit.  Ms. Davis referred to Mr. Dorsett, and Mr.
7     Dorsett is not before the court.  Indeed, Mr. Dorsett is
8     not before the court.

9          But the witness referred to the fact that Mr.
10    Dorsett in his evidence, in his evidence, he referred to
11    the fact that Mr. Dorsett was the Chief, was the Chief
12    Compliance Officer, but in an affidavit that he swore
13    before a US court, or in the US matter, he specifically
14    states that he was the Chief Compliance Officer.  So
15    it's a clarification on his evidence before the court.

16         So, everything that we would like to ask Mr.
17    Cooper is based on evidence he's presented, Mr.
18    Registrar.  It's nothing new, just clarifying what he
19    presented before the courts.  And that was permitted by
20    the ruling, a very well-reasoned ruling from Justice
21    Carla Card.

22         MS. ARCHER-GLASGLOW:  Mr. Registrar, I don't
23    mean to interrupt you, but we do, we are on a time limit
24    here.  I don't understand the proceedings to be where
25    counsel goes back and forth, back and forth.  I think my
26    learned friend made her submissions to the court, then
27    the Attorney-General responded that my learned friend
28    made further submissions, and now the Attorney-General
29    is responding.  I think, now, and then I will have a
30    chance to.

31         MS. DAVIS:  (Inaudible)

32         THE COURT:  Address the court, please, Ms.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  Davis.

2         MS. DAVIS:  Yes, sir.

3         THE COURT:  I got that point, and I think -

4  no, I even think the judge even at some point even

5  addressed the same point you raised as well even if you

6  read paragraph 85.

7         MS. DAVIS:  What is that you are referring to,

8  Mr. Registrar?

9         THE COURT:  When it talks about the protection

10 the witness at the point previously made.

11        MS. DAVIS:  (Inaudible)

12        THE COURT:  Which examining?  You mean the

13 cross-examination?

14        MS. DAVIS:  (Inaudible)

15        THE COURT:  Can I have the question, sorry,

16 can I have a copy of those questions?

17        MS. MAYCOCK:  It's attached to the front of

18 the folder.

19        THE COURT:  Continue.

20        MS. DAVIS:  (Inaudible)

21        THE COURT:  I don't know if you can make that

22 statement.

23        MS. DAVIS:  (Inaudible)

24        THE COURT:  But, I let you -- -

25        MS. DAVIS:

26        THE COURT:  -- You have to let me speak.

27 I'm saying that fact is because the court - The matter

28 was set down for an hearing.  Obviously, you indicated

29 that there was reasons that you were unable to be

30 present.  But on every occasion here, you came before

31 the court.  If I'm not mistaken, I think, on even the

32 last occasion, you had a junior with you, right?  There

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  should have been some representation on behalf of --
2        MS. DAVIS:  (Inaudible) Mr.
3        THE COURT:  -- Of the witness.
4        MS. DAVIS:  (Inaudible)
5        THE COURT:  I'm not - The reason I'm bringing
6  up and I'm going to leave it there, because I don't
7  think that's an issue to be raised in this court,
8  alright.
9        MS. DAVIS:  (Inaudible)
10       THE COURT:  Let me bring this court back to
11 some level of semblance.  We're here to determine
12 whether or not we're going to continue with the
13 questions.  Whether or not these questions are going to
14 be deemed 'additional' questions or these questions are
15 going to be deemed 'clarifying' questions.  I think I've
16 allowed a lot of time, we've done been on this point now
17 for the last 30-minutes, and I'm ready to move on.
18       MS. DAVIS:  (Inaudible) Two points, Registrar.
19       THE COURT:  Yes, but, at the same time,
20 Counsel, if this court makes a decision as to whether or
21 not we're going to accept these questions and allow you
22 to object as the questions are put, or whether or not
23 the court is going to take a position.  You will also
24 have the right to appeal that.
25       MS. DAVIS:  (Inaudible) Yes.
26       THE COURT:  At the end of the day, I cannot
27 use all of the court's time.
28       MS. DAVIS:  Absolutely, much more time.
29 (Inaudible)
30       THE COURT:  But the court, this matter was
31 only set for a certain period of time.
32       MS. DAVIS:  (Inaudible)

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
1           THE COURT:  No, no, no, no, Counsel.  It's not
2   whether or not we have to we have to indicate to you
3   whether or not you have a reasonable, I mean, a specific
4   time was set, you know.  You're an attorney, it is
5   reasonably expected that when you come before the court,
6   yes, you're going to vigorously argue on behalf of your
7   client, but I'm not going to take the entire day.
8           MS. DAVIS:  (Inaudible) The tone of the, Mr,
9   Registrar.
10          THE COURT:  So Ms. Davis, I want to get two
11  points?  Just list your two points, so I can address
12  them as we go so that we can move on.  What are the two
13  points that you're going to receive objection points
14  with?
15          MS. DAVIS:  Mr. Registrar - (Inaudible)
16          THE COURT:  But, this is the point I'm
17  making.  Counsel on behalf of the Attorney General's
18  office has already indicated to this court that she
19  referred to quote the paragraph 84 of the judge's
20  ruling, where she said, where the judge said, I consider
21  clarification questions to be contemplated in the
22  conduct of the examination.  And so it comes back to the
23  point that I was previously making.  Whether or not the
24  questions are going -- The court is going to treat these
25  questions are 'additional' question, or the court is
26  going to treat these as 'clarification' questions.
27  That's the point I'm making.
28          Now you made the point, and you said whether
29  you're treating the judge's ruling as open because the
30  perhaps the judge is not properly equipped with all of
31  the information because, what, I don't know if you are
32  going to deem it as ex parte in the absence of counsel
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  on behalf of Mr. Cooper.  But I said to you, and I said
2  to you whether or not that's something that should be
3  addressed inside this court.  That's not something that
4  should be addressed this court as to whether or not Mr.
5  Cooper's attorney was present before the originating
6  judge.  It's not for me to make that determination as to
7  whether or not it's the judge's decision to obiter --
8          MS. DAVIS:  (Inaudible)
9          THE COURT:  -- But you made a statement to
10 that effect.
11         MS. DAVIS:  I was not saying because we
12 weren't, present - (inaudible)
13         THE COURT:  But --
14         MS. DAVIS:  (Inaudible)
15         THE COURT:  -- Ms. Davis, now, let me address
16 - Let me stop you there.  Any point that was raised
17 before the judge of original jurisdiction, to me, at the
18 end of the day, where you said whether or not you're
19 aware that point is going to be - To me, it's moot.
20 And the reason is moot is because it was your
21 application.
22         MS. DAVIS:  We don't need to -
23         THE COURT:  No, this is the point.  Well,
24 okay, let's bring it back, then.  I've made my decision
25 that I'm going to allow the questions to be put to the
26 witness.  If there's an objection as to any of the
27 questions as to whether or not they're 'clarification'
28 questions or 'additional' questions. You have to leave
29 to raise those questions on your feet.  Could you please
30 call the witness, Mr. Edward Cooper.
31         MS. DAVIS:  (Inaudible)
32         THE COURT:  Yes, ma'am.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

 1          MS. DAVIS:  I would like to say.  If Counsel
 2  making objections, legal objections, there is no need in
 3  my view for a certain degree of deportment or conduct or
 4  response towards counsel --
 5          THE COURT:  Ms. Davis, if you feel as though,
 6  yes, if you feel as though that there was some, there
 7  was some improper conduct on my behalf, *that,* I will
 8  withdraw, but I now need to conduct a marshall this
 9  deposition fairly.
10          MS. DAVIS:  (Inaudible)I definitely --
11          THE COURT:  And I accept that.
12          MS. DAVIS:  (Inaudible)
13          THE COURT:  That's not an issue before this
14  court, that's not an issue before this court.  If you
15  want to raise any preliminary objections to that point
16  that matter should be raised before the court of
17  original jurisdiction. My capacity as Registrar --
18          MS. DAVIS:  (Inaudible)
19          THE COURT:  Well, which court to give
20  direction?
21          MS. DAVIS:  (Inaudible)
22          THE COURT:  That's fair enough.
23          MS. DAVIS:  That's fair enough.  So what we
24  would do in those circumstances, we will allow the
25  matter to continue, the same thing I believe Mr.
26  McKenzie raised on it on a previous point, that if it is
27  that an application is being made to question the
28  validity of these questions or anything, we allow the
29  deposition continue.  Alright.  And when the judge or
30  when your application is heard, if there's anything that
31  would need to be struck from the record, or we would not
32  disseminate.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          MS. DAVIS:  (Inaudible)

2          THE COURT:  That doesn't act as a stay in this

3   matter.  It doesn't act as a stay.

4          MS. DAVIS:  (Inaudible)

5          THE COURT:  Because the ruling is right there

6   and the ruling is very clear.  The ruling says, "I find

7   no merit in the Applicant's unsupported ground that the

8   CPR does not contemplate cross-examination."

9          MS. DAVIS:  I'm not raising that.  I said

10  (inaudible).

11         THE COURT:  Ms. Davis, why you didn't start

12  with that point?

13         MS. DAVIS:  No, but I (inaudible)

14         MS. ARCHER-GLASGOW:  I'm sorry, Mr. Registrar,

15  if I may.  I haven't even had a chance to address the

16  court, which I'm hired to do as well as a Mr. McKenzie,

17  KC, but just to clarify, this is not a re-examination.

18  This is a continuation of the deposition being taking.

19  This is not a *re-examination*.

20         On the last occasion, the continuation of the

21  examinations was adjourned to give my learned friend the

22  courtesy to make applications in the Supreme Court, and

23  in any event, the matter was being adjourned.  So just

24  to clarify, this is not a *re-examination*.

25         MR. MCKENZIE, KC:  Good morning, Mr.

26  Registrar, and I promise you I won't prolong this aspect

27  of these proceedings.  I think, Ms. Davis' point, just

28  to help her clarify, she probably just needs my

29  assistance on that.  Is that, assuming that I

30  cross-examine, whether it's her or the person who does

31  the chief.  The question is whether she will be

32  entitled, I think to re-examine.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1            THE COURT:  Yes.  Mind you, and let me
2    clarify.  And like I told Ms. Davis.  I think the
3    preliminary point that she reads in terms of the the
4    legalistic view of the approach has merit as to whether
5    or not the witness is actually, the witness of the SEC,
6    and who is marshalling the evidence.  But, the point I'm
7    simply making is whether or not that is an issue that
8    comes before me and my capacity.
9            MR. MCKENZIE, KC:  I understand.
10           THE COURT:  As just the marshall of the
11   deposition.  And that's why I said to counsel a while
12   ago, that should have been a point that she, the point
13   of the filing of an application, to question the
14   validity.
15           MR. MCKENZIE, KC:  Yes, yes.
16           THE COURT:  It should have been, in my humble
17   estimation, it should have been the starting point.  And
18   I think, and I said, that I think even the judge of
19   original jurisdiction made some recognition as to the
20   protection of the witness or even acknowledge that
21   particular point at paragraph 85 of her ruling.  And it
22   should have been something that all of these issues, I
23   think, was previously raised before me in this capacity
24   in which, I will repeat myself, that under this
25   capacity, I'm only under strict order to ensure that the
26   evidence or the questions are put before a particular
27   witness.
28           MR. MCKENZIE, KC:  Yes.
29           THE COURT:  I have no jurisdiction, my
30   jurisdiction goes no further than that in a deposition,
31   alright.
32           MR. MCKENZIE, KC:  Yes. Yes.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1        THE COURT:  And I was under the impression
2    that all of these preliminary objections, in terms of
3    lee (sic), whether or not the rules is properly been
4    followed, or the legality and the interpretation of a
5    particular section of the rule would have been raised
6    before the judge of original jurisdiction.
7        MR. MCKENZIE, KC:  Yes.
8        THE COURT:  But to comeback here to bring up
9    these same points where I have no jurisdiction to
10   interpret the law, even though I may have a particular
11   view.  To me is no moment.   She's accurate, where you
12   file a particular application that has to go back to the
13   judge of original jurisdiction.  My capacity is very
14   limited in a deposition.
15       MR. MCKENZIE, KC:  Yes.  Yes.  And, Mr.
16   Registrar, I accept the position that you have just
17   expelled the original order of the Supreme Court that
18   clearly establishes who are entitled to examine the
19   witnesses, so I accept that position.  So that's, it's
20   at that, is in that court where the question as to who
21   examine the witness is established.
22       THE COURT:  Yes.
23       MR. MCKENZIE, KC:  I accept that.
24       THE COURT:  So, like I'll repeat myself, I
25   will allow the questions, and as the questions arise.
26   If there's a dispute as to whether or not it's a
27   clarification, or it's an additional question outside of
28   the original questions contained in the original order,
29   then counsel is allowed or has liberty to object.
30       MS. DAVIS:  (Inaudible)
31       THE COURT:  Which court you want this in?
32       MS. DAVIS:  (Inaudible)

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          THE COURT:  I'm not going to accede to that
2     application, Counsel.  I'm not going to accede to that
3     application to stand this matter down.  Alright?  I
4     think that notwithstanding your position, that if there
5     was any application for a stay of this, of any questions
6     to put to this particular witness that counsel had ample
7     time to do so and to notify this court.
8          MS. DAVIS:  Immediately after (inaudible)
9          THE COURT:  Yes.
10          MS. DAVIS:  (Inaudible)
11          THE COURT:  No, and I'm following you.  Even
12     the questions that you put in the email, it still
13     doesn't change the outcome in terms of whether or not
14     your position.
15          MS. DAVIS:  The email was to give you what I
16     have. (Inaudible)
17          THE COURT:  That's fine.  You, you, in your
18     order --
19          MS. DAVIS:  (Inaudible)
20          THE COURT:  Yes, Ms. Davis.
21          MS. DAVIS:  (Inaudible)
22          THE COURT:  And I understand that, but I made
23     a position.  I took --
24          MS. DAVIS:  (Inaudible)
25          MS. MAYCOCK:  Mr. Registrar, I thought we've
26     already ventilated that and seems if we're ventilating
27     that again.  And I, as you've indicated, there's no stay
28     to the ruling of Justice Carla Card-Stubbs.  So, we are
29     here before the court ready to ask the questions. To put
30     the questions to Mr. Cooper.
31          THE COURT:  Yes.  Yes.  I'm going to continue
32     with the deposition, Ms. Davis, notwithstanding, notice

