xx

Attorney General v. The Securities Exchange Commission

1   (The following was derived from an audio

2   recording:)

3   (Court commenced)

4   MS. MAYCOCK:  Mr. Registrar, good afternoon.

5   THE COURT:  Good afternoon.

6   MS. MAYCOCK:  My name is Deidre Clarke-Maycock

7   and I am here representing the applicant, the Attorney

8   General in this - in the matter of the Attorney General

9   v. The Securities and Exchange Commission and MintBroker

10  International Limited formerly known as America

11  Securities Limited and doing business as SureTraders and

12  Guy Gentile aka Guy Gentile Negril. I'm accompanied by

13  Ms. Ronique Carey and we have Tara Archer-Glasglow who

14  is representing the First Respondents, Securities and

15  Exchange Commission. She is here along with Subusola

16  Swain today and -

17  THE COURT:  We're back on the record.

18  MS. MAYCOCK:  Thank you very much, Mr.

19  Registrar. Mr. Darville, I will try to speak slower

20  because there are persons taking notes and I would like

21  for you to speak slower and a little louder, if

22  possible.

23  BY MS. MAYCOCK:

24  Q.   Mr. Darville, you had indicated that you last

25  spoke with Mr. Guy Gentile in 2022 and that was for - he

26  had asked you to prepare - or to appear at the

27  deposition. What was the case or the matter in which you

28  were asked to prepare a deposition for?

29  A.   It was a case - I think it was Avalon Holdings

30  and New Concept.

31  Q.   Avalon Holdings and New Concepts?

32

**EXHIBIT**

**H**

Attorney General v. The Securities Exchange Commission

1     A.    Yes.

2     Q.    Do you have any idea what that case was about?

3     A.    I'm not one-hundred percent sure, but it was

4  something to do with some trades that had happened.

5     Q.    Some?

6     A.    Some trades that had happened.

7     Q.    Trades?

8     A.    Yes.

9     Q.    Okay. And prior to October 2022, have you

10 spoken to Mr. Gentile since then?

11    A.    No.

12    Q.    You'd indicated that you worked at MintBroker

13 International Limited, which is also Swiss Americas

14 Securities Limited and known to us - and doing business

15 as - are you aware that was also doing business or does

16 has done business' SureTraders - Sure Trader?

17    A.    Yes, ma'am.

18    Q.    You'd indicated that you only worked at Mint

19 International and Swiss America Securities. Were you

20 ever employed at the company when it was known as

21 SureTrader?

22    A.    No Ma'am.

23    Q.    When did you leave Swiss America Limited?

24    A.    What that be MintBroker as well?

25    Q.    Yes, MintBroker.

26    A.    That would've been in November or December of

27 2019. It's between October to December during that

28 period.

29    Q.    Okay. What was your title - job title at

30 MintBroker International?

31    A.    My last job title was, IT Supervisor.

32    Q.    For the record,can you tell the court what

Attorney General v. The Securities Exchange Commission


1  period was it that you were employed at MintBroker?

2      A.   Yes. That would've been from September 2016 to

3  November 2019, roughly.

4      Q.   Are you aware of a lawsuit filed by the US

5  Securities and Exchange Commission in the United States

6  Southern District of Florida v. Mr. Guy Gentile and

7  SureTrader?

8      A.   I wasn't aware of that particular suit, no.

9      Q.   Okay. Have you - you're not aware of the

10  action but have you ever spoken to Mr. Guy Gentile about

11  it?

12      A.   No, ma'am.

13      Q.   Have you spoken to anyone else other than Guy

14  Gentile about this lawsuit?

15      A.   No, ma'am.

16          MR. MCKENZIE,KC:  He answered, but - Mr.

17  Registrar, the only issue I'd have with a question like

18  that is the potential question that can follow that

19  because of those - if he had answered, yes, and the

20  person was somebody who wasn't being called then we

21  could be taking information about something that would -

22  he can't be cross-examined on and it can't be verified

23  otherwise.

24          So, that would be my only issue, would be the

25  follow-up question to that; if his answer had been yes.

26          MS. MAYCOCK:  For the record, Mr. McKenzie, we

27  are here to get information for an investigation.

28          MR. MCKENZIE, KC:  Pardon me?

29          MS. MAYCOCK:  We are here to get information

30  for an investigation -

31          MR. MCKENZIE, KC:  But we are not phish-- and

32  that's the issue that I would have.

Attorney General v. The Securities Exchange Commission

1          MS. MAYCOCK:  Noted.

2          MR. MCKENZIE, KC:  Can't be phishing.

3 BY MC. MAYCOCK:

4     Q.    Mr. Darville, have you spoken to anyone other

5 than - have you spoken to anyone regarding your

6 testimony here today?

