# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21079-BLOOM/Torres

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.
and GUY GENTILE,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon three separate motions: (1) Plaintiff's Motion for

Summary Judgment, ECF No. [222], filed on February 13, 2024; Defendant Gentile filed a

Response in Opposition, ECF No. [231] ("Response"), to which Plaintiff filed a Reply, ECF No.

[242] ("Reply"); with leave of Court, Defendant Gentile filed a Surreply, ECF No. [250]; (2)

Plaintiff's Omnibus Motion *in Limine*, ECF No. [220]; Defendant Gentile filed a Response, ECF

No. [247], to which Plaintiff filed a Reply, ECF No. [252]; and (3) Defendant Gentile's Motion *in*

*Limine* and to Strike Expert, ECF No. [221]; Plaintiff filed a Response, ECF No. [229]. The Parties

thereafter filed a Notice of Partial Resolution of the Motions *in Limine* and to Strike Expert, ECF

Nos. [220], [221]. *See* ECF No. [244]. The Court has reviewed the Motions, all opposing and

supporting submissions,[1] the record in the case, the applicable law, and is otherwise fully advised.

---

[1] Plaintiff filed a Statement of Material Facts ("SMF") in support of its Motion for Summary
Judgment, ECF No. [226] (another Statement of Material Facts filed by Plaintiff in ECF No. [223] is
duplicative of ECF No. [226] but does not include the exhibit list, so the Court will use ECF No. [226]).
Defendant filed a Response to Plaintiff's Statement of Material Facts ("Response to SMF"), ECF No. [237].
Plaintiff filed a Statement of Material Facts with its Reply ("Reply SMF"), ECF No. [243], to which

For the reasons set forth below, Plaintiff's Motion for Summary Judgment is denied on all counts; Plaintiff's Omnibus Motion *in Limine* is granted in part and denied in part; Defendant's Motion *in Limine* and to Strike Expert is granted in part and denied in part.

## I.  BACKGROUND

### A.  Material Facts

Based on the parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

In 2008, Gentile incorporated and founded Swiss America Securities Ltd. in the Bahamas. SMF, ECF No. [226] ¶ 7. In 2017, Gentile changed the name of the company from Swiss America Securities Ltd. to MintBroker International, Ltd. *Id.* at ¶ 8. The company was commonly known as SureTrader, including through its website www.suretrader.com.[2] *Id.* at ¶ 9. In 2011, Gentile registered SureTrader with the Securities Commission of the Bahamas ("SCB") as a broker-dealer. Id. at ¶ 11.  SureTrader has never been registered with the United States Securities and Exchange Commission ("SEC") in the United States in any capacity. Id. at ¶ 12. SureTrader was in the business of being a broker-dealer from no later than December 2011 until at least November 2019. *Id.* at ¶ 20. SureTrader offered broker-dealer services through which day traders could have their trades executed. *Id.* at ¶ 21. Gentile was an owner and chief executive officer of SureTrader from February 2017 until November 2019. Id. at ¶ 13.

"Day trading" means the "purchasing and selling or the selling and purchasing of the same security on the same day in a margin account[.]" FINRA Rule 4210(f)(8)(B)(i), available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/4210. "Pattern day trader" includes any margin customer that day trades (buys then sells or sells short then buys the same security on

---

Defendant filed a Response, ECF No. [251].

[2] The Court accordingly refers to the company as SureTrader throughout this Opinion.

the same day) four or more times in five business days, provided the number of day trades are more than six percent of the customer's total trading activity for that same five-day period. *Id.* at ¶ 15; *see* FINRA Rule 4210(f)(8)(B)(ii).

In the United States, pattern day trading is regulated by the Financial Industry Regulatory Authority ("FINRA"), a not-for-profit organization that oversees U.S. broker-dealers and works under the SEC. As set forth in FINRA's Day Trading Disclosure Statement, "[d]ay trading can be extremely risky." Day Trading Risk Disclosure Statement, FINRA Rule 2270, available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/2270. As a result, "[d]ay trading generally is not appropriate for someone of limited resources and limited investment or trading experience and low risk tolerance, as day traders "should be prepared to lose all of the funds that [they] use for day trading." FINRA Rule 2270. ECF No. [226] ¶ 16. Accordingly, FINRA has developed rules to require that certain levels of equity be deposited and maintained in day trading accounts, and that these levels be sufficient to support the risk associated with day trading activities. *Id.* at ¶ 18; *see* FINRA Rule 4210(f)(8)(B). Under the FINRA Rules, a pattern day trader must maintain minimum equity of $25,000.00 on any day that the customer day trades or will not be permitted to day trade. FINRA Rule 4210(f)(8)(B)(iv)(a). The required minimum equity must be in the account prior to any day-trading activities. *Id.* Pattern day traders cannot trade in excess of their day trading buying power or must undertake several actions. *Id.* at 4210(f)(8)(B)(iv)(c).

As a broker-dealer registered in the Bahamas, SureTrader did not require customers to meet any of the requirements set forth in the U.S. Pattern Day Trader Rules. ECF No. [226] ¶ 22. For example, SureTrader offered customers the ability to open an account and trade with as little as

$500.00 and did not require any margin account balances or place any other restriction required under the FINRA Rules.[3] *Id.*

The Parties disagree about how long Gentile was in control of SureTrader. The SEC argues that since Gentile founded SureTrader, Gentile was in charge and the "boss" of SureTrader. *Id.* at ¶ 14. Gentile contends that there were significant periods of time between 2012 and 2019 when he was not "in charge" of SureTrader. ECF No. [237] at ¶ 14. Gentile argues that he was cooperating with federal law enforcement to ensnare securities-law violators between about 2012 and 2015, and the government — FBI, DOJ, and the SEC — instructed him on how SureTrader should operate. *Id.*; *see also* Gentile deposition, ECF No. [237-1] at 70-71, 73-76. Gentile asserts that he resigned from SureTrader in late-2015 when he was trying to negotiate an agreement to conclude his cooperation with the government and did not return to the firm until 2017. *Id.* at 71-72.

The SEC points to SureTrader's website, emails sent by SureTrader to U.S. persons, and agreements between SureTrader and day trading schools to argue that despite its registration in the Bahamas, SureTrader solicited U.S. persons to use its platform. While there is no dispute about the existence of those materials, the parties disagree on what inferences should be drawn from them.

### i.     SureTrader Website

In at least October 2017, the SureTrader website included a post titled "7 Great Reasons Why You Should Consider SureTrader" which included a heading that SureTrader would "Allow You to Avoid the Nasty PDT [Pattern Day Trader] Rule" and asked potential customers if they "are up for circumventing the rules and getting what you want." ECF No. [226-10]. The post was

---

[3] The Parties dispute whether FINRA's Rules applied to SureTrader. ECF Nos. [226] ¶ 22, [237] ¶ 22.

made by a poster called "Ignite" on August 3, 2017, but the record sheds no light on whether "Ignite" was affiliated with or employed by SureTrader. *Id.* at 3. The website listed a "USA (Direct)" phone number among its contact information along with a New York City-based VoIP phone number "as a courtesy to . . . existing customers[.]" ECF No. [226-13] at 1, 2.

Starting in 2017, a large pop-up would display for visitors with U.S. IP addresses accessing SureTrader's website. The pop-up stated:

> In compliance with SEC RULE 15a-6 this website is not intended to solicit U.S. Residents.
> You will need an access code or be an existing client to view our website.
> By continuing, you certify that you have not been solicited to this website.
> To generate a code, please enter your mobile # or email @ and insert the code once received.

ECF No. [237-26].

The pop-up included a box for visitors to input their "Email or phone number or access code here" and a "Submit" button. Despite this pop-up, visitors to the website could also see a small pop-up window at the bottom-right of the website stating: "New to SureTrader? I'm happy to help with opening a new account or giving you a walk-through of our desktop platform demo." ECF No. [226-32] at 1. The box could expand if a visitor clicked on it, initiating a conversation with SureTrader. *Id.* at 2.

Previously, SureTrader used a less conspicuous pop-up, which stated "[u]se of this website is subject to your acceptance of the following Terms and Conditions" and then explained that "[b]y clicking the Continue button, you agree to the terms and conditions" ECF No. [226-31]. The linked terms and conditions consisted of seven paragraphs ranging from one to four lines. *Id.* The last line was bolded and stated: "Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations that have been solicited directly or indirectly in compliance with SEC Rule 15a-6." *Id.*

During the relevant period in the Complaint, SureTrader only permitted its customers to trade in U.S. equities (99%) and options (1%). ECF No. [226] at ¶ 23.

