# EXHIBIT E

**THE COMMONWEALTH OF THE BAHAMAS** SUPREME COURT

**IN THE SUPREME COURT** OCT 1 5 2019

**PUBLIC LAW DIVISION** Nassau, Bahamas

2019

PUB/jrv/00024

**IN THE MATTER** of an application by Mintbroker International Ltd. (formerly Swiss America Securities Ltd.) T/A Sure Trader, for Leave to apply for Judicial Review

**AND IN THE MATTER** of the Application for Leave to apply or an Order of Certiorari

**AND IN THE MATTER** of Purported Orders dated the 18th September 2019 made pursuant to sections 133(1) (b) and (f) and 133(3) of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the decision dated the 20th September 2019 of the Securities Commission of The Bahamas to appoint an auditor with costs payable by the Applicant, pursuant to section 45 of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the Securities Industry Act, 2011 as amended

**AND IN THE MATTER** of the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017.

**BETWEEN**

## MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER

**Applicant**

**AND**

### THE SECURITIES COMMISSION OF THE BAHAMAS

**Respondent**

_____

## SUPPLEMENTAL AFFIDAVIT

*(of Christina Rolle)*

_____

I, **CHRISTINA ROLLE**, Executive Director of the Securities Commission of The Bahamas (the "**Commission**" or also the "**Respondent**"), New Providence, one of the Islands of the Commonwealth of The Bahamas, **MAKE OATH** and **SAY** as follows:-

1

**PLAINTIFF'S EXHIBIT**
**105**

1. I am the Commission's Executive Director and the same person who swore the Affidavit ("**principal Affidavit**") filed on 24 September 2019. In my said capacity I am also duly authorized to make this Affidavit ("**supplemental Affidavit**") on the Respondent's behalf. The facts deposed to herein are true to the best of my knowledge, information and belief.

2. Terms used and defined in the principal Affidavit will bear the same meaning when the same are used in this supplemental Affidavit.

3. At all material times, Mr. Guy Gentile ("**Mr. Gentile**") was the CEO, shareholder and ultimate beneficial owner of SASL and wholly responsible for its decisions and day-to-day operation for the periods in question.

4. The Commission generally conducts For-Cause or Focused examinations where there are strong allegations of or reason to suspect irregularities in the operations of a registered firm or licensee. In this regard, SASL was no exception because SASL's CEO and Director, Mr. Gentile had been charged (the "**USSEC Action**") by the Securities and Exchange Commission ("**USSEC**") of the United States of America for penny stock manipulation schemes, giving rise to the need for the Commission to exercise heightened diligence respecting Mr. Gentile's securities dealings in The Bahamas. A true copy of the SEC's complaint is now produced and shown to me annexed hereto marked "**CR 1**".

5. The Commission executed a For-Cause examination ("**2016 For-Cause examination**") of SASL between 4 May 2016 and 23 May 2016. The 2016 For-Cause examination was conducted at the Registrant's office located at Elizabeth on Bay Plaza, Suite 17, Bay Street, Nassau, Bahamas, and upon conclusion the Commission confirmed sixteen (16) breaches via information obtained from SASL's employees and records. It bears stating that SASL had not disclosed the USSEC's Action to the Commission as it was statutorily obligated to do, and such default was one of several issues raised during the 2016 For-Cause examination.

2

NONE - the materials are public information

6. A true copy of the report of the 2016 For-Cause examination is now produced and shown to me annexed hereto marked "**CR 2**".

7. In 2017, the Commission engaged Ernst and Young to address specific concerns relative to market manipulation. The resulting audit report was produced dated 21 February 2018. A true copy of the audit report is now produced and shown to me annexed hereto marked "**CR 3**".

8. In addressing with SASL breaches cited in the 2016 For-Cause examination, the Commission invited SASL to rectify their compliance issues and to settle matters. Accordingly, subject to expressed conditions for the remediation of compliance issues a settlement agreement ("**2018 settlement agreement**") was executed on 30 August 2018. Pursuant to the settlement, SASL paid a total fine of $120,000.00 and was enjoined to remediate specific compliance issues. A failure to remediate those compliance issues would render SASL to further disciplinary action by the Commission.

9. Subsequent to the 2018 settlement agreement, a routine on-site examination of SASL transpired ("**2018 on-site examination**") from 19 November 2018 to 3 December 2018. The 2018 on-site examination revealed to the Commission that SASL had failed to remediate all compliance issues which were the basis of the conditions to the 2018 settlement agreement. Noting that the 2018 settlement agreement was executed only a few months prior on 30 August 2018, SASL agreed therein to take immediate steps to address the deficiencies. This did not happen.

10. In March 2019 the Commission commenced off-site investigations ("**2019 off-site investigations**") with respect to SASL. Over ensuing months, the Commission discovered that –
    a) Mr. Gentile had established entities with similar names to SASL in foreign jurisdictions;
    b) those foreign entities were all unregulated;
    c) those foreign entities had established bank accounts in foreign jurisdictions; and
    d) those foreign entities were receiving funds on behalf of SASL on terms unknown to the Commission.

3

11. In May 2019 the draft report of the Commission's findings from the 2018 on-site examination was given to SASL to review and to provide responses. Those findings included that SASL had failed to satisfy the conditions of the 2018 settlement agreement.

12. SASL responded to the draft report of the 2018 on-site examination on 22 May 2019, in respect of which the Commission thought to defer addressing such response until it had outcomes of the 2019 off-site investigations, which were by then already underway.

13. The failure of SASL to have satisfied the conditions of the 2018 settlement agreement together with breaches found in the 2018 on-site examination and discoveries in the 2019 off-site investigations, precipitated a decision by the Commission's to call Mr Gentile in for a meeting to hear from him regarding SASL's operations. That meeting ("**September meeting**") transpired on 12 September 2019.

14. From information derived in the September meeting, it was obvious that SASL's operations were being conducted in a manner which the Commission considered to be highly irregular such that it gave the Commission concerns of possible fraudulent goings on, meriting urgent and more intrusive investigations in the public interest.

