# EXHIBIT F

THE COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

PUBLIC LAW DIVISION

SUPREME COURT

OCT 3 1 2019

Nassau, Bahamas

2019

PUB/jrv/00024

**IN THE MATTER** of an application by Mintbroker International Ltd. (formerly Swiss America Securities Ltd.) T/A Sure Trader, for Leave to apply for Judicial Review

**AND IN THE MATTER** of the Application for Leave to apply or an Order of Certiorari

**AND IN THE MATTER** of Purported Orders dated the 18th September 2019 made pursuant to sections 133(1) (b) and (f) and 133(3) of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the decision dated the 20th September 2019 of the Securities Commission of The Bahamas to appoint an auditor with costs payable by the Applicant, pursuant to section 45 of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the Securities Industry Act, 2011 as amended

**AND IN THE MATTER** of the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017.

BETWEEN

**MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER**

Applicant

AND

**THE SECURITIES COMMISSION OF THE BAHAMAS**

Respondent

---

## SECOND SUPPLEMENTAL AFFIDAVIT

(*of Christina Rolle*)

---

I, **CHRISTINA ROLLE**, Executive Director of the Securities Commission of The Bahamas (the "**Commission**" or also the "**Respondent**"), New Providence, one of the Islands of the Commonwealth of The Bahamas, **MAKE OATH** and **SAY** as follows:-

PLAINTIFF'S
EXHIBIT
106

1

1.  I am the Commission's Executive Director and the same person who swore the Affidavits filed herein on 24 September 2019 ("**principal Affidavit**") and on 15 October 2019 ("**supplemental Affidavit**").  In my said capacity I am also duly authorized to make this Affidavit ("**second supplemental Affidavit**") on the Respondent's behalf.  The facts deposed to herein are true to the best of my knowledge, information and belief.

2.  Terms used and defined in the principal Affidavit and/or the supplemental Affidavit will bear the same meaning when the same are used in this second supplemental Affidavit.

3.  Since filing the supplemental Affidavit, the Commission has received additional information as follows:

    a)  On 22 October 2019, further information from the USSEC was received concerning matters it has ongoing with Mr Gentile and his entities; and

    b)  On 25 October 2019, Affidavit of Edward Charles Cooper ("**Cooper Affidavit**") filed herein 24 October 2019 was received via service upon the Commission's external counsel in these proceedings.

4.  Respecting the USSEC – The Commission was informed by the USSEC and I verily believe as follows:

    a)  The USSEC Action, was referred to in paragraph 7 of the principal Affidavit and paragraphs 4 and 28 (a) of the supplemental Affidavit.  I referred to the USSEC Action as having been discontinued due to limitation of action grounds.  However, the Commission has since learnt that the USSEC had appealed a decision of the court of first instance (that had discontinued the USSEC Action) to the United States Court of Appeals for the Third Circuit.  That appeal was heard 06 November 2018 and a judgment was issued on 26 September 2019.   The appeal judgment reversed the decision of the court of first instance and remitted the matter back to the lower court.

NONE - the materials are public information                                                      SEC-SCB-E-0000468

b)    There is another matter ("**USSEC Subpoena Action**") being pursued by the USSEC against Mr Gentile's Florida-based entity, Mintrade Technologies, LLC (Case 1:19-mc-20496-KMW; SD Fla, filed 06Feb19).  The USSEC Subpoena Action was an action for the enforcement of a subpoena.  In its filed application the USSEC stated:

> "The [USSEC] has been investigating Swiss America Securities, Ltd. d/b/a Sure Trader and MintBroker International Ltd. ("Swiss America"), a Bahamas-based broker-dealer registered with the Securities Commission of The Bahamas but not registered to act as a broker-dealer in the United States, and its owner, Guy Gentile, in connecting with potential ongoing violations of the federal securities laws (the "Investigation"). Issues central to the potential violations include whether Swiss America's customers include United States residents, the solicitation of US customers, and the movement of customer funds."

5.    A true copy of the USSEC Action decision of the court of first instance; the USSEC Action appeal judgment; and the Application For An Order in the USSEC Subpoena Action are now produced and shown to me annexed hereto marked "**CR 2<sup>nd</sup>Sup_1**", "**CR 2<sup>nd</sup>Sup_2**", and "**CR 2<sup>nd</sup>Sup_3**" respectively.

6.    SASL did not disclose to this Honourable Court the existence of or (indeed) anything about the USSEC Action or the USSEC Subpoena Action.

7.    Moreover, SASL and/or Mr Gentile as a registrant has and have statutory duties under the Regulations to keep the Commission apprised of such matters and failed to disclose to the Commission that there had been an appeal in the USSEC Action or of the eventual appeal decision.  Additionally, SASL and Mr Gentile also failed to disclose to the Commission the USSEC Subpoena Action.  Such derelict conduct by Mr Gentile and SASL exemplifies the challenges the Commission experiences in supervising them.

8.    Respecting SASL's Cooper Affidavit, on behalf of the Commission I make the following responses in brief:

NONE - the materials are public information                              SEC-SCB-E-0000469

a)  Regarding para 4 – It is denied that the Mr Gentile's Affidavit supporting the application deposed to facts material to the issues which informed the Commission's decision to suspend SASL by the Commission's regulatory orders on 18 September 2019.

b)  Regarding para 5 – It is no meritorious answer to the 16 breaches identified in the 2016 For-Cause Examination to say that they "were not accepted by SASL". In fact, SASL entered into the 2018 Settlement Agreement respecting them. Under the 2018 Settlement Agreement SASL was required to pay $120,000.00 and commit to conditions that the breaches would be remediated by or before 31 August 2018.

c)  Regarding para 6 – The Commission maintains that breaches cited in the 2016 For-Cause Examination were identified in the 2018 on-site examination as continuing to occur, and in that sense, not remediated[1]. Specifically:

   i.   Termination of Representative – reg. 48;

   ii.  Reporting to the Commission-Interim Reporting – reg. 50;

   iii. Notice of change in information after registration – reg. 53; and

   iv.  Reconciliations – reg. 87.

d)  Further, none of the 16 breaches identified in the 2016 For-Cause Examination were abandoned by the Commission. The Commission entered into the 2018 Settlement Agreement already mentioned.

e)  Regarding para 7 – The Commission denies that it or (to the Commission's knowledge) SASL's auditors and E&Y had awareness of SASL purporting to trade as principal but not owning the shares it purportedly sold, and directing payments made by clients to unregulated foreign entities. Further, the fact that "the issue

---

[1] As stated in para 9, supplemental Affidavit.

4

NONE - the materials are public information   SEC-SCB-E-0000470

never arose" is consistent with the fact of there having been no awareness. Moreover, the E&Y report did not have matters of proprietary trading within its scope.

f)    Regarding para 8 – The belated mention in the Cooper Affidavit of the USSEC Action is inadequate. The failure to have disclosed the USSEC Action, the nature of the complaint by the USSEC, and its status as pending before an appellate court on the application for the Ex parte Order (together with other failings to disclose and/or misrepresentations) allowed SASL wrongly to portray an overall factually incorrect narrative to the court that all was well with SASL's operations or there were no issues of significance with regulators, but for the Commissions regulatory orders made 18 September 2019.

g)    Regarding para 9 – It is denied that the Commission was informed in 2007 (SASL didn't then exist as a registrant) or at any other time prior to the 12 September 2019 meeting with Mr Gentile that it held client funds in foreign unregulated entities. Further, the reference to the BDO audit reports for 2015 and 2016 is non-responsive and irrelevant to the issue by reason of the fact that:

    i.    The 2015 report pre-dated the existence of the foreign unregulated entities and so, logically, made no reference to them; and

    ii.    The 2016 report was filed in June 2018. It states the fact of Bahamian and foreign subsidiaries being in existence. However, it does not state or disclose that there were foreign subsidiaries of SASL which –

        • were unregulated; and/or

        • held funds of <u>clients</u>.

5

SEC-SCB-E-0000471

h) Regarding para 13 – The Commission denies allegations that it lacks technical knowledge of day trading and principal trading.

i) Regarding para 15 – The letter of good standing issued in December 2017 was for the purpose of confirming payment of fees and required filings as at that date. It is of no relevance to subsequent matters of: SASL having breached the 2018 Settlement Agreement; SASL wrongly holding client funds in accounts of foreign unregulated entities; the concerns of the Commission surrounding SASL's trading activities arising to the Commission's notice in 2019; or to the material non-disclosures and misrepresentations made by SASL in the application for the Ex parte Order.

j) The Commission does not admit any allegation made in SASL's Cooper Affidavit which in the interest of brevity may not have been specifically addressed by me.

9. It remains the case that, despite the fact that SASL has been the subject of serious investigations both in the United States of America by the USSEC, and in The Bahamas by the Commission, on the application for the Ex parte Order SASL –

a) Failed to disclose that it had been subject to the USSEC Action or the USSEC Subpoena Action;

b) Failed to disclose that a 2016 For-Cause examination conducted by the Commission had cited 16 regulatory breaches pertaining to requirements under both the securities and the AML-CFT regimes;

c) Failed to disclose that SASL had entered a conditional settlement agreement (the 2018 settlement agreement) with Commission respecting the breaches found in the 2016 For-Cause examination, and that SASL had failed to satisfy the conditions of the 2018 settlement agreement, which renders it subject to further disciplinary action by the Commission;

6

SEC-SCB-E-0000472

d)      Failed to disclose that it has not as yet demonstrated to the Commission that the breaches cited in the 2016 For-Cause examination are no longer occurring;

e)      Failed to disclose that SASL by its principal, Mr Gentile, was called to a meeting with the Commission on 12 September 2019 in which concerns arising from 2019 off-site investigations of SASL were put to him and his explanations requested;

f)      Failed to disclose to the court or fully to disclose the Commission's concerns around the fact that SASL without disclosure to the SCB (as required) established entities in foreign jurisdictions, which are not regulated, and which are receiving and/holding funds of SASL's clients;

g)      Failed to disclose to the court or fully to disclose the Commission's concerns around SASL's dealings in particular the Commission's concerns of deception of its clients, specifically SASL misrepresenting to clients that the clients have purchased shares when in fact the purchase appears only simulated in a trading platform and in most instances not actualized in fact;

h)      Failed to disclose that SASL has not complied with the Commission's request made on 18 September 2019 for production of information (namely, clients' records, client account documents and transactions) to assist the Commission in urgent further investigations despite agreeing with the Commission to assist[2]; and

i)      Failed to disclose or adequately to disclose that the Commission's regulatory orders stipulated pursuant to section 133(3) SIA a hearing date for Tuesday, 24 September 2019 at 10:00am.

10.      Additionally, SASL engaged in material misrepresentations, namely –

---

[2] Supplemental Affidavit, paras 20-21.

