# EXHIBIT Q

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF FLORIDA
3  --oOo--
4  SECURITIES AND EXCHANGE        )
   COMMISSION,                    )
5                                 )
         Plaintiff,               )
6                                 ) Case No.
      vs.                         ) 1:21-cv-21079
7                                 )
   MINTBROKER INTERNATIONAL, LTD.,  )
8  f/k/a SWISS AMERICA            )
   SECURITIES LTD. and d/b/a      )
9  SURETRADER, and GUY GENTILE,   )
   a/k/a GUY GENTILE NIGRO,       )
10                                )
         Defendants.              )
11 _____)
12
13
14
15        VIDEOTAPED DEPOSITION OF
16            PHILIP DORSETT
17        VOLUME 1 - PAGES (1-221)
18  CONFIDENTIAL PORTIONS BOUND SEPARATELY
19       VIA REMOTE VIDEOCONFERENCE
20       MONDAY, FEBRUARY 27, 2023
21
22
23
   Stenographically Reported by:
24 Victoria L. Valine, CSR, RMR, CRR, RSA
   California CSR License No. 3036
25 Job No. 230227VV

1

---

1  REMOTE APPEARANCES:
2
3  FOR PLAINTIFF:
4     SECURITIES AND EXCHANGE COMMISSION
      BY:  Alice K. Sum, Esq.
5        Alice Johnson, Esq.
         Russell Koonin, Esq.
6     801 Brickell Avenue, Suite 1950
      Miami, Florida  33131
7     305-982-6300
      sumal@sec.gov
8     johnsonali@sec.gov
      kooninr@sec.gov
9
10 FOR DEFENDANTS:
11    FORD O'BRIEN LANDY LLP
      BY:  Matthew A. Ford, Esq.
12        Cara Filippelli, Esq.
      3700 Ranch Road 620 South, Suite B
13    Austin, Texas 78738
      512-503-6388    Fax: 212-256-1047
14    mford@fordobrien.com
15    FORD O'BRIEN LANDY LLP
      BY:  Adam C. Ford, Esq.
16        Stephen R. Halpin, III, Esq.
      275 Madison Avenue, Floor 24
17    New York, New York  10016
      212-858-0040     Fax: 212-256-1047
18    aford@fordobrien.com
      shalpin@fordobrien.com
19
20
21 Also Present: Guy Gentile
22 Videographer:  DeShawn White, Legal Videographer
23
24   (All parties appeared remotely via videoconference.)
25

2

---

1              INDEX
2        EXAMINATION BY COUNSEL
3                           PAGE
4  Examination By Ms. Sum            9
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

---

1              E X H I B I T S
2
3  EXHIBIT NO.   DESCRIPTION          PAGE
4  Exhibit 1    Deposition Subpoena          9
5  Exhibit 2    SureTrader.com Account Application    77
               Bates No. SEC-SCB-P-0009184 -
6              SEC-SCB-P-0009221
               Confidential pursuant to
7              Securities Exchange Act s.24(d)
               Exhibit 3    SureTrader Account Application    91
8              Bates No. SEC-SCB-P-0010164 -
               SEC-SCB-P-0010198
9              Confidential pursuant to
               Securities Exchange Act s.24(d)
10
11 Exhibit 4    SureTrader Tell Us About You form    101
               Bates No. SEC-SCB-P-0010428 -
12             SEC-SCB-P-0010428
               Confidential pursuant to
13             Securities Exchange Act s.24(d)
14 Exhibit 5    Swiss America Securities, Ltd. Web    108
               Page
15             SEC-SECWEBCAPTURE-E-0000340 -
               SEC-SECWEBCAPTURE-E-0000345
16
17 Exhibit 6    Funding & Banking Web Page    111
               Bates No.
18             SEC-SECWEBCAPTURE-E-0000377 -
               SEC-SECWEBCAPTURE-E-0000382
19 Exhibit 7    Email Thread          113
               Bates No. SEC-FL-03848-E-0012118 -
20             SEC-FL-03848-E-0012120
21 Exhibit 8    Email Thread          139
22 Exhibit 9    Email Thread          154
23 Exhibit 10   Email Thread          167
               Bates No. SEC-FL-03848-E-0000228 -
24             SEC-FL-03848-E-0000229
25

4

PLAINTIFF'S
EXHIBIT
141

1  Exhibit 11    Swiss America Securities Order      168
2         Flow
         Bates No. SEC-FL-03848-E-0000230 -
3         SEC-FL-03848-E-0000231

4  Exhibit 12    SureTrader Application -          184
         Christopher Miguel Penalver
5         Bates No. SEC-SCB-P-0010391 -
         SEC-SCB-P-0010409
6         Confidential pursuant to
         Securities Exchange Act s.24(d)
7  Exhibit 13    Email Thread              175
         Bates No.
8         SEC-FL-03848-E-0001195-SEC-FL-
         03848-E-0001203

9
   Exhibit 15    Declaration                188
10        Bates No. SEC-FL-03848-E-0001431
11 Exhibit 16    Declaration of Philip A. Dorsett   191
         Dated June 27, 2022
12
   Exhibit 17    Affidavit of Philip Dorsett Dated   192
13        January 9, 2014
         Bates No. GENTILE0004495 -
14        GENTILE0004497
         CONFIDENTIAL
15

16

17 *** EXHIBITS 2-4 BOUND IN CONFIDENTIAL TRANSCRIPT **
18

19

20

21

22

23

24

25

                              5

---

1        CONFIDENTIAL - ATTORNEYS' EYES ONLY
2               BOUND SEPARATELY
3                    - - -
4                Pages 77 - 107
5                Pages 186 - 187
6                Pages 193 - 198
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              6

---

1               UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF FLORIDA
3                       --o0o--
4  SECURITIES AND EXCHANGE          )
   COMMISSION,                      )
5                                   )
            Plaintiff,              )
6                                   )  Case No.
        vs.                         )  1:21-cv-21079
7                                   )
   MINTBROKER INTERNATIONAL, LTD.,  )
8  f/k/a SWISS AMERICA              )
   SECURITIES LTD. and d/b/a        )
9  SURETRADER, and GUY GENTILE,     )
   a/k/a GUY GENTILE NIGRO          )
10                                  )
            Defendants.             )
11 _____)
12                       --o0o--
13        BE IT REMEMBERED, that on Monday, February 27,
14 2023, commencing at the hour of 9:49 a.m. Eastern
15 Standard Time, all parties appearing via WebEx
16 videoconference, before me, Victoria L. Valine,
17 Certified Shorthand Reporter of the State of California,
18 appeared:
19            PHILIP DORSETT
20 called as a witness by the Plaintiff, who, being by me
21 remotely sworn, was thereupon examined and interrogated
22 as hereinafter set forth.
23                       --o0o--
24        THE VIDEOGRAPHER:  This is the videotaped
25 deposition of Philip Dorsett in the matter of SEC versus

                              7

---

1  Mintbroker International, Ltd., et al., pending in the
2  United States District Court Southern District -- yes,
3  United States District Court Southern District of
4  Florida.  Case number 1:21-cv-21079.
5        Today's date is February 27th, 2023.
6        The time on the video monitor is 9:49 a.m.
7  eastern time.
8        My name is DeShawn White.  The court reporter
9  today is Victoria Valine, both are with Gradillas Court
10 Reporters.
11       Would counsel please identify yourselves for
12 the record.
13       MS. SUM:  Good morning.  This is Alice Sum on
14 behalf of the United States Securities and Exchange
15 Commission.  Also present is trial counsel Alise
16 Johnson, and later my colleague, Russell Koonin, will be
17 joining.
18       MR. MATTHEW FORD:  Matthew Ford here for
19 defendant Guy Gentile along with my colleagues Adam
20 Ford, Stephen Halpin, and Cara Filippelli.
21       THE VIDEOGRAPHER:  Will the court reporter now
22 swear in the oath.
23       CERTIFIED STENOGRAPHER:  Raise your right
24 hand, please, sir.
25       Do you solemnly swear or affirm that the

                              8

---

1  testimony you will give will be the truth, the whole
2  truth, and nothing but the truth?
3      THE WITNESS:  I do.
4      CERTIFIED STENOGRAPHER:  Thank you very much.
5  Counsel, you may proceed.
6      MS. SUM:  Thank you.
7          EXAMINATION
8  BY MS. SUM:
9      Q.  Good morning.  Would you please state your
10 full name and spell it for the record?
11     A.  My name is Philip Dorsett, P-H-I-L-I-P,
12 D-O-R-S-E-T-T.
13     Q.  Mr. Dorsett, are you represented by counsel?
14     A.  No.
15     MS. SUM:  I'd ask the videographer to bring up
16 Exhibit 1, please.
17     (Deposition Exhibit 1 marked.)
18 BY MS. SUM:
19     Q.  First, are you able to read that on the
20 screen, Mr. Dorsett?
21     A.  No.
22     Q.  Okay.  We will tinker with it a little bit and
23 you let us know when it's large enough for you to see.
24     A.  Are you able to make it wider?
25     Q.  What I see on the screen is a portrait view of

9

1  it.
2      MS. SUM:  I ask the videographer, is there any
3  way to expand it -- the window itself?
4      Yes.  Thank you.  And then please fill the
5  screen if you could.
6      We do not need to see the full page just --
7  but if you would make it larger, please?
8  BY MS. SUM:
9      Q.  We're getting closer, Mr. Dorsett.  Would you
10 like it to be --
11     A.  Yes.  Just a little bigger.  That's good.
12     MS. SUM:  Why don't we try to go at
13 200 percent, and see if that will work for the duration
14 of the deposition, and we can adjust if necessary.
15 BY MS. SUM:
16     Q.  Is that sufficient, Mr. Dorsett?
17     A.  Yes.  That's good.
18     Q.  So what you see is the first page.
19     Do you see it's a subpoena to testify at a
20 deposition in a civil action issued by the SEC to you?
21     A.  Yes.
22     Q.  Okay.
23     MS. SUM:  May I please have the document
24 scrolled?
25     If you could keep on scrolling just so

10

1  Mr. Dorsett can see the entirety of the document.
2  BY MS. SUM:
3      Q.  Okay.  And here, Mr. Dorsett, do you see
4  "Plaintiff's Re-Notice of Taking Videotaped Deposition
5  of Philip Dorsett" --
6      A.  Yes.
7      Q.  -- do you see that in front of you?  Okay.
8      MS. SUM:  And please just scroll to the end.
9  Thank you.
10 BY MS. SUM:
11     Q.  All right.  Mr. Dorsett, have you seen what
12 we're putting up as Exhibit 1 before?
13     A.  Yes.  I've seen this document.
14     Q.  And you're appearing here voluntarily today to
15 testify?
16     A.  Correct.
17     Q.  All right.  Let me start with the --
18     MS. SUM:  You can take down Exhibit 1.  Thank
19 you.
20 BY MS. SUM:
21     Q.  All right.  So let me just start with some
22 ground rules for the deposition today.
23     Are you under the influence of any medication
24 or substances that would affect your ability to answer
25 my questions, remember facts, or answer truthfully?

11

1      A.  No.
2      Q.  Is there any reason why you might not be able
3  to answer any questions truthfully today?
4      A.  No.
5      Q.  I ask that if you do not understand a question
6  that I ask, please, you can request that I clarify.
7      Since we are conducting this by video
8  conference, if, for some reason, you do not hear me or
9  the question clearly, please ask me and I can either
10 repeat the question or we can have the court reporter
11 read it back.
12     Do you understand those basic ground rules for
13 this deposition?
14     A.  Yes.
15     Q.  Thank you.
16     Have you ever been deposed or given oral sworn
17 testimony before?
18     A.  I have.
19     Q.  Okay.  And can you identify the number of
20 times you have been deposed?
21     A.  When you say "deposed," do you mean given
22 sworn testimony?
23     Q.  Have you ever sat for a deposition before?
24     A.  Well, yes.  I was a witness in a case before.
25     Q.  Okay.  And what was that case?

12

1    A. I think it was United States versus Balandian
2  (phonetic).
3    Q. Okay. And was that for a deposition or at a
4  trial?
5    A. That was at a trial.
6    Q. So you're appearing hear today voluntarily to
7  testify in a lawsuit that the SEC has brought against
8  Guy Gentile and a company called Mintbroker
9  International Ltd., formerly known as Swiss America
10  Securities, Ltd., and doing business as SureTrader; is
11  that correct?
12    A. Correct.
13    Q. And if I refer to the company that's called
14  Mintbroker and Swiss America as SureTrader, do you
15  understand that SureTrader is the reference to the
16  entity?
17    A. Yes.
18    Q. Okay. Prior to this morning did you speak
19  with anyone regarding this deposition?
20    A. Yes.
21    Q. Okay. And who did you speak with?
22    A. I spoke with you.
23    Q. Okay. Anybody else?
24    A. Do you mean personally? Like I spoke with my
25  wife.

13

1    Q. Okay. Personally. Okay.
2      Other than your wife, did you discuss this
3  deposition with anyone else -- other than me and your
4  wife?
5    A. No.
6    Q. Okay. Could you please briefly describe your
7  education history?
8    A. Well, I have a Master's in business
9  administration from Nova Southeastern.
10      I have a Bachelor's in finance from the
11  University of South Florida.
12      I also have the Series 7.
13      I recently completed the compliance -- that's
14  an FIU compliance course by the financial -- sorry, the
15  Florida International University. I forget the actual
16  name of it. Yeah. I mean, that's basically me. I have
17  about -- how many years -- 18 or 19 years in the
18  securities industry --
19    Q. Okay.
20    A. -- give or take.
21    Q. Thank you.
22      What is your current place of employment?
23    A. I currently work at LTG Capital Markets, Ltd.
24    Q. Okay. And how long have you worked there?
25    A. Since 2018.

14

1    Q. All right. Do you know someone named Guy
2  Gentile?
3    A. Yes, I do.
4    Q. All right. And when did you first meet
5  Mr. Gentile?
6    A. Well, I first met Guy way back -- I was
7  working for another broker-dealer. This would have been
8  maybe about six years or so before we started
9  SureTrader.
10      Guy -- Guy's company, Stock USA, provided
11  services to that firm, and I was working on the trade
12  desk, and so, as the owner of the company, Guy came out
13  to meet us, and that was the first time I met him. And
14  then later I think Guy actually opened some sort of
15  account with us as well, and so I got to know him back
16  then.
17    Q. Okay. So you said it was approximately five
18  or six years before SureTrader was opened?
19    A. That's -- that sounds about correct --
20    Q. Okay.
21    A. -- give or take a few years. Yeah.
22    Q. Okay. So can you estimate from the time that
23  SureTrader was opened what -- what year that would be?
24    A. So we opened SureTrader the end of 2011. All
25  right. I was at another firm for maybe about three

15

1  years. And then the firm before that is the one where I
2  met Guy, and I was there for about four years. And I
3  think maybe about halfway through that time I met Guy.
4  So maybe -- that's, what, three plus about two and a
5  half, that's where I got about five years before. Yeah.
6    Q. And --
7    A. So about 2006, maybe. 2005 --
8    Q. Okay.
9    A. -- somewhere in there.
10    Q. All right. And did your business relationship
11  with Mr. Gentile evolve from when you first met him?
12    A. Well, yeah, I think. Eventually I actually
13  approached Guy about a business idea that I had. I
14  wanted to establish my own broker-dealer, and Guy was
15  someone who I thought might be able to assist me in
16  that, and I thought it might be something he would be
17  interested in as well.
18      So we -- he came down -- he flew down. We had
19  dinner. We discussed it. And he told me he would think
20  about it. He told me, you know, we would have to
21  establish trust -- he would think about it, and we
22  discussed some other things, and then we went from
23  there.
24    Q. Okay. And did you and Mr. Gentile, in fact,
25  enter into a business relationship?

16

1     A.  Well, we didn't enter into that business
2  relationship, but some years later Guy contacted me and
3  he told me that -- well, he didn't want to do the idea
4  that I gave, but he had a different idea.  And that's
5  when he told me about SureTrader, and he wanted me to be
6  his compliance officer.
7     Q.  Okay.  So can you estimate -- I'm sorry.  I
8  apologize for interrupting you.
9        What was the timeframe when Mr. Gentile
10  reached out to you about potentially opening SureTrader?
11     A.  This would have been probably early 2011 -- it
12  could have been 2010, but definitely in 2011 -- it could
13  have been 2010, but definitely by 2011 we were
14  definitely into the swing of things.
15     Q.  Okay.  And when did you say SureTrader opened?
16     A.  So we started taking -- I think we took our
17  first client in late November 2011.
18     Q.  Okay.  So from the time that you first started
19  discussing the possibility of working together on
20  SureTrader, how long would you estimate it took to -- to
21  formally open the company?
22     A.  Yeah.  I think -- I think we probably -- we
23  may have been talking about it since, like, late 2010.
24  So maybe a year.  Because I know it takes quite awhile
25  to get the stuff -- you know, to go through the

17

1  Commission and everything.  So maybe an year.  I'm not
2  really sure.  But it was -- it was definitely most of
3  2011 itself, but it might have gone back as early as
4  2010.
5     Q.  Just in your answer you referenced "the
6  Commission."  Only because I represent the United States
7  Securities and Exchange Commission, I would like to
8  clarify which commission you were talking about.
9     A.  The Securities Commission of The Bahamas.
10     Q.  Okay.  For the purposes of this deposition is
11  it acceptable for you to understand that when I use the
12  word "SCB" or that term, that I'm referring to the
13  Securities Commission of The Bahamas?
14     A.  Yes.
15     Q.  Okay.  Thank you.
16        All right.  So when Mr. Gentile approached you
17  about the possibility of opening SureTrader, what was
18  the business plan for the company?
19     A.  Well, he was pretty excited about it.  He
20  started to explain to me, you know, how we would earn
21  money.  He asked me if I was familiar with something
22  called PDT Rule -- the Pattern Day Trader Rule.  I told
23  him no, I wasn't familiar with it.  And so he explained
24  to me that in the U.S. there's this rule that limits how
25  much trades most customers can do.  All right.

18

1        And he was explaining to me that, you know,
2  before this rule came into place, customers used to
3  trade a lot and, you know, there was a lot of money
4  making for the broker-dealers, and after this rule came
5  into place, you know, clients -- well, he theorized that
6  clients would be looking for a broker-dealer where they
7  could trade freely like how they used to in the past.
8        And he said in the Bahamas there's no such
9  thing as a PDT Rule.  And so if we open up SureTrader,
10  basically all those clients that -- you know, that
11  stopped trading from his firm or restricted their
12  trading basically, he said everywhere else -- a client
13  from anywhere else in the United States are going to
14  flock to SureTrader.  He said we're going to make a ton
15  of money.
16        And so I was like okay.  He seemed really
17  excited about it.  He seemed like he had really done his
18  research.  It was something he was -- you know, he was
19  really sure about, and I was like okay.
20     Q.  Okay.  So when you discussed entering into
21  this business relationship, did you and Mr. Gentile
22  agree on what your job responsibilities would be, and
23  what his responsibilities would be?
24     A.  Well, I think the reason why Guy contacted me
25  -- because I think he had already done some preliminary

19

1  research and he knew that he needed a compliance
2  officer.
3        So back then I think we got a Class 2
4  broker-dealer license.  So the requirements were you
5  need two registered officers, the CEO and the CCO.  All
6  right.  And so he told me he needed me to be his
7  compliance officer.
8        And so basically much -- over the next few
9  months -- because I think he had hired a lawyer to give
10  him some assistance, and so we were filling out a bunch
11  of documents and stuff like that, and just going through
12  that whole process.
13     Q.  As far as you potentially being the CCO -- the
14  Chief Compliance Officer, were there any requirements
15  that you had to fulfill as far as licensing?
16     A.  Yes.
17        Now, admittedly, the requirements back then --
18  this is over 10 years ago, were not as stringent as they
19  are today, right?  And so my background, at that time,
20  actually was not in compliance.
21        I -- I had -- well, I had a lot of experience
22  in the industry, and the Commission -- the SCB -- I was
23  registered as a -- I think I was on the trade desk at
24  the first firm, and then I was registered as a -- I
25  forget the actual title, but I was selling financial

20

1  products and services.  So the point is the SCB, they
2  knew me.  There was a history on me, you know, and I
3  think that helped a lot with regard to them approving my
4  application.
5       They -- you know, because they basically
6  had -- you know, they were already following my career.
7  You know, I was already registered with them.  There was
8  no complaints.  There was nothing against me.
9       And so from the compliance perspective -- you
10 know, when you work in the industry, there's a lot of
11 compliance that you would naturally know in the Bahamas,
12 anyway.  We big on AML -- it doesn't matter if you're in
13 compliance or not, you know.  So we big on KYC.  And so
14 a lot of that stuff I knew.  All right.
15      It was just getting into the specific
16 requirements that the Commission required -- that the
17 SCB required.  So, like I said, we had a lawyer who was
18 helping us.  We were filling out the documents, and it
19 was just a matter of getting the actual approval.
20      I also -- I also had to -- at the same time,
21 apply for -- with the Financial Intelligence Unit -- the
22 FIU, as the money laundering reporting officer.  That
23 was another position that was mandated by law as well.
24 And so I got approved for both.
25      Q.  All right.  Could you briefly summarize what

21

1  your job responsibilities were as the Chief Compliance
2  Officer for SureTrader when it opened in approximately
3  November of 2011?
4       A.  Well, back then roles were not -- you know,
5  roles were not really established.  It was just me and
6  Guy, basically, right.  And I would be -- I would let
7  him know, from my understanding of compliance, what we
8  needed to do in order for -- to open up accounts for
9  clients.
10      So, again, my main focus was things like KYC,
11 doing proper due diligence on clients.  You know, making
12 sure that, you know, that the countries they come from
13 aren't on sanctions lists, that type of things.  Those
14 were like my main focus, and making sure we get proper
15 IDs, making sure -- you know, that type of stuff.  So we
16 went back and forth with trying to get the actual
17 application together.
18      And initially the application was really just
19 a dumbed down version of the SpeedTrader application.
20 SpeedTrader was like the -- SpeedTrader is basically the
21 same as Stock USA.  All right.  And so, you know, we ran
22 through that, and it was like, okay, well, that just
23 doesn't apply.  We don't need this.  We don't need this.
24 Okay.  We need that.  So it was that type of thing.  It
25 was a lot of back and forth.  We were bouncing ideas off

22

1  of each other.
2       And so, basically, my role as Chief Compliance
3  Officer was, you know, to make sure that the clients, as
4  they were coming in, were in accordance with Bahamian
5  law and, to a broader spectrum, to make sure our firm
6  was running in accordance with Bahamian law and
7  regulations.
8       Q.  Okay.  Did you have any responsibilities with
9  respect to whether SureTrader complied with U.S. laws?
10      A.  No.
11      Q.  Okay.  Did you have any responsibility as
12 Chief Compliance Officer as to whether SureTrader
13 complied with any other country's laws other than the
14 Bahamas?
15      A.  No.
16      Q.  What was Mr. Gentile's role when SureTrader
17 opened in November of 2011?
18      A.  All right.  So from the start, like I said,
19 Guy, he was aware that I wanted to open up my -- a
20 broker-dealer some day.  So he -- you know, he told me,
21 he's like Phil, you stick with me.  I'll teach you
22 everything I know.
23      And so it was really like -- I viewed him
24 almost like a mentor, really.  He was someone -- you
25 know, back then his -- Guy was, I would say, almost like

23

1  the golden child of the broker-dealers, you know, he was
2  the man.  So it was quite an honor to be working with
3  him.  And, you know, in some ways I was sort of in awe
4  of him.
5       So a lot of it was me just taking in what Guy
6  was explaining to me about how broker-dealers work.  And, to
7  that end, he also had a lot of experience with the
8  securities markets themselves.  He knew the ins and outs
9  of how the various -- literally, how the physical
10 systems of how trades would take place, and how they
11 would run, and all the rest of it, and I was quite
12 impressed.  And he also had a very healthy knowledge of
13 U.S. regulations as well.  You know, he was -- you know,
14 he had his own firms and that was something I knew for
15 many years.
16      And so he -- we had had discussions -- because
17 earlier when we were talking about when he mentioned
18 that, you know, we're going to get these U.S. clients
19 because of the PDT Rule, one of the things I mentioned
20 to Guy -- I told him, I said, well, Guy, I've worked for
21 a few firms at that time, and as far as I knew nobody
22 really had U.S. clients.  I didn't know why.  In fact, I
23 used to -- I was under the impression that it was some
24 sort of Bahamian thing.  Like it was some reason why it
25 was always more difficult for there to be U.S. clients.

24

1 I really didn't know. Like I said, back then my
2 background was actually not in really compliance, but
3 I --
4     **Q.** So I'm just going to pause you right there
5 because you talked about it a bit. So let's, you know,
6 break it down.
7     When SureTrader opened, did you and
8 Mr. Gentile plan on having SureTrader handle U.S.
9 customers?
10     **A.** Yes. Yes.
11     **Q.** Okay. And what -- what was the plan with
12 respect to finding U.S. customers to work with
13 SureTrader?
14     **A.** Well, initially -- well, initially I think Guy
15 had this thing whereas once -- once he opened the firm,
16 they would come. All right.
17     Now, the reason why I said it because there
18 was a -- there was a short time just before Christmas
19 when Guy --
20     **Q.** Christmas 2011?
21     **A.** Yes. All right.
22     **Q.** Okay.
23     **A.** When Guy -- he seemed to have like backed away
24 from his idea of, you know, getting the U.S. clients in
25 the PDT Rule and everything, right? It was like -- you

25

1 know I was a bit surprised by it because he was all
2 gung-ho like, you know, over the summer for the last --
3 I don't know how much months. Right.
4     And he had had me check on the Bahamian side
5 to see if there was any problem with us having U.S.
6 clients, and there wasn't. All right. And so when we
7 finally opened, like he would tell me, he would say, you
8 know -- you know, I'm not sure if I want to do it. And
9 I didn't -- I wasn't sure where the hesitation was
10 coming from, but I knew there was some hesitation.
11     And then as the weeks went on we were not
12 getting as much clients as I think Guy had hoped. All
13 right. And he was like -- he was like Philip, you know,
14 we gotta get U.S. clients. This is -- I'm going to have
15 to shut down if we don't. And I was like well, okay.
16 You know, I mean -- you know, it's up to you, right.
17 And so he made a decision -- this was within like the
18 first quarter -- the first few months -- first few weeks
19 of 2012, that we were going to start allowing for U.S.
20 clients.
21     And so, at that point, I think U.S. clients
22 were opening, but I don't think he was advertising. He
23 had not really discussed advertising with me at that
24 point. However, later on the idea started to come up
25 with okay, if we're going to have U.S. clients, we need

26

1 to, you know, like come up with a way to, I guess,
2 protect ourselves, or to make sure that we're in line
3 with U.S. regulations. All right.
4     And so that -- that was probably like around
5 February or so -- definitely within the first quarter,
6 that's when -- it was one day after work, you know, this
7 idea came up with the unsolicited acknowledgement
8 agreement. All right. And, apparently, this
9 unsolicited acknowledgement agreement would have a
10 certain amount of points that a U.S. client would attest
11 to, and then they would sign it, and then we would be
12 able to have that document in case U.S. regulators had
13 an issue, we would be able to say well hey, we didn't
14 solicit these clients. All right.
15     And so in that meeting he gave me a list of
16 points and he said, you know, he wanted it to come from
17 compliance. I said well, okay. So I put the points
18 together. It was a separate one-page document. All
19 right. And -- yeah. And then we attached it to the
20 applications, and we started sending them out.
21     **Q.** Okay. I'm going to pause you there.
22     Going back as far as when SureTrader opened in
23 November 2011, can you estimate, in the first couple of
24 months, how many customers SureTrader had?
25     **A.** Yeah. I estimated it altogether to be maybe a

27

1 hundred at best. And some of those -- I think what Guy
2 told me, some of those were not like real customers.
3 They were just persons he knew. All right. And they
4 weren't like, I guess, genuine customers. And so he was
5 concerned. He's like well, we don't have real new
6 people coming in. All right.
7     **Q.** All right.
8     **A.** So we had maybe about a hundred customers.
9     **Q.** And of those 100 -- approximate 100 customers,
10 can you estimate how many of those customers were U.S.
11 based?
12     **A.** Well, I -- I really don't know to be honest,
13 because it wasn't something that I was -- like my mind
14 was keen to keep track of at that point.
15     So some of them definitely were U.S., but to
16 say well, what percentage of that initial amount was
17 U.S., I really don't know. I mean, I would think most
18 of them probably were U.S., but, again, I didn't really
19 start taking note of like where the customers were
20 coming from until like -- for to retain in my memory,
21 until a little time later.
22     **Q.** All right. So I believe you were testifying
23 that there came a point when you were discussing with
24 Mr. Gentile concerns about there not being enough
25 customers and needing to increase the number of

28

1   customers.
2         Can you tell me what was the first
3   conversation where -- where the concern about the number
4   of customers came up?
5         A.   Well, like I said, Guy was -- was visually
6   frustrated, and he would tell me, he would say Philip,
7   I'm not used to this -- you know, we supposed to have,
8   like -- you know, a bunch of clients by now.  This is
9   just not going to work.
10        And I'm like well, okay.  What do you want to
11  do about it?
12        And then he would say well, okay.  We have to
13  go after U.S. customers.
14        And I would say, well, I mean, you tell me.  I
15  say, you are the one who said it's okay for us to do it.
16  So, I mean, if you want us to go after U.S. clients,
17  then let's do it.
18        So -- but I could tell it was something --
19  like he was trying to be careful about in his mind.  He
20  was like we have to be careful how we do it.  All right.
21  But, at the same time, you know -- you know, Guy's a
22  really smart guy.  He would come back with these
23  suggestions.  He would come back -- like I said, I knew
24  him to be someone who was very knowledgeable in the
25  industry.

29

1         And so when he came back with the unsolicited
2   acknowledgement agreement -- all right -- idea, I read
3   it, and I said well, okay.  I mean, basically it's
4   telling -- it would be saying that U.S. clients were not
5   solicited.  All right.  They would be agreeing they were
6   not solicited.
7         And so once -- once that took place, Guy's
8   focus sort of shifted.  All right.  Guy would be on the
9   phone all day.  I would be listening to Guy on the phone
10  all day with various, I guess, business partners or
11  individuals, and he would be, you know, what we call
12  hustling, you know, trying to get business into the
13  firm.
14        And so once it was sort of established that
15  okay, U.S. clients were okay, he went to town on getting
16  basically as much clients as possible.  He was making
17  call after call after call and, eventually,
18  that would lead into what would become the affiliates
19  program -- all right -- where we -- Guy eventually got
20  into contact with some of the big guys like Tim Sykes
21  and those guys who had massive platforms, and the idea
22  was if they would send their clients to us, then they
23  would get some sort of like kickback -- I think we
24  referred to them as rebates.  And so we gave -- you
25  know, the idea was to give these affiliates -- that's

30

1   what we called them -- incentive to send as much clients
2   to us as possible.
3         So Guy, he -- like I said, that became the
4   whole thing.  All right.
5         Q.   Okay.  So let me just pause you again.  I'm
6   trying to understand the timeframe here.
7         The discussion about the unsolicited
8   acknowledgement agreement, was that within days, weeks,
9   months after SureTrader opened?
10        Can you estimate the time period?
11        A.   That would have been, I would say, about two
12  months.
13        Q.   Okay.  This would then be early 2012?
14        A.   Right.  Early 2012.  Definitely within the
15  first quarter.  So, maybe two or three months.
16        Q.   Okay.  I'm going to go back to -- you
17  described a meeting with Mr. Gentile about the
18  unsolicited acknowledgement agreement document.
19        Can you estimate when that conversation
20  occurred?
21        A.   So, again, this conversation occurred -- you
22  know, I think -- I think in my deposition I indicated
23  around February.  And so that is -- I'm thinking in my
24  mind it was around February that, you know, Guy wanted
25  me to stay behind.  There was another individual with

31

1   him -- and it was obvious they had already discussed
2   this at length -- and so he presented this idea to me
3   with the unsolicited acknowledgement agreement, and he
4   said this, you know -- because he was referring to it as
5   a loophole.  And I remember saying -- I was like, well,
6   you know, is that going to be okay?
7         And he was like well, you know, with U.S. laws
8   you're either breaking the law or you're not breaking
9   the law, you know.  And he was like we will not be
10  breaking the law, and that's -- you know, that's it.
11  And I was like, okay.
12        Q.   Okay.  So again -- I apologize.  Let me pause
13  you there.
14        You said, asked you to stay behind.  What do
15  you mean "stay behind"?
16        A.   Right.
17        So this was not during working hours.  Like
18  the office had closed, right, and then we had the
19  meeting after work in the office.
20        Q.   Okay.  And you said "we" is that just you and
21  Mr. Gentile that were at the meeting?
22        A.   Right.  Yeah.  And there was another
23  individual there as well.
24        Q.   And who was the other individual?
25        A.   It was Karen, his wife.

32

1    Q.  And during this meeting, what specifically was
2  discussed?
3    A.  Well, basically what it was discussed was how,
4  you know, SureTrader can actively have U.S. clients
5  without getting in problems with U.S. regulators.
6  And -- and so that's when -- and, like I said, it wasn't
7  so much discussed.  It came across as if like this was
8  sort of discussed before, like, and so the idea with the
9  unsolicited acknowledgement agreement it was like okay.
10  Well, this is a good idea.  Da-da-da-da-da.  And then
11  Philip just type this out.  It should come from
12  compliance -- I mean, I understood that -- and we'll
13  send this out to all the U.S. -- well, we'll make --
14  whenever we get a U.S. client, we'll just make sure they
15  sign this, and that should suffice the SEC, right.
16    Q.  Okay.  When you say that it seemed like it was
17  discussed before, what are you referring to?
18    A.  It didn't seem like the -- the topic of how to
19  get U.S. clients but without getting U.S. authorities on
20  your back.  It seemed like that discussion had a -- was
21  already going on between Guy and his wife, and it was a
22  continuing -- a continuation of that.  It's like, okay.
23  Philip, listen to these ideas.  That's how it came
24  across.
25    Q.  And during the meeting when the topic of the

33

1  unsolicited acknowledgement agreement was discussed, how
2  did the -- the words get created to -- to fit whatever
3  needed to be in this document?
4    A.  Guy actually wrote -- with the unsolicited
5  acknowledgement agreement the main point of it is the
6  points that U.S. clients would agree to.  And so Guy
7  actually -- I don't know if he typed them out or if he
8  wrote them out, and he said well, this is the main
9  points.  And so that's was it.  I think I put like a
10  paragraph to say something to the extent of, I am a U.S.
11  client and I -- something like that, I agree -- I can't
12  remember, actually.  But the main points were basically
13  verbatim that -- what he had written down.  It was like
14  five or six points.
15    It was very basic and straightforward,
16  actually.
17    Q.  All right.  I'm going to just step away
18  momentarily from the topic of the unsolicited
19  acknowledgement agreement and go back to opening of
20  SureTrader in November of 2011.
21    When SureTrader opened, how many employees did
22  it have?
23    A.  Right.
24    So SureTrader it was just myself and Guy.  He
25  also brought on another lady.  She wasn't really a part

34

1  of SureTrader.  Guy also had a -- a magazine, I guess,
2  is the best -- or like a newspaper-type thing slash
3  magazine, and she -- I think she was sort of associated
4  with that, but, at the same time, she still was helping
5  with us.
6    And as that magazine grew, I think they got
7  two other staff.  And, again, they were doing the
8  magazine, but then they were still helping with us.  And
9  then eventually, I think Guy just forgot about the
10  magazine idea, and those three individuals just came --
11  they were officially a part of SureTrader at that time.
12    Q.  All right.  And what were their -- very
13  briefly, what were their job duties at SureTrader?
14    A.  Well, again, I think with the lady, I think he
15  gave her the title of office manager because I remember
16  later when Justin came, Justin became the office
17  manager, and then the lady, she left.  Right.  So I
18  think that was her title.  And so -- but she was really
19  responsible for the magazine.  All right.
20    And then later on when they all basically were
21  working for SureTrader, they basically was all doing
22  like customer service and customer support.  And so as
23  the applications were coming in, going through the
24  process, making sure that, you know -- you know, I had
25  to basically teach the staff what we were looking for

35

1  from a compliance perspective, you know.  And so it was
2  really hands-on -- that early time was really hands-on
3  for all of us.  But Guy and I were the main ones, and
4  then we had these other folks.
5    Eventually, Guy started to employ staff who
6  actually had like -- like finance backgrounds.  There
7  was two gentlemen who came in, and -- yeah.  So this is
8  all during 2012.  And so we were growing.
9    At that time we were -- you know, it was no
10  longer a question of are we going to survive, you know.
11  The clients were coming in pretty strong, you know, and
12  it was quite --
13    Q.  Can you -- all right.
14    So was there a physical office when SureTrader
15  opened in November 2011?
16    A.  Yes.  And so --
17    Q.  Can you just very briefly describe like what
18  was the office setup?
19    The basic office setup?
20    A.  It was a very small office.  We were in, I
21  guess, like the front corner of a building, and so the
22  office was like a half circle, and it was an open floor
23  plan.  And so we had, I think, about maybe eight to ten
24  desks going along the outer wall, and then Guy would sit
25  just a little bit diagonal behind me and his desk was

36

1  against the flat wall.  And he wanted it like that so he
2  could see everyone very clearly.
3      And so where I was sitting, I could see
4  everyone in front of me, and then Guy was in my
5  peripheral vision diagonally.  So it was an open floor
6  plan, really small office.  Yeah.
7      Q.  Okay.  And did SureTrader have a website when
8  it opened in November of 2011?
9      A.  I -- I can't -- I can't say for sure.  I don't
10  know if that happened immediately to say in
11  November 2011.  I -- I don't -- I can't recall right now
12  to say if it was at that date.
13     Q.  Do you recall if, within the first six months
14  SureTrader had --
15     A.  Yes.
16     Q.  -- a website?
17     A.  Yeah.  We certainly had a website by 2012.
18  And that was -- yeah.  We -- we had a website definitely
19  by 2012.  But, again, I -- you know, most of my memories
20  of the website was when we updated it when we moved to
21  the bigger office.  I think that's because they're more
22  recent in my mind.  But we certainly did have a website
23  back then, and then clients would go to the website.
24  They would download -- it was actual PDF application.
25  They would download the application, fill it in, and

37

1  then fax it in to us, or whatever the case may be.
2      Q.  Did SureTrader have any phone numbers where
3  someone could actually call in and ask questions?
4      A.  Yeah.  Yeah.  We had a phone -- we had local
5  numbers.  And I remember that ended up being a problem.
6  I think it was Tim Sykes who got upset with Guy, and he
7  was saying, you know, how can you expect my students to
8  make a long distance call just to, you know, check on
9  their accounts and stuff.  So Guy set it up where we had
10  a U.S. number so when clients would call, it wouldn't be
11  a long distance call for them.
12     Q.  Okay.  When you say Mr. Sykes complained, are
13  you talking about U.S.-based customers having to make a
14  long distance phone call?
15     A.  Right.
16     So he was upset -- Sykes referred to his
17  people as his students, right.  And so he did not like
18  the fact that they had to make a long distance call to
19  the Bahamas just, you know, for whatever reason -- to
20  check on their accounts or whatever the case may be, you
21  know, and Guy -- Guy concurred.  Because Guy told me
22  this.  He said, you know, Tim was upset.  And so he said
23  -- he said so I'm going to be setting up a number
24  whereas -- and I think he used his New York -- it was an
25  affiliation with like his New York office or something

38

1  that he added, like, an extra number or something like
2  that.  And he set it up whereas -- I think initially it
3  was just his phone where it would ring to, but as we
4  grew, he set it up where when they -- a person ring, it
5  would just ring to any of the phones.
6      Q.  Who made the decision to -- to create a U.S.
7  phone number for customers to call?
8      A.  Guy did.
9      Q.  Did you have any input on that decision?
10     A.  Nope.
11     Q.  Did any other employees of SureTrader have
12  input on that decision?
13     A.  No.  I mean, you know, Guy would tell us what
14  he's going to do.
15     Q.  Well, what do you mean Guy would just tell us
16  what we were going to do?
17     A.  You know, especially -- definitely early on in
18  the firm, you know, like, Guy was the man.  Guy
19  basically told everybody what to do.  This is how you do
20  it.
21     We were still very much, I guess, in the
22  embryonic stage and growing.  Like I said, my view
23  towards Guy was, you know, I viewed him like a mentor.
24  So I didn't question, you know, if he wanted to have a
25  U.S. number that made it easier for clients to be able

39

1  to reach us, that made sense.  And so I wouldn't -- I
2  didn't have any reason to question it.  So he would, you
3  know, tell us what to do, and we would do it, you know.
4      Q.  Regarding SureTrader's website, who created
5  the website including its content?
6      A.  Oh, well, I don't know specifically who Guy
7  hired.  So I don't -- I can't say.
8      Q.  Who approved the content for the SureTrader
9  website?
10     A.  Oh, well, Guy would have approved everything.
11  Like I say, anything to do with the company.  Certainly
12  the website Guy was the only -- Guy was the only one
13  dealing with that.
14     At that point, we didn't -- I don't even think
15  we had an I.T. person.  We didn't.  And so very early on
16  everything with the website -- because, you know, Guy
17  would tell me he already had the people in place who
18  knew how to do these things.  All right.  And so
19  remember, he already had a firm in the U.S., Stock USA,
20  and he had considerable experience.  So he knew exactly
21  how to get things done.  So he got the website done.
22     I remember -- he would -- you know, he didn't
23  ask us, you know, about the website or have to approve
24  anything.  It wouldn't have been us.  It would have been
25  me, really, because, I guess, I was the only other

40

1  person, I guess, on a senior level, but he didn't really
2  need approval from me with, you know, getting a website
3  done, stuff like that.
4      Q.  So when we talk about the formation of the
5  company, did you and Mr. Gentile discuss whose
6  responsibility it would be to get customers for
7  SureTrader?
8      A.  Oh, that was definitely Guy's responsibility.
9  And he, you know, he -- it was his responsibility.  We
10  just had to do what he said to do.  He told me straight
11  up, this is how we're going to do it.  We're going to
12  make a lot of money.  You know, he had it all thought
13  out.
14      Like, I said once we opened, Guy was on the
15  phone constantly.  I was quite impressed with his, I
16  guess, tenacity.  Like, he was just non-stop making
17  deals, talking to this one, talking to this one, trying
18  to generate business for the firm.  So he was calling
19  everybody and --
20      Q.  How did you know Mr. Gentile was doing what
21  you just described?
22      A.  Well, like I said, his desk literally was like
23  less than 10 feet away from me, and I could hear very
24  loudly what Guy was doing.  And, like I said, he -- it
25  was almost like he was mentoring me.

41

1      So Guy would -- would be saying something
2  loudly and he'd know like I'd hear him.  So sometimes I
3  would turn around and hear it, and he would give me the
4  thumbs up to be like yeah, we got this one, or this, and
5  this.  So I could hear very clearly everything that Guy
6  was doing.
7      The one or two times that Guy spoke quietly
8  those were odd.  And it's interesting.  As we talk I'll
9  probably talk more about that.  There was a difference
10  when Guy was just talking to some sort of like business
11  partner than when he was talking, perhaps, like a
12  regulator, or a lawyer, or something like that.
13  Normally when he was talking to his business partners,
14  he was very suave, very loud, very confident.
15      You could tell when he was talking to someone
16  of more importance he was more quiet, and more reserved.
17  So I would hear all day he was making these deals.
18      Sometimes I thought it was questionable
19  because it -- like he would be talking with -- let's say
20  business person A, and they're having a conversation
21  about business person B, and he'd say no, no don't trust
22  business person B.  It's me and you.  We're going to do
23  this.  Trust me.  And five minutes later he's on the
24  phone with business person B, and he's saying the same
25  thing about business person A, you know.  He says trust

42

1  me, don't trust the other guy.  And I would turn around
2  and look and he'd be like -- after the call, he would be
3  like, you know, Phil you gotta run circles around these
4  guys.  That's how you do it, you know.
5      So it was like he -- he was trying to teach
6  me, I guess, the ins and outs of the business, you know.
7  And it was interesting.
8      Q.  Did he -- did he ask you for input for these
9  conversations where he was trying to make deals with
10  business partners?
11      A.  He never asked me for input.  And, quite
12  honestly, I wouldn't -- I wouldn't even have known what
13  to say, to be honest.  I mean, a lot of the stuff -- you
14  know, that was -- it was -- a lot of it I could hear he
15  was discussing a lot of like U.S. regulations and stuff
16  with various people, and he was saying well, no, this is
17  going to work because of this, and this, and that.  So I
18  couldn't really give input to that because that's not --
19  you know, I cannot really comment on U.S. regulations.
20      But, like I said, he really knew what he was
21  doing.  And he, you know, would be talking with these
22  folks back and forth constantly, you know.  And yeah, he
23  felt really excited about it and -- you know, he would
24  give me the thumbs up a lot.  Like, I would turn
25  around -- every now and then, you know, Guy he's -- I

43

1  don't know, he's an interesting character, you know.
2  And so I get the feeling sometimes he may have been
3  trying to show off in front of me a bit, but I don't
4  know.  But he would just say things, and I would be like
5  okay.  Okay.  I guess that's how you do it.
6      Q.  All right.  So with respect to when he was on
7  the phone.  After he hung up, let's say on a particular
8  call, would he turn to you and say, Philip, this is what
9  just happened?  Or, you know, summarize it in any way
10  for you?
11      A.  The only times he would do that is like he
12  would be excited and me saying, Philip, there's some
13  big business coming our way, man, you know, like he
14  would say things like that.  So he would hang up the
15  phone and he would say, Philip, hey, this is going to
16  work.  This is going to work, or something like that.
17      It was never -- like, he never asked me for my
18  input or my opinion on his business deals, or his
19  conversations, and stuff like that.
20      The only time when Guy came to me with stuff
21  was when there was something from the Commission -- from
22  the SCB.  And he would be like oh, Philip -- and even
23  back then we would both go through it.  He wouldn't just
24  leave it to me.  We would still, you know, both go
25  through it, make sure we both understood it.  But

44

1 anything from the U.S. side, I mean, he just did that
2 totally on his own, you know. I mean, I wasn't
3 qualified to give input there anyway.
4     Q. All right. So I'm now going to just go back
5 to some of your testimony regarding what you called the
6 affiliate program.
7         Do you recall specifically who else
8 Mr. Gentile spoke with that was part of the -- what you
9 called the affiliate program?
10     A. Right. So some of the bigger names they stood
11 out to me. Obviously, Tim Sykes was the massive one,
12 right. You know, Tim Sykes is the one who really put us
13 on the map, right.
14         But then you had like Day Trading Radio. You
15 had, like, Warrior Trading. There was another one,
16 another guy's name -- and so -- like I said, that
17 eventually became Guy's total focus.
18         I mentioned that we hired two other gentleman,
19 and one of their main jobs was to stay inside of, I
20 think it was Tim Sykes -- inside of his chatroom so he
21 could talk directly with Tim Sykes' students as opposed
22 -- you know, I guess, Tim having to do all these things.
23 So we had a person in the chatroom or on the website
24 directly for the various affiliates' websites -- for the
25 larger ones. And so they would speak to the clients

45

1 directly and, you know -- but, like I said, things were
2 doing pretty good, like, we were -- we were no longer
3 concerned about shutting down. Things were growing --
4 you know, Guy was really excited about it. It was an
5 exciting time. I was excited too, you know.
6     Q. So can you estimate the approximate timeframe
7 when SureTrader went from approximate a hundred
8 customers to something more?
9     A. Definitely by mid 2012 we were on our feet and
10 running. All right. And so between, let's say February
11 when we came up with the unsolicited acknowledgement
12 agreement -- in retrospect, I think he wanted the
13 unsolicited acknowledgement agreement so he could start
14 making these business deals right away, because within
15 the next, what, three to four months clients were
16 rolling in. We were doing very well. So I would say by
17 mid 2012, definitely we were doing well.
18     Q. Can you estimate what the volume was by mid
19 2012 of customers?
20     A. Well, I cannot say what the volume was, but it
21 was certainly more than a hundred. You know, at one
22 point he brought in another individual to sort of manage
23 the affiliates as well, I think, and that would have
24 been Justin, because it was really growing -- not just
25 the clients, but the amount of affiliates, and he wanted

46

1 someone -- like a senior level person whose one of the
2 main duties would have been to manage that.
3         And, so, I don't know if that was Justin's
4 initial role, but that became his role very quickly.
5     Q. All right. And what's Justin's full name?
6     A. That would be Justin Ritchie.
7     Q. All right. I'm going to ask you, like, about
8 a specific affiliate program.
9         What was the basic idea of why SureTrader
10 would work with a company, for example, like Day Trading
11 Radio?
12         What was the business arrangement?
13     A. Right. So I've actually seen some of the
14 actual affiliate contracts, right.
15         Like I said, even though Guy initially set
16 that up where Justin was handling it, sometimes I would
17 be involved in those communications. And so if you
18 wanted to be an affiliate, basically there was a
19 particular -- like there was an affiliate application
20 that you would download and fill out, and then you would
21 agree to what percentage you would get -- like per
22 client that you send in, and then -- in essence, well,
23 Guy would agree, right. And then -- yeah.
24         And then I think what would happen is the
25 affiliates could try to renegotiate their rate after a

47

1 certain time, you know. I remember being privy to some
2 emails sometimes where some affiliates were complaining
3 that they didn't get the correct amount of rebates this
4 month, stuff like that.
5     Q. So what -- what was the expectation as far as
6 what these -- these affiliates -- and, again, I'm just
7 using the example of Day Trading Radio.
8         Like what -- what were -- what were they
9 supposed to do?
10         What was Day Trading Radio's job pursuant to
11 the agreement with SureTrader?
12     A. Well, they would talk about SureTrader. Talk
13 about this new broker-dealer in the Bahamas, right.
14         And, you know, talk about how you could make a
15 whole lot of money there because there's no Pattern Day
16 Trader Rule in the Bahamas. You know, and so once their
17 clients got aware of this, then they would come and open
18 up.
19         I remember there was -- I mentioned earlier, I
20 said, Tim was the man. I remember there was an incident
21 that happened where one of the ladies had established an
22 account numbering system -- like she put in a new
23 account numbering system, right, that neither Guy nor
24 myself were aware of, right. And I remember Tim
25 absolutely blasted us, right.

48

1    And, basically, what it really showed is that
2    how much of our clients were basically just his
3    students, because he saw that the account numbering
4    system that she came up with, it made it possible for
5    other persons to know what the account numbers were for
6    other people, and it would potentially cause, like, some
7    sort of hacking or something like that.  And I remember
8    he totally blasted us.  And I remember we had to switch
9    the account numbering system for our whole firm because
10   he -- well, basically our firm was made up of mostly his
11   clients at that point.  And so it was a really big deal,
12   you know.  Like, I said, Tim was the big one, but then
13   we had other big guys as well.
14      Q.   All right.  When I asked you for an example of
15   what a Day Trading Radio's job would be and you said
16   talk about SureTrader, the new Bahamian broker-dealer.
17      What do you mean by "talk about SureTrader"?
18      A.   Well, again, sometimes I would go into the
19   websites and I would hear or whatever, but the main
20   thing is these guys were receiving -- they had incentive
21   to send as much clients to us as possible.  All right.
22      And so I don't know if there was any agreement
23   to say this is what you must say, all right.  I doubt if
24   that existed.  But what existed was this is what you
25   would get for each client you send to us.

49

1    And so, you know -- now, I would hear Guy on
2    the phone talking to folks telling them well, listen,
3    there's no PDT Rule here man.  You can't make funds
4    trading in the states.  I mean, your clients this and
5    this, and that.
6       So I'm assuming this was a lot of the verbiage
7    that was being said to these affiliates' clients, but I
8    can't say that for sure.  All I know was these
9    affiliates had incentive to send as much clients to us
10   as possible.
11      Q.   Okay.  And earlier when I asked you about the
12   names of the affiliates, you mentioned Mr. Sykes, Day
13   Trading Radio, and Warrior Trading.
14      Where were these companies based?
15      A.   Tim was based in the U.S.  I think, basically,
16   all of them were based in the U.S.  And the reason why I
17   say that, because we mostly had U.S. clients.  And so --
18   I don't know.  I guess if one of them -- it could have
19   been based in Europe, but then they had U.S. listeners.
20   I don't know.  But we had mostly U.S. clients, at that
21   point.  And so I just assumed -- I know that Tim was in
22   the U.S., but I assume that the others were in the U.S.
23   as well.
24      Q.   And why were these particular affiliates
25   selected to work with SureTrader?

50

1       A.   Well, again, I didn't make that decision.  All
2    right.  But, again, listening to Guy, listening to the
3    deals and so forth, it -- it seems like they were
4    selected based on their large client base.
5       Q.   And their large client base was with customers
6    located where?
7       A.   Well, I would imagine it would have to be in
8    the U.S. because that's where the clients -- that's
9    where our clients were coming from, you know, so -- but,
10   I mean, I can't say definitively that Day Trading Radio
11   didn't have clients in Europe or something like that.  I
12   mean, I don't know that.  But based on the conversations
13   I would hear Guy talking, the whole incentive was based
14   off this PDT rule.  I don't know if that would come into
15   effect with other jurisdictions or not.
16      Q.   And did you discuss with Mr. Gentile, once
17   SureTrader started working with these affiliates, the
18   propriety of customers from -- sent by these affiliates
19   signing the unsolicited acknowledgement agreement?
20      A.   Did I discuss with Guy?
21      Q.   Yes.
22      A.   The need for these customers to sign the --
23      Q.   No.  No.
24      These were U.S.-based customers that were
25   coming to SureTrader is what I understood your testimony

51

1    to be; is that correct?
2       A.   Correct.
3       Q.   Okay.  Did you discuss with Mr. Gentile these
4    U.S.-based customers being sent by the affiliates
5    signing the unsolicited acknowledgement agreement?
6       A.   Well, all U.S. customers had to sign the
7    unsolicited acknowledgement agreement.  And so, I don't
8    know -- I think, at one point, certain documents were
9    made available -- like I said, to -- like in the
10   chatrooms and so forth to make it easier.
11      And so -- but, at that point, the unsolicited
12   acknowledgement agreement was almost -- you know, it was
13   just like needing an I.D. or proof of address.  It's
14   like well, this is just something you need this as well.
15   All right.
16      I remember there was one client -- we were
17   about to deny this account because they didn't fill out
18   the unsolicited acknowledgement agreement.  Right.  And
19   we checked.  They were actually not from the U.S.  And
20   everybody was like, oh, okay.  Well, I guess they don't
21   have to fill it out.  But most of the clients were from
22   the U.S., and so we were just used to everyone filling
23   out the unsolicited management agreement.  But every now
24   and then, like I said, there were clients who would not
25   fill it out, and we checked, they actually were not

52

1 U.S., so they didn't have to fill it out.
2    **Q.** Who was responsible for approving customer
3 applications in the first six months of 2012?
4    **A.** Right. So that would have been me. I would
5 have been ultimately responsible -- in the beginning,
6 like, literally me and Guy were actually going through
7 the applications ourselves. As we got more staff, we
8 tried to put together, like -- I guess, like departments
9 and so forth.
10    I still was ultimately responsible for that,
11 so I would be constantly going around to the desks and
12 so forth making sure -- like I said -- they have -- like
13 I said, they have like the KYC, proof of address,
14 everything. Making sure that they're not from any sort
15 of sanctioned country, and making sure that they fill
16 out the unsolicited acknowledgement agreement.
17    **Q.** When approving a U.S.-based customer who had
18 signed an unsolicited acknowledgement agreement, did you
19 conduct any further checks regarding whether, in fact,
20 they were not solicited?
21    MR. MATTHEW FORD: Objection.
22 BY MS. SUM:
23    **Q.** You can go ahead and answer, Mr. Dorsett.
24    **A.** Well, no, I didn't -- I didn't check into if
25 they were actually solicited or not. Once -- that was

53

1 never like -- that was never like going to be the focus.
2 The whole focus was, once they fill out this form, then
3 Guy will be able to show that to the U.S. regulators
4 that hey, we didn't solicit them. It was never even
5 discussed to be like, okay, are we soliciting them or
6 not. It was just make sure they fill out this form.
7 And he told me, make sure we don't advertise. He was
8 very big on that. Like, we could not advertise, you
9 know.
10    He -- I remember he told me like, at one
11 point, I spend zero dollars on advertisement so how
12 could they tell me I'm soliciting, you know, their
13 citizens. And so that was the whole thing. So once you
14 don't advertise, and once U.S. clients fill out this
15 unsolicited acknowledgement agreement, that's it. If
16 the U.S. authorities have a problem, then we'll be able
17 to show them that, and, according to Guy, like, that was
18 all we needed.
19    **Q.** All right. Did you have any subsequent
20 discussions with Mr. Gentile about the application
21 process and whether there needed to be any additions or
22 improvements to it?
23    **A.** Yes, actually. Guy and I would go back and
24 forth -- Guy wanted to make it, let's just say, as easy
25 as possible for clients to open an account and start

54

1 trading. All right.
2    And so, naturally, as a compliance officer,
3 you know, I want to make sure that we are good as far as
4 Bahamian regulations are concerned. And so we had --
5 you know, I would try to push with him to be like okay,
6 we have to -- we have to have systems in place to ensure
7 that we have proper KYC.
8    We have to have a proper system -- because I
9 remember there was a big one, at one point, Guy wanted
10 to make the application more automated, and he wanted to
11 have an automated signature -- sorry, electronic
12 signature. And I had a problem with it because the
13 technology, at the time, the signature was -- it
14 didn't -- it didn't so closely match the person's actual
15 signature. All right.
16    We would go back and forth, back and forth,
17 and so, finally, you know, I would -- so we would talk
18 about those type things. But, again, that was all from
19 the Bahamian regulatory perspective. Like, the main
20 thing I was really concerned with was know your clients,
21 doing due diligence, making sure we had everything in
22 case the regulators that came in and did a -- you know,
23 a surprise inspection, you know, and we had everything
24 on file. So that was my main thing.
25    And I -- and I went back and forth with him

55

1 just to make sure that us trying to make it easier for
2 clients to open, that we weren't shooting ourselves in
3 the foot, you know. So we would have those type
4 discussions.
5    **Q.** When you said that Mr. Gentile said no
6 advertising, what -- did he describe what advertising
7 was or what he considered it to be?
8    **A.** Well, I think, from his perspective,
9 advertising was like an actual advertising like a
10 commercial like or -- you know, on a website some sort
11 of ad or something like that. Because I knew he --
12 he -- just from the things he would say, I knew he had
13 experience with advertising because he would tell me how
14 expensive it is, right. But then he would also say, we
15 have it great, man. We don't have to advertise. He
16 would always say, I don't spend one dollar on
17 advertising, you know. How can anyone tell me I'm
18 advertising. I'm not spending -- someone is someone
19 advertising for us for free. You know, he would say
20 things like that.
21    So -- and, again, not just to me. I would
22 hear him saying things, like, on the phone to different
23 persons, you know. And so that's why, you know, I
24 realized that we were not advertising. And Guy was very
25 proud of the fact that he was not spending money on

56

1 advertising.  So I think his idea of advertising was
2 like a commercial -- like an ad.
3    **Q.**   As far as the business, can you briefly
4 describe its trajectory from approximately mid 2012
5 through late 2015 in terms of the volume of customers?
6    **A.**   Well, okay, that's a big jump.
7        Now, at some point, we had to switch offices.
8 We moved into a much bigger office.  It was literally
9 about -- I would say ten times bigger.  And so once --
10 you know, and Guy -- I have to give it to him, he's like
11 a forward thinker.  And he said, Philip, we're going to
12 grow like crazy.  We need space.  We need more people.
13       So we moved into this huge office.  And I
14 remember when we first moved in, we were just in one
15 small room in the back.  I was like wow, are we actually
16 going to fill out this place.  But, to his credit, we
17 filled it out.  In fact, we even had more people that
18 can adequately could have fit -- comfortably, I should
19 say, could fit in the office in the future.
20       And so certainly by 2015 we were a huge firm
21 by then.  Like, you know, things were -- by that time I
22 would say the staff, maybe, was in the 20s or 30s,
23 maybe, you know, or even more.  We probably, at that
24 point, we had proper departments, and he had other --
25 you know, other senior officers as well.  And so it was

57

1 a very well-oiled machine by that time.  We were a
2 massive firm, you know.
3       Things had changed between me and Guy by that
4 time, too.  You know -- well --
5    **Q.**   Okay.  Well, let's pause for a moment there.
6 I just wanted to understand the size in terms of, you
7 know, the number of customers, and you've described as
8 customers and staff.
9       So did your job duties change during the same
10 time period from middle of 2012 to 2015?
11    **A.**   My job duties never changed for the whole time
12 I was in Swiss America Securities.  There was one time
13 when Guy actually made me CEO, right, but that -- you
14 know, and I did not -- I was not even aware of it.
15 Literally, I came to work that day and the staff -- one
16 of the receptionists -- I remember she came to me she
17 said, "Good morning, boss."  I was like what?
18       She showed me the newspaper where Guy was
19 congratulating me.  He made a public statement in the
20 newspaper saying I was the new CEO.  All right.  But I
21 told Guy, I said Guy, you can't just make me CEO.  You
22 have to -- that's a regulated position.  You have to vet
23 that with the SCB.  You know, that's not just something
24 -- you can't just decide that, right.
25       So I don't know if that really counts.  But,

58

1 officially, from a regulatory perspective, my duties
2 never changed.  I was Chief Compliance Officer and MLRO
3 from the beginning right up until the day that I
4 departed.
5       My basic duties never changed.  They just sort
6 of evolved, because we had so much more staff, and so I
7 had to make sure that people knew what the regulatory
8 requirements were.  I had to make sure -- so that --
9 that was sort of my thing.  So --
10       **MS. SUM:**  Okay.  All right.  I know we've been
11 on for about an hour and a half.  I'd like to take a
12 short break.
13       **THE WITNESS:**  Okay.
14       **MS. SUM:**  Do you want to take a 10-minute
15 break?
16       **THE WITNESS:**  Okay.
17       **MS. SUM:**  All right, Matt?
18       **MR. MATTHEW FORD:**  Sounds good to me.  I would
19 leave it in the hands of the witness and the court
20 reporter how much time they need if they want 10, 15,
21 let me know.  I'm fine with either.
22       **MS. SUM:**  Okay.  Mr. Dorsett, how much time
23 would you like?
24       **THE WITNESS:**  Ten minutes is good for me.
25       **MS. SUM:**  So it's 11:00, plan to sign back on

59

1 at 11:10.
2       **THE WITNESS:**  Okay.
3       **THE VIDEOGRAPHER:**  The time is 11:00 a.m.  We
4 are now off the record.
5       (Off the record at 11:00 a.m.  Back on the
6 record at 11:12 a.m.)
7       --o0o--
8       **THE VIDEOGRAPHER:**  The time is 11:12 a.m.  We
9 are now on the record.
10       **MS. SUM:**  Thank you.
11 BY MS. SUM:
12    **Q.**   Before we took a break, Mr. Dorsett, we were
13 talking about the affiliate program, and I believe you
14 testified that sometimes there were SureTrader employees
15 in a chatroom with an affiliate.
16       Did I understand that correctly?
17    **A.**   Yes.
18    **Q.**   Okay.
19    **A.**   And so --
20    **Q.**   Why -- why did any SureTrader employees attend
21 or participate in a chatroom with an affiliate?
22    **A.**   Right.  So it was becoming too much of a task
23 for the affiliates themselves to be constantly trying to
24 deal with all of their clients' concerns with us.  All
25 right.  And so, at some point, a decision was made, it

60

1  just made sense for us to have one of our own people in
2  the chatroom, and they would just be called, I think,
3  SureTrader rep.
4       And so not only -- it was for clients, but it
5  was for prospective clients, too.  So if persons had
6  questions and so forth -- like say, it was Tim Sykes,
7  they didn't have to bother Tim Sykes.  They would just
8  ask our guy.  So it just made it -- it was a lot more
9  efficient that way.
10      Q.  Can you explain whether there was, like, one
11 employee at SureTrader that was assigned to this task or
12 was it, you know, more than one employee?
13      A.  Initially, it was one, but, eventually, it was
14 more than one.  Because it would be different persons
15 for different -- but, again, I'm not -- I'm not sure, to
16 be honest.  I'm not entirely sure.  I don't know if it
17 was one person going into different affiliates'
18 chatrooms at different times or if they had different
19 persons.
20      I can't recall, to be honest.
21      Q.  Was the SureTrader employee parked, if you
22 will, in the -- a particular chatroom for a set period
23 of time?
24      A.  Well, yeah --
25      MR. MATTHEW FORD:  Objection.

61

1  BY MS. SUM:
2       Q.  You can go ahead and answer.
3       A.  Well, yeah.  So --
4       Q.  Okay.  So, actually, let me stop you.
5       Can you explain how it was decided which
6  SureTrader employee would go where and for how long with
7  respect to these chatrooms?
8       MR. MATTHEW FORD:  Objection.
9  BY MS. SUM:
10      Q.  You can go ahead and answer.
11      A.  All right.  So -- all right.  So, Guy was the
12 one who told us, listen, we need -- the affiliates are
13 complaining that they are getting flooded with stuff
14 dealing just with SureTrader.  It makes more sense to
15 have one of our actual people in there who could
16 directly answer these people -- these clients' questions
17 and do whatever they need to do.
18      And so I think what it would be -- I -- this
19 was not like set in stone.  So, initially, I think we
20 had one of the guys in there and he would stay in
21 there -- he would be doing his work, but keep a window
22 open just in case someone gave him questions.  I think
23 that's how it was initially.
24      And then I think that setup was probably
25 duplicated for other persons for other chatrooms.  But,

62

1  again, this was not like set in stone.  It was, like,
2  definitely for the bigger chatrooms, we even had persons
3  in there, and they would be doing their work but also
4  just looking to see if someone contacted them.  And
5  so they just keep the window open while they're doing
6  their work.
7       Q.  And can you estimate approximately when
8  SureTrader started having an employee participate in an
9  affiliates' chatroom?
10      A.  Again, I want to say this probably would have
11 started around mid 2012.
12      Q.  Was there a specific event that precipitated
13 the need for an employee to -- for a SureTrader employee
14 to sit in a chatroom for one of the affiliates?
15      A.  I can't recall, but, like I said, I remember
16 Guy saying that, listen, the affiliates -- the idea
17 actually came from the affiliates.  It was like Guy was
18 saying listen, they're complaining.  You know, we need
19 to have somebody in there dealing with all these
20 questions and all the rest of it so they could, I guess,
21 finish doing what they normally do.  All right.
22      And so -- but I cannot say -- I cannot say
23 that I recall a specific event, or that I remember a
24 specific event that led to it, no.
25      Q.  Earlier you testified about the agreements

63

1  between SureTrader and the affiliates.
2       Can you describe what was the compensation
3  agreement or compensation understanding for the
4  affiliates and what they would bring to the table?
5       MR. MATTHEW FORD:  Objection.
6  BY MS. SUM:
7       Q.  Okay.
8       A.  Okay.  So I can -- I've seen the affiliate
9  agreements, but I've also seen how we worked out how we
10 would pay some of the affiliates as well.  And so --
11      Q.  Okay.  I'm going to stop you.
12      Do you have a specific affiliate -- let's
13 speak to Warrior Trading.
14      Do you have any knowledge of what the
15 compensation agreement was between SureTrader and
16 Warrior Trading?
17      A.  I would not know what the percentage is or
18 what the details.  Like I said, Guy -- he dealt
19 specifically -- especially with the bigger affiliates
20 like Warrior Trading, he would have had very specific
21 deals with them.  So I couldn't tell you what those
22 dealings -- what those specifics were.
23      Q.  Were you ever involved in any discussion
24 within SureTrader about the amount or percentage that
25 SureTrader would pay to the affiliates for the role that

64

1 they were playing?
2    **A.** I was privy to conversations where Guy was
3 complaining that -- I think it was Tim Sykes, wanted too
4 much. But, again, you know, it wasn't so much
5 discussion as opposed to Guy complaining to us.
6    By the time I think, you know, he would have
7 been complaining to like myself -- well, back then, like
8 I said, the office was so open. So it's like he's
9 complaining, but I think he really would have been
10 talking to like Justin, but he's sort of complaining to
11 all of us. Right.
12    And so -- but, again, I can't say -- I can't
13 say definitively what the exact numbers were all in my
14 head. I know that the documents exist that -- where
15 they go over what monthly amounts were sent to the
16 various affiliates, and it was based on that affiliate
17 contract.
18    **Q.** Did SureTrader ever offer any incentives to
19 potential customers?
20    MR. MATTHEW FORD: Objection.
21    THE WITNESS: You mean if clients could send
22 in other clients? Yes.
23 BY MS. SUM:
24    **Q.** I mean -- okay. So let's -- let me restate.
25    Were there -- did SureTrader offer any free

65

1 trial periods to potential customers?
2    MR. MATTHEW FORD: Objection.
3    THE WITNESS: I can't recall. There were --
4 when you say "free trial," what we offered -- there were
5 times when you would be able to trade and we don't
6 charge you commissions. So I don't know if that's what
7 you're referring to "free trial."
8 BY MS. SUM:
9    **Q.** Okay. Were there instances where SureTrader
10 offered --
11    **A.** Right. So, for instance --
12    **Q.** -- for -- to allow -- I'm sorry. Let me just
13 finish.
14    Were there times when SureTrader offered
15 potential customers to trade without paying a
16 commission?
17    **A.** Correct.
18    I remember we had incentive programs where
19 persons would open and they could get like 30 free
20 trades. I remember that was a big one.
21    And a lot of that was attached with the
22 affiliates, too, to be like hey -- because someone would
23 complain and say, listen, Tim told me I was supposed to
24 get 30 free trades and I didn't get it or something.
25 Sometimes we would offer things like that direct to

66

1 clients as well outside of an affiliate.
2    **Q.** Were there any other types of deals that were
3 offered to potential customers to trade either for --
4 for a lesser amount than what was normally charged?
5    **A.** Well, I know that some of the larger clients
6 was able to negotiate directly with Guy. I don't know
7 if we had an official system in place for a client to
8 apply for this. Something like that would be like a
9 client would just send us an email saying hey, we doing
10 this amount of trading. You need to give me a better
11 rate. It's as simple as that. And then that email
12 would get forwarded to Guy, and he would contact the
13 client and make a decision.
14    So I don't know if we had things like that set
15 in stone, but certainly amongst our larger clients they
16 would receive incentives to pay a lesser -- to pay a
17 lesser rate to.
18    **Q.** All right. I want to clarify.
19    When you refer to a larger client, are you
20 talking about a client that's existing with -- already
21 existing with SureTrader?
22    **A.** Right. So the larger clients would be clients
23 who either have a lot on deposit or who have high
24 trading volume. Especially the ones with the high
25 trading volume they would, I guess, feel that they can

67

1 ask for a better commission rate.
2    **Q.** Were there any incentives offered to potential
3 customers that were coming in through the affiliate
4 program?
5    MR. MATTHEW FORD: Objection.
6    And, Alice, I just want to note. I don't
7 think you should be leading this witness. This is not
8 cross-examination, nor is he an adverse witness. It's
9 been sort of going on throughout and I've been letting
10 it go, but during this second session here we've got a
11 lot of leading going on.
12    MS. SUM: Well, your objection is noted.
13 BY MS. SUM:
14    **Q.** You can answer, Mr. Dorsett.
15    **A.** Could you repeat the question?
16    MS. SUM: Madam Court Reporter, could you read
17 it back?
18    CERTIFIED STENOGRAPHER: Certainly.
19    "QUESTION: Were there any
20    incentives offered to potential
21    customers that were coming in through
22    the affiliate program?"
23    THE WITNESS: Well, yes. I mentioned that --
24 I remember definitely with the Tim Sykes clients they
25 would get 30 free trades if they came in through Tim

68

Philip Dorsett (nonconfidential)
2/27/2023

1  Sykes.  Right.  And we had other similar incentives for
2  other affiliates as well where if you mentioned this
3  particular affiliate, you would either get 30 free
4  trades or potentially get this rate or some other type
5  of incentive.
6  BY MS. SUM:
7      Q.  Okay.  Earlier you testified that you were
8  made CEO --
9      A.  Yes.
10     Q.  -- for a day.
11  Why were you made CEO of SureTrader?
12     MR. MATTHEW FORD:  Objection.
13  BY MS. SUM:
14     Q.  You can answer.
15     A.  Well, Guy never told me why he made me CEO,
16  but I -- later on I sort of figured it out.
17  I realized that Guy had incentive to separate
18  himself from the company.  He wanted to show that there
19  was separation, and I think this was for some foreign --
20  I don't know if it was regulatory or -- well, I guess it
21  would have been regulatory reasons, but he wanted to
22  show that there was separation.  And -- the problem is
23  he just didn't tell me about it.  He didn't advise me or
24  anything -- ask my advice.  He just did it, you know.  I
25  noticed that Guy would just do things like that

69

1  sometimes, whereas job position and title, Guy would
2  just switch it around as he sees fit.
3  Later on in the firm when we rehired a Chief
4  Financial Officer, there was a few times when Guy went
5  back and forth with him as to well, okay.  You are the
6  CEO or not.  I think, at some point, Guy officially
7  resigned as CEO.  When I say that I mean it was done
8  through the Commission.  All right.  But that didn't
9  happen until much later.
10  But definitely before that there were these
11  times -- and the first one was with me, and that was
12  with my knowledge.  Right.  Because I get the impression
13  that Guy would use us to just position around him as he
14  needed whether or not it was to our advantage or not.
15  And so, yeah, he made me CEO.  It would have
16  been longer than a day except for I told him that, you
17  know, we can't do that.  And, actually, the Commission,
18  I think they reached out to him as well because he put
19  this in the newspaper.  I think they reached out to him
20  to be like well, no, you can't do that.  Right.
21  But, like I said, later on I realized it was
22  some sort of -- it was -- I can't remember if he was
23  trying to establish a business relationship and their
24  regulatory reasons prohibited them from dealing with him
25  because he was CEO of a company in the Bahamas, but

70

1  that's why he did it.  And, again, I was literally the
2  last person to know about it.
3      Q.  So what was the resolution of Mr. Gentile's
4  decision to appoint you to be CEO for a day?
5      A.  So when you say, "the resolution"?
6      Q.  Okay.  You -- did you -- you came to learn
7  that you were made CEO of the company?
8      A.  Correct.
9      Q.  What happened immediately after you learning
10  of becoming the CEO of the company?
11     A.  Well, the first thing I did was I waited for
12  Guy to come into the office and I spoke to him about it.
13  I'm like Guy, what is this?
14  He was like, congratulations, man.
15  I'm like Guy, you can't just make me CEO just
16  because you want to, you know, that's -- I'm flattered,
17  but you have to vet that through the Securities
18  Commission Bahamas.
19     Q.  Okay.  And then after you had the conversation
20  with Mr. Gentile that you just described, what happened?
21     A.  He -- his response was don't worry about it.
22  Like, you know -- Guy would give me that response a lot.
23  I would bring concerns to him -- genuine compliance
24  concerns, and I can't tell you the amount of time that
25  Guy told me, don't worry about it, you know, those guys

71

1  are idiots, or they don't know nothing, or I can run
2  circles around them all day.  He just told me, oh, don't
3  worry about it.
4  And I think it was later that day the
5  Commission gave him a call, and he -- I think he
6  actually had to go there.  They demanded he come there.
7  I don't recall directly, but by the next day I was back
8  to Chief Compliance Officer.
9  Well, in the eyes of the law I was never not
10  Chief Compliance Officer.
11     Q.  How did you learn that that was the end result
12  of Mr. Gentile's attempt to appoint you as CEO?
13     A.  Well, I cannot say that I knew for certain
14  that that was the end of it.  I don't know what Guy was
15  telling other folks.  Right.  I knew there was a reason
16  that he wanted to appoint me as CEO, and I picked it up
17  a few weeks later that it was because -- I think it was
18  some business deal or something and he wanted to show
19  separation from the company.
20  I don't know definitively that he had told
21  whoever it was that that didn't happen or not.  All I
22  know is that I told him -- you know, I cannot be CEO
23  just because he says so, and I know the Commission
24  contacted him as well, and I imagine they reiterated the
25  same message.

72

**Page 73**

1  Q.  Who had the authority at SureTrader to make
2  decisions regarding the hiring and firing of employees?
3  A.  Well, in the beginning Guy -- Guy hired
4  everyone.  Guy didn't like to fire people personally,
5  and so he would ask me to do it.  I didn't like to do it
6  personally either, so we would ask the firm's local
7  lawyer to do it.  But Guy basically hired everyone.
8  Later on, once we grew, we moved into the new
9  office, Guy did not hands-on pick every single person,
10  but that would have been, I would say, the lower tier
11  staff.  But certainly all of the officers Guy
12  handpicked, and even the managers Guy would have
13  handpicked.
14  Q.  Did you have --
15  A.  Certainly the persons like the trade desk
16  manager, stuff like that, Guy would pick them himself.
17  Q.  Did you have authority to hire or fire any
18  employees of SureTrader?
19  A.  I did not have authority to hire.  I would say
20  I probably have more authority to fire someone if I -- if
21  someone was outright breaking the law and I knew about
22  it, I would imagine -- it never happened, but I would
23  imagine I could fire them.  But, obviously, I would
24  still have to really clear that with Guy.  So this
25  person would have to be doing something obviously

**Page 74**

1  illegal right in front of my face.
2  And so within the firm, you know, I carried a
3  certain amount of seniority so people listened to me.
4  Right.  But I don't know if it was written down anywhere
5  to say that Philip has the right to -- well, I didn't --
6  I never felt I had to right to hire someone.  And I
7  don't know if it was written out anywhere that Philip
8  had the right to fire people, but it probably was
9  understood that if you did something outrageous that,
10  you know, I could fire you.
11  Q.  If --
12  A.  In fact, I think one time I was talking to
13  Guy -- we were having a conversation about letting
14  someone go, and he sort of hinted that I could have just
15  fired the person, but I wasn't sure because, again, it
16  wasn't -- you know, I wasn't really sure if I had that
17  authority or not.  So, you know, everything had -- I had
18  to run -- any major decision had to be run by Guy.
19  Q.  When you say you had to run any major
20  decision, what -- what did you believe that constituted?
21  A.  Well, certainly hiring and firing.  But
22  anything that had to do with the course or the direction
23  of the firm I had to run it with Guy.  You know -- I
24  mean, well, he was the boss.  I had to keep him
25  informed.  Right.

**Page 75**

1  A lot of times Guy was not there.  Right.
2  After we grew and after we moved into the big office,
3  Guy actually spent a lot of time out of the office.  So
4  I would be speaking to him, a lot of times, on the
5  phone, and he would also be speaking to the other
6  officers a lot on the phone.  And, you know, so -- there
7  was not one day that went by that senior officers were
8  not in constant communication with Guy, whether he was
9  there or not.
10  So Guy was still hands-on even though he was
11  not physically there.
12  Q.  I'm going to go back to the application
13  materials that you testified about earlier.
14  Within the application package, can you please
15  describe what the components were?
16  A.  Right.  So, again, our application sort of
17  evolved over time.  And so, in the beginning, the basic
18  application was a PDF application that was almost
19  verbatim a copy of the SpeedTrader application, but was
20  dumbed down.
21  And so things that were in the application was
22  the know your client information.  So they would fill
23  out information about themselves.  Right.  And then --
24  then we had the client agreements.  And then the client
25  agreements, basically, were like word-for-word like

**Page 76**

1  SpeedTrader.  A lot of that was a lot of legal jargon
2  that Guy wanted in there.  In essence, you know -- you
3  know, like the terms and conditions to protect the firm
4  and things like that, right.  And so a lot of that
5  writing that made up actually like the bulk of the
6  application -- the terms and agreements.
7  And then, in the beginning, we had the
8  separate unsolicited acknowledgement agreement.  When
9  Guy changed the application to have -- to be more
10  streamlined and make it more of an online application,
11  the unsolicited acknowledgement agreement was actually a
12  part of the application itself.  And he told me that he
13  would have his IT persons set it up that when a person
14  signs, I think a separate signature would still show up
15  under the unsolicited acknowledgement agreement.  So he
16  would still be able to show that this portion was
17  significant and it had to be signed separately.
18  CERTIFIED STENOGRAPHER:  Mr. Ford, can I ask
19  that you mute yourself.  I'm getting some feedback from
20  you.
21  Thank you.
22  (Pages 77 to 107 were designated confidential
23  and are bound separately.)
24  - - -
25

1   (The following portion of the transcript was
2  designated as nonconfidential.)
3            --o0o--
4   (The proceedings resumed after the lunch break
5  at 1:19 p.m.)
6   THE VIDEOGRAPHER:  The time is 1:19 p.m.  We
7  are now on the record.
8  BY MS. SUM:
9   Q.  Mr. Dorsett, earlier I asked you some
10  questions regarding SureTrader's website.  I'm going to
11  bring up Exhibit 5 now and ask you some questions about
12  it.
13   MS. SUM:  I'm sorry.  Videographer, if you
14  could please bring up Exhibit 5.
15   Could you enlarge it a little bit?  And scroll
16  down a little bit.  It's doing something strange with
17  the way it's scrolling.
18   Okay.  If you could just take it back to the
19  top, please.
20   (Deposition Exhibit 5 marked.)
21  BY MS. SUM:
22   Q.  Okay.  Mr. Dorsett, do you recognize what's
23  been placed in front of you as Exhibit 5?
24   A.  Yes.
25   Q.  Okay.  And what is it?

108

1   A.  This is the SureTrader website.
2   Q.  And, specifically, what -- what page is this
3  on SureTrader's website?
4   A.  So this is the contact us page.
5   Q.  Do you see on this page that there are
6  telephone numbers and fax numbers?
7   A.  Yes.
8   Q.  Okay.  What phone numbers does SureTrader
9  have, according to its website?
10   A.  That's 328-7800, or -- I can't recall the last
11  four.
12   Q.  Okay.  And is that for a particular office or
13  country?
14   A.  That's -- that's -- that's just the -- if
15  you're calling us locally.  So that's the Bahamas'
16  number.
17   Q.  And below that is there another number?
18   A.  Right.  It says, "USA Direct."
19   Q.  And is that a U.S. number?
20   A.  I think that's a U.S. area code.  It's not
21  Bahamian.
22   Q.  Earlier I asked you some questions about
23  whether SureTrader had a U.S. phone number.  Is this the
24  phone number that you recall SureTrader having?
25   A.  Well, I don't remember the phone number, but I

109

1  know that it was a New York number.
2   Q.  A U.S. number was placed on SureTrader's --
3   CERTIFIED STENOGRAPHER:  I'm sorry.  Ms. Sum,
4  I didn't get the last part of the question.
5  BY MS. SUM:
6   Q.  Do you recall if, when SureTrader's website
7  was created, there was a U.S. number?
8   A.  Initially, I don't know if there was a U.S.
9  number in the very beginning, but in time Guy had to add
10  a U.S. number.  Like I said, I think he receive -- we
11  received a complaint, I think it was from Tim, that it
12  didn't make sense for U.S. clients to have to call us
13  long distance -- or, you know, call a different country
14  area code.
15   Q.  Do you believe that SureTrader had a U.S.
16  number up until the time that you departed SureTrader?
17   A.  Yes.  At the time I departed, yeah, they
18  definitely would have had a U.S. number.
19   MS. SUM:  All right.  Just to -- for the
20  record, the Bates range for Exhibit 5 is
21  SEC-SECWEBCAPTURE-E-0000340.
22   All right.  You can bring that down.  Thank
23  you.
24   And then videographer, I'll ask you to please
25  bring up Exhibit 6.

110

1   (Deposition Exhibit 6 marked.)
2   MS. SUM:  And if you could, please, enlarge
3  that a little bit.
4  BY MS. SUM:
5   Q.  Are you able to read Exhibit 6, Mr. Dorsett?
6   A.  I can see where it says, "Funding & Banking."
7   Q.  Okay.
8   MS. SUM:  So the Bates range for Exhibit 6 is
9  SEC-SECWEBCAPTURE-E-0000377.
10  BY MS. SUM:
11   Q.  Mr. Dorsett, do you recognize Exhibit 6?
12   A.  Yes.  So this is the funding and banking page
13  from the website.
14   MS. SUM:  I'll ask the videographer to please
15  scroll down through the document, please.
16   Okay.  And if -- yes.  If you could slow down
17  there.
18  BY MS. SUM:
19   Q.  Mr. Dorsett, do you see where it says the
20  letters "ACH"?
21   A.  Yes.
22   Q.  Okay.  Can you describe what -- what that is?
23   A.  Well, that's for clients who wanted to fund
24  their account via ACH transfer.
25   Q.  Okay.  And which clients would that be?

111

**Page 112**

1    **A.**  Just the clients. I don't know if there was
2 specific clients who used ACH or not.
3    **Q.**  Do you see under "ACH" where it references
4 available currencies?
5    **A.**  Yes. It says --
6    **Q.**  And what is the currency?
7    **A.**  USD.
8    **Q.**  Okay. And then do you see where there's a
9 reference to availability?
10    **A.**  Yes.
11    **Q.**  Okay. And what does that say?
12    **A.**  U.S. Bank holders only.
13    **Q.**  Why was the ACH option created and placed on
14 the SureTrader website?
15    **A.**  I -- I -- I cannot say why. I don't know
16 directly why.
17    I know Guy wanted as much options as possible
18 for clients. Initially, I think we just had the wire
19 transfer. And, again, I think some of the affiliates
20 who sort of schooled him on it wanted to have more
21 options available as opposed to just doing a traditional
22 bank wire.
23    **Q.**  Did you discuss with Mr. Gentile the options
24 available on Exhibit 6 to increase options for payment
25 or transfers?

**Page 113**

1    **A.**  Well, it's more correct to say he would have
2 discussed with me, because he would have brought this to
3 my attention, but I wouldn't have been able to give him
4 additional options. He would have been the one to add
5 the various funding options.
6    **Q.**  Was he the ultimate decision-maker for what
7 funding options there were for SureTrader?
8    **A.**  Yes.
9    MR. MATTHEW FORD: Objection.
10    THE WITNESS: Yes.
11    MS. SUM: All right. You can bring down
12 Exhibit 6.
13    MR. MATTHEW FORD: I just want to raise an
14 objection to that -- to that exhibit on the basis that
15 it was never authenticated, and we don't know what time
16 period it's from. Just for the record.
17    MS. SUM: All right. I'm going to ask the
18 videographer to bring up Exhibit 7, please.
19    (Deposition Exhibit 7 marked.)
20    MS. SUM: And to please scroll for Mr. Dorsett
21 to review.
22    And I'll ask that you please bring it back up
23 to the top.
24 BY MS. SUM:
25    **Q.**  Are you able to hear me because I'm having a

**Page 114**

1 connection disconnect.
2    **A.**  I can hear you.
3    **Q.**  You can hear me. Okay. All right.
4    MS. SUM: Just for identification purposes,
5 exhibit -- it just locked up on me -- Exhibit 7 is Bates
6 stamped SEC-FL-03848-E-0012118 through 12120.
7 BY MS. SUM:
8    **Q.**  Mr. Dorsett, do you recognize Exhibit 7?
9    **A.**  Well, this is an email from -- between Guy and
10 it seems Antonio and Justin, and I was copied.
11    **Q.**  And what is the substance of this email?
12    **A.**  Well, I would have to look at it. When you
13 scrolled through, you went pretty quickly.
14    **Q.**  Okay.
15    MS. SUM: Mr. Videographer, are you able to
16 scroll down -- well, we'll start with the very bottom
17 and then work our way to the top. Start with the first
18 email from the bottom. If you could scroll back up now.
19 Okay. Pause here for a moment, please.
20    And then you let us know, Mr. Dorsett, when
21 you're ready for it to scroll further up.
22    THE WITNESS: Okay. You can scroll up. Okay.
23 Okay. All right.
24 BY MS. SUM:
25    **Q.**  So I'll just ask my question again.

**Page 115**

1    What was the substance of this email exchange
2 at Exhibit 7?
3    **A.**  I actually cannot recall --
4    **Q.**  Okay.
5    **A.**  -- it's...
6    **Q.**  All right. Do you -- did you see at the -- in
7 the first email there -- there was --
8    **A.**  Well, sorry --
9    MR. MATTHEW FORD: Objection. Leading.
10    So if the witness could wait for the question
11 to be asked.
12    MS. SUM: Okay. So let's go back to the first
13 email working our way up from the bottom, please.
14    Scroll back up a little bit, please, so we can
15 find the first email. Scroll a little bit more please.
16 Okay. Let's stop there, please.
17 BY MS. SUM:
18    **Q.**  Do you see an email from July 4, 2013, at
19 10:15 a.m from a Courtney Kurisko?
20    **A.**  Yes.
21    **Q.**  Okay. And do you see where it says,
22    "Good morning and happy 4th.
23    Attached is the invoice for July"?
24    **A.**  Yes.
25    **Q.**  Okay. And then, as we scroll further up do

1 you see an email from Justin Ritchie to Courtney Kurisko
2 with a cc to guy@stockusainc.com?
3    **A.**  Yes.
4    **Q.**  And a Dac Benasillo -- dac@daytradingradio.com?
5    **A.**  Yes.
6    **Q.**  Okay.  And what is your understanding of what
7 this email provides?
8    **A.**  All right.  At first when you went through I
9 missed that Dac was included on this because I didn't
10 recognize the Courtney lady.  So I think this is
11 payment -- let's see.  Right.  So we sent them some
12 funds, and it looks like we sent it twice through an
13 error --
14    **Q.**  Okay.
15    **A.**  -- and --
16    MS. SUM:  If we could just scroll further up.
17 BY MS. SUM:
18    **Q.**  So you're referring to the payment going
19 twice, did I hear you correctly?
20    **A.**  Yes.
21    **Q.**  Okay.  And then now up on the screen you see
22 the email from a Justin Ritchie to Antonio Collie with a
23 cc to philip@suretrader.com and Guy Gentile?
24    **A.**  Yes.
25    **Q.**  Okay.  And what's internally being discussed?

116

1    **A.**  Well, so, Justin has let Antonio know that the
2 wire to Day Trading Radio went out twice.
3    Courtney says she received two deposits of
4 3,600 yesterday.  Can this be reversed.
5    MS. SUM:  I ask the videographer to scroll
6 further up, please.  Okay.
7 BY MS. SUM:
8    **Q.**  Do you see the last -- the two most recent
9 emails?
10    **A.**  Yes.
11    **Q.**  Okay.  And what was the end result of this
12 email chain at Exhibit 7?
13    **A.**  All right.  That -- we couldn't reverse the
14 payment, but that -- would they would apply the extra
15 amount to next month's billing invoice, this would have
16 been for September -- well, he's asking if it's for
17 September.  And then Guy came back and said it's fine
18 with him.
19    **Q.**  At this point in time, you see at the top the
20 date of September 18, 2013, was Mr. Gentile typically
21 involved in these types of communications?
22    **A.**  Yes.
23    MR. MATTHEW FORD:  Objection.
24 BY MS. SUM:
25    **Q.**  Okay.  And --

117

1    **A.**  Yes, he was.
2    **Q.**  And during your time of employment at
3 SureTrader did Mr. Gentile continue this level of
4 involvement?
5    **A.**  Yes.
6    MR. MATTHEW FORD:  Objection.
7 BY MS. SUM:
8    **Q.**  And can you describe any other similar
9 instances of Mr. Gentile being involved in similar types
10 of communications?
11    **A.**  Actually, there was an email communication
12 surrounding what ultimately led up to my departure in
13 which Guy ultimately had the final say, and it had to do
14 with -- with the debate over whether our clients had
15 direct market access or not and how we were to
16 respond to --
17    **Q.**  Okay.  I'll -- I'll get to that in a little
18 bit.
19    I'm trying to understand the level of
20 Mr. Gentile's involvement in the company's day-to-day
21 decision-making throughout the course of your employment
22 at SureTrader.
23    Can you describe his day-to-day involvement,
24 please?
25    **A.**  Certainly -- this is dealing with the

118

1 affiliates.  Certainly anything dealing with monetary
2 compensation to affiliates Guy would have been on top of
3 it.  But even more so, from my perspective, with
4 compliance matters.  So, for instance, if I get some
5 sort of request from the SCB, Guy would be made aware.
6 And I would also be cc'd in when Mr. Collie would send
7 financial matters that needed Guy's approval as well.
8 And so Guy -- yeah.
9    Guy would either approve everything, but
10 definitely he was cc'd on everything.  And so he would
11 approve most things.  So certainly those things -- those
12 higher end things that needed his approval, but he
13 certainly would have been cc'd on most of, if not all,
14 of the emails between the senior officers with the --
15 with the day-to-day runnings of the company.
16    **Q.**  Is your testimony that you just provided true
17 for 2016?
18    **A.**  This would be true for every year.  There was
19 one time when Guy, I think, tried to separate himself
20 from the company.  I don't know if that was official
21 through the Commission or not, but even then Guy was
22 still very much hands-on, you know.  He just officially
23 didn't have the title of CEO at that time.
24    **Q.**  Okay.
25    MS. SUM:  You can bring down Exhibit 7.  Thank

119

1 you.
2 BY MS. SUM:
3    Q.  Mr. Dorsett, do you -- do you recall when
4 Mr. Gentile, as you just testified, stepped down?
5    A.  I cannot remember the exact dates, but I know
6 it had something to do, I think, with foreign regulatory
7 investigations, and he thought it was best if he
8 separated himself from the company.  That was -- that
9 was the big official one.  I think that's when he --
10 they officially did it and made -- I think they made
11 Mr. Collie the new CEO or the new president, but the
12 Commission was aware of that.
13    Q.  And by "Commission," you're referring to the
14 SCB?
15    A.  Yes.
16    Q.  You used the term Mr. Gentile, "separated from
17 the company."
18        What do you mean by that?
19    A.  The main thing is, it was important for him to
20 show the separation.  You know, he still was very much
21 in charge and, you know, he was still running the
22 company, but he had to show to whoever the powers that
23 be were, that he was separated from the company.  He was
24 no longer in the day-to-day runnings of the company.
25    Q.  Did this involve a change in title?

                        120

1    A.  Yes, it did.  I think, at that time,
2 Mr. Collie either became the president and CEO or
3 something of that nature -- I can't remember, but there
4 certainly was a change and Guy was no longer the CEO.
5    Q.  Who is Mr. Collie?  Could you give us his full
6 name, please?
7    A.  That would be Antonio Collie, and he was the
8 Chief Financial Officer.
9    Q.  Okay.  And during the time that Mr. Gentile
10 was -- again, I'm using your words, separated from the
11 company, was he being copied on communications within
12 the company?
13    A.  From what I recall, yes and no.  Because I
14 remember Guy wanted -- he wanted to show, physically,
15 that he was not being copied on everything.  I remember
16 there was some discussion on that.  But, at the same
17 time -- and I'm not sure if he had a different email
18 address -- there was some discussion on it.  But there
19 still was communications with Guy.  There still was
20 email communications with Guy.
21        But, from what I recall, there was a change --
22 he either had a different email address, or he went
23 about it differently, or we were to -- I cannot remember
24 the exact specifics, but I remember there was some
25 discussion as to his email presence, and how we would be

                        121

1 emailing him, and how we would be able to communicate
2 with him during this time.
3    Q.  Okay.  When you say "there was some
4 discussion," who was involved in the discussion?
5    A.  Well, it would have been the senior officers.
6 So certainly myself, Mr. Collie, Justin -- depending on
7 what time this was, so Mr. -- Mr. Cooper or Janay might
8 have been involved as well.
9    Q.  All right.  And who is Mr. Cooper?
10    A.  Mr. Edward Cooper was the other compliance
11 officer that Guy hired, I think, around 2015.
12    Q.  And who was Janay?
13    A.  Janay Pyfrom.  I think she was hired for
14 marketing.  She would have come on after Mr. Cooper.  I
15 want to say late 2015, but I'm not sure.
16    Q.  During the time period when Mr. Gentile was
17 separated from the company, did you communicate with him
18 via phone?
19    A.  Yes.
20    Q.  Did you communicate with him by text message?
21    A.  I can't specifically recall if I used text
22 message or not.  I would have to think about that.
23    Q.  Did you communicate with him by email?
24    A.  Yes.  I think I still would have sent some
25 emails to him.

                        122

1    Q.  Did Mr. Gentile come to the office during the
2 time he was separated, as you've described, from the
3 company?
4    A.  Yes.  He would still come into his office.  I
5 remember he did this thing where he put a new sign on
6 his office door and he said it's technically a different
7 company because he had the sign on his door.  And he was
8 saying his office is no longer Swiss America Securities
9 because he had this sign on his door.
10        I'm not sure if that is directly related to
11 this point of him being separated from the company, but,
12 in my mind, I think it was related.
13    Q.  Okay.
14    A.  But he was in the -- he was in the office,
15 yes.
16    Q.  What did the sign on his door say?
17    A.  I cannot remember.
18    Q.  And what different company are you referring
19 to?
20    A.  I cannot remember the name.
21    Q.  Did Mr. Gentile provide any further
22 explanation for his actions of putting a different sign
23 on the door?
24        Excuse me.  On his door.
25    A.  No.  What was explained to us was that inside

                        123

1  his office is no longer Swiss America Securities.  That
2  was it.
3      Q.   At the time this occurred, what was the office
4  layout?
5      A.   Well, this was in the new office and so we had
6  a -- it was a pretty large office.  Guy's office was
7  probably about the size of our first entire office.  All
8  right.  So it was a good sized office.  He had a full
9  bathroom in there.
10         And then behind -- adjacent to his office was
11  the conference room.  And then behind that was an open
12  floor where we kept the trade desk folks.  And then
13  there was a corridor in the middle, and on the other
14  side there was a massive open floor that ran the span of
15  the entire office where everyone else was seated.  And
16  then towards the front was the receptionist desk, and
17  the bathrooms, and the kitchen.  So his office was sort
18  of in the middle.
19     Q.   How many floors was the office on?
20     A.   We were on the second floor.  We took up -- we
21  took up -- we took up the entire second floor of that
22  portion of the building.
23     Q.   Was SureTrader only on a single floor?
24     A.   Correct.
25     Q.   Did there come a time when Mr. Gentile resumed

124

1  title as president of the company?
2      A.   I'm not sure.  But there did come a time
3  when -- because his presence did diminish.  It was
4  noticeable.  But there did come a time when he was very
5  much back on the scene, but I -- to my knowledge, I
6  don't know if any official titles were changed.
7      Q.   When you say that he was "back on the scene,"
8  can you describe what the difference was compared to the
9  time when he was "separated" from the company?
10     A.   Right.  So there was a time when Guy was
11  making a real effort to disassociate himself from the
12  company.  So we would hardly see him.  And, you know, we
13  would only communicate with him if absolutely necessary.
14         There was a time when that came to an end, but
15  I'm not sure if -- if he ever took back on actual title
16  as CEO or not.  But certainly there was a time when he
17  came back and resumed his normal being about the
18  business, and you see -- you saw him a lot more.
19     Q.   When did you finish your employment with the
20  company?
21     A.   That --
22     Q.   A date.
23     A.   -- was August 2017, I believe.
24     Q.   Did -- so how long before you finished your
25  employment with the company did Mr. Gentile come back

125

1  from his separation?
2      A.   I can't -- I don't know -- I don't know if
3  I -- I don't have an answer to that.  I can't really --
4  I can't say.
5      Q.   From the time that Mr. Gentile came back from
6  his separation from the company, what was his level of
7  involvement in decision-making for the company?
8      A.   After he returned?
9      Q.   Yes.
10     A.   Well, again, his -- ultimately his level of
11  decision-making never changed, but now he was more
12  visual with it where you could see that he's back
13  around.  He's talking with everyone.  That he's making
14  decisions.
15     Q.   Did there come a time where you had
16  disagreements with Mr. Gentile about how you were doing
17  your job?
18     A.   Yes, there were.
19     Q.   Approximately when did you have that situation
20  occur?
21     A.   Well, it -- I guess it -- I guess this sort of
22  officially occurred when Guy actually wrote me a letter
23  that he entitled "Warning Letter."
24         This would have been around 2015 because this
25  would have been after Mr. Cooper had joined the company.

126

1  And Mr. Gentile was, in this warning letter, basically
2  saying that he did not like my job performance, right.
3  And -- he did not like my job performance and some other
4  things that I actually took exception with.  Right.
5         I realized the real reason why he was sending
6  that letter to me.  As I noted earlier, by 2015 the
7  relationship between myself and Mr. Guy -- and Guy had
8  deteriorated significantly.  You know, in the beginning
9  back in like 2012, you know, even 2013, the relationship
10  between myself and Guy was really good.  Again, you
11  know, I viewed him almost as like a mentor figure.  You
12  know, he said he would teach me everything he knew, and,
13  to his credit, I felt that he taught me quite a bit.
14         So I really looked up to Guy.  And, back then,
15  you know, I sort of just took what Guy said as just --
16  as gospel so to speak.  You know, it was like when he
17  would talk about various things, I, you know, took it as
18  okay, that's just how it is.
19         But over time -- like I said, Guy would talk
20  in my hearing, just a little behind me a lot.  Right.
21  And I started to feel as if, like, well, listening to
22  Guy talking to various business associates and so forth,
23  that he sort of just says whatever he needs to say to
24  appease the person and it's not always to the other
25  person's benefit.  And I started to see that over and

127

**128**

1  over again.  And he even -- it's almost like he boasted
2  it.  He was like this is the way to go, you know, you
3  gotta run circles around these guys.  I witnessed that a
4  lot.  Right.
5  **Q.**  And when was this occurring, what you just
6  described?
7  **A.**  This was occurring almost from the beginning,
8  like as soon as -- like from 2012.  I noticed -- I did
9  take note that the way how he was dealing with folks, it
10 was just different than what I expected.
11      And I said to myself, well, maybe this really
12 is how it's done, you know.  You know, it's -- you know,
13 granted nothing about what he was doing seemed illegal
14 to me.  You could make an argument that maybe it was
15 morally questionable, right -- but, you know, but I
16 started to notice that more and more and more.
17      And I also noticed when Guy and his wife
18 eventually went through their divorce, there was a few
19 things that was done in my presence that really sort
20 of -- sort of shook me up and, you know, I realized when
21 people are going through a divorce there's a lot of
22 anger going on, but he did some things -- at least one
23 thing to her that really sort of made me sort of view
24 him in a very different way.  And it made me think that,
25 you know, I had to probably start to be careful around

**129**

1  Guy.  And then there were some other things as well.
2  **Q.**  Okay.  I'm going to ask you just to pause for
3  a second.
4      MR. MATTHEW FORD:  If I could just get a
5  clarification.  I think my zoom cut out.
6      Did you say that nothing seemed illegal?
7      Did I hear you right?  I-L-L-E-G-A-L, illegal,
8  the did I hear that?
9      THE WITNESS:  Correct.  In his
10 communications with like --
11      MR. MATTHEW FORD:  Thank you.  My zoom cut
12 out.
13      THE WITNESS:  -- with his business partners.
14      MS. SUM:  Please, Matt -- Matt, I'm trying to
15 conduct my examination here.
16      MR. MATTHEW FORD:  I couldn't hear on my end.
17 I think it's a zoom issue.
18      Thank you.
19 BY MS. SUM:
20 **Q.**  All right.  So are we still talking about the
21 same time period when you're seeing what you just
22 described with Mr. Gentile -- is this still in 2015?
23 **A.**  No.  No.  This is leading up to 2015 and --
24 because you asked me about if we ever had -- I don't
25 know, you probably didn't use the word confrontation,

**130**

1  but if there was any sort of dispute between me and Guy.
2  And this is what sort of led up to it, and that's why I
3  started talking about this stuff.
4      But anyway, let's -- I will just say by the
5  time 2015 came around I viewed Guy totally different
6  from in 2012.  I -- I was not trusting of Guy at all.
7  And by that time I can also say I was a lot more
8  confident to challenge him with things, whereas, back in
9  the beginning, you know, I wasn't really so confident.
10 You know, he would say things.  I may have an issue with
11 it, but I probably didn't have the confidence to
12 challenge him.  By the time -- certainly by the time
13 2015 came around, that was very different.  And very
14 regularly, unfortunately, Guy and I would -- you know, I
15 would have to challenge a lot of the things that he was
16 doing.
17      He didn't -- I know he didn't like it, based
18 on his responses, but, at the same time, you know, I
19 felt I had to do it.  And so we were getting -- you
20 know, going back and forth, and there were a few
21 incidents --
22 **Q.**  Okay.  So I want to understand, because you're
23 talking about certain things happening.
24      Can you give an example of a situation where
25 you just described that you felt you needed to challenge

**131**

1  Mr. Gentile on what he was doing?
2  **A.**  Right.  So there was a time when this -- and
3  based on my estimation this had to be 2015, if not, then
4  it was early 2016.  But there were investigations going
5  on with reference to Guy, and I received an email from
6  Securities Commission of The Bahamas requesting some
7  company documents.  The email was not unusual in my
8  position as Chief Compliance Officer.  It was normal for
9  me to be in regular communication with the SCB, and I
10 would normally send documents whenever they asked for
11 it.
12      And so I was preparing what they requested,
13 and I got a call from Guy, and he said, Philip, how are
14 you going to respond to the SCB?
15 **Q.**  Okay.  I'm -- sorry.  I'm going to ask you to
16 pause.
17      How did Mr. Gentile know about the
18 communication from the SCB to you?
19 **A.**  Well, I was just going to say I was a bit
20 surprised because the email was just addressed to me,
21 but yet he somehow knew about it.  So I started to think
22 to myself okay.  Guy is reading my emails.
23      And so I told him -- I said, well, I'm putting
24 the information together.
25      And he says, well, no, you can't send it to

**Philip Dorsett (nonconfidential)**
**2/27/2023**

1  them.
2        And I said, well, Guy, I mean, they asked for
3  it.  They were very specific in their request.
4        And then he says, well, all you have to do is
5  redact it.
6        And I say, what do you mean by "redact it"?
7        And he say, Philip -- he said, all you have to
8  do is go into the system and just delete -- delete the
9  information and tell them you don't have it.
10        I said, Guy, I cannot do that.  I says,
11  there's no way I can just delete company documents and
12  then lie about it to the regulator.
13        And then he started to say, well, Philip,
14  they're trying to take us down, man.  They're going to
15  send this information to the SEC, man, come on.
16        I said, Guy, what you are asking me to do is
17  impossible.  I cannot delete company records and then
18  lie outright to the regulator about it.
19        And we went back and forth with that for
20  awhile.  And then, like, he switched over -- Guy knew
21  that I was partial to staff matters.  I would bring
22  staff matters to him many times.  And so he switched
23  over.  He said, well, what about the staff, you know.
24  If they shut us down, what are we going to do about the
25  staff, man.  You don't want that to happen to the staff,

132

1  right.
2        And I'm saying to myself, wow, as if Guy cares
3  about the staff all of a sudden.
4        I said, Guy, I'm sorry.  No.  I can't do it.
5  And he was very upset.
6        And I sent the information in.  I remember Guy
7  did not speak to me for like well over a month.  Like he
8  would come into the office, hail everyone else, and just
9  walk right passed me.  And it -- literally for like five
10  or six weeks later, I went -- I finally -- like I
11  couldn't take it anymore.  I went into his office, and I
12  said, I said, Guy, we have to speak about this.  I said,
13  listen, what you were asking me to do, it's not like I
14  was just trying to say no.  I said, I couldn't do it.  I
15  said, I'm the compliance officer.  I said, do you know
16  how much trouble I would get in if they found out what I
17  did, you know.
18        And then he was just quiet, and I figured -- I
19  said, well, let me try to appease to them more.  I said,
20  well, listen, I said, you know, the regulator doesn't
21  ask you for stuff unless they already have the answer.
22  I said, you know, they were probably just seeing if we
23  were going to be honest.  I said, if we had, you know,
24  not given them what they wanted, that just would have
25  made it worse.  And that seemed to get through to him a

133

1  bit.  He said, okay.  It's cool.  And then things
2  started to -- to get a little better.  Right.
3        And so that was an example of when Guy was
4  asking me to do something outright illegal.  There were
5  other examples of when Guy was asking me to do things --
6    Q.  I'm going to ask you to pause just for a
7  second.
8        So what was the approximate timeframe for that
9  request from the SCB and then the following events with
10  Mr. Gentile?
11    A.  This would have been in the first quarter of
12  the year.  Now --
13    Q.  Which year?
14    A.  -- I trace the year to be about 2015 because,
15  in my memory, Mr. Cooper wasn't with us yet.  And so
16  that's why I'm thinking it's 2015.  But it could have
17  been 2015 or 2016.  But I want to think more it's 2015
18  because I don't think Mr. Cooper was with us yet.
19    Q.  All right.  I interrupted you when you were
20  about to describe a different situation or example when
21  you and Mr. Gentile did not agree on something.
22    A.  Right.  So there was another time -- this one
23  was a little earlier.  This would have been, maybe,
24  around 2013 or so, where Guy calls me into his office
25  and he says, Phil, he said, he heard that Tim Sykes is

134

1  opening up his own broker-dealer.  I want to say that he
2  said it was Cayman, but I am not sure, but it was
3  another Caribbean country that, apparently, Tim Sykes
4  was trying to open up his own broker-dealer.
5        I said, okay.
6        And he said, well, we cannot let this happen,
7  man.  He said, you know -- you know, we gotta do
8  something about this, you know.  If he leaves, obviously
9  all of his students are going to go with him.
10        I say, well, I mean, I'm not sure there's much
11  we could do.
12        And he says, yes.  He says, you are a
13  registered compliance officer.  I want you to write the
14  regulators -- again, I'm thinking it was Cayman, but it
15  may have been another Caribbean country.
16        He said, I want you to write the regulators --
17  and he starts to list off this list of things he wants
18  me to put in this letter as to why Tim Sykes should not
19  be granted a broker-dealer license, right.
20        And I'm like, Guy, I cannot do that.
21        And he's like, come on, man, you don't even
22  like Tim Sykes -- which was an odd statement.  It is
23  true that I told Guy I didn't like that Tim Sykes had a
24  foul mouth, which, you know, he really had a foul mouth,
25  and when I found out he was coming to the office, I told

135

1 Guy I didn't want to be associated with Tim Sykes.  I
2 didn't want to be in the video.  Please set it up where
3 me and Tim Sykes don't have anything to do with each
4 other because, you know, I don't like his foul mouth.
5        So Guy believes that because I didn't like Tim
6 Sykes' foul mouth that I somehow would be -- that I -- I
7 don't know, like I hated him or something, like I was
8 willing to go along with this.  And I said, Guy, you
9 know, just because I don't like his foul mouth -- which
10 is true, I don't -- it doesn't mean I'm going to try to
11 sabotage him opening up a business.
12        And, I said, on top of that, I cannot just
13 write these things.  I say, I don't even know them to be
14 true.  That's going to cause me to get in trouble.
15        And he was like, come on -- he started the
16 same thing, come on, Phil, if all of his students go,
17 think about the staff.  I'm going to have to start
18 laying off folks.  You don't want that to happen to the
19 staff, right?
20        And I'm like, Guy, I cannot do that.  I'm
21 sorry.
22        And so there were things that we started to
23 split.  But the biggest split, in my mind, happened very
24 early on -- and this happened way back in 2012 where --
25 again, at this time, you know, Guy could have told me to

136

1 do anything I wouldn't have questioned it.  I was like
2 yes, sir, you know.
3        But I remember Guy was on the telephone -- and
4 he was not talking to one of his regular like -- you
5 know, like the broker-dealer friends or some other
6 people in the business -- I got the impression that he
7 was talking to someone official like a lawyer or a
8 regulator, because he wasn't his normal self.  Like Guy
9 is very loud and very like suave, stuff like that.
10 That's how he talks.  He puts his foot up on the desk
11 and stuff.  But he was talking to this person, and he
12 was sort of hunched over, and I could tell he was very
13 serious, and I'm listening, and he is saying to this
14 person oh, well, that's -- that has nothing to do with
15 me.  You have to ask my compliance officer.  Oh, well,
16 then, no that's not my fault.  Oh, that's my compliance
17 officer's fault.  Oh, well, that -- that's not me, I
18 guess you have to ask him.  And he was just going on,
19 and on, and on.
20        And I'm trying to figure out what is -- what
21 is he talking about?  Who's he talking to?
22        And like I said, I got the impression he was
23 talking to someone official.  And he kept saying, well,
24 that's him.  That has nothing to do with me.  I have
25 nothing to do with it.  No.  That's my compliance

137

1 officer.
2        When the conversation was over, I turned and I
3 was like, Guy, what's going on?
4        And he said, oh, Philip, don't worry about it.
5 Those guys are just idiots.  Back to work.  I mean --
6    Q.  All right.  So you've provided some examples
7 of where you and Mr. Gentile had some disagreements.
8        My question now is:  After the -- the issue
9 concerning the SCB's request for information -- okay --
10 did you and Mr. Gentile move on from that disagreement?
11    A.  When you say "move on," did things get better?
12    Q.  Well, did they get better?
13    A.  Well, yes.  Like I said, after I came to him,
14 and I reasoned with him, and I told him -- you know, I
15 really tried to reason with him, things seemed to get
16 better.  He said, okay.  Everything's cool.  All right.
17 And seems things did seem to get cool.
18        But, to sort of wrap this all up now,
19 towards -- in 2015 now, I get this letter saying --
20 basically questioning my -- you know, my work ethic and,
21 you know, telling me I need to do better or else sort of
22 thing.  Right.
23        And I knew exactly what it was.  It wasn't
24 something to question my work ethic.  It was him giving
25 me a shot across the bow telling me listen, stop

138

1 challenging me so much and -- you know, that's how it
2 came across to me.  And I really didn't -- I didn't like
3 that at all.  And so when I responded -- sorry?
4    Q.  Okay.  I'm going to just interrupt you here,
5 so -- I would like to bring up an exhibit regarding
6 you're -- what you're testifying to.
7        MS. SUM:  So could we please bring up
8 Exhibit 8?
9        THE VIDEOGRAPHER:  You said Exhibit 8,
10 Counsel?
11        MS. SUM:  Yes.  Exhibit 8.
12        THE VIDEOGRAPHER:  Okay.
13        (Deposition Exhibit 8 marked.)
14 BY MS. SUM:
15    Q.  All right.  Mr. Dorsett -- hello?  Hello?
16        MR. MATTHEW FORD:  Yeah.  So have these
17 documents been produced to us?
18        MS. SUM:  This was in the -- so I received
19 this last night from Mr. Dorsett.
20        MR. MATTHEW FORD:  Okay.
21        MS. SUM:  And, yes --
22        MR. MATTHEW FORD:  I'm going to request that
23 we have the opportunity to --
24        MS. SUM:  Yes.  Let me -- let me allow myself
25 to finish.  Okay.

139

1    They were sent as part of the Accellion
2  transmission with the -- with the rest of the exhibits.
3    MR. MATTHEW FORD:  No.  No.  What I'm asking
4  is, we received that link this morning 15 minutes before
5  the deposition.  I'm going to request -- I'm going to
6  insist that any documents that were produced 15 minutes
7  before the deposition not be used during the deposition,
8  at least until we've had the chance to review them.
9    I understand Mr. Dorsett stole over 30,000
10  emails from the company --
11    MS. SUM:  Matt -- Matt --
12    MR. MATTHEW FORD:  -- that this was not
13  included in that --
14    MS. SUM:  -- this is not how we practice in
15  Miami.
16    MR. MATTHEW FORD:  Yeah.  This is --
17    MS. SUM:  He's a witness.  We don't accuse a
18  witness of stealing documents.  This is not the way to
19  handle ourselves.
20    MR. MATTHEW FORD:  Oh, yeah.  Okay.  Well,
21  then let's pull this down and go to exhibits that have
22  been produced in this case.
23    MS. SUM:  No.  No.  I'm not going to pull this
24  down.
25    MR. ADAM FORD:  Alice, this is Adam.  I

140

1  just received 10, 15 minutes prior to the start of the
2  deposition is something that you can introduce as an
3  exhibit into the deposition and ask questions on.
4    So let's try and get the judge on the phone.
5    MS. SUM:  It's -- to clarify, for the record,
6  this is a document that I received last evening.  This
7  is not a document that's been withheld.  It has been
8  turned over, okay, from over the weekend on a Sunday
9  night to the morning to you.  Okay.  But fine.  We can
10  go ahead and try to --
11    MR. KOONIN:  I don't think we need to contact
12  the judge at all.  You guys have lodged your
13  objections --
14    CERTIFIED STENOGRAPHER:  Excuse me.  Who is --
15    MR. KOONIN:  -- you also have an opportunity
16  to come back and ask him questions, whether that's today
17  or tomorrow.  You'll have ample time to review this.
18    You do not have the right or authority to stop
19  our deposition.  You can later move in limine to exclude
20  this based on your argument, to the extent you want to,
21  you know, you don't think that this is a proper line of
22  questioning, your objection has been noted.
23    You do not have the authority to stop our
24  deposition and call the judge.  It's not your witness
25  right now it's our witness.

142

1  don't -- I don't think you can pull up exhibits that
2  have not been produced to us in advance of the
3  deposition and ask the question.
4    So we can bring this to the judge, but this is
5  not how we practice either in Miami, New York, or
6  anywhere else.  Documents have to be exchanged in
7  discovery.  This document was not produced.  It can't be
8  asked.
9    We can bring the witness back a later if the
10  judge allows it, but we're not going to do this right
11  now.
12    MS. SUM:  Well, I am going to proceed with
13  questioning him.  This is a document that I received
14  last evening.  This was produced this morning.
15    MR. ADAM FORD:  Why don't we -- why don't we
16  try and get the judge on the phone and ask about this.
17    MS. SUM:  I don't believe it's necessary.
18  This was produced and --
19    MR. MATTHEW FORD:  We're insisting --
20    MS. SUM:  -- this is a document that you all
21  are aware of.
22    MR. MATTHEW FORD:  Alice, we're insisting it's
23  within our right to suspend the deposition.  We want to
24  get the judge on the phone to determine whether or not
25  an email you never produced in discovery, but that we

141

1    So Alice, as she's stated multiple times, is
2  going to proceed with her questions.  Your objection is
3  noted for the record, and you can then move to --
4    MR. MATTHEW FORD:  It's a bigger objection
5  than an objection for the record.
6    The problem is, from what we can see and what
7  we can glean, based on what we know about this
8  situation, this witness, and what we've been arguing
9  about for, what, years now, there is no reason that this
10  should have been withheld until 15 minutes before the
11  start of the deposition.
12    We would like to raise this the with the judge
13  or the magistrate.  It's been part of an ongoing
14  discovery dispute -- this witness's exhibits, and that's
15  our position.  So why don't we try and get the
16  magistrate on.
17    MR. KOONIN:  We're not going to do that, Matt.
18  You don't have the right to stop your deposition.
19    MR. ADAM FORD:  Russell, Russell --
20    MR. KOONIN:  Yes?
21    MR. ADAM FORD:  -- it's not stopping the
22  deposition.  It's calling in to the judge for an
23  immediate ruling.  This is not that unusual.
24    If there was a privilege issue, we would call
25  in.  And if we had called in and asked the judge, we

143

1 could have gotten an answer, and we would be back to the
2 deposition.
3         Why are we going around in circles?  Let's
4 just call the judge and ask for a ruling on this issue.
5         We're not stopping the deposition.  We're
6 seeking guidance.  We do this all the time.
7         I don't know how you practice in Miami, to
8 paraphrase what you guys keep repeating.
9         MS. SUM:  Okay.  To be clear, this email that
10 I received last night from Mr. Dorsett approximately at
11 6:45, okay, is the first that I've received it.  This
12 has not been withheld somehow during the course of
13 discovery, and it was turned over the following morning,
14 meaning this morning prior to the deposition.  Okay.
15         And to be further clear about it, okay,
16 there -- the email below is actually embedded in your
17 client's production that was only dumped on us last
18 week.  Okay.  So if we're -- this is not the moment to
19 be getting into a discussion about, you know, raising
20 and tit for tat as far as the parties and their
21 production dates.
22         I intend to proceed with questioning with
23 Mr. Dorsett.
24         MR. MATTHEW FORD:  It just seems like an easy
25 thing to go ahead and call the magistrate and get a

144

1 ruling on whether you can use these documents.
2         MS. SUM:  It's not a question of whether it's
3 easy.  You don't have the right to stop this deposition
4 at this point.  I'm going to proceed.
5         MR. MATTHEW FORD:  We're not stopping the
6 deposition, as I've said.  We're just going to call the
7 judge for a ruling.
8         MS. SUM:  My position is that it is not
9 necessary, and you don't have the right to even pause
10 this deposition for a document that actually embeds
11 something that your client produced last week.
12         Do you deny that your client produced part of
13 this email last week?
14         MR. MATTHEW FORD:  Is that a question for the
15 witness?
16         MS. SUM:  Well, apparently, there's no answer.
17 Well, no.  We've been having our colloquy here.
18         So, without your answer, then I'm going to go
19 ahead and proceed with the questioning.
20 BY MS. SUM:
21     Q.   Mr. Dorsett, you described an instance where
22 disagreements with Mr. Gentile occurred, and you
23 referenced something called a warning letter, is that --
24 did I understand your testimony correctly?
25     A.   Yes.

145

1     Q.   Okay.
2         MS. SUM:  So starting from the bottom of
3 Exhibit 8 if -- thank you.  No.  I'm sorry.  Scroll
4 back -- scroll back up -- of the email chain.  Okay.  A
5 little bit further down there's another email.
6         MR. MATTHEW FORD:  Oh, and to answer your
7 question, Alice, I had never actually seen this email
8 because you're just pulling it up for the first time,
9 and you didn't scroll down.  So all I saw was an email
10 from Mr. Dorsett to you last night or whenever it was --
11 this morning.
12         MS. SUM:  Okay.  So this is an email that's,
13 in fact, embedded in your client's production of
14 documents last week.  But I'm going to continue with the
15 questioning.
16 BY MS. SUM:
17     Q.   So, Mr. Dorsett, do you see what I'll call
18 the first email chronologically at the bottom of
19 Exhibit 8?
20     A.   Yes.
21     Q.   Okay.  And could you please describe the
22 November 23, 2015, email?
23     A.   All right.  So it's a letter -- it's an
24 email -- sorry -- from Justin making me aware that Guy
25 sent a letter to me and that I can discuss the contents

146

1 of the letter with Guy at a later time.
2         MS. SUM:  Please, videographer, scroll up to
3 the later email.
4 BY MS. SUM:
5     Q.   Okay.  And what is this November 23, 2015
6 email at 6:20 p.m.?
7     A.   So I read Guy's warning letter, which was the
8 attached letter Justin referenced, and I responded to
9 it.  And this email was letting Guy know that I attached
10 my response for him to read.
11         MS. SUM:  Videographer, could you please
12 scroll to page 4 of the PDF, please?
13 BY MS. SUM:
14     Q.   Mr. Dorsett, is this the response to
15 Mr. Gentile's letter to you?
16     A.   Yes, it is.
17     Q.   And can you briefly describe your response to
18 Mr. Gentile's letter.
19     A.   Well -- well, can I just read it or is it too
20 long?
21     Q.   Yes.  Please go ahead and read it.
22     A.   So "To:  Guy Gentile" and "From:  Philip
23 Dorsett, November 23, 2015."
24     Q.   Oh, you don't need to read it out loud.
25     A.   Oh, sorry.  Okay.

147

1    Q.  You can read it.
2    A.  You can scroll down.  Scroll down.  And scroll
3  down.  Scroll down.
4       Okay.
5    Q.  All right.
6       MS. SUM:  So why don't we scroll back to the
7  top of this letter -- not to the PDF.
8       Okay.  Thank you.  Thank you.
9  BY MS. SUM:
10   Q.  All right.  First of all, Mr. Dorsett, why did
11 you feel like you had to write this letter in response
12 to Mr. Gentile's -- what you described as a warning
13 letter?
14   A.  By him writing the warning letter to me, that
15 was an official letter.  You know, it's official.  It's
16 going to be part of the company records.  It's going to
17 be on my file.  And it was very inaccurate.
18      It would have been different if Guy had called
19 me aside -- which he had done times before, and we
20 thrash it out.  Right.  But him writing a warning letter
21 and then putting things in the warning letter as if it's
22 my job performance that he has a problem with when, in
23 reality, it's not my job performance that Guy had a
24 problem with, it was me standing up to him that he had a
25 problem with.  But he's trying to pin something about

148

1  job performance that can be on the record against me.
2  And I saw right through it, and I didn't like it at all.
3       And so that's why I felt compelled to respond
4  to him.  And I told him just like how -- you know, well,
5  my thinking was, you write an official letter for the
6  record, I'm going to write an official letter for the
7  record, but the difference is mine says everything in
8  this is truth.
9       And so I started from the beginning with all
10 of the grievances that I've had with him.  I told him, I
11 say, how can I be your Chief Compliance Officer -- I'm
12 registered with the Commission which means I'm
13 accountable for this firm.  I have to -- I have to
14 basically give accounts to the regulator.  How can I be
15 your Chief Compliance Officer when you don't take my --
16 you don't adhere to the things that I'm saying at all?
17 It's as if I don't exist.
18      And other things that I brought him up to him,
19 I said, I notice that whenever I bring up an issue to
20 him that basically is in the best interest of the firm,
21 it's like he just automatically dismisses it.  It's like
22 he doesn't want to hear anything that's not his opinion.
23 He doesn't want to hear anything that goes against his
24 opinion.  And he certainly never wants to hear the words
25 no to anything, you know.

149

1       And I brought up certain situations where he
2  specifically put the risk because he did not
3  come to me first and discuss his actions first.  And
4  that is one of the major problems I had with Guy.  Guy
5  would do things in a very reckless manner at times, and
6  put me and my fellow officers at risk and put the entire
7  firm at risk.
8       You know, earlier one of the conversations I
9  heard with Guy that made me start to think -- change my
10 thinking towards him when he was speaking to one of
11 those earlier business partners, he said to them, you
12 know, I don't know how long this is going to last so I
13 have to milk it for everything I can.  I'll always
14 remember that.  He said that way in the beginning.  And
15 that's one of the things that started to make me realize
16 that the way how I thought about the firm was very
17 different from the way how Guy thought about the firm.
18      And so my opinions as Chief Compliance Officer
19 that I'm trying to bring to him -- and initially, in the
20 beginning, I didn't bring that much because it was just
21 all him.  But in time, once I started to realize, okay,
22 you know what, I have to stand up to Guy, and I got the
23 courage to do so, he was not impressed at all, you know.
24 When I got the -- you know, it's -- and he was just
25 blatant with it.

150

1       I mentioned how he hired the other compliance
2  officer.  I noticed that the compliance officer was
3  referring to himself as the Chief Compliance Officer.
4  And I'm like well, okay, how can you have two chief
5  compliance officers?  I know Guy had this thing where he
6  likes to set people off against each other but, you
7  know, I didn't decide to be upset with the other
8  compliance officer.  I knew where it came from.  I went
9  to Guy.  I went to the source.
10      I'm like, what's going on?
11      He said, oh, don't worry about it.  You know,
12 you the man.
13      I said, well, no.  Obviously this other guy
14 thinks he's the man.  Where's he going to get that from?
15 He's not going to just say that, right.
16      So I had a problem because Guy was, in
17 essence, treating this Guy as the Chief Compliance
18 Officer, but yet I'm the one with the responsibility
19 with the regulator, you know.  They're making decisions
20 that affect the company -- compliance decisions --
21   Q.  I hate to interrupt you, but I need to
22 understand.
23      You mentioned there was another compliance
24 officer that was hired and that Mr. Gentile referred to
25 him as the Chief Compliance Officer?

151

1    **A.** The person referred to himself as Chief
2  Compliance Officer.  And, yes, Guy, I had noticed, would
3  even refer to him as the Chief Compliance Officer.
4    **Q.** What was his name?
5    **A.** Edward Cooper.
6    **Q.** And was any kind of paperwork filed with the
7  SCB to reflect any change in the name of the Chief
8  Compliance Officer for SureTrader?
9    **A.** None.  None.
10    **Q.** After --
11    **A.** And I -- sorry.  Go ahead.
12    **Q.** Okay.  After you sent this response letter to
13  Mr. Gentile, did Mr. Gentile respond?
14    **A.** Yes.
15    **Q.** Okay.
16    MS. SUM:  Please take down Exhibit 8 and bring
17  up Exhibit 9.
18    And, Counsel, I will represent to you this --
19  this is a version that Mr. Dorsett -- I shouldn't say
20  version.
21    It is a forward of an email that you all
22  produced in Mr. Gentile's production last week.  So this
23  is just a -- you know, being forwarded from him with
24  Mr. Gentile's response in the email -- emails below.
25    MR. MATTHEW FORD:  Were these letters included

152

1  in the 33,000 documents that we received?
2    Were these emails included?
3    MS. SUM:  The short answer is, I do not know,
4  but it was produced from your client --
5    MR. MATTHEW FORD:  Well --
6    MS. SUM:  -- as well.
7    MR. MATTHEW FORD:  -- it says it's from
8  padorsett@gmail.com to Sum, Alice.
9    Was this produced in the 33,000 emails that we
10  received?
11    MS. SUM:  The short answer is, I do not know,
12  but I am producing it because it is the version that he
13  provided to me last night -- as you can see from the
14  date, but the -- you have this email -- excuse me --
15  yes, this email in the exhibits that I sent.
16    MR. MATTHEW FORD:  It's -- it's in the Bates
17  stamped 33,000 documents that we received?
18    MS. SUM:  I've answered you already.  I do not
19  know, but I also know it was in your client's
20  production.
21    MR. ADAM FORD:  Alice, you don't mean that the
22  email from Mr. Dorsett to you --
23    MS. SUM:  No.  No.
24    MR. ADAM FORD:  -- that you're using --
25    MS. SUM:  I'm not referring --

153

1    MR. ADAM FORD:  -- was in my client's
2  production --
3    MS. SUM:  -- to that.
4    MR. MATTHEW FORD:  Do you -- do you mean the
5  email from Mr. Dorsett SureTrader email address to his
6  Gmail address is --
7    MS. SUM:  No.  I'm referring to -- I will be
8  going to an email from Mr. Gentile responding to Mr. --
9  Mr. Gentile responding to Mr. Dorsett's letter that we
10  just covered in Exhibit 8.
11    MR. MATTHEW FORD:  Okay.  So, just to be
12  clear, this email chain was not produced by Mr. Gentile.
13  It was produced by Mr. Dorsett to you last night,
14  correct?
15    MS. SUM:  This -- this iteration, because it
16  was forwarded by Mr. Dorsett last night, was produced
17  this morning.  But the substance -- like the email chain
18  below was produced by your client last week.
19    MR. MATTHEW FORD:  Thank you.
20    MS. SUM:  Okay.  Mr. Videographer, could you
21  please scroll down a little bit to show the middle --
22  keep on going, please.  Okay.  Yes.
23    Actually, scroll back a little bit up so we
24  can see the date.  Okay.
25    (Deposition Exhibit 9 marked.)

154

1  BY MS. SUM:
2    **Q.** Mr. Dorsett, is this Mr. Gentile's response to
3  the letter that we just looked at in Exhibit 8?
4    **A.** Yes.
5    **Q.** Okay.  Do you want to take a moment to review
6  Mr. Gentile's response to you?
7    **A.** Scroll down.  Okay.  Yep.
8    MS. SUM:  You've reviewed it.
9  BY MS. SUM:
10    **Q.** Do you -- I'm going to ask you questions about
11  Mr. Gentile's email response to you.
12    First, I'll start with, do you see where here
13  it says, in point number 1 and 2, the first point it
14  says, "removing you as director of the firm."
15    And point two is "assigning Mr. Cooper as
16  Chief Compliance Officer."
17    Do you see that?
18    **A.** Yes.
19    **Q.** Did Mr. Gentile state that he was going to
20  take these two actions?
21    **A.** Yes.
22    **Q.** Did he, in fact, take those two actions?
23    **A.** I think I was removed as director and
24  principal.  I was not removed as Chief Compliance
25  Officer.

155

1    **Q.**  Did you discuss with Mr. Gentile, after he
2  sent this email, basically, the contents of both his
3  email and your response that we looked at in Exhibit 8?
4    **A.**  Yes, I did.
5        Again, I didn't -- I didn't say it, but in my
6  email -- in my letter response to him, I told him well,
7  if you really have a problem with my work experience,
8  then let's discuss my departure from the company
9  because, you know, I don't want to work for a company
10  where the CEO feels I'm not doing my job.  And so that's
11  what we discussed when I went into his office.
12        It became very evident right away that no, he
13  didn't want to do that.
14        And I said, well, okay, if you want to assign
15  Mr. Cooper as Chief Compliance Officer, you know, we can
16  fill out the documentation with the Securities
17  Commission of The Bahamas.
18        No.  No, Philip, we don't have to do that.  We
19  don't have to do that.
20        You know -- and so it's like he is putting
21  these things on record that -- even this email response
22  to me this is not for my eyes, this is for other
23  people's eyes who may see it later.  Like I noticed here
24  he responded the bank, and his response is
25  incorrect.  But, when you speak to him, it's a whole

156

1  'nother story.
2        And so what I saw right away was that Guy was
3  not interested in actually firing me.  I gave him the
4  opportunity.  I said, you know, it doesn't have to be a
5  bad thing, you know.  If you feel this way, you really
6  shouldn't have me as your chief -- you shouldn't have me
7  as an employee let alone your Chief Compliance Officer.
8  Right.  And if you want to remove and give the Chief
9  Compliance Officer to position to Mr. Cooper, certainly
10  that's your choice.  Let's fill out the paperwork with
11  the Commission.  And he was very much against it.
12        And so it showed me that it's like Guy wanted
13  me to maintain my official position which came with
14  responsibility to the regulator, but he actually didn't
15  want me to have responsibility within the firm.  Like,
16  he didn't want me to be able to challenge him in the
17  firm.  And he was trying to keep me out of the decisions
18  in the firm, but I had to be accountable to the
19  regulator, nonetheless.  And so things -- that's what
20  came out of this whole thing.
21        Interestingly enough, the relationship between
22  us got better even after this.  You know, because he was
23  like, well, you know, Philip, you know, we both said --
24  we both said our sides and, you know, let's move on, you
25  know, and things were better.

157

1        I didn't mind not being a director anymore.  I
2  mean, I was not being compensated for it in any case.
3  And, quite honestly, I didn't even mind if he wanted to
4  change the position of Chief Compliance Officer, just do
5  it properly.  Notify the Commission and take that
6  responsibility from a regulatory perspective off of me
7  and put it on to whoever you want.  And that is what Guy
8  did not want to do.  Because what he wanted was I was
9  pushing him to do that, it's like he turned back
10  completely.  He's like oh, no.  No, Phil.  I'm sure
11  things will work out, blah, blah, blah.
12        So I decided to let it go.  But there's a
13  whole lot of things that my letter response -- I'm glad
14  I documented it, but the reality is I was already
15  explaining these things to Guy anyway.  I told him,
16  listen, you can't just be upset with me because I tell
17  you no about stuff.  Why don't you ask me why I say no.
18  There's a reason for that, and let's just discuss it.
19  Don't just get upset, you know, that's not how you run
20  the firm.
21        And not just that, I tried to point out,
22  listen, we put ourselves at risk when you do these
23  things, you know, and -- well, you put us at risk when
24  you do these things.  And, you know, I try to make it --
25  make him understand because he's the owner of the firm.

158

1  He's the one who ultimately benefits when we do well.
2  But, I don't know, it's like he just -- he wants me to
3  just do as he says and that's it.
4    **Q.**  All right.
5        MS. SUM:  I think this is a good time to take
6  a short break.
7        Is 10 minutes sufficient, Mr. Dorsett, and to
8  the court reporter, and to the videographer?
9        THE VIDEOGRAPHER:  Yes.  That's fine.
10        Do you want to go off the record?
11        MS. SUM:  Yes.
12        THE VIDEOGRAPHER:  The time is 2:35 p.m.  We
13  are now off the record.
14        (Off the record at 2:35 p.m.  Back on the
15  record at 2:46 p.m.)
16              --oOo--
17        THE VIDEOGRAPHER:  The time is 2:46 p.m.  We
18  are now on the record.
19  BY MS. SUM:
20    **Q.**  Mr. Dorsett, after the exchange between you
21  and Mr. Gentile in November of 2015, did anything occur
22  that -- that renewed any kind of disagreement between
23  you and Mr. Gentile?
24    **A.**  Do you mean --
25    **Q.**  In the immediate aftermath.

159

1      **A.**   No.   I wouldn't say -- not in the immediate
2 aftermath.   I mean, Guy just went back to being his
3 normal self.   Things -- when I say things got better,
4 the confrontation had subsided.   And so -- but the
5 situation remained the same, basically.
6      **Q.**   What do you mean "the situation remained the
7 same"?
8      **A.**   Guy would do things according to however he
9 wanted to do it, and he did not want to hear your
10 opinion on it unless it was in agreement, basically.
11 And when I would give my opinion on it that was not in
12 agreement, it was evident that it irritated him.   And I
13 would not have a problem if this -- these were
14 insignificant things, but these are major things that
15 affect the company, and things that me, as the
16 registered compliance officer, are also accountable for.
17 And that was always my major concern.
18      That's why I never had a problem actually
19 giving over my position to someone else, because when
20 you give over that position, you give over the
21 responsibility that comes with it, you know.   And that's
22 what I told Guy.   And even I explained to Mr. Cooper
23 too, because I wanted to make sure -- we had to work
24 together.   I didn't want it to be this back and forth.
25 He's a seasoned professional in the industry.

160

1      I said, you know, surely you can understand
2 that if I am the one who have to be accountable to the
3 Commission, then it puts me in an odd position when you
4 and Guy are making the decisions that I have to be
5 accountable for.   And he understood that, you know.
6 That was not -- it's not something that he did not
7 understand.
8      So things got better.   They got back to the
9 normal bad, right.   And so that's -- you know, that's
10 how things continued.
11      **Q.**   In early 2016 did there come a time when you
12 reached out to the U.S. Securities and Exchange
13 Commission?
14      **A.**   Yes.
15      MR. MATTHEW FORD:   Objection.
16      THE WITNESS:   Yes, I did.
17 BY MS. SUM:
18      **Q.**   When -- when did you reach out to the U.S.
19 SEC?
20      **A.**   Well, I think I did officially, I think it was
21 in March.   It had been something that I had been
22 considering probably for well over a year at that time,
23 but I wasn't entirely sure how to go about doing it, and
24 I wasn't entirely sure if I wanted to do it.
25      But, the reality is -- and I mentioned the

161

1 thing that happened back in 2012 where I noticed Guy was
2 on the phone with someone who I assumed probably was a
3 regulator and he was just putting everything on his
4 compliance officer.   And when I -- when I asked him
5 about it, I really didn't like his response.   He just --
6 I got the feeling he was giving me one of the responses
7 like what he just gives to anyone else, like just
8 telling me what I wanted to hear.   And that's the first
9 time that I realized that, you know, Guy might just be
10 using me for my position as Chief Compliance Officer.
11 Like, he's just using that title, and if I get in
12 problems or if I get in trouble with foreign regulator
13 or the local regulator, like, it didn't matter to him.
14      And so I was thinking for a long time, because
15 I didn't like how -- I didn't like how I didn't know
16 what Guy was presenting to others about me.   And I got
17 the impression that Guy was setting me up to take the
18 fall in case it came to that.   I just got that
19 impression.
20      And I -- I saw -- I didn't bring it up
21 outright, but I tried to bring it up to him again.   I
22 said -- what was that you were talking about?   And he
23 just brushed me off again.   And, you know, that's not
24 going to make you feel comfortable.   It's going to
25 really be like okay -- and back then I was not in a

162

1 position to like really challenge Guy.   Things -- you
2 know, it was very different, you know.   Three years
3 later, 2015, 2014 -- sorry, three to four years later,
4 2015, 2016, I was a very different individual and as
5 that whole exchange just -- just exemplified, you know,
6 things were very different.
7      And, you know, I realized, you know, if Guy
8 can expect for me to redact things with the Securities
9 Commission of The Bahamas and have no care for what that
10 would do to my career -- I may have even been charged
11 with something like that -- what is he doing with the
12 U.S. regulators when he's talking about me.   And so --
13 and I was looking at all of the things that he was doing
14 with the firm, his reckless behavior, and I came to the
15 conclusion that, you know what, I need to contact the
16 U.S. authorities and let them know that me and Guy are
17 not the same.   I am not a part of his inner circle.
18      I used to see how Guy used to be going to war
19 with the regulators, and, quite honestly, it almost
20 seemed at times like he enjoyed it.   Like he would do
21 things and say things that were just very reckless.   And
22 it came across to me that he was doing those things
23 because he knew I would be the one to take the fall if
24 something happened, you know.
25      And so I said to myself, you know what, I

163

**Philip Dorsett (nonconfidential)**
**2/27/2023**

1 think I need to contact the U.S. regulators, at the very
2 least, to let them know that, you know, I'm not in
3 cahoots with Guy, you know.  I'm not a part of his inner
4 circle, you know.  I work for him, yes, but -- you know,
5 I needed to dispel whatever was happening there, you
6 know.  I had a very, very strong urge to do that.  The
7 problem is, I didn't know how to do it.  You know, I
8 even contemplated if I should go to the embassy and give
9 them a letter to give to the SEC.  I didn't really know
10 what to do.  And I started to research, and research,
11 and research, and I realized that the only way that you
12 can safely contact the SEC to bring up these type of
13 concerns was with the whistleblower program.  When I say
14 "safely," I mean, confidentially without, you know,
15 everyone knowing about it.
16        Obviously, I was still very much working for
17 Guy at the time, and so confidentiality and secrecy was
18 something very, very high on my agenda.  And so that was
19 actually the first time I heard of the whistleblower --
20 I mean, I know what a whistleblower is, but that's the
21 first time I knew of the SEC whistleblower program,
22 per se.
23        And so I started to look into it -- like I
24 said, I had been thinking -- I had been thinking and
25 praying about it for over a year at that point.  And I

164

1 realized things were not going to get better and I had
2 to -- I just had to do it, and not just to protect me,
3 but to protect the fellow officers as well because Guy
4 wasn't just setting me up to protect him.  I realized he
5 was doing the same with all his officers.  It's like he
6 treats you like pawns on a board, and he positions you
7 just so he does not get attacked.  And he positions you,
8 many times, without you even knowing, you know.
9        And I felt like I had to contact the SEC, and
10 I finally built up the courage to do so, I think it was
11 first quarter, like I say, in 2016.
12     Q.  Mr. Dorsett, did you contact the U.S. SEC
13 because of what happened in November of 2015 that we
14 just went over in the warning letter, and your response,
15 and then Mr. Gentile's response back to you, was it
16 because of that incident?
17     A.  No.  It was not because of that.  I mean,
18 that's not -- you know, that -- that really wasn't
19 anything to do with U.S. regulators, you know, that was
20 more of my concerns with really Bahamian stuff.
21        Like I said, the main reason I contacted the
22 SEB [sic] was really way back in 2012 when I heard that
23 conversation and just the subsequent behavior of Guy
24 since then, that showed me that, you know what, I can't
25 trust that Guy is doing right by me.  And that's the

165

1 reason why -- you know -- you know, I had no clue.  I
2 didn't even know how the U.S. system worked or whatever.
3 But -- I mean, by his own mouth he was blaming things on
4 his compliance officer right in front of me.
5        You know, I noticed later that he would go on
6 the calls and he would leave the office, right, and I
7 always assumed that he was still doing those
8 conversations because he never did that before.  You
9 know, he would now leave the office.  And I'm like, you
10 know, I can't trust Guy.  I just don't know.
11        And that's why I contacted the SEC.  It had
12 nothing to do with the confrontation in November.  Like
13 I said, things actually got better and, you know,
14 things -- and even when I contacted the SEC, at that
15 time, things were good.  There was nothing really bad,
16 you know what I mean.  So it wasn't -- I thought about
17 it very calmly, and I had been thinking about it and
18 praying about it for -- like I said, for about a year at
19 that time.  And so I just realized, okay, it's now or
20 never.  You know, how long you gonna hold off on this?
21 You think you need to do it, Guy is not getting better.
22 You try to talk to him.  You bring your concerns to him
23 and he makes you pay for it, you know.
24        And so that's -- that's why I reached out to
25 the SEC.

166

1     Q.  After you reached out to the SEC, did the SEC
2 ask you for more information?
3     A.  Yes.
4     Q.  And did you provide information to the SEC?
5     A.  Yes, I did.
6     Q.  Did you provide that information voluntarily
7 to the SEC?
8     A.  Yes.
9     Q.  After you filed with the -- strike that.
10        After you contacted the SEC with your concerns
11 as you've described, how did you continue doing your job
12 at SureTrader?
13     A.  With a sense of relief because at least, you
14 know, the U.S. authorities -- at least I figured they
15 were getting things from a different perspective now.
16 And so -- you know, I just did my job and -- you know,
17 continued doing my job.  I just continued doing my work
18 to the best of my ability.
19     Q.  All right.
20        MS. SUM:  I'm going to ask the videographer to
21 bring up Exhibit 10.
22        (Deposition Exhibit 10 marked.)
23        MS. SUM:  And I'll ask the videographer to
24 please scroll through for Mr. Dorsett to review.
25        Okay.  Sorry.  Scroll back down a little

167

1 further. Okay. Stop right there, please.
2 BY MS. SUM:
3     **Q.** Mr. Dorsett, do you see that there is this
4 April 12, 2016 email from a Wade Matasumoto at
5 SureTrader --
6     **A.** Yes.
7     **Q.** -- to Edward Cooper, Antonio Collie, and to
8 you?
9     **A.** Yes.
10     **Q.** Okay. And you see the subject is "Flow
11 Chart"?
12     **A.** Yes.
13     **Q.** Okay. Do you recall this particular exchange?
14     **A.** It doesn't come to memory right --
15     **Q.** Okay.
16     **A.** -- off the top of my mind. I think I would
17 need to see it.
18     **Q.** Okay. I'll bring up the attachment.
19     MS. SUM: Could we please bring up Exhibit 11?
20     (Deposition Exhibit 11 marked.)
21     THE WITNESS: Okay.
22 BY MS. SUM:
23     **Q.** Do you recognize the document that's in
24 Exhibit 11?
25     **A.** Yes.

1     **Q.** Okay. And what is it?
2     **A.** All right. So this is what we're referring to
3 as the order flow.
4     **Q.** Does this help you recall now in Exhibit 9 the
5 -- excuse me, Exhibit 10 the email, what it was
6 referring to, the flow chart?
7     **A.** Yes.
8     **Q.** Why was this document prepared?
9     **A.** Well, I -- well, I don't know if I can say why
10 it was prepared, but I know that -- right. I mean, I
11 don't know if I can answer this and say I knew exactly
12 why the document was prepared.
13     **Q.** Why -- based on what information you have
14 available to you what do you know about why it was
15 prepared?
16     **A.** Right. So Wade was brought on, I think,
17 officially as a consultant, right. And he was someone
18 who was knowledgeable of the securities business Guy
19 worked with, I think back in Stock USA, I think. But
20 Wade was brought on for a number of reasons, and one of
21 them was to try to put together an order flow.
22     And I think parts of this were -- this --
23 parts of it were so we could generate more profits, how
24 we were sending the orders to various desks, but parts
25 of it were also -- I think Guy wanted to show the order

1 flow in a particular way. And this may eventually have
2 something to do with -- at least -- I don't want to
3 speculate.
4     **Q.** I'm not asking you to speculate, but what are
5 you referring to that Mr. Gentile had reasons for the
6 preparation of this document?
7     **A.** Right. So I think this eventually may have
8 had something to do with how Guy wanted to show that the
9 clients didn't have direct market access. That's what I
10 was gonna say.
11     **Q.** All right. And what is your reason for your
12 belief that this may relate to the issue of whether
13 clients had direct market access?
14     **A.** Well, the reason why I say that is because I
15 know that came up as a big thorn with Stock USA where we
16 couldn't -- they couldn't have us with our clients
17 having direct market access. And so I remember when Guy
18 signed the agreement and sent it over to Stock USA
19 stating that our clients do not have direct market access.
20     And so when I see this with the order flow --
21 and I remember there's some discussion with this -- now,
22 again, I'm not an expert on this -- this is Wade and
23 Guy, but that's one of the things that I think about.
24     **Q.** Okay.
25     **A.** The other thing is, I know Guy was really good

1 when it came to how he was able to cipher profits by
2 having orders go through various desks and so forth,
3 too, so I think that was a part of it as well.
4     MS. SUM: Just for clarification purposes for
5 the record, I'd like to identify the Bates numbers for
6 Exhibits 10 and 11.
7     For Exhibit 10 it is SEC-FL-0348-E-0000228
8 through 229. And then for Exhibit 11 same prefix 230.
9 BY MS. SUM:
10     **Q.** So, as you continued your employment at the
11 company through later in 2016, did you encounter any
12 other difficulties or disagreements with Mr. Gentile?
13     MR. MATTHEW FORD: Objection.
14     THE WITNESS: Well, again, we went to -- back
15 to the norm which was, you know, just the usual where
16 Guy, you know, he didn't change.
17     We were not having outright confrontations
18 anymore, but -- you know, the writing was somewhat on
19 the wall. Even though Guy had indicated to me
20 everything was cool -- and everything was cool. There
21 was no more confrontation and stuff -- it was very clear
22 to me that I was out of the loop.
23     You know, during 2016 there would be a
24 management meeting and I would find out about it when
25 it's over, you know. And it's like, okay. And so --

1  and again, I'm still the registered Chief Compliance
2  Officer.
3        And so, during this time, like, I started to
4  think seriously about leaving the company.  I started to
5  really think about it.  Again, I started to really pray
6  about it and stuff like that.  And so that's how things
7  were.
8        I mean, off the top of my mind, I cannot think
9  of any major events that really happened in 2016.  I'm
10  sure there was a whole bunch of little stuff.
11  BY MS. SUM:
12     Q.  Okay.
13     A.  The next big thing would have been in -- you
14  know, a year later after, you know, that culminated with
15  my departure from the company.
16     Q.  Okay.  So let's hold off.
17     MS. SUM:  You can take down Exhibit 11.
18  BY MS. SUM:
19     Q.  Let's talk about your ultimate departure from
20  the firm.  I believe you were just saying that the next
21  event occurred sometime in 2017.
22        What was the -- the genesis of the issue that
23  ultimately led to your departure from the firm?
24     A.  Right.  So it had to do with Stock USA and our
25  clients and if -- whether or not they had direct market

172

1  access or not.
2        Now, again, I -- myself and Mr. Collie, we --
3  we were there and sort of in the beginning when Guy
4  explained to us why he had to show the Stock USA why we
5  did not have direct market access and, you know, we were
6  there.  Mr. Cooper didn't come on until much later.  So,
7  in essence, what I'm saying is that I knew that our
8  clients had direct market access.  All right.
9        The problem is, one of our clients mistakenly
10  contacted Stock USA and was complaining about a trade.
11  And the genesis of what he was saying seemed to imply
12  that he had direct market access.  And, of course, Stock
13  USA now has a problem.  They have a dilemma.  And so
14  they sent, I think, Mr. Collie, an official email saying
15  please explain this, right.  So that's how it started.
16        And so through a bunch of emails back and
17  forth, Mr. Collie, in essence, wanted me to respond to
18  Stock USA officially saying no, we do not have direct
19  market access.  Right.
20        I obviously did not want to do that.  At that
21  time, you know, I was -- like I said, I was a very
22  different person from when I first entered the firm way
23  back in 2012.  At this time I was very cautious about
24  anything that I signed, anything that I put my name
25  to -- especially dealing with like foreign -- because I

173

1  got the impression that Stock USA was doing this for
2  some regulatory reason.  It wasn't just their choice.
3  They was requiring this of us for some regulatory
4  reason.  That was my impression.
5        So I did not want to -- in essence, I would
6  have been attesting to something -- something that might
7  go before a regulator that I knew -- that I outright
8  knew wasn't true.  Right.  And so I didn't want to say
9  that in the email chain, so I was just sort of back and
10  forth with Collie.  In essence, I was trying to get him
11  to do it.  Right.  And I can't say what his reasons
12  were.  I can speculate, but he was trying to get me to
13  do it.  Right.  None of us would do it.
14        And finally, like I -- I wrote something to
15  the effect of, are you authorizing me to do this?
16  Something to that effect, and I took offense to that.
17  He said, no.  I'm not authorizing you to do it.  You
18  must do it based on your own -- or something.  In fact,
19  it got like into an argument.  Right.  And it got
20  heated, and he said something that was, I thought, very
21  strange.  He said, Philip, you know, he says, you always
22  wash your hands of the stuff we are doing in this firm.
23  You know, he actually wrote that in the email.  I
24  thought that was just very strange.  And where --
25     Q.  Okay.  So I'm going to just pause you and

174

1  bring up Exhibit 13.
2     MS. SUM:  While it's coming up, I will note
3  the Bates stamp range for Exhibit 13.  It is
4  SEC-FL-03848-E-0001195 through 1203.
5     THE VIDEOGRAPHER:  Counsel, what exhibit did
6  you say you wanted up?
7     MS. SUM:  13.
8     THE VIDEOGRAPHER:  Okay.
9     MS. SUM:  And I'll ask the videographer to
10  please scroll through it so that Mr. Dorsett can review
11  Exhibit 13.
12     (Deposition Exhibit 13 marked.)
13  BY MS. SUM:
14     Q.  Is this the email exchange that you were just
15  testifying about?
16     A.  Yes.
17     Q.  And on page 3 -- I want to direct your
18  attention to the bottom of page 3 of the -- okay.
19     MS. SUM:  If you could continue scrolling just
20  so it leaves the last original message and starting on
21  page 4.
22  BY MS. SUM:
23     Q.  Okay.  So I know you can't see what's on
24  page 4, but do you see where there's an email from
25  Mr. Cooper to you on July 28, 2017, and then it will

175

1  continue scrolling.  Yep.  Stop right there.
2      What is -- what is the message from
3  Mr. Cooper?
4      A.  Let me just read this again.  Right.  So I
5  think this is ultimately what -- because there's been
6  some communication between Mr. -- well, after the big
7  confrontation between myself and Mr. Collie, Guy was
8  getting upset.  Right.  And so Mr. Cooper was brought in
9  and he was now going to be the person who was going to
10  respond to Stock USA.
11      And I think -- I think he was sending this to
12  me to show me that what he was going to say, but I could
13  be wrong about that.  But, eventually, he -- like I say,
14  he consulted with Guy, and he responded to Stock USA.
15      MS. SUM:  Can I ask the videographer to please
16  scroll up closer towards the top of -- keep scrolling.
17  Okay.  Right -- slow down right here.
18  BY MS. SUM:
19      Q.  Do you see the email dated July 28, 2017, from
20  Mr. Gentile to you with cc to the
21  executives@SureTrader.com?
22      A.  Yes.
23      Q.  Okay.  And did you discuss Mr. Gentile's email
24  to you?
25      A.  Sorry, did I?

                              176

1      Q.  Did you discuss what Mr. Gentile says -- said
2  in this email to you?
3      A.  You said, did I discuss?
4      Q.  Yes.
5      Did you discuss it -- did you and Mr. Gentile
6  discuss what's in this July 28th, 2017, email at 11:43?
7      A.  No.  I think -- I don't know if me and Guy --
8  well, he -- he told me that, you know, my response was
9  not what they wanted to hear.  Right.  And that's what
10  he was -- he was very upset.  Right.
11      And then, I think, after this, this is we
12  Mr. -- Mr. Cooper got involved, and that's why the in
13  email he says this isn't what they want to hear, guys.
14  And so that's -- but I didn't -- I don't think I
15  responded to Guy.
16      MS. SUM:  All right.  We can scroll up just so
17  you can see the rest of the email.
18      Will the videographer please scroll up.  So
19  we'll pause for a second.
20  BY MS. SUM:
21      Q.  Here do you see that there's an email from
22  Yaniv Frantz?
23      Who is Yaniv Frantz?
24      A.  Right.  So he was brought in, I think, as an
25  operations guy.  He was someone known to Guy.  And he

                              177

1  came in and he was the Chief of Operations.
2      Q.  And he provides a response here?
3      A.  Yeah.  Because I think the email that Guy sent
4  went to all the -- all the -- all of us.  Right.  And so
5  I think, at this point, Yaniv is trying to figure out
6  what's going on.
7      Him and Ed would not have been aware of the
8  actual facts of the matter.  The only ones who were
9  really aware was myself, and Mr. Collie, and Guy.
10      MS. SUM:  Let's scroll further up from
11  Mr. Frantz's email.  And then you see -- whoops.  Sorry.
12  Slow down.  There.
13  BY MS. SUM:
14      Q.  Do you see the email from you in response?
15      A.  Right.  The email was sent to Mr. Collie for
16  his approval.
17      Q.  Okay.  I mean, what did you understand, at
18  this point, was a potential resolution to this
19  disagreement?
20      A.  Well, the problem is, there was no resolution.
21  I -- okay.  I was not going to do -- I was not going to,
22  basically, attest to something that I knew was not true.
23  All right.  And, you know, it was -- the pressure was
24  there.  So, the only resolution would be for me to just
25  send it out and just do what Guy wanted.  And, at that

                              178

1  point, I had already decided, you know, I'm not going to
2  do that anymore.  You know, I have to be very careful
3  when dealing with Guy.
4      And so I sort of, you know, held my ground, so
5  to speak that, you know, I was just -- I was not going
6  to do this.  And, yes, so this -- and so it got resolved
7  in the sense that I think Mr. Cooper eventually
8  responded to Stock USA and told them, in effect, that
9  the client was just wrong.  That they don't -- our
10  clients do not have direct market access.
11      Q.  Did you agree with that response?
12      A.  Well, no.  I don't agree with that response.
13  That's inaccurate.  It was inaccurate.
14      MS. SUM:  Let's scroll further up in the email
15  chain, please.  Okay.  Stop there, please.
16  BY MS. SUM:
17      Q.  Okay.  Do you see an email from Mr. Collie
18  dated July 28, 2017?
19      A.  Yes.
20      Q.  In response to you, Mr. Frantz, Mr. Gentile,
21  cc to the executives?
22      A.  Yes.
23      Q.  Is this the message from Mr. Collie that you
24  were referring to earlier about you washing your hands?
25      A.  Correct.  All right.  And -- and, again, I was

                              179

1  just -- you know, and he's very -- the email is very --
2  I don't know if everyone can see what I'm seeing, but
3  it's very -- you know, somewhat insulting.  You know, he
4  used some harsh language and stuff, which is actually a
5  first.  Right.
6        And so -- but I found it interesting that he
7  said, you always wash your hands of the stuff we do in
8  this firm.  Right.  And mind you that's probably a half
9  truth.  I would like to think I try to keep my hands
10  clean so I don't need to wash them, but I got his point.
11       After this I basically just -- I gave -- I
12  gave an answer very similar to the answer what I gave to
13  -- what I gave to Guy when I sent him the letter, and I
14  told him I said, well -- I told him something to the
15  effect of, I think, well, my answers are going to be in
16  line with, you know, things that I can explain before a
17  competent regulator.  I said something to that effect.
18  Or I might have said competent authority.
19       MS. SUM:  I'm going to ask the videographer to
20  please go to the very first chronological email in
21  exhibit -- excuse me, 13.  So it's at the very bottom of
22  the exhibit.  Okay.
23  BY MS. SUM:
24       Q.  Is this the name of the customer that made the
25  inquiry?

1        A.  Yes.  That's the one that contacted Stock USA.
2        Q.  Okay.  And what's his name?
3        A.  Chris Penalver.
4        Q.  Had you ever separately had any dealings with
5  Mr. Penalver?
6        Did you ever talk to Mr. Penalver?
7        A.  I -- I may have -- I don't know -- in the
8  course of, you know, just working at the firm, but I
9  can't really recall.
10       Q.  After this email exchange, how would you
11  describe your relationship with Mr. Gentile?
12       A.  Well, after this email exchange, if I recall,
13  I think I was informed the very next day or the day
14  after that I was being let go.  And so -- and it was
15  actually Mr. Cooper who let me know.
16       And I'll always remember, it took him over an
17  hour to say -- like it was so difficult for him to come
18  out and say it.  I was like, you know, you could say it,
19  you know.  But he informed me that Guy decided to let me
20  go.
21       I think -- and I can't remember the exact
22  details of how it happened, but eventually they made me
23  an offer which, on the surface, seemed like a very good
24  offer.  They offered to keep me on the payroll for an
25  entire year and I would continue to get paid.  I would

1  even continue to get my benefits for an entire year.
2  And, in addition, they would also give me a reference
3  letter -- a good reference letter.  And, again, that on
4  the surface --
5        Q.  Did you accept that offer?
6        A.  No.  I did not.  I thought about it, and --
7        Q.  Why -- why didn't you take the money and the
8  benefits that they offered you?
9        A.  Well, the problem is -- the problem that I had
10  in SureTrader was that my title as the registered
11  compliance officer was just being used and sometimes
12  probably not without my knowledge and, you know, they're
13  making decisions that I have to be accountable to for
14  the regulator.  And I'm like, well, if I'm not even
15  here, but yet they have my title to do whatever they
16  want with, that's not going to make things better for
17  me.  And, you know, I suspected that's one of the
18  reasons and -- well, that's one of the reasons why I was
19  very hesitant.
20       I suspected part of the reason why Guy didn't
21  want to officially fire me is because in the Bahamas if
22  you -- if your -- if a registered compliance officer or
23  a registered CEO if they -- even if they resign, if they
24  leave the company for whatever reason, the company has
25  to report that to the regulator.  Okay.  And Guy, for

1  whatever reason, did not want to report to the regulator
2  that, you know -- even earlier when I was giving him the
3  opportunity, I said, well, okay.  You could just remove
4  me from that position and officially give it to
5  Mr. Cooper.  Like he just did not want to do that.  Like
6  he wanted to keep my title and position to do with as he
7  wished.
8        And I thought about that, and I was like, you
9  know what, no.  I think it's best if I do a clean split.
10  A clean cut.  Obviously I wasn't going to get all the
11  money.  You know, it was a good offer.  You know, I
12  would have, in essence, been getting a paycheck without
13  working for a whole year.  Right.  But I was like, the
14  risk of it is too much.  Right.  And, at that point, you
15  know, it just was too much.
16       So I came back to them and I said, no.  You
17  know, we'll just do a clean split.  And Guy was upset.
18  He was like well, we're making you such a good offer.
19  Why are you so -- what's the word -- why are you so -- I
20  don't know if it was ungrateful -- anyway, they thought
21  that I was -- you know, I was not being fair because
22  they made such a good offer.
23       I didn't tell them the reasons why.  I just
24  said, no.  Let's just do a clean split.  And that's what
25  they did.  They did the clean split.  They paid me what

1 was required by law, and they still gave me my good
2 reference letter.
3       And so things actually departed relatively
4 well.  I have to give it to Guy.  I think he made an
5 effort to try to make the split amicable, you know.  And
6 so we split.
7    Q.  And what was the effective date of your
8 departure from the company?
9    A.  I don't remember the actual effective date,
10 but it was August something.  I would have to check my
11 records to see the actual date on the letter.
12    Q.  August of 2017?
13    A.  Yes.  2017.
14    Q.  All right.
15       MS. SUM:  We can take down Exhibit 13, please.
16 I'd like to bring up Exhibit 12, please.
17       (Deposition Exhibit 12 marked.)
18       MS. SUM:  And I ask that the videographer
19 scroll to the -- through the first 12 pages of
20 Exhibit 12.
21       Okay.  Thank you.
22       I realized we scrolled through that quickly,
23 Mr. Dorsett.
24       Could we go back to the first page and I'll
25 ask the questions from there.

184

1       (Pages 186 to 187 were designated confidential
2 and are bound separately.)
3                    - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

185

1       (The following portion of the transcript was
2 designated as nonconfidential)
3       MS. SUM:  All right.  Let me -- hold on one
4 moment, please.
5 BY MS. SUM:
6    Q.  After your departure from SureTrader did you
7 communicate further with the U.S. SEC?
8    A.  Yes.
9    Q.  Did there come a time that you provided a
10 declaration to the SEC?
11    A.  Yes.
12       MS. SUM:  I'd like to bring up Exhibit 15.
13 I'd ask -- let me go ahead and identify the Bates.  It
14 is SEC-FL-03848-E-0001431 through -- oh, it's just a
15 single Bates.  1431.
16       And could the videographer please scroll
17 through this declaration?  And then we'll, please, pop
18 back up to the first page.
19       (Deposition Exhibit 15 marked.)
20 BY MS. SUM:
21    Q.  Mr. Dorsett, I realize the scrolling went a
22 little bit quickly, but is this a declaration that you
23 provided to the SEC?
24    A.  Yes, it is.
25    Q.  As we sit here today, are you aware of

188

1 anything that's inaccurate or untrue in this
2 affidavit -- this declaration?
3    A.  Not -- I'm not aware of anything that's
4 untrue.
5    Q.  And did you provide this declaration to the
6 SEC voluntarily?
7    A.  Yes.
8    Q.  And what was the date of this declaration?
9    A.  This was 2020.  I think it was September 2020
10 is what we saw.
11       MS. SUM:  Yes.  Videographer if you could
12 please just scroll to the very last page.
13 BY MS. SUM:
14    Q.  Do you see the date, Mr. Dorsett?
15    A.  Correct.  So it was the 1st of September 2020.
16       MS. SUM:  And you can take down Exhibit 15.
17       And, you know what, I need to do cleanup on
18 Exhibit 12 -- you don't have to bring it up, but that
19 actually was stamped confidential.
20       Counsel, are you amenable to me basically back
21 designating it since it has a confidential stamp -- that
22 is the application of Mr. Penalver?
23       MR. MATTHEW FORD:  No.
24       MS. SUM:  You're not willing to agree to that?
25       MR. MATTHEW FORD:  No.  I am willing to agree.

189

1  We already discussed this.  You can -- you're
2  designating it confidential for the purpose of this, and
3  then if we have the argument, we'll have it somewhere
4  down the line, but with regards to the transcript, it
5  will be designated confidentially, yes.
6       MS. SUM:  Okay.  So I'm just instructing the
7  court reporter to note that Exhibit 12 is stamped
8  confidential and the questions that resulted from
9  Exhibit 12, please.
10 BY MS. SUM:
11      **Q.**  All right.  When you went to go work for
12 SureTrader, what kind of technology were you provided?
13      **A.**  Well, Guy bought both me and himself two
14 laptops, and when we started off, we just used those.
15      **Q.**  And did you ever use a personal computer or a
16 personal laptop to conduct work for SureTrader?
17      MR. MATTHEW FORD:  Objection.  The leading
18 again.
19      THE WITNESS:  Yes.  I used my personal
20 computer for work as well.
21 BY MS. SUM:
22      **Q.**  Was Mr. Gentile aware of you using your
23 personal computer?
24      MR. MATTHEW FORD:  Objection.  Leading.
25      THE WITNESS:  Yes.  He was aware.  He would

                                190

1  see it open on my desk.
2  BY MS. SUM:
3       **Q.**  What email did you use to conduct business for
4  SureTrader?
5       **A.**  Well, I used my SureTrader email, just the
6  philipdorsett@suretrader.com.
7       MS. SUM:  And let me bring up Exhibit 16.
8       (Deposition Exhibit 16 marked.)
9       MS. SUM:  And I will ask the court reporter to
10 scroll the document.
11      Thank you.
12 BY MS. SUM:
13      **Q.**  All right.  Mr. Dorsett, do you recognize
14 Exhibit 16?
15      **A.**  Yes.
16      **Q.**  And what is Exhibit 16?
17      **A.**  So this is the declaration I made on the 27th
18 of June, 2022.
19      MS. SUM:  And let's -- could you please scroll
20 all the way back up to the top?
21 BY MS. SUM:
22      **Q.**  Mr. Dorsett, do you see that there is what we
23 would describe as a court case and a number on this
24 document?
25      **A.**  Yes.

                                191

1       **Q.**  Okay.  This is a declaration that was
2  submitted in the SEC's lawsuit against Mr. Gentile and
3  SureTrader, yes?
4       MR. MATTHEW FORD:  Objection.  Leading.
5       THE WITNESS:  Yes.  It appears to be a legal
6  document.
7  BY MS. SUM:
8       **Q.**  And, as you sit here today, are you aware of
9  any inaccuracy or incorrect statement in Exhibit 16?
10      **A.**  I am not aware of any inaccuracies.
11      **Q.**  And did you provide this declaration
12 voluntarily to the SEC?
13      **A.**  Yes.
14      MS. SUM:  All right.  I'm going to ask that
15 Exhibit 17 -- sorry.  Take down Exhibit 16 and put up
16 Exhibit 17.
17      (Deposition Exhibit 17 marked.)
18      MS. SUM:  I'm noting the Bates range for this
19 document is GENTILE0004495 through 4497, and it's
20 designation as confidential.
21      I ask the videographer to please scroll
22 through this document for Mr. Dorsett to review.
23      Okay.  And then please scroll all the way back up.
24      (Pages 193- 198 were designated confidential
25 and are bound separately.)

                                192

1  BY MS. SUM:
2       **Q.**  When was the last time you spoke with
3  Mr. Gentile?
4       **A.**  The last time I spoke with Guy was probably at
5  some point in August 2017.
6       **Q.**  Have you ever talked about the SEC's lawsuit
7  against Mr. Gentile and SureTrader with Mr. Gentile?
8       **A.**  No.
9       **Q.**  Have you -- other than the SEC, have you
10 discussed the SEC's lawsuit against Mr. Gentile and
11 SureTrader with anybody else?
12      **A.**  No.
13      **Q.**  Have you ever seen Mr. Gentile's court filing
14 titled "Answer and Affirmative Defenses" in this
15 lawsuit?
16      **A.**  I -- I don't remember.  I cannot say that I
17 have or have not.
18      **Q.**  Did Mr. Gentile ever talk to you about any
19 U.S. authority investigating either him or SureTrader?
20      **A.**  Yes.
21      **Q.**  And what were those discussions?
22      **A.**  Well, again, like I said, Guy used to have
23 numerous regulators coming after him.  The first one was
24 FINRA.  That was the big one.  That was, I guess, really
25 the scary one.

                                199

**Page 200**

1  I don't know if it was so much him talking to
2  me, but he was certainly talking out loud, you know.
3  But he also made mention of the other -- of the others
4  as well, that -- you know, the SEC, they're coming after
5  him again. He doesn't really have a high opinion of
6  regulators. Every time he refers to the SEC it's a four
7  letter word, idiots. It's like -- so sometimes it would
8  seem like he just is very flippant, like he doesn't
9  care. And then other times it looks like he's taking it
10  very serious.
11      And that's one of the things that sort of
12  concerned me with his behavior. Like, he would take
13  very serious matters like it's a joke. Like oh, the SEC
14  they're just a bunch of idiots, don't worry about it,
15  Phil. Blah, blah, blah. And I would say, okay. Well,
16  maybe you should -- you know, maybe you should do things
17  different, or maybe this and that. No.
18      So it's -- he would talk to me, but he
19  wouldn't go in-depth. He would let me know they're
20  coming after me again, but no, don't worry about it.
21  They're idiots. But what we need to do is this, and
22  this, and this, and this. So it was that type of
23  conversation. He certainly didn't really take me into
24  his confidence.
25      Q.  Did you discuss with any SureTrader employee

**Page 201**

1  any U.S. regulatory authority investigating Mr. Gentile?
2      MR. MATTHEW FORD: Objection.
3      THE WITNESS: Well, yes. Some of the other
4  senior officers were very concerned.
5      Mr. Collie was very concerned about the
6  investigations. And he had some very serious concerns,
7  and he -- well, yeah. He -- he and I would discuss
8  them.
9  BY MS. SUM:
10      Q.  What were Mr. Collie's specific concerns?
11      A.  Well, his concerns was -- was if these things
12  could somehow endanger him. Right. He was the Chief
13  Financial Officer -- you know, he had brought some
14  concerns to me before as Chief Compliance Officer. He
15  did not like how the funds of the firm were being
16  handled, and how Guy just had sole authority to move
17  client funds wherever he wanted without anyone knowing.
18  He was bothered by that and he brought it to my
19  attention, I think -- well, I know he brought it to my
20  attention. So if something ever came about it, he would
21  be able to say he discussed it with me who was the
22  compliance officer.
23      And so he was concerned -- he was concerned.
24  I don't know if the junior staff -- I think they were
25  concerned, but I wouldn't -- I didn't really have

**Page 202**

1  discussions with them. I would just say oh, no.
2  Everything is going to be okay and stuff like that. But
3  Mr. Collie was very concerned.
4      Justin was concerned, too.
5      Q.  I'm sorry. Who was?
6      A.  I said, Justin was concerned, too. It was --
7  you know --
8      Q.  What were -- this is Justin Ritchie you're
9  talking about?
10      A.  Yes.
11      Q.  Okay. What were Mr. Ritchie's concerns about
12  U.S. regulators and SureTrader?
13      A.  Well, one of the big things that we were all
14  talking about and it was -- I don't think anybody liked
15  Guy's response -- I'm referring to that "Bloomberg"
16  article that Guy did. That was just horrific and no --
17  even -- you know, some of the other officers were a lot
18  closer to Guy, I would say. No one was impressed by
19  that. They were all horrified by that. I was horrified
20  by that, and I actually told Guy.
21      So I told him that was a huge mistake. You
22  know, that made absolutely no sense. I told him, again,
23  you're just putting us at risk. I said yes. The U.S.
24  authorities, you have these problems with them, but you
25  throw in fuel on the fire by saying these very insulting

**Page 203**

1  things. I told him --
2      Q.  I apologize. I'm going to pause you for a
3  second.
4      What "Bloomberg" article are you referring to?
5      A.  Guy wrote a "Bloomberg" article saying
6  something about him going rogue. About he -- he's not
7  helping the FBI anymore, but instead he's going -- he
8  started recording the FBI. And in the article he refers
9  to the Department of Justice. He refers to the FBI. I
10  think he refers to the SEC. He uses lots of
11  explicatives, and it is a very -- it was very poor and
12  out of taste. And, basically, he was insulting the
13  whole U.S. authoritative system it almost seemed.
14      But the part where I had a big problem, I told
15  him, I said, the gist of this article comes across
16  like -- like it almost comes across like you're saying
17  hey, I'm in the Bahamas. You can't do anything to me.
18  F you. That was the gist of it.
19      And I said, Guy, the Commission is not going
20  to be impressed when they read this. I said -- and, you
21  know, he was just laughing -- when I first came to him,
22  he actually thought that I came to compliment him. I
23  mean, I don't understand. I said, Guy, this article.
24      And he was like, oh, did you read it?
25      I said, yes. I read it. It's horrific.

1    He said, no.  It's not that bad.
2    And I said, Guy, what are you doing?
3    And then he just, oh, you know, they're a
4  bunch of idiots and this, and that.
5    And I said, no.  I said, but Guy, any
6  regulator on the planet who reads this, they're not
7  going to be impressed, including the Securities
8  Commission of The Bahamas.
9    And it's like he could not see that.  And the
10  other officers were -- Mr. Collie was upset -- I think
11  me and Mr. Collie spoke about this, but I remember
12  speaking to one of the other ones -- I don't remember if
13  it was Mr. Collie or Justin at the time, but I was not
14  the only one who was upset about this, you know.  And I
15  tried to plead with Guy.  I said, well, listen, that is
16  just -- in fact, I think the Commission actually called
17  him in to explain himself.  You know, it was just -- and
18  that's the type of stuff he did.  Like, he did these
19  completely reckless things putting us at risk.
20    At that time, if you were associated to Guy,
21  that, quite literally, that would be an equivalent of
22  having a close association to Putin right now in the
23  eyes of America.  It's like really -- you really want to
24  do that to your officers?
25    And it was just crazy, you know.  It was

204

1  crazy.  But that's the type of stuff Guy did.  Very
2  reckless, and it's like carefree.
3    MS. SUM:  I'd like to take a short break here,
4  and my expectation is that we'll -- we will wrap up
5  before 4:30.
6    THE WITNESS:  Okay.
7    MS. SUM:  Okay.  Is 10 minutes okay with you,
8  Mr. Dorsett, and the videographer, and the court
9  reporter?
10    THE VIDEOGRAPHER:  Yes.  Do you want to go off
11  the record?
12    MS. SUM:  Yes.
13    THE VIDEOGRAPHER:  Time is 3:57 p.m.  We are
14  now off the record.
15    (Off the record at 3:57 p.m.  Back on the
16  record at 4:11 p.m.)
17    --o0o--
18    THE VIDEOGRAPHER:  The time is 4:11 p.m.  We
19  are now on the record.
20  BY MS. SUM:
21    Q.  Mr. Dorsett, did Mr. Gentile ever tell you
22  that he discussed SureTrader and solicitation of U.S.
23  customers with any U.S. authority?
24    A.  That he discussed SureTrader --
25    MR. MATTHEW FORD:  Objection.

205

1    THE WITNESS:  That he discussed SureTrader
2  with U.S. authorities?
3  BY MS. SUM:
4    Q.  No.  Discussed soliciting U.S. customers with
5  the U.S. authorities?
6    A.  No.  I don't -- I don't think Guy had
7  discussions with the regulators.
8    Q.  But did he tell you that he discussed with the
9  regulators?
10    A.  No.
11    Q.  Did ever tell you that U.S. regulators,
12  such as the DOJ, or the FBI, or the SEC told him that he
13  could solicit U.S. customers?
14    MR. MATTHEW FORD:  Objection.  Leading.
15  Compound.  Form.
16    THE WITNESS:  Well, no.  He never told me that.
17  BY MS. SUM:
18    Q.  Did Mr. Gentile ever tell you that the
19  U.S. Government assured him that SureTrader's acceptance
20  of non-solicited U.S. clients conformed with U.S.
21  securities laws?
22    MR. MATTHEW FORD:  Objection.  Leading.
23    THE WITNESS:  No.  He never told me that.
24  BY MS. SUM:
25    Q.  Did Mr. Gentile ever tell you that the

206

1  U.S. Government assured him that SureTrader's use of the
2  unsolicited acknowledgement agreement conformed with
3  U.S. securities laws?
4    MR. MATTHEW FORD:  Objection.  Leading.
5    THE WITNESS:  He -- well, he basically told us
6  that this would be acceptable, but he never made it seem
7  as if -- like persons specifically told him it was
8  acceptable if that's what you're asking.
9  BY MS. SUM:
10    Q.  Did he say that someone from the
11  U.S. Government told him that using the unsolicited
12  acknowledgement agreement conformed with U.S. securities
13  laws?
14    A.  No.
15    MR. MATTHEW FORD:  Objection.  Leading.
16    THE WITNESS:  No.  He never told me that.
17    MS. SUM:  I'm going to -- I'm going to ask
18  that we bring back up Exhibit 15.  And then please
19  scroll to page 2.
20    Actually, just to show Mr. Dorsett what it is,
21  could you please pop up to page 1?
22  BY MS. SUM:
23    Q.  Mr. Dorsett, I'm referring to Exhibit 15 which
24  you previously acknowledged is your declaration.
25    A.  Yes.

207

1    Q.  I point your attention to paragraph 10 on
2  page 2.
3         Do you see where it says,
4            "At all times that I worked at
5         SureTrader, SureTrader traded
6         exclusively in U.S. securities"?
7         Do you see that?
8    A.  Yes.
9    Q.  Is that a -- is that an accurate statement?
10   A.  Well, what I probably should say is, to my
11  knowledge.  In the beginning when Guy was discussing the
12  opening of the firm, he made it very clear that he
13  wasn't interested in trading foreign securities, that
14  his expertise was with U.S. securities.
15        And so, as far as I know, I never really, to
16  my understanding, had knowledge of persons trading other
17  markets.
18        MS. SUM:  Please scroll to page 3,
19  paragraph 15.
20  BY MS. SUM:
21   Q.  Do you see in paragraph 15 where it says,
22            "Gentile's efforts at promoting
23         SureTrader's brokerage services to
24         U.S.-based customers resulted in a
25         steady increase in new accounts.  From

208

1         2012 through 2017, roughly 80 percent
2         of SureTrader's customers were based in
3         the U.S.  I know these facts because I
4         reviewed the applications for new
5         customers until 2014.  The SureTrader
6         staff responsible for new accounts from
7         2014 until I left SureTrader in 2017
8         reported this information to me, and I
9         reviewed customer records in 2017."
10        Is paragraph 15 accurate?
11   A.  Yes.  Now, what I would say is that's me
12  looking back over the entire time that I was at
13  SureTrader.
14        So, for instance -- let's see, when I have
15  roughly 80 percent of SureTrader's customers were based
16  in the U.S., that's because I actually did a study one
17  time at Guy's request.  He wanted to know how much U.S.
18  clients we had.
19   Q.  When -- I'm sorry.  When did you do this
20  study?
21   A.  I think that was in -- that would either have
22  been in 2015 or 2016.  I want to say 2016.
23   Q.  Did Mr. Gentile -- strike that.
24        Did Mr. Gentile tell you why he wanted you to
25  do that study?

209

1    A.  He didn't tell me why, but, I mean, I was able
2  to decipher that it had something to do with the
3  investigations, I think, into him.
4    Q.  Okay.  And did you, in fact, perform a review
5  of the percentage of SureTrader's customers that were
6  based in the U.S.?
7    A.  Yes, I did.
8    Q.  Okay.  And how did you conduct that review?
9    A.  I think -- well, what I did was on a monthly
10  basis I chose the last, I think, business day of the
11  month, and I looked at all the clients in iBoss as of
12  that date, and I just basically sorted it on
13  jurisdiction, and then I got the percentages, and that's
14  when I got to, basically, about 80 percent.
15        So it was like 12 amounts because I did it per
16  month for the full year.
17        Now, I don't think it was -- it was a full
18  year in total, but it wasn't the end of 2016.  I just
19  did it to encompass a full year.  But I -- I don't
20  remember the exact date it was done to be honest.
21   Q.  But you performed it in approximately 2016?
22   A.  Yes.  I do remember that.
23   Q.  At the time of your departure is it your
24  belief that it was still approximately 80 percent of
25  SureTrader's customers were based in the U.S.?

210

1    A.  Yeah.  I had no reason not to think that.
2    Q.  I'm going to turn your attention to page 4,
3  paragraph 20.  If you want to take a moment to read to
4  yourself paragraph 20, and I'll ask you a specific
5  question after that.
6    A.  Okay.
7    Q.  All right.  I'm going to go up five lines from
8  the bottom of paragraph 20 starting with "Pursuant to
9  Gentile's instructions."
10        Okay.
11   Q.  Did you create an account for each U.S.-based
12  applicant who completed an application and signed the
13  unsolicited acknowledgement agreement pursuant to his
14  instructions?
15   A.  Yes.  The clients' accounts were opened.
16   Q.  And your statement that,
17            "No other evaluation was conducted
18         by me, nor requested of me, nor, to my
19         knowledge, was any other evaluation
20         conducted at SureTrader to determine
21         whether the U.S.-based customer had
22         been solicited by SureTrader"?
23   A.  That's correct.
24   Q.  I'm going to go to page 5, paragraph 24.  If
25  you could please take a moment to read to yourself

211

1 paragraph 24.
2    A.   Okay.
3    Q.   All right.  Going to the third line where it
4 says,
5         "Gentile instructed me, and I
6         instructed staff at SureTrader, to
7         accept any account application from a
8         U.S. resident as long as their
9         application was complete, including
10        submission of the signed unsolicited
11        acknowledgement agreement.  No further
12        inquiry into whether the applicant had
13        been solicited by SureTrader was
14        conducted."
15    Is that accurate?
16    A.   Right.  So when I say "application was
17 complete," that includes the due diligence as well.  So,
18 yes.  That's accurate.
19    Q.   So I'm going to turn your attention to
20 paragraph 25.  If you could read that to yourself,
21 please.
22    A.   Okay.
23    Q.   Okay.  Turn your attention to the second
24 sentence,
25        "I did not deny any account

212

1         application nor am I aware of any
2         SureTrader account application that was
3         ever denied because the applicant was a
4         U.S. resident."
5    Is that accurate?
6    A.   That's accurate.
7    Q.   Turn your attention to paragraph 29.  Please
8 read it to yourself.
9    A.   Yes.
10    Q.   Okay.  So earlier you testified that you
11 reviewed the customer records.
12    Is that the same instance that you describe
13 here in paragraph 29?
14    A.   No.  This is different.
15    Q.   Okay.  Can you please explain what happened
16 when Mr. Gentile made the request referenced in
17 paragraph 29?
18    A.   Right.  So in this one he specifically wanted
19 me to state that most of our clients were not U.S.
20 residents.  All right.  And I don't think I did the
21 comprehensive review as I did in the other one, but it
22 didn't take much for me to conclude that that was not
23 the case.
24        And so I told him, you know, I couldn't give
25 you something in writing to state that some -- that most

213

1 of our clients are not U.S. residents.
2    Q.   What was the context for the request?
3    A.   Well, my understanding is that he wanted this
4 because of, you know, foreign regulators' cases against
5 him, and this was going to be to help his case.
6    Q.   And when you refer to "foreign regulators,"
7 what -- who is that specifically?
8    A.   Well, the SEC.
9    Q.   And did you have any further discussion with
10 him in response to his request to create the document
11 referenced in paragraph 29?
12    A.   Let me just add, also, this is, perhaps, one
13 of the things that moved towards me receiving that
14 warning letter, because I'm looking at the dates, too.
15 And I think I got -- this would have been something that
16 I denied probably weeks before I received that warning
17 letter, that just came to mind.
18        I'm sorry, but could you repeat the question?
19    Q.   So did you have any further discussion with
20 Mr. Gentile regarding his request for you to provide
21 this document referenced in paragraph 29?
22    A.   No.  Actually, what I recall is when I told
23 him no, I couldn't let it go.
24    Q.   All right.  I'm going to turn your attention
25 to page 6, paragraph 30.  And please read it to

214

1 yourself.
2    A.   Okay.
3    Q.   So is it accurate when you stated in the
4 declaration,
5         "When I left SureTrader in 2017, the
6         vast majority of customers remained
7         U.S. residents who were solicited by
8         advertising websites Gentile used for
9         solicitation efforts"?
10    A.   Right.  So what I really should -- I should
11 explain that.  I was basically referring to the affiliates.
12    Q.   But is paragraph 30 accurate?
13    A.   Yes.  Uh-huh.
14    Q.   When you left your employment in August
15 of 2017, was Mr. Gentile still in charge of SureTrader,
16 making decisions for the company?
17    MR. MATTHEW FORD:  Objection.  Leading.
18    THE WITNESS:  I don't know if he officially
19 was still an officer, but he certainly was making
20 decisions, including the one to fire me.  But I'm not
21 sure if he was registered as an officer at that time.
22 BY MS. SUM:
23    Q.   To the best of your knowledge, was he still
24 making decisions for the company like you previously
25 described in your testimony?

215

1   A.  Yes.
2   Q.  Did you ever express any concerns to
3   Mr. Gentile about the number and percentage of
4   SureTrader's clients being from the U.S.?
5       MR. MATTHEW FORD:  Objection.  Leading.
6       THE WITNESS:  No, I did not.
7   BY MS. SUM:
8   Q.  And why is that?
9   A.  Well -- okay.  I remember I was at SureTrader
10  for many years.  Right.  And so my reasons for not
11  having a discussion with him probably changed over the
12  years.  It was the latter, and it didn't make sense --
13  it didn't make sense -- well, first off, Guy's -- well,
14  it didn't make sense me trying to bring up stuff with
15  Guy that I knew was just going to cause an argument.
16      If I was going to cause an argument, I wanted
17  it to be based, perhaps, on Bahamian regulations.
18  Something that -- so I had to sort of choose my battles.
19  Right.
20      In the beginning I probably wouldn't have had
21  the conversation with him just through naivety.  And so,
22  you know, I never really had that type of conversation
23  with him, but it was for different reasons.
24  Q.  Do you know if SureTrader, when it conducted
25  trades, whether -- strike that.

216

1       "What currency did customers trade
2   in with SureTrader?
3       "ANSWER:  Well, I think for most, if
4   not all of our time, I think -- well,
5   for most of the time we had U.S. dollar
6   accounts.  I do remember, at some
7   point, I think -- anyway, I'm not sure.
8   I remember there was some discussion
9   with him opening up --"
10      And that's where it ended.
11  BY MS. SUM:
12  Q.  Okay.  Mr. Dorsett, did you want to conclude
13  your answer?
14  A.  Yes.  So I think there was some discussion
15  with him opening up a pound sterling account.  I can't
16  remember if it was actually done or not, but I do
17  remember there was some discussion.
18  Q.  Okay.
19      MS. SUM:  All right.  Give me just one moment.
20  Let me take a quick look through my notes.
21      THE VIDEOGRAPHER:  Do you want to go off the
22  record or stay on?
23      MS. SUM:  Just stay on.  It will take me less
24  than 30 seconds.
25      THE VIDEOGRAPHER:  Okay.

218

1       What currency did customers trade in with
2   SureTrader?
3   A.  Well, I think for most, if not all of our
4   time, I think -- well, for most of the time we had U.S.
5   dollar accounts.  I do remember, at some point, I
6   think -- anyway, I'm not sure.
7       I remember there was some discussion with him
8   opening up --
9       (Zoom meeting disconnected.)
10      (Off the record at 4:30 p.m.  Back on the
11  record at 4:33 p.m.)
12      THE VIDEOGRAPHER:  The time is 4:33 p.m.  We
13  are now on the record.
14      MS. SUM:  Thank you.
15      Madam Court Reporter, I'm not sure where folks
16  were disconnected, so could you please read back my
17  question, and then we'll pick up with Mr. Dorsett after
18  that.
19      CERTIFIED STENOGRAPHER:  Would you like me to
20  read the part of his answer that I got?
21  MS. SUM:  Yes.
22      CERTIFIED STENOGRAPHER:  Okay.
23      "QUESTION:  Do you know if
24      SureTrader, when it conducted trades,
25      whether -- strike that.

217

1       MS. SUM:  Thank you.
2       I'm done with my questions.  We can go off
3   the -- well, Matt, given the time today, I didn't see a
4   notice for tomorrow's start time or anything related to
5   the Webex, like if you were planning on using our Webex
6   or anything else and your court reporter.
7       MR. MATTHEW FORD:  We're going to circulate
8   the zoom link.  We'll meet tomorrow at the same time,
9   which is 9:30 a.m. Eastern Standard Time.  We expect to
10  take the full day of deposition.  So that's how tomorrow
11  will go.
12      MS. SUM:  Can you please provide a notice so
13  we know who the court reporter is?  We have to make
14  arrangements, as you would expect.  If it's not with the
15  SEC's court reporter, I have to make arrangements to
16  obtain transcripts and those internal red tape type of
17  things.
18      MR. MATTHEW FORD:  Yeah.  Absolutely.  Emily
19  Bratton, my paralegal who is in charge of doing that
20  stuff, will provide you with that information.
21      So we will be -- we'll have a court reporter.
22  We will also be recording tomorrow's deposition.
23      MS. SUM:  Okay.  Do you -- so I think we can
24  go off the record, but I did want to just finish up with
25  the folks on the defense side, please.

219

Philip Dorsett (nonconfidential)
2/27/2023

1    MR. MATTHEW FORD:  Sure.  Should we excuse the
2  witness then?
3    MS. SUM:  Yes.  I just wanted him to go off
4  the record and then formally finish it out.
5    THE VIDEOGRAPHER:  This concludes for today's
6  deposition.  The date is February 27, 2023.  It's
7  4:37 p.m.
8    We are now off the record.
9    CERTIFIED STENOGRAPHER:  And, Counsel, before
10  I log off, can I ask, Mr. Ford, would you like a
11  certified copy of the transcript?
12    MR. MATTHEW FORD:  Yeah.  And as quick as you
13  can get a rough, we'll take it.
14    CERTIFIED STENOGRAPHER:  Okay.  And, Ms. Sum,
15  would you like a copy of the rough?
16    MS. SUM:  Yes.
17    CERTIFIED STENOGRAPHER:  All right.  Thank
18  you.  That's all for me.
19    We are now off the stenographic record.
20    (The matter concluded at 4:39 p.m.)
21    --o0o--
22
23
24
25

220

---

ERRATA SHEET
Deposition of: PHILIP DORSETT
Date taken: FEBRUARY 27, 2023
Case: SEC v. MINTBROKER INTERNATIONAL, LTD., et al.
PAGE LINE
    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
    _____    CHANGE: _____
    REASON: _____

    _____    CHANGE: _____
    REASON: _____
Signed_____
Dated_____

222

---

CERTIFICATE OF WITNESS

I, PHILIP DORSETT, do hereby declare under
penalty of perjury that I have read the entire
foregoing transcript of my deposition testimony,
or the same has been read to me, and certify that
it is a true, correct and complete transcript of
my testimony given on February 27, 2023, save and
except for changes and/or corrections, if any, as
indicated by me on the attached Errata Sheet, with
the understanding that I offer these changes and/or
corrections as if still under oath.
    _____ I have made corrections to my deposition.
    _____ I have NOT made any changes to my deposition.

Signed: _____
    PHILIP DORSETT

Dated this _____ day of _____ of 20____.

221

---

STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION
- - -
    I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,
RSA, certify:  That the foregoing proceedings were
remotely taken before me via videoconference at the time
herein set forth; at which time the witness was duly
sworn; that a record of the proceedings was made by me
using machine shorthand which was thereafter transcribed
under my direction; and that the transcript is a true
record of the testimony so given.
    Further, that these proceedings pertain to the
original transcript of a deposition in a federal case,
and before completion of the proceedings, review of
transcript was requested.
    The dismantling, unsealing, or unbinding of
the original transcript will render the Stenographer's
Certificate null and void.
    I further certify that I am not financially
interested in the action, and I am not a relative or
employee of any attorney of the parties, nor of any of
the parties.
    Dated this 1st day of March, 2023.

    _____
    Victoria L. Valine, CSR License #3036

223

1      STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION

2                          - - -

3           I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,

4      RSA, certify:  That the foregoing proceedings were

5      remotely taken before me via videoconference at the time

6      herein set forth; at which time the witness was duly

7      sworn; that a record of the proceedings was made by me

8      using machine shorthand which was thereafter transcribed

9      under my direction; and that the transcript is a true

10     record of the testimony so given.

11          Further, that these proceedings pertain to the

12     original transcript of a deposition in a federal case,

13     and before completion of the proceedings, review of

14     transcript was requested.

15          The dismantling, unsealing, or unbinding of

16     the original transcript will render the Stenographer's

17     Certificate null and void.

18          I further certify that I am not financially

19     interested in the action, and I am not a relative or

20     employee of any attorney of the parties, nor of any of

21     the parties.

22          Dated this 1st day of March, 2023.

23

24          _____
            Victoria L. Valine, CSR License #3036

25

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4         I, PHILIP DORSETT, do hereby declare under

 5    penalty of perjury that I have read the entire

 6    foregoing transcript of my deposition testimony,

 7    or the same has been read to me, and certify that

 8    it is a true, correct and complete transcript of

 9    my testimony given on February 27, 2023, save and

10    except for changes and/or corrections, if any, as

11    indicated by me on the attached Errata Sheet, with

12    the understanding that I offer these changes and/or

13    corrections as if still under oath.

14         ____✓___ I have made corrections to my deposition.

15         _____ I have NOT made any changes to my deposition.

16

17    Signed: _____
                      PHILIP DORSETT
18

19    Dated this __27__ day of __MARCH__ of 20_23_.

20

21

22

23

24

25
                                                              221
```

ERRATA SHEET

Deposition of: PHILIP DORSETT
Date taken: FEBRUARY 27, 2023
Case:   SEC v. MINTBROKER INTERNATIONAL, LTD., et al.

PAGE   LINE
_14_   _23_   CHANGE:   _L T G  →  L C G_
              REASON:   _~~L C G~~ RECORDED INCORRECTLY_

_70_   _3_    CHANGE:   _REHIRED  →  HIRED_
              REASON:   _RECORDED INCORRECTLY_

_70_   _12_   CHANGE:   _WITH  →  WITHOUT_
              REASON:   _RECORDED INCORRECTLY_

_72_   _9_    CHANGE:   _LAW  →  REGULATORS_
              REASON:   _MORE CORRECT WORD_

_76_   _7_    CHANGE:   _HAD THE  →  HAD A_
_133_          REASON:   _MORE CORRECT WORD_

_~~102~~_ _19_  CHANGE:  _TO THEM  →  TO HIM_
_151_          REASON:   _RECORDED INCORRECTLY_

_~~120~~_ _12_  CHANGE:  _VOU  →  YOU'RE_
_165_          REASON:   _RECORDED Incorrectly_

_~~134~~_ _22_  CHANGE:  _SE B  →  S E C_
_173_          REASON:   _RECORDED Incorrectly_

_~~141~~_ _18_  CHANGE:  _WE  →  OUR CLIENTS_
_174_          REASON:   _CLARIFICATION_

_~~143~~_ _16_  CHANGE:  _AND I  →  AND HE_
_200_          REASON:   _RECORDED INCORRECTLY_

_~~161~~_ _20_  CHANGE:  _AFTER ME  →  AFTER HIM_
              REASON:   _CORRECTION_

_____  _____   CHANGE:   _____
              REASON:   _____

_____  _____   CHANGE:   _____
              REASON:   _____

Signed _____

Dated _MARCH  27  2023_

222

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4        I, PHILIP DORSETT, do hereby declare under

 5     penalty of perjury that I have read the entire

 6     foregoing transcript of my deposition testimony,

 7     or the same has been read to me, and certify that

 8     it is a true, correct and complete transcript of

 9     my testimony given on February 27, 2023, save and

10     except for changes and/or corrections, if any, as

11     indicated by me on the attached Errata Sheet, with

12     the understanding that I offer these changes and/or

13     corrections as if still under oath.

14           _____  I have made corrections to my deposition.

15           _____  I have NOT made any changes to my deposition.

16

17     Signed: _____

18             PHILIP DORSETT
               (CONFIDENTIAL SECTION)
19

20     Dated this  27  day of  MARCH  of 20 23 .

21

22

23

24

25
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SECTION

ERRATA SHEET

Deposition of: PHILIP DORSETT
Date taken: FEBRUARY 27, 2023
Case:   SEC v. MINTBROKER INTERNATIONAL, LTD., et al.

PAGE   LINE

86  ~~17~~  16   CHANGE:   OLD FACT → OFAC
                 REASON:   RECORDED INCORRECTLY

196  ~~44~~  5   CHANGE:   IN THERE → IN MY RESUMAE
                 REASON:   CLARIFICATION

198  ~~46~~  6   CHANGE:   APPREHENSIVE → AGGRESIVE
                 REASON:   RECORDED INCORRECTLY

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

_____  _____   CHANGE: _____
               REASON: _____

Signed _____

Dated  MARCH 27, 2023

222

## A

**a.m** 7:14 8:6 60:3,5,6,8 115:19 219:9
**a/k/a** 1:9 7:9
**ability** 11:24 167:18
**able** 9:19,24 12:2 16:15 27:12,13 39:25 54:3,16 66:5 67:6 76:16 111:5 113:3,25 114:15 122:1 157:16 171:1 201:21 210:1
**absolutely** 48:25 125:13 202:22 219:18
**Accellion** 140:1
**accept** 182:5 212:7
**acceptable** 18:11 207:6,8
**acceptance** 206:19
**access** 118:15 170:9,13,17 170:19 173:1,5,8,12,19 179:10
**account** 4:5,7 15:15 48:22 48:23 49:3,5,9 52:17 54:25 111:24 211:11 212:7,25 213:2 218:15
**accountable** 149:13 157:18 160:16 161:2,5 182:13
**accounts** 22:8 38:9,20 149:14 208:25 209:6 211:15 217:5 218:6
**accurate** 208:9 209:10 212:15,18 213:5,6 215:3 215:12
**accuse** 140:17
**ACH** 111:20,24 112:2,3,13
**acknowledged** 207:24
**acknowledgement** 27:7,9 30:2 31:8,18 32:3 33:9 34:1,5,19 46:11,13 51:19 52:5,7,12,18 53:16,18 54:15 76:8,11,15 207:2,12 211:13 212:11
**Act** 4:7,9,12 5:6
**action** 10:20 223:19
**actions** 123:22 150:3 155:20 155:22
**actively** 33:4
**actual** 14:15 20:25 21:19 22:16 37:24 47:14 55:14 56:9 62:15 125:15 178:8 184:9,11
**ad** 56:11 57:2
**Adam** 2:15 8:19 140:25,25 141:15 143:19,21 153:21 153:24 154:1
**add** 110:9 113:4 214:12
**added** 39:1

**addition** 182:2
**additional** 113:4
**additions** 54:21
**address** 52:13 53:13 121:18 121:22 154:5,6
**addressed** 131:20
**adequately** 57:18
**adhere** 149:16
**adjacent** 124:10
**adjust** 10:14
**administration** 14:9
**admittedly** 20:17
**advance** 141:2
**advantage** 70:14
**adverse** 68:8
**advertise** 54:7,8,14 56:15
**advertisement** 54:11
**advertising** 26:22,23 56:6,6 56:9,9,13,17,18,19,24 57:1 57:1 215:8
**advice** 69:24
**advise** 69:23
**affect** 11:24 151:20 160:15
**affidavit** 5:12 189:2
**affiliate** 45:6,9 47:8,14,18,19 60:13,15,21 64:8,12 65:16 67:1 68:3,22 69:3
**affiliates** 30:18,25 46:23,25 47:25 48:2,6 50:9,12,24 51:17,18 52:4 60:23 62:12 63:14,16,17 64:1,4,10,19 64:25 65:16 66:22 69:2 112:19 119:1,2 215:11
**affiliates'** 45:24 50:7 61:17 63:9
**affiliation** 38:25
**affirm** 8:25
**Affirmative** 199:14
**aford@fordobrien.com** 2:18
**aftermath** 159:25 160:2
**agenda** 164:18
**ago** 20:18
**agree** 19:22 34:6,11 47:21 47:23 134:21 179:11,12 189:24,25
**agreeing** 30:5
**agreement** 27:8,9 30:2 31:8 31:18 32:3 33:9 34:1,5,19 46:12,13 48:11 49:22 51:19 52:5,7,12,18,23 53:16,18 54:15 64:3,15 76:8,11,15 160:10,12 170:18 207:2,12 211:13 212:11

**agreements** 63:25 64:9 75:24,25 76:6
**ahead** 53:23 62:2,10 142:10 144:25 145:19 147:21 152:11 188:13
**al** 8:1 222:3
**Alice** 2:4 8:13 68:6 140:25 141:22 143:1 146:7 153:8 153:21
**Alise** 2:5 8:15
**allow** 66:12 139:24
**allowing** 26:19
**allows** 141:10
**altogether** 27:25
**amenable** 189:20
**America** 1:8 4:13 5:1 7:8 13:9,14 58:12 123:8 124:1 204:23
**amicable** 184:5
**AML** 21:12
**amount** 27:10 28:16 46:25 48:3 64:24 67:4,10 71:24 74:3 117:15
**amounts** 65:15 210:15
**ample** 142:17
**and/or** 221:10,12
**anger** 128:22
**answer** 11:24,25 12:3 18:5 53:23 62:2,10,16 68:14 69:14 126:3 133:21 144:1 145:16,18 146:6 153:3,11 169:11 180:12,12 199:14 217:20 218:3,13
**answered** 153:18
**answers** 180:15
**Antonio** 114:10 116:22 117:1 121:7 168:7
**anybody** 13:23 74:6 199:11 202:14
**anymore** 133:11 158:1 171:18 179:2 203:7
**anyway** 21:12 45:3 130:4 158:15 183:20 217:6 218:7
**apologize** 17:8 32:12 203:2
**apparently** 27:8 135:3 145:16
**APPEARANCES** 2:1
**appeared** 2:24 7:18
**appearing** 7:15 11:14 13:6
**appears** 192:5
**appease** 127:24 133:19
**applicant** 211:12 212:12 213:3
**application** 4:5,7 5:3 21:4 22:17,18,19 37:24,25

**47:19 54:20 55:10 75:12 75:14,16,18,18,19,21 76:6 76:9,10,12 189:22 211:12 212:7,9,16 213:1,2
**applications** 17:20 35:23 53:3,7 209:4
**apply** 21:21 22:23 67:8 117:14
**appoint** 71:4 72:12,16
**approached** 16:13 18:16
**approval** 21:19 41:2 119:7 119:12 178:16
**approve** 40:23 119:9,11
**approved** 21:24 40:8,10
**approving** 21:3 53:2,17
**approximate** 28:9 46:6 134:8
**approximately** 15:17 22:2 46:7 57:4 63:7 126:19 144:10 210:21,24
**April** 168:4
**area** 109:20 110:14
**arguing** 143:8
**argument** 128:14 142:20 174:19 190:3 216:15,16
**arrangement** 47:12
**arrangements** 219:14,15
**article** 202:16 203:4,5,8,15 203:23
**aside** 148:19
**asked** 18:21 32:14 43:11 44:17 49:14 50:11 108:9 109:22 115:11 129:24 131:10 132:2 141:8 143:25 162:4
**asking** 117:16 132:16 133:13 134:4,5 140:3 170:4 207:8
**assign** 156:14
**assigned** 61:11
**assigning** 155:15
**assist** 16:15
**assistance** 20:10
**associated** 35:3 136:1 204:20
**associates** 127:22
**association** 204:22
**assume** 50:22
**assumed** 50:21 162:2 166:7
**assuming** 50:6
**assured** 206:19 207:1
**attached** 27:19 66:21 115:23 147:8,9 221:11
**attachment** 168:18
**attacked** 165:7

**attempt** 72:12
**attend** 60:20
**attention** 113:3 175:18 201:19,20 208:1 211:2 212:19,23 213:7 214:24
**attest** 27:10 178:22
**attesting** 174:6
**attorney** 223:20
**ATTORNEYS'** 6:1
**August** 125:23 184:10,12 199:5 215:14
**Austin** 2:13
**authenticated** 113:15
**authoritative** 203:13
**authorities** 33:19 54:16 163:16 167:14 202:24 206:2,5
**authority** 73:1,17,19,20 74:17 142:18,23 180:18 199:19 201:1,16 205:23
**authorizing** 174:15,17
**automated** 55:10,11
**automatically** 149:21
**availability** 112:9
**available** 52:9 112:4,21,24 169:14
**Avenue** 2:6,16
**aware** 23:19 48:17,24 58:14 119:5 120:12 141:21 146:24 178:7,9 188:25 189:3 190:22,25 192:8,10 213:1
**awe** 24:3
**awhile** 17:24 132:20

**B**

**B** 2:12 4:1 42:21,22,24
**Bachelor's** 14:10
**back** 12:11 15:6,15 18:3 20:3,17 22:4,16,25 23:25 25:1 27:22 29:22,23 30:1 31:16 33:20 34:19 37:23 43:22 44:23 45:4 54:23 55:16,16,25 57:15 59:25 60:5 65:7 68:17 70:5 72:7 75:12 108:18 113:22 114:18 115:12,14 117:17 125:5,7,15,17,25 126:5,12 127:9,14 130:8,20 132:19 136:24 138:5 141:9 142:16 144:1 146:4,4 148:6 154:23 158:9 159:14 160:2 160:24 161:8 162:1,25 165:15,22 167:25 169:19 171:14 173:16,23 174:9
**backed** 25:23
**background** 20:19 25:2
**backgrounds** 36:6
**bad** 157:5 161:9 166:15 204:1
**Bahamas** 18:9,13 19:8 21:11 23:14 38:19 48:13 48:16 70:25 71:18 131:6 156:17 163:9 182:21 203:17 204:8
**Bahamas'** 109:15
**Bahamian** 23:4,6 24:24 26:4 49:16 55:4,19 109:21 165:20 216:17
**Balandian** 13:1
**bank** 112:12,22 156:24
**banking** 4:16 111:6,12
**base** 51:4,5
**based** 28:11 50:14,15,16,19 51:4,12,13 65:16 130:17 131:3 142:20 143:7 169:13 174:18 209:2,15 210:6,25 216:17
**basic** 12:12 34:15 36:19 47:9 59:5 75:17
**basically** 14:16 19:10,12 20:8 21:5 22:6,20 23:2 30:3,16 33:3 34:12 35:20 35:21,25 39:19 47:18 49:1 49:2,10 50:15 73:7 75:25 127:1 138:20 149:14,20 156:2 160:5,10 178:22 180:11 189:20 203:12 207:5 210:12,14 215:11
**basis** 113:14 210:10
**Bates** 4:5,8,11,14,17,19,23 5:2,4,7,10,13 110:20 111:8 114:5 153:16 171:5 175:3 188:13,15 192:18
**bathroom** 124:9
**bathrooms** 124:17
**battles** 216:18
**becoming** 60:22 71:10
**beginning** 53:5 59:3 73:3 75:17 76:7 110:9 127:8 128:7 130:9 149:9 150:14 150:20 173:3 208:11 216:20
**behalf** 8:14
**behavior** 163:14 165:23 200:12

**belief** 170:12 210:24
**believe** 28:22 60:13 74:20 110:15 125:23 141:17 172:20
**believes** 136:5
**Benasillo** 116:4
**benefit** 127:25
**benefits** 159:1 182:1,8
**best** 28:1 35:2 120:7 149:20 167:18 183:9 215:23
**better** 67:10 68:1 134:2 138:11,12,16,21 157:22,25 160:3 161:8 165:1 166:13 166:21 182:16
**big** 21:12,13 30:20 44:13 49:11,12,13 54:8 55:9 57:6 66:20 75:2 120:9 170:15 172:13 176:6 199:24 202:13 203:14
**bigger** 10:11 37:21 45:10 57:8,9 63:2 64:19 143:4
**biggest** 136:23
**billing** 117:15
**bit** 9:22 25:5 26:1 36:25 44:3 108:15,16 111:3 115:14,15 118:18 127:13 131:19 134:1 146:5 154:21,23 188:22
**blah** 158:11,11,11 200:15,15 200:15
**blaming** 166:3
**blasted** 48:25 49:8
**blatant** 150:25
**Bloomberg** 202:15 203:4,5
**board** 165:6
**boasted** 128:1
**boss** 58:17 74:24
**bother** 61:7
**bothered** 201:18
**bottom** 114:16,18 115:13 146:2,18 175:18 180:21 211:8
**bought** 190:13
**bouncing** 22:25
**bound** 1:18 5:17 6:2 76:23 185:2 192:25
**bow** 138:25
**Bratton** 219:19
**break** 25:6 59:12,15 60:12 108:4 159:6 205:3
**breaking** 32:8,8,10 73:21
**Brickell** 2:6
**briefly** 14:6 21:25 35:13 36:17 57:3 147:17
**bring** 9:15 64:4 71:23

108:11,14 110:22,25 113:11,18,22 119:25 132:21 139:5,7 141:4,9 149:19 150:19,20 152:16 162:20,21 164:12 166:22 167:21 168:18,19 175:1 184:16 188:12 189:18 191:7 207:18 216:14
**broader** 23:5
**broker-dealer** 15:7 16:14 19:6 20:4 23:20 48:13 49:16 135:1,4,19 137:5
**broker-dealers** 19:4 24:1,6
**brokerage** 208:23
**brought** 13:7 34:25 46:22 113:2 149:18 150:1 169:16 169:20 176:8 177:24 201:13,18,19
**brushed** 162:23
**building** 36:21 124:22
**built** 165:10
**bulk** 76:5
**bunch** 20:10 29:8 172:10 173:16 200:14 204:4
**business** 13:10 14:8 16:10 16:13,25 17:1 18:18 19:21 30:10,12 41:18 42:10,13 42:20,21,22,24,25 43:6,10 44:13,18 46:14 47:12 57:3 70:23 72:18 125:18 127:22 129:13 136:11 137:6 150:11 169:18 191:3 210:10

**C**

**C** 2:15
**cahoots** 164:3
**California** 1:24 7:17
**call** 30:11,17,17,17,17 38:3 38:8,10,11,14,18 39:7 43:2 44:8 72:5 110:12,13 131:13 142:24 143:24 144:4,25 145:6 146:17
**called** 7:20 13:8,13 18:22 31:1 45:5,9 61:2 143:25 145:23 148:18 204:16
**calling** 41:18 109:15 143:22
**calls** 134:24 166:6
**calmly** 166:17
**Capital** 14:23
**Cara** 2:12 8:20
**care** 163:9 200:9
**career** 21:6 163:10
**carefree** 205:2
**careful** 29:19,20 128:25

179:2
**cares** 133:2
**Caribbean** 135:3,15
**carried** 74:2
**case** 1:6 7:6 8:4 12:24,25
27:12 38:1,20 55:22 62:22
140:22 158:2 162:18
191:23 213:23 214:5 222:3
223:12
**cases** 214:4
**cause** 49:6 136:14 216:15
216:16
**cautious** 173:23
**Cayman** 135:2,14
**cc** 116:2,23 176:20 179:21
**cc'd** 119:6,10,13
**CCO** 20:5,13
**CEO** 20:5 58:13,20,21 69:8
69:11,15 70:6,7,15,25 71:4
71:7,10,15 72:12,16,22
119:23 120:11 121:2,4
125:16 156:10 182:23
**certain** 27:10 48:1 52:8
72:13 74:3 130:23 150:1
**certainly** 37:17,22 40:11
46:21 57:20 67:15 68:18
73:11,15 74:21 118:25
119:1,11,13 121:4 122:6
125:16 130:12 149:24
157:9 200:2,23 215:19
**Certificate** 221:1 223:17
**CERTIFICATION** 223:1
**certified** 7:17 8:23 9:4 68:18
76:18 110:3 142:14 217:19
217:22 220:9,11,14,17
**certify** 221:7 223:4,18
**chain** 117:12 146:4 154:12
154:17 174:9 179:15
**challenge** 130:8,12,15,25
157:16 163:1
**challenging** 139:1
**chance** 140:8
**change** 58:9 120:25 121:4
121:21 150:9 152:7 158:4
171:16 222:4,6,7,9,10,12
222:13,15,16,18,19,21,22
**changed** 58:3,11 59:2,5
76:9 125:6 126:11 216:11
**changes** 221:10,12,15
**character** 44:1
**charge** 66:6 120:21 215:15
219:19
**charged** 67:4 163:10
**chart** 168:11 169:6
**chatroom** 45:20,23 60:15,21

61:2,22 63:9,14
**chatrooms** 52:10 61:18 62:7
62:25 63:2
**check** 26:4 38:8,20 53:24
184:10
**checked** 52:19,25
**checks** 53:19
**chief** 20:14 22:1 23:2,12
59:2 70:3 72:8,10 121:8
131:8 149:11,15 150:18
151:3,4,17,25 152:1,3,7
155:16,24 156:15 157:6,7
157:8 158:4 162:10 172:1
178:1 201:12,14
**child** 24:1
**choice** 157:10 174:2
**choose** 216:18
**chose** 210:10
**Chris** 181:3
**Christmas** 25:18,20
**Christopher** 5:4
**chronological** 180:20
**chronologically** 146:18
**cipher** 171:1
**circle** 36:22 163:17 164:4
**circles** 43:3 72:2 128:3
144:3
**circulate** 219:7
**citizens** 54:13
**civil** 10:20
**clarification** 129:5 171:4
**clarify** 12:6 18:8 67:18 142:5
**Class** 20:3
**clean** 180:10 183:9,10,17,24
183:25
**cleanup** 189:17
**clear** 73:24 144:9,15 154:12
171:21 208:12
**clearly** 12:9 37:2 42:5
**client** 17:17 19:12 27:10
33:14 34:11 47:22 49:25
51:4,5 52:16 67:7,9,13,19
67:20 75:22,24,24 145:11
145:12 153:4 154:18 179:9
201:17
**client's** 144:17 146:13
153:19 154:1
**clients** 19:5,6,10 22:9,11
23:3 24:18,22,25 25:24
26:6,12,14,20,21,25 27:14
29:8,16 30:4,15,16,22 31:1
33:4,19 34:6 36:11 37:23
38:10 39:25 45:25 46:15
46:25 48:17 49:2,11,21
50:4,7,9,17,20 51:8,9,11

52:21,24 54:14,25 55:20
56:2 61:4,5 65:21,22 67:1
67:5,15,22,22 68:24
110:12 111:23,25 112:1,2
112:18 118:14 170:9,13,16
170:19 172:25 173:8,9
179:10 206:20 209:18
210:11 213:19 214:1 216:4
**clients'** 60:24 62:16 211:15
**close** 204:22
**closed** 32:18
**closely** 55:14
**closer** 10:9 176:16 202:18
**clue** 166:1
**code** 109:20 110:14
**colleague** 8:16
**colleagues** 8:19
**Collie** 116:22 119:6 120:11
121:2,5,7 122:6 168:7
173:2,14,17 174:10 176:7
178:9,15 179:17,23 201:5
202:3 204:10,11,13
**Collie's** 201:10
**colloquy** 145:17
**come** 22:12 25:16 26:24
27:1,16 29:22,23 33:11
48:17 51:14 71:12 72:6
122:14 123:1,4 124:25
125:2,4,25 126:15 132:15
133:8 135:21 136:15,16
142:16 150:3 161:11
168:14 173:6 181:17 188:9
**comes** 160:21 203:15,16
**comfortable** 162:24
**comfortably** 57:18
**coming** 23:4 26:10 28:6,20
35:23 36:11 44:13 51:9,25
68:3,21 135:25 175:2
199:23 200:4,20
**commencing** 7:14
**comment** 43:19
**commercial** 56:10 57:2
**commission** 1:4 2:4 7:4
8:15 18:1,6,7,8,9,13 20:22
21:16 44:21 66:16 68:1
70:8,17 71:18 72:5,23
119:21 120:12,13 131:6
149:12 156:17 157:11
158:5 161:3,13 163:9
203:19 204:8,16
**commissions** 66:6
**communicate** 122:1,17,20
122:23 125:13 188:7
**communication** 75:8 118:11
131:9,18 176:6

**communications** 47:17
117:21 118:10 121:11,19
121:20 129:10
**companies** 50:14
**company** 13:8,13 15:10,12
17:21 18:18 40:11 41:5
47:10 69:18 70:25 71:7,10
72:19 119:15,20 120:8,17
120:22,23,24 121:11,12
122:17 123:3,7,11,18
125:1,9,12,20,25 126:6,7
126:25 131:7 132:11,17
140:10 148:16 151:20
156:8,9 160:15 171:11
172:4,15 182:24,24 184:8
215:16,24
**company's** 118:20
**compared** 125:8
**compelled** 149:3
**compensated** 158:2
**compensation** 64:2,3,15
119:2
**competent** 180:17,18
**complain** 66:23
**complained** 38:12
**complaining** 48:2 62:13
63:18 65:3,5,7,9,10 173:10
**complaint** 110:11
**complaints** 21:8
**complete** 212:9,17 221:8
**completed** 14:13 211:12
**completely** 158:10 204:19
**completion** 223:13
**compliance** 14:13,14 17:6
20:1,7,14,20 21:9,11,13
22:1,7 23:2,12 25:2 27:17
33:12 36:1 55:2 59:2 71:23
72:8,10 119:4 122:10
131:8 133:15 135:13
137:15,16,25 149:11,15
150:18 151:1,2,3,5,8,17,20
151:23,25 152:2,3,8
155:16,24 156:15 157:7,9
158:4 160:16 162:4,10
166:4 172:1 182:11,22
201:14,22
**complied** 23:9,13
**compliment** 203:22
**components** 75:15
**Compound** 206:15
**comprehensive** 213:21
**computer** 190:15,20,23
**concern** 29:3 160:17
**concerned** 28:5 46:3 55:4
55:20 200:12 201:4,5,23

201:23,25 202:3,4,6
concerning 138:9
concerns 28:24 60:24 71:23
71:24 164:13 165:20
166:22 167:10 201:6,10,11
201:14 202:11 216:2
conclude 213:22 218:12
concluded 220:20
concludes 220:5
conclusion 163:15
concurred 38:21
conditions 76:3
conduct 53:19 129:15
190:16 191:3 210:8
conducted 211:17,20
212:14 216:24 217:24
conducting 12:7
conference 12:8 124:11
confidence 130:11 200:24
confident 42:14 130:8,9
confidential 1:18 4:6,9,12
5:5,14,17 6:1 76:22 185:1
189:19,21 190:2,8 192:20
192:24
confidentiality 164:17
confidentially 164:14 190:5
conformed 206:20 207:2,12
confrontation 129:25 160:4
166:12 171:21 176:7
confrontations 171:17
congratulating 58:19
congratulations 71:14
connection 114:1
considerable 40:20
considered 56:7
considering 161:22
constant 75:8
constantly 41:15 43:22
53:11 60:23
constituted 74:20
consultant 169:17
consulted 176:14
contact 30:20 67:12 109:4
142:11 163:15 164:1,12
165:9,12
contacted 17:2 19:24 63:4
72:24 165:21 166:11,14
167:10 173:10 181:1
contemplated 164:8
content 40:5,8
contents 146:25 156:2
context 214:2
continuation 33:22
continue 118:3 146:14
167:11 175:19 176:1

181:25 182:1
continued 161:10 167:17,17
171:10
continuing 33:22
contract 65:17
contracts 47:14
conversation 29:3 31:19,21
42:20 71:19 74:13 138:2
165:23 200:23 216:21,22
conversations 43:9 44:19
51:12 65:2 150:8 166:8
cool 134:1 138:16,17 171:20
171:20
Cooper 122:7,9,10,14
126:25 134:15,18 152:5
155:15 156:15 157:9
160:22 168:7 173:6 175:25
176:3,8 177:12 179:7
181:15 183:5
copied 114:10 121:11,15
copy 75:19 220:11,15
corner 36:21
correct 11:16 13:11,12
15:19 48:3 52:1,2 66:17
71:8 113:1 124:24 129:9
154:14 179:25 189:15
211:23 221:8
corrections 221:10,13,14
correctly 60:16 116:19
145:24
corridor 124:13
counsel 3:2 8:11,15 9:5,13
139:10 152:18 175:5
189:20 220:9
countries 22:12
country 53:15 109:13
110:13 135:3,15
country's 23:13
counts 58:25
couple 27:23
courage 150:23 165:10
course 14:14 74:22 118:21
144:12 173:12 181:8
court 1:1 7:1 8:2,3,8,9,21
12:10 59:19 68:16 159:8
190:7 191:9,23 199:13
205:8 217:15 219:6,13,15
219:21
Courtney 115:19 116:1,10
117:3
covered 154:10
crazy 57:12 204:25 205:1
create 39:6 211:11 214:10
created 34:2 40:4 110:7
112:13

credit 57:16 127:13
cross-examination 68:8
CRR 1:24 223:3
CSR 1:24,24 223:3,24
culminated 172:14
currencies 112:4
currency 112:6 217:1 218:1
current 14:22
currently 14:23
customer 35:22,22 53:2,17
180:24 209:9 211:21
213:11
customers 18:25 19:2 25:9
25:12 27:24 28:2,4,8,9,10
28:19,25 29:1,4,13 38:13
39:7 41:6 46:8,19 51:5,18
51:22,24 52:4,6 57:5 58:7
58:8 65:19 66:1,15 67:3
68:3,21 205:23 206:4,13
208:24 209:2,5,15 210:5
210:25 215:6 217:1 218:1
cut 129:5,11 183:10

D

D-O-R-S-E-T-T 9:12
d/b/a 1:8 7:8
Da-da-da-da-da 33:10
Dac 116:4,9
dac@daytradingradio.com
116:4
date 8:5 37:12 117:20
125:22 153:14 154:24
184:7,9,11 189:8,14
210:12,20 220:6 222:2
dated 5:11,12 176:19 179:18
221:19 222:25 223:22
dates 120:5 144:21 214:14
day 18:22 23:20 27:6 30:9
30:10 42:17 45:14 47:10
48:7,10,15 49:15 50:12
51:10 58:15 59:3 69:10
70:16 71:4 72:2,4,7 75:7
117:2 181:13,13 210:10
219:10 221:19 223:22
day-to-day 118:20,23
119:15 120:24
days 14:3
deal 49:11 60:24 72:18
dealing 40:13 62:14 63:19
70:24 118:25 119:1 128:9
173:25 179:3
dealings 64:22 181:4
deals 41:17 42:17 43:9
44:18 46:14 51:3 64:21
67:2

dealt 64:18
debate 118:14
decide 58:24 151:7
decided 62:5 158:12 179:1
181:19
decipher 210:2
decision 26:17 39:6,9,12
51:1 60:25 67:13 71:4
74:18,20
decision-maker 113:6
decision-making 118:21
126:7,11
decisions 73:2 126:14
151:19,20 157:17 161:4
182:13 215:16,20,24
declaration 5:9,11 188:10
188:17,22 189:2,5,8
191:17 192:1,11 207:24
215:4
declare 221:4
defendant 8:19
Defendants 1:10 2:10 7:10
defense 219:25
Defenses 199:14
definitely 17:12,13,14 18:2
27:5 28:15 31:14 37:18
39:17 41:8 46:9,17 63:2
68:24 70:10 110:18 119:10
definitively 51:10 65:13
72:20
delete 132:8,8,11,17
demanded 72:6
denied 213:3 214:16
deny 52:17 145:12 212:25
departed 59:4 110:16,17
184:3
Department 203:9
departments 53:8 57:24
departure 118:12 156:8
172:15,19,23 184:8 188:6
210:23
depending 122:6
deposed 12:16,20,21
deposit 67:23
deposition 1:15 4:4 7:25
9:17 10:14,20 11:4,22
12:13,23 13:3,19 14:3
18:10 31:22 108:20 111:1
113:19 139:13 140:5,7,7
141:3,23 142:2,3,19,24
143:11,18,22 144:2,5,14
145:3,6,10 154:25 167:22
168:20 175:12 184:17
188:19 191:8 192:17
219:10,22 220:6 221:6,14

221:15 222:2 223:12
**deposits** 117:3
**describe** 14:6 36:17 56:6
57:4 64:2 75:15 111:22
118:8,23 125:8 134:20
146:21 147:17 181:11
191:23 213:12
**described** 31:17 41:21 58:7
71:20 123:2 128:6 129:22
130:25 145:21 148:12
167:11 215:25
**DESCRIPTION** 4:3
**DeShawn** 2:22 8:8
**designated** 76:22 108:2
185:1 188:2 190:5 192:24
**designating** 189:21 190:2
**designation** 192:20
**desk** 15:12 20:23 36:25
41:22 73:15 124:12,16
137:10 191:1
**desks** 36:24 53:11 169:24
171:2
**details** 64:18 181:22
**deteriorated** 127:8
**determine** 141:24 211:20
**diagonal** 36:25
**diagonally** 37:5
**difference** 42:9 125:8 149:7
**different** 17:4 56:22 61:14
61:15,17,18,18 110:13
121:17,22 123:6,18,22
128:10,24 130:5,13 134:20
148:18 150:17 163:2,4,6
167:15 173:22 200:17
213:14 216:23
**differently** 121:23
**difficult** 24:25 181:17
**difficulties** 171:12
**dilemma** 173:13
**diligence** 22:11 55:21
212:17
**diminish** 125:3
**dinner** 16:19
**direct** 66:25 109:18 118:15
170:9,13,17,19 172:25
173:5,8,12,18 175:17
179:10
**direction** 74:22 223:9
**directly** 45:21,24 46:1 62:16
67:6 72:7 112:16 123:10
**director** 155:14,23 158:1
**disagreement** 138:10
159:22 178:19
**disagreements** 126:16
138:7 145:22 171:12

**disassociate** 125:11
**disconnect** 114:1
**disconnected** 217:9,16
**discovery** 141:7,25 143:14
144:13
**discuss** 14:2 41:5 51:16,20
52:3 112:23 146:25 150:3
156:1,8 158:18 176:23
177:1,3,5,6 200:25 201:7
**discussed** 16:19,22 19:20
26:23 32:1 33:2,3,7,8,17
34:1 54:5 113:2 116:25
156:11 190:1 199:10
201:21 205:22,24 206:1,4
206:8
**discussing** 17:19 28:23
43:15 208:11
**discussion** 31:7 33:20
64:23 65:5 121:16,18,25
122:4,4 144:19 170:21
214:9,19 216:11 217:7
218:8,14,17
**discussions** 24:16 54:20
56:4 199:21 202:1 206:7
**dismantling** 223:15
**dismisses** 149:21
**dispel** 164:5
**dispute** 130:1 143:14
**distance** 38:8,11,14,18
110:13
**District** 1:1,2 7:1,2 8:2,2,3,3
**divorce** 128:18,21
**document** 10:23 11:1,13
27:12,18 31:18 34:3
111:15 141:7,13,20 142:6
142:7 145:10 168:23 169:8
169:12 170:6 191:10,24
192:6,19,22 214:10,21
**documentation** 156:16
**documented** 158:14
**documents** 20:11 21:18
52:8 65:14 131:7,10
132:11 139:17 140:6,18
141:6 145:1 146:14 153:1
153:17
**doing** 13:10 22:11 35:7,21
41:20,24 42:6 43:21 46:2
46:16,17 55:21 62:21 63:3
63:5,21 67:9 73:25 108:16
112:21 126:16 128:13
130:16 131:1 156:10
161:23 163:11,13,22 165:5
165:25 166:7 167:11,17,17
174:1,22 204:2 219:19
**DOJ** 206:12

**dollar** 56:16 217:5 218:5
**dollars** 54:11
**door** 123:6,7,9,16,23,24
**Dorsett** 1:16 5:11,12 7:19,25
9:11,13,20 10:9,16 11:1,3
11:5,11 53:23 59:22 60:12
68:14 108:9,22 111:5,11
111:19 113:20 114:8,20
120:3 139:15,19 140:9
144:10,23 145:21 146:10
146:17 147:14,23 148:10
152:19 153:22 154:5,13,16
155:2 159:7,20 165:12
167:24 168:3 175:10
184:23 188:21 189:14
191:13,22 192:22 205:8,21
207:20,23 217:17 218:12
221:4,17 222:2
**Dorsett's** 154:9
**doubt** 49:23
**download** 37:24,25 47:20
**due** 22:11 55:21 212:17
**duly** 223:6
**dumbed** 22:19 75:20
**dumped** 144:17
**duplicated** 62:25
**duration** 10:13
**duties** 35:13 47:2 58:9,11
59:1,5

_____

**E**

**E** 4:1
**earlier** 24:17 48:19 50:11
63:25 69:7 75:13 108:9
109:22 127:6 134:23 150:8
150:11 179:24 183:2
213:10
**early** 17:11 18:3 31:13,14
36:2 39:17 40:15 131:4
136:24 161:11
**earn** 18:20
**easier** 39:25 52:10 56:1
**eastern** 7:14 8:7 219:9
**easy** 54:24 144:24 145:3
**Ed** 178:7
**education** 14:7
**Edward** 122:10 152:5 168:7
**effect** 51:15 174:15,16 179:8
180:15,17
**effective** 184:7,9
**efficient** 61:9
**effort** 125:11 184:5
**efforts** 208:22 215:9
**eight** 36:23
**either** 12:9 32:8 59:21 67:3

67:23 69:3 73:6 119:9
121:2,22 141:5 199:19
209:21
**electronic** 55:11
**email** 4:19,21,22,23 5:7 67:9
67:11 114:9,11,18 115:1,7
115:13,15,18 116:1,7,22
117:12 118:11 121:17,20
121:22,25 122:23 131:5,7
131:20 141:25 144:9,16
145:13 146:4,5,7,9,12,18
146:22,24 147:3,6,9
152:21,24 153:14,15,22
154:5,5,8,12,17 155:11
156:2,3,6,21 168:4 169:5
173:14 174:9,23 175:14,24
176:19,23 177:2,6,13,17
177:21 178:3,11,14,15
179:14,17 180:1,20 181:10
181:12 191:3,5
**emailing** 55:11
**emails** 48:2 117:9 119:14
122:25 131:22 140:10
152:24 153:2,9 173:16
**embassy** 164:8
**embedded** 144:16 146:13
**embeds** 145:10
**embryonic** 39:22
**Emily** 219:18
**employ** 36:5
**employee** 61:11,12,21 62:6
63:8,13,13 157:7 200:25
223:20
**employees** 34:21 39:11
60:14,20 73:2,18
**employment** 14:22 118:2,21
125:19,25 171:10 215:14
**encompass** 210:19
**encounter** 171:11
**endanger** 201:12
**ended** 38:5 218:10
**enjoyed** 163:20
**enlarge** 108:15 111:2
**ensure** 55:6
**enter** 16:25 17:1
**entered** 173:22
**entering** 19:20
**entire** 124:7,15,21 150:6
181:25 182:1 209:12 221:5
**entirely** 61:16 161:23,24
**entirety** 11:1
**entitled** 126:23
**entity** 13:16
**equivalent** 204:21
**Errata** 221:11 222:1

Philip Dorsett (nonconfidential)
2/27/2023

6

error 116:13
especially 39:17 64:19
  67:24 173:25
Esq 2:4,5,5,11,12,15,16
essence 47:22 76:2 151:17
  173:7,17 174:5,10 183:12
establish 16:14,21 70:23
established 22:5 30:14
  48:21
estimate 15:22 17:7,20
  27:23 28:10 31:10,19 46:6
  46:18 63:7
estimated 27:25
estimation 131:3
et 8:1 222:3
ethic 138:20,24
Europe 50:19 51:11
evaluation 211:17,19
evening 141:14 142:6
event 63:12,23,24 172:21
events 134:9 172:9
eventually 16:12 30:17,19
  35:9 36:5 45:17 61:13
  128:18 170:1,7 176:13
  179:7 181:22
everybody 39:19 41:19
  52:20
Everything's 138:16
evident 156:12 160:12
evolve 16:11
evolved 59:6 75:17
exact 65:13 120:5 121:24
  181:21 210:20
exactly 40:20 138:23 169:11
examination 3:2,4 9:7
  129:15
examined 7:21
example 47:10 48:7 49:14
  130:24 134:3,20
examples 134:5 138:6
exception 127:4
exchange 1:4 2:4 4:7,9,12
  5:6 7:4 8:14 18:7 115:1
  159:20 161:12 163:5
  168:13 175:14 181:10,12
exchanged 141:6
excited 18:19 19:17 43:23
  44:12 46:4,5
exciting 46:5
exclude 142:19
exclusively 208:6
excuse 123:24 142:14
  153:14 169:5 180:21 220:1
executives 179:21
executives@SureTrader....

176:21
exemplified 163:5
exhibit 4:3,4,5,7,10,13,16,19
  4:21,22,23 5:1,3,7,9,11,12
  9:16,17 11:12,18 108:11
  108:14,20,23 110:20,25
  111:1,5,8,11 112:24
  113:12,14,18,19 114:5,5,8
  115:2 117:12 119:25 139:5
  139:8,9,11,13 142:3 146:3
  146:19 152:16,17 154:10
  154:25 155:3 156:3 167:21
  167:22 168:19,20,24 169:4
  169:5 171:7,8 172:17
  175:1,3,5,11,12 180:21,22
  184:15,16,17,20 188:12,19
  189:16,18 190:7,9 191:7,8
  191:14,16 192:9,15,15,16
  192:17 207:18,23
exhibits 5:17 140:2,21 141:1
  143:14 153:15 171:6
exist 65:14 149:17
existed 49:24,24
existing 67:20,21
expand 10:3
expect 38:7 163:8 219:9,14
expectation 48:5 205:4
expected 128:10
expensive 56:14
experience 20:21 24:7
  40:20 56:13 156:7
expert 170:22
expertise 208:14
explain 18:20 61:10 62:5
  173:15 180:16 204:17
  213:15 215:11
explained 18:23 123:25
  160:22 173:4
explaining 19:1 24:6 158:15
explanation 123:22
explicatives 203:11
express 216:2
extent 34:10 142:20
extra 39:1 117:14
eyes 6:1 72:9 156:22,23
  204:23

F

F 203:18
f/k/a 1:8 7:8
face 74:1
fact 16:24 24:22 38:18 53:19
  56:25 57:17 74:12 146:13
  155:22 174:18 204:16
  210:4

facts 11:25 178:8 209:3
fair 183:21
fall 162:18 163:23
familiar 18:21,23
far 20:13,15 24:21 27:22
  48:5 55:3 57:3 144:20
  208:15
fault 137:16,17
fax 2:13,17 38:1 109:6
FBI 203:7,8,9 206:12
February 1:20 7:13 8:5 27:5
  31:23,24 46:10 220:6
  221:9 222:2
federal 223:12
feedback 76:19
feel 67:25 127:21 148:11
  157:5 162:24
feeling 44:2 162:6
feels 156:10
feet 41:23 46:9
fellow 150:6 165:3
felt 43:23 74:6 127:13
  130:19,25 149:3 165:9
figure 127:11 137:20 178:5
figured 69:16 133:18 167:14
file 55:24 148:17
filed 152:6 167:9
filing 199:13
Filippelli 2:12 8:20
fill 10:4 37:25 47:20 52:17
  52:21,25 53:1,15 54:2,6,14
  57:16 75:22 156:16 157:10
filled 57:17
filling 20:10 21:18 52:22
final 118:13
finally 26:7 55:17 133:10
  165:10 174:14
finance 14:10 36:6
financial 14:14 20:25 21:21
  70:4 119:7 121:8 201:13
financially 223:18
find 115:15 171:24
finding 25:12
fine 59:21 117:17 142:9
  159:9
finish 63:21 66:13 125:19
  139:25 219:24 220:4
finished 125:24
FINRA 199:24
fire 73:4,17,20,23 74:8,10
  182:21 202:25 215:20
fired 74:15
firing 73:2 74:21 157:3
firm 15:11,25 16:1 19:11
  20:24 23:5 25:15 30:13

39:18 40:19 41:18 49:9,10
  57:20 58:2 70:3 74:2,23
  76:3 149:13,20 150:2,7,16
  150:17 155:14 157:15,17
  157:18 158:20,25 163:14
  172:20,23 173:22 174:22
  180:8 181:8 201:15 208:12
firm's 73:6
firms 24:14,21
first 9:19 10:18 15:4,6,13
  16:11 17:17,18 20:24
  26:18,18,18 27:5,23 29:2
  31:15 37:13 53:3 57:14
  70:11 71:11 114:17 115:7
  115:12,15 116:8 124:7
  134:11 144:11 146:8,18
  148:10 150:3,3 155:12,13
  162:8 164:19,21 165:11
  173:22 180:5,20 184:19,24
  188:18 199:23 203:21
  216:13
fit 34:2 57:18,19 70:2
FIU 14:14 21:22
five 15:17 16:5 34:14 42:23
  133:9 211:7
flat 37:1
flattered 71:16
flew 16:18
flippant 200:8
flock 19:14
flooded 62:13
floor 2:16 36:22 37:5 124:12
  124:14,20,21,23
floors 124:19
Florida 1:2 2:6 7:2 8:4 14:11
  14:15
flow 5:1 168:10 169:3,6,21
  170:1,20
focus 22:10,14 30:8 45:17
  54:1,2
folks 36:4 43:22 50:2 72:15
  124:12 128:9 136:18
  217:15 219:25
following 21:6 108:1 134:9
  144:13 188:1
foot 56:3 137:10
Ford 2:11,11,15,15 8:18,18
  8:20 53:21 59:18 61:25
  62:8 64:5 65:20 66:2 68:5
  69:12 76:18 113:9,13
  115:9 117:23 118:6 129:4
  129:11,16 139:16,20,22
  140:3,12,16,20,25 141:15
  141:19,22 143:4,19,21
  144:24 145:5,14 146:6

152:25 153:5,7,16,21,24
154:1,4,11,19 161:15
171:13 189:23,25 190:17
190:24 192:4 201:2 205:25
206:14,22 207:4,15 215:17
216:5 219:7,18 220:1,10
220:12
**foregoing** 221:6 223:4
**foreign** 69:19 120:6 162:12
173:25 208:13 214:4,6
**forget** 14:15 20:25
**forgot** 35:9
**form** 4:10 54:2,6 206:15
**formally** 17:21 220:4
**formation** 41:4
**formerly** 13:9
**forth** 7:22 22:16,25 43:22
51:3 52:10 53:9,12 54:24
55:16,16,25 61:6 70:5
127:22 130:20 132:19
160:24 171:2 173:17
174:10 223:6
**forward** 57:11 152:21
**forwarded** 67:12 152:23
154:16
**foul** 135:24,24 136:4,6,9
**found** 133:16 135:25 180:6
**four** 16:2 46:15 109:11
163:3 200:6
**Frantz** 177:22,23 179:20
**Frantz's** 178:11
**free** 56:19 65:25 66:4,7,19
66:24 68:25 69:3
**freely** 19:7
**friends** 137:5
**front** 11:7 36:21 37:4 44:3
74:1 108:23 124:16 166:4
**frustrated** 29:6
**fuel** 202:25
**fulfill** 20:15
**full** 9:10 10:6 47:5 121:5
124:8 210:16,17,19 219:10
**fund** 111:23
**funding** 4:16 111:6,12 113:5
113:7
**funds** 50:3 116:12 201:15
201:17
**further** 53:19 114:21 115:25
116:16 117:6 123:21
144:15 146:5 168:1 178:10
179:14 188:7 212:11 214:9
214:19 223:11,18
**future** 57:19

---

**G**

---

**generate** 41:18 169:23
**genesis** 172:22 173:11
**Gentile** 1:9,9 2:21 7:9,9 8:19
13:8 15:2,5 16:11,24 17:9
18:16 19:21 25:8 28:24
31:17 32:21 41:5,20 45:8
51:16 52:3 54:20 56:5
71:20 112:23 116:23
117:20 118:3,9 120:4,16
121:9 122:16 123:1,21
124:25 125:25 126:5,16
127:1 129:22 131:1,17
134:10,21 138:7,10 145:22
147:22 151:24 152:13,13
154:8,9,12 155:19 156:1
159:21,23 170:5 171:12
176:20 177:1,5 179:20
181:11 190:22 192:2 199:3
199:7,7,10,18 201:1
205:21 206:18,25 209:23
209:24 212:5 213:16
214:20 215:8,15 216:3
**Gentile's** 23:16 71:3 72:12
118:20 147:15,18 148:12
152:22,24 155:2,6,11
165:15 176:23 199:13
208:22 211:9
**GENTILE0004495** 5:13
192:19
**GENTILE0004497** 5:14
**gentleman** 45:18
**gentlemen** 36:7
**genuine** 28:4 71:23
**getting** 10:9 21:15,19 25:24
26:12 30:15 33:5,19 41:2
62:13 76:19 130:19 144:19
166:21 167:15 176:8
183:12
**gist** 203:15,18
**give** 9:1 14:20 15:21 20:9
30:25 42:3 43:18,24 45:3
57:10 67:10 71:22 113:3
121:5 130:24 149:14 157:8
160:11,20,20 164:8,9
182:2 183:4 184:4 213:24
218:19
**given** 12:16,21 133:24 219:3
221:9 223:10
**gives** 162:7
**giving** 138:24 160:19 162:6
183:2
**glad** 158:13
**glean** 143:7
**Gmail** 154:6
**go** 10:12 17:25 29:13,16

---

31:16 34:19 37:23 44:23
44:24 45:4 49:18 53:23
54:23 55:16 62:2,6,10
65:15 68:10 72:6 74:14
75:12 115:12 128:2 132:8
135:9 136:8,16 140:21
142:10 144:25 145:18
147:21 152:11 158:12
159:10 161:23 164:8 166:5
171:2 174:7 180:20 181:14
181:20 184:24 188:13
190:11 200:19 205:10
211:7,24 214:23 218:21
219:2,11,24 220:3
**goes** 149:23
**going** 19:13,14 20:11 24:18
25:4 26:14,19,25 27:21,22
29:9 31:16 32:6 33:21
34:17 35:23 36:10,24
38:23 39:14,16 41:11,11
42:22 43:17 44:15,16 45:4
47:7 53:6,11 54:1 57:11,16
61:17 64:11 68:9,11 75:12
108:10 113:17 116:18
128:21,22 129:2 130:20
131:4,14,15,19 132:14,24
133:23 134:6 135:9 136:10
136:14,17 137:18 138:3
139:4,22 140:5,5,23
141:10,12 143:2,17 144:3
145:4,6,18 146:14 148:16
148:16 149:6 150:12
151:10,14,15 154:8,22
155:10,19 162:24,24
163:18 165:1 167:20
174:25 176:9,9,12 178:6
178:21,21 179:1,5 180:15
180:19 182:16 183:10
192:14 202:2 203:2,6,7,19
204:7 207:17,17 211:2,7
211:24 212:3,19 214:5,24
216:15,16 219:7
**golden** 24:1
**gonna** 166:20 170:10
**good** 8:13 9:9 10:11,17
33:10 46:2 55:3 58:17
59:18,24 115:22 124:8
127:10 159:5 166:15
170:25 181:23 182:3
183:11,18,22 184:1
**gospel** 127:16
**gotta** 26:14 43:3 128:3
135:7
**gotten** 144:1
**Government** 206:19 207:1

---

207:11
**Gradillas** 8:9
**granted** 128:13 135:19
**great** 56:15
**grew** 35:6 39:4 73:8 75:2
**grievances** 149:10
**ground** 11:22 12:12 179:4
**grow** 57:12
**growing** 36:8 39:22 46:3,24
**guess** 27:1 28:4 30:10 35:1
36:21 39:21 40:25 41:1,16
43:6 44:5 45:22 50:18
52:20 53:8 63:20 67:25
69:20 126:21,21 137:18
199:24
**guidance** 144:6
**gung-ho** 26:2
**guy** 1:9,9 2:21 7:9,9 8:19
13:8 15:1,6,10,12,14 16:2
16:3,13,14 17:2 19:24 22:6
23:19,25 24:5,20,20 25:14
25:19,23 26:12 28:1 29:5
29:22 30:8,9,19 31:3,24
33:21 34:4,6,24 35:1,9
36:3,5,24 37:4 38:6,9,21
38:21,21 39:8,13,15,18,18
39:23 40:6,10,12,12,16
41:14,24 42:1,5,7,10 43:1
43:25 44:20 46:4 47:15,23
48:23 50:1 51:2,13,20 53:6
54:3,17,23,24 55:9 56:24
57:10 58:3,13,18,21,21
61:8 62:11 63:16,17 64:18
65:2,5 67:6,12 69:15,17,25
70:1,4,6,13 71:12,13,15,22
71:25 72:14 73:3,3,4,7,9
73:11,12,16,24 74:13,18
74:23 75:1,3,8,10 76:2,9
110:9 112:17 114:9 116:23
117:17 118:13 119:2,5,8,9
119:19,21 121:4,14,19,20
122:11 125:10 126:22
127:7,7,10,14,15,19,22
128:17 129:1 130:1,5,6,14
131:5,13,22 132:2,10,16
132:20 133:2,4,6,12 134:3
134:5,24 135:20,23 136:1
136:5,8,20,25 137:3,8
138:3 146:24 147:1,9,22
148:18,23 150:4,4,9,17,22
151:5,9,13,16,17 152:2
157:2,12 158:7,15 160:2,8
160:22 161:4 162:1,9,16
162:17 163:1,7,16,18
164:3,17 165:3,23,25

166:10,21 169:18,25 170:8
170:17,23,25 171:16,19
173:3 176:7,14 177:7,15
177:25,25 178:3,9,25
179:3 180:13 181:19
182:20,25 183:17 184:4
190:13 199:4,22 201:16
202:16,18,20 203:5,19,23
204:2,5,15,20 205:1 206:6
208:11 216:15
**guy's** 15:10 29:21 30:7 41:8
45:16,17 119:7 124:6
147:7 202:15 209:17
216:13

**guy@stockusainc.com**
116:2
**guys** 30:20,21 43:4 49:13,20
62:20 71:25 128:3 138:5
142:12 144:8 177:13

_____

**H**

**H** 4:1
**hacking** 49:7
**hail** 133:8
**half** 16:5 36:22 59:11 180:8
**halfway** 16:3
**Halpin** 2:16 8:20
**hand** 8:24
**handle** 25:8 140:19
**handled** 201:16
**handling** 47:16
**handpicked** 73:12,13
**hands** 59:19 174:22 179:24
180:7,9
**hands-on** 36:2,2 73:9 75:10
119:22
**hang** 44:14
**happen** 47:24 70:9 72:21
132:25 135:6 136:18
**happened** 37:10 44:9 48:21
71:9,20 73:22 136:23,24
162:1 163:24 165:13 172:9
181:22 213:15
**happening** 130:23 164:5
**happy** 115:22
**harsh** 180:4
**hate** 151:21
**hated** 136:7
**head** 65:14
**healthy** 24:12
**hear** 12:8 13:6 41:23 42:2,3
42:5,17 43:14 49:19 50:1
51:13 56:22 113:25 114:2
114:3 116:19 129:7,8,16
149:22,23,24 160:9 162:8

177:9,13
**heard** 134:25 150:9 164:19
165:22
**hearing** 127:20
**heated** 174:20
**held** 179:4
**hello** 139:15,15
**help** 169:4 214:5
**helped** 21:3
**helping** 21:18 35:4,8 203:7
**hereinafter** 7:22
**hesitant** 182:19
**hesitation** 26:9,10
**hey** 27:13 44:15 54:4 66:22
67:9 203:17
**high** 67:23,24 164:18 200:5
**higher** 119:12
**hinted** 74:14
**hire** 73:17,19 74:6
**hired** 20:9 40:7 45:18 73:3,7
122:11,13 151:1,24
**hiring** 73:2 74:21
**history** 14:7 21:2
**hold** 166:20 172:16 188:3
**holders** 112:12
**honest** 28:12 43:13 61:16
61:20 133:23 210:20
**honestly** 43:12 158:3
163:19
**honor** 24:2
**hoped** 26:12
**horrific** 202:16 203:25
**horrified** 202:19,19
**hour** 7:14 59:11 181:17
**hours** 32:17
**huge** 57:13,20 202:21
**hunched** 137:12
**hundred** 28:1,8 46:7,21
**hung** 44:7
**hustling** 30:12

_____

**I**

**I-L-L-E-G-A-L** 129:7
**I.D** 52:13
**I.T** 40:15
**iBoss** 210:11
**idea** 16:13 17:3,4 25:24
26:24 27:7 30:2,21,25 32:2
33:8,10 35:10 47:9 57:1
63:16
**ideas** 22:25 33:23
**identification** 114:4
**identify** 8:11 12:19 171:5
188:13
**idiots** 72:1 138:5 200:7,14

200:21 204:4
**IDs** 22:15
**III** 2:16
**illegal** 74:1 128:13 129:6,7
134:4
**imagine** 51:7 72:24 73:22,23
**immediate** 143:23 159:25
160:1
**immediately** 37:10 71:9
**imply** 173:11
**importance** 42:16
**important** 120:19
**impossible** 132:17
**impressed** 24:12 41:15
150:23 202:18 203:20
204:7
**impression** 24:23 70:12
137:6,22 162:17,19 174:1
174:4
**improvements** 54:22
**in-depth** 200:19
**inaccuracies** 192:10
**inaccuracy** 192:9
**inaccurate** 148:17 179:13
179:13 189:1
**incentive** 31:1 49:20 50:9
51:13 66:18 69:5,17
**incentives** 65:18 67:16 68:2
68:20 69:1
**incident** 48:20 165:16
**incidents** 130:21
**included** 116:9 140:13
152:25 153:2
**includes** 212:17
**including** 40:5 204:7 212:9
215:20
**incorrect** 156:25 192:9
**increase** 28:25 112:24
208:25
**INDEX** 3:1
**indicated** 31:22 171:19
221:11
**individual** 31:25 32:23,24
46:22 163:4
**individuals** 30:11 35:10
**industry** 14:18 20:22 21:10
29:25 160:25
**influence** 11:23
**information** 75:22,23
131:24 132:9,15 133:6
138:9 167:2,4,6 169:13
209:8 219:20
**informed** 74:25 181:13,19
**initial** 28:16 47:4
**initially** 22:18 25:14,14 39:2

47:15 61:13 62:19,23
110:8 112:18 150:19
**inner** 163:17 164:3
**input** 39:9,12 43:8,11,18
44:18 45:3
**inquiry** 180:25 212:12
**ins** 24:8 43:6
**inside** 45:19,20 123:25
**insignificant** 160:14
**insist** 140:6
**insisting** 141:19,22
**inspection** 55:23
**instance** 66:11 119:4 145:21
209:14 213:12
**instances** 66:9 118:9
**instructed** 212:5,6
**instructing** 190:6
**instructions** 211:9,14
**insulting** 180:3 202:25
203:12
**Intelligence** 21:21
**intend** 144:22
**interest** 149:20
**interested** 16:17 157:3
208:13 223:19
**interesting** 42:8 43:7 44:1
180:6
**Interestingly** 157:21
**internal** 219:16
**internally** 116:25
**International** 1:7 7:7 8:1
13:9 14:15 222:3
**interrogated** 7:21
**interrupt** 139:4 151:21
**interrupted** 134:19
**interrupting** 17:8
**introduce** 142:2
**investigating** 199:19 201:1
**investigations** 120:7 131:4
201:6 210:3
**invoice** 115:23 117:15
**involve** 120:25
**involved** 47:17 64:23 117:21
118:9 122:4,8 177:12
**involvement** 118:4,20,23
126:7
**irritated** 160:12
**issue** 27:13 129:17 130:10
138:8 143:24 144:4 149:19
170:12 172:22
**issued** 10:20
**iteration** 154:15

_____

**J**

**Janay** 122:7,12,13

**January** 5:13
**jargon** 76:1
**job** 1:25 19:22 22:1 35:13
  48:10 49:15 58:9,11 70:1
  126:17 127:2,3 148:22,23
  149:1 156:10 167:11,16,17
**jobs** 45:19
**Johnson** 2:5 8:16
**johnsonali@sec.gov** 2:8
**joined** 126:25
**joining** 8:17
**joke** 200:13
**judge** 141:4,10,16,24 142:4
  142:12,24 143:12,22,25
  144:4 145:7
**July** 115:18,23 175:25
  176:19 177:6 179:18
**jump** 57:6
**June** 5:11 191:18
**junior** 201:24
**jurisdiction** 210:13
**jurisdictions** 51:15
**Justice** 203:9
**Justin** 35:16,16 46:24 47:6
  47:16 65:10 114:10 116:1
  116:22 117:1 122:6 146:24
  147:8 202:4,6,8 204:13
**Justin's** 47:3,5

**K**

**K** 2:4
**Karen** 32:25
**keen** 28:14
**keep** 10:25 28:14 62:21 63:5
  74:24 144:8 154:22 157:17
  176:16 180:9 181:24 183:6
**kept** 124:12 137:23
**kickback** 30:23
**kind** 152:6 159:22 190:12
**kitchen** 124:17
**knew** 20:1 21:2,14 24:8,14
  24:21 26:10 28:3 29:23
  40:18,20 43:20 56:11,12
  59:7 72:13,15 73:21
  127:12 131:21 132:20
  138:23 151:8 163:23
  164:21 169:11 173:7 174:7
  174:8 178:22 216:15
**know** 9:23 15:1,15 16:20
  17:24,25 18:20 19:1,3,5,10
  19:18 21:2,5,6,7,10,11,13
  22:4,7,11,12,15,21 23:3,20
  23:22,25 24:1,3,13,13,18
  24:22 25:1,5,24 26:1,2,3,8
  26:8,13,16,16 27:1,6,16

28:12,17 29:7,8,21,21
30:11,12,25 31:22,24 32:4
32:6,7,9,10 33:4 34:7
35:24,24 36:1,9,10,11
37:10,19 38:7,8,19,21,22
39:13,17,18,23,24 40:3,3,6
40:16,22,23 41:2,9,12,20
42:2,25 43:3,4,6,14,19,21
43:22,23,25 44:1,1,4,9,13
44:24 45:2,12,22 46:1,4,5
46:21 47:3 48:1,14,16 49:5
49:12,22 50:1,8,18,20,21
51:9,12,14 52:8,12 54:9,12
55:3,5,17,20,22,23 56:3,10
56:17,18,19,23,23 57:10
57:21,23,25 58:2,4,7,14,23
58:25 59:10,21 61:12,16
63:18 64:17 65:4,6,14 66:6
67:5,6,14 69:20,24 70:17
71:2,16,22,25 72:1,14,20
72:22,22,23 74:2,4,7,10,16
74:17,23 75:6,22 76:2,3
110:1,8,13 112:1,15,17
113:15 114:20 117:1
119:20,22 120:5,20,21
125:6,12 126:2,2 127:8,9
127:11,12,15,16,17 128:2
128:12,12,15,20,25
129:25 130:9,10,14,17,18
130:20 131:17 132:23
133:15,17,20,22,23 135:7
135:7,8,24 136:4,7,9,13,25
137:2,5 138:14,20,21
139:1 142:21 143:7 144:7
144:19 147:9 148:15 149:4
149:25 150:8,12,12,22,23
150:24 151:5,7,11,19
152:23 153:3,11,19,19
156:9,15,20 157:4,5,22,23
157:23,24,25 158:19,23,24
159:2 160:21 161:1,5,9
162:9,15,23 163:2,2,5,7,7
163:15,16,24,25 164:2,2,3
164:4,4,6,7,7,9,14,20
165:8,18,19,24 166:1,1,2,5
166:9,10,10,13,16,20,23
167:14,16,16 169:9,10,11
169:14 170:15,25 171:15
171:16,18,23,25 172:14,14
173:5,21 174:21,23 175:23
177:7,8 178:23 179:1,2,4,5
180:1,2,3,3,16 181:7,8,15
181:18,19 182:12,17 183:2
183:9,11,11,15,17,20,21
184:5 189:17 200:1,2,4,16

200:19 201:13,19,24 202:7
202:17,22 203:21 204:3,14
204:17,25 208:15 209:3,17
213:24 214:4 215:18
216:22,24 217:23 219:13
**knowing** 164:15 165:8
  201:17
**knowledge** 24:12 64:14
  70:12 125:5 182:12 208:11
  208:16 211:19 215:23
**knowledgeable** 29:24
  169:18
**known** 13:9 43:12 177:25
**Koonin** 2:5 8:16 142:11,15
  143:17,20
**kooninr@sec.gov** 2:8
**Kurisko** 115:19 116:1
**KYC** 21:13 22:10 53:13 55:7

**L**

**L** 1:24 7:16 223:3,24
**ladies** 48:21
**lady** 34:25 35:14,17 116:10
**LANDY** 2:11,15
**language** 180:4
**laptop** 190:16
**laptops** 190:14
**large** 9:23 51:4,5 124:6
**larger** 10:7 45:25 67:5,15,19
  67:22
**late** 17:17,23 57:5 122:15
**laughing** 203:21
**laundering** 21:22
**law** 21:23 23:5,6 32:8,9,10
  72:9 73:21 184:1
**laws** 23:9,13 32:7 206:21
  207:3,13
**lawsuit** 13:7 192:2 199:6,10
  199:15
**lawyer** 20:9 21:17 42:12
  73:7 137:7
**laying** 136:18
**layout** 124:4
**leading** 68:7,11 115:9
  129:23 190:17,24 192:4
  206:14,22 207:4,15 215:17
  216:5
**learn** 71:6 72:11
**learning** 71:9
**leave** 44:24 59:19 166:6,9
  182:24
**leaves** 135:8 175:20
**leaving** 172:4
**led** 30:18 63:24 118:12
  130:2 172:23

**left** 35:17 209:7 215:5,14
**legal** 2:22 76:1 192:5
**length** 32:2
**lesser** 67:4,16,17
**let's** 25:5 29:17 42:19 44:7
  46:10 54:24 58:5 64:12
  65:24 115:12,16 116:11
  130:4 140:21 142:4 144:3
  156:8 157:10,24 158:18
  172:16,19 178:10 179:14
  183:24 191:19 209:14
**letter** 126:22,23 127:1,6
  135:18 138:19 145:23
  146:23,25 147:1,7,8,15,18
  148:7,11,13,14,15,20,21
  149:5,6 152:12 154:9
  155:3 156:6 158:13 164:9
  165:14 180:13 182:3,3
  184:2,11 200:7 214:14,17
**letters** 111:20 152:25
**letting** 68:9 74:13 147:9
**level** 41:1 47:1 118:3,19
  126:6,10
**license** 1:24 20:4 135:19
  223:24
**licensing** 20:15
**lie** 132:12,18
**liked** 202:14
**likes** 151:6
**limine** 142:19
**limits** 18:24
**line** 27:2 142:21 180:16
  190:4 212:3 222:4
**lines** 211:7
**link** 140:4 219:8
**list** 27:15 135:17,17
**listen** 33:23 50:2 62:12
  63:16,18 66:23 133:13,20
  138:25 158:16,22 204:15
**listened** 74:3
**listeners** 50:19
**listening** 30:9 51:2,2 127:21
  137:13
**lists** 22:13
**literally** 24:9 41:22 53:6 57:8
  58:15 71:1 133:9 204:21
**little** 9:22 10:11 28:21 36:25
  108:15,16 111:3 115:14,15
  118:17 127:20 134:2,23
  146:5 154:21,23 167:25
  172:10 188:22
**LLP** 2:11,15
**local** 38:4 73:6 162:13
**locally** 109:15
**located** 51:6

locked 114:5
lodged 142:12
log 220:10
long 14:24 17:20 38:8,11,14
  38:18 62:6 110:13 125:24
  147:20 150:12 162:14
  166:20 212:8
longer 36:10 46:2 70:16
  120:24 121:4 123:8 124:1
look 43:2 114:12 164:23
  218:20
looked 127:14 155:3 156:3
  210:11
looking 19:6 35:25 63:4
  163:13 209:12 214:14
looks 116:12 200:9
loop 171:22
loophole 32:5
lot 19:3,3 20:21 21:3,10,14
  22:25 24:5,7 41:12 43:13
  43:14,15,24 48:15 50:6
  61:8 66:21 67:23 68:11
  71:22 75:1,3,4,6 76:1,1,4
  125:18 127:20 128:4,21
  130:7,15 158:13 202:17
lots 203:10
loud 42:14 137:9 147:24
  200:2
loudly 41:24 42:2
lower 73:10
LTG 14:23
lunch 108:4

**M**

machine 58:1 223:8
Madam 68:16 217:15
Madison 2:16
magazine 35:1,3,6,8,10,19
magistrate 143:13,16
  144:25
main 22:10,14 34:5,8,12
  36:3 45:19 47:2 49:19
  55:19,24 120:19 165:21
maintain 157:13
major 74:18,19 150:4
  160:14,17 172:9
majority 215:6
making 19:4 22:11,14,15
  30:16 35:24 41:16 42:17
  46:14 53:12,14,15 55:21
  125:11 126:13 146:24
  151:19 161:4 182:13
  183:18 215:16,19,24
man 24:2 39:18 44:13 48:20
  50:3 56:15 71:14 132:14

132:15,25 135:7,21 151:12
  151:14
manage 46:22 47:2
management 52:23 171:24
manager 35:15,17 73:16
managers 73:12
mandated 21:23
manner 150:5
map 45:13
March 161:21 223:22
marked 9:17 108:20 111:1
  113:19 139:13 154:25
  167:22 168:20 175:12
  184:17 188:19 191:8
  192:17
market 118:15 170:9,13,17
  170:19 172:25 173:5,8,12
  173:19 179:10
marketing 122:14
markets 14:23 24:8 208:17
massive 30:21 45:11 58:2
  124:14
Master's 14:8
Matasumoto 168:4
match 55:14
materials 75:13
Matt 59:17 129:14,14 140:11
  140:11 143:17 219:3
matter 7:25 21:12,19 162:13
  178:8 220:20
matters 119:4,7 132:21,22
  200:13
Matthew 2:11 8:18,18 53:21
  59:18 61:25 62:8 64:5
  65:20 66:2 68:5 69:12
  113:9,13 115:9 117:23
  118:6 129:4,11,16 139:16
  139:20,22 140:3,12,16,20
  141:19,22 143:4 144:24
  145:5,14 146:6 152:25
  153:5,7,16 154:4,11,19
  161:15 171:13 189:23,25
  190:17,24 192:4 201:2
  205:25 206:14,22 207:4,15
  215:17 216:5 219:7,18
  220:1,12
mean 12:21 13:24 14:16
  26:16 28:17 29:14,16 30:3
  32:15 33:12 39:13,15
  43:13 45:1,2 49:17 50:4
  51:10,12 65:21,24 70:7
  74:24 120:18 132:2,6
  135:10 136:10 138:5
  153:21 154:4 158:2 159:24
  160:2,6 164:14,20 165:17

166:3,16 169:10 172:8
  178:17 203:23 210:1
meaning 144:14
means 149:12
medication 11:23
meet 15:4,13 219:8
meeting 27:15 31:17 32:19
  32:21 33:1,25 171:24
  217:9
memories 37:19
memory 28:20 134:15
  168:14
mention 200:3
mentioned 24:17,19 45:18
  48:19 50:12 68:23 69:2
  151:1,23 161:25
mentor 23:24 39:23 127:11
mentoring 11:21
message 72:25 122:20,22
  175:20 176:2 179:23
met 15:6,13 16:2,3,11
mford@fordobrien.com
  2:14
Miami 2:6 140:15 141:5
  144:7
mid 46:9,17,18 57:4 63:11
middle 58:10 124:13,18
  154:21
Miguel 5:4
milk 150:13
mind 28:13 29:19 31:24
  37:22 123:12 136:23 158:1
  158:3 168:16 172:8 180:8
  214:17
mine 149:7
Mintbroker 1:7 7:7 8:1 13:8
  13:14 222:3
minutes 42:23 59:24 140:4
  140:6 142:1 143:10 159:7
  205:7
missed 116:9
mistake 202:21
mistakenly 173:9
MLRO 59:2
moment 58:5 114:19 144:18
  155:5 188:4 211:3,25
  218:19
momentarily 34:18
Monday 1:20 7:13
monetary 119:1
money 18:21 19:3,15 21:22
  41:12 48:15 56:25 182:7
  183:11
monitor 8:6
month 48:4 133:7 210:11,16

month's 117:15
monthly 65:15 210:9
months 20:9 26:3,18 27:24
  31:9,12,15 37:13 46:15
  53:3
morally 128:15
morning 8:13 9:9 13:18
  58:17 115:22 140:4 141:14
  142:9 144:13,14 146:11
  154:17
mouth 135:24,24 136:4,6,9
  166:3
move 138:10,11 142:19
  143:3 157:24 201:16
moved 37:20 57:8,13,14
  73:8 75:2 214:13
multiple 143:1
mute 76:19

**N**

naivety 216:21
name 8:8 9:10,11 14:16
  45:16 47:5 121:6 123:20
  152:4,7 173:24 180:24
  181:2
named 15:1
names 45:10 50:12
naturally 21:11 55:2
nature 121:3
necessary 10:14 125:13
  141:17 145:9
need 10:6 20:5 22:23,23,24
  26:25 41:2 51:22 52:14
  57:12,12 59:20 62:12,17
  63:13,18 67:10 138:21
  142:11 147:24 151:21
  163:15 164:1 166:21
  168:17 180:10 189:17
  200:21
needed 20:1,6 22:8 34:3
  54:18,21 70:14 119:7,12
  130:25 164:5
needing 28:25 52:13
needs 127:23
negotiate 67:6
neither 48:23
never 43:11 44:17,17 54:1,1
  54:4 58:11 59:2,5 69:15
  72:9 73:22 74:6 113:15
  126:11 141:25 146:7
  149:24 160:18 166:8,20
  206:16,23 207:6,16 208:15
  216:22
new 2:17,17 28:5 38:24,25
  48:13,22 49:16 58:20 73:8

110:1 120:11,11 123:5
124:5 141:5 208:25 209:4
209:6
**newspaper** 58:18,20 70:19
**newspaper-type** 35:2
**night** 139:19 142:9 144:10
146:10 153:13 154:13,16
**NIGRO** 1:9 7:9
**non-solicited** 206:20
**non-stop** 41:16
**nonconfidential** 108:2
188:2
**Nope** 39:10
**norm** 171:15
**normal** 127:17 131:8 137:8
160:3 161:9
**normally** 42:13 63:21 67:4
131:10
**note** 28:19 68:6 128:9 175:2
190:7
**noted** 68:12 127:6 142:22
143:3
**notes** 218:20
**nother** 157:1
**notice** 128:16 149:19 219:4
219:12
**noticeable** 125:4
**noticed** 69:25 128:8,17
151:2 152:2 156:23 162:1
166:5
**Notify** 158:5
**noting** 192:18
**Nova** 14:9
**November** 17:17 22:3 23:17
27:23 34:20 36:15 37:8,11
146:22 147:5,23 159:21
165:13 166:12
**null** 223:17
**number** 8:4 12:19 28:25
29:3 38:10,23 39:1,7,25
58:7 109:16,17,19,23,24
109:25 110:1,2,7,9,10,16
110:18 155:13 169:20
191:23 216:3
**numbering** 48:22,23 49:3,9
**numbers** 38:2,5 49:5 65:13
109:6,6,8 171:5
**numerous** 199:23

---

**O**

**O'BRIEN** 2:11,15
**o0o--** 1:3 7:3,12,23 60:7
108:3 159:16 205:17
220:21
**oath** 8:22 221:13

**objection** 53:21 61:25 62:8
64:5 65:20 66:2 68:5,12
69:12 113:9,14 115:9
117:23 118:6 142:22 143:2
143:4,5 161:15 171:13
190:17,24 192:4 201:2
205:25 206:14,22 207:4,15
215:17 216:5
**objections** 142:13
**obtain** 219:16
**obvious** 32:1
**obviously** 45:11 73:23,25
135:8 151:13 164:16
173:20 183:10
**occur** 126:20 159:21
**occurred** 31:20,21 124:3
126:22 145:22 172:21
**occurring** 128:5,7
**odd** 42:8 135:22 161:3
**offense** 174:16
**offer** 65:18,25 66:25 181:23
181:24 182:5 183:11,18,22
221:12
**offered** 66:4,10,14 67:3 68:2
68:20 181:24 182:8
**office** 32:18,19 35:15,16
36:14,18,19,20,22 37:6,21
38:25 57:8,13,19 65:8
71:12 73:9 75:2,3 109:12
123:1,4,6,8,14 124:1,3,5,6
124:6,7,8,10,15,17,19
133:8,11 134:24 135:25
156:11 166:6,9
**officer** 17:6 20:2,7,14 21:22
22:2 23:3,12 55:2 59:2
70:4 72:8,10 121:8 122:11
131:8 133:15 135:13
137:15 138:1 149:11,15
150:18 151:2,2,3,8,18,24
151:25 152:2,3,8 155:16
155:25 156:15 157:7,9
158:4 160:16 162:4,10
166:4 172:2 182:11,22
201:13,14,22 215:19,21
**officer's** 137:17
**officers** 20:5 57:25 73:11
75:6,7 119:14 122:5 150:6
151:5 165:3,5 201:4
202:17 204:10,24
**offices** 57:7
**official** 67:7 119:20 120:9
125:6 137:7,23 148:15,15
149:5,6 157:13 173:14
**officially** 35:11 59:1 70:6
119:22 120:10 126:22

161:20 169:17 173:18
182:21 183:4 215:18
**oh** 40:6,10 41:8 44:22 52:20
72:2 137:14,15,16,17
138:4 140:20 146:6 147:24
147:25 151:11 158:10
188:14 200:13 202:1
203:24 204:3
**okay** 9:22 10:18,22 11:3,7
12:19,25 13:3,18,21,23
14:1,1,6,19,24 15:17,20,22
16:8,24 17:7,15,18 18:10
18:15 19:16,19,20 22:22
22:24 23:8,11 25:11,22
26:15,25 27:17,21 29:10
29:12,15 30:3,15,15 31:5
31:13,16 32:6,11,12,20
33:9,16,22 37:7 38:12 44:5
44:5 50:11 52:3,20 54:5
55:5 57:6 58:5 59:10,13,16
59:22 60:2,18 62:4 64:7,8
64:11 65:24 66:9 69:7 70:5
71:6,19 108:18,22,25
109:8,12 111:7,16,22,25
112:8,11 114:3,14,19,22
114:22,23 115:4,12,16,21
115:25 116:6,14,21,25
117:6,11,25 118:17 119:24
121:9 122:3 123:13 127:18
129:2 130:22 131:15,22
134:1 135:5 138:9,16
139:4,12,20,25 140:20
142:8,9 144:9,11,14,15,18
146:1,4,12,21 147:5,25
148:4,8 150:21 151:4
152:12,15 154:11,20,22,24
155:5,7 156:14 162:25
166:19 167:25 168:1,10,13
168:15,18,21 169:1 170:24
171:25 172:12,16 174:25
175:8,18,23 176:17,23
178:17,21 179:15,17
180:22 181:2 182:25 183:3
184:21 190:6 192:1,23
200:15 202:2,11 205:6,7,7
210:4,8 211:6,10 212:2,22
212:23 213:10,15 215:2
216:9 217:22 218:12,18,25
219:23 220:14
**once** 25:15,15 30:7,7,14
41:14 48:16 51:16 53:25
54:2,13,14 57:9 73:8
150:21 158:8
**one-page** 27:18
**ones** 36:3 45:25 67:24 178:8

204:12
**ongoing** 143:13
**online** 76:10
**open** 17:21 19:9 22:8 23:19
36:22 37:5 48:17 54:25
56:2 62:22 63:5 65:8 66:19
124:11,14 135:9 141:5
**opened** 15:14,18,23,24
17:15 22:2 23:17 25:7,15
26:7 27:22 31:9 34:21
36:15 37:8 41:14 211:15
**opening** 17:10 18:17 26:22
34:19 135:1 136:11 208:12
217:8 218:9,15
**operations** 177:25 178:1
**opinion** 44:18 149:22,24
160:10,11 200:5
**opinions** 150:18
**opportunity** 139:23 142:15
157:4 183:3
**opposed** 45:21 65:5 112:21
**option** 112:13
**options** 112:17,21,23,24
113:4,5,7
**oral** 12:16
**order** 5:1 22:8 169:3,21,25
170:20
**orders** 169:24 171:2
**original** 175:20 223:12,16
**outer** 36:24
**outrageous** 74:9
**outright** 73:21 132:18 134:4
162:21 171:17 174:7
**outs** 24:8 43:6
**outside** 67:1
**owner** 15:12 158:25

---

**P**

**P-H-I-L-I-P** 9:11
**p.m** 108:5,6 147:6 159:12,14
159:15,17 205:13,15,16,18
217:10,11,12 220:7,20
**package** 75:14
**padorsett@gmail.com**
153:8
**page** 3:3 4:3,14,16 10:6,18
109:2,4,5 111:12 147:12
175:17,18,21,24 184:24
188:18 189:12 207:19,21
208:2,18 211:2,24 214:25
222:4
**pages** 1:17 6:4,5,6 76:22
184:19 185:1 192:24
**paid** 181:25 183:25
**paperwork** 152:6 157:10

**paragraph** 34:10 208:1,19 208:21 209:10 211:3,4,8 211:24 212:1,20 213:7,13 213:17 214:11,21,25 215:12
**paralegal** 219:19
**paraphrase** 144:8
**parked** 61:21
**part** 34:25 35:11 45:8 76:12 110:4 140:1 143:13 145:12 148:16 163:17 164:3 171:3 182:20 203:14 217:20
**partial** 132:21
**participate** 60:21 63:8
**particular** 44:7 47:19 50:24 61:22 69:3 109:12 168:13 170:1
**parties** 2:24 7:15 144:20 223:20,21
**partner** 42:11
**partners** 30:10 42:13 43:10 129:13 150:11
**parts** 169:22,23,24
**passed** 133:9
**Pattern** 18:22 48:15
**pause** 25:4 27:21 31:5 32:12 58:5 114:19 129:2 131:16 134:6 145:9 174:25 177:19 203:2
**pawns** 165:6
**pay** 64:10,25 67:16,16 166:23
**paycheck** 183:12
**paying** 66:15
**payment** 112:24 116:11,18 117:14
**payroll** 181:24
**PDF** 37:24 75:18 147:12 148:7
**PDT** 18:22 19:9 24:19 25:25 50:3 51:14
**penalty** 221:5
**Penalver** 5:4 181:3,5,6 189:22
**pending** 8:1
**people** 28:6 38:17 40:17 43:16 49:6 57:12,17 59:7 61:1 62:15,16 73:4 74:3,8 128:21 137:6 151:6
**people's** 156:23
**percent** 10:13 209:1,15 210:14,24
**percentage** 28:16 47:21 64:17,24 210:5 216:3
**percentages** 210:13

**perform** 210:4
**performance** 127:2,3 148:22,23 149:1
**performed** 210:21
**period** 31:10 58:10 61:22 113:16 122:16 129:21
**periods** 66:1
**peripheral** 37:5
**perjury** 221:5
**person** 39:4 40:15 41:1 42:20,21,22,24,25 45:23 47:1 61:17 71:2 73:9,25 74:15 76:13 127:24 137:11 137:14 152:1 173:22 176:9
**person's** 55:14 127:25
**personal** 190:15,16,19,23
**personally** 13:24 14:1 73:4 73:6
**persons** 28:3 49:5 56:23 61:5,14,19 62:25 63:2 66:19 73:15 76:13 207:7 208:16
**perspective** 21:9 36:1 55:19 56:8 59:1 119:3 158:6 167:15
**pertain** 223:11
**Phil** 23:21 43:3 134:25 136:16 158:10 200:15
**Philip** 1:16 5:11,12 7:19,25 9:11 11:5 26:13 29:6 33:11 33:23 44:8,12,15,22 57:11 74:5,7 131:13 132:7,13 138:4 147:22 156:18 157:23 174:21 221:4,17 222:2
**philip@suretrader.com** 116:23
**philipdorsett@suretrader...** 191:6
**phone** 30:9,9 38:2,4,14 39:3 39:7 41:15 42:24 44:7,15 50:2 56:22 75:5,6 109:8,23 109:24,25 122:18 141:16 141:24 142:4 162:2
**phones** 39:5
**phonetic** 13:2
**physical** 24:9 36:14
**physically** 75:11 121:14
**pick** 73:9,16 217:17
**picked** 72:16
**pin** 148:25
**place** 14:22 19:2,5 24:10 30:7 40:17 55:6 57:16 67:7
**placed** 108:23 110:2 112:13
**Plaintiff** 1:5 2:3 7:5,20

**Plaintiff's** 11:4
**plan** 18:18 25:8,11 36:23 37:6 59:25
**planet** 204:6
**planning** 219:5
**platforms** 30:21
**playing** 65:1
**plead** 204:15
**please** 8:11,24 9:9,16 10:4,7 10:23 11:8 12:6,9 14:6 75:14 108:14,19 110:24 111:2,14,15 113:18,20,22 114:19 115:13,16,16 117:6 118:24 121:6 129:14 136:2 139:7 146:21 147:2 147:11,12,21 152:16 154:21,22 167:24 168:1,19 173:15 175:10 176:15 177:18 179:15,15 180:20 184:15,16 188:4,16,17 189:12 190:9 191:19 192:21,23 207:18,21 208:18 211:25 212:21 213:7,15 214:25 217:16 219:12,25
**plus** 16:4
**point** 21:1 26:21,24 28:14 28:23 34:5 40:14 46:22 49:11 50:21 52:8,11 54:11 55:9 57:7,24 60:25 70:6 117:19 123:11 145:4 155:13,13,15 158:21 164:25 178:5,18 179:1 180:10 183:14 199:5 208:1 217:5 218:7
**points** 27:10,16,17 34:6,9 34:12,14
**poor** 203:11
**pop** 188:17 207:21
**portion** 76:16 108:1 124:22 188:1
**PORTIONS** 1:18
**portrait** 9:25
**position** 21:23 58:22 70:1 70:13 131:8 143:15 145:8 157:9,13 158:4 160:19,20 161:3 162:10 163:1 183:4 183:6
**positions** 165:6,7
**possibility** 17:19 18:17
**possible** 30:16 31:2 49:4,21 50:10 54:25 112:17
**potential** 65:19 66:1,15 67:3 68:2,20 178:18
**potentially** 17:10 20:13 49:6

69:4
**pound** 218:15
**powers** 120:22
**practice** 140:14 141:5 144:7
**pray** 172:5
**praying** 164:25 166:18
**precipitated** 63:12
**prefix** 171:8
**preliminary** 19:25
**preparation** 170:6
**prepared** 169:8,10,12,15
**preparing** 131:12
**presence** 121:25 125:3 128:19
**present** 2:21 8:15
**presented** 32:2
**presenting** 162:16
**president** 120:11 121:2 125:1
**pressure** 178:23
**pretty** 18:19 36:11 46:2 114:13 124:6
**previously** 207:24 215:24
**principal** 155:24
**prior** 13:18 142:1 144:14
**privilege** 143:24
**privy** 48:1 65:2
**probably** 17:11,22 27:4 28:18 42:9 57:23 62:24 63:10 73:20 74:8 124:7 128:25 129:25 130:11 133:22 161:22 162:2 180:8 182:12 199:4 208:10 214:16 216:11,20
**problem** 26:5 38:5 54:16 55:12 69:22 143:6 148:22 148:24,25 151:16 156:7 160:13,18 164:7 173:9,13 178:20 182:9,9 203:14
**problems** 33:5 150:4 162:12 202:24
**proceed** 9:5 141:12 143:2 144:22 145:4,19
**proceedings** 108:4 223:4,7 223:11,13
**process** 20:12 35:24 54:21
**produced** 139:17 140:6,22 141:2,7,14,18,25 145:11 145:12 152:22 153:4,9 154:12,13,16,18
**producing** 153:12
**production** 144:17,21 146:13 152:22 153:20 154:2
**products** 21:1

professional 160:25
profits 169:23 171:1
program 30:19 45:6,9 47:8
60:13 68:4,22 164:13,21
programs 66:18
prohibited 70:24
promoting 208:22
proof 52:13 53:13
proper 22:11,14 55:7,8
57:24 142:21
properly 158:5
propriety 51:18
prospective 61:5
protect 27:2 76:3 165:2,3,4
proud 56:25
provide 123:21 167:4,6
189:5 192:11 214:20
219:12,20
provided 15:10 119:16
138:6 153:13 188:9,23
190:12
provides 116:7 178:2
public 58:19
pull 140:21,23 141:1
pulling 146:8
purpose 190:2
purposes 18:10 114:4 171:4
pursuant 4:6,9,12 5:5 48:10
211:8,13
push 55:5
pushing 158:9
put 27:17 34:9 45:12 48:22
53:8 70:18 123:5 135:18
150:2,6,6 158:7,22,23
169:21 173:24 192:15
Putin 204:22
puts 137:10 161:3
putting 11:12 123:22 131:23
148:21 156:20 162:3
202:23 204:19
Pyfrom 122:13

**Q**

qualified 45:3
quarter 26:18 27:5 31:15
134:11 165:11
question 12:5,9,10 36:10
39:24 40:2 68:15,19 110:4
114:25 115:10 138:8,24
141:3 145:2,14 146:7
211:5 214:18 217:17,23
questionable 42:18 128:15
questioned 137:1
questioning 138:20 141:13
142:22 144:22 145:19

146:15
questions 11:25 12:3 38:3
61:6 62:16,22 63:20
108:10,11 109:22 142:3,16
143:2 155:10 184:25 190:8
219:2
quick 218:20 220:12
quickly 47:4 114:13 184:22
188:22
quiet 42:16 133:18
quietly 42:7
quite 17:24 24:2,11 36:12
41:15 43:11 127:13 158:3
163:19 204:21

**R**

R 2:16
Radio 45:14 47:11 48:7
50:13 51:10 117:2
Radio's 48:10 49:15
raise 8:23 113:13 143:12
raising 144:19
ran 22:21 124:14
Ranch 2:12
range 110:20 111:8 175:3
192:18
rate 47:25 67:11,17 68:1
69:4
Re-Notice 11:4
reach 40:1 161:18
reached 17:10 70:18,19
161:12 166:24 167:1
read 9:19 12:11 30:2 68:16
111:5 147:7,10,19,21,24
148:1 176:4 203:20,24,25
211:3,25 212:20 213:8
214:25 217:16,20 221:5,7
reading 131:22
reads 204:6
ready 114:21
real 28:2,5 125:11 127:5
reality 148:23 158:14 161:25
realize 150:15,21 188:21
realized 56:24 69:17 70:21
127:5 128:20 158:8 162:9
163:7 164:11 165:1,4
166:19 184:22
really 18:2 19:16,17,19 22:5
22:18 23:23,24 24:22 25:1
25:2 26:23 28:12,17,18
29:22 34:25 35:18 36:2,2
37:6 40:25 41:1 43:18,19
43:20,23 45:12 46:4,24
49:1,11 55:20 58:25 65:9
73:24 74:16 115:3 126:3

127:10,14 128:11,19,23
130:9 135:24 138:15 139:2
156:7 157:5 162:5,25
163:1 164:9 165:18,20,22
166:15 170:25 172:5,5,9
178:9 181:9 199:24 200:5
200:23 201:25 204:23,23
208:15 215:10 216:22
reason 12:2,8 19:24 24:24
25:17 38:19 40:22 56:10
72:15 127:5 138:15 143:9
158:18 165:21 166:1
170:11,14 174:2,4 182:20
182:24 183:1 211:1 222:5
222:6,8,9,11,12,14,15,17
222:18,20,21,23
reasoned 138:14
reasons 69:21 70:24 169:20
170:5 174:11 182:18,18
183:23 216:10,23
rebates 30:24 48:3
recall 37:11,13 45:7 61:20
63:15,23 66:3 72:7 109:10
109:24 110:6 115:3 120:3
121:13,21 122:21 168:13
169:4 181:9,12 214:22
receive 67:16 110:10
received 110:11 117:3 131:5
139:18 140:4 141:13 142:1
142:6 144:10,11 153:1,10
153:17 214:16
receiving 49:20 214:13
receptionist 124:16
receptionists 58:16
reckless 150:5 163:14,21
204:19 205:2
recognize 108:22 111:11
114:8 116:10 168:23
191:13
record 8:12 9:10 60:4,5,6,9
108:7 110:20 113:16 142:5
143:3,5 149:1,6,7 156:21
159:10,13,14,15,18 171:5
205:11,14,15,16,19 217:10
217:11,13 218:22 219:24
220:4,8,19 223:7,10
recording 203:8 219:22
records 132:17 148:16
184:11 209:9 213:11
red 219:16
redact 132:5,6 163:8
refer 13:13 67:19 152:3
214:6
reference 13:15 112:9 131:5
182:2,3 184:2

referenced 18:5 145:23
147:8 213:16 214:11,21
references 112:3
referred 30:24 38:16 151:24
152:1
referring 18:12 32:4 33:17
66:7 116:18 120:13 123:18
151:3 153:25 154:7 169:2
169:6 170:5 179:24 202:15
203:4 207:23 215:11
refers 200:6 203:8,9,10
reflect 152:7
regard 21:3
regarding 13:19 40:4 45:5
53:19 73:2 108:10 139:5
214:20
regards 190:4
registered 20:5,23,24 21:7
135:13 149:12 160:16
172:1 182:10,22,23 215:21
regular 131:9 137:4
regularly 130:14
regulated 58:22
regulations 23:7 24:13 27:3
43:15,19 55:4 216:17
regulator 42:12 132:12,18
133:20 137:8 149:14
151:19 157:14,19 162:3,12
162:13 174:7 180:17
182:14,25 183:1 204:6
regulators 27:12 33:5 54:3
55:22 135:14,16 163:12,19
164:1 165:19 199:23 200:6
202:12 206:7,9,11 214:6
regulators' 214:4
regulatory 55:19 59:1,7
69:20,21 70:24 120:6
158:6 174:2,3 201:1
rehired 70:3
reiterated 72:24
relate 170:12
related 123:10,12 219:4
relationship 16:10,25 17:2
19:21 70:23 127:7,9
157:21 181:11
relative 223:19
relatively 184:3
relief 167:13
remained 160:5,6 215:6
remember 11:25 32:5 34:12
35:15 38:5 40:19,22 48:1
48:19,20,24 49:7,8 52:16
54:10 55:9 57:14 58:16
63:15,23 66:18,20 68:24
70:22 109:25 120:5 121:3

121:14,15,23,24 123:5,17
123:20 133:6 137:3 150:14
170:17,21 181:16,21 184:9
199:16 204:11,12 210:20
210:22 216:9 217:5,7
218:6,8,16,17
**REMEMBERED** 7:13
**REMOTE** 1:19 2:1
**remotely** 2:24 7:21 223:5
**remove** 157:8 183:3
**removed** 155:23,24
**removing** 155:14
**render** 223:16
**renegotiate** 47:25
**renewed** 159:22
**rep** 61:3
**repeat** 12:10 68:15 214:18
**repeating** 144:8
**report** 182:25 183:1
**reported** 1:23 209:8
**reporter** 7:17 8:8,21 12:10
59:20 68:16 159:8 190:7
191:9 205:9 217:15 219:6
219:13,15,21
**REPORTER'S** 223:1
**Reporters** 8:10
**reporting** 21:22
**represent** 18:6 152:18
**represented** 9:13
**request** 12:6 119:5 132:3
134:9 138:9 139:22 140:5
209:17 213:16 214:2,10,20
**requested** 131:12 211:18
223:14
**requesting** 131:6
**required** 21:16,17 184:1
**requirements** 20:4,14,17
21:16 59:8
**requiring** 174:3
**research** 19:18 20:1 164:10
164:10,11
**reserved** 42:16
**resident** 212:8 213:4
**residents** 213:20 214:1
215:7
**resign** 182:23
**resigned** 70:7
**resolution** 71:3,5 178:18,20
178:24
**resolved** 179:6
**respect** 23:9 25:12 44:6
62:7
**respond** 118:16 131:14
149:3 152:13 173:17
176:10

**responded** 139:3 147:8
156:24 176:14 177:15
179:8
**responding** 154:8,9
**response** 71:21,22 147:10
147:14,17 148:11 152:12
152:24 155:2,6,11 156:3,6
156:21,24 158:13 162:5
165:14,15 177:8 178:2,14
179:11,12,20 202:15
214:10
**responses** 130:18 162:6
**responsibilities** 19:22,23
22:1 23:8
**responsibility** 23:11 41:6,8
41:9 151:18 157:14,15
158:6 160:21
**responsible** 35:19 53:2,5,10
209:6
**rest** 24:11 63:20 140:2
177:17
**restate** 65:24
**restricted** 19:11
**result** 72:11 117:11
**resulted** 190:8 208:24
**resumed** 108:4 124:25
125:17
**retain** 28:20
**retrospect** 46:12
**returned** 126:8
**reverse** 117:13
**reversed** 117:4
**review** 113:21 140:8 142:17
155:5 167:24 175:10
192:22 210:4,8 213:21
223:13
**reviewed** 155:8 209:4,9
213:11
**right** 8:23 11:11,17,21 15:1
15:4,25 16:10 18:16,25
20:6,19 21:14,25 22:6,21
23:18 25:4,16,21,25 26:3,6
26:13,16 27:3,8,14,19 28:3
28:6,7,22 29:20 30:2,5,8
30:19 31:4,14 32:16,18,22
33:15 34:17,23 35:12,17
35:19 36:13 37:11 38:15
38:17 40:18 44:6 45:4,10
45:12,13 46:10,14 47:5,7
47:13,14,23 48:13,23,24
48:25 49:14,21,23 51:2
52:15,18 53:4 54:19 55:1
55:15 56:14 58:13,20,24
59:3,10,17 60:22,25 62:11
62:11 63:21 65:11 66:11

67:18,22 69:1 70:8,12,20
72:15 74:1,4,5,6,8,25 75:1
75:16,23 76:4 109:18
110:19,22 113:11,17 114:3
114:23 115:6 116:8,11
117:13 122:9 124:8 125:10
127:2,4,20 128:4,15 129:7
129:20 131:2 133:1,9
134:2,19,22 135:19 136:19
138:6,16,22 139:15 141:10
141:23 142:18,25 143:18
145:3,9 146:23 148:5,10
148:20 149:2 151:15
156:12 157:2,8 159:4
161:9 165:25 166:4,6
167:19 168:1,14 169:2,10
169:16,17 170:7,11 172:24
173:8,15,19 174:8,11,13
174:19 176:1,4,8,17,17
177:9,10,16,24 178:4,15
178:23 179:25 180:5,8
183:13,14 184:14 188:3
190:11 191:13 192:14
201:12 204:22 211:7 212:3
212:16 213:18,20 214:24
215:10 216:10,19 218:19
220:17
**ring** 39:3,4,5
**risk** 150:2,6,7 158:22,23
183:14 202:23 204:19
**Ritchie** 47:6 116:1,22 202:8
**Ritchie's** 202:11
**RMR** 1:24 223:3
**Road** 2:12
**rogue** 203:6
**role** 23:2,16 47:4,4 64:25
**roles** 22:4,5
**rolling** 46:16
**room** 57:15 124:11
**rough** 220:13,15
**roughly** 209:1,15
**RSA** 1:24 223:4
**rule** 18:22,22,24 19:2,4,9
24:19 25:25 48:16 50:3
51:14
**rules** 11:22 12:12
**ruling** 43:23 144:4 145:1,7
**run** 24:11 43:3 72:1 74:18
74:18,19,23 128:3 158:19
**running** 23:6 46:10 120:21
**runnings** 119:15 120:24
**Russell** 2:5 8:16 143:19,19

─────────

**S**

**S** 4:1

**s.24(d)** 4:7,9,12 5:6
**sabotage** 136:11
**safely** 164:12,14
**sanctioned** 53:15
**sanctions** 22:13
**sat** 12:23
**save** 221:9
**saw** 49:3 125:18 146:9
149:2 157:2 162:20 189:10
**saying** 30:4 32:5 38:7 42:1
42:24 43:16 56:22 58:20
63:16,18 67:9 123:8 127:2
133:2 137:13,23 138:19
149:16 172:20 173:7,11,14
173:18 202:25 203:5,16
**says** 42:25 72:23 109:18
111:6,19 112:5 115:21
117:3 127:23 131:25 132:4
132:10 134:25 135:12,12
149:7 153:7 155:13,14
159:3 174:21 177:1,13
208:3,21 212:4
**scary** 199:25
**SCB** 18:12 20:22 21:1,17
44:22 58:23 119:5 120:14
131:9,14,18 134:9 152:7
**SCB's** 138:9
**scene** 125:5,7
**schooled** 112:20
**screen** 9:20,25 10:5 116:21
**scroll** 11:8 108:15 111:15
113:20 114:16,18,21,22
115:14,15,25 116:16 117:5
146:3,4,9 147:2,12 148:2,2
148:2,3,6 154:21,23 155:7
167:24,25 175:10 176:16
177:16,18 178:10 179:14
184:19 188:16 189:12
191:10,19 192:21,23
207:19 208:18
**scrolled** 10:24 114:13
184:22
**scrolling** 10:25 108:17
175:19 176:1,16 188:21
**se** 164:22
**seasoned** 160:25
**seated** 124:15
**SEB** 165:22
**SEC** 7:25 10:20 13:7 33:15
132:15 161:19 164:9,12,21
165:9,12 166:11,14,25
167:1,1,4,7,10 188:7,10,23
189:6 192:12 199:9 200:4
200:6,13 203:10 206:12
214:8 222:3

**SEC's** 192:2 199:6,10 219:15
**SEC-FL-0348-E-0000228** 171:7
**SEC-FL-03848-E-0000228** 4:23
**SEC-FL-03848-E-0000229** 4:24
**SEC-FL-03848-E-0000230** 5:2
**SEC-FL-03848-E-0000231** 5:2
**SEC-FL-03848-E-0001195** 175:4
**SEC-FL-03848-E-0001195...** 5:8
**SEC-FL-03848-E-0001431** 5:10 188:14
**SEC-FL-03848-E-0012118** 4:19 114:6
**SEC-FL-03848-E-0012120** 4:20
**SEC-SCB-P-0009184** 4:5
**SEC-SCB-P-0009221** 4:6
**SEC-SCB-P-0010164** 4:8
**SEC-SCB-P-0010198** 4:8
**SEC-SCB-P-0010391** 5:4
**SEC-SCB-P-0010409** 5:5
**SEC-SCB-P-0010428** 4:11 4:11
**SEC-SECWEBCAPTURE-...** 4:15 110:21
**SEC-SECWEBCAPTURE-...** 4:15
**SEC-SECWEBCAPTURE-...** 4:17 111:9
**SEC-SECWEBCAPTURE-...** 4:18
**second** 68:10 124:20,21 129:3 134:7 177:19 203:3 212:23
**seconds** 218:24
**secrecy** 164:17
**securities** 1:4,8 2:4 4:7,9,12 4:13 5:1,6 7:4,8 8:14 13:10 14:18 18:7,9,13 24:8 58:12 71:17 123:8 124:1 131:6 156:16 161:12 163:8 169:18 204:7 206:21 207:3 207:12 208:6,13,14
**see** 9:23,25 10:6,13,18,19 11:1,3,7 26:5 37:2,3 63:4 109:5 111:6,19 112:3,8 115:6,18,21 116:1,11,21 117:8,19 125:12,18 126:12

127:25 143:6 146:17 153:13 154:24 155:12,17 156:23 163:18 168:3,10,17 170:20 175:23,24 176:19 177:17,21 178:11,14 179:17 180:2 184:11 189:14 191:1,22 204:9 208:3,7,21 209:14 219:3
**seeing** 129:21 133:22 180:2
**seeking** 144:6
**seen** 11:11,13 47:13 64:8,9 146:7 199:13
**sees** 70:2
**selected** 50:25 51:4
**self** 137:8 160:3
**selling** 20:25
**send** 30:22 31:1 33:13 47:22 49:21,25 50:9 65:21 67:9 119:6 131:10,25 132:15 178:25
**sending** 27:20 127:5 169:24 176:11
**senior** 41:1 47:1 57:25 75:7 119:14 122:5 201:4
**seniority** 74:3
**sense** 40:1 61:1 62:14 110:12 167:13 179:7 202:22 216:12,13,14
**sent** 51:18 52:4 65:15 116:11,12 122:24 133:6 140:1 146:25 152:12 153:15 156:2 170:18 173:14 178:3,15 180:13
**sentence** 212:24
**separate** 27:18 69:17 76:8 76:14 119:19
**separated** 120:8,16,23 121:10 122:17 123:2,11 125:9
**separately** 1:18 6:2 76:17 76:23 181:4 185:2 192:25
**separation** 69:19,22 72:19 120:20 126:1,6
**September** 117:16,17,20 189:9,15
**Series** 14:12
**serious** 137:13 200:10,13 201:6
**seriously** 172:4
**service** 35:22
**services** 15:11 21:1 208:23
**session** 68:10
**set** 7:22 38:9 39:2,4 47:15 61:22 62:19 63:1 67:14 76:13 136:2 151:6 223:6

**setting** 38:23 162:17 165:4
**setup** 36:18,19 62:24
**shalpin@fordobrien.com** 2:18
**Sheet** 221:11 222:1
**shifted** 30:8
**shook** 128:20
**shooting** 56:2
**short** 25:18 59:12 153:3,11 159:6 205:3
**shorthand** 7:17 223:1,8
**shot** 138:25
**show** 44:3 54:3,17 69:18,22 72:18 76:14,16 120:20,22 121:14 154:21 169:25 170:8 173:4 176:12 207:20
**showed** 49:1 58:18 157:12 165:24
**shut** 26:15 132:24
**shutting** 46:3
**sic** 165:22
**side** 26:4 45:1 124:14 219:25
**sides** 157:24
**sign** 27:11 33:15 51:22 52:6 59:25 123:5,7,9,16,22
**signature** 55:11,12,13,15 76:14
**signed** 53:18 76:17 170:18 173:24 211:12 212:10 221:17 222:24
**significant** 76:17
**significantly** 127:8
**signing** 51:19 52:5
**signs** 76:14
**similar** 69:1 118:8,9 180:12
**simple** 67:11
**single** 73:9 124:23 188:15
**sir** 8:24 137:2
**sit** 36:24 63:14 188:25 192:8
**sitting** 37:3
**situation** 126:19 130:24 134:20 143:8 160:5,6
**situations** 150:1
**six** 15:8,18 34:14 37:13 53:3 133:10
**size** 58:6 124:7
**sized** 124:8
**slash** 35:2
**slow** 111:16 176:17 178:12
**small** 36:20 37:6 57:15
**smart** 29:22
**sole** 201:16
**solemnly** 8:25
**solicit** 27:14 54:4 206:13

**solicitation** 205:22 215:9
**solicited** 30:5,6 53:20,25 211:22 212:13 215:7
**soliciting** 54:5,12 206:4
**somebody** 63:19
**somewhat** 171:18 180:3
**soon** 128:8
**sorry** 14:14 17:7 55:11 66:12 108:13 110:3 115:8 131:15 133:4 136:21 139:3 146:3,24 147:25 152:11 163:3 167:25 176:25 178:11 192:15 202:5 209:19 214:18
**sort** 15:14 24:3,24 30:8,14 30:23 33:8 35:3 42:10 46:22 49:7 53:14 56:10 59:5,9 65:10 68:9 69:16 70:22 74:14 75:16 112:20 119:5 124:17 126:21 127:15,23 128:19,20,23,23 130:1,2 137:12 138:18,21 173:3 174:9 179:4 200:11 216:18
**sorted** 210:12
**sounds** 15:19 59:18
**source** 151:9
**South** 2:12 14:11
**Southeastern** 14:9
**Southern** 1:2 7:2 8:2,3
**space** 57:12
**span** 124:14
**speak** 13:18,21 45:25 64:13 127:16 133:7,12 156:25 179:5
**speaking** 75:4,5 150:10 204:12
**specific** 21:15 47:8 63:12,23 63:24 64:12,20 112:2 132:3 201:10 211:4
**specifically** 33:1 40:6 45:7 64:19 109:2 122:21 150:2 207:7 213:18 214:7
**specifics** 64:22 121:24
**spectrum** 23:5
**speculate** 170:3,4 174:12
**SpeedTrader** 22:19,20,20 75:19 76:1
**spell** 9:10
**spend** 54:11 56:16
**spending** 56:18,25
**spent** 75:3
**split** 136:23,23 183:9,17,24 183:25 184:5,6
**spoke** 13:22,24 42:7 45:8

71:12 199:2,4 204:11
**staff** 35:7,25 36:5 53:7 57:22
58:8,15 59:6 73:11 132:21
132:22,23,25,25 133:3
136:17,19 201:24 209:6
212:6
**stage** 39:22
**stamp** 175:3 189:21
**stamped** 114:6 153:17
189:19 190:7
**stand** 150:22
**Standard** 7:15 219:9
**standing** 148:24
**start** 11:17,21 23:18 26:19
28:19 46:13 54:25 114:16
114:17 128:25 136:17
142:1 143:11 150:9 155:12
219:4
**started** 15:8 17:16,18 18:20
26:24 27:20 36:5 51:17
63:8,11 127:21,25 128:16
130:3 131:21 132:13 134:2
136:15,22 149:9 150:15,21
164:10,23 172:3,4,5
173:15 190:14 203:8
**starting** 146:2 175:20 211:8
**starts** 135:17
**state** 7:17 9:9 155:19 213:19
213:25
**stated** 143:1 215:3
**statement** 58:19 135:22
192:9 208:9 211:16
**states** 1:1 7:1 8:2,3,14 13:1
18:6 19:13 50:4
**stating** 170:19
**stay** 31:25 32:14,15 45:19
62:20 218:22,23
**steady** 208:25
**stealing** 140:18
**STENOGRAPHER** 8:23 9:4
68:18 76:18 110:3 142:14
217:19,22 220:9,14,17
**Stenographer's** 223:16
**stenographic** 220:19 223:1
**Stenographically** 1:23
**step** 34:17
**Stephen** 2:16 8:20
**stepped** 120:4
**sterling** 218:15
**stick** 23:21
**Stock** 15:10 22:21 40:19
169:19 170:15,18 172:24
173:4,10,12,18 174:1
176:10,14 179:8 181:1
**stole** 140:9

**stone** 62:19 63:1 67:15
**stood** 45:10
**stop** 62:4 64:11 115:16
138:25 142:18,23 143:18
145:3 168:1 176:1 179:15
**stopped** 19:11
**stopping** 143:21 144:5
145:5
**story** 157:1
**straight** 41:10
**straightforward** 34:15
**strange** 108:16 174:21,24
**streamlined** 76:10
**strike** 167:9 209:23 216:25
217:25
**stringent** 20:18
**strong** 36:11 164:6
**students** 38:7,17 45:21 49:3
135:9 136:16
**study** 209:16,20,25
**stuff** 17:25 20:11 21:14
22:15 38:9 41:3 43:13,15
44:19,20 48:4 62:13 73:16
130:3 133:21 137:9,11
158:17 165:20 171:21
172:6,10 174:22 180:4,7
202:2 204:18 205:1 216:14
219:20
**suave** 42:14 137:9
**subject** 168:10
**submission** 212:10
**submitted** 192:2
**subpoena** 4:4 10:19
**subsequent** 54:19 165:23
**subsided** 160:4
**substance** 114:11 115:1
154:17
**substances** 11:24
**sudden** 133:3
**suffice** 33:15
**sufficient** 10:16 159:7
**suggestions** 29:23
**Suite** 2:6,12
**Sum** 2:4 3:4 8:13,13 9:6,8
9:15,18 10:2,8,12,15,23
11:2,8,10,18,20 53:22
59:10,14,17,22,25 60:10
60:11 62:1,9 64:6 65:23
66:8 68:12,13,16 69:6,13
108:8,13,21 110:3,5,19
111:2,4,8,10,14,18 113:11
113:17,20,24 114:4,7,15
114:24 115:12,17 116:16
116:17 117:5,7,24 118:7
119:25 120:2 129:14,19

139:7,11,14,18,21,24
140:11,14,17,23 141:12,17
141:20 142:5 144:9 145:2
145:8,16,20 146:2,12,16
147:2,4,11,13 148:6,9
152:16 153:3,6,8,11,18,23
153:25 154:3,7,15,20
155:1,8,9 159:5,11,19
161:17 167:20,23 168:2,19
168:22 171:4,9 172:11,17
172:18 175:2,7,9,13,19,22
176:15,18 177:16,20
178:10,13 179:14,16
180:19,23 184:15,18 188:3
188:5,12,20 189:11,13,16
189:24 190:6,10,21 191:2
191:7,9,12,19,21 192:7,14
192:18 199:1 201:9 205:3
205:7,12,20 206:3,17,24
207:9,17,22 208:18,20
215:22 216:7 217:14,21
218:11,19,23 219:1,12,23
220:3,14,16
**sumal@sec.gov** 2:7
**summarize** 21:25 44:9
**summer** 26:2
**Sunday** 142:8
**support** 35:22
**supposed** 29:7 48:9 66:23
**sure** 18:2 19:19 22:12,14,15
23:3,5 26:8,9 27:2 33:14
35:24 37:9 44:25 50:8
53:12,14,15 54:6,7 55:3,21
56:1 59:7,8 61:15,16 74:15
74:16 121:17 122:15
123:10 125:2,15 135:2,10
158:10 160:23 161:23,24
172:10 215:21 217:6,15
218:7 220:1
**surely** 161:1
**SureTrader** 1:9 4:7,10 5:3
7:9 13:10,14,15 15:9,18,23
15:24 17:5,10,15,20 18:17
19:9,14 22:2 23:9,12,16
25:7,8,13 27:22,24 31:9
33:4 34:20,21,24 35:1,11
35:13,21 36:14 37:7,14
38:2 39:11 40:8 41:7 46:7
47:9 48:11,12 49:16,17
50:25 51:17,25 60:14,20
61:3,11,21 62:6,14 63:8,13
64:1,15,24,25 65:18,25
66:9,14 67:21 69:11 73:1
73:18 109:1,8,23,24
110:15,16 112:14 113:7

118:3,22 124:23 152:8
154:5 167:12 168:5 182:10
188:6 190:12,16 191:4,5
192:3 199:7,11,19 200:25
202:12 205:22,24 206:1
208:5,5 209:5,7,13 211:20
211:22 212:6,13 213:2
215:5,15 216:9,24 217:2
217:24 218:2
**SureTrader's** 40:4 108:10
109:3 110:2,6 206:19
207:1 208:23 209:2,15
210:5,25 216:4
**SureTrader.com** 4:5
**surface** 181:23 182:4
**surprise** 55:23
**surprised** 26:1 131:20
**surrounding** 118:12
**survive** 36:10
**suspected** 182:17,20
**suspend** 141:23
**swear** 8:22,25
**swing** 17:14
**Swiss** 1:8 4:13 5:1 7:8 13:9
13:14 58:12 123:8 124:1
**switch** 49:8 57:7 70:2
**switched** 132:20,22
**sworn** 7:21 12:16,22 223:7
**Sykes** 30:20 38:6,12,16
45:11,12,20 50:12 61:6,7
65:3 68:24 69:1 134:25
135:3,18,22,23 136:1,3
**Sykes'** 45:21 136:6
**system** 48:22,23 49:4,9 55:8
67:7 132:8 166:2 203:13
**systems** 24:10 55:6

---
**T**
---

**T** 4:1
**table** 64:4
**take** 11:18 14:20 15:21
24:10 59:11,14 108:18
128:9 132:14 133:11
149:15 152:16 155:5,20,22
158:5 159:5 162:17 163:23
172:17 182:7 184:15
189:16 192:15 200:12,23
205:3 211:3,25 213:22
218:20,23 219:10 220:13
**taken** 222:2 223:5
**takes** 17:24
**talk** 41:4 42:8,9 45:21 48:12
48:12,14 49:16,17 55:17
127:17,19 166:22 172:19
181:6 199:18 200:18

Philip Dorsett (nonconfidential)
2/27/2023

17

talked 25:5 199:6
talking 17:23 18:8 24:17
    38:13 41:17,17 42:10,11
    42:13,15,19 43:21 50:2
    51:13 60:13 65:10 67:20
    74:12 126:13 127:22
    129:20 130:3,23 137:4,7
    137:11,21,21,23 162:22
    163:12 200:1,2 202:9,14
talks 137:10
tape 219:16
task 60:22 61:11
taste 203:12
tat 144:20
taught 127:13
teach 23:21 35:25 43:5
    127:12
technically 123:6
technology 55:13 190:12
telephone 109:6 137:3
tell 4:10 26:7 29:2,6,14,18
    39:13,15 40:3,17 42:15
    54:12 56:13,17 64:21
    69:23 71:24 132:9 137:12
    158:16 183:23 205:21
    206:8,11,18,25 209:24
    210:1
telling 30:4 50:2 72:15
    138:21,25 162:8
ten 36:23 57:9 59:24
tenacity 41:16
term 18:12 120:16
terms 57:5 58:6 76:3,6
testified 60:14 63:25 69:7
    75:13 120:4 213:10
testify 10:19 11:15 13:7
testifying 28:22 139:6
    175:15
testimony 9:1 12:17,22 45:5
    51:25 119:16 145:24
    215:25 221:6,9 223:10
Texas 2:13
text 122:20,21
thank 9:4,6 10:4 11:9,18
    12:15 14:21 18:15 60:10
    76:21 110:22 119:25
    129:11,18 146:3 148:8,8
    154:19 184:21 191:11
    217:14 219:1 220:17
theorized 19:5
thing 19:9 22:24 24:24
    25:15 31:4 35:2 42:25
    49:20 54:13 55:20,24 59:9
    71:11 120:19 123:5 128:23
    136:16 138:22 144:25

151:5 157:5,20 162:1
    170:25 172:13
things 16:22 17:14 22:10,13
    24:19 40:18,21 44:4,14
    45:22 46:1,3 55:18 56:12
    56:20,22 57:21 58:3 66:25
    67:14 69:25 75:21 76:4
    119:11,11,12 127:4,17
    128:19,22 129:1 130:8,10
    130:15,23 134:1,5 135:17
    136:13,22 138:11,15,17
    148:21 149:16,18 150:5,15
    156:21 157:19,25 158:11
    158:13,15,23,24 160:3,3,8
    160:14,14,15 161:8,10
    163:1,6,8,13,21,21,22
    165:1 166:3,13,14,15
    167:15 170:23 172:6
    180:16 182:16 184:3
    200:11,16 201:11 202:13
    203:1 204:19 214:13
    219:17
think 13:1 15:14 16:3,12,19
    16:21 17:16,22,22 19:24
    19:25 20:3,9,23 21:3 25:14
    26:12,21,22 28:1,17 30:23
    31:22,22 34:9 35:3,6,9,14
    35:14,18 36:23 37:21 38:6
    38:24 39:2 40:14 45:20
    46:12,23 47:24 50:15 52:8
    56:8 57:1 61:2 62:18,19,22
    62:24 65:3,6,9 68:7 69:19
    70:6,18,19 72:4,5,17 74:12
    76:14 109:20 110:10,11
    112:18,19 116:10 119:19
    120:6,9,10 121:1 122:11
    122:13,22,24 123:12
    128:24 129:5,17 131:21
    134:17,18 136:17 141:1
    142:11,21 150:9 155:23
    159:5 161:20,20 164:1
    165:10 166:21 168:16
    169:16,19,19,22,25 170:7
    170:23 171:3 172:4,5,8
    173:14 176:5,11,11 177:7
    177:11,14,24 178:3,5
    179:7 180:9,15 181:13,21
    183:9 184:4 189:9 201:19
    201:24 202:14 203:10
    204:10,16 206:6 209:21
    210:3,9,10,17 211:1
    213:20 214:15 217:3,4,6
    218:3,4,7,14 219:23
thinker 57:11
thinking 31:23 134:16

135:14 149:5 150:10
    162:14 164:24,24 166:17
thinks 151:14
third 212:3
thorn 170:15
thought 16:15,16 41:12
    42:18 120:7 150:16,17
    166:16 174:20,24 182:6
    183:8,20 203:22
thrash 148:20
Thread 4:19,21,22,23 5:7
three 15:25 16:4 31:15
    35:10 46:15 163:2,3
throw 202:25
thumbs 42:4 43:24
tier 73:10
Tim 30:20 38:6,22 45:11,12
    45:20,21,22 48:20,24
    49:12 50:15,21 61:6,7 65:3
    66:23 68:24,25 110:11
    134:25 135:3,18,22,23
    136:1,3,5
time 7:15 8:6,7 15:13,22
    16:3 17:18 20:19 21:20
    24:21 25:18 28:21 29:21
    31:10 35:4,11 36:2,9 44:20
    46:5 48:1 55:13 57:21 58:1
    58:4,10,11,12 59:20,22
    60:3,8 61:23 65:6 71:24
    74:12 75:3,17 108:6 110:9
    110:16,17 113:15 117:19
    118:2 119:19,23 121:1,9
    121:17 122:2,7,16 123:2
    124:3,25 125:2,4,9,10,14
    125:16 126:5,15 127:19
    129:21 130:5,7,12,12,18
    131:2 134:22 136:25
    142:17 144:6 146:8 147:1
    150:21 159:5,12,17 161:11
    161:22 162:9,14 164:17,19
    164:21 166:15,19 172:3
    173:21,23 188:9 199:2,4
    200:6 204:13,20 205:13,18
    209:12,17 210:23 215:21
    217:4,4,12 218:4,5 219:3,4
    219:8,9 223:5,6
timeframe 17:9 31:6 46:6
    134:8
times 12:20 42:7 44:11 57:9
    61:18 66:5,14 70:4,11 75:1
    75:4 132:22 143:1 148:19
    150:5 163:20 165:8 200:9
    208:4
tinker 9:22
tit 144:20

title 20:25 35:15,18 70:1
    119:23 120:25 125:1,15
    162:11 182:10,15 183:6
titled 199:14
titles 125:6
today 8:9 11:14,22 12:3 13:6
    20:19 142:16 188:25 192:8
    219:3
today's 8:5 220:5
told 16:19,20 17:3,5 18:22
    20:6 23:20 24:20 28:2
    38:21 39:19 41:10 54:7,10
    58:21 62:12 66:23 69:15
    70:16 71:25 72:2,20,22
    76:12 131:23 135:23,25
    136:25 138:14 149:4,10
    156:6 158:15 160:22 177:8
    179:8 180:14,14 202:20,21
    202:22 203:1,14 206:12,16
    206:23 207:5,7,11,16
    213:24 214:22
tomorrow 142:17 219:8,10
tomorrow's 219:4,22
ton 19:14
top 108:19 113:23 114:17
    117:19 119:2 136:12 148:7
    168:16 172:8 176:16
    191:20
topic 33:18,25 34:18
total 45:17 210:18
totally 45:2 49:8 130:5
town 30:15
trace 134:14
track 28:14
trade 15:11 19:3,7 20:23
    66:5,15 67:3 73:15 124:12
    173:10 217:1 218:1
traded 208:5
Trader 18:22 48:16
trades 18:25 24:10 66:20,24
    68:25 69:4 216:25 217:24
trading 19:11,12 45:14,15
    47:10 48:7,10 49:15 50:4
    50:13,13 51:10 55:1 64:13
    64:16,20 67:10,24,25
    117:2 208:13,16
traditional 112:21
trajectory 57:4
transcribed 223:8
transcript 5:17 108:1 188:1
    190:4 220:11 221:6,8
    223:9,12,14,16
transcripts 219:16
transfer 111:24 112:19
transfers 112:25

**transmission** 140:2
**treating** 151:17
**treats** 165:6
**trial** 8:15 13:4,5 66:1,4,7
**tried** 53:8 119:19 138:15
158:21 162:21 204:15
**trouble** 133:16 136:14
162:12
**true** 119:16,18 135:23
136:10,14 174:8 178:22
221:8 223:9
**trust** 16:21 42:21,23,25 43:1
165:25 166:10
**trusting** 130:6
**truth** 9:1,2,2 149:8 180:9
**truthfully** 11:25 12:3
**try** 10:12 47:25 55:5 133:19
136:10 141:16 142:4,10
143:15 158:24 166:22
169:21 180:9 184:5
**trying** 22:16 29:19 30:12
31:6 41:17 43:5,9 44:3
56:1 60:23 70:23 118:19
129:14 132:14 133:14
135:4 137:20 148:25
150:19 157:17 174:10,12
178:5 216:14
**turn** 42:3 43:1,24 44:8 211:2
212:19,23 213:7 214:24
**turned** 138:2 142:8 144:13
158:9
**twice** 116:12,19 117:2
**two** 16:4 20:5 31:11,15 35:7
36:7 42:7 45:18 117:3,8
151:4 155:15,20,22 190:13
**type** 22:13,15,24 33:11
55:18 56:3 69:4 164:12
200:22 204:18 205:1
216:22 219:16
**typed** 34:7
**types** 67:2 117:21 118:9
**typically** 117:20

**U**

**U.S** 18:24 23:9 24:13,18,22
24:25 25:8,12,24 26:5,14
26:19,21,25 27:3,10,12
28:10,15,17,18 29:13,16
30:4,15 32:7 33:4,5,13,14
33:19,19 34:6,10 38:10
39:6,25 40:19 43:15,19
45:1 50:15,16,17,19,20,22
50:22 51:8 52:6,19,22 53:1
54:3,14,16 109:19,20,23
110:2,7,8,10,12,15,18
112:12 161:12,18 163:12
163:16 164:1 165:12,19
166:2 167:14 188:7 199:19
201:1 202:12,23 203:13
205:22,23 206:2,4,5,11,13
206:19,20,20 207:1,3,11
207:12 208:6,14 209:3,16
209:17 210:6,25 212:8
213:4,19 214:1 215:7
216:4 217:4 218:5
**U.S.-based** 38:13 51:24 52:4
53:17 208:24 211:11,21
**Uh-huh** 215:13
**ultimate** 113:6 172:19
**ultimately** 53:5,10 118:12
118:13 126:10 159:1
172:23 176:5
**unbinding** 223:15
**understand** 12:5,12 13:15
18:11 31:6 58:6 60:16
118:19 130:22 140:9
145:24 151:22 158:25
161:1,7 178:17 203:23
**understanding** 22:7 64:3
116:6 208:16 214:3 221:12
**understood** 33:12 44:25
51:25 74:9 161:5
**unfortunately** 130:14
**ungrateful** 183:20
**Unit** 21:21
**United** 1:1 7:1 8:2,3,14 13:1
18:6 19:13
**University** 14:11,15
**unsealing** 223:15
**unsolicited** 27:7,9 30:1 31:7
31:18 32:3 33:9 34:1,4,18
46:11,13 51:19 52:5,7,11
52:18,23 53:16,18 54:15
76:8,11,15 207:2,11
211:13 212:10
**untrue** 189:1,4
**unusual** 31:17 143:23
**updated** 37:20
**upset** 38:6,16,22 133:5
151:7 158:16,19 176:8
177:10 183:17 204:10,14
**urge** 164:6
**USA** 15:10 22:21 40:19
109:18 169:19 170:15,18
172:24 173:4,10,13,18
174:1 176:10,14 179:8
181:1
**USD** 112:7
**use** 18:11 70:13 129:25
145:1 190:15 191:3 207:1

**uses** 203:10
**usual** 171:15

**V**

**v** 222:3
**Valine** 1:24 7:16 8:9 223:3
223:24
**various** 24:9 30:10 43:16
45:24 65:16 113:5 127:17
127:22 169:24 171:2
**vast** 215:6
**verbatim** 34:13 75:19
**verbiage** 50:6
**version** 22:19 152:19,20
153:12
**versus** 7:25 13:1
**vet** 58:22 71:17
**Victoria** 1:24 7:16 8:9 223:3
223:24
**video** 8:6 12:7 136:2
**videoconference** 1:19 2:24
7:16 223:5
**videographer** 2:22,22 7:24
8:21 9:15 10:2 60:3,8
108:6,13 110:24 111:14
113:18 114:15 117:5 139:9
139:12 147:2,11 154:20
159:8,9,12,17 167:20,23
175:5,8,9 176:15 177:18
180:19 184:18 188:16
189:11 192:21 205:8,10,13
205:18 217:12 218:21,25
220:5
**videotaped** 1:15 7:24 11:4
**view** 9:25 39:22 128:23
**viewed** 23:23 39:23 127:11
130:5
**vision** 37:5
**visual** 126:12
**visually** 29:5
**void** 223:17
**volume** 1:17 46:18,20 57:5
67:24,25
**voluntarily** 11:14 13:6 167:6
189:6 192:12
**vs** 1:6 7:6

**W**

**Wade** 168:4 169:16,20
170:22
**wait** 115:10
**waited** 71:11
**walk** 133:9
**wall** 36:24 37:1 171:19
**want** 17:3 26:8 29:10,16

55:3 59:14,20 63:10 67:18
68:6 71:16 113:13 122:15
130:22 132:25 134:17
135:1,13,16 136:1,2,18
141:23 142:20 149:22,23
155:5 156:9,13,14 157:8
157:15,16 158:7,8 159:10
160:9,24 170:2 173:20
174:5,8 175:17 177:13
182:16,21 183:1,5 204:23
205:10 209:22 211:3
218:12,21 219:24
**wanted** 16:14 17:5 23:19
27:16 31:24 37:1 39:24
46:12,25 47:18 54:24 55:9
55:10 58:6 65:3 69:18,21
72:16,18 76:2 111:23
112:17,20 121:14,14
133:24 157:12 158:3 160:9
160:23 161:24 162:8
169:25 170:8 173:17 175:6
177:9 178:25 183:6 201:17
209:17,24 213:18 214:3
216:16 220:3
**wants** 135:17 149:24 159:2
**war** 163:18
**warning** 126:23 127:1
145:23 147:7 148:12,14,20
148:21 165:14 214:14,16
**Warrior** 45:15 50:13 64:13
64:16,20
**wash** 174:22 180:7,10
**washing** 179:24
**wasn't** 18:23 26:6,9 28:13
33:6 34:25 45:2 65:4 74:15
74:16,16 130:9 134:15
137:8 138:23 161:23,24
165:4,18 166:16 174:2,8
183:10 208:13 210:18
**way** 10:3 15:6 27:1 44:9,13
61:9 108:17 114:17 115:13
128:2,9,24 132:11 136:24
140:18 150:14,16,17 157:5
164:11 165:22 170:1
173:22 191:20 192:23
**ways** 24:3
**we'll** 33:12,13,14 54:16
114:16 177:19 183:17
188:17 190:3 205:4 217:17
219:8,21 220:13
**we're** 10:9 11:12 19:14
24:18 26:25 27:2 41:11,11
42:22 57:11 141:10,19,22
143:17 144:5,5,18 145:5,6
169:2 183:18 219:7

Philip Dorsett (nonconfidential)
2/27/2023

19

we've 59:10 68:10 140:8
143:8 145:17
Web 4:13,16
WebEx 7:15 219:5,5
website 37:7,16,17,18,20,22
37:23 40:4,5,9,12,16,21,23
41:2 45:23 56:10 108:10
109:1,3,9 110:6 111:13
112:14
websites 45:24 49:19 215:8
week 144:18 145:11,13
146:14 152:22 154:18
weekend 142:8
weeks 26:11,18 31:8 72:17
133:10 214:16
well-oiled 58:1
went 16:22 22:16 26:11
30:15 46:7 55:25 70:4 75:7
114:13 116:8 117:2 121:22
128:18 132:19 133:10,11
151:8,9 156:11 160:2
165:14 171:14 178:4
188:21 190:11
weren't 28:4 56:2
whistleblower 164:13,19,20
164:21
White 2:22 8:8
whoops 178:11
wider 9:24
wife 13:25 14:2,4 32:25
33:21 128:17
willing 136:8 189:24,25
window 10:3 62:21 63:5
wire 112:18,22 117:2
wished 183:7
withheld 142:7 143:10
144:12
witness 7:20 9:3 12:24
59:13,16,19,24 60:2 65:21
66:3 68:7,8,23 113:10
114:22 115:10 129:9,13
140:17,18 141:9 142:24,25
143:8 145:15 161:16
168:21 171:14 190:19,25
192:5 201:3 205:6 206:1
206:16,23 207:5,16 215:18
216:6 220:2 221:1 223:6
witness's 143:14
witnessed 128:3
word 18:12 129:25 183:19
200:7
word-for-word 75:25
words 34:2 121:10 149:24
work 10:13 14:23 21:10 24:6
25:12 27:6 29:9 32:19

43:17 44:16,16 47:10
50:25 58:15 62:21 63:3,6
114:17 138:5,20,24 156:7
156:9 158:11 160:23 164:4
167:17 190:11,16,20
worked 14:24 24:20 64:9
166:2 169:19 208:4
working 15:7,11 17:19 24:2
32:17 35:21 51:17 115:13
164:16 181:8 183:13
worry 71:21,25 72:3 138:4
151:11 200:14,20
worse 133:25
wouldn't 38:10 40:1,24
43:12,12 44:23 113:3
137:1 160:1 200:19 201:25
216:20
wow 57:15 133:2
wrap 138:18 205:4
write 135:13,16 136:13
148:11 149:5,6
writing 76:5 148:14,20
171:18 213:25
written 34:13 74:4,7
wrong 176:13 179:9
wrote 34:4,8 126:22 174:14
174:23 203:5

―――――――――――――
            X
―――――――――――――
X 4:1

―――――――――――――
            Y
―――――――――――――
Yaniv 177:22,23 178:5
yeah 14:16 15:21 16:5,12
17:22 27:19,25 32:22 36:7
37:6,17,18 38:4,4 42:4
43:22 47:23 61:24 62:3
70:15 110:17 119:8 139:16
140:16,20 178:3 201:7
211:1 219:18 220:12
year 15:23 17:24 18:1
119:18 134:12,13,14
161:22 164:25 166:18
172:14 181:25 182:1
183:13 210:16,18,19
years 14:17,17 15:8,18,21
16:1,2,5,17 22:20:18 24:15
143:9 163:2,3 216:10,12
Yep 155:7 176:1
yesterday 117:4
York 2:17,17 38:24,25 110:1
141:5

―――――――――――――
            Z
―――――――――――――
zero 54:11

zoom 129:5,11,17 217:9
219:8

―――――――――――――
            0
―――――――――――――
03848-E-0001203 5:8

―――――――――――――
            1
―――――――――――――
1 1:17 4:4 9:16,17 11:12,18
155:13 207:21
1-221 1:17
1:19 108:5,6
1:21-cv-21079 1:6 7:6 8:4
10 4:23 20:18 41:23 59:20
142:1 159:7 167:21,22
169:5 171:6,7 205:7 208:1
10-minute 59:14
10:15 115:19
100 28:9,9
10016 2:17
101 4:10
107 6:4 76:22
108 4:13
11 5:1 168:19,20,24 171:6,8
172:17
11:00 59:25 60:3,5
11:10 60:1
11:12 60:6,8
11:43 177:6
111 4:16
113 4:19
12 5:3 168:4 184:16,17,19
184:20 189:18 190:7,9
210:15
1203 175:4
12120 114:6
13 5:7 175:1,3,7,11,12
180:21 184:15
139 4:21
1431 188:15
15 5:9 59:20 140:4,6 142:1
143:10 188:12,19 189:16
207:18,23 208:19,21
209:10
154 4:22
16 5:11 191:7,8,14,16 192:9
192:15
167 4:23
168 5:1
17 5:12 192:15,16,17
175 5:7
18 14:17 117:20
184 5:3
186 6:5 185:1
187 6:5 185:1
188 5:9

19 14:17
191 5:11
192 5:12
193 6:6
193- 192:24
1950 2:6
198 6:6 192:24
1st 189:15 223:22

―――――――――――――
            2
―――――――――――――
2 4:5 20:3 155:13 207:19
208:2
2-4 5:17
2:35 159:12,14
2:46 159:15,17
20 211:3,4,8 221:19
200 10:13
2005 16:7
2006 16:7
2010 17:12,13,23 18:4
2011 15:24 17:11,12,13,17
18:3 22:3 23:17 25:20
27:23 34:20 36:15 37:8,11
2012 26:19 31:13,14 36:8
37:17,19 46:9,17,19 53:3
57:4 58:10 63:11 127:9
128:8 130:6 136:24 162:1
165:22 173:23 209:1
2013 115:18 117:20 127:9
134:24
2014 5:13 163:3 209:5,7
2015 57:5,20 58:10 122:11
122:15 126:24 127:6
129:22,23 130:5,13 131:3
134:14,16,17,17 138:19
146:22 147:5,23 159:21
163:3,4 165:13 209:22
2016 119:17 131:4 134:17
161:11 163:4 165:11 168:4
171:11,23 172:9 209:22,22
210:18,21
2017 125:23 172:21 175:25
176:19 177:6 179:18
184:12,13 199:5 209:1,7,9
215:5,15
2018 14:25
2020 189:9,9,15
2022 5:11 191:18
2023 1:20 7:14 8:5 220:6
221:9 222:2 223:22
20s 57:22
212-256-1047 2:13,17
212-858-0040 2:17
229 171:8
23 146:22 147:5,23