## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:21-CV-21079-Bloom/Torres

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE NIGRO,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR REMEDIES AGAINST DEFENDANTS

## I.  INTRODUCTION

Following a ten-day jury trial, a verdict was returned in favor of Plaintiff Securities and Exchange Commission ("Commission" or "SEC") finding Defendant MintBroker International, Ltd., f/k/a Swiss America Securities Ltd. and d/b/a SureTrader ("SureTrader"), and its founder, owner, and chief executive officer Guy Gentile ("Gentile") liable for violations of Section 15(a)(1)[1] of the Securities Exchange Act of 1934 ("Exchange Act").  Gentile was additionally found liable for violations of Section 20(b) of the Exchange Act.

"Once [a] district court has found federal securities law violations, it has broad . . . power to fashion appropriate remedies[.]"  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir.1998) (noting a "district court has broad . . . powers to fashion appropriate relief for violations of the federal securities laws").  As discussed

---

[1] A Clerk's Default was entered against SureTrader on November 16, 2021.  ECF No. [46].  The SEC seeks entry of default final judgment against SureTrader pursuant to the Court's Order on Default Final Judgment Procedure, ECF No. [47], based on its default and the jury finding that SureTrader violated Section 15(a)(1).  ECF Nos. [313].

below, the Commission asks this Court to order the following remedies and enter final judgments providing: (a) a permanent injunction against Gentile enjoining him from future violations of the federal securities laws that the jury found he violated; (b) disgorgement against SureTrader and Gentile, on a joint and several basis, in the amount of $13,129,809, plus prejudgment interest of $3,547,617, for a total of $16,677,426; (c) additional disgorgement against Gentile in the amount of $1,083,750, plus prejudgment interest of $502,278, for a total of $1,586,028; and a civil money penalty against Gentile in the amount of $1,887,378.[2]

## II.  SUMMARY OF DEFENDANTS' CONDUCT

SureTrader was a company incorporated under the laws of the Commonwealth of The Bahamas with its principal place of business in Nassau, The Bahamas.[3]  It had been registered with the Securities Commission of The Bahamas ("SCB") as a broker-dealer since 2011 through September 2019.[4]  Gentile is the founder, owner, director, and CEO of SureTrader.[5]  Gentile was the founder of and, through a trust, the controlling owner of Mint Global Markets, Inc. (fka Stock USA Execution Services, Inc., dba SpeedTrader), a broker-dealer formerly registered with the SEC.[6]  He previously held Series 4, 7, 24, 55, and 63 licenses, all of which have expired.[7]

Since at least March 2016 through November 2019 ("Relevant Period"), Gentile, through SureTrader, marketed itself to novice day traders seeking to avoid U.S. regulations on securities trading, including regulations on pattern day trading and leverage.[8]  SureTrader solicited securities

---

[2] The SEC is foregoing seeking injunctive relief and a civil money penalty as to SureTrader because the Bahamian Supreme Court appointed Joint Official Liquidators (JOLs") for SureTrader, who are in the process of completing the liquidation of the company, at which point the SEC understands it cannot be revived.

[3] ECF No. [80], Gentile's Amended Answer and Affirmative Defenses ("Answer") at ¶¶ 1, 12.

[4] *Id.* at ¶¶13, 25.

[5] *Id.* at ¶¶ 1, 12.

[6] *Id.* at ¶ 17.

[7] *Id.*

[8] ECF No. [346], Transcript of Trial ("Trial Tr.") Day 2 at 45:10-46, 51:11-21, 58:13-20, 63:11-14;

transactions from thousands of U.S.-resident prospective and existing customers ("U.S. Customers") through its website, by email, and by means of advertisements on popular U.S.-based day trading websites (known inside SureTrader as "Affiliates") without registering with the SEC in violation of Section 15(a) Exchange Act.[9]   As determined by the jury in this case, SureTrader failed to meet the conditions for an exception or exemption to registration for foreign-broker dealers provided by Rule 15a-6 of the Exchange Act.[10]

SureTrader, through its website, marketed itself to novice day traders seeking to avoid FINRA's Pattern Day Trader Rule.  Specifically, SureTrader's website heralded that trading through SureTrader will "Allow You to Avoid the Nasty PDT Rule," and asked prospective customers if they "are up for circumventing the rules and getting what you want."[11]  SureTrader charged commissions of $4.95 per trade and sometimes as low as $1.95 per trade.[12]

When SureTrader initially went into business in 2011, it had only three employees.[13]  Shortly thereafter, SureTrader, through Gentile, began soliciting U.S. Customers through, among other ways, advertisements it placed on popular U.S.-based day trading websites of Affiliates.[14]  In addition to its Affiliates program, SureTrader's website also marketed the firm to U.S. Customers, comparing itself to well-known U.S. brokerage firms offering self-directed platforms, providing U.S. telephone numbers for contact, stating commissions and costs in U.S. dollars, and only allowing for trading of

---

ECF No. [323-17], Plaintiff's Exhibit ("PX") 265; ECF No. [321-5], PX 18; ECF No. [323-9], PX 235.
[9] ECF Nos. [321-5], PX 18; [321-7], PX 20; [323-2], PX 188; [323-5], PX 224; [323-8], PX 234; [323-10], PX 237; [323-11], PX 238; [323-12], PX 241; [323-13], PX 242; [323-14], PX 243; [323-16], PX 260; [323-17], PX 265.
[10] ECF No. [313] at p.1.
[11] ECF No. [323-17], PX 265.
[12] ECF No. [321-4], PX 8.
[13] Answer at ¶ 5.
[14] Trial Tr. Day 2 at 63:15-18.

