# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF FLORIDA
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
                   Plaintiff,     )
 6                                )
     vs.                          ) Case No.
 7                                ) 1:21-CV-21079-Bloom
     MINTBROKER INTERNATIONAL,    )
 8   LTD., f/k/a SWISS AMERICA    )
     SECURITIES LTD. and d/b/a    )
 9   SURETRADER, and GUY GENTILE, )
     a/k/a GUY GENTILE NIGRO,     )
10                                )
                   Defendants.    )
11   _____ )
12
13
14         VIDEOTAPED DEPOSITION OF GUY GENTILE
15                    Miami, Florida
16            Wednesday, November 29, 2023
17
18
19
20
21
22
23   Reported by:
24   Rebecca Callow, RMR, CRR, RPR
25   Job No. 231129RJC
```

                                                              1

```
 1
 2      VIDEOTAPED DEPOSITION OF GUY GENTILE, produced
 3  as a witness at the instance of the Plaintiff and
 4  duly sworn, was taken in the above-styled and
 5  numbered cause on the 29th day of November 2023,
 6  from 11:08 a.m. to 6:15 p.m., before
 7  Rebecca J. Callow, Registered Merit Reporter,
 8  Certified Realtime Reporter, Registered
 9  Professional Reporter and Notary Public for the
10  State of Florida, reported by computerized
11  stenotype machine at the offices of the Securities
12  and Exchange Commission, 801 Brickell Avenue,
13  Suite 1950, Miami, Florida, pursuant to the
14  Federal Rules of Civil Procedure.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    APPEARANCES
 2
 3   FOR PLAINTIFF:
 4        Securities and Exchange Commission
 5        801 Brickell Avenue
 6        Suite 1950
 7        Miami, Florida 33131
 8        (305) 982-6300
 9            By:  Alise Johnson
10                 johnsonali@sec.gov
11                 Alice K. Sum
12                 sumal@sec.gov
13
14   FOR GUY GENTILE:
15        Ford O'Brien Landy LLP
16        3700 Ranch Road 620 South
17        Suite B
18        Austin, Texas 78738
19        (512) 503-06388
20            By:  Matthew A. Ford
21                 mford@fordobrien.com
22
23   ALSO PRESENT:
24        Edwin Aragon, videographer
25
```

3

```
11:31   1        A.   Well, from 2008 until the middle of 2011,
        2   it was not doing anything.  It was just an
        3   incorporation just sitting out there.  Didn't have
        4   any assets.
11:32   5               And then middle of 2011, I hired a law
        6   firm to file a registration with the Securities
        7   Commission of the Bahamas to apply for a
        8   broker-dealer license.
        9        Q.   And was that received?
11:32  10        A.   Yes.
       11        Q.   Okay.
       12        A.   It was received sometime in, I believe,
       13   October.  Late 2011, I think around October.
       14        Q.   Okay.  And then did Swiss America
11:32  15   Securities start doing business?
       16        A.   It did.
       17               It hired Philip Dorsett and, I
       18   believe, one other person.  Dia was her name, I
       19   think.
11:33  20        Q.   Okay.  We'll come back to Swiss America.  I
       21   just want to get the rest of the background done
       22   before we go off on down that road.
       23        A.   Sure.
       24        Q.   Do you currently own a controlling interest
11:33  25   in any companies, whether directly or through a
```

26

```
11:46    1  Mint Global Markets, I think you said?
         2       Q.   Um-hmm.
         3       A.   And then now I believe that they've changed
         4  their name again to SpeedTrader, Inc., I think their
11:46    5  name is now.  So they've changed their name several
         6  times.
         7       Q.   What about Mint Bank International?
         8       A.   That company never existed.
         9       Q.   Okay.
11:46   10       A.   It was never incorporated.
        11       Q.   And then Swiss America Group.  Okay.  Let's
        12  say -- you were talking about -- you started it with
        13  Karen Gentile?
        14       A.   Karen Gentile.
11:47   15       Q.   That brings us back to where we started in
        16  2008.  And then 2011 you registered.
        17            What kind of company was it in 2012?
        18       A.   In 2012?
        19       Q.   Yeah.
11:47   20       A.   Swiss America, you're talking about?
        21       Q.   Yeah.
        22       A.   It was -- when you say what kind of company
        23  it was --
        24       Q.   What was its business?
11:47   25       A.   Okay.  So it was a company incorporated in
```

36

