## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-21079-CIV-BLOOM/TORRES

SECURITIES AND EXCHANGE
COMMISSION,

      *Plaintiff*,

v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
and d/b/a SURETRADER, and
GUY GENTILE, a/k/a GUY GENTILE
NIGRO,

      *Defendants*.

_____/

## REPORT AND RECOMMENDATION
## ON PLAINTIFF'S MOTION FOR REMEDIES

This matter is before the Court on Plaintiff Securities and Exchange Commission's ("SEC") Motion for Remedies. [D.E. 359]. Defendants timely responded [D.E. 371], and Plaintiff replied [D.E. 376]. The motion is now ripe for disposition. On April 4, 2025, the Honorable Beth Bloom referred this motion to the Undersigned for a Report and Recommendation. [D.E. 377]. Upon thorough and careful review of the record and the applicable law, and for the reasons set forth below, we **RECOMMEND** that the SEC's Motion for Remedies should be **GRANTED in part and DENIED in part**.

1

## I.      BACKGROUND

The SEC brought this action against Defendants MintBroker International, Ltd., f/k/a/ Swiss America Securities Ltd. and d/b/a SureTrader ("SureTrader"), for violations of Section 15(a)(1) of the Securities Exchange Act of 1932 (the "Exchange Act"), and against "its founder, owner, and chief executive officer" [D.E. 359 at 1], Guy Gentile ("Gentile"), for violations of Section 20(a) and (b) of the Exchange Act.   [D.E. 1 at 19–20].   After a ten-day jury trial, the jury returned judgment in favor of the SEC on July 2, 2024.   [D.E. 359 at 1]; [D.E. 313].

Moreover, the jury verdict form reflects that the SEC succeeded on all three counts: (1) that "SureTrader was required to register under Section 15(a)(1) of the Exchange Act"; (2) that Gentile "is liable as a control person under section 20(a) for SureTrader's failure to register under Section 15(a)(1) of the Exchange Act"; and (3) that Gentile "directly or indirectly induced SureTrader to engage in unregistered broker activity in violation of Section 15(a)(1)."   [D.E. 313 at 1–3].

Following the jury verdict, the SEC moved for remedies against Defendants. [D.E. 359].   Defendants responded in opposition [D.E. 371] and Plaintiff replied [D.E. 376].   Upon review of the briefing before the Court, we find the motion, response, and reply to be complete as submitted, and thus no hearing has been held. Accordingly, this action is now ripe for disposition.

## II.      ANALYSIS

The SEC asks this Court to: (1) impose an injunction on Gentile "enjoining him from future violations of the federal securities laws that the jury found he violated"; (2) order Defendants SureTrader and Gentile, jointly and severally, to disgorge their unlawful gains plus prejudgment interest, for a total of $16,677,426; and (3) order additional disgorgement from Gentile, totaling $1,586,028 (plus prejudgment interest), and a civil money penalty of $1,887,378.   [D.E. 359 at 2].

Importantly and for the sake of clarity as to the following analysis, we note that a Clerk's Default has been long entered against snow-defunct Defendant SureTrader [D.E. 47], which is not represented by counsel.   Specifically the record relects:

> The Court: All right.   And regard to the status of the second Defendant, who is here on behalf of SureTrader?
> Mr. Ford: So MintBroker International, Ltd., or SureTrader, was voluntarily liquidated in 2019.   There was some remaining assets, I understand, or potential for assets.   It wasn't significant.   It was then moved into formal liquidation in 2020.   In the past, we have represented MintBroker in several actions.   We intended to represent them in this action by the time that the litigation was brought.   We were unable to enter an appearance on their behalf because they were in formal liquidation and under the control of joint official liquidators. So at present they do not have counsel, and I understand that the SEC moved for a default judgment early in the proceeding.
> Ms. Sum: Your Honor, if I may clarify, we moved for the entry of a clerk's default, which was, in fact, entered.   Your Honor entered your standard default procedures, and we provided the notification indicating that there's basically related liability.   So that default final judgment motion could not be filed at that time but after the end of the case.
> The Court: All right.   But the procedural posture is such that a default has been entered against MintBroker doing business as SureTrader; is that correct?

3

> Ms. Sum: Clerk's default.   Yes, Your Honor.
> The Court: All right.   But the clerk's default means that the Defendant SureTrader has admitted all of the allegations contained within the complaint.
> Ms. Sum.   That would be our position, Your Honor.
> The Court: Well, that would be the law.   So with regard to any liability, what I want to make sure is that the jury is afforded an understanding as to who is the Defendant and who is the Plaintiff.   The Plaintiff is Securities and Exchange Commission.   The Defendant in this case is Guy Gentile; is that correct?
> Ms. Sum: That is correct, Your Honor.
> Mr. Ford: That is correct, Your Honor.

[D.E. 345 at 4:10–5:21].

So, while all remedies may be imposed as against SureTrader as requested by the SEC, the remedies at issue here only relate to the specific remedies to be imposed on Defendant Gentile.

