# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE
COMMISSION,

               *Plaintiff*,

      v.

MINTBROKER INTERNATIONAL, LTD.,
f/k/a SWISS AMERICA SECURITIES LTD.
And d/b/a SURETRADER, and GUY
GENTILE, a/k/a GUY GENTILE NIGRO


             *Defendants*.

No. 21-CV-21079 (BFB)

## DEFENDANT GUY GENTILE'S OBJECTIONS TO REPORT AND RECOMMENDATION ON PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STANDARD OF REVIEW ...................................................................................................3

OBJECTIONS.......................................................................................................................4

I.    Objection: The Report's Recommended Imposition of Over $13 Million in
"Disgorgement" is Not Equitable and, Therefore, Not Permitted ......................................4

     A.   The Recommended Disgorgement Amount is Untethered to Any Money Received by
Gentile or Pecuniary Harm Suffered By SureTrader's Clients....................................4
     B.   The Recommended Disgorgement Amount Includes A Purported Fee that the SEC
Has Failed to Show Gentile Ever Received ..................................................................8
     C.   The Report Impermissibly Imposed Disgorgement on a Joint and Several Basis ........9
     D.   The Report Failed to Deduct Legitimate Expenses ...................................................10

II.    Objection: The SEC's Request for a Penalty is An Impermissible Request for a Joint and
Several Penalty in Disguise ........................................................................................13

III.   Objection: The SEC Failed to Show that SureTrader Profited from Registering as a
Broker-Dealer with the SCB Rather than the SEC .........................................................13

IV.   Objection: The Injunctive Relief The Report Recommended Is Punitive, Not Equitable .16

     A.   The "Obey the Law" Injunction Recommended Here is Punitive ...............................16
     B.   The Report Fails to Support Imposition of a Punitive Injunction Here ......................18

V.    Objection: Because No Disgorgement is Appropriate Here, the Court Should Not Award
Prejudgment Interest ..................................................................................................19

VI.   Objection: The Report Fails to Consider the SEC's Delay in Bringing this Action in its
Proposed Prejudgment Interest Calculation ...................................................................19

VII.  Objection: The Report Fails to Apply the Summary Judgment Standard to the SEC's
Motion, Which was a Disguised Motion for Summary Judgment....................................20

CONCLUSION....................................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aaron v. SEC*,
  446 U.S. 680 (1980) ................................................................................................ 18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 20

*Gabelli v. S.E.C.*,
  568 U.S. 442 (2013) ............................................................................................. 4, 5

*Gen. Motors Corp. v. Devex Corp.*,
  461 U.S. 648 (1983) ................................................................................................ 19

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*,
  141 F.3d 1434 (11th Cir. 1998) ............................................................................. 19

*Liu v. SEC*,
  591 U.S. 71 (2020) .......................................................................................... Passim

*Pierce Mfg., Inc. v. E-One, Inc.*,
  2022 WL 479804 (M.D. Fla. Feb. 16, 2022) ......................................................... 20

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) .................................................................................................. 5

*S.E.C. v. Goble*,
  682 F.3d 934 (11th Cir. 2012) ......................................................................... 17, 18

*S.E.C. v. Patel*,
  61 F.3d 137 (2d Cir. 1995) ..................................................................................... 19

*S.E.C. v. Pentagon Cap. Mgmt. PLC*,
  725 F.3d 279 (2d Cir. 2013) ............................................................................ 10, 13

*SEC v. Ahmed*,
  72 F.4th 379 (2d Cir. 2023) ...................................................................................... 5

*SEC v. Almagarby*,
  92 F.4th 1306 (11th Cir. 2024) ............................................................... 4, 7, 8, 17

*SEC v. First City Fin. Corp.*,
  890 F.2d 1215 (D.C. Cir. 1989) ................................................................................ 6

*SEC v. Gentile*,
  939 F.3d 549 (3d Cir. 2019) .................................................................................... 17

*SEC v. Govil*,
  86 F.4th 89 (2d Cir. 2024) .......................................................................... 1, 2, 4, 5

*SEC v. Graham*,
  823 F.3d 1357 (11th Cir. 2016) .............................................................................. 16

*SEC v. Lemelson*,
  596 F. Supp. 3d 227 (D. Mass. 2022) ...................................................................... 6

*SEC v. Ripple Labs, Inc.*,
  2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ....................................................... 4, 5

*SEC v. Teo*,
  746 F.3d 90 (3d Cir. 2014) ........................................................................................ 6

*SEC v. U.S. Pension Tr. Corp.*,
  2010 WL 3894082 (S.D. Fla. Sept. 30, 2010) ................................................................ 4
*SEC v. Watkins*,
  2019 WL 13026037 (N.D. Ga. July 5, 2019) ............................................................... 10
*SEC v. Wyly*,
  860 F. Supp. 2d 275 (S.D.N.Y. 2012) ........................................................................ 5
*Steadman v. S.E.C.*,
  603 F.2d 1126 (5th Cir. 1979) ................................................................................. 18
*Tug Allie-B, Inc. v. United States*,
  273 F.3d 936 (11th Cir. 2001) ................................................................................. 10
*Tull v. United States*,
  481 U.S. 412 (1987) .................................................................................................. 4
*United States v. Milheiser*,
  98 F.4th 935 (9th Cir. 2024) ...................................................................................... 7
*United States v. Schultz*,
  565 F.3d 1353 (11th Cir. 2009) ................................................................................. 3