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  given to the court.   You can the witness, Mr. Edward
2  Cooper.
3  E D W A R D   C O O P E R, having been called as
4  witness, being duly affirm, testified as follows:
5  EXAMINATION IN CHIEF BY MS. MAYCOCK:
6      Q.   Good afternoon, Mr. Cooper.  How are you
7  doing, sir?
8      A.   Not the best physically.  Suffering from the
9  flu a bit.
10     Q.   Okay.  Keep your flu over there.  Okay, Mr.
11 Cooper, in your evidence.  Sorry, one second.  I'm
12 trying to get your initial questions.  I'm referring to
13 questions 22.
14         THE COURT:  I'm looking at part two.  Is this
15 is the same document we're referring to, Ms. Maycock?
16         MS. DAVIS:  Yes.
17         MS. MAYCOCK:  Pardon?
18         THE COURT:  Is this the same document that was
19 --
20         MS. MAYCOCK:  That's the same document I'm
21 asking the questions from.
22         MS. DAVIS:  I don't have that.
23         THE COURT:  There's just one paragraph at the
24 back.
25         MS. MAYCOCK:  One second, please, Mr.
26 Registrar.
27 BY MS. MAYCOCK:
28     Q.   Okay, Mr. Cooper, sorry about that.  This
29 answer of this question relates to, and I refer you to
30 the question related to question 22.  Ms. Davis and Mr.
31 Registrar, 22 of the original question.  And in your
32 evidence, you indicated that you had stopped working at

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  SureTrader when we asked what were your duties and
2  responsibilities.  Can you tell the court when did you
3  stop working at SureTrader?
4        MS. DAVIS:  (Inaudible).
5        MS. MAYCOCK:  He gave a period.  I'm asking
6  *when* did he stop working at SureTrader?  Mr. Registrar,
7  I'd like to know the date he stopped working at
8  SureTrader.
9        THE WITNESS:  SureTrader was liquidated 2019.
10 By MS. MAYCOCK:
11      Q.   Month?  Was there a month, particular?
12      A.   December, at the end of the year.  I said
13 that.
14      Q.   Okay.  It was liquidated in December 2019.
15 And that was the reason why you've stopped working at
16 SureTrader?
17        MS. DAVIS:  (Inaudible). I already asked him
18 that.
19 BY MS. MAYCOCK:
20      Q.   Okay, Mr. Cooper.  Mr. Gentile, you'd
21 indicated that, when we asked what was his role at
22 SureTrader, you'd indicated that you did not know.
23      A.   I indicated that Mr. Gentile - I did not know?
24 He was the CEO, owner of the company, still is.  So I
25 didn't say, "I did not know."
26      Q.   And being the CEO, what was, you'd indicated
27 to, that you had no involvement with Mr. Gentile.  So,
28 can you expound, being the CEO, and you're being an
29 employee of the SureTrader, what was the relationship
30 between the two of you?
31        MS. DAVIS:  He indicated those details.
32 (Inaudible)

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1          MS. MAYCOCK:  The next sets of questions will
 2  be question number 24.  It relates to question 24.
 3  BY MS. MAYCOCK:
 4      Q.   While employed at SureTrader, who did you, who
 5  was your boss?
 6          MS. MAYCOCK:  Mr. Registrar, can you have him
 7  answer the question, "who did he how did he report to as
 8  the boss?"  And he also indicated that he reported to
 9  nobody.  So, if he works in an institution, he must
10  report to somebody.
11          THE COURT:  I wouldn't allow that question.
12  You can move faster.
13  BY MS. MAYCOCK:
14      Q.   Okay, Mr. Cooper. During what time period did
15  you work with Mr. Dorsett?
16          MS. DAVIS:  (Inaudible).
17          MS. MAYCOCK:  Mr. Cooper, when did Mr. Dorsett
18  stop working at SureTrader?
19          THE COURT:  No, no.  Okay.  Because we're
20  going to be back and forth all day.  I'm trying not to
21  do this.  Counsel is correct, Ms. Maycock.  If the court
22  is going to allow these clarification questions, you
23  have to lay the foundation for the purpose in which
24  you're trying to clarify.  So if you're going to ask him
25  at what time period did you work for Mr. Dorsett, then
26  the question is, how did that arise from the previous
27  question.  And what is the point that's being clarified
28  in order for the question to be allowed.
29  BY MS. MAYCOCK:
30      Q.   Okay, Mr. Cooper, in your evidence you said
31  that Mr. Dorsett was the Chief Compliance Officer during
32  the time you worked there.  Am I correct in saying that?
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1       A.    Yes, he was the Chief Compliance Officer.
2       Q.    During what period, can you remember what
3    period he was the Chief Compliance Officer?  Because we
4    have evidence, Mr. Registrar, that Mr. Cooper was at one
5    point in time the Chief Compliance Officer, yet he said
6    that he was not.  And Mr. Dorsett was the Chief
7    Compliance Officer.  I just need to know at what point
8    period that Mr Dorsett was the Chief Compliance Officer
9    at SureTrader because they all both work together at the
10   place the same time.
11           MS. DAVIS:  (Inaudible).
12           MS. MAYCOCK:  That's hearsay evidence, Mr.
13   Registrar, we bring him before the courts.  The
14   newspaper.
15           MS. DAVIS:  (Inaudible).
16           THE COURT:  Okay, so, on the last occasion at
17   question 11, Mr. Cooper was asked, "What was his title?"
18   Didn't he specify that he was the Chief Compliance
19   Officer of SureTrader?
20           MS. MAYCOCK:  Not to my knowledge, he didn't.
21   He always denied that he was the Chief Compliance
22   Officer.
23           THE COURT:  What was his response?
24           MS. MAYCOCK:  That's the reason why --
25           THE COURT:  Did you have his questions
26   there?  Has answer to his question?
27           MS. MAYCOCK:  That's number 11.
28           THE COURT:  The original questions.  Do you
29   recall what your answer was, Mr. Cooper?
30           MS. MAYCOCK:  That was his evidence.
31           MS. DAVIS:  (Inaudible).
32           MS. MAYCOCK:  Okay.  Your point in setting the

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  stage, Mr. Registrar, is well-noted.  Mr. Cooper had
2  indicated that he was aware of a US matter.  And I'd
3  like to bring before the court an affidavit that was
4  sworn in this US matter by Mr. Cooper.  Now this is just
5  presenting an evidence that, evidence to justify the
6  evidence of Mr. Cooper.   Mr. Edward Cooper has sworn an
7  affidavit in the US court.  I will hand this over to the
8  court.
9          THE COURT:  The documents in particular, she's
10 asking the court to look at a document from which this
11 matter originated from.
12         MS. MAYCOCK:  I will. (Inaudible)
13         THE COURT:  All of this related? Continue Ms.
14 Davis.
15         MS. DAVIS:  (Inaudible).
16         THE COURT:  That's why I said let me see, and
17 let me see the question so I can make a determination;
18 let me see the point.  I'm following you.  Which point
19 are you directing the question?
20         MS. MAYCOCK:  Okay.  I just want to find out
21 from Mr. Cooper, if he sworn --
22         THE COURT:  No, you're referring the court to
23 something in this particular matter.
24         MS. MAYCOCK:  Okay.  Yes.  I wanted to refer
25 the court to the fact that Mr. Cooper had indicated that
26 he was Chief Compliance Officer.  Paragraph 4 of the
27 affidavit, Mr. Registrar.
28         THE COURT:  Okay.  I'm so, sorry, do you need
29 to see sight of this?
30         MR. MCKENZIE, KC:  Yes, Mr. Registrar,I have a
31 copy.
32         THE COURT:  Okay.  Ms. Davis, do you need to

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  see sight of this?

2          MS. MAYCOCK:  And, Mr. Registrar, this is not

3  my evidence, this is Mr. Cooper's previous evidence

4  before the US court, and I just want to confirm, for him

5  to confirm at this particular point in time, what was

6  his role at SureTrader while employed there.

7          THE COURT:  You said you want to know what his

8  role was?

9          MS. MAYCOCK:  Yes, he indicated. This is his

10 evidence before the US court.  And he's indicated before

11 *this* court that he was Compliance Officer.  I just want

12 to confirm whether this is his evidence before the US

13 court.

14         THE COURT:  Yes, because the US, wait, so,

15 holdup, did the issue with the US court arise in his

16 original question?

17         MS. MAYCOCK:  In the original question?

18         THE COURT:  In his original examination.

19         MS. MAYCOCK:  Yes, it was.  It was raised in

20 the original examination.  The fact that we are, not the

21 issue with the US, but we asked what was his role at

22 SureTrader?

23         MS. DAVIS:  So, that was not the same thing,

24 right?

25         MS. MAYCOCK:  But we put before the court, my

26 Lord, sorry, Mr. Registrar.

27         THE COURT:  His original examination, did we

28 did it ever, did anything ever arose as to whether or

29 not he gave, that he gave an affidavit, he swore an

30 affidavit.

31         MS. MAYCOCK:  No. And I actually, I wanted to

32 lay it before the court so we can bring in evidence and

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  have an exhibit as Mr. Cooper's, as an exhibit to his
2  evidence, that it does this afternoon.
3         MR. MCKENZIE, KC:  Mr. Registrar, I will
4  object to that only because this affidavit would bring
5  in other evidence which clearly takes them outside of
6  the order of the Justice Card-Stubbs, so for that
7  reason, and that reason alone, I will object to that.
8  So, for example, the --
9         THE COURT:  I completely follow you.
10        MR. MCKENZIE, KC:  Yes.
11        MR. MCKENZIE, KC:  I complete follow you.
12 By MS. MAYCOCK:
13    Q.   Mr. Cooper, after Mr. Dorsett, the Chief
14 Compliance Officer, stopped working at SureTrader, what
15 was your responsibility?
16        MS. DAVIS:  (Inaudible).
17        MS. MAYCOCK:  I don't think we asked after, I
18 don't think we asked Mr. - We put the question to him,
19 after Mr. Dorsett left, what was his responsibilities,
20 because I'm still trying to establish what Mr. Cooper's
21 responsibilities were at SureTrader?
22        THE COURT:  He never stated what his
23 responsibilities were?
24        MS. MAYCOCK:  He said he did nothing.  And I
25 guess that's his evidence.  Thank you, very much.
26        THE COURT:  No, no, no.  You can't do that,
27 Ms. Maycock.  You can't do that.
28        MS. MAYCOCK:  If you did nothing, then that is
29 his evidence.
30        THE COURT:  No, I'm not saying that part.  You
31 can't say, "Thank you, very much", and then put Counsel
32 out when she's making an objection to the point that you

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  raised.  Continue Ms. Davis.

2          MS. DAVIS:  (Inaudible).

3          MS. MAYCOCK:  Mr Registrar, I can continue

4  with my evidence?

5          THE COURT:  Yes, you can.

6  BY MS. MAYCOCK:

7      Q.   Mr. Cooper, is it your evidence that you were

8  never Chief Compliance Officer at SureTrader?

9          THE COURT:  That's a clarifying question, Ms

10 Davis.

11         MS. MAYCOCK:  I'm just confirming, Mr.

12 Registrar, I'm just confirming.

13         MS. DAVIS:  (Inaudible).

14         THE COURT:  Even in the order, in the order,

15 he was, in the order itself, I think that point needs to

16 be clarified because even in the original order of the

17 court he is deemed, he is listed in the original order

18 as Chief Examiner, Chief Compliance Officer?

19         MR. MCKENZIE, KC:  Yes.

20         MS. DAVIS:  (Inaudible).

21         MS. MAYCOCK:  Mr. Registrar, I am only asking

22 a question --

23         THE COURT:  No, let her finish, Ms. Maycock.

24         MS. DAVIS:  (Inaudible).

25         THE COURT:  No.  I just think it's a

26 clarification point better not, because there were two

27 persons, according from what I understand, there may

28 have held probably similar capacities.  Whether it was

29 Mr. Cooper or Mr. Dorsett, as to whether a clear

30 determination as to what their responsibilities were.