7     A.    No, ma'am.

8     Q.    As an IT person, qualified IT person, as an IT

9 person - could you tell the court what your educational

10 background is?

11    A.    Yes, ma'am. I attended Auburn University for

12 Management Information Systems. I also hold several

13 technical certifications with Microsoft,CISCO, Zerto and

14 a few other IT companies.

15    Q.    Okay. And those would be considered your

16 professional qualifications as well?

17    A.    Yes, ma'am. Along with my experience in life -

18    Q.    How long have you been in the business?

19    A.    Been in IT almost 16/17 years, roughly.

20    Q.    Prior to your employment with MintBroker,

21 where were you employed?

22    A.    I was employed at a place called Armstrong

23 Technology.

24    Q.    Armstrong Technology here in The Bahamas?

25    A.    Yes, ma'am. Right here in The Bahamas.

26    Q.    While working at MintBrokers what were your

27 duties and responsibilities?

28    A.    My responsibilites were maintaining the

29 computer systems, the network - the company network, and

30 anything basically computer-related.

31          Preparing the workstations, keeping the

32 firewalls upgraded,upgrading the servers making sure

Attorney General v. The Securities Exchange Commission

1  they were all updated on-time; checking them for

2  vulnerabilities; and maintaining a company inventory of

3  the computer assets.

4       Q.   You said you stopped working at MintBroker in

5  2019. Why did you stop working there?

6       A.   I was let go. I think the company was closing

7  down and my position was made redundant.

8       Q.   You indicate that you know Mr. Guy Gentile.

9  What was his title at MintBroker during the time that

10 you were there?

11      A.   I don't recall his specific title, I would

12 say, maybe CEO or Owner would be - would be-

13      Q.   Appropriate?

14      A.   Yes.

15      Q.   And being CEO Owner/Owner, what was his role

16 at MintBroker during your time there?

17      A.   I wouldn't really be able to answer that. I

18 really didn't know what his role was other than kind of

19 managing the company.

20      Q.   I may have forgotten where they said this but

21 you started off as an IT person, right? Did your

22 position - did you - did your position change while at

23 MintBroker?

24      A.   Yes, I became the IT Supervisor and I got an

25 assistant about a year and half into my tenure with the

26 company.

27      Q.   A year and a half?

28      A.   Yes.

29      Q.   Okay, that's good. So, your position - prior

30 to - okay, why did your - why did your position change?

31      A.   Company was growing and there was a need for

32 additional staff and I had taken the head of IT, so I

Attorney General v. The Securities Exchange Commission

1  required some help. So, I was given authority to hire an
2  assistant.
3      Q.   Okay. And you were in that position until you
4  left - until you were fired in 2019?
5      A.   Yes, ma'am.
6      Q.   And did your duties or responsibilites change
7  other than becoming a Supervisor, did you take on any
8  other duties?
9      A.   No. My duties were pretty much the same.
10     Q.   While at MintBroker did you report to anyone?
11     A.   Yes, ma'am. I reported to Justin Ritchie. He
12  was my direct manager.
13     Q.   Okay. And you said you supervised one
14  additional person?
15     A.   Yes, and his name is Jonathan Bain.
16     Q.   During your employment at MintBroker did you
17  interact - did you ever interact with Mr. Gentile in any
18  way?
19     A.   Only in the capacity to provide IT assistance,
20  other than the occasional "hello" or general
21  conversation -
22     Q.   The IT assistance in which regard?
23     A.   Like his computer, he had a problem with his
24  computer I'd go and resolve the issue or set up various
25  microphone or video systems, stuff like that.
26     Q.   Okay. How did these interactions occur? I
27  mean, you would face-to-face in most cases I guess?
28     A.   Yes.
29     Q.   Okay. What about emails?
30     A.   Yes. Sometimes we would email with computer
31  issue or resort to me via chat.
32     Q.   So there was a chatting system within the

Attorney General v. The Securities Exchange Commission

1   organization?

2        A.   Yes.

3        Q.   How frequently did you interact with Mr. Guy

4   Gentile?

5        A.   Not very frequently.

6        Q.   Did SureTrader provide you with a computer to

7   perform your work?

8        A.   Yes, ma'am. I did have a work machine.

9        Q.   Did you serve work on this work computer?

10       A.   Yes.

11       Q.   Did SureTrader have a computer server?

12       A.   Yes.

13       Q.   Did SureTrader have a computer server?

14       A.   Yes, ma'am.

15       Q.   Was your work saved on SureTrader - sorry, I'm

16   saying SureTraders because that's the name we use now,

17   okay. Was your work saved on MintBroker? Go back because

18   that's the last time you said you worked there. Was your

19   work saved on MintTraders computer server?