### ii.    SureTrader Emails

The record contains multiple e-mail messages from SureTrader to Orestes Jimenez, an individual located in Miami, Florida. On March 8, 2017, Jimenez received an email from SureTrader entitled "Trading Tips You Can't Afford to Ignore," stating "Your SureTader [(sic)] demo has now expired, and it's time to put all your practice into action!" ECF No. [226-18] at 1. The email continues: "To get you started, we'd like to offer you $99 in Free Trades when you open an account with SureTrader. Use Code: SURE99, and fund your account with a minimum of $1,000." *Id.* SureTrader sent subsequent emails to ask Jimenez to "Please Confirm Your Account[,]" stating that "This email has been sent to you because you've started a new application in the SureTrader Account Center." ECF No. [226-19] at 1. Subsequently, SureTrader sent Jimenez "a courtesy email letting you know that your buying power has been updated." ECF No. [226-20]. Those e-mail messages did not include any disclaimers regarding restrictions on opening accounts for U.S. persons.

The record also contains a Declaration from U.S. resident Mazen Agha, who states that:

> The SureTrader website also offered a "SureTrade 100k Demo Platform" where you could download a program that allowed participants to practice day trading for 7 days for free before opening an account. I downloaded the SureTrader 100K Demo Platform program in August 2016. On August 22, 2016, I received an email from SureTrader stating that my SureTrader demo had expired, and that "it's time to put all your practice into action!" The email also offered $99 in free trades when you opened an account at SureTrader. There was nothing in the email stating the offer for free trades was not available for residents of the United States.

ECF No. [226-21] ¶ 6.

The existence of the emails are not in dispute, although Gentile maintains that before any email would have been sent to a SureTrader customer, the customer would have already agreed to

receive emails from SureTrader and agreed to the terms and conditions of the website. ECF No. [237] ¶ 38.

### iii.    SureTrader Agreements with Day Trading Schools

SureTrader entered into the following advertising agreements with U.S.-based day trading school websites, DayTradingRadio.com and WarriorTrading.com. The Marketing Services Agreements that SureTrader entered into with Day Trading Radio and Warrior Trading state that the contract is to "provide certain marketing services to Swiss America [(SureTrader)] for non-United States investors[.]" ECF Nos. [226-24] at 1, [226-26] at 21.

The Warrior Trading Agreement appears to have been entered into pursuant to an August 23, 2016 email from Ross Cameron from Warrior Trading. Cameron reached out to Justin Ritchie at SureTrader to ask about SureTrader's interest in "working together to promote Suretrader among the Warrior Trading community." ECF No. [237-5] at 2. When Ritchie answered on September 14, 2016, he asked Cameron: "how do you ensure that U.S. clients don't come to us or is it up to us not to accept U.S. persons using your code or name?" *Id.* Later, when Ritchie agreed to the partnership, he stated that "[t]he agreement's use would be more for use to outline the parameters of marketing i.e. not intended for U.S. persons." *Id.* at 3. The ads from SureTrader placed on the day trading schools' websites contain disclaimers in all caps: "NOT INTENDED FOR U.S. PERSONS." *See* ECF Nos. [226-27], [226-28]. Gentile contends that he was not at SureTrader when SureTrader entered into a Marketing Services Agreement with Warrior Trading; the agreement was negotiated by Deputy Director Justin Ritchie. ECF No. [237] ¶ 44. According to the deposition of Yaniv Frantz, who managed the sales team at SureTrader, the day trading schools were referred to as "affiliates." ECF No. [226-4] at 15, 28-29.

### iv.     The Instant Action

On March 22, 2021, the SEC filed three claims for relief against SureTrader and Gentile, for conduct that occurred from no later than March 2016 until at least November 2019, ECF No. [1]:

1.  Violations of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), against SureTrader. The SEC alleged these violations occurred when "SureTrader, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while it was not registered with the Commission as a broker or dealer." ECF No. [1] ¶¶ 97-99 (Count I);

2.  Liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as a Control Person against Gentile. The SEC alleged these violations occurred when "Gentile was, directly or indirectly, a control person of SureTrader for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), when SureTrader violated Section 15(a)(1) of the Exchange Act." ECF No. [1] ¶¶ 100-04 (Count II); and

3.  Liability under Section 20(b) of the Exchange Act against Gentile, 15 U.S.C. § 78t(b). The SEC alleged these violations occurred when "Gentile, directly or indirectly, through SureTrader, did acts or things which it would have been unlawful for him to do under the provisions of the Exchange Act and the rules and regulations set forth above[,]" specifically SureTrader's violation of Section 15(a)(1) of the Exchange Act. ECF No. [1] ¶¶ 105-08 (Count III).

Defendants' liability in Count II and Count III derives from liability in Count I - Defendant's violation of Section 15(a)(1) of the Exchange Act. Only Gentile filed a Response in Opposition to Plaintiff's Motions. SureTrader never made an appearance in this case.[4]

## II.  LEGAL STANDARD

### A.    Summary Judgment

The court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, the burden then shifts to the opposing party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Liberty Lobby, Inc.*, 477 U.S. at 257; see Fed. R. Civ. P. 56(c). "[T]he nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

---

[4] When construing inferences in the light most favorable to the non-moving party, the Court considers inferences in the light most favorable to both SureTrader and Gentile. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). The Court does so despite SureTrader's failure to appear because SureTrader and Gentile's liability is closely intertwined, as liability as to Gentile under Counts II and III depends on SureTrader's liability under Count I.

*Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In resolving a summary judgment motion, the Court must view the record evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee*, 695 F.2d at 1296.

**B.    Motions *in Limine***

"In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Id.* "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of

foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769-Orl-22DAB, 6:07-cv-15733-Orl-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Likewise, "[i]n light of the preliminary or preemptive nature of motions *in limine*, 'any party may seek reconsideration at trial in light of the evidence actually presented and shall make contemporaneous objections when evidence is elicited.'" *Holder v. Anderson*, No. 3:16-CV-1307-J-39JBT, 2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018) (quoting *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01CV545FTM-29DNF, 2004 WL 4054843, at *1 (M.D. Fla. July 22, 2004)); *In re Seroquel Prod.*, 2009 WL 260989, at *1 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*" (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989))).

Evidence is admissible if relevant, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence. Fed. R. Evid. 401, 402; Advisory Comm. Notes, Fed. R. Evid. 401 ("The standard of probability under the rule is 'more probable than it would be without the evidence.'"); *United States v. Patrick*, 513 F. App'x 882, 886 (11th Cir. 2013). A district court may exclude relevant evidence under Rule 403 if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *Patrick*, 513 F. App'x at 886 (citing *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011); *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)). Rule 403's "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v.*

*Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). The movant has the burden to demonstrate that the evidence is inadmissible. *Gonzalez*, 718 F. Supp. 2d at 1345.

### C. *Daubert* Motion

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which asks whether: (1) the expert is qualified to testify competently regarding the matters the expert intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The Eleventh Circuit Court of Appeals refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations and quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations and quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. Dec. 15, 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1258).

## III. DISCUSSION

### A. Summary Judgment

The SEC argues that it is entitled to summary judgment on all three counts of its Complaint. *See generally* ECF No. [222]. Gentile argues that summary judgment is inappropriate as the central

issues involve fact-intensive disputes that will require jurors to weigh conflicting evidence and make credibility determinations. ECF No. [231] at 2 (quoting *SEC v. Montano*, No. 618CV1606ORL31GJK, 2020 WL 5534671, at *6 (M.D. Fla. July 31, 2020)). The Court starts with the SEC's argument for summary judgment on Count I, as liability on Count II and Count III derive from liability on Count I.