15. Specifically, the September meeting revealed that:

a) SASL characterizes its activity as "trading in principle", however, in the case of equities trading, clients would expect that "as principle", SASL was selling equities to clients from its own proprietary inventory. However, such was not the case.

b) The purchase of securities by SASL's clients do not result in those clients having the securities they believe they have purchased.

c) Mr. Gentile purported that SASL does not hold any inventory of securities, but rather that it is in a "short" position relative to its clients.

16. The Commission's concerns around the nature of SASL's manner of dealings may be understood by constructing a fictional illustration as follows -

4

NONE - the materials are public information                                        SEC-SCB-E-0000387

*Market price of share A may be trading at $50 per share.*

*Via a platform used by SASL, the client performs a purchase of 100 of share A, total cost of which is $5,000.*

*SASL simulates that the client has purchased the shares, while (it seems) unbeknownst to the client, it hasn't.*

*Also it seems unbeknownst to the client, the client's funding for its trades are directed (per instructions issued to the client by SASL) to a bank account of a different entity that has a similar name to SASL, but which is unregulated and domiciled in a foreign jurisdiction. It is not clear or yet verified by the Commission whether or the extent to which the different entity is owned or controlled by SASL.*

*If the client intends to hold shares it thought it purchased for a period, or wants to liquidate it and cash out, such that the client's actual ownership of the shares by the client must be actualized, then SASL appears to simulate the portfolio value and sale of client shares against prevailing market market prices. In the case where clients require the liquidation of their presumed shares, SASL can only hope that the current prices are less than the client had (supposedly) paid for them at the time SASL had simulated that the client had purchased them.*

*If at that later time at which the simulation of the sale of shares are being carried out, the shares are then trading lower, say, at $40 per share (given that the client had, supposedly, purchased them at $50 per share) SASL would profit from the difference, which in the example would be $1,000 for 100 shares.*

*However, if the price of the shares were then trading higher in the market, say, up from the $50 per share it was at the time client thought it had purchased to $60 per share, then SASL has to spend $1,000 more to actually effect the simulation of the sale of shares to the client's account.*

*If by chance SASL were faced with having to actualize share sales in large numbers for many clients in which the share prices had risen - apart from the apparent deception of the clients (if they were unaware of these goings on) - there is risk of an inability of SASL to deliver on the sales thereby possibly resulting in insolvency. The scheme would unravel.*

5

> *Recovery against SASL would be complicated by the fact that funds paid by the client were never received into SASL but by the different and unregulated entities of foreign domicile.*

17. The Commission notes that should SASL's clients demand their securities at any point, SASL would be unable to provide them as they should be able to, which is an untenable position for any duly registered firm. According to Mr. Gentile, SASL's position in such scenario is that clients are not allowed to transfer securities from SASL to another broker. Instead, clients are told that they must liquidate their positions and thereafter transfer out cash. This policy of SASL covers up the fact that no securities are held at any time by SASL on behalf of its clients.

18. Given the gravity of the Commission's concerns, the Commission determined that to allow SASL to continue to operate would be irresponsible, at a minimum, and potentially continue to expose SASL's clients as well as the jurisdiction to irreparable harm.

19. As such, the Commission took the extraordinary step of using its powers under section 133(3) of the Act to suspend SASL for the least amount of time it thought the Commission would need to obtain necessary information from SASL (assuming SASL were cooperating) to either alleviate the Commission's concerns or to show that additional regulatory action was merited.

20. Accordingly, upon entry into SASL on 18 September 2019 to serve the notice of suspension on SASL, pursuant to its powers under section 43 of the Act, the Commission also sought to obtain information that would assist the Commission in urgent further investigations. Specifically, the Commission asked for access to SASL's clients' records, including client account documents and transactions.

21. SASL, through its Compliance Officer and Chief Financial Officer, agreed to assist the Commission and explained it would be necessary to obtain much of the required information from its service provider, Cloud Caribe, located in Sandyport, because most of SASL's data and/or clients' information is kept "in the cloud", or on servers maintained

6

by Cloud Caribe. The remainder, such as SASL's online platform, was accessible from SASL via the internet.

22. SASL's officers gave a directive via telephone to Cloud Caribe to provide the Commission with the information, and on the evening of the 18 September 2019 the Commission went to Cloud Caribe and left a new mobile drive with Cloud Caribe on which to download SASL's information for delivery up to the Commission.

23. On 20 and 23 September 2019, the Commission attempted to enter SASL's premises to continue the said examination, but were prevented from doing so as the premises remained closed.

24. Cloud Caribe initially indicated that it would provide same but failed to do so up to Monday 23 September 2019. It became apparent from the discussions with Cloud Caribe personnel that SASL had subsequently countermanded the directive to provide the information to the Commission. The Commission has yet to obtain any information which it requires urgently for its further investigations of SASL.

25. Instead of cooperating with the Commission, on Monday 23 September 2019, SASL applied *ex parte*, to the Court for Judicial Review and for an Order to vacate the Commission's regulatory orders and directives and to prevent any further regulatory orders and directives from the Commission. SASL's application to this Honourable Court has fully disabled the Commission's further investigations of SASL at a critical time.

26. It is of concern to the Commission and prejudicial to its need for urgent further investigations that SASL moved *ex parte* to seek such relief, thereby depriving the Court of full and sufficient facts for the Court's due consideration. It is also prejudicial to the urgency of the matters at hand that SASL did not seek an early return date for an *inter partes* hearing.

27. The Commission urgently requires the mentioned disclosures and delivery up of information from SASL and its agent Cloud Caribe for purposes of its further investigations.