NONE - the materials are public information      **SEC-SCB-E-0000473**

a)   Wrongly misrepresented and conveyed the overall impression that there were "...no material concerns relating to compliance..."[3] when in truth there were several compliance breaches cited in the 2016 For-Cause examination which were continuing to occur and revealed in the 2018 on-site examination.  Moreover, several of those types of breaches continue to occur;

b)   Wrongly misrepresented that "none of the concerns raise from the onsite inspections forms the basis of the decision of the Commission dated 18 September, 2019"[4] when in truth several deficiencies cited in the 2016 For-Cause examination were referred to in the Commission's letter dated 18 September 2019 (which communicated the Commission's regulatory orders) in which "various deficiencies arising from onsite examinations conducted by the Commission that have not been addressed satisfactorily" were expressly referenced;

c)   Wrongly misrepresented that "[t]here was no opportunity given to SASL by the Commission to address their immediate concerns"[5] when in truth SASL by its principal, Mr Gentile, had a serious meeting with the Commission on 12 September 2019 called for the singular purpose of discussing the Commission's concerns and matters which culminated in the making of the Commission's regulatory orders;

d)   Wrongly misrepresented that "[i]n fact, the letter did not speak to SASL being heard on the concerns raised therein..."[6] when in truth the Commission's letter dated 18 September 2019 (which communicated the Commission's regulatory orders) opened with the words "[r]eference is made to our meeting of 12 September 2019 with Mr. Guy Gentile, sole shareholder and CEO of Swiss America Securities Ltd. (SASL), and further had scheduled for SASL to be heard on 24 September 2019;" and

e)   Wrongly misrepresented that "SASL has always operated in compliance with the act and protocols of the Industry"[7] when in truth SASL has for years failed and or refused fully to

---

[3] SASL's evidence, Gentile Affid para 2.
[4] SASL's evidence, Gentile Affid para 2.
[5] SASL's evidence, Gentile Affid para 5.
[6] SASL's evidence, Gentile Affid para 5.
[7] SASL's evidence, Gentile Affid para 8.

NONE - the materials are public information   **SEC-SCB-E-0000474**

remedy the breaches cited in the 2016 For-Cause examination and breached the conditions of the 2018 settlement agreement.

11. The Commission requires urgently to continue it investigations into the affairs of SASL in the faithful performance of the Commission's statutory mandate. I pray that this Honourable Court discharges the Ex parte Order as prayed.

**SWORN** this        )
31st day of October, A.D.)
2019              )

Before Me,

Notary Public

9

**THE COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**

**2019**
**PUB/jrv/00024**

**PUBLIC LAW DIVISION**

**IN THE MATTER** of an application by Mintbroker International Ltd. (formerly Swiss America Securities Ltd.) T/A Sure Trader, for Leave to apply for Judicial Review

**AND IN THE MATTER** of the Application for Leave to apply or an Order of Certiorari

**AND IN THE MATTER** of Purported Orders dated the 18th September 2019 made pursuant to sections 133(1) (b) and (f) and 133(3) of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the decision dated the 20th September 2019 of the Securities Commission of The Bahamas to appoint an auditor with costs payable by the Applicant, pursuant to section 45 of the Securities Industry Act, 2011.

**AND IN THE MATTER** of the Securities Industry Act, 2011 as amended

**AND IN THE MATTER** of the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017.

**BETWEEN**

**MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER**

**Applicant**

**AND**

**THE SECURITIES COMMISSION OF THE BAHAMAS**

**Respondent**

# **CERTIFICATE**

These are the Exhibits mentioned and referred to in the supplemental Affidavit of Christina Rolle marked "**CR 2ndSup_1**", "**CR 2ndSup_2**" and "**CR 2ndSup_3**" dated the 31st day of October, 2019.

Before Me,

_____

Notary Public

10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                   Plaintiff,<br><br>v.<br><br>GUY GENTILE,<br><br>               Defendant. | Civil Action No.: 16-1619 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Defendant Guy Gentile's Motion to Dismiss Plaintiff Securities and Exchange Commission's First Amended Complaint ("FAC"). (ECF No. 50 ("Def. Mov. Br.")). Plaintiff has submitted opposition (ECF No. 54 ("Pl. Opp. Br.")), which Defendant has replied to. (ECF No. 23 ("Def. Rep. Br.")). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants Defendant's Motion to Dismiss.

## I.      <u>BACKGROUND</u>[1]

Plaintiff brings the within action seeking "equitable" relief in connection with "two penny stock manipulation schemes [allegedly] perpetrated by [Defendant] Gentile." (FAC ¶ 1). These schemes allegedly began in April of 2007 and ended approximately in June 2008. (Id.). The 2007 scheme "involved the stock of Raven Gold Corporation" ("RVNG Scheme"), while the 2008

---

[1] This background is derived from Plaintiff's FAC, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

NONE - the materials are public information

scheme "involved the stock of Kentucky USA Energy, Inc." ("KYUS Scheme"). (Id.). Plaintiff's FAC asserts the following causes of actions: 1) Count I – "Violations of Sections 5(a) and 5(c) of the Securities Act;" 2) Count II – "Violations of Section 17(b) of the Securities Act;" 3) Count III – "Violations of Section 17(a) of the Securities Act;" 4) Count IV – "Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder;" and 5) Count V – "Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder." (FAC ¶¶ 86-100).[2] Plaintiff seeks two "equitable" forms of relief for the aforementioned violations: 1) an "obey-the-law" injunction; and 2) a "penny stock" bar. (FAC at 25-26, "Prayer For Relief").

The Court need not restate the intricate details of the schemes as Defendant's Motion to Dismiss requests dismissal of the FAC pursuant to the statute of limitations, and there is no dispute that, as previously stated, Defendant's alleged criminal activity ended as of June 2008. (See Crim. No. 16-cr-155, December 21, 2016 Transcript at 41:21-42:11; see also FAC ¶ 1; Def. Mov. Br. at 3-4; Pl. Opp. Br. at 4-6). Specifically, Defendant moves to dismiss the FAC asserting it is untimely pursuant to the statute of limitations set forth in 28 U.S.C. § 2462. (Def. Mov. Br. at 9). Plaintiff opposes Defendant's Motion asserting that the relief sought in the FAC is not punitive and therefore not subject to the five-year statute of limitations. (See generally Pl. Opp. Br.).

## II.   **LEGAL STANDARD**

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[2] The Court notes that the Government filed a parallel criminal action against Defendant under Docket No. 16-cr-155 (JLL) ("Parallel Criminal Action"). The allegations therein are identical to those in FAC. (See generally Crim. No. 16-cr-155, ECF No. 1). On January 30, 2017, this Court dismissed the Parallel Criminal Action as time barred pursuant to the relevant statute of limitations. *See United States v. Gentile*, 235 F. Supp. 3d 649 (D.N.J. 2017).

NONE - the materials are public information

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Defendants may prevail on the statute of limitations at the motion to dismiss stage "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (citation omitted); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Cain v. Dep't of Pub. Welfare*, 442 F. App'x 638, 638 (3d Cir. 2011) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

3

NONE - the materials are public information

### III.   <u>ANALYSIS</u>

The resolution of Defendant's Motion turns on whether the reliefs sought by Plaintiff are penal.  This is because 28 U.S.C. § 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, *penalty*, or forfeiture, *pecuniary or otherwise*, shall not be entertained unless commenced within five years from the date when the claim first accrued…" 28 U.S.C. § 2462 (emphasis added).  The parties all agree, and this Court has previously found, that Defendant's allegedly illegal conduct ended in June of 2008.  Accordingly, if Defendant is subject to Section 2462's five-year statute of limitation, Plaintiff had until June of 2013 to institute the within action.  However, Plaintiff filed this action in March 2016.  As noted above, Section 2462's statute of limitations only applies when the action brought by the Government seeks a remedy that is penal in nature.  Hence, if this action is subject to Section 2462, it is untimely.  However, if this action is not subject to Section 2462, it may proceed in due course.  Thus, whether Plaintiff's demanded reliefs are penal in nature is dispositive.[3]

Courts throughout the country have consistently held that a remedy, including an injunction, is penal in nature when it serves no retributive or remedial purpose and merely seeks to punish an individual.  *See, e.g., Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996); *SEC v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007); *SEC v. Alexander*, 248 F.R.D. 108, 115-16 (E.D.N.Y. 2007).  "Penalty" is defined as "*punishment imposed on a wrongdoer*."  *Penalty*, Black's Law Dictionary (10th ed. 2014), available at Westlaw BLACKS (emphasis added).  In

---

[3] The Court is aware that Defendant signed two tolling waivers in the Parallel Criminal Action, which extended the criminal statute of limitations therein by two years and 55 days.  While those waivers are not applicable to this civil action, the Court concludes that, even if the Court were to consider them, the analysis is unchanged.  This is because of the fact that, even if said waivers were applicable here, the statute of limitations would have been extended to the end of August 2015.  Yet, Plaintiff's Complaint was first filed in March of 2016.  Accordingly, if Section 2462's statute of limitations is applicable, the Complaint would be untimely, regardless of which statute of limitations' date is applied.

4

discussing Section 2462, the Tenth Circuit interpreted the term "penalty" "as a sanction or punishment imposed for violating a public law *which goes beyond compensation for the injury caused by the defendant.*" *United States v. Telluride*, 146 F.3d 1241, 1245-46 (10th Cir. 1998) (emphasis added). The D.C. Circuit has explained that a penalty is "a form of *punishment* imposed by the government for unlawful or proscribed conduct, *which goes beyond remedying the damage caused to the harmed parties by the defendant's actions.*" *Johnson*, 87 F.3d at 488 (emphasis added). The Second Circuit has noted that "[a]n injunction, while not always a 'drastic remedy' as appellants contend, often is much more than the 'mild prophylactic'" and that "[i]n some cases the collateral consequences [of an injunction] can be very grave." *SEC v. Commonwealth Chem. Sec., Inc.*, 574, F.2d 90, 99 (2d Cir. 1978) (citations omitted).

Recently, the Supreme Court discussed Section 2462's applicability with respect to disgorgement. *See Kokesh v. SEC*, 137 S. Ct. 1635 (2017). While the remedy therein differs from the one in the matter *sub judice* (*i.e.*, disgorgement versus injunction), the Supreme Court's reasoning is quite instructive. Consistent with the above law, the Court found that "[p]enal laws, strictly and properly, are those imposing punishment for an offense committed against the State." *Kokesh*, 137 S. Ct. at 1642 (citations and internal quotation marks omitted). The Court concluded that "[w]hen an individual is made to pay a *noncompensatory sanction* to the Government as a consequence of a legal violation, *the payment operates as a penalty.*" *Id.* at 1644 (emphasis added).

As discussed above, Plaintiff seeks two remedies. The first is the so called "obey-the-law" injunction. (FAC at 25). There, Plaintiff seeks to

> [p]ermanently restrain[] and enjoin[ Defendant] Gentile, his agents, servants, employees, attorneys and other persons in active concert or

5

SEC-SCB-E-0000481

participation with him who receive actual notice by personal service or otherwise, from violating Sections 5(a), 5(c), 17(a), and 17(b) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a) and 77q(b), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

(FAC at 25-26, "Prayer For Relief"). Additionally, Plaintiff seeks a "penny stock bar." With regards to the "penny stock bar," Plaintiff asks this Court to issue an injunction "[p]ermanently prohibiting [Defendant] Gentile from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6)." (FAC at 26, "Prayer for Relief").