U.S. equities and options.[15]  Finally, SureTrader also sent emails directly to U.S. Customers about participating in a demo trading program and offering $99 worth of free trades, among other things.[16]

SureTrader and Gentile's solicitation efforts resulted in a steady increase in new accounts, with hundreds of accounts being opened each month.[17]  During the Relevant Period, U.S. Customers comprised at least 50% and, at times, as high as 80% of SureTrader's customer base.[18]  By 2018, SureTrader had nearly 75 employees and had over 40,000 customer accounts, generating millions in trading commissions and other fees assessed by the firm.[19]  As CEO and majority shareholder, Gentile owned and exercised control over and had sole discretion regarding all aspects of SureTrader's operations.[20]

SureTrader and Gentile took deliberate steps to create the false appearance that they were not soliciting U.S. Customers.  For example, during the Relevant Period, SureTrader also required U.S. Customers to sign an "Unsolicited Acknowledgement Agreement" ("UAA"), which provided: "I affirm that in no way did Swiss America Securities, Ltd solicit me to become a client.  I initiated contact with Swiss America Securities, Ltd on an unsolicited basis.  I understand that Swiss America Securities, Ltd does not target or intend their services for United States citizens or residents."[21]  However, SureTrader's Chief Compliance Officer testified at trial that the UAA became part of the series of disclosures and other documents that were automatically "signed" when the customer opened a new account electronically.[22]

---

[15] ECF Nos. [323-13], PX 242; [323-16], PX 260; [323-12], PX 241; Trial Tr. Day 2 at 78:16-85:2.
[16] ECF No. [321-5], PX 18.
[17] Trial Tr. Day 2 at 60:2-16.
[18] ECF Nos. [321-3], PX 8; [321-4], PX 7; Trial Tr. Day 2 at 74:7-13; ECF No. [347], Trial Tr. Day 3 at 56:22-57:2.
[19] Answer at ¶¶ 5, 93.
[20] ECF Nos. [321-1], PX 4; [321-2], PX 5; Trial Tr. Day 3 at 13:23-25, 35:13-18, 73:14-24; ECF No. [349], Trial Tr. Day 5 at 18:21-19:1.
[21] ECF No. [322-2], PX 151 at p. 9.
[22] Trial Tr. Day 2 at 66:25-67:10.

Additionally, by October 2017, Gentile was concerned about the SEC's investigation into potential registration violations and told his team to create an IP based "pop-up blocker" to vitiate any appearance of solicitation.[23]  The pop-up blocker included a box for a password to access the website; however, it also included spaces for a new visitor to enter an email address or phone number to receive an access code.[24]  The pop-up window included an area for current U.S. Customers to login and gain website access.[25]  Testimony at trial confirmed that prospective U.S. Customers – indeed, all prospective customers – were provided with a generic passcode automatically upon request.[26]

During the Relevant Period, SureTrader generated over $25.27 million in commissions from more than 14,000 U.S. Customers alone.[27]  These U.S. customers lost $29.69 million trading with SureTrader.[28]

### III.  MEMORANDUM OF LAW

**A.  The Court Should Enjoin Gentile From Violations of the Securities Laws**

The Court has authority to enjoin Gentile from committing further violations of Exchange Act, Section 15(a)(1).  *See* 15 U.S.C. § 78u(1) (authority for a federal district court to enter an injunction in SEC enforcement proceedings under the Exchange Act).  The SEC is entitled to injunctive relief when it establishes: (1) a prima facie case of previous violations of the federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated.  *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).

The jury's verdict establishes the first element against Gentile.  Following a lengthy ten-day jury trial, the jury found that SureTrader violated Section 15(a)(1) of the Exchange Act and Gentile

---

[23] Trial Tr. Day 2 at 94:8-96:13; Trial Tr. Day 3 at 64:23-65:16.
[24] ECF No. [323-15], PX 259.
[25] *Id.*
[26] Trial Tr. Day 3 at 67:17-68:6; ECF No. [352], Trial Tr. Day 8 at 218:18-219:19.
[27] Declaration of Alexander Lefferts ("Lefferts Dec.") attached as **Exhibit A** at ¶ 23.
[28] *Id.*

is liable for SureTrader's violations as a control person and for violating Section 15(a)(1) of the Exchange Act through or by means of SureTrader in violation of Section 20(b) of the Exchange Act. Therefore, the SEC meets the *Calvo* requirement to show "a prima facie case of previous violations." *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1336 (N.D. Ga. 2010); *SEC v. Graham*, 823 F.3d 1357, 1363 (11ᵗʰ Cir. 2016) (quoting *Miller* for the proposition: "[N]umerous courts have found no requirement that a defendant must have committed violations before the ones at issue.   Indeed, the 'previous' violations relied upon by federal courts as a basis for injunctive relief are frequently the same ones just proven in the liability portion of those cases.").