```
11:47   1  the Bahamas.  I don't believe it was an IBC, which
        2  stands for International Business Company.  I think
        3  it was a domestic Bahamas company, and it was
        4  licensed as a broker-dealer.  It was licensed as
11:48   5  a --
        6     Q.   When you say "licensed as a broker-dealer,"
        7  by the ...
        8     A.   Securities Commission of the Bahamas.
        9     Q.   Okay.
11:48  10     A.   And it had several licenses within that
       11  license that it can do:  Arranging deals, advising,
       12  principal trading, and one other thing, maybe.
       13            And it also had a separate license,
       14  which was called a corporate and financial service
11:48  15  provider license.  It was a separate license within
       16  the same firm.  And the firm focused on active
       17  trading.
       18     Q.   When you say "focused on active trading,"
       19  for customers or who?
11:48  20            What was the customer base?
       21     A.   For customers.
       22     Q.   Retail?
       23     A.   It had retail and it also had some
       24  institutional customers -- or corporate customers.
11:49  25  I don't know the definition of --
```

37

```
12:26   1   running your firm?
        2             MR. FORD:  Objection.
        3        Foundation.  He never testified that
        4        somebody was running his firm in 2016.
12:26   5   BY MS. JOHNSON:
        6        Q.   Okay.  Go ahead.  Answer the question if
        7   you can.
        8        A.   So from 2012 to the middle of 2015, I had
        9   over a dozen meetings with, like I said, the SEC,
12:26  10   the DOJ, and the FBI, with my attorneys there,
       11   Adam Ford.
       12             And in 2012 -- this is, like, probably
       13   October-November range of 2012 -- the FBI -- or the
       14   SEC asked me to explain to them, you know, how
12:26  15   SureTrader was running.
       16             And I told them everything about the
       17   firm.  I told them, you know, how it got clients,
       18   what the firm did, and, you know, who the employees
       19   were, who the customers were, how it got customers.
12:27  20             Never once did they ever tell me that
       21   there was anything wrong with the way it was
       22   operating.  They told me it was the opposite.  The
       23   FBI told me, in front of the SEC there, that I was
       24   not to change any way, in any form, how the firm was
12:27  25   operating; that I had to do whatever they said.
```

70

```
12:27   1                    The DOJ told me I had to do whatever
        2    the SEC said to do, and whatever the FBI told me to
        3    do, and I couldn't change anything.  That was the
        4    main thing.  Don't change anything.  And, I believe
12:27   5    it's because they wanted to use the firm, which they
        6    eventually did.
        7                    And to answer your question, in 2016,
        8    you know, when the prior -- at the end of 2015 -- I
        9    remember this.  December 31 of 2015, I resigned from
12:27  10    the firm completely as the director and CEO, and I
       11    didn't come back to the firm until after the
       12    indictment was dismissed, which was in probably late
       13    January or February of 2017.
       14                    So during that time, I was not -- from
12:28  15    my recollection, I wasn't involved in the firm
       16    during that time.  I had stepped away.  And the main
       17    reason why I had did it at the time was because I
       18    was negotiating a settlement with the SEC, which
       19    would have required me to have stepped down,
12:28  20    which -- so I had prepared myself to step down.
       21                    And I had, you know, put -- you know,
       22    just basically resigned, submitted my paperwork to
       23    resign.  And then I didn't come back until after --
       24    those -- that deal broke apart anyway with the SEC,
12:28  25    and I just stayed away.
```

71

```
12:28   1        Q.   What was the time period you stepped away?
        2        A.   I believe it was pretty much all of 2016.
        3             And I didn't come back until probably
        4   January of late -- late January of 2017, or
12:29   5   February.
        6        Q.   Okay.  When you say "stepped away," did
        7   you -- were you on the board of directors during
        8   that time period?
        9        A.   I resigned my -- I resigned as a board of
12:29  10   director.  I resigned as a CEO.  I was still, I
       11   believe, a shareholder, but I had stepped away
       12   completely from the firm.
       13        Q.   Okay.  So you stepped away from the
       14   operations of the company fully.
12:29  15             Were you involved at all in the
       16   operations during that time.
       17        A.   I mean, there might have been questions
       18   that they had of just things that I may have had
       19   information for.  Like, Hey, this happened, what do
12:29  20   we do.
       21             There might have been some questions
       22   that they may have called me about here and there,
       23   but I wasn't -- I remember -- like, I was under
       24   indictment at the time, so I was under -- what's it
12:29  25   called?  Supervised release of some sort.
```

72