### A. *Injunctive Relief*

"The [SEC] may obtain a permanent injunction if it shows 'a prima facie case of previous violations of federal securities laws, and … a reasonable likelihood that the wrong will be repeated.'" *SEC v. Almagarby*, 92 F.4th 1306, 1321 (11th Cir. 2024) (citing *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004)).   Courts look to the following factors to determine if the SEC is entitled to injunctive relief:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).   Further, "[w]hile

scienter is an important factor in this analysis, it is not a prerequisite to injunctive relief." *Calvo*, 378 F.3d at 1216; *Almagarby*, 92 F.4th at 1321 (same).   Applying these factors, the Court of Appeals has concluded that the "'recurrence' factor" can support the imposition of an injunction, where such recurrence was "from engaging in further violations of the law [Defendants] already broke."   *Almagarby*, 92 F.4th at 1322.   Additionally, the maintenance of entities that "would allow [a Defendant] the opportunity for future securities-law violations" can factor into the imposition of an injunction.   *Id.*

In practice, imposing this relief would "permanently enjoin[] Defendants from transacting in securities without registering as dealers or associating with a registered broker-dealer."   *Id.* at 1321; [D.E. 359-9 at 2–3].

Defendant Gentile correctly argues that the SEC's proposed injunction [D.E. 359-8–359-9] is an "obey the law" injunction—*i.e.*, "it does little more than order the defendant to obey the law."   *Goble*, 682 F.3d at 949.   The proposed injunction text is as follows:

> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], by making use or any means or instrumentality of interstate commerce or of the mails and engaging in the business of effecting transactions in securities for the account of others, or inducing or effecting transactions in, or to induce or attempt to induce the purchase or sale of securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) while not registered as a broker or dealer with the Securities and Exchange Commission as provided in Section 15(b) of the Exchange Act, or while not associated with a broker or dealer that was so registered.

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with defendant or with anyone described in (a).

[D.E. 359-9 at 2–3] (emphasis in original).

And, as Gentile points out, "obey the law" injunctions are typically disfavored. *See Goble*, 682 F.3d at 949 (collecting cases). The Court of Appeals expanded on this rationale in *Goble* while examining prior cases: "Most notably, in *SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005), we went out of our way to condemn these injunctions because they lack specificity and deprive defendants of the procedural protections that would ordinarily accompany a future charge of a violation of the securities laws." 682 F.3d at 949. "An injunction 'should clearly let [the] defendant know what he is ordered to do or not to do. A court order should be phrased in terms of objective actions, not legal conclusions.'" *Id.* at 950 (citing *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001)). However, "at times an injunction that orders a defendant to comply with a statute may be appropriate; Supreme Court dictates this." *Id.*

This case, we believe, is one of those times where an injunction that largely tracks the language of the statute is warranted. Under the Exchange Act, district courts have "broad discretion to enjoin violations of the Act." *Id.* at 952. Thus, "a broad, but properly drafted injunction, which largely uses the statutory or regulatory

language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do." *Id.*  In *Gobel*, the Court of Appeals applied this interpretation of Rule 65(d) to Sections 15(c)(3) and 17(a) of the Exchange Act.  *Id.* at 951–52 (noting that neither rule was vague and each "set[] forth specific, objective criteria for compliance").

> We think the same for Section 15(a)(1):
>
> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15. U.S.C. § 78o(a)(1).

Recent precedent supports this view.  In *Almagarby*, the Court of Appeals found no abuse of discretion in the imposition of an injunction "prohibiting Defendants from engaging in future violations of section 15(a)(1) of the Exchange Act."  92 F.4th at 1321.  There, when applying the factors entitling the SEC to injunctive relief, the findings that "Defendants had engaged in hundreds of unregistered transactions" and that the named Defendant's "maintenance of Microcap and two similar companies as active business entities would allow him the opportunity for future securities-law violations" were dispositive.  *Id.* at 1322.

Applying the same analysis here, there is even greater weight in this record to impose this relief against Gentile.   First, stepping back to prong one of the two-prong test[1], and as the SEC notes in its briefing, the jury's verdict based on years of SureTrader's operation is prima facie evidence of previous violations of the securities laws.   [D.E. 359 at 5]; *Almagarby*, 92 F.4th at 1322 ("Defendants' engagement in securities transactions without registering as 'dealers' violated the Exchange Act at the time of the transactions . . . .   Here, as the district court found, Defendants engaged in hundreds of unregistered transactions—all of which were unlawful at the time and continue to be so[.]").

Then, as to prong two, Gentile ticks several of the factors considered.[2] Beginning with scienter[3], while "[i]t is undisputed that section 15(a) of the Exchange Act does not contain a scienter element," it is nonetheless an important factor courts consider.   *Almagarby*, 92 F.4th at 1322.   To that end, a key element of the decision to impose an injunction is "the degree of wrongdoing evident in the defendant's past

---

[1] "The Commission may obtain a permanent injunction if it shows 'a prima facie case of previous violations of federal securities laws, and … a reasonable likelihood that the wrong will be repeated.'"   *Id.* at 1321 (citing *Calvo*, 378 F.3d at 1216); *see supra* at 4.