**Statutes**

15 U.S.C. § 78u(d)(3)(A)(ii) ......................................................................................... 6
15 U.S.C. § 78u(d)(3)(B)(i)-(iii) ................................................................................... 2
15 U.S.C. § 78u(d)(7) ................................................................................................... 4
15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B) ........................................................................ 13
18 U.S.C. § 78t ............................................................................................................ 10
18 U.S.C. § 78u(d)(3)(A)(ii) .......................................................................................... 2
28 U.S.C. § 636 ............................................................................................................. 3
28 U.S.C. § 636(b)(1) ................................................................................................... 3
Article III of the United States Constitution ............................................................... 3

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 20
Fed. R. Civ. P. 65(d) ................................................................................................... 16
Fed. R. Civ. P. 72(b)(3) ................................................................................................ 4

**Regulations**

Further Definition of 'As a Part of a Regular Business' in the Definition of Dealer and
  Government Securities Dealer in Connection with Certain Liquidity Providers," 89 FR 14938
  (Feb. 29, 2024) ............................................................................................... 14, 15

Defendant Guy Gentile ("Gentile") submits this memorandum of law objecting to the Report and Recommendations on Plaintiff's Motion for Remedies (the "Report," ECF No. 381).[1]

## PRELIMINARY STATEMENT

The SEC has demanded a nearly $20 million windfall in damages against Gentile disguised as disgorgement and penalties for SureTrader's registration with the Securities Commission of the Bahamas (the "SCB") instead of the SEC. The Report gave the SEC what it asked for, disregarding binding precedent and Congress's equitable limitations on the SEC's authority to seek disgorgement. Gentile provides specific objections below, but in the Court's *de novo* review, the Report as a whole should be rejected as a relic of when the SEC collected exorbitant sums from defendants that exceeded any equitable limits by "disgorging" amounts defendants never received and investors never lost. *See Liu v. SEC*, 591 U.S. 71, 79 (2020) (rejecting this practice and only permitting disgorgement "restricted ... to an individual wrongdoer's net profits *to be awarded for victims*.") (emphasis added); *SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2024).

Here, despite the SEC's investigation of Gentile since 2011, the SEC has presented *no* evidence that Gentile obtained any of the amounts it seeks to "disgorge": rather, the SEC seeks commissions that SureTrader, not Gentile, received and a supposed consulting fee that there is no evidence Gentile received. No less critically, the SEC failed to present evidence that SureTrader's clients suffered any pecuniary harm as a result of the self-directed trades executed through their SureTrader brokerage accounts. To the contrary, SureTrader charged *significantly lower* commissions than US registered broker-dealers. Further, the Report's recommendation of

---

[1] All references to defined terms shall have the meaning ascribed to them in Defendant Guy Gentile's Opposition to Plaintiff Securities and Exchange Commission's Motion for Remedies (the "Opp." or "Opposition," ECF No. 371).

joint and several disgorgement fails as a matter of law given the Supreme Court's restriction of disgorgement "to an individual wrongdoer's net profits…." *Liu*, 591 U.S. at 79; *see also* 18 U.S.C. § 78u(d)(3)(A)(ii) (authorizing SEC to seek disgorgement "unjust enrichment *by the person who received such unjust enrichment…*") (emphasis added).

The Report's treatment of the SEC's requested penalty also disregards restrictions on the SEC's limited congressional authorization to obtain punitive relief.  Congress only authorized penalties in the "the gross amount of pecuniary gain to *such defendant* as a result of the violation." *See* 15 U.S.C. § 78u(d)(3)(B)(i)-(iii) (emphasis added).  Yet the Report recommends penalizing *Gentile* for the amount that *SureTrader* purportedly failed to pay by registering with the SCB rather than the SEC (although SureTrader paid all registration and related fees in the Bahamas as well as United States IRS related fees and taxes and millions of dollars in SEC and FINRA imposed transactions fees).  The Report seeks to impose this penalty joint and severally, which is not allowed and, therefore, must be rejected.  As critically, the SEC does not require registration fees, rendering the Report's finding that SureTrader owes the SEC over $1.875 million in "registration fees" wrong. *See https://www.sec.gov/answers/brkrdlr.htm* ("The SEC does not charge a filing fee…").  And while Self-Regulatory Organizations ("SROs") may charge registration fees, FINRA's registration fees are only a few thousand dollars—significantly less than the fees the SCB charged SureTrader for registration.

The SEC's and the Report's bizarre findings on "registration fees" are based on a 2024 SEC Rule that *estimates* the *operational costs* associated with *running* a broker at $529,000 per year—an estimate based almost exclusively on estimated costs paid to employees of the firm tasked with monitoring compliance, outside auditors and accountants, and lawyers, not "registration fees".  In other words, none of the made up "registration fees" the Report

recommends imposing would have been paid to the SEC or FINRA and it is not disputed that SureTrader during the relevant time frame had as many as 75 employees, including two Chief Compliance Officers, a Chief Financial Officer, and a Chief Marketing Officer, and paid millions of dollars to outside accounts and auditing firms (such as BDO, one of the Big Four) and lawyers.

Finally, the Report's recommended obey the law injunction should be rejected as legally deficient because it lacks specificity and is not equitable.  The Report even acknowledges the Eleventh Circuit's rejection of "obey the law injunctions," but then recommends one anyway.  In its attempt to justify such an injunction here, the Report impermissibly focuses on Gentile's criticisms of the SEC while scolding him for his past conduct—which, by itself, does not support an inference of likely *future* violations—disregarding evidence of Gentile's good faith efforts to comply with registration requirements and neglecting that SureTrader has not operated for six years.  The Report disregards that the DOJ, FBI, and SEC used SureTrader to ensnare securities violators during Gentile's cooperation with the government and expressly informed Gentile and his counsel beginning in 2012 that SureTrader need not register with the SEC.