31         MS. DAVIS:  (Inaudible).

32         THE COURT:  And I think the question is a fair

AGvSecuritiesExchange 2023CLEgen00125

```
 1   question.  What, at ever what at anytime were you ever
 2   the Chief Compliance Officer?  So that means, were you
 3   the overall head or did you have persons who carried out
 4   certain functions under you?  Or if you wasn't --
 5           MS. DAVIS:  (Inaudible)
 6           THE COURT:  And I think that goes to a
 7   clarifying point.  At what point, I mean, at anytime
 8   were you the Chief Compliance Officer?
 9           MS. DAVIS:  (Inaudible).
10           THE COURT:  I'm not referring to that
11   affidavit, you know.
12           MS. DAVIS:  (Inaudible).
13           THE COURT:  I'm referring to - And I'm
14   following what you're saying, but I'm saying to you for
15   clarification point as well even for this court.  Follow
16   me, follow me.  In the original order in this before
17   this, in *this* jurisdiction.
18           MS. DAVIS:  Right.
19           THE COURT:  He is listed as a Chief Compliance
20   Officer.  And so the things, and then at question 11,
21   when asked, the original question 11, what was your
22   title?  He said, "Compliance Officer."  So I think what
23   counsellor is now attempting to clarify, is whether or
24   not.  Okay, you're saying --
25           MS. MAYCOCK:  You're being truth1ful.
26           THE COURT:  Let's takeaway from the first
27   after, I would call it the foreign affidavit, and I'm
28   looking at whether or not the title in the original
29   order of the court, and the court is Chief Compliance
30   Officer or him saying - So it's just for clarification
31   point.  So are we now just dropping the Chief and you're
32   just a regular Compliance Officer?
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1            MS. DAVIS:  (Inaudible).
 2            THE COURT:  I'm not referring to the affidavit
 3  before the US court.
 4            MS. DAVIS:  (Inaudible).
 5            THE COURT:  I'm not perplexing, you keep going
 6  back the affidavit. I've, you're --
 7            MS. DAVIS:  (Inaudible).
 8            THE COURT:  Okay, I'm ready to move past this
 9  foreign affidavit.  I'm here dealing with what's
10  happening in this jurisdiction as the question of what
11  was the witness responsible for, because like I said,
12  there were two persons at the time, according to the
13  information out before this court.   Mr. Dorsett, Mr.
14  Cooper, who probably had some parallel responsibilities.
15            MS. DAVIS:  Sorry.
16            THE COURT:  Distracting you.  That's fine.
17  That's fine.
18            MS. DAVIS:  (Inaudible)
19            THE COURT:  So I mean, I really don't see any
20  issue as to that particular question.  I mean, I'm
21  following where you going, where *you're* going.  But in
22  terms of this jurisdiction, I really didn't see any harm
23  in that particular question as a 'clarification point'.
24  If he is, all he had to just say, you I know, "I repeat
25  my original answer."  I can't see the harm in that.
26            MS. DAVIS:  Okay.
27            THE COURT:  That's all I'm saying.  Ms.
28  Maycock, you have leave to repeat your question.
29  BY MS. MAYCOCK:
30     Q.   Mr. Cooper?  I even forgot my question.
31     A.   I'll take the Registrar.  I will repeat my
32  original answer then.
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          THE COURT:  No, you can't say you take the
2    Registrar.  Repeat the question, please.
3    BY MS. MAYCOCK:
4          Q.    Mr. Cooper, at no point were you ever Chief
5    Compliance Officer?
6          A.    Mr. Dorsett left the company in 2017 of July.
7    And they sent, the Securities Commission had to come in
8    and do an audit within the company, and I *could not* give
9    a response to the Securities Commission.  So they
10   needed, they have a Chief Compliance Officer to respond
11   to them.  So the company had to do a resolution
12   appointing me.  So I don't, you know, hence the other
13   thing came up, so.
14         Q.    Okay.
15         A.    Again, I, my conditions are still the same.  I
16   onboarded account, the procedures and all those things,
17   nothing else other than that.  I've answered everything
18   correctly as in this court.  I don't lie about anything.
19         Q.    Okay.  Thank you, very much, Mr. Cooper.
20   We're not saying that you're, we just want get, we want
21   to make sure that we have the evidence.
22         A.    But I'm not framing myself.
23         Q.    You refer to "the other thing came up".  What
24   is the other thing?
25         A.    What other thing?
26         Q.    In your evidence just now you said that asked
27   Securities Commission came in and then the other thing
28   came up?
29         A.    I was telling you, meaning that they had to
30   have me registered to them as Chief to be able to
31   respond to them.  That's what I'm saying.
32         Q.    Okay, that's the other thing.  Okay, thank you

AGvSecuritiesExchange 2023CLEgen00125

1  very much, Mr. Cooper.  Mr. Registrar, I think that's

2  the end of our examination of Mr. Cooper.

3          THE COURT:  Re-examination?

4          MR. MCKENZIE, KC:  Cross.

5          THE COURT:  I'm so sorry, cross for Ms. Davis.

6          MR. MCKENZIE, KC:  Thank you.

7          MS. MAYCOCK:  Oh, I'm sorry.  It was my

8  misunderstanding, Mr. Registrar.  I was told this is the

9  last one under that particular number, but not under the

10 other.

11 BY MS. MAYCOCK:

12     Q.   Sorry, Mr. Cooper, I have to continue.  You're

13 almost done, I only have a couple more questions.  One

14 second for me.  The next question refers to question 68.

15         THE COURT:  Mhm-mhm.

16         MS. MAYCOCK:  Okay, yes.  Under 68, when we

17 asked you, "What employees did SureTrader was

18 responsible for reviewing new customers' application?",

19 you said you did not.  You were not responsible.  So, a

20 question --

21         MS. DAVIS:  (Inaudible)

22         MS. MAYCOCK:  He'd indicated that he was not

23 responsible what employees the short term was

24 responsible for reviewing new customers application, you

25 said

26         MS. MAYCOCK:  So a question -- -

27         MS. DAVIS:  (Inaudible).

28         MS. MAYCOCK:  He indicated think that he was

29 not, he didn't have anything to do with it.  He was not

30 responsible for reviewing that refers to question 68.

31         THE COURT:  Reviewing new customers'

32 application.  He said that was not his responsibility.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          MS. MAYCOCK:  So my question is, if a new
2    customer listed a US base addressed on their
3    application, what policy does SureTrader have regarding
4    how the application was to be processed?
5          MS. DAVIS:  (Inaudible).
6          MS. MAYCOCK:  Any indicator that he didn't
7    have anything to do with it.
8          MR. MCKENZIE, KC:  Yes, and -- Sorry.
9          MS. DAVIS:  (Inaudible).
10         MS. MAYCOCK:  With regards to new customers.
11         MR. MCKENZIE, KC:  And the present question
12   is, what is the present question?
13         MS. MAYCOCK:  The present question is, if a
14   new customer - We're still asking about new customers.
15         MR. MCKENZIE, KC:  Okay.
16         MS. MAYCOCK:  So if a new customer is listed
17   a, and all this is in his capacity.  So if a new
18   customer listed a US-based address on their application,
19   what policy did SureTrader have regarding how the
20   application was to be processed?
21         MS. DAVIS:  (Inaudible).
22         MS. MAYCOCK:  Mr Cooper, is that the case?
23         THE WITNESS:  Yes, it is the case.
24   By MS. MAYCOCK:
25     Q.   Okay, so if a new customer listed to US-based
26   address on their application, what steps did SureTrader
27   take before approving new customers.  Do you know?
28     A.   I think you're confusing the whole question.
29     Q.   Okay.  Again, we're still trying as, in the
30   capacity as Compliance Officer.  We want to know what
31   happened when a new customer listed a US-based address
32   on their application.  What steps did SureTrader take

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  before approving the customer?

2      A.   I answered that.  I answered that already,

3  that all customers were done the same way; they were

4  treated the same way.

5      Q.   They were treated the same way?

6      A.   Yes.

7      Q.   In what was that?

8      A.   All compliance-related questions that needed

9  to be asked, they had to make certain that everything

10  was onboarded the same process.  No one was given any

11  special privilege.

12      Q.   Okay.

13      A.   That was answered already in many different

14  ways.

15      Q.   So --

16      A.   You've asked that the last time in several

17  different ways.

18      Q.   I apologize if I (*sic*) feel as if I'm

19  bothering you, but I'm just trying to get clarification

20  on the evidence.

21      A.   I accept your apologies, but I've answered

22  that totally, and in totality.

23      Q.   The side --

24          MS. DAVIS:  (Inaudible).

25          MS. MAYCOCK:  Ms. Davis, I'm trying to find

26  40.

27          MS. DAVIS:  Yes.

28          MS. MAYCOCK:  I, thank you, very much.  Mr.

29  Cooper, I thank you very much for the evidence.  I am

30  finished Mr. Registrar.

31          THE COURT:  Cross-examination.

32          MR. MCKENZIE, KC:  Yes.  Thank you, Mr.

AGvSecuritiesExchange 2023CLEgen00125

1  Registrar.  Let's go by - I won't be long.  Mr. Cooper,
2  I'll start where you ended.
3  CROSS-EXAMINATION BY MR. MCKENZIE, KC:
4       Q.   So, when, I think he had said that all
5  customers were treated the same.  Would I be correct in
6  saying that the firm had a 'popup blocker' on his
7  systems when it receive an interest from US base
8  customers?
9       A.   Yes.  When you say blocker?
10      Q.   Well, can you - You know, a popup blockers are
11  like a some type of electronic system.
12           THE COURT:  Like a firewall?
13           MR. MCKENZIE, KC:  Like an alert that says --
14           THE WITNESS:  No, we don't have a firewall.
15  We didn't have a firewall in there.
16  BY MR. MCKENZIE, KC:
17      Q.   No, but you didn't have anything that pop up
18  in the US customer --
19      A.   No.
20      Q.   US-based customer made inquiries?
21      A.   All enhanced due diligence were done on all
22  customers.
23      Q.   I understand that.
24           MS. DAVIS:  (Inaudible).
25           MR. MCKENZIE, KC:  No, I'm only asking him a
26  question, the answer is either --
27           MS. DAVIS:  (Inaudible) So sorry.
28           MR. MCKENZIE, KC:  So inquiries means that if
29  I go, if a customer reaches out and say, a US-based
30  person reach out and say, "I want to do business with
31  the firm", and that's on them.  At any level --
32           THE COURT:  Was there anything technologically

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  ahead of them?
2          MR. MCKENZIE, KC:  -- I want to know what
3  services you provide.  I want to open an account with
4  you - Telling me how to proceed.  At any level at any
5  stage.
6          THE WITNESS:  Okay.  No, I came from a company
7  which had all those kinds of things, but this one did
8  not.
9          MR. MCKENZIE, KC:  Okay, so this one didn't
10 have any.
11         THE WITNESS:  No, we didn't have any blocks.
12         MR. MCKENZIE, KC:  Okay.  Were US-based
13 customers required to sign non-solicitation
14 Acknowledgement Form?
15         MS. DAVIS:  I think. (Inaudible)
16         MR. MCKENZIE, KC: Yeah, but I could.  Of
17 course, but I can ask, but I could start over from the
18 very beginning.  Excellent question, at cross, but I
19 would not, that's not my objective here.
20         THE WITNESS:  Everyone signed a nondisclosure
21 solicitation for us.
22     Q.   Every customer?
23     A.   Every customer.
24     Q.   But you sure that it wasn't just US-based
25 customers?
26     A.   The US-based customers signed, all of those
27 signed, the US customer signed those.
28     Q.   Okay.
29     A.   But when I came to the firm, I met those
30 things in place.
31     Q.   Yes, I understand that.  So these were
32 policies you met in place?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1    A.   Yes, sir.

2    Q.   Okay.  But, just to make, be absolutely clear.

3 Customers with a US address were required to sign a

4 non-solicitation US form?

5    A.   Yes.

6    Q.   And the, without being very simplistic about

7 it, would it be correct to say that the point there was

8 to say that the firm didn't reach out to them for

9 business.

10    A.   Again, I had no concerns for the solicitation,

11 or any kind of requesting for clienteles.  That was not

12 my forte.

13    Q.   Understood.  Now, so you said that when you

14 joined the firm you met those policies in place?

15    A.   Every one of them in place.

16    Q.   And that, would that be true of all of the

17 compliance-related policies?

18    A.   Yes, sir.

19    Q.   You met them in place when you got there?

20    A.   Yes, sir.

21    Q.   Okay.  And I think it's, you said this

22 earlier, but the, from the time you were there at the

23 firm, the only, the person who was Chief Compliance

24 Officer, I think you said earlier was Philip Dorsett.

25    A.   Yes, sir.

26    Q.   Except for a very short period, and for that

27 when you, when he was.

28    A.   Yes.

29         MR. MCKENZIE, KC:  Mr. Registrar, that's the

30 extend of my cross-examination. Thank you.

31         THE COURT:  Thank you, Mr. Cooper.  You are

32 excused.  Are we moving on to the next witness?  There's

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1 one more, Ms. Maycock?  You have one more witness,

2 correct?

3         MS. MAYCOCK:  I have one witness, Mr.

4 Registrar.  That completes --

5         THE COURT:  I think you're just here on behalf

6 of Mr. Cooper, right?

7         MS. MAYCOCK:  Yes, and I -- This is a private

8 deposition.

9         THE COURT:  I know you mind my good company.

10 Unless you mind my good company.

11        MS. DAVIS:  (Inaudible).

12        MR. MCKENZIE, KC:  Ms. Cooper don't have an

13 interest in this, Ms. Davis, sorry, may have an interest

14 in this.  The transcripts, the files - I don't know if

15 she might have an interest or a moment that will be

16 available just because she's leaving.

17        THE COURT:  Yes.  For, I think for this one

18 and the first examination of Mr. Cooper.

19        MS. MAYCOCK:  We have - I thought you returned

20 the first sets.

21        THE COURT:  No, I think the first set was not,

22 was redacted, was suspended until the termination of the

23 decision of Justice Card-Stubbs.

24        MS. MAYCOCK:  Right.

25        THE COURT:  So that was not included on the

26 chapter audio nor was the written transcript provided to

27 counsel.

28        MS. MAYCOCK:  Right.

29        MR. MCKENZIE, KC:  Just to be clear, Mr.

30 Registrar, are you in possession of the jump drive?

31 Because I was told by my junior that --

32        THE COURT:  I may.  If you want a copy of the

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  audio.

2          MR. MCKENZIE, KC:  Yes.

3          THE COURT:  Yes.  That's fine.  You can just

4  email me and get it to my office, and we'll make

5  application for it.  I will just double-check my

6  possession of your jump drive.

7          MR. MCKENZIE, KC:  Yes.

8          THE COURT:  I don't, I thought everybody

9  collected their jump drive.

10          MS. MAYCOCK:  I think we did.  Yes, we did

11  mine.

12          THE COURT:  I think Mr. Lightbourne collected

13  yours.

14          MS. DAVIS:  He collected it?

15          THE COURT:  Yes.

16          MS. DAVIS:  Okay.

17          MR. MCKENZIE, KC:  Okay, so -

18          THE COURT: And I have one.  That means the one

19  I have is yours.

20          MR. MCKENZIE, KC:  Yes.  Thank you. Thank you,

21  Mr. Registrar.

22          MS. DAVIS:  You have it?

23          THE COURT:  You have it, correct?  You have

24  the jump drive?

25          MS. MAYCOCK:  We have to get it.

26          MS. DAVIS:  And we'll send it back today.

27          THE COURT:  Yes.

28          MS. DAVIS:  Yes, sir.

29          THE COURT:  Yes.  Well, I know the jump drives

30  were collected from here, and so I know all of who

31  provided the last jump drive, so I should have the other

32  one.  What's the name of the next witness?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1           MS. MAYCOCK:  Janay Symonette-Pyfrom.

2           THE COURT:  You can call her in.  Bring her

3    forth.  She spells it, G-E-N-A?

4           MS. MAYCOCK:  J-A-N-A-Y.

5           THE COURT:  Do you have questions for her?

6           MS. MAYCOCK:  Pardon?

7           THE COURT:  Do you have questions for her?