20       A.   Yes, ma'am.

21       Q.   Did your - during your employment at

22   MintTrader, did you have a personal computer?

23       A.   Yes, ma'am.

24       Q.   Did you use your personal computer to conduct

25   MintTrader work?

26       A.   No, I did not.

27            MS. GLASGLOW:  MintBroker. MintBroker.

28            MS. MAYCOCK:  MintBroker. I'm saying

29   MintTrader, right? MintBroker.

30   BY MS. MAYCOCK:

31       Q.   MintBroker's work?

32       A.   No, ma'am.

Attorney General v. The Securities Exchange Commission

1      Q.    Did MintBroker provide you with a work email
2  address?

3      A.    Yes, ma'am.

4      Q.    Do you have in your possession any emails that
5  you sent?

6            MR. MCKENZIE,KC: So, I just want to object to
7  that question about documents in possession and the
8  questions relative to that and the basis for that is the
9  act itself and section -

10           MS. MAYCOCK:  Which Act is this?

11           MR. MCKENZIE,KC:  Pardon me. The evidence and
12  proceedings and other jurisdiction act. Section 54A -

13           THE COURT:  You can go on.

14           MR. MCKENZIE,KC:  Under that provision
15  essentially says that in order under the Section, which
16  is the - section 5(1), captioned: Power of Supreme Court
17  to give effect to application. It tells you what the
18  process is, what the order could contain under 5(1),
19  5(1)(ii), and then 5(1)(iv) provides an order under the
20  section should not require person to state what
21  documents wallowing to the proceeding to which the
22  application for the order relates are or are being in
23  his possession custody of power.

24           And that question, Mr. Registrar -

25           THE COURT: Which Act you said you are looking
26  in?

27           MR. MCKENZIE,KC:  Sorry, the Evidence
28  proceedings(and other Jurisdictions)Act Chapter 66. It's
29  entitled to avoid what I suppose to be feed earlier, but
30  that's phishing. When you leave 5(4)(a); 5(4)(b); then
31  goes on:

32           An order under this section should not require

Attorney General v. The Securities Exchange Commission

1   a person to produce any document other than the
2   particular document specified in the order that's been
3   documented apparent to the court, to be or likely to be,
4   in his possession custody of power. My submission is
5   that my learned friend is seeking to have the deponent
6   state whether there are documents which are not before
7   the court; documents which the order does not
8   particularize and to have those documents be a part of
9   the proceedings.
10          We think 5(4)(a) and 5(4)(b) are both seeks to
11  exclude that line of questioning. So, we said the
12  (inaudible)of the acquiesce should not require but we
13  say that its prohibited from - questions should not be
14  put.
15          THE COURT:  So, you were saying questions
16  should not be put notwithstanding they're not requesting
17  the particular document?
18          MR. MCKENZIE,KC:  Well, the 5(4)(a) says that
19  we can't ask, with person being deposed, whether that
20  document is presently or was previously was in his or
21  her possession.
22          THE COURT: Ms. Maycock?
23          MS. MAYCOCK:  Mr. Registrar, first and
24  foremost, we don't think that this provision is
25  applicable because we're not asking for any particular
26  document. We're just asking if he has any documents in
27  his email, and in his possession as a result having been
28  giving - in his personal capacity and in his personal
29  computer as well as using his email address.
30          We're not specific, we've not even asked for
31  any documents - for him to produce any documents, we're
32  just asking questions as to his role in the office; and

Attorney General v. The Securities Exchange Commission

1  what he did, his practices, his habits.

2            THE COURT:  Mr. McKenzie?

3            MR. MCKENZIE,KC:  Mr. Registrar, with all due

4  respect the question was: "Do you have any emails?" He

5  emailed himself some documents and besides that, if - I

6  think the provision is pretty clear - you are not

7  supposed to ask the witness about any document whether

8  they are currently in his possession or having being

9  previously in his possession. Unless there are documents

10 which are apart - which the court has ordered to be

11 produced.

12            And like I said, the idea, the provision, the

13 tentative version, I think, is to prevent an exercise

14 like this from becoming a phishing expedition and that's

15 - sorry, if it's apart of the order then I think the

16 witness can be asked that -

17            MR. COURT:  If it's, what's his name again?

18 Mr.-

19            MR. MCKENZIE,KC:  Mr. Darville.

20            MS. MAYCOCK:  Mr. Registrar, I'll move on.

21            THE COURT:  I hear list of questions. Which

22 question is that? Which number was that?

23            MS. MAYCOCK:  This was question just above

24 number 32.

25            THE COURT: But isn't that question -- isn't

26 questions relating to direct emails Mr. McKenzie

27 included directly - specifically included in the order?

28            MR. MCKENZIE,KC:  I'm sorry -

29            THE COURT:  The original court had

30 contemplated this question would've been used?