### i.       Section 15(a)(1) of the Exchange Act: Count I

The SEC argues that the undisputed facts establish that SureTrader was a broker-dealer, was not registered, was not subject to an exemption, and thus violated Section 15(a)(1). ECF No. [222] at 9. Gentile does not dispute that SureTrader was operating as a foreign broker-dealer and that SureTrader was not registered with the SEC. ECF No. [231] at 6. Instead, Gentile argues that SureTrader is exempt from registration under Section 15(a)(1) as it is a foreign broker-dealer that "[e]ffects transactions in securities with or for persons that have not been solicited by the foreign broker or dealer[.]" 17 C.F.R. § 240.15a-6(a)(1); ECF No. [231] at 6. Gentile argues there is a genuine dispute of material fact about whether any U.S. person who used SureTrader's services was improperly solicited under Rule 15a-6(a)(1): a reasonable juror could conclude that SureTrader did not improperly "solicit" U.S persons as it complied with Rule 15a-6 by posting a prominent disclaimer on its website, using IP-detection technology after 2017, requiring customers to attest in writing that they were not solicited by SureTrader, and explaining in its advertising that it was "not intended for U.S. persons[.]" *See* 17 C.F.R. § 240.15a-6; ECF No. [231] at 4, 6. Gentile adds that whether SureTrader solicited a U.S. person to engage in securities transactions is a fact-intensive question inappropriate for resolution on summary judgment. *Id.* at 4. The SEC replies that the record is replete with examples of SureTrader soliciting customers in the U.S. through its

website, agreements with affiliate day trading school websites, and emails to prospective and existing customers in the U.S. ECF No. [222] at 11-17.

Section 15(a)(1) of the Exchange Act states:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).

A broker-dealer who effects transactions in, induces or attempts to induce the purchase or sale of securities via the instrumentalities and means of interstate commerce in the United States must register with the SEC as a broker-dealer. "Registration is one of the primary enforcement mechanisms of the Exchange Act, and it obligates dealers to provide regulators with adequate information for oversight." *Sec. & Exch. Comm'n v. Ibrahim Almagarby*, 92 F.4th 1306, 1315 (11th Cir. 2024) (citation omitted). Subsection (b) — 15 U.S.C. § 78o(b)(1) — then sets forth the manner of registration of brokers and dealers with the SEC.

The SEC is authorized to implement exemptions to the broker-dealer registration requirement by rule under subsection 15(a)(2) of the Exchange Act, which specifies that:

> The Commission, by rule or order, as it deems consistent with the public interest and the protection of investors, may conditionally or unconditionally exempt from paragraph (1) of this subsection any broker or dealer or class of brokers or dealers specified in such rule or order.

15 U.S.C. § 78o(a)(2).

In 1989, the SEC authorized exemptions in Rule 15a-6 "to provide conditional exemptions from broker-dealer registration for foreign broker-dealers that engage in certain activities

involving U.S. investors and securities markets." *See In Re Registration Requirements for Foreign Broker-Dealers*, Release No. 105, 54 Fed. Reg. 30,013, 1989 WL 1097092, at *1 (July 18, 1989) (adopting 17 C.F.R. § 240.15a-6) ("1989 Release"), available at https://www.sec.gov/files/rules/final/34-27017.pdf.[5] The SEC Rules set forth several exemptions, including the following:

> (a) A foreign broker or dealer shall be exempt from the registration requirements of sections 15(a)(1) or 15B(a)(1) of the Act to the extent that the foreign broker or dealer:
> (1) Effects transactions in securities with or for persons that have not been solicited by the foreign broker or dealer;…
>
> 17 C.F.R. § 240.15a-6(a)(1).

The SEC has published two releases to clarify the scope of Rule 15a-6. As the Eleventh Circuit has noted, "'[a]lthough [an] SEC release is entitled to great weight, it is not dispositive.'" *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995), *amended*, 82 F.3d 989 (11th Cir. 1996) (adopting SEC interpretive release clarifying the definition of an "investment adviser" under the Investment Advisor Act) (citing *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 525 (5th Cir.1974)). First, the SEC published a release accompanying Final Rule 15a-6. Therein, the SEC explained that "the Commission generally views "solicitation," in the context of broker-dealer regulation, as including, any affirmative effort by a broker or dealer intended to induce transactional business, for the broker-dealer or its affiliates*."* 1989 Release at *6. The SEC explained that:

> Solicitation includes efforts to induce a single transaction or to develop an ongoing securities business relationship. Conduct deemed [to] be solicitation includes telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect, transactions, as well as advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United

---

[5] The page numbers for the 1989 Release throughout this Order are from Westlaw, not from the SEC copy of the 1989 Release available at https://www.sec.gov/files/rules/final/34-27017.pdf.

States or on any radio or television station whose broadcasting is directed into the United States.

*Id.* at *6. Still, the Commission acknowledged:

The expanded rule did not define the concept of solicitation, and neither does the Rule as adopted. The Commission's general views on meaning of the term "solicitation" have been discussed previously. Taking into account the expansive, fact-specific, and variable nature of this concept, the Commission believes that the question of solicitation is best addressed by the staff on a case-by-case basis, consistent with the principles elucidated in this release.

*Id.* at *11.

The 1989 Release also clarified that Rule 15a-6 was developed because "the Commission does not believe, as a policy matter, that registration is necessary if U.S. investors have sought out foreign broker-dealers outside the United States and initiated transactions in foreign securities markets entirely of their own accord." *Id.* at *6.

Nearly ten years after Rule 15a-6's implementation, the SEC published another release on Rule 15a-6: "Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore" in order "to clarify when the posting of offering or solicitation materials on Internet Web sites would not be considered activity taking place 'in the United States.'" *Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore*, Release Number 33-7516, 63 Fed. Reg. 14,806, 14,806 (Mar. 27, 1998), available at https://www.sec.gov/rule-release/33-7516 ("1998 Internet Release"). It recognized that "[b]ecause anyone who has access to the Internet can obtain access to a Web site unless the Web site sponsor adopts special procedures to restrict access, the pertinent legal issue is whether those Web site postings are offers in the United States that must be registered." *Id.* at 14,808. The SEC explained that:

a foreign broker-dealer generally would be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities if it:

- Posts a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and

- Refuses to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.

As a means to implement the latter procedure, the broker-dealer should require potential customers to provide sufficient residence information.

These procedures are not exclusive. Adoption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities.

*Id.* at 14,813. The SEC further recommended that:

Foreign broker-dealers that have Internet Web sites and that intend to rely on Rule 15a-6's "unsolicited" exemption should ensure that the "unsolicited" customer's transactions are not in fact solicited, either directly or indirectly, through customers accessing their Web sites. In particular, these broker-dealers could obtain, as a precaution reasonably designed to prevent that result, affirmative representations from potential U.S. customers that they deem unsolicited that those customers have not previously accessed their Web sites. Alternatively, a broker-dealer could maintain records that are sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its Web site.

*Id.*

The 1998 Internet Release stated that Rule 15a-6 "exempted foreign broker-dealers that effect transactions with U.S. customers from registering in the United States if these customers initiated transactions with the foreign broker-dealers outside of the United States without solicitation." *Id.* "Foreign broker-dealers that solicit transactions with U.S. persons, however, are required to register as broker-dealers in the United States." *Id.*

Moreover, in a general section not specific to broker-dealer requirements, the SEC explained that it:

distinguish[es] between Web site postings and more targeted Internet communication methods. More targeted communication methods are comparable to traditional mail because the sender directs the information to a particular person, group or entity. These methods include e-mail and technology that allows mass e-

mailing or "spamming." Information posted on a Web site, however, is not sent to any particular person, although it is available for anyone to search for and retrieve. Offerors using those more targeted technologies must assume the responsibility of identifying when their offering materials are being sent to persons in the United States and must comply fully with the U.S. securities laws.

*Id.* at 14,807 (footnote omitted).

Confronted with such "indications that would put the issuer on notice that the purchaser was a U.S. person" the SEC explained it "would expect offerors to take steps to verify that the purchaser is not a U.S. person before selling to that person." *Id.* at 14,809. Finally, the SEC explained that an offshore Internet offeror may offer materials via a third-party website: "if the offeror uses a third-party Web service that employs at least the same level of precautions against sales to U.S. persons as would be adequate for the offshore Internet offeror to employ, we would not view the third-party's Web site as an offer that is targeted to the United States." *Id.* at 14,807. However, "additional precautions may be called for when the Internet offeror:"

- Posts offering or solicitation material or otherwise causes the offer to be listed on an investment-oriented Web site that has a significant number of U.S. clients or subscribers, or where U.S. investors could be expected to search for information about investment opportunities or services; or
- Arranges for direct or indirect hyperlinks from a third-party investment-oriented page to its own Web page containing the offering material.

*Id.* at 14,809.

If a party claims an exemption from the broker-dealer registration requirement, it "bears the burden of proving that an exemption applies." *UBS Asset Management (New York) Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 70 (S.D.N.Y. 1996) (citing *Sec. & Exch. Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 126, 97 L. Ed. 1494 (1953)).

The SEC alleges that three forms of solicitation by SureTrader violated Section 15(a)(1): (1) SureTrader's website, (2) agreements with day trading school websites, and (3) emails to prospective and existing customers in the U.S.