7

 SEC-SCB-E-0000390

28. In summary, it is apparent that the Applicant has woefully failed in the duty to be full and frank with facts material to the Court when making an ex parte application, as follows:

   a) Failing to disclose to the Court the USSEC Action, albeit that action was eventually discontinued due to limitation of action grounds;

   b) Failing to disclose to the Court the court the conditions of the 2018 settlement agreement, and that SASL did not satisfy those conditions;

   c) Failing to disclose to the court the outcome of the 2018 on-site examination citing on going breaches of concern to the Commission;

   d) Failing to disclose to the court or fully to disclose the Commission's concerns around the fact that SASL had established entities (purported subsidiaries) in foreign jurisdictions, which are non-regulated, and which are receiving funds of SASL's clients;

   e) Failing to disclose to the Court that SASL had an obligation to make disclosure to the Commission regarding the purported subsidiaries and the directing of client funds to such entities and that SASL had failed to do so;

   f) Failing to disclose to the court or fully to disclose the Commission's concerns around SASL's dealings in particular concerns of deception of its clients.

29. I respectfully request on the Commission's behalf in all the circumstances, that the ex parte Order made herein 23 September 2019 be set aside.

**SWORN** this     )
12th day of October, A.D.)
2019     )     _____

Before Me,

Notary Public

8

NONE - the materials are public information

SEC-SCB-E-0000391

**THE COMMONWEALTH OF THE BAHAMAS**                     **2019**
**IN THE SUPREME COURT**                                **PUB/jrv/00024**

**PUBLIC LAW DIVISION**

**IN THE MATTER** of an application by Mintbroker International Ltd. (formerly Swiss America Securities Ltd.) T/A Sure Trader, for Leave to apply for Judicial Review

**AND IN THE MATTER** of the Application for Leave to apply or an Order of Certiorari

**AND IN THE MATTER** of Purported Orders dated the 18th September 2019 made pursuant to sections 133(1) (b) and (f) and 133(3) of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the decision dated the 20th September 2019 of the Securities Commission of The Bahamas to appoint an auditor with costs payable by the Applicant, pursuant to section 45 of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the Securities Industry Act, 2011 as amended

**AND IN THE MATTER** of the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017.

**BETWEEN**

**MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER**

**Applicant**

**AND**

**THE SECURITIES COMMISSION OF THE BAHAMAS**

**Respondent**

## CERTIFICATE

These are the Exhibits mentioned and referred to in the supplemental Affidavit of Christina Rolle marked **"CR 1"** through **"CR 3"** dated the 12th day of October, 2019.

Before Me,

Notary Public

9

**NONE - the materials are public information**                    **SEC-SCB-E-0000392**

Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------------------x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | **16 Civ.** ( ) |
| : | |
| -against- : | **COMPLAINT** |
| : | |
| **GUY GENTILE,** : | |
| : | |
| **Defendant.** : | |

-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Guy Gentile ("Gentile") (who, upon information and belief, resides at 103 Bryant

Pond Road, Putnam Valley, New York, 10579), alleges:

### SUMMARY

1.     This case involves two penny stock manipulation schemes perpetrated by Gentile.

The first scheme was perpetrated in 2007 and involved the stock of Raven Gold Corporation

("RVNG"), a purported gold and silver exploration company. The second scheme was

perpetrated in 2007-2008 and involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a

company involved in natural gas production. In addition to market manipulation and fraudulent

promotion, the schemes involved illegal unregistered offerings of the issuers' stocks, and,

**NONE - the materials are public information**

together, generated over $17 million in illegal gross stock sale proceeds as well as substantial profits for the schemes' participants.

2.     In the RVNG scheme, two penny stock promoters from Toronto, Canada, Mike Taxon and Itamar Cohen ("Taxon" and "Cohen," respectively), were hired to promote RVNG stock by the persons who controlled the company in exchange for a controlling block of the company's purportedly unrestricted shares. Taxon and Cohen then recruited Gentile, the owner of a broker-dealer based in upstate New York, to execute key aspects of the promotion in exchange for half of their newly-acquired RVNG shares.

3.     Gentile agreed to the arrangement, and manipulated the market for RVNG stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock.

4.     In addition, Gentile, together with the Taxon and Cohen, created and distributed a glossy promotional "newsletter" touting RVNG stock (the "RVNG Mailer"). The RVNG Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements or omissions about the promoters' identity, compensation, and control of the issuer's stock.

5.     Finally, to increase the appearance of active market demand for the stock, Gentile, Taxon and Cohen bribed friends and acquaintances to make open-market purchases of RVNG by handing out free blocks of RVNG stock to them.

6.     In the KYUS scheme, Gentile was recruited to promote the stock by the individuals who controlled the issuer, and then invited Taxon and Cohen to participate and help finance the scheme, in exchange for a share of the ultimate profits. Gentile used his own funds and the funds provided by Taxon and Cohen to obtain control of a substantial block of the

2

company's purportedly unrestricted shares and used proceeds from the illegal unregistered sales of the stock to finance the promotion.

7.      As in the RVNG scheme, Gentile manipulated the market for KYUS stock by executing manipulative trades intended to create the false appearance of liquidity and market demand, by, among other things, executing matched trades between multiple accounts that he controlled. Once again, Gentile, together with Taxon and Cohen, fabricated from whole cloth and distributed a fake promotional newsletter, the "KYUS Mailer." Just like the RVNG Mailer, the KYUS Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements and omissions about the promoters' identity, compensation, and control of the issuer's stock.

8.      Because Gentile obtained RVNG and KYUS stock from the persons controlling the issuers, with a view to selling it to the public, Gentile was a statutory underwriter under the Securities Act of 1933 ("Securities Act"), and his unregistered sales of the stock violated the securities registration requirements of the Securities Act.

9.      In addition, by engaging in these schemes, Gentile violated the anti-touting and anti-fraud provisions of the Securities Act and violated or aided and abetted violations of the anti-fraud provisions of the Securities Exchange Act of 1934 ("Exchange Act").

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment: (a) permanently restraining and enjoining Gentile from engaging in the acts, practices and courses of business alleged herein; (b) requiring Gentile to disgorge his ill-gotten gains and to pay prejudgment interest thereon; (c) imposing

3

civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) permanently prohibiting Gentile from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey.  For example, Gentile sold unregistered RVNG and KYUS securities and executed manipulative trades in those securities, in part, through broker-dealers located in the District of New Jersey, and using trading systems operated through servers in the District of New Jersey.