Plaintiff seeks both of these "remedies" based on Defendant's alleged involvement in the RVNG and KYUS schemes. (*See generally* FAC). According to Plaintiff, Defendant is likely to commit similar violations in the future, thereby necessitating the requested injunctions. (*See, e.g.*, FAC ¶¶ 79, 87-88, 90-91, 93-94, 96-97, 99-100). Plaintiff attempts to bolster this assertion by alleging that Defendant has taken no responsibility for the alleged wrongdoings. Specifically, Plaintiff points to an interview with Bloomberg Businessweek, where Defendant stated "he did nothing wrong." (FAC ¶ 80). Plaintiff also alleges that Defendant "has [publicly] labeled [Plaintiff's] instant action a 'witch hunt'" and has declared on his social media that he "never scammed anyone." (Id.). Furthermore, Plaintiff asserts that Defendant "Gentile has not offered any assurance that he will not violate the securities laws in the future." (FAC ¶ 81). Finally, Plaintiff asserts that Defendant "maintains an active presence in the securities industry as a beneficiary of a Commission-registered broker-dealer" and that Defendant has recently publicly stated his intent to expand his business. (FAC ¶¶ 14, 82). Plaintiff avers that these facts, along

NONE - the materials are public information

SEC-SCB-E-0000482

with the allegations regarding the RVNG and KYUS schemes, support the request for the two injunctions.

The Court disagrees with Plaintiff's arguments. First, and most importantly, both injunctions sought by Plaintiff are punitive in nature. Indeed, the "obey-the-law" injunction would simply require Defendant to obey the already established federal laws and regulations relating to securities. Should the Court enter such an order, Defendant would not be required to do anything more than obey the law; a basic understanding of all citizens and those involved with securities. However, such an order would also stigmatize Defendant in the eyes of the public.

Additionally, there would be no retributive effect from such an order, nor would such an order restore any "*status quo ante*." As a matter of fact, Plaintiff has not identified a single "victim" or a specific harmed party that these injunctions would be designed to compensate or benefit. Hence, the only person who would be impacted by such an order would be Defendant, and the only purpose for such an order would be to penalize him for his alleged involvement in the RVNG and KYUS schemes.

The same analysis applies to the "penny stock bar." This injunction would specifically prohibit Defendant from being involved in any "penny stock" offerings. Once again, this order would only serve to punish Defendant. The order would not restore any "*status quo ante*" nor would it serve any retributive purposes. Rather, it would merely restrict Defendant's business structure and methodology, *in perpetuity*, simply because he was alleged to have violated securities laws when he purportedly was involved in the RVNG and KYUS schemes.

None of Plaintiff's arguments are persuasive. Simply alleging that Defendant violated securities laws does not lead the Court to conclude that Plaintiff is likely to violate securities laws

NONE - the materials are public information

SEC-SCB-E-0000483

in the future.  The fact that Defendant boasted about "not scamming anyone" during an interview and made shrewd comments about the Securities and Exchange Commission on social media also does not indicate that Defendant will violate federal securities laws in the future.  While the Court understands Plaintiff's desire to protect the public from predatory conduct, the Court cannot conclude that, under the limited set of facts currently before it, the requested injunctions are anything more than a penalty.  Simply, Plaintiff's requested reliefs herein are "*noncompensatory sanctions*" and must be considered penalties.

Because the relief sought by Plaintiff is penal in nature, Section 2462 is applicable.  As noted, Section 2462 places a five-year statute of limitations on the civil remedy actions brought by Plaintiff herein.  It is undisputed that Defendant's alleged illegal conduct concluded in June 2008. Accordingly, Plaintiff had until June 2013 to institute the within action.  Plaintiff did not file this lawsuit until March 2016.  As such, this action is time barred under Section 2462 and must be dismissed.

## IV.   CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiff's First Amended Complaint is granted.  An appropriate Order accompanies this Opinion.

DATED: December 13, 2017

JOSE L. LINARES
Chief Judge, United States District Court

8

NONE - the materials are public information                                                        SEC-SCB-E-0000484

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1242
_____

SECURITIES AND EXCHANGE COMMISSION,
Appellant

v.

GUY GENTILE
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:16-cv-01619)
District Judge: Honorable Jose L. Linares
_____

Argued November 6, 2018
Before: HARDIMAN, KRAUSE, and GREENBERG, *Circuit
Judges*.

(Opinion Filed:  September 26, 2019)

Daniel Staroselsky [Argued]
Sarah Prins
United States Securities & Exchange Commission
100 F Street, N.E.

Washington, D.C. 20549
*Counsel for Appellant*

Adam C. Ford [Argued]
Ford O'Brien LLP
575 Fifth Avenue
17th Floor
New York, NY 10017
*Counsel for Appellee*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge.*

A five-year statute of limitations applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. In *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), the Supreme Court held that "[d]isgorgement in the securities-enforcement context" is a "penalty" subject to that five-year limitations period. *Id.* at 1639. At issue in this appeal are two different remedies sought by the SEC: an injunction against further violations of certain securities laws and an injunction barring participation in the penny stock industry. The District Court held that those remedies—like the disgorgement remedy at issue in *Kokesh*—were penalties. We see these questions of first impression differently and hold that because 15 U.S.C. § 78u(d) does not permit the issuance of punitive injunctions, the injunctions at issue do not fall within the reach of § 2462. We will vacate the District Court's order dismissing the Commission's enforcement action and remand the case for the

2

District Court to decide whether the injunctions sought are permitted under § 78u(d).

I[1]

Appellant Guy Gentile, the owner of an upstate New York broker-dealer, was involved in two pump-and-dump schemes to manipulate penny stocks[2] from 2007 to 2008. In both schemes, Gentile promoted and "manipulated the market for . . . stock by placing trades and trade orders that created the false appearance of liquidity, market depth, and demand for the stock." Am. Compl. ¶ 3, No. 2:16-cv-01619 (D.N.J. Oct. 6, 2017), ECF No. 47 (Complaint); *see id.* ¶ 7.

---

[1] The District Court had jurisdiction under sections 20(b) and 22(a) of the Securities Act (15 U.S.C. §§ 77t(b) and 77v(a)), sections 21(d) and 27 of the Exchange Act (15 U.S.C. §§ 78u(d) and 78aa), and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). We accept the Commission's well-pleaded allegations as true, construe them in the light most favorable to the Commission, and draw all reasonable inferences from those allegations in the Commission's favor. *Davis v. Wells Fargo*, 824 F.3d 333, 341, 351 (3d Cir. 2016).

[2] "Penny stocks are low-priced, high-risk equity securities for which there is frequently no well-developed market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 175 n.14 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 914 n.1 (3d Cir. 1992)).

3

NONE - the materials are public information

SEC-SCB-E-0000487

The United States Attorney's Office for the District of New Jersey filed a sealed criminal complaint against Gentile in June 2012 and he was arrested a few weeks later. Gentile agreed to cooperate against his confederates, but the deal fell apart in 2016 after the Government rejected Gentile's demand for a non-felony disposition. *United States v. Gentile*, 235 F. Supp. 3d 649, 651 (D.N.J. 2017). A grand jury indicted Gentile, but the District Court dismissed the indictment as untimely. *Id.* at 656.

Gentile "maintains an active presence in the securities industry" as the CEO of a Bahamas-based brokerage and the beneficial owner of a broker-dealer. Compl. ¶ 82. Since his criminal charges were dismissed, he has expressed an intention to expand that brokerage and hire new employees. *Id.* ¶ 14 (alleging Gentile announced plans to "increas[e] staff by 60 to 80 employees by year-end 2017, target[] 30 per cent growth, and reactivat[e] 'stalled' expansion plans"). And he has been quite candid about his view of the Commission's enforcement action. He called it a "witch hunt," and stated in the news and on social media that he "did nothing wrong" and "never scammed anyone." *Id.* ¶ 80.

The Commission disagrees. In this civil enforcement action, filed eight years after Gentile's involvement in the second scheme, it alleges violations of several provisions of the Securities and Exchange Acts.[3] It initially sought: (1) an

---

[3] Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c); section 17(b) of the Securities Act, 15 U.S.C. § 77q(b); section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

NONE - the materials are public information     SEC-SCB-E-0000488

injunction prohibiting Gentile from violating those provisions in the future; (2) disgorgement of wrongful profits; (3) civil money penalties; and (4) an order barring him from the penny stock industry. Following *Kokesh*, the Commission dropped its requests for disgorgement and penalties. That left only its requests for an "obey-the-law" injunction and a prohibition on Gentile's participation in penny-stock offerings. *SEC v. Gentile*, No. 2:16-cv-01619, 2017 WL 6371301, at *1 (D.N.J. Dec. 13, 2017).

The District Court granted Gentile's motion to dismiss. *Id.* at *4. Applying *Kokesh*, the Court found that the remedies the Commission sought were penalties under § 2462. *Id.* at *3–4. And because Gentile's illegal activity ceased in 2008, *id.* at *1, the Court dismissed the case as untimely.

In holding the obey-the-law injunction was a penalty, the Court first noted that the injunction would not require Gentile to do anything the public at large is not already obliged to do, but it would stigmatize him. Nor would the injunction restore the status quo ante or compensate any victim of Gentile's schemes. Similarly, the Court found the penny stock bar would punish Gentile by "restrict[ing] [his] business structure and methodology, *in perpetuity*," without benefitting any victim or remediating the schemes' effects. *Id.* at *4. Though it "underst[ood] [the Commission's] desire to protect the public from predatory conduct," the Court could not conclude "that, under the limited set of facts currently before it, the requested injunctions are anything more than a penalty." *Id.* The Commission filed this appeal.

5

II

The default federal statute of limitations requires that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise," be brought within five years of the claim's accrual. 28 U.S.C. § 2462. In *Kokesh*, the Supreme Court held disgorgement, "as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462." 137 S. Ct. at 1645. The Court defined a "penalty" as a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." *Id.* at 1642 (alteration in original) (quoting *Huntington v. Attrill*, 146 U.S. 657, 667 (1892)). The Court's definition of "penalty" was informed by two principles. First, whether a sanction is a penalty turns in part on whether the wrongdoing it targets was perpetrated against the public, rather than an individual. *Id.* Second, "a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner'—as opposed to compensating a victim for his loss." *Id.* (quoting *Huntington*, 146 U.S. at 668).

The Court held SEC disgorgement "readily" satisfies these criteria because (1) it is imposed for violations of public laws; (2) it is imposed for punitive purposes; and (3) in many cases the disgorged money is not used to compensate victims. *Id.* at 1643–44. The Commission protested that disgorgement sometimes does compensate victims, but the Court was unpersuaded. While "sanctions frequently serve more than one purpose," a "civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." *Id.* at 1645 (quoting *Austin v. United States*, 509 U.S. 602, 610, 621 (1993)).

6

NONE - the materials are public information                                                 SEC-SCB-E-0000490

According to Gentile, the Supreme Court's definition of "penalty" applies equally to injunctions prohibiting future lawbreaking and participation in penny stock offerings. There is no question the Commission's action is to enforce what *Kokesh* described as "public laws." *Id.* at 1643; *see SEC v. Teo*, 746 F.3d 90, 101–02 (3d Cir. 2014). So this case turns on whether the remedies the Commission seeks are imposed for punitive reasons.