Indicia that a wrong will be repeated include: (1) the egregiousness of the defendant's violations, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations.  *Calvo*, 378 F.3d at 1216.  The SEC need not prove every factor in order to obtain permanent injunctive relief.  *Id.*  While scienter is an important factor in this analysis, "it is not a prerequisite to injunctive relief."  *Id.*  Moreover, "the likelihood of future illegal conduct is 'strongly suggested' by past illegal activity."  *SEC v. American Bd. of Trade*, 750 F. Supp. 100, 104 (S.D.N.Y. 1990); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

Here, the elements warranting an injunction are easily met.  Defendants violated one of the central requirements of the federal securities laws.  The registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the Commission "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records."   *SEC v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (quoting *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001)); *Regional Props. v. Financial & Real Estate Consulting, Co.*, 678

F.2d 552, 562 (5th Cir. 1982).

Certainly, Gentile's conduct was egregious because the jury's verdict finding that Gentile violated Section 20(b) required a finding that Gentile acted *knowingly*[29] when he used SureTrader to violate Section 15(a)(1). ECF No. [314] at p. 10. The jury rejected Gentile's affirmative defense of good faith and found that he did not meet his burden to show that he did not act recklessly or with conscious disregard of a substantial and unjustifiable risk in gross deviation from accepted standards. ECF Nos. [313; 314 at p. 9]. Video evidence at trial showed Gentile explaining that he "started SureTrader because there needed to be a revolution for trading" because he believed that U.S. firms "put too many restrictions" on their customers, "limit how much buying power they give," and "require a lot of capital in your account in order to trade."[30] Upon being shown the video, Gentile said "[t]hat is a great video, by the way."[31] Gentile wanted to service customers who sought to avoid U.S. pattern day trading rules (including the $25,000 minimum equity requirement), and Gentile used SureTrader to do exactly that, touting on its website how "SureTrader Allows You to Avoid the Nasty PDT Rule."[32] Gentile created the "Affiliate Program" to work with U.S.-based online day trading schools to advertise SureTrader's services and so that U.S. day trading students were funneled to SureTrader. In fact, SureTrader's records reflect that 97% of "United States" accounts that traded had opening deposit amounts of $5,000 or less, and 43% of "United States" accounts that traded had opening deposit amounts of $1,000

---

[29]The Court's Instructions to the Jury for Count III-Section 20(b) of the Exchange Act defined "knowingly" as acting "with intent to deceive, manipulate, or defraud." ECF No. [314] at p. 10. The SEC sought to amend this instruction to remove the fraud component because the underlying violation was for unregistered broker activity in violation of Section 15(a), which is a strict liability claim and is not a fraud based claim. ECF No. [309] at pp. 3-4. The Court denied the SEC's request. *See* ECF No. [314].
[30] ECF No. [341], PX 277.
[31] ECF No. [351], Trial Tr. Day 7 at 262:2-4.
[32] ECF No. [323-17], PX 265.

or less.  Lefferts Dec. at ¶¶ 25-26.

Second, SureTrader and Gentile's conduct was recurrent, far reaching, and lasted several years.  For the entirety of the existence of SureTrader and during the Relevant Period, SureTrader and Gentile disregarded the broker registration requirement and solicited customers located in the U.S. without registering with the SEC.  Gentile was fully aware of the registration requirement from the inception of SureTrader and concocted multiple tactics to attempt to avoid compliance.  Gentile and SureTrader engaged in a systemic practice of noncompliance with Section 15(a)(1) of the Exchange Act.

Third, as argued *supra*, the jury found that Gentile acted knowingly when he used SureTrader to violate Section 15(a)(1).  ECF No. [314] at p. 10.  Even if the verdict did not require a finding of Gentile's knowing conduct, courts have frequently found injunctions to be appropriate for non-scienter based broker-dealer registration violations.   *See, e.g., SEC v. Keener,*[33] 644 F. Supp. 3d 1290 (S.D. Fla. 2022) (permanently enjoining unregistered dealer); *SEC v Almagarby,* 92 F.4th 1306 (11th Cir. 2024) (permanently enjoining unregistered dealers); *SEC v. Sky Way Global*, No. 8:09-cv-455-T-23TBM, 2010 WL 3025033, at *2 (M.D. Fla. July 29, 2010) (in default order, court found injunction against broker-dealer registration violations to be appropriate); *SEC v.*

---

[33] The proposed Final Judgment (attached as Exhibit I) against Gentile conforms with Eleventh Circuit law, which requires that judgments for injunctive relief describe in reasonable detail the acts or conduct sought to be restrained.  *SEC v. Goble*, 682 F.3d 934, 951-52 (11th Cir. 2012).  *Goble* held that injunctions that track the language of the antifraud provisions "deprive defendants of procedural safeguards that would ordinarily accompany a future charge of a violation of the securities laws" because of the broad range of conduct encompassed by those Section 10(b) and Rule 10b-5 of the Exchange Act.  *Id.* at 952.  The Eleventh Circuit acknowledged that an injunction based on a statutory provision that states specifically what is required to comply with it could satisfy Fed. R. Civ. P. 65(d)(1) and be permissible because the rules "specifically describe the acts required of the person enjoined." *Id.* (noting that an injunction against violations of Exchange Act Sections 15(c)(3) and 17(a) and Exchange Act Rules 15c3-3 and 17a-3 may be permissible).  Thus, under *Goble*, "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language" is permissible "so long as it clearly lets the defendant know what he is ordered to do or not." *Id.* at 952.