```
12:29   1              So I was restricted in my travel to
        2   some degree and -- and I had stepped away.  So I
        3   wasn't involved.
        4       Q.   Okay.  So back to my original question:
12:30   5   Who, in 2016 from the SEC, was running your company?
        6              MR. FORD:  Objection.
        7       BY MS. JOHNSON:
        8       Q.   You can answer.
        9       A.   I believe I answered that already.  I said
12:30  10   from 2012 -- from the middle of 2012 to the middle
       11   of 2015 is when I was told from the DOJ --
       12       Q.   I'm not asking about that time period.
       13              2016.  If you don't know, if you don't
       14   have a name -- I'm asking specifically in 2016.
12:30  15       A.   Oh.  In 2016.  In 2016, the person that was
       16   controlling my firm was Sajjad from the SEC.  He
       17   was -- he had an undercover operative working in my
       18   office, stealing documents on behalf of the SEC and
       19   providing them to the government while I was in
12:30  20   active litigation with them and then forwarding
       21   those documents again to the DOJ, which was in
       22   active litigation also.
       23              That's who was controlling my firm.
       24   Manipulating --
12:31  25       Q.   How was Sajjad controlling your firm?
```

73

```
12:31   1        A.   He was telling a director to steal
        2   documents from the firm.
        3        Q.   Mr. -- who are you saying he told to steal
        4   from the firm?
12:31   5        A.   He was telling lying Philip Dorsett to
        6   steal documents from my firm.  And he was doing it
        7   at his request.
        8        Q.   All right.  How is that controlling your
        9   firm?
12:31  10             Did -- Mr. Sajjad Matin, did he tell
       11   you what customers to accept?
       12             MR. FORD:  Objection.
       13   Foundation.
       14        A.   He -- he -- controlling the firm --
12:31  15   BY MS. JOHNSON:
       16        Q.   All right.  Define "control" for me.
       17             What are you talking about when you say
       18   "control of the firm"?
       19        A.   Well, he threatened Philip Dorsett with
12:31  20   criminal charges.  There's a letter from Sajjad to
       21   Philip saying, Do this, or I'm going to potentially
       22   bring criminal charges against you, from my
       23   recollection of that.
       24             And based on discovery, we found out
12:31  25   that lying Philip Dorsett was working with Sajjad
```

74

```
12:31    1   while I'm in active litigation with the SEC, and
         2   Sajjad was asking him to go into the firm and, say,
         3   Hey, look for these documents and get these
         4   documents and send them to me, you know?
12:32    5              And this guy's the chief compliance
         6   officer of the firm -- or the compliance officer at
         7   the firm being directed by the SEC on what to do
         8   under threat of being charged criminally.  So, to
         9   me, that's a form of control.
12:32   10        Q.    Okay.
        11        A.    Just the same way I was controlled by the
        12   DOJ, the FBI, and the SEC, Philip Dorsett was also
        13   controlled.
        14        Q.    All right.  In 2016 --
12:32   15        A.    The SEC has been really controlling this
        16   whole thing.
        17        Q.    -- who decided which customers to accept?
        18        A.    Philip Dorsett.
        19        Q.    Who decided what trades could be made in
12:32   20   2016?
        21        A.    Customers.  Customers.
        22        Q.    Who decided what your marketing campaign
        23   would be in 2016?
        24        A.    Well, that would have been Janay.
12:32   25        Q.    All right.  What about in 2017?  Who
```

75

```
12:32   1   decided which customers to accept at the firm?
        2        A.   Is this after Philip Dorsett was fired?
        3        Q.   Yeah.  After he left.
        4        A.   I mean, accepting clients is something that
12:33   5   the -- that compliance would do.  And Philip Dorsett
        6   is who laid out the compliance guidelines on how a
        7   customer should be accepted.
        8             So I believe that the compliance
        9   department, even after his termination for stealing
12:33  10   documents on behalf of the government, that those
       11   policies were probably very similar.
       12        Q.   Okay.  Who was enforcing the policies in
       13   2017?
       14        A.   That would have been -- the chief
12:33  15   compliance officer should have been enforcing the
       16   policies of the company.
       17        Q.   Okay.  Who was on --
       18        A.   And just to --
       19        Q.   -- the board of directors of 2016?
12:33  20        A.   And just to -- just to add to that -- just
       21   to add to that, you know, all chief compliance
       22   officers would have known that if at any time that
       23   they needed any help, that they had legal -- legal
       24   staff.  Not staff in house, but legal counsel that
12:34  25   were retained by the firm; you know, Adam Ford,
```

76

```
12:39    1        record at 12:39.
         2                  (Recess taken.)
         3                  THE VIDEOGRAPHER:  We're back on
         4        the record at 1:46.
01:46    5        BY MS. JOHNSON:
         6        Q.   We were talking about, before the break,
         7   the different employees and their responsibilities.
         8                  What was the -- Janay Symonette's
         9   responsibilities as the chief marketing officer?
01:47   10        A.   I believe her responsibilities was, in
        11   general, all things related to marketing.
        12        Q.   Did she need approval from anyone before
        13   starting on a marketing campaign?
        14        A.   I believe that she would have marketing
01:47   15   stuff approved by the chief compliance officer.
        16        Q.   Did she have the authority to sign
        17   contracts on behalf of SureTrader?
        18        A.   I don't think so, but I'm not -- I'm not
        19   sure, but I don't think she did.
01:47   20        Q.   Let's talk about your role at SureTrader
        21   from 2017 to 2019.  What were your responsibilities
        22   there?
        23        A.   Well, between 2017 and 2019, I wasn't there
        24   all the time.  I was there, maybe, a few months a
01:48   25   year between those -- between those two years.
```

81