[2] "We assess the likelihood of a repeat violation by considering the following factors: '[the] egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.'"   *Almagarby*, 92 F.4th at 1321 (citing *Carriba Air, Inc.*, 681 F.2d at 1322); *see supra* at 4.

[3] As in *Almagarby*, "[w]e have already acknowledged that [the] 'recurrence' factor supports an injunction here."   94 F.4th at 1322.

8

conduct." *Aaron v. SEC,* 446 U.S. 680, 701 (1980).   Another "aggravating or mitigating factor[] to be taken into account" is "scienter or lack of it."   *Id.*   Here, the record is replete with testimony and references to Gentile's years-long, opposition to the Pattern Day Trader Rule. [D.E. 351 at 250:11–23 ("So we moved three times and we got up to 15 employees, until the pattern day trading rule came out.   And then all of a sudden the office closed down, I had to fire everybody[.]"), 251:14–253:1 ("So nothing really changed, except for when PTD came out SpeedTrader lost—went from 3,000 transactions a day for its customers down to about 50.   So it couldn't pay for anything anymore. . . . [T]he customers also, you know, got squeezed out of the business."), 272:2–20 ("So I decided to set up a firm internationally so that foreign people would not have to deal with getting restricted. . . . No one likes the rule.   It's a stupid rule.").   By his own admission, Gentile created SureTrader to circumvent what the business he founded later termed, "the Nasty PDT Rule" and "FINRA, the killjoy Financial Industry Regulatory Authority."   [D.E. 323-17].

Compared to *Almagarby,* where the defendant "consulted numerous attorneys and appeared to at least try to follow the law," 92 F.4th at 1322, Gentile's behavior indicates a disdain for some elements of the securities laws and a clear willingness to flout them. [D.E. 351 at 272:2–20]; [D.E. 323-17].   Coupled with the jury's finding that Gentile "directly or indirectly induced SureTrader to engage in unregistered broker activity in violation of Section 15(a)(1)" [D.E. 313 at 3], based (as the SEC points out) on a jury instruction defining "knowingly" as "with intent to deceive,

manipulate, or defraud" [D.E. 314 at 10], Gentile's conduct in so inducing SureTrader to break the securities laws was inescapably purposeful.   Gentile's intent weighs in favor of imposing this injunction.

Next, we address "the sincerity of defendant's assurances against future violations" and "the defendant's recognition of the wrongful nature of the conduct," *Almagarby*, 92 F.4th at 1321.   As to any assurances against future violations and/or recognitions of the wrongful nature of Gentile's conduct, we find none in this record. In fact, quite the opposite as evidenced by the brazenness exhibit in Gentile's briefing:

> The SEC failed in its lawsuit in the District of New Jersey against Gentile.   After the third dismissal of that time-barred suit, the SEC decided to head south, shopping for a better forum.   The SEC found it. And now, following a trial on a purported "registration" violation by *registered* foreign broker-dealer, MintBroker International, Ltd. ("SureTrader"), the SEC has fabricated "disgorgement" and "penalty" amounts so they are equal to those it sought in the original dismissed District of New Jersey cases based on alleged conduct from 2007–2008. The relief sought against Gentile is punitive—intended to punish him for alleged conduct from 17 years ago.

[D.E. 371 at 1].

Apart from this lawyerly bravado, there is also ample evidence in the record of Gentile's longstanding disregard for the Pattern Day Trader Rule:

> So I decided to go set up a firm internationally so that foreign people would not have to deal with getting restricted.   And you heard it from other traders.   They don't like it.   No one likes the rule.   It's a stupid rule.   And it's not made to protect investors.   That's for sure.   And— repeat the question.   I lost my train of thought.

10

[D.E. 351 at 272:14–20]. [4]   And when presented at trial with a video about SureTrader narrated by Gentile himself (touting, among other things, the minimal amount of capital required in one's account to begin trading—*i.e.*, in contravention of the Pattern Day Trader rule requiring heightened capital to trade), Gentile responded: "That is a great video by the way.   Thank you.   That is me talking."   *Id.* at 261:7–262:4.

Accordingly, there is nothing in the record before us to suggest that Gentile has either recognized the wrongful nature of his conduct or issued *any* assurances that he will not continue to violate the securities laws.   These factors, then, also counsel in favor of imposing an injunction.

Next, we will address "the likelihood that the defendant's occupation will present opportunities for future violations."   *Almagarby*, 92 F.4th at 1322.   Here, the SEC argues that Gentile's many years of experience in the industry presents opportunities for future violations.   [D.E. 359 at 9].   This argument is well taken. Very well taken.