## <u>STANDARD OF REVIEW</u>

"Magistrate judges do not exercise the authority of judges appointed under Article III of the United States Constitution; rather, magistrate judges draw their authority entirely from an exercise of Congressional power" as "outlined principally in 28 U.S.C. § 636." *United States v. Schultz*, 565 F.3d 1353, 1357 (11th Cir. 2009) (internal quotations and alterations omitted).  Under 28 U.S.C. § 636(b)(1), a district court may accept, reject, or modify a magistrate judge's

report and recommendation.  Where a party objects to a part of a report and recommendation, the district judge reviews that part *de novo*.  Fed. R. Civ. P. 72(b)(3).

<strong><u>OBJECTIONS</u></strong>

I.    **<u>Objection: The Report's Recommended Imposition of Over $13 Million in "Disgorgement" is Not Equitable and, Therefore, Not Permitted</u>**

In *Liu*, the United States Supreme Court lamented that the SEC's practices over the last few decades, specifically in the field of "disgorgement," have "test[ed] the bounds of equity practice."  591 U.S. at 79, 85.   To comport with equitable principles, (1) any disgorgement amount may not exceed the pecuniary gain obtained by the wrongdoer; (2) any disgorgement amount awarded to a victim may not exceed a reasonable approximation of the pecuniary harm suffered by that victim; and (3) both the pecuniary gain obtained by the wrongdoer and the pecuniary loss suffered by the victim must have resulted from the securities law violation.  *See id.* at 80; *SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2024); *SEC v. Ripple Labs, Inc.*, 2024 WL 3730403, at *5 (S.D.N.Y. Aug. 7, 2024).  The Report resurrects the discredited practice of penalizing defendants under the guise of equitable disgorgement by violating all three principles.

A.  **The Recommended Disgorgement Amount is Untethered to Any Money Received by Gentile or Pecuniary Harm Suffered By SureTrader's Clients**

The Report stated that "disgorgement is ultimately measured by a defendant's profits, not the losses of their investors."   Report at 16.  This is a misstatement of law, and this misstatement led to an inflated and punitive award that transgresses equity.[2]

---

[2] The Report derives this principle from a 2010 case—before *Liu* and its progeny and before the 2021 NDAA's explicit limitation of disgorgement at 15 U.S.C. § 78u(d)(7)—that employed reasoning based on an antiquated view of disgorgement as "designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws." *See SEC v. U.S. Pension Tr. Corp.*, 2010 WL 3894082, at *23 (S.D. Fla. Sept. 30, 2010).  *U.S. Pension Tr. Corp.* improperly conflated equitable disgorgement and punishment.  *Tull v. United States*, 481 U.S. 412, 424 (1987) ("[A] court in equity … may not enforce civil penalties.").  Penalties may

Disgorgement in SEC cases is an equitable remedy.  *See Liu*, 591 U.S. at 74–75; *see also SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023).  Money-based equity remedies "restor[e] the status quo and order[] the return of that which rightfully belongs to the" victim of wrongful conduct.  *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946); *see also SEC v. Wyly*, 860 F. Supp. 2d 275, 283 (S.D.N.Y. 2012) ("disgorgement … merely seek[s] to prevent a wrongdoer…from profiting from illegal activity, but [does not] impose any penalties on the defendant for his conduct beyond restoring the status quo ante").  Since disgorgement is about "return[ing] funds to victims," *Liu*, 591 U.S. at 87, and "[f]unds cannot be returned if there was no deprivation in the first place," the court "would be conferring a windfall" outside of its equitable powers, restricted to "restor[ing] the status quo," if a victim who did not suffer pecuniary harm receives any disgorged funds (or if a victim were to be awarded disgorged funds exceeding that victim's loss).  *Govil*, 86 F.4th at 103.

Further, to be equitable, an award of disgorgement must have resulted from the violation, since "[a]n investor who suffered no pecuniary harm as a result of the fraud is not a victim."  *Id.* at 98; *see also Liu*, 591 U.S. at 80; *Ripple Labs, Inc.*, 2024 WL 3730403, at *5-6 (no harm, and thus no disgorgement, when defendant sold securities at undisclosed selective discounts).  Thus, a court "'may exercise its equitable power only over property that is causally related to the

_____

deter others because penalties "go beyond compensation, are intended to punish, and label defendants wrongdoers."  *Gabelli v. S.E.C.,* 568 U.S. 442, 451-52 (2013).  But disgorgement is "restricted ... to an individual wrongdoer's net profits to be awarded for victims."  *Liu.* 591 U.S. at 79.  The Report also attempts to buttress its reliance on *U.S. Pension Tr. Corp.* by citing *SEC v. Almagarby*, which as explained below is distinguishable on its facts from this case.  92 F.4th 1306, 1312 (11th Cir. 2024).  Further, the Report cited *Almagarby* for the proposition that "[d]isgorgement sounds in equity and[] stripping wrongdoers of ill-gotten profits is consistent with equitable practice."  Report at 17.  This quote shows the opposite of what the Report intended to show, since that "equitable practice" includes restrictions of disgorgement "to an individual wrongdoer's net profits to be awarded for victims." *Liu*, 591 U.S. at 79.

wrongdoing.'"  *SEC v. Lemelson*, 596 F. Supp. 3d 227, 238 (D. Mass. 2022) (*quoting SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  *See also SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (discussing "the need for proof of a causal connection between the securities violation and the disgorged funds").  Congress codified this causal requirement by limiting disgorgement to "any unjust enrichment by the person who received such unjust enrichment *as a result of such violation*." 15 U.S.C. § 78u(d)(3)(A)(ii) (emphasis added).