8           MS. MAYCOCK:  I can give you one without

9    anybody's handwriting on it.

10   J A N A Y   S Y M O N E T T E - P Y F R O M, having been

11   called as witness, being duly sworn, testified as

12   follows:

13   EXAMINATION IN CHIEF MS. MAYCOCK:

14       Q.   Good afternoon, Ms. Pyfrom.  Could you please

15   for the court records state your full name, spell it if

16   you need to, and give us your address, and place of

17   employment.

18       A.   Yes.  Janay Pyfrom.  My address is: 7 Oxford

19   Road, Nassau, Bahamas.  And I work at Deltec

20   International group.  That's where I'm employed right

21   now.

22       Q.   Okay.  Do you know someone by the name of Guy

23   Gentile?

24       A.   I do.

25       Q.   How long have you known Mr. Gentile?

26       A.   Since 2014, around there.

27       Q.   Under what circumstances did you meet Mr.

28   Gentile?

29       A.   He had reached out to me to work for

30   SureTrader at one point.  And then he had reached out, I

31   couldn't come over at the time, but he had reached out

32   again about a year later.  And I didn't, I gotten there.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1    Q.   So at what time was, so that was in 2014?

2    A.   That was in 2014 when I first met him, yes.

3    Q.   Okay.  When was the last time you spoke to Mr.

4  Gentile?

5    A.   Around mid-last year.  That's 2023.

6    Q.   That was 2023?

7    A.   Yes.

8    Q.   And what was the subject of that discussion?

9    A.   It was a 'Happy Birthday', and he discussed a

10  bit of his scooter business with me.

11   Q.   And his scooter business?

12   A.   Mhm-mhm.

13   Q.   Have you ever heard of Mint Broker

14  International Limited formerly known as Swiss America

15  Securities Limited and doing business as SureTrader?

16   A.   Yes.

17   Q.   Were you ever employed a SureTrader?

18   A.   Yes, I was.

19   Q.   How did you become employed at SureTrader?

20   A.   I interviewed with Guy Gentile and Antonio

21  Collie at the time.

22   Q.   Guy Gentile.  So, Mr. Guy Gentile hired you?

23   A.   Yes.

24   Q.   And while a SureTrader, what was your job

25  title?

26   A.   Chief Marketing Officer.

27   Q.   Chief?

28   A.   Marketing Officer?

29   Q.   Could you provide the court with the period

30  under which you were employed at SureTrader?

31   A.   The dates?

32   Q.   The dates, yes.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

 1      A.    July first 2015.  I don't recall when I
 2  finished but that would have been late 2019.
 3      Q.    Late 2019.  Are you aware of a lawsuit in the
 4  US Securities and Exchange Commission in the United
 5  States Southern District of Florida against Mr. Guy
 6  Gentile and SureTrader?
 7      A.    Yes.
 8      Q.    How did you learn about this lawsuit?
 9      A.    I learned about the lawsuit when I was, when I
10  crossed paths with Ms. Glasgow at an event, and she
11  informed me of the lawsuit.
12      Q.    Ms. Glasgow?
13      A.    Yes.
14      Q.    Which Glasgow?
15      A.    Tara --
16      Q.    Tara Burnside-Glasgow.
17      A.    Burnside-Glasgow --
18      Q.    No.  Again.  I am so sorry.  Archer-Glasgow?
19      A.    Archer-Glasgow.
20      Q.    -- Like I said, I don't know why.  Sorry about
21  that, Ms. Glasgow.  Have you spoken with Mr. Gentile
22  about this lawsuit?
23      A.    No.
24      Q.    Have you spoken to anyone other than Ms.
25  Glasgow about this lawsuit?
26      A.    I've spoken to potential legal representation
27  about it in the seeking whether I needed representation
28  but I didn't go ahead with that.
29      Q.    Okay.  So you want me to clarify that.  That's
30  the clarification, notification, sorry.
31      A.    Yes.  She notified me at the time of the
32  lawsuit.

AGvSecuritiesExchange 2023CLEgen00125

1      Q.    Okay.

2      A.    And that I should make sure to check that I
3  get the, what is it called, the (affidavit), the
4  documents.

5      Q.    Okay.  In this matter.

6      A.    Yes.

7      Q.    Thank you, very much.

8      A.    Mhm-mhm.

9      Q.    Okay.  Have you?  Okay.  So, you said you
10  spoke with potential legal representation on this
11  matter.

12     A.    Mhm-mhm.

13     Q.    Okay.  Please describe to the court your
14  educational history?

15     A.    Yes.  When I got my Bachelors of Science in
16  Marketing and Management from Elmira College in Upstate
17  New York, and I had around six years of Marketing
18  experience up until I was employed with SureTrader with
19  big brands, major brands like Heineken, and also with
20  smaller, bespoke brands like Old Ford Bay, and Dolphin
21  Encounters.

22     Q.    Just going back?

23     A.    Mhm -- mhm.

24     Q.    Have you spoken to anyone other than persons
25  looking for legal representation regarding your
26  testimony?

27     A.    No, that's it.  No.

28           MR. MCKENZIE, KC:  Besides my learned friend,
29  has asked that question about three or four times now,
30  and I was just --

31           MS. MAYCOCK:  No, no, no, not that particular
32  question.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1           THE COURT:  Well, it was asked, and answered.
2    You asked her, just generally, has she spoken to anybody
3    outside of Ms Glasgow about it.  She said, "No, just
4    other legal representatives in the event that she needed
5    legal representation," she said, "luckily, she didn't."
6           MS. MAYCOCK:  Noted.  Thank you.
7    BY MS. MAYCOCK:
8        Q.   Do you hold professional license?  Any
9    professional licenses?
10       A.   I do.  In 2017, I believe it was, I passed the
11   Series 7 exam.
12       Q.   And what is the Series 7 exam?
13       A.   That is the Brokerage License exam for --
14       Q.   Securities Brokerage.
15       A.   Securities Brokerage exam, yes.
16       Q.   Prior to your employment at SureTrader work,
17   where were you employed?
18       A.   I was with Commonwealth Brewery.
19       Q.   Yes. You said that.   When were you hired at
20   --
21          THE COURT:  I think she answered that already.
22          THE WITNESS:  July 1, 2015.
23          MS. MAYCOCK:  I have that information. I have
24   that evidence.
25   BY MS. MAYCOCK:
26       Q.   When you were hired at SureTrader, were you
27   given a title other than the CMO?
28       A.   No, that's the only title.
29       Q.   And while there what were your
30   responsibilities at SureTrader.
31       A.   So as CMO, I was responsible for the execution
32   of the marketing programs.  So that included Digital

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1   Marketing, it included Social Media and any campaigns
2   from a PR perspective as well.
3       Q.   What kind of campaigns would you have done
4   while employed at SureTrader?
5       A.   Mostly digital campaigns, given that it was an
6   online brokerage, broker dealer.
7       Q.   Digital campaign?  Can you explain more?
8       A.   So when you think digital, I think like Google
9   PPC, doing like Google Search Engine Optimization (SEO),
10  and anything that has to do with online social media is
11  a part of that as well.
12      Q.   So if I put in SureTrader that kind of digital
13  platform.
14      A.   Yes.  That presence.
15      Q.   Okay, when did you start working with
16  SureTrader?
17      A.   The end of 2019.  I don't remember the exact
18  date.
19      Q.   Why did you stop working SureTrader?
20      A.   The firm, well, I'm not sure, I don't know the
21  particulars, but the firm no longer decided to operate.
22      Q.   They decided?
23      A.   The firm, well, I'm not sure what happened to
24  the firm, exactly.  I can't say, but the firm was not,
25  the firm had shut down.  I don't want to say shut down,
26  but wound up or stopped operating, I guess.
27      Q.   It stopped operating.
28      A.   Yes.
29      Q.   Okay, you met Mr. Guy Gentile, and he offered
30  you a job.  Do you know what is role at SureTrader was
31  during your time of employment?
32      A.   He was the CEO.

AGvSecuritiesExchange 2023CLEgen00125

1      Q.   He was the CEO?  And during your employment,
2 he was only the CEO straight through.
3      A.   As far as I'm aware, yes.
4      Q.   While you started working as the Chief
5 Marketing Officer, while there, your duties remain the
6 same with any changes in their responsibilities?
7      A.   I wouldn't say changes but an expansion of
8 responsibility as in I've gotten into commercial
9 operations which involved managing customer service.
10 And they, basically the front office, as a part of, in
11 addition to marketing.
12      Q.   Managing front office?
13      A.   Mhm-mhm.
14      Q.   But your title never changed.  You still, even
15 though you got these additional responsibilities, you
16 were still just the CMO.
17      A.   That's right.
18      Q.   As the CMO, did you report to anyone?
19      A.   I reported to Guy Gentile, mostly.  And then I
20 worked very closely of course, within Antonio Collie, as
21 Guy Gentile was, he wasn't around as much after a
22 certain period.
23      Q.   Okay.  You had, did you have staff while at,
24 while the CMO?
25      A.   Yes.  So we had a team of about, let's see
26 1,2,3,4.  I'd say around four or five marketing persons,
27 right.  One in charge of Social, one in charge of
28 Content Creation, one in charge of Basic Marketing
29 Administration.  So that's three, and then one in charge
30 of Designs - Graphic Design, and things like that.  And
31 then, so that was kind of my core team.  And then there
32 was Customer Service, which had a, from an operational

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  standpoint had a dotted line to me, just to make sure
2  that you know, we were, they were, you know, being
3  productive.
4      Q.   Okay.  Quick question.  One second for me,
5  please.
6      A.   Mhm-mhm.
7      Q.   Okay, Ms. Symonette.  Are you able to provide
8  names for us for those persons whom you supervised?
9      A.   In Marketing?  Sure.
10     Q.   Are you able?
11     A.   Jessica Johnson, Senea Duncombe [Phonetic].
12     Q.   What's the first name?  Senea? [Phonetic].
13     A.   Mhm-mhm.
14     Q.   Duncombe?
15     A.   Mhm-mhm.  Sean Gomez.  What else did I say?
16 So, administration, oh, and Felicia - I can't remember
17 her last name at the moment.
18     Q.   Okay.  Well, thank you, very much for that.
19 And you said you reported to Guy Gentile, mostly, right?
20 What kind of interaction would you say that you, during
21 your employment, what interaction of any did you have
22 with him other than just supervision.  Was it just him
23 supervising you or?
24     A.   It wasn't micromanagement.  It was more there
25 was a strategy, right, that we had, and I was on the
26 execution side, but that interaction was by email just
27 to kind of deliver --
28     Q.   So, he was saying, this is what we want done
29 and --
30          MR. MCKENZIE, KC:  That's clearly leading.
31          THE COURT:  Putting words in her mouth.
32          MR. MCKENZIE, KC:  That is clearly leading.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  BY MS. MAYCOCK:

2      Q.   When we talk about strategy, where would the

3  suggestions of how to, where would most of the

4  recommendations or suggestions come from?  What

5  direction?

6      A.   Where would the strategy - the direction come

7  from?

8           THE COURT:  I think a better way to word the

9  question, Counsel, is, when you say the word,

10  "strategy", what do you refer to?

11           THE WITNESS:  Yes, I mean, when I think of

12  strategy, it was you know, there's visions and goals for

13  an organization.  So of course as a CEO, he delivered,

14  you know, the vision, right, and I was really in charge

15  of the execution of that vision, however, that came

16  about, you know.

17           MS. MAYCOCK:  Thank you.

18  BY MS. MAYCOCK:

19      Q.   Was this face-to-face interaction with Mr.

20  Guy?

21      A.   If he was in town, yes, but most of that

22  day-to-day interaction was through email.

23      Q.   Through email.  How frequently did you

24  interact with him during your employment?

25      A.   There was no rhyme or reason, it was just a

26  matter of, you know, if something needed approval or,

27  you know, I had an idea that I wanted to run fast him,

28  it would be very ad hoc, I guess.

29      Q.   Sometimes on a daily basis or monthly weekly?

30      A.   Could have been either, right, during that

31  tenure.

32      Q.   What tools did SureTrader provide you to

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  perform your work?

2       A.   A computer, and then a phone number.

3       Q.   A computer.

4       A.   Mhm-mhm.

5       Q.   Okay.  What was your usual business practice

6  regarding preserving your work?

7       A.   I saved everything on the computer, which was,

8  I'm not sure, more than likely backed up.  Since it was

9  a work computer, IT dealt with the service side of

10 things, but everything was saved on my files on my

11 computer.

12      Q.   On the computer.

13      A.   Mhm-mhm.

14      Q.   Did you use any personal computer on the job?

15      A.   No, I didn't.

16      Q.   Did you have a work email address while at

17 SureTrader?

18      A.   I did.  Yes.

19      Q.   Can you tell us what it was?

20      A.   Janay@suretrader.com.

21      Q.   Just Janay, right?  Yes.

22      A.   Mhm-mhm.

23      Q.   Do you have, now, in your possession any

24 work-related emails?

25           MR. MCKENZIE, KC:  Mr. Registrar, I believe

26 the rule in this respect is correct.  I don't have it

27 with me, but the Act prohibits, per the question of

28 whether you have documents in your possession.  That is

29 clearly prohibited in the -- I think I raised this

30 objection before.

31           THE COURT:  Yes, you did.  Ms. Maycock, you

32 can move on.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  BY MS. MAYCOCK:
2      Q.   Did you ever, did you, do you have a personal
3  email?
4      A.   If I have --
5      Q.   Do you have a personal email?
6      A.   If I have one?  Like a personal SureTrader
7  email.
8      Q.   Yes.  A personal email address.
9      A.   If I have one?  Yes.
10          MR. MCKENZIE, KC:  Again, the relevance of
11  that, she said she saved none of her work.
12          MS. MAYCOCK:  On the computer, personal
13  computer.
14          MR. MCKENZIE, KC:  Well, maybe we you should.
15  I'll wait --
16          THE COURT:  I thought you were making a
17  different point, right?
18          MR. MCKENZIE, KC:  Yes.
19          THE COURT:  I think I --
20          MR. MCKENZIE, KC:  I'll wait until you get to
21  that, if you get the second question.  Let me see the
22  answer.  Sorry about that.  I apologize.
23          THE COURT:  His question is going to
24  foreshadow again anything dealing with possession.
25          MS. MAYCOCK:  Yes.
26          THE COURT:  So whether it be physical or
27  whether it be --
28          MS. MAYCOCK:  On email.
29          THE COURT:  Digital.
30          MS. MAYCOCK:  Digital.  So --
31          THE COURT:  I mean, you raise it then you
32  allow him to make an objection.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  BY MS. MAYCOCK:

2      Q.   Have you ever used your personal email address

3  on the job?

4      A.   No.

5      Q.   And I guess when you strategize with Mr. Guy

6  Gentile on your whole business --

7           THE COURT:  I don't know if you can put the

8  question the way you already started question,

9  Counsellor.  When you say, "I guess."  You cannot put

10  the questions to him like that.

11          MS. MAYCOCK:  Okay.  When strategizing with

12  Mr. Guy Gentile, at the end of your strategizing, you

13  would give him updates during your -- While you were

14  there.

15          THE COURT:  Again, you put words in the

16  witness mouth again, Counsellor.

17          MS. MAYCOCK:  Okay.

18  BY MS. MAYCOCK:

19      Q.   Did you provide Mr. Guy with updates during

20  your employment?

21      A.   Yes, I did.

22      Q.   How did you provide these updates?

23      A.   Mostly by email.

24      Q.   And what would these updates address?

25      A.   Well, it depends on the circumstances, right.

26  So if there was like a budget that I needed to set and

27  get approved, then obviously that would have to go

28  through email and that approval would need to come

29  through.

30          If it was a PR strategy or something in terms

31  of seeing, you know, what the company's doing from a

32  public relations standpoint, I did press release would

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  be drafted, and of course, shared beforehand.  So
2  there's different scenarios, and I guess, in that
3  instance, where those updates or that communication
4  exchange would need to happen in order to get by, I
5  guess.
6      Q.  So would this communication or updates be