31            MR. MCKENZIE,KC:  Mr. Registrar, these are ex

32 parte orders and if its not drawn to the attention of it

Attorney General v. The Securities Exchange Commission

1  - of recorded - might be missed, but the - it's just

2  that the -

3          THE COURT:  But isn't that furthers something

4  of this email by consent?

5          MR. MCKENZIE,KC:  Pardon me?

6          THE COURT:  Isn't the furthers of this order

7  by consent?

8          MC. MCKENZIE, KC: There were some objections -

9  I think we had an objection to that particular question.

10 We had an objections - we have noted an objection to

11 that - but Mr. Registrar, the issue here is that the -

12 in my opinion, prohibits it from being asked.

13         The mischief is this,if he says, "yes", then

14 the question is what follows?

15         MS. GLASGLOW:  I mean - I think it was

16 self-explanatory in the order. If you look at page 15 of

17 the original order.

18         MR. MCKENZIE,KC: Page 15 -

19         THE COURT:- and you look at question 33 - are

20 we starting from question 31 - it says: Did you have a

21 work email? Did you ever use your personal email to

22 conduct work for SureTrader?  If the answer is 'yes',

23 what is the personal email address? Do you still have

24 SureTrader work-related emails relating to your personal

25 email address? 33 - did you have a backup or save

26 SureTrader-related work documents or personal computer?

27 If yes, then do you still have these documents?

28         MR. MCKENZIE,KC:  Yes, and the access the

29 provision 5(4)(a) says that the order cannot require -

30         THE COURT: Now he said this is 5(4)(a)?

31         MR. MCKENZIE, KC:  Yes.

32         THE COURT: Hold on for me, let me read the

Attorney General v. The Securities Exchange Commission

1  entire file for context.
2          MR. MCKENZIE,KC There is a - the order does
3  have a production clause by which documents could be
4  produced, but the - I think the act if intended to
5  prohibit the production of documents not previously
6  ordered to be produced. I suppose - (inaudible)- with
7  the further order of production.
8          THE COURT:  Hold on, Ms. Maycock.
9          MR. MCKENZIE,KC:  I'm sorry -
10         THE COURT: No, I was telling her to hold on, I
11 see she was on her feet.
12         THE COURT: I'm trying to preface subsection 4
13 in section 5 by subsection 2 because there is
14 anticipation that there would've been - if an order was
15 specifically referring to the examination of witness
16 either orally or in-ready or for the production of
17 documents or for the inspection?
18         MR. MCKENZIE,KC:  That's correct. Yes. Mr.
19 Registrar, the way I read 5(2) is that the court would
20 be made aware of existence of certain documents and
21 there would be an order for the production of those
22 documents.
23         THE COURT: But if she ask you - she isn't
24 requesting production. She is asking for - kind of what
25 - how to - I don't want to speak on Ms. Maycock's behalf
26 but it seem as though I think it's more of an
27 inquisition as to whether or not she is in custody of
28 email - work-related emails during the time he was
29 employed.  And his personal email -
30         MR. MCKENZIE,KC:  Her question is, do you have
31 email? Do you have emails in your possession? I assume
32 that's where persons go -

Attorney General v. The Securities Exchange Commission

1          THE COURT: - and obviously if the question was
2     answered different then I think it comes back to your
3     point. That if at any point those emails are acquired to
4     be produced, then an application ought to be made under
5     this particular legislation.
6          MR. MCKENZIE,KC:  Mr. Registrar, I just went
7     further to the - I read that provision to say that the
8     inquiry cannot ask whether it isn't his possession or
9     not and I think it is to avoid the phishing.
10          (4)(b) for example, it makes it clear that the
11     order cannot require person to produce any document
12     other than those specified in the order. They would've
13     been documents disclosed to the court during the
14     application; the existence of which was disclose to the
15     court during the application.
16          THE COURT: But, you don't read when it says -
17     5(4), when it says to state documents being more of a
18     specific documents? I think emails in and of itself is
19     just - is general and broad in the widest sense. Rather
20     than something specific as an email - an email itself
21     could contain other documents?
22          MR. MCKENZIE,KC:  I don't quite read it that
23     way, Mr. Registrar. Well, I abide by your - well I
24     understand what you're saying. You're saying that the
25     email for the purpose of the provision of the Act might
26     not be a document. I don't necessarily join you with
27     that but I understand why you could construe it that
28     way. The Act here say -
29          THE COURT: -If they give a definition of
30     documents in their - in section 2?
31          MR. MCKENZIE, KC: Section 2, no. It's a 2000
32     Act so was -