The Court considers each solicitation in turn to determine whether the SEC is entitled to summary judgment against SureTrader for violating Section 15(a)(1) of the Exchange Act (Count I).

### a.    SureTrader's Website

The SEC argues that SureTrader solicited U.S. persons via its website, as its internet disclaimer is not sufficient to comply with SEC guidance: SureTrader must also refuse to provide services to U.S. persons to comply with the 1998 Internet Release. ECF No. [242] at 2. SureTrader argues it complied with Rule 15a-6 and the SEC's interpretive guidance through its website use. ECF No. [231] at 8-10.

The SEC has not carried its burden to demonstrate that there is no genuine dispute of material fact as to whether the Defendants violated Section 15(a)(1) of the Exchange Act by the maintaining of the SureTrader website. Instead, Gentile has carried his burden to demonstrate that the exemption of Rule 15a-6(a)(1) may apply. The record demonstrates that SureTrader implemented some measures to comply with an exemption to Section 15(a)(1) — Rule 15a-6(a)(1) — such as prominent disclaimers and affirmative representations from potential U.S. customers that they were not solicited. As such, the Court cannot find as a matter of law that Defendants violated Section 15(a)(1).

Gentile has demonstrated that there is at minimum a genuine dispute of material fact as to whether Defendants complied with Rule 15-a6(a)(1) and the SEC's 1998 Internet Release. Whether SureTrader's pop-ups and affirmative representations properly complied with the SEC's 1998 Internet Release's recommendations for non-solicitation under Rule 15a-6 is an issue of fact best left to the jury, absent additional guidance in section 15(a)(1) of the Exchange Act, Rule 15-a6(a)(1), and the SEC's 1989 Release and 1998 Internet Release. In light of the paucity of

administrative guidance or case law clarifying what types of disclaimers, pop-ups or agreements are factually sufficient to comply with Rule 15-a6(a)(1), the Court declines to grant summary judgment to the SEC on the issue of SureTrader's compliance. The Release explains "a foreign broker-dealer generally would be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities if it:"

> - Posts a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons; and
> - Refuses to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds.
> As a means to implement the latter procedure, the broker-dealer should require potential customers to provide sufficient residence information.
> These procedures are not exclusive. Adoption of other equally or more effective precautions can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities.

1998 Internet Release at 14,813.

Beginning in 2017, the record shows that SureTrader did "[p]ost[] a prominent disclaimer on the Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons." *Id.* The record demonstrates that in 2017, a prominent pop-up would display on SureTrader's website for visitors with U.S. IP addresses accessing SureTrader's website. The pop-up stated:

> In compliance with SEC RULE 15a-6 this website is not intended to solicit U.S. Residents.
> You will need an access code or be an existing client to view our website.
> By continuing, you certify that you have not been solicited to this website.
> To generate a code, please enter your mobile # or email @ and insert the code once received.

ECF No. [237-26]. The pop-up contained a box for visitors to input their "Email or phone number or access code here" and a "Submit" button. As the SEC points out, despite this pop-up, visitors to the website could also see a small pop-up window at the bottom-right of the website

stating: "New to SureTrader? I'm happy to help with opening a new account or giving you a walk-through of our desktop platform demo." ECF No. [226-32] at 1. This box could expand if a visitor clicked on it. *Id.* at 2. Gentile argues that this pop-up constitutes compliance with Rule 15a-6(a)(1). ECF No. [231] at 8.

Before 2017, SureTrader used a less conspicuous pop-up, which stated "[u]se of this website is subject to your acceptance of the following Terms and Conditions" and then explained that "[b]y clicking the Continue button, you agree to the terms and conditions" ECF No. [226-31]. The linked terms and conditions included seven small-print paragraphs ranging from one to four lines. *Id.* The last one is bolded and states "Swiss America Securities, Ltd (SureTrader) does not service accounts for U.S. citizens, U.S. residents or U.S. corporations that have been solicited directly or indirectly in compliance with SEC Rule 15a-6." *Id.*

The Court finds that there is a genuine dispute of material fact as to whether those disclaimers complied with Rule 15-a6(a)(1) and the 1998 Internet Release. The record demonstrates that SureTrader put in place some measures that a reasonable jury could find complied with the 1998 Internet Release, such as its recommendation to post a "prominent disclaimer… stating that the services are not available to U.S. persons" and its recommendation to obtain "affirmative representations from potential U.S. customers that they deem unsolicited that those customers have not previously accessed their Web sites" to establish that they were not solicited under Rule 15a-6. 1998 Internet Release at 14,813.

The SEC argues that compliance with the "prominent disclaimer" requirement is insufficient under the 1998 Internet Release. ECF No. [242] at 2-3. The record demonstrates that SureTrader failed to comply with the second measure recommended by the 1998 Internet Release, which must be taken in conjunction with a prominent disclaimer on the foreign broker-dealer's

website so that the foreign broker-dealer would "generally … be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities[.]" 1998 Internet Release at 14,813. SureTrader did not:

> [r]efuse[] to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds. As a means to implement the latter procedure, the broker-dealer should require potential customers to provide sufficient residence information."

*Id.*

The SEC is correct that SureTrader failed to comply with this requirement. SureTrader did open accounts for people it knew to be U.S. persons. First, 2,216 of the 2,824 traders (78.47 percent) listed by SureTrader in its Active Traders List were listed as being in the U.S. ECF No. [226-8].[6] Yaniv Frantz, a former SureTrader staffer, testified that U.S. based customers were approved by SureTrader. ECF No. [226-4] at 82-83. This was despite the fact SureTrader knew customers were based in the U.S. when it opened their accounts. SureTrader collected clients' "Country of Residence" in its "Money Laundering Risk Assessment" forms yet proceeded to open accounts for them anyway. *See, e.g.*, ECF Nos. [226-34] at 2, [226-35] at 2, [226-36] at 2, [226-37] at 2. Because of this non-compliance, the SEC argues it should be entitled to summary judgment. Gentile responds that those U.S. clients were unsolicited and there is no legal or factual support for the proposition that accepting unsolicited U.S. clients in and of itself violates Section 15(a)(1) of the Exchange Act. ECF No. [250] at 3.

The SEC is correct that the 1998 Internet Release states that a foreign broker dealer who uses a prominent disclaimer on their website *and* refuses to provide brokerage services to U.S.

---

[6] The list appears to have been compiled by Yaniv Frantz in February and March 2018, per Frantz's deposition. ECF No. [226-4] at 133.

persons "generally would be considered to have taken measures reasonably designed to ensure it does not effect securities transactions with U.S. persons as a result of its Internet activities." 1998 Internet Release at 14,813. While the record supports that SureTrader failed to refuse U.S. persons and failed to comply with a recommendation in the 1998 Internet Release, that is not dispositive as to whether SureTrader violated Section 15(a)(1) or can instead rely on the exemption in Rule 15a-6.

Though the record demonstrates that SureTrader did not comply with the strictest mode of compliance indicated in the 1998 Internet Release, it does not demonstrate that no genuine dispute of material fact exists as to SureTrader's "solicitation" of U.S. persons. Not accepting U.S. persons as clients *at all*, as the 1998 Internet Release recommends, is the surest way to comply with Section 15(a)(1)'s requirement to register with the SEC "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security…" in the United States. 15 U.S.C. § 78o(a)(1). However, Rule 15a-6(a)(1) does not bar the transaction in securities with all U.S. persons, as it allows a foreign broker or dealer to "[e]ffect[] transactions in securities with or for persons that have not been solicited by the foreign broker or dealer[,]" including U.S. persons. 17 C.F.R. § 240.15a-6(a)(1). Under the text of Rule 15a-6(a)(1), one can have U.S. clients it did not solicit and still comply with Rule 15a-6(a)(1), and thus not violate Section 15(a)(1). Though SureTrader did not refuse all U.S. clients — and in fact accepted a disproportional amount of U.S. clients — that fact is not enough to find that it solicited U.S. persons and violated Section 15(a)(1) as a matter of law, absent additional evidence demonstrating these clients were solicited. Fed. R. Civ. P. 56(a).