13.     Gentile, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

4

NONE - the materials are public information                                                   SEC-SCB-E-0000396

## DEFENDANT

14.     **Gentile**, age 39, resides in Putnam Valley, New York.  At the time of the conduct alleged herein, Gentile resided in Mahopac, New York.  Gentile is the founder and, at the time of the conduct alleged herein, was the owner of a Commission-registered broker-dealer located in Carmel, New York.  Over the years, Gentile has been the principal of multiple securities-related businesses in addition to his registered broker-dealer, including, most recently, a Bahamas-based online brokerage firm, which Gentile opened in 2011.

## ISSUERS

15.     **RVNG** was a Nevada corporation.  During the scheme alleged herein, RVNG's headquarters were in Vancouver and Penticton, British Columbia, and its common stock was quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

16.     **KYUS** was a Delaware corporation headquartered in London, Kentucky.  During the scheme alleged herein, KYUS represented that it was engaged in shale gas exploration in western Kentucky.  During the scheme alleged herein, its common stock was quoted on the OTCBB and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

5

**NONE - the materials are public information**                                    **SEC-SCB-E-0000397**

## FACTS

### I.     THE RVNG SCHEME

#### A.     RVNG's Corporate Background

17.     RVNG was incorporated in Nevada in or about February 2005, under the name Riverbank Resources, Inc. In its public filings, the company claimed that it was in the business of mineral exploration. In reality, however, the company was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies.

18.     In April 2005, the company conducted two unregistered offerings of a total of 7.424 million shares of its common stock under Regulation S. The individuals who received the stock in the offerings, including the company's purported officers and directors, were nominees of the attorney who had created the shell, and not true owners of the stock.

19.     In or about July 2005, the company filed with the Commission a registration statement on Form SB-2, purporting to register the resale of 3.424 million shares held by individuals other than the company's purported officers and directors. The registration statement became effective in or about September 2005.

20.     Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the Riverbank Resources shell from the attorney who had created it. Subsequently, to effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees, including, in 2007, Gentile, Taxon and Cohen. These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer – first, the attorney who had created the shell and then the RVNG Owners – directed all the transfers.

6

**NONE - the materials are public information**                                                    **SEC-SCB-E-0000398**

21.     In or about August 2006, the company, now controlled by the RVNG Owners,

changed its name to Raven Gold Corporation, carried out a 5:1 stock split, and announced a

change in management. In September 2006, the company announced that it had "decided to

discontinue" mineral exploration at its British Columbia property. In or about March 2007,

RVNG carried out a 2:1 split of its common stock.

22.     As a result of the stock splits in 2006 and 2007, as well as additional restricted

stock issuances directed by the RVNG Owners during this time period, during the stock

manipulation scheme alleged below, RVNG had approximately 75 million shares of common

stock issued and outstanding, of which approximately 34 million shares were traceable to the

April 2005 Regulation S offerings and purportedly covered by the subsequent resale registration

statement, the goal of which was to make the shares appear unrestricted.

23.     In or about March 2007, RVNG common stock began trading on the OTCBB

under its new symbol, "RVNG."

24.     During the stock manipulation scheme alleged below, the RVNG Owners had

complete control of RVNG and its management.

**B.      The RVNG Stock Promotion Deal**

25.     In early 2007, the RVNG Owners met Taxon and Cohen through a common

acquaintance and proposed that Taxon and Cohen promote RVNG stock. Taxon and Cohen then

reached out to Gentile and invited him to participate in the "deal."

26.     In the course of the following few weeks, the RVNG Owners agreed to give

Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock

promotion campaign consisting of a promotional mailing, other advertising, and manipulative

trading that would create the false impression of liquidity and active interest in the stock. In

7

turn, Taxon and Cohen agreed that Gentile would help them execute the key aspects of the promotion, including the advertising campaign and the manipulative trading, in exchange for a portion of Taxon and Cohen's cut of the stock. Gentile, Taxon, and Cohen also agreed that they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign.

27. To put these plans in motion, between mid-May and mid-June 2007, the RVNG Owners directed transfers of eighty percent of RVNG's purportedly unrestricted stock (approximately twenty-seven million shares) to accounts controlled by Gentile, Taxon and Cohen. Of that amount, approximately twenty million shares, represented Gentile's and Taxon and Cohen's compensation, and the remaining, approximately seven million shares, was parked in an offshore account under Taxon's control for the duration of the promotion – a term that Taxon and Cohen negotiated with the RVNG Owners, to ensure that the RVNG Owners would not sell large quantities of RVNG stock behind Gentile, Taxon and Cohen's backs, and thus undermine Gentile, Taxon, and Cohen's efforts to drive up the stock price and sell shares at a high price.

28. To obscure their connection to and control of the majority of the purportedly unrestricted RVNG stock, Gentile, Taxon, and Cohen did not deposit their RVNG stock in U.S.-based accounts held in their own names. Instead, the share blocks were deposited in U.S. brokerage accounts held in the names of several offshore brokerage firms where Gentile, Taxon and Cohen had or controlled accounts.

8

NONE - the materials are public information

**C.    Manipulative Trading and Fraudulent Promotion of RVNG Stock**

29.    On receiving their blocks of RVNG shares, Gentile, Taxon and Cohen embarked on a promotional campaign for the stock, which consisted of manipulative trading, a promotional mailer, and advertisements placed in multiple news publications. The RVNG Owners, for their part, supported the promotion by ensuring a steady stream of positive company press releases.