III

Both remedies are found in 15 U.S.C. § 78u(d).[4] The Commission's general authority to seek injunctions against ongoing or threatened violations, § 78u(d)(1), states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder . . . it may in its discretion bring an action in [district court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

---

[4] The Commission has parallel injunction and penny-stock bar authority under the Securities Act. *See* 15 U.S.C. § 77t(b), (g). Those provisions are materially indistinguishable from the Exchange Act provisions we set forth below, and our analysis applies equally to them.

7

SEC-SCB-E-0000491

Section 78u(d)(1) injunctions that simply reference or restate the text of statutory prohibitions are called "obey-the-law" injunctions.

The Commission's authority to seek a penny-stock industry bar is found in § 78u(d)(6)(A):

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

Paragraph (6) does not use the word "enjoin" like paragraph (1) does, so first we must determine whether § 78u(d)(6) penny-stock industry bars are a species of injunction. Several considerations convince us they are.

First, take the text. Section 78u(d)(6) authorizes a court to "prohibit" a defendant from participating in penny stock offerings. Just like a typical injunction, this is a judicial order "to refrain from doing a particular thing . . . . which operates as a restraint upon the party in the exercise of his real or supposed rights." 2 Joseph Story, Commentaries on Equity Jurisprudence § 861, at 154 (1836). It is "wholly preventive, prohibitory, or protective," 4 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 1337, at 3206 (4th ed. 1919), and it "directs the conduct of a party . . . with the backing of [the court's] full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

8

SEC-SCB-E-0000492

The statute's structure also suggests the penny stock bar is injunctive. It is only "in a[] proceeding [for an injunction under § 78u(d)(1)]" that the statute empowers courts to issue the bar. Consistent with that close relation, courts use similar factors to decide whether to issue both industry bars and obey-the-law injunctions. *See SEC v. Kahlon*, 873 F.3d 500, 506–07 (5th Cir. 2017) (per curiam). *Compare SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980), *with SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). And paragraph (6), like paragraph (1), bespeaks equitable discretion. *See* 15 U.S.C. § 78u(d)(6)(A) ("[T]he court *may* prohibit that person from participating in an offering of penny stock, *conditionally or unconditionally*, and permanently *or for such period of time as the court shall determine*." (emphases added)). Because it can be sought only "[i]n a[] proceeding under paragraph (1)," *id.*, a district court may impose a penny stock bar only "upon a proper showing," *id.* § 78u(d)(1). Thus, like paragraph (1), paragraph (6) contemplates injunctive relief's "nice adjustment and reconciliation between the public interest and private needs," *Aaron v. SEC*, 446 U.S. 680, 701 (1980) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Finally, at least two courts of appeals have acknowledged that these court-ordered industry bars are injunctive. *See Kahlon*, 873 F.3d at 508 (penny stock bar); *Patel*, 61 F.3d at 141 (director-and-officer bar). That makes sense, since courts have also reasoned that the statutory D&O bar authority merely codifies courts' preexisting power to include these bars in injunctions. *See SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 & n.8 (9th Cir. 1998); *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994). For all these reasons, we hold § 78u(d)(6) penny-stock industry bars are injunctive in nature.

9

IV

We next consider the question whether properly issued and framed § 78u(d)(1) and (6) injunctions can be penalties subject to the statute of limitations. We look first to the equitable principles governing injunctions, before turning to the text and history of the Commission's authority to seek them.

A

The federal courts' equity jurisdiction mirrors that of the High Court of Chancery in England in 1789, when Congress passed the first Judiciary Act. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). This does not mean, however, that equitable relief is strictly a common law matter. Innumerable acts of Congress explicitly provide for injunctions, and courts must account for the policy judgments exemplified by those statutes when exercising their equitable discretion. *See Hecht*, 321 U.S. at 331. But unless Congress clearly states an intention to the contrary, statutory injunctions are governed by the same "established principles" of equity that have developed over centuries of practice. *Weinberger*, 456 U.S. at 313; *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Hecht*, 321 U.S. at 329. This clear statement rule applies to regulatory statutes enforced by government agencies. *Hecht*, 321 U.S. at 329–30.

Gentile's argument that SEC injunctions are penalties, even when properly issued and framed, runs headlong into a core tenet of equity jurisprudence. "The historic injunctive process was designed to deter, not to punish." *Hecht*, 321 U.S. at 329. Or as one treatise put it, a court may not by injunction "interfere for purposes of punishment, or . . . compel persons

10

NONE - the materials are public information                                                                      SEC-SCB-E-0000494

to do right" but may only "prevent them from doing wrong."
1 James L. High, A Treatise on the Law of Injunctions § 1, at 3
(4th ed. 1905). This principle is a corollary to the most basic
rule of preventive injunctive relief—that the plaintiff must
show a cognizable risk of future harm. *See United States v. Or.
State Med. Soc'y*, 343 U.S. 326, 333 (1952).

Besides being an element of Article III standing for
prospective relief, the need to show risk of harm is also a
traditional equitable requirement that applies to enforcement
agencies pursuing statutory injunctions. *See United States v. W.
T. Grant Co.*, 345 U.S. 629, 633 (1953); Douglas Laycock,
Modern American Remedies 278 (4th ed. 2010); Gene R.
Shreve, Federal Injunctions and the Public Interest, 51 Geo.
Wash. L. Rev. 382, 405 (1983). Unless the agency shows a real
threat of future harm, "there is in fact no lawful purpose to be
served" by a preventive injunction. *SEC v. Torr*, 87 F.2d 446,
450 (2d Cir. 1937).

In *Kokesh*'s parlance, a preventive injunction
unsupported by that showing could not "fairly be said *solely* to
serve a remedial purpose," 137 S. Ct. at 1645 (quoting *Austin*,
509 U.S. at 621). *Cf. Conmar Prods. Corp. v. Universal Slide
Fastener Co.*, 172 F.2d 150, 155–56 (2d Cir. 1949) (L. Hand,
C.J.) (rejecting injunction that would not prevent harm and so
"must rest upon the theory that it is a proper penalty for the
[defendant's] wrong" because "we can find no support [for the
injunction] in principle"). But a properly issued and framed
injunction is "fairly" so described, because its "sole function
. . . is to forestall future violations." *Or. State Med. Soc'y*, 343
U.S. at 333. We think this prevention principle most sharply
distinguishes SEC injunctions from the disgorgement remedy
at issue in *Kokesh*. *See SEC v. Commonwealth Chem. Sec., Inc.*,
574 F.2d 90, 103 n.13 (2d Cir. 1978) (Friendly, J.) (holding that

11

NONE - the materials are public information

even if the Commission fails "to show the likelihood of recurrence required to justify an injunction," courts may still impose disgorgement); Jayne W. Barnard, The SEC's Suspension and Bar Powers in Perspective, 76 Tul. L. Rev. 1253, 1258 (2002) ("All of these [SEC] injunctions except the disgorgement injunction depend on the government's ability to demonstrate that, in the absence of an injunction, there is a reasonable likelihood of future violations."). In short, injunctions may properly issue only to prevent harm—not to punish the defendant.

## B

As we have explained, Congress must provide a clear statement to substantially depart from traditional equitable principles like that one. *See Hecht*, 321 U.S. at 329 ("We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made."). We perceive no such intent in the text of § 78u(d)(1) and (6). And while this clear statement rule might suffice to decide the case, requiring all injunctions under § 78u(d)(1) and (6) to be preventive and thus bringing them out of the realm of penalties, we are mindful that the *Kokesh* Court analyzed how SEC disgorgement operates in practice.[5] So we also analyze the history and caselaw surrounding these provisions. That analysis reinforces our conclusion but also impels us to

_____

[5] The disgorgement remedy addressed in *Kokesh* was not created by statute, *see* 137 S. Ct. at 1640, so there would have been nowhere to look for a clear statement of congressional intent to deviate from traditional equitable principles. *See infra* Part IV(B)(2).

12

SEC-SCB-E-0000496

reinforce the parameters within which an SEC injunction is properly issued and framed.

1

Once again, we start with the text. When the Commission believes a person "is engaged or is about to engage" in securities violations, it may bring a suit "to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 78u(d)(1). If the suit is against a "person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock" and a "proper showing" has been made as to likelihood of future harm, the court may also "prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." *Id.* § 78u(d)(1), (6)(A).

Nothing in either provision just quoted suggests Congress meant to depart from the rule that injunctions are issued to prevent harm rather than to punish past wrongdoing. Neither provision mentions retribution or general deterrence. *See Kokesh*, 137 S. Ct. at 1645; *cf. Tull v. United States*, 481 U.S. 412, 423 (1987) ("[A provision's] authorization of punishment to further retribution and deterrence clearly evidences that [it] reflects more than a concern to provide equitable relief."). Neither shows an intent—let alone a clear intent—that injunctions should issue automatically on a finding of past violations or without a proper showing of the likelihood of future harm. Each uses open-ended language that suggests traditional equitable discretion. *Compare* 15 U.S.C. § 78u(d)(1) ("[U]pon a proper showing . . . ."), *and id.* § 78u(d)(6)(A) ("[T]he court *may* prohibit that person from

13

SEC-SCB-E-0000497

participating in an offering of penny stock, *conditionally or unconditionally, and permanently or for such period of time as the court shall determine*." (emphases added)), *with Hecht*, 321 U.S. at 321–22, 329–30 (holding no clear intent to strip traditional discretion in statute that provided that an injunction or other order "shall be granted" "upon a showing . . . that [the defendant] has engaged or is about to engage in [prohibited] acts or practices"), *and id.* at 327 (noting distinction between "shall be granted" language and statutes, like § 78u(d)(1), that "provide that an injunction or restraining order shall be granted 'upon a proper showing'" (citations omitted)). In sum, "[a]bsent much clearer language than is found in the [Exchange Act], the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 868–69 (2d Cir. 1968) (en banc) (Friendly, J., concurring).

2

The history of the Commission's injunction authority leads to the same conclusion. "Prior to the labor injunctions of the late 1800's, injunctions were issued primarily in relatively narrow disputes over property." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 842 (1994) (Scalia, J., concurring). But that changed as more and more conduct came to be regulated by injunction through a rough analogy to public nuisance. *See* Comment, The Statutory Injunction as an Enforcement Weapon of Federal Agencies, 57 Yale L.J. 1023, 1024 n.5 (1948). Securities enforcement injunctions emerged as part of this expansion of American equity jurisprudence into public law enforcement. *See* Daniel J. Morrissey, SEC Injunctions, 68 Tenn. L. Rev. 427, 437–39 (2001).