*Collyard*, 154 F. Supp. 3d 781, 793 (D. Minn. 2015), *aff'd* in part and *vac'd* on other grounds, 861 F.3d 760 (8th Cir. 2017); *SEC v. Offill*, No. 3:07-CV- 1643-D, 2012 WL 1138622, at *4-5 (N.D. Tex. Apr. 5, 2012)(granting permanent injunction).

As to the fourth and fifth factors, Gentile has provided no assurances that he will not repeat the violations and completely failed to acknowledge any aspect of Defendants' wrongful conduct. Gentile categorically denied the violations, and his defenses were that SureTrader was exempt from registration and that he acted in good faith.  Even after the jury's verdict, Gentile called the SEC's case a "sham case" and his counsel said, "I feel this verdict is a sham."[34]  Thus, Gentile continues to shift the blame and has provided no assurances against future violations, nor has he recognized the wrongful nature of his conduct.

Finally, Gentile's extensive history in the securities industry would allow him to continue his past pattern of committing violations.  Gentile testified proudly at trial about his long history and expertise in the securities industry, including holding several securities licenses and owning/operating multiple securities related businesses since the early 2000s.[35]  In fact, SureTrader's records reflect the sprawling web of entities using the same "Mint" moniker in which Gentile was a President, Director, CEO, or Sole Member.  *See* Swiss America (Mint Group) International Structure attached as **Exhibit B**.  Consequently, Gentile has similar opportunities to commit future violations, especially operating an offshore broker that is intended to run undetected by the SEC.  Unless enjoined, Gentile will have the ability to resume his unregistered foreign broker business with minimal effort and target U.S. customers through the internet, use of third-parties, and other means. For all of these reasons, a permanent injunction is clearly warranted.

---

[34] *See* Bahamas broker guilty of US legal violations | The Tribune (tribune242.com) (last visited on October 15, 2024); Bahamas Broker Gentile to Appeal SEC Non-Registration Verdict (bloomberglaw.com) (last visited on October 15, 2024).
[35] Trial Tr. Day 7 at 246:21-257:3.

**B. The Court Should Order SureTrader and Gentile to Disgorge Their Ill-Gotten Gains**

Exchange Act Sections 21(d)(5) and 21(d)(7) authorize courts to order disgorgement in SEC enforcement actions.  15 U.S.C. §§ 78u(d)(5) & 78u(d)(7); *see also*, *Liu v. SEC,* 140 S. Ct 1936 (2020) (upholding the authority of lower courts to order disgorgement pursuant to Section 21(d)(5) of the Exchange Act.  15 U.S.C. § 78u(d)(5)).[36]  Indeed, the SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains.  *Calvo*, 378 F.3d at 1217. "Exactitude is not a requirement; so long as the measurement of disgorgement is reasonable, and risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.; see also*, *SEC v. Hall*, 759 Fed. Appx. 877, 882 (11th Cir. 2019).  Once the SEC provides a reasonable approximation, "the burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Calvo,* 378 F.3d at 1217; *Hall*, 759 Fed. Appx. at 883.  Further, a defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement.  *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Courts have repeatedly recognized that disgorgement is measured by a defendant's gain, not investor losses.  *See, e.g., Keener,* 644 F. Supp. 3d at 1304-05; *Almagarby*, 2021 WL 4461831, at *3 (rejecting post-*Liu* argument that there was no causation between dealer registration violation and investor losses and stating "disgorgement is measured by Defendant's profits and not investor losses") (*citing SEC v. U.S. Pension Trust Corp.*, 2010 WL 3894082, at *23 (S.D. Fla Sept. 10, 2010) ("The disgorgement amount should be calculated by measuring illegal profits, not an amount needed

---

[36]  After *Liu,* on January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which includes the disgorgement provision since codified at 15 U.S.C. § 78u(d)(7).  The NDAA applies to "any action or proceeding that is pending on, or commenced on or after" January 1, 2021.  NDAA Section 6501(b).

to reimburse defrauded investors.")); *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) (affirming disgorgement where "the district court properly based the disgorgement upon Levin's gains and not the investors' losses").

Joint and several liability is appropriate pursuant to the express terms of Section 20(a), which states, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." Joint and several liability is also consistent with Sections 21(d)(7) of the Exchange Act, in light of Gentile's ownership and control of SureTrader. Moreover, "[i]t is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct." *Calvo*, 378 F.3d at 1215. *See also SEC v. Hughes Capital Corp*., 124 F.3d 449, 455 (3d. Cir. 1997) ("Courts have held that joint and several liability is appropriate in securities cases when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct); *First Jersey Sec*., 101 F.3d at 1475 (holding officer who collaborated in unlawful conduct of firm may be held jointly and severally liable with firm for disgorgement of unlawful gains received).

As argued above, Gentile violated Section 20(b) by knowingly engaging in unregistered broker activity in violation of Section 15(a)(1) and should be ordered to disgorge his ill-gotten gains. The fact that SureTrader committed a non-scienter based violation of Section 15(a) does not diminish the obligation to pay disgorgement.   "Disgorgement is not dependent on scienter, but is tied instead to the idea of unjust enrichment: the broad idea is that persons not profit from breaking the securities laws." *SEC v. Merchant Capital*, 397 Fed. Appx. 593, 595 (11th Cir. 2010).   Thus, courts have not hesitated to order disgorgement where, as here, the violations by SureTrader did not require a finding of scienter.   *See, e.g., Keener,* 644 F. Supp. 3d at 1303 (ordering disgorgement for securities

registration violations); *SEC v. Friendly Power*, 49 F. Supp. 2d 1363, 1372-73 (S.D. Fla. 1999) (ordering disgorgement for securities registration violations); *SEC v. Enviro Board Corp*., No. CV 16-6427-R, 2017 WL 4586335, at *4 (C.D. Cal. May 9, 2017) (ordering disgorgement for securities and broker-dealer registration violations).