```
01:48   1          Q.   Okay.
        2          A.   Or is that three years, approximately?
        3                    So, generally, you know, it's whenever
        4    Mr. Collie or any of the other executive staff had
01:48   5    any questions of something, they would come to me
        6    with those questions.
        7          Q.   Okay.
        8          A.   And that was the main thing is just --
        9    mostly just answering any questions that they might
01:48  10    have come to me with or ask my expertise in.
       11          Q.   Okay.  Were you on the board during that
       12    time?
       13          A.   Yes.
       14          Q.   Did you sign contracts on behalf of the
01:49  15    firm at that time?
       16          A.   I don't remember specifically any contracts
       17    that I've signed, but I'm sure that I must have
       18    signed some contracts during that time.
       19          Q.   Okay.
01:49  20          A.   But I just can't remember any specific
       21    contract that I've --
       22          Q.   Who saw over the day-to-day operations of
       23    the firm at that time?
       24          A.   The day-to-day operations was the people
01:49  25    that were on the ground, which would have been
```

82

```
01:49   1   Antonio, the compliance officer, and the other
        2   executives.
        3        Q.   Who controlled SureTrader's banking
        4   relationships?
01:49   5        A.   They were controlled by the executives of
        6   the company, for the most part.
        7             I believe I was a signor for at least
        8   one or two of the accounts, and then maybe Janay and
        9   Antonio could have been signors for some of the
01:50  10   accounts as well.
       11        Q.   Who chose where to bank?
       12        A.   It was just a combination of whatever banks
       13   would do business with the company.  It's very
       14   difficult to get banking for a brokerage firm.
01:50  15        Q.   So who negotiated with the banks or talked
       16   to the banks?
       17        A.   It could have been Antonio.  I could have
       18   talked to some banks as well.  Potentially, Yan may
       19   have talked to some banks for a period of time as
01:50  20   well.  I don't remember if Janay did, but she could
       21   have.  But I think it was mostly Antonio, Yan, and
       22   myself.
       23        Q.   Who was in charge of corporate strategy at
       24   that time?
01:51  25        A.   "Corporate strategy."  What does that mean?
```

83

```
01:55   1        A.   I can't spell it.  I don't remember how to
        2   spell it.
        3        Q.   Okay.  "C" or a "K"?
        4        A.   I don't remember.
01:55   5             MR. FORD:  With a "Q."
        6   Q-u-i-n-t-e-r-o.
        7        A.   Okay.
        8             MS. JOHNSON:  Thank you.
        9        A.   He reviewed the website; he made
01:55  10   recommendations to Philip Dorsett and myself.
       11             I remember we had a conference call,
       12   and he walked us through, because he read through
       13   all the SEC regulations, and he recommended certain
       14   changes to the website before it goes public.
01:55  15             And those things that he recommended
       16   never changed.  Some of those things were that every
       17   page of the website would specifically say that it
       18   was not intended for U.S. people.
       19             And he explained that that is part of
01:55  20   what the SEC's guidance is.  It's not in their
       21   regulation, but it's in their guidance that it
       22   should have that.
       23             He also recommended a pop-up that
       24   would say something similar, or in that regard,
01:56  25   which the company implemented.  He may have
```

87

```
01:56   1   recommended that maybe a few months after it
        2   started.
        3              I don't remember if it had the pop-up
        4   on day one.  It could have been maybe a month or two
01:56   5   later.  And a few other things that I just don't
        6   remember off the top of my head.
        7              I think the unsolicitation
        8   acknowledgment agreement, as well.  He either
        9   recommended it or recommended changes to it.  I just
01:56  10   don't remember specifically.  It could have been a
       11   combination of that.
       12       Q.    Okay.  I'm sorry if you said this, but who
       13   was Mr. Quintero?  Was he a consultant? a lawyer?
       14       A.    He was a compliance consultant.
01:56  15       Q.    Was he with a company?
       16              Do you remember his company?
       17       A.    I don't remember the name of the company.
       18       Q.    And where was he located?
       19              Where was he out of?
01:57  20       A.    He was out of California.
       21              I believe I also had asked at that
       22   time the chief compliance officer of SpeedTrader to
       23   take a look at it as well, but I just don't remember
       24   if he had any recommendations at this time.  I kind
01:57  25   of vaguely remember asking him to take a look at it
```

88