Gentile indeed has a long history in the securities business, dating back to 1998.   [D.E. 351 at 246:21].   In that time, Gentile has started and/or managed a number of brokerage businesses, *e.g.*:

---

[4] Also, apparently, Gentile's counsel believes the jury's verdict "is a sham."   Martina Barash, *Bahamas Broker Gentile to Appeal SEC Non-Registration Verdict*, BLOOMBERG         (July         3,         2024,         5:39         PM         EDT), https://news.bloomberglaw.com/litigation/bahamas-broker-gentile-to-appeal-sec-non-registration-verdict.

> I think it was like two years, like from '99.   From January '99 until
> sometime in 2001.   Because once we—it grew very quickly.   So it
> started from my parents' basement.   Then eventually I was in my
> dining room of my house in Upstate New York.   Then eventually we got
> an office. . . . So we moved three times and we got up to 15 employees,
> until the pattern day trading rule came out.   And then all of a sudden
> the office closed down, I had to fire everybody[.]

*Id.* at 250:14–22;

> So in the middle of—while I was running the office of Stock USA in
> Upstate New York, we were in the process of becoming a member of
> NASD, that's now known as FINRA.   You've heard that before here.
> So we applied for [the] application, and it was very inexpensive back
> then to do.   I think it probably only cost me $5,000 to set up the—to set
> up SpeedTrader, basically, which was then its own firm.   So it didn't
> have to go through Stock USA to get to the markets anymore.   And still
> to this day, anyone can set up a broker-dealer, and they only need
> $5,000.   But they want you to have 25,000 to pattern day trade.   It
> doesn't make any sense.

*Id.* at 251:15–252:1.

Gentile also admitted at trial that he "was in the process of opening up a third securities business while opening SureTrader (which came after SpeedTrader), but "just canceled the application" after it was registered with the SEC.   *Id.* at 257:13–17.   Finally, Gentile noted at trial that, "other than that, there was Swiss America Securities [*i.e.*, SureTrader] that was incorporated in 2008, and then it became registered as a broker-dealer in the Bahamas in 2011, late 2011, like October or November."   *Id.* at 257:18–21.

Importantly, there is no allegation that Gentile is currently maintaining a securities business à la SureTrader.   But Gentile does, as is addressed more in-depth below, still maintain some level of, either, ownership over or relatedness to aspects of

his prior securities businesses.   For instance, while Gentile testified he no longer has a financial interest in SpeedTrader, he did sell "it to a trust for the benefit of [his] kids probably 2011 or '12."   *Id.* at 257:4–10.   And Gentile is a beneficiary of the Swiss America Asset Trust, which appears to have an interest in a significant consultancy fee that was paid from SureTrader to an intermediary, Swiss America Asset Group, of which 1000 shares is owned by Swiss America Asset Trust.   [D.E. 359-5 at 2]; [D.E. 359-6 at 25].

So, while Gentile is perhaps not, as in *Almagarby*, maintaining several companies that could readily engage in securities-law violations (albeit "currently employed in the home-repair business"), 94 F.4th at 1322, he has a wealth of experience and ties to capital related to his securities businesses.   At minimum, Gentile's own testimony demonstrates how "anyone" can set up a brokerage with the commensurate funds [D.E. 351 at 251:15–252:1]—let alone years of experience and access to funds, if not an interest in a preexisting brokerage company.   Thus, we believe this factor also weighs in favor of imposing a broad injunction.

Finally, courts look to several factors to determine egregiousness: "(1) 'blatant' securities-law violations, (2) knowingly or recklessly making material representations or omissions (fraud), and (3) scienter."   *Almagarby*, 94 F.4th at 1324 (citing *Caribba Air*, 681 F.2d at 1321).   While we have indeed found, for the foregoing reasons and in conjunction with the jury's verdict, scienter and quite blatant flouting of the securities laws (e.g., Gentile's disdain for the Pattern Day Trader Rule and that

13

being the driving force behind SureTrader), there is, rightfully, no allegation of or verdict on fraud. This is because, "unlike securities fraud, which is never lawful, had Defendants been registered as dealers [and thus conducted themselves according to the rules], their conduct would not have violated the law." *Id.* Thus, we decline to find Gentile's actions truly *egregious* such that this factor would weigh in favor of imposing an injunction.

However, of six factors determining the likelihood of a repeat violation, we believe five strongly counsel in favor of imposing an injunction. *See also SEC v. Complete Bus. Sols. Group, Inc.*, No. 20-CV-81205-RAR, 2024 WL 4826059, at *25 (S.D. Fla. Nov. 18, 2024) (imposing permanent injunction because "Furman's conduct was egregious; it was recurrent over several years and a jury found he had the requisite scienter for four securities violations."), *aff'd,* No. 22-13853, 2025 WL 1639323 (11th Cir. June 10, 2025); *SEC v. Solow*, 554 F. Supp. 2d 1356, 1362 (S.D. Fla. 2008) (imposing permanent injunction where there was "a reasonable likelihood that Mr. Solow will again violate the securities laws. I base this finding on the degree of scienter involved given Solow's background and experience, the egregiousness of the conduct, Mr. Solow's failure to recognize the wrongful nature of his conduct, and, relatedly, the absence of any assurances against future violations."), *aff'd,* 308 F. App'x 364 (11th Cir. 2009).