The Report disregards these equitable principles by ordering disgorgement even though the SEC has failed to show that *any* of SureTrader's clients (who engaged only in self-directed daytrading) suffered any pecuniary harm attributable to SureTrader registering with the SCB instead of the SEC.  The Report cites as "evidence backing th[e SEC's] claim" for disgorgement that the SEC provided data regarding "the profit and/or loss by SureTrader customers that are residents of the U.S.," Report at 17,[3] but these clients' profits and losses are only relevant if they are the result of SureTrader registering with the SCB, not the SEC.  The fundamental problem with both the Report and the Motion is that they treat failure-to-register cases as equivalent to securities fraud cases where a defendant fraudulently induces investors to enter into transactions they otherwise would not have entered into, in which case their losses are traceable to the securities violations.

That is *not* what happened here. Rather, SureTrader's clients engaged in self-directed trades using SureTrader as their broker, which charged *significantly lower commissions* than

---

[3] The Report's reference to other "evidence" is no more compelling, since this other evidence either is irrelevant to whether daytraders suffered pecuniary harm (for example, the percentage of SureTrader revenue attributable to US clients and the opening deposit amounts of SureTrader clients) or even undermines the notion that the daytraders suffered pecuniary harm (for example, the total commissions SureTrader's US resident daytraders paid, which were significantly lower than those charged by large SEC-registered US broker-dealers).

large US SEC-registered broker-dealers, including Schwab, Fidelity, and TD Ameritrade.  *See,*
*e.g.*, Ford Decl. Ex. 2 at 21–22.  Although SureTrader clients at times made money on their
investments and at times lost money, the SEC failed to show (and the Report failed to find) that
SureTrader's registration with the SCB rather than the SEC played any role in these daytraders'
decisions to buy, sell, or retain the securities they chose.  These daytraders received the benefit
of the bargain, and any further compensation—even labeled as "disgorgement"—is an
inequitable windfall.  *See United States v. Milheiser*, 98 F.4th 935, 943–44 (9th Cir. 2024)
(vacating fraud convictions where purported victims of fraud received the benefit of the bargain).

     Yet the Report finds that since SureTrader registered with the SCB rather than the SEC,
"*any* profits generated from his prohibited transactions were causally linked to his failure to
register."  Report at 18 (*quoting SEC v. Almagarby*, 92 F.4th 1306, 1320-21 (11th Cir. 2024)).
The Report's heavy reliance on *Almagarby* is misplaced since there, unlike here, the investor
losses resulted from the violation.  There, the Eleventh Circuit addressed the appropriate
remedies related to *dealer* registration in the context of toxic financing ("obtain[ing] the
convertible debt of penny-stock companies, convert[ing] the debt into common stock at a steep
discount, and [selling] the stock in high volumes").  92 F.4th at 1312.  As the Eleventh Circuit
explained, toxic financing "dilute[s] the value of extant shares and often cause[s] penny-stock
prices to plummet."  *Id.*  The SEC demonstrated that toxic financers' "quick turnaround and
sheer volume" required registration as a *dealer*, and disgorgement was appropriate since the
toxic financer's "profits were causally linked to his failure to register" as registration would have
involved "significant restraints on his toxic lending activity" (including FINRA's prohibition on
"'unfair or unreasonable' underwriting").  *Id.* at 1314, 1320-21.  Accordingly, there, the SEC
was clear that it "planned to distribute awards to counterparties who had purchased shares from

[the toxic financer defendant] and were negatively affected by the price impact of his selling activity." *Id.* at 1320.   That award is permissible since, had the toxic financer defendant registered, he could not have engaged in the transactions that caused losses to counterparties and other investors in companies whose shares plummeted as a result of his toxic lending.

The Report could not, and did not, make such a finding here, since SureTrader's daytrader clients could have made the exact same trades in a cash brokerage account with an SEC-registered US broker-dealer (though they would have paid *significantly more* in commissions).   Further, SureTrader was a third-party broker in the relevant transactions where its clients purportedly lost money on their daytrades and thus stands in a different position than did the toxic financer in *Almagarby*, who was a participant in the relevant transactions.   Yet the Report blurred the distinction between SureTrader's clients engaged in self-directed daytrading of exchange-listed stocks and the investors in *Almagarby*, characterizing them both as merely cases "when the group of victims is somewhat amorphously defined."   Report at 15.   Since the SEC failed to show that any losses resulted from the violation, the group of "victims" is not merely "amorphously defined," but does not exist here in the first place.   Therefore, the Report's recommendation of any disgorgement is an impermissible windfall.

### B.  The Recommended Disgorgement Amount Includes A Purported Fee that the SEC Has Failed to Show Gentile Ever Received

The Supreme Court is clear that since the congressional authorization of disgorgement is bounded by equitable limits, "Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing." *Liu*, 591 U.S. at 85.   Yet the Report includes $520,000 in its recommended disgorgement, representing the portion of a $1,300,500 consultancy fee that the Report estimates was "tied to US resident" trades.   Report at

21. But as explained in the Opposition, the SEC adduced *no* evidence that Gentile received any of this fee, notwithstanding its investigation of SureTrader since 2012.

The Report never contends otherwise, but instead merely finds that SureTrader paid $1,300,500 to the Trust because of a decrease in the payable amount from SureTrader to Swiss America Group ("SAG") in financial records (without citing any bank transfer).  Report at 19–21.  The Report then notes that the Trust owns one-fifth of SAG.  Report at 20.  But the Trust is an *irrevocable* trust for Gentile's children, not Gentile, and neither the Trust nor Gentile's children are named as relief defendants here.  Opp. at 10–11.  There is *no* evidence that Gentile actually received any of this fee.  Nor is there is even evidence that the Trust received the fee, and the Trust's supposed minority ownership of SAG does not show otherwise.