7  orally or would they, how would they be communicated to
8  Mr. Guy?
9      A.  It depends.  It really depends, but mostly by
10 email, and face-to-face.
11     Q.  Okay.  And those are dates to be saved on the
12 computer.
13     A.  There would be an email, if it's email, yes.
14     Q.  An email?
15     A.  Mhm-mhm.
16     Q.  Okay.  You have your Bachelor's degree.  You
17 have your --
18     A.  Masters now.
19     Q.  I'm trying to figure out what experience,
20 sorry.
21     A.   I've upgraded since.
22     Q.  (Inaudible) Some people decide to just upgrade
23 themselves.  And I like that.
24     A.  Thank you.
25     Q.  And in Marketing, right?
26     A.  MBA.  It's for a general MBA.
27     Q.  That's even better, because you could be
28 anywhere.
29          THE COURT:  You could've been in a position
30 with the court.
31 BY MS. MAYCOCK:
32     Q.  What experiences did you have to prepare

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1   yourself as Chief Marketing Officer for SureTrader?

2        A.   Sure.  So, I guess the the biggest thing was,

3   I was the manager of a multi-national brand, which was

4   Heineken.  So I had, you know, at that point, extensive

5   experience in building campaigns and brand development

6   and things like that.

7        Q.   I know a little something about brand and

8   marketing, but anyway, staying focused.  Who was

9   involved in the day-to-day decision making for how

10  SureTrader was marketed to potential customers?

11       A.   Yes.  So day-to-day would be me, right?

12       Q.   Would be you.  Was Mr. Guy Gentile in any way

13  involved?

14       A.   Yes, like I said, if there was a budget

15  consideration or a, if they're, like, if we wanted to

16  record videos at the office, we'd have obviously have to

17  hire third parties as those approvals needed to come

18  from somewhere.

19       Q.   Okay.

20       A.   And, but it was varied, right, depending on

21  the time.  Usually, I would make the decision and other

22  times if I felt like it was above my threshold, and I

23  would seek his opinion on that.

24       Q.   Okay.  As Chief Marketing Officer, did you

25  have any role in reviewing or approving content on

26  SureTrader's website?

27       A.   Reviewing content, yes. Proofing, more than

28  likely, yes.

29       Q.   And in doing that, what was your role?

30       A.   So a lot of it was an alignment with design,

31  right.  So if there was a website that we design a new

32  page, you know, we would have to make sure that it was

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  formatted to the right - For mobile or for certain
2  browsers.
3         A lot of the content predated me, so I didn't
4  necessarily change content, per se.  But I did make sure
5  that it was optimized from a Search Engine Optimization
6  (SEO) point of view or anything along those lines.
7      Q.   When you say, "optimized", what do you mean?
8      A.   Optimized.  So there's some technical terms
9  from a digital perspective, technical things from a
10 digital perspective, if you want to show up on the
11 search engines that that you have to do, whether it's
12 metadata connection, or there's like, there's a whole
13 SEO component within WordPress where you put snippets.
14 And so that helps to optimize websites from an organic
15 point of view.
16     Q.   This is just making sure that it's fast or
17 nice, making sure --
18     A.   Yes.  Optimization is really making sure that
19 - Google, for example, knows what you're talking about
20 on.  So when people search, it's relevant information
21 that Google is showing you and not like, if you're
22 Googling something about a white dog, they don't show
23 you a red dog, you know.
24     Q.   So what would you do or what did you do to
25 review the website content?
26     A.   So, yes, a lot of it was that.  We had like a
27 plug-in for SEO, and it would make, we would kind of
28 catch the relevance of the point that was being made to
29 make sure it was optimized.  From a design perspective,
30 you know, I would work with the designer to make sure
31 that the logo showed up appropriately or the you know,
32 the text wasn't running off the page.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1        Q.    Okay.

2        A.    What else wouldn't I'd say from a content

3   perspective there was blogs, for example, if we wanted

4   to create new content around certain topics, these are

5   the types of things that we would work on.

6        Q.    Did SureTrader have retail customers located

7   in the United States?

8        A.    Yes.

9        Q.    Have you heard of US pattern day trading

10  rules?

11       A.    Yes.

12       Q.    What do you know about the US pattern day

13  trading rules?

14       A.    My knowledge of it is if anybody wants to open

15  a Day trade and open an account in the US, they will

16  need a minimum of $25,000 on the account.

17       Q.    That's one of the rules.

18       A.    Yes.  That's my understanding of the rule.

19       Q.    So did you have any discussion regarding the

20  US pattern day rules during your employment at

21  SureTrader, and if so, what did you discuss?

22       A.    I don't remember details of any discussion,

23  but I knew it was there on the website before I got

24  there.  So, and like I said, that was my understanding

25  of what it was.

26       Q.    Okay.  And did you have any discussions with

27  Mr. Guy Gentile regarding the US pattern day trading?

28       A.    I'm sure, yes.  I don't, but I don't have

29  recollection of those conversations.

30       Q.    How did SureTrader get its retail customers?

31       A.    Through their website.

32       Q.    Their website?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1      A.    Mhm-mhm.

2      Q.    Did SureTrader try to advertise the services

3  to potential customers?

4      A.    Yes, through the Google PPC program.

5      Q.    Through Google PPC?

6      A.    Google PPC is what it's called, yes.

7      Q.    Did SureTrader advertise its services to

8  potential customers in the United States?

9            THE COURT:  I think you already asked that

10  question.

11           MS. MAYCOCK:  Not specifically the United

12  States though.

13           THE COURT:  She said, "Yes."

14           THE WITNESS:  No, not to.  Sorry, what was the

15  question?

16  BY MS. MAYCOCK:

17      Q.    How did SureTrader advertise the service to

18  potential customers in the United States?  I spoke about

19  potential customers, but more specifically now, United

20  States?

21      A.    So there's couple of ways I would think to

22  phrase it, right, in that so there was no marketing to

23  retail customers in the United States.  At least not the

24  PPC campaigns that I'm talking about were strictly for

25  other jurisdictions, right, other countries.

26           But there was no advertising-to-advertising,

27  and when I say, think advertising, there was no paid

28  advertising to US persons.  That was one of the strong,

29  kind of policies we have in place.

30      A.    Okay, so no paid advertisement.  So was there

31  advertisement that was not paid for, I don't know if

32  that's possible.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          MR. MCKENZIE, KC:  Well, just for clarity.
2   You talk about advertisement by the firm itself?  Is
3   that your question?
4          MS. MAYCOCK:  Ms. Symonette referred to "paid
5   advertisement" and I'm wondering if, did the company
6   engaged in advertisements that was not paid for or?
7     A.   No, I mean.  If it's not paid for then it's
8   organic, which means that like.  Yes, it's tough because
9   advertisements to me, it means you pay it for it.  When
10  you don't pay for advertisement it's more like, I don't
11  know, something.  I guess we would call it organic in
12  our in our world, right.  But the paid approach means
13  that you've pay to play.
14    Q.   Okay.  Pay to play.  Did SureTrader have any
15  policies that --
16         THE COURT:  Ms. Maycock, are you going to ask
17  a question?
18         MS. MAYCOCK:  Okay.
19         THE COURT:  Ms. Pyfrom, you indicated in your
20  original answer that when you talk about advertisement,
21  that there is a policy, a strong policy that your
22  company had against advertising?  Are you implying that
23  there was a policy against advertising a particular
24  grouping?
25         THE WITNESS:  Yes.  So we we would not pay for
26  ads directed towards us.  Anyone with a US, I guess, in
27  Google's terms would be like US VPN or IP, right.  And
28  so, you know, I would manage campaigns with like a
29  third-party firm that dealt specifically with Google
30  PPC.
31         And we would say, okay, well, we want to
32  avoid, we wouldn't want to pay for US advertising, but

AGvSecuritiesExchange 2023CLEgen00125

1  we would, you know, other jurisdictions that were
2  allowed, of course.
3  BY MS. MAYCOCK:
4      Q.   Okay.  Were these policies and procedures
5  exist when you started working at SureTrader?
6      A.   I don't know.
7      Q.   But while you were there, did they change
8  while you were at SureTrader?
9      A.   No, it was pretty set from when I got there.
10 We never paid for US advertisements.
11     Q.   Okay.  Remind me again when you said you left.
12     A.   Late 2019.
13     Q.   '19?
14     A.   Mhm-mhm.
15     Q.   Okay.  Did SureTrader website ever referenced
16 the US pattern day trade rules, trader rules?
17     A.   Yes.
18          THE COURT:  I think she said it's on the
19 website, right?
20          MR. MCKENZIE, KC:  Right.
21          THE WITNESS:  On the website.
22 BY MS. MAYCOCK:
23     Q.   Starting around October 2017.  Did SureTrader
24 website state that it would allow you to avoid the nasty
25 PDT - Pattern Day Trader rule?
26     A.   I don't recall that specific language, but I
27 do know that there was language related to not avoiding
28 the rule.  Now that specific language, I don't recall.
29     Q.   There was language indicating that you can
30 avoid the rule?
31     A.   Yes.
32     Q.   Did you discuss this language with Guy

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1   Gentile?  The language that was on the website?

2        A.   I don't recall that language at all, but, no.

3        Q.   So do you know who would've approved the

4   language that was on the website?

5        A.   So I do, I mean, I'm aware of the language to

6   avoid the PDT rule, but I don't recall nasty or anything

7   or circumventing.  I don't remember that language.

8        Q.   Okay.  So there was a language to say that you

9   weren't.

10       A.   Yes.

11       Q.   So who would've approved this language?

12       A.   So, that would've predated me for sure.

13            MR. MCKENZIE, KC:  I just want classification

14   on the answer because I thought I heard about two

15   different potentially conflicting answer.  I just want,

16   can you ask her to repeat it?

17            MS. MAYCOCK:  He wants you to repeat your

18   answer with regards to the allow you to avoid nasty PDT.

19            THE WITNESS:  Yes.  So what I'm saying is, I

20   don't, that specific language I'm not aware of.  But

21   there of course, was language related to that the PDT

22   rule didn't apply at SureTrader.

23            MR. MCKENZIE, KC:  Rule that didn't apply.

24            THE WITNESS:  Yes, but I don't remember the

25   specific language, no.

26            MS. MAYCOCK:  And you said this would have

27   been approved by Mr. Guy, whatever language was on the

28   site?

29            THE WITNESS:  Yes, this would've been already

30   there when I got there.

31            THE COURT:  I don't think she said that.

32            MR. MCKENZIE, KC:  She never said that.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          THE COURT:  I don't remember her saying that.
2  You had said that originally?
3          THE WITNESS:  What's that?
4          MR. MCKENZIE, KC:  That particular language on
5  the website would have been approved by Mr. Gentile, but
6  I don't think that --
7          THE WITNESS:  No, I didn't say that.  I said
8  that would - I didn't say that.  No, I said it was there
9  before me.  So I don't know.
10          THE COURT:  Prior to her appointment.  I
11  remember saying that.  And she said --
12          MS. MAYCOCK:  Right.  And I think at that
13  point I was about to ask her whether it was approved by
14  Mr. Guy, and that's when Mr. --
15          THE COURT:  No, you didn't say that.  You
16  didn't say that, Counsellor, not like that.
17          MS. MAYCOCK:  Okay, my --
18          THE COURT:  You phrased it in a manner in
19  which as though she made the statement that it was
20  approved by Mr. Guy Gentile.  Where in fact she never
21  made that statement.
22          MS. MAYCOCK:  Okay.
23          THE COURT:  So that needs to be clarified for
24  the purpose of the record.
25          MS. MAYCOCK:  Okay.  For the purpose of the
26  record, the, you're saying that, your evidence is that,
27  there was, the the comment that I made --
28          THE COURT:  There was language.
29          MS. MAYCOCK:  -- There was language --
30          THE COURT:   There was language as to the
31  avoidance of the PDT.  Let me help you.  There was
32  language, in your humble estimation, there was language

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1   of an ability to avoid the PDT rule.

2              THE WITNESS:  Right.

3              THE COURT:  If that's what you're saying?

4              THE WITNESS:  That's right.  But the specific

5   --

6              THE COURT:  But the specific.  You're not

7   aware of the specific language.  In your humble

8   estimation, that language was there prior to your

9   appointment in your capacity as CMO.

10             THE WITNESS:  Exactly.

11             THE COURT:  Now, Counsel is asking whether or

12  not you knew who approve the language that was there

13  prior to - are you aware?

14             THE WITNESS:  No.  Not aware.

15             THE COURT:  Okay.

16             MS. MAYCOCK:  Thank you, very much, Mr.

17  Registrar.

18             THE COURT:  You're welcome.

19  BY MS. MAYCOCK:

20      Q.   Okay.  Starting around October 2017, did the

21  SureTrader website ask potential customers if they

22  "aren't" (in quotes) are up for circumventing the rules

23  and getting what you want?

24      A.   I don't recall that language at all.

25      Q.   Are there any, was there anything on the

26  website that referred to circumventing?

27      A.   Not that I can recall.

28      Q.   In what currency were trading and account fees

29  listed on the SureTrader website?

30      A.   Because I've seen the questions before I know

31  where this is going, I'm guessing it was USD.  I don't,

32  I guess my official answer is, "I don't recall" and then

AGvSecuritiesExchange 2023CLEgen00125

1  you'll go to the next question.

2        Q.    Okay.  So what *did* the SureTrader website use,

3  why did the SureTrader website use US Dollars?

4        A.    My answer is, "I don't know."

5        Q.    You don't know.

6              THE COURT:  Where are we now?  Which question

7  number are we on?

8              MS. MAYCOCK:  We are on the two second

9  questions above 46.  Two questions - 46.  We're two

10  questions above them.

11  BY MS. MAYCOCK:

12        Q.    Did you discuss?  Okay, no you don't know.  Do

13  you know why the company would have used US currency?

14        A.    No, I don't know why.  Not a question number.

15        Q.    Okay.  What country equities did the, did the

16  SureTrader website permit trading in?

17        A.    US Equities and US options.  Equities, US

18  Equities.

19        Q.    So why did SureTrader permit trading in US

20  Equities and Options?

21        A.    I have no idea.  I don't know, recall or know,

22  actually.

23        Q.    Okay, so no idea.  What phone numbers did

24  SureTrader website lists for its customers to call?

25        A.    I don't recall.

26        Q.    Do you know why they listed you, the website

27  listed US direct numbers?

28              MR. MCKENZIE, KC:  No --

29              MS. MAYCOCK:  Among contact information?

30              MR. MCKENZIE, KC:  -- Again, we have

31  established that.  She says she doesn't recall the phone

32  number, so.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          MS. MAYCOCK:  Yes, but why?

2          MR. MCKENZIE, KC:  No, but you're giving

3  evidence that it's US-based.  She's saying she doesn't

4  know at all, she doesn't recall at all.

5          MS. MAYCOCK:  Excuse me, sir.

6  BY MS. MAYCOCK:

7      Q.   Did the SureTrader website lists phone numbers

8  with local New York exchanges among its contact

9  information?

10     A.   I don't recall that.

11     Q.   What funding methods that SureTrader websites