Attorney General v. The Securities Exchange Commission

1        THE COURT:  So you may have to apply the
2   literal interpretation to it but, I'm seeing -
3        Let me hear the response from Ms. Maycock.
4        MS. MAYCOCK: Mr. Registrar, it seems that Mr.
5   McKenzie want us to go after some documents but anyway,
6   my submission is that we're only asking  information
7   relative to the email itself, not necessarily asking for
8   any documents and the provisions that he is referring to
9   are very clearly asking for the production of documents,
10  and more specifically specific documents. If we're going
11  to ask for specific documents is not permitted in the
12  Act; we are not doing such a thing.
13       Further, any objections pursuant to the
14  evidence that were are asking for. It is submitted that
15  - by consent order I'm understanding that it was agreed
16  that any objections would be taken or the objections can
17  be raised that it would be argued in the courts in the
18  United States. So, I guess we can accept his objections
19  to the extent that he has objected that as far as we are
20  concerned it has not new relevance to the evidence that
21  we're asking.
22       THE COURT:  Is that still your position, Mr.
23  McKenzie? That was raised originally -
24       MR. MCKENZIE,KC: Yes -
25       THE COURT: - that the objection would be
26  noted, but it would be properly ventilated in the
27  foreign jurisdiction.
28       MR. MCKENZIE,KC:  Those objections we were
29  referring to were objections with regards to the foreign
30  jurisdiction rules. I think I made that clear there -
31  I'm advised that there may be differences between rules
32  of evidence and rules of evidence in other

Attorney General v. The Securities Exchange Commission

1  jurisdictions. So, obviously a matter like this cannot
2  be ventilated in a different jurisdiction because this
3  is a Bahamian statue. But, let me just research
4  (inaudible)objection and we'll abide the terms of the
5  process, your decision with respect to that.
6            MS. MAYCOCK:  Before I - sorry, Mr. Registrar.
7  I also would like to draw - cause attention to the fact
8  that if we are going to use the tenure or sticking to
9  the tenure of the order of the court; it stands in this
10 same situation. And the order of the court granted in
11 March 20th, 2023, the question was specific. It was -
12 it's number 63 of the March 20th is a question that is
13 in the order.
14           And more specifically I refer to question 32
15 of Mr. Darville's questions which is on page 15 of the
16 order. It speaks to, did you ever use your personal
17 email to conduct work for SureTrader?
18           THE COURT:  That's the same point that I'm
19 taking with Mr. McKenzie's indicating that perhaps that
20 was something that was recently discovered when he
21 looked at this particular legislation.
22           MR. MCKENZIE, KC: I'm sorry, Mr. Registrar,
23 this question -
24           THE COURT: No-no, she's referring back to the
25 point where I said that in the actual order it referred
26 to emails, but I think you raised the point that this
27 was something, at the time, when the order was drafted
28 that it wasn't a point that came to your attention until
29 afterwards.
30           MR. MCKENZIE,KC:  Mr. Registrar, so we - just
31 (inaudible) objections so we we'll abide by -
32           THE COURT: I'll note your objection but I'll

Attorney General v. The Securities Exchange Commission

1    allow the email, I'll allow the question reference to
2    the email to stand because it was already included in
3    the original order by the court of original
4    jurisdiction.
5              MR. MCKENZIE,KC:  Oblige
6              THE COURT:  You can continue, Ms. Maycock.
7              MS. MAYCOCK:  Thank you very much, Mr.
8    Registrar.
9    BY MS. MAYCOCK:
10        Q.   Mr. Darville during time that you were
11   employed with MintBroker, did you have a personal email
12   address?
13        A.   I did. Yes.
14        Q.   Did you ever use your personal email address
15   to conduct business for MintTrader?
16        A.   No, ma'am, I didn't.
17        Q.   Do you have in your possession any emails at
18   your personal email address regarding work for
19   MintTrader?
20        A.   No, ma'am, I don't.
21        Q.   MintBroker, sorry?
22        A.   No, ma'am, I don't.
23
24        Q.   Did you ever save MintBroker related work
25   documents on a personal laptop, sorry a personal
26   computer?
27        A.   No, ma'am, I didn't.
28        Q.   Do you have documents related to Sure -
29   MintBroker on your personal computer?
30        A.   No, ma'am, I don't.
31        Q.   Do you have any paper copies of MintBroker
32   documents?

Attorney General v. The Securities Exchange Commission

1       A.   No, ma'am, I don't.

2       Q.   Did you provide, Mr. Darville, did you provide

3   updates to Mr. Guy - Mr. Gentile - did you provide Mr.

4   Gentile with updates during your employment?

5       A.   No. I did not provide any reporting to -

6   directly to Mr. Gentile. It was just through my manager

7   at the time, Justin Ritchie.

8       Q.   What experiences did you have to prepare

9   yourself to serve - sorry - did MintBroker have a policy

10  regarding saving MintBroker electronic documents or

11  records?

12      A.   There was an IT policy, but however it did not

13  speak to data retention. It was just basically for

14  confidentiality.

15      Q.   So, there was no time period in which you keep

16  documents?