The 1998 Internet Release also recognizes there are other ways to comply with Rule 15a-6(a)(1)'s non-solicitation requirement than the combined use of a website disclaimer and refusal

to accept all suspected U.S. persons as clients. As SureTrader correctly notes, the 1998 Internet Release states that a prominent disclaimer on a website *and* refusal to provide brokerage services "are not exclusive" procedures to comply with Rule 15a-6. 1998 Internet Release at 14,813. ECF No. [250] at 2. Indeed, "[a]doption of *other equally or more effective precautions* can also suffice to demonstrate that the broker-dealer does not effect securities transactions with U.S. persons as a result of its Internet activities." *Id*. (emphasis added). In addition to these stringent precautions, the 1998 Internet Release explains that there are other ways for foreign broker-dealers to rely on Rule 15a-6(a)(1) and show that the "'unsolicited' customer's transactions are not in fact solicited, either directly or indirectly, through customers accessing their Web sites." *Id.* at 14,813. One such way is to "obtain, as a precaution reasonably designed to prevent that result, affirmative representations from potential U.S. customers that they deem unsolicited that those customers have not previously accessed their Web sites" or "to maintain records that are sufficiently detailed and verifiable to reliably determine that such U.S. customers had not obtained access to its Web site." *Id.* at 14,813. SureTrader appears to have complied with the first recommendation starting in 2017, by obtaining "affirmative representations from potential U.S. customers that they deem unsolicited that those customers have not previously accessed their Web sites" via its disclaimer, ECF No. [237-26], in an apparent attempt at compliance with the 1998 Internet Release. 1998 Internet Release at 14,813.

Accordingly, the SEC is not entitled to judgment as a matter of law by merely showing SureTrader did not refuse U.S. clients. Even if SureTrader did not establish full compliance with two recommended procedures that would "generally" demonstrate it did not solicit U.S. persons with its website, 1998 Internet Release at 14,813, there is still a genuine dispute of material fact as to whether other measures taken by SureTrader complied with Rule 15a-6's non-solicitation

exemption and the 1998 Internet Release. On this record, there are still genuine disputes of material facts as to whether SureTrader's behavior constituted solicitation of U.S. persons falling outside the scope of the Rule 15a-6(a)(1) exemption. This result aligns with the SEC's cautious definition of solicitation, indicating that solicitation is "expansive, fact-specific, and [of] variable nature" such that "the Commission believes that the question of solicitation is best addressed by the staff on a case-by-case basis..." 1989 Release at 6.

As other evidence of website solicitation, the SEC points to a website screenshot "7 Great Reasons Why You Should Consider SureTrader" by a poster called "Ignite" as evidence that the SEC was engaging in solicitation via its website. ECF No. [226-10]. Gentile argues that he does not know who "Ignite" is, but that there is no evidence it was affiliated with or employed by SureTrader. ECF No. [237] ¶ 35. The screenshot indicates that Ignite's post received: "No comments yet, 0 Views." *Id.* Further Gentile urges the Court not to credit a "review" on SureTrader's website by an unknown person as a statement by SureTrader. ECF No. [231] at 8-9. In doing so, Gentile raises a genuine dispute of material fact as to whether the post can be termed a solicitation by SureTrader, as the identity of the poster is unknown on this record. The Court declines to grant summary judgment to the SEC based on the Ignite post.

In addition, the SEC points to a U.S. phone number on SEC's website as further evidence of solicitation by SureTrader. ECF No. [222] at 12. A May 11, 2017 web archive capture of the "Contact us" page of SureTrader's website shows a U.S. phone number, as well as a VOIP (Voice over Internet Protocol) USA number listed "as a courtesy to our existing clients[,]" alongside United Kingdom and Australia numbers telephone and VOIP numbers. ECF No. [226-13] at 1, 2. The 1989 Release explains that "[c]onduct deemed [to] be solicitation includes telephone calls from a broker-dealer to a customer" — but does not indicate whether listing a phone number or

phone calls from customers to the broker dealer are sufficient for a finding of solicitation. 1989 Release at *6. Though the phone number may constitute evidence that SureTrader had U.S. clients or was approached by U.S. clients, it is not sufficient to find as a matter of law that SureTrader solicited U.S. clients in violation of Section 15(a)(1) of the Exchange Act.

The SEC has not carried its burden to establish that there is no genuine dispute of material fact as to whether SureTrader engaged in solicitation of U.S. persons via its website. Drawing all reasonable inferences in the light most favorable to the non-moving party, Gentile made "enough of a showing that the jury could reasonably find for" Defendants, that they complied with Rule 15-a6, and did not violate Section 15(a)(1) of the Exchange Act via their website. *Walker*, 911 F.2d at 1577.

### b.  Agreements with Day Trading School Websites

The SEC argues that SureTrader solicited U.S. citizens when it entered in an advertising agreement with Warrior Trading and Day Trading Radio, which are based in the United States. ECF No. [222] at 13. Gentile argues that no such solicitation occurred as all advertising contained disclaimers that SureTrader's services were not intended for U.S. customers, both Warrior Trading and Day Trading Radio had students and customers all over the world, and SureTrader's contracts with both day trading schools prohibited solicitation of U.S. customers. ECF No. [231] at 9.

The record evidences a genuine dispute of material fact as to SureTrader's solicitation of U.S. customers when entering an advertising relationship with Warrior Trading and Day Trading Radio. On one end, both Warrior Trading and Day Trading Radio are based in the United States. ECF Nos. [226-24] at 1, [222] at 6. However, the contracts between SureTrader and Warrior Trading and Day Trading Radio each state that the contract is to "provide certain marketing services to Swiss America [(SureTrader)] for non-United States investors[.]" ECF Nos. [226-24]

27

at 1, [226-26] at 21. In addition, the record shows that it was not SureTrader who initiated at least one of the partnerships with the affiliate day trading schools. In an August 23, 2016 email, Ross Cameron from Warrior Trading reached out to Justin Ritchie at SureTrader to ask about SureTrader's interest in "working together to promote Suretrader among the Warrior Trading community." ECF No. [237-5] at 2. Ritchie answered on September 14, 2016 and asked: "how do you ensure that U.S. clients don't come to us or is it up to us not to accept U.S. persons using your code or name?" *Id.* When Ritchie eventually agreed to the partnership, he stated that "[t]he agreement's use would be more for use to outline the parameters of marketing i.e. not intended for U.S. persons." *Id.* at 3.[7]

Finally, the ads from SureTrader placed on the day trading schools' websites contain disclaimers in all caps: "NOT INTENDED FOR U.S. PERSONS." *See* ECF Nos. [226-27], [226-28]. The SEC explained that an offshore Internet offeror may comply with Rule 15a-6 "if the offeror uses a third-party Web service that employs at least the same level of precautions against sales to U.S. persons as would be adequate for the offshore Internet offeror to employ....", such as through the use of a disclaimer "stating that the services are not available to U.S. persons." 1998 Internet Release at 14,809, 14,813. Accordingly, there is a genuine dispute of material fact as to whether the advertisements placed on Day Trading Radio and Warrior Trading complied with the SEC's 1998 Internet Release.

On the other end, the record establishes that both Warrior Trading and Day Trading Radio have U.S. and non-U.S. clients such as "international students, mostly from English speaking countries, like the U.K. and Australia." Ross Cameron Deposition, ECF Nos. [237-3] at 2, [237-

---

[7] Whether Gentile was aware and actively or passively involved in the deal with the day trading radios is unclear from the record. *See* Yaniv Frantz Deposition, ECF No. [226-4] at 29-33; Philip Dorsett Deposition, ECF No. [237-2] at 60-61.

4] at 21; ECF No. [226-30]. The partnership with Warrior Trading did yield some U.S. clients for SureTrader, evidenced by several U.S.-based clients filling out a form when opening an account with SureTrader, which stated they heard about SureTrader via Warrior Trading. *See*, *e.g.*, ECF Nos. [226-34] at 2, [226-35] at 2, [226-36] at 2, [226-37] at 2.

According to the SEC's 1998 Internet Release, advertising on a third-party website may require "additional precautions[,]" which "may be called for when the Internet offeror[ p]osts offering or solicitation material or otherwise causes the offer to be listed on an investment-oriented Web site that has a significant number of U.S. clients or subscribers, or where U.S. investors could be expected to search for information about investment opportunities or services[.]" *Id.* at 14,809.

However, what third-party advertisement complies with the non-solicitation exemption under Rule 15-a6(a)(1) is an issue of fact, as the law does not make clear what "additional precautions" suffice at this stage. Viewing the record evidence and drawing all reasonable inferences in the light most favorable to Defendants, there is a genuine dispute of material fact as to whether SureTrader's contracts with the affiliate day trading schools restricting the advertising to non-U.S. investors and the ads stating in legible, all-capital print "Not Intended for U.S. Persons" were sufficient for compliance with Rule 15a-6(a)(1). *Diebold, Inc.*, 369 U.S. at 655.