**1.    Manipulative Trading and Kick-Backs**

30.    In June and July 2007, Gentile and Taxon directed manipulative trades in RVNG stock. Their RVNG stock trading in June and July 2007 was intended to achieve two primary goals. First, Gentile and Taxon sold RVNG stock to generate cash to fund the promotional mailing and advertising that would follow in July 2007. Second, Gentile and Taxon traded RVNG stock between their various accounts in order to create the false appearance of liquidity and active interest in the stock – in substance, an attractive (but fake) price and volume history for investors who would be researching the stock after seeing the upcoming promotional mailer or advertisements.

31.    To amplify the false appearance of increased liquidity and market interest in the stock, Gentile, Taxon and Cohen reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market purchases of RVNG stock. Some of those offers were accepted. For example, on or about July 19, 2007 and August 20, 2007, Taxon and Cohen transferred blocks of 5,000 and 25,000 RVNG shares, respectively, from one of their offshore accounts to the accounts of one of Gentile's acquaintances. That acquaintance bought approximately 101,500 shares of RVNG in the open market in June and July of 2007, and sold all of his RVNG shares – those received as a kick-back

9

    SEC-SCB-E-0000401

and those bought in the open market – by early September of 2007, making a profit of
approximately $25,600.

### 2.    The RVNG Mailer and Media Advertisements

32.    The centerpiece of the RVNG promotion was the RVNG Mailer – an eight-page
glossy "newsletter" touting RVNG stock that Gentile, Taxon, and Cohen distributed in mid-July
2007 under a fake entity name, "Stock Trend Report."

33.    The RVNG Mailer contained multiple materially false or misleading statements,
as Gentile, one of its authors, knew or was reckless in not knowing. For example, the mailer was
purportedly published by an entity named "Stock Trend Report" and claimed to be a July 2007
"Special Edition of Premium Members." In reality, Stock Trend Report was an entirely fictional
name created specifically for the RVNG campaign, with no prior or subsequent "editions."

34.    Additionally, the RVNG Mailer's cover page claimed that RVNG stock had been
"seen on" CNBC, Bloomberg, in the Wall Street Journal, the New York Times, and in other
respected news publications, creating the impression that the stock had been a subject of
reporting in those publications. In reality, the stock had only been "seen" in those publications in
paid advertisements placed by Gentile, Taxon and Cohen.

35.    These misstatements were material because they lent the RVNG Mailer an aura of
legitimacy and reliability, and helped conceal the fact that it was an advertisement placed on
behalf of and in coordination with the RVNG Owners.

36.    The RVNG Mailer also touted the stock's "strong move upward" in "recent
weeks," which the RVNG Mailer attributed to the company's strong business prospects. A chart
covering the time period from early May to mid-June of 2007 purportedly showed the stock's
"remarkable uptrend so far." These statements were materially misleading. The RVNG Mailer

10

failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Gentile, Taxon, and those acting in concert with them, which were executed for the very purpose of creating an attractive price and volume history for the stock, not because of legitimate, independent market interest.

37.     The RVNG Mailer's last page contained a warning: "Please note: Due to high market demand for RVNG by institutional investors, some brokers may require you to phone in your order." This statement was materially false: No "high market demand for RVNG by institutional investors" existed.

38.     The RVNG Mailer contained a fine-print disclaimer that purported to disclose the compensation received by the mailer's publisher and the publisher's motivations and intentions with respect to the stock. The disclaimer was itself materially false and misleading.

39.     For example, the disclaimer continued to attribute the RVNG Mailer to "Stock Trend Report," a nonexistent entity.

40.     The disclaimer also stated that the company, RVNG, had "not approved the statements made in this opinion." In reality, the RVNG Owners, who controlled the company and its management, had seen drafts of the mailer and had signed off on its content.

41.     On the subject of compensation, share ownership, and intent to sell with respect to RVNG stock, the disclaimer stated that Stock Trend Report (called "STR" in the disclaimer) "has been compensated by third party shareholders or with cash from the company on behalf of one or more of the companies mentioned in this opinion . . . for dissemination of this advertisement and other professional services. … STR's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value."

11

          SEC-SCB-E-0000403

42.      These statements were materially false or misleading, as Gentile knew or was reckless in not knowing. Stock Trend Report was a nonexistent, fictional enterprise. Moreover, the compensation that Gentile, Taxon and Cohen had received for the "dissemination of this advertisement" and other promotional efforts, including the manipulative trading, consisted of sixty percent of RVNG's purportedly unrestricted stock – and the mailer itself was financed with the proceeds from the sale of that stock. The disclaimer that Stock Trend Report "may have bought" or "may buy" RVNG shares was also misleading, as most of Gentile, Taxon and Cohen's shares had been received at no cost and had already been partially liquidated to finance the promotional campaign.

43.      In July 2007, Gentile, Taxon and Cohen also placed paid advertisements for RVNG in multiple major publications. The advertisements were, in substance, condensed versions of the RVNG Mailer and contained many of the same materially false or misleading statements, including the attribution of the advertisements to the nonexistent Stock Trend Report, the misleading touting of the stock's recent performance, and a disclaimer identical to that in the RVNG Mailer.

44.      Gentile closely collaborated with Taxon and Cohen in the creation and distribution of the RVNG Mailer and the RVNG advertising materials. Gentile knew or was reckless in not knowing that the RVNG Mailer and the advertisements contained the materially false or misleading statements as alleged above.

### 3.      Press Releases

45.      It was understood among the RVNG Owners and Taxon and Cohen that, for the RVNG stock promotion campaign to succeed, the issuer should disclose a string of "positive

12

events" during the promotion. Thus, throughout June and July 2007, the RVNG Owners supported the stock promotion campaign with a steady stream of RVNG press releases.

46.    RVNG issued a total of thirteen press releases during this time period: five in June and eight in July. Of those thirteen releases, five announced purported arrivals of new officers and directors, and the remaining eight vaguely touted purported developments in RVNG's exploration business, such as plans to "commence general exploration at La Currita, Mexico, within the next 21 days," the commissioning of a "detailed 'Phase 1 Exploration Program' at La Currita," receipt of certain initial sample results, and discovery of a "New Parallel Mineralized Vein Structure." The RVNG Owners, Gentile, Taxon and Cohen coordinated the timing and number of these press releases, and the press releases were intended to and did support the ongoing market manipulation scheme conducted by Gentile, Taxon and Cohen.