14

SEC-SCB-E-0000498

Before Congress created the SEC, states authorized injunctive enforcement of laws that targeted "speculative schemes which have no more basis than so many feet of 'blue sky,'" *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917). Part of a new breed of statutory remedy, these injunctions were an extension of traditional equity "even less directly traceable to the remedial devices fashioned by the common law" than previous remedies that had "f[ound] a basic analogy in the common-law right of the state to abate and restrain public nuisances." Note, Statutory Extension of Injunctive Law Enforcement, 45 Harv. L. Rev. 1096, 1097, 1099 (1932). Those predecessor nuisance actions distinguished punishment from prevention. *See Eilenbecker v. Dist. Court of Plymouth Cty.*, 134 U.S. 31, 40 (1890) ("[I]t seems to us to be quite as wise to use the processes of the law and the powers of the court to prevent the evil, as to punish the offence as a crime after it has been committed."), *overruled in part on other grounds by Bloom v. Illinois*, 391 U.S. 194 (1968); *Mugler v. Kansas*, 123 U.S. 623, 672–73 (1887) ("In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information, also, lies in equity to redress the grievance by way of injunction." (quoting 2 Story, *supra*, §§ 921–922)). And while statutory injunctions aimed at fraud on the public were an innovation, they too respected this fundamental distinction.

New York's Martin Act is perhaps the best-known example. That blue sky law empowered the state attorney general to seek information and commence actions in equity or criminal prosecutions. *See Dunham v. Ottinger*, 154 N.E. 298, 300 (N.Y. 1926). Injunction actions were meant to "stop[]" or "prevent" threatened violations, *id.*, while prosecutions were meant to "punish" them. *Id.* Other states sought to use the

15

SEC-SCB-E-0000499

injunctive process to "stop" and "suppress" securities fraud. *E.g.*, *Stevens v. Washington Loan Co.*, 152 A. 20, 23 (N.J. Ch. 1930). Then, responding to the 1929 stock market crash and the Great Depression, Congress entered the fray. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). It enacted first the Securities Act of 1933 and then the Securities Exchange Act of 1934, which created the SEC.

At first the Commission had only one arrow in its quiver: injunctions against future violations of the securities laws.[6] *See Kokesh*, 137 S. Ct. at 1640. Much like those authorized by blue sky laws, SEC injunctions were "a classic example of modern utilization of traditional equity jurisdiction for the enforcement of a congressionally declared public policy administered by a regulatory agency established for that purpose." *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53 (7th Cir. 1972). For a time, courts were too quick to issue injunctions on modest showings of threatened harm. *See Commonwealth Chem.*, 574 F.2d at 99 ("It is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days."). But spurred by renewed attention to the statute's text and the harsh consequences of SEC injunctions, courts began taking a harder

---

[6] Decades later, Congress granted the authority to seek penny stock bars. That authority came in 1990 as part of an amendment to the Exchange Act designed "to provide additional enforcement remedies for violations of [the securities] laws and to eliminate abuses in transactions in penny stocks, and for other purposes." Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931, 931 pmbl.

NONE - the materials are public information

SEC-SCB-E-0000500

look at whether violators posed a real threat of recidivism. *See id.* at 99–100 (collecting cases).

Citing *Commonwealth Chemical* with approval, the Supreme Court said of SEC injunctions that "the proper exercise of equitable discretion is necessary to ensure a 'nice adjustment and reconciliation between the public interest and private needs.'" *Aaron*, 446 U.S. at 701 (quoting *Hecht*, 321 U.S. at 329). To merit an injunction based on threatened harm, "the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." *Id.* Our Court makes that determination based on factors including not merely the fact of a past violation, but more importantly "the degree of scienter involved [in the past violation], the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, [and] the sincerity of his assurances against future violations." *Bonastia*, 614 F.2d at 912.

Moreover, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972) (citing *Hecht*, 321 U.S. at 328–30). Those considerations include not only the need to protect the public where the circumstances of the offense and of the offender give rise to a substantial risk of future harm, *Bonastia*, 614 F.2d at 912, but also the stigma, humiliation, and loss of livelihood attendant to the imposition of the two injunctions sought here, whether temporary or permanent. So "the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *Manor Nursing Ctrs.*, 458 F.2d at 1102; *see Aaron*, 446 U.S. at 703 (Burger, C.J., concurring) ("An [SEC]

17

injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith."); *SEC v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978) (weighing hardship to defendant in approving injunction's dissolution). In other words, the harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible.

These principles would be dishonored if courts aimed to inflict hardship instead of tailoring injunctions to minimize it. A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing. *See Hartford-Empire Co. v. United States*, 323 U.S. 386, 433–35 (1945) (striking part of antitrust injunction applicable to directors and officers who, though they "may have rendered themselves liable to prosecution," had not been shown to pose a threat of future violations), *supplemented*, 324 U.S. 570. As the Court of Appeals for the D.C. Circuit aptly explained, "[j]ustifying an injunction, even in part, in terms of propitiating public sentiment, is objectionable as a matter of law." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989). Nor is general deterrence a proper consideration. *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180 n.6 (2d Cir. 1976) (Friendly, J.) (distinguishing "injunctive proceedings, the objective of which is solely to prevent threatened future harm" from administrative sanctions used "not so much to control the respondent as to warn others ... [which] has a significant

NONE - the materials are public information

SEC-SCB-E-0000502

'penal' component" (quoting Louis L. Jaffe, Judicial Control of Administrative Action 267–68 (1965))).

And the principle that injunctions may issue only "to prevent threatened future harm," not to punish, *Arthur Lipper*, 547 F.2d at 180 n.6, applies equally to an injunction's scope. *See SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 542–43 (2d Cir. 1984) (Friendly, J.). Just as it is error to issue an injunction for punishment's sake, it is error to broaden the scope of an injunction because of moral desert or to make an example of the defendant. That principle is implicit in the well-established rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Indeed, rather than using punishment to *justify* SEC injunctions, courts must shape those injunctions to provide full relief without inflicting unnecessary pain. *See, e.g.*, *Patel*, 61 F.3d at 142 ("The loss of livelihood and the stigma attached to permanent exclusion from the corporate suite certainly requires more."); *Am. Bd. of Trade*, 751 F.2d at 542–43. And courts have consistently explained that SEC injunctions must be intended to deter the violator from further infractions (and thereby protect the public), not punish past misconduct. *See, e.g.*, *Bonastia*, 614 F.2d at 912; *SEC v. Graham*, 823 F.3d 1357, 1361–62 (11th Cir. 2016); *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978); *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 54–56 (2d Cir. 1976) (Friendly, J.). Because an injunction must be fully supported by threatened harm, we reject Gentile's argument that a properly issued and framed SEC injunction can be a "penalty" as defined by *Kokesh*.

19

SEC-SCB-E-0000503

The SEC itself agrees with this approach in principle. In *Saad*, Exchange Act Release No. 86751, 2019 WL 3995968 (Aug. 23, 2019), the Commission was asked to evaluate a disciplinary sanction barring an individual from associating with any FINRA member firm. *Id.* at \*1. The Commission observed at the outset that "if a sanction is imposed for punitive purposes as opposed to remedial purposes, the sanction is excessive or oppressive and therefore impermissible." *Id.* at \*3. The Commission went on to explain that a reasonable, well-grounded finding that the sanctioned party "posed a clear risk of future misconduct" such that "the bar was . . . necessary to protect investors" was what distinguished an "appropriately-issued FINRA bar[]" from an impermissibly punitive bar. *Id.* at \*4 (internal quotation marks and citation omitted). Conversely, "[a] sanction based solely on past misconduct . . . would be impermissibly punitive and thus excessive or oppressive." *Id.* at \*5.

That an injunction is permissible only where necessary "to prevent . . . misconduct from occurring in the future," and not merely "to punish past transgressions," *Saad*, 2019 WL 3995968, at \*12, is a standard to which the SEC must also hold itself. When it does not, the buck stops here: Lest we return to those days when only a modest showing was considered sufficient, *Commonwealth Chem.*, 574 F.2d at 99, federal courts may not grant SEC injunctions except "upon a proper showing" of the likelihood of future harm.[7]

---

[7] As we explain below, we perceive an important distinction between the statutorily authorized equitable relief at issue here and the administrative sanctions at issue in *Saad*. So we do not think all of the *Saad* Release's reasoning is

NONE - the materials are public information

Other courts are divided on whether an injunction can ever be a § 2462 penalty. The Eleventh Circuit, bound by its precedent, held that injunctions cannot be penalties under § 2462 because they are equitable. *Graham*, 823 F.3d at 1360. It went on to explain that even had that precedent not been established, it would hold § 2462 "does not apply to injunctions like the one in [that] case." *Id.* The court reasoned that injunctive relief is forward looking, while penalties address past wrongdoing. *See id.* at 1361–62. By contrast, the Fifth Circuit held in a non-precedential opinion that SEC injunctions and D&O bars could be—and in that case were—penalties under § 2462. *SEC v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) (per curiam). The Eighth, Sixth, and Tenth Circuits declined to say whether injunctions can ever be § 2462 penalties, instead holding the particular injunctions before them were not punitive. *See SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017); *SEC v. Quinlan*, 373 F. App'x 581, 587 (6th Cir. 2010) (non-precedential); *United States v. Telluride Co.*, 146 F.3d 1241, 1245–48 (10th Cir. 1998). The D.C. Circuit has taken yet another approach in the agency context. That court evaluates whether an administrative sanction constitutes a penalty for purposes of § 2462 on a case-by-case basis, considering "the degree and extent of the consequences

---

applicable to the injunction context. In particular, we do not believe that, under § 78u(d)(1) or (6), "general deterrence . . . may be considered as part of the overall remedial inquiry." *Saad*, 2019 WL 3995968, at *2 (alteration in original) (quoting *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1066 (D.C. Cir. 2007)).

21

SEC-SCB-E-0000505

to the subject of the sanction." *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996).[8] None of this is inconsistent with our holdings here; these courts simply have not decided the scope of injunctions permitted under § 78u(d).

In our view, the *Graham* court got it right. We have deemed inappropriate an injunction that was the functional equivalent of a monetary penalty. *United States v. EME Homer City Generation, LP*, 727 F.3d 274, 295–96 (3d Cir. 2013) ("Such injunctive cap-and-trade relief is the equivalent of awarding monetary relief and 'could not reasonably be characterized as an injunction.'" (quoting *United States v. Midwest Generation*, 781 F. Supp. 2d 677, 685 (N.D. Ill. 2011))); *see United States v. Luminant Generation Co.*, 905 F.3d 874, 890–91 (5th Cir. 2018) (Elrod, J., concurring in part and dissenting in part) (advocating our Court's approach in *EME Homer City*), *reh'g en banc granted*, 929 F.3d 316 (5th

---

[8]  While we agree with the D.C. Circuit that considerations of both purpose and effect are relevant to whether an injunction constitutes a penalty, we believe these considerations bear on the authority of the district court to enter an SEC injunction, not on whether that injunction, while within the court's power to grant, is nonetheless time barred. We question too the consistency and administrability of this approach, which appears to contemplate the imposition of both punitive and remedial injunctions within § 2462's limitations period but of only remedial injunctions outside of it, with the time bar conclusively determined on appeal only after the fact. The approach we espouse today has the virtue of providing clear guidance ex ante by focusing instead on the SEC's authority to seek and the court's authority to impose an injunction under § 78u(d)(1) and (6).