### Calculation of Disgorgement

Consistent with these principles, the SEC has identified the ill-gotten gains that SureTrader and Gentile generated by operating as an unregistered foreign broker by soliciting customers located in the U.S. Specifically, using the company's records[37] the SEC compiled the account information for SureTrader's customers and their trading activity each month during the Relevant Period. *See* Lefferts Dec. at ¶¶ 6-10. Alexander Lefferts, who is a Securities Compliance Examiner with the SEC, aggregated the data contained in 41,632 customer folders, to create an Overall Summary Worksheet. *Id.* at ¶ 4. The Overall Summary Worksheet contains the total customer accounts traded, trades made, shares traded, and commissions, and categorizes all accounts between U.S. accounts and non-U.S. accounts, for the Relevant Period. The Overall Summary Worksheet reflects, among other details, the percentage of SureTrader's commissions that are attributable to U.S. customers (as a percentage of total commissions from all countries) on a quarterly basis, which is summarized in Table 5 on p. 4 of Lefferts' Dec.:

| Trade Quarter | Total Commission (All Countries) (USD) | Total Commission (United States) (USD) | United States v. Total (Commission) |
|---|---|---|---|
| 2016-Q2 | $1,830,519 | $763,149 | 42% |
| 2016-Q3 | $1,582,968 | $774,990 | 49% |
| 2016-Q4 | $1,669,093 | $903,425 | 54% |
| 2017-Q1 | $2,065,940 | $1,330,043 | 64% |
| 2017-Q2 | $3,132,451 | $2,260,621 | 72% |
| 2017-Q3 | $2,852,845 | $2,058,903 | 72% |
| 2017-Q4 | $3,355,547 | $2,520,452 | 75% |
| 2018-Q1 | $3,306,505 | $2,571,252 | 78% |
| 2018-Q2 | $3,120,631 | $2,477,472 | 79% |

---

[37] The records were produced by the JOLs (May 1, 2023 Letter from Igal Wizman attached as **Exhibit C**) in response to the Request for International Judicial Assistance, ECF No. [116].

| | | | |
|---|---|---|---|
| 2018-Q3 | $2,664,873 | $2,053,541 | 77% |
| 2018-Q4 | $2,818,658 | $2,140,426 | 76% |
| 2019-Q1 | $2,781,344 | $2,131,739 | 77% |
| 2019-Q2 | $2,531,491 | $1,988,385 | 79% |
| 2019-Q3 | $1,809,868 | $1,340,214 | 74% |
| **Total (2016-Q2 through 2019-Q3)** | **$35,522,732** | **$25,314,613** | **71%** |

Disgorgement was then calculated using the percentage of commissions from U.S. customers from Table 5 in Lefferts' Dec. (and the Overall Summary Worksheet attached as Ex. 1 thereto) and applied to the net income reported by SureTrader (in its quarterly Financial and Operational Reports (Form 13), which SureTrader was required to submit to the Securities Commission of the Bahamas:

| Quarter | SureTrader Net Income (USD) | Percentage of SureTrader Commissions from U.S. Resident Customers (Table 5 and Ex. 1 to Declaration of Alexander Lefferts) | Disgorgement Amount (USD) |
|---|---|---|---|
| Q2 2016 | $1,151,558 | 42% | $483,654 |
| Q3 2016 | $410,223 | 49% | $201,009 |
| Q4 2016 | $(288,733) | 54% | $(155,916) |
| Q1 2017 | $910,003 | 64% | $582,402 |
| Q2 2017 | $2,890,683 | 72% | $2,081,292 |
| Q3 2017 | $1,727,799 | 72% | $1,244,015 |
| Q4 2017 | $2,090,486 | 75% | $1,567,865 |
| Q1 2018 | $(259,863) | 78% | $(202,693) |
| Q2 2018 | $519,067 | 79% | $410,063 |
| Q3 2018 | $7,020,096 | 77% | $5,405,474 |
| Q4 2018 | $258,808 | 76% | $196,694 |
| Q1 2019 | $1,349,901 | 77% | $1,039,424 |
| Q2 2019 | $1,277,048 | 79% | $1,008,868 |
| Q3 2019 | $(989,651) | 74% | $(732,342) |
| | | | **$13,129,809** |

*See* Declaration of Tonya Tullis ("Tullis Dec.) attached as **Exhibit D** at ¶ 5.

For the purposes of the disgorgement calculation, the SEC has accepted as accurate[38] the data

---

[38] Each Financial and Operational Report – Form 13 contains the following Attestation, signed by the Chief Financial Officer of SureTrader: "I, the undersigned, hereby affirm that to the best of our information, knowledge and belief that: . . . The contents of this form and any attachments provided with this form are true, correct and not misleading."

contained in SureTrader's quarterly financial filings made with the Securities Commission of the Bahamas. The quarterly filings include all of the company's purported gross expenses, and thus, no additional expenses have been deducted, nor should they be. All of the commissions paid by U.S. customers during the Relevant Period were included in this calculation as ill-gotten gains because the jury found that SureTrader violated Section 15(a)(1) by failing to register with the SEC and Gentile is both liable as a control person under Section 20(a) of the Exchange Act and for acting through SureTrader under Section 20(b) of the Exchange Act. Thus, the amount of disgorgement against SureTrader and Gentile, jointly and severally, during the Relevant Period[39] is $13,129,809.