14

Accordingly, we **RECOMMEND** that Gentile should be permanently enjoined from violating Section 15(a)(1) of the Exchange Act—directly or indirectly offering or selling unregistered securities in interstate commerce.

### B. *Disgorgement*

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."  *Calvo*, 378 F.3d at 1217 (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231–232 (D.C. Cir. 1989)).  "The burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation."  *Id.* (citing *First City Fin. Corp.*, 890 F.2d at 1232).  "Exactitude is not a requirement; '[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *Id.* (citing *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).  "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)[5] [of the Exchange Act]." *Liu v. SEC,* 591 U.S. 71, 74 (2020).

To that end, our Court of Appeals recently upheld disgorgement of ill-gotten profits, and in doing so examined post-*Liu* caselaw, when the group of victims is somewhat amorphously defined:

---

[5] "In any action or proceeding brought by or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5)5.

Almagarby argues that the district court violated *Liu*'s victim-benefit requirement by never explaining how "*anyone* was harmed" and by not identifying a "class of victims" or a "methodology to calculate losses." But the Commission *did* explain that it planned to distribute awards to counterparties who had purchased shares from Almagarby and were negatively affected by the price impact of his selling activity. A Commission expert attested that it was possible to track the counterparties to Almagarby's sales using the "Electronic Bluesheet System," which records trading data obtained from broker-dealers and clearing firms. The expert explained that "the vast majority of counter-parties to the relevant sales of shares by [Almagarby] can be readily identified." Post-*Liu*, our sister circuits have held that the victim-benefit requirement is satisfied under similar conditions.

*Almagarby*, 92 F.4th at 1320.  Thus, "[w]hen the Commission is able to identify investors who have suffered pecuniary harm, disgorgement satisfies the requirement that disgorgement be 'for the benefit of investors.'"  *Id.* (citing 15 U.S.C. § 78u(d)(5)).

Gentile evinces a similar argument—that the SEC cannot "show[] that *any* investor losses resulted from the violation, let alone enough to warrant the exorbitant award here."  [D.E 371 at 9].  But disgorgement "is tied[] to the idea of unjust enrichment"—"that persons not profit from breaking the securities laws."  *SEC v. Merch. Cap., LLC*, 397 F. App'x 593, 595 (11th Cir. 2010); *see also SEC v. U.S. Pension Trust Corp.*, 2010 WL 3894082, at *23 (S.D. Fla. Sept. 30, 2010) ("Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws.") (citing *First City Fin. Corp.*, 890 F.2d at 1230).  Thus, and in accordance with Eleventh Circuit precedent, disgorgement is ultimately measured by a defendant's profits, not the losses of their investors.  *See Almagarby*,

16

92 F.4th at 1320 ("[D]isgorgement sounds in equity and[] stripping wrongdoers of ill-gotten profits is consistent with equitable practice."); *U.S. Pension Trust Corp.*, 2010 WL 3894082, at *23 ("The disgorgement amount should be calculated by measuring illegal profits, not amount needed to reimburse defrauded investors.").

Here, as in *Almagarby*, the SEC makes a similar argument: "If paid, the Commission staff has determined that it would be feasible to distribute to U.S. investors who collectively lost more than $29.69 million during the Relevant Period." [D.E. 359 at 15]; [D.E. 376 at 6] ("[T]he Commission has requested that the Court order the creation of a fair fund that will allow the Court to determine how any money collected from Defendants should be distributed to investors."). Upon closer inspection of the SEC's evidence backing that claim, the record reflects extensive analysis of SureTrader's customer account data as to: "(1) the percentage of SureTrader's total commissions attributable to trades by customers that are residents of the U.S.; (2) total commissions paid by SureTrader customers that are residents of the U.S.; (3) the profit and/or loss by SureTrader customers that are residents of the U.S.; and (4) the opening deposit amounts of SureTrader customers." [D.E. 359-1] (going on to describe in detail the Python computer program designed to parse the SureTrader data, including resident vs. citizenship status; commissions only from U.S. residents (or, those with both U.S. residency and citizenship); and extensive profit and loss ("P/L") data related to trade activity for U.S. resident accounts). The SEC has "identif[ied] investors who have suffered pecuniary harm,"

and thus "disgorgement satisfies the requirement that disgorgement be 'for the benefit of investors.'"   *Almagarby*, 92 F.4th at 1320.