The Report states that "moneys paid to SAG" are "effectively available to Gentile by virtue of common ownership and/or benefit."  Report at 21.  The Report provided no support for this finding of "common ownership and/or benefit" other than the Trust's minority ownership of SAG and there is no evidence that Gentile even could have accessed the fee.  But even if there were, the Report conflates control (which is irrelevant) with benefit.  Even if Gentile *could have* accessed the fee through some supposed ownership of the Trust and/or SAG, that hypothetical access does nothing to add to his actual "net profits from wrongdoing," which are the only amounts that Gentile may be equitably ordered to disgorge.  *Liu*, 591 U.S. at 85.

### C.  The Report Impermissibly Imposed Disgorgement on a Joint and Several Basis

As Gentile established in his Opposition, under these facts, joint and several disgorgement is impermissible as a matter of law.  Opp. at 11–14.  The Report disregarded Gentile's arguments and imposed $13,129,809 in disgorgement on a joint and several basis.  Report at 18–19.  Gentile thus incorporates by reference his arguments regarding joint and

several liability that the Report ignored.  Opp. at 11–15.  In brief, and as explained further in the Opposition, the imposition of joint and several disgorgement is impermissible in light of the 2021 amendments to § 78u(d) limiting disgorgement to "the person" who received it and as well as the Supreme Court's rejection in *Liu* of disgorgement "against multiple wrongdoers under a joint-and-several liability theory." 591 U.S. at 82–83.

While 18 U.S.C. § 78t permits joint and several *liability* for control persons, this general statute takes a back seat to the §78u, which imposes precise and specifical limitations on the equitable remedy of disgorgement forbidding imposition of joint and several liability under the facts here.  *See Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948 (11th Cir. 2001) ("if two statutes conflict, the more recent or more specific statute controls").  As the Second Circuit has already held in the penalty context: "[t]he statutory language allowing a court to impose a civil penalty … does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally.  *S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287–88 (2d Cir. 2013) (§ 78u's "gross pecuniary gain to such defendant" language trumps § 78t's joint and several liability); *see also SEC v. Watkins*, 2019 WL 13026037, at *7–8 (N.D. Ga. July 5, 2019) (citing *Pentagon Cap. Mgmt.* and rejecting joint and several penalties based on "to such defendant" language).   The language authorizing disgorgement under § 78u(d)(3)(a)(ii) ("by the person who received such unjust enrichment") parallels the language under § 77t(d)(2) ("to such defendant") and the reasoning applies in full.  No basis exists to disgorge $13,129,809 in commissions that SureTrader received, given the lack of any evidence Gentile received it.

### D. The Report Failed to Deduct Legitimate Expenses

As Gentile established in his Opposition, which the Report does not deny, when disgorging profits, "courts consistently restricted awards to net profits from wrongdoing after

deducting legitimate expenses." *Liu*, 591 U.S. at 84.  Thus, disgorgement is limited to "*net profits* from wrongdoing, that is, the gain made upon any business or investment, when both the receipts and payments are taken into the account."  *Id.* at 83 (collecting cases; emphasis added; internal quotation marks and citations omitted).

In calculating and imposing $13,129,809 in disgorgement against Gentile, the Report endorsed the SEC's reliance on SureTrader's quarterly "Form 13" filings with the Securities Commission of the Bahamas, which reported SureTrader's expenses and income, and were signed by the company's Chief Financial Officer, Antonio Collie.  *See* Report at 19 (citing ECF No. 376 at 6); *see also* ECF No. 359-4 at 40-95 (quarterly reports).

As the basis for its disgorgement calculation, the SEC calculated commissions purportedly "attributable to U.S. customers".  *See* ECF No. 359 at 12–13; Report at 17; *see also* ECF No. 359-1; 359-4 at 3.[4]  But the only evidence in the record relied on in the Report, SureTrader quarterly reports, demonstrates that SureTrader's net expenses *far exceeded* its revenue from U.S. commissions—by more than $22 million, which refutes the SEC's argument (adopted by the Report in full) that its disgorgement calculation "*already* include[s] all the company's gross expenses.'"  Report at 19 (*quoting* ECF No. 376 at 6).

| Quarter | SureTrader Total Expenses | Total Commission (United States customers) (USD) |
|---|---|---|
| Q2 2016 | $2,620,859.00 | $763,149 |
| Q3 2016 | $2,867,963.00 | $774,990 |
| Q4 2016 | $3,230,358.00 | $903,425 |
| Q1 2017 | $3,096,415.00 | $1,330,043 |
| Q2 2017 | $3,186,114.00 | $2,260,621 |

---

[4] The Report's methodology is lacking here because it does not account for Gentile's own individual trades, which constituted a substantial proportion of all SureTrader U.S. client commission revenue.  In other words, in framing SureTrader's U.S. commission revenue— including that from Gentile's own trades—as "net profits from wrongdoing" subject to disgorgement, the SEC would be "disgorging" money from SureTrader back to Gentile.

| Q3 2017 | $3,406,297.00 | $2,058,903 |
| Q4 2017 | $4,100,066.00 | $2,520,452 |
| Q1 2018 | $4,301,965.00 | $2,571,252 |
| Q2 2018 | $3,788,458.00 | $2,477,472 |
| Q3 2018 | $4,001,951.00 | $2,053,541 |
| Q4 2018 | $4,017,489.00 | $2,140,426 |
| Q1 2019 | $2,915,210.00 | $2,131,739 |
| Q2 2019 | $2,708,391.00 | $1,988,385 |
| Q3 2019 | $3,427,733.00 | $1,340,214 |
| Total (2016-Q2 through 2019-Q3) | $47,669,269.00 | $25,314,613 |

*See* ECF No. 359 at 12–13; ECF No. 359-4 at 40–95 (quarterly reports).