12 provide to fund a trading account for US customers?

13     A.   Credit or Debit card?  Bank wire and ACH was

14 an option at one point.

15     Q.   Why did SureTrader website provide ways to

16 fund a trading account specifically for US customers?

17          MR. MCKENZIE, KC:  Well, again, that's leading

18 also.  You have to established that another day.

19          THE COURT:  That's a very leading question,

20 Counsel.

21          MS. MAYCOCK:  I didn't hear your

22 question.CHECK 2:12:05

23          MR. MCKENZIE, KC:  No, you haven't established

24 that.  The website, in fact did provide that.

25          MS. MAYCOCK:  She did say they did.

26          MR. MCKENZIE, KC:  What did --

27          MS. MAYCOCK:  She said they had.  The question

28 was, what funding methods the US trade website find -

29 Sorry.  Okay, I stand corrected.  One second, please.

30 Yes, I did ask a question, "What funding methods did

31 SureTrader website provide to fund a trading account for

32 US customers?"

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1              And she indicated that the methods, debit
 2   cards, ACH and ACH.  So I asked, why did the SureTrader
 3   website provide ways to fund a trading account
 4   specifically for US customers, including automatic
 5   clearing house.
 6              MR. MCKENZIE, KC:  The disconnect is that she
 7   gave evidence that the firm provided certain ways, it
 8   doesn't mean that those methods were advertised on the
 9   website.  Understand the question is, can she --
10              THE COURT:  Answer those questions.
11              MR. MCKENZIE, KC:  -- Answer that question
12   first.  It may not have been on the website, it could be
13   in the forms, application forms.
14              THE COURT:  So I think that foundation need to
15   be laid as to whether or not in her capacity, Chief
16   Marketing Officer --
17              MS. MAYCOCK:  This is specific.  Mr.
18   Registrar, but this is saying--
19              THE COURT:  -- Remember.  If you remember at
20   the beginning of your question, you asked her what her
21   responsibilities as Chief Marketing Officer.  One of the
22   main responsibilities she talked about was
23   advertisement, she talked about optimizations, she
24   talked about all those things.
25              Now, we're now going now into a different
26   realm.  You're now asking, in terms of the method of
27   funding -- -
28              MS. MAYCOCK:  On the website.
29              THE COURT:  -- On the website.  So at the end
30   of the day, the question I think, the foundation hasn't
31   been laid as to whether or not she approve those things,
32   whether or not those things were on the website prior to
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  her being there, because you're asking, why were those
2  things there.
3          So at the end of the day, if it is that there
4  is a day, you need to ask her is she down for costs, and
5  say, these are credit cards, debit cards there.  Who was
6  given the instructions, either was there before.  Now
7  that you're here, now who gave you the instructions to
8  maintain.  And now you lay the lay of different
9  foundation as for putting your question directly towards
10  her as the Chief Marketing Officer, which doesn't fall
11  within her direct responsibilities, as indicated by the
12  witness earlier.
13          MS. MAYCOCK:  Noted.  Thank you, very much.
14  BY MS. MAYCOCK:
15     Q.  So initially you'd, in response to saying that
16  the funding methods were used were cards, and ACH, and
17  another methods.  Were you, were these on the website?
18     A.  These were, I mean, the client, not
19  necessarily on the website, but the client had options
20  on their account to do that.
21     Q.  On their account?
22     A.  Yes.
23     Q.  Okay.  So I'm purchasing equities, whatever I
24  need to do, and then I just go and have the option to
25  pay, paid by these various means.  It's not advertised
26  on the advertised on the website that these means are
27  available for payment?
28     A.  It's when they want to make a deposit that's
29  when those means show up.
30     Q.  Were you, did you have any involvement with
31  with the payment methods?
32     A.  Not with the payment methods.  I mean, I had

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  some technical background in terms of liaising with the
2  developer that was given the instruction to do it in
3  terms of formatting.  But that would be basically my
4  role in that.
5      Q.    Who would approve the various methods for
6  payment?
7      A.    I don't know who would it have been.
8      Q.    Or where were the instructions come from.
9      A.    Right.  I mean, I don't want to make
10 assumptions.  I can make an assumption, but I can't say
11 for certain.
12     Q.    Okay.  So do you know why there may, the
13 website, would allow persons to pay by Automated
14 Clearing House?
15     A.    Again, I would be making an assumption, which
16 I don't necessarily want to do.
17     Q.    What comparisons did the SureTrader websites
18 make between itself and other prominent online
19 brokerage, if at all, anything?
20     A.    Ask the question again.
21     Q.    What comparisons did the SureTrader website
22 make between itself and other prominent online
23 brokerage, if at all?
24     A.    So I don't recall the specifics of the
25 comparison, but if I can say it is a prominent strategy
26 for companies to compare themselves from a fee point of
27 view, from a service point of view, we see it all the
28 time with software as a service.  Right, so it is a
29 strategy, but I can't recall who was on the website for,
30 who was being compared to SureTrader, I can remember.
31     Q.    And do you remember where these brokerage,
32 online brokerages would have been based?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1        A.    Not specifically.  I mean, there there were
2   some brokerages I know that we were comparing ourselves
3   to locally, right.  There, probably the US, and then I
4   remember there was one in Trinidad that might have been
5   there as well, but I can't remember the specifics of
6   that.
7        Q.    Do you know why the SureTrader website would
8   have offered the pricing comparison?
9        A.    So like I said, that is a strategy that
10  companies use when they want to show that they've got
11  lower prices, or they've got better service.  So that is
12  a pretty common strategy of software companies and
13  online companies.
14       Q.    This strategy, was it ever discussed with Guy
15  Gentile?
16       A.    It wasn't ever a discussion from what I can
17  remember.
18       Q.    What, if anything, did SureTrader website say
19  about the Foreign Account Tax Compliance Act (FATCA)?
20       A.    The website?  I don't recall we had anything
21  stating what it was.
22       A.    On the website?
23       Q.    Yes.  What do you know about FATCA?
24       A.    That it's a law that requires US persons to
25  report assets outside of the US?  Is that what it is?
26  Vaguely.  Well, I built, I helped to build onboarding
27  platform, so I just remember, I see it sometimes.
28       Q.    So do you know why the SureTrader website
29  contain information relating FATCA?
30       A.    No.
31             MR. MCKENZIE, KC:  She has answered.  She
32  answered that.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  MS. MAYCOCK:

2      Q.   Did you discuss with Mr. Guy Gentile that the
3  SureTrader website would reference FATCA?

4      A.   No, I never had that discussion, no.

5      Q.   Did Mr. Guy Gentile approve the website
6  reference to get services to potential customers?

7      A.   So this is where the distinction has probably
8  has to happen again, in terms of advertised vs promote
9  vs PR, right.

10     Q.   Advertise, promote, pr.

11     A.   Because advertise means, at least from where I
12  sit, advertise, it's like we 'paid to be seen' in this
13  place.  Whereas promotion and PR, that's more, I guess,
14  I could say organic again, or, yes, it's probably more
15  organic, right. So, when we talk about advertising,
16  which is that idea of paying for ad placement to be seen
17  somewhere that was done through Google, for the most
18  part, and then I had one company, I can't remember the
19  name at this point where we'd have some banner ads on
20  their website.

21     Q.   Banner?

22     A.   Banner ads.  I want to say at it's A-D-B
23  something, they're based in the UK.  Then there's of
24  course, PR, and SEO, which is the more organic stuff,
25  which is a part of, kind of the whole marketing, I
26  guess, repertoire.

27     Q.   Did SureTrader send out email messages to
28  potential customers?

29     A.   Yes.

30     Q.   What kind of messages were they sent to
31  potential customers?

32     A.   So we had a daily, like a daily best

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1    performing stocks and worst performing stocks on the
2    platform.  So that was something that was done daily.
3    There was the demo on the website, so if someone signed
4    up for the demo there were, what we called transactional
5    or marketing emails, that were automated as a part of
6    that.
7            And then it's probably through the PPC
8    campaigns.  There would have been some email marketing
9    around that as well.
10       Q.   Okay.  How did SureTrader decide whom to send
11   an email message advertising your services?
12       A.   So there was the subscription on the website,
13   right.  If they landed on the website and --
14       Q.   So if someone land on the website.
15       A.   Mhm-mhm.  And signs up for, let's say, the
16   demo or signed up for, kind of those daily emails, they
17   would be a part of the like, we use the platform to get
18   those subscriptions, I guess, or opt-ins.
19       Q.   And this may have been how they would have
20   gotten messages, the email addresses, is that how?
21       A.   Yes, well, we had like a camp automated email
22   campaign for some of those things.  And so they would be
23   subscribed into kind of that, that automation of that
24   might say.
25       Q.   I think this, I'm not sure whether I asked
26   that question right, but how did SureTrader get the
27   email addresses to send these messages?
28       A.   Subscribers, I guess.  People that subscribe
29   to things.
30       Q.   So if I subscribe to something that is not -
31   It has to be related to the search engine, I guess.
32       A.   It has to, you mean the actual email campaign?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1        Q.    Yes.

2        A.    Well, it has to be related to what they've

3    subscribed to, right?  In the example of the demo, if

4    they wanted more information on the demo, they would

5    subscribe and there would be an email saying, you've

6    just signed up for the demo, things like that, is what

7    we considered email marketing, right.

8             And then you've had, like client's got the

9    daily email, for example.  So they became a client, they

10   would get a daily email that says this is the best

11   performing stocks and losers kind of thing.

12       Q.    Where were the recipients, where were the

13   recipients of emails from SureTrader advertising if

14   services located?

15       A.    So when we talk advertising, which is the

16   'paid advertising', those were, I don't remember the

17   specific countries, but the filter was that they were

18   non-US, like, we didn't advertise the US customers.

19       Q.    Were any of the recipients of emails from

20   SureTrader advertising its services located in the US?

21            THE COURT:  Well, she just answered that.

22            MS. MAYCOCK: She said they didn't advertise to

23   them.  Were *any* of those recipients?

24            THE COURT:  Oh.

25            MS. DAVIS:  Oh.

26            THE WITNESS:  Right.  So if a visitor of the

27   website, I mean, I don't, I guess the answer is, I I

28   don't know, right, because if it was someone that landed

29   on the website and put their email address for a demo,

30   that could, there was not necessarily a filter to say or

31   someone didn't telling me where they were located.  We

32   didn't ask that question.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1          THE COURT:  So for clarification, if someone
2   subscribes or you get a new customer, were there any key
3   indicating factors to indicate their nationality?
4          THE WITNESS:  It depends on the campaign.  So
5   for PPC, yes, right.  For the demo, probably not.  No, I
6   think we asked their name, phone number, and email
7   address.  And that was, that was like the, what we would
8   call the low entry barrier to get them subscribed
9   without too much information.  And, then the customers
10  would get the daily emails, for example.
11         THE COURT:  But if they become a customer, are
12  you aware, in your capacity, whether or not there were
13  compliance indicators that would have probably indicated
14  nationality?
15         THE WITNESS:  If they were a customer, they
16  would have had to go through the onboarding process.  So
17  there would be --
18         THE COURT:  That's something different outside
19  your scope.
20         THE WITNESS:  Yes, exactly.
21         MS. MAYCOCK:  Thank you, Mr. Registrar.
22  BY MS. MAYCOCK:
23      Q.   What other methods did SureTrader use to
24  advertise to potential customers?
25      A.   To advertise?  So to pay, right?
26      Q.   Mhm-mhm.
27      A.   So the Google was the product was basically
28  the primary and like I said, there was one website that
29  I worked with in the UK that we did ads for.  Yes.
30      Q.   Were any of these websites based in the United
31  States?
32      A.   Not on my side?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1      Q.    Okay.  Were any located outside the United

2  States?

3      A.    Located outside?  So for advertising, they

4  were all located outside of the United States, to

5  clarify.

6      Q.    What kind of offers did SureTrader make to

7  potential customers?

8      A.    What are offerings?

9      Q.    Sorry, what -- To get them to come on to them,

10  to become a client.

11      A.    Like whether it was free trades or, or those

12  offers - you consider offers?

13      Q.    Mhm-mhm.

14      A.    So for the demo process, I do recall, we maybe

15  had it.  So from a marketing perspective, right, you

16  would see that a strategy would possibly be that, if you

17  don't hear from someone in three days, it means that

18  they're not interested.  And then you would maybe offer

19  them like an incentive to finish the process, right, if

20  they weren't interacting.

21          So an offer would be like, if they've reached

22  the end of the demo process, it's been seven days, and

23  you want to close it, you would say, okay, here is 15%

24  off or something like that.  Now, I don't remember the

25  specific offers, like I can't remember, perhaps it was a

26  free trades or something, I can't recall.  But that was

27  a strategy that would have been a part of like a demo

28  process.

29      Q.    Okay.  Was there an offer for a  free trial

30  period to potential customers?

31      A.    That's a demo.

32      Q.    That's a demo?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1      A.   Yes.
 2      Q.   How did SureTrader decide whom to send email
 3  messages offering free trial periods.
 4      A.   Through the subscription process on the
 5  website; the sign up process.
 6      Q.   How did SureTrader offer limited free trade to
 7  potential customers?
 8      A.   Through that same process.
 9      Q.   How did SureTrader decide which potential
10  customers to email an offer limiting free trades?
11  One second, one second.  So how does traders decide
12  which potential customers to email to offer limited free
13  trades?
14      A.   Well, everything had to be, was opt-in based,
15  especially during the, I mean, there's the kind of, I
16  mean, it's not - it's forbidden to email, cold call, you
17  know, especially now with GDPR and everything.  So
18  everything was opt-in based from the website or from a
19  campaign.
20      Q.   Okay.  What websites did SureTrader promote
21  on?
22      A.   So promote - advertise, right.  We used Google
23  one time.
24      Q.   One second.  Okay, sorry, yes.  What websites
25  did SureTrader promote on?
26      A.   So I would have used Google, and then the
27  company in the UK, which I think is called some ADVN
28  something like that.  Those were the main two that I
29  advertised on from what I recall.
30      Q.   Help me out, what is the difference between
31  advertise and promote?
32           MR. MCKENZIE, KC:  She explained that earlier.
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