17      A.   No. The policy didn't speak to that.

18      Q.   Was this policy in writing?

19      A.   Yes, ma'am.

20      Q.   Did MintBroker have a server on which it

21  recorded - its records were kept?

22      A.   Yes, it was kept on cloud servers.

23      Q.   Cloud servers. That's the name or that's the

24  system?

25      A.   The servers were in -

26      Q.   In the cloud.

27      A.   In the cloud, yes.

28      Q.   Were individual employees computers backed up

29  by a server?

30      A.   No. Due to the nature of the business there

31  was not any need for backing up of any particular

32  systems as everything was web-based.

Attorney General v. The Securities Exchange Commission


1      Q.    What do you know about the Supreme Court of

2  The Bahamas appointing joint provisional liquidators for

3  MintTrader in 2020?

4      A.    By that time I would've been employed with a

5  different company so I wouldn't really know much about

6  that period.

7      Q.    What steps did you take to preserve

8  MintTrader's records and documents?

9      A.    At the time I was let-go. I was asked to take

10  a copy of the trading records to the securities

11  commission, which I think was my last Act during my

12  employment. So, I dropped off a USB stick where they

13  back-up of the trading records and that was given to

14  Securities Commission along with a letter that they

15  signed.

16      Q.    And this was in 2019?

17      A.    Yes. I think that would've been in December of

18  2019 if I remember correctly, but they do have - should

19  have a log of the date.

20      Q.    And this is me not understanding how servers

21  and stuff like that operate - right? This backup, did it

22  cover the server?

23      A.    Well, like I said, it was just basically the

24  trading data.

25      Q.    It was just the trading data?

26      A.    The trading data, yes.

27      Q.    Did this cover the employees computers and

28  laptops?

29      A.    No.

30      Q.    What about their email accounts?

31      A.    No, that wouldn't include their email.

32      Q.    It would just cover the trading records?

Attorney General v. The Securities Exchange Commission

1      A.    Yes.

2      Q.    Okay. Did Guy Gentile contact you after March

3  2021 about getting copies of the MintBroker's

4  international records?

5      A.    He made a request to me to get some trading

6  data relating to that case?

7      Q.    Trading data?

8      A.    Yes.

9      Q.    Relating to which case?

10      A.    To the case I spoke about previously -

11      Q.    Earlier one -

12      A.    Yes.

13      Q.    How many times did he reach out to you

14  regarding this?

15      A.    It was only one time.

16      Q.    Okay. What steps did you take to preserve -

17  one second. Okay, Mr. Darville, what did you do with

18  respect to the server?

19      A.    Well after I was let-go, I just - I didn't do

20  anything, I just left the premises. I don't know what

21  happened what the servers after my employment were

22  terminated.

23      Q.    Okay. Do you know how long after your

24  employment - your having been let-go, that MintTrader

25  continued doing business?

26      A.    I have no idea. I didn't keep up with -

27      Q.    Okay. So, what did you do with respect to

28  employees computers and laptops before prior to a

29  meeting?

30      A.    They were all left at the office.

31      Q.    The information on the computers were saved on

32  the server and then -

Attorney General v. The Securities Exchange Commission


1    A.   Yes. Some of the computers were wiped and
2 given to the staff.

3    Q.   Okay.

4    A.   What did you do with respect to employee email
5 accounts?

6    A.   I was not requested to perform any backups of
7 any emails or systems other than the trading data.

8    Q.   Okay. Trading records. You'd indicated that
9 Mr. Gentile contacted you after March 2021. Refresh my
10 memory if I did ask, I can't remember whether I asked,
11 but what did he ask you for?

12    A.   He asked me to provide two forensic auditors
13 with specific records related to a period.

14    Q.   Related to which period?

15    A.   I don't recall the exact period where there
16 was a period - I'll have to check back to the
17 information but it was just to provide them with the
18 trading data for that particular period - for a
19 particular set of stocks.

20    Q.   Can you provide me with - do you have - are
21 you a - can you remember the stocks that he asked you to
22 check on?

23    A.   I do not recall them at this time, but it was
24 - it would've been the Avalon - same people who were in
25 the case - the Avalon.

26    Q.   The Avalon?

27    A.   Yes.

28    Q.   So, my next question is: You provided him with
29 the information?

30    A.   Yes. I did provide him - provide the auditors
31 with that information.

32    Q.   Speak up a little -

Attorney General v. The Securities Exchange Commission


1      A.    Yes, I did provide them with that information.

2      Q.    Provide him with that information?

3      A.    No, the auditors.

4      Q.    Okay. So, how did you - what did you have to

5 do to provide him with the information for - the

6 auditor's the information?

7            THE COURT: Well that's assuming he had to do

8 anything.

9 BY THE COURT:

10     Q.    Did you have to do anything to provide the

11 auditors with the information?