### c.    Emails to U.S. Customers

The Court considers whether emails sent by SureTrader to prospective and existing customers in the U.S. constitute solicitation. The SEC argues that emails to U.S. residents Orestes Jimenez and Mazen Agha constitute inappropriate solicitation in violation of Section 15(a)(1) of the Exchange Act. ECF No. [222] at 14. Gentile responds that Jimenez was the one to actively seek out SureTrader, and the emails to Jimenez were sent "after he had already signed up for a 'demo' and started opening an account ... after he would have already had to navigate through the SureTrader website, including its pop-up disclaimer indicating that SureTrader was not intended

for U.S. persons." ECF No. [231] at 16. Gentile also argues that Agha was not a U.S. person, *id.*, and that it was Agha and Jimenez who sought out SureTrader, and not vice versa. ECF No. [250] at 4-5.

The SEC points to an email sent by SureTrader on March 8, 2017 to Orestes Jimenez, a Florida resident, titled "Trading Tips You Can't Afford to Ignore" stating "Your SureTader [(sic)] demo has now expired, and it's time to put all your practice into action!" ECF No. [226-18] at 1. The email then states: "To get you started, we'd like to offer you $99 in Free Trades when you open an account with SureTrader. Use Code: SURE99, and fund your account with a minimum of $1,000." *Id.* SureTrader sent subsequent emails to ask Jimenez to "Please Confirm Your Account[,]" stating that "This email has been sent to you because you've started a new application in the SureTrader Account Center." ECF No. [226-19] at 1. Subsequently, SureTrader sent Jimenez "a courtesy email letting you know that your buying power has been updated." ECF No. [226-20]. SEC also points to a declaration by U.S. resident Mazen Agha, who indicates that:

> The SureTrader website also offered a "SureTrade 100k Demo Platform" where you could download a program that allowed participants to practice day trading for 7 days for free before opening an account. I downloaded the SureTrader 100K Demo Platform program in August 2016. On August 22, 2016, I received an email from SureTrader stating that my SureTrader demo had expired, and that "it's time to put all your practice into action!" The email also offered $99 in free trades when you opened an account at SureTrader. There was nothing in the email stating the offer for free trades was not available for residents of the United States.

ECF No. [226-21] ¶ 6.

There is a genuine dispute of material fact as to whether those emails constitute solicitation in violation of Rule 15a-6(a)(1). Those emails could fall under "solicitation" as defined in the supplementary information accompanying Final Rule 15a-6 "as including, any affirmative effort by a broker or dealer intended to induce transactional business, for the broker-dealer or its affiliates." 1989 Release at *6. They could also be examples of "more targeted Internet

communication methods" which require offerors to "assume the responsibility of identifying when their offering materials are being sent to persons in the United States and must comply fully with the U.S. securities laws." 1998 Internet Release at 14,807 (footnote omitted). However, if the emails were sent *after* a U.S. investor reached out to SureTrader to download SureTrader's "Demo Platform" without solicitation by SureTrader, there is a question of fact as to whether the subsequent email from SureTrader would comply with Rule 15a-6's authorization to "[e]ffect[] transactions in securities with or for persons that have not been solicited by the foreign broker or dealer." 17 C.F.R. § 240.15a-6(a)(1).

Drawing all reasonable inferences in the light most favorable to Defendants, the emails in the record do not unambiguously demonstrate solicitation by SureTrader because the SureTrader emails follow the downloading of a SureTrader demo by both Agha and Jimenez. The emails from SureTrader to Jimenez and Asha were responsive to Jimenez and Agha seeking out SureTrader by enlisting in the SureTrader demo. Agha's Declaration evidences that SureTrader sent him an email that "offered $99 in free trades" *after* he first downloaded the 100K Demo Platform from SureTrader. ECF No. [226-21] ¶ 6. So did the email to Jimenez, which states: ""Your SureTader [(sic)] demo has now expired, and it's time to put all your practice into action!" ECF No. [226-18] at 1.

It is not entirely clear from the record what content led Agha and Jimenez to SureTrader. Agha indicates that he learned about SureTrader through Warrior Trading. It's not clear from the record if he came to SureTrader after seeing ads on Warrior Trading that stated SureTrader was not intended for U.S. persons or via other content on Warrior Trading. ECF No. [226-21] ¶ 4. Absent more information about what led Agha and Jimenez to SureTrader, the Court declines to grant the SEC summary judgment that SureTrader solicited Agha and Jimenez when it sent them

emails pursuant to their use of SureTrader's free demo. As noted, the SEC acknowledged that solicitation is "expansive, fact-specific, and variable" and best addressed on a "case-by-case" basis. 1989 Release at 11. Though the SEC relies on the 1989 Release and the 1998 Internet Release, these do not definitively answer the question of whether an email from a foreign broker-dealer that follows a U.S. investor downloading a demo from that broker-dealer would be considered solicitation. Whether this constitutes solicitation depends on what led Agha and Jimenez to the free demo in the first place and could vary based on whether they were led to SureTrader by advertisements "not intended for U.S. persons" or by other content on the Warrior Trading website.

Drawing inferences in the light most favorable to Defendants, it could be inferred that Jimenez and Agha sought out SureTrader when they downloaded the SureTrader demo, which would make SureTrader "exempt from the registration requirements of sections 15(a)(1) or 15B(a)(1) of the Act." 17 C.F.R. § 240.15a-6(a)(1). There is a genuine dispute of material fact as to whether such seeking out by U.S. persons would shield SureTrader of liability, since Rule 15a-6 was developed because:

> the Commission does not believe, as a policy matter, that registration is necessary if U.S. investors have sought out foreign broker-dealers outside the United States and initiated transactions in foreign securities markets entirely of their own accord. In that event, U.S. investors would have taken the initiative to trade outside the United States with foreign broker-dealers that are not conducting activities within this country. Consequently, the U.S. investors would have little reason to expect these foreign broker-dealers to be subject to U.S. broker-dealer requirements. Moreover, requiring a foreign broker-dealer to register as a broker-dealer with the Commission because of unsolicited trades with U.S. persons could cause that foreign broker-dealer to refuse to deal with U.S. persons under any circumstances.

> *Id.* at 6.

The Court declines to define the factual contours of what constitutes solicitation under Rule 15a-6(a)(1) on a summary judgment motion. The Court has good reason for doing so:

> Although Rule 56 applies in all civil cases, it has long been recognized that summary treatment is rarely suitable in complex cases, particularly those involving complicated legislation and regulations. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2732 *et seq.* (4th ed. Apr. 2020). This principle applies with even greater force when summary judgment is sought by the party bearing the burden of proof and persuasion.

*Sec. & Exch. Comm'n v. Montano*, No. 618CV1606ORL31GJK, 2020 WL 5534671, at *6 (M.D. Fla. July 31, 2020), *report and recommendation adopted*, No. 6:18-CV-1606-GAP-GJK, 2020 WL 5887648 (M.D. Fla. Oct. 5, 2020). Indeed, "summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice." *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57 (1948). Moreover "complexity does not stand as the only prudential reason for insisting upon cautious use of the summary procedure. Novel application of legal principles and potential impact are also relevant considerations." *Bradbury v. Wainwright*, 718 F.2d 1538, 1546 (11th Cir. 1983) (citing 10A Wright, Miller & Kane, Federal Practice & Procedure § 2725 (1983)).

The Court declines to grant summary judgment to the SEC on Count I for violation of Section 15(a)(1) of the Exchange Act.

### ii.   Section 20(a) of the Exchange Act as a Control Person: Count II

The SEC also seeks summary judgment on Count II of the Complaint, Defendant's violation of Section 20(a) of the Exchange Act, and assert that Gentile is liable by virtue of his status as founder, owner, director, CEO, and boss, and he does not have a good faith defense. ECF No. [222] at 18. The SEC asserts Gentile directed the actions of others regarding the solicitation

of U.S. customers, including, among other things, the advertising agreements with SureTrader Affiliates. *Id.* Gentile responds that he was not affiliated with SureTrader during a significant portion of the relevant period, March 2016 to November 2019, as he left SureTrader between the end of December 2015 and early February 2017. ECF No. [231] at 1. Gentile asserts that the record contains many examples of Gentile' efforts to formulate corporate policy in compliance with Rule 15a-6. *Id.* at 11-14. Gentile urges that his state of mind and whether he had the requisite intent or acted in good faith are questions of fact best left to the jury. *Id.* at 14. Moreover, because no primary violation of Section 15(a)(1) was established, Gentile contends he is not liable. *Id.* at 11.