47.    By taking the steps described above, Gentile, Taxon and Cohen successfully manipulated the market for RVNG stock. Until May 31, 2007, RVNG traded at prices not exceeding $0.80 per share and with minimal volume, with no trading occurring on many days. Starting on May 31, 2007, the daily price and especially the daily volume went up dramatically – only to decline as soon as the promotion was complete. The summary chart below demonstrates the dramatic manipulative effect of the promotion on the market for RVNG stock.

13

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07* | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

*\* Starting after 2:1 stock split and receipt of new symbol RVNG.OB.*

48.     Because Gentile, Taxon and Cohen obtained RVNG stock from the persons
controlling the issuer, with a view to selling it to the public, each was a statutory underwriter
under the Securities Act.  Yet no registration statement was filed or in effect with respect to their
sales of RVNG stock.

49.     The selling of unregistered RVNG stock by Gentile, Taxon and Cohen generated
an estimated five million dollars in gross proceeds.

14

NONE - the materials are public information

SEC-SCB-E-0000406

## II.    THE KYUS SCHEME

### A.    KYUS Corporate Background

50.    KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas"). In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims." In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

51.    In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000. The registration statement became effective in or about June 2007. The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers. These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

52.    After the purported public offering, the company had three million common shares issued and outstanding: two million restricted shares, previously issued to Las Rocas' sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

53.    On or about October 15, 2007, as alleged in greater detail below, Adam S. Gottbetter, a New York microcap lawyer ("Gottbetter"), arranged the purchase of the Las Rocas shell from the KYUS Shell Sellers for $760,000 contributed by Gentile, Taxon, Cohen, and Gottbetter's business partner in the KYUS deal ("Gottbetter's Partner").

15

54.     Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("KYUS Privco"); the merger ultimately closed on May 2, 2008.

55.     In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding: 24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by Gentile (together with Taxon and Cohen), Gottbetter, and Gottbetter's Partner.

56.     On or about November 20, 2007, the KYUS common stock began trading on the OTCBB under its new symbol, "KYUS."

**B.      The KYUS Stock Promotion Deal**

57.     In the summer of 2007, Gottbetter and Gottbetter's Partner became acquainted with Gentile and invited him to participate in the KYUS "deal." Over the course of multiple meetings and conversations, it was agreed that Gentile, working with his partners (Taxon and Cohen), would (1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market. It was further agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for Gentile to obtain control of a substantial block of purportedly unrestricted KYUS stock.

16

58.     Gentile, in turn, invited Taxon and Cohen to participate in the "deal." Unlike the
RVNG Owners, who provided unrestricted RVNG stock to Gentile, Taxon and Cohen at no cost,
Gottbetter insisted that Gentile and his partners purchase KYUS stock in private transactions for
$604,000. Taxon and Cohen agreed to split this upfront cost with Gentile and transferred
$300,000 to Gentile for use in the deal. Gentile then transferred Taxon and Cohen's $300,000
and an additional $304,000 from his own offshore accounts to Gottbetter as payment for seventy-
five percent of KYUS's purportedly unrestricted common shares. The remaining twenty-five
percent of the purportedly unrestricted shares were transferred to Gottbetter and Gottbetter's
Partner.

59.     As in the RVNG scheme, in the KYUS scheme, Gentile, Taxon and Cohen's
allocation of the purportedly unrestricted KYUS stock was directed to accounts in the names of
nominee entities ("Nominee Entities"), rather than to accounts held in their own names. By
depositing their shares in the Nominee Entities' accounts – in this case, accounts of three
offshore and one domestic brokerage firms – Gentile, Taxon and Cohen obscured their
connection to the stock and the upcoming market manipulation.

## C.   **Manipulative Trading and Fraudulent Promotion of KYUS Stock**

60.     Similar to the RVNG promotion, the KYUS promotion had two components:
manipulative trading, which began in November 2007, and a promotional mailer, which Gentile
created and distributed in May 2008, shortly after the merger of the KYUS shell with KYUS
Privco.

61.     Immediately after receiving their KYUS shares into the Nominee Entities'
accounts in late 2007, Gentile, Taxon and Cohen began "building the chart" for KYUS stock, in
preparation for the distribution of the promotional mailer and the ultimate sell-off that they

17

executed in May 2008, once the promotion worked to inflate the stock's price. Gentile, Taxon and Cohen controlled seventy-five percent of the public float, and on many days between late 2007 and May 2008, most and sometimes even all of the market activity in the stock was generated by accounts that they controlled.

62.     Among other things, Gentile executed matched trades between the Nominee Entities' accounts and accounts in the names of Gentile's friends and family members that Gentile controlled. Gentile also asked some of his acquaintances among penny stock traders to buy KYUS stock in the open market (in substance, from Gentile), based on the understanding that Gentile would be promoting the stock and would give his "buyers" a heads-up about the upcoming promotion, enabling them to sell the stock at a high price. At least two of Gentile's acquaintances agreed and purchased KYUS stock in the open market in advance of the promotion, and then sold it during the promotion at a profit.

63.     The matched trades and the efforts to "bring in buyers" described above had the same twin goals. First, KYUS stock sales generated the cash that Gentile would later use to fund the KYUS promotional mailing. Second, through these actions, Gentile was delivering on his promise to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

64.     In or about May 2008, shortly after the KYUS merger closed, Gentile distributed by mail a glossy promotional mailer touting KYUS. The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch. The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called

18

Green Century Capital. In fact, Gentile funded the KYUS Mailer with proceeds from selling his, Taxon and Cohen's allotments of KYUS stock.

65.     Gentile took the lead role in creating and distributing the KYUS Mailer, and he knew or was reckless in not knowing that the KYUS Mailer contained materially false or misleading statements, including false attribution, as alleged above.