22

NONE - the materials are public information

Cir. 2019); *cf. Edelman v. Jordan*, 415 U.S. 651, 668 (1974) ("While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State."). A similar principle applies here. Injunctions may not be supported by the desire to punish the defendant or deter others, so courts abuse their discretion when they issue or broaden injunctions for those reasons. We therefore hold SEC injunctions that are properly issued and valid in scope are not penalties and thus are not governed by § 2462. If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion—not held time barred by § 2462.

There is one puzzle we feel compelled to address. The *Kokesh* Court held SEC disgorgement is a penalty—despite the maxim that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law," *Tull*, 481 U.S. at 421–22; *see Decorative Stone Co. v. Bldg. Trades Council of Westchester Cty.*, 23 F.2d 426, 427–28 (2d Cir. 1928) ("Courts of equity do not award as incidental relief damages penal in character without express statutory authority . . . ."). If SEC disgorgement is both an equitable remedy and a § 2462 penalty, could an injunction be both too?

We think not. First, unlike § 78u(d)(1) and (6) injunctions, SEC disgorgement is not authorized by statute. It has instead been justified as part of courts' "inherent equity power to grant relief ancillary to an injunction." *Kokesh*, 137 S. Ct. at 1640 (quoting *SEC v. Tex. Gulf Sulphur Co.*, 312 F. Supp. 77, 91 (S.D.N.Y. 1970)). Without any textual basis, it is hard to see where the Supreme Court would look for a clear statement of congressional intent to deviate from equitable

23

SEC-SCB-E-0000507

traditions. Indeed, at the *Kokesh* oral argument several Justices expressed frustration that the lack of statutory text made it hard to define SEC disgorgement. *See* Transcript of Oral Argument at 7–9, 13, 31, 52, *Kokesh*, 137 S. Ct. 1635 (No. 16-529), 2017 WL 1399509.

Second, the *Hecht* admonition—that "[t]he historic injunctive process was designed to deter, not to punish," 321 U.S. at 329—is at the core of preventive injunctive relief. By contrast, *Tull* spoke to equity more broadly. So notwithstanding what *Kokesh* might suggest about equitable relief in general, we do not believe it opens the door to punitive injunctions.

Finally, though the *Kokesh* Court was careful to reserve the issue, *see* 137 S. Ct. at 1642 n.3, we note its skepticism that SEC disgorgement is applied in conformity with traditional equitable principles. *Compare id.* at 1640 ("Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'" (alteration in original) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a, at 204 (Am. Law Inst. 2010))), *with id.* at 1644 ("[I]t is not clear that disgorgement, as courts have applied it in the SEC enforcement context, simply returns the defendant to the place he would have occupied had he not broken the law. SEC disgorgement sometimes exceeds the profits gained as a result of the violation."). For these reasons, we conclude that proper injunctions do not fall within the definition of penalties as defined in *Kokesh*.

V

Our analysis to this point disposes of most of Gentile's arguments, but a few remain. First, Gentile argues that the

24

SEC-SCB-E-0000508

*Hecht* admonition—that "[t]he historic injunctive process was designed to deter, not to punish"—does not apply because it is inconsistent with *Kokesh*'s treatment of § 2462. That is, *Hecht* sets forth a dichotomy—punishment versus deterrence—that is untenable because *Kokesh* holds deterrence is punitive. We think this overreads *Kokesh*. Though the Court referred several times to "deterrence" without elaboration, we understand those references to address general deterrence. *See Kokesh*, 137 S. Ct. at 1642 ("[A] pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner' . . . ." (quoting *Huntington*, 146 U.S. at 668)). Our Court's gloss on *Hecht* reflects this important distinction between restraining the defendant on fear of contempt and making an example of him to deter others. *See Bonastia*, 614 F.2d at 912 (noting that injunctive relief serves "to *deter* [the violator] from committing future infractions of the securities laws," not to "punish" him for past misconduct (emphasis added)). The former is the very point of preventive injunctive relief; the latter is punitive. "When it comes to discerning and applying [traditional equitable] standards . . . 'a page of history is worth a volume of logic.'" *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (quoting *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921)). All the more so here—where Gentile's logic is based on a strained reading of a single word in a case addressing a different remedy.

And unlike in *Kokesh*, there are few signs that courts issue SEC injunctions for general deterrence. True, there are isolated examples. *See, e.g.*, *Posner*, 16 F.3d at 522 ("We intend our affirmance . . . as a sharp warning to those who violate the securities laws that they face precisely such banishment."). But the caselaw in the main reflects the

25

SEC-SCB-E-0000509

traditional principles we have discussed. We also find it significant that cases prior to *Kokesh* addressing both SEC injunctions and disgorgement often discuss general deterrence only with respect to the latter. *See, e.g., SEC v. Kokesh*, 834 F.3d 1158, 1162–64 (10th Cir. 2016), *rev'd*, 137 S. Ct. 1635; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474, 1477–78 (2d Cir. 1996); *First City Fin. Corp.*, 890 F.2d at 1228–29, 1231–32; *see also Collyard*, 861 F.3d at 765. What is more, we have explained in an SEC case that "there is no great public or national interest to be served by an injunction in essence against a single individual." *Warren*, 583 F.2d at 121. That would hardly be true if we sought to implement a program of general deterrence through injunctions.

Part of our disagreement with Gentile stems from his focus on the Commission's intent. It may well be that in its zeal for enforcement, the Commission more recently has tended to seek injunctions in part for their general deterrent effect. *See* James D. Cox et al., SEC Enforcement Heuristics: An Empirical Inquiry, 53 Duke L.J. 737, 751 (2003). The impetus may be understandable; after all, SEC enforcement actions are "independent of the claims of individual investors" and are aimed at "promot[ing] economic and social policies." *Teo*, 746 F.3d at 102 (alteration in original) (quoting *SEC v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993)); *see* Comment, Federal Agencies, *supra*, at 1048–49. But any tendency in that direction would be at odds with the Commission's own understanding of the limits on its powers, *cf. Saad*, 2019 WL 3995968, at *3–5, *12. And ultimately, rather than probe the agency's rationale for seeking a judicial remedy, we look to the nature of the remedy itself as explained by the courts imposing it. *See Kokesh*, 137 S. Ct. at 1643–44 (analyzing why disgorgement "is imposed by the courts"); *cf. Tull*, 481 U.S. at

26

423 ("Thus, the District Court intended not simply to disgorge profits but also to impose punishment.").

Second, Gentile argues that because obey-the-law injunctions require mere compliance with preexisting obligations, they must be punitive. Citing *Bonastia*, the Commission responds that "injunctions that track the statutory language charged in a complaint are permissible in this Circuit." SEC Br. 30 n.5. Gentile's argument has some force to the extent that obey-the-law injunctions pose a risk of overbreadth, lack of fair notice, unmanageability, and noncompliance with Federal Rule of Civil Procedure 65(d). *See Graham*, 823 F.3d at 1362 n.2 (collecting cases); *SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (collecting cases); *Savoy*, 665 F.2d at 1318; *United States v. Corn*, 836 F.2d 889, 892 & n.6 (5th Cir. 1988); Laycock, *supra*, at 274–75. So in some cases—and perhaps in this one—an obey-the-law injunction will add little if anything to the sanctions already in place. There has been and continues to be "a difference of opinion as to whether as a general proposition injunctions to 'obey the law' should be issued in order that enforcement by administrative agencies may be sought by contempt rather than by the statutory route." *SEC v. Thermodynamics, Inc.*, 464 F.2d 457, 461 (10th Cir. 1972).

But Gentile has not asked us to hold obey-the-law injunctions impermissible—he argues only that they are subject to the § 2462 statute of limitations. So we note only that the appropriate scope of an injunction against further lawbreaking depends on the facts and circumstances of each case. Courts should make this determination on a developed record, *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013), assuming the plaintiff has stated a plausible claim for relief, *see EME Homer City*

27

*Generation*, 727 F.3d at 295–96 (affirming dismissal of claims for improper injunctive relief). It is true that in *Bonastia* we reversed the district court's refusal to grant an obey-the-law injunction. *See* 614 F.2d at 910–11. We have also struck overbroad language enjoining parties to obey the law. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003) (citing *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 83 (3d Cir. 1990), and *Warren*, 583 F.2d at 121). The "degree of particularity required of an injunction depends on the subject matter involved." *Pub. Interest Research Grp.*, 913 F.2d at 83 (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987)). Ultimately, "[t]he district courts are invested with discretion to model their orders to fit the exigencies of the particular case, and have the power to enjoin related unlawful acts which may fairly be anticipated from the defendants' conduct in the past, but a decree cannot enjoin conduct about which there has been no complaint." *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1180 (3d Cir. 1976) (footnotes omitted); *see NLRB v. Express Publ'g. Co.*, 312 U.S. 426, 435–37 (1941).

We stress that the District Court, on remand, should not rubber-stamp the Commission's request for an obey-the-law injunction simply because it has been historically permitted to do so by various courts. After all, *Bonastia* was decided almost 40 years ago, when the landscape for SEC enforcement actions was significantly different than today's. *See Kokesh*, 137 S. Ct. at 1640. Indeed, Congress did not enact the penny-stock bar until ten years later. If the District Court, after weighing the facts and circumstances of this case as alleged or otherwise, concludes that the obey-the-law injunction sought here serves no preventive purpose, or is not carefully tailored to enjoin

28

only that conduct necessary to prevent a future harm, then it should, and must, reject the Commission's request. We note that the District Court has already addressed some of the relevant concerns involved in its opinion. We are also troubled by the fact that the Commission appears to seek two injunctions that attempt to achieve the same result.

Third, Gentile argues the penny stock bar is punitive because it "provides no benefit to victims of alleged past securities violations, nor does it purport to do so." Gentile Br. 27. In making this argument, he tacitly agrees with us that § 78u(d)(6) penny stock bars are injunctive in nature. But then he cites a series of cases that involve administrative suspensions and debarments, not court-ordered injunctive relief. *See De La Fuente v. FDIC*, 332 F.3d 1208, 1214–15, 1219–20 (9th Cir. 2003); *Proffitt v. FDIC*, 200 F.3d 855, 860–61 (D.C. Cir. 2000); *Johnson*, 87 F.3d at 488; *Saad v. SEC*, 873 F.3d 297, 304 (D.C. Cir. 2017) (Kavanaugh, J., concurring). We concede some courts have used similar logic. *See Collyard*, 861 F.3d at 764 (citing *Riordan v. SEC*, 627 F.3d 1230, 1234 (D.C. Cir. 2010) (Kavanaugh, J.), *abrogated on other grounds by Kokesh*, 137 S. Ct. 1635); *Telluride*, 146 F.3d at 1246–47; *Bartek*, 484 F. App'x at 956–57. But we think the distinction between injunctions and administrative sanctions makes all the difference. *See supra* Part IV; *Arthur Lipper*, 547 F.2d at 180 n.6. Our analysis is, after all, predicated on traditional principles of *judicial* relief. Gentile is quite right to point out that exclusion from one's chosen profession is a devastating sanction. But the question is not whether an administrative sanction can be punitive; it is whether a federal court can issue a § 78u(d)(6) injunction for punitive purposes. It cannot.