Additionally, one of the operating expenses reported in SureTrader's audited Consolidated Financial Statements for 2016[40] is a $4.8 million consultancy fee payable to Swiss America Group ("SAG"). As of year-end 2016, there was a corresponding payable of $3,499,500 to SAG. Thus, this indicates that $1,300,500 was paid to SAG in 2016. The Swiss America Asset Trust ("Trust") owns all 1,000 shares in SAG. *See* **Exhibit E**. In turn, Gentile and his children are the beneficiaries of the Trust. *See* **Exhibit F**. For purposes of establishing disgorgement as to SureTrader, the SEC is accepting the consulting expense as accurate. However, the consultancy fee arrangement with SAG (one of many SureTrader related entities owned by Gentile, directly or indirectly) appears to have been arranged around the time that Gentile purportedly resigned from the company in December 2015 and allowed Gentile to receive compensation from the company during 2016 when he claimed to not be involved in SureTrader's management or operations. Gentile received these funds as a

---

[39] Although the relevant period in this case is March 2016 to November 2019, the income from the months of March 2016, October 2019, and November 2019 is not included in the analysis. March 2016 was not included because there were no financial statements reflecting the net income for that time period. Similarly, October 2019 and November 2019 were not included because no Quarterly Financial and Operational Report – Form 13 as of the quarter ended December 31, 2019, was received by the Commission.

[40] The Consolidated Financial Statements were approved by the Board of Directors, authorized for issue on June 11, 2018, and signed on its behalf by Gentile as a Director. ECF No. [322-3] at p. 8.

beneficiary of the Trust that owns SAG.  Thus, Gentile's personal disgorgement liability should be increased by the consultancy fee (prorated for the relevant period, March 2016 to December 2016) of $1,083,750.  *See* Tullis Dec. at ¶ 7.

Having produced a reasonable approximation of SureTrader and Gentile's ill-gotten gains, the SEC is entitled to disgorgement.  If paid, the Commission staff has determined that it would be feasible to distribute to U.S. investors who collectively lost more than $29.69 million during the Relevant Period.

**C.     The Court Should Order Pre-Judgment Interest**

The Court should order Defendants to pay prejudgment interest on the amounts of disgorgement it orders.  The purpose of prejudgment interest is "to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain."  *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001), *aff'd* in part and *vac'd* on other grounds, 327 F.3d 1263 (11th Cir. 2001).  Courts routinely use the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. Radius Capital Corp.*, No. 2:11-cv-116- FtM-29DNF, 2015 WL 1781567, at *7 (M.D. Fla. Apr. 20, 2015) (citations and quotations omitted).

Using the IRS underpayment rate and calculating from December 1, 2019 (SureTrader ceased its operations in November 2019), the prejudgment interest on the proposed disgorgement figure of $13,129,809 against SureTrader and Gentile is $3,547,617.  *See* Tullis Dec. at ¶ 6.  Additionally, for the separate proposed disgorgement from Gentile of $1,083,750, calculating from December 31, 2016 (the latest date when Gentile received a benefit from the purported consulting agreement), the prejudgment interest is $502,278.  *Id.* at ¶ 8.  Accordingly, the Court should order SureTrader and Gentile, jointly and severally to pay $16,677,426, and Gentile to pay $1,586,028.

15

**D.      The Court Should Order Gentile to Pay a Civil Penalty**

Section 21(d)(3) of the Exchange Act authorizes the Court to order penalties for violations of the federal securities laws, providing three tiers of escalating penalty amounts.  15 U.S.C. § 78u(d)(3). Even under the lowest tier for non-scienter based violations, courts may impose a penalty up to the amount of a defendant's gross pecuniary gain, which here totaled more than $13 million from the percentage of SureTrader's commissions attributable to U.S. customers.  *See* 15 U.S.C. § 78u(d)(3)(B)(i).  For individuals, courts may impose a first-tier penalty of up to $11,524 for any violation.  *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2010) (citing 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)); 17 C.F.R. § 201.1004(a), Table I;[41] *Keener*, 644 F. Supp. 3d at 1308 (citing 15 U.S.C. § 78u(d)(3)(B)(i)).  In general, "[c]ivil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Keener*, 644 F. Supp. 3d at 1308 (citing *Monterosso*, 756 F.3d at 1338).  The decision whether to impose a penalty and in amount falls within the Court's discretion.  *Id.* (citing *SEC v. Aura Financial Services, Inc.*, No. 09-cv-21592, 2010 WL 3419200, at *3 (S.D. Fla. July 14, 2010)).

Courts look to a number of factors, including: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.  *SEC v. Big Apple Consulting USA, Inc.*, No. 6:09-cv-1963-Orl-28GJK, 2013 WL 1352166, at *3 (M.D. Fla. Mar. 29, 2013), *aff'd* 783 F.2d 786 (11th Cir. 2015).  However, these factors are not a rigid checklist that must be satisfied in

---

[41]  The penalty amounts for each tier are periodically adjusted for inflation.  *See* 17 C.F.R. § 201.1004(a).  The penalties enumerated above apply to violations occurring from November 3, 2015, to the present.  *See* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2024) (last accessed on October 15, 2024).

every case.  *Id.* (while "these factors are helpful in characterizing a particular defendant's actions. . . each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed'") (citation and quotation omitted).