And, further, to Gentile's argument that such profits are not linked to his failure to register, "Section 15(a) prohibits unregistered dealers from using interstate commerce 'to effect *any transactions* in … any security.'   [15 U.S.C.] § 78o(a)(1) (emphasis added).   [He] was altogether prohibited from making transactions as an unregistered dealer, so *any* profits generated from his prohibited transactions were causally linked to his failure to register."   *Almagarby*, 92 F.4th at 1320–321 (citing *SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014)).

Hence, as to the ultimate requirement under *Liu* (and Section 78u(d)(5)) that a disgorgement award must (1) "not exceed a wrongdoer's net profits" and (2) be "awarded for victims," we find that any disgorgement here related to Defendants' at-issue securities-law violations is indeed "awarded for victims."   *Liu*, 591 U.S. at 74. As to profits, we assess each request for disgorgement in turn.

### i.   *Joint and Several—SureTrader and Gentile*

As an initial matter, the jury found Gentile "liable as a control person under section 20(a) for SureTrader's failure to register under Section 15(a)(1) of the Exchange Act."   [D.E. 313 at 2].   Accordingly, we find that Gentile is jointly and severally liable for any disgorgement, prejudgment interest, and civil penalties that the Court orders Defendant SureTrader to pay.

As to joint and several disgorgement, Gentile nevertheless argues that the

disgorgement amount sought is beyond SureTrader's compensation and does not deduct "legitimate expenses," as required in *Liu*.   [D.E. 371 at 3, 8].   But as the SEC points out, "the quarterly filings which form the basis for the SEC's calculation of profits *already* include all the company's gross expenses."   [D.E. 376 at 6].   Hence, says the SEC, "no additional expenses have been deducted, nor should they be."   *Id.*

The record of the SEC's evidence for its accounting analysis (and, by extension, computer analysis) of SureTrader's finances indeed reflects SureTrader's filings with the Securities Commission of the Bahamas—including income net of "Advisory fees & Commissions"; "Staff costs"; "Rental expense"; "Professional fees"; "Depreciation & amortization"; and "Other general & administrative costs."   *See, e.g.*, [D.E. 359-4 at 44, 48, 52] (reporting net income—*i.e.*, the "bottom line" net of expenses/the costs of doing business).

Accordingly, we **RECOMMEND** that Defendant SureTrader, jointly and severally with Defendant Gentile, be ordered to disgorge the amount of $13,129,809.

### *ii.   Gentile*

The SEC seeks additional disgorgement only from Gentile, arising out of a consulting fee paid from SureTrader to Swiss America Group ("SAG").   Gentile and members of his family are beneficiaries of Swiss America Asset Trust ("SAAT"), which owns 1,000 shares of SAG. [D.E. 359-5 at 2].

The SEC characterizes SAAT's ownership stake of 1,000 shares as "all" the shares in SAG, but the purchase certificate from the Commonwealth of the Bahamas

does not necessarily support this claim.   *Id.*   The certificate indicates that SAG has 5,000 shares with a par value of $1.00 USD, each.   So, a payment in full for $1,000 shares, even if SAAT is the only other owner in SAG besides SAG itself, does not mean that SAAT owns *all* of SAG.   It owns exactly 1,000 shares, or one-fifth of SAG. That said, however, and while the SEC does not actually allege that SAG is itself similarly owned by Gentile, we note that SureTrader's Consolidated Financial Statements from 2016 include several iterations of the following: "SAG is considered a related party by virtue of common beneficial ownership."   [D.E. 322-3 at 29]; *see also id.* at 27.

In support of its argument, the SEC claims that SureTrader's Consolidated Financial Statements for 2016 reflect a $4,800,000 consultancy fee under the "Operating Expenses" section of its P/L statement.   [D.E. 359 at 14].   And indeed, it does.   Per the SEC, it was payable to SAG: "As of year-end 2016, there was a corresponding payable of $3,499,500 to SAG.   Thus, this indicates that $1,300,500 was paid to SAG in 2016."   *Id.*   Albeit largely uncited, this, too, is supported by further assessment of the 2016 records:

> On 31 December 2015, the Parent Company entered into a service agreement with Swiss America Group, Limited ("SAG") wherein SAG will provide consultancy to the Group in the areas of technology, marketing support and provide advice on business strategy for a fee of $400,000 per month.   As at year-end, the Group has a payable of $3,499,500 related to outstanding consultancy fees.

[D.E. 322-3 at 29].   All this, we agree, would inherently mean that $1,300,500 of a consultancy fee was paid to SAG, and that moneys paid to SAG (both by way of

20

SAAT's ownership and not) would be effectively available to Gentile by virtue of common ownership and/or benefit.

But, while the SEC's request for joint and several disgorgement is evidently tied to U.S. residents, this request for disgorgement solely from Gentile is not so tailored.  In other words, there is no indication that this consultancy fee—even if fully within Gentile's access and control—consists solely of ill-gotten funds.  We acknowledge that, being a payment from SureTrader, it is likely by nature of the sheer volume of U.S. resident trades (often exceeding 70% of trading commissions for that quarterly report) that it included moneys from ill-gotten means. [D.E. 359 at 13].