Accordingly, per *Liu*, any disgorgement of the estimated U.S. daytrader client commissions-based revenue that accrued to SureTrader should be absorbed by SureTrader's legitimate business expenses, which prominently included expenses required to comply with U.S. and Bahamian regulatory and accounting, tax, and legal fees, in addition to the broader costs of running the business.[5]  *See* Opp. at 3.

Further, the Report focuses on expenses by SureTrader as a company, but ignores that Gentile personally paid approximately $5.7 million in taxes, which is not only a legitimate expense but also demonstrates his personal commitment to complying with the law and repatriating money to the U.S. Opp. at 14-16; Gentile Decl. ¶ 7; Ex.'s B, C, E, and F.  Per *Liu*, that amount in taxes should be deducted from any disgorgement amount.

---

[5] It bears noting that the SEC's case-in-chief asserted that SureTrader's success relied on doing business with U.S. clients.  But as reflected here, U.S. client commission revenue was nowhere near sufficient to sustain SureTrader.  Rather, SureTrader's profitability resulted from revenue derived from proprietary trading, that is, trading with its own money.

## II.     Objection: The SEC's Request for a Penalty is An Impermissible Request for a Joint and Several Penalty in Disguise

As Gentile explained in his Opposition, the SEC's request for over $1.8 million in penalties is an impermissible demand for collective punishment.  Opp. at 15–17.  Setting aside a fixed penalty amount, Congress authorized no more than a penalty for "the gross amount of pecuniary gain to *such defendant* as a result of the violation." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B) (emphasis added).  As the Report (does not deny but) fails to recognize, individual penalties must thereby be assessed on a defendant-by-defendant basis, not jointly and severally.  *Pentagon Cap. Mgmt. PLC,* 725 F.3d at 287 (reversing "decision to impose joint and several liability for the amount of the civil penalty as an error of law").

Nonetheless, the Reports recommends a penalty of "$1,875,854 as the costs that "Gentile and SureTrader would have paid to register and maintain registration."  Report at 27.  Since SureTrader and Gentile are not only separate persons but also separate parties to the litigation, imposing this penalty on Gentile for SureTrader's purported decision to register with the SCB, not the SEC, would be in effect to impose joint and several liability.  Thus, the recommended imposition of any penalty—beyond the $11,524 tier one statutory penalty—fails as a matter of law.

## III.    Objection: The SEC Failed to Show that SureTrader Profited from Registering as a Broker-Dealer with the SCB Rather Than the SEC

As noted, the Report recommended a penalty of almost $2 million based on "the [additional] costs that Gentile and SureTrader would have paid to register and maintain registration."  Report at 27.  That is wrong.  In the first place, the SEC does not charge a

registration fee for broker-dealers.[6]  Filing SEC "Form BD," does not require a fee at all.[7]  And while the SEC requires broker-dealers to register with an SRO, the cost of registering with the largest SRO, FINRA, as applied to SureTrader (or any similar entity), would cost *only a few thousand dollars*, not $2 million: for example, new membership in FINRA for a broker-dealer with 75 employees that, like SureTrader, does not engage in clearing activities, would total approximately $12,500.[8]  Securities Investor Protection Corporation membership is also required for broker-dealer registration, but is "automatic[]" for "[a]ll registered brokers or dealers, by law,"[9] and the "assessment rate" charged to broker-dealers by the SIPC is small.[10]  Notably, SureTrader paid significantly more than this amount to be registered with the SCB.  *See* ECF No. 371-8 at 11 (confirming payments of $175,323.55 to the SCB).

Despite this, the SEC baselessly asserts, and the Report accepts for penalty calculation purposes, that additional "*ongoing registration costs*" would have raised SureTrader's registration costs to this over $1.8 million.[11]  Specifically, the SEC invokes a footnote from a 2024 rule (5 years after SureTrader shut down) that provided a rough "estimated upper bound" on *compliance based operational expenses* that broker-dealers *may* incur while noting that

---

[6] *See* "How to Register as a Broker-Dealer," *SEC*, https://www.sec.gov/about/divisions-offices/division-trading-markets/division-trading-markets-compliance-guides/guide-broker-dealer-registration#III

[7] *See* "Form BD," *SEC*, https://www.sec.gov/files/formbd.pdf

[8] *See* "New Membership Application Fee Calculator," *FINRA*, https://www.finra.org/registration-exams-ce/classic-crd/fee-schedule#FormBD

[9] There are a few exceptions that do not appear applicable to Mintbroker. https://www.sipc.org/for-members/member-faqs

[10] *See* "Assessment Rate," *SIPC*, https://www.sipc.org/for-members/assessment-rate

[11] *See* Report at 26 (citing ECF No. 359 at 19-20, relying on "Further Definition of 'As a Part of a Regular Business' in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers," 89 FR 14938 (Feb. 29, 2024)).

"smaller firms with relatively simple trading operations . . . could incur lower" operational expenses.[12]  As a "smaller firm," SureTrader falls outside such an estimate.

More importantly, the operational expenses identified by the 2024 Rule are not registration fees *at all*—they are *rough estimates* on *operational expenses based on estimated costs paid to employees and outside professionals to comply with SEC rules and regulations*. For example, these cost estimates include "personnel hours and legal services," "administrative and financial operations,[13] and "compliance, clerical, and accounting related costs in association with preparing and verifying financial statements required to comply with broker-dealer related regulations."[14]  These are not fees paid to the SEC (or FINRA), and any suggestion to the contrary is Doublethink.