```
 1              THE WITNESS:  Yes.
 2              MS. MAYCOCK:  Sorry, I need an explanation
 3  again.  Sorry, if you don't mind?
 4              THE WITNESS:  Yes, so I mean, for me, it's
 5  advertise.  And it's like promotion or PR, right, which
 6  falls into the same bucket.  But advertise is really
 7  means you paid --
 8              MS. MAYCOCK:   Okay.  Advertise is paid.
 9  Promotion or wherever - Would you use the word that some
10  --
11              THE COURT:  Generic?
12              THE WITNESS:  Like public relations-type of
13  activity.
14  BY MS. MAYCOCK:
15     Q.  Okay.  So did SureTrader ever promote on any
16  particular, I mean, do promotions, aggressively promote
17  their services?
18              THE COURT:  What are you asking?
19              MS. MAYCOCK:  I know --
20              THE COURT: It's subjective.
21              MS. DAVIS:  (Inaudible).
22              MR. MCKENZIE, KC:  Aggressively.  I know maybe
23  if that's defined --
24              MS. MAYCOCK:  Subjective.  Okay.  Did
25  SureTrader promote?
26              THE COURT:  Okay, so let me rephrase the
27  question for you.  Is there of any particular websites
28  that SureTrader may have, I guess, frequent more than
29  any other.  Is there a particular one that may have been
30  more attractive to them?  In any which way, form or
31  fashion?
32              THE WITNESS:  I dealt more with the
```

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  advertising piece, right.  I didn't, I mean, in terms of
2  promotion, no.
3          THE COURT:  So promotions didn't come under
4  your portfolio.
5          The WITNESS:  It did.  PR did.  Right.  So if
6  there was a press release about, let's say, the office
7  expansion, that is for me, public relations/promotion,
8  right, of the organization.  For me, it's paid or it's
9  PR.
10         THE COURT:  I think she's speaking of either
11  or.
12         THE WITNESS:  Of either or.  So in terms of
13  adverts, so on websites like, that was done through
14  Google, right, paid that way.  And then the advertising
15  network.  And then from a PR perspective, promotion
16  perspective, that was mainly press releases.
17         MS. MAYCOCK:  Okay.
18         MR. MCKENZIE, KC:  Did you?  Sorry, it's just
19  that you're looking at the phone, and I don't know which
20  one -- No, no, the witness.
21         THE WITNESS:  I didn't see anything. I
22  honestly didn't.
23         MS. MAYCOCK:  Okay, before this goes off the
24  scene.
25  BY MS. MAYCOCK:
26     Q.   Was there a campaign to advertise on, and I
27  will call a number of websites to you.  I will call them
28  now: Warrior Trading?
29     A.   Not with me, no.
30     Q.   Day Trading Radio?
31     A.   No.
32     Q.   Commission Junction.

AGvSecuritiesExchange 2023CLEgen00125

1      A.   Yes, so we did have an affiliate program with
2  Commission Junction.
3      Q.   What about the Sites challenge?
4      A.   No.
5      Q.   Investor's underground?
6      A.    No.
7      Q.   Stocktradeideas.com?
8      A.   No.
9      Q.   Mojo Day Trading?
10     A.   No.
11          MR. MCKENZIE, KC:  What was the last answer?
12  No?
13          THE WITNESS:  No.
14          MS. MAYCOCK:  What kind of business
15  arrangements is SureTrader engage in?
16          THE COURT:  Well, first you have to establish
17  whether or not there was any business arrangement
18  engaged with any of the following.  Because she just
19  said that they didn't advertise on those websites.  I
20  think the only one she said they had an affinity to was
21  Commission Junction.
22          THE WITNESS:  Commission Junction.
23  BY MS. MAYCOCK:
24     Q.   With Commission Junction, what kind of
25  business arrangements that SureTrader engaged Commission
26  Junction.
27     A.   So my memory is vague on commission junction,
28  but it's a website where you can sign up for affiliate
29  programming.  And affiliate programming is like, you go
30  on their website, you sign up, and I'm sure there's
31  couple of parameters, but I don't recall how it actually
32  worked anymore.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1      Q.   Do you know if on SureTrader's website there
2  was a reference to a rule 15A-6.
3      A.   Yes.
4      Q.   What is that all about, 15A-6.  Can you
5  explain what it's about?  What that's all about?
6      A.   My memory's is vague on it but it was on the
7  Footer, I remember that.
8      Q.   It was in the Footer of the website.
9      A.   Regarding, I can't remember what it said
10 though.  I just remember 15 -A.  It's about broker
11 dealer, non, I can't remember.  Oh, the direct or
12 indirect solicitation of --
13     Q.   The direct and indirect solicitation.
14     A.   Right.  Yes.
15     Q.   Why did you SureTrader's website say that US
16 customers want to work --
17          THE COURT:  Hold on, hold on, hold on,
18 Counsellor.  You can't do that.  You can't do that.  You
19 can't put to her why the - because I get there's nothing
20 before the court to verify whether or not that's
21 actually --
22          MS. MAYCOCK:  If it's on the website.
23          THE COURT:  -- If it's on the website.  So was
24 this, was there anything on the website regarding 15,
25 Rule 15A-6?
26          MR. MCKENZIE, KC:  Right.
27          MS. MAYCOCK:
28     A.   Yes, in the Footer from what I recall.
29          THE COURT:  Now if you leave, you can, if you
30 properly lay the foundation facts, you can get it in.
31 BY MS. MAYCOCK:
32     Q.   Okay.  So on the website, do you remember, you

AGvSecuritiesExchange 2023CLEgen00125

1   said, you don't specifically remember.

2        A.   No, I don't remember.

3        Q.   Okay, can I assist you with what's on the

4   website?

5             THE COURT:  You can't assist her it's with

6   what's on the website.

7             MS. MAYCOCK:  Okay.

8             THE COURT:  Before this court there's nothing

9   to verify that that's actually on the website.

10            MS. MAYCOCK:  Yes, you can.  Put her on the

11  website.

12            THE COURT: She said there is a *Footer* on the

13  website.

14            MS. MAYCOCK:  No, she said, A, 15A-6 --

15            THE WITNESS:  Referencing it, but I don't

16  remember the language.

17            THE COURT:  But what are you reading?

18            MS. MAYCOCK:  What's on the Footer of the

19  website?

20            THE COURT:  We don't know that.

21            MR. MCKENZIE, KC:  No.

22            MS. MAYCOCK:  Okay.

23

24  BY MS. MAYCOCK:

25       Q.   Okay.  And you can't remember what was on the

26  Footer?

27       A.   Yes, I do (sic) remember the language on the

28  Footer.  I do remember 15-A, though.

29       Q.   When a new customer wanted to open an account

30  with SureTrader, what did they have to do?

31       A.   They had to go through the onboarding process,

32  through the website.

AGvSecuritiesExchange 2023CLEgen00125

1    Q.   And what all did that include, entail?
2    A.   Clarify the question for me.
3    Q.   Wanting to become, open an account with
4  SureTrader.
5    A.   The application process you mean?
6    Q.   What kind of information is requested on the
7  onboarding?
8    A.   Compliance specific questions related to name,
9  address, I mean, it's strictly all compliance-related
10 questions.
11   Q.   Did they request passport information, and so
12 forth?
13   A.   Yes.
14   Q.   They had an application form?
15   A.   Yes.  An online form.
16   Q.   On the onboarding, did they inquire as to how
17 the new customer learned about SureTrader?
18   A.   I think that's a regulatory requirement to
19 establish source of business, if I remember correctly?
20   Q.   Not source of business, but how they knew
21 about SureTrader, find out about SureTrader?
22   A.   Like, a 'How did you hear about us?'  I think
23 I was there, yes.
24   Q.   Did any of SureTrader customers identify on
25 their account opening documents that the SureTrader
26 website was the source of referral to, was the website
27 source of referral?
28        MR. MCKENZIE, KC:  In this case, my objection
29 would be her capacity to answer that question.
30        THE COURT:  Which question is that, Counsel?
31        MS. MAYCOCK:  That's 26, I'm sorry, that's 26,
32 the 1-2-3-4, fifth, fifth one.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1            MR. MCKENZIE, KC:  62?

2            MS. MAYCOCK:  60 --

3            MR. MCKENZIE, KC:  65?

4            MS. MAYCOCK:  No, 60 - fifth question.

5            MR. MCKENZIE, KC:  Sixty what?

6            MS. MAYCOCK:  Sixty.

7            MR. MCKENZIE, KC:  That's 6 - 0.

8            THE COURT:  Did the application reference how

9    a new customer came to the SureTrader?

10           MS. MAYCOCK:  Pardon?  I asked, did any of

11   SureTrader customers identify on their account opening

12   documents that SureTrader website was the source of

13   referral to SureTrader?

14           MR. MCKENZIE, KC:  Right.

15           MS. MAYCOCK:  That's the last one in 60.

16           MR. MCKENZIE, KC: And then you asked another

17   question.

18           MS. MAYCOCK:  No.  She hasn't answered that

19   yet.

20           MR. MCKENZIE, KC:  My objection would be this,

21   that she's clearly accept she's marketing.  That's her

22   main function.  I don't know that she, that's just any

23   foundation, they say that she reviewed interface with --

24           THE COURT:  They can't open their documents.

25           MR. MCKENZIE, KC:  -- They can't open their

26   documents, all with the customers after, went, I'll say

27   went through that process.  So rather than get her, ask

28   the witness to engage in speculation, perhaps a question

29   might be --

30           MS. MAYCOCK:  I will.

31           MR. MCKENZIE, KC:  Yes.

32   BY MS. MAYCOCK:

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1     Q.    Ms. Symonette, in your employ at SureTrader,

2  as CMO, did you ever, interface or come into contact

3  with persons onboarding and the application process?

4     A.    Persons or client?

5     Q.    Yes.

6     A.    No, I didn't.  I was never client-facing.

7     Q.    So, the account opening document.  Are you

8  aware of what is required when a person opens an account

9  with SureTrader?

10    A.    From a technical perspective, yes, I know,

11 what would have been in an application, but that's

12 because I manage the kind of overall look and feel which

13 required, like how were fields positioned, for example,

14 on the website.

15    Q.    So in your capacity as CMO, you would also

16 have, be concerned as to how you're, how successful your

17 marketing strategies were, right?

18    A.    Definitely.

19    Q.    Right.  So would you be aware as to whether

20 any SureTrader customers on their onboarding, opening

21 documents, I mean, when they can't open documents, where

22 they would indicate the source of their knowledge or

23 referral to SureTrader?

24    A.    Yes, I mean, I guess.  I don't understand the

25 question, though.  If I would be interested in it?

26    Q.    No.  Okay.  I wanted to know, do you have, on

27 their application form do they indicate whether they

28 were attracted, I guess.  Or they onboarded because they

29 saw SureTrader on the website?

30    A.    So that was, not necessarily a website.  But

31 if they came in through, like Google PPC, I would

32 already see that process.  I didn't necessarily rely on

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  the application.

2      Q.   But do they - You initially said that they

3  will say how they became a customer.

4      A.   There was a 'How did you hear about us?'

5  Question on the application from what I recall.

6      Q.   Okay.  Thank you.  And from all, if it was

7  from the website, then they would have indicated that on

8  the form.

9      A.   I don't remember what the options were on, how

10  did you hear about us?'  I don't know.

11      Q.   Did any of SureTrader customers identify on

12  their account opening documents that Commission Junction

13  was the source of referral to SureTrader?

14      A.   On their application?

15      MR. MCKENZIE, KC:  Again, my objection is that

16  She has not established that statement, she saw any

17  account opening documents.  She says, because of her

18  role as in marketing, she is aware of what would be on

19  the form.  We're talking about completed forms here.

20  And she's not said that she's ever seen A completed

21  account opening form.

22      MS. MAYCOCK:  Have you ever seen a completed

23  application?

24      THE WITNESS:  I designed them, so I've seen

25  how --

26      MS. DAVIS:  Customers (inaudible)

27      THE COURT:  No.  That's not a completed form.