12     A.    Well, I basically emailed them the records.

13     Q.    You emailed the auditors the records?

14     A.    Yes.

15     Q.    So, in order to email the auditors the

16 records, you had to?

17     A.    Had to pull the data for that specific period.

18     Q.    From?

19     A.    From the trading data records.

20     Q.    As you sis here today, do you have access to

21 MintBroker's records and documents?

22     A.    No, ma'am.

23           MR. MCKENZIE,KC:  That's my objection. Just

24 record on earlier, Mr. Registrar.

25           THE COURT: That's fine. That one was clear.

26 BY MS. MAYCOCK:

27     Q.    Okay, Mr. Darville we're getting near to the

28 end. I only have three more questions for you. Do you

29 know where MintBroker's records and documents are now?

30     A.    No, ma'am.

31           MR. MCKENZIE,KC:  Objection. My objection.

32           THE COURT:  Ms. Maycock?

Attorney General v. The Securities Exchange Commission

1            MS. MAYCOCK:  Oblige.

2            THE COURT:  State within confines of the

3    rules.

4            MS. MAYCOCK:  Oblige, Mr. Registrar.

5    BY MS. MAYCOCK:

6        Q.   As the IT person for MintBrokers

7    International, did any of your work involve designing

8    their website?

9        A.   No ma'am.

10       Q.   Were you involved in any way deciding on the

11   contents of the website?

12       A.   No ma'am.

13       Q.   Do you have any ideas as to who may have been

14   involved with the designing of the website?

15       A.   Yes. That would've been Janay Symonette.

16       Q.   Janay Symonette?

17       A.   Yes. The marketing -

18       Q.   Pyfrom-Symonette?

19       A.   Yes.

20       Q.   Okay. I thought I only had three more

21   questions for you. Unfortunately I have some more, but

22   they are related to the answers that you've offered

23   already. You refer to the fact information - trading

24   information was hosted in a cloud. Do you know what

25   cloud server host the information?

26       A.   If I know what cloud server host it now?

27       Q.   Well, then and even now?

28       A.   Before I left, it was hosted at OVH.

29       Q.   OVH?

30       A.   Yes. That was the last place.

31       Q.   And now?

32       A.   I have no idea.

Attorney General v. The Securities Exchange Commission

1    Q.   You also refer to trading records. What does
2  the trading record include?
3         MR. MCKENZIE,KC:  I think foundation has to be
4  laid for that. He simply said that he was involved in
5  the preservation. I think the question - he have to look
6  at the documents and identify them or whether or not he
7  just downloaded documents.
8         MS. MAYCOCK: Mr. Registrar, I think that he
9  keep - he's throughout this/his evidence spoke about
10 trading records. I'd like to know what kind of records
11 were - are considered trading records.
12        THE COURT:  I think you can put that question
13 to him.
14 BY MS. MAYCOCK:
15   Q.   Mr. Darville what kind of records would - that
16 were uploaded when you refer to 'uploading trading
17 records into the cloud'?
18   A.   The records would basically be how much a
19 particular stock - that a particular user-board at a
20 particular time. So, just to show you like every single
21 transaction that happened with that user that particular
22 day.
23        Everyday the records were saved. So, if a
24 person traded 10 stocks of a particular symbol, all of
25 that would've been recorded in that trading dealer.
26   Q.   And observed and uploaded into the cloud?
27   A.   Yes. Correct.
28   Q.   And how is this - and again please bare with
29 me - how is this information uploaded? Is it on a USB
30 stick or is it - as the individually would come in, you
31 would just upload it into the system?
32   A.   Well, once the user interacts with the trading

Attorney General v. The Securities Exchange Commission

1   platform, the system - that's how it works. It
2   automatically recorded any trades done for each user and
3   then all that was saved into the cloud servers.
4       Q.   One second, please. Mr. Darville,where were
5   customers records saved while you were employed at
6   MintBroker?
7       A.   Customer records as in personal information?
8       Q.   Personal information and their -
9       A.   Yes. Everything was saved in the cloud system.
10      Q.   Where were new applications saved?
11      A.   Same. Same place.
12      Q.   Going back to the information provided to Mr.
13  Guy Gentile pursuant to your 2021 conversation -
14           MR. MCKENZIE,KC:  Just for the record, he did
15  say the information was provided directly to auditors
16  and not to Mr. Gentile, so I just want the record to
17  reflect that.
18           THE COURT:  He did say that.
19           MS. MAYCOCK:  But I was referring to the
20  conversation.
21           THE COURT:  Which one?
22           MS. MAYCOCK:   I was referring to the
23  conversation pursuant to the conversation - sorry, the
24  records pursuant to the conversation with Mr. Gentile
25  which he said was given to the auditors -
26           MR. MCKENZIE,KC:  Okay -
27           MS. MAYCOCK:  - but I'm just going back to
28  that conversation -
29           MR. MCKENZIE,KC:  I apologize. I thought you
30  were asking him about the documents itself.
31           MS. MAYCOCK:  Okay.
32  BY MS. MAYCOCK:

Attorney General v. The Securities Exchange Commission

1       Q.    Subsequent to your conversation with Mr.
2  Gentile, how did you pull the records that Mr. Gentile
3  requested?
4       A.    Using like a database program because its
5  basically a data copy of the database.
6       Q.    It was just sent to the auditor?
7       A.    Right.
8       Q.    Mr. Darville, what time - what time period,
9  I'm talking about you worked there from 2016 to 2019, I
10 think it is?
11      A.    Yes.
12      Q.    Okay. So, what time periods did the trading
13 records covered that you testified that you gave to the
14 Securities Commission of The Bahamas?
15      A.    I think it was five years.
16           MR. MCKENZIE,KC:  So, Mr. Registrar, I'm just
17 not certain that the evidence he gave suggested that he
18 actually saw the document itself. He know that they were
19 trading the records I guess because of, I don't know
20 that he saw the documents themselves, so I don't know if
21 he could establish that.
22           THE COURT:  He wants you to lay the foundation
23 down for that particular question.
24           MS. MAYCOCK:  Mr. Registrar, he said he
25 uploaded the documents on a jump drive and he gave it to
26 the Securities Commission -
27           MR. MCKENZIE, KC:  Yes, I -
28           MS. MAYCOCK:  -am I - is that true?
29           THE WITNESS:  Right, that's correct.
30           MS. MAYCOCK: Sir, I just need to know what
31 time period of data that was submitted to Securities
32 Commission, what's uploaded on the disket and given to

Attorney General v. The Securities Exchange Commission

1  Securities Commission.

2          MR. MCKENZIE,KC: Yes, I remove my objections.

3          MS. MAYCOCK: Thank you very much, Mr.

4  McKenzie.

5  BY MS. MAYCOCK:

6      Q.    To answer the question, what period of data

7  was submitted?

8      A.    I don't recall the exact, but I believe it was

9  five years, if I remember correctly.

10      Q.    Five years?

11      A.    Yes.

12      Q.    So, that was information prior to your being

13  emoloyed by MintBroker?

14      A.    Yes. So, it would've been 2019 and then five

15  years previous.

16      Q.    Okay. You testified earlier that records were

17  web-based. Which vendor was used, or which vendor was -

18  it was to web-based?

19      A.    Well, it was a custom-built web application

20  that insist that we used.

21      Q.    When you say custom-based, can you explain?

22      A.    It's like a program - a programming team

23  designed it and it worked along with our trading

24  company's software.

25      Q.    Which programming team?

26      A.    I think it was an inter-group of Indian guys

27  at first.

28      Q.    I didn't hear that -

29      A.    It was custom designed by some developers but

30  Janay would have more information on that part of it.

31      Q.    Okay, so you don't know the name of the

32  developers?

Attorney General v. The Securities Exchange Commission

1        A.    No.

2        Q.    At the point when you were terminated, were

3   MintBroker's records still saved on the website? On the

4   web?

5        A.    Yes, ma'am.

6        Q.    And where?

7        A.    It was at the OVH -

8        Q.    OVH?

9        A.    Yes. OVH hosting.

10            MS. MAYCOCK:  Thank you, Mr. Registrar.

11            MR. MCKENZIE,KC:  Mr. Registrar, yes, just two

12   minutes, Mr. Registrar.

13            THE COURT: Un mute the mics.

14            MR. MCKENZIE, KC:  Mr. Registrar, just a few

15   questions.

16            THE COURT: Go ahead.

17            MS. MAYCOCK:  Excuse me. No, I just want the -

18   I don't know if its appropriate for me to say that he's

19   going to be cross-examined by you. Mr. McKenzie will be

20   cross-examining you.

21            THE WITNESS:  Okay. No, problem.

22            MR. MCKENZIE,KC: Thanks. Mr. Registrar you can

23   let me know when you're ready.

24   CROSS-EXAMINATION BY PHILIP MCKENZIE,KC:

25        Q.    Mr. Darville, I think earlier in your

26   examination, you said that Mr. Gentile was, I think you

27   said, owner and CEO?

28        A.    Right.

29        Q.    You accept that you didn't interact with him

30   often?

31        A.    Yes, that's correct.

32        Q.    And you don't know exactly what role he

Attorney General v. The Securities Exchange Commission

1  played?

2       A.    That's correct.

3       Q.    In the management of the company?

4       A.    Yes.

5             MR. MCKENZIE,KC:  With that, Mr.

6  Registrar,that's it.

7             (Court adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32