Section 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order for Section 20(a) to apply, there must be liability by SureTrader of Section 15(a)(1) of the Exchange Act. Because the Court does not grant summary judgment as to Count I for violation of Section 15(a)(1) of the Exchange Act by SureTrader, it cannot grant summary judgment as to Count II for violation of Section 20(a) of the Exchange Act.

### iii.    Section 20(b) of the Exchange Act: Count III

The SEC also seeks summary judgment on Section(b) of the Exchange Act and argues that Gentile is liable for acting through SureTrader to commit violations of Section 15(a)(1) of the Exchange Act as prohibited by Section 20(b). ECF No. [222] at 18-19. Specifically, Gentile used

SureTrader to solicit U.S. customers. *Id.*  Gentile responds that he had no control over SureTrader. ECF No. [231] at 15-16.

Under Section 20(b) of the Exchange Act, "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). Gentile's liability under Section 20(b) depends on whether there was a violation of Section 15(a)(1) of the Exchange Act  - whether SureTrader solicited U.S. customers without properly registering with the SEC. As the Court does not grant summary judgment as to Section 15(a)(1) of the Exchange Act, it declines to grant summary judgment as to Count III.

### iv.    Gentile's Affirmative Defenses

The SEC moves for summary judgment as to Gentile's affirmative defenses. *See* ECF No. [78] at 11-14. The SEC briefly argues that there is no evidence supporting any affirmative defense: there is no evidence underlying Gentile's First, Sixth, Seventh, Eighth, Ninth, and Tenth Affirmative Defenses that the Government instructed SureTrader to behave as it did, nor is Gentile's scienter relevant to the counts alleged; the third affirmative defense that the statute of limitations has run similarly fails; there is no evidence of fraud by the SEC, Government or a third-party as to Gentile's Fourth Affirmative Defense; res judicata is not relevant as the current claims were not made in prior cases; there is no evidence supporting spoliation of evidence under Gentile's Eleventh Affirmative Defense; and there is no evidence of duress and unconscionability under Gentile's Twelfth Affirmative Defense. ECF No. [222] at 19-20. Gentile responds that there is evidence supporting his affirmative defenses. ECF No. [231] at 17.

The SEC does not attach sufficient facts or law to explain its entitlement to summary judgment on Gentile's affirmative defenses. "Merely stating there is no evidence to support the

affirmative defenses is not enough to prevail on summary judgment." *Fed. Deposit Ins. Corp. for Superior Bank v. Hall*, No. 8:14-CV-834-T-24 TGW, 2016 WL 7325590, at *2 (M.D. Fla. Aug. 29, 2016) (citation omitted). Instead, "[a] court may grant partial summary judgment on affirmative defenses, so long as the movant meets its burden of showing that the defenses cannot be maintained by a preponderance of the evidence." *Id.* The SEC did not do so here, so the Court declines to grant summary judgment as to Gentile's affirmative defenses.

### B. Motions *in Limine*

#### i.      Criticism of SEC Investigation Preceding Litigation

Following their Joint Notice of Partial Resolution of Motions *in Limine*, Gentile agrees that it shall not make *ad hominem* attacks on SEC Counsel. ECF No. [244] ¶ 1.a. Defendants shall not discuss the Commission's motive for bringing this action. *Id.* The parties continue to dispute whether the SEC's investigation that preceded this litigation may be criticized before the jury. *Id.*

Plaintiff's request to exclude criticism of the SEC investigation that preceded this litigation is denied, as the Court is unsure of what this criticism entails other than the *ad hominem* attacks from which Gentile agreed to refrain.

> Motions *in limine* that are broad, vague, and include speculative categories of evidence and argument of which the Court cannot predetermine the admissibility are due to be denied, as the real purpose of a motion *in limine* is to avoid the introduction of evidence at trial that is clearly inadmissible on all potential grounds and could irretrievably impact the fairness of the trial.

*Robbins v. Robertson*, No. 7:15-CV-00124 (WLS), 2022 WL 2987890, at *5 (M.D. Ga. July 28, 2022); *see also Perez v. Fla. POP, LLC*, No. 20-14214-CV, 2022 WL 18023487, at *2 (S.D. Fla. Jan. 28, 2022) (denying motions *in limine* for being "too vague, overbroad, or confusing for purposes of making a definitive informed pretrial ruling").

Here, it is unclear what specific evidence is or is not covered in Defendant's Motion pertaining to criticism of the SEC's prior investigation. "[M]otions *in limine* should be limited to specific pieces of evidence and not serve as reinforcement regarding the various rules governing trial." *Perez*, 2022 WL 18023487, at *2 (citation omitted). "When confronted with a broad motion *in limine*, therefore, the "better practice is to deal with questions of admissibility of evidence as they arise" during the trial. *Whidden v. Roberts*, 334 F.R.D. 321, 323 (N.D. Fla. 2020).

Accordingly, the Court denies Defendant's Motion *in Limine* pertaining to criticism of the SEC preceding this litigation.

### ii.    Documents and Evidence Regarding FINRA's Prior Charging Decisions, Wells Submission, and Related Involvement of Counsel

Following their Joint Notice of Partial Resolution of Motions *in Limine*, the Parties agree that no party shall mention any of the prior SEC or Department of Justice ("DOJ") investigations, and resulting court cases in the District of New Jersey, or that Gentile was a cooperator for the FBI or DOJ. ECF No. [244] ¶ 1.b. The Parties continue to dispute whether documents and evidence regarding FINRA's prior charging decision should be precluded. *Id.* The Parties also continue to dispute whether the SEC gave Gentile assurances that SureTrader's solicitation policies and practices conformed with U.S. securities law in those prior investigations (and subsequent cooperation with the DOJ) and whether evidence of this should be precluded. *Id.* Moreover, the Parties agree that no party shall mention any of the prior SEC or DOJ investigations and resulting court cases in the District of New Jersey, and whether the FBI, SEC or DOJ approved of SureTrader's solicitation of U.S. based investors in those matters. *Id.* at ¶ 1.c.

Gentile intends to introduce the Wells Submission — a document submitted by respondents to defend themselves against formal charges by FINRA — that he submitted to FINRA detailing his compliance with all non-solicitation rules and FINRA's decision to close its investigation with

no further action. *Id.* The SEC maintains its opposition to the introduction of the Wells Submission. *Id.* The Parties also agree that if the Court admits this evidence, neither side will mention that the Wells Submission was provided in connection with his cooperation with the DOJ, only that it was provided. *Id.* at ¶ 2.a. Gentile argues that evidence pertaining to his cooperation and his Wells Submission to FINRA are relevant and go to the heart of his good faith defense under Section 20 of the Exchange Act. ECF No. [247] at 3. Finally, the Parties also disagree as to whether Gentile should be precluded from presenting evidence of involvement or presence of counsel regarding his compliance with non-solicitation rules. ECF No. [244] ¶ 1.d.

There appear to be two investigations at issue: a 2007-2008 investigation by the SEC into Gentile pertaining to a pump and dump scheme and a 2013 FINRA investigation into SureTrader. The Court agrees with the SEC that the prior investigation and non-prosecution of Gentile related to an unrelated pump and dump scheme should be excluded. It occurred in 2007 and 2008 before the formation of SureTrader in 2011. ECF No. [220] at 6. As such, the evidence of prior investigations and non-prosecution relate to an entirely different scheme and fails to satisfy Rule 401's low threshold for relevant evidence. Such evidence does not have "any tendency to make a fact more or less probable than it would be without the evidence" and it is not "of consequence in determining the action." Fed. R. Evid. 401. It is "irrelevant evidence" and is accordingly not admissible. *See* Fed. R. Evid. 402.

In contrast, Gentile can introduce the Wells Submission from SureTrader in the prior FINRA investigation in 2013, as well as prior assurances given to Gentile by the SEC and DOJ relating to SureTrader's compliance with Section 15(a)(1). Gentile can introduce the related evidence of involvement of counsel in the drafting of the Wells Submission explaining SureTrader's policies and procedures aimed at ensuring compliance with Section 15(a)(1), as long

as he complies with the Parties' Joint Notice of Partial Resolution of Motions *in Limine*, ECF No. [244]. Such evidence is relevant as it makes Gentile's defense of good faith as to SureTrader's compliance "more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401. Acting in good faith is a defense under Section 20(a) of the Exchange Act which shields a controlling person from liability if "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The jury is capable of understanding FINRA's prior investigation into SureTrader and Gentile's drafting of the Wells Submission without risk of confusion. Accordingly, exclusion is not warranted under Rule 403's exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Accordingly, the SEC's Motion *in Limine* is denied regarding the exclusion of the Wells Submissions to FINRA; documents and evidence regarding FINRA's prior decision not to charge SureTrader or Gentile with violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78*o*(a)(1); and related evidence of involvement of counsel in the drafting of the Wells Submission explaining SureTrader's policies and procedures aimed at ensuring compliance with Section 15(a)(1).