66.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the stock price rose from $0.69 per share to $1.70 per share. Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008. The volume also increased dramatically. While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

67.     By the end of May 2008, Gentile, Taxon and Cohen had sold millions of the purportedly unrestricted KYUS shares that they had received into the Nominee Entities' accounts in late 2007, for estimated gross proceeds of approximately $10 million. They used a portion of these proceeds to fund the printing and distribution of the KYUS mailer, and they shared the remaining proceeds with the issuer and Gottbetter.

68.     Gottbetter and Gottbetter's Partner, for their part, also sold substantial portions of their KYUS stock holdings both during the promotion and thereafter. Gottbetter continued selling KYUS stock through November 2010, and Gottbetter's Partner continued selling KYUS stock at least through November 2009. Gottbetter and Gottbetter's Partner sold their KYUS stock holdings in whole or in part through offshore accounts. Gentile had access to and ability to

19

execute trades in at least one of those accounts, and he assisted in the execution of some of these subsequent sales of KYUS stock.

69. Because Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner had obtained KYUS stock from the persons controlling the issuer, with a view to selling it to the public, each was a statutory underwriter under the Securities Act.

70. No registration statement was filed or in effect with respect to the KYUS stock sales of Gentile, Taxon, Cohen, Gottbetter, and Gottbetter's Partner.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

71. Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

72. By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

73. By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

NONE - the materials are public information                                          SEC-SCB-E-0000412

### SECOND CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act

74.    Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

75.    By virtue of the foregoing, Gentile, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, published, gave publicity to, or circulated notices, circulars, advertisements, newspaper articles, letters, investment services, or communications which described securities for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

76.    By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

### THIRD CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

77.    Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

78.    By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: (1) with scienter, employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

79.    By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

21

NONE - the materials are public information                                                  SEC-SCB-E-0000413

## FOURTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

80.    Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

81.    By virtue of the foregoing, Gentile, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

82.    By virtue of the foregoing, Gentile violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Thereunder

83.    Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

84.    By virtue of the foregoing, Gentile, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to

22

engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

85.     By virtue of the foregoing, Gentile aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Gentile, his agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), 17(a) and 17(b) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77q(b), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Ordering Gentile to disgorge his ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

### III.

Ordering Gentile to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

23

NONE - the materials are public information
SEC-SCB-E-0000415

**IV.**

Permanently prohibiting Gentile from participating in any offering of penny stock

pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the

Exchange Act, 15 U.S.C. § 78u(d)(6).

**V.**

Granting such other and further relief as this Court deems just and appropriate.

Dated: March 23, 2016
      New York, New York

SECURITIES AND EXCHANGE COMMISSION

By:

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

24

**NONE - the materials are public information**

**SEC-SCB-E-0000416**

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against Defendant Gentile in the foregoing Complaint is not the subject of any other civil action against Gentile pending in any court, or of any pending arbitration or administrative proceeding.

A related civil case involving the Commission's claims against Adam S. Gottbetter arising out of the KYUS scheme (SEC v. Gottbetter, et al., 15-CV-3528 (JLL)) was filed in this Court in 2015 but is now closed.

A related civil case involving the Commission's claims against Mike Taxon and Itamar Cohen arising out of the RVNG and KYUS schemes (SEC v. Taxon, et al.; 15-CV-3587 (JLL)) is pending before the Court and is currently stayed pending the resolution of the parallel criminal cases (United States v. Taxon, 15-CR- 0249 (JLL), and United States v. Cohen, 15-CR-0248 (JLL)), which are also pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

> Chief, Civil Division
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Ste. 700
> Newark, New Jersey 07102

SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Lara S. Mehraban
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

**NONE - the materials are public information**



**THE SECURITIES COMMISSION OF THE BAHAMAS**
**ROUTINE EXAMINATION REPORT**

19 February 2018

| | |
|---|---|
| Registrant: | Swiss America Securities Limited ("SASL") |
| License Type: | Registered Firm ("RF") – Dealing, Arranging, Managing and Advising on Securities |
| | Financial & Corporate Service Provider ("FCSP") |

| | |
|---|---|
| License Date: | 26 September 2011 (RF) |
| | 30 November 2011 (FCSP) |
| License No: | SIA-F108 (RF) |
| | FCSP 612 |
| Inspection Date: | 4 May 2016 – 23 May 2016 |
| Response Date: | |
| Follow-Up Date: | |

**THE SECURITIES COMMISSION OF THE BAHAMAS**

The Securities Commission of the Bahamas (the Commission) is a statutory body established under the Securities Industry Act, 2011 (the SIA) for the regulation of investment funds and securities and capital markets in The Bahamas. The regulatory authority of the Commission to regulate participants in the securities industry of The Bahamas, is contained in the SIA, while the Investment Funds Act, 2003 (the IFA) makes similar provisions relating to the regulation of the investment fund industry participants.

The responsibilities of the Commission are clearly delineated in Section 12 of the SIA which charges the Commission inter alia with responsibility to:

1. Formulate principles to regulate and govern investment funds, securities and capital markets;

2. Maintain surveillance over investment funds, securities and capital markets ensuring orderly, fair and equitable dealings; and

3. Create and promote conditions to ensure the orderly growth and development of the capital markets.

In addition to these specific functions, the Commission is granted, pursuant to Section 45 of the SIA, powers to conduct onsite inspections to execute its mandate. This is necessary to ensure fair-play and the integrity of the market while facilitating its development. Investor education and protection also constitute an important part of the Commission's mandate.

LP/JR/CD/NB/AB

Page 1 of 17

Swiss America Securities Limited (SASL)
May 23, 2016

NONE - the materials are public information

# THE SECURITIES COMMISSION OF THE BAHAMAS
## ROUTINE EXAMINATION REPORT

The Commission's regulatory activities are not only designed to ensure compliance with the laws governing the industry, but ultimately to contribute to the development and maintenance of a financial environment that is vibrant and competitive; one in which the public can have confidence because of its sound corporate governance, prudent business practices and transparency, with due regard to international standards and the need for operational freedom.