Finally, Gentile argues that the obey-the-law injunction and penny stock bar are punitive because they do not seek to

29

SEC-SCB-E-0000513

restrain imminent violations. Gentile concedes, as he must, that an injunction against an imminent violation is not a penalty. *See* Gentile Br. 42 ("Of course the SEC has unlimited power to obtain an injunction against an individual who is actually violating the securities laws or on the precipice of doing so."). He objects that his case does not rise to that standard. It is true that we apply a somewhat less demanding imminence standard in SEC enforcement cases than we do in reviewing the FTC's exercise of similar statutory injunction authority. *Compare Bonastia*, 614 F.2d at 912 ("The well established standard . . . is based on a determination of whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct."), *with FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019) ("'[I]s about to violate' means something more than a past violation and a likelihood of recurrence."). But neither *Bonastia* nor the *Aaron* Court (which seemed to approve a test much like ours) dispensed with the requirement of "a proper showing." *See Aaron*, 446 U.S. at 701 ("[T]he Commission must establish a sufficient evidentiary predicate to show that such future violation may occur." (citing *Commonwealth Chem.*, 574 F.2d at 98–100)); *Bonastia*, 614 F.2d at 913 (concluding that the SEC had made "a strong showing" that justified the reversal of the district court and entry of an injunction). Nor did either suggest that the fact of a past violation alone was sufficient to impose so onerous and stigmatizing a sanction as an industry bar or obey-the-law injunction. Rather, even with a lesser imminence requirement, we insisted the showing itself be substantial and based as well on "the circumstances surrounding the particular defendant." *Bonastia*, 614 F.2d at 912.

Along those same lines, we are mindful that we are interpreting the meaning of "penalty" for statute of limitations

30

purposes. Even assuming a valid preventive injunction could be a penalty, it is hard to see when it would accrue. *See Johnson*, 87 F.3d at 489 n.7. Gentile's argument must reject either *Bonastia* or our conclusion that § 78u(d)(1) and (6) conform to traditional equitable principles. We can do neither.

## VI

SEC injunctions come with serious collateral consequences. *Commonwealth Chem.*, 574 F.2d at 99; *Am. Bd. of Trade*, 751 F.2d at 535. They can lead to administrative sanctions and disabilities, *see* Thomas J. Andre, Jr., The Collateral Consequences of SEC Injunctive Relief: Mild Prophylactic or Perpetual Hazard?, 1981 U. Ill. L. Rev. 625, 643–68, and collaterally estop defendants in subsequent private litigation, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–33 (1979). Enjoined defendants suffer harm to their personal and business reputations. *See Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 423 n.5 (1975) ("The moment you bring a public proceeding against a broker-dealer who depends upon public confidence in his reputation, he is to all intents and purposes out of business." (quoting Milton V. Freeman, Administrative Procedures, 22 Bus. Law 891, 897 (1967))); *Warren*, 583 F.2d at 122; ABA Committee on Federal Regulation of Securities, Report of the Task Force on SEC Settlements, 47 Bus. Law. 1083, 1091, 1149–50 (1992). And when a court bans a defendant from his industry, it imposes what in the administrative context has been called the "securities industry equivalent of capital punishment." *Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013) (quoting *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

So we conclude by repeating Judge Friendly's warning: an SEC injunction "often is much more than [a] 'mild

31

SEC-SCB-E-0000515

prophylactic.'" *Commonwealth Chem.*, 574 F.2d at 99. When the Commission seeks an injunction, "the famous admonitions in [*Hecht*] must never be forgotten." *Am. Bd. of Trade*, 751 F.2d at 535–36.

\*　　\*　　\*

Because properly issued and framed injunctions under § 78u(d)(1) and (6) are not penalties governed by § 2462, we will vacate the District Court's judgment and remand for proceedings consistent with this opinion.

32

SEC-SCB-E-0000516

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

    Applicant,

v.

MINTRADE TECHNOLOGIES, LLC,

    Respondent.

_____/

### SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR FOR AN ORDER TO SHOW CAUSE AND AN ORDER ENFORCING AN ADMINISTRATIVE SUBPOENA AGAINST MINTRADE TECHNOLOGIES, LLC

Applicant Securities and Exchange Commission applies for an Order compelling Respondent MinTrade Technologies, LLC ("MinTrade") to comply with a subpoena to produce documents in connection with a Commission investigation of potential ongoing federal securities law violations [Exhibit 1, Subpoena], and an Order enforcing the subpoena. In support of this application, the Commission states as follows:

## I. BACKGROUND

The Commission has been investigating Swiss America Securities, Ltd., d/b/a SureTrader and MintBroker International Ltd. ("Swiss America"), a Bahamas-based broker-dealer registered with the Securities Commission of the Bahamas but not registered to act as a broker-dealer in the United States, and its owner, Guy Gentile, in connection with potential ongoing violations of the federal securities laws (the "Investigation"). Issues central to the potential violations include whether Swiss America's customers include United States residents, the solicitation of U.S. customers, and the movement of customer funds.

SEC-SCB-E-0000517

For the reasons set forth below, the Commission requests that this Court enter an Order to Show Cause, compelling MinTrade to appear before the Court and show cause why the Commission's subpoena for documents should not be enforced.

## II. STATEMENT OF FACTS

### A. The Commission's Authority and Reason for Investigation

1. The Commission has issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in the Matter of Traders Cafe (FL-03848) [Exhibit 2, Formal Order].

2. Under the Formal Order, members of the Commission's staff are officers of the Commission empowered to administer oaths, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the investigation. *Id.*

3. The Formal Order directs the Commission's staff to conduct a private investigation to determine whether Trader's Cafe and its "affiliates and/or other individuals or entities related thereto" have engaged in, or are about to engage in, the enumerated potential violations of the federal securities laws. *Id.* The investigation has revealed that Traders Café, a U.S.-based day trading firm, maintained a master account at SureTrader, f/k/a Swiss America.

4. The Commission is investigating, among other things, possible ongoing violations of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a). Section 15(a) prohibits unregistered broker-dealer conduct. *Id.*

5. SureTrader, a Bahamian broker-dealer, is not registered as a broker-dealer in the United States. Nor is its CEO, Guy Gentile. However, at least one-half of SureTrader's clients are United States residents and it employs more than fifty "experienced employees," servicing

NONE - the materials are public information

more than 20,000 clients, and processing over 12,000 trades per day [Exhibit 3, Swiss America website].

6.      MinTrade holds itself out as a company providing "custom technologies for financial services, brokerage firms and trade desks." [Exhibit 4, MinTrade website].

7.      The Investigation has revealed that MinTrade is a Florida limited liability company based in West Palm Beach connected to SureTrader and Gentile. Nicholas Abadiotakis is MinTrade's registered agent and according to his Linkedin profile, has been a trader at Stock USA Execution Services, LLC, a Gentile affiliate.[1] [Exhibit 5, Linkedin page].

8.      On December 12, 2018, the Commission issued a subpoena to MinTrade for the production of documents related to Gentile and Suretrader and its affiliates. [Exhibit 1].

9.      MinTrade failed to comply with the subpoena.

10.     Instead, MinTrade asserted that the statute of limitations has expired and the subpoena seeks documents outside the scope of the Formal Order authorizing the Commission's Investigation [Exhibit 7, Correspondence from Counsel]. The Commission attempted to confer with MinTrade's counsel, who failed to respond to email communications. *Id.*

For the reasons set forth below, the Commission requests that this Court enter an Order to Show Cause, compelling MinTrade to appear before the Court and show cause why the Commission's subpoena should not be enforced, and an Order enforcing the subpoena.

### III. <u>MEMORANDUM OF LAW</u>

#### A. <u>The Court Has Jurisdiction And Venue Properly Lies In This District</u>

Congress gave the Commission broad authority to conduct investigations and require production of evidence and testimony relevant to those investigations. *See, e.g.*, Sections 21(a)

---

[1] Through a trust of which Abadiotakis is the trustee, Gentile owns a majority interest in Stock USA (now known as Mint Global Markets), which clears trades for SureTrader (Exhibit 6).

NONE - the materials are public information

SEC-SCB-E-0000519

and (b) of the Exchange Act, 15 U.S.C. §§ 78u(a) and (b) ("For the purpose of any such investigation, or any other proceeding under this title, any member of the Commission or any officer designated by it is empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence . . . ."); *see also S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984) ("It appears, in short, that Congress intended to vest the Commission with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission"); *S.E.C. v. Dresser Indus., Inc.*, 628 F.2d 1368, 1380 (D.C. Cir. 1980) (given the Commission's broad statutory mandate to investigate, there was "virtually no possibility" the Commission exceeded its authority in issuing an investigative subpoena).

When parties refuse to comply with lawful Commission demands for documents issued pursuant to the Commission's broad statutory authority to investigate, Congress has authorized the Commission to seek, and the federal courts to issue, orders compelling production. "In case of . . . refusal to obey a subpoena issued to any person, the Commission may invoke the aid of any court of the United States within which the jurisdiction of which such investigation or proceeding is carried on . . . in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records." Section 21(c) of the Exchange Act, 15 U.S.C. § 78u(c). That very language also provides that venue lies in the Southern District of Florida, as it provides the Commission may seek a court order "within which the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business." *Id.*

4

SEC-SCB-E-0000520

Here, venue is proper in this district because the Investigation is being carried on in and requires MinTrade to produce documents in the Southern District of Florida. [Exhibits 1 & 2]. Additionally, MinTrade is located in the Southern District of Florida.

## B. The Court Should Conduct A Summary Proceeding

Under Rule 81(a)(5), *Proceedings Involving a Subpoena,* the Federal Rules of Civil Procedure apply, except as otherwise provided by statute, local rule, or by court order in the proceedings. As the Court noted in *United States v. Elmes,* 532 F.3d 1138, 1144 (11th Cir. 2008), summons enforcement proceedings are "most appropriate for streamlined procedures" (internal citation omitted). *See also S.E.C. v. Sprecher,* 594 F.2d 317, 320 (2d Cir. 1979) (upholding right of district court to enforce subpoenas in summary proceedings without the filing of a complaint pursuant to Section 22(b) of the Securities Act, 15 U.S.C. § 77v(b), which allows a district court to enforce a subpoena "upon application by the Commission"); *SEC v. McCarthy* 322 F.3d 650, 655 (9th Cir. 2003) ("summary proceedings may be conducted without formal pleadings, on short notice, [and] without summons and complaints. . .") (quoting *New Hampshire Fire Ins. Co. v. Scanlon,* 362 U.S. 404, 406 (1960)); *First Nat'l Bank of Miami Springs,* 655 F.2d 661, 663 (5th Cir. 1981) ([Rule 81(a)(3)] make[s] application of the rules of civil procedure in subpoena enforcement proceedings discretionary with the district court").[2]

Accordingly, the Commission asks the Court to promptly set an Order to Show Cause Hearing so that MinTrade's failure to comply with the subpoena is not allowed to continue. *S.E.C. v. First Security Bank*, 447 F.2d 166, 168 (10th Cir. 1971).