Evaluated in their totality, these factors weigh in favor of ordering penalties against Gentile. With respect to the first two factors, Gentile's conduct was egregious, and the jury found that Gentile knowingly, directly or indirectly, through SureTrader, engaged in unregistered broker activity in violation of Section 15(a)(1).  The jury rejected Gentile's affirmative defense of good faith and found that he did not meet his burden to show that he did not act recklessly or with conscious disregard of a substantial and unjustifiable risk in gross deviation from accepted standards.  ECF Nos. [313, 314 at p. 9].  Unlike in more conventional failure to register cases, such as *Keener*, where an investor could arguably purchase the same security from a registered broker or dealer, Gentile and SureTrader's conduct was more egregious because they created a vehicle for U.S. customers to pattern day trade when they otherwise would not have been able to with a registered broker because said broker would have been bound by U.S. Pattern Day Trading Rules, including minimum $25,000 equity and leverage limitations.  In fact, 97% of "United States" accounts that traded had opening deposit amounts of $5,000 or less, and 43% of "United States" accounts that traded had opening deposit amounts of $1,000 or less.  Lefferts Dec. at ¶¶ 25-26.

As to the third factor, Gentile's violations created substantial losses to SureTrader's customers.  The evidence at trial shows that SureTrader solicited and opened thousands of accounts for U.S. Customers during the Relevant Period.[42]  For all U.S. customers during the Relevant Period, they paid $25.27 million in commissions but lost $29.69 million on the trade activity.  Lefferts Dec. at ¶ 23.  Additionally, at trial, two SureTrader customers, Mazen Agha and Orestes Jimenez, testified

---

[42] ECF Nos. [321-5 through 7], PX 18-20; [10 through 14], PX 34-38; [324-1 through 332-8], PX 286.

as to their losses.[43]

For the fourth factor, Gentile's conduct was recurrent.  Gentile's violations were not isolated because he structured SureTrader in a way to solicit U.S. Customers and avoided Section 15(a) registration requirements from its inception in 2011 until it shut down in late 2019.

Finally, as to the fifth factor, the records of SureTrader's customers' trading activity show that SureTrader and Gentile received significant net income generated by U.S. customers' trading. SureTrader's own records show that it indirectly paid Gentile $1,300,500 via the consulting agreement in 2016 after, according to Gentile's own testimony, Gentile had no involvement in the business during that time period.  Additionally, SureTrader's JOLs, who were appointed by the Bahamas Supreme Court, reported opaque circumstances surrounding Gentile's winding down of SureTrader during the third and fourth quarters of 2019.  Based upon the JOLs' First Report dated August 30, 2022 (attached as **Exhibit G**), in the five months leading up to Gentile shutting down SureTrader, its assets were depleted.  SureTrader's unaudited balance sheet for the period ending June 30, 2019, reflected total assets of $64,773,135, liabilities of $40,533,668, and total equity of $24,239,467.  As of December 31, 2019, SureTrader's assets were reported to be $33,489, yet the JOLs did not identify any additional cash or investments held by SureTrader.  *Id*. at p. 8.  The JOLs' First Report raises serious questions about Gentile's handling of SureTrader's finances in its last days, and the circumstances indicate that Gentile likely received the benefit of SureTrader's closure.

### Calculation of Civil Penalty

Consistent with this Court's ruling in *Keener*, 644 F. Supp. 3d 1290 (S.D. Fla. 2022), the SEC seeks imposition of a penalty in the amount of the costs Gentile avoided by not registering SureTrader with the SEC as required under Section 15(a)(1) during the Relevant Period.  Such a penalty sends

---

[43] ECF No. [350], Trial Tr. Day 6 at 48:13-21; Trial Tr. Day 7 at 198:21-199:6; ECF Nos. [322-2], PX 151; [323-1], PX 186.

the message to brokers "that failing to register is never in the [broker's] financial interest." *Id.* at 1308.  Indeed, in promulgating Section 21(d)(3) of the Exchange Act, Congress recognized the need to "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws, as opposed to engaging in affirmative conduct to defraud investors." Securities Law Enforcement Remedies Act of 1990, H.R. Rep. 101-616, 1990 WL 25646, at *1384 (July 23, 1990).  The House Report further noted that "[a] broker-dealer . . . may fail to comply with regulatory requirements simply because it is unwilling to devote the resources necessary to comply with these statutory objectives.…To the extent that such violations are motivated by a desire to maximize profits by reducing costs, the prospect of civil money penalties will improve compliance with the law and have a significant remedial effect." *Id.*

Here, there is a substantial need to deter Gentile and others from this type of conduct.  Even in non-scienter based failure to register cases, a penalty is appropriate.  *Keener*, 644 F. Supp. 3d at 1307-08; *see also Friendly Power*, 49 F. Supp. 2d at 1373 (ordering $100,000 penalty for violation of securities registration requirements); *SEC v. Lefkowitz*, No. 8:12-cv-1210-T35-MAP, 2013 WL 12170296, at *6 (M.D. Fla. Sep. 6, 2013) (in default motion, court imposed civil penalty equaling defendant's gross pecuniary gain based on violations of securities registration requirements).