Thus, a more measured approach would be appropriate in order to award a percentage of the consultancy fee that can be reasonably tied, based on the data in the record, to U.S. resident trades.  Taking an average over the period March 2016 to December 2016 (or Q2 2016 through Q4 2016), the average percentage of SureTrader commissions that resulted from U.S. resident customers was 48%.  *See* [D.E. 359 at 13].  Thus, we **RECOMMEND** that Defendant Gentile be ordered to disgorge the amount of $520,200 (48% of the $1,083,750 amount prorated for the relevant period of March 2016 to December 2016).  We address below the question of prejudgment interest.

### iii.    *Prejudgment Interest on Disgorgement*

The SEC additionally seeks prejudgment interest on both tranches of disgorgement.  "In the Eleventh Circuit, 'awards of prejudgment interest are

equitable remedies, to be awarded or not awarded in the district court's sound discretion.'"  *SEC v. Keener*, 644 F. Supp. 3d 1290, 1307 (S.D. Fla. 2022) (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998)).   As applied here, "'[r]equiring the payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity.'"  *Id.* (citing *SEC v. Credit Bancorp, LTD.*, No. 99 CIV. 11395 RWS, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011), *aff'd sub nom.*, *SEC v. Blech*, 501 F. App'x 74 (2d Cir. 2012)).

The SEC's proffered values for prejudgment interest utilize the IRS underpayment rate.   [D.E. 359 at 15].   This rate is routinely used, as it "'reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.'"  *SEC v. Radius Cap. Corp.*, No. 2:11-CV-116-FTM, 2015 WL 1781567, at *7 (M.D. Fla. Apr. 20, 2015) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).   As applied to joint and several disgorgement, the IRS underpayment rate is calculated from December 1, 2019, as SureTrader ceased operations in November 2019, and the rate for disgorgement sought solely from Gentile is calculated from December 31, 2016, when Gentile last received a benefit from the consulting agreement at-issue.   [D.E. 359 at 15].

The SEC's proffered prejudgment interest for both disgorgement amounts is then calculated "on the proposed disgorgement figure."  *Id.*  This is generally the

22

preferred method of calculating prejudgment interest, as it is calculated on the actual amount of unrealized gain sought. *SEC v. Keener*, 20-21254-CIV, 2022 WL 17748407 (S.D. Fla. Aug. 8, 2022), *report and recommendation adopted in part*, 644 F. Supp. 3d 1290 (S.D. Fla. 2022).

We note, however, that the SEC's IRS prejudgment interest reports at [D.E. 359-4 97–98, 100–101] set the "Prejudgment Violation Range" through August 31, 2024.   It is not clear from the prejudgment interest reports, or, for that matter, the SEC's briefing, that the prejudgment interest stops accruing on July 2, 2024—the date of the jury's verdict.   [D.E. 313].   And, to that end, neither prejudgment interest report appears to reflect the correct starting date (1/1/2020 and 1/1/2017, respectively).

Accordingly, while we agree that levying prejudgment interest is reasonable under the circumstances, we **RECOMMEND** ordering the parties to submit a notice within ten (10) days that specifically calculates prejudgment interest as follows: (1) for the joint and several disgorgement in the amount of $13,129,809, from December 1, 2019 through July 2, 2024; and (2) for the disgorgement from Gentile alone in the amount of $520,200, from December 31, 2016 through July 2, 2024.

### C. *Civil Penalty*

Pursuant to Section 21(d)(3) of the Exchange Act, the SEC then asks the Court to impose on Gentile a penalty of $1,875,854, "the cost for SureTrader and Gentile to register and maintain registration during the Relevant Period," along with a tier-one

penalty of $11,524.  [D.E. 359 at 20].  Gentile does not dispute that the SEC can seek the tier-one penalty [D.E. 371 at 15], but he argues that he cannot be held responsible for "the cost that *SureTrader* purportedly avoided by not register[ing] with the SEC," *id.* at 16.

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations."  *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) (citing *SEC v. Sargent*, 329 F.3d 34, 41 n.2 (1st Cir. 2003)). "The statutes leave the amount to be imposed to the discretion of the district judge." *Id.* (citing *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008)).  "Whereas tier two and tier three penalties can be imposed only in cases involving 'fraud, deceit, manipulation, or deliberate or reckless disregard or a regulatory requirement,' a tier one penalty 'may be imposed for any violation.'"  *Keener*, 644 F. Supp. 3d at 1308 (citing *Monterosso*, 756 F.3d at 1338).  "Regardless of the tier, the Court may impose a penalty up to the amount of a defendant's gross pecuniary gain."  *Id.*

The SEC argues that we should hew closely to this Court's decision in *Keener*. There, this Court imposed a civil penalty of $1,030,000, after concluding that "Kenner's proposed penalty of a mere $5,000.00 would have no deterrent effect on Keener or others, given the substantial profit he earned from unregistered dealing," such that the imposition of an additional $1,025,000—"the amount of registration and fees that Keener would have paid had he complied with Section 15(a)(1)'s registration requirement"—was warranted.  *Id.* at 1307–308.