And, by the way, as the SEC concedes, SureTrader incurred these costs.  It is undisputed that SureTrader operated at times with as many as 75 employees.[15]  SureTrader relied on a robust compliance regime including a Chief Financial Officer, two Chief Compliance Officers, and a Chief Marketing Officer among others[16] and also retained elite accounting firms such as BDO and engaged lawyers, tax professionals, and auditors.[17]  This is reflected in the line items of SureTrader's quarterly "Form 13" filings with the SCB—on which the SEC itself relies—

---

[12] "Further Definition of 'As a Part of a Regular Business' in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers," 89 FR 14938 (Feb. 29, 2024), n. 504.

[13] "Further Definition of 'As a Part of a Regular Business' in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers," 89 FR 14938 (Feb. 29, 2024), n. 504

[14] *Id.*, n.508

[15] Opp. at 9.

[16] *See, e.g.*, ECF No. 371-5 at 13-14 (describing one aspect of SureTrader's compliance regime, supervised by its Chief Compliance Officer).

[17] *See, e.g.,* ECF No. 371-8 at 3 (listing retention of BDO Chartered Accountants & Advisors" as an expense).

corroborating millions of dollars in expenses for "Advisory fees & Commissions," "staff costs," "Professional fees," and "Other general and administrative costs." *See* generally ECF No. 359–4 at 40–95.

The Report's findings on these purported "registration fees" are a *sham*. SureTrader did not enjoy any pecuniary gain related to its decision to register with the SCB rather than the SEC because it incurred major costs to comply with U.S. law and Bahamian law, including with SCB registration and regulatory requirements. *See, e.g.*, Opp at 3, 14–15, 19; *see also, e.g.*, ECF No. 371-8 at 3 ($68,175.00 paid to retain "BDO Chartered Accountants & Advisors); ECF No. 371-8 at 11 (confirming payment of $175,323.55 to the SCB).

IV.     **Objection; The Injunctive Relief The Report Recommended Is Punitive, Not Equitable**

A.  **The "Obey the Law" Injunction Recommended Here Is Punitive**

As Gentile explained in his Opposition, "the Eleventh Circuit has consistently held that "in the context of SEC enforcement actions and otherwise, 'obey-the-law' injunctions are unenforceable," since they lack specificity and the procedural protections that accompany the commencement of a new action each time a defendant allegedly fails to "obey the law." Opp. at 17 (quoting *SEC v. Graham*, 823 F.3d 1357, 1362 n. 2 (11th Cir. 2016) (collecting cases)). Such injunctions are punitive in nature and violate Rule 65(d)'s requirement that an injunctive order must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

The Report acknowledges that the SEC proposes an "obey the law" injunction and acknowledges the inherent problems with such injunctions—but then disregards them and recommends such an injunction anyway in reliance in two inapposite cases, *Almagarby* and

*SEC v. Goble*, 682 F.3d 934, 951-52 (11th Cir. 2012).  Report at 7.  In *Almagarby*, as explained above, the defendant engaged in conduct that is difficult to describe with the specificity required for a typical injunction: toxic financing.  92 F.4th at 1312.  Adding to the complexity, that defendant did not engage in "typical toxic lending" (obtaining convertible debt directly from an issuer) but rather "purchased existing instruments held by unaffiliated third parties."  *Id.* at 1312–13.  Even if an injunction could adequately describe typical toxic lending, it would be almost impossible to describe and prohibit every variant of toxic lending in which the *Almagarby* defendant could engage.

As a result, the Eleventh Circuit faced the Hobson's choice of either permitting an obey the law injunction under those atypical circumstances or simply refusing to authorize an injunction to prohibit the defendant's conduct.  The Eleventh Circuit chose the former option.  That choice is irrelevant here, however, where the SEC could have, but chose not to, request an injunction tailored to Gentile's specific conduct (for example, barring Gentile from operating SureTrader without registering with this SEC, which they could have done in 2012, by the way).  *See SEC v. Gentile*, 939 F.3d 549, 560 (3d Cir. 2019) ("Just as it is error to issue an injunction for punishment's sake, it is error to broaden the scope of an injunction because of moral desert or to make an example of the defendant.").

The Report also cites *SEC v. Goble*, for the proposition that *other* securities provisions "'set[] forth specific, objective criteria for compliance.'"  Report at 7 (*quoting Goble* 682 F.3d at 951–52).  But the Report neglects *Goble*'s extended critique of "obey the law" injunctions in securities cases, which led to the Circuit vacating the injunction and admonishing the district court on remand to "craft terms that provide the defendant fair notice of what conduct risks

contempt and clearly inform the defendant of what he is ordered to do or not do." *Id.* at 952. *Goble* provides no support for an "obey the law" injunction here.

### B.  The Report Fails to Support Imposition of a Punitive Injunction Here

As Gentile explained in the opposition, to the extent punitive injunctions are ever appropriate (including the "obey the law" injunction sought here), they are only appropriate when the SEC clears a high bar: it must "'establish a sufficient evidentiary predicate to show that [a] future violation may occur.'"  Opp. at 18 (*quoting Aaron v. SEC*, 446 U.S. 680, 701 (1980)). Much like the SEC's Motion, the Report merely recites Gentile's past conduct, as the basis for the injunction.  Report at 11–13.  Absent some showing that Gentile will likely commit the violation in the future, there is no basis for an injunction here.