28  A completed form is the one that's already been accepted

29  by a client or customer.

30      THE WITNESS:  So technically, yes, but out of

31  interest on making sure that everything looks as if it's

32  supposed to, and not necessarily like I was studying

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  what was on it.
2          MR. MCKENZIE, KC:  I just want get
3  clarification.  Mr. Registrar, can you ask her to just
4  repeat her answer?  She said, technically, yes.  But I
5  don't know.
6          THE COURT:  Yes.  I think for clarification,
7  what I understand is that she has seen the completed
8  application by customer, but from her, from my
9  understanding, you can correct me if I'm wrong, it's
10 only for the purpose of kind of verification from a
11 marketing point of view to ensure that the --
12          THE WITNESS:  The aesthetics are, yes.
13          THE COURT:  -- The aesthetics, yes --
14          THE WITNESS:  If we generate a PDF, the PDF is
15 formatted correctly and -
16          THE COURT:  -- For the purpose of marketing.
17 Not in terms of purpose of compliance.
18          MR. MCKENZIE, KC:  Thank you.
19          MS. MAYCOCK:  Thank you, very much.  And
20 that's my understanding, too.
21 BY MS. MAYCOCK:
22     Q.  What is an unsolicited acknowledgement
23 agreement?
24     A.  That was an agreement in the online
25 application form dealing with the, I guess, the customer
26 verifying that they were not directly or indirectly
27 solicited, by the firm.
28     Q.  And this is filled out by every one of their
29 potential clients?
30     A.  I don't recall if it was everyone.
31     Q.  What, who exactly drafted this unsolicited
32 acknowledgement agreement?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1      A.   I do not know.

2      Q.   Okay.  What kind of policies did SureTrader

3 have about the unsolicited acknowledgment agreement?

4      A.   I don't, I can't recall that.

5      Q.   Do you know which SureTrader customers had to

6 sign - You said you don't know.  Where were the

7 customers who had to sign the unsolicited

8 acknowledgement agreement located?

9           THE COURT:  Yes --

10          MS. MAYCOCK:  Just asking a question.

11          THE COURT:  -- But you can't ask a question

12 unless you properly need a foundation because I think

13 she just recently indicated not even every customer

14 would have even acknowledged and solicited to agreement.

15 I think, what was your question, you asked specific

16 question?

17          MR. MCKENZIE, KC:  What was the policy on it

18 and she --

19          MS. MAYCOCK:  Yes, and Counsel asked who

20 drafted the unsolicited.  She doesn't know it.

21          THE COURT:  The one that says, which

22 SureTrader customer had to sign it.  And then now your

23 question is, where were the customers who signed the

24 agreement located?

25          MS. MAYCOCK:  Yes.  Noted, Mr. Registrar.

26 BY MS. MAYCOCK:

27      Q.   You mentioned an affiliate program, who was in

28 charge of the affiliate program?

29      A.   So the cj.com, right, is was a website.  That

30 was, if I remember correctly, it's just something that

31 you subscribe to, but I don't remember what, but it's a

32 website where you sign up for an account.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

 1            It wasn't specific to like financial services
 2    they had, it was more of a global kind of approach. They
 3    had different types of websites.  But, I am very vague
 4    on on cj.com, I just know we have an account with them
 5        Q.   Okay.  With cj.com.
 6        A.   Mhm-mhm.
 7        Q.   Okay, other than Commission Junction, were
 8    there other websites or entities in the affiliate
 9    program?
10            MR. MCKENZIE, KC:  I think she answered that
11    question earlier.
12            THE WITNESS:  Within cj?  Or, I don't know
13    what was in the --
14            MS. MAYCOCK:  Other than Cj.  Other than this
15    CJ for them.  Were there any other affiliates, are there
16    any other affiliate programs?
17            MR. MCKENZIE, KC:  My objection is this.  I
18    think earlier she, I think the question was posed, and
19    then seven or eight websites was read to her.  And she
20    said, I think the answer was on that particular website
21    that they advertise or promote. I think that was, I
22    think this is another way of asking that same question
23    because --
24            MS. MAYCOCK:  Mr. Registrar, it's just trying
25    to find out the information.  She mentioned she spoke
26    about affiliate program.  And I'm just trying to find
27    out if there were any other website attached to this
28    affiliate program.
29            THE COURT:  I will allow that particular
30    question.
31            THE WITNESS:  To clarify, I don't remember the
32    mechanics of cj.com.  I just remember that, how it

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  worked is that you signed up for an account, and it had
2  an affiliate program in it, but I can't recall any
3  details that related to specifics.  If there were
4  websites selected, if there were country filters, I
5  can't remember, I honestly don't.
6  BY MS. MAYCOCK:
7      Q.    Do you know who's in charge of that affiliate
8  program?
9      A.    In charge of the affiliate program?  I imagine
10 that *I* should have been managing it, which I was, but
11 it's been so long, I just don't remember how it works
12 anymore.
13     Q.    Okay.  We're coming down to the final few.
14 I'm sure you're happy, because I am.  What employee -
15 because witness is standing up, I'm sure you're in
16 heels.  Sorry, Mr. Registrar.
17         THE COURT:  I'm kidding.
18         MS. MAYCOCK:  What employees at SureTrader was
19 responsible for reviewing new customer applications?
20     A.    That was compliance.  New accounts team and
21 the compliance officer.
22     Q.    Do you know who was the supervisor of the
23 compliance section?
24     A.    At which period?  There was Phillip Dorset
25 when I first started.
26     Q.    And that was in 2015, right?
27         THE COURT:  You can't offer that information.
28         MS. MAYCOCK:  I'm sorry.  Yes.
29         THE WITNESS:  And then Edward Cooper towards
30 the end.
31         MS. MAYCOCK:  And what is towards the end?
32         THE WITNESS:  I can't remember when he?

AGvSecuritiesExchange 2023CLEgen00125

1  By MS. MAYCOCK:

2      Q.   Okay, first of all, Mr. Dorsett, how long was

3  he in charge of compliance?

4      A.   I don't remember the dates.  He was there when

5  I started in 2015.  He left at some point, and I don't

6  recall when and Edward Cooper was his predecessor.

7      Q.   Do you know how long Mr. Cooper was his

8  predecessor.

9      A.   I don't recall.  I know up until 2019, but I

10  don't remember when he started.

11      Q.   Okay.  A year?  Two days?  A week?

12      A.   I don't know.  I would be completely guessing.

13      Q.   Just checking.  If a new customer listed a

14  US-based address on their application, what policy, do

15  you know, what policy does SureTrader have regarding how

16  the application was to be processed?

17      A.   That was not in my jurisdiction.

18      Q.   Do you know what policy or steps were taken

19  before approving the customers, any US customers, based

20  customers?

21          MR. MCKENZIE, KC: Again, I think she

22  established earlier that she is not involved and not

23  familiar with the account opening process.

24          MS. MAYCOCK:  But that still don't mean that

25  she doesn't have any idea.

26          THE COURT:  But she has to establish, that has

27  to be established, Counsellor.

28          MS. MAYCOCK:  Noted, Mr. Registrar.

29

30  BY MS. MAYCOCK:

31      Q.   Did SureTrader have a web-based internet

32  protocol blocker to the to the SureTrader website?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1      A.    There was one.  I don't remember when it
2   established, but there was one.
3      Q.    Okay.  You don't know when it was established?
4      A.    Mhm-mhm.
5      Q.    Okay.  Do you know who was --
6      A.    I don't recall when it was established.
7      Q.    Okay.  You don't recall when it was
8   established.  Do you know who was involved in the
9   decision to add the IP Blocker?
10     A.    I don't know who was involved, no.
11     Q.    Was it the Guy Gentile involved?
12           THE COURT:  Counsellor.
13           MR. MCKENZIE, KC:  She said she don't, she
14  doesn't know, so.
15           MS. MAYCOCK:  Well, I can ask her.  I can help
16  her, you know?
17           THE COURT:  No, you can't.
18           MR. MCKENZIE, KC:  She said she don't know who
19  --
20           THE COURT:  You don't have the liberty of
21  cross-examination.
22           THE WITNESS:  I would assume, but I don't want
23  to make any assumptions.
24           MR. MCKENZIE, KC:  She said she don't know.
25  BY MS. MAYCOCK:
26     Q.    What if anything, did Guy Gentile tell you
27  about his affirmative defense that he's asserted in his
28  amended answer in an affirmative defense and paid --
29           MR. MCKENZIE, KC:  Objection.
30           MS. MAYCOCK:  I was like, why I ask that
31  question because I don't even have the supporting
32  documents to even asked that question.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  BY MS. MAYCOCK:

2      Q.   What if anything did, Mr. Guy?

3          THE COURT:  I'm not gonna allow that question

4  either.  You cannot put any of those questions.

5          MS. MAYCOCK:  No.  And that's why we are now

6  letting the court know, Sir, that we have completed our

7  Evidence in Chief - Ms. Symonette.

8          THE COURT:  Most obliged.

9          MS. MAYCOCK:  Thank you, very much, Sir.

10          THE COURT:  Any cross-examination, Counsel?

11          MR. MCKENZIE, KC:  Yes.  Mr. Registrar, I'm

12  just going to ask the court, if this might be a proper

13  time to take a very short adjournment.  And --

14          THE COURT:  How short?  We are on borrowed

15  time at this moment.  As you can see, the Prosecutor is

16  sitting at the back of the courtroom.

17          MR. MCKENZIE, KC:  Maybe 15-minutes.

18          THE COURT:  I don't know what time - What time

19  were you supposed to resume?  2:15

20          MR. MCKENZIE, KC:  Maybe 10-minutes to see, my

21  issue is that I just need to speak with my client for a

22  minute.  And that might decide whether I --

23          THE COURT:  Continue or not?

24          MR. MCKENZIE, KC:  -- Continue the

25  cross-examination.

26          THE COURT:  Are we going to be able to do that

27  within five?

28          MR. MCKENZIE, KC:  Pardon?

29          THE COURT:  Are we going to be able to do that

30  within five?

31          MR. MCKENZIE, KC:  Within five?  I will do my

32  very best?

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1  CROSS-EXAMINATION BY MR. MCKENZIE, KC:

2      Q.   Thank you, Ms. Pyfrom.  Will it be fair to say

3  that the firm had a clear policy against solicitation of

4  US-based customers?

5      A.   I was not allowed to advertise in any way to

6  US customers or to US residents or to exclude US.

7      Q.   The policy was to exclude US?

8      A.   Yes.  At all times.

9      Q.   Was there a IP blocker pop-up is?  I hope

10  that's the right phrase.

11      A.   There was, yes.

12      Q.   That was designed to alert the firm where a

13  customer who was a person you sought not to do business

14  with?  Like, for example, a US-based customer?

15      A.   Yes. Totally.  So the implementation for me

16  was on the website.  So anybody that came in from a US

17  IP address would have to clearly state that they were

18  US, and then they had to meet conditions I guess, to

19  interact with the firm.  But from an implementation

20  point of view, the IP address which Sure would block the

21  website, and then they would have to state that they are

22  from the US.

23          MR. MCKENZIE, KC:  Okay.  No further

24  questions.  Thank you.

25          THE COURT:  Thank you.  It's been a long day

26  working together.  Witness excused.

27          THE WITNESS:  Okay, thank you.

28          THE COURT:  These are the last two witnesses?

29          MS. MAYCOCK:  Mr. Registrar, that was our last

30  witness in this matter.  Thank the Lord.  We could go on

31  record saying that.  And we thank you, very much.  We

32  thank you, very much for accommodating us.

ROUGH - 26 JANUARY 2024

AGvSecuritiesExchange 2023CLEgen00125

1            THE COURT:  That's no problem.  I will

2   instruct you.

3            (Court adjourned)

4   OA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

ROUGH - 26 JANUARY 2024