### ii. Documents Produced by Philip Dorsett and Yaniv Frantz and Their Testimony

The Parties continue to dispute whether documents produced by Philip Dorsett and Yaniv Frantz and their testimony should be precluded and whether the SEC's expert should be excluded. ECF No. [244] ¶ 2.c. Gentile seeks a hearing as to the admissibility of testimony and documents obtained in discovery from Dorsett and Frantz, both former SureTrader staffers. ECF No. [221] at

1. The SEC argues that Gentile provides no reasons to exclude testimony and documents from Frantz, who was properly deposed in the presence of Gentile's counsel. ECF No. [229] at 4. The Court finds no basis for exclusion of Dorsett or Frantz's testimony.

### C. *Daubert* Motion to Strike Expert

Gentile also moves to strike the expert report dated February 3, 2023 and anticipated testimony of David F. MacNair, an expert whose report and testimony the SEC aims to introduce. ECF No. [221-1]. ECF No. [221] at 2. MacNair aims "to render an opinion on whether the conduct and activities of [SureTrader and Gentile] comported with standards, practices, and regulations governing specified exemptions under SEC Rule 15a-6 of the Securities and Exchange Act of 1934 ("Exchange Act") and FINRA Rules governing "Pattern Day Trading" ("PDT") from an industry perspective." ECF No. [221-1] at 5. Gentile argues that MacNair's report fails to satisfy the criteria of Federal Rule of Evidence 402, as a trier of fact does not need an expert in this area, and the expert report ignores disputes of facts that do not support his conclusion and does not reflect reliable principles and methods. *Id.* at 2-3. In the alternative, Gentile requests a *Daubert* hearing. *Id.* at 3. The SEC responds that MacNair has more than 30 years of experience in the securities industry and that this is a complex issue appropriate for expert testimony. ECF No. [229] at 2.[8] The SEC argues that MacNair will help the trier of fact understand the complicated framework of operating a foreign broker-dealer under the Exchange Act and its exemptions, and McNair built a profile of the Defendant's business to determine if it met the requirements of 15a-6. As described by the SEC,

> MacNair synthesizes all the information reviewed to opine that (1) Defendants did
> not have the necessary processes and controls associated with the general standards
> of care in place when evaluating the possible U.S. registration exemption

---

[8] In addition, the SEC argues that Defendants' Motion *in Limine* and to Strike should be stricken for failing to confer, a demand now mooted by Parties' Joint Notice of Partial Resolution of Motions *in Limine*, ECF No. [244].

requirements; (2) Defendants failed to implement controls to prevent SureTrader solicitations from targeting U.S. residents; and (3) Gentile did not perform any meaningful evaluation of the available exemptions, and had he done do, he would have concluded based on the facts and circumstances, that Defendants did not meet any exemptions to SEC Rule 15a-6.

*Id.* at 6.

The Court analyzes whether the SEC has established the "qualifications," "reliability," and "helpfulness" prongs of *Daubert*, such that MacNair's expert report is admissible. *Frazier*, 387 F.3d at 1260.

An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). MacNair has over 30 years of experience in the securities industry, including compliance support to broker-dealers, banks, and financial institutions MacNair was also an Examiner for the Financial Industry Regulatory Authority ("FINRA"), formerly the National Association of Securities Dealers ("NASD"). ECF No. [221-1] at 1-2. He is the founder and managing principal of MacNair Consulting, LLC, a regulatory compliance consulting firm founded in November 2021, which offers compliance support to broker-dealers ("BD"), banks, and other financial institutions. *Id.* He provided expert witness and litigation support in securities industry cases. *Id.* MacNair also performed annual reviews of foreign financial institutional clients where SEC Rule 15a-6 exemptions were evaluated, and he was responsible for the investigation of suspect activity involving foreign financial institutions where evaluation of applicable exemptions and regulations would be determined. *Id.* MacNair holds numerous FINRA licenses. *Id.* Accordingly, Plaintiff has sufficiently established the "qualifications" prong for MacNair's expert testimony.

Second, the SEC has sufficiently established the "reliability" prong for MacNair's testimony. As the basis of his expert opinion MacNair invokes his "extensive experience in the review of FBDs from a compliance perspective, including: review of new account documents; KYC information; incorporation documents; and, performing due diligence on FBDs [and] perform[ance of] accuracy evaluations of materials presented by FBDs submitted for purported exemption under the relevant registration requirements." *Id.* at 6. The SEC points out that MacNair used his own experience in evaluating whether an exemption under SEC Rule 15a-6 applied to foreign financial institutional clients and broker-dealers before concluding that SureTrader did not have the necessary processes or controls in place. *Id.* at 6, 15. That is sufficient to satisfy the reliability clause, as "an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

Third, while the Court finds that the SEC has sufficiently established the "helpfulness" prong for MacNair's explanations of SEC regulations and potential controls and processes for compliance, the SEC has not established "helpfulness" as to MacNair's legal conclusions that SureTrader did not comply with Rule 15-a6(a)(1). Expert testimony must "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink*, 400 F.3d at 1292 (citation omitted). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But "testifying experts may not offer legal conclusions." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). Moreover, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63.

MacNair's expert report provides extensive background on the operations of broker-dealers, day trading, registration requirements for broker-dealers, possible exemptions to registration, and possible processes and controls to comply with SEC regulations. *See generally* ECF No. [221-1]. As to this aspect of his report, MacNair's testimony is both admissible and helpful to a jury that has likely never encountered foreign broker-dealers, exemptions to registration requirements with the SEC, or modes of compliance. *See United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2nd Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *Highland Capital Management, L.P., v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008) (holding that an expert "may testify as to the customs and practices of the industry" because such testimony was "relevant to this case and may prove helpful to the jury"). The portions of the report pertaining to the SEC's and FINRA's regulatory framework for broker-dealers are admissible at trial, as are the sections pertaining to common practice, processes and controls in the industry.

Yet, the Court finds that certain portions of the report veer into inappropriate legal conclusions that would not assist the jury. As to Rule 15a-6(a)(1), MacNair states: "This exemption should have been ruled out as it was clear that the communications aimed at U.S. Investors were solicitations based on the SEC broad definition of 'Solicitation'." ECF No. [221-1] at 16. MacNair's report then expands on why the 15a-6(a)(1) exemptions are not met. *Id.* at 20. The report concludes that "[b]ased on the facts and circumstances referenced above, it is apparent that SureTrader actively solicited U.S. investors." *Id.* at 24. Finally, MacNair states that "[b]ased on my experience in evaluating FBDs [(foreign broker-dealers)], there were not the necessary processes and controls associated with the general standards of care expected when evaluating the

four (4) possible U.S. registration exemption requirements as noted below." *Id.* at 16. Thus, SureTrader could not use the "unsolicited" exemptions under Rule 15a-6(1)" *Id.* at 24.

Those opinions are inappropriate legal conclusions which "will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63. MacNair is precluded from offering legal conclusions to the jury. While MacNair is free to opine about methods of compliance in the industry or shed light on existing SEC regulations, MacNair cannot offer a legal conclusion as to whether SureTrader violated Section 15(a)(1) or complied with Rule 15-a6. It is for the jury to determine whether those violations occurred based on the evidence in the case.

Accordingly, MacNair is permitted to render his expert opinions in all areas except yhose opinions are inappropriate legal conclusions.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment, **ECF No. [222]**, is **DENIED**.

2. Plaintiff's Omnibus Motion *in Limine*, **ECF No. [220]**, is **GRANTED IN PART AND DENIED IN PART.**

3. Defendant's Motion *in Limine* and to Strike Expert, **ECF No. [221]**, is **GRANTED IN PART AND DENIED IN PART.**

**DONE AND ORDERED** in Chambers at Miami, Florida on May 20, 2024.

_____
BETH BLOOM
**UNITED STATES DISTRICT JUDGE**

Copies to:

44

Case No. 21-cv-21079-BLOOM/Torres

Counsel of Record