## THE COMMISSION'S REGISTER

As of the end of field work, the Commission's Official Register included the following information with respect to the Company's registration as a Registered Firm:

**NAME**

Swiss America Securities Limited ("SASL")

**LICENSE | REGISTRATION**

RF - SIA-F108 | 26 September 2011
FCSP 612 | 30 November 2011

**ADDRESS**

Elizabeth on Bay Plaza, Suite 17
Bay Street
P. O. Box N-8340
Nassau, The Bahamas

**TELEPHONE NUMBERS**

242-328-7800

## PERSONNEL

Guy Gentile, CEO/Director
Philip Dorsett, MLRO/Compliance Officer
Tiffany Donaldson, Trading Representative
Dramelko Moore, Trading Representative

**LICENSE/REGISTRATION**

SIA-F108-01 | 26 September 2011
SIA-F108-02 | 26 September 2011
SIA-F108-05 | 21 August 2015
SIA-F108-06 | 21 August 2015

*If any of the above information is incorrect, please contact the Commission's Market Surveillance Department at (242) 397-4100 Monday thru Friday between the hours of 9:00 am to 5:00 pm Eastern Time.*

LP/JR/CD/NB/AB

*Swiss America Securities Limited (SASL)*
*May 23, 2016*

NONE - the materials are public information

SEC-SCB-E-0000420

## THE SECURITIES COMMISSION OF THE BAHAMAS
ROUTINE EXAMINATION REPORT

### THE ONSITE EXAMINATION

In carrying out its mandate, the Commission conducts periodic onsite examinations to ensure that its registrants are complying with the legislation that governs the investment funds and securities and capital markets industries in The Bahamas. In particular, the objectives of the Commission's onsite examination process are to:

(i)   Update the Commission's understanding of the Registrant's operations.

(ii)  Determine the accuracy of the Registrant's registration as dealing in securities, managing securities, arranging deals in securities and advising on securities, Investment Funds Administrator and the registration of individuals within the Company.

(iii) Testing the Registrant's compliance with the Securities Industry Act, 2011, the Securities Industry Regulations, 2012 (the SIA Regulations), the Investment Funds Act, 2003, the Investment Funds Regulations, 2003 (the IFA Regulations), the Financial Transactions Reporting Act, 2000, its procedures manual and generally accepted corporate governance practices.

### Rotation

The Commission seeks to conduct such examinations on a periodic basis, at intervals that it determines to be appropriate, considering its assessed level of risk of the registrant's business and operations.

### Disclaimer

This report should not be relied upon for assurance that a registrant's operations are in compliance with the prescribed legislation or any other legislation to which it is subject. The Commission would remind you that it is the responsibility of the registrant and its management to ensure that it complies with all applicable legislation. Because of the test nature and other inherent limitations of the examination, there is an unavoidable risk that certain breaches may remain undiscovered. Essentially, the Commission makes no assurance to any party as to the adequacy of a registrant's operations or its compliance with legislation.

### Use of Report

This report is to be used solely by the Commission in carrying out its duties and responsibilities under its mandate and for the Registrant's information. It is not to be used for any other purpose, or to be distributed to any other party without the Commission's prior consent. The Commission accepts no responsibility for any third party relying on the contents of this report.

LP/JR/CD/NB/AB

Page 3 of 17

*Swiss America Securities Limited (SASL)*
*May 23, 2016*

NONE - the materials are public information

SEC-SCB-E-0000421

# THE SECURITIES COMMISSION OF THE BAHAMAS
## ROUTINE EXAMINATION REPORT

## SUMMARY OF FINDINGS

### Current Examination Results

The Commission's current examination covered the period 1 January 2012 to 30 April 2016. The examination began on 4 May 2016 and ended on 23 May 2016. The examination was conducted at the Registrant's Office: Elizabeth on Bay Plaza, Bay Street, Suite #17, Nassau, The Bahamas.

### SASL – Registered Firm – SIA-F108

| No. | Description of Findings | Page |
|---|---|---|
| | **Business Risk Profile** | |
| 1 | Regulation 43 (3) of the Securities Industry Regulations, 2012 – Insurance | 6 |
| 2 | Regulation 55 (a) of the Securities Industry Regulations, 2012 - Transactions affecting financial resources | 6-7 |
| | **Anti-Money Laundering/Countering Terrorist Financing** | |
| 3 | Rule 4 (2)(3) of the Securities Industry (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2015 – Money Laundering Reporting Officer | 7-8 |
| 4 | Rule 5 (1)(2)(a)(c-e) of the Securities Industry (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2015 - Requirements for risk rating framework | 8-9 |
| 5 | Regulation 68 (1)(2)(3) of the Securities Industry Regulations, 2012 – Client Account Opening Form & Documentation | 9-10 |
| 6 | Regulation 3 of the Financial Transactions Reporting Regulations – Verification of Identity | 10 |
| 7 | Regulation 75 of the Securities Industry Regulations, 2012 – Complaints | 11 |
| 8 | Regulation 9 (2) of the Financial Transactions Reporting Regulations – Continued Verification of Accounts | 11-12 |
| | **Business Conduct** | |
| 9 | Regulation 44 (1) of the Securities Industry Regulations, 2012 – Outsourcing | 12-13 |
| 10 | Regulation 53 (2)(h) of the Securities Industry Regulations, 2012 – Notice of change in information – after registration | 13 |
| 11 | Regulation 62 (1)(b) of the Securities Industry Regulations, 2012 - Notice of change in information – after registration | 14 |
| | **Registration Matters** | |
| 12 | Regulation 48 (1)(2) of the Securities Industry Regulations, 2012 - Termination of Representative | 14-15 |
| | **Trading Operations** | |
| 13 | Regulation 74 (2)(b) of the Securities Industry Regulations, 2012 – Supervision, Compliance and Risk Management Systems | 15 |

NONE - the materials are public information

SEC-SCB-E-0000422