---

[2] The predecessor to Rule 81(a)(5) is 81(a)(3), but the change was "without substantive difference." *US v. AS Holdings Group, LLC,* 521 Fed. Appx. 405, 409, fn. 2 (6th Cir., April 3, 2013).

NONE - the materials are public information

SEC-SCB-E-0000521

### C. **The Commission's Subpoena Satisfies All Requirements for Enforcement**

A district court's role in a proceeding to enforce an administrative subpoena "is limited." *EEOC v. Tire Kingdom, Inc.*, 80 F.3d 449, 450 (11th Cir. 1996). Under that limited review, a court should enforce an administrative subpoena if it is reasonably relevant to an authorized investigation. *Id.; EEOC v. Technocrest Sys.,* 448 F.3d 1035, 1040 (8th Cir. 2006).

Courts have generally looked at four criteria to determine whether to enforce a Commission subpoena: (1) the investigation is being conducted pursuant to a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the information the Commission seeks is not already in its possession; and (4) the Commission has fulfilled the necessary administrative steps. *United States v. Powell*, 379 U.S. 48, 57-58 (1964); *RNR Enterprises, Inc. v. S.E.C.,* 122 F.3d 93, 96-97 (2d Cir. 1997); *S.E.C. v. Howatt*, 525 F.2d 226, 229 (1st Cir. 1975); *S.E.C. v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973). Once the Commission satisfies these criteria, the burden shifts to a respondent to demonstrate the subpoena is unreasonable. *Brigadoon Scotch,* 480 F.2d at 1056. However, the burden of showing unreasonableness "is not easily met" as long as the Commission's inquiry is legally authorized and the information it seeks is relevant to the inquiry. *Id.*

### 1. The Commission's Purpose is Lawful

As discussed above, Congress has given the Commission broad authority to investigate whether the federal securities laws, rules, and regulations "have been or are about to be violated." Section 20(a) of the Securities Act, 15 U.S.C. § 77t(a); Sections 21(a) and (b) of the Exchange Act, 15 U.S.C. §§ 78u(a) and (b). Pursuant to that authority, the Commission issued the Formal Order authorizing designated officers to conduct an investigation into possible violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Sections 15(a) and 10(b) of

6

SEC-SCB-E-0000522

the Exchange Act and Rule 10b-5 thereunder by Traders Cafe, its affiliates, and any related persons and entities. [Exhibit 2].

Pursuant to the authority conferred under the Formal Order, the Commission's investigative team issued a subpoena to MinTrade seeking documents related to SureTrader and Gentile [Exhibit 1]. The subpoena is within the parameters of the Commission's broad discretion to investigate: "For the purpose of any such investigation, or any other proceeding under this title, any member of the Commission or any officer designated it is empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence . . . ."); *see also O'Brien*, 467 U.S. at 745 (1984) ("It appears, in short, that Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission."); *Dresser Indus.*, 628 F.2d at 1380 (given the Commission's broad statutory mandate to investigate, there was "virtually no possibility" the Commission exceeded its authority in issuing an investigative subpoena).

Accordingly, the Commission's purpose in issuing the subpoena was lawful.

## 2. The Commission Seeks Relevant Information

The measure of relevance used in subpoena enforcement actions is "quite broad." *United States v. Florida Azalea Specialists*, 19 F.3d 620, 624 (11th Cir. 1994). A district court may enforce a subpoena so long as "the materials sought are not clearly irrelevant or immaterial." *S.E.C. v. Arthur Young & Co.*, 584 F.2d 1018, 1029 (D.C. Cir. 1978) (upholding district court's use of that language as standard for relevance).

The documents subpoenaed from MinTrade are highly pertinent to the Investigation. The Investigation concerns, among other things, SureTrader, an overseas brokerage, and Gentile soliciting U.S.-based customers in violation of the federal securities laws. The subpoena seeks

NONE - the materials are public information

SEC-SCB-E-0000523

relevant documents concerning SureTrader and Gentile [Exhibit 1], in matters that play a significant role in protecting investors.  Registration Requirements for Foreign Broker-Dealers, Sec. Rel. No. 25801; 53 FR 23645, 1988 WL 1000013 (June 14, 1988) ("Registration of market professionals is a key element in the federal statutory scheme and plays a significant role in protecting investors.").  "[Registration] promotes baseline levels of integrity among broker-dealers and their personnel dealing with investors, through statutory disqualification provisions and the Commission's disciplinary authority; retention of sufficient capital to operate safely, through Commission net capital requirements; and maintenance of adequate competency levels, through self-regulatory organizations ("SRO") qualification requirements."  *Id.*  The Commission's broad enforcement authority over broker-dealers "helps assure that investors in the U.S. securities markets are protected by the statutory and regulatory provisions governing the U.S. securities industry."  *Id.*  Moreover, "the Commission's financial supervision of all entities participating in the interdependent network of securities professionals contributes to the financial soundness of this nation's securities markets."  *Id.*

### 3. MinTrade Possesses Information the Commission Lacks

MinTrade possesses information the Commission lacks.  The documents we seek in the subpoena are not in our possession.

### 4. The Commission Has Satisfied All Necessary Administrative Steps

The Commission issued the subpoena in accord with all applicable administrative requirements. Section 19(c) of the Securities Act, 15 U.S.C. § 77s(c), and Section 21(b) of the Exchange Act, 15 U.S.C. § 78u(b), empower the Commission to subpoena documents and testimony in the course of investigations.  Here, Jessica Weissman, an attorney for the Division

8

SEC-SCB-E-0000524

of Enforcement, designated as an officer of the Commission in the Formal Order, issued the
Subpoena to MinTrade. [Exhibits 1 & 2].

**D.  MinTrade Cannot Show the Subpoena Is Unreasonable And Its Excuses Lack Merit**

**1.  The Subpoena Is Reasonable – And MinTrade Does Not Argue To The Contrary**

As set forth above, the Commission has satisfied all requirements for enforcement of the
subpoena.    Accordingly,  MinTrade  would  have  to  demonstrate  that  the  subpoena  is
unreasonable. *Brigadoon Scotch,* 480 F.2d at 1056.  Because the Commission's inquiry is legally
authorized and the Commission seeks information relevant to the Investigation, MinTrade's
burden  "is  not  easily  met."  *Id.*    MinTrade  has  not  argued  the  subpoena  is  unreasonable.
Accordingly, it cannot meet this burden.  Instead, MinTrade makes two baseless arguments.

First, MinTrade refuses to produce documents on grounds "there does not appear to be a
nexus  or  causal  connection  between  the  order  of  investigation  and  the  documents  being
requested."  [Exhibit 5].   As set forth above in Section III.C.2 above, the measure of relevance
used in subpoena enforcement actions is "quite broad."  *Florida Azalea Specialists*, 19 F.3d at
624.  So long as "the materials sought are not clearly irrelevant or immaterial," the district court
can enforce the subpoena.  *Arthur Young & Co.*, 584 F.2d at 1029.  Here, the documents sought
are clearly and directly relevant to the Investigation.  As set forth in Section II.A. above, under
the Formal Order, the Commission is investigating SureTrader, Gentile, and others in connection
with possible ongoing violations of the federal securities laws.  *See* Section II.A ¶¶ 1-7.  As is
clear on the face of the subpoena, we are seeking documents from MinTrade directly related to
SureTrader and Gentile [Exhibit 1, Subpoena].   Accordingly, the Commission seeks relevant
documents and MinTrade should be compelled to produce them.

NONE - the materials are public information

SEC-SCB-E-0000525

Next, MinTrade asserts "the subpoena is untimely and is otherwise overbroad." It is unclear why MinTrade believes the subpoena is untimely, in part because MinTrade failed to respond to our requests for further conferral. Regardless, there is no statute of limitations issue with respect to the Investigation because it concerns *ongoing* conduct. Accordingly MinTrade's argument is frivolous and the Court should compel MinTrade to respond to the subpoena and produce all responsive documents.

## IV. CONCLUSION

The Commission has satisfied all the requirements for enforcement of the subpoena. Accordingly, the Commission requests this Court to expeditiously conduct a summary proceeding and issue an Order to Show Cause compelling MinTrade to appear before the Court and show cause why the Commission's subpoena should not be enforced, and to issue an Order enforcing the subpoena.

February 6, 2019                              Respectfully submitted,

By:    Amie Riggle Berlin
       Amie Riggle Berlin, Esq.
       Senior Trial Counsel
       Florida Bar No. 630020
       Direct Dial: (305) 982-6322
       Email: berlina@sec.gov

       Attorney for Plaintiff
       **SECURITIES AND EXCHANGE    COMMISSION**
       801 Brickell Avenue, Suite 1800
       Miami, Florida 33131
       Telephone: (305) 982-6300
       Facsimile:  (305) 536-4154

NONE - the materials are public information                                **SEC-SCB-E-0000526**

## CERTIFICATE OF CONFERRAL

I hereby certify that, as set forth in this Application, Commission staff and I conferred with counsel for MinTrade in an effort to resolve this matter and asked counsel to confer further, but counsel did not respond to our request.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 6, 2019, I electronically filed the above document using CM/ECF or directed service in the method set forth in the attached Service List either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those who are not authorized to receive electronically Notices of Electronic Filing.

Amie Riggle Berlin
Amie Riggle Berlin

## SERVICE LIST

Lorne Berkeley, Esq.
Daniels Rodriguez Berkeley Daniels Cruz
4000 Ponce De Leon Boulevard, Suite 800
Coral Gables, FL 33146
Telephone: 305-448-7988
Facsimile: 305-448-7978
Email: lberkeley@drbdc-law.com
*Attorney for Respondent*

NONE - the materials are public information

SEC-SCB-E-0000527

**THE COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**
**PUBLIC LAW DIVISION**

**IN THE MATTER** of an application by Mintbroker International Ltd. (formerly Swiss America Securities Ltd.) T/A Sure Trader, for Leave to apply for Judicial Review

**AND IN THE MATTER** of the Application for Leave to apply or an Order of Certiorari

**AND IN THE MATTER** of Purported Orders dated the 18th September 2019 made pursuant to sections 133(1) (b) and (f) and 133(3) of the Securities Industry Act, 2011

**AND IN THE MATTER** of the decision dated the 20th September 2019 of the Securities Commission of The Bahamas to appoint an auditor with costs payable by the Applicant, pursuant to section 45 of the Securities Industry Act, 2011

**AND IN THE MATTER** of the Securities Industry Act, 2011 as amended

**AND IN THE MATTER** of the Securities Industry (Disciplinary Proceedings) (Hearings and Settlements) Rules, 2017.

**BETWEEN**

**MINTBROKER INTERNATIONAL LTD. (FORMERLY SWISS AMERICA SECURITIES LTD.) T/A SURE TRADER**

**Applicant**

**AND**

**THE SECURITIES COMMISSION OF THE BAHAMAS**

**Respondent**

---

## SECOND SUPPLEMENTAL AFFIDAVIT
(Of *Christina Rolle*)

---

**2019  PUB/jrv/00024**

The Securities Commission of the Bahamas
Poinciana House, 31A East Bay Street.
The Respondent

NONE - the materials are public information