In *Keener*, this Court imposed as a penalty the initial costs of registration and continuing costs of maintaining registration identified in the SEC's Proposed Rule: Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer, Release No. 34-94524, 87 Fed. Reg. 23054 (Apr. 18, 2022).  644 F. Supp. 3d at 1307-08.  Since this Court's opinion in the *Keener* case, the SEC issued the Final Rule on Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with

Certain Liquidity Providers," Release No. 34-99477, 89 Fed. Reg. 14838 (Feb. 29, 2024).[44]  There are three components to the registration costs SureTrader should have paid during the Relevant Period:  initial registration, ongoing registration, and annual audit.  Based upon the inflation adjustment formula[45] described in the Final Rule, *id.* at n.504, the initial cost of registration in March 2016, adjusted for inflation is $500,729,[46] and the ongoing registration costs are $458,375 ($230,335[47] for ongoing registration costs and $228,040[48] for annual audits).  Thus, the cost for SureTrader and Gentile to register and maintain registration during the Relevant Period would have been $1,875,854.

As the jury found Gentile to be a control person of SureTrader under Section 20(a) and having violated Section 20(b) knowingly, this Court should impose a penalty of $1,875,854 on Gentile as it forces Gentile to "pay the costs he sought to avoid by declining to register" SureTrader.  *Keener*, 644 F. Supp. 3d at 1308.  In addition, this Court should impose a first-tier penalty of $11,524 on Gentile.  Thus, the SEC seeks imposition of a total civil penalty amount against Gentile of $1,887,378.[49]

---

[44] Based on comments to the Proposed Rule, with respect to the ongoing cost of broker-dealer registration, the SEC included an auditing expense of $300,000.  *Id.* at 14982 n. 508.

[45] The data from Consumer Price Index (CPI) Databases: U.S. Bureau of Labor Statistics (bls.gov) was used in the Magistrate Judge's Report and Recommendation.  *SEC v. Keener*, 2022 WL 17748407, at *15 (S.D. Fla. Aug. 8, 2022).

[46] The baseline (from October 2015) for Initial Registration is $500,000.  The inflation adjustment from October 2015 to March 2016 (start of the Relevant Period) is an increase in .145962%.  Thus, $500,000 x  1.00145962 = $500,729.

[47] The baseline (from October 2015) for Ongoing Registration Costs is $230,000.  The inflation adjustment from October 2015 to March 2016 is an increase in .145962%.  Thus, $230,000 x 1.00145962 = $230,335.

[48] The baseline (as of April 2024) for annual audit costs is $300,000.  The inflation adjustment from April 2024 to March 2016 is decreased to .76013627.  Thus, $300,000 x .76013627 = $228,040.

[49] The proposed penalty is 13.28% of the SEC's proposed total disgorgement amount against Gentile ($14,213,559).  Although this Court declined to use a percentage-of-disgorgement penalty formula in *Keener*, this figure is similar to the percentage the Commission has obtained in other recent unregistered dealer cases.  *See, e.g., SEC v. Fierro*, No. 20-02104 (D. N.J. Jun. 29, 2023) (civil penalty about 12.3% of disgorgement); *SEC v. GPL Ventures LLC*, No. 21-cv-6814 (AKH) (S.D.N.Y. May 2, 2023) (civil penalty about 12% disgorgement); *SEC v. Crown Bridge Partners, LLC*, No. 22-cv-06537-JPC  (S.D.N.Y. Aug. 9, 2022) (settled; civil penalty represented about 10% of

### IV.  CONCLUSION

For the foregoing reasons, the Court should enter an order imposing the remedies the SEC has requested and enter final judgments for: (a) a permanent injunction against Gentile from violating Sections 15(a) and 20(b) of the Exchange Act, which the jury found he violated; (b) disgorgement against SureTrader and Gentile, on a joint and several basis, in the amount of $13,129,809, plus prejudgment interest of $3,547,617, for a total of $16,677,426; (c) additional disgorgement against Gentile in the amount of $1,083,750, plus prejudgment interest of $502,278, for a total of $1,586,028; and a civil money penalty against Gentile in the amount of $1,887,378.   Proposed Final Judgments incorporating the remedies and terms the SEC has requested in this Motion against SureTrader and Gentile are attached as **Exhibits H** and **I**, respectively.

### Certificate of Conferral under Local Rule 7.1(a)(3)

Undersigned counsel emailed counsel for Gentile on October 18, 2024 three times to determine whether there is opposition to the relief sought, but as of the time of filing this Motion has not received a response.

---

disgorgement).  While the proposed civil penalty is slightly higher than the amount imposed in *SEC v. Almagarby*, 2021 WL 4459439, at *1 (S.D. Fla. Sept. 29, 2021) (civil penalty approximately 9% of disgorgement), it is nonetheless appropriate because of Gentile's conduct in light of the factors.

October 18, 2024.

Respectfully submitted,

/s/ Alice Sum
Alice Sum
Senior Trial Counsel
Fla Bar No.: 354510
Phone: (305) 416-6293
Email: sumal@sec.gov

Alise Johnson
Senior Trial Counsel
Fla. Bar No. 0003270
Direct Dial: (305) 982-6385
Email: johnsonali@sec.gov

*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154