"Because civil penalties, like a permanent injunction, are imposed in part to deter the wrongdoer from similar conduct in the future, courts apply the same factors for determining injunctive relief in assessing civil penalties." *Keener*, 2022 WL 17748407, at *14.   Thus, "'[i]n determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial conditions.'" *SEC vs. Big Apple Consulting USA, Inc.*, 06:09-CV-1965-ORL-28, 2013 WL 1352166, at *3 (M.D. Fla. Mar. 29, 2013) (citing *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)), *aff'd*, 783 F.3d 7865 (11th Cir. 2015).   As we have already performed a similar assessment for the imposition of the injunction, we will not belabor the point here.[6]   Thus, considering the totality of the factors assessed, we agree that a civil penalty is indeed warranted.

To that end, we first address the first-tier penalty of $11,524.   To say nothing of the fact that Gentile himself agrees the SEC could seek this penalty [D.E. 371 at 15], courts routinely award first-tier penalties for registration violations.   *See, e.g.*,

---

[6] Notably, Gentile does not argue that the penalty should be reduced due to his "current and future financial conditions," which is the only distinct factor.   *See* [D.E. 371 at 15–16].

*Keener*, 644 F. Supp. 3d at 1308; *Keener*, 2022 WL 17748407, at \*14.   And, regardless of the tier, courts "may impose a penalty up to the amount of a defendant's gross pecuniary gain."   *Keener*, 644 F. Supp. 3d at 1308.   Thus, the proposed penalty of $11,524 is indeed appropriate here.

As to the SEC's additional proposed penalty of $1,875,854, we believe that appropriate, as well.   Tracking closely with *Keener*, the SEC argues that the additional penalty is necessary so that "[t]he message to [brokers] is that failing to register is never in the [broker's] financial interest."   644 F. Supp. 3d at 1308; [D.E. 359 at 19].   The SEC calculated the costs that Gentile and SureTrader would have paid to register and maintain registration during the Relevant Period:

> There are three components to the registration costs SureTrader should have paid during the Relevant Period: initial registration, ongoing registration, and annual audit.   Based upon the inflation adjustment formula described in the Final Rule . . ., the initial cost of registration in March 2016, adjusted for inflation is $500,729, and the ongoing registration costs are $458,375 ($230,335 for ongoing registration costs and $228,040 for annual audits).   Thus, the cost for SureTrader and Gentile to register and maintain registration during the Relevant Period would have been $1,875, 854.

[D.E. 359 at 20].   We agree that such a penalty would "deter[] individuals in [Gentile's] position because it forces [Gentile] to pay the costs that he sought to avoid by declining to register."   *Keener*, 644 F. Supp. 3d at 1308.

Thus, we **RECOMMEND** imposing against Gentile[7] a total civil penalty of $1,887,378—$11,524 for the first-tier penalty and $1,875,854 as the costs that Gentile and SureTrader would have paid to register and maintain registration.

## IV.    CONCLUSION

Based on the foregoing, the undersigned **RECOMMENDS** that the SEC's Motion for Remedies [D.E. 359] be **GRANTED in part and DENIED in part**.   The undersigned specifically recommends the following:

- Defendant should be permanently enjoined from committing further violations of the Exchange Act Section 15(a)(1), as set forth in [D.E. 359-9 at 2] (Exhibit I, Section I);

- Defendants SureTrader and Gentile, jointly and severally, should be ordered to disgorge the amount of $13,129,809, plus prejudgment interest on the disgorged amount between December 1, 2019 and July 2, 2024, to be entered in [D.E. 359-8 at 2–5] (Exhibit H, Section I) and [D.E. 359-9 at 3–5] (Exhibit I, Section II);

- Defendant Gentile should be ordered to disgorge the amount of $520,200, plus prejudgment interest on the disgorged amount between December 31, 2016

---

[7] Gentile, here, also argues that he cannot be jointly and severally liable for the costs of SureTrader's failure to register.   [D.E. 371 at 15–16].   As with disgorgement, the jury found Gentile "liable as a control person under section 20(a) for SureTrader's failure to register under Section 15(a)(1) of the Exchange Act."   [D.E. 313 at 2]. Accordingly, we find that Gentile is jointly and severally liable for any civil penalties imposed.

and July 2, 2024, to be entered in [D.E. 359-9 at 3–5] (Exhibit I, Section II); and

- A first-tier penalty in the amount of $1,887,378 should be imposed against Defendant, as set forth in [D.E. 359-9 at 3–5] (Exhibit I, Section II).

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.   Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.   28 U.S.C. §636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767 (11th Cir. 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 21st day of July, 2025.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

28