As Gentile explained in the Opposition, SureTrader has not been in operation since 2019 and cannot be used as a vehicle for securities law violations.  Opp. at 18–19.  The Report does not dispute this, but discounts this critical fact because Gentile "has a wealth of experience and ties to capital related to his securities businesses."  Report at 13.  But this is just a restatement of the fact of Gentile's *prior* conduct (his past involvement in the securities industry), revealing the fundamental problem with the proposed injunctive relief:  it serves only to punish Gentile for an alleged violation that the SEC and FINRA knew about and approved as early as 2012, when the DOJ, FBI. And SEC were using SureTrader to ensnare securities violators.  *See Steadman v. S.E.C.*, 603 F.2d 1126, 1140 (5th Cir. 1979) ("[T]o say that past misconduct gives rise to an inference of future misconduct is not enough" to warrant an injunction.), *aff'd*, 450 U.S. 91, 101 S. Ct. 999, 67 L. Ed. 2d 69 (1981).  Further, Gentile has never been previously found to have violated the securities laws, and the SEC has not even accused him of any violations since the conduct relevant to this case from over five years ago.

The Report also fails to acknowledge the evidence of good faith attempts to comply with the SEC's registration requirements, as outlined in Gentile's opposition to the SEC's motion for summary judgment and confirmed at trial, including repeatedly disclosing the nature of SureTrader's business to the SEC and FINRA over the course of 8 years and causing SureTrader to pay U.S. taxes and SEC and FINRA based transactional fees.  (Opposition Memorandum, ECF No. 231 at 9–12).  Finally, the Report fails to consider that even if injunctive relief were appropriate, it should be for a limited time of no more than 2 years.[18]

## V.    Objection: Because No Disgorgement is Appropriate Here, the Court Should Not Award Prejudgment Interest

As neither the Motion nor the Report denies, prejudgment interest may be awarded as a form of equitable relief; that is, prejudgment interest may not be awarded based on a civil money penalty, and the SEC does not claim otherwise.[19] Because the SEC has failed to demonstrate entitlement to disgorgement, it is only entitled to civil money penalties, not prejudgment interest.

## VI.    Objection: The Report Fails to Consider the SEC's Delay in Bringing this Action in its Proposed Prejudgment Interest Calculation

The Report neglects that the SEC's request for prejudgment interest should also be denied, or in the alternative substantially reduced, because of the SEC's "undue delay in prosecuting the lawsuit." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  The Report deems January 1, 2020 to be "the correct starting date" but that would reward the SEC for nine years of delay before bringing this action in March 2021 and filing five separate requests for

---

[18] *See, e.g., S.E.C. v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995) (reversing lifetime bar; holding "before imposing a permanent bar, the court should consider whether a conditional bar … and/or a bar limited in time … might be sufficient");.

[19] *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998) ("awards of prejudgment interest are equitable remedies"), *overruled on other grounds*, 66 F.4th 876 (11th Cir. 2023).

extensions of deadlines, including for trial.[20]  Moreover, Gentile and his counsel made clear to

the SEC, DOJ, and FBI in 2012 that SureTrader began accepting U.S. clients from its inception,

and FINRA issued a no action letter to Gentile in November 2015, declining to take action

against SureTrader for registering with the SCB but not the SEC.

### VII.    Objection: The Report Fails to Apply the Summary Judgment Standard to the SEC's Motion, Which was a Disguised Motion for Summary Judgment

The Report ruled on a "motion for remedies."  But the Federal Rules of Civil Procedure

do not recognize such a motion, particularly where (as here) there are unresolved issues of fact.

The Rules recognize a motion for *summary* judgment, which requires "the movant [to] show that

there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56.[21]  The SEC may

bifurcate its case into two components—one for liability and one for damages—but that does

not permit the SEC to use an *ad hoc* "motion for remedies" for the damages phase but without

defining what, if any, standard or burden of proof applies.  Opp. at 6.

Here, the Report failed to identify what, if any, burden the SEC bore.  And when

addressing factual disputes, the Report in effect placed the burden on *Gentile*, the non-movant, to

disprove unproven factual allegations by the SEC.  For instance, as explained above, the Report

treated the SEC's allegation that Gentile received a consultancy fee as true notwithstanding the

lack of any evidence showing he received this fee.  The Court should clarify that the Rule 56

standard applies here and that the SEC retains the same burden, which the SEC cannot satisfy.

---

[20] *See, e.g.,* ECF Nos. 169, 179, 191, 198, and 202 (Motions), *c.f. Pierce Mfg., Inc. v. E-One, Inc.*, 2022 WL 479804, at *2 (M.D. Fla. Feb. 16, 2022) ("Plaintiffs are not entitled to prejudgment interest for the period of the continuance they requested.").

[21] The Supreme Court circumscribed summary judgment by precluding judges from making "[c]redibility determinations, [] weighing of the evidence, and [] drawing of legitimate inferences from the facts" when deciding such motions.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## **CONCLUSION**

For the foregoing reasons, the Court should reject the Report.  The only appropriate relief

is a penalty of $11,524, consistent with the proposed order Gentile submitted in connection with

the Opposition.


Date:   August 19, 2025
        New York, New York

                                                    Respectfully submitted,

                                                    /s/Matthew A. Ford_____
                                                    Matthew A. Ford (admitted *pro hac
                                                    vice*)
                                                    Ford O'Brien Landy LLP
                                                    275 Madison Avenue, 24th Floor
                                                    New York, New York 10016
                                                    Telephone: (212) 858-0040
                                                    Facsimile: (212) 256-1047

                                                    Dayliset Rielo
                                                    The Rielo Law Firm, LLC
                                                    8180 N.W. 36th Street, Suite 220
                                                    Doral, FL 33166
                                                    Telephone: (786) 454-9873

                                                    *Attorneys for
                                                    Defendant Gentile*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2025, a true and correct copy of the foregoing document has been electronically served on all counsel of record via the Court's CM/ECF system.

Date: August 19, 2025
New York, New York

Respectfully submitted,

_/s/ Matthew A. Ford_____
Matthew A. Ford
Ford O'Brien Landy LLP
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
Facsimile: (212) 256-1047

*Attorneys for*
*Defendant Gentile*

22